# EIGHTEENTH REPORT

## Independent Monitor
## for the
## Maricopa County Sheriff's Office



Reporting Period – Third Quarter 2018

Chief (Ret.) Robert S. Warshaw

Independent Monitor

February 20, 2019

WAI 36897

# Table of Contents

Section 1:  Introduction…………………………………………………...………3

Section 2:  Methodology and Compliance Summary…………………………..5

Section 3:  Implementation Unit Creation and Documentation Request………..8

Section 4:  Policies and Procedures……………………..………………………13

Section 5:  Pre-Planned Operations………………………………..…….………45

Section 6:  Training………………………………………………………….....50

Section 7:  Traffic Stop Documentation and Data Collection……………..…..62

Section 8:  Early Identification System (EIS)…………………………..…...107

Section 9:  Supervision and Evaluation of Officer Performance……….……...132

Section 10:  Misconduct and Complaints…………………………………......156

Section 11:  Community Engagement……………………………………….161

Section 12:  Misconduct Investigations, Discipline, and Grievances………...174

Section 13:  Community Outreach and Community Advisory Board………..260

Section 14:  Supervision and Staffing…………………………………………262

Section 15:  Document Preservation and Production…………………………265

Section 16:  Additional Training……………………………………………...270

Section 17:  Complaints and Misconduct Investigations Relating to
            Members of the Plaintiff Class…………………………………271

Section 18:  Concluding Remarks…………………………………………......289

Appendix:  Acronyms……………………………………………………290

WAI 36898

## Section 1:  Introduction

This is the eighteenth report issued in my capacity as the Court-appointed Monitor in the case of *Manuel de Jesus Ortega Melendres, et al., v. Paul Penzone, et al.* (No. CV-07-02513-PHX-GMS), and documents activities that occurred during the third quarter of 2018.

On May 13, 2016, the Court issued its Findings of Fact in the civil contempt proceedings that commenced in April 2015.  This led to the issuance of a Second Supplemental Permanent Injunction/Judgment Order (Second Order) on July 20, 2016, significantly expanding the duties of the Monitor.  Our reports cover the additional requirements of the Second Order while continuing to document MCSO's compliance efforts with the First Supplemental Permanent Injunction/Judgment Order (First Order) issued in October 2013.  We will provide summaries of compliance with both Orders separately, as well as a summary of MCSO's overall, or combined, compliance.

The compliance Paragraphs of the Second Order commence where the First Order ends, and they are numbered from Paragraph 160 through and including Paragraph 337.  Not all are subject to our review.  For example, the Second Order outlines the duties of the Independent Investigator and the Independent Disciplinary Authority.  These are autonomous positions, not subject to oversight of the Court or its Monitor.

The Second Order also delineates in great detail requirements in the areas of misconduct investigations, training, discipline and discipline review, transparency and reporting, community outreach, document preservation, and misconduct investigations involving members of the Plaintiffs' class.  The Court granted the Monitor the authority to supervise and direct all of the investigations that fall into the latter category.

This report covers the period from July 1-September 30, 2018.  We continue to enjoy a close working relationship with the Sheriff; his upper command staff; and the Maricopa County Attorney's Office (MCAO), which has taken over exclusive representation of MCSO as it pertains to compliance.  We interact with the Court Implementation Division (CID) almost daily; and CID personnel continue to be responsive to our requests and facilitate the production of all compliance-related documents.

Shortly after our October site visit, our designated point of contact in CID (as required by Paragraph 9 of the First Order) was promoted from lieutenant to captain.  He remains the point of contact for us and the Parties.

WAI 36899

As noted in our recent quarterly status reports, MCSO completed the delivery of Misconduct Investigative Training late last year.  Though overall compliance percentages for the completion of administrative misconduct investigations did not increase during this reporting period, we found that the number of serious deficiencies has continued to decrease.  We also found that administrative investigations completed after the training are of a much higher quality than those completed prior to the training.  District command personnel are now taking an active role in addressing deficiencies in investigations conducted by their personnel, and this is resulting in overall improvement in quality of these investigations.

As documented in our last quarterly status report, MCSO ended its contractual relationship with the outside vendor who, in addition to assisting MCSO with other analyses of traffic stop data, produced the Second and Third Traffic Stop Annual Reports (TSARs).  Prior to and during our October site visit, MCSO facilitated briefings for us and the Parties from MCSO's new vendor, CNA.  Our initial impression is that CNA appears well-qualified to assist MCSO with coming into compliance with the various analyses required by the First Order.  CNA has assembled a fairly large team, including a local contact in the Phoenix area, to work with MCSO.  There will be some delays associated with their getting up to speed and proposing different, improved methodologies, but we are optimistic that the benefits will outweigh any adverse impacts on the schedule.

During this reporting period, MCSO began the process of addressing the deputies identified as potential outliers in the Third TSAR.  The efforts have been coordinated out of the Early Intervention Unit, which has taken on a more substantive role in the process based on the lessons learned from the Second TSAR.  The process now includes a preliminary discussion and action plan with the involved deputies, followed by a more substantive discussion once all of the analyses and document review are completed.  We have begun to receive documentation of the discussions and resulting action plans, and we will comment on the overall process in more detail once it is completed.

WAI 36900

## Section 2: Methodology and Compliance Summary

The Monitor's primary responsibility is to determine the status of compliance of the Maricopa County Sheriff's Office (MCSO) with the requirements of the requirements in the Order. To accomplish this, the Monitoring Team makes quarterly visits to Maricopa County to meet with the agency's Court Implementation Division (CID) and other Office personnel – at Headquarters, in Patrol District offices, or at the office that we occupy when onsite. We also observe Office practices; review Office policies and procedures; collect and analyze data using appropriate sampling and analytic procedures; and inform the Parties and, on a quarterly basis, the Court, about the status of MCSO's compliance.

This report documents compliance with applicable Order requirements, or Paragraphs, in two phases. For Phase 1, we assess compliance according to whether MCSO has developed and approved requisite policies and procedures, and MCSO personnel have received documented training on their contents. For Phase 2 compliance, generally considered operational implementation, MCSO must demonstrate that it is complying with applicable Order requirements more than 94% of the time, or in more than 94% of the instances under review.

We use four levels of compliance: In compliance; Not in compliance; Deferred; and Not applicable. "In compliance" and "Not in compliance" are self-explanatory. We use "Deferred" in circumstances in which we are unable to fully determine the compliance status – due to a lack of data or information, incomplete data, or other reasons that we explain in the narrative of our report. We will also use "Deferred" in situations in which MCSO, in practice, is fulfilling the requirements of a Paragraph, but has not yet memorialized the requirements in a formal policy.

For Phase 1 compliance, we use "Not applicable" for Paragraphs where a policy is not required; for Phase 2 compliance, we use "Not applicable" for Paragraphs that do not necessitate a compliance assessment.

The tables below summarize the compliance status of Paragraphs tracked in this report.[1] This is our ninth quarterly status report in which we report on MCSO's compliance with both the First and Second Orders. During this reporting period, MCSO's overall Phase 1 compliance rate with the **First Order** increased by 12 percentage points, to 97%. MCSO's overall Phase 1 compliance rate with the **Second Order** remained the same, at 78%.

---

[1] The percent in compliance for Phase 1 is calculated by dividing the number of Order Paragraphs determined to be in compliance by the total number of Paragraphs requiring a corresponding policy or procedure. Paragraphs with the status of Deferred are included in the denominator, while Paragraphs with the status of Not Applicable are not included. Therefore, the number of Paragraphs included in the denominator totals 190 for Phase 1. The number of Paragraphs included in the denominator totals 213 for Phase 2.

WAI 36901

During this reporting period, MCSO's overall Phase 2 compliance rate with the **First Order** increased by 11 percentage points, from 66% to 77%.  MCSO's overall Phase 2 compliance rate with the **Second Order** increased by one percentage point, from 80% to 81%.

| Eighteenth Quarterly Status Report | | |
|---|---|---|
| **First Order Summary** | | |
| **Compliance Status** | **Phase 1** | **Phase 2** |
| Not Applicable | 14 | 1 |
| Deferred | 0 | 2 |
| Not in Compliance | 3 | 21 |
| In Compliance | 83 | 76 |
| **Percent in Compliance** | **97%** | **77%** |

| Eighteenth Quarterly Status Report | | |
|---|---|---|
| **Second Order Summary** | | |
| **Compliance Status** | **Phase 1** | **Phase 2** |
| Not Applicable | 19 | 9 |
| Deferred | 1 | 12 |
| Not in Compliance | 22 | 10 |
| In Compliance | 81 | 92 |
| **Percent in Compliance** | **78%** | **81%** |

WAI 36902

| MCSO's Compliance with the Requirements of the **First Order** *(October 2, 2013)* | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Report 1 | Report 2 | Report 3 | Report 4 | Report 5 | Report 6 | Report 7 | Report 8 | Report 9 | Report 10 |
| **Phase 1** | 4% | 10% | 44% | 40% | 51% | 57% | 61% | 60% | 67% | 60% |
| **Phase 2** | 0% | 0% | 26% | 25% | 28% | 37% | 38% | 39% | 44% | 49% |

| | Report 11 | Report 12 | Report 13 | Report 14 | Report 15 | Report 16 | Report 17 | Report 18 |
|---|---|---|---|---|---|---|---|---|
| **Phase 1** | 63% | 79% | 88% | 85% | 85% | 85% | 85% | 97% |
| **Phase 2** | 50% | 57% | 67% | 62% | 65% | 64% | 66% | 77% |

| MCSO's Compliance with the Requirements of the **Second Order** *(July 20, 2016)* | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Report 1 | Report 2 | Report 3 | Report 4 | Report 5 | Report 6 | Report 7 | Report 8 | Report 9 | Report 10 |
| **Phase 1** | N/A | | | | | | | | | 1% |
| **Phase 2** | N/A | | | | | | | | | 43% |

| | Report 11 | Report 12 | Report 13 | Report 14 | Report 15 | Report 16 | Report 17 | Report 18 |
|---|---|---|---|---|---|---|---|---|
| **Phase 1** | 10% | 12% | 72% | 75% | 77% | 77% | 78% | 78% |
| **Phase 2** | 46% | 60% | 63% | 66% | 72% | 75% | 80% | 81% |

WAI 36903

## First Supplemental Permanent Injunction/Judgment Order

## Section 3: Implementation Unit Creation and Documentation Requests

**COURT ORDER III.  MCSO IMPLEMENTATION UNIT AND INTERNAL AGENCY-WIDE ASSESSMENT** (*Court Order wording in italics*)

*Paragraph 9.  Defendants shall hire and retain, or reassign current MCSO employees to form an interdisciplinary unit with the skills and abilities necessary to facilitate implementation of this Order.  This unit shall be called the MCSO Implementation Unit and serve as a liaison between the Parties and the Monitor and shall assist with the Defendants' implementation of and compliance with this Order.  At a minimum, this unit shall: coordinate the Defendants' compliance and implementation activities; facilitate the provision of data, documents, materials, and access to the Defendants' personnel to the Monitor and Plaintiffs representatives; ensure that all data, documents and records are maintained as provided in this Order; and assist in assigning implementation and compliance-related tasks to MCSO Personnel, as directed by the Sheriff or his designee.  The unit will include a single person to serve as a point of contact in communications with Plaintiffs, the Monitor and the Court.*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

**Phase 2:**  In compliance

To verify Phase 2 compliance with this Paragraph, we reviewed the monthly personnel rosters for the Court Implementation Division (CID).  As of this reporting period, CID has one captain, one lieutenant, three sergeants, two deputies, one management assistant, and one administrative assistant.  CID continues to be supported by MCAO attorneys, who frequently participate in our meetings and telephone calls with Division personnel.

During this reporting period, CID continued to provide documents through MCSO's counsel via an Internet-based application.  The Monitoring Team, the Plaintiffs, and the Plaintiff-Intervenors receive all files and documents simultaneously, with only a few exceptions centering on open internal investigations.  CID effectively facilitates the Monitoring Team and Parties' access to MCSO's personnel.

During the last reporting period, we learned that CID created a "*Melendres* Compliance Corner" page on MCSO's website which provides information to the public about CID's role.  The webpage contains a historical overview of the case, the Monitor's compliance reports, and additional links to both the First and Second Orders.  The page also provides a link to information about the Immigration Stops and Detention Compensation Fund.  The webpage can be read in both English and Spanish.  MCSO continues to update the website to include our most recent quarterly status reports.

WAI 36904

*Paragraph 10.   MCSO shall collect and maintain all data and records necessary to: (1) implement this order, and document implementation of and compliance with this Order, including data and records necessary for the Monitor to conduct reliable outcome assessments, compliance reviews, and audits; and (2) perform ongoing quality assurance in each of the areas addressed by this Order.   At a minimum, the foregoing data collection practices shall comport with current professional standards, with input on those standards from the Monitor.*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

**Phase 2:**  In compliance

As discussed above, during this reporting period, CID continued to be responsive to our requests.  CID also addresses with immediacy any issues we encounter in the samples we request – be they technical issues, missing documents, or other problems.  For example, several reporting periods ago, we faced problems downloading of voluminous documents, and raised this with CID.  CID now sends us these documents on flash drives for review.

In addition, MCSO has established a robust Bureau of Internal Oversight (BIO), which routinely audits the work products of the Office, particularly in the areas that directly affect compliance with the requirements of the Orders.  In many instances, BIO will review the same material we request in our samples, and BIO frequently notes – and addresses – the same deficiencies we identify in our reviews.

*Paragraph 11.   Beginning with the Monitor's first quarterly report, the Defendants, working with the unit assigned for implementation of the Order, shall file with the Court, with a copy to the Monitor and Plaintiffs, a status report no later than 30 days before the Monitor's quarterly report is due.  The Defendants' report shall (i) delineate the steps taken by the Defendants during the reporting period to implement this Order; (ii) delineate the Defendants' plans to correct any problems; and (iii) include responses to any concerns raised in the Monitor's previous quarterly report.*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

**Phase 2:**  In compliance

WAI 36905

On December 28, 2018, CID published its most recent quarterly report as required by this Paragraph.  The report covered the second quarter of 2018, July 1-September 30, 2018.  For each section, MCSO provided an overview of the agency's activities working toward compliance.  For each Paragraph, MCSO offered comments on the compliance status; and in some instances, provided responses to concerns raised in our previous quarterly status report, published on November 5, 2018.  MCSO's report, as is customary, included a table showing the compliance of the numbered Paragraphs, developed with the information provided in our previous quarterly status report.

For the first time, MCSO asserted full and effective compliance with Paragraphs 9-13, 23, 26, 28-30, 35-38, 40, 48-51, 55, 59-60, 68, 71, 77, 88, and 101.  These Paragraphs relate to the Court Implementation Division, policies and procedures, pre-planned operations, training, traffic stop data, EIS, and supervision.

***Paragraph 12.***   *The Defendants, working with the unit assigned for implementation of the Order, shall conduct a comprehensive internal assessment of their Policies and Procedures affecting Patrol Operations regarding Discriminatory Policing and unlawful detentions in the field as well as overall compliance with the Court's orders and this Order on an annual basis. The comprehensive Patrol Operations assessment shall include, but not be limited to, an analysis of collected traffic-stop and high-profile or immigration-related operations data; written Policies and Procedures; Training, as set forth in the Order; compliance with Policies and Procedures; Supervisor review; intake and investigation of civilian Complaints; conduct of internal investigations; Discipline of officers; and community relations.   The first assessment shall be conducted within 180 days of the Effective Date.  Results of each assessment shall be provided to the Court, the Monitor, and Plaintiffs' representatives.*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

**Phase 2:**  In compliance

See Paragraph 13.

WAI 36906

***Paragraph 13.***  *The internal assessments prepared by the Defendants will state for the Monitor and Plaintiffs' representatives the date upon which the Defendants believe they are first in compliance with any subpart of this Order and the date on which the Defendants first assert they are in Full and Effective Compliance with the Order and the reasons for that assertion. When the Defendants first assert compliance with any subpart or Full and Effective Compliance with the Order, the Monitor shall within 30 days determine whether the Defendants are in compliance with the designated subpart(s) or in Full and Effective Compliance with the Order. If either party contests the Monitor's determination it may file an objection with the Court, from which the Court will make the determination.  Thereafter, in each assessment, the Defendants will indicate with which subpart(s) of this Order it remains or has come into full compliance and the reasons therefore.  The Monitor shall within 30 days thereafter make a determination as to whether the Defendants remain in Full and Effective Compliance with the Order and the reasons therefore.  The Court may, at its option, order hearings on any such assessments to establish whether the Defendants are in Full and Effective Compliance with the Order or in compliance with any subpart(s).*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

**Phase 2:**  In compliance

CID and the Monitoring Team established that the schedule for the submission of comprehensive annual assessments as required by these Paragraphs will run according to MCSO's fiscal year cycle, July 1-June 30.  MCSO will submit reports on or before September 15 of each year.

MCSO submitted its 2018 Annual Compliance Report on September 17, 2018 in compliance with Paragraphs 12 and 13.  The report offers as an assessment of MCSO's compliance with the Court orders for the period of July 1, 2017-June 30, 2018.  MCSO did not make any assertion of Full and Effective Compliance as defined in the First Order.

MCSO highlighted a number of advancements in the past year.  MCSO has established the hardware and software technology used to collect traffic stop data and data required for the Early Identification System (EIS).  MCSO has promulgated Offices Policies and Procedures related to Patrol Operations and completed the associated training required.  MCSO has also increased the number of supervisors, as well as their responsibilities.

MCSO reported that since Sheriff Penzone took office, he has made several structural changes to prioritize compliance with the Orders.  He also petitioned the Court to retake the community outreach sections of the First Order.  On August 3, 2017, the Court granted MCSO's request that it take on the responsibility for planning, organizing, advertising, and hosting the community meetings.  In addition, the Court granted MCSO's request that the Community Advisory Board (CAB) be expanded with appointments from MCSO, and a joint appointment from MCSO and the ACLU.

WAI 36907

On September 21, 2017, MCSO filed with the Court its Plan to Promote Constitutional Policing. The plan is scheduled to be republished twice per year, in January and July.  Work also continues on the refinement and expansion of MCSO's Traffic Stop Collection Data System (TraCS).

MCSO and the Monitor both prepare quarterly reports, which MCSO distributes to all employees via its online learning tool, the HUB.  All employees can access them, and they are required reading for lieutenants and above.   MCSO developed the Court Implementation Division Liaison Program with the Patrol Districts, as recommended by the Monitoring Team.

According to MCSO, the Training Division finalized and delivered several Court Order-related training curriculums including the following: 2017 Supervisor Responsibility: Effective Law Enforcement (SRELE), 2017 Early Identification System (EIS), 2017 4th and 14th Amendment Training/Bias Free Policing Annual Combined Training (ACT), and 2017 Misconduct Investigative Training.

WAI 36908

# Section 4:  Policies and Procedures

**COURT ORDER V. POLICIES AND PROCEDURES**


*Paragraph 18.  MCSO shall deliver police services consistent with the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order, and with current professional standards.  In conducting its activities, MCSO shall ensure that members of the public receive equal protection of the law, without discriminating based on actual or perceived race or ethnicity, and in a manner that promotes public confidence.*


*Paragraph 19.  To further the goals in this Order, the MCSO shall conduct a comprehensive review of all Patrol Operations Policies and Procedures and make appropriate amendments to ensure that they reflect the Court's permanent injunction and this Order.*

**Phase 1:**  In compliance

- GA-1 (Development of Written Orders), most recently amended on January 9, 2018.

**Phase 2:**  In compliance

MCSO has taken steps toward a comprehensive review of its Patrol Operations Policies and Procedures in four phases.  First, on December 31, 2013, prior to my appointment as Monitor, MCSO filed with the Court all of its policies and procedures, with amendments, that MCSO believed complied with the various Paragraphs of the First Order.  Second, in the internal assessment referenced above, MCSO discussed its ongoing evaluation of Patrol Operations and its development of policies and procedures.  Third, in response to our requests, MCSO provided all of the policies and procedures it maintains are applicable to the First Order for our review and that of the Plaintiffs.  We provided our feedback, which also included the Plaintiffs' comments, on these policies on August 12, 2014.  Based on that feedback, MCSO made adjustments to many of the policies, concentrating first on the policies to be disseminated in Detentions, Arrests, and the Enforcement of Immigration-Related Laws Training; and the Bias Free Policing Training (often referred to as Fourth and Fourteenth Amendment Training) that commenced in early September.  We reviewed MCSO's updated policies and provided our approval for several on August 25, 2014.

Fourth, in discussions during 2016, MCSO requested more specific guidance on what we considered to be Patrol-related policies and procedures.  In response, we provided MCSO with a list of the Patrol-related policies for the purposes of Paragraph 19.  We included on this list policies that were not recently revised or currently under review.  Several policies required changes to comport with the First Order, Second Order, or both.

In 2018, MCSO published the last of the outstanding policies, placing it into compliance with this Paragraph.

WAI 36909

**Paragraph 20.**  *The MCSO shall comply with and operate in accordance with the Policies and Procedures discussed in this Order and shall take all reasonable measures to ensure that all Patrol Operations personnel comply with all such Policies and Procedures.*

**Paragraph 21.**  *The MCSO shall promulgate a new, department-wide policy or policies clearly prohibiting Discriminatory Policing and racial profiling.  The policy or policies shall, at a minimum:*

a.  *define racial profiling as the reliance on race or ethnicity to any degree in making law enforcement decisions, except in connection with a reliable and specific suspect description;*

b.  *prohibit the selective enforcement or non-enforcement of the law based on race or ethnicity;*

c.  *prohibit the selection or rejection of particular policing tactics or strategies or locations based to any degree on race or ethnicity;*

d.  *specify that the presence of reasonable suspicion or probable cause to believe an individual has violated a law does not necessarily mean that an officer's action is race-neutral; and*

e.  *include a description of the agency's Training requirements on the topic of racial profiling in Paragraphs 48–51, data collection requirements (including video and audio recording of stops as set forth elsewhere in this Order) in Paragraphs 54–63 and oversight mechanisms to detect and prevent racial profiling, including disciplinary consequences for officers who engage in racial profiling.*

**Phase 1:**  In compliance

- CP-2 (Code of Conduct), most recently amended on May 9, 2018.

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 26, 2018.

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- GI-1 (Radio and Enforcement Communications Procedures), most recently amended on April 19, 2018.

- GJ-33 (Significant Operations), most recently amended on May 10, 2018.

**Phase 2:**  Not applicable

WAI 36910

MCSO has developed and published the policies required by Paragraph 21. MCSO distributed these policies and has trained agency personnel during the required Fourth and Fourteenth Amendment training, on an annual basis, since 2014.

MCSO's implementation of these policies is covered in other Paragraphs.

***Paragraph 22.*** *MCSO leadership and supervising Deputies and detention officers shall unequivocally and consistently reinforce to subordinates that Discriminatory Policing is unacceptable.*

**Phase 1:** In compliance

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 26, 2018.
- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

**Phase 2:** In compliance

With input from the Parties, the methodology for delivering reinforcement that discriminatory policing is unacceptable was modified. Whereas supervisors were previously required to meet with employees to discuss CP-8 (Preventing Racial and Other Bias-Based Policing) once per quarter and document these discussions in Blue Team, the reinforcement of the policy will now be a two-step process conducted annually. MCSO describes Part 1 of the process as the following: "On an annual basis, within the first six months, supervisors will have discussions, either individual or group, and view videos from the Training library with assigned employees, reserve deputies, and posse members. The videos will be available through the HUB and attestation of the training will be through the HUB." Part 2 of the process as described by MCSO: "On an annual basis, within the last six months, supervisors shall ensure that all employees, reserve deputies, and posse members complete their annual review and acknowledgment of office policy. In addition, employees will be required to view a video from the Sheriff or designee, which reinforces the policy. Acknowledgement is done through the HUB."

As an additional measure, supervisors will have the latitude to review and discuss the policy with their employees, and document the discussion in Blue Team. MCSO will provide proof of compliance biannually, at the end of the six-month periods, when each of the elements of the process is completed. MCSO will also provide progress reports in the interim. The first proof of compliance report will cover the third and fourth quarters of 2018, and will be submitted in January 2019. Since MCSO has been in compliance with this Paragraph for some time, they will retain their compliance rating until the biannual proof of compliance reports are submitted for evaluation.

WAI 36911

***Paragraph 23.*** *Within 30 days of the Effective Date, MCSO shall modify its Code of Conduct to prohibit MCSO Employees from utilizing County property, such as County e-mail, in a manner that discriminates against, or denigrates, anyone on the basis of race, color, or national origin.*

**Phase 1:**  In compliance

- CP-2 (Code of Conduct), most recently amended on May 9, 2018.
- GM-1 (Electronic Communications, Data, and Voice Mail), most recently amended on May 24, 2018.

**Phase 2:**  In compliance

BIO uses a randomizing program to select samples for each inspection.  BIO reviews CAD messages in an effort to identify compliance with CP-2 (Code of Conduct), CP-3 (Workplace Professionalism: Discrimination and Harassment), and GM-1 (Electronic Communications, Data and Voice Mail).  In its submission, MCSO includes the specific nature of any potential concerns identified during the audits.  In May 2016, a Monitoring Team member observed the processes BIO uses to conduct CAD and email audits, to ensure that we thoroughly understand the mechanics involved in conducting these audits.  For CAD and email audits, we receive copies of the audits completed by BIO, the details of any violations found, and copies of the memoranda of concern or BIO Action Forms that are completed.

During this reporting period, MCSO submitted three CAD and Alpha Paging inspection reports, pursuant to our request for verification of compliance with this Paragraph.  BIO inspected 26,388 CAD/Alpha Paging messages for July 2018, and reported a 100% compliance rate (BI2018-0090).  BIO inspected 22,005 CAD/Alpha Paging messages for August 2018, and reported a 100% compliance rate (BI2018-0103).  BIO inspected 23,666 CAD/Alpha Paging messages for September 2018, and reported a compliance rate of 100% (BI2018-0116).

During this reporting period, MCSO submitted three email inspection reports, pursuant to our request for verification of compliance with this Paragraph.  The number of emails reviewed is usually less than the total number of emails, due to the elimination of routine business-related and administrative emails such as training announcements and Administrative Broadcasts.  For July 2018, the BIO inspection report (BI2018-0089) states that there were a total of 8,746 emails, of which BIO reviewed 7,704.  The inspection found that 100% of the inspected emails were in compliance.  BIO inspected 7,607 of 8,699 emails for August 2018 (Inspection Report BI2018-0102), and reported a 100% compliance rate.  For September 2018, BIO inspected 12,984 of 14,588 emails.  The BIO inspection report (BI2018-0115) reported a 99.99% compliance rate.  MCSO identified one email that was not in compliance with GM-1 (Electronic Communications, Data and Voice Mail).

WAI 36912

During this reporting period, BIO conducted facility inspections of the Classification Division, the Extraditions Unit, and the Pre-Employment Services Division. On July 24, 2018, BIO conducted an inspection of the Classification Division, which is located in the Fourth Avenue Jail, and is staffed by 53 employees. This Division is a 24-hour a day operation, 365 days a year. The Classification Division uses a point system to determine the risk factor for each inmate, and then determines the inmates' level of security. The three areas of inspection were Administration/Supervision, Facility, and Property and Evidence. The BIO inspection report (BI2018-0083) noted no areas of concern and no deficiencies. The inspection resulted in a 100% compliance rating.

On August 21, 2018, BIO conducted an inspection of the Extraditions Unit. The Extraditions Unit consists of 14 employees, and has the responsibility of securing and returning wanted subjects back to Maricopa County. The Unit also coordinates with law enforcement agencies from outside the state to assist with the extradition of individuals wanted in their respective jurisdictions. Two deficiencies were noted pertaining to documentation of inspections in the work environment, and documentation of vehicle inspections. One BIO Action Form was issued for the deficiencies. Inspection report BI2018-0095 yielded a compliance rate of 94%.

On September 12, 2018, BIO conducted an inspection of the Pre-Employment Services Division, inspection report BI2018-0109. The mission of the Pre-Employment Division is to conduct background checks on agency applicants, which include deputies, Detention officers, and civilians. BIO found two areas that were non-compliant. The first deficiency related to the quarterly inspection of Division vehicles. It was determined that the Division had not been conducting quarterly inspection of vehicles. The second deficiency found was that the Division had not been maintaining a briefing book. The Division's personnel do not routinely handle property or evidence; no property and evidence inspection was conducted. BIO personnel reviewed the property and evidence policy with supervisory personnel to ensure familiarity with the requirements. The inspection resulted in a 92% compliance rating. One BIO Action Form was generated for the two deficiencies found.

The inspections of the listed facilities found that there was no evidence indicating that any of the facilities were used in a manner that would discriminate, or denigrate anyone on the basis of race, color, national origin, age, religious beliefs, gender, culture, sexual orientation, veteran status, or disability. We reviewed the Matrix Checklist used for these inspections, and it contains a specific question regarding the use of any Office or County equipment that would violate this Paragraph. During our October visits to Districts 1, 2, 3, and 6, and Lake Patrol, we observed no evidence to indicate a violation of this Paragraph.

MCSO's September inspection reports, which we review to assess compliance with this Paragraph, were completed somewhat late. MCSO has experienced timeliness issues with inspection reports previously, due to staffing shortages and turnover of personnel in BIO. We remain concerned with the availability and timeliness of inspection reports. MCSO risks impacting its compliance findings if the reports are not available for our review when we conduct our quarterly assessments.

WAI 36913

*Paragraph 24.  The MCSO shall ensure that its operations are not motivated by or initiated in response to requests for law enforcement action based on race or ethnicity.  In deciding to take any law enforcement action, the MCSO shall not rely on any information received from the public, including through any hotline, by mail, email, phone or in person, unless the information contains evidence of a crime that is independently corroborated by the MCSO, such independent corroboration is documented in writing, and reliance on the information is consistent with all MCSO policies.*

**Phase 1:**  In compliance

- GI-7 (Processing of Bias-Free Tips), published August 23, 2017.

**Phase 2:**  In compliance

MCSO created the Sheriff's Intelligence Leads and Operations (SILO) Unit in the first quarter of 2016.  The SILO Unit became operational on September 11, 2017.  GI-7 requires that any tips received by MCSO components be forwarded to the SILO Unit for recording and processing.  The SILO Unit classifies this information by the type of alleged criminal activity, or service requested, and forwards it to the appropriate unit for action and response.  In some cases, residents email or call with requests for traffic enforcement, or for MCSO to address quality-of-life issues; these are considered calls for service rather than tips on criminal activity. If the information provided pertains to criminal activity in another jurisdiction, MCSO forwards the information to the appropriate law enforcement agency and documents it in the SILO database.  Generally, if there is any bias noted in the information received, MCSO closes the tip and takes no action.  We review all tips that MCSO closes due to bias.

During this reporting period, we reviewed 415 tips submitted for July, 377 tips submitted for August, and 317 tips submitted for September.  The SILO Unit received a total of 1,109 tips, which were classified and recorded according to the type of alleged violation or service requested.  Our reviews indicate that a major percentage of tips are related to warrants (24%), animal crimes (10%), and drug-related offenses (14%).  The other two categories that result in large numbers of tips are "information only" (23%) and "other" (13%).  During this reporting period, MCSO did not receive any tips that suggested any type of bias by the caller.  During our October site visit, we confirmed that all information provided by the public, as it pertains to alleged criminal activity, is screened, and logged by the SILO Unit.

Our reviews of the documentation provided, pursuant to the requirements of this Paragraph, have not discovered any evidence of bias in the processing of tips.  We have also determined that MCSO is independently corroborating information received through tips before it is acted upon, to ensure that there is an appropriate criminal predicate.

WAI 36914

**b. Policies and Procedures to Ensure Bias-Free Traffic Enforcement**

***Paragraph 25.*** *The MCSO will revise its policy or policies relating to traffic enforcement to ensure that those policies, at a minimum:*

a.   *prohibit racial profiling in the enforcement of traffic laws, including the selection of which vehicles to stop based to any degree on race or ethnicity, even where an officer has reasonable suspicion or probable cause to believe a violation is being or has been committed;*

b.   *provide Deputies with guidance on effective traffic enforcement, including the prioritization of traffic enforcement resources to promote public safety;*

c.   *prohibit the selection of particular communities, locations or geographic areas for targeted traffic enforcement based to any degree on the racial or ethnic composition of the community;*

d.   *prohibit the selection of which motor vehicle occupants to question or investigate based to any degree on race or ethnicity;*

e.   *prohibit the use of particular tactics or procedures on a traffic stop based on race or ethnicity;*

f.   *require deputies at the beginning of each stop, before making contact with the vehicle, to contact dispatch and state the reason for the stop, unless Exigent Circumstances make it unsafe or impracticable for the deputy to contact dispatch;*

g.   *prohibit Deputies from extending the duration of any traffic stop longer than the time that is necessary to address the original purpose for the stop and/or to resolve any apparent criminal violation for which the Deputy has or acquires reasonable suspicion or probable cause to believe has been committed or is being committed;*

h.   *require the duration of each traffic stop to be recorded;*

i.   *provide Deputies with a list and/or description of forms of identification deemed acceptable for drivers and passengers (in circumstances where identification is required of them) who are unable to present a driver's license or other state-issued identification; and*

j.   *instruct Deputies that they are not to ask for the Social Security number or card of any motorist who has provided a valid form of identification, unless it is needed to complete a citation or report.*

**Phase 1:**  In compliance

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 26, 2018.

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

WAI 36915

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- GI-1 (Radio and Enforcement Communications Procedures), most recently amended on April 19, 2018.

- GJ-26 (Sheriff's Reserve Deputy Program), most recently amended on March 30, 2018.

- GJ-27 (Sheriff's Posse Program), currently under revision.

**Phase 2:**  In compliance

During the finalization of the Fourth and Fourteenth Amendment training curricula required by the Order, the Parties agreed to a list and/or description of forms of identification deemed acceptable for drivers and passengers, as required by this Paragraph.  The data required for verification to ensure compliance with these policies is captured by the TraCS system.  The system documents the requirements of the Order and MCSO policies.  MCSO has continued to make technical changes to the TraCS system to ensure that the mandatory fields on the forms used to collect the data are completed and that deputies are capturing the required information.  TraCS is a robust system that allows MCSO to make technical changes to improve how required information is captured.

To verify Phase 2 compliance with this Paragraph, we reviewed MCSO's Vehicle Stop Contact Form (VSCF), Vehicle Stop Contact Form Supplemental Sheet, Incidental Contact Receipt, Written Warning/Repair Form, Arizona Traffic Ticket and Complaint Form, Internet I/Viewer Event Form, Justice Web Interface Form, CAD printout, and any Incident Report generated by the traffic stop.  MCSO created many of these forms to capture the requirements of Paragraphs 25 and 54.

During our previous site visits, we met with personnel from Arizona State University, MCSO's vendor, and reviewed the analysis of the traffic stop data that they presented.  Since our July 2015 site visit, there has been significant improvement in the TraCS system that has enhanced the reliability and validity of the data provided by MCSO.  This improvement has been buttressed by the introduction of data quality control procedures now being implemented and memorialized in the EIU Operations Manual.  (This is further discussed in Paragraph 56, below.)  We also compared traffic stop data between Latino and non-Latino drivers in the samples provided to us.

Paragraph 25.a. prohibits racial profiling in the enforcement of traffic laws, including the selection of which vehicles to stop based to any degree on race or ethnicity, even where a deputy has reasonable suspicion or probable cause to believe a violation is being or has been committed.  The selection of the sample size and the sampling methodology employed for drawing our sample is detailed in Section 7: Traffic Stop Documentation and Data Collection.

WAI 36916

Our review of a sample of 105 traffic stops that occurred during this reporting period in Districts 1, 2, 3, 4, 6, and 7, and Lake Patrol indicated that MCSO was following protocol, and that the stops did not violate the Order or internal policies.  During our October 2018 site visit, we met with the commanding officers from Districts 2, 3, and 6 and Lake Patrol, who advised us that they had not received any complaints during this reporting period from Latino drivers alleging racial profiling.  We interviewed the District Commanders and inquired if their respective Districts had received any complaints alleging selective enforcement targeting specific communities or enforcement based on race.  None of the District Commanders were aware of any complaints alleging racial or ethnic-based traffic enforcement.  Paragraphs 66 and 67 require an annual comprehensive analysis of all traffic stop data, which will more accurately determine if MCSO is meeting the requirements of this Paragraph.  MCSO remains in compliance with this Subparagraph.

Paragraph 25.b. requires MCSO to provide deputies with guidance on effective traffic enforcement, including the prioritization of traffic enforcement resources to promote public safety.  EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), Sections A-E, address these concerns.  The policy specifies that driving under the influence and speeding are the main causes of accidents, and should be the focus of traffic enforcement.  Based on our review of the data provided for this reporting period, the most common traffic stop violations are as follows: 66 stops for speed above the posted limit (63%); 13 stops for failure to obey official traffic control devices (13%); five stops for failure to possess valid registrations or tags (5%); seven stops for equipment violations (7%); five stops for failure to maintain a lane of traffic (5%); and nine stops for other moving violations (9%).

As the policy specifically identifies speeding violations as one of the contributing factors of traffic accidents, MCSO deputies have targeted this violation.  In our review, we break down the specific traffic violation for each stop and use each traffic stop form completed by deputies during the stop to make a determination if the stop is justified and fulfills the requirements of this Paragraph.  When we review the sample traffic stops from across all Districts, we note the locations of the stops contained on the VSCF, the CAD printout, and the I/Viewer system to ensure that they are accurate.  We continue to identify instances where the location of the stop contained on the VSCF and the location of the stop contained on the CAD printout are inconsistent.  Reviewing supervisors are not identifying and addressing this issue.  We recommend that reviewing supervisors closely review the VSCFs and CAD printouts and address such deficiencies.  MCSO remains in compliance with this Subparagraph.

WAI 36917

Paragraph 25.c. requires MCSO to prohibit the selection of particular communities, locations, or geographic areas for targeted traffic enforcement based to any degree on the racial or ethnic composition of the community.  During our inspection, we document the location of every stop and note the GPS coordinates if available.  Our review of the sample data covering all MCSO Districts during this reporting period did not indicate that MCSO was targeting any specific area or ethnicity to conduct traffic stops.  During our October 2018 visits to Districts 2, 3, and 6 and Lake Patrol, we inquired if the District Commanders had received any complaints from the public regarding MCSO enforcement activities in their communities.  None of the Districts had received any complaints with regard to racial or ethnic-based targeted enforcement.

MCSO is in compliance with this Subparagraph.

Paragraph 25.d. requires MCSO to prohibit the selection of which motor vehicle occupants to question or investigate based, to any degree, on race or ethnicity.  During this reporting period's review of the sample of 105 traffic stops, we noted three instances where deputies contacted the passengers.

- In one case, the deputy stopped a Latino driver for speeding.  The deputy made contact with the front seat passenger, a Latino, as he made inquiries to as to whether any marijuana was in the vehicle.  The passenger produced a plastic container where marijuana was stored.  The deputy seized the marijuana.  The deputy then obtained the identity of the front seat Latino passenger.  The deputy did not provide the passenger with an Incidental Contact Receipt.  The vehicle's other occupants were a Latino and a Black male.

- In one case, the deputy stopped a White male driver for speeding.  The passenger, a Latina, was contacted to verify whether she was in possession of a valid driver's license after the deputy discovered that the driver did not have a valid driver's license.  The deputy allowed the passenger to drive the vehicle.  The deputy did not provide the passenger with an Incidental Contact Receipt.

- In one case, the deputy stopped a White female driver for a stop sign violation.  During the stop, the passengers, a Black male and a Latina, asked the deputy questions and explained that they had just attended Teen Court.  The deputy noted on his VSCF that he informed the passengers about MCSO's Explorer Program.

There were eight cases identified in the stops that we reviewed for Paragraph 54.k in which the passengers were contacted.

- In one case, a Latino driver was stopped for traveling the wrong way on the roadway.  The vehicle was occupied by an Asian/Pacific Islander female passenger.  The driver was arrested for driving under the influence.  The deputy contacted the passenger to advise her regarding the arrest of the driver.

- In one case, the deputy stopped a Black female driver for driving with no lights on.  The vehicle was occupied by a Black male passenger.  The deputy smelled the odor of

WAI 36918

marijuana and investigated.  The driver was subsequently arrested for driving under the influence and possession of marijuana.  The deputy contacted the passenger to determine if he had a valid driver's license.  Upon verifying the license was valid, the deputy released the vehicle to the passenger.

- In one case, the deputy stopped a White female driver for an illegal turn on a red light. The vehicle was occupied by a White male passenger.  Prior to the stop, the deputy had observed the vehicle being driven by the passenger.  After stopping at a local food establishment, the two vehicle occupants switched seats.  The deputy detected the odor of alcohol from the passenger compartment of the vehicle and investigated the driver and passenger for driving under the influence, after which both were arrested and charged with the offense.

- In one case, the deputy stopped a Black male for speeding.  The vehicle was occupied by a Black female (child).  A warrant check revealed that the driver was wanted on two warrants.  The driver was placed into custody.  The deputy contacted the passenger, removed her from the vehicle to ensure that she stayed in a cool environment in the patrol unit.  The driver was later released after the agencies that issued the warrants indicated that they would not extradite the driver.

- In one case, the deputy stopped a Latino driver for failure to maintain a lane of traffic. The vehicle was occupied by a White female passenger.  The driver was arrested for driving under the influence.  The passenger was contacted to determine if she was sober so that she could to take custody of the vehicle.  It was determined that she too had been drinking.

- In one case, a deputy stopped a Black male for speeding.  The vehicle was occupied by a Black male passenger, a Black female passenger and a White male passenger.  During the stop, the deputy detected the odor of marijuana coming from the interior of the vehicle.  The driver was arrested for driving under the influence and driving with a suspended driver's license.  During a search of the vehicle, marijuana and narcotic paraphernalia was located.  The Black male passenger was arrested for possession of narcotics.  The White male passenger and White female passenger both provided consent to be searched.  The deputy conducted a search of both individuals, and found no contraband.

- In one case, a White male was stopped for failure to maintain a lane of traffic.  The vehicle was occupied by a White male passenger, a White female passenger and a Latino passenger.  The driver was arrested for the offense of aggravated driving under the influence.  The reason for addition of "aggravated" to the charge was due to the presence of a minor under the age of 15 being in the vehicle.  The White female passenger, who was a minor, was contacted as part of the investigation.

- In one case, a deputy stopped a White male driver for speeding.  The vehicle was occupied by a White female passenger, a White male passenger and a Latino passenger.

WAI 36919

> During the stop, the deputy detected the odor of marijuana coming from the interior of the vehicle.  The driver was arrested for possession of narcotics.  The White male passenger was also arrested for possession of narcotics.  The White female passenger consented to the search of her purse.  No contraband was found.

There were 29 cases identified in the stops that we reviewed for Paragraph 54.g. in which the passengers were contacted.  In six cases, the passengers and the deputies engaged in general conversation.  In three cases, the vehicles were released to the passengers after the drivers were placed under arrest.  In two cases, the passengers contacted the deputies to provide insurance information for the vehicles.  In one case, the passenger was provided a courtesy ride by a deputy after the driver was placed under arrest.  In one case, the passenger was contacted to determine if she had a valid driver's license after it was determined that the driver was being placed under arrest.  In one case, the passenger was contacted to determine if she had a valid driver's license as the driver was in possession of a learner's permit and is required to drive with a licensed driver.  In the remaining instances where MCSO made contact with passengers, the following occurred:

- In one case, the deputy stopped a White male for speeding.  The vehicle was occupied by a White female and a White child of an unknown gender (unable to determine by viewing the body-worn camera recording).  The deputy detected a faint odor of marijuana coming from the vehicle.  During the stop, he asked the passenger if she had a valid driver's license in case she needed to drive.  The deputy did not request that she produce the license and she did not produce the license.  The deputy then determined that the odor of marijuana was so faint as to not require any further investigation.

- In one case, a deputy stopped a White male for speeding.  The vehicle was occupied by a Latino passenger.  The deputy noted that he smelled the odor of fresh marijuana.  The deputy documented on the VSCF that he requested and obtained consent to search the driver and passenger.  However, a review of the body-worn camera recording reveals that the deputy did not request and obtain consent from the driver and passenger for conducting a search of their persons.  The deputy conducted a pat-down of the driver and passenger after he requested them to exit the vehicle.  We discussed this case with MCSO during our October 2018 site visit.

- In one case, the deputy stopped an American Indian/Alaskan Native female driver for speeding.  The vehicle was occupied by an American Indian/Alaskan Native female passenger and an American Indian/Alaskan Native male passenger.  Due to the deputy detecting the odor of alcohol from the passenger compartment of the vehicle, he evaluated the driver and determined she was sober.  The deputy then contacted the American Indian/Alaskan Native male passenger to determine if he had consumed alcohol, since he appeared to be under the age of 21.  The deputy determined that the passenger was also sober; however, the deputy discovered via a records check that the American Indian/Alaskan Native male passenger was listed as a runaway.  The deputy contacted the facility that reported him missing, and they advised the deputy that his

WAI 36920

missing status is no longer an issue since he has reached the age of 18. The deputy took action to have the passenger's name removed from the law enforcement database as missing.

- In one case, the deputy stopped a Latina driver for failure to maintain lane of traffic. The vehicle was occupied by a Latina passenger. The driver was arrested for driving under the influence. The deputy contacted the passenger, who was the registered owner of the vehicle, to determine if she was too impaired to drive. The deputy determined that she also had been drinking and advised to arrange for transportation home.

- In one case, the deputy stopped a 16-year-old Latino driver for a stop sign violation. The vehicle was occupied by three Latino passengers. The deputy detected the smell of recently burnt marijuana. The driver admitted to having smoked marijuana within the past hour. The deputy had the passengers exit the vehicle and so that a search of the vehicle could be conducted. No contraband was found. The deputy contacted the parents of the driver who arrived and took custody of the driver and the vehicle.

- In one case, the deputy stopped a White male driver for passing in a no passing zone. The deputy detected the odor of alcohol, evaluated the driver, and determined that the driver had been drinking but was not impaired. The deputy contacted the passenger to determine if she was sober. The passenger consented to a preliminary breath test, and the results indicated that she had no alcohol in her system.

- In one case, a deputy stopped a White male for failure to maintain a lane of traffic. The vehicle was occupied by a Latina passenger. During the stop, the driver was arrested for a felony probation violation warrant. Also, narcotic paraphernalia was located in the vehicle. The deputy asked the passenger for consent to conduct a search of her purse and her person and she agreed. No contraband was found. The deputy did not provide the passenger with an Incidental Contact Receipt.

- In one case, the deputy stopped a Latino driver for driving with no license plate on a vehicle. The vehicle was occupied by a Latino passenger. The driver was arrested for possession of narcotics. The deputy contacted the passenger, obtained his identification, and ran his name for warrants. The deputy then released the passenger. The deputy did not provide the passenger with an Incidental Contact Receipt.

- In one case, the deputy was looking in the area for a person who had reportedly been involved in single vehicle crash on the roadside, and left the scene in a vehicle with another person. The deputy observed a vehicle stopped on the roadside, with a White male driver and a Black male passenger. The deputy asked the vehicle occupants if they were aware of the vehicle that crashed. The passenger informed the deputy that he was the driver of the vehicle that was involved in a crash, due to trouble with a tire. The deputy determined that the vehicle that was involved in the crash was registered to the passenger's father. The deputy provided an Incidental Contact Receipt to the driver; however, the passenger was not provided with an Incidental Contact Receipt.

WAI 36921

- In one case, a Latino driver was stopped for speeding.  The vehicle was occupied by six Latina passengers.  During the traffic stop, a Latina passenger provided assistance with translating from English to Spanish for the driver as the deputy communicated with the driver.

- In one case, the deputy stopped a White female driver for failure to maintain a lane of traffic.  The vehicle was occupied by a Latina passenger.  The passenger voluntarily offered her driver's license to the deputy.  The deputy ran the passenger's name for warrants.  The passenger was not provided with an Incidental Contact Receipt.

- In one case, the deputy stopped a Latino driver for speeding.  The vehicle was occupied by a Latina passenger.  Upon running the driver's name for warrants, the deputy learned that he had an order of protection prohibiting contact with a certain individual.  The deputy then contacted the passenger to determine if she was the person who was listed on the order of protection.  It was determined that the passenger was not the person named in the order of protection.

- In one case, a Latino driver was stopped for driving with an expired license plate.  The vehicle was occupied by a Latino passenger.  During the traffic stop, the passenger helped with translating from English to Spanish for the driver as the deputy communicated with the driver.

- In one case, a Latino driver was stopped for speeding.  The vehicle was occupied by a Latina passenger and a Latino passenger.  The driver was arrested for driving with a suspended driver's license and for a warrant that was issued from a local jurisdiction.  The deputy detected the odor of alcohol from the vehicle and contacted the two passengers to determine if they had consumed alcohol, as they appeared to be under the age of 21.  Both passengers submitted to a preliminary breath test.  The Latina passenger was found to have consumed alcohol and was detained briefly before being issued a citation and then released.

As noted in some of the cases above, deputies have not been consistent in preparing and providing passengers with Incidental Contact Receipts during traffic stops in which the passenger is contacted and asked by the deputy to provide identification.  Supervisors should identify such omissions during their reviews of the VSCFs and take corrective action.  During our October 2018 site visit, we discussed with MCSO that we have noted an increase in the number of passengers being contacted and not being provided with an Incidental Contact Receipt.  During this reporting period, MCSO provided the Incidental Contact Receipt when required in 36% of the cases.  We will follow up with MCSO regarding this issue during our next site visit.  While MCSO consistently documents passenger contacts in the VSCFs in compliance with this subparagraph, they should also consistently follow their own policy, which requires Incidental Contact Receipts in these instances as well.

WAI 36922

We reviewed the demographic data of Maricopa County (according to 2014 U.S. Census data, 30.3% of the population is Latino), and found that the ratio of Latino drivers stopped during this reporting period was lower than in past reporting periods in comparison to the ethnicity of the population in the County.  (See Paragraph 54.e.)  Eleven (28%) of the 39 stops where passenger contacts occurred involved Latino drivers.   A review of citizen complaints for this reporting period did not reveal any allegations against MCSO personnel that would indicate that deputies were conducting pre-textual traffic stops to question drivers or passengers regarding their ethnicity, or to determine whether they are unlawfully present in the country.  MCSO has fully implemented body-worn cameras, and we review a sample of the recordings each reporting period to verify if deputies are questioning occupants to determine if they are legally in the country.

During this reporting period, we observed that 24 of the 105 stops occurred during nighttime hours.  During our visits to Districts 2, 3, and 6 and Lake Patrol in October 2018, we inquired if any Latino drivers or passengers made any complaints regarding deputies using particular tactics or procedures to target Latinos.  None of the personnel we interviewed were aware of any complaints alleging discrimination or the targeting of Latinos in traffic enforcement.  Our review of the sample data indicated that generally, traffic stops were not based on race or ethnicity and reflected the general makeup of the population of the County.  MCSO is in compliance with this Subparagraph.

Paragraph 25.e. requires MCSO to prohibit the use of particular tactics or procedures on a traffic stop based on race or ethnicity.  We reviewed a sample of CAD audio recordings and CAD printouts where the dispatcher entered the reason for the stop when advised by the deputy in the field.  We also reviewed body-worn camera recordings of deputies making traffic stops.  The methodology that we employed to select our cases is described in detail in Section 7.  In the cases we reviewed, the CAD audio recordings and the body-worn camera video revealed that deputies were not making traffic stops using tactics based on race or ethnicity.  MCSO remains in compliance with this Subparagraph.

Paragraph 25.f. requires deputies at the beginning of each stop, before making contact with the vehicle, to verbally contact dispatch and state the reason for the stop unless exigent circumstances make it unsafe for the deputy to contact Communications.  When the deputy advises Communications of the location, tag number, and reason for the stop, this information is digitally logged on the CAD printout and it is audio recorded.  (See Subparagraph 54.e.)  We reviewed 30 CAD audio recordings and the CAD printouts; in each, the deputy advised dispatch of the reason for the stop.  Through our reviews of BWC recordings and CAD printouts, we verified that the reason for the stop was voiced prior to making contact with the drivers in 30 of the 30 cases we reviewed.  For the 75 other cases that were part of our sample, we reviewed the VSCFs and the CAD printouts to ensure that deputies properly advised dispatch of the reason for the stop prior to making contact with the violator.  In all 75 stops, the deputy properly advised dispatch the reason for the stop.  MCSO is in compliance with this Subparagraph.

WAI 36923

Paragraph 25.g. prohibits deputies from extending the duration of any traffic stop longer than the time that is necessary to address the original purpose for the stop and/or to resolve any apparent criminal violation for which the deputy has or acquires reasonable suspicion or probable cause to believe has been committed or is being committed. MCSO employs a series of five questions on the VSCF to document the circumstances that might require a stop to be prolonged. In our review of 105 traffic stops, we determined that MCSO documented a response to one of the series of five questions in 16 of the stops. Our review of those stops revealed that in seven of the stops, the deputies indicated that they experienced a technological difficulty; however, the duration of those stops was not significant, ranging from 12 minutes to 19 minutes. For one stop, the deputy noted that he experienced technical difficulties; however, the only issue he listed was that he delayed activating his body-worn camera in error. The duration of that stop was 21 minutes. For the remaining eight stops, the responses to the five questions provided an adequate explanation for the duration of the stop. The particulars of those stops are as follows:

- A White male was stopped for a red signal violation. The driver was investigated for Driving Under the Influence. The vehicle was towed and impounded. The deputy prepared a report for review by the Maricopa County Attorney's Office in relation to potential criminal charges against the driver.

- An American Indian/Native American male was stopped for a stop sign violation. The driver had a suspended driver's license, and a warrant check revealed a warrant for his arrest in a local jurisdiction. The driver was arrested and the vehicle was towed and impounded. The driver was issued a citation.

- A Latino driver was stopped for speeding. The driver had a suspended driver's license and a warrant check revealed a warrant for his arrest in a local jurisdiction. The deputy seized narcotics and narcotic paraphernalia during the stop. The vehicle was occupied by a Black male passenger and two Latino passengers. The driver was arrested and the vehicle was towed and impounded. The driver was issued a citation.

- A White male was stopped for driving with an expired registration. The driver's license was suspended. The vehicle was towed and impounded. The deputy seized the driver's license and the vehicle's license plate and placed the items into evidence. The driver was issued a citation.

- A White male driver was stopped for a red light violation. The vehicle was occupied by a White male passenger and a White female passenger. The deputy indicated on the VSCF that a language barrier existed due to the driver stating that English is not his first language. In addition, the deputy documented on his VSCF that his scanner was not operational, which required him to manually input the driver's and vehicle information into TraCS. The driver was issued a citation.

- A White male driver was stopped for a stop sign violation. The deputy indicated on the VSCF that the stop was extended due to the driver experiencing difficulty locating the

WAI 36924

vehicle registration and verifying his insurance online via his cell phone.  The driver was issued a warning.  The deputy incorrectly listed this as a technological issue on the VSCF.

- A Black male driver was stopped for following too closely.  The vehicle was occupied by a Black male passenger.  The driver's license was suspended.  The vehicle was towed and impounded.  The driver was issued a citation.

- A Latino driver was stopped for driving in reverse on the highway.  The driver was arrested for Driving Under the Influence and the vehicle was towed and impounded.  The driver was issued a citation.

In addition to the review of the responses to the series of five questions on the VSCF, we also review any other circumstances that may provide an explanation for a stop being conducted by a deputy for an extended duration.   Our review revealed an additional five stops that were extended for various reasons:

- In one case, a deputy initially stopped to assist a 16-year-old White male motorist with a vehicle that was overheating.   The vehicle was occupied by three White male passengers.  The deputy then discovered that the license plate was not valid for highway use and that the driver had driving restrictions.  Due to the circumstances, the deputy contacted a parent of the driver and the registered owner of the vehicle and required that proper paperwork be provided.  The parent responded to the location and the driver was issued a warning.

- In one case, a Latino driver was stopped for failure to maintain a lane of traffic.  The vehicle was occupied by two Latino passengers and another passenger, whose race/ethnicity and gender were unknown (unable to determine via review of body-worn camera recording).  The deputy detected the odor of alcohol coming from the passenger compartment of the vehicle.   The driver complied with a request by the deputy to conduct a preliminary breath test (PBT).   The results indicated that no alcohol was detected.  In addition, the deputy had to verify that the driver had a valid out-of-state driver's license as he did not have it on his person.  The deputy also had to manually enter the information into TraCS, in lieu of scanning.  The driver was issued a warning.

- In one case, a White male was stopped for speeding.   The driver's license was suspended.  The deputy contacted the Latina passenger, who was the registered owner of the vehicle.  The deputy confirmed that the passenger's driver's license was valid before he released the vehicle to her.  The driver was issued a citation.

- In one case, a White male was stopped for failure to maintain lane of traffic.  The deputy noted on the VSCF that the driver provided inconsistent information during the stop.  The deputy requested that the Phoenix Police Department contact the registered owner of the vehicle to confirm whether the driver had permission to drive the vehicle.  The deputy seized the license plate (suspended) from the vehicle and placed it into evidence.  The driver was issued a citation.

WAI 36925

- In one case, a White male was stopped for driving with a suspended license plate.  The driver did not have any identification on his person.  The vehicle was occupied by a White female passenger.  The deputy discovered via a records check that the driver's license was suspended.  The deputy seized the license plate and placed it into evidence.  The driver was issued a citation.

MCSO remains in compliance with this Subparagraph.

Paragraph 25.h. requires the duration of each traffic stop to be recorded.  The time of the stop and its termination is now auto-populated on the VSCF by the CAD system.  To ensure data entry accuracy, MCSO implemented a technical change to the TraCS system on November 29, 2016.  The change automatically creates a red field in the stop contact times if the deputy manually changes these times on the VSCF.  In our review, we determined that the duration was recorded accurately in 104 of the 105 traffic stops.  In one case, the time in the termination of the stop in the CAD system did not match the termination time on the VSCF; there was a 10-minute time difference.  We will follow up with MCSO on this case.  MCSO is in compliance with this Subparagraph, with 99% compliance.

Paragraph 25.i. requires that MCSO provide deputies with a list and/or description of forms of identification deemed acceptable for drivers and passengers (in circumstances where identification is required of them) who are unable to present a driver's license or other state-issued identification.  The Plaintiffs' attorneys and MCSO have agreed on acceptable forms of identification, and this information has been included in the Fourth and Fourteenth Amendment training.  EA-11 (Arrest Procedures), most recently amended on June 14, 2018, provides a list of acceptable forms of identification if a valid driver's license cannot be produced.  During this reporting period's review of the sample of 105 traffic stops, there were nine drivers who did not present a valid driver's license to deputies.  Four of the cases involved a Latino driver.  The cases are described in detail below:

- A White male driver was stopped for a red light violation.  The driver did not have any identification on his person.  The driver was arrested for driving under the influence.  The deputy prepared a report for review by the Maricopa County Attorney's Office in relation to potential criminal charges against the driver.

- An American Indian/Native American male was stopped for a stop sign violation.  The driver presented an Arizona identification card.  The driver's license was suspended and a warrant check revealed a warrant for his arrest in a local jurisdiction.  The driver was arrested and the vehicle was towed and impounded.  The driver was issued a citation.

- A Latino driver was stopped for speeding.  The driver did not have any identification on his person.  The vehicle was occupied by a Black male passenger and two Latino passengers.  The driver had a suspended driver's license and a warrant check revealed a warrant for his arrest in a local jurisdiction.  The deputy seized narcotics and narcotic paraphernalia during the stop.  The driver was arrested and the vehicle was towed and impounded.  The driver was issued a citation.

WAI 36926

- A Latino driver was stopped for speeding.  The driver did not have any identification on his person.  The deputy confirmed via records check that the driver had a valid driver's license.  The driver was issued a citation.

- A Black male driver was stopped for following too closely.  The driver produced an Arizona identification card.  The vehicle was occupied by a Black male passenger.  The driver's license was suspended.  The vehicle was towed and impounded.  The driver was issued a citation.

- A White female driver was stopped for speeding.   The driver did not have any identification on her person.  The occupant of the vehicle was listed on the VSCF as being White, with an unknown gender, due to the vision of the deputy being obstructed.  The driver was issued a citation and released.

- A Latino driver was stopped for failure to maintain a lane of traffic.  The driver did not have any identification on his person.   The vehicle was occupied by two Latino passengers and another passenger, whose race/ethnicity and gender were unknown (unable to determine via review of body-worn camera recording).  The driver was issued a warning.

- A White male was stopped for driving with an expired registration.  The driver did not have any identification on his person.  The vehicle was occupied by a White female passenger.  The driver's license was suspended.  The deputy seized the driver's license and the vehicle's license plate and placed the items into evidence.  The driver was issued a citation.

- A Latino driver was stopped for speeding.   The driver presented a Mexican driver's license to the deputy.  The vehicle was occupied by a Latina passenger and another passenger, whose race/ethnicity and gender were unknown (unable to determine via review of body-worn camera recording).  The driver was issued a citation and released.

In our review of the sample of cases in relation to Paragraph 54.k., searches of persons, there were seven cases identified where the drivers did not present a valid driver's license to the deputies.  The cases are described in detail below:

- An Asian/Pacific Islander male driver was stopped for failure to maintain a lane of traffic.  The driver initially produced a driver's license to the deputy that was not his; however, after further inquiries by the deputy, he produced a green card (permanent resident card).  The vehicle was occupied by an Asian/Pacific Islander male passenger.  The driver was arrested for driving under the influence.  The driver was issued a citation.

- A Latino was stopped for a speeding.  The driver did not have any identification on his person.  The vehicle was occupied by a White male passenger.  The driver's license was suspended and a warrant check revealed a warrant for his arrest in a local jurisdiction.  The driver was arrested, and the vehicle was towed and impounded.  The driver was issued a citation.

WAI 36927

- An American Indian/Alaskan Native female driver was stopped for speeding. The driver did not have any identification on her person. The vehicle was occupied by an American Indian/Alaskan Native female passenger and two small children passengers, an American Indian/Alaskan Native female, and an American Indian/Alaskan male. The driver was arrested for driving with a suspended license and for a warrant from a local jurisdiction. The passenger was arrested for a warrant from a local jurisdiction. The driver was issued a citation. Family members responded to the location of the stop to pick up the children.

- A Latino male was stopped for no license plate light. The driver did not have any identification on his person. The driver was issued a warning.

- A Black male was stopped for speeding. The driver produced an Arizona identification card. The vehicle was occupied by a Black male passenger, a Black female passenger, and a White male passenger. The driver's license was suspended and he was arrested for driving under the influence. The vehicle was towed and impounded. The driver was issued a citation.

- A White male was stopped for speeding. The driver produced a California identification card. The vehicle was occupied by a White male passenger, a White female passenger, and a Latino passenger. The driver was arrested for driving under the influence and driving with a suspended driver's license. The White male passenger was arrested for possession of narcotics. The driver was issued a citation.

- A Latino driver was stopped for operating a vehicle with no license plate. The driver did not have any identification on his person. The driver was arrested for driving under the influence. The vehicle was towed and impounded. The driver was issued a citation.

In our review of the sample of cases in relation to Paragraphs 25.d. and 54.g., passenger contacts, there were eight cases identified where the drivers did not present a valid driver's license to the deputies. The cases are described in detail below:

- A Latina driver was stopped for failure to maintain a lane of traffic. The driver did not have any identification on her person. The vehicle was occupied by a Latina passenger. The driver was arrested for driving under the influence. The vehicle was released to the passenger, the registered owner of the vehicle. The deputy prepared a report for review by the Maricopa County Attorney's Office in relation to potential criminal charges against the driver.

- A White male driver was stopped for failure to maintain a lane of traffic. The driver presented a driver's license to the deputy; however, the license was not the driver's. The driver did not have any valid identification on his person. The vehicle was occupied by a Latina passenger. The driver was arrested for felony warrant. The vehicle was towed and impounded and the driver's license was seized and placed on evidence. The driver was issued a citation.

WAI 36928

- A Latino driver was stopped for operating a vehicle with no visible license plate. The driver produced an Arizona identification card. The vehicle was occupied by a Latina passenger. The driver was arrested for two warrants that were issued from local jurisdictions and possession of narcotics, which were recovered during the stop. The vehicle was towed and impounded. The driver was issued a citation.

- A Latino driver was stopped for speeding. The driver did not have any identification on his person. The vehicle was occupied by six Latina passengers. The driver was issued a citation.

- A White male driver was stopped for driving with an expired registration. The driver did not have any identification on his person. The vehicle was occupied by a White female passenger. The deputy seized the license plate and placed it into evidence. The vehicle was released to the passenger, who was the registered owner. The driver was issued a citation.

- A Latino driver was stopped for driving with an expired registration. The driver produced a Mexican passport. The vehicle was occupied by a Latino passenger. The deputy seized the license plate and placed it into evidence. The driver was issued a citation.

- A Latino driver was stopped for speeding. The driver produced an Arizona identification card. The vehicle was occupied by a Latino passenger and a Latina passenger. The deputy arrested the driver for driving with a suspended driver's license and for a warrant that was issued for his arrest from a local jurisdiction. The deputy also investigated the passengers, both of whom were under the age of 21, to determine if they had consumed alcohol. The driver was issued a citation.

MCSO remains in compliance with this Subparagraph.

Paragraph 25.j. requires MCSO to instruct deputies that they are not to ask for the Social Security Number or card of any motorist who has provided a valid form of identification, unless it is needed to complete a citation or report. EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) prohibits deputies from asking for the Social Security Number of any motorist who has provided a valid form of identification. During this reporting period's review of the sample of 105 traffic stops, we did not identify any cases where a deputy requested the Social Security Number or card of a driver. In our review of the sample of traffic stops reviewed for Paragraph 54.k., one case was identified where the deputy made an arrest of a Latino driver for a criminal charge of speeding. The deputy requested and obtained the driver's social security number for the purposes of the preparing an Arrest Report, which is permissible.

MCSO remains in compliance with this Subparagraph.

WAI 36929

*Paragraph 26.   The MCSO shall revise its policy or policies relating to Investigatory Detentions and arrests to ensure that those policies, at a minimum:*

a.   *require that Deputies have reasonable suspicion that a person is engaged in, has committed, or is about to commit, a crime before initiating an investigatory seizure;*

b.   *require that Deputies have probable cause to believe that a person is engaged in, has committed, or is about to commit, a crime before initiating an arrest;*

c.   *provide Deputies with guidance on factors to be considered in deciding whether to cite and release an individual for a criminal violation or whether to make an arrest;*

d.   *require Deputies to notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration-Related Crime, or for any crime by a vehicle passenger related to lack of an identity document;*

e.   *prohibit the use of a person's race or ethnicity as a factor in establishing reasonable suspicion or probable cause to believe a person has, is, or will commit a crime, except as part of a reliable and specific suspect description; and*

f.   *prohibit the use of quotas, whether formal or informal, for stops, citations, detentions, or arrests (though this requirement shall not be construed to prohibit the MCSO from reviewing Deputy activity for the purpose of assessing a Deputy's overall effectiveness or whether the Deputy may be engaging in unconstitutional policing).*

**Phase 1:**  In compliance

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.
- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

**Phase 2:**  In compliance

MCSO has not reported any immigration-related arrests or investigations for some time, and there were none reported during this reporting period. There was one report of identity theft that occurred in July. This was a Driving Under the Influence (DUI) arrest in which the subject arrested provided deputies with identification information that belonged to the arrestee's sister. There was one arrest made in August for failing to provide identification. This individual was stopped for speeding, and was subsequently cited for speeding and for not having a valid driver's license. There were no incidents or arrests that would fall under the reporting requirements of this Paragraph in September.

We also received a booking list and a criminal citation list for each month of this reporting period. From each list, we selected a 10% random sample of incidents. In total, we reviewed 64 incidents resulting in arrest and 74 incidents in which criminal citations were issued. In addition, we reviewed 251 Incident Reports for the quarter. All of the documentation we reviewed during this reporting period indicates that MCSO is in compliance with this Paragraph.

WAI 36930

We carefully review field interviews and contacts with members of the community to assess compliance with Paragraph 26. These types of contacts, that do not involve traffic stops, are being documented in Non-Traffic Contact Forms. For this reporting period, we reviewed 74 NTCFs. Our reviews of the NTCFs for this reporting period did not reveal any issues of concern.

### d. Policies and Procedures Governing the Enforcement of Immigration-Related Laws

*Paragraph 27.* *The MCSO shall remove discussion of its LEAR Policy from all agency written Policies and Procedures, except that the agency may mention the LEAR Policy in order to clarify that it is discontinued.*

**Phase 1:** In compliance

MCSO asserts that it does not have an agency LEAR policy. We have verified, through our document reviews and site compliance visits, that MCSO does not have a LEAR policy.

**Phase 2:** In compliance

*Paragraph 28.* *The MCSO shall promulgate a new policy or policies, or will revise its existing policy or policies, relating to the enforcement of Immigration-Related Laws to ensure that they, at a minimum:*

a. *specify that unauthorized presence in the United States is not a crime and does not itself constitute reasonable suspicion or probable cause to believe that a person has committed or is committing any crime;*

b. *prohibit officers from detaining any individual based on actual or suspected "unlawful presence," without something more;*

c. *prohibit officers from initiating a pre-textual vehicle stop where an officer has reasonable suspicion or probable cause to believe a traffic or equipment violation has been or is being committed in order to determine whether the driver or passengers are unlawfully present;*

d. *prohibit the Deputies from relying on race or apparent Latino ancestry to any degree to select whom to stop or to investigate for an Immigration-Related Crime (except in connection with a specific suspect description);*

e. *prohibit Deputies from relying on a suspect's speaking Spanish, or speaking English with an accent, or appearance as a day laborer as a factor in developing reasonable suspicion or probable cause to believe a person has committed or is committing any crime, or reasonable suspicion to believe that an individual is in the country without authorization;*

WAI 36931

f. *unless the officer has reasonable suspicion that the person is in the country unlawfully and probable cause to believe the individual has committed or is committing a crime, the MCSO shall prohibit officers from (a) questioning any individual as to his/her alienage or immigration status; (b) investigating an individual's identity or searching the individual in order to develop evidence of unlawful status; or (c) detaining an individual while contacting ICE/CBP with an inquiry about immigration status or awaiting a response from ICE/CBP. In such cases, the officer must still comply with Paragraph 25(g) of this Order.  Notwithstanding the foregoing, an officer may (a) briefly question an individual as to his/her alienage or immigration status; (b) contact ICE/CBP and await a response from federal authorities if the officer has reasonable suspicion to believe the person is in the country unlawfully and reasonable suspicion to believe the person is engaged in an Immigration-Related Crime for which unlawful immigration status is an element, so long as doing so does not unreasonably extend the stop in violation of Paragraph 25(g) of this Order;*

g. *prohibit Deputies from transporting or delivering an individual to ICE/CBP custody from a traffic stop unless a request to do so has been voluntarily made by the individual;*

h. *Require that, before any questioning as to alienage or immigration status or any contact with ICE/CBP is initiated, an officer check with a Supervisor to ensure that the circumstances justify such an action under MCSO policy and receive approval to proceed.  Officers must also document, in every such case, (a) the reason(s) for making the immigration-status inquiry or contacting ICE/CBP, (b) the time approval was received, (c) when ICE/CBP was contacted, (d) the time it took to receive a response from ICE/CBP, if applicable, and (e) whether the individual was then transferred to ICE/CBP custody.*

**Phase 1:**  In compliance

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 26, 2018.

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

**Phase 2:**  In compliance

During the third quarter of 2018, there were no reported instances of deputies having contact with Immigration and Customs Enforcement (ICE) or Customs and Border Protection (CBP) for the purpose of making an immigration status inquiry, and there were no reported arrests for any immigration-related investigations, or for any immigration-related crimes.  The reviews of documentation submitted for this reporting period indicate that MCSO has complied with the reporting requirements related to Paragraph 28.  In our reviews of incidents involving contact with the public, including traffic stops, arrests, and investigative stops, we monitor deputies' actions to verify compliance with this Order.

WAI 36932

For September, MCSO submitted one incident as responsive to this Paragraph.  This incident involved a VSCF wherein a deputy noted an immigration status inquiry.  MCSO stated that this was an error in the entry, which was later corrected by the deputy.  The individual in question was a Bulgarian citizen who was arrested for speeding and possession of marijuana.  The error made in the VSCF was a result of booking procedures that require the notification of the arrestee's foreign consulate, whenever a foreign national is arrested.  In addition to documentation provided in response to this Paragraph, our reviews of documentation provided for other Paragraphs of this Order have found no evidence to indicate a violation of this Paragraph.  In total, we reviewed 64 Arrest Reports, 74 criminal citations, 165 traffic stops, 74 NTCFs, and 251 Incident Reports for this reporting period and found no issues of concern, as it relates to this Paragraph.

### e. Policies and Procedures Generally

**Paragraph 29.**  *MCSO Policies and Procedures shall define terms clearly, comply with applicable law and the requirements of this Order, and comport with current professional standards.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

See Paragraph 30.

**Paragraph 30.**  *Unless otherwise noted, the MCSO shall submit all Policies and Procedures and amendments to Policies and Procedures provided for by this Order to the Monitor for review within 90 days of the Effective Date pursuant to the process described in Section IV. These Policies and Procedures shall be approved by the Monitor or the Court prior to their implementation.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

MCSO continues to provide us, the Plaintiffs' attorneys, and the Plaintiff-Intervenors with drafts of its Order-related policies and procedures prior to publication, as required by the Order. We, the Plaintiffs' attorneys, and the Plaintiff-Intervenors review the policies to ensure that they define terms clearly, comply with applicable law and the requirements of the Order, and comport with current professional standards.  Once drafts are finalized, incorporating the feedback of the Plaintiffs' attorneys, the Plaintiff-Intervenors, and the Monitoring Team, MCSO provides them to the Monitoring Team for final review and approval.  As this process has been followed for the Order-related policies published thus far, MCSO is in compliance with this Paragraph.

WAI 36933

***Paragraph 31.*** *Within 60 days after such approval, MCSO shall ensure that all relevant MCSO Patrol Operation Personnel have received, read, and understand their responsibilities pursuant to the Policy or Procedure. The MCSO shall ensure that personnel continue to be regularly notified of any new Policies and Procedures or changes to Policies and Procedures. The Monitor shall assess and report to the Court and the Parties on whether he/she believes relevant personnel are provided sufficient notification of and access to, and understand each policy or procedure as necessary to fulfill their responsibilities.*

**Phase 1:** In compliance

- GA-1 (Development of Written Orders), most recently amended on January 9, 2018.

**Phase 2:** In compliance

GA-1 indicates that Office personnel shall be notified of new policies and changes to existing policies via Briefing Boards and via the HUB, Maricopa County's adaptation of the online training software program, Cornerstone, that MCSO implemented in July 2017 to replace its E-Policy system. Per GA-1, "Prior to some policies being revised, time-sensitive changes are often announced in the Briefing Board until the entire policy can be revised and finalized." As noted previously, we recognize the authority of Briefing Boards and understand their utility in publishing critical policy changes quickly, but we have advised MCSO that we generally do not grant Phase 1 compliance for an Order requirement until the requirement is memorialized in a more formal policy.

During this reporting period, MCSO issued (or issued revisions of) five Order-related policies, including: CP-8 (Preventing Racial and Other Bias-Based Profiling); DJ-3 (Inmate Grievances); GC-7 (Transfer of Personnel); GH-2 (Internal Investigations); and GJ-24 (Community Relations and Youth Services). MCSO also published the Court Implementation Division Operations Manual.

During this reporting period, MCSO also issued several Briefing Boards and Administrative Broadcasts that touched on Order-related topics and revised the language of General Orders.

During our October 2018 site visit, MCSO updated us on the status of its implementation of the HUB. As noted above, the HUB replaced E-Policy, after several delays related to licensing and other technical issues, in July 2017. Initially, MCSO intended to continue using E-Policy to distribute policies mandated by the Orders, and to distribute non-Court-mandated training via the HUB. During our January 2018 site visit, Training Division personnel reported that MCSO would soon begin using the HUB for distributing Court-mandated policies as well; and MCSO officially made this change in March. The Training Division has experienced a few technical problems during the transition, but it has mostly been smooth. Employees are required to complete personal attestations that indicate that they have read and understand the policy.

WAI 36934

*Paragraph 32.  The MCSO shall require that all Patrol Operation personnel report violations of policy; that Supervisors of all ranks shall be held accountable for identifying and responding to policy or procedure violations by personnel under their command; and that personnel be held accountable for policy and procedure violations.   The MCSO shall apply policies uniformly.*

**Phase 1:**  In compliance

- CP-2 (Code of Conduct), most recently amended on May 9, 2018.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on April 10, 2018.

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:**  Not in compliance

Since we began reviewing internal investigations conducted by MCSO, we have reviewed more than 700 administrative misconduct investigations submitted to our Team for this Paragraph. During our reviews, we have continued to observe deficiencies in both the investigations and the associated documentation, but have also continued to note overall improvement.

During each site visit, we meet with the Professional Standards Bureau (PSB) and District and Division Command personnel to provide them with information regarding the cases that we find to be deficient in structure, format, investigation, or reporting requirements.  We also highlight those cases we find to be properly investigated and in full compliance with Order requirements. In 2016, PSB developed and implemented the use of an investigative checklist and specific format for the completion of internal investigations.  MCSO trained all supervisors who conduct investigations in the use of these documents.  Since June 1, 2016, the use of these investigative protocol documents has been required for all administrative investigations.

Revised policies related to internal investigations and the discipline process were finalized and implemented on May 18, 2017.  Since that time, additional revisions have been made to GC-17 (Employee Disciplinary Procedures), GH-2 (Internal Investigations), and the investigative checklist and format.

WAI 36935

During our site visits, we meet with PSB to discuss our concerns with the overall quality of administrative investigations, and provide specific case examples from the Paragraph 32 submissions that illustrate these concerns. PSB personnel have remained responsive to our feedback, and the investigations they submit for compliance with this Paragraph continue to remain near full compliance. Their reviews of investigations conducted by District personnel continue to be thorough and have identified appropriate concerns.

We have noted many improvements in those investigations conducted at the District level, but we continue to observe some deficiencies in the investigations they conduct. Investigations are still being returned by PSB after review for additional follow-up or corrections. This review by PSB continues to allow some District cases to be near full compliance when they are finalized. However, as we have noted in previous reports, it continues to delay the timely completion of many of these same investigations. PSB continues to assign liaison personnel to each District to provide assistance while the investigations are underway. While we have noted the positive effects of PSB's efforts to assist investigators in the Districts, the time commitment involved with conducting these reviews continues to result in significant personnel hours being dedicated to this effort by PSB personnel.

During our District visits in July 2018, members of our Team spoke to sworn supervisors and command personnel in Districts 1, 2, 3, and 7 about internal investigations. As was the case in prior District visits, those we spoke to provided positive feedback on the 40-hour Misconduct Investigative Training that was completed in late 2017, though some indicated they believed additional training was still necessary. They also continued to note their appreciation for the assistance of PSB. The time required to complete administrative investigations continued to be a concern for District personnel; but we noted that some personnel in the Districts believed that as they had gained experience in conducting these investigations, it had become easier to complete them and they were better able to manage the time commitment.

During our District visits in October 2018, members of our Team spoke with sworn supervisors and command personnel in Districts 1, 2, 3, 6, and 7, and Lake Patrol about internal misconduct investigations. In each of these Districts, District leadership told us that they believed that the quality of the investigations their personnel are now conducting has improved. Some District supervisors and command personnel continue to identify the difficulty in locating and interviewing complainants and witnesses, and the time it takes to complete investigations as barriers to completing investigations in a timely manner. Overall, the personnel we talked to believe that adequate training has been provided and has been helpful, though several identified the need for ongoing or refresher training, as significant time sometimes passes between training and the necessity to conduct an investigation.

As in prior District visits, during our District visits in October 2018, we provided feedback to the supervisory personnel present at the meetings regarding our reviews of internal affairs investigations and areas where we note the need for improvement. We also asked District Captains and lieutenants how they are addressing any deficient investigations now that training has been completed. Several District command personnel advised of instances where they have

WAI 36936

identified concerns or deficiencies in investigations and have provided training, mentoring, or other intervention strategies to assist their personnel in improving. This is consistent with what we are observing in the monthly document submissions from MCSO that we have received since March 2018. We again found this reporting period that these submissions document appropriate actions, and we agree with the current methods MCSO is using to assist personnel. We will continue to monitor the intervention strategies being documented by MCSO to ensure that if intervention strategies do not result in improvement, MCSO takes additional appropriate action.

During the last reporting period, we reviewed all 28 administrative misconduct investigations submitted for compliance with this Paragraph. Of the 11 conducted by PSB, 91% complied with all investigative and administrative requirements over which the PSB Commander has authority. Of the 17 conducted by Districts, 65% were in compliance with requirements of the Order.

During this reporting period, we reviewed all 26 administrative misconduct investigations submitted for compliance with this Paragraph. PSB conducted eight of these investigations, and District personnel conducted the remaining 18. Sworn supervisors with the rank of sergeant or higher completed all the investigations conducted at the District level. There were 73 potential policy violations included in the 26 cases. Fourteen of the investigations resulted from external complainants, and 12 were internally generated. All but two of the 26 investigations were both initiated and completed after July 20, 2016. Twenty-one of the 26 were both initiated and completed after the new investigation and discipline policies became effective in May 2017. Seven were both initiated and concluded after the completion of the 40-hour Misconduct Investigative Training that was completed in late 2017.

Of the 26 administrative cases we reviewed for this Paragraph, 15 resulted in sustained findings against one or more employee. We concur with all of the sustained findings, and concur with the final discipline imposed in all but one of these cases. Discipline included: coachings; written reprimands; suspensions of eight hours or more; and in one case, a demotion. In all of these cases, the PSB Commander properly identified the category and offense number, as well as the presumptive discipline or range of discipline. We agree with his decisions in all 15 cases.

There were two cases we reviewed for compliance with this Paragraph where the Appointing Authority mitigated the presumptive discipline. In one case, the Appointing Authority assessed discipline that fell within the range, but was not the presumptive discipline established in the policies revised in May 2017. We believe the facts of the investigation, the employee's work history, and the justification provided by the Appointing Authority support the decision to mitigate the discipline; and we agree with the decision to do so. In the second case, the Appointing Authority mitigated the discipline outside of the discipline range after the employee filed an appeal. Without written documentation of some kind to review, we are unable to support this decision.

WAI 36937

All but two of the 26 cases we reviewed for this Paragraph were completed on or after July 20, 2016.  Of the eight investigations conducted by PSB, seven were not completed within the 85-day timeframe.  All but one of these investigations contained a request for, and an authorization of, an extension.  Thirteen of the 18 investigations conducted at the District level were not initially completed and submitted to PSB for review within the required 60-day timeframe.  All but one included an appropriate request for, and an authorization of, an extension.  We will continue to reinforce that these extensions need to be authored and approved when appropriate.

All but one of the eight administrative investigations submitted for this Paragraph and conducted by PSB were completed after July 20, 2016.  We continue to find that PSB investigations are thorough and well-documented.  Seven (88%) of the eight cases PSB investigated for compliance with this Paragraph were in compliance with all investigative and administrative requirements.  One case was not compliant, only because there was not a timely investigative extension request.  Investigations by PSB continue to be near full compliance.

District personnel outside of PSB conducted 18 of the investigations MCSO submitted for review for this Paragraph.  All but one were completed after July 20, 2016.  We found 11 (61%) in compliance with all investigative and documentation requirements.  This represents a decrease from the 65% compliance finding the last reporting period.  We have some concerns with seven of the investigations.  The concerns include: failure to complete a thorough investigation, lack of detail in the investigative report; failure to both audio and video-record interviews of witnesses or investigative leads without explanation; and ongoing administrative concerns.  Six were returned to the Districts by PSB for additional investigation or corrections, and we believe that District command personnel should have identified many of the deficiencies and corrections prior to forwarding the cases to PSB.  One of the seven cases was not returned to the District for corrections, as it was a failure to complete a proper extension request, which cannot be corrected after the fact.  We noted that 12 of the 18 investigations were completed prior to the completion of the Misconduct Investigative Training.  Six (50%) of these 12 investigations required additional investigation or corrections and were returned to the Districts.  Five (83%) of the six investigations completed after the Misconduct Investigative Training were in compliance.  One was not in compliance, only because there was not a required request or approval of an investigative extension.  We are encouraged with the overall improvement we are observing, particularly in those cases initiated after the training was completed.

All District command personnel provide monthly documentation of any instances where they find concerns or deficiencies in investigations conducted by their personnel.  During this reporting period, five District Commanders identified concerns or deficiencies and employed appropriate intervention strategies to assist their employees.  In one District, an administrative misconduct investigation was initiated after intervention strategies were unsuccessful.

Our review of cases submitted for this Paragraph indicates a continuing effort by PSB and District personnel to complete proper investigations.  PSB investigations reviewed under this Paragraph remain near full compliance and District cases are continuing to show ongoing improvement.

WAI 36938

*Paragraph 33.  MCSO Personnel who engage in Discriminatory Policing in any context will be subjected to administrative Discipline and, where appropriate, referred for criminal prosecution.  MCSO shall provide clear guidelines, in writing, regarding the disciplinary consequences for personnel who engage in Discriminatory Policing.*

**Phase 1:**  In compliance

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 26, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

**Phase 2:**  In compliance

The investigations that we review for compliance with this Paragraph do not include biased policing complaints involving the Plaintiffs' class.  Those investigations have additional compliance requirements and are discussed in Paragraphs 275-283.

During the last reporting period, we reviewed one administrative misconduct investigation submitted in compliance with this Paragraph.  This complaint was investigated by PSB.  It was initiated after July 20, 2016, but prior to May 18, 2017.  The investigation involved a sworn employee who was sustained for misconduct, resulting in an eight-hour suspension.  In addition to the suspension, the Training Division facilitated the deputy's attendance at training specific to biased policing and decision-making.  We found the investigation to be compliant, and MCSO remained in Phase 2 compliance with this Paragraph.

During this reporting period, we reviewed one administrative misconduct investigation submitted in compliance with this Paragraph.  This was an internally generated complaint by a supervisor alleging that an employee had shown bias in favor of an individual due to the individual's age and had been insubordinate to his supervisor.  While we agree with the not sustained and exonerated findings relative to the principal in this investigation once the IA was initiated by PSB, we have concerns that the issues the supervisor identified were initially handled with a supervisory note and PSB was not notified of the alleged misconduct.  As was identified by the Bureau of Internal Oversight (BIO) during their review of supervisory notes, this type of alleged misconduct should have been immediately handled as an administrative misconduct investigation.  While both BIO and PSB properly handled the alleged misconduct by the principal when they became aware of it, there does not appear to have been any action taken to address the initial handling of this incident by the supervisor and his chain of command.

MCSO remains in compliance with this Paragraph, but we will withdraw Phase 2 compliance if MCSO fails to satisfactorily meet the Paragraph's requirements in the next reporting period.

WAI 36939

While biased policing allegations that involve members of the Plaintiffs' class are not reported in this Paragraph, we note here that MCSO completed three investigations that were determined to be Class Remedial Matters (CRMs) during this reporting period, and all three were in compliance.

**Paragraph 34.** *MCSO shall review each policy and procedure on an annual basis to ensure that the policy or procedure provides effective direction to MCSO Personnel and remains consistent with this Order, current law and professional standards. The MCSO shall document such annual review in writing. MCSO also shall review Policies and Procedures as necessary upon notice of a policy deficiency during audits or reviews. MCSO shall revise any deficient policy as soon as practicable.*

**Phase 1:** In compliance

- GA-1 (Development of Written Orders), most recently amended on January 9, 2018.

**Phase 2:** In compliance

MCSO now conducts annual written reviews of Office policies. Policy GA-1 (Development of Written Orders) guides these assessments. These reviews ensure effectiveness and consistency with Constitutional policing, current law, professional standards, and any Court Order or Judgment. MCSO documents each examination; and after the Parties and we evaluate them, our Team approves the policies.

During this reporting period, nine (19%) of the 48 required policies received their annual review. The current reviews assessed: CP-8 (Preventing Racial and Other Bias-Based Policing); EB-4 (Traffic Records); GC-7 (Transfer of Personnel); GF-5 (Incident Report Guidelines); GH-2 (Internal Investigations; GH-4 (Bureau of Internal Oversight); GH-5 (Early Identification System); GI-5 (Voiance Language Services); and GJ-35 (Body-Worn Cameras). During this reporting period, MCSO requested to rescind EB-4 (Traffic Records), maintaining that information contained in this policy also appears in GF-5 (Incident Report Guidelines), EB-2 (Traffic Stop Data Collection), and EB-7 (Traffic Control and Services). After reviewing the identified policies, we did not note a direct correlation of some of the pertinent information in the other policies. We did not rule out the rescission of this policy in the future, but we must ensure that the required information is incorporated in the other policies before granting any rescission.

WAI 36940

# Section 5: Pre-Planned Operations

***Paragraph 35.*** *The Monitor shall regularly review the mission statement, policies and operations documents of any Specialized Unit within the MCSO that enforces Immigration-Related Laws to ensure that such unit(s) is/are operating in accordance with the Constitution, the laws of the United States and State of Arizona, and this Order.*

**Phase 1:**  In compliance

- Special Investigations Division Operations Manual, most recently amended on April 1, 2018.

- Special Investigations Division Organizational Chart, most recently amended on April 1, 2018.

- Memorandum from Executive Chief Trombi to Deputy Chief Lopez directing the elimination of the Criminal Employment Unit, dated January 6, 2015.

**Phase 2:**  In compliance

To verify Phase 2 compliance with this Paragraph, we previously verified that the Criminal Employment Unit (CEU) was disbanded and removed from the Special Investigations Division organizational chart.  The Human Smuggling Unit (HSU) was also disbanded and personnel reassigned to the Anti-Trafficking Unit (ATU).

During our review of the arrests made by the Special Investigations Division ATU between March 2015-March 2017, we did not note any arrests for immigration or human smuggling violations.  The cases submitted by MCSO and reviewed for the ATU were primarily related to narcotics trafficking offenses.

MCSO reported in April 2017 that it had disbanded the Anti-Trafficking Unit and formed a new unit, Fugitive Apprehension and Tactical Enforcement (FATE).  The primary mission of FATE is to locate and apprehend violent fugitives.  We reviewed FATE's mission statement and objectives, as well as the organizational chart for the Special Investigations Division.  MCSO had removed the ATU from the organizational chart, and the mission of FATE did not include any reference to the enforcement of Immigration-Related Laws.

The revised organizational chart for SID and documentation provided by MCSO regarding the implementation of FATE supported that the ATU no longer existed, and that there were no specialized units in MCSO that enforced Immigration-Related Laws.

During this reporting period, we received and reviewed the most current Special Investigations Division Operations Manual and organizational chart.  Both continue to confirm that MCSO has no specialized units that enforce Immigration-Related Laws, that the Human Smuggling Unit (HSU) was disbanded, and that the Anti-Trafficking Unit (ATU) no longer exists.

WAI 36941

***Paragraph 36.*** *The MCSO shall ensure that any Significant Operations or Patrols are initiated and carried out in a race-neutral fashion.  For any Significant Operation or Patrol involving 10 or more MCSO personnel, excluding posse members, the MCSO shall develop a written protocol including a statement of the operational motivations and objectives, parameters for supporting documentation that shall be collected, operations plans, and provide instructions to supervisors, deputies and posse members.  That written protocol shall be provided to the Monitor in advance of any Significant Operation or Patrol.*

**Phase 1:**  In compliance

- GJ-33 (Significant Operations), most recently amended on May 10, 2018.

**Phase 2:**  In compliance

Since the requirements for conducting significant operations were implemented, MCSO has reported conducting only one significant operation that invoked the requirements of this Paragraph.  "Operation Borderline" was conducted from October 20-27, 2014, to interdict the flow of illegal narcotics into Maricopa County.  MCSO met all of the requirements of this Paragraph during the operation.

In February 2016, we became aware of "Operation No Drug Bust Too Small" when it was reported in the media, and requested details on this operation from MCSO.  After reviewing the documentation provided by MCSO, we were satisfied that it did not meet the reporting requirements of this Paragraph.

In October 2016, we became aware of "Operation Gila Monster" when it was reported in the media.  According to media reports, this was a two-week operation conducted by a special operations unit in MCSO and was intended to interdict the flow of illegal drugs into Maricopa County.  We requested all documentation regarding this operation for review.  The documentation indicated that this operation was conducted from October 17-23, 2016.  The documentation provided by MCSO was sufficient for us to determine that this operation did not meet the reporting criteria for this, or other Paragraphs, related to significant operations.  The Plaintiffs also reviewed the documentation submitted by MCSO on this operation and agreed that the operation did not invoke the requirements of this Paragraph.  We and the Plaintiffs noted that "Operation Gila Monster" involved traffic stops of Latinos, and that those arrested were undocumented Latinos.

We continue to review documentation submitted for this Paragraph by all Districts, the Enforcement Support Division, and the Investigations Division on a monthly basis.  During this reporting period, and since October 2014, MCSO continues to report that it has not conducted any additional significant operations.  In addition, we have not learned of any potential significant operation through media releases or other sources during this reporting period.  We will continue to monitor and review any operations we become aware of to ensure continued compliance with this and other Paragraphs related to significant operations.

WAI 36942

*Paragraph 37.   The MCSO shall submit a standard template for operations plans and standard instructions for supervisors, deputies and posse members applicable to all Significant Operations or Patrols to the Monitor for review pursuant to the process described in Section IV within 90 days of the Effective Date.   In Exigent Circumstances, the MCSO may conduct Significant Operations or Patrols during the interim period but such patrols shall be conducted in a manner that is in compliance with the requirement of this Order.   Any Significant Operations or Patrols thereafter must be in accordance with the approved template and instructions.*

**Phase 1:**  In compliance

- GJ-33 (Significant Operations), most recently amended on May 10, 2018.

**Phase 2:**  In compliance

In late 2014, we reviewed all the documentation submitted by MCSO regarding the significant operation conducted from October 24-27, 2014.  This operation was intended to interdict the flow of illegal narcotics into Maricopa County and fully complied with the requirements of this Paragraph.

MCSO continues to report that it has not conducted any operations that invoke the requirements of this Paragraph since October 2014.


**(Note: Unchanged language is presented in *italicized font*.   Additions are indicated by underlined font.  Deletions are indicated by ~~crossed-out font~~.)**

*Paragraph 38.   If the MCSO conducts any Significant Operations or Patrols involving 10 or more MCSO Personnel excluding posse members, it shall create the following documentation and provide it to the Monitor and Plaintiffs within 30 days after the operation:*

a.      *documentation of the specific justification/reason for the operation, certified as drafted prior to the operation (this documentation must include analysis of relevant, reliable, and comparative crime data);*

b.      *information that triggered the operation and/or selection of the particular site for the operation;*

c.      *documentation of the steps taken to corroborate any information or intelligence received from non-law enforcement personnel;*

d.      *documentation of command staff review and approval of the operation and operations plans;*

e.      *a listing of specific operational objectives for the patrol;*

f.      *documentation of specific operational objectives and instructions as communicated to participating MCSO Personnel;*

WAI 36943

g.   any operations plans, other instructions, guidance or post-operation feedback or debriefing provided to participating MCSO Personnel;

h.   a post-operation analysis of the patrol, including a detailed report of any significant events that occurred during the patrol;

i.   arrest lists, officer participation logs and records for the patrol; and

j.   data about each contact made during the operation, including whether it resulted in a citation or arrest.

**Phase 1:**  In compliance

- GJ-33 (Significant Operations), most recently amended on May 10, 2018.

**Phase 2:**  In compliance

Since the initial publication of GJ-33, MCSO has reported that it has conducted only one significant operation, "Operation Borderline," in October 2014.  At the time of this operation, we reviewed MCSO's compliance with policy; attended the operational briefing; and verified the inclusion of all the required protocols, planning checklists, supervisor daily checklists, and post-operation reports.  MCSO was in full compliance with this Paragraph for this operation.

During this reporting period, MCSO again reported that it did not conduct any significant operations invoking the requirements of this Paragraph.


**Paragraph 39.**   *The MCSO shall hold a community outreach meeting no more than 40 days after any Significant Operations or Patrols in the affected District(s).  MCSO shall work with the Community Advisory Board to ensure that the community outreach meeting adequately communicates information regarding the objectives and results of the operation or patrol.  The community outreach meeting shall be advertised and conducted in English and Spanish.*

**Phase 1:**  In compliance

- GJ-33 (Significant Operations), most recently amended on May 10, 2018.

**Phase 2:**  In compliance

The Amendments to the Supplemental Permanent Injunction/Judgment Order (Document 2100) issued on August 3, 2017 returned the responsibility for compliance with this Paragraph to MCSO.

During this reporting period, MCSO again reported that it did not conduct any significant operations that invoked the requirements of this Paragraph.

WAI 36944

*Paragraph 40. The MCSO shall notify the Monitor and Plaintiffs within 24 hours of any immigration related traffic enforcement activity or Significant Operation involving the arrest of 5 or more people unless such disclosure would interfere with an on-going criminal investigation in which case the notification shall be provided under seal to the Court, which may determine that disclosure to the Monitor and Plaintiffs would not interfere with an on-going criminal investigation. In any event, as soon as disclosure would no longer interfere with an on-going criminal investigation, MCSO shall provide the notification to the Monitor and Plaintiffs. To the extent that it is not already covered above by Paragraph 38, the Monitor and Plaintiffs may request any documentation related to such activity as they deem reasonably necessary to ensure compliance with the Court's orders.*

**Phase 1:**  In compliance

- GJ-33 (Significant Operations), most recently amended on May 10, 2018.

**Phase 2:**  In compliance

Since MCSO first developed GJ-33 (Significant Operations) in 2014, MCSO has reported conducting only one operation, "Operation Borderline," that required compliance with this Paragraph. We verified that MCSO employed the appropriate protocols and made all required notifications. MCSO was in full compliance with this Paragraph during this operation.

Based on a concern raised by the Plaintiffs, and to provide clarification regarding the portion of this Paragraph that addresses the requirement for MCSO to notify the Monitor and Plaintiffs within 24 hours of any immigration-related traffic enforcement activity or significant operations involving "the arrest of 5 or more persons," we requested during our October 2015 site visit that MCSO provide a statement regarding this requirement each month. MCSO began including this information in its November 2015 submission and continues to do so.

MCSO continues to report that it has not conducted any operations that meet the reporting requirements for this Paragraph since October 2014.

WAI 36945

# Section 6: Training

**COURT ORDER VII.  TRAINING**

### a.  General Provisions

***Paragraph 41.***   *To ensure that the Policies and Procedures provided for by this Order are effectuated, the MCSO shall implement the following requirements regarding Training.*

***Paragraph 42.***   *The persons presenting this Training in each area shall be competent instructors with significant experience and expertise in the area.  Those presenting Training on legal matters shall also hold a law degree from an accredited law school and be admitted to a Bar of any state and/or the District of Columbia.*

**Phase 1:**  In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.

- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2018

- Training Division Operations Manual, most recently amended on September 21, 2017.

**Phase 2:**  In compliance

During this reporting period, MCSO continued to make strides in correcting previously identified deficiencies with individuals selected as FTOs who did not meet the criteria of GG-1. MCSO had already implemented an internal tracking document for FTOs.  This document captures the five requirements for FTOs as outlined in GG-1.  Previously missing General Instructor (GI) documentation for two individuals was located.  An additional seven individuals attended an AZ POST General Instructor course.  An additional six individuals provided satisfactory EPAs.  During our October site visit, the Training Division advised that 34 individuals currently meet all criteria of GG-1.  We will continue to monitor all FTO files.

Annual Combined Training (ACT) instructors consist of attorneys either provided by the Maricopa County Attorney's Office (MCAO), or others who teach on a contract basis.  During this reporting period, the Training Division removed two previously utilized instructors from the ACT instructor list.  We discussed this during our October site visit and requested additional documentation.  The Training Division analyzed the 2017 ACT in three areas; Missed Question Analysis; Instructor Critiques; and Course Assessments.  The Training Division indicates that it has not adopted a standardized process to utilize these analyses to aid with instructor selection. We encourage MCSO to continue developing the instructor selection process for both external and internal instructors.  It will assist MCSO in identifying the best instructors for Order-related training.

WAI 36946

During our October site visit, Training Division personnel expressed concerns with the impact that PSB reviews of instructors/FTOs has on both the Training Division and the PSB. GG-1 requires that all instructors/FTOs receive an annual PSB review. A second review is required 30 days before being assigned an Officer in Training (OIT) for FTOs, or 30 days before teaching an Order-related class for instructors. For accountability, the Training Division is attempting to develop a standardized request form for submission to PSB. This form is intended to address requirements for both FTOs and instructors. We encourage the Training Division to continue with these efforts.

**Paragraph 43.** *The Training shall include at least 60% live training (i.e., with a live instructor), which includes an interactive component, and no more than 40% on-line training. The Training shall also include testing and/or writings that indicate that MCSO Personnel taking the Training comprehend the material taught whether via live training or via on-line training.*

**Phase 1:** In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.
- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2018.
- Training Division Operations Manual, most recently amended on September 21, 2017.

**Phase 2:** In compliance

We verify compliance with this Paragraph by reviewing all completed tests, documentation of all failures, and all failure remediation efforts for each Order-related class delivered during each reporting period.

During this reporting period, MCSO delivered the following training: Blue Team (BT); Body-Worn Camera (BWC); Detention, Arrests, and Immigration-Related Laws; Bias-Free Policing; 2017 Early Identification System (EIS); and TraCS.

Blue Team Training was delivered once to 18 sworn personnel. No staff required test remediation.

MCSO delivered the Body-Worn Camera Training once to 18 sworn personnel. No staff required test remediation.

MCSO delivered the Detention, Arrests, and Immigration-Related Laws, and Bias-Free Policing Training once to 25 personnel (19 sworn, six Posse members). No staff required test remediation.

MCSO delivered the 2017 Early Identification System Training once during this reporting period to two personnel (two civilians). No staff required test remediation.

WAI 36947

MCSO delivered the TraCS Training once to 18 sworn personnel.  No staff required test remediation.

During our October site visit, we continued our discussions of staff and student instructor evaluations with MCSO.  During this reporting period, we provided recommendations for an evaluation form supplied by the Training Division.  Although we offered suggestions, the structure of the form was not finalized or adopted during this reporting period.  Training Division staff conducted five Instructor Observations during this reporting period.  The Commander of the Training Division personally performed three.  We believe this activity was a significant effort by the Commander to address one of the more critical training issues related to instructor selection.  We also noted that his reviews were significantly more thorough and in-depth than others we had reviewed.  Each observation occurred during Supervisor Responsibilities Effective Law Enforcement (SRELE) deliveries and was of supervisory level instructors.

During this reporting period, Training Division personnel continued to participate in ride-alongs as required by GG-1.  Training staff conducted two ride-alongs.  During these observed ride-alongs, deputies were asked to respond to five questions related to the previous ACT training program.  Question topics included implicit bias, deputy-civilian voluntary contacts, the use of race or ethnicity to initiate voluntary contacts and consent searches, frisk criteria, and the enforcement of immigration laws.  Training Division personnel then documented the responses from the deputies along with their observations.

During our October site visit, we requested copies of Districts 1 and 6 ride-along reviews.  We also requested documentation of the formalized process developed for inclusion in the Training Division Operations Manual.  Within the returned documents, Training Division personnel advised us that both ride-alongs were considered pilots; and they were not moving forward with this style field ride, and no formalized process would be developed.  They also indicated that MCSO policy notes ride-alongs as optional and not required.  The Training Division incorrectly considers ride-alongs "as an option...not required by MCSO policy or the Order."  We remind the Training Division that GG-1 requires a training diagnosis and needs review which "will include a review of deputy performance through the Training Division participation in ride-alongs with deputy sheriffs of varying levels of tenure with the Office."  Ride-alongs are not duplicative of the efforts of BIO and PSB.  Training Division ride-along observations provide the Training Division with information to assess the effectiveness of training delivered.  We encourage the Training Division to develop a standardized process and schedule for ride-alongs.

During this reporting period, Training did not conduct any train-the-trainers.  There has been no standardization of this process.  We encourage the Training Division to continue to improve the train-the-trainer format, and to include any changes adopted in either GG-1 or the Training Division Operations Manual.

WAI 36948

***Paragraph 44.*** *Within 90 days of the Effective Date, MCSO shall set out a schedule for delivering all Training required by this Order. Plaintiffs' Representative and the Monitor shall be provided with the schedule of all Trainings and will be permitted to observe all live trainings and all on-line training. Attendees shall sign in at each live session. MCSO shall keep an up-to-date list of the live and on-line Training sessions and hours attended or viewed by each officer and Supervisor and make that available to the Monitor and Plaintiffs.*

**Phase 1:** In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.

- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2018.

- Training Division Operations Manual, most recently amended on September 21, 2017.

**Phase 2:** In compliance

MCSO continues to maintain the Master Training Calendar. We did not identify any inaccuracies during this reporting period.

Master Personnel Rosters are used to determine the number of personnel requiring Order-related training. At the end of this reporting period, MCSO reports that 685 sworn members, 24 reserve members, 23 retired reserve members, 541 Posse members, 1,851 Detention members, and 699 civilian employees require Order-related instruction. These categories vary by reporting period, as a result of the attrition in the organization.

***Paragraph 45.*** *The Training may incorporate adult-learning methods that incorporate roleplaying scenarios, interactive exercises, as well as traditional lecture formats.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

During this reporting period, we continued to review new and revised lesson plans for inclusion of the requirements of this Paragraph. These requirements apply to both MCSO-developed lesson plans, as well as vendor-created lesson plans. The 2018 ACT, 2018 BWC, and the 2018 eight-hour PSB Annual In-service Training (PSB8) for District personnel are currently under review. A vendor provided the eight-hour PSB Annual In-service Training for PSB personnel. At our recommendation, the vendor adjusted the testing process to accommodate Order requirements. This class was conducted November 16, 2018, and appeared on the Master Training Calendar.

WAI 36949

**Paragraph 46.** *The curriculum and any materials and information on the proposed instructors for the Training provided for by this Order shall be provided to the Monitor within 90 days of the Effective Date for review pursuant to the process described in Section IV. The Monitor and Plaintiffs may provide resources that the MCSO can consult to develop the content of the Training, including names of suggested instructors.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

The Training Division provides all new and revised lesson plans and supporting materials for review by our Team and the Parties, as well as background information on all instructors for Order-related training.

As previously discussed, during this reporting period we noted preliminary attempts to create a standardized train-the-trainer process for the selection and evaluation of instructors. We are encouraged by these efforts and believe MCSO will benefit from this process.


**Paragraph 47.** *MCSO shall regularly update the Training to keep up with developments in the law and to take into account feedback from the Monitor, the Court, Plaintiffs and MCSO Personnel.*

**Phase 1:** In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.

- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2018.

- Training Division Operations Manual, most recently amended on September 21, 2017.

**Phase 2:** In compliance

The Monitoring Team and Parties continue to comment on lesson plans and training support material for all training required by both Orders. This review includes the material produced by vendors retained by MCSO to produce and deliver curriculum on their behalf. Where applicable, we, MCSO, and the Parties ensure inclusion in the training material of the most recent developments in state and federal law.

During this reporting period, we reviewed the overview and test for the eight-hour PSB Annual In-service Training for PSB personnel. As a result of our review, the vendor modified the test to comply with Order requirements.

The Training Division continued to revise the 2018 ACT, 2018 SRELE, and BWC lesson plans. Previously the Training Division advised us it had retained a vendor to create and deliver the eight-hour PSB Annual In-service Training (PSB8) for District personnel. During our October site visit, Training Division personnel informed us that MCSO had terminated the contract with

WAI 36950

the vendor.  The lesson plan remained with the Training Division for continued revisions.  A former member of PSB provided subject matter expertise and worked with Training Division to continue drafting this lesson plan.  The lesson plan was approved and delivered in December.

We did not review any roll-call briefings and videos to support the ACT, SRELE, or the Constitutional Policing Plan during this reporting period.

MCSO can reasonably expect that members of the Monitoring Team and the Parties will observe training sessions and provide appropriate feedback.

## B.  Bias-Free Policing Training

*Paragraph 48.*  *The MCSO shall provide all sworn Deputies, including Supervisors and chiefs, as well as all posse members, with 12 hours of comprehensive and interdisciplinary Training on bias-free policing within 240 days of the Effective Date, or for new Deputies or posse members, within 90 days of the start of their service, and at least 6 hours annually thereafter.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

MCSO did not deliver the 2017 ACT during this reporting period.

During this reporting period, the Training Division continued to develop the ACT for the current year.  The Training Division is experiencing difficulties in expanding the bias-free section of the ACT.  The curriculum was intended to include enhanced elements on implicit bias, fair and impartial decision-making, and cultural competency.  MCSO is considering retaining a vendor to provide the implicit bias component.  The slow pace of the development process raises concerns regarding the successful delivery of the curriculum before the end of the calendar year.  We did not receive the first draft for the 2018 ACT until August.  The submitted curriculum appeared deficient in incorporating accepted principals for adult learning, and failed to provide adequate direction as an instructor guide for the contracted and MCAO individuals who deliver this training for MCSO.  Both we and the Plaintiffs recommended the inclusion of more group learning activities and knowledge checkpoints where specific student outcomes are determined.  Also provided in the ACT materials was a draft training video script titled "History of Law Enforcement in Maricopa County and How it Relates to Diversity Within the County."  Our team and the Plaintiffs were critical of its content, which we believed was inappropriate for the ACT lesson plan.  We participated in a conference call on August 13 to discuss these materials.  After this discussion, MCSO decided that the content would not be part of the 2018 ACT curriculum.  The many issues affecting the development of the ACT stem from a failure on the part of the Training Division to adhere to the Training Cycle as adopted by GG-1.  The cycle encompasses seven steps that provide the basis for identifying training needs, proper curriculum development to include adult learning models, timely delivery of training, testing, revision of curriculum, evaluating deputy activities in the field employing the concepts taught, and ultimately documenting each step of the process.  Policy GG-1 was adopted in May 2017

WAI 36951

and revised in May 2018. Phase 2 compliance is predicated upon MCSO adhering to the requirements of the issued policy. We advise MCSO that a continued failure to follow the needs of their published policy may jeopardize its compliance assessment with this Paragraph.

During our October site visit, we further discussed enhancements to the ACT that are also intended to support the Constitutional Policing Plan. The upgrades are designed to assist with developing new roll-call briefings for Patrol personnel. During this reporting period, two videos were distributed to Patrol personnel on Order-required topics. Neither of these videos or the accompanying information received the required reviews by the Parties and our Team before distribution. We remind MCSO that the development of new roll-call briefings supplementing Order-required components of the ACT requires a review by the Parties and our Team. Training Division advised us they are responsible for the acquisition and maintenance of a video library to support these and other training initiatives.

MCSO delivered Bias-Free Policing Training once during this reporting period to 25 personnel (19 sworn, six Posse members). No staff required remedial testing.

**Paragraph 49.** *The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:*

a.  *definitions of racial profiling and Discriminatory Policing;*

b.  *examples of the type of conduct that would constitute Discriminatory Policing as well as examples of the types of indicators Deputies may properly rely upon;*

c.  *the protection of civil rights as a central part of the police mission and as essential to effective policing;*

d.  *an emphasis on ethics, professionalism and the protection of civil rights as a central part of the police mission and as essential to effective policing;*

e.  *constitutional and other legal requirements related to equal protection, unlawful discrimination, and restrictions on the enforcement of Immigration-Related Laws, including the requirements of this Order;*

f.  *MCSO policies related to Discriminatory Policing, the enforcement of Immigration-Related Laws and traffic enforcement, and to the extent past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;*

g.  *MCSO's protocol and requirements for ensuring that any significant pre-planned operations or patrols are initiated and carried out in a race-neutral fashion;*

h.  *police and community perspectives related to Discriminatory Policing;*

i.  *the existence of arbitrary classifications, stereotypes, and implicit bias, and the impact that these may have on the decision-making and behavior of a Deputy;*

WAI 36952

j.      methods and strategies for identifying stereotypes and implicit bias in Deputy decision-making;

k.      methods and strategies for ensuring effective policing, including reliance solely on non-discriminatory factors at key decision points;

l.      methods and strategies to reduce misunderstanding, resolve and/or de-escalate conflict, and avoid Complaints due to perceived police bias or discrimination;

m.      cultural awareness and how to communicate with individuals in commonly encountered scenarios;

n.      problem-oriented policing tactics and other methods for improving public safety and crime prevention through community engagement;

o.      the benefits of actively engaging community organizations, including those serving youth and immigrant communities;

p.      the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;

q.      background information on the Melendres v. Arpaio litigation, as well as a summary and explanation of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in Melendres v. Arpaio, the parameters of the Court's permanent injunction, and the requirements of this Order; and

r.      Instruction on the data collection protocols and reporting requirements of this Order.

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

MCSO did not conduct an annual review of the lesson plan for the Bias-Free Policing Training during this reporting period.


### c. Training on Detentions, Arrests, and the Enforcement of Immigration-Related Laws

*Paragraph 50.*  *In addition to the Training on bias-free policing, the MCSO shall provide all sworn personnel, including Supervisors and chiefs, as well as all posse members, with 6 hours of Training on the Fourth Amendment, including on detentions, arrests and the enforcement of Immigration-Related Laws within 180 days of the effective date of this Order, or for new Deputies or posse members, within 90 days of the start of their service.  MCSO shall provide all Deputies with 4 hours of Training each year thereafter.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

MCSO did not deliver the 2017 ACT during this reporting period.

WAI 36953

During this reporting period, the Training Division continued to develop the ACT for the current year.  MCSO is considering retaining a vendor to provide enhanced elements on implicit bias, fair and impartial decision-making, and cultural competency since MCSO does not have this expertise within the Office.  The slow pace of the development process raises concerns regarding the successful delivery of the curriculum before the end of the calendar year.  As previously noted, we believe that the many issues affecting the development of the ACT stem from a failure on the part of the Training Division to adhere to the Training Cycle as adopted by GG-1.  Policy GG-1 was adopted in May 2017 and revised in May 2018.  Phase 2 compliance is predicated upon MCSO adhering to the requirements of the issued policy.  We advise MCSO that a continued failure to follow the needs of its published policy may jeopardize compliance.

During our October site visit, MCAO advised us that a training component for discretionary searches was nearing completion.  The lesson plan still requires review.  It remains undecided if the discretionary search component would be included in the ACT or delivered as a stand-alone curriculum.

MCSO delivered the Detention, Arrests, and Immigration-Related Laws Training once in September to 25 personnel (19 sworn, six Posse members).  No staff required remedial testing.

**Paragraph 51.**   *The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:*

a.   *an explanation of the difference between various police contacts according to the level of police intrusion and the requisite level of suspicion; the difference between reasonable suspicion and mere speculation; and the difference between voluntary consent and mere acquiescence to police authority;*

b.   *guidance on the facts and circumstances that should be considered in initiating, expanding or terminating an Investigatory Stop or detention;*

c.   *guidance on the circumstances under which an Investigatory Detention can become an arrest requiring probable cause;*

d.   *constitutional and other legal requirements related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, including the requirements of this Order;*

e.   *MCSO policies related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, and the extent to which past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;*

f.   *the circumstances under which a passenger may be questioned or asked for identification;*

WAI 36954

g.   *the forms of identification that will be deemed acceptable if a driver or passenger (in circumstances where identification is required of them) is unable to present an Arizona driver's license;*

h.   *the circumstances under which an officer may initiate a vehicle stop in order to investigate a load vehicle;*

i.   *the circumstances under which a Deputy may question any individual as to his/her alienage or immigration status, investigate an individual's identity or search the individual in order to develop evidence of unlawful status, contact ICE/CBP, await a response from ICE/CBP and/or deliver an individual to ICE/CBP custody;*

j.   *a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause to believe that a vehicle or an individual is involved in an immigration-related state crime, such as a violation of the Arizona Human Smuggling Statute, as drawn from legal precedent and updated as necessary; the factors shall not include actual or apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a Hispanic day laborer;*

k.   *a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause that an individual is in the country unlawfully, as drawn from legal precedent and updated as necessary; the factors shall not include actual or apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a day laborer;*

l.   *an emphasis on the rule that use of race or ethnicity to any degree, except in the case of a reliable, specific suspect description, is prohibited;*

m.   *the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;*

n.   *Provide all trainees a copy of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in Melendres v. Arpaio and this Order, as well as a summary and explanation of the same that is drafted by counsel for Plaintiffs or Defendants and reviewed by the Monitor or the Court; and*

o.   *Instruction on the data collection protocols and reporting requirements of this Order, particularly reporting requirements for any contact with ICE/CBP.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

The 2018 ACT remained under development during this reporting period.

WAI 36955

### d. Supervisor and Command Level Training

**Paragraph 52.**   *MCSO shall provide Supervisors with comprehensive and interdisciplinary Training on supervision strategies and supervisory responsibilities under the Order.   MCSO shall provide an initial mandatory supervisor training of no less than 6 hours, which shall be completed prior to assuming supervisory responsibilities or, for current MCSO Supervisors, within 180 days of the Effective Date of this Order.   In addition to this initial Supervisor Training, MCSO shall require each Supervisor to complete at least 4 hours of Supervisor-specific Training annually thereafter.   As needed, Supervisors shall also receive Training and updates as required by changes in pertinent developments in the law of equal protection, Fourth Amendment, the enforcement of Immigration-Related Laws, and other areas, as well as Training in new skills.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

MCSO delivered the Supervisor Responsibilities: Effective Law Enforcement (SRELE) Training eight times to a total of 175 sworn supervisory personnel.  No personnel required test remediation.  The SRELE train-the-trainer was delivered previously to 15 personnel.  Total personnel receiving SRELE training was 190.

**Paragraph 53.**  *The Supervisor-specific Training shall address or include, at a minimum:*

a.   *techniques for effectively guiding and directing Deputies, and promoting effective and constitutional police practices in conformity with the Policies and Procedures in Paragraphs 18–34 and the Fourth and Fourteenth Amendment Training in Paragraphs 48–51;*

b.   *how to conduct regular reviews of subordinates;*

c.   *operation of Supervisory tools such as EIS;*

d.   *evaluation of written reports, including how to identify conclusory, "canned," or perfunctory language that is not supported by specific facts;*

e.   *how to analyze collected traffic stop data, audio and visual recordings, and patrol data to look for warning signs or indicia of possible racial profiling or unlawful conduct;*

f.   *how to plan significant operations and patrols to ensure that they are race-neutral and how to supervise Deputies engaged in such operations;*

g.   *incorporating integrity-related data into COMSTAT reporting;*

h.   *how to respond to calls from Deputies requesting permission to proceed with an investigation of an individual's immigration status, including contacting ICE/CBP;*

i.   *how to respond to the scene of a traffic stop when a civilian would like to make a Complaint against a Deputy;*

WAI 36956

j.  *how to respond to and investigate allegations of Deputy misconduct generally;*

k.  *evaluating Deputy performance as part of the regular employee performance evaluation; and*

l.  *building community partnerships and guiding Deputies to do the Training for Personnel Conducting Misconduct Investigations.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

The 2018 SRELE curriculum was previously approved for delivery.  The curriculum previously incorporated all requirements of this Paragraph.

WAI 36957

## Section 7: Traffic Stop Documentation and Data Collection

**COURT ORDER VIII.    TRAFFIC STOP DOCUMENTATION AND DATA COLLECTION AND REVIEW**

For Paragraphs 54 and 55, in particular, we request traffic stop data from MCSO.  The following describes how we made that request and how we handled the data once we received it.  These data may also be referred to in other areas of Section 7 and the report as a whole.

In selecting traffic stop cases for our compliance review, we modified our statistical technique in that, rather than selecting a representative random sample of 100 cases per quarter, we instead pulled a sample of about 35 cases per month (or 105 cases per quarter).  Our original selection of a sample size of 35 cases was based on information from MCSO TraCS data that reported the average number of traffic stops per month was fewer than 2,000 during the April 2014-June 2015 time period when TraCS data were first available.  The selection of 35 cases reflects a sample based on this average per month.  This gave us a 95 percent confidence level (the certainty associated with our conclusion).

We continue to pull our monthly sample of traffic stop cases from the six Districts (Districts 1, 2, 3, 4, 6, and 7) and Lake Patrol.  By way of background, MCSO reported a total of 3,740 cases of traffic stop events for these areas between January 1-March 31, 2018 (averaging 1,247 per month).  This number of traffic stops represents a significant decline from previous reporting periods.  We discussed this issue with MCSO during our April 2018 site visit.  MCSO personnel informed us that they were aware of the issue and were exploring ways to ensure that deputies effectively perform their duties, which includes the enforcement of traffic laws.

Once we received files each month containing traffic stop case numbers from MCSO, denoting from which area they came, we selected a sample of up to 35 cases representing the areas and then selected a subsample averaging 10 cases, from the 35 selected cases, to obtain CAD audiotapes and body-worn camera recordings.  Our sampling process involved selecting a sample of cases stratified by the areas according to the proportion of specific area cases relative to the total area cases.  Stratification of the data was necessary to ensure that each area was represented proportionally in our review.  Randomization of the cases and the selection of the final cases for CAD review were achieved using a statistical software package (IBM SPSS Version 22), which contains a specific function that randomly selects cases and that also allows cases to be weighted by the areas.  Our use of SPSS required that we first convert the MCSO Excel spreadsheet into a format that would be readable in SPSS.  We next pulled the stratified sample each month for the areas and then randomly selected a CAD audio subsample from the selected cases.  In February 2016, we began pulling cases for our body-worn camera review from the audio subsample.  Since that time, we began pulling additional samples for passenger contacts and persons' searches (10 each per month).  The unique identifiers for these two samples were relayed back to MCSO personnel, who produced documentation for the selected sample (including the CAD documentation for the subsample).

WAI 36958

On October 10, 2014, the Court issued an Order Granting Stipulation to Amend Supplemental/Permanent Injunction/Judgment Order (Document 748). The stipulation affects Paragraphs 57, 61, 62, and Paragraph 1.r.xv.; and has been incorporated in the body of this report. The stipulation referenced amends the First Order, and will be addressed in Section 7.

### *a. Collection of Traffic Stop Data*

**Paragraph 54.** *Within 180 days of the Effective Date, MCSO shall develop a system to ensure that Deputies collect data on all vehicle stops, whether or not they result in the issuance of a citation or arrest. This system shall require Deputies to document, at a minimum:*

a.    *the name, badge/serial number, and unit of each Deputy and posse member involved;*

b.    *the date, time and location of the stop, recorded in a format that can be subject to geocoding;*

c.    *the license plate state and number of the subject vehicle;*

d.    *the total number of occupants in the vehicle;*

e.    *the Deputy's subjective perceived race, ethnicity and gender of the driver and any passengers, based on the officer's subjective impression (no inquiry into an occupant's ethnicity or gender is required or permitted);*

f.    *the name of any individual upon whom the Deputy runs a license or warrant check (including subject's surname);*

g.    *an indication of whether the Deputy otherwise contacted any passengers, the nature of the contact, and the reasons for such contact;*

h.    *the reason for the stop, recorded prior to contact with the occupants of the stopped vehicle, including a description of the traffic or equipment violation observed, if any, and any indicators of criminal activity developed before or during the stop;*

i.    *time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; time a release was made without citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere or Deputy's departure from the scene;*

j.    *whether any inquiry as to immigration status was conducted and whether ICE/CBP was contacted, and if so, the facts supporting the inquiry or contact with ICE/CBP, the time Supervisor approval was sought, the time ICE/CBP was contacted, the time it took to complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual;*

k.    *whether any individual was asked to consent to a search (and the response), whether a probable cause search was performed on any individual, or whether a pat-and-frisk search was performed on any individual;*

WAI 36959

*l.*    *whether any contraband or evidence was seized from any individual, and nature of the contraband or evidence; and*

*m.*    *The final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without citation.*

**Phase 1:**  In compliance

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 26, 2018.

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- GI-1 (Radio and Enforcement Communications Procedures), most recently amended on April 19, 2018.

- GJ-3 (Search and Seizure), most recently amended on March 2, 2018.

**Phase 2:**  Deferred

To verify the information required for this Paragraph, MCSO created, and we reviewed, the Vehicle Stop Contact Form (VSCF), the Vehicle Stop Contact Form Supplemental Sheet, the Incidental Contact Receipt, and the Written Warning/Repair Order, all in electronic form, for those motorists who, during this reporting period, committed a traffic violation or operated a vehicle with defective equipment and received a warning.  We also reviewed the Arizona Traffic Ticket and Complaint Forms issued for violations of Arizona Statutes, Internet I/Viewer Event Unit printout, Justice Web Interface printout, and any Incident Report associated with the event.  We selected a sample of 105 traffic stops conducted by deputies from July 1-September 30, 2018, for the purposes of this review; and assessed the collected data from the above-listed documents for compliance with Subparagraphs 54.a.-54.m.  All of the listed documentation was used for our review of the following subsections of this Paragraph.

The Paragraph requires that MCSO create a system for data collection.  The data collected pursuant to this Paragraph will be captured in the Early Identification System, which we discuss further in this report.

Paragraph 54.a. requires MCSO to document the name, badge/serial number, and unit of each deputy and Posse member involved.  Our review indicated that in the 105 vehicle traffic stops, there were 20 cases where the deputy's unit had another deputy assigned to the vehicle or one or more other deputy units or Posse members were on the scene.  In 18 of the 20 cases where there were multiple units or deputies on a stop, the deputy properly documented the name, badge, and serial number of the deputies and Posse members on the VSCF.  In one case, a deputy who was listed on the CAD document and prepared an Assisting Deputy and Body-worn Camera Log was not listed on the VSCF.  In one case, a Posse member was observed at the scene of the stop

WAI 36960

during a review of the BWC video; however, the deputy did not effectively document the presence of the Posse member.  In the 30 cases we reviewed for passenger contacts under Subparagraph 54.g., there were 14 cases where there were multiple units or deputies on a stop. In 12 of the 14 cases, the deputy properly documented the required information on the VSCF. In two cases, the deputies did not effectively document the presence of Posse members who were at the scene of the traffic stops.  In the 30 cases we reviewed for searches of persons under Subparagraph 54.k., there were 19 cases where the deputy's unit had another deputy assigned to the vehicle, or one or more other deputies or Posse members were on the scene.  In 17 of the 19 cases, the deputy properly documented the required information on the VSCF.  In two cases, the deputies did not effectively document the presence of Posse members who were at the scene of the traffic stops.  During our October 2018 site visit, we discussed the issue of MCSO deputies not consistently documenting the presence of other units and deputies at traffic stops.

For this reporting period, all of the primary deputies indicated their own serial numbers for every stop they initiated.  We review the VSCF, I/Viewer Event document, the Justice Web Interface, and the CAD printout to determine which units are on the scene.  If back-up units arrive on a scene and do not announce their presence to dispatch, CAD does not capture this information.  A TraCS change was made to the VSCF during 2016 to secure this information. MCSO added a drop-down box so the deputy could enter the number of units on the scene and the appropriate fields would be added for the additional deputies.  While this addition is an improvement, if the deputy fails to enter the number of additional units on the form, the drop-down boxes do not appear.

The identification of personnel on scenes is a core issue in this case, and we shall consistently evaluate MCSO's measure of compliance with this requirement.  This Paragraph requires that all deputies on the scene be identified with their names, and serial and unit numbers, on the appropriate forms.  For this reporting period, MCSO attained a compliance rate of 89%.  MCSO shall remain in compliance with this requirement during this reporting period; however, MCSO shall be required to attain a compliance rate of greater than 94% to remain in compliance in the next reporting period.

Paragraph 54.b. requires MCSO to document the date, time, and location of the stop, recorded in a format that can be subject to geocoding.  Our reviews of the CAD printout for all 105 traffic stops in our sample indicated that the date, time, and location is captured with the time the stop is initiated and the time the stop is cleared.  In previous reporting periods, we noted instances where the GPS coordinates could not be located on the documentation received (CAD printout/I/Viewer).  We contacted MCSO about this issue, and MCSO now provides us with the GPS coordinates via a separate document that lists the coordinates for the traffic stop sample we provide.  MCSO uses GPS to determine location for the CAD system.  GPS collects coordinates from three or more satellites to enhance the accuracy of location approximation.  The data from the satellites can be decoded to determine the longitude and latitude of traffic stop locations should that be necessary.  During our quarterly site visits, we review the GPS coordinates with CID personnel to ensure the accuracy of the data.  The CAD system was upgraded in 2014 to include geocoding of traffic stops.  CID continues to provide us with a printout of all case

WAI 36961

numbers in the sample containing the associated coordinates. For this reporting period, the CAD or I/Viewer system contained the coordinates in about 43% of the cases. In a separate spreadsheet, MCSO provided GPS coordinates for all 105 cases we reviewed, for 100% compliance with this portion of the Subparagraph.

Occasionally, the CAD time of stop and end of stop time do not exactly match those listed on the Vehicle Stop Contact Form, due to extenuating circumstances the deputy may encounter. During this reporting period, we found one instance where the end time on the VSCF Contact differed by 10 minutes from the CAD printout. We will follow up with MCSO regarding the specifics of this case during our next site visit. In monthly audits of traffic stop data, the Bureau of Internal Oversight (BIO) reviews the beginning/ending times of the stops and sends Action Forms to the Districts when there are discrepancies. The CAD system is more reliable than the VSCF in determining stop times, as it is less prone to human error. When the deputy verbally advises dispatch that s/he is conducting a traffic stop, the information is digitally time-stamped into the CAD system without human input; and when the deputy clears the stop, s/he again verbally advises dispatch.

During our April 2016 site visit, we discussed with MCSO the possibility of using the CAD printout instead of the TraCS data to determine stop times. We determined that using the CAD system to determine stop end times created additional challenges. However, a decision was made to use the CAD printout to determine traffic stop beginning and ending times for data analysis. MCSO issued Administrative Broadcast 16-62 on June 29, 2016, which indicated that, beginning with the July 2016 traffic stop data collection, the stop times captured on the CAD system would be used for reporting and analytical purposes. Several additional TraCS technical changes were made and implemented in 2016. Some of the changes implemented include: a feature that automatically imports the CAD time onto the VSCF; mandatory fields requiring the selection of an ARS Offense Classification (Civil, Traffic, Criminal Traffic, Criminal, or Petty Offense) – including a series of five questions (and responses) to document circumstances that frequently require a stop to be prolonged; the addition of help features to assist deputies using the TraCS system; the addition of a search feature that allows for the search of citations and warnings by a driver's last name or license plate; and permitting a reviewing supervisor to reject a VSCF if a deficiency is identified and to request that a deputy make the appropriate changes to the document.

The first change listed above should ensure that the start and end time of the stop from the CAD system and VSCF should be consistent. MCSO remains in compliance with this Subparagraph.

Paragraph 54.c. requires MCSO to document the license plate and state of the subject vehicle. During this reporting period, we found that deputies properly recorded the vehicle tag number and state of issuance in 105 of 105 cases.

MCSO remains in compliance with this Subparagraph, with a compliance rate of 100%.

WAI 36962

Paragraph 54.d. requires MCSO to document the total number of occupants in the vehicle when a stop is conducted.  The VSCF, completed by the deputy on every traffic stop, is used to capture the total number of occupants and contains a separate box on the form for that purpose. EB-2 (Traffic Stop Data Collection) requires deputies to collect data on all traffic stops using the VSCF; this includes incidental contacts with motorists.  In 44 of the 105 traffic stops we reviewed, the driver had one or more passengers in the vehicle (79 total passengers).  In 42 of the 44 cases, the deputies properly documented the total number of occupants in the vehicles. In two cases, the deputies did not document the presence of passengers on the VSCF.  In one case, a White male driver was stopped for speeding.  The deputy indicated that the driver was the only occupant of the vehicle.  During a review of the body-worn camera recording, a White female passenger was observed in the front passenger seat of the vehicle.  MCSO's Audits and Inspections Unit (AIU) identified the same issue during its inspection of traffic stop data.  AIU issued a BIO Action Form to the District personnel to ensure corrective action is taken.  In one case, a Latino driver was stopped for speeding.  The deputy indicated that the driver was the only occupant of the vehicle.  During a review of the body-worn camera recording, a Latino male (child) passenger was observed in the rear passenger seat of the vehicle.  The Latino passenger was identified during the review of the body-worn camera recording of the traffic stop.  We will follow up with MCSO regarding this case.

With a compliance rate of 95%, MCSO remains in compliance with this Subparagraph.

Paragraph 54.e. requires MCSO to document the perceived race, ethnicity, and gender of the driver and any passengers, based on the deputy's subjective impression.  (No inquiry into the occupant's ethnicity or gender is required or permitted.)  In 44 of the 105 stops from the traffic stop data sample, there was more than one occupant in the vehicle (79 total passengers).  In our sample of 30 that contained body-worn camera recordings, we identified one stop in which the gender of the driver was listed as male, when it should have been listed as female on the VSCF. We discussed this case with MCSO during our October 2018 site visit.

Sixty-eight, or 65%, of the 105 traffic stops involved White drivers.  Twenty-six, or 25%, of the 105 stops involved Latino drivers.  Eight, or 8%, of the 105 traffic stops involved Black drivers. Two, or less than 1%, of the 105 traffic stops involved American Indian/Alaskan Native drivers. One, or 1%, of the 105 traffic stops involved an Asian/Pacific Islander driver.  Sixty-one traffic stops, or 58%, resulted in citations.  The breakdown of those motorists issued citations is as follows: 40 White drivers (66% of drivers who were issued citations); 14 Latino drivers (23% of drivers who were issued citations); five Black drivers (5% of drivers who were issued citations); one Asian/Pacific Islander driver (2% of drivers who were issued citations); and one American Indian/Alaskan Native driver (2% of drivers who were issued citations).  Forty-one, or 39%, of the 105 traffic stops we reviewed resulted in a written warning.  The breakdown of those motorists issued warnings is as follows: 25 White drivers (61% of the total who were issued warnings); 11 Latino drivers (27% of the drivers who were issued warnings); three Black drivers (7% of the drivers who were issued warnings); and one Asian or Pacific Islander driver (2% of the drivers who were issued warnings).  There were three stops in which the deputy did not issue a warning or a citation.  In two of the cases, the drivers were found to not have

WAI 36963

violated any traffic laws. In those two stops, the deputies issued the drivers Incidental Contact Receipts. In one case, a White male driver was arrested for driving under the influence. The deputy prepared a report for review by the Maricopa County Attorney's Office in relation to potential criminal charges against the driver.

In one case, which was reviewed under Paragraph 54.k., the deputy, while processing a Latino driver for driving under the influence, asked the driver whether he was White or Latino, which is in violation of MCSO policy and this requirement. We will follow up with MCSO on this issue.

This Paragraph requires deputies to document the perceived race, ethnicity, and gender of any passengers whether contact is made with them or not. By way of our previous reviews as well as BIO's inspections, MCSO has learned of deputies' failure to properly document the race or ethnicity of passengers. MCSO's policy does not require that the names of passengers be documented unless a passenger is contacted and the deputy requests and obtains the identity of the passenger. In such instances, the passenger's name and the reason for the contact is required to be documented on the VSCF and an Incidental Contact Receipt. In addition, in such situations, MCSO's policy requires that the deputy provide the passenger with a copy of the Incidental Contact Receipt. During our October 2018 site visit, we discussed with MCSO that we have noted an increase in the number of passengers being contacted and not being provided with an Incidental Contact Receipt. This trend continues.

During the last two reporting periods of 2017, supervisors attended MCSO's Supervisor Responsibilities: Effective Law Enforcement (SRELE) Training, which included a video component, accompanied with a discussion, specific to traffic stops and properly classifying the ethnicity of drivers and persons with Latino surnames on the VSCFs. Upon completion of the SRELE Training, supervisors provided roll-call training on this topic for sworn personnel.

We have noted that MCSO has improved the accuracy of documenting the perceived race or ethnicity of drivers and passengers.

For this reporting period, MCSO remains in compliance with this requirement.

Paragraph 54.f. requires that MCSO record the name of any individual upon whom the deputy runs a license or warrant check (including the subject's surname). Our review found that deputies recorded the name of each driver and passenger on the VSCF in each instance that a driver's license or warrant check was run. In addition, MCSO's policy requires that deputies perform a license plate check on each vehicle stopped by its deputies, as well as warrant checks on every driver stopped by its deputies. For this reporting period, we found that of the 105 traffic stops we reviewed, 105 included a check on the license plate. There were 102 stops where the deputies ran warrant checks on the drivers. In three cases, there was no explanation provided as to why the deputies failed to perform a warrant check on the drivers. During its monthly inspections of the traffic stop data, BIO identified these same three cases that we identified in which a warrant check was not run on the drivers. BIO issued Action Forms in those three cases. In one of the cases, the deputy did not perform a warrant check on a driver

WAI 36964

after he realized his misread the license plate on the vehicle and determined that there was no traffic violation.  The deputy issued an Incidental Contact Receipt to the driver.

MCSO's compliance rate is 100%, and MCSO remains in compliance with this Subparagraph.

Paragraph 54.g. requires the deputy to document whether contact was made with any passengers, the nature of the contact, and the reasons for the contact.  Due to the low number of cases where contact is made with passengers in our sample of 105 traffic stop cases per quarter, we pulled an additional sample for those cases involving passenger contacts.  For this reporting period, we reviewed 30 traffic stops where the deputy had interaction with one or more passengers.  Each passenger contact is described in detail in Paragraph 25.d.  All passenger contacts in the traffic stops we reviewed for Paragraph 25.d. were noted in the VSCFs.

To ensure that deputies are accurately capturing passenger information and to verify if passengers are contacted, we compare the number of passengers listed by the deputy with the number of passengers entered in the passenger drop-down box on the Vehicle Stop Contact Form.  We also review any Incidental Contact Receipts issued to passengers by deputies.  We also review the deputies' notes on the VSCF, the Arizona Citation, and the CAD printout for any information involving the passengers.  We reviewed MCSO's I/Viewer System and the Justice Web Interface (JWI) to verify if a record check was requested for the driver or any passengers.

In our experience, the vast majority of traffic stops do not require contact with a passenger unless the driver is arrested, the vehicle will be towed, or there are minor children in the vehicle that will need care.  The other type of traffic stop where we noted that deputies routinely contact passengers is when upon approaching a vehicle, the deputy detects the smell of burnt marijuana.  In the stops we reviewed where this has occurred, deputies have inquired if the driver or any passengers possess a medical marijuana card.  In other instances, the deputy may, for safety purposes, approach the vehicle from the passenger side, which often results in contact with the passenger who may be seated in the front seat.

As noted under Paragraph 25.d, we have noted that there has been an increase in the number of passengers being contacted and not being provided with an Incidental Contact Receipt when required.  During this reporting period, MCSO provided the Incidental Contact Receipt when required in 36% of the cases.  While MCSO consistently documents passenger contacts in the VSCFs in compliance with this subparagraph, they should also consistently follow their own policy, which requires Incidental Contact Receipts in these instances as well.

WAI 36965

Paragraph 54.h. requires deputies to record, prior to the stop, the reason for the vehicle stop, including a description of the traffic or equipment violation observed, and any indicators of criminal activity developed before or during the stop. For this reporting period, we identified a random sample of 10 cases from the 35 cases we initially requested each month, and requested CAD audio and body-worn camera (BWC) footage for those cases. We listened to CAD dispatch audio recordings, reviewed the CAD printouts, and reviewed body-worn camera recordings for 30 traffic stops from the sample of 105 traffic stops used for this review; and found that the deputies advised Communications of the reason for the stop, location of the stop, license plate, and state of registration for all 30 stops.

For the remaining 75 traffic stops where body-worn camera recordings and CAD audiotapes were not requested, we review the CAD printout and the VSCF to ensure that the reason for the stop has been captured. These forms are included in our monthly sample requests. The dispatcher enters the reason for the stop in the system as soon as the deputy verbally advises Communications of the stop, location, and tag number. The VSCF and the CAD printout documents the time the stop begins and when it is concluded – either by arrest, citation, or warning. Deputies need to be precise when advising dispatch of the reason for the traffic stop, and likewise entering that information on the appropriate forms.

MCSO's compliance rating for this Subparagraph is 100%.

Paragraph 54.i. requires deputies to document the time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; the time a release was made without a citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere, or the deputy's departure from the scene. In our review of the documentation provided, the CAD printouts, the Vehicle Stop Contact Forms created by MCSO, along with the E-Ticketing system and the Arizona Ticket and Complaint Form, capture the information required. As we noted in Subparagraph 54.b., the stop times on the CAD printout and the Vehicle Stop Contact Form vary slightly on occasion. We understand that this may occur due to extenuating circumstances, and we will report on those instances where there is a difference of five minutes or more from either the initial stop time or the end time.

We review the circumstances of each stop and the activities of the deputies during each stop to assess whether the length of the stop was justified. During this reporting period, we did not identify any stops that were extended for an unreasonable amount of time.

Supervisors conducted timely reviews and discussions of 101 of the 105 VSCFs reviewed. Deputies accurately entered beginning and ending times of traffic stops in 105 of the 105 cases that we reviewed. MCSO accurately entered the time citations and warnings were issued in all 105 cases.

MCSO remains in compliance with this Subparagraph.

WAI 36966

Paragraph 54.j. requires MCSO to document whether any inquiry as to immigration status was conducted and whether ICE/CBP was contacted, and if so, the facts supporting the inquiry or contact with ICE/CBP, the time supervisor approval was sought, the time ICE/CBP was contacted, the time it took to complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual.

On November 7, 2014, a United States District Court Judge issued an Order permanently enjoining enforcement of Arizona Revised Statute (A.R.S.) 13-2319, commonly referred to as the Arizona Human Smuggling Act. On November 17, 2014, MCSO issued Administrative Broadcast 14-75, prohibiting deputies from enforcing the above state statute, including arresting, detaining, or questioning persons for suspected (or even known) violations of the act and from extending the duration of traffic stops or other deputy-civilian encounters to do so.

We reviewed 105 traffic stops submitted for this Paragraph, and found that none of the stops involved any contacts with ICE/CBP. None of the stops we reviewed involved any inquires as to immigration status. In addition, our reviews of Incident Reports and Arrest Reports conducted as part of the audits for Paragraphs 89 and 101 revealed no immigration status investigations. MCSO remains in compliance with this Subparagraph.

Paragraph 54.k. requires MCSO to document whether any individual was asked to consent to a search (and the response), whether a probable-cause search was performed on any individual, or whether a pat-and-frisk search was performed on any individual. During our January 2018 site visit, we discussed with MCSO whether any other method may be feasible to identify a larger population of searches of individuals specific to the requirements of this Paragraph. MCSO's response was that the current method is appropriate, and that there may be more cases identified once deputies properly document the searches of persons consistent with this Paragraph. We encourage MCSO to continue to explore methods to identify the overall population of cases that fit the criteria of this Paragraph. Due to the limited number of cases being identified that fit the criteria of this Paragraph, MCSO's rate of compliance continues to stagnate. In the last reporting period of 2017, we identified two cases in which deputies documented on the VSCFs that a consent search of individuals had occurred. However, in one case, a pat-and-frisk search was performed on the driver and passenger, without requesting or obtaining consent; and in the other case, no search appeared to have been conducted. During the first reporting period of 2018, we identified only one case that met the criteria of this Paragraph. During the second reporting period of 2018, we identified four cases that met the criteria of this Paragraph.

MCSO's Compliance Report for the 17th Quarter reporting period indicates that MCSO is considering training opportunities for deputies to assist them to better identify and document searches of persons. We continue to recommend that MCSO implement training to ensure that deputies properly document consent searches of persons, probable-cause searches of persons, and pat-and-frisk searches of persons.

WAI 36967

The method MCSO currently employs to identify our sample of cases to review is to identify the population of all traffic stops in which searches of individuals were documented on the VSCF. Once that population is identified, a random sample of 10 traffic stops from each month (30 total for the reporting period) is identified and reviewed. In addition, we also review any cases in which the deputies performed searches of individuals in the sample of 105 traffic stops reviewed in relation to Paragraphs 25 and 54 and the sample of 30 traffic stops reviewed in relation to Subparagraphs 25.d. and 54.g. Generally, we review 165 traffic stops each reporting period to identify stops where a deputy may have performed a search of an individual specific to the requirements of this Subparagraph. However, in some instances, there are some stops that are reviewed for compliance in relation to both Paragraph 54.k and Subparagraphs 25.d. and 54.g., which means that total number of traffic stops reviewed would be less than 165. There were no cases that met these criteria in our sample of 105 traffic stops reviewed in relation to Paragraphs 25 and 54. In relation to the sample of 30 traffic stops reviewed in relation to Subparagraphs 25.d. and 54.g., there were three stops identified that met the criteria of this Subparagraph.

- In one case, a deputy stopped a White male for speeding. The vehicle was occupied by a Latino passenger. The deputy noted that he smelled the odor of fresh marijuana. The deputy documented on the VSCF that he requested and obtained consent to search the driver and passenger. However, a review of the body-worn camera recording reveals that the deputy did not request and obtain consent from the driver and passenger for the conducting of a search of their persons. The deputy conducted a pat-down of the driver and passenger after he requested them to exit the vehicle. We discussed this case with MCSO during our October 2018 site visit.

- In one case, a deputy stopped a White male for failure to maintain a lane of traffic. The vehicle was occupied by a Latina passenger. During the stop, the driver was arrested for a felony probation violation warrant. Also, narcotic paraphernalia was located in the vehicle. The deputy asked the passenger for consent to conduct a search of her purse and her person and she agreed. Due to the angle of the body-worn camera device, one is unable to view the search of the passenger. MCSO's policy concerning consent searches, GJ-3 (Search and Seizure), requires that when a deputy seeks consent for a search, that the individual is to be informed of the right to refuse and revoke consent at any time. In this instance, the deputy did not inform the passenger of her right to refuse or revoke the consent to search.

- In one case, a Black female was stopped for speeding. The vehicle was occupied by a Black male passenger. The driver was arrested for driving under the influence and the vehicle was towed and impounded. The passenger was offered a courtesy ride. Prior to the courtesy ride a deputy conducted a pat-down search of the passenger. The search was not documented on the VSCF.

In the sample of 30 traffic stops identified in relation to this Subparagraph, there were six cases that appeared to meet the criteria specific to searches of individuals.

WAI 36968

- In one case, a deputy stopped a Latino driver for speeding.  The vehicle was occupied by a White male passenger.  The driver did not have any identification on his person.  His driver's license was suspended and he had a warrant for his arrest.  The driver was arrested.  The passenger was offered a courtesy ride and a pat-down of the passenger was conducted prior to the courtesy ride.  The search of the passenger was not documented on the VSCF.

- In one case, a deputy stopped a White female driver for driving with one headlight.  The driver was driving with a suspended driver's license and the deputy towed and impounded the vehicle.  The deputy offered the driver a courtesy ride and conducted a pat-down of the driver.  The driver later declined the courtesy ride.

- In one case, a deputy stopped a Latino driver for driving with a suspended registration.  The deputy indicated on the VSCF in the driver's search field that a "protective sweep" was conducted of the driver.  The body-worn camera was not operable at the beginning of the stop, so the event related to the search was not recorded.  We discussed this case with MCSO during our October 2018 site visit and we will continue to follow up on the issue.  MCSO may want to consider eliminating the option to select "protective sweep" in relation to searches of persons on the VSCF.

- In one case, a deputy stopped a White male driver for speeding.   As the deputy approached the driver, the driver informed the deputy that he had a firearm and stated it was in the backpack on the passenger seat.  The deputy advised that driver that they would jointly go through the backpack together.  The deputy then seized the handgun for the duration of the stop, with the driver's consent.  The actions of the deputy appeared appropriate; however, the deputy erroneously classified the search on the VSCF as a search of an individual.

- In one case, a deputy stopped a Black male for speeding.  The vehicle was occupied by a Black male passenger, a Black female passenger, and a White male passenger.  During the stop, the deputy detected the odor of marijuana coming from the interior of the vehicle.   The driver was arrested for driving under the influence and driving with a suspended driver's license.   During a search of the vehicle, marijuana and narcotic paraphernalia was located.  The Black male passenger was arrested for possession of narcotics.   The White male passenger and White female passenger both provided consent to be searched.  The deputy conducted a search of both individuals, with no contraband being found.  However, in relation the search of the White male, the VSCF indicates that no search of his person was conducted.  In addition, based on a review of the body-worn camera recordings, the passengers were not informed of their right to refuse or revoke the consent to search.

- In one case, a deputy stopped a White male driver for speeding.   The vehicle was occupied by a White female passenger, a White male passenger, and a Latino passenger.  During the stop, the deputy detected the odor of marijuana coming from the interior of the vehicle.   The driver was arrested for possession of narcotics.   The White male

WAI 36969

passenger was also arrested for possession of narcotics. The White female passenger consented to a search of her purse. No contraband was found. Based on a review of the body-worn camera recordings, the White female passenger was not informed of her right to refuse or revoke the consent to search.

The remaining cases were not specific to the requirements of this Subparagraph, as they involved searches of individuals incident to arrest.

MCSO has indicated that it does not require its deputies to use Consent to Search Forms as the primary means for documenting consent searches. MCSO requires that deputies document requests to conduct consent searches by way of video-recording the event via the BWCs. In the event the BWC is not operational, MCSO policy requires deputies to document requests to conduct consent searches on the Consent to Search Form. MCSO reports that deputies have electronic access to the Consent to Search Forms. We continue to recommend that MCSO revisit the requirements of this section of the policy and require deputies to read the Consent to Search Form to the subject and require a signature from the individual for every request for consent to search unless the search is an actual search incident to arrest. Due to the small population of cases that MCSO and the Monitoring Team have identified, it is important that deputies accurately document each search and/or request to a consent search, as required by this Subparagraph, to attain and maintain compliance with the requirement. Based on some of the cases we reviewed this reporting period, it appears that some deputies are not aware of the policy requirements as it relates to informing individuals that a consent search may be refused; or, if granted, that the consent search may be revoked by the individual at any time. We recommend that MCSO implement training on the specific policy requirements regarding consent searches.

In the last reporting period of 2017, MCSO's compliance rate with this Subparagraph was 67%, with only three cases identified. During the first reporting period of 2018, we identified only one case that was applicable to this requirement and determined that the compliance status would be deferred. Due to the low number of cases identified in the last reporting period, coupled with the inaccuracies in the some of the cases that were reviewed, we again determined that the compliance status would be deferred. Based on the number of cases reviewed this reporting period that fit the criteria of this Subparagraph, MCSO's compliance rate is 71%.

Paragraph 54.l. requires MCSO to document whether any contraband or evidence was seized from any individual, and the nature of the contraband or evidence. Of a total sample of 165 stops reviewed for the reporting period, which includes 105 stops for Paragraph 25; 30 stops for Subparagraph 54.k.; and 30 stops for Subparagraphs 25.d and 54.g., there were 20 cases identified in which MCSO deputies documented the seizure of contraband or evidence on the VSCFs. A summary of the cases is listed below. There were six cases where the deputies did not properly document the seizure of contraband or evidence on the VSCFs. A summary of those cases is also listed below. During our October 2018 site visit, we discussed with MCSO the issue of deputies failing to properly document the seizure of contraband and/or evidence on the VSCFs.

WAI 36970

During our review of the collected traffic stop data (our sample of 105) during this reporting period, we identified one case in which a license plate and a driver's license were seized by a deputy and placed into evidence. In two cases, deputies seized license plates and placed them into evidence. In one case, a deputy seized narcotics and narcotic paraphernalia and placed the items into evidence.

In the 30 cases we reviewed for searches of individuals under Subparagraph 54.k., the following items were seized by deputies and placed into evidence or safekeeping. In five cases, deputies seized driver's licenses and placed the items into evidence. In one case, the deputy seized a driver's license and a license plate and placed the items into evidence. In one case, the deputy seized marijuana and placed the item into evidence. In one case, a deputy seized narcotics and a license plate and placed the items into evidence. In one case, the deputy seized narcotics and narcotics paraphernalia and placed the items into evidence. In one case, the deputy seized a license plate and placed the item into evidence. In four cases, deputies seized driver's licenses and placed the items into evidence; however, the deputies did not list the items on the VSCFs.

In the 30 cases we reviewed for passenger contacts under Subparagraph 54.g., there were four cases in which deputies seized license plates and placed the items into evidence. In one case, a deputy seized a driver's license, a license plate, and narcotic paraphernalia and placed the items into evidence. In one case, a deputy seized several bottles containing a narcotic and placed the items into evidence. In one case, a deputy seized narcotics and placed the item on evidence; however, the deputy did not list the seizure on the VSCF. In one case, a driver's license was seized and placed into evidence; however, the deputy did not list the seizure on the VSCF. During our October 2018 site visit we discussed with MCSO the noted increase in the number of cases in which deputies were not effectively documenting the seizure of contraband or evidence on the VSCF. We noted in the previous reporting period that there was an increase in the number of errors and omissions in relation to deputies documenting the seizure of contraband or evidence on the VSCF. MCSO's compliance rate in the last reporting period was 85% and we reported that MCSO would remain in compliance with this Subparagraph for that reporting period. We also reported that MCSO would be required to attain a rate of compliance of greater than 94% to maintain compliance for this reporting period. MCSO attained a compliance rate of 70% for this reporting period. MCSO is not in compliance with this Subparagraph.

Paragraph 54.m. requires the documentation of the final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without a citation. In all 105 cases we reviewed, we found documentation indicating the final disposition of the stop; and whether the deputy made an arrest, issued a citation, issued a warning, or made a release without a citation. MCSO is in compliance with this Subparagraph.

WAI 36971

***Paragraph 55.*** *MCSO shall assign a unique ID for each incident/stop so that any other documentation (e.g., citations, incident reports, tow forms) can be linked back to the stop.*

**Phase 1:**  In compliance

- GI-1 (Radio and Enforcement Communications Procedures), most recently amended on April 19, 2018.
- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

**Phase 2:**  In compliance

To verify compliance for this Paragraph, we reviewed a sample of the Vehicle Stop Contact Forms, CAD printouts, I/Viewer documentation, citations, warning forms, and any Incident Report that may have been generated as a result of the traffic stop.

The unique identifier "went live" in September 2013 when the CAD system was implemented. This number provides the mechanism to link all data related to a specific traffic stop. The number is automatically generated by the CAD software and is sent to the deputy's MDT at the time the deputy advises Communications of the traffic stop. The unique identifier is visible and displayed at the top of the CAD printout and also visible on the Vehicle Stop Contact Form, the Arizona Traffic Citation, and the Warning/Repair Form.

We visited Districts 2, 3, and 6 and Lake Patrol during our October 2018 site visit; and found no indications from any personnel that there were recurring issues with the unique identifier, including duplicates. Once the deputy scans the motorist's driver's license, the system automatically populates most of the information into one or more forms required by the Order. If the data cannot be entered into TraCS from the vehicle (due to malfunctioning equipment), policy requires the deputy to enter the written traffic stop data electronically prior to the end of the shift. The start and end times of the traffic stop are now auto-populated into the Vehicle Stop Contact Form from the CAD system.

Since our first visit for monitoring purposes in June 2014, TraCS has been implemented in all Districts; and the unique identifier (CFS number) is automatically entered from the deputy's MDT. No user intervention is required.

To determine compliance with this requirement, we reviewed 105 traffic stop cases and reviewed the CAD printouts and the Vehicle Stop Contact Forms for all stops. We reviewed the Warning/Repair Forms, when applicable, for those stops where a warning was issued or the vehicle had defective equipment. The unique identification number assigned to each event was listed on correctly on all CAD printouts for every stop.

WAI 36972

***Paragraph 56.*** *The traffic stop data collection system shall be subject to regular audits and quality control checks. MCSO shall develop a protocol for maintaining the integrity and accuracy of the traffic stop data, to be reviewed by the Monitor pursuant to the process described in Section IV.*

**Phase 1:** Not in compliance

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- EIU Operations Manual, currently under revision.

**Phase 2:** Not in compliance

To verify compliance for this Paragraph, we reviewed the monthly audits of the traffic stop data conducted by BIO on the samples we selected. While audits require in-depth analysis, quality control checks serve as more of an inspection or spot-check of the data. We reviewed the BIO traffic stop audits for July-September 2018, and found that the audits were thorough and captured most deficiencies. During our review of the sample dataset, we identified additional deficiencies, and brought them to the attention of CID while onsite; we identify them in other areas of this report.

We reviewed the draft EIU Operations Manual, which includes procedures for traffic stop data quality assurance. During our October 2018 site visit, EIU provided an update about the status of its effort to compete the EIU Operations Manual. EIU reported that 13 of the total 30 sections of the manual had been approved, six sections were under development, and 11 sections were submitted to us for review. EIU presented a tracking table that it uses to monitor its progress in finalizing the EIU Operations Manual. We note that some sections of the EIU Operations Manual cannot be finalized, as they required finalizing methodologies related to monthly analyses of traffic stop data in accordance with the requirements of Paragraph 67. (See below.) As is discussed in Paragraph 66 below, MCSO's new vendor, CNA, is reviewing methodologies used to analyze traffic stop data; the results of their review may affect the content of those sections of the EIU Operations Manual pertaining to traffic stop data. We continue to encourage MCSO to submit completed sections of the operations manual for review and approval to enable Phase 1 compliance with those Paragraphs covered by those sections of the operations manual.

On September 8, 2015, MCSO issued Administrative Broadcast 15-96, which addressed the security of paper traffic stop forms. The procedure requires that paper forms (prior to April 1, 2014) be stored in a locked cabinet box at the District. The protocol also includes traffic stop data that may be handwritten by deputies in the field if the TraCS system is nonoperational due to maintenance or lack of connectivity. Any personnel who require access to those files must contact the Division Commander or his/her designee who will unlock the cabinet. Once the deputy accesses his file, a TraCS file log must be completed and signed by the deputy. During our October 2018 site visits to the Districts, we inspected the written (hardcopy) files and verified that all records were locked and secure, that logs were properly maintained, and that only authorized personnel had access to these files.

WAI 36973

MCSO began auditing traffic stop data in January 2014; and since April 2014, MCSO has conducted audits of the data monthly and provided those results to us.  We reviewed BIO's monthly audits of the traffic samples from July 1-September 30, 2018, and found them to be satisfactory.  MCSO conducts audits of the 105 traffic stop samples that we request each reporting period.  It also conducts a more expansive review of 30 of the 105 sample pulls we request each reporting period to include passenger contacts and persons' searches.  EB-2 also requires regularly scheduled audits of traffic stop data on a monthly basis.

As we reiterated during our recent site visits, MCSO will achieve Phase 1 compliance with this Paragraph when it incorporates in its EIU Operations Manual procedures for ensuring the integrity and accuracy of traffic stop data.  To achieve Phase 2 compliance with this Paragraph, MCSO must demonstrate ongoing use of the procedures to ensure traffic stop data quality assurance.

***Paragraph 57.***  *MCSO shall explore the possibility of relying on the CAD and/or MDT systems to check if all stops are being recorded and relying on on-person recording equipment to check whether Deputies are accurately reporting stop length.  In addition, MCSO shall implement a system for Deputies to provide motorists with a copy of non-sensitive data recorded for each stop (such as a receipt) with instructions for how to report any inaccuracies the motorist believes are in the data, which can then be analyzed as part of any audit.  The receipt will be provided to motorists even if the stop does not result in a citation or arrest.*

**Phase 1:**  In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- GJ-35 (Body-Worn Cameras), most recently amended on January 7, 2017.

**Phase 2:**  In compliance

To verify compliance for this Paragraph, we reviewed all TraCS forms for each traffic stop that were included in the sample.  In addition, we reviewed a subset of CAD audio recordings and body-worn camera footage of the stops.

The system for providing "receipts" is outlined in EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) and EB-2 (Traffic Stop Data Collection).  GJ-35 addresses the requirement that supervisors review recordings to check whether deputies are accurately reporting stop length.  In addition to GJ-35, BIO developed a Body-Worn Camera Matrix for its inspectors to review camera recordings.

The deputy should provide every person contacted on a traffic stop with an Arizona Traffic Ticket or Complaint (Citation), a Written Warning/Repair Order (Warning), or an MCSO Incidental Contact Receipt.  To verify compliance that the violator received the required

WAI 36974

"receipt" from the deputy, a signature is required, or, if the violator refuses to sign, the deputy may note the refusal on the form. We are unable to verify that motorists have been issued a receipt without a signature on the form, or the deputy advising of the refusal of the receipt from the driver. Placing "SERVED" in the signature box without any explanation does not comply with the requirement. For this reporting period, deputies issued citations or written warnings in 102 of the 105 cases we reviewed. In three cases, no warning or citation was issued. In two of the cases, the drivers were found to not have violated any traffic laws. In those two stops, the deputies issued the drivers Incidental Contact Receipts. In one case, a White male driver was arrested for driving under the influence. The deputy prepared a report for review by the Maricopa County Attorney's Office in relation to potential criminal charges against the driver.

In our review of passenger contacts, Subparagraph 54.g., there was one case where the deputy's scanner was not operational and the signature was not scanned into TraCS. In our review of searches of individuals, Subparagraph 54.k., a Latino driver was stopped for speeding and issued a citation. The signature of the driver was not obtained on the citation, and there was no explanation for the omission. The signature field contained "SERVED" instead of the driver's signature. MCSO's compliance rate with this requirement is 99%. MCSO remains in compliance with this portion of the Subparagraph.

The approved policies dictate that the CAD system will be used for verification of the recording of the initiation and conclusion of the traffic stop and that MCSO will explore the possibility of relying on the BWC recordings to verify that the stop times reported by deputies are accurate. The deputy verbally announces the stops initiation and termination on the radio, and then CAD permanently records this information. In May 2016, MCSO advised us that all deputies and sergeants who make traffic stops had been issued body-worn cameras and that they were fully operational. We verified this assertion during our July 2016 site visit; and since that time, we have been reviewing the BWC recordings to determine if stop times indicated by CAD were accurate. MCSO's Audit and Inspections Unit (AIU) conducts monthly inspections of traffic stop data, which includes an assessment as to whether the BWC video captured the traffic stop in its entirety; to verify the time the stop began; and to verify if all information on forms prepared for each traffic stop match the BWC video. AIU conducts reviews of 30 body-worn camera recordings each reporting period.

During this reporting period, we requested from MCSO 30 body-worn camera recordings for our review. We are able to use the BWC recordings that were provided for each stop to assess whether deputies are accurately reporting the stop length. The compliance rate for the sample of 30 cases selected from the 105 for using the BWC to determine if deputies are accurately reporting stop length is 100%.

WAI 36975

***Paragraph 58.***  *The MCSO shall ensure that all databases containing individual-specific data comply with federal and state privacy standards governing personally identifiable information. MCSO shall develop a process to restrict database access to authorized, identified users who are accessing the information for a legitimate and identified purpose as defined by the Parties. If the Parties cannot agree, the Court shall make the determination.*

**Phase 1:** In compliance

- GF-1 (Criminal Justice Data Systems), most recently amended on January 9, 2018.
- GF-3 (Criminal History Record Information and Public Records), most recently amended on May 24, 2018.

**Phase 2**: In compliance

To verify compliance for this Paragraph, we reviewed the applicable policies and met with Technology Management Bureau personnel to determine if any unauthorized access and/or illegitimate access to any of MCSO's database systems had occurred during this reporting period.  The policies state that the dissemination of Criminal History Record Information (CHRI) is based on federal guidelines, Arizona statutes, the Department of Public Safety (ASDPS), and the Arizona Criminal Justice Information System; and that any violation is subject to fine.  No secondary dissemination is allowed.  The policies require that the Professional Standards Bureau (PSB) provide written notification to the System Security Officer whenever it has been determined that an employee has violated the policy by improperly accessing any Office computer database system.  Every new recruit class receives three hours of training on this topic during initial Academy training.  In addition, MCSO's Chief Information Officer informed us on previous site visits that a Standard Operating Procedure (SOP) for the processing of any requests from PSB had been implemented in relation to any alleged misuse or unauthorized access to any of MCSO's database systems.  The SOP requires that the Technology Management Bureau create and maintain a tracking log of PSB requests for any database system audit logs.

During our October 2018 site visit, MCSO informed us that its Chief Information Officer was no longer employed with MCSO.  We inquired whether there had been any instances of unauthorized access to and/or any improper uses of the database systems.  We advised MCSO that we identified a case that was recently listed on the monthly summaries of closed cases from the Professional Standards Bureau (PSB), which indicated that an employee was alleged to have accessed a database for an improper purpose.  MCSO personnel reported to us that were not aware of the case, and explained that the former Chief Information Officer likely would have been the person prepared to respond to that issue.  While we understand that oftentimes there are key personnel who are aware of specific issues such as this one, MCSO has policies and procedures in place that should ensure that such information does not rest with one person.

WAI 36976

*Paragraph 59.   Notwithstanding the foregoing, the MCSO shall provide full access to the collected data to the Monitor and Plaintiffs' representatives, who shall keep any personal identifying information confidential.   Every 180 days, MCSO shall provide the traffic stop data collected up to that date to the Monitor and Plaintiffs' representatives in electronic form.   If proprietary software is necessary to view and analyze the data, MCSO shall provide a copy of the same.   If the Monitor or the Parties wish to submit data with personal identifying information to the Court, they shall provide the personally identifying information under seal.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

Electronic traffic stop data capture began on April 1, 2014.   The forms created by MCSO capture the traffic stop details required by MCSO policy and Paragraphs 25 and 54.   BIO provides the traffic stop data on a monthly basis, which includes a spreadsheet of all traffic stops for the reporting period, listing Event Numbers as described at the beginning of Section 7. All marked patrol vehicles used for traffic stops are now equipped with the automated TraCS system, and all Patrol deputies have been trained in TraCS data entry.   MCSO has provided full access to all available electronic and written collected data since April 1, 2014.   MCSO did not collect electronic data before this time.   MCSO has continued to provide full access to the traffic stop data.


### b. Electronic Data Entry

*Paragraph 60.   Within one year of the Effective Date, the MCSO shall develop a system by which Deputies can input traffic stop data electronically.   Such electronic data system shall have the capability to generate summary reports and analyses, and to conduct searches and queries.   MCSO will explore whether such data collection capability is possible through the agency's existing CAD and MDT systems, or a combination of the CAD and MDT systems with a new data collection system.   Data need not all be collected in a single database; however, it should be collected in a format that can be efficiently analyzed together.   Before developing an electronic system, the MCSO may collect data manually but must ensure that such data can be entered into the electronic system in a timely and accurate fashion as soon as practicable.*

**Phase 1:**  In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

**Phase 2:**  In compliance

WAI 36977

To verify compliance with this Paragraph, we reviewed the documents generated electronically that capture the required traffic stop data. The electronic data entry of traffic stop data by deputies in the field went online on April 1, 2015. If TraCS experiences a malfunction in the field, there is a protocol that requires the deputy to electronically enter the traffic stop data prior to the end of the shift.

MCSO continues to conduct monthly traffic stop inspections and forwards them for our review. Initially, the traffic stop data was captured on handwritten forms created by MCSO, completed by the deputy in the field, and manually entered in the database by administrative personnel located at each District. Now all traffic stop data is entered electronically, whether in the field or at MCSO District offices. Occasionally, connectivity is lost in the field due to poor signal quality, and citations are handwritten. Per policy, deputies must enter electronically any written traffic stop data they have created by the end of the shift in which the event occurred. As noted in our Paragraph 90 review, VSCFs are routinely entered into the system by the end of the shift. During our October 2018 site visit, we met with MCSO and the Parties; and reviewed the deficiencies BIO and our reviews discovered for this reporting period, along with the results of the Action Forms generated by BIO.

Deputies have demonstrated their ability to access and use TraCS, as evidenced by the fact that their total time on a traffic stop averages 16 minutes or less.

### c. Audio-Video Recording of Traffic Stops

**Paragraph 61.** *The MCSO will issue functional video and audio recording equipment to all patrol deputies and sergeants who make traffic stops, and shall commence regular operation and maintenance of such video and audio recording equipment. Such issuance must be complete within 120 days of the approval of the policies and procedures for the operation, maintenance, and data storage for such on-person body cameras and approval of the purchase of such equipment and related contracts by the Maricopa County Board of Supervisors. Subject to Maricopa County code and the State of Arizona's procurement law, The Court shall choose the vendor for the video and audio recording equipment if the Parties and the Monitor cannot agree on one.*

**Phase 1:** In compliance

- GJ-35 (Body-Worn Cameras), most recently amended on January 7, 2017.

**Phase 2:** In compliance

During our September 2014 site visit, we met with two MCSO Deputy Chiefs and other personnel to discuss MCSO's progress of acquiring in-car video and audio equipment for all patrol vehicles used to conduct traffic stops. MCSO had initially set out to purchase fixed in-car cameras as required by the Order, but expressed an interest in acquiring body-worn video and audio recording devices for deputies. The Court issued an Order providing an amendment/stipulation on October 10, 2014, requiring on-body cameras. This was a prudent

WAI 36978

decision, in that it allows for capturing additional data, where a fixed mounted camera has limitations. We have documented MCSO's transition from in-car to body-worn cameras (BWC) in our previous quarterly status reports.

Body-worn cameras were fully implemented and operational in May 2016, and the equipment has worked well. The BWC recordings are stored in a cloud-based system (on evidence.com) that can be easily accessed by supervisors and command personnel. The retention requirement for the recordings is three years.

We verified during our District visits that MCSO has issued body-worn cameras to all Patrol deputies. Records indicate that MCSO began distribution of the body-worn cameras on September 14, 2015, and full implementation occurred on May 16, 2016. Every reporting period, we review a printout provided by CID that documents each deputy, by District, who has been issued a BWC.

During our October 2018 site visit, we met with District 2, 3, and 6 and Lake Patrol supervisors and commanders; and inquired if Patrol supervisors had experienced any difficulty with the BWC equipment and the BWC system. As reported in previous reporting periods, MCSO informed us that it continues to experience minor issues with cords breaking and batteries not lasting for deputies' entire shifts. There were also reports of BWC recordings not properly uploading. In some instances, BWC recordings had to be manually uploaded into the system.

MCSO is currently procuring a new body-worn camera system for all of its deputies. The new BWC system will resolve the current issues of cords breaking and becoming disconnected, as there is no cord. MCSO also anticipates that the issues related to battery life will be remedied with the new equipment. During our July 2018 site visit, MCSO provided a proposed revised policy and lesson plan to the Parties and the Monitoring Team in relation to the new BWC system and equipment for review and comments.


***Paragraph 62.*** *Deputies shall turn on any video and audio recording equipment as soon the decision to initiate the stop is made and continue recording through the end of the stop. MCSO shall repair or replace all non-functioning video or audio recording equipment, as necessary for reliable functioning. Deputies who fail to activate and to use their recording equipment according to MCSO policy or notify MCSO that their equipment is nonfunctioning within a reasonable time shall be subject to Discipline.*

**Phase 1:** In compliance

- GJ-35 (Body-Worn Cameras), most recently amended on January 7, 2017.
- Body-Worn Camera Operations Manual, published on December 22, 2016.

**Phase 2**: Not in compliance

WAI 36979

MCSO evaluated on-person body cameras from other jurisdictions and selected a vendor (TASER International, now known as Axon). Body-worn cameras have been implemented in all Districts since May 2016 and are fully operational.

To verify compliance for this Paragraph, we reviewed the body-worn camera recordings included in our monthly samples. During this reporting period, in our sample of 30 body-worn camera recordings reviewed for Subparagraph 54.k. there were three cases which were also reviewed as part of the sample for Subparagraph 54.g. and two cases that were also reviewed as part of the sample for Paragraphs 25 and 54. In addition, during this reporting period the Plaintiffs requested BWC recordings for an additional eight cases from the remaining sample of 75 stops that were under review for Paragraphs 25 and 54. Accordingly, for the purposes of calculating compliance with this requirement, the total number of cases reviewed for this reporting period is 93.

For our selection of a sample to review BWC recordings, we used the same sample of 30 cases we selected for the CAD audio request. Of the 30 cases in which we requested BWC recordings, there were two cases that had no recordings available. In both cases, the deputies documented on the VSCF that the BWC devices did not operate properly during the stop. A supervisor was made aware of the issue in both instances. In the remaining 28 cases, 27 were in compliance with the deputy activating the video- and audio-recording equipment as soon as the deputy decided to initiate the stop, and continuing to record through the end of the stop. In one case, the BWC recording concluded approximately 10 minutes before the stop concluded. There was no documentation made by the deputy or a supervisor in relation to any type of malfunction of the BWC device in this instance. We also reviewed an additional eight cases out of the sample of 105 stops in relation to a request made by the Plaintiffs for the production of additional BWC recordings. Of those eight cases, six were in compliance with the deputy activating the video- and audio-recording equipment as soon as the deputy decided to initiate the stop, and continuing to record through the end of the stop. In the other two cases, there were no BWC recordings provided. MCSO provided documentation regarding one of the cases where no BWC recording was provided, indicating that the BWC device had not been uploading properly for a period of time. In the other case, there was no documentation made by the deputy or a supervisor in relation to any type of malfunction of the BWC device. In relation to the sample of 67 cases in which BWC recordings were not provided, there were two cases in which the deputies noted on the VSCF that they did not activate their BWCs at the beginning of the stops. In one case, the deputy indicated that he delayed the activation of the BWC in error, but that he did activate the BWCs during the stop. In one case, the deputy indicated that he was wearing search and rescue uniform attire due to the nature of his assignment at the time of the stop and did not have his BWC device affixed at the initiation of the stop; however, he indicated that he activated the BWC during the stop.

In our sample of 25 body-worn camera recordings reviewed for Subparagraph 54.k., 23 cases were in compliance with the deputy activating the video- and audio-recording equipment as soon as the deputy decided to initiate the stop, and continuing to record through the end of the stop. In one case, the deputy noted on the VSCF that he had forgot to turn the device on after

WAI 36980

having recently replaced the battery. When the deputy tried activating the BWC device, he realized the error, turned it on after the traffic stop was initiated and recorded the remainder of the stop. In one case, the BWC recording began after the traffic stop was initiated and the driver was placed in the rear seat of the patrol unit. In that case, the deputy noted on the VSCF that the BWC device deactivated at some point during the stop and that he had to reactivate the device. In one case, there were periods of time not accounted for on the BWC recordings during the traffic stop. In addition, the deputy deactivated his BWC once he issued the driver a warning; however, the deputy appeared to have remained at the location of the stop while MCSO detectives, who arrived during the stop, investigated the driver and a vehicle in the driveway. The deputy did not indicate on the VSCF that the BWC was not operating properly. In our review of the sample of 30 body-worn camera recordings for Subparagraph 54.g., 29 cases were in compliance with the deputy activating the video- and audio-recording equipment as soon as the deputy decided to initiate the stop, and continuing to record through the end of the stop. In one cases there was no BWC recording of the initial stop from the deputy that conducted the traffic stop. In addition, there were other segments of the stop that were not recorded by the deputy who initiated the stop. The deputy noted on the VSCF that he had been experiencing issues with the BWC device and that it had become inoperable and was taken out of service. Other deputies assisting in the stop captured some portions of the stop.

The compliance rate for the sample of 93 cases reviewed is 95%.

We also identified cases in which the deputies did not use the BWC according to policy. Although it is less frequent, we still have identified some instances in which the deputies have failed to ensure that the BWC is positioned properly during contact with the driver and/or passenger(s).

We continue to identify instances in which deputies that respond to assist at traffic stops do not complete the Assisting Deputy and Body-Worn Camera Log. AIU also continues to identify this issue during its monthly inspections of traffic stops. We discussed this issue with MCSO during our October 2018 site visit. We recommend that supervisors enhance their reviews of traffic stops to ensure that the log is completed when required.

Our reviews of the body-worn camera recordings often reveal instances of deputies exhibiting positive, model behavior; and, at times, instances of deputies making errors, or exhibiting less than model behavior – all of which would be useful for training purposes. During our October 2018 visits to the Districts, District personnel informed that in some instances, allegations against deputies have been disproven after reviews of the body-worn camera recordings were conducted. In some instances, allegations of improper demeanor by a deputy have been substantiated after a review of body-worn camera recordings. At one District, personnel informed us that they identified a body-worn camera recording in which a deputy effectively utilized Narcan on a member of the public who was experiencing distress after ingesting narcotics. We encourage MCSO to ensure that any body-worn camera recordings that may be useful for training purposes be forwarded to the Training Division.

WAI 36981

MCSO has already discovered the value of body-worn cameras – including in instances where community members have lodged accusations against deputies and the recordings proved to be invaluable in resolving complaints.

***Paragraph 63.*** *MCSO shall retain traffic stop written data for a minimum of 5 years after it is created, and shall retain in-car camera recordings for a minimum of 3 years unless a case involving the traffic stop remains under investigation by the MCSO or the Monitor, or is the subject of a Notice of Claim, civil litigation or criminal investigation, for a longer period, in which case the MCSO shall maintain such data or recordings for at least one year after the final disposition of the matter, including appeals. MCSO shall develop a formal policy, to be reviewed by the Monitor and the Parties pursuant to the process described in Section IV and subject to the District Court, to govern proper use of the on-person cameras; accountability measures to ensure compliance with the Court's orders, including mandatory activation of video cameras for traffic stops; review of the camera recordings; responses to public records requests in accordance with the Order and governing law; and privacy protections. The MCSO shall submit such proposed policy for review by the Monitor and Plaintiff's counsel within 60 days of the Court's issuance of an order approving the use of on-body cameras as set forth in this stipulation. The MCSO shall submit a request for funding to the Maricopa County Board of Supervisors within 45 days of the approval by the Court or the Monitor of such policy and the equipment and vendor(s) for such on-body cameras.*

**Phase 1:**  In compliance

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.
- GJ-35 (Body-Worn Cameras), most recently amended on January 7, 2017.
- Body-Worn Camera Operations Manual, published on December 22, 2016.

**Phase 2:**  In compliance

MCSO developed and issued a protocol and policy that requires the original hardcopy form of any handwritten documentation of data collected during a traffic stop to be stored at the District level and filed separately for each deputy.  When a deputy is transferred, his/her written traffic stop information follows the deputy to his/her new assignment.  During our October 2018 site visit, we inspected the traffic stop written data files of Districts 2, 3, and 6 and Lake Patrol; to ensure that hardcopies of traffic stop cases are stored for a minimum of five years.  We found that the files were in order and properly secured, and did not note any issues of concern.

WAI 36982

***d. Review of Traffic Stop Data***

***Paragraph 64.*** *Within 180 days of the Effective Date, MCSO shall develop a protocol for periodic analysis of the traffic stop data described above in Paragraphs 54 to 59 ("collected traffic stop data") and data gathered for any Significant Operation as described in this Order ("collected patrol data") to look for warning signs or indicia or possible racial profiling or other improper conduct under this Order.*

**Phase 1:** Not in compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

  GJ-33 (Significant Operations), most recently amended on May 10, 2018.

- GH-4 (Bureau of Internal Oversight), most recently amended on October 30, 2018.

- GH-5 (Early Identification System), currently under revision, though the proposed revisions do not affect the language pertaining to this Paragraph.

- EIU Operations Manual, currently under revision.

**Phase 2:** Not in compliance

MCSO will achieve Phase 1 compliance with this Paragraph when it incorporates its protocols for periodic analysis of the traffic stop data into the EIU Operations Manual. To achieve Phase 2 compliance with this Paragraph, MCSO must demonstrate ongoing use of the methodology delineated in the protocol established for Phase 1 compliance in the monthly, quarterly, and annual analyses used to identify racial profiling or other bias-based problems.


***Paragraph 65.*** *MCSO shall designate a group with the MCSO Implementation Unit, or other MCSO Personnel working under the supervision of a Lieutenant or higher-ranked officer, to analyze the collected data on a monthly, quarterly and annual basis, and report their findings to the Monitor and the Parties. This review group shall analyze the data to look for possible individual-level, unit-level or systemic problems. Review group members shall not review or analyze collected traffic stop data or collected patrol data relating to their own activities.*

**Phase 1:** In compliance

- GH-4 (Bureau of Internal Oversight), most recently amended on October 30, 2018.

- GH-5 (Early Identification System), currently under revision, though the proposed revisions do not affect the language pertaining to this Paragraph.

**Phase 2:** Not in compliance

WAI 36983

MCSO designated the Early Intervention Unit (EIU) as the organizational component responsible for this Paragraph. EIU is to conduct analyses of traffic stop data on a monthly, quarterly, and annual basis to identify warning signs or indicia or possible racial profiling or other improper conduct as prescribed by Paragraph 64. EIU must report the findings of its analyses to the Monitor and the Parties.

We note that Paragraph 65 contemplates quarterly analyses of traffic stop data, but it does not specify exactly what such analyses might entail. We have discussed during our prior site visits potential topics that might be studied by MCSO under the quarterly traffic stop analysis requirement. While many potential topics have been identified, EIU requested permission in April 2018 to place the effort to develop the topic list on hold due to competing workload demands, essentially related to the second and third Traffic Stop Annual Report (TSAR) processes. During our October 2018 site visit, MCSO requested continuation of this status, noting its heavy workload demand and its desire to give its new vendor time to provide recommendations about potential topics. We agreed to MCSO's request to keep the development of the list of potential study topics on hold.

MCSO's original monthly process to analyze traffic stop data began in 2015, and was suspended in May 2016 because of our determination that the original process lacked statistical validity and required significant refinement to improve the identification of potential alerts in EIS. The problems with this original process are documented in our Quarterly Reports from that period. MCSO resumed monthly analyses of traffic stop data in May 2017 using a new methodology that was statistically based and not subject to the arbitrary, unscientific method originally employed by MCSO. MCSO's resumption of monthly analyses was a significant milestone because MCSO employed a more meaningful statistical approach and had automated most of it, thereby lessening the chance of human error in the analysis. While vastly improved, the methodology generated a substantial number of alerts, many of which did not demonstrate a pattern of potential bias sufficient to warrant the setting of an alert in EIS, which could be acted on by a supervisor. Because of our concern about the number of potential alerts the monthly analysis generated – a concern that MCSO also shared – we suspended the process during our July 2017 site visit to allow us and EIU time to consider possible refinements to the existing methodology.

Beginning with our October 2017 site visit, we started exploring refinements to the monthly methodology. MCSO provided a demonstration of a promising approach during our site January 2018 visit, which it subsequently documented in an April 1, 2018 memorandum. The memorandum presented two options that were explored by EIU to refine the methodology to analyze monthly traffic stop data. One option involved setting an alert in EIS if a deputy had two or more allegations (a traffic stop outlier that is entered into EIS that has the potential of becoming an alert) during a rolling three-month period. The second option involved setting an alert if a deputy had three allegations or more in a rolling five-month period. The two options were tested using Paragraph 67 Benchmarks 1, 2, 4, 5, 10, and 11. (See Paragraph 67 for a description of the Benchmarks.) We agreed during our January 2018 site visit to suspend Benchmark 9; Benchmarks 6 and 7 are now essentially combined. During our April 2018 site

WAI 36984

visit, we reviewed both options and agreed that each option was quite promising.  During our July 2018 site visit, MCSO presented the methodology it believes is the most practical, involving a rolling three-month sample using Benchmarks 1, 2, 4, 5, 10, and 11.  During our October 2018 site visit, MCSO stated its desire to consult with its new vendor about this process before finalizing its recommendation for the monthly methodology.

MCSO will achieve Phase 2 compliance with this Paragraph when its periodic analyses involve the consistent use of a statistical methodology designed to identify patterns of deputy behavior at odds with their peers, and data that accurately represents deputy traffic stop behavior over time.

**Paragraph 66.**  *MCSO shall conduct one agency-wide comprehensive analysis of the data per year, which shall incorporate analytical benchmarks previously reviewed by the Monitor pursuant to the process described in Section IV.  The benchmarks may be derived from the EIS or IA-PRO system, subject to Monitor approval.  The MCSO may hire or contract with an outside entity to conduct this analysis.  The yearly comprehensive analysis shall be made available to the public and at no cost to the Monitor and Plaintiffs.*

**Phase 1:**  In compliance

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- GH-4 (Bureau of Internal Oversight), most recently amended on October 30, 2018.

- GH-5 (Early Identification System), currently under revision, though the proposed revisions do not affect the language pertaining to this Paragraph.

**Phase 2:**  Not in compliance

MCSO has completed three comprehensive annual evaluations of traffic stop data to look for evidence of racial profiling or other bias-based policing.  MCSO released the first annual comprehensive evaluation on May 24, 2016 titled, "Preliminary Yearly Report for the Maricopa County's Sheriff's Office, Years 2014-2015."  It found that there are deputies engaged in racially biased policing when compared to the average behavior of their peers.  MCSO released the second annual evaluation on March 1, 2017.  However, the March 1, 2017 final evaluation had to be withdrawn due to data problems.  It was revised and re-released on July 28, 2017 and posted on MCSO's website in October 2017.  There were no significant differences in findings from those of the first annual evaluation.  The revised second annual evaluation confirmed the earlier report's main finding that racially biased policing within MCSO appears to be both a deputy and organizational level problem.

The third annual comprehensive evaluation was released on May 17, 2018.  It employed methodologies similar to those in the first two comprehensive evaluations.  It found the same results of its two predecessor reports: racially biased policing persists within MCSO at the organizational level.  In other words, potential bias across race/ethnicities is not due to the behavior of a few deputies – but occurs over the entirety of the MCSO's patrol function.  And,

WAI 36985

as was the case with the earlier reports, Hispanic drivers had statistically significantly higher rates of citations, arrests, searches, and seizures of contraband; and longer length of stops when compared to non-Hispanic drivers. Hispanics and Blacks are more likely to have longer traffic stops, even after controlling for factors known to make a stop long – e.g., a tow. All minorities are more likely to be arrested compared to Whites. Hispanics are more likely to be searched compared to Whites. Blacks and Native Americans are more likely to have a seizure of contraband compared to Whites. The evaluation of changes over time in post-stop outcomes since 2014 found no improvement (reduction) in organizational bias.

The contract with the vendor responsible for supporting MCSO's first three comprehensive annual evaluations of traffic stop data ended on June 30, 2018. On May 18, 2018, MCSO issued a Request for Proposal (RFP) open to the public to establish a contract to collect, maintain, clean, analyze, and disseminate traffic stop data. A contract was awarded to a new vendor on August 29, 2018. We were introduced to the new vendor, CNA, telephonically on September 21, 2018; and we met with CNA's representatives in person during our October 2018 site visit. During our in-person meeting, MCSO presented a projected timeline for completion of work by the new vendor on the annual comprehensive analysis. This schedule allotted time for the vendor to review the existing methodology to determine what changes they would recommend to strengthen the analysis. One change to the methodology that was of immediate concern was the use of 18 months of traffic stop data (spanning the July 1, 2017 to December 31, 2019 time period) for the first study (the Fourth TSAR) with the intent of switching to the calendar year data for subsequent TSARs. This particular change to the methodology was approved immediately following our October 2018 site visit. While there are milestones in the schedule requiring our approval, assuming there are no concerns affecting the schedule, MCSO projects the completion date for the Fourth TSAR to be March 29, 2019.

MCSO will achieve Phase 2 compliance with this Paragraph when it demonstrates an ability to conduct the annual comprehensive evaluation of traffic stop data in a consistent fashion each year using a statistical methodology supported by the peer-review literature and data that accurately represents deputy traffic stop behavior.

**Paragraph 67.** *In this context, warning signs or indicia of possible racial profiling or other misconduct include, but are not limited to:*

a. *racial and ethnic disparities in deputies', units' or the agency's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of deputies' duties, or racial or ethnic disparities in traffic stop patterns when compared with data of deputies' peers;*

b. *evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;*

WAI 36986

c.   *a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;*

d.   *indications that deputies, units or the agency is not complying with the data collection requirements of this Order; and*

e.   *other indications of racial or ethnic bias in the exercise of official duties.*

**Phase 1:**  In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- GH-5 (Early Identification System), currently under revision, though the proposed revisions do not affect the language pertaining to this Paragraph.

**Phase 2:**  Deferred

The EIU provides monthly analyses and documents describing the benchmarks used to set alerts for possible cases of racial profiling or other misconduct involving traffic stops.  As reported in Paragraph 65, this process is suspended pending MCSO's effort to finalize a refinement to the methodology used to analyze traffic stop data for the purposes of setting alerts for deputies potentially engaging in bias-based policing.  During our July 2018 site visit, MCSO requested additional time to enable its new vendor adequate time to review MCSO's proposed approach before formally presenting its final methodology to us for approval.  We agreed to that request.

During our October 2018 site visit, we met with the new vendor, CNA, and EIU to discuss the status of the monthly methodology.  MCSO presented its proposed refinement the current methodology used in the analysis of monthly traffic stop data.  It involves a rolling three-month analyses of traffic stop data using refinements designed to identify patterns of behavior that would substantiate allegations in EIS.  The proposed methodology disentangles the overlap between months so that there are no duplicative deputies from one month to the next.

According to the test of the methodology by EIU, the number of alerts triggered during this simulation ranged from six to 29 deputies.  MCSO reported that its new vendor is evaluating this methodology and will provide its recommendations for improving it by the end of calendar year 2018 for our consideration and approval.

Paragraph 67.a. identifies three benchmarks pertaining to racial and ethnic disparities.  The first benchmark references disparities or increases in stops for minor traffic violations (Benchmark 1).  The second benchmark addresses disparities or increases in arrests following traffic stops (Benchmark 2).  The third benchmark addresses disparities or increases in immigration status inquiries (Benchmark 3).  MCSO reported in its May 16, 2017 memorandum that the last areas awaiting completion (District-level analysis for benchmarks 67.a. and 67.b.) were completed.  Since these three benchmarks are operational, MCSO is in compliance with Paragraph 67.a.

WAI 36987

Paragraph 67.b. identifies a benchmark pertaining to evidence of an extended traffic stop involving Latino drivers or passengers (Benchmark 4).  MCSO reported in its May 16, 2017 memorandum that Benchmark 4 became operational on March 1, 2017.  Since this benchmark is now operational, MCSO is in compliance with Paragraph 67.b.

Paragraph 67.c. identifies three benchmarks.   The first benchmark pertains to the rate of citations (Benchmark 5):   MCSO is required to identify citation rates for traffic stops that are outliers when compared to a deputy's peers.  MCSO's draft EIS Project Plan 4.0 reported that this benchmark became operational at the organization and beat levels as of March 10, 2017.  The second benchmark (Benchmark 6) pertains to seizures of contraband:  MCSO is required to identify low rates of seizures of contraband following a search or investigation.   The third benchmark in Paragraph 67.c. (Benchmark 7) is similar to Benchmark 6, but it pertains to arrests following a search or investigation.   According to the draft EIS Project Plan 4.0, Benchmark 6 became operational by manual entry as of December 1, 2016.  This is also the case for Benchmark 7.   Since the three benchmarks are now operational, MCSO is in compliance with Paragraph 67.c.

Paragraph 67.d. establishes a benchmark pertaining to agency, unit, or deputy non-compliance with the data collection requirements under the First Order (Benchmark 8).  This benchmark requires that any cases involving non-compliance with data collection requirements results in an alert in EIS.  EIU published an Administrative Broadcast on November 28, 2016 to instruct supervisors how to validate data in TraCS in those cases involving duplicate traffic stop records to deliver timely data validation for our review.  MCSO's draft EIS Project Plan 4.0 reported that MCSO began the data validation process for this benchmark on November 28, 2016. Therefore, MCSO is in compliance with Paragraph 67.d.

Paragraph 67.e. allows for other benchmarks to be used beyond those prescribed by Paragraph 67.a.-d.  MCSO has three benchmarks under Paragraph 67.e.  Benchmark 9 is defined as racial or ethnic disparities in search rates.  Benchmark 10 is defined as a racial or ethnic disparity in passenger contact rates.  Benchmark 11 is defined for non-minor traffic stops.  The May 16, 2017 memorandum from MCSO reports that Benchmarks 9-11 are operational at the required levels of analysis.  Therefore, MCSO is in compliance with Paragraph 67.e.

WAI 36988

MCSO has completed operationalizing the benchmarks required by this Paragraph. That said, the monthly analysis that relies on these benchmarks generated a substantial number of alerts in the first two months of its use. As discussed in Paragraph 65, the benchmarks used in the monthly analysis of traffic stop data for May 2017 generated too many alerts (well over 100 per month), most of which lacked sufficient detail to establish a pattern of problematic behavior for the individual deputies identified by the methodology. Because of this problem, we suspended the monthly analysis process to allow us and MCSO time to explore refinements to the methodology, which affects Benchmarks 1, 2, 4, 5, 10, and 11. During our October 2017 site visit, we determined that the use of four benchmarks (Benchmark 3, Benchmark 6, Benchmark 7, and Benchmark 8) to set alerts in EIS should resume. We also approved the suspension of Benchmark 9 (search rate for traffic stops that is an outlier) added by MCSO under Paragraph 67.e.

Until the methodology is refined in a manner that redresses the problem of too many alerts, we are deferring our Phase 2 compliance assessment of Paragraph 67.

**Paragraph 68.** *When reviewing collected patrol data, MCSO shall examine at least the following:*

a. *the justification for the Significant Operation, the process for site selection, and the procedures followed during the planning and implementation of the Significant Operation;*

b. *the effectiveness of the Significant Operation as measured against the specific operational objectives for the Significant Operation, including a review of crime data before and after the operation;*

c. *the tactics employed during the Significant Operation and whether they yielded the desired results;*

d. *the number and rate of stops, Investigatory Detentions and arrests, and the documented reasons supporting those stops, detentions and arrests, overall and broken down by Deputy, geographic area, and the actual or perceived race and/or ethnicity and the surname information captured or provided by the persons stopped, detained or arrested;*

e. *the resource needs and allocation during the Significant Operation; and*

f. *any Complaints lodged against MCSO Personnel following a Significant Operation.*

**Phase 1:** In compliance

- GJ-33 (Significant Operations), most recently amended on May 10, 2018.

**Phase 2:** In compliance

WAI 36989

MCSO has not conducted a significant operation that met the requirements of the Order since Operation Borderline in December 2014. Subsequent activities (i.e., Operation Gila Monster in October 2016) have not met the criteria for review under this or other Paragraphs.

We assess Phase 2 compliance via a combination of responses to monthly document requests and interviews of command and District staff during our regular site visits. CID provides monthly memoranda from each District, as well as Investigations and Enforcement Support, regarding involvement in special operations and immigration-related traffic enforcement. For July-September 2018, the memoranda show that no activity meeting the criteria of this Paragraph has occurred. Additionally, during our July and October 2018 site visits, our interviews with District personnel and central command indicate that no reported significant operations or immigration-related traffic enforcement occurred during this time period.

**Paragraph 69.** *In addition to the agency-wide analysis of collected traffic stop and patrol data, MCSO Supervisors shall also conduct a review of the collected data for the Deputies under his or her command on a monthly basis to determine whether there are warning signs or indicia of possible racial profiling, unlawful detentions and arrests, or improper enforcement of Immigration-Related Laws by a Deputy. Each Supervisor will also report his or her conclusions based on such review on a monthly basis to a designated commander in the MCSO Implementation Unit.*

**Phase 1:** In compliance

- GH-5 (Early Identification System), currently under revision, though the proposed revisions do not affect the language pertaining to this Paragraph.

**Phase 2:** Not in compliance

MCSO has placed into production database interfaces with EIS, inclusive of Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), Arizona Office of Courts (AOC) records, and the Cornerstone software program (referred to as "the HUB"), that includes training and policy records for MCSO. Supervisors have demonstrated the ability to access these during our recent site visits.

MCSO has automated the dissemination and responses to Action Forms generated from BIO's Audits and Inspections Unit. MCSO has also initiated alert investigations for repetitive issues discovered during the audit and inspection process. BIO continues to develop the audit for tracking alert investigation processes following the initial proposal reviewed by us and the Parties.

Additionally, the Traffic Stop Monthly Report, incorporating significant benchmarks from Paragraph 67, is still under development due to a change in MCSO's contract vendor. MCSO has proposed, and is evaluating, several analytical options. While some of the benchmarks – immigration inquiries and data collection issues – continue to trigger alerts that are being investigated by supervisors, the remainder continue to be in a holding process while the

WAI 36990

methodological options are being evaluated. Finally, due to the priority of the Traffic Stop Annual and Monthly Reports, MCSO has not yet proposed the initiation of quarterly traffic stop reports required by the Order. Each of these reports could greatly improve the quality and quantity of information that supervisors have at their disposal to oversee their subordinates. The routine publication of each of these reports is necessary for the evaluation of Phase 2 compliance for this Paragraph.

Each month, MCSO provides a list of completed alert investigations. From this list, we randomly select 15 cases, to review the investigations conducted by supervisors and evaluate the effectiveness of supervisory oversight. In several cases, there are ongoing PSB investigations that limit the ability of supervisors to review materials beyond the brief descriptions provided to supervisors, as outlined in Paragraph 75.a. and 75.b. below. During our July and October site visits, we requested clarification of what supervisors can view regarding materials relevant to an ongoing PSB investigation that also led to an alert investigation. MCSO advised us that the majority of materials underlying an ongoing PSB investigation would only be closed to supervisors in the most serious cases until such time as the PSB investigation is closed. We recommended to MCSO that supervisors be advised to review as much material as possible without impacting PSB processes and note these circumstances in the closure of the alert investigations.

MCSO has created an Alert Investigation Review Committee that reviews the investigations of supervisors prior to closing an alert. The committee ensures that the reports of the supervisors address all aspects of the assigned investigation, and returns those that are deficient to the District for continued revision. As a result, the number of closed alert investigations in recent months has been fewer than 15 cases per month. Of those available, we have found the supervisors' investigations and actions to be well-founded. In one case, the District, in consultation with the committee, instituted an Action Plan for a deputy that included training and additional observation of the deputy's activity by his supervisor. We have reviewed the early supervisory notes pertaining to this Action Plan and found them to be clear, concise, and comprehensive. Prior to our October site visit, we requested that MCSO provide added information pertaining to two closed investigations from July and August. During our October site visit, MCSO indicated that the alert investigation for a sergeant in July stemmed from the fact that five deputies under his command had received external complaints. The investigation of the sergeant was closed due to the fact that there appeared to be no link between these five incidents. However, MCSO also noted that one of the deputies receiving these external complaints had also triggered an alert since three of the complaints had been lodged against him. This alert remains under investigation. The August alert investigation closure was reviewed since the supervisor noted that he was recommending "no further action" but then included a synopsis of a conversation he had with the deputy regarding the alert. MCSO agreed that the closure should have been closed indicating "meeting with a supervisor" and will ensure consistency in their review of future closed investigations.

WAI 36991

AIU conducts monthly audits of supervisory oversight via the Supervisory Notes made for each deputy. Minimally, each month supervisors should be making a performance appraisal note, reviewing two body-worn camera recordings and reviewing the EIS profile of their subordinate. When deficiencies are found, AIU sends out Action Forms to District command for correction. In addition, multiple Action Forms for the same supervisor deficiencies over time would result in an alert being set on the supervisor. In July, the review found 100% compliance for the randomly selected sample of supervisors across all four measures. The compliance rate for August was 95%, resulting from five deficiencies found in District 2. During our October site visit, AIU personnel confirmed that they had sent out Action Forms to District 2 Command Staff but had not yet received a response. AIU also reported that the deficiencies were all attributed to one supervisor from District 2. On October 25, 2018 MCSO provided additional information on the Action Form indicating that District 2 command staff had provided mentoring to the sergeant during one-on-one meetings. In addition, the completed Action Form indicated that the sergeant had experienced an FMLA event while he was completing his supervisory responsibilities and had failed to make arrangements for another supervisor to complete these prior to taking time off to address the FMLA issue. The inspection for September has not yet been made available. MCSO is currently revising thresholds for deputy and supervisor activity that will result in an alert being triggered. Action Forms due to supervisor deficiencies will be included in these thresholds. We will evaluate these as they are made available.

AIU also conducts three inspections of traffic stop information: two of these pertain to the timely review and discussion of traffic stops by supervisors for each subordinate; and the third is an inspection regarding the correct completion of traffic forms and the coordination of these forms with databases like CAD. In the review inspection, AIU found that, overall, the majority of supervisors are reviewing the traffic stops of subordinates within three days. The compliance rates for July and August were above 98% with one Action Form being sent to District 5. The discussion inspections are lagged by one month since supervisors have 30 days to discuss traffic stops with their subordinates. The compliance rates for June and July were above 98%, resulting in one Action Form being sent to District 1 in June and one Action Form being sent to District 4 in July. The traffic stop data inspection is intended to maintain the integrity of the data compiled, and to evaluate that in their review of subordinate activity, supervisors are catching any traffic form deficiencies. While this inspection typically uncovers a greater number of deficiencies, the trend since January of this year has improved from the mid-seventieth percentile to a high of 97% in May and a steady 88% from June through August. The deficiencies for July and August range from a failure to conduct warrant checks to incorrect vehicle, deputy or occupant information on Vehicle Stop Contact Forms. A total of nine Action Forms were sent to the Districts due to these deficiencies. MCSO is currently working on tracking audits/inspections to ensure that the same supervisors/deputies are not repeating the same mistakes over time. The inspections for September have not yet been made available.

WAI 36992

AIU also conducts inspections of Patrol Activity Logs, to ensure that deputies are accounting for their time and that supervisors sign the logs.  The shift roster inspections are designed to determine that supervisors are working the same shifts as their subordinates and that their span of control meets policy guidelines.  Each inspection shows compliance rates in the high ninetieth percentile for July and August.  In August, the inspection notes a span of control issue that was handled by the Chief of Patrol with the District 1 Captain, and two other Action Forms sent to Districts 2 and 4 due to single shift rosters not being completed on time.  During our October site visit to District 1, the District Captain noted that the instance where a sergeant was supervising 11 deputies occurred when one sergeant left his shift early and had not adequately communicated that to his fellow supervisors or command staff.  The sergeant was counseled by the lieutenant and captain about the importance of ongoing and effective communication among supervisors.  The inspection for September has not yet been provided.

AIU also conducts an inspection of County and Justice Court cases that are turned down for prosecution.  While the major issue being inspected centers on whether probable cause existed to support the actions of the deputy during the original activity, AIU also identifies other issues that can result in memoranda to Districts that suggest additional training of deputies might be in order.  For July and August, AIU found one case each month that had been turned down for prosecution due to errors of a deputy.  In June, a case that was over one year old had been submitted and MCAO determined that the report lacked sufficient probable cause statements to support the identified violation, although several other violations were indicated in the report and the notes from MCAO indicated they would pursue charges for these violations if the appropriate documentation was submitted.  In August, MCAO reviewed an Incident Reports (IR) indicating a physical arrest and questioning that lacked probable cause.  A memo of concern was sent to PSB for each of these cases.  We will follow up on the determination of PSB's review of these cases.  The remaining deficiencies noted in the inspection typically involve missing signatures or property receipts in the documents submitted.  AIU sent Action Forms addressing these deficiencies to the respective Districts.

The inspections of supervisory oversight conducted by MCSO indicate stable compliance trends in most areas reviewed.  Aside from Traffic Stop Data Inspection, the compliance findings in other inspections exceed the 95th percentile.  During both our July and October site visits, lieutenants and captains indicated that many of the errors they have observed resulted from new supervisors that were not yet accustomed to their numerous responsibilities.  Each commander suggested that the most difficult aspect for new supervisors is time management regarding all the requirements of line supervision.  After several months of experience, they believe these errors will decrease.  MCSO indicated during our October site visit that AIU was behind in conducting several inspections due to a shuffling of responsibilities.  We will continue to evaluate this issue in our quarterly status reports.

WAI 36993

***Paragraph 70.*** *If any one of the foregoing reviews and analyses of the traffic stop data indicates that a particular Deputy or unit may be engaging in racial profiling, unlawful searches or seizures, or unlawful immigration enforcement, or that there may be systemic problems regarding any of the foregoing, MCSO shall take reasonable steps to investigate and closely monitor the situation. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or of other supervised, monitored, and documented action plans and strategies designed to modify activity. If the MCSO or the Monitor concludes that systemic problems of racial profiling, unlawful searches or seizures, or unlawful immigration enforcement exist, the MCSO shall take appropriate steps at the agency level, in addition to initiating corrective and/or disciplinary measures against the appropriate Supervisor(s) or Command Staff. All interventions shall be documented in writing.*

**Phase 1:**  In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- GH-5 (Early Identification System), currently under revision, though the proposed revisions do not affect the language pertaining to this Paragraph.

**Phase 2:**  Not in compliance

EIU personnel are continuing to develop the next draft of the EIU Operations Manual. MCSO continues to evaluate and develop the methods and plans for the Traffic Stop Monthly Reports (TSMR) and Traffic Stop Quarterly Reports (TSQR). The manual will provide a basis for the transparency of roles and duties of EIS personnel. Given recent transfers into and out of the Unit, it is imperative that MCSO complete the manual to ease the process for personnel to understand their responsibilities. In addition, the manual will provide the organization as a whole an explanation of the goals to be achieved by a fully functioning early intervention process. Due to the recent discontinuation of a contract with the outside vendor that assists MCSO in the compilation and analysis of traffic data, the TSMR and TSQR have been slowed. The issues related to the statistical reports (including the Traffic Stop Annual Report) have been a central focus of discussions with MCSO both during and between our site visits. At times, these discussions have also included the Parties and their experts. To its credit, MCSO has created a "data quality" workgroup consisting of members of all units that participate in the compilation, creation, and transmission of traffic data. The regular meetings and reports of this committee are intended to ensure that future data anomalies are minimized and reports are produced in a timely manner. Several times in the past, the reports were based on data or methods that were opaque and undocumented, resulting in the need for recompilation of data or new analyses.

WAI 36994

MCSO has finalized a contract with a new data analysis vendor, CNA, a non-profit research and analysis organization located in Arlington, VA.  We and the Parties have had several conference calls with vendor's representatives, as well as meeting them during our October site visit.  MCSO's vendor has prioritized the assessment of past methodologies used for annual and monthly traffic stop analyses; and will assist in the completion of related aspects of the EIU Operations Manual.  This will provide more confidence in the reports that are produced in the future.  We will continue to work with MCSO and the Parties toward this end.

During our October site visit, MCSO also presented a table outlining the current status of sections of the EIU Operations Manual.  At the time of our site visit, 43% of all sections had been approved and 37% were submitted to the Monitoring Team for review.  The remaining 20% pertained to issues related to monthly, quarterly, and annual analyses and definitions that remained under development.  During our site visit, MCSO requested that they be allowed to expand the timeframe of the Fourth Traffic Stop Annual Report (TSAR) from 12 months to 18 months due to the necessity of hiring a new contractor.  This would allow MCSO to include data from July 1, 2017 to December 31, 2018.  MCSO also requested that thereafter, the annual reports would be based upon annual calendar year data rather than fiscal year data.  These actions would allow MCSO to bring the annual analyses up-to-date without impacting the ability to compare results with past annual evaluations.  After consultation with the Parties, we approved these changes.

A portion of the monthly alert report produced by EIU depends upon the TSMR required in Paragraph 67 of the First Order.  The methods for the elements of Paragraph 67 remain under evaluation.  The EIS also produces alerts for numerous activities, ranging from use of force to county attorney turndowns lacking probable cause.  The new leadership of BIO has begun the process of evaluating and updating the thresholds used to trigger these alerts to ensure that they are sufficient to detect behaviors that might indicate bias on the part of deputies, taking into consideration the current assignment of the deputies as noted in Paragraph 81.f.  The alerts triggered are first evaluated by EIS personnel and then transmitted, via Blue Team, to the appropriate supervisor and District command.  The supervisors conduct an investigation, including a potential discussion with the designated deputy, and memorialize their actions in Blue Team.  These investigations are reviewed by District command staff and a newly formed "alert investigation review committee" to ensure that proper investigation and possible interventions are clearly outlined.  Any deficiencies result in the return of the original investigation to the immediate supervisor for revision.  The introduction of Attachment B to GH-5 (Early Identification System), a checklist of responsibilities for supervisors conducting alert investigations, has greatly improved the efficiency of this process.  We have noted several instances each month where command staff have returned investigations to supervisors; and, with the introduction of the alert review committee we have also found that the ARC has requested additional information in several cases since April 2018.  This dual quality control process has resulted in fewer instances of incomplete investigations being discovered during our reviews and greater oversight by command personnel to ensure proper responses to problematic behavior of deputies when such behavior has been discovered.  We also noted during our

WAI 36995

October site visit that there are fewer instances of false alerts being sent to supervisors for investigation.  AIU is also developing an alert audit/inspection to further track the timeliness and sufficiency of randomly selected alert investigations.  We have commented on the first draft of this inspection and continue to work with AIU personnel on the refinement of these processes.

We have previously reported on MCSO's strategy to address systemic issues identified in the first two Traffic Stop Annual Reports (TSARs).  These issues have persisted, as evidenced in the findings of the third TSAR.  MCSO had developed a nine-goal plan, known as the "Plan to Promote Constitutional Policing," in response to the findings of the first TSAR.  The plan has undergone several alterations, but the results of the last TSAR indicate that there are still concerns that need to be addressed.  Notwithstanding, the third TSAR highlighted some positives.  The report summary concluded that, "There have been improvements in reducing the higher likelihood of Hispanics being cited (when compared to Whites) over time" and noted a reduction in the overall length of stops for Hispanic drivers.  The third TSAR concluded that data suggests there are still racial differences in post-stop outcomes, and Hispanics are more likely to be arrested and subjected to searches.  During our October site visit, we learned that MCSO planned a significant modification of the existing nine-goal plan.  The changes to the Plan to Promote Constitutional Policing are addressed in this review.

In September, MCSO submitted a spreadsheet titled "Revised Constitutional Plan Outline" that listed five projects related to the Plan to Promote Constitutional Policing.  The projects are scheduled to begin in the first quarter of 2019, and end in the fourth quarter of 2020.  In this review there are comments on the five projects, as well as a summary of discussions on the CPP that occurred during our October site visit.  Also included are comments pertaining to the monthly Captains' meetings, and comments related to the proposed new Constitutional Policing Plan.

With regard to enhanced implicit bias training (Project 1), MCSO noted that it would hire an outside expert to deliver enhanced implicit bias.  We were made aware that MCSO was partnering with the Anti-Defamation League (ADL) to conduct enhanced implicit bias training.  Some employees had already attended the training at the time of our October site visit, and had provided positive feedback.  We inquired, but MCSO could not provide, a concrete timeline for the completion of the ADL training.  According to the revised CPP timeline, enhanced implicit bias training should be completed by the third quarter of 2019.  MCSO will engage a vendor to assess the effectiveness of the enhanced implicit training, and will revise the curriculum based on their assessment.  MCSO noted in the outline that Captains would continue to address implicit bias at the Captains' monthly meetings, and distribute the information discussed to the rank and file.

WAI 36996

As to enhanced cultural competency training (Project 2), MCSO noted that the Office would focus on the Latino community. The timetable notes that MCSO plans to engage an outside expert in the third quarter of 2019 to teach cultural competency, with focus on the Latino community. The training will be delivered in the first quarter of 2020. MCSO will engage a vendor to assess the effectiveness of enhanced cultural competency training. The assessment of the training will occur in the fourth quarter of 2020.

Regarding the improvement of recruiting and hiring of qualified candidates (Project 3), MCSO listed several initiatives for the first quarter of 2019. These include expanding advertising for both sworn and civilian positions. MCSO listed several organizations that they can potentially partner with for recruiting, and noted the creation of an "applicant engagement" position to assist applicants through the hiring process. The outline also states that MCSO intends to evaluate the background investigation procedures to determine if they could be made more efficient. The idea of streamlining the background process has been discussed in our previous site visits. MCSO advised us during our July site visit that it had hired an outside vendor to conduct civilian background investigations. Human Resources had also previously advised us that AZPOST has strict requirements on background investigations for sworn personnel, so backgrounds for deputy applicants will continue to be done by sworn investigators. MCSO will implement a strategic onboarding program in the second quarter of 2019, to support new employees' success. MCSO noted that Human Resources would also develop a recruitment video for social media. In the first quarter of 2020, MCSO will evaluate and revise recruitment goals. In the second quarter of 2020, MCSO will also develop a new entry-level exam for deputy trainees. MCSO noted that it would develop current and future recruitment goals. Human Resources will measure the results of the recruitment and hiring strategies in the third and fourth quarters of 2019, and again in the third and fourth quarters of 2020.

Regarding the improvement of retention and promotion of qualified employees (Project 4), MCSO plans to create an internal career-planning program in the second quarter of 2019. MCSO noted that the Office will implement an employee survey to identify opportunities to enhance the work environment, and will work with employees to develop action plans to address areas of needed improvement. MCSO listed the implementation of an employee recognition program in the fourth quarter of 2019. Also listed is the evaluation and revision of retention and promotion practices, in the first quarter of 2020. MCSO noted that the Office would develop a baseline measurement of current processes and develop future goals for retention and promotion; this will occur in the first quarter of 2019. MCSO will measure the outcomes of these goals and analyze the results in the third and fourth quarters of 2019, and again in 2020.

With regard to increasing deputy engagement in non-enforcement contexts (Project 5), MCSO noted that it intends to focus its efforts on the Latino community. The MCSO project outline notes that MCSO will roll out the Community Policing/Outreach report to the Districts in the first quarter of 2019. It is unclear what the report is or what it will report on. For large community events, Districts are to coordinate with COrD. MCSO notes that it will roll out neighborhood watch programs in Districts 1, 2, and 3, focused on Latino areas. MCSO intends

WAI 36997

to increase employee involvement by having deputies attend neighborhood events and watch programs. Although these are positive steps, we suggest that mere attendance at community events does not necessarily lead to improved communication and cooperation. MCSO should develop a strategy to exchange information, note issues of concern, and respond back on any action taken. Deputy-resident interactions in large community events involve dynamics that are different than personal encounters. While participation in planned community events can result in future collaboration, we also suggest, as we have in the past, that deputies can achieve great results through person-to-person interactions with residents. Consistent with the principles of problem-oriented policing, deputies and residents can address quality of life concerns and achieve quantifiable results by working together.

As part of Project 5, MCSO will roll out surveys for Districts to use in their events in the first quarter of 2019. We have recommended that surveys include an assessment of resident satisfaction with MCSO services. During our October site visit, MCSO advised us that surveys would include a measurement of citizen satisfaction. MCSO will conduct a community survey of neighborhoods where block watches have been implemented in the fourth quarter of 2019. MCSO will roll out the neighborhood watch program in Latino areas of District 4 during the first and second quarter of 2020. MCSO will conduct another community survey in areas where the block watch program has been implemented in the third quarter of 2020.

MCSO conducted monthly Captains' meetings on July 31, August 28, and September 25. The topics of discussions were implicit bias, cultural competency, and Constitutional policing. We received documentation that the information discussed at the July and August meetings was disseminated to the rank and file, including two video presentations made by two Captains. One of the video presentations contained an inappropriate comment; we commend the Sheriff for quickly addressing the issue. We received a copy of the video presentation given at the September 25th meeting, the agenda, and sign-in sheet. We received no documentation confirming that the material discussed at the September meeting was disseminated to the rank and file.

During our October site visit, we met with MCSO to discuss the progress of the Plan to Promote Constitutional Policing. MCSO advised us that the nine-goal plan that MCSO had previously developed was changed to a plan with three tenets, which MCSO refers to as the "three pillars." According to MCSO, the goals of the new plan are to provide enhanced implicit bias training, improve recruitment and hiring, and increase deputy engagement in non-enforcement contexts. The details of the new plan are discussed in the latter part of this review. There are a number of projects listed in previous iterations of the CPP that are not addressed in the documents we reviewed, and we requested updates.

We inquired as to the training on the history and impact of discrimination in Maricopa County (Goal 3), and learned that the Training Division had "gone back to the drawing board," as it relates to the curriculum. This project has not met the previously established timeline. We inquired about the status of consent search training (Goal 3), and it appears that MCSO is still working out the logistics for this training. This training has not met the previously established

WAI 36998

timeline.  With regard to the Training Division video library (Goal 5), MCSO has not received any BWC submissions to date.  This endeavor has not proven very successful.  The Training Division developed an in-house training video using role-players, but it was pending the appropriate approvals before dissemination.  We inquired as to the progress of the revision to the VSCF (Goal 6), and learned that MCSO is still working on the revision.  In our July meeting, MCSO personnel informed us that they had other priorities, and had to place this project on the "back burner."  With regard to the community engagement worksheet for deputies to document non-enforcement interactions (Goal 7), MCSO advised us that it would be completed by the end of the year.  This project appears to be on schedule.  The Deputy Liaison program (Goal 5) is active and liaison deputies are working with Patrol Districts to establish neighborhood watch programs.  MCSO advised us that the protocol to track deputies who have made exemplary contributions (Goal 7) was completed, and will be incorporated in the next revision of the EPA form.  MCSO has continued to meet internally to obtain feedback and work out issues related to the EPA process (Goal 2).  We inquired about the alternative to the Peer Intervention Program (Goal 8), and learned that MCSO was having ongoing internal discussions about the program, so there was no definitive answer.  We inquired about recruitment (Goal 9), and MCSO advised us that it is considering setting up partnerships with local high schools for recruitment of Detention officers.  Human Resources is advertising near community colleges and is looking to expand advertising in other areas.  MCSO is not currently recruiting out of the state.  At the time of our October site visit, MCSO had 46 deputy vacancies of 556 budgeted positions, and 269 Detention vacancies of 1,863 budgeted positions.

During our October site visit, MCSO made a presentation on the proposed new Constitutional Policing Plan.  We received and reviewed a copy of the PowerPoint presentation.  The proposed new plan appears to be an abbreviated version of previous iterations.  The PowerPoint presentation included no measureable goals; we are uncertain if goals and timelines will be added to the next draft of the plan.  The timeline submitted with the PowerPoint is related to the publishing of the plan, not the accomplishment of any of its goals.  The final draft of the plan was to be submitted to the Monitor and Parties by November 27th.

As a result of our discussions during our October site visit, and reviews of documents submitted, we learned that MCSO held two "listening sessions" in October.  An additional session was scheduled for October 30, after our site visit; we will include our comments on that session in our next report.  The first session was conducted in District 1, and the second session in District 2.  MCSO also met with the Community Advisory Board (CAB), the African American Advisory Board (AAAB), the Hispanic Advisory Board (HAB), and the LGBTQ Advisory Board, to obtain input on the plan.  The PowerPoint presentation listed the recommendations discussed at the listening sessions and meeting with the boards, but did not specify which recommendations were made by non-MCSO participants.  With regard to the listening session conducted in District 1, it was recommended that deputies be trained in de-escalation techniques, aggression bias awareness, and sensitivity to domestic violence victims.  It was also recommended that deputies receive orientation as to the demographics of the Districts.  The leadership of the town of Guadalupe expressed a desire for deputies to take a

WAI 36999

more active role in addressing the drug problem in Guadalupe.  With regard to non-enforcement contacts, participants suggested that deputies focus their efforts on schools, parks, and public events.  A participant suggested that MCSO conduct one-day community academies to talk about current issues affecting the town.   The participants also expressed the desire to be informed as to what action had been taken regarding their concerns and suggestions.  Insofar as the recruitment and retention strategy, there was a recommendation to rebrand MCSO to emphasize growth and diversity.  It was suggested that current employees be featured in social media platforms to inspire prospective candidates to apply.  Participants also suggested that MCSO engage the public in order to debunk common negative misconceptions about law enforcement that are prevalent in many current police movies.

The participants in the listening session in District 2 recommended that enhanced implicit bias training be done in partnership with organizations outside of law enforcement.  It was suggested that deputies focus on increasing interaction with children by distributing toys during calls for service, and by reinstituting the Officer Friendly program.  Participants suggested that MCSO promote a current program that allows residents to turn in unused prescription medications at District offices.   Community members advocated for deputies to attend block watch and homeowners association meetings, and expressed the desire for MCSO to provide drug prevention and cardiopulmonary resuscitation (CPR) training to residents.   Participants suggested that MCSO combat the negative perception of law enforcement by publicizing positive deputy-community interactions; examples included positive encounters captured in BWC recordings and awards for outstanding employee performance.  It was also suggested that MCSO work with high school counselors and parents to attract students interested in law enforcement, and recommended holding a career day at the MCSO training facility. Discussions also included recommendations for creating an internal mentorship program. Participants emphasized that all employees need to be recruiters, and that all employees need to promote a consistent positive message.

The Sheriff's Advisory Boards and the CAB provided input on the plan as well.  The boards recommended that MCSO communicate with Latino residents by using Spanish social media.  It was also suggested that deputies participate in mentorship programs at high schools; that deputies volunteer at special events; and that deputies conduct training sessions to educate refugee communities on safety.  Other suggestions included starting an anti-bullying campaign, and promoting the Community Academy.  With regard to recruitment, members of the boards suggested that MCSO educate prospective job applicants on the positive aspects of living in Arizona, and the benefits of working for MCSO.   Board members suggested that MCSO rebrand itself and distance itself from the prior administration.  Board members recommended that MCSO endeavor to create a desire in applicants to want to work in MCSO, and implement strategies to increase job satisfaction so that employees will want to remain part of MCSO.  It was suggested that MCSO recruit out of state and streamline the application process for out-of-state applicants.

WAI 37000

The PowerPoint presentation states that MCSO intends to change their focus to include more community input.  MCSO will focus on open communication and providing feedback to listening session attendees and Advisory Boards.  MCSO plans to continue the listening sessions, and notes that the Constitutional Policing Plan is a living document, which suggests that the plan may be revised based on the feedback received.  During our October site visit, we inquired about the goals and objectives that MCSO began as part of the original Plan to Promote Constitutional Policing.  In particular, we inquired about the goals that were not associated with enhanced implicit bias training and enhanced cultural competency training.   It is our understanding MCSO will continue working on some of the initiatives listed in previous plans.

MCSO had finalized the Action Plan processes for all deputies found to be outliers in the Second TSAR by the time of our October site visit, and had set up a schedule for the supervisory discussions for deputies who were found to be outliers in the Third TSAR.  We have begun receiving documentation of these discussions, and will address our findings in future quarterly status reports.  When necessary, MCSO has provided additional resources and personnel to complete the tasks related to the findings of potential individual (deputy) bias.  MCSO is not in Phase 2 compliance with this Paragraph; as the TSAR, TSMR, and TSQR are undergoing revision and not yet in production.  In addition, there is much work to be done to finalize and implement the Constitutional Policing Plan.  We will continue to evaluate and provide feedback to MCSO as these materials are produced.


***Paragraph 71.*** *In addition to the underlying collected data, the Monitor and Plaintiffs' representatives shall have access to the results of all Supervisor and agency level reviews of the traffic stop and patrol data.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

MCSO has provided us with access to existing data from monthly and annual reports.

Prior to MCSO's decision to discontinue its contract with its former statistical contractor, we had been working with MCSO on the refinement of the Traffic Stop Monthly Reports (TSMRs).  In April 2016, the TSMR was discontinued because the methods employed were not sufficiently rigorous or theoretically grounded.  After some modification, MCSO reintroduced the TSMR in January 2017; we recommended discontinuation a second time (July 2017) as the methods employed were not refined to detect patterns of problematic deputy behavior.  While MCSO has proposed new methods based upon three-month rolling averages of traffic stops, the whole TSMR methodology is being reviewed and revised by the new analytic contractor.  We will evaluate these methods as they are proposed.  As noted in Paragraph 69, MCSO continues to set alerts for some elements of Paragraph 67 not affected by the TSMR, as well as non-traffic activity of deputies.  MCSO is also reviewing and refining the thresholds that trigger non-traffic alerts.  We will continue to work closely with MCSO on these issues.

MCSO has not yet published a Traffic Stop Quarterly Report (TSQR) as required by the Order. MCSO is working closely with the new statistical contractor, CNA, to produce a proposal for special studies that MCSO might conduct that would benefit either the annual or monthly traffic stop analyses.  Given the priority of the methods being developed for the TSAR and TSMR, the quarterly reports proposal has been placed on hold.  Additionally, we have requested that MCSO and its contractor develop a method to analyze the Non-Traffic Contact Forms that have been conducted since the completion of the interface between these data and EIS in July 2017 (see Paragraph 75.h.).  While we have been given access each month to the NTCFs completed, there has not been a means of analyzing potential trends across months for these particular incidents.

MCSO has worked with us and the Parties to resolve each of these deficiencies, and has been transparent in advising us of problems that have arisen.  We have consistently been provided access to the data and reports relevant to this Paragraph.  The deficiencies noted do impact compliance with other Paragraphs.

WAI 37002

## Section 8: Early Identification System (EIS)

**COURT ORDER IX.  EARLY IDENTIFICATION SYSTEM ("EIS")**

***Paragraph 72.*** *MCSO shall work with the Monitor, with input from the Parties, to develop, implement and maintain a computerized EIS to support the effective supervision and management of MCSO Deputies and employees, including the identification of and response to potentially problematic behaviors, including racial profiling, unlawful detentions and arrests, and improper enforcement of Immigration-Related Laws within one year of the Effective Date. MCSO will regularly use EIS data to promote lawful, ethical and professional police practices; and to evaluate the performance of MCSO Patrol Operations Employees across all ranks, units and shifts.*

**Phase 1:**  In compliance

- GH-5 (Early Identification System), currently under revision, though the proposed revisions do not affect the language pertaining to this Paragraph.

**Phase 2:**  Not in compliance

During 2017 and early 2018, MCSO introduced interfaces between EIS and several remote databases of importance.  EIS now includes Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), records from the Administrative Office of the Courts (AOC), training completion and policy acknowledgement records from the Cornerstone software (the HUB).  MCSO continues to work on the EIU Operations Manual to memorialize the collection, analysis, and dissemination of relevant data; as well as the responsibilities and roles of departmental and EIS personnel.  During our October site visit, MCSO provided a table indicating the current status of the EIU Operations Manual.  The table indicated that 43% of the manual had been completed and that 37% of the manual was being evaluated by the Monitoring Team and the Parties.  The remaining 20% of the manual pertaining to monthly, quarterly, and annual analyses and definitions remain under development.

MCSO has not produced a consistent Traffic Stop Monthly Report (TSMR) in nearly two years as a result of data and methodological problems discovered by MCSO and us.  Additionally, MCSO has yet to produce a Traffic Stop Quarterly Report (TSQR).  We have been working with MCSO and the Parties to overcome the problems inhibiting the production of these reports and incremental progress has been made.  MCSO has recently contracted with a new analytic provider who is evaluating current practices and will propose methodologies for all three statistical reports within the next several months.  To that end, MCSO requested a modification in the timeframe for the Fourth Traffic Stop Annual Report from a 12-month to an 18-month report to encompass the period from July 1, 2017 to December 31, 2018.  This would afford MCSO the opportunity to come up-to-date in terms of annual analyses without sacrificing the ability to compare trends with past reports.  In addition, MCSO would like future annual reports to be based upon calendar year data rather than fiscal year data.  We thoroughly discussed both

WAI 37003

requests during our site visit, and MCSO was granted approval for both proposals during the exit meeting with the Court Implementation Division at the end of our October site visit. MCSO continues to regularly publish a number of reports on deputy activity and supervisory oversight that are not tied to the methodologies of the TSMR, TSQR, or TSAR.

The Audits and Inspections Unit (AIU) produces a monthly report evaluating Supervisory Notes that indicate whether supervisors are reviewing the EIS data of deputies under their command. The inspection looks for indications that supervisors made entries for each person they supervise with regard to two randomly selected BWC videos, provide one EPA note, make two supervisor entries, and indicate that the supervisor has reviewed their deputies EIS status. In July, the inspection found no deficiencies among the supervisors selected for review. In August, the overall compliance rate was 95%; however, the deficiencies noted all emanated from District 2. AIU sent a BIO Action Form to District 2 via Blue Team. During our October site visit meeting, we made a formal request for a copy of the results of this Action Form. District 2 command staff indicated that the sergeant in question experienced an FMLA event and took some time off to address these issues. During this period of time, due to a miscommunication, the oversight responsibilities of this sergeant were not covered. Both the District Captain and lieutenant addressed these issues with meetings of all supervisors in the District. As of this writing, there has been no publication of the supervisor note inspection from September.

In the Traffic Stop Review and Discussion Inspections for July and August, supervisors were found to be in compliance in excess of 98%. These results continue to show a high level of oversight and interaction between supervisors and deputies regarding traffic stops. There is a slight drop in compliance for the Traffic Stop Data Inspection. For this inspection, AIU uses a matrix comparing traffic stop information found on Vehicle Stop Contact Forms (VSCFs) with Computer Aided Dispatch (CAD) and Body-Worn Camera (BWC) footage. The overall inspection results for July and August were 88% and 86%, respectively. The deficiencies were for failure to run warrant checks, incorrect numbers on VSCFs, and failure to document passengers or fellow deputies on VSCFs when they were visible on BWC recordings. AIU sent out 15 BIO Action Forms for this two-month period. While supervisors only review two BWC recordings per month, some of the other deficiencies could have been discovered in the review of VSCFs that occur within three days of a citation/stop. This is an excellent quality check for supervisors and District command to address when Action Forms are received.

EIU also produces a monthly report on alerts triggered within EIS. The alerts are reviewed by EIU personnel and disseminated to supervisors and District command if potential deficiencies or problems may exist. The supervisors employ a template (Attachment B of GH-5) to conduct the investigation and report their findings and results to the chain of command through Blue Team. Command personnel have improved their effectiveness in reviewing these investigations and have indicated that a number of investigations are returned to supervisors for clarification or further processing. BIO has also created an alert investigation review committee to check the quality of the original investigation and the review of District command staff. During this reporting period, the Alert Review Committee (ARC) communicated with District personnel to

WAI 37004

initiate an Action Plan for a deputy who had received a number of external complaints that at first appeared disconnected, but upon closer examination indicated communication issues with civilians.  The Action Plan involves training as well as added oversight of the deputy.  We requested a review of the Supervisory Notes pertaining to the Action Plan and found them to adequately address the issues of the Plan.  Other alert investigations appeared to be properly closed.

AIU is currently working to develop inspections for both the alert inspection process and the tracking of Action Forms disseminated to the Districts because of deficiencies discovered.  We have commented on early drafts of these inspections and will use them as they are published to access the compliance of MCSO.

As noted in Paragraph 70, MCSO has also completed the Action Plans emanating from the Second Traffic Stop Annual Report (TSAR).  We have evaluated both the supervisory discussions leading up to the Action Plans (APs) and the Supervisory Notes describing the activity during the AP process.  We have shared with MCSO our concern that some supervisors did not appear well-prepared or comfortable conducting the taped supervisor discussion.  Moreover, a few supervisors noted repeated deficiencies of their subordinates during the Action Plan process, but did not recommend additional training that may have ameliorated these problems.  There were also examples of supervisors invested in the process and providing significant mentorship to their deputies.  MCSO took note of these issues and made several modifications in preparation for supervisor discussions emanating from the Third TSAR.  These processes are ongoing, and we will address our findings in future quarterly reports.

***Paragraph 73.***  *Within 180 days of the Effective Date, MCSO shall either create a unit, which shall include at least one full-time-equivalent qualified information technology specialist, or otherwise expand the already existing role of the MCSO information technology specialist to facilitate the development, implementation, and maintenance of the EIS.  MCSO shall ensure that there is sufficient additional staff to facilitate EIS data input and provide Training and assistance to EIS users.  This unit may be housed within Internal Affairs ("IA").*

**Phase 1:**  In compliance

- GH-5 (Early Identification System), currently under revision, though the proposed revisions do not affect the language pertaining to this Paragraph.

**Phase 2:**  In compliance

The EIU is a fully functioning unit.  A lieutenant coordinates the Unit, with three sergeants conducting investigations, one analyst, and one administrative staff member under the auspices of BIO.  Over the past six months, this unit has experienced a number of transfers and changes to leadership in both EIU and BIO.  These transitions occurred during the evaluation and implementation of the Second TSAR.  At the direction of the new leadership, MCSO provided significant additional personnel and support staff to address the volume of activity surrounding the creation and evaluation of documents, as well as the execution of supervisory discussions

WAI 37005

and action plan processes in the Districts.  While these processes were not without delay, we acknowledge MCSO's commitment.  More importantly, the lessons learned during this process have prompted MCSO to suggest a special unit within BIO for the future responsibilities surrounding annual traffic stop reports and processes.  MCSO has quickly moved from the implementation of Action Plans for the Second TSAR to organizing the materials and supervisory discussions for the Third TSAR.  The processes for the Third TSAR eliminated some of the redundancies found during the Second TSAR and have attempted to integrate the line supervisors into the discussion of TSAR findings with deputies without overwhelming them.  We will evaluate these discussions in future quarterly evaluations.

EIU has also overseen the expansion of the EIS database over the 18 months to include Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), records from the Arizona Office of Courts (AOC) and training and policy receipt records from the Cornerstone software program (the HUB).  Supervisors now have much more information available to them about the deputies under their command than they ever had before.

EIU has also overseen the development and revision of the EIU Operations Manual.  MCSO has provided a table indicating that 43% of the manual has been approved, while another 37% has been submitted for review and 20% remains under development.  The hiring of a new outside contractor to analyze traffic stop data (TSAR, TSMR, and TSQR) will provide the foundation for the completion of the remaining aspects of the EIU Operations Manual that are incomplete or under revision.  The manual is fundamentally important to improve the transparency and effectiveness of MCSO data collection and use as a whole.

***Paragraph 74.***  *MCSO shall develop and implement a protocol setting out the fields for historical data, deadlines for inputting data related to current and new information, and the individuals responsible for capturing and inputting data.*

**Phase 1:**  In compliance

- GH-5 (Early Identification System), currently under revision, though the proposed revisions do not affect the language pertaining to this Paragraph.
- EIU Operations Manual, currently under revision.

**Phase 2:**  Not in compliance

WAI 37006

MCSO continues to work on the development of the EIU Operations Manual.  As a result of the demands of the Second Traffic Stop Annual Report (TSAR), and the more recent need to replace the outside contractor responsible for traffic stop data analysis, MCSO had suspended the completion of the EIU Operations Manual.  While MCSO continues to develop sections of the manual, the sections relating to Traffic Stop Annual Report (TSAR), Traffic Stop Monthly Report (TSMR) and Traffic Stop Quarterly Report (TSQR) have been placed on hold.  MCSO's new vendor is currently reviewing existing and proposed processes to determine if they meet the needs of MCSO and the Court Order.  During our October site visit, MCSO provided a tabular breakdown indicating that 43% of the manual had been approved, 37% had been submitted for review, and 20% remained under development.

The new leadership of BIO and EIU has also undertaken a re-examination of the thresholds that potentially trigger alert investigations.  This is responsive to our repeated comments that many of the thresholds had never been based upon statistical or theoretical foundations.  MCSO is revisiting each threshold, particularly the complaints accumulated by subordinates of supervisors and the use of force, to ensure that they are set at a level commensurate with the type of assignment of deputies and their supervisors in accordance with Paragraph 81.f.  While the old thresholds remain in place, BIO is conducting a thorough examination of what led to the original thresholds and how these might need to be modified, given contemporary experience. In addition, the leadership has suggested they will consult with adjoining jurisdictions to further solidify the threshold changes that may be proposed.

MCSO has shown progress in the development of a data-handling protocol.  A committee of personnel from units responsible for assembling the data used for analysis has been established. The monthly reports of these committee meetings appear consistent with the general guidelines of this Paragraph.  The previous outside contractor for data analyses used methods of analysis and software in the publication of the Second TSAR that differed from expectations.  With the hiring of a new outside contractor, these methods and software programs may need to be altered.  We will evaluate these proposals as they are produced.

Finally, during the months of July-September, EIU produced a monthly report for benchmarks not related to the above methodologies.  Benchmarks 3 and 8 (Paragraph 67) involve incidents of immigration inquiries and data validation errors committed by deputies.  During this period, there was one immigration inquiry that MCSO found to be in error when it reviewed Body-Worn Camera (BWC) images, Computer Aided Dispatch (CAD) logs, and Vehicle Stop Contact Form (VSCF).  The deputy was found to have incorrectly indicated an immigration inquiry during a traffic stop that did not involve such an investigation.  The District was informed of this error and took corrective action with the deputy.  MCSO also found 13 data validation entries and submitted corrective action to the appropriate Districts for review and action.  We believe MCSO's oversight of the benchmarks has been transparent and effective to this date.

We will evaluate each of these processes as they are produced and ensure that they meet the Order requirements.  At present, MCSO is not in Phase 2 compliance with this Paragraph.

WAI 37007

*Paragraph 75.*  *The EIS shall include a computerized relational database, which shall be used to collect, maintain, integrate, and retrieve:*

a.   *all misconduct Complaints or allegations (and their dispositions), excluding those made by inmates relating to conditions of confinement or conduct of detention officers (i.e., any complaint or allegation relating to a traffic stop shall be collected and subject to this Paragraph even if made by an inmate);*

b.   *all internal investigations of alleged or suspected misconduct;*

c.   *data compiled under the traffic stop data collection and the patrol data collection mechanisms;*

d.   *all criminal proceedings initiated, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the County and/or its Deputies or agents, resulting from MCSO Patrol Operations or the actions of MCSO Patrol Operation Personnel;*

e.   *all arrests;*

f.   *all arrests in which the arresting Deputy fails to articulate probable cause in the arrest report, or where an MCSO Supervisor, court or prosecutor later determines the arrest was not supported by probable cause to believe a crime had been committed, as required by law;*

g.   *all arrests in which the individual was released from custody without formal charges being sought;*

h.   *all Investigatory Stops, detentions, and/or searches, including those found by the Monitor, an MCSO supervisor, court or prosecutor to be unsupported by reasonable suspicion of or probable cause to believe a crime had been committed, as required by law;*

i.   *all instances in which MCSO is informed by a prosecuting authority or a court that a decision to decline prosecution or to dismiss charges, and if available, the reason for such decision;*

j.   *all disciplinary action taken against employees;*

k.   *all non-disciplinary corrective action required of employees;*

l.   *all awards and commendations received by employees;*

m.   *Training history for each employee; and*

n.   *bi-monthly Supervisory observations of each employee.*

**Phase 1:**  In compliance

- GC-13 (Awards), most recently revised on November 30, 2017.

- GH-5 (Early Identification System), currently under revision, though the proposed revisions do not affect the language pertaining to this Paragraph.

WAI 37008

- EIU Operations Manual, currently under revision.

- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:** Not in compliance

During 2017, and the first quarter of 2018, MCSO has made progress toward the automation of data in the EIS database relevant to this Paragraph. MCSO has placed into production data interfaces for Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), Justice Court turndowns (AOC) and the Cornerstone software program (the HUB) that provides reports for training and policy acknowledgment. MCSO continues to develop some inspections that ensure that personnel are accurately using the EIS data available to them. We continue to evaluate and monitor the use of EIS in furtherance of the First Order.

Paragraph 75.a. requires that the database include "all misconduct Complaints or allegations (and their dispositions)," with some exclusions.

EIPro, a web-based software application that allows employees and supervisors to view information in the IAPro case management system, includes the number of misconduct complaints and allegations against deputies.

Since February 2017, both open and closed cases have been viewable by supervisors. PSB controls the ability to view open cases based upon the parties who may be involved. PSB personnel developed a protocol to write the summaries for both open and closed cases. This protocol has been approved, and will be incorporated into the PSB Operations Manual that is currently under revision. As a result of a regular quarterly document request, we receive synopses of open and closed external complaints/investigations. Our review of these cases confirms that the summaries meet expectations. Additionally, during our July and October site visits, we observed that field supervisors could easily access these summaries and understand the types of issues involved in the complaints. Supervisors are also advised that they can always contact EIU and PSB for clarification if it is necessary.

MCSO is in compliance with this Subparagraph.

Paragraph 75.b. requires that the database include "all internal investigations of alleged or suspected misconduct."

Corresponding to the discussion above involving complaints, internal investigation summaries also appear in the IAPro system. All complaint summaries, open and closed, have been viewable since February 2017. PSB uses a standard protocol to develop the case summaries and access limits. This protocol has been approved by us and will be included in the PSB Operations Manual that is now being drafted. We receive the synopses of open and closed internal investigations each month as a result of a regular quarterly document request. Field supervisors have also been able to show that they have access to these summaries in EIS and find them to be clear and concise. Field supervisors always have the option of requesting additional information from EIU and PSB should they deem the summaries insufficient. We have not received any indication that such a request has occurred.

WAI 37009

MCSO is in compliance with this Subparagraph.

Paragraph 75.c. requires that the database include "data compiled under the traffic stop data collection and the patrol data collection mechanisms."

As documented in past quarterly reports, MCSO has created electronic forms to collect data from traffic stops, incidental contacts and warnings.  As noted in Paragraphs 69 and 74, MCSO has suspended traffic stop alerts based upon the benchmarks of Paragraph 67.  MCSO continues to collect this information within EIS and once the methodology is approved this data will be used to trigger future alerts.

MCSO has also created interfaces with EIS for remote databases including Incident Reports (IRs) and Non-Traffic Contact Forms (NTCFs).   These reports are readily available to supervisors to review within EIS.  During both our July and October site visits, field supervisors have shown that they have the ability to view IRs and NTCFs.  AIU already conducts an inspection of IRs, and is currently developing a similar quarterly inspection of NTCFs.  When proposed, we will evaluate the sufficiency of this new inspection.  In lieu of the inspection, MCSO has made available all NTCFs that we have evaluated.  We have found no areas of concern regarding the handling of these incidents.

MCSO has also hired a new outside contractor to conduct the analyses for monthly, quarterly, and annual traffic stop data.  A review of past practices is ongoing and methodologies are currently under development.  We have also advised MCSO that they must create a statistical methodology for NTCFs that is similar to that for traffic stops to ensure that deputies are not acting in a biased fashion during the NTCF incidents.  When proposed, we will review these analytic strategies.

MCSO is not in compliance with this Subparagraph.

Paragraph 75.d. requires that the database include "all criminal proceedings initiated, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the County and/or its Deputies or agents, resulting from MCSO Patrol Operations or the actions of MCSO Patrol Operation Personnel."

MCSO's Legal Liaison Section receives and forwards this information to EIU for entry into the EIS database.  Deputies self-report contacts they have with other agencies, and any two contacts within a rolling six-month period results in an alert requiring a supervisor to investigate.  Supervisors have demonstrated the ability to access this information during our July and October 2018 site visits.

MCSO is in compliance with this Subparagraph.

Paragraph 75.e. requires that the database include "all arrests."

WAI 37010

Arrests may not always occur as a result of a traffic stop.  MCSO, therefore, has placed into production an interface between EIS and the Jail Management System (JMS).  This interface allows supervisors to easily access information regarding arrest that cannot be viewed through traffic data.  During our site visits, supervisors have demonstrated the ability to access the IRs and related arrest information.

MCSO is in compliance with this Subparagraph.

Paragraph 75.f. requires that the database include "all arrests in which the arresting Deputy fails to articulate probable cause in the arrest report, or where an MCSO Supervisor, court or prosecutor later determines the arrest was not supported by probable cause to believe a crime had been committed, as required by law."

Incident Reports (IRs) are housed in the Filebound software system.  MCSO has created an interface between Filebound and EIS to provide a summary of information to facilitate supervisory oversight.  Supervisors must review and sign off on IRs for each deputy involving an arrest or detention of a suspect within 72 hours of the incident.  Supervisors are also required to ensure that probable cause exists for each charge or arrest outlined within an IR.  AIU additionally conducts a quarterly audit of IRs to ensure that all policy requirements are met.  In both the first and second quarters of 2018, 97% of supervisors memorialized their review of the IRs and 100% of IRs contained the necessary probable cause statements.  The audit for the third quarter has not yet been produced.

If a court or prosecutor decides not to prosecute a case, both the deputy and their immediate supervisor are notified.  AIU also conducts an inspection of all cases turned down for prosecution.  For July and August, there were two cases that were turned down due to errors in the reports.  One was submitted over one year after the incident and did not include any new information to support the charge, although, MCAO indicated that the report included evidence that could be used for other charges not originally requested.  One involved an IR that did not articulate probable cause but led to the arrest and questioning of a suspect at a substation before the person was released.  These cases were referred to the Districts for further examination, and a memo of concern was sent to PSB.  In addition, AIU noted several deficiencies as a result of the cases turned down for prosecution that did not involve issues of probable cause.  These cases were also referred to the Districts for corrective action.

MCSO is in compliance with this Subparagraph.

Paragraph 75.g. requires that the database include "all arrests in which the individual was released from custody without formal charges being sought."

WAI 37011

The ability to capture this information depends upon what actually occurred within the context of the interaction.  If the suspect was taken into physical custody but released prior to booking, there would be a JMS record, as indicated in Subparagraph 75.e. above.  Therefore, MCSO could use the interface described above to pull the relevant data elements into EIS.  However, if the incident does not rise to the point of physical custody and detention, then it would likely yield an Incident Report, covered under Subparagraph 75.f. above or an Investigatory Stop under Subparagraph 75.h. to follow.  The interfaces for IR and NTCF data became operational prior to July 1, 2017.

MCSO is in compliance with this Subparagraph.

Paragraph 75.h. requires that the database include "all Investigatory Stops, detentions, and/or searches, including those found by the Monitor, an MCSO supervisor, court or prosecutor to be unsupported by reasonable suspicion of/or probable cause to believe a crime had been committed, as required by law."

MCSO has created interfaces for both IRs and NTCFs.  As noted in 75.f., the first and second quarter audits of IRs found that 100% had the necessary probable cause or reasonable suspicion statements necessary.  While the audit for the third quarter has not yet been produced, the monthly report of County Attorney turndowns for July and August indicate that there was one case each month that was not prosecuted because there was a lack of probable cause described in the documents.  These cases have been sent to PSB for review.

In July 2017, the interface between EIS and the database for NTCFs was placed into production.  MCSO also reissued EA-3 (Non-Traffic Contact) on June 1, 2017 – and further amended the policy on June 14, 2018.  This policy specifies the responsibility of MCSO personnel regarding different types of search occurrences.  If the search is related to a traffic stop, it should be captured on the VSCF.  Searches occurring within activities resulting in an Incident Report will be captured under Subparagraph 75.e., and NTCF searches fall under this Subparagraph.

From January-April 2018, the number of NTCF reports was insignificant; and we reviewed each report.  However, in May 2018, we selected a sample of 25 cases due to an increased volume.  In both July and August, the number of NTCF cases numbered 25 and 26, respectively.  While our review of the July and August NTCF cases reveals no significant issues, the volume of cases is getting to the point where examination of each case becomes less impractical.  MCSO has been working on the development of an audit, like that for IRs, to ensure that the actions of deputies and supervisors meet the necessary policy requirements.  MCSO must make the development of this audit a priority to maintain compliance with this Subparagraph.  We have also requested under this Subparagraph, and section 75.c. above, as well as Paragraph 68.d., that MCSO create a methodology to analyze NTCF cases to ensure that there are no trends or indications that bias might be occurring.  Except for the month of May 2018, noted above, we have reviewed all NTCF documents provided by MCSO.  If the volume of NTCFs increases to the point that this is no longer feasible, MCSO should be prepared with a plan to conduct regular audits of these forms.  We will evaluate these processes as they are proposed.

MCSO is in compliance with this Subparagraph.

WAI 37012

Paragraph 75.i. requires that the database include "all instances in which MCSO is informed by a prosecuting authority or a court that a decision to decline prosecution or to dismiss charges, and if available, the reason for such decision."

The EIS database has included both County Attorney Actions and an interface with the Justice Courts (AOC) since July 2017.  AIU produces a monthly inspection of these cases, looking for the lack of probable cause as well as a host of other issues.  The majority of deficiencies found result in an Action Form to the relevant District command.  In July and August, there was one case each month where MCAO indicated that probable cause for the charges listed by the deputy were not supported in the documentation.  Both cases resulted in memos of concern for PSB evaluation.  AIU additionally identified seven cases each month where MCAO or Justice Court (JC) personnel had noted deficiencies involving missing documentation to support the original charge.  These and other cases with minor deficiencies were returned to District command staff through Action Forms in Blue Team for corrective action and return.

MCSO is in compliance with this Subparagraph.

Paragraph 75.j. requires that the database include "all disciplinary action taken against employees."

MCSO currently tracks disciplinary actions in the IAPro system, which allows supervisors to search the history of their employees in EIS.

EIU produces a monthly alert report relevant to Paragraphs 70, 71, 75, and 81.  Table 8 of this report indicates the disposition of the alerts for the reporting period, ranging from "no further action" to "referral to PSB."  Out of the 97 cases referred to supervisors for investigation from July to September, 17 cases resulted in a meeting with a supervisor; and supervisors closed 26 cases, indicating that no further action was required.  One case was referred to PSB for further processing and has not yet been completed.  An additional two cases in September resulted in additional training for the deputy.  The problem, evident in these numbers, is that there remain a significant number of cases with no disposition within the first two months.  We have discussed this with EIU and AIU personnel.  In response, they are working on an alert tracking inspection to better capture the time to disposition and the approval of the closure and disposition imposed.  We have received only the first proposal of this report, and will evaluate subsequent iterations as they are made available.

MCSO is in compliance with this Subparagraph.

Paragraph 75.k. requires that the database include "all non-disciplinary corrective action required of employees."

MCSO uses a combination of Supervisory Note inspections (in particular, bimonthly reviews of a deputy's performance) and the monthly alert report described in the previous Subparagraph to fulfill the requirements for this Subparagraph.  As noted previously, the majority of alert investigations reported each month are closed by supervisors as requiring no further action.  The second most frequently used closure is meeting with a supervisor.  We also conduct evaluations of a randomly selected group of closed alert investigations each month.  Those closed with the

WAI 37013

notation of meeting with a supervisor have generally been found to be supported by the documents connected to the investigation. In these reports, supervisors provide a synopsis of the instances leading up to the alert being triggered and provide a substantive description of the discussion they have had with the respective deputy. It would appear from the sampling that deputies are receptive to these meetings, as they provide clarification for the proper processes to use should future similar instances arise.

Supervisors can also search the Supervisory Note field for each deputy using key words and phrases to determine if prior supervisors of a particular subordinate had employed briefings, trainings, or supervisory discussions to address similar issues.

AIU also evaluates a supervisor's use of EIS in the supervision of their deputies. The Supervisory Note inspection for July and August shows an overall compliance rate of 100% and 95% respectively for the criteria investigated. In August, AIU sent an Action Form to District 5 due to one sergeant with five deficiencies. The District investigation noted that the supervisor had experienced a family FMLA event and took time off of work. Due to a lack of communication, the supervisory responsibilities of this sergeant had not been covered, resulting in the deficiencies. District command held squad and supervisory meetings to ensure that this did not occur again. MCSO is planning to initiate an inspection of Action Forms and alerts. Neither of these is in place yet, but we have reviewed and commented on draft proposals.

MCSO is in compliance with this Subparagraph.

Paragraph 75.l. requires that the database include "all awards and commendations received by employees."

MCSO published GC-13 (Awards) on November 30, 2017. With this publication, EIU created categories for awards or commendations within EIS. With the introduction of the newest version of EIPro, these fields are also searchable by supervisors. During our July and October 2018 site visits, supervisors demonstrated how they search and locate these in their subordinates' EIS data. According to the monthly alert inspection report for August, a supervisor had recommended a commendation for a deputy under their command.

MCSO is in compliance with this Subparagraph.

Paragraph 75.m. requires that the database include the "[t]raining history for each employee."

MCSO has transitioned from the Skills Manager System to the Cornerstone (the HUB) software program. The HUB has replaced the E-Policy and E-Learning programs. The HUB routinely updates recent training and policy for deputies and is visible by immediate supervisors. MCSO also created an interface between the HUB and EIS.

During our April and July site visits, all field supervisors stated they were familiar with the HUB and were able to access the information contained therein. Several supervisors continued to note that they were experiencing difficulty scheduling training for their subordinates, but they could view whether subordinates had completed training or logged in to review policy documents. During our October site visit, MCSO advised that they had remedied a glitch that

WAI 37014

was impacting the purview of supervisors.  We verified with District personnel that supervisors were now able to view all information pertaining to their subordinates.  The supervisors also noted that when they ran into difficulties they could easily contact Training Division or technology staff to assist them.  The Technology Management Bureau and Training Division noted that they were keeping a running list of problems with the HUB and were incrementally correcting them.  We will evaluate this again during our next site visit.

MCSO is in compliance with this Subparagraph.

Paragraph 75.n. requires that the database include "bi-monthly Supervisory observations of each employee."

The Audits and Inspections Unit (AIU) conducts a monthly inspection of Supervisory Notes. One of the indicators AIU evaluates is whether supervisors are making two notes per deputy each month.  In July, the compliance rate was 100%,; while in August, the compliance rate was 93%.  An Action Form was sent to District 5 regarding these deficiencies.  A supervisor who experienced an FMLA event did not have someone make the necessary Supervisory Notes for his deputies during his absence, which resulted in the deficient inspection report.  The Action Form was returned through Blue Team with the notation that the District held squad and individual sessions due to a lapse of communication regarding supervisory oversight.  EIU has already included multiple BIO Action Forms for repetitive deficiencies as a trigger for an alert investigation.

MCSO is not in compliance with this Subparagraph.

MCSO is making progress toward the development of a functioning relational database that is used consistently by MCSO personnel.  With the operationalization of interfaces for Incident Reports, Non-Traffic Contact Forms, the Arizona Office of the Courts, and the HUB, EIS now contains the information required by the Order.  MCSO has worked diligently to use some of the data above to investigate compliance rates with the Court Orders and continues to work on the development of added inspections for alert tracking, BIO Action Form deficiencies, and NTCF evaluations similar to those conducted for IRs.  We will evaluate these as they are made available.

***Paragraph 76.***  *The EIS shall include appropriate identifying information for each involved Deputy (i.e., name, badge number, shift and Supervisor) and civilian (e.g., race and/or ethnicity).*

**Phase 1:**  In compliance

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- GH-5 (Early Identification System), currently under revision, though the proposed revisions do not affect the language pertaining to this Paragraph.

**Phase 2:**  In compliance

WAI 37015

MCSO has instituted a quality check process for VSCFs that requires supervisors to review all traffic stop documents within three days of the stop. AIU conducts an inspection of the timeliness of these reviews. For July and August, the compliance rate for supervisor review exceeded 98%. A subsequent inspection by AIU of Traffic Stop Data is designed to ensure that all necessary information is included on traffic forms and these forms coincide with CAD and BWC images. The compliance rate for the data inspection ranges from 88% in July to 86% in August. The inspection for September has not yet been submitted. While none of the deficiencies that led to these lower percentages were the result of failing to identify themselves, the driver or passengers of the vehicles stopped, or failing to register the perceived race/ethnicity of persons contacted, there was one instance in which the identifying call number for an additional deputy on scene was incorrect. This resulted in an Action Form being sent to the District.

MCSO has incorporated patrol data into the EIS through the creation of interfaces for Incident Report (IR) and Non-Traffic Contact Form (NTCF) documents. Each of these documents lists the required name of the deputy and civilian, as well as the ethnicity of the civilian, in accordance with the Paragraph. AIU conducts a quarterly inspection of IRs, including a check for racial/ethnic bias in the reporting documents and the identification of all parties contacted as a result of the incident. The compliance rate for the IR inspection during the second quarter of 2018 was up slightly to 94%. None of the deficiencies found by AIU were related to the identification of persons contacted or deputies involved. Most deficiencies were the result of failing to notify supervisors in a timely fashion or filing/signing documents within policy timeframes. The IR inspection for the third quarter has not yet been published. Non-Traffic Contact Forms contain the same basic information about the identity of the deputy making the contact and the persons being contacted. MCSO does not yet have an inspection of NTCFs, but they do provide us with copies of the documents. Up to this point we have not found an NTCF document that does not include the criteria required by this Paragraph. However, as the volume of NTCF documents increases MCSO will have to finalize their plans to create an inspection like that used for IRs.

***Paragraph 77.*** *MCSO shall maintain computer hardware, including servers, terminals and other necessary equipment, in sufficient amount and in good working order to permit personnel, including Supervisors and commanders, ready and secure access to the EIS system to permit timely input and review of EIS data as necessary to comply with the requirements of this Order.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

Since our earliest site visits in 2014, we have addressed the issue of "necessary equipment, in sufficient amount and in good working order" with MCSO. As part of our monthly document requests, we receive an accounting, by District, of how many vehicles have functioning TraCS systems.

WAI 37016

Since the end of 2015, we have found that all marked patrol vehicles were properly equipped with TraCS equipment. MCSO developed EB-2 (Traffic Stop Data Collection), which states that in the event that a TraCS vehicle is not operational, or available, each District possesses the necessary equipment at the substation for deputies to input his/her traffic stop information before the end of the shift. Due to the mountainous regions throughout Maricopa County, there have always been connectivity issues. However, these areas are well-known to patrol deputies; and they have demonstrated how they adapt to connectivity problems. The VSCF also allows deputies to note issues with technology on a traffic stop.

During our July and October visits to the Districts, we spot-checked the facilities and patrol cars, and found that they had functioning TraCS equipment, and each District office had available computers for any occurrence of system failures with vehicle equipment. In addition, each District had spare parts in the eventuality that body-worn camera issues arose. Even so, command staff in the Districts have repeatedly noted that the old body-worn camera systems are experiencing battery and cable issues on a regular basis.

At present, the technology and equipment available at MCSO meet the requirements of the Order.

**Paragraph 78.** *MCSO shall maintain all personally identifiable information about a Deputy included in the EIS for at least five years following the Deputy's separation from the agency. Information necessary for aggregate statistical analysis will be maintained indefinitely in the EIS. On an ongoing basis, MCSO shall enter information into the EIS in a timely, accurate, and complete manner, and shall maintain the data in a secure and confidential manner. No individual within MCSO shall have access to individually identifiable information that is maintained only within EIS and is about a deputy not within that individual's direct command, except as necessary for investigative, technological, or auditing purposes.*

**Phase 1:** In compliance

- GH-5 (Early Identification System), currently under revision, though the proposed revisions do not affect the language pertaining to this Paragraph.

**Phase 2:** In compliance

GH-5 (Early Identification System) clearly states that employees only have access to EIS in furtherance of the performance of their duties, and that any other unauthorized access will be addressed under MCSO's discipline policy. The policy also notes that access to individual deputy information will be limited to appropriate supervisory/administrative personnel of that deputy. In addition, the policy states that personal information will be maintained in the database for at least five years following an employee's separation from the agency; however, all other information will be retained in EIS indefinitely

WAI 37017

The most recent occurrences of a misuse of MCSO's computer system occurred in 2011 and 2015. These instances were discovered as a result of a quality audit by the FBI in 2017. As a result, MCSO published a System Log Audit operating procedure in November 2017 that required PSB to notify the Technology Management Bureau of any investigations involving a system breach. This operating procedure (BAS SOP 17-4) was fully vetted during the January 2018 site visit. MCSO reported no system breaches occurring between our July and October site visits. We will continue to inquire about these issues during subsequent site visits.

MCSO's concern for the integrity of information in EIS is further exemplified by the protocols that PSB has created to meet the requirements of Subparagraphs 75.a. and 75.b. regarding purview of open complaints and internal investigations. PSB not only controls who can view summaries of open investigations, but has created a protocol for creating the summary of open investigations to protect the integrity of the case while it is being processed.

MCSO has also created a work group to ensure the integrity of traffic stop data used for analysis. These protocols will be incorporated into the next draft of the EIU Operations Manual. Moreover, although the annual report includes analyses that identifies deputies who are outliers compared to their peers with regard to traffic stops, citations, warnings and arrests that may indicate racial/ethnic bias, the identities of these deputies are removed from documents prior to being made public.

***Paragraph 79.*** *The EIS computer program and computer hardware will be operational, fully implemented, and be used in accordance with policies and protocols that incorporate the requirements of this Order within one year of the Effective Date. Prior to full implementation of the new EIS, MCSO will continue to use existing databases and resources to the fullest extent possible, to identify patterns of conduct by employees or groups of Deputies.*

**Phase 1:**  In compliance

- GH-5 (Early Identification System), currently under revision, though the proposed revisions do not affect the language pertaining to this Paragraph.

**Phase 2:**  Not in compliance

During 2017 and early 2018, MCSO added four interfaces between remote databases and EIS. The EIS now includes Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), Justice Court turndowns (AOC) and the Cornerstone software program (the HUB) that replaced the Skills Management System (SMS). Supervisors now have the ability to search this additional information for their subordinates without having to access multiple systems. While a significant improvement, the employment of the EIS database remains limited as MCSO is still developing methodologies for the Traffic Stop Monthly and Quarterly Reports, as well as reviewing the methods used for the Traffic Stop Annual Report with the hiring of a new outside contractor who will propose new methodologies prior to the next quarterly report. Until these are complete and operational, MCSO will not achieve Phase 2 compliance with this Paragraph.

WAI 37018

In the meantime, EIU and AIU pull together data to produce reports and inspections of both deputy and supervisor activity.  The EIS automatically triggers alerts for behaviors ranging from unscheduled absences to external complaints.  The EIU uses this information to create monthly reports and to determine whether an investigation by a supervisor is required.  EIU and AIU are continuing to work on the tracking of alert investigations to ensure that they do not languish without some form of closure.

AIU uses the EIS database to generate numerous inspections of Traffic Stop data, Supervisory Notes, County Attorney turndowns, among many others.  When deficiencies are found, AIU sends out BIO Action Forms to the District command to rectify the situation and memorialize what was done.  AIU has already automated an alert threshold for repeated Action Forms for the same events.  AIU personnel are developing a monthly inspection for Action Forms that allows command staff to pinpoint if there are patterns occurring that may not be evident by looking at individual cases.  The goal is to track deficiencies by Districts, shifts, and squads to focus corrective measures in the most beneficial way.

MCSO has hired a new outside contractor for data analysis.  Progress on the methodologies for the TSMR and TSQR have been limited to allow the contractor the opportunity to evaluate the proposals that have been developed so far.  In addition, MCSO is awaiting the review of past TSAR's by their new analytic vendor to determine if future annual methodologies might be modified.  We will review these as they are made available.


### b. Training on the EIS

*Paragraph 80.    MCSO will provide education and training to all employees, including Deputies, Supervisors and commanders regarding EIS prior to its implementation as appropriate to facilitate proper understanding and use of the system.  MCSO Supervisors shall be trained in and required to use EIS to ensure that each Supervisor has a complete and current understanding of the employees under the Supervisor's command.   Commanders and Supervisors shall be educated and trained in evaluating and making appropriate comparisons in order to identify any significant individual or group patterns.   Following the initial implementation of the EIS, and as experience and the availability of new technology may warrant, MCSO may propose to add, subtract, or modify data tables and fields, modify the list of documents scanned or electronically attached, and add, subtract, or modify standardized reports and queries.  MCSO shall submit all such proposals for review by the Monitor pursuant to the process described in Section IV.*

**Phase 1:**  In compliance

- GH-5 (Early Identification System), currently under revision, though the proposed revisions do not affect the language pertaining to this Paragraph.

**Phase 2:**  In compliance

WAI 37019

MCSO completed the EIS and SRELE Training for all supervisory personnel overseeing patrol or traffic operations in November 2017. During our visits to the Districts, several supervisors have noted that they had finally received training on systems they had been using for over one year; while others commented that they did not understand how many tasks had been automated to make their supervisory roles easier. Nearly all supervisors remarked that they believe that future training should include more hands-on activities that they encounter on a regular basis. We recommended that the supervisors contact EIU and the Training Division to develop these ideas.

We will continue to evaluate how the delivery of this training impacts the use of EIS tools by supervisors. We have noted in previous Paragraphs that the Supervisory Note inspections produced on a monthly basis show compliance rates in excess of 95% during July and August f 2018. MCSO has not yet produced the inspection for September.

### c. Protocol for Agency and Supervisory Use of the EIS

*Paragraph 81.* *MCSO shall develop and implement a protocol for using the EIS and information obtained from it. The protocol for using the EIS shall address data storage, data retrieval, reporting, data analysis, pattern identification, identifying Deputies for intervention, Supervisory use, Supervisory/agency intervention, documentation and audit. Additional required protocol elements include:*

a.   *comparative data analysis, including peer group analysis, to identify patterns of activity by individual Deputies and groups of Deputies;*

b.   *identification of warning signs or other indicia of possible misconduct, including, but not necessarily limited, to:*

　　i.   *failure to follow any of the documentation requirements mandated pursuant to this Order;*

　　ii.   *racial and ethnic disparities in the Deputy's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of Deputies' specific duties, or racial or ethnic disparities in traffic stop patterns when compared with data of a Deputy's peers;*

　　iii.   *evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;*

　　iv.   *a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;*

　　v.   *complaints by members of the public or other officers; and*

WAI 37020

vi.     other indications of racial or ethnic bias in the exercise of official duties;

c.    MCSO commander and Supervisor review, on a regular basis, but not less than bimonthly, of EIS reports regarding each officer under the commander or Supervisor's direct command and, at least quarterly, broader, pattern-based reports;

d.    a requirement that MCSO commanders and Supervisors initiate, implement, and assess the effectiveness of interventions for individual Deputies, Supervisors, and units, based on assessment of the information contained in the EIS;

e.    identification of a range of intervention options to facilitate an effective response to suspected or identified problems.  In any cases where a Supervisor believes a Deputy may be engaging in racial profiling, unlawful detentions or arrests, or improper enforcement of Immigration-Related Laws or the early warning protocol is triggered, the MCSO shall notify the Monitor and Plaintiffs and take reasonable steps to investigate and closely monitor the situation, and take corrective action to remedy the issue.  Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or other supervised, monitored, and documented action plans and strategies designed to modify activity.  All interventions will be documented in writing and entered into the automated system;

f.    a statement that the decision to order an intervention for an employee or group using EIS data shall include peer group analysis, including consideration of the nature of the employee's assignment, and not solely on the number or percentages of incidents in any category of information recorded in the EIS;

g.    a process for prompt review by MCSO commanders and Supervisors of the EIS records of all Deputies upon transfer to their supervision or command;

h.    an evaluation of whether MCSO commanders and Supervisors are appropriately using the EIS to enhance effective and ethical policing and reduce risk; and

i.    mechanisms to ensure monitored and secure access to the EIS to ensure the integrity, proper use, and appropriate confidentiality of the data.

**Phase 1:** In compliance

- GH-5 (Early Identification System), currently under revision, though the proposed revisions do not affect the language pertaining to this Paragraph.

**Phase 2:** Not in compliance

MCSO produces a number of reports and inspections that are relevant for this Paragraph. However, due to issues with EIS data and methods of analysis, MCSO has not been able to reliably produce the Traffic Stop Monthly Report based upon the criteria outlined in Paragraph 67; nor has MCSO ever produced a Traffic Stop Quarterly Report.  Additionally, each of the Annual Reports have been delayed, or had to be rewritten, because of anomalies that arose in

WAI 37021

the data or the manner in which it was analyzed.  MCSO has contracted with a new outside vendor to conduct analyses of traffic stop data.  MCSO's vendor is currently reviewing past TSAR methodologies and proposals for the TSMR to ensure that the methods employed are efficient and meet the requirements of the Order.  We will work in concert with MCSO to find solutions for the issues that currently limit the full use of the EIS database.

Paragraph 81.a. requires that MCSO's EIS protocols include "comparative data analysis, including peer group analysis, to identify patterns of activity by individual Deputies and groups of Deputies."

The EIU has conducted monthly and annual analyses looking for outliers that may indicate that an individual is behaving in a biased or unprofessional manner, in accordance with Paragraphs 65, 66, and 67.  The TSMR has been suspended and under revision since April 2016.  We anticipate that MCSO's new vendor will have some suggestions regarding the methodology that MCSO has been developing for the past several months.  We will work with them to test and implement these processes as soon as possible.

MCSO has never produced a TSQR.  There have been several proposals regarding the substance and form these reports may take, but no data has been used to produce an analysis to date.  The Second and Third Traffic Stop Annual Reports, like the first, were delayed due to unforeseen data and analytical problems.  When these issues were discovered, they were addressed as quickly as possible.  MCSO initiated the supervisory oversight and action plans associated with the findings of the Second TSAR.  We and the Parties have commented on the supervisory discussions with deputies and action plan processes.  MCSO provided documentation on the completion of Action Plans stemming from the Second TSAR and has employed approved modified processes to begin the supervisory discussions stemming from the Third TSAR.  We have received the completed supervisory discussions for some of the deputies found to be outliers and will comment on the process in subsequent quarterly reports.

For both the TSMR and TSAR, the analysis has focused on geographic peers; that is, comparing deputy activity to deputies that patrol or conduct traffic stops in the same District.  This remains a rather coarse comparison as Districts can have a variety of social, economic and ethnic differences within their boundaries.  We will work with MCSO's new vendor to determine if there is a means to focus the analysis so that it might be more useful for shift and squad supervisors to identify patterns of concern.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.b. requires that MCSO's EIS protocols include "identification of warning signs or other indicia of possible misconduct."

The publication of GH-5 (Early Identification System) on March 24, 2017 provides significant direction for employees and supervisors alike to understand what type of behaviors will be viewed as problematic.  As noted above, the intent of the TSAR and TSMR is to identify deputies who might be engaged in biased activity regarding who they stop, cite, warn, or search.  MCSO has been developing new methods for the TSMR, and we have collectively engaged in

WAI 37022

numerous discussions about the TSAR. We believe many of these issues will be addressed once MCSO's new vendor is able to evaluate what has been completed to date and what MCSO would like to do in the future. We are confident that the benchmarks from Paragraph 67 will be operational in future monthly analyses, given the progress that MCSO has made to date.

MCSO is also revising the EIU Operations Manual, which will include sections on data protocols and the several analyses based upon the traffic stop data. The manual also includes thresholds for behavior ranging from failure to arrive on time for work to external complaints. BIO is examining these thresholds to determine why they were set at the present levels. This investigation may result in the modification of thresholds that have proven unproductive over the last several years. We will review these changes as they are proposed. Regardless of the outcome, we believe it is a worthwhile endeavor to test processes that have been in place to ensure that they are as efficient as they were intended.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.c. requires that MCSO's EIS protocols include "MCSO Commander and Supervisor review, on a regular basis, but not less than bimonthly, of EIS reports regarding each officer under the Commander or Supervisor's direct command and, at least quarterly, broader, pattern-based reports."

Supervisory Note inspections include four measures to assess how well supervisors are using EIS information to oversee the activity and behavior of their subordinates. These actions range from making supervisory comments on deputies, reviewing their body-worn camera footage, making Employee Performance Appraisal (EPA) notations, and reviewing subordinates' EIS profiles. The overall compliance average across these criteria has remained steady in the upper 90th percentile for the past several months; including July and August 2018. When deficiencies are discovered in this inspection, AIU sends out an Action Form to the immediate supervisor for response and remedy. In August, AIU noted that District 5 had deficiencies across several of the measures included in the inspection. District 5 conducted a further examination and found that all the deficiencies resulted from a single sergeant who had experienced a family FMLA event and had taken several days off. During this period, due to miscommunication, the supervisory note responsibilities of this sergeant had not been delegated to someone else. As a result, District 5 held several meetings to formulate a more thorough approach should an event like this occur again. AIU is developing a proposal to better track Action Forms by type, individual, and District to ensure that any corrective actions are targeted at the most appropriate level.

MCSO is in compliance with this Subparagraph.

Paragraph 81.d. requires that MCSO's EIS protocols include "a requirement that MCSO Commanders and Supervisors initiate, implement and assess the effectiveness of interventions for individual Deputies, Supervisors, and units, based on assessment of the information contained in the EIS."

WAI 37023

Aside from interventions stemming from the Second TSAR, which include Action Plans requiring 30-, 60-, and 90-day follow-up evaluations, EIU personnel were not able to recall other interventions that have been tracked. In August, EIU – in concert with District command – found a need to create an Action Plan for a deputy who had received a number of external complaints and other alerts. We have reviewed the initial supervisory notes pertaining to this Action Plan and have found them to be clear, concise and on target with the intentions of the Action Plan. We have also made several recommendations to BIO and EIU during our site visits and conference calls discussing the requirements of this Paragraph. MCSO is working to develop a tracking protocol and intends to include it in the next draft of the EIU Operations Manual.

The Action Plan interventions stemming from the Second TSAR were tracked through Supervisory Notes under a specific heading for the Second TSAR. While helpful, we found that the Supervisory Notes were often too general; they should specifically address issues that led to the Action Plan to begin with – for instance, the race/ethnicity of driver/passenger contacts during traffic stops. Additionally, we noted that several Action Plans were modified before completion without significant compelling reason. MCSO has addressed these issues and made plans to modify processes for the Third TSAR Action Plans. We will evaluate these as they become available.

While there have been few interventions to track up to this point, apart from those stemming from the Second TSAR, EIU stated that the current revision of the EIU Operations Manual will include a description of the protocol for tracking interventions. Once it is produced, we will evaluate the proposed process.

MCSO is not in compliance with the Subparagraph.

Paragraph 81.e. requires MCSO's EIS protocols include "identification of a range of intervention options to facilitate an effective response to suspected or identified problems. In any case where a Supervisor believes a Deputy may be engaging in racial profiling, unlawful detentions or arrests, or improper enforcement of Immigration-Related Laws or the early warning protocol is triggered, MCSO shall notify the Monitor and Plaintiffs and take reasonable steps to investigate and closely monitor the situation, and take corrective action to remedy the issue. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or other supervised, monitored, and documented action plans and strategies designed to modify activity. All interventions will be documented in writing and entered into the automated system."

GC-17 (Employee Disciplinary Procedures) and GH-5 (Early Identification System) provide a wide range of options for supervisor interventions, as well as practical guidelines about how to employ those options. As noted above, GH-5 includes Attachment B, "Early Identification Alert Response Form." This form specifies the responsibility of supervisors and serves as a checklist of processes the supervisor should use. EIU also attaches any documents, citations, or BWC recordings the supervisor might need to conduct an inquiry. We began seeing the use of

WAI 37024

these forms in April 2017. By September 2017, we found that the closure of alert investigations by supervisors had improved. Most recently, we have only inquired about the ongoing status of PSB inquiries that took priority over alert investigations. MCSO has also created an alert inspection review committee (ARC) to ensure that the closure of alerts is supported by documentation from supervisors and responsive to the needs of the organization. The number of completed investigations has dropped over the past several months as the ARC has taken a proactive role to communicate with the Districts and individual supervisors how to effectively complete these investigations. This has meant that when the ARC intervenes, the total time to complete an investigation has increased; however, once complete, these investigations contain sufficient information to support the actions taken by District personnel. During this reporting period, the committee has returned four cases that needed additional information or investigation from the Districts. We applaud this preemptive move, and will continue to review all documents related to alert investigations and closures.

The monthly alert report produced by MCSO identifies not only the allegation or incident that led to the alert (Tables 1-6), but also dispositions available to supervisors investigating the alert (Tables 8 and 9). In most cases we reviewed, the disposition is "no further action" or "meeting with a supervisor." However, we have also noted that in July, an alert investigation led to a memo of concern to PSB; in August, a supervisor recommended a deputy for a commendation; and in September, there were two instances where a supervisor recommended additional training related to an Action Plan. EIU and AIU are working jointly on an inspection that would track investigations to their completion and evaluate the effect of any intervention planned. We will review this proposal when it is finalized.

MCSO is in compliance with this Subparagraph.

Paragraph 81.f. requires that MCSO's EIS protocols include "a statement that the decision to order an intervention for an employee or group using EIS data shall include peer group analysis, including consideration of the nature of the employee's assignment, and not solely on the number or percentages of incidents in any category of information recorded in the EIS."

In the development of GH-5 (Early Identification System), MCSO has taken into consideration the nature of the employee's assignment. In prior versions of GH-5, MCSO created an appendix for thresholds that indicated, for example, that the "use of force" threshold was different for Detention and Patrol personnel. Detention personnel are much more likely to need to employ force than their Patrol counterparts. In the current version of GH-5, MCSO makes reference to thresholds that will be included in the EIU Operations Manual. MCSO is also evaluating the threshold limits to ensure that they are achieving the goals for which they were originally set.

The hiring of a new vendor for data analysis will allow MCSO to review TSAR processes used in the past as well as evaluate proposals for TSMR and TSQR reports to ensure that they meet the needs of the Organization and comply with the First Order. Until such time as these are approved and put into practice, MCSO will not be in compliance with this Subparagraph.

WAI 37025

When MCSO conducts patrol data analyses, a portion of those analyses is founded on the notion of comparing "geographic peers." Therefore, deputies are only compared to other deputies who make stops within the same District. We, the Parties, and MCSO have often discussed more fine-tuned analyses – but at present, no option exists. During our October site visit, we discussed this issue with MCSO's new vendor at length; and we look forward to reviewing the vendor's proposal as it is produced.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.g. requires that MCSO's EIS protocols include "a process for prompt review by MCSO Commanders and Supervisors of the EIS records of all Deputies upon transfer to their supervision or command."

MCSO has noted the need for a prompt review in both the "Supervisor Responsibilities" and "Command Staff Responsibilities" sections of GH-5 (Early Identification System). EIU specifically addressed this issue during the EIS and SRELE training completed in November 2017. EIU advised supervisors to document when they conducted their review in Supervisory Notes, as well as how long the deputy had been working in their chain of command when the review was conducted. During our July and October site visits, both lieutenants and District Captains noted that they always try to complete these within the first week of a subordinate's arrival and they prompt their sergeants to do the same. We have found no instances where the 14-day limit outlined in policy has been problematic.

MCSO is in compliance with this Subparagraph.

Paragraph 81.h. requires that MCSO's EIS protocols include "an evaluation of whether MCSO Commanders and Supervisors are appropriately using the EIS to enhance effective and ethical policing and reduce risk."

EIU has improved the processing and tracking of alert investigations. The development of Attachment B to GH-5 (Early Identification System) and training completed in EIS and SRELE in November 2017 has dramatically improved the information provided by supervisors when closing alerts. Command staff have also taken an active role in ensuring that if investigations appear incomplete, that they will return them for revision to the supervisor. EIU is working with AIU to develop an inspection that tracks alert investigations and the resultant outcomes. In this way, we should better be able to judge whether these investigations are being conducted in a timely fashion.

WAI 37026

Since the fourth quarter of 2017 to the current reporting period, AIU has found that all supervisors included comments in their Supervisory Notes regarding how they had discussed bias-free policing with their subordinates. We have also repeatedly raised this issue with District command staff during on-site discussions. The comments we have received indicate that command staff and supervisors would like to receive some guidance from the Training Bureau about innovative ways to address the topic of bias-free policing. MCSO is further developing strategies through its Constitutional Policing Plan to promote ethical policing, as we have noted in Paragraph 70. Until such time as these processes are finalized MCSO will not be in compliance with this Subparagraph.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.i. requires that MCSO's EIS protocols include "mechanisms to ensure monitored and secure access to the EIS to ensure the integrity, proper use, and appropriate confidentiality of the data."

MCSO has addressed the security and integrity of data in GH-5 (Early Identification System), as well as instituted facility inspections throughout the Districts – including the security of terminals, access to information, and mobile displays. We spot-check technology and security of old forms during each site visit and have found no problems to date. Additionally, on November 6, 2017, MCSO published the operating procedure for System Log Audit Requests; this became effective on November 30, 2017. The procedure outlines how PSB personnel will notify the Technology Management Bureau of any misuse of MCSO information systems allegations and request an audit of the suspected breach. We discussed this operating procedure, BAS SOP 17-4, during our January 2018 site visit meetings; it meets all of the concerns voiced since the February 2017 discovery of two cases where data was compromised, but no one notified the Technology Management Bureau. We believe this new procedure will ensure that such an oversight does not occur again.

MCSO is in compliance with this Subparagraph.

MCSO meets some of the requirements of Paragraph 81, but there remain a variety of activities that are currently ongoing that need to be completed before MCSO will be compliant. These range from the finalization of the TSMR, TSQR, and TSAR methods to the completion of revisions to the EIU Operations Manual. In addition, both EIU and AIU staff are working to track the effectiveness of alerts and BIO Action Forms. Finally, the lack of substantive progress to institute the Constitutional Policing Plan to target potential bias across the organization has kept MCSO from achieving compliance with this Paragraph. We and the Parties remain concerned that we have not noted many instances where supervisors proactively intervene with their subordinates; rather, the supervisors wait until prompted by EIS alerts. Command staff have taken a more active role in evaluating the work of supervisors as evidenced by a number of alert investigations returned to supervisors for revision or additional inquiry. We will continue to evaluate the progress toward the goals outlined in this Paragraph.

WAI 37027

## Section 9: Supervision and Evaluation of Officer Performance

**COURT ORDER X. SUPERVISION AND EVALUATIONS OF OFFICER PERFORMANCE**

*Paragraph 82. MCSO and the County shall ensure that an adequate number of qualified first-line Supervisors are available to provide the effective supervision necessary to ensure that Deputies are following the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order. First-line Supervisors shall ensure that Deputies are policing actively and effectively, are provided with the instruction necessary to correct mistakes, and are held accountable for misconduct. To achieve these outcomes, MCSO shall undertake the following duties and measures:*

*Paragraph 83. MCSO Supervisors shall provide the effective supervision necessary to direct and guide Deputies. Effective supervision requires that Supervisors: respond to the scene of certain arrests; review each field interview card and incident report; confirm the accuracy and completeness of Deputies' daily activity reports; respond to each Complaint of misconduct; ensure Deputies are working actively to engage the community and increase public trust and safety; provide counseling, redirection, support to Deputies as needed, and are held accountable for performing each of these duties.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

**Phase 2:** In compliance

During our October site visit, we interviewed supervisors and commanders from Districts 1 and 3 to determine compliance with MCSO policies and the requirements of this Paragraph.

WAI 37028

During our visit to District 1, we met with the District Commander, two lieutenants, and two sergeants.  The District 1 hours of operation remain the same: Monday-Friday, from 0800-1600.  With regard to crime, the District 1 Commander reported a 15% increase in property crimes, and a 5% decrease in persons crimes.  The District 1 Commander advised us there had been a "listening session" held in the town of Guadalupe, at the beginning of October.  Guadalupe is a contract city with a considerable Latino population.  The intent of the session was to meet with city leaders and residents to hear complaints and concerns.  We note that these types of exchanges with the community are generally productive if conducted regularly, and the community is provided with feedback as to the action taken with regard to their concerns.  MCSO advised us that the town administrator was concerned with drug-related crime and gang activities, and requested that MCSO take a more proactive approach.   The District 1 Commander reported that there is general apprehension among deputies that if they make more traffic stops they will likely be identified in the TSAR process.  This concern conveyed by the District Commander could hamper any proactive efforts to address problems identified by community leaders.

We inquired as to how much time sergeants dedicate to field supervision, and learned that supervisors routinely spend half of their days in the office handling administrative matters.  Some supervisors take their paperwork with them and complete administrative tasks in the field.  District 1 personnel reported that they were short three sergeants and one deputy.  The District 1 Commander stated that many of the issues they are experiencing would be lessened if the District had more supervisors.

During our visit to District 2, we interviewed the District Commander, one lieutenant, and two sergeants.  The District 2 hours of operation remain the same: Monday-Friday, from 0800-1600.  District 2 personnel advised us that the most common types of persons crimes in the District are assaults and domestic violence.  The most common property crimes are theft, criminal damage, and stolen vehicles.  District 2 experienced an increase in complaints in the previous quarter; most related to accidents and driving complaints.   During this reporting period, personnel complaints have gone down.  District 2 reported that the staff has conducted several outreach events in the District, mostly with local area schools.  They have done backpack and school supply drives, as well as anti-bullying presentations.  District 2 also held a "listening session" in which District 2 staff met with community leaders and representatives to obtain feedback; the suggestions are being tracked on a whiteboard.   As noted previously, we recommend that District 2 staff provide feedback to stakeholders on the results of any action taken in response to their concerns.

WAI 37029

We reviewed a representative sample of 96 Incident Reports for July 2018**,** for the randomly selected date of July 4, 2018.  Ninety-two of the 96 Incident Reports had proper documentation of supervisory review.  Of the 96 Incident Reports, six were vehicle crashes.  We found that two of the six Vehicle Crash Reports had no documentation that a supervisor had reviewed and approved the reports.  The compliance rate for timely supervisory review of Incident Reports in July was 96%.  With the exceptions noted, supervisors reviewed and approved all other Incident Reports, including 18 Arrest Report, within the required timeframes.  During our quality control review of Incident Reports, we noted some spelling and grammar mistakes; but otherwise, there were no glaring errors.  For July, MCSO reported 425 hours of community policing.

We reviewed a representative sample of 72 Incident Reports for August 2018**,** for the randomly selected date of August 18.   Seventy of the 72 Incident Reports were reviewed and memorialized by a supervisor within the required seven days.  There were 10 Vehicle Crash Reports submitted in the sample for August, of which nine included documentation of supervisory review.  The compliance rate for timely supervisory review of Incident Reports in August was 97%.  We conducted a quality review on a 10% random sample of the reports we reviewed, and found no significant deficiencies.  For August, MCSO reported 753 hours of community policing.

We reviewed a representative sample of 83 Incident Reports for September 2018**,** for the randomly selected date of September 3.  All of the 83 Incident Reports included documentation that they had been reviewed and approved by supervisors as required by this Paragraph.  There were seven vehicle crashes submitted in the sample, all of which included documentation of timely supervisory review.  The compliance rate for timely supervisory review of Incident Reports for September was 100%.  Supervisors reviewed and approved all 16 Arrest Reports within 72 hours.  We conducted a quality review on a 10% random sample of the reports submitted and found no significant errors.  For September, MCSO reported 734 hours of community policing.

For each month of the quarter, we selected a supervisor and a squad of deputies from each District.  We requested several documents, including Patrol Activity Logs (PALs), for each deputy.  We reviewed PALs for each month of the quarter to assess if they were turned in by the end of each shift, and if supervisors reviewed each PAL.  For July, we reviewed PALs for 31 deputies and eight supervisors.  All 31 deputies' Patrol Activity Logs contained documentation of supervisory review.  All eight supervisors' Patrol Activity Logs contained documentation of command-level review.  For August, we reviewed Patrol Activity Logs for 27 deputies and eight supervisors.  All 27 deputies' PALs contained documentation of supervisory review.  All eight supervisors' PALs contained documentation of command-level review.  For September, we reviewed Patrol Activity Logs for 33 deputies and eight supervisors.  All 33 deputies' PALs contained documentation of supervisory review; all eight sergeants' PALs contained documentation of command-level review.

WAI 37030

We also reviewed deputies' and supervisors' PALs to determine if supervisors provided on-scene supervision, and if those supervisor-deputy contacts were documented. For the sample dates selected in July, there were a total of 48 supervisor-deputy field contacts reported by deputies and supervisors. For the sample dates selected in August, there were a total of 26 supervisor-deputy field contacts reported by deputies and supervisors. For the sample dates selected in September, there were a total of 68 supervisor-deputy field contacts reported by deputies and supervisors.

For July, August, and September, we reviewed the submissions of non-traffic incidents involving stops and detentions, which were recorded in Non-Traffic Contact Forms (NTCFs). For July, the Monitoring Team selected 25 NTCFs generated during the month, for review. All 25 NTCFs had been submitted prior to the end of the shift. Twenty-four of the 25 NTCFs were reviewed and approved by supervisors within 72 hours as required by the First Order. The compliance rate for timely supervisory review of NTCFs in July was 96%. For August, we selected 25 NTCFs to review. All NTCFs were submitted prior to the end of the shift, and all 25 NTCFs were reviewed and approved by supervisors within the required timeframe. The compliance rate for timely supervisory review of NTCFs in August was 100%. For September, we selected all 24 NTCFs generated during the month in review. Twenty-three of the 24 NTCFs were submitted within the required timeframe. Twenty-one of the 24 NTCFs were reviewed and approved by supervisors within the required 72 hours. The compliance rate for timely supervisory review of NTCFs in September was 88%. For the third quarter, compliance with timely supervisory review of NTCFs was 95%.

In our last quarterly status report, we noted that, timely supervisory reviews of Incident Reports and NTCFs did not meet Paragraph requirements. We also noted that community engagement activities reported by deputies in the sample of Patrol Activity Logs significantly decreased in the second quarter. During this reporting period, timely supervisory review of NTCFs was 95% and there were a total of 14 community engagement events reported in the sample of Patrol Activity Logs reviewed.

**Paragraph 84.**  *Within 120 days of the Effective Date, all patrol Deputies shall be assigned to a single, consistent, clearly identified Supervisor.  First-line field Supervisors shall be assigned to supervise no more than twelve Deputies.*

**Phase 1:**  In compliance

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

**Phase 2:**  In compliance

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the third quarter of 2018.   During this reporting period, consistent with our methodology, for July we reviewed a sample of shift rosters from Districts 1, 2 and 3; for August we reviewed a sample of shift rosters from Districts 4, 6, and 7 and Lake Patrol; and for September, we reviewed a sample of shift rosters from Districts 1, 2, and 3.  Monthly and daily

WAI 37031

rosters indicated that deputies were assigned to one single consistent supervisor.  Of the 60 shifts we reviewed for this reporting period, all were in compliance.  There were 15 span of control memos generated during this reporting period, indicating that those shifts or part of those shifts exceeded the supervisor-deputy ratio of 1:8.  Three of the span of control memos were generated by District 1, 10 memos were generated by District 2, and three memos were generated by District 3.  MCSO did not exceed the 1:10 supervisor-deputy ratio in any of the sample shifts we inspected during this reporting period.  MCSO remains in compliance with this Paragraph.

**Paragraph 85.**  *First-line field Supervisors shall be required to discuss individually the stops made by each Deputy they supervise with the respective Deputies no less than one time per month in order to ensure compliance with this Order.  This discussion should include, at a minimum, whether the Deputy detained any individuals stopped during the preceding month, the reason for any such detention, and a discussion of any stops that at any point involved any immigration issues.*

**Phase 1:**  In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

**Phase 2:**  In compliance

Consistent with our methodology, we requested that MCSO provide copies of reports documenting that supervisors are meeting with and discussing individually the stops made by each deputy, at least once per month.  We requested documentation for one randomly selected supervisor from each District, for each month of the reporting period, and the squad of deputies who reports to that supervisor.  Supervisors record the discussion of traffic stops by applying the "Discussed with Deputy" option.  MCSO documents supervisor-deputy discussions in a spreadsheet, which it submits for inspection.  The spreadsheet also documents timely supervisory review of VSCFs.  In addition to the spreadsheet, MCSO submits all VSCFs for the month in review.  We select a 10% random sample of VSCFs from each District to review for content.  We also inspect the sample of VSCFs submitted for review of traffic stops under Paragraphs 25 and 54, as part of compliance with Paragraph 91, to verify if supervisors are addressing deficiencies in the documentation related to the stops.

WAI 37032

Paragraph 85 requires that supervisors discuss traffic stops at least once per month with their deputies.  To efficiently manage this requirement along with other administrative and operational duties, supervisors generally conduct several traffic stop-related discussions with each deputy during the month.  Supervisor-deputy discussions of traffic stops that occurred toward the latter part of the month may not get reviewed until the following month.  Our selections for these discussions changes every month, so to obtain complete records for each deputy, MCSO holds the submission until all of the information requested for the month is complete.  Accordingly, the documentation of supervisory-deputy discussions of traffic stops is submitted 30 days retroactively.

For July, MCSO submitted the June traffic stops for each deputy, by District.  The total number of traffic stops for each District was:  District 1, two; District 2, 67 District 3, one; District 4, 14; Lake Patrol, 67; District 6, 130; and District 7, 12.  There were a total of 293 traffic-related events in July for all Districts, and sergeants discussed 277 of these events with the deputies who conducted them, for a compliance rate of 95%.

For August, MCSO submitted the July traffic stops for each deputy, by District.  The total number of traffic stops for each District were: District 1, one; District 2, 22; District 3, one; District 4, 66; Lake Patrol, 30; District 6, 16; and District 6, four.  There were a total of 142 traffic-related events in July for all Districts, and sergeants discussed all 142 traffic stops with the deputies that conducted them, for a compliance rate of 100%.

For September MCSO submitted the August traffic stops for each deputy, by District.  The total number of traffic stops for each District were:  District 1, three; District 2, two; District 3, four District 4, 26; Lake Patrol, 18; District 6, 34; and District 7, five.  There were a total of 92 traffic-related events in August, and sergeants discussed 91 of those with the deputies who conducted them, for a compliance rate of 99%.

The compliance rate for discussion of traffic stops was 98% for this reporting period.  We have noted an increase in the thoroughness of supervisory reviews of documentation related to traffic stops, but supervisors are still not capturing all errors.  Additional comments are provided in our review of Paragraph 91.

**Paragraph 86.**  *On-duty field Supervisors shall be available throughout their shift to provide adequate on-scene field supervision to Deputies under their direct command and, as needed, to provide Supervisory assistance to other units.  Supervisors shall be assigned to and shall actually work the same days and hours as the Deputies they are assigned to supervise, absent exceptional circumstances.*

**Phase 1:**  In compliance

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

**Phase 2:**  In compliance

WAI 37033

To assess Phase 2 compliance with this Paragraph, we reviewed a sample of daily shift rosters for the three months of the reporting period.  For July, we reviewed Districts 1, 2 and 3; for August, we reviewed Districts 4, 6, and 7, and Lake Patrol; and for September, we reviewed Districts 1, 2, and 3.  Our reviews of monthly and daily rosters indicated that deputies were assigned to and worked the same schedules as their supervisors.

MCSO deputies' and sergeants' activities are captured in Patrol Activity Logs (PALs).  We selected a random sample of one day per month, and one squad per District, for review.  For July, we requested PALs for eight sergeants and 31 deputies, which we reviewed.  We noted a total of 48 field supervisor-deputy contacts between the combined deputies' and sergeants' PALs for the selected dates.  For August, we requested PALs for 27 deputies and eight sergeants.  We received and reviewed all requested PALs, and noted a total of 26 field supervisor-deputy contacts between the combined deputies' and sergeants' PALs for the selected dates.  For September, we reviewed PALs for 33 deputies and eight sergeants.  We noted a total of 68 field supervisor-deputy contacts between the combined deputies' and sergeants' PALs for the selected dates.  We reviewed the monthly shift rosters for each month of the reporting period.  Our reviews indicate that supervisors work the same hours as the deputies under their supervision.  Our reviews of Patrol Activity Logs indicate that supervisors have been available to provide on-scene supervision.

***Paragraph 87.***  *MCSO shall hold Commanders and Supervisors directly accountable for the quality and effectiveness of their supervision, including whether commanders and Supervisors identify and effectively respond to misconduct, as part of their performance evaluations and through non-disciplinary corrective action, or through the initiation of formal investigation and the disciplinary process, as appropriate.*

**Phase 1:**  In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

**Phase 2:**  Not in compliance

WAI 37034

Consistent with our methodology, we requested the names of all deputies and supervisors who were evaluated during this reporting period. From the lists of employees submitted, we requested a representative sample. We received and reviewed performance evaluations submitted for 10 deputies and nine supervisors whose performance evaluations were completed in July 2018. All 10 deputy EPAs touched on the needed areas of evaluation, but two of the EPAs used repetitive language, mostly due to over-reliance on Blue Team notes. As we have previously noted, Blue Team notes should be used to support comments related to dimension ratings. In these two specific examples, raters used an assortment of Blue Team notes as the assessment of performance for the dimensions being rated. The problem we found is that these particular Blue Team notes related to specific incidents, and none of them provided an overall assessment of performance related to the dimension.

With regard to supervisors' EPAs, six of the nine met all requirements. All nine EPAs addressed the complaint history and their dispositions, discipline, commendations, awards, civil or administrative claims, lawsuits, training history, assignment and rank history, supervisory actions, and EIS histories. All of the EPAs had comments on the supervisors' ability to identify and respond to misconduct. Three of the 10 EPAs did not assess the supervisor's quality of internal affairs investigations and/or the quality of the supervisor's reviews of internal investigations, as required by Paragraph 176.

We received and reviewed performance evaluations submitted for six deputies and 10 supervisors whose EPAs were completed in August 2018. Five of the six deputy EPAs addressed all required areas of assessment. Two deputy EPAs failed to address the requirements of Paragraph 99. Paragraph 99 has several requirements listed, all of which need to be addressed in the appraisal. Six of the 10 supervisors' EPAs contained comments on all of the required rating dimensions. All 10 of the supervisors' EPAs rated the supervisors on the quality and effectiveness of their supervision. Nine of the 10 EPAs addressed the quality of supervisory reviews. Six of the 10 supervisors' appraisals included comments related to the supervisors' ability to identify and respond to misconduct. Five of the 10 EPAs addressed the complaint history and their dispositions, discipline, commendations, awards, civil or administrative claims, lawsuits, training history, assignment and rank history, supervisory actions, and EIS histories. Seven of the 10 EPAs assessed the supervisors' quality of internal investigations and/or the quality of their reviews of internal affairs investigations.

WAI 37035

We received and reviewed Employee Performance Appraisals submitted for five deputies and eight supervisors whose EPAs were completed in September 2018.  All five of the deputy EPAs addressed all requirements.  All eight supervisors' EPAs rated the employees on the quality and effectiveness of their supervision.  Seven of the eight EPAs rated the quality of supervisory reviews.  Four of the eight supervisors' appraisals included comments related to the supervisors' ability to identify and respond to misconduct.  Five of the eight EPAs addressed the complaint history and their dispositions, discipline, commendations, awards, civil or administrative claims, lawsuits, training history, assignment and rank history, supervisory actions, and EIS histories.  Five of the eight EPAs assessed supervisors on the quality of their internal affairs investigations and/or the quality of their reviews of internal affairs investigations, as required by Paragraph 176.

Of the 48 EPAs reviewed for the third quarter, 38 were in compliance.  The compliance rating for the period in review was 79%.

***Paragraph 88.***  *To ensure compliance with the terms of this Order, first-line Supervisors in any Specialized Units enforcing Immigration-Related Laws shall directly supervise the law enforcement activities of new members of the unit for one week by accompanying them in the field, and directly supervise the in-the-field-activities of all members of the unit for at least two weeks every year.*

**Phase 1:**  In compliance

- GC-7 (Transfer of Personnel), most recently amended on September 27, 2018.
- Memorandum from Executive Chief Trombi, dated January 6, 2015.
- Memorandum from Sheriff Arpaio, dated February 12, 2015.
- Special Investigations Division Operations Manual, published on May 15, 2015.

**Phase 2:**  In compliance

MCSO does not have any specialized units that enforce immigration-related laws.  We continue to monitor arrests and detentions as part of our review process to ensure that MCSO is in compliance with its own directives on this issue.

For July, August, and September, we received lists containing all incidents involving MCSO arrests and criminal citations.  For each month, we requested a random sample of arrests and criminal citations.  In total, we reviewed 64 incidents involving arrests and 74 incidents involving criminal citations.  We also reviewed a random sample of 251 Incident Reports for this reporting period.  During our reviews of the documentation provided for this reporting period, we have found no evidence to indicate any violations of this Paragraph.

WAI 37036

***Paragraph 89.** A Deputy shall notify a Supervisor before initiating any immigration status investigation, as discussed in Paragraph 28. Deputies shall also notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration Related Crime, or for any crime related to identity fraud or lack of an identity document. The responding Supervisor shall approve or disapprove the Deputy's investigation or arrest recommendation based on the available information and conformance with MCSO policy. The Supervisor shall take appropriate action to address any deficiencies in Deputies' investigation or arrest recommendations, including releasing the subject, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative investigation.*

**Phase 1:** In compliance

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GF-5 (Incident Report Guidelines), most recently amended on January 4, 2019.

**Phase 2:** In compliance

To assess MCSO's compliance with this Paragraph, we requested all reports related to immigration status investigations, any immigration-related crimes, or any incidents or arrests involving lack of identity documents. The Incident Reports MCSO submitted covered the period of July 1-September 30, 2018. Any incident wherein a deputy requests supervisory permission to contact Immigration and Customs Enforcement (ICE) or Customs and Border Patrol (CBP) – to ascertain the legal status of an individual involved in a stop, detention, or any incident under investigation by MCSO – falls under the reporting requirements of this request. MCSO did not report any cases involving immigration status investigations or immigration-related crime.

For this reporting period, MCSO submitted two cases as responsive to this Paragraph. The first incident occurred in July. The incident reported in July involved an individual who was suspected of drunken driving and was arrested for Driving Under the Influence (DUI). During the traffic stop, the subject did not provide a driver's license, but verbally identified herself with her sister's name and date of birth. The subject was arrested for DUI and also charged with identity theft. The second incident occurred in August, and involved an individual who was stopped for speeding. The subject did not have a valid driver's license. He was cited and released.

WAI 37037

We also received a booking list and a criminal citation list for each month of the reporting period.  From each list, we selected a 10% random sample of incidents.  In total, we reviewed 64 incidents resulting in arrest and 74 incidents involving criminal citations.  In addition, we reviewed 251 Incident Reports for the quarter.  All of the documentation we reviewed during this reporting period indicates that MCSO is in compliance with this Paragraph.

**Paragraph 90.**  *MCSO Deputies shall submit documentation of all stops and Investigatory Detentions conducted to their Supervisors by the end of the shift in which the action occurred. Absent exceptional circumstances, within 72 hours of receiving such documentation, a Supervisor shall independently review the information.  Supervisors shall review reports and forms for Boilerplate or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct.  Appropriate disciplinary action should be taken where Deputies routinely employ Boilerplate or conclusory language.*

**Phase 1:**  In compliance

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

**Phase 2:**  In compliance

We reviewed 35 incidents involving traffic stops for July 2018.  There were 25 stops related to speeding, 20 of which resulted in citations and five resulted in warnings.  Two stops related to equipment violations, and six stops were for moving violations other than speeding.  Two stops related to registration or license plate violations.  Twenty-four of the stops resulted in citations, and 10 resulted in warnings.  One stop resulted in no action taken; the license plate was illegible due to damage.  All 35 Vehicle Stop Contact Forms we reviewed noted the serial number of the reviewing supervisor, date, and time of supervisory review.  All of the 35 VSCFs were reviewed within the required 72 hours.  MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 306 VSCFs in July.  Supervisors reviewed all VSCFs within 72 hours, for a compliance rate of 100%.

We reviewed 35 incidents involving traffic stops for August 2018.  Twenty-three of the 35 traffic stops related to speeding.  Seventeen citations and six warnings were issued for speeding. One stop related to an equipment violation.  Six stops involved moving traffic infractions other than speeding.  Four stops related to registration or license plate violations.  Of the 35 stops, 21 resulted in citations, and 13 resulted in warnings.  One stop was in reference to a suspected stolen vehicle; it was determined that the driver had no involvement.  Supervisors reviewed all 35 VSCFs within 72 hours.  For August, MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 157 VSCFs.  Supervisors reviewed 154 of 157 VSCFs within 72 hours, for a compliance rate of 98%.

We reviewed 35 incidents involving traffic stops for September 2018.  Eighteen of the 35 traffic stops involved speeding violations.  Fourteen of the drivers who were stopped for speeding were issued citations; four drivers were issued warnings.  Three stops related to equipment

WAI 37038

violations. Eleven stops involved traffic violations other than speeding. Three stops related to registration or license plate violations. Of the 35 stops, 21 resulted in citations and 14 resulted in warnings. All 35 Vehicle Stop Contact Forms we reviewed noted the serial number of the reviewing supervisor. Thirty-four of the 35 VSCFs were in compliance with timely supervisory reviews. For August MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 94 VSCFs. We reviewed the data and supervisors reviewed all 94 VSCFs within 72 hours, for a 100% compliance rate.

For July, we selected all 25 NTCFs to review. All 25 NTCFs were reviewed and approved by supervisors. Twenty-four of the 25 were reviewed within 72 hours for a 96% compliance rate. For August, we reviewed a random sample of 25 NTCFs. Of the 25 NTCFs inspected, all were reviewed and approved by supervisors, and all were reviewed within 72 hours. The compliance rate for timely supervisory review for August was 100%. For September, we reviewed all 24 NTCFs generated. Twenty-three of the 24 NTCFs were reviewed and approved by supervisors. Twenty-one of the 24 NTCFs were reviewed and approved within the required timeframes, for a compliance rate of 88%. In total, we reviewed 74 NTCFs for the quarter. Seventy of the 74 NTCFs were reviewed within the required 72 hours, for a compliance rate of 95%. We take into account all stops and detentions, both traffic and non-traffic, when we determine the compliance rate for this Paragraph. The compliance rate for timely reviews of all combined stops and detentions for this reporting period was 97%. For this reporting period, our inspection of the documentation provided has not revealed any evidence of boilerplate or conclusory language, inconsistent or inaccurate information, or lack of articulation, as to the legal basis for stops and detentions.

***Paragraph 91.*** *As part of the Supervisory review, the Supervisor shall document any Investigatory Stops and detentions that appear unsupported by reasonable suspicion or are otherwise in violation of MCSO policy, or stops or detentions that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The Supervisor shall take appropriate action to address all violations or deficiencies in Investigatory Stops or detentions, including recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.*

**Phase 1:** In compliance

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- GF-5 (Incident Report Guidelines), most recently amended on January 4, 2019.

**Phase 2:** Not in compliance

WAI 37039

We reviewed traffic stop data reported by MCSO for its July inspection (BI2018-0088).  To determine compliance with this Paragraph, for July, the Monitoring Team randomly selected 35 traffic-related events, which BIO then audited for compliance.  Of the 35 traffic-related events, MCSO reported that 31 or 88% had no deficiencies.  This was the same compliance rate as June.  As a result of the inspection, BIO issued four BIO Action Forms.  BIO identified one deficiency that related to the deputy failing to run warrants checks on the driver.  One deficiency related to an incorrect number listed on a VSCF.  One deficiency related to BWC video showing more than one occupant, but the VSCF listed only the driver.  One deficiency related to a vehicle number listed in the VSCF that did not match what was listed in CAD.  We reviewed the same traffic-related events, independent of BIO's audits, as part of our compliance assessment for Paragraphs 25 and 54.  Our inspection revealed that eight of the 35 stops had deficiencies that supervisors failed to identify during their reviews of documentation related to the traffic stops.

We reviewed a spreadsheet documenting each VSCF by District, for July, to determine if supervisors were reviewing VSCFs within the required 72 hours.  We reviewed data for 306 traffic stops, and determined that supervisors had completed timely reviews in 100% of the cases.

For July, we requested all 22 corrective actions generated for the month.  Corrective actions are documented on Blue Team Supervisory Notes.  Of the 22 corrective actions, seven related to body-worn camera and recording issues, including: failure to activate the BWC; late activation of the BWC; turning off the camera before the event was concluded; or poor positioning of the BWC.  Nine corrective actions related to inaccurate or missing information on VSCFs, citations, or written warnings.  Three corrective actions related to procedural or policy violations during traffic stops, and one corrective action pertained to a procedural violation not involving a traffic stop.  There were no corrective actions related to deputy performance or safety procedures during traffic stops.  One corrective action was associated with a technical malfunction, and one corrective action did not specify the deficiency found.

We reviewed traffic stop data reported by MCSO for its August inspection (BI2018-0101).  We randomly selected 35 traffic-related events, which BIO then audited for compliance.  The inspection report noted that 30 stops, or 86%, had no deficiencies.  There were two BIO Action Forms issued for failure to run warrants checks on the drivers during the stops.  One BIO Action Form was issued for failure to activate the BWC.  One BIO Action Form was issued for an incorrect vehicle number listed on the VSCF.  One BIO Action Form was issued for an incorrect call sign, for an additional deputy who was listed on the VSCF.  We reviewed the same traffic-related events, independent of BIO's audits, as part of our compliance assessment for Paragraphs 25 and 54.  Our examination revealed that the documentation provided for 10 of the 35 stops had deficiencies that supervisors did not identify during their reviews.

We reviewed a spreadsheet documenting each VSCF by District, for August, to determine if supervisors were reviewing VSCFs within the required 72 hours.  We reviewed 154 VSCFs and determined that supervisors had completed timely reviews in 98% of the cases.

WAI 37040

For August, we selected the total population of 23 corrective actions generated for the month. Of the 23 corrective actions, four related to body-worn camera and recording issues: failure to activate the BWC; late activation of the BWC; turning off the camera before the event was concluded; or poor positioning of the BWC.  Six corrective actions related to inaccurate or missing information on VSCFs, citations, or written warnings.  Eight corrective actions related to procedural or policy violations during traffic stops.  One corrective action related to a procedural or policy violation, not associated with a traffic stop.  There was one corrective action generated for a deputy safety issue, and two corrective actions related to technical failures.  There was one corrective action generated for a deputy performance issue.

We reviewed traffic stop data reported by MCSO for its September inspection (BI2018-0114).  We randomly selected 35 traffic-related events, which BIO then audited for compliance.  The inspection report noted that 33 stops, or 94%, had no deficiencies.  The results indicated an 8% increase in compliance from the August inspection.  There were two BIO Action Forms issued.  One BIO Action Form was issued as a result of a vehicle not towed per policy requirements, and the second BIO Action Form was issued for a BWC failure.  We reviewed the 35 traffic-related events selected by the Monitoring Team for BIO's September inspection, as part of our compliance assessment for Paragraphs 25 and 54.   Our examination revealed that the documentation associated with eight of the 35 stops had deficiencies that supervisors did not identify during their reviews.

For September, the Monitoring Team selected the total population of 32 corrective actions to review for the month.  Of the 32 corrective actions, 13 related to body-worn camera and recording issues: failure to activate the BWC; late activation of the BWC; turning off the camera before the event was concluded; or poor positioning of the BWC.  Eight corrective actions related to inaccurate or missing information on VSCFs, citations, or written warnings. Five corrective actions related to procedural or policy violations involving traffic stops.  There was one corrective action issued for a deputy safety concern.  There were five corrective actions generated as a result of technical malfunctions.

We reviewed a spreadsheet documenting each VSCF by District, for September, to determine if supervisors were reviewing VSCFs within the required 72 hours.  We reviewed 94 VSCFs and determined that supervisors had completed timely reviews in 100% of the cases.

Paragraph 90 requires timely supervisory reviews of documentation pertaining to stops and detentions.  Paragraph 91 requires supervisors to identify policy violations, deficiencies, and training issues noted in stops and detentions.  Of the 105 stops inspected for this reporting period, the documentation for 26 of the stops had deficiencies that supervisors failed to identify during their reviews.  This is a compliance rate of 75%.

WAI 37041

*Paragraph 92.  Supervisors shall use EIS to track each subordinate's violations or deficiencies in Investigatory Stops or detentions and the corrective actions taken, in order to identify Deputies needing repeated corrective action.  Supervisors shall notify IA.  The Supervisor shall ensure that each violation or deficiency is documented in the Deputy's performance evaluations.  The quality and completeness of these Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations.  MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct complete, thorough, and accurate reviews of Deputies' stops and Investigatory Detentions.*

**Phase 1:**  In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

**Phase 2:**  Not in compliance

The Employee Performance Appraisals completed for this reporting period, discussed in detail under Paragraph 87, did not meet the requirements of this Paragraph.  MCSO has not yet developed a methodology that will document MCSO's verification of compliance for this Paragraph.  We again discussed these issues during our October site visit.  MCSO advised us that it has contracted with a new vendor, and is focusing their efforts on the TSAR and TSMR processes; this has left MCSO short-staffed in this area and unable to devote resources to the tracking of alerts.  MCSO does not have an audit process for NTCFs, and is not in compliance with Paragraph 75.h.  District command personnel have continued to improve how they identify incomplete alert investigations, but there is still no report on alert investigations and the tracking of outcomes or interventions.


*Paragraph 93.   Absent extraordinary circumstances, MCSO Deputies shall complete all incident reports before the end of shift.  MCSO field Supervisors shall review incident reports and shall memorialize their review of incident reports within 72 hours of an arrest, absent exceptional circumstances.*

**Phase 1:**  In compliance

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

- GF-5 (Incident Report Guidelines), most recently amended on January 4, 2019.

**Phase 2:**  In compliance

We reviewed a representative sample of 96 Incident Reports for July 2018**,** for the randomly selected date of July 4, 2018.  The sample of 96 Incident Reports included six Vehicle Crash Reports.  Of the 90 Incident Reports, not related to vehicle crashes, 88 were turned in by the end of the shift and reviewed by supervisors within the required timeframes.  MCSO submits a separate spreadsheet documenting vehicle crash reviews.  We confirmed supervisory review and approval of four of the six Vehicle Crash Reports.  In total, 92 of 96 reports inspected had

WAI 37042

timely documentation of supervisory review.  The compliance rate for July was 96%.  All 18 Incident Reports involving arrests and criminal citations were reviewed by supervisors and approved, or reviewed and returned for corrections within the required 72 hours.  We conducted a quality review on a 10% random sample of the reports we reviewed and noted no significant errors or deficiencies.

We reviewed a representative sample of 72 Incident Reports for August 2018, for the randomly selected date of August 18, 2018.  Of the 72 reports submitted, there were 10 Vehicle Crash Reports.  Of these, we confirmed supervisory review on nine reports.  Of the remaining 62 Incident Reports, we confirmed timely supervisory review on 61 of the reports.  In total, 70 of 72 Incident Reports for the selected date included documentation of timely supervisory review. The compliance rate for August, for timely supervisory reviews of Incident Reports, was 97%. We conducted a quality review on a 10% random sample of the reports we reviewed.  We noted no significant errors.

We reviewed a representative sample of 83 Incident Reports for September, for the randomly selected date of September 3, 2018.  Of the 83 Incident Reports, seven were Vehicle Crash Reports.  We confirmed timely supervisory reviews of all seven Vehicle Crash Reports for the selected date.  Of the remaining 76 Incident Reports, we confirmed timely supervisory reviews on all reports.  The compliance rate for timely supervisory reviews of Incident Reports for September was 100%.  All 16 Arrest Reports were reviewed and approved by supervisors within 72 hours.  We conducted a quality review on a 10% random sample of the reports and noted no significant errors or deficiencies.

In our last quarterly status report, we noted the compliance rate for timely supervisory reviews of Incident Reports had dropped below acceptable standards.  This was primarily due to lack of documentation or proof of compliance with reviews of Vehicle Crash Reports.  MCSO has addressed this issue and remains in compliance with this Paragraph.

**Paragraph 94.**  *As part of the Supervisory review, the Supervisor shall document any arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The Supervisor shall take appropriate action to address violations or deficiencies in making arrests, including notification of prosecuting authorities, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.*

**Phase 1:**  In compliance

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.
- GF-5 (Incident Report Guidelines), most recently amended on January 4, 2019.

**Phase 2:**  In compliance

WAI 37043

To determine compliance with this Paragraph, we review documentation related to arrests where MCSO found deficiencies and took corrective action, which are documented in Incident Memorialization Forms (IMFs), and arrests where the Maricopa County Attorney (MCAO) declined prosecution.  The Maricopa County Attorney's Office generally does not provide specific details as to the reason arrests cases are declined for prosecution.  For each arrest where MCAO declined prosecution, and no specific reasons are provided, there must be an inquiry to determine if the cause of the rejection was due to unsupported of probable cause, if there was a violation of MCSO policy, or there is a need for corrective action or review of MCSO policy, strategy, tactics, or training.  If the rejection was related to any of these factors, we look for the supervisor's comments and any corrective action taken.

Starting with this reporting period, we have modified our methodology for review of documentation provided as proof of compliance with Paragraphs 94 and 96.  Due to the time required for processing Blue Team notes through the chain of command, we will review monthly documentation that overlaps the standard quarterly periods.  For this reporting period, we reviewed proof of compliance for the first two months of the quarter, July and August.  Proof of compliance for September will be reviewed in our next report, which will include October and November.  For this reporting period, we received four Incident Memorialization Forms (IMFs) – one in July, and three in August.

For July, MCSO submitted one IMF that was generated as a result of an arrest involving an assault.  In the Incident Report for this case, the deputy did not document the correct information reported by the victim.  The victim stated that she was beaten by the offender, and the deputy wrote in his report that the victim had beaten the offender.  This appeared to be a typographical error that should have been identified by the supervisor.  The commander who generated the IMF discussed the deficiency both with the deputy and his supervisor.

There were no IMFs completed for August.  For September, MCSO submitted three IMFs.  The first two pertained to the same incident.  This incident involved a domestic violence case in which two deputies wrote reports.  The Patrol commander reviewing Arrest Reports for quality control discovered the deficiency.  The first Arrest Report lacked clear articulation for the probable cause for the arrest.  The supplemental report written by the second deputy established sufficient probable cause for arrest.   The first report written should have included the information contained in the supplemental report written by the second deputy.  In this case, the supervisor should have noted the deficiency and addressed it.  The second IMF was generated for the supervisor who failed to correct the mistake in his review of the documentation.  The deficiencies were documented in Blue Team and discussed with the deputy and sergeant involved in the incident.

WAI 37044

The fourth IMF generated during this reporting period involved a situation in which a female called MCSO to complain that her adult son had trespassed in her home and was unwilling to return her house keys. Deputies responded, and when the adult son refused to return the keys, the deputies took the keys out of his pocket and returned them to the complainant. Upon review of the incident, the supervisor determined it was a civil matter; the deputy had no legal authority to intervene. The deputy was coached with regard to search and seizure, as it relates to civil cases.

We reviewed the inspection report for County Attorney Dispositions for July (BI2018-0084). BIO reviewed 20 of 63 dismissals of criminal cases from the Maricopa County Justice Court. BIO notes that the focus of the inspection is the identification of irreversible errors. For the July inspection, MCSO found one irreversible error and seven non-compliance deficiencies outside of the scope of the inspection. The inspection resulted in a 98% compliance rating. The deficiency identified involved a case in which the defendant failed to comply with a court order. The incident occurred in July 2016. The case was submitted for prosecution in June 2018. Not only did an inordinate amount of time lapse, but additional aggravated harassment charges would have been appropriate since there were several other documented violations. BIO issued eight BIO Action Forms for the deficiencies, which included the non-compliance deficiencies. In addition, for July, we reviewed 21 Arrest Reports and 24 incidents involving criminal citations. All arrests and criminal citations were reviewed by supervisors within the required timeframes. We noted no significant deficiencies.

For cases in which the Maricopa County Attorney's Office (MCAO) declines prosecution, we review MCAO letters, Arrest Reports and supplements, and the Blue Team entries generated by the Compliance Division. The Blue Team MCAO Turndown Notice Report is sent by Compliance to the involved deputy's supervisor for investigation. We review the supervisors' entries to ensure supervisors note the reason for MCAO's decision to decline prosecution. In a number of cases, MCAO declines to prosecute without with articulating the reason. We look for the supervisor to inquire and identify if the turndown was a result of an arrest where there was insufficient probable cause, or where there was another type of deficiency requiring corrective action. We also expect the supervisor to identify if there is need for a review of the agency's policies, strategy, tactics, or training. For July, we reviewed 20 cases in which the Maricopa County Attorney's Office declined prosecution. In four of the 20 cases we reviewed, there were no Blue Team entries. In two of the cases, there was insufficient information noted by the supervisor for us to determine the reason for the turndown. Fourteen of 20 cases were in compliance. Compliance for August was 63%.

We reviewed the inspection report for County Attorney Dispositions for August (BI2018-0097). BIO reviewed 20 of 98 dismissals, from the Justice Court, and 60 dismissals from the Superior Court. The inspection found one irreversible error and seven deficiencies outside of the scope of "irreversible errors." The inspection resulted in a 98% compliance rating. The deficiency was noted in an arrest where the deputy did not articulate sufficient probable cause for the arrest. The deputy also wrote in the narrative that he did not believe the elements of the crime were present, but the arrest was still made. The individual was transported to an MCSO sub-

WAI 37045

station and later released.  BIO issued a total of eight BIO Action Forms, including seven for deficiencies found outside the scope of "irreversible errors."  In addition, we reviewed 23 Arrest Reports and 24 criminal citations for August.  We found one Arrest Report where the deputy articulated sufficient probable cause on the Incident Report, but failed to articulate the same level of detail for probable cause on Form 4 (form used to submit criminal charges to the County Attorney).  All of the 23 Arrest Reports documented timely reviews by supervisors.  There were no deficiencies noted in the 24 criminal citations, and we verified timely supervisory review on all 24 cases.

For August, we reviewed 16 cases in which the Maricopa County Attorney's Office declined prosecution.  In four of the 16 cases reviewed there were no Blue Team entries; we could not determine the reasons for the turndowns, and we could not determine if there were any actions taken.  Compliance for August was 75%.

Based on our reviews of the documentation provided, there were 36 cases involving MCAO turndowns reviewed for July and August.  Of those 36 cases, we found the documentation in 26 cases in compliance with the requirements of this Paragraph, for a compliance rate of 72%.  MCSO has been in compliance with this Paragraph.  Therefore, they will retain the compliance rating for this reporting period.  If MCSO fails to meet the requirements of this Paragraph in the next reporting period, we will withdraw compliance.

Since we have changed our methodology for the review of documentation for this Paragraph, September submissions including the BIO Inspection Report, IMFs, and MCAO Turndown Notice Reports, will be discussed in our next report.

**Paragraph 95.**  *Supervisors shall use EIS to track each subordinate's violations or deficiencies in the arrests and the corrective actions taken, in order to identify Deputies needing repeated corrective action.  The Supervisor shall ensure that each violation or deficiency is noted in the Deputy's performance evaluations.  The quality of these supervisory reviews shall be taken into account in the Supervisor's own performance evaluations, promotions, or internal transfers.  MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct reviews of adequate and consistent quality.*

**Phase 1:**  In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

**Phase 2:**  Not in compliance

WAI 37046

The Employee Performance Appraisals completed for this reporting period, discussed in detail under Paragraph 87, did not meet the requirements of this Paragraph.  MCSO has not yet developed a methodology that will document MCSO's verification of compliance for this Paragraph.  We again discussed these issues during our October site visit.  MCSO advised us that they have contracted with a new vendor, and are focusing their efforts on the TSAR and TSMR processes; this has left them short-staffed and unable to devote resources to the tracking of alerts.  MCSO does not have an audit process for NTCFs, and is not in compliance with Paragraph 75.h.  District command personnel have continued to improve how they identify incomplete alert investigations, but there is still no report on alert investigations and the tracking of outcomes or interventions.

**Paragraph 96.**  *A command-level official shall review, in writing, all Supervisory reviews related to arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training.  The commander's review shall be completed within 14 days of receiving the document reporting the event.  The commander shall evaluate the corrective action and recommendations in the Supervisor's written report and ensure that all appropriate corrective action is taken.*

**Phase 1:**  In compliance

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

**Phase 2:**  In compliance

Starting with this reporting period, our methodology for reviews of documentation provided as proof of compliance with Paragraphs 94 and 96 has been modified.  Due to the time involved in processing Blue Team notes through the chain of command, we will review monthly documentation that overlaps quarterly periods.  For this reporting period, we reviewed proof of compliance for the first two months of the quarter, July and August.  Proof of compliance for September will be reviewed in our next report, which will include October and November.  As required by this Paragraph, a command-level official is required to review a supervisor's investigation of the circumstances pertaining to any arrest that lacks probable cause, is in violation of policy, or where there is a need for corrective action or review of the agency's policy, strategy, tactics, or training.  For compliance with this Paragraph, command review of the supervisor's investigation is required within 14 days of the supervisor's submission.

This Paragraph requires that a command-level official review a supervisor's investigation of the circumstances pertaining to any arrest that lacks probable cause; is in violation of policy; or where there is a need for corrective action or review of the agency's policy, strategy, tactics, or training.  The Maricopa County Attorney's Office (MCAO) generally does not provide specific details as to the reason arrests cases are declined for prosecution.  For each arrest where MCAO declined prosecution and no specific reasons are provided, there must be an inquiry to determine if the cause of the rejection was due to any of the factors listed above.  If the rejection was

WAI 37047

related to any of these factors, we look for the supervisor's comments related to the investigation, and any corrective action taken. For compliance with this Paragraph, we review the cases submitted for Paragraph 94, to determine if there was Command review of the supervisor's investigation within 14 days of the supervisor's submission.

For this reporting period, we received four Incident Memorialization Forms (IMFs) – one in July, and three in August. All IMFs are reviewed in detail, as described in Paragraph 94. Command personnel reviewed all four IMFs submitted for the period in review, within the required 14 days. For July, we reviewed 20 MCAO Turndown Notice Reports. Of the 20 reports, we confirmed command review within 14 days, as required by this Paragraph, of 13 of the 20 cases. For August, we reviewed 16 MCAO Turndown Notice Reports. Of the 16 reports, we confirmed command review within 14 days, in 11 of the 16 cases reviewed. Based on our reviews of the documentation provided, there were 24 of 36 cases in compliance with Paragraph 96, for a compliance rate of 67%. MCSO was in compliance with this Paragraph in our last quarterly status report. Therefore, they will retain the compliance rating for this reporting period. If MCSO fails to meet the requirements of this Paragraph in the next reporting period, compliance will be withdrawn.

***Paragraph 97.*** *MCSO Commanders and Supervisors shall periodically review the EIS reports and information, and initiate, implement, or assess the effectiveness of interventions for individual Deputies, Supervisors, and units based on that review. The obligations of MCSO Commanders and Supervisors in that regard are described above in Paragraphs 81(c)–(h).*

**Phase 1:** In compliance

- GH-5 (Early Identification System), currently under revision, though the proposed revisions do not affect the language pertaining to this Paragraph.

**Phase 2:** Not in compliance

As per GH-5 (Early Identification System) and GB-2 (Command Responsibility), supervisors are required to conduct EIS reviews twice per month for sworn members. Command review of EIS profiles of supervisory and command personnel began in February 2017. Review of broader pattern-based reports, as required by Paragraph 81.c., and assessments of interventions as required by this Paragraph, has not been sufficiently documented to meet compliance with this Paragraph. The requirement described in Paragraph 81.c. is covered in GH-5, under "Command Staff Responsibilities."

Consistent with our methodology, for every month of the quarter, we selected a supervisor and a squad of deputies from each District. We then reviewed the documentation provided as verification of compliance with this Paragraph. We also requested that EIS reviews of the commanders responsible for the selected personnel be included. For July, we reviewed the documentation provided for 61 employees – which included the ranks of deputy, sergeant, lieutenant, and captain. Of the 61 employees, 59 had the required two EIS reviews in the month, for a 97% compliance rate. For August, we reviewed Supervisory Notes requested as

WAI 37048

verification of compliance for 55 employees.  Of the 55 selected employees, 51 had appropriate documentation of the required EIS reviews, for a compliance rate of 93%.  For September, we received Supervisory Notes as verification of compliance of EIS reviews for the selected 55 employees.  Of the 55 employees, 53 had appropriate documentation of compliance with this Paragraph, for a compliance rate of 96%.  The total compliance rate for the quarter was 95%.  During this reporting period, MCSO did not yet have a methodology for capturing the requirements of Paragraphs 81(c)–(h).  We have continued to discuss the assessment of interventions and the formulation of broader pattern-based reports with MCSO.  MCSO has continued to work on attaining compliance, in particular, as it pertains to EIS monthly reviews.  MCSO must continue to work to complete the requirements of this Paragraph regarding broader pattern-based reviews in order to attain compliance.

### d. Regular Employee Performance Review and Evaluations

**Paragraph 98.**  *MCSO, in consultation with the Monitor, shall create a system for regular employee performance evaluations that, among other things, track each officer's past performance to determine whether the officer has demonstrated a pattern of behavior prohibited by MCSO policy or this Order.*

**Phase 1:**  In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

**Phase 2:**  Not in compliance

Employee Performance Appraisal Training was completed during the third quarter of 2017, and the new EPA format was initiated on September 1, 2017.  Employee Performance Appraisals had been slowly improving, and MCSO attained compliance with Paragraph 100 in the last reporting period.  However, for this reporting period, MCSO was not in compliance with Paragraph 100.  There are still several areas where EPAs are deficient, as discussed in our reviews of Paragraph 87.  Of the 48 EPAs reviewed for this reporting period, 38 were in compliance.  The compliance rating for the period in review was 79%.  MCSO did not meet the requirements of this Paragraph during this reporting period.

**Paragraph 99.**  *The review shall take into consideration all past Complaint investigations; the results of all investigations; Discipline, if any, resulting from the investigation; citizen Complaints and commendation; awards; civil or administrative claims and lawsuits related to MCSO operations; Training history; assignment and rank history; and past Supervisory actions taken pursuant to the early warning protocol.*

WAI 37049

**Phase 1:**  In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

**Phase 2:**  Not in compliance

MCSO's documentation of employee discipline, citizen complaints, past complaint investigations, corrective actions, lawsuits, claims, awards, and commendations in Employee Performance Appraisals has been slowly improving.  MCSO is continuing its effort to update GH-5 (Early Identification System), but has not yet completed the procedures for tracking violations, deficiencies, and corrective actions in EIS.  Although the procedure has not been finalized, MCSO supervisors have started to include information pertaining to EIS alerts, violations, deficiencies, and corrective actions in EPAs.  For this reporting period, 36 of 48 EPAs had comments pertaining to the requirements of this Paragraph.  We commend the effort, but we believe the tracking procedure is critical to the accuracy of the information.

***Paragraph 100.***   *The quality of Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations.*

**Phase 1:**  In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

**Phase 2:**  In compliance

We reviewed Employee Performance Appraisals for 27 supervisors and commanders who received EPAs during this reporting period.  All of the 27 of the appraisals rated the quality and effectiveness of supervision.  One supervisor had no direct reports.  Nineteen of the 27 appraisals contained comments and/or rated the supervisors' demonstrated ability to identify and effectively respond to misconduct.  Twenty-five of 27 appraisals rated supervisors on the quality of their reviews, for a 93% compliance rating with this Paragraph.  There were two EPAs where the raters deferred assessment of this dimension by referring to comments pertaining to other sections of the EPA.  However, the employees' performance as to quality of supervisory reviews was never established.  MCSO attained compliance with this Paragraph in our last quarterly status report.  MCSO will retain compliance for this reporting period.  If the EPAs in the next reporting period do not meet the requirements of this Paragraph, we will withdraw compliance.

WAI 37050

***Paragraph 101.*** *Within 180 days of the Effective Date, MCSO shall develop and implement eligibility criteria for assignment to Specialized Units enforcing Immigration-Related Laws.*

*Such criteria and procedures shall emphasize the individual's integrity, good judgment, and demonstrated capacity to carry out the mission of each Specialized Unit in a constitutional, lawful, and bias-free manner.  Deputies assigned to a Specialized Unit who are unable to maintain eligibility shall be immediately re-assigned.*

**Phase 1:**  In compliance

- Memorandum from Executive Chief Trombi, dated January 6, 2015.
- Memorandum from Sheriff Arpaio, dated February 12, 2015.
- Special Investigations Division Operations Manual, published on May 15, 2015.

MCSO has no specialized units whose mission includes the enforcement of human smuggling laws as part of their duties.  MCSO is in Phase 1 compliance with this Paragraph.

**Phase 2:**  In compliance

MCSO does not have any specialized units that enforce immigration-related laws.  Therefore, by default, MCSO is in Phase 2 compliance with this Paragraph.  We continue to monitor arrests and detentions as part of our review process to ensure that MCSO is in compliance with its own directives on this issue.

For July, August, and September, we received lists containing all incidents involving MCSO arrests and criminal citations.  For each month, we requested a random sample of arrests and criminal citations.  In total, we reviewed 64 incidents involving arrests and 74 incidents involving criminal citations.  We also reviewed a random sample of 251 Incident Reports for this reporting period.  We found no evidence of enforcement of immigration-related laws.

WAI 37051

## Section 10: Misconduct and Complaints

**COURT ORDER XI.  MISCONDUCT AND COMPLAINTS**

### a. Internally-Discovered Violations

***Paragraph 102.*** *MCSO shall require all personnel to report without delay alleged or apparent misconduct by other MCSO Personnel to a Supervisor or directly to IA that reasonably appears to constitute: (i) a violation of MCSO policy or this Order; (ii) an intentional failure to complete data collection or other paperwork requirements required by MCSO policy or this Order; (iii) an act of retaliation for complying with any MCSO policy; (iv) or an intentional provision of false information in an administrative investigation or any official report, log or electronic transmittal of information. Failure to voluntarily report or document apparent misconduct described in this Paragraph shall be an offense subject to Discipline.*

**Phase 1:**  In compliance

- CP-2 (Code of Conduct), most recently amended on May 9, 2018.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on April 10, 2018.

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

**Phase 2:**  In compliance

During our assessments of compliance with this Paragraph, we have reviewed hundreds of misconduct investigations involving MCSO personnel.  Many of them have been internally generated.

During this reporting period, we reviewed 56 administrative misconduct investigations. Twenty-eight were internally generated.  Fifteen of these 28 involved sworn employees, 12 involved Detention personnel, and one involved a civilian employee.

MCSO has continued to identify and address misconduct that is raised by other employees or observed by supervisory personnel.  While some of these investigations did not meet all requirements for the proper reporting or completion of misconduct investigations, we address these failures in other Paragraphs in this report.

WAI 37052

### b. Audit Checks

***Paragraph 103.*** *Within one year of the Effective Date, MCSO shall develop a plan for conducting regular, targeted, and random integrity audit checks to identify and investigate Deputies possibly engaging in improper behavior, including: Discriminatory Policing; unlawful detentions and arrests; improper enforcement of Immigration-Related Laws; and failure to report misconduct.*

**Phase 1:**  Not in compliance

- Audits and Inspections Unit Operations Manual, Section 303, currently under revision.

- GH-4 (Bureau of Internal Oversight), most recently amended on October 30, 2018.

**Phase 2:**  Not in compliance

MCSO established the Audits and Inspections Unit (AIU), a unit of the Bureau of Internal Oversight (BIO), to take responsibility for these requirements. AIU continues to develop an Operations Manual that will outline how the AIU will fulfill the "targeted" Paragraph 103 requirements. We and the Parties provided comments on different versions of the relevant section of the manual, and currently await the next iteration from MCSO.

In the meantime, for the last several reporting periods, MCSO has maintained a structure for AIU that includes one lieutenant, four sworn sergeants, and one Detention sergeant, three senior (civilian) auditors, and an administrative assistant. The AIU lieutenant and the four sworn sergeants assigned to the Unit have all completed a two-part training course on law enforcement audits and inspections offered by a private consultancy. According to AIU's lieutenant, as new personnel are assigned to the Unit, they will attend the training, as well.

We continue to work with AIU to explore possible avenues for integrity testing. During our site visits and via conference calls, we have discussed with AIU personnel some examples of integrity tests that would satisfy the requirements of this Paragraph without placing too many demands on personnel and other resources. We have advised AIU to devise tests that rely on the many data sources that are already available at MCSO. For example, we recommended that AIU consider reviews of body-worn camera footage or deputies with patterns of not sustained complaints. AIU personnel have met with analysts from both PSB and the Training Division, and EIU personnel, to discuss information on complaint and other trends. During our January site visit, AIU personnel advised us that they intended to conduct AIU's first integrity test, an examination of the misidentification of the ethnicity of drivers who are stopped by deputies. As we have noted previously, while Paragraph 103 does not require that the integrity tests focus on Order-related topics, this first test does; and it is a topic that is of great interest to the Plaintiffs' class. As of our October site visit, AIU had not yet initiated this test. AIU personnel reported that the Unit's main priority is completing the AIU Operations Manual. We will inquire with AIU as to the progress of this test and other relevant updates during our upcoming site visit.

WAI 37053

While the review process of the operations manual is still underway, for this reporting period, BIO again submitted several completed inspections in support of the "regular" and "random" elements of this Paragraph. The inspections examined, for example, Supervisory Notes, Patrol Activity Logs, Traffic Stop Discussions, County Attorney turndown dispositions, Patrol Shift Rosters, and employee email usage. We reviewed these reports and believe that they comport with the Paragraph 103 requirement for "regular" and "random" integrity audit checks.

### c. Complaint Tracking and Investigations

*Paragraph 104. Subject to applicable laws, MCSO shall require Deputies to cooperate with administrative investigations, including appearing for an interview when requested by an investigator and providing all requested documents and evidence. Supervisors shall be notified when a Deputy under their supervision is summoned as part of an administrative investigation and shall facilitate the Deputy's appearance, absent extraordinary and documented circumstances.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

In the fall of 2015, MCSO developed a draft checklist and investigative format for administrative investigations. All of the requirements in this Paragraph are included in these protocols. The checklist and formats were approved for use in early 2016, and all personnel through the rank of captain were required to attend a training session regarding the use of these forms. Effective June 1, 2016, all administrative investigations were required to use these forms. MCSO has consistently met this requirement, and MCSO has included the checklists in administrative investigations forwarded for our review.

During the last reporting period, the Professional Standards Bureau (PSB) drafted revisions to the investigation checklist and format to provide additional clarification on procedural requirements. We and the Parties reviewed the revisions and provided our feedback. The revised format and investigation checklist were approved for use during this reporting period. The upcoming Misconduct Investigative Training for personnel outside of PSB will include a discussion of the revisions to these forms.

During this reporting period, we reviewed 56 administrative misconduct investigations. Thirty involved sworn MCSO personnel. All but two were completed after June 20, 2016 and included the use of the currently approved investigative format and checklist. We continue to note that deputies consistently appear for scheduled interviews, provide all required information to investigators, and cooperate with investigations. There were no instances where a supervisor failed to facilitate a deputy's attendance at a required interview.

WAI 37054

**Paragraph 105.** *Investigators shall have access to, and take into account as appropriate, the collected traffic stop and patrol data, Training records, Discipline history, and any past Complaints and performance evaluations of involved officers.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

Our reviews of investigations conducted by MCSO have verified that the information required for compliance with this Paragraph is consistently provided in the checklist and investigative reports.

As a result of the Second Order and effective July 20, 2016, the PSB Commander makes all preliminary disciplinary decisions. The PSB and Compliance Bureau Commanders created a worksheet that provides information regarding how MCSO makes disciplinary decisions, and how MCSO considers employees' work history. PSB includes this form in the sustained investigation documentation that we receive and review for compliance.

During our reviews for this reporting period, we reviewed 31 sustained administrative misconduct investigations. Seventeen involved misconduct by sworn personnel; 13 involved Detention personnel; and one involved a civilian employee. Twenty-two of the 31 involved personnel were still employed by MCSO at the time final findings and discipline decisions were made. In all of these 22 cases, the PSB Commander determined the findings and presumptive discipline range for the sustained violations. We found these preliminary decisions to be consistent with the Discipline Matrices in effect at the time the decisions were made. We also found that generally, where appropriate, discipline history, past complaints, performance evaluations, traffic stop and patrol data, and training records were included in the documents considered for final discipline findings.


**Paragraph 106.** *Records of Complaints and investigations shall be maintained and made available, un-redacted, to the Monitor and Plaintiffs' representatives upon request. The Monitor and Plaintiffs' representatives shall maintain the confidentiality of any information therein that is not public record. Disclosure of records of pending investigations shall be consistent with state law.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

MCSO has two obligations under this Paragraph: to maintain and make records available. The Paragraph also covers the requirement that MCSO make unredacted records of such investigations available to the Plaintiffs' attorneys and Plaintiff-Intervenors as well.

WAI 37055

MCSO has been responsive to our requests, and neither the Plaintiffs nor Plaintiff-Intervenors have raised any concerns related to the requirements of this Paragraph for this or the past several reporting periods.  MCSO, via its counsel, distributes responses to our document and site visit requests via a document-sharing website.  The Plaintiffs' attorneys and Plaintiff-Intervenors have access to this information, including documents applicable to this Paragraph, at the same time as we do.

WAI 37056

## Section 11: Community Engagement

**COURT ORDER XII.  COMMUNITY ENGAGEMENT**

*a. Community Outreach Program*

***Paragraph 107.***  *To rebuild public confidence and trust in the MCSO and in the reform process, the MCSO shall work to improve community relationships and engage constructively with the community during the time that this order is in place.  To this end, the MCSO shall conduct the following district community outreach program.*

***Paragraph 109.***  *As part of its Community Outreach and Public Information program, the MCSO shall hold at least one public meeting per quarter to coincide with the quarterly site visits by the Monitor in a location convenient to the Plaintiffs class.  The MCSO shall consult with Plaintiffs' representatives and the Community Advisory Board on the locations of the meetings.  These meetings shall be used to inform community members of the policy changes or other significant actions that the MCSO has taken to implement the provisions of this Order.  Summaries of audits and reports completed by the MCSO pursuant to this Order shall be made available.  The MCSO shall clarify for the public at these meetings that it does not enforce immigration laws except to the extent that it is enforcing Arizona and federal criminal laws.*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

**Phase 2:**  In compliance

This Paragraph, per the August 3, 2017 Amendments to the Supplemental Permanent Injunction/Judgment Order (Document 2100), directs MCSO to conduct a District community outreach program.  More specifically, it requires that MCSO hold at least one public meeting per quarter to coincide with the quarterly site visits by the Monitor in a location convenient to the Plaintiffs' class.  This Paragraph requires MCSO to consult with Plaintiffs' representatives and the Community Advisory Board (CAB) on the location of the meetings, and to inform community members at the meetings of the policy changes or other significant actions that MCSO has taken to implement the provisions of the Order.  The Order also requires that MCSO provide summaries of audits and reports completed by MCSO pursuant to this Order and that MCSO clarify for the public at these meetings that it does not enforce immigration laws except to the extent that it is enforcing Arizona and federal criminal laws.

WAI 37057

During this reporting period, MCSO held a public meeting coinciding with our July 2018 site visit on July 18, 2018, at Mountain View Recreation Center, at 9749 107th Avenue, in Sun City, in MCSO Patrol District 3.  MCSO consulted with Plaintiffs' representatives and the CAB on the meeting location, as required.  Approximately 250 community members attended this meeting.

The meeting began with a video presentation by MCSO, which included a review of the history of the *Melendres* case, and information on MCSO community relations and the Sheriff's advisory boards.  The presentation included a summary of changes in the community engagement-related Paragraphs contained in the August 2017 Court Order.  The video was presented in Spanish with English subtitles.  Sheriff Penzone welcomed everyone and stated that the video presentation was in Spanish and subtitled in English because MCSO has a responsibility to ensure that the MCSO community meetings are communicated to everyone. He added that the community meetings were Court-ordered due to the outcomes of the *Melendres* case; and, while MCSO needs to communicate certain information in the meetings, the meetings are also to provide the attendees the opportunity to express their concerns.

At the meeting, MCSO informed community members of the policy changes and other significant actions that the agency has taken to implement the provisions of this Order.  Sheriff Penzone welcomed the attendees, and MCSO also acknowledged the Department of Justice (DOJ), the American Civil Liberties Union (ACLU) of Arizona, the CAB, the Monitoring Team and the representatives from MCSO, all of whom he indicated would be available to interact with the attendees after the meeting if there were any additional concerns or questions.  Sheriff Penzone stated that MCSO's top priority is public safety; and that when community members have a need, MCSO will respond as a professional, ethical, and law-abiding organization.  He stated that the purpose of the Orders is to provide oversight to ensure that any acts of bias, racism, or unethical law enforcement are appropriately addressed and not tolerated.  Sheriff Penzone concluded his welcoming remarks by stating that he looked forward to hearing the questions and concerns from the community members.

MCSO made summaries of audits and reports completed by MCSO pursuant to this Order available, and MCSO representatives clarified for the attendees that it does not enforce immigration laws except to the extent that it is enforcing Arizona and federal criminal laws. Sheriff Penzone provided a presentation of MCSO's progress in attaining compliance with the requirements of the Court Order.

MCSO also held a public meeting coinciding with our October 2018 site visit on October 17, 2018 at Queen Creek Middle School at 20435 Old Elsworth Road in Queen Creek, in MCSO Patrol District 6.  MCSO consulted with Plaintiffs' representatives and the CAB on the meeting location, as required.  Approximately 10 community members attended this meeting.

The meeting began with a welcome by an MCSO District 6 representative who introduced Sheriff Penzone.  Sheriff Penzone stated that issues of the past were due to leadership that failed the community and also failed MCSO.  He stated that rebuilding the organization to properly address these issues takes time, and that MCSO is working to rebuild internally and externally.

WAI 37058

Sheriff Penzone invited attendees to pick up the handout available by the front door with information about Order-related policies that MCSO has published and other information about the Court Orders.   As required, MCSO made it clear that the agency does not enforce immigration laws, and made summaries of audits and reports completed by MCSO available to community members.

***Paragraph 110.***   *The meetings present an opportunity for MCSO representatives to listen to community members' experiences and concerns about MCSO practices implementing this Order, including the impact on public trust.   MCSO representatives shall make reasonable efforts to address such concerns during the meetings and afterward as well as explain to attendees how to file a comment or complaint.*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

**Phase 2:**  In compliance

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program.   This Paragraph, among the provisions of Document 2100, requires that MCSO's quarterly community meetings present an opportunity for MCSO representatives to listen to community members' experiences and concerns about MCSO practices implementing the Order; and that MCSO representatives make reasonable efforts to address such concerns during the meetings and afterward as well as explain to attendees how to file a comment or complaint.

As noted above, during this reporting period, MCSO held a public meeting coinciding with our July 2018 site visit, on July 18, 2018, at Mountain View Recreation Center, at 9749 107th avenue, in Sun City, in MCSO Patrol District 3.   The approximately 250 community members in attendance were given ample opportunity to ask questions or offer comments.   One attendee asked how much of the County budget is expended to address the compliance issues and how that impacts on the number of deputies MCSO was able to have on patrol in the community. Another attendee asked about time delays to 911 calls.   An attendee stated that there are still some members of MCSO who treat Latinos more harshly than non-Latinos, and was critical of the fact that U.S. Immigration and Customs Enforcement (ICE) maintains offices in MCSO jails.   Another attendee inquired as to why it takes so long to for a volunteer to complete the process to become a member of the Posse.

Members of the CAB addressed the attendees and explained that the CAB was comprised of the community dedicated to representing community members.   One CAB member stated that the CAB is unique because it is responsible for gathering feedback from community members to provide to the Monitor and the Court.   He stated that the CAB provides opinions to MCSO regarding policies and procedures, and he commended MCSO on its progress in working toward

WAI 37059

compliance with the Court Orders.  Another CAB member explained that, if a member of the community has a complaint of bias against MCSO, that complaint can be filed with the CAB, the ACLU, or the Monitor.  A representative of the ACLU of Arizona outlined the background of the *Melendres* case and explained the MCSO Immigration Stops and Detention Compensation Fund eligibility requirements to receive compensation funds and provided contact information for those who wanted to learn more about the program.

At the meeting, MCSO representatives announced that complaint and comment forms were available in the back of the meeting room for any attendees who wished to provide a written complaint or comment.    After the meeting, representatives of MCSO – as well as representatives of the Monitoring Team, the ACLU of Arizona, CAB, and DOJ – remained behind to individually answer questions.

As noted above, MCSO also held a public meeting coinciding with our October 2018 site visit on October 17, 2018 at Queen Creek Middle School at 20435 Old Elsworth Road in Queen Creek, in MCSO Patrol District 6.  MCSO consulted with Plaintiffs' representatives and the CAB on the meeting location, as required.  Approximately 10 community members attended this meeting.  MCSO provided an opportunity for community members to communicate with MCSO regarding their experiences and concerns about MCSO practices in implementing the Order and explained to the attendees how to file a complaint.  Two attendees requested to speak. One attendee introduced herself as a board member from SOMOS America, who are the Plaintiffs in the *Melendres* case.  She said they met with the CAB the previous night and were pleased with their response, and that SOMOS would turn over to them some requests for information.  A second attendee introduced herself as a local mother who works for a company that creates safety apps, and she asked if she could leave information with MCSO.

**Paragraph 111.**  *English and Spanish-speaking MCSO Personnel shall attend these meetings and be available to answer questions from the public.  At least one MCSO supervisor with extensive knowledge of the agency's implementation of the Order, as well as an MCSO Community Liaison, shall participate in the meetings.  The Monitor, Plaintiffs' and Plaintiff-Intervenor's representatives shall be invited to attend and MCSO shall announce their presence and state their availability to answer questions.*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:**  In compliance

WAI 37060

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program. This Paragraph, among the provisions of Document 2100, requires that both English- and Spanish-speaking MCSO personnel attend MCSO's quarterly community meetings; at least one MCSO supervisor with extensive knowledge of the agency's implementation of the Order participate in these meetings; and that MCSO invite the Monitor, Plaintiffs' and Plaintiff-Intervenors' representatives to attend the meeting, and announce their presence and state their availability to answer questions.

As noted above, during this reporting period, MCSO held a public meeting coinciding with our July 2018 site visit, on July 18, 2018, at Mountain View Recreation Center, at 9749 107th Avenue, in Sun City, in MCSO Patrol District 3. MCSO provided a professional Spanish interpreter for the meeting at Mountain View Recreation Center MCSO provided live, consecutive Spanish interpretation throughout the meeting for the full audience. This method of providing interpretation sends a positive message that MCSO wants to be inclusive and responsive to the needs of Maricopa County's Latino and Spanish-speaking residents.

Several MCSO personnel who participated in and attended the meeting play instrumental roles in the implementation of the Orders. In addition, the Monitoring Team and representatives of the ACLU of Arizona, DOJ, and the CAB were invited to attend; and MCSO announced their presence and stated their availability to answer questions.

As noted above, MCSO also held a public meeting coinciding with our October 2018 site visit on October 17, 2018 at Queen Creek Middle School at 20435 Old Elsworth Road in Queen Creek, in MCSO Patrol District 6. MCSO consulted with Plaintiffs' representatives and the CAB on the meeting location, as required. Approximately 10 community members attended this meeting. MCSO was prepared to provide live, consecutive Spanish interpretation throughout the meeting; but upon inquiry, all attendees indicated that they spoke and understood English. As we noted previously, we do not consider this to be an appropriate or effective means of providing interpretation for a few reasons. First, there may have been attendees who felt uncomfortable raising their hands to acknowledge in front of the audience that they did not understand English. Second, attendees arriving late would not be able to avail themselves of the interpretation. We recommend that MCSO provide live, consecutive Spanish interpretation throughout the meeting for the full audience. This sends a message that MCSO wants to be inclusive, and cares about and is responsive to the needs of Maricopa County's Latino and Spanish-speaking residents.

Several MCSO personnel who participated in and attended the meeting play instrumental roles in the implementation of the Orders. In addition, the Monitoring Team and representatives of the ACLU of Arizona, DOJ, and the CAB were invited to attend. An MCSO representative announced the presence of the ACLU of Arizona and DOJ and stated their availability to answer questions. The MCSO representative indicated that members of the CAB were unavailable to attend the meeting.

WAI 37061

*Paragraph 112.  At least ten days before such meetings, the MCSO shall widely publicize the meetings in English and Spanish after consulting with Plaintiffs' representatives and the Community Advisory Board regarding advertising methods.  Options for advertising include, but are not limited to, television, radio, print media, internet and social media, and any other means available.  If any party determines there is little interest or participation in such meetings among community members, or that they have otherwise fulfilled their purpose, it can file a request with the Court that this requirement be revised or eliminated.*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:**  In compliance

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program.  This Paragraph, among the provisions of Document 2100, requires that MCSO widely publicize, in English and Spanish, its quarterly community meetings at least 10 days before such meetings and after consulting with Plaintiffs' representatives and the CAB regarding advertising methods.

As noted above, during this reporting period, MCSO held a public meeting coinciding with our July April 2018 site visit, on July 18, 2018, at Mountain View Recreation Center, at 9749 107th Avenue, in Sun City, in MCSO Patrol District 3.  As required, MCSO consulted with the CAB and the ACLU of Arizona regarding the advertisement in local radio and print media in English and Spanish – as well as on the site selection, agenda creation, and meeting logistics.  Members of the Monitoring Team also participated in discussions with MCSO regarding preparations for the public meeting.

MCSO's selection of the venue for the meeting was based on accessibility, adequate meeting space, adequate parking, and ease in locating the meeting site.  MCSO publicized the meeting with advertisements in both English and Spanish print media.  MCSO also ran radio spots in Spanish and English, and distributed flyers in the vicinity of the meeting venue.

WAI 37062

As noted above, MCSO also held a public meeting coinciding with our October 2018 site visit, on October 17, 2018, at Queen Creek Middle School at 20435 Old Elsworth Road in Queen Creek, in MCSO Patrol District 6.  MCSO consulted with Plaintiffs' representatives and the CAB on the meeting location, as required.  MCSO also consulted with the CAB and the ACLU of Arizona regarding the advertisement in local radio and print media in English and Spanish – as well as on the site selection, agenda creation, and meeting logistics.  Members of the Monitoring Team also participated in discussions with MCSO regarding preparations for the public meeting.

MCSO's selection of the venue for the meeting was based on accessibility, adequate meeting space, adequate parking, and ease in locating the meeting site.  MCSO publicized the meeting with advertisements in both English and Spanish print media.  MCSO also ran radio spots in Spanish and English, and distributed flyers in the vicinity of the meeting venue.

### b. MCSO Community Liaison

*Paragraph 113.  MCSO shall select or hire a Community Liaison who is fluent in English and Spanish.  The hours and contact information of the MCSO Community Outreach Division ("COD") shall be made available to the public including on the MCSO website.  The COD shall be directly available to the public for communications and questions regarding the MCSO.*

**Phase 1:**  In compliance

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:**  In compliance

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program.  This Paragraph, among the provisions of Document 2100, requires that MCSO select or hire a Community Liaison who is fluent in English and Spanish; and that MCSO post on its public website the hours and contact information of the Community Outreach Division (COrD), which is responsible for public communications and questions regarding MCSO.

MCSO has a Community Liaison who is fluent in English and Spanish, and lists on the MCSO website the hours and contact information for the Community Liaison Officer and other members of the COrD.  The MCSO website includes information about the COrD – such as its mission and frequently asked questions regarding MCSO.

WAI 37063

***Paragraph 114.*** *The COD shall have the following duties in relation to community engagement:*

a.   *to coordinate the district community meetings described above in Paragraphs 109 to 112;*

b.   *to provide administrative support for, coordinate and attend meetings of the Community Advisory Board described in Paragraphs 117 to 118; and*

c.   *to compile any complaints, concerns and suggestions submitted to the COD by members of the public about the implementation of this Order and the Court's order of December 23, 2011, and its findings of fact and conclusions of law dated May 24, 2013, even if they don't rise to the level of requiring formal action by IA or other component of the MCSO, and to respond to Complainants' concerns; and*

d.   *to communicate concerns received from the community at regular meetings with the Monitor and MCSO leadership.*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.
- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:**  In compliance

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program.  This Paragraph, among the provisions of Document 2100, requires that the Community Outreach Division (COrD) be responsible for the following: coordinating MCSO's quarterly community meetings; providing administrative support for, coordinating, and attending meetings of the CAB; compiling complaints, concerns, and suggestions submitted to the COrD by members of the public about the implementation of the Orders, and to respond to the complainants' concerns; and to communicate such concerns from the community at regular meetings with the Monitor and MCSO leadership.

As noted above, shortly after the issuance of Document 2100, MCSO began the transition to assume responsibility for its Community Outreach and Public Information Program; and COrD – in collaboration with CID – began coordinating the required community meetings.  As noted above (in Paragraphs 109-112), during this reporting period, COrD worked with CID to coordinate a community meeting coinciding with our site visit.

WAI 37064

During the last reporting period, Sheriff Penzone designated a Deputy Chief as the CAB's new point of contact.  For the second consecutive reporting period, the Deputy Chief worked with and provided support to the CAB.  She distributed policies and other materials for CAB members to review and provide feedback upon, and tracked and responded to CAB members' inquiries and requests for information about MCSO's implementation of the Orders.

During this reporting period, the CAB held one public meeting, a panel discussion on *Melendres* featuring a CAB member, ACLU attorney, and an MCSO employee.  A CAB member moderated the meeting.  The event was co-sponsored by the Chicano/Latino Law Students Association at the Arizona State University Sandra Day O'Connor College of Law, and held at the law school.  In addition to the MCSO employee who served on the panel, several MCSO employees (including COrD personnel) participated in the event, which discussed the history of the *Melendres* case and sought ideas from the law students on how MCSO can build community trust.  The CAB did not seek assistance from the COrD in coordinating the event.  Some CAB members also attended a few of the Monitoring Team's compliance meetings during our October site visit.  CAB members also exchanged numerous email messages with COrD, CID, and the Deputy Chief who is the CAB's designated point of contact regarding the quarterly community meeting, planning meetings between CAB members and MCSO officials, and various inquiries and requests for information.

Following discussions during our October 2017 site visit, COrD created a form for capturing information on complaints, concerns, and suggestions submitted by members of the public to the COrD.  Upon our request, following our January 2018 site visit, MCSO provided documentation that all current COrD personnel completed an online Complaint Intake and Processing course, to assist them in receiving and appropriately directing any complaints or concerns from community members they receive.

During our October 2018 site visit, we inquired with COrD regarding any complaints or concerns from community members they received during this reporting period.  COrD personnel reported that they occasionally receive complaints from community members, and that they forward those that are complaints to PSB.  They also reported that they sometimes receive inquiries for which COrD staff believe it is appropriate to direct community members to written materials or the MCSO website.  During this reporting period, COrD did not submit any MCSO Complaint and Comment Forms for our review.  During our October site visit, we inquired with COrD personnel if COrD had received any complaints or concerns during the reporting period.  When pressed, a COrD staff member noted that community members were "happy" COrD members were attending community events; he added that a few community members asked questions about available youth programs, but nothing specific to *Melendres*.  We are surprised that, given the large number of community events that COrD personnel apparently attend each month, COrD did not receive *any* complaints or concerns from community members in a three-month period.  During our upcoming site visit, we will discuss with COrD personnel how they engage with community residents at events they attend.

WAI 37065

Per this Paragraph, the COrD is required to communicate concerns received from the community at regular meetings with the Monitor and MCSO leadership. As in the past, we will discuss this topic with COrD personnel during our upcoming site visit. We will also inquire with them if – and if so, how – COrD communicates community concerns to the MCSO leadership, beyond at our quarterly site visit compliance meetings.

### c. Community Advisory Board

**Paragraph 115.**   *MCSO and Plaintiffs' representatives shall work with community representatives to create a Community Advisory Board ("CAB") to facilitate regular dialogue between MCSO and the community, and to provide specific recommendations to MCSO about policies and practices that will increase community trust and ensure that the provisions of this Order and other orders entered by the Court in this matter are met.*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

**Phase 2:**  In compliance

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program. This Paragraph, among the provisions of Document 2100, requires that MCSO have specific duties in relation to the Community Advisory Board (CAB). MCSO and Plaintiffs' representatives are required to work with community representatives to create a CAB to facilitate regular dialogue between MCSO and community leaders, and to provide specific recommendations to MCSO about policies and practices that will increase public trust and ensure that the provisions of this Order and other orders entered by the Court in this matter are met.

Shortly after the issuance of Document 2100, MCSO began the transition to assume responsibility for its Community Outreach and Public Information Program; MCSO and the Plaintiffs' counsel selected the CAB members; and MCSO began providing support and guidance to the CAB.

During this reporting period, CAB members and representatives of MCSO – specifically, the Deputy Chief who is the CAB's designated point of contact, COrD, and CID – exchanged numerous email messages. In these messages, among other topics, CAB members provided specific recommendations to MCSO about policies and practices that will increase community trust and ensure that the provisions of this Order and other orders entered by the Court in this matter are met. For example, CAB members made recommendations regarding outreach and site selection for MCSO's community meeting; and on behalf of Maricopa County community members, inquired about various Office policies and processes.

WAI 37066

The MCSO and the CAB need to forge an enduring bond that will ensure that agency-community collaboration flourishes long past the terms of the Orders.  While MCSO does interface with the CAB, there needs to be a more intense and sincere attempt on the Office's part to better institutionalize the presence and utility of the CAB's role.

***Paragraph 116.***  *The CAB shall have five members, two to be selected by MCSO and two to be selected by Plaintiffs' representatives.  One member shall be jointly selected by MCSO and Plaintiffs' representatives.  Members of the CAB shall not be MCSO Employees or any of the named class representatives nor any of the attorneys involved in this case.  A member of the MCSO COD and at least one representative for Plaintiffs shall attend every meeting of the CAB, but the CAB can request that a portion of the meeting occur without COD or the Plaintiffs' representative.  The CAB shall continue for at least the length of this Order.*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.
- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:**  In compliance

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program.  This Paragraph, among the provisions of Document 2100, reconstitutes the CAB so that it is comprised of five members – two selected by MCSO, two selected by Plaintiffs' attorneys, and one member jointly selected by MCSO and Plaintiffs' attorneys.

In September 2017, MCSO and the Plaintiffs' counsel announced their selection of the CAB members.  One of the two CAB members who had served prior to the issuance of Document 2100 resigned, leaving one CAB member previously appointed by the Plaintiffs' representatives.  The MCSO and Plaintiffs' representatives appointed four new CAB members, resulting in a total of five members; two selected by MCSO, two selected by the Plaintiffs' representatives, and one jointly selected by MCSO and Plaintiffs' representatives.  None of the CAB members are MCSO employees, named class representatives, or attorneys involved in this case.

WAI 37067

As noted above, during this reporting period, the CAB held one public meeting, a panel discussion on *Melendres* featuring a CAB member, ACLU attorney, and an MCSO employee. A CAB member moderated the discussion.  The event was co-sponsored by the Chicano/Latino Law Students Association at the Arizona State University Sandra Day O'Connor College of Law, and held at the law school.  Some CAB members also attended a few of the Monitoring Team's compliance meetings during our October site visit.

**Paragraph 117.**  *The CAB shall hold meetings at regular intervals.  The meetings may be either public or private as the purpose of the meeting dictates, at the election of the CAB.   The Defendants shall provide a suitable place for such meetings.  The MCSO shall coordinate the meetings and communicate with CAB members, and provide administrative support for the CAB.*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

**Phase 2:**  In compliance

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program.  This Paragraph, among the provisions of Document 2100, requires that the CAB hold either public or private meetings at regular intervals; and that MCSO should provide a suitable place for such meetings, coordinate the meetings and communicate with CAB members, and provide administrative support to the CAB.

During this reporting period, the CAB held one public meeting, a panel discussion on *Melendres* featuring a CAB member, ACLU attorney, and an MCSO employee.  A CAB member moderated the discussion.  The event was co-sponsored by the Chicano/Latino Law Students Association at the Arizona State University Sandra Day O'Connor College of Law, and held at the law school.  The event discussed the history of the *Melendres* case and sought ideas from the law students on how MCSO can build community trust.  Some CAB members also attended a few of the Monitoring Team's compliance meetings during our October site visit.

WAI 37068

*Paragraph 118.  During the meetings of the CAB, members will relay or gather concerns from the community about MCSO practices that may violate the provisions of this Order and the Court's previous injunctive orders entered in this matter and transmit them to the COD for investigation and/or action.  Members may also hear from MCSO Personnel on matters of concern pertaining to the MCSO's compliance with the orders of this Court.*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

**Phase 2:**  In compliance

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program.  This Paragraph, among the provisions of Document 2100, requires that at their meetings, CAB members relay or gather concerns from the community about MCSO practices that may violate the provisions of the Orders; this Paragraph also allows for the CAB to hear from MCSO personnel on matters of concern pertaining to MCSO's compliance with the Orders.

As noted above, during this reporting period, the CAB held one public meeting, a panel discussion on *Melendres* featuring a CAB member, ACLU attorney, and an MCSO employee. A CAB member moderated the discussion.  The event – which was co-sponsored by the Chicano/Latino Law Students Association at the Arizona State University Sandra Day O'Connor College of Law – discussed the history of the *Melendres* case and sought ideas from the law students on how MCSO can build community trust.

Also during this reporting period, CAB members inquired with MCSO officials regarding several concerns that they received from the community – on topics including crime trends in District 2.  CAB members indicated that they would share this information with the community. Some CAB members also attended a few of the Monitoring Team's compliance meetings during our October site visit.

WAI 37069

## Second Supplemental Permanent Injunction/Judgment Order

### Section 12: Misconduct Investigations, Discipline, and Grievances

**COURT ORDER XV.       MISCONDUCT INVESTIGATIONS, DISCIPLINE, AND GRIEVANCES**

*Paragraph 163.  The Sheriff will ensure that all allegations of employee misconduct, whether internally discovered or based on a civilian complaint, are fully, fairly, and efficiently investigated; that all investigative findings are supported by the appropriate standard of proof and documented in writing; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair, consistent, unbiased and provides due process.  To achieve these outcomes, the Sheriff shall implement the requirements set out below.*

### A.  Policies Regarding Misconduct Investigations, Discipline, and Grievances

*Paragraph 165.  Within one month of the entry of this Order, the Sheriff shall conduct a comprehensive review of all policies, procedures, manuals, and other written directives related to misconduct investigations, employee discipline, and grievances, and shall provide to the Monitor and Plaintiffs new policies and procedures or revise existing policies and procedures. The new or revised policies and procedures that shall be provided shall incorporate all of the requirements of this Order.  If there are any provisions as to which the parties do not agree, they will expeditiously confer and attempt to resolve their disagreements.  To the extent that the parties cannot agree on any proposed revisions, those matters shall be submitted to the Court for resolution within three months of the date of the entry of this Order.  Any party who delays the approval by insisting on provisions that are contrary to this Order is subject to sanction.*

**Phase 1:** Not applicable

**Phase 2:** Deferred

MCSO provided us with the following:

- CP-2 (Code of Conduct), most recently amended on May 9, 2018.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on April 10, 2018.

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- CP-8 (Preventing Racial and Other Bias-Based Profiling), most recently amended on September 26, 2018.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- EA-2 (Patrol Vehicles), most recently amended on December 8, 2017.

WAI 37070

- GA-1 (Development of Written Orders), most recently amended on January 9, 2018.

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

- GC-7 (Transfer of Personnel), most recently amended on September 27, 2018.

- GC-11 (Employee Probationary Periods), most recently amended on May 30, 2018.

- GC-12 (Hiring and Promotional Procedures), most recently amended on April 10, 2018.

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), published on October 13, 2017.

- GE-4 (Use, Assignment, and Operation of Vehicles), most recently amended on October 7, 2017.

- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.

- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- GH-4 (Bureau of Internal Oversight), most recently amended on October 30, 2018.

- GH-5 (Early Identification System), currently under revision, though the proposed revisions do not affect the language pertaining to this Paragraph.

- GI-5 (Voiance Language Services), most recently amended on December 8, 2017.

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

- GJ-26 (Sheriff's Reserve Deputy Program), most recently amended on March 30, 2018.

- GJ-27 (Sheriff's Posse Program), currently under revision.

- GJ-35 (Body-Worn Cameras), most recently amended on January 7, 2017.

- Audits and Inspections Unit Operations Manual, currently under revision.

- Body-Worn Camera Operations Manual, published on December 22, 2016.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

- Professional Standards Bureau Operations Manual, currently under development.

WAI 37071

- Training Division Operations Manual, currently under revision.

We received a majority of the documents listed above within one month of the entry of the Order.  The Monitoring Team and the Parties conducted initial reviews and returned the revised documents, with additional recommendations, to MCSO for additional work.  MCSO continues to revise the remaining policies and operations manuals related to misconduct investigations, the Sheriff's Posse Program, Audits and Inspections, and Training.  Those remaining policies and operations manuals identified by MCSO were in some phase of review by us and the Parties at the end of this reporting period.

This Paragraph implies that the review process and final adoption of the updated policies would take two months to complete, assuming that the new or revised policies were provided within one month of the Second Order's issuance.  The sheer volume of policies, as well as the extensive modifications they contain, rendered that target date unachievable.  This is due, in large measure, to researched and well-considered recommendations by the Parties; and robust discussion about policy language, application, and outcomes during our site visit meetings.

**Paragraph 166.**  *Such policies shall apply to all misconduct investigations of MCSO personnel.*

**Paragraph 167.**  *The policies shall include the following provisions:*

a.    *Conflicts of interest in internal affairs investigations or in those assigned by the MCSO to hold hearings and make disciplinary decisions shall be prohibited.  This provision requires the following:*

    i.    *No employee who was involved in an incident shall be involved in or review a misconduct investigation arising out of the incident.*

    ii.   *No employee who has an external business relationship or close personal relationship with a principal or witness in a misconduct investigation may investigate the misconduct.  No such person may make any disciplinary decisions with respect to the misconduct including the determination of any grievance or appeal arising from any discipline.*

    iii.  *No employee shall be involved in an investigation, whether criminal or administrative, or make any disciplinary decisions with respect to any persons who are superior in rank and in their chain of command.  Thus, investigations of the Chief Deputy's conduct, whether civil or criminal, must be referred to an outside authority.  Any outside authority retained by the MCSO must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest.*

b.    *If an internal affairs investigator or a commander who is responsible for making disciplinary findings or determining discipline has knowledge of a conflict of interest*

WAI 37072

*affecting his or her involvement, he or she should immediately inform the Commander of the Professional Standards Bureau or, if the holder of that office also suffers from a conflict, the highest-ranking, non-conflicted chief-level officer at MCSO or, if there is no non-conflicted chief-level officer at MCSO, an outside authority. Any outside authority retained by the MCSO must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest.*

c.    *Investigations into an employee's alleged untruthfulness can be initiated by the Commander of the Professional Standards Bureau or the Chief Deputy. All decisions not to investigate alleged untruthfulness must be documented in writing.*

d.    *Any MCSO employee who observes or becomes aware of any act of misconduct by another employee shall, as soon as practicable, report the incident to a Supervisor or directly to the Professional Standards Bureau. During any period in which a Monitor is appointed to oversee any operations of the MCSO, any employee may, without retaliation, report acts of alleged misconduct directly to the Monitor.*

e.    *Where an act of misconduct is reported to a Supervisor, the Supervisor shall immediately document and report the information to the Professional Standards Bureau.*

f.    *Failure to report an act of misconduct shall be considered misconduct and may result in disciplinary or corrective action, up to and including termination. The presumptive discipline for a failure to report such allegations may be commensurate with the presumptive discipline for the underlying misconduct.*

g.    *No MCSO employee with a rank lower than Sergeant will conduct an investigation at the District level.*

**Phase 1:**  In compliance

- CP-2 (Code of Conduct), most recently amended on May 9, 2018.
- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on April 10, 2018.
- CP-5 (Truthfulness), most recently amended on October 24, 2017.
- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.
- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.
- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:**  In compliance

WAI 37073

To determine Phase 2 compliance with this Paragraph, we review administrative misconduct investigations.

During this reporting period, we reviewed 56 closed administrative misconduct investigations. Twenty-nine cases involved sworn personnel. Twenty-four cases involved Detention personnel; one involved a civilian employee; one involved a combination of sworn and non-sworn personnel; and one involved unknown MCSO personnel. Sworn or Detention personnel assigned to the Professional Standards Bureau (PSB) conducted 38 of the investigations. Sworn supervisors in the Districts or Divisions outside of PSB conducted 18 of these investigations.

Paragraph 167.a.i-iii. prohibits any employee with any conflicts of interest from participating in, holding hearings on, or making any disciplinary decisions in a misconduct investigation. During this reporting period, there were no instances where any potential conflict of interest was identified.

Paragraph 167.b. requires that if the internal affairs investigator or a commander responsible for making disciplinary decisions identifies a conflict of interest, appropriate notifications must be made immediately. Our review of the 56 completed administrative investigations for this reporting period revealed that there were no instances where MCSO identified a conflict of interest by an MCSO member responsible for making disciplinary decisions

Paragraph 167.c. requires that investigations into truthfulness be initiated by the Chief Deputy or the PSB Commander. Of the 56 completed misconduct investigations, there were eight during this reporting period where the Chief Deputy or the PSB Commander authorized a truthfulness allegation. We did not identify any investigations where we believe a truthfulness investigation should have been initiated and was not.

Paragraph 167.d. requires that any MCSO employee who observes or becomes aware of misconduct by another employee shall immediately report such conduct to a supervisor or directly to PSB. Per the requirement, during the period in which the Monitor has authority to oversee any operations of MCSO, any employee may also report alleged misconduct to the Monitor. Of the 56 completed administrative cases we reviewed for this reporting period, there were 27 investigations where an employee reported potential misconduct by another employee, or a supervisor identified potential employee misconduct. There were no instances identified where an employee failed to report potential misconduct to a supervisor as required.

Paragraph 167.e. requires that when supervisors learn of an act of misconduct, the supervisor shall immediately document and report the information to PSB. Of the 27 cases where employees brought forward potential misconduct, 26 were properly documented and forwarded by the supervisor in a timely manner. In one (4%) of the 27 cases, a supervisor failed to immediately report misconduct he was aware of to PSB as required.

WAI 37074

Paragraph 167.f. provides for the potential for a disciplinary sanction or other corrective action if an employee fails to bring forth an act of misconduct. During this reporting period, there were no investigations initiated because employees failed to bring forth information regarding potential misconduct of another employee that they were aware of. In one (4%) of the 27 cases, while the supervisor informed his chain of command of potential misconduct, PSB was not immediately notified. No action was taken to address this failure to notify PSB.

Paragraph 167.g. requires that a sergeant or higher-ranking employee conduct all misconduct investigations conducted at the District level. All District-level cases that we reviewed for this reporting period complied with this requirement.

***Paragraph 168.*** *All forms of reprisal, discouragement, intimidation, coercion, or adverse action against any person, civilian, or employee because that person reports misconduct, attempts to make or makes a misconduct complaint in good faith, or cooperates with an investigation of misconduct constitute retaliation and are strictly prohibited. This also includes reports of misconduct made directly to the Monitor, during any period in which a Monitor is appointed to oversee any operations of the MCSO.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on May 9, 2018.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on April 10, 2018.

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 56 administrative misconduct investigations that were completed during this reporting period.

WAI 37075

There was one administrative misconduct investigation completed this reporting period where it was alleged that an employee had made intimidating and retaliatory statements to other employees involved in a separate misconduct investigation.  PSB initiated an investigation into this alleged misconduct as required for compliance with this Paragraph.  MCSO reported that there were no grievances or other documents filed with PSB or the Compliance Division that alleged any other misconduct related to the requirements of this Paragraph.

***Paragraph 169.***  *Retaliating against any person who reports or investigates alleged misconduct shall be considered a serious offense and shall result in discipline, up to and including termination.*

**Phase 1:**  In compliance

- CP-2 (Code of Conduct), most recently amended on May 9, 2018.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on April 10, 2018.

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 56 administrative misconduct investigations that were completed during this reporting period.  As noted in Paragraph 168, there was one investigation initiated where intimidation and retaliation was alleged.  A misconduct investigation was initiated.  There were no grievances or other documents submitted to PSB or to the Compliance Division that alleged any other retaliation related to the requirements of this Paragraph.

WAI 37076

***Paragraph 170.*** *The Sheriff shall investigate all complaints and allegations of misconduct, including third-party and anonymous complaints and allegations. Employees as well as civilians shall be permitted to make misconduct allegations anonymously.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 56 completed administrative misconduct investigations conducted during this reporting period. Twenty-eight of these were generated as a result of external complaints, and 28 were generated internally. We also reviewed five criminal misconduct investigations, three of which were generated as a result of external complaints.

Of the 56 administrative misconduct investigations we reviewed this reporting period, four involved externally generated anonymous complaints. Two involved third-party complaints. One of the five criminal misconduct investigations we reviewed during this reporting period was also generated due to an anonymous complaint. We have not become aware of any evidence that indicates that MCSO refused to accept and complete investigations in compliance with the requirements of this Paragraph. None of the 56 administrative misconduct investigations we reviewed during this reporting period included any allegations indicating that any third-party or anonymous complaints were not appropriately accepted and investigated.

***Paragraph 171.*** *The MCSO will not terminate an administrative investigation solely on the basis that the complainant seeks to withdraw the complaint, or is unavailable, unwilling, or unable to cooperate with an investigation, or because the principal resigns or retires to avoid discipline. The MCSO will continue the investigation and reach a finding, where possible, based on the evidence and investigatory procedures and techniques available.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 56 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

WAI 37077

We determined that two of the 56 completed administrative investigations involved complainants who sought to withdraw their complaints; or were unavailable, unwilling, or unable to cooperate. MCSO completed both investigations and reached a finding as required. We also found that in 11 of the 56 investigations, the principal left MCSO employment prior to the finalization of the investigation or discipline process. MCSO completed all 11 of these investigations and reached a finding. Of the 56 investigations we evaluated for compliance, none were prematurely terminated.

**Paragraph 172.** *Employees are required to provide all relevant evidence and information in their custody and control to internal affairs investigators. Intentionally withholding evidence or information from an internal affairs investigator shall result in discipline.*

**Phase 1:** In compliance

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph during this reporting period, we reviewed 56 completed administrative misconduct investigations conducted by MCSO personnel. There were two investigations identified by MCSO where an employee failed to accurately provide all information or evidence required during the investigation. In both cases, allegations for truthfulness were initiated. We did not identify any cases during our reviews where we believe an employee intentionally failed to provide all required information or evidence during an investigation and MCSO failed to act.

**Paragraph 173.** *Any employee who is named as a principal in an ongoing investigation of serious misconduct shall be presumptively ineligible for hire or promotion during the pendency of the investigation. The Sheriff and/or the MCSO shall provide a written justification for hiring or promoting an employee or applicant who is a principal in an ongoing investigation of serious misconduct. This written justification shall be included in the employee's employment file and, during the period that the MCSO is subject to Monitor oversight, provided to the Monitor.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

- GC-11 (Employee Probationary Periods), most recently amended on April 10, 2018.

WAI 37078

- GC-12 (Hiring and Promotional Procedures), most recently amended on April 10, 2018.

**Phase 2:** In compliance

MCSO has established a protocol to address the requirements of this Paragraph. When a promotion list is established for sworn or Detention personnel, a copy of the list is forwarded to the Professional Standards Bureau (PSB). Before any promotion is finalized, PSB conducts a check of each employee's disciplinary profile in the automated system (IAPro). As part of the promotional process, MCSO conducts a meeting with command staff to discuss each employee's qualifications. During this meeting, the results of the IAPro checks are provided to the staff for review and consideration. The PSB Commander generally attends the promotion meetings for both Detention and sworn personnel, and clarifies any questions regarding the disciplinary history that the staff may have. When an employee is moved from a civilian employment position to a sworn employment position, MCSO conducts a thorough background investigation. The process involves a review and update of the candidate's PSB files, which is completed by Pre-Employment Services. For Detention employees who are moving to sworn positions, the information in the employee's file is updated to include any revised or new information.

During this reporting period, MCSO had no submissions relative to this Paragraph. MCSO remains in compliance.

**Paragraph 174.** *Employees' and applicants' disciplinary history shall be considered in all hiring, promotion, and transfer decisions, and this consideration shall be documented. Employees and applicants whose disciplinary history demonstrates multiple sustained allegations of misconduct, or one sustained allegation of a Category 6 or Category 7 offense from MCSO's disciplinary matrices, shall be presumptively ineligible for hire or promotion. MCSO shall provide a written justification for hiring or promoting an employee or applicant who has a history demonstrating multiple sustained allegations of misconduct or a sustained Category 6 or Category 7 offense. This written justification shall be included in the employee's employment file and, during the period that the MCSO is subject to Monitor oversight, provided to the Monitor.*

**Phase 1:** In compliance

- GC-12 (Hiring and Promotional Procedures), most recently amended on April 10, 2018.

**Phase 2:** In compliance

During this reporting period, we requested and received the names of employees hired, promoted, and transferred for each month of the quarter. There were no transfers to or from PSB, CID, and BIO during this reporting period.

WAI 37079

For employees who are promoted, the documentation submitted by MCSO generally includes the disciplinary history for the previous 10 years and any applicable disciplinary actions. MCSO also provides the disciplinary history of Detention and civilian employees who have been upgraded in classification to sworn status.  We reviewed the documentation provided for five new employees hired during the third quarter of 2018, and found no issues of concern. MCSO submitted memorandums of justification for two promoted employees who had been the subjects of serious discipline.  The first promotion involved a Detention employee who had been engaged in a romantic relationship with another employee assigned to the same facility. The employee received a 40-hour suspension.  The incident occurred in 2011, and the employee did not have any other disciplinary issues.  The second promotion involved another Detention employee who had three sustained Internal Affairs complaints.  The complaints were in 2009, 2010, and 2014.  Two of these resulted in written reprimands, in 2009 and 2014.  MCSO could not find any record of discipline for the sustained complaint in 2010.  This complaint involved the use of inappropriate language.  None of the investigations involved serious misconduct.

MCSO promoted 13 Detention sergeants and one Detention lieutenant during this reporting period.  We reviewed the disciplinary profiles for each employee promoted and determined that the promotions met the requirements of this Paragraph.  MCSO also promoted five civilian employees.  We reviewed the profiles submitted for each civilian employee.  During our October site visit, we reviewed the files of all sworn and Detention employees promoted during the period in review.  We also reviewed the files of a select sample of civilian employees.  We noted no issues of concern.

**Paragraph 175.**  *As soon as practicable, commanders shall review the disciplinary history of all employees who are transferred to their command.*

**Phase 1:**  In compliance

- GC-7 (Transfer of Personnel), most recently amended on September 27, 2018.

- GH-5 (Early Identification System), currently under revision, though the proposed revisions do not affect the language pertaining to this Paragraph.

**Phase 2:**  Not in compliance

Per MCSO policy, an EIS review is to be conducted within 14 days of an affected employee's transfer.  We requested a list of employees that were transferred during this reporting period. From the list, we selected a sample of employees to review and verify that there was documentation of the required EIS reviews.  We received and reviewed Blue Team Notes submitted for the selected employees as verification of compliance with this Paragraph.

WAI 37080

For July, MCSO submitted a list of employees who were transferred during the previous month. From the list, we selected a random sample of 25 employees, of which six were sworn and 19 were Detention. Of the six transferred sworn employees selected, all included documentation of command review of their EIS profiles. Of the 19 transferred Detention employees selected, 11 included documentation of command review of their EIS profiles. One individual was no longer employed with the agency. In total, 17 of 24 transfers included documentation of supervisory reviews, for a compliance rate of 70% for July.

For August, MCSO submitted a list of employees who were transferred during July. From the list, we selected a sample of 25 employees transferred, to assess MCSO's compliance with this Paragraph. The transfers selected for review included four sworn employees and 21 Detention employees. All four sworn employees included documentation of command review of their EIS profiles. Of the 21 Detention employees selected, 18 included documentation of timely command review of their EIS profiles upon transfer. Two Detention personnel files were missing documentation of EIS reviews; one Detention personnel file included documentation of EIS review, but it occurred 30 days after the date of transfer. In total, 22 of 25 transfers included documentation of supervisory reviews, for a compliance rate of 88% for August.

For September, MCSO submitted a list of employees who were transferred during August. From the list, we selected 25 employees transferred to assess MCSO's compliance with this Paragraph. The transfers included 23 Detention employees and two sworn employees. Of the 23 Detention employees, all included documentation of command review of their disciplinary history after the transfer. Of the two sworn employees selected, one included documentation of command review of their disciplinary history upon transfer. In total, 24 of 25 transfers included documentation of supervisory reviews, for a compliance rate of 96% for September. For the quarter, 63 of 74 transfers were in compliance with this Paragraph, for a compliance rate of 85%.

**Paragraph 176.** *The quality of investigators' internal affairs investigations and Supervisors' reviews of investigations shall be taken into account in their performance evaluations.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

**Phase 2:** Not in compliance

We reviewed Employee Performance Appraisals for 27 supervisors and commanders who received EPAs during this reporting period. All 27 appraisals rated the quality and effectiveness of supervision. Nineteen of the 27 appraisals contained comments and/or rated the supervisors' demonstrated ability to identify and effectively respond to misconduct. Eighteen of the 27 supervisors' EPAs assessed the employees' quality of internal investigations and/or the quality of their reviews of internal investigations, as required by this Paragraph. Twenty-five of the 27 appraisals rated supervisors on the quality of their reviews. Eighteen of the supervisors' 27

WAI 37081

EPAs that we reviewed for this reporting period were in compliance with the requirements of this Paragraph. The number of EPAs that met the requirements of this Paragraph again slightly decreased during this reporting period. The compliance rate for the previous quarter was 78%. Compliance for this reporting period was 67%.

***Paragraph 177.*** *There shall be no procedure referred to as a "name-clearing hearing." All pre-disciplinary hearings shall be referred to as "pre-determination hearings," regardless of the employment status of the principal.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 56 administrative misconduct investigations that were completed during this reporting period.

In misconduct investigations that resulted in serious discipline and in which the employee was afforded the opportunity for an administrative hearing, the only reference to the hearing was "pre-determination hearing."

### B. *Misconduct-Related Training*

***Paragraph 178.*** *Within three months of the finalization of these policies consistent with ¶ 65of this Order, the Sheriff will have provided all Supervisors and all personnel assigned to the Professional Standards Bureau with 40 hours of comprehensive training on conducting employee misconduct investigations. This training shall be delivered by a person with subject matter expertise in misconduct investigation who shall be approved by the Monitor. This training will include instruction in:*

a.  *investigative skills, including proper interrogation and interview techniques, gathering and objectively analyzing evidence, and data and case management;*

b.  *the particular challenges of administrative law enforcement misconduct investigations, including identifying alleged misconduct that is not clearly stated in the complaint, or that becomes apparent during the investigation;*

c.  *properly weighing the credibility of civilian witnesses against employees;*

d.  *using objective evidence to resolve inconsistent statements;*

e.  *the proper application of the appropriate standard of proof;*

f.  *report-writing skills;*

WAI 37082

g.  *requirements related to the confidentiality of witnesses and/or complainants;*

h.  *considerations in handling anonymous complaints;*

i.  *relevant MCSO rules and policies, including protocols related to administrative investigations of alleged officer misconduct; and*

j.  *relevant state and federal law, including Garrity v. New Jersey, and the requirements of this Court's orders.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

MCSO did not deliver the 40-hour Misconduct Investigative Training during this reporting period.  This lesson plan is under review by Training and PSB personnel.


***Paragraph 179.*  *All Supervisors and all personnel assigned to the Professional Standards Bureau also will receive eight hours of in-service training annually related to conducting misconduct investigations.  This training shall be delivered by a person with subject matter expertise in misconduct investigation who shall be approved by the Monitor.***

**Phase 1:**  Not in compliance

- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.

- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2018.

- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:**  Deferred

During our October site visit, Training and PSB jointly advised us of the termination of the outside vendor to deliver the required annual in-service training to District personnel.  Our Team and the Parties had completed an initial review, and Training and PSB continued to collaborate on the curriculum.  The lesson plan was approved and delivered to District personnel in December after our technical assistance site visit.

The annual in-service for PSB personnel was approved and delivered on November 16, 2018. Any PSB personnel unavailable for this training were required to attend the training provided to District personnel.

WAI 37083

*Paragraph 180.  Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all employees on MCSO's new or revised policies related to misconduct investigations, discipline, and grievances.  This training shall include instruction on identifying and reporting misconduct, the consequences for failing to report misconduct, and the consequences for retaliating against a person for reporting misconduct or participating in a misconduct investigation.*

**Phase 1:**  In compliance

- CP-2 (Code of Conduct), most recently amended on May 9, 2018.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on April 10, 2018.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.

- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- GJ-26 (Sheriff's Reserve Deputy Program), most recently amended March 30, 2018.

- GJ-27 (Sheriff's Posse Program), currently under revision.

- Training Division Operations Manual, most recently amended on September 21, 2017.

**Phase 2:**  In compliance

We review documentation of the individual review of the following policies to gauge compliance with this Paragraph:  CP-2 (Code of Conduct); CP-3 (Workplace Professionalism: Discrimination and Harassment; CP-11 (Anti-Retaliation); GB-2 (Command Responsibility); GH-2 (Internal Investigations); GC-16 (Employee Grievance Procedures); and GC-17 (Employee Disciplinary Procedures).

Annual reviews for each of these policies require new individual reviews by all employees.  The HUB, a training management system, is utilized to distribute all policies.  Employees are required to complete personal attestations that indicate that they have read and understand the policy.  We will continue reviewing policy attestations by all personnel.

WAI 37084

*Paragraph 181.  Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all employees, including dispatchers, to properly handle civilian complaint intake, including how to provide complaint materials and information, and the consequences for failing to take complaints.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.
- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Training Division Operations Manual, most recently amended on September 21, 2017.

**Phase 2:**  In compliance

During this reporting period, the Complaint Intake and Reception Training was approved for distribution via the HUB.  Posse members recruited after January 1, 2018, were the first to receive the training.  Training was extended to all other personnel in July.  Tracking personnel who completed this training has been problematic due to data migration issues between the HUB and the Skills Management System.  (Skills Management System is the software MCSO used to track completed training prior to the HUB.)  In 2017, MCSO achieved a 96% compliance rate while utilizing the Skills Management System.  MCSO was unable to migrate this documentation into the HUB.  As a result, MCSO has chosen to separate 2017 and 2018 reporting.  After transitioning to the HUB, MCSO identified 369 new hires requiring this training.  At the end of this reporting period, 251 of 369 (68%) have completed this class.  We will continue to monitor compliance measures during this transition.

*Paragraph 182.  Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all Supervisors on their obligations when called to a scene by a subordinate to accept a civilian complaint about that subordinate's conduct and on their obligations when they are phoned or emailed directly by a civilian filing a complaint against one of their subordinates.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.

WAI 37085

- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Training Division Operations Manual, most recently amended on September 21, 2017.

**Phase 2:** In compliance

During this reporting period, our review of the ACT curriculum continued to affirm the inclusion of material compliant with this Paragraph. We continue to reinforce supervisory obligations during the review process.

### C.    *Administrative Investigation Review*

***Paragraph 183.*** *The Sheriff and the MCSO will conduct objective, comprehensive, and timely administrative investigations of all allegations of employee misconduct. The Sheriff shall put in place and follow the policies set forth below with respect to administrative investigations.*

***Paragraph 184.*** *All findings will be based on the appropriate standard of proof. These standards will be clearly delineated in policies, training, and procedures, and accompanied by detailed examples to ensure proper application by internal affairs investigators.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 56 completed administrative misconduct investigations conducted during this reporting period.

Of the 56 cases we reviewed, 54 (96%) complied with the requirements of this Paragraph. In two cases – both involving Detention employees – we do not believe the findings were based on an appropriate standard of proof. In both, we believe that findings of sustained should have been made and were not.

During our next site visit, we will discuss these investigations with PSB personnel.

***Paragraph 185.*** *Upon receipt of any allegation of misconduct, whether internally discovered or based upon a civilian complaint, employees shall immediately notify the Professional Standards Bureau.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

WAI 37086

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 56 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.  In three cases (5%), PSB was not immediately notified at the time of the incidents, resulting in a delay in the initiation of the administrative investigations.

***Paragraph 186.***  *Effective immediately, the Professional Standards Bureau shall maintain a centralized electronic numbering and tracking system for all allegations of misconduct, whether internally discovered or based upon a civilian complaint.  Upon being notified of any allegation of misconduct, the Professional Standards Bureau will promptly assign a unique identifier to the incident.  If the allegation was made through a civilian complaint, the unique identifier will be provided to the complainant at the time the complaint is made.  The Professional Standards Bureau's centralized numbering and tracking system will maintain accurate and reliable data regarding the number, nature, and status of all misconduct allegations, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status, if requested, and final disposition of the complaint.  The system will be used to determine the status of misconduct investigations, as well as for periodic assessment of compliance with relevant policies and procedures and this Order, including requirements of timeliness of investigations.  The system also will be used to monitor and maintain appropriate caseloads for internal affairs investigators.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:**  In compliance

During our October 2016, January 2017, and July 2017 site visits, we met with the PSB lieutenant who served as the primary administrator for the IAPro database system.  The lieutenant's demonstration represented IAPro as a technology instrument that meets the compliance criteria of this Paragraph – to include logging of critical dates and times, alerts regarding timeframes and deadlines, chronological misconduct investigation status, notifications, and dispositions.  The lieutenant conducted a weekly evaluation of closed cases to ensure that data was entered in to the system, and a monthly review to audit timeframes associated with open investigations.  The tracking system provides estimates of key timeframes for all investigators to ensure that they learn of previous and upcoming investigative milestones.

WAI 37087

PSB has verified that civil notice claims are entered in the tracking system. The IAPro system integrates exceptionally well with the EIS and Blue Team technology systems. The system can be accessed remotely. Additionally, PSB hired a management analyst dedicated to the administration of the centralized tracking system. The documentation that PSB provided to us for review, and the direct user access that a member of our Team has to the centralized numbering and tracking system, indicates that the system possesses the functionality as required by this Paragraph and is being used according to the requirements of this Paragraph.

During our January 2018 site visit, a member of our Team met with the management analyst assigned to PSB who is now responsible for management of the IAPro database. The management analyst again demonstrated the functionality of the tracking system in use. The analyst also showed us the documents that are sent out regarding the status of investigations and demonstrated how the Blue Team Dashboard can be used to track investigation information.

During this reporting period, we found that all 56 of the administrative misconduct investigations were properly assigned a unique identifier. All but three of these cases were both initiated and completed after July 20, 2016. Of the 56 cases, 28 involved an external complaint requiring that PSB provide the complainant with this unique identifier. In all of these 28 cases, MCSO sent the initial letter that includes this unique identifier to the complainant within seven days, or provided an appropriate explanation for not doing so. In some cases, anonymous complainants do not provide contact information; and in others, known complainants decline to provide MCSO with adequate contact information. PSB has developed a form that identifies the reason why a required notification letter is not sent, and includes this document in the cases they forward for our review.

***Paragraph 187.*** *The Professional Standards Bureau shall maintain a complete file of all documents within the MCSO's custody and control relating to any investigations and related disciplinary proceedings, including pre-determination hearings, grievance proceedings, and appeals to the Maricopa County Law Enforcement Merit System Council or a state court.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

To determine compliance with this Paragraph, we previously verified that PSB maintains both hardcopy and electronic files intended to contain all the documents required for compliance with this Paragraph.

WAI 37088

During past site visits, a member of our Team inspected the file rooms where hardcopies of investigations are stored and randomly reviewed case files to verify compliance. We verified that criminal and administrative investigation files are stored in separate rooms, and access to these rooms is restricted. Our Team member has also used the access granted to IAPro to randomly select internal affairs case files to verify that all information is being maintained electronically.

In May 2018, PSB relocated to its new offsite facility. We have since confirmed that PSB continues to maintain both hardcopy and electronic files intended to contain all documents required for compliance with this Paragraph at the new facility. A member of our Team has verified this compliance at the new facility by inspecting both the criminal and administrative investigation file rooms and randomly selecting internal affairs case files to verify that all information is also being electronically maintained in IAPro.

*Paragraph 188. Upon being notified of any allegation of misconduct, the Professional Standards Bureau will make an initial determination of the category of the alleged offense, to be used for the purposes of assigning the administrative investigation to an investigator. After initially categorizing the allegation, the Professional Standards Bureau will promptly assign an internal affairs investigator.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review administrative misconduct investigations and service complaints that were conducted and completed by MCSO personnel during the reporting period.

We previously concurred with MCSO that Phase 2 compliance with this Paragraph would be based on PSB's determination of the initial allegations, and not which category of offense is determined once the investigation is completed.

During this reporting period, we reviewed 56 administrative misconduct investigations and 15 service complaints. All 56 administrative misconduct investigations and 14 of the 15 service complaints we reviewed complied with the requirements of this Paragraph.

With the approved revisions to the internal investigations and discipline policies in May 2017, PSB is authorized to determine that some complaints can be classified as service complaints. PSB has initiated both a process and a complaint-tracking system for these complaints. During the last reporting period, MCSO completed and closed 64 service complaints. Sixty of the 64 service complaints complied with the requirements of this Paragraph.

WAI 37089

During this reporting period, MCSO completed and closed 15 service complaints. Two were appropriately reclassified to administrative misconduct investigations after review by PSB. The remaining 13 were classified and handled as service complaints. As we have consistently noted in our review of service complaints, the majority of these complaints involve laws, policies, or procedures where there is no employee misconduct; or are contacts from the public that do not include allegations of misconduct. Only two (13%) of the service complaints this reporting period were determined not to involve MCSO employees.

We concur with MCSO's handling of 14 of these 15 complaints. In one, the complaint clearly alleged conduct that, had it occurred, would have been misconduct. MCSO should have initiated an administrative misconduct investigation.

During our April and July 2018 site visits, we discussed service complaints with PSB personnel. During both discussions, PSB advised us that the number of service complaints being initiated far exceeded their expectations. They also noted in both meetings that between 20-25% of the service complaints were determined not to involve MCSO employees, and our reviews for these two reporting periods confirmed this assertion. We agreed to review an expedited process for handling complaints where it can be immediately determined that the complaint does not involve MCSO personnel.

During our October 2018 site visit, PSB personnel informed us that the number of service complaints being initiated has continued to exceed their expectations. As of our October site visit meeting, MCSO has initiated 263 service complaints in 2018. Despite MCSO's expressed interest in making additional changes to the service complaint process, MCSO has not yet drafted any proposed revisions to the process or form for our Team to review. During our October site visit, we discussed some additional modifications PSB personnel would like to make to the service complaint process. (These modifications are noted in more detail in Paragraph 194.)

We remain satisfied that generally MCSO continues to properly classify and handle administrative misconduct investigations and service complaints and are completing the required documentation. We will discuss the one service complaint where we disagree with the decision not to initiate a misconduct investigation during the next site visit.

Consistent with the provisions of the revised policies on internal investigations and discipline, the PSB Commander now has the discretion to determine that internal complaints alleging minor policy violations can be addressed without a formal investigation if certain criteria exist. If the PSB Commander makes this determination, it must be documented. There were no internal complaints during this or the last five reporting periods where the PSB Commander determined that the internal complaint did not require an administration investigation.

WAI 37090

***Paragraph 189.***  *The Professional Standards Bureau shall administratively investigate:*

a.    *misconduct allegations of a serious nature, including any allegation that may result in suspension, demotion, or termination; and*

b.    *misconduct indicating apparent criminal conduct by an employee.*

**Phase 1:**  In compliance

- CP-2 (Code of Conduct), most recently amended on May 9, 2018.
- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on April 10, 2018.
- CP-5 (Truthfulness), most recently amended on October 24, 2017.
- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.
- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph during this reporting period, we reviewed 56 completed administrative misconduct investigations conducted by MCSO personnel.

Division or District personnel outside of PSB investigated 18 of the 56 administrative misconduct investigations conducted during this reporting period.  PSB investigated 38 of the cases.  PSB also investigated five allegations of criminal misconduct.  We did not identify any cases during this reporting period where we believe PSB failed to investigate allegations of serious misconduct.

***Paragraph 190.***  *Allegations of employee misconduct that are of a minor nature may be administratively investigated by a trained and qualified Supervisor in the employee's District.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed a total of 61 misconduct investigations conducted by MCSO personnel and completed during this reporting period.  Of these, 56 were administrative investigations, and five involved alleged criminal misconduct. PSB personnel conducted all of the criminal investigations.

Of the 56 administrative misconduct cases we reviewed for this Paragraph, PSB investigators conducted 38 of the investigations.  Eighteen were investigated at the District or Division level.

WAI 37091

We did not identify any case where Divisions outside of PSB investigated allegations of serious misconduct that we believe should have been investigated by PSB.

The 40-hour Misconduct Investigative Training was completed prior to January 1, 2018. Of the 18 administrative misconduct investigations completed outside of PSB during this reporting period, 12 were initiated before the Misconduct Investigative Training was completed. Six (50%) of these 12 were in compliance with the requirements for completion of misconduct investigations. Those not in compliance had a variety of concerns and were returned for corrections or additional investigation by PSB. Six of the investigations were both initiated and finalized after the completion of the Misconduct Investigative Training. Five of these six (83%) were in compliance with all requirements for the completion of administrative misconduct investigations. The one case not in compliance lacked a timely request for an extension, which cannot be corrected after the fact.

All supervisors have attended the required Misconduct Investigative Training. While some investigations still do not comply with all the requirements for the investigation of misconduct, these deficiencies are covered in other Paragraphs. We note again this reporting period that those investigations completed after the completion of the Misconduct Investigative Training are of overall higher quality and have fewer administrative errors than those completed prior to the training.

MCSO has complied with the requirements to train all supervisors who conduct minor misconduct investigations; and they provide a monthly report regarding those supervisors who they have determined are not qualified to conduct these investigations.


***Paragraph 191.*** *If at any point during a misconduct investigation an investigating Supervisor outside of the Professional Standards Bureau believes that the principal may have committed misconduct of a serious or criminal nature, he or she shall immediately notify the Professional Standards Bureau, which shall take over the investigation.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 56 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

There were no cases for this reporting period where an investigating supervisor outside of PSB discovered potential serious or criminal misconduct during their investigation. Our Team did not identify any investigation where the complainant alleged serious misconduct had occurred, and the case was not forwarded to PSB for investigation.

WAI 37092

***Paragraph 192.*** *The Professional Standards Bureau shall review, at least semi-annually, all investigations assigned outside the Bureau to determine, among the other matters set forth in ¶ 251 below, whether the investigation is properly categorized, whether the investigation is being properly conducted, and whether appropriate findings have been reached.*

**Phase 1:**  Not in compliance

- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:**  Deferred

PSB command personnel advised us that they continue to review investigations in "real time" as they come into the Bureau.  During this reporting period, MCSO provided copies of PSB's daily reviews of 17 completed Division level misconduct investigations that were assigned outside the Bureau.  The report review template used by PSB includes sections that address whether or not the investigation is properly categorized, whether the investigation is properly conducted, and whether appropriate findings have been reached.  Additionally, copies of emails detailing the quality of the investigation, identified deficiencies, and required edits sent electronically to affected Division Commanders were provided for each case reviewed.

PSB included the information required by this Paragraph in its semi-annual public Misconduct Investigations Report, which is required under Paragraph 251.  The most recent report was published on MCSO's website in July 2018.  The report covers the period of July 1-December 31, 2017; and contains an analysis as to whether cases assigned outside of PSB are properly categorized, whether the investigations were properly conducted, and whether appropriate findings have been reached.  Some of the issues identified in the review of the investigations include: failure to conduct a timely investigation; failure to attempt to interview complainants in person; failure to interview all parties (e.g., investigative leads and witnesses); failure to audio- and video-record all interviews without any documented explanation; failure to properly conduct investigative interviews; and findings not supported by the facts of the investigation.

We are deferring our Phase 2 compliance assessment of this Paragraph until MCSO achieves Phase 1 compliance via the publication of the Professional Standards Bureau Operations Manual.

***Paragraph 193.*** *When a single act of alleged misconduct would constitute multiple separate policy violations, all applicable policy violations shall be charged, but the most serious policy violation shall be used for determining the category of the offense.  Exoneration on the most serious offense does not preclude discipline as to less serious offenses stemming from the same misconduct.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

WAI 37093

- Compliance Division Operations Manual, most recently amended on June 25, 2018.
- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 56 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period. In all 31 cases with sustained allegations, the most serious policy violation was used to determine the category of the offense if more than one policy violation had been alleged. In cases where multiple violations of policy occurred, this information was also listed on the preliminary discipline document. There were no cases where the exoneration of any offense precluded discipline for sustained allegations.

*Paragraph 194. The Commander of the Professional Standards Bureau shall ensure that investigations comply with MCSO policy and all requirements of this Order, including those related to training, investigators' disciplinary backgrounds, and conflicts of interest.*

Phase 1: Not in compliance

- CP-2 (Code of Conduct), most recently amended on May 9, 2018.
- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on April 10, 2018.
- CP-5 (Truthfulness), most recently amended on October 24, 2017.
- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.
- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.
- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.
- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:** Not in compliance

We determine Phase 2 compliance with this Paragraph by a review of completed misconduct investigations conducted by MCSO personnel, the review of attendance by internal investigators at required Misconduct Investigative Training, the disciplinary backgrounds of internal investigators and the efforts being made by the PSB Commander to reach compliance.

During this reporting period, we reviewed 56 administrative misconduct investigations and five criminal investigations. All five (100%) of the criminal investigations complied with MCSO policy and the requirements of the Second Order. Of the 56 administrative misconduct investigations, 42 (75%) were in compliance with all of the investigative and administrative

WAI 37094

responsibilities over which the PSB Commander has authority.  This is a decrease of 2% from the last reporting period.  There was one case where we disagreed with the final discipline decision of the Appointing Authority, resulting in an overall finding of 73% for compliance with all MCSO policy and Second Order requirements.

There were no administrative misconduct cases completed and reviewed in response to the requirements of Paragraphs 249 (investigatory stops) during this reporting period.  One case submitted in compliance with Paragraph 33, involving an allegation of bias policing not involving members of the Plaintiffs class, was reviewed and found not to be in compliance with the requirements of the Order.  Three cases were submitted and reviewed for Paragraph 275 Class Remedial Matters (CRMs).  All three were in compliance.

Of the 56 total administrative misconduct cases we reviewed, PSB personnel completed 38. Thirty-one (82%) were in compliance with all investigative and administrative requirements over which the PSB Commander has authority.  This is a decrease from the 86% compliance the last reporting period.

Sworn personnel in PSB conducted 16 of these investigations.  Fourteen (88%) were in compliance with all of the investigative and administrative responsibilities over which the PSB Commander has authority.  This is the same percentage of compliance as the last reporting period.  Of the two cases that were not compliant, one lacked an extension request; and a second lacked sufficient follow-up with MCSO employees involved in the investigation.

Twenty-two of the investigations conducted by PSB were completed by Detention personnel assigned to PSB.  Of the 22 they investigated, 17 (77%) were in compliance with all of the investigative and administrative responsibilities over which the PSB Commander has authority. This is a decrease from the 82% compliance rate during the last reporting period.  In one case, we disagree with the findings; in two, policy concerns were not addressed; in one, there was an administrative error in the final disposition letter to the complainant; and in one case, required information regarding weapon certification and training was not included.

Eighteen investigations were conducted by Districts or Divisions outside of PSB.  We found 11 (61%) to be in compliance with investigative and administrative requirements.  This is a decrease from the 65% compliance during the last reporting period.  We noted that investigations initiated and completed by District personnel after the completion of the Misconduct Investigative Training have a much higher percentage of compliance than those completed prior to the training.

As previously noted, there are many factors that impact the PSB Commander's ability to ensure compliance in all cases.  The PSB Commander must rely on other members of PSB staff to conduct case reviews and ensure proper documentation is completed.  We continue to find that PSB personnel are identifying and ensuring, where possible, that corrections are made and all documentation is completed in those cases they review, but in some cases, deficiencies cannot be corrected after the fact.

WAI 37095

One of the most significant factors that has adversely impacted compliance for those cases completed outside of PSB has been the failure of District Command personnel to identify and correct deficiencies prior to forwarding cases to PSB for review.  During this reporting period, we noted numerous examples of District Command staff identifying and addressing concerns and deficiencies in those investigations conducted by their personnel.  In the six cases submitted for our review that were completed by District personnel after January 1, 2018, only one was not compliant with the Orders of the Court and none had to be returned by PSB for corrections that could have been found and corrected prior to the case submittals to PSB.  We are optimistic that the attention being given to District IA investigations by their Command personnel, along with the increased overall quality of investigations we have noted since the completion of the Misconduct Investigative Training, will continue to result in ongoing improvement and increased compliance.

The final factor affecting the PSB Commander's ability to ensure all investigations are properly completed is that the Appointing Authority – not the PSB Commander – determines the final findings and discipline decisions.  During this reporting period, there was only one case where the final discipline decision of the Appointing Authority resulted in a case being found non-compliant.  We continue to note an ongoing increase in the number of cases where the Appointing Authority either makes a final discipline decision consistent with the presumptive discipline, or provides justified mitigation or aggravation for any change to the final decision.

While PSB continues to experience challenges in ensuring that completed internal investigations are reaching full compliance with both MCSO policy and both Court Orders, the Bureau continues to make efforts to improve compliance.  A member of our Team continues to meet personally with the PSB Commander weekly to discuss Class Remedial Matters.  We also use this opportunity to discuss other ongoing related concerns that affect compliance with the Second Order.  The PSB Commander is attentive to our concerns.  We have raised a number of concerns in our weekly meetings during this reporting period, and have found that the PSB Commander and his staff our responsive to these concerns.  The ability to discuss investigative or administrative concerns during these weekly meetings has resulted in concerns being immediately addressed; and in some cases, has resulted in necessary actions being taken to correct issues that have been identified.

Since October 2016, during each site visit, we have met with PSB personnel and District and Division command personnel to update them on our identification of training and performance issues that adversely affect compliance with the Second Order.  Since January 2017, Detention personnel assigned to PSB to oversee investigations have also participated in these meetings. We continue to find them attentive and responsive to our input during these meetings.

Since we began conducting these site visit meetings, the PSB Commander has taken a number of actions to address issues we have raised.   Based on concerns regarding those cases investigated by Detention supervisors, the PSB Commander assigned a sworn lieutenant in the Bureau to serve as a secondary reviewer of these cases, and provided additional training and oversight for those who conduct these investigations.  We believe that this review and oversight,

WAI 37096

the additional training, and increased experience in conducting these investigations, are all factors in the overall improvement we are observing in these cases.

To address some of the concerns with the cases conducted outside of PSB, the PSB Commander continues to assign PSB liaisons to every District.  There are also PSB personnel assigned to review District cases; provide feedback; and when necessary, return the cases for additional investigation or analysis by the District personnel.  To address the ongoing backlog of cases that need to be reviewed, PSB has now engaged supervisors from the Compliance Division to assist with the initial case reviews of District investigations.

During our April 2018 site visit discussions with the PSB Commander and his staff, we discussed both the completion of witness interviews and the handling of instances where inappropriate comments are made while a Body-Worn Camera (BWC) or other recording device is activated but no members of the public are present.

In the case of witness interviews, we discussed that in some cases, witnesses have already been interviewed during the course of a criminal or traffic-related incident; and in others, there is clear and convincing evidence that misconduct did or did not occur without the need to interview some potential witnesses.  In the cases we have reviewed that involve such witnesses, there have been some inconsistencies in whether these witnesses are being interviewed during the administrative investigation.  We agreed that in some cases, the interview of witnesses might be unnecessary, but these types of instances must be clearly defined.  We also noted that any decision not to interview a witness should be documented and then approved by a Command member of the Division where the decision is made.

In the case of BWC or other recordings, we discussed that while inappropriate comments may have been made, they may not be related to the law enforcement contact and may not have been made in the presence of any community members.  In other cases, though the comments were not made in the presence of community members, the comments made have had a direct relationship to the law enforcement contact.  We believe that there is a clear distinction on how such comments should be addressed.   We agree that in some cases, an administrative misconduct investigation may not be appropriate; but there should be clear direction provided on how these instances are handled.

In both the interview of witnesses and the handling of comments captured on BWC or other recording devices, we believe that consistency is necessary; and that MCSO needs to develop protocols to address how these instances are handled.  The PSB Commander committed to drafting protocols for our review and approval prior to making any changes to the current procedures.

During our July 2018 site visit, we again discussed witness interviews and inappropriate comments that may be made outside the presence of any community members.  PSB personnel advised us that they are continuing to work on draft protocols and would forward them for our review when they were completed.  During this reporting period, PSB submitted the draft criteria and checklist for witness interviews.  It is currently in the review process by our Team and the Parties.

WAI 37097

During the last reporting period, 48 administrative misconduct investigations were completed and forwarded for our review. During the reporting period previous to that, 142 investigations were forwarded for review. This reporting period, there were 56 misconduct investigations completed and forwarded. We have discussed our concerns with the fluctuation in the completion of investigations with PSB during previous site visits, to determine what factors contribute to MCSO's ability to complete investigations. The PSB Commander informed us during our July 2018 site visit, that in 2013 PSB initiated 76 internal investigations. In 2014, PSB initiated 717 cases. In 2015, PSB initiated 986 cases; and in 2016, PSB initiated 847 cases. There were more than 1,000 cases initiated in 2017. During the first six months of 2018, 586 investigations had been initiated, in addition to 155 service complaints that had been opened.

During our site visit in October 2018, we again discussed with PSB our concerns regarding the low number of investigations being completed, and particularly the amount of time investigations are taking to complete. PSB personnel advised us that as of our October 2018 site visit, they have initiated 629 administrative misconduct investigations and 263 service complaints for a total of 892 to date in 2018. They continue to expect to meet or exceed the number of complaints initiated in 2017. They further advised us that the nine sworn investigators in PSB are now carrying a caseload of approximately 36 active cases per month, and the 15 Detention supervisors in PSB are averaging 33 active cases per month. There has been a continuing increase in the caseloads of PSB investigators each quarter since 2016. There are currently 823 active misconduct investigations being conducted by PSB. PSB further informed us that the average time for PSB to fully investigate and close an investigation is 204 days. In addition to those investigations currently active in PSB, there are 182 active cases being investigated in Districts and Divisions outside of PSB.

PSB has been authorized an additional 11 positions in the July 2018 budget. To date, none of these positions have been filled. During our October 2018 site visit, PSB advised that they may receive two lieutenant positions in early 2019, but due to ongoing sworn staffing vacancies, do not expect to fill any of the other positions anytime in the foreseeable future. PSB is now working on budget requests for the July 2019 budget. Recognizing that authorized sworn positions for the July 2018 budget still have not been filled in PSB, PSB's requests for the July 2019 budget will include primarily civilian personnel, including management analysts and administrative support personnel instead of sworn personnel. They believe that civilian personnel can be more expeditiously hired, and that many functions currently be completed by sworn and Detention investigators in PSB could be handled by civilian personnel, freeing up more investigation time.

At the time of our July 2018 site visit, there were 84 sworn vacancies at MCSO. During our discussion with MCSO personnel about staffing, MCSO informed us that the Sheriff was actively working to secure more funding for positions and the ability to implement a pay plan that would assist with the recruitment of qualified applicants.

WAI 37098

PSB personnel also informed us during our July site visit that in its limited research of what an adequate number of investigators would be for the number of investigations they conduct, they believed an additional 40 investigators would be required.  We requested that they provide us with any information they could obtain from any studies where the appropriate ratio of investigators to investigations has been established.  We suggested that the Police Executive Research Forum (PERF), the International Association of Police Chiefs (IACP), or the Major County Sheriffs of America Organization (MCSA), might have this type of information.  In our follow-up conversation during our October 2018 site visit, PSB personnel advised us that they had been unable to locate any studies that articulated ideal staffing levels for PSB functions. Despite the inability to identify a study regarding this topic, we concur with PSB's assessment that the Bureau remains inadequately staffed to handle the current and projected caseloads.

For numerous reporting periods, we have identified and noted the lack of sufficient staff in PSB. We have also continued to note that failure to provide adequate staff to conduct misconduct investigations is a disservice to both community members and MCSO employees.  While we continue to believe this is true, we acknowledge that staffing alone may not be sufficient to address the serious backlog and the increase in the number of investigations that are being initiated.  It also does not appear there will necessarily be any reduction in the amount of investigations being initiated, as they have continued to increase since 2013.  We have noted the increasing number of cases and believe that PSB is making sincere efforts to address the investigations and meet the requirements of their policies and the Orders of the Court.  We have also noted that hundreds of extension memorandums are being authored and approved for these investigations.  While we agree that the extensions are appropriate, given all of the factors involved, it is simply not appropriate to continue to delay completion of these investigations without taking some action to address the ongoing concern.

During our July 2018 site visit meetings with PSB, we discussed several pending investigations regarding identifications in the custody of MCSO.  One of these cases involves the 1,459 IDs that had been impounded at the MCSO Property Room and then checked out by an MCSO sergeant.  This investigation was initiated in 2015.  Since late 2017, this investigation has stalled due to other, more immediate priorities for investigators.  While PSB has provided updates on this investigation, and we acknowledge the many challenges PSB faces with its completion, it cannot continue to remain inactive.  Two other investigations involving IDs – one from 2015, and one from 2016 – also remain outstanding and need to be resolved.  We requested during our July site visit that PSB provide us with a written update on these investigations, and a plan for resolving them.

During our October site visit, we met with PSB personnel to again discuss the pending investigations regarding identifications in the custody of MCSO and the written update MCSO provided us regarding these investigations.  Three ID cases remain pending.  MCSO advised that there had been no appreciable progress on these cases due to other priorities.  We discussed the necessity to ensure that these investigations are properly addressed.  We recognize that the 1459 IDs impounded at the MCSO Property Room and then checked out by an MCSO sergeant, represents a monumental task to determine if these IDs were properly seized and impounded.

WAI 37099

To date, MCSO has searched their databases for 400 of the 596 IDs that appear to belong to members of the Plaintiffs class.  Only 132 have been linked to any MCSO deputy.  In all of these 132 cases, MCSO found that the IDs were properly seized and no internal investigations were necessary.  The remaining 268 IDs now need to be searched through the state Log Scan system to determine if MCSO or any other law enforcement officer had run the names.  A total of 196 of the IDs have not yet been searched through the MCSO databases.

We acknowledge the limitations in researching these IDs, as in many there is no information other than a name on the ID.  Without some other information, like a driver's license number, social security number, or other searchable data, name searches can take extensive time with little likelihood of obtaining any results.  We further acknowledge the limitations of the Log Scan system that is used to search the entire state database, as information can only be searched for one year at a time, and the process is lengthy and time consuming.  After discussion with MCSO, we agreed to select a random sample from the 464 IDs that have not been linked through MCSO databases, or have not yet been run through any database.  The sample selection includes IDs that contain searchable information beyond a name, creating a higher likelihood of obtaining some result.  A suitable sample has been determined to be one in 20.  A sample of 24 has been selected and forwarded to MCSO.  Our expectation is that MCSO will complete the research on the 24 selected IDs within a 90-day period.  We will determine any further course of action after reviewing the results of this search.

During our July 2018 site visit, we had lengthy discussions with PSB command staff regarding the challenges they are facing ensuring that misconduct investigations are properly completed within established timeframes, given the number of investigations they conduct, the requirements for completion, and the lack of adequate staffing.  During these discussions, both we, and the Parties, expressed our willingness to discuss with them any changes in the investigation methodology they might want to propose to address the challenges and obstacles that exist.  If PSB was prepared to do so, we advised that we would provide an opportunity for this discussion during our next site visit.  PSB requested further discussion and a meeting was scheduled for our October 2018 site visit.

During our site visit meeting in October 2018, we again had lengthy discussion with MCSO and the Parties regarding the ongoing concerns and challenges with the timely completion of IA investigations.  PSB presented a number of suggestions for modifications to the current processes in place in PSB.  The suggestions for modifications brought forth by MCSO included: changing the requirement for in-person interviews to an offer of an in-person interview; discontinuing the investigation of misconduct brought forward to MCSO involving former employees unless the misconduct was criminal, would affect law enforcement certification, or also involved current employees of MCSO; allowing the PSB Commander the discretion to determine if complaints of misconduct that occurred more than three years before the complaint was filed would be investigated, unless the complaint involved misconduct that was criminal in nature, would affect law enforcement certification, or was determined to be egregious; expanding the use of the service complaint process to include complaints on former employees, or misconduct that occurred more than three years prior to ensure that the information was

WAI 37100

captured, maintained, and could be reviewed; implementing an expedited discipline process, without a full investigation, if there was clear and convincing evidence that the misconduct had occurred; increasing the timeframes for the completion of misconduct investigations; and exploring the possibility of using alternative administrative closures.

Each topic brought forward was discussed during our site visit meeting.  The Parties articulated their understanding of the concerns brought forth by MCSO, but seek additional information on each topic so they can review it and confer with both the Community Advisory Board (CAB) and the MCSO service population.  We also acknowledged our willingness to further review these topics once additional information was provided.  At the conclusion of the meeting, we requested that PSB provide us with a proposal document that would provide additional information and detail on the topics we discussed, so that we and the Parties could evaluate each topic.  We requested that this document also include information on what MCSO has already done to address the ongoing concerns with the completion of IAs and what they can do in the future, independent of any changes to the current processes.  We requested that this proposal be forwarded for our review by December 1, 2018, and we will discuss further developments in our next report.

Over our past several site visits, PSB staff have continued to communicate that they are properly outsourcing those cases where conflicts of interest exist.  PSB has contracted with a qualified private vendor to conduct these investigations.  Additionally, PSB previously outsourced investigations to another local law enforcement agency.

PSB personnel updated us on these investigations during our October 2018 site visit.  Both cases outsourced to another law enforcement agency have been previously completed, and no additional cases have been outsourced to any another law enforcement agency.  The contract investigator continues with his investigations.  He has completed six of the investigations assigned to him; and they have been forwarded to MCSO for review, prior to being forwarded to our Team.  PSB did not outsource any new cases to this investigator during this reporting period.

MCSO finalized and published the revised internal investigation and discipline policies on May 18, 2017.  The required 40-hour Misconduct Investigative Training was completed during late 2017, and the 2018 Misconduct Investigative Training is currently being scheduled.

After the Second Order was implemented, PSB reviewed the disciplinary backgrounds of all those who might conduct internal investigations, and notified us of those supervisors who would be prohibited from conducting such investigations due to their backgrounds.  Two supervisors were determined to be ineligible to conduct internal investigations.  Since January 2017, PSB personnel have reported on a monthly basis that they have not identified any additional members of MCSO who are disqualified from conducting misconduct investigations

WAI 37101

*Paragraph 195. Within six months of the entry of this Order, the Professional Standards Bureau shall include sufficient trained personnel to fulfill the requirements of this Order.*

**Phase 1:** Not in compliance

- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:** Not in compliance

In conjunction with this Paragraph, Paragraph 178 mandates that within three months of the finalization of policies consistent with Paragraph 165, all PSB personnel would receive 40 hours of comprehensive training. Paragraph 178 requires training of all supervisors within three months of the finalization of policies, and further requires sufficient trained personnel in PSB within six months of the entry of the Order. The first week of the required Misconduct Investigative Training commenced on September 18, 2017 and the training was completed prior to the end of 2017.

During our April 2018 site visit, the PSB Commander informed us that MCSO had been approved for six budget positions for PSB for the July 2018 budget year. These positions included one sworn lieutenant, three sworn sergeants, and two Detention sergeants. There were an additional five positions that PSB requested, but were not approved for the 2018 budget year at the time of our site visit. With the number of current vacancies throughout MCSO, and the time it takes to train new deputies, PSB did not expect that any of these positions would be filled before mid to late 2019.

During our July 2018 site visit, PSB informed us that a total of 11 additional personnel had been approved for PSB in MCSO's July 2018 budget. PSB personnel informed us that due to ongoing staffing shortages they still did not believe any of these positions would be filled before 2019.

During our October 2018 site visit, PSB informed us that they have not yet received any of the 2018 budgeted positions for PSB. PSB advised that there is some possibility that PSB will receive two of the budgeted lieutenant positions in early 2019; but due to the continuing sworn personnel staffing shortages, it is unlikely that PSB will receive any of the other positions anytime in the foreseeable future. PSB continues to note that with the continuing influx of new cases, and the ongoing backlog of investigations, even if these personnel were added, the Bureau will still be insufficiently staffed to meet its responsibilities.

The Second Order requires that PSB have "sufficient trained personnel to fulfill the requirements of this Order." MCSO has delivered the required Misconduct Investigative Training, and our focus has shifted to the sufficiency of PSB staff to carry out its mission. As documented in this and previous reports, PSB, in its command's estimation, is understaffed. We will not find MCSO in compliance with this Paragraph until MCSO addresses PSB's staffing issues.

WAI 37102

**Paragraph 196.**  *Where appropriate to ensure the fact and appearance of impartiality, the Commander of the Professional Standards Bureau or the Chief Deputy may refer administrative misconduct investigations to another law enforcement agency or may retain a qualified outside investigator to conduct the investigation.  Any outside investigator retained by the MCSO must possess the requisite background and level of experience of Internal Affairs investigators and must be free of any actual or perceived conflicts of interest.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:**  In compliance

During our April 2017 site visit, the PSB Commander indicated that MCSO had not envisioned any need to retain additional contract investigators beyond the one investigator that had been already retained.  A member of PSB's staff serves as MCSO's single point-of-contact to liaise and assist with scheduling for the contract investigator.  The contract investigator will advance the investigations to the level of recommending findings.

PSB previously outsourced three misconduct investigations to a separate regional law enforcement agency.  Two of these investigations were completed by the outside law enforcement agency and closed by MCSO.  One was closed as the Independent Investigator was investigating the same alleged misconduct.  PSB has not outsourced any additional investigations to any outside law enforcement agencies since that time.

During this and the previous two reporting periods, PSB did not outsource any additional investigations to the contract investigator.  This investigator has now completed six investigations and forwarded them to PSB for review.  We have not yet received or reviewed these investigations.


**Paragraph 197.**  *The Professional Standards Bureau will be headed by a qualified Commander. The Commander of the Professional Standards Bureau will have ultimate authority within the MCSO for reaching the findings of investigations and preliminarily determining any discipline to be imposed.  If the Sheriff declines to designate a qualified Commander of the Professional Standards Bureau, the Court will designate a qualified candidate, which may be a Civilian Director in lieu of a sworn officer.*

**Phase 1:**  Not in compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

- Professional Standards Bureau Operations Manual, currently under development.

WAI 37103

**Phase 2:**  In compliance

In January 2018, MCSO advised that due to reorganizations within the Office, the responsibility to serve as the PSB Commander for purposes of compliance with this Order would be transferred to a captain within PSB.  The PSB Deputy Chief, who previously had this responsibility was promoted, but will maintain overall oversight of PSB as an Executive Chief. We have worked with the assigned captain during his tenure in PSB, reviewed his qualifications, and believe he possesses the requisite qualifications and capabilities to fulfill the requirements of this Paragraph.

During our site visits, and our regularly scheduled meetings with PSB to discuss CRMs and other internal affairs matters since January 2018, we have had numerous opportunities to meet and interact with the captain now serving as PSB Commander.  He is responsive to our input and concerns regarding misconduct investigations, and has immediately addressed any issues that we have brought to his attention.  We remain optimistic that PSB will continue to make necessary improvements under his leadership.  As we have previously noted, MCSO must support the PSB Commander with resources and executive leadership.


*Paragraph 198.   To promote independence and the confidentiality of investigations, the Professional Standards Bureau shall be physically located in a facility that is separate from other MCSO facilities, such as a professional office building or commercial retail space.  This facility shall be easily accessible to the public, present a non-intimidating atmosphere, and have sufficient space and personnel for receiving members of the public and for permitting them to file complaints.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

In May 2018, PSB moved into the first and second floors of 101 West Jefferson Street.  During our July and October 2018 site visits, members of the Monitoring Team toured the facility.  In addition, we inspected the placards and comment and complaint forms at the Districts we visited and noted that they all had been updated to reflect PSB's new address.  The address was also updated on the comment and complaint form that is accessible to the public on MCSO's website.  PSB's criminal investigators are housed on the first floor, and administrative investigators are housed on the second floor of the building.  PSB's off-site facility has two dedicated security personnel assigned during normal business hours of 8:00 am-4:00 pm, Monday-Friday.

WAI 37104

*Paragraph 199. The MCSO will ensure that the qualifications for service as an internal affairs investigator shall be clearly defined and that anyone tasked with investigating employee misconduct possesses excellent investigative skills, a reputation for integrity, the ability to write clear reports, and the ability to be fair and objective in determining whether an employee committed misconduct. Employees with a history of multiple sustained misconduct allegations, or one sustained allegation of a Category 6 or Category 7 offense from MCSO's disciplinary matrices, will be presumptively ineligible to conduct misconduct investigations. Employees with a history of conducting deficient investigations will also be presumptively ineligible for these duties.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:** In compliance

During our October 2018 site visit, we met with the PSB Commander and learned that PSB was reviewing the profiles of two supervisors to determine if their qualifications would preclude them from conducting internal investigations. We were subsequently informed that command review determined that the employees would continue to be eligible to conduct such investigations. PSB staff has continued working on the finalization of the PSB Operations Manual. The manual will formalize the review process to ensure that, at the time a minor misconduct case is referred to a District for investigation, the District Commander is notified of any supervisors under his command who are ineligible to conduct misconduct investigations. We reviewed the monthly submissions pertaining to this Paragraph for this reporting period, and noted no additions to the list of employees prohibited from conducting misconduct investigations. GH-2 reflects the directive of this Paragraph, to ensure that only supervisors who meet the criteria established by this Paragraph are assigned misconduct investigations. The current operational procedures are that if any supervisor is deemed ineligible, the PSB commander notifies the supervisor's commander, and ensures that no misconduct investigations are assigned to that employee. This review and notification process is already in place; however, it is not documented in writing. We have reviewed a draft of the proposed revision that covers the requirements of this Paragraph. We expect to receive the finalized draft of the PSB Operations Manual in the first quarter of 2019. Any further delay will jeopardize the compliance rating for this Paragraph.

WAI 37105

***Paragraph 200.***  *In each misconduct investigation, investigators shall:*

a.     *conduct investigations in a rigorous and impartial manner designed to determine the facts;*

b.     *approach investigations without prejudging the facts and without permitting any preconceived impression of the principal or any witness to cloud the investigation;*

c.     *identify, collect, and consider all relevant circumstantial, direct, and physical evidence, including any audio or video recordings;*

d.     *make reasonable attempts to locate and interview all witnesses, including civilian witnesses;*

e.     *make reasonable attempts to interview any civilian complainant in person;*

f.     *audio and video record all interviews;*

g.     *when conducting interviews, avoid asking leading questions and questions that may suggest justifications for the alleged misconduct;*

h.     *make credibility determinations, as appropriate; and*

i.     *attempt to resolve material inconsistencies between employee, complainant, and witness statements.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 56 administrative misconduct investigations that were completed by MCSO personnel during this reporting period.  Fifty-three were completed after the issuance of the Second Order.  Forty of these 53 investigations were initiated after May 18, 2017, and are subject to all requirements of the internal affairs policies finalized and published on that date.  PSB investigated 38 of the total cases.  District or Division supervisory personnel not assigned to PSB investigated 18 of the cases.  Of the cases we reviewed, 28 involved external complaints and 28 were internally generated.

Paragraph 200.a. requires that misconduct investigations be conducted in a rigorous and impartial manner.  During this and the last reporting period, all investigations complied with the requirements of this Subparagraph.

Paragraph 200.b. requires that investigations be approached without prejudging the facts or permitting preconceived impressions.  During this and the last reporting period, all investigations complied with the requirements of this Subparagraph.

WAI 37106

Paragraph 200.c. requires that investigators identify, collect, and consider all relevant evidence. During this and the last reporting period, all investigations complied with the requirements of this Subparagraph.

Paragraph 200.d. requires that investigators make reasonable attempts to locate and interview all witnesses. During the last reporting period, one investigation (3%) fell short of compliance with this Subparagraph. During this reporting period, all investigations complied with the requirements of this Subparagraph.

Paragraph 200.e. requires that investigators make reasonable attempts to interview civilian complainants in person. During this and the last reporting period, all investigations complied with the requirements of this Subparagraph.

Paragraph 200.f. requires audio- and video-recording of all interviews. During the last reporting period, there were eight investigations that were not both audio- and video-recorded. All included documented appropriate reasons why the interviews were not. During this reporting period, seven of the 56 investigations were not both audio- and video-recorded. All but one of these investigations documented appropriate reasons why they were not.

Paragraph 200.g. requires that when conducting interviews, investigators avoid asking leading questions or questions that may suggest justification for the alleged misconduct. During this and the last reporting period, all investigations complied with the requirements of this Subparagraph.

Paragraph 200.h. requires that proper credibility determinations be made. During the last reporting period, one completed investigation (3%) fell short of compliance with this Subparagraph. During this reporting period, one investigation (2%) fell short of compliance with this Subparagraph.

Paragraph 200.i. requires that investigators attempt to resolve all material inconsistencies. During this and the last reporting period, all investigations complied with the requirements of this Subparagraph.


***Paragraph 201.*** *There will be no automatic preference for an employee's statement over a non-employee's statement. Internal affairs investigators will not disregard a witness's statement solely because the witness has some connection to either the complainant or the employee or because the witness or complainant has a criminal history, but may consider the witness's criminal history or any adjudicated findings of untruthfulness in evaluating that witness's statement. In conducting the investigation, internal affairs investigators may take into account the record of any witness, complainant, or officer who has been determined to have been deceptive or untruthful in any legal proceeding, misconduct investigation, or other investigation.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

WAI 37107

- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 56 administrative misconduct investigations conducted by MCSO personnel that were completed during this reporting period.

Of the 56 completed administrative misconduct investigations, 28 involved complainants that were not MCSO employees.  Twenty-six of the 56 total investigations also included interviews with witnesses or investigative leads who were not MCSO employees.  We did not identify any cases where there was an automatic preference for the statement of an employee over a non-employee witness.

We did not identify any completed investigations where a witness's statement was disregarded solely because of any connection identified in this Paragraph, nor where a witness's criminal history or findings of truthfulness were considered.

*Paragraph 202.  Internal affairs investigators will investigate any evidence of potential misconduct uncovered during the course of the investigation, regardless of whether the potential misconduct was part of the original allegation.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 56 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.  In four of the 56 investigations, MCSO identified additional potential misconduct during the course of the investigations and properly added additional allegations or initiated new investigations.  We did not identify any instances where additional potential misconduct that was not part of the original allegation was discovered but not addressed by MCSO.

*Paragraph 203.  If the person involved in the encounter with the MCSO pleads guilty or is found guilty of an offense, internal affairs investigators will not consider that information alone to be determinative of whether an MCSO employee engaged in misconduct, nor will it by itself justify discontinuing the investigation.  MCSO training materials and policies on internal investigations will acknowledge explicitly that the fact of a criminal conviction related to the administrative investigation is not determinative of whether an MCSO employee engaged in misconduct and that the mission of an internal affairs investigator is to determine whether any misconduct occurred.*

WAI 37108

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 56 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

There were no indications in any of the completed investigations we reviewed that any MCSO investigators considered alone any pleading or finding of guilty by any person as a reason to make any determination regarding the potential misconduct of any MCSO personnel, nor were any investigations discontinued for this reason.

***Paragraph 204.*** *Internal affairs investigators will complete their administrative investigations within 85 calendar days of the initiation of the investigation (60 calendar days if within a Division).  Any request for an extension of time must be approved in writing by the Commander of the Professional Standards Bureau.  Reasonable requests for extensions of time may be granted.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we review administrative misconduct investigations conducted by MCSO personnel.

Forty-eight (86%) of the total 56 administrative misconduct investigations reviewed for this reporting period were not completed within the 60 or 85-day timeline.  Of these 48, two (4%) did not contain a timely extension request or approval.

PSB conducted 38 of the 56 administrative misconduct investigations we reviewed.  Thirty-five of these investigations were not completed within the required 85-day time period.  While all 35 investigations included a request for, and an approval of an extension, one (2%) of the extension requests was not completed or approved in a timely manner.

As noted in the last reporting period, we now determine the 60-day time period compliance findings for those investigations conducted by personnel outside of PSB based on the original date the investigation is approved by the District or Division Commander and forwarded to PSB.  We acknowledge that with the ever-increasing delays in the completion and reviews of internal investigations, District and Division personnel may not know that PSB has found internal investigations they have submitted to require further investigation or other action, until after the 60-day time period has expired.  In those cases where deficiencies are identified by

WAI 37109

PSB, the cases will continue to be found non-compliant in other relevant Paragraphs, and specifically in Paragraph 213, which requires the District or Division Commander ensure that investigations conducted by their personnel are complete and the findings are supported by the evidence prior to their submittal to PSB.

Districts or Divisions outside of PSB conducted 18 of the administrative misconduct investigations.   Thirteen of these 18 investigations were not submitted to PSB within the required 60-day timeframe.   All but one included a timely request and approval for an extension.

In addition to those investigations not completed within 60 or 85 days as required by this Paragraph, two of the cases that exceeded the 180-day timeframe did not contain a timely request for an extension.   Neither of these two investigations resulted in a sustained finding of any kind.

***Paragraph 205.*** *The Professional Standards Bureau shall maintain a database to track all ongoing misconduct cases, and shall generate alerts to the responsible investigator and his or her Supervisor and the Commander of the Professional Standards Bureau when deadlines are not met.*

**Phase 1:**  Not in compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- GH-5 (Early Identification System), currently under revision, though the proposed revisions do not affect the language pertaining to this Paragraph.

- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:**  In compliance

We determine compliance with this Paragraph by assigning a member of our Team to observe demonstrations of the IAPro database during our site visits or other meetings with PSB throughout the reporting period.   The IAPro technology serves as the centralized electronic numbering and tracking system for all allegations of misconduct, whether internally discovered or based on an external complaint.   This database contains the capacity to manage and store information required for compliance with this Paragraph.

During our January 2018 site visit, we met with PSB personnel and observed IAPro to ensure that the system still generates alerts to responsible investigators and PSB supervisors/commanders if deadlines are not met.   We also reviewed copies of emails PSB disseminates to the District/Divisions on the 15th of every month to identify investigatory deadlines.   The Blue Team Dashboard was also viewed, which uses a color system (green,

WAI 37110

yellow, red) to identify investigations that are nearing deadlines or are past deadlines.  Case management information appears in each supervisor's Blue Team while they are monitoring ongoing/open cases.  Once again, this demonstration represented IAPro as a technological instrument that meets the compliance criteria of this Paragraph – to include logging of critical dates and times, alerts regarding timeframes and deadlines, chronological misconduct investigation status, notifications, and dispositions.

The civilian PSB management analyst has the primary responsibility to administer the centralized tracking system.  In addition, all PSB and Division investigators can access the electronic Blue Team database – a system that integrates with IAPro – at any time to view the assignment and status of administrative investigations.  In response to our previous concerns about ensuring system administration redundancy, PSB has trained two lieutenants to administer the system, in addition to the analyst.

In May 2018, PSB relocated to an offsite location.  In July 2018, a member of our Team verified that the existing tracking mechanisms continue to be used for the tracking of investigations at the new facility.  We also continue to receive monthly notifications from PSB regarding closed administrative investigations, and we evaluate these closed investigations for the entirety of a reporting period against a multitude of criteria, including whether the cases were completed in a timely fashion.  (See Paragraph 204.)

**Paragraph 206.**   *At the conclusion of each investigation, internal affairs investigators will prepare an investigation report.  The report will include:*

a.     *a narrative description of the incident;*

b.     *documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the incident.  In situations in which there are no known witnesses, the report will specifically state this fact.  In situations in which witnesses were present but circumstances prevented the internal affairs investigator from determining the identification, phone number, or address of those witnesses, the report will state the reasons why.  The report will also include all available identifying information for anyone who refuses to provide a statement;*

c.     *documentation of whether employees were interviewed, and a transcript or recording of those interviews;*

d.     *the names of all other MCSO employees who witnessed the incident;*

e.     *the internal affairs investigator's evaluation of the incident, based on his or her review of the evidence gathered, including a determination of whether the employee's actions appear to be within MCSO policy, procedure, regulations, orders, or other standards of conduct required of MCSO employees;*

WAI 37111

f.     in cases where the MCSO asserts that material inconsistencies were resolved, explicit credibility findings, including a precise description of the evidence that supports or detracts from the person's credibility;

g.     in cases where material inconsistencies must be resolved between complainant, employee, and witness statements, explicit resolution of the inconsistencies, including a precise description of the evidence relied upon to resolve the inconsistencies;

h.     an assessment of the incident for policy, training, tactical, or equipment concerns, including any recommendations for how those concerns will be addressed;

i.     if a weapon was used, documentation that the employee's certification and training for the weapon were current; and

j.     documentation of recommendations for initiation of the disciplinary process; and

k.     in the instance of an externally generated complaint, documentation of all contacts and updates with the complainant.

**Phase 1:**  In compliance

•     GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 56 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

Paragraph 206.a. requires a written description on the incident be included in the investigative report.  All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.b. requires documentation of all evidence gathered, including all known information about witnesses.  All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.c. requires documentation of whether employees were interviewed, and a transcript or recording of these interviews.  All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.d. requires that the names of all MCSO employees who witnessed the incident be included in the report.  All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.e. requires that the internal affairs investigator's evaluation of the incident includes a determination of whether the employee's actions appear to be within MCSO policy, procedure, regulations, orders, or other standards of conduct required of MCSO employees.  All completed investigations that we reviewed complied with the requirements of this Subparagraph.

WAI 37112

Paragraph 206.f. requires that when MCSO asserts that material inconsistencies were resolved, explicit credibility findings, including a precise description of the evidence that supports or detracts from the person's credibility must be provided.  All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.g. requires that when material inconsistencies must be resolved, a precise description of the evidence be included in the report.  All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.h. requires that assessment of the incident for policy, training, tactical, or equipment concerns be included in the investigative report, to include any recommendations. We identified two completed investigations where MCSO identified a policy concern, but the documentation provided for our review did not contain any referral to the Policy Section or any other action.  We will discuss these two cases with PSB during our next site visit.

Paragraph 206.i. requires that if a weapon was used, documentation that the employee's certification and training for the weapon must be included in the investigative written report. During this reporting period, there was one incident where a taser was deployed and the investigative file did not contain documentation of the employee's certification and training.

Paragraph 206.j. requires that documentation of the initiation of the disciplinary process be included in the investigation.  Compliance is achieved when the misconduct investigator completes the investigation with a finding of sustained, when applicable, and the PSB Commander subsequently approves the finding.  This is considered the initiation of the disciplinary process.  Thirty-one of the 56 administrative misconduct investigations we reviewed had sustained findings against one or more MCSO employees.  All complied with the requirements of this Subparagraph.

Paragraph 206.k. requires that any contacts and updates with the complainant be documented in the investigative report.  All of the investigations we reviewed for this Subparagraph complied with this requirement.


***Paragraph 207.***  *In assessing the incident for policy, training, tactical, or equipment concerns, investigation reports will include an assessment of whether:*

a.      *the law enforcement action was in compliance with training and legal standards;*

b.      *the use of different tactics should or could have been employed;*

c.      *the incident indicates a need for additional training, counseling, or other non-disciplinary corrective actions; and*

d.      *the incident suggests that the MCSO should revise its policies, strategies, tactics, or training.*

**Phase 1:**  In compliance

WAI 37113

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:**  In compliance

During this reporting period, we reviewed 56 administrative misconduct investigations.  MCSO properly assessed and documented whether any of the requirements of this Paragraph were relevant in all completed cases we reviewed for this reporting period.  MCSO identified eight cases where action related to this Paragraph was appropriate; and addressed the concerns identified with either memorandums of concern, requests for policy review, remedial training, or additional supervisory oversight.  Of the total 56 cases, there were two cases where MCSO identified a policy concern; but the documentation provided for our review did not contain any referral to the Policy Section for review or any other action.  We will discuss these two cases with PSB during our next site visit.

PSB continues to use an internal tracking form to ensure that those concerns that are forwarded to other Divisions within MCSO for action or review are addressed.  We receive and review this tracking document each month.  We have found that the tracking form contains ongoing information on the status of concerns that have been identified and is regularly updated.

**Paragraph 208.**   *For each allegation of misconduct, internal affairs investigators shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation:*

a.    *"Unfounded," where the investigation determines, by clear and convincing evidence, that the allegation was false or not supported by fact;*

b.    *"Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur and justifies a reasonable conclusion of a policy violation;*

c.    *"Not Sustained," where the investigation determines that there is insufficient evidence to prove or disprove the allegation; or*

d.    *"Exonerated," where the investigation determines that the alleged conduct did occur but did not violate MCSO policies, procedures, or training.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review administrative misconduct investigations conducted by MCSO personnel and completed during the reporting period.  We evaluate compliance with this Paragraph against the standard of whether a finding was made, and whether the finding was correct.

WAI 37114

During the last reporting period, we concurred with the findings of the PSB Commander in 47 (97%) of the 48 cases that were completed.

During this reporting period, we concurred with the findings of the PSB Commander in 55 (98%) of the 56 administrative misconduct investigations we reviewed.  In one case, the PSB Commander made a finding of not sustained, where we believe that the preponderance of evidence supported a finding of sustained.  There were no investigations during this reporting period where the Appointing Authority changed the findings made by the PSB Commander.  As is our practice, we will discuss the cases where we disagree with the findings with PSB during our next site visit.

***Paragraph 209.***  *For investigations carried out by Supervisors outside of the Professional Standards Bureau, the investigator shall forward the completed investigation report through his or her chain of command to his or her Division Commander.  The Division Commander must approve the investigation and indicate his or her concurrence with the findings.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 18 administrative misconduct investigations not conducted by PSB personnel and completed during this reporting period.  All 18 of the investigations completed outside of PSB were forwarded to PSB as required, and all contained the approval of the responsible District or Division Commander.  As noted in previous reporting periods, and again during *this* reporting period, some of the District-level investigations were not in compliance with various requirements of the Second Order – as indicated throughout this report.  However, we assessed MCSO's compliance with this Paragraph based on these cases being forwarded through the chain of command for approval of the investigation and findings.

***Paragraph 210.***  *For investigations carried out by the Professional Standards Bureau, the investigator shall forward the completed investigation report to the Commander.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 38 administrative misconduct investigations conducted by PSB investigative personnel and completed during this reporting period.  All 38 complied with the requirements of this Paragraph.

WAI 37115

***Paragraph 211.*** *If the Commander—meaning the Commander of the PSB or the Commander of the Division in which the internal affairs investigation was conducted—determines that the findings of the investigation report are not supported by the appropriate standard of proof, the Commander shall return the investigation to the investigator for correction or additional investigative effort, shall document the inadequacies, and shall include this documentation as an addendum to the original investigation. The investigator's Supervisor shall take appropriate action to address the inadequately supported determination and any investigative deficiencies that led to it. The Commander shall be responsible for the accuracy and completeness of investigation reports prepared by internal affairs investigators under his or her command.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** Not in compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 56 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

We previously noted that neither the PSB Commander nor other District or Division Commanders appeared to use any formal mechanism to ensure that the investigator's supervisor has taken appropriate action to address any instances of unsupported findings. This issue was included in the training curricula required under Paragraph 178.

PSB investigated 38 of the 56 administrative misconduct investigations we reviewed during this reporting period. In 31 (82%) of those cases investigated by PSB, we found the investigations to be thorough and well-written; and we concurred with the findings by the PSB Commander. This is a decrease in compliance from 86% the last reporting period. We identified seven cases conducted by PSB this reporting period that were not fully compliant. In one, we believe a finding of sustained should have been made and was not. In two, PSB did not follow up on policy or training concerns identified during the investigation. In one case, PSB did not ensure that all parties were interviewed or identify and address potential additional misconduct. One case did not have a timely extension request, in one the final disposition letter sent to the complainant was not consistent with the findings of the investigation; and in one, the documentation of certification and training was not included as required. Though we identified some deficiencies, we continue to find that many investigations completed by PSB continue to display appropriate – and often excellent – investigative efforts.

WAI 37116

Of the 18 investigations investigated by Districts or Divisions outside of PSB, we identified seven (39%) where we had some concerns regarding the investigation and documentation. In all seven of these cases, PSB also identified concerns and six cases were returned for additional investigation or corrections. We believe that many of the concerns found in these cases could, and should, have been identified at the District or Division level prior to forwarding the cases to PSB for review. Concerns with these investigations included: failure to interview all witnesses; failure to audio and video-record witness interviews without explanation; lack of sufficient information in the investigative report; and failure to provide all required documentation. Compliance for investigations conducted outside of PSB decreased from 65% the last reporting period to 61% this reporting period.

We have observed that while there is improvement in the overall quality of those investigations being conducted by MCSO personnel outside of PSB, there are still many that do not comply with all of the Order requirements and MCSO policy. Of the 12 investigations initiated prior to the Misconduct Investigative Training, six (50%) were non-compliant. Only one (17%) of the six investigations initiated after the Misconduct Investigative Training was found to be non-compliant.

In January 2018, we requested that MCSO begin providing us documentation that reflects the actions being taken to address deficient misconduct investigations. We requested that command personnel provide a response to this request on a monthly basis. We have consistently received the requested documentation since March 2018. We have noted numerous instances this reporting period where Command personnel are now addressing needed clarifications, corrections, or additional investigation in cases completed or reviewed by their personnel.

During this reporting period, we noted that Command personnel in Districts 1, 2, 3, 4, and 6 had all identified concerns or deficiencies with investigations conducted by their personnel. These concerns are being addressed with a variety of intervention strategies to help the employees improve, including: one-on-one coachings; mentoring; training; Blue Team notes; and increased supervisory oversight. One administrative misconduct investigation was also initiated by District Command personnel after a supervisor failed to respond to intervention strategies. We did not note any instances during this reporting period where we believe actions other than those being taken by MCSO would be necessary. We will continue to review these reports to ensure that appropriate actions are being taken to address investigations where corrections are needed or deficiencies are found.

WAI 37117

We have noted in numerous previous reporting periods that both the supervisors who complete deficient investigations and the command personnel who approve them must be held accountable if MCSO is to achieve Phase 2 compliance with this Paragraph. During this and the last reporting period, our reviews of both investigations submitted since the completion of the Misconduct Investigative Training and the documentation being provided by command personnel indicate that MCSO is making efforts to identify and address areas of concern with the completion of misconduct investigations. We continue to be optimistic that we will observe continuing improvement in the quality of misconduct investigations being conducted by MCSO personnel.

***Paragraph 212.***   *Where an internal affairs investigator conducts a deficient misconduct investigation, the investigator shall receive the appropriate corrective and/or disciplinary action.   An internal affairs investigator's failure to improve the quality of his or her investigations after corrective and/or disciplinary action is taken shall be grounds for demotion and/or removal from a supervisory position or the Professional Standards Bureau.*

**Phase 1:**  In compliance

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.
- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 56 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

The 40-hour Misconduct Investigative Training was completed in late 2017. In January 2018, we requested that MCSO begin providing us with a document that reflects what actions are being taken to address deficient misconduct investigations on a monthly basis. As discussed in Paragraph 211, we have consistently received the required documentation since March 2018. During this reporting period MCSO command personnel has continued to identify and address concerns they have found with incomplete or deficient investigations conducted and reviewed by their personnel. We also noted that one of the investigations we reviewed for this reporting period included allegations that an internal affairs investigator had conducted a deficient misconduct investigation. This investigation was initiated after other intervention strategies to assist the supervisor had been unsuccessful. In addition to receiving appropriate discipline, MCSO developed an action plan; and the employee was scheduled to attend training on managing priorities and deadlines and was tasked with conducting additional Supervisory Notes reviews to develop more effective note-taking skills.

We will continue to review the monthly reports submitted by MCSO command personnel, along with reviewing completed misconduct investigations, to ensure that any additional deficiencies are being identified and addressed.

WAI 37118

*Paragraph 213. Investigations of minor misconduct conducted outside of the Professional Standards Bureau must be conducted by a Supervisor and not by line-level deputies. After such investigations, the investigating Supervisor's Commander shall forward the investigation file to the Professional Standards Bureau after he or she finds that the misconduct investigation is complete and the findings are supported by the evidence. The Professional Standards Bureau shall review the misconduct investigation to ensure that it is complete and that the findings are supported by the evidence. The Professional Standards Bureau shall order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings. Where the findings of the investigation report are not supported by the appropriate standard of proof, the Professional Standards Bureau shall document the reasons for this determination and shall include this documentation as an addendum to the original investigation.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 56 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period. Of the 56 investigations, 38 were investigated by PSB personnel. Eighteen were investigated by MCSO personnel outside of PSB.

None of the documentation we received regarding investigations conducted outside of PSB indicated that any person below the rank of sergeant was responsible for the investigation.

All 18 District or Division level approved cases were forwarded to, and reviewed by, PSB as required. Six (33%) of the 18 cases investigated at the District or Division level were returned by PSB personnel for additional investigation, corrections, proper documentation, or other changes. One additional case was non-compliant, but corrections could not be made after the fact, as the deficiency was the failure to author an appropriate extension request.

PSB documented all the cases returned to District investigators for additional investigation or corrections, and this information was included in the documentation we reviewed.

*Paragraph 214. At the discretion of the Commander of the Professional Standards Bureau, a misconduct investigation may be assigned or re-assigned to another Supervisor with the approval of his or her Commander, whether within or outside of the District or Bureau in which the incident occurred, or may be returned to the original Supervisor for further investigation or analysis. This assignment or re-assignment shall be explained in writing.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

WAI 37119

To assess Phase 2 compliance with this Paragraph, we reviewed 56 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

Our analysis for this reporting period revealed that of the 18 investigations conducted outside of PSB, six were returned by PSB to the original investigating supervisor for further investigation, analysis, or corrections.   There were no instances where an investigation was assigned or reassigned to a different supervisor.

**Paragraph 215.**   *If, after an investigation conducted outside of the Professional Standards Bureau, an employee's actions are found to violate policy, the investigating Supervisor's Commander shall direct and ensure appropriate discipline and/or corrective action.  Where the incident indicates policy, training, tactical, or equipment concerns, the Commander shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.*

**Phase 1:**   In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**   In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 18 administrative misconduct investigations conducted by MCSO personnel outside of PSB and completed during this reporting period.

Eleven of the 18 completed misconduct investigations conducted outside of PSB resulted in sustained findings.   In all 11 cases, the reports included documentation that appropriate discipline or corrective action was taken.  In three of the investigations with sustained findings, in addition to discipline, the need for additional training and supervisory oversight was identified and addressed.

**Paragraph 216.**   *If, after an investigation conducted by the Professional Standards Bureau, an employee's actions are found to violate policy, the Commander of the Professional Standards Bureau shall direct and ensure appropriate discipline and/or corrective action.  Where the incident indicates policy, training, tactical, or equipment concerns, the Commander of the Professional Standards Bureau shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.*

**Phase 1:**   In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

WAI 37120

- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 56 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

Thirty-eight of the completed investigations were conducted by PSB.  Twenty resulted in a sustained finding against one or more MCSO employees.  In 12 of these sustained investigations, the PSB Commander ensured that appropriate discipline and/or corrective action was recommended.  In the eight remaining cases, the employees left MCSO employment prior to the determination of discipline., The PSB Commander provided the preliminary determination of the range of discipline in all of the 12 cases involving current MCSO employees.  The PSB Commander cannot ensure that appropriate discipline or corrective action are the final outcome of sustained misconduct investigations, as the Appointing Authority makes the final decisions for discipline on both minor misconduct cases and in serious misconduct cases that result in PDHs.  The hearing officer has the authority to change the findings or reduce the discipline.

Of the 20 sustained misconduct investigations conducted by PSB, two indicated a need for training or policy review.  PSB conducted proper follow-up on one case and ensured that extensive training was provided to the employee, but in the second, failed to ensure that a policy issue was addressed.  We will discuss this case with PSB during our next site visit.


***Paragraph 217.***  *The Professional Standards Bureau shall conduct targeted and random reviews of discipline imposed by Commanders for minor misconduct to ensure compliance with MCSO policy and legal standards.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:**  Not applicable

Based on the requirements of the Second Order, District and Division Commanders will not impose discipline for minor misconduct.  In all cases, the PSB Commander will determine the final findings for internal investigations and the presumptive range of discipline for those cases with sustained findings.  The Appointing Authority will then make the final determination of discipline.

WAI 37121

*Paragraph 218.   The Professional Standards Bureau shall maintain all administrative investigation reports and files after they are completed for record-keeping in accordance with applicable law.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:**  In compliance

To determine compliance with this Paragraph, we have observed that PSB maintains both hardcopy and electronic files intended to contain all documents required for compliance with this Paragraph.

A member of our Team has inspected the file rooms where hardcopies of administrative investigations are stored and randomly reviewed case files to verify compliance on multiple occasions when PSB was housed at MCSO Headquarters.  Our Team member also used the access granted to IAPro to randomly select internal affairs case files to verify that all information was being maintained electronically.

PSB completed the move to its new offsite facility in May 2018.  A member of our Team has since conducted an inspection of the file rooms in the new facility; and conducted a review of random internal investigations in IAPRO to ensure ongoing compliance.


### D.     Discipline

*Paragraph 219.  The Sheriff shall ensure that discipline for sustained allegations of misconduct comports with due process, and that discipline is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented regardless of the command level of the principal of the investigation.*


*Paragraph 220.  To ensure consistency in the imposition of discipline, the Sheriff shall review the MCSO's current disciplinary matrices and, upon approval of the parties and the Monitor, will amend them as necessary to ensure that they:*

*a.     establish a presumptive range of discipline for each type of violation;*

*b.     increase the presumptive discipline based on an employee's prior violations;*

*c.     set out defined mitigating and aggravating factors;*

*d.     prohibit consideration of the employee's race, gender, gender identity, sexual orientation, national origin, age, or ethnicity;*

*e.     prohibit conflicts, nepotism, or bias of any kind in the administration of discipline;*

WAI 37122

f.    *prohibit consideration of the high (or low) profile nature of the incident, including media coverage or other public attention;*

g.    *clearly define forms of discipline and define classes of discipline as used in policies and operations manuals;*

h.    *provide that corrective action such as coaching or training is not considered to be discipline and should not be used as a substitute for discipline where the matrix calls for discipline;*

i.    *provide that the MCSO will not take only non-disciplinary corrective action in cases in which the disciplinary matrices call for the imposition of discipline;*

j.    *provide that the MCSO will consider whether non-disciplinary corrective action is also appropriate in a case where discipline has been imposed;*

k.    *require that any departures from the discipline recommended under the disciplinary matrices be justified in writing and included in the employee's file; and*

l.    *provide a disciplinary matrix for unclassified management level employees that is at least as demanding as the disciplinary matrix for management level employees.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, 31 of the 56 administrative misconduct investigations resulted in sustained findings against one or more members of MCSO.  Compliance findings for this Paragraph are based on the discipline findings for both minor and serious discipline.  In those cases where serious discipline is recommended, compliance findings specific to those cases are addressed in Paragraph 226.

Paragraph 220.a. requires a presumptive range of discipline for each type of violation.  In seven of the 31 sustained cases, the employee resigned prior to the completion of the investigative and discipline processes.  In two cases, discipline was determined and served in 2015 but the cases were under appeal until 2018 and were only recently reviewed.  In the remaining 22 cases, the PSB Commander determined and documented the presumptive discipline range.

WAI 37123

Paragraph 220.b. requires that presumptive discipline be increased if an employee has prior violations.  In seven of the 22 sustained investigations where discipline was assessed, the employee had prior sustained violations.  The PSB Commander considered and increased the presumptive discipline or discipline range based on the matrices in place at the time of the investigation.

Paragraph 220.c. requires that mitigating and aggravating factors be defined.  Aggravating and mitigating factors are not specifically defined in the internal affairs investigation or discipline policy in effect prior to May 18, 2017.  The revised discipline policy, effective May 18, 2017, does define these factors.  We note that aggravating or mitigating factors are not identified by the PSB Commander, but are identified and considered by the Appointing Authority when making the final disciplinary decisions.  During this reporting period, the Appointing Authority provided justification and documentation for all factors he considered when making the final discipline decisions for cases initiated both before and after May 18, 2017.  We also found that he continues to specifically identify those instances where there are aggravating or mitigating factors in the justification documents when appropriate.

Paragraph 220.d. prohibits the consideration of any prohibited biases when determining discipline.  None of the sustained cases that resulted in discipline that we reviewed during this reporting period included any indication that any biases were considered when determining discipline.

Paragraph 220.e. prohibits any conflicts, nepotism, or bias of any kind in the administration of discipline.  None of the sustained cases we reviewed during this reporting period had any indication of conflicts, nepotism, or bias of any kind when determining the disciplinary sanction.

Paragraph 220.f. prohibits the consideration of the high (or low) profile nature of an incident when determining discipline.  None of the sustained cases we reviewed during this reporting period indicated any consideration of the high- or low-profile nature of the incident when considering discipline.

Paragraph 220.g. requires that clearly defined forms of discipline and classes of discipline be defined.  Phase 2 compliance is not applicable to this Subparagraph.

Paragraph 220.h. requires that corrective action such as coaching or training is not considered to be discipline and should not be used as a substitute for discipline.  None of the sustained investigations resulted in the use of coaching or training as a substitute when discipline was required.

Paragraph 220.i. requires that MCSO will not take only non-disciplinary action in cases where the Discipline Matrices call for the imposition of discipline.  None of the sustained cases we reviewed during this reporting period resulted in MCSO taking non-disciplinary action when the Discipline Matrices in effect required the imposition of discipline.

WAI 37124

Paragraph 220.j. requires that MCSO consider whether non-disciplinary corrective action is also appropriate in a case where discipline has been imposed. Investigators identified three cases where non-disciplinary corrective action was also appropriate. All resulted in the recommendation for training for the involved employees, in addition to the discipline imposed.

Paragraph 220.k. requires that any departure from the discipline recommended under the Discipline Matrices be justified in writing and included in the employee's file.

During the last reporting period, 13 of the sustained administrative misconduct investigations resulted in the recommendation for minor discipline, and 21 resulted in the recommendation for serious discipline. We agreed with the final discipline in 32 of these 34 investigations. In all of the cases, the final discipline fell within the discipline range. In two of the 34 sustained investigations, we believe the Appointing Authority failed to properly consider the types of violations and the employee work history when he made his final discipline decision. While he provided mitigating factors for the decisions, we disagreed that these factors were sufficient to mitigate the discipline.

During this reporting period, 22 investigations with sustained findings resulted in employee discipline. Twelve involved minor discipline; 10 involved serious discipline. Twenty-four employees received discipline. We agree with the final decision of the appointing authority in 21 (95%) of these 22 cases. In all but one of the cases, the final discipline fell within the discipline range. In one case, the Appointing Authority made a final discipline decision that, while within the range, was not the presumptive discipline. In this case, we believe the Appointing Authority properly documented and supported the mitigating factors he presented, and we agree with his decision. In one of the investigations, we found the final decision of the Appointing Authority to lack any justification for mitigating the discipline outside of the range of discipline prescribed by the discipline matrices in effect at the time of the investigation.

As we have previously noted, compliance for this Paragraph is based on the final discipline outcome for all sustained investigations. Those instances that involve only serious discipline are specifically covered in Paragraph 226 of this Order.

Paragraph 220.l. requires that a Discipline Matrix for unclassified management employees be at least as demanding as the Discipline Matrix for management-level employees. We reviewed the recently approved policies that affect discipline for unclassified management employees, and they comply with this requirement. During this reporting period, MCSO did not complete or submit any administrative investigations involving unclassified management employees.

Of the 22 total sustained investigations where discipline was assessed, four were initiated prior to May 18, 2017. In these cases, the Discipline Matrices in effect provided a presumptive discipline range. In one of these four cases, the final discipline was mitigated outside of the presumptive range. A justification for this mitigation of discipline was not provided. Without information as to why this case was mitigated, we are unable to agree that it was appropriate to do so. We will discuss this case with the Appointing Authority during the next site visit.

WAI 37125

Eighteen of the sustained investigations where discipline was assessed were both initiated and completed after May 18, 2017, and are subject to all the requirements relative to investigations and disciplinary procedures contained in these revised policies. Those investigations initiated and completed after May 18, 2018 have both a discipline range and a presumptive discipline. Aggravating or mitigating the presumptive discipline requires a justification. In 17 of these cases, the final discipline was the presumptive discipline identified in the matrices in effect. In one case, though the discipline was within the range of discipline, it was not the presumptive. The Appointing Authority provided a written justification and we agree with the mitigation in this case.

***Paragraph 221.*** *The Sheriff shall mandate that each act or omission that results in a sustained misconduct allegation shall be treated as a separate offense for the purposes of imposing discipline.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed 22 misconduct investigations with sustained allegations that resulted in the recommendation for discipline for current MCSO employees. We found that MCSO again met the requirements of this Paragraph.

***Paragraph 222.*** *The Sheriff shall also provide that the Commander of the Professional Standards Bureau shall make preliminary determinations of the discipline to be imposed in all cases and shall document those determinations in writing, including the presumptive range of discipline for the sustained misconduct allegation, and the employee's disciplinary history.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

WAI 37126

During this reporting period, there were 22 sustained investigations that were completed after July 20, 2016 where discipline was assessed.  In all of these cases, the PSB Commander determined and documented in writing the presumptive discipline or presumptive range of discipline based on the policies and Discipline Matrices that were in effect at the time of the investigation.  The documentation submitted for this Paragraph included the category, offense number, and employee's discipline history.

### E.    Pre-Determination Hearings

***Paragraph 223.***  *If the Commander of the Professional Standards Bureau makes a preliminary determination that serious discipline (defined as suspension, demotion, or termination) should be imposed, a designated member of MCSO's command staff will conduct a pre-determination hearing and will provide the employee with an opportunity to be heard.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel where MCSO holds a Pre-Determination Hearing (PDH).

During this reporting period, 22 administrative misconduct investigations resulted in sustained findings against current MCSO employees.  Ten investigations resulted in the recommendation for serious discipline.  In nine, MCSO held a Pre-Determination Hearing, as required.  In one case, the employee declined to attend a hearing so it was not held.

***Paragraph 224.***  *Pre-determination hearings will be audio and video recorded in their entirety, and the recording shall be maintained with the administrative investigation file.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.

**Phase 2:**  In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, in all cases where a PDH was held, the hearing was audio- and video-recorded as required, included in the administrative file, and reviewed by a member of our Team.

WAI 37127

***Paragraph 225.*** *If an employee provides new or additional evidence at a pre-determination hearing, the hearing will be suspended and the matter will be returned to the internal affairs investigator for consideration or further investigation, as necessary. If after any further investigation or consideration of the new or additional evidence, there is no change in the determination of preliminary discipline, the matter will go back to the pre-determination hearing. The Professional Standards Bureau shall initiate a separate misconduct investigation if it appears that the employee intentionally withheld the new or additional evidence during the initial misconduct investigation.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.

**Phase 2:** In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, nine sustained investigations resulted in a PDH and we reviewed all of the recordings of these hearings. There were no instances where we, or the Appointing Authority, identified any concerns that required additional follow-up related to the requirements of this Paragraph.

***Paragraph 226.*** *If the designated member of MCSO's command staff conducting the pre-determination hearing does not uphold the charges recommended by the Professional Standards Bureau in any respect, or does not impose the Commander of the Professional Standards Bureau's recommended discipline and/or non-disciplinary corrective action, the Sheriff shall require the designated member of MCSO's command staff to set forth in writing his or her justification for doing so. This justification will be appended to the investigation file.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.

**Phase 2:** Not in compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

WAI 37128

During every site visit, we meet with the Appointing Authority and the Compliance Division to discuss our concerns with final outcomes and decisions that result from Pre-Determination Hearings.  We have emphasized the need to comply with agency policies when determining disciplinary outcomes, and encouraged the Appointing Authority to provide detailed written justification in those cases where he determines that a sustained finding should be changed or discipline should be reduced.

During this reporting period, 10 cases resulted in serious discipline.  In all cases, the Appointing Authority provided a justification for the final decisions, and this information was provided to our Team in the submissions regarding closed internal affairs investigations.  The Appointing Authority did not overturn any of the sustained findings by the PSB Commander.  In one case both initiated and completed after May 2017, the Appointing Authority made the decision to mitigate the discipline below the presumptive discipline.  We agree with his decision to do so. In one case (10%), the Appointing Authority mitigated the discipline outside of the range of discipline.  The decision to mitigate this discipline outside of the range occurred after the employee filed an appeal to the Merit Commission on the initial suspension received.  The Appointing Authority did not provide any written justification for mitigating the discipline; and without any information that supports his decision, we are unable to concur.

During our January 2018 site visit, we met with the Appointing Authority and personnel from the Compliance Division to discuss the PDH process and the final outcomes of cases completed during this reporting period.  During the meeting, MCSO advised us that the Appointing Authority does not have the authority to reduce discipline based only on timeframe concerns when an employee appeals discipline in these cases.  It is the Maricopa County Attorney's Office (MCAO) that reviews these cases and determines whether the cases should go forward. Both the Appointing Authority and the representative from the MCAO advised that they have taken some of these cases forward; but in others, they did not believe it was appropriate to do so, based on the totality of circumstances.  The Parties present at the meeting also commented on their concerns regarding cases involving the Plaintiffs' class that might result in reductions in discipline as a result of the failure to complete the case within the 180-day timeframe.  We discussed the specific requirements of Arizona Revised Statutes 38-1110, and that the statute only requires a "good faith" attempt to complete cases that result in suspensions, demotions, or dismissals within the 180-day timeframe.

During that site visit, we also discussed those cases where a decision may be made after a PDH that a reduction in discipline will occur, and those cases where a decision to reduce the discipline may occur if an appeal is filed.  It is our understanding from our meeting with the Appointing Authority and other staff who were present that MCSO consults with the MCAO in these cases and their input is related to the final outcomes.  However, all the documentation we receive and review is authored and signed by the Appointing Authority, so our assessment can only consider any final decisions as his.

WAI 37129

During our October site visit, we met with the Appointing Authority and Compliance Division to discuss cases where we had concerns with final outcomes.  We discussed those cases where we disagreed with final discipline decisions; and those where we found that the Appointing Authority had provided sufficient justification for his decisions and we were in agreement with the final outcomes.  As has been our experience during prior site visits, the Appointing Authority was attentive to our concerns and provided detailed information and explanations regarding the PDH process and the concerns we raised.

**Paragraph 227.**   *The Sheriff shall promulgate MCSO policy which shall provide that the designated member of MCSO's command staff conducting a pre-determination hearing should apply the disciplinary matrix and set forth clear guidelines for the grounds on which a deviation is permitted.  The Sheriff shall mandate that the designated member of MCSO's command staff may not consider the following as grounds for mitigation or reducing the level of discipline prescribed by the matrix:*

a.      *his or her personal opinion about the employee's reputation;*

b.      *the employee's past disciplinary history (or lack thereof), except as provided in the disciplinary matrix;*

c.      *whether others were jointly responsible for the misconduct, except that the MCSO disciplinary decision maker may consider the measure of discipline imposed on other employees involved to the extent that discipline on others had been previously imposed and the conduct was similarly culpable.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.

**Phase 2:**  In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed 22 administrative misconduct investigations where discipline was imposed.  The serious sustained allegations in 10 of these investigations resulted in their referrals for Pre-Determination Hearings.

Paragraph 227.a. prohibits the designated member of command staff conducting a Pre-Determination Hearing from considering a personal opinion of an employee's reputation when determining discipline.  There were no indications in our reviews of these investigations that any opinion was considered in making a disciplinary decision.

WAI 37130

Paragraph 227.b. prohibits the consideration of the employee's past disciplinary history (or lack thereof), except as provided in the Discipline Matrix.  There were no instances where we determined that the member of command staff responsible for conducting the PDH considered disciplinary history outside of the requirements of this Paragraph.

Paragraph 227.c. prohibits the consideration of others jointly responsible for misconduct, except that the decision-maker may consider such discipline to the extent that discipline on others had been previously imposed and the conduct was similarly culpable.  There were no indications in our reviews that the misconduct of others was improperly considered in the disciplinary decisions that were made.

***Paragraph 228.***  *The Sheriff or his designee has the authority to rescind, revoke or alter any disciplinary decision made by either the Commander of the Professional Standards Bureau or the appointed MCSO disciplinary authority so long as:*

a.     *that decision does not relate to the Sheriff or his designee;*

b.     *the Sheriff or his designee provides a thorough written and reasonable explanation for the grounds of the decision as to each employee involved;*

c.     *the written explanation is placed in the employment files of all employees who were affected by the decision of the Sheriff or his designee; and*

d.     *the written explanation is available to the public upon request.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.

**Phase 2:**  In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, there were no instances where the Sheriff or his designee rescinded, revoked, or altered any disciplinary decision made by either the Commander of PSB or the appointed MCSO disciplinary authority.

WAI 37131

### F.    Criminal Misconduct Investigations

*Paragraph 229.   Whenever an internal affairs investigator or Commander finds evidence of misconduct indicating apparent criminal conduct by an employee, the Sheriff shall require that the internal affairs investigator or Commander immediately notify the Commander of the Professional Standards Bureau.   If the administrative misconduct investigation is being conducted by a Supervisor outside of the Professional Standards Bureau, the Sheriff shall require that the Professional Standards Bureau immediately take over the administrative investigation.   If the evidence of misconduct pertains to someone who is superior in rank to the Commander of the Professional Standards Bureau and is within the Commander's chain of command, the Sheriff shall require the Commander to provide the evidence directly to what he or she believes is the appropriate prosecuting authority—the Maricopa County Attorney, the Arizona Attorney General, or the United States Attorney for the District of Arizona—without notifying those in his or her chain of command who may be the subject of a criminal investigation.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review completed criminal misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed five internal criminal investigations.   Three were externally generated, and two were internally generated.   All were initiated and completed after July 20, 2016, and appropriately assigned to criminal investigators in PSB.   The potential misconduct was brought to the attention of the PSB Commander as required; and in all cases, an administrative misconduct investigation was also initiated.   None involved someone superior in rank to the PSB Commander.

*Paragraph 230.   If a misconduct allegation will be investigated criminally, the Sheriff shall require that the Professional Standards Bureau not compel an interview of the principal pursuant to Garrity v. New Jersey, 385 U.S. 493 (1967), until it has first consulted with the criminal investigator and the relevant prosecuting authority.   No other part of the administrative investigation shall be held in abeyance unless specifically authorized by the Commander of the Professional Standards Bureau in consultation with the entity conducting the criminal investigation.   The Sheriff shall require the Professional Standards Bureau to document in writing all decisions regarding compelling an interview, all decisions to hold any aspect of an administrative investigation in abeyance, and all consultations with the criminal investigator and prosecuting authority.*

**Phase 1:**  In compliance

WAI 37132

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by both criminal and administrative investigators to ensure that they contain appropriate documentation that complies with the requirements of this Paragraph.

We previously determined that in many cases, the administrative investigation is not submitted and reviewed during the same reporting period as the criminal investigation, as generally, administrative investigations are finalized after the completion of the criminal investigation.  To ensure our ability to verify that MCSO maintains compliance with this Paragraph on an ongoing basis, we discussed this issue with PSB during our January 2017 site visit.  To resolve the concern, PSB agreed to provide us with a copy of any criminal investigation when PSB submits the administrative misconduct investigation for our review, even if the criminal investigation has been previously submitted.  MCSO has been consistently providing copies of these criminal investigations with the administrative investigation since that time.

During this reporting period, we reviewed two administrative misconduct investigations where criminal misconduct may have also occurred.  One had a companion criminal investigation completed by MCSO.  In the second case, the criminal investigation was conducted by the agency where the criminal offense was alleged to have occurred.


***Paragraph 231.***   *The Sheriff shall require the Professional Standards Bureau to ensure that investigators conducting a criminal investigation do not have access to any statements by the principal that were compelled pursuant to Garrity.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:**  In compliance

PSB is divided into criminal and administrative sections.   Criminal investigators and administrative investigators are housed on separate floors of the building.   Criminal investigators do not have access to the IAPro database for administrative investigations, and there are separate file rooms for criminal and administrative investigative documents and reports.  We have previously verified during our site visits that the required separation of criminal and administrative investigations and restricted access to IAPro is in place.

WAI 37133

In May 2018, PSB relocated to a new offsite location.  We have since verified that criminal and administrative investigators continue to be housed on separate floors in the new facility. Criminal investigators do not have access to the IAPro database for administrative investigations, and there are separate and secured file rooms for criminal and administrative documents and reports.

***Paragraph 232.***  *The Sheriff shall require the Professional Standards Bureau to complete all such administrative investigations regardless of the outcome of any criminal investigation, including cases in which the prosecuting agency declines to prosecute or dismisses the criminal case after the initiation of criminal charges.   The Sheriff shall require that all relevant provisions of MCSO policies and procedures and the operations manual for the Professional Standards Bureau shall remind members of the Bureau that administrative and criminal cases are held to different standards of proof, that the elements of a policy violation differ from those of a criminal offense, and that the purposes of the administrative investigation process differ from those of the criminal investigation process.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:**  In compliance

To determine MCSO's compliance with this Paragraph, we review on a monthly basis administrative and criminal misconduct investigations conducted by MCSO.

During this reporting period, we reviewed five criminal misconduct investigations conducted by MCSO personnel.  All have a companion administrative misconduct investigation, as required; and are in compliance with the requirements of this Paragraph.

***Paragraph 233.***  *If the investigator conducting the criminal investigation decides to close the investigation without referring it to a prosecuting agency, this decision must be documented in writing and provided to the Professional Standards Bureau.   The Commander of the Professional Standards Bureau shall separately consider whether to refer the matter to a prosecuting agency and shall document the decision in writing.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:**  In compliance

WAI 37134

To determine MCSO's compliance with this Paragraph, we review on a monthly basis administrative and criminal misconduct investigations conducted by MCSO.

During this reporting period, three of the five criminal investigations we reviewed were closed without submittal to a prosecuting agency. In all three cases, the decisions were supported by the facts of the investigation, interviews, or other investigative follow-up. The investigators documented their conclusions and decisions to close the cases without submittal and the PSB Commander approved these decisions in writing.

**Paragraph 234.** *If the investigator conducting the criminal investigation decides to refer the matter to a prosecuting agency, the Professional Standards Bureau shall review the information provided to the prosecuting agency to ensure that it is of sufficient quality and completeness. The Commander of the Professional Standards Bureau shall direct that the investigator conduct additional investigation when it appears that there is additional relevant evidence that may improve the reliability or credibility of the investigation. Such directions shall be documented in writing and included in the investigatory file.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:** In compliance

To determine MCSO's compliance with this Paragraph, we review on a monthly basis administrative and criminal misconduct investigations conducted by MCSO.

During this reporting period, we reviewed five criminal misconduct investigations conducted by PSB personnel. Two of the five cases were forwarded to an appropriate prosecutorial agency as required. In both cases, MCSO provided documentation that the PSB Commander reviewed and approved the submittal. Neither of the cases noted that the PSB Commander had directed any further investigation prior to the submittal to the prosecuting agency. In one case, charges were filed by the MCAO; and in the second, prosecution was declined by the MCAO based on "no reasonable likelihood of conviction."

**Paragraph 235.** *If the prosecuting agency declines to prosecute or dismisses the criminal case after the initiation of criminal charges, the Professional Standards Bureau shall request an explanation for this decision, which shall be documented in writing and appended to the criminal investigation report.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Professional Standards Bureau Operations Manual, currently under development.

WAI 37135

**Phase 2:**  In compliance

To determine MCSO's compliance with this Paragraph, we review on a monthly basis administrative and criminal misconduct investigations conducted by MCSO.

During this reporting period, one case submitted for charging resulted in a determination by a prosecutorial agency that charges would not be pursued due to "no reasonable likelihood of conviction."  The case was properly investigated and there is no indication that the decision by MCAO not to prosecute was related in any way to the investigator's failure to conduct a thorough investigation.

*Paragraph 236.  The Sheriff shall require the Professional Standards Bureau to maintain all criminal investigation reports and files after they are completed for record-keeping in accordance with applicable law.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:**  In compliance

To determine compliance with this Paragraph, we observed that PSB maintains both hardcopy and electronic files that are intended to contain all the documents required per this Paragraph.

During previous site visits, we have inspected the file rooms where hardcopies of investigations are stored.  Criminal and administrative investigation files are stored in separate rooms, and access to these rooms is restricted.  Our random review of criminal investigation case files verified that PSB was maintaining files as required.  A member of our Team also has access to IAPro, and has verified that case files are maintained in an electronic format.

During our January 2018 site visit, a member of our Team inspected the file rooms where hardcopies of criminal investigation are stored and randomly reviewed case files to verify compliance.

In May 2018, PSB relocated to a new offsite location.  We have since verified that PSB is properly maintaining criminal investigation reports and files at its new facility.

WAI 37136

### G.      Civilian Complaint Intake, Communication, and Tracking

*Paragraph 237.  Within six months of the entry of this Order, the Monitor, in consultation with the Community Advisory Board, will develop and implement a program to promote awareness throughout the Maricopa County community about the process for filing complaints about the conduct of MCSO employees.*

**Phase 1**:  Not applicable

**Phase 2:**  Not applicable

The Monitoring Team developed and implemented a Complaint Process Community Awareness Program to promote awareness throughout the Maricopa County community about the process for filing complaints about the conduct of MCSO employees.   The program provides for distributing brochures describing the complaint process at the Monitoring Team's community meetings and using public service announcements – made via local media outlets and social media – to provide basic information (in both English and Spanish) about MCSO's complaint process.

The Monitoring Team contacted faith organizations and civic groups throughout Maricopa County requesting that they make complaint process information forms available to members of their congregations and groups.   The Complaint Process Community Awareness Program incorporates input from the CAB, MCSO, and the ACLU of Arizona.

*Paragraph 238.   The Sheriff shall require the MCSO to accept all civilian complaints, whether submitted verbally or in writing; in person, by phone, by mail, or online; by a complainant, someone acting on the complainant's behalf, or anonymously; and with or without a signature from the complainant.  MCSO will document all complaints in writing.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.   In addition, we review many initial complaint documents or initial phone calls, BWC videos, traffic stop videos, and consider findings in the complaint testing process.

WAI 37137

During the last reporting period, MCSO initiated 131 externally generated administrative misconduct investigations and 111 externally generated service complaints. We reviewed 48 completed administrative misconduct investigations and 64 completed service complaints. Twenty of the misconduct investigations and 63 of the service complaints were externally generated. We also reviewed traffic stops, BWC videos and the complaint intake tests. We did not find any instances were a supervisor failed to accept a complaint from a civilian. We did identify two complaint intake tests that had concerns. While in both cases, the complaints were accepted, the initial contacts were problematic. These were addressed in Paragraph 254, which specifically addresses the complaint intake process.

During this reporting period, MCSO initiated 127 externally generated administrative misconduct investigations. Twenty-eight of the 56 completed administrative investigations we reviewed for this reporting period were externally generated. We also reviewed 15 service complaints this reporting period, all of which were externally generated. As is our practice, we reviewed many of the initial complaint phone calls, emails, complaint forms, or initial in-person contact with complainants. In those instances where we reviewed the initial contact with the complainant, we did not identify any instances where we believe that any complaint was initially refused, or any instances where the employee who received the complaint attempted to dissuade the complainant from filing a complaint. As has been true in prior reporting periods, we again found instances where a complainant did not want to file a complaint after initially speaking to an MCSO employee. In the cases we reviewed this reporting period, MCSO personnel properly initiated an administrative investigation or service complaint despite a complainant's reluctance to do so. There were no instances this reporting period where either Compliance or BIO identified during their reviews that a supervisor had failed to initiate a complaint when appropriate.

In our review of traffic stops this reporting period, we identified one instance where a subject being arrested attempted to make a complaint against MCSO employees. There is no indication that any complaint was taken. We requested that PSB review this incident and provide a response as to what actions, if any, will be taken. We did not identify any complaint intake tests for this reporting period where MCSO failed to accept a complaint.

Compliance findings for this Paragraph cover all complaint intake. We have found that MCSO consistently accepts and records complaints as required for compliance with this Paragraph.

WAI 37138

*Paragraph 239.  In locations clearly visible to members of the public at the reception desk at MCSO headquarters and at all District stations, the Sheriff and the MCSO will post and maintain permanent placards clearly and simply describing the civilian complaint process that is visible to the public at all hours.  The placards shall include relevant contact information, including telephone numbers, email addresses, mailing addresses, and Internet sites.  The placards shall be in both English and Spanish.*

**Phase 1:**  In compliance

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:**  In compliance

During this reporting period, the permanent placards were prominently displayed at MCSO Headquarters, and Monitoring Team members visiting MCSO Districts found that the permanent placards were prominently displayed.  The placard states that anyone who has a concern regarding the performance of any MCSO employee has the right to file a complaint in English or Spanish or their preferred language, to include American Sign Language; in person at any District facility or at the Professional Standards Bureau, by mail, by telephone, by fax, or online.  The placard includes relevant contact information, including telephone numbers, email addresses, mailing addresses, and websites.

During our October site visit, we verified that the placards had been updated to reflect PSB's new address.


*Paragraph 240.  The Sheriff shall require all deputies to carry complaint forms in their MCSO vehicles.  Upon request, deputies will provide individuals with complaint forms and information about how to file a complaint, their name and badge number, and the contact information, including telephone number and email address, of their immediate supervising officer.  The Sheriff must provide all supervising officers with telephones.  Supervising officers must timely respond to such complaints registered by civilians.*

**Phase 1:**  In compliance

- EA-2 (Patrol Vehicles), most recently revised on December 8, 2017.

- GE-4 (Use, Assignment and Operation of Vehicles), most recently revised on October 7, 2017.

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:**  In compliance

WAI 37139

During this reporting period, Monitoring Team members visiting District offices verified that MCSO maintained adequate supplies of complaint forms for deputies to carry in their vehicles. All deputies with whom Monitoring Team members made contact understood their obligations to provide individuals with complaint forms and information about how to file a complaint, their name and badge number, and the contact information for their immediate supervising officer.

Also during this reporting period, Monitoring Team members verified that the supervisors with whom they made contact were in possession of MCSO-issued cellular telephones.

**Paragraph 241.** *The Sheriff will ensure that the Professional Standards Bureau facility is easily accessible to members of the public. There shall be a space available for receiving walk-in visitors and personnel who can assist the public with filing complaints and/or answer an individual's questions about the complaint investigation process.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

In May 2018, PSB moved into the first and second floors of 101 West Jefferson Street. During our July 2018 site visit, members of the Monitoring Team toured the facility. In addition, we inspected the placards and comment and complaint forms at Districts 1, 2, 3, and 7; and noted that they all had been updated to reflect PSB's new address. The address was also updated on the comment and complaint form that is accessible to the public on MCSO's website.

The facility, the former East Court Building Library, is easily accessible to members of the public. The County Court facilities in the building are separate from the future PSB reception area and offices. The PSB area is accessible from First Avenue, a major thoroughfare; and there is no required security screening of individuals entering the building through the First Avenue entrance. A member of the Monitoring Team visited the PSB facility during this reporting period. There was an MCSO employee stationed at the reception area desk in the entrance lobby to welcome visitors and provide information and assistance. As noted previously, the PSB facility's outside entrance located on First Avenue was well-marked and easily accessible to the public with no required security screening.

WAI 37140

***Paragraph 242.*** *The Sheriff will also make complaint forms widely available at locations around the County including: the websites of MCSO and Maricopa County government; the lobby of MCSO's headquarters; each patrol District; and the Maricopa County government offices. The Sheriff will ask locations, such as public library branches and the offices and gathering places of community groups, to make these materials available.*

**Phase 1:**  In compliance

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:**  In compliance

MCSO has complaint forms available in English and Spanish on the MCSO and Maricopa County websites. MCSO maintains a list – of MCSO facilities, County offices, and public locations where community groups meet – where Community Outreach Division personnel try to make the forms available.

During our October site visit, we surveyed 10 locations in Maricopa County that were included on MCSO's list of facilities where complaint forms were available to the public. We visited these facilities and discovered a significant improvement since our visit in July. Every facility visited displayed an ample supply of complaint forms in English and Spanish, were in locations readily visible to the public, and contained the new PSB facility address.

***Paragraph 243.*** *The Sheriff shall establish a free, 24-hour hotline for members of the public to make complaints.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

The free 24-hour hotline for members of the public to make complaints was established in July 2016 and continued to be operational during this reporting period. A Monitoring Team representative periodically called the hotline during this reporting period and verified that the hotline is operational in both English and Spanish, and provides instructions in both languages on how to register a complaint. The recording advises callers that if the call is an emergency, they are to call 911. Callers are requested to provide their name, telephone number, and a brief summary of their complaint. If callers leave a recorded message, they are advised that MCSO will contact them as soon as possible. If callers do not wish to leave a recorded message, they are provided with a telephone number to call to speak to a supervisor. That number connects the callers to the MCSO switchboard operator, who will connect the caller to an appropriate supervisor. Callers are further advised of MCSO's operating hours if they wish to contact PSB directly.

WAI 37141

The hotline is housed in PSB, and PSB personnel access any recorded messages at the beginning of each business day.  During this reporting period, PSB personnel reported that the hotline received three complaints.  A member of the Monitoring Team visited PSB during this reporting period and received a briefing from MCSO personnel on the procedures followed regarding receiving complaints on the 24-hour hotline.  The established procedures provide for creating a record of every complaint received on the hotline and maintaining a log of follow-up actions regarding referral of the complaint.

**Paragraph 244.**  *The Sheriff shall ensure that the MCSO's complaint form does not contain any language that could reasonably be construed as discouraging the filing of a complaint, such as warnings about the potential criminal consequences for filing false complaints.*

**Phase 1:**  In compliance

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:**  In compliance

Our review of the English and Spanish complaint forms' content did not reveal any language that could reasonably be construed as discouraging the filing of a complaint.

**Paragraph 245.**  *Within two months of the entry of this Order, complaint forms will be made available, at a minimum, in English and Spanish.  The MCSO will make reasonable efforts to ensure that complainants who speak other languages (including sign language) and have limited English proficiency can file complaints in their preferred language.  The fact that a complainant does not speak, read, or write in English, or is deaf or hard of hearing, will not be grounds to decline to accept or investigate a complaint.*

**Phase 1:**  In compliance

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:**  In compliance

Complaint forms in English and Spanish are accessible on MCSO's website.  The complaint form states that anyone who has a concern regarding the performance of any MCSO employee has the right to file a complaint – in English or Spanish or their preferred language, to include American Sign Language – in person at any District facility or at the Professional Standards Bureau, by mail, by telephone, by fax, or online.  The forms provide street addresses, contact numbers, and website information.

WAI 37142

During our October site visit, we verified that the forms had been updated to reflect PSB's new address. The address was also updated on the form that is accessible to the public on MCSO's website.

**_Paragraph 246._** _In the course of investigating a civilian complaint, the Professional Standards Bureau will send periodic written updates to the complainant including:_

a.    _within seven days of receipt of a complaint, the Professional Standards Bureau will send non-anonymous complainants a written notice of receipt, including the tracking number assigned to the complaint and the name of the investigator assigned. The notice will inform the complainant how he or she may contact the Professional Standards Bureau to inquire about the status of a complaint;_

b.    _when the Professional Standards Bureau concludes its investigation, the Bureau will notify the complainant that the investigation has been concluded and inform the complainant of the Bureau's findings as soon as is permitted by law; and_

c.    _in cases where discipline is imposed, the Professional Standards Bureau will notify the complainant of the discipline as soon as is permitted by law._

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed 56 administrative misconduct investigations conducted by MCSO personnel. Twenty-eight of these complaints were externally generated.

Paragraph 246.a. requires that a civilian complainant receive a written notice of receipt of his/her complaint within seven days. This letter must include the tracking number, the name of the investigator assigned, and information regarding how the complainant can inquire about the status of their complaint. In 25 of the 28 external complaints, PSB sent the required written notice within seven days. In three cases, the complaints were anonymous and no contact information was provided. All of the letters sent and reviewed included the name of the investigator and information regarding how the complainant could inquire about the status of the complaint.

Paragraph 246.b. requires that PSB notify a civilian complainant of the outcome of the investigation. In all of the externally generated complaints, the complainant was provided a notice of the outcome when contact information was known. In one case, the outcome letter sent to the complainant provided inaccurate information.

WAI 37143

Paragraph 246.c. requires that PSB notify a civilian complainant of any discipline imposed as soon as permitted by law.  Ten of the externally generated complaints had sustained findings. In eight of these, PSB notified the complainant of the sustained findings and the discipline imposed.  In the two remaining sustained cases, the complaint was anonymous and no contact information had been provided.

**Paragraph 247.**  *Notwithstanding the above written communications, a complainant and/or his or her representative may contact the Professional Standards Bureau at any time to determine the status of his or her complaint.   The Sheriff shall require the MCSO to update the complainant with the status of the investigation.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2**:  In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed 56 administrative misconduct investigations conducted by MCSO.  Externally generated complaints resulted in 28 of the investigations.  We did not identify any instances where a complainant was discouraged from, or denied, contact with MCSO investigators to determine the status of his/her complaint, or to request and receive an update.  MCSO appropriately had contact with complainants as required in Paragraph 246 in all of these cases where the complainant was known.  On six occasions, MCSO personnel reported that they had additional contact with complainants during the course of the investigation.

**Paragraph 248.**  *The Professional Standards Bureau will track, as a separate category of complaints, allegations of biased policing, including allegations that a deputy conducted an investigatory stop or arrest based on an individual's demographic category or used a slur based on an individual's actual or perceived race, ethnicity, nationality, or immigration status, sex, sexual orientation, or gender identity.   The Professional Standards Bureau will require that complaints of biased policing are captured and tracked appropriately, even if the complainant does not so label the allegation.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:**  In compliance

WAI 37144

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

Each month, PSB provides a list of new complaints alleging biased policing. PSB also provides all closed investigations where biased policing was alleged. For this Paragraph, only allegations of biased policing that do not affect the Plaintiffs' class are reported. Those complaints alleging bias against members of the Plaintiffs' class are captured in a separate category and reported under Paragraphs 275-288.

During the last reporting period, PSB completed one investigation where potential bias was alleged that did not affect members of the Plaintiffs' class. The investigation was initiated and completed after July 20, 2016; investigated by PSB; and tracked in a separate category as required by this Paragraph.

During this reporting period, PSB completed one investigation where potential bias was alleged that did not affect members of the Plaintiffs' class. This investigation was initiated and completed after July 20, 2016, investigated by PSB, and tracked in a separate category as required by this Paragraph.

**Paragraph 249.** *The Professional Standards Bureau will track, as a separate category of complaints, allegations of unlawful investigatory stops, searches, seizures, or arrests.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:** In compliance

To determine Phase 2 compliance for this Paragraph, we review a monthly report from PSB that provides the information required for compliance.

To ensure that we are consistently informed of complaints relative to this Paragraph, PSB provides information concerning these investigations in its monthly document submission relative to this Paragraph.

During this and the last reporting period, PSB did not complete, or submit for our review, any investigation where reporting under this Paragraph is applicable.

WAI 37145

*Paragraph 250.  The Professional Standards Bureau will conduct regular assessments of the types of complaints being received to identify and assess potential problematic patterns and trends.*

**Phase 1:**  Not in compliance

- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:**  In compliance

PSB continues to prepare a quarterly assessment of the types of complaints received to identify and assess potential problematic patterns or trends.  During this reporting period, PSB identified potential issues related to the operation of motor vehicles by MCSO employees.  MCSO revised the Emergency and Pursuit Driving policy during this reporting period to address a continuing issue with emergency driving by MCSO employees.  In addition, PSB identified that the Lower Buckeye Jail was the Division that received the highest number of complaints during the reporting period.  In addition, during the last reporting period PSB began to include the information required by this Paragraph in its semi-annual public Misconduct Investigations Report, which is required under Paragraph 251.  The most recent report for the period of July 1- December 31, 2017, contains the issues identified as potentially problematic patterns or trends for that six-month period.  We will review the next semi-annual Misconduct Investigations Report when it is issued to determine if it contains the information specific to this requirement. MCSO remains in compliance with this requirement.

### *H.      Transparency Measures*

*Paragraph 251.  The Sheriff shall require the Professional Standards Bureau to produce a semi-annual public report on misconduct investigations, including, at a minimum, the following:*

a.      *summary information, which does not name the specific employees involved, about any sustained allegations that an employee violated conflict-of-interest rules in conducting or reviewing misconduct investigations;*

b.      *aggregate data on complaints received from the public, broken down by district; rank of principal(s); nature of contact (traffic stop, pedestrian stop, call for service, etc.); nature of allegation (rudeness, bias-based policing, etc.); complainants' demographic information; complaints received from anonymous complainants or third parties; and principals' demographic information;*

c.      *analysis of whether any increase or decrease in the number of civilian complaints received from reporting period to reporting period is attributable to issues in the complaint intake process or other factors;*

d.      *aggregate data on internally-generated misconduct allegations, broken down by similar categories as those for civilian complaints;*

WAI 37146

e.  *aggregate data on the processing of misconduct cases, including the number of cases assigned to Supervisors outside of the Professional Standards Bureau versus investigators in the Professional Standards Bureau; the average and median time from the initiation of an investigation to its submission by the investigator to his or her chain of command; the average and median time from the submission of the investigation by the investigator to a final decision regarding discipline, or other final disposition if no discipline is imposed; the number of investigations returned to the original investigator due to conclusions not being supported by the evidence; and the number of investigations returned to the original investigator to conduct additional investigation;*

f.  *aggregate data on the outcomes of misconduct investigations, including the number of sustained, not sustained, exonerated, and unfounded misconduct complaints; the number of misconduct allegations supported by the appropriate standard of proof; the number of sustained allegations resulting in a non-disciplinary outcome, coaching, written reprimand, suspension, demotion, and termination; the number of cases in which findings were changed after a pre-determination hearing, broken down by initial finding and final finding; the number of cases in which discipline was changed after a pre-determination hearing, broken down by initial discipline and final discipline; the number of cases in which findings were overruled, sustained, or changed by the Maricopa County Law Enforcement Merit System Council, broken down by the finding reached by the MCSO and the finding reached by the Council; and the number of cases in which discipline was altered by the Council, broken down by the discipline imposed by the MCSO and the disciplinary ruling of the Council; and similar information on appeals beyond the Council; and*

g.  *aggregate data on employees with persistent or serious misconduct problems, including the number of employees who have been the subject of more than two misconduct investigations in the previous 12 months, broken down by serious and minor misconduct; the number of employees who have had more than one sustained allegation of minor misconduct in the previous 12 months, broken down by the number of sustained allegations; the number of employees who have had more than one sustained allegation of serious misconduct in the previous 12 months, broken down by the number of sustained allegations; and the number of criminal prosecutions of employees, broken down by criminal charge.*

**Phase 1:**  Not in compliance

- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:**  Deferred

WAI 37147

The proposed PSB Operations Manual reviewed by the Monitoring Team identifies the PSB Commander as responsible for preparing the semi-annual public report on misconduct investigations. The proposed manual also contains provisions for the production of summary information regarding sustained conflict of interest violations; an analysis of the complaint intake process; and aggregate data on complaints (internal and external), processing of misconduct cases, outcomes of misconduct cases, and employees with persistent misconduct problems.

In January 2018, PSB issued and posted on the MCSO website its semi-annual public report for period of January 1-June 30, 2017. The report contained the relevant information that is required by this Paragraph, including whether any sustained allegations exist in which an employee violated conflict-of-interest rules when conducting or reviewing misconduct investigations; aggregated data on complaints received from the public; an analysis to determine whether there is an increase or decrease of complaints that may be attributable to the intake process; aggregated data on internally generated misconduct allegations; aggregated data on the processing of misconduct investigations; aggregated data on the outcome of misconduct investigations; and aggregated data on employees with persistent or serious misconduct problems.

In July 2018, PSB issued and posted on the MCSO website its semi-annual public report for period of July 1-December 31, 2017. PSB also incorporated information relevant to Paragraph 192 in this report, which requires that PSB review, at least semi-annually, all misconduct investigations that were assigned outside the Bureau to determine whether or not the investigation was properly categorized, whether the investigation was properly conducted, and whether appropriate findings were reached. PSB also incorporated information relevant to Paragraph 250 in this report, which includes an assessment of potential problematic patterns or trends, based on a review on complaints received, for the time period of July 1-December 31, 2017.

During our July 2018 site visit, PSB informed us that it was developing a voluntary survey for complainants to complete after the conclusion of the investigation, which would capture demographic information in relation to the complainants. Once the survey is implemented and responses from the complainants are received by PSB, the information will be included in future reports. During our October 2018 site visit, PSB informed us that the survey is still under development and that demographic information related to complainants will not be included in the next semi-annual public report.

As in the previous reporting period, we are deferring our Phase 2 compliance assessment of this Paragraph until MCSO achieves Phase 1 compliance via the publication of the Professional Standards Bureau Operations Manual.

WAI 37148

*Paragraph 252.  The Sheriff shall require the MCSO to make detailed summaries of completed internal affairs investigations readily available to the public to the full extent permitted under state law, in electronic form on a designated section of its website that is linked to directly from the MCSO's home page with prominent language that clearly indicates to the public that the link provides information about investigations of misconduct alleged against MCSO employees.*

**Phase 1:**  Not in compliance

- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:**  In compliance

PSB provided its template for the information that will be captured from completed misconduct investigations for posting as required on the MCSO website.  The following data fields have been identified for public disclosure:  Internal Affairs Number; Date Opened; Incident Type; Original Complaint; Policy Violation(s) Alleged/Outcome; Discipline; Investigative Summary; and Date Completed.  During our April 2017 site visit, we approved the PSB template containing detailed summaries of completed misconduct investigations for placement on the MCSO website.  Each reporting period, we conduct a review of the detailed summaries of completed misconduct investigations to ensure that the content is consistent with the requirements of this Paragraph.  In addition, we verify that the detailed summaries of completed misconduct investigations are posted on MCSO's website for public review.

During this reporting period, PSB made detailed summaries of completed internal investigations readily available to the public in electronic form in a designated section on the homepage of the MCSO website.  During our review of one of the summaries, which was conducted prior to PSB posting the document on the website, we identified some minor errors.  We discussed the issue with PSB personnel, who advised that corrections would be made to the document.  MCSO remains in compliance with this requirement.

*Paragraph 253.  The MCSO Bureau of Internal Oversight shall produce a semi-annual public audit report regarding misconduct investigations.  This report shall analyze a stratified random sample of misconduct investigations that were completed during the previous six months to identify any procedural irregularities, including any instances in which:*

a.   *complaint notification procedures were not followed;*

b.   *a misconduct complaint was not assigned a unique identifier;*

c.   *investigation assignment protocols were not followed, such as serious or criminal misconduct being investigated outside of the Professional Standards Bureau;*

d.   *deadlines were not met;*

e.   *an investigation was conducted by an employee who had not received required misconduct investigation training;*

WAI 37149

f.    an investigation was conducted by an employee with a history of multiple sustained misconduct allegations, or one sustained allegation of a Category 6 or Category 7 offense from the MCSO's disciplinary matrices;

g.    an investigation was conducted by an employee who was named as a principal or witness in any investigation of the underlying incident;

h.    an investigation was conducted of a superior officer within the internal affairs investigator's chain of command;

i.    any interviews were not recorded;

j.    the investigation report was not reviewed by the appropriate personnel;

k.    employees were promoted or received a salary increase while named as a principal in an ongoing misconduct investigation absent the required written justification;

l.    a final finding was not reached on a misconduct allegation;

m.    an employee's disciplinary history was not documented in a disciplinary recommendation; or

n.    no written explanation was provided for the imposition of discipline inconsistent with the disciplinary matrix.

**Phase 1:**   In compliance

- GH-4 (Bureau of Internal Oversight), most recently amended on October 30, 2018.

**Phase 2:**   In compliance

During our January 2018 site visit, the Bureau of Internal Oversight (BIO) Commander reported that the semi-annual public audit report regarding misconduct investigations had not yet been prepared.  After a telephone conference between BIO and the Monitoring Team on January 10, 2018, it was determined that the semi-annual public audit report would be placed on hold while BIO's Audit and Inspections Unit (AIU) developed the appropriate methodology for conducting the inspection.  On June 26, we approved the methodology for the inspection, which would start with an inspection of investigations that commenced after November 1, 2017.  MCSO is conducting monthly inspections of misconduct investigations in lieu of conducting a semi-annual audit.  MCSO has conducted two inspections of misconduct investigations; one for investigations that closed during the month of July 2018 and one for the investigations that closed during month of August 2018.  The reports have been made available to the public by way of MCSO's BIO website.  MCSO is in compliance with this Paragraph.

WAI 37150

### I.     Testing Program for Civilian Complaint Intake

***Paragraph 254.***   *The Sheriff shall initiate a testing program designed to assess civilian complaint intake.   Specifically, the testing program shall assess whether employees are providing civilians appropriate and accurate information about the complaint process and whether employees are notifying the Professional Standards Bureau upon the receipt of a civilian complaint.*

**Phase 1:**  Not in compliance

- Audits and Inspections Unit Operations Manual, Section 304, currently under revision.

- GH-4 (Bureau of Internal Oversight), most recently amended on October 30, 2018.

**Phase 2:**  Deferred

To meet the requirements of this Paragraph, AIU contracted with two vendors:  Progressive Management Resources (PMR), which is responsible for conducting complaint intake testing via telephone, email, U.S. Mail, and MCSO's website; and the Arizona Fair Housing Center (AFHC), which is responsible for conducting in-person tests.   We receive and review documentation of these tests – including any available audio-recorded documentation – as they are completed, as part of our monthly document requests.   PMR does not advise AIU of the tests in advance; instead, PMR emails AIU once a test has been completed with documentation of the test.

During this reporting period, PMR did not conduct any tests, due to a contract issue with Maricopa County; AFHC conducted one test.   In this test (conducted in September), the tester visited a District office to make a complaint about a deputy she observed driving in the high-occupancy vehicle lane and using a cell phone while driving on the highway.   Two MCSO employees met with her at the District office and asked several follow-up questions about what she observed.   The tester described both employees with whom she interacted as courteous and professional.   She noted in her documentation that while the employees did not advise her that the information about her complaint would be forwarded to a supervisor with her contact information, neither attempted to dissuade her from filing a complaint.

During the last reporting period, we were concerned with three completed tests – two tests conducted via telephone by PMR; one in-person test conducted by AFHC.   We inquired with MCSO during our October site visit to learn more about how AIU followed up on these tests.   Regarding the two telephone tests conducted by PMR, AIU responded, "[T]here was no follow-up action taken by AIU."   While AIU noted that it "did not believe a clear violation of policy occurred," AIU noted, "[T]he tester marked a box in their test forms that they felt the employees attempted to discourage them from filing a complaint."   AIU also noted that the revised relevant section (Section 304) of the Audits and Inspections Unit Operations Manual has been revised by MCSO, with input from the Monitoring Team and the Parties, to address such concerns.   In addition, AIU's forthcoming monthly inspection reports will examine and discuss any complete complaint intake tests, as well as any follow-up actions taken by AIU or MCSO.   According to AIU, "[A]fter the emphasis of employees not discouraging people from filing complaints was

WAI 37151

expressed, this component was added to the methodology for this inspection and will ensure that each test is reviewed for this factor." We will continue to review documentation of all complaint intake tests for discussion in future quarterly status reports.

For the in-person test conducted by AFHC, AIU noted, "[T]his resulted in the AIU authoring a memo of concern to the Professional Standard Bureau based upon concerns that the complaint was not accepted by the MCSO employee." AIU provided us with the memo of concern that summarized the complaint intake test, as well as the relevant provisions of GH-2 (Internal Investigations) and a notation that "it doesn't appear that this process was followed." This was the appropriate follow-up by AIU for this test; we will inquire with PSB during our upcoming site visit to determine what action, if any, the Bureau took in response.

We also encouraged MCSO to provide refresher training on the complaint process to all employees who interact with the public. AIU reports that it intends to work on this, and we will follow up on this issue during our upcoming site visit.

Earlier in 2018, we inquired with AIU personnel whether PMR and AFHC have deployed test complainants with Hispanic surnames. While the complaint intake testing Paragraphs do not specifically include this provision, the Plaintiffs' class in this case is the Latino population of Maricopa County. Following our April 2018 site visit, AIU personnel informed us that approximately one-third of the test complainants as of that time were lodged by complainants with Hispanic surnames – one of whom, as noted above, presented as a monolingual Spanish speaker. MCSO also advised us that it would "have internal discussion regarding the possibility of adding this aspect to the operations manual or the testing companies' manuals." We discussed this issue further with MCSO during our July site visit, and emphasized that the complaint intake testing process will have more credibility with the Plaintiffs' class in this case and the County at large if the testers represent the diverse communities of Maricopa County.

***Paragraph 255.*** *The testing program is not intended to assess investigations of civilian complaints, and the MCSO shall design the testing program in such a way that it does not waste resources investigating fictitious complaints made by testers.*

**Phase 1:** Not in compliance

- Audits and Inspections Unit Operations Manual, Section 304, currently under revision.
- GH-4 (Bureau of Internal Oversight), most recently amended on October 30, 2018.

**Phase 2:** Deferred

As noted above, AIU contracted with two vendors to meet the complaint intake testing requirements: Progressive Management Resources (PMR), which is responsible for conducting testing via telephone, email, U.S. Mail, and MCSO's website; and the Arizona Fair Housing Center (AFHC), which is responsible for conducting in-person tests.

WAI 37152

AIU has informed both vendors of this requirement.  AIU has created several procedures to ensure that the Complaint Intake Testing Program does not waste resources investigating fictitious complaints made by testers – including setting parameters for the types of inquiries that testers make, and creating official identification cards for testers designating them as such. For tests conducted by AFHC, the vendor responsible for in-person testing, AFHC has agreed to inform AIU in advance of all tests, and AIU personnel make themselves available via telephone if testers encounter any issue as they lodge their test complaints.

***Paragraph 256.***  *The testing program shall assess complaint intake for complaints made in person at MCSO facilities, complaints made telephonically, by mail, and complaints made electronically by email or through MCSO's website.  Testers shall not interfere with deputies taking law enforcement action.  Testers shall not attempt to assess complaint intake in the course of traffic stops or other law enforcement action being taken outside of MCSO facilities.*

**Phase 1:**  Not in compliance

- Audits and Inspections Unit Operations Manual, Section 304, currently under revision.
- GH-4 (Bureau of Internal Oversight), most recently amended on October 30, 2018.

**Phase 2:**  Deferred

As noted above, AIU contracted with two vendors to meet the complaint intake testing requirements:  Progressive Management Resources (PMR), which is responsible for conducting testing via telephone, email, U.S. Mail, and MCSO's website; and the Arizona Fair Housing Center (AFHC), which is responsible for conducting in-person tests.  AIU advised both vendors that testers shall not interfere with deputies taking law enforcement action, nor shall they attempt to assess complaint intake in the course of traffic stops or other law enforcement action being taken outside of MCSO facilities.

For tests conducted by AFHC, the vendor responsible for in-person testing, AFHC has agreed to inform AIU in advance of all tests, and AIU personnel make themselves available via telephone if testers encounter any issue as they lodge their test complaints.

***Paragraph 257.***  *The testing program shall include sufficient random and targeted testing to assess the complaint intake process, utilizing surreptitious video and/or audio recording, as permitted by state law, of testers' interactions with MCSO personnel to assess the appropriateness of responses and information provided.*

**Phase 1:**  Not in compliance

- Audits and Inspections Unit Operations Manual, Section 304, currently under revision.
- GH-4 (Bureau of Internal Oversight), most recently amended on October 30, 2018.

**Phase 2:**  Deferred

WAI 37153

As noted above, AIU contracted with two vendors to meet the complaint intake testing requirements: Progressive Management Resources (PMR), which is responsible for conducting testing via telephone, email, U.S. Mail, and MCSO's website; and the Arizona Fair Housing Center (AFHC), which is responsible for conducting in-person tests.

AIU has informed both vendors of the requirements of this Paragraph. We receive copies of the recordings following the completion of the tests. Per the agreed-upon methodology, PMR audio-records all testing conducted via telephone; and AFHC video-records all in-person testers' interactions with MCSO personnel to assess the appropriateness of responses and information provided.

***Paragraph 258.*** *The testing program shall also assess whether employees promptly notify the Professional Standards Bureau of civilian complaints and provide accurate and complete information to the Bureau.*

**Phase 1:** Not in compliance

- Audits and Inspections Unit Operations Manual, Section 304, currently under revision.
- GH-4 (Bureau of Internal Oversight), most recently amended on October 30, 2018.

**Phase 2:** Deferred

As noted above, AIU contracted with two vendors to meet the complaint intake testing requirements: Progressive Management Resources (PMR), which is responsible for conducting testing via telephone, email, U.S. Mail, and MCSO's website; and the Arizona Fair Housing Center (AFHC), which is responsible for conducting in-person tests.

AIU has informed both vendors of the requirements of this Paragraph so that the tests conducted by both vendors shall also assess whether employees promptly notify the PSB of civilian complaints and provide accurate and complete information to the Bureau.

***Paragraph 259.*** *MCSO shall not permit current or former employees to serve as testers.*

**Phase 1:** Not in compliance

- Audits and Inspections Unit Operations Manual, Section 304, currently under revision.
- GH-4 (Bureau of Internal Oversight), most recently amended on October 30, 2018.

**Phase 2:** Deferred

AIU has informed both vendors it has contracted with to conduct the tests of this requirement. AIU personnel have informed us that no current or former employees have served, or will be serving, as testers.

WAI 37154

***Paragraph 260.***  *The MCSO shall produce an annual report on the testing program.  This report shall include, at a minimum:*

a.  *a description of the testing program, including the testing methodology and the number of tests conducted broken down by type (i.e., in-person, telephonic, mail, and electronic);*

b.  *the number and proportion of tests in which employees responded inappropriately to a tester;*

c.  *the number and proportion of tests in which employees provided inaccurate information about the complaint process to a tester;*

d.  *the number and proportion of tests in which employees failed to promptly notify the Professional Standards Bureau of the civilian complaint;*

e.  *the number and proportion of tests in which employees failed to convey accurate information about the complaint to the Professional Standards Bureau;*

f.  *an evaluation of the civilian complaint intake based upon the results of the testing program; and*

g.  *a description of any steps to be taken to improve civilian complaint intake as a result of the testing program.*

**Phase 1:**  Not in compliance

- Audits and Inspections Unit Operations Manual, Section 304, currently under revision.

- GH-4 (Bureau of Internal Oversight), most recently amended on October 30, 2018.

**Phase 2:**  Not in compliance

AIU is developing a methodology for the process by which it will analyze the findings of the completed tests for the required annual report.  As it receives documentation about completed tests from its two vendors, AIU reviews the information; and issues Action Forms, authors memorandums of concern, or takes other appropriate action if a test fails or raises any concerns about the conduct of MCSO employees.

During our July site visit, and in a subsequent conference call, we discussed the requirements of this Paragraph further with AIU personnel.  Although Paragraph 260 requires that MCSO produce an annual report summarizing its complaint intake testing, AIU personnel have also elected to complete monthly reports.  AIU personnel are currently drafting methodology for the monthly and annual reports, and we look forward to discussing this further with AIU during our upcoming site visit.

WAI 37155

## Section 13: Community Outreach and Community Advisory Board

**COURT ORDER XVI.     COMMUNITY     OUTREACH     AND     COMMUNITY ADVISORY BOARD**

***Paragraph 261.*** *The Community Advisory Board may conduct or retain a consultant to conduct a study to identify barriers to the filing of civilian complaints against MCSO personnel.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

During this reporting period, the CAB continued to explore the possibility of retaining a consultant to conduct a study to identify barriers to the filing of civilian complaints against MCSO personnel, by researching polling firms that are experienced in working with Latino populations.

***Paragraph 262.*** *In addition to the administrative support provided for in the Supplemental Permanent Injunction, (Doc. 670 ¶ 117), the Community Advisory Board shall be provided with annual funding to support its activities, including but not limited to funds for appropriate research, outreach advertising and website maintenance, stipends for intern support, professional interpretation and translation, and out-of-pocket costs of the Community Advisory Board members for transportation related to their official responsibilities. The Community Advisory Board shall submit a proposed annual budget to the Monitor, not to exceed $15,000, and upon approval of the annual budget, the County shall deposit that amount into an account established by the Community Advisory Board for that purpose. The Community Advisory Board shall be required to keep detailed records of expenditures which are subject to review.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

The Amendments to the Supplemental Permanent Injunction/Judgment Order (Document 2100) issued on August 3, 2017 altered the composition of the Community Advisory Board (CAB) and CAB's responsibilities and relationship to MCSO. As of September 1, 2017, the CAB is comprised of five members – two selected by the Plaintiffs, two selected by MCSO, and one jointly selected.

During the last reporting period, the Monitor approved CAB's proposed budget. The budget includes the following categories: community meetings; video production (to produce a short video in English and Spanish that provides information about the CAB and the MCSO complaint process); marketing materials; stipends for an assistant to help coordinate CAB meeting logistics; and reimbursement for CAB members' meeting expenses.

WAI 37156

During this reporting period, the CAB established a bank account, and the County provided the $15,000. CAB members also developed procedures for tracking funds and receiving reimbursement.

During our upcoming site visit, we will meet with CAB members to discuss these procedures and review the CAB's expenditures to date.

WAI 37157

# Section 14: Supervision and Staffing

## COURT ORDER XVII.     SUPERVISION AND STAFFING

***Paragraph 263.*** *The following Section of this Order represents additions and amendments to Section X of the first Supplemental Permanent Injunction, Supervision and Evaluations of Officer Performance, and the provisions of this Section override any conflicting provisions in Section X of the first Supplemental Permanent Injunction.*

***Paragraph 264.*** *The Sheriff shall ensure that all patrol deputies shall be assigned to a primary, clearly identified, first-line supervisor.*

**Phase 1:**  In compliance

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed a sample of daily shift rosters for the three months of the reporting period.  For July and September, we reviewed rosters from Districts 1, 2, and 3.  For August, we reviewed rosters from Districts 4, 6, and 7, and Lake Patrol.  Our reviews of monthly and daily rosters indicated that deputies were assigned to a clearly identified supervisor, and that they worked the same schedules as their supervisors.

***Paragraph 265.*** *First-line patrol supervisors shall be responsible for closely and consistently supervising all deputies under their primary command.*

**Phase 1:**  In compliance

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

**Phase 2:**  Not in compliance

Paragraph 265 is a general directive that covers several aspects of supervision.  There are several requirements covered in other Paragraphs of this Order that directly impact this Paragraph; these requirements must be met before MCSO can establish compliance with Paragraph 265.  We have determined that MCSO is in compliance with Paragraphs 83, 85, 89, 90, and 93, as they relate to this Paragraph.  During this reporting period, MCSO failed to meet compliance standards for Paragraph 94.  Since MCSO has been in compliance with Paragraph 94, the compliance rating will be maintained for this reporting period.  However, failure to remain in compliance with Paragraph 94 will adversely affect the compliance rating for this Paragraph.  For MCSO to achieve compliance with this Paragraph, it must retain compliance with Paragraphs 83, 85, 89, 90, 93, and 94 and attain compliance with Paragraph 91.  During this reporting period, our reviews of documentation of traffic stops revealed that 26 of the 105

WAI 37158

stops had deficiencies that supervisors overlooked.  This is a compliance rate of 75%.  The number of deficiencies that supervisors miss in their reviews has decreased since our last quarterly status report, but the number still falls short of compliance standards.

***Paragraph 266.***  *First-line patrol supervisors shall be assigned as primary supervisor to no more persons than it is possible to effectively supervise.  The Sheriff should seek to establish staffing that permits a supervisor to oversee no more than eight deputies, but in no event should a supervisor be responsible for more than ten persons.  If the Sheriff determines that assignment complexity, the geographic size of a district, the volume of calls for service, or other circumstances warrant an increase or decrease in the level of supervision for any unit, squad, or shift, it shall explain such reasons in writing, and, during the period that the MCSO is subject to the Monitor, shall provide the Monitor with such explanations.  The Monitor shall provide an assessment to the Court as to whether the reduced or increased ratio is appropriate in the circumstances indicated.*

**Phase 1:**  In compliance

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

**Phase 2:**  In compliance

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters.  During this reporting period, for July, we reviewed a sample of shift rosters from Districts 1, 2 and 3; for August, we reviewed a sample of shift rosters from Districts 4, 6, and 7 and Lake Patrol; and for September, we reviewed a sample of shift rosters from Districts 1, 2, and 3.  Monthly and daily rosters indicated that deputies were assigned to one single consistent supervisor.  Of the 60 shifts we reviewed for this reporting period, all were in compliance.  There were 15 span of control memos generated during this reporting period, indicating that those shifts or part of those shifts exceeded the supervisor-deputy ratio of 1:8.  District 1 generated three span of control memos.  District 2 generated 10 span of control memos.  District 3 generated three span of control memos.  MCSO did not exceed the 1:10 supervisor-deputy ratio in any of the sample shifts inspected during this reporting period.

***Paragraph 267.***  *Supervisors shall be responsible for close and effective supervision of deputies under their command.  Supervisors shall ensure that all deputies under their direct command comply with MCSO policy, federal, state and local law, and this Court's orders.*

**Phase 1:**  In compliance

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

**Phase 2:**  Not in compliance

WAI 37159

Close and effective supervision requires that supervisors consistently apply the concepts established in several Paragraphs of the First Order.  There are requirements covered in other Paragraphs that directly impact Paragraph 267, and must therefore be in compliance for MCSO to establish compliance with this Paragraph.  During this reporting period, we found MCSO in compliance with Paragraphs 83, 85, 89, 90, and 93.  During this reporting period, MCSO failed to meet compliance standards for Paragraph 96.   Since MCSO was in compliance with Paragraph 96 in our last quarterly status report, the compliance rating will be maintained for this reporting period.  However, failure to remain in compliance with Paragraph 96 will adversely impact the compliance rating for this Paragraph.  For MCSO to achieve compliance with this Paragraph, it must remain in compliance with Paragraphs 83, 85, 89, 90, 93, and 96, and achieve compliance with Paragraph 91.

**Paragraph 268.**  *During the term that a Monitor oversees the Sheriff and the MCSO in this action, any transfer of sworn personnel or supervisors in or out of the Professional Standards Bureau, the Bureau of Internal Oversight, and the Court Implementation Division shall require advanced approval from the Monitor.  Prior to any transfer into any of these components, the MCSO shall provide the Court, the Monitor, and the parties with advance notice of the transfer and shall produce copies of the individual's résumé and disciplinary history.  The Court may order the removal of the heads of these components if doing so is, in the Court's view, necessary to achieve compliance in a timely manner.*

**Phase 1:**  Deferred

- Court Implementation Division Operations Manual, most recently amended on August 17, 2018.
- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:**  In compliance

During this reporting period, there were two transfers into the Bureau of Internal Oversight (BIO) and one transfer into the Professional Standards Bureau (PSB).  One of the supervisors transferred into BIO had an open Internal Affairs investigation.  We reviewed the justification memo that was submitted and determined that the transfer was in compliance with this Paragraph.  We reviewed the documentation for all three incoming transfers and noted no issues of concern.  During this reporting period, MCSO transferred one employee out of PSB and one employee out of BIO.  We reviewed the documentation submitted and found the transfers to meet the requirements of this Paragraph.

WAI 37160

## Section 15: Document Preservation and Production

**COURT ORDER XVIII.    DOCUMENT PRESERVATION AND PRODUCTION**

*Paragraph 269.    The Sheriff shall ensure that when the MCSO receives a document preservation notice from a litigant, the MCSO shall promptly communicate that document preservation notice to all personnel who might possibly have responsive documents.*

**Phase 1:**  In compliance

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), published on October 13, 2017.

**Phase 2:**  In compliance

To verify MCSO's Phase 2 compliance with this Paragraph, we reviewed monthly submittals of document preservation notices to MCSO employees for the reporting period.  We also reviewed a sample of cases during our July 2018 site visit to assess if MCSO is properly preserving documents that are requested in the course of litigation.

Document preservation is set in motion when a party sends a litigation hold notice or written directive to MCSO requesting the preservation of relevant documents or records and electronically stored information (ESI), in anticipation of future litigation against the agency. MCSO's Legal Liaison Section (LLS) manages litigation holds.  Upon the receipt of a litigation hold, which is usually sent by the Maricopa County Attorney's Office (MCAO), the LLS conducts an initial research to determine whether the request is something that LLS can provide or if LLS has to request it from an MCSO Division.  If the LLS requires documents from other MCSO Divisions, it must draft a Document Preservation Notice within five business days and address it to the required Division.  Upon receipt of the Document Preservation Notice, MCSO must identify responsive documents and also preserve them in the manner in which they are usually kept in the course of business.  During this reporting period, the LLS began using the online tool OpenAxes in order to manage the litigation holds.  The process is conducted electronically through the system so that the employees need only access the program to complete any forms and identify litigation holds of any responsive document.

During our October site visit, we reviewed a sample of the third-party source documents that generate the litigation holds that the LLS receives from MCAO.  The LLS identify possible document custodians through OpenAxes, who then receive the Document Preservation Notices. MCSO correctly conveys the information contained in the third-party source document into the Document Preservation Notices that are then forwarded to the employees in the different Divisions.  The Document Preservation Notices have been distributed 100% in a timely manner to employees who may have responsive documents.

WAI 37161

GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices) requires that the employee who receives a document preservation request complete two forms: Attachment A, Document Preservation Acknowledgment and Attachment B, Document Preservation Questionnaire.  Attachment A, the attestation, is due within five days of receipt; while Attachment B – which requires more in-depth information such as steps taken to search documents, the outcome of the search, and the itemization of the documents identified as responsive – is due within 10 days of receipt.  Attachment A was returned in a timely manner 93% of the time, a 3% increase since the last reporting period.  Attachment B was returned within established timeframes 91% of the time, consistent with the last reporting period.

During our October site visit, we reviewed completed copies of Attachment B, and found that 92% of them were properly completed.  We noted that the LLS intercepted the improperly completed forms and returned them for corrections.  We identified the following deficiencies on the forms: files that were missing Attachment A and/or Attachment B; and improper completion of Attachment B.  We discussed our observations with the LLS personnel during our October site visit, and commended them for identifying many deficiencies and returning the forms to the employees in a timely manner.

To prepare our assessment of this Paragraph, we also visited the Districts to assess their document preservation practices.  The Districts confirmed that they are now receiving requests for document preservations through OpenAxes; they continue to meet the requirements of GD-9 when they receive a document preservation hold.  For the most part, the Districts do not receive requests for production of documents, so there is little knowledge about the procedure to follow for those requests.

During the reporting period, MCSO submitted its final version of the GD-9 User Guide, which will more plainly set out deadlines, interchangeable terms, office requirements, helpful hints, the Division Commander and employees' responsibilities, and frequently asked questions and answers on the policy.


***Paragraph 270.***  *The Sheriff shall ensure that when the MCSO receives a request for documents in the course of litigation, it shall:*

a.    *promptly communicate the document request to all personnel who might possibly be in possession of responsive documents;*

b.    *ensure that all existing electronic files, including email files and data stored on networked drives, are sequestered and preserved through a centralized process; and*

c.    *ensure that a thorough and adequate search for documents is conducted, and that each employee who might possibly be in possession of responsive documents conducts a thorough and adequate search of all relevant physical and electronic files.*

**Phase 1:**  Not in compliance

WAI 37162

- GD-9 (Litigation Initiation, Document Preservation and Document Production Notices), published on October 13, 2017.

- GM-1 (Electronic Communications, Data, and Voice Mail), most recently amended on May 24, 2018.

- OpenAxes Operations Manual, not yet drafted.

**Phase 2:** Deferred

To verify MCSO's Phase 2 compliance with this Paragraph, we reviewed monthly submittals of requests for documents to MCSO employees for the reporting period and documents drafted by the LLS in search of documents from other Divisions of the agency. For this reporting period, we identified a sample of document requests and requested a copy of the responsive documents sequestered and/or produced.

Paragraph 270.a. requires prompt communication of document requests to all personnel who might possibly be in possession of responsive documents. GD-9 requires the LLS to enter the data into a tracking system within five business days and to draft a Document Production Notice within five additional business days. The LLS is required, within five business days, to respond to the request for production if sourced within LLS, or to forward to the required MCSO Division for production.

This procedure will be completed through the OpenAxes software. OpenAxes allows for a more expedient search by the LLS of possible custodians who may have responsive documents to preservation holds or document requests and a faster return of the acknowledgement forms. The system seems easy to navigate and encompasses simple tasks so that the custodians can fill out the forms and identify responsive documents. A number of system malfunctions have occurred that required the LLS to return to the manual system in order to allow the outside vendor to make corrections. The main issue has been slow system response times, as well as duplicative notices being sent out to custodians. MCSO has confirmed that it continues to work with the vendor and the Technology Management Bureau to correct any deficiencies.

Our review revealed that MCSO is forwarding the Document Production Notices in a timely manner to all of its Divisions. In addition, MCSO is sending Attachment C, the Document Production Acknowledgement Questionnaire, to all employees. In 92% of the cases, the personnel who provided responsive documents properly completed Attachment C; this reflects a 1% increase from the last reporting period.

Paragraph 270.b. requires that all responsive ESI be stored, sequestered, and preserved by MCSO through a centralized process. MCSO now performs the searches through a centralized process through OpenAxes. The preservation of the data is completed at the Division that has the actual document while the notation is made in the OpenAxes program, which performs case management. LLS can now create a case, assign a case number, make associations with other cases, and trigger time alerts to the custodians of documents that they identify through the system. OpenAxes searches on the H, W, and U computer hard drives of MCSO, which are shared among Headquarters and the Districts.

During our January 2018 site visit, MCSO informed us that OpenAxes would be in its pilot phase in the LLS by March 2018. During our July site visit, we learned that the start date has been delayed due to indexing procedures and that the program would be operational by the end of July 2018. During our October 2018 site visit, we learned that only a handful of cases had been managed through the system for this reporting period. MCSO indicated that with any new software, glitches in the system would arise as it continues to be used. Any software malfunction is referred to the Technology Management Bureau and the vendor, who work to address it. Once the software is fully operational, MCSO will develop an OpenAxes Operations Manual outlining the protocols and procedures for the centralized process of document preservation, and make any necessary amendments to GD-9 following the deployment of the software.

Paragraph 270.c. requires that MCSO conduct an adequate search for documents, and that each employee who might possibly be in possession of responsive documents conducts a thorough and adequate search of all relevant physical and electronic files. We reviewed a sample of responsive documents for this reporting period, and MCSO identified responsive documents to the document production notices in all of the cases we reviewed.

***Paragraph 271.*** *Within three months of the effective date of this Order, the Sheriff shall ensure that the MCSO Compliance Division promulgates detailed protocols for the preservation and production of documents requested in litigation. Such protocols shall be subject to the approval of the Monitor after a period of comment by the Parties.*

**Phase 1:** In compliance

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), published on October 13, 2017.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.

**Phase 2:** In compliance

On June 25, 2018, MCSO published the Compliance Division Operations Manual, which details the protocols for the preservation and production of documents requested in litigation.

WAI 37164

**Paragraph 272.** *The Sheriff shall ensure that MCSO policy provides that all employees must comply with document preservation and production requirements and that violators of this policy shall be subject to discipline and potentially other sanctions.*

**Phase 1:**  In compliance

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), published on October 13, 2017.

 **Phase 2:**  In compliance

No internal investigations were completed against any MCSO employee during this reporting period for failure to preserve or produce documents.

WAI 37165

## Section 16: Additional Training

**COURT ORDER XIX.        ADDITIONAL TRAINING**

***Paragraph 273.*** *Within two months of the entry of this Order, the Sheriff shall ensure that all employees are briefed and presented with the terms of the Order, along with relevant background information about the Court's May 13, 2016 Findings of Fact, (Doc. 1677), upon which this Order is based.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

MCSO previously delivered this training on the E-Policy platform.  All personnel (100%) determined to be applicable by CID have received this training.

WAI 37166

# Section 17: Complaints and Misconduct Investigations Relating to Members of the Plaintiff Class

**COURT ORDER XX.    COMPLAINTS AND MISCONDUCT INVESTIGATIONS RELATING TO MEMBERS OF THE PLAINTIFF CLASS**

*Paragraph 274.   In light of the Court's finding that the MCSO, and in particular Sheriff Arpaio and Chief Deputy Sheridan, willfully and systematically manipulated, misapplied, and subverted MCSO's employee disciplinary policies and internal affairs processes to avoid imposing appropriate discipline on MCSO deputies and command staff for their violations of MCSO policies with respect to members of the Plaintiff class, the Court further orders as follows:*

*A.      Investigations to be Overseen and/or Conducted by the Monitor*

*Paragraph 275.   The Monitor is vested with the authority to supervise and direct all of the MCSO's internal affairs investigations pertaining to Class Remedial Matters.  The Monitor is free from any liability for such matters as is set forth in ¶ 144 of the Supplemental Permanent Injunction.*

*Paragraph 276.   The Monitor shall have the authority to direct and/or approve all aspects of the intake and investigation of Class Remedial Matters, the assignment of responsibility for such investigations including, if necessary, assignment to his own Monitor team or to other independent sources for investigation, the preliminary and final investigation of complaints and/or the determination of whether they should be criminally or administratively investigated, the determination of responsibility and the imposition of discipline on all matters, and any grievances filed in those matters.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

The Second Order requires oversight by the Monitor for all internal investigations determined to be Class Remedial Matters (CRMs).  The Professional Standards Bureau (PSB) holds a weekly meeting to discuss existing and incoming complaints to determine which, if any, could be CRMs.  During these meetings, PSB personnel discuss cases pending a CRM decision, cases determined to be CRMs, and any cases where the decision may be made that the case would not be classified as a CRM.  The PSB Commander determines the classification of the cases.  A member of our Team attends all of these meetings to provide the oversight required for this Paragraph.

WAI 37167

At the end of the July-September 2016 reporting period, PSB had reviewed 442 administrative investigations that were open as of July 20, 2016; and determined that 42 of them met the basic criteria for CRMs.  These cases were reviewed during the weekly CRM meetings.  In addition, a Monitoring Team member randomly selected an additional 52 cases from the 400 remaining pending cases; and concurred with PSB's assessment that the cases did not meet the basic criteria for CRMs.  In addition to the 42 cases determined to be potential CRMs from the pending case list as of July 20, 2016, PSB identified an additional 10 cases that were potential CRM cases.  At the end of the first reporting period after the Court's Second Order, nine cases had been determined to be CRMs; and one other was pending a CRM decision.  The remaining cases reviewed were determined not to be CRMs.

At the end of the last reporting period, PSB had reviewed a total of 201 cases since August 2016.  Of these, 45 had been classified as CRMs.

During this reporting period, an additional 25 cases were reviewed as possible CRMs.  Of these, one was determined to be a CRM.  As of the end of this reporting period, there are a total of 226 cases that have been reviewed and 46 cases that have been determined to be CRMs since the July 20, 2016 Court Order.

Since July 20, 2016, MCSO has completed a total of 38 CRM cases, including three during this reporting period.  In those cases closed during this reporting period, one was sustained for misconduct related to search and seizure.  The involved deputy received a 16-hour suspension and has attended multiple training sessions since this incident.  In the second case, a deputy had sustained misconduct related to the failure to activate his BWC, but resigned prior to the imposition of any discipline.  In the third case, involving a Detention employee, an allegation of an inappropriate racial comment being made was not sustained.  Our Team approved the investigation, findings, and, where appropriate, the discipline, in all three of these cases.

Of the 19 CRM cases that have been closed to date with findings of sustained misconduct and reviewed by our Team, nine have involved employees who are deceased or left MCSO employment prior to the completion of the investigation or the disciplinary process.  Ten involve current employees of MCSO.  Only one of these 10 cases involved a sustained finding of misconduct involving bias related to the Plaintiffs class: a sustained allegation of an inappropriate and biased comment.

During the weekly meetings, case investigators continue to provide investigative updates on all cases that could be, or are, CRMs.  Their briefings are thorough, and they continue to be responsive to any questions or input from members of our Team.  In all cases where we have provided oversight since July 20, 2016, we have concurred with the decisions made by the PSB Commander regarding the case classifications and findings.  Where appropriate, we have also approved the discipline in all of these cases.

WAI 37168

***Paragraph 277.*** *This authority is effective immediately and shall remain vested in the Monitor until the MCSO's internal affairs investigations reach the benchmarks set forth in ¶ 288 below. With respect to Class Remedial Matters, the Monitor has plenary authority, except where authority is vested in the Independent Investigative and Disciplinary Authorities separately appointed by the Court, as is further set forth in ¶¶ 296–337 below.*

***Paragraph 278.*** *The Sheriff shall alert the Monitor in writing to all matters that could be considered Class Remedial Matters, and the Monitor has the authority to independently identify such matters. The Monitor shall provide an effective level of oversight to provide reasonable assurance that all Class Remedial Matters come to his attention.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

Since the first CRM meeting held on August 17, 2016, PSB has consistently completed the required notification to us regarding the cases that could be considered CRMs. A Monitoring Team member has attended every CRM meeting with PSB where these matters are discussed and personally reviewed a number of the cases that were pending on July 20, 2016; and our Team member reviews the new cases that are presented each week. There has been no need for us to independently identify CRMs, as PSB consistently properly identifies and reports these cases as required.

***Paragraph 279.*** *The Monitor shall have complete authority to conduct whatever review, research, and investigation he deems necessary to determine whether such matters qualify as Class Remedial Matters and whether the MCSO is dealing with such matters in a thorough, fair, consistent, and unbiased manner.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

During the weekly CRM meetings attended by a Monitoring Team member, PSB has consistently properly identified cases that could be, or are, CRMs. PSB personnel brief each case during the weekly meetings, and their briefings include all appropriate information. They have been responsive to any questions from our Team members during the meetings, and have responded appropriately to any suggestions we have raised. There has been no need for us to independently conduct any review, research, or investigation; as PSB is consistently properly identifying and investigating these cases.

WAI 37169

*Paragraph 280.   The Monitor shall provide written notice to the Court and to the parties when he determines that he has jurisdiction over a Class Remedial Matter.  Any party may appeal the Monitor's determination as to whether he has jurisdiction over a Class Remedial Matter to this Court within seven days of the Monitor's notice.  During the pendency of any such appeal the Monitor has authority to make orders and initiate and conduct investigations concerning Class Remedial Matters and the Sheriff and the MCSO will fully comply with such action by the Monitor.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

During this reporting period, cases involving both sworn and non-sworn members of MCSO have continued to be reviewed as possible CRMs, when appropriate.  There were no appeals by any Parties regarding any of the CRM classifications.


*Paragraph 281.   Subject to the authority of the Monitor, the Sheriff shall ensure that the MCSO receives and processes Class Remedial Matters consistent with: (1) the requirements of this Order and the previous orders of this Court, (2) MCSO policies promulgated pursuant to this Order, and (3) the manner in which, pursuant to policy, the MCSO handles all other complaints and disciplinary matters.  The Sheriff will direct that the Professional Standards Bureau and the members of his appointed command staff arrive at a disciplinary decision in each Class Remedial Matter.*

**Phase 1:**  Not in compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:**  In compliance

To evaluate Phase 2 compliance with this Paragraph, a Monitoring Team member has attended each weekly meeting conducted by PSB to discuss Class Remedial Matters.   PSB has consistently provided thorough briefings, and the PSB Commander has made appropriate decisions regarding these matters.

WAI 37170

During this reporting period, PSB completed and closed three CRM cases. We concurred with, and approved, all allegations; policy violations; findings; and if sustained, the discipline; for all of these cases. The case reports we reviewed were consistent with the briefings that had been provided during the weekly CRM meetings. PSB investigators continue to conduct appropriate follow-up on these cases, expend extensive efforts to locate and contact all involved parties and witnesses, and provided detailed information concerning the allegations and the justifications for findings in their investigative reports.

One of the three cases closed this reporting period was properly not sustained as there was inadequate information or evidence to determine if the misconduct had occurred. Two cases resulted in sustained allegations of misconduct. In one of the sustained cases, the employee left MCSO employment prior to the completion of the investigation. As required, PSB completed the investigation despite the resignation and appropriately sustained an allegation of misconduct. In the third case, the involved employee received a suspension for the sustained misconduct, and also attended multiple training sessions to improve his understanding of relevant law and policies.

**Paragraph 282.** *The Sheriff and/or his appointee may exercise the authority given pursuant to this Order to direct and/or resolve such Class Remedial Matters, however, the decisions and directives of the Sheriff and/or his designee with respect to Class Remedial Matters may be vacated or overridden in whole or in part by the Monitor. Neither the Sheriff nor the MCSO has any authority, absent further order of this Court, to countermand any directions or decision of the Monitor with respect to Class Remedial Matters by grievance, appeal, briefing board, directive, or otherwise.*

**Phase 1:** Not in compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.
- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.
- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:** In compliance

There were no CRM cases completed during this, or previous reporting periods, in which the Sheriff and/or his appointee exercised their authority to resolve CRMs, which we needed to vacate or override.

WAI 37171

***Paragraph 283.***   *The Monitor shall review and approve all disciplinary decisions on Class Remedial Matters.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

At the end of this reporting period, MCSO has closed a total of 38 CRM cases since July 20, 2016.  Nineteen have resulted in sustained findings.  Six had sustained findings on two separate deputies who are deceased, and three involved sustained findings on deputies who left MCSO employment prior to the determination of discipline.  Ten have resulted in sustained findings against current deputies.  In all of the sustained cases, we have reviewed and approved all of the disciplinary decisions.

***Paragraph 284.***   *The Sheriff and the MCSO shall expeditiously implement the Monitor's directions, investigations, hearings, and disciplinary decisions.  The Sheriff and the MCSO shall also provide any necessary facilities or resources without cost to the Monitor to facilitate the Monitor's directions and/or investigations.*

**Phase 1:**  Not in compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:**  In compliance

During this, and previous reporting periods, a Monitoring Team member attended all weekly CRM meetings conducted in an appropriate location determined by MCSO.  PSB continues to provide a password and access to the IAPro system to a member of our Team so that we can complete independent case reviews if necessary.

PSB personnel continue to be professional and responsive to all input, questions, or concerns we have raised.

WAI 37172

***Paragraph 285.***  *Should the Monitor decide to deviate from the Policies set forth in this Order or from the standard application of the disciplinary matrix, the Monitor shall justify the decision in writing and place the written explanation in the affected employee's (or employees') file(s).*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

At of the end of this reporting period, there are a total of 19 CRM cases with sustained findings. Six had sustained findings on two separate deputies who are deceased, and three involved deputies who left MCSO employment prior to the determination of discipline.  Ten cases involved sustained findings against current MCSO employees.  All of these 10 cases have resulted in appropriate sanctions based on MCSO policy and the Discipline Matrices in effect at the time the investigations were conducted.  No action by us has been necessary relative to this Paragraph.

***Paragraph 286.***  *Should the Monitor believe that a matter should be criminally investigated, he shall follow the procedures set forth in ¶¶ 229–36 above.  The Commander of the Professional Standards Bureau shall then either confidentially initiate a Professional Standards Bureau criminal investigation overseen by the Monitor or report the matter directly and confidentially to the appropriate prosecuting agency.  To the extent that the matter may involve the Commander of the Professional Standards Bureau as a principal, the Monitor shall report the matter directly and confidentially to the appropriate prosecuting agency.  The Monitor shall then coordinate the administrative investigation with the criminal investigation in the manner set forth in ¶¶ 229–36 above.*

**Phase 1:**  Not in compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:**  In compliance

During this reporting period, there was one CRM case where PSB determined that a criminal misconduct investigation should also be conducted.  We agree with the decision by PSB.  We did not identify any other CRM where we believe a criminal investigation should be initiated. No action on our part relative to this Paragraph has been necessary.

WAI 37173

***Paragraph 287.*** *Any persons receiving discipline for any Class Remedial Matters that have been approved by the Monitor shall maintain any right they may have under Arizona law or MCSO policy to appeal or grieve that decision with the following alterations:*

a.  *When minor discipline is imposed, a grievance may be filed with the Sheriff or his designee consistent with existing MCSO procedure. Nevertheless, the Sheriff or his designee shall immediately transmit the grievance to the Monitor who shall have authority to and shall decide the grievance. If, in resolving the grievance, the Monitor changes the disciplinary decision in any respect, he shall explain his decision in writing.*

b.  *disciplined MCSO employee maintains his or her right to appeal serious discipline to the Maricopa County Law Enforcement Merit System Council to the extent the employee has such a right. The Council may exercise its normal supervisory authority over discipline imposed by the Monitor.*

**Phase 1:** In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.
- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.
- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:** In compliance

Nineteen completed CRM cases have had sustained findings of misconduct since the issuance of the Second. We concurred with MCSO's decision in all of these cases.

During this reporting period, there were no grievances or appeals filed on discipline received by employees on any sustained CRM case.


***Paragraph 288.*** *The Monitor's authority over Class Remedial Matters will cease when both:*

a,  *The final decision of the Professional Standards Bureau, the Division, or the Sheriff, or his designee, on Class Remedial Matters has concurred with the Monitor's independent decision on the same record at least 95% of the time for a period of three years.*

b.  *The Court determines that for a period of three continuous years the MCSO has complied with the complaint intake procedures set forth in this Order, conducted appropriate internal affairs procedures, and adequately investigated and adjudicated all matters that come to its attention that should be investigated no matter how ascertained, has done so consistently, and has fairly applied its disciplinary policies and matrices with respect to all MCSO employees regardless of command level.*

**Phase 1:** Not applicable

WAI 37174

**Phase 2:**  In compliance

During this and prior reporting periods, we and PSB have agreed on the investigative outcome of each CRM investigation completed.

PSB is responsible for the investigation of all CRM cases, and has continued to appropriately identify cases that could be, or are, CRMs.  PSB personnel are professional in our contacts with them and responsive to any concerns or questions we have raised; and they provide detailed information and updates in their weekly briefings.  Their written reports are thoroughly prepared, and the reports have been consistent with the information provided during the weekly case briefings.

***Paragraph 289.*** *To make the determination required by subpart (b), the Court extends the scope of the Monitor's authority to inquire and report on all MCSO internal affairs investigations and not those merely that are related to Class Remedial Matters.*

**Phase 1:**  Not in compliance

- CP-2 (Code of Conduct), most recently amended on May 9, 2018.
- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on April 10, 2018.
- CP-5 (Truthfulness), most recently amended on October 24, 2017.
- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.
- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.
- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.
- Professional Standards Bureau Operations Manual, currently under development.

**Phase 2:**  Not in compliance

During the last reporting period, we reviewed a total of 53 internal investigations.  All but two were both initiated and completed after the issuance of the Second Order.  We reviewed 48 administrative misconduct investigations and five criminal misconduct investigations.  All five (100%) of the criminal investigations were in compliance with the Second Order requirements, and 35 (73%) of the 48 administrative misconduct investigations were in compliance.  We found MCSO in compliance with all Second Order requirements in 37 (75%) of the 53 investigations.

During this reporting period, we reviewed 61 misconduct investigations.  Fifty-six were administrative investigations and five were criminal investigations.  All five of the criminal

WAI 37175

investigations were in compliance.  Of the 56 administrative investigations, 41 (73%) were in full compliance.  There were no completed investigations submitted for Paragraphs 249 (investigatory stops).  One investigation was submitted for Paragraph 33 (Bias Policing) and was found to be non-compliant.  Three investigations were submitted under Paragraph 275 (CRMs) and all three were in compliance.  Investigations conducted by PSB sworn personnel were compliant in 88% of the cases.  PSB investigations conducted by Detention personnel were compliant in 77% of the cases.  Those conducted by Divisions and Districts outside of PSB were compliant in 61% of the cases.  The above findings are based on the investigative and administrative actions by the investigators and the decisions of the PSB Commander.  Overall compliance for the 61 investigations was 75%.

The overall percentage of administrative misconduct cases that were fully compliant did not increase during this reporting period.  However, we again noted that even those cases found non-compliant did not generally contain multiple serious deficiencies as we have noted in the past.  We continue to note that the overall investigative quality has improved in both PSB and in the Districts and Divisions.  While MCSO still falls short of compliance, there continues to be evidence of improvement.

During our next site visit, we will discuss overall compliance and the concerns we identified with PSB and District and Division personnel, and provide them with specific case examples.

Effective with the revisions to internal affairs and discipline policies on May 18, 2017, the PSB Commander may now determine that a received complaint can be classified as a "service complaint" if certain specified criteria exists.  Service complaint documentation must then be completed and will be reviewed under this Paragraph.

MCSO handled 64 service complaints during the last reporting period.  We concurred with their handling of 60 of these complaints.  We noted that MCSO properly reclassified four complaints to administrative misconduct investigations after their review.  Of the remaining 50, we found that in 49, MCSO properly completed service complaints.  In one case, we disagreed with the final classification of service complaint and believe that MCSO should have conducted an administrative investigation.  MCSO was in 98% compliance with this requirement for this reporting period.

During this reporting period, we reviewed 15 service complaints completed by MCSO.  Two were properly reclassified to administrative misconduct investigations after review by PSB.  The remaining 13 were handled as service complaints.  Two (15%) of these 13 complaints were determined not to involve MCSO personnel.  Eleven (85%) involved complaints regarding laws, MCSO policies and procedures; or they involved other contacts from the public that did not include allegations of employee misconduct.  We concur with MCSO's handling of 12 of the 13 cases classified as service complaints.  In one case, while employee misconduct may not have occurred, the complainant was clearly alleging misconduct and an administrative misconduct investigation should have been initiated.  We continue to find that PSB is generally handling these service complaints in an appropriate manner.

WAI 37176

Effective with the revisions to the internal affairs and discipline policies, the PSB Commander is now authorized to determine that an internal complaint of misconduct does not necessitate a formal investigation if certain criteria exist.  The PSB Commander's use of this discretion will also be reported in this Paragraph.  No such incidents occurred during this or previous reporting periods.

**Paragraph 290.**  *This requirement is necessitated by the Court's Findings of Fact that show that the MCSO manipulates internal affairs investigations other than those that have a direct relation to the Plaintiff class.  The Court will not return the final authority to the Sheriff to investigate matters pertaining to members of the Plaintiff class until it has assurance that the MCSO uniformly investigates misconduct and applies appropriate, uniform, and fair discipline at all levels of command, whether or not the alleged misconduct directly relates to members of the Plaintiff Class.*

**Paragraph 291.**  *The Monitor shall report to the Court, on a quarterly basis, whether the MCSO has fairly, adequately, thoroughly, and expeditiously assessed, investigated, disciplined, and made grievance decisions in a manner consistent with this Order during that quarter.  This report is to cover all internal affairs matters within the MCSO whether or not the matters are Class Remedial Matters.  The report shall also apprise the Court whether the MCSO has yet appropriately investigated and acted upon the misconduct identified in the Court's Findings of Fact, whether or not such matters constitute Class Remedial Matters.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

This report, including all commentary regarding MCSO's compliance with investigative and disciplinary requirements, serves as our report to the Court on these matters.  An overall summary of our compliance observations and findings is provided here.

During this reporting period, we reviewed 56 administrative misconduct investigations and five criminal misconduct investigations.  All five criminal investigations were in full compliance with the Second Order.  Of the 56 administrative investigations we reviewed, 73% were in full compliance with the Second Order.  MCSO's overall compliance for both administrative and criminal investigations was 75%.

During the period of July-December 2016, PSB provided us with a memorandum describing PSB's efforts in meeting the requirements of this Paragraph related to the Court's Findings of Fact.  MCSO had outsourced three cases to another law enforcement agency, and an additional four investigations were pending outsourcing to an outside investigator.  These cases were outsourced due to the involvement of the former Chief Deputy, or other conflicts of interest identified by MCSO, and included the investigations identified in Paragraph 300.  MCSO processed a Request for Proposal and retained an outside investigator who met the requirements

WAI 37177

of Paragraphs 167.iii. and 196 to conduct the investigations identified. One potential misconduct case identified in the Court's Findings of Fact was retained and investigated by PSB, as no identifiable conflict of interest appeared to exist.

PSB provided us with a document sent by the Independent Investigator assigned by the Court to investigate, or reinvestigate, some of the misconduct that is related to the Plaintiffs' class. In this document, the Independent Investigator clarified his intent to investigate the matters assigned to him by the Court, as well as the matters that the Court determined were the discretion of the Independent Investigator. He further clarified that his investigations would include the initial misconduct alleged, as well as any misconduct that might have occurred during the process of review or issuance of discipline by MCSO personnel.

During each site visit, we meet with PSB personnel to discuss the status of those cases that have been outsourced to any contract vendor, other law enforcement agency, or other person or entity, so that we can continue to monitor these investigations and ensure that all misconduct cases, including those identified in the Findings of Fact, are thoroughly investigated. PSB has continued to keep us apprised of the status of all such investigations.

During our January 2018 site visit, PSB advised us that the two administrative misconduct investigations that had been outsourced to a separate law enforcement agency had been completed and closed. We received and reviewed both investigations. A third investigation that MCSO outsourced to this same law enforcement agency had been previously returned to MCSO without investigation, as the allegations duplicated those already under investigation by the Independent Investigator. MCSO outsourced six additional investigations to the contract investigator.

During our April and July 2018 site visits, PSB advised us that no additional investigations had been outsourced to the contract vendor. There were no cases completed and submitted for our review that had been investigated by this investigator. The Independent Investigator continued investigations identified by the Court, and notified us of the status of these cases on a regular basis. We also receive closed investigations that he completed.

During our October 2018 site visit, PSB advised us that no additional investigations were outsourced to the contract vendor. This investigator has now completed six investigations and forwarded them to PSB. They are currently being reviewed by PSB personnel prior to forwarding them to our Team.

The Independent Investigator continues investigations identified by the Court. To date, we have reviewed eight investigations he has conducted, including one that was completed this reporting period. We have reviewed these cases, only to ensure that the misconduct identified by the Court is being addressed.

WAI 37178

*Paragraph 292.   To make this assessment, the Monitor is to be given full access to all MCSO internal affairs investigations or matters that might have been the subject of an internal affairs investigation by the MCSO.   In making and reporting his assessment, the Monitor shall take steps to comply with the rights of the principals under investigation in compliance with state law.   While the Monitor can assess all internal affairs investigations conducted by the MCSO to evaluate their good faith compliance with this Order, the Monitor does not have authority to direct or participate in the investigations of or make any orders as to matters that do not qualify as Class Remedial Matters.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

PSB personnel continue to inform us of ongoing criminal and administrative misconduct investigations.   A member of our Team attends each weekly CRM meeting, reviews the lists of new internal investigations, and has access to the PSB IAPro database.   The only cases for which any oversight occurs during the investigative process are those that are determined to be CRMs.   We review all other misconduct investigations once they are completed, reviewed, and approved by MCSO personnel.


*Paragraph 293.   The Monitor shall append to the quarterly reports it currently produces to the Court its findings on the MCSO's overall internal affairs investigations.   The parties, should they choose to do so, shall have the right to challenge the Monitor's assessment in the manner provided in the Court's previous Order.  (Doc. 606 ¶¶ 128, 132.)*

Phase 1:  Not applicable

**Phase 2:**  Not applicable

Since we began reviewing internal investigations conducted by MCSO more than three years ago, we have reviewed hundreds of investigations into alleged misconduct by MCSO personnel. As noted in our previous quarterly status reports and elsewhere in this report, we continue to note concerns with internal investigations, but have also noted many improvements.

All five of the criminal misconduct investigations that we reviewed for this reporting period were investigated by PSB and complied with the Second Order requirements.

PSB conducted 38 of the 56 total administrative misconduct investigations we reviewed this reporting period.   PSB's overall compliance rate for the investigative and administrative requirements of the investigations was 82%.  This is a decrease from the 86% compliance the last reporting period.   Sworn investigators conducted 16 of these investigations.   Fourteen (88%) were in compliance with all investigative and administrative requirements for which the PSB Commander has authority.   This is the same percentage of compliance as the last reporting period.   Twenty-two investigations were completed by Detention personnel assigned to PSB. Seventeen (77%) of the 22 were in compliance.   This is a decrease in compliance from 82% the last reporting period.

WAI 37179

The concerns we identified in PSB investigations include: three administrative errors; two failures to address policy issues identified; one investigation that did not address all potential misconduct: and one investigation where we believe a finding of sustained should have been made and was not.  Despite the deficiencies we identified this reporting period, and the decrease in overall compliance in PSB cases, we continue to believe that PSB continues to complete thorough investigations and the quality of these investigations continues to improve.

Of the 18 cases investigated outside of PSB, 11 (61%) complied with Second Order requirements.  This is a decrease from the 65% compliance finding the last reporting period.  Those investigations conducted outside of PSB that were found not compliant still contain both qualitative and administrative documentation concerns as has been noted throughout this report.  We again note that, in most cases, the deficiencies and errors we have found should have been identified prior to them being forwarded to PSB for review.  We also note that again this reporting period the most significant concerns we found were in those cases that were initiated prior to the 40-hour Misconduct Investigative Training.  Of the 12 cases initiated and completed prior to the Misconduct Investigative Training, six (50%) were in compliance.  Of the six completed after the training, five (83%) were in compliance.

For the 56 administrative misconduct investigations we reviewed for this reporting period, MCSO's overall compliance was 75%.  This overall compliance finding takes into account multiple factors.  As we have noted throughout this report, investigators, reviewers, command personnel, and the final decision makers all impact the compliance for each case.

MCSO completed delivery of the 40-hour Misconduct Investigative Training at the end of 2017, and all sworn supervisors who investigate administrative misconduct attended the training.  During our site visit meetings and District visit meetings in October 2018, we continued to receive positive feedback on the training and District command personnel told us that they believe that investigations completed by their personnel are continuing to improve.  We agree with this assessment; and our review of a limited number of investigations completed after January 1, 2018, continues to indicate that the training is producing the desired outcome and that there is additional improvement in the quality of investigations.

PSB personnel continue to be receptive to our input, and we have had many productive meetings and discussions regarding the investigations being conducted.  We continue to note that PSB addresses issues we raise during our site visit meetings.   The quality of the investigations conducted and overall compliance, though slow in some cases, continues to improve.  We continue to stress that compliance is not the sole responsibility of any one individual or Division – but dependent on all those who complete, review, or approve internal investigations.

We have noted in numerous previous reporting periods that MCSO's executive leadership must take the appropriate actions to ensure that adequate resources are dedicated to the completion of administrative and criminal misconduct investigations.  MCSO informed us during our July 2018 site visit that efforts were being made to increase staffing, both in PSB and in MCSO as a whole.  We have also noted in numerous reporting periods that the executive leadership must

WAI 37180

provide appropriate oversight and support for the personnel who conduct these investigations. The documents we are now receiving from MCSO on a monthly basis continue to indicate that MCSO Command personnel are now noting, documenting, and taking corrective actions when incomplete or deficient investigations are completed or approved by their personnel.  While MCSO is not in compliance with a number of the requirements for the completion of internal investigations, we note that efforts are being made to address the obstacles to reaching compliance.

### B.      Investigations to be Conducted by the Independent Investigator and the Independent Disciplinary Authority

***Paragraph 294.***  *In its Findings of Fact, (Doc. 1677), the Court identified both: (1) internal affairs investigations already completed by the MCSO that were inadequate or insufficient; (see, e.g., Doc. 1677 at ¶ 903), and (2) misconduct or alleged misconduct that had never been investigated by MCSO that should be or should have been investigated.  (Id. at ¶ 904.)*

***Paragraph 295.***  *In light of MCSO's failure to appropriately investigate these matters, the Court appoints an Independent Investigator and an Independent Disciplinary Authority from the candidates set forth by the parties, and vests them with the authority to investigate and decide discipline in these matters.*

### 1.      The Independent Investigator

***Paragraph 298.***  *In assessing the existence of previously uncharged acts of misconduct that may be revealed by the Findings of Fact, the Independent Investigator does not have authority to investigate acts of misconduct that are not sufficiently related to the rights of the members of the Plaintiff class.  While the Independent Investigator should identify such acts of misconduct and report those acts to the Commander of the Professional Standards Bureau, and to the Monitor for purposes of making the Monitor's assessment identified in ¶¶ 291–93 above, the Independent Investigator may not independently investigate those matters absent the authorization and the request of the Sheriff.*

WAI 37181

***Paragraph 300.***   *The following potential misconduct is not sufficiently related to the rights of the members of the Plaintiff class to justify any independent investigation:*

a.    *Uninvestigated untruthful statements made to the Court under oath by Chief Deputy Sheridan concerning the Montgomery investigation.  (Doc. 1677 at ¶ 385).*

b.    *Uninvestigated untruthful statements made to the Court under oath by Chief Deputy Sheridan concerning the existence of the McKessy investigation.  (Id. at ¶ 816).*

c.    *Chief Deputy Sheridan's untruthful statements to Lieutenant Seagraves made during the course of an internal investigation of Detective Mackiewicz to the effect that an investigation into the overtime allegations against Detective Mackiewicz had already been completed.  (Id. at ¶ 823).*

d.    *Other uninvestigated acts of misconduct of Chief Deputy Sheridan, Captain Bailey, Sergeant Tennyson, Detective Zebro, Detective Mackiewicz, or others that occurred during the McKessy investigation.  (Id. at ¶¶ 766–825).*

**Phase 1:**  Not applicable

**Phase 2:**  Deferred

During our January 2017 site visit, the PSB Commander assured us that all acts of misconduct that we identified and discussed during our October 2016 site visit would be provided to a contracted independent investigator for investigative purposes.

Since that time, the PSB Commander has advised us that MCSO has contracted with a licensed private investigator.   The contract investigator possesses the requisite qualifications and experience to conduct the investigations of misconduct outlined in Paragraph 300 (a.-c.), and the additional misconduct in the Findings of Fact that directly associates with Paragraph 300 (d.).   PSB has not found it necessary to contract with any additional licensed private investigators.

During our April 2017 site visit, we met with PSB command staff and representatives from the Maricopa County Attorney's Office (MCAO) to verify that all of the acts of misconduct that were identified in the Findings of Fact (FOF) are under investigation, either by the Court-appointed Independent Investigator or the private licensed contract investigator.   Before this meeting, PSB command provided us with a roster of related acts of misconduct that PSB intended to be assigned to the contract investigator.   The roster of intended assignments did not include all of the acts of misconduct that we had discussed.   The MCAO and PSB command personnel explained that many of the acts of potential misconduct identified in the FOF were also identified by the Court in Paragraph 301 as sufficiently related to the rights of members of the Plaintiffs' class.   In Paragraph 301, the Court documented that because of this determination, investigations of the potential misconduct were justified if the Independent Investigator deemed that an investigation was warranted.

WAI 37182

To date, the Independent Investigator has completed eight investigations identified by the Court in the FOF, including one this reporting period.  We do not review these investigations for compliance with the investigative requirements in the Second Order, but we review them to ensure that the misconduct outlined in the FOF is being addressed.

Our ability to verify that all potential misconduct outlined in the FOF has been investigated by PSB, the PSB contract investigator, or the Independent Investigator remains pending until all the investigations are identified and completed.  Once this occurs, we can determine if there is any additional misconduct identified in the FOF that still requires investigation.  Finally, the PSB Commander and MCAO advised us that the acts of misconduct involving (former) Sheriff Arpaio as identified in the FOF would not be investigated by any entity, as there does not exist any statute that addresses how a Sheriff would be disciplined in the event of a sustained finding resulting from an administrative misconduct investigation.

*Paragraph 310.   The Monitor and the parties are directed to promptly comply with the Independent Investigator's requests for information.   The Monitor and the Independent Investigator may communicate to coordinate their investigations.   Nevertheless, each is independently responsible for their respective jurisdiction set forth in this Order, and each should make independent decisions within his own delegated responsibility.*

## *2. The Independent Disciplinary Authority*

*Paragraph 337.   Nevertheless, when discipline is imposed by the Independent Disciplinary Authority, the employee shall maintain his or her appeal rights following the imposition of administrative discipline as specified by Arizona law and MCSO policy with the following exceptions:*

*a.     When minor discipline is imposed, a grievance may be filed with the Sheriff or his designee consistent with existing MCSO procedure.   Nevertheless, the Sheriff or his designee shall transmit the grievance to the Monitor who shall have authority to decide the grievance.   If in resolving the grievance the Monitor changes the disciplinary decision in any respect, he shall explain his decision in writing.*

*b.     A disciplined MCSO employee maintains his or her right to appeal serious discipline to the Maricopa County Law Enforcement Merit System Council to the extent the employee has such a right.   The Council may exercise its normal supervisory authority over discipline imposed by the Independent Disciplinary Authority with one caveat.   Arizona law allows the Council the discretion to vacate discipline if it finds that the MCSO did not make a good faith effort to investigate and impose the discipline within 180 days of learning of the misconduct.   In the case of any of the disciplinary matters considered by the Independent Disciplinary Authority, the MCSO will not have made that effort.   The delay, in fact, will have resulted from MCSO's bad faith effort to avoid the appropriate imposition of discipline on MCSO employees to the detriment of the members of the*

WAI 37183

*Plaintiff class. As such, the Council's determination to vacate discipline because it was not timely imposed would only serve to compound the harms imposed by the Defendants and to deprive the members of the Plaintiff class of the remedies to which they are entitled due to the constitutional violations they have suffered at the hands of the Defendants. As is more fully explained above, such a determination by the Council would constitute an undue impediment to the remedy that the Plaintiff class would have received for the constitutional violations inflicted by the MCSO if the MCSO had complied with its original obligations to this Court. In this rare instance, therefore, the Council may not explicitly or implicitly exercise its discretion to reduce discipline on the basis that the matter was not timely investigated or asserted by the MCSO. If the Plaintiff class believes the Council has done so, it may seek the reversal of such reduction with this Court pursuant to this Order.*

**Phase 1:**  In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

**Phase 2:**  In compliance

During this reporting period, no grievances were filed that met the criteria for transmitting to the Monitor.

WAI 37184

## Section 18:  Concluding Remarks

We assess compliance with 99 Paragraphs of the First Order, and 114 Paragraphs of the Second Order, for a total of 213 Paragraphs.  MCSO is in Phase 1 compliance with 83 of the First Order Paragraphs, or 97%; and 81 of the Second Order Paragraphs, or 78%.  MCSO is in Phase 2, or operational compliance, with 76 of the First Order Paragraphs, or 77%; and 92 of the Second Order Paragraphs, or 81%.  Combining the requirements of both Orders, MCSO is in Phase 1 compliance with 164 Paragraphs, or 86%; and in Phase 2 compliance with 168 Paragraphs, or 79%.

During this reporting period, the Audit and Inspections Unit (AIU) completed its first two inspections of misconduct investigations and published the reports on the Bureau of Internal Oversight's (BIO) website, which allows the public access to the reports.  Although the Second Order specifies that MCSO is to conduct the inspections semi-annually, MCSO has decided to conduct the inspections on a monthly basis, in essence, exceeding the Order's requirements.  This is the first reporting period that MCSO has conducted the comprehensive inspections and attained compliance with the requirement.  With the implementation of this inspection, MCSO continues to improve its internal mechanisms to identify potential issues related to the conducting of misconduct investigations.

We note that the Early Intervention Unit (EIU) has taken on an increasingly integral role in Traffic Stop Annual Report (TSAR) process, in addition to ensuring that the EIS is more fully utilized to its maximum potential.  EIU personnel now have primary responsibility for analyses of deputies' traffic stop data, as well as a review of the videos from prior traffic stops and other background information, removing this responsibility from field supervisors.  This approach leverages the expertise gained by EIU from the Second TSAR, and frees up time for field supervisors to perform their other duties.  However, field supervisors still have an active role in the process, particularly in the discussions with deputies.

EIU has also created an Alert Review Committee (ARC) to ensure that closed alert investigation summaries by line supervisors contain sufficient information for command staff to evaluate the decisions of the supervisors.  While this has led to a decrease in the number of closed cases, the investigations are more complete before they are finalized in the Early Identification System (EIS).

WAI 37185

# Appendix:  Acronyms

The following is a listing of acronyms frequently used in our quarterly status reports:

| | |
|---|---|
| ACLU | American Civil Liberties Union |
| ACT | Annual Combined Training |
| AIU | Audits and Inspections Unit |
| AOC | Arizona Office of Courts |
| ASU | Arizona State University |
| ATU | Anti-Trafficking Unit |
| BIO | Bureau of Internal Oversight |
| CAB | Community Advisory Board |
| CAD | Computer Aided Dispatch |
| CBP | Customs and Border Protection |
| CDA | Command Daily Assessment |
| CEU | Criminal Employment Unit |
| CID | Court Implementation Division |
| COrD | Community Outreach Division |
| CORT | Court Order Required Training |
| CRM | Class Remedial Matter |
| DOJ | Department of Justice |
| DUI | Driving Under the Influence |
| EIS | Early Identification System |
| EIU | Early Intervention Unit |
| EPA | Employee Performance Appraisal |
| FBI | Federal Bureau of Investigation |
| FTO | Field Training Officer |
| ICE | Immigration and Customs Enforcement |
| IIU | Internal Investigations Unit |

WAI 37186

| IMF | Incident Memorialization Form |
|------|-------------------------------|
| IR | Incident Report |
| LOS | Length of stop |
| LLS | Legal Liaison Section |
| MCAO | Maricopa County Attorney's Office |
| MCSO | Maricopa County Sheriff's Office |
| NOI | Notice of Investigation |
| NTCF | Non-Traffic Contact Form |
| PAL | Patrol Activity Log |
| PDH | Pre-Determination Hearing |
| POST | Peace Officers Standards and Training |
| PPMU | Posse Personnel Management Unit |
| PSB | Professional Standards Bureau |
| SID | Special Investigations Division |
| SMS | Skills Manager System |
| SPSS | Statistical Package for the Social Science |
| SRT | Special Response Team |
| TraCS | Traffic Stop Data Collection System |
| TSAR | Traffic Stop Annual Report |
| TSMR | Traffic Stop Monthly Report |
| TSQR | Traffic Stop Quarterly Report |
| VSCF | Vehicle Stop Contact Form |

WAI 37187