**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al.<br><br>Plaintiffs,<br><br>and<br><br>United States of America,<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>Paul Penzone, in his official capacity as Sheriff of Maricopa County, Arizona; et al.<br><br>Defendants. | No. CV-07-2513-PHX-GMS<br><br>**ORDER** |

Pending before the Court is Plaintiff's Second Supplemental Motion for Award of Attorneys' Fees and Related Non-Taxable Expenses. (Doc. 2257). In that motion, the Plaintiffs request a reimbursement of fees and costs for the period from June 1, 2016 through August 31, 2017 in the amount of $1,237,192.10.[1] The fees they seek come from

---

[1] Plaintiffs break down the fees from the various counsel that have and continue to represent Plaintiff during that period. In addition to the ACLU of Arizona (Kathy Brody, Brenda Munoz Furnish, Kathryn Huddleston and Gloria Torres (paralegal)) those entities submitting affidavits include: (1) The ACLU Foundation Immigrants' Rights Project, (Cecilia Wong, Andre Segura); (2) Covington & Burling LLP (Stanley Young, Tammy Albarran, Lauren Pedley, Gizem Orbey, Emily Doan (paralegal), Julie Romanow (paralegal) Benjamin Suess (technical support), Seth Kalman (technical support); (3) The Law Offices of James B. Chanin (James B. Chanin); (4) The Mexican American Legal Defense and Educational Fund (Julia Gomez); and (5) Anne Lai (currently a clinical professor at the University of California, Irvine School of Law). The ACLU Foundation

a combination of monitoring, ongoing litigation and the creation of a court-ordered compensation fund for the victims. Defendant Maricopa County was the only Defendant to file a Response to Plaintiffs' Motion. For the reasons set forth below the motion is granted in part and denied in part. The Court awards Plaintiffs $723,869.90 in attorneys' fees and $23,966.34 in related non-taxable expenses.

## BACKGROUND

When the Court originally determined that the Defendants were liable for discriminating against the Plaintiff class, the parties asked for, and were given the opportunity to agree on as many terms of the eventual injunction as possible. The parties agreed to most of the terms of the first injunctive order. The order, as substantially agreed to, required Defendants to provide Plaintiffs access to certain information, procedures and training, authorized Plaintiffs to comment or act on that information, procedures and/or training, and required Plaintiff to perform certain functions. (*See, e.g.*, Doc. 606 ¶¶ 7, 9, 14-15, 38, 40, 44, 46, 59, 66, 71, 81(e), 106, 111, 115-16, 128, 132, 147, 149, 152, 157). It designated the Plaintiffs' representative "for purposes of implementation and enforcement of the Order" as "[t]he American Civil Liberties Union of Arizona ("ACLU-AZ") and any other representative(s) designated by the ACLU-AZ." *Id.* at ¶ 7.

At the time, however, the parties disagreed as to the extent to which Plaintiffs would be entitled to payment by the Defendant for the ongoing activity in which the order authorized their participation. (Doc. 592 at 10, Ex. 1 at ¶ 191). Both parties set forth their respective positions, *see* Docs. 595 and 596, and the Court set forth its resulting order, in which it adopted neither party's language.

The Court determined that "Defendants shall pay reasonable fees and costs incurred as a result of having to initiate litigation to secure enforcement." *Id.* at ¶ 157. Of course,

---

Immigrants' Rights Project seeks reimbursement of $400,199.47 in fees and $18,394.38 in costs for a total of $418,593.85, the ACLU of Arizona seeks reimbursement of $343,383.80 in fees and $1,367.19 in costs for a total of $344,750.99, Covington and Burling seeks an award of $220,027.50 in fees and $2,746.21 in costs for a total of $222,773.71, James B. Chanin seeks an award of $173,849.00 in fees and $4,458.56 in costs for a total of $178,307.56, MALDEF seeks an award of $55,505.00 in fees and $3,604.99 in costs for an award of $59,109.99 and Anne Lai seeks an award of $13,656.00 in fees.

any enforcement that Plaintiffs would initiate would logically be in the course of the already ongoing monitoring action. The Court thus views the original decree language as covering reimbursement for reasonable efforts made by the Plaintiffs in the ongoing monitoring action to obtain compliance with the Order when Defendants were/are out of compliance. Nevertheless, the Court's order, as originally entered, did not authorize the blanket reimbursement to the Plaintiffs for every choice they made with respect to the extent of their authorized participation in the monitoring process.

At the time that the Court entered the first order, it did not anticipate the obfuscation and malfeasance by the MCSO that so expanded the Plaintiffs' role in enforcing the initial order, justified the continued use of multiple entities representing the Plaintiffs, and resulted in the second injunctive order and the contempt orders entered against Sheriff Arpaio, Chief Deputy Sheridan, Chief Sands and Lieutenant Sousa. Plaintiffs played an integral role in those contempt proceedings and the fashioning of the second injunctive order. In those proceedings the roles of the Monitor and Plaintiff's counsel were sufficiently distinct so as not to be duplicative. This work in the Court's judgment should be, and for the most part has been, reimbursed. Yet, at least some of the reimbursement sought here is for such work by Plaintiffs which has not yet been reimbursed.

The advent of Sheriff Penzone in January 2017 has, as Plaintiffs acknowledge, significantly lessened the resistance of MCSO leadership to the requirements of the injunction at least during the period for which the fee award is sought. Yet, during that period the MCSO has continued to be unable, at least at times, to meet the deadlines set in the injunctive orders to which it had stipulated such as the implementation of the EIS. Further, the MCSO's own required evaluations have demonstrated indicia of ongoing discrimination among a number of patrol officers. At times, the MCSO failed to comply with the schedule it set for implementing the necessary remedial measures arrived at by the parties to address this indicia of bias which has largely been referred to as the TSAR process. Plaintiffs' counsel has appropriately pursued compliance within the confines of the existing enforcement action.

**Analysis**

Under Ninth Circuit law, as Defendant concedes, the Plaintiffs in this case are the prevailing party and are entitled to at least some fees in monitoring the enforcement of the injunctive orders entered by the Court. *Balla v. Idaho,* 677 F.3d 910, 916-17 (9th Cir. 2012); *Prison Legal News v. Schwarzenegger,* 608 F.3d 446, 451 (9th Cir. 2010); *Keith v. Volpe,* 833 F.2d 850, 860 (9th Cir. 1987).

In assessing the extent to which fees should be awarded in a case involving the ongoing monitoring of the defendants a court is required to ensure that the Plaintiff is not merely duplicating services provided by the Monitor or others, or otherwise needlessly extending the work required to enforce the order. *See, e.g.*, *Keith,* 833 F.2d at 858 ("[t]he existence of an independent court-appointed monitoring entity does not preclude an award of attorneys' fees to the prevailing party for monitoring activities where, as here, the monitoring services are not duplicative."); *Brewster v. Dukakis,* 544 F. Supp. 1069 (D. Mass. 1982), *aff'd as modified,* 786 F.2d 16, 19 (1st Cir. 1986). (holding that "the standard for evaluating the propriety of a fee award to plaintiffs when there is a court-appointed monitoring entity is the same as that where there is no such monitoring entity: the 'services [must] be necessary for reasonable monitoring of a consent decree.'"). In contemplating an award of fees, a Court must exercise its discretion to "assure that the case is not being milked by a [successful party or a] monitor after the injunction has been obtained, for fees that are unreasonable in amount, for work not reasonably performed to enforce the relief, or for work not directly related to enforcing the relief." *Balla,* 667 F.3d at 19.

As the Court previously found, adjusted out-of-forum rates for out-of-state lawyers is appropriate in this case as the local ACLU was not able to find a local firm that would accept the case and the Project lawyers had "experience, expertise, and specialization at a level that is otherwise unavailable in Maricopa County." (Doc. 742 at 1–2). For the initial period of fees at issue here, the parties were still involved in the litigation of the case, and even as they transitioned from litigation into compliance enforcement, it is still reasonable to pay the rates they seek to the extent that these lawyers have participated in the

implementation of the Orders in a meaningful way. The orders in this case involve detailed aspects of the MCSO and policing in general. Implementation requires familiarity with the subject matter of the first trial and, Plaintiffs were represented by these lawyers in negotiating the terms of the first order. The entire second order resulted from the painstaking and detailed contempt hearings that spanned many months and more than twenty trial days, at which the Plaintiffs were represented by these same representatives. Even assuming that some of the monitoring functions can be more practically and inexpensively provided by available in-town lawyers, the familiarity and expertise that Plaintiffs' litigation lawyers obtained during the history of this case, during the negotiation of the first consent decree, and the hearings that resulted in the second consent decree cannot be reasonably replaced by in-town lawyers who are unfamiliar with the case. To the extent that they are judiciously involved in the ongoing monitoring, the ongoing participation of the lawyers from those firms can actually represent a considerable efficiency for all concerned.

The ACLU, however, did not apparently affiliate with Mr. Chanin until at or towards the end of the contempt hearings. Thus, he did not obtain an expertise concerning the subject matter of this particular lawsuit by participating in it as have the ACLU Immigrants Rights Project and Covington & Burling. Nevertheless, he does have impressive experience in civil rights cases particularly in the area of police misconduct and police practices. He also has impressive experience in the implementation of consent decrees in that area that would appear to be largely unavailable to the Plaintiffs in Phoenix. It has been the Court's impression that in light of his experience, Mr. Chanin's services have been useful both to the Plaintiffs and to the implementation process on the whole in a way that would not be readily replaceable by an attorney from the Phoenix market. This is a sufficient basis on which the Court can authorize a rate above the local prevailing rate. *See Camacho v. Bridgeport Fin., Inc.,* 523 F.3d 973, 979 (9th Cir. 2008) (quoting *Barjon v. Dalton*, 132 F.3d 496, 500 (9th Cir. 1997)). The Court does so here to the extent that Ms. Chanin has engaged in activity that is both reimbursable and not duplicative.

The Plaintiffs thus have a basis to seek a significant fee award for their ongoing role in the promulgation, implementation and enforcement of the orders. Yet, the way in which they have done so makes it very difficult and time-consuming for the Court, or anyone else, to guard against unnecessary or duplicative activity. In their motion, Plaintiffs' Representative seeks an award for fifteen months of activity undertaken by itself and the five other entities that it has designated to represent the Plaintiffs' class interests in the monitoring phase. The motion generally asserts that counsel have participated in several categories of activities for which they are justified in seeking fees. (Doc. 2257 at 12). But it does not allocate the time entries to any of these several categories of activity for which Plaintiffs seek a fee award. Rather, the motion attaches the affidavits of the lead attorneys for these six different entities that detail the separate activities of the time keepers in each office and seeks reimbursement for all of their activities except for those that they have redacted. On occasion, at least, it is evident that some of the billing attorneys have eliminated some time entries to avoid duplicative activities and/or overbilling for activity within their separate offices. But, some of the affidavits have different time-keeping formats which additionally complicates the ability to compare possibly duplicative activity between offices.

By contrast, the Defense, in analyzing Plaintiffs request, breaks the fee request down into at least some categories of recognizable activities. The County's proposed breakdown does not include any analysis of the request for costs. Nor, is the time accounted for by the County an exact match for the time set forth for which the Plaintiffs request reimbursement. Nevertheless, the County's Response does a better job of setting forth the fee requests in a way that the Court can analyze. For example, on a category by category basis, the County sets forth on a chronological basis all of the time entries for which the various Plaintiffs' representatives seek reimbursement from their separate offices so that the Court can more efficiently see what similar activities were conducted on what dates. While the Court in making its award considers the material set forth by all parties, it is easier for the Court to conceptualize and explain its award in the categories set forth by the County. The Court

1  thus, for the most part, will address the fee request through the breakdown prepared by the
2  County.

3  In Exhibit B to the County's Response it segregates $209,560.80 for amounts that
4  "reflect [Plaintiffs'] work on contested motions." Then in Exhibit C the County collects
5  and tabulates the part of that time that it attributes to the former Defendants' efforts to once
6  again recuse this Court, conduct discovery of the Court's communications with the Monitor
7  and other incidental proceedings that arose during this time. The amount attributable to
8  that activity is, according to Defendants $168,770.40. Exhibit D sets forth the $83,318.70
9  that the Defendants assert is attributable to Plaintiff's work on the victim compensation
10 program. Exhibit E represents a subset of that time billed for establishing the Victims
11 Compensation Fund which was apparently spent on conference calls between July 21, 2016
12 and April 26, 2017, which Defendant deems to be excessive. In Exhibit F to the County's
13 response the County sets forth $810,873.55 that the Plaintiffs seek for general compliance
14 monitoring activity. The County conceptually does not oppose a fee award for the activities
15 in Exhibits B and D except to the extent that the activity is needless or duplicative. It
16 contests more generally the award of any additional amounts to the Plaintiffs.

### A. Work Done by Plaintiffs Relating to the Second Injunctive Order and Commenting on MCSO's Internal Affairs Process.

Upon a review of the difference between the $209,560.80 in Exhibit B, and the $168,770.40 in Exhibit C it appears that the $40,790.40 difference principally comes from the implementation of the second injunctive decree and Plaintiffs' comment on the operation of the Independent authority and or responses to Sheriff Penzone's request to modify the terms of the Orders. Plaintiffs played an integral role in those contempt proceedings and the fashioning of the second injunctive order which resulted. Their perspective was also necessary on modifications to the Order sought by the Defendants. In such proceedings the roles of the Monitor and Plaintiffs' counsel were sufficiently distinct. In the Court's judgment Plaintiffs should be, and for the most part have been, reimbursed for these amounts. At least some of the reimbursement sought here, however, is for that

1  activity which has not yet been reimbursed.  The Defendant raises no appreciable challenge
2  as to award of these latter amounts and the Court determines that they are reasonable and
3  reimbursable in full.

4  The County specifically contests a time entry for November 2, 2016.  This entry by
5  an attorney is for more than 24 hours in one day.  While the County, and the Court, do not
6  question the integrity of the attorney involved, the entry must be erroneous.[2]  The same
7  attorney had made entries for additional time expended on that same day.  Plaintiffs do not
8  address this evident billing error in their reply.  Absent any basis on which to know the
9  appropriate amount that should have been billed in the entry, if any, the Court adopts the
10 County's suggestion that it disallow this single time entry in full.  Thus, the Court does not
11 award $17,735.80 from the amount sought by the ACLU Foundation Immigrants' Rights
12 Project for November 2, 2016.

### B. Work Done By Plaintiffs in Defending the Injunctive Orders From Collateral Attack by Some of the Defendants.

15 The County asserts that $168.770.40 was incurred by Plaintiffs in Defending the
16 Injunctive Orders from various attempts by some of the Defendants to collaterally attack
17 those orders after they were entered.  Defendant does not conceptually contest that
18 Plaintiffs are entitled to reasonable amounts incurred by the Plaintiffs in defending those
19 injunctive decrees from efforts by the then Defendants to vacate them, at least some of
20 which are sought here.   This is an activity, after all, that could not have been performed
21 by the Monitor.  The County does assert, however, that the request demonstrates "over-
22 lawyering, duplication, excessive time, or time charged at an unreasonable rate."

23 The County further tabulates that $43,067.00 of the remaining amount was incurred
24 on research by seven attorneys and one paralegal over the eight months between October
25 2016 and May 2017, $28,427.80 was spent by seven attorneys and one paralegal over two

---

[2] The same attorney made an entry for 14 hours for preparing for a status conference on June 6, 2017.  That entry is also clearly erroneous and, while falling in a different category of activity is also deducted by the Court in its entirety for similar reasons.

months on transcript review, and $27,396.40 was spent over two months on conference calls. While these amounts are certainly expensive, they occurred within the midst of ongoing litigation brought with its associated pressures. Plaintiffs principal trial counsel, at that point, reasonably spread out among at least three of the six offices justifies significant transcript review, because at that point the action had been going for years with many of the proceedings over the years potentially bearing on the defenses to the motions. This requires significant and compressed transcript review with significant research and perhaps somewhat less consultation and staffing than actually occurred, and rates slightly adjusted to the extent the case was used for training. The record review was reasonable and merited. So was the legal research. While consultation was for the most part reasonable under the circumstances, there were occasionally consultations that appeared to be more than were necessary by the Plaintiffs, and the Court deducted a certain amount for the duplicative nature of the work that remained. Therefore, of the total amount of $209,560.80 identified in Plaintiffs' Exhibit B, the Court awards Plaintiffs $176,671.60.

### C.   Work Done By Plaintiffs On the Victim Compensation Fund.

Further, the Plaintiff's incurred $83,318.70 in assisting in the preparation of the victim compensation fund. The County suggests a reduction in the amount of $11,000 for an unnecessary number of lawyers working on the project. The Court has carefully reviewed the County's calculations and agrees that the reductions suggested by the County in this respect are appropriate. The Court, therefore, awards the Plaintiffs $72,318.70 for the work done by the Plaintiffs in creating the compensation fund during the indicated period.

### D.   Other Monitoring Work For Which Reimbursement Was Sought.

Finally, of the amount sought by the Plaintiffs the County has identified $474,879.60 which it attributes to generalized monitoring activity. The Court neither wholly rejects nor wholly accepts the County's argument. The County's division of matters was, with respect, not always perfect. (The Court would not expect it to be but can take it into account in reviewing the bill for purposes of a fee award.) Further, the Court

rejects the County's assertion that any of this amount is duplicative of the amounts the County has paid to the Monitor and/or the independent investigator and independent authority, and/or could be reasonably performed by the United States Department of Justice.

All of the money spent on the independent investigator and independent authority were necessary to re-conduct sham or inadequate internal affairs investigations that were directed and conducted by Chief Deputy Sheridan and others. That the County had to pay for the independent authorities to redo such internal investigations has little if anything to do with the ongoing implementation of the Orders and does not in any way duplicate the efforts of Plaintiff's counsel in overseeing MCSO's compliance with the Court's injunctions. Therefore, the appointment of the independent investigator or authority does not suggest that Plaintiffs' monitoring activities, whether they otherwise qualify for reimbursement, were duplicated by the independent investigator or independent authority.

Further, while significant amounts have also been paid by the County to the Monitor, much of that has been for necessary activity that is not what could fairly be considered monitoring in normal circumstances. For example, the County paid to the Monitor the necessary expenses of uncovering and addressing the obfuscation of the previous MCSO administration. To a considerable extent, that discovery has required additional oversight of the internal affairs matters that may relate to the Plaintiff class. This is not an area in which the Monitor's activities and the activities of Plaintiffs' counsel serves the same function. While the Plaintiffs class maintains the right to call out areas of concern to the Monitor concerning the adjudication of internal affairs matters, it is the Monitor's role to ensure the appropriate adjudication of such concerns by the MCSO. Therefore, the Monitor's role and the Plaintiffs' role do not overlap.

Further, the decree allows the MCSO to request technical assistance from the Monitor. The Monitor has provided such technical assistance in a not inconsiderable amount. These are amounts that are not attributable to normal monitoring and the Court has pointed out their cost to all parties with some regularity throughout the ongoing

monitoring proceedings. Thus, the County's enumeration of the amounts paid to the Monitor since the inception of the proceeding are not indicative of the amount spent on the painless implementation of an undisputed consent decree. Nor are they indicative of amounts spent in enterprises in which the role of the Monitor and of Plaintiff's counsel are indistinguishable.

Of course, the County can and should expect, within reason, that it will not have to pay the Plaintiff Class for monitoring activity that is adequately conducted by the Monitor alone. Yet, the original injunctive order specifically authorizes an independent role for the Plaintiffs in the implementation and enforcement of the injunctions. In specifying a role for Plaintiffs, it was evident that the parties agreed that the Plaintiffs role was not fungible with the Monitor's role in achieving compliance under the orders. The Court finds any contrary argument unpersuasive in light of the terms of the order itself. Further the Court is not persuaded by the argument that the Plaintiffs and the intervenors positions on issues will almost always be indistinguishable.

Yet to authorize the Plaintiffs to access the same information and reports to which the Monitor would have access, and to allow the Plaintiffs to comment on such materials, is not tantamount to a determination that Plaintiffs would be paid for all the time they spent in such activities. Thus, merely because the Plaintiffs independently reviewed records that were also subject to the Monitor's review or attended trainings that the Monitor also attended does not mean that the Plaintiffs will be reimbursed for all such activity. The Court remains of the view, that the County is not necessarily obliged to reimburse Plaintiffs' for all the time they incur that is related to monitoring compliance with the Order. To hold to such a standard would mean that Plaintiffs could tap into county revenues at their discretion rather than subject to an independent determination that the incurred expenses were reasonable, were incurred in an undertaking in which Plaintiffs' participation was authorized, requested or served an independent purpose, and did not unnecessarily duplicate efforts provided by the Monitor or other parties under the Order, or in fact complicate compliance under the Orders.

On the other hand, the MCSO has continued to be unable, at least at times, to meet the deadlines set in the injunctive orders to which it had stipulated—such as the implementation of the EIS in compliance with the Order's required schedule. Nor, at times, has the MCSO been able to comply with the schedule set by itself for evaluative and remedial, or corrective procedures as required by the Order—such as the measures required to address continuing indicia of bias as revealed by the TSAR. The Plaintiffs have raised their concern with this non-compliance during the ongoing monitoring process. It is appropriate for the Plaintiffs to be reimbursed for their activity in obtaining and facilitating compliance with the decree, especially when the MCSO is out of compliance with the decree or seeks that the decree otherwise be altered.

To their collective credit MCSO, the Plaintiffs and the intervenors have through meet and confer processes worked out such differences in the monitoring process that would have otherwise led to much more costly litigation. That the Plaintiffs were willing to demonstrate some forbearance from filing formal motions on Defendants non-compliance, while working with Defendants to obtain compliance does not disqualify them from fees for these efforts. Some of these consultations occurred in conjunction with the "technical assistance" that the Sheriff's office sought from the Monitor and in which Plaintiff's counsel may have been involved. Some such consultations also occurred during the week-long quarterly site visits that are conducted by the Monitor as, for example, those visits often include matters related to EIS implementation and the TSAR.

In any event, to the extent that Plaintiffs are involved with the Defendants in procedures that serve as "a catalyst speeding [defendant's] conduct to conform to the injunction," it is appropriate to reimburse Plaintiffs for that activity pursuant to a reasonableness review and this Court's further order. *Balla,* 677 F.3d at 916; *see also, Keith,* 833 F.2d at 857 ("we do not think that extreme tension and extreme animosity are precondition to a fee award of this sort.") Further, to the extent that the MCSO files requests, as it has, to modify the Court's injunctive orders, (*See* Doc. 2065) it is appropriate for the Plaintiffs to reasonably respond thereto and to be reimbursed for doing so.

To the extent that such activity occurs during the week-long site monitoring visits, however, it illustrates the challenge that the Plaintiffs' motion generally presents to the Court. As with all of Plaintiffs' enforcement activity, some site visit activity by Plaintiffs merits a fee award, and some may not. A considerable number of Plaintiffs' attorneys have attended some or all of the week-long quarterly site visits set by the Monitor. And, to be sure, there are aspects of site visits that may require representation at multiple locations at the same time for which a fee award is appropriate. Further, to the extent that the site visit meetings involve matters relating to areas in which the MCSO is not in compliance, Plaintiffs reasonable presence should be reimbursed. Yet, not every meeting is of the nature that it must be attended by an attorney or attorneys. And the time entries for the Plaintiffs' attorneys are frequently unhelpful in allowing the court to determine the topic of the meeting, whether it was attended by multiple attorneys, and whether Plaintiffs are justified in seeking a fee award for attending it. Generally, the time-keeping entries of James Chanin describes the meetings he attends on site visits sufficiently to evaluate whether attendance at that meeting is reasonable for purposes of a fee award. Often, the entries of Cecelia Wang, Julia Gomez and Kathryn Huddlestone do as well. Otherwise, the entries are generally not sufficiently detailed to make such necessary distinctions.

Plaintiffs attempt to justify a fee award for their general presence at meetings in part because "at each of those meetings at MCSO headquarters during the relevant time period, Defendants have had at least two, and as many as four, attorneys present to represent their interests along with numerous MCSO personnel." Such an argument is not a persuasive reason, by itself, to merit a fee award for additional Plaintiffs' attorneys. One might presume that there will be numerous MCSO personnel at an MCSO site visit. That, in and of itself, is no justification for authorizing a fee award to pay for multiple attorneys representing Plaintiffs' interests to attend the same meeting—and this is especially so when the monitoring team itself is there to perform the monitoring function. Nor is it evident to the Court that merely because the County may have two, and as many as four attorneys present at a meeting, that necessarily justifies the Court in authorizing payment for the

1  Plaintiffs to engage in an arms race of attorneys that will, as the Monitor has repeatedly
2  told the parties, only result in the partial or complete destruction of the potential for the
3  meeting to provide practical progress.

4  As an example of this, Plaintiffs request reimbursement for four attorneys to attend
5  the July 20, 2016 community meeting, for six attorneys to attend the October 18, 2016
6  community meeting and for multiple attorneys to attend the meetings thereafter.  They
7  frequently request that similar numbers of attorneys be reimbursed for attending the exit
8  meetings.  Even though it is understandable that those attorneys otherwise present in
9  Phoenix for the quarterly monitoring visit might wish to attend the community or exit
10 meetings, and even though it is conceivable that it may have to some degree or other been
11 beneficial to the Plaintiffs for them to do so, in the Court's judgment it is not reasonable
12 for Defendants to have to bear the burden of paying for this many Plaintiffs' attorneys to
13 attend the same meeting absent some unusual justification for doing so.  Yet, the affidavits
14 presented by Plaintiffs do not provide such a justification, and, because of their format they
15 make it extremely time-consuming for the Court to attempt to determine the instances of
16 such duplicative service.  This same problem is reflected in many of the extensive and
17 separated entries of the Plaintiff that the Court examined.

18 Given these difficulties the Court did its  best to examine the time entries by
19 Plaintiff, their reformatting by Defendants, and to provide its best judgment as to the
20 awardable fees.  It went through the fee requests and attempted to identify and deduct
21 activity that was not reimbursable, or duplicative, or inadequately described, and deduct
22 for that activity on a line by line basis.  Sometimes it was impossible to do that and it
23 required estimates by the Court.  In so doing the Court exercised its best judgment to
24 determine based on the information provided and the following factors none of which alone
25 was determinative: (a) whether the activity was duplicative of services that the Monitor can
26 provide without the necessary assistance of Plaintiffs' class representatives (Thus, for
27 example, while the Court, in light of the MCSO's failures to timely meet some deadlines
28 in this case, will authorize payment to Plaintiffs for time spent devising and implementing

a method to track MCSO's compliance with scheduled deadlines, it does not, absent specific justification or explicit explanation in the billing entry, reimburse the Plaintiffs for their document review, especially in those cases when the documents provided would, in any event be reviewed by the Monitor in the normal course of activity); (b) whether the work benefited the overall implementation of the Order; (c) whether the work had been overstaffed; (d) whether the activity needlessly increased the workload of the Monitor in obtaining compliance with the decree; (e) whether the activity was related to parts of the decree with which the MCSO was not in compliance; (f) whether the time entry was sufficiently detailed to allow the Court to determine whether it was for reimbursable work; (g) whether the work was performed in the transition period from litigation to monitoring. The Court also: (a) deducted charges that were not for the time period indicated in the motion; (b) reduced some of the rates for paralegal fees charged; (c) reduced and/or eliminated some support service charges that seemed excessive.

After having spent considerable time evaluating the request as described above, the Court awards $474,879.60 for the Plaintiffs general monitoring activities, which combined with the categories for reimbursement described above in the amount of $248,990.30. The Court thus awards Plaintiffs representatives $723,869.90. The Court similarly looked at the requested costs. It determined that most of the costs were awardable the Court thus awards Plaintiffs $23,966.34 in costs.

The Court declines to allocate the fees and costs award among the various counsel that participated in representing the Plaintiffs in this case. It so declines because it does not have sufficient knowledge to assess the relative worth of the contributions to the Plaintiffs made by the multiple representatives who may have sought reimbursement for the same activity which the Court may have reduced to reflect a reasonable fee. It has, throughout this Order attempted to explain its reasoning in doing so to inform those various entities representing the Plaintiffs in allocating the award among themselves. The Court will require that the representatives of the Plaintiffs submit a proposed order for the Court that would allocate the awarded amount among the various entities that have acted as

representatives of the Plaintiff class, within fourteen days of the date of this Order.  The Court will, thereafter, enter an award in those amounts.

Should the Plaintiffs wish to submit fee requests in the future for multiple timekeepers, the Court suggests the following:  the Plaintiffs should identify the several categories of activity its representatives undertook for which it seeks a fee award. If they believe a time entry represents activity for which they seek reimbursement by the Court, they should determine in what category that entry should be placed.  Each time entry should be place in only one category.  (Admittedly at times this might require a judgment call which the Court understands may be less than perfect.)  Within each category Plaintiffs should then list, chronologically the entries of all timekeepers for which they seek a fee award in that category.  The date of the activity, the identity of the timekeeper, the amount of time sought, and the description of the activity should be included.  A total for each category should then be calculated as well as a total of all categories.  To the extent that a timekeeper may wish to supplement her or his time entry (for example to justify why several attorneys are billing for what appears to be the same activity), they may of course do so in their affidavits or in their motion.   The parties may also separately submit their time entries by timekeeper if they choose.  Although the Court has taken considerable time in processing this request, and thus, presumably, prolonging any additional fee requests by Plaintiffs, it suggests the parties pro-actively work with the Court in submitting such requests on a more-timely basis.

**IT IS HEREBY ORDERED** granting the Plaintiffs' Second Supplemental Motion for Attorney Fees' and Related Non-Taxable Expenses (Doc. 2257) in the amount of $723,869.90 and $23,966.34 in costs for a total of $747,836.24.

/ / /

/ / /

/ / /

/ / /

/ / /

1 **IT IS FURTHER ORDERED** directing the Plaintiff class representatives submit a proposed form order for the Court that would allocate the awarded amount among the various entities **within fourteen (14) days** of the date of this Order.

Dated this 12th day of April, 2019.

*G. Murray Snow*
G. Murray Snow
Chief United States District Judge