# NINETEENTH REPORT
## Independent Monitor
## for the
## Maricopa County Sheriff's Office



## Reporting Period – Fourth Quarter 2018
## Chief (Ret.) Robert S. Warshaw
## Independent Monitor
## May 14, 2019

WAI 38129

# Table of Contents

Section 1:  Introduction……………………………………………...……..3

Section 2:  Methodology and Compliance Summary…………………………..6

Section 3:  Implementation Unit Creation and Documentation Request………..9

Section 4:  Policies and Procedures………………….…………………….13

Section 5:  Pre-Planned Operations……………………………..….…….39

Section 6:  Training…………………………………………………....44

Section 7:  Traffic Stop Documentation and Data Collection…………….…..58

Section 8:  Early Identification System (EIS)……………………….…...105

Section 9:  Supervision and Evaluation of Officer Performance………….....131

Section 10:  Misconduct and Complaints……………………………....154

Section 11:  Community Engagement…………………………………..158

Section 12:  Misconduct Investigations, Discipline, and Grievances………...168

Section 13:  Community Outreach and Community Advisory Board………..256

Section 14:  Supervision and Staffing…………………………………..258

Section 15:  Document Preservation and Production…………………….261

Section 16:  Additional Training………………………………………..266

Section 17:  Complaints and Misconduct Investigations Relating to

Members of the Plaintiff Class…………………………..267

Section 18:  Concluding Remarks……………………………………....285

Appendix:  Acronyms…………………………………………………287

WAI 38130

# Section 1:  Introduction

This is the nineteenth report issued in my capacity as the Court-appointed Monitor in the case of *Manuel de Jesus Ortega Melendres, et al., v. Paul Penzone, et al.* (No. CV-07-02513-PHX-GMS), and documents activities that occurred during the fourth quarter of 2018.

On May 13, 2016, the Court issued its Findings of Fact in the civil contempt proceedings that commenced in April 2015.  This led to the issuance of a Second Supplemental Permanent Injunction/Judgment Order (Second Order) on July 20, 2016, significantly expanding the duties of the Monitor.  Our reports cover the additional requirements of the Second Order while continuing to document MCSO's compliance efforts with the First Supplemental Permanent Injunction/Judgment Order (First Order) issued in October 2013.  We will provide summaries of compliance with both Orders separately, as well as a summary of MCSO's overall, or combined, compliance.

The compliance Paragraphs of the Second Order commence where the First Order ends, and they are numbered from Paragraph 160 through and including Paragraph 337.  Not all are subject to our review.  For example, the Second Order outlines the duties of the Independent Investigator and the Independent Disciplinary Authority.  These are autonomous positions, not subject to oversight of the Court or its Monitor.

The Second Order also delineates in great detail requirements in the areas of misconduct investigations, training, discipline and discipline review, transparency and reporting, community outreach, document preservation, and misconduct investigations involving members of the Plaintiffs' class.  The Court granted the Monitor the authority to supervise and direct all of the investigations that fall into the latter category.

This report covers the period from October 1-December 31, 2018.  At the end of this reporting period, MCSO asserted Full and Effective Compliance with 27 Paragraphs of the First Order, as that term is defined in the First Order.  After review, I agreed with their assertions for 23 of these 27 Paragraphs.  Those Paragraphs are identified below, as well as in the body of this report.  MCSO should be commended for this milestone.  Moving forward, MCSO retains the obligation to document that the Office remains in Full and Effective Compliance with these Paragraphs.

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|---|---|---|
| 9 | 12/28/18 | Concurred on 1/28/19 |
| 10 | 12/28/18 | Concurred on 1/28/19 |
| 11 | 12/28/18 | Concurred on 1/28/19 |
| 12 | 12/28/18 | Concurred on 1/28/19 |

WAI 38131

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|---|---|---|
| 13 | 12/28/18 | Concurred on 1/28/19 |
| 23 | 12/28/18 | Concurred on 1/28/19 |
| 26 | 12/28/18 | Concurred on 1/28/19 |
| 28 | 12/28/18 | Concurred on 1/28/19 |
| 29 | 12/28/18 | Concurred on 1/28/19 |
| 30 | 12/28/18 | Concurred on 1/28/19 |
| 35 | 12/28/18 | Concurred on 1/28/19 |
| 36 | 12/28/18 | Concurred on 1/28/19 |
| 37 | 12/28/18 | Concurred on 1/28/19 |
| 38 | 12/28/18 | Concurred on 1/28/19 |
| 40 | 12/28/18 | Concurred on 1/28/19 |
| 48 | 12/28/18 | Did not concur on 1/28/19 |
| 49 | 12/28/18 | Did not concur on 1/28/19 |
| 50 | 12/28/18 | Did not concur on 1/28/19 |
| 51 | 12/28/18 | Did not concur on 1/28/19 |
| 55 | 12/28/18 | Concurred on 1/28/19 |
| 59 | 12/28/18 | Concurred on 1/28/19 |
| 60 | 12/28/18 | Concurred on 1/28/19 |
| 68 | 12/28/18 | Concurred on 1/28/19 |
| 71 | 12/28/18 | Concurred on 1/28/19 |
| 77 | 12/28/18 | Concurred on 1/28/19 |
| 88 | 12/28/18 | Concurred on 1/28/19 |
| 101 | 12/28/18 | Concurred on 1/28/19 |

WAI 38132

During this reporting period, administrative misconduct investigations completed by both PSB and Districts and Divisions saw significant compliance increases.  There were few substantive deficiencies, and the quality of these investigations continues to improve.  These increases in compliance have been more pronounced in those investigations initiated since the completion of the 40-Hour Misconduct Investigative Training in late 2017.  District command personnel also continue to take an active role in addressing deficiencies in investigations conducted by their personnel.

However, we have noted in previous reports and in numerous instances throughout this report that we are aware of the challenges PSB is facing due to the high number of initiated complaints, and the lack of adequate staffing.  We have seen numerous occasions where extensions are requested multiple times as investigations cannot be completed in a timely manner.  From administrative misconduct investigations to critical incident investigations, the amount of time being taken to complete investigations continues to lengthen.  We are still reviewing administrative investigations that were initiated in 2016, and there are critical incidents from 2017 where investigative reports have yet to be written.  MCSO must find a means to address the significant and unacceptable backlog of cases.

As documented in our recent reports, MCSO engaged a new vendor, CNA, to assist with the traffic stop analyses required by the First Order.  We and the Parties participated in several conversations with MCSO and CNA before and during the January site visit.  The annual and monthly analyses (TSAR and TSMR, respectively) of traffic stop data remain on hold pending our approval of proposed methodologies.  Our discussions with CNA about the proposed TSAR and TSMR methodologies during our January 2019 site visit did much to address our concerns about the scientific basis of the proposed methodologies.  However, some questions remain; and MCSO and its vendor have been responsive to follow-up discussions and requests for modifications to the methodologies.

During this reporting period, MCSO continued the process of addressing the deputies identified as potential outliers in the Third TSAR.  The efforts have been coordinated out of the Early Intervention Unit, which has taken on a more substantive role in the process based on the lessons learned from the Second TSAR.  Throughout the reporting period, we received documentation of the discussions and resulting action plans.  The process is scheduled to be completed in the second quarter of 2019; and we will comment on the overall process in more detail once it is completed.

WAI 38133

## Section 2: Methodology and Compliance Summary

The Monitor's primary responsibility is to determine the status of compliance of the Maricopa County Sheriff's Office (MCSO) with the requirements of the requirements in the Order. To accomplish this, the Monitoring Team makes quarterly visits to Maricopa County to meet with the agency's Court Implementation Division (CID) and other Office personnel – at Headquarters, in Patrol District offices, or at the office that we occupy when onsite. We also observe Office practices; review Office policies and procedures; collect and analyze data using appropriate sampling and analytic procedures; and inform the Parties and, on a quarterly basis, the Court, about the status of MCSO's compliance.

This report documents compliance with applicable Order requirements, or Paragraphs, in two phases. For Phase 1, we assess compliance according to whether MCSO has developed and approved requisite policies and procedures, and MCSO personnel have received documented training on their contents. For Phase 2 compliance, generally considered operational implementation, MCSO must demonstrate that it is complying with applicable Order requirements more than 94% of the time, or in more than 94% of the instances under review.

We use four levels of compliance: In compliance; Not in compliance; Deferred; and Not applicable. "In compliance" and "Not in compliance" are self-explanatory. We use "Deferred" in circumstances in which we are unable to fully determine the compliance status – due to a lack of data or information, incomplete data, or other reasons that we explain in the narrative of our report. We will also use "Deferred" in situations in which MCSO, in practice, is fulfilling the requirements of a Paragraph, but has not yet memorialized the requirements in a formal policy.

For Phase 1 compliance, we use "Not applicable" for Paragraphs where a policy is not required; for Phase 2 compliance, we use "Not applicable" for Paragraphs that do not necessitate a compliance assessment.

The tables below summarize the compliance status of Paragraphs tracked in this report.[1] This is our tenth quarterly status report in which we report on MCSO's compliance with both the First and Second Orders. During this reporting period, MCSO's Phase 1 compliance rate with the **First Order** remained the same as the last reporting period, at 97%. MCSO's Phase 1 compliance rate with the **Second Order** increased by 21 percentage points, to 99%. This increase was largely attributable to the publication of the Professional Standards Bureau Operations Manual in December.

---

[1] The percent in compliance for Phase 1 is calculated by dividing the number of Order Paragraphs determined to be in compliance by the total number of Paragraphs requiring a corresponding policy or procedure. Paragraphs with the status of Deferred are included in the denominator, while Paragraphs with the status of Not Applicable are not included. Therefore, the number of Paragraphs included in the denominator totals 189 for Phase 1. The number of Paragraphs included in the denominator totals 212 for Phase 2.

WAI 38134

During this reporting period, MCSO's Phase 2 compliance rate with the **First Order** decreased by two percentage points, from 77% to 75%. This number includes Paragraphs that we consider to be in compliance and those that are now in Full and Effective Compliance, as described above. MCSO's Phase 2 compliance rate with the **Second Order** increased by nine percentage points, from 81% to 90%.

| Nineteenth Quarterly Status Report | | |
|---|---|---|
| **First Order Summary** | | |
| **Compliance Status** | **Phase 1** | **Phase 2** |
| Not Applicable | 14 | 1 |
| Deferred | 0 | 2 |
| Not in Compliance | 3 | 23 |
| In Compliance | 83 | 74[2] |
| **Percent in Compliance** | **97%** | **75%** |

| Nineteenth Quarterly Status Report | | |
|---|---|---|
| **Second Order Summary** | | |
| **Compliance Status** | **Phase 1** | **Phase 2** |
| Not Applicable | 20 | 10 |
| Deferred | 0 | 4 |
| Not in Compliance | 1 | 7 |
| In Compliance | 102 | 102 |
| **Percent in Compliance** | **99%** | **90%** |

---

[2] This number includes those Paragraphs that are deemed in Full and Effective Compliance.

WAI 38135

| MCSO's Compliance with the Requirements of the **First Order** *(October 2, 2013)* | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Report 1 | Report 2 | Report 3 | Report 4 | Report 5 | Report 6 | Report 7 | Report 8 | Report 9 | Report 10 |
| **Phase 1** | 4% | 10% | 44% | 40% | 51% | 57% | 61% | 60% | 67% | 60% |
| **Phase 2** | 0% | 0% | 26% | 25% | 28% | 37% | 38% | 39% | 44% | 49% |
| | Report 11 | Report 12 | Report 13 | Report 14 | Report 15 | Report 16 | Report 17 | Report 18 | Report 19 | |
| **Phase 1** | 63% | 79% | 88% | 85% | 85% | 85% | 85% | 97% | 97% | |
| **Phase 2** | 50% | 57% | 67% | 62% | 65% | 64% | 66% | 77% | 75% | |

| MCSO's Compliance with the Requirements of the **Second Order** *(July 20, 2016)* | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Report 1 | Report 2 | Report 3 | Report 4 | Report 5 | Report 6 | Report 7 | Report 8 | Report 9 | Report 10 |
| **Phase 1** | | N/A | | | | | | | | 1% |
| **Phase 2** | | N/A | | | | | | | | 43% |
| | Report 11 | Report 12 | Report 13 | Report 14 | Report 15 | Report 16 | Report 17 | Report 18 | Report 19 | |
| **Phase 1** | 10% | 12% | 72% | 75% | 77% | 77% | 78% | 78% | 99% | |
| **Phase 2** | 46% | 60% | 63% | 66% | 72% | 75% | 80% | 81% | 90% | |

WAI 38136

## First Supplemental Permanent Injunction/Judgment Order

## Section 3: Implementation Unit Creation and Documentation Requests

**COURT ORDER III.  MCSO IMPLEMENTATION UNIT AND INTERNAL AGENCY-WIDE ASSESSMENT** (*Court Order wording in italics*)

*Paragraph 9.  Defendants shall hire and retain, or reassign current MCSO employees to form an interdisciplinary unit with the skills and abilities necessary to facilitate implementation of this Order.  This unit shall be called the MCSO Implementation Unit and serve as a liaison between the Parties and the Monitor and shall assist with the Defendants' implementation of and compliance with this Order.  At a minimum, this unit shall: coordinate the Defendants' compliance and implementation activities; facilitate the provision of data, documents, materials, and access to the Defendants' personnel to the Monitor and Plaintiffs representatives; ensure that all data, documents and records are maintained as provided in this Order; and assist in assigning implementation and compliance-related tasks to MCSO Personnel, as directed by the Sheriff or his designee.  The unit will include a single person to serve as a point of contact in communications with Plaintiffs, the Monitor and the Court.*

**In Full and Effective Compliance**

To verify Phase 2 compliance with this Paragraph, we reviewed the monthly personnel rosters for the Court Implementation Division (CID).  As of this reporting period, CID has one captain, one lieutenant, three sergeants, two deputies, one management assistant, and one administrative assistant.  CID continues to be supported by MCAO attorneys, who frequently participate in our meetings and telephone calls with Division personnel.

During this reporting period, CID continued to provide documents through MCSO's counsel via an Internet-based application.   The Monitoring Team, the Plaintiffs, and the Plaintiff-Intervenors receive all files and documents simultaneously, with only a few exceptions centering on open internal investigations.  CID effectively facilitates the Monitoring Team and Parties' access to MCSO's personnel.

During the last reporting period, we learned that CID created a "*Melendres* Compliance Corner" page on MCSO's website which provides information to the public about CID's role.  The webpage contains a historical overview of the case, the Monitor's compliance reports, and additional links to both the First and Second Orders.   The page also provides a link to information about the Immigration Stops and Detention Compensation Fund.  The webpage can be read in both English and Spanish.  MCSO continues to update the website to include our most recent quarterly status reports.

During this reporting period, on December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 38137

*Paragraph 10. MCSO shall collect and maintain all data and records necessary to: (1) implement this order, and document implementation of and compliance with this Order, including data and records necessary for the Monitor to conduct reliable outcome assessments, compliance reviews, and audits; and (2) perform ongoing quality assurance in each of the areas addressed by this Order. At a minimum, the foregoing data collection practices shall comport with current professional standards, with input on those standards from the Monitor.*

**In Full and Effective Compliance**

CID continues to be responsive to our requests. CID also addresses with immediacy any issues we encounter in the samples we request – be they technical issues, missing documents, or other problems. MCSO's Bureau of Internal Oversight (BIO) routinely audits the work products of the Office, particularly in the areas that directly affect compliance with the requirements of the Orders. In many instances, BIO will review the same material we request in our samples, and BIO frequently notes – and addresses – the same deficiencies we identify in our reviews.

During this reporting period, on December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

*Paragraph 11. Beginning with the Monitor's first quarterly report, the Defendants, working with the unit assigned for implementation of the Order, shall file with the Court, with a copy to the Monitor and Plaintiffs, a status report no later than 30 days before the Monitor's quarterly report is due. The Defendants' report shall (i) delineate the steps taken by the Defendants during the reporting period to implement this Order; (ii) delineate the Defendants' plans to correct any problems; and (iii) include responses to any concerns raised in the Monitor's previous quarterly report.*

**In Full and Effective Compliance**

On March 22, 2018, CID published its most recent quarterly report as required by this Paragraph. The report covered the fourth quarter of 2018: October 1-December 31, 2018. For each section, MCSO provided an overview of the agency's activities working toward compliance. For each Paragraph, MCSO offered comments on the compliance status; and in some instances, provided responses to concerns raised in our previous quarterly status report, published on February 21, 2019. MCSO asserted Full and Effective Compliance (FEC) with Paragraph 27 for the first time and continued to assert it for the following Paragraphs for which we previously granted FEC: Paragraphs 9; 10; 11; 12; 13; 23; 26; 28; 29; 30; 35; 36; 37; 38; 40; 55; 59; 60; 68; 71; 77; 88; and 101. We advised MCSO that we concurred with the agency's assertion for Paragraph 27, and this change will be reflected in our next quarterly status report.

During this reporting period, on December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 38138

***Paragraph 12.*** *The Defendants, working with the unit assigned for implementation of the Order, shall conduct a comprehensive internal assessment of their Policies and Procedures affecting Patrol Operations regarding Discriminatory Policing and unlawful detentions in the field as well as overall compliance with the Court's orders and this Order on an annual basis. The comprehensive Patrol Operations assessment shall include, but not be limited to, an analysis of collected traffic-stop and high-profile or immigration-related operations data; written Policies and Procedures; Training, as set forth in the Order; compliance with Policies and Procedures; Supervisor review; intake and investigation of civilian Complaints; conduct of internal investigations; Discipline of officers; and community relations. The first assessment shall be conducted within 180 days of the Effective Date. Results of each assessment shall be provided to the Court, the Monitor, and Plaintiffs' representatives.*

**In Full and Effective Compliance**

See Paragraph 13.

During this reporting period, on December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.


***Paragraph 13.*** *The internal assessments prepared by the Defendants will state for the Monitor and Plaintiffs' representatives the date upon which the Defendants believe they are first in compliance with any subpart of this Order and the date on which the Defendants first assert they are in Full and Effective Compliance with the Order and the reasons for that assertion. When the Defendants first assert compliance with any subpart or Full and Effective Compliance with the Order, the Monitor shall within 30 days determine whether the Defendants are in compliance with the designated subpart(s) or in Full and Effective Compliance with the Order. If either party contests the Monitor's determination it may file an objection with the Court, from which the Court will make the determination. Thereafter, in each assessment, the Defendants will indicate with which subpart(s) of this Order it remains or has come into full compliance and the reasons therefore. The Monitor shall within 30 days thereafter make a determination as to whether the Defendants remain in Full and Effective Compliance with the Order and the reasons therefore. The Court may, at its option, order hearings on any such assessments to establish whether the Defendants are in Full and Effective Compliance with the Order or in compliance with any subpart(s).*

**In Full and Effective Compliance**

CID and the Monitoring Team established that the schedule for the submission of comprehensive annual assessments as required by these Paragraphs will run according to MCSO's fiscal year cycle, July 1-June 30. MCSO will submit reports on or before September 15 of each year.

WAI 38139

Consistent with this agreement, on September 17, 2018 (September 15 fell on a Saturday), MCSO filed with the Court its 2017 Annual Compliance Report covering the period of July 1, 2016-June 30, 2017.

During this reporting period, on December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 38140

## Section 4:  Policies and Procedures

**COURT ORDER V. POLICIES AND PROCEDURES**

*Paragraph 18.  MCSO shall deliver police services consistent with the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order, and with current professional standards.  In conducting its activities, MCSO shall ensure that members of the public receive equal protection of the law, without discriminating based on actual or perceived race or ethnicity, and in a manner that promotes public confidence.*

*Paragraph 19.  To further the goals in this Order, the MCSO shall conduct a comprehensive review of all Patrol Operations Policies and Procedures and make appropriate amendments to ensure that they reflect the Court's permanent injunction and this Order.*

**Phase 1:**  In compliance

- GA-1 (Development of Written Orders), most recently amended on March 28, 2019.

**Phase 2:**  In compliance

MCSO has taken steps toward a comprehensive review of its Patrol Operations Policies and Procedures in four phases.  First, on December 31, 2013, prior to my appointment as Monitor, MCSO filed with the Court all of its policies and procedures, with amendments, that MCSO believed complied with the various Paragraphs of the First Order.  Second, in the internal assessment referenced above, MCSO discussed its ongoing evaluation of Patrol Operations and its development of policies and procedures.  Third, in response to our requests, MCSO provided all of the policies and procedures it maintains are applicable to the First Order for our review and that of the Plaintiffs.  We provided our feedback, which also included the Plaintiffs' comments, on these policies on August 12, 2014.  Based on that feedback, MCSO made adjustments to many of the policies, concentrating first on the policies to be disseminated in Detentions, Arrests, and the Enforcement of Immigration-Related Laws Training; and the Bias Free Policing Training (often referred to as Fourth and Fourteenth Amendment Training) that commenced in early September.  We reviewed MCSO's updated policies and provided our approval for several on August 25, 2014.

Fourth, in discussions during 2016, MCSO requested more specific guidance on what we considered to be Patrol-related policies and procedures.  In response, we provided MCSO with a list of the Patrol-related policies for the purposes of Paragraph 19.  We included on this list policies that were not recently revised or currently under review.  Several policies required changes to comport with the First Order, Second Order, or both.  In 2018, MCSO published the last of the outstanding policies, placing it into compliance with this Paragraph.

WAI 38141

*Paragraph 20.   The MCSO shall comply with and operate in accordance with the Policies and Procedures discussed in this Order and shall take all reasonable measures to ensure that all Patrol Operations personnel comply with all such Policies and Procedures.*

*Paragraph 21.   The MCSO shall promulgate a new, department-wide policy or policies clearly prohibiting Discriminatory Policing and racial profiling.   The policy or policies shall, at a minimum:*

a.   *define racial profiling as the reliance on race or ethnicity to any degree in making law enforcement decisions, except in connection with a reliable and specific suspect description;*

b.   *prohibit the selective enforcement or non-enforcement of the law based on race or ethnicity;*

c.   *prohibit the selection or rejection of particular policing tactics or strategies or locations based to any degree on race or ethnicity;*

d.   *specify that the presence of reasonable suspicion or probable cause to believe an individual has violated a law does not necessarily mean that an officer's action is race-neutral; and*

e.   *include a description of the agency's Training requirements on the topic of racial profiling in Paragraphs 48–51, data collection requirements (including video and audio recording of stops as set forth elsewhere in this Order) in Paragraphs 54–63 and oversight mechanisms to detect and prevent racial profiling, including disciplinary consequences for officers who engage in racial profiling.*

**Phase 1:**   In compliance

- CP-2 (Code of Conduct), most recently amended on March 15, 2019.

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 26, 2018.

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- GI-1 (Radio and Enforcement Communications Procedures), most recently amended on April 19, 2018.

- GJ-33 (Significant Operations), most recently amended on May 10, 2018.

**Phase 2:**   Not applicable

WAI 38142

MCSO has developed and published the policies required by Paragraph 21.  MCSO distributed these policies and has trained agency personnel during the required Fourth and Fourteenth Amendment training, on an annual basis, since 2014.

MCSO's implementation of these policies is covered in other Paragraphs.

**Paragraph 22.**  *MCSO leadership and supervising Deputies and detention officers shall unequivocally and consistently reinforce to subordinates that Discriminatory Policing is unacceptable.*

**Phase 1:**  In compliance

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 26, 2018.
- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

**Phase 2:**  In compliance

With input from the Parties, the methodology for delivering reinforcement that discriminatory policing is unacceptable was modified.  Whereas supervisors were previously required to meet with employees to discuss CP-8 (Preventing Racial and Other Bias-Based Policing) once per quarter and document these discussions in Blue Team, the reinforcement of the policy will now be a two-step process conducted annually.  MCSO describes Part 1 of the process as the following: "On an annual basis, within the first six months, supervisors will have discussions, either individual or group, and view videos from the Training library with assigned employees, reserve deputies, and posse members.  The videos will be available through the HUB and attestation of the training will be through the HUB."  Part 2 of the process as described by MCSO: "On an annual basis, within the last six months, supervisors shall ensure that all employees, reserve deputies, and posse members complete their annual review and acknowledgment of office policy.  In addition, employees will be required to view a video from the Sheriff or designee, which reinforces the policy.  Acknowledgement is done through the HUB."

As an additional measure, supervisors will have the latitude to review and discuss the policy with their employees, and document the discussion in Blue Team.  MCSO will provide proof of compliance biannually, at the end of the six-month periods, when each of the elements of the process is completed.  MCSO will also provide progress reports in the interim.

The training for this reporting period consisted of viewing the Sheriff's video, reviewing CP-8 (Preventing Racial and Other Biased-Based Profiling), answering test questions on the subject matter, and acknowledging the video and understanding the content of CP-8.

WAI 38143

In November, MCSO submitted a Training Progress Summary.  The report indicated that 97.33% of sworn employees, 97.96% of Detention employees, 96.19% of civilian employees, 78.26% of reserve employees, 87.50% of retired reserve employees, and 83.90% of Posse members had undergone CP-8 training.  In December, MCSO submitted a Training Progress Summary that indicated compliance rates as follows: sworn, 98.35%; Detention, 98.61%; civilian, 97.04%; reserve, 82.61%; retired reserve, 87.50%; and Posse, 92.26%.  The overall compliance rate for the period in review was 97.27%

**Paragraph 23.**  *Within 30 days of the Effective Date, MCSO shall modify its Code of Conduct to prohibit MCSO Employees from utilizing County property, such as County e-mail, in a manner that discriminates against, or denigrates, anyone on the basis of race, color, or national origin.*

**In Full and Effective Compliance**

BIO uses a randomizing program to select samples for each inspection.  BIO reviews CAD messages in an effort to identify compliance with CP-2 (Code of Conduct), CP-3 (Workplace Professionalism: Discrimination and Harassment), and GM-1 (Electronic Communications, Data and Voice Mail).  In its submission, MCSO includes the specific nature of any potential concerns identified during the audits.  In May 2016, a Monitoring Team member observed the processes BIO uses to conduct CAD and email audits, to ensure that we thoroughly understand the mechanics involved in conducting these audits.  For CAD and email audits, we receive copies of the audits completed by BIO, the details of any violations found, and copies of the memoranda of concern or BIO Action Forms that are completed.

During this reporting period, MCSO submitted three CAD and Alpha Paging inspection reports, pursuant to our request for verification of compliance with this Paragraph.  BIO inspected 23,666 CAD/Alpha Paging messages for the October inspection, and reported a 100% compliance rate (BI2018-0116).  BIO inspected 18,742 CAD/Alpha Paging messages for the November inspection, and reported a 100% compliance rate (BI2018-0144).  BIO inspected 16,022 CAD/Alpha Paging messages for December 2018, and reported a compliance rate of 100% (BI2018-0157).

During this reporting period, MCSO submitted three email inspection reports, pursuant to our request for verification of compliance with this Paragraph.  The number of emails reviewed is usually less than the total number of emails, due to the elimination of routine business-related and administrative emails such as training announcements and Administrative Broadcasts.  For October 2018, the BIO inspection report (BI2018-0115) states that there were a total of 14,588 emails, of which BIO reviewed 12,984.  The inspection found that 99.99% of the inspected emails were in compliance.  The inspection found one email that contained profanity, and was therefore in violation of GM-1 (Electronic Communications, Data and Voice Mail).  BIO generated an Action Form for the violation.  BIO inspected 14,951 of 16,925 emails for the November inspection (Inspection Report BI2018-0129), and reported a 100% compliance rate.  For the December inspection, BIO inspected 11,738 of 13,741 emails.  The BIO inspection report (BI2018-0143) reported a 99.97% compliance rate.  MCSO identified two employees

WAI 38144

who sent emails with obscene or unprofessional content, in violation of GM-1 (Electronic Communications, Data and Voice Mail). BIO generated two Action Forms to address the noted deficiencies.

During this reporting period, BIO conducted facility inspections of Patrol District 1, Medical Transport Services, and the Court Implementation Division. On October 18, 2018, BIO conducted an inspection of Patrol District 1. District 1 is considered MCSO's busiest District, and covers an area of 502 square miles. The District has a total of 78 employees. The inspection found four deficiencies. Inspectors found four files containing outdated documents, missing documentation of required inspections, improper storage of used syringes, and four unsubmitted property reports. The inspection resulted in a 95% compliance rating. BIO generated one Action Form, listing the four deficiencies.

On November 27, 2018, BIO conducted an inspection of Medical Transport Services (MTS). MTS is a sub-unit of the Inmate Medical Services Division. MTS operates out of the Maricopa Medical Center, one of several medical facilities operated by the Maricopa Integrated Health System. MTS is headed by a lieutenant, and staffed by nine sergeants and 73 officers. The inspection covered three areas: administration and supervision, safety and security of the facility, and property and evidence handling. The inspection resulted in a 100% compliance rating.

On December 20, 2018, BIO conducted an inspection of the Court Implementation Division (CID), inspection report BI2018-0150. The mission of the Court Implementation Division is to work with the Monitoring Team and the Parties on issues of compliance with the Court Order. The inspection found two deficiencies. Three employee files contained outdated documents, and there was insufficient documentation of required inspections. The inspection resulted in a 93.5% compliance rating. BIO generated one Action Form for the two deficiencies.

All monthly inspection reports noted there was no evidence indicating that any of the facilities were used in a manner that would discriminate, or denigrate anyone on the basis of race, color, national origin, age, religious beliefs, gender, culture, sexual orientation, veteran status, or disability. We reviewed the Matrix Checklist used for these inspections, and it contains a specific question regarding the use of any Office or County equipment that would violate this Paragraph. During our January visits to Districts 1, 2, 4, and 6, and Lake Patrol, we observed no evidence to indicate a violation of this Paragraph.

During this reporting period, on December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 38145

***Paragraph 24.*** *The MCSO shall ensure that its operations are not motivated by or initiated in response to requests for law enforcement action based on race or ethnicity. In deciding to take any law enforcement action, the MCSO shall not rely on any information received from the public, including through any hotline, by mail, email, phone or in person, unless the information contains evidence of a crime that is independently corroborated by the MCSO, such independent corroboration is documented in writing, and reliance on the information is consistent with all MCSO policies.*

**Phase 1:** In compliance

- GI-7 (Processing of Bias-Free Tips), published August 23, 2017.

**Phase 2:** In compliance

MCSO created the Sheriff's Intelligence Leads and Operations (SILO) Unit in the first quarter of 2016. The SILO Unit became operational on September 11, 2017. GI-7 requires that any tips received by MCSO components be forwarded to the SILO Unit for recording and processing. The SILO Unit classifies this information by the type of alleged criminal activity, or service requested, and forwards it to the appropriate unit for action and response. In some cases, residents email or call with requests for traffic enforcement, or for MCSO to address quality-of-life issues; these are considered calls for service rather than tips on criminal activity. If the information provided pertains to criminal activity in another jurisdiction, MCSO forwards the information to the appropriate law enforcement agency and documents it in the SILO database. Generally, if there is any bias noted in the information received, MCSO closes the tip and takes no action. We review all tips that MCSO closes due to bias.

During this reporting period, we reviewed 351 tips submitted for October, 242 tips submitted for November, and 277 tips submitted for December. The SILO Unit received a total of 870 tips, which were classified and recorded according to the type of alleged violation or service requested. Our reviews for the fourth quarter indicated that the major percentages of tips were related to warrants (20%), animal crimes (8%), and drug-related offenses (17%). The other two categories that resulted in large numbers of tips were "information only" (20%) and "other" (14%). During this reporting period, MCSO received three tips that were closed due to bias. We reviewed the information provided for each tip and concluded that MCSO handled their disposition according to policy.

Our reviews of the documentation provided, pursuant to the requirements of this Paragraph, have not discovered any evidence of bias in the processing of tips. We have also determined that MCSO is independently corroborating information received through tips before it is acted upon, to ensure that there is an appropriate criminal predicate.

WAI 38146

**b. Policies and Procedures to Ensure Bias-Free Traffic Enforcement**

**Paragraph 25.**   The MCSO will revise its policy or policies relating to traffic enforcement to ensure that those policies, at a minimum:

a.    prohibit racial profiling in the enforcement of traffic laws, including the selection of which vehicles to stop based to any degree on race or ethnicity, even where an officer has reasonable suspicion or probable cause to believe a violation is being or has been committed;

b.    provide Deputies with guidance on effective traffic enforcement, including the prioritization of traffic enforcement resources to promote public safety;

c.    prohibit the selection of particular communities, locations or geographic areas for targeted traffic enforcement based to any degree on the racial or ethnic composition of the community;

d.    prohibit the selection of which motor vehicle occupants to question or investigate based to any degree on race or ethnicity;

e.    prohibit the use of particular tactics or procedures on a traffic stop based on race or ethnicity;

f.    require deputies at the beginning of each stop, before making contact with the vehicle, to contact dispatch and state the reason for the stop, unless Exigent Circumstances make it unsafe or impracticable for the deputy to contact dispatch;

g.    prohibit Deputies from extending the duration of any traffic stop longer than the time that is necessary to address the original purpose for the stop and/or to resolve any apparent criminal violation for which the Deputy has or acquires reasonable suspicion or probable cause to believe has been committed or is being committed;

h.    require the duration of each traffic stop to be recorded;

i.    provide Deputies with a list and/or description of forms of identification deemed acceptable for drivers and passengers (in circumstances where identification is required of them) who are unable to present a driver's license or other state-issued identification; and

j.    instruct Deputies that they are not to ask for the Social Security number or card of any motorist who has provided a valid form of identification, unless it is needed to complete a citation or report.

**Phase 1:**  In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

WAI 38147

- GI-1 (Radio and Enforcement Communications Procedures), most recently amended on April 19, 2018.

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 26, 2018.

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

**Phase 2:** In compliance

During the finalization of the Fourth and Fourteenth Amendment training curricula required by the Order, the Parties agreed to a list and/or description of forms of identification deemed acceptable for drivers and passengers, as required by this Paragraph.  The data required for verification to ensure compliance with these policies is captured by the TraCS system.  The system documents the requirements of the Order and MCSO policies.  MCSO has continued to make technical changes to the TraCS system to ensure that the mandatory fields on the forms used to collect the data are completed and that deputies are capturing the required information.  TraCS is a robust system that allows MCSO to make technical changes to improve how required information is captured.

To verify Phase 2 compliance with this Paragraph, we reviewed MCSO's Vehicle Stop Contact Form (VSCF), Vehicle Stop Contact Form Supplemental Sheet, Incidental Contact Receipt, Written Warning/Repair Form, Arizona Traffic Ticket and Complaint Form, Internet I/Viewer Event Form, Justice Web Interface Form, CAD printout, and any Incident Report generated by the traffic stop.  MCSO created many of these forms to capture the requirements of Paragraphs 25 and 54.

Since our July 2015 site visit, there has been significant improvement in the TraCS system that has enhanced the reliability and validity of the data provided by MCSO.  This improvement has been buttressed by the introduction of data quality control procedures now being implemented and memorialized in the EIU Operations Manual.  (This is further discussed in Paragraph 56, below.)  We also compared traffic stop data between Latino and non-Latino drivers in the samples provided to us.

Paragraph 25.a. prohibits racial profiling in the enforcement of traffic laws, including the selection of which vehicles to stop based to any degree on race or ethnicity, even where a deputy has reasonable suspicion or probable cause to believe a violation is being or has been committed.  The selection of the sample size and the sampling methodology employed for drawing our sample is detailed in Section 7: Traffic Stop Documentation and Data Collection.

Our review of a sample of 105 traffic stops that occurred during this reporting period in Districts 1, 2, 3, 4, 6, and 7, and Lake Patrol indicated that MCSO was following protocol, and that the stops did not violate the Order or internal policies.  During our January 2019 site visit, we met with the commanding officers from Districts 1, 4, 6, and 7 and Lake Patrol, who advised us that they had not received any complaints during this reporting period from Latino drivers alleging racial profiling.  We interviewed the District Commanders and inquired if their respective Districts had received any complaints alleging selective enforcement targeting

WAI 38148

specific communities or enforcement based on race.  None of the District Commanders were aware of any complaints alleging racial or ethnic-based traffic enforcement.  Paragraphs 66 and 67 require an annual comprehensive analysis of all traffic stop data, which will more accurately determine if MCSO is meeting the requirements of this Paragraph.  MCSO remains in compliance with this Subparagraph.

Paragraph 25.b. requires MCSO to provide deputies with guidance on effective traffic enforcement, including the prioritization of traffic enforcement resources to promote public safety.  EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), Sections A-E, address these concerns.  The policy specifies that driving under the influence and speeding are the main causes of accidents, and should be the focus of traffic enforcement.  Based on our review of the data provided for this reporting period, the most common traffic stop violations are as follows: 52 stops for speed above the posted limit (50%); 15 stops for failure to obey official traffic control devices (14%); 12 stops for failure to possess valid registrations or tags (11%); 10 stops for equipment violations (10%); five stops for failure to maintain a lane of traffic (5%); and 10 stops for other moving violations (10%).

As the policy specifically identifies speeding violations as one of the contributing factors of traffic accidents, MCSO deputies have targeted this violation.  In our review, we break down the specific traffic violation for each stop and use each traffic stop form completed by deputies during the stop to make a determination if the stop is justified and fulfills the requirements of this Paragraph.  When we review the sample traffic stops from across all Districts, we note the locations of the stops contained on the VSCF, the CAD printout, and the I/Viewer system to ensure that they are accurate.  We continue to identify instances where the location of the stop contained on the VSCF and the location of the stop contained on the CAD printout are inconsistent.  Reviewing supervisors are not identifying and addressing this issue.  We recommend that reviewing supervisors closely review the VSCFs and CAD printouts and address such deficiencies.  MCSO remains in compliance with this Subparagraph.

Paragraph 25.c. requires MCSO to prohibit the selection of particular communities, locations, or geographic areas for targeted traffic enforcement based to any degree on the racial or ethnic composition of the community.  During our inspection, we document the location of every stop and note the GPS coordinates if available.  Our review of the sample data covering all MCSO Districts during this reporting period did not indicate that MCSO was targeting any specific area or ethnicity to conduct traffic stops.  During our January 2019 visits to Districts 1, 4, 6, and 7 and Lake Patrol, we inquired if the District Commanders had received any complaints from the public regarding MCSO enforcement activities in their communities.  None of the Districts had received any complaints with regard to racial or ethnic-based targeted enforcement.

MCSO is in compliance with this Subparagraph.

WAI 38149

Paragraph 25.d. requires MCSO to prohibit the selection of which motor vehicle occupants to question or investigate based, to any degree, on race or ethnicity. We reviewed the demographic data of Maricopa County (according to 2018 U.S. Census data, 31.1% of the population is Latino), and found that the ratio of Latino drivers stopped during this reporting period was lower than in past reporting periods in comparison to the ethnicity of the population in the County. (See Paragraph 54.e.) Fifteen (42%) of the 36 stops where passenger contacts occurred involved Latino drivers.

A review of citizen complaints for this reporting period revealed that one complaint was filed by a complainant with a Hispanic surname; he alleged that he was stopped by an MCSO deputy because he was Latino. The complaint is currently under investigation. We will monitor the outcome of this case.

MCSO has fully implemented body-worn cameras, and we review a sample of the recordings each reporting period to verify if deputies are questioning occupants to determine if they are legally in the country.

During this reporting period, we observed that 35 of the 105 stops occurred during nighttime hours. During our visits to Districts 1, 4, 6, and 7 and Lake Patrol in January 2019, we inquired if any Latino drivers or passengers made any complaints regarding deputies using particular tactics or procedures to target Latinos. None of the personnel we interviewed were aware of any complaints alleging discrimination or the targeting of Latinos in traffic enforcement. Our review of the sample data indicated that generally, traffic stops were not based on race or ethnicity and reflected the general makeup of the population of the County. MCSO is in compliance with this Subparagraph.

Paragraph 25.e. requires MCSO to prohibit the use of particular tactics or procedures on a traffic stop based on race or ethnicity. We reviewed a sample of CAD audio recordings and CAD printouts where the dispatcher entered the reason for the stop when advised by the deputy in the field. We also reviewed body-worn camera recordings of deputies making traffic stops. The methodology that we employed to select our cases is described in detail in Section 7. In the cases we reviewed, the CAD audio recordings and the body-worn camera video revealed that deputies were not making traffic stops using tactics based on race or ethnicity. MCSO remains in compliance with this Subparagraph.

WAI 38150

Paragraph 25.f. requires deputies at the beginning of each stop, before making contact with the vehicle, to verbally contact dispatch and state the reason for the stop unless exigent circumstances make it unsafe for the deputy to contact Communications.  When the deputy advises Communications of the location, tag number, and reason for the stop, this information is digitally logged on the CAD printout and it is audio recorded.  (See Subparagraph 54.e.)  We reviewed 30 CAD audio recordings and the CAD printouts; in each, the deputy advised dispatch of the reason for the stop.  Through our reviews of BWC recordings and CAD printouts, we verified that the reason for the stop was voiced prior to making contact with the drivers in 30 of the 30 cases we reviewed.  For the 75 other cases that were part of our sample, we reviewed the VSCFs and the CAD printouts to ensure that deputies properly advised dispatch of the reason for the stop prior to making contact with the violator.  In all 75 stops, the deputy properly advised dispatch the reason for the stop.  MCSO is in compliance with this Subparagraph.

Paragraph 25.g. prohibits deputies from extending the duration of any traffic stop longer than the time that is necessary to address the original purpose for the stop and/or to resolve any apparent criminal violation for which the deputy has or acquires reasonable suspicion or probable cause to believe has been committed or is being committed.  MCSO employs a series of five questions on the VSCF to document the circumstances that might require a stop to be prolonged.  In our review of 105 traffic stops, we determined that MCSO documented a response to at least one of the series of five questions in 23 of the stops.  Our review of those stops revealed that in 11, the deputies indicated that they experienced a technological difficulty. For nine of those stops, the duration of the stops ranged from 12 minutes to 24 minutes; while for two of the stops, the duration ranged from 27 minutes to 50 minutes.  For the remaining 12 stops, the responses to the five questions provided an adequate explanation for the duration of the stop.  The duration of those stops ranged from nine minutes to three hours and 25 minutes. The particulars of those 12 stops are as follows:

- A Latino driver was stopped for speeding.  The VSCF indicated that the stop involved training.  The driver was issued a citation.

- A White male driver was stopped for a stop sign violation.  The VSCF indicated that the stop involved training.  The driver was issued a citation.

- A White female driver was stopped for a red-light violation.  The VSCF indicated that the stop involved training.  The driver was issued a citation.

- A Black male driver was stopped for driving with no visible license plate.  During the stop it was discovered that the vehicle did have a license plate that appeared to have been altered.  In addition, during the stop, the driver was found to be in possession of narcotics and narcotic paraphernalia.  The driver was arrested and the vehicle was impounded.  The driver was issued a warning for the traffic violation.  In addition, the deputy prepared a report for review by the Maricopa County Attorney's Office in relation to potential criminal charges against the driver.

WAI 38151

- A White male driver was stopped for driving the wrong way on the roadway.  The driver was arrested for Driving Under the Influence.  The vehicle was towed and impounded.  The driver was issued a citation.

- A White female driver was stopped for speeding.  The VSCF indicated that the stop involved training.  The driver was issued a citation.

- A White male driver was stopped for driving the wrong way on the roadway.  The vehicle was occupied by a White female passenger.  The driver was arrested for Driving Under the Influence.  The vehicle was towed and impounded.  The deputy prepared a report for review by the Maricopa County Attorney's Office in relation to potential criminal charges against the driver.  In addition, the VSCF indicated that the stop involved training.

- A White male driver was stopped for a stop sign violation.  The vehicle was occupied by a White female passenger.  The deputy indicated on the VSCF that a Driving Under the Influence investigation was conducted after he detected the odor of alcohol emanating from the passenger compartment of the vehicle.  The deputy determined that the driver was not impaired.  The driver was issued a warning.

- A White male driver was stopped for speeding.  The VSCF indicated that the deputy experienced technological difficulties with the printer during the stop.  The driver was issued a warning.

- A White female was stopped for failure to maintain lane of traffic.  The deputy indicated on the VSCF that a Driving Under the Influence investigation was conducted.  The deputy determined that the driver was not impaired.  The driver was issued a warning.

- A White female driver was stopped for failure to maintain lane of traffic.  The driver was arrested for Driving Under the Influence.  The vehicle was towed and impounded.  The driver's license was seized and placed in evidence.  The driver was issued a citation.  In addition, the VSCF indicated that the stop involved training.

- A Black female driver was stopped for speeding.  The driver did not have any identification on her person.  The vehicle was occupied by a Black male passenger.  The driver's license was revoked.  The vehicle was towed and impounded.  The driver was issued a citation.

MCSO remains in compliance with this Subparagraph.

Paragraph 25.h. requires the duration of each traffic stop to be recorded.  The time of the stop and its termination is now auto-populated on the VSCF by the CAD system.  To ensure data entry accuracy, MCSO implemented a technical change to the TraCS system on November 29, 2016.  The change automatically creates a red field in the stop contact times if the deputy manually changes these times on the VSCF.  In our review, we determined that the duration was recorded accurately in 105 of the 105 traffic stops.  MCSO is in compliance with this Subparagraph, with 100% compliance.

WAI 38152

Paragraph 25.i. requires that MCSO provide deputies with a list and/or description of forms of identification deemed acceptable for drivers and passengers (in circumstances where identification is required of them) who are unable to present a driver's license or other state-issued identification. The Plaintiffs' attorneys and MCSO have agreed on acceptable forms of identification, and this information has been included in the Fourth and Fourteenth Amendment training. EA-11 (Arrest Procedures), most recently amended on June 14, 2018, provides a list of acceptable forms of identification if a valid driver's license cannot be produced. During this reporting period's review of the sample of 105 traffic stops, there were three drivers who did not present a valid driver's license to deputies. The cases are described in detail below:

- A White female driver was stopped for speeding. The driver did not have any identification on her person. The deputy was able to verify that the driver had a valid driver's license and issued her a citation for the violation.

- A White male was stopped for a stop sign violation. The driver did not have any identification on his person. The deputy was able to verify that the driver had a valid driver's license and issued him a warning for the violation.

- A Black female driver was stopped for speeding. The driver did not have any identification on her person. The vehicle was occupied by a Black male passenger. The driver's license was revoked. The vehicle was towed and impounded. The driver was issued a citation.

In our review of the sample of cases in relation to Paragraph 54.k., searches of persons, we identified eight cases where the drivers did not present a valid driver's license to the deputies. The cases are described in detail below:

- A Latino driver was stopped for a stop sign violation. The driver fled from his vehicle and was subsequently apprehended by the deputy. The driver did not have any identification on his person. The driver was arrested for Driving Under the Influence, Resisting Arrest, and for an outstanding warrant. The deputy prepared a report for review by the Maricopa County Attorney's Office in relation to potential criminal charges against the driver.

- A Latino driver was stopped for a stop sign violation. The driver did not have any identification on his person. The vehicle was occupied by a Latino (child) passenger. The deputy discovered that the vehicle's license plate was suspended. The driver was issued a warning.

- A White female driver was stopped for an expired license plate registration. The driver produced an Arizona driver's license. The deputy subsequently discovered that the driver's license was suspended. The driver was arrested and the vehicle was towed and impounded. The driver's license and the license were seized and placed in evidence. The vehicle was towed and impounded. The driver was issued a citation.

WAI 38153

- A Latina driver was stopped for an equipment violation (missing brake light).  The driver produced an Arizona driver's license.  The vehicle was occupied by a Black male passenger.  The deputy subsequently discovered that the driver's license was suspended.  The driver's license was seized and placed in evidence.  The vehicle was towed and impounded.  The driver was issued a citation.

- A Latino driver was stopped for failure to maintain a lane of traffic.  The driver did not have any identification on his person.  The vehicle was occupied by three Latina passengers and one Latino passenger.  The driver's license was suspended and he had three warrants for his arrest.  The deputy arrested the driver.  The driver was issued a warning for the traffic violation and for driving with a suspended driver's license.

- A Black male driver was stopped for failure to maintain a lane of traffic.  The driver produced an Illinois identification card.  The driver's license was suspended and he was arrested for Driving Under the Influence and possession of marijuana.  The vehicle was towed and impounded.  The driver was issued a citation.

- A White male driver was stopped for operating a motor vehicle with an unreadable license plate.  The driver did not have any identification on his person.  The driver's license was suspended.  The driver was arrested and the vehicle was towed and impounded.  The driver was issued a citation.

- A Latino driver was stopped for speeding.  The driver did not have any identification on his person.  The vehicle was occupied by a Black male passenger.  The driver was arrested for two outstanding warrants.  The vehicle's license plate was seized as it was suspended.  The passenger was released.  The driver was issued a citation.

In our review of the sample of cases in relation to Paragraphs 25.d. and 54.g., passenger contacts, we identified two cases where the drivers did not present a valid driver's license to the deputies.  The cases are described in detail below:

- A Latino driver was stopped for making an improper right turn at a red light.  The driver produced an Arizona driver's license.  The vehicle was occupied by a Latina passenger and another passenger who was seated in the rear seat, who was listed as "unknown, vision obstructed."  The deputy subsequently discovered that the driver's license was suspended.  The driver's license was seized and placed in evidence.  The Latina passenger, who was the registered owner of the vehicle, took possession of the vehicle.  The driver was issued a citation.

- A Latino driver was stopped for an equipment violation (operating a motor vehicle with one headlight).  The driver produced an Arizona driver's license, which was suspended.  The vehicle was occupied by a Latino passenger.  The deputy seized the driver's license and placed it in evidence.  After the deputy verified that the passenger had a driver's license, the vehicle was released to him.  The driver was issued a citation.

MCSO remains in compliance with this Subparagraph.

WAI 38154

Paragraph 25.j. requires MCSO to instruct deputies that they are not to ask for the Social Security Number or card of any motorist who has provided a valid form of identification, unless it is needed to complete a citation or report. EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) prohibits deputies from asking for the Social Security Number of any motorist who has provided a valid form of identification. During this reporting period's review of the sample of 105 traffic stops, we did not identify any cases where a deputy requested the Social Security Number or card of a driver. In our review of the sample of traffic stops reviewed for Paragraph 54.k., one case was identified where the deputy made an arrest of a Latino driver for two outstanding warrants after the driver was stopped for speeding. The driver did not have any identification on his person. The deputy requested the driver's social security number; however, the driver stated that he did not know his Social Security Number.

In our review of the sample of traffic stops reviewed for Paragraphs 25.d and 54.g., we identified the following three cases:

- A Black male driver was stopped for driving with no lights on at night. The driver did not have any identification on his person. The vehicle was occupied by two Latina passengers. The driver advised the deputy that his driver's license was valid. The deputy ran the name provided by the driver in an attempt to verify that he had a valid driver's license; however, the deputy as unable to locate any driving record based on the name provided. After the driver insisted that he provided the deputy with accurate information regarding his name and date of birth, the deputy then requested and obtained the driver's Social Security Number. The deputy was still unable to confirm that the driver had a driver's license. After the deputy verified that the passenger had a driver's license, the vehicle was released to her. The driver was issued a citation.

- A White male driver was stopped for a red-light violation. The driver did not have any identification on his person. The vehicle was occupied by a White female passenger. The deputy ran the name provided by the driver in an attempt to verify that he had a valid driver's license; however, the deputy as unable to locate any driving record based on the name provided. In addition, based on the name provided, a records check revealed that the name the driver provided is an alias used by a subject who is wanted on a felony warrant. The driver's Social Security Number was then requested and obtained in an attempt to confirm his identity. The deputy subsequently confronted the driver, advising him that it was a crime to provide a false name to law enforcement. The driver subsequently confirmed that his real name is the name listed on the felony warrant. The driver was arrested for the felony warrant. The vehicle was released to the passenger. The driver was issued a citation.

- A Latino driver was stopped for an equipment violation (operating a motor vehicle with one headlight). The driver did not have any identification on his person. The vehicle was occupied by a Latina passenger. The deputy requested and obtained the last four numbers of the driver's Social Security Number to verify the driver's identity. The

WAI 38155

deputy determined that the driver's license was suspended.  The passenger was allowed to drive the vehicle from the scene.  The driver was issued a citation.

In each of these cases, the drivers did not have any identification on their persons, and the deputies had legitimate reasons to request the Social Security Numbers from the drivers. MCSO remains in compliance with this Subparagraph.

**Paragraph 26.**   *The MCSO shall revise its policy or policies relating to Investigatory Detentions and arrests to ensure that those policies, at a minimum:*

a.      *require that Deputies have reasonable suspicion that a person is engaged in, has committed, or is about to commit, a crime before initiating an investigatory seizure;*

b.      *require that Deputies have probable cause to believe that a person is engaged in, has committed, or is about to commit, a crime before initiating an arrest;*

c.      *provide Deputies with guidance on factors to be considered in deciding whether to cite and release an individual for a criminal violation or whether to make an arrest;*

d.      *require Deputies to notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration-Related Crime, or for any crime by a vehicle passenger related to lack of an identity document;*

e.      *prohibit the use of a person's race or ethnicity as a factor in establishing reasonable suspicion or probable cause to believe a person has, is, or will commit a crime, except as part of a reliable and specific suspect description; and*

f.      *prohibit the use of quotas, whether formal or informal, for stops, citations, detentions, or arrests (though this requirement shall not be construed to prohibit the MCSO from reviewing Deputy activity for the purpose of assessing a Deputy's overall effectiveness or whether the Deputy may be engaging in unconstitutional policing).*

**In Full and Effective Compliance**

MCSO has not made any immigration-related arrests or conducted any immigration-related investigations in recent years.  There were no incidents or arrests that would fall under the reporting requirements of this Paragraph during this reporting period.

To determine compliance with this Paragraph, we also review booking lists and criminal citation lists for each month of the reporting period.  From each list, we select a 10% random sample of incidents.  For this quarter, we reviewed 56 incidents resulting in arrest and 59 incidents in which criminal citations were issued.  In addition, we reviewed 243 Incident Reports.  All of the documentation we reviewed during this reporting period indicates that MCSO is in compliance with this Paragraph.

WAI 38156

In addition to the above, we review field interviews and contacts with members of the community to assess compliance with Paragraph 26.  These types of contacts, that do not involve traffic stops, are documented in Non-Traffic Contact Forms (NTCFs).  For this reporting period, we reviewed 63 NTCFs.  Our reviews of the NTCFs for this reporting period did not reveal any issues of concern, as it relates to this Paragraph.

During this reporting period, on December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

### d. Policies and Procedures Governing the Enforcement of Immigration-Related Laws

*Paragraph 27.*  *The MCSO shall remove discussion of its LEAR Policy from all agency written Policies and Procedures, except that the agency may mention the LEAR Policy in order to clarify that it is discontinued.*

**Phase 1:**  In compliance

MCSO asserts that it does not have an agency LEAR policy.  We have verified, through our document reviews and site compliance visits, that MCSO does not have a LEAR policy.

**Phase 2:**  In compliance

*Paragraph 28.*  *The MCSO shall promulgate a new policy or policies, or will revise its existing policy or policies, relating to the enforcement of Immigration-Related Laws to ensure that they, at a minimum:*

a.      *specify that unauthorized presence in the United States is not a crime and does not itself constitute reasonable suspicion or probable cause to believe that a person has committed or is committing any crime;*

b.      *prohibit officers from detaining any individual based on actual or suspected "unlawful presence," without something more;*

c.      *prohibit officers from initiating a pre-textual vehicle stop where an officer has reasonable suspicion or probable cause to believe a traffic or equipment violation has been or is being committed in order to determine whether the driver or passengers are unlawfully present;*

d.      *prohibit the Deputies from relying on race or apparent Latino ancestry to any degree to select whom to stop or to investigate for an Immigration-Related Crime (except in connection with a specific suspect description);*

e.      *prohibit Deputies from relying on a suspect's speaking Spanish, or speaking English with an accent, or appearance as a day laborer as a factor in developing reasonable suspicion or probable cause to believe a person has committed or is committing any*

WAI 38157

*crime, or reasonable suspicion to believe that an individual is in the country without authorization;*

f.   *unless the officer has reasonable suspicion that the person is in the country unlawfully and probable cause to believe the individual has committed or is committing a crime, the MCSO shall prohibit officers from (a) questioning any individual as to his/her alienage or immigration status; (b) investigating an individual's identity or searching the individual in order to develop evidence of unlawful status; or (c) detaining an individual while contacting ICE/CBP with an inquiry about immigration status or awaiting a response from ICE/CBP. In such cases, the officer must still comply with Paragraph 25(g) of this Order.   Notwithstanding the foregoing, an officer may (a) briefly question an individual as to his/her alienage or immigration status; (b) contact ICE/CBP and await a response from federal authorities if the officer has reasonable suspicion to believe the person is in the country unlawfully and reasonable suspicion to believe the person is engaged in an Immigration-Related Crime for which unlawful immigration status is an element, so long as doing so does not unreasonably extend the stop in violation of Paragraph 25(g) of this Order;*

g.   *prohibit Deputies from transporting or delivering an individual to ICE/CBP custody from a traffic stop unless a request to do so has been voluntarily made by the individual;*

h.   *Require that, before any questioning as to alienage or immigration status or any contact with ICE/CBP is initiated, an officer check with a Supervisor to ensure that the circumstances justify such an action under MCSO policy and receive approval to proceed.  Officers must also document, in every such case, (a) the reason(s) for making the immigration-status inquiry or contacting ICE/CBP, (b) the time approval was received, (c) when ICE/CBP was contacted, (d) the time it took to receive a response from ICE/CBP, if applicable, and (e) whether the individual was then transferred to ICE/CBP custody.*

**In Full and Effective Compliance**

During the fourth quarter of 2018, there were no reported instances of deputies having contact with Immigration and Customs Enforcement (ICE) or Customs and Border Protection (CBP) for the purpose of making an immigration status inquiry, and there were no reported arrests for any immigration-related investigations, or for any immigration-related crimes.  The reviews of documentation submitted for this reporting period indicate that MCSO has complied with the reporting requirements related to Paragraph 28.  In our reviews of incidents involving contact with the public, including traffic stops, arrests, and investigative stops, we monitor deputies' actions to verify compliance with this Order.

In the November document submission, MCSO reported that a deputy noted an immigration inquiry in a Vehicle Stop Contact Form (VSCF).  MCSO stated that this appeared to be an error in the entry, and that the BWC video confirmed there was no inquiry.  We reviewed the VSCF and agree that this was probably a mistake by the deputy.  The individual stopped was not a member of the Plaintiffs' class.  We note that the VSCF was reviewed and approved by the

WAI 38158

supervisor; this error was discovered by BIO, not by the deputy's supervisor. In addition to documentation provided in response to this Paragraph, our reviews of documentation provided for other Paragraphs of this Order have found no evidence to indicate a violation of this Paragraph. In total, we reviewed 56 Arrest Reports, 59 criminal citations, 164 traffic stops, 63 NTCFs, and 243 Incident Reports for this reporting period and found no issues of concern, as it relates to this Paragraph.

During this reporting period, on December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

### e. Policies and Procedures Generally

**Paragraph 29.** *MCSO Policies and Procedures shall define terms clearly, comply with applicable law and the requirements of this Order, and comport with current professional standards.*

**In Full and Effective Compliance**

During this reporting period, on December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

See Paragraph 30.

**Paragraph 30.** *Unless otherwise noted, the MCSO shall submit all Policies and Procedures and amendments to Policies and Procedures provided for by this Order to the Monitor for review within 90 days of the Effective Date pursuant to the process described in Section IV. These Policies and Procedures shall be approved by the Monitor or the Court prior to their implementation.*

**In Full and Effective Compliance**

MCSO continues to provide us, the Plaintiffs' attorneys, and the Plaintiff-Intervenors with drafts of its Order-related policies and procedures prior to publication, as required by the Order. We, the Plaintiffs' attorneys, and the Plaintiff-Intervenors review the policies to ensure that they define terms clearly, comply with applicable law and the requirements of the Order, and comport with current professional standards. Once drafts are finalized, incorporating the feedback of the Plaintiffs' attorneys, the Plaintiff-Intervenors, and the Monitoring Team, MCSO provides them to the Monitoring Team for final review and approval. As this process has been followed for the Order-related policies published thus far, MCSO is in compliance with this Paragraph.

WAI 38159

During this reporting period, on December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 31.** *Within 60 days after such approval, MCSO shall ensure that all relevant MCSO Patrol Operation Personnel have received, read, and understand their responsibilities pursuant to the Policy or Procedure. The MCSO shall ensure that personnel continue to be regularly notified of any new Policies and Procedures or changes to Policies and Procedures. The Monitor shall assess and report to the Court and the Parties on whether he/she believes relevant personnel are provided sufficient notification of and access to, and understand each policy or procedure as necessary to fulfill their responsibilities.*

**Phase 1:** In compliance

- GA-1 (Development of Written Orders), most recently amended on March 28, 2019.

**Phase 2:** In compliance

GA-1 indicates that Office personnel shall be notified of new policies and changes to existing policies via Briefing Boards and via the HUB, Maricopa County's adaptation of the online training software program, Cornerstone, that MCSO implemented in July 2017 to replace its E-Policy system. Per GA-1, "Prior to some policies being revised, time-sensitive changes are often announced in the Briefing Board until the entire policy can be revised and finalized." As noted previously, we recognize the authority of Briefing Boards and understand their utility in publishing critical policy changes quickly, but we have advised MCSO that we generally do not grant Phase 1 compliance for an Order requirement until the requirement is memorialized in a more formal policy.

During this reporting period, MCSO issued (or issued revisions of) two Order-related policies, including: CP-11 (Anti-Retaliation) and GH-4 (Bureau of Internal Oversight Audits and Inspections). MCSO also published the Professional Standards Bureau Operations Manual.

During this reporting period, MCSO also issued several Briefing Boards and Administrative Broadcasts that touched on Order-related topics and revised the language of General Orders.

MCSO continues to update us on the status of its implementation of the HUB during our site visits. As noted above, the HUB replaced E-Policy, after several delays related to licensing and other technical issues, in July 2017. Employees are required to complete personal attestations that indicate that they have read and understand policies; the HUB routinely updates recent training and policy reviews for deputies and is visible by immediate supervisors.

WAI 38160

*Paragraph 32.  The MCSO shall require that all Patrol Operation personnel report violations of policy; that Supervisors of all ranks shall be held accountable for identifying and responding to policy or procedure violations by personnel under their command; and that personnel be held accountable for policy and procedure violations.  The MCSO shall apply policies uniformly.*

**Phase 1:**  In compliance

- CP-2 (Code of Conduct), most recently amended on March 15, 2019.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on January 24, 2019.

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  Not in compliance

Since we began reviewing internal investigations conducted by MCSO, we have reviewed more than 750 administrative misconduct investigations submitted to our Team for this Paragraph. During our reviews, we have continued to observe deficiencies in both the investigations and the associated documentation, but have also continued to note overall improvement.

During each site visit, we meet with the Professional Standards Bureau (PSB) and District and Division Command personnel to provide them with information regarding the cases that we find to be deficient in structure, format, investigation, or reporting requirements.  We also highlight those cases we find to be properly investigated and in full compliance with Order requirements. In 2016, PSB developed and implemented the use of an investigative checklist and specific format for the completion of internal investigations.  MCSO trained all supervisors who conduct investigations in the use of these documents.  Since June 1, 2016, the use of these investigative protocol documents has been required for all administrative investigations.

Revised policies related to internal investigations and the discipline process were finalized and implemented on May 18, 2017.  Since that time, additional revisions have been made to GC-17 (Employee Disciplinary Procedures), GH-2 (Internal Investigations), and the investigative checklist and format, and the Professional Standards Bureau Operations Manual was published in December 2018.

WAI 38161

During our site visits, we meet with PSB to discuss our concerns with the overall quality of administrative investigations, and provide specific case examples from the Paragraph 32 submissions that illustrate these concerns. PSB personnel have remained responsive to our feedback, and the investigations they submit for compliance with this Paragraph continue to be examples of complete and thorough investigations. PSB's reviews of investigations conducted by District personnel continue to be thorough and have identified appropriate concerns.

We have noted many improvements in those investigations conducted at the District level, particularly in those completed after the 40-hour Misconduct Investigative Training, but we continue to observe some deficiencies in the investigations they conduct. Investigations are still being returned by PSB after review for additional follow-up or corrections. This review by PSB continues to allow some District cases to be near full compliance when they are finalized. However, as we have noted in previous reports, it continues to delay the timely completion of many of these same investigations. PSB continues to assign liaison personnel to each District to provide assistance while the investigations are underway. While we have noted the positive effects of PSB's efforts to assist investigators in the Districts, the time commitment involved with conducting these reviews continues to result in significant personnel hours being dedicated to this effort by PSB personnel.

During our site visits, our Team makes numerous visits to MCSO Districts. During these District visits, we spend time discussing the completion of administrative misconduct investigations by District personnel. We discuss those areas of the investigations where we continue to find deficiencies and provide input regarding the proper completion of investigations. We also seek information from District supervisors regarding their experience with the investigation process and any ongoing concerns they may have.

In many of our District visits, MCSO personnel have noted that training was needed, and most believed that the 40-hour Misconduct Investigative Training provided valuable information on the investigative process. Many District personnel also believed that ongoing and refresher training was going to be a continuing need. District personnel have also continued to note the value of the assistance provided to them by PSB personnel. District personnel remain concerned with the time it takes to complete administrative investigations; but many have noted that as they become more familiar with the investigative process and gain experience in the completion of these investigations, it has become easier to complete them and they are better able to manage the time commitment. They also continue to articulate the difficulty they sometimes have in locating and interviewing complainants and witnesses.

WAI 38162

Since March 2018, we have requested and reviewed a monthly report from each District and Division Command personnel that documents any actions they have taken to assist their personnel in the completion of administrative misconduct investigations and any actions they have taken to address any deficiencies they have identified. We have seen in these reports that District Command personnel are identifying and addressing concerns with the completion of these investigations. We have seen a number of intervention strategies employed, including: additional training; mentoring; one-on-one coaching; documentation in supervisor notes; and in one case, the initiation of an internal misconduct investigation when other intervention strategies were unsuccessful.

During our District visits in January 2019, members of our Team spoke with sworn supervisors and command personnel in Districts 1, 3, 4, and 6, and Lake Patrol about internal misconduct investigations. In each of these Districts, the personnel believe the quality of their investigations is improving, and that the training that has been provided has been valuable. Several mentioned the recent eight-hour training on Misconduct Investigations. While several described it as a good refresher, others said their personnel would benefit from a more practical experience, suggesting a walk-through of an actual investigation. District Command personnel also provided recent examples of ongoing strategies they are employing to assist their employees in improving their administrative investigations, including: the development of an action plan for an employee; additional individualized training; and mentoring by other supervisory personnel.

During the last reporting period, we reviewed all 26 administrative misconduct investigations submitted for compliance with this Paragraph. Of the eight conducted by PSB, 88% complied with all investigative and administrative requirements over which the PSB Commander has authority. Of the 18 conducted by Districts, 61% were in compliance with requirements of the Order.

During this reporting period, we reviewed all 38 administrative misconduct investigations submitted for compliance with this Paragraph. PSB conducted six of these investigations, and District personnel conducted the remaining 32. Sworn supervisors with the rank of sergeant or higher completed all the investigations conducted at the District level. There were 71 potential policy violations included in the 38 cases. Thirty-five of the investigations resulted from external complainants, and 3 were internally generated. All 38 investigations were completed after July 20, 2016. Thirty-four of the 38 were both initiated and completed after the new investigation and discipline policies became effective in May 2017. Eight were both initiated and concluded after the completion of the 40-hour Misconduct Investigative Training that was completed in late 2017.

Of the 38 administrative cases we reviewed for this Paragraph, eight resulted in sustained findings against one or more employee. We concur with the sustained findings in all of the eight investigations. In one investigation, however, though we agree with the allegations that were sustained, we believe additional investigation should have occurred which may have resulted in additional sustained findings against the employee. Discipline included: coaching;

WAI 38163

written reprimands; and suspensions of eight hours or more.  In all of these cases, the PSB Commander properly identified the category and offense number, as well as the presumptive discipline or range of discipline for the sustained allegations.

There was one case we reviewed for compliance with this Paragraph where the Appointing Authority mitigated the presumptive discipline.  The Appointing Authority assessed discipline that fell within the range, but was not the presumptive discipline established in the policies revised in May 2017.  We believe the facts of the investigation, the employee's work history, and the justification provided by the Appointing Authority support the decision to mitigate the discipline; and we agree with the decision to do so.

All of the 38 cases we reviewed for this Paragraph were completed on or after July 20, 2016. Of the six investigations conducted by PSB, five were not completed within the 85-day timeframe.  All five of these investigations contained a request for, and an authorization of, an extension.  Twenty-one of the 32 investigations conducted at the District level were not initially completed and submitted to PSB for review within the required 60-day timeframe.  All included an appropriate request for, and an authorization of, an extension.  While we appreciate the timely completion of extension requests, and agree that they are necessary, we are now often seeing two to four extensions for individual investigations due to the continuing backlog of cases.  The amount of time from the initiation of investigations to their completion is continuing to increase.

All six administrative investigations submitted for this Paragraph and conducted by PSB were completed after July 20, 2016.  We continue to find that PSB investigations are thorough and well-documented.  All six (100%) of the investigations PSB investigated and submitted for compliance with this Paragraph complied with all investigative and administrative requirements.

District personnel outside of PSB conducted 33 of the investigations MCSO submitted for review for this Paragraph.  All were completed after July 20, 2016.  We found 22 (67%) in compliance with all investigative and documentation requirements, an increase from the 61% compliance the last reporting period.  We have some concerns with 11 of the investigations. The concerns include: failure to interview all parties that may have had information about the incident; failure to identify all potential policy violations; failure to include sufficient details to support findings; leading questions; and ongoing administrative concerns.  All 11 were returned to the Districts by PSB for additional investigation or corrections, and we believe that District command personnel should have identified many of the deficiencies and corrections prior to forwarding the cases to PSB.  We noted that 26 of the 33 investigations were completed by District personnel prior to the completion of the 40-Hour Misconduct Investigative Training. Fifteen (58%) of these 26 investigations were in compliance with all requirements for the completion of administrative misconduct investigations.  All seven (100%) of the investigations initiated and completed after the Misconduct Investigative Training were in full compliance. We continue to be encouraged with the overall improvement we are observing, particularly in those cases initiated after the training was completed.

WAI 38164

All District command personnel provide monthly documentation of any instances where they find concerns or deficiencies in investigations conducted by their personnel. During this reporting period, one District Commander identified concerns or deficiencies and employed appropriate intervention strategies to assist the employee.

Our review of cases submitted for this Paragraph indicates a continuing effort by PSB and District personnel to complete proper investigations. PSB investigations reviewed under this Paragraph were in full compliance, and District cases are continuing to show improvement.

***Paragraph 33.*** *MCSO Personnel who engage in Discriminatory Policing in any context will be subjected to administrative Discipline and, where appropriate, referred for criminal prosecution. MCSO shall provide clear guidelines, in writing, regarding the disciplinary consequences for personnel who engage in Discriminatory Policing.*

**Phase 1:** In compliance

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 26, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

**Phase 2:** In compliance

The investigations that we review for compliance with this Paragraph do not include biased policing complaints involving the Plaintiffs' class. Those investigations have additional compliance requirements and are discussed in Paragraphs 275-283.

During the last reporting period, we reviewed one administrative misconduct investigation submitted in compliance with this Paragraph. This was an internally generated complaint by a supervisor alleging that an employee had shown bias in favor of an individual due to the individual's age and had been insubordinate to his supervisor. While we agreed with the not sustained and exonerated findings relative to the principal in this investigation once the investigation was initiated by PSB, we had concerns that the issues the supervisor identified were initially handled with a supervisory note and PSB was not notified of the alleged misconduct. We also noted that further follow-up should have been conducted to address the initial handling of the complaint by the employee's chain of command. MCSO had been in compliance with this Paragraph for multiple reporting periods. Based on our review of this investigation, we warned MCSO that we would withdraw Phase 2 compliance if MCSO did not comply with all requirements of this Paragraph for the next reporting period.

WAI 38165

During this reporting period, we reviewed two investigations submitted in compliance with this Paragraph.  One alleged a religious comment made by a Detention officer that involved a reference to Jewish people; the second involved an allegation that the complainant was treated differently than her husband because of her gender and race.  In both instances, the final findings were not sustained.  The investigations were thorough and well-written; and we agree with the findings in both cases.  MCSO remains in compliance with this Paragraph.

While biased policing allegations that involve members of the Plaintiffs' class are not reported in this Paragraph, we note here that MCSO completed three investigations that were determined to be Class Remedial Matters (CRMs) during this reporting period.   All three were in compliance.

***Paragraph 34.***  *MCSO shall review each policy and procedure on an annual basis to ensure that the policy or procedure provides effective direction to MCSO Personnel and remains consistent with this Order, current law and professional standards.  The MCSO shall document such annual review in writing.  MCSO also shall review Policies and Procedures as necessary upon notice of a policy deficiency during audits or reviews.  MCSO shall revise any deficient policy as soon as practicable.*

**Phase 1:**  In compliance

- GA-1 (Development of Written Orders), most recently amended on March 28, 2019.

**Phase 2:**  In compliance

MCSO continues to maintain an annual review process for all agency policies.  The review process ensures that all policies are consistent with Constitutional policing, current law, professional standards, and any Court Order or Judgment.

During this reporting period, 12 (25%) of the 48 required policies received their annual review.  These policies included:  CP-3 (Workplace Professionalism and Harassment); CP-11 (Anti-Retaliation); EB-1 (Traffic Enforcement); EB-4 (Traffic Records); EB-7 (Traffic Control and Services); GC-13 (Awards); GF-5 (Incident Report Guidelines); GH-5 (Early Identification System); GI-5 (Voiance Language Services); GJ-35 (Body-Worn Cameras); GJ-36 (Use of Digital Recording Devices [Non Body-Worn Cameras]); and GM-1 (Electronic Communications, Data and Voice Mail).

WAI 38166

## Section 5: Pre-Planned Operations

**Paragraph 35.** *The Monitor shall regularly review the mission statement, policies and operations documents of any Specialized Unit within the MCSO that enforces Immigration-Related Laws to ensure that such unit(s) is/are operating in accordance with the Constitution, the laws of the United States and State of Arizona, and this Order.*

**In Full and Effective Compliance**

To verify Phase 2 compliance with this Paragraph, we previously verified that the Criminal Employment Unit (CEU) was disbanded and removed from the Special Investigations Division organizational chart. The Human Smuggling Unit (HSU) was also disbanded and personnel reassigned to the Anti-Trafficking Unit (ATU).

During our review of the arrests made by the Special Investigations Division ATU between March 2015-March 2017, we did not note any arrests for immigration or human smuggling violations. The cases submitted by MCSO and reviewed for the ATU were primarily related to narcotics trafficking offenses.

MCSO reported in April 2017 that it had disbanded the Anti-Trafficking Unit and formed a new unit, Fugitive Apprehension and Tactical Enforcement (FATE). The primary mission of FATE is to locate and apprehend violent fugitives. We reviewed FATE's mission statement and objectives, as well as the organizational chart for the Special Investigations Division. MCSO had removed the ATU from the organizational chart, and the mission of FATE did not include any reference to the enforcement of Immigration-Related Laws.

The revised organizational chart for SID and documentation provided by MCSO regarding the implementation of FATE supported that the ATU no longer existed, and that there were no specialized units in MCSO that enforced Immigration-Related Laws.

During the last reporting period, we received and reviewed the most current Special Investigations Division Operations Manual and organizational chart. Both continued to confirm that MCSO has no specialized units that enforce Immigration-Related Laws, the Human Smuggling Unit (HSU) was disbanded, and the Anti-Trafficking Unit (ATU) no longer exists.

During this reporting period, on December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 38167

***Paragraph 36.*** *The MCSO shall ensure that any Significant Operations or Patrols are initiated and carried out in a race-neutral fashion. For any Significant Operation or Patrol involving 10 or more MCSO personnel, excluding posse members, the MCSO shall develop a written protocol including a statement of the operational motivations and objectives, parameters for supporting documentation that shall be collected, operations plans, and provide instructions to supervisors, deputies and posse members. That written protocol shall be provided to the Monitor in advance of any Significant Operation or Patrol.*

**In Full and Effective Compliance**

Since the requirements for conducting significant operations were implemented, MCSO has reported conducting only one significant operation that invoked the requirements of this Paragraph. "Operation Borderline" was conducted from October 20-27, 2014, to interdict the flow of illegal narcotics into Maricopa County. MCSO met all of the requirements of this Paragraph during the operation.

In February 2016, we became aware of "Operation No Drug Bust Too Small" when it was reported in the media, and requested details on this operation from MCSO. After reviewing the documentation provided by MCSO, we were satisfied that it did not meet the reporting requirements of this Paragraph.

In October 2016, we became aware of "Operation Gila Monster" when it was reported in the media. According to media reports, this was a two-week operation conducted by a special operations unit in MCSO and was intended to interdict the flow of illegal drugs into Maricopa County. We requested all documentation regarding this operation for review. The documentation indicated that this operation was conducted from October 17-23, 2016. The documentation provided by MCSO was sufficient for us to determine that this operation did not meet the reporting criteria for this, or other Paragraphs, related to significant operations. The Plaintiffs also reviewed the documentation submitted by MCSO on this operation and agreed that the operation did not invoke the requirements of this Paragraph. We and the Plaintiffs noted that "Operation Gila Monster" involved traffic stops of Latinos, and that those arrested were undocumented Latinos.

We continue to review documentation submitted for this Paragraph by all Districts, the Enforcement Support Division, and the Investigations Division on a monthly basis. During this reporting period, and since October 2014, MCSO continues to report that it has not conducted any additional significant operations. In addition, we have not learned of any potential significant operation through media releases or other sources during this reporting period. We will continue to monitor and review any operations we become aware of to ensure continued compliance with this and other Paragraphs related to significant operations.

During this reporting period, on December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 38168

*Paragraph 37.   The MCSO shall submit a standard template for operations plans and standard instructions for supervisors, deputies and posse members applicable to all Significant Operations or Patrols to the Monitor for review pursuant to the process described in Section IV within 90 days of the Effective Date.   In Exigent Circumstances, the MCSO may conduct Significant Operations or Patrols during the interim period but such patrols shall be conducted in a manner that is in compliance with the requirement of this Order.   Any Significant Operations or Patrols thereafter must be in accordance with the approved template and instructions.*

**In Full and Effective Compliance**

In late 2014, we reviewed all the documentation submitted by MCSO regarding the significant operation conducted from October 24-27, 2014.  This operation was intended to interdict the flow of illegal narcotics into Maricopa County and fully complied with the requirements of this Paragraph.

MCSO continues to report that it has not conducted any operations that invoke the requirements of this Paragraph since October 2014.

During this reporting period, on December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.


**(Note: Unchanged language is presented in *italicized font*.   Additions are indicated by underlined font.  Deletions are indicated by ~~crossed-out font~~.)**

*Paragraph 38.   If the MCSO conducts any Significant Operations or Patrols involving 10 or more MCSO Personnel excluding posse members, it shall create the following documentation and provide it to the Monitor and Plaintiffs within 30 days after the operation:*

a.   *documentation of the specific justification/reason for the operation, certified as drafted prior to the operation (this documentation must include analysis of relevant, reliable, and comparative crime data);*

b.   *information that triggered the operation and/or selection of the particular site for the operation;*

c.   *documentation of the steps taken to corroborate any information or intelligence received from non-law enforcement personnel;*

d.   *documentation of command staff review and approval of the operation and operations plans;*

e.   *a listing of specific operational objectives for the patrol;*

f.   *documentation of specific operational objectives and instructions as communicated to participating MCSO Personnel;*

WAI 38169

g.   *any operations plans, other instructions, guidance or post-operation feedback or debriefing provided to participating MCSO Personnel;*

h.   *a post-operation analysis of the patrol, including a detailed report of any significant events that occurred during the patrol;*

i.   *arrest lists, officer participation logs and records for the patrol; and*

j.   *data about each contact made during the operation, including whether it resulted in a citation or arrest.*

**In Full and Effective Compliance**

Since the initial publication of GJ-33, MCSO has reported that it has conducted only one significant operation, "Operation Borderline," in October 2014.  At the time of this operation, we reviewed MCSO's compliance with policy; attended the operational briefing; and verified the inclusion of all the required protocols, planning checklists, supervisor daily checklists, and post-operation reports.  MCSO was in full compliance with this Paragraph for this operation.

During this reporting period, MCSO again reported that it did not conduct any significant operations invoking the requirements of this Paragraph.

During this reporting period, on December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.


***Paragraph 39.**   The MCSO shall hold a community outreach meeting no more than 40 days after any Significant Operations or Patrols in the affected District(s).  MCSO shall work with the Community Advisory Board to ensure that the community outreach meeting adequately communicates information regarding the objectives and results of the operation or patrol.  The community outreach meeting shall be advertised and conducted in English and Spanish.*

**Phase 1:**  In compliance

- GJ-33 (Significant Operations), most recently amended on May 10, 2018.

**Phase 2:**  In compliance

The Amendments to the Supplemental Permanent Injunction/Judgment Order (Document 2100) issued on August 3, 2017 returned the responsibility for compliance with this Paragraph to MCSO.

During this reporting period, MCSO again reported that it did not conduct any significant operations that invoked the requirements of this Paragraph.

WAI 38170

***Paragraph 40.*** *The MCSO shall notify the Monitor and Plaintiffs within 24 hours of any immigration related traffic enforcement activity or Significant Operation involving the arrest of 5 or more people unless such disclosure would interfere with an on-going criminal investigation in which case the notification shall be provided under seal to the Court, which may determine that disclosure to the Monitor and Plaintiffs would not interfere with an on-going criminal investigation. In any event, as soon as disclosure would no longer interfere with an on-going criminal investigation, MCSO shall provide the notification to the Monitor and Plaintiffs. To the extent that it is not already covered above by Paragraph 38, the Monitor and Plaintiffs may request any documentation related to such activity as they deem reasonably necessary to ensure compliance with the Court's orders.*

**In Full and Effective Compliance**

Since MCSO first developed GJ-33 (Significant Operations) in 2014, MCSO has reported conducting only one operation, "Operation Borderline," that required compliance with this Paragraph. We verified that MCSO employed the appropriate protocols and made all required notifications. MCSO was in full compliance with this Paragraph during this operation.

Based on a concern raised by the Plaintiffs, and to provide clarification regarding the portion of this Paragraph that addresses the requirement for MCSO to notify the Monitor and Plaintiffs within 24 hours of any immigration-related traffic enforcement activity or significant operations involving "the arrest of 5 or more persons," we requested during our October 2015 site visit that MCSO provide a statement regarding this requirement each month. MCSO began including this information in its November 2015 submission and continues to do so.

MCSO continues to report that it has not conducted any operations that meet the reporting requirements for this Paragraph since October 2014.

During this reporting period, on December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 38171

# Section 6: Training

## COURT ORDER VII.  TRAINING

### a.  General Provisions

**Paragraph 41.**   *To ensure that the Policies and Procedures provided for by this Order are effectuated, the MCSO shall implement the following requirements regarding Training.*

**Paragraph 42.**   *The persons presenting this Training in each area shall be competent instructors with significant experience and expertise in the area.  Those presenting Training on legal matters shall also hold a law degree from an accredited law school and be admitted to a Bar of any state and/or the District of Columbia.*

**Phase 1:** In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.

- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2018

- Training Division Operations Manual, most recently amended on September 21, 2017.

**Phase 2:** In compliance

During this reporting period, the Training Division provided documentation for 27 Field Training Officers (FTOs) as meeting all requirements of GG-1.  During our January site visit, we learned that an additional 20 individuals were reviewed but did not meet some of the eligibility criteria, including a successful Professional Standards Bureau (PSB) review.  The Training Division indicated that PSB provides them with a negative response when PSB staff clearly believes the candidates will not meet GG-1 requirements.  They will also suggest that a deputy is "waiver eligible."  GG-1 puts the burden on the candidate to apply to the Training Commander for a waiver of the timelines imposed for sustained misconduct violations.  The request is to include an overview of the violation and a justification for waiving the review periods.  The Training Commander responds to this request and outlines his approval or denial of the application.  The employee's personnel and FTO file shall include the Training Commander's response.  During our January site visit, we requested the waiver and we were able to determine that the deputy correctly generated the initial waiver; however, the request did not include the required content.  The Training Division accepted the waiver without this information.

WAI 38172

Training Division personnel interpret the policy requirement (to include overview documentation) infringes on privacy issues related to misconduct investigations. We disagree with this assertion. They expressed a concern that unauthorized individuals may gain access to the information now included in the employee's personnel file and the instructor's folder. Security of this information is incumbent upon the Training Division. The requested information is necessary to determine if a waiver of disciplinary timelines is reasonable. MCSO must follow its adopted policies or recommend changes to the areas that it finds problematic. We will consider changes, provided they do not impact compliance with Order requirements. But absent one or the other, Phase 2 compliance will be in jeopardy. We will continue to monitor all FTO files, as well as the selection process for policy compliance.

With the aid of an analyst, the Training Division conducted analyses of instructor critiques for all Order-related training delivered during this reporting period. The studies merge all student assessments of the instructors. These analyses suggest that particular MCSO instructors consistently receive significantly higher reviews by students. The delivery of TraCS training during this quarter did not incorporate student assessment forms of the instructors as required by GG-1.

The Training Division previously requested our review of a new instructor evaluation form, and we and the Parties provided our feedback. While Training is revising the form, the current instructor evaluation has been loaded into the HUB and class participants complete this form electronically at the end of each class.

***Paragraph 43.*** *The Training shall include at least 60% live training (i.e., with a live instructor), which includes an interactive component, and no more than 40% on-line training. The Training shall also include testing and/or writings that indicate that MCSO Personnel taking the Training comprehend the material taught whether via live training or via on-line training.*

**Phase 1:** In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.
- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2018.
- Training Division Operations Manual, most recently amended on September 21, 2017.

**Phase 2:** In compliance

We verify compliance with this Paragraph by reviewing all completed tests, documentation of all failures, and all failure remediation efforts for each Order-related class delivered during each reporting period.

WAI 38173

During this reporting period, we did not receive all completed tests, documentation of any failures, and all failure remediation efforts for each Order-related class delivered in accordance with our monthly document request. Several courses – to include the 2018 Annual Combined Training (ACT), Body-Worn Camera (BWC), Early Identification System (EIS), Employee Performance Appraisals (EPA), 2018 Supervisory Responsibilities: Effective Law Enforcement (SRELE), Traffic and Criminal Software (TraCS), and the Misconduct Investigations (PSB40) – were delivered. Test results for the PSB40, the annual in-service for PSB personnel (PSB8 Internal), and the annual in-service for supervisors (PSB8 External) classes were provided. Statements provided by the Training Division indicated that no personnel required test remediation for any of the classes.

During this reporting period, Training Division personnel conducted a single ride-along within District 3 in conformance with GG-1. During our January site visit, we discussed their observations. They reaffirmed to us that this process remains under development. Two individuals were observed because they were an FTO and an OIT. The observer did not document any search or issues related to the ACT curriculum. We continue to encourage the Training Division to expand this vital evaluation tool.

On December 4, 2018, we provided technical assistance for the train-the-trainer for the eight-hour in-service, PSB8 External for District supervisory personnel. This train-the-trainer program was the most structured one offered so far by the Training Division. It included instructor assignments, evaluations, and testing. The Training Division selected three primary instructors: one MCAO attorney and two PSB lieutenants. Each was assigned specific blocks of instruction before the trainer program. Instructional assignments encompassed the entire eight-hour training. Eight additional PSB personnel were also in attendance.

As a result of the train-the-trainer, MCSO modified the lesson plan, PowerPoint presentation, and test in various ways to improve delivery and enhance student performance.

All instructors completed a test and instructor and curriculum critiques. After reviewing and analyzing the scores and critiques, we determined that there were no additional curriculum issues to address.

Upon completion of the train-the-trainer, Training personnel proceeded to incorporate all changes into the lesson plan and prepare the final documents. We approved the class for delivery. Deliveries occurred between December 7-19, 2018.

On December 21, 2018, we provided technical assistance for the 2018 ACT train-the-trainer. Also in attendance were the Plaintiffs' representatives, MCAO attorney instructors, and contracted attorney instructors. MCSO executive staff also participated and provided valuable input. The Training Division made changes to the training materials based on their suggestions. We recommend that executive staff continue to participate in train-the-trainer processes for Order-required training.

WAI 38174

For the first time, outside instructors from the Anti-Defamation League (ADL) provided a segment of the curriculum. Both instructors were competent with significant expertise. One instructor, however, was a local individual who was able to discuss and provide unique insight into specific MCSO patrol areas.

Three MCAO and one contract attorney delivered the entire Fourth and Fourteenth Amendment components. All were excellent instructors and offered additional legal and other changes to the lesson plan, which improved the delivery. A veteran instructor involved with this class from inception indicated to the participants that this was by far the best training session he had participated in and that the curriculum has seen steady improvement since that first year.

All instructors completed a test. The test did not include any questions relative to implicit bias taught by the ADL. We recognize that a vendor delivered implicit bias instruction that did not include testing. When dealing with vendors the Training Division can easily overcome this obstacle to meet the requirements of this Paragraph by including test questions on their internally developed test. Individuals then entered instructor and curriculum critiques into the HUB.

During this reporting period, Training delivered the following training: 2018 ACT; BWC; 2017 EIS; 2017 EPA, 2018 SRELE and TraCS.

The 2018 ACT was delivered once during December to 50 personnel (including 31 sworn personnel, five of whom attended the train-the-trainer; one retired reserve; and 18 Posse personnel). No personnel required test remediation.

BWC was delivered once in November to two sworn personnel. No staff required test remediation.

The 2017 EIS was delivered in October to 19 sworn personnel and five civilian supervisors. No staff required test remediation.

The 2017 EPA was delivered in October to 22 personnel (20 sworn, two civilian). No staff required test remediation.

The 2018 SRELE was delivered in October to 22 personnel (20 sworn, two civilian). No staff required test remediation.

TraCS Training was delivered in October to 20 sworn personnel. No staff required test remediation.

WAI 38175

***Paragraph 44.*** *Within 90 days of the Effective Date, MCSO shall set out a schedule for delivering all Training required by this Order. Plaintiffs' Representative and the Monitor shall be provided with the schedule of all Trainings and will be permitted to observe all live trainings and all on-line training. Attendees shall sign in at each live session. MCSO shall keep an up-to-date list of the live and on-line Training sessions and hours attended or viewed by each officer and Supervisor and make that available to the Monitor and Plaintiffs.*

**Phase 1:**  In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.

- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2018.

- Training Division Operations Manual, most recently amended on September 21, 2017.

**Phase 2:**  In compliance

The Master Training Calendar has evolved into a public document identifying tentative training dates, classes, and locations. The calendar is divided into 90-day increments, and the schedule is updated weekly to ensure accurate scheduling. We did not note any inaccuracies during this reporting period. The Training Division posts the calendar to the MCSO website for accessibility to the public. The schedule in its current form, however, provides limited information to the Training Division for implementation of the Training Cycle and curriculum development.

During our December 4, 2018 technical assistance site visit, we recommended to the Training Division that they expand the calendar and adopt an internal version in addition to the published version. The internal schedule would then assist the Training Division with implementing the Training Cycle as required by GG-1 by identifying appropriate milestones specific for Training Division personnel to accomplish. Each curriculum, Order-related or otherwise, should appear with specific dates indicating the work product to be completed, in addition to who is responsible for it. Individuals should be held accountable for their activities; and as a result, the Training Division should not experience a continuation of delayed development and end-of-year time constraints. The Training Division was receptive to this recommendation and indicated that a newly hired project manager could aid in its implementation. GG-1 was first adopted on May 17, 2017 and revised on May 16, 2018. Although published nearly two years ago, the Training Division has never fully implemented the requirements of the Training Cycle. MCSO must adhere to the requirements of its own policies – particularly where they are based on Order requirements – to ensure continued Phase 2 compliance.

Master Personnel Rosters are used to determine the number of personnel requiring Order-related training. At the end of this reporting period, MCSO reports that 669 sworn members, 21 reserve members, 24 retired reserve members, 487 Posse members, 1,824 Detention members, and 704 civilian employees require Order-related instruction. These categories vary by reporting period, as a result of the attrition in the organization.

WAI 38176

***Paragraph 45.***   *The Training may incorporate adult-learning methods that incorporate roleplaying scenarios, interactive exercises, as well as traditional lecture formats.*

**Phase 1:**  Not applicable

**Phase 2:** In compliance

During this reporting period, we reviewed the 2018 ACT, 2019 BWC, and the 2018 PSB8 Districts' lesson plans for inclusion of adult-learning methods.  Although each curriculum incorporates limited adult-learning methodology, MCSO has not embraced adult-learning techniques that encourage maximum learning, participation, and retention.   We have recommended the use of MCSO specific case studies memorialized through misconduct investigations, BWC recordings, IRs, or other MCSO documentation.  These recommendations have repeatedly met staunch resistance.  When developed adequately, group activities and role-playing developed from real job-related situations allow for the development of critical thinking, decision-making, and response skills by deputies and supervisors alike.

MCSO contracted with a vendor to provide the PSB8 annual in-service training program to members of PSB.  This program focused on Sexual Assault and Domestic Violence Trauma Informed Interviews.   The curriculum blended adult-learning methodologies of lecture, PowerPoint presentation, video, and several practical exercises that focused on interviewing and being interviewed.  Additionally, the vendor used a combination of a pre-test and post-test to assess knowledge transfer.  Forty-two individuals attended this training.  After participating in this class, MCSO personnel expressed a new understanding of how victims perceive law enforcement while investigating delicate cases.  The Training Division should be attentive to the construction of the curriculum, incorporating adult-learning techniques, and the overall positive reception by MCSO personnel.

MCSO contracted with a vendor to provide a section of the 2018 ACT titled "Managing Implicit Bias."   The curriculum incorporated adult-learning methodologies of lecture, PowerPoint presentation, and practical exercises.  Approximately 50 personnel received this training during the reporting period.  The Training Division did not provide any documentation of student evaluation of ADL instructors or their curriculum as required by GG-1.  We will follow up with this review during the next reporting period.  During our January site visit, we discussed this training further.  Training command personnel indicated that the ADL instruction had sparked passionate discussions.  Without the aid of evaluations, we cannot definitively determine the level of value provided by the vendor.  However, the open and robust discussion of difficult topics should be desirable to MCSO.

WAI 38177

**Paragraph 46.** *The curriculum and any materials and information on the proposed instructors for the Training provided for by this Order shall be provided to the Monitor within 90 days of the Effective Date for review pursuant to the process described in Section IV. The Monitor and Plaintiffs may provide resources that the MCSO can consult to develop the content of the Training, including names of suggested instructors.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

During this reporting period, Training Division personnel advised us that they continue to develop and work on plans to address Implicit Bias, Cultural Competency, Understanding Community Perspectives, and Fair and Impartial Decision Making training. We did not receive any curriculum or work plans for review.

During our January site visit, we discussed the use of BWC recordings to support roll-call briefings. We continue to recommend that the Training Division independently review these recordings for specific deputy activities that highlight both excellent and inadequate implementation of training received and policy direction. Training Division personnel advised us that they are hesitant to conduct these reviews should they expose deputy misconduct. They believe this places the Training Division in a position to initiate internal investigations as a result of their analysis for training issues. We do not support this opinion. The reviews of BWC recordings by the Training Division should be specifically designed to evaluate the efficacy of the training delivered. These recordings provide valuable information to the Training Division. Jointly with PSB, a satisfactory procedure to meet all needs should be developed. We have observed several BWC recordings that offer training benefits by highlighting areas for curriculum improvement for both the ACT and the SRELE.

**Paragraph 47.** *MCSO shall regularly update the Training to keep up with developments in the law and to take into account feedback from the Monitor, the Court, Plaintiffs and MCSO Personnel.*

**Phase 1:** In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.

- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2018.

- Training Division Operations Manual, most recently amended on September 21, 2017.

**Phase 2:** In compliance

WAI 38178

During this reporting period, the Monitoring Team and Parties commented on lesson plans and supporting documentation for all training required by both Orders.  During our December 21, 2018 technical assistance site visit, we were able to observe the Managing Implicit Bias component for the ACT.  We believe that the training provided was relevant and useful; it offered information that MCSO has been unable to adequately develop.  The Training Division can easily overcome vendor obstacles related to Order compliance by including additional test questions related to the provided content and requiring course and instructor evaluations of vendors.  It is essential that the Training Division document how deputies receive instruction provided by external vendors.

We previously commented on training provided to PSB personnel by an external vendor for PSB's annual in-service training.

We did not review any roll-call briefings or videos in support of the ACT or SRELE that would provide enhanced training.

During this reporting period, Training delivered the following training:  2018 ACT; BWC; 2017 EIS; 2017 EPA; 2018 SRELE; and TraCS.

MCSO can reasonably expect that members of the Monitoring Team and the Parties will observe training sessions and provide appropriate feedback.


## B. Bias-Free Policing Training

***Paragraph 48.*** *The MCSO shall provide all sworn Deputies, including Supervisors and chiefs, as well as all posse members, with 12 hours of comprehensive and interdisciplinary Training on bias-free policing within 240 days of the Effective Date, or for new Deputies or posse members, within 90 days of the start of their service, and at least 6 hours annually thereafter.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

We approved the 2018 ACT curriculum during this reporting period.  The Training Division delivered the train-the-trainer and a single class in December.  We previously had directed MCSO to schedule the remaining courses on a regular schedule beginning in January 2019.  We agreed to this delivery schedule because of difficulties slowing the pace of development and extending the curriculum development cycle.

WAI 38179

On December 4, 2018, MCSO submitted the curriculum and supporting documents for a second review. We reviewed the first draft in August. MCSO requested that the Monitoring Team and Parties conduct an expedited review. MCSO also contracted with the ADL to deliver content on Managing Implicit Bias. We previously requested their curriculum vitae, but only received biographies for two instructors. These documents were finally received on December 20, 2018. Learning activities were updated and included knowledge checkpoints identifying acceptable student outcomes. Additional guidance for instructors was incorporated, but MCSO continues to resist including timing for each block of instruction within the curriculum. Doing so provides instructors with clear direction for time management issues.

During the train-the-trainer we addressed any pending concerns and made additional curriculum modifications. Plaintiffs' representatives, who also participated, agreed with each modification. We previously attributed these developmental issues to the failure of the Training Division to adhere to the Training Cycle as adopted by GG-1. GG-1 was adopted in May 2017 and revised in May 2018. MCSO must follow its adopted policies or recommend changes to the areas that it finds problematic. We will consider changes provided they do not impact compliance with Order requirements. But absent one or the other, Phase 2 compliance will be in jeopardy.

Bias-Free Policing Training was not delivered during this reporting period.

The 2018 ACT was delivered once during December to 50 personnel (including 31 sworn personnel, five of whom attended the train-the-trainer; one retired reserve; and 18 Posse personnel). No personnel required test remediation.

During this reporting period, on December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we did not concur with this assertion; we provided MCSO with a detailed explanation for this decision. Neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 49.** *The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:*

a. *definitions of racial profiling and Discriminatory Policing;*

b. *examples of the type of conduct that would constitute Discriminatory Policing as well as examples of the types of indicators Deputies may properly rely upon;*

c. *the protection of civil rights as a central part of the police mission and as essential to effective policing;*

d. *an emphasis on ethics, professionalism and the protection of civil rights as a central part of the police mission and as essential to effective policing;*

e. *constitutional and other legal requirements related to equal protection, unlawful discrimination, and restrictions on the enforcement of Immigration-Related Laws, including the requirements of this Order;*

WAI 38180

f. *MCSO policies related to Discriminatory Policing, the enforcement of Immigration-Related Laws and traffic enforcement, and to the extent past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;*

g. *MCSO's protocol and requirements for ensuring that any significant pre-planned operations or patrols are initiated and carried out in a race-neutral fashion;*

h. *police and community perspectives related to Discriminatory Policing;*

i. *the existence of arbitrary classifications, stereotypes, and implicit bias, and the impact that these may have on the decision-making and behavior of a Deputy;*

j. *methods and strategies for identifying stereotypes and implicit bias in Deputy decision-making;*

k. *methods and strategies for ensuring effective policing, including reliance solely on non-discriminatory factors at key decision points;*

l. *methods and strategies to reduce misunderstanding, resolve and/or de-escalate conflict, and avoid Complaints due to perceived police bias or discrimination;*

m. *cultural awareness and how to communicate with individuals in commonly encountered scenarios;*

n. *problem-oriented policing tactics and other methods for improving public safety and crime prevention through community engagement;*

o. *the benefits of actively engaging community organizations, including those serving youth and immigrant communities;*

p. *the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;*

q. *background information on the Melendres v. Arpaio litigation, as well as a summary and explanation of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in Melendres v. Arpaio, the parameters of the Court's permanent injunction, and the requirements of this Order; and*

r. *Instruction on the data collection protocols and reporting requirements of this Order.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

MCSO did not conduct an annual review of the lesson plan for the Bias-Free Policing Training during this reporting period.

WAI 38181

During this reporting period, on December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we did not concur with this assertion; we provided MCSO with a detailed explanation for this decision.  Neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

### c. Training on Detentions, Arrests, and the Enforcement of Immigration-Related Laws

**Paragraph 50.**  *In addition to the Training on bias-free policing, the MCSO shall provide all sworn personnel, including Supervisors and chiefs, as well as all posse members, with 6 hours of Training on the Fourth Amendment, including on detentions, arrests and the enforcement of Immigration-Related Laws within 180 days of the effective date of this Order, or for new Deputies or posse members, within 90 days of the start of their service.  MCSO shall provide all Deputies with 4 hours of Training each year thereafter.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

In Paragraph 48, we discussed the development and delivery issues associated with the 2018 ACT.  The ACT is a combined curriculum incorporating Bias-Free Policing with Detentions, Arrests, and the Enforcement of Immigration-Related Laws.

MCSO contracts with vendor attorneys, in conjunction with MCAO attorneys, to deliver the Fourth Amendment content.  We were familiar with two of the four selected instructors.  We note that the Fourth Amendment content is developed more quickly than the Bias-Free Policing.  MCAO has historically developed this material and learning activities.  Additional curriculum modifications for legal issues occurred during the train-the-trainer session.  We previously attributed these developmental issues to the failure of the Training Division to adhere to the Training Cycle as adopted by GG-1.  MCSO must follow its adopted policies or recommend changes to the areas that it finds problematic.  We will consider changes provided they do not impact compliance with Order requirements.  But absent one or the other, Phase 2 compliance will be in jeopardy.

MCSO did not deliver Detentions, Arrests, and the Enforcement of Immigration-Related Laws Training during this reporting period.

The 2018 ACT was delivered once during December to 50 personnel (including 31 sworn personnel, five of whom attended the train-the-trainer; one retired reserve; and 18 Posse personnel).  No personnel required test remediation.

During this reporting period, on December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we did not concur with this assertion; we provided MCSO with a detailed explanation for this decision.  Neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 38182

**Paragraph 51.**  *The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:*

a.   *an explanation of the difference between various police contacts according to the level of police intrusion and the requisite level of suspicion; the difference between reasonable suspicion and mere speculation; and the difference between voluntary consent and mere acquiescence to police authority;*

b.   *guidance on the facts and circumstances that should be considered in initiating, expanding or terminating an Investigatory Stop or detention;*

c.   *guidance on the circumstances under which an Investigatory Detention can become an arrest requiring probable cause;*

d.   *constitutional and other legal requirements related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, including the requirements of this Order;*

e.   *MCSO policies related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, and the extent to which past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;*

f.   *the circumstances under which a passenger may be questioned or asked for identification;*

g.   *the forms of identification that will be deemed acceptable if a driver or passenger (in circumstances where identification is required of them) is unable to present an Arizona driver's license;*

h.   *the circumstances under which an officer may initiate a vehicle stop in order to investigate a load vehicle;*

i.   *the circumstances under which a Deputy may question any individual as to his/her alienage or immigration status, investigate an individual's identity or search the individual in order to develop evidence of unlawful status, contact ICE/CBP, await a response from ICE/CBP and/or deliver an individual to ICE/CBP custody;*

j.   *a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause to believe that a vehicle or an individual is involved in an immigration-related state crime, such as a violation of the Arizona Human Smuggling Statute, as drawn from legal precedent and updated as necessary; the factors shall not include actual or apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a Hispanic day laborer;*

k.   *a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause that an individual is in the country unlawfully, as drawn from legal precedent and updated as necessary; the factors shall not include actual or*

WAI 38183

*apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a day laborer;*

l.  *an emphasis on the rule that use of race or ethnicity to any degree, except in the case of a reliable, specific suspect description, is prohibited;*

m.  *the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;*

n.  *Provide all trainees a copy of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in Melendres v. Arpaio and this Order, as well as a summary and explanation of the same that is drafted by counsel for Plaintiffs or Defendants and reviewed by the Monitor or the Court; and*

o.  *Instruction on the data collection protocols and reporting requirements of this Order, particularly reporting requirements for any contact with ICE/CBP.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

The 2018 ACT curriculum and supporting documents were approved for delivery December 21, 2018.  Issues with the development process are described above.

During this reporting period, on December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we did not concur with this assertion; we provided MCSO with a detailed explanation for this decision.  Neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

### d.  Supervisor and Command Level Training

**Paragraph 52.**  *MCSO shall provide Supervisors with comprehensive and interdisciplinary Training on supervision strategies and supervisory responsibilities under the Order.  MCSO shall provide an initial mandatory supervisor training of no less than 6 hours, which shall be completed prior to assuming supervisory responsibilities or, for current MCSO Supervisors, within 180 days of the Effective Date of this Order.  In addition to this initial Supervisor Training, MCSO shall require each Supervisor to complete at least 4 hours of Supervisor-specific Training annually thereafter.  As needed, Supervisors shall also receive Training and updates as required by changes in pertinent developments in the law of equal protection, Fourth Amendment, the enforcement of Immigration-Related Laws, and other areas, as well as Training in new skills.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

The 2018 SRELE curriculum was previously approved for delivery.  SRELE was delivered in October, to 22 personnel (20 sworn, two civilian).  No staff required test remediation.

WAI 38184

**Paragraph 53.** *The Supervisor-specific Training shall address or include, at a minimum:*

a.   *techniques for effectively guiding and directing Deputies, and promoting effective and constitutional police practices in conformity with the Policies and Procedures in Paragraphs 18–34 and the Fourth and Fourteenth Amendment Training in Paragraphs 48–51;*

b.   *how to conduct regular reviews of subordinates;*

c.   *operation of Supervisory tools such as EIS;*

d.   *evaluation of written reports, including how to identify conclusory, "canned," or perfunctory language that is not supported by specific facts;*

e.   *how to analyze collected traffic stop data, audio and visual recordings, and patrol data to look for warning signs or indicia of possible racial profiling or unlawful conduct;*

f.   *how to plan significant operations and patrols to ensure that they are race-neutral and how to supervise Deputies engaged in such operations;*

g.   *incorporating integrity-related data into COMSTAT reporting;*

h.   *how to respond to calls from Deputies requesting permission to proceed with an investigation of an individual's immigration status, including contacting ICE/CBP;*

i.   *how to respond to the scene of a traffic stop when a civilian would like to make a Complaint against a Deputy;*

j.   *how to respond to and investigate allegations of Deputy misconduct generally;*

k.   *evaluating Deputy performance as part of the regular employee performance evaluation; and*

l.   *building community partnerships and guiding Deputies to do the Training for Personnel Conducting Misconduct Investigations.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

The 2018 SRELE curriculum was previously approved for delivery.  The curriculum previously incorporated all requirements of this Paragraph.

WAI 38185

## Section 7: Traffic Stop Documentation and Data Collection

**COURT ORDER VIII.   TRAFFIC STOP DOCUMENTATION AND DATA COLLECTION AND REVIEW**

For Paragraphs 54 and 55, in particular, we request traffic stop data from MCSO. The following describes how we made that request and how we handled the data once we received it. These data may also be referred to in other areas of Section 7 and the report as a whole.

In selecting traffic stop cases for our compliance review, we modified our statistical technique in that, rather than selecting a representative random sample of 100 cases per quarter, we instead pulled a sample of about 35 cases per month (or 105 cases per quarter). Our original selection of a sample size of 35 cases was based on information from MCSO TraCS data that reported the average number of traffic stops per month were fewer than 2,000 during the April 2014-June 2015 time period when TraCS data were first available. The selection of 35 cases reflects a sample based on this average per month. This gave us a 95 percent confidence level (the certainty associated with our conclusion).

We continue to pull our monthly sample of traffic stop cases from the six Districts (Districts 1, 2, 3, 4, 6, and 7) and Lake Patrol. By way of background, MCSO reported a total of 3,740 cases of traffic stop events for these areas between January 1-March 31, 2018 (averaging 1,247 per month). This number of traffic stops represents a significant decline from previous reporting periods. We discussed this issue with MCSO during our April 2018 site visit. MCSO personnel informed us that they were aware of the issue and were exploring ways to ensure that deputies effectively perform their duties, which includes the enforcement of traffic laws.

Once we received files each month containing traffic stop case numbers from MCSO, denoting from which area they came, we selected a sample of up to 35 cases representing the areas and then selected a subsample averaging 10 cases, from the 35 selected cases, to obtain CAD audiotapes and body-worn camera recordings. Our sampling process involved selecting a sample of cases stratified by the areas according to the proportion of specific area cases relative to the total area cases. Stratification of the data was necessary to ensure that each area was represented proportionally in our review. Randomization of the cases and the selection of the final cases for CAD review were achieved using a statistical software package (IBM SPSS Version 22), which contains a specific function that randomly selects cases and that also allows cases to be weighted by the areas. Our use of SPSS required that we first convert the MCSO Excel spreadsheet into a format that would be readable in SPSS. We next pulled the stratified sample each month for the areas and then randomly selected a CAD audio subsample from the selected cases. In February 2016, we began pulling cases for our body-worn camera review from the audio subsample. Since that time, we began pulling additional samples for passenger contacts and persons' searches (10 each per month). The unique identifiers for these two samples were relayed back to MCSO personnel, who produced documentation for the selected sample (including the CAD documentation for the subsample).

WAI 38186

On October 10, 2014, the Court issued an Order Granting Stipulation to Amend Supplemental/Permanent Injunction/Judgment Order (Document 748). The stipulation affects Paragraphs 57, 61, 62, and Paragraph 1.r.xv.; and has been incorporated in the body of this report. The stipulation referenced amends the First Order, and will be addressed in Section 7.

### a. Collection of Traffic Stop Data

**Paragraph 54.** *Within 180 days of the Effective Date, MCSO shall develop a system to ensure that Deputies collect data on all vehicle stops, whether or not they result in the issuance of a citation or arrest. This system shall require Deputies to document, at a minimum:*

a.  *the name, badge/serial number, and unit of each Deputy and posse member involved;*

b.  *the date, time and location of the stop, recorded in a format that can be subject to geocoding;*

c.  *the license plate state and number of the subject vehicle;*

d.  *the total number of occupants in the vehicle;*

e.  *the Deputy's subjective perceived race, ethnicity and gender of the driver and any passengers, based on the officer's subjective impression (no inquiry into an occupant's ethnicity or gender is required or permitted);*

f.  *the name of any individual upon whom the Deputy runs a license or warrant check (including subject's surname);*

g.  *an indication of whether the Deputy otherwise contacted any passengers, the nature of the contact, and the reasons for such contact;*

h.  *the reason for the stop, recorded prior to contact with the occupants of the stopped vehicle, including a description of the traffic or equipment violation observed, if any, and any indicators of criminal activity developed before or during the stop;*

i.  *time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; time a release was made without citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere or Deputy's departure from the scene;*

j.  *whether any inquiry as to immigration status was conducted and whether ICE/CBP was contacted, and if so, the facts supporting the inquiry or contact with ICE/CBP, the time Supervisor approval was sought, the time ICE/CBP was contacted, the time it took to complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual;*

k.  *whether any individual was asked to consent to a search (and the response), whether a probable cause search was performed on any individual, or whether a pat-and-frisk search was performed on any individual;*

WAI 38187

l.     whether any contraband or evidence was seized from any individual, and nature of the contraband or evidence; and

m.     The final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without citation.

**Phase 1:**  In compliance

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 26, 2018.

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- GI-1 (Radio and Enforcement Communications Procedures), most recently amended on April 19, 2018.

- GJ-3 (Search and Seizure), most recently amended on March 2, 2018.

**Phase 2:**  Deferred

To verify the information required for this Paragraph, MCSO created, and we reviewed, the Vehicle Stop Contact Form (VSCF), the Vehicle Stop Contact Form Supplemental Sheet, the Incidental Contact Receipt, and the Written Warning/Repair Order, all in electronic form, for those motorists who, during this reporting period, committed a traffic violation or operated a vehicle with defective equipment and received a warning.  We also reviewed the Arizona Traffic Ticket and Complaint Forms issued for violations of Arizona Statutes, Internet I/Viewer Event Unit printout, Justice Web Interface printout, and any Incident Report associated with the event.  We selected a sample of 105 traffic stops conducted by deputies from October 1-December 31, 2018, for the purposes of this review; and assessed the collected data from the above-listed documents for compliance with Subparagraphs 54.a.-54.m.   All of the listed documentation was used for our review of the following subsections of this Paragraph.

The Paragraph requires that MCSO create a system for data collection.  The data collected pursuant to this Paragraph will be captured in the Early Identification System, which we discuss further in this report.

Paragraph 54.a. requires MCSO to document the name, badge/serial number, and unit of each deputy and Posse member involved.

For this reporting period, all of the primary deputies indicated their own serial numbers for every stop they initiated.  We review the VSCF, I/Viewer Event document, the Justice Web Interface, and the CAD printout to determine which units were on the scene.  If back-up units arrive on a scene and do not announce their presence to dispatch, CAD does not capture this information.  A TraCS change was made to the VSCF during 2016 to secure this information.

WAI 38188

MCSO added a drop-down box so the deputy could enter the number of units on the scene and the appropriate fields would be added for the additional deputies.  While this addition is an improvement, if the deputy fails to enter the number of additional units on the form, the drop-down boxes do not appear.  In addition, MCSO policy requires deputies to prepare the Assisting Deputy and Body-Worn Camera Log in instances where deputies respond and assist at a traffic stop.  The log contains the relevant information required by this Subparagraph for any additional deputies involved in a traffic stop other than the primary deputy.

Our review indicated that in the sample of 105 vehicle traffic stops, there were 33 cases where the deputy's unit had another deputy assigned to the vehicle or one or more other deputy units or Posse members were on the scene.  In 32 of the 33 cases where there were multiple units or deputies on a stop, the deputy properly documented the name, badge, and serial number of the deputies and Posse members on the VSCF.  In one case, a deputy who was listed on the CAD document and who prepared an Assisting Deputy and Body-worn Camera Log was not listed on the VSCF; however, in such instances, we are not holding MCSO out of compliance because the required information was captured on the log.  In the 30 cases we reviewed for passenger contacts under Subparagraph 54.g., there were 20 cases where there were multiple units or deputies on a stop.  In all 20 cases, the deputy properly documented the required information on the VSCF.  In the 30 cases we reviewed for searches of persons under Subparagraph 54.k., there were 24 cases where the deputy's unit had another deputy assigned to the vehicle, or one or more other deputies or Posse members were on the scene.  In 23 of the 24 cases, the deputy properly documented the required information on the VSCF.  In one case, the deputy did not effectively document the presence of a deputy who was at the scene of the traffic stop; and an Assisting Deputy and Body-worn Camera Log was not prepared.  During our October 2018 and January 2019 site visits, we discussed the issue of MCSO deputies not consistently documenting the presence of other units and deputies at traffic stops.

The identification of personnel on scenes is a core issue in this case, and we shall consistently evaluate MCSO's measure of compliance with this requirement.  This Paragraph requires that all deputies on the scene be identified with their names, and serial and unit numbers, on the appropriate forms.  In the previous reporting period, MCSO attained a compliance rate of 89%.  In our last quarterly status report, we stated that MCSO would remain in compliance with this requirement during this reporting period; however, MCSO must attain a compliance rate of greater than 94% to remain in compliance in the next reporting period.  For this reporting period, MCSO attained a compliance rating of 99%.  MCSO remains in compliance with this requirement.

Paragraph 54.b. requires MCSO to document the date, time, and location of the stop, recorded in a format that can be subject to geocoding.  Our reviews of the CAD printout for all 105 traffic stops in our sample indicated that the date, time, and location is captured with the time the stop is initiated and the time the stop is cleared.  In previous reporting periods, we noted instances where the GPS coordinates could not be located on the documentation received (CAD printout/I/Viewer).  We contacted MCSO about this issue, and MCSO now provides us with the GPS coordinates via a separate document that lists the coordinates for the traffic stop sample we

WAI 38189

provide.  MCSO uses GPS to determine location for the CAD system.  GPS collects coordinates from three or more satellites to enhance the accuracy of location approximation.  The data from the satellites can be decoded to determine the longitude and latitude of traffic stop locations should that be necessary.  During our quarterly site visits, we review the GPS coordinates with CID personnel to ensure the accuracy of the data.  The CAD system was upgraded in 2014 to include geocoding of traffic stops.  CID continues to provide us with a printout of all case numbers in the sample containing the associated coordinates.  For this reporting period, the CAD or I/Viewer system contained the coordinates in about 41% of the cases.  In a separate spreadsheet, MCSO provided GPS coordinates for all 105 cases we reviewed, for 100% compliance with this portion of the Subparagraph.

During our April 2016 site visit, we discussed with MCSO the possibility of using the CAD printout instead of the TraCS data to determine stop times.  We determined that using the CAD system to determine stop end times created additional challenges.  However, a decision was made to use the CAD printout to determine traffic stop beginning and ending times for data analysis.  MCSO issued Administrative Broadcast 16-62 on June 29, 2016, which indicated that, beginning with the July 2016 traffic stop data collection, the stop times captured on the CAD system would be used for reporting and analytical purposes.

Occasionally, the CAD time of stop and end of stop time do not exactly match those listed on the Vehicle Stop Contact Form, due to extenuating circumstances the deputy may encounter.  During this reporting period, we did not find any instances where the end time on the VSCF Contact differed significantly from the CAD printout.  In monthly audits of traffic stop data, the Audits and Inspections Unit (AIU) reviews the beginning/ending times of the stops and requires that BIO Action Forms are generated by the Districts when there are discrepancies.  The CAD system is more reliable than the VSCF in determining stop times, as it is less prone to human error.  When the deputy verbally advises dispatch that s/he is conducting a traffic stop, the information is digitally time-stamped into the CAD system without human input; and when the deputy clears the stop, s/he again verbally advises dispatch.

MCSO remains in compliance with this Subparagraph.

WAI 38190

Paragraph 54.c. requires MCSO to document the license plate and state of the subject vehicle. During this reporting period, we found that deputies properly recorded the vehicle tag number and state of issuance in 103 of 105 cases.  In one case, a White female driver was stopped for driving with an expired vehicle registration.  The deputy notified Communications of the location of the stop, the reason for the stop, and the license plate number of the vehicle being stopped.  However, the license plate number recorded on the warning and on the VSCF was different than the one provided to Communications.  In addition, the vehicle's license plate was visible during a review of the body-worn camera recording, which confirmed that the license plate provided to Communications was accurate.  In the other case, a White male driver was stopped for speeding.  The vehicle was occupied by a White female passenger.  The deputy recorded the correct license plate number and state of issuance on the citation; however, the deputy listed the incorrect state of issuance on the VSCF.  Audits and Inspection Unit identified the issue during the monthly Traffic Stop Data Inspection and requested that the District prepare a BIO Action Form to address the issue.

MCSO remains in compliance with this Subparagraph, with a compliance rate of 98%.

Paragraph 54.d. requires MCSO to document the total number of occupants in the vehicle when a stop is conducted.  The VSCF, completed by the deputy on every traffic stop, is used to capture the total number of occupants and contains a separate box on the form for that purpose. EB-2 (Traffic Stop Data Collection) requires deputies to collect data on all traffic stops using the VSCF; this includes incidental contacts with motorists.  In 32 of the 105 traffic stops we reviewed, the driver had one or more passengers in the vehicle (88 total passengers).  In all 37 of the cases, the deputies properly documented the total number of occupants in the vehicles.  In our review of cases in relation to Paragraph 54.k., we identified one case in which the deputy did not properly document the total number of occupants in the vehicle.  In that case, a White male driver was stopped for an expired registration.  The VSCF indicates that the driver was the only occupant of the vehicle.  However, based on a review of the Incident Report prepared by the deputy and a review of the body-worn camera recording of the stop, it was determined that a White male child was in the vehicle at the time of the stop.  We discussed this case with MCSO during our January 2019 site visit.

With a compliance rate of 99%, MCSO remains in compliance with this Subparagraph.

Paragraph 54.e. requires MCSO to document the perceived race, ethnicity, and gender of the driver and any passengers, based on the deputy's subjective impression.  (No inquiry into the occupant's ethnicity or gender is required or permitted.)  In 32 of the 105 stops from the traffic stop data sample, there was more than one occupant in the vehicle (51 total passengers).

Eighty-one, or 77%, of the 105 traffic stops involved White drivers.  Thirteen, or 12%, of the 105 stops involved Latino drivers.  Eight, or 8%, of the 105 traffic stops involved Black drivers. Two, or 2%, of the 105 traffic stops involved Asian or Pacific Islander drivers.  One, or less than 1%, of the 105 traffic stops involved an American Indian/Alaskan Native driver.  Fifty-two traffic stops, or 50%, resulted in citations.  The breakdown of those motorists issued citations is as follows: 44 White drivers (85% of drivers who were issued citations); five Latino drivers

WAI 38191

(10% of drivers who were issued citations); and three Black drivers (6% of drivers who were issued citations. Fifty-one, or 49%, of the 105 traffic stops we reviewed resulted in a written warning. The breakdown of those motorists issued warnings is as follows: 35 White drivers (69% of the total who were issued warnings); eight Latino drivers (16% of the drivers who were issued warnings); five Black drivers (10% of the drivers who were issued warnings); two Asian or Pacific Islander drivers (4% of the drivers who were issued warnings); and one American Indian/Alaskan Native driver (2% of the drivers who were issued warnings). There were two stops in which the deputies did not issue a warning or a citation. In one of the cases, the White female driver was found to not have violated any traffic laws. The deputy issued the driver an Incidental Contact Receipt. In one case, a White male driver was arrested for Driving Under the Influence and an outstanding warrant. The deputy prepared a report for review by the Maricopa County Attorney's Office in relation to potential criminal charges against the driver.

In our sample of 30 traffic stops that contained body-worn camera recordings, we identified one stop in which the deputy did not accurately document the race/ethnicity of the driver.

- A female driver was stopped for driving with one inoperable headlight. The driver's race/ethnicity and gender was listed as a White female on the VSCF. The driver had a Hispanic surname. Based on a review of the body-worn camera recording of the stop, the Monitoring Team determined that the passenger should have been listed as a Latina. We discussed this case with MCSO during our January 2019 site visit.

In our review of traffic stops in relation to Subparagraphs 25.d. and 54.g, there were two cases in which the deputies did not accurately document the race/ethnicity and gender of the passengers.

- In one case, a Black male driver was stopped for speeding. One of the passengers was listed on the VSCF as a Black female and three other passengers were listed as "unknown, vision obstructed." However, our review of the body-worn camera recording of the stop revealed that two of the passengers that were listed as being "unknown, vision obstructed" were observed exiting the vehicle during the stop. Based on the Monitoring Team's review of the body-worn camera recordings, these two passengers should have been listed as a Black female and a Black male. One additional passenger was observed seated in the rear seat; however, we were unable to determine the race/ethnicity and gender of that passenger by reviewing the body-worn camera recordings.

- In the other case, a Latino driver was stopped for failure to maintain a lane of traffic. The VSCF indicates that the passengers were a Latina and one passenger was listed as "unknown, vision obstructed." The deputy indicated on the VSCF that the vehicle's window tint was dark, preventing the identification of the race/ethnicity and gender of the rear seat passenger; however, based on our review of the body-worn camera recording of the stop, it was determined that the vehicle's rear window was rolled down at one point, providing an unobstructed view of the passenger, a Latina child. The deputy acknowledged the passenger.

WAI 38192

In our review of cases in relation to Paragraph 54.k., there was one case in which the deputy did not accurately document the race/ethnicity and gender of the passenger.

- A White male driver was stopped for an expired license plate registration. The vehicle was occupied by a White male (child) passenger. The passenger was not listed on the VSCF. The driver produced an Arizona identification card. The deputy subsequently discovered that the driver's license was suspended. The driver also had two outstanding warrants for his arrest. The driver was arrested. The deputy did document that the child was a passenger in the vehicle on the Incident Report that was prepared. The deputy checked on the welfare of the child until he was picked up by his mother at the location of the stop.

This Paragraph requires deputies to document the perceived race, ethnicity, and gender of any passengers whether contact is made with them or not. By way of our previous reviews as well as AIU's inspections, MCSO has learned of deputies' failure to properly document the race or ethnicity of passengers. MCSO's policy does not require that the names of passengers be documented unless a passenger is contacted and the deputy requests and obtains the identity of the passenger. In such instances, the passenger's name and the reason for the contact is required to be documented on the VSCF and an Incidental Contact Receipt. In addition, in such situations, MCSO's policy requires that the deputy provide the passenger with a copy of the Incidental Contact Receipt. During our October 2018 and January 2019 site visits, we discussed with MCSO that we have noted an increase in the number of passengers being contacted and not being provided with an Incidental Contact Receipt. This trend continues.

We have noted that MCSO has improved the accuracy of documenting the perceived race or ethnicity of drivers and passengers.

For this reporting period, MCSO remains in compliance with this requirement.

Paragraph 54.f. requires that MCSO record the name of any individual upon whom the deputy runs a license or warrant check (including the subject's surname). Our review found that deputies recorded the name of each driver and passenger on the VSCF in each instance that a driver's license or warrant check was run. In addition, MCSO's policy requires that deputies perform a license plate check on each vehicle stopped by its deputies, as well as warrant checks on every driver stopped by its deputies. For this reporting period, we found that of the 105 traffic stops we reviewed, 105 included a check on the license plate. There were 102 stops where the deputies ran warrant checks on the drivers. In three cases, there was no explanation provided as to why the deputies failed to perform a warrant check on the drivers. During its monthly inspections of the traffic stop data, BIO identified two of the three cases that we identified in which a warrant check was not run on the drivers. AIU requested that the Districts prepare BIO Action Forms in those two cases.

MCSO's compliance rate with this requirement is 100%. MCSO remains in compliance with this Subparagraph.

WAI 38193

Paragraph 54.g. requires the deputy to document whether contact was made with any passengers, the nature of the contact, and the reasons for the contact. Due to the low number of cases where contact is made with passengers in our sample of 105 traffic stop cases per quarter, we pulled an additional sample of 10 cases each month for those cases involving passenger contacts. For this reporting period, we reviewed 30 traffic stops where the deputy had interaction with one or more passengers. Each passenger contact is described in detail below. All passenger contacts in the traffic stops we reviewed for Paragraph 25.d. were noted in the VSCFs.

To ensure that deputies are accurately capturing passenger information and to verify if passengers are contacted, we compare the number of passengers listed by the deputy with the number of passengers entered in the passenger drop-down box on the Vehicle Stop Contact Form. We also review any Incidental Contact Receipts issued to passengers by deputies. We also review the deputies' notes on the VSCF, the Arizona Citation, and the CAD printout for any information involving the passengers. We reviewed MCSO's I/Viewer System and the Justice Web Interface (JWI) to verify if a record check was requested for the driver or any passengers.

In our experience, the vast majority of traffic stops do not require contact with a passenger unless the driver is arrested, the vehicle will be towed, or there are minor children in the vehicle that will need care. The other type of traffic stop where we noted that deputies routinely contact passengers is when upon approaching a vehicle, the deputy detects the smell of burnt marijuana. In the stops we reviewed where this has occurred, deputies have inquired if the driver or any passengers possess a medical marijuana card. In other instances, the deputy may, for safety purposes, approach the vehicle from the passenger side, which often results in contact with the passenger who may be seated in the front seat.

Of the 30 cases identified for this Paragraph, there were five cases in which the passengers and the deputies engaged in general conversation. In four cases, the passenger assisted with language interpretation between the deputy and the driver. In two cases, the vehicles were released to the passengers after the drivers were placed under arrest. In two cases, the passengers were contacted to advise them that the driver was being arrested and to arrange for transportation. In one case, two passengers of a vehicle that was stopped were provided a courtesy ride by a Posse member after the deputy noted that the number of passengers in the vehicle appeared to exceed the number of seats in the vehicle. In one case, the passenger, who was the registered owner of the vehicle, provided the deputy with the vehicle title. In the remaining instances where MCSO made contact with passengers, the following occurred:

- A Latino driver was stopped for making an improper right turn at a red light. The driver produced an Arizona driver's license. The vehicle was occupied by a Latina passenger and another passenger who was seated in the rear seat, who was listed as "unknown, vision obstructed." The deputy subsequently discovered that the driver's license was suspended. The driver's license was seized and placed in evidence. The driver was issued a citation. The Latina passenger, who was the registered owner of the vehicle,

WAI 38194

took possession of the vehicle.  The deputy ran the passenger's name for warrants.  The passenger was not provided with an Incidental Contact Receipt.

- A Black male driver was stopped for driving with no lights on.  The driver did not have any identification on his person.  The vehicle was occupied by two Latina passengers.  The driver advised the deputy that his driver's license was valid.  The deputy ran the name provided by the driver in an attempt to verify that he had a valid driver's license; however, the deputy as unable to locate any driving record based on the name provided.  After the driver insisted that he provided the deputy with accurate information regarding his name and date of birth, the deputy then requested and obtained the driver's Social Security Number.  The deputy was still unable to confirm that the driver had a driver's license.  The driver was issued a citation.  After the deputy verified that the passenger had a driver's license, the vehicle was released to her.  The passenger was not provided with an Incidental Contact Receipt.

- A White male driver was stopped after the deputy observed litter being tossed from the passenger side of the vehicle.  The vehicle was occupied by a Latino passenger.  The deputy issued a warning to the passenger for the littering violation.  The driver was provided with an Incidental Contact Receipt.

- A Latino driver was stopped for driving with no lights on at night.  The vehicle was occupied by three Black males.  As the deputy approached the vehicle he observed that the passenger seated behind the driver was moving around.  The deputy directed the passenger to stop moving and asked him what he was doing.  The passenger replied that he was reaching for his phone.  The driver was issued a warning.

- A Latina driver was stopped for a missing brake light.  The vehicle was occupied by a Black male passenger.  The deputy detained the driver for driving with a suspended driver's license and impounded the vehicle.  The driver was issued a citation.  The deputy indicated on the VSCF that the contact with the passenger was "consensual."  However, the deputy requested and obtained the passenger's name and date of birth and ran his name for warrants.  The passenger was not provided with an Incidental Contact Receipt.

- An Asian or Pacific Islander male driver was stopped for speeding.  The vehicle was occupied by an Asian or Pacific Islander female passenger.  The passenger produced her Japanese passport and international driver's license to the deputy without being requested the information.  There was a language barrier, as it appeared the driver and passenger communicated primarily in Japanese.  The deputy was able to utilize a smart phone feature to effectively interpret from English to Japanese to communicate with the driver during the stop.  The driver was issued a warning.

- A Latino driver was stopped for driving with no lights on at night.  The vehicle was occupied by a Latino passenger.  The driver did not have a driver's license.  The driver was issued a warning.  The deputy requested and obtained the name of the passenger to

WAI 38195

verify whether she had a valid driver's license.  The deputy ran the passenger's name for warrants and to confirm whether she had a valid driver's license.  The passenger was allowed to drive the vehicle.  The passenger was not provided with an Incidental Contact Receipt.

- A Black male was stopped for speeding.  The driver did not have any identification on his person.  The vehicle was occupied by four passengers.  One of the passengers was listed on the VSCF as a Black female and three other passengers were listed as "unknown, vision obstructed."  However, as described in Paragraph 54.e., above, our review of the body-worn camera recording the stop revealed that two of the passengers that were listed as being "unknown, vision obstructed" were observed exiting the vehicle during the stop.  Based on the Monitoring Team's review of the body-worn camera recordings, these two passengers should have been listed as a Black female and a Black male.  One additional passenger was observed seated in the rear seat; however, we were unable to determine the race/ethnicity and gender of that passenger by reviewing the body-worn camera recordings.  The deputy obtained the driver's license of the Black female passenger that was seated in the rear seat and allowed her to drive the vehicle.  The driver was issued a warning.  The passenger was not provided with an Incidental Contact Receipt.

- A White male driver was stopped for driving with no license plate on a motor vehicle.  The vehicle was occupied by a White female passenger.  The driver had a suspended driver's license and a warrant for his arrest.  The driver was arrested and the vehicle was towed and impounded.  The deputy obtained the passenger's name and ran the name for warrants.  The deputy advised the passenger that the vehicle was being towed and advised her to arrange for transportation from the location.  The passenger was not provided with an Incidental Contact Receipt.

- A Black female driver was stopped for driving the wrong way on the roadway.  The vehicle was occupied by four Black males.  The driver did not have any identification on her person.  The deputy detected the odor of marijuana emanating from the passenger compartment of the vehicle and directed the vehicle occupants exit the vehicle.  Subsequently, a search of the interior of the vehicle was conducted, with no contraband being located, other than minor traces of suspected marijuana.  The driver's license was suspended and she was arrested for Driving Under the Influence.  One of the passengers had a valid driver's license, and the deputy conducted field sobriety tests on him to determine whether he was impaired.  It was determined that he was not impaired and he was allowed to take possession of the vehicle.  The passenger was provided with an Incidental Contact Receipt.

- A Black male driver was stopped for making an improper right turn.  The vehicle was occupied by a White female passenger.  The deputy detected the odor of marijuana emanating from the passenger compartment of the vehicle.  The driver admitted to having consumed alcohol; however, he denied consuming any marijuana.  The driver

WAI 38196

consented to a search of the vehicle. The deputy did not locate any contraband in the vehicle. The deputy conducted field sobriety tests on the driver and determined that he was not impaired. The driver was issued a warning. The deputy contacted the passenger and inquired about the driver's use of marijuana. The deputy also obtained the passenger's name and ran her name for warrants. The passenger was not provided with an Incidental Contact Receipt.

- A Latino driver was stopped for driving with one inoperable headlight. The driver did not have any identification on his person. The vehicle was occupied by a Latina passenger. The driver was issued a citation. The deputy obtained the identification of the passenger. The deputy ran the passenger's name for warrants. The passenger was not provided with an Incidental Contact Receipt.

- A Latino driver was stopped for driving with one inoperable headlight. The driver fled on foot before being contacted by the deputy. The vehicle was occupied by a Latino passenger and a Latina passenger (child). The deputy prepared an Incidental Contact Receipt for the driver, although it could not be served, since the driver fled from the location. The deputy obtained the name of the Latino passenger's name. The deputy ran the passenger's name for warrants. The passenger was not provided with an Incidental Contact Receipt.

- A White male driver was stopped for failure to maintain a lane of traffic. The vehicle was occupied by a White female passenger. The driver was arrested for Driving Under the Influence. The vehicle was towed and impounded. The driver was issued a citation. The deputy obtained the passenger's name. The deputy ran the passenger's name for warrants. The passenger was not provided with an Incidental Contact Receipt.

- A Latina driver was stopped for driving with one inoperable headlight. The driver had a suspended driver's license. The vehicle was occupied by a Latino passenger. The driver was issued a citation. The deputy obtained the Mexican driver's license of the passenger. The deputy ran the passenger's name for warrants. The passenger was not provided with an Incidental Contact Receipt.

During this reporting period's review of the sample of 105 traffic stops, there was one case in which the passenger was contacted by the deputy to advise that the driver was being arrested and to arrange for transportation. In one case, the passenger and the deputy engaged in general conversation.

There were five cases identified in the stops that we reviewed for Paragraph 54.k in which the passengers were contacted. In two of those cases, the passengers were contacted to advise them that the driver was being arrested and, in one case, to arrange for transportation from the location. In the remaining instances where MCSO made contact with passengers, the following occurred:

WAI 38197

- A White female driver was stopped for driving with no lights at night. The driver did not have a driver's license. The vehicle was occupied by a White female passenger. The driver was arrested for an outstanding felony warrant. The driver was issued a warning. The deputy requested and obtained the name of the passenger. The passenger was the registered owner of the vehicle. The passenger was allowed to drive the vehicle. The passenger was not provided with an Incidental Contact Receipt.

- A White male driver was stopped for an expired license plate registration. The vehicle was occupied by a White male (child). The passenger was not listed on the VSCF. The driver produced an Arizona identification card. The deputy subsequently discovered that the driver's license was suspended. The driver also had two outstanding warrants for his arrest. The driver was arrested. The deputy checked on the welfare of the passenger until he was picked up by his mother at the traffic stop location. The vehicle was towed and impounded. The driver was issued a citation.

- A White male driver was stopped for an expired registration. In addition, the deputy reported that the vehicle matched the description of a vehicle involved in a recent burglary and that one of the vehicle occupants, a White male, was alleged to have been involved in the burglary. The vehicle was occupied by a White female passenger and two White male passengers. The deputy initially approached the passenger side of the vehicle and contacted the White male passenger who was alleged to have been involved in the burglary. That passenger was detained and arrested for a parole violation. The deputy and other deputies that responded to the stop location investigated the driver and the other two passengers. The driver was arrested for possession of narcotics, possession of narcotic paraphernalia and Driving Under the Influence. The vehicle was towed and impounded. The driver was issued a citation. During the investigation, the deputies conducted a *Terry* pat-down of the White male passenger and the White female passenger, both of whom were not arrested. The White female passenger and White male passenger were released; however, they were not provided with Incidental Contact Receipts.

As noted in some of the cases above, deputies have not been consistent in preparing and providing passengers with Incidental Contact Receipts during traffic stops in which the passenger is contacted and asked by the deputy to provide identification. Supervisors should identify such omissions during their reviews of the VSCFs and take corrective action. During our October 2018 and January 2019 site visits, we discussed with MCSO that we have noted an increase in the number of passengers being contacted and not being provided with an Incidental Contact Receipt. During the last reporting period, MCSO provided the Incidental Contact Receipt when required in 36% of the cases. During this reporting period, MCSO provided the Incidental Contact Receipt when required in 13% of the cases. MCSO reports that it has added a prompt to the TraCS system to inform deputies to complete the Incidental Contact Receipt when the passenger contact section of the Vehicle Stop Contact Form is populated. With the addition of this prompt, it will hopefully resolve this issue and serve as an effective reminder to the deputies to complete the Incidental Contact Receipt when required.

WAI 38198

Paragraph 54.h. requires deputies to record, prior to the stop, the reason for the vehicle stop, including a description of the traffic or equipment violation observed, and any indicators of criminal activity developed before or during the stop.  For this reporting period, we identified a random sample of 10 cases from the 35 cases we initially requested each month, and requested CAD audio and body-worn camera (BWC) footage for those cases.  We listened to CAD dispatch audio recordings, reviewed the CAD printouts, and reviewed body-worn camera recordings for 30 traffic stops from the sample of 105 traffic stops used for this review; and found that the deputies advised Communications of the reason for the stop, location of the stop, license plate, and state of registration for all 30 stops.

For the remaining 75 traffic stops where body-worn camera recordings and CAD audiotapes were not requested, we review the CAD printout and the VSCF to ensure that the reason for the stop has been captured.  These forms are included in our monthly sample requests.  The dispatcher enters the reason for the stop in the system as soon as the deputy verbally advises Communications of the stop, location, and tag number.  The VSCF and the CAD printout documents the time the stop begins and when it is concluded – either by arrest, citation, or warning.  Deputies need to be precise when advising dispatch of the reason for the traffic stop, and likewise entering that information on the appropriate forms.

MCSO's compliance rating for this Subparagraph is 100%.

Paragraph 54.i. requires deputies to document the time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; the time a release was made without a citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere, or the deputy's departure from the scene.  In our review of the documentation provided, the CAD printouts, the Vehicle Stop Contact Forms created by MCSO, along with the E-Ticketing system and the Arizona Ticket and Complaint Form, capture the information required.  As we noted in Subparagraph 54.b., the stop times on the CAD printout and the Vehicle Stop Contact Form vary slightly on occasion.  We understand that this may occur due to extenuating circumstances, and we will report on those instances where there is a difference of five minutes or more from either the initial stop time or the end time.

We review the circumstances of each stop and the activities of the deputies during each stop to assess whether the length of the stop was justified.  During this reporting period, we did not identify any stops that were extended for an unreasonable amount of time.

Supervisors conducted timely reviews and discussions of 98 of the 105 VSCFs reviewed. Deputies accurately entered beginning and ending times of traffic stops in 105 of the 105 cases that we reviewed.  MCSO accurately entered the time citations and warnings were issued in all 105 cases.

MCSO remains in compliance with this Subparagraph.

WAI 38199

Paragraph 54.j. requires MCSO to document whether any inquiry as to immigration status was conducted and whether ICE/CBP was contacted, and if so, the facts supporting the inquiry or contact with ICE/CBP, the time supervisor approval was sought, the time ICE/CBP was contacted, the time it took to complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual.

On November 7, 2014, a United States District Court Judge issued an Order permanently enjoining enforcement of Arizona Revised Statute (A.R.S.) 13-2319, commonly referred to as the Arizona Human Smuggling Act.  On November 17, 2014, MCSO issued Administrative Broadcast 14-75, prohibiting deputies from enforcing the above state statute, including arresting, detaining, or questioning persons for suspected (or even known) violations of the act and from extending the duration of traffic stops or other deputy-civilian encounters to do so.

We reviewed 105 traffic stops submitted for this Paragraph, and found that none of the stops involved any contacts with ICE/CBP.  None of the stops we reviewed involved any inquires as to immigration status.  In addition, our reviews of Incident Reports and Arrest Reports conducted as part of the audits for Paragraphs 89 and 101 revealed no immigration status investigations.  MCSO remains in compliance with this Subparagraph.

Paragraph 54.k. requires MCSO to document whether any individual was asked to consent to a search (and the response), whether a probable-cause search was performed on any individual, or whether a pat-and-frisk search was performed on any individual.  During our January 2018 site visit, we discussed with MCSO whether any other method may be feasible to identify a larger population of searches of individuals specific to the requirements of this Paragraph.  MCSO's response was that the current method is appropriate, and that there may be more cases identified once deputies properly document the searches of persons consistent with this Paragraph.  We encourage MCSO to continue to explore methods to identify the overall population of cases that fit the criteria of this Paragraph.  Due to the limited number of cases being identified that fit the criteria of this Paragraph, MCSO's rate of compliance continues to stagnate.

MCSO's Compliance Report for the 18th Quarter reporting period indicates that MCSO is considering training opportunities for deputies to assist them to better identify and document searches of persons.  We continue to recommend that MCSO implement training to ensure that deputies properly document consent searches of persons, probable-cause searches of persons, and pat-and-frisk searches of persons.

The method MCSO currently employs to identify our sample of cases to review is to identify the population of all traffic stops in which searches of individuals were documented on the VSCF.  Once that population is identified, a random sample of 10 traffic stops from each month (30 total for the reporting period) is identified and reviewed.  In addition, we also review any cases in which the deputies performed searches of individuals in the sample of 105 traffic stops reviewed in relation to Paragraphs 25 and 54 and the sample of 30 traffic stops reviewed in relation to Subparagraphs 25.d. and 54.g.  Generally, we review 165 traffic stops each reporting period to identify stops where a deputy may have performed a search of an individual specific to the requirements of this Subparagraph.  However, in some instances, there are some stops that

WAI 38200

are reviewed for compliance in relation to both Paragraph 54.k and Subparagraphs 25.d. and 54.g., which means that total number of traffic stops reviewed would be less than 165. There were no cases that met these criteria in our sample of 105 traffic stops reviewed in relation to Paragraphs 25 and 54. In relation to the sample of 30 traffic stops reviewed in relation to Subparagraph, there was one stop identified that met the criteria of this Subparagraph.

- A White male driver was stopped for an expired registration. In addition, the deputy reported that the vehicle matched the description of a vehicle involved in a recent burglary and that one of the vehicle occupants, a White male, was alleged to have been involved in the burglary. The vehicle was occupied by a White female passenger and two White male passengers. The deputy initially approached the passenger side of the vehicle and contacted the White male passenger who was alleged to have been involved in the burglary. That passenger was detained and arrested for a parole violation. The deputy and other deputies that responded to the stop location investigated the driver and the other two passengers. The driver was arrested for possession of narcotics, possession of narcotic paraphernalia and Driving Under the Influence. The two White males who were arrested were searched incident to arrest. The vehicle was towed and impounded. The driver was issued a citation. During the investigation, the deputies conducted a *Terry* pat-down of the White male passenger and the White female passenger, both of whom were not arrested. The White female passenger and White male passenger were released; however, they were not provided with Incidental Contact Receipts.

In the sample of 30 traffic stops identified in relation to Subparagraphs 25.d and 54.g., there was one stop that met the criteria specific to searches of individuals.

- A White male driver was stopped for speeding. The vehicle was occupied by a White male passenger. The driver was arrested for Driving Under the Influence. The deputy documented on the VSCF that the search of the driver was both incident to arrest, and that consent was requested and obtained to conduct the search. A review of the body-worn camera recording revealed that before the deputy conducted the search of the driver he did ask for consent to conduct the search. However, the deputy did not inform the driver of his right to refuse or revoke the consent to search, which is required by MCSO's policy.

The remaining cases were not specific to the requirements of this Subparagraph, as they involved searches of individuals incident to arrest.

MCSO has indicated that it does not require its deputies to use Consent to Search Forms as the primary means for documenting consent searches. MCSO requires that deputies document requests to conduct consent searches by way of video-recording the event via the BWCs. In the event the BWC is not operational, MCSO policy requires deputies to document requests to conduct consent searches on the Consent to Search Form. MCSO reports that deputies have electronic access to the Consent to Search Forms. We continue to recommend that MCSO revisit the requirements of this section of the policy and require deputies to read the Consent to

WAI 38201

Search Form to the subject and require a signature from the individual for every request for consent to search unless the search is an actual search incident to arrest. Due to the small population of cases that MCSO and the Monitoring Team have identified, it is important that deputies accurately document each search and/or request to a consent search, as required by this Subparagraph, to attain and maintain compliance with the requirement. Based on some of the cases we reviewed this reporting period, it appears that some deputies are not aware of the policy requirements as it relates to informing individuals that a consent search may be refused; or, if granted, that the consent search may be revoked by the individual at any time. We recommend that MCSO implement training on the specific policy requirements regarding consent searches.

In the last reporting period of 2017, MCSO's compliance rate with this Subparagraph was 67%, with only three cases identified. During the first reporting period of 2018, we identified only one case that was applicable to this requirement and determined that the compliance status would be deferred. Due to the low number of cases identified in the second reporting period of 2018, coupled with the inaccuracies in the some of the cases that were reviewed, we again determined that the compliance status would be deferred. During the last reporting period, MCSO's compliance rate was 71%. Due to the low number of cases identified during this reporting period, we will defer our compliance assessment.

Paragraph 54.l. requires MCSO to document whether any contraband or evidence was seized from any individual, and the nature of the contraband or evidence. Of a total sample of 165 stops reviewed for the reporting period, which includes 105 stops for Paragraph 25; 30 stops for Subparagraph 54.k.; and 30 stops for Subparagraphs 25.d and 54.g., there were 24 cases identified in which MCSO deputies documented the seizure of contraband or evidence on the VSCFs. There was one case where the deputy did not properly document the seizure of contraband or evidence on the VSCF. A summary of the cases is listed below.

During our review of the collected traffic stop data (our sample of 105) during this reporting period, we identified two cases in which license plates were seized by deputies and placed into evidence. In one case, the deputy seized a driver's license and placed the item into evidence. In one case, a deputy seized narcotics, narcotic paraphernalia and an altered license plate and placed the items into evidence.

WAI 38202

In the 30 cases we reviewed for searches of individuals under Subparagraph 54.k., the following items were seized by deputies and placed into evidence or safekeeping.  In six cases, deputies seized driver's licenses and placed the items into evidence; however, in one of those cases the deputy did not document the seizure of the driver's license on the VSCF.  In two cases, the deputies seized the driver's licenses and license plates and placed the items into evidence.  In three cases, the deputies seized the license plates and placed the items into evidence.  In one case, a deputy seized narcotics and a license plate and placed the items into evidence.  In one case, the deputy seized narcotics and narcotics paraphernalia and placed the items into evidence.  In one case, the deputy seized narcotics paraphernalia and placed the item into evidence.  In one case, the deputy seized a driver's license and two bottles of alcohol and placed the items into evidence.

In the 30 cases we reviewed for passenger contacts under Subparagraph 54.g., there were two cases in which deputies seized driver's licenses and placed the items into evidence.  In one case, a deputy seized a license plate and placed the item into evidence.  In one case, a deputy seized narcotics paraphernalia and placed the item into evidence.

We noted in the previous two reporting periods an increase in the number of errors and omissions in relation to deputies documenting the seizure of contraband or evidence on the VSCF.  MCSO's compliance rate in the second reporting period of 2018 was 85%, and we reported that MCSO would remain in compliance with this Subparagraph for that reporting period.  We also reported that MCSO would be required to attain a rate of compliance of greater than 94% to maintain compliance for the third reporting period of 2018; however, MCSO attained a compliance rate of 70% for that reporting period and MCSO was determined to not be in compliance with this Subparagraph.  During this reporting period, MCSO attained a compliance rate of 96%.  MCSO is in compliance with this requirement.

Paragraph 54.m. requires the documentation of the final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without a citation.  In all 105 cases we reviewed, we found documentation indicating the final disposition of the stop; and whether the deputy made an arrest, issued a citation, issued a warning, or made a release without a citation.  MCSO remains in compliance with this Subparagraph.


***Paragraph 55.*** *MCSO shall assign a unique ID for each incident/stop so that any other documentation (e.g., citations, incident reports, tow forms) can be linked back to the stop.*

**In Full and Effective Compliance**

To verify compliance for this Paragraph, we reviewed a sample of the Vehicle Stop Contact Forms, CAD printouts, I/Viewer documentation, citations, warning forms, and any Incident Report that may have been generated as a result of the traffic stop.

WAI 38203

The unique identifier "went live" in September 2013 when the CAD system was implemented. This number provides the mechanism to link all data related to a specific traffic stop. The number is automatically generated by the CAD software and is sent to the deputy's MDT at the time the deputy advises Communications of the traffic stop. The unique identifier is visible and displayed at the top of the CAD printout and also visible on the Vehicle Stop Contact Form, the Arizona Traffic Citation, and the Warning/Repair Form.

We visited Districts 1, 4, 6, and 7 and Lake Patrol during our January 2019 site visit; and found no indications from any personnel that there were recurring issues with the unique identifier, including duplicates. Once the deputy scans the motorist's driver's license, the system automatically populates most of the information into one or more forms required by the Order. If the data cannot be entered into TraCS from the vehicle (due to malfunctioning equipment), policy requires the deputy to enter the written traffic stop data electronically prior to the end of the shift. The start and end times of the traffic stop are now auto-populated into the Vehicle Stop Contact Form from the CAD system.

Since our first visit for monitoring purposes in June 2014, TraCS has been implemented in all Districts; and the unique identifier (CFS number) is automatically entered from the deputy's MDT. No user intervention is required.

To determine compliance with this requirement, we reviewed 105 traffic stop cases and reviewed the CAD printouts and the Vehicle Stop Contact Forms for all stops. We reviewed the Warning/Repair Forms, when applicable, for those stops where a warning was issued or the vehicle had defective equipment. The unique identification number assigned to each event was listed on correctly on all CAD printouts for every stop.

During this reporting period, on December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

***Paragraph 56.*** *The traffic stop data collection system shall be subject to regular audits and quality control checks. MCSO shall develop a protocol for maintaining the integrity and accuracy of the traffic stop data, to be reviewed by the Monitor pursuant to the process described in Section IV.*

**Phase 1:** Not in compliance

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- EIU Operations Manual, currently under revision.

**Phase 2:** Not in compliance

To verify compliance for this Paragraph, we reviewed the monthly audits of the traffic stop data conducted by BIO on the samples we selected. While audits require in-depth analysis, our quality control checks serve as more of an inspection or spot-check of the data. We reviewed

WAI 38204

the BIO traffic stop audits for October-December 2018 and found that the audits were thorough and captured most deficiencies. During our review of the sample dataset, we identified additional deficiencies, and brought them to the attention of CID while onsite; we identify them in other areas of this report.

We reviewed the draft EIU Operations Manual, which includes procedures for traffic stop data quality assurance. During our January 2019 site visit, EIU provided an update about the status of its effort to compete the EIU Operations Manual. EIU reported that 18 of the total 30 sections of the manual had been approved and 12 sections were under development. EIU reported during our site visit that there were no sections submitted to us for review during the quarter. The information about the status of the EIU Operations Manual is from a tracking table EIU uses to monitor its progress. We note that some sections of the EIU Operations Manual cannot be finalized, as they required finalizing methodologies related to monthly and annual analyses of traffic stop data in accordance with the requirements of Paragraphs 66 and 67. (See below.) As is discussed in Paragraph 66 below, MCSO's new vendor, CNA, has proposed new methodologies to analyze traffic stop data; once approved, the revised methodologies will be incorporated into the EIU Operations Manual. We continue to encourage MCSO to submit completed sections of the operations manual for review and approval to enable Phase 1 compliance with those Paragraphs covered by those sections of the operations manual.

On September 8, 2015, MCSO issued Administrative Broadcast 15-96, which addressed the security of paper traffic stop forms. The procedure requires that paper forms (prior to April 1, 2014) be stored in a locked cabinet box at the District. The protocol also includes traffic stop data that may be handwritten by deputies in the field if the TraCS system is nonoperational due to maintenance or lack of connectivity. Any personnel who require access to those files must contact the Division Commander or his/her designee who will unlock the cabinet. Once the deputy accesses his file, a TraCS file log must be completed and signed by the deputy. During our January 2019 visits to the Districts, we inspected the written (hardcopy) files and verified that all records were locked and secure, that logs were properly maintained, and that only authorized personnel had access to these files.

MCSO began auditing traffic stop data in January 2014; and since April 2014, MCSO has conducted audits of the data monthly and provided those results to us. We reviewed BIO's monthly audits of the traffic samples from October 1-December 31, 2018, and found them to be satisfactory. MCSO conducts audits of the 105 traffic stop samples that we request each reporting period. It also conducts a more expansive review of 30 of the 105 sample pulls we request each reporting period to include passenger contacts and persons' searches. EB-2 also requires regularly scheduled audits of traffic stop data on a monthly basis.

To achieve Phase 1 compliance with this Paragraph, MCSO must finalize the EIU Operations Manual to cover all matters applicable to this Paragraph. To achieve Phase 2 compliance with this Paragraph, MCSO must demonstrate ongoing use of the procedures to ensure traffic stop data quality assurance.

WAI 38205

*Paragraph 57.  MCSO shall explore the possibility of relying on the CAD and/or MDT systems to check if all stops are being recorded and relying on on-person recording equipment to check whether Deputies are accurately reporting stop length.  In addition, MCSO shall implement a system for Deputies to provide motorists with a copy of non-sensitive data recorded for each stop (such as a receipt) with instructions for how to report any inaccuracies the motorist believes are in the data, which can then be analyzed as part of any audit.  The receipt will be provided to motorists even if the stop does not result in a citation or arrest.*

**Phase 1:**  In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- GJ-35 (Body-Worn Cameras), most recently amended on January 7, 2017.

**Phase 2:**  In compliance

To verify compliance for this Paragraph, we reviewed all TraCS forms for each traffic stop that were included in the sample.  In addition, we reviewed a subset of CAD audio recordings and body-worn camera footage of the stops.

The system for providing "receipts" is outlined in EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) and EB-2 (Traffic Stop Data Collection).  GJ-35 addresses the requirement that supervisors review recordings to check whether deputies are accurately reporting stop length.  In addition to GJ-35, BIO developed a Body-Worn Camera Matrix for its inspectors to review camera recordings.

The deputy should provide every person contacted on a traffic stop with an Arizona Traffic Ticket or Complaint (Citation), a Written Warning/Repair Order (Warning), or an MCSO Incidental Contact Receipt.  To verify compliance that the violator received the required "receipt" from the deputy, a signature is required, or, if the violator refuses to sign, the deputy may note the refusal on the form.  We are unable to verify that motorists have been issued a receipt without a signature on the form, or the deputy advising of the refusal of the receipt from the driver.  Placing "SERVED" in the signature box without any explanation does not comply with the requirement.  For this reporting period, deputies issued citations or written warnings in 103 of the 105 cases we reviewed.  In one case, the deputy prepared a report for review by the Maricopa County Attorney's Office in relation to potential criminal charges against the driver.  In one case, the driver was found to not have violated any traffic laws and the deputy issued the driver an Incidental Contact Receipt.

We did not identify any issues with the citations, warning and Incidental Contact Receipts issued to drivers for the cases reviewed under Subparagraph 54.g., and Subparagraph 54.k.  MCSO's compliance rate with this requirement is 100%.  MCSO remains in compliance with this portion of the Subparagraph.

WAI 38206

The approved policies dictate that the CAD system will be used for verification of the recording of the initiation and conclusion of the traffic stop and that MCSO will explore the possibility of relying on the BWC recordings to verify that the stop times reported by deputies are accurate. The deputy verbally announces the stops initiation and termination on the radio, and then CAD permanently records this information. In May 2016, MCSO advised us that all deputies and sergeants who make traffic stops had been issued body-worn cameras and that they were fully operational. We verified this assertion during our July 2016 site visit; and since that time, we have been reviewing the BWC recordings to determine if stop times indicated by CAD were accurate. MCSO's Audit and Inspections Unit (AIU) conducts monthly inspections of traffic stop data, which includes an assessment as to whether the BWC video captured the traffic stop in its entirety; to verify the time the stop began; and to verify if all information on forms prepared for each traffic stop match the BWC video. AIU conducts reviews of 30 body-worn camera recordings each reporting period.

During this reporting period, we requested from MCSO 30 body-worn camera recordings for our review. We are able to use the BWC recordings that were provided for each stop to assess whether deputies are accurately reporting the stop length. The compliance rate for the sample of 30 cases selected from the 105 for using the BWC to determine if deputies are accurately reporting stop length is 100%. MCSO remains in compliance with this requirement.

**Paragraph 58.** *The MCSO shall ensure that all databases containing individual-specific data comply with federal and state privacy standards governing personally identifiable information. MCSO shall develop a process to restrict database access to authorized, identified users who are accessing the information for a legitimate and identified purpose as defined by the Parties. If the Parties cannot agree, the Court shall make the determination.*

**Phase 1:** In compliance

- GF-1 (Criminal Justice Data Systems), most recently amended on January 9, 2018.

- GF-3 (Criminal History Record Information and Public Records), most recently amended on February 20, 2019.

**Phase 2**: In compliance

WAI 38207

To verify compliance for this Paragraph, we reviewed the applicable policies and met with Technology Management Bureau personnel to determine if any unauthorized access and/or illegitimate access to any of MCSO's database systems had occurred during this reporting period.   The policies state that the dissemination of Criminal History Record Information (CHRI) is based on federal guidelines, Arizona statutes, the Department of Public Safety (ASDPS), and the Arizona Criminal Justice Information System; and that any violation is subject to fine.   No secondary dissemination is allowed.   The policies require that the Professional Standards Bureau (PSB) provide written notification to the System Security Officer whenever it has been determined that an employee has violated the policy by improperly accessing any Office computer database system.   Every new recruit class receives three hours of training on this topic during initial Academy training.

During our January 2019 site visit, we inquired whether there had been any instances of unauthorized access to and/or any improper uses of the database systems.   MCSO informed us that there had been no reports of any unauthorized access to and/or improper uses of MCSO's database systems during this reporting period.   MCSO remains in compliance with this requirement

***Paragraph 59.***   *Notwithstanding the foregoing, the MCSO shall provide full access to the collected data to the Monitor and Plaintiffs' representatives, who shall keep any personal identifying information confidential.   Every 180 days, MCSO shall provide the traffic stop data collected up to that date to the Monitor and Plaintiffs' representatives in electronic form.   If proprietary software is necessary to view and analyze the data, MCSO shall provide a copy of the same.   If the Monitor or the Parties wish to submit data with personal identifying information to the Court, they shall provide the personally identifying information under seal.*

**In Full and Effective Compliance**

Electronic traffic stop data capture began on April 1, 2014.   The forms created by MCSO capture the traffic stop details required by MCSO policy and Paragraphs 25 and 54.   BIO provides the traffic stop data on a monthly basis, which includes a spreadsheet of all traffic stops for the reporting period, listing Event Numbers as described at the beginning of Section 7.   All marked patrol vehicles used for traffic stops are now equipped with the automated TraCS system, and all Patrol deputies have been trained in TraCS data entry.   MCSO has provided full access to all available electronic and written collected data since April 1, 2014.   MCSO did not collect electronic data before this time.   MCSO has continued to provide full access to the traffic stop data.

During this reporting period, on December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph.   After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 38208

### b. Electronic Data Entry

***Paragraph 60.*** *Within one year of the Effective Date, the MCSO shall develop a system by which Deputies can input traffic stop data electronically. Such electronic data system shall have the capability to generate summary reports and analyses, and to conduct searches and queries. MCSO will explore whether such data collection capability is possible through the agency's existing CAD and MDT systems, or a combination of the CAD and MDT systems with a new data collection system. Data need not all be collected in a single database; however, it should be collected in a format that can be efficiently analyzed together. Before developing an electronic system, the MCSO may collect data manually but must ensure that such data can be entered into the electronic system in a timely and accurate fashion as soon as practicable.*

**In Full and Effective Compliance**

To verify compliance with this Paragraph, we reviewed the documents generated electronically that capture the required traffic stop data. The electronic data entry of traffic stop data by deputies in the field went online on April 1, 2015. If TraCS experiences a malfunction in the field, there is a protocol that requires the deputy to electronically enter the traffic stop data prior to the end of the shift.

MCSO continues to conduct monthly traffic stop inspections and forwards them for our review. Initially, the traffic stop data was captured on handwritten forms created by MCSO, completed by the deputy in the field, and manually entered in the database by administrative personnel located at each District. Now all traffic stop data is entered electronically, whether in the field or at MCSO District offices. Occasionally, connectivity is lost in the field due to poor signal quality, and citations are handwritten. Per policy, deputies must enter electronically any written traffic stop data they have created by the end of the shift in which the event occurred. As noted in our Paragraph 90 review, VSCFs are routinely entered into the system by the end of the shift. During our January 2019 site visit, we met with MCSO and the Parties; and reviewed the deficiencies BIO and our reviews discovered for this reporting period, along with the results of the Action Forms generated by BIO.

Deputies have demonstrated their ability to access and use TraCS, as evidenced by the fact that their total time on a traffic stop averages 16 minutes or less.

During this reporting period, on December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 38209

### c. Audio-Video Recording of Traffic Stops

***Paragraph 61.*** *The MCSO will issue functional video and audio recording equipment to all patrol deputies and sergeants who make traffic stops, and shall commence regular operation and maintenance of such video and audio recording equipment. Such issuance must be complete within 120 days of the approval of the policies and procedures for the operation, maintenance, and data storage for such on-person body cameras and approval of the purchase of such equipment and related contracts by the Maricopa County Board of Supervisors. Subject to Maricopa County code and the State of Arizona's procurement law, The Court shall choose the vendor for the video and audio recording equipment if the Parties and the Monitor cannot agree on one.*

**Phase 1:** In compliance

- GJ-35 (Body-Worn Cameras), most recently amended on January 7, 2017.

**Phase 2:** In compliance

During our September 2014 site visit, we met with two MCSO Deputy Chiefs and other personnel to discuss MCSO's progress of acquiring in-car video and audio equipment for all patrol vehicles used to conduct traffic stops. MCSO had initially set out to purchase fixed in-car cameras as required by the Order, but expressed an interest in acquiring body-worn video and audio recording devices for deputies. The Court issued an Order providing an amendment/stipulation on October 10, 2014, requiring on-body cameras. This was a prudent decision, in that it allows for capturing additional data, where a fixed mounted camera has limitations. We have documented MCSO's transition from in-car to body-worn cameras (BWC) in our previous quarterly status reports.

Body-worn cameras were fully implemented and operational in May 2016, and the equipment has worked well. The BWC recordings are stored in a cloud-based system (on evidence.com) that can be easily accessed by supervisors and command personnel. The retention requirement for the recordings is three years.

We verified during our District visits that MCSO has issued body-worn cameras to all Patrol deputies. Records indicate that MCSO began distribution of the body-worn cameras on September 14, 2015, and full implementation occurred on May 16, 2016. Every reporting period, we review a printout provided by CID that documents each deputy, by District, who has been issued a BWC.

During our January 2019 site visit, we met with District 1, 4, 6, and 7 and Lake Patrol supervisors and commanders; and inquired if Patrol supervisors had experienced any difficulty with the BWC equipment and the BWC system. As reported in previous reporting periods, MCSO informed us that it continues to experience minor issues with cords breaking and batteries not lasting for deputies' entire shifts. There were also reports of BWC recordings not properly uploading. In some instances, BWC recordings had to be manually uploaded into the system.

WAI 38210

MCSO is currently procuring a new body-worn camera system for all of its deputies.  The new BWC system will resolve the current issues of cords breaking and becoming disconnected, as there is no cord.  MCSO also anticipates that the issues related to battery life will be remedied with the new equipment.

***Paragraph 62.***  *Deputies shall turn on any video and audio recording equipment as soon the decision to initiate the stop is made and continue recording through the end of the stop.  MCSO shall repair or replace all non-functioning video or audio recording equipment, as necessary for reliable functioning.  Deputies who fail to activate and to use their recording equipment according to MCSO policy or notify MCSO that their equipment is nonfunctioning within a reasonable time shall be subject to Discipline.*

**Phase 1:**  In compliance

- GJ-35 (Body-Worn Cameras), most recently amended on January 7, 2017.
- Body-Worn Camera Operations Manual, published on December 22, 2016.

**Phase 2**:  In compliance

MCSO evaluated on-person body cameras from other jurisdictions and selected a vendor (TASER International, now known as Axon).  Body-worn cameras have been implemented in all Districts since May 2016 and are fully operational.

To verify compliance for this Paragraph, we reviewed the body-worn camera recordings included in our monthly samples.  During this reporting period, in our sample of 30 body-worn camera recordings reviewed for Subparagraph 54.g. there were two cases which were also reviewed as part of the sample for Subparagraph 54.k. and one case that was also reviewed as part of the sample for Paragraphs 25 and 54.  In addition, in two cases, the deputies documented on the VSCF that the BWC devices malfunctioned during the stop.  These cases were excluded for the purpose of calculating compliance with this requirement.  Accordingly, for the purposes of calculating compliance with this requirement, the total number of cases reviewed for this reporting period is 85.

For our selection of a sample to review BWC recordings, we used the same sample of 30 cases we selected for the CAD audio request.  Of the 30 cases in which we requested BWC recordings, there was one case that did not have a body-worn camera recording for an assisting deputy.  There was no documentation made by the deputy or a supervisor in relation to any type of malfunction of the BWC device.  In one case, the deputy documented that he had a technical issue with the BWC device.  He noted that the device did not activate initially at the beginning of the stop and it only worked after he shut the device off and restarted the device.  In such instances where the deputy documents a technical issue with the BWC device, such as this, it will not adversely impact MCSO's rate of compliance with this requirement.  In the remaining 28 cases, all were in compliance with the deputy activating the video- and audio-recording equipment as soon as the deputy decided to initiate the stop, and continuing to record through

WAI 38211

the end of the stop.  In relation to the sample of 75 cases in which BWC recordings were not provided, there were two cases in which the deputies noted on the VSCF that BWC devices did not activate properly at the beginning of the stop due to technical issues.  In one other case, a deputy documented on the VSCF that the BWC device malfunctioned near the conclusion of the stop.

In our sample of 30 body-worn camera recordings reviewed for Subparagraph 54.k., 27 cases were in compliance with the deputy activating the video- and audio-recording equipment as soon as the deputy decided to initiate the stop, and continuing to record through the end of the stop.  In one case, the deputy noted on the VSCF that, due to technical issues, the BWC device would randomly shut off.  As mentioned previously, in such instances where the deputy documents a technical issue with the BWC device, it will not adversely impact MCSO's compliance with this requirement.  In one case, the body-worn camera recording begins with the deputy already in contact with the driver.  In one case, there are no body-worn camera recordings of certain portions of the time that the individual was in the deputy's custody after being arrested.  In the aforementioned two cases, the deputies did not document any technical issues with the BWC devices.  In ten of the cases, there were deputies who responded to assist on the traffic stops and failed to prepare the Assisting Deputy and Body-Worn Camera Log, as required by MCSO policy.  In our review of the sample of 28 body-worn camera recordings for Subparagraph 54.g., 28 cases were in compliance with the deputy activating the video- and audio-recording equipment as soon as the deputy decided to initiate the stop, and continuing to record through the end of the stop.  In one of the cases, a deputy who responded to assist on a traffic stop, failed to prepare the Assisting Deputy and Body-Worn Camera Log, as required by MCSO policy.

The compliance rate for the sample of 85 cases reviewed is 96%.

We also identified cases in which the deputies did not use the BWC according to policy.  Although it is less frequent, we still have identified some instances in which the deputies have failed to ensure that the BWC is positioned properly during contact with the driver and/or passenger(s).

We continue to identify instances in which deputies that respond to assist at traffic stops do not complete the Assisting Deputy and Body-Worn Camera Log.  AIU also continues to identify this issue during its monthly inspections of traffic stops.  We discussed this issue with MCSO during our January 2019 site visit.  We recommend that supervisors enhance their reviews of traffic stops to ensure that the log is completed when required.

Our reviews of the body-worn camera recordings often reveal instances of deputies exhibiting positive, model behavior; and, at times, instances of deputies making errors, or exhibiting less than model behavior – all of which would be useful for training purposes.  During our January 2019 visits to the Districts, District personnel informed us that in some instances, allegations against deputies have been disproven after reviews of the body-worn camera recordings were conducted.  We also noted that the Professional Standards Bureau's monthly summary of closed cases for October 2018 contains a case in which the review of body-worn camera recording

WAI 38212

resulted in a disposition of unfounded for a PSB investigation.  The allegations were that the deputy was rude and failed to properly investigate a traffic collision.  The recording revealed that the allegations made were false and unfounded.  PSB's monthly summaries of closed cases are posted on MCSO's public webpage.  We encourage MCSO to ensure that any body-worn camera recordings that may be useful for training purposes be forwarded to the Training Division.

MCSO has already discovered the value of body-worn cameras – including in instances where community members have lodged accusations against deputies and the recordings proved to be invaluable in resolving complaints.

**Paragraph 63.**  *MCSO shall retain traffic stop written data for a minimum of 5 years after it is created, and shall retain in-car camera recordings for a minimum of 3 years unless a case involving the traffic stop remains under investigation by the MCSO or the Monitor, or is the subject of a Notice of Claim, civil litigation or criminal investigation, for a longer period, in which case the MCSO shall maintain such data or recordings for at least one year after the final disposition of the matter, including appeals. MCSO shall develop a formal policy, to be reviewed by the Monitor and the Parties pursuant to the process described in Section IV and subject to the District Court, to govern proper use of the on-person cameras; accountability measures to ensure compliance with the Court's orders, including mandatory activation of video cameras for traffic stops; review of the camera recordings; responses to public records requests in accordance with the Order and governing law; and privacy protections.  The MCSO shall submit such proposed policy for review by the Monitor and Plaintiff's counsel within 60 days of the Court's issuance of an order approving the use of on-body cameras as set forth in this stipulation. The MCSO shall submit a request for funding to the Maricopa County Board of Supervisors within 45 days of the approval by the Court or the Monitor of such policy and the equipment and vendor(s) for such on-body cameras.*

**Phase 1:**  In compliance

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.
- GJ-35 (Body-Worn Cameras), most recently amended on January 7, 2017.
- Body-Worn Camera Operations Manual, published on December 22, 2016.

**Phase 2:**  In compliance

WAI 38213

MCSO developed and issued a protocol and policy that requires the original hardcopy form of any handwritten documentation of data collected during a traffic stop to be stored at the District level and filed separately for each deputy.  When a deputy is transferred, his/her written traffic stop information follows the deputy to his/her new assignment.  During our January 2019 site visit, we inspected the traffic stop written data files of Districts 1, 4, 6, 7 and Lake Patrol; to ensure that hardcopies of traffic stop cases are stored for a minimum of five years.  We found that the files were in order and properly secured, and did not note any issues of concern.

### d. Review of Traffic Stop Data

***Paragraph 64.***  *Within 180 days of the Effective Date, MCSO shall develop a protocol for periodic analysis of the traffic stop data described above in Paragraphs 54 to 59 ("collected traffic stop data") and data gathered for any Significant Operation as described in this Order ("collected patrol data") to look for warning signs or indicia or possible racial profiling or other improper conduct under this Order.*

**Phase 1:**  Not in compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

  GJ-33 (Significant Operations), most recently amended on May 10, 2018.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

- EIU Operations Manual, currently under revision.

**Phase 2:**  Not in compliance

MCSO will achieve Phase 1 compliance with this Paragraph when it incorporates its protocols for periodic analysis of the traffic stop data into the EIU Operations Manual.  To achieve Phase 2 compliance with this Paragraph, MCSO must demonstrate ongoing use of the methodology delineated in the protocol established for Phase 1 compliance in the monthly, quarterly, and annual analyses used to identify racial profiling or other bias-based problems.

WAI 38214

*Paragraph 65.  MCSO shall designate a group with the MCSO Implementation Unit, or other MCSO Personnel working under the supervision of a Lieutenant or higher-ranked officer, to analyze the collected data on a monthly, quarterly and annual basis, and report their findings to the Monitor and the Parties.  This review group shall analyze the data to look for possible individual-level, unit-level or systemic problems.  Review group members shall not review or analyze collected traffic stop data or collected patrol data relating to their own activities.*

**Phase 1:**  In compliance

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:**  Not in compliance

MCSO designated the Early Intervention Unit (EIU) as the organizational component responsible for this Paragraph.  EIU is to conduct analyses of traffic stop data on a monthly, quarterly, and annual basis to identify warning signs or indicia or possible racial profiling or other improper conduct as prescribed by Paragraph 64.  EIU must report the findings of its analyses to the Monitor and the Parties.

We note that Paragraph 65 contemplates quarterly analyses of traffic stop data, but it does not specify exactly what such analyses might entail.  We have discussed during our prior site visits potential topics that might be studied by MCSO under the quarterly traffic stop analysis requirement.  While many potential topics have been identified, EIU requested permission in April 2018 to place the effort to develop the topic list on hold due to competing workload demands, essentially related to the second and third Traffic Stop Annual Report (TSAR) processes.  During our January 2019 site visit, MCSO noted the need to maintain this status to give CNA time to provide recommendations about potential topics.  We agreed to MCSO's request to keep the development of the list of potential study topics on hold.

MCSO's original monthly process to analyze traffic stop data began in 2015 and was suspended in May 2016 because of our determination that the original process lacked statistical validity and required significant refinement to improve the identification of potential alerts in EIS.  The problems with this original process are documented in our quarterly status reports from that period.  MCSO resumed monthly analyses of traffic stop data in May 2017 using a new methodology that was statistically based and not subject to the arbitrary, unscientific method originally employed by MCSO.  While vastly improved, the new methodology generated a substantial number of alerts, many of which did not demonstrate a pattern of potential bias sufficient to warrant the setting of an alert in EIS.  Because of our concern about the number of potential alerts the monthly analysis generated – a concern that MCSO also shared – we suspended the process during our July 2017 site visit to allow us and EIU time to consider possible refinements to the existing methodology.

WAI 38215

Beginning with our October 2017 site visit, we worked with EIU to explore refinements to the monthly methodology.  MCSO proposed and tested many promising approaches; however, it was clear that they were too complex analytically and required a substantial amount of qualitative evaluation.  During our October 2018 site visit, MCSO stated its desire to consult with CNA about this process before finalizing its recommendation for the monthly methodology.  We agreed to that request.  During our January 2019 site visit, we reviewed and commented on an alternative methodology proposed by the vendor.  We believe the new methodology is much more feasible, but we require further clarification about how it would incorporate traffic stop data from deputies who make very few traffic stops each month.  This challenge is discussed in more detail in Paragraph 67.

MCSO will achieve Phase 2 compliance with this Paragraph when its periodic analyses involve the consistent use of a statistical methodology designed to identify patterns of deputy behavior at odds with their peers.

**Paragraph 66.**  *MCSO shall conduct one agency-wide comprehensive analysis of the data per year, which shall incorporate analytical benchmarks previously reviewed by the Monitor pursuant to the process described in Section IV.  The benchmarks may be derived from the EIS or IA-PRO system, subject to Monitor approval.  The MCSO may hire or contract with an outside entity to conduct this analysis.  The yearly comprehensive analysis shall be made available to the public and at no cost to the Monitor and Plaintiffs.*

**Phase 1:**  In compliance

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:**  Not in compliance

MCSO has completed three comprehensive annual evaluations of traffic stop data to look for evidence of racial profiling or other bias-based policing.  MCSO released the first annual comprehensive evaluation on May 24, 2016 titled, "Preliminary Yearly Report for the Maricopa County's Sheriff's Office, Years 2014-2015."  It found that there are deputies engaged in racially biased policing when compared to the average behavior of their peers.  MCSO released the second annual evaluation on March 1, 2017.  However, this evaluation had to be withdrawn due to data problems; it was subsequently re-released on July 28, 2017 and posted on MCSO's website in October 2017.  There were no significant differences in findings from those of the first annual evaluation.

WAI 38216

The revised second annual evaluation confirmed the earlier report's main finding that racially biased policing within MCSO appears to be both a deputy and organizational level problem. The third annual comprehensive evaluation was released on May 17, 2018, employing methodologies similar to those in the first two comprehensive evaluations and finding the same results of its two predecessor reports: racially-biased policing persists within MCSO at the organizational level.

The three comprehensive evaluations employed methodologies that were supported by the peer-review literature and were approved by us for purposes of satisfying the requirements of this Paragraph. While the scientific basis of the methodology was valid, we note that its implementation was problematic. As previously stated, the second evaluation had to be completely redone due to data problems. Likewise, the third evaluation had to be redone due to serious miscoding of the underlying data. In fact, this report is now public even though it contains a flawed analysis pertaining to length of traffic stops that misidentified deputies potentially engaging in biased-based policing. The failure to successfully implement the approved methodologies is well-documented in our previous reports and is the main reason why MCSO has yet to achieve Phase 2 compliance with this Paragraph.

The contract with the vendor responsible for supporting MCSO's first three comprehensive annual evaluations of traffic stop data ended on June 30, 2018. A contract was awarded to the new vendor, CNA, on August 29, 2018.

During the January 2019 site visit, we discussed the proposed methodology proposed by CNA for the annual analysis. (We note that the proposed methodology would also be applied to the monthly analysis of traffic stop data.) In simple terms, the new methodology would take a different approach to defining the concept of peers, which the first Order requires as the basis of analysis for biased-based policing. Instead of defining peers as deputies making stops in similar geographic areas, the new methodology would utilize what is referred to as "similar deputy stops." Similar deputy stops would use propensity matching to define similar deputies involved in similar traffic stops to see if they have different stop outcomes (e.g., rate of citations) across race/ethnicity. By identifying similar deputy traffic stops, the methodology would determine if, for example, a Hispanic driver is treated differently that a White driver in similar circumstances; differences in stop outcomes would be the basis for asserting biased-based policing. We have provided our remaining questions regarding the proposed methodology. Our approval of the methodology is contingent upon satisfactory answers to our questions.

MCSO will achieve Phase 2 compliance with this Paragraph when it demonstrates an ability to conduct the annual comprehensive evaluation of traffic stop data in a consistent fashion each year using a statistical methodology supported by the peer-review literature and data that accurately represents deputy traffic stop behavior.

WAI 38217

*Paragraph 67.  In this context, warning signs or indicia of possible racial profiling or other misconduct include, but are not limited to:*

a.   *racial and ethnic disparities in deputies', units' or the agency's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of deputies' duties, or racial or ethnic disparities in traffic stop patterns when compared with data of deputies' peers;*

b.   *evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;*

c.   *a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;*

d.   *indications that deputies, units or the agency is not complying with the data collection requirements of this Order; and*

e.    *other indications of racial or ethnic bias in the exercise of official duties.*

**Phase 1:**  In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:**  Deferred

The EIU provides monthly analyses and documents describing the benchmarks used to set alerts for possible cases of racial profiling or other deputy misconduct involving traffic stops.  As reported in Paragraph 65, this process is suspended pending MCSO's effort to finalize a refinement to the methodology.

During our January 2019 site visit, we met with CNA and MCSO to discuss the proposed modification to the current methodology used for the monthly analysis of traffic stop data (referred to as the Traffic Stop Monthly Report, or TSMR).  The scientific basis of the modification, which involves the use of propensity score techniques, is discussed in Paragraph 66.

For the TSMR, the methodology would make use of a rolling 12-month sample to provide enough individual deputy traffic stop data to strengthen the statistical validity of the proposed methodology.  The proposed approach, however, would exclude any deputy from the analysis who made fewer than 20 traffic stops during the rolling 12-month period.  We expressed concern about dropping these low performing deputies from the analysis.  Our concern was based on an analysis we conducted using fourth quarter calendar year 2018 data, which found

WAI 38218

that the number of annual traffic stops has declined dramatically since 2014. For example, 31,060 traffic stops were used in the second TSAR; annualizing the fourth quarter calendar year stops would yield 14,704 annual traffic stops for 2019 – 51 percent less than the total number of traffic stops used for the second TSAR. Even more concerning was the fact that the almost 15 percent of the deputies who made stops during the quarter made only one traffic stop; in fact, almost one third of deputies making traffic stops during the quarter made three stops or less. Our concern about recent traffic stop behavior is that the exclusion of deputies making less than 20 traffic stops will mitigate the efficacy of the proposed methodology and exclude a cohort of deputies from the statistical analysis simply because they make too few traffic stops. MCSO proposed to have its supervisors, as part of their normal monthly review of individual deputy traffic stops, review the traffic stops that would be excluded from the TSMR methodology to look for evidence of biased-based policing. We requested more information about how such supervisory reviews would constitute a peer-comparison as required by the first Order. We also asked CNA if this group of deputies could be analyzed separately in a way that is less subjective and more quantitative in its approach. MCSO and CNA are revising the proposed methodology for our review. Approval of the proposed methodology is dependent upon receipt of a viable solution to our concerns.

MCSO has achieved Phase 1 compliance with regard to its intent to implement the individual Benchmarks required by this Paragraph. These Benchmarks are highlighted below. The proposed methodology for the analysis of traffic stop data will incorporate these benchmarks in the proposed methodology to test for biased-based policing.

Paragraph 67.a. identifies three benchmarks pertaining to racial and ethnic disparities. The first benchmark references disparities or increases in stops for minor traffic violations (Benchmark 1). The second benchmark addresses disparities or increases in arrests following traffic stops (Benchmark 2). The third benchmark addresses disparities or increases in immigration status inquiries (Benchmark 3). Since these three benchmarks are incorporated into the EIU Operations Manual, MCSO is in compliance with Paragraph 67.a.

Paragraph 67.b. identifies a benchmark pertaining to evidence of an extended traffic stop involving Latino drivers or passengers (Benchmark 4). Since this benchmark is now incorporated into the EIU Operations Manual, MCSO is in compliance with Paragraph 67.b.

Paragraph 67.c. identifies three benchmarks. The first benchmark pertains to the rate of citations (Benchmark 5): MCSO is required to identify citation rates for traffic stops that are outliers when compared to a deputy's peers. The second benchmark (Benchmark 6) pertains to seizures of contraband: MCSO is required to identify low rates of seizures of contraband following a search or investigation. The third benchmark in Paragraph 67.c. (Benchmark 7) is similar to Benchmark 6, but it pertains to arrests following a search or investigation. This is also the case for Benchmark 7. Since the three benchmarks are now incorporated into the EIU Operations Manual, MCSO is in compliance with Paragraph 67.c.

WAI 38219

Paragraph 67.d. establishes a benchmark pertaining to agency, unit, or deputy non-compliance with the data collection requirements under the First Order (Benchmark 8). This benchmark requires that any cases involving non-compliance with data collection requirements results in an alert in EIS. EIU published an Administrative Broadcast on November 28, 2016 to instruct supervisors how to validate data in TraCS in those cases involving duplicate traffic stop records to deliver timely data validation for our review. MCSO's draft EIS Project Plan 4.0 reported that MCSO began the data validation process for this benchmark on November 28, 2016. Therefore, MCSO is in compliance with Paragraph 67.d.

Paragraph 67.e. allows for other benchmarks to be used beyond those prescribed by Paragraph 67.a.-d. MCSO has three benchmarks under Paragraph 67.e. Benchmark 9 is defined as racial or ethnic disparities in search rates. Benchmark 10 is defined as a racial or ethnic disparity in passenger contact rates. Benchmark 11 is defined for non-minor traffic stops. MCSO reports that Benchmarks 9-11 are incorporated into the EIU Operations Manual. Therefore, MCSO is in compliance with Paragraph 67.e.

While MCSO has completed operationalizing the benchmarks required by this Paragraph, its current methodology produced too many alerts that MCSO could reasonably manage on an ongoing basis. As discussed in Paragraph 65, the monthly analysis of traffic stop data for May 2017 generated well over 100 alerts per month, most of which lacked sufficient detail to establish a pattern of problematic behavior for the individual deputies identified by the methodology. Because of this problem, we suspended the monthly analysis process to allow us and MCSO time to explore refinements to the methodology. MCSO developed a promising alternative methodology to use in setting alerts; however, the proposed methodology was placed on hold during the October 2018 site visit to give MCSO's new vendor, CNA, time to review it. As discussed above, CNA developed an alternative methodology for the TSMR. Approval of this proposed methodology requires MCSO to submit revised documentation that addresses the concerns we raised during our January 2019 site visit.

Until the methodology is refined in a manner that addresses the problem of too many alerts and the realities of deputy traffic stop behavior, we are deferring our Phase 2 compliance assessment of Paragraph 67.

**Paragraph 68.**  *When reviewing collected patrol data, MCSO shall examine at least the following:*

a.      *the justification for the Significant Operation, the process for site selection, and the procedures followed during the planning and implementation of the Significant Operation;*

b.      *the effectiveness of the Significant Operation as measured against the specific operational objectives for the Significant Operation, including a review of crime data before and after the operation;*

WAI 38220

c.    *the tactics employed during the Significant Operation and whether they yielded the desired results;*

d.    *the number and rate of stops, Investigatory Detentions and arrests, and the documented reasons supporting those stops, detentions and arrests, overall and broken down by Deputy, geographic area, and the actual or perceived race and/or ethnicity and the surname information captured or provided by the persons stopped, detained or arrested;*

e.    *the resource needs and allocation during the Significant Operation; and*

f.    *any Complaints lodged against MCSO Personnel following a Significant Operation.*

**In Full and Effective Compliance**

MCSO has not conducted a significant operation that met the requirements of the Order since Operation Borderline in December 2014.  Subsequent activities (i.e., Operation Gila Monster in October 2016) have not met the criteria for review under this or other Paragraphs.

We assess Phase 2 compliance via a combination of responses to monthly document requests and interviews of command and District staff during our regular site visits.  CID provides monthly memoranda from each District, as well as Investigations and Enforcement Support, regarding involvement in special operations and immigration-related traffic enforcement.  For October-December 2018, the memoranda show that no activity meeting the criteria of this Paragraph occurred.  Additionally, during our October 2018 and January 2019 site visits, our interviews with District personnel and central command indicate that no reported significant operations or immigration-related traffic enforcement occurred during this time period.

During this reporting period, on December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 69.**  *In addition to the agency-wide analysis of collected traffic stop and patrol data, MCSO Supervisors shall also conduct a review of the collected data for the Deputies under his or her command on a monthly basis to determine whether there are warning signs or indicia of possible racial profiling, unlawful detentions and arrests, or improper enforcement of Immigration-Related Laws by a Deputy.  Each Supervisor will also report his or her conclusions based on such review on a monthly basis to a designated commander in the MCSO Implementation Unit.*

**Phase 1:**  In compliance

- EA-3 (Non-Traffic Contact), most recently amended on June 14, 2018.

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:**  Not in compliance

WAI 38221

MCSO has placed into production database interfaces with EIS, inclusive of Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), Arizona Office of Courts (AOC) records, and the Cornerstone software program (referred to as "the HUB"), that includes training and policy records for MCSO. Supervisors have demonstrated the ability to access these during our recent site visits.

MCSO has automated the dissemination and responses to Action Forms generated from BIO's Audits and Inspections Unit. MCSO has also initiated alert investigations for repetitive issues discovered during the audit and inspection process. BIO continues to develop the audit for tracking alert investigation processes following the initial proposal reviewed by us and the Parties but has not yet produced an inspection. Once completed, the protocol for this audit will be included in the EIU Operations Manual, Section 302 (EIS Alert Processes). During our January 2019 site visit, MCSO noted that this portion of the manual was still under development.

Additionally, the Traffic Stop Monthly Report, incorporating significant benchmarks from Paragraph 67, is still under development due to a change in MCSO's contract vendor. MCSO has proposed, and is evaluating, several analytical options. While some of the benchmarks – immigration inquiries and data collection issues – continue to trigger alerts that are being investigated by supervisors, the remainder continue to be in a holding process while the methodological options are being evaluated. Finally, due to the priority of the Traffic Stop Annual and Monthly Reports, MCSO has not yet proposed the initiation of quarterly traffic stop report as required by the Order. Finally, with the addition of the NTCF interface, we have seen an average of 25 NTCF forms per month for the past nine months. We have recommended to MCSO that they create an audit/inspection of NTCFs to ensure that supervisors are accurately reviewing the completion of these forms and looking for potential bias. We have also recommended that MCSO create a quantitative analytic method to look for trends of deputy activity that might impact one ethnic/racial group disproportionately. Each of these reports could greatly improve the quality and quantity of information that supervisors have at their disposal to oversee their subordinates. The routine publication of each of these reports is necessary for the evaluation of Phase 2 compliance for this Paragraph.

Each month, MCSO provides a list of completed alert investigations. From this list, we randomly select 15 cases, to review the investigations conducted by supervisors and evaluate the effectiveness of supervisory oversight. In several cases, there are ongoing PSB investigations that limit the ability of supervisors to review materials beyond the brief descriptions provided to supervisors, as outlined in Paragraph 75.a. and 75.b. below. In these instances, the alert investigation is closed by the supervisor to maintain the integrity of the ongoing PSB inquiry.

MCSO has created an EIS Alert Review Group (ARG) that evaluates the investigations of supervisors prior to closing an alert. The ARG ensures that the reports of the supervisors address all aspects of the assigned investigation, and returns those that are deficient to the District for continued revision. As a result, the number of closed alert investigations in recent

WAI 38222

months has been fewer than 15 cases per month (seven in October, two in November, and 18 in December). Of those available, we have found the supervisors' investigations and actions to be well-founded but not always sufficiently detailed. The review group has requested additional information in two-thirds of the investigations completed. We have been provided with the original alert investigation documents (Attachment B of GH-5, Early Identification System) as well as modified ones arising from the review groups' requests. The additional material requested by the ARG always makes the closing of these alert investigations more comprehensible.

Our review of the closed alert investigations from October 2018 led to a request for additional information on three cases from EIU. These cases were the basis of a meeting during our January site visit. The first case involved a deputy being placed on an Action Plan due to multiple instances of external complaints involving rudeness and use of force. The supervisor notes from this Action Plan required additional training on Fourth and Fourteenth Amendment issues, proper communication training, and search and seizure practices. After consultation between EIU and District command, the Action Plan was extended in January for 30 days to include additional review of traffic stops and patrol investigations conducted by this deputy. A second case involved a deputy being placed on Administrative Leave pending the outcome of an internal complaint made by the deputy's supervisor that was being investigated by PSB. The third case involved a deputy who received external complaints; and as a result, was placed on an Action Plan to improve the deputy's ability to conduct field investigations, report writing, safe operation of County vehicles, and conformance with Office policy. According to the documentation provided by EIU, the deputy had completed defensive driving training and was scheduled for criminal documentation training in February 2019. We will follow up on the completion of these cases during future site visits. MCSO has been forthcoming with all requested information. We believe the addition of the ARC has substantially improved the oversight of supervisory performance as it relates to EIS documentation.

The Audit and Inspections Unit (AIU) conducts monthly audits of supervisory oversight via the Supervisory Notes made for each deputy. Minimally, each month supervisors should be making a performance appraisal note, reviewing two body-worn camera recordings and reviewing the EIS profile of their subordinate. When deficiencies are found, AIU sends out BIO Action Forms to District command for correction. In addition, multiple Action Forms for the same supervisor deficiencies over time would result in an alert being set on the supervisor. From October-December 2018, the compliance rate for these inspections was in the high 90th percentile. The deficiencies noted each month typically came from a single supervisor within different Districts. BIO sent out Action Forms to these Districts.

WAI 38223

In a separate monthly report of EIS alerts triggered, we found a few instances where the alert investigations were the result of multiple BIO Action Forms for a specific supervisor. EIU advised us that these alerts pertained to the timely completion of supervisor responsibilities and were handled through meeting with supervisors or command personnel. Once MCSO completes the tracking reports for closed, alerts these processes will be much more transparent than they are at present. We will evaluate the next iteration of the tracking report process when it becomes available.

AIU also conducts three inspections of traffic stop information: two of these pertain to the timely review and discussion of traffic stops by supervisors for each subordinate; and the third is an inspection regarding the correct completion of traffic forms and the coordination of these forms with databases like CAD. For the inspection of the review of traffic stops by supervisors within 72 hours, AIU found that the compliance rate exceeded 96% each month. The deficiencies noted occurred where reviews were conducted between six to nine days after a citation was written. BIO Action Forms were sent to those Districts with the deficiencies. For the inspection of traffic citation discussions between supervisors and deputies that are supposed to occur within 30 days of the citation being issued, the compliance rate was over 98%. BIO sent Action Forms to Districts 1 and 2. During our January visit to District 1, we addressed these deficiencies with the lieutenants and District Captain, who noted that these were the result of miscommunication between supervisors who were covering shifts due to vacation and family leave. The District Captain noted that he has addressed these in briefings with the supervisors to ensure that these problems do not reoccur. Finally, the traffic stop data inspections for October-December 2018 show a compliance rate of between 88-91%. The deficiencies ranged from incomplete forms to deputies failing to run warrant checks on persons they stopped. Districts received BIO Action Forms to follow-up on the particular deficiencies found. The disparity in compliance between the review and discuss inspections and the traffic data inspection suggest that supervisors may not be taking enough time to ensure that the Vehicle Stop Contact Forms (VSCFs) are completed properly. We have noted this to MCSO Administrators and District staff. We will continue to evaluate these trends.

AIU also conducts inspections of patrol activity logs, to ensure that deputies are accounting for their time and supervisors sign the logs. The shift roster inspections are designed to determine that supervisors are working the same shifts as their subordinates and that their span of control meets policy guidelines. Each inspection for the months of October-December show a compliance rate above 99%. The deficiencies found were the result of incorrect dates put on the shift rosters by supervisors, or the failure of individual supervisors to sign the patrol activity logs of their subordinates. The historical compliance rate shows remarkably consistent effectiveness with few deficiencies. BIO Action Forms were sent to those Districts with deficiencies.

WAI 38224

AIU also conducts an inspection of County and Justice Court cases that are turned down for prosecution.  While the major issue being inspected centers on whether probable cause existed to support the actions of the deputy during the original activity, AIU also identifies other issues that can result in memoranda to Districts that suggest additional training of deputies might be in order.  For October and December, the inspections found no issues of irreversible error and for November, the AIU noted that there were two cases of irreversible error.  This resulted in a compliance rate of 97.5%.  In one case, a deputy completed the TraCS forms using the wrong names of the people involved in the incident; and the documentation lacked the articulation of probable cause.  In a second case, another deputy failed to provide pictures of injuries resulting from a domestic incident and improperly justified this oversight in the report.  Both incidents resulted in BIO Action Forms and PSB investigations.  While these were noted as compliance deficiencies, there were several others in November that were noted as non-compliance deficiencies that were brought to the attention of District command through BIO Action Forms. However, within the description of the deficiencies, the inspector noted in two instances "no articulation of sufficient probable cause" to support the listed charges.  During our January site visit, we discussed with MCSO the designation by inspectors of irreversible error and lack of probable cause.  An MCSO captain stated that there is a distinction between lack of probable cause (an irreversible error) and failure to sufficiently articulate probable cause (a non-compliance deficiency).  It is the position of MCSO that the latter is not irreversible since a deputy can modify their language and re-submit the case.  After some discussion, MCSO was asked to provide the protocol inspectors use for their reviews.  In addition, we suggested that MCSO revisit these definitions to ensure that they comply with the Order.  Our review of the County Attorney/Justice Court Turndown Methodology used by inspectors does note the distinction described above; however, Paragraph 75.f. states "that all arrests in which the arresting Deputy fails to articulate probable cause in the arrest report, or where an MCSO Supervisor, court or prosecutor later determines the arrest was not supported by probable cause to believe a crime had been committed," has to be indicated in the EIS data.  We believe MCSO should explore a change in the methodology they employ to better reflect the language of the Order.

The inspections of supervisory oversight conducted by MCSO indicate stable compliance trends in most areas reviewed.  Aside from Traffic Stop Data Inspection and our questions about the County Attorney Turndown Inspection, the compliance findings in other inspections exceed the 95th percentile.  We will continue to evaluate these issues in our quarterly status reports.

WAI 38225

**Paragraph 70.** *If any one of the foregoing reviews and analyses of the traffic stop data indicates that a particular Deputy or unit may be engaging in racial profiling, unlawful searches or seizures, or unlawful immigration enforcement, or that there may be systemic problems regarding any of the foregoing, MCSO shall take reasonable steps to investigate and closely monitor the situation. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or of other supervised, monitored, and documented action plans and strategies designed to modify activity. If the MCSO or the Monitor concludes that systemic problems of racial profiling, unlawful searches or seizures, or unlawful immigration enforcement exist, the MCSO shall take appropriate steps at the agency level, in addition to initiating corrective and/or disciplinary measures against the appropriate Supervisor(s) or Command Staff. All interventions shall be documented in writing.*

**Phase 1:** In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:** Not in compliance

EIU personnel are continuing to develop the next draft of the EIU Operations Manual. MCSO continues to evaluate and develop the methods and plans for the Traffic Stop Monthly Reports (TSMR) and Traffic Stop Quarterly Reports (TSQR). The manual will provide a basis for the transparency of roles and duties of EIS personnel. It is imperative that MCSO complete the manual to ease the process for personnel to understand their responsibilities. In addition, the manual will provide the organization as a whole an explanation of the goals to be achieved by a fully functioning early intervention process. Contracting with a new outside vendor for traffic data compilation and analysis has resulted in new methodologies being explored and proposed which has expectedly slowed the completion of TSMR and TSQR processes. The issues related to the statistical reports (including the Traffic Stop Annual Report) have been a central focus of discussions with MCSO both during and between our site visits. These discussions have regularly included the Parties and their experts. To its credit, MCSO has created a "data quality" workgroup consisting of members of all units that participate in the compilation, creation, and transmission of traffic data. The regular meetings and reports of this committee are intended to ensure that future data anomalies are minimized and reports are produced in a timely manner. Several times in the past, the reports were based on data or methods that were opaque and undocumented, resulting in the need for recompilation of data or new analyses.

WAI 38226

During our January site visit, MCSO also presented a table outlining the current status of sections of the EIU Operations Manual.  At the time of our site visit, 60% of all sections had been approved which is a 17% increase from October 2018.  The remaining 40% pertained to issues related to monthly, quarterly, and annual analyses as well as definitions and alert tracking processes that remained under development.

A portion of the monthly alert report produced by EIU depends upon the TSMR required in Paragraph 67 of the First Order.  The methods for the elements of Paragraph 67 remain under evaluation.  The EIS also produces alerts for numerous activities, ranging from use of force to County Attorney turndowns lacking probable cause.  The new leadership of BIO has begun the process of evaluating and updating the thresholds used to trigger these alerts to ensure that they are sufficient to detect behaviors that might indicate bias on the part of deputies, taking into consideration the current assignment of the deputies as noted in Paragraph 81.f.  The alerts triggered are first evaluated by EIS personnel and then transmitted, via Blue Team, to the appropriate supervisor and District command.  The supervisors conduct an investigation, including a potential discussion with the designated deputy, and memorialize their actions in Blue Team.  These investigations are reviewed by District command staff and a newly formed Alert Review Group to ensure that proper investigation and possible interventions are clearly outlined.  From October-December 2018, we found that nearly two-thirds of alert investigations completed by supervisors were returned by the Alert Review Group for further information or investigation.  Since the formation of the review group we have only requested clarification on some of the Action Plans that have been put in place for deputies as a result of discussions between EIU and District command.  As noted in Paragraph 69, the creation of such Action Plans shows a higher level of evaluation than we have seen in the past.  More importantly, we have not found any deficiencies that command staff or the review group had not already discovered.  AIU is also continuing to develop an alert audit/inspection to further track the timeliness and sufficiency of randomly selected alert investigations.  We have commented on the first draft of this inspection and continue to work with AIU personnel on the refinement of these processes.  Once completed, this will become Section 302 of the EIU Operations Manual.

We have been reporting on MCSO's Plan to Promote Constitutional Policing, which was drafted to address systemic issues identified in the first three Traffic Stop Annual Reports (TSARs).  The Plan to Promote Constitutional Policing included nine goals and a timeline for the completion of the goals.  In October, we were informed that MCSO would change the strategy with which the agency will attempt to address the concerns noted in the TSARs.  MCSO and the Parties had previously agreed to the goals and timelines of the Constitutional Policing Plan.  MCSO concluded that the best course of action, at this point, would be to change their strategy to focus on community engagement, consistent with the community-policing model.  The intent of the new plan is to focus on non-enforcement contacts in deputy interactions with the community.  MCSO stated that they would not abandon the previous goals of the Constitutional Policing Plan.  During our January site visit, we inquired as to the status of these goals.  We also received a draft of the proposed new plan, along with a document titled "Appendix A" in which MCSO affirms that they have completed most of the goals of the

WAI 38227

previous Constitutional Policing Plan.   Since we consider the previously approved Constitutional Policing Plan to have been be in effect during the period in review, our comments below pertain to compliance with the plan that was in place during the fourth quarter.

MCSO advised us that Captains have completed their discussions and presentations relative to Goals 3, 4, and 5 of the previous plan.   There were Captains' Meetings in October and December.   There was no meeting in November.   The last community listening session was conducted on October 30, 2018.   We were advised that there were no more than four community participants in this session.   In the future, Districts will be required to conduct listening sessions every six months, and will be tasked with developing one project per year. The new plan indicates that District 6 was selected as the pilot, and the start date is April 29, 2019.   We will address compliance with the new plan in future quarterly status reports.

Goal 1: Implementing an effective Early Intervention System with supervisor discussions: MCSO asserts it has met this goal under the prior version of the Constitutional Policing Plan. We agree that MCSO has all the data components in place, and that the Office has made improvements.   Yet we do not agree that this goal has been completed.   MCSO is not in compliance with the Order's requirements on EIS.   While we are hopeful that the Fourth TSAR will yield more accurate results than the first three, it has not been completed.   We note that the data components are not being used effectively.   We suggest that first-line supervisors should be using EIS as a tool to identify issues.   Patrol supervisors are not adept at using the data, and, during the supervisor discussions, they have difficulty explaining the TSAR findings to deputies.   MCSO created a system that could be effective, but supervisors do not know how to use it yet, beyond the current requirements that they review VSCFs within 72 hours and talk to deputies about their stops within 30 days.   What remains lacking is training that shows supervisors how to use the data to look for patterns of problematic behavior.

Goal 2: Evaluating supervisors' performances through an effective Employee Performance Appraisal process:  MCSO asserts that it has completed this goal under the prior version of the Constitutional Policing Plan.   We agree that MCSO has made some improvements in the process, and has continued to work to address the issues we have noted in our quarterly status reports.   We do not agree that this goal has been completed.   MCSO is not in compliance with any of the Paragraphs related to the evaluation of employee performance.   In fact, most of the EPAs found out of compliance are supervisors' EPAs.   MCSO is aware that the current EPA process has issues that need to be addressed, and has been working to correct those.   During our January site visit, we were advised that MCSO has a target date of July 2019, for implementation of the revised EPA process.

Goal 3: Delivering enhanced implicit bias training:  MCSO asserts that it has met the aspects of delivering enhanced implicit bias training by an outside expert, and that enhanced implicit bias training has been addressed through Captains Meetings, and through the ACT.   We note that the 2017 ACT included implicit bias training as required by the order, but there was no additional curriculum or material to make it "enhanced."   Enhanced implicit bias training has been incorporated into the 2018 ACT, but it has not been completed.   The 2018 ACT was started in

WAI 38228

December, and during that month, only a small fraction of deputies completed the training. According to the previously submitted revised CPP timeline, enhanced implicit bias training is targeted for completion by the third quarter of 2019. In addition, MCSO has not completed the training on the History of Discrimination in Maricopa County. We do not consider this goal completed.

Goal 4: Enhanced fair and impartial decision-making training: MCSO asserts that it has met the training aspects of this goal through Captains' Meetings, ACT training, and posting policies on the MCSO website. The 2018 ACT contains only references to fair and impartial decision-making. Even at the completion of the 2018 ACT, MCSO will still not have met this goal unless separate enhanced fair and impartial decision making training is completed. The fair and impartial decision-making component in the ACT is not "enhanced." It is a requirement of Paragraph 49(m). Consent search training, which was part of Goal 4, has not been completed. This training was to be delivered by MCAO, but remains under development. We do not consider this goal completed.

Goal 5: Delivering enhanced training on cultural competency and community perspectives on policing: MCSO asserts that this goal has been met under the prior version of the Constitutional Policing Plan. MCSO stated that the 2018 ACT was revised to include a focus on cultural competency on Latino perspectives, and that the topic was addressed at the monthly Captains Meetings. There is no "enhanced" component in the cultural competency training that is part of the 2018 ACT. Even at the completion of the 2018 ACT, MCSO will still not have met this goal until separate enhanced training on cultural competency and community perspectives on policing is completed. The previously submitted timetable noted that MCSO planned to engage an outside expert in the third quarter of 2019, to teach cultural competency. The training would be delivered in the first quarter of 2020. Also included in Goal 5 was the development of a survey of the community's perspectives on the *Melendres* reforms. MCSO created a survey titled "Community Outreach General Survey." The survey is comprised of six questions that appear to be intended to assess participants' satisfaction with special events and presentations. We do not see a nexus to the community's perspectives on the *Melendres* reforms. MCSO stated that it has developed a process for incorporating greater cultural competency training and understanding of community perspectives on policing through the Field Training program. We have also not seen any documentation of the inclusion of enhanced cultural competency training in the Field Training program. We do not consider this goal completed.

Goal 6: Improving traffic stop data collection and analysis: MCSO claims to have met this goal under the prior version of the Constitutional Policing Plan. We agree that MCSO's summary in Appendix A accurately describes the historical aspect of what has developed over the past two years. MCSO did not mention the data glitches that have postponed the printing of each annual report up to the present time. The summary fails to mention that MCSO has not had a Traffic Stop Monthly Report methodology in over 18 months. Consequently, they have not been able to send out alerts based on monthly data. The summary also fails to note that they have never had a Traffic Stop Quarterly Report that has gone beyond the proposal stage. MCSO is not using the data they capture effectively. In addition, MCSO intended to capture information

WAI 38229

related to discretionary searches on the VSCF. MCSO has not been able to devise a solution to capture this information. In addition, MCSO would need to train deputies on the different types of searches, so that when the VSCF is modified, this information is captured correctly.

Goal 7: Encouraging and commending employees' performance and service to the community: MCSO asserts it has met this goal under the prior version of the Constitutional Policing Plan. While we agree that most aspects of this goal have been completed, there are still outstanding questions with regard to this goal. The 412 CAD code to track community engagement by deputies was implemented before the CPP was drafted, and it was developed in response to compliance with Paragraph 83. We agree that it is a useful tool. However, from our sample reviews of Patrol Activity Logs, we have not seen this code used very frequently by Patrol deputies. MCSO developed the Community Engagement Worksheet as another tool to track deputy involvement in community service. We have not seen the policy governing the circumstances of its use. The July iteration of the CPP noted that two patrols Districts would be selected for a pilot program involving deputy non-enforcement actions. The new plan states that District 6 has been selected as a pilot District for implementation of the new plan, with a start date of April 29, 2019.

Goal 8: Studying the Peer Intervention Program: MCSO asserts that it has met this goal under the previous version of the Constitutional Policing Plan. We agree that MCSO completed the study of the New Orleans EPIC program. MCSO has advised that this program was not suited for MCSO, and that the Office was considering an alternative in-house program. We do not have a definitive answer on the status of an alternate peer-to-peer intervention program.

Goal 9: Building a workforce that provides constitutional and community-oriented policing and reflects the community we serve: MCSO asserts that it has met this goal under the prior version of the Constitutional Policing Plan. During our January site visit, we inquired as to the status of this goal. MCSO employees have expressed concerns to us that Patrol is extremely understaffed, so we are particularly interested in determining if MCSO is having success in recruiting and hiring qualified applicants. Having an adequate number of deputies in Patrol is crucial for MCSO's success in implementing a community-policing model. Manpower shortages will limit the time that deputies have to conduct self-initiated activities. Patrol deputies in the busier Districts may find little or no time to conduct community-policing activities if they are handling calls for service during most of their shift. We have been advised that this occurs in Districts 1, 2, and 3. Although a staffing allocation study was conducted using 2016 and 2107 data, MCSO has not conclusively determined how many deputies each District needs by beat and shift. MCSO has removed all aspects of this goal from the new plan and declined to answer questions pertaining to current state of recruitment and hiring. We cannot verify that status of this goal, since we do not have sufficient information to do so. MCSO conducted an employee satisfaction survey in the fourth quarter. We understand that MCSO will share the findings with employees at a future date.

WAI 38230

MCSO had finalized the Action Plan processes for all deputies found to be outliers in the Second TSAR by the time of our October site visit, and had set a schedule for the supervisory discussions for deputies who were found to be outliers in the Third TSAR. We have begun receiving documentation and videos of these discussions, and will address our findings in future quarterly status reports when they are all completed. The Supervisor Discussions have been a topic undertaken during our October and January site visits with regard to the timing and finalization of the associated Action Plans for deputies. We will comment on the process as a whole once all of the Supervisor Discussions have occurred. MCSO has been forthcoming with all information requested regarding the TSAR process.

MCSO is not in Phase 2 compliance with this Paragraph; as the TSAR, TSMR, and TSQR are undergoing revision and not yet in production. In addition, there is much work to be done to finalize and implement the Constitutional Policing Plan. We will continue to evaluate and provide feedback to MCSO as these materials are produced.

**Paragraph 71.** *In addition to the underlying collected data, the Monitor and Plaintiffs' representatives shall have access to the results of all Supervisor and agency level reviews of the traffic stop and patrol data.*

**In Full and Effective Compliance**

MCSO has provided us with access to existing data from monthly and annual reports.

Prior to MCSO's decision to discontinue its contract with its former statistical contractor, we had been working with MCSO on the refinement of the Traffic Stop Monthly Reports (TSMRs). In April 2016, the TSMR was discontinued because the methods employed were not sufficiently rigorous or theoretically grounded. After some modification, MCSO reintroduced the TSMR in January 2017; we recommended discontinuation a second time (July 2017) as the methods employed were not refined to detect patterns of problematic deputy behavior. We and the Parties were working with MCSO toward solutions to this problem when MCSO made the decision to change contractors. Subsequently, we and the Parties had the opportunity to provide MCSO with feedback on the proposals to modify all traffic stop analysis methodology. We are evaluating these methods as they are proposed. As noted in Paragraph 69, MCSO continues to set alerts for some elements of Paragraph 67 not affected by the TSMR, as well as non-traffic activity of deputies. MCSO is also reviewing and refining the thresholds that trigger non-traffic alerts. We will continue to work closely with MCSO on these issues.

MCSO has not yet published a Traffic Stop Quarterly Report (TSQR) as required by the Order. MCSO is working closely with the new statistical contractor, CNA, to produce a proposal for special studies that MCSO might conduct that would benefit either the annual or monthly traffic stop analyses. Given the priority of the methods being developed for the TSAR and TSMR, the quarterly reports proposal has been placed on hold. Additionally, we have requested that MCSO and its contractor develop a method to analyze the Non-Traffic Contact Forms that have been conducted since the completion of the interface between these data and EIS in July 2017

WAI 38231

(see Paragraphs 69 and 75.h.).  While we have been given access each month to the NTCFs completed, there has not been a means of analyzing potential trends across months for these particular incidents.

MCSO has worked with us and the Parties to resolve each of these deficiencies, and has been transparent in advising us of problems that have arisen.  We have consistently been provided access to the data and reports relevant to this Paragraph.  The deficiencies noted impact compliance with other Paragraphs.

During this reporting period, on December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 38232

# Section 8: Early Identification System (EIS)

**COURT ORDER IX.  EARLY IDENTIFICATION SYSTEM ("EIS")**

***Paragraph 72.*** *MCSO shall work with the Monitor, with input from the Parties, to develop, implement and maintain a computerized EIS to support the effective supervision and management of MCSO Deputies and employees, including the identification of and response to potentially problematic behaviors, including racial profiling, unlawful detentions and arrests, and improper enforcement of Immigration-Related Laws within one year of the Effective Date. MCSO will regularly use EIS data to promote lawful, ethical and professional police practices; and to evaluate the performance of MCSO Patrol Operations Employees across all ranks, units and shifts.*

**Phase 1:**  In compliance

- EA-3 (Non-Traffic Contact), most recently amended on June 14, 2018.

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:**  Not in compliance

During 2017 and early 2018, MCSO introduced interfaces between EIS and several remote databases of importance.  EIS now includes Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), records from the Administrative Office of the Courts (AOC), training completion and policy acknowledgement records from the Cornerstone software (the HUB).  MCSO continues to work on the EIU Operations Manual to memorialize the collection, analysis, and dissemination of relevant data; as well as the responsibilities and roles of departmental and EIS personnel.  During our January site visit, MCSO provided a table indicating the current status of the EIU Operations Manual.  The table indicated that 60% of the manual had been completed after being evaluated by the Monitoring Team and the Parties.  The remaining 40% of the manual pertaining to monthly, quarterly, and annual analyses and definitions remain under development.

WAI 38233

MCSO has not produced a consistent Traffic Stop Monthly Report (TSMR) in nearly two years as a result of data and methodological problems discovered by MCSO and us.  Additionally, MCSO has yet to produce a Traffic Stop Quarterly Report (TSQR).  We have been working with MCSO and the Parties to overcome the problems inhibiting the production of these reports and incremental progress has been made.  MCSO has recently contracted with a new analytic provider who is evaluating current practices and will propose methodologies for all three statistical reports within the next several months.  In that vein, during our October and January site visits, we suggested that MCSO begin developing a methodology to analyze the Non-Traffic Contact Forms (NTCFs) that have been accumulating since the interface began in mid-2017 and policies were updated in mid-2018.  MCSO has been providing access to the NTCFs (approximately 25 per month) that are produced, but the agency currently has no means of analyzing these to evaluate potential trends over time.  MCSO continues to regularly publish a number of reports on deputy activity and supervisory oversight that are not tied to the methodologies of the TSMR, TSQR, or TSAR.

The Audits and Inspections Unit (AIU) produces a monthly report evaluating Supervisory Notes that indicate whether supervisors are reviewing the EIS data of deputies under their command.  The inspection looks for indications that supervisors made entries for each person they supervise with regard to two randomly selected BWC videos, provide one EPA note, make two supervisor entries, and indicate that the supervisor has reviewed their deputies EIS status.  In July, the inspection found no deficiencies among the supervisors selected for review.  From September-December 2018, the compliance rate for these reports has been above 97%.  AIU has sent out BIO Action Forms to the Districts where deficiencies have occurred.

In the Traffic Stop Review and Discussion Inspections for October-December, supervisors were found to be in compliance in excess of 96%.  These results continue to show a high level of oversight and interaction between supervisors and deputies regarding traffic stops; however, there is a slight drop in compliance for the Traffic Stop Data Inspection.  For this inspection, AIU uses a matrix comparing traffic stop information found on Vehicle Stop Contact Forms (VSCFs) with Computer Aided Dispatch (CAD) and Body-Worn Camera (BWC) footage.  The overall inspection results for this reporting period range from 88% to 91%.  The deficiencies were for failure to run warrant checks, incorrect numbers on VSCFs, and failure to document passengers or fellow deputies on VSCFs when they were visible on BWC recordings.  While AIU sent out BIO Action Forms to the respective Districts for the deficiencies found, the differences suggest that supervisors might be able to catch more of the deficiencies during the three days they have to review VSCFs if this were to be a priority of MCSO.  The combination of audits/inspections is an excellent quality assurance that can lead to changes in policy and/or practice.

EIU also produces a monthly report on alerts triggered within EIS.  EIU personnel review the alerts and disseminate them to supervisors and District command if potential deficiencies or problems may exist.  The supervisors employ a template (Attachment B of GH-5) to conduct the investigation and report their findings and results to the chain of command through Blue Team.  MCSO has also created an EIS Alert Review Group (ARG) to evaluate the closure of alert

WAI 38234

investigations.  During the period of October-December, we found that two-thirds of the alert closures were sent back to the Districts for additional information or processing.  In addition, as a result of this more thorough review process, EIU participated in the creation/modification of two Action Plans with District command staff.  We have requested and received information regarding these and found the plans to be comprehensive.  We will continue to request follow-up information as the plans near closure.

AIU is currently working to develop audits for both the alert inspection process and the tracking of Action Forms disseminated to the Districts because of deficiencies discovered.  We have commented on early drafts of these inspections and will use them as they are published to access the compliance of MCSO.

As noted in Paragraph 70, MCSO has also completed the Action Plans emanating from the Second Traffic Stop Annual Report (TSAR).  We have evaluated both the supervisory discussions leading up to the Action Plans (APs) and the Supervisory Notes describing the activity during the AP process.  We have shared with MCSO our concern that some supervisors did not appear well-prepared or comfortable conducting the taped supervisor discussion.  Moreover, a few supervisors noted repeated deficiencies of their subordinates during the Action Plan process, but did not recommend additional training that may have ameliorated these problems.  There were also examples of supervisors invested in the process and providing significant mentorship to their deputies.  MCSO took note of these issues and made several modifications in preparation for supervisor discussions emanating from the Third TSAR.  MCSO has set a schedule for completion of the Third TSAR discussions, and has been providing us with the documentation and videos as they are completed.  We have also discussed this ongoing process with MCSO during our site visits.  We will provide our overall conclusions in future quarterly status reports when all discussions are completed.

***Paragraph 73.***  *Within 180 days of the Effective Date, MCSO shall either create a unit, which shall include at least one full-time-equivalent qualified information technology specialist, or otherwise expand the already existing role of the MCSO information technology specialist to facilitate the development, implementation, and maintenance of the EIS.  MCSO shall ensure that there is sufficient additional staff to facilitate EIS data input and provide Training and assistance to EIS users.  This unit may be housed within Internal Affairs ("IA").*

**Phase 1:**  In compliance

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:**  In compliance

The EIU is a fully functioning unit.  A lieutenant commands the Unit, with four sergeants conducting investigations, and three office assistants to coordinate processes and paperwork.  In addition, MCSO has created a Traffic Stop Analysis Unit (TSAU) to compile data and prepare cases emanating from the traffic stop analyses conducted.  This Unit is led by a lieutenant with three sergeants and three analysts.  Both Units are housed within the Bureau of Internal

WAI 38235

Oversight. MCSO created the TSAU after it became clear during the Second TSAR process that the EIU could not effectively produce the myriad reports necessary without continual transfers and temporary assistance from across the organization. We noted that MCSO responded to the inefficiencies observed during the Second TSAR and has worked to eliminate the redundancies during the Third TSAR process. MCSO has provided us with documents and videos related to the Supervisor Discussions from the Third TSAR. Once all discussions are complete, we will provide our assessment; however, at this point, we believe that the new processes adopted have eliminated delays and attempted to incorporate line supervisors in a more effective fashion.

EIU has also overseen the expansion of the EIS database over the last 18 months to include Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), records from the Arizona Office of Courts (AOC), and training and policy receipt records from the Cornerstone software program (the HUB). Supervisors now have much more information available to them about the deputies under their command than they ever had in the past.

EIU continues to revise the EIU Operations Manual. During our January site visit, MCSO indicated that the manual is 60% complete, which is a 17% improvement from October. The remaining 40% of the manual that is under development is attributable to the hiring of a new outside contractor for data analysis, whose main focus is the completion of methodologies for the Traffic Stop Annual, Monthly, and Quarterly Reports. These methodologies and the manual are important to improve the transparency and effectiveness of MCSO data collection and use as a whole.

**Paragraph 74.** *MCSO shall develop and implement a protocol setting out the fields for historical data, deadlines for inputting data related to current and new information, and the individuals responsible for capturing and inputting data.*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

- EIU Operations Manual, currently under revision.

**Phase 2:** Not in compliance

As a result of the demands of the Second and Third Traffic Stop Annual Reports (TSAR), and the more recent need to replace the outside contractor responsible for traffic stop data analysis, MCSO has not yet completed the revision of the EIU Operations Manual. During our January site visit, MCSO showed that the Office had completed 60% of the manual and was working with its new vendor on the sections relating to Traffic Stop Annual Report (TSAR), Traffic Stop Monthly Report (TSMR) and Traffic Stop Quarterly Report (TSQR).

BIO has begun re-examining the thresholds that trigger potential alert investigations to determine whether these should be modified based upon theoretical, experiential, or statistical grounds. Our review of alert investigation triggers coincides with the findings of EIU that

WAI 38236

suggest the thresholds need to take better account of role and assignment of deputies as required in Paragraph 81.f. MCSO is examining not only what led to the creation of the old thresholds, but what other jurisdictions that are similarly situated may be doing. We will evaluate these changes as they are proposed and produced.

MCSO has shown progress in the development of a data-handling protocol. While this section of the EIU Operations Manual (Section 306) remains under development, MCSO has created a committee of personnel from each unit that handles, or adds to, traffic data before it is analyzed. The reports from the regular monthly meetings of this group show the attention to detail and memorialization of changes put in place to improve data processes.

Finally, during the months of October-December, EIU produced a monthly report for benchmarks not related to the above traffic stop methodologies. Benchmarks 3 and 8 (Paragraph 67) involve incidents of immigration inquiries and data validation errors committed by deputies. During this reporting period, there was one immigration inquiry that has been forwarded to the District as an alert investigation (December Alert Investigation Report). We will follow up on this with MCSO once the investigation is complete. In addition, there were seven data validation entries during this reporting period, and each has been submitted to the District supervisors for corrective actions and reports. We believe MCSO's oversight of the benchmarks has been transparent and effective to this date.

We will evaluate the materials for this Paragraph as they are produced to ensure that they meet the Order requirements. At present, MCSO is not in Phase 2 compliance with this Paragraph.

**Paragraph 75.** *The EIS shall include a computerized relational database, which shall be used to collect, maintain, integrate, and retrieve:*

a.   *all misconduct Complaints or allegations (and their dispositions), excluding those made by inmates relating to conditions of confinement or conduct of detention officers (i.e., any complaint or allegation relating to a traffic stop shall be collected and subject to this Paragraph even if made by an inmate);*

b.   *all internal investigations of alleged or suspected misconduct;*

c.   *data compiled under the traffic stop data collection and the patrol data collection mechanisms;*

d.   *all criminal proceedings initiated, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the County and/or its Deputies or agents, resulting from MCSO Patrol Operations or the actions of MCSO Patrol Operation Personnel;*

e.   *all arrests;*

f.   *all arrests in which the arresting Deputy fails to articulate probable cause in the arrest report, or where an MCSO Supervisor, court or prosecutor later determines the arrest*

WAI 38237

*was not supported by probable cause to believe a crime had been committed, as required by law;*

g.  *all arrests in which the individual was released from custody without formal charges being sought;*

h.  *all Investigatory Stops, detentions, and/or searches, including those found by the Monitor, an MCSO supervisor, court or prosecutor to be unsupported by reasonable suspicion of or probable cause to believe a crime had been committed, as required by law;*

i.  *all instances in which MCSO is informed by a prosecuting authority or a court that a decision to decline prosecution or to dismiss charges, and if available, the reason for such decision;*

j.  *all disciplinary action taken against employees;*

k.  *all non-disciplinary corrective action required of employees;*

l.  *all awards and commendations received by employees;*

m.  *Training history for each employee; and*

n.  *bi-monthly Supervisory observations of each employee.*

**Phase 1:**  In compliance

- EA-3 (Non-Traffic Contact), most recently amended on June 14, 2018.

- GC-13 (Awards), most recently amended on January 24, 2019.

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

- EIU Operations Manual, currently under revision.

- Professional Services Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  Not in compliance

During 2017, and the first quarter of 2018, MCSO has made progress toward the automation of data in the EIS database relevant to this Paragraph.  MCSO has placed into production data interfaces for Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), Justice Court turndowns (AOC) and the Cornerstone software program (the HUB) that provides reports for training and policy acknowledgment.  MCSO continues to develop some inspections that ensure that personnel are accurately using the EIS data available to them.  We continue to evaluate and monitor the use of EIS in furtherance of the First Order.

Paragraph 75.a. requires that the database include "all misconduct Complaints or allegations (and their dispositions)," with some exclusions.

EIPro, a web-based software application that allows employees and supervisors to view information in the IAPro case management system, includes the number of misconduct complaints and allegations against deputies.

Since February 2017, both open and closed cases have been viewable by supervisors. PSB controls the ability to view open cases based upon the parties who may be involved. PSB personnel developed a protocol to write the summaries for both open and closed cases. This protocol has been approved, and was incorporated into the PSB Operations Manual that was published on December 13, 2018. Following consultation with Court Implementation Division (CID) personnel, we modified our quarterly request for the external investigation synopses to a monthly request. Each month we receive synopses of how open and closed external complaints appear in EI Pro for supervisors to review. Our examination of these descriptions confirms that the summaries meet our expectations. Additionally, during our October and January site visits, we observed that field supervisors could easily access these summaries and understand the types of issues involved in the complaints. Supervisors are also advised that they can always contact EIU and PSB for clarification if it is necessary.

MCSO is in compliance with this Subparagraph.

Paragraph 75.b. requires that the database include "all internal investigations of alleged or suspected misconduct."

Corresponding to the discussion above involving complaints, internal investigation summaries also appear in the IAPro system. All complaint summaries, open and closed, have been viewable since February 2017. PSB uses a standard protocol to develop the case summaries and access limits. This protocol has been approved by us and has been included in the PSB Operations Manual published in December 2018. CID personnel provide us with summaries of all open and closed internal investigations each month as they would appear to supervisors using EI Pro. We have found these summaries to be transparent and easily understandable. During our site visits, we have found that line supervisors are also able to easily access the summaries of open and closed internal investigations pertaining to their subordinates. Field supervisors always have the option of requesting additional information from EIU and PSB should they deem the summaries insufficient.

MCSO is in compliance with this Subparagraph.

Paragraph 75.c. requires that the database include "data compiled under the traffic stop data collection and the patrol data collection mechanisms."

As documented previously, MCSO has created electronic forms to collect data from traffic stops, incidental contacts and warnings. As noted in Paragraphs 69 and 74, MCSO has suspended traffic stop alerts based upon the benchmarks of Paragraph 67. MCSO continues to collect this information within EIS and once the methodology is approved this data will be used to trigger future alerts.

WAI 38239

MCSO has also created interfaces with EIS for remote databases including Incident Reports (IRs) and Non-Traffic Contact Forms (NTCFs).   These reports are readily available to supervisors to review within EIS.   Field supervisors have shown that they have the ability to view IRs and NTCFs during our January site visit.   AIU already conducts an inspection of IRs. We have suggested during our last two site visits that MCSO create a similar inspection for NTCFs, as well as propose an analytical strategy to examine whether any racial or ethnic inconsistencies may exist in the incidents documented on the NTCF.   When proposed, we will evaluate the sufficiency of this new inspection.   Up to this point, MCSO has made available all NTCFs each month.   We have found that these contacts appear to be concentrated in certain geographic areas and often involve lighting violations for bicycles.   Paragraph 68.d. requires an analysis of these stops.

MCSO has hired a new vendor to conduct traffic stop analyses.   The past practices and proposals are being evaluated and we have had several conversations both during and between site visits regarding analytical methodologies, including the need to analyze NTCFs.

MCSO is not in compliance with this Subparagraph.

Paragraph 75.d. requires that the database include "all criminal proceedings initiated, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the County and/or its Deputies or agents, resulting from MCSO Patrol Operations or the actions of MCSO Patrol Operation Personnel."

MCSO's Legal Liaison Section receives and forwards this information to EIU for entry into the EIS database.   Deputies self-report contacts they have with other agencies, and any two contacts within a rolling six-month period results in an alert requiring a supervisor to investigate. Supervisors have demonstrated the ability to access this information during our October and January site visits.

MCSO is in compliance with this Subparagraph.

Paragraph 75.e. requires that the database include "all arrests."

Arrests may not always occur as a result of a traffic stop.   MCSO, therefore, has placed into production an interface between EIS and the Jail Management System (JMS).   This interface allows supervisors to easily access information regarding arrest that cannot be viewed through traffic data.   During our site visits, supervisors have demonstrated the ability to access the IRs and related arrest information.

MCSO is in compliance with this Subparagraph.

Paragraph 75.f. requires that the database include "all arrests in which the arresting Deputy fails to articulate probable cause in the arrest report, or where an MCSO Supervisor, court or prosecutor later determines the arrest was not supported by probable cause to believe a crime had been committed, as required by law."

WAI 38240

Incident Reports (IRs) are housed in the Filebound software system.  MCSO has created an interface between Filebound and EIS to provide a summary of information to facilitate supervisory oversight.  Supervisors must review and sign off on IRs for each deputy involving an arrest or detention of a suspect within 72 hours of the incident.  Supervisors are also required to ensure that probable cause exists for each charge or arrest outlined within an IR.  AIU additionally conducts a quarterly audit of IRs to ensure that all policy requirements are met.  In the first second and third quarters of 2018, over 97% of supervisors memorialized their review of the IRs and 100% of IRs contained the necessary probable cause statements.  The audit for the fourth quarter has not yet been produced.

If a court or prosecutor decides not to prosecute a case, both the deputy and their immediate supervisor are notified.  AIU also conducts an inspection of all cases turned down for prosecution.  For October and December, the inspections found no issues of irreversible error; and for November, the AIU noted that there were two cases of irreversible error.  This resulted in a compliance rate of 97.5%.  In one case, a deputy filled out the TraCS forms using the wrong names of the people involved in the incident, and the documentation lacked the articulation of probable cause.  In a second case, another deputy failed to provide pictures of injuries resulting from a domestic incident and improperly justified this oversight in the report.  Both incidents resulted in BIO Action Forms and PSB investigations.  While these were noted as compliance deficiencies, there were several others in November that were noted as non-compliance deficiencies that were brought to the attention of District command through BIO Action Forms; however, within the description of the deficiencies the inspector noted in two instances "no articulation of sufficient probable cause" to support the listed charges.

During our January site visit, we discussed with MCSO the designation by inspectors of irreversible error and lack of probable cause.  An MCSO captain stated that there is a distinction between lack of probable cause (an irreversible error) and failure to sufficiently articulate probable cause (a non-compliance deficiency).  It is the position of MCSO that the latter is not irreversible since a deputy can modify their language and re-submit the case.  After some discussion, we asked MCSO to provide the protocol inspectors use for their reviews.  In addition, we suggested that MCSO revisit these definitions to ensure that they comply with the Order.  Our review of the County Attorney/Justice Court Turndown Methodology used by inspectors does note the distinction described above; however, Paragraph 75.f. states "that all arrests in which the arresting Deputy fails to articulate probable cause in the arrest report, or where an MCSO Supervisor, court or prosecutor later determines the arrest was not supported by probable cause to believe a crime had been committed," has to be indicated in the EIS data.  We believe MCSO should explore a change in the methodology they employ to better reflect the language of the Order.

MCSO remains in compliance with this Subparagraph, but must resolve the definition issue with reversible and irreversible error.  We will work with MCSO to clarify this issue.

Paragraph 75.g. requires that the database include "all arrests in which the individual was released from custody without formal charges being sought."

WAI 38241

The ability to capture this information depends upon what actually occurred within the context of the interaction.  If the suspect was taken into physical custody but released prior to booking, there would be a JMS record, as indicated in Subparagraph 75.e. above.  Therefore, MCSO could use the interface described above to pull the relevant data elements into EIS.  However, if the incident does not rise to the point of physical custody and detention, then it would likely yield an Incident Report, covered under Subparagraph 75.f. above or an Investigatory Stop under Subparagraph 75.h. to follow.  The interfaces for IR and NTCF data became operational prior to July 1, 2017.

MCSO is in compliance with this Subparagraph.

Paragraph 75.h. requires that the database include "all Investigatory Stops, detentions, and/or searches, including those found by the Monitor, an MCSO supervisor, court or prosecutor to be unsupported by reasonable suspicion of/or probable cause to believe a crime had been committed, as required by law."

MCSO has created interfaces for both IRs and NTCFs.  As noted in 75.f., the first through third quarter audits of IRs found that 100% had the necessary probable cause or reasonable suspicion statements necessary.  While the audit for the fourth quarter has not yet been produced, the monthly report of County Attorney turndowns for October-December indicate that there were two cases in November that were not prosecuted because there was a lack of probable cause described in the documents and two other cases in which the deputy's description was not sufficiently clear to support the probable cause for the charges listed.  The former cases have been sent to PSB for review and the latter cases were sent to District command for appropriate action.  We have noted our concerns about the County/Justice Court Turndown Methodology in Paragraphs 69 and 75.f.

In July 2017, the interface between EIS and the database for NTCFs was placed into production.  MCSO also reissued EA-3 (Non-Traffic Contact) on June 14, 2018 – and further amended the policy on June 14, 2018.  This policy specifies the responsibility of MCSO personnel regarding different types of search occurrences.  If the search is related to a traffic stop, it should be captured on the VSCF.  Searches occurring within activities resulting in an Incident Report will be captured under Subparagraph 75.e., and NTCF searches fall under this Subparagraph.

From January-April 2018, the number of NTCF reports was insignificant; and we reviewed each report.  Beginning in May 2018, we have found the number of NTCFs provided to us increased to approximately 25 per month.  We have brought these issues to the attention of MCSO and requested that they develop an audit of NTCFs similar to what is currently done for IRs.  We have also suggested that MCSO develop a methodology to statistically analyze the collection of NTCFs to look for possible issues of racial or ethnic bias in the way these interactions are conducted.  Our review of the NTCFs for October-December indicated that the majority of stops are confined to a few areas and often involve lighting issues for bicycles.  The development of a statistical examination of NTCF stops should be a priority for MCSO once the Traffic Stop Methodologies for Annual and Monthly Analyses are complete.   We will evaluate these processes as they are proposed.

WAI 38242

MCSO is in compliance with this Subparagraph.

Paragraph 75.i. requires that the database include "all instances in which MCSO is informed by a prosecuting authority or a court that a decision to decline prosecution or to dismiss charges, and if available, the reason for such decision."

The EIS database has included both County Attorney Actions and an interface with the Justice Courts (AOC) since July 2017. AIU produces a monthly inspection of these cases, looking for the lack of probable cause as well as a host of other issues. The majority of deficiencies found result in an Action Form being sent to the relevant District command. In November there were two cases turned down due to irreversible errors, including a lack of probable cause. In addition there were two other cases in which the auditor notes that the deputy's language did not sufficiently describe the probable cause to support the indicated charges. The former cases were referred to PSB for review and the latter cases were referred to District personnel for review and action. MCSO differentiates these based on the belief that the latter cases could be refiled if the deputies were to amend the language; therefore, they are labeled as non-compliance deficiencies. MCSO must ensure that its methodologies comport with Order requirements, which do not make these distinctions. We will continue to evaluate this in future quarterly status reports.

MCSO is in compliance with this Subparagraph.

Paragraph 75.j. requires that the database include "all disciplinary action taken against employees."

MCSO currently tracks disciplinary actions in the IAPro system, which allows supervisors to search the history of their employees in EIS.

EIU produces a monthly alert report relevant to Paragraphs 70, 71, 75, and 81. Tables 8 and 9 of this report indicates the disposition of the alerts for the reporting period, ranging from "no further action" to "referral to PSB." Out of the 65 cases referred to supervisors for investigation from October-December, 16 cases resulted in a meeting with a supervisor; and supervisors closed 14 cases, indicating that no further action was required. One case resulted in meeting with the commander, and an additional five cases resulted in some form of training. The problem, evident in these numbers, is that there remain a significant number of cases with no disposition within the first two months. We have discussed this with EIU and AIU personnel. In response, they are working on an alert tracking inspection to better capture the time to disposition and the approval of the closure and disposition imposed. We have commented on the first proposal of this report, and will evaluate subsequent iterations as they are made available.

MCSO is in compliance with this Subparagraph.

Paragraph 75.k. requires that the database include "all non-disciplinary corrective action required of employees."

WAI 38243

MCSO uses a combination of Supervisory Note inspections (in particular, bimonthly reviews of a deputy's performance) and the monthly alert report described in the previous Subparagraph to fulfill the requirements for this Subparagraph.  As noted previously, the majority of cases are closed through no further action or meeting with a supervisor.  We also conduct evaluations of a randomly selected group of closed alert investigations each month.  Those closed with the notation of meeting with a supervisor have generally been found to be supported by the documents connected to the investigation.  In these reports, supervisors provide a synopsis of the instances leading up to the alert being triggered and provide a substantive description of the discussion they have had with the respective deputy.  From the sample we review, it is clear that most deputies take these meetings seriously and work to conform to the suggestions of their supervisors.  Supervisors also are required to make two comments regarding their subordinates each month.

Supervisors can search the Supervisory Note field for each deputy using key words and phrases to determine if prior supervisors of a particular subordinate had employed briefings, trainings, or supervisory discussions to address similar issues.

AIU also evaluates a supervisor's use of EIS in the supervision of deputies assigned to them.  The Supervisory Note inspection for October-December shows an overall compliance rate exceeding 97% per month.  The lowest overall measure of compliance was for the review of EIS data for their subordinates, 94.5%.  AIU sends BIO Action Forms to the Districts that show deficiencies.  Our review of the Action Form returns indicates that supervisors are generally counseled by lieutenants and captains to be sure to meet all of their supervisory obligations.  In fact, District 3 has a whiteboard chart of supervisors noting whether they have noted their obligations for each subordinate in their supervisor notes.  While time-consuming, this process ensures that we do not often see instances of District 3 supervisors receiving BIO Action Forms pertaining to these requirements.  MCSO is planning to initiate an inspection of Action Forms and alerts.  While neither of these are in place yet, we have reviewed initial proposals and are awaiting a re-submission by MCSO.

MCSO is in compliance with this Subparagraph.

Paragraph 75.l. requires that the database include "all awards and commendations received by employees."

MCSO published GC-13 (Awards) on November 30, 2017 and updated this policy in January 2019.  With this publication, MCSO created categories for awards or commendations that could be tracked within the EIS database.  With the introduction of the newest version of EIPro, these fields are also searchable by supervisors.  During our October and January site visits, supervisors demonstrated how they could search these fields and locate awards of their subordinates' in the EIS data.  According to the monthly alert inspection reports for October-December there were no commendations recommended by supervisors.

MCSO is in compliance with this Subparagraph.

Paragraph 75.m. requires that the database include the "[t]raining history for each employee."

WAI 38244

MCSO has transitioned from the Skills Manager System to the Cornerstone (the HUB) software program. The HUB has replaced the E-Policy and E-Learning programs. The HUB routinely updates recent training and policy reviews for deputies and is visible by immediate supervisors. MCSO also created an interface between the HUB and EIS.

During our October and January site visits, all field supervisors stated they were familiar with the HUB and were able to access the information contained therein. The difficulties supervisors had previously noted to us about scheduling training for their subordinates had been rectified by the Training Division and the Technology Management Bureau. The supervisors also noted that when they ran into difficulties they could easily contact Training Division or Technology Management Bureau staff to assist them. We will continue evaluate the ability of supervisors to easily search and utilize EIS during our next site visit.

MCSO is in compliance with this Subparagraph.

Paragraph 75.n. requires that the database include "bi-monthly Supervisory observations of each employee."

The Audits and Inspections Unit (AIU) conducts a monthly inspection of Supervisory Notes. One of the indicators AIU evaluates is whether supervisors are making two notes per deputy each month. The overall average for this indicator from October-December is 97%, with a low of 93% in December and a high of 100% in November. When deficiencies are found, AIU sends out BIO Action Forms to the District for review and remedial steps to be taken when necessary. In December, a single Action Form was sent to District 6. Since District 6 also received an Action Form in November due to a supervisor's failure to make a performance note for a subordinate, we will request a copy of the return Action Form completed by District 6 command staff.

MCSO is in compliance with this Subparagraph.

MCSO is making progress toward the development of a functioning relational database that is used consistently by MCSO personnel. With the operationalization of interfaces for Incident Reports, Non-Traffic Contact Forms, the Arizona Office of the Courts, and the HUB, EIS now contains the information required by the Order. MCSO has worked diligently to use some of the data above to investigate compliance rates with the Court Orders and continues to work on the development of added inspections for alert tracking, BIO Action Form deficiencies, and NTCF evaluations similar to those conducted for IRs. We will evaluate each as they are made available. We have also raised several questions regarding the counting and categorization of probable cause findings in the review of County Attorney/Justice Court Turndown Methodologies.

WAI 38245

***Paragraph 76.*** *The EIS shall include appropriate identifying information for each involved Deputy (i.e., name, badge number, shift and Supervisor) and civilian (e.g., race and/or ethnicity).*

**Phase 1:** In compliance

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.
- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:** In compliance

MCSO has instituted a quality check process for VSCFs that requires supervisors to review all traffic stop documents within three days of the stop. AIU conducts an inspection of the timeliness of these reviews. For October-December, the compliance rate for supervisor review exceeded 96%. A subsequent inspection by AIU of Traffic Stop Data is designed to ensure that all necessary information is included on traffic forms, and these forms coincide with CAD and BWC images. The compliance rate for the data inspection ranges from 88% in November to 91% in October and December; however, none of the deficiencies during this reporting period were related to the identification of the deputy or drivers stopped.

MCSO has incorporated patrol data into the EIS through the creation of interfaces for Incident Report (IR) and Non-Traffic Contact Form (NTCF) documents. Each of these documents lists the required name of the deputy and civilian, as well as the ethnicity of the civilian, in accordance with this Paragraph. AIU conducts a quarterly inspection of IRs, including a check for racial/ethnic bias in the reporting documents and the identification of all parties contacted as a result of the incident. The compliance rate for the IR inspection during the third quarter of 2018 was 99%. None of the deficiencies found by AIU were related to the identification of persons contacted or deputies involved. Most deficiencies were the result of failing to file/sign documents within policy timeframes or the use of conclusory language. Non-Traffic Contact Forms contain the same basic information about the identity of the deputy making the contact and the persons being contacted. MCSO does not yet have an inspection of NTCFs, but they do provide us with copies of all the documents. Up to this point, we have not found an NTCF document that does not include the criteria required by this Paragraph. However, as the volume of NTCF documents increases MCSO will have to finalize its plans to create an inspection like that used for IRs.

WAI 38246

*Paragraph 77.  MCSO shall maintain computer hardware, including servers, terminals and other necessary equipment, in sufficient amount and in good working order to permit personnel, including Supervisors and commanders, ready and secure access to the EIS system to permit timely input and review of EIS data as necessary to comply with the requirements of this Order.*

**In Full and Effective Compliance**

Since our earliest site visits in 2014, we have addressed the issue of "necessary equipment, in sufficient amount and in good working order" with MCSO.  As part of our monthly document requests, we receive an accounting, by District, of how many vehicles have functioning TraCS systems.

Since the end of 2015, we have found that all marked patrol vehicles were properly equipped with TraCS equipment.  MCSO developed EB-2 (Traffic Stop Data Collection), which states that in the event that a TraCS vehicle is not operational, or available, each District possesses the necessary equipment at the substation for deputies to input his/her traffic stop information before the end of the shift.  Due to the mountainous regions throughout Maricopa County, there have always been connectivity issues.  However, these areas are well-known to Patrol deputies; and they have demonstrated how they adapt to connectivity problems.  The VSCF also allows deputies to note issues with technology on a traffic stop.

During our October and January visits to the Districts, we spot-checked the facilities and patrol cars, and found that they had functioning TraCS equipment, and each District office had available computers for any occurrence of system failures with vehicle equipment.  In addition, each District had spare parts, wires, and batteries, in the event that body-worn camera issues arose.  Even so, command staff in the Districts have repeatedly noted that the old body-worn camera systems are experiencing battery and cable issues on a regular basis.

At present, the technology and equipment available at MCSO meet the requirements of the Order.

During this reporting period, on December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 38247

***Paragraph 78.*** *MCSO shall maintain all personally identifiable information about a Deputy included in the EIS for at least five years following the Deputy's separation from the agency. Information necessary for aggregate statistical analysis will be maintained indefinitely in the EIS. On an ongoing basis, MCSO shall enter information into the EIS in a timely, accurate, and complete manner, and shall maintain the data in a secure and confidential manner. No individual within MCSO shall have access to individually identifiable information that is maintained only within EIS and is about a deputy not within that individual's direct command, except as necessary for investigative, technological, or auditing purposes.*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:** In compliance

GH-5 (Early Identification System) clearly states that employees only have access to EIS in furtherance of the performance of their duties, and that any other unauthorized access will be addressed under MCSO's discipline policy. The policy also notes that access to individual deputy information will be limited to appropriate supervisory/administrative personnel of that deputy. In addition, the policy states that personal information will be maintained in the database for at least five years following an employee's separation from the agency; however, all other information will be retained in EIS indefinitely

The most recent occurrences of a misuse of MCSO's computer system occurred in 2011 and 2015. These instances were discovered as a result of a quality audit by the FBI in 2017. As a result, MCSO published a System Log Audit operating procedure in November 2017 that required PSB to notify the Technology Management Bureau of any investigations involving a system breach. This operating procedure (BAS SOP 17-4) was fully vetted during our January 2018 site visit. MCSO reported no system breaches occurring between our October and January site visits. In addition, we receive summaries of all internal investigations each month and have found no instances where such investigations involved data system security breaches. We will continue to inquire about these issues during our subsequent site visits.

MCSO's concern for the integrity of information in EIS is further exemplified by the protocols that PSB has created to meet the requirements of Subparagraphs 75.a. and 75.b. regarding purview of open complaints and internal investigations. PSB not only controls who can view summaries of open investigations, but has created a protocol for creating the summary of open investigations to protect the integrity of the case while it is being processed.

MCSO has also created a work group to ensure the integrity of traffic stop data used for analysis. These protocols will be incorporated into the next draft of the EIU Operations Manual. Moreover, although the annual report includes analyses that identifies deputies who are outliers compared to their peers with regard to traffic stops, citations, warnings and arrests that may indicate racial/ethnic bias, the identities of these deputies are removed from documents prior to being made public.

WAI 38248

**Paragraph 79.** *The EIS computer program and computer hardware will be operational, fully implemented, and be used in accordance with policies and protocols that incorporate the requirements of this Order within one year of the Effective Date. Prior to full implementation of the new EIS, MCSO will continue to use existing databases and resources to the fullest extent possible, to identify patterns of conduct by employees or groups of Deputies.*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:** Not in compliance

During 2017 and early 2018, MCSO added four interfaces between remote databases and EIS. The EIS now includes Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), Justice Court turndowns (AOC) and the Cornerstone software program (the HUB) that replaced the Skills Management System (SMS). Supervisors now have the ability to search this additional information for their subordinates without having to access multiple systems. While a significant improvement, the employment of the EIS database remains limited as MCSO is still developing methodologies for the Traffic Stop Monthly and Quarterly Reports, as well as reviewing the methods used for the Traffic Stop Annual Report with the hiring of a new outside contractor who will propose new methodologies. In addition, during our October and January site visits, we suggested to MCSO that the agency would need to create an analytical plan for the Non-Traffic Contact Forms that have accumulated over the past year. Until these are complete and operational, MCSO will not achieve Phase 2 compliance with this Paragraph.

In the meantime, EIU and AIU pull together data to produce reports and inspections of both deputy and supervisor activity. The EIS automatically triggers alerts for behaviors ranging from unscheduled absences to external complaints. The EIU uses this information to create monthly reports and to determine whether an investigation by a supervisor is required. EIU and AIU continue to work on the tracking of alert investigations to ensure that they do not languish without some form of closure. We have commented on early drafts of the tracking protocol and are awaiting additional information.

AIU uses the EIS database to generate numerous inspections of Traffic Stop data, Supervisory Notes, and County Attorney turndowns – among many others. When deficiencies are found, AIU sends out BIO Action Forms to the District command to rectify the situation and memorialize what was done. AIU has already automated an alert threshold for repeated Action Forms for the same events. AIU personnel are developing a monthly inspection for Action Forms that allows command staff to pinpoint if there are patterns occurring that may not be evident by looking at individual cases. The goal is to track deficiencies by Districts, shifts, and squads to focus corrective measures in the most beneficial way.

During our January 2019 site visit, we were apprised of the progress made on methodologies for the annual and monthly traffic stop analyses. We and the Parties were able to ask questions and seek additional information. We will review the latest proposals as they are made available.

WAI 38249

***b. Training on the EIS***

***Paragraph 80.*** *MCSO will provide education and training to all employees, including Deputies, Supervisors and commanders regarding EIS prior to its implementation as appropriate to facilitate proper understanding and use of the system. MCSO Supervisors shall be trained in and required to use EIS to ensure that each Supervisor has a complete and current understanding of the employees under the Supervisor's command. Commanders and Supervisors shall be educated and trained in evaluating and making appropriate comparisons in order to identify any significant individual or group patterns. Following the initial implementation of the EIS, and as experience and the availability of new technology may warrant, MCSO may propose to add, subtract, or modify data tables and fields, modify the list of documents scanned or electronically attached, and add, subtract, or modify standardized reports and queries. MCSO shall submit all such proposals for review by the Monitor pursuant to the process described in Section IV.*

**Phase 1:**  In compliance

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:**  In compliance

MCSO completed the EIS and SRELE Training for all supervisory personnel overseeing patrol or traffic operations in November 2017. Nearly all supervisors remarked that they believe that future training should include more hands-on activities that they encounter on a regular basis. We recommended that the supervisors contact EIU and the Training Division to develop these ideas.

We will continue to evaluate how the delivery of this training impacts the use of EIS tools by supervisors. We have noted in previous Paragraphs that the Supervisory Note inspections produced on a monthly basis show compliance rates in excess of 97% for the period of October-December 2018. During our January site visit, the EIU lieutenant informed charge us that he had created a refresher course for supervisors on EIS tools that would eventually be accessible through the HUB. We will review these materials and follow up with line supervisors to access the impact.

WAI 38250

**c. Protocol for Agency and Supervisory Use of the EIS**

**Paragraph 81.**   *MCSO shall develop and implement a protocol for using the EIS and information obtained from it.  The protocol for using the EIS shall address data storage, data retrieval, reporting, data analysis, pattern identification, identifying Deputies for intervention, Supervisory use, Supervisory/agency intervention, documentation and audit.   Additional required protocol elements include:*

a.  *comparative data analysis, including peer group analysis, to identify patterns of activity by individual Deputies and groups of Deputies;*

b.  *identification of warning signs or other indicia of possible misconduct, including, but not necessarily limited to:*

   i.  *failure to follow any of the documentation requirements mandated pursuant to this Order;*

   ii.  *racial and ethnic disparities in the Deputy's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of Deputies' specific duties, or racial or ethnic disparities in traffic stop patterns when compared with data of a Deputy's peers;*

   iii.  *evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;*

   iv.  *a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;*

   v.  *complaints by members of the public or other officers; and*

   vi.  *other indications of racial or ethnic bias in the exercise of official duties;*

c.  *MCSO commander and Supervisor review, on a regular basis, but not less than bimonthly, of EIS reports regarding each officer under the commander or Supervisor's direct command and, at least quarterly, broader, pattern-based reports;*

d.  *a requirement that MCSO commanders and Supervisors initiate, implement, and assess the effectiveness of interventions for individual Deputies, Supervisors, and units, based on assessment of the information contained in the EIS;*

e.  *identification of a range of intervention options to facilitate an effective response to suspected or identified problems.  In any cases where a Supervisor believes a Deputy may be engaging in racial profiling, unlawful detentions or arrests, or improper enforcement of Immigration-Related Laws or the early warning protocol is triggered, the MCSO shall notify the Monitor and Plaintiffs and take reasonable steps to investigate and closely monitor the situation, and take corrective action to remedy the*

WAI 38251

*issue. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or other supervised, monitored, and documented action plans and strategies designed to modify activity. All interventions will be documented in writing and entered into the automated system;*

f.   *a statement that the decision to order an intervention for an employee or group using EIS data shall include peer group analysis, including consideration of the nature of the employee's assignment, and not solely on the number or percentages of incidents in any category of information recorded in the EIS;*

g.   *a process for prompt review by MCSO commanders and Supervisors of the EIS records of all Deputies upon transfer to their supervision or command;*

h.   *an evaluation of whether MCSO commanders and Supervisors are appropriately using the EIS to enhance effective and ethical policing and reduce risk; and*

i.   *mechanisms to ensure monitored and secure access to the EIS to ensure the integrity, proper use, and appropriate confidentiality of the data.*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:** Not in compliance

MCSO produces a number of reports and inspections that are relevant for this Paragraph. However, due to issues with EIS data and methods of analysis, MCSO has not been able to reliably produce the Traffic Stop Monthly Report based upon the criteria outlined in Paragraph 67; nor has MCSO ever produced a Traffic Stop Quarterly Report. Additionally, each of the Annual Reports have been delayed, or had to be rewritten, because of anomalies that arose in the data or the manner in which it was analyzed. MCSO has contracted with a new outside vendor to conduct analyses of traffic stop data. MCSO's vendor is currently reviewing past TSAR methodologies and proposals for the TSMR to ensure that the methods employed are efficient and meet the requirements of the Order. We will work in concert with MCSO to find solutions for the issues that currently limit the full use of the EIS database.

Paragraph 81.a. requires that MCSO's EIS protocols include "comparative data analysis, including peer group analysis, to identify patterns of activity by individual Deputies and groups of Deputies."

The EIU has conducted monthly and annual analyses looking for outliers that may indicate that an individual is behaving in a biased or unprofessional manner, in accordance with Paragraphs 65, 66, and 67. The TSMR has been suspended and under revision since April 2016. MCSO has proposed new methodologies in consultation with its new vendor. We and the Parties have had the opportunity during and between site visits to ask questions and receive additional information. Once proposals are finalized, we will work with them to test and implement these processes as soon as possible.

WAI 38252

MCSO has never produced a TSQR.  There have been several proposals regarding the substance and form these reports may take, but no data has been used to produce an analysis to date.  The Second and Third Traffic Stop Annual Reports, like the first, were delayed due to unforeseen data and analytical problems.  When these issues were discovered, they were addressed as quickly as possible.  MCSO initiated the supervisory oversight and action plans associated with the findings of the Second and Third TSARs.  We and the Parties have commented on the supervisory discussions with deputies and action plan processes.   MCSO provided documentation on the completion of Action Plans stemming from the Second TSAR and has modified processes to conduct the supervisory discussions stemming from the Third TSAR.  We have received the completed supervisory discussions for some of the deputies found to be outliers and will comment on the processes as whole once all discussions are complete.

For both the TSMR and TSAR, past analyses has focused on geographic peers – that is, comparing deputy activity to deputies that patrol or conduct traffic stops in the same District.  This remains a rather coarse comparison as Districts can have a variety of social, economic, and ethnic differences within their boundaries.  MCSO is now proposing a method for the TSMR that would match deputies on a number of characteristics, including stop location.  We will work with MCSO's new vendor to determine if these processes are a more useful means of identifying patterns of concern for shift and squad supervisors.  MCSO has also created an interface for Non-Traffic Contact Forms (NTCFs) to be available in the EIS database; however, MCSO has yet to develop a methodology to investigate whether patterns of problematic behavior/action might be taking place in the stops these form document.  These issues have been discussed with MCSO during our site visit meetings in October and January.  We will continue to work with MCSO to utilize these civilian contacts to their fullest potential.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.b. requires that MCSO's EIS protocols include "identification of warning signs or other indicia of possible misconduct."

GH-5 (Early Identification System) provides significant direction for employees and supervisors alike to understand what type of behaviors will be viewed as problematic.  As noted above, the intent of the TSAR and TSMR is to identify deputies who might be engaged in biased activity regarding who they stop, cite, warn, or search.  MCSO has been developing new methods for the TSMR, and we have collectively engaged in numerous discussions about the TSAR.  We are confident that the benchmarks from Paragraph 67 will be operational in future monthly analyses, given the progress that MCSO has made to date.

MCSO is also revising the EIU Operations Manual, which will include sections on data protocols and the several analyses based upon the traffic stop and patrol data.  The manual also includes thresholds for behavior ranging from failure to arrive on time for work to external complaints.  BIO is examining these thresholds to determine why they were set at the present levels.  This investigation may result in the modification of thresholds that have proven unproductive over the last several years.  MCSO has also indicated that it is surveying the practices of other local law enforcement organizations to receive examples of the best practices

WAI 38253

that are currently in use.  We will review these changes as they are proposed.  Regardless of the outcome, we believe it is a worthwhile endeavor to test processes that have been in place to ensure that they are as efficient as they were intended.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.c. requires that MCSO's EIS protocols include "MCSO Commander and Supervisor review, on a regular basis, but not less than bimonthly, of EIS reports regarding each officer under the Commander or Supervisor's direct command and, at least quarterly, broader, pattern-based reports."

Supervisory Note inspections include four measures to assess how well supervisors are using EIS information to oversee the activity and behavior of their subordinates.  These actions range from making supervisory comments on deputies, reviewing their body-worn camera footage, making Employee Performance Appraisal (EPA) notations, and reviewing subordinates' EIS profiles.  The overall compliance average across these criteria has remained steady in the upper 90th percentile for the past several months; including October-December 2018.   When deficiencies are discovered in this inspection, AIU sends out an Action Form to the immediate supervisor for response and remedy.  In November, a supervisor in District 7 lacked bi-monthly EIS reviews for three deputies.  In October, Lake Patrol supervisor had four similar deficiencies. In December, a District 6 supervisor failed to make two supervisor notes for four deputies during the month.  The deficiencies do not appear to be localized in any one District nor indicative of widespread organizational issues.  AIU is developing a proposal to better track Action Forms by type, individual, and District to ensure that any corrective actions are targeted at the most appropriate level and to be able to determine if there are particular supervisors that appear repeatedly within specified timeframes.

MCSO is in compliance with this Subparagraph.

Paragraph 81.d. requires that MCSO's EIS protocols include "a requirement that MCSO Commanders and Supervisors initiate, implement and assess the effectiveness of interventions for individual Deputies, Supervisors, and units, based on assessment of the information contained in the EIS."

The EIS database generates alerts for issues ranging from use of force to unexplained absences. From these alerts, EIU personnel send out for investigation those alerts that are not redundant or mischaracterized in some fashion.  Supervisors have a set amount of time to return these investigations with a description of their investigation and the outcome.  MCSO has created an EIS Alert Review Group (ARG) that reviews the investigations of supervisors prior to closing an alert.  The group ensures that the reports of the supervisors address all aspects of the assigned investigation, and returns those that are deficient to the District for continued revision.  As a result, the number of closed alert investigations we evaluated in October (seven) and November (two) were less than 15, our typical random sample; in December, we received 18,closed alert investigations and evaluated 15.   Of those available, we have found the supervisors' investigations and actions to be well-founded.  The review group has requested additional information in two-thirds of the investigations returned to them.  We have been provided the

WAI 38254

original alert investigation documents (Attachment B of GH-5, Early Identification System) as well as modified ones arising from the review group's requests. Our review of the closed alert investigations from October 2018 resulted in a request for additional information on three cases that were discussed during our January site visit. The first case involved a deputy being placed on an Action Plan due to multiple instances of external complaints involving rudeness and use of force. The supervisor notes from this Action Plan required additional training on Fourth and Fourteenth Amendment issues, proper communication training and search and seizure training. After consultation between EIU and District Command, the Action Plan was extended for 30 days to include additional review of traffic/patrol investigations conducted by this deputy. A second case involved a deputy being placed on Administrative Leave pending the outcome of an internal complaint made by the deputy's supervisor that was being investigated by PSB. The third case involved a deputy who received external complaints and as a result was placed on an Action Plan to improve the deputy's ability to conduct field investigations, report writing, safe operation of County vehicles, and conformance with Office policy. According to the documentation provided by EIU, the deputy had completed defensive driving training and was scheduled for criminal documentation training in February 2019. We will follow up on the completion of these outstanding cases during future site visits. MCSO has been forthcoming with all requested information. We believe the creation of the ARC has led to more comprehensive evaluation of the behavior of deputies than has existed in the past.

MCSO is in compliance with the Subparagraph.

Paragraph 81.e. requires MCSO's EIS protocols to include "identification of a range of intervention options to facilitate an effective response to suspected or identified problems. In any case where a Supervisor believes a Deputy may be engaging in racial profiling, unlawful detentions or arrests, or improper enforcement of Immigration-Related Laws or the early warning protocol is triggered, MCSO shall notify the Monitor and Plaintiffs and take reasonable steps to investigate and closely monitor the situation, and take corrective action to remedy the issue. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or other supervised, monitored, and documented action plans and strategies designed to modify activity. All interventions will be documented in writing and entered into the automated system."

GC-17 (Employee Disciplinary Procedures) and GH-5 (Early Identification System) provide a wide range of options for supervisor interventions, as well as practical guidelines about how to employ those options. As noted above, GH-5 includes Attachment B, "Early Identification Alert Response Form." This form specifies the responsibility of supervisors and serves as a checklist of processes the supervisor should use. EIU also attaches any documents, citations, or BWC recordings the supervisor might need to conduct an inquiry. We began seeing the use of these forms in April 2017. By September 2017, we found that the closure of alert investigations by supervisors had improved. Most recently, we have only inquired about the ongoing status of PSB inquiries that took priority over alert investigations or updates on Action Plans that have been enacted following discussions between District and EIU personnel. MCSO has also

WAI 38255

created an EIS Alert Review Group (ARG) to ensure that the closure of alerts is supported by documentation from supervisors and responsive to the needs of the organization. The number of completed investigations has dropped over the past several months as the ARG has taken a proactive role to communicate with the Districts and individual supervisors how to effectively complete these investigations. This has meant that when the ARG intervenes, the total time to complete an investigation has increased; however, once complete, these investigations contain sufficient information to support the actions taken by District personnel. During this reporting period, October-December 2018, the committee returned two-thirds of the cases needing additional information. We applaud this preemptive move, and will continue to review all documents related to alert investigations and closures.

The monthly alert report produced by MCSO identifies not only the allegation or incident that led to the alert (Tables 1-6), but also dispositions available to supervisors investigating the alert (Tables 8 and 9). In addition to the three Action Plan cases described in Subparagraph 81.d. above, there were three additional cases where supervisors initiated additional training for subordinates as a result of the alert investigations. There were also multiple cases where the investigation led to a discussion with a supervisor or command staff. With the addition of the ARC, we are seeing fewer cases where the outcome is simply "no further action." In each instance noted above, the supervisor was required to make notes about the investigation and action taken. These notes will then be available to future supervisors should there be a need to investigate the history of a deputies intervention or training. EIU and AIU are working jointly on an inspection that would track investigations to their completion and evaluate the effect of any intervention planned. We have made comments on the initial proposal provided by MCSO and will review future iterations as they are provided.

MCSO is in compliance with this Subparagraph.

Paragraph 81.f. requires that MCSO's EIS protocols include "a statement that the decision to order an intervention for an employee or group using EIS data shall include peer group analysis, including consideration of the nature of the employee's assignment, and not solely on the number or percentages of incidents in any category of information recorded in the EIS."

In the development of GH-5 (Early Identification System), MCSO has taken into consideration the nature of the employee's assignment. In prior versions of GH-5, MCSO created an appendix for thresholds that indicated, for example, that the "use of force" threshold was different for Detention and Patrol personnel. Detention personnel are much more likely to need to employ force than their Patrol counterparts. In the current version of GH-5, MCSO makes reference to thresholds that will be included in the EIU Operations Manual. MCSO is evaluating the threshold limits to ensure that they are achieving the goals for which they were originally set. In addition, MCSO is communicating with other local law enforcement agencies to collect information about current best practices regarding thresholds they employ.

WAI 38256

The hiring of a new vendor for data analysis will allow MCSO to review TSAR processes used in the past as well as evaluate proposals for TSMR and TSQR reports to ensure that they meet the needs of the Organization and comply with the First Order.  In the past, MCSO conducted traffic stop analyses based upon "geographic peers" – that is, deputies are compared to deputies within the same District.  During our January site visit, we discussed with MCSO the prospect of matching deputies based upon a number of characteristics.  Location of the stop was one of these features.  We await the next draft of methodology proposals for analyzing traffic stop data.  Until such time as these are approved and put into practice, MCSO will not be in compliance with this Subparagraph.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.g. requires that MCSO's EIS protocols include "a process for prompt review by MCSO Commanders and Supervisors of the EIS records of all Deputies upon transfer to their supervision or command."

MCSO has noted the need for a prompt review in both the "Supervisor Responsibilities" and "Command Staff Responsibilities" sections of GH-5 (Early Identification System).  EIU specifically addressed this issue during the EIS and SRELE training completed in November 2017.  EIU advised supervisors to document when they conducted their review in Supervisory Notes, as well as how long the deputy had been working in their chain of command when the review was conducted.  During our October and January visits to several Districts, we were informed that most command staff attempt to review these materials within the first few days that a deputy, or supervisor, moves to their District.  In no cases have we found information where the 14-day limit outlined in policy has been problematic.

MCSO is in compliance with this Subparagraph.

Paragraph 81.h. requires that MCSO's EIS protocols include "an evaluation of whether MCSO Commanders and Supervisors are appropriately using the EIS to enhance effective and ethical policing and reduce risk."

EIU has improved the processing and tracking of alert investigations.  The development of Attachment B to GH-5 (Early Identification System) and training completed in EIS and SRELE in November 2017 has dramatically improved the information provided by supervisors when closing alerts.  Command staff have also taken an active role in ensuring that if investigations appear incomplete, that they will return them for revision to the supervisor.  EIU is working with AIU to develop an inspection that tracks alert investigations and the resultant outcomes.  In this way, we should better be able to judge whether these investigations are being conducted in a timely fashion.

Since the fourth quarter of 2017 until the current reporting period, AIU has found that all Patrol supervisors included comments in their Supervisory Notes regarding how they had discussed bias-free policing with their subordinates.  In the recent Semi-Annual Bias-Free Policing Report, there was a slight drop for Detention personnel, to 94%.  We have also repeatedly raised this issue with District command staff during onsite discussions.  The comments we have

WAI 38257

received indicate that command staff and supervisors would like to receive some guidance from the Training Bureau about innovative ways to address the topic of bias-free policing. MCSO is further developing strategies through its Constitutional Policing Plan to promote ethical policing, as we have noted in Paragraph 70. Until such time as these processes are finalized MCSO will not be in compliance with this Subparagraph.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.i. requires that MCSO's EIS protocols include "mechanisms to ensure monitored and secure access to the EIS to ensure the integrity, proper use, and appropriate confidentiality of the data."

MCSO has addressed the security and integrity of data in GH-5 (Early Identification System), as well as instituted facility inspections throughout the Districts – including the security of terminals, access to information, and mobile displays. We spot-check technology and security of old forms during each site visit and have found no problems to date. Additionally, on November 6, 2017, MCSO published the operating procedure for System Log Audit Requests; this became effective on November 30, 2017. The procedure outlines how PSB personnel will notify the Technology Management Bureau of any misuse of MCSO information systems allegations and request an audit of the suspected breach. We discussed this operating procedure, BAS SOP 17-4, during our January 2018 site visit meetings; it meets all of the concerns voiced since the February 2017 discovery of two cases where data was compromised, but no one notified the Technology Management Bureau. We believe this new procedure will ensure that such an oversight does not occur again. In addition, we are provided all internal investigation summaries initiated each month and have found no instances involving the misuse of data during the period of October-December 2018.

MCSO is in compliance with this Subparagraph.

MCSO meets some of the requirements of Paragraph 81, but there remain a variety of activities that are currently ongoing that need to be completed before MCSO will be compliant. These range from the finalization of the TSMR, TSQR, and TSAR methods to the completion of revisions to the EIU Operations Manual. In addition, both EIU and AIU staff are working to track the effectiveness of alerts and BIO Action Forms. We have also requested that MCSO devise an audit for the NTCFs that have been accumulating over the past year. Finally, the lack of substantive progress to institute the Constitutional Policing Plan to target potential bias across the organization has kept MCSO from achieving compliance with this Paragraph. We and the Parties remain concerned that we have not noted many instances where supervisors proactively intervene with their subordinates; rather, the supervisors wait until prompted by EIS alerts or the ARC review of completed alert investigations. Command staff have taken a more active role in evaluating the work of supervisors as evidenced by a number of alert investigations returned to supervisors for revision or additional inquiry. We will continue to evaluate the progress toward the goals outlined in this Paragraph.

WAI 38258

## Section 9: Supervision and Evaluation of Officer Performance

**COURT ORDER X. SUPERVISION AND EVALUATIONS OF OFFICER PERFORMANCE**

*Paragraph 82. MCSO and the County shall ensure that an adequate number of qualified first-line Supervisors are available to provide the effective supervision necessary to ensure that Deputies are following the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order. First-line Supervisors shall ensure that Deputies are policing actively and effectively, are provided with the instruction necessary to correct mistakes, and are held accountable for misconduct. To achieve these outcomes, MCSO shall undertake the following duties and measures:*

*Paragraph 83. MCSO Supervisors shall provide the effective supervision necessary to direct and guide Deputies. Effective supervision requires that Supervisors: respond to the scene of certain arrests; review each field interview card and incident report; confirm the accuracy and completeness of Deputies' daily activity reports; respond to each Complaint of misconduct; ensure Deputies are working actively to engage the community and increase public trust and safety; provide counseling, redirection, support to Deputies as needed, and are held accountable for performing each of these duties.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

**Phase 2:** In compliance

During our January site visit, we interviewed supervisors and commanders from Districts 4 and 6 to determine compliance with MCSO policies and the requirements of this Paragraph.

During our visit to District 4, we met with the District Commander, two lieutenants, and a sergeant. The District 4 hours of operation remain the same: business days, from 0800-1600. With regard to crime, the District 4 Commander reported that most of their crime concerns are related to thefts, vehicle burglaries, and traffic. We asked if the District Commander was familiar with MCSO's new direction with the Constitutional Policing Plan, but the only information he had been provided was an action item list of things the District can do to promote community engagement. No specific direction had been provided regarding the new plan. We were advised that District 4 is adequately staffed due to contract requirements. However, the staff suggested that senior management should address deputies regarding future plans to address staffing issues. We inquired as to how much time sergeants dedicate to field supervision, and learned that supervisors routinely spend 65-70% of their time in the office handling administrative paperwork. Commanders suggested that there is too much redundancy in administrative paperwork and suggested that it needs to be streamlined. We were advised

WAI 38259

that the town of Anthem conducts a quarterly "First Responders Round Table" to discuss common concerns in the area. We believe these types of meetings can facilitate inter-agency cooperation.

During our visit to District 6, we interviewed the District Commander; there were no supervisors available to interview. The District 6 hours of operation remain the same: Monday-Friday, from 0800-1700. The town of Queen Creek has a population of about 55,000 to 60,000. The town has a significant amount of drive-through traffic to Phoenix, so many of the residents' concerns are related to traffic enforcement. District 6 is still on a 4/10 schedule. They are short seven deputies, but fill in vacancies using overtime. The District 6 Commander received an action item list related to MCSO's new community policing model, but had not received any particular instructions on it. District 6 has a school for troubled students, and District personnel attend meetings and regularly work with the school staff to address concerns. District 6 has three deputies assigned to community engagement. The District Commander advised us he is active in Queen Creek town events and attends all town meetings. District 6 has a crime analyst who has done a great job of tracking and forecasting crime trends; they will be losing the analyst to another employer. District 6 will have to recruit and hire another analyst in the near future. We were advised that the rank and file deputies feel that they are "in the dark" with regard to how MCSO will resolve what was referred to as a staffing crisis. The District Commander suggested that MCSO should address this concern.

We reviewed a representative sample of 57 Incident Reports for October 2018, for the randomly selected date of October 13, 2018. All of the 57 Incident Reports had proper documentation of supervisory review. Of the 57 Incident Reports, nine were vehicle crashes. All nine Vehicle Crash Reports had documentation that a supervisor had reviewed and approved the reports. The compliance rate for timely supervisory review of Incident Reports in October was 100%. Supervisors reviewed and approved all Incident Reports, including all Arrest Reports, within the required timeframes. During our quality control review of Incident Reports, we saw several spelling and grammar mistakes. We noted that there are several new deputies in field training. We attribute some of these errors to their unfamiliarity with reports. For October, MCSO reported 756 hours of community policing.

We reviewed a representative sample of 83 Incident Reports for November 2018, for the randomly selected date of November 13. Eighty-two of the 83 Incident Reports were reviewed and memorialized by a supervisor within the required seven days. There were 17 Vehicle Crash Reports submitted in the sample for November, of which 16 included documentation of supervisory review. The compliance rate for timely supervisory review of Incident Reports in November was 99%. We conducted a quality review on a 10% random sample of the reports we reviewed, and found no significant errors other than minor spelling mistakes. For November, MCSO reported 673 hours of community policing.

We reviewed a representative sample of 103 Incident Reports for December 2018, for the randomly selected date of December 6. All but one Incident Report had been turned in before the end of the shift. All but one of the 103 Incident Reports included documentation that they

WAI 38260

had been reviewed and approved by supervisors as required by this Paragraph.  There were 22 vehicle crashes submitted in the sample, all of which included documentation of timely supervisory review.  The compliance rate for timely supervisory review of Incident Reports for December was 99%.  Supervisors reviewed and approved all 15 Arrest Reports within 72 hours. We conducted a quality review on a 10% random sample of the reports submitted and found one report narrative that appeared to be missing several words.  Other than this one report, we found no significant errors.  For December, MCSO reported 623 hours of community policing.

For each month of the quarter, we selected a supervisor and a squad of deputies from each District.  We requested several documents, including Patrol Activity Logs (PALs), for each deputy.  We reviewed PALs for each month of the quarter to assess if they were turned in by the end of each shift, and if supervisors reviewed each PAL.  For October, we reviewed PALs for 28 deputies and eight supervisors.  All 28 deputies' Patrol Activity Logs contained documentation of supervisory review.  All eight supervisors' Patrol Activity Logs contained documentation of command-level review.  For November, we reviewed Patrol Activity Logs for 31 deputies and seven supervisors.  All 31 deputies' PALs contained documentation of supervisory review.  All seven supervisors' PALs contained documentation of command-level review.  For December, we reviewed Patrol Activity Logs for 27 deputies and seven supervisors.  All 27 deputies' PALs contained documentation of supervisory review; all seven sergeants' PALs contained documentation of command-level review.

We also reviewed deputies' and supervisors' PALs to determine if supervisors provided on-scene supervision, and if those supervisor-deputy contacts were documented.  For the sample dates selected in October, there were 11 supervisor-deputy field contacts reported by deputies and supervisors.  For the sample dates selected in November, there were 26 supervisor-deputy field contacts reported by deputies and supervisors.  For the sample dates selected in December, there were 19 supervisor-deputy field contacts reported by deputies and supervisors.

For October, November, and December, we reviewed the submissions of non-traffic incidents involving stops and detentions, which were recorded in Non-Traffic Contact Forms (NTCFs). For October, we selected all 22 NTCFs generated during the month, for review.  All 22 NTCFs had been submitted prior to the end of the shift.  All 22 NTCFs were reviewed and approved by supervisors within 72 hours as required by the First Order.  The compliance rate for timely supervisory review of NTCFs in October was 100%%.  For November, we selected all 23 NTCFs to review.  All NTCFs were submitted prior to the end of the shift, and all 23 NTCFs were reviewed and approved by supervisors within the required timeframe.  The compliance rate for timely supervisory review of NTCFs in November was 100%.  For December, we selected all 18 NTCFs generated during the month in review.  All 18 NTCFs were submitted within the required timeframe.  Sixteen of the 18 NTCFs were reviewed and approved by supervisors within the required 72 hours.  The compliance rate for timely supervisory review of NTCFs in December was 89%.  For the fourth quarter, compliance with timely supervisory review of NTCFs was 96%.

WAI 38261

We have previously reported that community engagement activities reported by deputies in the sample of Patrol Activity Logs we reviewed had decreased. During this reporting period, MCSO reported 11 community engagement events. Only four of the 11 community engagement activities recorded had any details of the event. MCSO has developed a community policing/outreach report; we are uncertain if the report will be required for all activities in which the 412 CAD code is used. We recommend that additional information be included in those 412 events.

**Paragraph 84.** *Within 120 days of the Effective Date, all patrol Deputies shall be assigned to a single, consistent, clearly identified Supervisor. First-line field Supervisors shall be assigned to supervise no more than twelve Deputies.*

**Phase 1:** In compliance

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

**Phase 2:** In compliance

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the fourth quarter of 2018. During this reporting period, consistent with our methodology, for October we reviewed a sample of shift rosters from Districts 1, 2, and 3; for November we reviewed a sample of shift rosters from Districts 4, 6, and 7 and Lake Patrol; and for December, we reviewed a sample of shift rosters from Districts 1, 2, and 3. Monthly and daily rosters indicated that deputies were assigned to one single consistent supervisor. Of the 66 shifts we reviewed for this reporting period, all were in compliance. There were 25 span of control memos generated during this reporting period, indicating that those shifts or part of those shifts exceeded the supervisor-deputy ratio of 1:8. Four of the span of control memos were generated by District 1, nine memos were generated by District 2, and 12 memos were generated by District 3. MCSO did not exceed the 1:10 supervisor-deputy ratio in any of the sample shifts we inspected during this reporting period. MCSO remains in compliance with this Paragraph.

**Paragraph 85.** *First-line field Supervisors shall be required to discuss individually the stops made by each Deputy they supervise with the respective Deputies no less than one time per month in order to ensure compliance with this Order. This discussion should include, at a minimum, whether the Deputy detained any individuals stopped during the preceding month, the reason for any such detention, and a discussion of any stops that at any point involved any immigration issues.*

**Phase 1:** In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

WAI 38262

**Phase 2:**  In compliance

Consistent with our methodology, we requested that MCSO provide copies of reports documenting that supervisors are meeting with and discussing individually the stops made by each deputy, at least once per month.  We requested documentation for one randomly selected supervisor from each District, for each month of the reporting period, and the squad of deputies who reports to that supervisor.  Supervisors record the discussion of traffic stops by applying the "Discussed with Deputy" option.  MCSO documents supervisor-deputy discussions in a spreadsheet, which it submits for inspection.   The spreadsheet also documents timely supervisory review of VSCFs.  In addition to the spreadsheet, MCSO submits all VSCFs for the month in review.  We select a 10% random sample of VSCFs from each District to review for content.  We also inspect the sample of VSCFs submitted for review of traffic stops under Paragraphs 25 and 54, as part of compliance with Paragraph 91, to verify if supervisors are addressing deficiencies in the documentation related to the stops.

Paragraph 85 requires that supervisors discuss traffic stops at least once per month with their deputies.   To efficiently manage this requirement along with other administrative and operational duties, supervisors generally conduct several traffic stop-related discussions with each deputy during the month.  Supervisor-deputy discussions of traffic stops that occurred toward the latter part of the month may not get reviewed until the following month.  Our selections for these discussions changes every month, so to obtain complete records for each deputy, MCSO holds the submission until all of the information requested for the month is complete.  Accordingly, the documentation of supervisory-deputy discussions of traffic stops is submitted 30 days retroactively.

For October, MCSO submitted the September traffic stops for each deputy, by District.  The total number of traffic stops for each District was:  District 1, 72; District 2, five; District 3, none; District 4, 10; Lake Patrol, 72; District 6, 37; and District 7, six.  There were a total of 202 traffic-related events in October for all Districts, and sergeants discussed all of these events with the deputies who conducted them, for a compliance rate of 100%.

For November, MCSO submitted the October traffic stops for each deputy, by District.  The total number of traffic stops for each District were: District 1, 45; District 2, 46; District 3, none; District 4, 31; Lake Patrol, 14; District 6, 23; and District 6, 10.  There were a total of 169 traffic-related events for all Districts, and sergeants discussed all 169 traffic stops with the deputies that conducted them, for a compliance rate of 100%.

For December MCSO submitted the November traffic stops for each deputy, by District.  The total number of traffic stops for each District were:  District 1, one; District 2, 53; District 3, seven; District 4, 56; Lake Patrol, 59; District 6, 127; and District 7, one.  There were a total of 304 traffic-related events in November, and sergeants discussed 287 of those with the deputies who conducted them, for a compliance rate of 94%.

WAI 38263

The compliance rate for discussion of traffic stops was 98% for this reporting period.  We have continued to note added thoroughness in supervisory reviews of documentation related to traffic stops, but supervisors are still not capturing all errors.  Additional comments are provided in our review of Paragraph 91.

***Paragraph 86.***  *On-duty field Supervisors shall be available throughout their shift to provide adequate on-scene field supervision to Deputies under their direct command and, as needed, to provide Supervisory assistance to other units.  Supervisors shall be assigned to and shall actually work the same days and hours as the Deputies they are assigned to supervise, absent exceptional circumstances.*

**Phase 1:**  In compliance

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed a sample of daily shift rosters for the three months of the reporting period.  For October, we reviewed Districts 1, 2, and 3; for November, we reviewed Districts 4, 6, and 7, and Lake Patrol; and for December, we reviewed Districts 1, 2, and 3.  Our reviews of monthly and daily rosters indicated that deputies were assigned to and worked the same schedules as their supervisors.

MCSO deputies' and sergeants' activities are captured in Patrol Activity Logs (PALs).  We selected a random sample of one day per month, and one squad per District, for review.  For October, we requested PALs for eight sergeants and 28 deputies, which we reviewed.  We noted a total of 11 field supervisor-deputy contacts between the combined deputies' and sergeants' PALs for the selected dates.  For November, we requested PALs for 31 deputies and seven sergeants.  We received and reviewed all requested PALs, and noted a total of 26 field supervisor-deputy contacts between the combined deputies' and sergeants' PALs for the selected dates.  For December, we reviewed PALs for 27 deputies and seven sergeants.  We noted a total of field supervisor-deputy contacts between the combined deputies' and sergeants' PALs for the selected dates.  We reviewed the monthly shift rosters for each month of the reporting period.  Our reviews indicate that supervisors work the same hours as the deputies under their supervision.  Our reviews of Patrol Activity Logs indicate that supervisors have been available to provide on-scene supervision.

WAI 38264

***Paragraph 87.*** *MCSO shall hold Commanders and Supervisors directly accountable for the quality and effectiveness of their supervision, including whether commanders and Supervisors identify and effectively respond to misconduct, as part of their performance evaluations and through non-disciplinary corrective action, or through the initiation of formal investigation and the disciplinary process, as appropriate.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.
- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

**Phase 2:** Not in compliance

Consistent with our methodology, we requested the names of all deputies and supervisors whose performance appraisals were completed during this reporting period. From the lists of employees submitted, we requested a representative sample. We received and reviewed performance evaluations submitted for six deputies and nine supervisors whose performance evaluations were completed in October 2018. Five of the six deputy EPAs touched on the needed areas of evaluation, but one EPA failed to address the requirements of Paragraph 99.

Our reviews of the supervisors' EPAs concluded that five of the nine met all requirements. Six of the nine EPAs rated the supervisors on the quality of their reviews. Eight of the nine EPAs addressed the complaint history and their dispositions, discipline, commendations, awards, civil or administrative claims, lawsuits, training history, assignment and rank history, supervisory actions, and EIS histories. Six of the nine EPAs had comments on the supervisors' ability to identify and respond to misconduct. Eight of the nine EPAs assessed the supervisor's quality of internal affairs investigations and/or the quality of the supervisor's reviews of internal investigations, as required by Paragraph 176.

We received and reviewed performance evaluations submitted for five deputies and 11 supervisors whose EPAs were completed in November 2018. All five deputy EPAs addressed all required areas of assessment. All deputy EPAs addressed the requirements of Paragraph 99. Four of the 11 supervisors' EPAs contained comments on all of the required rating dimensions. All of the 11 supervisors' EPAs rated the supervisors on the quality and effectiveness of their supervision. Nine of the 11 EPAs addressed the quality of supervisory reviews. Seven of the 11 supervisors' appraisals included comments related to the supervisors' ability to identify and respond to misconduct. Ten of the 11 EPAs addressed the complaint history and their dispositions, discipline, commendations, awards, civil or administrative claims, lawsuits, training history, assignment and rank history, supervisory actions, and EIS histories. Five of the 11 EPAs assessed the supervisors' quality of internal investigations and/or the quality of their reviews of internal affairs investigations. In total, four of the 11 supervisors' EPA met all requirements.

WAI 38265

We received and reviewed Employee Performance Appraisals submitted for six deputies and 10 supervisors whose EPAs were completed in December 2018.  Five of the six deputy EPAs addressed all requirements.  All 10 supervisors' EPAs rated the employees on the quality and effectiveness of their supervision.  Eight of the 10 EPAs addressed the quality of supervisory reviews.  Five of the 10 supervisors' appraisals included comments related to the supervisors' ability to identify and respond to misconduct.  Nine of the 10 EPAs addressed the complaint history and their dispositions, discipline, commendations, awards, civil or administrative claims, lawsuits, training history, assignment and rank history, supervisory actions, and EIS histories.  Seven of the 10 EPAs assessed supervisors on the quality of their internal affairs investigations and/or the quality of their reviews of internal affairs investigations, as required by Paragraph 176.  In total, four of the 10 supervisors' EPAs met all requirements.  Of the 47 EPAs reviewed for the third quarter, 39 were in compliance.  The compliance rating for the period in review was 83%.

During our January site visit we met with Human Resources and discussed some of the areas that commanders are failing to address in supervisors' EPAs.  We were advised that MCSO continues to work on the revised EPA process.  The new EPA will be weighted, and employee salaries will be dependent upon performance.  Deputy EPAs will have five core competencies and supervisors will have an additional two competencies.  The EPA will also have a dimension in community engagement.  MCSO staff stated that they are working to reduce redundant Blue Team notes in the new process.  This has been an issue we have discussed extensively, as some EPAs we have reviewed have been unnecessarily long, mostly with superfluous Blue Team comments.  The new EPA process will require retraining of supervisors.

**Paragraph 88.**  *To ensure compliance with the terms of this Order, first-line Supervisors in any Specialized Units enforcing Immigration-Related Laws shall directly supervise the law enforcement activities of new members of the unit for one week by accompanying them in the field, and directly supervise the in-the-field-activities of all members of the unit for at least two weeks every year.*

**In Full and Effective Compliance**

MCSO does not have any specialized units that enforce immigration-related laws.  We continue to monitor arrests and detentions as part of our review process to ensure that MCSO is in compliance with its own directives on this issue.

For October, November, and December we received lists containing all incidents involving MCSO arrests and criminal citations.  For each month, we requested a random sample of arrests and criminal citations.  In total, we reviewed 56 incidents involving arrests and 59 incidents involving criminal citations.  We also reviewed a random sample of 243 Incident Reports for this reporting period.  During our reviews of the documentation provided for this reporting period, we have found no evidence to indicate any violations of this Paragraph.

WAI 38266

During this reporting period, on December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 89.** *A Deputy shall notify a Supervisor before initiating any immigration status investigation, as discussed in Paragraph 28. Deputies shall also notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration Related Crime, or for any crime related to identity fraud or lack of an identity document. The responding Supervisor shall approve or disapprove the Deputy's investigation or arrest recommendation based on the available information and conformance with MCSO policy. The Supervisor shall take appropriate action to address any deficiencies in Deputies' investigation or arrest recommendations, including releasing the subject, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative investigation.*

**Phase 1:** In compliance

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- GF-5 (Incident Report Guidelines), most recently amended on January 4, 2019.

**Phase 2:** In compliance

To assess MCSO's compliance with this Paragraph, we requested all reports related to immigration status investigations, any immigration-related crimes, or any incidents or arrests involving lack of identity documents. The Incident Reports MCSO submitted covered the period of October 1-December 31, 2018. Any incident wherein a deputy requests supervisory permission to contact Immigration and Customs Enforcement (ICE) or Customs and Border Patrol (CBP) – to ascertain the legal status of an individual involved in a stop, detention, or any incident under investigation by MCSO – falls under the reporting requirements of this request. MCSO did not report any cases involving immigration status investigations or immigration-related crime.

In the November document submission, MCSO advised that a deputy noted an immigration inquiry in a Vehicle Stop Contact Form (VSCF). MCSO stated that this appeared to be an error in the entry, and that the BWC video confirmed there was no inquiry. We reviewed the VSCF, and agree that this was probably a mistake by the deputy. The individual stopped was not a member of the Plaintiffs' class.

WAI 38267

We also received a booking list and a criminal citation list for each month of the reporting period. From each list, we selected a 10% random sample of incidents. In total, we reviewed 56 incidents resulting in arrest and 59 incidents involving criminal citations. In addition, we reviewed 243 Incident Reports for the quarter. All of the documentation we reviewed during this reporting period indicates that MCSO is in compliance with this Paragraph.

**Paragraph 90.** *MCSO Deputies shall submit documentation of all stops and Investigatory Detentions conducted to their Supervisors by the end of the shift in which the action occurred. Absent exceptional circumstances, within 72 hours of receiving such documentation, a Supervisor shall independently review the information. Supervisors shall review reports and forms for Boilerplate or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct. Appropriate disciplinary action should be taken where Deputies routinely employ Boilerplate or conclusory language.*

**Phase 1:** In compliance

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

**Phase 2:** In compliance

We reviewed 35 incidents involving traffic stops for October 2018. There were 17 stops related to speeding, 13 of which resulted in citations and four resulted in warnings. Seven stops related to equipment violations, and six stops were for moving violations other than speeding. Five stops related to registration or license plate violations. Nineteen of the stops resulted in citations, and 15 resulted in warnings. There was no action taken on one stop related to an expired registration. All 35 Vehicle Stop Contact Forms we reviewed noted the serial number of the reviewing supervisor, date, and time of supervisory review. Thirty-four of the 35 VSCFs were reviewed within the required 72 hours. MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 79 VSCFs in October. Supervisors reviewed 76 of the 79 VSCFs within 72 hours, for a compliance rate of 96%.

We reviewed 35 incidents involving traffic stops for November 2018. Twenty of the 35 traffic stops related to speeding. Two stops related to equipment violations. Ten stops involved moving traffic infractions other than speeding. Three stops related to registration or license plate violations. Of the 35 stops, 20 resulted in citations, and 15 resulted in warnings. Supervisors reviewed all 35 VSCFs within 72 hours. For November MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 97 VSCFs. Supervisors reviewed all 97 VSCFs within 72 hours, for a compliance rate of 100%.

We reviewed 35 incidents involving traffic stops for December 2018. Fifteen of the 35 traffic stops involved speeding violations. Five stops related to equipment violations. Ten stops involved traffic violations other than speeding. Five stops related to registration or license plate violations. Of the 35 stops, 14 resulted in citations and 21 resulted in warnings. Thirty-four of the 35 Vehicle Stop Contact Forms we reviewed noted the serial number of the reviewing

WAI 38268

supervisor. For December, MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 232 VSCFs. We reviewed the data and supervisors reviewed 225 of 232 VSCFs within 72 hours, for a 97% compliance rate

For October, we selected all 22 NTCFs generated in the month, to review. All 22 were turned in before the end of the shift, and all NTCFs were reviewed and approved by supervisors within 72 hours, for a 100% compliance rate. For November, we reviewed all 23 NTCFs generated in the month. We inspected all 23 NTCFs, and all were reviewed and approved by supervisors, and all were reviewed within 72 hours. The compliance rate for timely supervisory review for October was 100%. For December, we reviewed all 18 NTCFs generated. Sixteen of the 18 NTCFs were reviewed and approved by supervisors within the required timeframes, for a compliance rate of 89%. In total, we reviewed 63 NTCFs for the quarter. Sixty-one of the 63 NTCFs were reviewed within the required 72 hours, for a compliance rate of 97%. We take into account all stops and detentions, both traffic and non-traffic, when we determine the compliance rate for this Paragraph. The compliance rate for timely reviews of all combined stops and detentions for this reporting period was 97%. For this reporting period, our inspection of the documentation provided has not revealed any evidence of boilerplate or conclusory language, inconsistent or inaccurate information, or lack of articulation, as to the legal basis for stops and detentions.

***Paragraph 91.*** *As part of the Supervisory review, the Supervisor shall document any Investigatory Stops and detentions that appear unsupported by reasonable suspicion or are otherwise in violation of MCSO policy, or stops or detentions that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The Supervisor shall take appropriate action to address all violations or deficiencies in Investigatory Stops or detentions, including recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.*

**Phase 1:** In compliance

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- GF-5 (Incident Report Guidelines), most recently amended on January 4, 2019.

**Phase 2:** Not in compliance

We reviewed traffic stop data reported by MCSO for its October inspection (BI2018-0128). To determine compliance with this Paragraph, for October, the Monitoring Team randomly selected 35 traffic-related events, which BIO then audited for compliance. Of the 35 traffic-related events, MCSO reported that 32 or 91% had no deficiencies. As a result of the inspection, BIO issued three BIO Action Forms. BIO identified two deficiencies that related to the deputies failing to run warrant checks on the drivers. One deficiency related to an incorrect license plate

WAI 38269

number listed on a VSCF.  We reviewed the same traffic-related events, independent of BIO's audits, as part of our compliance assessment for Paragraphs 25 and 54.  In our reviews, we noted nine stops that had errors in the documentation, which should have been addressed by supervisors.

We reviewed a spreadsheet documenting each VSCF by District, for October, to determine if supervisors were reviewing VSCFs within the required 72 hours.  We reviewed data for 79 traffic stops, and determined that supervisors had completed timely reviews in 96% of the cases.  For this month, we requested all NTCFs generated in October.  We reviewed 22 NTCFs to determine if supervisors were reviewing NTCFs within the required 72 hours.  We determined that supervisors had completed timely reviews in 100% of the cases.

For October, we requested a sample of 25 corrective actions generated in the month.  Corrective actions are documented on Blue Team Supervisory Notes.  Of the 25 corrective actions, seven related to body-worn camera and recording issues, including: failure to activate the BWC; late activation of the BWC; turning off the camera before the event was concluded; or poor positioning of the BWC.  Nine corrective actions related to inaccurate or missing information on VSCFs, citations, or written warnings.  Four corrective actions related to procedural or policy violations during traffic stops.  There were no corrective actions related to deputy performance.  One corrective action related to safety procedures during traffic stops.  One corrective action was associated with a technical malfunction, and three corrective actions did not specify the deficiencies found.

We reviewed traffic stop data reported by MCSO for its November inspection (BI2018-0142).  We randomly selected 35 traffic-related events, which BIO then audited for compliance.  The inspection report noted that 31 stops, or 88%, had no deficiencies.  One BIO Action Form was issued for failure to complete the assisting deputy BWC log.  One BIO Action Form related to the vehicle number on the VSCF not matching the information in CAD.  One BIO Action Form was issued for failure to document an additional deputy on the scene of a traffic stop.  We reviewed the same traffic-related events, independent of BIO's audits, as part of our compliance assessment for Paragraphs 25 and 54.  In our reviews, we noted three stops that had errors in the documentation, which should have been addressed by supervisors.

We reviewed a spreadsheet documenting each VSCF by District, for November, to determine if supervisors were reviewing VSCFs within the required 72 hours.  We reviewed 97 VSCFs and determined that supervisors had completed timely reviews in 100% of the cases.  For this month, we requested all NTCFs generated in November.  We reviewed 23 NTCFs to determine if supervisors were reviewing NTCFs within the required 72 hours.  We determined that supervisors had completed timely reviews in 100% of the cases.

WAI 38270

For November, we selected a sample of 25 corrective actions generated in the month. Of the 25 corrective actions, seven related to body-worn camera and recording issues: failure to activate the BWC; late activation of the BWC; turning off the camera before the event was concluded; or poor positioning of the BWC. Nine corrective actions related to inaccurate or missing information on VSCFs, citations, or written warnings. Four corrective actions related to procedural or policy violations during traffic stops. There was one corrective action generated related to technical failures. There was one corrective action generated for a deputy safety issue

We reviewed traffic stop data reported by MCSO for its December inspection (BI2018-0155). We randomly selected 35 traffic-related events, which BIO then audited for compliance. The inspection report noted that 32 stops, or 91%, had no deficiencies. The results indicated a 3% increase in compliance from the November inspection. There were three deficiencies noted and three BIO Action Forms issued. One BIO Action Form was issued as a result of an incomplete form. The second BIO Action Form was issued for an assisting deputy BWC log that was not completed. The third BIO Action Form was issued for failure to complete a warrant check on a driver during a traffic stop. We reviewed the 35 traffic-related events selected by the Monitoring Team for BIO's September inspection, as part of our compliance assessment for Paragraphs 25 and 54. In our reviews, we noted one deficiency that should have been addressed by supervisors.

For December, the Monitoring Team selected a sample of 25 corrective actions to review for the month. Of the 25 corrective actions, 13 related to body-worn camera and recording issues: failure to activate the BWC; late activation of the BWC; turning off the camera before the event was concluded; or poor positioning of the BWC. Five corrective actions related to inaccurate or missing information on VSCFs, citations, or written warnings. One corrective action related to procedural or policy violations involving a traffic stop. There were four corrective actions issued for deputy safety concerns. There was one corrective action generated as a result of a technical malfunction.

We reviewed a spreadsheet documenting each VSCF by District, for September, to determine if supervisors were reviewing VSCFs within the required 72 hours. We reviewed 232 VSCFs and determined that supervisors had completed timely reviews in 97% of the cases. For this month, we requested all NTCFs generated in December. We reviewed 18 NTCFs to determine if supervisors were reviewing NTCFs within the required 72 hours. We determined that supervisors had completed timely reviews in 89% of the cases.

Paragraph 90 requires timely supervisory reviews of documentation pertaining to stops and detentions. Paragraph 91 requires supervisors to identify policy violations, deficiencies, and training issues noted in stops and detentions. Of the 105 stops inspected for this reporting period, the documentation for 13 of the stops had deficiencies that supervisors failed to identify during their reviews. This is a compliance rate of 88%. Although not sufficient to attain compliance, Patrol supervisors are improving the thoroughness of their reviews.

WAI 38271

*Paragraph 92.  Supervisors shall use EIS to track each subordinate's violations or deficiencies in Investigatory Stops or detentions and the corrective actions taken, in order to identify Deputies needing repeated corrective action.  Supervisors shall notify IA.  The Supervisor shall ensure that each violation or deficiency is documented in the Deputy's performance evaluations.  The quality and completeness of these Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations.  MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct complete, thorough, and accurate reviews of Deputies' stops and Investigatory Detentions.*

**Phase 1:**  In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

**Phase 2:**  Not in compliance

MCSO does not yet have an audit process for NTCFs.  District command personnel have continued to improve how they identify incomplete alert investigations, but there is still no report on alert investigations and the tracking of outcomes or interventions.  During our January site visit, MCSO advised us that the agency is working on a solution, which BIO hopes to have in place by the second quarter of 2019.

*Paragraph 93.   Absent extraordinary circumstances, MCSO Deputies shall complete all incident reports before the end of shift.  MCSO field Supervisors shall review incident reports and shall memorialize their review of incident reports within 72 hours of an arrest, absent exceptional circumstances.*

**Phase 1:**  In compliance

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

- GF-5 (Incident Report Guidelines), most recently amended on January 4, 2019.

**Phase 2:**  In compliance

We reviewed a representative sample of 57 Incident Reports for October 2018**,** for the randomly selected date of October 13, 2018.  The sample of 57 Incident Reports included nine Vehicle Crash Reports.  Of the 48 Incident Reports, not related to vehicle crashes, all were turned in by the end of the shift and reviewed by supervisors within the required timeframes.  MCSO submits a separate spreadsheet documenting vehicle crash reviews.  We confirmed supervisory review and approval on all nine Vehicle Crash Reports.  All of the 57 reports we inspected had timely documentation of supervisory review.  The compliance rate for October was 100%.  All five Incident Reports involving arrests and criminal citations were reviewed by supervisors and approved, or reviewed and returned for corrections within the required 72 hours.  We conducted a quality review on a 10% random sample of the reports.  We noted three reports with spelling and grammar deficiencies.

WAI 38272

We reviewed a representative sample of 83 Incident Reports for November 2018, for the randomly selected date of November 13, 2018. Of the 83 reports submitted, there were 18 Vehicle Crash Reports. We confirmed supervisory review on all vehicle crash reports. Of the remaining 74 Incident Reports, we confirmed timely supervisory review on 73 of the reports. In total, 82 of 83 Incident Reports for the selected date included documentation of timely supervisory review. The compliance rate for timely supervisory reviews of Incident Reports was 99%. We conducted a quality review on a 10% random sample of the reports we reviewed. For the reports we reviewed for November we did not find any issues of concern.

We reviewed a representative sample of 103 Incident Reports for December, for the randomly selected date of December 6, 2018. Of the 103 Incident Reports, 22 were Vehicle Crash Reports. We confirmed timely supervisory reviews of all Vehicle Crash Reports for the selected date. Of the remaining 81 Incident Reports, we confirmed timely supervisory reviews on 102 of the 103 reports. One Incident Report was not submitted before the end of the shift. One Incident Report appeared to be missing words in the narrative. We found 100 of 103 reports in compliance, for a compliance rate of 97%. All 15 Arrest Reports were reviewed and approved by supervisors within 72 hours. We conducted a quality review on a 10% random sample. Other than the report mentioned, the rest of the reports had no significant errors or deficiencies.


***Paragraph 94.*** *As part of the Supervisory review, the Supervisor shall document any arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The Supervisor shall take appropriate action to address violations or deficiencies in making arrests, including notification of prosecuting authorities, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.*

**Phase 1:** In compliance

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.
- GF-5 (Incident Report Guidelines), most recently amended on January 4, 2019.

**Phase 2:** Not in compliance

WAI 38273

To determine compliance with this Paragraph, we review documentation related to arrests where MCSO found deficiencies and took corrective action, which are documented in Incident Memorialization Forms (IMFs), and arrests where the Maricopa County Attorney's Office (MCAO) declined prosecution.  The Maricopa County Attorney's Office generally does not provide specific details as to the reason arrests cases are declined for prosecution.  For each arrest where MCAO declined prosecution, and no specific reasons are provided, there must be an inquiry to determine if the cause of the rejection was due to lack of probable cause, if there was a violation of MCSO policy, or there is a need for corrective action or review of MCSO policy, strategy, tactics, or training.  If the rejection was related to any of these factors, we look for the supervisor's comments and any corrective action taken.  We also review the BIO inspection reports associated with MCAO turndowns.

For this reporting period, we received eight Incident Memorialization Forms (IMFs).  Three of the eight were previously reviewed in our status report for the third quarter, so the review for this reporting period is for the remaining five IMFs.  The first IMF pertained to an arrest where detectives entered a suspect's residence to affect the arrest.  Detectives had enough probable cause to make an arrest for burglary.  However, it was determined that the individual had a reasonable expectation of privacy and detectives should have secured an arrest warrant.  The second IMF involved a vehicle crash where the deputy lacked probable cause to issue a criminal citation.  After intervention by the supervisor, the deputy filed a motion to dismiss the citation.  This deputy has had other issues and is a participant in an action plan.  The third IMF resulted from a commander's review of an arrest.  The commander noted that there were concerns with the quality of the investigation and that there was lack of probable cause for the arrest.  The deputy is a relatively new deputy who just completed Field Training.  An EIS alert was generated for the deputy.  The supervisor was also found to have not carried out his responsibilities overseeing this incident.  An internal investigation was initiated, and the supervisor's actions are pending further administrative review by PSB.  The fourth IMF was generated by MCSO after receiving a letter from MCAO declining prosecution on the arrest.  The commander's review concluded that the deputy failed to articulate sufficient probable cause for the arrest, and failed to submit other required documents with the case.  The commander noted that the supervisor failed to note the deficiency when he approved the Arrest Report, and failed to note the deficiency when reviewing the MCAO turndown notice.  The fifth IMF we reviewed was related to a case that was submitted to the Maricopa County Attorney's Office for prosecution, but was rejected due to no likelihood of conviction.  The case involved a violation of a court order; this was a submittal, not an arrest.  The documents MCSO submitted for our review of this case pertained to a vehicle crash report that was unrelated.  There was minimal documentation on the IMF as to any corrective action.

For this reporting period we reviewed three County Attorney Dispositions inspection reports.  We reviewed the summaries for the non-compliance deficiencies and noted that there were several deficiencies related to lack of articulation for probable cause for charging individuals with violations of state statues, and there were several violations of policies and procedures.  The BIO inspection methodology lists lack of probable cause as an irreversible error.  The

WAI 38274

methodology also lists the other type of deficiencies BIO looks for, that fall outside the scope of the inspection: violations of policy, serious report writing deficiencies that contain conclusory or boilerplate language, inconsistent or missing information, lack of articulation of the legal basis for action, lack of articulation of probable cause for arrest, cite or submittal, and lack of elements of the crime(s) charged.   We recommend that these deficiencies, labeled "non-compliance deficiencies," be part of the scope of the inspection, and factored into the total for a more accurate finding, as they relate to Paragraphs 75.i., 94, and 96.   These are the types of deficiencies that field supervisors should be noting and correcting, and deficiencies that fall within the scope of the mentioned Paragraphs.   In addition, we suggest that MCSO clarify the inspection protocol with regard to lack of probable cause.   Lack of probable cause is listed as an irreversible error, and failure to articulate probable cause is listed as a non-compliance deficiency outside the scope of the inspection.

We reviewed the inspection report for County Attorney Dispositions for September (BI2018-0110).   BIO reviewed 20 of 138 dismissals of criminal cases from the Maricopa County Justice Courts and 70 cases from the Maricopa County Superior Court.   BIO notes that the focus of the inspection is the identification of irreversible errors.   For the September inspection, MCSO found one irreversible error and 16 non-compliance deficiencies outside of the scope of the inspection.   The inspection resulted in a 99% compliance rating.   The irreversible error related to a burglary arrest that lacked articulation for the charges listed on the Arrest Report.   The report was also found to have conclusory language.   A BIO Action Form was issued for this case.   With regard to the 16 non-compliance deficiencies noted, BIO issued 16 BIO Action Forms to Patrol Divisions.   We reviewed the 16 cases associated with these deficiencies and determined that 13 were arrests that applied to the requirements of this Paragraph.   When factored into the formula, in addition to the irreversible error, 76 of 90 cases were in compliance.   The compliance rate, as it pertains to the requirements of Paragraph 94, was 85%.

In addition to assessing compliance through BIO's inspections, we review a sample of cases in which MCAO declines prosecution.   For October, we requested 22 cases.   We found that all 22 cases were in compliance with this Paragraph.

We reviewed the inspection report for County Attorney Dispositions for October (BI2018-0124).   BIO reviewed 20 of 131 dismissals, from the Justice Courts, and 64 dismissals from the Superior Court.   The inspection found no irreversible errors and 21 deficiencies outside of the scope of the inspection.   The inspection resulted in a 100% compliance rating.   We reviewed the non-compliance deficiencies found by BIO in this inspection.   We reviewed the 21 cases associated with these deficiencies and determined that 12 cases were arrests that fall within the requirements of this Paragraph.   When factored into the formula, considering a total of 84 cases, 72 cases were in compliance.   The compliance rate, as it pertains to the requirements of Paragraph 94, was 86%.

WAI 38275

In addition to the above, for October, we reviewed 16 cases in which the Maricopa County Attorney's Office declined prosecution. We found 15 of the 16 cases had appropriate comments by supervisors regarding their investigation as to the reason cases were rejected by MCAO, and action taken. One Blue Team Turndown Notice Report had insufficient documentation by the supervisor. The compliance rate for the October cases was 94%.

We reviewed the inspection report for County Attorney Dispositions for November (BI2018-0138). BIO reviewed 20 of 81 dismissals from the Justice Courts, and 61 dismissals from the Superior Court. The inspection found two irreversible errors and 18 deficiencies outside of the scope of irreversible errors. The inspection report noted a compliance rate of 97.53%. BIO issued 17 BIO Action Forms as a result of the inspection. The compliance deficiencies listed were related to lack of probable cause for charges and violations of policy. BIO noted that common issues found in the inspection were weak or lack of articulation for probable cause for the submitted charges; failure to provide property receipts when seizing property; weak or incomplete investigations resulting from not interviewing suspects, victims, and witnesses; and inconsistent or inaccurate information provided in reports, supplements, and other forms. We reviewed the cases associated with the non-compliance deficiencies and determined that 10 of the 18 cases were arrests that fall within the scope of this Paragraph. When factored into the formula, in addition to the two irreversible errors, 69 of 81 cases were in compliance. The compliance rate, as it pertains to the requirements of Paragraph 94, was 85%.

For November, we reviewed 13 cases from the Superior Court, in which the County Attorney's Office declined prosecution. We found that 10 of the 13 cases were in compliance with the requirements of this Paragraph. In three cases, there was no documentation by supervisors to explain the results of their investigation as to why the cases were rejected. Compliance for the sample of November cases was 77%.

Based on our reviews of 51 cases for this quarter, independent of BIO's reviews, we found the documentation in 47 cases in compliance with the requirements of this Paragraph, for a compliance rate of 92%. We reviewed the cases inspected by BIO for September, October, and November, and based on our reviews of their inspections, the compliance rates for the inspections were 85%, 86%, and 85%, respectively. We commend BIO for the thoroughness of their inspection process and their recommendations regarding the noted deficiencies. Their findings indicate that a number of deficiencies are related to lack of articulation of probable cause, policy violations, and training issues, as it pertains to the requirements of this Paragraph. These deficiencies are slipping through unaddressed by the supervisory review process. MCSO has now been out of compliance with this Paragraph for two consecutive quarters; we must therefore withdraw compliance for the fourth quarter.

WAI 38276

*Paragraph 95.  Supervisors shall use EIS to track each subordinate's violations or deficiencies in the arrests and the corrective actions taken, in order to identify Deputies needing repeated corrective action.  The Supervisor shall ensure that each violation or deficiency is noted in the Deputy's performance evaluations.  The quality of these supervisory reviews shall be taken into account in the Supervisor's own performance evaluations, promotions, or internal transfers. MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct reviews of adequate and consistent quality.*

**Phase 1:**  In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

**Phase 2:**  Not in compliance

The Employee Performance Appraisals completed for this reporting period, discussed in detail under Paragraph 87, did not meet the requirements of this Paragraph.  MCSO has not yet developed a methodology that will document MCSO's verification of compliance for this Paragraph.  MCSO does not have an audit process for Non-Traffic Contact Forms (NTCFs). District command personnel have improved how they identify incomplete alert investigations, but there is still no report on alert investigations and the tracking of outcomes or interventions. During our January site visit, BIO personnel advised us that MCSO is working on a solution, which BIO hopes to have in place by the second quarter of 2019.

*Paragraph 96.  A command-level official shall review, in writing, all Supervisory reviews related to arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training.  The commander's review shall be completed within 14 days of receiving the document reporting the event.  The commander shall evaluate the corrective action and recommendations in the Supervisor's written report and ensure that all appropriate corrective action is taken.*

**Phase 1:**  In compliance

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

**Phase 2:**  Not in compliance

Our methodology for reviews of documentation provided as proof of compliance with Paragraphs 94 and 96 has been modified, as of our last report.  For compliance with this Paragraph, we review the cases submitted for Paragraph 94, to assess if command review is occurring within 14 days of the supervisors' submissions, and to ensure the commander evaluates corrective actions taken in cases where deficiencies are noted.

WAI 38277

This Paragraph requires that a command-level official review a supervisor's investigation of the circumstances pertaining to any arrest that lacks probable cause; is in violation of policy; or where there is a need for corrective action or review of the agency's policy, strategy, tactics, or training. We review cases documented in Incident Memorialization Forms, and we review cases in which the Maricopa County Attorney's Office declines prosecution. The Maricopa County Attorney's Office (MCAO) generally does not provide specific details as to the reason arrests cases are declined for prosecution. For each arrest where MCAO declined prosecution, and no specific reasons are provided, there must be an inquiry to determine if the cause of the rejection was due to any of the factors listed above. If the rejection was related to any of these factors, we look for the supervisor's comments related to the investigation, and any corrective action taken. To verify compliance with this Paragraph, we review the cases submitted for Paragraph 94, to determine if there was Command review of the supervisor's investigation within 14 days of the supervisor's submission, and if the commander evaluated any corrective actions that resulted from deficiencies.

For this reporting period, we received eight Incident Memorialization Forms (IMFs). Three of the eight were previously reviewed in our last quarterly status report, so our review for this quarter is for the remaining five IMFs. Command personnel reviewed all five IMFs submitted for the period in review, within the required 14 days. The only issue noted was related to an error in the documentation submitted with one IMF. We saw no other issues of concern with the IMFs. For September, we reviewed 22 MCAO Turndown Notice Reports. Of the 22 reports, we confirmed command review within 14 days, as required by this Paragraph, of 20 of the 22 cases. For October, we reviewed 16 MCAO Turndown Notice Reports. Of the 16 reports, we confirmed command review within 14 days, in 14 of the 16 cases reviewed. For December, we reviewed 13 MCAO Turndown Notice Reports. Of the 13 cases, we confirmed that nine cases met the requirements of this Paragraph. Based on our reviews of the documentation provided, there were 43 of 51 cases in compliance with Paragraph 96, for a compliance rate of 84%. For the period in review, MCSO was not in compliance.

**Paragraph 97.** *MCSO Commanders and Supervisors shall periodically review the EIS reports and information, and initiate, implement, or assess the effectiveness of interventions for individual Deputies, Supervisors, and units based on that review. The obligations of MCSO Commanders and Supervisors in that regard are described above in Paragraphs 81(c)–(h).*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:** Not in compliance

WAI 38278

As per GH-5 (Early Identification System) and GB-2 (Command Responsibility), supervisors are required to conduct EIS reviews twice per month for sworn members. Command review of EIS profiles of supervisory and command personnel began in February 2017. Review of broader pattern-based reports, as required by Paragraph 81.c., and assessments of interventions as required by this Paragraph, has not been sufficiently documented to meet compliance with this Paragraph. The requirement described in Paragraph 81.c. is covered in GH-5, under "Command Staff Responsibilities."

Consistent with our methodology, for every month of the quarter, we selected a supervisor and a squad of deputies from each District. We then reviewed the documentation provided as verification of compliance with this Paragraph. We also requested that EIS reviews of the commanders responsible for the selected personnel be included. For October, we reviewed the documentation provided for 56 employees – which included the ranks of deputy, sergeant, lieutenant, and captain. Of the 56 employees, 50 had the required two EIS reviews in the month, for an 89% compliance rate. For September, we reviewed Supervisory Notes requested as verification of compliance for 53 employees. Of the 53 selected employees, 46 had appropriate documentation of the required EIS reviews, for a compliance rate of 87%. For December, we received Supervisory Notes as verification of compliance of EIS reviews for the selected 53 employees. Of the 53 employees, 47 had appropriate documentation of compliance with this Paragraph, for a compliance rate of 89%. The total compliance rate for the quarter was 88%.

During this reporting period, MCSO did not yet have a methodology for capturing the requirements of Paragraphs 81(c)–(h). We discussed the assessment of interventions and the formulation of broader pattern-based reports with MCSO during our January site visit. MCSO continues to work on attaining compliance. We have reviewed Section 302 of the EIS Operations Manual and returned it with comments. During our January site visit, we were advised that the procedure for EIS alert notification and intervention has been modified, but remains under development.

### d. Regular Employee Performance Review and Evaluations

*Paragraph 98.* *MCSO, in consultation with the Monitor, shall create a system for regular employee performance evaluations that, among other things, track each officer's past performance to determine whether the officer has demonstrated a pattern of behavior prohibited by MCSO policy or this Order.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

**Phase 2:** Not in compliance

WAI 38279

Employee Performance Appraisal Training was completed during the third quarter of 2017, and the new EPA format was initiated on September 1, 2017. MCSO attained compliance with Paragraph 100 in the second quarter, but did not meet compliance requirements for Paragraph 100 during the third or fourth quarter; we withdrew Phase 2 compliance for Paragraph 100. Our reviews of EPAs are discussed in detail in Paragraph 87. The great majority of non-compliant EPAs are supervisors' EPAs. Of the 47 EPAs reviewed for this reporting period, 39 were in compliance. The compliance rating for the period in review was 83%. MCSO did not meet the requirements of this Paragraph during this reporting period.

*Paragraph 99. The review shall take into consideration all past Complaint investigations; the results of all investigations; Discipline, if any, resulting from the investigation; citizen Complaints and commendation; awards; civil or administrative claims and lawsuits related to MCSO operations; Training history; assignment and rank history; and past Supervisory actions taken pursuant to the early warning protocol.*

**Phase 1:**  In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

**Phase 2:**  Not in compliance

For this reporting period, we reviewed Employee Performance Appraisals for 17 deputies and 30 supervisors. Of the 17 deputies' appraisals, 14 were in compliance with the requirements of Paragraph 99. Of the 30 supervisors' appraisals, 26 were in compliance with this Paragraph. Supervisors and commanders have been more attentive to the requirements of Paragraph 99, and we have seen an increase in the number of EPAs that address all the requirements of this Paragraph. However, there were EPAs in this reporting period where the raters only addressed complaints.

*Paragraph 100. The quality of Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations.*

**Phase 1:**  In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

**Phase 2:**  Not in compliance

We reviewed Employee Performance Appraisals for 30 supervisors and commanders who received EPAs during this reporting period. All of the 30 of the appraisals rated the quality and effectiveness of supervision. Eighteen of the 30 appraisals contained comments and/or rated the supervisors' demonstrated ability to identify and effectively respond to misconduct. Twenty-three of the 30 appraisals addressed the requirements of this Paragraph, as it pertains to the

WAI 38280

quality of supervisory reviews. MCSO had achieved compliance with this Paragraph in the second quarter. MCSO was not in compliance with this Paragraph in the third quarter, and was not in compliance in the fourth quarter. We have noted inconsistencies in the quality and thoroughness of EPAs, as it relates to Order requirements. Many commanders appropriately document events that occurred during the rating period, but they fail to address all required areas of assessment. During our January site visit, MCSO personnel advised us that a new EPA process would be in place in the second quarter of 2019. We recommend that training for the new process address inconsistencies regarding the completion of EPAs.

**Paragraph 101.** *Within 180 days of the Effective Date, MCSO shall develop and implement eligibility criteria for assignment to Specialized Units enforcing Immigration-Related Laws.*

*Such criteria and procedures shall emphasize the individual's integrity, good judgment, and demonstrated capacity to carry out the mission of each Specialized Unit in a constitutional, lawful, and bias-free manner. Deputies assigned to a Specialized Unit who are unable to maintain eligibility shall be immediately re-assigned.*

**In Full and Effective Compliance**

MCSO does not have any specialized units that enforce immigration-related laws. Therefore, by default, MCSO is in Phase 2 compliance with this Paragraph. We continue to monitor arrests and detentions as part of our review process to ensure that MCSO is in compliance with its own directives on this issue.

For October, November, and December, we received lists containing all incidents involving MCSO arrests and criminal citations. For each month, we requested a random sample of arrests and criminal citations. In total, we reviewed 56 incidents involving arrests and 59 incidents involving criminal citations. We also reviewed a random sample of 243 Incident Reports for this reporting period. We found no evidence of enforcement of immigration-related laws.

During this reporting period, on December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, the Monitor concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with the Monitor's determination.

WAI 38281

## Section 10: Misconduct and Complaints

**COURT ORDER XI.  MISCONDUCT AND COMPLAINTS**

### a. Internally-Discovered Violations

***Paragraph 102.*** *MCSO shall require all personnel to report without delay alleged or apparent misconduct by other MCSO Personnel to a Supervisor or directly to IA that reasonably appears to constitute: (i) a violation of MCSO policy or this Order; (ii) an intentional failure to complete data collection or other paperwork requirements required by MCSO policy or this Order; (iii) an act of retaliation for complying with any MCSO policy; (iv) or an intentional provision of false information in an administrative investigation or any official report, log or electronic transmittal of information. Failure to voluntarily report or document apparent misconduct described in this Paragraph shall be an offense subject to Discipline.*

**Phase 1:**  In compliance

- CP-2 (Code of Conduct), most recently amended on March 15, 2019.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on January 24, 2019.

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

**Phase 2:**  In compliance

During our assessments of compliance with this Paragraph, we have reviewed hundreds of misconduct investigations involving MCSO personnel.  Many of them have been internally generated.

During this reporting period, we reviewed 56 administrative misconduct investigations.  Ten of these were internally generated.  Four involved sworn personnel and six involved Detention personnel.

MCSO has continued to identify and address misconduct that is raised by other employees or observed by supervisory personnel.  While some of these investigations did not meet all requirements for the proper reporting or completion of misconduct investigations, we address these failures in other Paragraphs in this report.

WAI 38282

### b. Audit Checks

*Paragraph 103.  Within one year of the Effective Date, MCSO shall develop a plan for conducting regular, targeted, and random integrity audit checks to identify and investigate Deputies possibly engaging in improper behavior, including: Discriminatory Policing; unlawful detentions and arrests; improper enforcement of Immigration-Related Laws; and failure to report misconduct.*

**Phase 1:**  Not in compliance

- Audits and Inspections Unit Operations Manual, Section 303, currently under revision.
- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

**Phase 2:**  Not in compliance

MCSO established the Audits and Inspections Unit (AIU), a unit of the Bureau of Internal Oversight (BIO), to take responsibility for these requirements.  AIU continues to develop an Operations Manual that will outline how the AIU will fulfill the "targeted" Paragraph 103 requirements.  We and the Parties provided comments on different versions of the relevant section of the manual, and currently await the next iteration from MCSO.

During our last few site visits, AIU personnel have reported that the Unit's main priority is completing the AIU Operations Manual.  We will inquire with AIU as to its progress on this manual during our upcoming site visit.

While the review process of the operations manual is still underway, for this reporting period, BIO again submitted several completed inspections in support of the "regular" and "random" elements of this Paragraph.  The inspections examined, for example, Supervisory Notes, Patrol Activity Logs, Traffic Stop Discussions, County Attorney turndown dispositions, Patrol Shift Rosters, and employee email usage.  We reviewed these reports and believe that they comport with the Paragraph 103 requirement for "regular" and "random" integrity audit checks.

### c. Complaint Tracking and Investigations

*Paragraph 104.  Subject to applicable laws, MCSO shall require Deputies to cooperate with administrative investigations, including appearing for an interview when requested by an investigator and providing all requested documents and evidence.  Supervisors shall be notified when a Deputy under their supervision is summoned as part of an administrative investigation and shall facilitate the Deputy's appearance, absent extraordinary and documented circumstances.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

WAI 38283

In the fall of 2015, MCSO developed a draft checklist and investigative format for administrative investigations. All of the requirements in this Paragraph are included in these protocols. The checklist and formats were approved for use in early 2016, and all personnel through the rank of captain were required to attend a training session regarding the use of these forms. Effective June 1, 2016, all administrative investigations were required to use these forms. MCSO has consistently met this requirement, and MCSO has included the checklists in administrative investigations forwarded for our review.

The Professional Standards Bureau (PSB) drafted revisions to the investigation checklist and format to provide additional clarification on procedural requirements. We and the Parties reviewed the revisions and provided our feedback. The revised format and investigation checklist have been approved for use. The Misconduct Investigative Training for personnel outside of PSB included a discussion of the revisions to these forms.

During this reporting period, we reviewed 56 administrative misconduct investigations. Forty-one involved sworn MCSO personnel. All were completed after June 20, 2016 and included the use of an approved investigative format and checklist. We continue to note that deputies consistently appear for scheduled interviews, provide all required information to investigators, and cooperate with investigations. There were no instances where a supervisor failed to facilitate a deputy's attendance at a required interview.

**Paragraph 105.** *Investigators shall have access to, and take into account as appropriate, the collected traffic stop and patrol data, Training records, Discipline history, and any past Complaints and performance evaluations of involved officers.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

Our reviews of investigations conducted by MCSO have verified that the information required for compliance with this Paragraph is consistently provided in the checklist and investigative reports.

As a result of the Second Order and effective July 20, 2016, the PSB Commander makes all preliminary disciplinary decisions. The PSB and Compliance Bureau Commanders created a worksheet that provides information regarding how MCSO makes disciplinary decisions, and how MCSO considers employees' work history. PSB includes this form in the sustained investigation documentation that we receive and review for compliance.

During our reviews for this reporting period, we reviewed 15 sustained administrative misconduct investigations. Nine involved misconduct by sworn personnel, and six involved misconduct by Detention personnel. Eleven of the 15 investigations involved personnel still employed by MCSO at the time final findings and discipline decisions were made. In all of these 11 cases, the PSB Commander determined the findings and presumptive discipline range

WAI 38284

for the sustained violations.  We found these preliminary decisions to be consistent with the Discipline Matrices in effect at the time the decisions were made.  We also found that generally, where appropriate, discipline history, past complaints, performance evaluations, traffic stop and patrol data, and training records were included in the documents considered for final discipline findings.

**Paragraph 106.**  *Records of Complaints and investigations shall be maintained and made available, un-redacted, to the Monitor and Plaintiffs' representatives upon request.   The Monitor and Plaintiffs' representatives shall maintain the confidentiality of any information therein that is not public record.  Disclosure of records of pending investigations shall be consistent with state law.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

MCSO has two obligations under this Paragraph: to maintain and make records available.  The Paragraph also covers the requirement that MCSO make unredacted records of such investigations available to the Plaintiffs' attorneys and Plaintiff-Intervenors as well.

MCSO has been responsive to our requests, and neither the Plaintiffs nor Plaintiff-Intervenors have raised any concerns related to the requirements of this Paragraph for this or the past several reporting periods.  MCSO, via its counsel, distributes responses to our document and site visit requests via a document-sharing website.  The Plaintiffs' attorneys and Plaintiff-Intervenors have access to this information, including documents applicable to this Paragraph, at the same time as we do.

WAI 38285

## Section 11: Community Engagement

**COURT ORDER XII.  COMMUNITY ENGAGEMENT**

### a. Community Outreach Program

***Paragraph 107.*** *To rebuild public confidence and trust in the MCSO and in the reform process, the MCSO shall work to improve community relationships and engage constructively with the community during the time that this order is in place.  To this end, the MCSO shall conduct the following district community outreach program.*

***Paragraph 109.*** *As part of its Community Outreach and Public Information program, the MCSO shall hold at least one public meeting per quarter to coincide with the quarterly site visits by the Monitor in a location convenient to the Plaintiffs class.  The MCSO shall consult with Plaintiffs' representatives and the Community Advisory Board on the locations of the meetings.  These meetings shall be used to inform community members of the policy changes or other significant actions that the MCSO has taken to implement the provisions of this Order.  Summaries of audits and reports completed by the MCSO pursuant to this Order shall be made available.  The MCSO shall clarify for the public at these meetings that it does not enforce immigration laws except to the extent that it is enforcing Arizona and federal criminal laws.*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

**Phase 2:**  In compliance

This Paragraph, per the August 3, 2017 Amendments to the Supplemental Permanent Injunction/Judgment Order (Document 2100), directs MCSO to conduct a District community outreach program.  More specifically, it requires that MCSO hold at least one public meeting per quarter to coincide with the quarterly site visits by the Monitor in a location convenient to the Plaintiffs' class.  This Paragraph requires MCSO to consult with Plaintiffs' representatives and the Community Advisory Board (CAB) on the location of the meetings, and to inform community members at the meetings of the policy changes or other significant actions that MCSO has taken to implement the provisions of the Order.  The Order also requires that MCSO provide summaries of audits and reports completed by MCSO pursuant to this Order and that MCSO clarify for the public at these meetings that it does not enforce immigration laws except to the extent that it is enforcing Arizona and federal criminal laws.

MCSO held a public meeting coinciding with our January 2019 site visit at Eliseo C. Felix Elementary School in Goodyear in MCSO Patrol District 2.  MCSO consulted with Plaintiffs' representatives and the CAB on the meeting location, as required.  There were approximately 10 community members in attendance.  The meeting was held on Tuesday, January 15, 2019 at

WAI 38286

8:45 a.m. and was the first quarterly community meeting held in the morning, rather than the evening.  An MCSO District 2 representative welcomed the attendees and introduced Sheriff Penzone.  Sheriff Penzone stated that MCSO does not enforce immigration laws except to the extent that it is enforcing Arizona state and federal criminal laws.  He also stated that MCSO is actively recruiting qualified individuals.  The Sheriff then opened the meeting up for comments and questions.

An MCSO representative introduced two members of the Community Advisory Board (CAB), one of whom addressed the audience.  He explained that the CAB is an independent committee established by the Court to facilitate regular dialogue between MCSO and the community and to provide recommendations to MCSO about policies and practices that will increase community trust.  He stated that MCSO has an established complaint process and is open to requests and information that help build community trust.  The MCSO representative also introduced the ACLU of Arizona and the Monitoring Team.

MCSO prepared an informative bilingual brochure that was available on a display table in the rear of the meeting room.   The brochure contained contact information for the MCSO Community Outreach Division, contact information for PSB to register comments or complaints with MCSO, and information about the MCSO website.  The brochure also contained a list of four policies relevant to the Court Orders that were reviewed and published since the last quarterly community meeting, and a chart reflecting MCSO compliance with the Orders.  While the brochure contained useful information, MCSO personnel did not include or address its contents in the MCSO presentation.  We recommend, at future quarterly community meetings, that MCSO personnel distribute copies of the handout to attendees as they enter and share its contents at the beginning of the meeting.

***Paragraph 110.***  *The meetings present an opportunity for MCSO representatives to listen to community members' experiences and concerns about MCSO practices implementing this Order, including the impact on public trust.  MCSO representatives shall make reasonable efforts to address such concerns during the meetings and afterward as well as explain to attendees how to file a comment or complaint.*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

**Phase 2:**  In compliance

WAI 38287

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program. This Paragraph, among the provisions of Document 2100, requires that MCSO's quarterly community meetings present an opportunity for MCSO representatives to listen to community members' experiences and concerns about MCSO practices implementing the Order; and that MCSO representatives make reasonable efforts to address such concerns during the meetings and afterward as well as explain to attendees how to file a comment or complaint.

As noted above, during this reporting period, MCSO held a public meeting coinciding with our January 2019 site visit, on January 15, 2019 at Eliseo C. Felix Elementary School in Goodyear in MCSO Patrol District 2. MCSO consulted with Plaintiffs' representatives and the CAB on the meeting location, as required. The meeting was held at 8:45 a.m., and was the first quarterly meeting held in the morning, rather than the evening. There were approximately 10 community members in attendance. As required, MCSO provided an opportunity for community members to communicate with MCSO regarding their experiences and concerns about MCSO practices in implementing the Order and explained to the attendees how to file a complaint. A community member introduced herself as someone who has recently been disappointed in MCSO because her daughter, a Latina, was an alleged victim of racial profiling when two Cave Creek deputies ignored her request for assistance from the domestic violence she was experiencing. The community member stated that her daughter's husband, who is White, is friendly with many deputies in the District. Sheriff Penzone thanked the community member for having the courage to share her story, and gave her the opportunity to provide the information to an MCSO employee at the meeting. Sheriff Penzone stated that the incident discussed by the community member was currently under investigation by PSB.

**Paragraph 111.** *English and Spanish-speaking MCSO Personnel shall attend these meetings and be available to answer questions from the public. At least one MCSO supervisor with extensive knowledge of the agency's implementation of the Order, as well as an MCSO Community Liaison, shall participate in the meetings. The Monitor, Plaintiffs' and Plaintiff-Intervenor's representatives shall be invited to attend and MCSO shall announce their presence and state their availability to answer questions.*

**Phase 1:** In compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.
- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:** In compliance

WAI 38288

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program.  This Paragraph, among the provisions of Document 2100, requires that both English- and Spanish-speaking MCSO personnel attend MCSO's quarterly community meetings; at least one MCSO supervisor with extensive knowledge of the agency's implementation of the Order participate in these meetings; and that MCSO invite the Monitor, Plaintiffs' and Plaintiff-Intervenors' representatives to attend the meeting, and announce their presence and state their availability to answer questions.

As noted above, during this reporting period, MCSO held a public meeting coinciding with our January 2019 site visit, on January 15, 2019 at Eliseo C. Felix Elementary School in Goodyear in MCSO Patrol District 2.  There were approximately 10 community members in attendance.  MCSO provided Spanish interpretation using interpretation listening devices provided by MCSO.

Several MCSO personnel, including MCSO's Spanish-speaking Community Liaison Officer, participated in and attended the meeting play instrumental roles in the implementation of the Orders.  In addition, the Monitoring Team and representatives of the ACLU of Arizona, the Plaintiff-Intervenors, and the CAB were invited to attend.  An MCSO representative announced the presence of the Monitoring Team, the ACLU of Arizona, and the CAB, and stated their availability to answer questions.  (The Plaintiff-Intervenors did not attend.)


***Paragraph 112.***  *At least ten days before such meetings, the MCSO shall widely publicize the meetings in English and Spanish after consulting with Plaintiffs' representatives and the Community Advisory Board regarding advertising methods.  Options for advertising include, but are not limited to, television, radio, print media, internet and social media, and any other means available.  If any party determines there is little interest or participation in such meetings among community members, or that they have otherwise fulfilled their purpose, it can file a request with the Court that this requirement be revised or eliminated.*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:**  In compliance

WAI 38289

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program. This Paragraph, among the provisions of Document 2100, requires that MCSO widely publicize, in English and Spanish, its quarterly community meetings at least 10 days before such meetings and after consulting with Plaintiffs' representatives and the CAB regarding advertising methods.

As noted above, during this reporting period, MCSO held a public meeting coinciding with our January 2019 site visit. As required, MCSO consulted with the CAB and the ACLU of Arizona regarding the advertisement in local radio and print media in English and Spanish – as well as on the site selection, agenda creation, and meeting logistics. Members of the Monitoring Team also participated in discussions with MCSO regarding preparations for the public meeting.

MCSO's selection of the venue for the meeting was based on accessibility, adequate meeting space, adequate parking, and ease in locating the meeting site. MCSO publicized the meeting with advertisements in both English and Spanish print media. MCSO also ran radio spots in Spanish and English, and distributed flyers in the vicinity of the meeting venue.

### b. MCSO Community Liaison

**Paragraph 113.** *MCSO shall select or hire a Community Liaison who is fluent in English and Spanish. The hours and contact information of the MCSO Community Outreach Division ("COD") shall be made available to the public including on the MCSO website. The COD shall be directly available to the public for communications and questions regarding the MCSO.*

**Phase 1:** In compliance

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:** In compliance

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program. This Paragraph, among the provisions of Document 2100, requires that MCSO select or hire a Community Liaison who is fluent in English and Spanish; and that MCSO post on its public website the hours and contact information of the Community Outreach Division (COrD), which is responsible for public communications and questions regarding MCSO.

MCSO has a Community Liaison who is fluent in English and Spanish, and lists on the MCSO website the hours and contact information for the Community Liaison Officer and other members of the COrD. The MCSO website includes information about the COrD – such as its mission and frequently asked questions regarding MCSO.

WAI 38290

*Paragraph 114.    The COD shall have the following duties in relation to community engagement:*

a.    *to coordinate the district community meetings described above in Paragraphs 109 to 112;*

b.    *to provide administrative support for, coordinate and attend meetings of the Community Advisory Board described in Paragraphs 117 to 118; and*

c.    *to compile any complaints, concerns and suggestions submitted to the COD by members of the public about the implementation of this Order and the Court's order of December 23, 2011, and its findings of fact and conclusions of law dated May 24, 2013, even if they don't rise to the level of requiring formal action by IA or other component of the MCSO, and to respond to Complainants' concerns; and*

d.    *to communicate concerns received from the community at regular meetings with the Monitor and MCSO leadership.*

**Phase 1:** In compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:** In compliance

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program. This Paragraph, among the provisions of Document 2100, requires that the Community Outreach Division (COrD) be responsible for the following: coordinating MCSO's quarterly community meetings; providing administrative support for, coordinating, and attending meetings of the CAB; compiling complaints, concerns, and suggestions submitted to the COrD by members of the public about the implementation of the Orders, and to respond to the complainants' concerns; and to communicate such concerns from the community at regular meetings with the Monitor and MCSO leadership.

Shortly after the issuance of Document 2100, MCSO began the transition to assume responsibility for its Community Outreach and Public Information Program; and COrD – in collaboration with CID – began coordinating the required community meetings. As noted above (in Paragraphs 109-112), during this reporting period, COrD worked with CID to coordinate a community meeting coinciding with our site visit.

WAI 38291

For the third consecutive reporting period, the Deputy Chief designated as the CAB's point of contact worked with and provided support to the CAB. She distributed policies and other materials for CAB members to review and provide feedback, and tracked and responded to CAB members' inquiries and requests for information about MCSO's implementation of the Orders.

During this reporting period, the CAB did not hold any public meetings. Some CAB members also attended a few of the Monitoring Team's compliance meetings during our October and January site visits. CAB members also exchanged numerous email messages with COrD, CID, and the Deputy Chief who is the CAB's designated point of contact regarding the quarterly community meeting, planning meetings between CAB members and MCSO officials, and various inquiries and requests for information.

Following discussions during our October 2017 site visit, COrD created a form for capturing information on complaints, concerns, and suggestions submitted by members of the public to the COrD. MCSO has provided documentation that all current COrD personnel completed an online Complaint Intake and Processing course, to assist them in receiving and appropriately directing any complaints or concerns from community members they receive.

During our January 2019 site visit, we inquired with COrD regarding any complaints or concerns related to the implementation of the Orders from community members that COrD received during this reporting period. COrD personnel reported that they occasionally receive concerns from community members, and that they forward those that are complaints to PSB. They also reported that they sometimes receive inquiries for which COrD staff believe it is appropriate to direct community members to written materials or the MCSO website. During this reporting period, COrD did not submit any MCSO Complaint and Comment Forms for our review.

Per this Paragraph, the COrD is required to communicate concerns received from the community at regular meetings with the Monitor and MCSO leadership. During our upcoming site visit, we will inquire with COrD personnel to learn more about how COrD communicates community concerns to the MCSO leadership.

### c. Community Advisory Board

**Paragraph 115.** *MCSO and Plaintiffs' representatives shall work with community representatives to create a Community Advisory Board ("CAB") to facilitate regular dialogue between MCSO and the community, and to provide specific recommendations to MCSO about policies and practices that will increase community trust and ensure that the provisions of this Order and other orders entered by the Court in this matter are met.*

**Phase 1:** In compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

WAI 38292

**Phase 2:**  In compliance

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program.  This Paragraph, among the provisions of Document 2100, requires that MCSO have specific duties in relation to the Community Advisory Board (CAB).  MCSO and Plaintiffs' representatives are required to work with community representatives to create a CAB to facilitate regular dialogue between MCSO and community leaders, and to provide specific recommendations to MCSO about policies and practices that will increase public trust and ensure that the provisions of this Order and other orders entered by the Court in this matter are met.

Shortly after the issuance of Document 2100, MCSO began the transition to assume responsibility for its Community Outreach and Public Information Program; MCSO and the Plaintiffs' counsel selected the CAB members; and MCSO began providing support and guidance to the CAB.

During this reporting period, CAB members and representatives of MCSO – specifically, the Deputy Chief who is the CAB's designated point of contact, COrD, and CID – exchanged numerous email messages.  In these messages, among other topics, CAB members provided specific recommendations to MCSO about policies and practices that will increase community trust and ensure that the provisions of this Order and other orders entered by the Court in this matter are met.  For example, CAB members made recommendations regarding outreach and site selection for MCSO's community meeting; and on behalf of Maricopa County community members, inquired about various Office policies and processes.

**Paragraph 116.**  *The CAB shall have five members, two to be selected by MCSO and two to be selected by Plaintiffs' representatives.  One member shall be jointly selected by MCSO and Plaintiffs' representatives.  Members of the CAB shall not be MCSO Employees or any of the named class representatives nor any of the attorneys involved in this case.  A member of the MCSO COD and at least one representative for Plaintiffs shall attend every meeting of the CAB, but the CAB can request that a portion of the meeting occur without COD or the Plaintiffs' representative.  The CAB shall continue for at least the length of this Order.*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:**  In compliance

WAI 38293

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program. This Paragraph, among the provisions of Document 2100, reconstitutes the CAB so that it is comprised of five members – two selected by MCSO, two selected by Plaintiffs' attorneys, and one member jointly selected by MCSO and Plaintiffs' attorneys.

In September 2017, MCSO and the Plaintiffs' counsel announced their selection of the CAB members. One of the two CAB members who had served prior to the issuance of Document 2100 resigned, leaving one CAB member previously appointed by the Plaintiffs' representatives. The MCSO and Plaintiffs' representatives appointed four new CAB members, resulting in a total of five members; two selected by MCSO, two selected by the Plaintiffs' representatives, and one jointly selected by MCSO and Plaintiffs' representatives. None of the CAB members are MCSO employees, named class representatives, or attorneys involved in this case.

As noted above, during this reporting period, the CAB did not hold any public meetings. Some CAB members also attended a few of the Monitoring Team's compliance meetings during our October and January site visits.

***Paragraph 117.*** *The CAB shall hold meetings at regular intervals. The meetings may be either public or private as the purpose of the meeting dictates, at the election of the CAB. The Defendants shall provide a suitable place for such meetings. The MCSO shall coordinate the meetings and communicate with CAB members, and provide administrative support for the CAB.*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

**Phase 2:**  In compliance

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program. This Paragraph, among the provisions of Document 2100, requires that the CAB hold either public or private meetings at regular intervals; and that MCSO should provide a suitable place for such meetings, coordinate the meetings and communicate with CAB members, and provide administrative support to the CAB.

During this reporting period, the CAB did not hold any public meetings, although the CAB members met privately. Some CAB members also attended a few of the Monitoring Team's compliance meetings during our October and January site visits.

WAI 38294

***Paragraph 118.***  *During the meetings of the CAB, members will relay or gather concerns from the community about MCSO practices that may violate the provisions of this Order and the Court's previous injunctive orders entered in this matter and transmit them to the COD for investigation and/or action.  Members may also hear from MCSO Personnel on matters of concern pertaining to the MCSO's compliance with the orders of this Court.*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

**Phase 2:**  In compliance

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program.  This Paragraph, among the provisions of Document 2100, requires that at their meetings, CAB members relay or gather concerns from the community about MCSO practices that may violate the provisions of the Orders; this Paragraph also allows for the CAB to hear from MCSO personnel on matters of concern pertaining to MCSO's compliance with the Orders.

As noted above, during this reporting period, the CAB did not hold any public meetings.

During this reporting period, as in the past, CAB members inquired with MCSO officials regarding concerns that they received from the community – on topics including crime trends and MCSO's engagement of Latino community members.  CAB members indicated that they would share this information with the community.  Some CAB members also attended a few of the Monitoring Team's compliance meetings during our October and January site visits.

WAI 38295

## Second Supplemental Permanent Injunction/Judgment Order

### Section 12: Misconduct Investigations, Discipline, and Grievances

**COURT ORDER XV.       MISCONDUCT   INVESTIGATIONS,   DISCIPLINE,   AND GRIEVANCES**

*Paragraph 163.  The Sheriff will ensure that all allegations of employee misconduct, whether internally discovered or based on a civilian complaint, are fully, fairly, and efficiently investigated; that all investigative findings are supported by the appropriate standard of proof and documented in writing; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair, consistent, unbiased and provides due process.  To achieve these outcomes, the Sheriff shall implement the requirements set out below.*

### A.  Policies Regarding Misconduct Investigations, Discipline, and Grievances

*Paragraph 165.  Within one month of the entry of this Order, the Sheriff shall conduct a comprehensive review of all policies, procedures, manuals, and other written directives related to misconduct investigations, employee discipline, and grievances, and shall provide to the Monitor and Plaintiffs new policies and procedures or revise existing policies and procedures. The new or revised policies and procedures that shall be provided shall incorporate all of the requirements of this Order.  If there are any provisions as to which the parties do not agree, they will expeditiously confer and attempt to resolve their disagreements.  To the extent that the parties cannot agree on any proposed revisions, those matters shall be submitted to the Court for resolution within three months of the date of the entry of this Order.  Any party who delays the approval by insisting on provisions that are contrary to this Order is subject to sanction.*

**Phase 1:** Not applicable

**Phase 2:** Deferred

MCSO provided us with the following:

- CP-2 (Code of Conduct), most recently amended on March 15, 2019.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on January 24, 2019.

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- CP-8 (Preventing Racial and Other Bias-Based Profiling), most recently amended on September 26, 2018.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- EA-2 (Patrol Vehicles), most recently revised on February 20, 2019.

WAI 38296

- GA-1 (Development of Written Orders), most recently amended on March 28, 2019.

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

- GC-7 (Transfer of Personnel), most recently amended on September 27, 2018.

- GC-11 (Employee Probationary Periods), most recently amended on March 28, 2019.

- GC-12 (Hiring and Promotional Procedures), most recently amended on April 10, 2018.

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on November 29, 2018.

- GE-4 (Use, Assignment, and Operation of Vehicles), most recently amended on October 7, 2017.

- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.

- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

- GI-5 (Voiance Language Services), most recently amended on January 4, 2019.

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

- GJ-26 (Sheriff's Reserve Deputy Program), most recently amended on March 30, 2018.

- GJ-27 (Sheriff's Posse Program), currently under revision.

- GJ-35 (Body-Worn Cameras), most recently amended on January 7, 2017.

- Audits and Inspections Unit Operations Manual, currently under revision.

- Body-Worn Camera Operations Manual, published on December 22, 2016.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

WAI 38297

- Training Division Operations Manual, currently under revision.

We received a majority of the documents listed above within one month of the entry of the Order. The Monitoring Team and the Parties conducted initial reviews and returned the revised documents, with additional recommendations, to MCSO for additional work. MCSO continues to revise the remaining policies and operations manuals related to misconduct investigations, the Sheriff's Posse Program, Audits and Inspections, and Training. Those remaining policies and operations manuals identified by MCSO were in some phase of review by us and the Parties at the end of this reporting period.

This Paragraph implies that the review process and final adoption of the updated policies would take two months to complete, assuming that the new or revised policies were provided within one month of the Second Order's issuance. The sheer volume of policies, as well as the extensive modifications they contain, rendered that target date unachievable. This is due, in large measure, to researched and well-considered recommendations by the Parties; and robust discussion about policy language, application, and outcomes during our site visit meetings.

**Paragraph 166.** *Such policies shall apply to all misconduct investigations of MCSO personnel.*

**Paragraph 167.** *The policies shall include the following provisions:*

a. *Conflicts of interest in internal affairs investigations or in those assigned by the MCSO to hold hearings and make disciplinary decisions shall be prohibited. This provision requires the following:*

   i. *No employee who was involved in an incident shall be involved in or review a misconduct investigation arising out of the incident.*

   ii. *No employee who has an external business relationship or close personal relationship with a principal or witness in a misconduct investigation may investigate the misconduct. No such person may make any disciplinary decisions with respect to the misconduct including the determination of any grievance or appeal arising from any discipline.*

   iii. *No employee shall be involved in an investigation, whether criminal or administrative, or make any disciplinary decisions with respect to any persons who are superior in rank and in their chain of command. Thus, investigations of the Chief Deputy's conduct, whether civil or criminal, must be referred to an outside authority. Any outside authority retained by the MCSO must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest.*

b. *If an internal affairs investigator or a commander who is responsible for making disciplinary findings or determining discipline has knowledge of a conflict of interest*

WAI 38298

*affecting his or her involvement, he or she should immediately inform the Commander of the Professional Standards Bureau or, if the holder of that office also suffers from a conflict, the highest-ranking, non-conflicted chief-level officer at MCSO or, if there is no non-conflicted chief-level officer at MCSO, an outside authority.  Any outside authority retained by the MCSO must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest.*

c.  *Investigations into an employee's alleged untruthfulness can be initiated by the Commander of the Professional Standards Bureau or the Chief Deputy.  All decisions not to investigate alleged untruthfulness must be documented in writing.*

d.  *Any MCSO employee who observes or becomes aware of any act of misconduct by another employee shall, as soon as practicable, report the incident to a Supervisor or directly to the Professional Standards Bureau.  During any period in which a Monitor is appointed to oversee any operations of the MCSO, any employee may, without retaliation, report acts of alleged misconduct directly to the Monitor.*

e.  *Where an act of misconduct is reported to a Supervisor, the Supervisor shall immediately document and report the information to the Professional Standards Bureau.*

f.  *Failure to report an act of misconduct shall be considered misconduct and may result in disciplinary or corrective action, up to and including termination.  The presumptive discipline for a failure to report such allegations may be commensurate with the presumptive discipline for the underlying misconduct.*

g.  *No MCSO employee with a rank lower than Sergeant will conduct an investigation at the District level.*

**Phase 1:**  In compliance

- CP-2 (Code of Conduct), most recently amended on March 15, 2019.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on January 24, 2019.

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

WAI 38299

To determine Phase 2 compliance with this Paragraph, we review administrative misconduct investigations.

During this reporting period, we reviewed 56 closed administrative misconduct investigations. Thirty-eight cases involved only sworn personnel; 14 cases involved only Detention personnel; two involved a combination of sworn and non-sworn personnel; one involved a Posse member; and one involved a reserve deputy. Sworn or Detention personnel assigned to the Professional Standards Bureau (PSB) conducted 23 of the investigations. Sworn supervisors in the Districts or Divisions outside of PSB conducted 33 of these investigations.

Paragraph 167.a.i-iii. prohibits any employee with any conflicts of interest from participating in, holding hearings on, or making any disciplinary decisions in a misconduct investigation. During this reporting period, there were no instances where any potential conflict of interest was identified.

Paragraph 167.b. requires that if the internal affairs investigator or a commander responsible for making disciplinary decisions identifies a conflict of interest, appropriate notifications must be made immediately. Our review of the 56 completed administrative investigations for this reporting period revealed that there were no instances where MCSO identified a conflict of interest by an MCSO member responsible for making disciplinary decisions

Paragraph 167.c. requires that investigations into truthfulness be initiated by the Chief Deputy or the PSB Commander. MCSO did not identify any misconduct investigations during this reporting period where they believed a truthfulness allegation was appropriate. We identified one instance where we believe a truthfulness investigation should have been initiated and was not.

Paragraph 167.d. requires that any MCSO employee who observes or becomes aware of misconduct by another employee shall immediately report such conduct to a supervisor or directly to PSB. Per the requirement, during the period in which the Monitor has authority to oversee any operations of MCSO, any employee may also report alleged misconduct to the Monitor. Of the 56 administrative cases we reviewed for this reporting period, there were 11 investigations where an employee reported potential misconduct by another employee, or a supervisor identified potential employee misconduct. There were no instances identified where an employee failed to report potential misconduct to a supervisor as required.

Paragraph 167.e. requires that when supervisors learn of an act of misconduct, the supervisor shall immediately document and report the information to PSB. All 11 cases where employees brought forward potential misconduct were properly documented and forwarded by a supervisor as required.

WAI 38300

Paragraph 167.f. provides for the potential for a disciplinary sanction or other corrective action if an employee fails to bring forth an act of misconduct. During this reporting period, there were no investigations initiated because employees failed to bring forth information regarding potential misconduct of another employee that they were aware of. We did not identify any circumstances during our reviews that we believe would have necessitated any action related to this Subparagraph.

Paragraph 167.g. requires that a sergeant or higher-ranking employee conduct all misconduct investigations conducted at the District level. All District-level cases that we reviewed for this reporting period complied with this requirement.

***Paragraph 168.*** *All forms of reprisal, discouragement, intimidation, coercion, or adverse action against any person, civilian, or employee because that person reports misconduct, attempts to make or makes a misconduct complaint in good faith, or cooperates with an investigation of misconduct constitute retaliation and are strictly prohibited. This also includes reports of misconduct made directly to the Monitor, during any period in which a Monitor is appointed to oversee any operations of the MCSO.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on March 15, 2019.
- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on January 24, 2019.
- CP-5 (Truthfulness), most recently amended on October 24, 2017.
- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.
- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.
- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 56 administrative misconduct investigations that were completed during this reporting period.

There were no completed investigations where there were any allegations relevant to compliance with this Paragraph. MCSO also reported that there were no grievances or other documents filed with PSB or the Compliance Division that alleged any other misconduct related to the requirements of this Paragraph.

WAI 38301

***Paragraph 169.*** *Retaliating against any person who reports or investigates alleged misconduct shall be considered a serious offense and shall result in discipline, up to and including termination.*

**Phase 1:**  In compliance

- CP-2 (Code of Conduct), most recently amended on March 15, 2019.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on January 24, 2019.

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 56 administrative misconduct investigations that were completed during this reporting period.  There were no completed investigations where allegations relevant to this Paragraph were made.  There were no grievances or other documents submitted to PSB or to the Compliance Division that alleged any other retaliation related to the requirements of this Paragraph.


***Paragraph 170.***  *The Sheriff shall investigate all complaints and allegations of misconduct, including third-party and anonymous complaints and allegations.  Employees as well as civilians shall be permitted to make misconduct allegations anonymously.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 56 completed administrative misconduct investigations conducted during this reporting period.  Forty-six of these were generated as a result of external complaints, and 10 were generated internally.  We also reviewed five criminal misconduct investigations, four of which were generated as a result of external complaints.  PSB submitted an additional three administrative misconduct

investigations for review this reporting period.  These investigations were closed and combined with an already ongoing investigation of the same alleged misconduct and were therefore not included in our review of investigations for this reporting period.

Of the 56 administrative misconduct investigations we reviewed this reporting period, two involved externally generated anonymous complaints.  One involved a third-party complaint. None of the five criminal misconduct investigations we reviewed during this reporting period were generated due to an anonymous or third party complaint.  We have not become aware of any evidence that indicates that MCSO refused to accept and complete investigations in compliance with the requirements of this Paragraph.  None of the 56 administrative misconduct investigations we reviewed during this reporting period included any allegations indicating that any third-party or anonymous complaints were not appropriately accepted and investigated.

***Paragraph 171.***  *The MCSO will not terminate an administrative investigation solely on the basis that the complainant seeks to withdraw the complaint, or is unavailable, unwilling, or unable to cooperate with an investigation, or because the principal resigns or retires to avoid discipline.  The MCSO will continue the investigation and reach a finding, where possible, based on the evidence and investigatory procedures and techniques available.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 56 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

We determined that 13 of the 56 completed administrative investigations involved complainants who sought to withdraw their complaints; or were unavailable, unwilling, or unable to cooperate.  MCSO completed all 13 investigations and reached a finding as required.  We also found that in five of the 56 investigations, the principal left MCSO employment prior to the finalization of the investigation or discipline process.   MCSO completed all of these investigations and reached a finding.  Of the 56 investigations we evaluated for compliance, none were prematurely terminated.

WAI 38303

*Paragraph 172.  Employees are required to provide all relevant evidence and information in their custody and control to internal affairs investigators.  Intentionally withholding evidence or information from an internal affairs investigator shall result in discipline.*

**Phase 1:** In compliance

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph during this reporting period, we reviewed 56 completed administrative misconduct investigations conducted by MCSO personnel.  There were no investigations identified by MCSO where an employee failed to accurately provide all information or evidence required during the investigation.  We identified one case during our reviews where we believe an employee may have intentionally failed to provide all required information or evidence during an investigation and MCSO failed to act.

*Paragraph 173.  Any employee who is named as a principal in an ongoing investigation of serious misconduct shall be presumptively ineligible for hire or promotion during the pendency of the investigation.  The Sheriff and/or the MCSO shall provide a written justification for hiring or promoting an employee or applicant who is a principal in an ongoing investigation of serious misconduct.  This written justification shall be included in the employee's employment file and, during the period that the MCSO is subject to Monitor oversight, provided to the Monitor.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

- GC-11 (Employee Probationary Periods), most recently amended on March 28, 2019.

- GC-12 (Hiring and Promotional Procedures), most recently amended on April 10, 2018.

**Phase 2:** In compliance

MCSO has established a protocol to address the requirements of this Paragraph.  When a promotion list is established for sworn or Detention personnel, a copy of the list is forwarded to the Professional Standards Bureau (PSB).  Before any promotion is finalized, PSB conducts a check of each employee's disciplinary profile in the automated system (IAPro).  As part of the promotional process, MCSO conducts a meeting with command staff to discuss each employee's qualifications.  During this meeting, the results of the IAPro checks are provided to

WAI 38304

the staff for review and consideration.  The PSB Commander generally attends the promotion meetings for both Detention and sworn personnel, and clarifies any questions regarding the disciplinary history that the staff may have.  When an employee is moved from a civilian employment position to a sworn employment position, MCSO conducts a thorough background investigation.  The process involves a review and update of the candidate's PSB files, which is completed by Pre-Employment Services.  For Detention employees who are moving to sworn positions, the information in the employee's file is updated to include any revised or new information.  Due to the scheduling of our site visits, we will inspect personnel files for employees who were promoted during the last month of the preceding quarter, and the first two months of the period in review.  In our reviews, we ensure that the documentation, as it pertains to compliance with this Paragraph, is included in personnel files.

During this reporting period, we became aware of six employees who were promoted who had open misconduct investigations.  These included four sworn employees, one Detention employee, and one civilian.  There were two deputies promoted to sergeant who had open PSB cases.  One sergeant had an open investigation related to a violation of CP-2 (Code of Conduct).  This employee has a sustained complaint in which he received a reprimand in 2016.  The second sergeant also has an open misconduct investigation for a violation of CP-2.  Both employees had notations in their Promotional Eligibility Review documents that even if sustained, the allegations would not rise to the level of serious misconduct.  The other two sworn employees are discussed in the latter part of this review.

The civilian promoted had an open allegation of a violation of CP-2 related to a rudeness complaint.  The documentation provided stated that if sustained, the presumptive discipline, a Category 2 violation, could result in an eight-hour suspension.  Although if sustained this violation could result in serious discipline, the allegation itself is not considered serious misconduct.  MCSO also promoted a Detention captain who had an open internal investigation.  MCSO provided a justification memorandum for this promotion.  We reviewed the documentation and saw no issues of concern.

One promotion of concern was a deputy who was alleged to have been involved in an excessive use of force, and was alleged to have falsified the reports related to the use of force.  There are currently open criminal and administrative investigations related to these cases.  Since this is an open investigation, we do not have all the related information.  The justification memorandum states that the allegations, if sustained, would not result in charging serious misconduct, nor would they result in major discipline.  We disagree with this conclusion.  Although we are not privy to the details of these cases, both involve serious allegations.  We believe that if sustained, they could result in serious discipline.

WAI 38305

We are concerned with another promotion that occurred in December.  The individual was promoted to a high-ranking position in MCSO.   There was a justification memorandum provided in the submission.  The employee currently has four open misconduct investigations – two of which, according to MCSO, are for serious misconduct.   The allegations involve the following violations: CP-2 (Code of Conduct), Employee Relationships with Other Employees; CP-8 (Preventing Racial and Other Biased Based Profiling); CP-3 (Workplace Professionalism: Discrimination and Harassment); and GE-4 (Use and Operation of Vehicles).

The employee received a verbal counseling that falls within the 10-year review period.  This counseling was related to a violation of CP-2 (Code of Conduct), Incompetence/Failure to Meet Standards).   This case involved a subordinate who falsified timesheets.   There was also a previous misconduct investigation involving the use of quotas for traffic stops.   This investigation was initiated as a result of a written comment by a supervisor, and an anonymous complaint.   The allegations were unfounded; however, PSB generated a memorandum of concern regarding the employee's failure to provide clear direction to subordinates.   The employee has three other cases with sustained violations that do not fall within the 10-year review period, one of which resulted in a 40-hour suspension.  These were violations of CP-2 (Code of Conduct), Employee Relationships with Other Employees) and CP-3 (Workplace Professionalism: Discrimination and Harassment).  Our reviews normally would not go beyond the 10-year disciplinary history, but we are concerned with a possible pattern, since there seems to be a recurring issue with employee relationships.  In the MCSO transfer request, the receiving commander noted, "Have concerns w/current open IAs and previous closed IAs – will monitor outcomes."   The previous closed "IAs" is a reference to sustained allegations of serious misconduct that occurred outside the 10-year review period.  In effect, we are not the only ones concerned with a possible pattern of behavior.  In addition, one current open allegation involves a violation of CP-8 (Preventing Racial and Other Biased Based Profiling).   The employee already has one sustained complaint within the 10-year review period.  While this Paragraph is associated with open serious misconduct investigations, Paragraph 174 presumptively precludes employees with multiple sustained misconduct violations from promotion.  Therefore, two more sustained complaints would render the employee presumably ineligible for promotion under the requirements of Paragraph 174.   Bearing in mind that there are four open misconduct investigations, and considering that this is an appointed position, MCSO could have expedited the investigations, or delayed the promotion until these open allegations were resolved.

MCSO hired two civilian employees who had open minor misconduct investigations.  The first individual had allegations of violations of CP-2 (Code of Conduct), Employee Relationships with Other Employees) and CP-3 (Workplace Professionalism: Discrimination and Harassment).   The second individual was a former Detention officer who was re-hired as a civilian.  This employee had one sustained allegation of a violation of CP-2 and an eight-day suspension.  The current open allegation is regarding a violation of CP-2.

WAI 38306

MCSO has been in compliance with this Paragraph.  However, we are very concerned with the promotion of two employees who are still pending resolution of serious allegations of misconduct.  The intent of this Paragraph is to ensure that MCSO is hiring and promoting qualified individuals who will carry out the agency's mission within the parameters of established laws and MCSO policies.   MCSO must give greater consideration to the requirements of this Paragraph, with regard to promoting employees with open serious misconduct investigations.  Due to the concerns stated, we conclude that MCSO was not in compliance with this Paragraph for this reporting period.   We have previously expressed concerns over the justification of promotions of individuals who have serious issues in their disciplinary histories.  In addition, we found the justification memorandum for one employee to be inaccurate with regard to the seriousness of the allegations.  If MCSO is non-compliant with this Paragraph in the next quarter, we will withdraw compliance.

**Paragraph 174.**  *Employees' and applicants' disciplinary history shall be considered in all hiring, promotion, and transfer decisions, and this consideration shall be documented. Employees and applicants whose disciplinary history demonstrates multiple sustained allegations of misconduct, or one sustained allegation of a Category 6 or Category 7 offense from MCSO's disciplinary matrices, shall be presumptively ineligible for hire or promotion. MCSO shall provide a written justification for hiring or promoting an employee or applicant who has a history demonstrating multiple sustained allegations of misconduct or a sustained Category 6 or Category 7 offense. This written justification shall be included in the employee's employment file and, during the period that the MCSO is subject to Monitor oversight, provided to the Monitor.*

**Phase 1:**  In compliance

- GC-12 (Hiring and Promotional Procedures), most recently amended on April 10, 2018.

**Phase 2:**  In compliance

For employees who are promoted, the documentation submitted by MCSO generally includes the disciplinary history for the previous 10 years and any applicable disciplinary actions. MCSO also provides the disciplinary history of Detention and civilian employees who have been upgraded in classification to sworn status.  We reviewed the documentation provided for eight new employees hired during the fourth quarter of 2018, and found three civilian employees who were hired while pending the outcome of open misconduct investigations.  One individual had previously received an eight-hour suspension for a violation of CP-2 (Code of Conduct), Abuse of Process, Withholding Evidence, and Misappropriation of Property.  The employee also has an open misconduct investigation, for minor misconduct.  This individual was a former Detention employee who returned to MCSO as a civilian.  This transfer is discussed in Paragraph 173.  There were no issues noted with the remaining employees who were hired.

WAI 38307

MCSO promoted 24 employees during this reporting period. There were 13 sworn, four Detention, six civilian, and one reserve deputy in the listed promotions. MCSO promoted a lieutenant who had three sustained allegations of misconduct, which resulted in two written reprimands and a coaching. These were not serious misconduct violations. Our concerns regarding the promotions for this quarter are noted in Paragraph 173.


**Paragraph 175.** *As soon as practicable, commanders shall review the disciplinary history of all employees who are transferred to their command.*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on January 4, 2019.
- GC-7 (Transfer of Personnel), most recently amended on September 27, 2018.

**Phase 2:** In compliance

Per policy, MCSO is to conduct an EIS review within 14 days of an affected employee's transfer. We requested a list of employees that were transferred during this reporting period. From the list, we selected a sample of employees to review and verify that there was documentation of the required EIS reviews. For this reporting period, we reviewed different documentation for compliance with this Paragraph. As MCSO noted that Blue Team notes require quite a bit of time to undergo the review process, we agreed to review the transfer request documents that MCSO completes for each employee. The documents memorialize the commander's acknowledgment of review of the transferred employee's disciplinary history, as well as the review of the employee's performance appraisals for the previous five years. This review is generally conducted before the gaining commander accepts the transfer, a few days prior to the transfer becoming effective. For this reporting period, we reviewed the documentation for 69 employees.

For October, MCSO submitted a list of employees who were transferred during the previous month. From the list, we selected a random sample of 25 employees, of which two were sworn and 23 were Detention. Both of the transferred sworn employees selected included documentation of command review of their EIS profiles. Of the 23 transferred Detention employees selected, 22 included documentation of command review of their EIS profiles. In total, 24 of the 25 transfers included documentation of command reviews, for a compliance rate of 96% for October.

For November, MCSO submitted a list of employees who were transferred during October. From the list, we selected all 15 employees transferred, to assess MCSO's compliance with this Paragraph. The transfers selected for review included eight sworn employees and seven Detention employees. All employees had documentation of command review of their EIS profiles. The compliance rate for October was 100%.

WAI 38308

For December, we reviewed the documentation for 29 employees to assess MCSO's compliance with this Paragraph. The transfers included 16 Detention employees and 13 sworn employees. All employees had documentation of command reviews as required by this Paragraph. The compliance rate for December was 100%. For the quarter, the compliance rate was 99%.

**Paragraph 176.** *The quality of investigators' internal affairs investigations and Supervisors' reviews of investigations shall be taken into account in their performance evaluations.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

**Phase 2:** Not in compliance

We reviewed Employee Performance Appraisals for 30 supervisors and commanders who received EPAs during this reporting period. All 30 appraisals rated the quality and effectiveness of supervision. Fifteen of the 30 appraisals contained comments and/or rated the supervisors' demonstrated ability to identify and effectively respond to misconduct. Nineteen of the 30 supervisors' EPAs assessed the employees' quality of internal investigations and/or the quality of their reviews of internal investigations, as required by this Paragraph. Twenty-three of the 30 appraisals rated supervisors on the quality of their reviews. The number of EPAs that met the requirements of this Paragraph again decreased during this reporting period. The compliance rate for the previous quarter was 67%. The compliance rate for this reporting period was 63%.

**Paragraph 177.** *There shall be no procedure referred to as a "name-clearing hearing." All pre-disciplinary hearings shall be referred to as "pre-determination hearings," regardless of the employment status of the principal.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 56 administrative misconduct investigations that were completed during this reporting period.

In misconduct investigations that resulted in serious discipline and in which the employee was afforded the opportunity for an administrative hearing, the only reference to the hearing was "pre-determination hearing."

WAI 38309

**B.      Misconduct-Related Training**

**Paragraph 178.**  *Within three months of the finalization of these policies consistent with ¶ 65of this Order, the Sheriff will have provided all Supervisors and all personnel assigned to the Professional Standards Bureau with 40 hours of comprehensive training on conducting employee misconduct investigations.  This training shall be delivered by a person with subject matter expertise in misconduct investigation who shall be approved by the Monitor.  This training will include instruction in:*

a.      *investigative skills, including proper interrogation and interview techniques, gathering and objectively analyzing evidence, and data and case management;*

b.      *the particular challenges of administrative law enforcement misconduct investigations, including identifying alleged misconduct that is not clearly stated in the complaint, or that becomes apparent during the investigation;*

c.      *properly weighing the credibility of civilian witnesses against employees;*

d.      *using objective evidence to resolve inconsistent statements;*

e.      *the proper application of the appropriate standard of proof;*

f.      *report-writing skills;*

g.      *requirements related to the confidentiality of witnesses and/or complainants;*

h.      *considerations in handling anonymous complaints;*

i.      *relevant MCSO rules and policies, including protocols related to administrative investigations of alleged officer misconduct; and*

j.      *relevant state and federal law, including Garrity v. New Jersey, and the requirements of this Court's orders.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

During this reporting period, the Misconduct Investigative Training (PSB40) curriculum underwent a revision to include changes to GH-2 and changes to the administrative misconduct investigative forms.  The curriculum did not receive a review following the Section IV review process.  During our December 4, 2018 technical assistance site visit, we discussed this issue with the Training Division.  We advised the Training Division that because these changes were as a direct result of policy changes, the curriculum required a review by our Team and the Parties.

In October 35 personnel (19 sworn, 16 Detention) received the 2017 PSB40 Training.  No personnel required test remediation.

WAI 38310

*Paragraph 179. All Supervisors and all personnel assigned to the Professional Standards Bureau also will receive eight hours of in-service training annually related to conducting misconduct investigations. This training shall be delivered by a person with subject matter expertise in misconduct investigation who shall be approved by the Monitor.*

**Phase 1:**  In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.

- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  Deferred

During this reporting period, PSB personnel received the annual eight-hour in-service (PSB8 Internal).  A vendor supplied Sexual Assault and Domestic Violence Trauma Informed Training, a proprietary curriculum product.

As noted, this program focused on Sexual Assault and Domestic Violence Trauma Informed Interviews – including identifying and empathizing with victims' perceptions of investigators. The curriculum blended adult-learning methodologies of lecture, PowerPoint presentation, video, and several practical exercises.

A total of 42 personnel (21 sworn, 21 Detention) attended this training.  We observed that the instructor employed both a pre- and post-test.  Pre-test averages were significantly lower than the 15-question post-test averages.  No personnel required test remediation.  The Training Division should be attentive to the construction of the curriculum, incorporating adult-learning techniques, and the overall reception by MCSO personnel.

District supervisors received the annual eight-hour in-service training (PSB8 Internal) in December.  We provided technical assistance for the train-the-trainer, the first trainer session conducted by the new Training Division lieutenant.  The course was the most structured to date. Three individuals were selected as primary instructors and received teaching assignments covering the entire curriculum.  All three individuals were excellent instructors.  Additional PSB personnel also attended.  During presentations, specific curriculum content was modified.

The course was delivered eight times during December.  A total of 123 sworn supervisory personnel received the training.  No personnel required test remediation.

WAI 38311

*Paragraph 180.  Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all employees on MCSO's new or revised policies related to misconduct investigations, discipline, and grievances.  This training shall include instruction on identifying and reporting misconduct, the consequences for failing to report misconduct, and the consequences for retaliating against a person for reporting misconduct or participating in a misconduct investigation.*

**Phase 1:**  In compliance

- CP-2 (Code of Conduct), most recently amended on March 15, 2019.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on January 24, 2019.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.

- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2018.

- GJ-26 (Sheriff's Reserve Deputy Program), most recently amended March 30, 2018.

- GJ-27 (Sheriff's Posse Program), most recently amended on April 4, 2014.

- Training Division Operations Manual, most recently amended on September 21, 2017.

**Phase 2:**  In compliance

The HUB, a training management system, is used to distribute all policies.  Employees are required to complete personal attestations that indicate that they have read and understand the policies.

We review the reports of attestations that identify each individual and their dates of review for each of the following policies to gauge compliance with this Paragraph:  CP-2 (Code of Conduct); CP-3 (Workplace Professionalism: Discrimination and Harassment); CP-11 (Anti-Retaliation); GB-2 (Command Responsibility); GH-2 (Internal Investigations); GC-16 (Employee Grievance Procedures); and GC-17 (Employee Disciplinary Procedures).

WAI 38312

Revision of these policies can occur with the use of a Briefing Board (BB) or an annual review. Each change requires a new review by all employees.  Briefing Board distribution allows for all personnel to be advised of an immediate policy change.  During this reporting period, we reviewed the status of individual reviews for BB 18-14 (GC-16), BB 18-16 (CP-3), BB 18-23 (CP-2), BB 18-31 (GH-2), BB 18-41 and 18-47 (GB-2), and BB 18-48 (CP-11).

We will continue reviewing policy attestations by all personnel.

***Paragraph 181.***  *Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all employees, including dispatchers, to properly handle civilian complaint intake, including how to provide complaint materials and information, and the consequences for failing to take complaints.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.

- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2018.

- Training Division Operations Manual, most recently amended on September 21, 2017.

**Phase 2:**  In compliance

Staff continued to receive Complaint Intake and Reception Training via the HUB during this reporting period.  Previously, the number of personnel receiving this training was documented in Skills Manager, and MCSO maintained compliance with the requirements of this Paragraph. Current reporting from the HUB has created difficulties for the Training Division. Documentation provided during the current reporting period does not reflect adequate levels of compliance.  Reporting should include documentation of new hires that indicates the date of hire and allows for the 60 days to complete training.  This would require reporting of dates from the previous reporting period (e.g., December report for new hires in September).  Additionally, there should be master rosters for each employee title that indicates the date of training.

We discussed this situation with Training Division personnel during our December 4, 2018 technical assistance site visit.  Based on those discussions, we believe that the Training Division is adequately seeking to establish accurate reporting.  They have consistently sought ways to improve reporting issues and believe the problems will be overcome during the next reporting period.

WAI 38313

MCSO must improve the HUB reporting or recommend changes to the way this information is provided. We will consider changes provided they do not impact compliance with Order requirements. But absent one or the other, Phase 2 compliance will be in jeopardy.

We will continue to monitor the completion of training by new hires.

***Paragraph 182.*** *Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all Supervisors on their obligations when called to a scene by a subordinate to accept a civilian complaint about that subordinate's conduct and on their obligations when they are phoned or emailed directly by a civilian filing a complaint against one of their subordinates.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.

- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2018.

- Training Division Operations Manual, most recently amended on September 21, 2017.

**Phase 2:** In compliance

During this reporting period, the Training Division experienced difficulties that extended the curriculum development cycle for the ACT. During our review, we noted that clear language directing supervisory actions when called to a scene was absent from the curriculum. Only policies referenced in the lesson plan contained these directions. We recommend that the next annual ACT and SRELE curriculums include clear and precise language that reaffirms the requirements of this Paragraph. The many issues affecting the development of the ACT stem from a failure on the part of the Training Division to adhere to the Training Cycle as adopted by GG-1. GG-1 was published in May 2017 and revised in May 2018. MCSO must follow its adopted policies or recommend changes to the areas that it finds problematic. We will consider changes provided they do not impact compliance with Order requirements. But absent one or the other, MCSO's Phase 2 compliance with this Paragraph will be in jeopardy.

WAI 38314

### C.    *Administrative Investigation Review*

**Paragraph 183.**  *The Sheriff and the MCSO will conduct objective, comprehensive, and timely administrative investigations of all allegations of employee misconduct.  The Sheriff shall put in place and follow the policies set forth below with respect to administrative investigations.*

**Paragraph 184.**  *All findings will be based on the appropriate standard of proof.  These standards will be clearly delineated in policies, training, and procedures, and accompanied by detailed examples to ensure proper application by internal affairs investigators.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 56 completed administrative misconduct investigations conducted during this reporting period.

Of the 56 cases we reviewed, 54 (96%) complied with the requirements of this Paragraph.  In two cases – both involving sworn employees – we do not believe the findings were based on an appropriate standard of proof.  In one, we believe a finding of sustained should have been made and was not.  In the second, while some allegations were sustained, we believe that additional allegations should have been investigated and could have resulted in additional sustained findings.

During our next site visit, we will discuss these investigations with PSB personnel.

**Paragraph 185.**  *Upon receipt of any allegation of misconduct, whether internally discovered or based upon a civilian complaint, employees shall immediately notify the Professional Standards Bureau.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 56 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.  In all of these cases, PSB was immediately notified at the time of the complaint as required.

WAI 38315

*Paragraph 186. Effective immediately, the Professional Standards Bureau shall maintain a centralized electronic numbering and tracking system for all allegations of misconduct, whether internally discovered or based upon a civilian complaint. Upon being notified of any allegation of misconduct, the Professional Standards Bureau will promptly assign a unique identifier to the incident. If the allegation was made through a civilian complaint, the unique identifier will be provided to the complainant at the time the complaint is made. The Professional Standards Bureau's centralized numbering and tracking system will maintain accurate and reliable data regarding the number, nature, and status of all misconduct allegations, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status, if requested, and final disposition of the complaint. The system will be used to determine the status of misconduct investigations, as well as for periodic assessment of compliance with relevant policies and procedures and this Order, including requirements of timeliness of investigations. The system also will be used to monitor and maintain appropriate caseloads for internal affairs investigators.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

During our October 2016, January 2017, and July 2017 site visits, we met with the PSB lieutenant who served as the primary administrator for the IAPro database system. The lieutenant's demonstration represented IAPro as a technology instrument that meets the compliance criteria of this Paragraph – to include logging of critical dates and times, alerts regarding timeframes and deadlines, chronological misconduct investigation status, notifications, and dispositions. The lieutenant conducted a weekly evaluation of closed cases to ensure that data was entered in to the system, and a monthly review to audit timeframes associated with open investigations. The tracking system provides estimates of key timeframes for all investigators to ensure that they learn of previous and upcoming investigative milestones.

PSB has confirmed that civil notice claims are entered in the tracking system. The IAPro system integrates exceptionally well with the EIS and Blue Team technology systems. The system can be accessed remotely. Additionally, PSB hired a management analyst dedicated to the administration of the centralized tracking system. The documentation that PSB provided to us for review, and the direct user access that a member of our Team has to the centralized numbering and tracking system, indicates that the system possesses the functionality as required by this Paragraph and is being used according to the requirements of this Paragraph.

During our January 2018 site visit, a member of our Team met with the management analyst assigned to PSB who is now responsible for management of the IAPro database. The management analyst demonstrated the functionality of the tracking system in use. The analyst also showed us the documents that are sent out regarding the status of investigations and demonstrated how the Blue Team Dashboard can be used to track investigation information.

WAI 38316

During this reporting period, we found that all 56 of the administrative misconduct investigations were properly assigned a unique identifier.  All but two of these cases were both initiated and completed after July 20, 2016.  Of the 56 cases, 46 involved an external complaint requiring that PSB provide the complainant with this unique identifier.  In all of these 46 cases, MCSO sent the initial letter that includes this unique identifier to the complainant within seven days, or provided an appropriate explanation for not doing so.  In some cases, anonymous complainants do not provide contact information; and in others, known complainants decline to provide MCSO with adequate contact information.  PSB has developed a form that identifies the reason why a required notification letter is not sent, and includes this document in the cases they forward for our review.

***Paragraph 187.***  *The Professional Standards Bureau shall maintain a complete file of all documents within the MCSO's custody and control relating to any investigations and related disciplinary proceedings, including pre-determination hearings, grievance proceedings, and appeals to the Maricopa County Law Enforcement Merit System Council or a state court.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To determine compliance with this Paragraph, we previously verified that PSB maintains both hardcopy and electronic files intended to contain all the documents required for compliance with this Paragraph.

During past site visits, a member of our Team inspected the file rooms where hardcopies of investigations are stored and randomly reviewed case files to verify compliance.  We verified that criminal and administrative investigation files are stored in separate rooms, and access to these rooms is restricted.  Our Team member has also used the access granted to IAPro to randomly select internal affairs case files to verify that all information is being maintained electronically.

In May 2018, PSB relocated to its new offsite facility.  We confirmed at that time that PSB maintained both hardcopy and electronic files intended to contain all documents required for compliance with this Paragraph at the new facility.

During our January 2019 site visit, a member of our Team again verified this compliance at the PSB facility by inspecting both the criminal and administrative investigation file rooms and randomly selecting internal affairs case files to verify that all information is also being electronically maintained in IAPro.

WAI 38317

***Paragraph 188.*** *Upon being notified of any allegation of misconduct, the Professional Standards Bureau will make an initial determination of the category of the alleged offense, to be used for the purposes of assigning the administrative investigation to an investigator. After initially categorizing the allegation, the Professional Standards Bureau will promptly assign an internal affairs investigator.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review administrative misconduct investigations and service complaints that were conducted and completed by MCSO personnel during the reporting period.

We previously concurred with MCSO that Phase 2 compliance with this Paragraph would be based on PSB's determination of the initial allegations, and not which category of offense is determined once the investigation is completed.

During this reporting period, we reviewed 56 administrative misconduct investigations and 12 service complaints. All complied with the requirements of this Paragraph.

With the approved revisions to the internal investigations and discipline policies in May 2017, PSB is authorized to determine that some complaints can be classified as service complaints. PSB has initiated both a process and a complaint-tracking system for these complaints. During the last reporting period, MCSO completed and closed 15 service complaints. Thirteen of the 15 complaints complied with the requirements of this Paragraph.

During this reporting period, MCSO completed and closed 12 service complaints. One service complaint was appropriately reclassified to an administrative misconduct investigation after review by PSB. The remaining 11 were classified and handled as service complaints. As we have consistently noted in our review of service complaints, the majority of these complaints involve laws, policies, or procedures where there is no employee misconduct; are contacts from the public that do not include allegations of misconduct; or are complaints where it is determined that MCSO employees are not involved. During this reporting period, five of the 11 service complaints did not involve employee misconduct, five did not involve MCSO employees and one was closed as MCSO was unable to contact the complainant or determine any specific allegation of misconduct. We concur with MCSO's handling of all 12 service complaints submitted for this reporting period.

WAI 38318

During our April and July 2018 site visits, we discussed service complaints with PSB personnel. During both discussions, PSB advised us that the number of service complaints being initiated far exceeded their expectations. They also noted in both meetings that between 20-25% of the service complaints were determined not to involve MCSO employees, and our reviews for these two reporting periods confirmed this assertion. We agreed to review an expedited process for handling complaints where it can be immediately determined that the complaint does not involve MCSO personnel.

During our October 2018 site visit, PSB personnel informed us that the number of service complaints being initiated had continued to exceed their expectations. As of our October site visit meeting, MCSO had initiated 263 service complaints in 2018. Despite MCSO's expressed interest in making additional changes to the service complaint process, MCSO had not yet drafted any proposed revisions to the process or form for our Team to review. During our October site visit, we discussed some additional modifications PSB personnel would like to make to the service complaint process before forwarding a draft for our review. (These modifications are noted in more detail in Paragraph 194.)

During our January 2019 site visit, PSB personnel advised us that they initiated 354 service complaints during 2018. The number of service complaints has continued to exceed their expectations. The PSB Commander told us that they have now assigned a Detention supervisor in PSB to manage Detention employee service complaints. In addition, PSB is working on a plan to have identified supervisors in the Detention facilities handle some of the service complaints. They will ensure that these supervisors meet all of the requirements for those who conduct internal investigations. The sworn supervisor who has been managing all service complaint intake will continue to manage service complaints involving only sworn personnel.

We remain satisfied that MCSO is properly classifying and handling administrative misconduct investigations and service complaints and are completing the required documentation.

Consistent with the provisions of the revised policies on internal investigations and discipline, the PSB Commander now has the discretion to determine that internal complaints alleging minor policy violations can be addressed without a formal investigation if certain criteria exist. If the PSB Commander makes this determination, it must be documented.

During this reporting period, the PSB Commander determined that two internally generated complaints could be addressed without a formal investigation. Both of these investigations involved at fault traffic accidents with minor property damage. The employees involved met the established criteria for the handling of these complaints without a formal investigation. This is the first reporting period where we have seen the PSB Commander use this provision to handle internally generated complaints of minor policy violations. PSB provided sufficient documentation and both employees appropriately received coaching.

WAI 38319

***Paragraph 189.*** *The Professional Standards Bureau shall administratively investigate:*

a. *misconduct allegations of a serious nature, including any allegation that may result in suspension, demotion, or termination; and*

b. *misconduct indicating apparent criminal conduct by an employee.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on March 15, 2019.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on January 24, 2019.

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph during this reporting period, we reviewed 56 completed administrative misconduct investigations conducted by MCSO personnel.

Division or District personnel outside of PSB investigated 33 of the 56 administrative misconduct investigations conducted during this reporting period.  PSB investigated 23 of the cases.  PSB also investigated five allegations of criminal misconduct.  We identified one administrative misconduct investigation conducted by a District supervisor where we believe that potential additional misconduct discovered during the initial investigation should have resulted in the investigation being forwarded to PSB for completion and it was not.

***Paragraph 190.*** *Allegations of employee misconduct that are of a minor nature may be administratively investigated by a trained and qualified Supervisor in the employee's District.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed a total of 61 misconduct investigations conducted by MCSO personnel and completed during this reporting period.  Of these, 56 were administrative investigations, and five involved alleged criminal misconduct.  PSB personnel conducted all of the criminal investigations.

WAI 38320

Of the 56 administrative misconduct cases we reviewed for this Paragraph, PSB investigators conducted 23 of the investigations. Thirty-three were investigated at the District or Division level. We identified one case where a Division supervisor outside of PSB conducted an investigation that we believe should have been forwarded to PSB for investigation as potential serious misconduct was discovered.

The 40-hour Misconduct Investigative Training was completed prior to January 1, 2018. During the last reporting period, we determined that of the 18 administrative misconduct investigations completed outside of PSB during the reporting period, 12 were initiated before the Misconduct Investigative Training was completed. Six (50%) of these 12 were in compliance with the requirements for completion of misconduct investigations. Six of the investigations were both initiated and finalized after the completion of the Misconduct Investigative Training. Five of these six (83%) were in compliance with all requirements for the completion of administrative misconduct investigations.

During this reporting period, we reviewed 33 administrative misconduct investigations conducted by Divisions or Districts outside of PSB. Twenty-six of the investigations were initiated before the 40-hour Misconduct Investigative Training was completed. Fifteen (58%) of these 26 were in compliance with the requirements for completion of misconduct investigations. Seven of the investigations were both initiated and finalized after the completion of the 40-hour Misconduct Investigative Training. All seven (100%) were in compliance with all requirements for the completion of administrative misconduct investigations.

All supervisors have attended the required Misconduct Investigative Training. While some investigations still do not comply with all the requirements for the investigation of misconduct, these deficiencies are covered in other Paragraphs. We note again for this reporting period that those investigations completed after the completion of the 40-Hour Misconduct Investigative Training are of higher quality than those completed prior to the training.

MCSO has complied with the requirements to train all supervisors who conduct minor misconduct investigations; and they provide a monthly report regarding those supervisors who they have determined are not qualified to conduct these investigations.

**Paragraph 191.** *If at any point during a misconduct investigation an investigating Supervisor outside of the Professional Standards Bureau believes that the principal may have committed misconduct of a serious or criminal nature, he or she shall immediately notify the Professional Standards Bureau, which shall take over the investigation.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

WAI 38321

To determine Phase 2 compliance with this Paragraph, we reviewed 56 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.  Of the 33 administrative misconduct cases investigated at the District level, we identified one where we believe that potential serious misconduct was discovered by the investigating supervisor and the investigation should have been forwarded to PSB for completion and was not.

**Paragraph 192.**  *The Professional Standards Bureau shall review, at least semi-annually, all investigations assigned outside the Bureau to determine, among the other matters set forth in ¶ 251 below, whether the investigation is properly categorized, whether the investigation is being properly conducted, and whether appropriate findings have been reached.*

**Phase 1:**  In compliance

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

PSB command personnel advised us that they continue to review investigations in "real time" as they come into the Bureau.  During this reporting period, MCSO provided copies of PSB's daily reviews of 32 completed Division level misconduct investigations that were assigned outside the Bureau.  The report review template used by PSB includes sections that address whether or not the investigation is properly categorized, whether the investigation is properly conducted, and whether appropriate findings have been reached.  Additionally, copies of emails detailing the quality of the investigation, identified deficiencies, and required edits sent electronically to affected Division Commanders were provided for each case reviewed.

PSB included the information required by this Paragraph in its semi-annual public Misconduct Investigations Report, which is required under Paragraph 251.  The most recent report was published on MCSO's website in February 2019.  The report covers the period of January 1-June 30, 2018; and contains an analysis as to whether cases assigned outside of PSB are properly categorized, whether the investigations were properly conducted, and whether appropriate findings have been reached.  Some of the issues of concern identified in the review of the investigations where improvement is needed include: improper use of leading questions; content issues with the narrative of the report; failure to interview all parties (e.g., investigative leads and witnesses); and failure to complete an in-depth and thorough investigation.  The following trends were identified during PSB's review of the investigations: lack of attention to detail; use of inappropriate policies; and issues differentiating between the use of the findings of "unfounded" and "exonerated."

MCSO published the Professional Standards Bureau Operations Manual during this reporting period, achieving Phase 1 compliance with this requirement.  We previously deferred our Phase 2 compliance assessment of this Paragraph until MCSO achieved Phase 1 compliance via the publication of the manual.  MCSO is now in Phase 2 compliance with this Paragraph.

WAI 38322

***Paragraph 193.***  *When a single act of alleged misconduct would constitute multiple separate policy violations, all applicable policy violations shall be charged, but the most serious policy violation shall be used for determining the category of the offense.  Exoneration on the most serious offense does not preclude discipline as to less serious offenses stemming from the same misconduct.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 56 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.  In all 15 cases with sustained allegations, the most serious policy violation was used to determine the category of the offense if more than one policy violation had been alleged.  In cases where multiple violations of policy occurred, this information was also listed on the preliminary discipline document.  There were no cases where the exoneration of any offense precluded discipline for sustained allegations.


***Paragraph 194.***  *The Commander of the Professional Standards Bureau shall ensure that investigations comply with MCSO policy and all requirements of this Order, including those related to training, investigators' disciplinary backgrounds, and conflicts of interest.*

Phase 1:  In compliance

- CP-2 (Code of Conduct), most recently amended on March 15, 2019.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on January 24, 2019.

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

WAI 38323

**Phase 2:**  Not in compliance

We determine Phase 2 compliance with this Paragraph by a review of completed misconduct investigations conducted by MCSO personnel, the review of attendance by internal investigators at required Misconduct Investigative Training, the disciplinary backgrounds of internal investigators and the efforts being made by the PSB Commander to reach compliance.

During this reporting period, we reviewed 56 administrative misconduct investigations and five criminal investigations.  All five (100%) of the criminal investigations complied with MCSO policy and the requirements of the Second Order.  Of the 56 administrative misconduct investigations, 44 (79%) were in compliance with all of the investigative and administrative responsibilities over which the PSB Commander has authority.  This is an increase of 4% from the last reporting period.  There were no cases where we disagreed with the final discipline decision of the Appointing Authority,

There were no administrative misconduct cases completed and reviewed in response to the requirements of Paragraphs 249 (investigatory stops) during this reporting period.  Two cases submitted in compliance with Paragraph 33, involving an allegation of bias policing not involving members of the Plaintiffs' class, were reviewed and found to be in compliance with the requirements of the Order.  Three cases were submitted and reviewed for Paragraph 275 Class Remedial Matters (CRMs).  All three were in compliance.

Of the 56 total administrative misconduct cases we reviewed, PSB personnel completed 23.  Twenty-two (96%) were in compliance with all investigative and administrative requirements over which the PSB Commander has authority.  This is an increase from the 82% compliance the last reporting period.

Sworn personnel in PSB conducted nine of these investigations.  All nine (100%) were in compliance with all of the investigative and administrative responsibilities over which the PSB Commander has authority.  This is an increase from 88% the last reporting period.

Fourteen of the investigations conducted by PSB were completed by Detention personnel assigned to PSB.  Of the 14 they investigated, 13 (93%) were in compliance with all of the investigative and administrative responsibilities over which the PSB Commander has authority.  This is an increase from the 77% compliance rate during the last reporting period.  The one case that was not compliant lacked a timely request and approval of an extension.

Thirty-three investigations were conducted by Districts or Divisions outside of PSB.  We found 22 (67%) to be in compliance with investigative and administrative requirements.  This is an increase from the 61% compliance during the last reporting period.  We noted that investigations initiated and completed by District personnel after the completion of the Misconduct Investigative Training have a much higher percentage of compliance than those completed prior to the training.

WAI 38324

As previously noted, there are many factors that impact the PSB Commander's ability to ensure compliance in all cases. The PSB Commander must rely on other members of PSB staff to conduct case reviews and ensure proper documentation is completed. We continue to find that PSB personnel are identifying and ensuring, where possible, that corrections are made and all documentation is completed in those cases they review, but in some cases, deficiencies cannot be corrected after the fact.

One of the most significant factors that has adversely impacted compliance for those cases completed outside of PSB has been the failure of District Command personnel to identify and correct deficiencies prior to forwarding cases to PSB for review. While we continue to find this a concern in those cases that were initiated prior to the 40-hour Misconduct Investigative Training, we have found that those investigations completed after the training are of much higher quality. During the last reporting period, five of the six cases completed by District personnel after the training were in full compliance. During this reporting period, all seven of the cases completed by District personnel after the completion of the training were in full compliance.

During this and the last reporting period, we noted numerous examples of District Command staff identifying and addressing concerns and deficiencies in those investigations conducted by their personnel. We continue to be optimistic that the attention being given to District internal investigations by their Command personnel, along with the increased overall quality of investigations we have noted since the completion of the Misconduct Investigative Training, will continue to result in ongoing improvement and increased compliance.

The final factor affecting the PSB Commander's ability to ensure all investigations are properly completed is that the Appointing Authority – not the PSB Commander – determines the final findings and discipline decisions. During this reporting period, there were no cases where the final discipline decision of the Appointing Authority resulted in a case being found non-compliant. While the Appointing Authority did mitigate discipline in one case this reporting period, the discipline still fell within the range, and sufficient justification for the mitigation was provided. We continue to note an increase in the number of cases where the Appointing Authority either makes a final discipline decision consistent with the presumptive discipline, or provides justified mitigation or aggravation for any change to the final decision.

WAI 38325

While PSB continues to experience challenges in ensuring that completed internal investigations are reaching full compliance with both MCSO policy and both Court Orders, the Bureau continues to make efforts to improve compliance. A member of our Team continues to meet personally with the PSB Commander weekly to discuss Class Remedial Matters. We also use this opportunity to discuss other ongoing related concerns that affect compliance with the Second Order. The PSB Commander is attentive to our concerns. We have raised a number of concerns in our weekly meetings during this reporting period, and have found that the PSB Commander and his staff our responsive to these concerns. The ability to discuss investigative or administrative concerns during these weekly meetings has resulted in concerns being immediately addressed; and in some cases, has resulted in necessary actions being taken to correct issues that have been identified.

Since October 2016, during each site visit, we have met with PSB personnel and District and Division command personnel to update them on our identification of training and performance issues that adversely affect compliance with the Second Order. Since January 2017, Detention personnel assigned to PSB to oversee investigations have also participated in these meetings. We continue to find them attentive and responsive to our input during these meetings.

Since we began conducting these site visit meetings, the PSB Commander has taken a number of actions to address issues we have raised. Based on concerns regarding those cases investigated by Detention supervisors, the PSB Commander assigned a sworn lieutenant in the Bureau to serve as a secondary reviewer of these cases, and provided additional training and oversight for those who conduct these investigations. We believe that this review and oversight, the additional training, and increased experience in conducting these investigations, are all factors in the overall improvement we are observing in these cases.

To address some of the concerns with the cases conducted outside of PSB, the PSB Commander continues to assign PSB liaisons to every District. There are also PSB personnel assigned to review District cases; provide feedback; and when necessary, return the cases for additional investigation or analysis by the District personnel. To address the ongoing backlog of cases that need to be reviewed, PSB has now engaged supervisors from the Compliance Division to assist with the initial case reviews of District investigations.

During our April 2018 site visit discussions with the PSB Commander and his staff, we discussed both the completion of witness interviews and the handling of instances where inappropriate comments are made while a Body-Worn Camera (BWC) or other recording device is activated but no members of the public are present.

WAI 38326

In the case of witness interviews, we discussed that in some cases, witnesses have already been interviewed during the course of a criminal or traffic-related incident; and in others, there is clear and convincing evidence that misconduct did or did not occur without the need to interview some potential witnesses.  In the cases we have reviewed that involve such witnesses, there have been some inconsistencies in whether these witnesses are being interviewed during the administrative investigation.  We agreed that in some cases, the interview of witnesses might be unnecessary, but these types of instances must be clearly defined.  We also noted that any decision not to interview a witness should be documented and then approved by a Command member of the Division where the decision is made.

In the case of BWC or other recordings, we discussed that while inappropriate comments may have been made, they may not be related to the law enforcement contact and may not have been made in the presence of any community members.  In other cases, though the comments were not made in the presence of community members, the comments made have had a direct relationship to the law enforcement contact.  We believe that there is a clear distinction on how such comments should be addressed.  We agree that in some cases, an administrative misconduct investigation may not be appropriate; but there should be clear direction provided on how these instances are handled.

In both the interview of witnesses and the handling of comments captured on BWC or other recording devices, we believe that consistency is necessary; and that MCSO needs to develop protocols to address how these instances are handled.  The PSB Commander committed to drafting protocols for our review and approval prior to making any changes to the current procedures.

During our July and October 2018 site visits, we again discussed witness interviews and inappropriate comments that may be made outside the presence of any community members.  PSB personnel advised us that they were continuing to work on draft protocols and would forward them for our review when they were completed.  During this reporting period, PSB submitted the draft protocol for witness interviews.  We and the Parties reviewed the proposal and provided our input.  This process for conducting witness interviews was approved in December 2018.

During our July site visit, The PSB Commander informed us that in 2013 PSB initiated 76 internal investigations.  In 2014, PSB initiated 717 cases.  In 2015, PSB initiated 986 cases; and in 2016, PSB initiated 847 cases.  There were more than 1,000 cases initiated in 2017.  During the first six months of 2018, 586 investigations had been initiated, in addition to 155 service complaints that had been opened.

During our site visit in October 2018, we discussed with PSB our concerns regarding the low number of investigations being completed, and particularly the amount of time investigations are taking to complete.  PSB personnel advised us that as of our October 2018 site visit, they had initiated 629 administrative misconduct investigations and 263 service complaints for a total of 892 to date in 2018.  They continued to expect to meet or exceed the number of complaints initiated in 2017.  They further advised us that the nine sworn investigators in PSB

WAI 38327

were now carrying a caseload of approximately 36 active cases per month, and the 15 Detention supervisors in PSB were averaging 33 active cases per month.  There has been a continuing increase in the caseloads of PSB investigators each quarter since 2016.  PSB further informed us that the average time for PSB to fully investigate and close an investigation is 204 days.  In addition to those investigations currently active in PSB, there are 182 active cases being investigated in Districts and Divisions outside of PSB.

During our January 2019 site visit, we again discussed our concerns with the low number of investigations being completed and the continuing backlog of cases.  PSB told us that during 2018, there were 1114 investigations initiated by PSB: 716 administrative misconduct investigations, 354 service complaints, 36 criminal investigations, and 8 critical incident investigations.  This is an increase from the total of 1028 opened in 2017.  PSB further told us that the caseload for sworn investigators is now between 29 and 48 active cases per month and the caseload for Detention investigators is between 25 and 49 active cases per month.

PSB was authorized an additional 11 positions in the July 2018 budget.  To date, none of these positions have been filled.  During our January site visit, PSB advised us that due to ongoing sworn staffing vacancies, they do not expect to fill any of the positions anytime in the foreseeable future.  PSB has now submitted their budget requests for the July 2019 budget.  Recognizing that authorized sworn positions for the July 2018 budget still have not been filled in PSB, PSB's requests for the July 2019 budget will include only civilian personnel.  Their request includes: two administrative assistants; two management analyst assistants; one special projects manager; and three civilian investigators.  PSB staff believe that civilian personnel can be more expeditiously hired, and that many functions currently be completed by sworn and Detention investigators in PSB could be handled by civilian personnel, freeing up more investigation time.

For numerous reporting periods, we have identified and noted the lack of sufficient staff in PSB.  We have also continued to note that failure to provide adequate staff to conduct misconduct investigations is a disservice to both community members and MCSO employees.  While we continue to believe this is true, we acknowledge that staffing alone may not be sufficient to address the serious backlog and the increase in the number of investigations that are being initiated.  It also does not appear there will necessarily be any reduction in the amount of investigations being initiated, as they have continued to increase since 2013.  We have continued to note the increasing number of cases and believe that PSB is making sincere efforts to address the investigations and meet the requirements of their policies and the Orders of the Court.  We have also noted that hundreds of extension memorandums are being authored and approved for these investigations.  While we agree that the extensions are appropriate, given all of the factors involved, it is simply not appropriate to continue to delay completion of these investigations without taking some action to address the ongoing concern.

During our July 2018 site visit meetings with PSB, we discussed several pending investigations regarding identifications in the custody of MCSO.  One of these cases involves the 1,459 IDs that had been impounded at the MCSO Property Room and then checked out by an MCSO

WAI 38328

sergeant.  This investigation was initiated in 2015.  Since late 2017, this investigation has stalled due to other, more immediate priorities for investigators.  While PSB has provided updates on this investigation, and we acknowledge the many challenges PSB faces with its completion, it cannot continue to remain inactive.  Two other investigations involving IDs – one from 2015, and one from 2016 – also remain outstanding and need to be resolved.  We requested during our July site visit that PSB provide us with a written update on these investigations, and a plan for resolving them.

During our October site visit, we met with PSB personnel to again discuss the pending investigations regarding identifications in the custody of MCSO and the written update MCSO provided us regarding these investigations.  Three ID cases remain pending.  MCSO advised that there had been no appreciable progress on these cases due to other priorities.  We discussed the necessity to ensure that these investigations are properly addressed.  We recognize that the 1,459 IDs impounded at the MCSO Property Room and then checked out by an MCSO sergeant, represent a monumental task to determine if these IDs were properly seized and impounded.  To date MCSO has searched their databases for 400 of the 596 IDs that appear to belong to members of the Plaintiffs' class.  Only 132 have been linked to any MCSO deputy.  In all of these 132 cases, MCSO found that the IDs were properly seized and no internal investigations were necessary.  The remaining 268 IDs now need to be searched through the state Log Scan system to determine if MCSO or any other law enforcement officer had run the names.  A total of 196 of the IDs have not yet been searched through the MCSO databases.

We acknowledged the limitations in researching these IDs, as in many there is no information other than a name on the ID.  Without some other information, like a driver's license number, social security number, or other searchable data, name searches can take extensive time with little likelihood of obtaining any results.  We further acknowledge the limitations of the Log Scan system that is used to search the entire state database, as information can only be searched for one year at a time, and the process is lengthy and time consuming.  After discussion with MCSO, we agreed to select a random sample from the 464 IDs that have not been linked through MCSO databases, or have not yet been run through any database.  The sample selection includes IDs that contain searchable information beyond a name, creating a higher likelihood of obtaining some result.  A suitable sample has been determined to be one in 20.  A sample of 24 has been selected and forwarded to MCSO.  Our expectation is that MCSO will complete the research on the 24 selected IDs within a 90-day period.  We will determine any further course of action after reviewing the results of this search.

During our January 2019 site visit, we met with PSB to discuss the progress on the sample identifications selected for Log Scan research.  PSB personnel told us they had completed all of the Log Scans for the 25 identifications selected.  Many of these identifications were confirmed to have been run by MCSO deputies and others by MCSO Detention and civilian personnel. PSB now needs to conduct additional follow-up with other databases to locate investigative reports or other documents that may exist.  PSB personnel believe that by our next site visit, they will have exhausted all research on the 25 identifications and be able to present a final report on them.  At that time, we will determine any additional steps that need to be taken.

WAI 38329

During our July 2018 site visit, we had lengthy discussions with PSB command staff regarding the challenges they are facing ensuring that misconduct investigations are properly completed within established timeframes, given the number of investigations they conduct, the requirements for completion, and the lack of adequate staffing.  During these discussions, both we, and the Parties, expressed our willingness to discuss with them any changes in the investigation methodology they might want to propose to address the challenges and obstacles that exist.  If PSB was prepared to do so, we advised that we would provide an opportunity for this discussion during our next site visit.  PSB requested further discussion and a meeting was scheduled for our October 2018 site visit.

During our site visit meeting in October 2018, we had lengthy discussion with MCSO and the Parties regarding the ongoing concerns and challenges with the timely completion of IA investigations.   PSB presented a number of suggestions for modifications to the current processes in place in PSB.  The suggestions for modifications brought forth by MCSO included: changing the requirement for in-person interviews to an offer of an in-person interview; discontinuing the investigation of misconduct brought forward to MCSO involving former employees unless the misconduct was criminal, would affect law enforcement certification, or also involved current employees of MCSO; allowing the PSB Commander the discretion to determine if complaints of misconduct that occurred more than three years before the complaint was filed would be investigated, unless the complaint involved misconduct that was criminal in nature, would affect law enforcement certification, or was determined to be egregious; expanding the use of the service complaint process to include complaints on former employees, or misconduct that occurred more than three years prior to ensure that the information was captured, maintained, and could be reviewed; implementing an expedited discipline process, without a full investigation, if there was clear and convincing evidence that the misconduct had occurred; increasing the timeframes for the completion of misconduct investigations; and exploring the possibility of using alternative administrative closures.

Each topic brought forward was discussed during our site visit meeting.  The Parties articulated their understanding of the concerns brought forth by MCSO, but wanted additional information on each topic so they could review it and confer with both the Community Advisory Board (CAB) and the MCSO service population.  We also acknowledged our willingness to further review these topics once additional information was provided.   At the conclusion of the meeting, we requested that PSB provide us with a proposal document that would provide additional information and detail on the topics we discussed, so that we and the Parties could evaluate each topic.  We requested that this document also include information on what MCSO has already done to address the ongoing concerns with the completion of IAs and what they can do in the future, independent of any changes to the current processes.  We requested that this proposal be forwarded for our review by December 1, 2018.

WAI 38330

In December 2018, PSB provided a document describing the Bureau's ongoing concerns with the completion of misconduct investigations and a proposal for addressing some of these concerns. The document did not contain any substantive information on what MCSO has done or can do to address the ongoing concerns, independent of any of the requested changes. Both we and the Parties provided feedback to PSB on this document. There was no substantive discussion regarding the PSB proposal during our January 2019 site visit.

Over our past several site visits, PSB staff have continued to communicate that they are properly outsourcing those cases where conflicts of interest exist. PSB has contracted with a qualified private vendor to conduct these investigations. Additionally, PSB previously outsourced investigations to another local law enforcement agency.

PSB personnel updated us on these investigations during our January 2019 site visit. Both cases outsourced to another law enforcement agency have been previously completed, and no additional cases have been outsourced to any another law enforcement agency. The contract investigator continues with his investigations. He has completed numerous investigations assigned to him; and they have been forwarded to MCSO for review, prior to being forwarded to our Team. PSB did not outsource any new cases to this investigator during this reporting period.

MCSO finalized and published the revised internal investigation and discipline policies on May 18, 2017. The required 40-hour Misconduct Investigative Training was completed during late 2017.

After the Second Order was implemented, PSB reviewed the disciplinary backgrounds of all those who might conduct internal investigations, and notified us of those supervisors who would be prohibited from conducting such investigations due to their backgrounds. One supervisor remains ineligible to conduct internal investigations. Since January 2017, PSB personnel have reported on a monthly basis that they have not identified any additional members of MCSO who are disqualified from conducting misconduct investigations

**Paragraph 195.** *Within six months of the entry of this Order, the Professional Standards Bureau shall include sufficient trained personnel to fulfill the requirements of this Order.*

**Phase 1:** In compliance

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** Not in compliance

WAI 38331

In conjunction with this Paragraph, Paragraph 178 mandates that within three months of the finalization of policies consistent with Paragraph 165, all PSB personnel would receive 40 hours of comprehensive training.   Paragraph 178 requires training of all supervisors within three months of the finalization of policies, and further requires sufficient trained personnel in PSB within six months of the entry of the Order.   The first week of the required Misconduct Investigative Training commenced on September 18, 2017 and the training was completed prior to the end of 2017.

During our April 2018 site visit, the PSB Commander informed us that MCSO had been approved for six budget positions for PSB for the July 2018 budget year.   These positions included one sworn lieutenant, three sworn sergeants, and two Detention sergeants.   There were an additional five positions that PSB requested, but were not approved for the 2018 budget year at the time of our site visit.   With the number of current vacancies throughout MCSO, and the time it takes to train new deputies, PSB did not expect that any of these positions would be filled before mid to late 2019.

During our July and October 2018 site visits, PSB informed us that a total of 11 additional personnel had been approved for PSB in MCSO's July 2018 budget.   PSB personnel informed us that due to ongoing staffing shortages they did not believe any of these positions would be filled before 2019.

During our January 2019 site visit, PSB again informed us that they have not yet received any of the 2018 budgeted positions for PSB.   They further noted that it continues to remain unlikely that they will receive any of the positions any time in the foreseeable future due to ongoing personnel staffing shortages throughout the organization.   PSB continues to note that with the continuing influx of new cases, and the ongoing backlog of investigations, even if these personnel were added, the Bureau will still be insufficiently staffed to meet its responsibilities. The PSB budget requests for the July 2019 budget year include only civilian staff.   Their requests include: two administrative assistants, two management analyst assistants, one special projects manager, and three civilian investigators.   PSB believes that the addition of these positions will allow sworn and Detention supervisors to focus more on the investigative process and mitigate some of the administrative requirements currently being handled by these personnel.

The Second Order requires that PSB have "sufficient trained personnel to fulfill the requirements of this Order."   MCSO has delivered the required Misconduct Investigative Training, and our focus has shifted to the sufficiency of PSB staff to carry out its mission.   As documented in this and previous reports, PSB, in its command's estimation, is understaffed. We will not find MCSO in compliance with this Paragraph until MCSO addresses PSB's staffing issues.

WAI 38332

*Paragraph 196.  Where appropriate to ensure the fact and appearance of impartiality, the Commander of the Professional Standards Bureau or the Chief Deputy may refer administrative misconduct investigations to another law enforcement agency or may retain a qualified outside investigator to conduct the investigation.  Any outside investigator retained by the MCSO must possess the requisite background and level of experience of Internal Affairs investigators and must be free of any actual or perceived conflicts of interest.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

During our April 2017 site visit, the PSB Commander indicated that MCSO had not envisioned any need to retain additional contract investigators beyond the one investigator that had been already retained.  A member of PSB's staff serves as MCSO's single point-of-contact to liaise and assist with scheduling for the contract investigator.  The contract investigator will advance the investigations to the level of recommending findings.

PSB previously outsourced three misconduct investigations to a separate regional law enforcement agency.  Two of these investigations were completed by the outside law enforcement agency and closed by MCSO.  One was closed as the Independent Investigator was investigating the same alleged misconduct.  PSB has not outsourced any additional investigations to any outside law enforcement agencies since that time.

During this and the previous three reporting periods, PSB did not outsource any additional investigations to the contract investigator.  This investigator has completed numerous assigned investigations and forwarded them to PSB for review.  We have not yet received or reviewed these investigations.  Additional investigations being conducted by the contract investigator are still in progress.


*Paragraph 197.  The Professional Standards Bureau will be headed by a qualified Commander. The Commander of the Professional Standards Bureau will have ultimate authority within the MCSO for reaching the findings of investigations and preliminarily determining any discipline to be imposed.  If the Sheriff declines to designate a qualified Commander of the Professional Standards Bureau, the Court will designate a qualified candidate, which may be a Civilian Director in lieu of a sworn officer.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.

WAI 38333

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

In January 2018, MCSO advised that due to reorganizations within the Office, the responsibility to serve as the PSB Commander for purposes of compliance with this Order would be transferred to a captain within PSB.  The PSB Deputy Chief, who previously had this responsibility was promoted, but will maintain overall oversight of PSB as an Executive Chief. We have worked with the assigned captain during his tenure in PSB, reviewed his qualifications, and believe he possesses the requisite qualifications and capabilities to fulfill the requirements of this Paragraph.

During our site visits, and our regularly scheduled meetings with PSB to discuss CRMs and other internal affairs matters since January 2018, we have had numerous opportunities to meet and interact with the captain now serving as PSB Commander.  He continues to be responsive to our input and concerns regarding misconduct investigations, and has immediately addressed any issues that we have brought to his attention.  As we have previously noted, MCSO must support the PSB Commander with resources and executive leadership.

*Paragraph 198.    To promote independence and the confidentiality of investigations, the Professional Standards Bureau shall be physically located in a facility that is separate from other MCSO facilities, such as a professional office building or commercial retail space.  This facility shall be easily accessible to the public, present a non-intimidating atmosphere, and have sufficient space and personnel for receiving members of the public and for permitting them to file complaints.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

In May 2018, PSB moved into the first and second floors of 101 West Jefferson Street.  PSB's address is available on the comment and complaint form that is accessible to the public at the Districts and on MCSO's website.  PSB's criminal investigators are housed on the first floor, and administrative investigators are housed on the second floor of the building.  PSB's off-site facility has two dedicated security personnel assigned during normal business hours of 8:00 am-4:00 pm, Monday-Friday.  MCSO remains in compliance with this requirement.

WAI 38334

*Paragraph 199.  The MCSO will ensure that the qualifications for service as an internal affairs investigator shall be clearly defined and that anyone tasked with investigating employee misconduct possesses excellent investigative skills, a reputation for integrity, the ability to write clear reports, and the ability to be fair and objective in determining whether an employee committed misconduct.  Employees with a history of multiple sustained misconduct allegations, or one sustained allegation of a Category 6 or Category 7 offense from MCSO's disciplinary matrices, will be presumptively ineligible to conduct misconduct investigations.  Employees with a history of conducting deficient investigations will also be presumptively ineligible for these duties.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

MCSO did not have any submissions pertaining to this Paragraph for this reporting period, and noted no additions to the list of employees prohibited from conducting misconduct investigations during our January site visit.  GH-2 reflects the directive of this Paragraph, to ensure that only supervisors who meet the criteria established by this Paragraph are assigned misconduct investigations.  The PSB Operations Manual, which formalizes the review process, states that if any supervisor is deemed ineligible, the PSB commander will notify the supervisor's commander in writing, and will ensure that a Blue Team entry is made to memorialize the supervisor's ineligibility to conduct misconduct investigations.  A record of supervisors deemed ineligible to conduct misconduct investigations is maintained in PSB. These procedures were finalized and documented in the PSB Manual, published on December 13, 2018.


*Paragraph 200.  In each misconduct investigation, investigators shall:*

a.      *conduct investigations in a rigorous and impartial manner designed to determine the facts;*

b.      *approach investigations without prejudging the facts and without permitting any preconceived impression of the principal or any witness to cloud the investigation;*

c.      *identify, collect, and consider all relevant circumstantial, direct, and physical evidence, including any audio or video recordings;*

d.      *make reasonable attempts to locate and interview all witnesses, including civilian witnesses;*

e.      *make reasonable attempts to interview any civilian complainant in person;*

f.      *audio and video record all interviews;*

WAI 38335

g.    *when conducting interviews, avoid asking leading questions and questions that may suggest justifications for the alleged misconduct;*

h.    *make credibility determinations, as appropriate; and*

i.    *attempt to resolve material inconsistencies between employee, complainant, and witness statements.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 56 administrative misconduct investigations that were completed by MCSO personnel during this reporting period. Fifty-four were both initiated and completed after the issuance of the Second Order. Forty-seven of these 56 administrative investigations were both initiated and completed after May 18, 2017, and are subject to all requirements of the internal affairs policies finalized and published on that date. PSB investigated 23 of the total cases. District or Division supervisory personnel not assigned to PSB investigated 33 of the cases. Of the cases we reviewed, 46 involved external complaints and 10 were internally generated.

Paragraph 200.a. requires that misconduct investigations be conducted in a rigorous and impartial manner. During the last reporting period, all investigations complied with the requirements of this Subparagraph. During this reporting period, one investigation (2%) fell short of compliance with this Subparagraph.

Paragraph 200.b. requires that investigations be approached without prejudging the facts or permitting preconceived impressions. During the last reporting period, all investigations complied with the requirements of this Subparagraph. During this reporting period, one investigation (2%) fell short of compliance with this Subparagraph.

Paragraph 200.c. requires that investigators identify, collect, and consider all relevant evidence. During this and the last reporting period, all investigations complied with the requirements of this Subparagraph.

Paragraph 200.d. requires that investigators make reasonable attempts to locate and interview all witnesses. During the last reporting period, one investigation (2%) fell short of compliance with this Subparagraph. During this reporting period, one investigation (2%) again fell short of compliance with this Subparagraph.

Paragraph 200.e. requires that investigators make reasonable attempts to interview civilian complainants in person. During this and the last reporting period, all investigations complied with the requirements of this Subparagraph.

WAI 38336

Paragraph 200.f. requires audio- and video-recording of all interviews. During the last reporting period, there were eight investigations that were not both audio- and video-recorded. All included documented appropriate reasons why the interviews were not. During this reporting period, there were 19 investigations where the interviews of all complainants, witnesses, and investigative leads were not both audio- and video-recorded. In all of these investigations, MCSO documented appropriate reasons why they were not.

Paragraph 200.g. requires that when conducting interviews, investigators avoid asking leading questions or questions that may suggest justification for the alleged misconduct. During the last reporting period, all investigations complied with the requirements of this Subparagraph. During this reporting period, one of the investigations (2%) did not comply with all requirements of this Subparagraph.

Paragraph 200.h. requires that proper credibility determinations be made. During the last reporting period, one completed investigation (2%) fell short of compliance with this Subparagraph. During this reporting period, one investigation (2%) again fell short of compliance with this Subparagraph.

Paragraph 200.i. requires that investigators attempt to resolve all material inconsistencies. During the last reporting period, all investigations complied with the requirements of this Subparagraph. During this reporting period, one investigation (2%) fell short of compliance with this Subparagraph.

***Paragraph 201.*** *There will be no automatic preference for an employee's statement over a non-employee's statement. Internal affairs investigators will not disregard a witness's statement solely because the witness has some connection to either the complainant or the employee or because the witness or complainant has a criminal history, but may consider the witness's criminal history or any adjudicated findings of untruthfulness in evaluating that witness's statement. In conducting the investigation, internal affairs investigators may take into account the record of any witness, complainant, or officer who has been determined to have been deceptive or untruthful in any legal proceeding, misconduct investigation, or other investigation.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 56 administrative misconduct investigations conducted by MCSO personnel that were completed during this reporting period.

WAI 38337

Of the 56 completed administrative misconduct investigations, 46 involved complainants that were not MCSO employees. Sixteen of the 56 total investigations also included interviews with witnesses or investigative leads who were not MCSO employees. We did not identify any cases where there was an automatic preference for the statement of an employee over a non-employee witness.

We did not identify any completed investigations where a witness's statement was disregarded solely because of any connection identified in this Paragraph, nor where a witness's criminal history or findings of truthfulness were considered.

**Paragraph 202.** *Internal affairs investigators will investigate any evidence of potential misconduct uncovered during the course of the investigation, regardless of whether the potential misconduct was part of the original allegation.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 56 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period. In four of the 56 investigations, MCSO identified additional potential misconduct during the course of the investigations and properly added additional allegations or initiated new investigations. We identified one investigation conducted by a District supervisor where we believe that additional serious misconduct may have occurred. We believe the case should have been forwarded to PSB for additional investigation and was not.

**Paragraph 203.** *If the person involved in the encounter with the MCSO pleads guilty or is found guilty of an offense, internal affairs investigators will not consider that information alone to be determinative of whether an MCSO employee engaged in misconduct, nor will it by itself justify discontinuing the investigation. MCSO training materials and policies on internal investigations will acknowledge explicitly that the fact of a criminal conviction related to the administrative investigation is not determinative of whether an MCSO employee engaged in misconduct and that the mission of an internal affairs investigator is to determine whether any misconduct occurred.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

WAI 38338

To determine Phase 2 compliance with this Paragraph, we reviewed 56 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

There were no indications in any of the completed investigations we reviewed that any MCSO investigators considered alone any pleading or finding of guilty by any person as a reason to make any determination regarding the potential misconduct of any MCSO personnel, nor were any investigations discontinued for this reason.

**Paragraph 204.** *Internal affairs investigators will complete their administrative investigations within 85 calendar days of the initiation of the investigation (60 calendar days if within a Division). Any request for an extension of time must be approved in writing by the Commander of the Professional Standards Bureau. Reasonable requests for extensions of time may be granted.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we review administrative misconduct investigations conducted by MCSO personnel.

Forty-three (77%) of the total 56 administrative misconduct investigations reviewed for this reporting period were not completed within the 60 or 85-day timeline. Of these 43, only one (2%) did not contain a timely extension request or approval.

PSB conducted 23 of the 56 administrative misconduct investigations we reviewed. Twenty-two of these investigations were not completed within the required 85-day time period. All but one of these 22 investigations included a request for, and an approval of an extension.

As noted in previous reporting periods, we now determine the 60-day time period compliance findings for those investigations conducted by personnel outside of PSB based on the original date the investigation is approved by the District or Division Commander and forwarded to PSB. We acknowledge that with the ever-increasing delays in the completion and reviews of internal investigations, District and Division personnel may not know that PSB has found internal investigations they have submitted to require further investigation or other action, until after the 60-day time period has expired. In those cases where deficiencies are identified by PSB, the cases will continue to be found non-compliant in other relevant Paragraphs, and specifically in Paragraph 213, which requires the District or Division Commander ensure that investigations conducted by their personnel are complete and the findings are supported by the evidence prior to their submittal to PSB.

WAI 38339

Districts or Divisions outside of PSB conducted 33 of the administrative misconduct investigations. Twenty-one of these 33 investigations were not submitted to PSB within the required 60-day timeframe. All 21 had a timely request and approval for an extension.

In addition to those investigations not completed within 60 or 85 days as required by this Paragraph, 19 cases exceeded the 180-day timeframe. Only one of these did not contain a timely request for an extension.

***Paragraph 205.*** *The Professional Standards Bureau shall maintain a database to track all ongoing misconduct cases, and shall generate alerts to the responsible investigator and his or her Supervisor and the Commander of the Professional Standards Bureau when deadlines are not met.*

**Phase 1:** In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

We determine compliance with this Paragraph by assigning a member of our Team to observe demonstrations of the IAPro database during our site visits or other meetings with PSB throughout the reporting period. The IAPro technology serves as the centralized electronic numbering and tracking system for all allegations of misconduct, whether internally discovered or based on an external complaint. This database contains the capacity to manage and store information required for compliance with this Paragraph.

During our January 2018 site visit, we met with PSB personnel and observed IAPro to ensure that the system still generates alerts to responsible investigators and PSB supervisors/commanders if deadlines are not met. We also reviewed copies of emails PSB disseminates to the District/Divisions on the 15th of every month to identify investigatory deadlines. The Blue Team Dashboard was also viewed, which uses a color system (green, yellow, red) to identify investigations that are nearing deadlines or are past deadlines. Case management information appears in each supervisor's Blue Team while they are monitoring ongoing/open cases. Once again, this demonstration represented IAPro as a technological instrument that meets the compliance criteria of this Paragraph – to include logging of critical dates and times, alerts regarding timeframes and deadlines, chronological misconduct investigation status, notifications, and dispositions.

WAI 38340

The civilian PSB management analyst has the primary responsibility to administer the centralized tracking system.  In addition, all PSB and Division investigators can access the electronic Blue Team database – a system that integrates with IAPro – at any time to view the assignment and status of administrative investigations.  In response to our previous concerns about ensuring system administration redundancy, PSB has trained two lieutenants to administer the system, in addition to the analyst.

In May 2018, PSB relocated to an offsite location.  In July 2018, a member of our Team verified that the existing tracking mechanisms continue to be used for the tracking of investigations at the new facility.

During our January 2019 site visit, a member of our Team again verified that the tracking mechanisms remain in place.  We also continue to receive monthly notifications from PSB regarding closed administrative investigations, and we evaluate these closed investigations for the entirety of a reporting period against a multitude of criteria, including whether the cases were completed in a timely fashion.  (See Paragraph 204.)

**Paragraph 206.**  *At the conclusion of each investigation, internal affairs investigators will prepare an investigation report.  The report will include:*

a.   *a narrative description of the incident;*

b.   *documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the incident.  In situations in which there are no known witnesses, the report will specifically state this fact.  In situations in which witnesses were present but circumstances prevented the internal affairs investigator from determining the identification, phone number, or address of those witnesses, the report will state the reasons why.  The report will also include all available identifying information for anyone who refuses to provide a statement;*

c.   *documentation of whether employees were interviewed, and a transcript or recording of those interviews;*

d.   *the names of all other MCSO employees who witnessed the incident;*

e.   *the internal affairs investigator's evaluation of the incident, based on his or her review of the evidence gathered, including a determination of whether the employee's actions appear to be within MCSO policy, procedure, regulations, orders, or other standards of conduct required of MCSO employees;*

f.   *in cases where the MCSO asserts that material inconsistencies were resolved, explicit credibility findings, including a precise description of the evidence that supports or detracts from the person's credibility;*

WAI 38341

g.    *in cases where material inconsistencies must be resolved between complainant, employee, and witness statements, explicit resolution of the inconsistencies, including a precise description of the evidence relied upon to resolve the inconsistencies;*

h.    *an assessment of the incident for policy, training, tactical, or equipment concerns, including any recommendations for how those concerns will be addressed;*

i.    *if a weapon was used, documentation that the employee's certification and training for the weapon were current; and*

j.    *documentation of recommendations for initiation of the disciplinary process; and*

k.    *in the instance of an externally generated complaint, documentation of all contacts and updates with the complainant.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 56 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

Paragraph 206.a. requires a written description on the incident be included in the investigative report. All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.b. requires documentation of all evidence gathered, including all known information about witnesses. All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.c. requires documentation of whether employees were interviewed, and a transcript or recording of these interviews. All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.d. requires that the names of all MCSO employees who witnessed the incident be included in the report. All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.e. requires that the internal affairs investigator's evaluation of the incident includes a determination of whether the employee's actions appear to be within MCSO policy, procedure, regulations, orders, or other standards of conduct required of MCSO employees. All completed investigations that we reviewed complied with the requirements of this Subparagraph.

WAI 38342

Paragraph 206.f. requires that when MCSO asserts that material inconsistencies were resolved, explicit credibility findings, including a precise description of the evidence that supports or detracts from the person's credibility must be provided.  We identified one completed investigation where we do not believe that material consistencies were resolved.

Paragraph 206.g. requires that when material inconsistencies must be resolved, a precise description of the evidence be included in the report.  All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.h. requires that assessment of the incident for policy, training, tactical, or equipment concerns be included in the investigative report, to include any recommendations. We identified one completed investigation where MCSO identified an employee training issue, but failed to document any actions to address this concern.

Paragraph 206.i. requires that if a weapon was used, documentation that the employee's certification and training for the weapon must be included in the investigative written report. All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.j. requires that documentation of the initiation of the disciplinary process be included in the investigation.  Compliance is achieved when the misconduct investigator completes the investigation with a finding of sustained, when applicable, and the PSB Commander subsequently approves the finding.  This is considered the initiation of the disciplinary process.  Fifteen of the 56 administrative misconduct investigations we reviewed had sustained findings against one or more MCSO employees.  All complied with the requirements of this Subparagraph.

Paragraph 206.k. requires that any contacts and updates with the complainant be documented in the investigative report.  All of the investigations we reviewed for this Subparagraph complied with this requirement.


***Paragraph 207.***  *In assessing the incident for policy, training, tactical, or equipment concerns, investigation reports will include an assessment of whether:*

a.   *the law enforcement action was in compliance with training and legal standards;*

b.   *the use of different tactics should or could have been employed;*

c.   *the incident indicates a need for additional training, counseling, or other non-disciplinary corrective actions; and*

d.   *the incident suggests that the MCSO should revise its policies, strategies, tactics, or training.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

WAI 38343

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

During this reporting period, we reviewed 56 administrative misconduct investigations. MCSO properly assessed and documented whether any of the requirements of this Paragraph were relevant in all but one of the completed cases we reviewed for this reporting period. MCSO identified six cases where action related to this Paragraph was appropriate; and addressed the concerns identified with one-on-one meetings with employees, additional training, additional supervisory oversight – and where appropriate, policy review.

PSB continues to use an internal tracking form to ensure that those concerns that are forwarded to other Divisions within MCSO for action or review are addressed. We receive and review this tracking document each month. We continue to find that this tracking form contains ongoing information on the status of concerns that have been identified and is regularly updated.

*Paragraph 208. For each allegation of misconduct, internal affairs investigators shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation:*

a.    *"Unfounded," where the investigation determines, by clear and convincing evidence, that the allegation was false or not supported by fact;*

b.    *"Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur and justifies a reasonable conclusion of a policy violation;*

c.    *"Not Sustained," where the investigation determines that there is insufficient evidence to prove or disprove the allegation; or*

d.    *"Exonerated," where the investigation determines that the alleged conduct did occur but did not violate MCSO policies, procedures, or training.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review administrative misconduct investigations conducted by MCSO personnel and completed during the reporting period. We evaluate compliance with this Paragraph against the standard of whether a finding was made, and whether the finding was correct.

During the last reporting period, we concurred with the findings of the PSB Commander in 55 (98%) of the 56 cases that were completed.

WAI 38344

During this reporting period, we concurred with the findings of the PSB Commander in 54 (96%) of the 56 administrative misconduct investigations we reviewed.  In one case, the PSB Commander made a finding of not sustained, where we believe that the preponderance of evidence supported a finding of sustained.  In the second investigation, while some policy violations were sustained, we believe that additional investigation should have occurred regarding other potential misconduct that was identified during the investigation before coming to a finding.  There were no investigations during this reporting period where the Appointing Authority changed the findings made by the PSB Commander.  As is our practice, we will discuss the cases where we disagree with the findings with PSB during our next site visit.

**Paragraph 209.**  *For investigations carried out by Supervisors outside of the Professional Standards Bureau, the investigator shall forward the completed investigation report through his or her chain of command to his or her Division Commander.  The Division Commander must approve the investigation and indicate his or her concurrence with the findings.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 33 administrative misconduct investigations not conducted by PSB personnel and completed during this reporting period.  All 33 of the investigations completed outside of PSB were forwarded to PSB as required, and all contained the approval of the responsible District or Division Commander.  As noted in previous reporting periods, and again during *this* reporting period, some of the District-level investigations were not in compliance with various requirements of the Second Order – as indicated throughout this report.  However, we assessed MCSO's compliance with this Paragraph based on these cases being forwarded through the chain of command for approval of the investigation and findings.

**Paragraph 210.**  *For investigations carried out by the Professional Standards Bureau, the investigator shall forward the completed investigation report to the Commander.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 23 administrative misconduct investigations conducted by PSB investigative personnel and completed during this reporting period.  All 23 complied with the requirements of this Paragraph.

WAI 38345

*Paragraph 211.  If the Commander—meaning the Commander of the PSB or the Commander of the Division in which the internal affairs investigation was conducted—determines that the findings of the investigation report are not supported by the appropriate standard of proof, the Commander shall return the investigation to the investigator for correction or additional investigative effort, shall document the inadequacies, and shall include this documentation as an addendum to the original investigation.  The investigator's Supervisor shall take appropriate action to address the inadequately supported determination and any investigative deficiencies that led to it.  The Commander shall be responsible for the accuracy and completeness of investigation reports prepared by internal affairs investigators under his or her command.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  Not in compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 56 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

We previously noted that neither the PSB Commander nor other District or Division Commanders appeared to use any formal mechanism to ensure that the investigator's supervisor has taken appropriate action to address any instances of unsupported findings.  This issue was included in the training curricula required under Paragraph 178.

PSB investigated 23 of the 56 administrative misconduct investigations we reviewed during this reporting period.  In 22 (96%) of those cases investigated by PSB, we found the investigations to be thorough and well-written; and we concurred with the findings by the PSB Commander.  This is an increase in compliance from 82% the last reporting period.  We identified only one case conducted by PSB this reporting period that was not fully compliant.  This was a result of a failure to request a timely extension for the investigation.  This is a notable increase in compliance and evidence of PSB's continuing efforts to meet the requirements of the Orders of the Court.

Of the 33 investigations investigated by Districts or Divisions outside of PSB, we identified 11 (32%) where we had some concerns regarding the investigation and documentation.  In all 11 of these cases, PSB also identified concerns and the cases were returned for additional investigation or corrections.  We believe that many of the concerns found in these cases could, and should, have been identified at the District or Division level prior to forwarding the cases to PSB for review.  Concerns with these investigations included: failure to interview all parties; leading questions; lack of detail to support the findings; failure to identify all potential policy violations; and numerous administrative deficiencies.  Compliance for investigations conducted outside of PSB increased from 61% the last reporting period to 68% this reporting period.

WAI 38346

All 11 of the non-compliant District and Division case that we reviewed for this reporting period were initiated prior to the completion of the 40-hour Misconduct Investigative Training. The seven cases investigated at the District or Division level that were initiated after the 40-hour Misconduct Investigative Training were all fully compliant with the Orders of the Court. This is continuing evidence of the value of the training that has been delivered to MCSO supervisory personnel on the completion of misconduct investigations. `

In January 2018, we requested that MCSO begin providing us documentation that reflects the actions being taken to address deficient misconduct investigations. We requested that command personnel provide a response to this request on a monthly basis. We have consistently received the requested documentation since March 2018. We have noted numerous instances where Command personnel have addressed needed clarifications, corrections, or additional investigation in cases completed or reviewed by their personnel.

During the last reporting period, we noted that Command personnel in Districts 1, 2, 3, 4, and 6 had all identified concerns or deficiencies with investigations conducted by their personnel. The identified concerns were addressed with a variety of intervention strategies, including: one-on-one coachings; mentoring; training; Blue Team notes; and increased supervisory oversight. One administrative misconduct investigation was also initiated by District Command personnel after a supervisor failed to respond to intervention strategies.

During this reporting period, we noted one instance of a Commander in a District taking action to address concerns with a supervisor's completion of administrative investigations. In this case, the intervention strategy included one on one mentoring and a notation in Blue Team. We agree with MCSO's handling of this concern. We did not note any instances during this reporting period where we believe actions other than those being taken by MCSO would be necessary. We will continue to review these reports to ensure that appropriate actions are being taken to address investigations where corrections are needed or deficiencies are found.

We have noted in numerous previous reporting periods that both the supervisors who complete deficient investigations and the command personnel who approve them must be held accountable if MCSO is to achieve Phase 2 compliance with this Paragraph. During this and the last reporting period, our reviews of both investigations submitted since the completion of the Misconduct Investigative Training and the documentation being provided by command personnel indicate that MCSO is making efforts to identify and address areas of concern with the completion of misconduct investigations. We continue to be optimistic that we will observe continuing improvement in the quality of misconduct investigations being conducted by MCSO personnel.

WAI 38347

*Paragraph 212.   Where an internal affairs investigator conducts a deficient misconduct investigation, the investigator shall receive the appropriate corrective and/or disciplinary action.   An internal affairs investigator's failure to improve the quality of his or her investigations after corrective and/or disciplinary action is taken shall be grounds for demotion and/or removal from a supervisory position or the Professional Standards Bureau.*

**Phase 1:**  In compliance

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.
- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 56 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

The 40-hour Misconduct Investigative Training was completed in late 2017.  In January 2018, we requested that MCSO begin providing us with a document that reflects what actions are being taken to address deficient misconduct investigations on a monthly basis.  As discussed in Paragraph 211, we have consistently received the required documentation since March 2018. During this reporting period, MCSO command personnel have continued to identify and address concerns they have found with incomplete or deficient investigations conducted and reviewed by their personnel.

We will continue to review the monthly reports submitted by MCSO command personnel, along with reviewing completed misconduct investigations, to ensure that any additional deficiencies are being identified and addressed.

*Paragraph 213.   Investigations of minor misconduct conducted outside of the Professional Standards Bureau must be conducted by a Supervisor and not by line-level deputies.  After such investigations, the investigating Supervisor's Commander shall forward the investigation file to the Professional Standards Bureau after he or she finds that the misconduct investigation is complete and the findings are supported by the evidence.  The Professional Standards Bureau shall review the misconduct investigation to ensure that it is complete and that the findings are supported by the evidence.   The Professional Standards Bureau shall order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings.  Where the findings of the investigation report are not supported by the appropriate standard of proof, the Professional Standards Bureau shall document the reasons for this determination and shall include this documentation as an addendum to the original investigation.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

WAI 38348

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 56 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.  Of the 56 investigations, 23 were investigated by PSB personnel.  Thirty-three were investigated by MCSO personnel outside of PSB.

None of the documentation we received regarding investigations conducted outside of PSB indicated that any person below the rank of sergeant was responsible for the investigation.

All 33 District or Division level approved cases were forwarded to, and reviewed by, PSB as required.  Eleven (33%) of the 33 cases investigated at the District or Division level were returned by PSB personnel for additional investigation, corrections, proper documentation, or other changes.

PSB documented all the cases returned to District investigators for additional investigation or corrections, and this information was included in the documentation we reviewed.


*Paragraph 214.  At the discretion of the Commander of the Professional Standards Bureau, a misconduct investigation may be assigned or re-assigned to another Supervisor with the approval of his or her Commander, whether within or outside of the District or Bureau in which the incident occurred, or may be returned to the original Supervisor for further investigation or analysis.  This assignment or re-assignment shall be explained in writing.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 56 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

Our analysis for this reporting period revealed that of the 33 investigations conducted outside of PSB, 11 were returned by PSB to the original investigating supervisor for further investigation, analysis, or corrections.  There were no instances where an investigation was assigned or reassigned to a different supervisor.


*Paragraph 215.  If, after an investigation conducted outside of the Professional Standards Bureau, an employee's actions are found to violate policy, the investigating Supervisor's Commander shall direct and ensure appropriate discipline and/or corrective action.  Where the incident indicates policy, training, tactical, or equipment concerns, the Commander shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.*

**Phase 1:**  In compliance

WAI 38349

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 34 administrative misconduct investigations conducted by MCSO personnel outside of PSB and completed during this reporting period.

Seven of the 33 completed misconduct investigations conducted outside of PSB resulted in sustained findings.  In six of these cases, the reports included documentation that appropriate discipline or corrective action was taken.  In one of the six investigations, in addition to discipline, the need for additional training was also identified and addressed.  In one case, the employee resigned prior to the determination of discipline.

*Paragraph 216.  If, after an investigation conducted by the Professional Standards Bureau, an employee's actions are found to violate policy, the Commander of the Professional Standards Bureau shall direct and ensure appropriate discipline and/or corrective action.  Where the incident indicates policy, training, tactical, or equipment concerns, the Commander of the Professional Standards Bureau shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 56 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

Twenty-three of the completed investigations were conducted by PSB.  Eight resulted in a sustained finding against one or more MCSO employees.  In five of these sustained investigations, the PSB Commander ensured that appropriate discipline and/or corrective action was recommended.  In the three remaining cases, the employees left MCSO employment prior to the determination of discipline., The PSB Commander provided the preliminary determination of the range of discipline in all of the five cases involving current MCSO employees.  The PSB Commander cannot ensure that appropriate discipline or corrective action are the final outcome of sustained misconduct investigations, as the Appointing Authority makes the final decisions for discipline on both minor misconduct cases and in serious misconduct cases that result in PDHs.  The hearing officer has the authority to change the findings or reduce the discipline.

WAI 38350

Of the five sustained misconduct investigations conducted by PSB, none indicated a need for additional training or administrative action.

***Paragraph 217.***  *The Professional Standards Bureau shall conduct targeted and random reviews of discipline imposed by Commanders for minor misconduct to ensure compliance with MCSO policy and legal standards.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  Not applicable

Based on the requirements of the Second Order, District and Division Commanders will not impose discipline for minor misconduct.  In all cases, the PSB Commander will determine the final findings for internal investigations and the presumptive range of discipline for those cases with sustained findings.  The Appointing Authority will then make the final determination of discipline.

***Paragraph 218.***  *The Professional Standards Bureau shall maintain all administrative investigation reports and files after they are completed for record-keeping in accordance with applicable law.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

To determine compliance with this Paragraph, we have observed that PSB maintains both hardcopy and electronic files intended to contain all documents required for compliance with this Paragraph.

A member of our Team has inspected the file rooms where hardcopies of administrative investigations are stored and randomly reviewed case files to verify compliance on multiple occasions when PSB was housed at MCSO Headquarters.  Our Team member also used the access granted to IAPro to randomly select internal affairs case files to verify that all information was being maintained electronically.

PSB completed the move to its new offsite facility in May 2018.  Subsequent to the move, a member of our Team conducted an inspection of the file rooms in the new facility; and conducted a review of random internal investigations in IAPRO to ensure ongoing compliance.

WAI 38351

During our January 2019 site visit, a member of our Team again verified compliance at the PSB facility by inspecting both the criminal and administrative investigation file rooms and randomly selecting internal affairs case files to verify that all information is also being electronically maintained in IAPro.

### D.    Discipline

**Paragraph 219.**  *The Sheriff shall ensure that discipline for sustained allegations of misconduct comports with due process, and that discipline is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented regardless of the command level of the principal of the investigation.*

**Paragraph 220.**  *To ensure consistency in the imposition of discipline, the Sheriff shall review the MCSO's current disciplinary matrices and, upon approval of the parties and the Monitor, will amend them as necessary to ensure that they:*

a.    *establish a presumptive range of discipline for each type of violation;*

b.    *increase the presumptive discipline based on an employee's prior violations;*

c.    *set out defined mitigating and aggravating factors;*

d.    *prohibit consideration of the employee's race, gender, gender identity, sexual orientation, national origin, age, or ethnicity;*

e.    *prohibit conflicts, nepotism, or bias of any kind in the administration of discipline;*

f.    *prohibit consideration of the high (or low) profile nature of the incident, including media coverage or other public attention;*

g.    *clearly define forms of discipline and define classes of discipline as used in policies and operations manuals;*

h.    *provide that corrective action such as coaching or training is not considered to be discipline and should not be used as a substitute for discipline where the matrix calls for discipline;*

i.    *provide that the MCSO will not take only non-disciplinary corrective action in cases in which the disciplinary matrices call for the imposition of discipline;*

j.    *provide that the MCSO will consider whether non-disciplinary corrective action is also appropriate in a case where discipline has been imposed;*

k.    *require that any departures from the discipline recommended under the disciplinary matrices be justified in writing and included in the employee's file; and*

WAI 38352

*l.      provide a disciplinary matrix for unclassified management level employees that is at least as demanding as the disciplinary matrix for management level employees.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, 15 of the 56 administrative misconduct investigations resulted in sustained findings against one or more members of MCSO.  Compliance findings for this Paragraph are based on the discipline findings for both minor and serious discipline.  In those cases where serious discipline is recommended, compliance findings specific to those cases are addressed in Paragraph 226.

Paragraph 220.a. requires a presumptive range of discipline for each type of violation.  In four of the 15 sustained cases, the employee resigned prior to the completion of the investigative and discipline processes.  In the remaining 11 cases, the PSB Commander determined and documented the presumptive discipline range.

Paragraph 220.b. requires that presumptive discipline be increased if an employee has prior violations.  In five of the 11 sustained investigations where discipline was assessed, the employee had prior sustained violations.  The PSB Commander considered and increased the presumptive discipline or discipline range based on the matrices in place at the time of the investigation.

Paragraph 220.c. requires that mitigating and aggravating factors be defined.  Aggravating and mitigating factors are not specifically defined in the internal affairs investigation or discipline policy in effect prior to May 18, 2017.  The revised discipline policy, effective May 18, 2017, does define these factors.  We note that aggravating or mitigating factors are not identified by the PSB Commander, but are identified and considered by the Appointing Authority when making the final disciplinary decisions.  During this reporting period, the Appointing Authority provided justification and documentation for all factors he considered when making the final discipline decisions for cases initiated both before and after May 18, 2017.  We also found that he continues to specifically identify those instances where there are aggravating or mitigating factors in the justification documents when appropriate.

WAI 38353

Paragraph 220.d. prohibits the consideration of any prohibited biases when determining discipline. None of the sustained cases that resulted in discipline that we reviewed during this reporting period included any indication that any biases were considered when determining discipline.

Paragraph 220.e. prohibits any conflicts, nepotism, or bias of any kind in the administration of discipline. None of the sustained cases we reviewed during this reporting period had any indication of conflicts, nepotism, or bias of any kind when determining the disciplinary sanction.

Paragraph 220.f. prohibits the consideration of the high (or low) profile nature of an incident when determining discipline. None of the sustained cases we reviewed during this reporting period indicated any consideration of the high- or low-profile nature of the incident when considering discipline.

Paragraph 220.g. requires that clearly defined forms of discipline and classes of discipline be defined. Phase 2 compliance is not applicable to this Subparagraph.

Paragraph 220.h. requires that corrective action such as coaching or training is not considered to be discipline and should not be used as a substitute for discipline. None of the sustained investigations resulted in the use of coaching or training as a substitute when discipline was required.

Paragraph 220.i. requires that MCSO will not take only non-disciplinary action in cases where the Discipline Matrices call for the imposition of discipline. None of the sustained cases we reviewed during this reporting period resulted in MCSO taking non-disciplinary action when the Discipline Matrices in effect required the imposition of discipline.

Paragraph 220.j. requires that MCSO consider whether non-disciplinary corrective action is also appropriate in a case where discipline has been imposed. Investigators identified one case where non-disciplinary corrective action was also appropriate and recommended training for the employee, in addition to the discipline imposed.

Paragraph 220.k. requires that any departure from the discipline recommended under the Discipline Matrices be justified in writing and included in the employee's file.

During the last reporting period, 22 investigations with sustained findings resulted in employee discipline. Twelve involved minor discipline; 10 involved serious discipline. We agreed with the final decision of the appointing authority in 21 (95%) of these 22 cases. In one investigation, we found the final decision of the Appointing Authority to lack justification for mitigating the discipline outside of the discipline prescribed by the discipline matrices in effect at the time of the investigation.

WAI 38354

During this reporting period, 11 investigations with sustained findings resulted in employee discipline.  Five involved minor discipline; six involved serious discipline.  In 10 of these cases, the final discipline was the presumptive discipline for the offense.  In one case, the discipline was mitigated to a lower sanction than the presumptive discipline, but still fell within the range of discipline.  The Appointing Authority authored a justification document for this mitigation.  He provided substantive justification for the mitigation and we agree with his decision in this case.

As we have previously noted, compliance for this Paragraph is based on the final discipline outcome for all sustained investigations.  Those instances that involve only serious discipline are specifically covered in Paragraph 226 of this Order.

Paragraph 220.l. requires that a Discipline Matrix for unclassified management employees be at least as demanding as the Discipline Matrix for management-level employees.  We reviewed the recently approved policies that affect discipline for unclassified management employees, and they comply with this requirement.  During this reporting period, MCSO did not complete or submit any administrative investigations involving unclassified management employees.

Of the 11 total sustained investigations where discipline was assessed, two were initiated prior to May 18, 2017.  In these two cases, the Discipline Matrices in effect at the time provided only a presumptive discipline range.  The final discipline for both cases fell within this range

Nine of the sustained investigations where discipline was assessed were both initiated and completed after May 18, 2017, and are subject to all the requirements relative to investigations and disciplinary procedures contained in these revised policies.  Those investigations initiated and completed after May 18, 2018 have both a discipline range and a presumptive discipline.  Aggravating or mitigating the presumptive discipline requires a justification.  In eight of these cases, the final discipline was the presumptive discipline identified in the matrices in effect.  In one case, though the discipline was within the range of discipline, it was not the presumptive.  The Appointing Authority provided a written justification and we agree with the mitigation in this case.

***Paragraph 221.***  *The Sheriff shall mandate that each act or omission that results in a sustained misconduct allegation shall be treated as a separate offense for the purposes of imposing discipline.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

WAI 38355

During this reporting period, we reviewed 11 misconduct investigations with sustained allegations that resulted in the recommendation for discipline for current MCSO employees. We found that MCSO again met the requirements of this Paragraph.

**Paragraph 222.** *The Sheriff shall also provide that the Commander of the Professional Standards Bureau shall make preliminary determinations of the discipline to be imposed in all cases and shall document those determinations in writing, including the presumptive range of discipline for the sustained misconduct allegation, and the employee's disciplinary history.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, there were 11 sustained investigations that were completed after July 20, 2016 where discipline was assessed.   In all of these cases, the PSB Commander determined and documented in writing the presumptive discipline or presumptive range of discipline based on the policies and Discipline Matrices that were in effect at the time of the investigation.   The documentation submitted for this Paragraph included the category, offense number, and employee's discipline history.

### E.    Pre-Determination Hearings

**Paragraph 223.** *If the Commander of the Professional Standards Bureau makes a preliminary determination that serious discipline (defined as suspension, demotion, or termination) should be imposed, a designated member of MCSO's command staff will conduct a pre-determination hearing and will provide the employee with an opportunity to be heard.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel where MCSO holds a Pre-Determination Hearing (PDH).

WAI 38356

During this reporting period, 11 administrative misconduct investigations resulted in sustained findings against current MCSO employees.  Six investigations resulted in the recommendation for serious discipline.  In all six, MCSO held a Pre-Determination Hearing, as required

**Paragraph 224.**  *Pre-determination hearings will be audio and video recorded in their entirety, and the recording shall be maintained with the administrative investigation file.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.

**Phase 2:**  In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, in all cases where a PDH was held, the hearing was audio- and video-recorded as required, included in the administrative file, and reviewed by a member of our Team.

**Paragraph 225.**  *If an employee provides new or additional evidence at a pre-determination hearing, the hearing will be suspended and the matter will be returned to the internal affairs investigator for consideration or further investigation, as necessary.  If after any further investigation or consideration of the new or additional evidence, there is no change in the determination of preliminary discipline, the matter will go back to the pre-determination hearing.  The Professional Standards Bureau shall initiate a separate misconduct investigation if it appears that the employee intentionally withheld the new or additional evidence during the initial misconduct investigation.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.

**Phase 2:**  In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, six sustained investigations resulted in a PDH and we reviewed all of the recordings of these hearings.  There were no instances where we, or the Appointing Authority, identified any concerns that required additional follow-up related to the requirements of this Paragraph.

WAI 38357

**Paragraph 226.**   *If the designated member of MCSO's command staff conducting the pre-determination hearing does not uphold the charges recommended by the Professional Standards Bureau in any respect, or does not impose the Commander of the Professional Standards Bureau's recommended discipline and/or non-disciplinary corrective action, the Sheriff shall require the designated member of MCSO's command staff to set forth in writing his or her justification for doing so.   This justification will be appended to the investigation file.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

**Phase 2:**  In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During every site visit, we meet with the Appointing Authority and the Compliance Division to discuss our concerns with final outcomes and decisions that result from Pre-Determination Hearings.  We have emphasized the need to comply with agency policies when determining disciplinary outcomes, and encouraged the Appointing Authority to provide detailed written justification in those cases where he determines that a sustained finding should be changed or discipline should be reduced.

During our January 2018 site visit, we met with the Appointing Authority and Compliance Division personnel to discuss the PDH process and the final outcomes of cases completed during this reporting period.   During the meeting, MCSO advised us that the Appointing Authority does not have the authority to reduce discipline based only on timeframe concerns when an employee appeals discipline in these cases.   It is the Maricopa County Attorney's Office (MCAO) that reviews these cases and determines whether the cases should go forward. Both the Appointing Authority and the representative from the MCAO advised that they have taken some of these cases forward; but in others, they did not believe it was appropriate to do so, based on the totality of circumstances.  The Parties present at the meeting also commented on their concerns regarding cases involving the Plaintiffs' class that might result in reductions in discipline as a result of the failure to complete the case within the 180-day timeframe.  We discussed the specific requirements of Arizona Revised Statutes 38-1110, and that the statute only requires a "good faith" attempt to complete cases that result in suspensions, demotions, or dismissals within the 180-day timeframe.  Since the time of our discussion in 2018, Arizona law has added a definition of good faith.  A.R.S. 38-1101 now defines good faith as "honesty of purpose and absence of intent to defraud."

WAI 38358

During that same site visit, we discussed those cases where a decision may be made after a PDH that a reduction in discipline will occur, and those cases where a decision to reduce the discipline may occur if an appeal is filed.  It is our understanding from our meeting with the Appointing Authority and other staff who were present that MCSO consults with the MCAO in these cases and their input is related to the final outcomes.  However, all the documentation we receive and review is authored and signed by the Appointing Authority, so our assessment can only consider any final decisions as his.

During this reporting period, six cases resulted in serious discipline.  In all six cases, the Appointing Authority provided a justification for the final decisions, and this information was provided to our Team in the submissions regarding closed internal affairs investigations.  The Appointing Authority did not overturn any of the sustained findings by the PSB Commander.  In five of the six cases, the final discipline was consistent with the presumptive discipline identified in the matrices in effect at the time of the investigation.  In one case, both initiated and completed after May 2017, the Appointing Authority made the decision to mitigate the discipline below the presumptive discipline, but within the discipline range.  He authored a justification document that provided the reasons for this mitigation.  We agree with his decision in this case.

MCSO has attained Phase 2 compliance with this Paragraph.

**Paragraph 227.**  *The Sheriff shall promulgate MCSO policy which shall provide that the designated member of MCSO's command staff conducting a pre-determination hearing should apply the disciplinary matrix and set forth clear guidelines for the grounds on which a deviation is permitted.  The Sheriff shall mandate that the designated member of MCSO's command staff may not consider the following as grounds for mitigation or reducing the level of discipline prescribed by the matrix:*

a.    *his or her personal opinion about the employee's reputation;*

b.    *the employee's past disciplinary history (or lack thereof), except as provided in the disciplinary matrix;*

c.    *whether others were jointly responsible for the misconduct, except that the MCSO disciplinary decision maker may consider the measure of discipline imposed on other employees involved to the extent that discipline on others had been previously imposed and the conduct was similarly culpable.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.

**Phase 2:**  In compliance

WAI 38359

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed 11 administrative misconduct investigations where discipline was imposed.  The serious sustained allegations in six of these investigations resulted in their referrals for Pre-Determination Hearings.

Paragraph 227.a. prohibits the designated member of command staff conducting a Pre-Determination Hearing from considering a personal opinion of an employee's reputation when determining discipline.  There were no indications in our reviews of these investigations that any opinion was considered in making a disciplinary decision.

Paragraph 227.b. prohibits the consideration of the employee's past disciplinary history (or lack thereof), except as provided in the Discipline Matrix.  There were no instances where we determined that the member of command staff responsible for conducting the PDH considered disciplinary history outside of the requirements of this Paragraph.

Paragraph 227.c. prohibits the consideration of others jointly responsible for misconduct, except that the decision-maker may consider such discipline to the extent that discipline on others had been previously imposed and the conduct was similarly culpable.  There were no indications in our reviews that the misconduct of others was improperly considered in the disciplinary decisions that were made.


***Paragraph 228.***  *The Sheriff or his designee has the authority to rescind, revoke or alter any disciplinary decision made by either the Commander of the Professional Standards Bureau or the appointed MCSO disciplinary authority so long as:*

a.    *that decision does not relate to the Sheriff or his designee;*

b.    *the Sheriff or his designee provides a thorough written and reasonable explanation for the grounds of the decision as to each employee involved;*

c.    *the written explanation is placed in the employment files of all employees who were affected by the decision of the Sheriff or his designee; and*

d.    *the written explanation is available to the public upon request.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.

**Phase 2:**  In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

WAI 38360

During this reporting period, there were no instances where the Sheriff or his designee rescinded, revoked, or altered any disciplinary decision made by either the Commander of PSB or the appointed MCSO disciplinary authority.

### F.    *Criminal Misconduct Investigations*

***Paragraph 229.***   *Whenever an internal affairs investigator or Commander finds evidence of misconduct indicating apparent criminal conduct by an employee, the Sheriff shall require that the internal affairs investigator or Commander immediately notify the Commander of the Professional Standards Bureau.   If the administrative misconduct investigation is being conducted by a Supervisor outside of the Professional Standards Bureau, the Sheriff shall require that the Professional Standards Bureau immediately take over the administrative investigation.   If the evidence of misconduct pertains to someone who is superior in rank to the Commander of the Professional Standards Bureau and is within the Commander's chain of command, the Sheriff shall require the Commander to provide the evidence directly to what he or she believes is the appropriate prosecuting authority—the Maricopa County Attorney, the Arizona Attorney General, or the United States Attorney for the District of Arizona—without notifying those in his or her chain of command who may be the subject of a criminal investigation.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review completed criminal misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed five internal criminal investigations.  Four were externally generated, and one was internally generated.  All were initiated and completed after July 20, 2016, and appropriately assigned to criminal investigators in PSB.  The potential misconduct was brought to the attention of the PSB Commander as required; and in all cases, an administrative misconduct investigation was also initiated.  None involved someone superior in rank to the PSB Commander.

WAI 38361

*Paragraph 230. If a misconduct allegation will be investigated criminally, the Sheriff shall require that the Professional Standards Bureau not compel an interview of the principal pursuant to Garrity v. New Jersey, 385 U.S. 493 (1967), until it has first consulted with the criminal investigator and the relevant prosecuting authority. No other part of the administrative investigation shall be held in abeyance unless specifically authorized by the Commander of the Professional Standards Bureau in consultation with the entity conducting the criminal investigation. The Sheriff shall require the Professional Standards Bureau to document in writing all decisions regarding compelling an interview, all decisions to hold any aspect of an administrative investigation in abeyance, and all consultations with the criminal investigator and prosecuting authority.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by both criminal and administrative investigators to ensure that they contain appropriate documentation that complies with the requirements of this Paragraph.

We previously determined that in many cases, the administrative investigation is not submitted and reviewed during the same reporting period as the criminal investigation, as generally, administrative investigations are finalized after the completion of the criminal investigation. We discussed this issue with PSB during our January 2017 site visit. To resolve the concern, PSB agreed to provide us with a copy of any criminal investigation when PSB submits the administrative misconduct investigation for our review, even if the criminal investigation has been previously submitted. MCSO has been consistently providing copies of these criminal investigations with the administrative investigation since that time.

During this reporting period, we reviewed two administrative misconduct investigations where criminal misconduct may have also occurred. Both had companion criminal investigations completed by MCSO as required.

*Paragraph 231. The Sheriff shall require the Professional Standards Bureau to ensure that investigators conducting a criminal investigation do not have access to any statements by the principal that were compelled pursuant to Garrity.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

WAI 38362

PSB is divided into criminal and administrative sections. Criminal investigators and administrative investigators are housed on separate floors of the building. Criminal investigators do not have access to the IAPro database for administrative investigations, and there are separate file rooms for criminal and administrative investigative documents and reports. We have previously verified during our site visits that the required separation of criminal and administrative investigations and restricted access to IAPro is in place. In May 2018, PSB relocated to a new offsite location. After PSB's move to its new facility, we verified that criminal and administrative investigation files were housed on separate floors in the new facility. Criminal investigators do not have access to the IAPro database for administrative investigations, and there are separate and secured file rooms for criminal and administrative documents and reports.

During our January 2019 site visit, a member of our Team again verified that criminal and administrative investigative files are housed on separate floors, there is restricted access to both file rooms, and restricted access to IAPro remains in place.

**Paragraph 232.** *The Sheriff shall require the Professional Standards Bureau to complete all such administrative investigations regardless of the outcome of any criminal investigation, including cases in which the prosecuting agency declines to prosecute or dismisses the criminal case after the initiation of criminal charges. The Sheriff shall require that all relevant provisions of MCSO policies and procedures and the operations manual for the Professional Standards Bureau shall remind members of the Bureau that administrative and criminal cases are held to different standards of proof, that the elements of a policy violation differ from those of a criminal offense, and that the purposes of the administrative investigation process differ from those of the criminal investigation process.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine MCSO's compliance with this Paragraph, we review on a monthly basis administrative and criminal misconduct investigations conducted by MCSO.

During this reporting period, we reviewed five criminal misconduct investigations conducted by MCSO personnel. All have a companion administrative misconduct investigation, as required; and are in compliance with the requirements of this Paragraph.

WAI 38363

***Paragraph 233.*** *If the investigator conducting the criminal investigation decides to close the investigation without referring it to a prosecuting agency, this decision must be documented in writing and provided to the Professional Standards Bureau. The Commander of the Professional Standards Bureau shall separately consider whether to refer the matter to a prosecuting agency and shall document the decision in writing.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine MCSO's compliance with this Paragraph, we review on a monthly basis administrative and criminal misconduct investigations conducted by MCSO.

During this reporting period, four of the five criminal investigations we reviewed were closed without submittal to a prosecuting agency. In all four cases, the decisions were supported by the facts of the investigation, interviews, or other investigative follow-up. The investigators documented their conclusions and decisions to close the cases without submittal and the PSB Commander approved these decisions in writing.

***Paragraph 234.*** *If the investigator conducting the criminal investigation decides to refer the matter to a prosecuting agency, the Professional Standards Bureau shall review the information provided to the prosecuting agency to ensure that it is of sufficient quality and completeness. The Commander of the Professional Standards Bureau shall direct that the investigator conduct additional investigation when it appears that there is additional relevant evidence that may improve the reliability or credibility of the investigation. Such directions shall be documented in writing and included in the investigatory file.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine MCSO's compliance with this Paragraph, we review on a monthly basis administrative and criminal misconduct investigations conducted by MCSO.

During this reporting period, we reviewed five criminal misconduct investigations conducted by PSB personnel. One of the five cases was forwarded to an appropriate prosecutorial agency as required. MCSO provided documentation that the PSB Commander reviewed and approved the submittal. The PSB Commander did not direct any further investigation prior to the submittal to the prosecuting agency. In this case, felony charges were filed by the MCAO.

WAI 38364

***Paragraph 235.*** *If the prosecuting agency declines to prosecute or dismisses the criminal case after the initiation of criminal charges, the Professional Standards Bureau shall request an explanation for this decision, which shall be documented in writing and appended to the criminal investigation report.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine MCSO's compliance with this Paragraph, we review on a monthly basis administrative and criminal misconduct investigations conducted by MCSO.

During this reporting period, only one criminal case was submitted to a prosecutorial agency for charging and charges were filed.  There were no instances where a case was submitted for prosecution by MCSO and the prosecutorial agency declined prosecution or dismissed the criminal case.


***Paragraph 236.*** *The Sheriff shall require the Professional Standards Bureau to maintain all criminal investigation reports and files after they are completed for record-keeping in accordance with applicable law.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine compliance with this Paragraph, we observed that PSB maintains both hardcopy and electronic files that are intended to contain all the documents required per this Paragraph.

During previous site visits, we have inspected the file rooms where hardcopies of investigations are stored.  Criminal and administrative investigation files are stored in separate rooms, and access to these rooms is restricted.  Our random review of criminal investigation case files verified that PSB was maintaining files as required.  A member of our Team also has access to IAPro, and has verified that case files are maintained in an electronic format.

During our January 2018 site visit, a member of our Team inspected the file rooms where hardcopies of criminal investigation are stored and randomly reviewed case files to verify compliance.

In May 2018, PSB relocated to a new offsite location.  After the move, we verified that PSB was properly maintaining criminal investigation reports and files at its new facility.

WAI 38365

During our January 2019 site visit, a member of our Team again confirmed that criminal and administrative investigative files are housed on separate floors and restricted access to both the file rooms and IAPro remains in place.


### G.      Civilian Complaint Intake, Communication, and Tracking

*Paragraph 237.  Within six months of the entry of this Order, the Monitor, in consultation with the Community Advisory Board, will develop and implement a program to promote awareness throughout the Maricopa County community about the process for filing complaints about the conduct of MCSO employees.*

**Phase 1**: Not applicable

**Phase 2:** Not applicable

The Monitoring Team developed and implemented a Complaint Process Community Awareness Program to promote awareness throughout the Maricopa County community about the process for filing complaints about the conduct of MCSO employees.  The program provides for distributing brochures describing the complaint process at the Monitoring Team's community meetings and using public service announcements – made via local media outlets and social media – to provide basic information (in both English and Spanish) about MCSO's complaint process.

The Monitoring Team contacted faith organizations and civic groups throughout Maricopa County requesting that they make complaint process information forms available to members of their congregations and groups.  The Complaint Process Community Awareness Program incorporates input from the CAB, MCSO, and the ACLU of Arizona.


*Paragraph 238.  The Sheriff shall require the MCSO to accept all civilian complaints, whether submitted verbally or in writing; in person, by phone, by mail, or online; by a complainant, someone acting on the complainant's behalf, or anonymously; and with or without a signature from the complainant.  MCSO will document all complaints in writing.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

To assess compliance with this Paragraph, we review all new misconduct complaints received each month and completed misconduct investigations conducted by MCSO personnel.  In addition, we review many initial complaint documents or initial phone calls, BWC videos, traffic stop videos, supervisor notes, Compliance and BIO reviews, and consider findings in the complaint testing process.

WAI 38366

During the last reporting period, there were no instances where either Compliance Division or BIO personnel identified in their reviews that a supervisor had failed to initiate a complaint when appropriate.   There were no completed administrative misconduct cases with any allegations of failure to take a complaint.  There were no instances where we identified during our review of contacts with complainants that a complainant had attempted to make a complaint prior to the contact and was refused.  There were no instances identified in the complaint intake testing process where an MCSO employee refused to take a complaint.  During our review of traffic stops for the reporting period, we identified one incident where a subject being arrested attempted to make a complaint against MCSO, and there was no indication that MCSO personnel accepted the complaint.   We notified PSB of this concern, and a misconduct investigation has since been initiated.   This investigation has not yet been completed and reviewed.

During this reporting period, MCSO initiated 115 new internal investigations and 95 service complaints.  Except for the previously noted incident we brought to MCSO's attention during the last reporting period, there were no other complaints externally or internally generated for failing to take a complaint.   In the 56 completed administrative misconduct investigations we reviewed, there were no indications or allegations that the complainant had tried unsuccessfully to make a complaint.  Our review of traffic stops and supervisor notes did not identify any incidents where there were indications that a complaint had been made but not properly reported.   We reviewed numerous complainant contacts and found no indication that a supervisor initially refused to take a complaint or attempted to dissuade the complainant from making a complaint.  We found numerous incidents where the complainant articulated that they did not want to make a complaint and just wanted to make MCSO aware of something.  In all of these instances we reviewed, a complaint was taken by MCSO as required.  Neither CID or BIO identified any instances during their reviews this reporting period that indicated a complainant had attempted to file a complaint and been refused.  We did not identify any complaint intake tests for this reporting period where MCSO failed to accept a complaint.

We have found that MCSO consistently accepts and records complaints as required for compliance with this Paragraph.

**Paragraph 239.**   *In locations clearly visible to members of the public at the reception desk at MCSO headquarters and at all District stations, the Sheriff and the MCSO will post and maintain permanent placards clearly and simply describing the civilian complaint process that is visible to the public at all hours.   The placards shall include relevant contact information, including telephone numbers, email addresses, mailing addresses, and Internet sites.   The placards shall be in both English and Spanish.*

**Phase 1:**  In compliance

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

WAI 38367

**Phase 2:** In compliance

During this reporting period, the permanent placards were prominently displayed at MCSO Headquarters, and Monitoring Team members visiting MCSO Districts found that the permanent placards were prominently displayed. The placard states that anyone who has a concern regarding the performance of any MCSO employee has the right to file a complaint in English or Spanish or their preferred language, to include American Sign Language; in person at any District facility or at the Professional Standards Bureau, by mail, by telephone, by fax, or online. The placard includes relevant contact information, including telephone numbers, email addresses, mailing addresses, and websites.

***Paragraph 240.*** *The Sheriff shall require all deputies to carry complaint forms in their MCSO vehicles. Upon request, deputies will provide individuals with complaint forms and information about how to file a complaint, their name and badge number, and the contact information, including telephone number and email address, of their immediate supervising officer. The Sheriff must provide all supervising officers with telephones. Supervising officers must timely respond to such complaints registered by civilians.*

**Phase 1:** In compliance

- EA-2 (Patrol Vehicles), most recently revised on February 20, 2019.
- GE-4 (Use, Assignment and Operation of Vehicles), most recently revised on October 7, 2017.
- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:** In compliance

During this reporting period, Monitoring Team members visiting District offices verified that MCSO maintained adequate supplies of complaint forms for deputies to carry in their vehicles. All deputies with whom Monitoring Team members made contact understood their obligations to provide individuals with complaint forms and information about how to file a complaint, their name and badge number, and the contact information for their immediate supervising officer.

Also during this reporting period, Monitoring Team members verified that the supervisors with whom they made contact were in possession of MCSO-issued cellular telephones.

WAI 38368

*Paragraph 241.   The Sheriff will ensure that the Professional Standards Bureau facility is easily accessible to members of the public.   There shall be a space available for receiving walk-in visitors and personnel who can assist the public with filing complaints and/or answer an individual's questions about the complaint investigation process.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

In May 2018, PSB moved into the first and second floors of 101 West Jefferson Street.  During our July 2018 site visit, members of the Monitoring Team toured the facility.  During this reporting period, Monitoring Team members visiting MCSO Districts inspected the placards and comment and complaint forms, and noted that they all had been updated to reflect PSB's new address.  The address was also updated on the comment and complaint form that is accessible to the public on MCSO's website.

The facility, the former East Court Building Library, is easily accessible to members of the public.  The County Court facilities in the building are separate from the PSB reception area and offices.  The PSB area is accessible from First Avenue, a major thoroughfare; and there is no required security screening of individuals entering the building through the First Avenue entrance.  A member of the Monitoring Team visited the PSB facility during this reporting period.  There was an MCSO employee stationed at the reception area desk in the entrance lobby to welcome visitors and provide information and assistance.  As noted previously, the PSB facility's outside entrance located on First Avenue was well-marked and easily accessible to the public with no required security screening.

*Paragraph 242.   The Sheriff will also make complaint forms widely available at locations around the County including:  the websites of MCSO and Maricopa County government; the lobby of MCSO's headquarters; each patrol District; and the Maricopa County government offices.  The Sheriff will ask locations, such as public library branches and the offices and gathering places of community groups, to make these materials available.*

**Phase 1:**  In compliance

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:**  In compliance

MCSO has complaint forms available in English and Spanish on the MCSO and Maricopa County websites.  MCSO maintains a list – of MCSO facilities, County offices, and public locations where community groups meet – where Community Outreach Division personnel attempt to make the forms available.

WAI 38369

During our January site visit, we visited eight locations in Maricopa County that were included on MCSO's list of facilities where complaint forms are available to the public. All eight facilities displayed an ample supply of complaint forms that contained the correct PSB facility address, and were in English and Spanish. We also observed that the forms were placed in locations readily visible to the public.

***Paragraph 243.*** *The Sheriff shall establish a free, 24-hour hotline for members of the public to make complaints.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

The free 24-hour hotline for members of the public to make complaints was established in July 2016 and continued to be operational during this reporting period. A Monitoring Team representative periodically called the hotline during this reporting period and verified that the hotline is operational in both English and Spanish, and provides instructions in both languages on how to register a complaint. The recording advises callers that if the call is an emergency, they are to call 911. Callers are requested to provide their name, telephone number, and a brief summary of their complaint. If callers leave a recorded message, they are advised that MCSO will contact them as soon as possible. If callers do not wish to leave a recorded message, they are provided with a telephone number to call to speak to a supervisor. That number connects the callers to the MCSO switchboard operator, who will connect the caller to an appropriate supervisor. Callers are further advised of MCSO's operating hours if they wish to contact PSB directly.

The hotline is housed in PSB, and PSB personnel access any recorded messages at the beginning of each business day. During this reporting period, PSB personnel reported that the hotline did not receive any new complaints. The procedures established and followed by PSB provide for creating a record of every complaint received on the hotline and maintaining a log of follow-up actions regarding referral of the complaint.

***Paragraph 244.*** *The Sheriff shall ensure that the MCSO's complaint form does not contain any language that could reasonably be construed as discouraging the filing of a complaint, such as warnings about the potential criminal consequences for filing false complaints.*

**Phase 1:** In compliance

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:** In compliance

WAI 38370

Our review of the English and Spanish complaint forms' content did not reveal any language that could reasonably be construed as discouraging the filing of a complaint.

***Paragraph 245.*** *Within two months of the entry of this Order, complaint forms will be made available, at a minimum, in English and Spanish. The MCSO will make reasonable efforts to ensure that complainants who speak other languages (including sign language) and have limited English proficiency can file complaints in their preferred language. The fact that a complainant does not speak, read, or write in English, or is deaf or hard of hearing, will not be grounds to decline to accept or investigate a complaint.*

**Phase 1:** In compliance

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:** In compliance

Complaint forms in English and Spanish are accessible on MCSO's website. The complaint form states that anyone who has a concern regarding the performance of any MCSO employee has the right to file a complaint – in English or Spanish or their preferred language, to include American Sign Language – in person at any District facility or at the Professional Standards Bureau, by mail, by telephone, by fax, or online. The forms provide street addresses, contact numbers, and website information.

***Paragraph 246.*** *In the course of investigating a civilian complaint, the Professional Standards Bureau will send periodic written updates to the complainant including:*

a.  *within seven days of receipt of a complaint, the Professional Standards Bureau will send non-anonymous complainants a written notice of receipt, including the tracking number assigned to the complaint and the name of the investigator assigned. The notice will inform the complainant how he or she may contact the Professional Standards Bureau to inquire about the status of a complaint;*

b.  *when the Professional Standards Bureau concludes its investigation, the Bureau will notify the complainant that the investigation has been concluded and inform the complainant of the Bureau's findings as soon as is permitted by law; and*

c.  *in cases where discipline is imposed, the Professional Standards Bureau will notify the complainant of the discipline as soon as is permitted by law.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

WAI 38371

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed 56 administrative misconduct investigations conducted by MCSO personnel.  Forty-six of these complaints were externally generated.

Paragraph 246.a. requires that a civilian complainant receive a written notice of receipt of his/her complaint within seven days.  This letter must include the tracking number, the name of the investigator assigned, and information regarding how the complainant can inquire about the status of their complaint.  In all but one of the cases where PSB had contact information for the complainant, the letter was sent within seven days as required.  All of the letters sent and reviewed included the name of the investigator and information regarding how the complainant could inquire about the status of the complaint.

Paragraph 246.b. requires that PSB notify a civilian complainant of the outcome of the investigation.  In all of the externally generated complaints, the complainant was provided a notice of the outcome when contact information was known.

Paragraph 246.c. requires that PSB notify a civilian complainant of any discipline imposed as soon as permitted by law.  Seven of the externally generated complaints had sustained findings.  PSB notified the complainant of the sustained findings and the discipline imposed when contact information for the complainant was known.

***Paragraph 247.***  *Notwithstanding the above written communications, a complainant and/or his or her representative may contact the Professional Standards Bureau at any time to determine the status of his or her complaint.  The Sheriff shall require the MCSO to update the complainant with the status of the investigation.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2**:  In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed 56 administrative misconduct investigations conducted by MCSO.  Externally generated complaints resulted in 46 of the investigations.  We did not identify any instances where a complainant was discouraged from, or denied, contact with MCSO investigators to determine the status of his/her complaint, or to request and receive an update.  MCSO appropriately had contact with complainants as required in Paragraph 246 in all of these cases where the complainant was known and wanted to participate in the investigation.  On five occasions, MCSO personnel reported that they had additional contact with complainants during the course of the investigation.

WAI 38372

***Paragraph 248.*** *The Professional Standards Bureau will track, as a separate category of complaints, allegations of biased policing, including allegations that a deputy conducted an investigatory stop or arrest based on an individual's demographic category or used a slur based on an individual's actual or perceived race, ethnicity, nationality, or immigration status, sex, sexual orientation, or gender identity. The Professional Standards Bureau will require that complaints of biased policing are captured and tracked appropriately, even if the complainant does not so label the allegation.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

Each month, PSB provides a list of new complaints alleging biased policing. PSB also provides all closed investigations where biased policing was alleged. For this Paragraph, only allegations of biased policing that do not affect the Plaintiffs' class are reported. Those complaints alleging bias against members of the Plaintiffs' class are captured in a separate category and reported under Paragraphs 275-288.

During the last reporting period, PSB completed one investigation where potential bias was alleged that did not affect members of the Plaintiffs' class. The investigation was initiated and completed after July 20, 2016; investigated by PSB; and tracked in a separate category as required by this Paragraph.

During this reporting period, PSB completed two investigations where potential bias was alleged that did not affect members of the Plaintiffs' class. Both investigations were initiated and completed after July 20, 2016, investigated by PSB, and tracked in a separate category as required by this Paragraph.

***Paragraph 249.*** *The Professional Standards Bureau will track, as a separate category of complaints, allegations of unlawful investigatory stops, searches, seizures, or arrests.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine Phase 2 compliance for this Paragraph, we review a monthly report from PSB that provides the information required for compliance.

WAI 38373

To ensure that we are consistently informed of complaints relative to this Paragraph, PSB provides information concerning these investigations in its monthly document submission relative to this Paragraph.

During this and the last three reporting periods, PSB did not complete, or submit for our review, any investigation where reporting under this Paragraph is applicable.

**Paragraph 250.** *The Professional Standards Bureau will conduct regular assessments of the types of complaints being received to identify and assess potential problematic patterns and trends.*

**Phase 1:** In compliance

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

PSB continues to prepare a quarterly assessment of the types of complaints received to identify and assess potential problematic patterns or trends. During this reporting period, PSB identified potential issues Office-wide as it relates to the number of complaints alleging that employees engaged in the use of inappropriate language/actions and rude behavior. District 1 was identified as having received the most complaints during this reporting period. The complaints involving District 1 included allegations that deputies engaged in behavior that was either threatening, harassing, unprofessional, or rude toward members of the public and allegations that employees' conduct failed to conform to established laws. There were an additional six complaints that did not follow a pattern or trend. PSB also includes the information required by this Paragraph in its semi-annual public Misconduct Investigations Report, which is required under Paragraph 251. The most recent semi-annual report for the period of January 1-June 30, 2018, contains the issues identified as potentially problematic patterns or trends for that six-month period. MCSO remains in Phase 2 compliance with this Paragraph. MCSO published the Professional Standards Bureau Operations Manual during this reporting period; therefore, MCSO has attained Phase 1 compliance, as well.

### H. *Transparency Measures*

**Paragraph 251.** *The Sheriff shall require the Professional Standards Bureau to produce a semi-annual public report on misconduct investigations, including, at a minimum, the following:*

a. *summary information, which does not name the specific employees involved, about any sustained allegations that an employee violated conflict-of-interest rules in conducting or reviewing misconduct investigations;*

b. *aggregate data on complaints received from the public, broken down by district; rank of principal(s); nature of contact (traffic stop, pedestrian stop, call for service, etc.);*

WAI 38374

*nature of allegation (rudeness, bias-based policing, etc.); complainants' demographic information; complaints received from anonymous complainants or third parties; and principals' demographic information;*

c. *analysis of whether any increase or decrease in the number of civilian complaints received from reporting period to reporting period is attributable to issues in the complaint intake process or other factors;*

d. *aggregate data on internally-generated misconduct allegations, broken down by similar categories as those for civilian complaints;*

e. *aggregate data on the processing of misconduct cases, including the number of cases assigned to Supervisors outside of the Professional Standards Bureau versus investigators in the Professional Standards Bureau; the average and median time from the initiation of an investigation to its submission by the investigator to his or her chain of command; the average and median time from the submission of the investigation by the investigator to a final decision regarding discipline, or other final disposition if no discipline is imposed; the number of investigations returned to the original investigator due to conclusions not being supported by the evidence; and the number of investigations returned to the original investigator to conduct additional investigation;*

f. *aggregate data on the outcomes of misconduct investigations, including the number of sustained, not sustained, exonerated, and unfounded misconduct complaints; the number of misconduct allegations supported by the appropriate standard of proof; the number of sustained allegations resulting in a non-disciplinary outcome, coaching, written reprimand, suspension, demotion, and termination; the number of cases in which findings were changed after a pre-determination hearing, broken down by initial finding and final finding; the number of cases in which discipline was changed after a pre-determination hearing, broken down by initial discipline and final discipline; the number of cases in which findings were overruled, sustained, or changed by the Maricopa County Law Enforcement Merit System Council, broken down by the finding reached by the MCSO and the finding reached by the Council; and the number of cases in which discipline was altered by the Council, broken down by the discipline imposed by the MCSO and the disciplinary ruling of the Council; and similar information on appeals beyond the Council; and*

g. *aggregate data on employees with persistent or serious misconduct problems, including the number of employees who have been the subject of more than two misconduct investigations in the previous 12 months, broken down by serious and minor misconduct; the number of employees who have had more than one sustained allegation of minor misconduct in the previous 12 months, broken down by the number of sustained allegations; the number of employees who have had more than one sustained allegation of serious misconduct in the previous 12 months, broken down by the number of sustained allegations; and the number of criminal prosecutions of employees, broken down by criminal charge.*

WAI 38375

**Phase 1:**  In compliance

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

The PSB Operations Manual identifies the PSB Commander as responsible for preparing the semi-annual public report on misconduct investigations.  The manual also contains provisions for the production of summary information regarding sustained conflict of interest violations; an analysis of the complaint intake process; and aggregate data on complaints (internal and external), processing of misconduct cases, outcomes of misconduct cases, and employees with persistent misconduct problems.

In February 2019, PSB issued and posted on the MCSO website its semi-annual public report for period of January 1-June 30, 2018.  PSB also incorporated information relevant to Paragraph 192 in this report, which requires that PSB review, at least semi-annually, all misconduct investigations that were assigned outside the Bureau to determine whether or not the investigation was properly categorized, whether the investigation was properly conducted, and whether appropriate findings were reached.  PSB also incorporated information relevant to Paragraph 250 in this report, which includes an assessment of potential problematic patterns or trends, based on a review on complaints received, for the time period of January 1-June 30, 2018.

During our October 2018 and January 2019 site visits, PSB informed us that it was developing a voluntary survey for complainants to complete after the conclusion of the investigation, which would capture demographic information in relation to the complainants.  Once the survey is implemented and responses from the complainants are received by PSB, the information will be included in future quarterly status reports.

As MCSO published the Professional Standards Bureau Operations Manual during this reporting period, it has attained Phase 1 compliance with this Paragraph.  We previously deferred our Phase 2 compliance assessment of this Paragraph until MCSO achieved Phase 1 compliance via the publication of the Professional Standards Bureau Operations Manual.  MCSO is now in Phase 2 compliance with this Paragraph.

**Paragraph 252.**  *The Sheriff shall require the MCSO to make detailed summaries of completed internal affairs investigations readily available to the public to the full extent permitted under state law, in electronic form on a designated section of its website that is linked to directly from the MCSO's home page with prominent language that clearly indicates to the public that the link provides information about investigations of misconduct alleged against MCSO employees.*

**Phase 1:**  In compliance

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

WAI 38376

PSB provided its template for the information that will be captured from completed misconduct investigations for posting as required on the MCSO website. The following data fields have been identified for public disclosure: Internal Affairs Number; Date Opened; Incident Type; Original Complaint; Policy Violation(s) Alleged/Outcome; Discipline; Investigative Summary; and Date Completed. During our April 2017 site visit, we approved the PSB template containing detailed summaries of completed misconduct investigations for placement on the MCSO website. Each reporting period, we conduct a review of the detailed summaries of completed misconduct investigations to ensure that the content is consistent with the requirements of this Paragraph. In addition, we verify that the monthly detailed summaries of completed misconduct investigations are posted on MCSO's website for public review.

During this reporting period, PSB made the monthly detailed summaries of completed internal investigations available to the public in a designated section on the homepage of MCSO's website. MCSO remains in compliance with this requirement.

**Paragraph 253.** *The MCSO Bureau of Internal Oversight shall produce a semi-annual public audit report regarding misconduct investigations. This report shall analyze a stratified random sample of misconduct investigations that were completed during the previous six months to identify any procedural irregularities, including any instances in which:*

a.   *complaint notification procedures were not followed;*

b.   *a misconduct complaint was not assigned a unique identifier;*

c.   *investigation assignment protocols were not followed, such as serious or criminal misconduct being investigated outside of the Professional Standards Bureau;*

d.   *deadlines were not met;*

e.   *an investigation was conducted by an employee who had not received required misconduct investigation training;*

f.   *an investigation was conducted by an employee with a history of multiple sustained misconduct allegations, or one sustained allegation of a Category 6 or Category 7 offense from the MCSO's disciplinary matrices;*

g.   *an investigation was conducted by an employee who was named as a principal or witness in any investigation of the underlying incident;*

h.   *an investigation was conducted of a superior officer within the internal affairs investigator's chain of command;*

i.   *any interviews were not recorded;*

j.   *the investigation report was not reviewed by the appropriate personnel;*

k.   *employees were promoted or received a salary increase while named as a principal in an ongoing misconduct investigation absent the required written justification;*

WAI 38377

l.    *a final finding was not reached on a misconduct allegation;*

m.   *an employee's disciplinary history was not documented in a disciplinary recommendation; or*

n.   *no written explanation was provided for the imposition of discipline inconsistent with the disciplinary matrix.*

**Phase 1:**  In compliance

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

**Phase 2:**  In compliance

During our January 2018 site visit, the Bureau of Internal Oversight (BIO) Commander reported that the semi-annual public audit report regarding misconduct investigations had not yet been prepared.  After a telephone conference between BIO and the Monitoring Team on January 10, 2018, it was determined that the semi-annual public audit report would be placed on hold while BIO's Audit and Inspections Unit (AIU) developed the appropriate methodology for conducting the inspection.  On June 26, we approved the methodology for the inspection, which would start with an inspection of investigations that commenced after November 1, 2017.   AIU is conducting monthly inspections of misconduct investigations in lieu of conducting a semi-annual audit.  During the previous reporting period, AIU conducted two inspections – one for investigations that closed in July 2018, and one for investigations that closed in August 2018. During this reporting period, AIU prepared inspection reports for the following months in which misconduct investigations were closed: September; October; and November 2018.   When perceived deficiencies are identified, AIU requests a BIO Action form from the specific District/Division Commander to address the issue(s).  The reports have been made available to the public by way of MCSO's BIO website.

MCSO remains in compliance with this Paragraph.

### I.   *Testing Program for Civilian Complaint Intake*

***Paragraph 254.***  *The Sheriff shall initiate a testing program designed to assess civilian complaint intake.   Specifically, the testing program shall assess whether employees are providing civilians appropriate and accurate information about the complaint process and whether employees are notifying the Professional Standards Bureau upon the receipt of a civilian complaint.*

**Phase 1:**  In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on November 19, 2018.

WAI 38378

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

**Phase 2:**   In compliance

To meet the requirements of this Paragraph, AIU contracted with two vendors:  Progressive Management Resources (PMR), which is responsible for conducting complaint intake testing via telephone, email, U.S. Mail, and MCSO's website; and the Arizona Fair Housing Center (AFHC), which is responsible for conducting in-person tests.   We receive and review documentation of these tests – including any available audio-recorded documentation – as they are completed, as part of our monthly document requests.  PMR does not advise AIU of the tests in advance; instead, PMR emails AIU once a test has been completed with documentation of the test.

During the last reporting period, PMR did not conduct any tests, due to a contract issue with Maricopa County.   During this reporting period, AFHC did not conduct any tests; PMR conducted eight tests (none in October, two in November, and six in December).   PMR's tests for this reporting period were conducted via telephone, email, U.S. Mail, and MCSO's website.

Overall, the testers described the MCSO employees with whom they interacted as professional. One tester, who called MCSO in December, wrote on the documentation form, "I would like to note that I was impressed that despite portraying a flaky complaint, I feel it is positive I was treated with respect throughout and for the follow through."  In a few tests, the testers noted that they received prompt responses to their inquiries – although one tester sent a letter via U.S. Mail and did not receive a reply for 12 days.  (The tester's letter was written in Spanish, and she received email replies from MCSO in both English and Spanish, which may have accounted for the delay.)  None of the testers believed that the MCSO employees attempted to discourage, interfere with, or delay them from registering their complaints.

We were concerned with the outcomes of two completed tests.  In the first test, conducted in December, the tester sent a letter to MCSO via U.S. Mail to report a deputy who "ignore[d] a blatant driving violation."  The tester wrote, "I want to file a complaint," and included an email address in the letter – but never received a reply from MCSO.

In the second test, conducted via telephone in December, the tester called the non-emergency number for MCSO to report seeing a deputy park in a handicapped parking space outside a convenience store.  The dispatcher asked the tester a few questions about the deputy's vehicle and then transferred the call to PSB.  The tester left a voicemail message with her name, contact telephone number, and a brief statement as to why she was calling – but according to the documentation, she did not receive a return telephone call from MCSO.

We will inquire with MCSO during our upcoming site visit to learn more about how AIU followed up on these tests.

Previously, we have encouraged MCSO to provide refresher training on the complaint process to all employees who interact with the public.  We will follow up on this issue during our upcoming site visit.

WAI 38379

***Paragraph 255.***   *The testing program is not intended to assess investigations of civilian complaints, and the MCSO shall design the testing program in such a way that it does not waste resources investigating fictitious complaints made by testers.*

**Phase 1:**  In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on November 19, 2018.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

**Phase 2:**  In compliance

AIU has informed both vendors it has contracted with of this requirement.  AIU has created several procedures to ensure that the Complaint Intake Testing Program does not waste resources investigating fictitious complaints made by testers – including setting parameters for the types of inquiries that testers make, and creating official identification cards for testers designating them as such.  For in-person tests, AIU has required that the vendor it has contracted with inform AIU in advance of all tests, and AIU personnel make themselves available via telephone if testers encounter any issue as they lodge their test complaints.

***Paragraph 256.***   *The testing program shall assess complaint intake for complaints made in person at MCSO facilities, complaints made telephonically, by mail, and complaints made electronically by email or through MCSO's website.  Testers shall not interfere with deputies taking law enforcement action.  Testers shall not attempt to assess complaint intake in the course of traffic stops or other law enforcement action being taken outside of MCSO facilities.*

**Phase 1:**  In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on November 19, 2018.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

**Phase 2:**  In compliance

As noted above, AIU has contracted with two vendors to meet the complaint intake testing requirements.  AIU advised both vendors that testers shall not interfere with deputies taking law enforcement action, nor shall they attempt to assess complaint intake in the course of traffic stops or other law enforcement action being taken outside of MCSO facilities.

AIU has asked the vendor responsible for in-person testing to inform AIU in advance of all tests, and AIU personnel make themselves available via telephone if testers encounter any issue as they lodge their test complaints.

WAI 38380

***Paragraph 257.*** *The testing program shall include sufficient random and targeted testing to assess the complaint intake process, utilizing surreptitious video and/or audio recording, as permitted by state law, of testers' interactions with MCSO personnel to assess the appropriateness of responses and information provided.*

**Phase 1:** In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on November 19, 2018.
- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

**Phase 2:** In compliance

AIU has informed both vendors it has contracted with of the requirements of this Paragraph. We receive copies of the recordings following the completion of the tests. Per the agreed-upon methodology, all tests conducted via telephone are audio-recorded; and all in-person testers' interactions with MCSO personnel are video-recorded to assess the appropriateness of responses and information provided.


***Paragraph 258.*** *The testing program shall also assess whether employees promptly notify the Professional Standards Bureau of civilian complaints and provide accurate and complete information to the Bureau.*

**Phase 1:** In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on November 19, 2018.
- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

**Phase 2:** In compliance

AIU has informed both vendors it has contracted with of the requirements of this Paragraph so that the tests conducted by both vendors shall also assess whether employees promptly notify the PSB of civilian complaints and provide accurate and complete information to the Bureau.

As it receives documentation about completed tests from its vendors, AIU reviews the information; and issues Action Forms, authors memorandums of concern, or takes other appropriate action if a test fails or raises any concerns about the conduct of MCSO employees.

WAI 38381

**Paragraph 259.** *MCSO shall not permit current or former employees to serve as testers.*

**Phase 1:** In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on November 19, 2018.
- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

**Phase 2:** In compliance

AIU has informed both vendors it has contracted with to conduct the tests of this requirement. AIU personnel have informed us that no current or former employees have served, or will serve in the future, as testers.

**Paragraph 260.** *The MCSO shall produce an annual report on the testing program. This report shall include, at a minimum:*

a.  *a description of the testing program, including the testing methodology and the number of tests conducted broken down by type (i.e., in-person, telephonic, mail, and electronic);*

b.  *the number and proportion of tests in which employees responded inappropriately to a tester;*

c.  *the number and proportion of tests in which employees provided inaccurate information about the complaint process to a tester;*

d.  *the number and proportion of tests in which employees failed to promptly notify the Professional Standards Bureau of the civilian complaint;*

e.  *the number and proportion of tests in which employees failed to convey accurate information about the complaint to the Professional Standards Bureau;*

f.  *an evaluation of the civilian complaint intake based upon the results of the testing program; and*

g.  *a description of any steps to be taken to improve civilian complaint intake as a result of the testing program.*

**Phase 1:** In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on November 19, 2018.
- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

**Phase 2:** Not in compliance

WAI 38382

We have discussed with AIU personnel the requirements of this Paragraph.  Although Paragraph 260 requires that MCSO produce an annual report summarizing its complaint intake testing, AIU personnel have also elected to complete monthly reports.   AIU personnel drafted methodology for the monthly and annual reports, and we look forward to discussing this further with AIU during our upcoming site visit.

WAI 38383

## Section 13: Community Outreach and Community Advisory Board

**COURT ORDER XVI.     COMMUNITY     OUTREACH     AND     COMMUNITY ADVISORY BOARD**

*Paragraph 261.  The Community Advisory Board may conduct or retain a consultant to conduct a study to identify barriers to the filing of civilian complaints against MCSO personnel.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

During this reporting period, the CAB continued to explore the possibility of retaining a consultant to conduct a study to identify barriers to the filing of civilian complaints against MCSO personnel, by researching polling firms that are experienced in working with Latino populations.

*Paragraph 262.  In addition to the administrative support provided for in the Supplemental Permanent Injunction, (Doc. 670 ¶ 117), the Community Advisory Board shall be provided with annual funding to support its activities, including but not limited to funds for appropriate research, outreach advertising and website maintenance, stipends for intern support, professional interpretation and translation, and out-of-pocket costs of the Community Advisory Board members for transportation related to their official responsibilities.  The Community Advisory Board shall submit a proposed annual budget to the Monitor, not to exceed $15,000, and upon approval of the annual budget, the County shall deposit that amount into an account established by the Community Advisory Board for that purpose.  The Community Advisory Board shall be required to keep detailed records of expenditures which are subject to review.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

The Amendments to the Supplemental Permanent Injunction/Judgment Order (Document 2100) issued on August 3, 2017 altered the composition of the Community Advisory Board (CAB) and CAB's responsibilities and relationship to MCSO.  As of September 1, 2017, the CAB is comprised of five members – two selected by the Plaintiffs, two selected by MCSO, and one jointly selected.

In July 2018, the Monitor approved CAB's proposed budget.  The budget includes the following categories: community meetings; video production (to produce a short video in English and Spanish that provides information about the CAB and the MCSO complaint process); marketing materials; stipends for an assistant to help coordinate CAB meeting logistics; and reimbursement for CAB members' meeting expenses.

WAI 38384

Following the Monitor's approval of the CAB's budget, the CAB established a bank account, and the County provided the $15,000.  CAB members developed procedures for tracking funds and receiving reimbursement.  During our January site visit, we met with CAB members to discuss these procedures and review the CAB's expenditures to date; these records appear to be in order.

WAI 38385

## Section 14: Supervision and Staffing

**COURT ORDER XVII.     SUPERVISION AND STAFFING**

*Paragraph 263.  The following Section of this Order represents additions and amendments to Section X of the first Supplemental Permanent Injunction, Supervision and Evaluations of Officer Performance, and the provisions of this Section override any conflicting provisions in Section X of the first Supplemental Permanent Injunction.*

*Paragraph 264.  The Sheriff shall ensure that all patrol deputies shall be assigned to a primary, clearly identified, first-line supervisor.*

**Phase 1:**  In compliance

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

**Phase 2:**  In compliance

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the fourth quarter of 2018.  During this reporting period, consistent with our methodology, for October, we reviewed a sample of shift rosters from Districts 1, 2, and 3; for November, we reviewed a sample of shift rosters from Districts 4, 6, and 7 and Lake Patrol; and for December, we reviewed a sample of shift rosters from Districts 1, 2, and 3.  Monthly and daily rosters indicated that deputies were assigned to one single consistent supervisor.

*Paragraph 265.  First-line patrol supervisors shall be responsible for closely and consistently supervising all deputies under their primary command.*

**Phase 1:**  In compliance

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

**Phase 2:**  Not in compliance

WAI 38386

Paragraph 265 is a general directive that covers several aspects of supervision. There are several requirements covered in other Paragraphs of this Order that directly impact this Paragraph; these requirements must be met before MCSO can establish compliance with Paragraph 265. We have determined that MCSO is in compliance with Paragraphs 83, 85, 89, 90, and 93, as they relate to this Paragraph. During this reporting period, MCSO failed to meet compliance standards for Paragraph 94. For MCSO to achieve compliance with this Paragraph, it must retain compliance with Paragraphs 83, 85, 89, 90, and 93, and attain compliance with Paragraphs 91 and 94. During this reporting period, our reviews of documentation of traffic stops revealed that 13 of the 105 stops had deficiencies that supervisors overlooked. This is a compliance rate of 88%. We recognize that the thoroughness of supervisory reviews, as it relates to Paragraph 91, has improved. However, MCSO has not achieved compliance with Paragraph 91. In addition, MCSO did not attain compliance with Paragraph 94 during this reporting period.

**Paragraph 266.** *First-line patrol supervisors shall be assigned as primary supervisor to no more persons than it is possible to effectively supervise. The Sheriff should seek to establish staffing that permits a supervisor to oversee no more than eight deputies, but in no event should a supervisor be responsible for more than ten persons. If the Sheriff determines that assignment complexity, the geographic size of a district, the volume of calls for service, or other circumstances warrant an increase or decrease in the level of supervision for any unit, squad, or shift, it shall explain such reasons in writing, and, during the period that the MCSO is subject to the Monitor, shall provide the Monitor with such explanations. The Monitor shall provide an assessment to the Court as to whether the reduced or increased ratio is appropriate in the circumstances indicated.*

**Phase 1:** In compliance

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

**Phase 2:** In compliance

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters. During this reporting period, consistent with our methodology, for October, we reviewed a sample of shift rosters from Districts 1, 2, and 3; for November, we reviewed a sample of shift rosters from Districts 4, 6, and 7 and Lake Patrol; and for December, we reviewed a sample of shift rosters from Districts 1, 2, and 3. Monthly and daily rosters indicated that deputies were assigned to one single consistent supervisor. Of the 66 shifts we reviewed for this reporting period, all were in compliance. There were 25 span of control memos generated during this reporting period, indicating that those shifts or part of those shifts exceeded the supervisor-deputy ratio of 1:8. Four of the spans of control memos were generated by District 1, nine memos were generated by District 2, and 12 memos were generated by District 3. MCSO did not exceed the 1:10 supervisor-deputy ratio in any of the sample shifts we inspected during this reporting period. MCSO remains in compliance with this Paragraph.

WAI 38387

*Paragraph 267.  Supervisors shall be responsible for close and effective supervision of deputies under their command.  Supervisors shall ensure that all deputies under their direct command comply with MCSO policy, federal, state and local law, and this Court's orders.*

**Phase 1:**  In compliance

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

**Phase 2:**  Not in compliance

Close and effective supervision requires that supervisors consistently apply the concepts established in several Paragraphs of the First Order.  There are requirements covered in other Paragraphs that directly impact Paragraph 267, and must therefore be in compliance for MCSO to establish compliance with this Paragraph.  During this reporting period, we found MCSO in compliance with Paragraphs 83, 85, 89, 90, and 93.  During this reporting period, MCSO did not meet the compliance requirements of Paragraph 96.  For MCSO to achieve compliance with this Paragraph, it must remain in compliance with Paragraphs 83, 85, 89, 90, and 93, and achieve compliance with Paragraphs 91 and 96.


*Paragraph 268.  During the term that a Monitor oversees the Sheriff and the MCSO in this action, any transfer of sworn personnel or supervisors in or out of the Professional Standards Bureau, the Bureau of Internal Oversight, and the Court Implementation Division shall require advanced approval from the Monitor.  Prior to any transfer into any of these components, the MCSO shall provide the Court, the Monitor, and the parties with advance notice of the transfer and shall produce copies of the individual's résumé and disciplinary history.  The Court may order the removal of the heads of these components if doing so is, in the Court's view, necessary to achieve compliance in a timely manner.*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, most recently amended on August 17, 2018.
- Professional Standards Bureau Operations Manual, most recently amended on December 13, 2018.

**Phase 2:**  In compliance

During this reporting period, there were two transfers into the Bureau of Internal Oversight (BIO) and one transfer into the Court Implementation Division (CID).  We reviewed the documentation for all three incoming transfers and noted no issues of concern.  Also during this reporting period, MCSO transferred two employees out of BIO.  We reviewed the documentation MCSO submitted and found that the transfers met the requirements of this Paragraph.

WAI 38388

## Section 15: Document Preservation and Production

**COURT ORDER XVIII.    DOCUMENT PRESERVATION AND PRODUCTION**

***Paragraph 269.*** *The Sheriff shall ensure that when the MCSO receives a document preservation notice from a litigant, the MCSO shall promptly communicate that document preservation notice to all personnel who might possibly have responsive documents.*

**Phase 1:**  In compliance

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on November 29, 2018.

**Phase 2:**  In compliance

To verify MCSO's Phase 2 compliance with this Paragraph, we reviewed monthly submittals of document preservation notices to MCSO employees for the reporting period.  We also reviewed a sample of cases during our January 2019 site visit to assess if MCSO is properly preserving documents that are requested in the course of litigation.

Document preservation is set in motion when a party sends a litigation hold notice or written directive to MCSO requesting the preservation of relevant documents or records and electronically stored information (ESI), in anticipation of future litigation against the agency.  MCSO's Legal Liaison Section (LLS) manages litigation holds.  Upon the receipt of a litigation hold, which is usually sent by the Maricopa County Attorney's Office (MCAO), the LLS conducts an initial research to determine whether the request is something that LLS can provide or if LLS has to request it from an MCSO Division.  If the LLS requires documents from other MCSO Divisions, it must draft a Document Preservation Notice within five business days and address it to the required Division.  Upon receipt of the Document Preservation Notice, MCSO must identify responsive documents and also preserve them in the manner in which they are usually kept in the course of business.  During this reporting period, the LLS began using the online tool Open Axes in order to manage the litigation holds.  The process is conducted electronically through the system so that the employees need only access the program to complete any forms and identify litigation holds of any responsive document.

During our January site visit, we reviewed a sample of the third-party source documents that generate the litigation holds that the LLS receives from MCAO.  The LLS identify possible document custodians through Open Axes, who then receive the Document Preservation Notices.  MCSO correctly conveys the information contained in the third-party source document into the Document Preservation Notices that are then forwarded to the employees in the different Divisions.  The Document Preservation Notices have been distributed 100% in a timely manner to employees who may have responsive documents.

GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices) requires that the employee who receives a document preservation request complete two forms:

WAI 38389

Attachment A, Document Preservation Acknowledgment and Attachment B, Document Preservation Questionnaire. Attachment A, the attestation, is due within five days of receipt; while Attachment B – which requires more in-depth information such as steps taken to search documents, the outcome of the search, and the itemization of the documents identified as responsive – is due within 10 days of receipt. Attachment A was returned in a timely manner 84% of the time, a 9% decrease since the last reporting period. Attachment B was returned within established timeframes 89% of the time, a 2% decrease from the last reporting period.

During our January site visit, we reviewed completed copies of Attachment B, and found that 93% of them were properly completed, a 1% increase since the last quarter. We noted that the LLS intercepted the improperly completed forms and returned them for corrections. We identified the following deficiencies on the forms: files that were missing Attachment A or Attachment B; and improper completion of Attachment B.

We discussed our observations with the LLS personnel during our January site visit – specifically discussing the untimely receipt of Attachment A and B. We explained that although the Paragraph requires that MCSO promptly communicate the hold to the employees, it also requires that MCSO comply with the timeframes set in GD-9. As a result of the deficiencies identified in this reporting period, we advised MCSO that if deficiencies continued, we would withdraw Phase 2 compliance. As per our methodology, a second consecutive period of performance below the requirements will result in withdrawal of compliance.

From our discussions, we concluded that the delay in the turnaround had to do in part with the holiday period (Thanksgiving and Christmas) during which many employees were off on vacation; some had their out-of-office email notification turned on.

We recommended that a procedure be put into place so that the supervisor can attend to the litigation hold and resend to the employee once s/he returns from vacation. The policy timeframes could start to run once the employee is in actual receipt of Attachment A when the employee is on a short-term leave. MCSO will also explore alternatives of rerouting the litigation hold to the supervisor when an employee is out, through Open Axes. Both the employee and the supervisor would continue to be accountable for complying with GD-9.

To prepare our assessment of this Paragraph, we also identified a sub-sample from our sample data to assess document preservation practices within MCSO. During this reporting period, we were only able to identify the sub-sample for the first two months of the quarter since we received the December 2018 quarterly data during our site visit. We visited 24 MCSO divisions, including Computer Aided Dispatch, Early Intervention Unit, Policy, Intake, Classification, Pre-Employment, Hearing Unit, among others. Two divisions were not preserving Electronically Stored Information, while one division was printing out Electronically Stored Information simply because we were reviewing the data. We informed MCSO that there was no need to print out the documents if they are kept as Electronically Stored Information.

MCSO remains in compliance with this Paragraph, but we will withdraw Phase 2 compliance if MCSO fails to satisfactorily meet the Paragraph's requirements in the next reporting period.

WAI 38390

*Paragraph 270.  The Sheriff shall ensure that when the MCSO receives a request for documents in the course of litigation, it shall:*

a. *promptly communicate the document request to all personnel who might possibly be in possession of responsive documents;*

b. *ensure that all existing electronic files, including email files and data stored on networked drives, are sequestered and preserved through a centralized process; and*

c. *ensure that a thorough and adequate search for documents is conducted, and that each employee who might possibly be in possession of responsive documents conducts a thorough and adequate search of all relevant physical and electronic files.*

**Phase 1:**  Not in compliance

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on November 29, 2018.
- GM-1 (Electronic Communications, Data and Voicemail), most recently amended on March 7, 2019.
- Open Axes Operations Manual, currently under development.

**Phase 2:**  Deferred

To verify MCSO's Phase 2 compliance with this Paragraph, we reviewed monthly submittals of requests for documents to MCSO employees for the reporting period and documents drafted by the LLS in search of documents from other Divisions of the agency.  For this reporting period, we identified a sample of document requests and requested a copy of the responsive documents sequestered and/or produced.

Paragraph 270.a. requires prompt communication of document requests to all personnel who might possibly be in possession of responsive documents.  GD-9 requires the LLS to enter the data into a tracking system within five business days and to draft a Document Production Notice within five additional business days.  The LLS is required, within five business days, to respond to the request for production if sourced within LLS, or to forward to the required MCSO Division for production.

Our review revealed that MCSO is manually forwarding the Document Production Notices in a timely manner to all of its Divisions.  In addition, MCSO is sending Attachment C, the Document Production Acknowledgement Questionnaire, to all employees.  In 90% of the cases, the personnel who provided responsive documents properly completed Attachment C.  Open Axes is not being used for Attachment C at this time.

WAI 38391

Paragraph 270.b. requires that all responsive ESI be stored, sequestered, and preserved by MCSO through a centralized process. MCSO now performs the searches through a centralized process through Open Axes. The preservation of the data is completed at the Division that has the actual document while the notation is made in the Open Axes program, which performs case management. LLS can now create a case, assign a case number, and trigger time alerts to the custodians of documents that LLS identifies through the system. Open Axes searches on the H, W, and U computer hard drives of MCSO, which are shared among Headquarters and the Districts.

During our January 2019 site visit, we learned that only a handful of cases had been managed through the system for the first two months of the quarter, while December cases all went through Open Axes. MCSO indicated that with any new software, glitches in the system would arise as it continues to be used. Any software malfunction is referred to the Technology Management Bureau and the vendor, who work to address it. Once the software is fully operational, MCSO will develop an Open Axes Operations Manual outlining the protocols and procedures, and make any necessary amendments to GD-9 following the deployment of the software.

Paragraph 270.c. requires that MCSO conduct an adequate search for documents, and that each employee who might possibly be in possession of responsive documents conducts a thorough and adequate search of all relevant physical and electronic files. We reviewed a sample of responsive documents for this reporting period, and MCSO identified responsive documents to the document production notices in all of the cases we reviewed.

***Paragraph 271.*** *Within three months of the effective date of this Order, the Sheriff shall ensure that the MCSO Compliance Division promulgates detailed protocols for the preservation and production of documents requested in litigation. Such protocols shall be subject to the approval of the Monitor after a period of comment by the Parties.*

**Phase 1:** In compliance

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on November 29, 2018.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.

**Phase 2:** In compliance

On June 25, 2018, MCSO published the Compliance Division Operations Manual, which details the protocols for the preservation and production of documents requested in litigation.

WAI 38392

***Paragraph 272.*** *The Sheriff shall ensure that MCSO policy provides that all employees must comply with document preservation and production requirements and that violators of this policy shall be subject to discipline and potentially other sanctions.*

**Phase 1:**  In compliance

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on November 29, 2018.

**Phase 2:**  In compliance

No internal investigations were completed against any MCSO employee during this reporting period for failure to preserve or produce documents.

WAI 38393

## Section 16: Additional Training

**COURT ORDER XIX.        ADDITIONAL TRAINING**

***Paragraph 273.*** *Within two months of the entry of this Order, the Sheriff shall ensure that all employees are briefed and presented with the terms of the Order, along with relevant background information about the Court's May 13, 2016 Findings of Fact, (Doc. 1677), upon which this Order is based.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

MCSO previously delivered this training on the E-Policy platform.  All personnel (100%) determined to be applicable by CID have received this training.

WAI 38394

# Section 17: Complaints and Misconduct Investigations Relating to Members of the Plaintiff Class

**COURT ORDER XX.      COMPLAINTS AND MISCONDUCT INVESTIGATIONS RELATING TO MEMBERS OF THE PLAINTIFF CLASS**

*Paragraph 274.  In light of the Court's finding that the MCSO, and in particular Sheriff Arpaio and Chief Deputy Sheridan, willfully and systematically manipulated, misapplied, and subverted MCSO's employee disciplinary policies and internal affairs processes to avoid imposing appropriate discipline on MCSO deputies and command staff for their violations of MCSO policies with respect to members of the Plaintiff class, the Court further orders as follows:*

*A.      Investigations to be Overseen and/or Conducted by the Monitor*

*Paragraph 275.  The Monitor is vested with the authority to supervise and direct all of the MCSO's internal affairs investigations pertaining to Class Remedial Matters.  The Monitor is free from any liability for such matters as is set forth in ¶ 144 of the Supplemental Permanent Injunction.*

*Paragraph 276.  The Monitor shall have the authority to direct and/or approve all aspects of the intake and investigation of Class Remedial Matters, the assignment of responsibility for such investigations including, if necessary, assignment to his own Monitor team or to other independent sources for investigation, the preliminary and final investigation of complaints and/or the determination of whether they should be criminally or administratively investigated, the determination of responsibility and the imposition of discipline on all matters, and any grievances filed in those matters.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

The Second Order requires oversight by the Monitor for all internal investigations determined to be Class Remedial Matters (CRMs).  The Professional Standards Bureau (PSB) holds a weekly meeting to discuss existing and incoming complaints to determine which, if any, could be CRMs.  During these meetings, PSB personnel discuss cases pending a CRM decision, cases determined to be CRMs, and any cases where the decision may be made that the case would not be classified as a CRM.  The PSB Commander determines the classification of the cases.  A member of our Team attends all of these meetings to provide the oversight required for this Paragraph.

WAI 38395

At the end of the July-September 2016 reporting period, PSB had reviewed 442 administrative investigations that were open as of July 20, 2016; and determined that 42 of them met the basic criteria for CRMs. These cases were reviewed during the weekly CRM meetings. In addition, a Monitoring Team member randomly selected an additional 52 cases from the 400 remaining pending cases; and concurred with PSB's assessment that the cases did not meet the basic criteria for CRMs. In addition to the 42 cases determined to be potential CRMs from the pending case list as of July 20, 2016, PSB identified an additional 10 cases that were potential CRM cases. At the end of the first reporting period after the Court's Second Order, nine cases had been determined to be CRMs; and one other was pending a CRM decision. The remaining cases reviewed were determined not to be CRMs.

At the end of the last reporting period, PSB had reviewed a total of 226 cases since August 2016. Of these, 46 had been classified as CRMs.

During this reporting period, an additional 16 cases were reviewed as possible CRMs. Of these, five were determined to be CRMs. At of the end of this reporting period, there are a total of 242 cases that have been reviewed and 51 cases that have been determined to be CRMs since the July 20, 2016 Court Order.

During our review of investigations submitted under Paragraph 32 of the Court's First Order during this reporting period, we identified that a complainant in a complaint generated as a result of a traffic stop was Hispanic. Complaints from a person with a Hispanic surname, generated for any reason as a result of traffic stop, are automatically classified as CRMs. We immediately brought this to the attention of the PSB Commander. Upon his review, he agreed with our assessment and classified the case as a CRM. When the initial complaint was taken, there was no allegation of racial bias, complaint intake personnel did not identify the last name of the complainant as Hispanic, and the complaint was forwarded to a District for investigation. We reviewed the entirety of this investigation, including all BWC and recorded interviews. The complainant believed that she had not committed a traffic violation and was upset that the deputy had given her a written warning. Once it was explained to her that a written warning was not a citation of any kind, nor would it affect her driving record, she wanted to withdraw the complaint. MCSO completed the investigation as required. While this investigation should have initially been identified as a CRM, we are confident that this was simply a situation where intake personnel did not recognize the surname as possibly being Hispanic. We have not seen previous incidents of this nature. We have discussed with PSB the importance of the complaint intake process in ensuring that wherever possible, potential CRM cases are identified.

Since July 20, 2016, MCSO has completed a total of 41 CRM cases, including three during this reporting period. In those cases closed during this reporting period, one was sustained for a failure to properly complete a written report. The involved deputy received a written reprimand, which is consistent with MCSO policies for this violation. In the second case, allegations of failure to properly dispatch calls for service and failure to properly respond to calls for service were made against MCSO dispatch personnel and deputies. The allegations included that proper response by MCSO had not occurred, possibly due to both complainants

WAI 38396

being Hispanic.  All allegations were either not sustained, unfounded, or exonerated.  In the third case, a vehicle driver was upset that a deputy had given her a written warning for a traffic violation instead of a verbal warning.  The deputy was exonerated.  Our Team approved the investigation, findings, and, where appropriate, the discipline, in all of these cases.

Of the 20 CRM cases that have been closed to date with findings of sustained misconduct and reviewed by our Team, nine have involved employees who are deceased or left MCSO employment prior to the completion of the investigation or the disciplinary process.  Eleven involve current employees of MCSO.  Only one of these 11 cases involved a sustained finding of misconduct involving bias related to the Plaintiffs' class: a sustained allegation of an inappropriate and biased comment.

During the weekly meetings, case investigators continue to provide investigative updates on all cases that could be, or are, CRMs.  Their briefings are thorough, and they continue to be responsive to any questions or input from members of our Team.  In all cases where we have provided oversight since July 20, 2016, we have concurred with the decisions made by the PSB Commander regarding the case classifications and findings.  Where appropriate, we have also approved the discipline in all of these cases.

**Paragraph 277.**  *This authority is effective immediately and shall remain vested in the Monitor until the MCSO's internal affairs investigations reach the benchmarks set forth in ¶ 288 below. With respect to Class Remedial Matters, the Monitor has plenary authority, except where authority is vested in the Independent Investigative and Disciplinary Authorities separately appointed by the Court, as is further set forth in ¶¶ 296–337 below.*

**Paragraph 278.**  *The Sheriff shall alert the Monitor in writing to all matters that could be considered Class Remedial Matters, and the Monitor has the authority to independently identify such matters.  The Monitor shall provide an effective level of oversight to provide reasonable assurance that all Class Remedial Matters come to his attention.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

Since the first CRM meeting held on August 17, 2016, PSB has consistently completed the required notification to us regarding the cases that could be considered CRMs.  A Monitoring Team member has attended every CRM meeting with PSB where these matters are discussed and personally reviewed a number of the cases that were pending on July 20, 2016; and our Team member reviews the new cases that are presented each week.  There has been no need for us to independently identify CRMs, as PSB consistently properly identifies and reports these cases as required.

WAI 38397

*Paragraph 279. The Monitor shall have complete authority to conduct whatever review, research, and investigation he deems necessary to determine whether such matters qualify as Class Remedial Matters and whether the MCSO is dealing with such matters in a thorough, fair, consistent, and unbiased manner.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

During the weekly CRM meetings attended by a Monitoring Team member, PSB has consistently properly identified cases that could be, or are, CRMs. PSB personnel brief each case during the weekly meetings, and their briefings include all appropriate information. They have been responsive to any questions from our Team members during the meetings, and have responded appropriately to any suggestions we have raised. There has been no need for us to independently conduct any review, research, or investigation; as PSB is consistently properly identifying and investigating these cases.

*Paragraph 280. The Monitor shall provide written notice to the Court and to the parties when he determines that he has jurisdiction over a Class Remedial Matter. Any party may appeal the Monitor's determination as to whether he has jurisdiction over a Class Remedial Matter to this Court within seven days of the Monitor's notice. During the pendency of any such appeal the Monitor has authority to make orders and initiate and conduct investigations concerning Class Remedial Matters and the Sheriff and the MCSO will fully comply with such action by the Monitor.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

During this reporting period, cases involving both sworn and non-sworn members of MCSO have continued to be reviewed as possible CRMs, when appropriate. There were no appeals by any Parties regarding any of the CRM classifications.

*Paragraph 281. Subject to the authority of the Monitor, the Sheriff shall ensure that the MCSO receives and processes Class Remedial Matters consistent with: (1) the requirements of this Order and the previous orders of this Court, (2) MCSO policies promulgated pursuant to this Order, and (3) the manner in which, pursuant to policy, the MCSO handles all other complaints and disciplinary matters. The Sheriff will direct that the Professional Standards Bureau and the members of his appointed command staff arrive at a disciplinary decision in each Class Remedial Matter.*

**Phase 1:** In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

WAI 38398

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

To evaluate Phase 2 compliance with this Paragraph, a Monitoring Team member has attended each weekly meeting conducted by PSB to discuss Class Remedial Matters.  PSB has consistently provided thorough briefings, and the PSB Commander has made appropriate decisions regarding these matters.

During this reporting period, PSB completed and closed three CRM cases.  We concurred with, and approved, all allegations; policy violations; findings; and if sustained, the discipline.  The case reports we reviewed were consistent with the briefings that had been provided during the weekly CRM meetings.  PSB investigators continue to conduct appropriate follow-up on these cases, expend extensive efforts to locate and contact all involved parties and witnesses, and provided detailed information concerning the allegations and the justifications for findings in their investigative reports.

One of the three cases closed this reporting period had multiple allegations against MCSO dispatch and patrol personnel for failure to properly respond to calls for service in the complainants' neighborhood.  Findings of not sustained, exonerated, and unfounded were made.  In the second case, a complainant alleged that a deputy should not have given her a written warning for a traffic violation.  A finding of exonerated was made by MCSO.  In the third case, a sustained violation of failing to properly complete a report resulted in a written reprimand for the deputy.  We agree with all the findings made by MCSO on these three investigations.

***Paragraph 282.***  *The Sheriff and/or his appointee may exercise the authority given pursuant to this Order to direct and/or resolve such Class Remedial Matters, however, the decisions and directives of the Sheriff and/or his designee with respect to Class Remedial Matters may be vacated or overridden in whole or in part by the Monitor.  Neither the Sheriff nor the MCSO has any authority, absent further order of this Court, to countermand any directions or decision of the Monitor with respect to Class Remedial Matters by grievance, appeal, briefing board, directive, or otherwise.*

**Phase 1:**  In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

WAI 38399

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

There were no CRM cases completed during this, or previous reporting periods, in which the Sheriff and/or his appointee exercised their authority to resolve CRMs, which we needed to vacate or override.

**Paragraph 283.** *The Monitor shall review and approve all disciplinary decisions on Class Remedial Matters.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

At the end of this reporting period, MCSO has closed a total of 41 CRM cases since July 20, 2016.  Twenty have resulted in sustained findings.  Six had sustained findings on two separate deputies who are deceased, and three involved sustained findings on deputies who left MCSO employment prior to the determination of discipline.  Eleven have resulted in sustained findings against current deputies.  In all of the sustained cases, we have reviewed and approved all of the disciplinary decisions.

**Paragraph 284.** *The Sheriff and the MCSO shall expeditiously implement the Monitor's directions, investigations, hearings, and disciplinary decisions.  The Sheriff and the MCSO shall also provide any necessary facilities or resources without cost to the Monitor to facilitate the Monitor's directions and/or investigations.*

**Phase 1:** In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

During this, and previous reporting periods, a Monitoring Team member attended all weekly CRM meetings conducted in an appropriate location determined by MCSO.  PSB continues to provide a password and access to the IAPro system to a member of our Team so that we can complete independent case reviews if necessary.

PSB personnel continue to be professional and responsive to all input, questions, or concerns we have raised.

WAI 38400

***Paragraph 285.***  *Should the Monitor decide to deviate from the Policies set forth in this Order or from the standard application of the disciplinary matrix, the Monitor shall justify the decision in writing and place the written explanation in the affected employee's (or employees') file(s).*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

At of the end of this reporting period, there are a total of 20 CRM cases with sustained findings. Six had sustained findings on two separate deputies who are deceased, and three involved deputies who left MCSO employment prior to the determination of discipline.  Eleven cases involved sustained findings against current MCSO employees.  All of these 11 cases have resulted in appropriate sanctions based on MCSO policy and the Discipline Matrices in effect at the time the investigations were conducted.  No action by us has been necessary relative to this Paragraph.


***Paragraph 286.***  *Should the Monitor believe that a matter should be criminally investigated, he shall follow the procedures set forth in ¶¶ 229–36 above.  The Commander of the Professional Standards Bureau shall then either confidentially initiate a Professional Standards Bureau criminal investigation overseen by the Monitor or report the matter directly and confidentially to the appropriate prosecuting agency.   To the extent that the matter may involve the Commander of the Professional Standards Bureau as a principal, the Monitor shall report the matter directly and confidentially to the appropriate prosecuting agency.  The Monitor shall then coordinate the administrative investigation with the criminal investigation in the manner set forth in ¶¶ 229–36 above.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

During this reporting period, there were no CRM cases where PSB determined that a criminal misconduct investigation should also be conducted.  We did not identify any CRM where we believe a criminal investigation should be initiated.  No action on our part relative to this Paragraph has been necessary.

WAI 38401

*Paragraph 287.  Any persons receiving discipline for any Class Remedial Matters that have been approved by the Monitor shall maintain any right they may have under Arizona law or MCSO policy to appeal or grieve that decision with the following alterations:*

a.  *When minor discipline is imposed, a grievance may be filed with the Sheriff or his designee consistent with existing MCSO procedure.  Nevertheless, the Sheriff or his designee shall immediately transmit the grievance to the Monitor who shall have authority to and shall decide the grievance.  If, in resolving the grievance, the Monitor changes the disciplinary decision in any respect, he shall explain his decision in writing.*

b.  *disciplined MCSO employee maintains his or her right to appeal serious discipline to the Maricopa County Law Enforcement Merit System Council to the extent the employee has such a right.  The Council may exercise its normal supervisory authority over discipline imposed by the Monitor.*

**Phase 1:**  In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.
- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

Twenty completed CRM cases have had sustained findings of misconduct since the issuance of the Second Order.  We concurred with MCSO's decisions in all of these cases.

During this reporting period, there was an appeal filed on discipline received by an employee on a sustained CRM case.  The appeal to the Maricopa County Law Enforcement Merit System Council is pending.

*Paragraph 288.  The Monitor's authority over Class Remedial Matters will cease when both:*

a,  *The final decision of the Professional Standards Bureau, the Division, or the Sheriff, or his designee, on Class Remedial Matters has concurred with the Monitor's independent decision on the same record at least 95% of the time for a period of three years.*

b.  *The Court determines that for a period of three continuous years the MCSO has complied with the complaint intake procedures set forth in this Order, conducted appropriate internal affairs procedures, and adequately investigated and adjudicated all matters that come to its attention that should be investigated no matter how ascertained, has done so consistently, and has fairly applied its disciplinary policies and matrices with respect to all MCSO employees regardless of command level.*

WAI 38402

**Phase 1:** Not applicable

**Phase 2:** In compliance

During this and prior reporting periods, we and PSB have agreed on the investigative outcome of each CRM investigation completed.

PSB is responsible for the investigation of all CRM cases, and has continued to appropriately identify cases that could be, or are, CRMs. PSB personnel are professional in our contacts with them and responsive to any concerns or questions we have raised; and they provide detailed information and updates in their weekly briefings. Their written reports are thoroughly prepared, and the reports have been consistent with the information provided during the weekly case briefings.

*Paragraph 289.   To make the determination required by subpart (b), the Court extends the scope of the Monitor's authority to inquire and report on all MCSO internal affairs investigations and not those merely that are related to Class Remedial Matters.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

During the last reporting period, we reviewed a total of 61 internal investigations. All five of the criminal investigations were in compliance with the requirements of the Court. Forty-one (73%) of the 56 administrative misconduct investigations were in full compliance. We found MCSO in full compliance in 46 (75%) of the total misconduct investigations they conducted.

During this reporting period, we again reviewed 61 misconduct investigations. Fifty-six were administrative investigations and five were criminal investigations. All five of the criminal investigations were in compliance. Of the 56 administrative investigations, 44 (79%) were in full compliance. This is an increase from the 73% compliance finding during the last reporting period. There were no completed investigations submitted for Paragraphs 249 (investigatory stops). Two investigations were submitted for Paragraph 33 (Bias Policing) and both were found to be in compliance. Three investigations were submitted under Paragraph 275 (CRMs), and all three were in compliance. Investigations conducted by PSB sworn personnel were compliant in 100% of the cases, an increase of 12% from the last reporting period. PSB investigations conducted by Detention personnel were compliant in 93% of the cases, an increase of 16% from the last reporting period. Those investigations conducted by Divisions and Districts outside of PSB were compliant in 67% of the cases, an increase of 7% from the previous reporting period. Overall compliance for all 61 investigations was 80%, an increase of 5% from the last reporting period.

WAI 38403

The overall percentage of administrative misconduct cases that were fully compliant improved both in PSB and in those cases conducted outside of PSB.  While we continue to identify some cases that are not fully compliant, the improvements from the last reporting period are significant.  We also continue to note that the overall investigative quality continues to improve in both PSB and in the Districts and Divisions.

During our next site visit, we will discuss overall compliance and the concerns we identified with PSB and District and Division personnel, and provide them with specific case examples.

Effective with the revisions to internal affairs and discipline policies on May 18, 2017, the PSB Commander may now determine that a received complaint can be classified as a "service complaint" if certain specified criteria exists.  Service complaint documentation must then be completed and will be reviewed under this Paragraph.

MCSO handled 15 service complaints during the last reporting period.  MCSO properly reclassified two of these complaints to administrative misconduct investigations after their review.  Of the remaining 13, we found that in 12, MCSO properly completed service complaints.  In one case, while employee misconduct may not have occurred, the complainant was clearly alleging misconduct and an administrative misconduct investigation should have been initiated.

During this reporting period, we reviewed 12 service complaints completed by MCSO.  One was properly reclassified to an administrative misconduct investigation after review by PSB.  The remaining 11 were handled as service complaints.  Five (45%) of these 11 complaints were determined not to involve MCSO personnel.  Five (45%) involved complaints regarding laws, MCSO policies and procedures; or they involved other contacts from the public that did not include allegations of employee misconduct.  One (9%) involved a non-specific complaint with no contact information for the complainant.  We concur with MCSO's handling of all 11 cases classified as service complaints.  We continue to find that PSB is handling these service complaints appropriately.

Effective with the revisions to the internal affairs and discipline policies, the PSB Commander is now authorized to determine that an internal complaint of misconduct does not necessitate a formal investigation if certain criteria exist.  The PSB Commander's use of this discretion is reported in this Paragraph.  During this reporting period, the PSB Commander used this discretion in two cases.  Both involved internally generated complaints of a minor nature and met the criteria for handling with coachings without a formal investigation.  We agree with the PSB Commander's decision in both of these cases.

WAI 38404

***Paragraph 290.***  *This requirement is necessitated by the Court's Findings of Fact that show that the MCSO manipulates internal affairs investigations other than those that have a direct relation to the Plaintiff class.  The Court will not return the final authority to the Sheriff to investigate matters pertaining to members of the Plaintiff class until it has assurance that the MCSO uniformly investigates misconduct and applies appropriate, uniform, and fair discipline at all levels of command, whether or not the alleged misconduct directly relates to members of the Plaintiff Class.*

***Paragraph 291.***  *The Monitor shall report to the Court, on a quarterly basis, whether the MCSO has fairly, adequately, thoroughly, and expeditiously assessed, investigated, disciplined, and made grievance decisions in a manner consistent with this Order during that quarter.  This report is to cover all internal affairs matters within the MCSO whether or not the matters are Class Remedial Matters.  The report shall also apprise the Court whether the MCSO has yet appropriately investigated and acted upon the misconduct identified in the Court's Findings of Fact, whether or not such matters constitute Class Remedial Matters.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

This report, including all commentary regarding MCSO's compliance with investigative and disciplinary requirements, serves as our report to the Court on these matters.  An overall summary of our compliance observations and findings is provided here.

During this reporting period, we reviewed 56 administrative misconduct investigations and five criminal misconduct investigations.  All five criminal investigations were in full compliance with the Second Order.  Of the 56 administrative investigations we reviewed, 79% were in full compliance with the Second Order.  MCSO's overall compliance for both administrative and criminal investigations was 80%.

During the period of July-December 2016, PSB provided us with a memorandum describing PSB's efforts in meeting the requirements of this Paragraph related to the Court's Findings of Fact.  MCSO had outsourced three cases to another law enforcement agency, and an additional four investigations were pending outsourcing to an outside investigator.  These cases were outsourced due to the involvement of the former Chief Deputy, or other conflicts of interest identified by MCSO, and included the investigations identified in Paragraph 300.  MCSO processed a Request for Proposal and retained an outside investigator who met the requirements of Paragraphs 167.iii. and 196 to conduct the investigations identified.  One potential misconduct case identified in the Court's Findings of Fact was retained and investigated by PSB, as no identifiable conflict of interest appeared to exist.

PSB provided us with a document sent by the Independent Investigator assigned by the Court to investigate, or reinvestigate, some of the misconduct that is related to the Plaintiffs' class.  In this document, the Independent Investigator clarified his intent to investigate the matters assigned to him by the Court, as well as the matters that the Court determined were the

WAI 38405

discretion of the Independent Investigator. He further clarified that his investigations would include the initial misconduct alleged, as well as any misconduct that might have occurred during the process of review or issuance of discipline by MCSO personnel.

During each site visit, we meet with PSB personnel to discuss the status of those cases that have been outsourced to any contract vendor, other law enforcement agency, or other person or entity, so that we can continue to monitor these investigations and ensure that all misconduct cases, including those identified in the Findings of Fact, are thoroughly investigated. PSB has continued to keep us apprised of the status of all such investigations.

During our January 2018 site visit, PSB advised us that the two administrative misconduct investigations that had been outsourced to a separate law enforcement agency had been completed and closed. We received and reviewed both investigations. A third investigation that MCSO outsourced to this same law enforcement agency had been previously returned to MCSO without investigation, as the allegations duplicated those already under investigation by the Independent Investigator. MCSO outsourced six additional investigations to the contract investigator.

During our April and July 2018 site visits, PSB advised us that no additional investigations had been outsourced to the contract vendor. There were no cases completed and submitted for our review that had been investigated by this investigator. The Independent Investigator continued investigations identified by the Court, and notified us of the status of these cases on a regular basis. We also receive closed investigations that he completed.

During the last reporting period, PSB advised us that no additional investigations were outsourced to the contract vendor. The investigator had completed six investigations and forwarded them to PSB. PSB personnel were reviewing them prior to forwarding them to our Team. The Independent Investigator was continuing investigations identified by the Court. At the end of the last reporting period, we had reviewed eight investigations he conducted. We have reviewed these cases only to ensure that the misconduct identified by the Court is being addressed.

During this reporting period, the contract investigator continues to investigate assigned cases. Those cases he has forwarded to PSB are still being reviewed by PSB. We have yet to receive any investigations completed by this investigator for our review. The Independent Investigator has reported that he has completed all of the investigations identified by the Court. While he has completed them, many remain in the PSB review process, the discipline process, or the appeal process. We will not see these reports to ensure that all conduct outlined in the FOF has been addressed until these processes are completed.

WAI 38406

*Paragraph 292. To make this assessment, the Monitor is to be given full access to all MCSO internal affairs investigations or matters that might have been the subject of an internal affairs investigation by the MCSO. In making and reporting his assessment, the Monitor shall take steps to comply with the rights of the principals under investigation in compliance with state law. While the Monitor can assess all internal affairs investigations conducted by the MCSO to evaluate their good faith compliance with this Order, the Monitor does not have authority to direct or participate in the investigations of or make any orders as to matters that do not qualify as Class Remedial Matters.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

PSB personnel continue to inform us of ongoing criminal and administrative misconduct investigations. A member of our Team attends each weekly CRM meeting, reviews the lists of new internal investigations, and has access to the PSB IAPro database. The only cases for which any oversight occurs during the investigative process are those that are determined to be CRMs. We review all other misconduct investigations once they are completed, reviewed, and approved by MCSO personnel.

*Paragraph 293. The Monitor shall append to the quarterly reports it currently produces to the Court its findings on the MCSO's overall internal affairs investigations. The parties, should they choose to do so, shall have the right to challenge the Monitor's assessment in the manner provided in the Court's previous Order. (Doc. 606 ¶¶ 128, 132.)*

Phase 1: Not applicable

**Phase 2:** Not applicable

Since we began reviewing internal investigations conducted by MCSO more than three years ago, we have reviewed hundreds of investigations into alleged misconduct by MCSO personnel. As noted in our previous quarterly status reports and elsewhere in this report, we continue to note concerns with internal investigations, but have also noted many improvements.

All five of the criminal misconduct investigations that we reviewed for this reporting period were investigated by PSB and complied with the Second Order requirements.

PSB conducted 23 of the 56 total administrative misconduct investigations we reviewed this reporting period. PSB's overall compliance rate for the investigative and administrative requirements of the investigations was 96%. This is an increase from the 82% compliance the last reporting period. Sworn investigators conducted seven of these investigations. All seven (100%) were in compliance with all investigative and administrative requirements for which the PSB Commander has authority. This is a 12% increase from the 88% compliance in the last reporting period. Fourteen investigations were completed by Detention personnel assigned to PSB. Thirteen (93%) of the 14 investigations were in compliance. This is a 16% increase in compliance from 77% the last reporting period. The single concern we found with a PSB

WAI 38407

investigation this reporting period was the failure to request and receive a timely investigative extension. Overall compliance this reporting period for investigations conducted by PSB was 96%. We note that PSB continues to complete thorough investigations, and the quality of these investigations improved significantly this reporting period.

Of the 33 cases investigated outside of PSB, 22 (67%) complied with Second Order requirements. This is an increase from the 61% compliance finding the last reporting period. Those investigations conducted outside of PSB that were found not compliant still contain both qualitative and administrative documentation concerns as has been noted throughout this report. We again note that, in most cases, the deficiencies and errors we have found should have been identified prior to them being forwarded to PSB for review. We note that this reporting period all concerns we found were in those cases that were initiated prior to the 40-hour Misconduct Investigative Training. Of the 26 cases initiated and completed prior to the Misconduct Investigative Training, 15 (58%) were in compliance. All seven (100%) of those completed after the 40-Hour Misconduct Investigative Training were in compliance.

For the 56 administrative misconduct investigations we reviewed for this reporting period, MCSO's overall compliance was 79%. This is an increase of 4% from the last reporting period. This overall compliance finding takes into account multiple factors. As we have noted throughout this report, investigators, reviewers, command personnel, and the final decision makers all impact the compliance for each case.

MCSO completed delivery of the 40-hour Misconduct Investigative Training at the end of 2017, and all sworn supervisors who investigate administrative misconduct attended the training. During our site visit meetings and District visit meetings in October 2018 and January 2019, we continued to receive positive feedback on the training and District command personnel told us that they believe that investigations completed by their personnel are continuing to improve. We agree with this assessment; and our review of a limited number of investigations initiated and completed after January 1, 2018, continues to indicate that the training is producing the desired outcome and that there is additional improvement in the quality of investigations.

PSB personnel continue to be receptive to our input, and we have had many productive meetings and discussions regarding the investigations being conducted. We continue to note that PSB addresses issues we raise during our site visit meetings. The quality of the investigations conducted and overall compliance, though slow in some cases, continues to improve. We continue to stress that compliance is not the sole responsibility of any one individual or Division – but dependent on all those who complete, review, or approve internal investigations.

We have noted in numerous previous reporting periods that MCSO's executive leadership must take the appropriate actions to ensure that adequate resources are dedicated to the completion of administrative and criminal misconduct investigations. MCSO informed us during our July 2018 site visit that numerous investigative personnel were requested for PSB in the 2018 budget year and approved. As of our site visit in January 2019, none of these positions have been filled. Based on the overall number of vacancies in MCSO, PSB personnel do not believe that

WAI 38408

any of these positions will be filled in the foreseeable future. We have also noted in numerous reporting periods that the executive leadership must provide appropriate oversight and support for the personnel who conduct these investigations. The documents we are now receiving from MCSO on a monthly basis continue to indicate that MCSO command personnel are noting, documenting, and taking corrective actions when incomplete or deficient investigations are completed or approved by their personnel. While MCSO is not in compliance with a number of the requirements for the completion of internal investigations, we note that efforts are being made to address the obstacles to reaching compliance.

**B.      *Investigations to be Conducted by the Independent Investigator and the Independent Disciplinary Authority***

***Paragraph 294.*** *In its Findings of Fact, (Doc. 1677), the Court identified both: (1) internal affairs investigations already completed by the MCSO that were inadequate or insufficient; (see, e.g., Doc. 1677 at ¶ 903), and (2) misconduct or alleged misconduct that had never been investigated by MCSO that should be or should have been investigated. (Id. at ¶ 904.)*

***Paragraph 295.*** *In light of MCSO's failure to appropriately investigate these matters, the Court appoints an Independent Investigator and an Independent Disciplinary Authority from the candidates set forth by the parties, and vests them with the authority to investigate and decide discipline in these matters.*

**1.      *The Independent Investigator***

***Paragraph 298.*** *In assessing the existence of previously uncharged acts of misconduct that may be revealed by the Findings of Fact, the Independent Investigator does not have authority to investigate acts of misconduct that are not sufficiently related to the rights of the members of the Plaintiff class. While the Independent Investigator should identify such acts of misconduct and report those acts to the Commander of the Professional Standards Bureau, and to the Monitor for purposes of making the Monitor's assessment identified in ¶¶ 291–93 above, the Independent Investigator may not independently investigate those matters absent the authorization and the request of the Sheriff.*

***Paragraph 300.*** *The following potential misconduct is not sufficiently related to the rights of the members of the Plaintiff class to justify any independent investigation:*

a.       *Uninvestigated untruthful statements made to the Court under oath by Chief Deputy Sheridan concerning the Montgomery investigation. (Doc. 1677 at ¶ 385).*

b.       *Uninvestigated untruthful statements made to the Court under oath by Chief Deputy Sheridan concerning the existence of the McKessy investigation. (Id. at ¶ 816).*

WAI 38409

c.  *Chief Deputy Sheridan's untruthful statements to Lieutenant Seagraves made during the course of an internal investigation of Detective Mackiewicz to the effect that an investigation into the overtime allegations against Detective Mackiewicz had already been completed.  (Id. at ¶ 823).*

d.  *Other uninvestigated acts of misconduct of Chief Deputy Sheridan, Captain Bailey, Sergeant Tennyson, Detective Zebro, Detective Mackiewicz, or others that occurred during the McKessy investigation.  (Id. at ¶¶ 766–825).*

**Phase 1:** Not applicable

**Phase 2:** Deferred

During our January 2017 site visit, the PSB Commander assured us that all acts of misconduct that we identified and discussed during our October 2016 site visit would be provided to a contracted independent investigator for investigative purposes.

Since that time, the PSB Commander has advised us that MCSO has contracted with a licensed private investigator.  The contract investigator possesses the requisite qualifications and experience to conduct the investigations of misconduct outlined in Paragraph 300 (a.-c.), and the additional misconduct in the Findings of Fact that directly associates with Paragraph 300 (d.).  PSB has not found it necessary to contract with any additional licensed private investigators.

During our April 2017 site visit, we met with PSB command staff and representatives from the Maricopa County Attorney's Office (MCAO) to verify that all of the acts of misconduct that were identified in the Findings of Fact (FOF) are under investigation, either by the Court-appointed Independent Investigator or the private licensed contract investigator.  Before this meeting, PSB command provided us with a roster of related acts of misconduct that PSB intended to be assigned to the contract investigator.  The roster of intended assignments did not include all of the acts of misconduct that we had discussed.  The MCAO and PSB command personnel explained that many of the acts of potential misconduct identified in the FOF were also identified by the Court in Paragraph 301 as sufficiently related to the rights of members of the Plaintiffs' class.   In Paragraph 301, the Court documented that because of this determination, investigations of the potential misconduct were justified if the Independent Investigator deemed that an investigation was warranted.

The Independent Investigator has now reported that he has completed all of the investigations identified by the Court.  While he has completed them, many remain in the PSB review process, the discipline process, or the appeal process.  We will not see these reports to ensure that all conduct outlined in the FOF has been addressed until these processes are completed.

Our ability to verify that all potential misconduct outlined in the FOF has been investigated by PSB, the PSB contract investigator, or the Independent Investigator is pending until all the investigations are completed.  Once this occurs, we can determine if there is any additional misconduct identified in the FOF that still requires investigation.  Finally, the PSB Commander and MCAO advised us that the acts of misconduct involving (former) Sheriff Arpaio as

WAI 38410

identified in the FOF would not be investigated by any entity, as there does not exist any statute that addresses how a Sheriff would be disciplined in the event of a sustained finding resulting from an administrative misconduct investigation.

**Paragraph 310.** *The Monitor and the parties are directed to promptly comply with the Independent Investigator's requests for information. The Monitor and the Independent Investigator may communicate to coordinate their investigations. Nevertheless, each is independently responsible for their respective jurisdiction set forth in this Order, and each should make independent decisions within his own delegated responsibility.*

### 2. The Independent Disciplinary Authority

**Paragraph 337.** *Nevertheless, when discipline is imposed by the Independent Disciplinary Authority, the employee shall maintain his or her appeal rights following the imposition of administrative discipline as specified by Arizona law and MCSO policy with the following exceptions:*

a.    *When minor discipline is imposed, a grievance may be filed with the Sheriff or his designee consistent with existing MCSO procedure. Nevertheless, the Sheriff or his designee shall transmit the grievance to the Monitor who shall have authority to decide the grievance. If in resolving the grievance the Monitor changes the disciplinary decision in any respect, he shall explain his decision in writing.*

b.    *A disciplined MCSO employee maintains his or her right to appeal serious discipline to the Maricopa County Law Enforcement Merit System Council to the extent the employee has such a right. The Council may exercise its normal supervisory authority over discipline imposed by the Independent Disciplinary Authority with one caveat. Arizona law allows the Council the discretion to vacate discipline if it finds that the MCSO did not make a good faith effort to investigate and impose the discipline within 180 days of learning of the misconduct. In the case of any of the disciplinary matters considered by the Independent Disciplinary Authority, the MCSO will not have made that effort. The delay, in fact, will have resulted from MCSO's bad faith effort to avoid the appropriate imposition of discipline on MCSO employees to the detriment of the members of the Plaintiff class. As such, the Council's determination to vacate discipline because it was not timely imposed would only serve to compound the harms imposed by the Defendants and to deprive the members of the Plaintiff class of the remedies to which they are entitled due to the constitutional violations they have suffered at the hands of the Defendants. As is more fully explained above, such a determination by the Council would constitute an undue impediment to the remedy that the Plaintiff class would have received for the constitutional violations inflicted by the MCSO if the MCSO had complied with its original obligations to this Court. In this rare instance, therefore, the Council may not explicitly or implicitly exercise its discretion to reduce discipline on the*

WAI 38411

> *basis that the matter was not timely investigated or asserted by the MCSO. If the Plaintiff class believes the Council has done so, it may seek the reversal of such reduction with this Court pursuant to this Order.*

**Phase 1:**  In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

**Phase 2:**  In compliance

During this reporting period, no grievances were filed that met the criteria for transmitting to the Monitor.

WAI 38412

## Section 18:  Concluding Remarks

We assess compliance with 99 Paragraphs of the First Order, and 113 Paragraphs of the Second Order, for a total of 212 Paragraphs.  MCSO is in Phase 1 compliance with 83 of the First Order Paragraphs, or 97%; and 102 of the Second Order Paragraphs, or 99%.

As noted above, at the end of this reporting period, MCSO asserted Full and Effective Compliance with 27 Paragraphs of the First Order, as that term is defined in the First Order. After review, I agreed with their assertions for 23 of these 27 Paragraphs.  Including these 23 Full and Effective Compliance Paragraphs, MCSO is in Phase 2, or operational compliance, with 74 of the First Order Paragraphs, or 75%.  MCSO is in Phase 2 compliance with 102 of the Second Order Paragraphs, or 90%.  Combining the requirements of both Orders, MCSO is in Phase 1 compliance with 185 Paragraphs, or 98%; and in Phase 2 compliance with 176 Paragraphs, or 83%.

District visits are an integral part of our onsite compliance visits, and we find value in speaking with the practitioners in the field regarding a variety of subjects.  A recurring theme we heard during our January site visit was MCSO employees' concerns over what they perceive as a "staffing crisis."  Their concerns may be exacerbated by MCSO's plans to more fully implement a community policing model as part of their proposed revisions to their Paragraph 70 plan.  Our impression is that employees support the concepts of community policing and problem solving, but there is a general concern that the personnel shortages will not allow the appropriate time to implement these strategies.  The Sheriff may want to consider more personal and direct ways to address these issues with the rank and file.  District personnel advised us that they would benefit from hearing directly from the Sheriff that he is aware of the personnel issues and has a plan for addressing them.

In our last report, we noted that EIU created an Alert Review Committee (ARC) to ensure that closed alert investigation summaries by line supervisors contain sufficient information for command staff to evaluate the decisions of the supervisors.  This body, renamed the Alert Review Group (ARG), has been very active in returning incomplete alert investigations to District staff for additional information and processing.  During this reporting period, two-thirds of the completed alert cases had multiple Attachment B forms, which indicate that either commanders and/or the ARG requested additional information.  The ARG also collaborated with District command staff to institute three action plans during the reporting period.  Such plans most likely would not have resulted without this interaction between EIU and the field.

WAI 38413

During our last two site visits, we expressed our concerns regarding the need to start conducting some analyses of the Non-Traffic Contact Forms (NTCFs) used by deputies to document field stops which do not involve motor vehicles.   MCSO developed this form to capture the information required by Paragraph 75.h., and the forms have been stored in the EIS database since mid-2017.  Initially, the use of new form was infrequent, but as deputies became familiar with its required use, their numbers increased noticeably.  MCSO has amassed enough of them to analyze trends and patterns.  Our review of the forms so far has revealed that the majority of them are used to document bicycle light violations in certain areas like Guadalupe, and the majority of the recipients are Latinos.

Lastly, we continue to see ongoing issues with deputies failing to prepare and provide Incidental Contact Receipts to passengers with whom they have contact with during traffic stops.  We have suggested that MCSO remedy the issue of deputies failing to provide passengers with the forms, when required, by making changes to TraCS to create a prompt when deputies prepare the Vehicle Stop Contact Form (VSCF) to remind the deputies to complete the form.

WAI 38414

# Appendix:  Acronyms

The following is a listing of acronyms frequently used in our quarterly status reports:

| | |
|---|---|
| ACLU | American Civil Liberties Union |
| ACT | Annual Combined Training |
| AIU | Audits and Inspections Unit |
| AOC | Arizona Office of Courts |
| ARG | Alert Review Group |
| ASU | Arizona State University |
| ATU | Anti-Trafficking Unit |
| BIO | Bureau of Internal Oversight |
| CAB | Community Advisory Board |
| CAD | Computer Aided Dispatch |
| CBP | Customs and Border Protection |
| CDA | Command Daily Assessment |
| CEU | Criminal Employment Unit |
| CID | Court Implementation Division |
| COrD | Community Outreach Division |
| CORT | Court Order Required Training |
| CRM | Class Remedial Matter |
| DOJ | Department of Justice |
| DUI | Driving Under the Influence |
| EIS | Early Identification System |
| EIU | Early Intervention Unit |
| EPA | Employee Performance Appraisal |
| FBI | Federal Bureau of Investigation |
| FEC | Full and Effective Compliance |
| FOF | Findings of Fact |

WAI 38415

| FTO | Field Training Officer |
|-----|------------------------|
| ICE | Immigration and Customs Enforcement |
| IIU | Internal Investigations Unit |
| IMF | Incident Memorialization Form |
| IR | Incident Report |
| LOS | Length of stop |
| LLS | Legal Liaison Section |
| MCAO | Maricopa County Attorney's Office |
| MCSO | Maricopa County Sheriff's Office |
| NOI | Notice of Investigation |
| NTCF | Non-Traffic Contact Form |
| PAL | Patrol Activity Log |
| PDH | Pre-Determination Hearing |
| POST | Peace Officers Standards and Training |
| PPMU | Posse Personnel Management Unit |
| PSB | Professional Standards Bureau |
| SID | Special Investigations Division |
| SMS | Skills Manager System |
| SPSS | Statistical Package for the Social Science |
| SRT | Special Response Team |
| TraCS | Traffic Stop Data Collection System |
| TSAR | Traffic Stop Annual Report |
| TSAU | Traffic Stop Analysis Unit |
| TSMR | Traffic Stop Monthly Report |
| TSQR | Traffic Stop Quarterly Report |
| VSCF | Vehicle Stop Contact Form |

WAI 38416