# TWENTIETH REPORT
## Independent Monitor
### for the
## Maricopa County Sheriff's Office



## Reporting Period – First Quarter 2019
### Chief (Ret.) Robert S. Warshaw
### Independent Monitor
### July 29, 2019

WAI 39777

# Table of Contents

Section 1:  Introduction……………………………………………...……..3

Section 2:  Methodology and Compliance Summary…………………………..6

Section 3:  Implementation Unit Creation and Documentation Request………11

Section 4:  Policies and Procedures…………………….………………….15

Section 5:  Pre-Planned Operations…………………………….….……….44

Section 6:  Training……………………………………………………....49

Section 7:  Traffic Stop Documentation and Data Collection…………….…..61

Section 8:  Early Identification System (EIS)……….….……………..…...104

Section 9:  Supervision and Evaluation of Officer Performance……….…....129

Section 10:  Misconduct and Complaints…………………………….....152

Section 11:  Community Engagement………………………………...156

Section 12:  Misconduct Investigations, Discipline, and Grievances………...166

Section 13:  Community Outreach and Community Advisory Board………..254

Section 14:  Supervision and Staffing……………………………….256

Section 15:  Document Preservation and Production…………………….259

Section 16:  Additional Training…………………………………….264

Section 17:  Complaints and Misconduct Investigations Relating to

 Members of the Plaintiff Class…………………………….265

Section 18:  Concluding Remarks……………………………………....283

Appendix:  Acronyms……………………………………………..285

WAI 39778

## Section 1:  Introduction

This is the twentieth report issued in my capacity as the Court-appointed Monitor in the case of *Manuel de Jesus Ortega Melendres, et al., v. Paul Penzone, et al.* (No. CV-07-02513-PHX-GMS), and documents activities that occurred during the first quarter of 2019.

On May 13, 2016, the Court issued its Findings of Fact in the civil contempt proceedings that commenced in April 2015.  This led to the issuance of a Second Supplemental Permanent Injunction/Judgment Order (Second Order) on July 20, 2016, significantly expanding the duties of the Monitor.  Our reports cover the additional requirements of the Second Order while continuing to document MCSO's compliance efforts with the First Supplemental Permanent Injunction/Judgment Order (First Order) issued in October 2013.  We will provide summaries of compliance with both Orders separately, as well as a summary of MCSO's overall, or combined, compliance.

The compliance Paragraphs of the Second Order commence where the First Order ends, and they are numbered from Paragraph 160 through and including Paragraph 337.  Not all are subject to our review.  For example, the Second Order outlines the duties of the Independent Investigator and the Independent Disciplinary Authority.  These are autonomous positions, not subject to oversight of the Court or its Monitor.

The Second Order also delineates in great detail requirements in the areas of misconduct investigations, training, discipline and discipline review, transparency and reporting, community outreach, document preservation, and misconduct investigations involving members of the Plaintiffs' class.  The Court granted the Monitor the authority to supervise and direct all of the investigations that fall into the latter category.

This report covers the period from January 1-March 31, 2019.  At the end of the last reporting period, MCSO asserted Full and Effective Compliance with 27 Paragraphs of the First Order, as that term is defined in the First Order.  After review, I agreed with their assertions for 23 of these 27 Paragraphs.  During this reporting period, MCSO asserted Full and Effective Compliance with one additional Paragraph, Paragraph 27.  On April 22, 2019, I agreed with MCSO's assertion.  As of this reporting period, MCSO is in Full and Effective Compliance with 24 First Order Paragraphs, as identified in Section 2 of this report.  Moving forward, MCSO retains the obligation to document that the Office remains in Full and Effective Compliance with these Paragraphs.

WAI 39779

During this reporting period, we continued to see steady improvement in the overall quality of administrative misconduct investigations being conducted by MCSO personnel. The number of cases finalized this reporting period increased significantly from the past several reporting periods, indicating that MCSO is making efforts to address the large backlog of cases. We also noted that both PSB and District Command personnel addressed identified concerns or deficiencies with investigations when appropriate. Overall compliance with the Order requirements increased to 84% this reporting period; and for the second time, all of the cases completed by sworn PSB personnel were 100% compliant with the requirements of the Second Order.

As documented in our recent reports, MCSO engaged a new vendor, CNA, to assist with the traffic stop analyses required by the First Order. MCSO and its vendor have been transparent in their development of the methodologies for the Traffic Stop Annual Report (TSAR) and the Traffic Stop Monthly Report (TSMR). The TSAR methodology represents a departure from the previous approach used by MCSO and its former vendor, and was developed with significant input from our Team and the Parties. The methodology was approved shortly after our April 2019 site visit, reflecting discussions that occurred during the visit. While MCSO conducts the analysis for what will be the Fourth TSAR, we will collectively turn our attention to the finalization of the TSMR methodology, which has proven to be more of a challenge.

While MCSO is on the cusp of producing its Fourth TSAR, the agency completed the supervisory discussions and action plans associated with the Third TSAR during this reporting period. MCSO provided us and the Parties with videos and supporting documentation for the discussions on an ongoing basis since they commenced. We will have after-action discussions regarding the Third TSAR process during our July site visit.

During our last site visit, we inquired about MCSO's progress with the Plan to Promote Constitutional Policing. MCSO officials did not provide any updates on its progress. MCSO also reported that it had already achieved progress with the outstanding goals of the plan. We do not agree with this assessment, and we will continue to assess MCSO's progress in this area. This is a critical topic, as it is relevant to deputy contact and community trust.

The Bureau of Internal Oversight (BIO) has emerged as a success story in the furtherance of MCSO's compliance efforts. This organizational component is responsible for overseeing the implementation of many of the First Order's requirements, either directly or indirectly, via the three main units housed in BIO. The Early Intervention Unit (EIU) maintains the Early Identification System (EIS), and is responsible for screening and processing the myriad of alerts generated by the system. The Audit and Inspections Unit (AIU) internally monitors compliance with agency policies and procedures – and consequently, many of the Orders' requirements. Their work supplements ours, and their inspections often assess the same cases that we review. In certain instances, we rely on the results of their audits and inspections in our determinations of compliance.

WAI 39780

Most recently, MCSO has committed permanent resources to create a Traffic Stop Analysis Unit (TSAU) to coordinate the agency's traffic stop data analysis activities and oversee the TSAR and TSMR processes.  The Captain responsible for overseeing BIO for the past few years has been promoted to Deputy Chief and will be moving on to a field assignment.  We note the significant accomplishments of BIO under his leadership, as well as his personal commitment to the TSAR process.  (He facilitated all of the supervisory discussions for the last two cycles.)  We are optimistic that he will leverage his knowledge and experience in his new Patrol assignment to further MCSO's compliance with the Orders' requirements.

WAI 39781

## Section 2: Methodology and Compliance Summary

The Monitor's primary responsibility is to determine the status of compliance of the Maricopa County Sheriff's Office (MCSO) with the requirements of the Order. To accomplish this, the Monitoring Team makes quarterly visits to Maricopa County to meet with the agency's Court Implementation Division (CID) and other Office personnel – at Headquarters, in Patrol District offices, or at the office that we occupy when onsite. We also observe Office practices; review Office policies and procedures; collect and analyze data using appropriate sampling and analytic procedures; and inform the Parties and, on a quarterly basis, the Court, about the status of MCSO's compliance.

This report documents compliance with applicable Order requirements, or Paragraphs, in two phases. For Phase 1, we assess compliance according to whether MCSO has developed and approved requisite policies and procedures, and MCSO personnel have received documented training on their contents. For Phase 2 compliance, generally considered operational implementation, MCSO must demonstrate that it is complying with applicable Order requirements more than 94% of the time, or in more than 94% of the instances under review.

We use four levels of compliance: In compliance; Not in compliance; Deferred; and Not applicable. "In compliance" and "Not in compliance" are self-explanatory. We use "Deferred" in circumstances in which we are unable to fully determine the compliance status – due to a lack of data or information, incomplete data, or other reasons that we explain in the narrative of our report. We will also use "Deferred" in situations in which MCSO, in practice, is fulfilling the requirements of a Paragraph, but has not yet memorialized the requirements in a formal policy.

For Phase 1 compliance, we use "Not applicable" for Paragraphs where a policy is not required; for Phase 2 compliance, we use "Not applicable" for Paragraphs that do not necessitate a compliance assessment.

The tables below summarize the compliance status of Paragraphs tracked in this report.[1] This is our eleventh quarterly status report in which we report on MCSO's compliance with both the First and Second Orders. During this reporting period, MCSO's Phase 1 compliance rate with the **First Order** remained the same as the last two reporting periods, at 97%. MCSO's Phase 1 compliance rate with the **Second Order** remained the same as the last reporting period, at 99%.

---

[1] The percent in compliance for Phase 1 is calculated by dividing the number of Order Paragraphs determined to be in compliance by the total number of Paragraphs requiring a corresponding policy or procedure. Paragraphs with the status of Deferred are included in the denominator, while Paragraphs with the status of Not Applicable are not included. Therefore, the number of Paragraphs included in the denominator totals 189 for Phase 1. The number of Paragraphs included in the denominator totals 212 for Phase 2.

WAI 39782

During this reporting period, MCSO's Phase 2 compliance rate with the **First Order** increased by three percentage points, from 75% to 78%.  This number includes Paragraphs that we consider to be in compliance and those that are now in Full and Effective Compliance, as described above.  (See below for the list of Paragraphs that are in Full and Effective Compliance.)  During this reporting period, MCSO's Phase 2 compliance rate with the **Second Order** decreased by one percentage point, from 90% to 89%.

| Twentieth Quarterly Status Report | | |
|---|---|---|
| **First Order Summary** | | |
| **Compliance Status** | **Phase 1** | **Phase 2** |
| Not Applicable | 14 | 1 |
| Deferred | 0 | 2 |
| Not in Compliance | 3 | 20 |
| In Compliance | 83 | 77[2] |
| **Percent in Compliance** | **97%** | **78%** |

| Twentieth Quarterly Status Report | | |
|---|---|---|
| **Second Order Summary** | | |
| **Compliance Status** | **Phase 1** | **Phase 2** |
| Not Applicable | 20 | 10 |
| Deferred | 0 | 3 |
| Not in Compliance | 1 | 9 |
| In Compliance | 102 | 101 |
| **Percent in Compliance** | **99%** | **89%** |

---

[2] This number includes those Paragraphs that are deemed in Full and Effective Compliance.

WAI 39783

| MCSO's Compliance with the Requirements of the **First Order** *(October 2, 2013)* | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Report 1 | Report 2 | Report 3 | Report 4 | Report 5 | Report 6 | Report 7 | Report 8 | Report 9 | Report 10 |
| **Phase 1** | 4% | 10% | 44% | 40% | 51% | 57% | 61% | 60% | 67% | 60% |
| **Phase 2** | 0% | 0% | 26% | 25% | 28% | 37% | 38% | 39% | 44% | 49% |
| | Report 11 | Report 12 | Report 13 | Report 14 | Report 15 | Report 16 | Report 17 | Report 18 | Report 19 | Report 20 |
| **Phase 1** | 63% | 79% | 88% | 85% | 85% | 85% | 85% | 97% | 97% | 97% |
| **Phase 2** | 50% | 57% | 67% | 62% | 65% | 64% | 66% | 77% | 75% | 78% |

| MCSO's Compliance with the Requirements of the **Second Order** *(July 20, 2016)* | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Report 1 | Report 2 | Report 3 | Report 4 | Report 5 | Report 6 | Report 7 | Report 8 | Report 9 | Report 10 |
| **Phase 1** | | N/A | | | | | | | | 1% |
| **Phase 2** | | N/A | | | | | | | | 43% |
| | Report 11 | Report 12 | Report 13 | Report 14 | Report 15 | Report 16 | Report 17 | Report 18 | Report 19 | Report 20 |
| **Phase 1** | 10% | 12% | 72% | 75% | 77% | 77% | 78% | 78% | 99% | 99% |
| **Phase 2** | 46% | 60% | 63% | 66% | 72% | 75% | 80% | 81% | 90% | 89% |

WAI 39784

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|:---:|:---:|:---:|
| 9 | 12/28/18 | Concurred on 1/28/19 |
| 10 | 12/28/18 | Concurred on 1/28/19 |
| 11 | 12/28/18 | Concurred on 1/28/19 |
| 12 | 12/28/18 | Concurred on 1/28/19 |
| 13 | 12/28/18 | Concurred on 1/28/19 |
| 23 | 12/28/18 | Concurred on 1/28/19 |
| 26 | 12/28/18 | Concurred on 1/28/19 |
| 27 | 3/22/19 | Concurred on 4/22/19 |
| 28 | 12/28/18 | Concurred on 1/28/19 |
| 29 | 12/28/18 | Concurred on 1/28/19 |
| 30 | 12/28/18 | Concurred on 1/28/19 |
| 35 | 12/28/18 | Concurred on 1/28/19 |
| 36 | 12/28/18 | Concurred on 1/28/19 |
| 37 | 12/28/18 | Concurred on 1/28/19 |
| 38 | 12/28/18 | Concurred on 1/28/19 |
| 40 | 12/28/18 | Concurred on 1/28/19 |
| 48 | 12/28/18 | Did not concur on 1/28/19 |
| 49 | 12/28/18 | Did not concur on 1/28/19 |
| 50 | 12/28/18 | Did not concur on 1/28/19 |
| 51 | 12/28/18 | Did not concur on 1/28/19 |
| 55 | 12/28/18 | Concurred on 1/28/19 |
| 59 | 12/28/18 | Concurred on 1/28/19 |
| 60 | 12/28/18 | Concurred on 1/28/19 |
| 68 | 12/28/18 | Concurred on 1/28/19 |
| 71 | 12/28/18 | Concurred on 1/28/19 |

WAI 39785

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|---|---|---|
| 77 | 12/28/18 | Concurred on 1/28/19 |
| 88 | 12/28/18 | Concurred on 1/28/19 |
| 101 | 12/28/18 | Concurred on 1/28/19 |

WAI 39786

## First Supplemental Permanent Injunction/Judgment Order

## Section 3: Implementation Unit Creation and Documentation Requests

**COURT ORDER III.  MCSO IMPLEMENTATION UNIT AND INTERNAL AGENCY-WIDE ASSESSMENT (***Court Order wording in italics***)**

***Paragraph 9.*** *Defendants shall hire and retain, or reassign current MCSO employees to form an interdisciplinary unit with the skills and abilities necessary to facilitate implementation of this Order.  This unit shall be called the MCSO Implementation Unit and serve as a liaison between the Parties and the Monitor and shall assist with the Defendants' implementation of and compliance with this Order.  At a minimum, this unit shall: coordinate the Defendants' compliance and implementation activities; facilitate the provision of data, documents, materials, and access to the Defendants' personnel to the Monitor and Plaintiffs representatives; ensure that all data, documents and records are maintained as provided in this Order; and assist in assigning implementation and compliance-related tasks to MCSO Personnel, as directed by the Sheriff or his designee.  The unit will include a single person to serve as a point of contact in communications with Plaintiffs, the Monitor and the Court.*

**In Full and Effective Compliance**

To verify Phase 2 compliance with this Paragraph, we reviewed the monthly personnel rosters for the Court Implementation Division (CID).  As of this reporting period, CID has one captain, one lieutenant, three sergeants, two deputies, two management analysts, one management assistant, and two administrative assistants.  CID continues to be supported by MCAO attorneys, who frequently participate in our meetings and telephone calls with Division personnel.

During this reporting period, CID continued to provide documents through MCSO's counsel via an Internet-based application.  The Monitoring Team, the Plaintiffs, and the Plaintiff-Intervenors receive all files and documents simultaneously, with only a few exceptions centering on open internal investigations.  CID effectively facilitates the Monitoring Team and Parties' access to MCSO's personnel.

CID continues to update the "*Melendres* Compliance Corner" page on MCSO's website which provides information to the public about CID's role.  The webpage contains a historical overview of the case, the Monitor's compliance reports, and additional links to both the First and Second Orders.  The page also provides a link to information about the Immigration Stops and Detention Compensation Fund.  The webpage can be read in both English and Spanish.  MCSO continues to update the website to include our most recent quarterly status reports.

WAI 39787

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 10.**   *MCSO shall collect and maintain all data and records necessary to: (1) implement this order, and document implementation of and compliance with this Order, including data and records necessary for the Monitor to conduct reliable outcome assessments, compliance reviews, and audits; and (2) perform ongoing quality assurance in each of the areas addressed by this Order.  At a minimum, the foregoing data collection practices shall comport with current professional standards, with input on those standards from the Monitor.*

**In Full and Effective Compliance**

CID continues to be responsive to our requests.  CID also addresses with immediacy any issues we encounter in the samples we request – be they technical issues, missing documents, or other problems.  MCSO's Bureau of Internal Oversight (BIO) routinely audits the work products of the Office, particularly in the areas that directly affect compliance with the requirements of the Orders.  In many instances, BIO will review the same material we request in our samples, and BIO frequently notes – and addresses – the same deficiencies we identify in our reviews.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 11.**   *Beginning with the Monitor's first quarterly report, the Defendants, working with the unit assigned for implementation of the Order, shall file with the Court, with a copy to the Monitor and Plaintiffs, a status report no later than 30 days before the Monitor's quarterly report is due.  The Defendants' report shall (i) delineate the steps taken by the Defendants during the reporting period to implement this Order; (ii) delineate the Defendants' plans to correct any problems; and (iii) include responses to any concerns raised in the Monitor's previous quarterly report.*

**In Full and Effective Compliance**

MCSO submitted its Twentieth Quarterly Compliance Report on June 3, 2019, in compliance with this Paragraph.  The report covers the steps MCSO has taken to implement the Court's Orders during the first quarter of 2019 – that is, January 1-March 31, 2019.  The report also includes any plans to correct difficulties encountered during the quarter and responses to concerns raised in our Nineteenth Quarterly Status Report, filed on May 14, 2019.

MCSO asserted Full and Effective Compliance (FAEC) with Paragraphs 34 and 106, as defined in the Court Order.  Paragraph 34 requires the annual review of policies.  Paragraph 106 requires that records of complaints and investigations be maintained and made available to the Monitor and Plaintiffs' representative upon request.

WAI 39788

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

***Paragraph 12.*** *The Defendants, working with the unit assigned for implementation of the Order, shall conduct a comprehensive internal assessment of their Policies and Procedures affecting Patrol Operations regarding Discriminatory Policing and unlawful detentions in the field as well as overall compliance with the Court's orders and this Order on an annual basis. The comprehensive Patrol Operations assessment shall include, but not be limited to, an analysis of collected traffic-stop and high-profile or immigration-related operations data; written Policies and Procedures; Training, as set forth in the Order; compliance with Policies and Procedures; Supervisor review; intake and investigation of civilian Complaints; conduct of internal investigations; Discipline of officers; and community relations. The first assessment shall be conducted within 180 days of the Effective Date. Results of each assessment shall be provided to the Court, the Monitor, and Plaintiffs' representatives.*

**In Full and Effective Compliance**

See Paragraph 13.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

***Paragraph 13.*** *The internal assessments prepared by the Defendants will state for the Monitor and Plaintiffs' representatives the date upon which the Defendants believe they are first in compliance with any subpart of this Order and the date on which the Defendants first assert they are in Full and Effective Compliance with the Order and the reasons for that assertion. When the Defendants first assert compliance with any subpart or Full and Effective Compliance with the Order, the Monitor shall within 30 days determine whether the Defendants are in compliance with the designated subpart(s) or in Full and Effective Compliance with the Order. If either party contests the Monitor's determination it may file an objection with the Court, from which the Court will make the determination. Thereafter, in each assessment, the Defendants will indicate with which subpart(s) of this Order it remains or has come into full compliance and the reasons therefore. The Monitor shall within 30 days thereafter make a determination as to whether the Defendants remain in Full and Effective Compliance with the Order and the reasons therefore. The Court may, at its option, order hearings on any such assessments to establish whether the Defendants are in Full and Effective Compliance with the Order or in compliance with any subpart(s).*

**In Full and Effective Compliance**

WAI 39789

CID and the Monitoring Team established that the schedule for the submission of comprehensive annual assessments as required by these Paragraphs will run according to MCSO's fiscal year cycle, July 1-June 30.  MCSO will submit reports on or before September 15 of each year.

Consistent with this agreement, on September 17, 2018 (September 15 fell on a Saturday), MCSO filed with the Court its 2017 Annual Compliance Report covering the period of July 1, 2016-June 30, 2017.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 39790

# Section 4:  Policies and Procedures

**COURT ORDER V. POLICIES AND PROCEDURES**

*Paragraph 18.  MCSO shall deliver police services consistent with the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order, and with current professional standards.  In conducting its activities, MCSO shall ensure that members of the public receive equal protection of the law, without discriminating based on actual or perceived race or ethnicity, and in a manner that promotes public confidence.*

*Paragraph 19.  To further the goals in this Order, the MCSO shall conduct a comprehensive review of all Patrol Operations Policies and Procedures and make appropriate amendments to ensure that they reflect the Court's permanent injunction and this Order.*

**Phase 1:**  In compliance

- GA-1 (Development of Written Orders), most recently amended on March 28, 2019.

**Phase 2:**  In compliance

MCSO has taken steps toward a comprehensive review of its Patrol Operations Policies and Procedures in four phases.  First, on December 31, 2013, prior to my appointment as Monitor, MCSO filed with the Court all of its policies and procedures, with amendments, that MCSO believed complied with the various Paragraphs of the First Order.  Second, in the internal assessment referenced above, MCSO discussed its ongoing evaluation of Patrol Operations and its development of policies and procedures.  Third, in response to our requests, MCSO provided all of the policies and procedures it maintains are applicable to the First Order for our review and that of the Plaintiffs.  We provided our feedback, which also included the Plaintiffs' comments, on these policies on August 12, 2014.  Based on that feedback, MCSO made adjustments to many of the policies, concentrating first on the policies to be disseminated in Detentions, Arrests, and the Enforcement of Immigration-Related Laws Training; and the Bias Free Policing Training (often referred to as Fourth and Fourteenth Amendment Training) that commenced in early September.  We reviewed MCSO's updated policies and provided our approval for several on August 25, 2014.

Fourth, in discussions during 2016, MCSO requested more specific guidance on what we considered to be Patrol-related policies and procedures.  In response, we provided MCSO with a list of the Patrol-related policies for the purposes of Paragraph 19.  We included on this list policies that were not recently revised or currently under review.  Several policies required changes to comport with the First Order, Second Order, or both.  In 2018, MCSO published the last of the outstanding policies, placing it into compliance with this Paragraph.

WAI 39791

**Paragraph 20.**  *The MCSO shall comply with and operate in accordance with the Policies and Procedures discussed in this Order and shall take all reasonable measures to ensure that all Patrol Operations personnel comply with all such Policies and Procedures.*

**Paragraph 21.**  *The MCSO shall promulgate a new, department-wide policy or policies clearly prohibiting Discriminatory Policing and racial profiling.  The policy or policies shall, at a minimum:*

a.  *define racial profiling as the reliance on race or ethnicity to any degree in making law enforcement decisions, except in connection with a reliable and specific suspect description;*

b.  *prohibit the selective enforcement or non-enforcement of the law based on race or ethnicity;*

c.  *prohibit the selection or rejection of particular policing tactics or strategies or locations based to any degree on race or ethnicity;*

d.  *specify that the presence of reasonable suspicion or probable cause to believe an individual has violated a law does not necessarily mean that an officer's action is race-neutral; and*

e.  *include a description of the agency's Training requirements on the topic of racial profiling in Paragraphs 48–51, data collection requirements (including video and audio recording of stops as set forth elsewhere in this Order) in Paragraphs 54–63 and oversight mechanisms to detect and prevent racial profiling, including disciplinary consequences for officers who engage in racial profiling.*

**Phase 1:**  In compliance

- CP-2 (Code of Conduct), most recently amended on March 15, 2019.

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 26, 2018.

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- GI-1 (Radio and Enforcement Communications Procedures), most recently amended on April 19, 2018.

- GJ-33 (Significant Operations), most recently amended on May 10, 2018.

**Phase 2:**  Not applicable

WAI 39792

MCSO has developed and published the policies required by Paragraph 21.  MCSO distributed these policies and has trained agency personnel during the required Fourth and Fourteenth Amendment training, on an annual basis, since 2014.

MCSO's implementation of these policies is covered in other Paragraphs.

**Paragraph 22.**  *MCSO leadership and supervising Deputies and detention officers shall unequivocally and consistently reinforce to subordinates that Discriminatory Policing is unacceptable.*

**Phase 1:**  In compliance

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 26, 2018.
- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

**Phase 2:**  In compliance

With input from the Parties, the reinforcement of CP-8 (Preventing Racial and Other Bias-Based Policing) was modified to a two-step process conducted annually.  MCSO describes Part 1 of the process as the following: "On an annual basis, within the first six months, supervisors will have discussions, either individual or group, and view videos from the Training library with assigned employees, reserve deputies, and posse members.  The videos will be available through the HUB and attestation of the training will be through the HUB."  Part 2 of the process as described by MCSO: "On an annual basis, within the last six months, supervisors shall ensure that all employees, reserve deputies, and posse members complete their annual review and acknowledgment of office policy.  In addition, employees will be required to view a video from the Sheriff or designee, which reinforces the policy.  Acknowledgement is done through the HUB."

As an additional measure, supervisors will have the latitude to review and discuss the policy with their employees, and document the discussion in Blue Team.  MCSO will provide proof of compliance biannually, at the end of the six-month periods, when each of the elements of the process is completed.  MCSO will also provide progress reports in the interim.

The training for this reporting period consisted of completion of Part 1 requirements as described above.  For the first quarter of 2019, MCSO submitted a Training Progress Summary.  The report indicated that 98.98% of sworn employees, 98.16% of Detention employees, 98.18% of civilian employees, 95% of reserve employees, 100% of retired reserve employees, and 95.17% of Posse members had undergone CP-8 training.  MCSO remains in compliance with this Paragraph.

WAI 39793

***Paragraph 23.*** *Within 30 days of the Effective Date, MCSO shall modify its Code of Conduct to prohibit MCSO Employees from utilizing County property, such as County e-mail, in a manner that discriminates against, or denigrates, anyone on the basis of race, color, or national origin.*

**In Full and Effective Compliance**

BIO uses a randomizing program to select samples for each inspection. BIO reviews CAD messages in an effort to identify compliance with CP-2 (Code of Conduct), CP-3 (Workplace Professionalism: Discrimination and Harassment), and GM-1 (Electronic Communications, Data and Voice Mail). In its submission, MCSO includes the specific nature of any potential concerns identified during the audits. In May 2016, a Monitoring Team member observed the processes BIO uses to conduct CAD and email audits, to ensure that we thoroughly understand the mechanics involved in conducting these audits. For CAD and email audits, we receive copies of the audits completed by BIO, the details of any violations found, and copies of the memoranda of concern or BIO Action Forms that are completed.

During this reporting period, MCSO conducted three CAD and Alpha Paging inspection reports. BIO inspected 19,827 CAD/Alpha Paging messages for the January inspection, and reported a 100% compliance rate (BI2019-0007). BIO inspected 20,972 CAD/Alpha Paging messages for the February inspection, and reported a 100% compliance rate (BI2019-0022). BIO inspected 19,889 CAD/Alpha Paging messages for the March inspection, and reported a compliance rate of 100% (BI2019-0037).

During this reporting period, MCSO conducted three email inspection reports. The number of emails reviewed is usually less than the total number of emails, due to the elimination of routine business-related and administrative emails such as training announcements and Administrative Broadcasts. For January, the BIO inspection report (BI2019-0006) states that there were a total of 17,880 emails, of which BIO reviewed 16,235. The inspection found that 99.99% of the inspected emails were in compliance. The inspection found one email, by a Detention employee, that contained unprofessional content and was therefore in violation of GM-1 (Electronic Communications, Data and Voice Mail). BIO generated an Action Form for the violation. BIO inspected 9,887 of 19,640 emails for the February inspection (Inspection Report BI2019-0021). The inspection found that 100% of the inspected emails were in compliance.

MCSO has not submitted its March inspection report as of this writing. MCSO will not be in compliance with this Paragraph if it is not submitted in the near future.

WAI 39794

During this reporting period, BIO conducted facility inspections of Estrella Jail, the Criminal Intelligence Division, and the Food Services Division. On January 29, 2019, BIO conducted an inspection of Estrella Jail, inspection report BI2019-0015. Estrella Jail houses all classifications of adult male and female inmates and provides housing and programming space for the Mosaic program. The Mosaic program includes counseling and rehabilitative services for inmates. Estrella Jail is staffed by 119 Detention Officers, four Field Training Officers, and 18 supervisory personnel. The inspection resulted in an overall compliance rating of 100%. The report noted that the inspector could not access a number of employee lockers due to commanders not having the combination or keys to access the lockers. This issue was addressed with command staff.

On February 13, 2019, BIO conducted an inspection of the Criminal Intelligence Division (CID). The Criminal Intelligence Division is part of the Arizona Counter Terrorism Information Center (ACTIC). CID is made up of three units: the Criminal Intelligence Unit (CIU), the Criminal and Research Analysis Unit (CRAU), and the Sheriff's Intelligence and Leads Operations Unit (SILO). CID has a total of 22 employees. The inspection found two deficiencies and resulted in a 94.4% compliance rating. The deficiencies were related to lack of documentation of commanders' inspection of their areas of responsibility, and insufficient documentation of supervisors' monthly inspections of equipment and work environments. One BIO Action Form was generated as a result of the deficiencies.

On March 12, 2019, BIO conducted an inspection of the Food Services Division, inspection report BI2019-0030. The mission of the Food Services Division is to "Provide a well-balanced nutritious menu at a reasonable cost." The Food Services Division serves an average of 15,000 meals daily to inmates in MCSO custody. The inspection resulted in a 100% overall compliance rating. The inspection team recommended that the division's operations manual be updated to reflect operational practices when current MCSO policy is unclear, or when policy does not address the specific operational requirements.

All monthly inspection reports noted there was no evidence indicating that any of the facilities were used in a manner that would discriminate, or denigrate anyone on the basis of race, color, national origin, age, religious beliefs, gender, culture, sexual orientation, veteran status, or disability. We reviewed the Matrix Checklist used for these inspections, and it contains a specific question regarding the use of any Office or County equipment that would violate this Paragraph. During our April visits to Districts 3 and 6, we observed no evidence to indicate a violation of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 39795

***Paragraph 24.*** *The MCSO shall ensure that its operations are not motivated by or initiated in response to requests for law enforcement action based on race or ethnicity. In deciding to take any law enforcement action, the MCSO shall not rely on any information received from the public, including through any hotline, by mail, email, phone or in person, unless the information contains evidence of a crime that is independently corroborated by the MCSO, such independent corroboration is documented in writing, and reliance on the information is consistent with all MCSO policies.*

**Phase 1:**  In compliance

- GI-7 (Processing of Bias-Free Tips), published August 23, 2017.

**Phase 2:**  In compliance

MCSO created the Sheriff's Intelligence Leads and Operations (SILO) Unit in the first quarter of 2016. The SILO Unit became operational on September 11, 2017. GI-7 requires that any tips received by MCSO components be forwarded to the SILO Unit for recording and processing. The SILO Unit classifies this information by the type of alleged criminal activity, or service requested, and forwards it to the appropriate unit for action and response. In some cases, residents email or call with requests for traffic enforcement, or for MCSO to address quality-of-life issues; these are considered calls for service rather than tips on criminal activity. If the information provided pertains to criminal activity in another jurisdiction, MCSO forwards the information to the appropriate law enforcement agency and documents it in the SILO database. Generally, if there is any bias noted in the information received, MCSO closes the tip and takes no action. We review all tips that MCSO closes due to bias.

During this reporting period, we reviewed 328 tips submitted for January, 337 tips submitted for February, and 535 tips submitted for March. The SILO Unit received a total of 1,200 tips, which were classified and recorded according to the type of alleged violation or service requested. Our reviews for this reporting period indicate that the major percentages of tips were classified as "information only" and "other." The other categories that received a large percentage of tips were warrants, suspicious activity, animal crimes, and drugs. During this reporting period, MCSO received two tips that were closed due to bias. We reviewed the information provided for each tip and concluded that MCSO handled their disposition according to policy.

Our reviews of the documentation provided, pursuant to the requirements of this Paragraph, have not discovered any evidence of bias in the processing of tips. We have also determined that MCSO is independently corroborating information received through tips before it is acted upon, to ensure that there is an appropriate criminal predicate.

WAI 39796

**b. Policies and Procedures to Ensure Bias-Free Traffic Enforcement**

***Paragraph 25.*** *The MCSO will revise its policy or policies relating to traffic enforcement to ensure that those policies, at a minimum:*

a.  *prohibit racial profiling in the enforcement of traffic laws, including the selection of which vehicles to stop based to any degree on race or ethnicity, even where an officer has reasonable suspicion or probable cause to believe a violation is being or has been committed;*

b.  *provide Deputies with guidance on effective traffic enforcement, including the prioritization of traffic enforcement resources to promote public safety;*

c.  *prohibit the selection of particular communities, locations or geographic areas for targeted traffic enforcement based to any degree on the racial or ethnic composition of the community;*

d.  *prohibit the selection of which motor vehicle occupants to question or investigate based to any degree on race or ethnicity;*

e.  *prohibit the use of particular tactics or procedures on a traffic stop based on race or ethnicity;*

f.  *require deputies at the beginning of each stop, before making contact with the vehicle, to contact dispatch and state the reason for the stop, unless Exigent Circumstances make it unsafe or impracticable for the deputy to contact dispatch;*

g.  *prohibit Deputies from extending the duration of any traffic stop longer than the time that is necessary to address the original purpose for the stop and/or to resolve any apparent criminal violation for which the Deputy has or acquires reasonable suspicion or probable cause to believe has been committed or is being committed;*

h.  *require the duration of each traffic stop to be recorded;*

i.  *provide Deputies with a list and/or description of forms of identification deemed acceptable for drivers and passengers (in circumstances where identification is required of them) who are unable to present a driver's license or other state-issued identification; and*

j.  *instruct Deputies that they are not to ask for the Social Security number or card of any motorist who has provided a valid form of identification, unless it is needed to complete a citation or report.*

**Phase 1:** In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

WAI 39797

- GI-1 (Radio and Enforcement Communications Procedures), most recently amended on April 19, 2018.
- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 26, 2018.
- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

**Phase 2:**  In compliance

During the finalization of the Fourth and Fourteenth Amendment training curricula required by the Order, the Parties agreed to a list and/or description of forms of identification deemed acceptable for drivers and passengers, as required by this Paragraph.  The data required for verification to ensure compliance with these policies is captured by the TraCS system.  The system documents the requirements of the Order and MCSO policies.  MCSO has continued to make technical changes to the TraCS system to ensure that the mandatory fields on the forms used to collect the data are completed and that deputies are capturing the required information. TraCS is a robust system that allows MCSO to make technical changes to improve how required information is captured.

To verify Phase 2 compliance with this Paragraph, we reviewed MCSO's Vehicle Stop Contact Form (VSCF), Vehicle Stop Contact Form Supplemental Sheet, Incidental Contact Receipt, Written Warning/Repair Form, Arizona Traffic Ticket and Complaint Form, Internet I/Viewer Event Form, Justice Web Interface Form, CAD printout, and any Incident Report generated by the traffic stop.  MCSO created many of these forms to capture the requirements of Paragraphs 25 and 54.

Since our July 2015 site visit, there has been significant improvement in the TraCS system that has enhanced the reliability and validity of the data provided by MCSO.  This improvement has been buttressed by the introduction of data quality control procedures now being implemented and memorialized in the EIU Operations Manual.  (This is further discussed in Paragraph 56, below.)  We also compared traffic stop data between Latino and non-Latino drivers in the samples provided to us.

During our April 2019 site visit, a Monitoring Team member visited District 1 and participated in a ride-along with a patrol supervisor.  The supervisor provided a brief overview of the TraCS and CAD systems and explained how the deputies are deployed during his tour of duty.  During the ride-along, the supervisor and deputies were observed interacting with members of the public during a call for service.  The deputies were observed in the field wearing the body-worn camera devices and there was evidence that the devices were being utilized.

Paragraph 25.a. prohibits racial profiling in the enforcement of traffic laws, including the selection of which vehicles to stop based to any degree on race or ethnicity, even where a deputy has reasonable suspicion or probable cause to believe a violation is being or has been committed.  The selection of the sample size and the sampling methodology employed for drawing our sample is detailed in Section 7: Traffic Stop Documentation and Data Collection.

WAI 39798

Our review of a sample of 105 traffic stops that occurred during this reporting period in Districts 1, 2, 3, 4, 6, and 7, and Lake Patrol indicated that MCSO was following protocol, and that the stops did not violate the Order or internal policies. During our April 2019 site visit, we met with the commanding officer from District 3, who advised us that the District had not received any complaints during this reporting period from Latino drivers alleging racial profiling. We interviewed the District Commander and inquired if the District had received any complaints alleging selective enforcement targeting specific communities or enforcement based on race. The District Commander was not aware of any complaints alleging racial or ethnic-based traffic enforcement. Paragraphs 66 and 67 require an annual comprehensive analysis of all traffic stop data, which will more accurately determine if MCSO is meeting the requirements of this Paragraph. MCSO remains in compliance with this Subparagraph.

Paragraph 25.b. requires MCSO to provide deputies with guidance on effective traffic enforcement, including the prioritization of traffic enforcement resources to promote public safety. EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), Sections A-E, address these concerns. The policy specifies that driving under the influence and speeding are the main causes of accidents, and should be the focus of traffic enforcement. Based on our review of the data provided for this reporting period, the most common traffic stop violations are as follows: 66 stops for speed above the posted limit (63%); 11 stops for failure to obey official traffic control devices (10%); 10 stops for failure to possess valid registrations or tags (10%); four stops for equipment violations (10%); two stops for failure to maintain a lane of traffic (2%); and 12 stops for other moving violations (11%).

As the policy specifically identifies speeding violations as one of the contributing factors of traffic accidents, MCSO deputies have targeted this violation. In our review, we break down the specific traffic violation for each stop and use each traffic stop form completed by deputies during the stop to make a determination if the stop is justified and fulfills the requirements of this Paragraph. When we review the sample traffic stops from across all Districts, we note the locations of the stops contained on the VSCF, the CAD printout, and the I/Viewer system to ensure that they are accurate. We continue to identify instances where the location of the stop contained on the VSCF and the location of the stop contained on the CAD printout are inconsistent. Reviewing supervisors are not identifying and addressing this issue. We recommend that reviewing supervisors closely review the VSCFs and CAD printouts and address such deficiencies. MCSO remains in compliance with this Subparagraph.

Paragraph 25.c. requires MCSO to prohibit the selection of particular communities, locations, or geographic areas for targeted traffic enforcement based to any degree on the racial or ethnic composition of the community. During our inspection, we document the location of every stop and note the GPS coordinates if available. Our review of the sample data covering all MCSO Districts during this reporting period did not indicate that MCSO was targeting any specific area or ethnicity to conduct traffic stops. During our April 2019 visit to District 3, we inquired if the District Commander had received any complaints from the public regarding MCSO enforcement activities in their communities. No complaints were received with regard to racial or ethnic-based targeted enforcement.

WAI 39799

MCSO is in compliance with this Subparagraph.

Paragraph 25.d. requires MCSO to prohibit the selection of which motor vehicle occupants to question or investigate based, to any degree, on race or ethnicity. We reviewed the demographic data of Maricopa County (according to 2018 U.S. Census data, 31.1% of the population is Latino), and found that the ratio of Latino drivers stopped during this reporting period was lower than in past reporting periods in comparison to the ethnicity of the population in the County. (See Paragraph 54.e.) Two (33%) of the six stops where passenger contacts occurred involved Latino drivers.

A review of citizen complaints for this reporting period did not reveal that any complaints were filed alleging that MCSO deputies selected motor vehicle occupants for questioning or investigation, based on the individual's race or ethnicity.

MCSO has fully implemented body-worn cameras, and we review a sample of the recordings each reporting period to verify if deputies are questioning occupants to determine if they are legally in the country.

During this reporting period, we observed that 23 of the 105 stops occurred during nighttime hours. During our visit to District 3 in April 2019, we inquired if any Latino drivers or passengers made any complaints regarding deputies using particular tactics or procedures to target Latinos. None of the personnel we interviewed were aware of any complaints alleging discrimination or the targeting of Latinos in traffic enforcement. Our review of the sample data indicated that generally, traffic stops were not based on race or ethnicity and reflected the general makeup of the population of the County. MCSO is in compliance with this Subparagraph.

Paragraph 25.e. requires MCSO to prohibit the use of particular tactics or procedures on a traffic stop based on race or ethnicity. We reviewed a sample of CAD audio recordings and CAD printouts where the dispatcher entered the reason for the stop when advised by the deputy in the field. We also reviewed body-worn camera recordings of deputies making traffic stops. The methodology that we employed to select our cases is described in detail in Section 7. In the cases we reviewed, the CAD audio recordings and the body-worn camera video revealed that deputies were not making traffic stops using tactics based on race or ethnicity. MCSO remains in compliance with this Subparagraph.

Paragraph 25.f. requires deputies at the beginning of each stop, before making contact with the vehicle, to verbally contact dispatch and state the reason for the stop unless exigent circumstances make it unsafe for the deputy to contact Communications. When the deputy advises Communications of the location, tag number, and reason for the stop, this information is digitally logged on the CAD printout and it is audio recorded. (See Subparagraph 54.e.) We reviewed 30 CAD audio recordings and the CAD printouts; in each, the deputy advised dispatch of the reason for the stop. Through our reviews of BWC recordings and CAD printouts, we verified that the reason for the stop was voiced prior to making contact with the drivers in 30 of the 30 cases we reviewed. For the 75 other cases that were part of our sample, we reviewed the VSCFs and the CAD printouts to ensure that deputies properly advised dispatch of the reason

WAI 39800

for the stop prior to making contact with the violator.  In all 75 stops, the deputy properly advised dispatch the reason for the stop.  MCSO is in compliance with this Subparagraph.

Paragraph 25.g. prohibits deputies from extending the duration of any traffic stop longer than the time that is necessary to address the original purpose for the stop and/or to resolve any apparent criminal violation for which the deputy has or acquires reasonable suspicion or probable cause to believe has been committed or is being committed.  MCSO employs a series of five questions on the VSCF to document the circumstances that might require a stop to be prolonged.  In our review of 105 traffic stops, we determined that MCSO documented a response to at least one of the series of five questions in eight of the stops.  Our review of those stops revealed that in seven instances, the deputies indicated that they experienced a technological difficulty.  The duration of the seven stops ranged from 18 minutes to 30 minutes.  For the remaining one stop, the deputy indicated that the driver's vehicle was towed and that the stop involved a language barrier.  The length of the stop was 39 minutes.  The particulars of the eight stops are as follows:

- A White male driver was stopped for an expired registration.  The vehicle was occupied by a White female passenger.  The VSCF indicated that the deputy experienced technological issues with the printer.  The driver was issued a citation.  The duration of the stop was 19 minutes.

- A White male driver was stopped for a speeding violation.  The VSCF indicates that the deputy experienced technological issues with the body-worn camera device.  In addition, the deputy seized the driver's license and placed the item into evidence.  The driver was issued a citation.  The duration of the stop was 26 minutes.

- A Latino driver was stopped for failing to dim the vehicle's high-beam headlights when approaching oncoming traffic.  The vehicle was occupied by a Latino passenger.  The VSCF indicates that the deputy experienced technological issues with TraCS and, as a result, had to handwrite the written warning.  The driver was issued a warning.  The duration of the stop was 18 minutes.

- A White male was stopped for an expired temporary license plate.  The vehicle was occupied by a White female passenger.  The VSCF indicates that the deputy experienced technological issues with the Computer Aided Dispatch system and had to restart the Mobile Data Computer to make the system operate properly.  The driver was issued a warning.  The duration of the stop was 20 minutes.

- A Latino driver was stopped for a speeding violation.  The VSCF indicates that the deputy experienced technological issues with the printer, the scanner, and the body-worn camera device.  The driver was issued a citation.  The duration of the stop was 18 minutes.

- A Latino driver was stopped for a speeding violation.  The VSCF indicates that the vehicle that the driver was operating was towed and that a language barrier existed.  The driver was issued a citation.  The duration of the stop was 39 minutes.

WAI 39801

- A White male driver was stopped for a speeding violation.  The VSCF indicates that the deputy experienced technological issues with the printer.  The driver was issued a citation.  The duration of the stop was 30 minutes.

- In the final instance, it was determined that the deputy conducted a traffic stop of two vehicles, both for utilizing private property to avoid a traffic control device.  One of the drivers was Latina, and the other driver was Latino.  The VSCF indicated that the deputy experienced technological difficulties with his body-worn camera device.  Both of the drivers were issued a warning.  The duration of the stop was 18 minutes.

During our review, we identified five stops that were extended for reasons other than those that were identified via the five questions and responses employed on the VSCF.  The particulars of the five stops are as follows:

- A White female driver was stopped for a speeding violation.  The vehicle was occupied by a White male passenger.  During the stop the deputy identified an issue regarding the license plate; the plate number was not consistent with the registration paperwork, likely due to a clerical error.  The deputy explained the issue to the driver and advised the driver to clarify the issue with the Arizona Department of Transportation Motor Vehicle Division.  The driver was issued a citation.  The duration of the stop was 20 minutes.

- A Latina driver was stopped for making an improper left turn.  The vehicle was occupied by a Latina passenger.  The driver did not have a driver's license.  The driver produced a Mexican identification card.  The license plate was suspended.  The deputy seized the license plate and placed it into evidence.  The driver was issued a citation for driving with no valid driver's license and driving with a suspended license plate.  The driver was issued a citation.  The duration of the stop was 47 minutes.

- A Latino driver was stopped for driving with a suspended license plate.  The vehicle was occupied by two Latina passengers.  The deputy seized the license plate and placed it in evidence.  The driver was issued a citation.  The duration of the stop was 27 minutes.

- A White male driver was stopped for driving with a suspended license plate.  The deputy indicated on the VSCF that he allowed the driver to attempt to locate his insurance information via a cell phone, which extended the stop.  The deputy seized the license plate and placed it into evidence.  The driver was issued a citation.  The duration of the stop was 32 minutes.

- A White male driver was stopped for operating a vehicle with no headlights.  The driver produced a driver's license; however, the deputy determined that the license was suspended.  The deputy conducted an investigation of the driver to determine if he was impaired, based on the smell of burnt marijuana emanating from the vehicle.  The deputy determined that the driver was not impaired.  The deputy seized narcotic paraphernalia from the vehicle and placed the items into evidence.  The driver was issued a citation for driving with no headlights, driving with a suspended driver's

WAI 39802

license, no mandatory insurance, and possession of narcotic paraphernalia.  The duration of the stop was one hour and 10 minutes.

MCSO remains in compliance with this Subparagraph.

Paragraph 25.h. requires the duration of each traffic stop to be recorded.  The time of the stop and its termination is now auto-populated on the VSCF by the CAD system.  To ensure data entry accuracy, MCSO implemented a technical change to the TraCS system on November 29, 2016.  The change automatically creates a red field in the stop contact times if the deputy manually changes these times on the VSCF.  In our review, we determined that the duration was recorded accurately in 104 of the 105 traffic stops.  In one stop, the ending time of the stop documented on the VSCF and CAD differed by seven minutes.  AIU identified the issue during its inspection of traffic stop data and requested that the District investigate the issue and prepare a BIO Action Form.  MCSO is in compliance with this Subparagraph, with a compliance rate of 99%.

Paragraph 25.i. requires that MCSO provide deputies with a list and/or description of forms of identification deemed acceptable for drivers and passengers (in circumstances where identification is required of them) who are unable to present a driver's license or other state-issued identification.  The Plaintiffs' attorneys and MCSO have agreed on acceptable forms of identification, and this information has been included in the Fourth and Fourteenth Amendment training.  EA-11 (Arrest Procedures), most recently amended on June 14, 2018, provides a list of acceptable forms of identification if a valid driver's license cannot be produced.  During this reporting period's review of the sample of 105 traffic stops, there were five drivers who did not present a valid driver's license to deputies.  The cases are described in detail below:

- A White male driver was stopped for operating a vehicle with an expired registration. The vehicle was occupied by a White female passenger.  The driver did not have any identification on his person.  The deputy was able to verify that the driver had a valid driver's license.  The driver was issued a citation for failure to produce the vehicle's registration.

- A White male was stopped for operating a vehicle with no headlights.  The driver produced a driver's license; however, the deputy determined that the license was suspended.  The deputy conducted an investigation of the driver to determine if he was impaired, based on the smell of burnt marijuana emanating from the vehicle.  The deputy determined that the driver was not impaired.  The deputy seized narcotic paraphernalia from the vehicle and placed the items into evidence.  The driver was issued a citation for driving with no headlights, driving with a suspended driver's license, not having mandatory insurance, and possession of narcotic paraphernalia.

WAI 39803

- A Latina driver was stopped for making an improper left turn.  The vehicle was occupied by a Latina passenger.  The driver did not have a valid driver's license.  The driver produced a Mexican identification card.  The license plate was suspended.  The deputy seized the license plate and placed it into evidence.  The driver was issued a citation for driving without a valid driver's license and driving with a suspended license plate.

- A White female was stopped for operating a vehicle without headlights.  The vehicle was occupied by a White female passenger.  The driver produced a driver's license; however, the deputy determined that the license was expired.  The deputy contacted the passenger to determine if she had a valid driver's license to operate the vehicle.  The passenger was issued an Incidental Contact Receipt.  The driver was issued a citation for driving with an expired driver's license.

- A White male driver was stopped for a speeding violation.  The driver produced a driver's license; however, the deputy determined that the license was suspended.  The deputy seized the driver's license and placed it into evidence.  The driver was issued a citation for speeding, driving with a suspended license, and failing to produce insurance.

In our review of the sample of cases in relation to Paragraph 54.k., searches of persons, we identified 11 cases where the drivers did not present a valid driver's license to the deputies.  The cases are described in detail below:

- A White male driver was stopped for a speeding violation.  The driver produced an Arizona driver's license.  The deputy subsequently discovered that the driver's license was suspended and that the driver was wanted on an outstanding warrant.  The driver was arrested.  The driver's license was seized and placed into evidence.  The driver was issued a citation.  The registered owner of the vehicle responded to the stop location and took custody of the vehicle.

- A Latino driver was stopped for speeding and reckless driving.  The deputy observed the Latino driver and the Latina passenger switch seats while the vehicle was moving on the roadway as the deputy initiated the traffic stop.  As the deputy approached the driver's side of the vehicle, the Latina passenger was now seated in the driver's seat.  The Latino driver, now seated in the front passenger seat, did not have any identification on his person.  The deputy subsequently discovered that the Latino's driver's license was suspended.  The vehicle was towed and impounded.  The Latino driver was issued a citation for speeding, reckless driving, driving with a suspended driver's license, and not having insurance.  The Latina driver was issued a citation for reckless driving and no insurance.

- A White male driver was stopped for stop sign violation.  The driver did not have any identification on his person.  The deputy determined, via a records inquiry, that the driver had an Arizona driver's license.  The deputy conducted an investigation of the driver and the vehicle as he detected the odor of burnt marijuana.  The deputy seized

WAI 39804

marijuana and narcotic paraphernalia from the vehicle.  The items were placed into evidence.  Due to the driver being 17 years old, the deputy contacted the driver's parent. The driver's mother responded to the stop location and took custody of the driver and the vehicle.  The driver was issued a citation for the stop sign violation, and the deputy prepared a report for the review of the Maricopa County Attorney's Office for potential criminal charges in relation the possession of narcotics and narcotic paraphernalia.

- A Black male driver was stopped for making an improper left turn and failing to yield to oncoming traffic.  The driver produced an Arizona driver's license.  The deputy subsequently discovered that the driver's license was suspended and that the driver was wanted on an outstanding warrant.  The driver was arrested.  The driver's license was seized and placed into evidence.  The driver's spouse responded to the scene and took custody of the vehicle.  The driver was issued a citation.

- A Latino driver was stopped for a speeding violation.  The vehicle was occupied by a Latina passenger; the driver's seven-year-old daughter.  The driver provided his passport for identification purposes.  The deputy determined, via a records check, that the driver had never obtained an Arizona driver's license.  The driver was investigated and arrested for Driving Under the Influence (DUI).  The vehicle was towed and impounded.  The passenger's aunt responded to the MCSO facility and picked up the child.  The driver was issued a warning for the speeding violation, and the deputy prepared a report for the review of the Maricopa County Attorney's Office for potential charges in relation to the DUI and Aggravated DUI – passenger under 15 years of age.

- A White male driver was stopped for a red-light violation.  The vehicle was occupied by a White male passenger and a White female passenger.  The driver did not have any identification on his person.  During the stop, the deputy detected the smell of burnt marijuana.  The deputy conducted an investigation and subsequently seized marijuana and narcotic paraphernalia from the vehicle.  The White male passenger, the vehicle's registered owner, was intoxicated.  The rear seat passenger was contacted to verify if she had a valid driver's license.  The deputy issued the driver a citation for the red-light violation and the deputy prepared a report for the review of the Maricopa County Attorney's Office for potential criminal charges in relation to the possession of narcotics and narcotic paraphernalia.

- A White male driver was stopped for driving with no headlights activated.  The driver did not have any identification on his person.  The deputy determined, via a records check, that the driver had a suspended driver's license.  The vehicle was towed and impounded.  The driver was issued a citation for driving with a suspended driver's license, failure to produce evidence of insurance, and failure to produce registration. The deputy gave the driver a verbal warning regarding the issue of driving with no headlights activated.

WAI 39805

- A Black male driver was stopped for a speeding violation.  The vehicle was occupied by a Black male passenger.  The driver produced an Arizona identification card.  The driver was arrested for four outstanding warrants.  The vehicle was towed and impounded.  The passenger, a three-year-old, was released to his mother.  The driver was issued a citation for speeding, driving with a suspended driver's license, and failure to produce evidence of insurance.

- A White female driver was stopped for driving with one headlight.  The vehicle was occupied by a Latino passenger.  The driver did not have any identification on her person.  The deputy determined, via a records check, that the driver had a suspended driver's license.  The driver was issued a citation for driving with a suspended driver's license.  The driver also had an outstanding warrant for her arrest.  The driver was arrested and released to another law enforcement agency.

- A Latino driver was stopped for not having a license plate visible on the vehicle.  It was determined that the license plate was a temporary plate that was affixed in the vehicle's rear tinted window.  The license plate was expired.  The deputy determined, via a records check, that the driver had a suspended driver's license.  The driver was issued a citation for driving with a suspended driver's license.  The driver also had an outstanding warrant for his arrest.  The driver was arrested.

In our review of the sample of cases in relation to Paragraphs 25.d. and 54.g., passenger contacts, we identified eight cases where the drivers did not present a valid driver's license to the deputies.  The cases are described in detail below:

- A Latina driver was stopped for driving with no headlights activated.  The vehicle was occupied by a Latina passenger.  The driver did not have any identification on her person.  The deputy determined, via a records check, that the driver had never obtained an Arizona driver's license.  The driver was issued a citation for driving without a driver's license and driving with no headlights activated.

- A Latino driver was stopped for a stop sign violation.  The vehicle was occupied by a Latina passenger.  The driver did not have any identification on his person.  The deputy contacted the passenger to determine if she had a valid driver's license; she did not.  The driver was issued a citation.

- A Latino driver was stopped for an equipment violation (operating a motor vehicle with one headlight).  The vehicle was occupied by a Latina passenger.  The driver did not have any identification on his person.  The deputy determined that the driver had never obtained a driver's license.  The driver was arrested for failure to provide identification after driving while unlicensed and driving with one headlight.  The passenger took custody of the vehicle.

- A White female driver was stopped for a red-light violation.  The vehicle was occupied by two White female passengers.  The driver produced an Arizona driver's license.  The deputy determined, via a records check, that the driver's license was suspended.  The

WAI 39806

deputy determined that the license plate had been altered. The license plate was seized and placed into evidence. The driver was issued a citation for the red-light violation, driving with a suspended driver's license, driving with a fictitious license plate, and providing false information to a law enforcement officer.

- A Latino driver was stopped for a speeding violation. The vehicle was occupied by a Latina passenger and two children, listed on the VSCF as "unknown, vision obstructed" in the race/ethnicity and gender fields. The driver did not have any identification on his person. The driver stated that he had a valid Mexican driver's license. The passenger did not have any identification on her person. The driver was issued a warning for the speeding violation. We were unable to view the rear seat passengers via the body-worn camera recordings to determine the race/ethnicity and gender of those occupants; however, the deputy made reference to the rear seat passengers as being children.

- A White male was stopped for driving with an invalid license plate. The vehicle was occupied by a White female passenger. The valid license plate was located in the trunk of the vehicle. The driver's license was expired. The passenger was contacted to determine whether she had a valid driver's license. The driver was issued a warning for failing to produce a current registration.

- A Black male was stopped for driving with one headlight. The vehicle was occupied by a Latina passenger. The deputy determined, via a records check, that the driver had a suspended driver's license and an outstanding warrant for his arrest. The driver was arrested for the warrant. The driver was issued a citation for driving with a suspended license and driving with a suspended license plate. The driver was issued a warning for driving with one headlight.

- A Latina driver was stopped for a red-light violation. The vehicle was occupied by two White males. The driver did not have any identification on her person. The deputy determined, via a records check, that the driver had a valid driver's license. The driver was issued a citation for the red-light violation. One of the passengers was arrested for possession of narcotics.

MCSO remains in compliance with this Subparagraph.

Paragraph 25.j. requires MCSO to instruct deputies that they are not to ask for the Social Security Number or card of any motorist who has provided a valid form of identification, unless it is needed to complete a citation or report. EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) prohibits deputies from asking for the Social Security Number of any motorist who has provided a valid form of identification. During this reporting period's review of the sample of 105 traffic stops, we did not identify any cases where a deputy requested the Social Security Number or card of a driver. In our review of the sample of traffic stops reviewed for Paragraph 54.k., one case was identified where the deputy made an arrest of a Latina driver for an outstanding warrant after the driver was stopped for speeding. The vehicle was occupied by one Latino and three Latina passengers. The driver stated that she had never

WAI 39807

shoplifted and was unaware of any such warrant for her arrest. The deputy requested and obtained the driver's Social Security Number as he sought to verify that the driver was the person listed on the warrant. The driver was arrested based on the warrant information. The requesting and obtaining of the Social Security Number in this instance fell within the scope of this requirement.

During this reporting period's review of the sample of traffic stops reviewed for Paragraphs 25.d and 54.g., we identified one case where the driver did not have any identification on his person and the driver reported that he had never obtained a driver's license. The deputy requested the driver's Social Security Number in an attempt to identify him. The driver stated that he did not have a Social Security Number. The driver was arrested for failure to provide identification after driving while unlicensed. The remainder of the cases we identified where deputies requested a driver's Social Security Number was limited to incidents involving the arrest of the drivers and/or passengers. In those cases, the deputies obtained the Social Security Number information for the purpose of completing the Incident Reports, which is allowable under this Subparagraph.

MCSO remains in compliance with this Subparagraph.

**Paragraph 26.** *The MCSO shall revise its policy or policies relating to Investigatory Detentions and arrests to ensure that those policies, at a minimum:*

a.   *require that Deputies have reasonable suspicion that a person is engaged in, has committed, or is about to commit, a crime before initiating an investigatory seizure;*

b.   *require that Deputies have probable cause to believe that a person is engaged in, has committed, or is about to commit, a crime before initiating an arrest;*

c.   *provide Deputies with guidance on factors to be considered in deciding whether to cite and release an individual for a criminal violation or whether to make an arrest;*

d.   *require Deputies to notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration-Related Crime, or for any crime by a vehicle passenger related to lack of an identity document;*

e.   *prohibit the use of a person's race or ethnicity as a factor in establishing reasonable suspicion or probable cause to believe a person has, is, or will commit a crime, except as part of a reliable and specific suspect description; and*

f.   *prohibit the use of quotas, whether formal or informal, for stops, citations, detentions, or arrests (though this requirement shall not be construed to prohibit the MCSO from reviewing Deputy activity for the purpose of assessing a Deputy's overall effectiveness or whether the Deputy may be engaging in unconstitutional policing).*

**In Full and Effective Compliance**

WAI 39808

MCSO has not made any immigration-related arrests or conducted any immigration-related investigations in recent years. MCSO reported no incidents or arrests that would fall under the reporting requirements of this Paragraph during the first quarter of 2019.

To determine compliance with this Paragraph, we also review booking lists and criminal citation lists for each month of the reporting period. From each list, we select a 10% random sample of incidents. For this reporting period, we reviewed 51 incidents resulting in arrest and 47 incidents in which criminal citations were issued. In addition, we reviewed 258 Incident Reports. All of the documentation we reviewed during this reporting period indicates that MCSO is in compliance with this Paragraph.

In addition to the above, we review field interviews and contacts with members of the community to assess compliance with Paragraph 26. These types of contacts, that do not involve traffic stops, are documented in Non-Traffic Contact Forms (NTCFs). For this reporting period, we reviewed 60 NTCFs. Our reviews of the NTCFs for this reporting period did not reveal any issues of concern, as it relates to this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

### d. Policies and Procedures Governing the Enforcement of Immigration-Related Laws

**Paragraph 27.**  *The MCSO shall remove discussion of its LEAR Policy from all agency written Policies and Procedures, except that the agency may mention the LEAR Policy in order to clarify that it is discontinued.*

**In Full and Effective Compliance**

MCSO asserts that it does not have an agency LEAR policy. We have verified, through our document reviews and site compliance visits, that MCSO does not have a LEAR policy.

On March 22, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 28.**  *The MCSO shall promulgate a new policy or policies, or will revise its existing policy or policies, relating to the enforcement of Immigration-Related Laws to ensure that they, at a minimum:*

a.      *specify that unauthorized presence in the United States is not a crime and does not itself constitute reasonable suspicion or probable cause to believe that a person has committed or is committing any crime;*

b.      *prohibit officers from detaining any individual based on actual or suspected "unlawful presence," without something more;*

WAI 39809

c.  *prohibit officers from initiating a pre-textual vehicle stop where an officer has reasonable suspicion or probable cause to believe a traffic or equipment violation has been or is being committed in order to determine whether the driver or passengers are unlawfully present;*

d.  *prohibit the Deputies from relying on race or apparent Latino ancestry to any degree to select whom to stop or to investigate for an Immigration-Related Crime (except in connection with a specific suspect description);*

e.  *prohibit Deputies from relying on a suspect's speaking Spanish, or speaking English with an accent, or appearance as a day laborer as a factor in developing reasonable suspicion or probable cause to believe a person has committed or is committing any crime, or reasonable suspicion to believe that an individual is in the country without authorization;*

f.  *unless the officer has reasonable suspicion that the person is in the country unlawfully and probable cause to believe the individual has committed or is committing a crime, the MCSO shall prohibit officers from (a) questioning any individual as to his/her alienage or immigration status; (b) investigating an individual's identity or searching the individual in order to develop evidence of unlawful status; or (c) detaining an individual while contacting ICE/CBP with an inquiry about immigration status or awaiting a response from ICE/CBP. In such cases, the officer must still comply with Paragraph 25(g) of this Order.  Notwithstanding the foregoing, an officer may (a) briefly question an individual as to his/her alienage or immigration status; (b) contact ICE/CBP and await a response from federal authorities if the officer has reasonable suspicion to believe the person is in the country unlawfully and reasonable suspicion to believe the person is engaged in an Immigration-Related Crime for which unlawful immigration status is an element, so long as doing so does not unreasonably extend the stop in violation of Paragraph 25(g) of this Order;*

g.  *prohibit Deputies from transporting or delivering an individual to ICE/CBP custody from a traffic stop unless a request to do so has been voluntarily made by the individual;*

h.  *Require that, before any questioning as to alienage or immigration status or any contact with ICE/CBP is initiated, an officer check with a Supervisor to ensure that the circumstances justify such an action under MCSO policy and receive approval to proceed.  Officers must also document, in every such case, (a) the reason(s) for making the immigration-status inquiry or contacting ICE/CBP, (b) the time approval was received, (c) when ICE/CBP was contacted, (d) the time it took to receive a response from ICE/CBP, if applicable, and (e) whether the individual was then transferred to ICE/CBP custody.*

**In Full and Effective Compliance**

WAI 39810

During this reporting period, there were no reported instances of deputies having contact with Immigration and Customs Enforcement (ICE) or Customs and Border Protection (CBP) for the purpose of making an immigration status inquiry, and there were no reported arrests for any immigration-related investigations, or for any immigration-related crimes.  The reviews of documentation submitted for this reporting period indicate that MCSO has complied with the reporting requirements related to Paragraph 28.  In our reviews of incidents involving contact with the public, including traffic stops, arrests, and investigative stops, we monitor deputies' actions to verify compliance with this Order.

In addition to documentation provided in response to this Paragraph, our reviews of documentation provided for other Paragraphs of this Order have found no evidence to indicate a violation of this Paragraph.  In total, we reviewed 51 Arrest Reports, 47 criminal citations, 167 traffic stops, 60 NTCFs, and 258 Incident Reports for this reporting period; and found no issues of concern, as it relates to this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.


### e. Policies and Procedures Generally

**Paragraph 29.**  *MCSO Policies and Procedures shall define terms clearly, comply with applicable law and the requirements of this Order, and comport with current professional standards.*

**In Full and Effective Compliance**

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

See Paragraph 30.


**Paragraph 30.**  *Unless otherwise noted, the MCSO shall submit all Policies and Procedures and amendments to Policies and Procedures provided for by this Order to the Monitor for review within 90 days of the Effective Date pursuant to the process described in Section IV. These Policies and Procedures shall be approved by the Monitor or the Court prior to their implementation.*

**In Full and Effective Compliance**

MCSO continues to provide us, the Plaintiffs' attorneys, and the Plaintiff-Intervenors with drafts of its Order-related policies and procedures prior to publication, as required by the Order. We, the Plaintiffs' attorneys, and the Plaintiff-Intervenors review the policies to ensure that they define terms clearly, comply with applicable law and the requirements of the Order, and

WAI 39811

comport with current professional standards.   Once drafts are finalized, incorporating the feedback of the Plaintiffs' attorneys, the Plaintiff-Intervenors, and the Monitoring Team, MCSO provides them to us for final review and approval.   As this process has been followed for the Order-related policies published thus far, MCSO is in compliance with this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 31.**  *Within 60 days after such approval, MCSO shall ensure that all relevant MCSO Patrol Operation Personnel have received, read, and understand their responsibilities pursuant to the Policy or Procedure.  The MCSO shall ensure that personnel continue to be regularly notified of any new Policies and Procedures or changes to Policies and Procedures.  The Monitor shall assess and report to the Court and the Parties on whether he/she believes relevant personnel are provided sufficient notification of and access to, and understand each policy or procedure as necessary to fulfill their responsibilities.*

**Phase 1:**  In compliance

- GA-1 (Development of Written Orders), most recently amended on March 28, 2019.

**Phase 2:**  In compliance

GA-1 indicates that Office personnel shall be notified of new policies and changes to existing policies via Briefing Boards and via the HUB, Maricopa County's adaptation of the online training software program, Cornerstone, that MCSO implemented in July 2017 to replace its E-Policy system.   Per GA-1, "Prior to some policies being revised, time-sensitive changes are often announced in the Briefing Board until the entire policy can be revised and finalized."  As noted previously, we recognize the authority of Briefing Boards and understand their utility in publishing critical policy changes quickly, but we have advised MCSO that we generally do not grant Phase 1 compliance for an Order requirement until the requirement is memorialized in a more formal policy.

During this reporting period, MCSO issued (or issued revisions of) 13 Order-related policies: CP-2 (Code of Conduct); CP-3 (Workplace Professionalism: Discrimination and Harassment); EA-2 (Patrol Vehicles); EB-7 (Traffic Control and Services); GA-1 (Development of Written Orders); GC-11 (Employee Probationary Periods); GC-13 (Awards); GF-1 (Criminal Justice Data Systems); GF-5 (Incident Report Guidelines); GH-5 (Early Identification System); GI-5 (Voiance Language Services); GJ-36 (Use of Digital Recording Devices [Non-Body-Worn Cameras]); and GM-1 (Electronic Communications, Data and Voicemail).  During this reporting period, MCSO also issued several Briefing Boards and Administrative Broadcasts that touched on Order-related topics and revised the language of General Orders.  MCSO did not publish any Order-related operations manuals during this reporting period.

WAI 39812

During this reporting period, we reviewed policy compliance reports for policies that were approved over 60 days prior to the start of this reporting period.  Each report lists the MCSO personnel who are required, according to the Training Division, to receive the particular policy and the date upon which the employee received and read the policy.  In cases where formal training is required by the Order, distribution of policies via the HUB cannot serve as a substitute for the training.  We verified via the policy compliance reports that at least 95% of relevant MCSO employees received the following policies within 60 days of their publication: CP-3 (Workplace Professionalism: Discrimination and Harassment); CP-8 (Preventing Racial and Other Bias-Based Profiling); CP-11 (Anti-Retaliation); DJ-3 (Inmate Grievance Procedures); EA-2 (Patrol Vehicles); EA-3 (Non-Traffic Contact); GC-13 (Awards); GF-1 (Criminal Justice Data Systems); GF-5 (Incident Report Guidelines); GH-2 (Internal Investigations); GH-4 (Bureau of Internal Oversight Audits and Inspections); GH-5 (Early Identification System); GI-5 (Voiance Language Services); and GJ-24 (Community Relations and Youth Programs).

MCSO continues to update us on the status of its implementation of the HUB during our site visits.  As noted above, the HUB replaced E-Policy, after several delays related to licensing and other technical issues, in July 2017.  Employees are required to complete personal attestations that indicate that they have read and understand policies; the HUB routinely updates recent training and policy reviews for deputies and is visible by immediate supervisors.

**Paragraph 32.**  *The MCSO shall require that all Patrol Operation personnel report violations of policy; that Supervisors of all ranks shall be held accountable for identifying and responding to policy or procedure violations by personnel under their command; and that personnel be held accountable for policy and procedural violations. The MCSO shall apply policies uniformly.*

**Phase 1:**  In compliance

- CP-2 (Code of Conduct), most recently amended on March 15, 2019.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on January 24, 2019.

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

WAI 39813

**Phase 2:**  Not in compliance

Since we began reviewing internal investigations conducted by MCSO, we have reviewed more than 800 administrative misconduct investigations submitted to our Team for this Paragraph. During our reviews, we have continued to observe deficiencies in both the investigations and the associated documentation, but have also continued to note ongoing improvement.

During each site visit, we meet with the Professional Standards Bureau (PSB) and District and Division Command personnel to provide them with information regarding the cases that we find to be deficient in structure, format, investigation, or reporting requirements.  We also highlight those cases we find to be properly investigated and in full compliance with Order requirements. In 2016, PSB developed and implemented the use of an investigative checklist and specific format for the completion of internal investigations.  MCSO trained all supervisors who conduct investigations in the use of these documents.  Since June 1, 2016, the use of these investigative protocol documents has been required for all administrative investigations.

MCSO finalized and implemented revised policies related to internal investigations and the discipline process on May 18, 2017.  Since that time, additional revisions have been made to GC-17 (Employee Disciplinary Procedures), GH-2 (Internal Investigations), and the investigative checklist and format, and the Professional Standards Bureau Operations Manual was published in December 2018.

During our site visits, we meet with PSB to discuss our concerns with the overall quality of administrative investigations, and provide specific case examples from the Paragraph 32 submissions that illustrate these concerns.  PSB personnel have remained responsive to our feedback, and the investigations they submit for compliance with this Paragraph continue to be examples of complete and thorough investigations.  PSB's reviews of investigations conducted by District personnel continue to be thorough and have identified appropriate concerns.

We have noted many improvements in those investigations conducted at the District level, particularly in those completed after the 40-hour Misconduct Investigative Training, but we continue to observe some deficiencies in the investigations they conduct.  Investigations are still being returned by PSB after review for additional follow-up or corrections.  This review by PSB continues to allow some District cases to be near full compliance when they are finalized. However, as we have noted in previous reports, it continues to delay the timely completion of many of these same investigations.  PSB continues to assign liaison personnel to each District to provide assistance while the investigations are underway.  While we have noted the positive effects of PSB's efforts to assist investigators in the Districts, the time commitment involved with conducting these reviews continues to result in significant personnel hours being dedicated to this effort by PSB personnel.

WAI 39814

During our site visits, our Team makes numerous visits to MCSO Districts.  During these District visits, we discuss the completion of administrative misconduct investigations by District personnel.  We discuss those areas of the investigations where we continue to find deficiencies and provide input regarding the proper completion of investigations.  We also seek information from District supervisors regarding their experience with the investigation process and any ongoing concerns they may have.

In many of our District visits, MCSO personnel have noted that training was needed, and most believe that the 40-hour Misconduct Investigative Training provided valuable information on the investigative process.  Many District personnel also believe that ongoing and refresher training is going to be a continuing need.  District personnel continue to note the value of the assistance provided to them by PSB personnel.  District personnel remain concerned with the time it takes to complete administrative investigations; but many have noted that as they become more familiar with the investigative process and gain experience in the completion of these investigations, it has become easier to complete them and they are better able to manage the time commitment.  They also continue to articulate the difficulty they sometimes have in locating and interviewing complainants and witnesses.

During our visits to Districts 3 and 6 in April 2019, we spoke with sworn supervisors and command personnel about administrative misconduct investigations.  In both Districts, the personnel we talked to believe that the quality of investigations completed by their personnel has improved.  They continue to believe the training that has been provided has been valuable, but also believe training should be ongoing and include practical experience, such as conducting a walk-through of an actual investigation.  In one District, command personnel noted that despite training, some supervisors simply lack the skills or investigative experience to do these types of investigations.  They noted that they have initiated strategies to assist their personnel in conducting these investigations.  These strategies include roundtable discussions to review investigations prior to their completion and meetings with sergeants prior to interviews to discuss interview questions and strategies.

Since March 2018, we have requested and reviewed a monthly report from District Command personnel that documents any actions they have taken to assist their personnel in the completion of administrative misconduct investigations and any actions they have taken to address any deficiencies they have identified.  We have seen in these reports that District Command personnel are identifying and addressing concerns with the completion of these investigations.  We have seen a number of intervention strategies employed, including: additional training; mentoring; one-on-one coaching; documentation in Supervisory Notes; and in one case, the initiation of an internal misconduct investigation when other intervention strategies were unsuccessful.

WAI 39815

During this reporting period, we found that District command personnel continue to document concerns and deficiencies found in investigations conducted by their personnel, and identify specific follow-up actions as necessary.  We also noted that in addition to District personnel documenting and addressing deficient investigations, PSB identified two concerns at the Command level during this reporting period and forwarded these concerns to Deputy Chiefs to be addressed.

During the last reporting period, we reviewed all 38 administrative misconduct investigations submitted for compliance with this Paragraph.  All six of the investigations conducted by PSB complied with all investigative and administrative requirements over which the PSB Commander has authority.  Of the 32 conducted by Districts, 77% were in compliance with Order requirements.

During this reporting period, we reviewed all 75 administrative misconduct investigations submitted for compliance with this Paragraph.  PSB conducted 11 of these investigations, and District personnel conducted the remaining 64.  Sworn supervisors with the rank of sergeant or higher completed all the investigations conducted at the District level.  There were 126 potential policy violations included in the 75 cases.  Sixty-two of the investigations resulted from external complainants, and 13 were internally generated.  All of the 75 investigations were completed after July 20, 2016.  Seventy of the 75 were both initiated and completed after the new investigation and discipline policies became effective in May 2017.  Forty-nine were both initiated and concluded after the completion of the 40-hour Misconduct Investigative Training that was completed in late 2017.

Of the 75 administrative investigations we reviewed for this Paragraph, 16 resulted in sustained findings against one or more employee.  We concur with the sustained findings in all 16 investigations.  In one investigation, however, we believe that findings of sustained should have been made and were not.  In a second investigation that was unfounded, we believe the proper finding would have been not sustained.  Discipline for sustained investigations included: coaching; written reprimands; suspensions of eight hours or more; and dismissals.  In all of these cases, the PSB Commander properly identified the category and offense number, as well as the presumptive discipline or range of discipline for the sustained allegations.

There were two cases we reviewed for compliance with this Paragraph where the Appointing Authority mitigated the presumptive discipline.  In both cases, the Appointing Authority assessed discipline that fell within the range, but was not the presumptive discipline established in the policies revised in May 2017.  We believe the facts of the investigations, the employees' work histories, and the justification provided by the Appointing Authority support the decisions to mitigate the discipline; and we agree with the decision to do so.  In one case, the Appointing Authority aggravated the final discipline within the range.  We also agree with his decision in this case.

All of the 75 cases we reviewed for this Paragraph were completed on or after July 20, 2016.  Of the 11 investigations conducted by PSB, seven were not completed within the 85-day timeframe.  All seven investigations contained a request for, and an authorization of, an

WAI 39816

extension.  Twenty-six of the 64 investigations conducted at the District level were not initially completed and submitted to PSB for review within the required 60-day timeframe.  All but two included an appropriate request for, and an authorization of, an extension.

We continue to find that PSB investigations are thorough and well-documented.  All 11 (100%) of the investigations PSB investigated and submitted for compliance with this Paragraph complied with investigative and administrative requirements.

District personnel outside of PSB conducted 64 of the investigations MCSO submitted for review for this Paragraph.  All were completed after July 20, 2016.  We found 49 (77%) in compliance with all investigative and documentation requirements, an increase from the 67% compliance the last reporting period.  We have some concerns with 15 of the investigations.  The concerns include: leading questions; failure to justify findings; failure to notify employee supervisors of investigations; witnesses listed but not interviewed; and ongoing administrative concerns.  Eight of the investigations were returned to the Districts by PSB for additional investigation or corrections.  Some were not returned as identified deficiencies could not be corrected after the fact or the concern identified was the responsibility of PSB.  We also noted that in several of these investigations, the deficiencies were identified by the District Captain and addressed with the investigator prior to the submission of the case to PSB.  We noted that 21 of the 64 investigations were completed by District personnel prior to the completion of the 40-Hour Misconduct Investigative Training.  Fifteen (71%) of these 21 investigations were in compliance with all requirements for the completion of administrative misconduct investigations.  Forty-three of the investigations were initiated and completed after the Misconduct Investigative Training.  Of these, 43 (81%) were in full compliance.  We continue to be encouraged with the overall improvement we are observing in those investigations conducted by District personnel.

Our review of cases submitted for this Paragraph indicates a continuing effort by PSB and District personnel to complete proper investigations.  PSB investigations reviewed under this Paragraph were in full compliance, and District cases continue to show improvement.

**Paragraph 33.**  *MCSO Personnel who engage in Discriminatory Policing in any context will be subjected to administrative Discipline and, where appropriate, referred for criminal prosecution.  MCSO shall provide clear guidelines, in writing, regarding the disciplinary consequences for personnel who engage in Discriminatory Policing.*

**Phase 1:**  In compliance

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 26, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

**Phase 2:**  In compliance

WAI 39817

The investigations that we review for compliance with this Paragraph do not include biased policing complaints involving the Plaintiffs' class.  Those investigations have additional compliance requirements and are discussed in Paragraphs 275-283.

During the last reporting period, we reviewed two investigations submitted in compliance with this Paragraph.  In both instances, the final findings were not sustained.  The investigations were thorough and well-written; and we agreed with the findings in both cases.

During this reporting period, we reviewed four investigations submitted in compliance with this Paragraph.  Three alleged racial bias or racial slurs based on race or ethnicity.  Two were unfounded, and we agree with these findings.  In the third case, MCSO unfounded the allegation without sufficient information or evidence to do so.  This investigation should have been not sustained.  In the fourth case, bias due to gender identification was alleged and sustained.  The involved employee was appropriately dismissed from MCSO employment.

MCSO is not compliant with the requirements of this Paragraph for this reporting period.  We will withdraw Phase 2 compliance if MCSO is not in compliance with all requirements of this Paragraph for the next reporting period.

While biased policing allegations that involve members of the Plaintiffs' class are not reported in this Paragraph, we note here that MCSO completed five investigations that were determined to be Class Remedial Matters (CRMs) during this reporting period.   All five were in compliance.


**Paragraph 34.**  *MCSO shall review each policy and procedure on an annual basis to ensure that the policy or procedure provides effective direction to MCSO Personnel and remains consistent with this Order, current law and professional standards.  The MCSO shall document such annual review in writing.  MCSO also shall review Policies and Procedures as necessary upon notice of a policy deficiency during audits or reviews.  MCSO shall revise any deficient policy as soon as practicable.*

**Phase 1:**  In compliance

- GA-1 (Development of Written Orders), most recently amended on March 28, 2019.

**Phase 2:**  In compliance

MCSO conducts annual reviews of all critical policies and all policies relevant to the Court Orders.  The review process ensures that all policies are consistent with Constitutional policing, current law, professional standards, and any Court Order or Judgment.

WAI 39818

During this reporting period, 19 (39%) of the 48 required policies received their annual review. These policies included: CP-2 (Code of Conduct); CP-5 (Truthfulness); EA-2 (Patrol Vehicles); EA-3 (Non-Traffic Contact); EA-11 (Arrest Procedures); EB-1 (Traffic Enforcement); EB-2 (Traffic Stop Data Collection); EB-7 (Traffic Control and Services); ED-2 (Covert Operations); GA-1 (Development of Written Order); GC-11 (Employee Probationary Periods); GC-16 (Employee Grievance Procedures); GF-1 (Criminal Justice Data Systems); GF-3 (Criminal History Record Information and Public Records); GJ-33 (Significant Operations); GJ-35 (Body-Worn Cameras); GJ-36 (Digital Recording Devices); GI-1 (Radio and Enforcement Communications); and GM-1 (Electronic Communications Data Voicemail).

WAI 39819

## Section 5: Pre-Planned Operations

*Paragraph 35.   The Monitor shall regularly review the mission statement, policies and operations documents of any Specialized Unit within the MCSO that enforces Immigration-Related Laws to ensure that such unit(s) is/are operating in accordance with the Constitution, the laws of the United States and State of Arizona, and this Order.*

**In Full and Effective Compliance**

To verify Phase 2 compliance with this Paragraph, we previously verified that the Criminal Employment Unit (CEU) was disbanded and removed from the Special Investigations Division organizational chart.  The Human Smuggling Unit (HSU) was also disbanded and personnel reassigned to the Anti-Trafficking Unit (ATU).

During our review of the arrests made by the Special Investigations Division ATU between March 2015-March 2017, we did not note any arrests for immigration or human smuggling violations.  The cases submitted by MCSO and reviewed for the ATU were primarily related to narcotics trafficking offenses.

MCSO reported in April 2017 that it had disbanded the Anti-Trafficking Unit and formed a new unit, Fugitive Apprehension and Tactical Enforcement (FATE).  The primary mission of FATE is to locate and apprehend violent fugitives.  We reviewed FATE's mission statement and objectives, as well as the organizational chart for the Special Investigations Division.  MCSO had removed the ATU from the organizational chart, and the mission of FATE did not include any reference to the enforcement of Immigration-Related Laws.

The revised organizational chart for SID and documentation provided by MCSO regarding the implementation of FATE supported that the ATU no longer existed, and that there were no specialized units in MCSO that enforced Immigration-Related Laws.

During the last reporting period, we received and reviewed the most current Special Investigations Division Operations Manual and organizational chart.  Both confirmed that MCSO has no specialized units that enforce Immigration-Related Laws, that the Human Smuggling Unit (HSU) was disbanded, and the Anti-Trafficking Unit (ATU) no longer exists.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 39820

*Paragraph 36. The MCSO shall ensure that any Significant Operations or Patrols are initiated and carried out in a race-neutral fashion. For any Significant Operation or Patrol involving 10 or more MCSO personnel, excluding posse members, the MCSO shall develop a written protocol including a statement of the operational motivations and objectives, parameters for supporting documentation that shall be collected, operations plans, and provide instructions to supervisors, deputies and posse members. That written protocol shall be provided to the Monitor in advance of any Significant Operation or Patrol.*

**In Full and Effective Compliance**

Since the requirements for conducting significant operations were implemented, MCSO has reported conducting only one significant operation that invoked the requirements of this Paragraph. "Operation Borderline" was conducted from October 20-27, 2014, to interdict the flow of illegal narcotics into Maricopa County. MCSO met all the requirements of this Paragraph during the operation.

In February 2016, we became aware of "Operation No Drug Bust Too Small" when it was reported in the media, and requested details on this operation from MCSO. After reviewing the documentation provided by MCSO, we were satisfied that it did not meet the reporting requirements of this Paragraph.

In October 2016, we became aware of "Operation Gila Monster" when it was reported in the media. According to media reports, this was a two-week operation conducted by a special operations unit in MCSO and was intended to interdict the flow of illegal drugs into Maricopa County. We requested all documentation regarding this operation for review. The documentation indicated that this operation was conducted from October 17-23, 2016. The documentation provided by MCSO was sufficient for us to determine that this operation did not meet the reporting criteria for this, or other Paragraphs, related to significant operations. The Plaintiffs also reviewed the documentation submitted by MCSO on this operation and agreed that the operation did not invoke the requirements of this Paragraph. We and the Plaintiffs noted that "Operation Gila Monster" involved traffic stops of Latinos, and that those arrested were undocumented Latinos.

We continue to review documentation submitted for this Paragraph by all Districts, the Enforcement Support Division, and the Investigations Division on a monthly basis. During this reporting period, and since October 2014, MCSO continues to report that it has not conducted any additional significant operations. In addition, we have not learned of any potential significant operation through media releases or other sources during this reporting period. We will continue to monitor and review any operations we become aware of to ensure continued compliance with this and other Paragraphs related to significant operations. During this reporting period, we did not learn of any significant operations conducted by MCSO.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 39821

*Paragraph 37.   The MCSO shall submit a standard template for operations plans and standard instructions for supervisors, deputies and posse members applicable to all Significant Operations or Patrols to the Monitor for review pursuant to the process described in Section IV within 90 days of the Effective Date.   In Exigent Circumstances, the MCSO may conduct Significant Operations or Patrols during the interim period but such patrols shall be conducted in a manner that is in compliance with the requirement of this Order.   Any Significant Operations or Patrols thereafter must be in accordance with the approved template and instructions.*

**In Full and Effective Compliance**

In late 2014, we reviewed all the documentation submitted by MCSO regarding the significant operation conducted from October 24-27, 2014.  This operation was intended to interdict the flow of illegal narcotics into Maricopa County and fully complied with the requirements of this Paragraph.

MCSO continues to report that it has not conducted any operations that invoke the requirements of this Paragraph since October 2014.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

During this reporting period, we did not become aware of any significant operations conducted by MCSO.  MCSO remains in Full and Effective Compliance with this Paragraph.

**(Note: Unchanged language is presented in *italicized font*.   Additions are indicated by underlined font.  Deletions are indicated by ~~crossed-out font~~.)**

*Paragraph 38.   If the MCSO conducts any Significant Operations or Patrols involving 10 or more MCSO Personnel excluding posse members, it shall create the following documentation and provide it to the Monitor and Plaintiffs within 30 days after the operation:*

a.      *documentation of the specific justification/reason for the operation, certified as drafted prior to the operation (this documentation must include analysis of relevant, reliable, and comparative crime data);*

b.      *information that triggered the operation and/or selection of the particular site for the operation;*

c.      *documentation of the steps taken to corroborate any information or intelligence received from non-law enforcement personnel;*

d.      *documentation of command staff review and approval of the operation and operations plans;*

e.      *a listing of specific operational objectives for the patrol;*

WAI 39822

f.  *documentation of specific operational objectives and instructions as communicated to participating MCSO Personnel;*

g.  *any operations plans, other instructions, guidance or post-operation feedback or debriefing provided to participating MCSO Personnel;*

h.  *a post-operation analysis of the patrol, including a detailed report of any significant events that occurred during the patrol;*

i.  *arrest lists, officer participation logs and records for the patrol; and*

j.  *data about each contact made during the operation, including whether it resulted in a citation or arrest.*

**In Full and Effective Compliance**

Since the initial publication of GJ-33, MCSO has reported that it has conducted only one significant operation, "Operation Borderline," in October 2014. At the time of this operation, we reviewed MCSO's compliance with policy; attended the operational briefing; and verified the inclusion of all the required protocols, planning checklists, supervisor daily checklists, and post-operation reports. MCSO was in full compliance with this Paragraph for this operation.

During this reporting period, MCSO again reported that it did not conduct any significant operations invoking the requirements of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

During this reporting period, we did not become aware of any significant operations conducted by MCSO. MCSO remains in Full and Effective Compliance with this Paragraph.

**Paragraph 39.** *The MCSO shall hold a community outreach meeting no more than 40 days after any Significant Operations or Patrols in the affected District(s). MCSO shall work with the Community Advisory Board to ensure that the community outreach meeting adequately communicates information regarding the objectives and results of the operation or patrol. The community outreach meeting shall be advertised and conducted in English and Spanish.*

**Phase 1:** In compliance

- GJ-33 (Significant Operations), most recently amended on May 10, 2018.

**Phase 2:** In compliance

The Amendments to the Supplemental Permanent Injunction/Judgment Order (Document 2100) issued on August 3, 2017 returned the responsibility for compliance with this Paragraph to MCSO.

WAI 39823

During this reporting period, MCSO did not report conducting any significant operations that would invoke the requirements of this Paragraph.

***Paragraph 40.*** *The MCSO shall notify the Monitor and Plaintiffs within 24 hours of any immigration related traffic enforcement activity or Significant Operation involving the arrest of 5 or more people unless such disclosure would interfere with an on-going criminal investigation in which case the notification shall be provided under seal to the Court, which may determine that disclosure to the Monitor and Plaintiffs would not interfere with an on-going criminal investigation. In any event, as soon as disclosure would no longer interfere with an on-going criminal investigation, MCSO shall provide the notification to the Monitor and Plaintiffs. To the extent that it is not already covered above by Paragraph 38, the Monitor and Plaintiffs may request any documentation related to such activity as they deem reasonably necessary to ensure compliance with the Court's orders.*

**In Full and Effective Compliance**

Since MCSO first developed GJ-33 (Significant Operations) in 2014, MCSO has reported conducting only one operation, "Operation Borderline," that required compliance with this Paragraph. We verified that MCSO employed the appropriate protocols and made all required notifications. MCSO was in full compliance with this Paragraph during this operation.

Based on a concern raised by the Plaintiffs, and to provide clarification regarding the portion of this Paragraph that addresses the requirement for MCSO to notify the Monitor and Plaintiffs within 24 hours of any immigration-related traffic enforcement activity or significant operations involving "the arrest of 5 or more persons," we requested during our October 2015 site visit that MCSO provide a statement regarding this requirement each month. MCSO began including this information in its November 2015 submission and continues to do so.

MCSO continues to report that it has not conducted any operations that meet the reporting requirements for this Paragraph since October 2014. During this reporting period, we did not learn of any traffic-related enforcement or significant operations conducted by MCSO that would invoke the requirements of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 39824

# Section 6: Training

**COURT ORDER VII.  TRAINING**

*a.  General Provisions*

***Paragraph 41.***   *To ensure that the Policies and Procedures provided for by this Order are effectuated, the MCSO shall implement the following requirements regarding Training.*

***Paragraph 42.***   *The persons presenting this Training in each area shall be competent instructors with significant experience and expertise in the area.  Those presenting Training on legal matters shall also hold a law degree from an accredited law school and be admitted to a Bar of any state and/or the District of Columbia.*

**Phase 1:**  In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.

- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2018

- Training Division Operations Manual, most recently amended on September 21, 2017.

**Phase 2:**  In compliance

During this reporting period, the Training Division did not name any new Field Training Officers (FTOs) or General Instructors (GIs).  Training Division command started a review to improve upon and standardize the Professional Standards Bureau (PSB) reviews for both FTOs and GIs as required by GG-1.  We did not review any proposals in this regard during this reporting period.

No FTOs submitted a waiver of disciplinary timelines during this reporting period.

During this reporting period, the Anti-Defamation League (ADL), a previously approved vendor, supplied implicit bias instruction for the 2018 Annual Combined Training (ACT).  The ADL initially supplied MCSO biographies for two instructors.  Once class deliveries began, instructors that had not been vetted delivered classes.  We discussed these concerns during our April site visit.  Training Division personnel advised that they were initially unaware of the new instructors until after the delivery of the classes.  In response, MCSO appropriately requested biographies for the additional instructors.  The ADL did not provide the requested information.  Previously, we approved the use of an outside vendor because MCSO cited a lack of internal expertise to develop and deliver this Order-required topic.  We support the use of outside experts to develop and deliver training.  However, this initiative has exposed potential problems related to the use of vendors.  In January, we and the Parties learned that the ADL would not be able to provide instructors for six of the scheduled ACT classes.  Nearly 270 Office personnel

WAI 39825

were enrolled to attend. After significant negotiations, the ADL agreed to have one of their four-hour blocks of instruction videotaped so that it could be shown during the sessions the ADL could not teach. Videotaping allowed for the original training schedule to be maintained; however, all personnel did not experience a live classroom delivery. MCSO required three additional instructors for each of the six affected deliveries.

During our April site visit, Training Division personnel said that they had completed several independent observations of ADL instructors. We requested these documents during our visit. Standard HUB evaluations did not name individual ADL instructors. Rather, the HUB report identified the instructors generically as "ADL Instructor."

***Paragraph 43.*** *The Training shall include at least 60% live training (i.e., with a live instructor), which includes an interactive component, and no more than 40% on-line training. The Training shall also include testing and/or writings that indicate that MCSO Personnel taking the Training comprehend the material taught whether via live training or via on-line training.*

**Phase 1:** In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.

- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2018.

- Training Division Operations Manual, most recently amended on September 21, 2017.

**Phase 2:** In compliance

We verify compliance with this Paragraph by reviewing all individual test failures; individual retests; and failure remediation efforts, by training class; for both live and online Order-related training.

In January and February, we received aggregated test results for the 2018 Annual Combined Training (ACT). In April we received redacted March test results. Missing were the names of the individuals taking the tests. During our April site visit, we discussed the failure of MCSO to supply the requested information; and reaffirmed our request for the documentation. MCSO ultimately provided the unredacted information for March, and committed to providing unredacted information in future document productions.

We reviewed the test for the 2019 Body-Worn Camera Lesson Plan (BWC) during our April site visit. The test required several modifications for consistency with the lesson plan. The Training Division agreed to incorporate the recommendations and we approved the test.

During this reporting period, the Training Division delivered the following programs: Bias-Free Policing and Detentions, Arrests, and the Enforcement of Immigration-Related Laws (Fourth and Fourteenth Amendment); 2018 Annual Combined Training (ACT); Body-Worn

WAI 39826

Camera (BWC); 2017 Early Identification System (EIS); 2017 Employee Performance Appraisals (EPA), 2018 Supervisory Responsibilities: Effective Law Enforcement (SRELE) and 2018 Traffic and Criminal Software (TraCS).

MCSO delivered Fourth and Fourteenth Amendment Training twice during this quarter to 25 sworn personnel.  No personnel required test remediation.

MCSO delivered the 2018 ACT 32 times during this reporting period.  A total of 978 personnel (611 sworn personnel, 27 retired reserve personnel, 13 reserve personnel, 327 Posse personnel) attended these courses.  Three personnel required test remediation.

MCSO delivered BWC Training once in February to 41 sworn personnel.  No personnel required test remediation.

MCSO delivered the 2017 EIS once in February to 28 personnel (four sworn, 20 Detention, and four civilians).  No personnel required test remediation.

MCSO delivered the 2017 EPA once in February to 22 personnel (one sworn, 20 Detention, one civilian).  Four individuals required test remediation.

MCSO delivered the 2018 SRELE once in March to three personnel (one sworn, two Detention).  No personnel required test remediation.

MCSO delivered TraCS Training once in January to 10 sworn personnel.  Six personnel required test remediation.


**Paragraph 44.**  *Within 90 days of the Effective Date, MCSO shall set out a schedule for delivering all Training required by this Order.  Plaintiffs' Representative and the Monitor shall be provided with the schedule of all Trainings and will be permitted to observe all live trainings and all on-line training.  Attendees shall sign in at each live session.  MCSO shall keep an up-to-date list of the live and on-line Training sessions and hours attended or viewed by each officer and Supervisor and make that available to the Monitor and Plaintiffs.*

**Phase 1:**  In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.

- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2018.

- Training Division Operations Manual, most recently amended on September 21, 2017.

**Phase 2:**  In compliance

WAI 39827

MCSO continues to support a Master Training Calendar.  The calendar, posted to the MCSO website, allows the public accessibility to tentative training dates, classes, and locations.  The calendar displays 90-day increments.  Training Division personnel update the calendar weekly to ensure accurate scheduling.  We did not find any inaccuracies in the calendar during this reporting period.

We previously discussed the limitations of this calendar for helping the Training Division with the development of training.  During our April site visit, Training Personnel said there have been no further discussions of expanding this calendar internally to identify each curriculum, work product completion dates, and the responsible individual(s).  The hiring of a project manager for the Training Division did not occur as expected.  We continue to urge the Training Division to better manage the training cycle on a schedule that can be adhered to.  Better time management will aid in reducing delayed development and end-of-year time constraints that the Training Division continues to experience with the development of Order-related curriculum.  We also remind MCSO to adhere to the requirements of its own policies – particularly where they are based on Order requirements – to ensure continued Phase 2 compliance.

Master Personnel Rosters determine the number of personnel requiring Order-related training.  At the end of this reporting period, MCSO reports that 675 sworn members, 19 reserve members, 24 retired reserve members, 476 Posse members, 1,821 Detention members, and 715 civilian employees require Order-related instruction.  These categories vary by reporting period, because of the attrition in the organization.


***Paragraph 45.*** *The Training may incorporate adult-learning methods that incorporate roleplaying scenarios, interactive exercises, as well as traditional lecture formats.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

We continued our review of the 2019 BWC Lesson Plan during the first quarter.  During our April site visit, MCSO command personnel expressed dissatisfaction with the curriculum review process in general, and the BWC lesson plan, characterizing it as going "awry."  We disagree with this assessment.  The failure of the Training Division to follow its adopted lesson plan format and to develop and supply all supporting documents for prompt review caused the extended review period.  In January, we remained dissatisfied with lesson plan content.  We noted that the lesson plan did not provide elaboration and clarification of the material contained in the PowerPoint presentation.  The lesson plan was a combination of technical manual and policy regurgitation – without further development of important teaching points.  We recognized the importance of referencing policy in this lesson plan, but we believe the lesson plan should supply clear direction on how to achieve policy compliance using critical teaching points.  We noted that four of five practical scenarios were simply activation/deactivation pushing of buttons without highlighting advantages and disadvantages of the BWC.  We considered these to be mundane activities that did not meet standards for adult-learning

WAI 39828

methods, satisfactory scenarios, or reinforce the goals of the curriculum. We continued to recommend scenarios that would show the capabilities and weaknesses of the BWC and address field deficiencies by using simulated vehicle stops, vehicle searches, person searches, and other law enforcement activities that require BWC activation and recording by the Order and policy. Plaintiffs' representatives noted extended periods of lecture without learning scenarios or videos. The test did not follow the lesson plan. As a result, we arranged for a conference call in January to clarify any questions the Training Division may have had. During our April site visit, after further discussions on the incorporation of adult-learning methods and content recommendations, we approved the lesson plan.

Also, during our April site visit, we discussed the status of curriculum development for annual Order-required training.

The 2019 SRELE will conceptually address the daily activities of a sergeant. The draft has begun and is in outline form. Based on early discussions, MCSO believes this concept will be able to address both Order requirements and contemporary management issues.

TraCS for Supervisors is another curriculum under development to specifically address the needs of supervisors. The first draft is expected in May, with delivery during the third quarter.

MCSO anticipates contracting with a vendor to provide the PSB8 annual in-service training program to members of the PSB. This year's curriculum will address the receipt and handling of Equal Employment Opportunity Commission (EEOC) workplace discrimination investigations. MCSO predicts a single class delivery during the third quarter.

The PSB8 annual in-service training program for members external to PSB (District supervisors) is being developed internally by PSB and the Training Division. The curriculum is anticipated to be centered on a single administrative investigation, and will guide supervisors from the receipt of the initial allegations through a completed investigation. MCSO described the lesson plan as practicum-based. During our District visits, District Commanders indicated they would like to see the curriculum focus on rudeness complaints. The District Commanders believe that this type of allegation causes confusion among District supervisors. The Training Division has not selected the type of complaint for the curriculum.

The Training Division expects production of the first draft of the curriculum during the second quarter, with delivery to follow in the third quarter.

***Paragraph 46.*** *The curriculum and any materials and information on the proposed instructors for the Training provided for by this Order shall be provided to the Monitor within 90 days of the Effective Date for review pursuant to the process described in Section IV. The Monitor and Plaintiffs may provide resources that the MCSO can consult to develop the content of the Training, including names of suggested instructors.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

WAI 39829

Training Division personnel advised us that – aside from the 2018 ACT curriculum – there has been no development of lesson plans to provide enhanced training for Implicit Bias, Cultural Competency, Understanding Community Perspectives, and Fair and Impartial Decision Making.

During our April site visit, we continued to discuss the use of BWC recordings to support roll-call briefings and Order-related curriculum.  We supplied specific examples that highlighted good patrol supervision, the improper placement of the BWC recording device, officer safety issues, and incorrect search protocols.  In response to repeated requests by MCSO for quality videos that are relevant and meaningful for roll-call briefings and curriculum revision, we continue to provide examples that easily augment the ACT, SRELE, BWC training programs, and roll-call briefings.

***Paragraph 47.***  *MCSO shall regularly update the Training to keep up with developments in the law and to take into account feedback from the Monitor, the Court, Plaintiffs and MCSO Personnel.*

**Phase 1:**  In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.

- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2018.

- Training Division Operations Manual, most recently amended on September 21, 2017.

**Phase 2:**  In compliance

During this reporting period, we and Parties continued commenting on the 2019 BWC lesson plan and supporting documentation.  During our April site visit, we approved this lesson plan for delivery.

We did not review any roll-call briefings or videos in support of the ACT or SRELE that would provide enhanced training.

MCSO can reasonably expect that we and the Parties will observe training sessions and provide appropriate feedback.

WAI 39830

### b. Bias-Free Policing Training

*Paragraph 48.  The MCSO shall provide all sworn Deputies, including Supervisors and chiefs, as well as all posse members, with 12 hours of comprehensive and interdisciplinary Training on bias-free policing within 240 days of the Effective Date, or for new Deputies or posse members, within 90 days of the start of their service, and at least 6 hours annually thereafter.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

MCSO delivers Bias-Free Policing Training to all new deputies during POST Academy training.  During this reporting period, this class was delivered twice to 25 sworn personnel.  No personnel required test remediation.

The 2018 ACT was delivered 32 times during this reporting period.  A total of 978 personnel (611 sworn personnel, 27 retired reserve personnel, 13 reserve personnel, 327 Posse personnel) attended these courses.  Three personnel required test remediation.

As previously discussed, MCSO experienced difficulties with the Anti-Defamation League (ADL), a previously approved vendor, who provided implicit bias instruction for the 2018 Annual Combined Training (ACT).  We recommend discussing and resolving these types of delivery issues with vendors during negotiations.  MCSO should not be pressured by a vendor to alter a training program for any of its personnel.  All personnel should experience training in the same manner.  MCSO is responsible for overcoming vendor obstacles impacting Order compliance by including additional test questions related to the provided content and requiring course and individual instructor evaluations of vendors.  It is essential that the Training Division consistently document how deputies receive instruction provided by external vendors in the same manner as other training.

*Paragraph 49.  The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:*

a.   *definitions of racial profiling and Discriminatory Policing;*

b.   *examples of the type of conduct that would constitute Discriminatory Policing as well as examples of the types of indicators Deputies may properly rely upon;*

c.   *the protection of civil rights as a central part of the police mission and as essential to effective policing;*

d.   *an emphasis on ethics, professionalism and the protection of civil rights as a central part of the police mission and as essential to effective policing;*

e.   *constitutional and other legal requirements related to equal protection, unlawful discrimination, and restrictions on the enforcement of Immigration-Related Laws, including the requirements of this Order;*

WAI 39831

f.   *MCSO policies related to Discriminatory Policing, the enforcement of Immigration-Related Laws and traffic enforcement, and to the extent past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;*

g.   *MCSO's protocol and requirements for ensuring that any significant pre-planned operations or patrols are initiated and carried out in a race-neutral fashion;*

h.   *police and community perspectives related to Discriminatory Policing;*

i.   *the existence of arbitrary classifications, stereotypes, and implicit bias, and the impact that these may have on the decision-making and behavior of a Deputy;*

j.   *methods and strategies for identifying stereotypes and implicit bias in Deputy decision-making;*

k.   *methods and strategies for ensuring effective policing, including reliance solely on non-discriminatory factors at key decision points;*

l.   *methods and strategies to reduce misunderstanding, resolve and/or de-escalate conflict, and avoid Complaints due to perceived police bias or discrimination;*

m.   *cultural awareness and how to communicate with individuals in commonly encountered scenarios;*

n.   *problem-oriented policing tactics and other methods for improving public safety and crime prevention through community engagement;*

o.   *the benefits of actively engaging community organizations, including those serving youth and immigrant communities.*

p.   *the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;*

q.   *background information on the Melendres v. Arpaio litigation, as well as a summary and explanation of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in Melendres v. Arpaio, the parameters of the Court's permanent injunction, and the requirements of this Order; and*

r.   *Instruction on the data collection protocols and reporting requirements of this Order.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

MCSO did not conduct an annual review of the lesson plan for the Bias-Free Policing Training during this reporting period.

WAI 39832

### c. *Training on Detentions, Arrests, and the Enforcement of Immigration-Related Laws*

***Paragraph 50.*** *In addition to the Training on bias-free policing, the MCSO shall provide all sworn personnel, including Supervisors and chiefs, as well as all posse members, with 6 hours of Training on the Fourth Amendment, including on detentions, arrests and the enforcement of Immigration-Related Laws within 180 days of the effective date of this Order, or for new Deputies or posse members, within 90 days of the start of their service. MCSO shall provide all Deputies with 4 hours of Training each year thereafter.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

Detentions, Arrests, and the Enforcement of Immigration-Related Laws Training was delivered twice during this reporting period. A total of 25 sworn personnel attended the training. No personnel required test remediation.

The 2018 ACT was delivered 32 times during this reporting period. A total of 978 personnel (611 sworn personnel, 27 retired reserve personnel, 13 reserve personnel, 327 Posse personnel) attended these courses. Three personnel required test remediation.

***Paragraph 51.*** *The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:*

a.  *an explanation of the difference between various police contacts according to the level of police intrusion and the requisite level of suspicion; the difference between reasonable suspicion and mere speculation; and the difference between voluntary consent and mere acquiescence to police authority;*

b.  *guidance on the facts and circumstances that should be considered in initiating, expanding or terminating an Investigatory Stop or detention;*

c.  *guidance on the circumstances under which an Investigatory Detention can become an arrest requiring probable cause;*

d.  *constitutional and other legal requirements related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, including the requirements of this Order;*

e.  *MCSO policies related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, and the extent to which past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;*

f.  *the circumstances under which a passenger may be questioned or asked for identification;*

WAI 39833

g.   the forms of identification that will be deemed acceptable if a driver or passenger (in circumstances where identification is required of them) is unable to present an Arizona driver's license;

h.   the circumstances under which an officer may initiate a vehicle stop in order to investigate a load vehicle;

i.   the circumstances under which a Deputy may question any individual as to his/her alienage or immigration status, investigate an individual's identity or search the individual in order to develop evidence of unlawful status, contact ICE/CBP, await a response from ICE/CBP and/or deliver an individual to ICE/CBP custody;

j.   a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause to believe that a vehicle or an individual is involved in an immigration-related state crime, such as a violation of the Arizona Human Smuggling Statute, as drawn from legal precedent and updated as necessary; the factors shall not include actual or apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a Hispanic day laborer;

k.   a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause that an individual is in the country unlawfully, as drawn from legal precedent and updated as necessary; the factors shall not include actual or apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a day laborer;

l.   an emphasis on the rule that use of race or ethnicity to any degree, except in the case of a reliable, specific suspect description, is prohibited;

m.   the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;

n.   Provide all trainees a copy of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in Melendres v. Arpaio and this Order, as well as a summary and explanation of the same that is drafted by counsel for Plaintiffs or Defendants and reviewed by the Monitor or the Court; and

o.   Instruction on the data collection protocols and reporting requirements of this Order, particularly reporting requirements for any contact with ICE/CBP.

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

The 2018 ACT curriculum and supporting documents were approved for delivery December 21, 2018.  Development of the 2019 ACT did not occur during this reporting period.

MCSO did not conduct an annual review of the lesson plan for Detentions, Arrests, and the Enforcement of Immigration-Related Laws Training during this reporting period.

WAI 39834

### d. Supervisor and Command Level Training

***Paragraph 52.*** *MCSO shall provide Supervisors with comprehensive and interdisciplinary Training on supervision strategies and supervisory responsibilities under the Order. MCSO shall provide an initial mandatory supervisor training of no less than 6 hours, which shall be completed prior to assuming supervisory responsibilities or, for current MCSO Supervisors, within 180 days of the Effective Date of this Order. In addition to this initial Supervisor Training, MCSO shall require each Supervisor to complete at least 4 hours of Supervisor-specific Training annually thereafter. As needed, Supervisors shall also receive Training and updates as required by changes in pertinent developments in the law of equal protection, Fourth Amendment, the enforcement of Immigration-Related Laws, and other areas, as well as Training in new skills.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

The 2018 SRELE curriculum was previously approved for delivery. SRELE was delivered in March, to three personnel (one sworn, two civilian). No personnel required test remediation.

***Paragraph 53.*** *The Supervisor-specific Training shall address or include, at a minimum:*

a.   *techniques for effectively guiding and directing Deputies, and promoting effective and constitutional police practices in conformity with the Policies and Procedures in Paragraphs 18–34 and the Fourth and Fourteenth Amendment Training in Paragraphs 48–51;*

b.   *how to conduct regular reviews of subordinates;*

c.   *operation of Supervisory tools such as EIS;*

d.   *evaluation of written reports, including how to identify conclusory, "canned," or perfunctory language that is not supported by specific facts;*

e.   *how to analyze collected traffic stop data, audio and visual recordings, and patrol data to look for warning signs or indicia of possible racial profiling or unlawful conduct;*

f.   *how to plan significant operations and patrols to ensure that they are race-neutral and how to supervise Deputies engaged in such operations;*

g.   *incorporating integrity-related data into COMSTAT reporting;*

h.   *how to respond to calls from Deputies requesting permission to proceed with an investigation of an individual's immigration status, including contacting ICE/CBP;*

i.   *how to respond to the scene of a traffic stop when a civilian would like to make a Complaint against a Deputy;*

j.   *how to respond to and investigate allegations of Deputy misconduct generally;*

WAI 39835

k.      *evaluating Deputy performance as part of the regular employee performance evaluation; and*

l.      *building community partnerships and guiding Deputies to do the Training for Personnel Conducting Misconduct Investigations.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

The 2018 SRELE curriculum was previously approved for delivery.  The curriculum previously incorporated all requirements of this Paragraph.  Development for the 2019 SRELE began during this reporting period.

WAI 39836

## Section 7: Traffic Stop Documentation and Data Collection

**COURT ORDER VIII.    TRAFFIC STOP DOCUMENTATION AND DATA COLLECTION AND REVIEW**

For Paragraphs 54 and 55, in particular, we request traffic stop data from MCSO.  The following describes how we made that request and how we handled the data once we received it.  These data may also be referred to in other areas of Section 7 and the report as a whole.

In selecting traffic stop cases for our compliance review, we modified our statistical technique in that, rather than selecting a representative random sample of 100 cases per quarter, we instead pulled a sample of about 35 cases per month (or 105 cases per quarter).  Our original selection of a sample size of 35 cases was based on information from MCSO TraCS data that reported the average number of traffic stops per month was fewer than 2,000 during the April 2014-June 2015 time period when TraCS data were first available.  The selection of 35 cases reflects a sample based on this average per month.  This gave us a 95 percent confidence level (the certainty associated with our conclusion).

We continue to pull our monthly sample of traffic stop cases from the six Districts (Districts 1, 2, 3, 4, 6, and 7) and Lake Patrol.  By way of background, MCSO reported a total of 3,740 cases of traffic stop events for these areas between January 1-March 31, 2018 (averaging 1,247 per month).  This number of traffic stops represents a significant decline from previous reporting periods.  We discuss this issue with MCSO during our site visits.  While MCSO personnel have informed us that they are aware of the issue and that they continue to explore ways to ensure that deputies effectively perform their duties, which includes the enforcement of traffic laws, the issue remains.

Once we received files each month containing traffic stop case numbers from MCSO, denoting from which area they came, we selected a sample of up to 35 cases representing the areas and then selected a subsample averaging 10 cases, from the 35 selected cases, to obtain CAD audiotapes and body-worn camera recordings.  Our sampling process involved selecting a sample of cases stratified by the areas according to the proportion of specific area cases relative to the total area cases.  Stratification of the data was necessary to ensure that each area was represented proportionally in our review.  Randomization of the cases and the selection of the final cases for CAD review were achieved using a statistical software package (IBM SPSS Version 22), which contains a specific function that randomly selects cases and that also allows cases to be weighted by the areas.  Our use of SPSS required that we first convert the MCSO Excel spreadsheet into a format that would be readable in SPSS.  We next pulled the stratified sample each month for the areas and then randomly selected a CAD audio subsample from the selected cases.

WAI 39837

In February 2016, we began pulling cases for our body-worn camera review from the audio subsample.  Since that time, we began pulling additional samples for passenger contacts and persons' searches (10 each per month).  The unique identifiers for these two samples were relayed back to MCSO personnel, who produced documentation for the selected sample (including the CAD documentation for the subsample).

On October 10, 2014, the Court issued an Order Granting Stipulation to Amend Supplemental/Permanent Injunction/Judgment Order (Document 748).  The stipulation affects Paragraphs 57, 61, 62, and Paragraph 1.r.xv.; and has been incorporated in the body of this report.  The stipulation referenced amends the First Order, and will be addressed in Section 7.

### a. Collection of Traffic Stop Data

***Paragraph 54.***  *Within 180 days of the Effective Date, MCSO shall develop a system to ensure that Deputies collect data on all vehicle stops, whether or not they result in the issuance of a citation or arrest.  This system shall require Deputies to document, at a minimum:*

a.  *the name, badge/serial number, and unit of each Deputy and posse member involved;*

b.  *the date, time and location of the stop, recorded in a format that can be subject to geocoding;*

c.  *the license plate state and number of the subject vehicle;*

d.  *the total number of occupants in the vehicle;*

e.  *the Deputy's subjective perceived race, ethnicity and gender of the driver and any passengers, based on the officer's subjective impression (no inquiry into an occupant's ethnicity or gender is required or permitted);*

f.  *the name of any individual upon whom the Deputy runs a license or warrant check (including subject's surname);*

g.  *an indication of whether the Deputy otherwise contacted any passengers, the nature of the contact, and the reasons for such contact;*

h.  *the reason for the stop, recorded prior to contact with the occupants of the stopped vehicle, including a description of the traffic or equipment violation observed, if any, and any indicators of criminal activity developed before or during the stop;*

i.  *time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; time a release was made without citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere or Deputy's departure from the scene;*

j.  *whether any inquiry as to immigration status was conducted and whether ICE/CBP was contacted, and if so, the facts supporting the inquiry or contact with ICE/CBP, the time Supervisor approval was sought, the time ICE/CBP was contacted, the time it took to*

WAI 39838

*complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual;*

k.   *whether any individual was asked to consent to a search (and the response), whether a probable cause search was performed on any individual, or whether a pat-and-frisk search was performed on any individual;*

l.   *whether any contraband or evidence was seized from any individual, and nature of the contraband or evidence; and*

m.   *The final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without citation.*

**Phase 1:**  In compliance

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 26, 2018.

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- GI-1 (Radio and Enforcement Communications Procedures), most recently amended on April 19, 2018.

- GJ-3 (Search and Seizure), most recently amended on March 2, 2018.

**Phase 2:**  Deferred

To verify the information required for this Paragraph, MCSO created, and we reviewed, the Vehicle Stop Contact Form (VSCF), the Vehicle Stop Contact Form Supplemental Sheet, the Incidental Contact Receipt, and the Written Warning/Repair Order, all in electronic form, for those motorists who, during this reporting period, committed a traffic violation or operated a vehicle with defective equipment and received a warning.  We also reviewed the Arizona Traffic Ticket and Complaint Forms issued for violations of Arizona Statutes, Internet I/Viewer Event Unit printout, Justice Web Interface printout, and any Incident Report associated with the event.  We selected a sample of 105 traffic stops conducted by deputies from January 1-March 31, 2019, for the purposes of this review; and assessed the collected data from the above-listed documents for compliance with Subparagraphs 54.a.-54.m.  All of the listed documentation was used for our review of the following subsections of this Paragraph.

The Paragraph requires that MCSO create a system for data collection.  The data collected pursuant to this Paragraph will be captured in the Early Identification System, which we discuss further in this report.

WAI 39839

During this reporting period, we identified two traffic stops that were conducted where the deputies stopped two vehicles simultaneously; however, the deputy only prepared one VSCF in each case. The deputy did not prepare VSCFs for the other drivers/vehicles that were stopped. One of the stops involved a Latina driver (use private property to avoid traffic control device violation); the other stop involved a White male driver (speeding violation). We will discuss these issues with MCSO during our next site visit.

We have identified VSCFs that were not timely prepared. In one case, the VSCF was prepared one day after the traffic stop occurred. The stop involved a White female driver. In one case, the VSCF was prepared more than two months after the stop occurred. The stop involved a White female driver and a White female passenger. We discussed these cases with MCSO during our April 2019 site visit.

In another case, the VSCF was prepared six days after the traffic stop occurred. The stop involved a Latino driver. We will discuss this case with MCSO during our July 2019 site visit.

Paragraph 54.a. requires MCSO to document the name, badge/serial number, and unit of each deputy and Posse member involved.

For this reporting period, all of the primary deputies indicated their own serial numbers for every stop they initiated. We review the VSCF, I/Viewer Event document, the Justice Web Interface, and the CAD printout to determine which units were on the scene. If back-up units arrive on a scene and do not announce their presence to dispatch, CAD does not capture this information. A TraCS change was made to the VSCF during 2016 to secure this information. MCSO added a drop-down box so the deputy could enter the number of units on the scene and the appropriate fields would be added for the additional deputies. While this addition is an improvement, if the deputy fails to enter the number of additional units on the form, the drop-down boxes do not appear. In addition, MCSO policy requires deputies to prepare the Assisting Deputy and Body-Worn Camera Log in instances where deputies respond and assist at a traffic stop. The log contains the relevant information required by this Subparagraph for any additional deputies involved in a traffic stop other than the primary deputy. During our April 2019 site visit, we discussed with MCSO, the Plaintiffs, and the Plaintiff-Intervenors the method of evaluating this requirement. It was determined that in instances where a deputy's name, serial number and unit number may have been omitted on the VSCF, yet the deputy prepared the Assisting Deputy and Body-Worn Camera Log, the requirements of this Subparagraph will have been met.

During our review of the sample of 105 vehicle traffic stops, we identified 13 cases where the deputy's unit had another deputy assigned to the vehicle or one or more other deputy units or Posse members were on the scene. In each of the 13 cases where there were multiple units or deputies on a stop, the deputy properly documented the name, badge, and serial number of the deputies and Posse members on the VSCF. In two cases, a VSCF was not prepared as is required. In the 27 cases we reviewed for passenger contacts under Subparagraph 54.g., there were 12 cases where there were multiple units or deputies on a stop. In 11 cases, the deputy properly documented the required information on the VSCF or the information was captured on

WAI 39840

the Assisting Deputy and Body-Worn Camera Log. In one case, the field on the VSCF for the unit number for the three assisting deputies was left blank. In the 28 cases we reviewed for searches of persons under Subparagraph 54.k., there were 24 cases where the deputy's unit had another deputy assigned to the vehicle, or one or more other deputies or Posse members were on the scene. In 22 cases, the deputy properly documented the required information on the VSCF or the information was captured on the Assisting Deputy and Body-Worn Camera Log. In two cases, the deputies did not effectively document the serial numbers and unit numbers of the assisting deputies on the VSCF; and the assisting deputies did not prepare the Assisting Deputy and Body-Worn Camera Log. We encourage MCSO to provide guidance to supervisors to be attentive to this issue during their reviews of traffic stop documentation.

During our review, we identified two cases in which the deputies did not list the assisting deputies' names, serial numbers, and unit numbers on the VSCFs; however, the required information was documented on the Assisting Deputy and Body-Worn Camera Log.

In the last reporting period, MCSO attained a compliance rating of 97%. During this reporting period, MCSO attained a compliance rating of 92%. MCSO will remain in compliance with this requirement during this reporting period; however, MCSO will be required to attain a compliance rating of greater than 94% in the next reporting period to remain in compliance with this requirement.

Paragraph 54.b. requires MCSO to document the date, time, and location of the stop, recorded in a format that can be subject to geocoding. Our reviews of the CAD printout for all 105 traffic stops in our sample indicated that the date, time, and location is captured with the time the stop is initiated and the time the stop is cleared. In previous reporting periods, we noted instances where the GPS coordinates could not be located on the documentation received (CAD printout/I/Viewer). We contacted MCSO about this issue, and MCSO now provides us with the GPS coordinates via a separate document that lists the coordinates for the traffic stop sample we provide. MCSO uses GPS to determine location for the CAD system. GPS collects coordinates from three or more satellites to enhance the accuracy of location approximation. The data from the satellites can be decoded to determine the longitude and latitude of traffic stop locations should that be necessary. The CAD system was upgraded in 2014 to include geocoding of traffic stops. CID continues to provide us with a printout of all case numbers in the sample containing the associated coordinates. For this reporting period, the CAD or I/Viewer system contained the coordinates in 44% of the cases. In a separate spreadsheet, MCSO provided GPS coordinates for all 105 cases we reviewed, for 100% compliance with this portion of the Subparagraph.

WAI 39841

During our April 2016 site visit, we discussed with MCSO the possibility of using the CAD printout instead of the TraCS data to determine stop times. We determined that using the CAD system to determine stop end times created additional challenges. However, a decision was made to use the CAD printout to determine traffic stop beginning and ending times for data analysis. MCSO issued Administrative Broadcast 16-62 on June 29, 2016, which indicated that, beginning with the July 2016 traffic stop data collection, the stop times captured on the CAD system would be used for reporting and analytical purposes.

Occasionally, the CAD time of stop and end of stop time do not exactly match those listed on the Vehicle Stop Contact Form, due to extenuating circumstances the deputy may encounter. During this reporting period, we did not find any instances where the end time on the VSCF Contact differed significantly from the CAD printout. In monthly audits of traffic stop data, the Audits and Inspections Unit (AIU) reviews the beginning/ending times of the stops and requires that BIO Action Forms are generated by the Districts when there are discrepancies. The CAD system is more reliable than the VSCF in determining stop times, as it is less prone to human error. When the deputy verbally advises dispatch that s/he is conducting a traffic stop, the information is digitally time-stamped into the CAD system without human input; and when the deputy clears the stop, s/he again verbally advises dispatch.

MCSO remains in compliance with this Subparagraph.

Paragraph 54.c. requires MCSO to document the license plate and state of the subject vehicle. During this reporting period, we found that deputies properly recorded the vehicle tag number and state of issuance in each of 105 cases reviewed; however, there were two additional cases identified where the deputies did not prepare VSCFs, as required.

MCSO remains in compliance with this Subparagraph, with a compliance rate of 98%.

Paragraph 54.d. requires MCSO to document the total number of occupants in the vehicle when a stop is conducted. The VSCF, completed by the deputy on every traffic stop, is used to capture the total number of occupants and contains a separate box on the form for that purpose. EB-2 (Traffic Stop Data Collection) requires deputies to collect data on all traffic stops using the VSCF; this includes incidental contacts with motorists. During this reporting period, there were two additional stops identified that were not captured on the VSCF.

In 37 of the 105 traffic stops we reviewed, the driver had one or more passengers in the vehicle (52 total passengers). In all 37 of the cases, the deputies properly documented the total number of occupants in the vehicles.

With a compliance rate of 98%, MCSO remains in compliance with this Subparagraph.

Paragraph 54.e. requires MCSO to document the perceived race, ethnicity, and gender of the driver and any passengers, based on the deputy's subjective impression. (No inquiry into the occupant's ethnicity or gender is required or permitted.) In 37 of the 105 stops from the traffic stop data sample, there was more than one occupant in the vehicle (52 total passengers).

WAI 39842

Seventy-three, or 70%, of the 105 traffic stops involved White drivers.  Twenty-four, or 23%, of the 105 stops involved Latino drivers.  Five, or 5%, of the 105 traffic stops involved Black drivers.  Two, or 2%, of the 105 traffic stops involved Asian or Pacific Islander drivers.  Seventy-two traffic stops, or 69%, resulted in citations.  The breakdown of those motorists issued citations is as follows: 46 White drivers (64% of drivers who were issued citations); 18 Latino drivers (25% of drivers who were issued citations); and five Black drivers (7% of drivers who were issued citations.  Thirty-three, or 31%, of the 105 traffic stops we reviewed resulted in a written warning.  The breakdown of those motorists issued warnings is as follows: 27 White drivers (82% of the total who were issued warnings) and six Latino drivers (18% of the drivers who were issued warnings).

In our sample of 30 traffic stops that contained body-worn camera recordings, we identified one stop in which the deputy did not accurately document the race/ethnicity of the driver.

- A female driver was stopped for a stop sign violation.  The driver's race/ethnicity and gender was listed as a White female on the VSCF.  The driver had a Hispanic surname.  Based on a review of the body-worn camera recording of the stop, we determined that the driver should have been listed as a Latina.  There was a passenger in the vehicle, who was listed as a White male on the VSCF; however, due to the vehicle having dark tinted windows, we were unable to clearly view the passenger.  We will discuss this case with MCSO during our next site visit.

In our review of cases in relation to Paragraph 54.k., we identified one stop relevant to this requirement.

- A male driver was stopped for driving with no visible license plate.  Upon approaching the vehicle, the deputy noted that a temporary license plate was in the rear window.  The temporary license plate was expired.  The driver's license was suspended, and an outstanding warrant existed for his arrest.  The driver was arrested.  The deputy listed the driver as a White male on the VSCF.  A review of the Incident Report reveals the deputy listed the driver's ethnicity as Hispanic or Latino.  The driver's surname was Hispanic.  Based on a review of the body-worn camera recording of the stop, we determined that the driver should have been listed as a Latino.

In addition, during this reporting period, we identified two additional traffic stops that were not documented on the VSCF.

This Paragraph requires deputies to document the perceived race, ethnicity, and gender of any passengers whether contact is made with them or not.  By way of our previous reviews as well as AIU's inspections, MCSO has learned of deputies' failure to properly document the race or ethnicity of passengers.  MCSO's policy does not require that the names of passengers be documented unless a passenger is contacted and the deputy requests and obtains the identity of the passenger.  In such instances, the passenger's name and the reason for the contact is required to be documented on the VSCF and an Incidental Contact Receipt.

WAI 39843

We have noted that MCSO has improved the accuracy of documenting the perceived race or ethnicity of drivers and passengers; however, we encourage MCSO to take corrective action promptly when the information is not documented properly.

MCSO remains in compliance with this requirement.

Paragraph 54.f. requires that MCSO record the name of any individual upon whom the deputy runs a license or warrant check (including the subject's surname). In addition, MCSO's policy requires that deputies perform a license plate check on each vehicle stopped by its deputies, as well as warrant checks on every driver stopped by its deputies. During the last several quarters, our reviews found that deputies recorded the name of each driver and passenger on the VSCF in each instance that a driver's license or warrant check was run. However, during this reporting period, there were two additional cases where drivers/vehicles were stopped and VSCFs were not prepared. In each case, the deputies stopped two vehicles simultaneously. In each of those two cases, only one VSCF was prepared which contained the required information for one of the drivers. The deputies did not prepare VSCFs for the other two drivers who were stopped.

For this reporting period, we found that of the 105 traffic stops we reviewed, 104 included a check on the license plate; in one case, the vehicle did not have a license plate. There were 97 stops where the deputies ran warrant checks on the drivers. During its monthly inspections of the traffic stop data, BIO also identifies stops in which a warrant check was not run on the drivers. AIU requests that the Districts prepare BIO Action Forms in such cases.

MCSO's compliance rate with this requirement is 98%. MCSO remains in compliance with this Subparagraph.

Paragraph 54.g. requires the deputy to document whether contact was made with any passengers, the nature of the contact, and the reasons for the contact. Due to the low number of cases where contact is made with passengers in our sample of 105 traffic stop cases per quarter, we pulled an additional sample of 10 cases each month for those cases involving passenger contacts. For this reporting period, we reviewed 30 traffic stops where the deputy had interaction with one or more passengers. Each passenger contact is described in detail below. All passenger contacts in the traffic stops we reviewed for Paragraph 25.d. were noted in the VSCFs.

To ensure that deputies are accurately capturing passenger information and to verify if passengers are contacted, we compare the number of passengers listed by the deputy with the number of passengers entered in the passenger drop-down box on the Vehicle Stop Contact Form. We also review any Incidental Contact Receipts issued to passengers by deputies. We also review the deputies' notes on the VSCF, the Arizona Citation, and the CAD printout for any information involving the passengers. We reviewed MCSO's I/Viewer System and the Justice Web Interface (JWI) to verify if a record check was requested for the driver or any passengers.

WAI 39844

In our experience, the vast majority of traffic stops do not require contact with a passenger unless the driver is arrested, the vehicle will be towed, or there are minor children in the vehicle that will need care. The other type of traffic stop where we noted that deputies routinely contact passengers is when upon approaching a vehicle, the deputy detects the smell of burnt marijuana. In the stops we reviewed where this has occurred, deputies have inquired if the driver or any passengers possess a medical marijuana card. In other instances, the deputy may, for safety purposes, approach the vehicle from the passenger side, which often results in contact with the passenger who may be seated in the front seat.

Of the 30 cases identified for this Paragraph, there were 20 cases in which the passengers and the deputies either engaged in general conversation, or the passengers assisted by providing vehicle paperwork to the deputies; the deputy provided stickers to children; the deputy ensured that the passenger had arranged a ride from the scene due to the driver being arrested; the deputy advised the passenger to wear a seat belt (no identification was requested/obtained); the deputy inquired as to whether a passenger wanted Fire Rescue to respond as the passenger was en route to the hospital; the deputies inquired as to whether the passengers possessed valid driver's licenses and the response was "no." In four cases, the passenger assisted with language interpretation between the deputy and the driver. In the remaining six instances where MCSO made contact with passengers, the following occurred:

- A White male driver was stopped for driving with an invalid license plate. The vehicle was occupied by a White male passenger. The passenger was contacted by the deputy for failing to wear a seat belt. The passenger was issued a warning for the violation. The driver was issued a warning for failing to produce a registration.

- A Latino driver was stopped while operating an All-Terrain Vehicle in a prohibited area. The vehicle was occupied by three Latino passengers. One of the passengers was in possession of an open alcoholic beverage. The deputy obtained that passenger's identification and issued a citation for open alcohol in a motor vehicle. The driver was issued a citation for driving in a prohibited area.

- A White male driver was stopped for driving with an invalid license plate. The vehicle was occupied by a White female passenger. The passenger was contacted by the deputy for failing to wear a seat belt. The passenger was issued a warning for the violation. The driver was issued a warning for failing to produce a registration.

- A Black male drive was stopped for driving with one headlight. The vehicle was occupied by a Latina passenger. The driver was arrested for possession of narcotics and an outstanding warrant. The passenger was provided a courtesy ride home by an assisting deputy. The passenger's name was run for wants/warrants. The passenger was provided with an Incidental Contact Receipt.

WAI 39845

- A White male driver was stopped for a stop sign violation.  The vehicle was occupied by two White male passengers.  The driver was arrested for Driving Under the Influence.  One of the passengers was contacted to determine if he had a valid driver's license and to determine whether he was sober.  The passenger's name was run for wants/warrants.  The passenger was not provided with an Incidental Contact Receipt.

- A White male was stopped for driving with an invalid license plate.  The vehicle was occupied by a White female passenger.  The valid license plate was located in the trunk of the vehicle.  The driver's license was expired.  The passenger was contacted to determine whether she had a valid driver's license.  The passenger's name was run for wants/warrants.  The passenger was not provided with an Incidental Contact Receipt.

There were four cases identified in the stops that we reviewed for Paragraph 54.k in which the passengers were contacted.  In one case, the driver was contacted to arrange for transportation from the stop location after the driver was arrested.  In the remaining three instances where MCSO made contact with passengers, the following occurred:

- A Latino driver was stopped for speeding and reckless driving.  The deputy observed the Latino driver and the Latina passenger switch seats while the vehicle was moving on the roadway as the deputy initiated the traffic stop.  As the deputy approached the driver's side of the vehicle, the Latina was now seated in the driver's seat.  The Latino driver did not have any identification on his person.  The deputy subsequently discovered that the Latino's driver's license was suspended.  The vehicle was towed and impounded.  The Latino driver was issued a citation for speeding, reckless driving, driving with a suspended driver's license and no insurance.  The Latina driver was issued a citation for reckless driving and no insurance.

- A White male driver was stopped for a red-light violation.  The vehicle was occupied by a White male passenger and a White female passenger.  The driver did not have any identification on his person.  During the stop, the deputy detected the smell of burnt marijuana.  The deputy conducted an investigation and subsequently seized marijuana and narcotic paraphernalia from the vehicle.  The White male passenger, the vehicle's registered owner, was intoxicated.  The rear seat passenger was contacted to verify if she had a valid driver's license.  The deputy issued the driver a citation for the red-light violation and the deputy prepared a report for the review of the Maricopa County Attorney's Office for potential criminal charges in relation the possession of narcotics and narcotic paraphernalia.  The White female passenger was not provided with an Incidental Contact Receipt.

- A Latina passenger was stopped for a red-light violation.  The vehicle was occupied by two White males.  During the stop, the deputy detected the odor of marijuana and inquired if any of the occupants of the vehicle were in possession of marijuana.  The front seat passenger admitted to being in possession of marijuana.  After further investigation, the passenger was arrested for possession of narcotics and an outstanding warrant.

WAI 39846

There was one case identified in the stops that we reviewed for Paragraphs 25 and 54 in which the passenger was contacted:

- A White female was stopped for operating a vehicle with no headlights. The vehicle was occupied by a White female passenger. The driver produced a driver's license; however, the deputy determined that the license was expired. The deputy contacted the passenger to determine if she had a valid driver's license to operate the vehicle. The passenger was issued an Incidental Contact Receipt. The driver was issued a citation for driving with an expired driver's license.

As noted in some of the cases above, deputies have not been consistent in preparing and providing passengers with Incidental Contact Receipts during traffic stops in which the passenger is contacted and asked by the deputy to provide identification. Supervisors should identify such omissions during their reviews of the VSCFs and take corrective action. During previous site visits, we discussed with MCSO that we have noted an increase in the number of passengers being contacted and not being provided with an Incidental Contact Receipt. MCSO has informed us that the TraCS system has been modified so that when a deputy prepares the Vehicle Stop Contact Form and utilizes the passenger contact field, a prompt will appear to instruct the deputy to prepare the Incidental Contact Receipt. The addition of this prompt will hopefully resolve this issue and reinforce MCSO's policy requirement as it relates to the form. During the third quarter of 2018, MCSO provided the Incidental Contact Receipt when required in 36% of the cases. During the last reporting period, MCSO provided the Incidental Contact Receipt when required in 13% of the cases. In this reporting period, there were four stops that resulted in the passengers being issued a warning or citation during the deputies' contact with the passengers; and one stop that resulted in the passenger being arrested. There were five stops that required deputies to provide an Incidental Contact Receipt to the passengers. During this reporting period, MCSO provided the Incidental Contact Receipt when required in 40% of the cases. MCSO is not in compliance with this Subparagraph.

Paragraph 54.h. requires deputies to record, prior to the stop, the reason for the vehicle stop, including a description of the traffic or equipment violation observed, and any indicators of criminal activity developed before or during the stop. For this reporting period, we identified a random sample of 10 cases from the 35 cases we initially requested each month, and requested CAD audio and body-worn camera (BWC) footage for those cases. We listened to CAD dispatch audio recordings, reviewed the CAD printouts, and reviewed body-worn camera recordings for 30 traffic stops from the sample of 105 traffic stops used for this review; and found that the deputies advised Communications of the reason for the stop, location of the stop, license plate, and state of registration for all 30 stops.

For the remaining 75 traffic stops where body-worn camera recordings and CAD audiotapes were not requested, we review the CAD printout and the VSCF to ensure that the reason for the stop has been captured. These forms are included in our monthly sample requests. The dispatcher enters the reason for the stop in the system as soon as the deputy verbally advises Communications of the stop, location, and tag number. The VSCF and the CAD printout

WAI 39847

documents the time the stop begins and when it is concluded – either by arrest, citation, or warning.  Deputies need to be precise when advising dispatch of the reason for the traffic stop, and likewise entering that information on the appropriate forms.

MCSO's compliance rating for this Subparagraph is 100%.

Paragraph 54.i. requires deputies to document the time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; the time a release was made without a citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere, or the deputy's departure from the scene.  In our review of the documentation provided by MCSO, the CAD printouts, the Vehicle Stop Contact Forms, along with the E-Ticketing system and the Arizona Ticket and Complaint Form, the information required is effectively captured.   As we noted in Subparagraph 54.b., the stop times on the CAD printout and the Vehicle Stop Contact Form vary slightly on occasion.  We understand that this may occur due to extenuating circumstances, and we will report on those instances where there is a difference of five minutes or more from either the initial stop time or the end time.

We review the circumstances of each stop and the activities of the deputies during each stop to assess whether the length of the stop was justified.  During this reporting period, we did not identify any stops that were extended for an unreasonable amount of time.

Supervisors conducted timely reviews and discussions of 103 of the 105 VSCFs reviewed. Deputies accurately entered beginning and ending times of traffic stops in 105 of the 105 cases that we reviewed.  MCSO accurately entered the time citations and warnings were issued in all 105 cases.

MCSO remains in compliance with this Subparagraph.

Paragraph 54.j. requires MCSO to document whether any inquiry as to immigration status was conducted and whether ICE/CBP was contacted, and if so, the facts supporting the inquiry or contact with ICE/CBP, the time supervisor approval was sought, the time ICE/CBP was contacted, the time it took to complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual.

On November 7, 2014, a United States District Court Judge issued an Order permanently enjoining enforcement of Arizona Revised Statute (A.R.S.) 13-2319, commonly referred to as the Arizona Human Smuggling Act.  On November 17, 2014, MCSO issued Administrative Broadcast 14-75, prohibiting deputies from enforcing the above state statute, including arresting, detaining, or questioning persons for suspected (or even known) violations of the act and from extending the duration of traffic stops or other deputy-civilian encounters to do so.

We reviewed 105 traffic stops submitted for this Paragraph, and found that none of the stops involved any contacts with ICE/CBP.  None of the stops we reviewed involved any inquires as to immigration status.   In addition, our reviews of Incident Reports and Arrest Reports conducted as part of the audits for Paragraphs 89 and 101 revealed no immigration status investigations.  MCSO remains in compliance with this Subparagraph.

WAI 39848

Paragraph 54.k. requires MCSO to document whether any individual was asked to consent to a search (and the response), whether a probable-cause search was performed on any individual, or whether a pat-and-frisk search was performed on any individual. During our January 2018 site visit, we discussed with MCSO whether any other method may be feasible to identify a larger population of searches of individuals specific to the requirements of this Paragraph. MCSO's response was that the current method is appropriate, and that there may be more cases identified once deputies properly document the searches of persons consistent with this Paragraph. We encourage MCSO to continue to explore methods to identify the overall population of cases that fit the criteria of this Paragraph. Due to the limited number of cases being identified that fit the criteria of this Paragraph, MCSO's rate of compliance continues to stagnate.

MCSO's Compliance Report for the 19th Quarter reporting period indicates that MCSO is considering a policy revision and training opportunities for deputies to assist them to better identify and document searches of persons. We continue to recommend that MCSO implement training to ensure that deputies properly document consent searches of persons, probable-cause searches of persons, and pat-and-frisk searches of persons.

The method MCSO currently employs to identify our sample of cases to review is to identify the population of all traffic stops in which searches of individuals were documented on the VSCF. Once that population is identified, a random sample of 10 traffic stops from each month (30 total for the reporting period) is identified and reviewed. In addition, we also review any cases in which the deputies performed searches of individuals in the sample of 105 traffic stops reviewed in relation to Paragraphs 25 and 54 and the sample of 30 traffic stops reviewed in relation to Subparagraphs 25.d. and 54.g. Generally, we review 165 traffic stops each reporting period to identify stops where a deputy may have performed a search of an individual specific to the requirements of this Subparagraph. However, in some instances, there are some stops that are reviewed for compliance in relation to both Paragraph 54.k and Subparagraphs 25.d. and 54.g., which means that total number of traffic stops reviewed would be less than 165. When we identify issues that impact compliance or where MCSO policy was not followed, we discuss those cases with MCSO during our site visits. There was one case that met these criteria in our sample of 105 traffic stops reviewed in relation to Paragraphs 25 and 54.

- A White male driver was stopped for driving with no headlights activated. The deputy detected the odor of marijuana and conducted an investigation to determine the source. The deputy informed the driver that a search of the vehicle was going to be conducted. Prior to conducting a search of the vehicle, the deputy conducted a pat-and-frisk of the driver prior to having the driver seated in the rear of the patrol vehicle. The deputy incorrectly listed the type of search as a "Jail-Pat-Down."

In relation to the sample of 29 traffic stops reviewed in relation to Subparagraph 54.k, there were two stops identified that met the criteria of this Subparagraph.

- A Black male driver was stopped for a stop-sign violation. The deputy detected the odor of marijuana. The deputy documented on the VSCF that the search of the driver was conducted after having requested and obtained consent to conduct the search; however, a

WAI 39849

review of the body-worn camera recording revealed that consent was not requested, nor obtained.  The deputy conducted a search of the vehicle as well.

- A White male driver was stopped for a red-light violation.  The vehicle was occupied by a White male passenger and a White female passenger.  The deputy detected the odor of marijuana.  The deputy documented on the VSCF that a *Terry* pat-down search of the driver was conducted after having requested and obtained consent to conduct the search. However, a review of the body-worn camera recording revealed that consent was not requested, nor obtained.

There was one additional stop where the VSCF indicated that a consent search was conducted of the driver's person.  The stop involved a White male driver who was stopped for speeding.  As the deputy approached the vehicle, the driver respectfully announced that he was in possession of a firearm.  The driver indicated that the weapon was in his right hip area and his wallet was in his right rear pocket.  The deputy requested the driver to exit the vehicle.  After the driver exited the vehicle, the deputy advised the driver that he would take custody of the weapon until the stop was concluded; and the driver appeared to be agreeable with that action being taken.  The deputy then confiscated the weapon from the driver.  The driver was issued a warning, and his handgun was returned to him.  While this does not appear to be a consent search as defined by MCSO policy, the actions of the deputy appeared appropriate.

In the sample of 30 traffic stops identified in relation to Subparagraphs 25.d and 54.g., there no stops that met the criteria specific to searches of individuals.  The cases reviewed involved searches of individuals incident to arrest.

MCSO has indicated that it does not require its deputies to use Consent to Search Forms as the primary means for documenting consent searches.  MCSO requires that deputies document requests to conduct consent searches by way of video-recording the event via the BWCs.  In the event the BWC is not operational, MCSO policy requires deputies to document requests to conduct consent searches on the Consent to Search Form.  MCSO reports that deputies have electronic access to the Consent to Search Forms.  We continue to recommend that MCSO revisit the requirements of this section of the policy and require deputies to read the Consent to Search Form to the subject and require a signature from the individual for every request for consent to search unless the search is an actual search incident to arrest.  Due to the small population of cases that we and MCSO identified, it is important that deputies accurately document each search and/or request to a consent search, as required by this Subparagraph, to attain and maintain compliance with the requirement.  As we have noted in previous reporting periods, it appears that some deputies are not aware of the policy requirements as it relates to informing individuals that a consent search may be refused; or, if granted, that the consent search may be revoked by the individual at any time.  We consider this to be a core issue and one that can be remediated easily by the Office.  We recommend that MCSO implement training on the specific policy requirements regarding consent searches.

WAI 39850

In the last reporting period of 2017, MCSO's compliance rate with this Subparagraph was 67%, with only three cases identified. During the first reporting period of 2018, we identified only one case that was applicable to this requirement and determined that the compliance status would be deferred. Due to the low number of cases identified in the second reporting period of 2018, coupled with the inaccuracies in the some of the cases that were reviewed, we again determined that the compliance status would be deferred. During the third reporting period of 2018, MCSO's compliance rate was 71%. Due to the low number of cases identified during the fourth reporting period of 2018, we deferred our compliance assessment. Due to the low number of cases and the issues identified in the three stops reviewed during this reporting period, we are again deferring our compliance assessment.

Paragraph 54.l. requires MCSO to document whether any contraband or evidence was seized from any individual, and the nature of the contraband or evidence. Of a total sample of 164 stops reviewed for this reporting period, which includes 105 stops for Paragraph 25; 29 stops for Subparagraph 54.k.; and 30 stops for Subparagraphs 25.d and 54.g., there were 27 cases identified in which MCSO deputies documented the seizure of contraband or evidence on the VSCFs. There were four cases where the deputies did not properly document the seizure of contraband or evidence on the VSCF. A summary of the cases is listed below.

During our review of the collected traffic stop data (our sample of 105) during this reporting period, we identified four cases in which license plates were seized by deputies and placed into evidence. In one case, the deputy seized a driver's license and placed the item into evidence. In one case, a deputy seized narcotic paraphernalia placed the item into evidence.

In the 29 cases we reviewed for searches of individuals under Subparagraph 54.k., the following items were seized by deputies and placed into evidence or safekeeping. In 10 cases, deputies seized driver's licenses and placed the items into evidence; however, in three of those cases the deputies did not document the seizures of the driver's licenses on the VSCFs. In three cases, the deputies seized narcotics and narcotics paraphernalia and placed the items into evidence. In two cases, the deputies seized narcotics paraphernalia and placed the items into evidence. In one case, the deputy seized narcotics and placed the item into evidence.

In the 30 cases we reviewed for passenger contacts under Subparagraph 54.g., there was one case in which deputy seized a driver's license and placed the item into evidence. In one case, a deputy seized a driver's license, a license plate and narcotics and placed the items into evidence. In two cases, deputies seized license plates and placed the items into evidence.

We noted in the previous reporting periods an increase in the number of errors and omissions in relation to deputies documenting the seizure of contraband or evidence on the VSCF. MCSO's compliance rate in the second reporting period of 2018 was 85%, and we reported that MCSO would remain in compliance with this Subparagraph for that reporting period. We also reported that MCSO would be required to attain a rate of compliance of greater than 94% to maintain compliance for the third reporting period of 2018; however, MCSO attained a compliance rate of 70% for that reporting period and MCSO was determined to not be in compliance with this Subparagraph. During the last reporting period, MCSO attained a compliance rate of 96%.

WAI 39851

During this reporting period, MCSO attained a compliance rate of 87%. MCSO will remain in compliance with this Subparagraph for this reporting period. We caution the agency to be vigilant in requirements that fall in, and out, of compliance. Previous adherence accomplishments that subside should easily be corrected by more robust supervision. However, MCSO is required to attain a rate of compliance of greater than 94% to maintain compliance during the next reporting period. MCSO remains in compliance with this requirement.

Paragraph 54.m. requires the documentation of the final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without a citation. In all 105 cases we reviewed, we found documentation indicating the final disposition of the stop; and whether the deputy made an arrest, issued a citation, issued a warning, or made a release without a citation. MCSO remains in compliance with this Subparagraph.

***Paragraph 55.*** *MCSO shall assign a unique ID for each incident/stop so that any other documentation (e.g., citations, incident reports, tow forms) can be linked back to the stop.*

**In Full and Effective Compliance**

To verify compliance for this Paragraph, we reviewed a sample of the Vehicle Stop Contact Forms, CAD printouts, I/Viewer documentation, citations, warning forms, and any Incident Report that may have been generated as a result of the traffic stop.

The unique identifier "went live" in September 2013 when the CAD system was implemented. This number provides the mechanism to link all data related to a specific traffic stop. The number is automatically generated by the CAD software and is sent to the deputy's MDT at the time the deputy advises Communications of the traffic stop. The unique identifier is visible and displayed at the top of the CAD printout and also visible on the Vehicle Stop Contact Form, the Arizona Traffic Citation, and the Warning/Repair Form.

We visited Districts 1 and 3 during our April 2019 site visit; and found no indications from any personnel that there were recurring issues with the unique identifier, including duplicates. Once the deputy scans the motorist's driver's license, the system automatically populates most of the information into one or more forms required by the Order. If the data cannot be entered into TraCS from the vehicle (due to malfunctioning equipment), policy requires the deputy to enter the written traffic stop data electronically prior to the end of the shift. The start and end times of the traffic stop are now auto-populated into the Vehicle Stop Contact Form from the CAD system.

Since our first visit for monitoring purposes in June 2014, TraCS has been implemented in all Districts; and the unique identifier (CFS number) is automatically entered from the deputy's MDT. No user intervention is required.

WAI 39852

To determine compliance with this requirement, we reviewed 105 traffic stop cases and reviewed the CAD printouts and the Vehicle Stop Contact Forms for all stops. We reviewed the Warning/Repair Forms, when applicable, for those stops where a warning was issued or the vehicle had defective equipment. The unique identification number assigned to each event was listed on correctly on all CAD printouts for every stop.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 56.** *The traffic stop data collection system shall be subject to regular audits and quality control checks. MCSO shall develop a protocol for maintaining the integrity and accuracy of the traffic stop data, to be reviewed by the Monitor pursuant to the process described in Section IV.*

**Phase 1:** Not in compliance

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.
- EIU Operations Manual, currently under revision.

**Phase 2:** Not in compliance

To verify compliance for this Paragraph, we reviewed the monthly audits of the traffic stop data conducted by BIO on the monthly samples we select. While audits require in-depth analysis, our quality control checks serve as more of an inspection or spot-check of traffic stop data. We reviewed the BIO traffic stop audits for the January 1-March 31, 2019 time period and found that the audits were thorough and captured most deficiencies. During our review of the sample dataset, we identified additional deficiencies, and brought them to the attention of CID while onsite during our April 2019 site visit; we identify them in other areas of this report.

We reviewed the draft EIU Operations Manual, which includes procedures for traffic stop data quality assurance. During our April 2019 site visit, EIU provided an update about the status of its effort to complete the EIU Operations Manual. Of the total 31 sections in the EIU Operations Manual, seven sections are currently under development or review. The remaining sections have been approved. We note that some sections of the EIU Operations Manual cannot be finalized in the near term, as they required finalizing methodologies related to annual and monthly analyses of traffic stop data (TSAR and TSMR, respectively) in accordance with the requirements of Paragraphs 66 and 67. (See below.) We continue to encourage MCSO to submit completed sections of the EIU Operations Manual for review and approval to enable Phase 1 compliance with those Paragraphs covered by those sections of the operations manual.

On September 8, 2015, MCSO issued Administrative Broadcast 15-96, which addressed the security of paper traffic stop forms. The procedure requires that paper forms (prior to April 1, 2014) be stored in a locked cabinet box at the District. The protocol also includes traffic stop data that may be handwritten by deputies in the field if the TraCS system is nonoperational due

WAI 39853

to maintenance or lack of connectivity.  Any personnel who require access to those files must contact the Division Commander or his/her designee who will unlock the cabinet.  Once the deputy accesses his file, a TraCS file log must be completed and signed by the deputy.  During our April 2019 visits to the Districts, we inspected the written (hardcopy) files and verified that all records were locked and secure, that logs were properly maintained, and that only authorized personnel had access to these files.

MCSO began auditing traffic stop data in January 2014; and since April 2014, MCSO has conducted audits of the data monthly and provided those results to us.  We reviewed BIO's monthly audits of the traffic samples from January 1-March 31, 2018, and found them to be satisfactory.  MCSO conducts audits of the 105 traffic stop sample that we request each reporting period.  It also conducts a more expansive review of 30 of the 105 sample pulls we request each reporting period to include passenger contacts and persons' searches.  EB-2 also requires regularly scheduled audits of traffic stop data on a monthly basis.

To achieve Phase 1 compliance with this Paragraph, MCSO must finalize the EIU Operations Manual to cover all matters applicable to this Paragraph.  To achieve Phase 2 compliance with this Paragraph, MCSO must demonstrate ongoing use of the procedures to ensure traffic stop data quality assurance.

**Paragraph 57.**  *MCSO shall explore the possibility of relying on the CAD and/or MDT systems to check if all stops are being recorded and relying on on-person recording equipment to check whether Deputies are accurately reporting stop length.  In addition, MCSO shall implement a system for Deputies to provide motorists with a copy of non-sensitive data recorded for each stop (such as a receipt) with instructions for how to report any inaccuracies the motorist believes are in the data, which can then be analyzed as part of any audit.  The receipt will be provided to motorists even if the stop does not result in a citation or arrest.*

**Phase 1:**  In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- GJ-35 (Body-Worn Cameras), most recently amended on January 7, 2017.

**Phase 2:**  In compliance

To verify compliance for this Paragraph, we reviewed all TraCS forms for each traffic stop that were included in the sample.  In addition, we reviewed a subset of CAD audio recordings and body-worn camera footage of the stops.

WAI 39854

The system for providing "receipts" is outlined in EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) and EB-2 (Traffic Stop Data Collection). GJ-35 addresses the requirement that supervisors review recordings to check whether deputies are accurately reporting stop length. In addition to GJ-35, BIO developed a Body-Worn Camera Matrix for its inspectors to review camera recordings.

The deputy should provide every person contacted on a traffic stop with an Arizona Traffic Ticket or Complaint (Citation), a Written Warning/Repair Order (Warning), or an MCSO Incidental Contact Receipt. To verify compliance that the violator received the required "receipt" from the deputy, a signature is required, or, if the violator refuses to sign, the deputy may note the refusal on the form. We are unable to verify that motorists have been issued a receipt without a signature on the form, or the deputy advising of the refusal of the receipt from the driver. Placing "SERVED" in the signature box without any explanation does not comply with the requirement. There have been instances where MCSO has provided copies of the Arizona Traffic Ticket or Complaint and a signature from the driver was absent; however, based on our review of the body-worn camera recording we observed the signature being obtained from the driver. For this reporting period, deputies issued citations or written warnings in all of the 105 cases we reviewed.

We did not identify any issues with the citations, warning and Incidental Contact Receipts issued to drivers for the cases reviewed under Subparagraph 54.k. We identified one case reviewed under Subparagraph 54,g., where the deputy conducted a traffic stop for a violation of the High-Occupancy Vehicle Lane, which requires a vehicle to have more than one occupant to use the lane. Upon stopping the vehicle, the deputy believed the driver was the only occupant; however, upon approaching the vehicle he observed that the vehicle had two occupants. The deputy then advised the driver to leave. The deputy did not obtain the driver's license or vehicle paperwork. The deputy then prepared an Incidental Contact Receipt; however, the driver was not provided with the document. The stop involved an Asian or Pacific Islander driver and an Asian or Pacific Islander passenger. We will discuss this case with MCSO during our next site visit. Additionally, in another case reviewed under Subparagraph 54,g., we identified one stop where the deputy stopped a White male driver for driving with no tail lights activated. The vehicle was occupied by a White female passenger. Prior to the conclusion of the stop, the deputy was alerted by a citizen of a traffic crash nearby involving an injury. As a result, the deputy returned the driver his vehicle information and driver's license and advised him that he would receive a contact form in the mail. The deputy then immediately responded to the traffic crash scene. The deputy later prepared an Incidental Contact Receipt, which was provided to us for our review. Due to the exigent circumstances involved in this case, we determined that the deputy's actions were appropriate.

MCSO's compliance rate with this requirement is 98%. MCSO remains in compliance with this portion of the Subparagraph.

WAI 39855

The approved policies dictate that the CAD system will be used for verification of the recording of the initiation and conclusion of the traffic stop and that MCSO will explore the possibility of relying on the BWC recordings to verify that the stop times reported by deputies are accurate. The deputy verbally announces the stops initiation and termination on the radio, and then CAD permanently records this information. In May 2016, MCSO advised us that all deputies and sergeants who make traffic stops had been issued body-worn cameras and that they were fully operational. We verified this assertion during our July 2016 site visit; and since that time, we have been reviewing the BWC recordings to determine if stop times indicated by CAD were accurate. MCSO's Audit and Inspections Unit (AIU) conducts monthly inspections of traffic stop data, which includes an assessment as to whether the BWC video captured the traffic stop in its entirety; to verify the time the stop began; and to verify if all information on forms prepared for each traffic stop match the BWC video. AIU conducts reviews of 30 body-worn camera recordings each reporting period.

During this reporting period, we requested from MCSO 30 body-worn camera recordings for our review. We are able to use the BWC recordings that were provided for each stop to assess whether deputies are accurately reporting the stop length. The compliance rate for the sample of 30 cases selected from the 105 for using the BWC to determine if deputies are accurately reporting stop length is 100%. MCSO remains in compliance with this requirement.

**Paragraph 58.** *The MCSO shall ensure that all databases containing individual-specific data comply with federal and state privacy standards governing personally identifiable information. MCSO shall develop a process to restrict database access to authorized, identified users who are accessing the information for a legitimate and identified purpose as defined by the Parties. If the Parties cannot agree, the Court shall make the determination.*

**Phase 1:** In compliance

- GF-1 (Criminal Justice Data Systems), most recently amended on January 9, 2018.

- GF-3 (Criminal History Record Information and Public Records), most recently amended on February 20, 2019.

**Phase 2**: In compliance

WAI 39856

To verify compliance for this Paragraph, we reviewed the applicable policies and met with Technology Management Bureau personnel to determine if any unauthorized access and/or illegitimate access to any of MCSO's database systems had occurred during this reporting period. The policies state that the dissemination of Criminal History Record Information (CHRI) is based on federal guidelines, Arizona statutes, the Department of Public Safety (ASDPS), and the Arizona Criminal Justice Information System (ACJIS); and that any violation is subject to fine. No secondary dissemination is allowed. The policies require that the Professional Standards Bureau (PSB) provide written notification to the System Security Officer whenever it has been determined that an employee has violated the policy by improperly accessing any Office computer database system. Every new recruit class receives three hours of training on this topic during initial Academy training.

During our April 2019 site visit, we inquired whether there had been any instances of unauthorized access to and/or any improper uses of the database systems. MCSO informed us that there had been no reports of any unauthorized access to and/or improper uses of MCSO's database systems during this reporting period. MCSO remains in compliance with this requirement

***Paragraph 59.*** *Notwithstanding the foregoing, the MCSO shall provide full access to the collected data to the Monitor and Plaintiffs' representatives, who shall keep any personal identifying information confidential. Every 180 days, MCSO shall provide the traffic stop data collected up to that date to the Monitor and Plaintiffs' representatives in electronic form. If proprietary software is necessary to view and analyze the data, MCSO shall provide a copy of the same. If the Monitor or the Parties wish to submit data with personal identifying information to the Court, they shall provide the personally identifying information under seal.*

**In Full and Effective Compliance**

Electronic traffic stop data capture began on April 1, 2014. The forms created by MCSO capture the traffic stop details required by MCSO policy and Paragraphs 25 and 54. BIO provides the traffic stop data on a monthly basis, which includes a spreadsheet of all traffic stops for the reporting period, listing Event Numbers as described at the beginning of Section 7. All marked patrol vehicles used for traffic stops are now equipped with the automated TraCS system, and all Patrol deputies have been trained in TraCS data entry. MCSO has provided full access to all available electronic and written collected data since April 1, 2014. MCSO did not collect electronic data before this time. During this reporting period, MCSO has continued to provide full access to the traffic stop data.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 39857

### b. Electronic Data Entry

**Paragraph 60.** *Within one year of the Effective Date, the MCSO shall develop a system by which Deputies can input traffic stop data electronically. Such electronic data system shall have the capability to generate summary reports and analyses, and to conduct searches and queries. MCSO will explore whether such data collection capability is possible through the agency's existing CAD and MDT systems, or a combination of the CAD and MDT systems with a new data collection system. Data need not all be collected in a single database; however, it should be collected in a format that can be efficiently analyzed together. Before developing an electronic system, the MCSO may collect data manually but must ensure that such data can be entered into the electronic system in a timely and accurate fashion as soon as practicable.*

### In Full and Effective Compliance

To verify compliance with this Paragraph, we reviewed the documents generated electronically that capture the required traffic stop data. The electronic data entry of traffic stop data by deputies in the field went online on April 1, 2015. If TraCS experiences a malfunction in the field, there is a protocol that requires the deputy to electronically enter the traffic stop data prior to the end of the shift.

MCSO continues to conduct monthly traffic stop inspections and forwards them for our review. Initially, the traffic stop data was captured on handwritten forms created by MCSO, completed by the deputy in the field, and manually entered in the database by administrative personnel located at each District. Now all traffic stop data is entered electronically, whether in the field or at MCSO District offices. Occasionally, connectivity is lost in the field due to poor signal quality, and citations are handwritten. Per policy, deputies must enter electronically any written traffic stop data they have created by the end of the shift in which the event occurred. As noted in our Paragraph 90 review, VSCFs are routinely entered into the system by the end of the shift. During our April 2019 site visit, we met with MCSO and the Parties; and reviewed the deficiencies BIO and our reviews discovered for this reporting period, along with the results of the Action Forms generated by BIO.

Deputies have demonstrated their ability to access and use TraCS, as evidenced by the fact that their total time on a traffic stop averages 16 minutes or less.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 39858

### c. Audio-Video Recording of Traffic Stops

**Paragraph 61.**   *The MCSO will issue functional video and audio recording equipment to all patrol deputies and sergeants who make traffic stops, and shall commence regular operation and maintenance of such video and audio recording equipment.   Such issuance must be complete within 120 days of the approval of the policies and procedures for the operation, maintenance, and data storage for such on-person body cameras and approval of the purchase of such equipment and related contracts by the Maricopa County Board of Supervisors.   Subject to Maricopa County code and the State of Arizona's procurement law, The Court shall choose the vendor for the video and audio recording equipment if the Parties and the Monitor cannot agree on one.*

**Phase 1:**  In compliance

- GJ-35 (Body-Worn Cameras), most recently amended on January 7, 2017.

**Phase 2:**  In compliance

During our September 2014 site visit, we met with two MCSO Deputy Chiefs and other personnel to discuss MCSO's progress of acquiring in-car video and audio equipment for all patrol vehicles used to conduct traffic stops.  MCSO had initially set out to purchase fixed in-car cameras as required by the Order, but expressed an interest in acquiring body-worn video and audio recording devices for deputies.   The Court issued an Order providing an amendment/stipulation on October 10, 2014, requiring on-body cameras.  This was a prudent decision, in that it allows for capturing additional data, where a fixed mounted camera has limitations.   We have documented MCSO's transition from in-car to body-worn cameras (BWC) in our previous quarterly status reports.

Records indicate that MCSO began distribution of body-worn cameras on September 14, 2015, and full implementation occurred on May 16, 2016.  The BWC recordings are stored in a cloud-based system (on evidence.com) that can be easily accessed by supervisors and command personnel.  The retention requirement for the recordings is three years.

To verify that all Patrol deputies have been issued body-worn cameras, and properly utilize the devices, we review random samples of the traffic stops as described in Paragraphs 25 and 54.  In addition, during our District visits we observe that deputies are equipped with body-worn cameras.

During our April 2019 site visit, we met with personnel from Districts 1 and 3 and inquired if supervisors had experienced any difficulty with the BWC equipment and system.  As reported in previous reporting periods, MCSO informed us that it continues to experience minor issues with cords breaking and batteries not lasting for deputies' entire shifts.  There were also reports of BWC recordings not properly uploading.  In some instances, BWC recordings had to be manually uploaded into the system.

WAI 39859

MCSO is currently procuring a new body-worn camera system for all of its deputies.  The new BWC system will resolve the current issues of cords breaking and becoming disconnected, as there is no cord.  MCSO also anticipates that the issues related to battery life will be remedied with the new equipment.

***Paragraph 62.***  *Deputies shall turn on any video and audio recording equipment as soon the decision to initiate the stop is made and continue recording through the end of the stop.  MCSO shall repair or replace all non-functioning video or audio recording equipment, as necessary for reliable functioning.  Deputies who fail to activate and to use their recording equipment according to MCSO policy or notify MCSO that their equipment is nonfunctioning within a reasonable time shall be subject to Discipline.*

**Phase 1:**  In compliance

- GJ-35 (Body-Worn Cameras), most recently amended on January 7, 2017.
- Body-Worn Camera Operations Manual, published on December 22, 2016.

**Phase 2**:  In compliance

MCSO evaluated on-person body cameras from other jurisdictions and selected a vendor (TASER International, now known as Axon).  Body-worn cameras have been implemented in all Districts since May 2016 and are fully operational.

To verify compliance for this Paragraph, we reviewed the body-worn camera recordings included in our monthly samples, which is generally 90 traffic stops.  This includes the 10 stops reviewed each month for Paragraphs 25 and 54; 10 stops reviewed each month for Subparagraph 54.k.; and 10 stops reviewed each month for Subparagraph 54.g.  For purposes of calculating compliance, we exclude any stops where the deputies documented on the VSCF that the BWC devices malfunctioned during the stop.

For our selection of a sample to review BWC recordings, we used the same sample of 30 cases we selected for the CAD audio request.  Of the 30 cases in which we requested BWC recordings, there were two cases where the deputies documented that the devices malfunctioned.  In each case, the deputies were able to record a portion of the traffic stop.  In such instances where the deputy documents a technical issue with the BWC device it will not adversely impact MCSO's rate of compliance with this requirement.  In the remaining 28 cases, all were in compliance with the deputy activating the video- and audio-recording equipment as soon as the deputy decided to initiate the stop, and continuing to record through the end of the stop.  In one case, the deputy did not properly position the BWC device, which did not allow for an optimal view of the driver.  In relation to the sample of 75 cases in which BWC recordings were not provided, there were three cases in which the deputies noted on the VSCF that BWC devices did not activate properly at the beginning of the stop or remain activated due to technical issues.  In one other case, a deputy documented on the VSCF that the BWC device malfunctioned near the conclusion of the stop.

WAI 39860

In our sample of 29 body-worn camera recordings reviewed for Subparagraph 54.k., Twenty-eight cases were in compliance with the deputy activating the video- and audio-recording equipment as soon as the deputy decided to initiate the stop, and continuing to record through the end of the stop.  In one case, the BWC recording commenced after the deputy apparently made contact with the driver; there was no documentation that the BWC device malfunctioned.  In one case, the deputy noted on the VSCF that, due to the battery losing power, the BWC device would randomly shut off.  In one case, the deputy noted on the VSCF that the BWC device failed to activate at the initiation of the traffic stop.  The deputy was accompanied by another deputy who was performing the duties of a Field Training Officer (FTO) for the deputy who was in training.  The FTO identified that the deputy's BWC device was not activated during the stop and instructed the deputy on how to address the issue.  The FTO's BWC device activated properly and captured the events of the traffic stop.  In one case, MCSO was unable to locate a BWC recording for a deputy that assisted on a traffic stop.  In that case, the deputy did not prepare an Assisting Deputy and Body-Worn Camera Log and no other documentation existed that indicated that the BWC device malfunctioned.  The deputy that initiated the traffic stop documented the stop via his BWC device.  As mentioned previously, in such instances where the deputy documents a technical issue with the BWC device, it will not adversely impact MCSO's compliance with this requirement.  In 13 of the cases, there were deputies who responded to assist on the traffic stops and failed to prepare the Assisting Deputy and Body-Worn Camera Log, as required by MCSO policy.  In our review of the sample of 30 body-worn camera recordings for Subparagraph 54.g., all 30 cases were in compliance with the deputy activating the video- and audio-recording equipment as soon as the deputy decided to initiate the stop, and continuing to record through the end of the stop.  In one of the cases, the deputy documented that he experienced technological difficulties with the BWC – it would not remain activated.  In six of the cases, there were deputies who responded to assist on a traffic stop, who failed to prepare the Assisting Deputy and Body-Worn Camera Log, as required by MCSO policy.

MCSO's compliance rate for this requirement is 99%.

We also identified cases in which the deputies did not use the BWC according to policy.  Although it is less frequent, we still have identified some instances in which the deputies have failed to ensure that the BWC is positioned properly during contact with the driver and/or passenger(s).

We continue to identify instances in which deputies that respond to assist at traffic stops do not complete the Assisting Deputy and Body-Worn Camera Log.  AIU also continues to identify this issue during its monthly inspections of traffic stops.  During our April 2019 site visit, we discussed with MCSO the utility of the Assisting Deputy and Body-Worn Camera Log as well as a conflict in policy in regards to when the log is required to be prepared, which may be a reason why the log is not prepared in each instance.  EB-2 (Traffic Stop Data Collection) requires that each deputy assisting on a traffic stop to prepare the Assisting Deputy and Body-Worn Camera Log; however, GJ-35 (Body-Worn Cameras) requires that deputies prepare the log when assisting on a traffic stop unless an Incident Report is prepared.  We recommend that

WAI 39861

MCSO clarify the policy in regards to when the Assisting Deputy and Body-Worn Camera Log is required to be prepared.  We recommend that supervisors enhance their reviews of traffic stops to ensure that the log is completed when required.

Our reviews of the body-worn camera recordings often reveal instances of deputies exhibiting positive, model behavior; and, at times, instances of deputies making errors, or exhibiting less than model behavior – all of which would be useful for training purposes.  During our April 2019 visits to District 1 and 3, District personnel informed us that in some instances, allegations against deputies have been disproven after reviews of the body-worn camera recordings were conducted.  We also noted that the Professional Standards Bureau's monthly summary of closed cases for March 2019 contain the following cases in which the review of body-worn camera recordings assisted in the determination of whether the allegations were valid or not:

- In one case, it was alleged that a deputy treated the complainant and her son in a disrespectful manner and threatened her with arrest for trespassing.  Based on a review of the body-worn camera recording, it was determined that the deputy was not disrespectful and that his actions in regards to advising the complainant of the possibility of arrest were within MCSO policy.

- In one case, it was alleged by a complainant that a deputy acted in a passive aggressive manner toward her and that the deputy was rude to a second complainant.  Based on a review of the body-worn camera recording, it was determined that the deputy was calm, professional, and courteous to both complainants.  PSB determined that the deputy violated MCSO policy when he failed to take items that were provided to him from one of the complainants.

- In one case, it was alleged that MCSO deputies took the complainant's identification card.  Based on a review of the body-worn camera recordings and MCSO records databases, it was determined that the deputies did not have contact with the complainant around the time he alleged that his identification card was taken.

- In one case, it was alleged that deputies used excessive force when handcuffing the complainant and exacerbated an injury to his arm.  Based on a review of the body-worn camera recordings, it was determined that the deputies were gentle and accommodating to the complainant; and that the handcuffing fell within MCSO policy.

There was also one case where the body-worn camera was not functioning properly and PSB was unable to prove or disprove the allegation made.  In another case, a deputy failed to activate his body-worn camera during emergency driving and was issued a written reprimand.  As demonstrated with the aforementioned examples, body-worn cameras recordings have proven to be invaluable in resolving complaints; and, when recordings are not available, the complaints are more challenging to resolve.

WAI 39862

***Paragraph 63.*** *MCSO shall retain traffic stop written data for a minimum of 5 years after it is created, and shall retain in-car camera recordings for a minimum of 3 years unless a case involving the traffic stop remains under investigation by the MCSO or the Monitor, or is the subject of a Notice of Claim, civil litigation or criminal investigation, for a longer period, in which case the MCSO shall maintain such data or recordings for at least one year after the final disposition of the matter, including appeals. MCSO shall develop a formal policy, to be reviewed by the Monitor and the Parties pursuant to the process described in Section IV and subject to the District Court, to govern proper use of the on-person cameras; accountability measures to ensure compliance with the Court's orders, including mandatory activation of video cameras for traffic stops; review of the camera recordings; responses to public records requests in accordance with the Order and governing law; and privacy protections. The MCSO shall submit such proposed policy for review by the Monitor and Plaintiff's counsel within 60 days of the Court's issuance of an order approving the use of on-body cameras as set forth in this stipulation. The MCSO shall submit a request for funding to the Maricopa County Board of Supervisors within 45 days of the approval by the Court or the Monitor of such policy and the equipment and vendor(s) for such on-body cameras.*

**Phase 1:**  In compliance

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- GJ-35 (Body-Worn Cameras), most recently amended on January 7, 2017.

- Body-Worn Camera Operations Manual, published on December 22, 2016.

**Phase 2:**  In compliance

MCSO developed and issued a protocol and policy that requires the original hardcopy form of any handwritten documentation of data collected during a traffic stop to be stored at the District level and filed separately for each deputy.  When a deputy is transferred, his/her written traffic stop information follows the deputy to his/her new assignment.  During our April 2019 site visit, we inspected the traffic stop written data file at District 3 to ensure that hardcopies of traffic stop cases are stored for a minimum of five years.  We found that the records were in order and properly secured.


***d. Review of Traffic Stop Data***

***Paragraph 64.*** *Within 180 days of the Effective Date, MCSO shall develop a protocol for periodic analysis of the traffic stop data described above in Paragraphs 54 to 59 ("collected traffic stop data") and data gathered for any Significant Operation as described in this Order ("collected patrol data") to look for warning signs or indicia or possible racial profiling or other improper conduct under this Order.*

**Phase 1:**  Not in compliance

WAI 39863

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

  GJ-33 (Significant Operations), most recently amended on May 10, 2018.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

- EIU Operations Manual, currently under revision.

**Phase 2:** Not in compliance

MCSO will achieve Phase 1 compliance with this Paragraph when it incorporates its protocols for periodic analysis of the traffic stop data into the EIU Operations Manual. To achieve Phase 2 compliance with this Paragraph, MCSO must demonstrate ongoing use of the methodologies delineated in the protocol established for Phase 1 compliance in the monthly, quarterly, and annual analyses used to identify racial profiling or other bias-based problems.


***Paragraph 65.*** *MCSO shall designate a group with the MCSO Implementation Unit, or other MCSO Personnel working under the supervision of a Lieutenant or higher-ranked officer, to analyze the collected data on a monthly, quarterly and annual basis, and report their findings to the Monitor and the Parties. This review group shall analyze the data to look for possible individual-level, unit-level or systemic problems. Review group members shall not review or analyze collected traffic stop data or collected patrol data relating to their own activities.*

**Phase 1:** In compliance

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:** Not in compliance

MCSO designated the Early Intervention Unit (EIU) as the organizational component responsible for this Paragraph. EIU's Traffic Stop Analysis Unit (TSAU) is the unit that is now directly responsible for analyses of traffic stop data on a monthly, quarterly, and annual basis to identify warning signs or indicia or possible racial profiling or other improper conduct as prescribed by Paragraph 64. EIU must report the findings of its analyses to the Monitor and the Parties.

We note that Paragraph 65 contemplates quarterly analyses of traffic stop data, but it does not specify exactly what such analyses might entail. We have discussed during our prior site visits potential topics that might be studied by MCSO under the quarterly traffic stop analysis

WAI 39864

requirement.  While many potential topics have been identified, EIU first requested permission in April 2018 to place the effort to develop the topic list on hold due to competing workload demands, essentially related to the second and third Traffic Stop Annual Report (TSAR) processes.  During our April 2019 site visit, MCSO noted the need to maintain this status to give CNA time to provide recommendations about potential topics and to complete efforts to finalize the TSAR and TSMR methodologies.  We agreed to MCSO's request to keep the development of the list of potential study topics on hold.

MCSO's original monthly process to analyze traffic stop data began in 2015 and was suspended in May 2016 because of our determination that the original process lacked statistical validity and required significant refinement to improve the identification of potential alerts in EIS.  The problems with this original process are documented in our quarterly status reports from that period.  MCSO resumed monthly analyses of traffic stop data in May 2017 using a new methodology that was statistically based and not subject to the arbitrary, unscientific method originally employed by MCSO.  While vastly improved, the new methodology generated a substantial number of alerts, many of which did not demonstrate a pattern of potential bias sufficient to warrant the setting of an alert in EIS.  Because of our concern about the number of potential alerts the monthly analysis generated – a concern that MCSO also shared – we suspended the process during our July 2017 site visit to allow us and EIU time to consider possible refinements to the existing methodology.  MCSO's vendor, CNA, has developed the TSMR methodology that is currently under review by us.  Our review has involved conference calls with MCSO, CNA, and the Parties; and has been addressed during our January and April 2019 site visits.  We believe the new TSMR methodology is much more feasible, but we require further clarification about how it would incorporate traffic stop data from deputies who make very few traffic stops each month and clarification about how CNA will treat missing data.  We are working very closely with MCSO and CNA to resolve these final matters.

MCSO will achieve Phase 2 compliance with this Paragraph when its periodic analyses involve the consistent use of a statistical methodology designed to identify patterns of deputy behavior at odds with their peers.


***Paragraph 66.***  *MCSO shall conduct one agency-wide comprehensive analysis of the data per year, which shall incorporate analytical benchmarks previously reviewed by the Monitor pursuant to the process described in Section IV.  The benchmarks may be derived from the EIS or IA-PRO system, subject to Monitor approval.  The MCSO may hire or contract with an outside entity to conduct this analysis.  The yearly comprehensive analysis shall be made available to the public and at no cost to the Monitor and Plaintiffs.*

**Phase 1:**  In compliance

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

WAI 39865

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:**  Not in compliance

MCSO has completed three comprehensive annual evaluations of traffic stop data to look for evidence of racial profiling or other bias-based policing.  MCSO released the first annual comprehensive evaluation on May 24, 2016 titled, "Preliminary Yearly Report for the Maricopa County's Sheriff's Office, Years 2014-2015."  It found that there are deputies engaged in racially biased policing when compared to the average behavior of their peers.  MCSO released the second annual evaluation on March 1, 2017.  However, this evaluation had to be withdrawn due to data problems; it was subsequently re-released on July 28, 2017 and posted on MCSO's website in October 2017.  There were no significant differences in findings from those of the first annual evaluation.

The revised second annual evaluation confirmed the earlier report's main finding that racially biased policing within MCSO appears to be both a deputy and organizational level problem.  The third annual comprehensive evaluation was released on May 17, 2018, employing methodologies similar to those in the first two comprehensive evaluations and finding the same results of its two predecessor reports: racially-biased policing persists within MCSO at the organizational level.

The three comprehensive evaluations employed methodologies that were supported by the peer-review literature and were approved by us for purposes of satisfying the requirements of this Paragraph.  While the scientific basis of the methodology is valid, we note that its implementation was problematic.  As previously stated, the second evaluation had to be completely redone due to data problems.  Likewise, the third evaluation had to be redone due to serious miscoding of the underlying data.  In fact, this report is now public even though it contains a flawed analysis pertaining to length of traffic stops that misidentified deputies potentially engaging in biased-based policing.  The failure to successfully implement the approved methodologies is well-documented in our previous reports and is the main reason why MCSO has yet to achieve Phase 2 compliance with this Paragraph.

The contract with the vendor responsible for supporting MCSO's first three comprehensive annual evaluations of traffic stop data ended on June 30, 2018.  A contract was awarded to the new vendor, CNA, on August 29, 2018.

During our January 2019 site visit, we discussed the proposed methodology proposed by CNA for the TSAR.  (We note for purposes of providing background that much of the proposed TSAR methodology would also be applied to the TSMR.)  In simple terms, the new methodology would take a different approach to defining the concept of peers, which the first Order requires as the basis of analysis for biased-based policing.  Instead of defining peers as deputies making stops in similar geographic areas, the new methodology would utilize what is referred to as "similar deputy stops."  Similar deputy stops would use propensity matching to define similar deputies involved in similar traffic stops to see if they have different stop outcomes (e.g., rate of citations) across race/ethnicity.  By identifying similar deputy traffic stops, the methodology would determine if, for example, a Hispanic driver is treated differently

WAI 39866

that a White driver in similar circumstances; differences in stop outcomes would be the basis for asserting biased-based policing. Our remaining questions regarding the proposed TSAR methodology were addressed during our April 2019 site visit. We approved the TSAR methodology on April 30, 2019.

MCSO will achieve Phase 2 compliance with this Paragraph when it demonstrates an ability to conduct the annual TSAR using the newly approved methodology in a consistent fashion each year. Achieving Phase 2 compliance with this Paragraph will also enhance the Office's credibility with a large segment of the community.

***Paragraph 67.*** *In this context, warning signs or indicia of possible racial profiling or other misconduct include, but are not limited to:*

a. *racial and ethnic disparities in deputies', units' or the agency's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of deputies' duties, or racial or ethnic disparities in traffic stop patterns when compared with data of deputies' peers;*

b. *evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;*

c. *a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;*

d. *indications that deputies, units or the agency is not complying with the data collection requirements of this Order; and*

e. *other indications of racial or ethnic bias in the exercise of official duties.*

**Phase 1:** In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:** Deferred

The EIU provides monthly analyses and documents describing the benchmarks used to set alerts for possible cases of racial profiling or other deputy misconduct involving traffic stops. As reported in Paragraph 65, this process is suspended pending MCSO's effort to finalize the TSMR methodology.

WAI 39867

During our April 2019 site visit, we met with CNA and MCSO to discuss the proposed modification to the current methodology used for the TSMR. The scientific basis of the modification, which involves the use of propensity score techniques, is discussed in Paragraph 66.

For the TSMR, the methodology would make use of a rolling 12-month sample to provide enough individual deputy traffic stop data to strengthen the statistical validity of the proposed methodology. The proposed approach, however, would exclude any deputy from the analysis who made fewer than 20 traffic stops during the rolling 12-month period. We expressed concern about dropping these low performing deputies from the analysis. Our concern was based on an analysis we conducted using six months of traffic stop data from the fourth quarter calendar year 2018 and the first quarter of 2019, which found that the number of annual traffic stops has declined dramatically since 2014. Our concern about recent traffic stop behavior is that the exclusion of deputies making less than 20 traffic stops will mitigate the efficacy of the proposed methodology and exclude a cohort of deputies from the statistical analysis simply because they make too few traffic stops. The Office must continue to deploy field supervisors to ensure that deputies are fulfilling their duties in furtherance of their public safety mission; and in so doing, help the data-gathering process to be more meaningful and useful.

During our April 2019 site visit, MCSO and CNA discussed options to ensure these "low performing" deputies are not ignored the analysis required by the First Order to identify deputies possibly engaging in biased based policing. CNA offered two suggestions that it will delineate in its revised document describing the proposed TSMR methodology. One proposal is to apply qualitative methods using quarterly data representing low performers to analyze how well supervisors analyze low performing deputies to look for possible cases of biased-policing. This analysis is intended to strengthen supervisory reviews of this pool of deputies. The second option that will supplement the first option involves developing descriptive statistics for low performing deputies about post-stop outcomes and length of traffic stops to give EIU and supervisors better information to use in their reviews.

Another issue pending approval is the treatment of missing data and the possible exclusion of all deputy traffic stops for those instances when a deputy has missing data required for the TSMR analysis. CNA stated that all traffic stops for a deputy would be dropped even if only one of the stops had missing data. We are concerned that deputies may manipulate the system by ensuring that key data are missing for at least one stop – and thereby would not be scrutinized by the TSMR. In discussions with MCSO and CNA during our April 2019 site visit, there were a number of arguments made by MCSO and CNA mitigating our concern over this problem. One counterargument is the fact that MCSO has very few problems with missing data. Each month, the TSAU notifies supervisors whenever it encounters missing data so that the traffic stop event can be fully and properly described. Second, patterns of missing data can generate alerts that must be addressed by the supervisor and their deputies. And third, data validation procedures recently implemented in EIU and the Technology Management Bureau has resulted in another layer of data oversight and management. While we remain very concerned about the potential problem of missing data, the evidence suggests that this be a minor issue. CNA is evaluating

WAI 39868

this potential problem and will provide documentation about how it will resolve this issue in its revised write-up of the TSMR methodology.  Approval of the proposed TSMR methodology is dependent upon receipt of a viable solution mitigating our concerns.

We note that MCSO has achieved Phase 1 compliance with regard to its intent to implement the individual benchmarks required by this Paragraph.  These benchmarks are highlighted below.  The proposed methodology for the analysis of traffic stop data will incorporate these benchmarks in the proposed methodology to test for biased-based policing.

Paragraph 67.a. identifies three benchmarks pertaining to racial and ethnic disparities.  The first benchmark references disparities or increases in stops for minor traffic violations (Benchmark 1).  The second benchmark addresses disparities or increases in arrests following traffic stops (Benchmark 2).  The third benchmark addresses disparities or increases in immigration status inquiries (Benchmark 3).  Since these three benchmarks are incorporated into the EIU Operations Manual, MCSO is in compliance with Paragraph 67.a.

Paragraph 67.b. identifies a benchmark pertaining to evidence of an extended traffic stop involving Latino drivers or passengers (Benchmark 4).  Since this benchmark is now incorporated into the EIU Operations Manual, MCSO is in compliance with Paragraph 67.b.

Paragraph 67.c. identifies three benchmarks.  The first benchmark pertains to the rate of citations (Benchmark 5):  MCSO is required to identify citation rates for traffic stops that are outliers when compared to a deputy's peers.  The second benchmark (Benchmark 6) pertains to seizures of contraband:  MCSO is required to identify low rates of seizures of contraband following a search or investigation.  The third benchmark in Paragraph 67.c. (Benchmark 7) is similar to Benchmark 6, but it pertains to arrests following a search or investigation.  This is also the case for Benchmark 7.  Since the three benchmarks are now incorporated into the EIU Operations Manual, MCSO is in compliance with Paragraph 67.c.

Paragraph 67.d. establishes a benchmark pertaining to agency, unit, or deputy non-compliance with the data collection requirements under the First Order (Benchmark 8).  This benchmark requires that any cases involving non-compliance with data collection requirements results in an alert in EIS.  EIU published an Administrative Broadcast on November 28, 2016 to instruct supervisors how to validate data in TraCS in those cases involving duplicate traffic stop records to deliver timely data validation for our review.  MCSO's draft EIS Project Plan 4.0 reported that MCSO began the data validation process for this benchmark on November 28, 2016.  Therefore, MCSO is in compliance with Paragraph 67.d.

Paragraph 67.e. allows for other benchmarks to be used beyond those prescribed by Paragraph 67.a.-d.  MCSO has three benchmarks under Paragraph 67.e.  Benchmark 9 is defined as racial or ethnic disparities in search rates.  Benchmark 10 is defined as a racial or ethnic disparity in passenger contact rates.  Benchmark 11 is defined for non-minor traffic stops.  MCSO reports that Benchmarks 9-11 are incorporated into the EIU Operations Manual.  Therefore, MCSO is in compliance with Paragraph 67.e.

WAI 39869

While MCSO has completed operationalizing the benchmarks required by this Paragraph, its current methodology produced too many alerts that MCSO could reasonably manage on an ongoing basis. As discussed in Paragraph 65, the monthly analysis of traffic stop data for May 2017 generated too many alerts per month, most of which lacked sufficient detail to establish a pattern of problematic behavior for the individual deputies identified by the methodology. Because of this problem, we suspended the monthly analysis process to allow us and MCSO time to explore refinements to the methodology. As discussed above, CNA developed an alternative methodology for the TSMR. Approval of this proposed methodology requires MCSO to submit revised documentation that addresses the few remaining concerns we raised during our April 2019 site visit.

Until the methodology is refined in a manner that addresses the problem of too many alerts and the realities of deputy traffic stop behavior, we are deferring our Phase 2 compliance assessment of Paragraph 67.

**Paragraph 68.** *When reviewing collected patrol data, MCSO shall examine at least the following:*

a. *the justification for the Significant Operation, the process for site selection, and the procedures followed during the planning and implementation of the Significant Operation;*

b. *the effectiveness of the Significant Operation as measured against the specific operational objectives for the Significant Operation, including a review of crime data before and after the operation;*

c. *the tactics employed during the Significant Operation and whether they yielded the desired results;*

d. *the number and rate of stops, Investigatory Detentions and arrests, and the documented reasons supporting those stops, detentions and arrests, overall and broken down by Deputy, geographic area, and the actual or perceived race and/or ethnicity and the surname information captured or provided by the persons stopped, detained or arrested;*

e. *the resource needs and allocation during the Significant Operation; and*

f. *any Complaints lodged against MCSO Personnel following a Significant Operation.*

**In Full and Effective Compliance**

MCSO has not conducted a significant operation that met the requirements of the Order since Operation Borderline in December 2014. Subsequent activities (i.e., Operation Gila Monster in October 2016) have not met the criteria for review under this or other Paragraphs.

WAI 39870

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination. As a result, MCSO District command staff – as well as Investigations and Enforcement Support – will no longer be required to submit monthly statements that they have not participated in Significant Operations as defined by this and other Paragraphs; however, they will be required to notify us should staff become involved in a Significant Operation. We will continue to assess Phase 2 compliance through interviews with command and District staff during our regular site visits. In January and April 2019, we visited each District and were advised that no significant operations had occurred within their jurisdictional boundaries, nor had any of their staff participated in such operations with other departments.

**Paragraph 69.** *In addition to the agency-wide analysis of collected traffic stop and patrol data, MCSO Supervisors shall also conduct a review of the collected data for the Deputies under his or her command on a monthly basis to determine whether there are warning signs or indicia of possible racial profiling, unlawful detentions and arrests, or improper enforcement of Immigration-Related Laws by a Deputy. Each Supervisor will also report his or her conclusions based on such review on a monthly basis to a designated commander in the MCSO Implementation Unit.*

**Phase 1:** In compliance

- EA-3 (Non-Traffic Contact), most recently amended on June 14, 2018.

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:** Not in compliance

MCSO has placed into production database interfaces with EIS, inclusive of Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), Arizona Office of Courts (AOC) records, and the Cornerstone software program (referred to as "the HUB"), that includes training and policy records for MCSO. Supervisors have demonstrated the ability to access these during our recent site visits.

MCSO has automated the dissemination and responses to Action Forms generated from BIO's Audits and Inspections Unit. MCSO has also initiated alert investigations for repetitive issues discovered during the audit and inspection process. AIU has completed development of the inspection for tracking EIS alert investigations. The protocol for this inspection has been included in the EIU Operations Manual, Section 302 (EIS Alert Processes), and was approved on March 27, 2019. The first of these inspections was published in April 2019 for alert investigations closed in February 2019. In this initial inspection, AIU reported that 67% of the investigations had been completed within policy guidelines and five investigations exceeded the 30-day timeframe. BIO Action Forms were sent to the appropriate Districts that did not meet this compliance standard. While the EIS Alert Process inspection includes instances where investigations were initiated as a result of supervisors receiving multiple BIO Action Forms for

WAI 39871

repetitive deficiencies for the same issue, it does not track all BIO Actions Forms by supervisors and Districts.  We have asked BIO to develop an inspection similar to the quarterly audit of Incident Reports to track all BIO Action Forms sent to the Districts; to ensure that supervisors are meeting their responsibilities under this Paragraph, as well as those covered in Paragraphs 81, 94, and 95.  MCSO continues to work on the development of this audit/inspection.

We continue to work with MCSO to develop new methodologies for the Traffic Stop Annual and Monthly reports through conference calls and site visit meetings.  Once approved and implemented, these should provide meaningful information for supervisors regarding their subordinates' activity in comparison to colleagues working patrol.  Due to the priority of the Traffic Stop Annual and Monthly Reports, MCSO has not yet proposed the initiation of a quarterly traffic stop report as required by the Order.  From January-March, we received over 18 Non-Traffic Contact Forms per month.  Our review of these forms during this period found no prevailing trends of concern.  However, since MCSO now has over 18 months of NTCFs, we have recommended during our last three site visits that MCSO create an audit/inspection to ensure that supervisors are routinely reviewing the activity noted and looking for potential bias.  The latter will require additional training to show supervisors how to examine a small number of Forms for any potentially troubling patterns that may arise.  The publication of each of these reports (TSAR, TSMR, TSQR, and NTCF) is necessary for the evaluation of Phase 2 compliance for this Paragraph.

Each month, MCSO provides a list of completed alert investigations.  From this list, we randomly select 15 cases, to review the investigations conducted by supervisors and evaluate the effectiveness of supervisory oversight.  In several cases, there are ongoing PSB investigations that limit the ability of supervisors to review materials beyond the brief descriptions provided to supervisors, as outlined in Paragraph 75.a. and 75.b. below.  In these instances, the alert investigation is closed by the supervisor to maintain the integrity of the ongoing PSB inquiry.

MCSO has created an EIS Alert Review Group (ARG) that evaluates the investigations of supervisors prior to closing an alert.  The ARG ensures that the reports of the supervisors address all aspects of the assigned investigation, and returns those that are deficient to the District for continued revision.  As a result, the number of closed alert investigations in recent months has often been fewer than 15 cases per month (11 in January, seven in February, and 15 in March).  However, of those that were provided, we have found the supervisors' actions and recommendations about the issue raised to be transparent and clear.  MCSO has also recently developed an additional inspection of closed alert investigations (EIS Alert Processes) to track the timely closure of these investigations as well as to follow up on issues of training or Action Plans that are ongoing.  The inaugural inspection was published in early April on alert investigations conducted prior to February 2019.  AIU found that two-thirds of the investigations were closed within policy timeframes and included sufficient information to justify the actions of the supervisor.  The remaining one-third were not completed within the appropriate time of 30 days and resulted in an Action Forms being sent to the appropriate District Commanders.  We believe this ongoing inspection will provide necessary assurance that

WAI 39872

supervisors are meeting their responsibilities for oversight of their subordinates.  Additionally, if supervisors have recurring problems closing alert investigations, this will also trigger an alert investigation to be completed by lieutenants or captains.  In this way, MCSO is better able to ensure that supervisory oversight is effective and transparent.

The Audit and Inspections Unit (AIU) conducts monthly audits of supervisory oversight via the Supervisory Notes made for each deputy.  Minimally, each month supervisors should be making a performance appraisal note, reviewing two body-worn camera recordings and reviewing the EIS profile of their subordinate.  During January and February 2019, AIU found that supervisors were in compliance in excess of 97%.  There were three BIO Action Forms sent to Districts 1 and 2 and Lake Patrol for follow-up by command personnel.  During our April site visit, we were advised that the BIO Action Forms from November and December, emanating from the Supervisory Note inspections during this time period, were closed with meetings with a supervisor.  Both lieutenants and captains have informed us during our site visits that the most difficult task for new supervisors is time management; therefore, when deficiencies are discovered during such inspections command personnel work to improve a new sergeants' ability to juggle multiple responsibilities during the early transition into supervisory capacity.

AIU also conducts three inspections of traffic stop information: two of these pertain to the timely review and discussion of traffic stops by supervisors for each subordinate; and the third is an inspection regarding the correct completion of traffic forms and the coordination of these forms with databases like CAD.  AIU reported problems in District 1 during January and December.  During this period, 12 discussions and nine reviews occurred outside of policy timelines, all relating to a single supervisor.  Each time AIU issued one BIO Action Form.  As a result, the organizational compliance rate for these inspections was in the low 90th percentile.  The inspections in the month following this anomaly were in excess of 97% and did not indicate a deficiency in District 1.  The Traffic Stop Data Inspection mirrors one we conduct by using a 21-item matrix of information from traffic stop forms and databases.  In January and February 2019, this inspection showed a compliance rate of 94% and 86% respectively.  The noted involved disparate stop locations and missing vehicle information.  AIU sent BIO Action Forms to those Districts where the deficiencies arose.  None of the deficiencies in any of these inspections involved potential indications of bias.

AIU also conducts inspections of Patrol Activity Logs, to ensure that deputies are accounting for their time and supervisors sign and note any anomalies in the logs, as well as patrol shift roster inspections, to ensure span of control issues as outlined in policy and the Courts' Order.  MCSO has exceeded a 99% compliance rate for the past six months for both inspections.  In the small number of instances where deficiencies are noted, AIU sends a BIO Action Form to the command personnel to examine why the deficiencies occurred.

WAI 39873

AIU also conducts an inspection of County and Justice Court cases that are turned down for prosecution. While the major issue being inspected centers on whether probable cause existed to support the actions of the deputy during the original activity, AIU also identifies other issues that can result in memoranda to Districts that suggest additional training of deputies might be in order. For January and February, the inspections noted no issues of irreversible error occurred during this time period and indicate 100% compliance within the reviewed documents. However, AIU notes 14 "non-compliance" deficiencies in January, and 20 in the documents reviewed in February. As we have noted during past quarterly reports, we have found that the non-compliance deficiencies include notations of "unable no locate evidence to support elements of the charged offense," "unable to locate probable cause on Form 4," and "deputy doesn't believe culpable mental state of "knowingly" is met but he submitted the case for charges." We have raised these issues with MCSO personnel, who believe that there is a difference between there being no probable cause for the actions of the deputy and the deputy failing to effectively communicate probable cause in the charging documents. While we acknowledge that difference, the Order clearly states that it is the failure of the deputy to articulate probable cause in the charging documents (Paragraph 75.f.) that is of concern. Therefore, we consider these "non-compliance" deficiencies to be not in compliance with Order requirements. We will continue to discuss how well the methodology employed by inspectors mirrors the intent of the Order. Plaintiffs' representatives had also requested additional information on a turndown case that was included in the December 2018 monthly document request. MCSO had initially indicated that this case should not have been included as it was a "further" rather than a turndown. "Furthers," for MCSO, are cases where the prosecutor finds problems with the evidence gathered, documents submitted or some other issue; but the prosecutor's office notes that they will pursue charges if the missing material was supplied. Our review of the documents and videos supplied by MCSO led us to concur with the decision of the prosecutor; specifically, that there were deficiencies in the original reports submitted and evidence gathered. However, if these items were supplied, it was clear that the case could be charged. We raised this case as an example that MCSO might use to reevaluate the methodology employed for reviewing cases that are turned down for prosecution.

The inspections of supervisory oversight conducted by MCSO indicate stable compliance trends in most areas reviewed. Aside from Traffic Stop Data, Review, and Discussion Inspections and our questions about the County Attorney Turndown Inspection, the compliance findings in other inspections exceed the 95th percentile. We will continue to evaluate these issues in our quarterly status reports.

WAI 39874

**Paragraph 70.** *If any one of the foregoing reviews and analyses of the traffic stop data indicates that a particular Deputy or unit may be engaging in racial profiling, unlawful searches or seizures, or unlawful immigration enforcement, or that there may be systemic problems regarding any of the foregoing, MCSO shall take reasonable steps to investigate and closely monitor the situation.   Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or of other supervised, monitored, and documented action plans and strategies designed to modify activity.   If the MCSO or the Monitor concludes that systemic problems of racial profiling, unlawful searches or seizures, or unlawful immigration enforcement exist, the MCSO shall take appropriate steps at the agency level, in addition to initiating corrective and/or disciplinary measures against the appropriate Supervisor(s) or Command Staff.   All interventions shall be documented in writing.*

**Phase 1:**  In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:**  Not in compliance

EIU personnel are continuing to develop the next draft of the EIU Operations Manual.  MCSO continues to evaluate and develop the methods and plans for the Traffic Stop Monthly Reports (TSMR) and Traffic Stop Quarterly Reports (TSQR).  The manual will provide a basis for the transparency of roles and duties of EIS personnel.  It is imperative that MCSO complete the manual to ease the process for personnel to understand their responsibilities.  In addition, the manual will provide the organization as a whole with an explanation of the goals to be achieved by a fully functioning early intervention process.

Since our January site visit, there have been several opportunities for us and the Parties to confer with MCSO on the new TSAR methodology being proposed for the compilation and analysis of traffic stop data.  As a result, the methodology was modified and approved so that the analysis could be conducted and the annual report completed during the summer of 2019. We continue to work with MCSO on the methodology for the TSMR, and expect that preliminary models will be analyzed once the TSAR is completed.  While no TSQR has yet been produced, we have discussed several possible special studies that could be conducted that would assist in the evolution of both the TSAR and TSMR.  To its credit, MCSO has created a "data quality" workgroup consisting of members of all units that participate in the compilation, creation, and transmission of traffic data.  The regular meetings and reports of this committee are intended to ensure that future data anomalies are minimized and reports are produced in a timely manner.  We have reviewed the minutes and outcome of these meetings, and found them to be informative and transparent.

WAI 39875

During our April site visit, MCSO also presented a table outlining the current status of sections of the EIU Operations Manual. At the time of our site visit, 77% of all sections had been approved which is a 17% increase from January 2019. Of the remaining 23% five sections are under review by us and two sections are still being developed.

A portion of the monthly alert report produced by EIU depends upon the TSMR required in Paragraph 67 of the First Order. The methods for the elements of Paragraph 67 remain under development. The EIS also produces alerts for numerous activities, ranging from use of force to County Attorney Turndowns lacking probable cause. The new leadership of BIO has begun the process of evaluating and updating the thresholds used to trigger these alerts to ensure that they are sufficient to detect behaviors that might indicate bias on the part of deputies, taking into consideration the current assignment of the deputies as noted in Paragraph 81.f. The alerts triggered are first evaluated by EIS personnel and then transmitted, via Blue Team, to the appropriate supervisor and District command. The supervisors conduct an investigation, including a potential discussion with the designated deputy, and memorialize their actions in Blue Team. These investigations are reviewed by District command staff and a newly formed Alert Review Group (ARG) to ensure that proper investigation and possible interventions are clearly outlined. AIU began producing an inspection of EIS Alert Processes in April 2019 that evaluates the timeliness of alert investigation completion and the effect of discussions, trainings or Action Plans that might result from the supervisory investigation. In this first inspection, AIU reported that two-thirds of the investigations were completed within policy timeframes. Since the formation of the review group, we have only requested clarification on some of the Action Plans that have been put in place for deputies as a result of discussions between EIU and District command. As noted in Paragraph 69, the creation of such Action Plans shows a higher level of evaluation than we have seen in the past. More importantly, we have not found any deficiencies that command staff or the review group had not already discovered. The new AIU inspection of EIS Alert Processes has also been included in the EIU Operations Manual (Section 302).

We have been reporting on MCSO's Plan to Promote Constitutional Policing, which was drafted to address systemic issues identified in the Traffic Stop Annual Reports (TSARs). The Plan to Promote Constitutional Policing included nine goals and a timeline for the completion of the goals. In October 2018, MCSO informed us that it intended to change the strategy with which the agency would attempt to address the concerns noted in the TSARs. At that time, MCSO reasoned that its best course of action would be to change the agency's policing strategy to community policing. On February 14, 2019, MCSO filed a motion with the Court to modify the Plan to Promote Constitutional Policing. MCSO asserted that, with few exceptions, it had met all the goals of the Court-approved plan. Notwithstanding this assertion, MCSO reiterated that they would continue to work on the goals of the plan. We consider the Court-approved Plan to Promote Constitutional Policing to have been the governing document during this reporting period. Our comments in this report pertain to compliance with the plan that was in place during the first quarter of 2019.

WAI 39876

During our April site visit, we met with MCSO to inquire about the progress of the Court-approved Plan to Promote Constitutional Policing.  MCSO noted that it has continued to work on the outstanding issues of the plan.  However, there were no specific updates provided regarding the progress of the goals.  Based on information we were able to ascertain, the following is our assessment of the progress of each of the goals:

Goal 1: Implementing an effective Early Intervention System (EIS) with supervisor discussions. MCSO has asserted that it has met this goal, but we do not agree that this goal has been completed.  MCSO is still not in compliance with some Paragraphs related to the EIS.  Many of the supervisor discussions we review are *pro forma* and of questionable value.  Additionally, the supervisor discussions specifically associated with the Third Traffic Stop Annual Report (TSAR) were still in progress during this reporting period.

Goal 2: Evaluating supervisors' performances through an effective Employee Performance Appraisal process.  MCSO has asserted that it has met this goal, but we do not agree that it has been completed.  During this reporting period, MCSO was not in compliance with any of the Paragraphs related to the evaluation of employee performance.  Most of the EPAs found out of compliance were supervisors' EPAs.  During this reporting period, MCSO was not incompliance with Paragraphs 87, 92, 95, 98, 100, and 176, which relate to Employee Performance Appraisals.

Goal 3: Delivering enhanced implicit bias training.  MCSO has asserted that it has met the aspects of delivering enhanced implicit bias training.  We do not consider this goal completed.  MCSO completed the 2018 ACT, but during this reporting period, did not complete the training on the History of Discrimination in Maricopa County.

Goal 4: Enhanced fair and impartial decision-making training.  MCSO asserted that it has met the aspects of this goal, but we do not consider this goal completed.  The 2018 ACT contained only references to fair and impartial decision-making.  MCSO will complete this goal when enhanced fair and impartial decision-making is provided in the Annual Combined Training, or when it provides additional enhanced training on this topic.

Goal 5: Delivering enhanced training on cultural competency and community perspectives on policing.  MCSO has asserted that it has met this goal, but we do not consider this goal completed.  There was no "enhanced" component in the cultural competency training, in the 2018 ACT.  MCSO will complete this goal when enhanced cultural competency and community perspectives on policing is included in the Annual Combined Training, or when MCSO provides additional enhanced training on these topics.

Goal 6: Improving traffic stop data collection and analysis.  MCSO has asserted it has met this goal, but we do not consider this goal completed.  MCSO did not have a Traffic Stop Monthly Report methodology in place during this reporting period.  Consequently, MCSO was not able to send out alerts based on monthly data.  Additionally, MCSO has not yet completed a quarterly traffic stop analysis, as required by the First Order.

WAI 39877

Goal 7: Encouraging and commending employees' performance and service to the community. MCSO has asserted that it has met this goal. We agree that MCSO completed this goal. This goal was not part of the requirements set by the First Order.

Goal 8: Studying the Peer Intervention Program. MCSO has asserted that it has met this goal. We agree that MSO completed the study of the New Orleans EPIC program. There was no alternative program implemented. This goal was not part of the requirements set by the First Order.

Goal 9: Building a workforce that provides constitutional and community-oriented policing and reflects the community we serve. During our last two site visits of 2018, MCSO had declined to answer questions pertaining to recruitment and hiring. During our April site visit, we were advised that MCSO has continued to advertise its recruitment, with the intent of having a diversified workforce. We learned that there was a class of approximately 20 Detention trainees in the Academy. We inquired, but MCSO did not provide any specific information as to the current state of attrition, the number of vacancies, or the number of employees hired. Based on insufficient information substantiating any progress, we conclude that this goal has not been met. This goal was not part of the requirements set by the First Order.

MCSO has completed the supervisor discussions and Action Plan processes for all but one deputy identified as an outlier in the Third TSAR. In this one case, MCSO has been attempting to work with this deputy through extensive training and oversight. BIO and District command staff will be re-evaluating the finalization of this Action Plan following the completion of the proscribed training. Given the priority of modifying the TSAR and TSMR methodologies MCSO has not yet engaged in an overall evaluation of processes leading to the selection of deputies who would undergo a supervisor discussion and Action Plan process. We will be engaging MCSO in this evaluation once the above mentioned methodologies approach conclusion. We believe the process developed to respond to the results of the Third TSAR were a dramatic improvement over prior years: in particular, the time from publication of the Third TSAR to the initiation of supervisor discussions was significantly shortened; deputies were provided much more information regarding analysis, selection processes, and BIO protocols before supervisory discussions were even scheduled; immediate supervisors were better prepared and more actively involved in the discussions with deputies; and, deputies themselves appeared less defensive during the taped supervisor discussions and the majority welcomed training suggestions and the development of guidelines they could use during future traffic stops.

While the Third TSAR processes were much more transparent and effective than those following the prior TSARs, we remain concerned about the fact that it took several months for MCSO to complete all of the supervisor discussions (September 2018 to March 2019). MCSO has recognized this limitation, and has committed permanent resources to create a Traffic Stop Analysis Unit (TSAU) housed within BIO to coordinate traffic stop data and develop protocols to respond in the future. This should alleviate the need to borrow organizational resources to fulfill the requirements of annual analyses conducted in the past. Although improved, we

WAI 39878

continue to note that not all immediate supervisors appeared ready to participate and direct the supervisory discussions without the intervention of BIO command staff.  In that vein, MCSO is planning to develop specific supervisory training once both the TSAR and TSMR methodologies are finalized.  In addition, while the issue of implicit bias was discussed during each supervisory discussion, we continue to believe that the supervisor discussions, supervisor training and Action Plan processes need a stronger foundation based on research and practice of other organizations struggling with many of the same issues as MCSO.  As noted previously, we will be engaging MCSO and the Parties in a discussion of the Third TSAR during our July site visit.

MCSO is not in Phase 2 compliance with this Paragraph; as the TSAR, TSMR, and TSQR are undergoing revision and not yet in production.  In addition, there is much work to be done to finalize and implement the Constitutional Policing Plan.  This is a matter that continues to fester, and we urge the agency to aggressively pursue a path that will culminate in the production of a meaningful plan that benefits the Office and the community.  We will continue to evaluate and provide feedback to MCSO as these materials are produced.


**Paragraph 71.**  *In addition to the underlying collected data, the Monitor and Plaintiffs' representatives shall have access to the results of all Supervisor and agency level reviews of the traffic stop and patrol data.*

**In Full and Effective Compliance**

MCSO has provided us with access to existing data from monthly and annual reports.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

While we continue to work with both MCSO and the Parties on specific issues of methodology for the Annual, Monthly, and Quarterly Reports, we have nonetheless been afforded complete access to all data requests.

WAI 39879

# Section 8: Early Identification System (EIS)

**COURT ORDER IX.  EARLY IDENTIFICATION SYSTEM ("EIS")**

*Paragraph 72.   MCSO shall work with the Monitor, with input from the Parties, to develop, implement and maintain a computerized EIS to support the effective supervision and management of MCSO Deputies and employees, including the identification of and response to potentially problematic behaviors, including racial profiling, unlawful detentions and arrests, and improper enforcement of Immigration-Related Laws within one year of the Effective Date. MCSO will regularly use EIS data to promote lawful, ethical and professional police practices; and to evaluate the performance of MCSO Patrol Operations Employees across all ranks, units and shifts.*

**Phase 1:**  In compliance

- EA-3 (Non-Traffic Contact), most recently amended on June 14, 2018.

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:**  Not in compliance

During 2017 and early 2018, MCSO introduced interfaces between EIS and several remote databases of importance.  EIS now includes Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), records from the Administrative Office of the Courts (AOC), and training completion and policy acknowledgement records from the Cornerstone software (the HUB).   MCSO continues to work on the EIU Operations Manual to memorialize the collection, analysis, and dissemination of relevant data; as well as the responsibilities and roles of departmental and EIU personnel.  During our April site visit, MCSO provided a table indicating the current status of the EIU Operations Manual.  The table indicated that 77% of the manual has been completed and approved by us and the Parties.  The remaining 23% are comprised of two sections that are under development, and five sections that are under review.  MCSO has made steady progress in the completion of the manual and has only been limited due to the complexities involved in changing statistical contractors and methodologies.

Three sections of the manual that remain under development or review are related to the Traffic Stop Annual, Monthly, and Quarterly Reports (TSAR, TSMR, and TSQR).  MCSO has prioritized the annual and monthly reports.  The new methodology for the annual report is intended to better approximate several requirements of the Order, specifically, comparing deputies to colleagues that perform similar functions and share other organizational characteristics.  MCSO has been transparent in the methods proposed and has evaluated and incorporated critiques by us and the Parties.  Our central concern remains the ability to employ the proposed methodology to track trends in traffic stop activity and levels of potential bias over time.  MCSO has committed to exploring the development of such options following the publication of its first report using the new methods.  We will evaluate the results of the new TSAR methodology when they become available.

WAI 39880

MCSO has not produced a consistent TSMR in nearly three years; however, MCSO continues to produce a monthly report of alerts triggered within the EIS that are not related to the TSMR. MCSO has made several proposals for the TSMR and both we and the Parties continue to comment on them as they are developed and modified.

MCSO has not yet produced a TSQR.  During several discussions surrounding the TSAR and TSMR methodologies, we have broached topics that could fulfill the First Order's requirements of the TSQR.  MCSO will be proposing a series of quarterly report topics that may clarify outstanding issues related to the other methodologies.  We will evaluate these as they are proposed.

During our October, January and April site visits, we suggested that MCSO begin developing a methodology to analyze the Non-Traffic Contact Forms (NTCFs) that have been accumulating since the interface began in mid-2017.  MCSO has been providing access to the NTCFs (approximately 25 per month) that are produced, but the agency currently has no means of analyzing these to evaluate potential trends over time or look for indications of bias.  MCSO continues to regularly publish a number of reports on deputy activity and supervisory oversight that are not tied to the methodologies of the TSMR, TSQR, or TSAR.

The Audits and Inspections Unit (AIU) produces a monthly report evaluating Supervisory Notes that indicate whether supervisors are reviewing the EIS data of deputies under their command. The inspection looks for indications that supervisors made entries for each person they supervise with regard to two randomly selected BWC videos, provide one EPA note, make two supervisor entries, and indicate that the supervisor has reviewed their deputies' EIS statuses. Over the past six months of this inspection there has been remarkably high compliance rates – 97% or higher.  Each month, there have been one or two BIO Action Forms sent to Districts – but there does not appear to be any consistent patterns of concern.

In the Traffic Stop Review and Discussion Inspections for January and February, we see slightly more inconsistency from month to month; however, the compliance percentage remains above 90% and the deficiencies often stem from particular Districts and individual supervisors. For example, both the review and discussion inspection deficiencies in December and January stem from a single supervisor in District 1.  The District was sent a BIO Action Form to address these findings, and the inspection results from January and February show no deficiencies in District 1.

A third traffic-related audit is the Traffic Stop Data Inspection in which AIU uses a matrix comparing traffic stop information found on Vehicle Stop Contact Forms (VSCFs) with Computer Aided Dispatch (CAD) and Body-Worn Camera (BWC) footage.  In January and February, only six deficiencies were noted; but the compliance rate in each month fell below 95%.  The deficiencies noted were the result of inconsistent stop locations, end times, and vehicle information; however, these problems were spread across the organization and do not indicate repeated problems in any one District.  Any deficiencies that arise within these audits results in a BIO Action Form.  While we can look for trends over each quarter, we have suggested to MCSO that AIU should conduct an evaluation of all BIO Action Forms sent to

WAI 39881

Districts to ensure that there are not long term trends by District or supervisor that cannot be distinguished in looking at shorter timeframes.

EIU also produces a monthly report on alerts triggered within EIS. EIU personnel review the alerts and disseminate them to supervisors and District command if alerts indicate the potential for biased activity or thresholds are exceeded for particular actions like external complaints, unexcused absences, etc. Once the supervisors receive the alert investigation, they employ a template (Attachment B of GH-5, Early Identification System) to conduct the investigation and report their findings and results to the chain of command through Blue Team. MCSO has also created an EIS Alert Review Group (ARG) to evaluate the closure of alert investigations. During January-February, our review of the alert closures revealed no problematic findings. Following our previous suggestion, AIU has produced the first inspection of the alert investigation process in April 2019 using data from February 2019. The inspection specifically addresses the requirement that alert investigations should be completed within 30 days of assignment and evaluates the manner and effect of the closure of an investigation. In this first report, AIU indicates two-thirds of the investigations were completed within policy requirements. In time, this inspection may assist MCSO in recognizing patterns that may occur by District, supervisor or activity that triggers alerts to begin with. We will continue to evaluate these reports as they are produced.

As noted in Paragraph 70, MCSO has also completed all but one of the Action Plans emanating from the Third Traffic Stop Annual Report (TSAR). We have evaluated both the supervisory discussions leading up to the Action Plans (APs) and the Supervisory Notes describing the activity during the AP process. During our site visit meetings we have engaged MCSO in an ongoing dialogue about particular issues we observed in the data and videos provided. We will discuss the process and outcomes of the Third TSAR during the July 2019 site visit with the Parties and MCSO.

**Paragraph 73.** *Within 180 days of the Effective Date, MCSO shall either create a unit, which shall include at least one full-time-equivalent qualified information technology specialist, or otherwise expand the already existing role of the MCSO information technology specialist to facilitate the development, implementation, and maintenance of the EIS. MCSO shall ensure that there is sufficient additional staff to facilitate EIS data input and provide Training and assistance to EIS users. This unit may be housed within Internal Affairs ("IA").*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:** In compliance

The EIU is a fully functioning unit. A lieutenant commands the Unit, with four sergeants conducting investigations, and three office assistants to coordinate processes and paperwork. In addition, MCSO has created a Traffic Stop Analysis Unit (TSAU) to compile data and prepare cases emanating from the traffic stop analyses conducted. This Unit is led by a lieutenant with

WAI 39882

three sergeants and three analysts.  Both Units are housed within the Bureau of Internal Oversight.  MCSO created the TSAU after it became clear during the Second TSAR process that the EIU could not effectively produce the myriad reports necessary without continual transfers and temporary assistance from across the organization.  We noted that MCSO responded to the inefficiencies observed during the Second TSAR and has worked to eliminate the redundancies during the Third TSAR process.  MCSO has provided us with documents and videos related to the Supervisor Discussions from the Third TSAR.  These processes will be discussed during our July site visit.  MCSO has recognized the significance of early intervention and dedicated permanent resources to create a Traffic Stop Analysis Unit (TSAU), housed within BIO, to coordinate traffic stop data and develop protocols to respond in the future.  MCSO has noted that this new unit, and EIU in general, will develop specific supervisory training to respond to the requirements of both the TSAR and TSMR methodologies once they are finalized.

EIU has also overseen the expansion of the EIS database over the last 18 months to include Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), records from the Arizona Office of Courts (AOC), and training and policy receipt records from the Cornerstone software program (the HUB).  Supervisors now have much more information available to them about the deputies under their command than they ever had in the past.

EIU continues to revise the EIU Operations Manual.  During our April site visit, MCSO presented materials indicating that 77% of the manual is complete, which is a 17% improvement from January.  The remaining 23% of the manual is either under review or being developed.  These include all of the analytic methodologies mentioned above.  The eventual completion of the manual will provide additional transparency to MCSO data processes as a whole.

***Paragraph 74.***  *MCSO shall develop and implement a protocol setting out the fields for historical data, deadlines for inputting data related to current and new information, and the individuals responsible for capturing and inputting data.*

**Phase 1:**  In compliance

- GH-5 (Early Identification System), most recently amended on January 4, 2019.
- EIU Operations Manual, currently under revision.

**Phase 2:**  In compliance

MCSO has met the requirements of this Paragraph by elaborating the data to be collected and the responsibility of persons across the organization to review, verify, and inspect the data making up the early intervention system.

MCSO has not yet completed the revision of the EIU Operations Manual.  While 77% of the manual has been completed and approved, the remainder – pertaining to traffic stop analyses – is under development or review.

WAI 39883

MCSO has shown progress in the development of a data-handling protocol. While this section of the EIU Operations Manual (Section 306) remains under review, MCSO has created a committee of personnel from each unit that handles, or adds to, traffic data before it is analyzed. The reports from the regular monthly meetings of this group are made available to us and show the attention to detail and memorialization of changes put in place to improve data processes.

Finally, during January and February, EIU produced a monthly report for benchmarks not related to the above traffic stop methodologies. Benchmarks 3 and 8 (Paragraph 67) involve incidents of immigration inquiries and data validation errors committed by deputies. During this reporting period, there were no immigration inquiries and two data validation alerts noted in the January report. As noted in the AIU Traffic Data Inspection from January and February these occur when vehicle information is incomplete/incorrect or where information on the VSCF is not consistent with what is found in Computer Aided Dispatch (CAD). Each data validation alert resulted in an alert investigation that will appear in our closed alert cases for review. We believe MCSO's oversight of the benchmarks has been transparent and effective to this date.

**Paragraph 75.** *The EIS shall include a computerized relational database, which shall be used to collect, maintain, integrate, and retrieve:*

a.  *all misconduct Complaints or allegations (and their dispositions), excluding those made by inmates relating to conditions of confinement or conduct of detention officers (i.e., any complaint or allegation relating to a traffic stop shall be collected and subject to this Paragraph even if made by an inmate);*

b.  *all internal investigations of alleged or suspected misconduct;*

c.  *data compiled under the traffic stop data collection and the patrol data collection mechanisms;*

d.  *all criminal proceedings initiated, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the County and/or its Deputies or agents, resulting from MCSO Patrol Operations or the actions of MCSO Patrol Operation Personnel;*

e.  *all arrests;*

f.  *all arrests in which the arresting Deputy fails to articulate probable cause in the arrest report, or where an MCSO Supervisor, court or prosecutor later determines the arrest was not supported by probable cause to believe a crime had been committed, as required by law;*

g.  *all arrests in which the individual was released from custody without formal charges being sought;*

h.  *all Investigatory Stops, detentions, and/or searches, including those found by the Monitor, an MCSO supervisor, court or prosecutor to be unsupported by reasonable*

WAI 39884

*suspicion of or probable cause to believe a crime had been committed, as required by law;*

i.    *all instances in which MCSO is informed by a prosecuting authority or a court that a decision to decline prosecution or to dismiss charges, and if available, the reason for such decision;*

j.    *all disciplinary action taken against employees;*

k.    *all non-disciplinary corrective action required of employees;*

l.    *all awards and commendations received by employees;*

m.    *Training history for each employee; and*

n.    *bi-monthly Supervisory observations of each employee.*

**Phase 1:**  In compliance

- EA-3 (Non-Traffic Contact), most recently amended on June 14, 2018.
- GC-13 (Awards), most recently amended on January 24, 2019.
- GH-5 (Early Identification System), most recently amended on January 4, 2019.
- EIU Operations Manual, currently under revision.
- Professional Services Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

Since 2017, MCSO has placed into production data interfaces for Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), Justice Court turndowns (AOC) and the Cornerstone software program (the HUB) that provides reports for training and policy acknowledgment.  MCSO continues to develop some inspections that ensure that personnel are accurately using the EIS data available.  We will evaluate and monitor the use of EIS in furtherance of the First Order.

Paragraph 75.a. requires that the database include "all misconduct Complaints or allegations (and their dispositions)," with some exclusions.

EIPro, a web-based software application that allows employees and supervisors to view information in the IAPro case management system, includes the number of misconduct complaints and allegations against deputies.

Since February 2017, both open and closed cases have been viewable by supervisors.  PSB controls the ability to view open cases based upon the parties who may be involved.  PSB personnel developed a protocol to write the summaries for both open and closed cases.  This protocol has been approved, and was incorporated into the PSB Operations Manual that was published on December 13, 2018.  Following consultation with Court Implementation Division (CID) personnel, we modified our quarterly request for the external investigation synopses to a monthly request.  Each month we receive synopses of how open and closed external complaints appear in EI Pro for supervisors to review.  Our examination of these descriptions for January

WAI 39885

and February confirms that the summaries meet our expectations. Additionally, during our January and April site visits, we observed that field supervisors could easily access these summaries and understand the types of issues involved in the complaints. Supervisors are also advised that they can always contact EIU and PSB for clarification if it is necessary.

MCSO is in compliance with this Subparagraph.

Paragraph 75.b. requires that the database include "all internal investigations of alleged or suspected misconduct."

Corresponding to the discussion above involving external complaints, internal investigation summaries also appear in the IAPro system. All complaint summaries, open and closed, have been viewable since February 2017. PSB uses a standard protocol to develop the case summaries and access limits. This protocol has been approved by us and has been included in the PSB Operations Manual published in December 2018. CID personnel provide us with summaries of all open and closed internal investigations each month as they would appear to supervisors using EI Pro. Our review of the summaries for January and February finds that these summaries are transparent and easily understood. During our site visits, we have found that line supervisors are also able to easily access the summaries of open and closed internal investigations pertaining to their subordinates. Field supervisors always have the option of requesting additional information from EIU and PSB should they deem the summaries insufficient.

MCSO is in compliance with this Subparagraph.

Paragraph 75.c. requires that the database include "data compiled under the traffic stop data collection and the patrol data collection mechanisms."

MCSO has created electronic forms to collect data from traffic stops, incidental contacts and warnings.

MCSO has also created interfaces with EIS for remote databases including Incident Reports (IRs) and Non-Traffic Contact Forms (NTCFs). These reports are readily available to supervisors to review within EIS. Field supervisors have shown that they have the ability to view IRs and NTCFs during our January and April site visits. AIU already conducts an inspection of IRs. We have suggested during our last three site visits that MCSO create a similar inspection for NTCFs, as well as propose an analytical strategy to examine whether any racial or ethnic inconsistencies may exist in the incidents documented on the NTCF. When proposed, we will evaluate the sufficiency of this new inspection. Up to this point, MCSO has made available all NTCFs each month. In prior reporting periods, we have seen indications of trends of stops in particular geographic areas; however, during this reporting period, we saw no such indication. A statistical methodology would allow a more comprehensive examination. This Paragraph requires that the data for such activities exists within EIS; however, Paragraphs 72, 81a. and 81b.vi. require an analysis of these stops.

MCSO is in compliance with this Subparagraph.

WAI 39886

Paragraph 75.d. requires that the database include "all criminal proceedings initiated, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the County and/or its Deputies or agents, resulting from MCSO Patrol Operations or the actions of MCSO Patrol Operation Personnel."

MCSO's Legal Liaison Section receives and forwards this information to EIU for entry into the EIS database. Deputies self-report contacts they have with other agencies, and any two contacts within a rolling six-month period results in an alert requiring a supervisor to investigate. Supervisors have demonstrated the ability to access this information during our January and April site visits. In addition, there were no "notice of claim" alerts in the monthly alert allegations report from January through March provided by EIU.

MCSO is in compliance with this Subparagraph.

Paragraph 75.e. requires that the database include "all arrests."

Arrests may not always occur as a result of a traffic stop. MCSO, therefore, has placed into production an interface between EIS and the Jail Management System (JMS). This interface allows supervisors to easily access information regarding arrest that cannot be viewed through traffic data. During our site visits, supervisors have demonstrated the ability to access the IRs and related arrest information. The timeliness and sufficiency of that review is evaluated under Paragraph 93.

MCSO is in compliance with this Subparagraph.

Paragraph 75.f. requires that the database include "all arrests in which the arresting Deputy fails to articulate probable cause in the arrest report, or where an MCSO Supervisor, court or prosecutor later determines the arrest was not supported by probable cause to believe a crime had been committed, as required by law."

Incident Reports (IRs) are housed in the Filebound software system. MCSO has created an interface between Filebound and EIS to provide a summary of information to facilitate supervisory oversight. Supervisors must review and sign off on IRs for each deputy involving an arrest or detention of a suspect within 72 hours of the incident. Supervisors are also required to ensure that probable cause exists for each charge or arrest outlined within an IR. AIU additionally conducts a quarterly audit of IRs to ensure that all policy requirements are met. In all four quarters of 2018 over 97% of supervisors memorialized their review of the IRs and 100% of IRs contained the necessary probable cause statements.

If a court or prosecutor decides not to prosecute a case, both the deputy and their immediate supervisor are notified. AIU conducts an inspection of all cases turned down for prosecution. For January and February, the inspections found no issues of irreversible error. This resulted in a compliance rate of 100% for both months. MCSO also makes note of non-compliance deficiencies in their inspection. These are potential violations of policy, law or best practices that do not rise to the level of "irreversible error." In January-February, the inspections noted 29 deficiencies resulting in BIO Action Forms being sent to the appropriate District command staff. In two instances the investigator noted "unable to locate document that articulates

WAI 39887

aggravated assault" and "unable to locate probable cause on form 4"; however, neither was classified as an irreversible error as the deputy could supplement the case file and resubmit for a charging evaluation.  We have taken the position that the Order requires all instances where a deputy's reports involve a lack of probable cause must be captured in the data system, regardless of actions taken afterward.

MCSO remains in compliance with this Subparagraph, but must make an effort to resolve the definitions described previously.  We will work with MCSO on this issue.

Paragraph 75.g. requires that the database include "all arrests in which the individual was released from custody without formal charges being sought."

The ability to capture this information depends upon what actually occurred within the context of the interaction.  If the suspect was taken into physical custody but released prior to booking, there would be a JMS record, as indicated in Subparagraph 75.e. above.  Therefore, MCSO could use the interface described above to pull the relevant data elements into EIS.  However, if the incident does not rise to the point of physical custody and detention, then it would likely yield an Incident Report, covered under Subparagraph 75.f. above or an Investigatory Stop under Subparagraph 75.h. to follow.  The interfaces for IR and NTCF data became operational prior to July 1, 2017.

MCSO is in compliance with this Subparagraph.

Paragraph 75.h. requires that the database include "all Investigatory Stops, detentions, and/or searches, including those found by the Monitor, an MCSO supervisor, court or prosecutor to be unsupported by reasonable suspicion of/or probable cause to believe a crime had been committed, as required by law."

MCSO has created interfaces for both IRs and NTCFs.  As noted in 75f., all four quarterly audits of IRs for 2018 found that 100% had the necessary probable cause or reasonable suspicion statements necessary.  The monthly report of County Attorney turndowns for January and February, however, indicate two instances where prosecution was turned down due to the insufficient articulation of probable cause.  These two cases were sent to District personnel for review using a BIO Action Form.   We have already noted our concerns about the County/Justice Court Turndown Methodology in Paragraphs 69 and 75f.

In July 2017, the interface between EIS and the database for NTCFs was placed into production.  MCSO also reissued EA-3 (Non-Traffic Contact) and further amended the policy on June 14, 2018.  This policy specifies the responsibility of MCSO personnel regarding different types of search occurrences.  If the search is related to a traffic stop, it should be captured on the VSCF.  Searches occurring within activities resulting in an Incident Report will be captured under Subparagraph 75e., and NTCF searches fall under this Subparagraph.

Initially, the number of NTCF reports was insignificant; however, since May 2018, we generally receive between 15-25 NTCFs each month.  These are all captured within EIS as required by this Subparagraph (as well as 75.c.).  Our review of these cases for January-March note that they range from investigation of suspicious behavior to riding a bicycle without a

WAI 39888

light; however, there does not appear to be a consistent pattern other than the reoccurrence of locations in Guadalupe, Sun City and Mesa. We have brought the accumulated numbers of NTCFs to the attention of MCSO and requested that they develop an audit of NTCFs similar to what is currently done for IRs. We have also suggested that MCSO develop a methodology to statistically analyze the collection of NTCFs to look for possible issues of racial or ethnic bias in the way these interactions are conducted. In our review of the October-December NTCFs, we had noted a predominance of bicycle lighting violations in particular areas of the County; our review of the NTCFs from January-February have found no such tendencies. The development of a statistical examination of NTCF stops should be a priority for MCSO once the Traffic Stop Methodologies for the Annual and Monthly Analyses are complete. Such an examination is required by Paragraphs 72 and 81.b.vi. We will evaluate these processes as they are proposed.

Since NTCFs and IRs are included in EIS, MCSO is in compliance with this Subparagraph.

Paragraph 75.i. requires that the database include "all instances in which MCSO is informed by a prosecuting authority or a court that a decision to decline prosecution or to dismiss charges, and if available, the reason for such decision."

The EIS database has included both County Attorney Actions and an interface with the Justice Courts (AOC) since July 2017. AIU produces a monthly inspection of these cases, looking for the lack of probable cause as well as a host of other issues. The majority of deficiencies found result in an Action Form being sent to the relevant District command. In January and February we noted two instances where the prosecuting attorney noted that the deputies had not sufficiently articulated probable cause; however, these cases could be resubmitted with additional documentation noted by the prosecuting attorney. These cases were also referred to District personnel for review and action. We believe that MCSO must ensure that its methodologies comport with Order requirements, which do not make these distinctions. We will continue to evaluate this in future quarterly status reports.

MCSO is in compliance with this Subparagraph.

Paragraph 75.j. requires that the database include "all disciplinary action taken against employees."

MCSO currently tracks disciplinary actions in the IAPro system, which allows supervisors to search the history of their employees in EIS.

EIU produces a monthly alert report relevant to Paragraphs 70, 71, 75, and 81. Tables 8 and 9 of this report indicates the disposition of the alerts for the reporting period, ranging from "no further action" to "referral to PSB." Out of the 40 cases referred to supervisors for investigation from January to March, one resulted in an Action Plan, one was referred to PSB, and several have been completed through meetings with supervisors.

MCSO is in compliance with this Subparagraph.

WAI 39889

Paragraph 75.k. requires that the database include "all non-disciplinary corrective action required of employees."

MCSO uses a combination of Supervisory Note inspections (in particular, bimonthly reviews of a deputy's performance) and the monthly alert report described in the previous Subparagraph to fulfill the requirements for this Subparagraph.  As noted previously, the majority of cases are closed through no further action or meeting with a supervisor.  We also conduct evaluations of a randomly selected group of closed alert investigations each month.  Those closed with the notation of meeting with a supervisor have generally been found to be supported by the documents connected to the investigation.  In these reports, supervisors provide a synopsis of the instances leading up to the alert being triggered and provide a substantive description of the discussion they have had with the respective deputy.  From the sample we review, it is clear that most deputies take these meetings seriously and work to conform to the suggestions of their supervisors.  Supervisors also are required to make two comments regarding their subordinates each month.  In April, AIU also produced the first EIS Alerts Inspection Report for February data.  This report is meant to provide a clearer indication of what occurs with all closed alert investigations as well as evaluate the time it took to accomplish the tasks.  For the 15 cases closed in February nine indicated "no further action" while six noted that a "meeting with a supervisor" occurred.  Additionally, AIU reports that only 66.6% of the cases were closed within policy timeframes.  For those five cases where the timeframe exceeded policy guidelines a BIO Action Form was sent to the immediate supervisor.  Given time, this new audit should eliminate some of the guesswork in tracking the closure of alert investigations.

Supervisors can search the Supervisory Note field for each deputy using key words and phrases to determine if prior supervisors of a particular subordinate had employed briefings, trainings, or supervisory discussions to address similar issues.

AIU also evaluates a supervisor's use of EIS in the supervision of deputies assigned to them.  The Supervisory Note Inspection for January and February shows an overall compliance rate exceeding 97% per month.  The lowest overall measure of compliance was for the review of EIS data for their subordinates in February, 91%.  AIU sent BIO Action Forms to District 1 and Lake Patrol for these deficiencies.  Our review of the Action Form returns indicates that supervisors are generally counseled by lieutenants and captains to be sure to meet all of their supervisory obligations.

MCSO is in compliance with this Subparagraph.

Paragraph 75.l. requires that the database include "all awards and commendations received by employees."

WAI 39890

MCSO published GC-13 (Awards) on November 30, 2017 and updated this policy in January 2019.  With this publication, MCSO created categories for awards or commendations that could be tracked within the EIS database.  With the introduction of the newest version of EIPro, these fields are also searchable by supervisors.  During our January and April site visits, supervisors demonstrated how they could search these fields and locate awards of their subordinates' in the EIS data.  According to the monthly alert inspection reports for January-March there were no commendations recommended by supervisors.

MCSO is in compliance with this Subparagraph.

Paragraph 75.m. requires that the database include the "[t]raining history for each employee."

MCSO has transitioned from the Skills Manager System to the Cornerstone (the HUB) software program.  The HUB has replaced the E-Policy and E-Learning programs.  The HUB routinely updates recent training and policy reviews for deputies and is visible by immediate supervisors.  MCSO also created an interface between the HUB and EIS.

During our January and April site visits, all field supervisors stated they were familiar with the HUB and were able to access the information contained therein.  The difficulties supervisors had previously noted to us about scheduling training for their subordinates had been rectified by the Training Division and the Technology Management Bureau.  The supervisors also noted that when they ran into difficulties they could easily contact Training Division or Technology Management Bureau staff to assist them.  EIU personnel have also created an EIS refresher training for supervisors who have to conduct alert investigations.  We have approved this training, but during our April site visit, we requested that the Training Division evaluate the lesson plan to ensure that it comports with all other supervisory training before it is placed on the HUB.  We will continue to evaluate the ability of supervisors to easily search and utilize EIS during our next site visit.

MCSO is in compliance with this Subparagraph.

Paragraph 75.n. requires that the database include "bi-monthly Supervisory observations of each employee."

The Audits and Inspections Unit (AIU) conducts a monthly inspection of Supervisory Notes.  One of the indicators AIU evaluates is whether supervisors are making two notes per deputy each month.  In both January and February, the compliance rate for this measure was 98%.  Action Forms were sent to District 1 and 2 as a result of these deficiencies.  There were similar instances noted in November and December 2018.  Those forms had been returned with a note stating that lieutenants had met with the supervisors to reinforce the need to employ EIS to its fullest extent.

MCSO is in compliance with this Subparagraph.

WAI 39891

With the operationalization of interfaces for Incident Reports, Non-Traffic Contact Forms, the Arizona Office of the Courts, and the HUB, EIS now contains the information required by the Order. MCSO has worked diligently to use some of the data above to investigate compliance rates with the Orders.

**Paragraph 76.** *The EIS shall include appropriate identifying information for each involved Deputy (i.e., name, badge number, shift and Supervisor) and civilian (e.g., race and/or ethnicity).*

**Phase 1:** In compliance

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:** In compliance

MCSO has instituted a quality check process for VSCFs that requires supervisors to review all traffic stop documents within three days of the stop. AIU conducts an inspection of the timeliness of these reviews. For January, the compliance rate for supervisor review was 91%, which was due to a single supervisor in District 1. A subsequent inspection by AIU of Traffic Stop Data is designed to ensure that all necessary information is included on traffic forms, and these forms coincide with CAD and BWC images. The compliance rate for the data inspection ranges from 86% in February to 94% in January; however, none of the deficiencies during this reporting period were related to the identification of the deputy or drivers stopped.

MCSO has incorporated patrol data into the EIS through the creation of interfaces for Incident Report (IR) and Non-Traffic Contact Form (NTCF) documents. Each of these documents lists the required name of the deputy and civilian, as well as the ethnicity of the civilian, in accordance with this Paragraph. AIU conducts a quarterly inspection of IRs, including a check for racial/ethnic bias in the reporting documents and the identification of all parties contacted as a result of the incident. The compliance rate for the IR inspection during the third and fourth quarters of 2018 was 99%. None of the deficiencies found by AIU were related to the identification of persons contacted or deputies involved. Most deficiencies were the result of failing to file/sign documents within policy timeframes or the use of conclusory language. Non-Traffic Contact Forms contain the same basic information about the identity of the deputy making the contact and the persons being contacted. MCSO does not yet have an inspection of NTCFs, but they do provide us with copies of all the documents. Up to this point, we have not found an NTCF document that does not include the criteria required by this Paragraph.

WAI 39892

***Paragraph 77.*** *MCSO shall maintain computer hardware, including servers, terminals and other necessary equipment, in sufficient amount and in good working order to permit personnel, including Supervisors and commanders, ready and secure access to the EIS system to permit timely input and review of EIS data as necessary to comply with the requirements of this Order.*

**In Full and Effective Compliance**

Since our earliest site visits in 2014, we have addressed the issue of "necessary equipment, in sufficient amount and in good working order" with MCSO. As part of our monthly document requests, we receive an accounting, by District, of how many vehicles have functioning TraCS systems.

Since the end of 2015, we have found that all marked patrol vehicles were properly equipped with TraCS equipment. MCSO developed EB-2 (Traffic Stop Data Collection), which states that in the event that a TraCS vehicle is not operational, or available, each District possesses the necessary equipment at the substation for deputies to input his/her traffic stop information before the end of the shift. Due to the mountainous regions throughout Maricopa County, there have always been connectivity issues. However, these areas are well-known to Patrol deputies; and they have demonstrated how they adapt to connectivity problems. The VSCF also allows deputies to note issues with technology on a traffic stop.

During our January and April visits to the Districts, we spot-checked the facilities and patrol cars, and found that they had functioning TraCS equipment, and each District office had available computers for any occurrence of system failures with vehicle equipment. In addition, each District had spare parts, wires, and batteries, in the event that body-worn camera issues arose. Even so, command staff in the Districts have repeatedly noted that the old body-worn camera systems are experiencing battery and cable issues on a regular basis.

At present, the technology and equipment available at MCSO meet the requirements of the Order.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination. We will continue to conduct our spot inspections at the Districts, and MCSO will apprise us of any event that falls within the scope of this Paragraph.

WAI 39893

***Paragraph 78.*** *MCSO shall maintain all personally identifiable information about a Deputy included in the EIS for at least five years following the Deputy's separation from the agency. Information necessary for aggregate statistical analysis will be maintained indefinitely in the EIS. On an ongoing basis, MCSO shall enter information into the EIS in a timely, accurate, and complete manner, and shall maintain the data in a secure and confidential manner. No individual within MCSO shall have access to individually identifiable information that is maintained only within EIS and is about a deputy not within that individual's direct command, except as necessary for investigative, technological, or auditing purposes.*

**Phase 1:**  In compliance

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:**  In compliance

GH-5 (Early Identification System) clearly states that employees only have access to EIS in furtherance of the performance of their duties, and that any other unauthorized access will be addressed under MCSO's discipline policy. The policy also notes that access to individual deputy information will be limited to appropriate supervisory/administrative personnel of that deputy. In addition, the policy states that personal information will be maintained in the database for at least five years following an employee's separation from the agency; however, all other information will be retained in EIS indefinitely

The most recent occurrences of a misuse of MCSO's computer system occurred in 2011 and 2015. As a result, MCSO published a System Log Audit operating procedure in November 2017 that required PSB to notify the Technology Management Bureau of any investigations involving a system breach. This operating procedure (BAS SOP 17-4) was fully vetted during our January 2018 site visit. MCSO reported no system breaches occurring between our January and April site visits. In addition, we receive summaries of all internal investigations each month. In March, one case indicated that a deputy was under investigation for potentially misusing the Arizona Criminal Justice Information System (ACJIS). As this is an ongoing investigation, we will request additional information on the outcome of this investigation when it becomes available. At present, this case would not have triggered the operating procedure noted above because PSB has not yet completed its investigation.

MCSO's concern for the integrity of information in EIS is further exemplified by the protocols that PSB has created to meet the requirements of Subparagraphs 75.a. and 75.b. regarding purview of open complaints and internal investigations. PSB not only controls who can view summaries of open investigations, but has created a protocol for creating the summary of open investigations to protect the integrity of the case while it is being processed.

WAI 39894

MCSO has also created a work group to ensure the integrity of traffic stop data used for analysis. These protocols used by this work group are currently under review and will be incorporated into the next draft of the EIU Operations Manual (Section 306) when approved. Moreover, although the annual report includes analyses that identifies deputies who are outliers compared to their peers with regard to traffic stops, citations, warnings and arrests that may indicate racial/ethnic bias, the identities of these deputies are removed from documents prior to being made public.

*Paragraph 79. The EIS computer program and computer hardware will be operational, fully implemented, and be used in accordance with policies and protocols that incorporate the requirements of this Order within one year of the Effective Date. Prior to full implementation of the new EIS, MCSO will continue to use existing databases and resources to the fullest extent possible, to identify patterns of conduct by employees or groups of Deputies.*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:** Not in compliance

During 2017 and early 2018, MCSO added four interfaces between remote databases and EIS. The EIS now includes Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), Justice Court turndowns (AOC) and the Cornerstone software program (the HUB) that replaced the Skills Management System (SMS). Supervisors now have the ability to search this additional information for their subordinates without having to access multiple systems. While a significant improvement, the employment of the EIS database remains limited as MCSO is reviewing and developing methodologies for the Traffic Stop Monthly, Quarterly, and Annual Reports (TSMR, TSQR, and TSAR) as the result of hiring a new statistical contractor. During our last three site visits, we have also suggested to MCSO that the agency would need to create an analytical plan for the Non-Traffic Contact Forms that have accumulated over the past year. Until these are complete and operational, MCSO will not achieve Phase 2 compliance with this Paragraph.

In the meantime, EIU and AIU pull together data to produce reports and inspections of both deputy and supervisor activity. The EIS automatically triggers alerts for behaviors ranging from unscheduled absences to external complaints. The EIU uses this information to create monthly reports and to determine whether an investigation by a supervisor is required. AIU has most recently published a new inspection on EIS Alert Processes to ensure that alert investigations are conducted within policy timeframes and to summarize the manner in which investigations were closed. The inspection shows that nearly one third of completed alert investigations exceeded policy timeframes and resulted in a BIO Action Form being sent to affected Districts.

WAI 39895

AIU also uses the EIS database to generate numerous inspections of traffic stop data, Supervisory Notes, and County Attorney turndowns – among many others.  When deficiencies are found, AIU sends out BIO Action Forms to the District command to rectify the situation and memorialize what was done.  AIU has already automated an alert threshold for repeated Action Forms for the same events.  AIU personnel are developing a monthly inspection for Action Forms that allows command staff to pinpoint if there are patterns occurring that may not be evident by looking at individual cases.  The goal is to track deficiencies by Districts, shifts, and squads to focus corrective measures in the most beneficial way.

We will review the proposals as they are made available.

### b. Training on the EIS

**Paragraph 80.**   *MCSO will provide education and training to all employees, including Deputies, Supervisors and commanders regarding EIS prior to its implementation as appropriate to facilitate proper understanding and use of the system.  MCSO Supervisors shall be trained in and required to use EIS to ensure that each Supervisor has a complete and current understanding of the employees under the Supervisor's command.   Commanders and Supervisors shall be educated and trained in evaluating and making appropriate comparisons in order to identify any significant individual or group patterns.   Following the initial implementation of the EIS, and as experience and the availability of new technology may warrant, MCSO may propose to add, subtract, or modify data tables and fields, modify the list of documents scanned or electronically attached, and add, subtract, or modify standardized reports and queries.  MCSO shall submit all such proposals for review by the Monitor pursuant to the process described in Section IV.*

**Phase 1:**  In compliance

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:**  In compliance

MCSO completed the EIS and SRELE Training for all supervisory personnel overseeing patrol or traffic operations in November 2017.  Nearly all supervisors remarked that they believe that future training should include more hands-on activities that they encounter on a regular basis.  We recommended that the supervisors contact EIU and the Training Division to develop these ideas.

WAI 39896

We will continue to evaluate how the delivery of this training impacts the use of EIS tools by supervisors.  We have noted in previous Paragraphs that the Supervisory Note inspections produced on a monthly basis show compliance rates in excess of 97% for the period of January – February.  During our January site visit, the EIU lieutenant informed us that he had created a refresher course for supervisors on EIS tools that would eventually be accessible through the HUB.  We reviewed these materials and made several suggestions.  During our April site visit, we asked the Training Division to review the material to ensure that it coincides with other supervisory training before it is placed on the HUB.  We will report on the outcome of this evaluation when it is made available.

### c. Protocol for Agency and Supervisory Use of the EIS

**Paragraph 81.**  *MCSO shall develop and implement a protocol for using the EIS and information obtained from it.  The protocol for using the EIS shall address data storage, data retrieval, reporting, data analysis, pattern identification, identifying Deputies for intervention, Supervisory use, Supervisory/agency intervention, documentation and audit.  Additional required protocol elements include:*

a.    *comparative data analysis, including peer group analysis, to identify patterns of activity by individual Deputies and groups of Deputies;*

b.    *identification of warning signs or other indicia of possible misconduct, including, but not necessarily limited, to:*

  i.    *failure to follow any of the documentation requirements mandated pursuant to this Order;*

  ii.    *racial and ethnic disparities in the Deputy's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of Deputies' specific duties, or racial or ethnic disparities in traffic stop patterns when compared with data of a Deputy's peers;*

  iii.    *evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;*

  iv.    *a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;*

  v.    *complaints by members of the public or other officers; and*

  vi.    *other indications of racial or ethnic bias in the exercise of official duties;*

WAI 39897

c.    *MCSO commander and Supervisor review, on a regular basis, but not less than bimonthly, of EIS reports regarding each officer under the commander or Supervisor's direct command and, at least quarterly, broader, pattern-based reports;*

d.    *a requirement that MCSO commanders and Supervisors initiate, implement, and assess the effectiveness of interventions for individual Deputies, Supervisors, and units, based on assessment of the information contained in the EIS;*

e.    *identification of a range of intervention options to facilitate an effective response to suspected or identified problems.  In any cases where a Supervisor believes a Deputy may be engaging in racial profiling, unlawful detentions or arrests, or improper enforcement of Immigration-Related Laws or the early warning protocol is triggered, the MCSO shall notify the Monitor and Plaintiffs and take reasonable steps to investigate and closely monitor the situation, and take corrective action to remedy the issue.  Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or other supervised, monitored, and documented action plans and strategies designed to modify activity.  All interventions will be documented in writing and entered into the automated system;*

f.    *a statement that the decision to order an intervention for an employee or group using EIS data shall include peer group analysis, including consideration of the nature of the employee's assignment, and not solely on the number or percentages of incidents in any category of information recorded in the EIS;*

g.    *a process for prompt review by MCSO commanders and Supervisors of the EIS records of all Deputies upon transfer to their supervision or command;*

h.    *an evaluation of whether MCSO commanders and Supervisors are appropriately using the EIS to enhance effective and ethical policing and reduce risk; and*

i.    *mechanisms to ensure monitored and secure access to the EIS to ensure the integrity, proper use, and appropriate confidentiality of the data.*

**Phase 1:**  In compliance

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:**  Not in compliance

MCSO produces a number of reports and inspections that are relevant for this Paragraph. However, due to issues with EIS data and methods of analysis, MCSO has not been able to reliably produce the Traffic Stop Monthly Report (TSMR) based upon the criteria outlined in Paragraph 67; nor has MCSO ever produced a Traffic Stop Quarterly Report (TSQR). Additionally, each of the Annual Reports (TSAR) has been delayed, or had to be rewritten, because of anomalies that arose in the data or the manner in which it was analyzed.  MCSO has contracted with a new outside vendor to conduct analyses of traffic stop data.  MCSO's vendor is currently reviewing past TSAR methodologies and proposals for the TSMR to ensure that the

WAI 39898

methods employed are efficient and meet the requirements of the Order. We and the Parties have commented on earlier drafts of the methodologies for TSMR and TSAR and will continue to work in concert with MCSO to find solutions for the issues that currently limit the full use of the EIS database.

Paragraph 81.a. requires that MCSO's EIS protocols include "comparative data analysis, including peer group analysis, to identify patterns of activity by individual Deputies and groups of Deputies."

The EIU has conducted monthly and annual analyses looking for outliers that may indicate that an individual is behaving in a biased or unprofessional manner, in accordance with Paragraphs 65, 66, and 67. The TSMR has been suspended and under revision since April 2016. MCSO has proposed new methodologies in consultation with its new vendor. We and the Parties have had the opportunity during and between site visits to ask questions and receive additional information. Once proposals are finalized, we will work with them to test and implement these processes as soon as possible. Most importantly, MCSO is proposing a new method of matching deputies using personal and professional characteristics to go beyond previous methods that were based upon geographic location of traffic stops. These proposals have been met with support from deputies across the organization during meetings between MCSO personnel and the data analyst vendor (CNA).

MCSO has never produced a TSQR. There have been several proposals regarding the substance and form these reports may take, but no data has been used to produce an analysis to date. During our discussions with MCSO over the past several months regarding the TSAR and TSMR, we have broached several possible topics for special studies that would fulfill the requirements of the TSQR. These special studies may include, but are not limited to: possible refinements to the proposed TSAR and TSMR methods once they are implemented; a review of deputies who have gone through previous iterations of the supervisory discussion process; the impact of special assignments on the traffic stop data; and the impact of the backfill program which requires deputies not assigned to Patrol to work in a District on an occasional basis. We will evaluate these as they are proposed.

MCSO has completed the supervisory discussions emanating from the Third TSAR and with the exception of one deputy have completed all of the Action Plans associated with these supervisor discussions. We will discuss our evaluation and findings of the Third TSAR with the Parties and MCSO during our July 2019 site visit.

MCSO has also created an interface for Non-Traffic Contact Forms (NTCFs) to be available in the EIS database; however, MCSO has yet to develop a methodology to investigate whether patterns of problematic behavior/action might be occurring in the stops these forms document. We have discussed these issues with MCSO during our site visit meetings since October 2018. We will continue to work with MCSO to utilize these civilian contacts to their fullest potential.

MCSO is not in compliance with this Subparagraph.

WAI 39899

Paragraph 81.b. requires that MCSO's EIS protocols include "identification of warning signs or other indicia of possible misconduct."

GH-5 (Early Identification System) provides significant direction for employees and supervisors alike to understand what type of behaviors will be viewed as problematic. As noted above, the intent of the TSAR and TSMR is to identify deputies who might be engaged in biased activity regarding who they stop, cite, warn, or search. MCSO has been developing new methods for the TSMR, and we have collectively engaged in numerous discussions about the TSAR. We are confident that the benchmarks from Paragraph 67 will be operational in future monthly analyses, given the progress that MCSO has made to date.

MCSO is also revising the EIU Operations Manual, which will include sections on data protocols and the several analyses based upon the traffic stop and patrol data. The manual also includes thresholds for behavior ranging from failure to arrive on time for work to external complaints. BIO is examining these thresholds to determine why they were set at the present levels. This investigation may result in the modification of thresholds that have proven unproductive over the last several years. MCSO has also indicated that it is surveying the practices of other local law enforcement organizations to receive examples of the best practices that are currently in use. We will review these changes as they are proposed. Regardless of the outcome, we believe it is a worthwhile endeavor to test processes that have been in place to ensure that they are as efficient as they were intended.

Finally, as noted in Subparagraph 81.a. and 81.b.vi, MCSO should utilize all patrol data to evaluate the behavior of deputies in comparison to their peers. While the volume of NTCFs pales in comparison to traffic stops, there are enough accumulated forms for analysis to commence. As we noted in Paragraph 75, we receive all NTCFs each month. The volume ranges from 15-25 per month. In our review of these interactions, we have noted that they typically involve suspicious behavior or violations of traffic laws while on bicycles. We have suggested to MCSO that the agency should create an analytic method to determine trends in activity over time. We will await MCSO's proposal and provide assistance where possible.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.c. requires that MCSO's EIS protocols include "MCSO Commander and Supervisor review, on a regular basis, but not less than bimonthly, of EIS reports regarding each officer under the Commander or Supervisor's direct command and, at least quarterly, broader, pattern-based reports."

Supervisory Note inspections include four measures to assess how well supervisors are using EIS information to oversee the activity and behavior of their subordinates. These actions range from making supervisory comments on deputies, reviewing their body-worn camera footage, making Employee Performance Appraisal (EPA) notations, and reviewing subordinates' EIS profiles. The overall compliance average across these criteria has remained steady in the upper 90th percentile for the past several months; including October 2018-February 2019. When deficiencies are discovered in this inspection, AIU sends out an Action Form to the immediate supervisor for response and remedy. Given the high level of compliance, these deficiencies

WAI 39900

usually involve individual supervisors across the organization. Rarely have we seen deficiencies involving the same supervisors in consecutive months; however, identifying such trends from static data is difficult. MCSO has already included repetitive Action Form deficiencies as an alert allegation. AIU is developing a proposal to better track Action Forms by type, individual, and District to ensure that any corrective actions are targeted at the most appropriate level and to be able to determine if there are particular supervisors that appear repeatedly within specified timeframes. We will evaluate this proposal as it is made available.

MCSO is in compliance with this Subparagraph.

Paragraph 81.d. requires that MCSO's EIS protocols include "a requirement that MCSO Commanders and Supervisors initiate, implement and assess the effectiveness of interventions for individual Deputies, Supervisors, and units, based on assessment of the information contained in the EIS."

The EIS database generates alerts for issues ranging from use of force to unexplained absences. From these alerts, EIU personnel send out for investigation those alerts that are not redundant or mischaracterized in some fashion. Supervisors have a set amount of time to return these investigations with a description of their investigation and the outcome. MCSO has created an EIS Alert Review Group (ARG) that reviews the investigations of supervisors prior to closing an alert. The group ensures that the reports of the supervisors address all aspects of the assigned investigation, and returns those that are deficient to the District for continued revision. Following the creation of the ARG, we have found the supervisors' investigations and actions to be well-founded. The review group typically has requested additional information in two-thirds of the investigations evaluated by them. We have been provided the original alert investigation documents (Attachment B of GH-5, Early Identification System) as well as modified ones arising from the review group's requests. AIU has also created a new inspection for EIS Alert Review Processes. This inspection initially determines whether the investigation was completed within policy timeframes. The first inspection, published in April 2019 for the closed alerts from February 2019, showed that one-third were not completed within 30 days. Action Forms were sent to the affected Districts. In this first inspection, AIU found that the investigations were closed with either no action or through a meeting with a supervisor. We believe that as the experience with this inspection evolves, MCSO will also be able to address whether the interventions undertaken are successful based upon whether new investigations are triggered for the same deputies or supervisors. We will continue to engage MCSO in this evaluation process in accordance with this Paragraph.

MCSO is in compliance with the Subparagraph.

Paragraph 81.e. requires MCSO's EIS protocols to include "identification of a range of intervention options to facilitate an effective response to suspected or identified problems. In any case where a Supervisor believes a Deputy may be engaging in racial profiling, unlawful detentions or arrests, or improper enforcement of Immigration-Related Laws or the early warning protocol is triggered, MCSO shall notify the Monitor and Plaintiffs and take reasonable steps to investigate and closely monitor the situation, and take corrective action to remedy the

WAI 39901

issue.  Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or other supervised, monitored, and documented action plans and strategies designed to modify activity.  All interventions will be documented in writing and entered into the automated system."

GC-17 (Employee Disciplinary Procedures) and GH-5 (Early Identification System) provide a wide range of options for supervisor interventions, as well as practical guidelines about how to employ those options.  As noted above, GH-5 includes Attachment B, "Early Identification Alert Response Form."  This form specifies the responsibility of supervisors and serves as a checklist of processes the supervisor should use.  EIU also attaches any documents, citations, or BWC recordings the supervisor might need to conduct an inquiry.  We began seeing the use of these forms in April 2017.  By September 2017, we found that the closure of alert investigations by supervisors had improved.  Most recently, we have only inquired about the ongoing status of PSB inquiries that took priority over alert investigations or updates on Action Plans that have been enacted following discussions between District and EIU personnel.  MCSO has also created an EIS Alert Review Group (ARG) to ensure that the closure of alerts is supported by documentation from supervisors and responsive to the needs of the organization.  The number of completed investigations has dropped over the past several months as the ARG has taken a proactive role to communicate with the Districts and individual supervisors how to effectively complete these investigations.  This has meant that when the ARG intervenes, the total time to complete an investigation has increased; however, once complete, these investigations contain sufficient information to support the actions taken by District personnel.

As described in previous Paragraphs, AIU has also published the first EIS Alert Review Process inspection.  This inspection ensures that supervisors are being held to policy timeframes and that the interventions recommended comport with the context surrounding the initial allegation.  We believe that this inspection will promote more consistency – in the tracking of alert investigations and the resultant outcomes – than has been available in the past.

MCSO is in compliance with this Subparagraph.

Paragraph 81.f. requires that MCSO's EIS protocols include "a statement that the decision to order an intervention for an employee or group using EIS data shall include peer group analysis, including consideration of the nature of the employee's assignment, and not solely on the number or percentages of incidents in any category of information recorded in the EIS."

In the development of GH-5 (Early Identification System), MCSO has taken into consideration the nature of the employee's assignment.  In prior versions of GH-5, MCSO created an appendix for thresholds that indicated, for example, that the "use of force" threshold was different for Detention and Patrol personnel.  Detention personnel are much more likely to need to employ force than their Patrol counterparts.  In the current version of GH-5, MCSO makes reference to thresholds that will be included in the EIU Operations Manual.  MCSO is evaluating the threshold limits to ensure that they are achieving the goals for which they were

WAI 39902

originally set.  In addition, MCSO is communicating with other local law enforcement agencies to collect information about current best practices regarding thresholds they employ.

MCSO has also engaged a new outside contractor for analysis of traffic stop data.  Up to this point, MCSO is proposing an expansion of "peer" comparisons beyond just the location of the traffic stop.  MCSO is proposing to match deputies based upon personal and professional characteristics.  This proposal has been vetted by us and the Parties.  We will evaluate the sufficiency of these methods as the process evolves.  At present, we believe the proposed methodology is well-founded.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.g. requires that MCSO's EIS protocols include "a process for prompt review by MCSO Commanders and Supervisors of the EIS records of all Deputies upon transfer to their supervision or command."

MCSO has noted the need for a prompt review in both the "Supervisor Responsibilities" and "Command Staff Responsibilities" sections of GH-5 (Early Identification System).  EIU specifically addressed this issue during the EIS and SRELE training completed in November 2017.  EIU advised supervisors to document when they conducted their review in Supervisory Notes, as well as how long the deputy had been working in their chain of command when the review was conducted.  During our January and April visits to several Districts, we were informed that most command staff attempt to review these materials within the first few days that a deputy, or supervisor, moves to their District.  In no cases have we found information where the 14-day limit outlined in policy has been problematic.

MCSO is in compliance with this Subparagraph.

Paragraph 81.h. requires that MCSO's EIS protocols include "an evaluation of whether MCSO Commanders and Supervisors are appropriately using the EIS to enhance effective and ethical policing and reduce risk."

EIU has improved the processing and tracking of alert investigations.  The development of Attachment B to GH-5 (Early Identification System) and training completed in EIS and SRELE in November 2017 has dramatically improved the information provided by supervisors when closing alerts.  AIU has also created a new EIS Alert Review Process inspection that specifically looks for indications that supervisors have conducted a thorough examination within appropriate policy timeframes and selected effective responses to the allegations included in the alert investigation.  The first inspection was completed in April 2019, using data from February 2019.  MCSO has been working on this inspection process for several months.  We believe that, over time, MCSO will be able to judge the effectiveness of interventions with this tracking inspection by identifying deputies and supervisors who trigger additional alerts.  This inspection will become a valuable component to ensure that supervisors and command staff are utilizing EIS to promote efficiency and ethical policing during the alert investigation process.  The first inspection provides a foundation for future comparison.  While only two-thirds of the inspections closed in February met policy timeframes, we found no issues with the

WAI 39903

conclusions used for closing these investigations. For the one-third of cases that were not closed within policy guidelines, BIO sent out Action Forms to the Districts. As this process becomes more routine, we expect that District personnel will adjust to the policy requirements.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.i. requires that MCSO's EIS protocols include "mechanisms to ensure monitored and secure access to the EIS to ensure the integrity, proper use, and appropriate confidentiality of the data."

MCSO has addressed the security and integrity of data in GH-5 (Early Identification System), as well as instituted facility inspections throughout the Districts – including the security of terminals, access to information, and mobile displays. We spot-check technology and security of old forms during each site visit and have found no problems to date. Additionally, on November 6, 2017, MCSO published the operating procedure for System Log Audit Requests; this became effective on November 30, 2017. The procedure outlines how PSB personnel will notify the Technology Management Bureau of any misuse of MCSO information systems allegations and request an audit of the suspected breach. We discussed this operating procedure, BAS SOP 17-4, during our January 2018 site visit meetings; it meets all of the concerns voiced since the February 2017 discovery of two cases where data was compromised, but no one notified the Technology Management Bureau. We believe this procedure has proven effective to this point. In addition, we are provided all internal investigation summaries initiated each month; and found only one instance in March 2019 where a deputy is accused of misusing ACJIS. This complaint is currently under investigation and we will report on the results as they become available. This complaint will not be forwarded to the Technology Management Bureau until after PSB's investigation is complete.

MCSO is in compliance with this Subparagraph.

MCSO meets some of the requirements of Paragraph 81, but there remain a variety of activities that are currently ongoing that need to be completed before MCSO will be compliant. These range from the finalization of the TSMR, TSQR, and TSAR methods to the completion of revisions to the EIU Operations Manual. AIU has improved the tracking of alert investigations with the creation the EIS Alert Review Process Inspection; and we have suggested to MCSO that a similar tracking inspection should be created for all BIO Action Forms sent to the Districts. We have also requested that MCSO devise an audit for the NTCFs that have been accumulating over the past year. We and the Parties remain concerned that we have not noted many instances where supervisors proactively intervene with their subordinates; rather, the supervisors wait until prompted by EIS alerts or the ARG review of completed alert investigations. Command staff have taken a more active role in evaluating the work of supervisors as evidenced by the number of alert investigations returned to supervisors for revision or additional inquiry. We will continue to evaluate progress toward the goals outlined in this Paragraph.

WAI 39904

## Section 9: Supervision and Evaluation of Officer Performance

**COURT ORDER X. SUPERVISION AND EVALUATIONS OF OFFICER PERFORMANCE**

*Paragraph 82.  MCSO and the County shall ensure that an adequate number of qualified first-line Supervisors are available to provide the effective supervision necessary to ensure that Deputies are following the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order.  First-line Supervisors shall ensure that Deputies are policing actively and effectively, are provided with the instruction necessary to correct mistakes, and are held accountable for misconduct.   To achieve these outcomes, MCSO shall undertake the following duties and measures:*

*Paragraph 83.  MCSO Supervisors shall provide the effective supervision necessary to direct and guide Deputies.  Effective supervision requires that Supervisors: respond to the scene of certain arrests; review each field interview card and incident report; confirm the accuracy and completeness of Deputies' daily activity reports; respond to each Complaint of misconduct; ensure Deputies are working actively to engage the community and increase public trust and safety; provide counseling, redirection, support to Deputies as needed, and are held accountable for performing each of these duties.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

**Phase 2:**  In compliance

During our April site visit, we interviewed supervisors and commanders from Districts 3 and 6 to determine compliance with MCSO policies and the requirements of this Paragraph.

During our visit to District 6, we met with the District Commander, a lieutenant, and a sergeant. The District 6 hours of operation remain the same: business days, from 0800-1700.  District 6 is still on a 4/10 schedule.  With regard to crime, the District 6 Commander reported that most of their concerns are related to property crimes and traffic.  The Town of Queen Creek is growing at a rate of 7-10% annually, and the crime rate reflects that growth.  District 6 deputies averaged 1.6 arrests daily in 2018.  The District recently lost its crime analyst; and during the week of our site visit, there were several applicants scheduled for interviews.  We inquired if any deputies had received community-policing training, and learned that deputies had not had any formal community-policing training.  The District Commander stated that there were four supervisors who previously had community-policing instruction.  This was not AZPOST (Arizona Peace Officers Standards and Training)-approved training, but discussions on the concepts of community policing.

WAI 39905

We noted that there is still a significant concern with lack of staffing in the District. (At the time of our visit, the District had 11 vacancies.) For the time being, the command staff at District 6 appears to be properly managing staffing issues. It is incumbent upon MCSO to find a solution to its staffing issues, as prolonged use of personnel on an overtime basis could lead to increased stress levels and negatively impact employee morale.

During our visit to District 3, we interviewed the District Commander, a lieutenant, and a sergeant. The District 3 hours of operation are Monday-Friday, from 0800-1600. District 3 uses a 3/13 shift schedule. The primary concerns are thefts, traffic crashes, and fraud. Proactively, deputies do welfare checks and vacation watches. District personnel have conducted fraud presentations to community groups. An open house was conducted in April, for community residents to interact with MCSO personnel. District 3 personnel met with community groups in Youngstown concerning issues with the homeless population. The command staff at District 3 has been encouraging deputies to increase their interactions with the community when they are not answering calls for service. District 3 has nine deputy vacancies and two sergeant vacancies. When asked if there were any suggestions to improve the efficiency of operations, the District 3 Captain suggested that each District have an employee assigned to compliance matters to update personnel, conduct reviews of documents, and monitor compliance issues. The command staff stated that the burden of administrative tasks are prohibiting supervisors from being proactive in the field.

We reviewed a representative sample of 86 Incident Reports for January, for the randomly selected date of January 24, 2019. Of the 86 Incident Reports, 82 had proper documentation of timely supervisory review. Of the 86 Incident Reports, 11 were vehicle crashes. All 11 Vehicle Crash Reports had documentation that a supervisor had reviewed and approved the reports. The compliance rate for timely supervisory review of Incident Reports in January was 95%. Supervisors reviewed and approved nine of 10 Arrest Reports, within the required timeframes. During our quality control review of Incident Reports, we noted no significant deficiencies. For January, MCSO reported 624 hours of community policing.

We reviewed a representative sample of 85 Incident Reports for February, for the randomly selected date of February 20. Eighty-three of the 85 Incident Reports were reviewed and memorialized by a supervisor within the required seven days. There were 16 Vehicle Crash Reports submitted in the sample for February, of which all included documentation of supervisory review. The compliance rate for timely supervisory review of Incident Reports in February was 98%. We conducted a quality review on a 10% random sample of the reports we reviewed, and found no significant errors. For February, MCSO reported 631 hours of community policing.

We reviewed a representative sample of 87 Incident Reports March, for the randomly selected date of March 7. All Incident Reports had been turned in before the end of the shift. Seventy of the 87 Incident Reports included documentation that they had been reviewed and approved by supervisors as required by this Paragraph. One Incident Report was not reviewed within the required timeline, and there were 16 vehicle crashes where we could not verify proof of

WAI 39906

supervisory review. The compliance rate for timely supervisory reviews of Incident Reports for March was 80%. Supervisors reviewed and approved all 12 Arrest Reports within 72 hours. We conducted a quality review on a 10% random sample of the reports submitted and found no significant deficiencies. For March, MCSO reported 528 hours of community policing.

For each month of the quarter, we selected a supervisor and a squad of deputies from each District. We requested several documents, including Patrol Activity Logs (PALs), for each deputy. We reviewed PALs for each month of the quarter to assess if they were turned in by the end of each shift, and if supervisors reviewed each PAL. For January, we reviewed PALs for 31 deputies and eight supervisors. All 31 deputies' Patrol Activity Logs contained documentation of supervisory review. All eight supervisors' Patrol Activity Logs contained documentation of command-level review. For February, we reviewed Patrol Activity Logs for 28 deputies and seven supervisors. All 28 deputies' PALs contained documentation of supervisory review. All seven supervisors' PALs contained documentation of command-level review. For March, we reviewed Patrol Activity Logs for 24 deputies and eight supervisors. All 24 deputies' PALs contained documentation of supervisory review; all eight sergeants' PALs contained documentation of command-level review.

We also reviewed deputies' and supervisors' PALs to determine if supervisors provided on-scene supervision, and if those supervisor-deputy contacts were documented. For the sample dates selected in January, there were 19 supervisor-deputy field contacts reported by deputies and supervisors. For the sample dates selected in February, there were 34 supervisor-deputy field contacts reported by deputies and supervisors. For the sample dates selected in March, there were 33 supervisor-deputy field contacts reported by deputies and supervisors.

For January, February, and March, we reviewed the submissions of non-traffic incidents involving stops and detentions, which were recorded in Non-Traffic Contact Forms (NTCFs). For January, we selected all 18 NTCFs generated during the month, for review. All NTCFs had been submitted prior to the end of the shift. Seventeen of the 18 NTCFs were reviewed and approved by supervisors within 72 hours as required by the First Order. The compliance rate for timely supervisory review of NTCFs in January was 94%. For February, we selected all 18 NTCFs to review. All NTCFs were submitted prior to the end of the shift. Twelve of the 18 NTCFs were reviewed and approved by supervisors within the required timeframe. The compliance rate for timely supervisory review of NTCFs in February was 67%. For March, we selected 24 NTCFs generated during the month, for review. All 24 NTCFs were submitted within the required timeframe. All 24 NTCFs were reviewed and approved by supervisors within the required 72 hours. The compliance rate for timely supervisory review of NTCFs in March was 100%. For the fourth quarter, compliance with timely supervisory review of NTCFs was 88%. Compliance with timely reviews of NTFCs is assessed in conjunction with timely reviews of VSCFs, under Paragraph 90.

WAI 39907

We have previously reported that community engagement activities reported by deputies in the sample of Patrol Activity Logs we reviewed had decreased.  During this reporting period, from the sample of PALs reviewed, we noted five instances where deputies noted community-policing events.

**Paragraph 84.** *Within 120 days of the Effective Date, all patrol Deputies shall be assigned to a single, consistent, clearly identified Supervisor.  First-line field Supervisors shall be assigned to supervise no more than twelve Deputies.*

**Phase 1:** In compliance

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

**Phase 2:** In compliance

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the first quarter of 2019.  During this reporting period, consistent with our methodology, for January we reviewed a sample of shift rosters from Districts 1, 2, and 3; for February we reviewed a sample of shift rosters from Districts 4, 6, and 7 and Lake Patrol; and for March we reviewed a sample of shift rosters from Districts 1, 2, and 3.  Monthly and daily rosters indicated that deputies were assigned to one single consistent supervisor.  For the 60 dates selected in this reporting period, all shifts were in compliance.  There were 10 span of control memos generated during this reporting period, indicating that those shifts or part of those shifts exceeded the supervisor-deputy ratio of 1:8.  Five of the span of control memos were generated by District 2, four memos were generated by District 3, and one memo was generated by District 4.  MCSO did not exceed the 1:10 supervisor-deputy ratio in any of the sample shifts we inspected during this reporting period.  MCSO remains in compliance with this Paragraph.

**Paragraph 85.** *First-line field Supervisors shall be required to discuss individually the stops made by each Deputy they supervise with the respective Deputies no less than one time per month in order to ensure compliance with this Order.  This discussion should include, at a minimum, whether the Deputy detained any individuals stopped during the preceding month, the reason for any such detention, and a discussion of any stops that at any point involved any immigration issues.*

**Phase 1:** In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

**Phase 2:** In compliance

WAI 39908

Consistent with our methodology, we requested that MCSO provide copies of reports documenting that supervisors are meeting with and discussing individually the stops made by each deputy, at least once per month. We requested documentation for one randomly selected supervisor from each District, for each month of the reporting period, and the squad of deputies who reports to that supervisor. Supervisors record the discussion of traffic stops by applying the "Discussed with Deputy" option. MCSO documents supervisor-deputy discussions in a spreadsheet, which it submits for inspection. The spreadsheet also documents timely supervisory review of VSCFs. In addition to the spreadsheet, MCSO submits all VSCFs for the month in review. We select a 10% random sample of VSCFs from each District to review for content. We also inspect the sample of VSCFs submitted for review of traffic stops under Paragraphs 25 and 54, as part of compliance with Paragraph 91, to verify if supervisors are addressing deficiencies in the documentation related to the stops.

Paragraph 85 requires that supervisors discuss traffic stops at least once per month with their deputies. To efficiently manage this requirement along with other administrative and operational duties, supervisors generally conduct several traffic stop-related discussions with each deputy during the month. Supervisor-deputy discussions of traffic stops that occurred toward the latter part of the month may not get reviewed until the following month. Our selections for these discussions changes every month, so to obtain complete records for each deputy, MCSO holds the submission until all of the information requested for the month is complete. Accordingly, the documentation of supervisory-deputy discussions of traffic stops is submitted 30 days retroactively.

For January, MCSO submitted the December traffic stops for each deputy, by District. The total number of traffic stops for each District was: District 1, 34; District 2, six; District 3, 13; District 4, 18; Lake Patrol, 23; District 6, eight; and District 7, one. There were a total of 103 traffic-related events in December for all Districts, and sergeants discussed 94 of these events with the deputies who conducted them, for a compliance rate of 91%.

For February, MCSO submitted the January traffic stops for each deputy, by District. The total number of traffic stops for each District were: District 1, none; District 2, 46; District 3, seven; District 4, 73; Lake Patrol, 14; District 6, 29; and District 6, none. There were a total of 169 traffic-related events for all Districts, and sergeants discussed all 169 traffic stops with the deputies that conducted them, for a compliance rate of 100%.

For March MCSO submitted the February traffic stops for each deputy, by District. The total number of traffic stops for each District were: District 1, four; District 2, seven; District 3, one; District 4, 18; Lake Patrol, 56; District 6, 18; and District 7, four. There were a total of 111 traffic-related events in February, and sergeants discussed 108 of those with the deputies who conducted them, for a compliance rate of 97%.

WAI 39909

The compliance rate for discussion of traffic stops was 96% for this reporting period. During this reporting period, we noted that supervisors are making a concerted effort to address deficiencies. However, they are still not identifying *all* deficiencies in traffic stop documentation; and they are not addressing all deficiencies related to policy violations during traffic stops. Additional comments are provided in our review of Paragraph 91.

**Paragraph 86.** *On-duty field Supervisors shall be available throughout their shift to provide adequate on-scene field supervision to Deputies under their direct command and, as needed, to provide Supervisory assistance to other units. Supervisors shall be assigned to and shall actually work the same days and hours as the Deputies they are assigned to supervise, absent exceptional circumstances.*

**Phase 1:** In compliance

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed a sample of daily shift rosters for the three months of the reporting period. For January, we reviewed Districts 1, 2, and 3; for February, we reviewed Districts 4, 6, and 7, and Lake Patrol; and for March, we reviewed Districts 1, 2, and 3. Our reviews of monthly and daily rosters indicated that deputies were assigned to and worked the same schedules as their supervisors.

MCSO deputies' and sergeants' activities are captured in Patrol Activity Logs (PALs). We selected a random sample of one day per month, and one squad per District, for review. For January, we requested PALs for eight sergeants and 31 deputies, which we reviewed. We noted a total of 19 field supervisor-deputy contacts between the combined deputies' and sergeants' PALs for the selected dates. For February, we requested PALs for 28 deputies and seven sergeants. We received and reviewed all requested PALs, and noted a total of 34 field supervisor-deputy contacts between the combined deputies' and sergeants' PALs for the selected dates. For March, we reviewed PALs for 24 deputies and eight sergeants. We noted a total of 33 field supervisor-deputy contacts between the combined deputies' and sergeants' PALs for the selected dates. We reviewed the monthly shift rosters for each month of the reporting period. Our reviews indicate that supervisors are assigned to work the same hours as the deputies under their supervision. Our reviews of Patrol Activity Logs indicate that supervisors have been available to provide on-scene supervision.

WAI 39910

*Paragraph 87.  MCSO shall hold Commanders and Supervisors directly accountable for the quality and effectiveness of their supervision, including whether commanders and Supervisors identify and effectively respond to misconduct, as part of their performance evaluations and through non-disciplinary corrective action, or through the initiation of formal investigation and the disciplinary process, as appropriate.*

**Phase 1:**  In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

**Phase 2:**  Not in compliance

Consistent with our methodology, we requested the names of all deputies and supervisors whose performance appraisals were completed during this reporting period.  From the lists of employees submitted, we requested a representative sample.

We received and reviewed performance evaluations submitted for six deputies and 10 supervisors whose performance evaluations were completed in January 2019.  All of the six deputy EPAs were acceptable.  With regard to supervisors' EPAs, all 10 EPAs rated the supervisors on the quality of their reviews.  All 10 EPAs addressed the quality and effectiveness of supervision.  Eight of the 10 EPAs addressed the complaint history and their dispositions, discipline, commendations, awards, civil or administrative claims, lawsuits, training history, assignment and rank history, supervisory actions, and EIS histories.  Nine of the 10 supervisors' EPAs commented on the employees' ability to identify and respond to misconduct.  Six of the 10 EPAs assessed supervisors on the quality of their internal affairs investigations and/or the quality of their reviews of internal affairs investigations, as required by Paragraph 176.  In total, six of the 10 supervisors' EPAs met all requirements.

We received and reviewed performance evaluations submitted for four deputies and 12 supervisors whose EPAs were completed in February 2019.  All four deputy EPAs addressed all required areas of assessment, including the requirements of Paragraph 99.  All of the 12 supervisors' EPAs rated the supervisors on the quality and effectiveness of their supervision.  Eight of the 12 EPAs addressed the quality of supervisory reviews.  Nine of the 12 supervisors' appraisals included comments related to the supervisors' ability to identify and respond to misconduct.  Six of the 12 EPAs addressed the complaint history and their dispositions, discipline, commendations, awards, civil or administrative claims, lawsuits, training history, assignment and rank history, supervisory actions, and EIS histories.  Six of the 12 EPAs assessed the supervisors' quality of internal investigations and/or the quality of their reviews of internal affairs investigations.  In total, four of the 12 supervisors' EPA met all requirements.

We received and reviewed Employee Performance Appraisals submitted for six deputies and 10 supervisors whose EPAs were completed in March.  All six deputy EPAs addressed all requirements. All 10 supervisors' EPAs rated the employees on the quality and effectiveness of their supervision.  All 10 EPAs addressed the quality of supervisory reviews.  Nine of the 10

WAI 39911

supervisors' appraisals included comments related to the supervisors' ability to identify and respond to misconduct.  Seven of the 10 EPAs addressed the complaint history and their dispositions, discipline, commendations, awards, civil or administrative claims, lawsuits, training history, assignment and rank history, supervisory actions, and EIS histories.  Five of the 10 EPAs assessed supervisors on the quality of their internal affairs investigations and/or the quality of their reviews of internal affairs investigations, as required by Paragraph 176.  In total, five of the 10 supervisors' EPAs met all requirements.  Of the 48 EPAs reviewed for the first quarter, 31 were in compliance.  The compliance rating for this reporting period was 65%.

During our April site visit, we met with Human Resources and discussed the progress of the EPA revision.  We again discussed the areas that commanders are failing to address in supervisors' EPAs, as well as the lack of consistency in the way EPAs are completed.  MCSO personnel advised us that MCSO is working to address the previously mentioned areas of weakness, some through technology changes.  MCSO continues to work on the EPA revision, with input from a committee that includes personnel from different divisions.  Deputy EPAs will have four core competencies – not five as previously reported – and supervisors will have two additional competencies.  MCSO is considering the implementation a pilot program for the new EPA process in one of the Patrol Districts beginning in July 2019.

**Paragraph 88.**  *To ensure compliance with the terms of this Order, first-line Supervisors in any Specialized Units enforcing Immigration-Related Laws shall directly supervise the law enforcement activities of new members of the unit for one week by accompanying them in the field, and directly supervise the in-the-field-activities of all members of the unit for at least two weeks every year.*

**In Full and Effective Compliance**

MCSO does not have any specialized units that enforce immigration-related laws.  We continue to monitor arrests and detentions as part of our review process to ensure that MCSO is in compliance with its own directives on this issue.

For January, February, and March we received lists containing all incidents involving MCSO arrests and criminal citations.  For each month, we requested a random sample of arrests and criminal citations.  In total, we reviewed 51 incidents involving arrests and 47 incidents involving criminal citations.  We also reviewed a random sample of 258 Incident Reports for this reporting period.  During our reviews of the documentation provided for this reporting period, we have found no evidence to indicate any violations of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 39912

*Paragraph 89.  A Deputy shall notify a Supervisor before initiating any immigration status investigation, as discussed in Paragraph 28.  Deputies shall also notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration Related Crime, or for any crime related to identity fraud or lack of an identity document.  The responding Supervisor shall approve or disapprove the Deputy's investigation or arrest recommendation based on the available information and conformance with MCSO policy.  The Supervisor shall take appropriate action to address any deficiencies in Deputies' investigation or arrest recommendations, including releasing the subject, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative investigation.*

**Phase 1:**  In compliance

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- GF-5 (Incident Report Guidelines), most recently amended on January 4, 2019.

**Phase 2:**  In compliance

To assess MCSO's compliance with this Paragraph, we requested all reports related to immigration status investigations, any immigration-related crimes, or any incidents or arrests involving lack of identity documents.  The Incident Reports requested were for the period of January 1-March 31, 2019.  Any incident wherein a deputy requests a supervisor's permission to contact Immigration and Customs Enforcement (ICE) or Customs and Border Patrol (CBP) – to ascertain the legal status of an individual involved in a stop, detention, or any incident under investigation by MCSO – falls under the reporting requirements of this request.  For this reporting period, there were no reported events that would fall under the requirements of this Paragraph.

We also received a booking list and a criminal citation list for each month of the reporting period.  From each list, we selected a 10% random sample of incidents.  In total, we reviewed 51 incidents resulting in arrest and 47 incidents involving criminal citations.  In addition, we reviewed 258 Incident Reports for the quarter.  All of the documentation we reviewed during this reporting period indicates that MCSO is in compliance with this Paragraph.

WAI 39913

**Paragraph 90.** *MCSO Deputies shall submit documentation of all stops and Investigatory Detentions conducted to their Supervisors by the end of the shift in which the action occurred. Absent exceptional circumstances, within 72 hours of receiving such documentation, a Supervisor shall independently review the information. Supervisors shall review reports and forms for Boilerplate or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct. Appropriate disciplinary action should be taken where Deputies routinely employ Boilerplate or conclusory language.*

**Phase 1:** In compliance

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

**Phase 2:** In compliance

We reviewed 35 incidents involving traffic stops for January 2019. There were 21 stops related to speeding, 15 of which resulted in citations and six resulted in warnings. There were no stops related to equipment violations. Ten stops were for moving violations other than speeding. Four stops related to registration or license plate violations. Twenty-three of the stops resulted in citations, and 12 resulted in warnings. All 35 Vehicle Stop Contact Forms we reviewed noted the serial number of the reviewing supervisor, date, and time of supervisory review. All of the 35 VSCFs were reviewed within the required 72 hours. For January, MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 151 VSCFs. Supervisors reviewed 139 VSCFs within 72 hours, for a compliance rate of 92%.

We reviewed 35 incidents involving traffic stops for February 2019. Nineteen of the 35 traffic stops related to speeding. Of the 19 stops related to speeding, 18 drivers received citations, and one received a warning. One of the stops related to equipment violations. Ten stops involved moving traffic infractions other than speeding. Five stops related to registration or license plate violations. Of the 35 stops, 25 resulted in citations, and nine resulted in warnings. One stop involved an on-duty law enforcement officer, and no action was taken. Supervisors reviewed all 35 VSCFs within 72 hours. For February, MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 93 VSCFs. Supervisors reviewed 91 VSCFs within 72 hours, for a compliance rate of 98%.

We reviewed 35 incidents involving traffic stops for March 2019. Twenty-seven of the 35 traffic stops involved speeding violations. Of the 27 stops related to speeding, 21 drivers received citations and six drivers received warnings. One stop related to an equipment violation. Five stops involved traffic violations other than speeding. Two stops related to registration or license plate violations. Of the 35 stops, 24 resulted in citations and 11 resulted in warnings. Thirty-four of the 35 Vehicle Stop Contact Forms had timely supervisory reviews. For March, MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 240 VSCFs. We reviewed the data and supervisors reviewed 235 of 240 VSCFs within 72 hours, for a 98% compliance rate.

WAI 39914

For January, February, and March, we reviewed the submissions of non-traffic incidents involving stops and detentions, which were recorded in Non-Traffic Contact Forms (NTCFs). For January, we selected all 18 NTCFs generated during the month, for review. All NTCFs had been submitted prior to the end of the shift. Seventeen of the 18 NTCFs were reviewed and approved by supervisors within 72 hours as required by the First Order. The compliance rate for timely supervisory review of NTCFs in January was 94%. For February, we selected all 18 NTCFs to review. All NTCFs were submitted prior to the end of the shift. Twelve of the 18 NTCFs were reviewed and approved by supervisors within the required timeframe. The compliance rate for timely supervisory review of NTCFs in February was 67%. For March, we selected 24 NTCFs generated during the month, for review. All 24 NTCFs were submitted within the required timeframe. All 24 NTCFs were reviewed and approved by supervisors within the required 72 hours. The compliance rate for timely supervisory review of NTCFs in March was 100%. Compliance with timely supervisory review of NTCFs was 88%.

We take into account all stops and detentions, both traffic and non-traffic, when we determine the compliance rate for this Paragraph. The compliance rate for timely reviews of all combined stops and detentions for this reporting period was 95%. For this reporting period, our inspection of the documentation provided has not revealed any evidence of boilerplate or conclusory language, inconsistent or inaccurate information, or lack of articulation, as to the legal basis for stops and detentions.

**Paragraph 91.** *As part of the Supervisory review, the Supervisor shall document any Investigatory Stops and detentions that appear unsupported by reasonable suspicion or are otherwise in violation of MCSO policy, or stops or detentions that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The Supervisor shall take appropriate action to address all violations or deficiencies in Investigatory Stops or detentions, including recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.*

**Phase 1:** In compliance

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- GF-5 (Incident Report Guidelines), most recently amended on January 4, 2019.

**Phase 2:** Not in compliance

WAI 39915

We reviewed traffic stop data reported by MCSO for its January inspection (BI2019-0005).  To determine compliance with this Paragraph, for January, we randomly selected 35 traffic-related events, which BIO then audited for compliance.  Of the 35 traffic-related events, MCSO reported that 33 or 94% had no deficiencies.  As a result of the inspection, BIO generated two BIO Action Forms.  BIO identified a stop where a deputy failed to run a warrants check on the driver, and a stop where the incorrect vehicle number was listed in the VSCF.  We reviewed the same traffic-related events, independent of BIO's audits, as part of our compliance assessment for Paragraphs 25 and 54.  In our reviews, we noted two stops that had errors in the documentation, or had policy violations, which should have been addressed by supervisors.

We reviewed a spreadsheet documenting each VSCF by District, for January, to determine if supervisors were reviewing VSCFs within the required 72 hours.  We reviewed data for 151 traffic stops, and determined that supervisors had completed timely reviews in 92% of the cases.  For this month, we requested all NTCFs generated in January.  We reviewed 18 NTCFs to determine if supervisors were reviewing NTCFs within the required 72 hours.  We determined that supervisors had completed timely reviews in 94% of the cases.

For January, we requested a sample of 25 corrective actions generated in the month.  Corrective actions are documented on Blue Team Supervisory Notes.  Of the 25 corrective actions, nine were associated with body-worn camera and recording issues, including: failure to activate the BWC; late activation of the BWC; turning off the camera before the event was concluded; or poor positioning of the BWC.  One corrective action was associated with inaccurate or missing information on VSCFs, citations, or written warnings.  Two corrective actions were taken as a result of procedural or policy violations during traffic stops.  Four corrective actions were taken as a result of procedural or policy violations, not related to traffic stops.  Three corrective actions taken were the result of poor deputy performance.  Two corrective actions were intended to address deficient safety procedures during traffic stops.  Three Blue Team notes submitted were not specifically corrective actions, but were intended to document technical malfunctions with equipment.  One Blue Team entry did not specify the deficiencies found.

We reviewed traffic stop data reported by MCSO for its February inspection (BI2019-0020).  We randomly selected 35 traffic-related events, which BIO then audited for compliance.  The inspection report noted that 30 stops, or 86%, had no deficiencies.  Three deficiencies found involved VSCFs where the location of the stop in the VSCF did not match the location of the stop in CAD.  One deficiency pertained to a break in the BWC video not being noted in the VSCF.  One deficiency found was associated with the stop time in the VSCF not matching the stop time in CAD.  BIO generated five Action Forms for the noted deficiencies.  We reviewed the same traffic-related events, independent of BIO's audits, as part of our compliance assessment for Paragraphs 25 and 54.  In our reviews, we noted seven stops that had errors in the documentation, or had policy violations, which should have been addressed by supervisors – an avoidable deficiency.

WAI 39916

We reviewed a spreadsheet documenting each VSCF by District, for February, to determine if supervisors were reviewing VSCFs within the required 72 hours.  We reviewed 93 VSCFs and determined that supervisors had completed timely reviews in 98% of the cases.  For this month, we requested all NTCFs generated in February.   We reviewed 18 NTCFs to determine if supervisors were reviewing NTCFs within the required 72 hours.   We determined that supervisors had completed timely reviews in 67%% of the cases.

For February, we selected 23 corrective actions generated for the month.  Of the 23 corrective actions, 10 were associated with body-worn camera and recording issues: failure to activate the BWC; late activation of the BWC; turning off the camera before the event was concluded; or poor positioning of the BWC.   Three corrective actions were associated with inaccurate or missing information on VSCFs, citations, or written warnings.  Seven corrective actions were associated with procedural or policy violations during traffic stops.   There were three Blue Team entries that were not associated with corrective actions, but were generated to document technical failures in equipment.

MCSO has not submitted its March inspection report as of this writing.  MCSO will not be in compliance with this Paragraph if it is not submitted in the near future.

For March, we selected a sample of 23 corrective actions to review for the month.  Of the 23 corrective actions, six were associated with body-worn camera and recording issues: failure to activate the BWC; late activation of the BWC; turning off the camera before the event was concluded; or poor positioning of the BWC.   Two corrective actions were associated with inaccurate or missing information on VSCFs, citations, or written warnings.   Ten corrective actions were associated with procedural or policy violations involving traffic stops.  There was one corrective action issued for deputy safety concerns.   There were two corrective actions issued for policy or procedural violations, not related to traffic stops.

We reviewed a spreadsheet documenting each VSCF by District, for March, to determine if supervisors were reviewing VSCFs within the required 72 hours.  We reviewed 240 VSCFs and determined that supervisors had completed timely reviews in 98% of the cases.  For this month, we requested all NTCFs generated in March.   We reviewed 24 NTCFs to determine if supervisors were reviewing NTCFs within the required 72 hours.   We determined that supervisors had completed timely reviews in 100% of the cases.

Paragraph 90 requires timely supervisory reviews of documentation pertaining to stops and detentions.  Paragraph 91 requires supervisors to identify policy violations, deficiencies, and training issues noted in stops and detentions.  Of the sample of 105 stops inspected for this reporting period, there were deficiencies in documentation, or policy violations, in 17 of the stops, that supervisors failed to identify in their reviews. This is a compliance rate of 86%.  We note that there continue to be problems related to BWC recordings, and several corrective actions were related to deputies not recording the stops in their entirety.

WAI 39917

***Paragraph 92.*** *Supervisors shall use EIS to track each subordinate's violations or deficiencies in Investigatory Stops or detentions and the corrective actions taken, in order to identify Deputies needing repeated corrective action. Supervisors shall notify IA. The Supervisor shall ensure that each violation or deficiency is documented in the Deputy's performance evaluations. The quality and completeness of these Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations. MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct complete, thorough, and accurate reviews of Deputies' stops and Investigatory Detentions.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

**Phase 2:** Not in compliance

MCSO implemented a monthly inspection report of EIS alerts, beginning in February. We selected a sample of 15 closed EIS alerts, which BIO then inspected for compliance. The first inspection report, BI2019-0029, concluded that 10 of the 15 closed alerts were in compliance. All five deficiencies noted, on the non-compliant cases, were for failure to complete the action required within 30 days. Five BIO Action Forms were generated for the deficiencies. For February, the compliance rate was 67%. There was insufficient proof of compliance in this quarter to meet the requirements of this Paragraph. In addition, MCSO does not yet have an audit process for NTCFs.

***Paragraph 93.*** *Absent extraordinary circumstances, MCSO Deputies shall complete all incident reports before the end of shift. MCSO field Supervisors shall review incident reports and shall memorialize their review of incident reports within 72 hours of an arrest, absent exceptional circumstances.*

**Phase 1:** In compliance

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

- GF-5 (Incident Report Guidelines), most recently amended on January 4, 2019.

**Phase 2:** In compliance

WAI 39918

We reviewed a representative sample of 86 Incident Reports for January 2019 for the randomly selected date of January 24, 2019.  The sample of 86 Incident Reports included 11 Vehicle Crash Reports.  Of the 75 Incident Reports not related to vehicle crashes, all were turned in by the end of the shift.  Seventy-one of the 75 Incident Reports were reviewed by supervisors within the required timeframes.  MCSO submits a separate spreadsheet documenting vehicle crash reviews.  We confirmed supervisory review and approval on all 11 Vehicle Crash Reports.  The reports in compliance for January were 82 of 86, or 95%.  Nine of 10 Incident Reports involving arrests and criminal citations were reviewed by supervisors and approved, or reviewed and returned for corrections within the required 72 hours.  We conducted a quality review on a 10% random sample of the reports.  We noted no significant deficiencies.

We reviewed a representative sample of 85 Incident Reports for February, for the randomly selected date of February 20, 2019.  Of the 85 reports submitted, there were 16 Vehicle Crash Reports.  We confirmed supervisory review on all vehicle crash reports.  Of the remaining 69 Incident Reports, we confirmed timely supervisory review on 67 of the reports.  In total, 83 of 85 Incident Reports for the selected date included documentation of timely supervisory review.  The compliance rate for timely supervisory reviews of Incident Reports was 98%.  We conducted a quality review on a 10% random sample of the reports we reviewed.  For the reports we reviewed for February we did not find any significant deficiencies.

We reviewed a representative sample of 87 Incident Reports for March, for the randomly selected date of March 7, 2019.  Of the 87 Incident Reports, 16 were Vehicle Crash Reports.  MCSO generally submits a spreadsheet documenting supervisory review of Vehicle Crash Reports.  For March, the spreadsheet was not submitted, so we could not confirm supervisory reviews of these reports.  Of the remaining 71 Incident Reports, we confirmed timely supervisory reviews on 70 of 71 reports.  We found 70 of 85 reports in compliance, for a compliance rate of 82%.  All 12 Arrest Reports were reviewed and approved by supervisors within 72 hours.  We conducted a quality review on a 10% random sample of Incident Reports and noted no significant deficiencies.  MCSO was in compliance with the requirements of this Paragraph in January and February.  When averaged in, the March compliance rate brings down the quarterly compliance rate to 91%.  MCSO has been in compliance with this Paragraph, and we believe supervisors are conducting timely reviews of Incident Reports.  However, we must be able to verify compliance through our reviews.  This appears to be an oversight attributed to the learning curve of new personnel.  We understand these issues can occur.  MCSO must work to ensure continued timely production of documentation.

WAI 39919

*Paragraph 94.  As part of the Supervisory review, the Supervisor shall document any arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The Supervisor shall take appropriate action to address violations or deficiencies in making arrests, including notification of prosecuting authorities, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.*

**Phase 1:**  In compliance

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.
- GF-5 (Incident Report Guidelines), most recently amended on January 4, 2019.

**Phase 2:**  Not in compliance

To determine compliance with this Paragraph, we review documentation related to arrests where MCSO found deficiencies and took corrective action, which are documented in Incident Memorialization Forms (IMFs), and arrests where the Maricopa County Attorney's Office (MCAO) declined prosecution.  The Maricopa County Attorney's Office generally does not provide specific details as to the reason arrests cases are declined for prosecution.  For each arrest where MCAO declined prosecution, and no specific reasons are provided, there must be an inquiry to determine if the cause of the rejection was due to lack of probable cause, if there was a violation of MCSO policy, or there is a need for corrective action or review of MCSO policy, strategy, tactics, or training.  If the rejection was related to any of these factors, we look for the supervisor's comments and any corrective action taken.  We also review the BIO inspection reports associated with MCAO turndowns.  Due to the time it takes MCSO to process Blue Team notes, our verification of proof of compliance with Paragraphs 94 and 96 will consist of the review of documentation for the last month of the preceding quarter, and the first two months of the quarter in review.

For this reporting period, we received six Incident Memorialization Forms (IMFs) that fall within the purview of this Paragraph.  The first IMF pertained to an arrest where the deputy handcuffed and searched a subject without documenting the facts to support the search.  The deputy received a coaching, and training on search and seizure.  This IMF addressed the requirements of this Paragraph.  The second IMF was generated in response to a County Attorney turndown, and was related to a case involving custodial interference.  The deputy was on extended leave; corrective action will be taken when the deputy returns to work.  The third IMF was related to an assault that was turned down for prosecution.  This case was not an arrest; it was a submittal that does not fall within the scope of this Paragraph.  The fourth IMF was related to a domestic violence case in which a Taser was used on an individual.  Command review found that the Incident Report lacked details, including how entry into the premises was made.  The report also lacked justification for the use of the Taser.  We reviewed the IMF and found that the commander's investigation was well-documented, but found no conclusion or description of the action taken to address the findings.  The fifth IMF was related to an assault

WAI 39920

investigation where the deputy made several mistakes, including conclusory language. The report also lacked details pertaining to the assault. In addition, the supervisor who reviewed the arrest did not address the deficiencies in the documentation. This IMF addressed the concerns, as well as the remedial action. The sixth IMF was related to a *Miranda* violation and conclusory language found in a DUI case. In this case, the deputy added charges of public sexual indecency related to a statement that was made by the driver. Again, we found the IMF addressed the case deficiencies, but there was no documentation of corrective action, or how the deficiencies were addressed. The last IMF reviewed involved a case where the charges of disorderly conduct were submitted to the County Attorney. This case involved the custodial interview of a handcuffed subject. The County Attorney noted that the deputy failed to read *Miranda* prior to asking incriminating questions. This IMF documented the deficiencies, but did not elaborate on the corrective measures taken to address the deficiencies.

We reviewed the inspection report for County Attorney Dispositions for December (BI2018-0151). BIO reviewed 20 of 98 dismissals of criminal cases from the Maricopa County Justice Courts and 28 cases from the Maricopa County Superior Court. BIO notes that the focus of the inspection is the identification of irreversible errors. For the December inspection, MCSO found no irreversible errors and eight non-compliance deficiencies outside of the scope of the inspection. The inspection resulted in a 100% compliance rating. With regard to the eight non-compliance deficiencies noted, BIO issued seven BIO Action Forms. We reviewed the eight cases associated with the non-compliance deficiencies and determined that two arrests, where deficiencies were noted, fall within the requirements of this Paragraph. These two cases had deficiencies that should have been identified by the supervisory review process.

In response to our request for proof of compliance with this Paragraph, MCSO submitted 13 Superior Court cases that had been turned down for prosecution in December. We reviewed MCSO's investigation of the 13 applicable cases and found that the documentation in 10 of the 13 cases was in compliance with this Paragraph. Our reviews found three cases out of compliance and BIO found two cases out of compliance, for a total of five cases out of compliance. When considered in aggregate, 36 of 41 cases were in compliance. The compliance rate, as it pertains to the requirements of Paragraph 94, was 88%.

We reviewed the inspection report for County Attorney Dispositions for January (BI2019-0001). BIO reviewed 20 of 122 dismissals, from the Justice Courts, and 68 dismissals from the Superior Court. The inspection found no irreversible errors and 14 deficiencies outside of the scope of the inspection. The inspection resulted in a 100% compliance rating. We reviewed the non-compliance deficiencies found by BIO in this inspection. We reviewed the 14 cases associated with these deficiencies and determined that eight cases were arrests that fall within the requirements of this Paragraph. The eight deficiencies noted in the BIO inspection should have been identified and addressed by the supervisory review process.

For January, MCSO submitted four Superior Court cases that were rejected, in response to our request for proof of compliance with this Paragraph. We reviewed MCSO's investigation of the four Superior Court cases that were rejected. We found that the documentation in all four cases

WAI 39921

was in compliance with this Paragraph.  Our reviews indicated that all four cases were in compliance, but the BIO inspection found eight cases out of compliance.  When considered in aggregate, a total of 72 cases, 64 cases were in compliance.  The compliance rate, as it pertains to the requirements of Paragraph 94, was 89%.

We reviewed the inspection report for County Attorney Dispositions for February (BI2019-0016).  BIO reviewed 20 of 142 dismissals, from the Justice Courts, and 50 dismissals from the Superior Court.  The inspection found no irreversible errors and 20 deficiencies outside of the scope of the inspection.  The inspection resulted in a 100% compliance rating.  We reviewed the non-compliance deficiencies found by BIO in this inspection and determined that nine of the 20 cases associated with these deficiencies were arrests that fall within the requirements of this Paragraph.  These nine cases had deficiencies that should have been identified in the supervisory review process.

For February, MCSO submitted 15 Superior Court cases that were rejected, in response to our request for proof of compliance with this Paragraph.  We reviewed MCSO's investigation of 15 Superior Court cases that were rejected.  We found that four cases did not fall within the reporting requirements of this Paragraph.  Of the remaining applicable 11 cases, we found that five cases had proper investigation and documentation.  Our reviews of the documentation found six cases out of compliance, and the BIO inspection found nine cases out of compliance.  Based on the total number of 61 cases, 46 were in compliance.  The compliance rate for February was 75%.

For the quarter, there were 146 of 174 Superior Court turndown cases in compliance, for a rate of 84%.  Of the six applicable IMFs reviewed, three were in compliance, for a rate of 50%.

***Paragraph 95.**  Supervisors shall use EIS to track each subordinate's violations or deficiencies in the arrests and the corrective actions taken, in order to identify Deputies needing repeated corrective action.  The Supervisor shall ensure that each violation or deficiency is noted in the Deputy's performance evaluations.  The quality of these supervisory reviews shall be taken into account in the Supervisor's own performance evaluations, promotions, or internal transfers. MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct reviews of adequate and consistent quality.*

**Phase 1:**  In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

**Phase 2:**  Not in compliance

The Employee Performance Appraisals completed for this reporting period, discussed in detail under Paragraph 87, did not meet the requirements of this Paragraph.  MCSO has not yet developed a methodology that will document MCSO's verification of compliance for this Paragraph.  MCSO implemented a monthly inspection report of EIS alerts, beginning in

WAI 39922

February.   We selected a sample of 15 closed EIS alerts, which BIO then inspected for compliance.   The first inspection report, BI2019-0029, concluded that 10 of the 15 closed alerts were in compliance.   All five deficiencies noted, on the non-compliant cases, were for failure to complete the action required within 30 days.   Five BIO Action Forms were generated for the deficiencies.   For February, the compliance rate was 67%.   There was insufficient proof of compliance in this quarter to meet the requirements of this Paragraph.

***Paragraph 96.***   *A command-level official shall review, in writing, all Supervisory reviews related to arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training.   The commander's review shall be completed within 14 days of receiving the document reporting the event.   The commander shall evaluate the corrective action and recommendations in the Supervisor's written report and ensure that all appropriate corrective action is taken.*

**Phase 1:**  In compliance

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

**Phase 2:**  Not in compliance

This Paragraph requires that a command-level official review a supervisor's investigation of the circumstances pertaining to any arrest that lacks probable cause, is in violation of policy, or where there is a need for corrective action or review of the agency's policy, strategy, tactics, or training.   We review cases documented in Incident Memorialization Forms, and we review cases in which the Maricopa County Attorney's Office declines prosecution.   The Maricopa County Attorney's Office (MCAO) generally does not provide specific details as to the reason arrests cases are declined for prosecution.   For each arrest where MCAO declined prosecution, and no specific reasons are provided, there must be an inquiry to determine if the cause of the rejection was due to any of the factors listed above.   If the rejection was related to any of these factors, we look for the supervisor's comments related to the investigation, and any corrective action taken.   To verify compliance with this Paragraph, we review the cases submitted for Paragraph 94, to determine if there was Command review of the supervisor's investigation within 14 days of the supervisor's submission, and if the commander evaluated any corrective actions that resulted from deficiencies.

For this reporting period, we received six Incident Memorialization Forms (IMFs) that fall within the purview of this Paragraph.   The first IMF pertained to an arrest where the deputy handcuffed and searched a subject without documenting the facts to support the search.   The deputy received a coaching, and training on search and seizure.   This IMF addressed the requirements of this Paragraph, and had documentation of command review within the required timeframe.   The second IMF was generated in response to a County Attorney turndown, and was related to a case involving custodial interference.   The deputy was on extended leave, so the corrective action is pending.   The third IMF was related to an assault that was turned down for

WAI 39923

prosecution.  This case was not an arrest; it was a submittal that does not fall within the scope of this Paragraph.  The fourth IMF was related to a domestic violence case in which a Taser was used on an individual.  Command review found the Incident Report lacked details, including how the entry was made, and lacked justification for the use of the Taser.  We reviewed this IMF and found that the commander's investigation was well-documented, but found no conclusion or description of the action taken to address the findings.  The commander's review did not address the remedial action.  The fifth IMF was related to an assault investigation where the deputy made several mistakes, including conclusory language and lack of details pertaining to the assault.  In addition, the reviewing supervisor did not address the deficiencies in the documentation.  This IMF addressed the concerns, as well as the remedial action.  This IMF had timely command review and was in compliance with all requirements.  The sixth IMF was related to a *Miranda* violation and conclusory language found in a DUI case.  In this case, the deputy added charges of public sexual indecency related to a statement that was made by the driver.  Again, we found the IMF addressed the case deficiencies, but there was no documentation of corrective action, or how the deficiencies were addressed.  The documentation submitted for this IMF was not in compliance with this Paragraph.  The last IMF involved a case where the charges of disorderly conduct were submitted to the County Attorney.  In this case there was a custodial interview of a subject in handcuffs.  The County Attorney concluded that the deputy failed to read *Miranda* prior to asking incriminating questions.  This IMF documented the deficiencies, but did not elaborate on the corrective measures taken to address the deficiencies.  The documentation submitted, for the investigation and corrective action taken in this case, was not in compliance.

For December, we reviewed MCSO's investigation of 13 Superior Court cases that were rejected.  We found that the documentation in nine of the 13 cases was in compliance with this Paragraph.  For January, we reviewed MCSO's investigation of four Superior Court cases that were rejected.  We found that the documentation in all four cases was in compliance with this Paragraph.  For February, we reviewed MCSO's investigation of 15 Superior Court cases that were rejected.  We found that four cases did not fall within the reporting requirements of this Paragraph.  Of the remaining 11 cases, we found that four were in compliance with this Paragraph.  For this quarter, there were 28 applicable cases that fall within the reporting requirements of this Paragraph.  Of those 28 cases, 17 had proper documentation of the supervisors' investigations, the corrective actions taken, and timely command reviews.  The compliance rate for this reporting period was 61%.

**Paragraph 97.**  *MCSO Commanders and Supervisors shall periodically review the EIS reports and information, and initiate, implement, or assess the effectiveness of interventions for individual Deputies, Supervisors, and units based on that review.  The obligations of MCSO Commanders and Supervisors in that regard are described above in Paragraphs 81(c)–(h).*

**Phase 1:**  In compliance

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

WAI 39924

**Phase 2:** Not in compliance

As per GH-5 (Early Identification System) and GB-2 (Command Responsibility), supervisors are required to conduct EIS reviews twice per month for sworn members. Command review of EIS profiles of supervisory and command personnel began in February 2017. Review of broader pattern-based reports, as required by Paragraph 81.c., and assessments of interventions as required by this Paragraph, has not been sufficiently documented to meet compliance with this Paragraph.

Consistent with our methodology, for every month of the quarter, we selected a supervisor and a squad of deputies from each District. We then reviewed the documentation provided as verification of compliance with this Paragraph. We also requested that EIS reviews of the commanders responsible for the selected personnel be included. For January, we reviewed the documentation provided for 54 employees – which included the ranks of deputy, sergeant, lieutenant, and captain. Of the 54 employees, 53 had the required two EIS reviews in the month, for a 98% compliance rate. For February, we reviewed Supervisory Notes requested as verification of compliance for 52 employees. Of the 52 selected employees, 45 had appropriate documentation of the required EIS reviews, for a compliance rate of 87%. For March, we received Supervisory Notes as verification of compliance of EIS reviews for the selected 48 employees. Of the 48 employees, 42 had appropriate documentation of compliance with this Paragraph, for a compliance rate of 88%. The total compliance rate for the quarter was 91%.

### d. Regular Employee Performance Review and Evaluations

**Paragraph 98.** *MCSO, in consultation with the Monitor, shall create a system for regular employee performance evaluations that, among other things, track each officer's past performance to determine whether the officer has demonstrated a pattern of behavior prohibited by MCSO policy or this Order.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

**Phase 2:** Not in compliance

Employee Performance Appraisal Training was completed during the third quarter of 2017, and the new EPA format was initiated on September 1, 2017. Our reviews of EPAs are discussed in detail in Paragraph 87. Of the 48 EPAs reviewed for this reporting period, 31 were in compliance. The compliance rating for this reporting period was 65%. MCSO did not meet the requirements of this Paragraph during this reporting period.

WAI 39925

***Paragraph 99.***  *The review shall take into consideration all past Complaint investigations; the results of all investigations; Discipline, if any, resulting from the investigation; citizen Complaints and commendation; awards; civil or administrative claims and lawsuits related to MCSO operations; Training history; assignment and rank history; and past Supervisory actions taken pursuant to the early warning protocol.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

**Phase 2:** In compliance

Pursuant to a discussion with MCSO, we agreed to accept the acknowledgement signed by the supervisor at the conclusion of the EPA as proof of compliance with the requirements of this Paragraph.   This acknowledgment states that the supervisor has done due diligence in researching the employee's history for the review period, as it pertains to the requirements of Paragraph 99.   The areas of review include: complaint investigations and dispositions; discipline; citizen complaints; commendations; awards; civil or administrative claims; and past supervisory actions taken pursuant to EIS alerts.  Supervisors completing EPAs are required to document their findings relevant to these areas if their reviews reveal any applicable events or actions.  The acknowledgement indicates that if something was discovered, it is included in the appropriate areas of the appraisal.  Training history, and rank and assignment history, will continue to be documented in separate sections.  During our July site visit, MCSO advised us that in addition to the acknowledgement described above, the new EPA form would include a section for supervisors to note their findings pertaining to each of the requirements of Paragraph 99.   Consequently, if the specific area of review has no events or actions to report, the supervisor will note it in the EPA.  We agree that this is a positive step, as it ensures that supervisors acknowledge review of each requirement of the Paragraph.

For this reporting period, we reviewed Employee Performance Appraisals for 16 deputies and 32 supervisors.  Of the 16 deputies' appraisals, all were in compliance with the requirements of Paragraph 99.  Of the 32 supervisors' appraisals, all were in compliance with this Paragraph.

***Paragraph 100.***   *The quality of Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

**Phase 2:** Not in compliance

WAI 39926

We reviewed Employee Performance Appraisals for 32 supervisors and commanders who received EPAs during this reporting period.  All of the 32 of the appraisals rated the quality and effectiveness of supervision.  Twenty-seven of the 32 appraisals contained comments and/or rated the supervisors' demonstrated ability to identify and effectively respond to misconduct. Twenty-eight of the 32 appraisals addressed the requirements of this Paragraph, as it pertains to the quality of supervisory reviews.  Many supervisors are spending considerable time documenting behaviors that occurred during this rating period, in detail.  Many EPAs are well-written, and we believe supervisors are making a conscious effort to submit a quality work product.  During our April site visit, we met with Human Resources and discussed the progress of the EPA revision.  We again discussed the areas that commanders are failing to address in supervisors' EPAs, as well as the lack of consistency in the way EPAs are completed.  The EPAs of command level employees must also assess the quality of reviews of internal affairs investigations to meet the compliance requirements of this Paragraph.

**Paragraph 101.**  *Within 180 days of the Effective Date, MCSO shall develop and implement eligibility criteria for assignment to Specialized Units enforcing Immigration-Related Laws.*

*Such criteria and procedures shall emphasize the individual's integrity, good judgment, and demonstrated capacity to carry out the mission of each Specialized Unit in a constitutional, lawful, and bias-free manner.  Deputies assigned to a Specialized Unit who are unable to maintain eligibility shall be immediately re-assigned.*

**In Full and Effective Compliance**

MCSO does not have any specialized units that enforce immigration-related laws.  Therefore, by default, MCSO is in Phase 2 compliance with this Paragraph.  We continue to monitor arrests and detentions as part of our review process to ensure that MCSO is in compliance with its own directives on this issue.

For January, February, and March, we received lists containing all incidents involving MCSO arrests and criminal citations.  For each month, we requested a random sample of arrests and criminal citations.  In total, we reviewed 51 incidents involving arrests and 47 incidents involving criminal citations.  We also reviewed a random sample of 258 Incident Reports for this reporting period.  During our reviews of the documentation provided for this reporting period, we found no evidence to indicate any violations of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, the Monitor concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with the Monitor's determination.

WAI 39927

## Section 10: Misconduct and Complaints

**COURT ORDER XI.  MISCONDUCT AND COMPLAINTS**

*a. Internally-Discovered Violations*

***Paragraph 102.*** *MCSO shall require all personnel to report without delay alleged or apparent misconduct by other MCSO Personnel to a Supervisor or directly to IA that reasonably appears to constitute: (i) a violation of MCSO policy or this Order; (ii) an intentional failure to complete data collection or other paperwork requirements required by MCSO policy or this Order; (iii) an act of retaliation for complying with any MCSO policy; (iv) or an intentional provision of false information in an administrative investigation or any official report, log or electronic transmittal of information. Failure to voluntarily report or document apparent misconduct described in this Paragraph shall be an offense subject to Discipline.*

**Phase 1:**  In compliance

- CP-2 (Code of Conduct), most recently amended on March 15, 2019.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on January 24, 2019.

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

**Phase 2:**  In compliance

During our assessments of compliance with this Paragraph, we have reviewed hundreds of misconduct investigations involving MCSO personnel.  Many of them have been internally generated.

During this reporting period, we reviewed 143 administrative misconduct investigations.  Forty of these were internally generated.  Sixteen involved sworn personnel, 21 involved Detention personnel, two involved civilian personnel, and one involved a reserve deputy.

MCSO has continued to identify and address misconduct that is raised by other employees or observed by supervisory personnel.  While some of these investigations did not meet all requirements for the proper reporting or completion of misconduct investigations, we address these failures in other Paragraphs in this report.

WAI 39928

### b. Audit Checks

*Paragraph 103.  Within one year of the Effective Date, MCSO shall develop a plan for conducting regular, targeted, and random integrity audit checks to identify and investigate Deputies possibly engaging in improper behavior, including: Discriminatory Policing; unlawful detentions and arrests; improper enforcement of Immigration-Related Laws; and failure to report misconduct.*

**Phase 1:** Not in compliance

- Audits and Inspections Unit Operations Manual, Section 303, currently under revision.
- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

**Phase 2:** Not in compliance

MCSO established the Audits and Inspections Unit (AIU), a unit of the Bureau of Internal Oversight (BIO), to take responsibility for these requirements.  AIU continues to develop an Operations Manual that will outline how the AIU will fulfill the "targeted" Paragraph 103 requirements.  We and the Parties provided comments on different versions of the relevant section of the manual, and currently await the next iteration from MCSO.

During our last few site visits, AIU personnel have reported that the Unit's main priority is completing the AIU Operations Manual.  We will inquire with AIU as to its progress on this manual during our upcoming site visit.

While the review process of the operations manual is still underway, for this reporting period, BIO again submitted several completed inspections in support of the "regular" and "random" elements of this Paragraph.  The inspections examined, for example, Supervisory Notes, Patrol Activity Logs, Traffic Stop Discussions, County Attorney turndown dispositions, Patrol Shift Rosters, and employee email usage.  We reviewed these reports and believe that they comport with the Paragraph 103 requirement for "regular" and "random" integrity audit checks.

### c. Complaint Tracking and Investigations

*Paragraph 104.  Subject to applicable laws, MCSO shall require Deputies to cooperate with administrative investigations, including appearing for an interview when requested by an investigator and providing all requested documents and evidence.  Supervisors shall be notified when a Deputy under their supervision is summoned as part of an administrative investigation and shall facilitate the Deputy's appearance, absent extraordinary and documented circumstances.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

WAI 39929

In the fall of 2015, MCSO developed a draft checklist and investigative format for administrative investigations. All the requirements in this Paragraph are included in these protocols. The checklist and formats were approved for use in early 2016, and all personnel through the rank of captain were required to attend a training session regarding the use of these forms. Effective June 1, 2016, all administrative investigations were required to use these forms. MCSO has consistently met this requirement, and MCSO has included the checklists in administrative investigations forwarded for our review.

Since that time, the Professional Standards Bureau (PSB) drafted revisions to the investigation checklist and format to provide additional clarification on procedural requirements. We and the Parties reviewed the revisions and provided our feedback. The revised format and investigation checklist were approved for use. The Misconduct Investigative Training for personnel outside of PSB also now includes a discussion of the revisions to these forms.

During this reporting period, we reviewed 143 administrative misconduct investigations. Eighty-six involved identified sworn MCSO personnel. All were completed after July 20, 2016 and included the use of an approved investigative format and checklist. We continue to note that deputies consistently appear for scheduled interviews, provide all required information to investigators, and cooperate with investigations. There were two instances during this reporting period where an investigator failed to notify an employee's supervisor of the intended administrative interview. We will discuss these cases with PSB during our next site visit. There were no instances where a supervisor failed to facilitate a deputy's attendance at a required interview.

***Paragraph 105.*** *Investigators shall have access to, and take into account as appropriate, the collected traffic stop and patrol data, Training records, Discipline history, and any past Complaints and performance evaluations of involved officers.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

Our reviews of investigations conducted by MCSO have verified that the information required for compliance with this Paragraph is consistently provided in the checklist and investigative reports.

As a result of the Second Order and effective July 20, 2016, the PSB Commander makes all preliminary disciplinary decisions. The PSB and Compliance Bureau Commanders created a worksheet that provides information regarding how MCSO makes disciplinary decisions, and how MCSO considers employees' work history. PSB includes this form in the sustained investigation documentation that we receive and review for compliance.

During our reviews for this reporting period, we reviewed 34 sustained administrative misconduct investigations. Sixteen of these 34 involved misconduct by sworn personnel.

WAI 39930

Fifteen cases involved misconduct by Detention personnel. Two cases involved civilian personnel and one involved a reserve deputy. Twenty-six of the 34 investigations involved personnel still employed by MCSO at the time final findings and discipline decisions were made. In all these cases, the PSB Commander determined the findings and presumptive discipline range for the sustained violations. We found these preliminary decisions to be consistent with the Discipline Matrices in effect at the time the decisions were made. We also found that generally, where appropriate, discipline history, past complaints, performance evaluations, traffic stop and patrol data, and training records were included in the documents considered for final discipline findings.

**Paragraph 106.** *Records of Complaints and investigations shall be maintained and made available, un-redacted, to the Monitor and Plaintiffs' representatives upon request. The Monitor and Plaintiffs' representatives shall maintain the confidentiality of any information therein that is not public record. Disclosure of records of pending investigations shall be consistent with state law.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

MCSO has two obligations under this Paragraph: to maintain and make records available. The Paragraph also covers the requirement that MCSO make unredacted records of such investigations available to the Plaintiffs' attorneys and Plaintiff-Intervenors as well.

MCSO has been responsive to our requests, and neither the Plaintiffs nor Plaintiff-Intervenors have raised any concerns related to the requirements of this Paragraph for this or the past several reporting periods. MCSO, via its counsel, distributes responses to our document and site visit requests via a document-sharing website. The Plaintiffs' attorneys and Plaintiff-Intervenors have access to this information, including documents applicable to this Paragraph, at the same time as we do.

WAI 39931

## Section 11: Community Engagement

**COURT ORDER XII.  COMMUNITY ENGAGEMENT**

### a. Community Outreach Program

**Paragraph 107.**  *To rebuild public confidence and trust in the MCSO and in the reform process, the MCSO shall work to improve community relationships and engage constructively with the community during the time that this order is in place.  To this end, the MCSO shall conduct the following district community outreach program.*

**Paragraph 109.**  *As part of its Community Outreach and Public Information program, the MCSO shall hold at least one public meeting per quarter to coincide with the quarterly site visits by the Monitor in a location convenient to the Plaintiffs class.  The MCSO shall consult with Plaintiffs' representatives and the Community Advisory Board on the locations of the meetings.  These meetings shall be used to inform community members of the policy changes or other significant actions that the MCSO has taken to implement the provisions of this Order.  Summaries of audits and reports completed by the MCSO pursuant to this Order shall be made available.  The MCSO shall clarify for the public at these meetings that it does not enforce immigration laws except to the extent that it is enforcing Arizona and federal criminal laws.*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

**Phase 2:**  In compliance

This Paragraph, per the August 3, 2017 Amendments to the Supplemental Permanent Injunction/Judgment Order (Document 2100), directs MCSO to conduct a District community outreach program.  More specifically, it requires that MCSO hold at least one public meeting per quarter to coincide with the quarterly site visits by the Monitor in a location convenient to the Plaintiffs' class.  This Paragraph requires MCSO to consult with Plaintiffs' representatives and the Community Advisory Board (CAB) on the location of the meetings, and to inform community members at the meetings of the policy changes or other significant actions that MCSO has taken to implement the provisions of the Order.  The Order also requires that MCSO provide summaries of audits and reports completed by MCSO pursuant to this Order and that MCSO clarify for the public at these meetings that it does not enforce immigration laws except to the extent that it is enforcing Arizona and federal criminal laws.

MCSO held a public meeting coinciding with our April 2019 site visit at Logan Auditorium, in Gila Bend in MCSO Patrol District 2.  MCSO consulted with Plaintiffs' representatives and the CAB on the meeting location, as required.  Initially, MCSO scheduled the meeting for Tuesday, April 16, 2019 at 10:00 a.m., which CAB members criticized as inaccessible to community

WAI 39932

members who work.  After contacting some Gila Bend community and civic organizations, CAB members argued that an evening meeting would allow more community members the opportunity to attend.  After some email exchanges between MCSO and the CAB on this topic, MCSO ultimately conceded, and held the meeting on Tuesday, April 16, 2019 at 6:00 p.m. There were approximately 18 community members in attendance.

At the meeting, an MCSO District 2 representative welcomed the attendees and introduced Sheriff Penzone.  Sheriff Penzone stated that MCSO does not enforce immigration laws except to the extent that it is enforcing Arizona state and federal criminal laws.  He also stated it was his responsibility to ensure compliance with the Court Orders related to *Melendres* and that MCSO is restructuring their organization to better address those requirements.  The Sheriff stated that, historically, MCSO was involved in racial profiling.  He explained that, to address those issues, the Court issued two orders that identified specific requirements for compliance, which was defined in two phases, Phase 1 and Phase 2.  The Sheriff offered the most recent compliance figures for both Phase 1 and 2; and said that, under his leadership, the issues of the past are being rectified.

An MCSO representative recognized the presence of the ACLU of Arizona and the Monitoring Team at the meeting.  The DOJ representative who was present at the meeting was not recognized.  MCSO prepared an informative bilingual handout that was available on a display table in the rear of the meeting room.  The brochure contained contact information for the MCSO Community Outreach Division, contact information for PSB to register comments or complaints with MCSO, and information about the MCSO website.  The brochure also contained a list of two policies relevant to the Orders that were reviewed and published since the last quarterly community meeting, and a chart reflecting MCSO compliance with the Orders. The handout also contained information regarding the creation of the Compliance Bureau, which is described as a consolidation of many divisions and units to ensure MCSO is operating more efficiently and effectively.  While the handout contained useful information, MCSO personnel did not include or address its contents in the MCSO presentation.  We recommend, at future quarterly community meetings, that MCSO personnel distribute copies of the handout to attendees as they enter and share its contents at the beginning of the meeting.  An intentional presentation of the information on the handout would seem to be an effective way of informing community members of its contents.

**Paragraph 110.**  *The meetings present an opportunity for MCSO representatives to listen to community members' experiences and concerns about MCSO practices implementing this Order, including the impact on public trust.  MCSO representatives shall make reasonable efforts to address such concerns during the meetings and afterward as well as explain to attendees how to file a comment or complaint.*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

WAI 39933

**Phase 2:**  In compliance

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program.  This Paragraph, among the provisions of Document 2100, requires that MCSO's quarterly community meetings present an opportunity for MCSO representatives to listen to community members' experiences and concerns about MCSO practices implementing the Order; and that MCSO representatives make reasonable efforts to address such concerns during the meetings and afterward as well as explain to attendees how to file a comment or complaint.

As noted above, during this reporting period, MCSO held a public meeting coinciding with our April 2019 site visit, on April 16, 2019 at Logan Auditorium, in Gila Bend, in MCSO Patrol District 2.  MCSO consulted with Plaintiffs' representatives and the CAB on the meeting location, as required.  As noted above, initially, MCSO scheduled the meeting for Tuesday, April 16, 2019 at 10:00 a.m., which CAB members criticized as inaccessible to community members who work.  After some email exchanges between MCSO and the CAB on this topic, MCSO ultimately conceded, and held the meeting on Tuesday, April 16, 2019 at 6:00 p.m.  There were approximately 18 community members in attendance.

As required, at the meeting, MCSO provided an opportunity for community members to communicate with MCSO regarding their experiences and concerns about MCSO practices in implementing the Order and explained to the attendees how to file a complaint.  A community member stated that there have been news reports about the Posse not being qualified and inquired as to the concept of the Posse.  Sheriff Penzone explained that MCSO's audit of the Posse program found that some Posse members had not completed the required training.  As a result, MCSO discussed the temporary suspension of Posse members to ensure that they were qualified.

Another community member asked about MCSO's enforcement of immigration laws.  Sheriff Penzone reiterated that MCSO does not enforce immigration laws except to the extent that it is enforcing Arizona state and federal criminal laws.  He also pointed out that individuals who go through the MCSO jail system are checked by Immigration and Customs Enforcement (ICE).

***Paragraph 111.***  *English and Spanish-speaking MCSO Personnel shall attend these meetings and be available to answer questions from the public.  At least one MCSO supervisor with extensive knowledge of the agency's implementation of the Order, as well as an MCSO Community Liaison, shall participate in the meetings.  The Monitor, Plaintiffs' and Plaintiff-Intervenor's representatives shall be invited to attend and MCSO shall announce their presence and state their availability to answer questions.*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

WAI 39934

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:**  In compliance

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program.  This Paragraph, among the provisions of Document 2100, requires that both English- and Spanish-speaking MCSO personnel attend MCSO's quarterly community meetings; at least one MCSO supervisor with extensive knowledge of the agency's implementation of the Order participate in these meetings; and that MCSO invite the Monitor, Plaintiffs' and Plaintiff-Intervenors' representatives to attend the meeting, and announce their presence and state their availability to answer questions.

As noted above, during this reporting period, MCSO held a public meeting coinciding with our April 2019 site visit, on April 16, 2019 at Logan Auditorium, in Gila Bend, in MCSO Patrol District 2.  There were approximately 18 community members in attendance.  MCSO had a Spanish language interpreter available at the meeting, but did not announce the interpreter's availability and did not employ the interpreter.

Several MCSO personnel, including MCSO's Spanish-speaking Community Liaison Officer, participated in and attended the meeting play instrumental roles in the implementation of the Orders.  In addition, the Monitoring Team and representatives of the ACLU of Arizona, the Plaintiff-Intervenors, and the CAB were invited to attend.  An MCSO representative announced the presence of the Monitoring Team and the ACLU of Arizona and stated their availability to answer questions.  MCSO did not recognize the DOJ representative in attendance, and the CAB did not attend.


***Paragraph 112.***  *At least ten days before such meetings, the MCSO shall widely publicize the meetings in English and Spanish after consulting with Plaintiffs' representatives and the Community Advisory Board regarding advertising methods.  Options for advertising include, but are not limited to, television, radio, print media, internet and social media, and any other means available.  If any party determines there is little interest or participation in such meetings among community members, or that they have otherwise fulfilled their purpose, it can file a request with the Court that this requirement be revised or eliminated.*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:**  In compliance

WAI 39935

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program.   This Paragraph, among the provisions of Document 2100, requires that MCSO widely publicize, in English and Spanish, its quarterly community meetings at least 10 days before such meetings and after consulting with Plaintiffs' representatives and the CAB regarding advertising methods.

As noted above, during this reporting period, MCSO held a public meeting coinciding with our April 2019 site visit.   As required, MCSO consulted with the CAB and the ACLU of Arizona regarding the advertisement in local radio and print media in English and Spanish – as well as on the site selection, agenda creation, and meeting logistics.   Members of the Monitoring Team also participated in discussions with MCSO regarding preparations for the public meeting.

MCSO's selection of the venue for the meeting was based on accessibility, adequate meeting space, adequate parking, and ease in locating the meeting site.   MCSO publicized the meeting with advertisements in both English and Spanish print media.   MCSO also ran radio spots in Spanish and English, and distributed flyers in the vicinity of the meeting venue.

### b. MCSO Community Liaison

*Paragraph 113.   MCSO shall select or hire a Community Liaison who is fluent in English and Spanish.   The hours and contact information of the MCSO Community Outreach Division ("COD") shall be made available to the public including on the MCSO website.   The COD shall be directly available to the public for communications and questions regarding the MCSO.*

**Phase 1:**  In compliance

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:**  In compliance

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program.   This Paragraph, among the provisions of Document 2100, requires that MCSO select or hire a Community Liaison who is fluent in English and Spanish; and that MCSO post on its public website the hours and contact information of the Community Outreach Division (COrD), which is responsible for public communications and questions regarding MCSO.

MCSO has a Community Liaison who is fluent in English and Spanish, and lists on the MCSO website the hours and contact information for the Community Liaison Officer and other members of the COrD.   The MCSO website includes information about the COrD – such as its mission and frequently asked questions regarding MCSO.

WAI 39936

*Paragraph 114.   The COD shall have the following duties in relation to community engagement:*

a.   *to coordinate the district community meetings described above in Paragraphs 109 to 112;*

b.   *to provide administrative support for, coordinate and attend meetings of the Community Advisory Board described in Paragraphs 117 to 118; and*

c.   *to compile any complaints, concerns and suggestions submitted to the COD by members of the public about the implementation of this Order and the Court's order of December 23, 2011, and its findings of fact and conclusions of law dated May 24, 2013, even if they don't rise to the level of requiring formal action by IA or other component of the MCSO, and to respond to Complainants' concerns; and*

d.   *to communicate concerns received from the community at regular meetings with the Monitor and MCSO leadership.*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:**  In compliance

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program.  This Paragraph, among the provisions of Document 2100, requires that the Community Outreach Division (COrD) be responsible for the following: coordinating MCSO's quarterly community meetings; providing administrative support for, coordinating, and attending meetings of the CAB; compiling complaints, concerns, and suggestions submitted to the COrD by members of the public about the implementation of the Orders, and to respond to the complainants' concerns; and to communicate such concerns from the community at regular meetings with the Monitor and MCSO leadership.

Shortly after the issuance of Document 2100, MCSO began the transition to assume responsibility for its Community Outreach and Public Information Program; and COrD – in collaboration with CID – began coordinating the required community meetings.  As noted above (in Paragraphs 109-112), during this reporting period, COrD worked with CID to coordinate a community meeting coinciding with our site visit.

WAI 39937

For the fourth consecutive reporting period, the Deputy Chief designated as the CAB's point of contact worked with and provided support to the CAB. She distributed policies and other materials for CAB members to review and provide feedback, and tracked and responded to CAB members' inquiries and requests for information about MCSO's implementation of the Orders.

During this reporting period, the CAB did not hold any public meetings. Some CAB members attended a few of the Monitoring Team's compliance meetings during our January and April site visits. CAB members also exchanged numerous email messages with COrD, CID, and the Deputy Chief who is the CAB's designated point of contact regarding the quarterly community meeting, planning meetings between CAB members and MCSO officials, and various inquiries and requests for information.

Following discussions during our October 2017 site visit, COrD created a form for capturing information on complaints, concerns, and suggestions submitted by members of the public to the COrD. MCSO has provided documentation that all current COrD personnel completed an online Complaint Intake and Processing course, to assist them in receiving and appropriately directing any complaints or concerns from community members they receive.

During our April site visit, as in the past, we inquired with COrD regarding any complaints or concerns related to the implementation of the Orders from community members that COrD received during this reporting period. COrD personnel reported that they occasionally receive concerns from community members, and that they forward those that are complaints to PSB. They also reported that they sometimes receive inquiries for which COrD staff believe it is appropriate to direct community members to written materials or the MCSO website. During this reporting period, COrD did not submit any MCSO Complaint and Comment Forms for our review. COrD personnel wrote, "No complaints, concerns or suggestions were submitted to the Community Outreach Division by members of the community (public) regarding the implementation of the Court's Orders; hence the Community Outreach Division has no response to complaints, concerns and suggestions."

Per this Paragraph, the COrD is also required to communicate concerns received from the community at regular meetings with the Monitor and MCSO leadership. During our upcoming site visit, we will again inquire with COrD personnel to learn more about how COrD communicates community concerns to the MCSO leadership.

### c. Community Advisory Board

**Paragraph 115.** *MCSO and Plaintiffs' representatives shall work with community representatives to create a Community Advisory Board ("CAB") to facilitate regular dialogue between MCSO and the community, and to provide specific recommendations to MCSO about policies and practices that will increase community trust and ensure that the provisions of this Order and other orders entered by the Court in this matter are met.*

**Phase 1:** In compliance

WAI 39938

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

**Phase 2:**  In compliance

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program.  This Paragraph, among the provisions of Document 2100, requires that MCSO have specific duties in relation to the Community Advisory Board (CAB).  MCSO and Plaintiffs' representatives are required to work with community representatives to create a CAB to facilitate regular dialogue between MCSO and community leaders, and to provide specific recommendations to MCSO about policies and practices that will increase public trust and ensure that the provisions of this Order and other orders entered by the Court in this matter are met.

Shortly after the issuance of Document 2100, MCSO began the transition to assume responsibility for its Community Outreach and Public Information Program; MCSO and the Plaintiffs' counsel selected the CAB members; and MCSO began providing support and guidance to the CAB.

During this reporting period, CAB members and representatives of MCSO – specifically, the Deputy Chief who is the CAB's designated point of contact, COrD, and CID – exchanged numerous email messages.  In these messages, among other topics, CAB members provided specific recommendations to MCSO about policies and practices that will increase community trust and ensure that the provisions of this Order and other orders entered by the Court in this matter are met.  For example, CAB members made recommendations regarding outreach and site selection for MCSO's community meeting; and on behalf of Maricopa County community members, inquired about various Office policies and processes.


***Paragraph 116.***  *The CAB shall have five members, two to be selected by MCSO and two to be selected by Plaintiffs' representatives.  One member shall be jointly selected by MCSO and Plaintiffs' representatives.  Members of the CAB shall not be MCSO Employees or any of the named class representatives nor any of the attorneys involved in this case.  A member of the MCSO COD and at least one representative for Plaintiffs shall attend every meeting of the CAB, but the CAB can request that a portion of the meeting occur without COD or the Plaintiffs' representative.  The CAB shall continue for at least the length of this Order.*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:**  In compliance

WAI 39939

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program.  This Paragraph, among the provisions of Document 2100, reconstitutes the CAB so that it is comprised of five members – two selected by MCSO, two selected by Plaintiffs' attorneys, and one member jointly selected by MCSO and Plaintiffs' attorneys.

In September 2017, MCSO and the Plaintiffs' counsel announced their selection of the CAB members.  One of the two CAB members who had served prior to the issuance of Document 2100 resigned, leaving one CAB member previously appointed by the Plaintiffs' representatives.  The MCSO and Plaintiffs' representatives appointed four new CAB members, resulting in a total of five members; two selected by MCSO, two selected by the Plaintiffs' representatives, and one jointly selected by MCSO and Plaintiffs' representatives.  None of the CAB members are MCSO employees, named class representatives, or attorneys involved in this case.

As noted above, during this reporting period, the CAB did not hold any public meetings.  Some CAB members attended a few of the Monitoring Team's compliance meetings during our January and April site visits.


***Paragraph 117.***  *The CAB shall hold meetings at regular intervals.  The meetings may be either public or private as the purpose of the meeting dictates, at the election of the CAB.  The Defendants shall provide a suitable place for such meetings.  The MCSO shall coordinate the meetings and communicate with CAB members, and provide administrative support for the CAB.*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

**Phase 2:**  In compliance

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program.  This Paragraph, among the provisions of Document 2100, requires that the CAB hold either public or private meetings at regular intervals; and that MCSO should provide a suitable place for such meetings, coordinate the meetings and communicate with CAB members, and provide administrative support to the CAB.

During this reporting period, the CAB did not hold any public meetings.  Some CAB members attended a few of the Monitoring Team's compliance meetings during our January and April site visits.

WAI 39940

**Paragraph 118.**  *During the meetings of the CAB, members will relay or gather concerns from the community about MCSO practices that may violate the provisions of this Order and the Court's previous injunctive orders entered in this matter and transmit them to the COD for investigation and/or action.  Members may also hear from MCSO Personnel on matters of concern pertaining to the MCSO's compliance with the orders of this Court.*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

**Phase 2:**  In compliance

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program.  This Paragraph, among the provisions of Document 2100, requires that at their meetings, CAB members relay or gather concerns from the community about MCSO practices that may violate the provisions of the Orders; this Paragraph also allows for the CAB to hear from MCSO personnel on matters of concern pertaining to MCSO's compliance with the Orders.

As noted above, during this reporting period, the CAB did not hold any public meetings.

During this reporting period, as in the past, CAB members inquired with MCSO officials regarding concerns that they received from the community – on topics including crime trends and MCSO's engagement of Latino community members.  CAB members indicated that they would share this information with the community.  Some CAB members also attended a few of the Monitoring Team's compliance meetings during our January and April site visits.

WAI 39941

## Second Supplemental Permanent Injunction/Judgment Order

### Section 12: Misconduct Investigations, Discipline, and Grievances

**COURT ORDER XV.       MISCONDUCT INVESTIGATIONS, DISCIPLINE, AND GRIEVANCES**

*Paragraph 163.  The Sheriff will ensure that all allegations of employee misconduct, whether internally discovered or based on a civilian complaint, are fully, fairly, and efficiently investigated; that all investigative findings are supported by the appropriate standard of proof and documented in writing; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair, consistent, unbiased and provides due process.  To achieve these outcomes, the Sheriff shall implement the requirements set out below.*

### A. Policies Regarding Misconduct Investigations, Discipline, and Grievances

*Paragraph 165.  Within one month of the entry of this Order, the Sheriff shall conduct a comprehensive review of all policies, procedures, manuals, and other written directives related to misconduct investigations, employee discipline, and grievances, and shall provide to the Monitor and Plaintiffs new policies and procedures or revise existing policies and procedures. The new or revised policies and procedures that shall be provided shall incorporate all of the requirements of this Order.  If there are any provisions as to which the parties do not agree, they will expeditiously confer and attempt to resolve their disagreements.  To the extent that the parties cannot agree on any proposed revisions, those matters shall be submitted to the Court for resolution within three months of the date of the entry of this Order.  Any party who delays the approval by insisting on provisions that are contrary to this Order is subject to sanction.*

**Phase 1:** Not applicable

**Phase 2:** Deferred

MCSO provided us with the following:

- CP-2 (Code of Conduct), most recently amended on March 15, 2019.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on January 24, 2019.

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- CP-8 (Preventing Racial and Other Bias-Based Profiling), most recently amended on September 26, 2018.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- EA-2 (Patrol Vehicles), most recently revised on February 20, 2019.

WAI 39942

- GA-1 (Development of Written Orders), most recently amended on March 28, 2019.

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

- GC-7 (Transfer of Personnel), most recently amended on September 27, 2018.

- GC-11 (Employee Probationary Periods), most recently amended on March 28, 2019.

- GC-12 (Hiring and Promotional Procedures), most recently amended on April 10, 2018.

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on November 29, 2018.

- GE-4 (Use, Assignment, and Operation of Vehicles), most recently amended on October 7, 2017.

- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.

- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

- GI-5 (Voiance Language Services), most recently amended on January 4, 2019.

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

- GJ-26 (Sheriff's Reserve Deputy Program), most recently amended on March 30, 2018.

- GJ-27 (Sheriff's Posse Program), currently under revision.

- GJ-35 (Body-Worn Cameras), most recently amended on January 7, 2017.

- Audits and Inspections Unit Operations Manual, currently under revision.

- Body-Worn Camera Operations Manual, published on December 22, 2016.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

WAI 39943

- Training Division Operations Manual, currently under revision.

We received a majority of the documents listed above within one month of the entry of the Order. The Monitoring Team and the Parties conducted initial reviews and returned the revised documents, with additional recommendations, to MCSO for additional work. MCSO continues to revise the remaining policies and operations manuals related to misconduct investigations, the Sheriff's Posse Program, Audits and Inspections, and Training. Those remaining policies and operations manuals identified by MCSO were in some phase of review by us and the Parties at the end of this reporting period.

This Paragraph implies that the review process and final adoption of the updated policies would take two months to complete, assuming that the new or revised policies were provided within one month of the Second Order's issuance. The sheer volume of policies, as well as the extensive modifications they contain, rendered that target date unachievable. This is due, in large measure, to researched and well-considered recommendations by the Parties; and robust discussion about policy language, application, and outcomes during our site visit meetings.

**Paragraph 166.** *Such policies shall apply to all misconduct investigations of MCSO personnel.*

**Paragraph 167.** *The policies shall include the following provisions:*

a. *Conflicts of interest in internal affairs investigations or in those assigned by the MCSO to hold hearings and make disciplinary decisions shall be prohibited. This provision requires the following:*

   i. *No employee who was involved in an incident shall be involved in or review a misconduct investigation arising out of the incident.*

   ii. *No employee who has an external business relationship or close personal relationship with a principal or witness in a misconduct investigation may investigate the misconduct. No such person may make any disciplinary decisions with respect to the misconduct including the determination of any grievance or appeal arising from any discipline.*

   iii. *No employee shall be involved in an investigation, whether criminal or administrative, or make any disciplinary decisions with respect to any persons who are superior in rank and in their chain of command. Thus, investigations of the Chief Deputy's conduct, whether civil or criminal, must be referred to an outside authority. Any outside authority retained by the MCSO must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest.*

b. *If an internal affairs investigator or a commander who is responsible for making disciplinary findings or determining discipline has knowledge of a conflict of interest*

WAI 39944

*affecting his or her involvement, he or she should immediately inform the Commander of the Professional Standards Bureau or, if the holder of that office also suffers from a conflict, the highest-ranking, non-conflicted chief-level officer at MCSO or, if there is no non-conflicted chief-level officer at MCSO, an outside authority. Any outside authority retained by the MCSO must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest.*

c. *Investigations into an employee's alleged untruthfulness can be initiated by the Commander of the Professional Standards Bureau or the Chief Deputy. All decisions not to investigate alleged untruthfulness must be documented in writing.*

d. *Any MCSO employee who observes or becomes aware of any act of misconduct by another employee shall, as soon as practicable, report the incident to a Supervisor or directly to the Professional Standards Bureau. During any period in which a Monitor is appointed to oversee any operations of the MCSO, any employee may, without retaliation, report acts of alleged misconduct directly to the Monitor.*

e. *Where an act of misconduct is reported to a Supervisor, the Supervisor shall immediately document and report the information to the Professional Standards Bureau.*

f. *Failure to report an act of misconduct shall be considered misconduct and may result in disciplinary or corrective action, up to and including termination. The presumptive discipline for a failure to report such allegations may be commensurate with the presumptive discipline for the underlying misconduct.*

g. *No MCSO employee with a rank lower than Sergeant will conduct an investigation at the District level.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on March 15, 2019.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on January 24, 2019.

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

WAI 39945

To determine Phase 2 compliance with this Paragraph, we review administrative misconduct investigations.

During this reporting period, we reviewed 143 closed administrative misconduct investigations. Eighty-eight cases involved sworn personnel; 44 cases involved Detention personnel; three involved civilian personnel; two involved reserve deputies; and two involved Posse members. Three involved unknown MCSO personnel and one was determined not to involve an MCSO employee. Sworn or Detention personnel assigned to the Professional Standards Bureau (PSB) conducted 71 of the investigations. Sworn supervisors in the Districts or Divisions outside of PSB conducted 72 of these investigations.

Paragraph 167.a.i-iii. prohibits any employee with any conflicts of interest from participating in, holding hearings on, or making any disciplinary decisions in a misconduct investigation. During this reporting period, there were two instances where a potential conflict of interest was identified. In both cases, the investigation was appropriately reassigned.

Paragraph 167.b. requires that if the internal affairs investigator or a commander responsible for making disciplinary decisions identifies a conflict of interest, appropriate notifications must be made immediately. Our review of the 143 completed administrative investigations for this reporting period revealed that there were two instances where MCSO identified a conflict of interest by an MCSO investigator or commander responsible for making disciplinary decisions. In both cases, the investigation and determination of findings were reassigned as required.

Paragraph 167.c. requires that investigations into truthfulness be initiated by the Chief Deputy or the PSB Commander. MCSO identified six instances during this reporting period where they believed a truthfulness allegation was appropriate. In all these cases, the PSB Commander approved the truthfulness investigation. We did not identify any instances where we believe a truthfulness investigation should have been initiated and was not.

Paragraph 167.d. requires that any MCSO employee who observes or becomes aware of misconduct by another employee shall immediately report such conduct to a supervisor or directly to PSB. Per the requirement, during the period in which the Monitor has authority to oversee any operations of MCSO, any employee may also report alleged misconduct to the Monitor. Of the 143 administrative cases we reviewed for this reporting period, there were 39 investigations where an employee reported potential misconduct by another employee, or a supervisor identified potential employee misconduct. There were no instances identified where an employee failed to report potential misconduct to a supervisor as required.

Paragraph 167.e. requires that when supervisors learn of an act of misconduct, the supervisor shall immediately document and report the information to PSB. In all 39 cases, the supervisor appropriately documented the information and immediately forwarded it to PSB, and an administrative investigation was initiated.

Paragraph 167.f. provides for the potential for a disciplinary sanction or other corrective action if an employee fails to bring forth an act of misconduct. During this reporting period, there was one investigation initiated because an employee failed to bring forth information regarding

WAI 39946

potential misconduct of another employee about which the employee was aware. PSB conducted an investigation, and determined that the actions of the involved supervisor had been within policy. We did not identify any circumstances during our reviews that we believe would have necessitated any action related to this Subparagraph.

Paragraph 167.g. requires that a sergeant or higher-ranking employee conduct all misconduct investigations conducted at the District level. All District-level cases that we reviewed for this reporting period complied with this requirement.

*Paragraph 168.* *All forms of reprisal, discouragement, intimidation, coercion, or adverse action against any person, civilian, or employee because that person reports misconduct, attempts to make or makes a misconduct complaint in good faith, or cooperates with an investigation of misconduct constitute retaliation and are strictly prohibited. This also includes reports of misconduct made directly to the Monitor, during any period in which a Monitor is appointed to oversee any operations of the MCSO.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on March 15, 2019.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on January 24, 2019.

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 143 administrative misconduct investigations that were completed during this reporting period.

There was one completed investigation where an inmate alleged that he was retaliated against, and had privileges denied by jail personnel, because he had filed too many grievances. The investigation determined that though inmate privileges had been denied, it was due to the actions of the inmate and unrelated to any previous grievances he had filed. MCSO exonerated the allegation, and we agree with this decision. MCSO also reported that there were no grievances or other documents filed with PSB or the Compliance Division that alleged any other misconduct related to the requirements of this Paragraph.

WAI 39947

***Paragraph 169.*** *Retaliating against any person who reports or investigates alleged misconduct shall be considered a serious offense and shall result in discipline, up to and including termination.*

**Phase 1:**  In compliance

- CP-2 (Code of Conduct), most recently amended on March 15, 2019.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on January 24, 2019.

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 143 administrative misconduct investigations that were completed during this reporting period.  One complaint of retaliation was filed by an inmate and the finding was exonerated, as noted in Paragraph 168.  There were no grievances or other documents submitted to PSB or to the Compliance Division that alleged any other retaliation related to the requirements of this Paragraph.


***Paragraph 170.*** *The Sheriff shall investigate all complaints and allegations of misconduct, including third-party and anonymous complaints and allegations.  Employees as well as civilians shall be permitted to make misconduct allegations anonymously.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

WAI 39948

To assess Phase 2 compliance with this Paragraph, we reviewed 143 completed administrative misconduct investigations conducted during this reporting period. Forty were initiated as a result of internal complaints and 103 were generated based on external complaints. We also reviewed 12 criminal misconduct investigations, seven of which were generated as a result of external complaints.

Of the 143 administrative misconduct investigations we reviewed for this reporting period, nine involved externally generated anonymous complaints. Three involved a third-party complaint. One of the criminal misconduct investigations we reviewed during this reporting period was generated due to an anonymous complaint. We have not become aware of any evidence that indicates that MCSO refused to accept and complete investigations in compliance with the requirements of this Paragraph. None of the 143 administrative misconduct investigations we reviewed during this reporting period included any allegations indicating that any third-party or anonymous complaint was not appropriately accepted and investigated.

**Paragraph 171.** *The MCSO will not terminate an administrative investigation solely on the basis that the complainant seeks to withdraw the complaint, or is unavailable, unwilling, or unable to cooperate with an investigation, or because the principal resigns or retires to avoid discipline. The MCSO will continue the investigation and reach a finding, where possible, based on the evidence and investigatory procedures and techniques available.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 143 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

We determined that 21 of the 143 completed administrative investigations involved complainants who sought to withdraw their complaints; or were unavailable, unwilling, or unable to cooperate. MCSO completed all 21 investigations and reached a finding as required. We also found that in 14 of the 143 investigations, the principal left MCSO employment prior to the finalization of the investigation or discipline process. MCSO completed all these investigations and reached a finding. Of the 143 investigations we evaluated for compliance, none were prematurely terminated.

WAI 39949

*Paragraph 172.   Employees are required to provide all relevant evidence and information in their custody and control to internal affairs investigators.   Intentionally withholding evidence or information from an internal affairs investigator shall result in discipline.*

**Phase 1:**  In compliance

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph during this reporting period, we reviewed 143 completed administrative misconduct investigations conducted by MCSO personnel.   There were no investigations identified by MCSO where an employee failed to accurately provide all information or evidence required during the investigation.   We did not identify any cases during our reviews where we believe an employee may have intentionally failed to provide all required information or evidence during an investigation and MCSO failed to act.

*Paragraph 173.   Any employee who is named as a principal in an ongoing investigation of serious misconduct shall be presumptively ineligible for hire or promotion during the pendency of the investigation.   The Sheriff and/or the MCSO shall provide a written justification for hiring or promoting an employee or applicant who is a principal in an ongoing investigation of serious misconduct.   This written justification shall be included in the employee's employment file and, during the period that the MCSO is subject to Monitor oversight, provided to the Monitor.*

**Phase 1:**  In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

- GC-11 (Employee Probationary Periods), most recently amended on March 28, 2019.

- GC-12 (Hiring and Promotional Procedures), most recently amended on April 10, 2018.

**Phase 2:**  In compliance

MCSO has established a protocol to address the requirements of this Paragraph.   When a promotion list is established for sworn or Detention personnel, a copy of the list is forwarded to the Professional Standards Bureau (PSB).   Before any promotion is finalized, PSB conducts a check of each employee's disciplinary profile in the automated system (IAPro).   As part of the promotional process, MCSO conducts a meeting with command staff to discuss each employee's qualifications.   During this meeting, the results of the IAPro checks are provided to

WAI 39950

the staff for review and consideration.  The PSB Commander generally attends the promotion meetings for both Detention and sworn personnel, and clarifies any questions regarding the disciplinary history that the staff may have.  When an employee is moved from a civilian employment position to a sworn employment position, MCSO conducts a thorough background investigation.  The process involves a review and update of the candidate's PSB files, which is completed by Pre-Employment Services.  For Detention employees who are moving to sworn positions, the information in the employee's file is updated to include any revised or new information.  Due to the scheduling of our site visits, we will inspect personnel files for employees who were promoted during the last month of the preceding quarter, and the first two months of the period in review.  In our reviews, we ensure that the documentation, as it pertains to compliance with this Paragraph, is included in personnel files.

During this reporting period, MCSO reported the promotions three civilian employees and six deputy sheriff trainees.  These employees had no record of discipline.  MCSO rehired three former employees, one of which had a sustained Category One offense.  The sustained allegation resulted in a coaching.

During our April site visit, we inspected the files of employees who had been promoted during this reporting period.  We found that the justification memorandum for one promoted employee, who had an open misconduct investigation, was missing from the personnel file.  The memorandum had been provided with the initial submission.  Human Resources corrected this deficiency, and notified us that the memorandum had been placed in the employee's personnel file.  One employee promoted during the last month of the previous quarter had four open misconduct investigations.  We noted our concerns with this promotion in our previous quarterly report.  We reviewed the personnel file to verify compliance with this Paragraph.  The employee's current supervisor had noted, in the transfer request, that he had concerns with the open misconduct investigations and would monitor the outcomes.

During our April meeting with Human Resources, we inquired as to the follow-up process for review of personnel files of employees who had open misconduct investigations at the time of their promotion.  We were advised that the current practice was to notate, "Open IA acknowledged; Chief/Commander will monitor the outcome."  MCSO responded that they would change the practice and modify the comments to, "Conferred with PSB regarding open IA.  If sustained, behavior will not rise to the level of serious misconduct, therefore, transfer is approved."  We agree that monitoring the employee is an appropriate step to take.  We do not oppose the change in comments.  However, there are situations where, during the course of the investigation, additional violations are uncovered.  MCSO should monitor the outcomes of open misconduct cases to ensure that, at the completion of the investigation, the findings and seriousness of the violations are consistent with the information initially provided to the Monitoring Team.  If there are any developments that change the outcome, MCSO should notify us in a timely manner.  We also recommend that when employees with open misconduct investigations are promoted or hired, the documents submitted as proof of compliance with this Paragraph should clearly state whether or not the alleged violations involve serious misconduct.

WAI 39951

*Paragraph 174.  Employees' and applicants' disciplinary history shall be considered in all hiring, promotion, and transfer decisions, and this consideration shall be documented. Employees and applicants whose disciplinary history demonstrates multiple sustained allegations of misconduct, or one sustained allegation of a Category 6 or Category 7 offense from MCSO's disciplinary matrices, shall be presumptively ineligible for hire or promotion. MCSO shall provide a written justification for hiring or promoting an employee or applicant who has a history demonstrating multiple sustained allegations of misconduct or a sustained Category 6 or Category 7 offense.  This written justification shall be included in the employee's employment file and, during the period that the MCSO is subject to Monitor oversight, provided to the Monitor.*

**Phase 1:**  In compliance

- GC-12 (Hiring and Promotional Procedures), most recently amended on April 10, 2018.

**Phase 2:**  In compliance

For employees who are promoted, the documentation submitted by MCSO generally includes the disciplinary history for the previous 10 years and any applicable disciplinary actions. MCSO also provides the disciplinary history of Detention and civilian employees who have been upgraded in classification to sworn status.

During this quarter, MCSO reported the promotions three civilian employees and six deputy sheriff trainees.  These employees had no record of discipline.  MCSO rehired three former employees, one of which had a sustained Category One offense.  The employee with the sustained violation received a coaching.  During our April site visit, we reviewed the personnel files of employees who were hired or promoted during this reporting period.  Our comments regarding our reviews are noted in Paragraph 173.  MCSO provided a promotion list for March that included eight Detention sergeants and four Detention lieutenants.  However, their disciplinary profile was not provided.  We will review the personnel files for these employees during our July site visit.

*Paragraph 175.  As soon as practicable, commanders shall review the disciplinary history of all employees who are transferred to their command.*

**Phase 1:**  In compliance

- GH-5 (Early Identification System), most recently amended on January 4, 2019.
- GC-7 (Transfer of Personnel), most recently amended on September 27, 2018.

**Phase 2:**  In compliance

WAI 39952

Per policy, MCSO is to conduct an EIS review within 14 days of an affected employee's transfer. We requested a list of employees that were transferred during this reporting period. From the list, we selected a sample of employees to review and verify that there was documentation of the required EIS reviews. To verify compliance with this Paragraph, we review the transfer request documents that MCSO completes for each employee. The documents memorialize the commander's acknowledgment of review of the transferred employee's disciplinary history, as well as the review of the employee's performance appraisals for the previous five years. This review is generally conducted before the gaining commander accepts the transfer, a few days prior to the transfer becoming effective. For this reporting period, we reviewed the documentation for 67 employees.

For January, MCSO submitted a list of employees who were transferred during the previous month. From the list, we selected 24 employees, of which six were sworn, and 18 were Detention. Five of the transferred sworn employees selected included documentation of command review of their EIS profiles. One sworn employee was transferred within the same bureau, so the EIS review was not necessary. Of the 18 transferred Detention employees selected, 17 included documentation of command review of their EIS profiles. In total, 23 of the 24 transfers had documentation that met the requirements of this Paragraph. The compliance rate was 96%.

For February, MCSO submitted a list of employees who were transferred during January. From the list, we selected 30 employees transferred, to assess MCSO's compliance with this Paragraph. The transfers selected for review included two sworn employees and 28 Detention employees. All 30 employees had documentation of command review of their EIS profiles. The compliance rate for February was 100%.

For March, we reviewed the documentation for 13 employees to assess MCSO's compliance with this Paragraph. The transfers were all Detention employees. Of the 13 employees transferred, 12 had proper documentation of command review of their disciplinary histories. For the first quarter of 2019, the compliance rate was 97%.


***Paragraph 176.*** *The quality of investigators' internal affairs investigations and Supervisors' reviews of investigations shall be taken into account in their performance evaluations.*

**Phase 1:**  In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

**Phase 2:**  Not in compliance

We reviewed Employee Performance Appraisals for 32 supervisors and commanders who received EPAs during this reporting period. All 32 appraisals rated the quality and effectiveness of supervision. Twenty-seven of the 32 appraisals contained comments and/or rated the supervisors' demonstrated ability to identify and effectively respond to misconduct. Seventeen

WAI 39953

of the 32 supervisors' EPAs assessed the employees' quality of internal investigations and/or the quality of their reviews of internal investigations, as required by this Paragraph. Twenty-eight of the 32 appraisals rated supervisors on the quality of their reviews. The number of EPAs that met the requirements of this Paragraph again decreased during this reporting period. The compliance rate for the previous quarter was 63%. The compliance rate for this reporting period was 53%.

**Paragraph 177.** *There shall be no procedure referred to as a "name-clearing hearing." All pre-disciplinary hearings shall be referred to as "pre-determination hearings," regardless of the employment status of the principal.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 143 administrative misconduct investigations that were completed during this reporting period.

In misconduct investigations that resulted in serious discipline and in which the employee was afforded the opportunity for an administrative hearing, the only reference to the hearing was "pre-determination hearing."

### B.    Misconduct-Related Training

**Paragraph 178.** *Within three months of the finalization of these policies consistent with ¶ 65of this Order, the Sheriff will have provided all Supervisors and all personnel assigned to the Professional Standards Bureau with 40 hours of comprehensive training on conducting employee misconduct investigations. This training shall be delivered by a person with subject matter expertise in misconduct investigation who shall be approved by the Monitor. This training will include instruction in:*

a.    *investigative skills, including proper interrogation and interview techniques, gathering and objectively analyzing evidence, and data and case management;*

b.    *the particular challenges of administrative law enforcement misconduct investigations, including identifying alleged misconduct that is not clearly stated in the complaint, or that becomes apparent during the investigation;*

c.    *properly weighing the credibility of civilian witnesses against employees;*

d.    *using objective evidence to resolve inconsistent statements;*

e.    *the proper application of the appropriate standard of proof;*

WAI 39954

f.    report-writing skills;

g.    requirements related to the confidentiality of witnesses and/or complainants;

h.    considerations in handling anonymous complaints;

i.    relevant MCSO rules and policies, including protocols related to administrative investigations of alleged officer misconduct; and

j.    relevant state and federal law, including Garrity v. New Jersey, and the requirements of this Court's orders.

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

In February, MCSO delivered the Misconduct Investigative Training (PSB40) to 22 personnel (two sworn personnel, 20 Detention personnel).  No personnel required test remediation.

A review of this curriculum did not occur during the reporting period.

**Paragraph 179.**  *All Supervisors and all personnel assigned to the Professional Standards Bureau also will receive eight hours of in-service training annually related to conducting misconduct investigations.  This training shall be delivered by a person with subject matter expertise in misconduct investigation who shall be approved by the Monitor.*

**Phase 1:**  In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.

- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

The annual eight-hour in-service training (PSB8 Internal) was not delivered during this reporting period.  MCSO has begun negotiations with a vendor to provide this training for this calendar year.   The training is anticipated to focus on Equal Employment Opportunity Commission (EEOC) workplace discrimination investigations.  MCSO has already discussed Order requirements with the vendor.  We received an outline, PowerPoint presentation, test, and instructor BIO during this reporting period.

In January, the annual eight-hour in-service training (PSB8 External) was provided twice to District supervisors.  A total of 54 sworn supervisors attended these classes.  One supervisor required test remediation.

WAI 39955

Development for this year's in-service began during this reporting period.  Jointly, the Training Division and PSB are developing the curriculum, associated documents, and internal videos.  .

***Paragraph 180.*** *Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all employees on MCSO's new or revised policies related to misconduct investigations, discipline, and grievances.  This training shall include instruction on identifying and reporting misconduct, the consequences for failing to report misconduct, and the consequences for retaliating against a person for reporting misconduct or participating in a misconduct investigation.*

**Phase 1:**  In compliance

- CP-2 (Code of Conduct), most recently amended on March 15, 2019.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on January 24, 2019.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.

- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2018.

- GJ-26 (Sheriff's Reserve Deputy Program), most recently amended March 30, 2018.

- GJ-27 (Sheriff's Posse Program), most recently amended on April 4, 2014.

- Training Division Operations Manual, most recently amended on September 21, 2017.

**Phase 2:**  In compliance

MCSO uses the HUB, a training management system, to distribute all policies.  Employees are required to complete personal attestations that indicate that they have read and understand the policies each time a policy is revised and distributed.

WAI 39956

Reports generated in the HUB do not provide the same information as the system that MCSO previously used, Skills Manager.  For example, HUB reporting does not indicate the date a Briefing Board (BB) was published, nor does it provide a date of review by the employee.  The lack of information contained in HUB reports has hampered both our and MCSO's ability to accurately assess compliance.

During our April site visit, we discussed possible modifications to the reporting format that would allow MCSO to more accurately determine compliance percentages.  The Order allows for a 60-day review period of policy changes by MCSO personnel.  MCSO has managed review periods by providing individuals an initial 30 days to review each policy change.  If the individual fails to complete the review within the initial period, an additional 30 days are allowed after email notification from the Training Division to the individual and their supervisor.  We have recommended that upon release of a BB, compliance reporting not begin until 90 days later, to allow time for this process to play out.  Doing so provides ample time for the individual to complete their review and for MCSO to document the attestations.  We will continue to monitor these changes to ensure a more positive and accurate reflection of compliance achievement.

We review the reports of attestations that identify each individual and their dates of review for each of the following policies to gauge compliance with this Paragraph:  CP-2 (Code of Conduct); CP-3 (Workplace Professionalism: Discrimination and Harassment); CP-11 (Anti-Retaliation); GB-2 (Command Responsibility); GH-2 (Internal Investigations); GC-16 (Employee Grievance Procedures); and GC-17 (Employee Disciplinary Procedures).

During this reporting period, we reviewed the status of individual reviews for BB 18-14 (GC-17), BB 18-23 (CP-2), BB 18-31 (GH-2), 18-47 (GB-2), BB 18-48 (CP-11), BB 19-04 (CP-3), and BB 19-14 (GC-16).

We will continue reviewing policy attestations by all personnel.  We have advised MCSO that a continued failure to improve upon the reporting accuracy could adversely affect compliance.


***Paragraph 181.***  *Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all employees, including dispatchers, to properly handle civilian complaint intake, including how to provide complaint materials and information, and the consequences for failing to take complaints.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.

WAI 39957

- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2018.

- Training Division Operations Manual, most recently amended on September 21, 2017.

**Phase 2:**  Not in compliance

MCSO continues to deliver Complaint Intake and Reception Training via the HUB.  We previously documented the difficulties reporting in the HUB has created.  These difficulties continue to persist.  Reporting for this required training for all classes of new employees during this reporting period remain below acceptable compliance levels.

Training personnel have diligently attempted to create reports for new hires that identify the date of hire and the date of completion of training.  MCSO believes this to be a system deficiency of HUB reporting.  We continued to discuss this issue with Training Division personnel during our April site visit.  We recommended that reporting for this training follow the proposed reporting protocols for policy attestations discussed above.  Reporting must include the date of hire and the date the training was completed.  If this information can be merged with the 90-day schedule we anticipate that reporting and acceptable compliance assessments will return.

MCSO must improve the HUB reporting or recommend changes to the way this information is provided.

We will continue to monitor the completion of training by new hires, but MCSO must address the system deficiency during the next reporting period in order to maintain compliance.


***Paragraph 182.***  *Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all Supervisors on their obligations when called to a scene by a subordinate to accept a civilian complaint about that subordinate's conduct and on their obligations when they are phoned or emailed directly by a civilian filing a complaint against one of their subordinates.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.

- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2018.

- Training Division Operations Manual, most recently amended on September 21, 2017.

WAI 39958

**Phase 2:**  In compliance

We previously discussed the difficulties the Training Division experienced that extended the curriculum development cycle for the 2018 ACT.  The curriculum was missing clear directions regarding supervisory actions when called to a scene by a subordinate to accept a civilian complaint.  There were only references to policy.  Development of the 2019 ACT and SRELE began during this reporting period.  Our review process will ensure the inclusion of clear and precise language reaffirming the requirements of this Paragraph.

### C.  *Administrative Investigation Review*

***Paragraph 183.***  *The Sheriff and the MCSO will conduct objective, comprehensive, and timely administrative investigations of all allegations of employee misconduct.  The Sheriff shall put in place and follow the policies set forth below with respect to administrative investigations.*

***Paragraph 184.***  *All findings will be based on the appropriate standard of proof.  These standards will be clearly delineated in policies, training, and procedures, and accompanied by detailed examples to ensure proper application by internal affairs investigators.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 143 completed administrative misconduct investigations conducted during this reporting period.

Of the 143 cases we reviewed, 140 (98%) complied with the requirements of this Paragraph.  In three cases, we do not believe the findings were based on an appropriate standard of proof.  In one, we believe a finding of sustained should have been made and was not.  In the remaining two, the investigations did not support the findings of exonerated and unfounded.  Both should have resulted in findings of not sustained.

During our next site visit, we will discuss these investigations with PSB personnel.

***Paragraph 185.***  *Upon receipt of any allegation of misconduct, whether internally discovered or based upon a civilian complaint, employees shall immediately notify the Professional Standards Bureau.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

WAI 39959

To determine Phase 2 compliance with this Paragraph, we reviewed 143 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period. We also reviewed 12 criminal misconduct investigations. In all of the administrative cases, PSB was immediately notified at the time of the complaint as required. In one of the criminal misconduct investigations, the notification to PSB was not made in a timely manner. We will discuss this case with PSB during our next site visit.

***Paragraph 186.*** *Effective immediately, the Professional Standards Bureau shall maintain a centralized electronic numbering and tracking system for all allegations of misconduct, whether internally discovered or based upon a civilian complaint. Upon being notified of any allegation of misconduct, the Professional Standards Bureau will promptly assign a unique identifier to the incident. If the allegation was made through a civilian complaint, the unique identifier will be provided to the complainant at the time the complaint is made. The Professional Standards Bureau's centralized numbering and tracking system will maintain accurate and reliable data regarding the number, nature, and status of all misconduct allegations, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status, if requested, and final disposition of the complaint. The system will be used to determine the status of misconduct investigations, as well as for periodic assessment of compliance with relevant policies and procedures and this Order, including requirements of timeliness of investigations. The system also will be used to monitor and maintain appropriate caseloads for internal affairs investigators.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

During our October 2016, January 2017, and July 2017 site visits, we met with the PSB lieutenant who served as the primary administrator for the IAPro database system. The lieutenant's demonstration represented IAPro as a technology instrument that meets the compliance criteria of this Paragraph – to include logging of critical dates and times, alerts regarding timeframes and deadlines, chronological misconduct investigation status, notifications, and dispositions. The lieutenant conducted a weekly evaluation of closed cases to ensure that data was entered in to the system, and a monthly review to audit timeframes associated with open investigations. The tracking system provides estimates of key timeframes for all investigators to ensure that they learn of previous and upcoming investigative milestones.

WAI 39960

PSB has confirmed that civil notice claims are entered in the tracking system. The IAPro system integrates exceptionally well with the EIS and Blue Team technology systems. The system can be accessed remotely. Additionally, PSB hired a management analyst dedicated to the administration of the centralized tracking system. The documentation that PSB provided to us for review, and the direct user access that a member of our Team has to the centralized numbering and tracking system, indicates that the system possesses the functionality as required by this Paragraph and is being used according to the requirements of this Paragraph.

During our January 2018 site visit, a member of our Team met with the management analyst assigned to PSB who is now responsible for management of the IAPro database. The management analyst demonstrated the functionality of the tracking system in use. The analyst also showed us the documents that are sent out regarding the status of investigations and demonstrated how the Blue Team Dashboard can be used to track investigation information.

During this reporting period, we found that all 143 of the administrative misconduct investigations were properly assigned a unique identifier. All but two of these cases were both initiated and completed after July 20, 2016. Of the 143 cases, 103 involved an external complaint requiring that PSB provide the complainant with this unique identifier. In all but two of these 103 cases, MCSO sent the initial letter that includes this unique identifier to the complainant within seven days, or provided an appropriate explanation for not doing so. In some cases, anonymous complainants do not provide contact information; and in others, known complainants decline to provide MCSO with adequate contact information. PSB has developed a form that identifies the reason why a required notification letter is not sent, and includes this document in the cases they forward for our review.

***Paragraph 187.*** *The Professional Standards Bureau shall maintain a complete file of all documents within the MCSO's custody and control relating to any investigations and related disciplinary proceedings, including pre-determination hearings, grievance proceedings, and appeals to the Maricopa County Law Enforcement Merit System Council or a state court.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

To determine compliance with this Paragraph, we previously verified that PSB maintains both hardcopy and electronic files intended to contain all the documents required for compliance with this Paragraph.

WAI 39961

During past site visits, a member of our Team has inspected the file rooms where hardcopies of investigations are stored and randomly reviewed case files to verify compliance. We verified that criminal and administrative investigation files are stored in separate rooms, and access to these rooms is restricted. Our Team member has also used the access granted to IAPro to randomly select internal affairs case files to verify that all information is being maintained electronically.

In May 2018, PSB relocated to its new offsite facility. We confirmed at that time that PSB maintained both hardcopy and electronic files intended to contain all documents required for compliance with this Paragraph at the new facility.

During our January 2019 site visit, a member of our Team again verified this compliance at the PSB facility by inspecting both the criminal and administrative investigation file rooms and randomly selecting internal affairs case files to verify that all information is also being electronically maintained in IAPro.

*Paragraph 188.* *Upon being notified of any allegation of misconduct, the Professional Standards Bureau will make an initial determination of the category of the alleged offense, to be used for the purposes of assigning the administrative investigation to an investigator. After initially categorizing the allegation, the Professional Standards Bureau will promptly assign an internal affairs investigator.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review administrative misconduct investigations and service complaints that were conducted and completed by MCSO personnel during the reporting period.

We previously concurred with MCSO that Phase 2 compliance with this Paragraph would be based on PSB's determination of the initial allegations, and not which category of offense is determined once the investigation is completed.

During this reporting period, we reviewed 143 closed administrative misconduct investigations and 64 closed service complaints. All complied with the requirements of this Paragraph.

With the approved revisions to the internal investigations and discipline policies in May 2017, PSB is authorized to determine that some complaints can be classified as service complaints. PSB has initiated both a process and a complaint-tracking system for these complaints.

During the last reporting period, MCSO completed and closed 12 service complaints. All 12 complied with the requirements of this Paragraph.

WAI 39962

During this reporting period, MCSO completed and closed 64 service complaints. Five service complaints were appropriately reclassified to administrative misconduct investigations after review by PSB. The remaining 59 were classified and handled as service complaints. Of these 59, 54 met the requirements established for service complaints. In one case that PSB closed as a service complaint, the investigator appropriately investigated the allegation; and we agree with the outcome. However, the allegation amounted to potential employee misconduct and an administrative misconduct investigation should have been conducted. In one case, MCSO did not ensure proper follow-up with the complainant; and in three others, no final letter was sent to the complainant and no explanation was provided.

As we have consistently noted in our review of service complaints, the majority of these complaints involve laws, policies, or procedures where there is no employee misconduct; or are complaints where it is determined that MCSO employees are not involved. During this reporting period, 23 (39%) of the 59 service complaints did not involve MCSO employees. Twenty-eight (44%) did not involve allegations of employee misconduct, and the remaining eight were closed based on a combination of factors.

During our April and July 2018 site visits, we discussed service complaints with PSB personnel. During both discussions, PSB advised us that the number of service complaints being initiated far exceeded their expectations. They also noted in both meetings that between 20-25% of the service complaints were determined not to involve MCSO employees, and our reviews for these two reporting periods confirmed this assertion. We agreed to review an expedited process for handling complaints where it could be immediately determined that the complaint did not involve MCSO personnel.

During our October 2018 site visit, PSB personnel informed us that the number of service complaints being initiated had continued to exceed their expectations. As of our October site visit meeting, MCSO had initiated 263 service complaints in 2018. Despite MCSO's expressed interest in making additional changes to the service complaint process, MCSO had not yet drafted any proposed revisions to the process or form for our Team to review. At the time, MCSO personnel informed us they wanted to explore additional changes and modifications to the service complaint process and form prior to submitting any revisions for our review.

During our January 2019 site visit, PSB personnel advised us that they initiated 354 service complaints during 2018. The number of service complaints has continued to exceed their expectations. The PSB Commander informed us that PSB had assigned a Detention supervisor in PSB to manage Detention employee service complaints. In addition, The PSB Commander informed us that PSB was working on a plan to identify supervisors in the Detention facilities handle some of the service complaints. They would ensure that these supervisors met all of the requirements for those who conduct internal investigations. The PSB Commander also informed us that the sworn supervisor who has been managing all service complaint intake would continue to manage service complaints involving only sworn personnel.

WAI 39963

During our April 2019 site visit, PSB advised us that 135 service complaints had been opened during the first three months of 2019. This compares with 54 service complaints that were opened the first three months of 2018. PSB informed us that the Bureau now intends to move forward with a proposed revision relative to the expedited process for handling service complaints where it can be immediately identified that the complaint does not involve MCSO employees. We again agreed to review this process once it is developed and submitted for our review.

Consistent with the provisions of the revised policies on internal investigations and discipline, the PSB Commander now has the discretion to determine that internal complaints alleging minor policy violations can be addressed without a formal investigation if certain criteria exist. If the PSB Commander makes this determination, it must be documented.

During the last reporting period, the PSB Commander determined that two internally generated complaints could be addressed without a formal investigation. Both involved at fault traffic accidents where there was minor damage and no injuries. We concurred with the decision of the PSB Commander. This was the first time we had seen the PSB Commander utilize this provision to handle internally generated complaints of minor policy violations.

During this reporting period, the PSB Commander determined that 10 internally generated complaints could be addressed without a formal investigation. All 10 involved at fault traffic accidents with minor property damage and no injuries. The employees involved met the established criteria for the handling of these complaints without a formal investigation. PSB provided sufficient documentation and all 10 employees appropriately received coaching.

**Paragraph 189.**  *The Professional Standards Bureau shall administratively investigate:*

a.    *misconduct allegations of a serious nature, including any allegation that may result in suspension, demotion, or termination; and*

b.    *misconduct indicating apparent criminal conduct by an employee.*

**Phase 1:**  In compliance

- CP-2 (Code of Conduct), most recently amended on March 15, 2019.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on January 24, 2019.

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

WAI 39964

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph during this reporting period, we reviewed 143 completed administrative misconduct investigations conducted by MCSO personnel.

Division or District personnel outside of PSB investigated 72 of the 143 administrative misconduct investigations conducted during this reporting period. PSB investigated 71 of the cases. PSB also submitted 12 investigations involving criminal allegations for review. We did not identify any misconduct investigations that were conducted by a District supervisor where we believe that potential additional misconduct discovered during the initial investigation should have resulted in the investigation being forwarded to PSB for completion and was not.

***Paragraph 190.*** *Allegations of employee misconduct that are of a minor nature may be administratively investigated by a trained and qualified Supervisor in the employee's District.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed a total of 155 misconduct investigations conducted by MCSO personnel and completed during this reporting period. Of these, 143 were administrative investigations, and 12 involved alleged criminal misconduct. PSB personnel conducted all of the criminal investigations.

Of the 143 administrative misconduct cases we reviewed for this Paragraph, PSB investigators conducted 71 of the investigations. Seventy-two were investigated at the District or Division level. We did not identify any instances where a District or Division supervisor outside of PSB conducted an investigation that we believe should have been forwarded to PSB for investigation as potential serious misconduct was discovered.

The 40-hour Misconduct Investigative Training was completed prior to January 1, 2018. During the last reporting period, we reviewed 33 administrative misconduct investigations conducted by Divisions or Districts outside of PSB. Twenty-six of the investigations were initiated before the 40-hour Misconduct Investigative Training was completed. Fifteen (58%) of these 26 were in compliance with the requirements for completion of misconduct investigations. Seven of the investigations were both initiated and finalized after the completion of the 40-hour Misconduct Investigative Training. All seven (100%) were in compliance with all requirements for the completion of administrative misconduct investigations.

During this reporting period, we reviewed 72 administrative misconduct investigations conducted by Divisions or Districts outside of PSB. Twenty-three of the investigations were initiated before the 40-hour Misconduct Investigative Training was completed. Sixteen (70%) of these 23 were in compliance with the requirements for completion of misconduct investigations. Forty-nine of the investigations were both initiated and finalized after the

WAI 39965

completion of the 40-hour Misconduct Investigative Training.   Thirty-nine (80%) were in compliance with all requirements for the completion of administrative misconduct investigations.

All supervisors have attended the required Misconduct Investigative Training.  While some investigations still do not comply with all the requirements for the investigation of misconduct, these deficiencies are covered in other Paragraphs.   We continue to note that those investigations completed after the delivery of the 40-Hour Misconduct Investigative Training are of higher quality than those completed prior to the training.

MCSO has complied with the requirements to train all supervisors who conduct minor misconduct investigations; and they provide a monthly report regarding those supervisors who they have determined are not qualified to conduct these investigations.

***Paragraph 191.***  *If at any point during a misconduct investigation an investigating Supervisor outside of the Professional Standards Bureau believes that the principal may have committed misconduct of a serious or criminal nature, he or she shall immediately notify the Professional Standards Bureau, which shall take over the investigation.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 143 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.  Of the 72 administrative misconduct cases investigated at the District level, we did not identify any cases where we believe that potential serious misconduct was discovered by the investigating supervisor and the supervisor failed to forward the case to PSB.

***Paragraph 192.***  *The Professional Standards Bureau shall review, at least semi-annually, all investigations assigned outside the Bureau to determine, among the other matters set forth in ¶ 251 below, whether the investigation is properly categorized, whether the investigation is being properly conducted, and whether appropriate findings have been reached.*

**Phase 1:**  In compliance

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

PSB command personnel advised us that they continue to review investigations in "real time" as they come into the Bureau.  During this reporting period, MCSO provided copies of PSB's reviews of 68 completed Division level misconduct investigations that were assigned outside the Bureau; which is a significant increase from the previous reporting period when 32 reviews

WAI 39966

were conducted.  The report review template used by PSB includes sections that address whether or not the investigation is properly categorized, whether the investigation is properly conducted, and whether appropriate findings have been reached.  Additionally, copies of emails detailing the quality of the investigation, identified deficiencies, and required edits sent electronically to affected Division Commanders were provided for each case reviewed.

PSB included the information required by this Paragraph in its semi-annual public Misconduct Investigations Report, which is required under Paragraph 251.  The most recent report was published on MCSO's website in February 2019.  The report covers the period of January 1-June 30, 2018; and contains an analysis as to whether cases assigned outside of PSB are properly categorized, whether the investigations were properly conducted, and whether appropriate findings have been reached.  Some of the issues of concern identified in the review of the investigations where improvement is needed include: improper use of leading questions; content issues with the narrative of the report; failure to interview all parties (e.g., investigative leads and witnesses); and failure to complete an in-depth and thorough investigation.  The following trends were identified during PSB's review of the investigations: lack of attention to detail; use of inappropriate policies; and issues differentiating between the use of the findings of "unfounded" and "exonerated."

**Paragraph 193.**  *When a single act of alleged misconduct would constitute multiple separate policy violations, all applicable policy violations shall be charged, but the most serious policy violation shall be used for determining the category of the offense.  Exoneration on the most serious offense does not preclude discipline as to less serious offenses stemming from the same misconduct.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 143 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.  Thirty-four cases had sustained allegations against one or more employees.  In 26 of these 34 investigations, the employee involved was still an MCSO employee at the time the investigation was completed and discipline decisions were made.  In one (4%) of these 26 cases, the most serious policy violation was not used to determine the category of the offense if more than one policy violation had been alleged.  We will discuss this case with PSB during our next site visit.

WAI 39967

In cases where multiple violations of policy occurred, this information was listed on the preliminary discipline document. There were no cases where the exoneration of any offense precluded discipline for sustained allegations.

**Paragraph 194.** *The Commander of the Professional Standards Bureau shall ensure that investigations comply with MCSO policy and all requirements of this Order, including those related to training, investigators' disciplinary backgrounds, and conflicts of interest.*

Phase 1: In compliance

- CP-2 (Code of Conduct), most recently amended on March 15, 2019.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on January 24, 2019.

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** Not in compliance

We determine Phase 2 compliance with this Paragraph by a review of completed misconduct investigations conducted by MCSO personnel, the review of attendance by internal investigators at required Misconduct Investigative Training, the disciplinary backgrounds of internal investigators and the efforts being made by the PSB Commander to reach compliance.

During this reporting period, we reviewed 143 administrative misconduct investigations and 12 criminal investigations. All 12 (100%) of the criminal investigations complied with MCSO policy and the requirements of the Second Order. Of the 143 administrative misconduct investigations, 121 (85%) were in compliance with all of the investigative and administrative responsibilities over which the PSB Commander has authority. This is an increase of 6% from the last reporting period. There was one case where we disagreed with the final discipline decision of the Appointing Authority.

WAI 39968

There were four administrative misconduct cases completed and reviewed in response to the requirements of Paragraphs 249 (investigatory stops) during this reporting period.  All four were in compliance.  Four cases submitted in compliance with Paragraph 33, involving an allegation of bias policing not involving members of the Plaintiffs' class, were reviewed.  Three of the four were found to be in compliance with the requirements of the Order.  Five cases were submitted and reviewed for Paragraph 275 Class Remedial Matters (CRMs).  All five were in compliance.

Of the 143 total administrative misconduct cases we reviewed, PSB personnel completed 71.  Sixty-seven (94%) were in compliance with all investigative and administrative requirements over which the PSB Commander has authority.  This is a slight decrease from the 96% compliance the last reporting period.

Sworn personnel in PSB conducted 22 of these investigations.  All 22 (100%) were in compliance with all of the investigative and administrative responsibilities over which the PSB Commander has authority.  This is consistent with the compliance findings for the last reporting period.

Forty-nine of the investigations conducted by PSB were completed by Detention personnel assigned to PSB.  Of the 49 they investigated, 45 (92%) were in compliance with all of the investigative and administrative responsibilities over which the PSB Commander has authority.  This is a slight decrease from the 93% compliance rate during the last reporting period.  In the four cases found non-compliant, we identified concerns with an unsupported finding, failure to address an identified policy issue, all interviews were not conducted, or administrative documentation was not completed or provided.

Seventy-two investigations were conducted by Districts or Divisions outside of PSB.  We found 54 (75%) to be in compliance with investigative and administrative requirements.  This is an increase from the 67% compliance during the last reporting period.  We noted that investigations initiated and completed by District personnel after the completion of the Misconduct Investigative Training continue to have a higher percentage of compliance than those completed prior to the training.

There are many factors that impact the PSB Commander's ability to ensure compliance in all cases.  The PSB Commander must rely on other members of PSB staff to conduct case reviews and ensure proper documentation is completed.  We continue to find that PSB personnel are identifying and ensuring, where possible, that corrections are made and all documentation is completed in those cases they review, but in some cases, deficiencies cannot be corrected after the fact.

One of the most significant factors that has adversely impacted compliance for those cases completed outside of PSB has been the failure of District and Division Command personnel to identify and correct deficiencies prior to forwarding cases to PSB for review.  While we continue to find  concerns in some cases completed and forwarded from District and Division personnel outside of PSB, we find that those cases initiated after the 40-hour Misconduct Investigative Training are of an overall higher quality than those completed prior to the training.

WAI 39969

Consistently.  During this and the last reporting period, we found several examples of District Command staff identifying and addressing concerns and deficiencies in those investigations conducted by their personnel.  We also noted two instances this reporting period where PSB identified concerns with the District level approval of misconduct investigations and forwarded these concerns to Deputy Chiefs to address.  We continue to be optimistic that the attention being given to District internal investigations, along with the increased overall quality of investigations we have noted since the completion of the Misconduct Investigative Training, will continue to result in ongoing improvement and increased compliance.

The final factor affecting the PSB Commander's ability to ensure all investigations are properly completed is that the Appointing Authority – not the PSB Commander – determines the final findings and discipline decisions.  During this reporting period, there were 26 cases that resulted in employee discipline or other action for a current employee of MCSO.  In 21 of the cases, the Appointing Authority assessed the presumptive discipline for the offense.  In one case, the Appointing Authority aggravated the discipline; and in two cases, he mitigated the discipline.  While not the presumptive discipline, all three cases were aggravated or mitigated within the appropriate range of discipline.  The Appointing Authority provided sufficient justification in all three cases.  In one case, a probationary employee was demoted, in part because of the misconduct investigation and no additional employment actions were taken.  We agree with the decision in this case.  In one case, the Appointing Authority combined two separate cases involving the same employee when he assessed the discipline.  We disagree with his decision in this case.

While PSB continues to experience challenges in ensuring that completed internal investigations are reaching full compliance with both MCSO policy and both Court Orders, the Bureau has continued to make efforts to improve compliance.  A member of our Team continues to meet personally with the PSB Commander weekly to discuss Class Remedial Matters.  We also use this opportunity to discuss other ongoing related concerns that affect compliance with the Second Order.  The PSB Commander is attentive to our concerns.  We have raised a number of concerns in our weekly meetings during this reporting period, and have found that the PSB Commander and his staff are responsive to these concerns.  The ability to discuss investigative or administrative concerns during these weekly meetings has resulted in concerns being immediately addressed; and in some cases, has resulted in necessary actions being taken to correct issues that have been identified.

Since October 2016, during each site visit, we have met with PSB personnel and District and Division command personnel to update them on our identification of training and performance issues that adversely affect compliance with the Second Order.  Since January 2017, Detention personnel assigned to PSB to oversee investigations have also participated in these meetings.  We continue to find them attentive and responsive to our input during these meetings.

Since we began conducting these site visit meetings, the assigned PSB Commander has taken a number of actions to address issues we have raised.  Based on concerns regarding those cases investigated by Detention supervisors, the PSB Commander assigned a sworn lieutenant in the

WAI 39970

Bureau to serve as a secondary reviewer of these cases, and provided additional training and oversight for those who conduct these investigations. We continue to believe that this review and oversight – along with training and the additional experience of these investigators – are all factors in the improvements we have noted in these cases.

To address concerns with the cases conducted outside of PSB, the PSB Commander continues to assign PSB liaisons to every District. There are also PSB personnel assigned to review District cases; provide feedback; and when necessary, return the cases for additional investigation or analysis by the District personnel. To address the ongoing backlog of cases that need to be reviewed, PSB has now engaged supervisors from the Compliance Division to assist with the initial case reviews of District investigations. To address the backlog of service complaints, the PSB Commander has assigned a second supervisor in PSB to assist with handling and tracking these complaints.

During our April 2018 site visit discussions with the PSB Commander and his staff, we discussed both the completion of witness interviews and the handling of instances where inappropriate comments are made while a Body-Worn Camera (BWC) or other recording device is activated but no members of the public are present.

In the case of witness interviews, we discussed that in some cases, witnesses had already been interviewed during the course of a criminal or traffic-related incident; and in others, there was clear and convincing evidence that misconduct did or did not occur without the need to interview some potential witnesses. In the cases we had reviewed that involved such witnesses, there were inconsistencies in whether these witnesses were being interviewed during the administrative investigation. We agreed that in some cases, the interview of witnesses might be unnecessary, but these types of instances had to be clearly defined. We also noted that any decision not to interview a witness should be documented and then approved by a Command member of the Division where the decision is made.

In the case of BWC or other recordings, we discussed that while inappropriate comments may have been discovered during an investigation, they may not be related to the law enforcement contact and may not have been made in the presence of any community members. In other cases, though the comments were not made in the presence of community members, the comments made have had a direct relationship to the law enforcement contact. We believe there is a clear distinction on how such comments should be addressed. We agreed that in some cases, an administrative misconduct investigation might not be appropriate; but there should be clear direction provided on how these instances are handled.

In both the interview of witnesses and the handling of comments captured on BWC or other recording devices, we believe that consistency is necessary; and that MCSO needs to develop protocols to address how these instances are handled. The PSB Commander committed to drafting protocols for our review and approval prior to making any changes to the current procedures.

WAI 39971

During our July and October 2018 site visits, we again discussed witness interviews and inappropriate comments that may be made outside the presence of any community members. PSB has since submitted a draft protocol for conducting witness interviews. We and the Parties reviewed this proposal and provided our input. The process for conducting witness interviews was approved in December 2018.

During our July 2018 site visit, The PSB Commander informed us that in 2013 PSB initiated 76 internal investigations. In 2014, PSB initiated 717 cases. In 2015, PSB initiated 986 cases; and in 2016, PSB initiated 847 cases. There were more than 1,000 cases initiated in 2017. During the first six months of 2018, 586 investigations had been initiated, in addition to 155 service complaints that had been opened.

During our site visit in October 2018, PSB personnel advised us that as of our October 2018 site visit, they had initiated 629 administrative misconduct investigations and 263 service complaints for a total of 892 to date in 2018. They continued to expect to meet or exceed the number of complaints initiated in 2017. They further advised us that the nine sworn investigators in PSB were carrying a caseload of approximately 36 active cases per month, and the 15 Detention supervisors in PSB were averaging 33 active cases per month. There had been a continuing increase in the caseloads of PSB investigators each quarter since 2016. PSB further informed us that the average time for PSB to fully investigate and close an investigation was 204 days. In addition to those investigations that were active in PSB, there were 182 active cases being investigated in Districts and Divisions outside of PSB.

During our January 2019 site visit, PSB informed us that during 2018, there were 1,114 investigations initiated by PSB, including: 716 administrative misconduct investigations; 354 service complaints; 36 criminal investigations; and eight critical incident investigations. This is an increase from the total of 1,028 opened in 2017. PSB further informed us that the caseload for sworn investigators had increased to between 29 and 48 active cases per month, and the caseload for Detention investigators was between 25 and 49 active cases per month.

During our April 2019 site visit, PSB informed us that during the first three months of 2019, the Bureau opened 232 administrative misconduct investigations and 135 service complaints . This compares with 252 administrative misconduct investigations and 54 service complaints during the first three months of 2018. We note that the service complaint process was in its early stages at the beginning of 2018. The combined numbers of service complaints and administrative investigations rose from 300 the first three months of 2018, to 367 for the first three months of 2019.

WAI 39972

PSB was authorized 11 new positions in the July 2018 budget. To date, none of those positions have been filled. During our April 2019 site visit, PSB personnel advised us they expect to fill one position in the near future, but do not expect to fill any of the other positions in the foreseeable future. Recognizing the difficulty in filling sworn positions, PSB requests for the July 2019 budget include only civilian personnel. Their request includes: two administrative assistants; two management analyst assistants; one special projects manager; and three civilian investigators. PSB staff believe that civilian personnel can be more expeditiously hired, and that many functions currently being completed by sworn and Detention investigators in PSB could be handled by civilian personnel.

During this reporting period, caseloads for investigators in PSB continued to climb. Sworn investigators are now averaging caseloads of 37 to 50 active cases per month. Detention investigators are now averaging caseloads of 28 to 54 active cases per months. Of the 71 cases completed by PSB personnel and submitted for review during this reporting period, 63 (89%) were not completed within 85 days. Sixty-two (87%) of the cases were not completed within 180 days. PSB is properly authoring both 85-day and 180-day extension memos.

In those cases investigated at the District and Division levels outside PSB, we have seen an increase in investigations being completed within the 60-day time period. Of the 72 cases investigated and completed during this reporting period, 43 (60%) were initially submitted to PSB within the required 60-days. However, many of these cases were returned for corrections, resulting in delays in their completion. The large backlog of District and Division investigations that wait for review in PSB results in additional delays in their finalization. Sixty-four (89%) of these 72 cases were not finalized within 180-days.

As we have for numerous reporting periods, we continue to note that the failure to provide adequate staff to conduct misconduct investigations is a disservice to both community members and MCSO employees. We also acknowledge that staffing alone may be insufficient to address the backlog of investigations. Given current numbers of investigations, it does not appear that there was a reduction in the amount of cases being initiated. The numbers have continued to increase since 2013. While we continue to believe that PSB makes sincere efforts to properly address investigations and the requirements of the Orders, it simply is not possible for them to do so with the current staffing and number of complaints. MCSO should not be willing to continue to accept this status in the investigation of complaints. Some action must be taken to address the ongoing and growing concern.

WAI 39973

During our July 2018 site visit meetings with PSB, we discussed several pending investigations regarding identifications in the custody of MCSO.  One of these cases involves the 1,459 IDs that had been impounded at the MCSO Property Room and then checked out by an MCSO sergeant.  This investigation was initiated in 2015.  Since late 2017, this investigation has stalled due to other, more immediate priorities for investigators.  While PSB has provided updates on this investigation, and we acknowledge the many challenges they face with its completion, it cannot be allowed to continue to remain inactive.  Two other investigations involving IDs – one from 2015, and one from 2016 – also remain outstanding and need to be resolved.  We requested during our July site visit that PSB provide us with a written update on these investigations, and a plan for resolving them.

During our October 2018 site visit, we met with PSB personnel to again discuss the pending investigations regarding identifications in the custody of MCSO and the written update MCSO provided us regarding these investigations.  Three ID cases remain pending.  MCSO advised that there had been no appreciable progress on these cases due to other priorities.  We discussed the necessity to ensure that these investigations are properly addressed.  We recognize that the 1,459 IDs impounded at the MCSO Property Room and then checked out by an MCSO sergeant, represent a monumental task to determine if these IDs were properly seized and impounded.  During our October site visit, PSB informed us that they had searched their databases for 400 of the 596 IDs that appear to belong to members of the Plaintiffs' class.  Only 132 had been linked to any MCSO deputy.  In all of these 132 cases, MCSO found that the IDs were properly seized and no internal investigations were necessary.  The remaining 268 IDs still needed to be searched through the state Log Scan system to determine if MCSO or any other law enforcement officer had run the names.  A total of 196 of the IDs had not yet been searched through the MCSO databases.

We acknowledge the limitations in researching these IDs, as in many there is no information other than a name on the ID.  Without some other information, like a driver's license number, social security number, or other searchable data, name searches can take extensive time with little likelihood of obtaining any results.  We further acknowledge the limitations of the Log Scan system that is used to search the entire state database, as information can only be searched for one year at a time, and the process is lengthy and time consuming.  After discussion with MCSO, we agreed to select a random sample from the 464 IDs that had not been linked through MCSO databases, or had not yet been run through any database.  The sample selection included IDs that contained searchable information beyond a name, creating a higher likelihood of obtaining some result.  A suitable sample was determined to be one in 20.  A sample of 25 was selected and forwarded to MCSO.  Our expectation was that MCSO would complete the research on the 24 selected IDs within a 90-day period.  We would then determine any further course of action after reviewing the results of this search.

During our January 2019 site visit, we met with PSB to discuss the progress on the sample identifications selected for Log Scan research.  PSB personnel informed us they had completed all of the Log Scans for the 25 identifications selected.  Many of these identifications were confirmed to have been run by MCSO deputies, Detention Officers, or civilian personnel.  PSB

WAI 39974

now needed to conduct additional follow-up with other databases to locate investigative reports or other documents that might exist.  PSB personnel believed that by the time of our April 2019 site visit, they would have exhausted all research on the 25 identifications and would be able to present a final report on them.

During our April 2019 site visit, PSB presented the results of the inquiries on the 25 sample identifications.  Based on the extensive history of this ID case, the large amount of data, and the research that has been conducted, we requested that PSB provide a written document that laid out the history of the 1,459 ID investigation, MCSO's findings on the research, the current status of this investigation, and any recommendations for further action.  MCSO has provided this document; we have reviewed it and will schedule a follow-up discussion with PSB during our July 2019 site visit.

During our July 2018 site visit, we had lengthy discussions with PSB command staff regarding the challenges they are facing ensuring that misconduct investigations are properly completed within established timeframes, given the number of investigations they conduct, the requirements for completion, and the lack of adequate staffing.  During these discussions, both we, and the Parties, expressed our willingness to discuss with them any changes in the investigation methodology they might want to propose to address the challenges and obstacles that exist.  If PSB was prepared to do so, we advised that we would provide an opportunity for this discussion during our next site visit.  PSB requested further discussion and a meeting was scheduled for our October 2018 site visit.

During our October 2018 site visit, we had lengthy discussion with MCSO and the Parties regarding the ongoing concerns and challenges with the timely completion of IA investigations. PSB presented a number of suggestions for modifications to the current processes in place in PSB.  The suggestions for modifications brought forth by MCSO included: changing the requirement for in-person interviews to an offer of an in-person interview; discontinuing the investigation of misconduct brought forward to MCSO involving former employees unless the misconduct was criminal, would affect law enforcement certification, or also involved current employees of MCSO; allowing the PSB Commander the discretion to determine if complaints of misconduct that occurred more than three years before the complaint was filed would be investigated, unless the complaint involved misconduct that was criminal in nature, would affect law enforcement certification, or was determined to be egregious; expanding the use of the service complaint process to include complaints on former employees, or misconduct that occurred more than three years prior to ensure that the information was captured, maintained, and could be reviewed; implementing an expedited discipline process, without a full investigation, if there was clear and convincing evidence that the misconduct had occurred; increasing the timeframes for the completion of misconduct investigations; and exploring the possibility of using alternative administrative closures.

Each topic brought forward was discussed during our site visit meeting.  The Parties articulated their understanding of the concerns brought forth by MCSO, but wanted additional information on each topic so they could review it and confer with both the Community Advisory Board

WAI 39975

(CAB) and the MCSO service population.  We also acknowledged our willingness to further review these topics once additional information was provided.   At the conclusion of the meeting, we requested that PSB provide us with a proposal document that would provide additional information and detail on the topics we discussed, so that we and the Parties could evaluate each topic.  We requested that this document also include information on what MCSO has already done to address the ongoing concerns with the completion of administrative misconduct investigations and what they can do in the future, independent of any changes to the current processes.  We requested that this proposal be forwarded for our review by December 1, 2018.

In December 2018, PSB provided a document describing the Bureau's ongoing concerns with the completion of misconduct investigations and a proposal for addressing some of these concerns.  The document did not contain any substantive information on what MCSO had done or could do to address the ongoing concerns, independent of any of the requested changes.  Both we and the Parties provided feedback to PSB on this document.   We had no substantive discussion regarding the PSB proposal during our January 2019 or April 2019 site visit.

During our past site visits, PSB staff have continued to communicate that they are properly outsourcing those cases where conflicts of interest exist.  PSB has contracted with a qualified private vendor to conduct these investigations.   Additionally, PSB previously outsourced investigations to another local law enforcement agency.

PSB personnel updated us on these investigations during our April 2019 site visit.  Both cases outsourced to another law enforcement agency have been previously completed, and no additional cases have been outsourced to any another law enforcement agency.

During this reporting period, the contract investigator continues with his investigations.  He has completed numerous investigations assigned to him; and they have been forwarded to MCSO for review, prior to being forwarded to our Team.  MCSO outsourced three additional cases to the contract investigator during this reporting period due to identified conflicts.  MCSO also outsourced a criminal misconduct investigation to the Attorney General's Office due to an identified conflict.

After the Second Order was implemented, PSB reviewed the disciplinary backgrounds of all those who might conduct internal investigations, and notified us of those supervisors who would be prohibited from conducting such investigations due to their backgrounds.  One supervisor remains ineligible to conduct internal investigations.  Since January 2017, PSB personnel have reported on a monthly basis that they have not identified any additional members of MCSO who are disqualified from conducting misconduct investigations

WAI 39976

***Paragraph 195.*** *Within six months of the entry of this Order, the Professional Standards Bureau shall include sufficient trained personnel to fulfill the requirements of this Order.*

**Phase 1:** In compliance

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** Not in compliance

In conjunction with this Paragraph, Paragraph 178 mandates that within three months of the finalization of policies consistent with Paragraph 165, all PSB personnel would receive 40 hours of comprehensive training. Paragraph 178 requires training of all supervisors within three months of the finalization of policies, and further requires sufficient trained personnel in PSB within six months of the entry of the Order. The first week of the required Misconduct Investigative Training commenced on September 18, 2017 and the training was completed prior to the end of 2017.

During our July and October 2018 site visits, PSB informed us that a total of 11 additional personnel had been approved for PSB in MCSO's July 2018 budget. PSB personnel informed us that due to ongoing staffing shortages they did not believe any of these positions would be filled before 2019.

During our January 2019 site visit, PSB personnel again informed us that it had not yet received any of the 2018 budgeted positions for PSB. They further noted that it continued to remain unlikely that they would receive any of the positions in the foreseeable future due to ongoing personnel staffing shortages throughout the organization. PSB continued to note that with the continuing influx of new cases, and the ongoing backlog of investigations, even if these personnel were added, the Bureau would still be insufficiently staffed to meet its responsibilities. The PSB budget requests for the July 2019 budget year include only civilian staff. Their requests include: two administrative assistants, two management analyst assistants, one special projects manager, and three civilian investigators. PSB believes that the addition of these positions would allow sworn and Detention supervisors to focus more on the investigative process and mitigate some of the administrative requirements currently being handled by these personnel.

During our April 2019 site visit, PSB again advised us that none of the 11 additional personnel approved in the July 2018 budget have been received. PSB expects to fill one of these positions in the near future, but there is no timeline for filling any additional positions. PSB again informed us that its personnel requests for the July 2019 budget are focused entirely on civilian staff as PSB personnel believe it may be easier to fill civilian positions.

The Second Order requires that PSB have "sufficient trained personnel to fulfill the requirements of this Order." MCSO has delivered the required Misconduct Investigative Training, and our focus has shifted to the sufficiency of PSB staff to carry out its mission. As documented in this and previous reports, PSB, in its command's estimation, is understaffed. We will not find MCSO in compliance with this Paragraph until MCSO addresses PSB's staffing issues.

WAI 39977

*Paragraph 196. Where appropriate to ensure the fact and appearance of impartiality, the Commander of the Professional Standards Bureau or the Chief Deputy may refer administrative misconduct investigations to another law enforcement agency or may retain a qualified outside investigator to conduct the investigation. Any outside investigator retained by the MCSO must possess the requisite background and level of experience of Internal Affairs investigators and must be free of any actual or perceived conflicts of interest.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

During our April 2017 site visit, the PSB Commander indicated that MCSO had not envisioned any need to retain additional contract investigators beyond the one investigator that had been already retained. A member of PSB's staff serves as MCSO's single point-of-contact to liaise and assist with scheduling for the contract investigator. The contract investigator will advance the investigations to the level of recommending findings.

PSB previously outsourced three misconduct investigations to a separate regional law enforcement agency. Two of these investigations were completed by the outside law enforcement agency and closed by MCSO. One was closed as the Independent Investigator was investigating the same alleged misconduct. PSB has not outsourced any additional investigations to any outside law enforcement agencies since that time.

During this reporting period, PSB outsourced three additional investigations to the contract investigator PSB has retained to conduct such cases. These were outsourced due to identified conflicts. PSB also outsourced one criminal investigation to the Attorney General's Office due to an identified conflict.

This investigator has completed numerous assigned investigations and forwarded them to PSB for review. We have not yet received or reviewed these investigations. Many investigations previously assigned to the contract investigator are also still in progress.

*Paragraph 197. The Professional Standards Bureau will be headed by a qualified Commander. The Commander of the Professional Standards Bureau will have ultimate authority within the MCSO for reaching the findings of investigations and preliminarily determining any discipline to be imposed. If the Sheriff declines to designate a qualified Commander of the Professional Standards Bureau, the Court will designate a qualified candidate, which may be a Civilian Director in lieu of a sworn officer.*

**Phase 1:** In compliance

WAI 39978

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

In January 2018, MCSO advised that due to reorganizations within the Office, the responsibility to serve as the PSB Commander for purposes of compliance with this Order would be transferred to a captain within PSB.  The PSB Deputy Chief, who previously had this responsibility was promoted, but maintains overall oversight of PSB as an Executive Chief.

During this reporting period, a new captain was assigned as the Commander of PSB.  We have worked with him prior to his promotion to captain, have reviewed his qualifications, and believe he possesses the requisite qualifications and capabilities to fulfill the requirements of this Paragraph.

During our April site visit, and our regularly scheduled meetings with PSB to discuss CRMs and other internal affairs matters during this reporting period, we have had opportunities to interact with the captain now serving as the PSB Commander.  He is an experienced PSB investigator and is cognizant of the many requirements and responsibilities of his new position. He is responsive to our input, and we have had a number of productive discussions with him regarding PSB processes and internal investigations.  In those cases where we have expressed concerns or requested information, he has provided timely responses.  We continue to note that MCSO must support the PSB Commander with resources and executive leadership.

***Paragraph 198.***  *To promote independence and the confidentiality of investigations, the Professional Standards Bureau shall be physically located in a facility that is separate from other MCSO facilities, such as a professional office building or commercial retail space.  This facility shall be easily accessible to the public, present a non-intimidating atmosphere, and have sufficient space and personnel for receiving members of the public and for permitting them to file complaints.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

In May 2018, PSB moved into the first and second floors of 101 West Jefferson Street.  PSB's address is available on the comment and complaint form that is accessible to the public at the Districts and on MCSO's website.  PSB's criminal investigators are housed on the first floor, and administrative investigators are housed on the second floor of the building.  PSB's off-site facility has two dedicated security personnel assigned during normal business hours of 8:00 am-4:00 pm, Monday-Friday.  MCSO remains in compliance with this requirement.

WAI 39979

*Paragraph 199. The MCSO will ensure that the qualifications for service as an internal affairs investigator shall be clearly defined and that anyone tasked with investigating employee misconduct possesses excellent investigative skills, a reputation for integrity, the ability to write clear reports, and the ability to be fair and objective in determining whether an employee committed misconduct. Employees with a history of multiple sustained misconduct allegations, or one sustained allegation of a Category 6 or Category 7 offense from MCSO's disciplinary matrices, will be presumptively ineligible to conduct misconduct investigations. Employees with a history of conducting deficient investigations will also be presumptively ineligible for these duties.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

GH-2 reflects the directive of this Paragraph, to ensure that only supervisors who meet the criteria established by this Paragraph are assigned misconduct investigations. The PSB Operations Manual, which formalizes the review process, states that if any supervisor is deemed ineligible, the PSB commander will notify the supervisor's commander in writing, and will ensure that a Blue Team entry is made to memorialize the supervisor's ineligibility to conduct misconduct investigations. A record of supervisors deemed ineligible to conduct misconduct investigations is maintained in PSB. These procedures were finalized and documented in the PSB Manual, published on December 13, 2018.

During this reporting period, MCSO did not have any additions to the list of employees prohibited from conducting misconduct investigations. During our April site visit, we inquired again, and the list remains unchanged. During this quarter, there was one employee transferred to the Professional Standards Bureau (PSB). We reviewed the background information submitted and concluded that the employee met the requirements of this Paragraph.

*Paragraph 200. In each misconduct investigation, investigators shall:*

a.   *conduct investigations in a rigorous and impartial manner designed to determine the facts;*

b.   *approach investigations without prejudging the facts and without permitting any preconceived impression of the principal or any witness to cloud the investigation;*

c.   *identify, collect, and consider all relevant circumstantial, direct, and physical evidence, including any audio or video recordings;*

WAI 39980

d.   *make reasonable attempts to locate and interview all witnesses, including civilian witnesses;*

e.   *make reasonable attempts to interview any civilian complainant in person;*

f.   *audio and video record all interviews;*

g.   *when conducting interviews, avoid asking leading questions and questions that may suggest justifications for the alleged misconduct;*

h.   *make credibility determinations, as appropriate; and*

i.   *attempt to resolve material inconsistencies between employee, complainant, and witness statements.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

- **Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 143 administrative misconduct investigations that were completed by MCSO personnel during this reporting period.  All but two of the 143 investigations were both initiated and completed after the issuance of the Second Order.  All but nine were also initiated and completed after May 18, 2017, and are subject to all requirements of the internal affairs policies finalized and published on that date.  PSB investigated 71 of the total cases.  District or Division supervisory personnel not assigned to PSB investigated 72 of the cases.  Of the cases we reviewed, 103 involved external complaints and 40 were internally generated.

Paragraph 200.a. requires that misconduct investigations be conducted in a rigorous and impartial manner.  During the last reporting period, one investigation (2%) fell short of compliance with this Subparagraph.  During this reporting one investigation (1%) again fell short of compliance with this Subparagraph

Paragraph 200.b. requires that investigations be approached without prejudging the facts or permitting preconceived impressions.  During the last reporting period, one investigation (2%) fell short of compliance with this Subparagraph.  During this reporting period, one investigation (1%) again fell short of compliance with this Subparagraph.

Paragraph 200.c. requires that investigators identify, collect, and consider all relevant evidence.  During the last reporting period, all investigations complied with the requirements of this Subparagraph.  During this reporting period, one investigation (1%) fell short of compliance with this Subparagraph

WAI 39981

Paragraph 200.d. requires that investigators make reasonable attempts to locate and interview all witnesses.  During the last reporting period, one investigation (2%) fell short of compliance with this Subparagraph.  During this reporting period, two investigations (1%) fell short of compliance with this Subparagraph.

Paragraph 200.e. requires that investigators make reasonable attempts to interview civilian complainants in person.  During this and the last reporting period, all investigations complied with the requirements of this Subparagraph.

Paragraph 200.f. requires audio- and video-recording of all interviews.  During the last reporting period, there were 19 investigations that were not both audio- and video-recorded.  All included documented appropriate reasons why the interviews were not.  During this reporting period, there were 36 investigations where the interviews of all complainants, witnesses, and investigative leads were not both audio- and video-recorded.  In all but one of these investigations, MCSO documented appropriate reasons why they were not.

Paragraph 200.g. requires that when conducting interviews, investigators avoid asking leading questions or questions that may suggest justification for the alleged misconduct.  During the last reporting period, one of the investigations (2%) did not comply with all requirements of this Subparagraph.  During this reporting period, five investigations (3%) fell short of compliance with this Subparagraph.

Paragraph 200.h. requires that proper credibility determinations be made.  During the last reporting period, one completed investigation (2%) fell short of compliance with this Subparagraph.  During this reporting period, one investigation (1%) again fell short of compliance with this Subparagraph.

Paragraph 200.i. requires that investigators attempt to resolve all material inconsistencies.  During the last reporting period, one investigation (2%) fell short of compliance with this Subparagraph.  During this reporting period, all investigations complied with the requirements of this Subparagraph.

**Paragraph 201.**  *There will be no automatic preference for an employee's statement over a non-employee's statement.  Internal affairs investigators will not disregard a witness's statement solely because the witness has some connection to either the complainant or the employee or because the witness or complainant has a criminal history, but may consider the witness's criminal history or any adjudicated findings of untruthfulness in evaluating that witness's statement.  In conducting the investigation, internal affairs investigators may take into account the record of any witness, complainant, or officer who has been determined to have been deceptive or untruthful in any legal proceeding, misconduct investigation, or other investigation.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

WAI 39982

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 143 administrative misconduct investigations conducted by MCSO personnel that were completed during this reporting period.

Of the 143 completed administrative misconduct investigations, 103 involved complainants that were not MCSO employees.  Eighty-two of the 143 total investigations also included interviews with witnesses or investigative leads who were not MCSO employees.  We identified one case where there was an automatic preference for the statement of an employee over a non-employee witness.  We will discuss this case with MCSO during our next site visit.

We did not identify any completed investigations where a witness's statement was disregarded solely because of any connection identified in this Paragraph, nor where a witness's criminal history or findings of truthfulness were considered.  We did identify two cases where the truthfulness of the employee had been a prior issue.  We will discuss these two cases with PSB during our next visit.


***Paragraph 202.***   *Internal affairs investigators will investigate any evidence of potential misconduct uncovered during the course of the investigation, regardless of whether the potential misconduct was part of the original allegation.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 143 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.  In 11 of the 143 investigations, MCSO identified additional potential misconduct during the course of the investigations and properly added additional allegations or initiated new investigations.  We did not identify any investigations during this reporting period where we believe that additional misconduct may have occurred and was not addressed by MCSO.

WAI 39983

**Paragraph 203.** *If the person involved in the encounter with the MCSO pleads guilty or is found guilty of an offense, internal affairs investigators will not consider that information alone to be determinative of whether an MCSO employee engaged in misconduct, nor will it by itself justify discontinuing the investigation. MCSO training materials and policies on internal investigations will acknowledge explicitly that the fact of a criminal conviction related to the administrative investigation is not determinative of whether an MCSO employee engaged in misconduct and that the mission of an internal affairs investigator is to determine whether any misconduct occurred.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

There were no indications in any of the completed investigations we reviewed that any MCSO investigators considered alone any pleading or finding of guilty by any person as a reason to make any determination regarding the potential misconduct of any MCSO personnel, nor were any investigations discontinued for this reason.

**Paragraph 204.** *Internal affairs investigators will complete their administrative investigations within 85 calendar days of the initiation of the investigation (60 calendar days if within a Division). Any request for an extension of time must be approved in writing by the Commander of the Professional Standards Bureau. Reasonable requests for extensions of time may be granted.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we review administrative misconduct investigations conducted by MCSO personnel.

During the last reporting period, 43 (77%) of the total 56 administrative misconduct investigations reviewed for the reporting period were not completed within the 60 or 85-day timeline. Of these 43, only one (2%) did not contain a timely extension request or approval.

During this reporting period, 92 (64%) of the total 143 administrative misconduct investigations reviewed for this reporting period were not completed within the 60- or 85-day timeline. Of these, five (5%) did not have a timely request for an extension.

WAI 39984

PSB conducted 71 of the 143 administrative misconduct investigations we reviewed. Sixty-three of these investigations were not completed within the required 85-day time period. All but two of these 71 investigations included a request for, and an approval of an extension.

As noted in previous reporting periods, we now determine the 60-day time period compliance findings for those investigations conducted by personnel outside of PSB based on the original date the investigation is approved by the District or Division Commander and forwarded to PSB. We acknowledge that with the delays in the completion and reviews of internal investigations, District and Division personnel may not know that PSB has found internal investigations they have submitted to require further investigation or other action, until after the 60-day time period has expired. In those cases where deficiencies are identified by PSB, the cases will continue to be found non-compliant in other relevant Paragraphs, and specifically in Paragraph 213, which requires the District or Division Commander ensure that investigations conducted by their personnel are complete and the findings are supported by the evidence prior to their submittal to PSB.

Districts or Divisions outside of PSB conducted 72 of the administrative misconduct investigations. Twenty-nine (40%) of these 72 investigations were not submitted to PSB within the required 60-day timeframe. All but three of the 29 included a timely request, and an approval for an extension.

In addition to those investigations not completed within 60 or 85 days as required by this Paragraph, 127 of the 143 cases exceeded the 180-day timeframe.

**Paragraph 205.** *The Professional Standards Bureau shall maintain a database to track all ongoing misconduct cases, and shall generate alerts to the responsible investigator and his or her Supervisor and the Commander of the Professional Standards Bureau when deadlines are not met.*

**Phase 1:** In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

WAI 39985

We determine compliance with this Paragraph by assigning a member of our Team to observe demonstrations of the IAPro database during our site visits or other meetings with PSB throughout the reporting period.  The IAPro technology serves as the centralized electronic numbering and tracking system for all allegations of misconduct, whether internally discovered or based on an external complaint.  This database contains the capacity to manage and store information required for compliance with this Paragraph.

During our January 2018 site visit, we met with PSB personnel and observed IAPro to ensure that the system still generates alerts to responsible investigators and PSB supervisors/commanders if deadlines are not met.  We also reviewed copies of emails PSB disseminates to the District/Divisions on the 15th of every month to identify investigatory deadlines.  The Blue Team Dashboard was also viewed, which uses a color system (green, yellow, red) to identify investigations that are nearing deadlines or are past deadlines.  Case management information appears in each supervisor's Blue Team while they are monitoring ongoing/open cases.  Once again, this demonstration represented IAPro as a technological instrument that meets the compliance criteria of this Paragraph – to include logging of critical dates and times, alerts regarding timeframes and deadlines, chronological misconduct investigation status, notifications, and dispositions.

The civilian PSB management analyst has the primary responsibility to administer the centralized tracking system.  In addition, all PSB and Division investigators can access the electronic Blue Team database – a system that integrates with IAPro – at any time to view the assignment and status of administrative investigations.  In response to our previous concerns about ensuring system administration redundancy, PSB has trained two lieutenants to administer the system, in addition to the analyst.

In May 2018, PSB relocated to an offsite location.  In July 2018, a member of our Team verified that the existing tracking mechanisms continue to be used for the tracking of investigations at the new facility.

During our January 2019 site visit, a member of our Team again verified that the tracking mechanisms remain in place.  We also continue to receive monthly notifications from PSB regarding closed administrative investigations, and we evaluate these closed investigations for the entirety of a reporting period against a multitude of criteria, including whether the cases were completed in a timely fashion.  (See Paragraph 204.)

**Paragraph 206.**   *At the conclusion of each investigation, internal affairs investigators will prepare an investigation report.  The report will include:*

a.      *a narrative description of the incident;*

b.      *documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the incident.  In situations in which there are no known witnesses, the report will specifically state this fact.  In situations in which witnesses were present but circumstances prevented the internal affairs investigator from*

WAI 39986

*determining the identification, phone number, or address of those witnesses, the report will state the reasons why. The report will also include all available identifying information for anyone who refuses to provide a statement;*

c.      *documentation of whether employees were interviewed, and a transcript or recording of those interviews;*

d.      *the names of all other MCSO employees who witnessed the incident;*

e.      *the internal affairs investigator's evaluation of the incident, based on his or her review of the evidence gathered, including a determination of whether the employee's actions appear to be within MCSO policy, procedure, regulations, orders, or other standards of conduct required of MCSO employees;*

f.      *in cases where the MCSO asserts that material inconsistencies were resolved, explicit credibility findings, including a precise description of the evidence that supports or detracts from the person's credibility;*

g.      *in cases where material inconsistencies must be resolved between complainant, employee, and witness statements, explicit resolution of the inconsistencies, including a precise description of the evidence relied upon to resolve the inconsistencies;*

h.      *an assessment of the incident for policy, training, tactical, or equipment concerns, including any recommendations for how those concerns will be addressed;*

i.      *if a weapon was used, documentation that the employee's certification and training for the weapon were current; and*

j.      *documentation of recommendations for initiation of the disciplinary process; and*

k.      *in the instance of an externally generated complaint, documentation of all contacts and updates with the complainant.*

**Phase 1:** In compliance

•      GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 143 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

Paragraph 206.a. requires a written description on the incident be included in the investigative report. All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.b. requires documentation of all evidence gathered, including all known information about witnesses. All completed investigations that we reviewed complied with the requirements of this Subparagraph.

WAI 39987

Paragraph 206.c. requires documentation of whether employees were interviewed, and a transcript or recording of these interviews.  All but one of the completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.d. requires that the names of all MCSO employees who witnessed the incident be included in the report.  All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.e. requires that the internal affairs investigator's evaluation of the incident includes a determination of whether the employee's actions appear to be within MCSO policy, procedure, regulations, orders, or other standards of conduct required of MCSO employees.  All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.f. requires that when MCSO asserts that material inconsistencies were resolved, explicit credibility findings, including a precise description of the evidence that supports or detracts from the person's credibility must be provided.  All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.g. requires that when material inconsistencies must be resolved, a precise description of the evidence be included in the report.   All but one of the completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.h. requires that assessment of the incident for policy, training, tactical, or equipment concerns be included in the investigative report, to include any recommendations.  We identified one completed investigation where MCSO failed to identify and address a potential policy issue.

Paragraph 206.i. requires that if a weapon was used, documentation that the employee's certification and training for the weapon must be included in the investigative written report.  All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.j. requires that documentation of the initiation of the disciplinary process be included in the investigation.  Compliance is achieved when the misconduct investigator completes the investigation with a finding of sustained, when applicable, and the PSB Commander subsequently approves the finding.  This is considered the initiation of the disciplinary process.  Twenty-six of the 143 administrative misconduct investigations we reviewed had sustained findings against one or more active MCSO employee.  All complied with the requirements of this Subparagraph.

Paragraph 206.k. requires that any contacts and updates with the complainant be documented in the investigative report.  All of the investigations we reviewed for this Subparagraph complied with this requirement.

WAI 39988

***Paragraph 207.***  *In assessing the incident for policy, training, tactical, or equipment concerns, investigation reports will include an assessment of whether:*

a.  *the law enforcement action was in compliance with training and legal standards;*

b.  *the use of different tactics should or could have been employed;*

c.  *the incident indicates a need for additional training, counseling, or other non-disciplinary corrective actions; and*

d.  *the incident suggests that the MCSO should revise its policies, strategies, tactics, or training.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

During this reporting period, we reviewed 143 administrative misconduct investigations. MCSO properly assessed and documented whether any of the requirements of this Paragraph were relevant in all but one of the completed cases we reviewed for this reporting period. MCSO identified seven cases where action related to this Paragraph was appropriate; and addressed the concerns identified with one-on-one meetings with employees, additional training, additional supervisory oversight – and where appropriate, policy review.  In one case, a policy issue existed, but it was not addressed by the investigator.

PSB continues to use an internal tracking form to ensure that those concerns that are forwarded to other Divisions within MCSO for action or review are addressed.  We receive and review this tracking document each month.  This tracking form contains regularly updated information on the status of concerns that have been identified.


***Paragraph 208.***  *For each allegation of misconduct, internal affairs investigators shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation:*

a.  *"Unfounded," where the investigation determines, by clear and convincing evidence, that the allegation was false or not supported by fact;*

b.  *"Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur and justifies a reasonable conclusion of a policy violation;*

c.  *"Not Sustained," where the investigation determines that there is insufficient evidence to prove or disprove the allegation; or*

WAI 39989

d.   *"Exonerated," where the investigation determines that the alleged conduct did occur but did not violate MCSO policies, procedures, or training.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review administrative misconduct investigations conducted by MCSO personnel and completed during the reporting period.  We evaluate compliance with this Paragraph against the standard of whether a finding was made, and whether the finding was correct.

During the last reporting period, we concurred with the findings of the PSB Commander in 54 (96%) of the 56 cases that were completed.

During this reporting period, we concurred with the findings of the PSB Commander in 140 (98%) of the 143 administrative misconduct investigations we reviewed.  In one investigation, the PSB Commander made a final finding of unfounded, where we believe the preponderance of evidence supported a finding of sustained.  In the second investigation, a finding of exonerated was made without sufficient evidence to do so and the finding should have been not sustained. In the third investigation, a finding of unfounded was made.  There was insufficient information or evidence for this finding and the case should have been not sustained.  There were no investigations during this reporting period where the Appointing Authority changed the findings made by the PSB Commander.  As is our practice, we will discuss the cases where we disagree with the findings with PSB during our next site visit.

**Paragraph 209.**  *For investigations carried out by Supervisors outside of the Professional Standards Bureau, the investigator shall forward the completed investigation report through his or her chain of command to his or her Division Commander.  The Division Commander must approve the investigation and indicate his or her concurrence with the findings.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

WAI 39990

To assess Phase 2 compliance with this Paragraph, we reviewed 72 administrative misconduct investigations not conducted by PSB personnel and completed during this reporting period.  All 72 of the investigations completed outside of PSB were forwarded to PSB as required, and all contained the approval of the responsible District or Division Commander.  As noted in previous reporting periods, and again during *this* reporting period, some of the District-level investigations were not in compliance with various requirements of the Second Order – as indicated throughout this report.  However, we assessed MCSO's compliance with this Paragraph based on these cases being forwarded through the chain of command for approval of the investigation and findings.

**Paragraph 210.**  *For investigations carried out by the Professional Standards Bureau, the investigator shall forward the completed investigation report to the Commander.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 71 administrative misconduct investigations conducted by PSB investigative personnel and completed during this reporting period.  All 71 complied with the requirements of this Paragraph.

**Paragraph 211.**  *If the Commander—meaning the Commander of the PSB or the Commander of the Division in which the internal affairs investigation was conducted—determines that the findings of the investigation report are not supported by the appropriate standard of proof, the Commander shall return the investigation to the investigator for correction or additional investigative effort, shall document the inadequacies, and shall include this documentation as an addendum to the original investigation.  The investigator's Supervisor shall take appropriate action to address the inadequately supported determination and any investigative deficiencies that led to it.  The Commander shall be responsible for the accuracy and completeness of investigation reports prepared by internal affairs investigators under his or her command.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  Not in compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 143 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

WAI 39991

PSB investigated 71 of the 143 administrative misconduct investigations we reviewed during this reporting period.   In 67 (94%) of those cases investigated by PSB, we found the investigations to be thorough and well-written; and we concurred with the findings by the PSB Commander.  This is a slight decrease in compliance from 96% the last reporting period.

Of the 72 investigations investigated by Districts or Divisions outside of PSB, 54 (75%) were in compliance with the requirements for the completion of administrative investigations.  This is an increase from the 68% compliance during the last reporting period.  We or PSB identified 18 (25%) where we had some concerns regarding the investigation or documentation.  In those cases where corrections could be made, the cases were returned to the Districts or Divisions.  We believe that many of the concerns found in these cases could, and should, have been identified at the District or Division level prior to forwarding the cases to PSB for review.  Concerns with these investigations included: failure to interview all parties; leading questions; lack of adequate justification to support the findings; failure to notify the employee's supervisor of the administrative interview; and numerous administrative deficiencies.   Compliance for investigations conducted outside of PSB increased from 68% the last reporting period to 75% this reporting period.

While we found concerns in District and Division investigations conducted both prior to and after the 40-hour Misconduct Investigative Training, we found fewer such concerns in those completed after the training was completed.  We also note that the overall quality of the investigations being submitted has improved since the training.  This is ongoing evidence of the value of the training that continues to be delivered to MCSO supervisory personnel on the completion of misconduct investigations.

In January 2018, we requested that MCSO begin providing us documentation that reflects the actions being taken to address deficient misconduct investigations.  We requested that PSB and command personnel provide a response to this request on a monthly basis.   We have consistently received the requested documentation since March 2018.  We have noted numerous instances where Command personnel have addressed needed clarifications, corrections, or additional investigation in cases completed or reviewed by their personnel.

During this reporting period, we noted three instances where District Commanders identified deficiencies or concerns with the investigations conducted by their personnel.  We also noted two instances where PSB identified concerns with the review of investigations by Command personnel and forwarded these concerns to Deputy Chiefs to be addressed.  In all of these instances, proper documentation was prepared and submitted and appropriate actions were taken to address the concerns or deficiencies.  We did not note any instances during this reporting period where we believe actions other than those being taken by MCSO would be necessary.  We will continue to review these reports to ensure that appropriate actions are being taken to address investigations where corrections are needed or deficiencies are found.

We have noted in numerous prior reporting periods that both the supervisors who complete deficient investigations and the command personnel who approve them must be held accountable if MCSO is to achieve Phase 2 compliance with this Paragraph.  During this

WAI 39992

reporting period, our reviews of investigations submitted since the completion of the Misconduct Investigative Training and the documentation being provided by command personnel continue to indicate that MCSO is making efforts to identify and address areas of concern with the completion of misconduct investigations. We continue to be optimistic that we will observe continuing improvement in the quality of misconduct investigations being conducted by MCSO personnel.

***Paragraph 212.*** *Where an internal affairs investigator conducts a deficient misconduct investigation, the investigator shall receive the appropriate corrective and/or disciplinary action. An internal affairs investigator's failure to improve the quality of his or her investigations after corrective and/or disciplinary action is taken shall be grounds for demotion and/or removal from a supervisory position or the Professional Standards Bureau.*

**Phase 1:** In compliance

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.
- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 143 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

The 40-hour Misconduct Investigative Training was completed in late 2017. In January 2018, we requested that MCSO begin providing us with a document that reflects what actions are being taken to address deficient misconduct investigations on a monthly basis. As discussed in Paragraph 211, we have consistently received the required documentation since March 2018. During this reporting period, MCSO command personnel identified and addressed concerns they found with incomplete or deficient investigations conducted and reviewed by their personnel.

We will continue to review the monthly reports submitted by MCSO command personnel, along with reviewing completed misconduct investigations, to ensure that any additional deficiencies are being identified and addressed.

***Paragraph 213.*** *Investigations of minor misconduct conducted outside of the Professional Standards Bureau must be conducted by a Supervisor and not by line-level deputies. After such investigations, the investigating Supervisor's Commander shall forward the investigation file to the Professional Standards Bureau after he or she finds that the misconduct investigation is complete and the findings are supported by the evidence. The Professional Standards Bureau shall review the misconduct investigation to ensure that it is complete and that the findings are supported by the evidence. The Professional Standards Bureau shall order additional investigation when it appears that there is additional relevant evidence that may assist in*

WAI 39993

*resolving inconsistencies or improving the reliability or credibility of the findings. Where the findings of the investigation report are not supported by the appropriate standard of proof, the Professional Standards Bureau shall document the reasons for this determination and shall include this documentation as an addendum to the original investigation.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 143 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period. Of the 143 investigations, 71 were investigated by PSB personnel. Seventy-two were investigated by MCSO personnel outside of PSB.

None of the documentation we received regarding investigations conducted outside of PSB indicated that any person below the rank of sergeant was responsible for the investigation.

During the last reporting period, all 33 District or Division level approved cases were forwarded to, and reviewed by, PSB as required. Eleven (33%) of the 33 cases investigated at the District or Division level were returned by PSB personnel for additional investigation, corrections, proper documentation, or other changes.

During this reporting period, all 72 District or Division level investigations were forwarded to and reviewed by, PSB as required. Eighteen (25%) were found to have concerns or deficiencies, either by PSB or our Team. Many of these concerns could and should have been addressed at the District or Division level prior to being forwarded to PSB. We noted several instances during this reporting period where deficiencies were identified and addressed by MCSO command personnel. We also noted that in some cases, the deficiencies or errors could not be corrected after the fact.

As is our practice, we will discuss these cases with MCSO during our next site visit.

**Paragraph 214.** *At the discretion of the Commander of the Professional Standards Bureau, a misconduct investigation may be assigned or re-assigned to another Supervisor with the approval of his or her Commander, whether within or outside of the District or Bureau in which the incident occurred, or may be returned to the original Supervisor for further investigation or analysis. This assignment or re-assignment shall be explained in writing.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 143 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

WAI 39994

Our analysis for this reporting period revealed that of the 143 investigations conducted outside of PSB, 10 were returned by PSB to the original investigating supervisor for further investigation, analysis, or corrections.  There were no instances where an investigation was assigned or reassigned to a different supervisor.

**Paragraph 215.**  *If, after an investigation conducted outside of the Professional Standards Bureau, an employee's actions are found to violate policy, the investigating Supervisor's Commander shall direct and ensure appropriate discipline and/or corrective action.  Where the incident indicates policy, training, tactical, or equipment concerns, the Commander shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 72 administrative misconduct investigations conducted by MCSO personnel outside of PSB and completed during this reporting period.

Ten of the 72 completed misconduct investigations conducted outside of PSB resulted in sustained findings.  In all 10 cases, the reports included documentation that appropriate discipline or corrective action was taken.  In one of the 10 investigations, in addition to discipline, the need for additional training was also identified and addressed.

**Paragraph 216.**  *If, after an investigation conducted by the Professional Standards Bureau, an employee's actions are found to violate policy, the Commander of the Professional Standards Bureau shall direct and ensure appropriate discipline and/or corrective action.  Where the incident indicates policy, training, tactical, or equipment concerns, the Commander of the Professional Standards Bureau shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

WAI 39995

To assess Phase 2 compliance with this Paragraph, we reviewed 143 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

Seventy-one of the completed investigations were conducted by PSB. Twenty-four resulted in a sustained finding against one or more MCSO employee. In 16 of these sustained investigations, the PSB Commander ensured that appropriate discipline and/or corrective action was recommended. In the eight remaining cases, the employees left MCSO employment prior to the determination of discipline. The PSB Commander provided the preliminary determination of the range of discipline in all of the 16 cases involving current MCSO employees. The PSB Commander cannot ensure that appropriate discipline or corrective action are the final outcome of sustained misconduct investigations, as the Appointing Authority makes the final decisions for discipline on both minor misconduct cases and in serious misconduct cases that result in PDHs. The hearing officer has the authority to change the findings or reduce the discipline.

Of the 16 sustained misconduct investigations conducted by PSB, one indicated a need for additional administrative action. Action was taken and documented as required.

**Paragraph 217.** *The Professional Standards Bureau shall conduct targeted and random reviews of discipline imposed by Commanders for minor misconduct to ensure compliance with MCSO policy and legal standards.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** Not applicable

Based on the requirements of the Second Order, District and Division Commanders will not impose discipline for minor misconduct. In all cases, the PSB Commander will determine the final findings for internal investigations and the presumptive range of discipline for those cases with sustained findings. The Appointing Authority will then make the final determination of discipline.

**Paragraph 218.** *The Professional Standards Bureau shall maintain all administrative investigation reports and files after they are completed for record-keeping in accordance with applicable law.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

WAI 39996

To determine compliance with this Paragraph, we have observed that PSB maintains both hardcopy and electronic files intended to contain all documents required for compliance with this Paragraph.

A member of our Team has inspected the file rooms where hardcopies of administrative investigations are stored and randomly reviewed case files to verify compliance on multiple occasions when PSB was housed at MCSO Headquarters.  Our Team member also used the access granted to IAPro to randomly select internal affairs case files to verify that all information was being maintained electronically.

PSB completed the move to its new offsite facility in May 2018.  Subsequent to the move, a member of our Team conducted an inspection of the file rooms in the new facility; and conducted a review of random internal investigations in IAPRO to ensure ongoing compliance.

During our January 2019 site visit, a member of our Team again verified compliance at the PSB facility by inspecting both the criminal and administrative investigation file rooms and randomly selecting internal affairs case files to verify that all information is also being electronically maintained in IAPro.

### D.   Discipline

**Paragraph 219.**   *The Sheriff shall ensure that discipline for sustained allegations of misconduct comports with due process, and that discipline is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented regardless of the command level of the principal of the investigation.*

**Paragraph 220.**   *To ensure consistency in the imposition of discipline, the Sheriff shall review the MCSO's current disciplinary matrices and, upon approval of the parties and the Monitor, will amend them as necessary to ensure that they:*

a.    *establish a presumptive range of discipline for each type of violation;*

b.    *increase the presumptive discipline based on an employee's prior violations;*

c.    *set out defined mitigating and aggravating factors;*

d.    *prohibit consideration of the employee's race, gender, gender identity, sexual orientation, national origin, age, or ethnicity;*

e.    *prohibit conflicts, nepotism, or bias of any kind in the administration of discipline;*

f.    *prohibit consideration of the high (or low) profile nature of the incident, including media coverage or other public attention;*

g.    *clearly define forms of discipline and define classes of discipline as used in policies and operations manuals;*

WAI 39997

h.    *provide that corrective action such as coaching or training is not considered to be discipline and should not be used as a substitute for discipline where the matrix calls for discipline;*

i.    *provide that the MCSO will not take only non-disciplinary corrective action in cases in which the disciplinary matrices call for the imposition of discipline;*

j.    *provide that the MCSO will consider whether non-disciplinary corrective action is also appropriate in a case where discipline has been imposed;*

k.    *require that any departures from the discipline recommended under the disciplinary matrices be justified in writing and included in the employee's file; and*

l.    *provide a disciplinary matrix for unclassified management level employees that is at least as demanding as the disciplinary matrix for management level employees.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, 34 of the 143 administrative misconduct investigations resulted in sustained findings against one or more members of MCSO.  Compliance findings for this Paragraph are based on the discipline findings for both minor and serious discipline.  In those cases where only serious discipline is recommended, compliance findings specific to those cases are addressed in Paragraph 226.

Paragraph 220.a. requires a presumptive range of discipline for each type of violation.  Of the total 34 sustained cases, eight involved employees who resigned, retired, or had been previously dismissed from MCSO prior to the conclusion of the current investigation.  In the remaining 26 cases, the PSB Commander determined and documented the presumptive discipline range in compliance with this Subparagraph.

Paragraph 220.b. requires that presumptive discipline be increased if an employee has prior violations.  In eight of the 26 sustained investigations where discipline was assessed, the employee had prior sustained violations.  The PSB Commander considered and increased the presumptive discipline or discipline range based on the matrices in place at the time of the investigation.

WAI 39998

Paragraph 220.c. requires that mitigating and aggravating factors be defined.  Aggravating and mitigating factors are not specifically defined in the internal affairs investigation or discipline policy in effect prior to May 18, 2017.  The revised discipline policy, effective May 18, 2017, does define these factors.  We note that aggravating or mitigating factors are not identified by the PSB Commander, but are identified and considered by the Appointing Authority when making the final disciplinary decisions.  During this reporting period, the Appointing Authority provided justification and documentation for all factors he considered when making the final discipline decisions for cases initiated both before and after May 18, 2017.  We also found that he continues to specifically identify those instances where there are aggravating or mitigating factors in the justification documents when appropriate.

Paragraph 220.d. prohibits the consideration of any prohibited biases when determining discipline.  None of the sustained cases that resulted in discipline that we reviewed during this reporting period included any indication that any biases were considered when determining discipline.

Paragraph 220.e. prohibits any conflicts, nepotism, or bias of any kind in the administration of discipline.  None of the sustained cases we reviewed during this reporting period had any indication of conflicts, nepotism, or bias of any kind when determining the disciplinary sanction.

Paragraph 220.f. prohibits the consideration of the high (or low) profile nature of an incident when determining discipline.  None of the sustained cases we reviewed during this reporting period indicated any consideration of the high- or low-profile nature of the incident when considering discipline.

Paragraph 220.g. requires that clearly defined forms of discipline and classes of discipline be defined.  Phase 2 compliance is not applicable to this Subparagraph.

Paragraph 220.h. requires that corrective action such as coaching or training is not considered to be discipline and should not be used as a substitute for discipline.  None of the sustained investigations resulted in the use of coaching or training as a substitute when discipline was required.

Paragraph 220.i. requires that MCSO will not take only non-disciplinary action in cases where the Discipline Matrices call for the imposition of discipline.  None of the sustained cases we reviewed during this reporting period resulted in MCSO taking non-disciplinary action when the Discipline Matrices in effect required the imposition of discipline.

Paragraph 220.j. requires that MCSO consider whether non-disciplinary corrective action is also appropriate in a case where discipline has been imposed.  Investigators identified two cases where non-disciplinary corrective action was also appropriate.  In one, additional training was recommended; and in the second, a Memorandum of Concern was written to provide additional administrative direction to the involved employee.

Paragraph 220.k. requires that any departure from the discipline recommended under the Discipline Matrices be justified in writing and included in the employee's file.

WAI 39999

During the last reporting period, 11 investigations with sustained findings resulted in employee discipline. Five involved minor discipline; six involved serious discipline. In 10 of these cases, the final discipline was the presumptive discipline for the offense. In one case, the discipline was mitigated to a lower sanction than the presumptive discipline, but still fell within the range of discipline. The Appointing Authority authored a justification document for this mitigation. He provided substantive justification for the mitigation and we agreed with his decision in this case.

During this reporting period, 26 investigations with sustained findings resulted in discipline or other action. Thirteen involved minor discipline; 11 involved serious discipline. In the remaining two cases: one employee did not pass probation: and one employee did not receive discipline for the violation as it was combined with a separate offense. In 21 of the 24 cases where discipline was assessed, the final discipline was the presumptive for the offense. In one case, the Appointing Authority aggravated the discipline sanction above the presumptive discipline, but still within the range of discipline. In two of the cases, the discipline was mitigated to a lower sanction than the presumptive discipline, but still fell within the range of discipline. The Appointing Authority authored justification documents for all three of these investigations and we agree with his decisions.

As we have previously noted, compliance for this Paragraph is based on the final discipline outcome for all sustained investigations. Those instances that involve only serious discipline are specifically covered in Paragraph 226 of this Order.

Paragraph 220.l. requires that a Discipline Matrix for unclassified management employees be at least as demanding as the Discipline Matrix for management-level employees. We have reviewed the approved policies that affect discipline for unclassified management employees, and they comply with this requirement. During this reporting period, MCSO did not complete or submit any administrative investigations involving unclassified management employees.

Of the 26 total sustained investigations where discipline or other action was taken, one was initiated prior to May 18, 2017. In this case, the Discipline Matrices in effect at the time provided only a presumptive discipline range. The final discipline for the case fell within the established range.

Twenty-five of the sustained investigations where discipline or other action was taken were both initiated and completed after May 18, 2017, and are subject to all the requirements relative to investigations and disciplinary procedures contained in these revised policies. Those investigations initiated and completed after May 18, 2018 have both a discipline range and a presumptive discipline. Aggravating or mitigating the presumptive discipline requires a justification. In 20 of these cases, the final discipline was the presumptive discipline identified in the matrices in effect. In three cases, though the discipline fell within the range of discipline, it was not the presumptive. The Appointing Authority provided a written justification and we agreed with his decision in these cases.

WAI 40000

In one of the 25 cases, discipline was not assessed as the employee failed to pass probation and was demoted partly due to this sustained investigation.  In one additional case, the Appointing Authority did not assess discipline as he combined it with a prior offense by the employee for the purposes of discipline.  We do not agree with his decision in this case.

**Paragraph 221.**  *The Sheriff shall mandate that each act or omission that results in a sustained misconduct allegation shall be treated as a separate offense for the purposes of imposing discipline.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed 26 misconduct investigations with sustained allegations that resulted in the recommendation for discipline for current MCSO employees. We found that MCSO again met the requirements of this Paragraph.

**Paragraph 222.**  *The Sheriff shall also provide that the Commander of the Professional Standards Bureau shall make preliminary determinations of the discipline to be imposed in all cases and shall document those determinations in writing, including the presumptive range of discipline for the sustained misconduct allegation, and the employee's disciplinary history.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, there were 26 sustained investigations that were completed after July 20, 2016 where discipline was recommended.  In all of these cases, the PSB Commander determined and documented in writing the presumptive discipline or presumptive range of discipline based on the policies and Discipline Matrices that were in effect at the time of the investigation.  The documentation submitted for this Paragraph included the category, offense number, and employee's discipline history.

WAI 40001

### E.     Pre-Determination Hearings

***Paragraph 223.***  *If the Commander of the Professional Standards Bureau makes a preliminary determination that serious discipline (defined as suspension, demotion, or termination) should be imposed, a designated member of MCSO's command staff will conduct a pre-determination hearing and will provide the employee with an opportunity to be heard.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel where MCSO holds a Pre-Determination Hearing (PDH).

During this reporting period, 26 administrative misconduct investigations resulted in sustained findings against current MCSO employees.   Thirteen investigations resulted in the recommendation for serious discipline.  In all 13, MCSO held a Pre-Determination Hearing, as required.


***Paragraph 224.***  *Pre-determination hearings will be audio and video recorded in their entirety, and the recording shall be maintained with the administrative investigation file.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.

**Phase 2:**  In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, in all 13 cases where a PDH was held, the hearing was audio- and video-recorded as required, included in the administrative file, and reviewed by a member of our Team.

WAI 40002

*Paragraph 225.   If an employee provides new or additional evidence at a pre-determination hearing, the hearing will be suspended and the matter will be returned to the internal affairs investigator for consideration or further investigation, as necessary.   If after any further investigation or consideration of the new or additional evidence, there is no change in the determination of preliminary discipline, the matter will go back to the pre-determination hearing.  The Professional Standards Bureau shall initiate a separate misconduct investigation if it appears that the employee intentionally withheld the new or additional evidence during the initial misconduct investigation.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.

**Phase 2:**  In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, 13 sustained investigations resulted in a PDH and we reviewed all of the recordings of these hearings.  There were no instances where we, or the Appointing Authority, identified any concerns that required additional follow-up related to the requirements of this Paragraph.

*Paragraph 226.   If the designated member of MCSO's command staff conducting the pre-determination hearing does not uphold the charges recommended by the Professional Standards Bureau in any respect, or does not impose the Commander of the Professional Standards Bureau's recommended discipline and/or non-disciplinary corrective action, the Sheriff shall require the designated member of MCSO's command staff to set forth in writing his or her justification for doing so.  This justification will be appended to the investigation file.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.

**Phase 2:**  In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

WAI 40003

During every site visit, we meet with the Appointing Authority and the Compliance Division to discuss our concerns with final outcomes and decisions that result from Pre-Determination Hearings.  We have emphasized the need to comply with agency policies when determining disciplinary outcomes, and encouraged the Appointing Authority to provide detailed written justification in those cases where he determines that a sustained finding should be changed or discipline should be reduced.

During our January 2018 site visit, we met with the Appointing Authority and Compliance Division personnel to discuss the PDH process and the final outcomes of cases completed during this reporting period.  During the meeting, MCSO advised us that the Appointing Authority does not have the authority to reduce discipline based only on timeframe concerns when an employee appeals discipline in these cases.  It is the Maricopa County Attorney's Office (MCAO) that reviews these cases and determines whether the cases should go forward.  Both the Appointing Authority and the representative from the MCAO advised that they have taken some of these cases forward; but in others, they did not believe it was appropriate to do so, based on the totality of circumstances.  The Parties present at the meeting also commented on their concerns regarding cases involving the Plaintiffs' class that might result in reductions in discipline as a result of the failure to complete the case within the 180-day timeframe.  We discussed the specific requirements of Arizona Revised Statutes 38-1101, and that the statute only requires a "good faith" attempt to complete cases that result in suspensions, demotions, or dismissals within the 180-day timeframe.  Since the time of our discussion in 2018, Arizona law has added a definition of good faith.  A.R.S. 38-1101 now defines good faith as "honesty of purpose and absence of intent to defraud."

During that same site visit, we discussed those cases where a decision may be made after a PDH that a reduction in discipline will occur, and those cases where a decision to reduce the discipline may occur if an appeal is filed.  It is our understanding from our meeting with the Appointing Authority and other staff who were present that MCSO consults with the MCAO in these cases and their input is related to the final outcomes.  However, all the documentation we receive and review is authored and signed by the Appointing Authority, so our assessment can only consider any final decisions as his.

During this reporting period, 13 cases resulted in the recommendation for serious discipline.  In all 13 cases, the Appointing Authority provided a justification for the final decisions, and this information was provided to our Team in the submissions regarding closed internal affairs investigations.  The Appointing Authority did not overturn any of the sustained findings by the PSB Commander.  In eight of the 13 cases, the final discipline was consistent with the presumptive discipline identified in the matrices in effect at the time of the investigation.  In three cases, both initiated and completed after May 2017, the Appointing Authority made the decision to mitigate or aggravate the discipline within the discipline range.  In all three, he authored appropriate documents that provided adequate justification for these decisions.

WAI 40004

In one of the 13 cases, an employee failed probation, in part due to misconduct.  In one additional case, the Appointing Authority did not assess discipline for a serious offense and combined it with a previous offense of the same kind by the same employee.  We disagree with his decision in this case.

MCSO attained Phase 2 compliance with this Paragraph during the last reporting period.  During this reporting period, MCSO fell below the required compliance.  If MCSO falls below the compliance standard during the next reporting period, we will withdraw our Phase 2 compliance finding.

*Paragraph 227.   The Sheriff shall promulgate MCSO policy which shall provide that the designated member of MCSO's command staff conducting a pre-determination hearing should apply the disciplinary matrix and set forth clear guidelines for the grounds on which a deviation is permitted.  The Sheriff shall mandate that the designated member of MCSO's command staff may not consider the following as grounds for mitigation or reducing the level of discipline prescribed by the matrix:*

a.      *his or her personal opinion about the employee's reputation;*

b.      *the employee's past disciplinary history (or lack thereof), except as provided in the disciplinary matrix;*

c.      *whether others were jointly responsible for the misconduct, except that the MCSO disciplinary decision maker may consider the measure of discipline imposed on other employees involved to the extent that discipline on others had been previously imposed and the conduct was similarly culpable.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.

**Phase 2:**  In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed 26 administrative misconduct investigations where discipline was recommended.  The serious sustained allegations in 13 of these investigations resulted in their referrals for Pre-Determination Hearings.

Paragraph 227.a. prohibits the designated member of command staff conducting a Pre-Determination Hearing from considering a personal opinion of an employee's reputation when determining discipline.  There were no indications in our reviews of these investigations that any personal opinion was considered in making a disciplinary decision.

WAI 40005

Paragraph 227.b. prohibits the consideration of the employee's past disciplinary history (or lack thereof), except as provided in the Discipline Matrix. There were no instances where we determined that the member of command staff responsible for conducting the PDH considered disciplinary history outside of the requirements of this Paragraph.

Paragraph 227.c. prohibits the consideration of others jointly responsible for misconduct, except that the decision-maker may consider such discipline to the extent that discipline on others had been previously imposed and the conduct was similarly culpable. There were no indications in our reviews that the misconduct of others was improperly considered in the disciplinary decisions that were made.

**_Paragraph 228._** _The Sheriff or his designee has the authority to rescind, revoke or alter any disciplinary decision made by either the Commander of the Professional Standards Bureau or the appointed MCSO disciplinary authority so long as:_

a.    _that decision does not relate to the Sheriff or his designee;_

b.    _the Sheriff or his designee provides a thorough written and reasonable explanation for the grounds of the decision as to each employee involved;_

c.    _the written explanation is placed in the employment files of all employees who were affected by the decision of the Sheriff or his designee; and_

d.    _the written explanation is available to the public upon request._

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.

**Phase 2:**  In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, there were no instances where the Sheriff or his designee rescinded, revoked, or altered any disciplinary decision made by either the Commander of PSB or the appointed MCSO disciplinary authority.

WAI 40006

### F.    Criminal Misconduct Investigations

***Paragraph 229.***  *Whenever an internal affairs investigator or Commander finds evidence of misconduct indicating apparent criminal conduct by an employee, the Sheriff shall require that the internal affairs investigator or Commander immediately notify the Commander of the Professional Standards Bureau.  If the administrative misconduct investigation is being conducted by a Supervisor outside of the Professional Standards Bureau, the Sheriff shall require that the Professional Standards Bureau immediately take over the administrative investigation.  If the evidence of misconduct pertains to someone who is superior in rank to the Commander of the Professional Standards Bureau and is within the Commander's chain of command, the Sheriff shall require the Commander to provide the evidence directly to what he or she believes is the appropriate prosecuting authority—the Maricopa County Attorney, the Arizona Attorney General, or the United States Attorney for the District of Arizona—without notifying those in his or her chain of command who may be the subject of a criminal investigation.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review completed criminal misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed 12 criminal misconduct investigations.  Seven were externally generated, and five were internally generated.  All were initiated and completed after July 20, 2016, and appropriately assigned to criminal investigators in PSB.  In all of the 12 cases reviewed, the potential misconduct was brought to the attention of the PSB Commander as required; and in all cases, an administrative misconduct investigation was also initiated.  None involved someone superior in rank to the PSB Commander.

In one of these 12 criminal cases, involving a complaint from an inmate, the Prison Rape Elimination Act (PREA) investigation was forwarded in error to the Jail Crimes Unit for investigation by a Detention Officer.  This resulted in a delay in forwarding the case to PSB.  Once received, PSB properly conducted the criminal investigation.  The Detention employee who improperly forwarded the investigation to the Jail Crimes Unit is not a supervisor, and was unaware of the proper procedure for complaint investigations.  PSB has since addressed the proper procedures with Detention employees.

WAI 40007

*Paragraph 230.   If a misconduct allegation will be investigated criminally, the Sheriff shall require that the Professional Standards Bureau not compel an interview of the principal pursuant to Garrity v. New Jersey, 385 U.S. 493 (1967), until it has first consulted with the criminal investigator and the relevant prosecuting authority.   No other part of the administrative investigation shall be held in abeyance unless specifically authorized by the Commander of the Professional Standards Bureau in consultation with the entity conducting the criminal investigation.   The Sheriff shall require the Professional Standards Bureau to document in writing all decisions regarding compelling an interview, all decisions to hold any aspect of an administrative investigation in abeyance, and all consultations with the criminal investigator and prosecuting authority.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by both criminal and administrative investigators to ensure that they contain appropriate documentation that complies with the requirements of this Paragraph.

We previously determined that in many cases, the administrative investigation is not submitted and reviewed during the same reporting period as the criminal investigation, as generally, administrative investigations are finalized after the completion of the criminal investigation. We discussed this issue with PSB during our January 2017 site visit.  To resolve the concern, PSB agreed to provide us with a copy of any criminal investigation when PSB submits the administrative misconduct investigation for our review, even if the criminal investigation has been previously submitted.  MCSO has been consistently providing copies of these criminal investigations with the administrative investigation since that time.

During this reporting period, we reviewed four administrative misconduct investigations where criminal misconduct may have also occurred.  Both had companion criminal investigations completed by MCSO as required.

*Paragraph 231.   The Sheriff shall require the Professional Standards Bureau to ensure that investigators conducting a criminal investigation do not have access to any statements by the principal that were compelled pursuant to Garrity.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

WAI 40008

PSB is divided into criminal and administrative sections. Criminal investigators and administrative investigators are housed on separate floors of the building. Criminal investigators do not have access to the IAPro database for administrative investigations, and there are separate file rooms for criminal and administrative investigative documents and reports. We have previously verified during our site visits that the required separation of criminal and administrative investigations and restricted access to IAPro is in place. In May 2018, PSB relocated to a new offsite location. After PSB's move to its new facility, we verified that criminal and administrative investigation files were housed on separate floors in the new facility. Criminal investigators do not have access to the IAPro database for administrative investigations, and there are separate and secured file rooms for criminal and administrative documents and reports.

During our January 2019 site visit, a member of our Team again verified that criminal and administrative investigative files are housed on separate floors, there is restricted access to both file rooms, and restricted access to IAPro remains in place.

**Paragraph 232.** *The Sheriff shall require the Professional Standards Bureau to complete all such administrative investigations regardless of the outcome of any criminal investigation, including cases in which the prosecuting agency declines to prosecute or dismisses the criminal case after the initiation of criminal charges. The Sheriff shall require that all relevant provisions of MCSO policies and procedures and the operations manual for the Professional Standards Bureau shall remind members of the Bureau that administrative and criminal cases are held to different standards of proof, that the elements of a policy violation differ from those of a criminal offense, and that the purposes of the administrative investigation process differ from those of the criminal investigation process.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine MCSO's compliance with this Paragraph, we review on a monthly basis administrative and criminal misconduct investigations conducted by MCSO.

During this reporting period, we reviewed 12 criminal misconduct investigations conducted by MCSO personnel. All have a companion administrative misconduct investigation, as required; and are in compliance with the requirements of this Paragraph.

WAI 40009

***Paragraph 233.*** *If the investigator conducting the criminal investigation decides to close the investigation without referring it to a prosecuting agency, this decision must be documented in writing and provided to the Professional Standards Bureau. The Commander of the Professional Standards Bureau shall separately consider whether to refer the matter to a prosecuting agency and shall document the decision in writing.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine MCSO's compliance with this Paragraph, we review on a monthly basis administrative and criminal misconduct investigations conducted by MCSO.

During this reporting period, 10 of the 12 criminal investigations we reviewed were closed without submittal to a prosecuting agency. In all 10 cases, the decisions were supported by the facts of the investigation, interviews, or other investigative follow-up. The investigators documented their conclusions and decisions to close the cases without submittal and the PSB Commander approved these decisions in writing.

***Paragraph 234.*** *If the investigator conducting the criminal investigation decides to refer the matter to a prosecuting agency, the Professional Standards Bureau shall review the information provided to the prosecuting agency to ensure that it is of sufficient quality and completeness. The Commander of the Professional Standards Bureau shall direct that the investigator conduct additional investigation when it appears that there is additional relevant evidence that may improve the reliability or credibility of the investigation. Such directions shall be documented in writing and included in the investigatory file.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine MCSO's compliance with this Paragraph, we review on a monthly basis administrative and criminal misconduct investigations conducted by MCSO.

WAI 40010

During this reporting period, we reviewed 12 criminal misconduct investigations conducted by PSB personnel.  Of the 12 cases, two were forwarded to an appropriate prosecutorial agency as required.  MCSO provided documentation that the PSB Commander reviewed and approved the submittal.  The PSB Commander did not direct any further investigation prior to the submittal to the prosecuting agency.

**Paragraph 235.**  *If the prosecuting agency declines to prosecute or dismisses the criminal case after the initiation of criminal charges, the Professional Standards Bureau shall request an explanation for this decision, which shall be documented in writing and appended to the criminal investigation report.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

To determine MCSO's compliance with this Paragraph, we review on a monthly basis administrative and criminal misconduct investigations conducted by MCSO.

During this reporting period, two criminal cases were submitted to a prosecutorial agency for charging.  In one case, charges were filed; the second is pending a decision.  There were no instances where a case was submitted for prosecution by MCSO and the prosecutorial agency declined prosecution or dismissed the criminal case.

**Paragraph 236.**  *The Sheriff shall require the Professional Standards Bureau to maintain all criminal investigation reports and files after they are completed for record-keeping in accordance with applicable law.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

To determine compliance with this Paragraph, we observed that PSB maintains both hardcopy and electronic files that are intended to contain all the documents required per this Paragraph.

During previous site visits, we have inspected the file rooms where hardcopies of investigations are stored.  Criminal and administrative investigation files are stored in separate rooms, and access to these rooms is restricted.  Our random review of criminal investigation case files verified that PSB was maintaining files as required.  A member of our Team also has access to IAPro, and has verified that case files are maintained in an electronic format.

WAI 40011

During our January 2018 site visit, a member of our Team inspected the file rooms where hardcopies of criminal investigation are stored and randomly reviewed case files to verify compliance.

In May 2018, PSB relocated to a new offsite location.  After the move, we verified that PSB was properly maintaining criminal investigation reports and files at its new facility.

During our January 2019 site visit, a member of our Team again confirmed that criminal and administrative investigative files are housed on separate floors and restricted access to both the file rooms and IAPro remains in place.


### G.    Civilian Complaint Intake, Communication, and Tracking

**Paragraph 237.**  *Within six months of the entry of this Order, the Monitor, in consultation with the Community Advisory Board, will develop and implement a program to promote awareness throughout the Maricopa County community about the process for filing complaints about the conduct of MCSO employees.*

**Phase 1**:  Not applicable

**Phase 2:**  Not applicable

The Monitoring Team developed and implemented a Complaint Process Community Awareness Program to promote awareness throughout the Maricopa County community about the process for filing complaints about the conduct of MCSO employees.  The program provides for distributing brochures describing the complaint process and using public service announcements – made via local media outlets and social media – to provide basic information (in both English and Spanish) about MCSO's complaint process.

We contacted faith organizations and civic groups throughout Maricopa County requesting that they make complaint process information forms available to members of their congregations and groups.  The Complaint Process Community Awareness Program incorporates input from the CAB, MCSO, and the ACLU of Arizona.


**Paragraph 238.**  *The Sheriff shall require the MCSO to accept all civilian complaints, whether submitted verbally or in writing; in person, by phone, by mail, or online; by a complainant, someone acting on the complainant's behalf, or anonymously; and with or without a signature from the complainant.  MCSO will document all complaints in writing.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To assess compliance with this Paragraph, we review all new misconduct complaints received each month and completed misconduct investigations conducted by MCSO personnel.  In

WAI 40012

addition, we review many initial complaint documents or initial phone calls, BWC videos, traffic stop videos, Supervisory Notes, Compliance and BIO reviews, and consider findings in the complaint testing process.

During the last reporting period, there were no instances where either Compliance Division or BIO personnel identified in their reviews that a supervisor had failed to initiate a complaint when appropriate. There were no completed administrative misconduct cases with any allegations of failure to take a complaint. There were no instances where we identified during our review of contacts with complainants that a complainant had attempted to make a complaint prior to the contact and was refused. There were no instances identified in the complaint intake testing process where an MCSO employee refused to take a complaint.

During this reporting period, MCSO initiated 143 new internal investigations and 64 service complaints. There were no complaints externally or internally generated for failing to take a complaint. Of the 143 completed administrative misconduct investigations we reviewed, there were no indications or allegations that the complainant had tried unsuccessfully to make a complaint. Our review of traffic stops for this reporting period identified one instance where a subject who was arrested made allegations of misconduct by MCSO personnel during his arrest. Prior to being booked, he withdrew his complaint; but it appears a complaint should have been initiated. We have forwarded this information to PSB who is researching this incident to determine if an administrative investigation should be initiated. We will follow up with PSB on the results of its inquiry. Our review of Supervisory Notes during this reporting period did not identify any incidents where there were indications that a complaint had been made but not properly reported. We reviewed numerous complainant contacts and found no indication that a supervisor initially refused to take a complaint or attempted to dissuade the complainant from making a complaint. We found numerous incidents where the complainant articulated that they did not want to make a complaint and just wanted to make MCSO aware of something. In all of these instances we reviewed, a complaint was taken by MCSO as required. Neither CID or BIO identified any instances in their reviews during this reporting period that indicated a complainant had attempted to file a complaint and been refused. We did not identify any complaint intake tests for this reporting period where MCSO failed to accept a complaint.

We have found that MCSO consistently accepts and records complaints as required for compliance with this Paragraph.

WAI 40013

*Paragraph 239.   In locations clearly visible to members of the public at the reception desk at MCSO headquarters and at all District stations, the Sheriff and the MCSO will post and maintain permanent placards clearly and simply describing the civilian complaint process that is visible to the public at all hours.   The placards shall include relevant contact information, including telephone numbers, email addresses, mailing addresses, and Internet sites.   The placards shall be in both English and Spanish.*

**Phase 1:**  In compliance

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:**  In compliance

During this reporting period, the permanent placards were prominently displayed at MCSO Headquarters, and Monitoring Team members visiting MCSO Districts found that the permanent placards were also conspicuously displayed.  The placard states that anyone who has a concern regarding the performance of any MCSO employee has the right to file a complaint in English or Spanish or their preferred language, to include American Sign Language; in person at any District facility or at the Professional Standards Bureau, by mail, by telephone, by fax, or online.  The placard includes relevant contact information, including telephone numbers, email addresses, mailing addresses, and websites.

*Paragraph 240.   The Sheriff shall require all deputies to carry complaint forms in their MCSO vehicles.  Upon request, deputies will provide individuals with complaint forms and information about how to file a complaint, their name and badge number, and the contact information, including telephone number and email address, of their immediate supervising officer.   The Sheriff must provide all supervising officers with telephones.  Supervising officers must timely respond to such complaints registered by civilians.*

**Phase 1:**  In compliance

- EA-2 (Patrol Vehicles), most recently revised on February 20, 2019.

- GE-4 (Use, Assignment and Operation of Vehicles), most recently revised on October 7, 2017.

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:**  In compliance

WAI 40014

During this reporting period, Monitoring Team members visiting District offices verified that MCSO maintained adequate supplies of complaint forms for deputies to carry in their vehicles. All deputies with whom Monitoring Team members made contact understood their obligations to provide individuals with complaint forms and information about how to file a complaint, their name and badge number, and the contact information for their immediate supervising officer.

Also during this reporting period, Monitoring Team members verified that the supervisors with whom they made contact were in possession of MCSO-issued cellular telephones.

**Paragraph 241.** *The Sheriff will ensure that the Professional Standards Bureau facility is easily accessible to members of the public. There shall be a space available for receiving walk-in visitors and personnel who can assist the public with filing complaints and/or answer an individual's questions about the complaint investigation process.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

In May 2018, PSB moved into the first and second floors of 101 West Jefferson Street. During our July 2018 site visit, we toured the facility. During this reporting period, Monitoring Team members visiting MCSO Districts inspected the placards and comment and complaint forms, and noted that they all had been updated to reflect PSB's new address. The address was also updated on the comment and complaint form that is accessible to the public on MCSO's website.

The facility, the former East Court Building Library, is easily accessible to members of the public. The County Court facilities in the building are separate from the PSB reception area and offices. The PSB area is accessible from First Avenue, a major thoroughfare; and there is no required security screening of individuals entering the building through the First Avenue entrance. We visited the PSB facility during this reporting period. There was an MCSO employee stationed at the reception area desk in the entrance lobby to welcome visitors and provide information and assistance. As noted previously, the PSB facility's outside entrance located on First Avenue was well-marked and easily accessible to the public with no required security screening.

WAI 40015

***Paragraph 242.*** *The Sheriff will also make complaint forms widely available at locations around the County including: the websites of MCSO and Maricopa County government; the lobby of MCSO's headquarters; each patrol District; and the Maricopa County government offices. The Sheriff will ask locations, such as public library branches and the offices and gathering places of community groups, to make these materials available.*

**Phase 1:** In compliance

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:** In compliance

MCSO has complaint forms available in English and Spanish on the MCSO and Maricopa County websites. MCSO maintains a list – of MCSO facilities, County offices, and public locations where community groups meet – where Community Outreach Division personnel attempt to make the forms available.

During our April site visit, we visited five locations in Maricopa County that were included on MCSO's list of facilities where complaint forms are available to the public. All five facilities displayed an ample supply of complaint forms that were in English and Spanish, and contained the correct PSB facility address. We also observed that the forms were placed in locations readily visible to the public.

***Paragraph 243.*** *The Sheriff shall establish a free, 24-hour hotline for members of the public to make complaints.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

The free 24-hour hotline for members of the public to make complaints was established in July 2016 and continued to be operational during this reporting period. A Monitoring Team representative periodically called the hotline during this reporting period and verified that the hotline is operational in both English and Spanish, and provides instructions in both languages on how to register a complaint. The recording advises callers that if the call is an emergency, they are to call 911. Callers are requested to provide their name, telephone number, and a brief summary of their complaint. If callers leave a recorded message, they are advised that MCSO will contact them as soon as possible. If callers do not wish to leave a recorded message, they are provided with a telephone number to call to speak to a supervisor. That number connects the callers to the MCSO switchboard operator, who will connect the caller to an appropriate supervisor. Callers are further advised of MCSO's operating hours if they wish to contact PSB directly.

WAI 40016

The hotline is housed in PSB, and PSB personnel access any recorded messages at the beginning of each business day.  During this reporting period, PSB personnel reported that the hotline received two complaints.  The procedures established and followed by PSB provide for creating a record of every complaint received on the hotline and maintaining a log of follow-up actions regarding referral of the complaint.

**Paragraph 244.**  *The Sheriff shall ensure that the MCSO's complaint form does not contain any language that could reasonably be construed as discouraging the filing of a complaint, such as warnings about the potential criminal consequences for filing false complaints.*

**Phase 1:**  In compliance

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:**  In compliance

Our review of the English and Spanish complaint forms' content did not reveal any language that could reasonably be construed as discouraging the filing of a complaint.

**Paragraph 245.**  *Within two months of the entry of this Order, complaint forms will be made available, at a minimum, in English and Spanish.  The MCSO will make reasonable efforts to ensure that complainants who speak other languages (including sign language) and have limited English proficiency can file complaints in their preferred language.  The fact that a complainant does not speak, read, or write in English, or is deaf or hard of hearing, will not be grounds to decline to accept or investigate a complaint.*

**Phase 1:**  In compliance

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:**  In compliance

Complaint forms in English and Spanish are accessible on MCSO's website.  The complaint form states that anyone who has a concern regarding the performance of any MCSO employee has the right to file a complaint – in English or Spanish or their preferred language, to include American Sign Language – in person at any District facility or at the Professional Standards Bureau, by mail, by telephone, by fax, or online.  The forms provide street addresses, contact numbers, and website information.

WAI 40017

***Paragraph 246.***  *In the course of investigating a civilian complaint, the Professional Standards Bureau will send periodic written updates to the complainant including:*

a.      *within seven days of receipt of a complaint, the Professional Standards Bureau will send non-anonymous complainants a written notice of receipt, including the tracking number assigned to the complaint and the name of the investigator assigned.  The notice will inform the complainant how he or she may contact the Professional Standards Bureau to inquire about the status of a complaint;*

b.      *when the Professional Standards Bureau concludes its investigation, the Bureau will notify the complainant that the investigation has been concluded and inform the complainant of the Bureau's findings as soon as is permitted by law; and*

c.      *in cases where discipline is imposed, the Professional Standards Bureau will notify the complainant of the discipline as soon as is permitted by law.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed 143 administrative misconduct investigations conducted by MCSO personnel.  Of these 143, 103 were externally generated.

Paragraph 246.a. requires that a civilian complainant receive a written notice of receipt of his/her complaint within seven days.  This letter must include the tracking number, the name of the investigator assigned, and information regarding how the complainant can inquire about the status of their complaint.  In all but two of the cases where PSB had contact information for the complainant, the letter was sent within seven days as required.  All of the letters sent and reviewed included the name of the investigator and information regarding how the complainant could inquire about the status of the complaint.

Paragraph 246.b. requires that PSB notify a civilian complainant of the outcome of the investigation.  In all of the externally generated complaints, the complainant was provided a notice of the outcome when contact information was known.

Paragraph 246.c. requires that PSB notify a civilian complainant of any discipline imposed as soon as permitted by law.  In all of the externally generated complaints with sustained findings, PSB properly notified the complainant of the sustained findings and the discipline imposed when contact information for the complainant was known.

WAI 40018

***Paragraph 247.*** *Notwithstanding the above written communications, a complainant and/or his or her representative may contact the Professional Standards Bureau at any time to determine the status of his or her complaint. The Sheriff shall require the MCSO to update the complainant with the status of the investigation.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed 143 administrative misconduct investigations conducted by MCSO. Externally generated complaints resulted in 103 of the investigations. We did not identify any instances where a complainant was discouraged from, or denied, contact with MCSO investigators to determine the status of his/her complaint, or to request an receive an update. MCSO appropriately had contact with complainants as required in Paragraph 246 in all of these cases where the complainant was known and wanted to participate in the investigation. On 14 occasions, MCSO personnel reported that they had additional contact with complainants during the course of the investigation.

***Paragraph 248.*** *The Professional Standards Bureau will track, as a separate category of complaints, allegations of biased policing, including allegations that a deputy conducted an investigatory stop or arrest based on an individual's demographic category or used a slur based on an individual's actual or perceived race, ethnicity, nationality, or immigration status, sex, sexual orientation, or gender identity. The Professional Standards Bureau will require that complaints of biased policing are captured and tracked appropriately, even if the complainant does not so label the allegation.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

Each month, PSB provides a list of new complaints alleging biased policing. PSB also provides all closed investigations where biased policing was alleged. For this Paragraph, only allegations of biased policing that do not affect the Plaintiffs' class are reported. Those complaints alleging bias against members of the Plaintiffs' class are captured in a separate category and reported under Paragraphs 275-288.

WAI 40019

During the last reporting period, PSB completed two investigations where potential bias was alleged that did not affect members of the Plaintiffs' class.  Both investigations were initiated and completed after July 20, 2016; investigated by PSB; and tracked in a separate category as required by this Paragraph.

During this reporting period, PSB completed four investigations where potential bias was alleged that did not affect members of the Plaintiffs' class.  All four investigations were initiated and completed after July 20, 2016, investigated by PSB, and tracked in a separate category as required by this Paragraph.

***Paragraph 249.***  *The Professional Standards Bureau will track, as a separate category of complaints, allegations of unlawful investigatory stops, searches, seizures, or arrests.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

To determine Phase 2 compliance for this Paragraph, we review a monthly report from PSB that provides the information required for compliance.

To ensure that we are consistently informed of complaints relative to this Paragraph, PSB provides information concerning these investigations in its monthly document submission relative to this Paragraph.

During the last four reporting periods, PSB did not complete, or submit for our review, any investigation where reporting under this Paragraph is applicable.

During this reporting period, PSB completed four investigations alleging unlawful investigatory stops, searches, seizures or arrests.  All four were initiated and completed after July 20, 2016 and tracked in a separate category as required by this Paragraph.

***Paragraph 250.***  *The Professional Standards Bureau will conduct regular assessments of the types of complaints being received to identify and assess potential problematic patterns and trends.*

**Phase 1:**  In compliance

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

PSB continues to prepare a quarterly assessment of the types of complaints received to identify and assess potential problematic patterns or trends.  During this reporting period, PSB identified potential issues Office-wide as it relates to the number of complaints alleging that employees

WAI 40020

engaged in the use of inappropriate language/actions and rude behavior.  District 2 and the Lower Buckeye Jail were identified as the Divisions that received the most complaints during this reporting period.  District 2 received 17 complaints, which included four complaints alleging that the deputies were unprofessional toward members of the public; three complaints where it was alleged that deputies used excessive force when handcuffing or taking a suspect into custody; three complaints where it was alleged that the deputies prepared incomplete investigations or Incident Reports; and two complaints alleging deputies misused the Arizona Criminal Justice Information System (ACJIS).  An additional five complaints did not follow a pattern or trend that could be identified.  The Lower Buckeye Jail received 16 complaints, which included seven allegations that Detention Officers were rude and harassing towards non-inmate members of the public and five allegations of employees failing to follow Office procedures and directives.  An additional four complaints did not follow a pattern or trend.

The total number of internal and external complaints received during this reporting period was 136.  Of those, 23 were identified as involving allegations categorized with inappropriate language/actions (unprofessional conduct to include harassment, taunting behavior, inappropriate gestures, comments, and the use of profanity) and 18 allegations of rudeness, which accounted for 30% of all complaints received.  Of those, 70% occurred in Detention-related divisions.  Another 23 complaints were identified with allegations categorized as "failure to follow procedure."  There were three investigations related to jail staff entering MCSO facilities without removing weapons from their persons/bags.  There were three investigations involving the alleged misuse of the ACJIS.

PSB also includes the information required by this Paragraph in its semi-annual public Misconduct Investigations Report, which is required under Paragraph 251.  The most recent semi-annual report for the period of January 1-June 30, 2018, contains the issues identified as potentially problematic patterns or trends for that six-month period.


## H.     Transparency Measures

***Paragraph 251.*** *The Sheriff shall require the Professional Standards Bureau to produce a semi-annual public report on misconduct investigations, including, at a minimum, the following:*

a.     *summary information, which does not name the specific employees involved, about any sustained allegations that an employee violated conflict-of-interest rules in conducting or reviewing misconduct investigations;*

b.     *aggregate data on complaints received from the public, broken down by district; rank of principal(s); nature of contact (traffic stop, pedestrian stop, call for service, etc.); nature of allegation (rudeness, bias-based policing, etc.); complainants' demographic information; complaints received from anonymous complainants or third parties; and principals' demographic information;*

WAI 40021

c.   *analysis of whether any increase or decrease in the number of civilian complaints received from reporting period to reporting period is attributable to issues in the complaint intake process or other factors;*

d.   *aggregate data on internally-generated misconduct allegations, broken down by similar categories as those for civilian complaints;*

e.   *aggregate data on the processing of misconduct cases, including the number of cases assigned to Supervisors outside of the Professional Standards Bureau versus investigators in the Professional Standards Bureau; the average and median time from the initiation of an investigation to its submission by the investigator to his or her chain of command; the average and median time from the submission of the investigation by the investigator to a final decision regarding discipline, or other final disposition if no discipline is imposed; the number of investigations returned to the original investigator due to conclusions not being supported by the evidence; and the number of investigations returned to the original investigator to conduct additional investigation;*

f.   *aggregate data on the outcomes of misconduct investigations, including the number of sustained, not sustained, exonerated, and unfounded misconduct complaints; the number of misconduct allegations supported by the appropriate standard of proof; the number of sustained allegations resulting in a non-disciplinary outcome, coaching, written reprimand, suspension, demotion, and termination; the number of cases in which findings were changed after a pre-determination hearing, broken down by initial finding and final finding; the number of cases in which discipline was changed after a pre-determination hearing, broken down by initial discipline and final discipline; the number of cases in which findings were overruled, sustained, or changed by the Maricopa County Law Enforcement Merit System Council, broken down by the finding reached by the MCSO and the finding reached by the Council; and the number of cases in which discipline was altered by the Council, broken down by the discipline imposed by the MCSO and the disciplinary ruling of the Council; and similar information on appeals beyond the Council; and*

g.   *aggregate data on employees with persistent or serious misconduct problems, including the number of employees who have been the subject of more than two misconduct investigations in the previous 12 months, broken down by serious and minor misconduct; the number of employees who have had more than one sustained allegation of minor misconduct in the previous 12 months, broken down by the number of sustained allegations; the number of employees who have had more than one sustained allegation of serious misconduct in the previous 12 months, broken down by the number of sustained allegations; and the number of criminal prosecutions of employees, broken down by criminal charge.*

**Phase 1:**  In compliance

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

WAI 40022

**Phase 2:**  In compliance

The PSB Operations Manual identifies the PSB Commander as responsible for preparing the semi-annual public report on misconduct investigations.  The manual also contains provisions for the production of summary information regarding sustained conflict of interest violations; an analysis of the complaint intake process; and aggregate data on complaints (internal and external), processing of misconduct cases, outcomes of misconduct cases, and employees with persistent misconduct problems.

In February 2019, PSB issued and posted on the MCSO website its semi-annual public report for period of January 1-June 30, 2018.  PSB also incorporated information relevant to Paragraph 192 in this report, which requires that PSB review, at least semi-annually, all misconduct investigations that were assigned outside the Bureau to determine whether or not the investigation was properly categorized, whether the investigation was properly conducted, and whether appropriate findings were reached.  PSB also incorporated information relevant to Paragraph 250 in this report, which includes an assessment of potential problematic patterns or trends, based on a review on complaints received, for the time period of January 1-June 30, 2018.

During our April 2019 site visit, PSB informed us that it has developing a voluntary survey for complainants to complete after the conclusion of the investigation, which would capture demographic information in relation to the complainants for external complaints.  MCSO is coordinating with the County to identify the proper funding source for prepaid postage return envelopes.  The use of prepaid postage return envelopes would allow the complainants to mail the survey to MCSO without having to incur any fees.  Once the survey is implemented and PSB receives responses from the complainants, the information will be included in future semi-annual reports.  The demographic information for complainants in relation to internal complaints is included in the semi-annual report.

As MCSO published the Professional Standards Bureau Operations Manual during this reporting period, it has attained Phase 1 compliance with this Paragraph.  We previously deferred our Phase 2 compliance assessment of this Paragraph until MCSO achieved Phase 1 compliance via the publication of the Professional Standards Bureau Operations Manual.

***Paragraph 252.*** *The Sheriff shall require the MCSO to make detailed summaries of completed internal affairs investigations readily available to the public to the full extent permitted under state law, in electronic form on a designated section of its website that is linked to directly from the MCSO's home page with prominent language that clearly indicates to the public that the link provides information about investigations of misconduct alleged against MCSO employees.*

**Phase 1:**  In compliance

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

WAI 40023

PSB publishes detailed summaries each month of completed misconduct investigations in an electronic format that is accessible via MCSO's website. The following data fields have been identified for public disclosure: Internal Affairs Number; Date Opened; Incident Type; Original Complaint; Policy Violation(s) Alleged/Outcome; Discipline; Investigative Summary; and Date Completed. During our April 2017 site visit, we approved the PSB template containing detailed summaries of completed misconduct investigations for placement on the MCSO website. Each reporting period, we conduct a review of the detailed summaries of completed misconduct investigations to ensure that the content is consistent with the requirements of this Paragraph. In addition, we verify that the monthly detailed summaries of completed misconduct investigations are posted on MCSO's website for public review.

During this reporting period, PSB made the monthly detailed summaries of completed internal investigations available to the public in a designated section on the homepage of MCSO's website. MCSO remains in compliance with this requirement.

**Paragraph 253.** *The MCSO Bureau of Internal Oversight shall produce a semi-annual public audit report regarding misconduct investigations. This report shall analyze a stratified random sample of misconduct investigations that were completed during the previous six months to identify any procedural irregularities, including any instances in which:*

a.  *complaint notification procedures were not followed;*

b.  *a misconduct complaint was not assigned a unique identifier;*

c.  *investigation assignment protocols were not followed, such as serious or criminal misconduct being investigated outside of the Professional Standards Bureau;*

d.  *deadlines were not met;*

e.  *an investigation was conducted by an employee who had not received required misconduct investigation training;*

f.  *an investigation was conducted by an employee with a history of multiple sustained misconduct allegations, or one sustained allegation of a Category 6 or Category 7 offense from the MCSO's disciplinary matrices;*

g.  *an investigation was conducted by an employee who was named as a principal or witness in any investigation of the underlying incident;*

h.  *an investigation was conducted of a superior officer within the internal affairs investigator's chain of command;*

i.  *any interviews were not recorded;*

j.  *the investigation report was not reviewed by the appropriate personnel;*

k.  *employees were promoted or received a salary increase while named as a principal in an ongoing misconduct investigation absent the required written justification;*

WAI 40024

l.   *a final finding was not reached on a misconduct allegation;*

m.   *an employee's disciplinary history was not documented in a disciplinary recommendation; or*

n.   *no written explanation was provided for the imposition of discipline inconsistent with the disciplinary matrix.*

**Phase 1:**  In compliance

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

**Phase 2:**  In compliance

During our January 2018 site visit, the Bureau of Internal Oversight (BIO) Commander reported that the semi-annual public audit report regarding misconduct investigations had not yet been prepared.  After a telephone conference between BIO and the Monitoring Team on January 10, 2018, it was determined that the semi-annual public audit report would be placed on hold while BIO's Audit and Inspections Unit (AIU) developed the appropriate methodology for conducting the inspection.  On June 26, we approved the methodology for the inspection, which would start with an inspection of investigations that commenced after November 1, 2017.  AIU is conducting monthly inspections of misconduct investigations in lieu of conducting a semi-annual audit.  During the previous two reporting periods, AIU prepared inspection reports for the following months in which misconduct investigations were closed: July; August; September; October; and November 2018.  During this reporting period, AIU prepared inspection reports for December 2018 and January 2019.  The reports have been made available to the public by way of BIO's website.  During our January 2019 site visit, we discussed the issue of the timeline for conducting the inspections with MCSO.  It was determined that AIU would alter its timeline for conducting the inspections.  The inspections will be conducted two months after the investigations have been closed.

When perceived deficiencies are identified, AIU requests a BIO Action Form from the specific District/Division Commander to address the issue(s).  During our April 2019 site visit, we discussed with MCSO certain issues that were identified during the inspections and the responses from the respective District/Division Commanders via the BIO Action Forms.  MCSO indicated that some of the issues identified in the inspections resulted in a refining of the inspection process.  There were instances where the District/Division Commanders provided clarification to AIU in response of the perceived deficiencies that were contained in the inspection reports.

WAI 40025

### I.   *Testing Program for Civilian Complaint Intake*

***Paragraph 254.***  *The Sheriff shall initiate a testing program designed to assess civilian complaint intake.   Specifically, the testing program shall assess whether employees are providing civilians appropriate and accurate information about the complaint process and whether employees are notifying the Professional Standards Bureau upon the receipt of a civilian complaint.*

**Phase 1:** In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.
- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

**Phase 2:** In compliance

To meet the requirements of this Paragraph, AIU contracted with two vendors:  Progressive Management Resources (PMR), which is responsible for conducting complaint intake testing via telephone, email, U.S. Mail, and MCSO's website; and the Arizona Fair Housing Center (AFHC), which is responsible for conducting in-person tests.   We receive and review documentation of these tests – including any available audio-recorded documentation – as they are completed, as part of our monthly document requests.  PMR does not advise AIU of the tests in advance; instead, PMR emails AIU once a test has been completed with documentation of the test.

The contract issues that both vendors experienced with Maricopa County during the last two reporting periods appear to have been resolved, but very few complaint intake tests were conducted during this reporting period.  AFHC did not conduct any tests, and PMR conducted only one test – via telephone, in February.

In the test, the tester called MCSO to complain that she observed a deputy sleeping in a marked MCSO vehicle.  The tester described the three MCSO employees with whom she interacted during the test as friendly and professional.  The tester did not believe that any of the MCSO employees attempted to discourage, interfere with, or delay her from registering her complaint. On her documentation form, she wrote that the first employee who assisted her "was trying earnestly to transfer me to the district related to my complaint.  I felt he was honestly concerned and trying to get me to the right person."

Previously, we have encouraged MCSO to provide refresher training on the complaint process to all employees who interact with the public.  We will follow up on this issue during our upcoming site visit.

WAI 40026

***Paragraph 255.*** *The testing program is not intended to assess investigations of civilian complaints, and the MCSO shall design the testing program in such a way that it does not waste resources investigating fictitious complaints made by testers.*

**Phase 1:** In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.
- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

**Phase 2:** In compliance

AIU has informed both vendors it has contracted with of this requirement. AIU has created several procedures to ensure that the Complaint Intake Testing Program does not waste resources investigating fictitious complaints made by testers – including setting parameters for the types of inquiries that testers make, and creating official identification cards for testers designating them as such. For in-person tests, AIU has required that the vendor it has contracted with inform AIU in advance of all tests, and AIU personnel make themselves available via telephone if testers encounter any issue as they lodge their test complaints.


***Paragraph 256.*** *The testing program shall assess complaint intake for complaints made in person at MCSO facilities, complaints made telephonically, by mail, and complaints made electronically by email or through MCSO's website. Testers shall not interfere with deputies taking law enforcement action. Testers shall not attempt to assess complaint intake in the course of traffic stops or other law enforcement action being taken outside of MCSO facilities.*

**Phase 1:** In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.
- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

**Phase 2:** In compliance

As noted above, AIU has contracted with two vendors to meet the complaint intake testing requirements. AIU advised both vendors that testers shall not interfere with deputies taking law enforcement action, nor shall they attempt to assess complaint intake in the course of traffic stops or other law enforcement action being taken outside of MCSO facilities.

AIU has asked the vendor responsible for in-person testing to inform AIU in advance of all tests, and AIU personnel make themselves available via telephone if testers encounter any issue as they lodge their test complaints.

WAI 40027

***Paragraph 257.*** *The testing program shall include sufficient random and targeted testing to assess the complaint intake process, utilizing surreptitious video and/or audio recording, as permitted by state law, of testers' interactions with MCSO personnel to assess the appropriateness of responses and information provided.*

**Phase 1:** In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.
- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

**Phase 2:** In compliance

AIU has informed both vendors it has contracted with of the requirements of this Paragraph. We receive copies of the recordings following the completion of the tests. Per the agreed-upon methodology, all tests conducted via telephone are audio-recorded; and all in-person testers' interactions with MCSO personnel are video-recorded to assess the appropriateness of responses and information provided.

***Paragraph 258.*** *The testing program shall also assess whether employees promptly notify the Professional Standards Bureau of civilian complaints and provide accurate and complete information to the Bureau.*

**Phase 1:** In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.
- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

**Phase 2:** In compliance

AIU has informed both vendors it has contracted with of the requirements of this Paragraph so that the tests conducted by both vendors shall also assess whether employees promptly notify the PSB of civilian complaints and provide accurate and complete information to the Bureau.

As it receives documentation about completed tests from its vendors, AIU reviews the information; and issues Action Forms, authors memorandums of concern, or takes other appropriate action if a test fails or raises any concerns about the conduct of MCSO employees.

***Paragraph 259.*** *MCSO shall not permit current or former employees to serve as testers.*

**Phase 1:** In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.

WAI 40028

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

**Phase 2:**  In compliance

AIU has informed both vendors it has contracted with to conduct the tests of this requirement. AIU personnel have informed us that no current or former employees have served, or will serve in the future, as testers.

**Paragraph 260.**   *The MCSO shall produce an annual report on the testing program.   This report shall include, at a minimum:*

a.   *a description of the testing program, including the testing methodology and the number of tests conducted broken down by type (i.e., in-person, telephonic, mail, and electronic);*

b.   *the number and proportion of tests in which employees responded inappropriately to a tester;*

c.   *the number and proportion of tests in which employees provided inaccurate information about the complaint process to a tester;*

d.   *the number and proportion of tests in which employees failed to promptly notify the Professional Standards Bureau of the civilian complaint;*

e.   *the number and proportion of tests in which employees failed to convey accurate information about the complaint to the Professional Standards Bureau;*

f.   *an evaluation of the civilian complaint intake based upon the results of the testing program; and*

g.   *a description of any steps to be taken to improve civilian complaint intake as a result of the testing program.*

**Phase 1:**  In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

**Phase 2:**  Not in compliance

We have discussed with AIU personnel the requirements of this Paragraph.  Although Paragraph 260 requires that MCSO produce an annual report summarizing its complaint intake testing, AIU personnel have also elected to complete monthly reports.   AIU personnel drafted methodology for the monthly and annual reports, and we look forward to discussing this further with AIU during our upcoming site visit.

WAI 40029

## Section 13: Community Outreach and Community Advisory Board

**COURT ORDER XVI.     COMMUNITY     OUTREACH     AND     COMMUNITY ADVISORY BOARD**

***Paragraph 261.*** *The Community Advisory Board may conduct or retain a consultant to conduct a study to identify barriers to the filing of civilian complaints against MCSO personnel.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

During this reporting period, the CAB continued to explore the possibility of retaining a consultant to conduct a study to identify barriers to the filing of civilian complaints against MCSO personnel, by researching polling firms that are experienced in working with Latino populations.

***Paragraph 262.*** *In addition to the administrative support provided for in the Supplemental Permanent Injunction, (Doc. 670 ¶ 117), the Community Advisory Board shall be provided with annual funding to support its activities, including but not limited to funds for appropriate research, outreach advertising and website maintenance, stipends for intern support, professional interpretation and translation, and out-of-pocket costs of the Community Advisory Board members for transportation related to their official responsibilities. The Community Advisory Board shall submit a proposed annual budget to the Monitor, not to exceed $15,000, and upon approval of the annual budget, the County shall deposit that amount into an account established by the Community Advisory Board for that purpose. The Community Advisory Board shall be required to keep detailed records of expenditures which are subject to review.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

The Amendments to the Supplemental Permanent Injunction/Judgment Order (Document 2100) issued on August 3, 2017 altered the composition of the Community Advisory Board (CAB) and CAB's responsibilities and relationship to MCSO. As of September 1, 2017, the CAB is comprised of five members – two selected by the Plaintiffs, two selected by MCSO, and one jointly selected.

In July 2018, the Monitor approved CAB's proposed budget. The budget includes the following categories: community meetings; video production (to produce a short video in English and Spanish that provides information about the CAB and the MCSO complaint process); marketing materials; stipends for an assistant to help coordinate CAB meeting logistics; and reimbursement for CAB members' meeting expenses.

WAI 40030

Following the Monitor's approval of the CAB's budget, the CAB established a bank account, and the County provided the $15,000.  CAB members developed procedures for tracking funds and receiving reimbursement.  During our January 2019 site visit, we met with CAB members to discuss these procedures and review the CAB's expenditures to date; these records appear to be in order and we will review the CAB's expenditures periodically.

WAI 40031

## Section 14: Supervision and Staffing

**COURT ORDER XVII.      SUPERVISION AND STAFFING**

*Paragraph 263.   The following Section of this Order represents additions and amendments to Section X of the first Supplemental Permanent Injunction, Supervision and Evaluations of Officer Performance, and the provisions of this Section override any conflicting provisions in Section X of the first Supplemental Permanent Injunction.*

*Paragraph 264.   The Sheriff shall ensure that all patrol deputies shall be assigned to a primary, clearly identified, first-line supervisor.*

**Phase 1:**  In compliance

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

**Phase 2:**  In compliance

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the first quarter of 2019.   During this reporting period, consistent with our methodology, for January we reviewed a sample of shift rosters from Districts 1, 2, and 3; for February we reviewed a sample of shift rosters from Districts 4, 6, and 7 and Lake Patrol; and for March, we reviewed a sample of shift rosters from Districts 1, 2, and 3.   Monthly and daily rosters indicated that deputies were assigned to one single consistent supervisor.   For the 60 dates selected in this reporting period, all shifts were in compliance.   Monthly and daily rosters indicated that deputies were assigned to one single consistent supervisor.

*Paragraph 265.   First-line patrol supervisors shall be responsible for closely and consistently supervising all deputies under their primary command.*

**Phase 1:**  In compliance

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

**Phase 2:**  Not in compliance

Paragraph 265 is a general directive that covers several aspects of supervision.   There are several requirements covered in other Paragraphs of this Order that directly impact this Paragraph; these requirements must be met before MCSO can establish compliance with Paragraph 265.   We have determined that for MCSO to meet the compliance requirements of this Paragraph, MCSO must be in compliance with Paragraphs 83, 85, 89, 90, 91, 93, and 94. During this reporting period, MCSO was in compliance with Paragraphs 83, 85, 89, 90, and 93. During this reporting period, MCSO did not achieve compliance with Paragraphs 91 and 94.

WAI 40032

For MCSO to achieve compliance with this Paragraph, it must retain compliance with Paragraphs 83, 85, 89, 90, and 93; and attain compliance with Paragraphs 91 and 94.

**Paragraph 266.** *First-line patrol supervisors shall be assigned as primary supervisor to no more persons than it is possible to effectively supervise. The Sheriff should seek to establish staffing that permits a supervisor to oversee no more than eight deputies, but in no event should a supervisor be responsible for more than ten persons. If the Sheriff determines that assignment complexity, the geographic size of a district, the volume of calls for service, or other circumstances warrant an increase or decrease in the level of supervision for any unit, squad, or shift, it shall explain such reasons in writing, and, during the period that the MCSO is subject to the Monitor, shall provide the Monitor with such explanations. The Monitor shall provide an assessment to the Court as to whether the reduced or increased ratio is appropriate in the circumstances indicated.*

**Phase 1:**  In compliance

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

**Phase 2:**  In compliance

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the first quarter of 2019. During this reporting period, consistent with our methodology, for January we reviewed a sample of shift rosters from Districts 1, 2, and 3; for February we reviewed a sample of shift rosters from Districts 4, 6, and 7 and Lake Patrol; and for March, we reviewed a sample of shift rosters from Districts 1, 2, and 3. Monthly and daily rosters indicated that deputies were assigned to one single consistent supervisor. For the 60 dates selected in this reporting period, all shifts were in compliance. There were 10 span of control memos generated during this reporting period, indicating that those shifts or part of those shifts exceeded the supervisor-deputy ratio of 1:8. Five of the span of control memos were generated by District 2, four memos were generated by District 3, and one memo was generated by District 4. MCSO did not exceed the 1:10 supervisor-deputy ratio in any of the sample shifts we inspected during this reporting period. MCSO remains in compliance with this Paragraph.

**Paragraph 267.** *Supervisors shall be responsible for close and effective supervision of deputies under their command. Supervisors shall ensure that all deputies under their direct command comply with MCSO policy, federal, state and local law, and this Court's orders.*

**Phase 1:**  In compliance

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

**Phase 2:**  Not in compliance

WAI 40033

Close and effective supervision requires that supervisors consistently apply the concepts established in several Paragraphs of the First Order. There are requirements covered in other Paragraphs that directly impact Paragraph 267, and must therefore be in compliance for MCSO to establish compliance with this Paragraph. We have determined that for MCSO to meet the compliance requirements of this Paragraph, it must be in compliance with Paragraphs 83, 85, 89, 90, 91, 93, and 96. During this reporting period, we found MCSO in compliance with Paragraphs 83, 85, 89, 90, and 93. During the first quarter of 2019, MCSO did not meet the compliance requirements of Paragraphs 91 and 96. For MCSO to achieve compliance with this Paragraph, it must remain in compliance with Paragraphs 83, 85, 89, 90, and 93, and achieve compliance with Paragraphs 91 and 96.

**Paragraph 268.** *During the term that a Monitor oversees the Sheriff and the MCSO in this action, any transfer of sworn personnel or supervisors in or out of the Professional Standards Bureau, the Bureau of Internal Oversight, and the Court Implementation Division shall require advanced approval from the Monitor. Prior to any transfer into any of these components, the MCSO shall provide the Court, the Monitor, and the parties with advance notice of the transfer and shall produce copies of the individual's résumé and disciplinary history. The Court may order the removal of the heads of these components if doing so is, in the Court's view, necessary to achieve compliance in a timely manner.*

**Phase 1:** In compliance

- Court Implementation Division Operations Manual, most recently amended on August 17, 2018.
- Professional Standards Bureau Operations Manual, most recently amended on December 13, 2018.

**Phase 2:** In compliance

During this reporting period, there were three transfers into the Bureau of Internal Oversight (BIO) and three transfers into the Court Implementation Division (CID). In addition, there was one transfer into the Professional Standards Bureau (PSB). We reviewed the documentation for all incoming transfers and noted no issues of concern. In addition, during this reporting period, MCSO transferred one employee out of BIO, three employees out of CID, and one employee out of PSB. We reviewed the documentation that MCSO submitted for the outgoing transfers and found that it met the requirements of this Paragraph. Also during this reporting period, MCSO designated a new PSB commander, and a new point of contact for CID.

WAI 40034

## Section 15: Document Preservation and Production

**COURT ORDER XVIII.    DOCUMENT PRESERVATION AND PRODUCTION**

***Paragraph 269.*** *The Sheriff shall ensure that when the MCSO receives a document preservation notice from a litigant, the MCSO shall promptly communicate that document preservation notice to all personnel who might possibly have responsive documents.*

**Phase 1:** In compliance

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on April 4, 2019.
- GD-9 User Guide, published on November 23, 2018.

**Phase 2:** Not in compliance

To verify MCSO's Phase 2 compliance with this Paragraph, we reviewed monthly submittals of document preservation notices to MCSO employees for the reporting period. We also reviewed a sample of cases during our April 2019 site visit to assess if MCSO is properly preserving documents that are requested in the course of litigation.

Document preservation is set in motion when a party sends a litigation hold notice or written directive to MCSO requesting the preservation of relevant documents or records and electronically stored information (ESI), in anticipation of future litigation against the agency. MCSO's Legal Liaison Section (LLS) manages litigation holds. Upon the receipt of a litigation hold, which is usually sent by the Maricopa County Attorney's Office (MCAO), the LLS conducts an initial research to determine whether the request is something that LLS can provide or if LLS has to request it from an MCSO Division. If the LLS requires documents from other MCSO Divisions, it must draft a Document Preservation Notice within five business days and address it to the required Division. Upon receipt of the Document Preservation Notice, MCSO must identify responsive documents and also preserve them in the manner in which they are usually kept in the course of business. The LLS began using the online tool Open Axes to manage the litigation holds. The process is conducted electronically through the system so that the employees need only access the program to complete any forms and identify litigation holds of any responsive document.

During our April site visit, we reviewed a sample of the third-party source documents that generate the litigation holds that the LLS receives from MCAO. The LLS identify possible document custodians through Open Axes, who then receive the Document Preservation Notices. MCSO correctly conveys the information contained in the third-party source document into the Document Preservation Notices that are then forwarded to the employees in the different Divisions. The Document Preservation Notices have been distributed 100% in a timely manner to employees who may have responsive documents.

WAI 40035

GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices) requires that the employee who receives a document preservation request complete two forms: Attachment A, Document Preservation Acknowledgment and Attachment B, Document Preservation Questionnaire.  Attachment A, the attestation, is due within five days of receipt; while Attachment B – which requires more in-depth information such as steps taken to search documents, the outcome of the search, and the itemization of the documents identified as responsive – is due within 10 days of receipt.  Attachment A was returned in a timely manner 82% of the time, a 2% decrease since the last reporting period.  Attachment B was returned within established timeframes 86% of the time, a 3% decrease from the last reporting period.

During our April site visit, we reviewed completed copies of Attachment B, and found that 97% of them were properly completed, a 4% increase since the last quarter.  We noted that the LLS intercepted the improperly completed forms and returned them for corrections.  We also noted the improper completion of Attachment B by personnel who were not accustomed to completing these types of forms.

During our April site visit, we discussed our observations – specifically the untimely receipt of the attachments – with LLS personnel.  We explained that although this Paragraph requires that MCSO promptly communicate the hold to the employees, it also requires that MCSO comply with the timeframes set in GD-9.  In our last report, we advised MCSO that it was not in compliance with these Paragraph requirements, and that a second consecutive period of performance below the requirements would result in the withdrawal of compliance.  A review of the data for this reporting period reflected the same deficiencies as the last: noncompliance with the timeframes set forth in GD-9, due to the late of submissions of both Attachments A and B.  Therefore, we are withdrawing compliance for this Paragraph.

From our discussions, we concluded that the delay in the turnaround resulted in part with the new personnel dealing with litigation holds.  In addition, there were some personnel who were also out of the office for extended periods of time.

**Paragraph 270.**  *The Sheriff shall ensure that when the MCSO receives a request for documents in the course of litigation, it shall:*

a.   *promptly communicate the document request to all personnel who might possibly be in possession of responsive documents;*

b.   *ensure that all existing electronic files, including email files and data stored on networked drives, are sequestered and preserved through a centralized process; and*

c.   *ensure that a thorough and adequate search for documents is conducted, and that each employee who might possibly be in possession of responsive documents conducts a thorough and adequate search of all relevant physical and electronic files.*

**Phase 1:**  Not in compliance

WAI 40036

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on April 4, 2019.

- GD-9 User Guide, published on November 23, 2018.

- GM-1 (Electronic Communications, Data and Voicemail), most recently amended on March 7, 2019.

- Open Axes Operations Manual, currently under development.

**Phase 2:**  Deferred

To verify MCSO's Phase 2 compliance with this Paragraph, we reviewed monthly submittals of requests for documents to MCSO employees for the reporting period and documents drafted by the LLS in search of documents from other Divisions of the agency.  For this reporting period, we identified a sample of document requests and requested a copy of the responsive documents sequestered and/or produced.

Paragraph 270.a. requires prompt communication of document requests to all personnel who might possibly be in possession of responsive documents.  GD-9 requires the LLS to enter the data into a tracking system within five business days and to draft a Document Production Notice within five additional business days.  The LLS is required, within five business days, to respond to the request for production if sourced within LLS, or to forward to the required MCSO Division for production.

Our review revealed that MCSO is manually forwarding the Document Production Notices in a timely manner to all of its Divisions.  In addition, MCSO is sending Attachment C, the Document Production Acknowledgement Questionnaire, to all employees.  In 100% of the cases, the personnel who provided responsive documents properly completed Attachment C.

To prepare our assessment of this Paragraph, we also identified a subsample from our sample data to assess document preservation practices within MCSO.  We visited 17 MCSO Divisions, including Body Camera Legal Liaison Section, Telecommunications, Crime Lab, Policy, Intake, Classification, Records, Mail Room, and the Hearing Unit.  Out of the 17 Divisions we visited, one, the Mail Room, was not preserving Electronically Stored Information; while another, Intake, continued printing out Electronically Stored Information simply because we were reviewing the data.  We informed MCSO that there was no need to print out the documents if they are kept as Electronically Stored Information.  We are deferring our compliance assessment for this Paragraph until MCSO publishes the Open Axes Operations Manual.

WAI 40037

Paragraph 270.b. requires that all responsive ESI be stored, sequestered, and preserved by MCSO through a centralized process. MCSO now performs the searches through a centralized process through Open Axes. The preservation of the data is completed at the Division that has the actual document while the notation is made in the Open Axes program, which performs case management. LLS can now create a case, assign a case number, and trigger time alerts to the custodians of documents that LLS identifies through the system. Open Axes searches on the H, W, and U computer hard drives of MCSO, which are shared among Headquarters and the Districts.

MCSO continues to manage litigation hold cases through Open Axes; all cases for this reporting period were managed through Open Axes. MCSO continues to work with the Technology Management Bureau and the vendor to address any software problems. MCSO developed the Open Axes Operations Manual outlining the protocols and procedures, and make any necessary amendments to GD-9 following the deployment of the software. The manual has yet to be published.

Paragraph 270.c. requires that MCSO conduct an adequate search for documents, and that each employee who might possibly be in possession of responsive documents conducts a thorough and adequate search of all relevant physical and electronic files. We reviewed a sample of responsive documents for this reporting period, and MCSO identified responsive documents to the document production notices in all of the cases we reviewed.

***Paragraph 271.*** *Within three months of the effective date of this Order, the Sheriff shall ensure that the MCSO Compliance Division promulgates detailed protocols for the preservation and production of documents requested in litigation. Such protocols shall be subject to the approval of the Monitor after a period of comment by the Parties.*

**Phase 1:** In compliance

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on April 4, 2019.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.

**Phase 2:** In compliance

On June 25, 2018, MCSO published the Compliance Division Operations Manual, which details the protocols for the preservation and production of documents requested in litigation.

WAI 40038

*Paragraph 272.  The Sheriff shall ensure that MCSO policy provides that all employees must comply with document preservation and production requirements and that violators of this policy shall be subject to discipline and potentially other sanctions.*

**Phase 1:**  In compliance

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on April 4, 2019.

 **Phase 2:**  In compliance

No internal investigations were completed against any MCSO employee during this reporting period for failure to preserve or produce documents.

WAI 40039

## Section 16: Additional Training

**COURT ORDER XIX.        ADDITIONAL TRAINING**

***Paragraph 273.*** *Within two months of the entry of this Order, the Sheriff shall ensure that all employees are briefed and presented with the terms of the Order, along with relevant background information about the Court's May 13, 2016 Findings of Fact, (Doc. 1677), upon which this Order is based.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

MCSO previously delivered this training on the E-Policy platform.  All personnel (100%) determined to be applicable by CID have received this training.

WAI 40040

# Section 17: Complaints and Misconduct Investigations Relating to Members of the Plaintiff Class

**COURT ORDER XX.    COMPLAINTS AND MISCONDUCT INVESTIGATIONS RELATING TO MEMBERS OF THE PLAINTIFF CLASS**

*Paragraph 274.  In light of the Court's finding that the MCSO, and in particular Sheriff Arpaio and Chief Deputy Sheridan, willfully and systematically manipulated, misapplied, and subverted MCSO's employee disciplinary policies and internal affairs processes to avoid imposing appropriate discipline on MCSO deputies and command staff for their violations of MCSO policies with respect to members of the Plaintiff class, the Court further orders as follows:*

*A.    Investigations to be Overseen and/or Conducted by the Monitor*

*Paragraph 275.  The Monitor is vested with the authority to supervise and direct all of the MCSO's internal affairs investigations pertaining to Class Remedial Matters.  The Monitor is free from any liability for such matters as is set forth in ¶ 144 of the Supplemental Permanent Injunction.*

*Paragraph 276.  The Monitor shall have the authority to direct and/or approve all aspects of the intake and investigation of Class Remedial Matters, the assignment of responsibility for such investigations including, if necessary, assignment to his own Monitor team or to other independent sources for investigation, the preliminary and final investigation of complaints and/or the determination of whether they should be criminally or administratively investigated, the determination of responsibility and the imposition of discipline on all matters, and any grievances filed in those matters.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

The Second Order requires oversight by the Monitor for all internal investigations determined to be Class Remedial Matters (CRMs).  The Professional Standards Bureau (PSB) holds a weekly meeting to discuss existing and incoming complaints to determine which, if any, could be CRMs.  During these meetings, PSB personnel discuss cases pending a CRM decision, cases determined to be CRMs, and any cases where the decision may be made that the case would not be classified as a CRM.  The PSB Commander determines the classification of the cases.  A member of our Team attends all of these meetings to provide the oversight required for this Paragraph.

WAI 40041

At the end of the July-September 2016 reporting period, PSB had reviewed 442 administrative investigations that were open as of July 20, 2016; and determined that 42 of them met the basic criteria for CRMs. These cases were reviewed during the weekly CRM meetings. In addition, a Monitoring Team member randomly selected an additional 52 cases from the 400 remaining pending cases; and concurred with PSB's assessment that the cases did not meet the basic criteria for CRMs. In addition to the 42 cases determined to be potential CRMs from the pending case list as of July 20, 2016, PSB identified an additional 10 cases that were potential CRM cases. At the end of the first reporting period after the Court's Second Order, nine cases had been determined to be CRMs; and one other was pending a CRM decision. The remaining cases reviewed were determined not to be CRMs.

At the end of the last reporting period, PSB had reviewed a total of 242 cases since August 2016. Of these, 50 had been classified as CRMs.

During this reporting period, an additional 15 cases were reviewed as possible CRMs. Of these, five were determined to be CRMs. As of the end of this reporting period, there is a total of 257 cases that have been reviewed and 55 cases that have been determined to be CRMs since the July 20, 2016 Court Order.

Since July 20, 2016, MCSO has completed a total of 45 CRM cases, including five completed during this reporting period. In those cases closed during this reporting period, one was sustained against an employee for making inappropriate comments that did not involve bias. The involved employee received a written reprimand, which is consistent with MCSO policies for this violation. In one case, allegations of racial bias against multiple ethnicities were alleged against MCSO employees who responded to a large party. The complainant, who was not present at the gathering, later withdrew his complaint after he said he had done his own research and determined that he had been misinformed and there was no bias on the part of MCSO employees. As required, PSB completed this investigation. It involved numerous interviews of both MCSO employees and other persons who were at the gathering. PSB exonerated the deputies in this investigation. The third case was the result of a traffic stop review that found that a supervisor had failed to activate her BWC at a traffic stop. The traffic stop involved a Hispanic driver. While the employee left MCSO prior to the completion of this investigation, PSB not sustained the allegation based on known and reported issues with the BWC by this employee. The fourth case resulted from a letter of concern from the Parties regarding MCSO employee actions at the scene of a traffic stop involving Hispanic persons. The concerns included misidentification of ethnicity on the traffic stop contact form, concerns regarding asking a passenger for identification, and failure to let this same passenger leave the scene of the stop. After reviewing these concerns, PSB opened an administrative misconduct investigation. All allegations were exonerated. The final investigation involved allegations that a detention officer had made an inappropriate and biased comment to an inmate. The allegation was not sustained. Our Team approved the investigations, findings; and, where appropriate, the discipline, in all of these cases.

WAI 40042

Of the 21 CRM cases that have been closed to date with findings of sustained misconduct and reviewed by our Team, nine have involved employees who are deceased or left MCSO employment prior to the completion of the investigation or the disciplinary process. Twelve involve current employees of MCSO. Only one of these 12 cases involved a sustained finding of misconduct involving bias related to the Plaintiffs' class: a sustained allegation of an inappropriate and biased comment.

During the weekly meetings, case investigators continue to provide investigative updates on all cases that could be, or are, CRMs. Their briefings are thorough, and they continue to be responsive to any questions or input from members of our Team. In all cases where we have provided oversight since July 20, 2016, we have concurred with the decisions made by the PSB Commander regarding the case classifications and findings. Where appropriate, we have also approved the discipline in all these cases.

*Paragraph 277. This authority is effective immediately and shall remain vested in the Monitor until the MCSO's internal affairs investigations reach the benchmarks set forth in ¶ 288 below. With respect to Class Remedial Matters, the Monitor has plenary authority, except where authority is vested in the Independent Investigative and Disciplinary Authorities separately appointed by the Court, as is further set forth in ¶¶ 296–337 below.*

*Paragraph 278. The Sheriff shall alert the Monitor in writing to all matters that could be considered Class Remedial Matters, and the Monitor has the authority to independently identify such matters. The Monitor shall provide an effective level of oversight to provide reasonable assurance that all Class Remedial Matters come to his attention.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

Since the first CRM meeting held on August 17, 2016, PSB has consistently completed the required notification to us regarding the cases that could be considered CRMs. A Monitoring Team member has attended every CRM meeting with PSB where these matters are discussed and personally reviewed a number of the cases that were pending on July 20, 2016; and our Team member reviews the new cases that are presented each week. There has been no need for us to independently identify CRMs, as PSB consistently properly identifies and reports these cases as required.

*Paragraph 279. The Monitor shall have complete authority to conduct whatever review, research, and investigation he deems necessary to determine whether such matters qualify as Class Remedial Matters and whether the MCSO is dealing with such matters in a thorough, fair, consistent, and unbiased manner.*

WAI 40043

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

During the weekly CRM meetings attended by a Monitoring Team member, PSB has consistently properly identified cases that could be, or are, CRMs.  PSB personnel have briefed each case during the weekly meetings, and their briefings have included all appropriate information.  They have been responsive to any questions from our Team members during the meetings, and have responded appropriately to any suggestions we have raised.  There has been no need for us to independently conduct any review, research, or investigation; as PSB is consistently properly identifying and investigating these cases.

*Paragraph 280.*  *The Monitor shall provide written notice to the Court and to the parties when he determines that he has jurisdiction over a Class Remedial Matter.  Any party may appeal the Monitor's determination as to whether he has jurisdiction over a Class Remedial Matter to this Court within seven days of the Monitor's notice.  During the pendency of any such appeal the Monitor has authority to make orders and initiate and conduct investigations concerning Class Remedial Matters and the Sheriff and the MCSO will fully comply with such action by the Monitor.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

During this reporting period, cases involving both sworn and non-sworn members of MCSO have continued to be reviewed as possible CRMs, when appropriate.  There were no appeals by any Parties regarding any of the CRM classifications.

*Paragraph 281.*  *Subject to the authority of the Monitor, the Sheriff shall ensure that the MCSO receives and processes Class Remedial Matters consistent with: (1) the requirements of this Order and the previous orders of this Court, (2) MCSO policies promulgated pursuant to this Order, and (3) the manner in which, pursuant to policy, the MCSO handles all other complaints and disciplinary matters.  The Sheriff will direct that the Professional Standards Bureau and the members of his appointed command staff arrive at a disciplinary decision in each Class Remedial Matter.*

**Phase 1:**  In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

WAI 40044

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To evaluate Phase 2 compliance with this Paragraph, a Monitoring Team member has attended each weekly meeting conducted by PSB to discuss Class Remedial Matters. PSB has consistently provided thorough briefings, and the PSB Commander has made appropriate decisions regarding these matters.

During this reporting period, PSB completed and closed five CRM cases. We concurred with, and approved, all allegations; policy violations; findings; and if sustained, the discipline. The case reports we reviewed were consistent with the briefings that had been provided during the weekly CRM meetings. PSB investigators continue to conduct appropriate follow-up on these cases, expend extensive efforts to locate and contact all involved parties and witnesses, and provided detailed information concerning the allegations and the justifications for findings in their investigative reports.

Of the five cases completed during this reporting period, only one had sustained findings. The employee received a written reprimand for unbecoming conduct, which is consistent with the discipline policies in place at the time of this violation.

***Paragraph 282.*** *The Sheriff and/or his appointee may exercise the authority given pursuant to this Order to direct and/or resolve such Class Remedial Matters, however, the decisions and directives of the Sheriff and/or his designee with respect to Class Remedial Matters may be vacated or overridden in whole or in part by the Monitor. Neither the Sheriff nor the MCSO has any authority, absent further order of this Court, to countermand any directions or decision of the Monitor with respect to Class Remedial Matters by grievance, appeal, briefing board, directive, or otherwise.*

**Phase 1:** In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.
- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

There were no CRM cases completed during this, or previous reporting periods, in which the Sheriff and/or his appointee exercised their authority to resolve CRMs, which we needed to vacate or override.

WAI 40045

**Paragraph 283.**  *The Monitor shall review and approve all disciplinary decisions on Class Remedial Matters.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

At the end of this reporting period, MCSO has closed a total of 45 CRM cases since July 20, 2016.  Twenty-one of the completed cases have resulted in sustained findings.  Six had sustained findings on two separate deputies who are deceased, and three involved sustained findings on deputies who left MCSO employment prior to the determination of discipline. Twelve have resulted in sustained findings against current deputies.  In all of the sustained cases, we have reviewed and approved all of the disciplinary decisions.

**Paragraph 284.**  *The Sheriff and the MCSO shall expeditiously implement the Monitor's directions, investigations, hearings, and disciplinary decisions.  The Sheriff and the MCSO shall also provide any necessary facilities or resources without cost to the Monitor to facilitate the Monitor's directions and/or investigations.*

**Phase 1:**  In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

During this, and previous reporting periods, a Monitoring Team member attended all weekly CRM meetings conducted in an appropriate location determined by MCSO.  PSB continues to provide a password and access to the IAPro system to a member of our Team so that we can complete independent case reviews if necessary.

PSB personnel continue to be professional and responsive to all input, questions, or concerns we have raised.

WAI 40046

***Paragraph 285.*** *Should the Monitor decide to deviate from the Policies set forth in this Order or from the standard application of the disciplinary matrix, the Monitor shall justify the decision in writing and place the written explanation in the affected employee's (or employees') file(s).*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

At of the end of this reporting period, there are a total of 21 CRM cases with sustained findings. Six have sustained findings on two separate deputies who are deceased, and three involve deputies who left MCSO employment prior to the determination of discipline. Twelve cases involve sustained findings against current MCSO employees. All of these 12 cases have resulted in appropriate sanctions based on MCSO policy and the Discipline Matrices in effect at the time the investigations were conducted. No action by us has been necessary relative to this Paragraph.

***Paragraph 286.*** *Should the Monitor believe that a matter should be criminally investigated, he shall follow the procedures set forth in ¶¶ 229–36 above. The Commander of the Professional Standards Bureau shall then either confidentially initiate a Professional Standards Bureau criminal investigation overseen by the Monitor or report the matter directly and confidentially to the appropriate prosecuting agency. To the extent that the matter may involve the Commander of the Professional Standards Bureau as a principal, the Monitor shall report the matter directly and confidentially to the appropriate prosecuting agency. The Monitor shall then coordinate the administrative investigation with the criminal investigation in the manner set forth in ¶¶ 229–36 above.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

During this reporting period, there were no CRM cases where PSB determined that a criminal misconduct investigation should also be conducted. We did not identify any CRM where we believe a criminal investigation should be initiated. No action on our part relative to this Paragraph has been necessary.

WAI 40047

**Paragraph 287.**  *Any persons receiving discipline for any Class Remedial Matters that have been approved by the Monitor shall maintain any right they may have under Arizona law or MCSO policy to appeal or grieve that decision with the following alterations:*

a.  *When minor discipline is imposed, a grievance may be filed with the Sheriff or his designee consistent with existing MCSO procedure.  Nevertheless, the Sheriff or his designee shall immediately transmit the grievance to the Monitor who shall have authority to and shall decide the grievance.  If, in resolving the grievance, the Monitor changes the disciplinary decision in any respect, he shall explain his decision in writing.*

b.  *disciplined MCSO employee maintains his or her right to appeal serious discipline to the Maricopa County Law Enforcement Merit System Council to the extent the employee has such a right.  The Council may exercise its normal supervisory authority over discipline imposed by the Monitor.*

**Phase 1:**  In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.
- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

Twenty-one completed CRM cases have had sustained findings of misconduct since the issuance of the Second Order.  We concurred with MCSO's decisions in all of these cases.

During the last reporting period, an appeal was filed on discipline received by an employee on a sustained CRM case.  During this reporting period, this appeal to the Maricopa County Law Enforcement Merit System Council remains pending.

**Paragraph 288.**  *The Monitor's authority over Class Remedial Matters will cease when both:*

a,  *The final decision of the Professional Standards Bureau, the Division, or the Sheriff, or his designee, on Class Remedial Matters has concurred with the Monitor's independent decision on the same record at least 95% of the time for a period of three years.*

b.  *The Court determines that for a period of three continuous years the MCSO has complied with the complaint intake procedures set forth in this Order, conducted appropriate internal affairs procedures, and adequately investigated and adjudicated all matters that come to its attention that should be investigated no matter how ascertained, has done so consistently, and has fairly applied its disciplinary policies and matrices with respect to all MCSO employees regardless of command level.*

WAI 40048

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

During this and prior reporting periods, we and PSB have agreed on the investigative outcome of each CRM investigation completed.

PSB is responsible for the investigation of all CRM cases, and has continued to appropriately identify cases that could be, or are, CRMs.  PSB personnel are professional in our contacts with them and responsive to any concerns or questions we have raised; and they provide detailed information and updates in their weekly briefings.  Their written reports are thoroughly prepared, and the reports have been consistent with the information provided during the weekly case briefings.

***Paragraph 289.*** *To make the determination required by subpart (b), the Court extends the scope of the Monitor's authority to inquire and report on all MCSO internal affairs investigations and not those merely that are related to Class Remedial Matters.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

During the last reporting period, we reviewed a total of 61 internal investigations.  Fifty-six were administrative investigations and five were criminal investigations.  All five of the criminal investigations were in compliance with the requirements of the Court.  Forty-four (79%) of the 56 administrative misconduct investigations were in full compliance.  Overall compliance for all 61 investigations was 80%.

During this reporting period, we reviewed 155 misconduct investigations.  Twelve were criminal investigations and 143 were administrative investigations.  All 12 of the criminal investigations were in compliance.  Of the 143 administrative investigations, 120 (84%) were in full compliance.  This is an increase from the 79% compliance finding during the last reporting period.

There were four completed investigations submitted for Paragraph 249 (investigatory stops).  All four were in compliance.  Four completed investigations were submitted for Paragraph 33 (Bias Policing).  Three of the four were in compliance.  Five investigations were submitted under Paragraph 275 (CRMs), and all five were in compliance.  Investigations conducted by PSB sworn personnel were compliant in 100% of the cases, consistent with the last reporting period.  PSB investigations conducted by Detention personnel were compliant in 92% of the cases, a slight decrease from the 93% compliance the last reporting period.  Those investigations conducted by Divisions and Districts outside of PSB were compliant in 75% of the cases, an increase of 8% from the previous reporting period.  Overall compliance for all 155 investigations was 85%, an increase of 5% from the last reporting period.

WAI 40049

The overall percentage of administrative misconduct cases that were fully compliant improved during this reporting period. While we continue to identify some cases that are not fully compliant, the improvements from the last reporting period show continued effort and improvement by those who conduct misconduct investigations.

During our next site visit, we will discuss overall compliance and the concerns we identified with PSB and District and Division personnel, and provide them with specific case examples.

Effective with the revisions to internal affairs and discipline policies on May 18, 2017, the PSB Commander may now determine that a received complaint can be classified as a "service complaint" if certain specified criteria exists. Service complaint documentation must then be completed and will be reviewed under this Paragraph.

MCSO closed 12 service complaints during the last reporting period. MCSO properly reclassified one of these complaints to an administrative misconduct investigation after their review. Of the remaining 11, we found MCSO properly completed the service complaints.

During this reporting period, we reviewed 64 service complaints completed by MCSO. Five were properly reclassified to administrative misconduct investigations after review by PSB. The remaining 59 were handled as service complaints. Twenty-three (39%) of these 59 complaints were determined not to involve MCSO personnel. Twenty-eight (44%) involved complaints regarding laws, MCSO policies and procedures; or they involved other contacts from the public that did not include allegations of employee misconduct. Eight others were closed for a combination of reasons. We concur with MCSO's handling in 54 (92%) of the 59 cases classified as service complaints. In one case, while a thorough investigation was completed and we agree with the outcome there was a clear allegation of employee misconduct that should have resulted in the opening of an administrative misconduct investigation. In three cases, the complainant was not notified of the outcome of the service complaint as required; and in one case, PSB should have followed up with the complainant and did not.

Effective with the revisions to the internal affairs and discipline policies, the PSB Commander is now authorized to determine that an internal complaint of misconduct does not necessitate a formal investigation if certain criteria exist. The PSB Commander's use of this discretion is reported in this Paragraph. During the last reporting period, the PSB Commander used this discretion in two cases. Both involved internally generated complaints of a minor nature and met the criteria for handling with coaching without a formal investigation. We agree with the PSB Commander's decision in both of these cases.

During this reporting period, the PSB Commander used the discretion allowed in policy to determine that 10 internal complaints of misconduct did not necessitate a formal investigation. All of these internally generated complaints involved minor misconduct and met the criteria for handling with coaching without a formal investigation. All 10 involved employees received a coaching, and all coaching were appropriately documented.

WAI 40050

***Paragraph 290.*** *This requirement is necessitated by the Court's Findings of Fact that show that the MCSO manipulates internal affairs investigations other than those that have a direct relation to the Plaintiff class. The Court will not return the final authority to the Sheriff to investigate matters pertaining to members of the Plaintiff class until it has assurance that the MCSO uniformly investigates misconduct and applies appropriate, uniform, and fair discipline at all levels of command, whether or not the alleged misconduct directly relates to members of the Plaintiff Class.*

***Paragraph 291.*** *The Monitor shall report to the Court, on a quarterly basis, whether the MCSO has fairly, adequately, thoroughly, and expeditiously assessed, investigated, disciplined, and made grievance decisions in a manner consistent with this Order during that quarter. This report is to cover all internal affairs matters within the MCSO whether or not the matters are Class Remedial Matters. The report shall also apprise the Court whether the MCSO has yet appropriately investigated and acted upon the misconduct identified in the Court's Findings of Fact, whether or not such matters constitute Class Remedial Matters.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

This report, including all commentary regarding MCSO's compliance with investigative and disciplinary requirements, serves as our report to the Court on these matters. An overall summary of our compliance observations and findings is provided here.

During this reporting period, we reviewed 143 administrative misconduct investigations and 12 criminal misconduct investigations. All 12 criminal investigations were in full compliance with the Second Order. Of the 143 administrative misconduct investigations we reviewed, 84% were in full compliance with the Second Order. MCSO's overall compliance for both administrative and criminal investigations was 85%.

During the period of July-December 2016, PSB provided us with a memorandum describing PSB's efforts in meeting the requirements of this Paragraph related to the Court's Findings of Fact. MCSO had outsourced three cases to another law enforcement agency, and an additional four investigations were pending outsourcing to an outside investigator. These cases were outsourced due to the involvement of the former Chief Deputy, or other conflicts of interest identified by MCSO, and included the investigations identified in Paragraph 300. MCSO processed a Request for Proposal and retained an outside investigator who met the requirements of Paragraphs 167.iii. and 196 to conduct the investigations identified. One potential misconduct case identified in the Court's Findings of Fact was retained and investigated by PSB, as no identifiable conflict of interest appeared to exist.

PSB provided us with a document sent by the Independent Investigator assigned by the Court to investigate, or reinvestigate, some of the misconduct that is related to the Plaintiffs' class. In this document, the Independent Investigator clarified his intent to investigate the matters assigned to him by the Court, as well as the matters that the Court determined were the

WAI 40051

discretion of the Independent Investigator.  He further clarified that his investigations would include the initial misconduct alleged, as well as any misconduct that might have occurred during the process of review or issuance of discipline by MCSO personnel.

During each site visit, we meet with PSB personnel to discuss the status of those cases that have been outsourced to any contract vendor, other law enforcement agency, or other person or entity, so that we can continue to monitor these investigations and ensure that all misconduct cases, including those identified in the Findings of Fact, are thoroughly investigated.  PSB has continued to keep us apprised of the status of all such investigations.

During our January 2018 site visit, PSB advised us that the two administrative misconduct investigations that had been outsourced to a separate law enforcement agency had been completed and closed.  We received and reviewed both investigations.  A third investigation that MCSO outsourced to this same law enforcement agency had been previously returned to MCSO without investigation, as the allegations duplicated those already under investigation by the Independent Investigator.  MCSO outsourced six additional investigations to the contract investigator.

During our January 2019 site visit, PSB advised us that no additional investigations had been outsourced to the contract vendor.  Six cases had been completed and forwarded to PSB for review.  None had yet been forwarded to our Team for review.  The Independent Investigator continued investigations identified by the Court, and notified us of the status of these cases on a regular basis.  We also receive closed investigations that he completed.

During our April 2019 site visit, PSB advised that three additional investigations had been outsourced to the contract investigator.  The six cases he has completed remain in review by PSB personnel.  We have not received any of the investigations completed by this investigator for our review.  The Independent Investigator reported that he has completed all of the investigations identified by the Court.  During this reporting period, we reviewed one investigation that he completed.  While he has completed additional investigations, they remain in the discipline process, or the appeal process.  We will not see these reports to ensure that all conduct outlined in the FOF has been addressed until these processes are completed.


***Paragraph 292.****  To make this assessment, the Monitor is to be given full access to all MCSO internal affairs investigations or matters that might have been the subject of an internal affairs investigation by the MCSO.  In making and reporting his assessment, the Monitor shall take steps to comply with the rights of the principals under investigation in compliance with state law.  While the Monitor can assess all internal affairs investigations conducted by the MCSO to evaluate their good faith compliance with this Order, the Monitor does not have authority to direct or participate in the investigations of or make any orders as to matters that do not qualify as Class Remedial Matters.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

WAI 40052

PSB personnel continue to inform us of ongoing criminal and administrative misconduct investigations. A member of our Team attends each weekly CRM meeting, reviews the lists of new internal investigations, and has access to the PSB IAPro database. The only cases for which any oversight occurs during the investigative process are those that are determined to be CRMs. We review all other misconduct investigations once they are completed, reviewed, and approved by MCSO personnel.

**Paragraph 293.** *The Monitor shall append to the quarterly reports it currently produces to the Court its findings on the MCSO's overall internal affairs investigations. The parties, should they choose to do so, shall have the right to challenge the Monitor's assessment in the manner provided in the Court's previous Order. (Doc. 606 ¶¶ 128, 132.)*

Phase 1: Not applicable

**Phase 2:** Not applicable

Since we began reviewing internal investigations conducted by MCSO more than four years ago, we have reviewed hundreds of investigations into alleged misconduct by MCSO personnel. As noted in our previous quarterly status reports and elsewhere in this report, we continue to note concerns with internal investigations, but have also noted many improvements.

All 12 criminal misconduct investigations we reviewed for this reporting period were investigated by PSB and complied with the Second Order requirements.

PSB conducted 71 of the 143 total administrative misconduct investigations we reviewed for this reporting period. PSB's overall compliance rate for the investigative and administrative requirements of the investigations was 94%. This is a slight decrease from the 96% compliance the last reporting period. Sworn investigators conducted 22 of these investigations. All 22 (100%) were in compliance with all investigative and administrative requirements for which the PSB Commander has authority. This is the same percentage as the last reporting period. Forty-nine investigations were completed by Detention personnel assigned to PSB. Forty-five (92%) of the 49 investigations were in compliance, a slight decrease from the 93% compliance the last reporting period.

Of the 72 cases investigated outside of PSB, 54 (75%) complied with Second Order requirements. This is an increase from the 67% compliance finding the last reporting period. Those investigations conducted outside of PSB that were found not compliant still contain both qualitative and administrative documentation concerns as has been noted throughout this report. We again note that, in many cases, the deficiencies and errors we have found should have been identified prior to them being forwarded to PSB for review. Those investigations initiated and completed after the 40-hour Misconduct Investigative Training continue to have a higher compliance rate than those completed before the training.

WAI 40053

For the 143 administrative misconduct investigations we reviewed for this reporting period, MCSO's overall compliance was 84%. This is an increase of 5% from the last reporting period. This overall compliance finding takes into account multiple factors. As we have noted throughout this report, investigators, reviewers, command personnel, and the final decision makers all impact the compliance for each case.

MCSO completed delivery of the 40-hour Misconduct Investigative Training at the end of 2017, and all sworn supervisors who investigate administrative misconduct attended the training. During our site visit meetings and District visit meetings in January and April 2019, we continued to receive positive feedback on the training and District command personnel informed us that they believe that investigations completed by their personnel are continuing to improve. We agree with this assessment; and our review of investigations during this and the last reporting period that were initiated and completed after January 1, 2018 indicates that the training is producing the desired outcome and that there is additional improvement in the quality of investigations.

PSB personnel continue to be receptive to our input, and we have had many productive meetings and discussions regarding the investigations being conducted. We continue to note that PSB addresses issues we raise during our site visit meetings. The quality of the investigations conducted and overall compliance continues to improve. We continue to stress that compliance is not the sole responsibility of any one individual or Division – but dependent on all those who complete, review, or approve internal investigations.

We have noted in numerous previous reporting periods that MCSO's executive leadership must take the appropriate actions to ensure that adequate resources are dedicated to the completion of administrative and criminal misconduct investigations. MCSO informed us during our July 2018 site visit that numerous investigative personnel were requested for PSB in the 2018 budget year and approved. As of our site visit in April 2019, none of these positions have been filled. While PSB expects one of these positions to be filled in the near future, there is no indication that any other positions will be filled in the foreseeable future. We have also noted in numerous reporting periods that the executive leadership must provide appropriate oversight and support for the personnel who conduct these investigations. The documents we are now receiving from MCSO on a monthly basis continue to indicate that MCSO command personnel are noting, documenting, and taking corrective actions when incomplete or deficient investigations are completed or approved by their personnel. While MCSO is not in compliance with a number of the requirements for the completion of internal investigations, we continue to note that the agency is making efforts to address the obstacles to reaching compliance.

WAI 40054

**B.      Investigations to be Conducted by the Independent Investigator and the Independent Disciplinary Authority**

**Paragraph 294.**   *In its Findings of Fact, (Doc. 1677), the Court identified both: (1) internal affairs investigations already completed by the MCSO that were inadequate or insufficient; (see, e.g., Doc. 1677 at ¶ 903), and (2) misconduct or alleged misconduct that had never been investigated by MCSO that should be or should have been investigated.  (Id. at ¶ 904.)*

**Paragraph 295.**   *In light of MCSO's failure to appropriately investigate these matters, the Court appoints an Independent Investigator and an Independent Disciplinary Authority from the candidates set forth by the parties, and vests them with the authority to investigate and decide discipline in these matters.*

**1.      The Independent Investigator**

**Paragraph 298.**   *In assessing the existence of previously uncharged acts of misconduct that may be revealed by the Findings of Fact, the Independent Investigator does not have authority to investigate acts of misconduct that are not sufficiently related to the rights of the members of the Plaintiff class.  While the Independent Investigator should identify such acts of misconduct and report those acts to the Commander of the Professional Standards Bureau, and to the Monitor for purposes of making the Monitor's assessment identified in ¶¶ 291–93 above, the Independent Investigator may not independently investigate those matters absent the authorization and the request of the Sheriff.*

**Paragraph 300.**   *The following potential misconduct is not sufficiently related to the rights of the members of the Plaintiff class to justify any independent investigation:*

a.      *Uninvestigated untruthful statements made to the Court under oath by Chief Deputy Sheridan concerning the Montgomery investigation.  (Doc. 1677 at ¶ 385).*

b.      *Uninvestigated untruthful statements made to the Court under oath by Chief Deputy Sheridan concerning the existence of the McKessy investigation.  (Id. at ¶ 816).*

c.      *Chief Deputy Sheridan's untruthful statements to Lieutenant Seagraves made during the course of an internal investigation of Detective Mackiewicz to the effect that an investigation into the overtime allegations against Detective Mackiewicz had already been completed.  (Id. at ¶ 823).*

d.      *Other uninvestigated acts of misconduct of Chief Deputy Sheridan, Captain Bailey, Sergeant Tennyson, Detective Zebro, Detective Mackiewicz, or others that occurred during the McKessy investigation.  (Id. at ¶¶ 766–825).*

**Phase 1:**  Not applicable

WAI 40055

**Phase 2:**  Deferred

During our January 2017 site visit, the PSB Commander assured us that all acts of misconduct that we identified and discussed during our October 2016 site visit would be provided to a contracted independent investigator for investigative purposes.

Since that time, the PSB Commander has advised us that MCSO has contracted with a licensed private investigator.   The contract investigator possesses the requisite qualifications and experience to conduct the investigations of misconduct outlined in Paragraph 300 (a.-c.), and the additional misconduct in the Findings of Fact that directly associates with Paragraph 300 (d.).   PSB has not found it necessary to contract with any additional licensed private investigators.

During our April 2017 site visit, we met with PSB command staff and representatives from the Maricopa County Attorney's Office (MCAO) to verify that all of the acts of misconduct that were identified in the Findings of Fact (FOF) are under investigation, either by the Court-appointed Independent Investigator or the private licensed contract investigator.   Before this meeting, PSB command provided us with a roster of related acts of misconduct that PSB intended to be assigned to the contract investigator.   The roster of intended assignments did not include all of the acts of misconduct that we had discussed.   The MCAO and PSB command personnel explained that many of the acts of potential misconduct identified in the FOF were also identified by the Court in Paragraph 301 as sufficiently related to the rights of members of the Plaintiffs' class.    In Paragraph 301, the Court documented that because of this determination, investigations of the potential misconduct were justified if the Independent Investigator deemed that an investigation was warranted.

The Independent Investigator has now reported that he has completed all of the investigations identified by the Court.   While he has completed them, many remain in the discipline process or the appeal process.   We will not see these reports to ensure that all conduct outlined in the FOF has been addressed until these processes are completed.

The contracted independent investigator has completed some of the investigations he was assigned.   Those he has completed remain in review by PSB personnel.   We have not yet received or reviewed any of the investigations he has completed relative to the Order of the Court.

Our ability to verify that all potential misconduct outlined in the FOF has been investigated by PSB, the PSB contract investigator, or the Independent Investigator is pending until all the investigations are completed.   Once this occurs, we can determine if there is any additional misconduct identified in the FOF that still requires investigation.   Finally, the PSB Commander and MCAO advised us that the acts of misconduct involving (former) Sheriff Arpaio as identified in the FOF would not be investigated by any entity, as there does not exist any statute that addresses how a Sheriff would be disciplined in the event of a sustained finding resulting from an administrative misconduct investigation.

WAI 40056

*Paragraph 310.   The Monitor and the parties are directed to promptly comply with the Independent Investigator's requests for information.   The Monitor and the Independent Investigator may communicate to coordinate their investigations.   Nevertheless, each is independently responsible for their respective jurisdiction set forth in this Order, and each should make independent decisions within his own delegated responsibility.*

## 2.  The Independent Disciplinary Authority

*Paragraph 337.   Nevertheless, when discipline is imposed by the Independent Disciplinary Authority, the employee shall maintain his or her appeal rights following the imposition of administrative discipline as specified by Arizona law and MCSO policy with the following exceptions:*

a.   *When minor discipline is imposed, a grievance may be filed with the Sheriff or his designee consistent with existing MCSO procedure.   Nevertheless, the Sheriff or his designee shall transmit the grievance to the Monitor who shall have authority to decide the grievance.   If in resolving the grievance the Monitor changes the disciplinary decision in any respect, he shall explain his decision in writing.*

b.   *A disciplined MCSO employee maintains his or her right to appeal serious discipline to the Maricopa County Law Enforcement Merit System Council to the extent the employee has such a right.   The Council may exercise its normal supervisory authority over discipline imposed by the Independent Disciplinary Authority with one caveat.   Arizona law allows the Council the discretion to vacate discipline if it finds that the MCSO did not make a good faith effort to investigate and impose the discipline within 180 days of learning of the misconduct.   In the case of any of the disciplinary matters considered by the Independent Disciplinary Authority, the MCSO will not have made that effort.   The delay, in fact, will have resulted from MCSO's bad faith effort to avoid the appropriate imposition of discipline on MCSO employees to the detriment of the members of the Plaintiff class.   As such, the Council's determination to vacate discipline because it was not timely imposed would only serve to compound the harms imposed by the Defendants and to deprive the members of the Plaintiff class of the remedies to which they are entitled due to the constitutional violations they have suffered at the hands of the Defendants.   As is more fully explained above, such a determination by the Council would constitute an undue impediment to the remedy that the Plaintiff class would have received for the constitutional violations inflicted by the MCSO if the MCSO had complied with its original obligations to this Court.   In this rare instance, therefore, the Council may not explicitly or implicitly exercise its discretion to reduce discipline on the basis that the matter was not timely investigated or asserted by the MCSO.   If the Plaintiff class believes the Council has done so, it may seek the reversal of such reduction with this Court pursuant to this Order.*

WAI 40057

**Phase 1:**  In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

**Phase 2:**  In compliance

During this reporting period, no grievances were filed that met the criteria for transmitting to the Monitor.

WAI 40058

## Section 18:  Concluding Remarks

We assess compliance with 99 Paragraphs of the First Order, and 113 Paragraphs of the Second Order, for a total of 212 Paragraphs.  MCSO is in Phase 1 compliance with 83 of the First Order Paragraphs, or 97%; and 102 of the Second Order Paragraphs, or 99%.

As noted above, at the end of the last reporting period, MCSO asserted Full and Effective Compliance with 27 Paragraphs of the First Order, as that term is defined in the First Order. After review, I agreed with their assertions for 23 of these 27 Paragraphs.  Toward the end of this reporting period, MCSO asserted Full and Effective Compliance with one additional Paragraph of the First Order; after review, I agreed with this assertion.  Including these 24 total Full and Effective Compliance Paragraphs, MCSO is in Phase 2, or operational compliance, with 77 of the First Order Paragraphs, or 78%.  MCSO is in Phase 2 compliance with 101 of the Second Order Paragraphs, or 89%.  Combining the requirements of both Orders, MCSO is in Phase 1 compliance with 185 Paragraphs, or 98%; and in Phase 2 compliance with 178 Paragraphs, or 84%.

During our April site visit, we held a productive meeting with MCSO executive staff and MCAO representatives to discuss some of our methodologies for assessing compliance with certain Order requirements.  We are always open to such discussions and to considering alternatives to our current means of determining compliance, provided we are comfortable that any changes will not adversely impact our ability to make our determinations.

In our last report, we raised the issue of deputies failing to prepare and provide Incidental Contact Receipts to passengers with whom they have contact with during traffic stops, when required to do so by MCSO policy.  Following up on our recommendation, MCSO has recently taken action to remedy the issue by including a new feature in TraCS that will display a prompt to inform the deputies to complete the receipt when deputies populate the "passenger contacted" field on the Vehicle Stop Contact Form.  We are optimistic that this will address the identified shortcoming.

The Audit and Inspections Unit has instituted a new inspection for alert investigation tracking. The EIS Alerts Inspection Report was first published shortly after the end of the reporting period.  The goal of this inspection is to ensure that supervisors are completing the alert investigations in accordance with policy timelines.  In addition, this inspection will allow AIU to better track alert investigations by District and deputy to ensure that there are not repeat problems arising over time.  We are hopeful that this will positively impact compliance with several EIS-related Paragraphs – particularly 69, 75, and 81.

At the close of the reporting period, the EIU Operations Manual was 77% complete.  The only major areas that are left are those pertaining to the Traffic Stop Annual, Monthly, and Quarterly Analyses.  These cannot be completed until methodologies are finalized.

WAI 40059

During our last few site visits, we expressed our concerns regarding the need to start conducting some analyses of the Non-Traffic Contact Forms (NTCFs) used by deputies to document field stops that do not involve motor vehicles.   While the volume of these forms is low (approximately 25 per month), they have been in use for almost two years; and MCSO now has a significant enough repository of forms to conduct an analysis of any trends.  Our anecdotal assessment is that the majority of these NTCFs are for suspicious activity, or for riding a bicycle without a light.  Most people contacted appear to be poor and many are people of color.  Most are asked without much justification if they can be searched, and the majority consent.  MCSO has made considerable strides in its analyses of traffic stops in the past several years, and shall be commended for such.  The First Order also requires the capture and analysis of patrol data. The NTCFs constitute such data.

In interviews during our site visits, we continued to hear of anxieties on the part of supervisors and commanders regarding what has been asserted as a lack of staffing.  MCSO personnel claim that supervisors spend more than half of their shifts completing administrative paperwork in the office.  Yet, we have noted that supervisors are still not adequately identifying deficiencies in documentation, and violations of policy.  From our conversations with Patrol sergeants, we believe that most of them are genuinely trying to do a good job, but some feel overwhelmed by administrative tasks.  Having supervisors in the field is key to proactive supervision.  Reducing the span of control by transferring supervisors to Patrol, or promoting additional sergeants, may alleviate some of these concerns. We have previously suggested that MCSO consider reviewing the types of calls it responds to and look for ways to handle these without a deputy having to physically respond.  In addition, we have discussed hiring non-sworn report takers to assist deputies in the field.  We understand MCSO is attempting to hire qualified personnel.  We also know that the recruiting, hiring, and training of new employees takes considerable time.  It may be in MCSO's best interests to consider alternative solutions to its staffing problem. There are a considerable number of models throughout the country that the Office might want to examine. Also, the Office continues to struggle with meeting certain requirements relevant to the Professional Standards Bureau.  We are hopeful that the agency will strive to identify new practices and innovations so it is better suited to meet the requirements of the Orders.

MCSO has made progress in its technical compliance with a significant number of the Order requirements.  Further progress can be made, and setbacks adverted, if greater attention is given to the quality and depth of supervision, timelines, community engagement, data-gathering processes and methodologies, and the pursuit of innovative programs that will append efforts of the cadre of sworn deputies who deliver both direct and indirect services to the community.

WAI 40060

# Appendix:  Acronyms

The following is a listing of acronyms frequently used in our quarterly status reports:

| ACJIS | Arizona Criminal Justice Information System |
|---|---|
| ACLU | American Civil Liberties Union |
| ACT | Annual Combined Training |
| AIU | Audits and Inspections Unit |
| AOC | Arizona Office of Courts |
| ARG | Alert Review Group |
| ARS | Arizona Revised Statutes |
| ASU | Arizona State University |
| ATU | Anti-Trafficking Unit |
| BIO | Bureau of Internal Oversight |
| CAB | Community Advisory Board |
| CAD | Computer Aided Dispatch |
| CBP | Customs and Border Protection |
| CDA | Command Daily Assessment |
| CEU | Criminal Employment Unit |
| CID | Court Implementation Division |
| COrD | Community Outreach Division |
| CORT | Court Order Required Training |
| CRM | Class Remedial Matter |
| DOJ | Department of Justice |
| DUI | Driving Under the Influence |
| EIS | Early Identification System |
| EIU | Early Intervention Unit |
| EPA | Employee Performance Appraisal |
| FBI | Federal Bureau of Investigation |

WAI 40061

| FEC | Full and Effective Compliance |
|-----|-------------------------------|
| FOF | Findings of Fact |
| FTO | Field Training Officer |
| ICE | Immigration and Customs Enforcement |
| IIU | Internal Investigations Unit |
| IMF | Incident Memorialization Form |
| IR | Incident Report |
| LOS | Length of stop |
| LLS | Legal Liaison Section |
| MCAO | Maricopa County Attorney's Office |
| MCSO | Maricopa County Sheriff's Office |
| NOI | Notice of Investigation |
| NTCF | Non-Traffic Contact Form |
| PAL | Patrol Activity Log |
| PDH | Pre-Determination Hearing |
| POST | Peace Officers Standards and Training |
| PPMU | Posse Personnel Management Unit |
| PSB | Professional Standards Bureau |
| SID | Special Investigations Division |
| SMS | Skills Manager System |
| SPSS | Statistical Package for the Social Science |
| SRT | Special Response Team |
| TraCS | Traffic Stop Data Collection System |
| TSAR | Traffic Stop Annual Report |
| TSAU | Traffic Stop Analysis Unit |
| TSMR | Traffic Stop Monthly Report |
| TSQR | Traffic Stop Quarterly Report |
| VSCF | Vehicle Stop Contact Form |

WAI 40062