Cecillia D. Wang (*Pro Hac Vice*)
cwang@aclu.org
ACLU Foundation
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-0775
Facsimile: (415) 395-0950

Molly Brizgys
mbrizgys@acluaz.org
ACLU Foundation of Arizona
3707 North 7th Street, Suite 235
Phoenix, AZ 85014
Telephone: (602) 650-1854
Facsimile: (602) 650-1376

*Attorneys for Plaintiffs (Additional attorneys for Plaintiffs listed on next page)*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, et al., | CV-07-2513-PHX-GMS |
| Plaintiffs, | **PLAINTIFFS' MOTION FOR STATUS CONFERENCE** |
| and | |
| United States of America, | |
| Plaintiff-Intervenor, | |
| v. | |
| Paul Penzone, in his official capacity as Sheriff of Maricopa County, et al., | |
| Defendants. | |

Additional Attorneys for Plaintiffs:

| | |
|---|---|
| Stanley Young (*Pro Hac Vice*) <br> syoung@cov.com <br> Covington & Burling LLP <br> 3000 El Camino Real <br> 5 Palo Alto Square <br> Palo Alto, CA 94306 <br> Telephone: (650) 632-4700 <br> Facsimile: (650) 632-4800 | Julia A. Gomez (*Pro Hac Vice*) <br> jgomez@maldef.org <br> Mexican American Legal Defense and Educational Fund <br> 634 South Spring Street, 11th Floor <br> Los Angeles, California 90014 <br> Telephone: (213) 629-2512 <br> Facsimile: (213) 629-0266 |
| Anne Lai (*Pro Hac Vice*) <br> alai@law.uci.edu <br> 401 E. Peltason, Suite 3500 <br> Irvine, CA 92697 <br> Telephone: (949) 824-9894 <br> Facsimile: (949) 824-0066 | James B. Chanin (*Pro Hac Vice*) <br> jbcofc@aol.com <br> Law Offices of James B. Chanin <br> 3050 Shattuck Avenue <br> Berkeley, CA 94705 <br> Telephone: (510) 848-4752 <br> Facsimile: (510) 848-5819 |

Following several important developments at the Monitor's October site visit, Plaintiffs respectfully request that the Court schedule a status conference to discuss the October 15, 2019 community meeting during the Monitor's site visit and MCSO's fourth, and most recent, Traffic Stop Annual Report (the "Report"). Defendants' actions and responses to the Monitor's and Plaintiffs' questions on those subjects give rise to concerns about the Defendants' commitment to compliance with Paragraphs 65, 66, 67, 70, and 109 of the Court's Supplemental Permanent Injunction/Judgment Order ("the Order") (Doc. 606).

**A. Community meeting at the Maryvale Community Center**

Plaintiffs request a status conference to address a troubling development during the recent Monitor's site visit, concerning the lack of meaningful compliance with community engagement provisions ordered by the Court. On June 3, 2019, this Court directed the Monitor to take over implementation of quarterly community meetings required under the Order, after previous meetings conducted by Defendant Penzone failed in their purpose of "rebuild[ing] public confidence and trust in the MCSO and in the reform process" and "improve[ing] community relationships and engage constructively with the community." Doc. 2431 at 4-8. The Court's June 3, 2019 order now provides that:

> The Sheriff and/or the MCSO will participate in the meetings to provide substantive comments related to the Melendres case and the implementation of the orders resulting from it, as well as answer questions related to its implementation, if requested to do so by the Monitor or the community. If the Sheriff is unable to attend a community meeting due to other obligations, he shall notify the Monitor at least thirty days prior to that meeting.

*Id*. at 5.

On October 15, 2019 the Monitor convened a community meeting at the Maryvale Community Center. Approximately 120 people attended, and the majority appeared to be Plaintiff Class members. The audience was engaged, respectful, and prepared with cogent questions. The packed crowd included people coming directly from work with their safety

vests and knee pads still on, and mothers with babies in their arms or toddlers coloring at their feet. Many spoke only Spanish and many appeared to be new faces to the reform process. The conditions could not have been better for Defendant Penzone and MCSO personnel to engage meaningfully and substantively with the Plaintiff Class and to begin restoring trust. However, Penzone failed to capitalize on this opportunity in three major ways.

First, Defendant Penzone outsourced the presentation on the traffic study to a data scientist from its out-of-state data vendor, CNA. She was tasked with explaining the findings on behalf of the agency. Although the CNA data scientist did point out the disparities in the stops, citations, arrests, and stop length times and searches, she also said "the analysis was not able to uncover actual evidence of bias." This public statement was inconsistent with the actual data findings, and it appeared to Plaintiffs to be an effort by Defendant Penzone to minimize and obfuscate the findings of his own traffic stop study.

Second, Defendant Penzone failed to designate a sworn officer with sufficient knowledge and authority to answer community members' questions about the Body Worn Camera ("BWC") program. A non-sworn MCSO employee gave a good presentation on the basics. However, the audience had excellent follow-up questions concerning Freedom of Information Act requests, policy nuances, and deputy-activation and it did not appear that MCSO had designated an employee with the requisite rank or knowledge to answer the public's questions. Although another MCSO employee stepped in to fill the gap, it was apparent that MCSO had not done sufficient planning for address audience questions that could easily have been anticipated.

Finally, the Monitor allocated time for questions about the *Ortega Melendres* orders and the Sheriff's progress towards reform. However, when the Monitor called the Sheriff to the podium he had apparently left the meeting and it did not appear that he had designated an appropriate proxy to answer the class members' questions. Other MCSO employees jumped on stage to fill the gap, but they too seemed surprised by this turn of events and the Sheriff's absence at this crucial point in the meeting was clearly considered

to be an affront to the community members who were present. Several Plaintiff Class members, as well as members of the Community Advisory Board, wrote a letter to the Monitor expressing their concern. "We are compelled to convey that the community members at the meeting last night were completely appalled and shocked when it was announced that Sheriff Penzone had left the meeting . . . . In our opinion, Sheriff Penzone has shown disregard not only to the affected community but to the Court as well." [Exhibit A, October 17, 2019 Letter from Community Members to Monitor]. Plaintiffs echo the community's concerns: the Sheriff should have been in attendance to answer the community's questions and if he could not be there, he should have given the Monitor 30 days' notice, as required by the Court, and designated a proxy.

**B. Annual Traffic Stop Analyses**

**1. Order Requirements and Previous Reports**

After a trial where this Court found that Defendants violated the Plaintiff Class's rights under the Fourth and Fourteenth Amendment, the Court permanently enjoined Defendants from, amongst other remedies, (1) using race or Latino ancestry as a factor in determining whether to stop any vehicle, and (2) detaining Latino occupants of vehicles stopped for traffic violations for a period longer than reasonably necessary to resolve the traffic violation in the absence of reasonable suspicion that any of the vehicle's occupants have committed or are committing a violation of federal or state criminal law. Order at 1-2.

To implement these remedies, the Court ordered Defendants to analyze MCSO traffic data on an annual basis and look for "warning signs or indicia or possible racial profiling or other improper conduct under this Order." *Id.* at 31 ¶64. This annual analysis is required in order to help Defendants identify "individual level, unit-level or systemic problems." *Id.* at ¶65. The Order defines some of the possible problematic "warning signs" that could show up in the data such as:

  a. racial and ethnic disparities in deputies', units' or the agency's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status

3

inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of deputies' duties, or racial or ethnic disparities in traffic stop patterns when compared with data of deputies' peers;
b. evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;
c. a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;
d. indications that deputies, units or the agency is not complying with the data collection requirements of this Order; and
e. other indications of racial or ethnic bias in the exercise of official duties.

*Id.* at 32-33.

Over the years since the Court issued the Order, Defendants, with inputs from the Monitor and the other parties, has attempted to develop standardized data collection tools in order to collect comprehensive traffic data to help the agency understand in detailed specifics what is going on in the field: who is being stopped, why they are being stopped, by whom, where, for how long, and with what outcomes. Defendants developed several controls for variables that might explain different outcomes in stops, such as whether the stop involved a DUI, language barrier, training, technical issues, and whether a vehicle was towed. From 2014 to 2017, the Sheriff compiled the traffic data and generated the required reports, working with Dr. Danielle Wallace at Arizona State University as a consultant. In those three reports, Defendants found that MCSO was still engaged in biased policing. Docs. 2116 and 2286, *See also* https://www.mcsobio.org/traffic-stop-data. Because of those past findings, Defendants are required under the Order to take "appropriate steps at the agency level" to "to investigate and closely monitor the situation." Order at 33 ¶70.

**2. The Current Report**

Over the last year, Defendant Penzone engaged a new consultant to assist in conducting the court-mandated annual traffic stop analysis. For the most recent study, analyzing 2017-2018 traffic data, Defendant retained CNA, a data analytics firm based in Washington, D.C. The Monitor and the Parties painstakingly worked with MCSO and CNA to develop a conservative methodology that would measure and explain what was

happening in the field and if there were "warning signs of racial profiling, indicia of possible racial profiling," and whether these problems were "systemic." *Id*. at 65. Defendant Penzone produced several iterations of the proposed methodology and, in accordance with the review protocol, the Monitor and the other parties provided input.

On September 30, 2019, Defendant Penzone released the Report.[1] It shows that: 1) Latinos are arrested at a higher rate than non-Latinos; 2) Latinos have a higher rate of citations than non-Latinos; 3) Latinos are held on the roadside three minutes longer than non-Latinos; and 4) Latinos are almost twice as likely to be searched during traffic stops as non-Latinos. Doc. 2467. Many of these are repeat findings and they gave rise to serious concerns for the Plaintiff Class and counsel intended to learn more about the analysis during the Monitor's October site visit. The Monitor and Plaintiffs' counsel were told that Defendants would be "prepared to discuss" the Report at the upcoming site visit. [Exhibit B, September 30, 2019 Email from Attorney Ann Scheel to Parties and Monitor].

Unfortunately, that discussion did not happen. Despite over two weeks to prepare for discussion on the implications of the Report and what the agency planned to do to comply with the Court's Order, Defendants refused to answer basic questions from the Monitor and Plaintiffs' counsel.[2] Defendant Penzone himself was present and directed MCSO personnel not to answer questions, including the basic conclusions that Defendants drew from their own Report. MCSO personnel refused to state whether they believed the Report indicates racial bias against the Plaintiff Class still persists in MCSO traffic stops, and would only state that they believed that a "deeper dive" into the data would be needed in order to draw such basic conclusions. Notably, this was after Defendants had made a public statement about those very findings at the community meeting

---

[1] MCSO continues to be out of compliance with companion paragraphs requiring it to analyze monthly and quarterly data as well as ongoing benchmarks in its Early Intervention System. Order at 31¶65, 72, 79, 81.

[2] This was despite the presence of roughly 40 members of high-ranking MCSO officials, including the Sheriff.

Defendants did not give advance notice to either the Parties or the Monitor that their long-deferred Report would lack such basic conclusions, over the roughly one-year period MCSO had spent developing the methodology to be used in generating the Report. Over that period, and until the Monitor's site visit, MCSO never suggested that its data analysis was inadequate to meet the requirements of the Court's Order, or that it would need additional modeling or data points in order to determine if there were warning signs or other indications of racial profiling. And in fact, Defendants had explicitly stated that the "purpose of the TSAR analysis is to detect bias at the 'organization level', otherwise known as the MCSO Patrol Function, for certain post-stop outcomes." [Exhibit C, May 22, 2019 Memorandum from Captain McFarland to Maureen Johnston].

Six days after the Monitor's site visit meeting concerning the Report, Defendant Penzone issued a "message" bulletin to the Monitor and the other parties, stating:

> The 4th Traffic Stop Annual Report continues to show disparate outcomes in our traffic stops of minorities. These disparate outcomes are warning signs of potential racial bias in our patrol function, which has been and continues to be a major concern for the Office. These may be indicative of a systemic problem. We will continue to work with the Monitor and the parties, on how best to determine the cause of these disparate outcomes and how best to address racial bias in our patrol function, where it exists. We will remain diligent, continue to develop our internal oversight, accountability and consequences to properly address and root out any behaviors in conflict with our commitment to ethical, constitutional policing practices.

Notably, however, even this comment by Defendant Penzone does not draw a firm conclusion about whether his Report's findings actually do indicate that systemic racial bias against the Plaintiff Class persists during the covered time period.

Plaintiffs also note, for context, that Defendants had already delayed the release on the Report for almost two years due to its protracted process for retaining a new consultant, and that Defendants are also late by a matter of years in implementing a Constitutional Policing Plan as ordered by the Court on October 12, 2017. Doc. 2120 and 2143. Plaintiffs request a status conference to discuss MCSO's concrete plans for remediation of the problems described in Report's findings.

For both of these reasons, Plaintiffs think it is imperative that this Court hold a

status conference to address the October community meeting and MCSO's latest traffic report and to answer questions by the plaintiffs concerning the Sheriff's commitment to compliance with the Court's orders.

Respectfully submitted this this 30th day of October, 2019.

By *Molly Brizgys*
Molly Brizgys
ACLU Foundation of Arizona

Julia A. Gomez (*Pro Hac Vice*)
Mexican American Legal Defense and Educational Fund

Cecillia D. Wang (*Pro Hac Vice*)
ACLU Foundation

Anne Lai (*Pro Hac Vice*)

Stanley Young (*Pro Hac Vice*)
Covington & Burling, LLP

James B. Chanin (*Pro Hac Vice*)

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 30, 2019 I electronically transmitted the attached document to the Clerk's office using the CM/ECF System for filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail as indicated on the Notice of Electronic Filing.

/s/ *Molly Brizgys*
Molly Brizgys