1
ALLISTER ADEL
MARICOPA COUNTY ATTORNEY
2
By:     JOSEPH I. VIGIL (018677)
3          JOSEPH J. BRANCO (031474)
           BRIAN PALMER (023394)
4          Deputy County Attorneys
           vigilj@mcao.maricopa.gov
5          brancoj@mcao.maricopa.gov
           palmeb02@mcao.maricopa.gov
6
CIVIL SERVICES DIVISION
7  Security Center Building
222 North Central Avenue, Suite 1100
8  Phoenix, Arizona 85004
Telephone (602) 506-8541
9  ca-civilmailbox@mcao.maricopa.gov
10  MCAO Firm No. 00032000

11  Attorneys for Defendant Paul Penzone

12              **UNITED STATES DISTRICT COURT**

13                  **DISTRICT OF ARIZONA**

14  Manuel De Jesus Ortega Melendres,        No. CV-07-2513-PHX-GMS
    on behalf of himself and all others
15  similarly situated;
    et. al.,
16                                           **DEFENDANT PAUL PENZONE'S**
                                             **MEMORANDUM REGARDING THE**
17                  Plaintiffs,              **NOVEMBER 26, 2019 STATUS**
                                             **CONFERENCE**
18  and

19  United States of America,

20                  Plaintiff-Intervenor,

21  v.

22  Paul Penzone, in his official capacity
    as Sheriff of Maricopa County,
23  Arizona, et. al.,

24                  Defendants.

25

26         Plaintiff's Motion for Status Conference filed on October 30, 2019 (Doc. 2475)

27
("Motion") set forth Plaintiffs' position regarding (1) Defendant Maricopa County Sheriff
28

                                             1

Paul Penzone ("Sheriff")'s Traffic Stops Analysis Report for July 2017 – December 2018 ("Report") (Doc. 2467-1), (2) the October 17, 2019 Monitor's site visit meeting discussing the MCSO's traffic stop analysis efforts, and (3) the October 15, 2019 Community Meeting. The Court granted the Motion on November 1, 2019 and set a status conference for November 26, 2019 at 1:30 p.m. The Sheriff respectfully submits this memorandum to provide the Court with his position on these matters ahead of the status conference, and, where he believes necessary, to correct the record.

### A. The Sheriff's Obligation to Produce an Annual Traffic Stop Report

#### 1.     ASU's Reports

The October 2, 2013 Supplemental Permanent Injunction/Judgment Order (Doc. 606) ("First Order") requires the Sheriff to perform various traffic stop analyses of the patrol function of the Maricopa County Sheriff's Office ("MCSO").  Specifically, the First Order instructs the Sheriff "to look for warning signs or indicia of possible racial profiling or other improper conduct under this Order," (First Order ¶ 64), "analyze the collected data on a monthly, quarterly and annual basis and report their findings to the Monitor and the Parties," (*Id.* ¶ 65), "to look for possible individual-level, unit-level or systemic problems… (*Id.*), and to "conduct one agency-wide comprehensive analysis of the data per year, [which] shall be made available to the public and at no cost to the Monitor and Plaintiff." (*Id.* ¶ 66).  The First Order permits the Sheriff to "hire or contract with an outside entity" to produce the annual report.  (*Id.*).

The "warning signs or indicia of possible racial profiling" include without limitation racial and ethnic disparities in the agency's traffic stop patterns, including

disparities or increases in stops for minor traffic violations and arrests following such stops "that cannot be explained by statistical modeling of race neutral factors or characteristics of deputies' duties," as well as evidence of extended traffic stops or increased inquiries/investigations of Latino drivers. (*Id.* ¶ 67). The First Order requires the Sheriff to "take appropriate steps at the agency level" if the "MCSO or the Monitor concludes that systemic problems of racial profiling . . . exist." (*Id.* ¶ 70). The First Order does not require that the Sheriff conclude that racial profiling exists across MCSO's patrol function on the sole basis of racial and ethnic disparities in traffic stops. (*Id.*).

Initially, MCSO retained Arizona State University ("ASU") to conduct the first three annual traffic stop analyses required by the First Order. The ASU reports (1) explored whether there was systemic bias throughout MCSO's patrol function, and (2) attempted to identify individual deputies who were engaging in policing behavior toward minority drivers that was markedly different from similarly-situated peers so that MCSO could conduct preemptive, non-punitive interventions.

From the outset, MCSO experienced numerous, ongoing, and significant difficulties with ASU's analyses. These difficulties have been well-documented in this case. For example, referring to the three previous ASU reports, the Monitor stated that:

> While the scientific basis of the methodology is valid, we note that its implementation was problematic. As previously stated, the second evaluation had to be completely redone due to data problems. Likewise, the third evaluation had to be redone due to serious miscoding of the underlying data. In fact, this report is now public even though it contains a flawed analysis pertaining to length of traffic stops that misidentified deputies potentially engaging in biased-based policing. The failure to successfully implement the approved methodologies is well-documented in our previous reports and is the main reason why MCSO has yet to achieve Phase 2 compliance with this Paragraph.

(Monitor's Twentieth Quarterly Report (Doc. 2458) at 90.)

The Motion declares that all three ASU reports conclusively found that the MCSO patrol function was engaged in biased policing at an organizational level.  (Motion at 4:18–19.)  But ASU's findings were not nearly so definitive, and evolved over time.  In its first report, for example, ASU remarked that

> In general, the analyses of the yearly data *suggest there may be some issues with racially biased policing* among some deputies, beats, and districts across the outcomes of decision to stop, type of stop, length of stop, and arrest by race/ethnicity. *Continued work should examine the depth of these relationships.*

(Preliminary Yearly Report for the Maricopa County Sheriff's Office, Years 2014-2015, May 25, 2016, https://www.mcsobio.org/traffic-stop-data (follow "July 1, 2014 - June 30, 2015" hyperlink ("First Report") at 10.) (emphasis added); *see also* Monitor's Ninth Quarterly Report (Doc. 1858 at 93) (remarking that "the methodology fell short of what the scientific literature requires to look for racial profiling or other misconduct," and concluding that "[e]ven with the data problems and the limited inferential analyses conducted by ASU, the report finds evidence of *possible* biased-based policing…..") (emphasis added)).  Similarly, ASU's second report stated that "the issue of racially biased policing within MCSO *appears* to be both a deputy and organizational level problem, and ASU's third report stated that '[t]hese results collectively *suggest* systemic bias within the patrol function of the MCSO….."  (Yearly Report for the Maricopa County Sheriff's Office, Years 2015-2016 (Doc. 2116-1) ("Second Report") at 75; Annual Report for the Maricopa County Sheriff's Office: 2016 to 2017 (Doc. 2286) ("Third Report") at 71 (emphasis added)).

4

The Motion also omits the fact that both the Second Report and Third Report found that length of stop times of Hispanic drivers are decreasing.  (Second Report at 84 ("[L]ength of stops for Hispanics are shorter in the 2015 to 2016 fiscal year than they were in 2014-2015."); Third Report at 72 ("Hispanics continually see a decrease in their length of stops. While the gap between Hispanic and White drivers in regards to length of stop has not closed, it is getting narrower over time.")).  The Third Report additionally found that Hispanics were experiencing a "reduction in the likelihood of citations over time, and concluded that "while the difference in post-stop outcomes remain in the 2016-2017 reporting year, over time the differential between Hispanics and Whites for the outcomes of length of stop and citation are improving."  (Third Report at 72.)[1]

The Motion also cites to "several controls for variables that might explain different outcomes in stops, such as whether the stops involved a DUI, language barrier, training, technical issues, and whether a vehicle was towed," and then appears to argue that ASU applied these variables to control for possible race-neutral causes of disparate outcomes for extended stops, citations and arrests. (Motion at p. 5:13–16.)  But that is not what ASU did.  First, these race-neutral variables were designed to control only for disparate outcomes with respect to length of stop; they were not applied to examine possible race-neutral causes for disparate outcomes in citations and arrests.

Second, data collection issues precluded ASU from comprehensively analyzing these variables for all of the traffic data collected for any given report.  ASU did not

---

[1]     These improvements should come as no surprise: since 2013, MCSO has worked diligently to comply with the various provisions of the First Order, including implementing wholesale changes in training, policy, and culture across the organization. Traffic stop data collection has also greatly improved during this time.

analyze these race-neutral variables at all in the First Report.  *See*, *generally*, First Report. In the Second Report, ASU attempted to analyze them through word searches of the comments field on MCSO's traffic stop forms.  Second Report at 75.  However, deputies were not consistently noting the reason for an extended stop across the agency in the comments field.  ASU recommended that these variables be added to MCSO's traffic stop forms for further analysis.  *Id.* at 75.  MCSO implemented the recommended change to the forms in November 2016, five months into the one-year analysis period for the Third Report.  Accordingly, only seven months of data were available for analysis using the new traffic stop forms.

### 2.    CNA's Report

In 2018, the Sheriff contracted its new vendor, the CNA Institute for Public Research ("CNA").  No party objected to CNA's retention, nor did the Monitor or the parties ever question CNA's professionalism, competence or objectivity during the development of the methodology for the most recent Report, a methodology that differed from the methodology previously used by ASU and that was approved by the Monitor. (Monitor's Twentieth Report (Doc. 2458) at 90–91.)  Additionally, the Monitor and the parties agreed that CNA's Report would not attempt to identify individual deputies engaging in policing behavior toward minority drivers that is markedly different from their similarly-situated peers.  Moving forward, it was agreed that the individual deputy analysis and any corresponding interventions would be conducted through and guided by the monthly traffic stop analysis.[2]

---

[2]    MCSO is on track to produce its monthly methodology to the Monitor for comment in early December.

6

On September 30, 2019, pursuant to Paragraph 66 of the First Order, the Sheriff published the Report on the MCSO website, and filed the Report with the Court. (Defendant Paul Penzone's Notice of Publication of Traffic Stops Analysis Report for July 2017 – December 2018 (Doc. 2467)).  The Report covers traffic stops that occurred within the 18-month period between July 2017 and December 2018.  (Report at 1.)  The Report analyzes traffic stops along five relevant outcome variables—stop length, search rates, citation rates, arrest rates, and seizure rates.  (*Id.*)  Significantly, the Report marked the first time that traffic stop forms specifically including the race-neutral variables referenced in the Motion were used for all of the analyzed traffic stops.  (Report at 19.)

In its concluding discussion, the Report states that

> MCSO and CNA's analysis team conclude that there is evidence of disparate outcomes by driver race in traffic stops.  This finding is consistent with past studies of traffic stop outcomes in other agencies as well as with previous traffic stop analyses within the MCSO under the court order.  In particular, stops involving Hispanic or Black drivers were more likely to be longer, involve a search, and result in an arrest than stops involving non-Hispanic or non-Black drivers.  Stops involving Hispanic drivers were more likely to result in citations than other outcomes.

(*Id.* at 22.)   As the Report notes, these findings are consistent with the ASU reports' findings that there were disparate outcomes for traffic stops across race in the MCSO's patrol function.

However, citing to authorities in the field, the Report additionally cautioned that

> [b]ased in part on the limitations of traffic stop analysis, the presence of disparate outcomes does not necessarily indicate the presence of bias. Practitioners and consumers of bias research should understand that disparate outcomes do not definitively indicate bias.  Quantitative analysis cannot capture all the possible reasons that could explain the disparate outcomes.

7

(*Id.* at 5 (citations omitted); *see also id.* at 10 (noting that "as with all statistical techniques to assess outcomes and behavior from law enforcement personnel, the results from these analyses can uncover only likely evidence of disparities in outcomes based on race—they cannot provide insight into the underlying causes of these disparities")).[3]

After applying race-neutral factors such as DUI, language barrier, training, technical issues, and whether a vehicle was towed, the Report concluded that "the length of stop for Hispanic drivers did not differ statistically significantly from non-Hispanic drivers," and that "[t]aken together, the results for the stop length outcomes suggest that the extended stop indicators played a substantial role in understanding the length of stops conducted by MCSO deputies." (Report at 20; *see also id.* at 22 ("[a]nalysis also suggests that the indicators for extended stop reasons may explain the differences in stop lengths better than the perceived race of the driver, a potential area for further inquiry by the MCSO and the analysis team.")).

As with ASU's First Report, CNA's Report concluded that the findings merited additional analysis with respect to disparate outcomes:

> MCSO will use the analyses in this report to better understand traffic stop behavior in the organization and better serve the residents of Maricopa County.  One application might be developing guidance for supervisors and deputies to reduce disparities by race in traffic stop outcomes.  The information in this report will be foundational to the MCSO's efforts to

---

[3]   The Report goes on to explain that

> Even with these limitations, the results from statistical analysis can provide better insight into policing practices in an agency and serve as a useful system for identifying disparate outcomes for action by the agency.  Such a system provides agencies with a tool to review officer traffic stop conduct and determine the necessary actions, if any, for officers and agencies as a whole.

(Report at 5.)

implement data-driven approaches to improving the effectiveness and fairness of partial activity.

(*Id.* at p. 23.)

### 3.      The October 17, 2019 Monitor Site Visit Meeting

The Monitor scheduled a site visit meeting for October 17, 2019 to discuss the Report and the Sheriff's additional traffic stop analysis efforts.  Remarkably, the Motion states as follows with respect to that meeting:

> The Monitor and Plaintiffs' counsel were told that Defendants would be 'prepared to discuss' the Report at the upcoming site visit. Unfortunately, that discussion did not happen.  Despite over two weeks to prepare for discussion on the implications of the Report and what the agency planned to do to comply with the Court's Order,[4] Defendants refused to answer basic questions from the Monitor and Plaintiffs' counsel.

(Motion at 7:14–23.)

This statement is inaccurate and does not fairly reflect what occurred during the site visit meeting.   In fact, MCSO employees and CNA representatives provided substantive answers to numerous and varied questions from both the Monitor and the parties' counsel, not only about the Report and its implications, but what actions MCSO was contemplating taking in light of the Report's findings.[5]   CNA representatives explained that, in order to determine definitively that racial bias is the cause of the disparate outcomes, MCSO would have to rule out all other explanations.  MCSO staff

---

[4]      In the two weeks referenced here, Plaintiffs did not once assert that they had "serious concerns" with the Report's findings.

[5]      The Motion complains that an MCSO employee answered that a deeper dive would be required to better understand the causes of the disparate outcomes identified in the Report.  (Motion at 5:19-23.)  The Sheriff fails to see how this response is insufficient, much less indicative of a refusal to answer.  The Monitor, parties, the Sheriff, and the community surely all share a paramount interest in better understanding, after over six years of First Order implementation, the causes of these disparate outcomes, whether they be due to racial bias exclusively, some other race-neutral factors, or combination of both.

and CNA representatives answered numerous additional questions regarding traffic analysis-related topics, including progress on the monthly analysis methodology—which, as noted above, will take the place of the individual-deputy analysis looking for warning signs and indicia of possible racial profiling in individual conduct previously included in the annual reports—and topics for quarterly studies.  The traffic stop analysis meeting lasted well over its originally-scheduled two hours.

At one point, the Monitoring Team asked an MCSO lieutenant what the Sheriff could conclude from the Report's findings.  The Sheriff, who was present at the time, replied that he should be the one to answer that question in his capacity as head of MCSO, in writing, and after discussing the matter with his staff and legal counsel.  The Monitor accepted the Sheriff's proposal.  Moments later, Plaintiffs' counsel again asked MCSO staff what the Sheriff concluded from the Report's findings, at which point the agreement between the Sheriff and the Monitor about the timing of that response was reiterated, and the meeting moved on.  There was no refusal to answer anything.

Indeed, within 24 hours, the Sheriff provided his answer to the Monitor in written form at the exit meeting.  On October 25, 2019, MCSO published this statement on its website as an addendum to the Report ("Addendum") and on October 28, 2019, the Addendum was filed with the Court.  (Defendant Paul Penzone's Notice of Publication of Addendum to Traffic Stops Analysis Report for July 2017 – December 2018 (Doc. 2474)).

The Addendum states as follows:

> The 4th Traffic Stop Annual Report continues to show disparate outcomes in our traffic stops of minorities.  These disparate outcomes are warning

signs of potential racial bias in our patrol function, which has been and continues to be a major concern for the Office. These may be indicative of a systemic problem. We will continue to work with the Monitor and the parties, on how best to determine the cause of these disparate outcomes and how best to address racial bias in our patrol function, where it exists. We will remain diligent, continue to develop our internal oversight, accountability and consequences to properly address and root out any behaviors in conflict with our commitment to ethical, constitutional policing practices.

(*Id.*).

The Motion complains that the Addendum does not conclude whether the "Report's findings actually indicate that systemic racial bias against the Plaintiff Class persists...." (Motion at 6:18-21.) Apparently, the Motion's position is that because the Report does not definitively conclude that racial bias is the sole cause of the disparate outcomes, the Report must be "inadequate to meet the requirements of the Court's Order." (*Id.* at 6:4–5.) But nothing in the First Order, or any other order entered in this proceeding, requires the Sheriff to conclude that racial bias exists in the patrol function based solely on a finding of disparate outcomes in traffic stops.

Nor does the absence of such a conclusion alter the course of the Sheriff and MCSO to address these findings. As the Sheriff has stated many times before, and most recently reiterated in writing and to the Monitor, parties and public through the Addendum, he continues to be concerned about the presence of these disparate outcomes, precisely because such outcomes are warning signs of potential racial bias. Moreover, the burden of law enforcement activity should not fall arbitrarily and unevenly on certain segments of the community, regardless of cause. That is why the Sheriff and MCSO are committed to conducting further investigation and analysis: to better understand the

disparate outcomes in order to remedy them.  It is unclear why Plaintiffs take issue with this approach.

### B.  The Monitor's Community Meeting

The Court's June 3, 2019 order requires the "Sheriff and/*or the MCSO*," "if requested to do so by the Monitor or the community," to participate in the quarterly community engagement meetings to provide substantive comments related to the Melendres case and the implementation of the orders resulting from it, as well as answer questions related to its implementation.  (Order (Doc. 2431) at 5:3–8 (emphasis added)). The community meeting for the October 2019 site visit marked the transition of meeting management from the Sheriff to the Monitor, and was held at the Maryvale Community Center on October 15, 2019.[6]  Numerous high-ranking MCSO personnel—including, as set forth more fully below, the Sheriff—attended and participated in the meeting, and answered questions from community members.  While the Sheriff admits that there should have been better communication among his staff and between the Monitor regarding his and MCSO's role in the meeting, he takes issue with the Motion's accusation that there was "a lack of meaningful compliance."  (Motion at 1:11–13.)[7]

---

[6]     In ordering the Monitor to take back management of the meetings from the Sheriff, the Court stated: "If the sheriff isn't there – well, I mean, if the sheriff isn't running the meeting – and I would expect that the sheriff should be there maybe for at least part of them – then the opportunity to berate or misuse or abuse the sheriff will not be present…" (Transcript of April 19, 2019 Status Conference (Doc. 2401), at 13:21–25.)

[7]     While the Sheriff was in charge of the meetings, the Monitor deemed him in compliance with all community engagement obligations of the Court's orders, including his obligations with respect to the community meetings.  (Monitor's Eighteenth Quarterly Report (Doc. 2371) at 161-73; *see also* Monitor's Nineteenth Quarterly Report (Doc. 2419) at 158-67.)

12

For example, the Motion complains that even though the MCSO employee who conducted the body worn camera presentation at the meeting "gave a good presentation on the basics," she was not a "sworn officer" and "lacked sufficient knowledge and authority to answer community members' questions."  (Motion at 2:14–16.)  It should be noted that the presenter worked on her presentation for a month leading up to the meeting, and MCSO was not informed of any desire for a sworn officer to conduct the presentation until approximately 24 hours before the meeting.

Moreover, aside from the Motion, the Sheriff is unaware of any complaint from the Monitor, Community Advisory Board member, any meeting attendee, or the DOJ that the presenter "lacked sufficient knowledge and authority to answer community members' questions."   To the contrary, it is the Sheriff's understanding that members of the Monitoring Team were complimentary of the presentation. In any event, as the Motion concedes, there were numerous MCSO personnel on hand, who collectively answered every single question arising from the presentation from community members. MCSO even had representatives of the camera's vendor present to answer questions if needed.

The Motion additionally accuses the Sheriff of "outsourcing" the presentation on the Report to his traffic stop analysis vendor and author of the Report itself, CNA. (Motion at 2:7–8.)  First, as the parties and Monitor have often reminded the Sheriff in the past, his vendor effectively speaks on his behalf when it opines on traffic stop analysis matters.  That was the case with respect to CNA's comments at the meeting.  Second, the Motion neglects to inform the Court that a lieutenant from MCSO's Bureau of Internal Oversight, Traffic Stop Analysis Unit also participated in the meeting and answered

questions from the community about the Report.  Indeed, insofar as the Sheriff and MCSO are aware, all questions asked by community members in attendance about the Report were answered by either MCSO staff or the Sheriff's vendor.

Particularly concerning to the Sheriff is the Motion's claim that the CNA representative made statements during the presentation inconsistent with CNA's own Report when the CNA representative stated that the Report "was not able to uncover actual evidence of bias." (Motion at 2:9–11.)  This accusation is simply untrue.  As noted above, the Report explicitly and repeatedly cautions that disparate outcomes, in and of themselves, cannot causally establish the presence of bias.  Nothing the CNA representative said at the community meeting is at odds with the Report.

Regarding the Sheriff's presence at the meeting, unlike his predecessor, the Sheriff has always been, and continues to be, willing to personally answer difficult questions from the community about his compliance efforts in this case.  Indeed, the Court has previously commended the Sheriff in this regard with respect to his participation at a previous community meeting, stating that

> Law enforcement is a difficult thing.  One of the things that I thought that you did that was very good . . . about all of the questions you took, is you were respectful, you took the heat, you were there as a member of the—as head of the agency that wanted to repair relations with the community, and you took questions, both hard and easy, very courteously.  I think that even though some of those questions may have been angry and not welcome, that you couldn't have done more in the meeting to repair—to start in a positive way to repair relationships.

(Transcript of January 26, 2018 Status Conference (Doc. 2200), at 10:5–14.)  The meeting to which the Court referred was managed by the Sheriff, attended by over 400 people, and

1   the Court described it as "one of the best community meetings I had ever seen." (*Id.* at
2   8:9–10, 23–24.)

3       Unfortunately, with respect to the October 15, 2019 meeting, there was a
4   breakdown in communication among the Sheriff's staff and between the Monitor and the
5   Sheriff with respect to the Sheriff's participation.  While the Monitor did ask  MCSO staff
6   if the Sheriff was attending, the Sheriff's role remained uncertain.  (October 3, 2019 email
7   between MCSO's Chief Deputy and a member of the Monitoring Team, attached hereto as
8   Exhibit A (confirming that the Sheriff "will be present; was not anticipating a designated
9   point to speak at the Community Meeting but will be available to answer questions or
10  conversation specific to him or the Agency from those attending.")).  The Sheriff was not
11  provided a meeting agenda or given any specifics regarding when he was supposed to
12  answer questions, and for how long.
13
14      When the Sheriff arrived at the beginning of the meeting, it was apparent that
15  community attendance exceeded planned expectations: the designated meeting space was
16  too small for the number of community members in attendance.   Many community
17  members inside had to stand, and many other community members could not get in and
18  remained outside the meeting room.   The Sheriff and MCSO staff moved to the back of
19  the room as well as outside to allow for more community members to enter. While waiting
20  to be called inside by the Monitor, the Sheriff stood outside with his security staff and
21  spoke with those community members who could not fit inside.   He answered their
22  questions, some of which were compliance-related, for over an hour. Eventually, the local
23  press covering the meeting focused on the Sheriff outside with their lights and cameras,
24
25
26
27
28

and began following the Sheriff around, effectively preventing the Sheriff from interacting with the community.  The Sheriff did not want to turn the situation into a political spectacle that would take away focus on the community meeting.[8]  Accordingly, and to avoid drawing undue attention to himself and away from the meeting, and with still no word from the Monitor as to if he was to take the stage inside, the Sheriff left.

The Sheriff admits that there could have been, and should have been, better communications regarding his role at the meeting, both within MCSO and between himself and the Monitor. This was the first monitor-led meeting in some time and was a learning experience for all.  At the October 18, 2019 exit meeting, the Sheriff and the Monitor had a conversation about the matter, and the Sheriff believes these communication issues have now been rectified.  Once again, and to be clear, the Sheriff has no hesitancy in fielding questions from the community about MCSO's compliance efforts, as he has done in the past, and looks forward to doing so at future community meetings, if asked by the Monitor or the community to do so.

///

///

///

///

///

///

---

[8]     The Court has made it clear that it does not want the meetings to be hijacked for political ends: "And the sheriff is an elected official, and I did not want these community meetings to be either used against the sheriff or by the sheriff in a way that would not have to do with their real, legitimate purpose."  (Transcript of April 19, 2019 Status Conference (Doc. 2401), at 7:7–11.)

1

**RESPECTFULLY SUBMITTED** this 13th day of November, 2019.

2

ALLISTER ADEL
MARICOPA COUNTY ATTORNEY

3

4

BY: /s/*Brian J. Palmer*

5

JOSEPH I. VIGIL, ESQ.
JOSEPH J. BRANCO, ESQ.

6

BRIAN PALMER, ESQ.
*Attorneys for Defendant Paul Penzone*

7

8

<u>CERTIFICATE OF SERVICE</u>

9

10

I hereby certify that on November 13, 2019, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the CM/ECF System for filing and served on counsel of record via the Court's CM/ECF system.

11

12

13

/s/ J. Barksdale

14

S:\CIVIL\CIV\Matters\CJ\2007\Melendres CJ07-0269\Pleadings\Word\Memo re status conference 111319.docx

15

16

17

18

19

20

21

22

23

24

25

26

27

28