# TWENTY-THIRD REPORT
## Independent Monitor
## for the
## Maricopa County Sheriff's Office



Reporting Period – Fourth Quarter 2019

Chief (Ret.) Robert S. Warshaw

Independent Monitor

May 14, 2020

# Table of Contents

Section 1: Introduction………………………………………………...…………...3

Section 2: Methodology and Compliance Summary………………………..............5

Section 3: Implementation Unit Creation and Documentation Request…………….11

Section 4: Policies and Procedures…………………….………………….………...15

Section 5: Pre-Planned Operations…………………………….…….…………...45

Section 6: Training……………………………………………………...............51

Section 7: Traffic Stop Documentation and Data Collection…………….…............63

Section 8: Early Identification System (EIS)…………….…………….…...............110

Section 9: Supervision and Evaluation of Officer Performance………….................136

Section 10: Misconduct and Complaints…………………………………...............165

Section 11: Community Engagement…………………………………….............169

Section 12: Misconduct Investigations, Discipline, and Grievances………................177

Section 13: Community Outreach and Community Advisory Board………………..265

Section 14: Supervision and Staffing…………………………………….............266

Section 15: Document Preservation and Production……………………….……..270

Section 16: Additional Training……………………………………….............274

Section 17: Complaints and Misconduct Investigations Relating to
Members of the Plaintiff Class…………………………….................275

Section 18: Concluding Remarks……………………………………..............295

Appendix: Acronyms……………………………………………............296

WAI 44671

# Section 1: Introduction

This is the twenty-third report issued in my capacity as the Court-appointed Monitor in the case of *Manuel de Jesus Ortega Melendres, et al., v. Paul Penzone, et al.* (No. CV-07-02513-PHX-GMS), and documents activities that occurred during the fourth quarter of 2019, October 1-December 31, 2019.

On May 13, 2016, the Court issued its Findings of Fact in the civil contempt proceedings that commenced in April 2015. This led to the issuance of a Second Supplemental Permanent Injunction/Judgment Order (Second Order) on July 20, 2016, significantly expanding the duties of the Monitor. Our reports cover the additional requirements of the Second Order while continuing to document MCSO's compliance efforts with the First Supplemental Permanent Injunction/Judgment Order (First Order) issued in October 2013. We provide summaries of compliance with both Orders separately, as well as a summary of MCSO's overall, or combined, compliance.

The compliance Paragraphs of the Second Order commence where the First Order ends, and they are numbered from Paragraph 160 through and including Paragraph 337. Not all are subject to our review. For example, the Second Order outlines the duties of the Independent Investigator and the Independent Disciplinary Authority. These are autonomous positions, not subject to oversight of the Court or its Monitor.

The Second Order also delineates in great detail requirements in the areas of misconduct investigations, training, discipline and discipline review, transparency and reporting, community outreach, document preservation, and misconduct investigations involving members of the Plaintiffs' class. The Court granted the Monitor the authority to supervise and direct all of the investigations that fall into the latter category.

As of the last reporting period, MCSO asserted Full and Effective Compliance with 28 Paragraphs of the First Order, as that term is defined in the First Order. After review, I agreed with their assertions. During this reporting period, on December 9, 2019, MCSO asserted Full and Effective Compliance with four additional Paragraphs, Paragraphs 45, 46, 61, and 89. On January 6, 2020, I agreed with MCSO's assertions, granting MCSO in Full and Effective Compliance with 32 First Order Paragraphs. (See Section 2 of this report.) MCSO retains the obligation to document that the Office remains in Full and Effective Compliance with these Paragraphs.

In our last report, we noted that MCSO published its Fourth Traffic Stop Annual Report (TSAR). This was the first TSAR conducted by MCSO's new contract vendor, CNA. As previously described, CNA's report identified disparities in the treatment of Latinos during traffic stops when compared to White drivers; but the report lacked conclusions regarding what these findings indicated regarding potential systemic issues within MCSO. On October 28, MCSO filed a statement with the Court, noting that the findings in the Fourth TSAR are warning signs of potential racial bias in MCSO's patrol function, and that they may be indicative of a systemic problem. The Sheriff noted that this has been, and continues to be, a major concern for the Office.

WAI 44672

With that filing, for the first time, MCSO achieved Phase 2 compliance with Paragraph 66, which requires that MCSO conduct one agency-wide comprehensive analysis of the data per year. While MCSO has produced previous TSARs, they were fraught with data issues which delayed their release and called into question some of their findings. The Fifth TSAR, which will analyze calendar year 2019 traffic stop data, is slated for publication in April.

Building on the methodologies used for the TSAR, MCSO resumed work on the Traffic Stop Monthly Reports (TSMRs), which have been on hold since July 2017. We discussed the TSMR methodology during our January site visit, and we and the Parties have continued to work with MCSO and its vendor via a series of conference calls since that visit. The TSMR will be tested in a pilot program before being fully implemented, to avoid a repeat of the issues which caused the suspension of production nearly three years ago.

In our previous reports, we documented ongoing improvement in the overall quality of all administrative misconduct investigations conducted by MCSO personnel. We have consistently found investigations conducted by the Professional Standards Bureau (PSB) to be at or near 90% compliance for numerous reporting periods. PSB has both sworn and Detention investigators, the latter primarily responsible for complaints lodged against MCSO jail staff. For this reporting period, sworn investigations were 100% compliant and Detention investigations were 96% compliant. Therefore, for the first time, investigations conducted by PSB reached compliance with the Second Order with a 97% compliance finding.

Unfortunately, the quality of administrative investigations conducted by District and Division personnel has continued to decline for this and the last two reporting periods, with a compliance finding this reporting period of 50%. It is these investigations that have been, and continue to be, the largest obstacle to overall compliance with the requirements for the agency's investigation of misconduct. Given the amount of training that has been provided, along with the several years of experience MCSO supervisors have working with the requirements for properly completing and reviewing investigations, these ongoing deficiencies should not be occurring. MCSO must take additional actions to improve compliance at the District and Division level.

WAI 44673

# Section 2: Methodology and Compliance Summary

The Monitor's primary responsibility is to determine the status of compliance of the Maricopa County Sheriff's Office (MCSO) with the requirements of the requirements in the Order. To accomplish this, the Monitoring Team makes quarterly visits to Maricopa County to meet with the agency's Court Implementation Division (CID) and other Office personnel – at Headquarters, in Patrol District offices, or at the office that we occupy when onsite. We also observe Office practices; review Office policies and procedures; collect and analyze data using appropriate sampling and analytic procedures; and inform the Parties and, on a quarterly basis, the Court, about the status of MCSO's compliance.

This report documents compliance with applicable Order requirements, or Paragraphs, in two phases. For Phase 1, we assess compliance according to whether MCSO has developed and approved requisite policies and procedures, and MCSO personnel have received documented training on their contents. For Phase 2 compliance, generally considered operational implementation, MCSO must demonstrate that it is complying with applicable Order requirements more than 94% of the time, or in more than 94% of the instances under review.

We use four levels of compliance: In compliance; Not in compliance; Deferred; and Not applicable. "In compliance" and "Not in compliance" are self-explanatory. We use "Deferred" in circumstances in which we are unable to fully determine the compliance status – due to a lack of data or information, incomplete data, or other reasons that we explain in the narrative of our report. We will also use "Deferred" in situations in which MCSO, in practice, is fulfilling the requirements of a Paragraph, but has not yet memorialized the requirements in a formal policy.

For Phase 1 compliance, we use "Not applicable" for Paragraphs where a policy is not required; for Phase 2 compliance, we use "Not applicable" for Paragraphs that do not necessitate a compliance assessment.

The tables below summarize the compliance status of Paragraphs tracked in this report.[1] This is our fourteenth quarterly status report in which we report on MCSO's compliance with both the First and Second Orders. During this reporting period, MCSO's Phase 1 compliance rate with the **First Order** remained the same as the last reporting period, at 96%. MCSO's Phase 1 compliance rate with the **Second Order** also remained the same as the last reporting period, at 100%.

---

[1] The percent in compliance for Phase 1 is calculated by dividing the number of Order Paragraphs determined to be in compliance by the total number of Paragraphs requiring a corresponding policy or procedure. Paragraphs with the status of Deferred are included in the denominator, while Paragraphs with the status of Not Applicable are not included. Therefore, the number of Paragraphs included in the denominator totals 183 for Phase 1. The number of Paragraphs included in the denominator totals 207 for Phase 2.

WAI 44674

During this reporting period, MCSO's Phase 2 compliance rate with the **First Order** increased by two percentage points, from 77% to 79%. This number includes Paragraphs that we consider to be in compliance and those that are now in Full and Effective Compliance (FAEC), as described above. (See below for the list of Paragraphs that are in Full and Effective Compliance.) During this reporting period, MCSO's Phase 2 compliance rate with the **Second Order** increased by two percentage points, from 90% to 92%.

| Twenty-Third Quarterly Status Report | | |
|---|---|---|
| **First Order Summary** | | |
| **Compliance Status** | **Phase 1** | **Phase 2** |
| Not Applicable | 20 | 6 |
| Deferred | 0 | 2 |
| Not in Compliance | 3 | 18 |
| In Compliance | 77 | 74[2] |
| **Percent in Compliance** | **96%** | **79%** |

| Twenty-Third Quarterly Status Report | | |
|---|---|---|
| **Second Order Summary** | | |
| **Compliance Status** | **Phase 1** | **Phase 2** |
| Not Applicable | 20 | 10 |
| Deferred | 0 | 2 |
| Not in Compliance | 0 | 7 |
| In Compliance | 103 | 104 |
| **Percent in Compliance** | **100%** | **92%** |

---

[2] This number includes those Paragraphs that are deemed in Full and Effective Compliance.

WAI 44675

| MCSO's Compliance with the Requirements of the **First Order** *(October 2, 2013)* | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **Report 1** | **Report 2** | **Report 3** | **Report 4** | **Report 5** | **Report 6** | **Report 7** | **Report 8** | **Report 9** | **Report 10** |
| **Phase 1** | 4% | 10% | 44% | 40% | 51% | 57% | 61% | 60% | 67% | 60% |
| **Phase 2** | 0% | 0% | 26% | 25% | 28% | 37% | 38% | 39% | 44% | 49% |

| | **Report 11** | **Report 12** | **Report 13** | **Report 14** | **Report 15** | **Report 16** | **Report 17** | **Report 18** | **Report 19** | **Report 20** |
|---|---|---|---|---|---|---|---|---|---|---|
| **Phase 1** | 63% | 79% | 88% | 85% | 85% | 85% | 85% | 97% | 97% | 97% |
| **Phase 2** | 50% | 57% | 67% | 62% | 65% | 64% | 66% | 77% | 75% | 78% |

| | **Report 21** | **Report 22** | **Report 23** |
|---|---|---|---|
| **Phase 1** | 96% | 96% | 96% |
| **Phase 2** | 76% | 77% | 79% |

WAI 44676

| MCSO's Compliance with the Requirements of the **Second Order** *(July 20, 2016)* | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **Report 1** | **Report 2** | **Report 3** | **Report 4** | **Report 5** | **Report 6** | **Report 7** | **Report 8** | **Report 9** | **Report 10** |
| **Phase 1** | N/A | | | | | | | | | 1% |
| **Phase 2** | N/A | | | | | | | | | 43% |

| | **Report 11** | **Report 12** | **Report 13** | **Report 14** | **Report 15** | **Report 16** | **Report 17** | **Report 18** | **Report 19** | **Report 20** |
|---|---|---|---|---|---|---|---|---|---|---|
| **Phase 1** | 10% | 12% | 72% | 75% | 77% | 77% | 78% | 78% | 99% | 99% |
| **Phase 2** | 46% | 60% | 63% | 66% | 72% | 75% | 80% | 81% | 90% | 89% |

| | **Report 21** | **Report 22** | **Report 23** |
|---|---|---|---|
| **Phase 1** | 100% | 100% | 100% |
| **Phase 2** | 91% | 90% | 92% |

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|---|---|---|
| 9 | 12/28/18 | Concurred on 1/28/19 |
| 10 | 12/28/18 | Concurred on 1/28/19 |
| 11 | 12/28/18 | Concurred on 1/28/19 |
| 12 | 12/28/18 | Concurred on 1/28/19 |
| 13 | 12/28/18 | Concurred on 1/28/19 |

WAI 44677

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|---|---|---|
| 23 | 12/28/18 | Concurred on 1/28/19 |
| 26 | 12/28/18 | Concurred on 1/28/19 |
| 27 | 3/22/19 | Concurred on 4/22/19 |
| 28 | 12/28/18 | Concurred on 1/28/19 |
| 29 | 12/28/18 | Concurred on 1/28/19 |
| 30 | 12/28/18 | Concurred on 1/28/19 |
| 31 | 9/9/19 | Concurred on 10/2/19 |
| 34 | 6/3/19 | Concurred on 6/25/19 |
| 35 | 12/28/18 | Concurred on 1/28/19 |
| 36 | 12/28/18 | Concurred on 1/28/19 |
| 37 | 12/28/18 | Concurred on 1/28/19 |
| 38 | 12/28/18 | Concurred on 1/28/19 |
| 40 | 12/28/18 | Concurred on 1/28/19 |
| 45 | 12/9/19 | Concurred on 1/6/20 |
| 46 | 12/9/19 | Concurred on 1/6/20 |
| 48 | 12/28/18 | Did not concur on 1/28/19 |
| 49 | 12/28/18 | Did not concur on 1/28/19 |
| 50 | 12/28/18 | Did not concur on 1/28/19 |
| 51 | 12/28/18 | Did not concur on 1/28/19 |
| 55 | 12/28/18 | Concurred on 1/28/19 |
| 59 | 12/28/18 | Concurred on 1/28/19 |
| 60 | 12/28/18 | Concurred on 1/28/19 |
| 61 | 12/9/19 | Concurred on 1/6/20 |
| 68 | 12/28/18 | Concurred on 1/28/19 |
| 71 | 12/28/18 | Concurred on 1/28/19 |

WAI 44678

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|---|---|---|
| 77 | 12/28/18 | Concurred on 1/28/19 |
| 84 | 9/9/19 | Concurred on 10/2/19 |
| 88 | 12/28/18 | Concurred on 1/28/19 |
| 89 | 12/9/19 | Concurred on 1/6/20 |
| 101 | 12/28/18 | Concurred on 1/28/19 |
| 106 | 6/3/19 | Concurred on 6/25/19 |

WAI 44679

**COURT ORDER III.  MCSO IMPLEMENTATION UNIT AND INTERNAL AGENCY-WIDE ASSESSMENT (***Court Order wording in italics***)**

*Paragraph 9.  Defendants shall hire and retain, or reassign current MCSO employees to form an interdisciplinary unit with the skills and abilities necessary to facilitate implementation of this Order.  This unit shall be called the MCSO Implementation Unit and serve as a liaison between the Parties and the Monitor and shall assist with the Defendants' implementation of and compliance with this Order.  At a minimum, this unit shall: coordinate the Defendants' compliance and implementation activities; facilitate the provision of data, documents, materials, and access to the Defendants' personnel to the Monitor and Plaintiffs representatives; ensure that all data, documents and records are maintained as provided in this Order; and assist in assigning implementation and compliance-related tasks to MCSO Personnel, as directed by the Sheriff or his designee.  The unit will include a single person to serve as a point of contact in communications with Plaintiffs, the Monitor and the Court.*

**In Full and Effective Compliance**

To verify Phase 2 compliance with this Paragraph, we reviewed the monthly personnel rosters for the Court Implementation Division (CID).  As of this reporting period, CID has 10 personnel: one captain; one lieutenant; three sergeants; two deputies; one management analyst; one management assistant; and one administrative assistant.  CID continues to be supported by MCAO attorneys, who frequently participate in our meetings and telephone calls with Division personnel.

During this reporting period, CID continued to provide documents through MCSO's counsel via an Internet-based application.  The Monitoring Team, the Plaintiffs, and the Plaintiff-Intervenors receive all files and documents simultaneously, with only a few exceptions centering on open internal investigations.  CID effectively facilitates our and Parties' access to MCSO's personnel.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 44680

***Paragraph 10.*** *MCSO shall collect and maintain all data and records necessary to: (1) implement this order, and document implementation of and compliance with this Order, including data and records necessary for the Monitor to conduct reliable outcome assessments, compliance reviews, and audits; and (2) perform ongoing quality assurance in each of the areas addressed by this Order. At a minimum, the foregoing data collection practices shall comport with current professional standards, with input on those standards from the Monitor.*

**In Full and Effective Compliance**

CID continues to be responsive to our requests. CID also addresses with immediacy any issues we encounter in the samples we request – be they technical issues, missing documents, or other problems. MCSO's Bureau of Internal Oversight (BIO) routinely audits the work products of the Office, particularly in the areas that directly affect compliance with the requirements of the Orders. In many instances, BIO will review the same material we request in our samples, and BIO frequently notes – and addresses – the same deficiencies we identify in our reviews.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.


***Paragraph 11.*** *Beginning with the Monitor's first quarterly report, the Defendants, working with the unit assigned for implementation of the Order, shall file with the Court, with a copy to the Monitor and Plaintiffs, a status report no later than 30 days before the Monitor's quarterly report is due. The Defendants' report shall (i) delineate the steps taken by the Defendants during the reporting period to implement this Order; (ii) delineate the Defendants' plans to correct any problems; and (iii) include responses to any concerns raised in the Monitor's previous quarterly report.*

**In Full and Effective Compliance**

As of this writing, MCSO has not submitted its quarterly report as required by this Paragraph. We will include the report information upon its submittal.

WAI 44681

***Paragraph 12.*** *The Defendants, working with the unit assigned for implementation of the Order, shall conduct a comprehensive internal assessment of their Policies and Procedures affecting Patrol Operations regarding Discriminatory Policing and unlawful detentions in the field as well as overall compliance with the Court's orders and this Order on an annual basis. The comprehensive Patrol Operations assessment shall include, but not be limited to, an analysis of collected traffic-stop and high-profile or immigration-related operations data; written Policies and Procedures; Training, as set forth in the Order; compliance with Policies and Procedures; Supervisor review; intake and investigation of civilian Complaints; conduct of internal investigations; Discipline of officers; and community relations. The first assessment shall be conducted within 180 days of the Effective Date. Results of each assessment shall be provided to the Court, the Monitor, and Plaintiffs' representatives.*

**In Full and Effective Compliance**

See Paragraph 13.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

***Paragraph 13.*** *The internal assessments prepared by the Defendants will state for the Monitor and Plaintiffs' representatives the date upon which the Defendants believe they are first in compliance with any subpart of this Order and the date on which the Defendants first assert they are in Full and Effective Compliance with the Order and the reasons for that assertion. When the Defendants first assert compliance with any subpart or Full and Effective Compliance with the Order, the Monitor shall within 30 days determine whether the Defendants are in compliance with the designated subpart(s) or in Full and Effective Compliance with the Order. If either party contests the Monitor's determination it may file an objection with the Court, from which the Court will make the determination. Thereafter, in each assessment, the Defendants will indicate with which subpart(s) of this Order it remains or has come into full compliance and the reasons therefore. The Monitor shall within 30 days thereafter make a determination as to whether the Defendants remain in Full and Effective Compliance with the Order and the reasons therefore. The Court may, at its option, order hearings on any such assessments to establish whether the Defendants are in Full and Effective Compliance with the Order or in compliance with any subpart(s).*

**In Full and Effective Compliance**

We and CID established that the schedule for the submission of comprehensive annual assessments as required by these Paragraphs will run according to MCSO's fiscal year cycle, July 1-June 30. MCSO will submit reports on or before September 15 of each year.

WAI 44682

Consistent with this agreement, on September 16, 2019 (September 15 fell on a Sunday), MCSO filed with the Court its 2018 Annual Compliance Report covering the period of July 1, 2018-June 30, 2019.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 44683

# Section 4: Policies and Procedures

**COURT ORDER V. POLICIES AND PROCEDURES**

***Paragraph 18.*** *MCSO shall deliver police services consistent with the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order, and with current professional standards. In conducting its activities, MCSO shall ensure that members of the public receive equal protection of the law, without discriminating based on actual or perceived race or ethnicity, and in a manner that promotes public confidence.*

***Paragraph 19.*** *To further the goals in this Order, the MCSO shall conduct a comprehensive review of all Patrol Operations Policies and Procedures and make appropriate amendments to ensure that they reflect the Court's permanent injunction and this Order.*

**Phase 1:** In compliance

- GA-1 (Development of Written Orders), most recently amended on February 19, 2020.

**Phase 2:** In compliance

MCSO has taken steps toward a comprehensive review of its Patrol Operations Policies and Procedures in four phases. First, on December 31, 2013, prior to my appointment as Monitor, MCSO filed with the Court all of its policies and procedures, with amendments, that MCSO believed complied with the various Paragraphs of the First Order. Second, in the internal assessment referenced above, MCSO discussed its ongoing evaluation of Patrol Operations and its development of policies and procedures. Third, in response to our requests, MCSO provided all of the policies and procedures it maintains are applicable to the First Order for our review and that of the Plaintiffs. We provided our feedback, which also included the Plaintiffs' comments, on these policies on August 12, 2014. Based on that feedback, MCSO made adjustments to many of the policies, concentrating first on the policies to be disseminated in Detentions, Arrests, and the Enforcement of Immigration-Related Laws Training; and the Bias Free Policing Training (often referred to as Fourth and Fourteenth Amendment Training) that commenced in early September. We reviewed MCSO's updated policies and provided our approval for several on August 25, 2014.

Fourth, in discussions during 2016, MCSO requested more specific guidance on what we considered to be Patrol-related policies and procedures. In response, we provided MCSO with a list of the Patrol-related policies for the purposes of Paragraph 19. We included on this list policies that were not recently revised or currently under review. Several policies required changes to comport with the First Order, Second Order, or both. In 2018, MCSO published the last of the outstanding policies, placing it into compliance with this Paragraph.

WAI 44684

***Paragraph 20.*** *The MCSO shall comply with and operate in accordance with the Policies and Procedures discussed in this Order and shall take all reasonable measures to ensure that all Patrol Operations personnel comply with all such Policies and Procedures.*

***Paragraph 21.*** *The MCSO shall promulgate a new, department-wide policy or policies clearly prohibiting Discriminatory Policing and racial profiling. The policy or policies shall, at a minimum:*

a.  *define racial profiling as the reliance on race or ethnicity to any degree in making law enforcement decisions, except in connection with a reliable and specific suspect description;*

b.  *prohibit the selective enforcement or non-enforcement of the law based on race or ethnicity;*

c.  *prohibit the selection or rejection of particular policing tactics or strategies or locations based to any degree on race or ethnicity;*

d.  *specify that the presence of reasonable suspicion or probable cause to believe an individual has violated a law does not necessarily mean that an officer's action is race-neutral; and*

e.  *include a description of the agency's Training requirements on the topic of racial profiling in Paragraphs 48–51, data collection requirements (including video and audio recording of stops as set forth elsewhere in this Order) in Paragraphs 54–63 and oversight mechanisms to detect and prevent racial profiling, including disciplinary consequences for officers who engage in racial profiling.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on March 15, 2019.

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 26, 2018.

- EA-11 (Arrest Procedures), most recently amended on June 18, 2019.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on October 25, 2019.

- EB-2 (Traffic Stop Data Collection), most recently amended on January 7, 2020.

- GI-1 (Radio and Enforcement Communications Procedures), most recently amended on February 5, 2020.

- GJ-33 (Significant Operations), most recently amended on May 10, 2018.

WAI 44685

**Phase 2:** Not applicable

MCSO has developed and published the policies required by Paragraph 21. MCSO distributed these policies and has trained agency personnel during the required Fourth and Fourteenth Amendment training, on an annual basis, since 2014.

MCSO's implementation of these policies is covered in other Paragraphs.

*Paragraph 22. MCSO leadership and supervising Deputies and detention officers shall unequivocally and consistently reinforce to subordinates that Discriminatory Policing is unacceptable.*

**Phase 1:** In compliance

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 26, 2018.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on October 25, 2019.

**Phase 2:** In compliance

With input from the Parties, the reinforcement of CP-8 (Preventing Racial and Other Bias-Based Policing) was modified to a two-step process conducted annually. MCSO describes Part 1 of the process as the following: "On an annual basis, within the first six months, supervisors will have discussions, either individual or group, and view videos from the Training library with assigned employees, reserve deputies, and Posse members. The videos will be available through the HUB and attestation of the training will be through the HUB." Part 2 of the process as described by MCSO: "On an annual basis, within the last six months, supervisors shall ensure that all employees, reserve deputies, and Posse members complete their annual review and acknowledgment of office policy. In addition, employees will be required to view a video from the Sheriff or designee, which reinforces the policy. Acknowledgement is done through the HUB."

As an additional measure, supervisors will have the latitude to review and discuss the policy with their employees; and document the discussion in Blue Team. MCSO will provide proof of compliance biannually, at the end of the six-month periods, when each of the elements of the process is completed. MCSO will also provide progress reports in the interim.

During the last reporting period, we found that MCSO did not fulfill its training requirements for the first six months of 2019, as it pertains to this Paragraph. As to compliance in the second half of 2019, in October, we approved a video by the Sheriff that introduces the CP-8 training to employees. Employees were required to review the video, review the policy, and answer test questions. In our previous report, we stated that the introductory video and CP-8 review would fulfill the training requirements for the second half of 2019, if completed by the due date. MCSO

reported that CP-8 training for the second half of 2019 was completed. As proof of compliance, MCSO submitted HUB reports for all classifications. We reviewed the documentation submitted to verify compliance. The compliance rate for the second half of 2019 for sworn was 97.25%; for Detention, 97.49%; for civilians, 97.76%; for Posse, 100%; for Reserve deputies, 100%; and for retired Reserve deputies, 96.15%. For the second half of 2019, we found MCSO in compliance with this Paragraph.


**Paragraph 23.** *Within 30 days of the Effective Date, MCSO shall modify its Code of Conduct to prohibit MCSO Employees from utilizing County property, such as County e-mail, in a manner that discriminates against, or denigrates, anyone on the basis of race, color, or national origin.*

**In Full and Effective Compliance**

BIO uses a randomizing program to select samples for each inspection. BIO reviews CAD messages in an effort to identify compliance with CP-2 (Code of Conduct), CP-3 (Workplace Professionalism: Discrimination and Harassment), and GM-1 (Electronic Communications, Data and Voice Mail). In its submission, MCSO includes the specific nature of any potential concerns identified during the audits. We observed the processes BIO uses to conduct CAD and email audits, to ensure that we thoroughly understand the mechanics involved in conducting these audits. For CAD and email audits, we receive copies of the audits completed by BIO, the details of any violations found, and copies of the memoranda of concern or BIO Action Forms that are completed.

During our October 2019 site visit, MCSO proposed changing the Email and CAD/Alpha Paging Inspections to a quarterly schedule, and we agreed. For Email inspections, MCSO will inspect 50 employees per quarter, and for CAD/Alpha Paging, MCSO will inspect 15 days per quarter. The new methodology became effective in the fourth quarter of 2019, for October, November, and December.

For this reporting period, the fourth quarter of 2019, MCSO submitted CAD and Alpha Paging Inspection Report BI2019-0178, as proof of compliance with this Paragraph. MCSO selected a random sample of 15 days in the quarter for inspection. There were a total of 63,224 CAD and Alpha Paging entries for the selected dates. The inspection found that 100% of the inspected messages were in compliance.

Also for this reporting period, MCSO submitted Employees Emails Inspection Report BI2019-0187, as proof of compliance. A total of 50 employees were selected for review, with a total of 18,314 emails inspected. The inspection found that 18,311, or 99.98%, of the emails were in compliance. The inspection found that two emails contained non-business-related information, and one email contained an unauthorized background image. The employees responsible for the emails worked in Towers Jail, Fourth Avenue Jail, and Central Intake. BIO generated three Action Forms for the noted deficiencies.

WAI 44687

During this reporting period, BIO conducted facility inspections of the Professional Standards Bureau (PSB), the Sheriff's Information Management Services (SIMS), and Patrol District 6. On October 23, 2019, BIO conducted an inspection of PSB, inspection report BI2019-0145. PSB's headquarters is located in a downtown office building, separate from MCSO headquarters. PSB consists of a total of 50 employees, of which 20 are sworn, 23 are Detention, and seven are civilian. PSB is responsible for investigating all criminal and administrative allegations of misconduct involving agency employees. During the inspection, Audits and Inspection personnel found that the facilities were properly secured, and that access was granted only to assigned personnel. Any other approved persons must present credentials or have key card access. The inspection resulted in a 96.88% compliance rating.

For November, BIO conducted a facility inspection of the Sheriff's Information Management Services (SIMS), inspection report BI2019-0151. The SIMS Division oversees control of all custody-related information processes and services, and is co-located with the Fourth Avenue Jail. The Division is headed by a civilian commander, and has 61 civilian employees, 12 Detention officers, and two Detention supervisors. The Division operates 24 hours a day, seven days a week. The inspection found that the facility was properly secured, and found no areas of weakness or security concerns. The SIMS Division's responsibilities are information management, so the property and evidence portion of the inspection was not applicable. The inspection resulted in an overall 100% compliance rating. For December, BIO conducted a facility inspection of Patrol District 6, inspection report BI2019-0173. District 6 has a total of 47 employees, which includes 42 deputies, one Reserve deputy, and four civilian employees. District 6 is composed primarily of the Town of Queen Creek, which has a contract with MCSO for law enforcement services. There were no deficiencies noted in the inspection. The inspection resulted in a 100% compliance rating,

All monthly inspection reports noted there was no evidence indicating that any of the facilities were used in a manner that would discriminate, or denigrate anyone on the basis of race, color, national origin, age, religious beliefs, gender, culture, sexual orientation, veteran status, or disability. We reviewed the Matrix Checklist used for these inspections, and it contains a specific question regarding the use of any Office or County equipment that would violate this Paragraph. During our January visits to Districts 1, 2, and 6, we observed no evidence to indicate a violation of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 44688

***Paragraph 24.*** *The MCSO shall ensure that its operations are not motivated by or initiated in response to requests for law enforcement action based on race or ethnicity. In deciding to take any law enforcement action, the MCSO shall not rely on any information received from the public, including through any hotline, by mail, email, phone or in person, unless the information contains evidence of a crime that is independently corroborated by the MCSO, such independent corroboration is documented in writing, and reliance on the information is consistent with all MCSO policies.*

**Phase 1:** In compliance

- GI-7 (Processing of Bias-Free Tips), published June 14, 2019.

**Phase 2:** In compliance

MCSO created the Sheriff's Intelligence Leads and Operations (SILO) Unit in the first quarter of 2016. The SILO Unit became operational on September 11, 2017. GI-7 requires that any tips received by MCSO components be forwarded to the SILO Unit for recording and processing. The SILO Unit classifies this information by the type of alleged criminal activity, or service requested, and forwards it to the appropriate Unit for action and response. In some cases, residents email or call with requests for traffic enforcement, or for MCSO to address quality-of-life issues; these are considered calls for service rather than tips on criminal activity. If the information provided pertains to criminal activity in another jurisdiction, MCSO forwards the information to the appropriate law enforcement agency and documents it in the SILO database. Generally, if there is any bias noted in the information received, MCSO closes the tip and takes no action. We review all tips that MCSO closes due to bias.

During this reporting period, we reviewed 268 tips submitted for October, 226 tips submitted for November, and 261 tips submitted for December. We reviewed a total of 755 tips, which were classified and recorded according to the type of alleged violation or service requested. Our reviews for this reporting period indicated that warrants and drugs comprised the largest numbers of tips. Suspicious activity is the third most frequent type of tip that may have actionable information. A large percentage of tips were classified as "information only" and "other." During this reporting period, there were no tips closed due to bias. MCSO remains in compliance with this Paragraph.

WAI 44689

***b. Policies and Procedures to Ensure Bias-Free Traffic Enforcement***

***Paragraph 25.*** *The MCSO will revise its policy or policies relating to traffic enforcement to ensure that those policies, at a minimum:*

a.  *prohibit racial profiling in the enforcement of traffic laws, including the selection of which vehicles to stop based to any degree on race or ethnicity, even where an officer has reasonable suspicion or probable cause to believe a violation is being or has been committed;*

b.  *provide Deputies with guidance on effective traffic enforcement, including the prioritization of traffic enforcement resources to promote public safety;*

c.  *prohibit the selection of particular communities, locations or geographic areas for targeted traffic enforcement based to any degree on the racial or ethnic composition of the community;*

d.  *prohibit the selection of which motor vehicle occupants to question or investigate based to any degree on race or ethnicity;*

e.  *prohibit the use of particular tactics or procedures on a traffic stop based on race or ethnicity;*

f.  *require deputies at the beginning of each stop, before making contact with the vehicle, to contact dispatch and state the reason for the stop, unless Exigent Circumstances make it unsafe or impracticable for the deputy to contact dispatch;*

g.  *prohibit Deputies from extending the duration of any traffic stop longer than the time that is necessary to address the original purpose for the stop and/or to resolve any apparent criminal violation for which the Deputy has or acquires reasonable suspicion or probable cause to believe has been committed or is being committed;*

h.  *require the duration of each traffic stop to be recorded;*

i.  *provide Deputies with a list and/or description of forms of identification deemed acceptable for drivers and passengers (in circumstances where identification is required of them) who are unable to present a driver's license or other state-issued identification; and*

j.  *instruct Deputies that they are not to ask for the Social Security number or card of any motorist who has provided a valid form of identification, unless it is needed to complete a citation or report.*

**Phase 1:** In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on October 25, 2019.

WAI 44690

- EB-2 (Traffic Stop Data Collection), most recently amended on January 7, 2020.

- GI-1 (Radio and Enforcement Communications Procedures), most recently amended on February 5, 2020.

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 26, 2018.

- EA-11 (Arrest Procedures), most recently amended on June 18, 2019.

**Phase 2:** In compliance

During the finalization of the Fourth and Fourteenth Amendment training curricula required by the Order, the Parties agreed to a list and/or description of forms of identification deemed acceptable for drivers and passengers, as required by this Paragraph. The data required for verification to ensure compliance with these policies is captured by the TraCS system. The system documents the requirements of the Order and MCSO policies. MCSO has continued to make technical changes to the TraCS system to ensure that the mandatory fields on the forms used to collect the data are completed and that deputies are capturing the required information. TraCS is a robust system that allows MCSO to make technical changes to improve how required information is captured.

To verify Phase 2 compliance with this Paragraph, we reviewed MCSO's Vehicle Stop Contact Form (VSCF), Vehicle Stop Contact Form Supplemental Sheet, Incidental Contact Receipt, Written Warning/Repair Form, Arizona Traffic Ticket and Complaint Form, Internet I/Viewer Event Form, Justice Web Interface Form, CAD printout, and any Incident Report generated by the traffic stop. MCSO created many of these forms to capture the requirements of Paragraphs 25 and 54.

Since our July 2015 site visit, there has been significant improvement in the TraCS system that has enhanced the reliability and validity of the data provided by MCSO. This improvement has been buttressed by the introduction of data quality control procedures now being implemented and memorialized in the EIU Operations Manual. (This is further discussed in Paragraph 56, below.) We also compared traffic stop data between Latino and non-Latino drivers in the samples provided to us.

Paragraph 25.a. prohibits racial profiling in the enforcement of traffic laws, including the selection of which vehicles to stop based to any degree on race or ethnicity, even where a deputy has reasonable suspicion or probable cause to believe a violation is being or has been committed. The selection of the sample size and the sampling methodology employed for drawing our sample is detailed in Section 7: Traffic Stop Documentation and Data Collection.

We review a sample of 105 traffic stops each reporting period in relation to this requirement. Our review of the sample of 105 traffic stops that occurred during this reporting period in Districts 1, 2, 3, 4, 6, and 7, and Lake Patrol indicated that MCSO was following protocol, and that the stops

WAI 44691

did not violate the Order or internal policies. During our January 2020 site visit, we met with the commanding officers from Districts 2 and 6, who advised us that the Districts had not received any complaints during this reporting period from Latino drivers alleging racial profiling. We interviewed the District Commanders and inquired if the District had received any complaints alleging selective enforcement targeting specific communities or enforcement based on race. The District Commanders were not aware of any complaints alleging racial or ethnic-based traffic enforcement. Paragraphs 66 and 67 require an annual comprehensive analysis of all traffic stop data, which will more accurately determine if MCSO is meeting the requirements of this Paragraph. MCSO remains in compliance with this Subparagraph.

Paragraph 25.b. requires MCSO to provide deputies with guidance on effective traffic enforcement, including the prioritization of traffic enforcement resources to promote public safety. EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), Sections A-E, address these concerns. The policy specifies that driving under the influence and speeding are the main causes of accidents, and should be the focus of traffic enforcement. Based on our review of the data provided for this reporting period, the most common traffic stop violations are as follows: 58 stops for speed above the posted limit (55%); 10 stops for failure to obey official traffic control devices (10%); seven stops for failure to possess valid registrations or tags (7%); 12 stops for equipment violations (11%); five stops for failure to maintain a lane of traffic (5%); and 13 stops for other moving violations (12%).

As the policy specifically identifies speeding violations as one of the contributing factors of traffic accidents, MCSO deputies have targeted this violation. In our review, we break down the specific traffic violation for each stop and use each traffic stop form completed by deputies during the stop to make a determination if the stop is justified and fulfills the requirements of this Paragraph. MCSO remains in compliance with this Subparagraph.

Paragraph 25.c. requires MCSO to prohibit the selection of particular communities, locations, or geographic areas for targeted traffic enforcement based to any degree on the racial or ethnic composition of the community. During our inspection, we document the location of every stop and note the GPS coordinates if available. Our review of the sample data covering all MCSO Districts during this reporting period did not indicate that MCSO was targeting any specific area or ethnicity to conduct traffic stops. During our January 2020 visits to District 2 and 6, we inquired if the District Commanders had received any complaints from the public regarding MCSO enforcement activities in their communities. No complaints were received with regard to racial or ethnic-based targeted enforcement.

MCSO is in compliance with this Subparagraph.

Paragraph 25.d. requires MCSO to prohibit the selection of which motor vehicle occupants to question or investigate based, to any degree, on race or ethnicity. We reviewed the demographic data of Maricopa County (according to 2018 U.S. Census data, 31.1% of the population is Latino), and found that the ratio of Latino drivers stopped during this reporting period was higher than in

WAI 44692

the past reporting period in comparison to the ethnicity of the population in the County. (See Paragraph 54.e.) Seventeen (30%) of the 57 stops where passenger contacts occurred involved Latino drivers.

A review of citizen complaints for this reporting period did not reveal that any complaints were filed alleging that MCSO deputies selected motor vehicle occupants for questioning or investigation, based on the individual's race or ethnicity.

MCSO has fully implemented body-worn cameras, and we review a sample of the recordings each reporting period to verify if deputies are questioning occupants to determine if they are legally in the country. There were one such event identified during this reporting period that is described in detail under Paragraph 62, which summarizes a recently closed case by the Professional Standards Bureau (PSB).

During this reporting period, we observed that 34 of the 105 stops occurred during nighttime hours. During our visits to Districts 2 and 6 in January 2020, we inquired if any Latino drivers or passengers made any complaints regarding deputies using particular tactics or procedures to target Latinos. None of the personnel we interviewed were aware of any complaints alleging discrimination or the targeting of Latinos in traffic enforcement. Our review of the sample data indicated that generally, traffic stops were not based on race or ethnicity and reflected the general makeup of the population of the County. MCSO is in compliance with this Subparagraph.

Paragraph 25.e. requires MCSO to prohibit the use of particular tactics or procedures on a traffic stop based on race or ethnicity. We reviewed a sample of CAD audio recordings and CAD printouts where the dispatcher entered the reason for the stop when advised by the deputy in the field. We also reviewed body-worn camera recordings of deputies making traffic stops. The methodology that we employed to select our cases is described in detail in Section 7. In the cases we reviewed, the CAD audio recordings and the body-worn camera recordings revealed that deputies were not making traffic stops using tactics based on race or ethnicity.

MCSO remains in compliance with this Subparagraph.

Paragraph 25.f. requires deputies at the beginning of each stop, before making contact with the vehicle, to verbally contact dispatch and state the reason for the stop unless exigent circumstances make it unsafe for the deputy to contact Communications. When the deputy advises Communications of the location, tag number, and reason for the stop, this information is digitally logged on the CAD printout and it is audio recorded. (See Paragraph 54.e.) We reviewed 30 CAD audio recordings and the CAD printouts; in each, the deputy advised dispatch of the reason for the stop. Through our reviews of BWC recordings and CAD printouts, we verified that the reason for the stop was voiced prior to making contact with the drivers in 30 of the 30 cases we reviewed. For the 75 other cases that were part of our sample, we reviewed the VSCFs and the CAD printouts to ensure that deputies properly advised dispatch of the reason for the stop prior to making contact with the violator. In all 75 stops, the deputy properly advised dispatch the reason for the stop. MCSO is in compliance with this Subparagraph.

WAI 44693

Paragraph 25.g. prohibits deputies from extending the duration of any traffic stop longer than the time that is necessary to address the original purpose for the stop and/or to resolve any apparent criminal violation for which the deputy has or acquires reasonable suspicion or probable cause to believe has been committed or is being committed. MCSO employs a series of five questions on the VSCF to document the circumstances that might require a stop to be prolonged. In our review of 105 traffic stops, we determined that MCSO documented a response to at least one of the series of five questions in 12 of the stops. Our review of those stops revealed that in seven instances, the deputies indicated that they experienced a technological difficulty. The duration of those seven stops ranged from 12 minutes to 23 minutes. There were five stops that involved the training of an MCSO employee. The duration of those five stops ranged from 15 minutes to 27 minutes. There was one stop that involved the arrest and processing of a person for driving under the influence. The duration of that stop was one hour and six minutes. There was one stop that involved the towing of a vehicle. The duration of that stop was 50 minutes.

During our review, we noted an additional six stops that were extended for reasons other than those that were identified via the five questions and responses employed on the VSCF. There were five stops that involved the seizure of evidence. The duration of those five stops ranged from 26 minutes to 35 minutes. The sixth stop involved a driver who had never been issued a driver's license. The deputy conducted a records check to determine whether the passenger, the driver's parent, had a valid driver's license prior to releasing the vehicle to the passenger. The duration of the stop was 35 minutes.

MCSO remains in compliance with this Subparagraph.

Paragraph 25.h. requires the duration of each traffic stop to be recorded. The time of the stop and its termination is now auto-populated on the VSCF by the CAD system. To ensure data entry accuracy, MCSO implemented a technical change to the TraCS system on November 29, 2016. The change automatically creates a red field in the stop contact times if the deputy manually changes these times on the VSCF. In our review, we determined that the duration was recorded accurately in all 105 traffic stops. MCSO is in compliance with this Subparagraph, with a compliance rate of 100%.

Paragraph 25.i. requires that MCSO provide deputies with a list and/or description of forms of identification deemed acceptable for drivers and passengers (in circumstances where identification is required of them) who are unable to present a driver's license or other state-issued identification. The Plaintiffs' attorneys and MCSO have agreed on acceptable forms of identification, and this information has been included in the Fourth and Fourteenth Amendment training. EA-11 (Arrest Procedures), most recently amended on June 18, 2019, provides a list of acceptable forms of identification if a valid driver's license cannot be produced. During this reporting period's review of the sample of 105 traffic stops, there were eight drivers who did not present a valid driver's license to deputies; however, in two of the stops, the deputies were able to verify that the driver's licenses were valid after conducting a records check. The remaining six cases are described in detail below:

WAI 44694

- A White male driver was stopped for driving with one headlight. The vehicle was occupied by a White female. The driver produced an Arizona identification card. The driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license. The passenger, who had a valid driver's license, was allowed to drive the vehicle.

- A White male driver was stopped for a speeding violation. The driver's license was in a suspended status. The deputy seized the driver's license and placed it in evidence. The driver was issued a citation for the speeding violation and driving with a suspended driver's license violation.

- A Latino driver was stopped for a speeding violation. The driver's license was in a suspended status. The deputy advised the driver to follow up regarding his license being suspended. The driver was issued a citation for the speeding violation.

- A Black male driver was stopped for a speeding violation. The driver's license was in a suspended status. The deputy seized the driver's license and placed it in evidence. The driver was issued a citation for the speeding violation and the driving with a suspended license violation.

- A Latino driver was stopped for a fail to yield violation. The vehicle was occupied by two Latino passengers. The driver did not have any identification on his person. The driver's license was in a suspended status. The driver was issued a citation for driving with a suspended license.

- A Black female driver was stopped for a stop sign violation. The vehicle was occupied by a Black female passenger. The driver only had an expired driver's license permit in her possession. The driver was issued a citation for the stop sign violation and the driving with no valid license violation.

In our review of the sample of cases in relation to Paragraph 54.k., searches of persons, there were 32 drivers who did not present a valid driver's license to deputies; however, in three of the stops, the deputies were able to verify that the driver's licenses were valid after conducting records checks. The remaining 29 cases are described in detail below:

- A Black female driver was stopped for failing to obey a traffic control device. The vehicle was occupied by a Black female passenger. The driver produced an Arizona driver's license. A records check revealed that the driver's license was in a suspended status and that there was a warrant for her arrest. The driver was arrested, and the vehicle was towed. The driver was issued a citation for failing to obey a traffic control device and for driving with a suspended driver's license.

- A Latino driver was stopped for failing to maintain a lane of traffic. The driver produced a Mexican driver's license. The deputy arrested and processed the driver for driving under the influence. The deputy also seized marijuana during the traffic stop. The driver was

issued a citation for failing to maintain a lane of traffic. Any potential charges regarding driving under the influence and possession of narcotics will be determined after a review by the Maricopa County Attorney's Office.

- A White male driver was stopped for blockading traffic. The driver produced an Arizona identification card. A records check revealed that the driver's license was in a revoked status. The driver was arrested. The driver was issued a citation for blockading traffic.

- A White male driver was stopped for driving with an expired registration. The driver produced an Arizona identification card. A records check revealed that the driver's license was in a suspended status and that there was a warrant for his arrest. The driver was arrested. The driver was issued a citation for driving with a suspended driver's license and no current registration.

- A Latino driver was stopped for an excessive speeding violation. The driver produced a Mexican passport. The driver stated he had never obtained a driver's license. A records check confirmed that he had never obtained a driver's license and that a felony warrant existed for his arrest. The driver was arrested. The driver was issued a citation for excessive speeding and driving with no valid driver's license.

- A White male driver was stopped for driving with an expired registration. The driver produced an Arizona driver's license. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license, no insurance, and no current registration.

- A White male driver was stopped for driving with one headlight. The vehicle was occupied by a White female. The driver had no identification on his person. The driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license, no current registration, no insurance, and driving with one headlight.

- A White male driver was stopped for speeding in a school zone violation. The driver produced an Arizona identification card. A records check revealed that the driver's license was in a revoked status. The driver was issued a citation for speeding in a school zone and driving with a suspended driver's license.

- A Latino driver was stopped for an excessive speeding violation. The driver had no identification on his person. A records check revealed that the driver's license was in a suspended status and that he had a warrant for his arrest. The driver was arrested, and he was issued a citation for driving with a suspended driver's license and no current registration.

- A Black male driver was stopped for driving with an expired registration. The vehicle was occupied by two Black males, who were children. The driver had no identification on his person. A records check revealed that the driver's license was in a suspended status

WAI 44696

and that he had a warrant for his arrest. The driver was arrested. The driver was issued a citation for driving with a suspended driver's license, no insurance, and no current registration. The mother of the two children arrived at the location to pick them up.

- A Latino driver was stopped for driving with an expired registration. The vehicle was occupied by two Latino passengers and one Latina passenger, all of whom were children. The driver had no identification on his person. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license, no insurance, and no current registration. The children were picked up by family members.

- A Latino driver was stopped for driving with an expired registration. The driver produced an Arizona identification card. A records check revealed that the driver's license was in a suspended status and that he had a warrant for his arrest. The driver was arrested. The driver was issued a citation for driving with a suspended driver's license, driving with an expired license plate, and no current registration.

- A Latino driver was stopped after being observed in the parking lot of a local business where fresh paint was used to deface property. The vehicle was occupied by two White female passengers and one Black male passenger. The driver had no identification on his person. A records check revealed he had never obtained a driver's license. The driver was issued a citation for being under the age of 21 and operating a motor vehicle after consuming alcohol. The driver was also arrested for defacing private property.

- An American Indian/Alaskan Native male driver was stopped for a speeding violation. The driver had no identification on his person. A records check revealed that his driver's license was in a suspended status and that he had a warrant for his arrest. The driver was arrested. The driver was issued a citation for driving with a suspended driver's license and speeding.

- A Black male driver was stopped for a stop sign violation. The driver produced an Arizona identification card. A records check revealed that the driver's license issued from the state of California was in a suspended status. The driver was issued a citation for the stop sign violation and the driving with no valid license violation. During the stop, the deputy detected the odor of marijuana and seized marijuana from the vehicle; and placed the narcotics in evidence.

- A Latino driver was stopped for driving with an expired license plate. The driver produced an Arizona driver's license. A records check revealed that the driver's license was in a suspended status. The driver was arrested for driving with a suspended driver's license and his driver's license was seized and placed in evidence. The driver was issued a citation for no current registration and driving with a suspended driver's license.

WAI 44697

- A White male driver was stopped for driving with a suspended license plate. The vehicle was occupied by a White male passenger. The driver produced an Arizona driver's license. A records check revealed that the driver's license was in a suspended status and that he had a warrant for his arrest. The driver was arrested, and his driver's license was seized and placed in evidence. The driver was issued a citation for displaying an expired license plate, no insurance, and driving with a suspended driver's license. The deputy also seized the vehicle's license plate and suspected narcotics that were located in the vehicle.

- A White male driver was stopped for driving with an expired registration. The vehicle was occupied by a White female passenger. The driver had no identification on his person. A records check revealed that the driver's license was in a revoked status. The driver was arrested. The driver was issued a citation for driving with a revoked driver's license, no insurance, and no current registration. The deputy seized the license plate and placed it in evidence.

- A White male driver was stopped for driving with one headlight. The driver had no identification on his person. A records check revealed the driver had never obtained a driver's license and that there was a warrant for his arrest. The driver was arrested. The driver was issued a citation for driving with one headlight and driving with no valid driver's license.

- A White male driver was stopped for driving with an expired registration. The driver had no identification on his person. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license and no current registration.

- An American Indian/Alaskan Native male driver was stopped for driving with no headlights activated. The vehicle was occupied by an Asian or Pacific Islander male passenger. The driver produced an Arizona driver's license. The driver was arrested and processed for driving under the influence. A records check revealed the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license and driving under the influence.

- A White male driver was stopped for driving with a suspended license plate. The vehicle was occupied by a White male passenger. The driver had no identification on his person. A records check revealed that the driver's license was in a suspended status and that there was a warrant for his arrest. The driver was not arrested due to having an apparent medical condition. The driver was issued a citation for driving with a suspended driver's license, displaying a suspended license plate, and no insurance. The vehicle was towed, and the deputy seized the license plate and placed it in evidence.

- A Latino driver was stopped for failing to maintain a lane of traffic. The driver produced an Arizona identification card. A records check revealed the driver had never obtained a

driver's license. The driver was arrested and processed for driving under the influence. The deputy also seized narcotics and narcotic paraphernalia during the traffic stop. The driver was issued a citation for failing to maintain a lane of traffic and driving under the influence.

- A White male driver was stopped for a speeding violation. The driver produced an Arizona driver's license. A records check revealed that the driver's license was in a suspended status. The driver was arrested and processed for driving under the influence. The driver was issued a citation for excessive speeding, open alcohol in a motor vehicle, littering, unauthorized possession of prescription medication, and driving under the influence.

- A White male driver was stopped for a speeding violation. The driver produced an Arizona driver's license. A records check revealed that the driver's license was in a suspended status and that there was a warrant for his arrest. The driver was arrested. The driver was issued a citation for driving with a suspended driver's license.

- A White male driver was stopped for driving with a suspended license plate. The vehicle was occupied by a White male passenger. The driver produced an Arizona driver's license. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license, displaying a suspended license plate, and no insurance. The deputy seized the license plate and placed it in evidence.

- A White male driver was stopped for driving with an expired registration. The driver produced an Arizona identification card. A records check revealed that the driver's license was in a suspended status and that there was a warrant for his arrest. The driver was arrested. The driver was issued a citation for driving with a suspended driver's license and no current registration.

- A White female driver was stopped for a speeding violation. The vehicle was occupied by a White male passenger. The driver had no identification on her person. After investigating the driver, the deputy determined that she initially provided a false name and date of birth to the deputy. The driver was arrested for providing false information to a law enforcement officer; and during a search of her person, the deputy located narcotic paraphernalia. Once the deputy obtained the driver's true name and date of birth, it was determined that her driver's license was revoked and that a warrant from a local jurisdiction existed. During a search of the vehicle, the deputy recovered suspected narcotics, narcotic paraphernalia, and a handgun. The driver was arrested and processed for driving under the influence. The deputy prepared a report for the review of the Maricopa County Attorney's Office for potential criminal charges in relation to this traffic stop.

WAI 44699

- A White male driver was stopped for driving with an expired registration. The driver produced a Michigan identification card. A records check revealed that the driver's license issued from the state of Arizona was in a revoked status and that there was a warrant for her arrest. The driver was arrested. The driver was issued a citation for driving with a suspended driver's license, no insurance, and no current registration.

In our review of the sample of cases in relation to Paragraphs 25.d. and 54.g., passenger contacts, we identified 23 cases where the drivers did not present a valid driver's license to the deputies. In four of the cases, the deputies were able to confirm that the driver's licenses were, in fact, valid. The remaining 19 cases are described in detail below:

- A White female driver was stopped for driving with one headlight. The vehicle was occupied by a White female passenger. The driver produced an Arizona identification card. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license. The passenger, who had a valid driver's license, was allowed to drive the vehicle.

- A White female driver was stopped for a speeding violation. The vehicle was occupied by two White male passengers and two White female passengers. The driver produced an Arizona driver's license. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license and speeding. The deputy seized the driver's license and placed it in evidence.

- A Latino driver was stopped for driving with a suspended license plate. The vehicle was occupied by a Latino passenger. The driver did not have any identification on his person. A records check revealed that the driver's license was in a suspended status and that he had numerous driving violations. The driver was arrested for driving with a suspended driver's license. The driver was issued a citation for driving with a suspended driver's license and no insurance.

- A Black male driver was stopped for a stop sign violation. The vehicle was occupied by two Black male passengers and one Black female passenger. The driver produced an Arizona identification card. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license, a stop sign violation, and having no insurance.

- A Latino driver was stopped for a speeding violation. The vehicle was occupied by a Latino passenger and a male infant, unknown race/ethnicity. The driver produced an Arizona identification card. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license.

- A White female driver was stopped for a speeding violation. The vehicle was occupied by a White male passenger. The driver did not have any identification on her person. A

WAI 44700

records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license and speeding.

- A Latino driver was stopped for making an improper wide turn violation. The vehicle was occupied by two Latino passengers. The driver produced an Arizona identification card. A records check revealed that the driver's license was in a suspended status. The driver was arrested and processed for driving under the influence. The driver was issued a citation for making an improper wide turn. The deputy prepared a report for the review of the Maricopa Attorney's Office for potential charges in relation to driving under the influence.

- A Latino driver was stopped for driving with no headlights. The vehicle was occupied by a Latino passenger and a Latina passenger. The driver did not have any identification on his person. A records check revealed that the driver had never obtained a driver's license. The driver was issued a citation for driving with no valid driver's license.

- A Latina driver was stopped for driving with one headlight. The vehicle was occupied by a Latina passenger. The driver did not have any identification on her person. A records check revealed that the driver had never obtained a driver's license. The driver was issued a citation for driving with one headlight and driving with no valid driver's license.

- A White male driver was stopped for a speeding violation. The vehicle was occupied by a White female passenger. The driver produced an Arizona driver's license. A records check revealed that the driver's license was in a suspended status. The driver's license was seized by the deputy and placed in evidence. The driver was issued a citation for driving with a suspended driver's license and speeding.

- A Latino driver was stopped for driving with one headlight. The vehicle was occupied by a Latino passenger. The driver did not have any identification on his person. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with one headlight and driving with a suspended driver's license.

- A Latino driver was stopped for driving with no taillights activated. The vehicle was occupied by a Latino passenger. The driver did not have any identification on his person. A records check revealed that the driver had never obtained a driver's license. The driver was issued a citation for driving with no taillights and driving with no valid driver's license.

- A Latino driver was stopped for driving with one headlight. The vehicle was occupied by two Latino passengers. The driver did not have any identification on his person. A records check revealed that the driver had never obtained a driver's license. The driver was issued a citation for driving with one headlight and driving with no valid driver's license.

- A Latina driver was stopped for driving with no headlights and taillights activated. The vehicle was occupied by three Latino passengers and one Latina passenger. The driver

did not have any identification on her person. A records check revealed that the driver had never obtained a driver's license. The driver was issued a citation for driving with no headlights and taillights activated, driving with no valid driver's license, and for a child passenger restraint violation.

- A Latina driver was stopped for a stop sign violation. The vehicle was occupied by a Latina passenger and one Latino child passenger, gender unknown. The driver did not have any identification on her person. A records check revealed that the driver had never obtained a driver's license. The driver was issued a citation for driving with no valid driver's license and for a child passenger restraint violation.

- A White male driver was stopped for making an improper lane change. The vehicle was occupied by two White female passengers. The driver did not have any identification on his person. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license and no insurance.

- A Latino driver was stopped for driving with a suspended license plate. The vehicle was occupied by a White female passenger and two Latina passengers. The driver produced an Arizona driver's license. A records check revealed that the driver's license was in a suspended status. The driver's license was seized by the deputy and placed in evidence. The driver was issued a citation for driving with a suspended driver's license and driving with a suspended license plate.

- A Latino driver was stopped for driving with a broken taillight. The vehicle was occupied by four Latino passengers. The driver produced a Mexican passport. The driver stated that his Mexican driver's license was valid. The deputy was unable to verify that information; however, he determined that the driver did not have an Arizona driver's license. The driver was issued a citation for driving with no valid driver's license and no insurance.

- A White male driver was stopped for driving with an improper license plate affixed to the vehicle. The vehicle was occupied by a White male passenger and three White female passengers. The driver produced a driver's license issued from the State of Florida. A records check revealed that the driver's license was in a suspended status. The deputy issued the driver a citation for driving with no valid driver's license.

MCSO remains in compliance with this Subparagraph.

WAI 44702

Paragraph 25.j. requires MCSO to instruct deputies that they are not to ask for the Social Security Number or card of any motorist who has provided a valid form of identification, unless it is needed to complete a citation or report. EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) prohibits deputies from asking for the Social Security Number of any motorist who has provided a valid form of identification. During this reporting period's review of the sample of 105 traffic stops, we did not identify any cases where a deputy requested the Social Security Number or card of a driver.

During this reporting period's review of the sample of traffic stops reviewed for Paragraph 54.k. and Paragraphs 25.d. and 54.g., we identified that deputies requested a driver's Social Security Number in incidents that either involved the arrest of the driver for the purpose of completing an Incident Report, or incidents where the driver did not produce a valid form of identification, both of which are permissible under this Subparagraph.

MCSO remains in compliance with this Subparagraph.

**Paragraph 26.** *The MCSO shall revise its policy or policies relating to Investigatory Detentions and arrests to ensure that those policies, at a minimum:*

a. *require that Deputies have reasonable suspicion that a person is engaged in, has committed, or is about to commit, a crime before initiating an investigatory seizure;*

b. *require that Deputies have probable cause to believe that a person is engaged in, has committed, or is about to commit, a crime before initiating an arrest;*

c. *provide Deputies with guidance on factors to be considered in deciding whether to cite and release an individual for a criminal violation or whether to make an arrest;*

d. *require Deputies to notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration-Related Crime, or for any crime by a vehicle passenger related to lack of an identity document;*

e. *prohibit the use of a person's race or ethnicity as a factor in establishing reasonable suspicion or probable cause to believe a person has, is, or will commit a crime, except as part of a reliable and specific suspect description; and*

f. *prohibit the use of quotas, whether formal or informal, for stops, citations, detentions, or arrests (though this requirement shall not be construed to prohibit the MCSO from reviewing Deputy activity for the purpose of assessing a Deputy's overall effectiveness or whether the Deputy may be engaging in unconstitutional policing).*

**In Full and Effective Compliance**

MCSO reported no incidents or arrests that would fall under the reporting requirements of this Paragraph during the fourth quarter of 2019. To determine compliance with this Paragraph, we review booking lists and criminal citation lists for each month of the reporting period. From each list, we select a 10% random sample of incidents. For this reporting period, we reviewed 60 incidents resulting in arrest and 60 incidents in which criminal citations were issued. In addition, we reviewed 244 Incident Reports. All of the documentation we reviewed during this reporting period indicates that MCSO is in compliance with this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

### d. Policies and Procedures Governing the Enforcement of Immigration-Related Laws

***Paragraph 27.*** *The MCSO shall remove discussion of its LEAR Policy from all agency written Policies and Procedures, except that the agency may mention the LEAR Policy in order to clarify that it is discontinued.*

**In Full and Effective Compliance**

MCSO asserts that it does not have an agency LEAR policy. We have verified, through our document reviews and site compliance visits, that MCSO does not have a LEAR policy.

On March 22, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

***Paragraph 28.*** *The MCSO shall promulgate a new policy or policies, or will revise its existing policy or policies, relating to the enforcement of Immigration-Related Laws to ensure that they, at a minimum:*

a.      *specify that unauthorized presence in the United States is not a crime and does not itself constitute reasonable suspicion or probable cause to believe that a person has committed or is committing any crime;*

b.      *prohibit officers from detaining any individual based on actual or suspected "unlawful presence," without something more;*

c.      *prohibit officers from initiating a pre-textual vehicle stop where an officer has reasonable suspicion or probable cause to believe a traffic or equipment violation has been or is being committed in order to determine whether the driver or passengers are unlawfully present;*

WAI 44704

d.    prohibit the Deputies from relying on race or apparent Latino ancestry to any degree to select whom to stop or to investigate for an Immigration-Related Crime (except in connection with a specific suspect description);

e.    prohibit Deputies from relying on a suspect's speaking Spanish, or speaking English with an accent, or appearance as a day laborer as a factor in developing reasonable suspicion or probable cause to believe a person has committed or is committing any crime, or reasonable suspicion to believe that an individual is in the country without authorization;

f.    unless the officer has reasonable suspicion that the person is in the country unlawfully and probable cause to believe the individual has committed or is committing a crime, the MCSO shall prohibit officers from (a) questioning any individual as to his/her alienage or immigration status; (b) investigating an individual's identity or searching the individual in order to develop evidence of unlawful status; or (c) detaining an individual while contacting ICE/CBP with an inquiry about immigration status or awaiting a response from ICE/CBP.  In such cases, the officer must still comply with Paragraph 25(g) of this Order.  Notwithstanding the foregoing, an officer may (a) briefly question an individual as to his/her alienage or immigration status; (b) contact ICE/CBP and await a response from federal authorities if the officer has reasonable suspicion to believe the person is in the country unlawfully and reasonable suspicion to believe the person is engaged in an Immigration-Related Crime for which unlawful immigration status is an element, so long as doing so does not unreasonably extend the stop in violation of Paragraph 25(g) of this Order;

g.    prohibit Deputies from transporting or delivering an individual to ICE/CBP custody from a traffic stop unless a request to do so has been voluntarily made by the individual;

h.    Require that, before any questioning as to alienage or immigration status or any contact with ICE/CBP is initiated, an officer check with a Supervisor to ensure that the circumstances justify such an action under MCSO policy and receive approval to proceed. Officers must also document, in every such case, (a) the reason(s) for making the immigration-status inquiry or contacting ICE/CBP, (b) the time approval was received, (c) when ICE/CBP was contacted, (d) the time it took to receive a response from ICE/CBP, if applicable, and (e) whether the individual was then transferred to ICE/CBP custody.

**In Full and Effective Compliance**

WAI 44705

For this reporting period, there were no reported instances of deputies having contact with Immigration and Customs Enforcement (ICE) or Customs and Border Protection (CBP) for the purpose of making an immigration status inquiry, and there were no reported arrests for any immigration-related investigations, or for any immigration-related crimes. The reviews of documentation submitted for this reporting period indicate that MCSO has complied with the reporting requirements related to Paragraph 28. In our reviews of incidents involving contact with the public, including traffic stops, arrests, and investigative stops, we monitor deputies' actions to verify compliance with this Order.

In addition to documentation MCSO provided in response to this Paragraph, our reviews of documentation provided for other Paragraphs of this Order have found no evidence to indicate a violation of this Paragraph. In total, we reviewed 60 Arrest Reports, 60 criminal citations, 311 traffic stops, 70 NTCFs, and 244 Incident Reports for this reporting period. We found no issues of concern, as it relates to this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

### e. Policies and Procedures Generally

**Paragraph 29.** *MCSO Policies and Procedures shall define terms clearly, comply with applicable law and the requirements of this Order, and comport with current professional standards.*

**In Full and Effective Compliance**

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

See Paragraph 30.


**Paragraph 30.** *Unless otherwise noted, the MCSO shall submit all Policies and Procedures and amendments to Policies and Procedures provided for by this Order to the Monitor for review within 90 days of the Effective Date pursuant to the process described in Section IV. These Policies and Procedures shall be approved by the Monitor or the Court prior to their implementation.*

**In Full and Effective Compliance**

MCSO continues to provide us, the Plaintiffs' attorneys, and the Plaintiff-Intervenors with drafts of its Order-related policies and procedures prior to publication, as required by the Order. We, the Plaintiffs' attorneys, and the Plaintiff-Intervenors review the policies to ensure that they define terms clearly, comply with applicable law and the requirements of the Order, and comport with current professional standards. Once drafts are finalized, incorporating the feedback of the

WAI 44706

Plaintiffs' attorneys, the Plaintiff-Intervenors, and the Monitoring Team, MCSO provides them to us for final review and approval. As this process has been followed for the Order-related policies published thus far, MCSO is in compliance with this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 31.** *Within 60 days after such approval, MCSO shall ensure that all relevant MCSO Patrol Operation Personnel have received, read, and understand their responsibilities pursuant to the Policy or Procedure. The MCSO shall ensure that personnel continue to be regularly notified of any new Policies and Procedures or changes to Policies and Procedures. The Monitor shall assess and report to the Court and the Parties on whether he/she believes relevant personnel are provided sufficient notification of and access to, and understand each policy or procedure as necessary to fulfill their responsibilities.*

**In Full and Effective Compliance**

GA-1 indicates that Office personnel shall be notified of new policies and changes to existing policies via Briefing Boards and via the HUB, Maricopa County's adaptation of the online training software program, Cornerstone, that MCSO implemented in July 2017 to replace its E-Policy system. Per GA-1, "Prior to some policies being revised, time-sensitive changes are often announced in the Briefing Board until the entire policy can be revised and finalized." As noted previously, we recognize the authority of Briefing Boards and understand their utility in publishing critical policy changes quickly, but we have advised MCSO that we generally do not grant Phase 1 compliance for an Order requirement until the requirement is memorialized in a more formal policy.

During this reporting period, MCSO issued (or issued revisions of) four Order-related policies: EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance); GC-7 (Transfer of Personnel); GJ-24 (Community Relations and Youth Programs); and GJ-35 (Body-Worn Cameras). During this reporting period, MCSO also issued several Briefing Boards and Administrative Broadcasts that touched on Order-related topics and revised the language of General Orders. MCSO also published one Order-related operations manual during this reporting period, a revised version of the Court Implementation Division (CID) Operations Manual.

As noted above, the HUB replaced E-Policy, after several delays related to licensing and other technical issues, in July 2017. Employees are required to complete personal attestations that indicate that they have read and understand policies; the HUB routinely updates recent training and policy reviews for deputies and is visible by immediate supervisors.

WAI 44707

On September 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

***Paragraph 32.*** *The MCSO shall require that all Patrol Operation personnel report violations of policy; that Supervisors of all ranks shall be held accountable for identifying and responding to policy or procedure violations by personnel under their command; and that personnel be held accountable for policy and procedural violations. The MCSO shall apply policies uniformly.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on March 15, 2019.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on January 24, 2019.

- CP-5 (Truthfulness), most recently amended on April 4, 2019.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

- GC-16 (Employee Grievance Procedures), most recently amended on April 2, 2019.

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 27, 2019.

- Administrative Services Division Operations Manual, published on June 17, 2019.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** Not in compliance

Since we began reviewing internal investigations conducted by MCSO, we have reviewed more than 900 administrative misconduct investigations submitted to our Team for this Paragraph. During our reviews, we have continued to note improvement in those cases investigated by PSB, but cases investigated at the District level have shown a significant decrease in compliance during this and the last two reporting periods.

During each site visit, we meet with the Professional Standards Bureau (PSB) and District and Division Command personnel to provide them with information regarding the cases that we find to be deficient in structure, format, investigation, or reporting requirements. We also highlight cases we find to be properly investigated and in full compliance with Order requirements. In 2016, PSB developed and implemented the use of an investigative checklist and specific format for the completion of internal investigations. MCSO trained all supervisors who conduct investigations in the use of these documents. Since June 1, 2016, the use of these investigative protocol documents has been required for all administrative investigations.

WAI 44708

PSB personnel have remained responsive to our feedback, and the investigations they submit for compliance with this Paragraph continue to be examples of complete and thorough investigations. PSB's reviews of investigations conducted by District personnel continue to be thorough and they have identified and addressed many concerns and deficiencies they have found.

During this and the last two reporting periods, we have noted a continuing decline in compliance for District administrative misconduct investigations. Compliance had dropped from 77% to 56% over the last two quarters, and dropped to 40% for this reporting period. This is concerning, particularly since MCSO has been conducting misconduct investigations under the Court's Second Order since 2016. In 2017, MCSO made major revisions to both GH-2 (Internal Investigations) and GC-16 (Employee Grievance Procedures). By the end of December 2017, all supervisory personnel responsible for conducting misconduct investigations had attended the 40-hour Misconduct Investigative Training. In both 2018 and 2019, supervisors attended additional training on the proper completion of these investigations.

During this reporting period, there were only a small number of investigations conducted by District personnel that were submitted for our review. Of the five submitted for this Paragraph, we, or PSB, identified deficiencies with three. Two were returned to Districts by PSB after review for corrections.

During our site visits, our Team makes numerous visits to MCSO Districts, where we discuss the completion of administrative misconduct investigations by District personnel. We discuss those areas of the investigations where we continue to find deficiencies and provide input regarding the proper completion of investigations. We also seek information from District supervisors regarding their experience with the investigation process and any ongoing concerns they may have.

During our visits to Districts 1, 2, and 6 in January 2020, we spoke with sworn supervisors and command personnel about administrative misconduct investigations. In all three Districts, the personnel we talked to believe that the quality of investigations completed by their personnel continues to improve. District personnel acknowledged the ongoing assistance of PSB and spoke highly of the most recent eight-hour training. Supervisory personnel in all three Districts noted that conducting these investigations, and completing other administrative tasks, is time-consuming and limits the amount of time supervisors can be out on the street and available to their personnel. Personnel also noted that the experience level of supervisors is lower than in the past – due to the number of employee promotions – which can also impact both the quality and timely completion of investigations. In one District, personnel advised us that a second supervisor now sits in on interviews, that questions are prepared and reviewed in advance of interviews, and that a second review of investigations is conducted prior to forwarding them to PSB. We encourage these positive efforts to improve the quality of investigations.

WAI 44709

Since March 2018, we have requested and reviewed a monthly report from District Command personnel that documents any actions they have taken to assist their personnel in the completion of administrative misconduct investigations and any actions they have taken to address any deficiencies they have identified. We have observed in these reports that District Command personnel have identified and addressed some concerns with the completion of these investigations. We have noted that MCSO has employed intervention strategies, including additional training; mentoring; one-on-one coaching; documentation in Supervisory Notes; and in one case, the initiation of an internal misconduct investigation when other intervention strategies were unsuccessful.

During the last reporting period, we noted six instances where Deputy Chiefs met with District Commanders to discuss deficient investigations or concerns with investigations conducted by their personnel which were not addressed prior to forwarding the cases to PSB. In those cases, supervisors held one-on-one discussions and made Blue Team entries. We also noted one instance where a District Commander identified and addressed a deficient investigation prior to forwarding it to PSB.

During this reporting period, we found no instances where Deputy Chiefs met with District Command personnel to discuss deficient investigations. We found four instances where a District Commander identified a deficiency or concern with an investigation. In these four cases, the Commander documented one-on-one meetings with the involved employees; and made Blue Team entries. We also noted that PSB identified four deficiencies regarding District Command level review of investigations that were submitted during this reporting period, and PSB forwarded these concerns to the appropriate Deputy Chiefs to be addressed. We continue to closely monitor these interventions to ensure that appropriate corrective actions are being taken to address any ongoing deficiencies that are found.

During the last reporting period, we reviewed all 49 administrative misconduct investigations submitted for compliance with this Paragraph. District supervisors completed 37, and PSB completed 12. All the investigations completed by PSB were in compliance with investigative and administrative requirements. Of the 37 conducted by Districts, 55% were in compliance with Order requirements. This was a decrease of 3% from the prior reporting period.

During this reporting period, we reviewed all eight administrative misconduct investigations submitted for compliance with this Paragraph. PSB conducted three of these investigations, and District personnel conducted the remaining five. Sworn supervisors with the rank of sergeant or higher completed all the investigations conducted at the District level. There were nine potential policy violations included in the eight cases. Four of the investigations resulted from external complainants, and four were internally generated. All eight investigations were initiated and completed after July 20, 2016. All five were also initiated after the new investigation and discipline policies became effective in May 2017, and after the completion of the 40-hour Misconduct Investigative Training that was completed in late 2017.

WAI 44710

Of the eight administrative investigations we reviewed for this Paragraph, three resulted in sustained findings against one or more employees. We concur with the sustained findings in all three of the investigations. Discipline for these cases included a Written Reprimand and two eight-hour suspensions. In all three cases, the PSB Commander properly identified the category and offense number, as well as the presumptive discipline or range of discipline for the sustained allegations. The Appointing Authority did not overturn any of the findings; and in all three, the final discipline was the presumptive discipline established by the PSB Commander.

All eight cases we reviewed for this Paragraph were completed on or after July 20, 2016. Of the three investigations conducted by PSB, one was not completed within the 85-day timeframe. An appropriate extension was requested and approved. Of the five investigations conducted at the District level, two were not completed within the 60-day timeframe. Appropriate extension requests were authored and approved in both cases.

District personnel outside PSB conducted five of the investigations that MCSO submitted for review for this Paragraph. All were completed after July 20, 2016. We found two (40%) in compliance with all investigative and documentation requirements. We have concerns with three of the cases. We note that unlike several previous reporting periods, we did not identify any instances where there were improper findings, a lack of detail in the investigation, or a failure to conduct all necessary interviews. Our non-compliant findings for the three investigations this reporting period involved: one case with multiple administrative errors; one case where a training need was not identified and addressed; and one case where there was a potential policy concern that was not addressed. Two cases were returned to the Districts for corrections. All five cases investigated in the Districts were initiated and conducted after the 40-hour Misconduct Investigative Training completed in late 2017.

For this and the past two reporting periods, we have noted a continuing decline in compliance with this Paragraph in those investigations conducted at the District level. We acknowledge that the number of cases submitted for this reporting period was small compared to previous reporting periods, and that we did not find substantive investigative deficiencies in those cases submitted. However, all of the cases submitted this reporting period were initiated after several years of working under the requirements of the Court, after training in how to conduct misconduct investigation, and after numerous site visit meetings where our Team identified the kinds of deficiencies we noted during this reporting period.

Our review of cases submitted for review this reporting period indicates ongoing overall compliance in those investigations conducted by PSB. Of the 12 investigations PSB submitted during the last quarter, 92% were compliant. During this reporting period, all three investigations PSB submitted (100%) were compliant with the requirements of this Paragraph. District investigations, however, have continued to show a decrease in compliance for this and the last two reporting periods, from 77% to 58% to 55%; and this reporting period, compliance is 40%. As is our practice, we will discuss those cases that we found non-compliant with MCSO personnel during our next site visit.

**Paragraph 33.** *MCSO Personnel who engage in Discriminatory Policing in any context will be subjected to administrative Discipline and, where appropriate, referred for criminal prosecution. MCSO shall provide clear guidelines, in writing, regarding the disciplinary consequences for personnel who engage in Discriminatory Policing.*

**Phase 1:** In compliance

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 26, 2018.
- GH-2 (Internal Investigations), most recently amended on June 28, 2019.
- GC-17 (Employee Disciplinary Procedures), most recently amended on June 27, 2019.

**Phase 2:** In compliance

The investigations that we review for compliance with this Paragraph do not include biased policing complaints involving the Plaintiffs' class. Those investigations have additional compliance requirements and are discussed in Paragraphs 275-283.

During the last reporting period, we reviewed two investigations submitted in compliance with this Paragraph. Both cases were compliant with the requirements of this Paragraph.

During this reporting period, there were no investigations submitted by PSB and reviewed by our Team where external allegations of discriminatory policing were made.

MCSO remains in compliance with the requirements of this Paragraph.

While discriminatory policing allegations that involve members of the Plaintiffs' class are not reported in this Paragraph, we note that MCSO completed four investigations this reporting period that were determined to be Class Remedial Matters. Paragraphs 275-288 contain our review and compliance findings for these four investigations.


**Paragraph 34.** *MCSO shall review each policy and procedure on an annual basis to ensure that the policy or procedure provides effective direction to MCSO Personnel and remains consistent with this Order, current law and professional standards. The MCSO shall document such annual review in writing. MCSO also shall review Policies and Procedures as necessary upon notice of a policy deficiency during audits or reviews. MCSO shall revise any deficient policy as soon as practicable.*

**In Full and Effective Compliance**

MCSO continues to review on an annual basis all critical policies and all policies relevant to the Court Orders for consistency with Constitutional policing, current law, and professional standards.

WAI 44712

During this reporting period, MCSO conducted its annual review on 12 (25%) of the 48 required policies.  These policies included:  CP-3 (Workplace Professionalism and Harassment); CP-5 (Truthfulness); CP-11 (Anti-Retaliation); EB-2 (Traffic Stop Data Collection); GC-7 (Transfer of Personnel); GE-3 (Property Management and Evidence Control); GF-3 (Criminal History Record Information); GI-1 (Radio Communications); GI-7 (Processing of Bias-Free Tips); GJ-3 (Search and Seizure); GJ-24 (Community Relations and Youth Programs); and GJ-35 (Body-Worn Cameras).

On June 3, 2019, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 44713

# Section 5: Pre-Planned Operations

***Paragraph 35.*** *The Monitor shall regularly review the mission statement, policies and operations documents of any Specialized Unit within the MCSO that enforces Immigration-Related Laws to ensure that such unit(s) is/are operating in accordance with the Constitution, the laws of the United States and State of Arizona, and this Order.*

**In Full and Effective Compliance**

To verify Phase 2 compliance with this Paragraph, we previously verified that the Criminal Employment Unit (CEU) was disbanded and removed from the Special Investigations Division organizational chart. The Human Smuggling Unit (HSU) was also disbanded and personnel reassigned to the Anti-Trafficking Unit (ATU).

During our review of the arrests made by the Special Investigations Division ATU between March 2015-March 2017, we did not note any arrests for immigration or human smuggling violations. The cases submitted by MCSO and reviewed for the ATU were primarily related to narcotics trafficking offenses.

MCSO reported in April 2017 that it had disbanded the Anti-Trafficking Unit and formed a new unit, Fugitive Apprehension and Tactical Enforcement (FATE). The primary mission of FATE is to locate and apprehend violent fugitives. We reviewed FATE's mission statement and objectives, as well as the organizational chart for the Special Investigations Division. MCSO had removed the ATU from the organizational chart, and the mission of FATE did not include any reference to the enforcement of Immigration-Related Laws.

The revised organizational chart for SID and documentation provided by MCSO regarding the implementation of FATE supported that the ATU no longer existed, and that there were no specialized Units in MCSO that enforced Immigration-Related Laws.

During the last reporting period, we received and reviewed the most current Special Investigations Division Operations Manual and organizational chart. Both confirmed that MCSO has no specialized Units that enforce Immigration-Related Laws, that the Human Smuggling Unit (HSU) was disbanded, and the Anti-Trafficking Unit (ATU) no longer exists.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 44714

***Paragraph 36.*** *The MCSO shall ensure that any Significant Operations or Patrols are initiated and carried out in a race-neutral fashion. For any Significant Operation or Patrol involving 10 or more MCSO personnel, excluding posse members, the MCSO shall develop a written protocol including a statement of the operational motivations and objectives, parameters for supporting documentation that shall be collected, operations plans, and provide instructions to supervisors, deputies and posse members. That written protocol shall be provided to the Monitor in advance of any Significant Operation or Patrol.*

**In Full and Effective Compliance**

Since the requirements for conducting Significant Operations were implemented, MCSO has reported conducting only one Significant Operation that invoked the requirements of this Paragraph. "Operation Borderline" was conducted from October 20-27, 2014, to interdict the flow of illegal narcotics into Maricopa County. MCSO met all the requirements of this Paragraph during the operation.

In February 2016, we became aware of "Operation No Drug Bust Too Small" when it was reported in the media, and requested details on this operation from MCSO. After reviewing the documentation provided by MCSO, we were satisfied that it did not meet the reporting requirements of this Paragraph.

In October 2016, we became aware of "Operation Gila Monster" when it was reported in the media. According to media reports, this was a two-week operation conducted by a special operations Unit in MCSO and was intended to interdict the flow of illegal drugs into Maricopa County. We requested all documentation regarding this operation for review. The documentation indicated that this operation was conducted from October 17-23, 2016. The documentation provided by MCSO was sufficient for us to determine that this operation did not meet the reporting criteria for this, or other Paragraphs, related to Significant Operations. The Plaintiffs also reviewed the documentation submitted by MCSO on this operation and agreed that the operation did not invoke the requirements of this Paragraph. We and the Plaintiffs noted that "Operation Gila Monster" involved traffic stops of Latinos, and that those arrested were undocumented Latinos.

We continue to review documentation submitted for this Paragraph by all Districts, the Enforcement Support Division, and the Investigations Division on a monthly basis. During this reporting period, and since October 2014, MCSO continues to report that it has not conducted any additional Significant Operations. In addition, we have not learned of any potential Significant Operation through media releases or other sources during this reporting period. We will continue to monitor and review any operations we become aware of to ensure continued compliance with this and other Paragraphs related to Significant Operations. During this reporting period, we did not learn of any Significant Operations conducted by MCSO.

WAI 44715

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

*Paragraph 37. The MCSO shall submit a standard template for operations plans and standard instructions for supervisors, deputies and posse members applicable to all Significant Operations or Patrols to the Monitor for review pursuant to the process described in Section IV within 90 days of the Effective Date. In Exigent Circumstances, the MCSO may conduct Significant Operations or Patrols during the interim period but such patrols shall be conducted in a manner that is in compliance with the requirement of this Order. Any Significant Operations or Patrols thereafter must be in accordance with the approved template and instructions.*

**In Full and Effective Compliance**

In late 2014, we reviewed all the documentation submitted by MCSO regarding the Significant Operation conducted from October 24-27, 2014. This operation was intended to interdict the flow of illegal narcotics into Maricopa County and fully complied with the requirements of this Paragraph.

MCSO continues to report that it has not conducted any operations that invoke the requirements of this Paragraph since October 2014.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

During this reporting period, we did not become aware of any Significant Operations conducted by MCSO. MCSO remains in Full and Effective Compliance with this Paragraph.

**(Note: Unchanged language is presented in *italicized font*. Additions are indicated by underlined font. Deletions are indicated by ~~crossed-out font~~.)**

*Paragraph 38. If the MCSO conducts any Significant Operations or Patrols involving 10 or more MCSO Personnel excluding posse members, it shall create the following documentation and provide it to the Monitor and Plaintiffs within 30 days after the operation:*

a.   *documentation of the specific justification/reason for the operation, certified as drafted prior to the operation (this documentation must include analysis of relevant, reliable, and comparative crime data);*

b.   *information that triggered the operation and/or selection of the particular site for the operation;*

WAI 44716

c.   *documentation of the steps taken to corroborate any information or intelligence received from non-law enforcement personnel;*

d.   *documentation of command staff review and approval of the operation and operations plans;*

e.   *a listing of specific operational objectives for the patrol;*

f.   *documentation of specific operational objectives and instructions as communicated to participating MCSO Personnel;*

g.   *any operations plans, other instructions, guidance or post-operation feedback or debriefing provided to participating MCSO Personnel;*

h.   *a post-operation analysis of the patrol, including a detailed report of any significant events that occurred during the patrol;*

i.   *arrest lists, officer participation logs and records for the patrol; and*

j.   *data about each contact made during the operation, including whether it resulted in a citation or arrest.*

**In Full and Effective Compliance**

Since the initial publication of GJ-33, MCSO has reported that it has conducted only one Significant Operation, "Operation Borderline," in October 2014.  At the time of this operation, we reviewed MCSO's compliance with policy; attended the operational briefing; and verified the inclusion of all the required protocols, planning checklists, supervisor daily checklists, and post-operation reports.  MCSO was in full compliance with this Paragraph for this operation.

During this reporting period, MCSO again reported that it did not conduct any Significant Operations invoking the requirements of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

During this reporting period, we did not become aware of any Significant Operations conducted by MCSO.  MCSO remains in Full and Effective Compliance with this Paragraph.

WAI 44717

**Paragraph 39.** *The MCSO shall hold a community outreach meeting no more than 40 days after any Significant Operations or Patrols in the affected District(s). MCSO shall work with the Community Advisory Board to ensure that the community outreach meeting adequately communicates information regarding the objectives and results of the operation or patrol. The community outreach meeting shall be advertised and conducted in English and Spanish.*

**Phase 1:** In compliance

- GJ-33 (Significant Operations), most recently amended on April 2, 2019.

**Phase 2:** In compliance

The Amendments to the Supplemental Permanent Injunction/Judgment Order (Document 2100) issued on August 3, 2017 returned the responsibility for compliance with this Paragraph to MCSO.

During this reporting period, MCSO did not report conducting any Significant Operations that would invoke the requirements of this Paragraph.


**Paragraph 40.** *The MCSO shall notify the Monitor and Plaintiffs within 24 hours of any immigration related traffic enforcement activity or Significant Operation involving the arrest of 5 or more people unless such disclosure would interfere with an on-going criminal investigation in which case the notification shall be provided under seal to the Court, which may determine that disclosure to the Monitor and Plaintiffs would not interfere with an on-going criminal investigation. In any event, as soon as disclosure would no longer interfere with an on-going criminal investigation, MCSO shall provide the notification to the Monitor and Plaintiffs. To the extent that it is not already covered above by Paragraph 38, the Monitor and Plaintiffs may request any documentation related to such activity as they deem reasonably necessary to ensure compliance with the Court's orders.*

**In Full and Effective Compliance**

Since MCSO first developed GJ-33 (Significant Operations) in 2014, MCSO has reported conducting only one operation, "Operation Borderline," that required compliance with this Paragraph. We verified that MCSO employed the appropriate protocols and made all required notifications. MCSO was in full compliance with this Paragraph during this operation.

Based on a concern raised by the Plaintiffs, and to provide clarification regarding the portion of this Paragraph that addresses the requirement for MCSO to notify the Monitor and Plaintiffs within 24 hours of any immigration-related traffic enforcement activity or Significant Operations involving "the arrest of 5 or more persons," we requested during our October 2015 site visit that MCSO provide a statement regarding this requirement each month. MCSO began including this information in its November 2015 submission and continues to do so.

WAI 44718

MCSO continues to report that it has not conducted any operations that meet the reporting requirements for this Paragraph since October 2014. During this reporting period, we did not learn of any traffic-related enforcement or Significant Operations conducted by MCSO that would invoke the requirements of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 44719

# Section 6: Training

## COURT ORDER VII. TRAINING

### a. General Provisions

***Paragraph 41.*** *To ensure that the Policies and Procedures provided for by this Order are effectuated, the MCSO shall implement the following requirements regarding Training.*

***Paragraph 42.*** *The persons presenting this Training in each area shall be competent instructors with significant experience and expertise in the area. Those presenting Training on legal matters shall also hold a law degree from an accredited law school and be admitted to a Bar of any state and/or the District of Columbia.*

**Phase 1:** In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on February 26, 2020.

- GG-2 (Detention/Civilian Training Administration), most recently amended on February 26, 2020.

- Training Division Operations Manual, most recently amended on March 9, 2020.

**Phase 2:** In compliance

MCSO utilizes three types of instructors to deliver Order-related training: They are either assigned to the Training Division as full-time staff; assigned to field assignments outside of the Training Division; or are paid vendors. The Training Division maintains individual instructor folders for Training Division staff, field instructors, and Field Training Officers (FTOs). Per GG-1, instructor folders are required to include annually updated CVs, General Instructor (GI) certificates, and either an annual or 30-day Misconduct and Disciplinary Review, as applicable. Additionally, instructors who have received prior sustained discipline or who are currently involved with an ongoing Professional Standards Bureau (PSB) investigation may request a Waiver of Presumptive Ineligibility from the Training Division Commander in order to teach. A waiver request should provide the Training Division Commander with ample justification to overcome presumptive ineligibility. Waiver requests require the Training Division Commander to produce written justifications for the approval or denial of each request. We verify compliance with this Paragraph by reviewing all instructor folders, waiver requests, and justifications.

During this reporting period, the Training Division approved 10 GIs. Our initial review identified seven of the 10 instructors as principals in pending administrative or criminal investigations. This initial review caused us concern. We conducted further research during our January site visit at

WAI 44720

the Academy. We reviewed each of the 10 instructor folders for required documentation. We then reviewed each of the submitted Waivers of Presumptive Eligibility. For each waiver submitted, the Training Division Commander outlined the actions taken by him to investigate the waiver request. In some cases, prior to making his determination, he also consulted with PSB. Each waiver investigated by the Training Division Commander included a written justification for his decision. The Training Commander approved all seven as GIs in accordance with GG-1.

The Training Division appointed one new FTO during this reporting period. The reviewed file contained all required documentation. The Training Commander informed us of MCSO's current efforts to improve the FTO program. FTOs currently receive a five percent stipend while assigned an Officer in Training (OIT). The stipend stops once the OIT satisfactorily completes the FTO program. MCSO is considering continuing the stipend for the entire time that the FTO maintains active FTO status. Maintaining active status requires participation in annual training and a satisfactory disciplinary status. Additionally, MCSO is considering changes to FTOs' uniforms to clearly identify them as active FTOs.

During our January site visit, the Training Division advised they had conducted two random instructor observations. Training Division personnel observed instructors assigned to an annual eight-hour in-service training for District supervisors (PSB8 External) class and a 2019 Annual Combined Training (ACT) class. Observers documented their instructor reviews by memo. The methodology for instructor reviews remains inconsistent. During our Academy visit, the Training Division Commander informed us that he had recently completed development of a new draft instructor evaluation form. A chain of command review of the new form and standardized process is ongoing.

During this reporting period, the Training Division did not provide advance notice of proposed instructors for approval by us and the Parties before scheduling the train-the-trainer and classroom sessions as required by the First Order. On November 4, 2019, we received the list of proposed 2019 ACT instructors. On November 5, the Training Division conducted the train-the-trainer. In this case, we quickly approved all instructors as meeting Order requirements. Previously, Plaintiffs inquired if ACT instructors would receive any professional development, additional training, or consultation prior to teaching. We recommend that the Training Division allow adequate time for thorough reviews of curriculum, supporting materials, and proposed instructors for training.

WAI 44721

***Paragraph 43.*** *The Training shall include at least 60% live training (i.e., with a live instructor), which includes an interactive component, and no more than 40% on-line training. The Training shall also include testing and/or writings that indicate that MCSO Personnel taking the Training comprehend the material taught whether via live training or via on-line training.*

**Phase 1:** In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on February 26, 2020.

- GG-2 (Detention/Civilian Training Administration), most recently amended on February 26, 2020.

- Training Division Operations Manual, most recently amended on March 9, 2020.

**Phase 2:** In compliance

We verify compliance with this Paragraph by reviewing all individual test failures; individual retests; failure remediation efforts, and test analyses by training class; for both live and HUB delivered Order-related training.

During this reporting period, the Training Division delivered the following programs: 2019 Annual Combined Training (ACT); Bias-Free Policing and Fourth and Fourteenth Amendment Training; 2015 Blue Team (BT); 2019 Body-Worn Camera (BWC); 2019 BWC HUB; 2017 Early Identification System (EIS); 2017 Employee Performance Appraisal (EPA); 2019 Supervisor Responsibilities Effective Supervision (SRELE); 2019 Traffic and Criminal Software (TraCS); and the 2019 TraCS for Supervisors.

MCSO began delivery of the 2019 ACT classroom training in November. MCSO delivered a train-the-trainer and an additional 12 classes to 464 personnel (357 sworn, 11 Reserve, 17 retired Reserve, 79 Posse). No personnel required test remediation.

MCSO delivered Bias-Free Policing and Fourth and Fourteenth Amendment classroom training in October to nine personnel (five sworn, four Posse). No personnel required test remediation.

MCSO delivered the eight-hour 2015 BT classroom training to five personnel (five sworn). No personnel required test remediation.

MCSO delivered the 2019 BWC classroom training to five personnel in October. No personnel required test remediation.

MCSO delivered the 2019 BWC HUB training continuously throughout this reporting period. Reporting indicates that 624 of 631 (99%) personnel have completed this course. During this reporting period, no personnel required test remediation.

MCSO delivered the 2017 EIS classroom training to 17 personnel (15 sworn, two civilian) in November. No personnel required test remediation.

MCSO delivered the 2017 EPA classroom training to 18 personnel in November (16 sworn, two civilian). No personnel required test remediation.

MCSO began delivery of the 2019 SRELE classroom training in October and continued delivery through December to a total of 195 sworn personnel. No personnel required test remediation.

MCSO delivered the 2019 TraCS classroom training during October to six sworn personnel. No personnel required test remediation.

MCSO delivered the 2019 TraCS for Supervisors classroom training during November to 16 sworn personnel. No personnel required test remediation.


***Paragraph 44.*** *Within 90 days of the Effective Date, MCSO shall set out a schedule for delivering all Training required by this Order. Plaintiffs' Representative and the Monitor shall be provided with the schedule of all Trainings and will be permitted to observe all live trainings and all on-line training. Attendees shall sign in at each live session. MCSO shall keep an up-to-date list of the live and on-line Training sessions and hours attended or viewed by each officer and Supervisor and make that available to the Monitor and Plaintiffs.*

**Phase 1:** In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on February 26, 2020.

- GG-2 (Detention/Civilian Training Administration), most recently amended on February 26, 2020.

- Training Division Operations Manual, most recently amended on March 9, 2020.

**Phase 2:** In compliance

The Training Division maintains a three-month Training Calendar. MCSO posts the Master Training calendar to the MCSO website to inform the public of tentative training dates, classes, and locations. The calendar displays 90-day increments and includes a legend specifically identifying Order-related training.

During our January Academy visit, the Training Division Commander informed us that MCSO implemented Smartsheet, an electronic project management software purchased by MCSO for use by Training and other Divisions. Training Division personnel provided a demonstration of this program during discussions of the Constitutional Policing Plan. The program appears to be user-friendly; and provides for the tracking, sharing, and editing of training and other projects. The Training Division Commander believes that the use of this planning tool will improve the overall training function and alleviate the scheduling of the majority of Order-required training late in the calendar year – a practice that has proved to be problematic in the past. We support the implementation of this long-term planning tool and will continue to monitor its use.

Master Personnel Rosters determine the number of personnel requiring Order-related training. At the end of this reporting period, MCSO reports that 657 sworn members; 15 Reserve members; 30 retired Reserve members; 211 Posse members; 1,915 Detention members; and 779 civilian employees require Order-related instruction. These categories vary by reporting period, because of the attrition in the organization.

**Paragraph 45.** *The Training may incorporate adult-learning methods that incorporate roleplaying scenarios, interactive exercises, as well as traditional lecture formats.*

**In Full and Effective Compliance**

The Training Division attempts to incorporate adult-learning methods into its curricula. We have seen the use of videos, as well as learning activities based primarily on group discussions. We have not seen an expanded use of role-plays, simulations, practice demonstrations, or physical activities. We understand that adult learning is best accomplished with blending the three learning domains of cognitive, affective, and behavioral into a curriculum to achieve a specific desired result. These combinations of learning methodologies in adults significantly raise the effective learning rate and can produce measurable results. We continue to recommend that the Training Division incorporate more robust adult-learning methods and employ evaluation measurements of deputy behaviors and activities after completing training, to better assess the efficacy of training provided.

On December 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 46.** *The curriculum and any materials and information on the proposed instructors for the Training provided for by this Order shall be provided to the Monitor within 90 days of the Effective Date for review pursuant to the process described in Section IV. The Monitor and Plaintiffs may provide resources that the MCSO can consult to develop the content of the Training, including names of suggested instructors.*

**In Full and Effective Compliance**

During our January site visit, we discussed the status of all Order-required training curricula. Bias-Free Policing and Fourth and Fourteenth Amendment Training, 2015 Blue Team, 2017 EIS, PSB40, and the 2017 Complaint Intake and Reception HUB training are currently under review by the Training and other Divisions.

We approved the 2019 ACT curriculum in October. The entire Bias-Free Policing content of the lesson plan – including the student handout, PowerPoint presentation, and test/answer key – were the same as provided in the 2017 ACT. While we and the Parties expressed reservations regarding

using previously taught material with little or no modification, we note that MCSO's inability to come to an agreement with a potential vendor to provide this content was a factor in its decision to reuse previous material. As anticipated, there were several evaluations by students critical of the repetitive use of the 2017 Bias-Free Policing content. We encourage the Training Division to anticipate these types of procurement problems and prepare additional lesson plans for use to overcome these situations.

During 2019, the Training Division conducted annual reviews of the BWC, BWC HUB, EIS Alert Refresher, TraCS, and TraCS for Supervisors curricula.

The 2015 Blue Team curriculum remained under review.

The 2017 EPA curriculum is pending revision after the completion of beta testing for a new employee performance review system.

The 2020 SRELE and the 2020 PSB8 External are under development.

In December, we approved the 2020 PSB8 Internal curriculum.

On December 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.


***Paragraph 47.*** *MCSO shall regularly update the Training to keep up with developments in the law and to take into account feedback from the Monitor, the Court, Plaintiffs and MCSO Personnel.*

**Phase 1:** In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on February 26, 2020.

- GG-2 (Detention/Civilian Training Administration), most recently amended on February 26, 2020.

- Training Division Operations Manual, most recently amended on March 9, 2020.

**Phase 2:** In compliance

The Training Division submits all new and revised lesson plans for our and the Parties' review. These reviews ensure that the requirements of this Paragraph are met. We anticipate that the implementation of Smartsheet will more easily facilitate this process.

We did not review any roll-call briefings, videos, or lesson plans in support of the ACT or SRELE that would provide enhanced training on Implicit Bias, Cultural Competency, Understanding Community Perspectives, and Fair and Impartial Decision Making. During our January site visit, we discussed with MCSO how "enhanced" training would be determined. We advised MCSO

WAI 44725

that we would consider training to be "enhanced" if it was demonstrably different from training currently offered as part of meeting the basic requirements of the First and Second Orders. Topics and material can, of course, overlap; and the enhanced training can reinforce material provided in the current venues – but the enhanced training cannot merely repackage existing material without notable modifications or additions. We will advise MCSO upon first review of a training offering if we do not consider it enhanced.

MCSO can expect that we and the Parties will observe training sessions and provide appropriate feedback.

### b. Bias-Free Policing Training

***Paragraph 48.*** *The MCSO shall provide all sworn Deputies, including Supervisors and chiefs, as well as all posse members, with 12 hours of comprehensive and interdisciplinary Training on bias-free policing within 240 days of the Effective Date, or for new Deputies or posse members, within 90 days of the start of their service, and at least 6 hours annually thereafter.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

MCSO delivers Bias-Free Policing Training to all new deputies during POST Academy training. During October, the Training Division delivered this class to nine personnel (five sworn, four Posse).

MCSO delivered the 2019 ACT in November and December to a total of 815 personnel (600 sworn, 14 Reserve, 23 retired Reserve, 178 Posse).

***Paragraph 49.*** *The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:*

a.      *definitions of racial profiling and Discriminatory Policing;*

b.      *examples of the type of conduct that would constitute Discriminatory Policing as well as examples of the types of indicators Deputies may properly rely upon;*

c.      *the protection of civil rights as a central part of the police mission and as essential to effective policing;*

d.      *an emphasis on ethics, professionalism and the protection of civil rights as a central part of the police mission and as essential to effective policing;*

e.      *constitutional and other legal requirements related to equal protection, unlawful discrimination, and restrictions on the enforcement of Immigration-Related Laws, including the requirements of this Order;*

WAI 44726

f.    MCSO policies related to Discriminatory Policing, the enforcement of Immigration-Related Laws and traffic enforcement, and to the extent past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;

g.    MCSO's protocol and requirements for ensuring that any significant pre-planned operations or patrols are initiated and carried out in a race-neutral fashion;

h.    police and community perspectives related to Discriminatory Policing;

i.    the existence of arbitrary classifications, stereotypes, and implicit bias, and the impact that these may have on the decision-making and behavior of a Deputy;

j.    methods and strategies for identifying stereotypes and implicit bias in Deputy decision-making;

k.    methods and strategies for ensuring effective policing, including reliance solely on non-discriminatory factors at key decision points;

l.    methods and strategies to reduce misunderstanding, resolve and/or de-escalate conflict, and avoid Complaints due to perceived police bias or discrimination;

m.    cultural awareness and how to communicate with individuals in commonly encountered scenarios;

n.    problem-oriented policing tactics and other methods for improving public safety and crime prevention through community engagement;

o.    the benefits of actively engaging community organizations, including those serving youth and immigrant communities;

p.    the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;

q.    background information on the Melendres v. Arpaio litigation, as well as a summary and explanation of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in Melendres v. Arpaio, the parameters of the Court's permanent injunction, and the requirements of this Order; and

r.    Instruction on the data collection protocols and reporting requirements of this Order.

**Phase 1:** Not applicable

**Phase 2:** In compliance

We did not review the Bias-Free Policing Training curriculum during this reporting period. During our January site visit, Training Division command advised us the curriculum remained under review.

WAI 44727

### c. Training on Detentions, Arrests, and the Enforcement of Immigration-Related Laws

*Paragraph 50.  In addition to the Training on bias-free policing, the MCSO shall provide all sworn personnel, including Supervisors and chiefs, as well as all posse members, with 6 hours of Training on the Fourth Amendment, including on detentions, arrests and the enforcement of Immigration-Related Laws within 180 days of the effective date of this Order, or for new Deputies or posse members, within 90 days of the start of their service.  MCSO shall provide all Deputies with 4 hours of Training each year thereafter.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

MCSO delivers training on Detentions, Arrests, and the Enforcement of Immigration-Related Laws to all new deputies during POST Academy training.  During October, the Training Division delivered this class to nine personnel (five sworn, four Posse).

MCSO delivered the 2019 ACT in November and December to a total of 815 personnel (600 sworn, 14 Reserve, 23 retired Reserve, 178 Posse).

*Paragraph 51.  The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:*

a.   *an explanation of the difference between various police contacts according to the level of police intrusion and the requisite level of suspicion; the difference between reasonable suspicion and mere speculation; and the difference between voluntary consent and mere acquiescence to police authority;*

b.   *guidance on the facts and circumstances that should be considered in initiating, expanding or terminating an Investigatory Stop or detention;*

c.   *guidance on the circumstances under which an Investigatory Detention can become an arrest requiring probable cause;*

d.   *constitutional and other legal requirements related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, including the requirements of this Order;*

e.   *MCSO policies related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, and the extent to which past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;*

f.   *the circumstances under which a passenger may be questioned or asked for identification;*

g.   *the forms of identification that will be deemed acceptable if a driver or passenger (in circumstances where identification is required of them) is unable to present an Arizona driver's license;*

WAI 44728

h.    *the circumstances under which an officer may initiate a vehicle stop in order to investigate a load vehicle;*

i.    *the circumstances under which a Deputy may question any individual as to his/her alienage or immigration status, investigate an individual's identity or search the individual in order to develop evidence of unlawful status, contact ICE/CBP, await a response from ICE/CBP and/or deliver an individual to ICE/CBP custody;*

j.    *a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause to believe that a vehicle or an individual is involved in an immigration-related state crime, such as a violation of the Arizona Human Smuggling Statute, as drawn from legal precedent and updated as necessary; the factors shall not include actual or apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a Hispanic day laborer;*

k.    *a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause that an individual is in the country unlawfully, as drawn from legal precedent and updated as necessary; the factors shall not include actual or apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a day laborer;*

l.    *an emphasis on the rule that use of race or ethnicity to any degree, except in the case of a reliable, specific suspect description, is prohibited;*

m.    *the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;*

n.    *Provide all trainees a copy of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in Melendres v. Arpaio and this Order, as well as a summary and explanation of the same that is drafted by counsel for Plaintiffs or Defendants and reviewed by the Monitor or the Court; and*

o.    *Instruction on the data collection protocols and reporting requirements of this Order, particularly reporting requirements for any contact with ICE/CBP.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

We did not review the curriculum for Detentions, Arrests, and the Enforcement of Immigration-Related Laws during this reporting period. During our January site visit, Training Division command advised us the curriculum remained under review.

WAI 44729

### d. Supervisor and Command Level Training

***Paragraph 52.*** *MCSO shall provide Supervisors with comprehensive and interdisciplinary Training on supervision strategies and supervisory responsibilities under the Order. MCSO shall provide an initial mandatory supervisor training of no less than 6 hours, which shall be completed prior to assuming supervisory responsibilities or, for current MCSO Supervisors, within 180 days of the Effective Date of this Order. In addition to this initial Supervisor Training, MCSO shall require each Supervisor to complete at least 4 hours of Supervisor-specific Training annually thereafter. As needed, Supervisors shall also receive Training and updates as required by changes in pertinent developments in the law of equal protection, Fourth Amendment, the enforcement of Immigration-Related Laws, and other areas, as well as Training in new skills.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

The Training Division delivered the 2019 SRELE throughout this reporting period. We experienced delays with the timely identification of proposed instructors consistent with Order requirements. On October 15, 2019, MCSO notified us of proposed instructors. The documents lacked information documenting an annual completion of CV and qualification updates. Additionally, MCSO failed to distinguish instructors assigned to the Training Division from instructors assigned to field Divisions. This distinction determines the appropriate Misconduct and Disciplinary review. Personnel assigned to the Training Division require an annual review. Field personnel require a review conducted 30 days in advance of an instructional assignment. The Training Division removed one instructor from consideration for failing to comply with these requirements. On October 22, 2019, MCSO conducted the train-the-trainer prior to instructor approval. We approved the proposed instructors and curriculum modifications on October 29, seven days after MCSO conducted the train-the-trainer and one day before the first scheduled delivery to deputies. The Training Division Commander advised us that the implementation of Smartsheet should alleviate these types of issues in the future.

In October, 49 sworn personnel attended and completed the train-the-trainer. Through November and December, 146 sworn supervisors attended this training.

***Paragraph 53.*** *The Supervisor-specific Training shall address or include, at a minimum:*

a.    *techniques for effectively guiding and directing Deputies, and promoting effective and constitutional police practices in conformity with the Policies and Procedures in Paragraphs 18–34 and the Fourth and Fourteenth Amendment Training in Paragraphs 48–51;*

b.    *how to conduct regular reviews of subordinates;*

c.    *operation of Supervisory tools such as EIS;*

WAI 44730

d.     evaluation of written reports, including how to identify conclusory, "canned," or perfunctory language that is not supported by specific facts;

e.     how to analyze collected traffic stop data, audio and visual recordings, and patrol data to look for warning signs or indicia of possible racial profiling or unlawful conduct;

f.     how to plan significant operations and patrols to ensure that they are race-neutral and how to supervise Deputies engaged in such operations;

g.     incorporating integrity-related data into COMSTAT reporting;

h.     how to respond to calls from Deputies requesting permission to proceed with an investigation of an individual's immigration status, including contacting ICE/CBP;

i.     how to respond to the scene of a traffic stop when a civilian would like to make a Complaint against a Deputy;

j.     how to respond to and investigate allegations of Deputy misconduct generally;

k.     evaluating Deputy performance as part of the regular employee performance evaluation; and

l.     building community partnerships and guiding Deputies to do the Training for Personnel Conducting Misconduct Investigations.

**Phase 1:** Not applicable

**Phase 2:** In compliance

The approved 2019 SRELE curriculum incorporated the requirements of the Paragraph. As is normally the case, instructors modified the 2019 SRELE curriculum, PowerPoint presentation, and test during the train-the-trainer program. MCSO's Chief Deputy delivered the train-the-trainer program to the other supervisor instructors. Participant evaluations praised the Chief Deputy as an excellent instructor, extremely familiar with the content, and well-prepared to deliver this content. The Chief was able to emphasize content crucial for personnel to meet organizational goals and needs. The participants engaged in critical review discussions that prompted curriculum changes directed at supervisor responsibilities while conducting traffic stop reviews, body-worn camera recording reviews, and critical incidents. We recommend that MCSO continue to provide command personnel to deliver these types of programs. Hearing directly from executive command personnel allows subordinate supervisors to better understand the goals and direction the Office desires.

# Section 7: Traffic Stop Documentation and Data Collection

**COURT ORDER VIII. TRAFFIC STOP DOCUMENTATION AND DATA COLLECTION AND REVIEW**

For Paragraphs 54 and 55, in particular, we request traffic stop data from MCSO. The following describes how we made that request and how we handled the data once we received it. These data may also be referred to in other areas of Section 7 and the report as a whole.

In selecting traffic stop cases for our compliance review, we modified our statistical technique in that, rather than selecting a representative random sample of 100 cases per quarter, we instead pulled a sample of 35 cases per month (or 105 cases per quarter). Our original selection of a sample size of 35 cases was based on information from MCSO TraCS data that reported the average number of traffic stops per month was fewer than 2,000 during the April 2014-June 2015 time period when TraCS data were first available. The selection of 35 cases reflects a sample based on this average per month. This gave us a 95 percent confidence level (the certainty associated with our conclusion).

We continue to pull our monthly sample of traffic stop cases from the six Districts (Districts 1, 2, 3, 4, 6, and 7) and Lake Patrol. Once we received files each month containing traffic stop case numbers from MCSO, denoting from which area they came, we selected a sample of up to 35 cases representing the areas and then selected a subsample averaging 10 cases, from the 35 selected cases, to obtain CAD audiotapes and body-worn camera recordings. Our sampling process involved selecting a sample of cases stratified by the areas according to the proportion of specific area cases relative to the total area cases. Stratification of the data was necessary to ensure that each area was represented proportionally in our review. Randomization of the cases and the selection of the final cases for CAD review were achieved using a statistical software package (IBM SPSS Version 22), which contains a specific function that randomly selects cases and that also allows cases to be weighted by the areas. Our use of SPSS required that we first convert the MCSO Excel spreadsheet into a format that would be readable in SPSS. We next pulled the stratified sample each month for the areas and then randomly selected a CAD audio subsample from the selected cases.

In February 2016, we began pulling cases for our body-worn camera review from the audio subsample. Since that time, we began pulling additional samples for passenger contacts and persons' searches (10 each per month). The unique identifiers for these two samples were relayed back to MCSO personnel, who produced documentation for the selected sample (including the CAD documentation for the subsample).

WAI 44732

On October 10, 2014, the Court issued an Order Granting Stipulation to Amend Supplemental/Permanent Injunction/Judgment Order (Document 748). The stipulation affects Paragraphs 57, 61, 62, and Paragraph 1.r.xv.; and has been incorporated in the body of this report. The stipulation referenced amends the First Order, and will be addressed in Section 7.

### a. Collection of Traffic Stop Data

***Paragraph 54.*** *Within 180 days of the Effective Date, MCSO shall develop a system to ensure that Deputies collect data on all vehicle stops, whether or not they result in the issuance of a citation or arrest. This system shall require Deputies to document, at a minimum:*

a.   *the name, badge/serial number, and unit of each Deputy and posse member involved;*

b.   *the date, time and location of the stop, recorded in a format that can be subject to geocoding;*

c.   *the license plate state and number of the subject vehicle;*

d.   *the total number of occupants in the vehicle;*

e.   *the Deputy's subjective perceived race, ethnicity and gender of the driver and any passengers, based on the officer's subjective impression (no inquiry into an occupant's ethnicity or gender is required or permitted);*

f.   *the name of any individual upon whom the Deputy runs a license or warrant check (including subject's surname);*

g.   *an indication of whether the Deputy otherwise contacted any passengers, the nature of the contact, and the reasons for such contact;*

h.   *the reason for the stop, recorded prior to contact with the occupants of the stopped vehicle, including a description of the traffic or equipment violation observed, if any, and any indicators of criminal activity developed before or during the stop;*

i.   *time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; time a release was made without citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere or Deputy's departure from the scene;*

j.   *whether any inquiry as to immigration status was conducted and whether ICE/CBP was contacted, and if so, the facts supporting the inquiry or contact with ICE/CBP, the time Supervisor approval was sought, the time ICE/CBP was contacted, the time it took to complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual;*

WAI 44733

*k.*      *whether any individual was asked to consent to a search (and the response), whether a probable cause search was performed on any individual, or whether a pat-and-frisk search was performed on any individual;*

*l.*      *whether any contraband or evidence was seized from any individual, and nature of the contraband or evidence; and*

*m.*      *The final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without citation.*

**Phase 1:** In compliance

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 26, 2018.

- EA-11 (Arrest Procedures), most recently amended on June 18, 2019.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on October 25, 2019.

- EB-2 (Traffic Stop Data Collection), most recently amended on January 7, 2020.

- GI-1 (Radio and Enforcement Communications Procedures), most recently amended on February 5, 2020.

- GJ-3 (Search and Seizure), most recently amended on July 25, 2019.

**Phase 2:** Deferred

To verify the information required for this Paragraph, MCSO created, and we reviewed, the Vehicle Stop Contact Form (VSCF), the Vehicle Stop Contact Form Supplemental Sheet, the Incidental Contact Receipt, and the Written Warning/Repair Order, all in electronic form, for those motorists who, during this reporting period, committed a traffic violation or operated a vehicle with defective equipment and received a warning. We also reviewed the Arizona Traffic Ticket and Complaint Forms issued for violations of Arizona Statutes, Internet I/Viewer Event Unit printout, Justice Web Interface printout, and any Incident Report associated with the event. We selected a sample of 105 traffic stops conducted by deputies from October 1-December 31, 2019, for the purposes of this review; and assessed the collected data from the above-listed documents for compliance with Subparagraphs 54.a.-54.m. All of the listed documentation was used for our review of the following subsections of this Paragraph.

The Paragraph requires that MCSO create a system for data collection. The data collected pursuant to this Paragraph will be captured in the Early Identification System, which we discuss further in this report.

Paragraph 54.a. requires MCSO to document the name, badge/serial number, and unit of each deputy and Posse member involved.

For this reporting period, all of the primary deputies indicated their own serial numbers for every stop they initiated. We review the VSCF, I/Viewer Event document, the Justice Web Interface, and the CAD printout to determine which units were on the scene. If back-up units arrive on a scene and do not announce their presence to dispatch, CAD does not capture this information. A TraCS change was made to the VSCF during 2016 to secure this information. MCSO added a drop-down box so the deputy could enter the number of units on the scene and the appropriate fields would be added for the additional deputies. While this addition is an improvement, if the deputy fails to enter the number of additional units on the form, the drop-down boxes do not appear. In addition, MCSO policy requires deputies to prepare the Assisting Deputy and Body-Worn Camera Log in instances where deputies respond and assist at a traffic stop. The log contains the relevant information required by this Subparagraph for any additional deputies involved in a traffic stop other than the primary deputy. During our April 2019 site visit, we discussed with MCSO, the Plaintiffs, and the Plaintiff-Intervenors the method of evaluating this requirement. It was determined that in instances where a deputy's name, serial number and unit number may have been omitted on the VSCF, yet the deputy prepared the Assisting Deputy and Body-Worn Camera Log, the requirements of this Subparagraph will have been met.

During our review of the sample of 105 vehicle traffic stops, we identified 17 cases where the deputy's unit had another deputy assigned to the vehicle or one or more other deputy units or Posse members were on the scene. In each of the 17 cases where there were multiple units or deputies on a stop, the deputy properly documented the name, badge, and serial number of the deputies and Posse members on the VSCF, or the information was captured on the Assisting Deputy and Body-Worn Camera Log. Of the cases we reviewed for passenger contacts under Subparagraph 54.g., there were 25 cases where the deputy's unit had another deputy assigned to the vehicle or one or more other deputy units or Posse members were on the scene. In 24 of the 25 cases, the deputy properly documented the required information on the VSCF or the information was captured on the Assisting Deputy and Body-Worn Camera Log. In one case, the deputy documented the name and serial number of a Posse member on the VSCF that was on the scene of the traffic stop; however, the unit number field was left blank. Of the cases we reviewed for searches of persons under Subparagraph 54.k., there were 67 cases where the deputy's unit had another deputy assigned to the vehicle, or one or more other deputies or Posse members were on the scene. In 64 of the cases, the deputy properly documented the required information on the VSCF or the information was captured on the Assisting Deputy and Body-Worn Camera Log. In one case, the deputy documented the names of three deputies on the VSCF that were on the scene of the traffic stop; however, the fields for the serial numbers and unit numbers were left blank. In one case, the deputy documented the name of a deputy on the VSCF that was on the scene of the traffic stop; however, the unit number field was left blank. In one case, the deputy documented the names of three deputies on the VSCF that were on the scene of the traffic stop; however, the fields for the unit numbers were left blank. In each of the aforementioned cases, the deputies did not prepare the Assisting Deputy and Body-Worn Camera Log; however, in the case involving the Posse member, the log is not required to be prepared.

WAI 44735

We are still identifying cases where the assisting deputies did not prepare the Assisting Deputy and Body-Worn Camera Log when required by MCSO policy. We encourage MCSO to provide guidance to supervisors to be attentive to this issue during their reviews of traffic stop documentation.

In the last reporting period of 2018, MCSO attained a compliance rating of 97%. During the first quarter of 2019, MCSO attained a compliance rating of 92%. During the second quarter of 2019, MCSO was required to attain a compliance rating of greater than 94% to remain in compliance with this requirement. MCSO attained a compliance rating of 99% in the second reporting period, and remained in compliance with this requirement. During the last reporting period, MCSO attained a compliance rating of 96%. During this reporting period, MCSO attained a compliance rating of 96%. MCSO remains in compliance with this requirement.

Paragraph 54.b. requires MCSO to document the date, time, and location of the stop, recorded in a format that can be subject to geocoding. Our reviews of the CAD printout for all 105 traffic stops in our sample indicated that the date, time, and location is captured with the time the stop is initiated and the time the stop is cleared. In previous reporting periods, we noted instances where the GPS coordinates could not be located on the documentation received (CAD printout/I/Viewer). We contacted MCSO about this issue, and MCSO now provides us with the GPS coordinates via a separate document that lists the coordinates for the traffic stop sample we provide. MCSO uses GPS to determine location for the CAD system. GPS collects coordinates from three or more satellites to enhance the accuracy of location approximation. The data from the satellites can be decoded to determine the longitude and latitude of traffic stop locations should that be necessary. The CAD system was upgraded in 2014 to include geocoding of traffic stops. CID continues to provide us with a printout of all case numbers in the sample containing the associated coordinates. For this reporting period, the CAD or I/Viewer system contained the coordinates in 41% of the cases. In a separate spreadsheet, MCSO provided GPS coordinates for all 105 cases we reviewed, for 100% compliance with this portion of the Subparagraph.

When we review the sample traffic stops from across all Districts, we note the locations of the stops contained on the VSCF, the CAD printout, and the I/Viewer system to ensure that they are accurate. We continue to identify instances where the location of the stop contained on the VSCF and the location of the stop contained on the CAD printout are inconsistent. Reviewing supervisors are not identifying and addressing this issue. We recommend that reviewing supervisors closely review the VSCFs and CAD printouts and address such deficiencies. The number of inconsistencies did not affect MCSO's rate of compliance.

WAI 44736

During our April 2016 site visit, we discussed with MCSO the possibility of using the CAD printout instead of the TraCS data to determine stop times. We determined that using the CAD system to determine stop end times created additional challenges. However, a decision was made to use the CAD printout to determine traffic stop beginning and ending times for data analysis. MCSO issued Administrative Broadcast 16-62 on June 29, 2016, which indicated that, beginning with the July 2016 traffic stop data collection, the stop times captured on the CAD system would be used for reporting and analytical purposes.

Occasionally, the CAD time of stop and end of stop time do not exactly match those listed on the Vehicle Stop Contact Form, due to extenuating circumstances the deputy may encounter. During this reporting period, we did not find any instances where the end time on the VSCF Contact differed significantly from the CAD printout. In monthly audits of traffic stop data, the Audits and Inspections Unit (AIU) reviews the beginning/ending times of the stops and requires that BIO Action Forms are generated by the Districts when there are discrepancies. The CAD system is more reliable than the VSCF in determining stop times, as it is less prone to human error. When the deputy verbally advises dispatch that s/he is conducting a traffic stop, the information is digitally time-stamped into the CAD system without human input; and when the deputy clears the stop, s/he again verbally advises dispatch.

MCSO remains in compliance with this Subparagraph.

Paragraph 54.c. requires MCSO to document the license plate and state of the subject vehicle. During this reporting period, we found that deputies properly recorded the vehicle tag number and state of issuance in each of 105 cases reviewed.

MCSO remains in compliance with this Subparagraph, with a compliance rate of 100%.

Paragraph 54.d. requires MCSO to document the total number of occupants in the vehicle when a stop is conducted. The VSCF, completed by the deputy on every traffic stop, is used to capture the total number of occupants and contains a separate box on the form for that purpose. EB-2 (Traffic Stop Data Collection) requires deputies to collect data on all traffic stops using the VSCF; this includes incidental contacts with motorists.

In 37 of the 105 traffic stops we reviewed, the driver had one or more passengers in the vehicle (61 total passengers). In all 37 of the cases, the deputies properly documented the total number of occupants in the vehicles.

With a compliance rate of 100%, MCSO remains in compliance with this Subparagraph.

Paragraph 54.e. requires MCSO to document the perceived race, ethnicity, and gender of the driver and any passengers, based on the deputy's subjective impression. (No inquiry into the occupant's ethnicity or gender is required or permitted.) In 37 of the 105 stops from the traffic stop data sample, there was more than one occupant in the vehicle (61 total passengers).

Sixty-eight, or 65%, of the 105 traffic stops involved White drivers. Twenty-five, or 24%, of the 105 stops involved Latino drivers. Ten, or 10%, of the 105 traffic stops involved Black drivers.

Two, or 2%, of the 105 traffic stops involved Asian or Pacific Islander drivers. Fifty-seven traffic stops, or 54%, resulted in citations. The breakdown of those motorists issued citations is as follows: 37 White drivers (65% of drivers who were issued citations); 12 Latino drivers (21% of drivers who were issued citations); seven Black drivers (12% of drivers who were issued citations); and one Asian or Pacific Islander driver (2% of drivers who were issued citations). Forty-eight, or 46%, of the 105 traffic stops we reviewed resulted in a written warning. The breakdown of those motorists issued warnings is as follows: 31 White drivers (65% of the total who were issued warnings); 13 Latino drivers (27% of the drivers who were issued warnings); three Black drivers (6% of the total who were issued warnings); and one Asian or Pacific Islander driver (2% of the total who were issued warnings).

In our sample of 30 traffic stops that contained body-worn camera recordings, we did not identify any stops in which the deputy did not accurately document the race/ethnicity of the driver or passenger. In our review of cases in relation to Paragraphs 25.d. and 54.g., in relation to passenger contacts, and in relation to Paragraph 54.k., in relation searches of persons, we did not identify any stops in which the deputy did not accurately document the race/ethnicity of the driver or passenger.

This Paragraph requires deputies to document the perceived race, ethnicity, and gender of any passengers whether contact is made with them or not. There were some instances where deputies indicated that they were unable to determine the gender and ethnicity of a passenger and listed the passenger as "unknown-vision obscured." During our review of the body-worn camera recordings, we were also unable to get a clear view of the some of the passengers, often due to vehicle being equipped with dark tinted windows combined with the stop occurring during night time hours; or due to vehicle being equipped with dark tinted windows combined with the glare of the sun during daytime hours.

During the second quarter of 2019, AIU commenced conducting the Post-Stop Perceived Ethnicity Inspection. The inspection includes: 1) a review of traffic stops where the deputy documented the driver as being White and the driver's surname is Latino; 2) a review of traffic stops where the deputy documented that the driver has a Latino surname with a passenger listed as "unknown-vision obscured;" and 3) a review of traffic stops where the deputy documented that the driver was Latino and the passengers were listed with a designated ethnicity on the VSCF. This inspection reviewed 10 stops for each of three aforementioned categories and determined that the deputies' perception of the ethnicity of the vehicle occupants was proper in each instance. This inspection was initiated by AIU in response to previous issues identified where deputies failed to properly document the ethnicity of the vehicle occupants. During a review of stops that were conducted in October 2019, the inspection identified two stops where deputies appeared to have not properly documented the relevant information relative to a driver and a passenger. In one case, the deputy listed the driver's race/ethnicity as being White; however, after a review was conducted of the body-worn camera recording, it appeared that the driver's race/ethnicity was Latino. In one case, the deputy listed the passenger's race/ethnicity and gender as being unknown,

WAI 44738

due to the deputy's vision being obscured; however, after a review was conducted of the body-worn camera recording, it appeared that the passenger was a White female. During a review of stops that were conducted in November 2019, the inspection identified one stop where the deputy appeared to have not properly documented the relevant information relative to a driver. In that case, the deputy listed the driver's race/ethnicity as being White; however, after a review was conducted of the body-worn camera recording, it appeared that the driver was Latino. During a review of stops that were conducted in December 2019, there were no issues identified. AIU requests that the Districts prepare BIO Action Forms in cases where issues are identified. We will follow up with MCSO during our next site visit regarding the actions taken in response to the findings of these inspection reports.

MCSO remains in compliance with this requirement.

Paragraph 54.f. requires that MCSO record the name of any individual upon whom the deputy runs a license or warrant check (including the subject's surname). In addition, MCSO's policy requires that deputies perform a license plate check on each vehicle stopped by its deputies, as well as warrant checks on every driver stopped by its deputies. Our previous reviews have found that deputies regularly record the name of each driver and passenger on the VSCF in each instance that a driver's license or warrant check was run.

MCSO policy requires that during each traffic stop, deputies are to conduct a records check on the license plate and a wants/warrant check on each driver. For this reporting period, we found that of the 105 traffic stops we reviewed, 104 included a check on the license plate. There were 98 stops where the deputies ran warrant checks on the drivers in accordance with MCSO policy. During its monthly inspections of the traffic stop data, BIO also identifies stops in which a warrant check was not run on the drivers. AIU requests that the Districts prepare BIO Action Forms in such cases.

MCSO's compliance rate with this requirement is 100%. MCSO remains in compliance with this Subparagraph.

Paragraph 54.g. requires the deputy to document whether contact was made with any passengers, the nature of the contact, and the reasons for the contact. During the third quarter of 2019, MCSO requested that we increase the number of cases reviewed in an effort to identify additional stops that fit the criteria of this Paragraph. The sample size of cases to be reviewed was increased from 10 stops each month to 35 stops each month, commencing with August 2019.

During our January 2020 site visit, we discussed with supervisors at District 2 the issue of deputies oftentimes selecting the check box indicating a "passenger contact" on the VSCF even if the interaction with the passengers simply involved general conversation or a child saying hello. The supervisors indicated that it is likely that deputies are noting such events as passenger contacts in an overly cautious effort to comply with policy. The supervisors stated that they were aware that such events do not require the issuance of Incidental Contact Receipts. The issue of deputies issuing Incidental Contact Receipts when required by policy has been ongoing.

WAI 44739

During our assessment, we specifically review traffic stops that include any instance where the deputy asks any questions of a passenger beyond a greeting, including asking passengers to identify themselves for any reason. In such instances, we determine if the passenger was issued one of the following: Incidental Contact Receipt, citation, or a warning. If the passenger was not issued any one of the following documents, it adversely impacts MCSO's compliance with this requirement. It is also important to note that in such instances where a deputy fails to issue one of the required documents after being involved in a passenger contact, it is a violation of MCSO's policy.

To ensure that deputies are accurately capturing passenger information and to verify if passengers are contacted, we compare the number of passengers listed by the deputy with the number of passengers entered in the passenger drop-down box on the Vehicle Stop Contact Form. We also review any Incidental Contact Receipts, citations, or warnings, issued to passengers by deputies. We also review the deputies' notes on the VSCF, the Arizona Citation, and the CAD printout for any information involving the passengers. We review MCSO's I/Viewer System and the Justice Web Interface (JWI) to verify if a record check was requested for the driver or any passengers.

All passenger contacts in the traffic stops we reviewed for Paragraphs 25.d. and 54.g were noted in the VSCFs. For this reporting period, we identified 37 traffic stops where the deputy had interaction with one or more passengers; which required the issuance of either an Incidental Contact Receipt, a citation, or a warning. The remaining stops did not meet the criteria for a passenger contact requiring the issuance of any one of the three aforementioned documents. Of the 37 stops, there were 11 stops where we determined that a passenger should have been issued either an Incidental Contact Receipt, a citation, or a warning. The cases that did not meet compliance with this requirement are described in detail below.

- A White female driver was stopped for driving with one headlight. The vehicle was occupied by a White female passenger. The passenger's name was obtained after it was discovered that the driver had a suspended driver's license. The deputy conducted a records check and determined that the passenger's driver's license was valid. The passenger was not issued an Incidental Contact Receipt. The driver was issued a citation for driving with a suspended driver's license.

- A Latina driver was stopped for operating a vehicle with illegally tinted windows. The vehicle was occupied by a Latina passenger. The deputy requested and obtained the passenger's identification and conducted a records check. The passenger was not issued an Incidental Contact Receipt. The driver was issued a warning for the window tint violation.

- A White male driver was stopped for a stop sign violation. The vehicle was occupied by a White male passenger. The deputy requested and obtained the passenger's identification and conducted a records check. The passenger was not issued an Incidental Contact Receipt. The driver was issued a warning for the stop sign violation.

WAI 44740

- A White female driver was stopped for failure to maintain a lane of traffic. The vehicle was occupied by a White female passenger. The deputy requested and obtained the passenger's identification and conducted a records check. The passenger was not issued an Incidental Contact Receipt. The driver was issued a warning for the traffic violation.

- A White male driver was stopped for a speeding violation. The vehicle was occupied by a White female passenger. The deputy requested and obtained the passenger's identification and conducted a records check. The passenger was not issued an Incidental Contact Receipt. The driver was issued a warning for the speeding violation.

- A White female driver was stopped for a speeding violation. The vehicle was occupied by a White female passenger. The deputy requested and obtained the passenger's identification and conducted a records check. The passenger was not issued an Incidental Contact Receipt. The driver was issued a warning for the speeding violation.

- A Latino driver was stopped for driving with no taillights activated on a trailer. The vehicle was occupied by a Latino passenger. The driver did not have any identification on his person, and it was determined that he had never obtained a driver's license. The deputy obtained the passenger's identity, and a records check revealed that she had a valid driver's license. The passenger was the registered owner of the vehicle, and he took custody of the vehicle. The passenger was not issued an Incidental Contact Receipt. The driver was issued a citation for driving without a valid driver's license and driving with no taillights.

- An Asian or Pacific Islander female driver was stopped for a stop sign violation. The vehicle was occupied by an Asian or Pacific Islander male passenger. The deputy requested and obtained the passenger's identification and conducted a records check. The passenger was not issued an Incidental Contact Receipt. The driver was issued a warning for the stop sign violation.

- A Latino driver was stopped for driving with one headlight. The vehicle was occupied by two Latino passengers. The driver did not have any identification on his person. One of the passengers indicated that he was the registered owner of the vehicle. The deputy obtained the passenger's identification and conducted a records check. The passenger was not issued an Incidental Contact Receipt. The driver was issued a citation for driving with no valid driver's license and driving with one headlight.

- A White male driver was stopped for an improper lane change. One of the passengers, a male, fled from the vehicle. The vehicle was occupied by two White female passengers. The deputy obtained the identity of one of the passengers and conducted a records check. The passenger was not issued an Incidental Contact Receipt. The driver was issued a citation for driving with a suspended driver's license and failure to produce evidence of insurance.

WAI 44741

- A Black male driver was stopped for a speeding violation. The vehicle was occupied by a Black male passenger and an Asian or Pacific Islander female passenger. The deputy conducted an investigation after detecting the odor of marijuana during the stop. The deputy recovered marijuana from the Black male passenger. A property receipt was issued to the passenger for the marijuana. The deputy did not provide the Black male passenger with an Incidental Contact Receipt, which is required by MCSO policy. A review of the body-worn camera recording revealed that the deputy believed that because he issued the passenger a property receipt, he was not required to issue an Incidental Contact Receipt. We will discuss this issue with MCSO during our next site visit. The deputy provided the Asian or Pacific Islander female passenger with an Incidental Contact Receipt. The driver was issued a citation for the speeding violation.

There were 18 cases identified in the stops that we reviewed for Paragraph 54.k. in which the passengers were contacted which required the issuance of either an Incidental Contact Receipt, a citation, or a warning. Of the 18 stops, there were three where we determined that a passenger should have been issued either an Incidental Contact Receipt, a citation, or a warning. The cases that did not meet compliance with this requirement are described in detail below.

- A Latino driver was stopped for a cracked windshield violation. The vehicle was occupied by a Latino passenger. Upon making the stop, the driver and passenger both exited the vehicle and were ordered by the deputy to stop. The driver was found to have a revoked driver's license. The deputy obtained the identity of the passenger and completed a records check. The deputy then released the passenger, but did not provide the passenger with an Incidental Contact Receipt.

- A White female driver was stopped for a speeding violation. The vehicle was occupied by a White male passenger. The driver had no identification on her person. After investigating the driver, the deputy determined that she initially provided a false name and date of birth to the deputy. The driver was arrested for providing false information to a law enforcement officer; and during a search of her person, the deputy located narcotic paraphernalia. Once the deputy obtained the driver's true name and date of birth, it was determined that her driver's license was revoked and that a warrant from a local jurisdiction existed. During a search of the vehicle, the deputy recovered suspected narcotics, narcotic paraphernalia, and a handgun. The driver was arrested and processed for driving under the influence. The deputy investigated the passenger and conducted a pat-and-frisk search of his person. The deputy obtained the passenger's name and conducted a records check, but did not provide the passenger with an Incidental Contact Receipt.

- A Latino driver was stopped after being observed in the parking lot of a local business where fresh paint was used to deface property. The vehicle was occupied by two White female passengers and one Black male passenger. The driver had no identification on his person. A records check revealed he had never obtained a driver's license. The driver

WAI 44742

was issued a citation for being under the age of 21 and operating a motor vehicle after consuming alcohol. The driver was also arrested for defacing private property. The deputy obtained the name of one of the female passengers and conducted a records check, but did not provide the passenger with an Incidental Contact Receipt.

There were two cases in the stops that we reviewed for Paragraphs 25 and 54 in which the passenger was contacted, which required that the passengers be issued Incidental Contact Receipts. In both cases, the passengers were properly issued Incidental Contact Receipts.

As noted in some of the cases above, deputies have not been consistent in preparing and providing passengers with Incidental Contact Receipts during traffic stops in which the passenger is contacted and asked by the deputy to provide identification. Supervisors should identify such omissions during their reviews of the VSCFs and take corrective action. During previous site visits, we discussed with MCSO that we have noted an increase in the number of passengers being contacted and not being provided with an Incidental Contact Receipt. MCSO has informed us that the TraCS system has been modified so that when a deputy prepares the Vehicle Stop Contact Form and utilizes the passenger contact field, a prompt will appear to instruct the deputy to prepare the Incidental Contact Receipt. The addition of this prompt will hopefully resolve this issue and reinforce MCSO's policy requirement as it relates to the form. During the third reporting period of 2018, MCSO provided the Incidental Contact Receipt, a citation, or a warning, when required in 36% of the cases. During the last reporting period of 2018, MCSO provided the Incidental Contact Receipt, a citation, or a warning, when required in 13% of the cases. During the first and second reporting periods of 2019, MCSO provided the Incidental Contact Receipt, a citation, or a warning, when required in 40% and 45% of the cases, respectively. MCSO has improved in this area of compliance during the previous reporting period. During the last reporting period, MCSO provided the Incidental Contact Receipt, a citation, or a warning, when required in 81% of the cases. During this reporting period, MCSO provided the Incidental Contact Receipt, a citation, or a warning, when required in 75% of the cases. MCSO is not in compliance with this Subparagraph.

Paragraph 54.h. requires deputies to record, prior to the stop, the reason for the vehicle stop, including a description of the traffic or equipment violation observed, and any indicators of criminal activity developed before or during the stop. For this reporting period, we identified a random sample of 10 cases from the 35 cases we initially requested each month, and requested CAD audio and body-worn camera (BWC) footage for those cases. We listened to CAD dispatch audio recordings, reviewed the CAD printouts, and reviewed body-worn camera recordings for 30 traffic stops from the sample of 105 traffic stops used for this review; and found that the deputies advised Communications of the reason for the stop, location of the stop, license plate, and state of registration for all 30 stops.

For the remaining 75 traffic stops where body-worn camera recordings and CAD audiotapes were not requested, we review the CAD printout and the VSCF to ensure that the reason for the stop has been captured. These forms are included in our monthly sample requests. The dispatcher

WAI 44743

enters the reason for the stop in the system as soon as the deputy verbally advises Communications of the stop, location, and tag number. The VSCF and the CAD printout documents the time the stop begins and when it is concluded – either by arrest, citation, or warning. Deputies need to be precise when advising dispatch of the reason for the traffic stop, and likewise entering that information on the appropriate forms.

MCSO's compliance rating for this Subparagraph is 100%.

Paragraph 54.i. requires deputies to document the time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; the time a release was made without a citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere, or the deputy's departure from the scene. In our review of the documentation provided by MCSO, the CAD printouts, the Vehicle Stop Contact Forms, along with the E-Ticketing system and the Arizona Ticket and Complaint Form, the information required is effectively captured. As we noted in Subparagraph 54.b., the stop times on the CAD printout and the Vehicle Stop Contact Form vary slightly on occasion. We understand that this may occur due to extenuating circumstances, and we will report on those instances where there is a difference of five minutes or more from either the initial stop time or the end time.

We review the circumstances of each stop and the activities of the deputies during each stop to assess whether the length of the stop was justified. During this reporting period, we did not identify any stops that were extended for an unreasonable amount of time.

Supervisors conducted timely reviews and discussions in all 105 VSCFs reviewed. Deputies accurately entered beginning and ending times of traffic stops in all 105 cases reviewed. MCSO accurately entered the time citations and warnings were issued in all 105 cases.

MCSO remains in compliance with this Subparagraph.

Paragraph 54.j. requires MCSO to document whether any inquiry as to immigration status was conducted and whether ICE/CBP was contacted, and if so, the facts supporting the inquiry or contact with ICE/CBP, the time supervisor approval was sought, the time ICE/CBP was contacted, the time it took to complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual.

On November 7, 2014, a United States District Court Judge issued an Order permanently enjoining enforcement of Arizona Revised Statute (A.R.S.) 13-2319, commonly referred to as the Arizona Human Smuggling Act. On November 17, 2014, MCSO issued Administrative Broadcast 14-75, prohibiting deputies from enforcing the above state statute, including arresting, detaining, or questioning persons for suspected (or even known) violations of the act and from extending the duration of traffic stops or other deputy-civilian encounters to do so.

WAI 44744

We reviewed 105 traffic stops submitted for this Paragraph, and found that none of the stops involved any contacts with ICE/CBP. None of the stops we reviewed involved any inquires as to immigration status. In our review of a traffic stops in relation to Paragraphs 25.d. and 54.g., we identified one stop where the deputy noted on the VSCF that a Latino driver was asked by the deputy why he did not have a driver's license. The deputy noted that as the driver explained the issue, he also declared his immigration status – although the deputy did not request such information. The deputy did not list the driver's immigration status and took no action in response to any immigration status information that was provided. The driver was issued a citation for driving without a driver's license and released. In addition, our reviews of Incident Reports and Arrest Reports conducted as part of the audits for Paragraphs 89 and 101 revealed no immigration status investigations. MCSO remains in compliance with this Subparagraph.

Paragraph 54.k. requires MCSO to document whether any individual was asked to consent to a search (and the response), whether a probable-cause search was performed on any individual, or whether a pat-and-frisk search was performed on any individual. During our January 2018 site visit, we discussed with MCSO whether any other method may be feasible to identify a larger population of searches of individuals specific to the requirements of this Paragraph. MCSO's response was that the current method is appropriate, and that there may be more cases identified once deputies properly document the searches of persons consistent with this Paragraph.

MCSO's Compliance Report for the 20th Quarter reporting period indicates that MCSO is considering a policy revision and training opportunities for deputies to assist them to better identify and document searches of persons. MCSO's Compliance Report for the 21st Quarter reporting period indicates that MCSO continues to enforce this Subparagraph requirement and the need for thorough supervisory reviews. We continue to recommend that MCSO implement training to ensure that deputies properly document consent searches of persons, probable-cause searches of persons, and pat-and-frisk searches of persons.

The method MCSO currently employs to identify our sample of cases to review is to identify the population of all traffic stops in which searches of individuals were documented on the VSCF. Once that population was identified, a random sample of 35 traffic stops from each month is identified for review. In addition, we also review any cases in which the deputies performed searches of individuals in the sample of 105 traffic stops reviewed in relation to Paragraphs 25 and 54 and the sample of traffic stops reviewed in relation to Subparagraphs 25.d. and 54.g. When we identify issues that impact compliance or where MCSO policy was not followed, we discuss those cases with MCSO during our site visits. There were not any cases that met these criteria in our sample of 105 traffic stops reviewed in relation to Paragraphs 25 and 54 or in relation to Subparagraphs 25.d. and 54.g. In relation to the sample of traffic stops reviewed in relation to Subparagraph 54.k, there were 10 stops identified that met the criteria of this Subparagraph:

- A White male driver was stopped for excessive speeding, a misdemeanor. The deputy conducted a pat-and-frisk search of the driver during the stop. The driver was detained briefly, and then cited and released for the speeding violation.

WAI 44745

- A White female driver was stopped for a speeding violation. The vehicle was occupied by a Latina passenger. During the stop, the deputy requested and obtained consent to search the driver. The driver then participated in field sobriety tests conducted by the deputy. The driver was subsequently arrested and processed for driving under the influence.

- A White male driver was stopped for failure to maintain a lane of traffic violation. During the stop, the deputy requested and obtained consent to search the driver. The driver then participated in field sobriety tests conducted by the deputy. The driver was subsequently arrested and processed for driving under the influence.

- A White male driver was stopped for a stop sign violation. The deputy requested and obtained consent to search the driver. The deputy conducted a search of the driver; no contraband was found. The deputy also requested consent from the driver to search the vehicle. The driver would not grant consent to search the vehicle.

- A White male driver was stopped for driving with an expired registration. The driver did not have any identification on his person. A records check revealed that the driver's license was in a suspended status. The vehicle was towed, and the driver was issued a citation for driving with a suspended driver's license and no current registration. A pat-and-frisk search of the driver was conducted by the deputy prior to providing the driver with a courtesy ride from the stop location.

- A Black male driver was stopped for a speeding violation. The deputy detected the odor of marijuana. During the stop, the deputy requested to search the driver and the vehicle. The driver granted consent to the search of his person and of the vehicle. The driver admitted that there was marijuana stored in the vehicle. The deputy retrieved the marijuana and placed it in evidence. The driver was arrested and processed for driving under the influence. The driver was issued a citation for the speeding violation. Any potential charges for the possession of marijuana and driving under the influence were pending laboratory testing results, and the review and determination by the Maricopa County Attorney's Office.

- A White male was stopped for driving with one headlight. The deputy detected the odor of alcohol on the driver's breath and requested the driver to the exit the vehicle to conduct field sobriety tests. Based on a review of the body-worn camera recording, after the driver exited the vehicle, the deputy conducted a pat-and-frisk search of the driver as the deputy advised the driver that he was checking for any weapons. The deputy did not request and obtain consent to search the driver; however, the deputy listed the type of search as consent / protective sweep. The driver was found to not be impaired and was issued a warning for the driving with one headlight violation.

- An American Indian/Alaskan Native male driver was stopped for making a wide right turn. Prior to the traffic stop, the driver was observed loitering in the area of a business

parking lot near some bushes. The driver stated he was attempting to lure a cat from the bushes. During the stop, the deputy requested consent to search the driver, which the driver granted. The deputy also requested consent to search the vehicle, which the driver also granted. The deputy did not locate any contraband. The deputy informed the driver that he had a right to tell him to stop the search. The driver was issued a citation for no insurance.

- An Asian or Pacific Islander male driver was stopped for failure to signal a turn. The vehicle was occupied by two Latino passengers. The deputy detected the odor of marijuana and requested consent to search all of the vehicle occupants. The deputy conducted the search and found no contraband. The deputy completed consent to search forms for each of the vehicle occupants, which was signed by each individual. The driver was issued a warning for the failure to signal a turn violation.

- A White female driver was stopped for a speeding violation. The vehicle was occupied by a White male passenger. The driver had no identification on her person. After investigating the driver, the deputy determined that she initially provided a false name and date of birth to the deputy. The driver was arrested for providing false information to a law enforcement officer; and during a search of her person, the deputy located narcotic paraphernalia. Once the deputy obtained the driver's true name and date of birth, it was determined that her driver's license was revoked and that a warrant from a local jurisdiction existed. During a search of the vehicle, the deputy recovered suspected narcotics, narcotic paraphernalia, and a handgun. The driver was arrested and processed for driving under the influence. The deputy investigated the passenger and conducted a pat-and-frisk search of his person; however, the deputy listed on the VSCF that the type of search conducted was an automobile exception, which is a category for use when a search of a vehicle is conducted. No contraband was found. The deputy obtained the passenger's name and conducted a records check; however, the passenger was not provided with an Incidental Contact Receipt.

MCSO has indicated that it does not require its deputies to use Consent to Search Forms as the primary means for documenting consent searches. MCSO requires that deputies document requests to conduct consent searches by way of video-recording the event via the BWCs. In the event the BWC is not operational, MCSO policy requires deputies to document requests to conduct consent searches on the Consent to Search Form. MCSO reports that deputies have electronic access to the Consent to Search Forms. We continue to recommend that MCSO revisit the requirements of this section of the policy and require deputies to read the Consent to Search Form to the subject and require a signature from the individual for every request for consent to search unless the search is an actual search incident to arrest. Due to the small population of cases that we and MCSO identified, it is important that deputies accurately document each search and/or request to a consent search, as required by this Subparagraph, to attain and maintain compliance with the requirement. As we have noted in previous reporting periods, it appears that some

WAI 44747

deputies are not aware of the policy requirements as it relates to informing individuals that a consent search may be refused; or, if granted, that the consent search may be revoked by the individual at any time. We consider this to be a core issue and one that can be remediated easily by the Office. We continue to recommend that MCSO implement training on the specific policy requirements regarding consent searches.

In the last reporting period of 2017, MCSO's compliance rate with this Subparagraph was 67%, with only three cases identified. During the first reporting period of 2018, we identified only one case that was applicable to this requirement and determined that the compliance status would be deferred. Due to the low number of cases identified in the second reporting period of 2018, coupled with the inaccuracies in the some of the cases that were reviewed, we again determined that the compliance status would be deferred. During the third reporting period of 2018, MCSO's compliance rate was 71%. Due to the low number of cases identified during the fourth reporting period of 2018 and the first and second reporting periods of 2019, we deferred our compliance assessment of this Subparagraph during those reporting periods. During the third reporting period of 2019, we determined that MCSO attained a compliance rate of 78%. During this reporting period, we determined that MCSO attained a compliance rating of 90%. MCSO is not in compliance with this requirement.

Paragraph 54.l. requires MCSO to document whether any contraband or evidence was seized from any individual, and the nature of the contraband or evidence. Generally, deputies seize the following types of contraband and/or evidence, which is documented on the VSCF, a Property Receipt, and an Incident Report: license plates; driver's licenses; alcoholic beverages; narcotics; narcotic paraphernalia; weapons; and ammunition. We conduct a review of the relevant documents and review the VSCF to ensure that deputies properly document the seizure of the evidence and/or contraband.

During our review of the collected traffic stop data (our sample of 105) during this reporting period, we identified five cases where items were seized and properly documented on the VSCFs. There was an additional case where an item was seized; however, the seizure was not properly documented on the VSCF. In that one case, the deputy seized a driver's license and placed it into evidence; however, the item was not listed on the VSCF and there was no evidence that the driver was provided with a property receipt, which is required by MCSO policy. An inspection by the Audits and Inspection Unit identified this same issue.

In the cases we reviewed for searches of individuals under Subparagraph 54.k., there were 62 items seized by deputies and placed into evidence. Of those 62 items, there were seven items that were seized and placed into evidence and the items were not properly listed on the VSCFs, as required by MCSO policy. The seven cases involved four cases where the seizure of license plates was not properly documented on the VSCFs, and three cases where the seizure of driver's licenses were not properly documented on the VSCFs.

WAI 44748

In the cases we reviewed for passenger contacts under Subparagraph 54.g., there were 12 items seized by deputies and placed into evidence, with all of the items being properly documented on the VSCFs as required by MCSO policy.

We noted in the previous reporting periods an increase in the number of errors and omissions in relation to deputies documenting the seizure of contraband or evidence on the VSCF. MCSO's compliance rate in the second reporting period of 2018 was 85%, and we reported that MCSO would remain in compliance with this Subparagraph for that reporting period. We also reported that MCSO would be required to attain a rate of compliance of greater than 94% to maintain compliance for the third reporting period of 2018; however, MCSO attained a compliance rate of 70% for that reporting period and MCSO was determined to not be in compliance with this Subparagraph. During the last reporting period of 2018, MCSO attained a compliance rate of 96%. During the first reporting period of 2019, MCSO attained a compliance rate of 87%; and we reported that MCSO would remain in compliance with this Subparagraph for that reporting period. We also reported that MCSO would be required to attain a rate of compliance of greater than 94% for the second quarter reporting period to maintain compliance with this requirement. During the second quarter reporting period of 2019, MCSO attained a compliance rate of 86% and was no longer in compliance with this requirement. During the third quarter reporting period of 2019, MCSO attained a compliance rate of 93%. During this reporting period, MCSO attained a compliance rate of 90%. MCSO is not in compliance with this requirement.

Paragraph 54.m. requires the documentation of the final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without a citation. In all 105 cases we reviewed, we found documentation indicating the final disposition of the stop; and whether the deputy made an arrest, issued a citation, issued a warning, or made a release without a citation. MCSO remains in compliance with this Subparagraph.


***Paragraph 55.*** *MCSO shall assign a unique ID for each incident/stop so that any other documentation (e.g., citations, incident reports, tow forms) can be linked back to the stop.*

**In Full and Effective Compliance**

To verify compliance for this Paragraph, we reviewed a sample of the Vehicle Stop Contact Forms, CAD printouts, I/Viewer documentation, citations, warning forms, and any Incident Report that may have been generated as a result of the traffic stop.

The unique identifier "went live" in September 2013 when the CAD system was implemented. This number provides the mechanism to link all data related to a specific traffic stop. The number is automatically generated by the CAD software and is sent to the deputy's MDT at the time the deputy advises Communications of the traffic stop. The unique identifier is visible and displayed at the top of the CAD printout and also visible on the Vehicle Stop Contact Form, the Arizona Traffic Citation, and the Warning/Repair Form.

WAI 44749

Once the deputy scans the motorist's driver's license, the system automatically populates most of the information into one or more forms required by the Order. If the data cannot be entered into TraCS from the vehicle (due to malfunctioning equipment), policy requires the deputy to enter the written traffic stop data electronically prior to the end of the shift. The start and end times of the traffic stop are now auto-populated into the Vehicle Stop Contact Form from the CAD system.

Since our first visit for monitoring purposes in June 2014, TraCS has been implemented in all Districts; and the unique identifier (CFS number) is automatically entered from the deputy's MDT. No user intervention is required.

To determine compliance with this requirement, we reviewed 105 traffic stop cases and reviewed the CAD printouts and the Vehicle Stop Contact Forms for all stops. We reviewed the Warning/Repair Forms, when applicable, for those stops where a warning was issued or the vehicle had defective equipment. The unique identification number assigned to each event was listed on correctly on all CAD printouts for every stop. MCSO remains in compliance with this requirement.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.


***Paragraph 56.*** *The traffic stop data collection system shall be subject to regular audits and quality control checks. MCSO shall develop a protocol for maintaining the integrity and accuracy of the traffic stop data, to be reviewed by the Monitor pursuant to the process described in Section IV.*

**Phase 1:** Not in compliance

- EB-2 (Traffic Stop Data Collection), most recently amended on January 7, 2020.

- EIU Operations Manual, currently under revision.

**Phase 2:** Not in compliance

To verify compliance for this Paragraph, we reviewed the monthly audits of the traffic stop data conducted by BIO on the monthly samples we select. While audits require in-depth analysis, our quality control checks serve as more of an inspection or spot-check of traffic stop data. We reviewed the BIO traffic stop audits for the October 1-December 31, 2019 time period and found that the audits were thorough and captured most deficiencies. During our review of the sample dataset, we identified some deficiencies and brought them to the attention of CID while onsite during our January 2020 site visit; we identify them in other areas of this report.

We reviewed the draft EIU Operations Manual, which includes procedures for traffic stop data quality assurance. During our January 2020 site visit, EIU provided an update on the status of its effort to complete the EIU Operations Manual. It reported that, of the total 30 sections in the EIU

WAI 44750

Operations Manual, 27 sections have been approved. The remaining sections under development cannot be finalized until the TSAR and TSMR methodologies related to annual and monthly analyses of traffic stop data (TSAR and TSMR, respectively) are determined to be reliable and valid in accordance with the requirements of Paragraphs 66 and 67. (See below.) Phase 1 compliance will be realized when all sections have been reviewed and approved.

On September 8, 2015, MCSO issued Administrative Broadcast 15-96, which addressed the security of paper traffic stop forms. The procedure requires that paper forms (related to traffic stop data that may be handwritten by deputies in the field if the TraCS system is nonoperational due to maintenance or lack of connectivity) be stored in a locked cabinet and overseen by the Division Commander. During our January 2020 visits to the Districts, we inspected the written (hardcopy) files and verified that all records were locked and secure, that logs were properly maintained, and that only authorized personnel had access to these files.

MCSO began auditing traffic stop data in January 2014; and since April 2014, MCSO has conducted audits of the data monthly and provided those results to us. We reviewed BIO's monthly audits of the traffic samples from October 1-December 31, 2019; and found them to be satisfactory. MCSO conducts audits of the 105 traffic stop sample that we request each reporting period. It also conducts a more expansive review of 30 of the 105 sample pulls we request each reporting period to include passenger contacts and persons' searches. EB-2 also requires regularly scheduled audits of traffic stop data on a monthly basis.

To achieve Phase 1 compliance with this Paragraph, MCSO must finalize the EIU Operations Manual to cover all matters applicable to this Paragraph. To achieve Phase 2 compliance with this Paragraph, MCSO must demonstrate ongoing use of the procedures to ensure traffic stop data quality assurance.


***Paragraph 57.*** *MCSO shall explore the possibility of relying on the CAD and/or MDT systems to check if all stops are being recorded and relying on on-person recording equipment to check whether Deputies are accurately reporting stop length. In addition, MCSO shall implement a system for Deputies to provide motorists with a copy of non-sensitive data recorded for each stop (such as a receipt) with instructions for how to report any inaccuracies the motorist believes are in the data, which can then be analyzed as part of any audit. The receipt will be provided to motorists even if the stop does not result in a citation or arrest.*

**Phase 1:** In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on October 25, 2019.

- EB-2 (Traffic Stop Data Collection), most recently amended on January 7, 2020.

- GJ-35 (Body-Worn Cameras), most recently amended on December 31, 2019.

WAI 44751

**Phase 2:** In compliance

To verify compliance for this Paragraph, we reviewed all TraCS forms for each traffic stop that were included in the sample. In addition, we reviewed a subset of CAD audio recordings and body-worn camera footage of the stops.

The system for providing "receipts" is outlined in EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) and EB-2 (Traffic Stop Data Collection). GJ-35 addresses the requirement that supervisors review recordings to check whether deputies are accurately reporting stop length. In addition to GJ-35, BIO developed a Body-Worn Camera Matrix for its inspectors to review camera recordings.

The deputy should provide every person contacted on a traffic stop with an Arizona Traffic Ticket or Complaint (Citation), a Written Warning/Repair Order (Warning), or an MCSO Incidental Contact Receipt. To verify compliance that the violator received the required "receipt" from the deputy, a signature is required, or, if the violator refuses to sign, the deputy may note the refusal on the form. We are unable to verify that motorists have been issued a receipt without a signature on the form, or the deputy advising of the refusal of the receipt from the driver. Placing "SERVED" in the signature box without any explanation does not comply with the requirement. There have been instances where MCSO has provided copies of the Arizona Traffic Ticket or Complaint and a signature from the driver was absent; however, based on our review of the body-worn camera recording we observed the signature being obtained from the driver. For this reporting period, deputies issued citations or written warnings in all 105 cases we reviewed.

We did not identify any issues with the citations, warnings and Incidental Contact Receipts issued to drivers for the cases reviewed under Subparagraphs 25.d. and 54.g., in relation to contact with passengers and Subparagraph 54.k., in relation to searches of persons.

MCSO's compliance rate with this requirement is 100%. MCSO remains in compliance with this portion of the Subparagraph.

The approved policies dictate that the CAD system will be used for verification of the recording of the initiation and conclusion of the traffic stop and that MCSO will explore the possibility of relying on the BWC recordings to verify that the stop times reported by deputies are accurate. The deputy verbally announces the stops initiation and termination on the radio, and then CAD permanently records this information. In May 2016, MCSO advised us that all deputies and sergeants who make traffic stops had been issued body-worn cameras and that they were fully operational. We verified this assertion during our July 2016 site visit; and since that time, we have been reviewing the BWC recordings to determine if stop times indicated by CAD were accurate. MCSO's Audit and Inspections Unit (AIU) conducts monthly inspections of traffic stop data, which includes an assessment as to whether the BWC video captured the traffic stop in its entirety; to verify the time the stop began; and to verify if all information on forms prepared for each traffic stop match the BWC video. AIU conducts reviews of 30 body-worn camera recordings each reporting period.

WAI 44752

During this reporting period, we requested from MCSO 30 body-worn camera recordings for our review. We are able to use the BWC recordings that were provided for each stop to assess whether deputies are accurately reporting the stop length. The compliance rate for the sample of 30 cases selected from the 105 stops reviewed for using the BWC to determine if deputies are accurately reporting stop length is 100%. MCSO remains in compliance with this requirement.

***Paragraph 58.*** *The MCSO shall ensure that all databases containing individual-specific data comply with federal and state privacy standards governing personally identifiable information. MCSO shall develop a process to restrict database access to authorized, identified users who are accessing the information for a legitimate and identified purpose as defined by the Parties. If the Parties cannot agree, the Court shall make the determination.*

**Phase 1:** In compliance

- GF-1 (Criminal Justice Data Systems), most recently amended on February 27, 2020.
- GF-3 (Criminal History Record Information and Public Records), most recently amended on April 3, 2019.

**Phase 2**: In compliance

To verify compliance for this Paragraph, we reviewed the applicable policies and met with Technology Management Bureau personnel to determine if any unauthorized access and/or illegitimate access to any of MCSO's database systems had occurred during this reporting period. The policies state that the dissemination of Criminal History Record Information (CHRI) is based on federal guidelines, Arizona statutes, the Department of Public Safety (ASDPS), and the Arizona Criminal Justice Information System (ACJIS); and that any violation is subject to fine. No secondary dissemination is allowed. The policies require that the Professional Standards Bureau (PSB) provide written notification to the System Security Officer whenever it has been determined that an employee has violated the policy by improperly accessing any Office computer database system. Every new recruit class receives three hours of training on this topic during initial Academy training.

During our January 2020 site visit, we inquired whether there had been any instances of unauthorized access to and/or any improper uses of the database systems. MCSO informed us that PSB did not identify any closed cases during this reporting period in which there was a finding that there was unauthorized access to and/or any improper uses of MCSO's database systems. MCSO remains in compliance with this requirement.

WAI 44753

***Paragraph 59.*** *Notwithstanding the foregoing, the MCSO shall provide full access to the collected data to the Monitor and Plaintiffs' representatives, who shall keep any personal identifying information confidential. Every 180 days, MCSO shall provide the traffic stop data collected up to that date to the Monitor and Plaintiffs' representatives in electronic form. If proprietary software is necessary to view and analyze the data, MCSO shall provide a copy of the same. If the Monitor or the Parties wish to submit data with personal identifying information to the Court, they shall provide the personally identifying information under seal.*

**In Full and Effective Compliance**

Electronic traffic stop data capture began on April 1, 2014. The forms created by MCSO capture the traffic stop details required by MCSO policy and Paragraphs 25 and 54. BIO provides the traffic stop data on a monthly basis, which includes a spreadsheet of all traffic stops for the reporting period, listing Event Numbers as described at the beginning of Section 7. All marked patrol vehicles used for traffic stops are now equipped with the automated TraCS system, and all Patrol deputies have been trained in TraCS data entry. MCSO has provided full access to all available electronic and written collected data since April 1, 2014. MCSO did not collect electronic data before this time. During this reporting period, MCSO has continued to provide full access to the traffic stop data.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.


*b. Electronic Data Entry*

***Paragraph 60.*** *Within one year of the Effective Date, the MCSO shall develop a system by which Deputies can input traffic stop data electronically. Such electronic data system shall have the capability to generate summary reports and analyses, and to conduct searches and queries. MCSO will explore whether such data collection capability is possible through the agency's existing CAD and MDT systems, or a combination of the CAD and MDT systems with a new data collection system. Data need not all be collected in a single database; however, it should be collected in a format that can be efficiently analyzed together. Before developing an electronic system, the MCSO may collect data manually but must ensure that such data can be entered into the electronic system in a timely and accurate fashion as soon as practicable.*

**In Full and Effective Compliance**

To verify compliance with this Paragraph, we reviewed the documents generated electronically that capture the required traffic stop data. The electronic data entry of traffic stop data by deputies in the field went online on April 1, 2015. If TraCS experiences a malfunction in the field, there is a protocol that requires the deputy to electronically enter the traffic stop data prior to the end of the shift.

WAI 44754

MCSO continues to conduct monthly traffic stop inspections and forwards them for our review. Initially, the traffic stop data was captured on handwritten forms created by MCSO, completed by the deputy in the field, and manually entered in the database by administrative personnel located at each District. Now all traffic stop data is entered electronically, whether in the field or at MCSO District offices. Occasionally, connectivity is lost in the field due to poor signal quality, and citations are handwritten. Per policy, deputies must enter electronically any written traffic stop data they have created by the end of the shift in which the event occurred. As noted in our Paragraph 90 review, VSCFs are routinely entered into the system by the end of the shift. During our January 2020 site visit, we met with MCSO and the Parties; and reviewed the deficiencies BIO and our reviews discovered for this reporting period, along with the results of the Action Forms generated by BIO.

Deputies have demonstrated their ability to access and use TraCS, as evidenced by the fact that their total time on a traffic stop averages 16 minutes or less.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.


### c. Audio-Video Recording of Traffic Stops

*Paragraph 61. The MCSO will issue functional video and audio recording equipment to all patrol deputies and sergeants who make traffic stops, and shall commence regular operation and maintenance of such video and audio recording equipment. Such issuance must be complete within 120 days of the approval of the policies and procedures for the operation, maintenance, and data storage for such on-person body cameras and approval of the purchase of such equipment and related contracts by the Maricopa County Board of Supervisors. Subject to Maricopa County code and the State of Arizona's procurement law, The Court shall choose the vendor for the video and audio recording equipment if the Parties and the Monitor cannot agree on one.*

**In Full and Effective Compliance**

During our September 2014 site visit, we met with two MCSO Deputy Chiefs and other personnel to discuss MCSO's progress of acquiring in-car video and audio equipment for all patrol vehicles used to conduct traffic stops. MCSO had initially set out to purchase fixed in-car cameras as required by the Order, but expressed an interest in acquiring body-worn video and audio recording devices for deputies. The Court issued an Order providing an amendment/stipulation on October 10, 2014, requiring on-body cameras. This was a prudent decision, in that it allows for capturing additional data, where a fixed mounted camera has limitations. We have documented MCSO's transition from in-car to body-worn cameras (BWC) in our previous quarterly status reports.

WAI 44755

Records indicate that MCSO began distribution of body-worn cameras on September 14, 2015, and full implementation occurred on May 16, 2016. The body-worn camera recordings are stored in a cloud-based system (on evidence.com) that can be easily accessed by supervisors and command personnel. The retention requirement for the recordings is three years. In July 2019, MCSO began distribution of the newer version of body-worn cameras to deputies. During our October site visit, MCSO reported that deputies assigned to the Districts have all been equipped with the new body-worn cameras and that deputies in specialized assignments were in the process of being equipped with the new devices. The new version of body-worn cameras purchased by MCSO is mounted on the chest area via a magnetic mount. In addition, the devices are self-contained, meaning that the device does not have any cords or wires that may become disconnected, which has been a recurring problem with the current devices. During our review of body-worn camera recordings during this reporting period, there was a significant increase in the number of traffic stops in which deputies used the new devices. As we reported in the previous reporting period, we noted improvement in the sound quality; we also noted that the video quality was clearer and provided a wider view of the event. During our review of traffic stops during this reporting period, we noted that in every instance, deputies used the new body-worn camera.

To verify that all Patrol deputies have been issued body-worn cameras, and properly utilize the devices, we review random samples of the traffic stops as described in Paragraphs 25 and 54. In addition, during our District visits we observe that deputies are equipped with body-worn cameras.

During our January 2020 site visit, we visited District 3 and participated in a ride-along with a Patrol supervisor. The deputies in the District were observed wearing the body-worn cameras affixed to the chest area. The supervisor stated that the new body-worn cameras appear to be more responsive and quicker to activate than the previous model. The supervisor stated that one drawback was that traffic violations would not be recorded with the new body-worn cameras since they are secured to the chest area.

The supervisor provided an overview of his duties, which included how he conducts his reviews of traffic stops and body-worn camera reviews and the documentation entry process for Blue Team. During the ride-along, deputies were observed in the field wearing the body-worn cameras in a proper manner during a call for service.

In addition, we met with personnel from Districts 2 and 6 and inquired whether deputies and supervisors had been experiencing any difficulty with the new BWC equipment. MCSO personnel reported that there have not been any performance issues with the new body-worn cameras.

On December 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 44756

***Paragraph 62.*** *Deputies shall turn on any video and audio recording equipment as soon the decision to initiate the stop is made and continue recording through the end of the stop. MCSO shall repair or replace all non-functioning video or audio recording equipment, as necessary for reliable functioning. Deputies who fail to activate and to use their recording equipment according to MCSO policy or notify MCSO that their equipment is nonfunctioning within a reasonable time shall be subject to Discipline.*

**Phase 1:** In compliance

- GJ-35 (Body-Worn Cameras), most recently amended on December 31, 2019.
- Body-Worn Camera Operations Manual, published on December 22, 2016.

**Phase 2**: In compliance

MCSO evaluated on-person body cameras from other jurisdictions and selected a vendor (TASER International, now known as Axon). Body-worn cameras have been implemented in all Districts since May 2016 and are fully operational. As mentioned under Paragraph 61, MCSO has obtained, and has equipped the deputies in the Districts with new body-worn cameras, also provided by Axon.

To verify compliance for this Paragraph, we reviewed the body-worn camera recordings included in our monthly samples. This includes the stops reviewed each month for Paragraphs 25 and 54; the stops reviewed each month for Subparagraph 54.k.; and the stops reviewed each month for Subparagraph 54.g. For purposes of calculating compliance, we exclude any stops where the deputies documented on the VSCF that the BWCs malfunctioned during the stop.

For our selection of a sample to review BWC recordings, we used the same sample of 30 cases we selected for the CAD audio request. Of the 30 cases in which we requested BWC recordings, there were not any cases where the deputies documented that the devices malfunctioned; however, there were two cases where body-worn camera recordings were not available:

- In one case, the deputy conducted a traffic stop and no recording could be located that captured the initiation of the stop and the initial contact with the driver. The body-worn camera recording commenced after the deputy had contact with the driver. There was no documentation on the VSCF that indicated that there was a malfunction of the body-worn camera. Audits and Inspection Unit also identified the issue and requested that the District prepare a BIO Action Form addressing any corrective action that is taken.

- In one case, no recording could be located for a deputy that assisted on a traffic stop. There was no documentation on the VSCF or the Assisting Deputy and Body-Worn Camera Log that indicated that there was a malfunction of the body-worn camera.

WAI 44757

In our sample of body-worn camera recordings reviewed for Subparagraph 54.k., we identified the following case in which the deputy did not properly a record traffic stop event:

- There was no body-worn camera recording of the traffic stop event. There was no documentation on the VSCF in relation to the body-worn camera malfunctioning.

In our sample of body-worn camera recordings for Subparagraph 54.g., we identified the following case in which deputy did not record a portion of a traffic stop event:

- The deputy documented that he attempted to activate his body-worn camera as the vehicle in front of him rapidly made an improper lane change and then subsequently stopped and a subject fled from the vehicle. Once the deputy discovered the body-worn camera was not activated, he turned on the camera. The deputy documented the exigent circumstances on the VSCF.

The remainder of the cases were in compliance, with the deputy activating the video- and audio-recording equipment as soon as the deputy decided to initiate the stop, and continuing to record through the end of the stop. We will discuss the aforementioned cases with MCSO during our next site visit.

MCSO's compliance rate for this requirement is 99%.

During our reviews, with the implementation of the new body-worn cameras, we have noted a decrease in the number of instances in which the deputies failed to ensure that the body-worn camera is positioned properly during contact with the driver and/or passenger(s).

There are still a number of instances in which deputies respond to assist at traffic stops and do not complete the Assisting Deputy and Body-Worn Camera Log. With the issuance of GJ-35 (Body-Worn Cameras), effective on December 31, 2019, the policy is now consistent with EB-2 (Traffic Stop Data Collection), which requires that each deputy assisting on a traffic stop prepare the Assisting Deputy and Body-Worn Camera Log. With that policy clarification, coupled with effective supervisory reviews, we anticipate that deputies will understand when they are required to complete the log.

Our reviews of the body-worn camera recordings often reveal instances of deputies exhibiting positive, model behavior; and, at times, instances of deputies making errors, or exhibiting less than model behavior – all of which would be useful for training purposes. We also reviewed the Professional Standards Bureau's monthly summary of closed cases for October, November, and December 2019. The following cases were identified that involve the review of body-worn camera recordings to assist in the determination of whether the allegations were valid or not:

WAI 44758

- In one case, it was alleged that a deputy was rude, disrespectful, and racist toward a complainant during a call for service. The deputy was alleged to have threatened to arrest the complainant is she did not "shut up." A review of the body-worn camera recording revealed that the allegations against the deputy were false. The deputy was found to have been stern with the complainant; yet he remained professional.

- In one case, it was alleged that a deputy yelled at the complainant's wife during a traffic stop and attempted to intimidate her during the stop. It was also alleged that the deputy failed to inform the driver of the reason for the traffic stop. A review of the body-worn camera recording revealed that the deputy acted in a calm and professional manner and that the information provided to the law enforcement agency was accurate. It was also determined that the deputy properly informed the driver of the reason for the traffic stop.

- In one case, based on an internal MCSO complaint, it was alleged that a deputy sergeant cited four people for a criminal violation without probable cause and that he denied them an opportunity to use the restroom. It was also alleged that a deputy involved in the incident used profane language toward the detainees and made references to holding their heads under water; and that since they would not communicate with him in the English language, that they were liars. It was also alleged that the deputy determined that the detainees were in the county without authorization; and he improperly impounded a vehicle due to the detainees not having any type of identification, and based upon their race/ethnicity and due to them speaking Spanish. It was also alleged that the deputy deactivated his body-worn camera prior to completion of the incident. After an investigation of the incident and review of the body-worn camera recording, it was determined that the report prepared by the deputy sergeant was within policy and contained probable cause for the issuance of four criminal citations. It was determined that the deputy sergeant failed to take appropriate action when the involved deputy made biased statements and took bias-based actions toward the detainees. The deputy was found to have displayed an unprofessional demeanor and exhibited bias-based behavior toward the detainees; failed to advise the detainees of their *Miranda* rights; and improperly deactivated his body-worn camera during the encounter. The deputy's sergeant was demoted; and the involved deputy is no longer employed by MCSO, as his employment was terminated.

As demonstrated with the aforementioned examples, body-worn cameras recordings have proven to be invaluable in resolving complaints alleging misconduct by deputies.

WAI 44759

*Paragraph 63.* *MCSO shall retain traffic stop written data for a minimum of 5 years after it is created, and shall retain in-car camera recordings for a minimum of 3 years unless a case involving the traffic stop remains under investigation by the MCSO or the Monitor, or is the subject of a Notice of Claim, civil litigation or criminal investigation, for a longer period, in which case the MCSO shall maintain such data or recordings for at least one year after the final disposition of the matter, including appeals. MCSO shall develop a formal policy, to be reviewed by the Monitor and the Parties pursuant to the process described in Section IV and subject to the District Court, to govern proper use of the on-person cameras; accountability measures to ensure compliance with the Court's orders, including mandatory activation of video cameras for traffic stops; review of the camera recordings; responses to public records requests in accordance with the Order and governing law; and privacy protections. The MCSO shall submit such proposed policy for review by the Monitor and Plaintiff's counsel within 60 days of the Court's issuance of an order approving the use of on-body cameras as set forth in this stipulation. The MCSO shall submit a request for funding to the Maricopa County Board of Supervisors within 45 days of the approval by the Court or the Monitor of such policy and the equipment and vendor(s) for such on-body cameras.*

**Phase 1:** In compliance

- EB-2 (Traffic Stop Data Collection), most recently amended on January 7, 2020.
- GJ-35 (Body-Worn Cameras), most recently amended on December 31, 2019.
- Body-Worn Camera Operations Manual, published on December 22, 2016.

**Phase 2:** In compliance

MCSO developed and issued a protocol and policy that requires the original hardcopy form of any handwritten documentation of data collected during a traffic stop to be stored at the District level and filed separately for each deputy. When a deputy is transferred, his/her written traffic stop information follows the deputy to his/her new assignment. During our January 2020 site visit, we inspected the traffic stop written data files at District 2 and District 6 to ensure that hardcopies of traffic stop cases are stored for a minimum of five years. We found that the records were in order and properly secured.

### d. Review of Traffic Stop Data

*Paragraph 64.* *Within 180 days of the Effective Date, MCSO shall develop a protocol for periodic analysis of the traffic stop data described above in Paragraphs 54 to 59 ("collected traffic stop data") and data gathered for any Significant Operation as described in this Order ("collected patrol data") to look for warning signs or indicia or possible racial profiling or other improper conduct under this Order.*

**Phase 1:** Not in compliance

WAI 44760

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on October 25, 2019.

- EB-2 (Traffic Stop Data Collection), most recently amended on January 7, 2020.

- GJ-33 (Significant Operations), most recently amended on May 10, 2018.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

- EIU Operations Manual, currently under revision.

**Phase 2:** Not in compliance

MCSO will achieve Phase 1 compliance with this Paragraph when it incorporates its protocols for periodic analyses of the traffic stop data into the EIU Operations Manual. To achieve Phase 2 compliance with this Paragraph, MCSO must demonstrate ongoing use of the methodologies delineated in the protocol established for Phase 1 compliance in the monthly, quarterly, and annual analyses used to identify racial profiling or other bias-based problems.

***Paragraph 65.*** *MCSO shall designate a group with the MCSO Implementation Unit, or other MCSO Personnel working under the supervision of a Lieutenant or higher-ranked officer, to analyze the collected data on a monthly, quarterly and annual basis, and report their findings to the Monitor and the Parties. This review group shall analyze the data to look for possible individual-level, unit-level or systemic problems. Review group members shall not review or analyze collected traffic stop data or collected patrol data relating to their own activities.*

**Phase 1:** In compliance

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:** Not in compliance

The Traffic Stop Analysis Unit (TSAU) is the Unit that is directly responsible for analyses of traffic stop data on a monthly, quarterly, and annual basis to identify warning signs or indicia or possible racial profiling or other improper conduct as prescribed by Paragraph 64. It must report the findings of its analyses to the Monitor and the Parties.

We note that Paragraph 65 contemplates quarterly analyses of traffic stop data, but no analyses have ever been conducted. During our January 2020 site visit, MCSO presented quarterly study topics for our consideration. MCSO expressed interest in our approving the list of topics in order to prevent a slowdown in its ability to produce quarterly reports. MCSO's concern is in response

WAI 44761

to our requirement that once the agency starts conducting quarterly analyses, it must do so continuously every quarter to maintain compliance. Agreeing that MCSO's concern was valid, we approved seven topics – with the caveat that methodologies for each topic are open for discussion in the future. We approved the first proposed quarterly study and its methodology during our January 2020 site visit. The topic of the first study will be an evaluation of supervisor traffic stop reviews. It will focus on the review process of BWC footage from deputy-initiated traffic stops.

Paragraph 65 also requires MCSO to conduct monthly analyses of traffic stop data. MCSO's original monthly process to analyze traffic stop data began in 2015, but was suspended in May 2016 because of our determination that the original process lacked statistical validity and required significant refinement to improve the identification of potential alerts in EIS. MCSO resumed monthly analyses of traffic stop data in May 2017 using a new methodology that was statistically based and not subject to the arbitrary, unscientific method originally employed by MCSO. While improved, the new methodology generated a substantial number of alerts, many of which did not demonstrate a pattern of potential bias sufficient to warrant the setting of an alert in EIS. Because of our concern about the number of potential alerts the monthly analysis generated – a concern that MCSO also shared – we suspended the process during our July 2017 site visit to allow EIU time to consider possible refinements to the existing methodology.

MCSO's vendor, CNA, has proposed a new methodology for the monthly analysis of traffic stop data (TSMR). This methodology involves using a comparative analysis involving propensity score weighting for those deputies making more than 20 stops over a rolling 12-month period. For those deputies making fewer than 20 stops over the same period, the methodology will involve using descriptive statistics to compare a deputy to their peers – i.e., those who are also in the pool of deputies making fewer than 20 stops. The TSMR methodology is to be implemented as a pilot program, currently planned to cover a four-to-five-month period starting in the first calendar year quarter of 2020. This will enable us and MCSO to test the efficacy of the methodology. We will be working with MCSO and CNA on an ongoing basis with periodic telephonic meetings to track progress of the pilot.

MCSO will achieve Phase 2 compliance with this Paragraph when its periodic analyses involve the consistent use of a statistical methodology designed to identify patterns of deputy behavior at odds with their peers.

WAI 44762

***Paragraph 66.*** *MCSO shall conduct one agency-wide comprehensive analysis of the data per year, which shall incorporate analytical benchmarks previously reviewed by the Monitor pursuant to the process described in Section IV. The benchmarks may be derived from the EIS or IA-PRO system, subject to Monitor approval. The MCSO may hire or contract with an outside entity to conduct this analysis. The yearly comprehensive analysis shall be made available to the public and at no cost to the Monitor and Plaintiffs.*

**Phase 1:** In compliance

- EB-2 (Traffic Stop Data Collection), most recently amended on January 7, 2020.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:** In compliance

MCSO has completed four comprehensive annual evaluations of traffic stop data to look for evidence of racial profiling or other bias-based policing. The first three were conducted by MCSO's first contract vendor, Arizona State University. The latest was conducted by MCSO's new vendor, CNA.

MCSO released the first annual comprehensive evaluation on May 24, 2016 titled, "Preliminary Yearly Report for the Maricopa County's Sheriff's Office, Years 2014-2015." It found that there are deputies engaged in racially biased policing when compared to the average behavior of their peers.

MCSO released the second annual evaluation on March 1, 2017. However, this evaluation had to be withdrawn due to data problems; it was subsequently re-released on July 28, 2017 and posted on MCSO's website in October 2017. There were no significant differences in findings from those of the first annual evaluation. It confirmed the first report's main finding that racially biased policing within MCSO appears to be both a deputy and organizational level problem.

The third annual comprehensive evaluation was released on May 17, 2018, employing methodologies similar to those in the first two comprehensive evaluations and found the same results of its two predecessor reports: racially biased policing persists within MCSO at the organizational level.

WAI 44763

The three comprehensive evaluations employed methodologies that were supported by the peer-review literature and were approved by us for purposes of satisfying the requirements of this Paragraph. While the scientific basis of the methodology is valid, we note that its implementation was problematic. As previously stated, the second evaluation had to be completely redone due to data problems. Likewise, the third evaluation had to be redone due to serious miscoding of the underlying data. During our July 2019 site visit, MCAO stated that the prior contractor's TSAR analysis was seriously flawed, thereby casting more doubt on the validity of the third comprehensive evaluation. The failure to successfully implement the approved methodologies is well-documented in our previous reports.

The contract with the first vendor ended on June 30, 2018. A contract was awarded to the new vendor on August 29, 2018.

During our July 2019 site visit, we were presented with a new methodology proposed by CNA for the TSAR. (We note for purposes of providing background that much of the proposed TSAR methodology would also be applied to the TSMR.) In simple terms, the new methodology took a different approach to defining the concept of peers, which the First Order requires as the basis of analysis to look for searching for evidence of bias-based policing. We have discussed the changes to the TSAR methodology in our previous quarterly status reports. We approved the TSAR methodology on April 30, 2019.

The fourth TSAR used a data file spanning the 18-month period from July 2017-June 2018. We received the fourth TSAR on September 30, 2019; and reviewed it during our October 2019 site visit. During our meeting with MCSO and CNA, we raised our concerns about the report's failure to comment on the potential existence of systemic problems. To be clear, we had no disagreements with the findings about disparate outcomes derived from the application of the approved TSAR methodology. However, despite the report's findings about disparate outcomes, it did not address the well-established historical practice approved by the Monitor, MCSO, and the Parties to weigh the body of evidence from the analysis and offer conclusions about potential systemic problems.

According to Paragraph 64, the purpose of traffic stop analysis – including the annual analysis – is to "to look for warning signs or indicia or possible racial profiling or other improper conduct under this Order." The stated purpose contained in the Fourth TSAR is to "determine whether disparate outcomes exist by race of driver." The Fourth TSAR did indeed find disparate outcomes by race of driver, but the report never explained what these findings meant with regard to systemic bias. More specifically, unlike the previous three TSARs that reported the presence of systemic bias within the Patrol Division of MCSO, the fourth TSAR failed to make a determination on whether the findings of disparate outcomes were a systemic problem. We, MCSO, and the Parties have all agreed to be the purpose of the TSAR. However, the Fourth TSAR did not include such a conclusionary statement.

WAI 44764

On October 25, 2019, the Sheriff issued a statement that read, "The 4th Traffic Stop Annual Report continues to show disparate outcomes in our traffic stops of minorities. These disparate outcomes are warning signs of potential racial bias in our patrol function, which has been and continues to be a major concern for the Office. These may be indicative of a systemic problem. We will continue to work with the Monitor and the Parties on how best to determine the cause of these disparate outcomes and how best to address racial bias in our patrol function, where it exists. We will remain diligent, continue to develop our internal oversight, accountability and consequences to properly address and root out any behaviors in conflict with our commitment to ethical, constitutional policing practices." Because MCSO did address the matter of systemic bias as a supplement to the TSAR and committed during our January 2020 site visit to fully satisfy this requirement to discuss systemic bias in future TSARs, MCSO is now in Phase 2 compliance with this Paragraph.

***Paragraph 67.*** *In this context, warning signs or indicia of possible racial profiling or other misconduct include, but are not limited to:*

a. *racial and ethnic disparities in deputies', units' or the agency's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of deputies' duties, or racial or ethnic disparities in traffic stop patterns when compared with data of deputies' peers;*

b. *evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;*

c. *a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;*

d. *indications that deputies, units or the agency is not complying with the data collection requirements of this Order; and*

e. *other indications of racial or ethnic bias in the exercise of official duties.*

**Phase 1:** In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on October 25, 2019.

- EB-2 (Traffic Stop Data Collection), most recently amended on January 7, 2020.

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:** Deferred

WAI 44765

The EIU provided monthly analyses and documents describing the benchmarks used to set alerts for possible cases of racial profiling or other deputy misconduct involving traffic stops. As reported in Paragraph 65, this process was suspended in July 2017. During our July 2019 site visit, we noted that we had sent MCSO our final comments; and that our remaining concerns were satisfactorily addressed. Our previous concerns about prior TSMR methodologies are documented in previous reports.

As discussed in Paragraph 65, we have approved a new TSMR methodology, which is to be piloted over a four-to-five-month period starting with the first calendar quarter of 2020. During our January 2020 site visit, we agreed to hold regular telephonic meetings during the pilot to identify potential problems and solutions to expedite the resumption of the TSMR.

We have discussed in our previous quarterly status reports that MCSO has achieved Phase 1 compliance with this Paragraph as a result of its intent to implement the individual benchmarks required by this Paragraph. These benchmarks are highlighted below and are generally referred to as post-stop outcomes in the TSMR methodology.

Paragraph 67.a. identifies three benchmarks pertaining to racial and ethnic disparities. The first benchmark references disparities or increases in stops for minor traffic violations (Benchmark 1). The second benchmark addresses disparities or increases in arrests following traffic stops (Benchmark 2). The third benchmark addresses disparities or increases in immigration status inquiries (Benchmark 3). Since these three benchmarks are incorporated into the EIU Operations Manual and are incorporated as post-stop outcomes in the TSMR methodology being piloted, MCSO is in compliance with Paragraph 67.a.

Paragraph 67.b. identifies a benchmark pertaining to evidence of an extended traffic stop involving Latino drivers or passengers (Benchmark 4). Since this benchmark is now incorporated into the EIU Operations Manual and is incorporated in the TSMR methodology being piloted, MCSO is in compliance with Paragraph 67.b.

Paragraph 67.c. identifies three benchmarks. The first benchmark pertains to the rate of citations (Benchmark 5): MCSO is required to identify citation rates for traffic stops that are outliers when compared to a deputy's peers. The second benchmark (Benchmark 6) pertains to seizures of contraband: MCSO is required to identify low rates of seizures of contraband following a search or investigation. The third benchmark in Paragraph 67.c. (Benchmark 7) is similar to Benchmark 6, but it pertains to arrests following a search or investigation. This is also the case for Benchmark 7. Since the three benchmarks are now incorporated into the EIU Operations Manual and are incorporated as post-stop outcomes in the TSMR methodology being piloted, MCSO is in compliance with Paragraph 67.c.

Paragraph 67.d. establishes a benchmark pertaining to agency, unit, or deputy non-compliance with the data collection requirements under the First Order (Benchmark 8). This benchmark requires that any cases involving non-compliance with data collection requirements results in an alert in EIS. EIU published an Administrative Broadcast on November 28, 2016 to instruct

supervisors how to validate data in TraCS for those cases involving duplicate traffic stop records to deliver timely data validation for our review. MCSO's draft EIS Project Plan 4.0 reported that MCSO began the data validation process for this benchmark on November 28, 2016. Therefore, MCSO is in compliance with Paragraph 67.d.

Paragraph 67.e. allows for other benchmarks to be used beyond those prescribed by Paragraph 67.a.-d. MCSO has three benchmarks under Paragraph 67.e. Benchmark 9 is defined as racial or ethnic disparities in search rates. Benchmark 10 is defined as a racial or ethnic disparity in passenger contact rates. Benchmark 11 is defined for non-minor traffic stops. Benchmarks 9-11 are incorporated into the EIU Operations Manual, as well as the TSMR methodology now being piloted. Therefore, MCSO is in compliance with Paragraph 67.e.

While MCSO has completed operationalizing the benchmarks required by this Paragraph, we have discussed the problems with MCSO's previous methodologies. Simply put, these earlier methodologies produced too many alerts that MCSO could reasonably manage on an ongoing basis. As noted earlier, CNA has developed an alternative methodology for the TSMR that has been approved and is now being piloted.

Until the TSMR methodology is tested and found to be reliable and valid, we are deferring our Phase 2 compliance assessment of Paragraph 67.

**Paragraph 68.** *When reviewing collected patrol data, MCSO shall examine at least the following:*

a. *the justification for the Significant Operation, the process for site selection, and the procedures followed during the planning and implementation of the Significant Operation;*

b. *the effectiveness of the Significant Operation as measured against the specific operational objectives for the Significant Operation, including a review of crime data before and after the operation;*

c. *the tactics employed during the Significant Operation and whether they yielded the desired results;*

d. *the number and rate of stops, Investigatory Detentions and arrests, and the documented reasons supporting those stops, detentions and arrests, overall and broken down by Deputy, geographic area, and the actual or perceived race and/or ethnicity and the surname information captured or provided by the persons stopped, detained or arrested;*

e. *the resource needs and allocation during the Significant Operation; and*

f. *any Complaints lodged against MCSO Personnel following a Significant Operation.*

**In Full and Effective Compliance**

MCSO has not conducted a Significant Operation that met the requirements of the Order since Operation Borderline in December 2014. Subsequent activities (i.e., Operation Gila Monster in October 2016) have not met the criteria for review under this or other Paragraphs.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination. As a result, MCSO District command staff – as well as Investigations and Enforcement Support – will no longer be required to submit monthly statements that they have not participated in Significant Operations as defined by this and other Paragraphs; however, they will be required to notify us should staff become involved in a Significant Operation. We will continue to assess Phase 2 compliance through interviews with command and District staff during our regular site visits. During our October and January visits to the Districts, District personnel advised us that no Significant Operations had occurred within their jurisdictional boundaries, nor had any of their staff participated in such operations with other departments. These statements were also confirmed in discussions with the Deputy Chiefs of Patrol Bureaus East and West.

***Paragraph 69.*** *In addition to the agency-wide analysis of collected traffic stop and patrol data, MCSO Supervisors shall also conduct a review of the collected data for the Deputies under his or her command on a monthly basis to determine whether there are warning signs or indicia of possible racial profiling, unlawful detentions and arrests, or improper enforcement of Immigration-Related Laws by a Deputy. Each Supervisor will also report his or her conclusions based on such review on a monthly basis to a designated commander in the MCSO Implementation Unit.*

**Phase 1:** In compliance

- EA-3 (Non-Traffic Contact), most recently amended on June 28, 2019.
- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:** Not in compliance

MCSO has placed into production database interfaces with EIS, inclusive of Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), Arizona Office of Courts (AOC) records, and the Cornerstone software program (referred to as "the HUB"), that includes training and policy records for MCSO. Supervisors have demonstrated the ability to access these during our site visits, but the audits and inspections of supervisory oversight activities often indicate fluctuating trends of compliance across the organization. In addition, MCSO continues to develop the Traffic Stop Monthly Report (TSMR) that will provide supervisors the ability to review and respond to data pertinent to the performance of deputies under their command with respect to the requirements of Paragraph 67.

WAI 44768

MCSO has automated the dissemination and responses to alert investigations initiated for repetitive deficiencies discovered during audit and inspection processes. AIU has developed an inspection that tracks EIS alert investigations from the time that they are assigned from EIU to District personnel and make their way back through the chain of command for final approval of a disposition. The protocol for this inspection has been included in the EIU Operations Manual, Section 302 (EIS Alert Processes), and was approved on March 27, 2019. From October through December, AIU reported that between 73% and 83% of cases are closed within policy timelines; however, no single District or Unit across MCSO appears to be repeatedly deficient. AIU sent out BIO Action Forms (BAFs) to the Units with deficiencies. MCSO addressed alert investigation issues for supervisors during SRELE training. MCSO also received approval to place on the HUB an Alert Refresher Resource Guide for supervisors who may not have conducted an alert investigation in some time. We will continue to track these trends. A review of the closed alerts themselves shows that the majority were completed with a meeting between the supervisor and their subordinate. During our January site visit, we discussed with MCSO three alert closure cases resulting from data validation or warrant check issues related to traffic stops. The supervisory discussions alluded to the deputies not taking sufficient time to check their work due to concerns over extended traffic stops. MCSO has dealt with this issue repeatedly and will continue to emphasize efficiency and effectiveness over speed.

While the alert inspection for closures is useful for showing whether supervisors completed the alert investigations in a timely fashion, it has not yet developed to the point to ensure that repeated alerts for the same issue are tracked uniformly. MCSO continues to refine the inspection with this goal in mind. The Training Division is creating a class to standardize evaluation of intervention effectiveness with the anticipation that the training would be delivered in early 2020 and implementation of effectiveness tracking would be piloted and implemented later in the year. In this way, BIO will be able to discover if Districts, or individual supervisors, are experiencing repetitive problems that need to be addressed to ensure compliance with this Paragraph, as well as those covered in Paragraphs 81, 94, and 95.

MCSO has conducted a pilot tracking analysis of BIO Action Forms that were sent out between January and May 2019. MCSO continues to use the insights gained from this initial analysis to refine and develop a repeatable process that is less labor-intensive than the first effort. We will continue to work with MCSO to develop and refine this inspection/audit.

WAI 44769

The Fourth Traffic Stop Annual Report (TSAR) was published in September 2019 covering the period from July 2017 through December 2018. This report focuses on organizational trends in traffic stop activity; however, the new methodology employed for the Fourth TSAR was meant to create a foundation for the Traffic Stop Monthly Report (TSMR) that continues to be developed by MCSO. We continue to work with MCSO on the development of a monthly traffic stop analysis that would provide information about potential bias of individual deputies when compared with their peers. The previous monthly traffic stop analysis was suspended because the benchmarks and thresholds were not grounded in either acceptable theory or analytic rigor that would make them consistently useful.

Due to the priority of the Traffic Stop Annual and Monthly Reports, MCSO has not initiated a quarterly traffic stop report as required by the First Order. However, MCSO discussed several studies during our January site visit, and will be providing additional material and timelines during conference calls prior to our next site visit.

MCSO continues to provide us access each month to all Non-Traffic Contact Forms (NTCFs) involving investigative stops – but has only begun planning to conduct more thorough statistical analyses of these for this and other Paragraphs. We remain concerned that, at times over the past several months, our review of the NTCFs provided each month sometimes indicate that a higher proportion of Latinos are being contacted in particular areas of the County for relatively minor infractions. Our review of the documents for October through December did not raise concerns of disparate treatment; however, several NTCFs appeared to duplicate other reporting processes (i.e., Incident Reports and arrests), and included some stops that did not appear investigative in nature. We raised these issues with MCSO during our January site visit. MCSO continues to reexamine existing policies on the use of NTCFs, the methods the agency will use to analyze these, and the review of NTCFs by supervisors to ensure that their subordinates are using the forms appropriately. As a result, MCSO will be proposing changes to existing practices; and requested, and was granted, an extension to continue the investigation of issues surrounding an NTCF exploratory analysis prior to our next site visit. Once finalized, both the TSMR and NTCF analyses will require additional training for supervisors to understand how to look for trends or patterns that may be problematic. The publication of each of these reports (TSAR, TSMR, TSQR, and NTCF) is necessary for the evaluation of Phase 2 compliance for this and other Paragraphs.

Each month, MCSO provides a list of completed alert investigations. From this list, we randomly select 15 cases, to review the investigations conducted by supervisors and evaluate the effectiveness of supervisory oversight. In several cases, there are ongoing PSB investigations that limit the ability of supervisors to review materials beyond the brief descriptions provided to supervisors, as outlined in Paragraph 75.a. and 75.b., below. In these instances, the supervisor closes the alert investigation to maintain the integrity of the ongoing PSB inquiry.

WAI 44770

MCSO has created an EIS Alert Review Group (ARG) that evaluates the investigations of supervisors prior to closing an alert. The ARG ensures that the reports of the supervisors address all aspects of the assigned investigation, and returns those that are deficient to the District for continued revision. It has not been uncommon for nearly one-third to one-half of all closed investigations to be returned to the District for corrections; however, these often have to do with the adequate completion of investigative forms (Attachment B) rather than inadequate investigations. As noted above, EIU has developed online supervisory resource material for alert investigations that was approved for placement on the HUB following our January site visit. Our review of the September to November closed alert summaries led to several questions addressed during our January site visit regarding data invalidation, but no concerns for the manner in which alert cases were closed.

The Audit and Inspections Unit (AIU) conducts monthly audits of supervisory oversight via the Supervisory Notes made for each deputy. Minimally, each month, supervisors should be making a performance appraisal note, reviewing two body-worn camera recordings, and reviewing the EIS profile of their subordinate. In October and November, these inspections showed 100% compliance; but in December, four deficiencies were found, for a 94.7% compliance rate for the 57 sworn officers' records that were reviewed. In those instances where supervisors failed to make the appropriate notations, AIU sent out BIO Action Forms to the respective Districts. We will continue to evaluate the processing of these as MCSO refines the tracking of BIO Action Forms (BAFs).

AIU also conducts three inspections of traffic stop information: two of these pertain to the timely review and discussion of traffic stops by supervisors for each subordinate; and the third is an inspection regarding the correct completion of traffic forms and the coordination of these forms with databases like CAD. For the review and discussion audits, MCSO reports a compliance rate above 97% during the months involved in the quarter. AIU sent out BIO Action Forms to several Districts during this reporting period; however, the deficiencies do not appear to indicate a pattern – except in District, 3 where a single sergeant failed to discuss several traffic stops with his subordinates. We discussed this case with MCSO, and MCSO provided us with the BIO Action Forms related to these events. The lieutenant met with the sergeant in question, offered several time management tools for him to explore, and oversaw his activities to ensure effective completion. We are satisfied that the issues have been addressed, as no future events occurred during November and December. The compliance rate for the traffic stop data inspection ranged from a low of 85% in November, to 97% in October and December. For November, of the 35 VSCFs inspected, five had deficiencies. The issues noted were minor in nature; however, BIO Action Forms were sent to the Districts where those problems arose.

AIU also conducts a Post-Stop Ethnicity Inspection for those stops where drivers with Latino surnames were marked as White or those stops involving Latino drivers where the deputy notes the view of the passenger was obstructed. In this inspection, AIU reviews the BWC footage to ensure compliance. In both October and November, MCSO reports a compliance rate just under

WAI 44771

94%; as the agency found an instance where one driver and one passenger in each month had been misidentified as White or the gender was incorrect. In December, no issues were discovered. AIU sent out BIO Action Forms to those Districts where deficiencies had been found.

MCSO has developed a new Incident Report Inspection that has been approved following several revisions. The inspection should include instances where prosecuting authorities turned cases down due to a lack of probable cause. From September to November, there was a single instance reported by MCSO. In addition, the inspection involves the examination of 20 In-Custody and 20 Criminal Citation Incident Reports each month. We have agreed that these reports should be lagged by one month to ensure that the inspectors have all necessary documents at their disposal when compiling the data. MCSO computes compliance rates by reference to a matrix that it has developed to review each Incident Report. The matrix includes 27 criteria used to evaluate each IR. For this Paragraph, we gauge compliance based upon how many of the IRs had deficiencies with respect to Order-related requirements; therefore, the compliance rate we calculated ranged from a low of 75% in November, to 87.5% in October. We continue to evaluate and discuss the new IR inspections with MCSO during our site visits and conference calls. We believe that the inspections and resulting BIO Action Forms sent to the Districts with deficiencies, will improve as staff become more aware of the ongoing evaluations. The inspections of supervisory oversight continue to show fluctuations that MCSO is investigating and addressing with BAFs, training and policy evaluation. We have found that measures like the creation of the Alert Review Committee have greatly enhanced the accountability of Districts and individual supervisors in the completion of their roles. We will continue to assist MCSO as the agency develops its new protocols and inspections.

**Paragraph 70.** *If any one of the foregoing reviews and analyses of the traffic stop data indicates that a particular Deputy or unit may be engaging in racial profiling, unlawful searches or seizures, or unlawful immigration enforcement, or that there may be systemic problems regarding any of the foregoing, MCSO shall take reasonable steps to investigate and closely monitor the situation. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or of other supervised, monitored, and documented action plans and strategies designed to modify activity. If the MCSO or the Monitor concludes that systemic problems of racial profiling, unlawful searches or seizures, or unlawful immigration enforcement exist, the MCSO shall take appropriate steps at the agency level, in addition to initiating corrective and/or disciplinary measures against the appropriate Supervisor(s) or Command Staff. All interventions shall be documented in writing.*

**Phase 1:** In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on October 25, 2019.

WAI 44772

- EB-2 (Traffic Stop Data Collection), most recently amended on January 7, 2020.

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:** Not in compliance

MCSO continues to develop the methodology and related plans for the Traffic Stop Monthly Reports (TSMRs) and the Traffic Stop Quarterly Reports (TSQRs). At present, MCSO is conducting pilot studies for the TSMR to ensure that the methodology can effectively identify deputies who may be engaging in activity that could potentially be biased. We have scheduled regular conference calls with MCSO and the Parties to stay abreast of the development of the TSMR processes and provide technical assistance and feedback where necessary. MCSO does not plan to take any action based upon the findings of the TSMR for several months until the methodology has been effectively refined to minimize misattribution and false alerts.

MCSO continues to develop the EIU Operations Manual. The sections of the manual that are undergoing development are those related to statistical methodologies for the TSMR, TSQR, and the thresholds that may trigger alert inquiries.

In September 2019, MCSO published the Fourth Traffic Stop Annual Report. The tenor of this report was much more cautious than prior reports. At our urging, MCSO published an addendum to the Fourth TSAR on October 25, 2019, indicating that the disparate outcomes "may be indicative of a systemic problem within the patrol function."

A portion of the monthly alert report produced by EIU depends upon the TSMR, which remains under development; however, the EIS also produces alerts for numerous activities, ranging from repetitive data entry errors to internal and external complaints. Many of these ongoing alerts are dependent upon the revision of alert thresholds which continue to undergo evaluation by MCSO. BIO personnel continue to evaluate and update the thresholds used to trigger these alerts to ensure that they are sufficient to detect behaviors that might indicate bias on the part of deputies, taking into consideration the current assignment of the deputies as noted in Paragraph 81.f. The alerts triggered are first evaluated by EIU personnel and then transmitted, via Blue Team, to the appropriate supervisor and District command. The supervisors conduct an investigation, including a potential discussion with the designated deputy, and memorialize their actions in Blue Team. District command staff and a newly formed Alert Review Group (ARG) review these investigations to ensure that proper investigation and possible interventions are clearly outlined. AIU began producing an inspection of EIS Alert Processes in April 2019 that evaluates the timeliness of alert investigation completion and whether discussions, training, or Action Plans might result from the supervisory investigation. The inspection is lagged by one month in order to allow supervisors 30 days to complete the investigation. The compliance rate for timeliness in October was 73%; and in November and December, it increased to 83% and 80%, respectively. The Training Division, working in concert with EIU, included in the SRELE training a refresher course on supervisory responsibilities in conducting alert investigations. This training was delivered during the fall of 2019. Following our January site visit, MCSO placed on the Hub

WAI 44773

resource materials for supervisors who may not have conducted alert investigations recently. This material provides supervisors with examples of how to fill out the alert investigation paperwork or contact EIU staff should the need arise. MCSO continues to develop the protocol to judge the effectiveness of interventions that supervisors deem necessary as a result of an alert investigation in accordance with the requirements of Paragraph 81.d. As noted in Paragraph 69, we discussed several past alert investigations with MCSO during our January site visit and were satisfied with the progress being made in each instance.

MCSO is not in Phase 2 compliance with this Paragraph; as both the TSMR and TSQR are undergoing development and have not yet been placed in production. During our January site visit, we and the Parties gave MCSO approval to begin pilot testing of the TSMR methodology. We and the Parties have been participating in regular conference calls between our site visits to receive updates on the TSMR. MCSO also provided a list of topics for proposed TSQR evaluations. We and the Parties gave MCSO approval for several of these, and MCSO will be providing a timeline for development and production of the reports.

MCSO's Plan to Promote Constitutional Policing (also referred to as the Constitutional Policing Plan, or CPP) was drafted to address systemic issues identified in the Traffic Stop Annual Reports (TSARs). As part of our compliance assessment of this Paragraph, we review documentation submitted by MCSO on the Plan, and obtain updates on the CPP during our site visits. The Plan to Promote Constitutional Policing included nine goals and a timeline for the completion of the goals. Our comments in this report pertain to compliance with the Plan during the fourth quarter of 2019.

In early January 2020, MCSO provided an online link to a newly created spreadsheet titled "2020 Constitutional Policing Plan." The spreadsheet was based on the plan originally agreed to by the Parties and approved by the Court. The spreadsheet provided additional details of MCSO's reported progress on each of the nine goals: the start date, the projected finish date, and the status of sub-goals and projects. During our January site visit, we met with MCSO to obtain additional details of the Plan. Below are our comments based on the information obtained from the spreadsheet, as well as updates provided by MCSO during our site visit.

Goal 1: Implementing an effective Early Intervention System (EIS) with supervisor discussions. MCSO reported an overall 51% completion rate on implementing an effective Early Intervention System (EIS) with supervisory discussions. The supervisory discussion process noted a starting date of April 3, 2018, with a projected completion date of December 31, 2020. The completion rate was noted at 69%. We are not aware of any improvements to EIS that occurred during the fourth quarter. The Traffic Stop Monthly Report (TSMR) was reported to be in progress, with a 45% completion rate, and with an expected finish date of December 31, 2020. The Internal Town Halls and the District Liaison Program were reported to be in progress on the spreadsheet. However, MCSO reported that no Internal Town Halls were held during the fourth quarter. The sub-goal of information sharing within the Office was reported to be 31% completed, with an expected finish date of December 31, 2020.

WAI 44774

Goal 2: Evaluating supervisors' performances through an effective Employee Performance Appraisal process. A pilot program for new EPAs was conducted over a three-month period in Districts 2 and 3. MCSO gathered feedback from supervisors and commanders and incorporated some of the suggestions into their final draft. MCSO also reported the completion of the first draft of the EPA writing assistant. We and the Parties reviewed the EPA materials and returned them with comments. Due to concerns expressed by us and the Parties regarding the purpose of the writing assistant, MCSO proposed publishing the document as a performance management guide. The EPA form, guide, and GC-4 (Employee Performance Appraisals) revision was noted as 80% complete on the spreadsheet. The system configuration for the revised EPA form is expected to be completed by May 5, 2020. Completion of the training, and implementation of the EPA process, is expected by May 31, 2022. During our January site visit, MCSO advised us that supervisors will undergo four hours of stand-alone training on concepts, beginning in July 2020. The following year, supervisors will receive another four hours of training on the practical application of the concepts. This will allow for a full year of assessment for each employee on the new core competencies. The new EPAs will not be implemented until 2022. Both we and the Parties expressed concern that the examples of observable behaviors listed in the guide could result in boilerplate comments. MCSO is aware of the concerns, and stated that this issue will be covered in training and reinforced in the policy revision. In addition, command officers will be directed to identify and correct boilerplate language during their reviews. We will also be attentive for these types of deficiencies during our compliance reviews.

Goal 3: Delivering enhanced implicit bias training. The 2020 ACT will cover required aspects of implicit bias; and according to MCSO, will be completed by June 30, 2020. The CPP spreadsheet notes that MCSO will develop a combined cultural competency and implicit bias training pilot program. This training will focus each year on a specific geographical area, starting with the Town of Guadalupe in 2020. We were advised that MCSO planned to meet with the leaders of Guadalupe to discuss issues and concerns that are important to the residents. The information learned will be incorporated into a video, which will be placed in the HUB for viewing. We have encouraged MCSO to include the CAB in the planning of this project. The completion date for this first phase of training is July 20, 2020. During our January site visit, we sought clarification on the timeline of this training. MCSO noted that the training will be held over a seven-year period, with each year focusing on the issues and concerns of different neighborhoods. MCSO added that deputies in all Districts will receive the training, starting with the first phase, which features Guadalupe. At the end of the seven-year period, the majority of patrol deputies should have completed all seven phases of training. MCSO is also reinstating discussions on implicit bias in captains' monthly meetings in 2020. There were no Captains' Meetings in the fourth quarter, in which the topic of Goal 3 was discussed. The spreadsheet noted that the January and February topics had been selected. We inquired as to how the information that is discussed at Captains' Meetings will be disseminated to the rank and file. MCSO stated that captains will be responsible for disseminating the information, but the methodology had not been finalized. Our concerns relate to the need for quality control, to ensure that what is passed on to the rank and file

WAI 44775

is accurate, and consistent with the information discussed by the staff. MCSO is still working on a Request for Proposals (RFP) for the training on the History of Discrimination in Maricopa County. Once a vendor is selected, MCSO plans to develop a script or outline to present to the CAB and Parties for comments.

Goal 4: Enhanced fair and impartial decision-making training. For 2020 MCSO will develop a stand-alone video/HUB training class with a five-question test on Fair and Impartial Decision Making. MCSO intends to include a section on this topic in the 2021 ACT. This project was noted as 4% complete, with the projected finish date of December 31, 2020. The topic of fair and impartial decision making will be discussed at the Captains' Meetings. MCSO did not provide a date for a meeting covering this topic. There were no Captains' Meetings in the fourth quarter, in which the topic of Goal 4 was discussed.

Goal 5: Delivering enhanced training on cultural competency and community perspectives on policing. The 2020 Annual Combined Training (ACT) on Fourth and Fourteenth Amendment training began on October 31, 2019, with a projected completion date of March 31, 2020. MCSO plans to conduct roll call briefings and online training with a selection of videos, paired and delivered with talking points. Online training will be delivered by supervisors and commanders biannually. The projected start date is September 1, 2020, with a completion date of December 31, 2020. Per MCSO, future Captains' Meetings will include discussion of successful and unsuccessful strategies to address cultural competency. There were no Captains' Meetings in the fourth quarter, in which the topic of Goal 5 was discussed. MCSO noted that the Training Division will add a minimum of four videos to their library, per year. During our January site visit, MCSO sought clarification as to whether their training proposals outlined in the CPP constituted "enhanced" training. We will consider training enhanced if it is demonstrably different from training currently offered as part of meeting the basic requirements of the First and Second Orders. There can be overlap of topics and material, and the enhanced training can reinforce material that is provided in the current venues, but the enhanced training cannot be simply a repackaging of existing material without notable modifications or additions or amplifications.

Goal 6: Improving traffic stop data collection and analysis. MCSO did not have a Traffic Stop Monthly Report (TSMR) methodology in place during the fourth quarter of 2019. MCSO continues to work on the TSMR, and noted a 40% completion rate, with the expected completion date of the report by April 9, 2020. MCSO noted that EIS threshold testing and evaluation is scheduled to start by May 1, 2020. With regard to the quarterly report, MCSO noted a completion rate of 2% on the first quarterly report, and a 67% completion rate on the second quarterly report. MCSO noted that the Traffic Stop Annual Report (TSAR) #5 started on October 17, 2019; and is expected to be completed by April 30, 2020. While we could not verify the reported progress on Goal 6 during the fourth quarter, we note that MCSO has been working on the TSMR and has developed a timeline for completion of this monthly report.

WAI 44776

Goal 7: Encouraging and commending employees' performance and service to the community. This goal has been completed. This goal was not part of the requirements set by the First Order.

Goal 8: Studying the Peer Intervention Program. This goal has been completed. This goal was not part of the requirements set by the First Order.

Goal 9: Building a workforce that provides constitutional and community-oriented policing and reflects the community we serve. MCSO's goal is to have a hiring process that will build a workforce that provides constitutional policing and reflects the community they serve. MCSO noted a completion rate of 22%, with a completion date on this project by December 31, 2020. MCSO noted that it has completed 30% of its goal of having a hiring process that is modern, efficient, and based on best practices. New background tiers will be implemented, along with a new hiring standard for drug use. A new electronic background investigation case management system, and a candidate self-service portal, was scheduled for implementation by February 28, 2020. This project was reported at 30% complete. A third-party vendor will be used to run background checks, including credit reports, employment verification, education verification, and other associated checks. This system was scheduled to be implemented by February 28, 2020. MCSO expects the demographics of the agency to reflect the population of Maricopa County by December 31, 2020. A new deputy sheriff exam was scheduled to be implemented by February 28, 2020. MCSO will continue its advertising campaign and will hold a series of question and answer events regarding careers at MCSO. An interview and selection training curriculum will be developed, and courses will be provided to all employees who participate in interview panels. MCSO noted that at least 50% of employees involved in the interview and selection process will complete this training by December 31, 2020. We believe this training will be very beneficial, and will positively impact employee morale. MCSO will issue a Request for Proposals (RFP) for a new promotional process for sworn personnel, which will be initiated for at least one ranked sworn classification by December 31, 2020. MCSO will develop and initiate a career planning program for employees by June 30, 2020. MCSO will develop a Human Resources Basics curriculum for supervisors that includes onboarding, employee engagement, diversity and inclusion, performance management, situational leadership, discrimination, harassment and retaliation, and FMLA/ADA. The completion date for this project is December 31, 2020. MCSO will develop and disseminate an employee engagement survey; this project will be completed by December 31, 2020.

The online spreadsheet is the most information we have seen pertaining to the MCSO plan since the last iteration of the CPP in July 2018. We note that, once again, all goals have been included, with quantifiable sub-goals and projects with due dates. Goal 1 was noted as 51% completed; Goal 2 was noted as 21% completed; Goal 3 was noted as 9% completed; Goal 4 was noted as 2% completed; Goal 5 was noted as 3% completed; Goal 6 was noted as 30% completed; and Goal 9 was noted as 22% completed.

WAI 44777

During this reporting period, some goals appear to have remained inactive; and we are unclear as to how the completion percentages were calculated. MCSO reported that there were no internal town halls, and we are not aware of any improvements to EIS to support Goal 1. There were no captains' monthly meetings with discussions of implicit bias, fair and impartial decision making, and cultural competency. There was no enhanced training with regard to these topics, as it pertains to Goals 3, 4, and 5. Although we cannot determine what progress was made with regard to Goal 6 during this reporting period, we are aware MCSO has been diligently working on the TSMR, and MCSO has developed a timeline of activities and outputs that the agency expects to meet. We are aware that MCSO made progress in Goal 2, with the EPA revision; and Human Resources also reported progress in the completion of Goal 9. We are encouraged by MCSO's refocused effort, but we remain cautiously optimistic about MCSO's advancement on the Court-approved CPP. We are unable to verify many aspects of the reported progress, as the online spreadsheet is only a tracking tool without supporting documentation to substantiate the reported achievements.

***Paragraph 71.*** *In addition to the underlying collected data, the Monitor and Plaintiffs' representatives shall have access to the results of all Supervisor and agency level reviews of the traffic stop and patrol data.*

**In Full and Effective Compliance**

MCSO has provided us with access to existing data from monthly and annual reports.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

While we continue to work with both MCSO and the Parties on specific issues of methodology for Non-Traffic Contact Forms and the Annual, Monthly, and Quarterly Reports for traffic stop data, we have nonetheless been afforded complete access to all requests involving data.

WAI 44778

# Section 8: Early Identification System (EIS)

**COURT ORDER IX. EARLY IDENTIFICATION SYSTEM ("EIS")**

***Paragraph 72.*** *MCSO shall work with the Monitor, with input from the Parties, to develop, implement and maintain a computerized EIS to support the effective supervision and management of MCSO Deputies and employees, including the identification of and response to potentially problematic behaviors, including racial profiling, unlawful detentions and arrests, and improper enforcement of Immigration-Related Laws within one year of the Effective Date. MCSO will regularly use EIS data to promote lawful, ethical and professional police practices; and to evaluate the performance of MCSO Patrol Operations Employees across all ranks, units and shifts.*

**Phase 1:** In compliance

- EA-3 (Non-Traffic Contact), most recently amended on June 28, 2019.

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:** Not in compliance

During 2017 and early 2018, MCSO introduced interfaces between EIS and several remote databases of importance. EIS now includes Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), records from the Administrative Office of the Courts (AOC), and training completion and policy acknowledgement records from the Cornerstone software (the HUB). MCSO continues to work on the EIU Operations Manual to memorialize the collection, analysis, and dissemination of relevant data; as well as the responsibilities and roles of departmental and EIU personnel. MCSO has completed approximately 90% of the manual. Those sections that are under development pertain to the Traffic Stop Monthly Report (TSMR), the Traffic Stop Quarterly Report (TSQR) and thresholds for triggering potential alert investigations arising from monthly analysis of traffic and patrol functions.

To capture certain activities that deputies participate in related to non-traffic stops of individuals, MCSO created Non-Traffic Contact Forms (NTCFs), which were interfaced with EIS in mid-2017. MCSO has provided us with access to investigative stops that make up a portion of NTCFs since their inception. Over the past 18 months, we have suggested that MCSO create a methodology to statistically examine these civilian contacts to ensure that there is no evidence of bias in the manner in which they are conducted. MCSO has produced a preliminary draft of an NTCF inspection methodology that we have returned with comments. In addition, we have requested and received several months of data for all contacts captured using NTCFs; and we found that the distinction between Field Information and Investigative Stop is not clear to deputies using the forms. MCSO is reviewing this information and evaluating the form and EA-3 (Non-Traffic Contact) to improve this data collection. We will continue to work with MCSO to finalize

WAI 44779

each of these data analytic methods. MCSO continues to regularly publish a number of reports on deputy activity and supervisory oversight that are not tied to the methodologies of the TSMR, TSQR, or TSAR.

The Audits and Inspections Unit (AIU) produces a monthly report evaluating Supervisory Notes that indicate whether supervisors are reviewing the EIS data of deputies under their command. The inspection looks for indications that supervisors made entries for each person they supervise with regard to two randomly selected BWC videos, provide one EPA note, make two supervisor entries, and indicate that the supervisor has reviewed their deputies' EIS statuses. Over the past six months of this inspection there has been remarkably high compliance rates – 97% or higher – except for August which was 91%. In August, inspectors found 16 deficiencies across all indicators of this inspection, of which 14 occurred in District 1. During our visit to District 1 in October, Command staff indicated they were short on both deputies and supervisors, resulting in some overlaps of responsibilities. We requested and received the BIO Action Forms completed as the result of the August deficiencies during our October site visit. In both October and November, the compliance rate for Supervisor Notes was 100% and in December it dropped slightly to 94.7%. AIU continues to send BIO Action Forms to the Districts with deficiencies, and we have always had the opportunity to review these forms when requested.

In the Traffic Stop Review and Discussion Inspections for October through December, we note stable compliance rates in the high 90th percentile. The deficiencies do not appear to indicate issues with any particular supervisor or trends of concern. A third traffic-related audit is the Traffic Stop Data Inspection in which AIU uses a matrix comparing traffic stop information found on Vehicle Stop Contact Forms (VSCFs) with Computer Aided Dispatch (CAD) and Body-Worn Camera (BWC) footage. In October and December, the compliance rate exceeded 97%; and in November, the rate was 85%. AIU noted five compliance deficiencies in the November inspection covering several Districts and involving inconsistencies between the data sources (VSCFs and CAD). AIU sent out several BIO Action Forms to the Districts where deficiencies were found.

While we can look for trends in deficiencies over each quarter, we have suggested to MCSO that AIU conduct an evaluation of all BIO Action Forms sent to Districts to ensure that there are not long-term trends by Districts or supervisors that cannot be distinguished in looking at shorter timeframes. MCSO conducted a preliminary analysis of BIO Action Forms from January to May 2019 and reported these findings during our July site visit. MCSO found that there were indeed a small number of deputies who had received several BIO Action Forms. During both our October and January site visits, we suggested that MCSO develop an inspection of BAFs based on the findings of the preliminary analysis. MCSO is developing a proposal for such an inspection. We will evaluate this as it becomes available.

WAI 44780

EIU also produces a monthly report on alerts triggered within EIS. EIU personnel review the alerts and disseminate them to supervisors and District command if alerts indicate the potential for biased activity or thresholds are exceeded for particular actions like external complaints, unexcused absences, data validations, etc. Once the supervisors receive the alert investigation, they employ a template (Attachment B of GH-5, Early Identification System) to conduct the investigation and report their findings and results to the chain of command through Blue Team. MCSO has also created an EIS Alert Review Group (ARG) to evaluate the closure of alert investigations. Our review of alert closures for October through December revealed several minor issues that we followed up on during our January site visit. MCSO has developed a comprehensive protocol to track alert investigations occurring throughout the organization. They continue to plan the addition of a component to the EIS Alerts Inspection that evaluates the effectiveness of any interventions undertaken. We continue to assist MCSO in the development of this protocol.

**Paragraph 73.** *Within 180 days of the Effective Date, MCSO shall either create a unit, which shall include at least one full-time-equivalent qualified information technology specialist, or otherwise expand the already existing role of the MCSO information technology specialist to facilitate the development, implementation, and maintenance of the EIS. MCSO shall ensure that there is sufficient additional staff to facilitate EIS data input and provide Training and assistance to EIS users. This unit may be housed within Internal Affairs ("IA").*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:** In compliance

The Bureau of Internal Oversight (BIO) is overseen by a captain and is comprised of three Units designed to achieve different compliance functions. Each is a fully operational Unit headed by a lieutenant with both sworn and civilian staff responsible for diverse but interrelated oversight functions. The Early Intervention Unit (EIU) coordinates the daily operation of the EIS. This unit evaluates alerts generated by the EIS, reviews them and sends out investigations to District personnel as prescribed by policy. The Audits and Inspections Unit (AIU) has developed and carries out ongoing inspections to ensure that deputies and supervisors are using the EIS properly and to the fullest extent possible. When it discovers deficiencies, the AIU sends out BIO Action Forms to the affected Districts and individuals; and ensures the return of the appropriate forms. The Traffic Stop Analysis Unit (TSAU) was most recently created due to the complexities of generating all of the statistical reports related to traffic and patrol functions of MCSO. The leaders of these units respond to specific requests made by us and the Parties and appear collectively during our site visit meetings to answer any questions related to the operation of BIO.

WAI 44781

Over the last 18 months the EIS database has been expanded to include Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), records from the Arizona Office of Courts (AOC), and training and policy receipt records from the Cornerstone software program (the HUB). Supervisors now have much more information available to them about the deputies under their command than they ever had in the past.

***Paragraph 74.*** *MCSO shall develop and implement a protocol setting out the fields for historical data, deadlines for inputting data related to current and new information, and the individuals responsible for capturing and inputting data.*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

- EIU Operations Manual, currently under revision.

**Phase 2:** In compliance

MCSO has met the requirements of this Paragraph by identifying the data to be collected and the responsibility of persons across the organization to review, verify, and inspect the data making up the early intervention system. These roles and responsibilities are originally developed in GH-5 (Early Identification System) and more comprehensively elaborated in Section 200 (Duties and Responsibilities), approved in August 2019, of the EIU Operations Manual.

MCSO has not yet completed the revision of the EIU Operations Manual. During our January site visit, MCSO noted that 90% of the manual had been finalized; the remaining 10% is due to the ongoing development of the methodologies for the Traffic Stop Monthly and Quarterly Reports, as well as the revision of the thresholds dependent on the results from the ongoing pilot project related to the TSMR. The manual sections pertaining to this Paragraph have already been finalized and published; and therefore, MCSO has attained Phase 1 compliance.

MCSO has shown progress in the development of a data-handling protocol. These processes have been memorialized in the EIU Operations Manual (Section 306), which was approved in July. Aside from Section 200, noted above, Section 305 (Software Change Control Processes), approved in October 2018, is meant to ensure that all modifications to software or data collection are coordinated in a prospective fashion before any implementation occurs. These software changes are provided to us on a monthly basis through regular document requests and are discussed during the quarterly site visit meetings. Each of these sections of the EIU Operations Manual expands upon policy that has already been approved.

MCSO has also created a committee of personnel from each unit that handles, or adds to, traffic data before it is analyzed. The reports from the regular monthly meetings of this group are made available to us and show the attention to detail and memorialization of changes put in place to improve data processes.

WAI 44782

Finally, EIU produces a monthly report for benchmarks not related to the traffic stop methodologies. Benchmarks 3 and 8 (Paragraph 67) involve incidents of immigration inquiries and data validation errors committed by deputies. During this reporting period, there were no immigration inquiries; however, two data validation alerts were sent to supervisors for investigation in October and December. As noted in the AIU Traffic Data Inspection reports from this time period, these occur when vehicle information is incomplete/incorrect or where information on the VSCF is not consistent with what is found in Computer Aided Dispatch (CAD). We believe MCSO's oversight of the benchmarks has been transparent and effective to this date.

***Paragraph 75.*** *The EIS shall include a computerized relational database, which shall be used to collect, maintain, integrate, and retrieve:*

a. *all misconduct Complaints or allegations (and their dispositions), excluding those made by inmates relating to conditions of confinement or conduct of detention officers (i.e., any complaint or allegation relating to a traffic stop shall be collected and subject to this Paragraph even if made by an inmate);*

b. *all internal investigations of alleged or suspected misconduct;*

c. *data compiled under the traffic stop data collection and the patrol data collection mechanisms;*

d. *all criminal proceedings initiated, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the County and/or its Deputies or agents, resulting from MCSO Patrol Operations or the actions of MCSO Patrol Operation Personnel;*

e. *all arrests;*

f. *all arrests in which the arresting Deputy fails to articulate probable cause in the arrest report, or where an MCSO Supervisor, court or prosecutor later determines the arrest was not supported by probable cause to believe a crime had been committed, as required by law;*

g. *all arrests in which the individual was released from custody without formal charges being sought;*

h. *all Investigatory Stops, detentions, and/or searches, including those found by the Monitor, an MCSO supervisor, court or prosecutor to be unsupported by reasonable suspicion of or probable cause to believe a crime had been committed, as required by law;*

i. *all instances in which MCSO is informed by a prosecuting authority or a court that a decision to decline prosecution or to dismiss charges, and if available, the reason for such decision;*

WAI 44783

*j.      all disciplinary action taken against employees;*

*k.      all non-disciplinary corrective action required of employees;*

*l.      all awards and commendations received by employees;*

*m.     Training history for each employee; and*

*n.      bi-monthly Supervisory observations of each employee.*

**Phase 1:**  In compliance

- EA-3 (Non-Traffic Contact), most recently amended on June 28, 2019.

- GC-13 (Awards), most recently amended on January 24, 2019.

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

- EIU Operations Manual, currently under revision.

- Professional Services Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

Since 2017, MCSO has placed into production data interfaces for Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), Justice Court turndowns (AOC) and the Cornerstone software program (the HUB) that provides reports for training and policy acknowledgment. MCSO continues to develop some inspections or analytic reports that ensure that personnel are accurately using the EIS data available; however, the data do exist in the EIS and are accessible by personnel we have interviewed during each site visit. We will evaluate and monitor the use of EIS in furtherance of the Orders. During our January site visit, we also reviewed with MCSO representatives how the data for the following Subparagraphs appear on-screen and are accessible to first-line supervisors.

Paragraph 75.a. requires that the database include "all misconduct Complaints or allegations (and their dispositions)," with some exclusions.

EIPro, a web-based software application that allows employees and supervisors to view information in the IAPro case management system, includes the number of misconduct complaints and allegations against deputies.

Since February 2017, both open and closed cases have been viewable by supervisors. PSB controls the ability to view open cases based upon the parties who may be involved. PSB personnel developed a protocol to write the summaries for both open and closed cases that appear in the EIS. This protocol has been approved, and was incorporated into the PSB Operations Manual that was published on December 13, 2018. Each month, we receive a spreadsheet of open and closed external complaints as they appear in EI Pro for supervisors to review. Our examination of these descriptions for October through December confirms that the summaries meet our expectations. Additionally, during our October and January site visits, we observed that

field supervisors could easily access these summaries and understand the types of issues involved in the complaints. Supervisors conducting alert investigations have also routinely referred to a review of complaint summaries as a portion of their investigative process. Supervisors are also advised that they can always contact EIU and PSB for clarification if it is necessary.

MCSO is in compliance with this Subparagraph.

Paragraph 75.b. requires that the database include "all internal investigations of alleged or suspected misconduct."

Corresponding to the discussion above involving external complaints, internal investigation summaries also appear in the IAPro system. All complaint summaries, open and closed, have been viewable since February 2017. PSB uses a standard protocol to develop the case summaries and access limits. This protocol has been approved by us and has been included in the PSB Operations Manual published in December 2018. Each month, we receive a spreadsheet of internal allegations as they appear to supervisors in EIS. Our review of the summaries for October through December finds that these summaries are transparent and easily understood. During our site visits, we have found that line supervisors are also able to easily access the summaries of open and closed internal investigations pertaining to their subordinates. Supervisors also have referred to these summary fields while conducting alert investigations. Field supervisors always have the option of requesting additional information from EIU and PSB should they deem the summaries insufficient.

MCSO is in compliance with this Subparagraph.

Paragraph 75.c. requires that the database include "data compiled under the traffic stop data collection and the patrol data collection mechanisms."

MCSO has created electronic forms to collect data from traffic stops, incidental contacts and warnings.

MCSO has also created interfaces with EIS for remote databases including Incident Reports (IRs) and Non-Traffic Contact Forms (NTCFs). These reports are readily available to supervisors to review within EIS. Field supervisors have shown that they have the ability to view IRs and NTCFs during our October and January site visits. AIU already conducts an inspection of IRs and has recently revised the methodology to improve and streamline the inspection process. We have suggested during our last several site visits that MCSO create a similar inspection for NTCFs, as well as propose an analytical strategy to examine whether any racial or ethnic inconsistencies may exist in the incidents documented on the NTCF. During our July site visit, MCSO prepared a detailed discussion of the issues arising from an examination of past NTCFs. Subsequently, MCSO produced a brief proposal of the methods they would use to analyze NTCFs. We have made comments on these early proposals and will fully evaluate the sufficiency of this new inspection methodology when it is produced. Up to this point, MCSO has made available all investigative stop NTCFs each month. In prior reporting periods, we have noted indications of trends for stops in particular geographic areas and for specific types of citizen interactions.

WAI 44785

From October to December, we did not find any issues of concern in reviewing these documents; however, a statistical methodology would allow a more comprehensive examination. Finally, we conducted a spot check of NTCFs that fell under the label of Field Information. Our evaluation suggested that 80% of these stops could have easily been identified as an Investigative Stop/Detention. We raised these issues with MCSO; and consequently, MCSO is in the process of redrafting the NTCF methodology. This Paragraph requires that the data for such activities exists within EIS; however, Paragraphs 72, 81a., and 81b.vi. require an analysis of these stops. Therefore, while MCSO complies with this Subparagraph, MCSO will not attain compliance for the other Paragraphs until a method of analysis is approved.

MCSO is in compliance with this Subparagraph.

Paragraph 75.d. requires that the database include "all criminal proceedings initiated, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the County and/or its Deputies or agents, resulting from MCSO Patrol Operations or the actions of MCSO Patrol Operation Personnel."

MCSO's Legal Liaison Section receives and forwards this information to EIU for entry into the EIS database. Deputies self-report contacts they have with other agencies, and any two contacts within a rolling six-month period results in an alert requiring a supervisor to investigate. Supervisors have demonstrated the ability to access this information during our site visits. In addition, there were no "notice of claim" alerts in the monthly alert allegations report from October through December 2019 provided by EIU.

MCSO is in compliance with this Subparagraph.

Paragraph 75.e. requires that the database include "all arrests."

Arrests may not always occur as a result of a traffic stop. MCSO, therefore, has placed into production an interface between EIS and the Jail Management System (JMS). This interface allows supervisors to easily access information regarding arrest that cannot be viewed through traffic data. During our site visits, supervisors have demonstrated the ability to access the IRs and related arrest information. The timeliness and sufficiency of that review is evaluated under Paragraph 93.

MCSO is in compliance with this Subparagraph.

Paragraph 75.f. requires that the database include "all arrests in which the arresting Deputy fails to articulate probable cause in the arrest report, or where an MCSO Supervisor, court or prosecutor later determines the arrest was not supported by probable cause to believe a crime had been committed, as required by law."

WAI 44786

Incident Reports (IRs) are housed in the TraCS (Traffic and Criminal Software) system. Supervisors must review and sign off on IRs for each deputy involving an arrest or detention of a suspect within 72 hours of the incident. Supervisors are also required to ensure that probable cause exists for each charge or arrest outlined within an IR. AIU additionally conducts an inspection of IRs to ensure that all policy requirements are met.

If a court or prosecutor decides not to prosecute a case, both the deputy and their immediate supervisor are notified. MCSO has created a new method of tracking any deficiencies related to the prosecution of cases. In the past, MCSO conducted a County Attorney Turndown Inspection; however, after July 2019, MCSO proposed an IR inspection process that incorporates these Turndowns as they apply to this Paragraph. In proposing the new methodology, MCSO's intent is to catch reasonable suspicion and probable cause issues earlier in the process. Other deficiencies result in BIO Action Forms being sent to the appropriate District personnel. In the September and November inspections, there were three cases where the articulation of reasonable suspicion/probable cause was lacking. MCSO reported a compliance rate in excess of 98% for the entire matrix of issues the agency investigates; while we computed a compliance rate of 95% and 97.5%, respectively, as a result of the inadequate articulation in these three cases. In October, there were no cases involving these issues. As MCSO continues to revise its inspections and audits, we have taken the position that the Order requires all instances where a deputy's reports involve an insufficient articulation of probable cause must be captured in the data system, regardless of actions taken afterward.

MCSO remains in compliance with this Subparagraph.

Paragraph 75.g. requires that the database include "all arrests in which the individual was released from custody without formal charges being sought."

The ability to capture this information depends upon what actually occurred within the context of the interaction. If the suspect was taken into physical custody but released prior to booking, there would be a JMS record, as indicated in Subparagraph 75.e. above. Therefore, MCSO could use the interface described above to pull the relevant data elements into EIS. However, if the incident does not rise to the point of physical custody and detention, then it would likely yield an Incident Report, covered under Subparagraph 75.f. above or an Investigatory Stop under Subparagraph 75.h. to follow. The interfaces for IR and NTCF data became operational prior to July 1, 2017. The new inspection process referred to above will also capture elements useful for the evaluation of this Subparagraph.

MCSO is in compliance with this Subparagraph.

Paragraph 75.h. requires that the database include "all Investigatory Stops, detentions, and/or searches, including those found by the Monitor, an MCSO supervisor, court or prosecutor to be unsupported by reasonable suspicion of/or probable cause to believe a crime had been committed, as required by law."

WAI 44787

MCSO has created interfaces for both IRs and NTCFs. As noted in 75.f., our inspection of IRs for September and November revealed a compliance rate over 95% regarding the inclusion of necessary probable cause or reasonable suspicion statements included in the reports. Other, unrelated deficiencies were sent to District personnel for review using a BIO Action Form.

In July 2017, the interface between EIS and the database for NTCFs was placed into production. MCSO also reissued EA-3 (Non-Traffic Contact) and amended the policy on June 14, 2018 (and further amended it on June 28, 2019). This policy specifies the responsibility of MCSO personnel regarding different types of search occurrences. If the search is related to a traffic stop, it should be captured on the VSCF. Searches occurring within activities resulting in an Incident Report will be captured under Subparagraph 75.e., and NTCF searches fall under this Subparagraph.

Initially, the number of NTCF reports was insignificant; however, since May 2018, we generally receive between 15-25 NTCFs for investigative stops each month. These are all captured within EIS as required by this Subparagraph (as well as 75.c.). Our review of these cases for October through December found no issues of significance for this Subparagraph. In addition, we requested a random sample of Field Information stops that were documented using the NTCF. Our review of these indicated that approximately 80% of civilian stops labeled as Field Information could easily have been labeled as Investigative stops. We have apprised MCSO of our findings and have subsequently provided MCSO with our summary evaluation. We have repeatedly brought the accumulated numbers of NTCFs to the attention of MCSO and requested that they develop an audit of NTCFs similar to what is currently done for IRs. We have also suggested that MCSO develop a methodology to statistically analyze the collection of NTCFs to look for possible issues of racial or ethnic bias in the way these interactions are conducted. The development of a statistical examination of NTCF stops should be a priority for MCSO once the Traffic Stop Methodologies for the Monthly and Quarterly Analyses are complete. Such an examination is required by Paragraphs 72 and 81.b.vi. MCSO has drafted an initial proposal for the evaluation of NTCFs. We provided extensive comments and will continue to work with MCSO on this methodology. Since NTCFs and IRs are included in EIS, MCSO is in compliance with this Subparagraph.

Paragraph 75.i. requires that the database include "all instances in which MCSO is informed by a prosecuting authority or a court that a decision to decline prosecution or to dismiss charges, and if available, the reason for such decision."

The EIS database has included both County Attorney Actions and an interface with the Justice Courts (AOC) since July 2017. MCSO began using a new method that merged the County Attorney Turndown Inspection with the IR inspection. The first inspection was produced in August using July data. Due to the timing of reporting periods and the need to ensure that MCSO has sufficient time to review necessary documentation, the new IR inspection is lagged by 30 days. Consequently, for September our evaluation of MCSOs inspection showed that 95% of cases reviewed contained an articulation of probable cause/reasonable suspicion. The compliance rate for October was 100%, and the compliance rate for November was 97.5%. In both months,

MCSO reported a slightly higher compliance rate based upon a matrix of issues they use to evaluate IRs. For this period, the IR inspection did not include any County Attorney Turndowns, as none were received indicating a problem with probable cause. Several BIO Action Forms were sent to the Districts for review due to the deficiencies found by the inspectors. We continue to work with MCSO to refine the implementation of this new IR inspection to ensure that it comports with Order requirements. We will continue to evaluate this inspection in future quarterly status reports.

MCSO is in compliance with this Subparagraph.

Paragraph 75.j. requires that the database include "all disciplinary action taken against employees."

MCSO currently tracks disciplinary actions in the IAPro system, which allows supervisors to search the history of their employees in EIS.

AIU produces a monthly alert inspection report relevant to Paragraphs 70, 71, 75, and 81. The possible outcomes from these alert investigations range from no further action to referral to PSB. In the alert inspections report from October through December, there were eight instances where cases were referred to PSB rather than to supervisors for investigation. Additionally, the Administrative Services Division replies to a monthly request that incorporates this Subparagraph; and their report indicates no discipline was imposed during October, November, and December.

MCSO is in compliance with this Subparagraph.

Paragraph 75.k. requires that the database include "all non-disciplinary corrective action required of employees."

MCSO uses a combination of Supervisory Note inspections (in particular, bimonthly reviews of a deputy's performance) and the monthly alert report described in the previous Subparagraph to fulfill the requirements for this Subparagraph. As noted previously, the majority of cases are closed through a meeting with a supervisor; however, in the EIS Alert Inspection for October indicates that two alert investigations included multiple interventions and one involved a meeting with a commander. We also conduct evaluations of a randomly selected group of closed alert investigations each month. We raised several questions during our January site visit stemming from the closed alert investigations from October to December, but we are satisfied that supervisors are conducting these investigations and deputies take the meetings with their supervisors seriously.

Supervisors also are required to make two comments regarding their subordinates each month in their Blue Team Notes. In the inspections for October through December, there were only three instances where supervisors failed to make appropriate entries for their subordinates. The compliance rate therefore remains in the high 90th percentile.

WAI 44789

Supervisors can also search the Supervisory Note field for each deputy using key words and phrases to determine if prior supervisors of a particular subordinate had employed briefings, trainings, or supervisory discussions to address similar issues.

MCSO is in compliance with this Subparagraph.

Paragraph 75.l. requires that the database include "all awards and commendations received by employees."

MCSO published GC-13 (Awards) on November 30, 2017 and updated this policy in January 2019. With this publication, MCSO created categories for awards or commendations that could be tracked within the EIS database. With the introduction of the newest version of EIPro, these fields are also searchable by supervisors. During our October site visit, supervisors demonstrated how they could search these fields and locate awards of their subordinates' in the EIS data. According to the monthly alert inspection reports for October through December, there was one commendation note per month recommended by supervisors.

MCSO is in compliance with this Subparagraph.

Paragraph 75.m. requires that the database include the "[t]raining history for each employee."

MCSO has transitioned from the Skills Manager System to the Cornerstone (the HUB) software program. The HUB has replaced the E-Policy and E-Learning programs. The HUB routinely updates recent training and policy reviews for deputies and is visible by immediate supervisors. MCSO also created an interface between the HUB and EIS.

During our October and January site visits, all field supervisors who we contacted stated they were familiar with the HUB and were able to access the information contained therein. Several supervisors noted how they assigned training to particular deputies following alert investigations they completed. Supervisors have not recently noted any difficulties working with the HUB; and when they have they found problems, they note that they can easily contact the Training Division or Technology Management Bureau staff to assist them. EIU personnel have also created resource materials for supervisors. The Training Division used this information in the creation of an alert investigation component of SRELE training. MCSO has now received approval to place the resource material on the HUB so that supervisors may refer to it as they need to. We will continue to evaluate the ability of supervisors to easily search and utilize EIS during our next site visit.

MCSO is in compliance with this Subparagraph.

Paragraph 75.n. requires that the database include "bi-monthly Supervisory observations of each employee."

WAI 44790

The Audits and Inspections Unit (AIU) conducts a monthly inspection of Supervisory Notes. One of the indicators AIU evaluates is whether supervisors are making two notes per deputy each month. From October through December, AIU reported a compliance rate of 100% each month for this particular activity among those supervisors evaluated.

MCSO is in compliance with this Subparagraph.

With the operationalization of interfaces for Incident Reports, Non-Traffic Contact Forms, the Arizona Office of the Courts, and the HUB, EIS now contains the information required by the Order. MCSO has worked diligently to use some of the data above to investigate compliance rates with the Orders. MCSO continues to develop other inspections or data analytic methods in response to our suggestions.

***Paragraph 76.*** *The EIS shall include appropriate identifying information for each involved Deputy (i.e., name, badge number, shift and Supervisor) and civilian (e.g., race and/or ethnicity).*

**Phase 1:** In compliance

- EB-2 (Traffic Stop Data Collection), most recently amended on January 7, 2020.
- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:** In compliance

MCSO has instituted a quality check process for VSCFs that requires supervisors to review all traffic stop documents within three days of the stop. AIU also conducts an inspection of the timeliness of these reviews as well as a second inspection on Traffic Stop Data. The Traffic Stop Data inspection employs a matrix that ensures that the name, serial number and unit of the deputy is included on the VSCF. For October through December, the Traffic Stop Data inspections yielded compliance rates of 97%, 85%, and 97% respectively. For reviews, given the 30-day time lag, the compliance rates for September through November were 98%, 99%, and 99%, respectively. While the overall rate of compliance for the Traffic Stop Data inspections for this period was close to 93%, the matrix information showed that none of the deficiencies had to do with identification of deputies or drivers.

WAI 44791

MCSO has incorporated patrol data into the EIS through the creation of interfaces for Incident Report (IR) and Non-Traffic Contact Form (NTCF) documents. Each of these documents lists the required name of the deputy and civilian, as well as the ethnicity of the civilian, in accordance with this Paragraph. AIU conducts an inspection of IRs, including a check for racial/ethnic bias in the reporting documents and the identification of all parties contacted as a result of the incident. The compliance rates reported by MCSO for the IR inspection from September to November were above 97%. Based upon MCSO's use of an inspection matrix, our review of deficiencies for the IRs we reviewed ranged from 75% in November to 87.5% in October; however, none of the deficiencies were related to the identification of persons contacted or deputies involved. Most deficiencies resulted from the failure to file/sign documents within policy timeframes or the use of conclusory language or failure to adequately articulate probable cause.

Non-Traffic Contact Forms contain the same basic information about the identity of the deputy making the contact and the persons being contacted. MCSO does not yet have an inspection of NTCFs, but they do provide us with copies of all the documents for investigative stops. Up to this point, we have not found an NTCF document that does not include the criteria required by this Paragraph.

***Paragraph 77.*** *MCSO shall maintain computer hardware, including servers, terminals and other necessary equipment, in sufficient amount and in good working order to permit personnel, including Supervisors and commanders, ready and secure access to the EIS system to permit timely input and review of EIS data as necessary to comply with the requirements of this Order.*

### In Full and Effective Compliance

Since our earliest site visits in 2014, we have addressed the issue of "necessary equipment, in sufficient amount and in good working order" with MCSO. As part of our monthly document requests, we receive an accounting, by District, of how many vehicles have functioning TraCS systems.

Since the end of 2015, we have found that all marked patrol vehicles were properly equipped with TraCS equipment. MCSO developed EB-2 (Traffic Stop Data Collection), which states that in the event that a TraCS vehicle is not operational, or available, each District possesses the necessary equipment at the substation for deputies to input his/her traffic stop information before the end of the shift. Due to the mountainous regions throughout Maricopa County, there have always been connectivity issues. However, these areas are well-known to Patrol deputies; and they have demonstrated how they adapt to connectivity problems. The VSCF also allows deputies to note issues with technology on a traffic stop.

WAI 44792

During our October and January visits to the Districts, we spot-checked the facilities and patrol cars; and found that they had functioning TraCS equipment, and that each District office had available computers for any occurrence of system failures with vehicle equipment. Finally, AIU randomly selects units throughout the organization to conduct spot facility and equipment inspections. From September to November, there were no inspections conducted that reported a compliance rate below 95%.

At present, the technology and equipment available at MCSO meet the requirements of the Order.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination. We will continue to conduct our spot inspections at the Districts, and MCSO will apprise us of any event that falls within the scope of this Paragraph.

**Paragraph 78.** *MCSO shall maintain all personally identifiable information about a Deputy included in the EIS for at least five years following the Deputy's separation from the agency. Information necessary for aggregate statistical analysis will be maintained indefinitely in the EIS. On an ongoing basis, MCSO shall enter information into the EIS in a timely, accurate, and complete manner, and shall maintain the data in a secure and confidential manner. No individual within MCSO shall have access to individually identifiable information that is maintained only within EIS and is about a deputy not within that individual's direct command, except as necessary for investigative, technological, or auditing purposes.*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:** In compliance

GH-5 (Early Identification System) clearly states that employees only have access to EIS in furtherance of the performance of their duties, and that any other unauthorized access will be addressed under MCSO's discipline policy. The policy also notes that access to individual deputy information will be limited to appropriate supervisory/administrative personnel of that deputy. In addition, the policy states that personal information will be maintained in the database for at least five years following an employee's separation from the agency; however, all other information will be retained in EIS indefinitely

The most recent occurrences of a substantiated misuse of MCSO's computer system occurred in 2011 and 2015. As a result, MCSO published a System Log Audit operating procedure in November 2017 that required PSB to notify the Technology Management Bureau of any investigations involving a system breach. We fully vetted this operating procedure (BAS SOP 17-4) during our January 2018 site visit. MCSO reported no system breaches occurring between our July and October site visits. In addition, we receive summaries of all internal investigations

WAI 44793

each month. In March, one case indicated that a deputy was under investigation for potentially misusing the Arizona Criminal Justice Information System (ACJIS); and in another, it was alleged that booking information might have been used for social media. These cases have not triggered the operating procedure noted above because, according to MCSO during our January site visit meetings, PSB has not yet completed its investigations.

MCSO's concern for the integrity of information in EIS is further exemplified by the protocols that PSB has created to meet the requirements of Subparagraphs 75.a. and 75.b. regarding purview of open complaints and internal investigations. PSB not only controls who can view summaries of open investigations, but has created a protocol for creating the summary of open investigations to protect the integrity of the case while it is being processed.

MCSO has also created a work group to ensure the integrity of traffic stop data used for analysis. The protocols used by this work group are incorporated into Section 306 of the EIU Operations Manual. This section has been approved by us and incorporated into the Manual as finalized.

**Paragraph 79.** *The EIS computer program and computer hardware will be operational, fully implemented, and be used in accordance with policies and protocols that incorporate the requirements of this Order within one year of the Effective Date. Prior to full implementation of the new EIS, MCSO will continue to use existing databases and resources to the fullest extent possible, to identify patterns of conduct by employees or groups of Deputies.*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:** Not in compliance

The employment of the EIS database remains limited as MCSO has not yet completed and published the results of new methodologies for the Traffic Stop Monthly and Quarterly Reports (TSMR and TSQR). During our last several site visits, we have also suggested to MCSO that the agency needs to create an analytical plan for the Non-Traffic Contact Forms that have accumulated over the 18 months. Until these are complete and operational, MCSO will not achieve Phase 2 compliance with this Paragraph. We and the Parties continue to work with MCSO to complete each of these analytic reports.

MCSO has published the Fourth Traffic Stop Annual Report (TSAR) that is discussed in other Paragraphs. MCSO is also in the process of developing a plan to ensure that subsequent TSARs are able to track trends in the level of potential bias/disparity found in traffic stop outcomes. MCSO's plan for the analysis of monthly traffic data continues to progress, and MCSO is in the process of conducting pilot analyses to ensure that the reports meet the requirements of the Order. MCSO has also proposed an initial method to analyze NTCFs but these plans remain in a preliminary stage.

WAI 44794

In the meantime, EIU and AIU pull together data to produce reports and inspections of both deputy and supervisor activity. The EIS automatically triggers alerts for behaviors ranging from unscheduled absences to external complaints. The EIU uses this information to create monthly reports and to determine whether an investigation by a supervisor is required. AIU has most recently published a new inspection on EIS Alert Processes to ensure that alert investigations are conducted within policy timeframes and to summarize the manner in which investigations were closed. The compliance rate for the EIS Alert Inspection ranges from 73% in October to 83% in November. We anticipate that as this inspection becomes more widely known throughout the organization, and as supervisors are trained to the new processes, District personnel will adjust accordingly and submit their investigations in a timelier fashion. MCSO is developing an extension of this inspection to include the evaluation of the effectiveness of interventions that supervisors recommend.

AIU also uses the EIS database to generate numerous inspections of traffic stop data, Supervisory Notes, and Incident Report inspections, among many others. When deficiencies are found, AIU sends out BIO Action Forms to the District command to rectify the situation and memorialize what was done. AIU has already automated an alert threshold for repeated Action Forms for the same events. During our July site visit, AIU personnel presented the initial analysis of BIO Action Form tracking processes. The main findings of this report indicate that the vast majority of persons receiving BIO Action Forms receive only one form; however, AIU also found that 7% of those who receive multiple BAFs received three or more during the five-month reporting period. During our January site visit, MCSO personnel noted that they are continuing to evaluate the findings from the first BAF tracking analysis and intend to propose a regular audit methodology when this process is complete. The goal of this inspection is to track deficiencies by Districts, shifts, and squads to focus corrective measures in the most beneficial way. We will review the proposal as it is made available.


### b. Training on the EIS

*Paragraph 80. MCSO will provide education and training to all employees, including Deputies, Supervisors and commanders regarding EIS prior to its implementation as appropriate to facilitate proper understanding and use of the system. MCSO Supervisors shall be trained in and required to use EIS to ensure that each Supervisor has a complete and current understanding of the employees under the Supervisor's command. Commanders and Supervisors shall be educated and trained in evaluating and making appropriate comparisons in order to identify any significant individual or group patterns. Following the initial implementation of the EIS, and as experience and the availability of new technology may warrant, MCSO may propose to add, subtract, or modify data tables and fields, modify the list of documents scanned or electronically attached, and add, subtract, or modify standardized reports and queries. MCSO shall submit all such proposals for review by the Monitor pursuant to the process described in Section IV.*

WAI 44795

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:** In compliance

MCSO's curriculum for Supervisor Responsibilities: Effective Law Enforcement (SRELE) was approved on September 30, 2019. A portion of the curriculum includes a refresher for supervisors regarding how to most effectively use EIS tools and complete Alert Investigations for their subordinates within policy guidelines. Following completion of the SRELE training MCSO requested and received approval to put the EIS Alert Investigations resource material on the HUB for supervisors to refer to as they are completing their supervisory duties. The list of instructors approved to teach the SRELE training does not include any current members of EIU; however, several of those instructors have had past supervisory roles over this Unit. Additionally, MCSO is modifying the Traffic Stop Monthly Report (TSMR) analysis and participating in discussions with us and the Parties about how to effectively train supervisors to use the statistical documents in the furtherance of their supervisory duties. We will continue to assist MCSO as it formulates training curriculum to enhance the supervisory functions of the Office.

### c. Protocol for Agency and Supervisory Use of the EIS

*Paragraph 81. MCSO shall develop and implement a protocol for using the EIS and information obtained from it. The protocol for using the EIS shall address data storage, data retrieval, reporting, data analysis, pattern identification, identifying Deputies for intervention, Supervisory use, Supervisory/agency intervention, documentation and audit. Additional required protocol elements include:*

a.  *comparative data analysis, including peer group analysis, to identify patterns of activity by individual Deputies and groups of Deputies;*

b.  *identification of warning signs or other indicia of possible misconduct, including, but not necessarily limited, to:*

  i.  *failure to follow any of the documentation requirements mandated pursuant to this Order;*

  ii.  *racial and ethnic disparities in the Deputy's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of Deputies' specific duties, or racial or ethnic disparities in traffic stop patterns when compared with data of a Deputy's peers;*

WAI 44796

      iii.    *evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;*

      iv.    *a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;*

      v.    *complaints by members of the public or other officers; and*

      vi.    *other indications of racial or ethnic bias in the exercise of official duties;*

c.    *MCSO commander and Supervisor review, on a regular basis, but not less than bimonthly, of EIS reports regarding each officer under the commander or Supervisor's direct command and, at least quarterly, broader, pattern-based reports;*

d.    *a requirement that MCSO commanders and Supervisors initiate, implement, and assess the effectiveness of interventions for individual Deputies, Supervisors, and units, based on assessment of the information contained in the EIS;*

e.    *identification of a range of intervention options to facilitate an effective response to suspected or identified problems. In any cases where a Supervisor believes a Deputy may be engaging in racial profiling, unlawful detentions or arrests, or improper enforcement of Immigration-Related Laws or the early warning protocol is triggered, the MCSO shall notify the Monitor and Plaintiffs and take reasonable steps to investigate and closely monitor the situation, and take corrective action to remedy the issue. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or other supervised, monitored, and documented action plans and strategies designed to modify activity. All interventions will be documented in writing and entered into the automated system;*

f.    *a statement that the decision to order an intervention for an employee or group using EIS data shall include peer group analysis, including consideration of the nature of the employee's assignment, and not solely on the number or percentages of incidents in any category of information recorded in the EIS;*

g.    *a process for prompt review by MCSO commanders and Supervisors of the EIS records of all Deputies upon transfer to their supervision or command;*

h.    *an evaluation of whether MCSO commanders and Supervisors are appropriately using the EIS to enhance effective and ethical policing and reduce risk; and*

i.    *mechanisms to ensure monitored and secure access to the EIS to ensure the integrity, proper use, and appropriate confidentiality of the data.*

**Phase 1:** In compliance

WAI 44797

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:** Not in compliance

MCSO produces a number of reports and inspections that are relevant for this Paragraph. Due to issues with EIS data and methods of analysis, MCSO has not been able to reliably produce the Traffic Stop Monthly Report (TSMR) based upon the criteria outlined in Paragraph 67; nor has MCSO ever produced a Traffic Stop Quarterly Report (TSQR). Additionally, each of the Annual Reports (TSAR) has been delayed, or had to be rewritten, because of anomalies that arose in the data or the manner in which it was analyzed. MCSO has contracted with a new outside vendor to conduct analyses of traffic stop data. We and the Parties have commented on drafts of the data analytic methodologies and will continue to work in concert with MCSO to find solutions for the issues that currently limit the full use of the EIS database. MCSO has published the Fourth Traffic Stop Annual Report (TSAR); however, the analysis from that report addresses issues of potential systemic bias across the entire traffic patrol function and cannot be employed to address potential individual-level biased activity. The TSMR, which is currently undergoing a revision and pilot process, will assist MCSO and its supervisors in evaluating the activity of individual deputies.

Paragraph 81.a. requires that MCSO's EIS protocols include "comparative data analysis, including peer group analysis, to identify patterns of activity by individual Deputies and groups of Deputies."

The EIU has conducted monthly and annual analyses looking for outliers that may indicate that an individual is behaving in a biased or unprofessional manner, in accordance with Paragraphs 65, 66, and 67. The TSMR has been suspended and under revision since April 2016. MCSO has proposed new methodologies in consultation with its new vendor. We and the Parties have had the opportunity during and between site visits to ask questions and receive additional information. Most importantly, MCSO is currently evaluating the extent to which it can match deputies using personal and professional characteristics that are intended to go beyond previous methods that were based upon geographic location of traffic stops alone. These proposals have been met with support from deputies across the organization during meetings between MCSO personnel and the data analyst vendor (CNA); however, the statistical problems that arose during the Fourth TSAR analysis have required additional investigation of these methodological techniques.

MCSO has never produced a TSQR. During our January site visit, MCSO presented a list of proposed quarterly studies. All but one of these studies received approval. We will evaluate these studies as they are produced. The main goal of most studies proposed is to investigate issues that would be beneficial to the refinement or development of either the Traffic Stop Annual or Monthly Reports.

WAI 44798

MCSO has also created an interface for Non-Traffic Contact Forms (NTCFs) to be available in the EIS database; however, MCSO has only begun to develop a methodology to investigate whether patterns of problematic behavior/action might be occurring in the stops these forms document. We have discussed these issues with MCSO during our site visit meetings since October 2018. We have commented on preliminary materials provided by MCSO, and we will continue to work with MCSO to utilize these civilian contacts to their fullest potential.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.b. requires that MCSO's EIS protocols include "identification of warning signs or other indicia of possible misconduct."

GH-5 (Early Identification System) provides significant direction for employees and supervisors alike to understand what type of behaviors will be viewed as problematic. As noted above, the intent of the TSAR and TSMR is to identify deputies who might be engaged in biased activity regarding who they stop, cite, warn, or search. MCSO has been developing new methods for the TSMR, and we have collectively engaged in numerous discussions about the TSAR.

MCSO is also revising the EIU Operations Manual, which will include sections on data protocols and the several analyses based upon the traffic stop and patrol data. The manual also includes thresholds for behavior ranging from failure to arrive on time for work to external complaints. BIO is examining these thresholds to determine why they were set at the present levels. This investigation may result in the modification of thresholds that have proven unproductive over the last several years. Additionally, MCSO is currently investigating threshold levels for the benchmarks for the TSMR outlined in Paragraph 67.

Finally, as noted in Subparagraph 81.a. and 81.b.vi, MCSO should utilize all patrol data to evaluate the behavior of deputies in comparison to their peers. While the volume of Non-Traffic Contact Forms (NTCFs) pales in comparison to traffic stops, there are enough accumulated forms for analyses to commence. As we noted in Paragraph 75, we receive all NTCFs for investigative stops each month. The volume ranges from 15-25 per month. In our review of these interactions, we have noted that they typically involve suspicious behavior, and violations of traffic laws while on bicycles or waterways. These violations are often concentrated in particular locations throughout the County that may make it more likely that minority members are contacted. We have suggested to MCSO that the agency create an analytic method to determine whether there may be trends in activity over time that may require closer examination to eliminate any possibility of bias. MCSO is in the early stages of proposing this methodology. Since our July site visit, we also undertook an evaluation of a random sample of Field Information contacts captured on NTCFs. Our review found a large overlap between civilian contacts labeled as Field Information and those labeled as Investigative Stops. We have engaged MCSO in further discussions clarifying this distinction. Until such time as this is resolved, we will select a combined sample of NTCFs from both categories of civilian interaction.

MCSO is not in compliance with this Subparagraph.

WAI 44799

Paragraph 81.c. requires that MCSO's EIS protocols include "MCSO Commander and Supervisor review, on a regular basis, but not less than bimonthly, of EIS reports regarding each officer under the Commander or Supervisor's direct command and, at least quarterly, broader, pattern-based reports."

Supervisory Note inspections include four measures to assess how well supervisors are using EIS information to oversee the activity and behavior of their subordinates: making supervisory comments on deputies; reviewing their body-worn camera footage; making Employee Performance Appraisal (EPA) notations; and reviewing subordinates' EIS profiles. The overall compliance average across these criteria has remained steady in the upper 90th percentile for the past year, except in August when 14 deficiencies were found in District 1. The compliance rate in August was 91%. AIU regularly sends out BIO Action Forms to those Districts with deficiencies. During our January site visit, we were provided documentation of the follow-up to the issues uncovered in District 1. The lieutenant met with the sergeant; and discussed supervisory strategies and time management tools, as well as lesson plans on the HUB. We have not seen a reoccurrence of issues stemming from District 1 since that time. Rarely have we noted deficiencies involving the same supervisors in consecutive months. MCSO has already included repetitive Action Form deficiencies as an alert allegation. AIU has developed and presented a proposal to better track Action Forms by type, individual, and District to ensure that any corrective actions are targeted at the most appropriate level and to be able to determine if there are particular supervisors that appear repeatedly within specified timeframes. MCSO presented the first analysis of BIO Action Form tracking, for January to May 2019, during our July 2019 site visit. MCSO is currently reviewing this first analysis in order to prepare a proposal for a regular BIO Action Form inspection. We will evaluate this proposal as it is made available.

MCSO is in compliance with this Subparagraph.

Paragraph 81.d. requires that MCSO's EIS protocols include "a requirement that MCSO Commanders and Supervisors initiate, implement and assess the effectiveness of interventions for individual Deputies, Supervisors, and units, based on assessment of the information contained in the EIS."

The EIS database generates alerts for issues ranging from data entry errors to internal and external complaints; however, many of the potential ongoing alerts are dependent upon the revision of alert thresholds which continue to undergo evaluation by MCSO. From these alerts, EIU personnel send out for investigation those alerts that are not redundant or mischaracterized in some fashion. Supervisors have a set amount of time to return these investigations with a description of their investigation and the outcome. MCSO has created an EIS Alert Review Group (ARG) that reviews the investigations of supervisors prior to closing an alert. The group ensures that the reports of the supervisors address all aspects of the assigned investigation, and returns those that are deficient to the District for continued revision. Following the creation of the ARG, we have found the supervisors' investigations and actions to be well-founded. The review group typically has requested additional information in one third to one half of the investigations

evaluated by them. We have been provided the original alert investigation documents (Attachment B of GH-5, Early Identification System) as well as modified ones arising from the review group's requests. AIU has also created a new inspection for EIS Alert Review Processes. This inspection initially determines whether the investigation was completed within policy timeframes of 30 days. The compliance rate for this quarter ranges from 73% in October to 83% in November. BIO sent Action Forms to the Districts where supervisors did not complete their investigations within policy guidelines. We believe that as the agency's experience with this inspection evolves, and supervisors receive additional training on alert investigation closure in SRELE training, that these variations will diminish. MCSO is working to also address whether the interventions undertaken are successful based upon whether new investigations are triggered for the same deputies or supervisors. We will continue to engage MCSO in this evaluation process in accordance with this Paragraph. As this is the second quarter in which MCSO has not achieved compliance for the Alert Investigation Inspection, and there is no mechanism in place to adequately judge the effectiveness of interventions, MCSO is no longer in compliance with this Subparagraph.

Paragraph 81.e. requires MCSO's EIS protocols to include "identification of a range of intervention options to facilitate an effective response to suspected or identified problems. In any case where a Supervisor believes a Deputy may be engaging in racial profiling, unlawful detentions or arrests, or improper enforcement of Immigration-Related Laws or the early warning protocol is triggered, MCSO shall notify the Monitor and Plaintiffs and take reasonable steps to investigate and closely monitor the situation, and take corrective action to remedy the issue. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or other supervised, monitored, and documented action plans and strategies designed to modify activity. All interventions will be documented in writing and entered into the automated system."

GC-17 (Employee Disciplinary Procedures) and GH-5 (Early Identification System) provide a wide range of options for supervisor interventions, as well as practical guidelines about how to employ those options. As noted above, GH-5 includes Attachment B, "Early Identification Alert Response Form." This form specifies the responsibility of supervisors and serves as a checklist of processes the supervisor should use. EIU also attaches any documents, citations, or BWC recordings the supervisor might need to conduct an inquiry. We began seeing the use of these forms in April 2017. By September 2017, we found that the closure of alert investigations by supervisors had improved. Most recently, we have only inquired about the ongoing status of PSB inquiries that took priority over alert investigations or updates on Action Plans that have been enacted following discussions between District and EIU personnel.

MCSO has also created an EIS Alert Review Group (ARG) to ensure that the closure of alerts is supported by documentation from supervisors and responsive to the needs of the organization. The number of completed investigations has dropped over the past several months as the ARG has taken a proactive role to communicate with the Districts and individual supervisors about how

WAI 44801

to effectively complete these investigations. This has meant that when the ARG intervenes, the total time to complete an investigation has increased; however, once complete, these investigations contain sufficient information to support the actions taken by District personnel. We have also worked with MCSO to propose an extension of alert investigation timeframes when documentation issues delay the process. We will evaluate this proposal when it is produced.

MCSO is in compliance with this Subparagraph.

Paragraph 81.f. requires that MCSO's EIS protocols include "a statement that the decision to order an intervention for an employee or group using EIS data shall include peer group analysis, including consideration of the nature of the employee's assignment, and not solely on the number or percentages of incidents in any category of information recorded in the EIS."

In the development of GH-5 (Early Identification System), MCSO has taken into consideration the nature of the employee's assignment. In prior versions of GH-5, MCSO created an appendix for thresholds that indicated, for example, that the "use of force" threshold was different for Detention and Patrol personnel. Detention personnel are much more likely to need to employ force than their Patrol counterparts. In the current version of GH-5, MCSO refers to thresholds that will be included in the EIU Operations Manual. MCSO is evaluating the threshold limits to ensure that they are achieving the goals for which they were originally set. In addition, MCSO is communicating with other local law enforcement agencies to collect information about current best practices regarding thresholds they employ. In addition, during our October site visit, we raised the issue of the number of alerts being sent for investigation as a result of vehicle accidents by Transportation staff. MCSO personnel noted that they are evaluating whether there should be unique thresholds for vehicle accidents dependent on the role of an employee. Likewise, in January, we raised a concern that data validation errors may be occurring in alert investigations as a result of deputies hurrying through their paperwork. MCSO is considering these issues in the evaluation of the current thresholds. We will comment on these thresholds when MCSO presents a proposal.

MCSO has also engaged a new outside contractor for analysis of traffic stop data. Up to this point, MCSO is proposing an expansion of "peer" comparisons beyond just the location of the traffic stop. MCSO is proposing to match deputies based upon personal and professional characteristics. This proposal has been vetted by us and the Parties. We will evaluate the sufficiency of these methods as the process evolves. During the analysis conducted for Fourth TSAR a statistical problem arose as the result of these matching characteristics. MCSO overcame this problem and is in the midst of pilot testing for the TSMR. MCSO will remain out of compliance with this Subparagraph until the TSMR is produced and evaluated.

Paragraph 81.g. requires that MCSO's EIS protocols include "a process for prompt review by MCSO Commanders and Supervisors of the EIS records of all Deputies upon transfer to their supervision or command."

WAI 44802

MCSO has noted the need for a prompt review in both the "Supervisor Responsibilities" and "Command Staff Responsibilities" sections of GH-5 (Early Identification System). EIU specifically addressed this issue during the EIS and SRELE training completed in November 2017. EIU advised supervisors to document when they conducted their review in Supervisory Notes, as well as how long the deputy had been working in their chain of command when the review was conducted. This was also reiterated in the SRELE training that was approved on September 30, 2019. During our visits to several Districts during our past four site visits, MCSO personnel informed us that most command staff attempt to review these materials within the first few days that a deputy, or supervisor, moves to their District. In no cases have we found information where the 14-day limit outlined in policy has been problematic.

MCSO is in compliance with this Subparagraph.

Paragraph 81.h. requires that MCSO's EIS protocols include "an evaluation of whether MCSO Commanders and Supervisors are appropriately using the EIS to enhance effective and ethical policing and reduce risk."

EIU has improved the processing and tracking of alert investigations. The development of Attachment B to GH-5 (Early Identification System) and training completed in EIS and SRELE has dramatically improved the information provided by supervisors when closing alerts. AIU has also created a new EIS Alert Review Process inspection that specifically looks for indications that supervisors have conducted a thorough examination within appropriate policy timeframes and selected appropriate responses to the allegations included in the alert investigation. At present, this inspection is limited to reviewing whether supervisors are completing alert investigations within the 30-day policy requirements. MCSOs compliance rate for this inspection ranges from 73% in October to 83% in November. MCSO continues to work on a secondary feature of this inspection, which will include criteria to judge the effectiveness of interventions by identifying deputies and supervisors who trigger additional alerts. This inspection will become a valuable component to ensure that supervisors and command staff are utilizing EIS to promote efficiency and ethical policing during the alert investigation process. We found no issues with the conclusions used for closing these investigations. For the cases that were not closed within policy guidelines, BIO sent out Action Forms to the Districts. As this process becomes more routine, we expect that District personnel will adjust to the policy requirements.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.i. requires that MCSO's EIS protocols include "mechanisms to ensure monitored and secure access to the EIS to ensure the integrity, proper use, and appropriate confidentiality of the data."

MCSO has addressed the security and integrity of data in GH-5 (Early Identification System), as well as instituted facility inspections throughout the Districts – including the security of terminals, access to information, and mobile displays. We spot-check technology and security of old forms during each site visit and have found no problems to date. Additionally, on November 6, 2017,

MCSO published the operating procedure for System Log Audit Requests; this became effective on November 30, 2017. The procedure outlines how PSB personnel will notify the Technology Management Bureau of any misuse of MCSO information systems allegations and request an audit of the suspected breach. We discussed this operating procedure, BAS SOP 17-4, during our January 2018 site visit meetings; it meets all of the concerns voiced since the February 2017 discovery of two cases where data was compromised, but no one notified the Technology Management Bureau. We believe this procedure has proven effective to this point. In addition, we are provided all internal investigation summaries initiated each month; and found only two instances in which an employee was accused of misusing ACJIS and booking information. These complaints are still under investigation by PSB. We will continue to evaluate the effectiveness of MCSOs attention to data integrity.

MCSO is in compliance with this Subparagraph.

MCSO meets some of the requirements of Paragraph 81, but there remain a variety of activities that are currently ongoing that need to be completed before MCSO will be compliant. These range from the finalization of methods for the TSMR and TSQR to the completion of revisions to the EIU Operations Manual. AIU has improved the tracking of alert investigations with the creation of the EIS Alert Review Process Inspection; and initiated an analysis of BIO Action Form tracking. MCSO presented this analysis during our July site visit and will use the results to propose an ongoing BIO Action Form review. We have also requested that MCSO devise an audit for the NTCFs that have accumulated over the past 18 months. We and the Parties remain concerned that we have not noted many instances where supervisors proactively intervene with their subordinates; rather, the supervisors wait until prompted by EIS alerts or the ARG review of completed alert investigations. Command staff have taken a more active role in evaluating the work of supervisors as evidenced by the number of alert investigations returned to supervisors for revision or additional inquiry. MCSO has suggested a proposal to initiate a statistical evaluation of accumulated NTCFs. We have provided feedback to this proposal and will evaluate the progression of this methodology as it becomes available. We will continue to evaluate progress toward the goals outlined in this Paragraph.

WAI 44804

# Section 9: Supervision and Evaluation of Officer Performance

**COURT ORDER X. SUPERVISION AND EVALUATIONS OF OFFICER PERFORMANCE**

*Paragraph 82. MCSO and the County shall ensure that an adequate number of qualified first-line Supervisors are available to provide the effective supervision necessary to ensure that Deputies are following the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order. First-line Supervisors shall ensure that Deputies are policing actively and effectively, are provided with the instruction necessary to correct mistakes, and are held accountable for misconduct. To achieve these outcomes, MCSO shall undertake the following duties and measures:*

*Paragraph 83. MCSO Supervisors shall provide the effective supervision necessary to direct and guide Deputies. Effective supervision requires that Supervisors: respond to the scene of certain arrests; review each field interview card and incident report; confirm the accuracy and completeness of Deputies' daily activity reports; respond to each Complaint of misconduct; ensure Deputies are working actively to engage the community and increase public trust and safety; provide counseling, redirection, support to Deputies as needed, and are held accountable for performing each of these duties.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 27, 2019.

**Phase 2:** In compliance

During our January site visit, we interviewed supervisors and commanders from Districts 1, 2, and 6 to determine compliance with MCSO policies and the requirements of this Paragraph.

During our visit to District 1, we met with the District Commander, three lieutenants, and one sergeant. The District 1 hours of operation remain the same: business days, from 8:00 a.m.-4:00 p.m. The most common types of calls are property-related: trespassing and theft. There have been no significant spikes in crimes or arrests. District 1 had 20 misconduct investigations in 2019, and currently has seven investigations open. Most of the complaints are related to rudeness. Supervisors noted that the current investigative format takes a considerable amount of time to complete. Supervisors expressed interest in a means to shorten the length of investigations when BWC recordings provide convincing evidence to either clear or substantiate the allegations. Even though BWC recordings sometimes provide convincing evidence, supervisors are still required to conduct interviews and complete the entire investigation. Another concern expressed is that District 1 supervisors are currently working on a backlog of cases from 2015-2016, and many individuals that need to be interviewed have since moved. Seven of the District supervisors are

WAI 44805

new and do not have investigative experience. The District 1 staff recommended that investigators, rather than supervisors, be responsible for conducting internal investigations. The District 1 staff do not believe it is fair for supervisors be responsible for all their administrative duties, as well as investigating complaints from two years ago. Supervisors are responsible for overseeing and responding to certain calls for service, and their ability to focus on investigations is constantly disrupted. It was the District 1 staff's opinion that supervisors are asked to do too much administratively; and this results in them rushing to get to the point during complaint interviews, which results in leading questions. District 1 personnel advised us that many of the complaints that the District receives are service complaints related to deputies taking too long to respond to calls for service. They believe this is a result of not having enough personnel in Patrol. The District 1 staff stated that additional staffing is needed to handle the volume of calls for service. District 1 currently has 11 deputy vacancies, one sergeant vacancy, and one deputy aide vacancy.

During our visit to District 2, we met with the Bureau Chief and three lieutenants. One of the lieutenants interviewed was acting as the District Commander. District 2 deputies are on a 3/13 schedule, but commanders are on a 4/10 shift configuration. The hours of operation of the District office are Monday-Friday from 0800-1600. The majority of crime in the District are property related – criminal damage and stolen vehicles. In 2019, there were 247 arrests made in District 2, in addition to 180 warrant arrests. With regard to addressing specific community concerns, District 2 has a squad that consists of a sergeant, two traffic cars, and a community deputy. This squad is routinely used to address crime concerns and quality of life issues. District 2 personnel are still attending "Coffee with a Cop" events, in addition to holiday gift drives and backpack drives with area schools. District 2 deputies work closely with the Saddle Mountain School District, as part of their community policing strategy. With regard to internal investigations, the District Acting Commander is a former lieutenant in the Professional Standards Bureau (PSB). From our discussions during the meeting, we concluded that his expertise will be beneficial in improving the quality of administrative investigations in the District. He has facilitated more collaboration between supervisors, and there are ongoing discussions and exchanges of information with regard to how to rectify common deficiencies found in investigations. The Acting Commander also implemented a "second chair" rule in administrative interviews, a common practice when conducting interviews in PSB. This requires two investigators to be present during administrative interviews, to ensure that proper procedures are followed and important topics are covered. In addition, District 2 supervisors are spending extra time formulating questions before interviews to ensure that the correct questions are asked.

WAI 44806

District 2 was one of the two Patrol Districts where the new EPA form was piloted. District 2 commanders had positive comments about the new EPA process, noting that in their opinion, it was an improvement over the current format. The District 2 staff stated that there was important and relevant information on what behaviors to look for in the writing assistant. The addition of the community engagement section in the EPA form allows supervisors to give due credit to deputies who routinely work with the community on quality of life issues. District 2 staff advised us that part of the EPA training they received addressed the issue of boilerplate comments, and how to avoid them.

District 2 had six deputy vacancies and two sergeant vacancies. With regard to morale, District 2 personnel advised us that deputies have a "full plate" and have a lot of personal stresses in their lives. The Bureau Chief noted that MCSO is aware of the concern, and is considering implementing initiatives in the near future to help with morale and provide deputies with the support they need. Personnel informed us that some deputies appear to be overwhelmed; they feel that they are under the microscope. A commander suggested that supervisors would benefit from additional information regarding the Traffic Stop Annual Report (TSAR), and where it shows potential bias so they can properly address the issue with deputies. The commander commented that the Traffic Stop Monthly Report (TSMR) may help provide more up to date information, so that specific issues are identified quickly and addressed.

We reviewed a representative sample of 83 Incident Reports for October, for the randomly selected date of October 13. Of the 83 Incident Reports, 80 had proper documentation of timely supervisory review. Of the 83 Incident Reports, 13 were vehicle collisions. Twelve of 13 Vehicle Crash Reports had documentation that a supervisor had reviewed and approved the reports. The compliance rate for timely supervisory review of Incident Reports in October was 96.3%%. During our quality control review of Incident Reports, we noted minor spelling mistakes in one Incident Report. Of the six Arrest Reports, supervisors reviewed all within 72 hours as required. For October, MCSO reported 892 hours of community policing. MCSO reported that there were 378 community policing encounters, of which 352 were attributed to Patrol deputies. We note that in our sample reviews of Patrol Activity Logs for October, we noted three community policing events.

We reviewed a sample of 78 Incident Reports for November, for the randomly selected date of November 11. Seventy-seven of 78 Incident Reports were reviewed and memorialized by a supervisor within the required timelines. One of the 14 Arrest Reports was not reviewed and approved within the required 72 hours. There were 16 Vehicle Crash Reports submitted in the sample for November, of which all included documentation of supervisory review. The compliance rate for timely supervisory review of Incident Reports in November was 98.7%. We conducted a quality review on a 10% random sample of the reports we reviewed; and with the exception of one Arrest Report that was reviewed late, we found no significant errors. For November, MCSO reported 799 hours of community policing. In our sample reviews of Patrol Activity Logs, we noted two instances in which Patrol deputies documented some type of community policing activity; and one occasion where a supervisor noted a community policing activity. Only one of the community policing contacts had detailed information about the event.

We reviewed a representative sample of 83 Incident Reports for December, for the randomly selected date of December 21. Eighty-one of the 83 Incident Reports included documentation that they had been reviewed and approved by supervisors as required by this Paragraph, for a compliance rate of 97.6%. Two of the 10 Arrest Reports had not been reviewed and signed by supervisors within the required 72 hours. There were 17 Vehicle Crash Reports submitted in the December sample; we confirmed timely supervisory review on all 17 reports. We conducted a quality review on a 10% random sample of the reports submitted and found no significant deficiencies. For December, MCSO reported 554 hours of community policing. MCSO reported that there were 337 community policing encounters, of which 329 were attributed to Patrol deputies. In our reviews of Patrol Activity Log samples, we noted three community policing activities.

For each month of the quarter, we selected a supervisor and a squad of deputies from each District. We requested several documents, including Patrol Activity Logs (PALs), for each deputy. We reviewed PALs for each month of the quarter to assess if deputies turned them in by the end of each shift, and if supervisors reviewed each PAL.

For October, we reviewed PALs for 31 deputies and seven supervisors. All 31 deputies' Patrol Activity Logs contained documentation of supervisory review. All seven supervisors' Patrol Activity Logs contained documentation of command-level review. For November, we reviewed Patrol Activity Logs for 24 deputies and seven supervisors. All 24 deputies' PALs contained documentation of supervisory review. All seven supervisors' PALs contained documentation of command-level review. For December, we reviewed Patrol Activity Logs for 27 deputies and seven supervisors. All 27 deputies' PALs contained documentation of supervisory review; all seven sergeants' PALs contained documentation of command-level review. Based on the review of PAL samples selected for October, on a daily basis, deputies completed an average of 0.97 Incident Reports, handled an average of 5.5 calls for service, completed an average of 2.9 self-initiated calls, and travelled an average of 58.3 miles. Based on the review of PAL samples selected for November, on a daily basis, deputies completed an average of 0.75 Incident Reports,

handled an average of 5.1 calls for service, completed an average of 1.4 self-initiated calls, and travelled an average of 66.9 miles. Based on the review of PAL samples selected for December, on a daily basis, deputies completed an average of 0.7 Incident Reports, handled an average of 3.1 calls for service, and travelled an average of 72.5 miles.

We also reviewed deputies' and supervisors' PALs to determine if supervisors provided on-scene supervision, and if those supervisor-deputy contacts were documented. For the sample dates selected in October, there were 29 supervisor-deputy field contacts reported by deputies and supervisors. For the sample dates selected in November, there were 16 supervisor-deputy field contacts reported by deputies and supervisors. For the sample dates selected in December, there were 22 supervisor-deputy field contacts reported by deputies and supervisors.

For October, November, and December, we reviewed selected samples of non-traffic incidents involving stops and detentions, which were recorded in Non-Traffic Contact Forms (NTCFs). For October, we selected 30 NTCFs for review. All 30 NTCFs had been submitted prior to the end of the shift. Twenty-nine of the 30 NTCFs were reviewed and approved by supervisors within 72 hours, as required. The compliance rate for timely submission and timely supervisory review of NTCFs in October was 96.67%. For November, we selected 25 NTCFs to review. All 25 NTCFs were submitted prior to the end of the shift. All 25 NTCFs were reviewed and approved by supervisors within the required timeframe. Of the 25 NTCFs reviewed, all were in compliance. The compliance rate for timely submission and timely supervisory review of NTCFs in November was 100%. For December, we selected 15 NTCFs for review. All 15 NTCFs were submitted within the required timeframe. Eleven of the 15 NTCFs were reviewed and approved by supervisors within the required 72 hours. The compliance rate for timely submission and timely supervisory review of NTCFs in December was 73.33%%. For this reporting period, compliance with timely submission and timely supervisory review of NTCFs was 92.85%. We assess compliance with this Paragraph, as it relates to NTCFs in conjunction with timely reviews of VSCFs, under Paragraph 90.

Our reviews for this reporting period revealed that in October, of the 30 NTCFs, 15 stops involved White individuals, with a total of 20 White individuals documented in these stops. Fourteen stops involved Latino individuals, with a total of 17 Latino individuals documented in these 15 stops. No stops involved Asians or Pacific Islanders. Four stops involved African Americans, with a total of four African American individuals documented in these stops. For November, we reviewed 25 NTCFs, of which 21 stops involved White individuals, with a total 25 of White individuals documented in these stops. Three stops involved Latino individuals, for a total of three Latino individuals documented in these stops. One stop involved an Asians or Pacific Islander, and one stop involved an African American. For December, we reviewed 15 NTFCs, of which nine involved White individuals, with a total of nine White individuals documented in these stops. Five stops involved Latino individuals, for a total of 10 Latino individuals involved in these stops. Two stops involved Asians or Pacific Islanders, and one stop involved an African American. Latinos were involved in 22 of the 70 stops, or 31.43%.

With regard to community engagement, we have previously noted that there were insufficient details provided in the CAD reports associated with these activities, to differentiate between casual contacts and actual problem-solving policing. We requested to review samples of the community-policing worksheets implemented by MCSO as part of the Plan to Promote Constitutional Policing. We reviewed 25 samples for October. As with our observations during the last quarter, there were a variety of activities recorded including school presentations, attendance at PTA meetings, meetings with business owners and employees, attendance at HOA meetings, and specialized unit demonstrations. For October, MCSO reported 5,048 individuals contacted in community policing activities, and deputies spent approximately 43 hours conducting those activities. In November, the community policing activities included District station tours, town hall meetings, attending charity fundraisers, and some of the previously described activities in October. In November, MCSO reported that 1,566 individuals were contacted in community policing activities, and deputies spent approximately 44 hours conducting those activities. In December, the events included similar types of activities previously noted, in addition to attendance at holiday events. In December, MCSO reported that 2,773 individuals were contacted in community policing activities, and deputies spent approximately 28 hours conducting those activities.

**Paragraph 84.** *Within 120 days of the Effective Date, all patrol Deputies shall be assigned to a single, consistent, clearly identified Supervisor. First-line field Supervisors shall be assigned to supervise no more than twelve Deputies.*

### In Full and Effective Compliance

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the fourth quarter of 2019. During this reporting period, consistent with our methodology, for October, we reviewed a sample of shift rosters from Districts 4, 6, and 7, and Lake Patrol; for November, we reviewed a sample of shift rosters from Districts 1, 2, and 3; for December, we reviewed a sample of shift rosters from Districts 4, 6, and 7, and Lake Patrol. Monthly and daily rosters indicated that deputies were assigned to one single consistent supervisor. For the 66 dates selected in this reporting period, all shifts were in compliance. There were 23 span of control memos generated during this reporting period, indicating that those shifts or part of those shifts exceeded the supervisor-deputy ratio of 1:8. Four of the span of control memos were generated by District 1. Fourteen of the span of control memos were generated by District 2. Six of the span of control memos were generated by District 3. MCSO remains in compliance with this Paragraph.

On September 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 44810

***Paragraph 85.*** *First-line field Supervisors shall be required to discuss individually the stops made by each Deputy they supervise with the respective Deputies no less than one time per month in order to ensure compliance with this Order. This discussion should include, at a minimum, whether the Deputy detained any individuals stopped during the preceding month, the reason for any such detention, and a discussion of any stops that at any point involved any immigration issues.*

**Phase 1:** In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on October 25, 2019.

**Phase 2:** In compliance

Consistent with our methodology, we requested that MCSO provide copies of reports documenting that supervisors are meeting with and discussing individually the stops made by each deputy, at least once per month. We requested documentation for one randomly selected supervisor from each District, for each month of the reporting period, and the squad of deputies who reports to that supervisor. Supervisors record the discussion of traffic stops by applying the "Discussed with Deputy" option. MCSO documents supervisor-deputy discussions in a spreadsheet, which it submits for inspection. The spreadsheet also documents timely supervisory review of VSCFs. In addition to the spreadsheet, MCSO submits all VSCFs for the month in review. We select a 10% random sample of VSCFs from each District to review for content. We also inspect the sample of VSCFs submitted for review of traffic stops under Paragraphs 25 and 54, as part of compliance with Paragraph 91, to verify if supervisors are addressing deficiencies in the documentation related to the stops.

Paragraph 85 requires that supervisors discuss traffic stops at least once per month with their deputies. To efficiently manage this requirement along with other administrative and operational duties, supervisors generally conduct several traffic stop-related discussions with each deputy during the month. Supervisor-deputy discussions of traffic stops that occurred toward the latter part of the month may not get reviewed until the following month. Our selections for these discussions change every month, so to obtain complete records for each deputy, MCSO holds the submission until all of the information requested for the month is complete. Accordingly, the documentation of supervisory-deputy discussions of traffic stops is submitted 30 days retroactively.

For October, MCSO submitted the September traffic stops for each deputy, by District. The total number of traffic stops for each District was: District 1, 98; District 2, six District 3, 25; District 4, 16; Lake Patrol, 148; District 6, 36; and District 7, 18. There were a total of 347 traffic-related events for all Districts, and sergeants discussed all of these events with the deputies who conducted them, for a compliance rate of 100%.

WAI 44811

For November, MCSO submitted the October traffic stops for each deputy, by District. The total number of traffic stops for each District were: District 1, 68; District 2, one; District 3, five; District 4, 43; Lake Patrol, 23; District 6, 75; and District 7, 22. There were a total of 237 traffic-related events for all Districts, and sergeants discussed 173 of these with the deputies that conducted them. For the month in review, District 1 had 68 traffic stops noted in the spreadsheet submitted as proof of compliance, but only four had documentation that supervisors had discussed these stops with the deputies that conducted them. For the month in review, the compliance rate was 73%.

For December MCSO submitted the November traffic stops for each deputy, by District. The total number of traffic stops for each District were: District 1, 90; District 2, 35; District 3, six; District 4, 20; Lake Patrol, 36; District 6, 26; and District 7, 18. There were a total of 233 traffic-related events in December, and sergeants discussed 231 of these events with the deputies who conducted them, for a compliance rate of 99%.

For this reporting period, there were a total of 817 traffic stops reported; and we received documentation that supervisors discussed 751 of these stops with the deputies that conducted them. This is a compliance rate of 92%. MCSO has been in compliance with this Paragraph. Consistent with our methodology, we will retain the compliance rating for this reporting period. However, if MCSO fails to meet the requirements of this Paragraph in the next reporting period, we will withdraw compliance.

**Paragraph 86.** *On-duty field Supervisors shall be available throughout their shift to provide adequate on-scene field supervision to Deputies under their direct command and, as needed, to provide Supervisory assistance to other units. Supervisors shall be assigned to and shall actually work the same days and hours as the Deputies they are assigned to supervise, absent exceptional circumstances.*

**Phase 1:** In compliance

- GB-2 (Command Responsibility), most recently amended on June 28, 2019.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed a sample of daily shift rosters for the three months of the reporting period. During this reporting period, consistent with our methodology, for October, we reviewed a sample of shift rosters from Districts 4, 6, and 7 and Lake Patrol; for November, we reviewed a sample of shift rosters from Districts 1, 2, and 3; and for December, we reviewed a sample of shift rosters from Districts 4, 6, and 7 and Lake Patrol. Our reviews of monthly and daily rosters indicated that deputies were assigned to and worked the same schedules as their supervisors.

WAI 44812

MCSO deputies' and sergeants' activities are captured in Patrol Activity Logs (PALs). We selected a random sample of one day per month, and one squad per District, for review. For October, we reviewed PALs for seven sergeants and 31 deputies. We noted a total of 29 field supervisor-deputy contacts between the combined deputies' and sergeants' PALs for the selected dates. For November, we requested PALs for 24 deputies and seven sergeants. We received and reviewed all requested PALs, and noted a total of 16 field supervisor-deputy contacts between the combined deputies' and sergeants' PALs for the selected dates. For December, we reviewed PALs for 27 deputies and seven sergeants. We noted a total of 22 field supervisor-deputy contacts between the combined deputies' and sergeants' PALs for the selected dates. We reviewed the monthly shift rosters for each month of the reporting period. Our reviews indicate that supervisors are assigned to work the same hours as the deputies under their supervision. Our reviews of Patrol Activity Logs indicate that supervisors have been available to provide on-scene supervision.

***Paragraph 87.*** *MCSO shall hold Commanders and Supervisors directly accountable for the quality and effectiveness of their supervision, including whether commanders and Supervisors identify and effectively respond to misconduct, as part of their performance evaluations and through non-disciplinary corrective action, or through the initiation of formal investigation and the disciplinary process, as appropriate.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 27, 2019.

**Phase 2:** Not in compliance

Consistent with our methodology, we requested the names of all deputies and supervisors whose performance appraisals were completed during this reporting period. From the lists of employees submitted, we requested a representative sample. The selection of deputies and supervisors whose EPAs are requested is based on the number of requirements set forth in the First and Second Orders. There are a greater number of requirements that supervisory EPAs must address, therefore, a greater number of supervisors' EPAs are reviewed for compliance.

For October 2019, we requested and reviewed performance evaluations submitted for five deputies and 10 supervisors whose performance evaluations were completed in October. All five deputy EPAs were in compliance. With regard to supervisors' EPAs, all 10 EPAs rated the supervisors on the quality of their reviews. All 10 EPAs addressed the quality and effectiveness of supervision. All 10 EPAs addressed the complaint history and their dispositions, discipline, commendations, awards, civil or administrative claims, lawsuits, training history, assignment and rank history, supervisory actions, and EIS histories. Eight of the 10 supervisors' EPAs had comments on the employees' ability to identify and respond to misconduct. Nine of the 10 EPAs assessed supervisors on the quality of their internal affairs investigations and/or the quality of

WAI 44813

their reviews of internal affairs investigations, as required by Paragraph 176. In total, seven of the 10 supervisors' EPAs met all requirements. For October, including both deputy and supervisor EPAs, 12 of 15 EPAs, or 80%, were in compliance

For November 2019, we requested and reviewed performance evaluations submitted for four deputies and nine supervisors whose EPAs were completed in November. All four deputy EPAs addressed all required areas of assessment, including the requirements of Paragraph 99. All nine of the supervisors' EPAs rated the supervisors on the quality and effectiveness of their supervision. All nine EPAs addressed the quality of supervisory reviews. Seven of the nine supervisors' appraisals included comments related to the supervisors' ability to identify and respond to misconduct. All nine of the EPAs addressed the complaint history and their dispositions, discipline, commendations, awards, civil or administrative claims, lawsuits, training history, assignment and rank history, supervisory actions, and EIS histories. Seven of the nine EPAs assessed the supervisors' quality of internal investigations and/or the quality of their reviews of internal investigations; one supervisor had no direct reports. In total, six of the nine supervisors' EPAs met all requirements. For November, including both deputy and supervisor EPAs, 10 of 13 EPAs, or 76.92%, were in compliance.

For December 2019, we requested and reviewed Employee Performance Appraisals submitted for five deputies and nine supervisors whose EPAs were completed in December. All five deputy EPAs addressed all requirements. All nine supervisors' EPAs rated the employees on the quality and effectiveness of their supervision. All nine supervisors' EPAs addressed the quality of supervisory reviews. All nine supervisors' appraisals included comments related to the supervisors' ability to identify and respond to misconduct. All nine supervisors' EPAs addressed the complaint history and their dispositions, discipline, commendations, awards, civil or administrative claims, lawsuits, training history, assignment and rank history, supervisory actions, and EIS histories. Seven of the nine EPAs assessed supervisors on the quality of their internal affairs investigations and/or the quality of their reviews of internal investigations, as required by Paragraph 176. In total, seven of nine supervisors' EPAs met all requirements. For December, including both deputy and supervisor EPAs, 12 of 14 EPAs, or 85.71%, were in compliance. Of the 42 EPAs reviewed for the third quarter, 34 were in compliance. The compliance rating for this reporting period was 80.95%.

During our January site visit, we met with Human Resources and discussed the progress of the EPA revision. MCSO has completed the three-month pilot program in Districts 2 and 3. We and the Parties reviewed and provided feedback on the EPA performance management guide (previously described as a writing assistant). We believe the guide to be a useful tool, if used as intended. Our concerns were primarily that supervisors would be tempted to copy descriptions of the observable behaviors directly from the guide. We shared our concerns with boilerplate language with MCSO. MCSO noted that this concern will be addressed through training, policy reinforcement, and reviews by the chain of command. In the few prototype EPAs we reviewed during the pilot program, we did not find evidence of boilerplate comments. However, we will

WAI 44814

carefully review EPAs completed in the new format to ensure that this concern has been addressed. Training on the new EPAs will be conducted in 2020 and 2021, in two four-hour training sessions. MCSO expects the new EPAs to be implemented in 2022.

**Paragraph 88.** *To ensure compliance with the terms of this Order, first-line Supervisors in any Specialized Units enforcing Immigration-Related Laws shall directly supervise the law enforcement activities of new members of the unit for one week by accompanying them in the field, and directly supervise the in-the-field-activities of all members of the unit for at least two weeks every year.*

**In Full and Effective Compliance**

MCSO does not have any specialized units that enforce immigration-related laws. We continue to monitor arrests and detentions as part of our review process to ensure that MCSO is in compliance with its own directives on this issue.

For this reporting period we received lists containing all incidents involving MCSO arrests and criminal citations. For each month, we requested a random sample of arrests and criminal citations. In total, we reviewed 60 incidents involving arrests and 60 incidents involving criminal citations. We also reviewed a random sample of 244 Incident Reports for this reporting period. During our reviews of the documentation provided for this reporting period, we have found no evidence to indicate any violations of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 89.** *A Deputy shall notify a Supervisor before initiating any immigration status investigation, as discussed in Paragraph 28. Deputies shall also notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration Related Crime, or for any crime related to identity fraud or lack of an identity document. The responding Supervisor shall approve or disapprove the Deputy's investigation or arrest recommendation based on the available information and conformance with MCSO policy. The Supervisor shall take appropriate action to address any deficiencies in Deputies' investigation or arrest recommendations, including releasing the subject, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative investigation.*

**In Full and Effective Compliance**

WAI 44815

To assess MCSO's compliance with this Paragraph, we requested all reports related to immigration status investigations, any immigration-related crimes, or any incidents or arrests involving lack of identity documents. The Incident Reports requested were for the period of July 31-September 30, 2019. Any incident wherein a deputy requests a supervisor's permission to contact Immigration and Customs Enforcement (ICE) or Customs and Border Patrol (CBP) – to ascertain the legal status of an individual involved in a stop, detention, or any incident under investigation by MCSO – falls under the reporting requirements of this request. For this reporting period, there were no reported events that would fall under the requirements of this Paragraph.

For this quarter, MCSO submitted three arrests that fall within the purview of this Paragraph. In November, MCSO made an arrest of an individual who was stopped for criminal speeding. The driver stated that he did not have a driver's license and identified himself with a Mexican consular card. Incident to arrest, the subject was searched and was found to have an Arizona identification card, with the subject's photo – but with a different name than was on the Mexican identification. Upon further investigation, the name printed on the identification card was found to be the name of an actual person who was the victim of identity theft. The driver subsequently admitted to having purchased the fictitious identification card; he was charged with identity theft. The second arrest in November involved a driver who was stopped for driving with only one operational headlight. The driver had no license and had an outstanding arrest warrant. The third arrest was made in December, and involved a driver who was stopped for a traffic violation. The driver used the name of her sister when she signed the citation. Further investigation revealed that the driver had four active warrants.

From each list, we selected a 10% random sample of incidents. In total, we reviewed 60 incidents resulting in arrest and 60 incidents involving criminal citations. In addition, we reviewed 244 Incident Reports for the quarter.

On December 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

***Paragraph 90.*** *MCSO Deputies shall submit documentation of all stops and Investigatory Detentions conducted to their Supervisors by the end of the shift in which the action occurred. Absent exceptional circumstances, within 72 hours of receiving such documentation, a Supervisor shall independently review the information. Supervisors shall review reports and forms for Boilerplate or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct. Appropriate disciplinary action should be taken where Deputies routinely employ Boilerplate or conclusory language.*

**Phase 1:** In compliance

WAI 44816

- EA-11 (Arrest Procedures), most recently amended on June 18, 2019.

**Phase 2:** In compliance

We reviewed 35 incidents involving traffic stops for October 2019. There were 21 stops related to speeding, 13 of which resulted in citations and eight of which resulted in warnings. There was one stop related to an equipment violation. Eleven stops were for moving violations other than speeding. Two stops related to registration or license plate violations. Nineteen of the stops resulted in citations, and 16 resulted in warnings. All 35 Vehicle Stop Contact Forms we reviewed noted the serial number of the reviewing supervisor, date, and time of supervisory review. All 35 VSCFs were reviewed within the required 72 hours. For October, MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 219 VSCFs. Supervisors reviewed 218 of the 219 VSCFs within 72 hours, for a compliance rate of 99%.

We reviewed 35 incidents involving traffic stops for November 2019. Eighteen of the 35 traffic stops related to speeding. Of the 18 stops related to speeding, 15 drivers received citations, and three received warnings. Six of the stops related to equipment violations. Eight stops involved moving traffic infractions other than speeding. Three stops related to registration or license plate violations. Of the 35 stops, 22 resulted in citations, and 13 resulted in warnings. Supervisors reviewed all 35 VSCFs within 72 hours. For November, MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 272 VSCFs. Supervisors reviewed 270 of 272 VSCFs within 72 hours, for a compliance rate of 99%.

We reviewed 35 incidents involving traffic stops for December 2019**.** Twenty of the 35 traffic stops involved speeding violations. Of the 20 stops related to speeding, 10 drivers received citations and 10 drivers received warnings. Four stops related to equipment violations. Eleven stops involved traffic violations other than speeding. Of the 35 stops, 17 resulted in citations and 18 resulted in warnings. All 35 Vehicle Stop Contact Forms had timely supervisory reviews. For December, MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 206 VSCFs. We reviewed the data and supervisors reviewed 202 of 206 VSCFs within 72 hours, for a 98% compliance rate.

For October, November, and December, we reviewed selected samples of non-traffic incidents involving stops and detentions, which were recorded in Non-Traffic Contact Forms (NTCFs). For October, we selected 30 NTCFs for review. All 30 NTCFs had been submitted prior to the end of the shift. Twenty-nine of the 30 NTCFs were reviewed and approved by supervisors within 72 hours, as required. The compliance rate for timely submission and timely supervisory review of NTCFs in October was 97%. For November, we selected 25 NTCFs to review. All 25 NTCFs were submitted prior to the end of the shift. All 25 NTCFs were reviewed and approved by supervisors within the required timeframe. For December, we selected 15 NTCFs to review. All NTCFs were turned in before the end of the shift, but only 11 of the 15 had supervisory reviews documented within 72 hours. For the quarter, 65 of 70 NTCFs reviewed were in compliance with timely supervisory review. The compliance rate was 92.86%

We take into account all stops and detentions, both traffic and non-traffic, when we determine the compliance rate for this Paragraph. The compliance rate for timely reviews of all combined stops and detentions, from the samples chosen, for this reporting period was 98.43%. For this reporting period, our inspection of the documentation provided has not revealed any evidence of boilerplate or conclusory language, inconsistent or inaccurate information, or lack of articulation, as to the legal basis for stops and detentions.

***Paragraph 91.*** *As part of the Supervisory review, the Supervisor shall document any Investigatory Stops and detentions that appear unsupported by reasonable suspicion or are otherwise in violation of MCSO policy, or stops or detentions that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The Supervisor shall take appropriate action to address all violations or deficiencies in Investigatory Stops or detentions, including recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.*

**Phase 1:** In compliance

- EA-11 (Arrest Procedures), most recently amended on June 18, 2019.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on October 25, 2019.

- GF-5 (Incident Report Guidelines), most recently amended on July 25, 2019.

**Phase 2:** Not in compliance

We reviewed traffic stop data reported by MCSO for its October inspection (BI2019-0149). To determine compliance with this Paragraph, for October, we randomly selected 35 traffic-related events, which BIO then audited for compliance. Of the 35 traffic-related events, MCSO reported that 35 or 97.14% had no deficiencies. As a result of the inspection, one BIO Action Form was generated. The deficiency was noted when the BIO inspector found there was no Body Worn Camera (BWC) log for the deputy assisting with the traffic stop. We reviewed the same traffic-related events, independent of BIO's audits, as part of our compliance assessment for Paragraphs 25 and 54. As a result of our reviews of the traffic stop documentation and the BIO inspection report, we concluded that there were no serious violations of policy that supervisors failed to address.

We reviewed a spreadsheet documenting each VSCF by District, for October, to determine if supervisors were reviewing VSCFs within the required 72 hours. We reviewed data for 219 traffic stops, and determined that supervisors had completed timely reviews in 99% of the cases. For October, we requested 30 NTCFs from the list that MCSO submitted. We reviewed the NTCFs to determine if supervisors were reviewing them within the required 72 hours. We determined that supervisors had completed timely reviews in 29 of 30 NTCFs, or in 96.67%% of the cases.

WAI 44818

For October, we requested a sample of 24 corrective actions generated during the month. Corrective actions are documented on Blue Team Supervisory Notes. Of the 24 corrective actions, nine were associated with body-worn camera and recording issues, including: failure to activate the BWC; late activation of the BWC; turning off the camera before the event was concluded; or poor positioning of the BWC. Four corrective actions were associated with inaccurate or missing information on VSCFs, citations, or written warnings. Nine corrective actions were taken as a result of procedural or policy violations during traffic stops. One corrective action resulted from deputy performance issues. In one entry we could not identify any deficiency or corrective action taken.

We reviewed traffic stop data reported by MCSO for its November inspection (BI2019-0163). We randomly selected 35 traffic-related events, which BIO then audited for compliance. The inspection report noted that 30 stops, or 85.7%, had no deficiencies. The inspection found two stops where there was inconsistent information of the violator's license plate in a number of forms. In another stop, the deputy noted the wrong city on the warning that was issued to the driver. In the last stop, the deputy had a civilian observer in the patrol vehicle; but the individual was not on the shift roster, so we are unable to determine if the individual was authorized to be in the vehicle, and if the supervisor was aware of the civilian observer. This may have been a clerical error. We did not consider these errors in documentation to be serious deficiencies. In another stop, the deputy failed to activate his BWC at the time the stop was initiated, and had inconsistent information on the license plate in several forms. In one stop, the deputy failed to document the arrest and arrest time on the VSCF. In another stop, there was inconsistent information regarding the reason for the stop in a number of forms. We consider that these three last stops had serious deficiencies that should have been identified and corrected by supervisors. A total of seven BIO Action Forms were generated for the deficiencies. We reviewed the same traffic-related events, independent of BIO's audits, as part of our compliance assessment for Paragraphs 25 and 54. Our reviews found two additional stops with serious deficiencies that should have been addressed by supervisors. In one, the deputy made an arrest but did not document the arrest in the VSCF. In the other, the deputy failed to run the driver for warrants, as required by MCSO policy. In total, five stops had serious deficiencies that supervisors overlooked; these are therefore out of compliance.

We reviewed a spreadsheet documenting each VSCF by District, for November, to determine if supervisors were reviewing VSCFs within the required 72 hours. We reviewed 272 VSCFs and determined that supervisors had completed timely reviews in 270 of 272 stops, or in 99% of the cases. From the list submitted by MCSO, we requested a sample of 25 NTCFs that were generated in November. We inspected the NTCFs to determine if supervisors were reviewing them within the required 72 hours. We determined that supervisors had completed timely reviews in 100% of the cases.

WAI 44819

For November, we requested a list of corrective actions. From the list submitted, we selected 25 corrective actions to review. Of the 25 corrective actions, seven were associated with body-worn camera and recording issues: failure to activate the BWC; late activation of the BWC; turning off the camera before the event was concluded; or poor positioning of the BWC. Two corrective actions were associated with inaccurate or missing information on the VSCF, citation, or written warning. Twelve corrective actions were associated with procedural or policy violations during traffic stops. One corrective action related to a policy or procedure violation not in a traffic stop. One corrective action was associated with a technical failure, and there were two entries where we could not identify deficiencies or corrective actions.

We reviewed traffic stop data reported by MCSO for its December inspection (BI2019-0177). We randomly selected 35 traffic-related events, which BIO then audited for compliance. The inspection report noted that 34 stops, or 97.14%, had no deficiencies. In the first stop, there was an arrest made, but the deputy indicated that there had been no arrest on the VSCF. Since there was no arrest documented, the deputy did not note the time of arrest, and did not document that items had been seized on the VSCF. The BIO inspection report noted an issue in another stop that was listed as a non-compliance deficiency. In this case, a deputy conducted a seizure according to policy, but the deputy failed to provide the driver with a property receipt for the driver's license. The seizure of drivers' identification documents without cause and without properly documenting the seizures has been an issue in the past. In this case, the driver's license was seized, but this was not noted in the VSCF. In addition, the VSCF incorrectly noted that consent for the vehicle search was requested and obtained; the BWC video suggested the search was an inventory search. We consider that these two stops had serious deficiencies that were not identified and corrected by supervisors. We reviewed the traffic-related events we had selected for BIO's audits, for December, as part of our compliance assessment for Paragraphs 25 and 54. We found another five stops where there were violations of policy – specifically, where deputies failed to check the drivers for possible warrants. We consider these serious deficiencies that should have been addressed by their respective supervisors.

For December, we requested a list of corrective actions. From the list submitted, we selected a sample of 32 corrective actions to review for the month. Of the 20 corrective actions, five were associated with body-worn camera and recording issues: failure to activate the BWC; late activation of the BWC; turning off the camera before the event was concluded; or poor positioning of the BWC. Three corrective actions were associated with inaccurate or missing information on VSCFs, citations, or written warnings. Seven corrective actions were associated with procedural or policy violations involving traffic stops. One corrective action was associated with a violation of policy or procedure not involving a traffic stop. One corrective action was associated with a deputy safety issue. There were three Blue Team entries that were not associated with corrective actions, but were generated to document technical failures in BWCs and Praxis.

WAI 44820

We reviewed a spreadsheet documenting each VSCF by District, for December, to determine if supervisors were reviewing VSCFs within the required 72 hours. We reviewed 206 VSCFs and determined that supervisors had completed timely reviews in 202 of 206 VSCFs, or in 98% of the cases. For this month, we requested 15 NTCFs from the list submitted by MCSO, for December. We reviewed all 15 NTCFs to determine if supervisors were reviewing NTCFs within the required 72 hours. We determined that supervisors had completed timely reviews in 11 of the 15, or 73.33% of the cases.

Paragraph 90 requires timely supervisory reviews of documentation pertaining to stops and detentions. Paragraph 91 requires supervisors to identify policy violations, deficiencies, and training issues noted in stops and detentions. Of the sample of 105 stops inspected for this reporting period, there were 10 serious deficiencies and policy violations, that supervisors failed to identify and address in their reviews. The compliance rate for Paragraph 91 for this reporting period was 90.47%.

*Paragraph 92. Supervisors shall use EIS to track each subordinate's violations or deficiencies in Investigatory Stops or detentions and the corrective actions taken, in order to identify Deputies needing repeated corrective action. Supervisors shall notify IA. The Supervisor shall ensure that each violation or deficiency is documented in the Deputy's performance evaluations. The quality and completeness of these Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations. MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct complete, thorough, and accurate reviews of Deputies' stops and Investigatory Detentions.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

**Phase 2:** Not in compliance

To determine compliance with this Paragraph, we reviewed EIS Alerts Inspection Reports. The methodology requires us to select a sample of 15 EIS alerts completed and closed. The selected alerts are then inspected by BIO using the EIS Alerts Inspection Matrix. Due to the time it requires to process the information, the data from EIS alerts is reviewed two months retroactively.

WAI 44821

For September, we selected a sample of 15 EIS alerts completed or closed, which BIO then inspected for compliance. Inspection Report BI2019-0141 concluded that 11 of 15 closed alerts were in compliance, for a compliance rate of 73.33%. All the deficiencies noted were for failure to complete the action required within 30 days. A total of four BIO Action Forms were generated in response to the noted deficiencies. Districts 2 and 3 each had one alert deficiency, and each completed a BIO Action Form. District 4 had one deficiency and completed one BIO Action Form. The Special Investigations Division (SID) had one deficiency and completed one BIO Action Form. Ten of the alert interventions resulted in meetings between supervisors and deputies. One alert resulted in training for the involved employee. One alert noted that there had been multiple interventions previously. Three of the alerts concluded with no further action.

For October, we selected a sample of 15 EIS alerts completed or closed, which BIO then inspected for compliance. The inspection report, BI2019-0157, concluded that 11 of 15 closed alerts were in compliance, for a compliance rate of 73.33%. All the deficiencies noted were for failure to complete the action required within 30 days. A total of four BIO Action Forms were generated in response to the noted deficiencies. District 1 had two deficiencies and completed two BIO Action Forms. District 7 had one deficiency and completed one BIO Action Form. Central Intake had one deficiency and completed one BIO Action Form. Seven of the alert interventions resulted in meetings between supervisors and deputies. One alert resulted in a meeting with a commander. Two alerts noted that there had been multiple interventions. Four of the alerts concluded with no further action. One alert resulted in a referral to the Professional Standards Bureau.

For November, we selected a sample of six EIS alerts completed or closed, which BIO then inspected for compliance. The inspection report, BI2019-0169, concluded that five of six closed alerts were in compliance, for a compliance rate of 83.33%. The deficiency noted was from District 6, for failure to complete the action required within 30 days. One BIO Action Form was completed in response. Five of the alert interventions resulted in meetings between supervisors and deputies. One of the alerts concluded with no further action.

The compliance rates for the three months of this quarter indicate that MCSO did not meet the requirements of this Paragraph. In addition, MCSO has not yet implemented an audit process for NTCFs. We discussed this issue with MCSO during our January site visit; and MCSO will be submitting a proposal for amending the NTCF, as well as for the development of an inspection methodology governing its use.

WAI 44822

***Paragraph 93.*** *Absent extraordinary circumstances, MCSO Deputies shall complete all incident reports before the end of shift. MCSO field Supervisors shall review incident reports and shall memorialize their review of incident reports within 72 hours of an arrest, absent exceptional circumstances.*

**Phase 1:** In compliance

- EA-11 (Arrest Procedures), most recently amended on June 18, 2019.

- GF-5 (Incident Report Guidelines), most recently amended on July 25, 2019.

**Phase 2:** In compliance

We reviewed a representative sample of 83 Incident Reports for October, for the randomly selected date of October 13. Of the 83 Incident Reports, 80 had proper documentation of timely supervisory review. Of the 83 Incident Reports, 13 were vehicle collisions. Twelve of 13 Vehicle Crash Reports had documentation that a supervisor had reviewed and approved the reports. The compliance rate for timely supervisory review of Incident Reports in October was 96.3%. During our quality control review of Incident Reports, we noted minor spelling mistakes in one Incident Report. Of the six Arrest Reports, supervisors reviewed all within 72 hours as required.

We reviewed a sample of 78 Incident Reports for November, for the randomly selected date of November 11. Seventy-seven of 78 Incident Reports were reviewed and memorialized by a supervisor within the required timelines. One of the 14 Arrest Reports was not reviewed and approved within the required 72 hours. There were 16 Vehicle Crash Reports submitted in the sample for November, of which all included documentation of supervisory review. The compliance rate for timely supervisory review of Incident Reports in November was 98.7%. We conducted a quality review on a 10% random sample of the reports we reviewed, and with the exception of the Arrest Report that was reviewed late, we found no significant errors.

We reviewed a representative sample of 83 Incident Reports for December, for the randomly selected date of December 21. Eighty-one of the 83 Incident Reports included documentation that they had been reviewed and approved by supervisors as required by this Paragraph, for a compliance rate of 97.6%. Two of the 10 Arrest Reports had not been reviewed and signed by supervisors within the required 72 hours. There were 17 Vehicle Crash Reports submitted in the December sample; we confirmed timely supervisory review on all 17 reports. We conducted a quality review on a 10% random sample of the reports submitted and found no significant deficiencies.

WAI 44823

***Paragraph 94.*** *As part of the Supervisory review, the Supervisor shall document any arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The Supervisor shall take appropriate action to address violations or deficiencies in making arrests, including notification of prosecuting authorities, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.*

**Phase 1:** In compliance

- EA-11 (Arrest Procedures), most recently amended on June 18, 2019.

- GF-5 (Incident Report Guidelines), most recently amended on July 25, 2019.

**Phase 2:** Not in compliance

During our last reporting period, we revised our methodology to determine compliance with this Paragraph. Our previous methodology included the review of supervisors' investigations of arrest cases in which the Maricopa County Attorney's Office (MCAO) declined prosecution. We also reviewed the BIO inspection reports associated with MCAO turndowns. In addition, we reviewed Incident Memorialization Forms to determine if supervisors conducted proper investigations, and took resulting corrective actions, in their reviews of deficient Arrest Reports. The revised methodology requires the selection of at least 20 bookings and 20 criminal citations by us, for the inspection month. In addition, MCSO will review all cases involving immigration arrests, and arrests related to lack of identity documents. MCSO will also review all MCAO turndowns for lack of probable cause, with the total of cases not to exceed 60 per month. Beginning with September 2019, we agreed to review the new Incident Report Inspection as part of the documentation to determine compliance with Paragraphs 94 and 96. The inspection will review the selected cases, which are retroactive two months. For this reporting period, MCSO submitted data for October, November, and December.

For October, we reviewed Incident Report Inspection, BI2019-0128. We selected 20 bookings and 20 criminal citations, which BIO then inspected for compliance. There were no immigration-related arrests, and no cases involving identity theft investigations. There was one County Attorney turndown for lack of probable cause. This case was a submittal, not a booking or criminal citation. The BIO inspection concluded with a 97.5% compliance rating. We reviewed the inspection report, which noted eight deficient cases; and reviewed the matrix used by BIO for the inspection. We determined that there were five cases where the inspector noted deficiencies that fall within the purview of this Paragraph. There were several other cases where deficiencies or violations of policy occurred. However, we did not consider these to have any debilitating effect on the cases. Some inspection points in the matrix are given stronger consideration in our reviews than others, as these are fundamental requirements of Paragraph 94, and if deficiencies are noted, they may also impact the successful conclusion of the case. In all the cases described below, we relied on the BIO inspector's notations and observations to determine our findings.

WAI 44824

The first two cases had similar deficiencies, in that the inspector noted lack of articulation of the elements of the crime, and lack of articulation of probable cause. In one of these two cases, the inspector also noted that the reason for the search was not properly documented. In the third case, the inspector noted that the deputy did not properly document all the required elements of the crime. The fourth case included the following deficiencies: the report did not contain all the elements of the crime; the report did not sufficiently articulate the legal basis of the action taken; and the report did not properly articulate reasonable suspicion or probable cause. This case was rejected by MCAO, which determined that no crime had occurred. In the fifth case, the inspector noted that there was an inadequate investigation; and the inspector was unable to locate documentation that the crime was investigated based on the physical evidence. This report also had some other deficiencies as well, including no explanation of how the video evidence was found, and no property receipt for the video. In total, we found five of the 40 cases to be non-compliant. For October, MCSO did not submit any Incident Memorialization Forms.

For November, we reviewed Incident Report Inspection, BI2019-0144. We selected 20 bookings and 20 criminal citations, which BIO then inspected for compliance. There were no immigration-related arrests, no cases involving identity theft investigations, and no County Attorney turndowns for lack of probable cause. The BIO inspection concluded that 35 of the 40 reports were in compliance, and in accordance with their rating system, the inspection resulted in a 98.75% compliance rating. We reviewed the matrix used by BIO for the inspection and noted that five of the 40 cases had deficiencies that fall within the purview of this Paragraph. One case was noted to have lack of probable cause, and three cases were noted to have boilerplate or conclusory language. In the last case, the inspector noted that the report was deficient and did not contain all the elements of the crime. The BIO inspection report noted several other cases with minor deficiencies. However, we did not consider these to have any debilitating effect on the cases. In all the cases described above, we relied on the BIO inspector's notations and observations to determine our findings. In total we found five of the 40 cases to be non-compliant in this inspection.

For November, MCSO submitted three Incident Memorialization Forms. The first IMF was the result of an MCAO turndown for no reasonable likelihood of conviction. The charges were Violation of a Court Order and Stalking. The supervisor assigned to review the MCAO turndown was not the supervisor who approved the original report, and he determined that there was insufficient probable cause for the charges. The reviewing supervisor also noted the supervisor approving the submittal should have noted the deficiency. The deputy was counselled and advised of his mistakes and how to correct them. The reviewing supervisor was counselled and told that he needed to do a better job of reviewing reports. The second IMF involved a case where deputies were dispatched to a call in reference to shots fired. It was determined that it was a dispute between two brothers, in which one brother pulled a gun. The subject was taken into custody on a warrant, but the deputy questioned the subject as to the whereabouts of the gun without first providing *Miranda* warnings. The matter was addressed through additional training. The third IMF was a result of conclusory language that was identified in a domestic violence

WAI 44825

report. The deficiencies were discussed with the deputy, and he attended a report-writing refresher class. The issue was also addressed with the supervisor approving the report. We found these three IMFs to be in compliance.

For December, we reviewed Incident Report Inspection, BI2019-0150. We selected 20 bookings and 20 criminal citations, which BIO then inspected for compliance. There were no immigration-related arrests, no cases involving identity theft investigations, and no County Attorney turndowns for lack of probable cause. The BIO inspection concluded that 30 of the 40 reports were in compliance; and in accordance with its rating system, the inspection resulted in a 98.07% compliance rating. We reviewed the inspection report and the matrix used by BIO for the inspection, and noted that there was one case where the inspector noted deficiencies that fall within the purview of this Paragraph. The noted deficiencies were: the report did not contain all the elements of the crime; the report did not sufficiently articulate the legal basis of the action taken; the report did not properly articulate reasonable suspicion or probable cause; and, the deputy did not have reasonable suspicion for the stop or detention. The inspector also noted that the deputy did not properly investigate the allegations of the alleged crime. We found this case to be not in compliance with the requirements of Paragraph 94.

For December, MCSO submitted two IMFs, which had previously been submitted and reviewed in our last report. The third IMF submitted was for an incident that occurred on December 20, 2017. This case involved a traffic stop that occurred on December 7, 2017. The deputy's supervisor was conducting a routine review of BWC recordings associated with traffic stops, on December 20, 2017. In the stop in question, the deputy detected the smell of burning marijuana coming from inside the vehicle, and asked the driver questions regarding whether or not he had drugs in the vehicle. The reviewing supervisor determined that *Miranda* warnings should have been given to the driver. The supervisor addressed the matter with the deputy and conducted squad briefings as to when *Miranda* warnings were required. In addition, there was some discussion of providing Field Training Officers with additional training on this issue. On February 1, 2018, the District Captain reviewed the IMF; and concluded that *Miranda* warnings were not required. The District Captain directed a lieutenant to reassign the IMF to another sergeant, since the original supervisor had transferred out of the District. The IMF was reassigned to another sergeant, and remained inactive for several months between February 2, 2018, and January 29, 2019. The last entry was made on May 17, 2019, by a new District Captain who questioned why it took so long for this issue to be resolved. We agree that it took too long for this IMF to be completed, and for this issue to be concluded. In the last entry on the IMF, the supervisor concluded that, "based on case law and lack of any formal arrest" there was no need for *Miranda* warnings. We are concerned that if squad briefings were held based on the original premise that *Miranda* warnings were required, faulty information may have been disseminated to deputies, as well as to FTOs. We find this IMF problematic based on the length of time that it took to address the issue, and conclude that it is not in compliance with the requirements of this Paragraph.

WAI 44826

In total, of the 120 cases selected for inspection for this quarter, we found that 109 were in compliance, for a compliance rating of 90.83%. In addition, we found that of four IMFs, three were in compliance with this Paragraph.

***Paragraph 95.*** *Supervisors shall use EIS to track each subordinate's violations or deficiencies in the arrests and the corrective actions taken, in order to identify Deputies needing repeated corrective action. The Supervisor shall ensure that each violation or deficiency is noted in the Deputy's performance evaluations. The quality of these supervisory reviews shall be taken into account in the Supervisor's own performance evaluations, promotions, or internal transfers. MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct reviews of adequate and consistent quality.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

**Phase 2:** Not in compliance

To determine compliance with this Paragraph, we reviewed EIS Alerts Inspection Reports. The methodology requires us to select a sample of 15 EIS alerts completed and closed. The selected alerts are then inspected by BIO using the EIS Alerts Inspection Matrix. Due to the time it requires to process the information, the data from EIS alerts is reviewed two months retroactively.

For September, we selected a sample of 15 EIS alerts completed or closed, which BIO then inspected for compliance. The inspection report, BI2019-0141, concluded that 11 of 15 closed alerts were in compliance, for a compliance rate of 73.33%. All the deficiencies noted were for failure to complete the action required within 30 days. A total of four BIO Action Forms were generated in response to the noted deficiencies. Districts 2 and 3 each had one alert deficiency, and each completed a BIO Action Form. District 4 completed one BIO Action Form. The Special Investigations Division (SID) completed one BIO Action Form. Ten of the alert interventions resulted in meetings between supervisors and deputies. One alert resulted in training for the involved employee. One alert noted that there had been multiple interventions. Three of the alerts concluded with no further action.

WAI 44827

For October, we selected a sample of 15 EIS alerts completed or closed, which BIO then inspected for compliance. The inspection report, BI2019-0157, concluded that 11 of 15 closed alerts were in compliance, for a compliance rate of 73.33%. All the deficiencies noted were for failure to complete the action required within 30 days. A total of four BIO Action Forms were generated in response to the noted deficiencies. District 1 completed two BIO Action Forms. District 7 completed one BIO Action Form. Central Intake completed one BIO Action Form. Seven of the alert interventions resulted in meetings between supervisors and deputies. One alert resulted in a meeting with a commander. Two alerts noted that there had been multiple interventions. Four of the alerts concluded with no further action. One alert resulted in a referral to the Professional Standards Bureau.

For November, we selected a sample of six EIS alerts completed or closed, which BIO then inspected for compliance. The inspection report, BI2019-0169, concluded that five of six closed alerts were in compliance, for a compliance rate of 83.33%. The deficiency noted was from District 6, and it was for failure to complete the action required within 30 days. One BIO Action Form was completed in response. Five of the alert interventions resulted in meetings between supervisors and deputies. One of the alerts concluded with no further action.

The compliance rates for the three months of this quarter indicate that MCSO did not meet the requirements of this Paragraph. In addition, MCSO has not yet implemented an audit process for NTCFs. During our January site visit we discussed this issue. MCSO will be submitting a proposal for revising the NTCF, as well as for the development of an inspection methodology for its use.

***Paragraph 96.*** *A command-level official shall review, in writing, all Supervisory reviews related to arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The commander's review shall be completed within 14 days of receiving the document reporting the event. The commander shall evaluate the corrective action and recommendations in the Supervisor's written report and ensure that all appropriate corrective action is taken.*

**Phase 1:** In compliance

- EA-11 (Arrest Procedures), most recently amended on June 18, 2019.

**Phase 2:** Not in compliance

This Paragraph requires that a command-level official review a supervisor's investigation of the circumstances pertaining to any arrest that lacks probable cause, is in violation of policy, or where there is a need for corrective action or review of the agency's policy, strategy, tactics, or training.

Our reviews to determine compliance with this Paragraph are associated with the documentation provided for Paragraph 94. As a result of the change in methodology for reviews of Paragraph 94, we have also revised the methodology we use to review this Paragraph. If BIO identifies

WAI 44828

deficient cases in the Incident Report inspection, and the deficiencies fall within any of the four areas noted in Paragraphs 94 and 96, we will review the documentation to determine compliance. Since this Paragraph pertains to command reviews of supervisory investigations of deficient arrests, we will also review Incident Memorialization Forms to determine compliance. Our reviews for compliance with this Paragraph are determined by the command staff's timely reviews of IMFs, once submitted by supervisors, and commanders' evaluation of the corrective actions taken.

There were no Incident Memorialization Forms (IMFs) submitted for October. For November, MCSO submitted three Incident Memorialization Forms. The first IMF was a result of an MCAO turndown for no reasonable likelihood of conviction. The charges were Violation of a Court Order and Stalking. The supervisor assigned to review the MCAO turndown determined that there was insufficient probable cause for the charges. The reviewing supervisor also noted that the supervisor approving the submittal should have noted the deficiency. The deputy was counselled on his mistake and how to correct it. The original approving supervisor was also advised he needed to do a better job of reviewing reports. The second IMF involved a case where deputies were dispatched in reference to a call of shots fired. It was determined that it was a dispute between two brothers, in which one of the two parties pulled a gun. The offending party was taken into custody on a warrant, but the deputy questioned the subject as to the whereabouts of the gun, without first providing *Miranda* warnings. The matter was addressed through additional training. The third IMF was a result of conclusory language that was identified in a domestic violence report. The deficiencies were discussed with the deputy, and he was sent to a report-writing refresher class. The issue was also addressed with the supervisor who approved the deficient report. We found that commanders satisfactorily addressed the issues identified these three IMFs within the required timeline. These IMFs are in compliance with Paragraph 96.

For December, MCSO submitted two IMFs, which had previously been submitted and reviewed in our last report. The third IMF submitted was for an incident that occurred on December 20, 2017. This case involved a traffic stop that occurred on December 7, 2017. The deputy's supervisor discovered the issue when he was conducting a routine review of BWC recordings associated with traffic stops, on December 20, 2017. In the stop in question, the deputy detected the smell of burning marijuana coming from inside the vehicle, and asked the driver questions regarding whether or not he had drugs in the vehicle. The reviewing supervisor determined that *Miranda* warnings should have been given to the driver. The supervisor addressed the matter with the deputy and conducted squad briefings as to when *Miranda* warnings were required. In addition, there was some discussion of providing Field Training Officers with additional training on this issue. On February 1, 2018, the District Captain reviewed the IMF and concluded that *Miranda* warnings were not required. The captain directed a lieutenant to reassign the IMF to another sergeant, since the original supervisor had transferred out of the District. The IMF was reassigned to another sergeant, and remained inactive for nearly a year. The last entry was made on May 17, 2019, when a new District Captain questioned why it took so long for this issue to be resolved. We agree that it took too long for this IMF to be completed, and for this matter to be

WAI 44829

resolved. It also appears that contradictory information may have been disseminated to deputies at roll call briefings, as well as to FTOs. We find that this case was not handled in a timely manner, and that there seemed to be confusion as to when *Miranda* warnings are appropriate. This case took more than two years to complete. In addition, incorrect information may have been disseminated to deputies in the District where this occurred. Three of four IMFs reviewed were in compliance, or 75%.

***Paragraph 97.*** *MCSO Commanders and Supervisors shall periodically review the EIS reports and information, and initiate, implement, or assess the effectiveness of interventions for individual Deputies, Supervisors, and units based on that review. The obligations of MCSO Commanders and Supervisors in that regard are described above in Paragraphs 81(c)–(h).*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

**Phase 2:** Not in compliance

As per GH-5 (Early Identification System) and GB-2 (Command Responsibility), supervisors are required to conduct EIS reviews twice per month for sworn members. Command review of EIS profiles of supervisory and command personnel began in February 2017. Consistent with our methodology, for every month of the reporting period, we selected a supervisor and a squad of deputies from each District. We then reviewed the documentation provided as verification of compliance with this Paragraph. We also requested that EIS reviews of the commanders responsible for the selected personnel be included.

For October, we reviewed the documentation provided for 51 employees – which included the ranks of deputy, sergeant, lieutenant, and captain. Of the 51 employees, 46 had the required two EIS reviews in the month, for a 90.19% compliance rate. For November, we reviewed Supervisory Notes requested as verification of compliance for 53 employees. Of the 53 selected employees, 48 had appropriate documentation of timely EIS reviews, for a compliance rate of 90.57%. For December, we received Supervisory Notes as verification of compliance of EIS reviews for the selected 56 employees. Of the 56 employees, 51 had appropriate documentation of compliance with this Paragraph, for a compliance rate of 96%. The total compliance rate for the quarter, for periodic supervisory and command EIS reviews, was 91.07%. The total compliance rate for the quarter was 90.61%. In addition, the reviews of broader pattern-based reports, as required by Paragraph 81.c., and assessments of interventions as required by this Paragraph, have not been sufficiently documented to meet compliance with this Paragraph.

WAI 44830

### d. Regular Employee Performance Review and Evaluations

***Paragraph 98.*** *MCSO, in consultation with the Monitor, shall create a system for regular employee performance evaluations that, among other things, track each officer's past performance to determine whether the officer has demonstrated a pattern of behavior prohibited by MCSO policy or this Order.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

**Phase 2:** Not in compliance

This Paragraph requires that MCSO create a system that "among other things," tracks each deputy's past performance to determine if there has been a pattern of behavior prohibited by MCSO policy. There are performance dimensions related to supervisory EPAs that are not being addressed with enough consistency to establish compliance in those areas. The requirement for the assessment of supervisors' effectiveness in identifying and responding to misconduct has been an area of weakness which continues; for this reporting period, 24 of 28 supervisory EPAs had comments pertaining to this requirement. The other area of concern relates to rating supervisors' quality of misconduct investigations, and command reviews of misconduct investigations, as per Paragraph 176. This requirement has not been addressed with enough consistency to establish compliance. For this reporting period, 23 of 28 supervisory EPAs addressed the quality and reviews of internal affairs investigations. These requirements are fundamental components of a system needed to accurately and effectively assess performance.

Our reviews of EPAs are discussed in detail in Paragraph 87. Of the 42 EPAs reviewed for this reporting period, 34 were in compliance. The compliance rating for this reporting period was 80.95%.

***Paragraph 99.*** *The review shall take into consideration all past Complaint investigations; the results of all investigations; Discipline, if any, resulting from the investigation; citizen Complaints and commendation; awards; civil or administrative claims and lawsuits related to MCSO operations; Training history; assignment and rank history; and past Supervisory actions taken pursuant to the early warning protocol.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

**Phase 2:** In compliance

WAI 44831

Pursuant to a discussion with MCSO, we agreed to accept the acknowledgement, signed by the supervisor, at the conclusion of the EPA, as proof of compliance with the requirements of this Paragraph. This acknowledgment states that the supervisor has done due diligence in researching the employee's history for the review period, as it pertains to the requirements of Paragraph 99. The areas of review include: complaint investigations and dispositions; discipline; citizen complaints; commendations; awards; civil or administrative claims; and past supervisory actions taken pursuant to EIS alerts. Supervisors completing EPAs are required to document their findings relevant to these areas if their reviews reveal any applicable events or actions. The acknowledgement indicates that if something was discovered, it is included in the appropriate areas of the appraisal. Training history, and rank and assignment history, will continue to be documented in separate sections.

We are aware of the Parties' concerns with regard to supervisors conducting due diligence and documenting their findings. We have previously commented that we believe that the new EPA will resolve this concern. In addition, we have noted that supervisors are taking the time to comment on each point of this Paragraph's requirements in the current EPAs. In the EPAs reviewed for this quarter, supervisors have documented their findings, as it pertains to complaints, discipline, commendations, awards, claims, and supervisory actions with enough consistency to meet the requirements of this Paragraph. For this reporting period, we reviewed Employee Performance Appraisals for 14 deputies and 28 supervisors. Of the 14 deputies' appraisals, all were in compliance with the requirements of Paragraph 99. Of the 28 supervisors' appraisals, all were in compliance with this Paragraph.


***Paragraph 100.*** *The quality of Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

**Phase 2:** In compliance

We reviewed Employee Performance Appraisals for 28 supervisors and commanders who received EPAs during this reporting period. All 28 appraisals rated the quality and effectiveness of supervision; one supervisor did not any have direct reports. Twenty-four of 28 appraisals contained comments and/or rated the supervisors' demonstrated ability to identify and effectively respond to misconduct. 27 of 28 appraisals addressed the requirements of this Paragraph, as it pertains to the quality of supervisory reviews. One commander was not assessed on the quality of his reviews of misconduct investigations. The compliance rate for this quarter was 96.43%.

WAI 44832

***Paragraph 101.*** *Within 180 days of the Effective Date, MCSO shall develop and implement eligibility criteria for assignment to Specialized Units enforcing Immigration-Related Laws.*

*Such criteria and procedures shall emphasize the individual's integrity, good judgment, and demonstrated capacity to carry out the mission of each Specialized Unit in a constitutional, lawful, and bias-free manner. Deputies assigned to a Specialized Unit who are unable to maintain eligibility shall be immediately re-assigned.*

**In Full and Effective Compliance**

MCSO does not have any specialized units that enforce immigration-related laws. Therefore, by default, MCSO is in Phase 2 compliance with this Paragraph. We continue to monitor arrests and detentions as part of our review process to ensure that MCSO is in compliance with its own directives on this issue.

For October, November, and December, we received lists containing all incidents involving MCSO arrests and criminal citations. For each month, we requested a random sample of arrests and criminal citations. In total, we reviewed 60 incidents involving arrests and 60 incidents involving criminal citations. We also reviewed a random sample of 244 Incident Reports for this reporting period. During our reviews of the documentation provided for this reporting period, we found no evidence to indicate any violations of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, the Monitor concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with the Monitor's determination.

WAI 44833

# Section 10: Misconduct and Complaints

## COURT ORDER XI.  MISCONDUCT AND COMPLAINTS

### a. Internally-Discovered Violations

***Paragraph 102.***  *MCSO shall require all personnel to report without delay alleged or apparent misconduct by other MCSO Personnel to a Supervisor or directly to IA that reasonably appears to constitute: (i) a violation of MCSO policy or this Order; (ii) an intentional failure to complete data collection or other paperwork requirements required by MCSO policy or this Order; (iii) an act of retaliation for complying with any MCSO policy; (iv) or an intentional provision of false information in an administrative investigation or any official report, log or electronic transmittal of information.  Failure to voluntarily report or document apparent misconduct described in this Paragraph shall be an offense subject to Discipline.*

**Phase 1:**  In compliance

- CP-2 (Code of Conduct), most recently amended on March 15, 2019.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on January 24, 2019.

- CP-5 (Truthfulness), most recently amended on April 18, 2019.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

- GC-16 (Employee Grievance Procedures), most recently amended on April 2, 2019

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 27, 2019.

**Phase 2:**  In compliance

During our assessments of compliance with this Paragraph, we have reviewed hundreds of misconduct investigations involving MCSO personnel.  Many of them have been internally generated.

During this reporting period, we reviewed 41 administrative misconduct investigations.  Twenty-three were generated internally.  Five investigations involved sworn personnel, one involved a Reserve deputy, one involved a Posse member, 14 involved Detention personnel, one involved a civilian employee, and one involved an unknown MCSO employee.

MCSO has continued to identify and address misconduct that is raised by other employees or identified by supervisory personnel.  While some of these investigations did not meet all requirements for the proper reporting or completion of misconduct investigations, we address these failures in other Paragraphs in this report.

WAI 44834

### b. Audit Checks

***Paragraph 103.*** *Within one year of the Effective Date, MCSO shall develop a plan for conducting regular, targeted, and random integrity audit checks to identify and investigate Deputies possibly engaging in improper behavior, including: Discriminatory Policing; unlawful detentions and arrests; improper enforcement of Immigration-Related Laws; and failure to report misconduct.*

**Phase 1:** Not in compliance

- Audits and Inspections Unit Operations Manual, Section 303, currently under revision.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

**Phase 2:** Not in compliance

MCSO's Audits and Inspections Unit (AIU), a unit of the Bureau of Internal Oversight (BIO), is responsible for these requirements. AIU continues to develop a section (Section 303) of the AIU Operations Manual that will outline how AIU will fulfill the "targeted" Paragraph 103 requirements. We and the Parties provided comments on different versions of the relevant section of the manual – most recently during our January 2020 site visit. We are currently awaiting a revised version of the manual for the Parties' review.

While the review process of the operations manual is still underway, for this reporting period, BIO again submitted several completed inspections in support of the "regular" and "random" elements of this Paragraph. The inspections examined, for example, complaint intake tests, Supervisory Notes, Patrol Activity Logs, traffic stop data, post-stop ethnicity, County Attorney turndown dispositions, and Patrol Shift Rosters. We reviewed these reports and believe that they comport with the Paragraph 103 requirement for "regular" and "random" integrity audit checks.

### c. Complaint Tracking and Investigations

***Paragraph 104.*** *Subject to applicable laws, MCSO shall require Deputies to cooperate with administrative investigations, including appearing for an interview when requested by an investigator and providing all requested documents and evidence. Supervisors shall be notified when a Deputy under their supervision is summoned as part of an administrative investigation and shall facilitate the Deputy's appearance, absent extraordinary and documented circumstances.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

**Phase 2:** In compliance

WAI 44835

In the fall of 2015, MCSO developed a draft checklist and investigative format for administrative investigations. All the requirements in this Paragraph are included in these protocols. The checklist and formats were approved for use in early 2016, and all personnel through the rank of captain were required to attend a training session regarding the use of these forms. Effective June 1, 2016, all administrative investigations were required to use these forms. MCSO has consistently met this requirement, and MCSO has included the checklists in administrative investigations forwarded for our review.

Since that time, the Professional Standards Bureau (PSB) drafted revisions to the investigation checklist and format to provide additional clarification on procedural requirements. We and the Parties reviewed the revisions and provided our feedback. The revised format and investigation checklist were approved for use. The Misconduct Investigative Training for personnel outside of PSB also now includes a discussion of the revisions to these forms.

During the last reporting period, we reviewed 93 administrative misconduct investigations. Fifty-three involved identified sworn MCSO personnel. All 53 complied with the requirements of this Paragraph.

During this reporting period, we reviewed 41 administrative misconduct investigations. Ten involved sworn MCSO personnel. All were completed after July 20, 2016, included the use of the approved investigative format and checklist, and complied with the requirements of this Paragraph. We continue to note that deputies consistently appear for scheduled interviews, provide all required information to investigators, and cooperate with investigations. There were no instances during this reporting period where an investigator failed to notify an employee's supervisor of the intended administrative interview or where a supervisor failed to facilitate a deputy's attendance at a required interview.


**Paragraph 105.** *Investigators shall have access to, and take into account as appropriate, the collected traffic stop and patrol data, Training records, Discipline history, and any past Complaints and performance evaluations of involved officers.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

**Phase 2:** In compliance

Our reviews of investigations conducted by MCSO have verified that the information required for compliance with this Paragraph is consistently provided in the checklist and investigative reports.

WAI 44836

As a result of the Second Order and effective July 20, 2016, the PSB Commander makes all preliminary disciplinary decisions. The PSB and Compliance Bureau Commanders created a worksheet that provides information regarding how MCSO makes disciplinary decisions, and how MCSO considers employees' work history. PSB includes this form in the sustained investigation documentation that we receive and review for compliance.

During this reporting period, we reviewed 20 sustained administrative misconduct investigations. Four of these 20 cases involved misconduct by sworn personnel. Fourteen cases involved misconduct by Detention personnel. One case involved a Posse member, and one involved a civilian employee. Eighteen of the 20 investigations involved personnel still employed by MCSO at the time final findings or discipline decisions were made. In all these cases, the PSB Commander determined the findings and presumptive discipline range for the sustained violations. We found these preliminary decisions to be consistent with the Discipline Matrices in effect at the time the decisions were made. We also found that generally, where appropriate, discipline history, past complaints, performance evaluations, traffic stop and patrol data, and training records were included in the documents considered for final discipline findings.

***Paragraph 106.*** *Records of Complaints and investigations shall be maintained and made available, un-redacted, to the Monitor and Plaintiffs' representatives upon request. The Monitor and Plaintiffs' representatives shall maintain the confidentiality of any information therein that is not public record. Disclosure of records of pending investigations shall be consistent with state law.*

**In Full and Effective Compliance**

MCSO has two obligations under this Paragraph: to maintain and make records available. The Paragraph also covers the requirement that MCSO make unredacted records of such investigations available to the Plaintiffs' attorneys and Plaintiff-Intervenors as well.

MCSO has been responsive to our requests, and neither the Plaintiffs nor Plaintiff-Intervenors have raised any concerns related to the requirements of this Paragraph for this or the past several reporting periods. MCSO, via its counsel, distributes responses to our document and site visit requests via a document-sharing website. The Plaintiffs' attorneys and Plaintiff-Intervenors have access to this information, including documents applicable to this Paragraph, at the same time as we do.

On June 3, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 44837

**COURT ORDER XII.  COMMUNITY ENGAGEMENT**

*a. Community Outreach Program*

*Paragraph 107.  To rebuild public confidence and trust in the MCSO and in the reform process, the MCSO shall work to improve community relationships and engage constructively with the community during the time that this order is in place.  To this end, the MCSO shall conduct the following district community outreach program.*

*Paragraph 109.  The Monitor shall hold at least one public meeting per quarter to coincide with the quarterly site visits by the Monitor in a location convenient to the Plaintiffs class.  The meetings shall be for the purpose of reporting the MCSO' progress in implementing this Order.  These meetings shall be used to inform community members of the policy changes or other significant actions that the MCSO has taken to implement the provisions of this Order.  Summaries of audits and reports completed by the MCSO pursuant to this Order shall be made available.  The meetings shall be under the direction of the Monitor and/or his designee.  The Sheriff and/or the MCSO will participate in the meetings to provide substantive comments related to the Melendres case and the implementation of the orders resulting from it, as well as answer questions related to its implementation, if requested to do so by the Monitor or the community.  If the Sheriff is unable to attend a meeting due to other obligations, he shall notify the Monitor at least 30 days prior to that meeting.  The Monitor shall consult with Plaintiffs' representatives and the Community Advisory Board on the location and content of the meetings.  The Monitor shall clarify for the public at these meetings that MCSO does not enforce immigration laws except to the extent that it is enforcing Arizona and federal criminal laws.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

This Paragraph, per the June 3, 2019 Order (Document 2431), returned the community meetings to the Monitor's supervision and directed the Monitor to hold at least one public meeting per quarter to coincide with the quarterly site visits by the Monitor in a location convenient to the Plaintiffs' class.

During our January site visit, on Wednesday, January 15, 2020, from 6:30 p.m.-8:30 p.m., we held our public community meeting at the Burton Barr Public Library Pulliam Auditorium, located at 1221 North Central Avenue, Phoenix, in MCSO District 2.  We consulted with the Plaintiffs' representatives and the CAB on the location and content of the meeting.  The location was convenient to the Plaintiffs' class.  At the meeting, we welcomed the attendees; and explained that the Monitoring Team is comprised of 12 law enforcement and criminal justice professionals

WAI 44838

who oversee the implementation of the *Melendres* Court requirements. We informed the community members that there were representatives at the meeting from the Community Advisory Board (CAB), American Civil Liberties Union (ACLU), the United States Department of Justice (US DOJ), and the Sheriff's Office. We stated that the Sheriff was in attendance and there would be an opportunity to hear from him and ask questions.

After providing an overview of the Orders and how we assess compliance, we followed up on our October community meeting where MCSO had reported the results of its Traffic Stop Annual Report (TSAR). The TSAR showed that in an analysis of more than 24,000 traffic stops, there was a disparate outcome relevant to Latino drivers. We advised the attendees that at that October meeting, a representative of MCSO's contract vendor stated that there was no direct evidence of bias. We informed the attendees that a few days after that meeting, MCSO advised that the findings indicated there were warning signs of potential racial bias in the MCSO patrol function; and that the Sheriff indicated that this is a concern to him and a major concern for his office. We also told attendees that based on the results of the TSAR, MCSO is required to develop a Constitutional Policing Plan (CPP) to mitigate the results of the TSAR. We stated that the CPP has been a subject of multiple conversations among us and the Parties; and while some progress has been made, there is still a considerable amount of work required.

Next, we identified the five members of the CAB, emphasizing its importance as an advisor to the Sheriff and the community regarding matters relevant to the enforcement of the Court's Orders. We invited a CAB member to offer remarks. The CAB member thanked the community members for attending and stated that one of the CAB's responsibilities is to represent the voices of the affected community. The CAB member encouraged attendees to ask questions and invited them to communicate any concerns they may have to CAB members at the end of the meeting.

We also introduced representatives from the ACLU of Arizona and the U.S. Department of Justice (DOJ) to speak to the attendees. The ACLU of Arizona representative thanked the community members for attending and stated that the ACLU's job is to represent the interests of the Plaintiffs' class in the compliance process. The DOJ representative stated that the engagement of the community has been essential to holding MCSO accountable and helping ensure that the Orders are realized.

We next introduced MCSO representatives, who presented a briefing on the MCSO Training Division. There were several questions from attendees regarding the Training Division's presentation, including: how MCSO tracks who has attended training; if MCSO has a policy for disciplinary action if there are deputies who are found to not follow policies or procedures; and how MCSO determines the community partners it works with to develop the trainings.

WAI 44839

We then introduced the Sheriff, who began his remarks by apologizing for leaving the last community meeting early. He stated that he never intended it to be an insult or to avoid the needs of the community. Regarding the Traffic Stop Annual Report (TSAR), the Sheriff stated that MCSO is committed and will continue to work hard to ensure that the actions of every individual in the organization are consistent with MCSO values and ethical policing. In referring to the Constitutional Policing Plan (CPP), the Sheriff said that it is the baseline MCSO will build on to achieve the goal of ethical policing.

***Paragraph 110.*** *The meetings present an opportunity for the Monitor and MCSO representatives to listen to community members' experiences and concerns about MCSO practices. The Monitor may investigate and respond to those concerns. The Monitor shall inform the public that the purpose of the meeting is to discuss the Melendres case and the orders implementing the relief of that case. To the extent that the Monitor receives concerns at such meetings that are neither within the scope of this order nor useful in determining the Defendant's compliance with this order, it may inform the complainant how to file an appropriate complaint with the MCSO or appropriate law enforcement agency. The Sheriff may respond to non-Melendres questions raised at meetings to the extent, in his sole discretion, if the Sheriff wishes to do so.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

We held a public community meeting on Wednesday, January 15, 2020, from 6:30 p.m-8:30 p.m. at the Burton Barr Public Library Pulliam Auditorium, located at 1221 North Central Avenue, Phoenix, in MCSO District 2. We consulted with the Plaintiffs' representatives and the CAB on the location and content of the meeting. The location was convenient to the Plaintiffs' class. We informed the attendees that the purpose of the meeting was to discuss the *Melendres* case and the Orders implementing the relief of that case. We offered the attendees the opportunity to ask questions or offer comments regarding their experiences and concerns about MCSO practices.

***Paragraph 111.*** *English and Spanish-speaking Monitor Personnel shall attend these meetings and be available to answer questions from the public about its publicly available reports concerning MCSO's implementation of this Order and other publicly available information. The Plaintiffs' and Plaintiff-Intervenor's representatives shall be invited to attend and the Monitor shall announce their presence and state their availability to answer questions.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

WAI 44840

As noted above, we held a public community meeting on Wednesday, January 15, 2020, from 6:30 p.m.-8:30 p.m. at the Burton Barr Public Library Pulliam Auditorium, located at 1221 North Central Avenue, Phoenix, in MCSO District 2. We provided consecutive Spanish interpretation for attendees. The Plaintiffs' and Plaintiff-Intervenors' representatives were introduced and invited to offer remarks, and we advised the attendees that they were available to answer questions.

*Paragraph 112. At least ten days before such meetings, the Monitor shall widely publicize the meetings in English and Spanish after consulting with Plaintiffs' representatives and the Community Advisory Board regarding advertising methods. Options for advertising include, but are not limited to, television, radio, print media, internet and social media, and any other means available. Defendants shall either provide a place for such meetings that is acceptable to the Monitor or pay the Monitor the necessary expenses incurred in arranging for such meeting places. The Defendants shall also pay the reasonable expenses of publicizing the meetings as required above, and the additional reasonable personnel and expenses that the Monitor will incur as a result of performing his obligations with respect to the Community Outreach Program. If any party determines there is little interest or participation in such meetings among community members, or that they have otherwise fulfilled their purpose, it can file a request with the Court that this requirement be revised or eliminated.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

We consulted with the CAB and the ACLU of Arizona regarding the advertising of the meeting in local radio and print media, in English and Spanish – as well as on the site selection, agenda creation, and meeting logistics. Our selection of the venue for the meeting was based on accessibility, adequate meeting space, adequate parking, and ease in locating the meeting site. We publicized the meeting with advertisements in Spanish print media, radio spots in Spanish and English, social media, and distribution of flyers to members of the Plaintiffs' class and in the vicinity of the meeting venue.

## b. MCSO Community Liaison

*Paragraph 113. MCSO shall select or hire a Community Liaison who is fluent in English and Spanish. The hours and contact information of the MCSO Community Outreach Division ("COD") shall be made available to the public including on the MCSO website. The COD shall be directly available to the public for communications and questions regarding the MCSO.*

**Phase 1:** In compliance

WAI 44841

- GJ-24 (Community Relations and Youth Programs), most recently revised on November 14, 2019.

**Phase 2:** In compliance

This Paragraph requires that MCSO select or hire a Community Liaison who is fluent in English and Spanish; and that MCSO post on its public website the hours and contact information of the Community Outreach Division (COrD), which is responsible for public communications and questions regarding MCSO.

MCSO has a Community Liaison who is fluent in English and Spanish and lists on the MCSO website the hours and contact information for the Community Liaison Officer and other members of the COrD. The MCSO website includes information about the COrD – such as its mission and frequently asked questions regarding MCSO.

*Paragraph 114. The COD shall have the following duties in relation to community engagement:*

a.      *to coordinate the district community meetings described above in Paragraphs 109 to 112;*

b.      *to provide administrative support for, coordinate and attend meetings of the Community Advisory Board described in Paragraphs 117 to 118; and*

c.      *to compile any complaints, concerns and suggestions submitted to the COD by members of the public about the implementation of this Order and the Court's order of December 23, 2011, and its findings of fact and conclusions of law dated May 24, 2013, even if they don't rise to the level of requiring formal action by IA or other component of the MCSO, and to respond to Complainants' concerns; and*

d.      *to communicate concerns received from the community at regular meetings with the Monitor and MCSO leadership.*

**Phase 1:** In compliance

- Court Implementation Division Operations Manual, most recently revised on November 13, 2019.

- GJ-24 (Community Relations and Youth Programs), most recently revised on November 14, 2019.

**Phase 2:** In compliance

WAI 44842

Pursuant to the June 3, 2019 Order (Document 2431), Subparagraphs a. and b. of this Paragraph are no longer applicable.

During this reporting period, the Deputy Chief designated as the CAB's point of contact continued to work with and provide support to the CAB. He distributed policies and other materials for CAB members to review and provide feedback, and tracked and responded to CAB members' inquiries and requests for information about MCSO's implementation of the Orders.

During this reporting period, the CAB did not hold any public meetings. Some CAB members attended a few of the Monitoring Team's compliance meetings during our January site visit, as in the past, including the quarterly community meeting.

COrD uses a form it created for capturing information on complaints, concerns, and suggestions submitted by members of the public to the COrD. MCSO has provided documentation that all current COrD personnel completed an online Complaint Intake and Processing course, to assist them in receiving and appropriately directing any complaints or concerns from community members they receive.

During this reporting period, COrD personnel reported that they occasionally receive concerns from community members, and that they forward those that are complaints to PSB. They also reported that they sometimes receive inquiries for which COrD staff believe it is appropriate to direct community members to written materials or the MCSO website. During this reporting period, COrD did not submit any MCSO Complaint and Comment Forms for our review. COrD personnel wrote, "The Community Outreach Division did not receive any complaints, concerns or suggestions submitted concerning the implementation of the Court's Orders. Therefore, no responses were authored."

During our upcoming site visit, we will discuss with COrD personnel the requirement that COrD communicate concerns received from the community at regular meetings with the Monitor and MCSO leadership.


### c. Community Advisory Board

***Paragraph 115.*** *MCSO and Plaintiffs' representatives shall work with community representatives to create a Community Advisory Board ("CAB") to facilitate regular dialogue between the MCSO and the community, and to provide specific recommendations to MCSO and the Monitor about policies and practices that will increase community trust and ensure that the provisions of this Order and other orders entered by the Court in this matter are met. The MCSO shall cooperate with the Monitor to assure that members of the CAB are given appropriate access to relevant material, documents, and training so the CAB can make informed recommendations and commentaries to the Monitor.*

**Phase 1:** In compliance

WAI 44843

- Court Implementation Division Operations Manual, most recently revised on November 13, 2019.

**Phase 2:** In compliance

During this reporting period, CAB members and representatives of MCSO – specifically, the Deputy Chief who is the CAB's designated point of contact – exchanged numerous email messages, which we also received. In these messages, among other topics, CAB members provided specific recommendations to MCSO about policies and practices that will increase community trust and ensure that the provisions of this Order and other orders entered by the Court in this matter are met.

***Paragraph 116.*** *The CAB shall have five members, two to be selected by MCSO and two to be selected by Plaintiffs' representatives. One member shall be jointly selected by MCSO and Plaintiffs' representatives. Members of the CAB shall not be MCSO Employees or any of the named class representatives nor any of the attorneys involved in this case. The CAB shall continue for at least the length of this Order.*

**Phase 1:** In compliance

- Court Implementation Division Operations Manual, most recently revised on November 13, 2019.

**Phase 2:** In compliance

The June 3, 2019 Order modified several requirements related to community engagement and the CAB, but it did not alter the requirements related to the composition of the CAB. The CAB remains a five-member body – with two members selected by MCSO, two members selected by Plaintiffs' attorneys, and one member jointly selected by MCSO and Plaintiffs' attorneys.

In September 2017, MCSO and the Plaintiffs' counsel announced their selection of the CAB members. At that time, one of the two CAB members who had served prior to the issuance of Document 2100 resigned, leaving one CAB member previously appointed by the Plaintiffs' representatives. The MCSO and Plaintiffs' representatives then appointed four new CAB members, resulting in a total of five members: two selected by MCSO; two selected by the Plaintiffs' representatives; and one jointly selected by MCSO and Plaintiffs' representatives.

In October, the Sheriff appointed two new CAB members to replace two members who had resigned.

None of the current CAB members are MCSO employees, named class representatives, or attorneys involved in this case.

WAI 44844

***Paragraph 117.*** *The CAB shall hold meetings at regular intervals. The meetings may be either public or private as the purpose of the meeting dictates, at the election of the CAB. The Defendants shall provide a suitable place for such meetings. The Monitor shall coordinate the meetings and communicate with CAB members, and provide administrative support for the CAB.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

During this reporting period, the CAB did not hold any public meetings. Some CAB members attended a few of our compliance meetings during our January site visit. We also held a meeting with CAB members during our January site visit. At the meeting, we discussed the important role that the CAB plays in helping to improve the relationship between the Plaintiffs' class and MCSO.

***Paragraph 118.*** *During the meetings of the CAB, members will relay or gather concerns from the community about MCSO practices that may violate the provisions of this Order and the Court's previous injunctive orders entered in this matter and transmit them to the Monitor and the MCSO for investigation and/or action. The Parties will also be given the CAB's reports and recommendations to the Monitor.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

As noted above, during this reporting period, the CAB did not hold any public meetings. However, during this reporting period, as in the past, some CAB members attended a few of our compliance meetings during our January site visit, including our quarterly community meeting.

According to MCSO, during this reporting period, "MCSO has not received any documentation of concerns from the CAB during their meetings, reference any practices by MCSO that may be in violation of the Court's Orders for investigation."

WAI 44845

## Section 12: Misconduct Investigations, Discipline, and Grievances

### COURT ORDER XV. MISCONDUCT INVESTIGATIONS, DISCIPLINE, AND GRIEVANCES

*Paragraph 163. The Sheriff will ensure that all allegations of employee misconduct, whether internally discovered or based on a civilian complaint, are fully, fairly, and efficiently investigated; that all investigative findings are supported by the appropriate standard of proof and documented in writing; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair, consistent, unbiased and provides due process. To achieve these outcomes, the Sheriff shall implement the requirements set out below.*

### A. Policies Regarding Misconduct Investigations, Discipline, and Grievances

*Paragraph 165. Within one month of the entry of this Order, the Sheriff shall conduct a comprehensive review of all policies, procedures, manuals, and other written directives related to misconduct investigations, employee discipline, and grievances, and shall provide to the Monitor and Plaintiffs new policies and procedures or revise existing policies and procedures. The new or revised policies and procedures that shall be provided shall incorporate all of the requirements of this Order. If there are any provisions as to which the parties do not agree, they will expeditiously confer and attempt to resolve their disagreements. To the extent that the parties cannot agree on any proposed revisions, those matters shall be submitted to the Court for resolution within three months of the date of the entry of this Order. Any party who delays the approval by insisting on provisions that are contrary to this Order is subject to sanction.*

**Phase 1:** Not applicable

**Phase 2:** Deferred

MCSO provided us with the following:

- CP-2 (Code of Conduct), most recently amended on March 15, 2019.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on January 24, 2019.

- CP-5 (Truthfulness), most recently amended on April 18, 2019.

- CP-8 (Preventing Racial and Other Bias-Based Profiling), most recently amended on September 26, 2018.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

WAI 44846

- EA-2 (Patrol Vehicles), most recently revised on February 20, 2019.

- GA-1 (Development of Written Orders), most recently amended on February 19, 2020.

- GB-2 (Command Responsibility), most recently amended on June 28, 2019.

- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

- GC-7 (Transfer of Personnel), most recently amended on December 4, 2019.

- GC-11 (Employee Probationary Periods), most recently amended on March 28, 2019.

- GC-12 (Hiring and Promotional Procedures), most recently amended on June 14, 2019.

- GC-16 (Employee Grievance Procedures), most recently amended on April 2, 2019.

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 27, 2019.

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on May 3, 2019.

- GE-4 (Use, Assignment, and Operation of Vehicles), most recently amended on June 27, 2019.

- GG-1 (Peace Officer Training Administration), most recently amended on February 26, 2020.

- GG-2 (Detention/Civilian Training Administration), most recently amended on February 26, 2020.

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

- GI-5 (Voiance Language Services), most recently amended on January 4, 2019.

- GJ-24 (Community Relations and Youth Programs), most recently revised on November 14, 2019.

- GJ-26 (Sheriff's Reserve Deputy Program), most recently amended on June 28, 2019.

- GJ-27 (Sheriff's Posse Program), currently under revision.

- GJ-35 (Body-Worn Cameras), most recently amended on December 31, 2019.

- Administrative Services Division Operations Manual, published on June 17, 2019.

- Audits and Inspections Unit Operations Manual, currently under revision.

- Body-Worn Camera Operations Manual, published on December 22, 2016.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.
- Training Division Operations Manual, most recently amended on March 9, 2020.

We received a majority of the documents listed above within one month of the entry of the Order. We and the Parties conducted initial reviews and returned the revised documents, with additional recommendations, to MCSO for additional work. MCSO continues to revise the remaining policies and operations manuals related to misconduct investigations, the Sheriff's Posse Program, Audits and Inspections, and Training. Those remaining policies and operations manuals identified by MCSO were in some phase of review by us and the Parties at the end of this reporting period.

This Paragraph implies that the review process and final adoption of the updated policies would take two months to complete, assuming that the new or revised policies were provided within one month of the Second Order's issuance. The sheer volume of policies, as well as the extensive modifications they contain, rendered that target date unachievable. This is due, in large measure, to researched and well-considered recommendations by the Parties; and robust discussion about policy language, application, and outcomes during our site visit meetings.

***Paragraph 166.*** *Such policies shall apply to all misconduct investigations of MCSO personnel.*

***Paragraph 167.*** *The policies shall include the following provisions:*

a. *Conflicts of interest in internal affairs investigations or in those assigned by the MCSO to hold hearings and make disciplinary decisions shall be prohibited. This provision requires the following:*

    i. *No employee who was involved in an incident shall be involved in or review a misconduct investigation arising out of the incident.*

    ii. *No employee who has an external business relationship or close personal relationship with a principal or witness in a misconduct investigation may investigate the misconduct. No such person may make any disciplinary decisions with respect to the misconduct including the determination of any grievance or appeal arising from any discipline.*

    iii. *No employee shall be involved in an investigation, whether criminal or administrative, or make any disciplinary decisions with respect to any persons who are superior in rank and in their chain of command. Thus, investigations of the Chief Deputy's conduct, whether civil or criminal, must be referred to an outside authority. Any outside authority retained by the MCSO must possess the*

WAI 44848

*requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest.*

b.    *If an internal affairs investigator or a commander who is responsible for making disciplinary findings or determining discipline has knowledge of a conflict of interest affecting his or her involvement, he or she should immediately inform the Commander of the Professional Standards Bureau or, if the holder of that office also suffers from a conflict, the highest-ranking, non-conflicted chief-level officer at MCSO or, if there is no non-conflicted chief-level officer at MCSO, an outside authority. Any outside authority retained by the MCSO must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest.*

c.    *Investigations into an employee's alleged untruthfulness can be initiated by the Commander of the Professional Standards Bureau or the Chief Deputy. All decisions not to investigate alleged untruthfulness must be documented in writing.*

d.    *Any MCSO employee who observes or becomes aware of any act of misconduct by another employee shall, as soon as practicable, report the incident to a Supervisor or directly to the Professional Standards Bureau. During any period in which a Monitor is appointed to oversee any operations of the MCSO, any employee may, without retaliation, report acts of alleged misconduct directly to the Monitor.*

e.    *Where an act of misconduct is reported to a Supervisor, the Supervisor shall immediately document and report the information to the Professional Standards Bureau.*

f.    *Failure to report an act of misconduct shall be considered misconduct and may result in disciplinary or corrective action, up to and including termination. The presumptive discipline for a failure to report such allegations may be commensurate with the presumptive discipline for the underlying misconduct.*

g.    *No MCSO employee with a rank lower than Sergeant will conduct an investigation at the District level.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on March 15, 2019.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on January 24, 2019.

- CP-5 (Truthfulness), most recently amended on April 18, 2019.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

- GC-16 (Employee Grievance Procedures), most recently amended on April 2, 2019.

WAI 44849

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 27, 2019.
- Administrative Services Division Operations Manual, published on June 17, 2019.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we review administrative misconduct investigations.

During this reporting period, we reviewed 41 closed administrative misconduct investigations. Sworn or Detention personnel assigned to the Professional Standards Bureau (PSB) conducted 35 of the investigations. Sworn supervisors in Districts or Divisions outside of PSB conducted the remaining six.

Paragraph 167.a.i-iii. prohibits any employee with any conflicts of interest from participating in, holding hearings on, or making any disciplinary decisions in a misconduct investigation. During this reporting period, there were two instances where a potential conflict of interest was identified. In one, the investigation was reassigned to a different District supervisor; and in the second, the investigation was reassigned to PSB.

Paragraph 167.b. requires that if the internal affairs investigator or a commander responsible for making disciplinary decisions identifies a conflict of interest, appropriate notifications must be made immediately. Our review of the 41 completed administrative investigations for this reporting period revealed that there were two instances where MCSO identified a possible conflict of interest by an MCSO investigator or commander responsible for making disciplinary decisions. In both cases, the investigation and determination of initial findings was reassigned as required by this Subparagraph.

Paragraph 167.c. requires that investigations into truthfulness be initiated by the Chief Deputy or the PSB Commander. MCSO did not identify any instances during this reporting period where they believed a truthfulness allegation was appropriate. We did not identify any instances during this reporting period where we believe a truthfulness investigation should have been initiated and was not.

Paragraph 167.d. requires that any MCSO employee who observes or becomes aware of misconduct by another employee shall immediately report such conduct to a supervisor or directly to PSB. Per the requirement, during the period in which the Monitor has authority to oversee any operations of MCSO, any employee may also report alleged misconduct to the Monitor. Of the 41 administrative cases we reviewed for this reporting period, there were 21 investigations where an employee reported potential misconduct by another employee, or a supervisor identified potential employee misconduct. There were no instances identified where an employee failed to report potential misconduct to a supervisor as required.

WAI 44850

Paragraph 167.e. requires that when supervisors learn of an act of misconduct, the supervisor shall immediately document and report the information to PSB. In one of the 21 cases, two supervisors failed to appropriately report and document misconduct by another employee and PSB initiated an administrative misconduct investigation.

Paragraph 167.f. provides for the potential for a disciplinary sanction or other corrective action if an employee fails to bring forth an act of misconduct. During this reporting period, there was one instance where two supervisors in the same incident failed to complete the proper documentation to notify PSB of potential misconduct. This failure was appropriately addressed in a misconduct investigation, and resulted in the dismissal of one of the employees. The second employee left MCSO employment prior to the conclusion of this investigation.

Paragraph 167.g. requires that a sergeant or higher-ranking employee conduct all misconduct investigations conducted at the District level. All District-level cases that we reviewed for this reporting period complied with this requirement.

**Paragraph 168.** *All forms of reprisal, discouragement, intimidation, coercion, or adverse action against any person, civilian, or employee because that person reports misconduct, attempts to make or makes a misconduct complaint in good faith, or cooperates with an investigation of misconduct constitute retaliation and are strictly prohibited. This also includes reports of misconduct made directly to the Monitor, during any period in which a Monitor is appointed to oversee any operations of the MCSO.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on March 15, 2019.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on January 24, 2019.

- CP-5 (Truthfulness), most recently amended on April 18, 2019.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- GC-16 (Employee Grievance Procedures), most recently amended on April 2, 2019.

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 27, 2019.

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

- Administrative Services Division Operations Manual, published on June 17, 2019.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

WAI 44851

To assess Phase 2 compliance with this Paragraph, we reviewed 41 administrative misconduct investigations that were completed during this reporting period.

There were two complaints reviewed where employees alleged retaliatory complaints had been filed against them by supervisory or peer employees. Both were properly investigated by PSB. The first case involved 24 allegations. Twenty-two were found unfounded, and two were not sustained. In the second investigation, the allegation was not sustained. We agree with the findings in both of these cases. MCSO reported that there were no grievances or other documents filed with PSB or the Administrative Services Division that alleged any other misconduct related to the requirements of this Paragraph.

**Paragraph 169.** *Retaliating against any person who reports or investigates alleged misconduct shall be considered a serious offense and shall result in discipline, up to and including termination.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on March 15, 2019.
- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on January 24, 2019.
- CP-5 (Truthfulness), most recently amended on April 18, 2019.
- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.
- GC-16 (Employee Grievance Procedures), most recently amended on April 2, 2019.
- GC-17 (Employee Disciplinary Procedures), most recently amended on June 27, 2019.
- GH-2 (Internal Investigations), most recently amended on June 28, 2019.
- Administrative Services Division Operations Manual, published on June 17, 2019.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 41 administrative misconduct investigations that were completed during this reporting period.

In one investigation, two employees made numerous allegations, including that they had been retaliated against for filing complaints against supervisory staff. Twenty-two of the allegations were unfounded, and two were not sustained. In the second investigation, the employee alleged that a peer employee had filed a complaint against her as retaliation for a previous complaint she had filed. The findings in this case were not sustained. We concur with the findings in both cases. There were no grievances or other documents submitted to PSB or to the Administrative Services Division that alleged any other retaliation related to the requirements of this Paragraph.

***Paragraph 170.*** *The Sheriff shall investigate all complaints and allegations of misconduct, including third-party and anonymous complaints and allegations. Employees as well as civilians shall be permitted to make misconduct allegations anonymously.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 27, 2019.
- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 41 completed administrative misconduct investigations submitted during this reporting period. Eighteen were initiated as a result of external complaints, and 23 were generated based on internal complaints. We also reviewed two criminal misconduct investigations, one of which was generated as a result of an external complaint.

Of the 41 administrative misconduct investigations we reviewed for this reporting period, two involved externally generated anonymous complaints. Two involved third-party complaints. None of the criminal misconduct investigations we reviewed during this reporting period were generated due to an anonymous or third-party complaint. We have not become aware of any evidence that indicates that MCSO refused to accept and complete investigations in compliance with the requirements of this Paragraph. None of the 41 administrative misconduct investigations we reviewed during this reporting period included any allegations indicating that any third-party or anonymous complaint was not appropriately accepted and investigated.

***Paragraph 171.*** *The MCSO will not terminate an administrative investigation solely on the basis that the complainant seeks to withdraw the complaint, or is unavailable, unwilling, or unable to cooperate with an investigation, or because the principal resigns or retires to avoid discipline. The MCSO will continue the investigation and reach a finding, where possible, based on the evidence and investigatory procedures and techniques available.*

**Phase 1:** In compliance

WAI 44853

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 41 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

We determined that four of the 41 completed administrative investigations involved complainants who sought to withdraw their complaints; or were unavailable, unwilling, or unable to cooperate. MCSO completed all four investigations and reached a finding as required. We also found that in three of the 41 investigations, the principal left MCSO employment prior to the finalization of the investigation or discipline process. MCSO completed all these investigations and reached a finding. None of the 41 investigations we evaluated for compliance were prematurely terminated.

***Paragraph 172.*** *Employees are required to provide all relevant evidence and information in their custody and control to internal affairs investigators. Intentionally withholding evidence or information from an internal affairs investigator shall result in discipline.*

**Phase 1:** In compliance

- CP-5 (Truthfulness), most recently amended on April 18, 2019.
- GC-17 (Employee Disciplinary Procedures), most recently amended on June 27, 2019.
- GH-2 (Internal Investigations), most recently amended on June 28, 2019.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph during this reporting period, we reviewed 41 completed administrative misconduct investigations conducted by MCSO personnel. There were no investigations identified by MCSO or our Team where an employee failed to accurately provide all information or evidence required during the investigation.

***Paragraph 173.*** *Any employee who is named as a principal in an ongoing investigation of serious misconduct shall be presumptively ineligible for hire or promotion during the pendency of the investigation. The Sheriff and/or the MCSO shall provide a written justification for hiring or promoting an employee or applicant who is a principal in an ongoing investigation of serious misconduct. This written justification shall be included in the employee's employment file and, during the period that the MCSO is subject to Monitor oversight, provided to the Monitor.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

- GC-11 (Employee Probationary Periods), most recently amended on March 28, 2019.

- GC-12 (Hiring and Promotional Procedures), most recently amended on June 14, 2019.

**Phase 2:** In compliance

MCSO has established a protocol to address the requirements of this Paragraph. When a promotion list is established for sworn or Detention personnel, a copy of the list is forwarded to the Professional Standards Bureau (PSB). Before any promotion is finalized, PSB conducts a check of each employee's disciplinary profile in the automated system (IAPro). As part of the promotional process, MCSO conducts a meeting with command staff to discuss each employee's qualifications. During this meeting, the results of the IAPro checks are provided to the staff for review and consideration. The PSB Commander generally attends the promotion meetings for both Detention and sworn personnel, and clarifies any questions regarding the disciplinary history that the staff may have. When an employee is moved from a civilian employment position to a sworn employment position, MCSO conducts a thorough background investigation. The process involves a review and update of the candidate's PSB files, which is completed by Pre-Employment Services. For Detention employees who are moving to sworn positions, the information in the employee's file is updated to include any revised or new information. Due to the scheduling of our site visits, we inspect personnel files for employees who were promoted during the last month of the preceding quarter, and the first two months of the current reporting period. In our reviews, we ensure that the documentation, as it pertains to compliance with this Paragraph, is included in personnel files.

During this reporting period, we reviewed the documents associated with the promotion of 33 employees. This included deputies, deputy services aides, background investigators, identification technicians, and Detention Officers – as well as civilian positions. During our personnel file reviews, we noted that three of the employees had open PSB investigations. None of the allegations involved serious misconduct. We reviewed the documentation that MCSO submitted, and determined that these promotions were in compliance with this Paragraph. During our January site visit, we inspected the files of employees who had been promoted during the last month of the previous quarter, and the first two months of this reporting period. We verified that the appropriate documents were contained in employee files.

WAI 44855

During the inspection of personnel files, we reviewed the file of a recently promoted sergeant whose information was submitted under Paragraphs 173 and 174 for September. The Promotional Eligibility Review form, which was included with the documents for the sergeant's promotion, noted two open internal investigations for violations that, if sustained, would not result in serious discipline. Upon inspection of the personnel file, we noted that the employee had a third open case. Although this case did not involve serious misconduct, we are concerned with the gap in the review process. We discussed this issue with the Human Resources commander. It appears that the background review of the employee was completed on June 26 in anticipation of the promotion, which occurred in early August. On July 31, a complaint was entered against the employee, for an incident that occurred on July 21. It appears that the last internal investigation was not documented in the background investigation preceding the promotion, and was therefore not taken into consideration in the promotional process. This gap in the review process occurred between the date when the employee was cleared and the time the employee was promoted. We recommended that MCSO review its current background procedures; and take appropriate measures to ensure command staff is apprised of any allegations of misconduct filed against an employee awaiting promotion, up to the date of promotion.

***Paragraph 174.*** *Employees' and applicants' disciplinary history shall be considered in all hiring, promotion, and transfer decisions, and this consideration shall be documented. Employees and applicants whose disciplinary history demonstrates multiple sustained allegations of misconduct, or one sustained allegation of a Category 6 or Category 7 offense from MCSO's disciplinary matrices, shall be presumptively ineligible for hire or promotion. MCSO shall provide a written justification for hiring or promoting an employee or applicant who has a history demonstrating multiple sustained allegations of misconduct or a sustained Category 6 or Category 7 offense. This written justification shall be included in the employee's employment file and, during the period that the MCSO is subject to Monitor oversight, provided to the Monitor.*

**Phase 1:** In compliance

- GC-12 (Hiring and Promotional Procedures), most recently amended on June 14, 2019.

**Phase 2:** In compliance

For employees who are promoted, the documentation submitted by MCSO generally includes the disciplinary history for the previous 10 years and any applicable disciplinary actions. MCSO also provides the disciplinary history of Detention and civilian employees who have been upgraded in classification to sworn status.

During this reporting period, MCSO reported the hiring and promotions of several sworn, Detention, and civilian employees. We reviewed the documentation associated with the hiring of 13 employees. Two were former employees rehired under different classifications. Each had a sustained complaint, but the allegations were not of serious misconduct. We found that none of

WAI 44856

the employees who were promoted or hired had any history of multiple sustained allegations of misconduct, or sustained allegations of Category 6 or 7 offenses. During our January site visit, we inspected the files of employees who had been promoted during the last month of the previous quarter, and the first two months of this reporting period. We found the employee personnel files to have the appropriate documents in place.

**Paragraph 175.** *As soon as practicable, commanders shall review the disciplinary history of all employees who are transferred to their command.*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

- GC-7 (Transfer of Personnel), most recently amended on December 4, 2019.

**Phase 2:** In compliance

Per policy, MCSO is to conduct an EIS review within 14 days of an affected employee's transfer. We requested a list of employees that were transferred during this reporting period. From the list, we selected a sample of employees to review and verify that there was documentation of the required EIS reviews. To verify compliance with this Paragraph, we review the transfer request documents that MCSO completes for each employee. The documents memorialize the commander's acknowledgment of review of the transferred employee's disciplinary history, as well as the review of the employee's performance appraisals for the previous five years. This review is generally conducted before the gaining commander accepts the transfer, a few days prior to the transfer becoming effective.

For October, we requested a list of employees who were transferred during the previous month. MCSO submitted a list, and we selected a sample of 30 employees. The list we requested was comprised all of Detention employees. Of the 30 Detention employees, 29 had proper documentation of command review of their EIS profiles. The compliance rate for September was 96.66%.

For November, we requested a list of employees who were transferred during the previous month. We selected a sample of 25 employees to review. This list was comprised all of Detention employees. Of the 25 Detention employees, all had proper documentation of command review of their EIS profiles. The compliance rate for October was 100%.

For December, we requested a list of employees who were transferred during the previous month. MCSO submitted a list, and we selected a sample of 25 employees. The documentation requested involved only Detention employees. Of the 25 Detention Officers, 22 had proper documentation of command review of their EIS profiles. The compliance rate for December was 88%. For the quarter, there were 76 of 80 employees in compliance, or 95%.

WAI 44857

During our last report, we issued a warning due to a non-compliance finding in the third quarter. During the fourth quarter, MCSO had deficiencies that were contributing to faulty documentation of their review process. MCSO subsequently provided proof of compliance on several deficient transfers, and they have assured us that the issues that have resulted in non-compliance findings have been corrected. We will continue our reviews to ensure that these deficiencies have been corrected.

**Paragraph 176.** *The quality of investigators' internal affairs investigations and Supervisors' reviews of investigations shall be taken into account in their performance evaluations.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

**Phase 2:** Not in compliance

We reviewed Employee Performance Appraisals for 28 supervisors and commanders who received EPAs during this reporting period. All 28 EPAs rated the quality and effectiveness of supervision. Twenty-four of the 28 supervisors' EPAs contained comments and/or rated the supervisors' demonstrated ability to identify and effectively respond to misconduct. Twenty-seven of the 28 EPAs rated supervisors on the quality of their reviews. Twenty-three of the 28 supervisors' EPAs assessed the employees' quality of internal investigations and/or the quality of their reviews of internal investigations, as required by this Paragraph. The compliance rate for the previous quarter was 89%. The compliance rate for this reporting period was 82.14%.

**Paragraph 177.** *There shall be no procedure referred to as a "name-clearing hearing." All pre-disciplinary hearings shall be referred to as "pre-determination hearings," regardless of the employment status of the principal.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 27, 2019.

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 41 administrative misconduct investigations that were completed during this reporting period.

In misconduct investigations that resulted in serious discipline and in which the employee was afforded the opportunity for an administrative hearing, the only reference to the hearing was "pre-determination hearing."

WAI 44858

### B. Misconduct-Related Training

***Paragraph 178.*** *Within three months of the finalization of these policies consistent with ¶ 65of this Order, the Sheriff will have provided all Supervisors and all personnel assigned to the Professional Standards Bureau with 40 hours of comprehensive training on conducting employee misconduct investigations. This training shall be delivered by a person with subject matter expertise in misconduct investigation who shall be approved by the Monitor. This training will include instruction in:*

a.   *investigative skills, including proper interrogation and interview techniques, gathering and objectively analyzing evidence, and data and case management;*

b.   *the particular challenges of administrative law enforcement misconduct investigations, including identifying alleged misconduct that is not clearly stated in the complaint, or that becomes apparent during the investigation;*

c.   *properly weighing the credibility of civilian witnesses against employees;*

d.   *using objective evidence to resolve inconsistent statements;*

e.   *the proper application of the appropriate standard of proof;*

f.   *report-writing skills;*

g.   *requirements related to the confidentiality of witnesses and/or complainants;*

h.   *considerations in handling anonymous complaints;*

i.   *relevant MCSO rules and policies, including protocols related to administrative investigations of alleged officer misconduct; and*

j.   *relevant state and federal law, including Garrity v. New Jersey, and the requirements of this Court's orders.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

The Training Division delivered the Misconduct Investigative Training (PSB40) once in November 2019 to 26 sworn personnel. This class was comprised of personnel pending promotion. No personnel required test remediation.

With our approval, revisions to the curriculum for the PSB40 occurred in November. Revisions included learning activities adopted from the annual eight-hour in-service training for District supervisors (PSB8 External). The lesson plan continues to meet the requirements of this Paragraph.

WAI 44859

***Paragraph 179.*** *All Supervisors and all personnel assigned to the Professional Standards Bureau also will receive eight hours of in-service training annually related to conducting misconduct investigations. This training shall be delivered by a person with subject matter expertise in misconduct investigation who shall be approved by the Monitor.*

**Phase 1:** In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on February 26, 2020.

- GG-2 (Detention/Civilian Training Administration), most recently amended on February 26, 2020.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

We previously reported completion of the 2019 annual eight-hour in-service training for Professional Standards Bureau personnel (PSB8 Internal). During this reporting period, we approved the 2020 PSB8 Internal curriculum for delivery. MCSO has retained an outside vendor to provide the instruction to MCSO. The curriculum provided by an outside vendor is not specific exclusively to MCSO. No further review of the curriculum occurred. The material provided allowed us to determine that there were no conflicts with either Order. We shared DOJ's concern that the test as presented was insufficient, using exclusively true/false questions that did not appear particularly challenging. We recommended that MCSO work with its vendor to make the test more robust. During our January site visit, Training Division command informed us the vendor revised the test to incorporate multiple choice questions.

MCSO delivered the 2019 PSB8 External training four times during this reporting period to 98 personnel (81 sworn, 17 Detention). One individual required test remediation.

The Training Division, in concert with PSB, began development of the 2020 annual eight-hour in-service for District supervisors (PSB8 External). The content included a complete investigation from intake through adjudication for the 2019 in-service. It was well received by District supervisors, prompting the Training Division to pursue a similar curriculum for the current year.

WAI 44860

***Paragraph 180.*** *Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all employees on MCSO's new or revised policies related to misconduct investigations, discipline, and grievances. This training shall include instruction on identifying and reporting misconduct, the consequences for failing to report misconduct, and the consequences for retaliating against a person for reporting misconduct or participating in a misconduct investigation.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on March 15, 2019.
- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on January 24, 2019.
- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.
- GB-2 (Command Responsibility), most recently amended on June 28, 2019.
- GC-16 (Employee Grievance Procedures), most recently amended on April 2, 2019.
- GC-17 (Employee Disciplinary Procedures), most recently amended on June 27, 2019.
- GG-1 (Peace Officer Training Administration), most recently amended on February 26, 2020.
- GG-2 (Detention/Civilian Training Administration), most recently amended on February 26, 2020.
- GH-2 (Internal Investigations), most recently amended on June 28, 2019.
- GJ-26 (Sheriff's Reserve Deputy Program), most recently amended June 28, 2019.
- GJ-27 (Sheriff's Posse Program), most recently amended on April 4, 2014.
- Training Division Operations Manual, most recently amended on March 9, 2020.

**Phase 2:** In compliance

MCSO distributes new or annually revised policies via the HUB, an electronic training management system. Each distribution requires all employees to complete personal attestations indicating they have read and understand the policy requirements.

To assess compliance with this Paragraph, we review the HUB generated reports of attestations that identify each individual and their dates of review. Compliance assessments for this Paragraph are based on the review of attestations for the following policies: CP-2 (Code of Conduct); CP-3 (Workplace Professionalism: Discrimination and Harassment); CP-11 (Anti-Retaliation); GB-2 (Command Responsibility); GH-2 (Internal Investigations); GC-16 (Employee Grievance Procedures); and GC-17 (Employee Disciplinary Procedures).

WAI 44861

During this reporting period, we reviewed the status of individual reviews for Briefing Board (BB) 19-29 (CP-2), BB 19-04 (CP-3), BB 18-48 (CP-11), BB 19-30 (GB-2), BB 19-30 (GH-2), BB 19-14 (GC-16), and BB 19-28 (GC-17). All employee categories are in compliance.

***Paragraph 181.*** *Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all employees, including dispatchers, to properly handle civilian complaint intake, including how to provide complaint materials and information, and the consequences for failing to take complaints.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 27, 2019.

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

- GG-1 (Peace Officer Training Administration), most recently amended on February 26, 2020.

- GG-2 (Detention/Civilian Training Administration), most recently amended on February 26, 2020.

- Training Division Operations Manual, most recently amended on March 9, 2020.

**Phase 2:** In compliance

MCSO delivers the 2017 Complaint Intake and Reception Training via the HUB to all personnel. This training provides all personnel with guidance when interacting with members of the public that wish to file a complaint against members of the MCSO. The content of this training provides a critical foundation for personnel to understand their responsibilities when accepting complaints from the public. The Training Division Commander informed us that MCSO intends to require that all civilian positions who may interact with the public retake this training during 2020. We agree that these positions would benefit from additional annual in-service trainings. This curriculum is currently under review.

***Paragraph 182.*** *Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all Supervisors on their obligations when called to a scene by a subordinate to accept a civilian complaint about that subordinate's conduct and on their obligations when they are phoned or emailed directly by a civilian filing a complaint against one of their subordinates.*

**Phase 1:** In compliance

WAI 44862

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 27, 2019.

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

- GG-1 (Peace Officer Training Administration), most recently amended on February 26, 2020.

- GG-2 (Detention/Civilian Training Administration), most recently amended on February 26, 2020.

- Training Division Operations Manual, most recently amended on March 9, 2020.

**Phase 2:** In compliance

Several training programs – the ACT, SRELE, EIS, and the PSB40 – address the requirements of this Paragraph by including policy reference and additional direction when appropriate. Additional direction to supervisors and deputies may not appear in each annual delivery, depending upon the content included.

## C. *Administrative Investigation Review*

***Paragraph 183.*** *The Sheriff and the MCSO will conduct objective, comprehensive, and timely administrative investigations of all allegations of employee misconduct. The Sheriff shall put in place and follow the policies set forth below with respect to administrative investigations.*

***Paragraph 184.*** *All findings will be based on the appropriate standard of proof. These standards will be clearly delineated in policies, training, and procedures, and accompanied by detailed examples to ensure proper application by internal affairs investigators.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 41 completed administrative misconduct investigations conducted during this reporting period.

Of the 41 cases we reviewed, 40 (98%) complied with the requirements of this Paragraph. In one, we believe a finding of sustained should have been made and was not.

During our next site visit, we will discuss this investigation with PSB personnel.

WAI 44863

**Paragraph 185.** *Upon receipt of any allegation of misconduct, whether internally discovered or based upon a civilian complaint, employees shall immediately notify the Professional Standards Bureau.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 41 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period. In all 41 of the cases, PSB was immediately notified at the time of the complaint as required. We also reviewed two criminal misconduct investigations. PSB was immediately notified in both of these investigations.


**Paragraph 186.** *Effective immediately, the Professional Standards Bureau shall maintain a centralized electronic numbering and tracking system for all allegations of misconduct, whether internally discovered or based upon a civilian complaint. Upon being notified of any allegation of misconduct, the Professional Standards Bureau will promptly assign a unique identifier to the incident. If the allegation was made through a civilian complaint, the unique identifier will be provided to the complainant at the time the complaint is made. The Professional Standards Bureau's centralized numbering and tracking system will maintain accurate and reliable data regarding the number, nature, and status of all misconduct allegations, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status, if requested, and final disposition of the complaint. The system will be used to determine the status of misconduct investigations, as well as for periodic assessment of compliance with relevant policies and procedures and this Order, including requirements of timeliness of investigations. The system also will be used to monitor and maintain appropriate caseloads for internal affairs investigators.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

WAI 44864

During numerous site visits, we have met with PSB personnel to discuss and observe the capabilities of IAPro, which serves as the technology instrument that meets the compliance criteria of this Paragraph. IAPro logs critical dates and times, alerts regarding timeframes and deadlines, chronological misconduct investigation status, notifications, and dispositions. The tracking system provides estimates of key timeframes for all investigators to ensure that they learn of previous and upcoming investigative milestones. PSB has confirmed that civil notice claims are entered in the tracking system. The IAPro system integrates exceptionally well with the EIS and Blue Team technology systems and can be remotely accessed.

PSB has hired a management analyst dedicated to the administration of the centralized tracking system. The documentation that PSB has provided to us for review, and the direct user access that a member of our Team has to the centralized numbering and tracking system, indicates that the system possesses the functionality as required by this Paragraph and is being used according to the requirements of this Paragraph.

During this reporting period, we found that all 41 of the administrative misconduct investigations were properly assigned a unique identifier. All of these investigations were both initiated and completed after July 20, 2016. Of the 41 cases, 18 involved an external complaint requiring that PSB provide the complainant with this unique identifier. In all 18, MCSO sent the initial letter that includes this unique identifier to the complainant within seven days, or provided an appropriate explanation for not doing so. In some cases, anonymous complainants do not provide contact information; and in others, known complainants decline to provide MCSO with adequate contact information. PSB has developed a form that identifies the reason why a required notification letter is not sent, and includes this document in the cases they forward for our review.

***Paragraph 187.*** *The Professional Standards Bureau shall maintain a complete file of all documents within the MCSO's custody and control relating to any investigations and related disciplinary proceedings, including pre-determination hearings, grievance proceedings, and appeals to the Maricopa County Law Enforcement Merit System Council or a state court.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

**Phase 2:** In compliance

To determine compliance with this Paragraph, we have verified that PSB maintains both hardcopy and electronic files intended to contain all the documents required for compliance with this Paragraph.

WAI 44865

During our site visits, a member of our Team inspects the file rooms where hardcopies of investigations are stored and randomly reviewed case files to verify compliance. We have verified that criminal and administrative investigation files are stored in separate rooms, and access to these rooms is restricted. Our Team member has also used the access granted to IAPro to randomly select internal affairs case files to verify that all information is being maintained electronically.

In May 2018, PSB relocated to its new offsite facility. We confirmed at that time that PSB maintained both hardcopy and electronic files intended to contain all documents required for compliance with this Paragraph at the new facility.

During our January 2019 site visit, a member of our Team verified continued compliance at the PSB facility by inspecting both the criminal and administrative investigation file rooms and randomly selecting internal affairs case files to verify that all information was also being electronically maintained in IAPro.

During our October 2019 site visit, a member of our Team verified continued compliance at the PSB facility by inspecting both the criminal and administrative investigation file rooms. We also randomly reviewed both electronic and hard copy documents to ensure that all information was being maintained as required for compliance with this Paragraph.


***Paragraph 188.*** *Upon being notified of any allegation of misconduct, the Professional Standards Bureau will make an initial determination of the category of the alleged offense, to be used for the purposes of assigning the administrative investigation to an investigator. After initially categorizing the allegation, the Professional Standards Bureau will promptly assign an internal affairs investigator.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review administrative misconduct investigations and service complaints that were forwarded for our review by MCSO personnel during the reporting period.

We previously concurred with MCSO that Phase 2 compliance with this Paragraph would be based on PSB's determination of the initial allegations, and not which category of offense was determined once the investigation is completed.

During this reporting period, we reviewed 41 closed administrative misconduct investigations and 87 closed service complaints. All complied with the requirements of this Paragraph.

WAI 44866

With the approved revisions to the internal investigations and discipline policies in May 2017, PSB is authorized to determine that some complaints can be classified as service complaints. PSB has initiated both a process and a complaint-tracking system for these complaints.

During the last reporting period, MCSO completed and closed 73 service complaints. All but one complied with the requirements of this Paragraph.

During this reporting period, MCSO completed and closed 87 service complaints. Eight service complaints were appropriately reclassified to administrative misconduct investigations after review by PSB. The remaining 79 were classified and handled as service complaints. Of these 79, 76 (96%) met the requirements established for service complaints. In one case, we believe the complainant alleged employee misconduct and PSB should have conducted an administrative investigation and did not. In two others, the investigating supervisor failed to conduct appropriate follow-up. As is our practice, we will discuss these cases with MCSO during our next site visit.

As we have consistently noted in our review of service complaints, the majority of these complaints involve laws, policies, or procedures where there is no employee misconduct; or are complaints where it is determined that MCSO employees are not involved. During this reporting period, 31 (39%) of the 79 service complaints did not involve MCSO employees. Forty-one (52%) did not involve allegations of employee misconduct, four were closed due to lack of specificity, and the remaining three were closed based on a combination of factors.

In numerous discussions during our 2018 site visits, PSB advised us that the number of service complaints far exceeded the Bureau's expectations. PSB also noted that, consistently, 20-25% of the service complaints did not involve MCSO employees. Our reviews of completed service complaints confirmed this assertion, and we agreed to review an expedited process for handling complaints where it was determined that the complaint did not involve MCSO personnel.

While all of the service complaints were initially managed by a single sworn supervisor in PSB, in January 2019, PSB added a Detention supervisor to manage the Detention-related service complaints due to the large volume. In addition, the PSB Commander informed us that PSB was working on a plan to identify supervisors in the Detention facilities to handle some of the service complaints. If they decided to implement this plan, they would ensure that these supervisors met all of the requirements for those who conduct internal investigations.

In July 2019, PSB pursued its earlier proposal to use an expedited process to handle service complaints where it could be immediately determined that the complaint did not involve MCSO personnel. We and the Parties have since reviewed the revised form and approved it for use. We had also discussed with PSB concerns we had found in some service complaints that were completed at the District level and forwarded to PSB for review and approval. In some, PSB determined that a service complaint was inappropriate, and a misconduct investigation should be opened. While PSB has done a good job of identifying those service complaints that should be administrative investigations, as is the case with administrative misconduct investigations, we have observed that PSB is again correcting the work of other personnel. The time it takes for

WAI 44867

PSB to conduct the reviews also delays the transition of the service complaint to an administrative investigation when necessary. To address this concern and ensure accountability, PSB also added a signature line to the revised service complaint form. District and Division Command personnel now note their review and approval of service complaints prior to them being forwarded to PSB for a final determination. Any future deficiencies PSB finds in service complaints will be addressed with formal memorandums.

Consistent with the provisions of the revised policies on internal investigations and discipline, the PSB Commander now has the discretion to determine that internal complaints alleging minor policy violations can be addressed without a formal investigation if certain criteria exist. If the PSB Commander makes this determination, it must be documented.

During this, and the last reporting period, the PSB Commander did not determine that any internally generated complaints would be addressed without a formal investigation.

**Paragraph 189.** *The Professional Standards Bureau shall administratively investigate:*

a.    *misconduct allegations of a serious nature, including any allegation that may result in suspension, demotion, or termination; and*

b.    *misconduct indicating apparent criminal conduct by an employee.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on March 15, 2019.
- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on January 24, 2019.
- CP-5 (Truthfulness), most recently amended on April 18, 2019.
- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.
- GC-17 (Employee Disciplinary Procedures), most recently amended on June 27, 2019.
- GH-2 (Internal Investigations), most recently amended on June 28, 2019.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph during this reporting period, we reviewed 41 completed administrative misconduct investigations conducted by MCSO personnel.

WAI 44868

Division or District personnel outside of PSB investigated six of the 41 administrative misconduct investigations submitted for review during this reporting period. PSB investigated 35 of the cases. PSB also submitted two investigations involving criminal allegations for review. We did not identify any misconduct investigations that were conducted by a District supervisor where we believe that potential additional misconduct discovered during the initial investigation should have resulted in the investigation being forwarded to PSB for completion and was not.

***Paragraph 190.*** *Allegations of employee misconduct that are of a minor nature may be administratively investigated by a trained and qualified Supervisor in the employee's District.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed a total of 43 misconduct investigations conducted by MCSO personnel and completed during this reporting period. Of these, 41 were administrative investigations, and two involved alleged criminal misconduct. PSB personnel conducted both of the criminal investigations.

Of the 41 administrative misconduct cases we reviewed for this Paragraph, PSB investigators conducted 35. Six were investigated at the District or Division level. We did not identify any instances where a District or Division supervisor outside of PSB conducted an investigation that we believe should have been forwarded to PSB for investigation.

During the last reporting period, we reviewed 44 administrative misconduct investigations conducted by Divisions or Districts outside of PSB. Nine were initiated prior to the completion of the 40-hour Misconduct Investigative Training. Only one (11%) of these nine was found in compliance. Of the 35 District investigations initiated after the completion of the training, 23 (66%) were compliant.

During this reporting period, we reviewed six administrative misconduct investigations conducted by Divisions or Districts outside of PSB. All six were initiated after the completion of the 40-hour Misconduct Investigative Training that was concluded in late 2017. Of the six investigations, three (50%) were compliant with all of the requirements for the completion of administrative misconduct investigations. Five were conducted by District personnel, and one was conducted by another Division outside of PSB. All three of the non-compliant cases were conducted by District personnel.

Prior to the last two reporting periods, we had noted ongoing improvement in those cases conducted outside of PSB. During this and the last two reporting periods, that has not been the case. Compliance for investigations completed outside of PSB dropped from 76% to 63%, to 55 % during the last two reporting periods. During this reporting period, we saw an additional

WAI 44869

decrease in compliance. The overall compliance for all cases investigated outside of PSB dropped from 55% the last reporting period to 50% this reporting period. We note that an unusually small number of investigations conducted by District and Division personnel were forwarded for review during this reporting period. We also note that for this reporting period, we did not see the same substantive investigative deficiencies that we had seen in the last two reporting periods. Deficiencies for this reporting period were related to the failure to address training concerns, policy concerns; and in one case, there were multiple administrative deficiencies.

MCSO has complied with the requirements to train all supervisors who conduct minor misconduct investigations; and they provide a monthly report regarding those supervisors who they have determined are not qualified to conduct these investigations.

**Paragraph 191.** *If at any point during a misconduct investigation an investigating Supervisor outside of the Professional Standards Bureau believes that the principal may have committed misconduct of a serious or criminal nature, he or she shall immediately notify the Professional Standards Bureau, which shall take over the investigation.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 41 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period. Of the six administrative misconduct cases investigated at the District or Division level, we did not identify any cases where we believe that potential serious misconduct was discovered by the investigating supervisor and the supervisor failed to forward the case to PSB.

**Paragraph 192.** *The Professional Standards Bureau shall review, at least semi-annually, all investigations assigned outside the Bureau to determine, among the other matters set forth in ¶ 251 below, whether the investigation is properly categorized, whether the investigation is being properly conducted, and whether appropriate findings have been reached.*

**Phase 1:** In compliance

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

PSB command personnel advised us that they continue to review investigations in "real time" as they come into the Bureau. During this reporting period, MCSO provided copies of PSB's reviews of five completed Division-level misconduct investigations that were assigned outside of the Bureau; this is a significant decrease from the previous reporting period, when PSB conducted

WAI 44870

28 reviews of such cases. The report review template used by PSB includes sections that address whether or not the investigation is properly categorized, whether the investigation is properly conducted, and whether appropriate findings have been reached. Additionally, copies of emails detailing the quality of the investigation, identified deficiencies, and required edits sent electronically to affected Division Commanders were provided for each case reviewed.

PSB included the information required by this Paragraph in its semi-annual public Misconduct Investigations Report, which is required under Paragraph 251. The most recent report was published on MCSO's website in January 2020. The report covers the period of January 1-June 30, 2019; and contains an analysis as to whether cases assigned outside of PSB are properly categorized, whether the investigations were properly conducted, and whether appropriate findings have been reached. Some of the issues of concern that we identified in our review of the District investigations where improvement is needed include: the improper use of leading questions; failure to justify findings; failure to notify employees' supervisors of the investigation; failure to conduct witness interviews; and various other administrative concerns. In its own review of the District investigations, PSB noted the need for more detailed interviews and more clarification within the investigative reports. During its six-month review period, PSB identified 10 cases where Division Commanders failed to identify issues within the reports – which included issues related to changing the findings and a need for further investigation. We will review the next semi-annual Misconduct Investigations Report, which is scheduled to be completed in July 2020, to evaluate whether it meets the requirements of this Paragraph.

MCSO remains in compliance with this requirement.


***Paragraph 193.*** *When a single act of alleged misconduct would constitute multiple separate policy violations, all applicable policy violations shall be charged, but the most serious policy violation shall be used for determining the category of the offense. Exoneration on the most serious offense does not preclude discipline as to less serious offenses stemming from the same misconduct.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 27, 2019.

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

- Administrative Services Division Operations Manual, published on June 17, 2019.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

WAI 44871

To determine Phase 2 compliance with this Paragraph, we reviewed 41 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period. Twenty cases had sustained allegations against one or more employees. In 18 of these 20 investigations, at least one principal employee was still an MCSO employee at the time the investigation was completed or discipline decisions were made. In all 18, the most serious policy violation was used to determine the category of the offense if more than one policy violation was sustained.

In cases where multiple violations of policy occurred, this information was listed on the preliminary discipline document. There were no cases where the exoneration of any offense precluded discipline for sustained allegations.

**Paragraph 194.** *The Commander of the Professional Standards Bureau shall ensure that investigations comply with MCSO policy and all requirements of this Order, including those related to training, investigators' disciplinary backgrounds, and conflicts of interest.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on March 15, 2019.
- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on January 24, 2019.
- CP-5 (Truthfulness), most recently amended on April 18, 2019.
- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.
- GC-16 (Employee Grievance Procedures), most recently amended on April 2, 2019.
- GC-17 (Employee Disciplinary Procedures), most recently amended on June 27, 2019.
- GH-2 (Internal Investigations), most recently amended on June 28, 2019.
- Administrative Services Division Operations Manual, published on June 17, 2019.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** Not in compliance

We determine Phase 2 compliance with this Paragraph by a review of completed misconduct investigations conducted by MCSO personnel, the review of attendance by internal investigators at required Misconduct Investigative Training, the disciplinary backgrounds of internal investigators, and the efforts being made by the PSB Commander to reach compliance.

WAI 44872

We reviewed 41 administrative misconduct investigations and two criminal investigations submitted by PSB during this reporting period. Both of the criminal investigations complied with MCSO policy and the requirements of the Second Order. Of the 41 administrative misconduct investigations, 90% were in compliance with all the investigative and administrative requirements over which the PSB Commander has authority – an increase from 73% we found in the last reporting period.

Of the 41 administrative misconduct cases we reviewed, PSB personnel completed 35. Thirty-four (97%) were in compliance with all requirements for the completion of administrative misconduct investigations, a 4% increase from the last reporting period. There were no investigations completed by the contract investigator submitted for our review during this reporting period.

Sworn personnel in PSB conducted nine of the 41 investigations. All nine were in compliance, a 6% increase from the last reporting period. Twenty-six of the 41 investigations were conducted by Detention personnel assigned to PSB. Of these, 25 (96%) were in compliance, an increase from the 93% compliance during the last reporting period. In one investigation, we believe findings of sustained should have been made and were not.

Districts or Divisions outside of PSB conducted six investigations. We found three to be in compliance with all investigative and administrative requirements. All three we found non-compliant were investigated by District personnel. In one case, we believe there was a training issue that was not addressed. In the second, a policy concern was identified, but not addressed; and in the last case, there were multiple administrative errors. The single investigation conducted by a Division other than Patrol was found to be compliant. Of the five conducted by the Patrol Division, two (40%) were compliant. Overall compliance for all cases investigated outside of PSB was 50%, a decrease from 55% last quarter. As we have noted throughout this report, the compliance rate for cases investigated outside of PSB has decreased this and the last two quarters.

There are many factors that impact the PSB Commander's ability to ensure compliance in all cases. One factor is that the PSB Commander must rely on other members of PSB staff to conduct case reviews and ensure proper documentation is completed. We continue to find that, in most cases, PSB personnel are identifying and ensuring that corrections are made and all documentation is completed in those cases they review. In some cases, deficiencies cannot be corrected after the fact.

WAI 44873

Another factor affecting the PSB Commander's ability to ensure that all investigations are properly completed is that the Appointing Authority – not the PSB Commander – determines the final findings and discipline. During this reporting period, there were no instances where the Appointing Authority overturned a finding made by the PSB Commander. There were two instances where the Appointing Authority assessed discipline other than the presumptive identified by the PSB Commander. In one, the discipline was mitigated and in the other, the discipline was aggravated. In both cases, we agree with the decision of the Appointing Authority and proper justification for the findings was provided.

During this reporting period, we found four instances where a District Commander identified and corrected deficiencies in an investigation prior to forwarding it to PSB. We also found four instances where PSB identified concerns with the District Commander approval of misconduct investigations and forwarded these concerns to Deputy Chiefs to address. We did not identify any instances during this reporting period where Deputy Chiefs met with District Command personnel as a result of deficient investigations being submitted. MCSO must make oversight and attention to the proper completion of administrative investigations a priority if MCSO is to achieve compliance with the completion of these investigations. During our next site visit, we will meet with Deputy Chiefs who have oversight over District and Division personnel to discuss what actions may be taken to address any continuing deficiencies that are identified.

While PSB continues to experience challenges in ensuring that completed internal investigations are reaching full compliance with both MCSO policy and both Court Orders, the Bureau has continued to make efforts to improve compliance. A member of our Team continues to meet personally with the PSB Commander every two weeks to discuss Class Remedial Matters. We also use this opportunity to discuss other ongoing concerns that affect compliance with the Second Order. The ability to discuss investigative or administrative concerns during these meetings has resulted in concerns being immediately addressed; and in some cases, has resulted in necessary actions being taken to correct issues that have been identified.

Since October 2016, during each site visit, we have met with PSB personnel and District and Division command personnel to update them on our identification of training and performance issues that adversely affect compliance with the Second Order. Since January 2017, Detention personnel assigned to PSB to oversee investigations have also participated in these meetings. We have used these meetings to discuss concerns with the quality of investigations; opportunities for improvement; and in some cases, investigative protocols.

WAI 44874

PSB has taken a number of actions to address both investigative deficiencies, and other concerns with the completion of administrative misconduct investigations that have been identified. Additional oversight was added for Detention investigations; PSB personnel were assigned as liaisons with District personnel; a service complaint process was developed and approved; revisions to witness and complaint interview processes were proposed and approved; a new protocol for the handling of service complaints not involving MCSO personnel was proposed and approved; and the PSB Commander was given the authority to resolve some minor internally generated complaints without the necessity to conduct an administrative misconduct investigation.

In addition to those actions that have been approved to address continuing backlogs and other challenges with administrative misconduct investigations, we have continued to have ongoing discussions with PSB and the Parties during our site visits regarding other potential opportunities to address these challenges. These discussions have included many suggestions and potential modifications to existing protocols, including such changes as: expanding the use of the service complaint process; using alternative types of administrative closures; discontinuing investigations of former employees if the conduct was not criminal in nature, would not affect law enforcement certification, and did not involve current MCSO employees; discretion for the investigation of minor policy violations that occurred more than three years prior to the complaint being filed; implementing an expedited discipline process for sustained cases; and increasing investigative time requirements. The Parties have articulated their understanding of PSB's concerns and have indicated a willingness to discuss ideas that are brought forward.

During September 2019, members of our Team met with the PSB Executive Chief who has oversight over PSB to discuss ongoing challenges with the completion of misconduct investigations. It was a productive meeting, with good discussion about potential ideas to resolve this ongoing issue. Some of the discussion included topics already discussed with our Team and the Parties, and others were new. The Executive Chief committed to developing a list of the ideas shared, along with more detailed information about how each idea might be implemented. The intent was to then share this information with our Team and the Parties. The Executive Chief informed us that due to ongoing priorities, this information would not be ready for discussion until our January 2020 site visit.

During our October 2019 site visit, we met with PSB and the Parties to discuss the ongoing issues with the completion of misconduct investigations. We briefly discussed some potential remedies, then tabled the discussion until our January 2020 site visit when MCSO would be prepared to provide more detailed information on any proposals they want to bring forward.

During our January 2020 site visit, PSB provided a document containing the Bureau's ideas and recommendations regarding the investigation of alleged employee misconduct. After some discussion, our Team offered to facilitate discussions with MCSO, Plaintiffs, and Plaintiff-Intervenors, to discuss the topics brought forward by MCSO; and any additional ideas that might be brought forward by any other member of the group. We advised all that we would discuss

WAI 44875

only those items that did not require a change to the Orders. We have since facilitated a conference call with MCSO and the Parties. During this call, MCSO personnel stated that they believed that all of the ideas and recommendations they had brought forward would require a change to the Orders and they had no additional suggestions to add. The representatives of the Plaintiffs and Plaintiff-Intervenors agreed with MCSO and added that they also had no additional suggestions or ideas to bring forward. This remains a topic for the Parties to discuss in a meet-and-confer process should they choose that approach.

In 2014, PSB initiated 717 internal investigations. In 2015, PSB initiated 916 cases; and in 2016, 847 cases. There were 1,028 cases initiated in 2017. In 2018, there were 1,114 investigation initiated; 354 service complaints; 716 administrative misconduct investigations, 36 criminal investigations, and eight critical incident investigations. In 2019, there were 615 internal investigations initiated, as well as 453 service complaints. With the inclusion of critical incidents and criminal investigations, the total for 2019 was 1,072 investigations. This number is fairly consistent with what we have seen for the past several years.

PSB has consistently informed us over past reporting periods that the caseload for PSB investigators continues to be excessive. During our January 2020 site visit, PSB informed us the average active monthly caseload for both PSB sworn investigators and Detention investigators had reached an average of 50 active cases per month, an increase from the average of 46 the last reporting period. These large caseloads continue to adversely impact the timely completion of investigations. The average number of days to finalize and close a PSB investigation was 409 days during this reporting period. The average number of days to close a District or Division investigation was 307 days during this reporting period. There are currently 1,617 open investigation, a decrease from the 1,682 the last reporting period. Of these, 1,478 are investigations being conducted by PSB personnel. The remaining 139 are investigations pending completion in Districts and Divisions outside PSB. While these totals include criminal misconduct investigations, critical incident investigations, and service complaints, the majority are open administrative misconduct investigations.

Though PSB was authorized 11 new positions in the July 2018 budget, during this reporting period, PSB again advised that only one of these positions, a Detention supervisor, has been filled. There is still no indication when any of the additional positions will be filled. Of the civilian positions authorized in the 2019 budget, PSB advised us during our January 2020 site visit that one management assistant position has been filled; other administrative staff hiring is still in progress; and job offers have been extended to fill the three civilian investigator positions. PSB staff also advised us that those selected for the civilian investigator positions have extensive backgrounds in law enforcement and significant investigative experience. As a result, PSB personnel believe that the new personnel will quickly be able to begin taking on investigative assignments.

WAI 44876

Despite the efforts of PSB, staffing remains a significant problem, resulting in the delayed completion of misconduct investigations. As we have for numerous reporting periods, we note that despite all the efforts that are being made to properly address investigations, it is simply not possible to do so with the existing staff. It is also obvious that the number of investigations has continued to increase since 2014 and there is no indication that will change. MCSO should not be willing to continue to accept this status quo in the investigation of complaints. Some action must be taken to address the ongoing and growing concern.

In July 2018, we discussed the investigation of the 1,459 identifications that had been impounded at the MCSO Property Room and then checked out by an MCSO sergeant. This investigation was initiated in 2015 but then stalled due to other, more immediate priorities for investigations. Of the total 1,459 identifications, 596 were believed to belong to members of the Plaintiffs' class.

Since July 2018, we have discussed the status of the 1,459 IDs investigation during each site visit. In October 2018, our Team agreed to select a sample of the identifications that had not been linked to any MCSO employee for additional follow-up. Since that time, PSB has provided us ongoing updates on the status of the investigation and any actions taken; and has followed our Team's recommendation regarding additional necessary investigative follow-up. MCSO has also addressed questions from our Team and the Parties regarding investigative strategies.

During our October 2019 site visit, PSB provided a final update on the sample identifications and other investigative actions that had been completed by investigative personnel. PSB also submitted a document recommending the closure of this investigation. The Parties' representatives said they would need time to discuss this with their respective clients and could have a response back by the end of November. They said they would provide their response by email to both MCSO and our Team. The MCAO attorney who attended our site visit meeting said he would draft a court document recommending the closing of the investigation for the Parties' review as well.

Prior to our January site visit, the Plaintiff-Intervenors provided their input regarding closure of this investigation. This was discussed during our site visit, and the Plaintiffs provided their response shortly after our site visit. MCSO committed to responding to the concerns and recommendations of the Parties within three weeks of receiving the Plaintiffs' input. Should additional discussion be necessary, we will schedule a meeting to do so during our next site visit.

During our past site visits, PSB staff have continued to communicate that they are properly outsourcing those cases where conflicts of interest exist. PSB has contracted with a qualified private vendor to conduct these investigations. Additionally, PSB has outsourced investigations to other law enforcement entities.

During this reporting period, we did not receive or review any investigations completed by the contract investigator retained by MCSO. Numerous investigations are still in process. MCSO did not outsource any additional cases to the contract investigator or any other entity during this reporting period.

WAI 44877

After the Second Order was implemented, PSB reviewed the disciplinary backgrounds of all those who might conduct internal investigations, and notified us of those supervisors who would be prohibited from conducting such investigations due to their backgrounds. One supervisor remains ineligible to conduct internal investigations. Since January 2017, PSB personnel have reported on a monthly basis that they have not identified any additional members of MCSO who are disqualified from conducting misconduct investigations

***Paragraph 195.*** *Within six months of the entry of this Order, the Professional Standards Bureau shall include sufficient trained personnel to fulfill the requirements of this Order.*

**Phase 1:** In compliance

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** Not in compliance

In conjunction with this Paragraph, Paragraph 178 mandates that within three months of the finalization of policies consistent with Paragraph 165, all PSB personnel would receive 40 hours of comprehensive training. Paragraph 178 requires training of all supervisors within three months of the finalization of policies, and further requires sufficient trained personnel in PSB within six months of the entry of the Order. The first week of the required Misconduct Investigative Training commenced on September 18, 2017 and the training was completed prior to the end of 2017.

During our July and October 2018 site visits, PSB informed us that a total of 11 additional personnel had been approved for PSB in MCSO's July 2018 budget. PSB personnel informed us that due to ongoing staffing shortages they did not believe any of these positions would be filled before 2019.

During our January and April 2019 site visits, PSB personnel informed us that they had not yet received any of the 2018 budgeted positions for PSB. They further noted that it continued to remain unlikely that they would receive any of the positions in the foreseeable future due to ongoing personnel staffing shortages throughout the organization. PSB continued to note that with the continuing influx of new cases, and the ongoing backlog of investigations, even if these personnel were added, the Bureau would still be insufficiently staffed to meet its responsibilities. The PSB budget requests for the July 2019 budget year included only civilian staff. PSB's requests included: two administrative assistants, two management analyst assistants, one special projects manager, and three civilian investigators. PSB personnel believed that the addition of these positions would allow sworn and Detention supervisors to focus more on the investigative process and mitigate some of the administrative requirements currently being handled by these personnel.

WAI 44878

During our July 2019 site visit, PSB advised that of the 11 approved positions in the July 2018 budget, one had been filled – that of a Detention sergeant. It was still unknown when any of the remaining 10 positions would be filled.

During our October 2019 site visit, PSB informed us that of the previously approved 11 positions in July 2018, there has still only been one filled. Of the civilian positions approved in the July 2019 budget, one management analyst position had been filled; interviews were in progress for management assistants; and the three civilian investigator positions were in the job-posting phase.

During our January 2020 site visit, PSB advised us again that only one of the 11 approved positions for PSB in the 2018 budget has been filled. Of the eight civilian positions approved in the 2019 budget, one management assistant position has been filled, other administrative positions are in the hiring process, and job offers have been extended to fill the three civilian investigator positions. PSB believes that, given the law enforcement and investigative experience of the three civilian investigators the Bureau has selected, these investigators should not need extensive training, and will likely be qualified to conduct a variety of investigations.

The Second Order requires that PSB have "sufficient trained personnel to fulfill the requirements of this Order." MCSO has delivered the required Misconduct Investigative Training, and our focus has shifted to the sufficiency of PSB staff to carry out its mission. As documented in this and previous reports, PSB, in its command's estimation, is understaffed. We will not find MCSO in compliance with this Paragraph until MCSO addresses PSB's staffing issues.


***Paragraph 196.*** *Where appropriate to ensure the fact and appearance of impartiality, the Commander of the Professional Standards Bureau or the Chief Deputy may refer administrative misconduct investigations to another law enforcement agency or may retain a qualified outside investigator to conduct the investigation. Any outside investigator retained by the MCSO must possess the requisite background and level of experience of Internal Affairs investigators and must be free of any actual or perceived conflicts of interest.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

During our April 2017 site visit, the PSB Commander indicated that MCSO had not envisioned any need to retain additional contract investigators beyond the one investigator that had been already retained. A member of PSB's staff serves as MCSO's single point-of-contact to liaise and assist with scheduling for the contract investigator. The contract investigator will advance the investigations to the level of recommending findings.

WAI 44879

PSB previously outsourced three misconduct investigations to a separate regional law enforcement agency. Two of these investigations were completed by the outside law enforcement agency and closed by MCSO. One was closed as the Independent Investigator was investigating the same alleged misconduct.

During this reporting period, PSB advised us that no additional cases were outsourced to the outside investigator or any other law enforcement agency. There were no investigations conducted by the outside investigator that were forwarded to our Team for review during this reporting period.

This investigator has previously completed numerous assigned investigations and forwarded them to PSB for review. We have received and reviewed seven investigations, and have found them to be thorough and well-written. Numerous investigations assigned to the contract investigator are still in progress.

**Paragraph 197.** *The Professional Standards Bureau will be headed by a qualified Commander. The Commander of the Professional Standards Bureau will have ultimate authority within the MCSO for reaching the findings of investigations and preliminarily determining any discipline to be imposed. If the Sheriff declines to designate a qualified Commander of the Professional Standards Bureau, the Court will designate a qualified candidate, which may be a Civilian Director in lieu of a sworn officer.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 27, 2019.

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

- Administrative Services Division Operations Manual, published on June 17, 2019.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

In January 2018, MCSO advised that due to reorganizations within the Office, the responsibility to serve as the PSB Commander for purposes of compliance with this Order would be transferred to a captain within PSB. The PSB Deputy Chief, who previously had this responsibility was promoted, but maintains overall oversight of PSB as an Executive Chief.

During our January 2020 site visit, and our regularly scheduled meetings with PSB to discuss CRMs and other internal affairs matters during this reporting period, we have had continuing opportunities to interact with the captain now serving as the PSB Commander. He is an experienced PSB investigator and is cognizant of the many requirements and responsibilities of his new position. He is responsive to our input, and we have had a number of productive discussions with him regarding PSB processes and internal investigations. In those cases where

WAI 44880

we have expressed concerns or requested information, he has generally provided timely responses. We continue to note that MCSO must support the PSB Commander with resources and executive leadership.

**Paragraph 198.** *To promote independence and the confidentiality of investigations, the Professional Standards Bureau shall be physically located in a facility that is separate from other MCSO facilities, such as a professional office building or commercial retail space. This facility shall be easily accessible to the public, present a non-intimidating atmosphere, and have sufficient space and personnel for receiving members of the public and for permitting them to file complaints.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

In May 2018, PSB moved into the first and second floors of 101 West Jefferson Street. PSB's address is available on the comment and complaint form that is accessible to the public at the Districts and on MCSO's website. PSB's criminal investigators are housed on the first floor, and administrative investigators are housed on the second floor of the building. PSB's off-site facility has two dedicated security personnel assigned during normal business hours of 8:00 a.m.-4:00 p.m., Monday-Friday. MCSO remains in compliance with this requirement.

**Paragraph 199.** *The MCSO will ensure that the qualifications for service as an internal affairs investigator shall be clearly defined and that anyone tasked with investigating employee misconduct possesses excellent investigative skills, a reputation for integrity, the ability to write clear reports, and the ability to be fair and objective in determining whether an employee committed misconduct. Employees with a history of multiple sustained misconduct allegations, or one sustained allegation of a Category 6 or Category 7 offense from MCSO's disciplinary matrices, will be presumptively ineligible to conduct misconduct investigations. Employees with a history of conducting deficient investigations will also be presumptively ineligible for these duties.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

GH-2 reflects the directive of this Paragraph, to ensure that only supervisors who meet the criteria established by this Paragraph are assigned misconduct investigations. The PSB Operations Manual, which formalizes the review process, states that if any supervisor is deemed ineligible,

WAI 44881

the PSB commander will notify the supervisor's commander in writing, and will ensure that a Blue Team entry is made to memorialize the supervisor's ineligibility to conduct misconduct investigations. A record of supervisors deemed ineligible to conduct misconduct investigations is maintained in PSB. These procedures were finalized and documented in the PSB Manual, published on December 13, 2018.

During this reporting period, MCSO did not have any additions to the list of employees prohibited from conducting misconduct investigations. During our January site visit, we inquired as to the status and the list remains unchanged. During this reporting period, there was one employee transferred into PSB. We reviewed the background information submitted and concluded that the employee met the requirements of this Paragraph.

*Paragraph 200.  In each misconduct investigation, investigators shall:*

a.    *conduct investigations in a rigorous and impartial manner designed to determine the facts;*

b.    *approach investigations without prejudging the facts and without permitting any preconceived impression of the principal or any witness to cloud the investigation;*

c.    *identify, collect, and consider all relevant circumstantial, direct, and physical evidence, including any audio or video recordings;*

d.    *make reasonable attempts to locate and interview all witnesses, including civilian witnesses;*

e.    *make reasonable attempts to interview any civilian complainant in person;*

f.    *audio and video record all interviews;*

g.    *when conducting interviews, avoid asking leading questions and questions that may suggest justifications for the alleged misconduct;*

h.    *make credibility determinations, as appropriate; and*

i.    *attempt to resolve material inconsistencies between employee, complainant, and witness statements.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

WAI 44882

To determine Phase 2 compliance with this Paragraph, we reviewed 41 administrative misconduct investigations that were completed by MCSO personnel during this reporting period. All of the investigations were both initiated and completed after the issuance of the Second Order. PSB investigated 35 of the total cases. District or Division supervisory personnel not assigned to PSB investigated six of the cases. Of the cases we reviewed, 18 involved external complaints and 23 were internally generated.

Paragraph 200.a. requires that misconduct investigations be conducted in a rigorous and impartial manner. During the last reporting period, two investigations (2%) fell short of compliance with this Subparagraph. During this reporting period, one investigation (2%) again fell short of compliance with this Subparagraph.

Paragraph 200.b. requires that investigations be approached without prejudging the facts or permitting preconceived impressions. During the last reporting period, two investigations (2%) fell short of compliance with this Subparagraph. During this reporting period, all investigations complied with the requirements of this Subparagraph.

Paragraph 200.c. requires that investigators identify, collect, and consider all relevant evidence. During this and the last reporting period, all investigations complied with the requirements of this Subparagraph.

Paragraph 200.d. requires that investigators make reasonable attempts to locate and interview all witnesses. During the last reporting period, one investigation (1%) fell short of compliance with this Subparagraph. During this reporting period, all investigations complied with the requirements of this Subparagraph.

Paragraph 200.e. requires that investigators make reasonable attempts to interview civilian complainants in person. During the last reporting period, one investigation (1%) fell short of compliance with this Subparagraph. During this reporting period, all investigations complied with the requirements of this Subparagraph.

Paragraph 200.f. requires audio- and video-recording of all interviews. During the last reporting period, of the 93 administrative misconduct investigations, there were 17 where the interviews were not both audio- and video-recorded. Two of the 17 did not contain justification for failing to video-record the interviews. During this reporting period, there were two investigations where the interviews were not both audio- and video-recorded. In both, adequate justification was provided.

Paragraph 200.g. requires that when conducting interviews, investigators avoid asking leading questions or questions that may suggest justification for the alleged misconduct. During the last reporting period, two investigations (2%) did not comply with all requirements of this Subparagraph. During this reporting period, all investigations complied with the requirements of this Subparagraph.

WAI 44883

Paragraph 200.h. requires that proper credibility determinations be made. During the last reporting period, three completed investigations (3%) fell short of compliance with this Subparagraph. During this reporting period, all investigations complied with the requirements of this Subparagraph.

Paragraph 200.i. requires that investigators attempt to resolve all material inconsistencies. During the last reporting period, two investigations (2%) fell short of compliance with this Subparagraph. During this reporting period, all investigations complied with the requirements of this Subparagraph.

**Paragraph 201.** *There will be no automatic preference for an employee's statement over a non-employee's statement. Internal affairs investigators will not disregard a witness's statement solely because the witness has some connection to either the complainant or the employee or because the witness or complainant has a criminal history, but may consider the witness's criminal history or any adjudicated findings of untruthfulness in evaluating that witness's statement. In conducting the investigation, internal affairs investigators may take into account the record of any witness, complainant, or officer who has been determined to have been deceptive or untruthful in any legal proceeding, misconduct investigation, or other investigation.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 41 administrative misconduct investigations conducted by MCSO personnel that were completed during this reporting period.

Of the 41 completed administrative misconduct investigations, 18 involved complainants that were not MCSO employees. Fourteen of the total 41 investigations also included interviews with witnesses or investigative leads who were not MCSO employees. We did not identify any cases where we believe there was an automatic preference for the statement of an employee over a non-employee's statement.

We did not identify any completed investigations where a witness's statement was disregarded solely because of any connection identified in this Paragraph, nor where a witness's criminal history or findings of truthfulness were considered.

WAI 44884

***Paragraph 202.*** *Internal affairs investigators will investigate any evidence of potential misconduct uncovered during the course of the investigation, regardless of whether the potential misconduct was part of the original allegation.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 41 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.  In two of the 41 investigations, MCSO identified additional potential misconduct during the course of the investigations and properly added additional allegations or initiated new investigations.  We did not identify any investigations during this reporting period where we believe additional misconduct may have occurred and was not addressed by MCSO.


***Paragraph 203.*** *If the person involved in the encounter with the MCSO pleads guilty or is found guilty of an offense, internal affairs investigators will not consider that information alone to be determinative of whether an MCSO employee engaged in misconduct, nor will it by itself justify discontinuing the investigation.  MCSO training materials and policies on internal investigations will acknowledge explicitly that the fact of a criminal conviction related to the administrative investigation is not determinative of whether an MCSO employee engaged in misconduct and that the mission of an internal affairs investigator is to determine whether any misconduct occurred.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

There were no indications in any of the completed investigations we reviewed that any MCSO investigators considered alone any pleading or finding of guilty by any person as a reason to make any determination regarding the potential misconduct of any MCSO personnel, nor were any investigations discontinued for this reason.

WAI 44885

***Paragraph 204.*** *Internal affairs investigators will complete their administrative investigations within 85 calendar days of the initiation of the investigation (60 calendar days if within a Division). Any request for an extension of time must be approved in writing by the Commander of the Professional Standards Bureau. Reasonable requests for extensions of time may be granted.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we review administrative misconduct investigations conducted by MCSO personnel.

During the last reporting period, we reviewed 93 administrative misconduct investigations. Seventy-four were not completed within the 60- or 85-day requirement. Of these 74, five (7%) did not have a timely request for, or an approval of, an extension. MCSO fell below the required compliance for this Paragraph for the second quarter in a row, and we withdrew Phase 2 compliance.

During this reporting period, 31 (76%) of the total 41 administrative misconduct investigations reviewed were not completed within the 60- or 85-day timeline. All contained a timely request for, and approval of, an extension.

PSB conducted 35 of the 41 administrative misconduct investigations we reviewed. Twenty-eight of these investigations were not completed within the required 85-day time period. All 28 included a timely request, and an approval for an extension.

As has been our practice for numerous reporting periods, we determine the 60-day time period compliance findings for those investigations conducted by personnel outside of PSB based on the original date the investigation is approved by the District or Division Commander and forwarded to PSB. We acknowledge that with the delays in the completion and reviews of internal investigations, District and Division personnel may not know that PSB has found internal investigations they have submitted to require further investigation or other action, until after the 60-day time period has expired. In those cases where deficiencies are identified by PSB, the cases will continue to be found non-compliant in other relevant Paragraphs, and specifically in Paragraph 213, which requires the District or Division Commander ensure that investigations conducted by their personnel are complete and the findings are supported by the evidence prior to their submittal to PSB.

Districts or Divisions outside of PSB conducted six of the administrative misconduct investigations. Three (50%) of these 6 investigations were not submitted to PSB within the required 60-day timeframe. All included a timely request, and an approval for an extension.

WAI 44886

In addition to those investigations not completed within 60 or 85 days as required by this Paragraph, 31 of the 41 cases exceeded the 180-day timeframe. In all 31, there was a timely request, and an approval for an extension.

MCSO is in compliance with this Paragraph.

**Paragraph 205.** *The Professional Standards Bureau shall maintain a database to track all ongoing misconduct cases, and shall generate alerts to the responsible investigator and his or her Supervisor and the Commander of the Professional Standards Bureau when deadlines are not met.*

**Phase 1:** In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 2, 2019.

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 27, 2019.

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

- GH-5 (Early Identification System), most recently amended on January 4, 2019.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

We determine compliance with this Paragraph by assigning a member of our Team to observe demonstrations of the IAPro database during our site visits or other meetings with PSB throughout the reporting period. The IAPro technology serves as the centralized electronic numbering and tracking system for all allegations of misconduct, whether internally discovered or based on an external complaint. This database contains the capacity to manage and store information required for compliance with this Paragraph.

During our site visits, we have met with PSB personnel on numerous occasions and observed IAPro to ensure that the system generates appropriate alerts to responsible investigators and PSB commanders if deadlines are not met. We have reviewed emails PSB disseminates each month to Districts and Divisions to identify investigative deadlines. We have also reviewed the Blue Team Dashboard, which uses a color-coded system to identify investigations that are nearing deadlines or are past deadlines. The information appears in each supervisor's Blue Team account when they are monitoring open cases.

The civilian PSB Special Projects Manager is primarily responsible for administering the centralized tracking system. In addition, all PSB and Division investigators can access the electronic Blue Team database – a system that integrates with IAPro – at any time to view the assignment and status of administrative investigations. PSB has also trained two lieutenants to administer the system.

WAI 44887

In May 2018, PSB relocated to an offsite location. In July 2018, a member of our Team verified that the existing tracking mechanisms continue to be used for the tracking of investigations at the new facility.

During our January, July, and October 2019 site visits, a member of our Team verified that the tracking mechanisms remain in place. We also continued to receive monthly notifications from PSB regarding closed administrative investigations, and we evaluate these closed investigations for the entirety of a reporting period against a multitude of criteria, including whether the cases were completed in a timely fashion.

During this reporting period, we continued to receive monthly notifications from PSB regarding closed administrative misconduct investigations; and we continue to evaluate these closed investigations for the entirety of a reporting period against a multitude of criteria, including whether the cases were completed in a timely fashion. (See Paragraph 204.)

**Paragraph 206.** *At the conclusion of each investigation, internal affairs investigators will prepare an investigation report. The report will include:*

a.   *a narrative description of the incident;*

b.   *documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the incident. In situations in which there are no known witnesses, the report will specifically state this fact. In situations in which witnesses were present but circumstances prevented the internal affairs investigator from determining the identification, phone number, or address of those witnesses, the report will state the reasons why. The report will also include all available identifying information for anyone who refuses to provide a statement;*

c.   *documentation of whether employees were interviewed, and a transcript or recording of those interviews;*

d.   *the names of all other MCSO employees who witnessed the incident;*

e.   *the internal affairs investigator's evaluation of the incident, based on his or her review of the evidence gathered, including a determination of whether the employee's actions appear to be within MCSO policy, procedure, regulations, orders, or other standards of conduct required of MCSO employees;*

f.   *in cases where the MCSO asserts that material inconsistencies were resolved, explicit credibility findings, including a precise description of the evidence that supports or detracts from the person's credibility;*

g.   *in cases where material inconsistencies must be resolved between complainant, employee, and witness statements, explicit resolution of the inconsistencies, including a precise description of the evidence relied upon to resolve the inconsistencies;*

WAI 44888

h.   *an assessment of the incident for policy, training, tactical, or equipment concerns, including any recommendations for how those concerns will be addressed;*

i.   *if a weapon was used, documentation that the employee's certification and training for the weapon were current; and*

j.   *documentation of recommendations for initiation of the disciplinary process; and*

k.   *in the instance of an externally generated complaint, documentation of all contacts and updates with the complainant.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 41 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

Paragraph 206.a. requires a written description on the incident be included in the investigative report. All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.b. requires documentation of all evidence gathered, including all known information about witnesses. During this reporting period, one investigation (2%) fell short of compliance with this Subparagraph.

Paragraph 206.c. requires documentation of whether employees were interviewed, and a transcript or recording of these interviews. All of the completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.d. requires that the names of all MCSO employees who witnessed the incident be included in the report. All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.e. requires that the internal affairs investigator's evaluation of the incident includes a determination of whether the employee's actions appear to be within MCSO policy, procedure, regulations, orders, or other standards of conduct required of MCSO employees. All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.f. requires that when MCSO asserts that material inconsistencies were resolved, explicit credibility findings, including a precise description of the evidence that supports or detracts from the person's credibility must be provided. All but one of the completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.g. requires that when material inconsistencies must be resolved, a precise description of the evidence be included in the report. All but one of the completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.h. requires that assessment of the incident for policy, training, tactical, or equipment concerns be included in the investigative report, to include any recommendations. During this reporting period, we identified two completed investigations where investigators failed to identify and address a potential policy issue or training need.

Paragraph 206.i. requires that if a weapon was used, documentation that the employee's certification and training for the weapon must be included in the investigative written report. All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.j. requires that documentation of the initiation of the disciplinary process be included in the investigation. Compliance is achieved when the misconduct investigator completes the investigation with a finding of sustained, when applicable, and the PSB Commander subsequently approves the finding. This is considered the initiation of the disciplinary process. Eighteen of the 41 administrative misconduct investigations we reviewed had sustained findings against one or more active MCSO employee. All complied with the requirements of this Subparagraph.

Paragraph 206.k. requires that any contacts and updates with the complainant be documented in the investigative report. All of the investigations we reviewed for this Subparagraph complied with this requirement.


***Paragraph 207.*** *In assessing the incident for policy, training, tactical, or equipment concerns, investigation reports will include an assessment of whether:*

*a.*     *the law enforcement action was in compliance with training and legal standards;*

*b.*     *the use of different tactics should or could have been employed;*

*c.*     *the incident indicates a need for additional training, counseling, or other non-disciplinary corrective actions; and*

*d.*     *the incident suggests that the MCSO should revise its policies, strategies, tactics, or training.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

During this reporting period, we reviewed 41 administrative misconduct investigations. MCSO properly assessed and documented whether any of the requirements of this Paragraph were relevant in all but two (5%) of the completed cases we reviewed for this reporting period. MCSO identified five cases where action related to this Paragraph was appropriate; and addressed the concerns identified with one-on-one meetings with employees, additional training, and where appropriate, policy review. During our next site visit, we will discuss both investigations where we believe that additional training or policy review should have occurred and did not.

PSB continues to use an internal tracking form to ensure that those concerns that are forwarded to other Divisions within MCSO for action or review are addressed. We receive and review this tracking document each month. This tracking form contains regularly updated information on the status of concerns that have been identified.

**Paragraph 208.** *For each allegation of misconduct, internal affairs investigators shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation:*

a.     *"Unfounded," where the investigation determines, by clear and convincing evidence, that the allegation was false or not supported by fact;*

b.     *"Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur and justifies a reasonable conclusion of a policy violation;*

c.     *"Not Sustained," where the investigation determines that there is insufficient evidence to prove or disprove the allegation; or*

d.     *"Exonerated," where the investigation determines that the alleged conduct did occur but did not violate MCSO policies, procedures, or training.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review administrative misconduct investigations conducted by MCSO personnel and completed during the reporting period. We evaluate compliance with this Paragraph against the standard of whether a finding was made, and whether the finding was correct.

During the last reporting period, we concurred with the findings of the PSB Commander in 88 (95%) of the 93 cases that were completed.

WAI 44891

During this reporting period, we concurred with the findings of the PSB Commander in 40 (98%) of the 41 administrative misconduct investigations we reviewed. In one investigation where the PSB Commander made a final finding of not sustained, we believe adequate evidence existed for sustained findings. There were no investigations during this reporting period where the Appointing Authority changed any findings made by the PSB Commander. As is our practice, we will discuss the case where we disagree with the findings with PSB during our next site visit.

**Paragraph 209.** *For investigations carried out by Supervisors outside of the Professional Standards Bureau, the investigator shall forward the completed investigation report through his or her chain of command to his or her Division Commander. The Division Commander must approve the investigation and indicate his or her concurrence with the findings.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed six administrative misconduct investigations not conducted by PSB personnel and completed during this reporting period. All six were forwarded to PSB as required, and all contained the approval of the responsible District or Division Commander. As noted in previous reporting periods, and again during *this* reporting period, some of the District or Division level investigations were not in compliance with various requirements of the Second Order – as indicated throughout this report. However, we assessed MCSO's compliance with this Paragraph based on these cases being forwarded through the chain of command for approval of the investigation and findings.

**Paragraph 210.** *For investigations carried out by the Professional Standards Bureau, the investigator shall forward the completed investigation report to the Commander.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 35 administrative misconduct investigations that were conducted by PSB personnel and completed during this reporting period. All 35 complied with the requirements of this Paragraph.

WAI 44892

***Paragraph 211.*** *If the Commander—meaning the Commander of the PSB or the Commander of the Division in which the internal affairs investigation was conducted—determines that the findings of the investigation report are not supported by the appropriate standard of proof, the Commander shall return the investigation to the investigator for correction or additional investigative effort, shall document the inadequacies, and shall include this documentation as an addendum to the original investigation. The investigator's Supervisor shall take appropriate action to address the inadequately supported determination and any investigative deficiencies that led to it. The Commander shall be responsible for the accuracy and completeness of investigation reports prepared by internal affairs investigators under his or her command.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

**Phase 2:** Not in compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 41 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

PSB personnel investigated 35 of the 41 administrative misconduct investigations we reviewed during this reporting period. In 34 (97%) of those cases investigated by PSB personnel, we found the investigations to be thorough and well-written; and we concurred with the findings by the PSB Commander. This is an increase from the 93% compliance the last reporting period. There were no investigations completed by the contract investigator that were forwarded for our review during this reporting period.

Of the six investigations investigated by Districts or Divisions outside of PSB, three (50%) were in compliance with the requirements for the completion of administrative investigations. This is a continuing decrease from the last reporting period where compliance dropped from 63% to 55%. We or PSB identified three investigations (50%) where we had some concerns regarding the investigation or documentation. We believe that the concerns found in these cases could, and should, have been identified at the District or Division level prior to forwarding the cases to PSB for review. Concerns with these three investigations included: failure to properly address a policy concern; failure to properly address a training issue; and in one, multiple administrative errors. We noted two other investigations where PSB had to return the investigations to obtain required signatures from District or Division Command personnel. While we did not find these two investigations out of compliance, we urge District and Division personnel to ensure that investigations are not only properly completed, but that they contain all necessary administrative requirements. We will discuss these cases with both PSB and the Division/District Commanders during our next site visit.

Until this and the last two reporting periods, we had noted a continuing increase in the compliance of those cases investigated by Districts and Divisions outside of PSB and believed that the 40-hour Misconduct Investigative Training was a significant factor in this improvement. We

WAI 44893

expected to continue to find ongoing improvement, but that has not been the case. While there was only a small number of cases completed in Districts and Divisions outside of PSB and submitted during this reporting period, compliance continues to remain low. Compliance has dropped from 76%, to 63%, 55%, and 50% over the past year. We again note our concerns that after several years of working within the requirements of current investigative processes, these investigations continue to have deficiencies.

In January 2018, we requested that MCSO begin providing us documentation that reflects the actions being taken to address deficient misconduct investigations. We requested that PSB and command personnel provide a response to this request on a monthly basis. We have consistently received the requested documentation since March 2018.

During this reporting period, we found no instances where Deputy Chiefs met with Command personnel to discuss deficient investigations. We found four instances where District Commanders identified a deficiency or concern with an investigation conducted by their personnel. In all cases, the Commander documented one-on-one meetings with the involved employees, and made Blue Team entries. We also noted that PSB identified four deficiencies regarding District Command level review of investigations that were submitted during this reporting period, and forwarded these concerns to the appropriate Deputy Chiefs to be addressed. We also noted, as reported during the last reporting period, that again this reporting period there are still five Command deficiency concerns that were forwarded to Executive staff for action that have not been addressed and remain pending. Some of these concerns were documented and forwarded by PSB more than six months ago. We continue to believe that the majority of deficiencies found in the District and Division cases should be identified prior to forwarding the case to PSB, and will continue to closely monitor how identified deficiencies are being addressed.

We have noted in numerous prior reporting periods that both the supervisors who complete deficient investigations and the command personnel who approve them must be held accountable if MCSO is to achieve Phase 2 compliance with this Paragraph. Again, during this reporting period, our review of cases completed by PSB personnel continues to indicate PSB's ongoing efforts to achieve compliance, and we remain optimistic that PSB will continue to do so.

However, based on our review of investigations during this and the last two reporting periods, we do not have the same optimism regarding those cases completed outside of PSB. Training has been provided, and personnel have been working with the requirements of the MCSO policy for misconduct investigations and the Orders for several years. Compliance should not be continuing to decline. It is unlikely MCSO will reach overall compliance unless its executive staff hold accountable those who conduct misconduct investigations, and those who review them – and ensure that there are appropriate actions when deficiencies are identified. During our next site visit, we will follow up with those Deputy Chiefs responsible for oversight of Districts and Divisions outside of PSB to discuss their efforts to address deficiencies with investigations conducted and reviewed by their personnel. We will also follow up with them on the five pending Commander deficiencies that have not yet been addressed.

***Paragraph 212.*** *Where an internal affairs investigator conducts a deficient misconduct investigation, the investigator shall receive the appropriate corrective and/or disciplinary action. An internal affairs investigator's failure to improve the quality of his or her investigations after corrective and/or disciplinary action is taken shall be grounds for demotion and/or removal from a supervisory position or the Professional Standards Bureau.*

**Phase 1:** In compliance

- GB-2 (Command Responsibility), most recently amended on June 28, 2019.
- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 41 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

The 40-hour Misconduct Investigative Training was completed in late 2017. In January 2018, we requested that MCSO begin providing us with a document that reflects what actions are being taken to address deficient misconduct investigations on a monthly basis. As discussed in Paragraph 211, we have consistently received documentation since March 2018. During this reporting period, PSB identified and documented several deficiencies with investigations completed outside of PSB. District Commanders also identified several concerns or deficiencies in investigations conducted by their personnel. Deputy Chiefs did not report identifying or addressing any deficiencies at the Command level during this reporting period. As noted in Paragraph 211, we will be scheduling a meeting with Deputy Chiefs during our next site visit to discuss their plans for addressing any ongoing deficiencies that are identified.

We will also continue to closely monitor these monthly reports submitted by MCSO command personnel, along with reviewing completed misconduct investigations, to determine if deficiencies are being properly identified and addressed.


***Paragraph 213.*** *Investigations of minor misconduct conducted outside of the Professional Standards Bureau must be conducted by a Supervisor and not by line-level deputies. After such investigations, the investigating Supervisor's Commander shall forward the investigation file to the Professional Standards Bureau after he or she finds that the misconduct investigation is complete and the findings are supported by the evidence. The Professional Standards Bureau shall review the misconduct investigation to ensure that it is complete and that the findings are supported by the evidence. The Professional Standards Bureau shall order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings. Where the findings of the investigation report are not supported by the appropriate standard of proof, the Professional Standards Bureau shall document the reasons for this determination and shall include this documentation as an addendum to the original investigation.*

WAI 44895

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 41 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period. Of the 41 investigations, 35 were investigated by PSB personnel. Six were investigated by MCSO personnel outside of PSB.

None of the documentation we received regarding investigations conducted outside of PSB indicated that any person below the rank of sergeant was responsible for the investigation.

During the last reporting period, all 44 District or Division level approved cases were forwarded to, and reviewed by, PSB as required. Twenty (45%) of the 44 cases investigated at the District or Division level were returned by PSB personnel for additional investigation, corrections, proper documentation, or other changes.

During this reporting period, all six District or Division level investigations were forwarded to and reviewed by PSB as required. Three (50%) were found to have concerns or deficiencies, either by PSB or our Team. The concerns identified in these three investigations could and should have been addressed at the District or Division level prior to being forwarded to PSB.

As is our practice, we will discuss these cases with MCSO during our next site visit.


***Paragraph 214.*** *At the discretion of the Commander of the Professional Standards Bureau, a misconduct investigation may be assigned or re-assigned to another Supervisor with the approval of his or her Commander, whether within or outside of the District or Bureau in which the incident occurred, or may be returned to the original Supervisor for further investigation or analysis. This assignment or re-assignment shall be explained in writing.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 41 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

Our analysis for this reporting period revealed that of the six investigations conducted outside of PSB, two were returned by PSB to the original investigating supervisor for further investigation, analysis. None were reassigned to a different investigator.

WAI 44896

***Paragraph 215.*** *If, after an investigation conducted outside of the Professional Standards Bureau, an employee's actions are found to violate policy, the investigating Supervisor's Commander shall direct and ensure appropriate discipline and/or corrective action. Where the incident indicates policy, training, tactical, or equipment concerns, the Commander shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 27, 2019.
- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed six administrative misconduct investigations conducted by MCSO personnel outside of PSB and completed during this reporting period.

Three of the six completed misconduct investigations conducted outside of PSB resulted in sustained findings. In all three cases, the reports included documentation that appropriate discipline or corrective action was taken. In one of the six investigations, in addition to discipline, the need for a potential policy revision was identified.

***Paragraph 216.*** *If, after an investigation conducted by the Professional Standards Bureau, an employee's actions are found to violate policy, the Commander of the Professional Standards Bureau shall direct and ensure appropriate discipline and/or corrective action. Where the incident indicates policy, training, tactical, or equipment concerns, the Commander of the Professional Standards Bureau shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 27, 2019.
- GH-2 (Internal Investigations), most recently amended on June 28, 2019.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 41 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

Thirty-five of the completed investigations were conducted by PSB personnel. Seventeen resulted in a sustained finding against one or more MCSO employee. In 15 of these sustained investigations, the PSB Commander ensured that appropriate discipline and/or corrective action

WAI 44897

was recommended. In the two remaining cases, the employees left MCSO employment prior to the completion of the investigation or the determination of discipline. The PSB Commander provided the preliminary determination of the range of discipline in all 15 cases involving current MCSO employees. The PSB Commander cannot ensure that appropriate discipline or corrective action are the final outcome of sustained misconduct investigations, as the Appointing Authority makes the final decisions for discipline in both minor misconduct cases and in serious misconduct cases that result in PDHs. The hearing officer has the authority to change the findings or reduce the discipline.

**Paragraph 217.** *The Professional Standards Bureau shall conduct targeted and random reviews of discipline imposed by Commanders for minor misconduct to ensure compliance with MCSO policy and legal standards.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** Not applicable

Based on the requirements of the Second Order, District and Division Commanders will not impose discipline for minor misconduct. In all cases, the PSB Commander will determine the final findings for internal investigations and the presumptive range of discipline for those cases with sustained findings. The Appointing Authority will then make the final determination of discipline.

**Paragraph 218.** *The Professional Standards Bureau shall maintain all administrative investigation reports and files after they are completed for record-keeping in accordance with applicable law.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine compliance with this Paragraph, we observed that PSB maintains both hardcopy and electronic files intended to contain all documents required for compliance with this Paragraph.

A member of our Team inspected the file rooms where hardcopies of administrative investigations were stored and randomly reviewed case files to verify compliance on multiple occasions when PSB was housed at MCSO Headquarters. Our Team member also used the access granted to IAPro to randomly select internal affairs case files to verify that all information was being maintained electronically.

PSB completed the move to its new offsite facility in May 2018. Subsequent to the move, a member of our Team conducted an inspection of the file rooms in the new facility; and conducted a review of random internal investigations in IAPro to ensure ongoing compliance.

During our January 2019 site visit, a member of our Team verified continued compliance at the new PSB facility by inspecting both the criminal and administrative investigation file rooms and randomly reviewing internal affairs case files to verify that all information was also being electronically maintained in IAPro.

During our July 2019 site visit, a member of our Team verified, by accessing IAPro and reviewing randomly selected cases, that electronic files were being properly maintained.

During our October 2019 site visit, a member of our Team again verified compliance at the PSB facility by inspecting both the criminal and administrative investigation file rooms and randomly reviewing internal affairs case files to verify that all information is also being electronically maintained in IAPro.

## D.    Discipline

***Paragraph 219.*** *The Sheriff shall ensure that discipline for sustained allegations of misconduct comports with due process, and that discipline is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented regardless of the command level of the principal of the investigation.*

***Paragraph 220.*** *To ensure consistency in the imposition of discipline, the Sheriff shall review the MCSO's current disciplinary matrices and, upon approval of the parties and the Monitor, will amend them as necessary to ensure that they:*

a.      *establish a presumptive range of discipline for each type of violation;*

b.      *increase the presumptive discipline based on an employee's prior violations;*

c.      *set out defined mitigating and aggravating factors;*

d.      *prohibit consideration of the employee's race, gender, gender identity, sexual orientation, national origin, age, or ethnicity;*

e.      *prohibit conflicts, nepotism, or bias of any kind in the administration of discipline;*

WAI 44899

*f.*      *prohibit consideration of the high (or low) profile nature of the incident, including media coverage or other public attention;*

*g.*      *clearly define forms of discipline and define classes of discipline as used in policies and operations manuals;*

*h.*      *provide that corrective action such as coaching or training is not considered to be discipline and should not be used as a substitute for discipline where the matrix calls for discipline;*

*i.*      *provide that the MCSO will not take only non-disciplinary corrective action in cases in which the disciplinary matrices call for the imposition of discipline;*

*j.*      *provide that the MCSO will consider whether non-disciplinary corrective action is also appropriate in a case where discipline has been imposed;*

*k.*      *require that any departures from the discipline recommended under the disciplinary matrices be justified in writing and included in the employee's file; and*

*l.*      *provide a disciplinary matrix for unclassified management level employees that is at least as demanding as the disciplinary matrix for management level employees.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 27, 2019.
- GH-2 (Internal Investigations), most recently amended on June 28, 2019.
- Administrative Services Division Operations Manual, published on June 17, 2019.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, 20 of the 41 administrative misconduct investigations resulted in sustained findings against one or more members of MCSO. In 18 of the sustained cases, one or more of the principal employees were still employed at MCSO at the time findings or discipline decisions were made. Compliance for this Paragraph is based on the discipline findings for both minor and serious discipline. In those cases where only serious discipline is recommended, compliance findings specific to those cases are addressed in Paragraph 226.

Paragraph 220.a. requires a presumptive range of discipline for each type of violation. Of the total 20 sustained cases, 18 involved employees still employed by MCSO at the time discipline decisions were made. The PSB Commander determined and documented the presumptive discipline range in compliance with this Subparagraph.

WAI 44900

Paragraph 220.b. requires that presumptive discipline be increased if an employee has prior violations. In five of the 18 sustained investigations where discipline was assessed, the employee had prior sustained violations. The PSB Commander considered and increased the presumptive discipline based on the matrices in place at the time of the investigation.

Paragraph 220.c. requires that mitigating and aggravating factors be defined. Aggravating and mitigating factors are not specifically defined in the internal affairs investigation or discipline policy in effect prior to May 18, 2017. The revised discipline policy, effective May 18, 2017, does define these factors. These aggravating or mitigating factors are not identified by the PSB Commander, but are identified and considered by the Appointing Authority when making the final disciplinary decisions. During this reporting period, all of the sustained cases were initiated after May 18, 2017. The Appointing Authority provided justification and documentation for all factors he considered when making the final discipline decisions for these cases. We also found that he continues to specifically identify those instances where there are aggravating or mitigating factors in the justification documents when appropriate.

Paragraph 220.d. prohibits the consideration of any prohibited biases when determining discipline. None of the sustained cases that resulted in discipline that we reviewed during this reporting period included any indication that any biases were considered when determining discipline.

Paragraph 220.e. prohibits any conflicts, nepotism, or bias of any kind in the administration of discipline. None of the sustained cases we reviewed during this reporting period had any indication of conflicts, nepotism, or bias of any kind when determining the disciplinary sanction.

Paragraph 220.f. prohibits the consideration of the high (or low) profile nature of an incident when determining discipline. None of the sustained cases we reviewed during this reporting period indicated any consideration of the high- or low-profile nature of the incident when considering discipline.

Paragraph 220.g. requires that clearly defined forms of discipline and classes of discipline be defined. Phase 2 compliance is not applicable to this Subparagraph.

Paragraph 220.h. requires that corrective action such as coaching or training is not considered to be discipline and should not be used as a substitute for discipline. None of the sustained investigations resulted in the use of coaching or training as a substitute when discipline was required.

Paragraph 220.i. requires that MCSO will not take only non-disciplinary action in cases where the Discipline Matrices call for the imposition of discipline. None of the sustained cases we reviewed during this reporting period resulted in MCSO taking non-disciplinary action when the Discipline Matrices in effect required the imposition of discipline.

WAI 44901

Paragraph 220.j. requires that MCSO consider whether non-disciplinary corrective action is also appropriate in a case where discipline has been imposed. Investigators identified one case where non-disciplinary corrective action was also appropriate. We believe that in a second case non-disciplinary corrective action was also appropriate, but this was not addressed by MCSO.

Paragraph 220.k. requires that any departure from the discipline recommended under the Discipline Matrices be justified in writing and included in the employee's file.

During the last reporting period, 20 investigations with sustained findings resulted in employee discipline. Ten involved minor discipline; 10 involved serious discipline. In 14 of the 20 cases, the final discipline was the presumptive for the offense. In one case, the Appointing Authority mitigated the discipline sanction, and we agreed with his decision. In five of the cases, we disagreed with the final discipline imposed. We advised MCSO that should the agency fall short of compliance for the next reporting period, we will withdraw Phase 2 compliance for this Subparagraph.

During this reporting period, MCSO complied with all the requirements of this Subparagraph and remains in Phase 2 compliance. Eighteen investigations with sustained findings resulted in discipline or other action. Nine involved minor discipline; nine involved serious discipline. In 16 of the 18 cases where discipline was assessed, the final discipline was the presumptive for the category and offense. In one case, the Appointing Authority mitigated the discipline to a lower sanction within the range, and we concur with his decision to do so. In one case with significant aggravating factors, the Appointing Authority aggravated the discipline outside of the range, and we concur with the decision to do so.

As we have previously noted, compliance for this Paragraph is based on the final discipline outcome for all sustained investigations. Those instances that involve only serious discipline are specifically covered in Paragraph 226 of this Order.

Paragraph 220.l. requires that a Discipline Matrix for unclassified management employees be at least as demanding as the Discipline Matrix for management-level employees. We have reviewed the approved policies that affect discipline for unclassified management employees, and they comply with this requirement. During this reporting period, MCSO did not complete or submit any administrative investigations involving unclassified management employees.

WAI 44902

During this reporting period, all 18 sustained investigations where discipline occurred were both initiated and completed after May 18, 2017; and are subject to all the requirements relative to investigations and disciplinary procedures contained in policies revised on that date. The investigations initiated and completed after May 18, 2017 have both a discipline range and a presumptive discipline. Aggravating or mitigating the presumptive discipline requires a justification. In 16 of the 18 cases, the final discipline was the presumptive discipline identified in the matrices. In one case, the Appointing Authority mitigated the discipline based on a number of factors; and we agree with his decision to do so. In a second case, the discipline was aggravated outside of the range. Given the significant aggravating factors in this case, we agree with the decision to do so. The Appointing Authority provided a written justification in all of the sustained cases where discipline was imposed.

MCSO remains in compliance with this Paragraph.

**Paragraph 221.** *The Sheriff shall mandate that each act or omission that results in a sustained misconduct allegation shall be treated as a separate offense for the purposes of imposing discipline.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 27, 2019.
- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed 18 misconduct investigations with sustained allegations that resulted in the recommendation for discipline for current MCSO employees. We found that MCSO again met the requirements for compliance with this Paragraph.

**Paragraph 222.** *The Sheriff shall also provide that the Commander of the Professional Standards Bureau shall make preliminary determinations of the discipline to be imposed in all cases and shall document those determinations in writing, including the presumptive range of discipline for the sustained misconduct allegation, and the employee's disciplinary history.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 27, 2019.
- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, there were 18 sustained investigations that were completed after July 20, 2016 where discipline was recommended. In all of these cases, the PSB Commander determined and documented in writing the presumptive discipline or presumptive range of discipline based on the policies and Discipline Matrices in effect at the time of the investigation. The documentation submitted for this Paragraph included the category, offense number, and employee's discipline history.

### E. *Pre-Determination Hearings*

**Paragraph 223.** *If the Commander of the Professional Standards Bureau makes a preliminary determination that serious discipline (defined as suspension, demotion, or termination) should be imposed, a designated member of MCSO's command staff will conduct a pre-determination hearing and will provide the employee with an opportunity to be heard.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 27, 2019.
- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel where MCSO holds a Pre-Determination Hearing (PDH).

During this reporting period, 18 administrative misconduct investigations resulted in sustained findings against current MCSO employees. Nine investigations resulted in the recommendation for serious discipline. In all nine, MCSO held the Pre-Determination Hearings, as required

**Paragraph 224.** *Pre-determination hearings will be audio and video recorded in their entirety, and the recording shall be maintained with the administrative investigation file.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 27, 2019.
- Administrative Services Division Operations Manual, published on June 17, 2019.

**Phase 2:** In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

WAI 44904

During this reporting period, in all nine cases where a PDH was held, the hearing was audio- and video-recorded as required, included in the administrative file, and reviewed by a member of our Team.

**Paragraph 225.** *If an employee provides new or additional evidence at a pre-determination hearing, the hearing will be suspended and the matter will be returned to the internal affairs investigator for consideration or further investigation, as necessary. If after any further investigation or consideration of the new or additional evidence, there is no change in the determination of preliminary discipline, the matter will go back to the pre-determination hearing. The Professional Standards Bureau shall initiate a separate misconduct investigation if it appears that the employee intentionally withheld the new or additional evidence during the initial misconduct investigation.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 27, 2019.
- Administrative Services Division Operations Manual, published on June 17, 2019.

**Phase 2:** In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, nine sustained investigations resulted in a PDH and we reviewed all the recordings of these hearings. There were no instances where we, or the Appointing Authority, identified any concerns that required additional follow-up related to the requirements of this Paragraph.

**Paragraph 226.** *If the designated member of MCSO's command staff conducting the pre-determination hearing does not uphold the charges recommended by the Professional Standards Bureau in any respect, or does not impose the Commander of the Professional Standards Bureau's recommended discipline and/or non-disciplinary corrective action, the Sheriff shall require the designated member of MCSO's command staff to set forth in writing his or her justification for doing so. This justification will be appended to the investigation file.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 27, 2019.
- Administrative Services Division Operations Manual, published on June 17, 2019.

**Phase 2:** In compliance

WAI 44905

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During every site visit, we meet with the Appointing Authority and the Administrative Services Division to discuss any concerns with final outcomes or decisions that result from Pre-Determination Hearings. We have continued to emphasize to MCSO the need to comply with agency policies when determining disciplinary outcomes.

During our January 2018 site visit, we met with the Appointing Authority and Administrative Services Division personnel to discuss the PDH process and the final outcomes of cases. During the meeting, MCSO advised us that the Appointing Authority does not have the authority to reduce discipline based only on timeframe concerns when an employee appeals discipline in these cases. It is the Maricopa County Attorney's Office (MCAO) that reviews these cases and determines whether the cases should go forward. Both the Appointing Authority and the representative from the MCAO advised that they have taken some of these cases forward; but in others, they did not believe it was appropriate to do so, based on the totality of circumstances. The Parties present at the meeting also commented on their concerns regarding cases involving the Plaintiffs' class that might result in reductions in discipline as a result of the failure to complete the case within the 180-day timeframe. We discussed the specific requirements of Arizona Revised Statutes 38-1101, and that the statute only requires a "good faith" attempt to complete cases that result in suspensions, demotions, or dismissals within the 180-day timeframe. Since the time of our discussion in 2018, Arizona law has added a definition of good faith. A.R.S. 38-1101 now defines good faith as "honesty of purpose and absence of intent to defraud."

During that same site visit, we discussed those cases where a decision may be made after a PDH that a reduction in discipline will occur, and those cases where a decision to reduce the discipline may occur if an appeal is filed. It is our understanding from our meeting with the Appointing Authority and other staff who were present that MCSO consults with the MCAO in these cases and their input is related to the final outcomes. However, all the documentation we receive and review is authored and signed by the Appointing Authority, so our assessment can only consider any final decisions as his.

Prior to the last reporting period, MCSO had been in compliance with this Paragraph for multiple reporting periods. During the last reporting period, MCSO fell short of compliance due to the percentage of discipline findings we found non-compliant. We advised MCSO that should the agency fall short of compliance in the next reporting period, we will withdraw Phase 2 compliance.

During this reporting period, all nine cases forwarded for consideration of serious discipline resulted in serious discipline. The Appointing Authority provided a justification for the final decisions in all cases, and this information was provided to our Team in the submissions regarding closed internal affairs investigations. The Appointing Authority did not overturn any of the sustained findings by the PSB Commander. In one of the nine cases, a CRM case, the Appointing

WAI 44906

Authority mitigated the discipline based on the totality of circumstances. Our Team agreed with the decision by the Appointing Authority and approved the mitigated discipline. In a second case, also a CRM, the Appointing Authority – in this case, the Sheriff – aggravated the discipline outside of the range. We agreed with the decision and approved the discipline. There were no cases during this reporting period where our Team disagreed with the final discipline decision made by the Appointing Authority.

MCSO remains in Phase 2 compliance with this Paragraph.

***Paragraph 227.*** *The Sheriff shall promulgate MCSO policy which shall provide that the designated member of MCSO's command staff conducting a pre-determination hearing should apply the disciplinary matrix and set forth clear guidelines for the grounds on which a deviation is permitted. The Sheriff shall mandate that the designated member of MCSO's command staff may not consider the following as grounds for mitigation or reducing the level of discipline prescribed by the matrix:*

*a.    his or her personal opinion about the employee's reputation;*

*b.    the employee's past disciplinary history (or lack thereof), except as provided in the disciplinary matrix;*

*c.    whether others were jointly responsible for the misconduct, except that the MCSO disciplinary decision maker may consider the measure of discipline imposed on other employees involved to the extent that discipline on others had been previously imposed and the conduct was similarly culpable.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 27, 2019.

- Administrative Services Division Operations Manual, published on June 17, 2019.

**Phase 2:** In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed 18 administrative misconduct investigations where discipline was recommended. The serious sustained allegations in 9 of these investigations resulted in their referrals for Pre-Determination Hearings.

Paragraph 227.a. prohibits the designated member of command staff conducting a Pre-Determination Hearing from considering a personal opinion of an employee's reputation when determining discipline. There were no indications in our reviews of these investigations that any personal opinion was considered in making a disciplinary decision.

WAI 44907

Paragraph 227.b. prohibits the consideration of the employee's past disciplinary history (or lack thereof), except as provided in the Discipline Matrix. There were no instances where we determined that the member of command staff responsible for conducting the PDH considered disciplinary history outside of the requirements of this Paragraph.

Paragraph 227.c. prohibits the consideration of others jointly responsible for misconduct, except that the decision-maker may consider such discipline to the extent that discipline on others had been previously imposed and the conduct was similarly culpable. There were no indications in our reviews that the misconduct of others was improperly considered in the disciplinary decisions that were made.

***Paragraph 228.*** *The Sheriff or his designee has the authority to rescind, revoke or alter any disciplinary decision made by either the Commander of the Professional Standards Bureau or the appointed MCSO disciplinary authority so long as:*

a. *that decision does not relate to the Sheriff or his designee;*

b. *the Sheriff or his designee provides a thorough written and reasonable explanation for the grounds of the decision as to each employee involved;*

c. *the written explanation is placed in the employment files of all employees who were affected by the decision of the Sheriff or his designee; and*

d. *the written explanation is available to the public upon request.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 27, 2019.
- Administrative Services Division Operations Manual, published on June 17, 2019.

**Phase 2:** In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, there were no instances where the Sheriff or his designee rescinded, revoked, or altered any disciplinary decision made by either the Commander of the Professional Standards Bureau or the appointed MCSO disciplinary authority. As noted in Paragraph 226, in one case the Sheriff served as the Appointing Authority, and did aggravate the presumptive discipline identified by the PSB Commander.

WAI 44908

## F.      Criminal Misconduct Investigations

***Paragraph 229.*** *Whenever an internal affairs investigator or Commander finds evidence of misconduct indicating apparent criminal conduct by an employee, the Sheriff shall require that the internal affairs investigator or Commander immediately notify the Commander of the Professional Standards Bureau. If the administrative misconduct investigation is being conducted by a Supervisor outside of the Professional Standards Bureau, the Sheriff shall require that the Professional Standards Bureau immediately take over the administrative investigation. If the evidence of misconduct pertains to someone who is superior in rank to the Commander of the Professional Standards Bureau and is within the Commander's chain of command, the Sheriff shall require the Commander to provide the evidence directly to what he or she believes is the appropriate prosecuting authority—the Maricopa County Attorney, the Arizona Attorney General, or the United States Attorney for the District of Arizona—without notifying those in his or her chain of command who may be the subject of a criminal investigation.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review completed criminal misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed two criminal misconduct investigations. One was externally generated, and one was internally generated. Both were initiated and completed after July 20, 2016, and appropriately assigned to criminal investigators in PSB. In both cases, the potential misconduct was brought to the attention of the PSB Commander as required and an administrative misconduct investigation was also initiated. Neither involved someone superior in rank to the PSB Commander.


***Paragraph 230.*** *If a misconduct allegation will be investigated criminally, the Sheriff shall require that the Professional Standards Bureau not compel an interview of the principal pursuant to Garrity v. New Jersey, 385 U.S. 493 (1967), until it has first consulted with the criminal investigator and the relevant prosecuting authority. No other part of the administrative investigation shall be held in abeyance unless specifically authorized by the Commander of the Professional Standards Bureau in consultation with the entity conducting the criminal investigation. The Sheriff shall require the Professional Standards Bureau to document in writing all decisions regarding compelling an interview, all decisions to hold any aspect of an administrative investigation in abeyance, and all consultations with the criminal investigator and prosecuting authority.*

WAI 44909

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by both criminal and administrative investigators to ensure that they contain appropriate documentation that complies with the requirements of this Paragraph.

We previously determined that in many cases, the administrative investigation is not submitted and reviewed during the same reporting period as the criminal investigation, as generally, administrative investigations are finalized after the completion of the criminal investigation.  We discussed this issue with PSB during our January 2017 site visit.  To resolve the concern, PSB agreed to provide us with a copy of any criminal investigation when PSB submits the administrative misconduct investigation for our review, even if the criminal investigation has been previously submitted.  MCSO has been consistently providing copies of these criminal investigations with the administrative investigation since that time.

During this reporting period, we reviewed three administrative misconduct investigations where criminal misconduct may have also occurred.  Two had companion criminal investigations completed by MCSO, as required.  The criminal investigation in the third case was conducted by the law enforcement agency that had jurisdiction where the incident occurred.


***Paragraph 231.***  *The Sheriff shall require the Professional Standards Bureau to ensure that investigators conducting a criminal investigation do not have access to any statements by the principal that were compelled pursuant to Garrity.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

PSB is divided into criminal and administrative sections.  Criminal investigators and administrative investigators are housed on separate floors of the building.  Criminal investigators do not have access to the IAPro database for administrative investigations, and there are separate file rooms for criminal and administrative investigative documents and reports.  We have previously verified during our site visits that the required separation of criminal and administrative investigations and restricted access to IAPro is in place.

WAI 44910

In May 2018, PSB relocated to a new offsite location. After PSB's move to its new facility, we verified that criminal and administrative investigation files were housed on separate floors in the new facility. Criminal investigators do not have access to the IAPro database for administrative investigations, and there are separate and secured file rooms for criminal and administrative documents and reports.

During our October 2019 site visit, a member of our Team again verified that criminal and administrative investigative files are housed on separate floors, there is restricted access to both file rooms, and restricted access to IAPro remains in place.

*Paragraph 232. The Sheriff shall require the Professional Standards Bureau to complete all such administrative investigations regardless of the outcome of any criminal investigation, including cases in which the prosecuting agency declines to prosecute or dismisses the criminal case after the initiation of criminal charges. The Sheriff shall require that all relevant provisions of MCSO policies and procedures and the operations manual for the Professional Standards Bureau shall remind members of the Bureau that administrative and criminal cases are held to different standards of proof, that the elements of a policy violation differ from those of a criminal offense, and that the purposes of the administrative investigation process differ from those of the criminal investigation process.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine MCSO's compliance with this Paragraph, we review on a monthly basis administrative and criminal misconduct investigations conducted by MCSO.

During this reporting period, we reviewed two criminal misconduct investigations conducted by MCSO personnel. Both have a companion administrative misconduct investigation, as required; and are in compliance with the requirements of this Paragraph.

*Paragraph 233. If the investigator conducting the criminal investigation decides to close the investigation without referring it to a prosecuting agency, this decision must be documented in writing and provided to the Professional Standards Bureau. The Commander of the Professional Standards Bureau shall separately consider whether to refer the matter to a prosecuting agency and shall document the decision in writing.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

WAI 44911

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine MCSO's compliance with this Paragraph, we review criminal misconduct investigations conducted by MCSO on a monthly basis.

During this reporting period, both of the criminal investigations we reviewed were closed without submittal to a prosecuting agency. In both, the decisions were supported by the facts of the investigation, interviews, or other investigative follow-up.

In both cases reviewed, the investigators documented their conclusions and decisions to close the cases without submittal and the PSB Commander approved these decisions in writing.

***Paragraph 234.*** *If the investigator conducting the criminal investigation decides to refer the matter to a prosecuting agency, the Professional Standards Bureau shall review the information provided to the prosecuting agency to ensure that it is of sufficient quality and completeness. The Commander of the Professional Standards Bureau shall direct that the investigator conduct additional investigation when it appears that there is additional relevant evidence that may improve the reliability or credibility of the investigation. Such directions shall be documented in writing and included in the investigatory file.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine MCSO's compliance with this Paragraph, we review on a monthly basis criminal misconduct investigations conducted by MCSO.

During this reporting period, we reviewed two criminal misconduct investigations conducted by PSB personnel. Neither of the investigations were forwarded to a prosecutorial agency for potential criminal charges.

WAI 44912

**Paragraph 235.** *If the prosecuting agency declines to prosecute or dismisses the criminal case after the initiation of criminal charges, the Professional Standards Bureau shall request an explanation for this decision, which shall be documented in writing and appended to the criminal investigation report.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine MCSO's compliance with this Paragraph, we review criminal misconduct investigations conducted by MCSO on a monthly basis.

During this reporting period, there were no investigations submitted to any prosecutorial agency for criminal charging.


**Paragraph 236.** *The Sheriff shall require the Professional Standards Bureau to maintain all criminal investigation reports and files after they are completed for record-keeping in accordance with applicable law.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine compliance with this Paragraph, we observed that PSB maintains both hardcopy and electronic files that are intended to contain all the documents required per this Paragraph

During previous site visits at Headquarters, we inspected the file rooms where hardcopies of investigations were stored. Criminal and administrative investigation files were stored in separate rooms, and access to these rooms was restricted. Our random review of criminal investigation case files verified that PSB was maintaining files as required. A member of our Team also has access to IAPro, and has verified that case files are maintained in an electronic format.

During our January 2018 site visit, a member of our Team inspected the file rooms where hardcopies of criminal investigation were stored and randomly reviewed case files to verify compliance.

In May 2018, PSB relocated to a new offsite location. After the move, we verified that PSB was properly maintaining criminal investigation reports and files at its new facility.

WAI 44913

During our October 2019 site visit, a member of our Team again verified – by accessing IAPro and reviewing random cases – that PSB is properly maintaining electronic files of criminal investigations. A random review of hard copy files securely maintained by criminal investigators was also conducted and found to be compliant.

### G.     Civilian Complaint Intake, Communication, and Tracking

***Paragraph 237.*** *Within six months of the entry of this Order, the Monitor, in consultation with the Community Advisory Board, will develop and implement a program to promote awareness throughout the Maricopa County community about the process for filing complaints about the conduct of MCSO employees.*

**Phase 1**: Not applicable

**Phase 2:** Not applicable

We developed and implemented a Complaint Process Community Awareness Program to promote awareness throughout the Maricopa County community about the process for filing complaints about the conduct of MCSO employees. The program provides for distributing brochures describing the complaint process at quarterly community meetings and using public service announcements – made via local media outlets and social media – to provide basic information (in both English and Spanish) about MCSO's complaint process.

We contacted faith organizations and civic groups throughout Maricopa County requesting that they make complaint process information forms available to members of their congregations and groups. The Complaint Process Community Awareness Program incorporates input from the CAB, MCSO, and the ACLU of Arizona.

***Paragraph 238.*** *The Sheriff shall require the MCSO to accept all civilian complaints, whether submitted verbally or in writing; in person, by phone, by mail, or online; by a complainant, someone acting on the complainant's behalf, or anonymously; and with or without a signature from the complainant. MCSO will document all complaints in writing.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

**Phase 2:** In compliance

To assess compliance with this Paragraph, we review all new misconduct complaints received each month and completed misconduct investigations conducted by MCSO personnel. In addition, we review many initial complaint documents or initial phone calls, BWC videos, traffic stop videos, Supervisory Notes, Compliance and BIO reviews, and consider findings in the complaint testing process.

WAI 44914

During the last reporting period, there were no instances where either Court Compliance Unit or BIO personnel identified in their reviews that a supervisor had failed to initiate a complaint when appropriate. There were no completed administrative misconduct cases with any allegations of failure to take a complaint. There were no instances where we identified during our review of MCSO contacts with complainants that a complainant had attempted to make a prior complaint and was refused. There were no instances identified in the complaint intake testing process where an MCSO employee refused to take a complaint.

During this reporting period, MCSO initiated 145 new internal investigations and 132 service complaints. There were no complaints externally or internally generated for failing to take a complaint. Of the 41 completed administrative misconduct investigations we reviewed, there were no indications or allegations that the complainant had previously tried unsuccessfully to make a complaint. Our review of traffic stops for this reporting period did not identify any instances where a subject who was arrested made allegations of misconduct by MCSO personnel during his arrest that went unaddressed. Our review of Supervisory Notes during this reporting period did not identify any incidents where there were indications that a complaint had been made but not properly reported. We reviewed numerous complainant contacts, and found no indication that a supervisor initially refused to take a complaint or attempted to dissuade the complainant from making a complaint. Neither CID or BIO identified any instances in their reviews during this reporting period that indicated a complainant had attempted to file a complaint and been refused. We did not identify any complaint intake tests for this reporting period where MCSO failed to accept a complaint.

We continue to find that MCSO consistently accepts and records complaints as required for compliance with this Paragraph.


**Paragraph 239.** *In locations clearly visible to members of the public at the reception desk at MCSO headquarters and at all District stations, the Sheriff and the MCSO will post and maintain permanent placards clearly and simply describing the civilian complaint process that is visible to the public at all hours. The placards shall include relevant contact information, including telephone numbers, email addresses, mailing addresses, and Internet sites. The placards shall be in both English and Spanish.*

**Phase 1:** In compliance

- GJ-24 (Community Relations and Youth Programs), most recently revised on November 14, 2019.

**Phase 2:** In compliance

During this reporting period, the permanent placards were prominently displayed at MCSO Headquarters, and Monitoring Team members visiting MCSO Districts found that the permanent placards were also conspicuously displayed. The placard states that anyone who has a concern

WAI 44915

regarding the performance of any MCSO employee has the right to file a complaint in English or Spanish or their preferred language, to include American Sign Language; in person at any District facility or at the Professional Standards Bureau, by mail, by telephone, by fax, or online. The placard includes relevant contact information, including telephone numbers, email addresses, mailing addresses, and websites.

***Paragraph 240.*** *The Sheriff shall require all deputies to carry complaint forms in their MCSO vehicles. Upon request, deputies will provide individuals with complaint forms and information about how to file a complaint, their name and badge number, and the contact information, including telephone number and email address, of their immediate supervising officer. The Sheriff must provide all supervising officers with telephones. Supervising officers must timely respond to such complaints registered by civilians.*

**Phase 1:** In compliance

- EA-2 (Patrol Vehicles), most recently revised on February 20, 2019.
- GE-4 (Use, Assignment and Operation of Vehicles), most recently revised on June 27, 2019.
- GJ-24 (Community Relations and Youth Programs), most recently revised on November 14, 2019.

**Phase 2:** In compliance

During this reporting period, Monitoring Team members visiting District offices verified that MCSO maintained adequate supplies of complaint forms for deputies to carry in their vehicles. All deputies with whom Monitoring Team members made contact understood their obligations to provide individuals with complaint forms and information about how to file a complaint, their name and badge number, and the contact information for their immediate supervising officer.

Also, during this reporting period, Monitoring Team members verified that the supervisors with whom they made contact were in possession of MCSO-issued cellular telephones.

***Paragraph 241.*** *The Sheriff will ensure that the Professional Standards Bureau facility is easily accessible to members of the public. There shall be a space available for receiving walk-in visitors and personnel who can assist the public with filing complaints and/or answer an individual's questions about the complaint investigation process.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

In May 2018, PSB moved into the first and second floors of 101 West Jefferson Street. During our July 2018 site visit, we toured the facility. During this reporting period, Monitoring Team members visiting MCSO Districts inspected the placards and comment and complaint forms and noted that they all had been updated to reflect PSB's new address. The address was also updated on the comment and complaint form that is accessible to the public on MCSO's website.

The facility, the former East Court Building Library, is easily accessible to members of the public. The County Court facilities in the building are separate from the PSB reception area and offices. The PSB area is accessible from First Avenue, a major thoroughfare; and there is no required security screening of individuals entering the building through the First Avenue entrance. We visited the PSB facility during this reporting period. There was an MCSO employee stationed at the reception area desk in the entrance lobby to welcome visitors and provide information and assistance. As noted previously, the PSB facility's outside entrance located on First Avenue was well-marked and easily accessible to the public with no required security screening.

***Paragraph 242.*** *The Sheriff will also make complaint forms widely available at locations around the County including: the websites of MCSO and Maricopa County government; the lobby of MCSO's headquarters; each patrol District; and the Maricopa County government offices. The Sheriff will ask locations, such as public library branches and the offices and gathering places of community groups, to make these materials available.*

**Phase 1:** In compliance

- GJ-24 (Community Relations and Youth Programs), most recently revised on November 14, 2019.

**Phase 2:** In compliance

MCSO has complaint forms available in English and Spanish on the MCSO and Maricopa County websites. MCSO maintains a list – of MCSO facilities, County offices, and public locations where community groups meet – where Community Outreach Division personnel attempt to make the forms available.

During our October site visit, we visited five locations in Maricopa County that were included on MCSO's list of facilities where complaint forms are available to the public. All five facilities displayed an ample supply of complaint forms that were in English and Spanish and contained the correct PSB facility address. We also observed that the forms were placed in locations readily visible to the public.

WAI 44917

***Paragraph 243.*** *The Sheriff shall establish a free, 24-hour hotline for members of the public to make complaints.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

**Phase 2:** In compliance

In July 2016, MCSO established the free 24-hour hotline for members of the public to make complaints; the hotline continued to be operational during this reporting period. A Monitoring Team representative periodically called the hotline during this reporting period; and verified that the hotline is operational in both English and Spanish, and provides instructions in both languages on how to register a complaint. The recording advises callers that if the call is an emergency, they are to call 911. Callers are requested to provide their name, telephone number, and a brief summary of their complaint. If callers leave a recorded message, they are advised that MCSO will contact them as soon as possible. If callers do not wish to leave a recorded message, they are provided with a telephone number to call to speak to a supervisor. That number connects the callers to the MCSO switchboard operator, who will connect the caller to an appropriate supervisor. Callers are further advised of MCSO's operating hours if they wish to contact PSB directly.

The hotline is housed in PSB, and PSB personnel access any recorded messages at the beginning of each business day. During this reporting period, PSB personnel reported that the hotline received the following complaints:

- In the first complaint, the complainant self-identified as a former MCSO employee and complained that they were denied a ride-along.

- In the second complaint, the complainant alleged that a Detention Officer at Fourth Avenue Jail was rude to her son, who is an inmate.

- In the third complaint, the complainant stated that she was unable to locate her daughter in the MCSO jail system.

The procedures established and followed by PSB provide for creating a record of every complaint received on the hotline and maintaining a log of follow-up actions regarding referral of the complaint.

WAI 44918

**Paragraph 244.** *The Sheriff shall ensure that the MCSO's complaint form does not contain any language that could reasonably be construed as discouraging the filing of a complaint, such as warnings about the potential criminal consequences for filing false complaints.*

**Phase 1:** In compliance

- GJ-24 (Community Relations and Youth Programs), most recently revised on November 14, 2019.

**Phase 2:** In compliance

Our review of the English and Spanish complaint forms' content did not reveal any language that could reasonably be construed as discouraging the filing of a complaint.

**Paragraph 245.** *Within two months of the entry of this Order, complaint forms will be made available, at a minimum, in English and Spanish. The MCSO will make reasonable efforts to ensure that complainants who speak other languages (including sign language) and have limited English proficiency can file complaints in their preferred language. The fact that a complainant does not speak, read, or write in English, or is deaf or hard of hearing, will not be grounds to decline to accept or investigate a complaint.*

**Phase 1:** In compliance

- GJ-24 (Community Relations and Youth Programs), most recently revised on November 14, 2019.

**Phase 2:** In compliance

Complaint forms in English and Spanish are accessible on MCSO's website. The complaint form states that anyone who has a concern regarding the performance of any MCSO employee has the right to file a complaint – in English or Spanish or their preferred language, to include American Sign Language – in person at any District facility or at the Professional Standards Bureau, by mail, by telephone, by fax, or online. The forms provide street addresses, contact numbers, and website information.

During this reporting period, no grievances were filed that met the criteria for transmitting to the Monitor.

***Paragraph 246.*** *In the course of investigating a civilian complaint, the Professional Standards Bureau will send periodic written updates to the complainant including:*

a.   *within seven days of receipt of a complaint, the Professional Standards Bureau will send non-anonymous complainants a written notice of receipt, including the tracking number assigned to the complaint and the name of the investigator assigned. The notice will inform the complainant how he or she may contact the Professional Standards Bureau to inquire about the status of a complaint;*

b.   *when the Professional Standards Bureau concludes its investigation, the Bureau will notify the complainant that the investigation has been concluded and inform the complainant of the Bureau's findings as soon as is permitted by law; and*

c.   *in cases where discipline is imposed, the Professional Standards Bureau will notify the complainant of the discipline as soon as is permitted by law.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

**Phase 2:**  In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed 41 administrative misconduct investigations conducted by MCSO personnel. Of these, 18 were externally generated.

Paragraph 246.a. requires that a civilian complainant receive a written notice of receipt of his/her complaint within seven days. This letter must include the tracking number, the name of the investigator assigned, and information regarding how the complainant can inquire about the status of his/her complaint. In all 18 externally generated cases where PSB had contact information for the complainant, the letter was sent within seven days as required. All of the letters sent and reviewed included the name of the investigator and information regarding how the complainant could inquire about the status of the complaint.

Paragraph 246.b. requires that PSB notify a civilian complainant of the outcome of the investigation. In all of the externally generated complaints, the complainant was provided a notice of the outcome when contact information was known.

Paragraph 246.c. requires that PSB notify a civilian complainant of any discipline imposed as soon as permitted by law. In all of the externally generated complaints with sustained findings, PSB properly notified the complainant of the sustained findings and the discipline imposed when contact information for the complainant was known.

WAI 44920

***Paragraph 247.*** *Notwithstanding the above written communications, a complainant and/or his or her representative may contact the Professional Standards Bureau at any time to determine the status of his or her complaint. The Sheriff shall require the MCSO to update the complainant with the status of the investigation.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

**Phase 2**: In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed 41 administrative misconduct investigations conducted by MCSO. Externally generated complaints resulted in 18 of the investigations. We did not identify any instances where a complainant was discouraged from, or denied, contact with MCSO investigators to determine the status of his/her complaint, or to request and receive an update. MCSO appropriately had contact with complainants as required in Paragraph 246 in all of these cases where the complainant was known and wanted to participate in the investigation. In one of the cases, MCSO personnel reported that they had additional contact with the complainant during the course of the investigation.


***Paragraph 248.*** *The Professional Standards Bureau will track, as a separate category of complaints, allegations of biased policing, including allegations that a deputy conducted an investigatory stop or arrest based on an individual's demographic category or used a slur based on an individual's actual or perceived race, ethnicity, nationality, or immigration status, sex, sexual orientation, or gender identity. The Professional Standards Bureau will require that complaints of biased policing are captured and tracked appropriately, even if the complainant does not so label the allegation.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

WAI 44921

Each month, PSB provides a list of new complaints alleging biased policing. PSB also provides all closed investigations where biased policing was alleged. For this Paragraph, only allegations of biased policing that do not affect the Plaintiffs' class are reported. Those complaints alleging bias against members of the Plaintiffs' class are captured in a separate category and reported under Paragraphs 275-288.

During the last reporting period, PSB submitted two investigations for our review where potential bias was alleged that did not affect members of the Plaintiffs' class. Both investigations were initiated and completed after July 20, 2016; investigated by PSB; and tracked in a separate category as required by this Paragraph.

During this reporting period, PSB did not submit for our review any investigation where reporting under this Paragraph is applicable.

***Paragraph 249.*** *The Professional Standards Bureau will track, as a separate category of complaints, allegations of unlawful investigatory stops, searches, seizures, or arrests.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine Phase 2 compliance for this Paragraph, we review a monthly report from PSB that provides the information required for compliance.

To ensure that we are consistently informed of complaints relative to this Paragraph, PSB provides information concerning these investigations in its monthly document submission relative to this Paragraph.

During the last reporting period, PSB submitted for our review two investigations alleging unlawful investigatory stops, searches, seizures, or arrests. Both were tracked in a separate category as required by this Paragraph.

During this reporting period, MCSO did not submit for our review any investigation where reporting under this Paragraph is applicable.

WAI 44922

***Paragraph 250.*** *The Professional Standards Bureau will conduct regular assessments of the types of complaints being received to identify and assess potential problematic patterns and trends.*

**Phase 1:** In compliance

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

PSB continues to prepare a quarterly assessment of the types of complaints received to identify and assess potential problematic patterns or trends. During this reporting period, there were 135 complaints received; 33 of which alleged rude behavior and 20 of which alleged that employees failed to follow proper procedures and office directives. There were 11 investigations opened into allegations of on- or off-duty crime by MCSO employees with no apparent trend identified at this time. There were five investigations opened in relation to allegations of deputies mishandling investigations and calls for service; three of those investigations were opened in District 2. There were seven complaints alleging bias-based policing.

PSB identified the Estrella Jail facility and the Fourth Avenue Jail facility as the two Divisions that received the most complaints during this reporting period. The Estrella Jail facility received 13 complaints resulting in misconduct investigations. Four of the investigations involved allegations of the use of profanity and disparaging remarks between employees. There were four investigations where the allegations involved employees' verbal abuse, use of profanity, and rude behavior toward members of the public. The remaining five complaints did not follow a pattern or trend that could be identified. The Fourth Avenue Jail received 13 complaints during this reporting period. There were four complaints alleging that Detention Officers taunted, harassed, used profanity, and made inappropriate comments toward inmates and members of the public. Two investigations were opened alleging that employees used inappropriate or excessive use of force. The remaining seven complaints did not follow a pattern or trend that could be identified.

PSB identified patterns and potential issues with certain employees who were involved in numerous internal investigations.

- One employee was identified as the principal in three internal investigations. The allegations in the investigations are related to rude, aggressive, and confrontational behavior when responding to a call for service and during two traffic stops.

- One employee was identified as the principal in two internal investigations involving allegations of combative behavior and an unwillingness to listen while responding to call for service.

WAI 44923

PSB also includes the information required by this Paragraph in its semi-annual public Misconduct Investigations Report, which is required under Paragraph 251. The most recent semi-annual report for the period of January 1-June 30, 2019, contains the issues identified as potentially problematic patterns or trends for that six-month period.

MCSO remains in compliance with this requirement.

## H. Transparency Measures

**Paragraph 251.** *The Sheriff shall require the Professional Standards Bureau to produce a semi-annual public report on misconduct investigations, including, at a minimum, the following:*

a. *summary information, which does not name the specific employees involved, about any sustained allegations that an employee violated conflict-of-interest rules in conducting or reviewing misconduct investigations;*

b. *aggregate data on complaints received from the public, broken down by district; rank of principal(s); nature of contact (traffic stop, pedestrian stop, call for service, etc.); nature of allegation (rudeness, bias-based policing, etc.); complainants' demographic information; complaints received from anonymous complainants or third parties; and principals' demographic information;*

c. *analysis of whether any increase or decrease in the number of civilian complaints received from reporting period to reporting period is attributable to issues in the complaint intake process or other factors;*

d. *aggregate data on internally-generated misconduct allegations, broken down by similar categories as those for civilian complaints;*

e. *aggregate data on the processing of misconduct cases, including the number of cases assigned to Supervisors outside of the Professional Standards Bureau versus investigators in the Professional Standards Bureau; the average and median time from the initiation of an investigation to its submission by the investigator to his or her chain of command; the average and median time from the submission of the investigation by the investigator to a final decision regarding discipline, or other final disposition if no discipline is imposed; the number of investigations returned to the original investigator due to conclusions not being supported by the evidence; and the number of investigations returned to the original investigator to conduct additional investigation;*

f. *aggregate data on the outcomes of misconduct investigations, including the number of sustained, not sustained, exonerated, and unfounded misconduct complaints; the number of misconduct allegations supported by the appropriate standard of proof; the number of sustained allegations resulting in a non-disciplinary outcome, coaching, written reprimand, suspension, demotion, and termination; the number of cases in which findings*

WAI 44924

*were changed after a pre-determination hearing, broken down by initial finding and final finding; the number of cases in which discipline was changed after a pre-determination hearing, broken down by initial discipline and final discipline; the number of cases in which findings were overruled, sustained, or changed by the Maricopa County Law Enforcement Merit System Council, broken down by the finding reached by the MCSO and the finding reached by the Council; and the number of cases in which discipline was altered by the Council, broken down by the discipline imposed by the MCSO and the disciplinary ruling of the Council; and similar information on appeals beyond the Council; and*

g.  *aggregate data on employees with persistent or serious misconduct problems, including the number of employees who have been the subject of more than two misconduct investigations in the previous 12 months, broken down by serious and minor misconduct; the number of employees who have had more than one sustained allegation of minor misconduct in the previous 12 months, broken down by the number of sustained allegations; the number of employees who have had more than one sustained allegation of serious misconduct in the previous 12 months, broken down by the number of sustained allegations; and the number of criminal prosecutions of employees, broken down by criminal charge.*

**Phase 1:** In compliance

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

The PSB Operations Manual identifies the PSB Commander as responsible for preparing the semi-annual public report on misconduct investigations. The manual also contains provisions for the production of summary information regarding sustained conflict of interest violations; an analysis of the complaint intake process; and aggregate data on complaints (internal and external), processing of misconduct cases, outcomes of misconduct cases, and employees with persistent misconduct problems.

In July 2019, PSB issued and posted on the MCSO website its semi-annual public report for period of July 1-December 31, 2018. PSB also incorporated information relevant to Paragraph 192 in this report, which requires that PSB review, at least semi-annually, all misconduct investigations that were assigned outside the Bureau to determine whether or not the investigation was properly categorized, whether the investigation was properly conducted, and whether appropriate findings were reached. PSB also incorporated information relevant to Paragraph 250 in this report, which includes an assessment of potential problematic patterns or trends, based on a review on complaints received, for the time period of January 1-June 30, 2019. This report was published in January 2020, and it was posted on MCSO's website.

WAI 44925

During our October 2019 site visit, PSB informed us that it developed a voluntary survey for complainants to complete after the conclusion of the investigation, which would capture demographic information in relation to the complainants for external complaints. In October, MCSO provided us with a copy of the survey; and we provided our feedback to MCSO. MCSO has identified a funding source for prepaid postage return envelopes. The use of the prepaid postage return envelopes will allow the complainants to mail the survey to MCSO without having to incur any fees. During our January 2020 site visit, PSB informed us that the Bureau commenced distribution of the surveys to complainants for cases that were closed in January 2020. In addition, PSB is also informing complainants of a web-based version of the survey that can be completed online. PSB will now collect all of the voluntary surveys that are returned and include the relevant demographic information in the next semi-annual report.

MCSO remains in compliance with this requirement.

*Paragraph 252. The Sheriff shall require the MCSO to make detailed summaries of completed internal affairs investigations readily available to the public to the full extent permitted under state law, in electronic form on a designated section of its website that is linked to directly from the MCSO's home page with prominent language that clearly indicates to the public that the link provides information about investigations of misconduct alleged against MCSO employees.*

**Phase 1:** In compliance

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

PSB publishes detailed summaries each month of completed misconduct investigations in an electronic format that is accessible via MCSO's website. The following data fields have been identified for public disclosure: Internal Affairs Number; Date Opened; Incident Type; Original Complaint; Policy Violation(s) Alleged/Outcome; Discipline; Investigative Summary; and Date Completed. During our April 2017 site visit, we approved the PSB template containing detailed summaries of completed misconduct investigations for placement on the MCSO website. Each reporting period, we conduct a review of the detailed summaries of completed misconduct investigations to ensure that the content is consistent with the requirements of this Paragraph. In addition, we verify that the monthly detailed summaries of completed misconduct investigations are posted on MCSO's website for public review.

During this reporting period, PSB made the monthly detailed summaries of completed internal investigations for October, November, and December 2019 available to the public in a designated section on the homepage of MCSO's website. The reports provide significant details regarding alleged misconduct, the findings of the investigation, and, if there is a finding of misconduct, what type of discipline was imposed. MCSO remains in compliance with this requirement.

WAI 44926

**Paragraph 253.** *The MCSO Bureau of Internal Oversight shall produce a semi-annual public audit report regarding misconduct investigations. This report shall analyze a stratified random sample of misconduct investigations that were completed during the previous six months to identify any procedural irregularities, including any instances in which:*

a.  *complaint notification procedures were not followed;*

b.  *a misconduct complaint was not assigned a unique identifier;*

c.  *investigation assignment protocols were not followed, such as serious or criminal misconduct being investigated outside of the Professional Standards Bureau;*

d.  *deadlines were not met;*

e.  *an investigation was conducted by an employee who had not received required misconduct investigation training;*

f.  *an investigation was conducted by an employee with a history of multiple sustained misconduct allegations, or one sustained allegation of a Category 6 or Category 7 offense from the MCSO's disciplinary matrices;*

g.  *an investigation was conducted by an employee who was named as a principal or witness in any investigation of the underlying incident;*

h.  *an investigation was conducted of a superior officer within the internal affairs investigator's chain of command;*

i.  *any interviews were not recorded;*

j.  *the investigation report was not reviewed by the appropriate personnel;*

k.  *employees were promoted or received a salary increase while named as a principal in an ongoing misconduct investigation absent the required written justification;*

l.  *a final finding was not reached on a misconduct allegation;*

m.  *an employee's disciplinary history was not documented in a disciplinary recommendation; or*

n.  *no written explanation was provided for the imposition of discipline inconsistent with the disciplinary matrix.*

**Phase 1:** In compliance

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

**Phase 2:** In compliance

WAI 44927

During our January 2018 site visit, the Bureau of Internal Oversight (BIO) Commander reported that the semi-annual public audit report regarding misconduct investigations had not yet been prepared. After a telephone conference between BIO and us on January 10, 2018, it was determined that the semi-annual public audit report would be placed on hold while BIO's Audit and Inspections Unit (AIU) developed the appropriate methodology for conducting the inspection. On June 26, 2018 we approved the methodology for the inspection, which would start with an inspection of investigations that commenced after November 1, 2017. AIU is conducting monthly inspections of misconduct investigations in lieu of conducting a semi-annual audit. During this reporting period, AIU prepared inspection reports for misconduct investigations that closed during August, September, and October 2019.

When perceived deficiencies are identified, AIU requests a BIO Action Form from the specific District/Division Commander to address the issue(s).

MCSO remains in compliance with this requirement.

### I.   *Testing Program for Civilian Complaint Intake*

***Paragraph 254.*** *The Sheriff shall initiate a testing program designed to assess civilian complaint intake. Specifically, the testing program shall assess whether employees are providing civilians appropriate and accurate information about the complaint process and whether employees are notifying the Professional Standards Bureau upon the receipt of a civilian complaint.*

**Phase 1:** In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

**Phase 2:** In compliance

To meet the requirements of this Paragraph, AIU contracted with two vendors: Progressive Management Resources (PMR), which is responsible for conducting complaint intake testing via telephone, email, U.S. Mail, and MCSO's website; and the Arizona Fair Housing Center (AFHC), which is responsible for conducting in-person tests. We receive and review documentation of these tests – including any available audio-recorded documentation – as they are completed, as part of our monthly document requests. PMR does not advise AIU of the tests in advance; instead, PMR emails AIU once a test has been completed with documentation of the test.

During the last reporting period, we had concerns about two tests we reviewed; though we believe that AIU took appropriate action in response to both of these tests. We discussed both tests further with MCSO during our January site visit. In the first test, a PMR tester called the Communications Division to make a complaint about a rude interaction she had with a detective

in Anthem. AIU appropriately noted that the Communications Division employee with whom the tester interacted violated GI-1 (Radio and Enforcement Communications Procedures), because she did not obtain the complainant's name and contact information, did not contact the on-duty supervisor in the applicable District, and did not email the Early Identification Unit (EIU) with the information. AIU took appropriate action by completing a BIO Action Form for the employee. In the second test that we found concerning, an AFHC tester visited a District office to make a complaint about three uniformed deputies being loud and using profanity at a restaurant. Although the tester was provided with a Comment and Complaint Form, the employee did not immediately forward the complaint to the on-duty supervisor. As we discussed with MCSO during our January site visit, had this been a real complaint from a community member, MCSO could have potentially lost vital information about potential misconduct. Again in this case, AIU took appropriate action; it noted on its documentation that the deficiency was discussed with the employee and documented in Blue Team.

During this reporting period, the two vendors conducted four complaint intake tests. AFHC conducted two in-person tests; and PMR conducted two tests, one via telephone and one via MCSO's website. In all four tests, the testers described the MCSO employees with whom they interacted as courteous and professional. However, in one of the AFHC tests, the tester added a comment to his testing documentation that indicated that he may have believed otherwise. In this test, the tester complained to MCSO personnel at a District office that the reckless driving of a deputy "caused him to swerve and spill his food and drink inside the cab of his vehicle," per MCSO's documentation of the incident. On his testing documentation, the tester wrote, "I did not find the woman on the phone to be curteous [sic], interested in [w]hat I had to say. She was a bit flippant because I didn't have a name [of the involved deputy]." While MCSO responded appropriately and in a timely fashion to this complaint, AIU did not document the tester's concern. We will discuss this case further with MCSO during our upcoming site visit.

This Paragraph requires that MCSO develop a "testing program" that assesses "whether employees are providing civilians appropriate and accurate information about the complaint process and whether employees are notifying the Professional Standards Bureau upon the receipt of a civilian complaint." MCSO is in compliance with this Paragraph because – with the collaboration of two independent vendors – it is coordinating a testing program that meets the requirements. We evaluate MCSO's compliance with this Paragraph based on how the agency responds to the outcomes of the tests, regardless of whether the tests "succeed" or "fail." (In contrast, Paragraph 238 requires that MCSO accept and document in writing "all civilian complaints," however they are submitted. See Paragraph 238.) For Paragraph 254, we believe that MCSO can learn a great deal from both the successful and unsuccessful complaint intake tests conducted by its vendors' representatives, and we have discussed with AIU how MCSO can make agency-wide adjustments based on what it learns. For instance, following several tests in which front-line staff responded inappropriately to complaint intake tests, we have encouraged MCSO to provide refresher training on the complaint process to all employees who interact with the public. In addition, AIU is currently developing a complaint intake checklist for

WAI 44929

administrative staff. We are also discussing with MCSO how executive staff explore and implement the recommendations made by AIU personnel in its monthly inspections of complaint intake tests. We will follow up on these efforts during our upcoming site visit.

***Paragraph 255.*** *The testing program is not intended to assess investigations of civilian complaints, and the MCSO shall design the testing program in such a way that it does not waste resources investigating fictitious complaints made by testers.*

**Phase 1:** In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

**Phase 2:** In compliance

AIU has informed both vendors it has contracted with of this requirement. AIU has created several procedures to ensure that the Complaint Intake Testing Program does not waste resources investigating fictitious complaints made by testers – including setting parameters for the types of inquiries that testers make, and creating official identification cards for testers designating them as such. For in-person tests, AIU has required that the vendor it has contracted with inform AIU in advance of all tests, and AIU personnel make themselves available via telephone if testers encounter any issue as they lodge their test complaints.

***Paragraph 256.*** *The testing program shall assess complaint intake for complaints made in person at MCSO facilities, complaints made telephonically, by mail, and complaints made electronically by email or through MCSO's website. Testers shall not interfere with deputies taking law enforcement action. Testers shall not attempt to assess complaint intake in the course of traffic stops or other law enforcement action being taken outside of MCSO facilities.*

**Phase 1:** In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

**Phase 2:** In compliance

WAI 44930

As noted above, AIU has contracted with two vendors to meet the complaint intake testing requirements. AIU advised both vendors that testers shall not interfere with deputies taking law enforcement action, nor shall they attempt to assess complaint intake in the course of traffic stops or other law enforcement action being taken outside of MCSO facilities.

AIU has asked the vendor responsible for in-person testing to inform AIU in advance of all tests, and AIU personnel make themselves available via telephone if testers encounter any issue as they lodge their test complaints.

**Paragraph 257.** *The testing program shall include sufficient random and targeted testing to assess the complaint intake process, utilizing surreptitious video and/or audio recording, as permitted by state law, of testers' interactions with MCSO personnel to assess the appropriateness of responses and information provided.*

**Phase 1:** In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

**Phase 2:** In compliance

AIU has informed both vendors it has contracted with of the requirements of this Paragraph. We receive copies of the recordings following the completion of the tests. Per the agreed-upon methodology, all tests conducted via telephone are audio-recorded; and all in-person testers' interactions with MCSO personnel are video-recorded to assess the appropriateness of responses and information provided.

**Paragraph 258.** *The testing program shall also assess whether employees promptly notify the Professional Standards Bureau of civilian complaints and provide accurate and complete information to the Bureau.*

**Phase 1:** In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

**Phase 2:** In compliance

WAI 44931

AIU has informed both vendors it has contracted with of the requirements of this Paragraph so that the tests conducted by both vendors shall also assess whether employees promptly notify the PSB of civilian complaints and provide accurate and complete information to the Bureau.

As it receives documentation about completed tests from its vendors, AIU reviews the information; and issues Action Forms, authors memorandums of concern, or takes other appropriate action if a test fails or raises any concerns about the conduct of MCSO employees.

**Paragraph 259.** *MCSO shall not permit current or former employees to serve as testers.*

**Phase 1:** In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

**Phase 2:** In compliance

AIU has informed both vendors it has contracted with to conduct the tests of this requirement. AIU personnel have informed us that no current or former employees have served, or will serve in the future, as testers.

**Paragraph 260.** *The MCSO shall produce an annual report on the testing program. This report shall include, at a minimum:*

a.  *a description of the testing program, including the testing methodology and the number of tests conducted broken down by type (i.e., in-person, telephonic, mail, and electronic);*

b.  *the number and proportion of tests in which employees responded inappropriately to a tester;*

c.  *the number and proportion of tests in which employees provided inaccurate information about the complaint process to a tester;*

d.  *the number and proportion of tests in which employees failed to promptly notify the Professional Standards Bureau of the civilian complaint;*

e.  *the number and proportion of tests in which employees failed to convey accurate information about the complaint to the Professional Standards Bureau;*

f.  *an evaluation of the civilian complaint intake based upon the results of the testing program; and*

g.    *a description of any steps to be taken to improve civilian complaint intake as a result of the testing program.*

**Phase 1:**  In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on October 30, 2018.

**Phase 2:**  Not in compliance

We have discussed with AIU personnel the requirements of this Paragraph.  Although Paragraph 260 requires that MCSO produce an annual report summarizing its complaint intake testing, AIU has begun completing monthly reports; we find that these reports accurately summarize the results of the complaint intake tests and any follow-up actions taken by MCSO.

To date, AIU has not published any annual reports as required by this Paragraph.  MCSO provided proposed methodology, as well as a draft template, for the Parties' review.  The template contained the required elements per this Paragraph, and was organized clearly.  The first annual report on the complaint intake testing program is due on September 15.

WAI 44933

# Section 13: Community Outreach and Community Advisory Board

**COURT ORDER XVI. COMMUNITY OUTREACH AND COMMUNITY ADVISORY BOARD**

*Paragraph 261.* *The Community Advisory Board may conduct or retain a consultant to conduct a study to identify barriers to the filing of civilian complaints against MCSO personnel.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

During this reporting period, the CAB continued to explore the possibility of retaining a consultant to conduct a study to identify barriers to the filing of civilian complaints against MCSO personnel, by researching polling firms that are experienced in working with Latino populations.

*Paragraph 262.* *In addition to the administrative support provided for in the Supplemental Permanent Injunction, (Doc. 670 ¶ 117), the Community Advisory Board shall be provided with annual funding to support its activities, including but not limited to funds for appropriate research, outreach advertising and website maintenance, stipends for intern support, professional interpretation and translation, and out-of-pocket costs of the Community Advisory Board members for transportation related to their official responsibilities. The Community Advisory Board shall submit a proposed annual budget to the Monitor, not to exceed $15,000, and upon approval of the annual budget, the County shall deposit that amount into an account established by the Community Advisory Board for that purpose. The Community Advisory Board shall be required to keep detailed records of expenditures which are subject to review.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

In July 2018, the Monitor approved CAB's proposed budget. The budget includes the following categories: community meetings; video production (to produce a short video in English and Spanish that provides information about the CAB and the MCSO complaint process); marketing materials; stipends for an assistant to help coordinate CAB meeting logistics; and reimbursement for CAB members' meeting expenses.

Following the Monitor's approval of the CAB's budget, the CAB established a bank account, and the County provided the $15,000. CAB members developed procedures for tracking funds and receiving reimbursement. During our January 2019 site visit, we met with CAB members to discuss these procedures and review the CAB's expenditures to date; these records appear to be in order. We review the CAB's expenditures periodically.

WAI 44934

**COURT ORDER XVII.        SUPERVISION AND STAFFING**

***Paragraph 263.*** *The following Section of this Order represents additions and amendments to Section X of the first Supplemental Permanent Injunction, Supervision and Evaluations of Officer Performance, and the provisions of this Section override any conflicting provisions in Section X of the first Supplemental Permanent Injunction.*

***Paragraph 264.*** *The Sheriff shall ensure that all patrol deputies shall be assigned to a primary, clearly identified, first-line supervisor.*

**Phase 1:** In compliance

- GB-2 (Command Responsibility), most recently amended on June 28, 2019.

**Phase 2:** In compliance

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the fourth quarter of 2019. During this reporting period, consistent with our methodology, for October, we reviewed a sample of shift rosters from Districts 4, 6, and 7, and Lake Patrol; for November, we reviewed a sample of shift rosters from Districts 1, 2, and 3; and for December, we reviewed a sample of shift rosters from Districts 4, 6, and 7, and Lake Patrol. Monthly and daily rosters indicated that deputies were assigned to one single consistent supervisor.

***Paragraph 265.*** *First-line patrol supervisors shall be responsible for closely and consistently supervising all deputies under their primary command.*

**Phase 1:** In compliance

- GB-2 (Command Responsibility), most recently amended on June 28, 2019.

**Phase 2:** Not in compliance

WAI 44935

Paragraph 265 is a general directive that covers several aspects of supervision. There are several requirements covered in other Paragraphs of this Order that directly concern this Paragraph; these requirements must be met before MCSO can establish compliance with Paragraph 265. We have determined that for MCSO to meet the requirements of this Paragraph, MCSO must be in compliance with Paragraphs 83, 85, 89, 90, 91, 93, and 94. During this reporting period, MCSO was in compliance with Paragraphs 83, 85, 89, 90, and 93. During this reporting period, MCSO did not achieve compliance with Paragraphs 91 and 94. Compliance with Paragraph 91 improved in the third quarter to 93.33%. In the fourth quarter, the compliance rate with Paragraph 91 was 90.47%. For MCSO to achieve compliance with this Paragraph, it must remain in compliance with Paragraphs 83, 85, 89, 90, and 93; and attain compliance with Paragraphs 91 and 94.

***Paragraph 266.*** *First-line patrol supervisors shall be assigned as primary supervisor to no more persons than it is possible to effectively supervise. The Sheriff should seek to establish staffing that permits a supervisor to oversee no more than eight deputies, but in no event should a supervisor be responsible for more than ten persons. If the Sheriff determines that assignment complexity, the geographic size of a district, the volume of calls for service, or other circumstances warrant an increase or decrease in the level of supervision for any unit, squad, or shift, it shall explain such reasons in writing, and, during the period that the MCSO is subject to the Monitor, shall provide the Monitor with such explanations. The Monitor shall provide an assessment to the Court as to whether the reduced or increased ratio is appropriate in the circumstances indicated.*

**Phase 1:** In compliance

- GB-2 (Command Responsibility), most recently amended on June 28, 2019.

**Phase 2:** In compliance

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the fourth quarter of 2019. During this reporting period, consistent with our methodology, for October, we reviewed a sample of shift rosters from Districts 4, 6, and 7, and Lake Patrol; for November, we reviewed a sample of shift rosters from Districts 1, 2, and 3; and for December, we reviewed a sample of shift rosters from Districts 4, 6, and 7, and Lake Patrol. Monthly and daily rosters indicated that deputies were assigned to one single consistent supervisor. For the 66 dates selected in this reporting period, all shifts were in compliance. There were 23 span of control memos generated during this reporting period, indicating that those shifts or part of those shifts exceeded the supervisor-deputy ratio of 1:8. Four of the span of control memos were generated by District 1. Fourteen of the span of control memos were generated by District 2. Six of the span of control memos were generated by District 3. MCSO remains in compliance with this Paragraph. Our reviews of monthly and daily rosters indicated that deputies were assigned to and worked the same schedules as their supervisors, and were assigned to one single consistent supervisor. MCSO remains in compliance with this Paragraph.

WAI 44936

**Paragraph 267.** *Supervisors shall be responsible for close and effective supervision of deputies under their command. Supervisors shall ensure that all deputies under their direct command comply with MCSO policy, federal, state and local law, and this Court's orders.*

**Phase 1:** In compliance

- GB-2 (Command Responsibility), most recently amended on June 28, 2019.

**Phase 2:** Not in compliance

Close and effective supervision requires that supervisors consistently apply the concepts established in several Paragraphs of the First Order. There are requirements covered in other Paragraphs that directly concern Paragraph 267, and must therefore be in compliance for MCSO to establish compliance with this Paragraph. We have determined that for MCSO to meet the requirements of this Paragraph, it must achieve compliance with Paragraphs 83, 85, 89, 90, 91, 93, and 96. During this reporting period, we again found MCSO in compliance with Paragraphs 83, 85, 89, 90, and 93. Although we noted improvement during this reporting period with Paragraph 91, MCSO did not meet the requirements of Paragraphs 91 and 96. The new Incident Report inspection may take some time to generate positive results with regard to Paragraph 96. For MCSO to achieve compliance with this Paragraph, it must remain in compliance with Paragraphs 83, 85, 89, 90, and 93; and achieve compliance with Paragraphs 91 and 96.


**Paragraph 268.** *During the term that a Monitor oversees the Sheriff and the MCSO in this action, any transfer of sworn personnel or supervisors in or out of the Professional Standards Bureau, the Bureau of Internal Oversight, and the Court Implementation Division shall require advanced approval from the Monitor. Prior to any transfer into any of these components, the MCSO shall provide the Court, the Monitor, and the parties with advance notice of the transfer and shall produce copies of the individual's résumé and disciplinary history. The Court may order the removal of the heads of these components if doing so is, in the Court's view, necessary to achieve compliance in a timely manner.*

**Phase 1:** In compliance

- Court Implementation Division Operations Manual, most recently revised on November 13, 2019.

- Professional Standards Bureau Operations Manual, most recently amended on December 13, 2018.

**Phase 2:** In compliance

WAI 44937

During this reporting period, there was one transfer into the Professional Standards Bureau (PSB), one transfer into the Bureau of Internal Oversight (BIO), and one transfer into the Court Implementation Division (CID).  We reviewed the documentation for the three transfers and noted no issues of concern.

WAI 44938

# Section 15: Document Preservation and Production

**COURT ORDER XVIII.  DOCUMENT PRESERVATION AND PRODUCTION**

***Paragraph 269.*** *The Sheriff shall ensure that when the MCSO receives a document preservation notice from a litigant, the MCSO shall promptly communicate that document preservation notice to all personnel who might possibly have responsive documents.*

**Phase 1:**  In compliance

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on May 3, 2019.

- GD-9 User Guide, published on May 3, 2019.

**Phase 2:**  In compliance

To verify MCSO's Phase 2 compliance with this Paragraph, we reviewed monthly submittals of document preservation notices to MCSO employees.  The data reviewed for this reporting period included September, October, and November 2019; as per an agreement that we reached with MCSO to stagger the document requests for this Paragraph, due to the large volume of data that MCSO had to provide prior to our site visits.

Document preservation is set in motion when a party sends a litigation hold notice or written directive to MCSO requesting the preservation of relevant documents or records and electronically stored information (ESI), in anticipation of future litigation against the agency. MCSO's Legal Liaison Section (LLS) manages litigation holds through Open Axes, a software program.  Upon the receipt of a litigation hold, which is usually sent by the Maricopa County Attorney's Office (MCAO), the LLS inputs the data into Open Axes which conducts a search for responsive documents within MCSO drives.  The system also identifies potential document custodians, which are later filtered by an LLS employee.  The LLS then serves the custodians with a legal hold in electronic format, known as a Document Preservation Notice, within five business days.  Upon receipt of the Open Axes email with the Document Preservation Notice, MCSO custodians must identify responsive documents, both electronic and hard copies, and preserve them in the manner in which they are kept in the course of business.

During our January site visit, we reviewed a sample of the third-party source documents that generate the litigation holds that the LLS receives from MCAO.  The Document Preservation Notices have been distributed 100% in a timely manner to the custodians who may have responsive documents.

GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices) requires that the employee who receives the email document preservation request must complete a Document Preservation Acknowledgment and a Document Preservation Questionnaire.  Both of

WAI 44939

the requirements are easily completed in an electronic format through the email sent by the Open Axes program. The attestation, which is due within five days of receipt, was returned in a timely manner 96% of the time. This reflected a 7% increase from the last quarter. The questionnaire, due within 10 days of receipt, was timely returned 99% of the time; a 3% increase from the last quarter. We also reviewed a sample of cases during our January 2019 site visit to assess if MCSO was properly preserving documents that are requested in the course of litigation. The review reflected that documents were being properly preserved.

During our January site visit, we reviewed the questionnaires, and found that 100% of them were properly completed. We noted that the LLS intercepted the few improperly completed forms and returned them for corrections.

We had previously withdrawn MCSO's compliance for this Paragraph due to the untimely receipt of the Document Preservation Acknowledgment and the Document Preservation Questionnaire. During the last reporting period, MCSO's rating for the Document Preservation increased, but not for the Document Acknowledgment. During this reporting period, MCSO was able to comply with the GD-9 timeframes and significantly improved with the acknowledgement requirement. MCSO is once again in compliance with this Paragraph. The LLS Section informed us during our January site visit that personnel had received additional training on GD-9. This appears to have made a difference during this reporting period.

**Paragraph 270.** *The Sheriff shall ensure that when the MCSO receives a request for documents in the course of litigation, it shall:*

a.  *promptly communicate the document request to all personnel who might possibly be in possession of responsive documents;*

b.  *ensure that all existing electronic files, including email files and data stored on networked drives, are sequestered and preserved through a centralized process; and*

c.  *ensure that a thorough and adequate search for documents is conducted, and that each employee who might possibly be in possession of responsive documents conducts a thorough and adequate search of all relevant physical and electronic files.*

**Phase 1:** In compliance

- Administrative Services Division Operations Manual, published on June 17, 2019.

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on May 3, 2019.

- GD-9 User Guide, published on May 3, 2019.

- GM-1 (Electronic Communications, Data and Voicemail), most recently amended on February 27, 2020.

WAI 44940

**Phase 2:** In compliance

To verify MCSO's Phase 2 compliance with this Paragraph, we reviewed monthly submittals of requests for documents to MCSO employees for the reporting period and documents drafted by the LLS in search of documents from other Divisions of the agency. For this reporting period, we identified a sample of document requests and requested a copy of the responsive documents sequestered and/or produced. The data reviewed for this reporting period only included September, October, and November, as per an agreement we reached with MCSO to stagger the document requests for this Paragraph. This was due to the large volume of data that MCSO had to provide prior to our site visits.

Paragraph 270.a. requires prompt communication of document requests to all personnel who might possibly be in possession of responsive documents. GD-9 requires the LLS to enter the data into a tracking system within five business days and to draft a Document Production Notice within five additional business days. The LLS is required, within five business days, to respond to the request for production if sourced within LLS, or to forward to the required MCSO Division for production.

Our review revealed that MCSO is manually forwarding the Document Production Notices in a timely manner to all of its Divisions. In addition, MCSO is sending Attachment C, the Document Production Acknowledgement Questionnaire, to all employees. In 100% of the cases, the personnel who provided responsive documents properly completed Attachment C.

Paragraph 270.b. requires that all responsive ESI be stored, sequestered, and preserved by MCSO through a centralized process. MCSO now performs the searches through a centralized process established by the LLS. The preservation of the data is completed at the Division that has the actual document while the notation is made in the Open Axes program, which aids the LLS in the case management. LLS can now create a case, assign a case number, and trigger time alerts to the custodians of documents that LLS identifies through the system. Open Axes searches on the H, W, and U computer hard drives of MCSO, which are shared among Headquarters and the Districts. Documents found in any additional servers are kept in their servers by the document custodians who notify LLS.

MCSO continues to manage litigation hold cases through Open Axes; all cases for this reporting period were managed through Open Axes. MCSO continues to work with the Technology Management Bureau and the vendor to address any software problems. MCSO developed the Open Axes Operations Manual as part of the Administrative Services Division Operations Manual.

Paragraph 270.c. requires that MCSO conduct an adequate search for documents, and that each employee who might possibly be in possession of responsive documents conducts a thorough and adequate search of all relevant physical and electronic files. We reviewed a sample of responsive documents for this reporting period, and MCSO identified responsive documents to the document production notices in all of the cases we reviewed.

WAI 44941

***Paragraph 271.*** *Within three months of the effective date of this Order, the Sheriff shall ensure that the MCSO Compliance Division promulgates detailed protocols for the preservation and production of documents requested in litigation. Such protocols shall be subject to the approval of the Monitor after a period of comment by the Parties.*

**Phase 1:** In compliance

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on May 3, 2019.
- Administrative Services Division Operations Manual, published on June 17, 2019.

**Phase 2:** In compliance

On June 17, 2019, MCSO published the Administrative Services Division Operations Manual, which details the protocols for the preservation and production of documents requested in litigation.


***Paragraph 272.*** *The Sheriff shall ensure that MCSO policy provides that all employees must comply with document preservation and production requirements and that violators of this policy shall be subject to discipline and potentially other sanctions.*

**Phase 1:** In compliance

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on May 3, 2019.

**Phase 2:** In compliance

During this reporting period, no internal investigations were completed against any MCSO employee for failure to preserve or produce documents.

WAI 44942

**COURT ORDER XIX.      ADDITIONAL TRAINING**

***Paragraph 273.*** *Within two months of the entry of this Order, the Sheriff shall ensure that all employees are briefed and presented with the terms of the Order, along with relevant background information about the Court's May 13, 2016 Findings of Fact, (Doc. 1677), upon which this Order is based.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

MCSO previously delivered this training on the E-Policy platform. All personnel (100%) determined to be applicable by CID have received this training.

WAI 44943

# Section 17: Complaints and Misconduct Investigations Relating to Members of the Plaintiff Class

**COURT ORDER XX.    COMPLAINTS AND MISCONDUCT INVESTIGATIONS RELATING TO MEMBERS OF THE PLAINTIFF CLASS**

*Paragraph 274.  In light of the Court's finding that the MCSO, and in particular Sheriff Arpaio and Chief Deputy Sheridan, willfully and systematically manipulated, misapplied, and subverted MCSO's employee disciplinary policies and internal affairs processes to avoid imposing appropriate discipline on MCSO deputies and command staff for their violations of MCSO policies with respect to members of the Plaintiff class, the Court further orders as follows:*

## A.    Investigations to be Overseen and/or Conducted by the Monitor

*Paragraph 275.  The Monitor is vested with the authority to supervise and direct all of the MCSO's internal affairs investigations pertaining to Class Remedial Matters.  The Monitor is free from any liability for such matters as is set forth in ¶ 144 of the Supplemental Permanent Injunction.*

*Paragraph 276.  The Monitor shall have the authority to direct and/or approve all aspects of the intake and investigation of Class Remedial Matters, the assignment of responsibility for such investigations including, if necessary, assignment to his own Monitor team or to other independent sources for investigation, the preliminary and final investigation of complaints and/or the determination of whether they should be criminally or administratively investigated, the determination of responsibility and the imposition of discipline on all matters, and any grievances filed in those matters.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

The Second Order requires oversight by the Monitor for all internal investigations determined to be Class Remedial Matters (CRMs).  The Professional Standards Bureau (PSB) now schedules meetings every two weeks to discuss existing and incoming complaints to determine which, if any, could be CRMs.  During these meetings, PSB personnel discuss cases pending a CRM decision, cases determined to be CRMs, and any cases where the decision may be made that the case would not be classified as a CRM.  The PSB Commander determines the classification of the cases.  A member of our Team attends all of these meetings to provide the oversight required for this Paragraph.

WAI 44944

At the end of the July-September 2016 reporting period, PSB had reviewed 442 administrative investigations that were open as of July 20, 2016; and determined that 42 of them met the basic criteria for CRMs. These cases were reviewed during the scheduled CRM meetings. In addition, a Monitoring Team member randomly selected an additional 52 cases from the 400 remaining pending cases; and concurred with PSB's assessment that the cases did not meet the basic criteria for CRMs. In addition to the 42 cases determined to be potential CRMs from the pending case list as of July 20, 2016, PSB identified an additional 10 cases that were potential CRM cases. At the end of the first reporting period after the Court's Second Order, nine cases had been determined to be CRMs; and one other was pending a CRM decision. The remaining cases reviewed were determined not to be CRMs.

At the end of the last reporting period, PSB had reviewed a total of 296 possible CRMs since August 2016. Of these, 64 were classified as CRMs.

During this reporting period, an additional 20 cases were reviewed as possible CRMs. Of these 20, four were determined to be CRMs. At of the end of this reporting period, there was a total of 316 cases that have been reviewed as possible CRMs; and 68 cases that have been determined to be CRMs since the July 20, 2016 Court Order.

Since July 20, 2016, MCSO has completed and closed a total of 53 CRM cases. Four were closed this reporting period and forwarded to our Team for review. Our Team reviewed all four and approved the findings; and in three cases with sustained findings, we approved the discipline.

One sustained case was classified as a CRM, as it involved the traffic stop of a Latino subject whose vehicle was towed for the driver's failure to possess a driver's license. While this driver did not file any complaint, MCSO's Traffic Stop Annual Review (TSAR) raised concerns regarding the towing of the vehicle. The investigation revealed that while the tow of the vehicle was legal and appropriate, the two principals failed to meet the standards required for the documentation of this incident. No indication of bias of any kind was alleged or identified. Both employees received Written Reprimands, and one of the principals also received additional training.

WAI 44945

In the second sustained CRM case, a deputy responded to a child custody civil matter involving a Latino male and female. The female later filed a complaint that the deputy had been biased due to her ethnicity. She was not satisfied with the outcome of the incident, but could not identify any specific actions or statements by the deputy that made her believe he was biased. The Latino male denied that the deputy had been biased in any way and stated the deputy had been appropriate throughout the contact. The entire contact with the female complainant was captured on the deputy's BWC and there was no indication of any bias. During his interview, the deputy self-disclosed that he had returned briefly to talk to the Latino male after the completion of the call, because he had forgotten to obtain the male's contact information. During this follow-up contact, the deputy disclosed that he had not reactivated his BWC. The investigator stated in his investigation; and we agree, that had the deputy not self-disclosed the failure to reactivate the BWC, it would not have been discovered. The deputy appropriately received a coaching for failing to reactivate his BWC.

In the third sustained CRM case, the investigation was initiated after BIO authored a Memorandum of Concern. The incident involved male subjects shooting a gun in a restricted area. The initial concern was that the citations issued at this call for service may not have been appropriate. It was determined during the investigation that the citations were appropriate for the violations identified. This was confirmed by the MCAO. However, during the investigation, PSB discovered serious misconduct by two principals who were involved in the incident. One principal was sustained for multiple policy violations, including bias-based policing. While dismissal was recommended for this employee, he resigned prior to the imposition of the discipline. The second principal was sustained for multiple policy violations, including failure to meet standards and failure to take command responsibility. In this case, MCSO aggravated the discipline based on the totality of circumstances; and the employee was demoted. The employee appealed the demotion to the Maricopa County Law Enforcement Merit System Council. The Merit System Council upheld the discipline imposed by MCSO.

In the fourth CRM case, a Latino male arrestee alleged that a Detention officer made an inappropriate racial comment and a second inappropriate rude comment while in the booking area of the MCSO jail. The complainant provided the name of a second subject who was being booked at the same time and said this subject had overheard what was said. This second subject was interviewed, denied that any racial comments had been made by any MCSO staff, and went on to say that it was the complainant who was making inappropriate racial comments and acting inappropriately in the facility. The principal in the investigation denied making any inappropriate comments. MCSO staff and other agency law enforcement personnel who were in the booking area and in a position to hear the conversation between the complainant and Detention officer were also interviewed. All said they did not hear any racial comment being made by any law enforcement personnel. This allegation was unfounded. Regarding the second inappropriate comment, no one was able to say for certain if the comment, a reference to the complainant having been beat up previously, had been made. This allegation was not sustained.

WAI 44946

Of the 26 CRM cases that have been closed to date with findings of sustained misconduct and reviewed by our Team, nine have involved employees who are deceased or left MCSO employment prior to the completion of the investigation or the disciplinary process. Seventeen involved current employees of MCSO. Two of the 17 cases closed to date involved a sustained finding of misconduct involving bias related to the Plaintiffs' class: a sustained allegation of an inappropriate and biased comment; and a sustained allegation of bias-based policing.

During the scheduled meetings, case investigators continue to provide investigative updates on all cases that could be, or are, CRMs. Their briefings are thorough, and they continue to be responsive to any questions or input from members of our Team. In all cases where we have provided oversight since July 20, 2016, we have concurred with the decisions made by the PSB Commander regarding the case classifications and findings. Where appropriate, we have also approved the discipline in all these cases.

**Paragraph 277.** *This authority is effective immediately and shall remain vested in the Monitor until the MCSO's internal affairs investigations reach the benchmarks set forth in ¶ 288 below. With respect to Class Remedial Matters, the Monitor has plenary authority, except where authority is vested in the Independent Investigative and Disciplinary Authorities separately appointed by the Court, as is further set forth in ¶¶ 296–337 below.*

**Paragraph 278.** *The Sheriff shall alert the Monitor in writing to all matters that could be considered Class Remedial Matters, and the Monitor has the authority to independently identify such matters. The Monitor shall provide an effective level of oversight to provide reasonable assurance that all Class Remedial Matters come to his attention.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

Since the first CRM meeting held on August 17, 2016, PSB has consistently completed the required notification to us regarding the cases that could be considered CRMs. A Monitoring Team member has attended every CRM meeting with PSB where these matters are discussed and personally reviewed a number of the cases that were pending on July 20, 2016; and our Team member reviews the new cases that are presented at each meeting. There has been no need for us to independently identify CRMs, as PSB consistently properly identifies and reports these cases as required.

WAI 44947

**Paragraph 279.** *The Monitor shall have complete authority to conduct whatever review, research, and investigation he deems necessary to determine whether such matters qualify as Class Remedial Matters and whether the MCSO is dealing with such matters in a thorough, fair, consistent, and unbiased manner.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

During the scheduled CRM meetings attended by a Monitoring Team member, PSB has consistently properly identified cases that could be, or are, CRMs. PSB personnel brief each case at these meetings, and their briefings have included all appropriate information. They have been responsive to any questions from our Team members during the meetings, and have responded appropriately to any suggestions we have raised. There has been no need for us to independently conduct any review, research, or investigation; as PSB is consistently properly identifying and investigating these cases.


**Paragraph 280.** *The Monitor shall provide written notice to the Court and to the parties when he determines that he has jurisdiction over a Class Remedial Matter. Any party may appeal the Monitor's determination as to whether he has jurisdiction over a Class Remedial Matter to this Court within seven days of the Monitor's notice. During the pendency of any such appeal the Monitor has authority to make orders and initiate and conduct investigations concerning Class Remedial Matters and the Sheriff and the MCSO will fully comply with such action by the Monitor.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

During this reporting period, cases involving both sworn and non-sworn members of MCSO have continued to be reviewed as possible CRMs, when appropriate. There were no appeals by any Parties regarding any of the CRM classifications.


**Paragraph 281.** *Subject to the authority of the Monitor, the Sheriff shall ensure that the MCSO receives and processes Class Remedial Matters consistent with: (1) the requirements of this Order and the previous orders of this Court, (2) MCSO policies promulgated pursuant to this Order, and (3) the manner in which, pursuant to policy, the MCSO handles all other complaints and disciplinary matters. The Sheriff will direct that the Professional Standards Bureau and the members of his appointed command staff arrive at a disciplinary decision in each Class Remedial Matter.*

**Phase 1:** In compliance

WAI 44948

- GC-16 (Employee Grievance Procedures), most recently amended on April 2, 2019.

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 27, 2019.

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

- Administrative Services Division Operations Manual, published on June 17, 2019.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To evaluate Phase 2 compliance with this Paragraph, a Monitoring Team member has attended each meeting conducted by PSB to discuss Class Remedial Matters. PSB has consistently provided thorough briefings, and the PSB Commander has made appropriate decisions regarding these matters.

During this reporting period, PSB submitted four closed CRM cases for our review. Our Team approved the findings in all four; and in the three sustained cases, we approved MCSO's disciplinary decisions.

*Paragraph 282.* *The Sheriff and/or his appointee may exercise the authority given pursuant to this Order to direct and/or resolve such Class Remedial Matters, however, the decisions and directives of the Sheriff and/or his designee with respect to Class Remedial Matters may be vacated or overridden in whole or in part by the Monitor. Neither the Sheriff nor the MCSO has any authority, absent further order of this Court, to countermand any directions or decision of the Monitor with respect to Class Remedial Matters by grievance, appeal, briefing board, directive, or otherwise.*

**Phase 1:** In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 2, 2019.

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 27, 2019.

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

- Administrative Services Division Operations Manual, published on June 17, 2019.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

There were no CRM cases completed during this, or previous reporting periods, in which the Sheriff and/or his appointee exercised their authority to resolve CRMs, which we needed to vacate or override.

WAI 44949

***Paragraph 283.*** *The Monitor shall review and approve all disciplinary decisions on Class Remedial Matters.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

At the end of this reporting period, MCSO has closed a total of 52 CRM cases since July 20, 2016. Four were closed during this reporting period. Twenty-six of the completed cases have resulted in sustained findings. Six had sustained findings on two separate deputies who are deceased, and three involved sustained findings on deputies who left MCSO employment prior to the determination of discipline. Seventeen resulted in sustained findings against current MCSO employees. In all of the sustained cases, we have reviewed and approved all of the disciplinary decisions.

***Paragraph 284.*** *The Sheriff and the MCSO shall expeditiously implement the Monitor's directions, investigations, hearings, and disciplinary decisions. The Sheriff and the MCSO shall also provide any necessary facilities or resources without cost to the Monitor to facilitate the Monitor's directions and/or investigations.*

**Phase 1:** In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 2, 2019.

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 27, 2019.

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.

- Administrative Services Division Operations Manual, published on June 17, 2019.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

During this and previous reporting periods, a Monitoring Team member has attended all scheduled CRM meetings conducted in an appropriate location determined by MCSO. PSB continues to provide a password and access to the IAPro system to a member of our Team so that we can complete independent case reviews if necessary.

PSB personnel continue to be professional and responsive to all input, questions, or concerns we have raised.

WAI 44950

***Paragraph 285.*** *Should the Monitor decide to deviate from the Policies set forth in this Order or from the standard application of the disciplinary matrix, the Monitor shall justify the decision in writing and place the written explanation in the affected employee's (or employees') file(s).*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

There were four completed CRMs forwarded for our review during this reporting period. To date, there are a total of 26 CRM cases with sustained findings. Six have sustained findings on two separate deputies who are deceased, and three involve deputies who left MCSO employment prior to the determination of discipline. Seventeen cases involve sustained findings against current MCSO employees. All 17 cases resulted in appropriate sanctions based on MCSO policy and the Discipline Matrices in effect at the time the investigations were conducted. No action on our part has been necessary relative to this Paragraph.

***Paragraph 286.*** *Should the Monitor believe that a matter should be criminally investigated, he shall follow the procedures set forth in ¶¶ 229–36 above. The Commander of the Professional Standards Bureau shall then either confidentially initiate a Professional Standards Bureau criminal investigation overseen by the Monitor or report the matter directly and confidentially to the appropriate prosecuting agency. To the extent that the matter may involve the Commander of the Professional Standards Bureau as a principal, the Monitor shall report the matter directly and confidentially to the appropriate prosecuting agency. The Monitor shall then coordinate the administrative investigation with the criminal investigation in the manner set forth in ¶¶ 229–36 above.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 28, 2019.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

During this reporting period, there were no CRM cases submitted for our review where PSB had determined that a criminal misconduct investigation should also be conducted. We did not identify any CRM where we believe a criminal investigation should have been initiated and was not. No action on our part relative to this Paragraph has been necessary.

WAI 44951

***Paragraph 287.*** *Any persons receiving discipline for any Class Remedial Matters that have been approved by the Monitor shall maintain any right they may have under Arizona law or MCSO policy to appeal or grieve that decision with the following alterations:*

a.    *When minor discipline is imposed, a grievance may be filed with the Sheriff or his designee consistent with existing MCSO procedure. Nevertheless, the Sheriff or his designee shall immediately transmit the grievance to the Monitor who shall have authority to and shall decide the grievance. If, in resolving the grievance, the Monitor changes the disciplinary decision in any respect, he shall explain his decision in writing.*

b.    *disciplined MCSO employee maintains his or her right to appeal serious discipline to the Maricopa County Law Enforcement Merit System Council to the extent the employee has such a right. The Council may exercise its normal supervisory authority over discipline imposed by the Monitor.*

**Phase 1:** In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 2, 2019.
- GC-17 (Employee Disciplinary Procedures), most recently amended on June 27, 2019.
- GH-2 (Internal Investigations), most recently amended on June 28, 2019.
- Administrative Services Division Operations Manual, published on June 17, 2019.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

Twenty-six completed CRM cases have had sustained findings of misconduct since the issuance of the Second Order. We concurred with MCSO's decisions in all of these cases.

During this reporting period, the one CRM case that had been pending an appeal to the Maricopa County Law Enforcement Merit System Council was resolved. The Merit System Council upheld MCSO's decision.


***Paragraph 288.*** *The Monitor's authority over Class Remedial Matters will cease when both:*

a,    *The final decision of the Professional Standards Bureau, the Division, or the Sheriff, or his designee, on Class Remedial Matters has concurred with the Monitor's independent decision on the same record at least 95% of the time for a period of three years.*

b.    *The Court determines that for a period of three continuous years the MCSO has complied with the complaint intake procedures set forth in this Order, conducted appropriate internal affairs procedures, and adequately investigated and adjudicated all matters that come to its attention that should be investigated no matter how ascertained, has done so*

WAI 44952

*consistently, and has fairly applied its disciplinary policies and matrices with respect to all MCSO employees regardless of command level.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

During this and prior reporting periods, we and PSB have agreed on the investigative outcome of each CRM investigation completed.

PSB is responsible for the investigation of all CRM cases, and has continued to appropriately identify cases that could be, or are, CRMs. PSB personnel are professional in our contacts with them and responsive to any concerns or questions we have raised; and they provide detailed information and updates in the scheduled briefings. Their written reports are thoroughly prepared, and the reports have been consistent with the information provided during the weekly case briefings.


***Paragraph 289.*** *To make the determination required by subpart (b), the Court extends the scope of the Monitor's authority to inquire and report on all MCSO internal affairs investigations and not those merely that are related to Class Remedial Matters.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

During the last reporting period, we reviewed a total of 103 internal investigations. Ten were criminal investigations, and 93 were administrative investigations. All but one of the criminal investigations was in compliance. Of the 93 administrative misconduct investigations, 71% were in full compliance. This was a 2% decrease in compliance from the previous reporting period.

During this reporting period, we reviewed 43 misconduct investigations. Two were criminal investigations, and 41 were administrative investigations. Both of the criminal investigations were in compliance. Of the 41 administrative investigations, 37 were in compliance with all investigative and administrative requirements over which the PSB Commander has authority. Full compliance for administrative misconduct investigations, however, also takes into account the findings of the Appointing Authority regarding discipline. During the last reporting period, MCSO's overall compliance was adversely affected as a result of two administrative misconduct cases found non-compliant solely because of the final discipline assessed; and one criminal case was found non-compliant. During this reporting period, we concurred with all discipline decisions made by the Appointing Authority; and both criminal investigations are in compliance. The overall compliance for all 43 investigations conducted is 91%, an increase from 75% the last reporting period.

WAI 44953

There were no completed administrative misconduct investigations submitted for compliance with Paragraph 249 (investigatory stops), or Paragraph 33 (biased policing) during this reporting period. There were four investigations submitted for compliance with Paragraph 275 (CRMs) during this reporting period.

Investigations conducted by PSB sworn personnel were compliant in 100% of the administrative misconduct investigations, an increase from 94% during the last quarter. PSB investigations conducted by Detention personnel were compliant in 96% of the cases they investigated, an increase from the 93% compliance the last quarter. There were no investigations submitted or reviewed by our Team that were conducted by the contract investigator retained by MCSO. Those investigations conducted by Divisions and Districts outside of PSB were compliant in 50% of the cases, a decrease of 5% from the previous reporting period. Overall compliance for all 41 administrative misconduct investigations was 90%.

During our October 2019 and January 2020 site visits, and at the request of PSB, we provided additional detailed information on all misconduct investigations we found non-compliant, to both PSB and District and Division Command personnel. The intent was to ensure that all those who review misconduct investigations conducted by their personnel are fully aware of deficiencies, both in the investigations and in their reviews of the completed cases. During our next site visit, we will continue to discuss overall compliance and the concerns we identified with PSB and District and Division personnel, and again provide them with detailed information on the cases we found non-compliant.

Effective with the revisions to internal affairs and discipline policies on May 18, 2017, the PSB Commander may now determine that a received complaint can be classified as a "service complaint" if certain specified criteria exists. Service complaint documentation must then be completed and is reviewed under this Paragraph.

MCSO closed 73 service complaints during the last reporting period. Twelve were properly reclassified to administrative misconduct investigations after review by PSB. Of the remaining 61, we found MCSO properly completed the service complaints in 60 (98%) of the cases.

During this reporting period, we reviewed 87 service complaints completed by MCSO. In eight, an administrative misconduct investigation was opened after review by PSB. The remaining 79 were approved by PSB as service complaints. Thirty-one (39%) of the 79 service complaints did not involve MCSO employees. Forty-one (52%) did not involve allegations of employee misconduct, four were closed due to lack of specificity, and the remaining three were closed based on a combination of factors. We concur with MCSO's handling of 76 (96%) of the 79 service complaints. In one case, we believe misconduct had been alleged and an administrative investigation should have been initiated. In two, the investigator did not conduct appropriate follow-up. We will discuss these three service complaints with MCSO during our next site visit.

WAI 44954

Effective with the revisions to the internal affairs and discipline policies, the PSB Commander is now authorized to determine that an internal complaint of misconduct does not necessitate a formal investigation if certain criteria exist. The PSB Commander's use of this discretion is reported in this Paragraph. During this and the last reporting period, the PSB Commander did not use the discretion allowed by policy to determine that any internal complaints of misconduct did not necessitate a formal investigation.

*Paragraph 291. The Monitor shall report to the Court, on a quarterly basis, whether the MCSO has fairly, adequately, thoroughly, and expeditiously assessed, investigated, disciplined, and made grievance decisions in a manner consistent with this Order during that quarter. This report is to cover all internal affairs matters within the MCSO whether or not the matters are Class Remedial Matters. The report shall also apprise the Court whether the MCSO has yet appropriately investigated and acted upon the misconduct identified in the Court's Findings of Fact, whether or not such matters constitute Class Remedial Matters.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

This report, including all commentary regarding MCSO's compliance with investigative and disciplinary requirements, serves as our report to the Court on these matters. An overall summary of our compliance observations and findings is provided below.

During this reporting period, we reviewed 41 administrative misconduct investigations and two criminal misconduct investigations. Both criminal investigations were in full compliance with the Second Order. Of the 41 administrative misconduct investigations we reviewed, 37 (90%) were in full compliance with the Second Order. This is an increase from the 71% compliance for the last reporting period. Overall compliance for all 43 investigations was 91%, an increase from 75% the last quarter. We note that MCSO forwarded a much smaller number of investigations for our review during this reporting period. This was also true during the last reporting period in 2018. PSB has attributed the low numbers during the last quarter of the year to required attendance at training; PSB personnel instructing training; holiday leave time; and this year, to a reassignment of PSB personnel assigned to review District and Division cases.

WAI 44955

During July-December 2016, PSB provided us with a memorandum describing PSB's efforts in meeting the requirements of this Paragraph related to the Court's Findings of Fact. MCSO had outsourced three cases to another law enforcement agency, and an additional four investigations were pending outsourcing to an outside investigator. These cases were outsourced due to the involvement of the former Chief Deputy, or other conflicts of interest identified by MCSO, and included the investigations identified in Paragraph 300. MCSO processed a Request for Proposal and retained an outside investigator who met the requirements of Paragraphs 167.iii and 196 to conduct the investigations identified. One potential misconduct case identified in the Court's Findings of Fact was retained and investigated by PSB, as no identifiable conflict of interest appeared to exist.

PSB provided us with a document sent by the Independent Investigator assigned by the Court to investigate, or reinvestigate, some of the misconduct that is related to the Plaintiffs' class. In this document, the Independent Investigator clarified his intent to investigate the matters assigned to him by the Court, as well as the matters that the Court determined were the discretion of the Independent Investigator. He further clarified that his investigations would include the initial misconduct alleged, as well as any misconduct that might have occurred during the process of review or issuance of discipline by MCSO personnel.

During each site visit, we meet with PSB personnel to discuss the status of those cases that have been outsourced to any contract vendor, other law enforcement agency, or other person or entity, so that we can continue to monitor these investigations and ensure that all misconduct cases, including those identified in the Findings of Fact, are thoroughly investigated. PSB has continued to keep us apprised of the status of all such investigations.

During our January 2018 site visit, PSB advised us that the two administrative misconduct investigations that had been outsourced to a separate law enforcement agency had been completed and closed. We received and reviewed both investigations. A third investigation that MCSO outsourced to this same law enforcement agency had been previously returned to MCSO without investigation, as the allegations duplicated those already under investigation by the Independent Investigator. MCSO outsourced six additional investigations to the contract investigator.

During our January 2019 site visit, PSB advised us that no additional investigations had been outsourced to the contract vendor. Six cases had been completed and forwarded to PSB for review. None had yet been forwarded to our Team for review. The Independent Investigator continued investigations identified by the Court, and notified us of the status of these cases on a regular basis. We also received closed investigations that he completed.

During our April 2019 site visit, PSB advised that three additional investigations had been outsourced to the contract investigator. The six cases he had completed remained in review by PSB personnel. We had not received any of the investigations completed by this investigator for our review.

WAI 44956

During our July 2019 site visit, PSB personnel advised us that they had outsourced an additional four investigations to the contract investigator. We received and reviewed four completed investigations conducted by this investigator. In all four cases, we found the investigations to be thorough and well-written. All, however, were non-compliant as proper extension memorandums were not completed. Additional cases completed by this investigator have been forwarded to PSB for their review prior to forwarding to our Team.

During our October site visit, PSB personnel advised us that they had not outsourced any additional cases to the contract investigator during the reporting period. We did receive and review three investigations he had conducted. All three were well written. However, two were non-compliant as proper extension memorandums were not completed.

During this reporting period, we did not receive or review any investigations conducted by the contract investigator. No new investigations were outsourced to this investigator during the reporting period.

The Independent Investigator previously reported that he had completed all of the investigations identified by the Court; and we have reviewed a number of investigations that he completed.

During this reporting period, the Independent Investigator again reported that he had completed all of the investigations identified by the Court, as well as those where he initiated new investigations due to potential misconduct he identified during his review of cases. He has submitted his final report, but some of the cases he investigated remain in either the discipline or appeal process. We will not receive and review these cases until these processes are complete.

***Paragraph 292.*** *To make this assessment, the Monitor is to be given full access to all MCSO internal affairs investigations or matters that might have been the subject of an internal affairs investigation by the MCSO. In making and reporting his assessment, the Monitor shall take steps to comply with the rights of the principals under investigation in compliance with state law. While the Monitor can assess all internal affairs investigations conducted by the MCSO to evaluate their good faith compliance with this Order, the Monitor does not have authority to direct or participate in the investigations of or make any orders as to matters that do not qualify as Class Remedial Matters.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

PSB personnel continue to inform us of ongoing criminal and administrative misconduct investigations. A member of our Team attends each CRM meeting, reviews the lists of new internal investigations, and has access to the PSB IAPro database. The only cases for which any oversight occurs during the investigative process are those that are determined to be CRMs. We review all other misconduct investigations once they are completed, reviewed, and approved by MCSO personnel.

WAI 44957

*Paragraph 293. The Monitor shall append to the quarterly reports it currently produces to the Court its findings on the MCSO's overall internal affairs investigations. The parties, should they choose to do so, shall have the right to challenge the Monitor's assessment in the manner provided in the Court's previous Order. (Doc. 606 ¶¶ 128, 132.)*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

Since we began reviewing internal investigations conducted by MCSO more than four years ago, we have reviewed hundreds of investigations into alleged misconduct by MCSO personnel. As noted in our previous quarterly status reports and elsewhere in this report, until the last two reporting periods, while we had identified ongoing concerns, we had also noted continuing improvement. That has not been the case for this and last two reporting periods. We have seen a significant drop in compliance for administrative misconduct investigations, primarily those conducted by District personnel during this and the last two reporting periods.

Both of the criminal investigations we reviewed for compliance during this reporting period were investigated by PSB and complied with the Second Order requirements.

PSB conducted 35 of the 41 total administrative misconduct investigations we reviewed for this reporting period. PSB sworn investigators completed nine of the investigations. All nine were in compliance. This is a 6% increase from 94% compliance during the last reporting period. Detention supervisors in PSB conducted 26 of the investigations. Twenty-five (96%) were in compliance. This is an increase from the 93% compliance the last reporting period. Overall PSB sworn and Detention investigations were 97% compliant, an increase from the 93% compliance during the last reporting period – and the first time since the implementation of the Second Order that PSB sworn and Detention investigations have both reached compliance.

Six investigations were conducted by Districts or Divisions outside of PSB. Of these six, three (50%) complied with all Second Order requirements. During the last reporting period, compliance dropped from 63 to 55%. This reporting period, compliance dropped an additional 5%. Those investigations conducted outside of PSB that were found non-compliant failed to address policy or training issues, or had numerous administrative errors. We note that in all three of these case, we believe the deficiencies and errors should have been identified prior to the investigations being forwarded to PSB for review.

For the 41 administrative misconduct investigations we reviewed for this reporting period, MCSO's overall compliance was 90%, a 19% increase from the 71% compliance the last reporting period. This overall compliance finding takes into account multiple factors. As we have noted throughout this report, investigators, reviewers, command personnel, and the final decision-makers all affect the compliance for each case.

WAI 44958

MCSO completed delivery of the 40-hour Misconduct Investigative Training at the end of 2017, and all sworn supervisors who investigate administrative misconduct attended the training. Refresher training on misconduct investigations has also been delivered since the initial 40-hour training. During our site visit and District visits in January 2020, we continued to receive positive feedback on the training that has been provided on misconduct investigations and District Command personnel have informed us investigations conducted by their personnel continue to improve. Until the completion of our case reviews for this and the last two reporting periods, we concurred with this assessment; and our reviews of investigations had supported that training and experience in the completion of administrative investigations had produced the desired effect of improved quality, particularly in those investigations completed after January 1, 2018. Our findings for this and the last two reporting periods indicate a decrease, rather than an increase, in compliance for those cases investigated outside of PSB.

PSB personnel continue to be receptive to our input, and we have had many productive meetings and discussions regarding the investigations being conducted and the compliance for both PSB and District and Division Cases. We also discuss compliance concerns with District and Division Command during every site visit. During our next site visit, we will discuss those cases that are non-compliant with both PSB and District and Division personnel, again addressing the significant reduction in compliance. We will also meet with the Deputy Chiefs who have oversight over District and Division investigations to discuss our continuing concerns with investigations conducted and reviewed by their personnel. We continue to stress that compliance is not the sole responsibility of any one individual or Division – but dependent on all those who complete, review, or approve internal investigations.

We have noted in numerous previous reporting periods that MCSO's executive leadership must take the appropriate action to ensure that adequate resources are dedicated to the completion of administrative and criminal misconduct investigations. PSB has continued to inform us that despite the approval for numerous additional investigative personnel in the July 2018 budget, only one of these positions has been filled and there is no indication that the additional positions will be filled in the foreseeable future. We noted again during this reporting period that the case backlog in PSB continues to increase. As we have said for multiple reporting periods, MCSO must take action to address this increasing backlog.

## B.       *Investigations to be Conducted by the Independent Investigator and the Independent Disciplinary Authority*

*Paragraph 294. In its Findings of Fact, (Doc. 1677), the Court identified both: (1) internal affairs investigations already completed by the MCSO that were inadequate or insufficient; (see, e.g., Doc. 1677 at ¶ 903), and (2) misconduct or alleged misconduct that had never been investigated by MCSO that should be or should have been investigated. (Id. at ¶ 904.)*

WAI 44959

**Paragraph 295.**  *In light of MCSO's failure to appropriately investigate these matters, the Court appoints an Independent Investigator and an Independent Disciplinary Authority from the candidates set forth by the parties, and vests them with the authority to investigate and decide discipline in these matters.*

### 1.  The Independent Investigator

**Paragraph 298.**  *In assessing the existence of previously uncharged acts of misconduct that may be revealed by the Findings of Fact, the Independent Investigator does not have authority to investigate acts of misconduct that are not sufficiently related to the rights of the members of the Plaintiff class.  While the Independent Investigator should identify such acts of misconduct and report those acts to the Commander of the Professional Standards Bureau, and to the Monitor for purposes of making the Monitor's assessment identified in ¶¶ 291–93 above, the Independent Investigator may not independently investigate those matters absent the authorization and the request of the Sheriff.*

**Paragraph 300.**  *The following potential misconduct is not sufficiently related to the rights of the members of the Plaintiff class to justify any independent investigation:*

a.  *Uninvestigated untruthful statements made to the Court under oath by Chief Deputy Sheridan concerning the Montgomery investigation.  (Doc. 1677 at ¶ 385).*

b.  *Uninvestigated untruthful statements made to the Court under oath by Chief Deputy Sheridan concerning the existence of the McKessy investigation.  (Id. at ¶ 816).*

c.  *Chief Deputy Sheridan's untruthful statements to Lieutenant Seagraves made during the course of an internal investigation of Detective Mackiewicz to the effect that an investigation into the overtime allegations against Detective Mackiewicz had already been completed.  (Id. at ¶ 823).*

d.  *Other uninvestigated acts of misconduct of Chief Deputy Sheridan, Captain Bailey, Sergeant Tennyson, Detective Zebro, Detective Mackiewicz, or others that occurred during the McKessy investigation.  (Id. at ¶¶ 766–825).*

**Phase 1:** Not applicable

**Phase 2:** Deferred

During our January 2017 site visit, the PSB Commander assured us that all acts of misconduct that we identified and discussed during our October 2016 site visit would be provided to a contracted investigator for investigative purposes.

WAI 44960

Since that time, the PSB Commander has advised us that MCSO has contracted with a licensed private investigator. The contract investigator possesses the requisite qualifications and experience to conduct the investigations of misconduct outlined in Paragraph 300 (a.-c.), and the additional misconduct in the Findings of Fact that directly associates with Paragraph 300 (d.). PSB has not found it necessary to contract with any additional licensed private investigators.

During our April 2017 site visit, we met with PSB command staff and representatives from the Maricopa County Attorney's Office (MCAO) to verify that all of the acts of misconduct that were identified in the Findings of Fact (FOF) are under investigation, either by the Court-appointed Independent Investigator or the private licensed contract investigator. Before this meeting, PSB command provided us with a roster of related acts of misconduct that PSB intended to be assigned to the contract investigator. The roster of intended assignments did not include all of the acts of misconduct that we had discussed. The MCAO and PSB command personnel explained that the Court also identified, in Paragraph 301, many of the acts of potential misconduct identified in the FOF as sufficiently related to the rights of members of the Plaintiffs' class. In Paragraph 301, the Court documented that because of this determination, investigations of the potential misconduct were justified if the Independent Investigator deemed that an investigation was warranted.

The Independent Investigator has previously reported that he has completed all of the investigations identified by the Court. The Independent Disciplinary Authority has also reported that he has completed all of the discipline hearings. During our January 2020 site visit, MCSO advised us that one case remains pending an appeal. Once all of the investigations are completed and forwarded for our review, we will ensure that all conduct outlined in the FOF has been addressed.

The contract investigator retained by MCSO continues to complete investigations he has been assigned. None were submitted for our review during this reporting period.

Our ability to verify that all potential misconduct outlined in the FOF has been investigated by PSB, the PSB contract investigator, or the Independent Investigator is pending until all the investigations are completed. Once this occurs, we can determine if there is any additional misconduct identified in the FOF that still requires investigation. Finally, the PSB Commander and MCAO advised us that the acts of misconduct involving (former) Sheriff Arpaio as identified in the FOF would not be investigated by any entity, as there does not exist any statute that addresses how a Sheriff would be disciplined in the event of a sustained finding resulting from an administrative misconduct investigation.

WAI 44961

**Paragraph 310.** *The Monitor and the parties are directed to promptly comply with the Independent Investigator's requests for information. The Monitor and the Independent Investigator may communicate to coordinate their investigations. Nevertheless, each is independently responsible for their respective jurisdiction set forth in this Order, and each should make independent decisions within his own delegated responsibility.*

### 2. The Independent Disciplinary Authority

**Paragraph 337.** *Nevertheless, when discipline is imposed by the Independent Disciplinary Authority, the employee shall maintain his or her appeal rights following the imposition of administrative discipline as specified by Arizona law and MCSO policy with the following exceptions:*

a. *When minor discipline is imposed, a grievance may be filed with the Sheriff or his designee consistent with existing MCSO procedure. Nevertheless, the Sheriff or his designee shall transmit the grievance to the Monitor who shall have authority to decide the grievance. If in resolving the grievance the Monitor changes the disciplinary decision in any respect, he shall explain his decision in writing.*

b. *A disciplined MCSO employee maintains his or her right to appeal serious discipline to the Maricopa County Law Enforcement Merit System Council to the extent the employee has such a right. The Council may exercise its normal supervisory authority over discipline imposed by the Independent Disciplinary Authority with one caveat. Arizona law allows the Council the discretion to vacate discipline if it finds that the MCSO did not make a good faith effort to investigate and impose the discipline within 180 days of learning of the misconduct. In the case of any of the disciplinary matters considered by the Independent Disciplinary Authority, the MCSO will not have made that effort. The delay, in fact, will have resulted from MCSO's bad faith effort to avoid the appropriate imposition of discipline on MCSO employees to the detriment of the members of the Plaintiff class. As such, the Council's determination to vacate discipline because it was not timely imposed would only serve to compound the harms imposed by the Defendants and to deprive the members of the Plaintiff class of the remedies to which they are entitled due to the constitutional violations they have suffered at the hands of the Defendants. As is more fully explained above, such a determination by the Council would constitute an undue impediment to the remedy that the Plaintiff class would have received for the constitutional violations inflicted by the MCSO if the MCSO had complied with its original obligations to this Court. In this rare instance, therefore, the Council may not explicitly or implicitly exercise its discretion to reduce discipline on the basis that the matter was not timely investigated or asserted by the MCSO. If the Plaintiff class believes the Council has done so, it may seek the reversal of such reduction with this Court pursuant to this Order.*

WAI 44962

**Phase 1:**  In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on March 21, 2019.

**Phase 2:**  In compliance

During this reporting period, no grievances were filed that met the criteria for transmitting to the Monitor.

WAI 44963

# Section 18:  Concluding Remarks

We assess compliance with 94 Paragraphs of the First Order, and 113 Paragraphs of the Second Order, for a total of 207 Paragraphs.  MCSO is in Phase 1 compliance with 77 of the First Order Paragraphs, or 96%; and 103 of the Second Order Paragraphs, or 100%.

Including the 32 total Paragraphs in which MCSO is in Full and Effective Compliance, MCSO is in Phase 2, or operational compliance, with 74 of the First Order Paragraphs, or 79%.  MCSO is in Phase 2 compliance with 104 of the Second Order Paragraphs, or 92%.  Combining the requirements of both Orders, MCSO is in Phase 1 compliance with 180 Paragraphs, or 98%; and in Phase 2 compliance with 178 Paragraphs, or 86%.

We commend MCSO on deployment of its second-generation body-worn cameras (BWCs).  During our review of BWC recordings during this reporting period, we noted for the first time that 100% of the reviews were of the newly issued devices, which have proven to be less prone to malfunctions and provide clearer video and improved audio recordings in comparison to the previous version that MCSO used.  After receiving training, deputies appear to have effectively transitioned to utilizing the new BWCs.

The reviews of the recordings have proven to be an effective tool to resolve certain misconduct investigations.  A review of the detailed summaries of closed PSB cases that are published on a monthly basis revealed that three cases were resolved, in large part, based on evidence obtained via a review of the BWC recordings.  In two of the cases, the recordings revealed that the deputies acted in a professional manner and in accordance with MCSO policy.  In one case, a review of the BWC recording revealed that certain allegations of serious misconduct were accurate; and MCSO subsequently imposed discipline.

During this reporting period, we noted some movement in the Constitutional Policing Plan (CPP), which previously remained stagnant for a very long time.  We note that the online spreadsheet MCSO provided is merely a tracking tool, and we must be able to substantiate the progress on the spreadsheet if we are to properly credit MCSO for the milestones the agency claims.   In our review of the documentation provided, we noted that with the exception of Goals 7 and 8, all other goals show in different stages of completion.  MCSO is reestablishing the discussion of training topics during the Captains' Meetings; we reiterate that MCSO needs to find an efficient methodology for disseminating the information gleaned from these meetings.  We also suggest that quality control of the information presented is important, as is keeping track of deputies who have received the information.  As in the past, we encourage MCSO to include the Community Advisory Board (CAB), as well as other community leaders, in the discussions of the Constitutional Policing Plan.  Including community stakeholders in the planning and execution of these goals is essential to the long-term sustainability of agency-community interaction.

WAI 44964

# Appendix:  Acronyms

The following is a listing of acronyms frequently used in our quarterly status reports:

| | |
|---|---|
| AB | Administrative Broadcast |
| ACJIS | Arizona Criminal Justice Information System |
| ACLU | American Civil Liberties Union |
| ACT | Annual Combined Training |
| AIU | Audits and Inspections Unit |
| AOC | Arizona Office of Courts |
| ARG | Alert Review Group |
| ARS | Arizona Revised Statutes |
| ASU | Arizona State University |
| ATU | Anti-Trafficking Unit |
| BAF | BIO Action Form |
| BB | Briefing Board |
| BIO | Bureau of Internal Oversight |
| BWC | Body-worn camera |
| CAB | Community Advisory Board |
| CAD | Computer Aided Dispatch |
| CBP | Customs and Border Protection |
| CDA | Command Daily Assessment |
| CEU | Criminal Employment Unit |
| CID | Court Implementation Division |
| COrD | Community Outreach Division |
| CORT | Court Order Required Training |
| CRM | Class Remedial Matter |
| DOJ | Department of Justice |

| | |
|---|---|
| DUI | Driving Under the Influence |
| EIS | Early Identification System |
| EIU | Early Intervention Unit |
| EPA | Employee Performance Appraisal |
| FAEC | Full and Effective Compliance |
| FBI | Federal Bureau of Investigation |
| FEC | Full and Effective Compliance |
| FOF | Findings of Fact |
| FTO | Field Training Officer |
| GI | General Instructor |
| ICE | Immigration and Customs Enforcement |
| IIU | Internal Investigations Unit |
| IMF | Incident Memorialization Form |
| IR | Incident Report |
| JED | Judicial Enforcement Division |
| LOS | Length of stop |
| LLS | Legal Liaison Section |
| MCAO | Maricopa County Attorney's Office |
| MCSO | Maricopa County Sheriff's Office |
| NOI | Notice of Investigation |
| NTCF | Non-Traffic Contact Form |
| PAL | Patrol Activity Log |
| PDH | Pre-Determination Hearing |
| POST | Peace Officers Standards and Training |
| PPMU | Posse Personnel Management Unit |
| PSB | Professional Standards Bureau |
| SID | Special Investigations Division |

| | |
|---|---|
| SMS | Skills Manager System |
| SPSS | Statistical Package for the Social Science |
| SRT | Special Response Team |
| TraCS | Traffic Stop Data Collection System |
| TSAR | Traffic Stop Annual Report |
| TSAU | Traffic Stop Analysis Unit |
| TSMR | Traffic Stop Monthly Report |
| TSQR | Traffic Stop Quarterly Report |
| VSCF | Vehicle Stop Contact Form |