# TWENTY-SIXTH REPORT
## Independent Monitor
## for the
## Maricopa County Sheriff's Office



Reporting Period – Third Quarter 2020

Chief (Ret.) Robert S. Warshaw

Independent Monitor

February 9, 2021

WAI 50716

# Table of Contents

Section 1: Introduction……………………………………………...…………..3

Section 2: Methodology and Compliance Summary………………………...............4

Section 3: Implementation Unit Creation and Documentation Request……………..10

Section 4: Policies and Procedures……………………..…………………………...13

Section 5: Pre-Planned Operations……………………….…….…………...40

Section 6: Training……………………………………………………...............45

Section 7: Traffic Stop Documentation and Data Collection……………..……........56

Section 8: Early Identification System (EIS)…………..……………..….…...........105

Section 9: Supervision and Evaluation of Officer Performance…………...............130

Section 10: Misconduct and Complaints…………………………………...............153

Section 11: Community Engagement…………………………………….............157

Section 12: Misconduct Investigations, Discipline, and Grievances………...............163

Section 13: Community Outreach and Community Advisory Board………………..246

Section 14: Supervision and Staffing…………………………………….............247

Section 15: Document Preservation and Production………………….…………..251

Section 16: Additional Training…………………………………………...............255

Section 17: Complaints and Misconduct Investigations Relating to
          Members of the Plaintiff Class………………………………..................256

Section 18: Concluding Remarks……………………………………...............274

Appendix: Acronyms…………………………………………………...............277

WAI 50717

# Section 1: Introduction

This is the twenty-sixth report issued in my capacity as the Court-appointed Monitor in the case of *Manuel de Jesus Ortega Melendres, et al., v. Paul Penzone, et al.* (No. CV-07-02513-PHX-GMS), and documents activities that occurred during the third quarter of 2020, July 1-September 30, 2020.

On May 13, 2016, the Court issued its Findings of Fact in the civil contempt proceedings that commenced in April 2015. This led to the issuance of a Second Supplemental Permanent Injunction/Judgment Order (Second Order) on July 20, 2016, significantly expanding the duties of the Monitor. Our reports cover the additional requirements of the Second Order while continuing to document MCSO's compliance efforts with the First Supplemental Permanent Injunction/Judgment Order (First Order) issued in October 2013. We provide summaries of compliance with both Orders separately, as well as a summary of MCSO's overall, or combined, compliance.

The compliance Paragraphs of the Second Order commence where the First Order ends, and they are numbered from Paragraph 160 through and including Paragraph 337. Not all are subject to our review. For example, the Second Order outlines the duties of the Independent Investigator and the Independent Disciplinary Authority. These are autonomous positions, not subject to oversight of the Court or its Monitor.

The Second Order also delineates in great detail requirements in the areas of misconduct investigations, training, discipline and discipline review, transparency and reporting, community outreach, document preservation, and misconduct investigations involving members of the Plaintiffs' class. The Court granted the Monitor the authority to supervise and direct all of the investigations that fall into the latter category.

As of the last reporting period, MCSO asserted Full and Effective Compliance with 37 Paragraphs of the First Order, as that term is defined in the First Order. After review, I agreed with their assertions. On October 5, MCSO asserted Full and Effective Compliance with four additional Paragraphs: Paragraphs 73, 85, 86, and 105. On November 4, 2020, I agreed with MCSO's assertions, granting MCSO in Full and Effective Compliance with 41 First Order Paragraphs. (See Section 2 of this report.) MCSO retains the obligation to document that the Office remains in Full and Effective Compliance with these Paragraphs.

Because of the COVID-19 pandemic, we once again conducted our October site visit remotely, in contrast to our regular practice of conducting onsite compliance visits. Our last in-person site visit was in January 2020. MCSO's compliance status with individual Paragraphs normally subject to in-person inspections will not be adversely impacted by any missed onsite reviews. We hope that circumstances change and we return to onsite visits. In the intervening period, if any adjustments need to be made to assess Paragraph compliance, we will consider options that might be available to us.

WAI 50718

# Section 2: Methodology and Compliance Summary

The Monitor's primary responsibility is to determine the status of compliance of the Maricopa County Sheriff's Office (MCSO) with the requirements of the requirements in the Order. To accomplish this, the Monitoring Team makes quarterly visits to Maricopa County to meet with MCSO's Court Implementation Division (CID) and other Office personnel – at Headquarters, in Patrol District offices, or at the office that we occupy when onsite. We also observe Office practices; review Office policies and procedures; collect and analyze data using appropriate sampling and analytic procedures; and inform the Parties and, on a quarterly basis, the Court, about the status of MCSO's compliance.

This report documents compliance with applicable Order requirements, or Paragraphs, in two phases. For Phase 1, we assess compliance according to whether MCSO has developed and approved requisite policies and procedures, and MCSO personnel have received documented training on their contents. For Phase 2 compliance, generally considered operational implementation, MCSO must demonstrate that it is complying with applicable Order requirements more than 94% of the time, or in more than 94% of the instances under review.

We use four levels of compliance: In compliance; Not in compliance; Deferred; and Not applicable. "In compliance" and "Not in compliance" are self-explanatory. We use "Deferred" in circumstances in which we are unable to fully determine the compliance status – due to a lack of data or information, incomplete data, or other reasons that we explain in the narrative of our report. We will also use "Deferred" in situations in which MCSO, in practice, is fulfilling the requirements of a Paragraph, but has not yet memorialized the requirements in a formal policy.

For Phase 1 compliance, we use "Not applicable" for Paragraphs where a policy is not required; for Phase 2 compliance, we use "Not applicable" for Paragraphs that do not necessitate a compliance assessment.

The tables below summarize the compliance status of Paragraphs tracked in this report.[1] This is our seventeenth quarterly status report in which we report on MCSO's compliance with both the First and Second Orders. During this reporting period, MCSO's Phase 1 compliance rate with the **First Order** increased by two percentage points, from 96% to 98%. MCSO's Phase 1 compliance rate with the **Second Order** remained the same as the last reporting period, at 100%.

During this reporting period, MCSO's Phase 2 compliance rate with the **First Order** decreased by three percentage points, from 81% to 78%. This number includes Paragraphs that we consider to be in compliance and those that are now in Full and Effective Compliance (FAEC), as described above. (See below for the list of Paragraphs that are in Full and Effective Compliance.) During this reporting period, MCSO's Phase 2 compliance rate with the **Second Order** increased by one percentage point from the last reporting period, to 91%.

---

[1] The percent in compliance for Phase 1 is calculated by dividing the number of Order Paragraphs determined to be in compliance by the total number of Paragraphs requiring a corresponding policy or procedure. Paragraphs with the status of Deferred are included in the denominator, while Paragraphs with the status of Not Applicable are not included. Therefore, the number of Paragraphs included in the denominator totals 183 for Phase 1. The number of Paragraphs included in the denominator totals 207 for Phase 2.

WAI 50719

| Twenty-Sixth Quarterly Status Report | | |
| --- | --- | --- |
| **First Order Summary** | | |
| **Compliance Status** | **Phase 1** | **Phase 2** |
| Not Applicable | 20 | 5 |
| Deferred | 0 | 0 |
| Not in Compliance | 2 | 21 |
| In Compliance | 78 | 74[2] |
| **Percent in Compliance** | **98%** | **78%** |

| Twenty-Sixth Quarterly Status Report | | |
| --- | --- | --- |
| **Second Order Summary** | | |
| **Compliance Status** | **Phase 1** | **Phase 2** |
| Not Applicable | 20 | 10 |
| Deferred | 0 | 2 |
| Not in Compliance | 0 | 8 |
| In Compliance | 103 | 103 |
| **Percent in Compliance** | **100%** | **91%** |

---

[2] This number includes those Paragraphs that are deemed in Full and Effective Compliance.

WAI 50720

| | MCSO's Compliance with the Requirements of the **First Order** *(October 2, 2013)* | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **Report 1** | **Report 2** | **Report 3** | **Report 4** | **Report 5** | **Report 6** | **Report 7** | **Report 8** | **Report 9** | **Report 10** |
| **Phase 1** | 4% | 10% | 44% | 40% | 51% | 57% | 61% | 60% | 67% | 60% |
| **Phase 2** | 0% | 0% | 26% | 25% | 28% | 37% | 38% | 39% | 44% | 49% |

| | **Report 11** | **Report 12** | **Report 13** | **Report 14** | **Report 15** | **Report 16** | **Report 17** | **Report 18** | **Report 19** | **Report 20** |
|---|---|---|---|---|---|---|---|---|---|---|
| **Phase 1** | 63% | 79% | 88% | 85% | 85% | 85% | 85% | 97% | 97% | 97% |
| **Phase 2** | 50% | 57% | 67% | 62% | 65% | 64% | 66% | 77% | 75% | 78% |

| | **Report 21** | **Report 22** | **Report 23** | **Report 24** | **Report 25** | **Report 26** |
|---|---|---|---|---|---|---|
| **Phase 1** | 96% | 96% | 96% | 96% | 96% | 98% |
| **Phase 2** | 76% | 77% | 79% | 82% | 81% | 78% |

WAI 50721

| | MCSO's Compliance with the Requirements of the **Second Order** *(July 20, 2016)* | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **Report 1** | **Report 2** | **Report 3** | **Report 4** | **Report 5** | **Report 6** | **Report 7** | **Report 8** | **Report 9** | **Report 10** |
| **Phase 1** | N/A | | | | | | | | | 1% |
| **Phase 2** | N/A | | | | | | | | | 43% |

| | **Report 11** | **Report 12** | **Report 13** | **Report 14** | **Report 15** | **Report 16** | **Report 17** | **Report 18** | **Report 19** | **Report 20** |
|---|---|---|---|---|---|---|---|---|---|---|
| **Phase 1** | 10% | 12% | 72% | 75% | 77% | 77% | 78% | 78% | 99% | 99% |
| **Phase 2** | 46% | 60% | 63% | 66% | 72% | 75% | 80% | 81% | 90% | 89% |

| | **Report 21** | **Report 22** | **Report 23** | **Report 24** | **Report 25** | **Report 26** |
|---|---|---|---|---|---|---|
| **Phase 1** | 100% | 100% | 100% | 100% | 100% | 100% |
| **Phase 2** | 91% | 90% | 92% | 93% | 90% | 91% |

WAI 50722

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|---|---|---|
| 9 | 12/28/18 | Concurred on 1/28/19 |
| 10 | 12/28/18 | Concurred on 1/28/19 |
| 11 | 12/28/18 | Concurred on 1/28/19 |
| 12 | 12/28/18 | Concurred on 1/28/19 |
| 13 | 12/28/18 | Concurred on 1/28/19 |
| 21 | 6/22/20 | Concurred on 7/20/20 |
| 23 | 12/28/18 | Concurred on 1/28/19 |
| 26 | 12/28/18 | Concurred on 1/28/19 |
| 27 | 3/22/19 | Concurred on 4/22/19 |
| 28 | 12/28/18 | Concurred on 1/28/19 |
| 29 | 12/28/18 | Concurred on 1/28/19 |
| 30 | 12/28/18 | Concurred on 1/28/19 |
| 31 | 9/9/19 | Concurred on 10/2/19 |
| 34 | 6/3/19 | Concurred on 6/25/19 |
| 35 | 12/28/18 | Concurred on 1/28/19 |
| 36 | 12/28/18 | Concurred on 1/28/19 |
| 37 | 12/28/18 | Concurred on 1/28/19 |
| 38 | 12/28/18 | Concurred on 1/28/19 |
| 40 | 12/28/18 | Concurred on 1/28/19 |
| 45 | 12/9/19 | Concurred on 1/6/20 |
| 46 | 12/9/19 | Concurred on 1/6/20 |
| 48 | 12/28/18 | Did not concur on 1/28/19 |
| 49 | 12/28/18 | Did not concur on 1/28/19 |
| 50 | 12/28/18 | Did not concur on 1/28/19 |
| 51 | 12/28/18 | Did not concur on 1/28/19 |
| 55 | 12/28/18 | Concurred on 1/28/19 |
| 58 | 6/22/20 | Concurred on 7/20/20 |

WAI 50723

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
| --- | --- | --- |
| 59 | 12/28/18 | Concurred on 1/28/19 |
| 60 | 12/28/18 | Concurred on 1/28/19 |
| 61 | 12/9/19 | Concurred on 1/6/20 |
| 63 | 6/22/20 | Concurred on 7/20/20 |
| 68 | 12/28/18 | Concurred on 1/28/19 |
| 71 | 12/28/18 | Concurred on 1/28/19 |
| 73 | 10/5/20 | Concurred on 11/4/20 |
| 77 | 12/28/18 | Concurred on 1/28/19 |
| 84 | 9/9/19 | Concurred on 10/2/19 |
| 85 | 10/5/20 | Concurred on 11/4/20 |
| 86 | 10/5/20 | Concurred on 11/4/20 |
| 88 | 12/28/18 | Concurred on 1/28/19 |
| 89 | 12/9/19 | Concurred on 1/6/20 |
| 93 | 3/17/20 | Concurred on 4/9/20 |
| 101 | 12/28/18 | Concurred on 1/28/19 |
| 104 | 3/17/20 | Concurred on 4/9/20 |
| 105 | 10/5/20 | Concurred on 11/4/20 |
| 106 | 6/3/19 | Concurred on 6/25/19 |

WAI 50724

**COURT ORDER III.  MCSO IMPLEMENTATION UNIT AND INTERNAL AGENCY-WIDE ASSESSMENT** *[Court Order wording in italics]*

*Paragraph 9.  Defendants shall hire and retain, or reassign current MCSO employees to form an interdisciplinary unit with the skills and abilities necessary to facilitate implementation of this Order.  This unit shall be called the MCSO Implementation Unit and serve as a liaison between the Parties and the Monitor and shall assist with the Defendants' implementation of and compliance with this Order.  At a minimum, this unit shall: coordinate the Defendants' compliance and implementation activities; facilitate the provision of data, documents, materials, and access to the Defendants' personnel to the Monitor and Plaintiffs representatives; ensure that all data, documents and records are maintained as provided in this Order; and assist in assigning implementation and compliance-related tasks to MCSO Personnel, as directed by the Sheriff or h is designee.  The unit will include a single person to serve as a point of contact in communications with Plaintiffs, the Monitor and the Court.*

**In Full and Effective Compliance**

To verify Phase 2 compliance with this Paragraph, we reviewed the monthly personnel rosters for the Court Implementation Division (CID).  As of this reporting period, CID has seven personnel: one captain; one lieutenant; three sergeants; one management assistant; and one administrative assistant.  CID continues to be supported by MCAO attorneys, who frequently participate in our meetings and telephone calls with Division personnel.

During this reporting period, CID continued to provide documents through MCSO's counsel via an Internet-based application.  The Monitoring Team, the Plaintiffs, and the Plaintiff-Intervenors receive all files and documents simultaneously, with only a few exceptions centering on open internal investigations.  CID effectively facilitates our and Parties' access to MCSO's personnel.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 50725

***Paragraph 10.*** *MCSO shall collect and maintain all data and records necessary to: (1) implement this order, and document implementation of and compliance with this Order, including data and records necessary for the Monitor to conduct reliable outcome assessments, compliance reviews, and audits; and (2) perform ongoing quality assurance in each of the areas addressed by this Order. At a minimum, the foregoing data collection practices shall comport with current professional standards, with input on those standards from the Monitor.*

**In Full and Effective Compliance**

CID continues to be responsive to our requests. CID also addresses with immediacy any issues we encounter in the samples we request – be they technical issues, missing documents, or other problems. MCSO's Bureau of Internal Oversight (BIO) routinely audits the work products of the Office, particularly in the areas that directly affect compliance with the requirements of the Orders. In many instances, BIO will review the same material we request in our samples, and BIO frequently notes – and addresses – the same deficiencies we identify in our reviews.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

***Paragraph 11.*** *Beginning with the Monitor's first quarterly report, the Defendants, working with the unit assigned for implementation of the Order, shall file with the Court, with a copy to the Monitor and Plaintiffs, a status report no later than 30 days before the Monitor's quarterly report is due. The Defendants' report shall (i) delineate the steps taken by the Defendants during the reporting period to implement this Order; (ii) delineate the Defendants' plans to correct any problems; and (iii) include responses to any concerns raised in the Monitor's previous quarterly report.*

**In Full and Effective Compliance**

MCSO submitted its 26th quarterly compliance report on December 16, 2020. The report covers the steps MCSO has taken to implement the Court's Orders during the third quarter of 2020. The report also includes any plans to correct difficulties encountered during the quarter and responses to concerns raised in our 25th quarterly status report.

In its report, MCSO asserted Full and Effective Compliance (FEC) with Paragraphs 22, 43, 44, 47, 57, 76, 102, 244, 245, 247, 248, 249, 264, 266, 273, 276, 278, 279, 287, 288, 292, and 337. After review of MCSO's submission, we concurred with MCSO's assertions of FEC for all of these Paragraphs except 22, 43, 44, 47, and 288. We will finalize these determinations in our next report.

WAI 50726

***Paragraph 12.*** *The Defendants, working with the unit assigned for implementation of the Order, shall conduct a comprehensive internal assessment of their Policies and Procedures affecting Patrol Operations regarding Discriminatory Policing and unlawful detentions in the field as well as overall compliance with the Court's orders and this Order on an annual basis. The comprehensive Patrol Operations assessment shall include, but not be limited to, an analysis of collected traffic-stop and high-profile or immigration-related operations data; written Policies and Procedures; Training, as set forth in the Order; compliance with Policies and Procedures; Supervisor review; intake and investigation of civilian Complaints; conduct of internal investigations; Discipline of officers; and community relations. The first assessment shall be conducted within 180 days of the Effective Date. Results of each assessment shall be provided to the Court, the Monitor, and Plaintiffs' representatives.*

**In Full and Effective Compliance**

See Paragraph 13.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.


***Paragraph 13.*** *The internal assessments prepared by the Defendants will state for the Monitor and Plaintiffs' representatives the date upon which the Defendants believe they are first in compliance with any subpart of this Order and the date on which the Defendants first assert they are in Full and Effective Compliance with the Order and the reasons for that assertion. When the Defendants first assert compliance with any subpart or Full and Effective Compliance with the Order, the Monitor shall within 30 days determine whether the Defendants are in compliance with the designated subpart(s) or in Full and Effective Compliance with the Order. If either party contests the Monitor's determination it may file an objection with the Court, from which the Court will make the determination. Thereafter, in each assessment, the Defendants will indicate with which subpart(s) of this Order it remains or has come into full compliance and the reasons therefore. The Monitor shall within 30 days thereafter make a determination as to whether the Defendants remain in Full and Effective Compliance with the Order and the reasons therefore. The Court may, at its option, order hearings on any such assessments to establish whether the Defendants are in Full and Effective Compliance with the Order or in compliance with any subpart(s).*

**In Full and Effective Compliance**

We and CID established that the schedule for the submission of comprehensive annual assessments as required by these Paragraphs will run according to MCSO's fiscal year cycle, July 1-June 30. MCSO will submit reports on or before September 15 of each year.

Consistent with this agreement, on September 16, 2020, MCSO filed with the Court its 2020 Annual Compliance Report covering the period of July 1, 2019 through June 30, 2020.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 50727

# Section 4: Policies and Procedures

**COURT ORDER V. POLICIES AND PROCEDURES**

***Paragraph 18.*** *MCSO shall deliver police services consistent with the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order, and with current professional standards. In conducting its activities, MCSO shall ensure that members of the public receive equal protection of the law, without discriminating based on actual or perceived race or ethnicity, and in a manner that promotes public confidence.*

***Paragraph 19.*** *To further the goals in this Order, the MCSO shall conduct a comprehensive review of all Patrol Operations Policies and Procedures and make appropriate amendments to ensure that they reflect the Court's permanent injunction and this Order.*

**Phase 1:** In compliance

- GA-1 (Development of Written Orders), most recently amended on February 19, 2020.

**Phase 2:** In compliance

MCSO has taken steps toward a comprehensive review of its Patrol Operations Policies and Procedures in four phases. First, on December 31, 2013, prior to my appointment as Monitor, MCSO filed with the Court all of its policies and procedures, with amendments, that MCSO believed complied with the various Paragraphs of the First Order. Second, in the internal assessment referenced above, MCSO discussed its ongoing evaluation of Patrol Operations and its development of policies and procedures. Third, in response to our requests, MCSO provided all of the policies and procedures it maintains are applicable to the First Order for our review and that of the Plaintiffs. We provided our feedback, which also included the Plaintiffs' comments, on these policies on August 12, 2014. Based on that feedback, MCSO made adjustments to many of the policies, concentrating first on the policies to be disseminated in Detentions, Arrests, and the Enforcement of Immigration-Related Laws Training; and the Bias Free Policing Training (often referred to as Fourth and Fourteenth Amendment Training) that commenced in early September. We reviewed MCSO's updated policies and provided our approval for several on August 25, 2014.

Fourth, in discussions during 2016, MCSO requested more specific guidance on what we considered to be Patrol-related policies and procedures. In response, we provided MCSO with a list of the Patrol-related policies for the purposes of Paragraph 19. We included on this list policies that were not recently revised or currently under review. Several policies required changes to comport with the First Order, Second Order, or both. In 2018, MCSO published the last of the outstanding policies, achieving compliance with this Paragraph.

WAI 50728

**Paragraph 20.** *The MCSO shall comply with and operate in accordance with the Policies and Procedures discussed in this Order and shall take all reasonable measures to ensure that all Patrol Operations personnel comply with all such Policies and Procedures.*

**Paragraph 21.** *The MCSO shall promulgate a new, department-wide policy or policies clearly prohibiting Discriminatory Policing and racial profiling. The policy or policies shall, at a minimum:*

a.  *define racial profiling as the reliance on race or ethnicity to any degree in making law enforcement decisions, except in connection with a reliable and specific suspect description;*

b.  *prohibit the selective enforcement or non-enforcement of the law based on race or ethnicity;*

c.  *prohibit the selection or rejection of particular policing tactics or strategies or locations based to any degree on race or ethnicity;*

d.  *specify that the presence of reasonable suspicion or probable cause to believe an individual has violated a law does not necessarily mean that an officer's action is race-neutral; and*

e.  *include a description of the agency's Training requirements on the topic of racial profiling in Paragraphs 48–51, data collection requirements (including video and audio recording of stops as set forth elsewhere in this Order) in Paragraphs 54–63 and oversight mechanisms to detect and prevent racial profiling, including disciplinary consequences for officers who engage in racial profiling.*

**In Full and Effective Compliance**

MCSO has developed and published the policies required by Paragraph 21. MCSO distributed these policies and has trained agency personnel during the required Fourth and Fourteenth Amendment training, on an annual basis, since 2014. MCSO's implementation of these policies is covered in other Paragraphs.

On June 22, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 50729

***Paragraph 22.*** *MCSO leadership and supervising Deputies and detention officers shall unequivocally and consistently reinforce to subordinates that Discriminatory Policing is unacceptable.*

**Phase 1:**  In compliance

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 4, 2020.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on May 28, 2020.

**Phase 2:**  In compliance

With input from the Parties, the reinforcement of CP-8 (Preventing Racial and Other Bias-Based Policing) was modified to a two-step process conducted annually.  MCSO describes Part 1 of the process as the following: "On an annual basis, within the first six months, supervisors will have discussions, either individual or group, and view videos from the Training library with assigned employees, reserve deputies, and Posse members.  The videos will be available through the HUB and attestation of the training will be through the HUB."  Part 2 of the process as described by MCSO: "On an annual basis, within the last six months, supervisors shall ensure that all employees, reserve deputies, and Posse members complete their annual review and acknowledgment of office policy.  In addition, employees will be required to view a video from the Sheriff or designee, which reinforces the policy.  Acknowledgement is done through the HUB."

As an additional measure, supervisors will have the latitude to review and discuss the policy with their employees, and document the discussion in BlueTeam.  MCSO will provide proof of compliance biannually, at the end of the six-month periods, when each of the elements of the process is completed.  MCSO will also provide progress reports in the interim.

MCSO provided proof of compliance with this Paragraph for the first half of 2020, as noted in our previous report.  We will conduct our next review of proof of compliance after the end of the second half of 2020.  MCSO remains in compliance with this Paragraph.

***Paragraph 23.*** *Within 30 days of the Effective Date, MCSO shall modify its Code of Conduct to prohibit MCSO Employees from utilizing County property, such as County e-mail, in a manner that discriminates against, or denigrates, anyone on the basis of race, color, or national origin.*

**In Full and Effective Compliance**

BIO uses a randomizing program to select samples for each inspection.  BIO reviews CAD messages in an effort to identify compliance with CP-2 (Code of Conduct), CP-3 (Workplace Professionalism: Discrimination and Harassment), and GM-1 (Electronic Communications, Data and Voice Mail).  In its submission, MCSO includes the specific nature of any potential concerns identified during the audits.  We observed the processes BIO uses to conduct CAD and email audits, to ensure that we thoroughly understand the mechanics involved in conducting these audits.  For CAD and email audits, we receive copies of the audits completed by BIO, the details of any violations found, and copies of the memoranda of concern or BIO Action Forms that are

WAI 50730

completed. Email and CAD/Alpha Paging Inspections are completed on a quarterly basis. For Email inspections, MCSO will inspect 50 employees per quarter, and for CAD/Alpha Paging, MCSO will inspect 15 days per quarter.

For this reporting period, the third quarter of 2020, MCSO submitted CAD and Alpha Paging Inspection Report BI2020-0115, as proof of compliance with this Paragraph. MCSO selected a random sample of 15 days in the quarter for inspection. There were a total of 6,685 CAD and Alpha Paging entries for the selected dates. The inspection found that 100% of the inspected messages were in compliance.

For the third quarter of 2020, we reviewed Employees Emails Inspection Report BI2020-0124 for compliance with this Paragraph. A total of 50 employees were selected for review, with a total of 6,845 emails inspected. The inspection found that 6,838, or 99.90%, of the emails were in compliance.

For the third quarter, MCSO again advised us that due to ongoing concerns with COVID-19, MCSO did not conduct any facility inspections. We will report again on facility inspections when they resume.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.


*Paragraph 24. The MCSO shall ensure that its operations are not motivated by or initiated in response to requests for law enforcement action based on race or ethnicity. In deciding to take any law enforcement action, the MCSO shall not rely on any information received from the public, including through any hotline, by mail, email, phone or in person, unless the information contains evidence of a crime that is independently corroborated by the MCSO, such independent corroboration is documented in writing, and reliance on the information is consistent with all MCSO policies.*

**Phase 1:** In compliance

- GI-7 (Processing of Bias-Free Tips), published June 14, 2019.

**Phase 2:** In compliance

MCSO created the Sheriff's Intelligence Leads and Operations (SILO) Unit in the first quarter of 2016. The SILO Unit became operational on September 11, 2017. GI-7 requires that any tips received by MCSO components be forwarded to the SILO Unit for recording and processing. The SILO Unit classifies this information by the type of alleged criminal activity, or service requested, and forwards it to the appropriate Unit for action and response. In some cases, residents email or call with requests for traffic enforcement, or for MCSO to address quality-of-life issues; these are considered calls for service rather than tips on criminal activity. If the information provided pertains to criminal activity in another jurisdiction, MCSO forwards the information to the appropriate law enforcement agency and documents it in the SILO database. Generally, if there is any bias noted in the information received, MCSO closes the tip and takes no action. We review all tips that MCSO closes due to bias.

WAI 50731

During this reporting period, we reviewed 312 tips submitted for July, 315 tips submitted for August, and 239 tips submitted for September. We reviewed a total of 866 tips, which were classified and recorded according to the type of alleged violation or service requested. Our reviews for this reporting period indicated that warrants, drugs, and suspicious persons or activities comprised the largest numbers of tips for the quarter. For each month of the quarter, we noted a large number of tips classified as "other." COVID-19-related tips for the quarter peaked in July with 100, and decreased to 27 and 16 for August and September, respectively. We reviewed three tips closed due to bias during this reporting period. We concluded that these tips were handled according to MCSO policy. MCSO remains in compliance with this Paragraph.

### b. Policies and Procedures to Ensure Bias-Free Traffic Enforcement

*Paragraph 25.* The MCSO will revise its policy or policies relating to traffic enforcement to ensure that those policies, at a minimum:

a.  prohibit racial profiling in the enforcement of traffic laws, including the selection of which vehicles to stop based to any degree on race or ethnicity, even where an officer has reasonable suspicion or probable cause to believe a violation is being or has been committed;

b.  provide Deputies with guidance on effective traffic enforcement, including the prioritization of traffic enforcement resources to promote public safety;

c.  prohibit the selection of particular communities, locations or geographic areas for targeted traffic enforcement based to any degree on the racial or ethnic composition of the community;

d.  prohibit the selection of which motor vehicle occupants to question or investigate based to any degree on race or ethnicity;

e.  prohibit the use of particular tactics or procedures on a traffic stop based on race or ethnicity;

f.  require deputies at the beginning of each stop, before making contact with the vehicle, to contact dispatch and state the reason for the stop, unless Exigent Circumstances make it unsafe or impracticable for the deputy to contact dispatch;

g.  prohibit Deputies from extending the duration of any traffic stop longer than the time that is necessary to address the original purpose for the stop and/or to resolve any apparent criminal violation for which the Deputy has or acquires reasonable suspicion or probable cause to believe has been committed or is being committed;

h.  require the duration of each traffic stop to be recorded;

i.  provide Deputies with a list and/or description of forms of identification deemed acceptable for drivers and passengers (in circumstances where identification is required of them) who are unable to present a driver's license or other state-issued identification; and

WAI 50732

j.      *instruct Deputies that they are not to ask for the Social Security number or card of any motorist who has provided a valid form of identification, unless it is needed to complete a citation or report.*

**Phase 1:**  In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on May 28, 2020.

- EB-2 (Traffic Stop Data Collection), most recently amended on January 7, 2020.

- GI-1 (Radio and Enforcement Communications Procedures), most recently amended on February 5, 2020.

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 4, 2020.

- EA-11 (Arrest Procedures), most recently amended on May 13, 2020.

**Phase 2:**  In compliance

During the finalization of the Fourth and Fourteenth Amendment training curricula required by the Order, the Parties agreed to a list and/or description of forms of identification deemed acceptable for drivers and passengers, as required by this Paragraph.  The data required for verification to ensure compliance with these policies is captured by the TraCS system.  The system documents the requirements of the Order and MCSO policies.  MCSO has continued to make technical changes to the TraCS system to ensure that the mandatory fields on the forms used to collect the data are completed and that deputies are capturing the required information.  TraCS is a robust system that allows MCSO to make technical changes to improve how required information is captured.

To verify Phase 2 compliance with this Paragraph, we reviewed MCSO's Vehicle Stop Contact Form (VSCF), Vehicle Stop Contact Form Supplemental Sheet, Incidental Contact Receipt, Written Warning/Repair Form, Arizona Traffic Ticket and Complaint Form, Internet I/Viewer Event Form, Justice Web Interface Form, CAD printout, and any Incident Report generated by the traffic stop.  MCSO created many of these forms to capture the requirements of Paragraphs 25 and 54.

Since our July 2015 site visit, there has been significant improvement in the TraCS system that has enhanced the reliability and validity of the data provided by MCSO.  This improvement has been buttressed by the introduction of data quality control procedures now being implemented and memorialized in the EIU Operations Manual.  (This is further discussed in Paragraph 56, below.)  We also compared traffic stop data between Latino and non-Latino drivers in the samples provided to us.

Paragraph 25.a. prohibits racial profiling in the enforcement of traffic laws, including the selection of which vehicles to stop based on any degree on race or ethnicity, even where a deputy has reasonable suspicion or probable cause to believe a violation is being or has been committed.  The selection of the sample size and the sampling methodology employed for drawing our sample is detailed in Section 7: Traffic Stop Documentation and Data Collection.

WAI 50733

We review a sample of 105 traffic stops each reporting period to assess this requirement. Our review of the sample of 105 traffic stops that occurred during this reporting period in Districts 1, 2, 3, 4, 6, and 7, and Lake Patrol indicated that MCSO was following protocol, and that the stops did not violate the Order or internal policies. Paragraphs 66 and 67 require an annual comprehensive analysis of all traffic stop data, which will more accurately determine if MCSO is meeting the requirements of this Paragraph. MCSO remains in compliance with this Subparagraph.

Paragraph 25.b. requires MCSO to provide deputies with guidance on effective traffic enforcement, including the prioritization of traffic enforcement resources to promote public safety. EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), Sections A-E, address these concerns. The policy specifies that driving under the influence and speeding are the main causes of accidents, and should be the focus of traffic enforcement. Based on our review of the data provided for this reporting period, the most common traffic stop violations are as follows: 61 stops for speed above the posted limit (58%); nine stops for failure to obey official traffic control devices (9%); 10 stops for failure to possess valid registrations or tags (10%); 10 stops for equipment violations (10%); five stops for failing to maintain a lane of traffic (5%); and 10 stops for other moving violations (10%).

As the policy specifically identifies speeding violations as one of the contributing factors of traffic accidents, MCSO deputies have targeted this violation. In our review, we break down the specific traffic violation for each stop and use each traffic stop form completed by deputies during the stop to make a determination if the stop is justified and fulfills the requirements of this Paragraph. MCSO remains in compliance with this Subparagraph.

Paragraph 25.c. requires MCSO to prohibit the selection of particular communities, locations, or geographic areas for targeted traffic enforcement based to any degree on the racial or ethnic composition of the community. During our inspection, we document the location of every stop and note the GPS coordinates if available. Our review of the sample data covering all MCSO Districts during this reporting period did not indicate that MCSO was targeting any specific area or ethnicity to conduct traffic stops.

MCSO remains in compliance with this Subparagraph.

Paragraph 25.d. requires MCSO to prohibit the selection of which motor vehicle occupants to question or investigate based, to any degree, on race or ethnicity. We reviewed the demographic data of Maricopa County (according to 2018 U.S. Census data, 31.1% of the population is Latino), and found that the ratio of Latino drivers stopped during this reporting period was higher than in the past reporting period in comparison to the ethnicity of the population in the County. (See Paragraph 54.e.) Thirty-eight (54%) of the 71 stops where passenger contacts occurred involved Latino drivers.

A review of complaints from the public for this reporting period did not reveal that any complaints were filed alleging that MCSO deputies selected motor vehicle occupants for questioning or investigation, based on the individual's race or ethnicity.

WAI 50734

MCSO has fully implemented body-worn cameras, and we review a sample of the recordings each reporting period to verify if deputies are questioning occupants to determine if they are legally in the country. We did not identify any such events during this reporting period.

During this reporting period, we observed that 30 of the 105 stops occurred during nighttime hours. Our review of the sample data indicated that generally, traffic stops were not based on race or ethnicity and reflected the general makeup of the population of the County. In most instances, the deputies document on the VSCF that they were unable to determine the race/ethnicity and gender of the vehicle occupants prior to the stop. MCSO is in compliance with this Subparagraph.

Paragraph 25.e. requires MCSO to prohibit the use of particular tactics or procedures on a traffic stop based on race or ethnicity. We reviewed a sample of CAD audio recordings and CAD printouts where the dispatcher entered the reason for the stop when advised by the deputy in the field. We also reviewed body-worn camera recordings of deputies making traffic stops. The methodology that we employed to select our cases is described in detail in Section 7. In the cases we reviewed, the CAD audio recordings and the body-worn camera recordings revealed that deputies were not making traffic stops using tactics based on race or ethnicity. MCSO remains in compliance with this Subparagraph.

Paragraph 25.f. requires deputies at the beginning of each stop, before making contact with the vehicle, to verbally contact dispatch and state the reason for the stop unless exigent circumstances make it unsafe for the deputy to contact Communications. When the deputy advises Communications of the location, tag number, and reason for the stop, this information is digitally logged on the CAD printout and it is audio recorded. (See Paragraph 54.e.) We reviewed 30 CAD audio recordings and the CAD printouts; in each, the deputy advised dispatch of the reason for the stop. Through our reviews of BWC recordings and CAD printouts, we verified that the reason for the stop was voiced prior to making contact with the drivers in 30 of the 30 cases we reviewed. For the 75 other cases that were part of our sample, we reviewed the VSCFs and the CAD printouts to ensure that deputies properly advised dispatch of the reason for the stop prior to making contact with the violator. In all 75 stops, the deputy properly advised dispatch the reason for the stop. MCSO is in compliance with this Subparagraph.

Paragraph 25.g. prohibits deputies from extending the duration of any traffic stop longer than the time that is necessary to address the original purpose for the stop and/or to resolve any apparent criminal violation for which the deputy has or acquires reasonable suspicion or probable cause to believe has been committed or is being committed. MCSO employs a series of five questions on the VSCF to document the circumstances that might require a stop to be prolonged. In our review of 105 traffic stops, we determined that MCSO documented a response to at least one of the series of five questions in six of the stops. Our review of those stops revealed that, in four instances, deputies indicated that they experienced technological difficulties. The duration of those four stops ranged from nine minutes to 43 minutes. There was one stop that involved a driving under the influence investigation. The duration of that stop was 15 minutes. There was one stop that involved the towing of a vehicle and the deputy also experienced technological difficulties. The duration of that stop was one hour and 36 minutes.

WAI 50735

During our review, we noted four additional stops that were extended for a reasons other than those that were identified via the five questions and responses employed on the VSCF. One stop involved the arrest of a driver. The duration of that stop was 32 minutes. One stop involved the deputy awaiting the arrival of a licensed driver to take custody of the vehicle as the driver did not have a valid driver's license. The duration of that stop was 35 minutes. One stop involved the deputy requesting and awaiting the arrival of a supervisor which had been requested by the driver. The duration of that stop was 34 minutes. One stop involved a foot chase of the driver and passenger, both of whom fled from the vehicle. The duration of that stop was one hour and 45 minutes.

MCSO remains in compliance with this Subparagraph.

Paragraph 25.h. requires the duration of each traffic stop to be recorded. The time of the stop and its termination is now auto-populated on the VSCF by the CAD system. To ensure data entry accuracy, MCSO implemented a technical change to the TraCS system on November 29, 2016. The change automatically creates a red field in the stop contact times if the deputy manually changes these times on the VSCF. In our review, we determined that the duration was recorded accurately in all 105 traffic stops. MCSO is in compliance with this Subparagraph, with a compliance rate of 100%.

Paragraph 25.i. requires that MCSO provide deputies with a list and/or description of forms of identification deemed acceptable for drivers and passengers (in circumstances where identification is required of them) who are unable to present a driver's license or other state-issued identification. The Plaintiffs' attorneys and MCSO agreed on acceptable forms of identification, and this information has been included in the Fourth and Fourteenth Amendment training. EA-11 (Arrest Procedures), most recently amended on May 13, 2020, provides a list of acceptable forms of identification if a valid driver's license cannot be produced. During this reporting period's review of the sample of 105 traffic stops, there were three cases where the drivers did not present a valid driver's license during the traffic stop. The cases are described in detail below:

- A Black male driver was stopped for a speeding violation. The driver presented an Arizona identification card. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for speeding and driving with no driver's license in his possession.

- A Latina driver was stopped for an expired registration. The vehicle was occupied by a White male passenger. The driver did not have any identification on her person. A records check revealed that the driver had never obtained a driver's license. The driver was issued a citation for no current registration and driving with no valid driver's license.

- A Latino driver was stopped for a stop sign violation. The vehicle was occupied by three Latina passengers. The driver did not have any identification on his person. A records check revealed that the driver had never obtained a driver's license. The driver was issued a citation for the stop sign violation and for driving with no valid driver's license.

WAI 50736

In our review of the sample of cases to assess compliance with Paragraph 54.k., searches of persons, there were 30 drivers who did not present a valid driver's license to deputies; however, in four of the stops, the deputies were able to verify that the driver's licenses were valid after conducting a records check. The remaining 26 cases are described in detail below:

- A Latino driver was stopped for driving with an invalid temporary license plate. The driver did not have any identification on his person. A records check revealed that the driver had never obtained a driver's license and that a warrant existed for his arrest. The driver was arrested and issued a citation for no evidence of insurance and driving with no valid driver's license.

- A White female driver was stopped for an expired registration. The driver did not have any identification on her person. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license and no current registration.

- An American Indian/Alaskan Native male driver was stopped for a speeding violation. The driver produced an Arizona identification card. A records check revealed that the driver's license was in a suspended status. During the traffic stop, the deputy seized narcotic paraphernalia. The driver was issued a citation for driving with a suspended driver's license and possession of narcotic paraphernalia. He was also issued a warning for the speeding violation.

- A White male driver was stopped for a speeding violation and for driving with no visible license plate. The driver did not have any identification on his person. A records check revealed that the driver had never obtained a driver's license, and that a warrant existed for his arrest. The driver was arrested and issued a citation for speeding and for driving without a license plate being visible.

- A White male driver was observed driving while using a cellular phone. The driver did not have any identification on his person. A records check revealed that the driver's license was in a suspended status, and that a warrant existed for his arrest. The driver was arrested and issued a citation for driving with a suspended driver's license.

- A Latina driver was stopped for driving with an expired registration. The vehicle was occupied by a Black male passenger. The driver did not have any identification on her person. A records check revealed that the driver's license was in a suspended status, and that a warrant existed for her arrest. The driver was arrested and she was issued a citation for driving with a suspended driver's license.

- A White male was stopped for a stop sign violation. The driver produced a driver's license. A records check revealed that the driver's license was in a suspended status. The deputy seized the driver's license, and issued the driver a citation for driving with a suspended driver's license.

WAI 50737

- A Latino driver was stopped for driving with an expired registration. The driver, a 15-year-old, did not have any identification on his person and had never obtained a driver's license. The driver was issued a citation for driving with no valid driver's license, no current registration, and no evidence of insurance.

- A White male driver was stopped for a driving with an expired registration. The driver produced an Arizona identification card. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license and no current registration.

- A Latino driver was stopped for driving with an expired registration. The driver did not have any identification on his person. A records check revealed that the driver's license was in a suspended status. During the stop, the deputy noted that the license plate had been altered. The driver was arrested for driving with a suspended driver's license and failing to provide driver's license or identification.

- A White male driver was stopped for driving with no visible license plate. The driver produced a driver's license. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license, no current registration, no evidence of insurance, and no rear license plate. The deputy seized the driver's license and placed it in evidence.

- A Latina driver was stopped for making an improper turn on a red signal violation. The driver produced an Arizona identification card. A records check revealed that the driver's license was in a revoked status and that a warrant existed for her arrest. The driver was arrested, and she was issued a citation for driving with a revoked driver's license. The deputy also seized suspected narcotics from the driver's purse and placed it in evidence.

- A White male driver was stopped for driving with an unreadable license plate. The driver did not have any identification on his person. A records check revealed that the driver's license was in a suspended status, and that a warrant existed for his arrest. The driver was arrested, and he was issued a citation for no current registration and for driving with a suspended driver's license.

- A Latino driver was stopped for a speeding violation. The driver produced an Arizona identification card. A records check revealed that the driver had never obtained a driver's license. The driver was arrested and processed for driving under the influence. The driver was issued a citation for speeding and driving under the influence.

- A Latino driver was stopped for a speeding violation. The vehicle was occupied by a Latina passenger. The driver produced an Arizona identification card. A records check revealed that the driver's license was in a suspended status, and that a warrant existed for his arrest. The driver was arrested. The driver was issued a citation for speeding and driving with a suspended driver's license.

WAI 50738

- An Asian/Pacific Islander male driver was stopped for an improper passing violation. The driver produced a Hawaii driver's license. A records check revealed that the driver's Hawaii license was in a canceled status, and that his Arizona license was in a suspended status. The driver was arrested and processed for driving under the influence. The driver was issued a citation for passing in a no passing zone.

- A White male driver was stopped for failure to maintain a lane of traffic. The driver produced a California driver's license. A records check revealed that the driver's license was in a suspended status. The driver was arrested and processed for driving under the influence. The driver was issued a citation for failure to maintain a lane of traffic and diving under the influence.

- A Latino driver was stopped for reckless driving. The vehicle was occupied by a Latina passenger. The driver produced an Arizona driver's license. A records check revealed that the driver had never obtained a driver's license. The driver was arrested and processed for driving under the influence. The driver was issued a citation for reckless driving and driving under the influence.

- A Latino driver was stopped for failure to maintain a lane of traffic. The driver did not have any identification on his person. A records check revealed that the driver had never obtained a driver's license. The driver was arrested and processed for driving under the influence. The driver was issued a citation for driving with no valid driver's license, possession of open alcohol in a motor vehicle, and driving under the influence.

- A Latino driver was stopped for a stop sign violation. The driver produced an Arizona identification card. A records check revealed that his driver's license was in a suspended status. The driver was arrested for driving under the influence and possession of narcotics. The driver was issued a warning for the stop sign violation, driving with no valid driver's license, no evidence of insurance, and improper position on a right turn.

- A White male driver was stopped for a speeding violation. The driver produced a Florida identification card. A records check revealed that his driver's license was in a suspended status. The driver was arrested for driving under the influence. The driver was issued a citation for driving with a suspended driver's license, speeding, failure to maintain a lane of traffic, and driving under the influence.

- A Black male driver was stopped for a stop sign violation. The vehicle was occupied by a Black male passenger and two Black female passengers. The driver produced a Colorado driver's license. A records check revealed that his driver's license was in a canceled status. The driver was issued a citation for the stop sign violation, no current registration, and possession of a canceled driver's license.

- A Latino driver was stopped for a speeding violation. The driver did not have any identification on his person. The driver stated that he has a valid Mexican driver's license; however, he did not have it on his person. The deputy was unable to verify if the driver had a valid Mexican driver's license. The driver was issued a citation for the speeding violation.

WAI 50739

- A Latino driver was stopped for having an inoperable license plate light. The driver did not have any identification on his person. A records check revealed that the driver had never obtained a driver's license. The driver was issued a citation for driving with no valid driver's license.

- A Black male driver was stopped for driving with an expired registration. The driver produced an Arizona identification card. A records check revealed that his driver's license was in a revoked status. The driver was issued a citation for driving with no current registration and driving with a revoked driver's license.

- A Latino driver was stopped for a red light violation. The vehicle was occupied by a Latina passenger. The driver produced an Arizona identification card. A records check revealed that his driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license.

In our review of the sample of cases to assess compliance with Paragraphs 25.d. and 54.g., passenger contacts, we identified 33 cases where the drivers did not present a valid driver's license to the deputies. In five of the cases, the deputies were able to confirm that the driver's licenses were, in fact, valid. The remaining 28 cases are described in detail below:

- A Latino driver was stopped for an improper passing violation. The vehicle was occupied by a White female passenger. The driver did not have any identification on his person. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license, passing in a no passing zone, and no current registration.

- A Latino passenger was stopped for driving with one headlight. The vehicle was occupied by a Latina passenger. The driver produced a California identification card. A records check revealed that the driver's license was in a suspended status and that a warrant existed for his arrest. The driver was arrested and issued a citation for driving with a suspended driver's license, no evidence of insurance, and no current registration. The driver was issued a warning for the headlight violation.

- A White male driver was stopped for driving with no headlights and taillights activated. The vehicle was occupied by a White female passenger. The driver did not have any identification on his person. A records check revealed that he had never obtained a driver's license. The driver was issued a citation for driving with no lights activated and driving with no valid driver's license.

- A Latino driver was stopped for making an unsafe lane change. The driver produced an Arizona identification card. A records check revealed that he had never obtained a driver's license. The driver was issued a citation for making an unsafe lane change and driving with no valid driver's license.

- A Latino driver was stopped for a speeding violation. The vehicle was occupied by a Latina passenger. The driver did not have any identification on his person. A records check revealed that he had never obtained a driver's license. The driver was issued a citation for a speeding violation and driving with no valid driver's license.

WAI 50740

- A Latino driver was stopped for driving with an expired registration. The vehicle was occupied by a Latina passenger. The driver produced a passport from Guatemala for identification purposes. A records check revealed that his driver's license was in a suspended status. The driver was issued a citation for driving with an expired registration and driving with no valid driver's license.

- A White male driver was stopped for a stop sign violation. The vehicle was occupied by a White female passenger. The driver did not have any identification on his person. A records check revealed that his driver's license was in a revoked status. The driver was issued a citation for driving with a revoked driver's license, a stop sign violation, and failing to have an interlock (breathalyzer) device installed in vehicle.

- A White male driver was stopped for a stop sign violation. The vehicle was occupied by a White female passenger. The driver produced a driver's license. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license, a stop sign violation, and conducting an illegal turn.

- A White male driver was stopped for driving with an inoperable license plate light. The vehicle was occupied by a White female passenger. The driver produced a driver's license. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license. The deputy seized the driver's license and placed it in evidence.

- A White male driver was stopped for a stop sign violation. The vehicle was occupied by a White female passenger. The driver produced an Arizona identification card. A records check revealed that he had never obtained a driver's license. The driver was issued a citation for driving with no valid driver's license and a stop sign violation. The passenger, who was determined to be the registered owner of the vehicle, was issued a citation for allowing an unlicensed driver to operate the vehicle.

- A White male driver was stopped for a speeding violation. The vehicle was occupied by a White male passenger. The driver did not have any identification on his person. The driver initially provided false identification information to the deputy. Once the deputy obtained the correct information, a records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license, speeding, and providing false information to a law enforcement officer.

- A Latino driver was stopped in relation to a call for service. The vehicle was occupied by a Latino passenger. The driver produced an Arizona identification card. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license and failing to have an interlock (breathalyzer) device installed in the vehicle.

WAI 50741

- A Latino driver was stopped for a speeding violation. The vehicle was occupied by a Latina passenger. The driver did not have any identification on his person. A records check revealed that he had never obtained a driver's license. The driver was arrested and processed for driving under the influence. The driver was issued a citation for speeding and driving under the influence.

- An American Indian/Alaska Native female driver was stopped for a speeding violation. The vehicle was occupied by a Black female passenger. The driver did not have any identification on her person. A records check revealed that she had never obtained a driver's license. The deputy issued the driver an Incidental Contact Receipt after he realized that the driver did not violate the speed limit.

- A White female driver was stopped for driving with an expired registration. The vehicle was occupied by a Latino passenger. The driver did not have any identification on her person. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license, no evidence of insurance, and no current registration.

- A Latina driver was stopped for a speeding violation. The vehicle was occupied by a Latina passenger. The driver presented a Mexican passport for identification purposes. A records check revealed that she had never obtained a driver's license. The driver was issued a citation for driving with no valid driver's license and no evidence of insurance.

- A White male driver was stopped for a speeding violation. The vehicle was occupied by a White female passenger. The driver did not have any identification on his person. A records check revealed that the driver's license was in a suspended status and that a warrant existed for his arrest. The driver was arrested and he was issued a citation for driving with a suspended driver's license and speeding.

- A White male driver was stopped for driving with one headlight. The vehicle was occupied by two Asian/Pacific Islander female passengers. The driver produced a United States passport for identification purposes. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license.

- A Latino driver was stopped for a speeding violation. The vehicle was occupied by a Latina passenger. The driver did not have any identification on her person. A records check revealed that he had never obtained a driver's license. The driver was issued a citation for speeding and driving with no valid driver's license.

- A Latino driver was stopped for driving with one headlight. The vehicle was occupied by a Latino passenger. The driver did not have any identification on his person. A records check revealed that he had never obtained a driver's license. The driver was issued a citation for driving with one headlight, no evidence of insurance, no valid driver's license, and open alcohol in a motor vehicle.

WAI 50742

- A Latino driver was stopped for a speeding violation. The vehicle was occupied by two Latina passengers. The driver produced a photocopy of a passport. A records check revealed that he had never obtained a driver's license. The driver was issued a citation for speeding and driving with no valid driver's license.

- A Latino driver was stopped for a speeding violation. The vehicle was occupied by a Latina passenger and three Latino passengers. The driver produced a social security card and, after the deputy advised the driver that he detected the odor of marijuana, he produced a medical marijuana card. A records check revealed that the driver's license was in a suspended status and a warrant existed for his arrest. The driver was arrested and he was issued a citation for speeding and driving with a suspended driver's license.

- A White male was stopped for a speeding violation. The vehicle was occupied by four White female passengers. The driver produced a driver's license. A records check revealed that the driver's license was in a suspended status. The driver was issued a warning for the speeding violation.

- A Latino driver was stopped for a speeding violation. The vehicle was occupied by a Latino passenger. The driver produced an Arizona identification card. A records check revealed that he had never obtained a driver's license. The driver was issued a citation for speeding, passing in a no passing zone, and driving with no valid driver's license.

- A Latino driver was stopped in for a speeding violation. The vehicle was occupied by a Latino passenger. The driver produced an Arizona identification card. A records check revealed that the driver's license was in a suspended status. The passenger was also investigated and it was determined that he was under the age of 21 and had consumed alcohol. The driver was issued a citation for speeding, driving with a suspended driver's license, driving with no valid driver's license, and providing alcohol to a person under the age of 21. The passenger was issued a citation for consumption of alcohol by person under the age of 21.

- A Latino driver was stopped for a speeding violation. The vehicle was occupied by a Latina passenger. The driver produced an expired California driver's license. A records check confirmed that the driver's license was in an expired status. The driver was issued a citation for the speeding violation.

- A Latino driver was stopped for failure to maintain a lane of traffic. The vehicle was occupied by two Latina passengers; one Latino passenger; and one infant passenger, unable to determine gender. The driver informed the deputy that his Mexican driver's license had been seized by the United States Immigration and Customs Enforcement, and he produced a document from that agency that contained his name and date of birth. The deputy was unable to determine if the driver's license was valid. The driver was issued a warning for the failure to maintain a lane of traffic violation.

WAI 50743

- A Black female driver was stopped for driving with no operable taillights. The vehicle was occupied by a Black male passenger. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license.

MCSO remains in compliance with this Subparagraph.

Paragraph 25.j. requires MCSO to instruct deputies that they are not to ask for the Social Security Number or card of any motorist who has provided a valid form of identification, unless it is needed to complete a citation or report. EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) prohibits deputies from asking for the Social Security Number of any motorist who has provided a valid form of identification. During this reporting period's review of the sample of 105 traffic stops, we identified that deputies requested a driver's Social Security Number in incidents that either involved the arrest of the driver for the purpose of completing an Incident Report, or incidents where the driver did not produce a valid form of identification, both of which are permissible under this Subparagraph.

During this reporting period's review of the sample of traffic stops reviewed for Paragraph 54.k. and Paragraphs 25.d. and 54.g., we identified that deputies requested a driver's Social Security Number in incidents that either involved the arrest of the driver for the purpose of completing an Incident Report, or incidents where the driver did not produce a valid form of identification, both of which are permissible under this Subparagraph.

MCSO remains in compliance with this Subparagraph.

*Paragraph 26.* *The MCSO shall revise its policy or policies relating to Investigatory Detentions and arrests to ensure that those policies, at a minimum:*

a.  *require that Deputies have reasonable suspicion that a person is engaged in, has committed, or is about to commit, a crime before initiating an investigatory seizure;*

b.  *require that Deputies have probable cause to believe that a person is engaged in, has committed, or is about to commit, a crime before initiating an arrest;*

c.  *provide Deputies with guidance on factors to be considered in deciding whether to cite and release an individual for a criminal violation or whether to make an arrest;*

d.  *require Deputies to notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration-Related Crime, or for any crime by a vehicle passenger related to lack of an identity document;*

e.  *prohibit the use of a person's race or ethnicity as a factor in establishing reasonable suspicion or probable cause to believe a person has, is, or will commit a crime, except as part of a reliable and specific suspect description; and*

f.  *prohibit the use of quotas, whether formal or informal, for stops, citations, detentions, or arrests (though this requirement shall not be construed to prohibit the MCSO from reviewing Deputy activity for the purpose of assessing a Deputy's overall effectiveness or whether the Deputy may be engaging in unconstitutional policing).*

WAI 50744

**In Full and Effective Compliance**

For the third quarter of 2020, MCSO reported one arrest that falls under the reporting requirements of this Paragraph. The arrest involved a Latino male who was stopped for a traffic infraction. The individual did not have a driver's license, registration for the vehicle, or proof of insurance. The supervisor was notified and approved the investigation. The driver was cited and released. We reviewed the information provided and concluded that this case was handled according to policy.

In addition to the review of reported cases, to determine compliance with this Paragraph, we review booking lists and criminal citation lists for each month of the reporting period. From each list, we select a 10% random sample of incidents. For this reporting period, we reviewed 59 incidents resulting in arrest and 60 incidents in which criminal citations were issued. In addition, we reviewed 249 Incident Reports. All of the documentation we reviewed during this reporting period indicates that MCSO is in compliance with this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

### d. Policies and Procedures Governing the Enforcement of Immigration-Related Laws

***Paragraph 27.*** *The MCSO shall remove discussion of its LEAR Policy from all agency written Policies and Procedures, except that the agency may mention the LEAR Policy in order to clarify that it is discontinued.*

**In Full and Effective Compliance**

MCSO asserts that it does not have an agency LEAR policy. We have verified, through our document reviews and site compliance visits, that MCSO does not have a LEAR policy.

On March 22, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

***Paragraph 28.*** *The MCSO shall promulgate a new policy or policies, or will revise its existing policy or policies, relating to the enforcement of Immigration-Related Laws to ensure that they, at a minimum:*

a.   *specify that unauthorized presence in the United States is not a crime and does not itself constitute reasonable suspicion or probable cause to believe that a person has committed or is committing any crime;*

b.   *prohibit officers from detaining any individual based on actual or suspected "unlawful presence," without something more;*

WAI 50745

c.   prohibit officers from initiating a pre-textual vehicle stop where an officer has reasonable suspicion or probable cause to believe a traffic or equipment violation has been or is being committed in order to determine whether the driver or passengers are unlawfully present;

d.   prohibit the Deputies from relying on race or apparent Latino ancestry to any degree to select whom to stop or to investigate for an Immigration-Related Crime (except in connection with a specific suspect description); prohibit Deputies from relying on a suspect's speaking Spanish, or speaking English with an accent, or appearance as a day laborer as a factor in developing reasonable suspicion or probable cause to believe a person has committed or is committing any crime, or reasonable suspicion to believe that an individual is in the country without authorization;

e.   unless the officer has reasonable suspicion that the person is in the country unlawfully and probable cause to believe the individual has committed or is committing a crime, the MCSO shall prohibit officers from (a) questioning any individual as to his/her alienage or immigration status; (b) investigating an individual's identity or searching the individual in order to develop evidence of unlawful status; or (c) detaining an individual while contacting ICE/CBP with an inquiry about immigration status or awaiting a response from ICE/CBP.  In such cases, the officer must still comply with Paragraph 25(g) of this Order.  Notwithstanding the foregoing, an officer may (a) briefly question an individual as to his/her alienage or immigration status; (b) contact ICE/CBP and await a response from federal authorities if the officer has reasonable suspicion to believe the person is in the country unlawfully and reasonable suspicion to believe the person is engaged in an Immigration-Related Crime for which unlawful immigration status is an element, so long as doing so does not unreasonably extend the stop in violation of Paragraph 25(g) of this Order;

f.   prohibit Deputies from transporting or delivering an individual to ICE/CBP custody from a traffic stop unless a request to do so has been voluntarily made by the individual;

g.   Require that, before any questioning as to alienage or immigration status or any contact with ICE/CBP is initiated, an officer check with a Supervisor to ensure that the circumstances justify such an action under MCSO policy and receive approval to proceed. Officers must also document, in every such case, (a) the reason(s) for making the immigration-status inquiry or contacting ICE/CBP, (b) the time approval was received, (c) when ICE/CBP was contacted, (d) the time it took to receive a response from ICE/CBP, if applicable, and (e) whether the individual was then transferred to ICE/CBP custody.

**In Full and Effective Compliance**

WAI 50746

For this reporting period, there were no reported instances of deputies having contact with Immigration and Customs Enforcement (ICE) or Customs and Border Protection (CBP) for the purpose of making an immigration status inquiry, and there were no reported arrests for any immigration-related investigations, or for any immigration-related crimes. The reviews of documentation submitted for this reporting period indicate that MCSO has complied with the reporting requirements related to Paragraph 28. In our reviews of incidents involving contact with the public, including traffic stops, arrests, and investigative stops, we monitor deputies' actions to verify compliance with this Order.

In addition to the documentation requested from MCSO, to determine compliance with this Paragraph, our reviews of documentation provided for other Paragraphs of the Order have found no evidence to indicate a violation of this Paragraph. In total, we reviewed 59 Arrest Reports, 60 criminal citations, 289 traffic stops, 71 NTCFs, and 249 Incident Reports for this reporting period. We found no issues of concern, as it relates to this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

### e. Policies and Procedures Generally

**Paragraph 29.** *MCSO Policies and Procedures shall define terms clearly, comply with applicable law and the requirements of this Order, and comport with current professional standards.*

**In Full and Effective Compliance**

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

See Paragraph 30.

**Paragraph 30.** *Unless otherwise noted, the MCSO shall submit all Policies and Procedures and amendments to Policies and Procedures provided for by this Order to the Monitor for review within 90 days of the Effective Date pursuant to the process described in Section IV. These Policies and Procedures shall be approved by the Monitor or the Court prior to their implementation.*

**In Full and Effective Compliance**

WAI 50747

MCSO continues to provide us, the Plaintiffs' attorneys, and the Plaintiff-Intervenors with drafts of its Order-related policies and procedures prior to publication, as required by the Order. We, the Plaintiffs' attorneys, and the Plaintiff-Intervenors review the policies to ensure that they define terms clearly, comply with applicable law and the requirements of the Order, and comport with current professional standards. Once drafts are finalized, incorporating the feedback of the Plaintiffs' attorneys, the Plaintiff-Intervenors, and the Monitoring Team, MCSO provides them to us for final review and approval. As this process has been followed for the Order-related policies published thus far, MCSO is in compliance with this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.


**Paragraph 31.** *Within 60 days after such approval, MCSO shall ensure that all relevant MCSO Patrol Operation Personnel have received, read, and understand their responsibilities pursuant to the Policy or Procedure. The MCSO shall ensure that personnel continue to be regularly notified of any new Policies and Procedures or changes to Policies and Procedures. The Monitor shall assess and report to the Court and the Parties on whether he/she believes relevant personnel are provided sufficient notification of and access to, and understand each policy or procedure as necessary to fulfill their responsibilities.*

### In Full and Effective Compliance

GA-1 indicates that Office personnel shall be notified of new policies and changes to existing policies via Briefing Boards and via the HUB, Maricopa County's adaptation of the online training software program, Cornerstone, that MCSO implemented in July 2017 to replace its E-Policy system. Employees are required to complete personal attestations that indicate that they have read and understand policies; the HUB routinely updates recent training and policy reviews for deputies and is visible by immediate supervisors. Per GA-1, "Prior to some policies being revised, time-sensitive changes are often announced in the Briefing Board until the entire policy can be revised and finalized." As noted previously, we recognize the authority of Briefing Boards and understand their utility in publishing critical policy changes quickly; but we have advised MCSO that we generally do not grant Phase 1 compliance for an Order requirement until the requirement is memorialized in a more formal policy.

During this reporting period, MCSO issued (or issued revisions of) six Order-related policies: CP-2 (Code of Conduct); CP-5 (Truthfulness); CP-8 (Preventing Racial and Other Bias-Based Profiling); GC-12 (Hiring and Promotional Procedures); GC-13 (Awards); and GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices). During this reporting period, MCSO also issued several Briefing Boards and Administrative Broadcasts that touched on Order-related topics and revised the language of General Orders. In addition, MCSO published one Order-related operations manual during this reporting period, for the Administrative Services Division.

WAI 50748

On September 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 32.** *The MCSO shall require that all Patrol Operation personnel report violations of policy; that Supervisors of all ranks shall be held accountable for identifying and responding to policy or procedure violations by personnel under their command; and that personnel be held accountable for policy and procedural violations. The MCSO shall apply policies uniformly.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on July 30, 2020.
- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on January 24, 2019.
- CP-5 (Truthfulness), most recently amended on September 11, 2020.
- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.
- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- GC-16 (Employee Grievance Procedures), most recently amended on April 7, 2020.
- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.
- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** Not in compliance

Since we began reviewing internal investigations conducted by MCSO, we have reviewed hundreds of administrative misconduct investigations submitted to our Team for this Paragraph. During our reviews, we have continued to note that the investigations conducted by PSB have consistently been thorough and well-written, and arrived at the appropriate findings. Compliance for investigations conducted at the District level, which had decreased for multiple reporting periods, has seen some slight improvement in the investigative quality of those cases we reviewed for this and the last reporting period.

During each site visit, we meet with the Professional Standards Bureau (PSB) and District and Division Command personnel to provide them with information regarding the cases that were deficient in structure, format, investigation, or reporting requirements. We have also highlighted cases we found to be properly investigated and in compliance with Order requirements. In 2016, PSB developed and implemented the use of an investigative checklist and specific format for the completion of internal investigations. MCSO trained all supervisors who conduct investigations in the use of these documents. Since June 1, 2016, the use of these investigative protocol documents has been required for all administrative investigations.

WAI 50749

PSB personnel have remained responsive to our feedback, and the investigations they submit for compliance with this Paragraph continue to be examples of complete and thorough investigations. PSB's reviews of investigations conducted by District personnel continue to be thorough and they have identified and addressed many concerns and deficiencies they have found.

District case compliance has been an ongoing concern, particularly since MCSO has been conducting misconduct investigations under the Court's Second Order since 2016. In 2017, MCSO made major revisions to both GH-2 (Internal Investigations) and GC-16 (Employee Grievance Procedures). By the end of December 2017, all supervisory personnel responsible for conducting misconduct investigations had attended the 40-hour Misconduct Investigative Training. In both 2018 and 2019, supervisors attended additional training on the proper completion of these investigations.

During this reporting period, there were 53 investigations conducted by District personnel that were submitted for our review. Of the 53 submitted for this Paragraph, we or PSB identified investigative and administrative deficiencies with 20 (38%), not including extension concerns. Numerous investigations were returned to District personnel by PSB to address improper findings, leading questions, insufficient investigations, or multiple administrative errors.

During our site visits, our Team has made numerous visits to MCSO Districts, where we have discussed the completion of administrative misconduct investigations by District personnel. We have specifically discussed those areas of the investigations where we continue to find deficiencies and have provided input regarding the proper completion of investigations. We have also sought information from District supervisors regarding their experience with the investigation process and any ongoing concerns they may have.

During our visits to Districts 1, 2, and 6 in January 2020, District supervisors identified several reasons for ongoing deficiencies including lower experience level of supervisors due to the number of promotions being made, and the continuing need to balance administrative time with time out on the street supervising their personnel. In one District, personnel had added a second supervisor to observe interviews and have the questions prepared and reviewed in advance of interviews. Personnel had also added an additional level of review in the District, prior to sending the investigations to PSB. We were encouraged by these efforts, and hopeful that the investigative process would improve as a result.

Since March 2018, we have requested and reviewed a monthly report from District Command personnel that documents any actions they have taken to assist their personnel in the completion of administrative misconduct investigations and any actions they have taken to address any deficiencies they have identified. During the last reporting period, we noted several instances where District Command personnel met with subordinate employees to address deficient investigations and several additional instances where Deputy Chiefs met with District Command personnel to address deficient investigations.

During this reporting period, we observed multiple instances where District Command personnel identified and addressed deficiencies in investigations by their personnel prior to forwarding the investigations to PSB. While in some cases, the deficiencies could not be corrected after the fact, we were encouraged by the efforts. We also noted several instances where Deputy Chiefs met with District command personnel to address deficiencies in administrative investigations. We

WAI 50750

note, however, that again for this reporting period, PSB identified the majority of the deficiencies upon its review of the District investigations. We also noted that the tracking document maintained by PSB continues to list multiple deficiency memorandums authored by PSB personnel for District investigations between March and October 2020 that are still pending resolution. Timely corrective actions are critical to ensuring that concerns are addressed and resolved before additional deficiencies of the same kind occur. We will continue to closely monitor both interventions and deficiency memos, and again encourage Executive Staff and Command personnel to address those deficiencies that have been identified.

During the last reporting period, we reviewed all 31 administrative misconduct investigations submitted for compliance with this Paragraph and made our compliance findings based on the investigative and administrative requirements for the completion of these investigations. District supervisors completed 25 investigations. Four (16%) were found in compliance. PSB conducted the remaining six. One (17%) of these six investigations were in compliance.

During this reporting period, we reviewed all 68 administrative misconduct investigations submitted for compliance with this Paragraph. PSB conducted 15 of these investigations, and District personnel conducted the remaining 53. Sworn supervisors with the rank of sergeant or higher completed all the investigations conducted at the District level. There were 143 potential policy violations included in the 68 cases. Fifty-three of the investigations resulted from external complainants, and 15 were internally generated. All but two of the 68 investigations were initiated after May 17, 2017, when MCSO revised all of its internal investigation policies; and after the completion of the 40-hour Misconduct Investigative training that concluded in late 2017.

Of the 68 administrative investigations we reviewed for this Paragraph, 15 resulted in sustained findings against one or more employees. We concur with the sustained findings in all 15 of these investigations. In one, the employee resigned prior to the completion of the disciplinary process. Discipline in the 14 cases included one coaching, five written reprimands, five suspensions, and three dismissals. In all 14, the PSB Commander properly identified the category and offense number, as well as the presumptive discipline or range of discipline for the sustained allegations. The Appointing Authority did not overturn any of the findings, but in one mitigated the final discipline within the range. We agree with his decision to do so.

District personnel outside PSB conducted 53 of the investigations that MCSO submitted for review for this Paragraph. All were completed after July 20, 2016. Fourteen of the investigations were noncompliant due to improper findings or leading questions; four of the investigations were not thoroughly conducted; and in two, there were numerous administrative deficiencies. We did not identify any instances where a District investigation failed to appropriately address a training or policy concern during this reporting period. Where appropriate, deficient cases were returned to the Districts by PSB for additional investigation or corrections. All but four of these cases investigated by District personnel this reporting period were initiated after several years of working under the requirements of the Court Orders, after training in how to conduct misconduct investigations (the 40-hour Misconduct Investigative Training completed in late 2017), and after numerous site visit meetings where our Team has identified the same kinds of deficiencies we again found during this reporting period.

WAI 50751

During our July 2020 remote site visit, we requested a meeting with the Deputy Chiefs responsible for oversight of Districts and Divisions outside of PSB. We were both surprised and disappointed with their responses during this meeting. We shared our ongoing concerns and asked for their comments and thoughts on how the quality of these investigations could be addressed and improved. The Deputy Chiefs did not provide any substantive thoughts or comments on how investigations could be improved, or how they would address any ongoing deficiencies. As there appeared to be some continuing confusion on how to identify proper investigative findings, a supervisor from the Training Division committed to including additional clarification on this topic in future training.

During our October 2020 remote site visit, we again met with Deputy Chiefs responsible for oversight of Districts and Divisions outside PSB. The Deputy Chiefs advised us that since our July remote site visit, they had started reviewing the administrative misconduct investigations conducted by their personnel. They informed us that they too had identified the same types of concerns that both we and PSB identified, and were working with their personnel to address the kinds of deficiencies that are being found. One of the Division Chiefs has met with all of his Commanders to discuss not only the quality of investigations, but how to ensure that thorough reviews are being conducted at the District level prior to forwarding the cases to PSB. We note here that of the 12 investigations initiated, completed and submitted for our review for this Paragraph since January 2020, only two had substantive investigative deficiencies. We are encouraged by the actions that some Deputy Chiefs are taking, and hopeful that we will see continuing improvement as a result.

The overall investigative quality for cases investigated by PSB and submitted for compliance with this Paragraph has remained high. In one of the 15 investigations conducted by PSB and submitted for compliance this reporting period, the investigator failed to include all investigative documents required.

All 68 cases we reviewed for this Paragraph were completed on or after July 20, 2016. Of the 15 investigations conducted by PSB, three (20%) were completed within the 85-day timeframe or had an approved extension related to the specific investigation. Of the 53 investigations conducted at the District level, 43 (81%) were initially completed within the 60-day timeframe or had an approved extension related to the specific investigation, though many of these cases were returned to the Districts for further work after review by PSB.

Of the 68 total investigations submitted for compliance with this Paragraph, 46 (68%) were either submitted within the required 60- or 85-day time line, or included an acceptable justification for an extension, an increase from 52% during the last quarter. Of the 68 total investigations reviewed for compliance with this Paragraph, 23 (34%) were finalized and closed with 180 days or included an acceptable extension approval. This is an increase from the 19% compliance that we found during the last reporting period. MCSO's failure to complete investigations in a timely manner is unacceptable. General workload issues are insufficient justification for the failure to complete investigations in a reasonably timely manner. To be considered compliant with the requirements for the completion of administrative misconduct investigations, extension requests and justifications must be submitted in a timely manner and be reasonably related to the specific investigation.

WAI 50752

Based on the identified deficiencies in District investigations and our assessment of the reasonability of the requested extensions, 15 (28%) of the 53 investigations conducted by District personnel were found in compliance, an increase from 16% during the last reporting period. Three (20%) of the 15 investigations conducted by PSB were in compliance, an increase from 17% during the last quarter. Overall compliance for the 68 investigations submitted for this Paragraph was 26%.

As is our practice, we will discuss those cases that we found noncompliant with MCSO personnel during our next site visit.

**Paragraph 33.** *MCSO Personnel who engage in Discriminatory Policing in any context will be subjected to administrative Discipline and, where appropriate, referred for criminal prosecution. MCSO shall provide clear guidelines, in writing, regarding the disciplinary consequences for personnel who engage in Discriminatory Policing.*

**Phase 1:** In compliance

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 4, 2020.
- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

**Phase 2:** Not in compliance

The investigations that we review for compliance with this Paragraph do not include biased policing complaints involving the Plaintiffs' class. Those investigations have additional compliance requirements and are discussed in Paragraphs 275-283.

During the last reporting period, there were three investigations submitted by PSB that contained allegations of discriminatory policing.

During this reporting period, there were five investigations where the alleged bias does not involve members of the Plaintiffs' class. Four involved allegations of inappropriate and potentially biased comments made within the jail setting. One of these was sustained, and PSB assessed the discipline. The fifth involved sustained allegations of biased comments made on a social media post. Due to the egregious nature of the comments, a dismissal was recommended and approved, though the employee resigned prior to the finalization of the process. Three of the five cases were appropriately unfounded.

PSB conducted thorough investigations, and we agree with their findings in all five cases. While MCSO is in compliance regarding the investigative quality and findings, only one of the five was submitted and approved within the required timeframes. Based on our assessment, these cases are not in compliance with the requirements for timely completion of administrative investigations; and therefore not in compliance with the requirements for completion of investigations covered in this Paragraph.

MCSO is not in Phase 2 compliance for this Paragraph.

WAI 50753

While discriminatory policing allegations that involve members of the Plaintiffs' class are not reported in this Paragraph, we note that MCSO completed seven investigations this reporting period that were determined to be Class Remedial Matters. Paragraphs 275-288 contain our review and compliance findings for these six investigations.

***Paragraph 34.*** *MCSO shall review each policy and procedure on an annual basis to ensure that the policy or procedure provides effective direction to MCSO Personnel and remains consistent with this Order, current law and professional standards. The MCSO shall document such annual review in writing. MCSO also shall review Policies and Procedures as necessary upon notice of a policy deficiency during audits or reviews. MCSO shall revise any deficient policy as soon as practicable.*

**In Full and Effective Compliance**

MCSO continues to review on an annual basis all critical policies and all policies relevant to the Court Orders for consistency with Constitutional policing, current law, and professional standards.

During this reporting period, MCSO conducted its annual review on eight (16%) of the 48 required policies. These policies included: CP-5 (Truthfulness); CP-8 (Preventing Racial and Other Bias-Based Policing); GB-2 (Command Responsibility); GC-4 (Employee Performance Management); GC-16 (Employee Grievance Procedures); GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices); GI-5 (Voiance Language Services); and GJ-33 (Significant Operations).

On June 3, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 50754

# Section 5: Pre-Planned Operations

***Paragraph 35.*** *The Monitor shall regularly review the mission statement, policies and operations documents of any Specialized Unit within the MCSO that enforces Immigration-Related Laws to ensure that such unit(s) is/are operating in accordance with the Constitution, the laws of the United States and State of Arizona, and this Order.*

**In Full and Effective Compliance**

To verify Phase 2 compliance with this Paragraph, we previously verified that the Criminal Employment Unit (CEU) was disbanded and removed from the Special Investigations Division organizational chart. The Human Smuggling Unit (HSU) was also disbanded and personnel reassigned to the Anti-Trafficking Unit (ATU).

During our review of the arrests made by the Special Investigations Division ATU between March 2015-March 2017, we did not note any arrests for immigration or human smuggling violations. The cases submitted by MCSO and reviewed for the ATU were primarily related to narcotics trafficking offenses.

MCSO reported in April 2017 that it had disbanded the Anti-Trafficking Unit and formed a new unit, Fugitive Apprehension and Tactical Enforcement (FATE). The primary mission of FATE is to locate and apprehend violent fugitives. We reviewed FATE's mission statement and objectives, as well as the organizational chart for the Special Investigations Division. MCSO had removed the ATU from the organizational chart, and the mission of FATE did not include any reference to the enforcement of Immigration-Related Laws.

The revised organizational chart for SID and documentation MCSO provided regarding the implementation of FATE supported that the ATU no longer existed, and that there were no specialized Units in MCSO that enforced Immigration-Related Laws.

We previously received and reviewed the Special Investigations Division Operations Manual and organizational chart. Both confirmed that MCSO has no specialized Units that enforce Immigration-Related Laws, that the Human Smuggling Unit (HSU) was disbanded, and the Anti-Trafficking Unit (ATU) no longer exists.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 50755

***Paragraph 36.*** *The MCSO shall ensure that any Significant Operations or Patrols are initiated and carried out in a race-neutral fashion. For any Significant Operation or Patrol involving 10 or more MCSO personnel, excluding posse members, the MCSO shall develop a written protocol including a statement of the operational motivations and objectives, parameters for supporting documentation that shall be collected, operations plans, and provide instructions to supervisors, deputies and posse members. That written protocol shall be provided to the Monitor in advance of any Significant Operation or Patrol.*

**In Full and Effective Compliance**

Since the requirements for conducting Significant Operations were implemented, MCSO has reported conducting only one Significant Operation that invoked the requirements of this Paragraph. "Operation Borderline" was conducted from October 20-27, 2014, to interdict the flow of illegal narcotics into Maricopa County. MCSO met all the requirements of this Paragraph during the operation.

In February 2016, we became aware of "Operation No Drug Bust Too Small" when it was reported in the media, and requested details on this operation from MCSO. After reviewing the documentation MCSO provided, we were satisfied that it did not meet the reporting requirements of this Paragraph.

In October 2016, we became aware of "Operation Gila Monster" when it was reported in the media. According to media reports, this was a two-week operation conducted by a special operations Unit in MCSO and was intended to interdict the flow of illegal drugs into Maricopa County. We requested all documentation regarding this operation for review. The documentation indicated that this operation was conducted from October 17-23, 2016. The documentation MCSO provided was sufficient for us to determine that this operation did not meet the reporting criteria for this, or other Paragraphs, related to Significant Operations. The Plaintiffs also reviewed the documentation submitted by MCSO on this operation and agreed that the operation did not invoke the requirements of this Paragraph. We and the Plaintiffs noted that "Operation Gila Monster" involved traffic stops of Latinos, and that those arrested were undocumented Latinos.

We continue to review documentation submitted for this Paragraph by all Districts, the Enforcement Support Division, and the Investigations Division on a monthly basis. During this reporting period, and since October 2014, MCSO continues to report that it has not conducted any additional Significant Operations. In addition, we have not learned of any potential Significant Operation through media releases or other sources during this reporting period. We will continue to monitor and review any operations we become aware of to ensure continued compliance with this and other Paragraphs related to Significant Operations. During this reporting period, we did not learn of any Significant Operations conducted by MCSO.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 50756

***Paragraph 37.*** *The MCSO shall submit a standard template for operations plans and standard instructions for supervisors, deputies and posse members applicable to all Significant Operations or Patrols to the Monitor for review pursuant to the process described in Section IV within 90 days of the Effective Date. In Exigent Circumstances, the MCSO may conduct Significant Operations or Patrols during the interim period but such patrols shall be conducted in a manner that is in compliance with the requirement of this Order. Any Significant Operations or Patrols thereafter must be in accordance with the approved template and instructions.*

**In Full and Effective Compliance**

In late 2014, we reviewed all the documentation submitted by MCSO regarding the Significant Operation conducted from October 24-27, 2014. This operation was intended to interdict the flow of illegal narcotics into Maricopa County and fully complied with the requirements of this Paragraph.

MCSO continues to report that it has not conducted any operations that invoke the requirements of this Paragraph since October 2014.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

During this reporting period, we did not become aware of any Significant Operations conducted by MCSO. MCSO remains in Full and Effective Compliance with this Paragraph.


**(Note: Unchanged language is presented in *italicized font*. Additions are indicated by underlined font. Deletions are indicated by ~~crossed-out font~~.)**

***Paragraph 38.*** *If the MCSO conducts any Significant Operations or Patrols involving 10 or more MCSO Personnel excluding posse members, it shall create the following documentation and provide it to the Monitor and Plaintiffs within 30 days after the operation:*

a.    *documentation of the specific justification/reason for the operation, certified as drafted prior to the operation (this documentation must include analysis of relevant, reliable, and comparative crime data);*

b.    *information that triggered the operation and/or selection of the particular site for the operation;*

c.    *documentation of the steps taken to corroborate any information or intelligence received from non-law enforcement personnel;*

d.    *documentation of command staff review and approval of the operation and operations plans;*

e.    *a listing of specific operational objectives for the patrol;*

f.    *documentation of specific operational objectives and instructions as communicated to participating MCSO Personnel;*

WAI 50757

g.     *any operations plans, other instructions, guidance or post-operation feedback or debriefing provided to participating MCSO Personnel;*

h.     *a post-operation analysis of the patrol, including a detailed report of any significant events that occurred during the patrol;*

i.     *arrest lists, officer participation logs and records for the patrol; and*

j.     *data about each contact made during the operation, including whether it resulted in a citation or arrest.*

**In Full and Effective Compliance**

Since the initial publication of GJ-33, MCSO has reported that it has conducted only one Significant Operation, "Operation Borderline," in October 2014. At the time of this operation, we reviewed MCSO's compliance with policy; attended the operational briefing; and verified the inclusion of all the required protocols, planning checklists, supervisor daily checklists, and post-operation reports. MCSO was in full compliance with this Paragraph for this operation.

During this reporting period, MCSO again reported that it did not conduct any Significant Operations invoking the requirements of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

During this reporting period, we did not become aware of any Significant Operations conducted by MCSO. MCSO remains in Full and Effective Compliance with this Paragraph.

**Paragraph 39.** *The MCSO shall hold a community outreach meeting no more than 40 days after any Significant Operations or Patrols in the affected District(s). MCSO shall work with the Community Advisory Board to ensure that the community outreach meeting adequately communicates information regarding the objectives and results of the operation or patrol. The community outreach meeting shall be advertised and conducted in English and Spanish.*

**Phase 1:** In compliance

- GJ-33 (Significant Operations), most recently amended on April 2, 2019.

**Phase 2:** In compliance

The Amendments to the Supplemental Permanent Injunction/Judgment Order (Document 2100) issued on August 3, 2017 returned the responsibility for compliance with this Paragraph to MCSO.

During this reporting period, MCSO did not report conducting any Significant Operations that would invoke the requirements of this Paragraph.

WAI 50758

***Paragraph 40.*** *The MCSO shall notify the Monitor and Plaintiffs within 24 hours of any immigration related traffic enforcement activity or Significant Operation involving the arrest of 5 or more people unless such disclosure would interfere with an on-going criminal investigation in which case the notification shall be provided under seal to the Court, which may determine that disclosure to the Monitor and Plaintiffs would not interfere with an on-going criminal investigation. In any event, as soon as disclosure would no longer interfere with an on-going criminal investigation, MCSO shall provide the notification to the Monitor and Plaintiffs. To the extent that it is not already covered above by Paragraph 38, the Monitor and Plaintiffs may request any documentation related to such activity as they deem reasonably necessary to ensure compliance with the Court's orders.*

## In Full and Effective Compliance

Since MCSO first developed GJ-33 (Significant Operations) in 2014, MCSO has reported conducting only one operation, "Operation Borderline," that required compliance with this Paragraph. We verified that MCSO employed the appropriate protocols and made all required notifications. MCSO was in full compliance with this Paragraph during this operation.

Based on a concern raised by the Plaintiffs, and to provide clarification regarding the portion of this Paragraph that addresses the requirement for MCSO to notify the Monitor and Plaintiffs within 24 hours of any immigration-related traffic enforcement activity or Significant Operations involving "the arrest of 5 or more persons," we requested during our October 2015 site visit that MCSO provide a statement regarding this requirement each month. MCSO began including this information in its November 2015 submission and continues to do so.

MCSO continues to report that it has not conducted any operations that meet the reporting requirements for this Paragraph since October 2014. During this reporting period, we did not learn of any traffic-related enforcement or Significant Operations conducted by MCSO that would invoke the requirements of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 50759

**COURT ORDER VII.  TRAINING**

*a.  General Provisions*

***Paragraph 41.*** *To ensure that the Policies and Procedures provided for by this Order are effectuated, the MCSO shall implement the following requirements regarding Training.*

***Paragraph 42.*** *The persons presenting this Training in each area shall be competent instructors with significant experience and expertise in the area.  Those presenting Training on legal matters shall also hold a law degree from an accredited law school and be admitted to a Bar of any state and/or the District of Columbia.*

**Phase 1:**  In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on February 26, 2020.

- GG-2 (Detention/Civilian Training Administration), most recently amended on February 26, 2020.

- Training Division Operations Manual, most recently amended on March 9, 2020.

**Phase 2:**  In compliance

MCSO uses three types of instructors to deliver Order-related training:  They are either assigned to the Training Division as full-time staff; assigned to field assignments outside of the Training Division; or are paid vendors.  The Training Division manually maintains individual instructor folders for Training Division staff, field instructors, and Field Training Officers (FTOs).  MCSO policy requires that instructor folders include annually updated CVs, General Instructor (GI) certificates, and either an annual or 30-day Misconduct and Disciplinary Review, as applicable. Additionally, instructors who have received prior sustained discipline or who are currently involved with an ongoing Professional Standards Bureau (PSB) investigation may request a Waiver of Presumptive Ineligibility for approval to teach from the Training Division Commander. A waiver request should provide the Training Division Commander with ample justification to overcome presumptive ineligibility.  Waiver requests require the Training Division Commander to produce written justifications for the approval or denial of each request.  We verify compliance with this Paragraph by reviewing all instructor folders, waiver requests, and justifications.

We and the Parties have continuously recommended that MCSO develop a long-term training plan that would also include planning for instructor development.  During this reporting period, MCSO encountered a limited availability of qualified instructors for the Annual Combined Training.  In August, MCSO requested approval to change the classroom delivery of the 2020 Annual Combined Training (ACT) to an online delivery in response to the regional impact of the COVID-19 pandemic.  Specifically, MCSO proposed delivery as a completely prerecorded HUB class, as it claimed that the agency had three or four instructors that could teach the Bias-Free

WAI 50760

Policing portion of the class. We agree with MCSO that the agency has limited instructor resources capable of delivering this specific content, so during our October remote site visit, we further discussed MCSO's perceived instructor shortfall. We inquired what standards MCSO was using to determine instructor qualifications for Bias-Free instruction that would limit qualified instructors. MCSO identified three qualifications: education; designation as a subject matter expert (SME); and attendance at a conference related to Bias-Free Instruction. We reviewed the provided curricula vitae (CVs) of six individuals. One was considered an SME, holds a graduate degree, and has developed several curricula. Two were considered to be Specialist Instructors meeting the requirements of policy and AZPOST. One of these Specialist Instructors holds a graduate degree, while the other has no college degree. The remaining three met the qualifications of a General Instructor. All six individuals met the qualifications of a General Instructor, but three met the qualifications to be a Specialist Instructor.

MCSO policy directs that instructor classifications and qualification standards shall follow AZPOST requirements for General, Proficiency, and Specialist classifications. According to MCSO, individual instructors meeting the qualifications to be a Specialist Instructor have provided documentation of their qualifications, but MCSO has not submitted the documentation to AZPOST for approval as required by policy. We encourage MCSO to submit the necessary documentation to AZPOST for instructors to receive recognition of their achievements and to employ procedures memorialized in policy that will assist in determining qualifications and categories of instructors related to all Order-required training. We revisited our previous recommendation to expand the use of the newly created electronic instructor database to include instructor expertise, but MCSO continues to resist this recommendation. We believe MCSO would experience substantial benefit to all of their training programs with the advent of a long-term training planning strategy.

During this reporting period, the Training Division approved four new individuals as GIs. Our review indicated that all individuals met all GI instructor criteria.

The Training Division appointed six individuals submitted as new FTOs during this reporting period. Each FTO file contained all required documentation. We noted that only one of six applicants did not have any sustained or open administrative internal investigations. One individual who was approved recorded two sustained allegations and three open pending cases. We were unable to determine the exact allegations from the waiver application. During our October remote site visit, we requested that the Commander include specific allegations on each FTO and Instructor Misconduct and Disciplinary Review during future reviews. The Commander has previously denied approval of individuals based on these reviews; but as a result of an FTO shortage, none of the recent individuals were denied approval.

WAI 50761

Previously, MCSO had provided two forms for reviews of instructors: an Instructor Observation Form for use by Training Division personnel; and an Instructor Evaluation Form for use by students attending training programs. During the last reporting period, the Training Division advised us that a new Standardized Instructor Evaluation form was currently receiving a chain of command review. During our October remote site visit, we discussed the status of these forms. MCSO advised us that the Training Division was currently finalizing a new form that would be presented for review. The new form is intended for sole use by the Training Division when randomly observing instructors. Students will continue to use the existing form. We anticipate reviewing the new form during the next reporting period.

***Paragraph 43.*** *The Training shall include at least 60% live training (i.e., with a live instructor), which includes an interactive component, and no more than 40% on-line training. The Training shall also include testing and/or writings that indicate that MCSO Personnel taking the Training comprehend the material taught whether via live training or via on-line training.*

**Phase 1:** In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on February 26, 2020.

- GG-2 (Detention/Civilian Training Administration), most recently amended on February 26, 2020.

- Training Division Operations Manual, most recently amended on March 9, 2020.

**Phase 2:** In compliance

We verify compliance with this Paragraph by reviewing all individual test failures; individual retests; failure remediation efforts, and test analyses by training class; for both live and HUB delivered Order-related training.

During this reporting period, MCSO delivered the following programs: Bias-Free Policing and Fourth and Fourteenth Amendment Training (Fourth and Fourteenth Amendment Training); 2015 Blue Team (BT); 2019 Body-Worn Camera (BWC); 2019 Body-Worn Camera HUB (BWC HUB); 2020 Supervisor Responsibilities: Effective Law Enforcement (SRELE); and the 2019 Traffic and Criminal Software (TraCS).

MCSO delivered the Fourth and Fourteenth Amendment classroom training in September to 18 personnel (two sworn, 16 Posse). No personnel required test remediation.

MCSO delivered the eight-hour 2015 BT classroom training in August to four personnel (one sworn, two Detention, one civilian). No personnel required test remediation.

MCSO delivered the 2019 BWC training in July to three personnel (one sworn, two civilian). No personnel required test remediation.

WAI 50762

MCSO delivered the 2019 BWC HUB training continuously throughout this reporting period. Recent reporting indicates that 612 of 617 (99%) personnel have completed this course. During this reporting period, no personnel required test remediation. MCSO indicated that the agency is considering removing this class from the HUB. This class was created in response to the previous issuance of the new body-worn cameras. No further personnel require this course.

MCSO delivered the 2020 SRELE training during August and September to 173 personnel (all sworn). No personnel required test remediation.

MCSO delivered the 2019 TraCS classroom training during August to one person (sworn). The individual did not require test remediation.

During our October remote site visit, we revisited with MCSO the discussion concerning the assignment of multiple instructors for proficiency classes such as TraCS, BT, BWC, and EPA. MCSO has returned to its previous procedure of assigning multiple instructors to these classes as an aid to increasing instructor-to-student ratios.

***Paragraph 44.*** *Within 90 days of the Effective Date, MCSO shall set out a schedule for delivering all Training required by this Order. Plaintiffs' Representative and the Monitor shall be provided with the schedule of all Trainings and will be permitted to observe all live trainings and all on-line training. Attendees shall sign in at each live session. MCSO shall keep an up-to-date list of the live and on-line Training sessions and hours attended or viewed by each officer and Supervisor and make that available to the Monitor and Plaintiffs.*

**Phase 1:** In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on February 26, 2020.
- GG-2 (Detention/Civilian Training Administration), most recently amended on February 26, 2020.
- Training Division Operations Manual, most recently amended on March 9, 2020.

**Phase 2:** In compliance

The Training Division maintains a three-month Training Calendar. MCSO posts the Master Training Calendar to the MCSO website to inform the public of tentative training dates, classes, and locations. The calendar displays 90-day increments and includes a legend specifically identifying Order-related training.

Master Personnel Rosters determine the number of personnel requiring Order-related training. At the end of this reporting period, MCSO reports that 657 sworn members; 16 Reserve members; 27 retired Reserve members; 198 Posse members; 1,983 Detention members; and 763 civilian employees require Order-related instruction. These categories vary by reporting period, because of the attrition in the organization.

WAI 50763

**Paragraph 45.** *The Training may incorporate adult-learning methods that incorporate roleplaying scenarios, interactive exercises, as well as traditional lecture formats.*

**In Full and Effective Compliance**

The Training Division routinely incorporates videos and small group discussions in its training classes. We encourage MCSO to continue increasing its use of role-plays, simulations, practice demonstrations, or physical activities – which we believe lead to a stronger learning environment and better retention of lesson content by adult learners. MCSO will benefit by further challenging the knowledge gained by deputies during training programs with more than a written test. We did not see any changes to the manner in which adult-learning methods are employed by MCSO during this reporting period.

On December 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 46.** *The curriculum and any materials and information on the proposed instructors for the Training provided for by this Order shall be provided to the Monitor within 90 days of the Effective Date for review pursuant to the process described in Section IV. The Monitor and Plaintiffs may provide resources that the MCSO can consult to develop the content of the Training, including names of suggested instructors.*

**In Full and Effective Compliance**

During our October remote site visit, we discussed the status of all Order-required training curricula. Bias-Free Policing and Fourth and Fourteenth Amendment Training, 2015 Blue Team, 2017 EIS, Employee Performance Management Training, Fair and Impartial Decision-Making HUB Training, and the 2017 Complaint Intake and Reception HUB training curricula remain under review by the Training and other Divisions.

Fourth and Fourteenth Amendment Training revisions were approved during this reporting period.

The 2020 ACT remains under development.

The History of Discrimination Training video remains under development.

The Aguila Community Video remains under development.

The 2020 Blue Team-Civilian and the 2020 Blue Team-Detention, Deputy, Lateral remain under development.

The 2019 BWC Training was previously approved for delivery.

The 2019 BWC HUB Training was previously approved. MCSO has indicated an intention to remove this training from the HUB.

The 2017 EIS Training requires annual review and update.

The 2020 Employee Performance Management Training remains under development.

WAI 50764

The introduction to Fair and Impartial Decision-Making HUB (FIDM) curriculum remains under review.

The annual refresher training for FTOs, Privilege and Bias Workshop, was approved during the previous reporting period.

The 2020 SRELE was previously approved for delivery.

2020 PSB8 External remains under development.

The 2020 PSB8 Internal curriculum was previously approved.

The 2019 TraCS Training was previously approved.

The 2019 TraCS for Supervisors Training was previously approved.

Traffic Stop Monthly Review (TSMR) Training is under development.

On December 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.


**Paragraph 47.** *MCSO shall regularly update the Training to keep up with developments in the law and to take into account feedback from the Monitor, the Court, Plaintiffs and MCSO Personnel.*

**Phase 1:** In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on February 26, 2020.

- GG-2 (Detention/Civilian Training Administration), most recently amended on February 26, 2020.

- Training Division Operations Manual, most recently amended on March 9, 2020.

**Phase 2:** In compliance

The Training Division routinely provides all new and revised lesson plans for our and the Parties' review. These reviews address the requirements of this Paragraph.

MCSO submitted the 2020 Blue Team curriculum for first review in February. This curriculum remains under development nine months after its original submission for review. A nine-month delay in receiving feedback and revision from subject-matter experts is unacceptable. We continue to recommend that the Training Division improve upon its long-term planning for training needs. GG-1 requires that all lesson plans be updated and revised annually. A long-term planning tool to address relevant curriculum would assist in identifying curriculum that has not been updated to meet MCSO's internal requirements.

The FTO Cultural Competency Workshop was delivered in late October. The program was originally scheduled for three workshops, but was reduced by one in response to fiscal concerns. The Training Division is attempting to satisfy the needs of the annual FTO refresher, as well as

WAI 50765

fulfill a sub-goal related to the Constitutional Policing Plan (CPP) with these workshops. During our October remote site visit, we discussed this training further. We anticipate that due to the reduced number of workshops, all FTOs will not attend this training. We questioned MCSO if it has developed a process to ensure that all FTOs receive this training – particularly because it has been identified by MCSO as a mandatory Annual Refresher. MCSO Command staff responded that the agency has not developed a process to either ensure that all personnel receive the training or attend an alternate training. MCSO has also not determined how a failure to attend the annual refresher affects the active status of an FTO. We encourage MCSO to address these concerns expeditiously. We will revisit this topic during our next site visit.

The History of Discrimination Training video remains under development.

The Aguila Community Video remains under development.

We will continue to advise MCSO upon first review of a training offering if we do not consider it to be enhanced. MCSO can continue to expect that we and the Parties will continue to observe training sessions and provide appropriate feedback.

### b. Bias-Free Policing Training

*Paragraph 48. The MCSO shall provide all sworn Deputies, including Supervisors and chiefs, as well as all posse members, with 12 hours of comprehensive and interdisciplinary Training on bias-free policing within 240 days of the Effective Date, or for new Deputies or posse members, within 90 days of the start of their service, and at least 6 hours annually thereafter.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

MCSO delivers Fourth and Fourteenth Amendment Training (Bias-Free Policing Training) to all new deputies during POST Academy training. MCSO delivered the Fourth and Fourteenth Amendment classroom training in September to 18 personnel (two sworn, 16 Posse).

*Paragraph 49. The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:*

a. *definitions of racial profiling and Discriminatory Policing;*

b. *examples of the type of conduct that would constitute Discriminatory Policing as well as examples of the types of indicators Deputies may properly rely upon;*

c. *the protection of civil rights as a central part of the police mission and as essential to effective policing;*

d. *an emphasis on ethics, professionalism and the protection of civil rights as a central part of the police mission and as essential to effective policing;*

e. *constitutional and other legal requirements related to equal protection, unlawful discrimination, and restrictions on the enforcement of Immigration-Related Laws, including the requirements of this Order;*

WAI 50766

f.   MCSO policies related to Discriminatory Policing, the enforcement of Immigration-Related Laws and traffic enforcement, and to the extent past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;

g.   MCSO's protocol and requirements for ensuring that any significant pre-planned operations or patrols are initiated and carried out in a race-neutral fashion;

h.   police and community perspectives related to Discriminatory Policing;

i.   the existence of arbitrary classifications, stereotypes, and implicit bias, and the impact that these may have on the decision-making and behavior of a Deputy;

j.   methods and strategies for identifying stereotypes and implicit bias in Deputy decision-making;

k.   methods and strategies for ensuring effective policing, including reliance solely on non-discriminatory factors at key decision points;

l.   methods and strategies to reduce misunderstanding, resolve and/or de-escalate conflict, and avoid Complaints due to perceived police bias or discrimination;

m.   cultural awareness and how to communicate with individuals in commonly encountered scenarios;

n.   problem-oriented policing tactics and other methods for improving public safety and crime prevention through community engagement;

o.   the benefits of actively engaging community organizations, including those serving youth and immigrant communities;

p.   the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;

q.   background information on the Melendres v. Arpaio litigation, as well as a summary and explanation of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in Melendres v. Arpaio, the parameters of the Court's permanent injunction, and the requirements of this Order; and

r.   Instruction on the data collection protocols and reporting requirements of this Order.

**Phase 1:** Not applicable

**Phase 2:** In compliance

The Fourth and Fourteenth Amendment Training curriculum was approved for delivery during this reporting period.

WAI 50767

### c. Training on Detentions, Arrests, and the Enforcement of Immigration-Related Laws

*Paragraph 50.  In addition to the Training on bias-free policing, the MCSO shall provide all sworn personnel, including Supervisors and chiefs, as well as all posse members, with 6 hours of Training on the Fourth Amendment, including on detentions, arrests and the enforcement of Immigration-Related Laws within 180 days of the effective date of this Order, or for new Deputies or posse members, within 90 days of the start of their service.  MCSO shall provide all Deputies with 4 hours of Training each year thereafter.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

MCSO delivers training on Fourth and Fourteenth Amendment (Detentions, Arrests, and the Enforcement of Immigration-Related Laws) to all new deputies during POST Academy training. MCSO delivered the Fourth and Fourteenth Amendment classroom training in September to 18 personnel (two sworn, 16 Posse).

*Paragraph 51.  The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:*

a. *an explanation of the difference between various police contacts according to the level of police intrusion and the requisite level of suspicion; the difference between reasonable suspicion and mere speculation; and the difference between voluntary consent and mere acquiescence to police authority;*

b. *guidance on the facts and circumstances that should be considered in initiating, expanding or terminating an Investigatory Stop or detention;*

c. *guidance on the circumstances under which an Investigatory Detention can become an arrest requiring probable cause;*

d. *constitutional and other legal requirements related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, including the requirements of this Order;*

e. *MCSO policies related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, and the extent to which past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;*

f. *the circumstances under which a passenger may be questioned or asked for identification;*

g. *the forms of identification that will be deemed acceptable if a driver or passenger (in circumstances where identification is required of them) is unable to present an Arizona driver's license;*

h. *the circumstances under which an officer may initiate a vehicle stop in order to investigate a load vehicle;*

i. *the circumstances under which a Deputy may question any individual as to his/her alienage or immigration status, investigate an individual's identity or search the*

WAI 50768

*individual in order to develop evidence of unlawful status, contact ICE/CBP, await a response from ICE/CBP and/or deliver an individual to ICE/CBP custody;*

j.      *a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause to believe that a vehicle or an individual is involved in an immigration-related state crime, such as a violation of the Arizona Human Smuggling Statute, as drawn from legal precedent and updated as necessary; the factors shall not include actual or apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a Hispanic day laborer;*

k.      *a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause that an individual is in the country unlawfully, as drawn from legal precedent and updated as necessary; the factors shall not include actual or apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a day laborer;*

l.      *an emphasis on the rule that use of race or ethnicity to any degree, except in the case of a reliable, specific suspect description, is prohibited;*

m.      *the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;*

n.      *Provide all trainees a copy of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in Melendres v. Arpaio and this Order, as well as a summary and explanation of the same that is drafted by counsel for Plaintiffs or Defendants and reviewed by the Monitor or the Court; and*

o.      *Instruction on the data collection protocols and reporting requirements of this Order, particularly reporting requirements for any contact with ICE/CBP.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

The Fourth and Fourteenth Amendment Training curriculum was approved for delivery during this reporting period.


### d. *Supervisor and Command Level Training*

**Paragraph 52.** *MCSO shall provide Supervisors with comprehensive and interdisciplinary Training on supervision strategies and supervisory responsibilities under the Order. MCSO shall provide an initial mandatory supervisor training of no less than 6 hours, which shall be completed prior to assuming supervisory responsibilities or, for current MCSO Supervisors, within 180 days of the Effective Date of this Order. In addition to this initial Supervisor Training, MCSO shall require each Supervisor to complete at least 4 hours of Supervisor-specific Training annually thereafter. As needed, Supervisors shall also receive Training and updates as required by changes in pertinent developments in the law of equal protection, Fourth Amendment, the enforcement of Immigration-Related Laws, and other areas, as well as Training in new skills.*

WAI 50769

**Phase 1:** Not applicable

**Phase 2:** In compliance

MCSO delivered the 2020 SRELE training in August and September to 173 sworn personnel.

*Paragraph 53. The Supervisor-specific Training shall address or include, at a minimum:*

a.   *techniques for effectively guiding and directing Deputies, and promoting effective and constitutional police practices in conformity with the Policies and Procedures in Paragraphs 18–34 and the Fourth and Fourteenth Amendment Training in Paragraphs 48–51;*

b.   *how to conduct regular reviews of subordinates;*

c.   *operation of Supervisory tools such as EIS;*

d.   *evaluation of written reports, including how to identify conclusory, "canned," or perfunctory language that is not supported by specific facts;*

e.   *how to analyze collected traffic stop data, audio and visual recordings, and patrol data to look for warning signs or indicia of possible racial profiling or unlawful conduct;*

f.   *how to plan significant operations and patrols to ensure that they are race-neutral and how to supervise Deputies engaged in such operations;*

g.   *incorporating integrity-related data into COMSTAT reporting;*

h.   *how to respond to calls from Deputies requesting permission to proceed with an investigation of an individual's immigration status, including contacting ICE/CBP;*

i.   *how to respond to the scene of a traffic stop when a civilian would like to make a Complaint against a Deputy;*

j.   *how to respond to and investigate allegations of Deputy misconduct generally;*

k.   *evaluating Deputy performance as part of the regular employee performance evaluation; and*

l.   *building community partnerships and guiding Deputies to do the Training for Personnel Conducting Misconduct Investigations.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

The 2020 SRELE was approved for delivery in June.

WAI 50770

**COURT ORDER VIII. TRAFFIC STOP DOCUMENTATION AND DATA COLLECTION AND REVIEW**

For Paragraphs 54 and 55, in particular, we request traffic stop data from MCSO. The following describes how we made that request and how we handled the data once we received it. These data may also be referred to in other areas of Section 7 and the report as a whole.

In selecting traffic stop cases for our compliance review, we modified our statistical technique in that, rather than selecting a representative random sample of 100 cases per quarter, we instead pulled a sample of 35 cases per month (or 105 cases per quarter). Our original selection of a sample size of 35 cases was based on information from MCSO TraCS data that reported the average number of traffic stops per month was fewer than 2,000 during the April 2014-June 2015 time period when TraCS data were first available. The selection of 35 cases reflects a sample based on this average per month. This gave us a 95 percent confidence level (the certainty associated with our conclusion).

We continue to pull our monthly sample of traffic stop cases from the six Districts (Districts 1, 2, 3, 4, 6, and 7) and Lake Patrol. Once we received files each month containing traffic stop case numbers from MCSO, denoting from which area they came, we selected a sample of up to 35 cases representing the areas and then selected a subsample averaging 10 cases, from the 35 selected cases, to obtain CAD audiotapes and body-worn camera recordings. Our sampling process involved selecting a sample of cases stratified by the areas according to the proportion of specific area cases relative to the total area cases. Stratification of the data was necessary to ensure that each area was represented proportionally in our review. Randomization of the cases and the selection of the final cases for CAD review were achieved using a statistical software package (IBM SPSS Version 22), which contains a specific function that randomly selects cases and that also allows cases to be weighted by the areas. Our use of SPSS required that we first convert the MCSO Excel spreadsheet into a format that would be readable in SPSS. We next pulled the stratified sample each month for the areas and then randomly selected a CAD audio subsample from the selected cases.

In February 2016, we began pulling cases for our body-worn camera review from the audio subsample. Since that time, we began pulling additional samples for passenger contacts and persons' searches (10 each per month). The unique identifiers for these two samples were relayed back to MCSO personnel, who produced documentation for the selected sample (including the CAD documentation for the subsample).

On October 10, 2014, the Court issued an Order Granting Stipulation to Amend Supplemental/Permanent Injunction/Judgment Order (Document 748). The stipulation affects Paragraphs 57, 61, 62, and 1.r.xv.; and has been incorporated in the body of this report. The stipulation referenced amends the First Order, and will be addressed in Section 7.

WAI 50771

## a. Collection of Traffic Stop Data

**Paragraph 54.**  Within 180 days of the Effective Date, MCSO shall develop a system to ensure that Deputies collect data on all vehicle stops, whether or not they result in the issuance of a citation or arrest.  This system shall require Deputies to document, at a minimum:

a.    the name, badge/serial number, and unit of each Deputy and posse member involved;

b.    the date, time and location of the stop, recorded in a format that can be subject to geocoding;

c.    the license plate state and number of the subject vehicle;

d.    the total number of occupants in the vehicle;

e.    the Deputy's subjective perceived race, ethnicity and gender of the driver and any passengers, based on the officer's subjective impression (no inquiry into an occupant's ethnicity or gender is required or permitted);

f.    the name of any individual upon whom the Deputy runs a license or warrant check (including subject's surname);

g.    an indication of whether the Deputy otherwise contacted any passengers, the nature of the contact, and the reasons for such contact;

h.    the reason for the stop, recorded prior to contact with the occupants of the stopped vehicle, including a description of the traffic or equipment violation observed, if any, and any indicators of criminal activity developed before or during the stop;

i.    time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; time a release was made without citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere or Deputy's departure from the scene;

j.    whether any inquiry as to immigration status was conducted and whether ICE/CBP was contacted, and if so, the facts supporting the inquiry or contact with ICE/CBP, the time Supervisor approval was sought, the time ICE/CBP was contacted, the time it took to complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual;

k.    whether any individual was asked to consent to a search (and the response), whether a probable cause search was performed on any individual, or whether a pat-and-frisk search was performed on any individual;

l.    whether any contraband or evidence was seized from any individual, and nature of the contraband or evidence; and

m.    The final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without citation.

WAI 50772

**Phase 1:** In compliance

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 4, 2020.

- EA-11 (Arrest Procedures), most recently amended on May 13, 2020.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on May 28, 2020.

- EB-2 (Traffic Stop Data Collection), most recently amended on January 7, 2020.

- GI-1 (Radio and Enforcement Communications Procedures), most recently amended on February 5, 2020.

- GJ-3 (Search and Seizure), most recently amended on May 22, 2020.

**Phase 2:** Not in compliance

To verify the information required for this Paragraph, MCSO created, and we reviewed, the Vehicle Stop Contact Form (VSCF), the Vehicle Stop Contact Form Supplemental Sheet, the Incidental Contact Receipt, and the Written Warning/Repair Order, all in electronic form, for those motorists who, during this reporting period, committed a traffic violation or operated a vehicle with defective equipment and received a warning. We also reviewed the Arizona Traffic Ticket and Complaint Forms issued for violations of Arizona Statutes, Internet I/Viewer Event Unit printout, Justice Web Interface printout, and any Incident Report associated with the event. We selected a sample of 105 traffic stops conducted by deputies from July 1-September 30, 2020, for the purposes of this review; and assessed the collected data from the above-listed documents for compliance with Subparagraphs 54.a.-54.m. All of the listed documentation was used for our review of the following subsections of this Paragraph.

The Paragraph requires that MCSO create a system for data collection. The data collected pursuant to this Paragraph will be captured in the Early Identification System, which we discuss further in this report.

Paragraph 54.a. requires MCSO to document the name, badge/serial number, and unit of each deputy and Posse member involved.

For this reporting period, all of the primary deputies indicated their own serial numbers for every stop they initiated. We review the VSCF, I/Viewer Event document, the Justice Web Interface, and the CAD printout to determine which units were on the scene. If back-up units arrive on a scene and do not announce their presence to dispatch, CAD does not capture this information. MCSO made a TraCS change to the VSCF during 2016 to secure this information. MCSO added a drop-down box so the deputy could enter the number of units on the scene and the appropriate fields would be added for the additional deputies. While this addition is an improvement, if the deputy fails to enter the number of additional units on the form, the drop-down boxes do not appear. In addition, MCSO policy requires deputies to prepare the Assisting Deputy and Body-Worn Camera Log in instances where deputies respond and assist at a traffic stop. The log contains the relevant information required by this Subparagraph for any additional deputies involved in a traffic stop other than the primary deputy. During our April 2019 site visit, we

WAI 50773

discussed with MCSO, the Plaintiffs, and the Plaintiff-Intervenors the method of evaluating this requirement. We determined that in instances where a deputy's name, serial number and unit number may have been omitted on the VSCF, yet the deputy prepared the Assisting Deputy and Body-Worn Camera Log, the requirements of this Subparagraph will have been met.

During our review of the sample of 105 vehicle traffic stops, we identified 22 cases where the deputy's unit had another deputy assigned to the vehicle or one or more other deputy units or Posse members were on the scene. In each of the 22 cases in which there were multiple units or deputies on a stop, the deputy properly documented the name, badge, and serial number of the deputies and Posse members on the VSCF, or the information was captured on the Assisting Deputy and Body-Worn Camera Log.

Of the cases we reviewed for passenger contacts under Subparagraph 54.g., there were 44 cases where the deputy's unit had another deputy assigned to the vehicle or one or more other deputy units or Posse members were on the scene. In 43 of the 44 cases, the deputy properly documented the required information on the VSCF or the information was captured on the Assisting Deputy and Body-Worn Camera Log. In one case, an, the assisting deputy was not listed on the VSCF and the Assisting Deputy and Body-Worn Camera Log was not prepared by the deputy.

Of the cases we reviewed for searches of persons under Subparagraph 54.k., there were 69 cases where the deputy's unit had another deputy assigned to the vehicle, or one or more other deputies or Posse members were on the scene. In each of the 69 cases, the deputy properly documented the required information on the VSCF or the information was captured on the Assisting Deputy and Body-Worn Camera Log.

We continue to identify cases where the assisting deputies have not prepared the Assisting Deputy and Body-Worn Camera Log when required by MCSO policy. We encourage MCSO to provide guidance to supervisors to be attentive to this issue during their reviews of traffic stop documentation.

During the third quarter of 2019, MCSO attained a compliance rating of 96%. During the fourth quarter of 2019, MCSO attained a compliance rating of 96%. During the first reporting period of 2020, MCSO attained a compliance rating of 97%. During the last reporting period, MCSO attained a compliance rating of 94%. During this reporting period, MCSO attained a compliance rating of 99%. MCSO remains in compliance with this requirement.

Paragraph 54.b. requires MCSO to document the date, time, and location of the stop, recorded in a format that can be subject to geocoding. Our reviews of the CAD printout for all 105 traffic stops in our sample indicated that the date, time, and location is captured with the time the stop is initiated and the time the stop is cleared. In previous reporting periods, we noted instances where the GPS coordinates could not be located on the documentation received (CAD printout/I/Viewer). We contacted MCSO about this issue, and MCSO now provides us with the GPS coordinates via a separate document that lists the coordinates for the traffic stop sample we provide. MCSO uses GPS to determine location for the CAD system. GPS collects coordinates from three or more satellites to enhance the accuracy of location approximation. The data from the satellites can be decoded to determine the longitude and latitude of traffic stop locations should that be necessary. The CAD system was upgraded in 2014 to include geocoding of traffic stops. CID continues to provide us with a printout of all case numbers in the sample containing

WAI 50774

the associated coordinates. For this reporting period, the CAD or I/Viewer system contained the coordinates in 69% of the cases. In a separate spreadsheet, MCSO provided GPS coordinates for all 105 cases we reviewed, for 100% compliance with this portion of the Subparagraph.

When we review the sample traffic stops from across all Districts, we note the locations of the stops contained on the VSCF, the CAD printout, and the I/Viewer system to ensure that they are accurate. We continue to identify a limited number instances where the location of the stop contained on the VSCF and the location of the stop contained on the CAD printout are inconsistent. Reviewing supervisors are not identifying and addressing this issue. We recommend that reviewing supervisors closely review the VSCFs and CAD printouts and address such deficiencies. The number of inconsistencies did not affect MCSO's rate of compliance.

During our April 2016 site visit, we discussed with MCSO the possibility of using the CAD printout instead of the TraCS data to determine stop times. We determined that using the CAD system to determine stop end times created additional challenges. However, MCSO decided to use the CAD printout to determine traffic stop beginning and ending times for data analysis. MCSO issued Administrative Broadcast 16-62 on June 29, 2016, which indicated that, beginning with the July 2016 traffic stop data collection, the stop times captured on the CAD system would be used for reporting and analytical purposes.

Occasionally, the CAD time of stop and end of stop time do not exactly match those listed on the Vehicle Stop Contact Form, due to extenuating circumstances the deputy may encounter. During this reporting period, we did not find any instances where the end time on the VSCF Contact differed significantly from the CAD printout. In monthly audits of traffic stop data, the Audits and Inspections Unit (AIU) reviews the beginning/ending times of the stops and requires that BIO Action Forms are generated by the Districts when there are discrepancies. The CAD system is more reliable than the VSCF in determining stop times, as it is less prone to human error. When the deputy verbally advises dispatch that s/he is conducting a traffic stop, the information is digitally time-stamped into the CAD system without human input; and when the deputy clears the stop, s/he again verbally advises dispatch.

MCSO remains in compliance with this Subparagraph.

Paragraph 54.c. requires MCSO to document the license plate and state of the subject vehicle. During this reporting period, we identified one case in which deputy had improperly documented the license plate information on the VSCF and on the citation that was issued to the driver. AIU identified the same issue and required that the District prepare a BIO Action Form to document the corrective action taken. In the remaining 104 stops reviewed, the deputies properly recorded the vehicle license plate information.

MCSO remains in compliance with this Subparagraph, with a compliance rate of 99%.

Paragraph 54.d. requires MCSO to document the total number of occupants in the vehicle when a stop is conducted. The VSCF, completed by the deputy on every traffic stop, is used to capture the total number of occupants and contains a separate box on the form for that purpose. EB-2 (Traffic Stop Data Collection) requires deputies to collect data on all traffic stops using the VSCF; this includes incidental contacts with motorists.

WAI 50775

In 40 of the 105 traffic stops we reviewed, the driver had one or more passengers in the vehicle (79 total passengers). In all 40 cases, the deputies properly documented the total number of occupants in the vehicles.

With a compliance rate of 100%, MCSO remains in compliance with this Subparagraph.

Paragraph 54.e. requires MCSO to document the perceived race, ethnicity, and gender of the driver and any passengers, based on the deputy's subjective impression. (No inquiry into the occupant's ethnicity or gender is required or permitted.) In 40 of the 105 stops from the traffic stop data sample, there was more than one occupant in the vehicle (96 total passengers).

Seventy-one, or 68%, of the 105 traffic stops involved White drivers. Twenty-five, or 24%, of the 105 stops involved Latino drivers. Four, or 4%, of the 105 traffic stops involved Black drivers. Four, or 4%, of the 105 traffic stops involved Asian or Pacific Islander drivers. Two, or 2%, of the traffic stops involved American Indian/Alaskan Native drivers. Forty traffic stops, or 38%, resulted in citations. The breakdown of those motorists issued citations is as follows: 27 White drivers (70% of the drivers who were issued citations); 10 Latino drivers (25% of the drivers who were issued citations); and three Black drivers (8% of the drivers who were issued citations). Sixty-six, or 63%, of the 105 traffic stops we reviewed resulted in a written warning. The breakdown of those motorists issued warnings is as follows: 44 White drivers (66% of the drivers who were issued warnings); 15 Latino drivers (23% of the drivers who were issued warnings); four Asian or Pacific Islander drivers (6% of the drivers who were issued warnings); two American Indian/Alaskan Native drivers (3% of the drivers who were issued warnings); and one Black driver (1% of the drivers who were issued warnings).

In our sample of 30 traffic stops that contained body-worn camera recordings, we identified one stop in which the deputy did not accurately document the race/ethnicity of the driver or passenger. In that one case, the deputy classified the driver as a White male; however, based on our review of the body-worn camera recording and our review of the driver's name, we determined that the driver should have been classified as an Asian or Pacific Islander male. In our review of cases to assess compliance with Paragraphs 25.d. and 54.g., passenger contacts, we did not identify any stops in which the deputy did not accurately document the race/ethnicity of the driver or passenger. In our review of cases to assess compliance with Paragraph 54.k., searches of persons, we did not identify any stops in which the deputy did not accurately document the race/ethnicity of the driver or passenger.

This Paragraph requires deputies to document the perceived race, ethnicity, and gender of any passengers whether contact is made with them or not. There were some instances where deputies indicated that they were unable to determine the gender and ethnicity of a passenger and listed the passenger as "unknown-vision obscured." During our review of the body-worn camera recordings, we were also unable to get a clear view of the some of the passengers, often due to vehicle being equipped with dark tinted windows combined with the stop occurring during night time hours; or due to vehicle being equipped with dark tinted windows combined with the glare of the sun during daytime hours.

WAI 50776

During the second quarter of 2019, AIU commenced conducting the Post-Stop Perceived Ethnicity Inspection. This inspection is conducted on a monthly basis and includes: 1) a review of traffic stops where the deputy documented the driver as being White and the driver's surname is Latino; 2) a review of traffic stops where the deputy documented that the driver has a Latino surname with a passenger listed as "unknown-vision obscured;" and 3) a review of traffic stops where the deputy documented that the driver was Latino and the passengers were listed with a designated ethnicity on the VSCF. This inspection was initiated by AIU in response to previous issues identified where deputies failed to properly document the ethnicity of the vehicle occupants. MCSO provided two BIO Action Forms for an inspection that was conducted in May 2020 where issues were identified. In one instance, the deputy listed the driver's perceived race/ethnicity as White on the VSCF, while the inspection determined that the driver appeared to be Latino, based on a review of the body-worn camera recording. The supervisor of the deputy conducted a review of the documents related to the traffic stop and reviewed the body-worn camera recording along with the deputy. The sergeant and the deputy concurred with the findings of the inspection. The deputy indicated that he may have inadvertently selected the wrong race/ethnicity on the VSCF. The sergeant provided re-instruction to the deputy regarding the importance of accurately documenting traffic stop data and the need to check for errors. In one instance, the deputy indicated on the VSCF that the race/ethnicity and gender of the passenger was not ascertained due to a vision obstruction. The inspection determined that the passenger was visible on the body-worn camera recording, and that the passenger appeared to be a Latino. The supervisor of the deputy conducted a review of the documents related to the traffic stop and reviewed the body-worn camera recording along with the deputy. The sergeant and the deputy concurred with the findings of the inspection. The deputy indicated that, as a result of the review with the sergeant, he understood that he needs to document the perceived race/ethnicity and gender of the vehicle occupants to the best of his ability. The sergeant also conducted a briefing with his squad on the issue of properly document the perceived race/ethnicity and gender of vehicle occupants on the VSCF. We reviewed AIU's monthly inspections that were conducted for the months of July, August, and September 2020. Based on AIU's inspections of the traffic stops that were reviewed in all three inspection reports, it was determined that the deputies properly documented the race/ethnicity of the drivers and passengers. There were no BIO Action Forms required since there were no deficiencies found.

MCSO remains in compliance with this requirement.

Paragraph 54.f. requires that MCSO record the name of any individual upon whom the deputy runs a license or warrant check (including the subject's surname). In addition, MCSO's policy requires that deputies perform a license plate check on each vehicle stopped by its deputies, as well as warrant checks on every driver stopped by its deputies. Our reviews have found that deputies regularly record the name of each driver and passenger on the VSCF in each instance where they have run a driver's license or warrant check.

WAI 50777

MCSO policy requires that during each traffic stop, deputies are to conduct a records check on the license plate and a wants/warrant check on each driver. For this reporting period, we found that of the 105 traffic stops we reviewed, each of the 105 stops included a check on the license plate. There were 103 stops where the deputies ran warrant checks on the drivers in accordance with MCSO policy. During its monthly inspections of the traffic stop data, BIO also identifies stops in which a warrant check was not run on the drivers. AIU requests that the Districts prepare BIO Action Forms in such cases.

MCSO's compliance rate with this requirement is 100%. MCSO remains in compliance with this Subparagraph.

Paragraph 54.g. requires the deputy to document whether contact was made with any passengers, the nature of the contact, and the reasons for the contact. During the third quarter of 2019, MCSO requested that we increase the number of cases reviewed in an effort to identify additional stops that fit the criteria of this Paragraph. The sample size of cases to be reviewed was increased from 10 stops each month to 35 stops each month, commencing with August 2019. During some months, the number of traffic stops that involve deputies having contact with passenger is fewer than 35 traffic stops.

During our assessment, we specifically review traffic stops that include any instance where the deputy asks any questions of a passenger beyond a greeting, including asking passengers to identify themselves for any reason. In such instances, we determine if the passenger was issued one of the following: Incidental Contact Receipt, citation, or a warning. If the passenger was not issued any one of the following documents, it adversely impacts MCSO's compliance with this requirement. It is also important to note that in such instances where a deputy fails to issue one of the required documents after being involved in a passenger contact, it is a violation of MCSO's policy.

To ensure that deputies are accurately capturing passenger information and to verify if passengers are contacted, we compare the number of passengers listed by the deputy with the number of passengers entered in the passenger drop-down box on the Vehicle Stop Contact Form. We also review any Incidental Contact Receipts, citations, or warnings, issued to passengers by deputies. We also review the deputies' notes on the VSCF, the Arizona Citation, and the CAD printout for any information involving the passengers. We review MCSO's I/Viewer System and the Justice Web Interface (JWI) to verify if a record check was requested for the driver or any passengers.

All passenger contacts in the traffic stops we reviewed for Paragraphs 25.d. and 54.g were noted in the VSCFs. For this reporting period, we identified 55 traffic stops where the deputy had interaction with one or more passengers; which required the issuance of either an Incidental Contact Receipt, a citation, or a warning. Of the 55 stops, there were 20 where we determined that a passenger, or passengers, were not provided with either an Incidental Contact Receipt, a citation, or a warning, as required by MCSO policy. In some instances, the deputies prepared Incidental Contact Receipts after the traffic stop concluded; yet they were not provided to the passengers. We informed MCSO of this issue, and the agency conducted a review of some of the stops where such instances occurred and they concurred with our assessment. We will be providing MCSO a listing of any additional cases that have been identified that we have not yet made them aware of, as we continue our continue our reviews of the stops. MCSO has also

WAI 50778

informed us that AIU is in the process of developing an inspection to conduct its own reviews of the sample of traffic stops in relation to passenger contacts so that they can identify such issues and require that BIO Action forms are prepared to address any deficiencies. The cases that did not meet compliance with this requirement are described in detail below.

- A White male driver was stopped for a stop sign violation. The vehicle was occupied by a White male passenger. The deputy conducted further investigation after detecting the odor of marijuana. The driver and passenger informed the deputy that they did not have a medical marijuana card. The deputy conducted a search of the vehicle, and located and seized narcotic paraphernalia. The passenger's name was obtained and documented on the VSCF; however, the passenger was not provided with an Incidental Contact Receipt. In this instance, we were provided with an Incidental Contact Receipt for our review even though it had not been provided to the passenger. We informed MCSO of this issue, and MCSO conducted a review of the stop and concurred with our assessment.

- A Latino driver was stopped for an improper passing violation. The vehicle was occupied by a White female passenger. The driver did not have any identification on his person. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license, passing in a no passing zone, and no current registration. The passenger's name was obtained, and the deputy conducted a records check to determine if she had a valid driver's license. The passenger was not provided with an Incidental Contact Receipt.

- A White female driver was stopped for making an improper turn. The vehicle was occupied by a Latino passenger. The deputy obtained the name of the passenger and conducted a records check. The deputy also seized suspected narcotics from the passenger. The driver was issued a citation for the improper turn violation. The passenger was not provided with an Incidental Contact Receipt. In this instance, we were provided with an Incidental Contact Receipt for our review even though it had not been provided to the passenger. We informed MCSO of this issue, and the agency conducted a review of the stop and concurred with our assessment.

- A White male driver was stopped for making an improper turn. The vehicle was occupied by a Latina passenger. The deputy detected the odor of marijuana. The passenger presented a medical marijuana card via her cellular phone. The deputy ended the traffic stop due to a priority call before issuing the driver or passenger any documents; however, the deputy informed the driver that he would mail him a warning. The deputy noted this information on the VSCF. We were provided with a copy of the warning. In addition, we were provided with an Incidental Contact Receipt that contained the passenger's name; however, there were no notation that the document was ever provided to the passenger.

WAI 50779

- A White male driver was stopped for driving with no headlights activated. The vehicle was occupied by a two White male passengers. The driver did not have any identification on his person. A records check revealed that he had never obtained a driver's license. The driver was issued a citation for driving with no lights activated and driving without a valid driver's license. The deputy obtained the identification of one of the passengers and determined, via a records check, that he had a valid driver's license. The passenger was not provided with an Incidental Contact Receipt.

- A White female driver was stopped for driving with an expired registration. The vehicle was occupied by a White female passenger. The passenger, who was the registered owner of the vehicle, provided paperwork for the vehicle to the deputy. The deputy listed the passenger's name on the VSCF as being contacted. The passenger was not provided with an Incidental Contact Receipt. In this instance, we were provided with an Incidental Contact Receipt for our review even though it had not been provided to the passenger. We informed MCSO of this issue, and the agency conducted a review of the stop and concurred with our assessment.

- A Black male driver was stopped for a speeding violation. The vehicle was occupied by a Black female passenger. Further investigation was conducted as the deputy detected the odor of marijuana. The driver and passenger informed the deputy that they did not have a medical marijuana card. The deputy located and seized marijuana from the vehicle. The driver was issued a warning for the speeding violation. The deputy obtained the name of the passenger and conducted a records check. The passenger was not provided with an Incidental Contact Receipt. In this instance, we were provided with an Incidental Contact Receipt for our review even though it had not been provided to the passenger. We informed MCSO of this issue, and the agency conducted a review of the stop and concurred with our assessment.

- A White male driver was stopped for driving with no headlights and taillights activated. The vehicle was occupied by a White female passenger. The driver did not have any identification on his person. A records check revealed that he had never obtained a driver's license. The driver was issued a citation for driving with no lights activated and driving with no valid driver's license. The deputy obtained the passenger's name, and conducted a records check. The passenger was not provided with an Incidental Contact Receipt. In this instance, we were provided with an Incidental Contact Receipt for our review even though it had not been provided to the passenger. We informed MCSO of this issue, and the agency conducted a review of the stop and concurred with our assessment.

WAI 50780

- A Latino driver was stopped for making an unsafe lane change. The vehicle was occupied by a Latina passenger. The driver produced an Arizona identification card. A records check revealed that he had never obtained a driver's license. The driver was issued a citation for making an unsafe lane change and driving with no valid driver's license. The passenger's name was obtained and a records check was conducted. The passenger was not provided with an Incidental Contact Receipt. In this instance, we were provided with an Incidental Contact Receipt for our review even though it had not been provided to the passenger. We informed MCSO of this issue, and the agency conducted a review of the stop and concurred with our assessment.

- A White male driver was stopped for failure to maintain a lane of traffic. The vehicle was occupied by three Latino passengers and one Latina passenger. The deputy investigated two of the passengers who appeared to be under the age of 21 for possible consumption of alcohol. The Latina passenger was determined to be under the age of 21 and she was issued a citation for alcohol consumption by a person under the age of 21. A Latino passenger was also investigated based on the possibility that he was under the age of 21. A records check was conducted and it was determined that the Latino passenger was 21 years old. The passenger was not provided with an Incidental Contact Receipt. We informed MCSO of this issue, and the agency conducted a review of the stop and concurred with our assessment.

- A Black female driver was stopped for a speeding violation. The vehicle was occupied by a Black female passenger. Further investigation was conducted as the deputy detected the odor of marijuana. The passenger admitted she had consumed marijuana earlier and that she did not have a medical marijuana card. A search of the vehicle was conducted and marijuana was seized. The passenger took responsibility for the marijuana. The driver was issued a citation for the speeding violation. The deputy obtained the passenger's name and conducted a records check. The passenger was not provided with an Incidental Contact Receipt. In this instance, we were provided with an Incidental Contact Receipt for our review even though it had not been provided to the passenger. We informed MCSO of this issue, and the agency conducted a review of the stop and concurred with our assessment.

- A White male driver was stopped for a stop sign violation. The vehicle was occupied by a White female passenger. The driver produced an Arizona identification card. A records check revealed that his driver's license was in a revoked status. The driver was issued a citation for driving with a revoked driver's license, failure to have an interlock device installed, and a stop sign violation. The deputy obtained the passenger's name and conducted a records check. The passenger was not provided with an Incidental Contact Receipt. In this instance, we were provided with an Incidental Contact Receipt for our review even though it had not been provided to the passenger. We informed MCSO of this issue, and the agency conducted a review of the stop and concurred with our assessment.

WAI 50781

- A White male driver was stopped for a stop sign violation. The vehicle was occupied by a White female passenger. The driver produced a driver's license. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license, a stop sign violation, and conducting an illegal turn. The passenger's name was obtained and a records check was conducted. The passenger was not provided with an Incidental Contact Receipt. In this instance, we were provided with an Incidental Contact Receipt for our review even though it had not been provided to the passenger. We informed MCSO of this issue, and the agency conducted a review of the stop and concurred with our assessment.

- A White male driver was stopped for a speeding violation. The vehicle was occupied by a White male passenger. The driver did not have any identification on his person. A records check revealed that his driver's license was in a suspended status. The driver was issued a citation for a speeding violation and for providing false information to a law enforcement officer. The passenger's name was obtained and a records check was conducted. The passenger was not provided with an Incidental Contact Receipt.

- A Latino driver was stopped in relation to a call for service. The vehicle was occupied by a Latino passenger. The driver produced an Arizona identification card. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license and failure to have an interlock (breathalyzer) device installed in the vehicle. The passenger's name was obtained and a records check was conducted. The passenger was not provided with an Incidental Contact Receipt. In this instance, we were provided with an Incidental Contact Receipt for our review even though it had not been provided to the passenger. We informed MCSO of this issue, and the agency conducted a review of the stop and concurred with our assessment.

- A White female driver was stopped for driving with an expired registration. The vehicle was occupied by a Latino passenger. The driver did not have any identification on her person. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license, no evidence of insurance, and no current registration. The passenger's name was obtained and a records check was conducted. The passenger was not provided with an Incidental Contact Receipt. In this instance, we were provided with an Incidental Contact Receipt for our review even though it had not been provided to the passenger. We informed MCSO of this issue, and the agency conducted a review of the stop and concurred with our assessment.

WAI 50782

- A Latina driver was stopped for a speeding violation. The vehicle was occupied by a Latina passenger and a Black male passenger. Further investigation was conducted as the deputy detected the odor of marijuana. The driver and passengers informed the deputy that they did not have a medical marijuana card. Marijuana and suspected cocaine was located and seized from the vehicle. The driver was arrested and processed for driving under the influence and was issued a citation for the speeding violation and for driving with no valid driver's license. The names of the passengers were obtained and records checks were conducted. The passengers were not provided with Incidental Contact Receipts.

- A Latino driver was stopped for driving with one headlight. The vehicle was occupied by a Latino passenger. The driver did not have any identification on his person. A records check revealed that he had never obtained a driver's license. The driver was issued a citation for driving with one headlight, no evidence of insurance, no valid driver's license, and open alcohol in a motor vehicle. The passenger's name was obtained and a records check was conducted. The passenger was not provided with an Incidental Contact Receipt.

- A White female driver was stopped for a stop sign violation. The vehicle was occupied by a White female passenger. The name of the passenger, the mother of the driver, was obtained and a records check was conducted. An Incidental Contact Receipt was prepared and provided for our review of this traffic stop. However, based on our review of the body-worn camera recordings, the passenger was not provided with an Incidental Contact Receipt.

- A Latino driver was stopped for a speeding violation. The vehicle was occupied by a Latina passenger. The driver did not have any identification on his person. A records check revealed that he had never obtained a driver's license. The driver was arrested and processed for driving under the influence. The driver was issued a citation for speeding and driving under the influence. An Incidental Contact Receipt was prepared and provided for our review of this traffic stop. However, based on our review of the body-worn camera recordings, the passenger was not provided with an Incidental Contact Receipt.

There were 13 cases identified in the stops that we reviewed for Paragraph 54.k. in which the passengers were contacted which required the issuance of either an Incidental Contact Receipt, a citation, or a warning. Of the 13 stops, there were three where we determined that a passenger should have been issued either an Incidental Contact Receipt, a citation, or a warning. The cases that did not meet compliance with this requirement are described in detail below.

- A Latino driver was stopped for a stop sign violation. The vehicle was occupied by a Latino passenger and a Latina passenger. The deputy investigated further upon detecting the odor of marijuana. The driver and passengers informed the deputy that they did not possess a medical marijuana card. The deputy obtained the identification of the passengers and a records check was conducted. During a search of the vehicle, narcotics and narcotic paraphernalia were located and seized. Under questioning, the Latino passenger informed the deputy that the narcotics and narcotic paraphernalia belonged to

WAI 50783

him. The Latino passenger was provided with a Property Receipt for the seized items. The driver was arrested for driving under the influence and he was issued a citation for driving under the influence, a stop sign violation, and improper position on a right turn. The Latina passenger was provided with an Incidental Contact Receipt; however, the Latino passenger was not provided with an Incidental Contact Receipt.

- A Latino driver was stopped for reckless driving. The vehicle was occupied by a Latina passenger. The driver was arrested for driving under the influence. The passenger was contacted in an effort to identify a sober driver, and it was requested that she submit to a preliminary breath test. She agreed to the test and it was determined that she had been drinking. The passenger was not provided with an Incidental Contact Receipt.

- A Latino driver was stopped for a red light violation. The vehicle was occupied by a Latina passenger. The driver was arrested for a warrant. The VSCF indicates that there was no contact with the passenger. Based on our review of the body-worn camera and the documents provided, the deputy obtained the driver's name and conducted a records check and the vehicle was released to her. The passenger was not provided with an Incidental Contact Receipt, as required by MCSO policy.

There were two cases in the stops that we reviewed for Paragraphs 25 and 54 in which the passenger was contacted, which required that the passenger be issued either an Incidental Contact Receipt, a citation, or a warning. In one case, the passenger was properly issued an Incidental Contact Receipt. The one case that did not meet compliance with this requirement is described in detail below.

- A Latino driver was stopped for a stop sign violation. The vehicle was occupied by three Latina passengers. One of the Latina passengers was contacted after it was determined that the driver did not have a valid driver's license and that she was the registered owner of the vehicle. The deputy obtained the passenger's driver's license and conducted a records check. The passenger was not provided with an Incidental Contact Receipt.

As noted in some of the cases above, deputies have not been consistent in preparing and providing passengers with Incidental Contact Receipts during traffic stops in which the passenger is contacted and asked by the deputy to provide identification. It was noted during this reporting period that in two incidents, a Non-Traffic Contact Form was prepared when an Incidental Contact Receipt should have been prepared and provided to the passengers. Supervisors should identify such errors and omissions during their reviews of the VSCFs and take corrective action. During previous site visits, we discussed with MCSO that we have noted an increase in the number of passengers being contacted and not being provided with an Incidental Contact Receipt. MCSO has informed us that the TraCS system has been modified so that when a deputy prepares the Vehicle Stop Contact Form and uses the passenger contact field, a prompt will appear to instruct the deputy to prepare the Incidental Contact Receipt.

During the third quarter of 2019, MCSO provided the Incidental Contact Receipt, a citation, or a warning, when required in 81% of the cases. During the fourth quarter of 2019, MCSO provided the Incidental Contact Receipt, a citation, or a warning, when required in 75% of the cases. During this first reporting period of 2020, MCSO provided the Incidental Contact Receipt, a citation, or a warning, when required in 73% of the cases. During the second reporting period of

WAI 50784

2020, MCSO provided the Incidental Contact Receipt, a citation, or a warning, when required in 67% of the cases. During this reporting period, MCSO provided the Incidental Contact Receipt, a citation, or a warning, when required in 66% of the cases. MCSO is not in compliance with this Subparagraph.

Paragraph 54.h. requires deputies to record, prior to the stop, the reason for the vehicle stop, including a description of the traffic or equipment violation observed, and any indicators of criminal activity developed before or during the stop. For this reporting period, we identified a random sample of 10 cases from the 35 cases we initially requested each month, and requested CAD audio and body-worn camera (BWC) footage for those cases. We listened to CAD dispatch audio recordings, reviewed the CAD printouts, and reviewed body-worn camera recordings for 30 traffic stops from the sample of 105 traffic stops used for this review; and found that the deputies advised Communications of the reason for the stop, location of the stop, license plate, and state of registration for all 30 stops.

For the remaining 75 traffic stops where body-worn camera recordings and CAD audiotapes were not requested, we review the CAD printout and the VSCF to ensure that the reason for the stop has been captured. These forms are included in our monthly sample requests. The dispatcher enters the reason for the stop in the system as soon as the deputy verbally advises Communications of the stop, location, and tag number. The VSCF and the CAD printout documents the time the stop begins and when it is concluded – either by arrest, citation, or warning. Deputies need to be precise when advising dispatch of the reason for the traffic stop, and likewise entering that information on the appropriate forms.

MCSO's compliance rating for this Subparagraph is 100%.

Paragraph 54.i. requires deputies to document the time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; the time a release was made without a citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere, or the deputy's departure from the scene. In our review of the documentation provided by MCSO, the CAD printouts, the Vehicle Stop Contact Forms, along with the E-Ticketing system and the Arizona Ticket and Complaint Form, the information required is effectively captured. As we noted in Subparagraph 54.b., the stop times on the CAD printout and the Vehicle Stop Contact Form vary slightly on occasion. We understand that this may occur due to extenuating circumstances, and we will report on those instances where there is a difference of five minutes or more from either the initial stop time or the end time.

We review the circumstances of each stop and the activities of the deputies during each stop to assess whether the length of the stop was justified. During this reporting period, we did not identify any stops that were extended for an unreasonable amount of time.

Supervisors conducted timely reviews in each of the 105 VSCFs reviewed. Supervisors are required to conduct reviews of the VSCFs within 72 hours of the stop. Deputies accurately entered beginning and ending times of traffic stops in all 105 cases reviewed. MCSO accurately entered the time citations and warnings were issued in all 105 cases.

MCSO remains in compliance with this Subparagraph.

WAI 50785

Paragraph 54.j. requires MCSO to document whether any inquiry as to immigration status was conducted and whether ICE/CBP was contacted, and if so, the facts supporting the inquiry or contact with ICE/CBP, the time supervisor approval was sought, the time ICE/CBP was contacted, the time it took to complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual.

On November 7, 2014, a United States District Court Judge issued an Order permanently enjoining enforcement of Arizona Revised Statute (A.R.S.) 13-2319, commonly referred to as the Arizona Human Smuggling Act. On November 17, 2014, MCSO issued Administrative Broadcast 14-75, prohibiting deputies from enforcing the above state statute, including arresting, detaining, or questioning persons for suspected (or even known) violations of the act and from extending the duration of traffic stops or other deputy-civilian encounters to do so.

We reviewed 105 traffic stops submitted for this Paragraph, and found that none of the stops involved any contacts with ICE/CBP. None of the stops we reviewed involved any inquires as to immigration status. In addition, our reviews of Incident Reports and Arrest Reports conducted as part of the audits for Paragraphs 89 and 101 revealed no immigration status investigations. MCSO remains in compliance with this Subparagraph. In addition, we monitor any complaints involve any traffic stops that contain an allegation that the race/ethnicity of the driver was a factor in how a driver was treated. During this reporting period, one such complaint investigation was closed by the Professional Standards Bureau (PSB). In that case, the driver alleged that the deputy made the traffic stop based on the fact that the driver was of Mexican heritage. The investigation found that the allegation was false, and that the deputy had a proper reason for conducting the traffic stop. This case was summarized on PSB's summary of closed cases for the month of July 2020, which is posted on MCSO's website for public review.

Paragraph 54.k. requires MCSO to document whether any individual was asked to consent to a search (and the response), whether a probable-cause search was performed on any individual, or whether a pat-and-frisk search was performed on any individual. During our January 2018 site visit, we discussed with MCSO whether any other method may be feasible to identify a larger population of searches of individuals specific to the requirements of this Paragraph. MCSO's response was that the current method is appropriate, and that there may be more cases identified once deputies properly document the searches of persons consistent with this Paragraph.

MCSO provided training to deputies specific to consent searches during the 2019 Annual Combined Training on the Fourth and Fifth Amendment, which included a video that contained a verbal exchange between a driver and a deputy who requested a consent search. In addition, on March 10, 2020, MCSO issued Administrative Broadcast Number 20-20, which re-emphasized the training segment in relation to consent searches.

The method MCSO currently employs to identify our sample of cases to review is to identify the population of all traffic stops in which searches of individuals were documented on the VSCF. Once that population was identified, a random sample of 35 traffic stops from each month is identified for review. During some months, the number traffic stops that involve searches of persons is less than 35 traffic stops. In addition, we also review any cases in which the deputies performed searches of individuals in the sample of 105 traffic stops reviewed to assess compliance with Paragraphs 25 and 54 and the sample of traffic stops reviewed to assess compliance with

WAI 50786

Subparagraphs 25.d. and 54.g. When we identify issues that impact compliance or where MCSO policy was not followed, we provide the list of cases to MCSO for review. In the sample of traffic stops that we reviewed to assess compliance with Subparagraph 54.k, there were 12 stops identified that met the criteria of this Subparagraph:

- A Black male driver was stopped for a stop sign violation. The deputy requested consent to conduct a pat-down search of the driver. The driver granted consent and the deputy conducted the search. No contraband was found. The deputy did not inform the driver of the right to refuse the search or revoke the consent at any time, as required by MCSO policy. The deputy properly documented the search on the VSCF.

- A Black male driver was stopped for a speeding violation. The deputy detected the odor of marijuana. The driver admitted to having consumed marijuana earlier and that he did not have a medical marijuana card. The deputy had the driver exit the vehicle and conducted a pat-down search of the driver. No contraband was found. The deputy properly documented the search on the VSCF.

- An American Indian/Alaskan Native male driver was stopped for a speeding violation. The deputy observed narcotic paraphernalia in the vehicle. The deputy requested the driver's consent to conduct a search of his person and the vehicle. The driver gave his consent. The deputy seized the narcotic paraphernalia from the vehicle. No contraband was located on the driver's person. The deputy did not inform the driver of the right to refuse the search or revoke the consent at any time, as required by MCSO policy. The deputy properly documented the search on the VSCF.

- A Latino driver was stopped for driving with no visible license plate. The deputy requested consent to conduct a search of the driver. The driver granted consent and the deputy conducted the search. No contraband was found. The deputy then asked the driver for consent to search the vehicle. The driver gave the deputy consent; however, the deputy did not conduct a search of the vehicle. The deputy properly documented the search on the VSCF.

- A White male driver was stopped for a stop sign violation. The driver admitted he had a medical marijuana card and that he had marijuana in his pocket. The deputy requested consent to conduct a search of the driver. The driver granted consent, and the deputy conducted the search and seized the marijuana. The deputy did not inform the driver of the right to refuse the search or revoke the consent at any time, as required by MCSO policy. The deputy properly documented the search on the VSCF.

- A White male driver was stopped for driving with an expired registration. The deputy asked for and obtained the driver's consent to search his person. The driver informed the deputy that he had a utility knife on his person. The deputy conducted a search of the driver. No contraband was found. The deputy did not inform the driver of the right to refuse the search or revoke the consent at any time, as required by MCSO policy. The deputy properly documented the search on the VSCF.

WAI 50787

- A Latino driver was stopped for a speeding violation. The deputy asked for and obtained the driver's consent to search his person. The deputy noted that there was an empty holster in the driver's door. The deputy conducted a search of the driver. No contraband was found. The deputy did not inform the driver of the right to refuse the search or revoke the consent at any time, as required by MCSO policy. The deputy properly documented the search on the VSCF.

- A Latino driver was stopped for a speeding violation. The deputy asked for and obtained the driver's consent to search his person. The deputy conducted a search of the driver. No contraband was found. The deputy did not inform the driver of the right to refuse the search or revoke the consent at any time, as required by MCSO policy. The driver was later arrested and searched incident to arrest. The deputy properly documented the search incident to arrest on the VSCF; however, the consent search was not listed on the VSCF.

- A Latina driver was stopped for a speeding violation. The vehicle was occupied by a Latina passenger and a Black female passenger. The driver was arrested and searched incident to arrest for driving under the influence. The passengers were juveniles and the VSCF indicated that the search conducted in relation to them was a protective sweep. The passengers were requested to submit to a preliminary breath test. No alcohol was detected. The deputy properly documented the search on the VSCF.

- A Latina driver was stopped for driving with no operable taillights. The vehicle was occupied by a White female passenger and a Latino passenger. The driver was arrested and searched incident to arrest for driving under the influence. The VSCF indicates that the driver was searched incident to arrest as well as searched after consent was requested and obtained; however, based on our review of the body-worn camera recording of the stop, the driver was not searched based on a request and granting of the driver's consent. The search incident to arrest was properly documented.

- A Latino driver was stopped for reckless driving. The vehicle was occupied by a Latina passenger. The deputy asked for and obtained the driver's consent to search his person. The deputy conducted a search of the driver. No contraband was found. The deputy did not inform the driver of the right to refuse the search or revoke the consent at any time, as required by MCSO policy. The driver was later arrested and searched incident to arrest. The deputy properly documented the search on the VSCF.

- A White female driver was stopped for a speeding violation and for failure to maintain a lane of traffic. The VSCF indicates that the driver was searched incident to arrest as well as searched after consent was requested and obtained; however, based on our review of the body-worn camera recording of the stop, the driver was not searched based on a request and granting of the driver's consent. The deputy did not properly document the search on the VSCF.

In relation to the sample of traffic stops reviewed to assess compliance with Subparagraphs 25.d. and 54.g., the following three stops involved searches of persons.

WAI 50788

- A White male driver was stopped for a failure to signal violation. The vehicle was occupied by two White female passengers and one White male passenger. The deputy asked for and obtained the driver's consent to search his person. The deputy conducted a search of the driver. No contraband was found. The deputy did not inform the driver of the right to refuse the search or revoke the consent at any time, as required by MCSO policy. The deputy properly documented the search on the VSCF.

- A Black female driver was stopped for a speeding violation. The vehicle was occupied by a Black female passenger. The deputy detected the odor of marijuana. During the stop, the deputy conducted a pat-down of the driver and passenger. The deputy properly documented the search of the driver on the VSCF; however, the deputy did not properly document the search of the passenger on the VSCF.

- A Latina driver was stopped for a speeding violation. The vehicle was occupied by a Latina passenger and a Black male passenger. The deputy detected the odor of marijuana. During the stop, the deputy conducted a pat-down of the driver. The deputy properly documented the search on the VSCF.

There were no searches of persons identified in the sample of traffic stops reviewed to assess compliance with Paragraphs 25 and 54.

During this reporting period, as described above, there was one traffic stop identified in which deputies presented the Consent to Search Forms to document when consent was requested and obtained to search four vehicle occupants. The body-worn camera recordings also captured the obtaining of the consent for the searches. MCSO has indicated that it does not require its deputies to use Consent to Search Forms as the primary means for documenting consent searches. MCSO requires that deputies document requests to conduct consent searches by way of video-recording the event via the BWCs. In the event the BWC is not operational, MCSO policy requires deputies to document requests to conduct consent searches on the Consent to Search Form. We continue to recommend that MCSO revisit the requirements of this section of the policy and require deputies to read the Consent to Search Form to the subject and require a signature from the individual for every request for consent to search. Due to the small population of cases that we and MCSO identified, it is important that deputies accurately document each search and/or request to a consent search, as required by this Subparagraph, to attain and maintain compliance with the requirement.

During the third quarter of 2019, we determined that MCSO attained a compliance rate of 78%. During the fourth quarter of 2019, we determined that MCSO attained a compliance rating of 90%. During the first reporting period of 2020, we determined that MCSO attained a compliance rating of 77%. During the second reporting period of 2020, we determined that MCSO attained a compliance rating of 75%. During this reporting period, we determined that MCSO attained a compliance rating of 87%. MCSO is not in compliance with this requirement.

WAI 50789

Paragraph 54.l. requires MCSO to document whether any contraband or evidence was seized from any individual, and the nature of the contraband or evidence. Generally, deputies seize the following types of contraband and/or evidence, which is documented on the VSCF, a Property Receipt, and an Incident Report: license plates; driver's licenses; alcoholic beverages; narcotics; narcotic paraphernalia; weapons; and ammunition. We conduct a review of the relevant documents and review the VSCF to ensure that deputies properly document the seizure of the evidence and/or contraband.

During our review of the collected traffic stop data (our sample of 105) during this reporting period, we did not any cases where evidence and/or contraband was seized.

In the cases we reviewed for searches of individuals under Subparagraph 54.k., there were 52 items seized by deputies and placed into evidence. Of those 52 items, there were four items that were seized and placed into evidence and the items were not properly listed on the VSCFs, as required by MCSO policy.

In the cases we reviewed for passenger contacts under Subparagraph 54.g., there were 36 items seized by deputies and placed into evidence. There was one case where the seizure of a driver's license was not properly documented on the VSCF, as required by MCSO policy.

In previous reporting periods, we noted an increase in the number of errors and omissions by deputies documenting the seizure of contraband or evidence on VSCFs. These issues continue through this reporting period. During the fourth quarter of 2019, MCSO attained a compliance rate of 90%. During the first reporting period of 2020, MCSO attained a compliance rate of greater than 94%. During the second reporting period of 2020, MCSO attained a compliance rate of 78%; and we reported that MCSO would remain in compliance with this requirement during that reporting period. However, MCSO will be required to attain a compliance rate of greater the 94% during this current reporting period to maintain compliance with this requirement. During this reporting period, MCSO attained a compliance rating of greater than 94%. MCSO remains in compliance with this requirement.

Paragraph 54.m. requires the documentation of the final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without a citation. In all 105 cases we reviewed, we found documentation indicating the final disposition of the stop; and whether the deputy made an arrest, issued a citation, issued a warning, or made a release without a citation. MCSO remains in compliance with this Subparagraph.

In the last reporting period, we noted that although MCSO has attained compliance with certain Subparagraphs, as described above, the agency has failed to achieve compliance with all of the Subparagraphs of Paragraph 54. We have, in the past, deferred our Phase 2 compliance assessment for Paragraph 54 as a whole. The requirements of this Paragraph are clear, and the guiding policies have been in place for several years now. We also stated that if MCSO did not achieve compliance with the remaining Subparagraphs of Paragraph 54 during this reporting period, we would change our compliance finding to not in compliance. Based on our review this quarter, we have determined that MCSO has not attained compliance with the remaining Subparagraphs of Paragraph 54. MCSO is not in compliance with Paragraph 54.

WAI 50790

***Paragraph 55.*** *MCSO shall assign a unique ID for each incident/stop so that any other documentation (e.g., citations, incident reports, tow forms) can be linked back to the stop.*

**In Full and Effective Compliance**

To verify compliance for this Paragraph, we reviewed a sample of the Vehicle Stop Contact Forms, CAD printouts, I/Viewer documentation, citations, warning forms, and any Incident Report that may have been generated as a result of the traffic stop.

The unique identifier "went live" in September 2013 when the CAD system was implemented. This number provides the mechanism to link all data related to a specific traffic stop. The number is automatically generated by the CAD software and is sent to the deputy's MDT at the time the deputy advises Communications of the traffic stop. The unique identifier is visible and displayed at the top of the CAD printout and also visible on the Vehicle Stop Contact Form, the Arizona Traffic Citation, and the Warning/Repair Form.

Once the deputy scans the motorist's driver's license, the system automatically populates most of the information into one or more forms required by the Order. If the data cannot be entered into TraCS from the vehicle (due to malfunctioning equipment), policy requires the deputy to enter the written traffic stop data electronically prior to the end of the shift. The start and end times of the traffic stop are now auto-populated into the Vehicle Stop Contact Form from the CAD system.

Since our first visit for monitoring purposes in June 2014, TraCS has been implemented in all Districts; and the unique identifier (CFS number) is automatically entered from the deputy's MDT. No user intervention is required.

To determine compliance with this requirement, we reviewed 105 traffic stop cases and reviewed the CAD printouts and the Vehicle Stop Contact Forms for all stops. We reviewed the Warning/Repair Forms, when applicable, for those stops where a warning was issued or the vehicle had defective equipment. The unique identification number assigned to each event was listed on correctly on all CAD printouts for every stop. A review was conducted of the Tow Sheets prepared by deputies in instances where a driver's vehicle is towed. In each instance, the unique identification number assigned to each event was listed correctly on the Tow Sheet. A review of the Incident Reports prepared by deputies in instances where policy requires the preparation of the report was conducted. In each instance, the unique identification number assigned to each event was listed correctly on the Incident Report. MCSO remains in compliance with this requirement.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 50791

**Paragraph 56.** *The traffic stop data collection system shall be subject to regular audits and quality control checks. MCSO shall develop a protocol for maintaining the integrity and accuracy of the traffic stop data, to be reviewed by the Monitor pursuant to the process described in Section IV.*

**Phase 1:** Not in compliance

- EB-2 (Traffic Stop Data Collection), most recently amended on January 7, 2020.

- EIU Operations Manual, currently under revision.

**Phase 2:** Not in compliance

To verify compliance for this Paragraph, we reviewed the monthly audits of the traffic stop data conducted by BIO on the monthly samples we select. While audits require in-depth analysis, our quality control checks serve as an inspection or spot-check of traffic stop data. We reviewed the BIO traffic stop audits for the July 1-September 30, 2020 time period and found that the audits were thorough and captured most deficiencies. During our review of the sample dataset, we brought some deficiencies to the attention of CID during our October 2020 remote site visit; we identify them in other areas of this report.

The draft EIU Operations Manual, which includes procedures for traffic stop data quality assurance, has 27 of the 30 sections approved. The remaining sections under development cannot be finalized until the Traffic Stop Monthly Report (TSMR) methodology related to the analyses of traffic stop data is finalized and determined to be reliable and valid in accordance with the requirements of Paragraphs 66 and 67. The TSMR methodology is being piloted by MCSO. (See below.) The remaining sections of the EIU Operations Manual also require procedures for the Traffic Stop Annual Report (TSAR) methodology, which is approved. The remaining task for MCSO regarding TSAR is to include the procedures for implementing the approved methodology into the EIU Operations Manual. Phase 1 compliance with this Paragraph requires that all sections of the EIU Operations Manual have been reviewed and approved.

On September 8, 2015, MCSO issued Administrative Broadcast 15-96, which addressed the security of paper traffic stop forms. The procedure requires that paper forms (related to traffic stop data that may be handwritten by deputies in the field if the TraCS system is nonoperational due to maintenance or lack of connectivity) be stored in a locked cabinet and overseen by the Division Commander. Because of the COVID-19 pandemic, we were unable to travel to Maricopa County and visit the Districts to confirm that all records were locked and secure, that logs were properly maintained, and that only authorized personnel had access to these files. This activity will be delayed until we are able to resume our in-person site visits. However, we note that MCSO has a consistent track record of complying with this Order requirement.

MCSO began auditing traffic stop data in January 2014; since April 2014, MCSO has conducted audits of the data monthly and provided those results to us. MCSO conducts audits of the 105 traffic stop sample that we request each reporting period. MCSO also conducts a more expansive review of 30 of the 105 sample pulls we request each reporting period to include passenger contacts and persons' searches. EB-2 also requires regularly scheduled audits of traffic stop data on a monthly basis. We reviewed BIO's monthly audits of the traffic samples from July 1-September 30, 2020, and found them to be satisfactory.

WAI 50792

To achieve Phase 1 compliance with this Paragraph, MCSO must finalize the EIU Operations Manual to cover all matters applicable to this Paragraph. To achieve Phase 2 compliance with this Paragraph, MCSO must demonstrate ongoing use of the procedures to ensure traffic stop data quality assurance.

***Paragraph 57.*** *MCSO shall explore the possibility of relying on the CAD and/or MDT systems to check if all stops are being recorded and relying on on-person recording equipment to check whether Deputies are accurately reporting stop length. In addition, MCSO shall implement a system for Deputies to provide motorists with a copy of non-sensitive data recorded for each stop (such as a receipt) with instructions for how to report any inaccuracies the motorist believes are in the data, which can then be analyzed as part of any audit. The receipt will be provided to motorists even if the stop does not result in a citation or arrest.*

**Phase 1:** In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on May 28, 2020.
- EB-2 (Traffic Stop Data Collection), most recently amended on January 7, 2020.
- GJ-35 (Body-Worn Cameras), most recently amended on December 31, 2019.

**Phase 2:** In compliance

To verify compliance for this Paragraph, we reviewed all TraCS forms for each traffic stop that were included in the sample. In addition, we reviewed a subset of CAD audio recordings and body-worn camera footage of the stops.

The system for providing "receipts" is outlined in EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) and EB-2 (Traffic Stop Data Collection). GJ-35 addresses the requirement that supervisors review recordings to check whether deputies are accurately reporting stop length. In addition to GJ-35, BIO developed a Body-Worn Camera Matrix for its inspectors to review camera recordings.

The deputy should provide every person contacted on a traffic stop with an Arizona Traffic Ticket or Complaint (Citation), a Written Warning/Repair Order (Warning), or an MCSO Incidental Contact Receipt. For this reporting period, deputies issued citations or written warnings in all 105 cases we reviewed.

We did not identify any issues with the citations, warnings, and Incidental Contact Receipts issued to drivers for the cases reviewed under Subparagraphs 25.d. and 54.g., contact with passengers, and Subparagraph 54.k., searches of persons.

MCSO's compliance rate with this requirement is 100%. MCSO remains in compliance with this portion of the Subparagraph.

The approved policies dictate that the CAD system will be used for verification of the recording of the initiation and conclusion of the traffic stop and that MCSO will explore the possibility of relying on the BWC recordings to verify that the stop times reported by deputies are accurate. The deputy verbally announces the stops initiation and termination on the radio, and then CAD

WAI 50793

permanently records this information. In May 2016, MCSO advised us that all deputies and sergeants who make traffic stops had been issued body-worn cameras and that they were fully operational. We verified this assertion during our July 2016 site visit; and since that time, we have been reviewing the BWC recordings to determine if stop times indicated by CAD were accurate. MCSO's Audit and Inspections Unit (AIU) conducts monthly inspections of traffic stop data, which includes an assessment as to whether the BWC video captured the traffic stop in its entirety; to verify the time the stop began; and to verify if all information on forms prepared for each traffic stop match the BWC video. AIU conducts reviews of 30 body-worn camera recordings each reporting period.

During this reporting period, we requested from MCSO 30 body-worn camera recordings for our review. We are able to use the BWC recordings that were provided for each stop to assess whether deputies are accurately reporting the stop length. The compliance rate for the sample of 30 cases selected from the 105 stops reviewed for using the BWC to determine if deputies are accurately reporting stop length is 100%. MCSO remains in compliance with this requirement.

***Paragraph 58.*** *The MCSO shall ensure that all databases containing individual-specific data comply with federal and state privacy standards governing personally identifiable information. MCSO shall develop a process to restrict database access to authorized, identified users who are accessing the information for a legitimate and identified purpose as defined by the Parties. If the Parties cannot agree, the Court shall make the determination.*

### In Full and Effective Compliance

To verify compliance for this Paragraph, we reviewed the applicable policies and met with Technology Management Bureau personnel to determine if any unauthorized access and/or illegitimate access to any of MCSO's database systems had occurred during this reporting period. The policies state that the dissemination of Criminal History Record Information (CHRI) is based on federal guidelines, Arizona statutes, the Department of Public Safety (ASDPS), and the Arizona Criminal Justice Information System (ACJIS); and that any violation is subject to fine. No secondary dissemination is allowed. The policies require that the Professional Standards Bureau (PSB) provide written notification to the System Security Officer whenever it has been determined that an employee has violated the policy by improperly accessing any Office computer database system. Every new recruit class receives three hours of training on this topic during initial Academy training.

During this reporting period, we inquired whether there had been any instances of unauthorized access to and/or any improper uses of the database systems. MCSO informed us that during this reporting period, PSB did not identify any closed cases in which there was a finding that there was unauthorized access to and/or any improper uses of MCSO's database systems. MCSO remains in compliance with this requirement.

On June 22, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 50794

*Paragraph 59. Notwithstanding the foregoing, the MCSO shall provide full access to the collected data to the Monitor and Plaintiffs' representatives, who shall keep any personal identifying information confidential. Every 180 days, MCSO shall provide the traffic stop data collected up to that date to the Monitor and Plaintiffs' representatives in electronic form. If proprietary software is necessary to view and analyze the data, MCSO shall provide a copy of the same. If the Monitor or the Parties wish to submit data with personal identifying information to the Court, they shall provide the personally identifying information under seal.*

**In Full and Effective Compliance**

Electronic traffic stop data capture began on April 1, 2014. The forms created by MCSO capture the traffic stop details required by MCSO policy and Paragraphs 25 and 54. BIO provides the traffic stop data on a monthly basis, which includes a spreadsheet of all traffic stops for the reporting period, listing Event Numbers as described at the beginning of Section 7. All marked patrol vehicles used for traffic stops are now equipped with the automated TraCS system, and all Patrol deputies have been trained in TraCS data entry. MCSO has provided full access to all available electronic and written collected data since April 1, 2014. MCSO did not collect electronic data before this time. During this reporting period, MCSO has continued to provide full access to the traffic stop data.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

### b. Electronic Data Entry

*Paragraph 60. Within one year of the Effective Date, the MCSO shall develop a system by which Deputies can input traffic stop data electronically. Such electronic data system shall have the capability to generate summary reports and analyses, and to conduct searches and queries. MCSO will explore whether such data collection capability is possible through the agency's existing CAD and MDT systems, or a combination of the CAD and MDT systems with a new data collection system. Data need not all be collected in a single database; however, it should be collected in a format that can be efficiently analyzed together. Before developing an electronic system, the MCSO may collect data manually but must ensure that such data can be entered into the electronic system in a timely and accurate fashion as soon as practicable.*

**In Full and Effective Compliance**

To verify compliance with this Paragraph, we reviewed the documents generated electronically that capture the required traffic stop data. The electronic data entry of traffic stop data by deputies in the field went online on April 1, 2015. If TraCS experiences a malfunction in the field, there is a protocol that requires the deputy to electronically enter the traffic stop data prior to the end of the shift.

WAI 50795

MCSO continues to conduct monthly traffic stop inspections and forwards them for our review. Initially, the traffic stop data was captured on handwritten forms created by MCSO, completed by the deputy in the field, and manually entered in the database by administrative personnel located at each District. Now all traffic stop data is entered electronically, whether in the field or at MCSO District offices. Occasionally, connectivity is lost in the field due to poor signal quality, and citations are handwritten. Per policy, deputies must enter electronically any written traffic stop data they have created by the end of the shift in which the event occurred. As noted in our Paragraph 90 review, VSCFs are routinely entered into the system by the end of the shift.

Deputies have demonstrated their ability to access and use TraCS, as evidenced by the fact that their total time on a traffic stop averages 16 minutes or less.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

### c. Audio-Video Recording of Traffic Stops

**Paragraph 61.** *The MCSO will issue functional video and audio recording equipment to all patrol deputies and sergeants who make traffic stops, and shall commence regular operation and maintenance of such video and audio recording equipment. Such issuance must be complete within 120 days of the approval of the policies and procedures for the operation, maintenance, and data storage for such on-person body cameras and approval of the purchase of such equipment and related contracts by the Maricopa County Board of Supervisors. Subject to Maricopa County code and the State of Arizona's procurement law, The Court shall choose the vendor for the video and audio recording equipment if the Parties and the Monitor cannot agree on one.*

**In Full and Effective Compliance**

During our September 2014 site visit, we met with two MCSO Deputy Chiefs and other personnel to discuss MCSO's progress of acquiring in-car video and audio equipment for all patrol vehicles used to conduct traffic stops. MCSO had initially set out to purchase fixed in-car cameras as required by the Order, but expressed an interest in acquiring body-worn video and audio recording devices for deputies. The Court issued an Order providing an amendment/stipulation on October 10, 2014, requiring on-body cameras. This was a prudent decision, in that it allows for capturing additional data, where a fixed mounted camera has limitations. We have documented MCSO's transition from in-car to body-worn cameras (BWC) in our previous quarterly status reports.

Records indicate that MCSO began distribution of body-worn cameras on September 14, 2015, and full implementation occurred on May 16, 2016. The body-worn camera recordings are stored in a cloud-based system (on evidence.com) that can be easily accessed by supervisors and command personnel. The retention requirement for the recordings is three years. In July 2019, MCSO began distribution of the newer version of body-worn cameras to deputies. During our October 2019 site visit, MCSO reported that deputies assigned to the Districts have all been equipped with the new body-worn cameras; and that deputies in specialized assignments were being equipped with the new devices. The new version of body-worn cameras purchased by

WAI 50796

MCSO is mounted on the chest area via a magnetic mount. In addition, the devices are self-contained, meaning that the device does not have any cords or wires that may become disconnected, which had been a recurring problem with the previous devices. As we reported in the last two reporting periods, during our review of traffic stops we noted that in every instance, deputies used the new body-worn camera.

To verify that all Patrol deputies have been issued body-worn cameras, and properly use the devices, we review random samples of the traffic stops as described in Paragraphs 25 and 54. In addition, during our District visits in January 2020, we observed that deputies were equipped with body-worn cameras.

On December 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

*Paragraph 62. Deputies shall turn on any video and audio recording equipment as soon the decision to initiate the stop is made and continue recording through the end of the stop. MCSO shall repair or replace all non-functioning video or audio recording equipment, as necessary for reliable functioning. Deputies who fail to activate and to use their recording equipment according to MCSO policy or notify MCSO that their equipment is nonfunctioning within a reasonable time shall be subject to Discipline.*

**Phase 1:** In compliance

- GJ-35 (Body-Worn Cameras), most recently amended on December 31, 2019.
- Body-Worn Camera Operations Manual, published on December 22, 2016.

**Phase 2**: In compliance

MCSO evaluated on-person body cameras from other jurisdictions and selected a vendor (TASER International, now known as Axon). Body-worn cameras have been implemented in all Districts since May 2016 and are fully operational. As mentioned under Paragraph 61, MCSO has obtained, and has equipped the deputies in the Districts with new body-worn cameras, also provided by Axon.

To verify compliance for this Paragraph, we reviewed the body-worn camera recordings included in our monthly samples. This includes the stops reviewed each month for Paragraphs 25 and 54; the stops reviewed each month for Subparagraph 54.k.; and the stops reviewed each month for Subparagraph 54.g. For purposes of calculating compliance, we exclude any stops where the deputies documented on the VSCF that the BWCs malfunctioned during the stop.

For our selection of a sample to review BWC recordings, we used the same sample of 30 cases we selected for the CAD audio request. In each of the 30 cases in which we requested BWC recordings, the deputies properly activated the body-worn cameras during the traffic stop events.

WAI 50797

In our sample of body-worn camera recordings reviewed for Subparagraph 54.k., we identified one traffic stop where the deputy activated the body-worn camera after he had initiated contact with the driver. The deputy did not make any notation that provided an explanation for the late activation. There was no documentation of any malfunction of the body-worn camera or any exigent circumstances that prevented the timely activation of the body-worn camera.

In our sample of body-worn camera recordings for Subparagraph 54.g., we identified one case where there was no body-worn camera recording for the traffic stop. There was no documentation of any malfunction of the body-worn camera or any exigent circumstances that prevented the activation of the body-worn camera. In one case, there was no body-worn camera recording for an assisting deputy during a traffic stop.

The remainder of the cases were in compliance, with the deputy activating the video- and audio-recording equipment as soon as the deputy decided to initiate the stop, and continuing to record through the end of the stop. We continue to provide MCSO with the information on the cases where issues are identified for its review.

MCSO's compliance rate for this requirement is 99%.

There are still a number of instances in which deputies respond to assist at traffic stops and do not complete the Assisting Deputy and Body-Worn Camera Log. With the issuance of GJ-35 (Body-Worn Cameras), effective on December 31, 2019, the policy is now consistent with EB-2 (Traffic Stop Data Collection), which requires that each deputy assisting on a traffic stop prepare the Assisting Deputy and Body-Worn Camera Log. We had anticipated that the policy clarification, coupled with effective supervisory reviews, would assist deputies to understand when they are required to complete the log. However, we continue to identify instances where the log was not prepared when required.

Our reviews of the body-worn camera recordings often reveal instances of deputies exhibiting positive, model behavior; and, at times, instances of deputies making errors, or exhibiting less than model behavior – all of which would be useful for training purposes. We also reviewed the Professional Standards Bureau's monthly summary of closed cases for July, August, and September 2020. The following cases were identified that involve the review of body-worn camera recordings to assist in the determination of whether the allegations were valid or not:

- In one case, it was alleged that a deputy was unprofessional during the traffic stop, and that the deputy did not have reasonable suspicion for conducting the stop and alleged that the stop length was improper. A review of the body-worn camera recording revealed that the deputy's actions were proper and that the allegations were false and not supported by the video recording.

- In one case, it was alleged that a deputy used inappropriate force when detaining the complainant and placing him in a patrol vehicle. It was also alleged that the deputy did not accommodate a request in a timely manner to allow the complainant access to a restroom. A review of the body-worn camera recording revealed that the deputy moved the handcuffs from the rear position to the front position to make the complainant more comfortable. It was determined that the deputy used appropriate force during the arrest, and that the deputy acted in accordance with MCSO policy.

WAI 50798

- In one case, it was alleged that a deputy was rude and dismissive and failed to properly perform his duties when he did not make an arrest. A review of the body-worn camera recording revealed that the deputy's actions were proper, and that there was a lack of probable cause to make an arrest in the incident. It was determined that insufficient evidence existed to prove or disprove whether the deputy was rude as he attempted to focus the complainant and de-escalate the situation.

- In one case, it was alleged that a deputy stopped the complainant because he was of Mexican heritage. A review of the body-worn camera recording revealed that the deputy's actions were proper and that the allegations were false and not supported by the video recording.

- In one case, it was alleged that a deputy made comments to the complainant's neighbor alleging that the complainant is a drug dealer and that he lures young women to his residence. A review of the body-worn camera recording revealed that the deputy did not make any such statements to the neighbor.

- In one case, it was alleged that a deputy was condescending and invaded the complainant's personal space. A review of the body-worn camera recording revealed that the deputy was professional and that the deputy did not invade the personal space of the complainant.

- In one case, it was alleged that a deputy was unprofessional during the traffic stop, that the deputy did not have reasonable suspicion for conducting the stop, and that the length of the stop was improper. A review of the body-worn camera recording revealed that the deputy's actions were proper and that the allegations were false.

- In one case, during a call for service, the complainant alleged that the deputy made condescending comments regarding her husband. A review of the body-worn camera recording revealed that the deputy acted in a professional manner. In addition, during the investigation the complainant admitted that she took the comment out of context as she was frustrated at the time.

- In one case, the complainant alleged that the deputy failed to take a report and was rude. A review of the body-worn camera recording revealed that the deputy was willing to take a report; however, the complainant refused to cooperate and left the area after being advised that she would also receive a citation. The deputy was found to have acted in a professional manner and in accordance with MCSO's policies.

- In one case, the complainant alleged that the deputy was rude, called her grandson a liar, and used profanity during a call for service. A review of the body-worn camera recording revealed that the deputy did not curse or call the complainant's grandson a liar. The deputy was found to have acted in a professional manner and in accordance with MCSO's policies.

WAI 50799

- In one case, the complainant alleged that the deputy was abrasive and demeaning toward him and failed to provide him with assistance when he reported an incident with an aggressive driver. A review of the body-worn camera recording revealed that the deputy acted in a professional manner and made multiple attempts to help the complainant resolve his concerns. The actions of the deputy were determined to be in accordance with MCSO's policies.

- In one case, the complainant alleged that the deputy was rude and aggressively kept asking about her vehicle registration during a traffic stop. A review of the body-worn camera recording revealed that the deputy was speaking in a loud voice due to the traffic noise that was passing during the stop. It was determined that the deputy acted in a professional manner and in accordance with MCSO's policies.

- In one case, the complainant alleged that the deputy was unprofessional as he taunted her regarding the traffic violations he stopped her for and that the stop was conducted for too long of a time period. A review of the body-worn camera recording revealed that the deputy was professional and that the complainant refused to answer basic questions during the stop and did not taunt the driver regarding any traffic violations. In addition, it was determined that the length of the traffic stop was in accordance with MCSO's policies and Fourth Amendment guidelines.

- In one case, the complainant alleged that the deputy failed to identify himself during a traffic stop and that he smirked at her during the traffic stop. The complainant also alleged that when the deputy drove away, the deputy's patrol vehicle kicked up a rock that struck her vehicle. A review of the body-worn camera recording revealed that the deputy introduced himself, as required by MCSO policy, upon making contact with the driver. There was insufficient evidence to prove or disprove whether the deputy smirked during the traffic stop or whether the deputy's patrol vehicle was responsible for the rock striking the complainant's vehicle.

- In one case, the complainant alleged that a sergeant laughed at her when she raised a concern regarding deputies not wearing gloves or a face mask during a traffic stop. A review of the body-worn camera recording revealed that the sergeant did not laugh during the contact with the complainant.

- In one case, the complainant alleged that the deputy actions during a traffic stop made her fearful and feel threatened. The complainant alleged that the deputy was demanding, that he raised his voice, and that he failed to identify himself. A review of the body-worn camera recording revealed that the deputy introduced himself as required by MCSO policy upon making contact with the driver, and that he was professional during the entire interaction.

- In one case, the complainant alleged that the deputy, while investigating a traffic crash, was extremely dismissive and cut her off as she attempted to explain the situation. A review of the body-worn camera recording revealed that the deputy was professional and courteous during the traffic crash investigation and that he allegations were false.

WAI 50800

- In one case, the complainants alleged that a deputy was rude and aggressive during their encounter with the deputy. A review of the body-worn camera recording revealed that the deputy was professional and spoke in an authoritative manner. The allegation that the deputy spoke in a rude or aggressive manner was determined to be false.

As demonstrated with the aforementioned examples, body-worn cameras recordings have proven to be invaluable in resolving complaints alleging misconduct by deputies.

***Paragraph 63.*** *MCSO shall retain traffic stop written data for a minimum of 5 years after it is created, and shall retain in-car camera recordings for a minimum of 3 years unless a case involving the traffic stop remains under investigation by the MCSO or the Monitor, or is the subject of a Notice of Claim, civil litigation or criminal investigation, for a longer period, in which case the MCSO shall maintain such data or recordings for at least one year after the final disposition of the matter, including appeals. MCSO shall develop a formal policy, to be reviewed by the Monitor and the Parties pursuant to the process described in Section IV and subject to the District Court, to govern proper use of the on-person cameras; accountability measures to ensure compliance with the Court's orders, including mandatory activation of video cameras for traffic stops; review of the camera recordings; responses to public records requests in accordance with the Order and governing law; and privacy protections. The MCSO shall submit such proposed policy for review by the Monitor and Plaintiff's counsel within 60 days of the Court's issuance of an order approving the use of on-body cameras as set forth in this stipulation. The MCSO shall submit a request for funding to the Maricopa County Board of Supervisors within 45 days of the approval by the Court or the Monitor of such policy and the equipment and vendor(s) for such on-body cameras.*

### In Full and Effective Compliance

MCSO developed and issued a protocol and policy that requires the original hardcopy form of any handwritten documentation of data collected during a traffic stop to be stored at the District level and filed separately for each deputy. When a deputy is transferred, his/her written traffic stop information follows the deputy to his/her new assignment. During our January 2020 site visit, we inspected the traffic stop written data files at Districts 2 and 6 to ensure that hardcopies of traffic stop cases are stored for a minimum of five years. We found that the records were in order and properly secured. MCSO remains in compliance with this requirement.

On June 22, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 50801

### d. Review of Traffic Stop Data

**Paragraph 64.** *Within 180 days of the Effective Date, MCSO shall develop a protocol for periodic analysis of the traffic stop data described above in Paragraphs 54 to 59 ("collected traffic stop data") and data gathered for any Significant Operation as described in this Order ("collected patrol data") to look for warning signs or indicia or possible racial profiling or other improper conduct under this Order.*

**Phase 1:** Not in compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on May 28, 2020.

- EB-2 (Traffic Stop Data Collection), most recently amended on January 7, 2020.

- GJ-33 (Significant Operations), most recently amended on May 10, 2018.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on April 30, 2020.

- GH-5 (Early Identification System), most recently amended on May 6, 2020.

- EIU Operations Manual, currently under revision.

**Phase 2:** Not in compliance

MCSO will achieve Phase 1 compliance with this Paragraph when it incorporates its protocols for periodic analyses of the traffic stop data into the EIU Operations Manual. To achieve Phase 2 compliance with this Paragraph, MCSO must demonstrate ongoing use of the methodologies delineated in the protocol established for Phase 1 compliance for the periodic analyses used to identify racial profiling or other bias-based problems.


**Paragraph 65.** *MCSO shall designate a group with the MCSO Implementation Unit, or other MCSO Personnel working under the supervision of a Lieutenant or higher-ranked officer, to analyze the collected data on a monthly, quarterly and annual basis, and report their findings to the Monitor and the Parties. This review group shall analyze the data to look for possible individual-level, unit-level or systemic problems. Review group members shall not review or analyze collected traffic stop data or collected patrol data relating to their own activities.*

**Phase 1:** In compliance

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on April 30, 2020.

- GH-5 (Early Identification System), most recently amended on May 6, 2020.

**Phase 2:** Not in compliance

WAI 50802

The Traffic Stop Analysis Unit (TSAU) is directly responsible for analyses of traffic stop data on a monthly, quarterly, and annual basis to identify warning signs or indicia or possible racial profiling or other improper conduct as required by Paragraph 64. MCSO must report TSAU's findings from its analyses to the Monitor and the Parties.

Paragraph 65 requires quarterly analyses of traffic stop data. MCSO submitted its first quarterly report, Maricopa County Sheriff's Office Traffic Stop Quarterly Review (TSQR1), on October 16, 2020. MCSO planned on publishing this report during this reporting period (July-September, 2020). We discussed this report with MCSO and the Parties, and we were convinced that TSQR1 was ready for publication during the reporting period; in fact, the Traffic Stop Analysis Unit personnel believed that it was published. However, due to an internal miscommunication, the completed report was not shared with us and the Parties until October. Based on our discussions, we agreed to treat TSQR1 as being completed during the third quarter of calendar year 2020. This, therefore, makes TSQR1 the first quarterly report in the now ongoing series of quarterly reports. MCSO understands that once it starts conducting quarterly analyses, it must do so continuously every quarter to maintain compliance.

TSQR1 reported two global findings. The first is that supervisors are inconsistent in their approach to reviewing, documenting, and discussing monthly traffic stop reviews. The second is that supervisors are unclear on MCSO's expectations about the review process. The report breaks these two global findings down into 19 specific findings, which we characterize as falling into four general subject areas: 1) Guidance, meaning that supervisors desire specific guidance or support about specific issues; 2) Policy, meaning that there is a need to address matters in formal policy documents (e.g., GB-2); 3) Process, meaning that supervisors raise specific concerns about their involvement in their reviews of traffic stops; and 4) Technical, meaning that there were problems associated with information systems used to support traffic stop reviews. In our view, TSQR1 makes a strong case for improved training, clarification from MCSO about expectations for supervisors responsible for conducting monthly traffic stop reviews, and increased guidance for supervisors about how to standardize traffic stop review practices.

Paragraph 65 also requires MCSO to conduct monthly analyses of traffic stop data. MCSO's original monthly process to analyze traffic stop data began in 2015, but was suspended in May 2016 because of our determination that the original process lacked statistical validity and required significant refinement to improve the identification of potential alerts in EIS. MCSO resumed monthly analyses of traffic stop data in May 2017 using a new methodology that was statistically based, but generated a substantial number of alerts, many of which did not demonstrate a pattern of potential bias sufficient to warrant the setting of an alert in EIS. Because of this problem, we suspended the process during our July 2017 site visit to allow EIU time to consider possible refinements to the existing methodology.

MCSO's vendor, CNA, proposed a new methodology for the monthly analysis of traffic stop data (TSMR) that involves using a comparative analysis involving propensity score weighting for those deputies making more than 20 stops over a rolling 12-month period. For those deputies making fewer than 20 stops over the same period, the methodology involves using descriptive statistics to compare a deputy to their peers – meaning in this particular instance, those who are also in the pool of deputies making fewer than 20 stops. The TSMR methodology was approved in January 2020, and is being tested as a pilot program. The pilot will involve developing

WAI 50803

thresholds for benchmarks required by Paragraph 67, below. These thresholds are the means to generate deputy-level alerts representing warning signs or indicia or possible racial profiling or other improper conduct as required by Paragraph 64. We and the Parties have worked with MCSO on an ongoing basis with periodic telephonic meetings to maintain momentum of the implementation of TSMR and to track the progress of the pilot.

MCSO has made progress during the reporting period in developing protocols for implementing the TSMR methodology, but finalization of the methodology remains pending. As part of its work in developing the methodology, we want to credit TSAU for identifying deputies for potential alerts from past datasets – most notably the Fifth Traffic Stop Annual Report (TSAR) dataset – and also taking the initiative to report this list of deputies to us and the Parties. These deputies represent those who made traffic stops during calendar year 2019 and in a rolling 12-month sample for the June 2020-August 2019 period. TSAU's findings prompted discussions about how best to conduct an intervention process for these deputies during the pilot phase of TSMR. We will comment on this further in our next quarterly status report.

MCSO will achieve Phase 2 compliance with this Paragraph when its periodic analyses involve the consistent use of a statistical methodology designed to identify patterns of deputy behavior at odds with their peers.

**Paragraph 66.** *MCSO shall conduct one agency-wide comprehensive analysis of the data per year, which shall incorporate analytical benchmarks previously reviewed by the Monitor pursuant to the process described in Section IV. The benchmarks may be derived from the EIS or IA-PRO system, subject to Monitor approval. The MCSO may hire or contract with an outside entity to conduct this analysis. The yearly comprehensive analysis shall be made available to the public and at no cost to the Monitor and Plaintiffs.*

**Phase 1:** In compliance

- EB-2 (Traffic Stop Data Collection), most recently amended on January 7, 2020.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on April 30, 2020.

- GH-5 (Early Identification System), most recently amended on May 6, 2020.

**Phase 2:** In compliance

MCSO has completed five comprehensive annual Traffic Stop Annual Reports (TSARs) analyzing traffic stop data to look for evidence of racial profiling or other bias-based policing. The first three TSARs were conducted by MCSO's first contract vendor, Arizona State University. The latest two TSARs were conducted by MCSO's current vendor, CNA.

MCSO released the first TSAR in May 2016 titled, "Preliminary Yearly Report for the Maricopa County's Sheriff's Office, Years 2014-2015." It found that there are deputies engaged in racially-biased policing when compared to the average behavior of their peers.

WAI 50804

MCSO released the second TSAR in March 2017. This evaluation confirmed the first report's main finding that racially-biased policing within MCSO appears to be both a deputy- and organizational-level problem.

MCSO released its third TSAR in May 2018, which reported the same results of its two predecessor reports: racially-biased policing persists within MCSO at the organizational level.

MCSO released its fourth TSAR in September 2019, employing a new methodology that we approved in April 2019. It reported disparate outcomes by race of driver, but the report never explained what these findings meant with regard to systemic bias. More specifically, unlike the previous three TSARs that reported the presence of systemic bias within the Patrol Division of MCSO, the Fourth TSAR failed to make a determination on whether the findings of disparate outcomes were a systemic problem. We, MCSO, and the Parties all agreed that such conclusionary statement was required. In October 2019, the Sheriff issued a statement that read, "The 4th Traffic Stop Annual Report continues to show disparate outcomes in our traffic stops of minorities. These disparate outcomes are warning signs of potential racial bias in our patrol function, which has been and continues to be a major concern for the Office. These may be indicative of a systemic problem. We will continue to work with the Monitor and the Parties on how best to determine the cause of these disparate outcomes and how best to address racial bias in our patrol function, where it exists. We will remain diligent, continue to develop our internal oversight, accountability and consequences to properly address and root out any behaviors in conflict with our commitment to ethical, constitutional policing practices."

In May 2020, MCSO released its fifth report, which reported findings that are consistent with past TSARs. The Fifth TSAR found that there were statistically significant disparities comparing Latino to Whites for all post-stop outcomes, except seizures. It also reported that the disparities were potential indicia of bias as described in the First Order. In a statement subsequent to the release of TSAR5, the Sheriff issued a statement that read: "[TSAR5] [s]hows disparate outcomes in our traffic stops of minorities similar to the outcomes……[and that]…these disparate outcomes are warning signs of potential racial bias in our patrol function…." The Sheriff committed to determining the cause of the disparate outcomes and working to address them.

***Paragraph 67.*** *In this context, warning signs or indicia of possible racial profiling or other misconduct include, but are not limited to:*

a. *racial and ethnic disparities in deputies', units' or the agency's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of deputies' duties, or racial or ethnic disparities in traffic stop patterns when compared with data of deputies' peers;*

b. *evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;*

c. *a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;*

WAI 50805

d.      indications that deputies, units or the agency is not complying with the data collection requirements of this Order; and

e.      other indications of racial or ethnic bias in the exercise of official duties.

**Phase 1:** In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on May 28, 2020.

- EB-2 (Traffic Stop Data Collection), most recently amended on January 7, 2020.

- GH-5 (Early Identification System), most recently amended on May 6, 2020.

**Phase 2:** Not in compliance

The EIU provided monthly analyses and documents describing the benchmarks used to set alerts for possible cases of racial profiling or other deputy misconduct involving traffic stops. As reported in Paragraph 65, this process was suspended in July 2017. Concerns about the shortcomings of prior TSMR methodologies are documented in our previous quarterly status reports.

We have discussed in our previous quarterly status reports that MCSO has achieved Phase 1 compliance with this Paragraph as a result of its intent to implement the individual benchmarks required by this Paragraph. These benchmarks are highlighted below and are generally referred to as post-stop outcomes in the TSMR methodology. These benchmarks are incorporated into the approved TSMR methodology (discussed in Paragraph 65), which is being implemented by MCSO with the support of its contractor, CNA.

Paragraph 67.a. identifies three benchmarks pertaining to racial and ethnic disparities. The first benchmark references disparities or increases in stops for minor traffic violations (Benchmark 1). The second benchmark addresses disparities or increases in arrests following traffic stops (Benchmark 2). The third benchmark addresses disparities or increases in immigration status inquiries (Benchmark 3). Since these three benchmarks are incorporated into the EIU Operations Manual and are incorporated as post-stop outcomes in the TSMR methodology being piloted, MCSO is in compliance with Paragraph 67.a.

Paragraph 67.b. identifies a benchmark pertaining to evidence of an extended traffic stop involving Latino drivers or passengers (Benchmark 4). Since this benchmark is now incorporated into the EIU Operations Manual and is incorporated in the TSMR methodology being piloted, MCSO is in compliance with Paragraph 67.b.

Paragraph 67.c. identifies three benchmarks. The first benchmark pertains to the rate of citations (Benchmark 5): MCSO is required to identify citation rates for traffic stops that are outliers when compared to a deputy's peers. The second benchmark (Benchmark 6) pertains to seizures of contraband: MCSO is required to identify low rates of seizures of contraband following a search or investigation. The third benchmark in Paragraph 67.c. (Benchmark 7) is similar to Benchmark 6, but it pertains to arrests following a search or investigation. This is also the case for Benchmark 7. Since the three benchmarks are now incorporated into the EIU Operations Manual and are incorporated as post-stop outcomes in the TSMR methodology being piloted, MCSO is in compliance with Paragraph 67.c.

WAI 50806

Paragraph 67.d. establishes a benchmark pertaining to agency, unit, or deputy noncompliance with the data collection requirements under the First Order (Benchmark 8). This benchmark requires that any cases involving noncompliance with data collection requirements results in an alert in EIS. EIU published an Administrative Broadcast on November 28, 2016 to instruct supervisors how to validate data in TraCS for those cases involving duplicate traffic stop records to deliver timely data validation for our review. MCSO's draft EIS Project Plan 4.0 reported that MCSO began the data validation process for this benchmark on November 28, 2016. Therefore, MCSO is in compliance with Paragraph 67.d.

Paragraph 67.e. allows for other benchmarks to be used beyond those prescribed by Paragraph 67.a.-d. MCSO has three benchmarks under Paragraph 67.e. Benchmark 9 is defined as racial or ethnic disparities in search rates. Benchmark 10 is defined as a racial or ethnic disparity in passenger contact rates. Benchmark 11 is defined for non-minor traffic stops. Benchmarks 9-11 are incorporated into the EIU Operations Manual, as well as the TSMR methodology now being piloted. Therefore, MCSO is in compliance with Paragraph 67.e.

While MCSO has completed operationalizing the benchmarks required by this Paragraph, we have discussed the problems with MCSO's previous methodologies. Simply put, these earlier methodologies produced too many alerts that MCSO could reasonably manage on an ongoing basis. As noted earlier, MCSO's proposed new TSMR methodology, which incorporates these benchmarks, has been approved; and MCSO is implementing a pilot program to operationalize the use of these benchmarks in the new TSMR methodology.

The new TSMR methodology is being piloted in four Phases. Phase I involves developing the TSMR analytical plan that includes, among other things, creating the STATA syntax for the methodology and a Dashboard that will present detailed results that will reflect potential deputy-level alerts generated. MCSO completed Phase I in June 2020. Phase II began in June 2020. This will include establishing thresholds for flags, allegations, and alerts that will eventually drive the selection of deputies potentially engaging in biased policing. Phase III will lead to the implementation of the intervention process whereby deputies who receive alerts will be subject to supervisory interventions. Finally, Phase IV will focus mostly on developing training protocols to apprise MCSO staff of the process and expected outcomes from TSMR. Each Phase requires review and approval of specific items by us and the Parties to ensure it is compliant with the intent of the First Order.

During our January 2020 site visit, we agreed to hold regular telephonic meetings during the pilot to identify potential problems and solutions to expedite the resumption of the analysis of traffic stop data to look for potential cases of biased policing at the individual deputy level. These telephonic meetings continued during this reporting period.

We noted in Paragraph 65 that TSAU, in conducting its pilot test of the TSMR methodology, used traffic stop data covering a 12-month sample of traffic stops for the January 2019 through December 2019 period. It also conducted a test of its methodology using a rolling 12-month period for June 2020 and the prior 11 months. TSAU identified deputies potentially engaging in biased policing and brought this information to our attention. While approval of a revised intervention process corresponding with the new TSMR methodology remains pending, the existence of these potential cases of biased policing began a discussion about when and how

WAI 50807

MCSO might take action with regard to the identified deputies. A final decision on this matter occurred after this reporting period, and we will discuss it in our next quarterly status report. While we recognize and support the goal of the TSMR process, and appreciate TSAU's effort in identifying potential deputies potentially engaging in biased policing, the fact remains that the efficacy of the approved TSMR methodology remains unknown. This information will not become known until the pilot is completed. Until the efficacy of the methodology is known, MCSO is not in Phase 2 compliance with this Paragraph.

***Paragraph 68.*** *When reviewing collected patrol data, MCSO shall examine at least the following:*

a.      *the justification for the Significant Operation, the process for site selection, and the procedures followed during the planning and implementation of the Significant Operation;*

b.      *the effectiveness of the Significant Operation as measured against the specific operational objectives for the Significant Operation, including a review of crime data before and after the operation;*

c.      *the tactics employed during the Significant Operation and whether they yielded the desired results;*

d.      *the number and rate of stops, Investigatory Detentions and arrests, and the documented reasons supporting those stops, detentions and arrests, overall and broken down by Deputy, geographic area, and the actual or perceived race and/or ethnicity and the surname information captured or provided by the persons stopped, detained or arrested;*

e.      *the resource needs and allocation during the Significant Operation; and*

f.      *any Complaints lodged against MCSO Personnel following a Significant Operation.*

**In Full and Effective Compliance**

MCSO has not conducted a Significant Operation that met the requirements of the Order since Operation Borderline in December 2014. Subsequent activities (i.e., Operation Gila Monster in October 2016) have not met the criteria for review under this or other Paragraphs.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination. As a result, MCSO District command staff – as well as Investigations and Enforcement Support – will no longer be required to submit monthly statements that they have not participated in Significant Operations as defined by this and other Paragraphs; however, they will be required to notify us should staff become involved in a Significant Operation.

WAI 50808

We will continue to assess Phase 2 compliance through interviews with command and District staff during our regular site visits. During our October 2019 and January 2020 visits to the Districts, District personnel advised us that no Significant Operations had occurred within their jurisdictional boundaries, nor had any of their staff participated in such operations with other departments. These statements were also confirmed in discussions with the Deputy Chiefs of Patrol Bureaus East and West. During our remote site visits since April 2020, MCSO administrative personnel have continued to advise us that there were no new Significant Operations conducted by MCSO or any of its personnel.

***Paragraph 69.*** *In addition to the agency-wide analysis of collected traffic stop and patrol data, MCSO Supervisors shall also conduct a review of the collected data for the Deputies under his or her command on a monthly basis to determine whether there are warning signs or indicia of possible racial profiling, unlawful detentions and arrests, or improper enforcement of Immigration-Related Laws by a Deputy. Each Supervisor will also report his or her conclusions based on such review on a monthly basis to a designated commander in the MCSO Implementation Unit.*

**Phase 1:** In compliance

- EA-3 (Non-Traffic Contact), most recently amended on June 28, 2019.
- GH-5 (Early Identification System), most recently amended on May 6, 2020.

**Phase 2:** Not in compliance

MCSO has placed into production database interfaces with EIS, inclusive of Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), Arizona Office of Courts (AOC) records, and the Cornerstone software program (referred to as "the HUB"), that includes training and policy records for MCSO. Supervisors have demonstrated the ability to access these during our site visits. Most audits and inspections of supervisory oversight activities indicate compliance but several continue to show fluctuating trends over time, and MCSO has yet to fully develop some inspections that would allow a determination of compliance under this Paragraph. MCSO continues to develop the Traffic Stop Monthly Report (TSMR) that will provide supervisors the ability to review and respond to data pertinent to the performance of deputies under their command with respect to the requirements of Paragraph 67. MCSO has published the first two Traffic Stop Quarterly Reports (TSQR) for the third and fourth quarters of 2020. In addition, MCSO has made progress in revising the proposed quarterly reports for the first two quarters of 2021.

MCSO has automated the dissemination and responses to alert investigations initiated for repetitive deficiencies discovered during audit and inspection processes; however, many of these processes have been placed on hold as MCSO reevaluates the thresholds for the triggering of alerts. In April 2020, we requested that MCSO provide an update on their progress toward the development of new/revised alert threshold triggers that are not tied to the Traffic Stop Monthly Analysis. The EIU lieutenant responded that MCSO was continuing to collect information from similar agencies regarding the thresholds they employ, and MCSO is also developing a survey to be sent to MCSO field personnel to assess the current practices of the organization. When the

WAI 50809

survey is presented to us, we will provide feedback as necessary. Nonetheless, AIU developed an inspection that tracks EIS alert investigations from the time that they are assigned from EIU to District personnel and make their way back through the chain of command for final approval of a disposition. The protocol for this inspection is included in the EIU Operations Manual, Section 302 (EIS Alert Processes), and was approved on March 27, 2019. In July, the percentage of investigations completed within policy timeframes was 85%. The percentage dipped to 67% in August and rose to 90% in September. AIU sent out BIO Action Forms (BAFs) to the Units with deficiencies. We will continue to track these trends. A review of the closed alerts themselves shows that the majority were completed with a meeting between the supervisor and their subordinate. We have also noted an increasing number of investigations involve repetitive BAFs. The outcome of these investigations is typically meeting with a supervisor, but they have also led to coaching and additional oversight on the part of the immediate supervisor.

Since there have been no closures that have not been adequately documented during this quarter, we did not schedule a telephonic site visit conference with MCSO on alert closures. We have requested that MCSO provide an update on the progress the agency has made in implementing an inspection evaluating the effectiveness of alert investigation outcomes, as well as an audit of repetitive BIO Action Forms for specific Districts and personnel. MCSO has already conducted a pilot tracking analysis of BIO Action Forms that were sent out between January and May 2019. MCSO continues to use the insights gained from this initial analysis to refine and develop a repeatable process that is less labor-intensive than the first effort. In response to a request submitted following our October remote site visit, MCSO noted that they should be producing a new BIO Action Form tracking proposal by the end of 2020. The study, if approved, will cover the period of January to December 2020. Additionally, MCSO has not yet developed a means of measuring the effectiveness of alert intervention outcomes but is in the process of developing a method that will eventually be included in the monthly EIS Alert Inspection. We will continue to work with MCSO on these processes and evaluate the proposals as they are provided. In this way, BIO will be able to discover if Districts, or individual supervisors, are experiencing repetitive problems that need to be addressed to ensure compliance with this Paragraph, as well as those covered in Paragraphs 81, 94, and 95.

The Fourth and Fifth Traffic Stop Annual Reports (TSAR) were published and available to the public on MCSO's website. These reports focus on organizational trends in traffic stop activity and do not allow an examination of potential individual bias in traffic stop outcomes. The methodology employed for the Fourth and Fifth TSARs was also meant to create a foundation for the Traffic Stop Monthly Report (TSMR). We continue to work with MCSO on the development of a monthly traffic stop analysis that would provide information about potential bias of individual deputies when compared with their peers. We, along with the Plaintiff and Plaintiff-Intervenors, have held frequent conference calls addressing a variety of outstanding issues related to the TSMR. MCSO plans to test the methods collectively developed in a pilot program, as well as creating training programs and intervention strategies for supervisors, which will subsequently be rolled out to the Office as a whole. The previous monthly traffic stop analysis was suspended because the benchmarks and thresholds were not grounded in either acceptable theory or analytic rigor that would make them consistently useful.

WAI 50810

As noted above, MCSO has produced Traffic Stop Quarterly Reports for both the third and fourth quarters of 2020. In TSQR1, MCSO investigated how supervisors conduct traffic stop reviews and discussions with their subordinates through interviews with 12 supervisors and observations of six other supervisors. In general, MCSO reported that the manner in which supervisors conducted reviews and discussions varied across the agency and those supervisors interviewed indicated a lack of understanding regarding the expectations of the organization. While the study reported the diligence of supervisors in evaluating traffic stops and Body Worn Camera (BWC) footage there was also a collective finding that supervisors want more training in this aspect of their roles, more explicit direction from the organization regarding expectations of them and more clearly defined concepts and training regarding bias-based policing, bias-based/racial profiling, and discriminatory policing as used throughout the organizations policies. TSQR2 was also dropped at the beginning of the fourth quarter and will be addressed in our next quarterly status report. While these were final reports published by MCSO, we and the Parties will provide comments on each of the studies. MCSO has noted that the agency anticipates using the results of each of these studies in the modification of policies and the development of training. In addition, MCSO will use these studies to inform the ongoing development of methods and protocol for the TSMR, which will take the place of the annual reports in identifying deputies who exhibit potentially biased behavior in the way that they conduct traffic stops. We will continue to assist MCSO in each of those objectives.

MCSO continues to provide us access each month to all Non-Traffic Contact Forms (NTCFs) involving investigative stops – but has only begun planning to conduct more thorough statistical analyses of these for this and other Paragraphs. At times over the past year our review of the NTCFs provided each month indicated that a higher proportion of Latinos are being contacted in particular areas of the County for relatively minor infractions. Our review of NTCFs for this quarter did not raise particular concern about disparate treatment. MCSO has proposed an initial study of how this form (NTCFs), and the related policy, are being used across the agency. While this proposed analysis falls short of the requirements of this Paragraph, as it does not investigate potential indications of bias in how these stops are conducted by deputies or evaluated by supervisors, it will give some insight into the modifications of both the form and policy going forward.

We continue to evaluate the effectiveness of supervisory investigations into non-traffic stop alerts each month by selecting a random sample of 15 cases. Over the past year, we have found that most supervisors are completing these investigations in a timely fashion and addressing the deficiencies raised. In several cases, there are ongoing PSB investigations that limit the ability of supervisors to review materials beyond the brief descriptions provided to supervisors, as outlined in Paragraph 75.a. and 75.b., below. In these instances, the supervisor closes the alert investigation to maintain the integrity of the ongoing PSB inquiry.

MCSO has created an EIS Alert Review Group (ARG) that evaluates the investigations of supervisors prior to closing an alert. The ARG ensures that the reports of the supervisors address all aspects of the assigned investigation, and returns those that are deficient to the District for continued revision. Over the past several months, we have noted that the proportion of completed alert investigations being sent back to the Districts by the ARG has fallen below one-third of all cases we evaluate. This may be due to the importance MCSO has placed on supervisory

WAI 50811

investigations in the past years' training, as well as the creation of liaisons between BIO and the Districts to ensure that supervisors receive the necessary support and information to complete these investigations. In addition, EIU has developed online supervisory resource material for alert investigations that was placed on the HUB in January 2020.

The Audit and Inspections Unit (AIU) conducts monthly audits of supervisory oversight via the Supervisory Notes made for each deputy. Minimally, each month, supervisors should be making a performance appraisal note, reviewing two body-worn camera recordings, and reviewing the EIS profile of their subordinate. In July, AIU reported a compliance rate of 93%, largely due to issues arising from District 1 where a supervisor had failed to document the reviews for all deputies. In the ensuing two months, the compliance rates were above 99%, with no issues found in District 1. AIU sent BIO Action Forms (BAFs) to the Districts with deficiencies.

AIU also conducts three inspections of traffic stop information: two of these pertain to the timely review and discussion of traffic stops by supervisors for each subordinate; and the third is an inspection regarding the correct completion of traffic forms and the coordination of these forms with databases like CAD. For the review audits, there was a compliance finding that remained above 99% for the entire quarter. The inspections for discussion of traffic stops were equally high for June and July (98.4% and 99.5% respectively), but dropped to 89% in August. The discussion inspections are lagged 30-days to allow for a discussion to occur between the supervisor and deputy. AIU sent BIO Action Forms to Districts where it found deficiencies. For the traffic stop data inspection, MCSO uses a matrix involving traffic forms, CAD and BWC recordings. The compliance rates for July and August were 91.4% while the rate for September dropped to 77%. Across all three months, the auditor noted a deficiency in accounting for all units at the scene of an event. In September, there were also deficiencies for failing to accurately note an inventory search, incorrect tow forms and the like across several Districts. AIU sent out BIO Action Forms to the Districts with deficiencies.

MCSO has developed a new Incident Report Inspection that has been approved following several revisions. The inspection should include instances where prosecuting authorities turned cases down due to a lack of probable cause, among other matrix items developed by MCSO. MCSO reports compliance rates for July through September exceeding 98% with no instances of cases being turned down due to a lack of probable cause. Our review of the inspection materials yielded slightly lower compliance rates, ranging from 92.5% in September and June, and 90% in August. In each month, the inspector noted an instance where *Miranda* was not properly given or the invocation of rights was not documented. A second deficiency that was found each month were reports lacking articulation of particular elements of a crime that were not followed by Incident Memorialization Forms (IMFs) filled out by supervisors. For those deficiencies discovered during the inspection process, AIU sent BIO Action Forms to the appropriate Districts for additional review and action. The inspections of supervisory oversight continue to show fluctuations that MCSO is investigating and addressing with BAFs, training, and policy evaluation. Additionally, MCSO is also developing an inspection of repetitive BAFs so that they might intervene for supervisors who evidence recurring problems. We have found that measures like the creation of the Alert Review Group have greatly enhanced the accountability of Districts and individual supervisors in the completion of their roles.

WAI 50812

***Paragraph 70.*** *If any one of the foregoing reviews and analyses of the traffic stop data indicates that a particular Deputy or unit may be engaging in racial profiling, unlawful searches or seizures, or unlawful immigration enforcement, or that there may be systemic problems regarding any of the foregoing, MCSO shall take reasonable steps to investigate and closely monitor the situation. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or of other supervised, monitored, and documented action plans and strategies designed to modify activity. If the MCSO or the Monitor concludes that systemic problems of racial profiling, unlawful searches or seizures, or unlawful immigration enforcement exist, the MCSO shall take appropriate steps at the agency level, in addition to initiating corrective and/or disciplinary measures against the appropriate Supervisor(s) or Command Staff. All interventions shall be documented in writing.*

**Phase 1:** In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on May 28, 2020.

- EB-2 (Traffic Stop Data Collection), most recently amended on January 7, 2020.

- GH-5 (Early Identification System), most recently amended on May 6, 2020.

**Phase 2:** Not in compliance

MCSO continues to develop the methodology and related plans for the Traffic Stop Monthly Reports (TSMRs). The TSMR is meant to be a more timely response to potential indications of bias at the deputy level through the examination of traffic stop data. We, the Parties, and MCSO have conducted frequent conference calls to ensure that the methodologies adopted will be effective in replacing the intervention processes emanating from prior Traffic Stop Annual Reports (TSARs). MCSO is planning a pilot program process to evaluate and assist in the refinement of each aspect related to the TSMR.

MCSO continues to develop the EIU Operations Manual. The sections of the manual that remain under development are those related to statistical methodologies for the TSMR and the thresholds that may trigger alert inquiries for all alert investigations. MCSO has received approval to move forward on several TSQR projects and published two of these reports for the third and fourth quarters of 2020.

MCSO has published the Fifth Traffic Stop Annual Report and continues to find in the examination of traffic stop outcomes disparities "that may indicate a systemic bias within the patrol function" that needs to be ameliorated. The analytic methods used in the Annual Reports are not able to identify individual deputy activity, but form the basis for organizational strategies to address systemic biases through training and policy.

WAI 50813

In refining the TSMR methodology, which will be used to identify potential bias for individual deputies, MCSO has employed data from 2019 and 2020. During this process, MCSO notified us that several deputies have been found to be outliers in comparison to their peers. As a result, we held several conference calls, including with the Plaintiffs and Plaintiff-Intervenors, to discuss these findings and how MCSO should address this issue given that the TSMR process has not yet been approved. MCSO has proposed a plan utilizing existing systems combined with some elements from previous TSAR processes. We will report on the outcomes of MCSO's efforts as they are made available to us.

A portion of the monthly alert report produced by EIU depends upon the TSMR, which remains under development. However, the EIS also produces alerts for numerous activities, ranging from repetitive data entry errors to internal and external complaints. Many of these ongoing alerts are dependent upon the revision of alert thresholds which continue to undergo evaluation by MCSO. While we acknowledge that the revision of these thresholds entails time consuming research and surveys of line personnel, we believe the delay of nearly two years has hampered the effective use of the EIS to track repetitive behavior that may be deleterious to the organization and the community it serves. BIO personnel continue to evaluate and update the thresholds used to trigger these alerts to ensure that they are sufficient to detect behaviors that might indicate bias on the part of deputies, taking into consideration the current assignment of the deputies as noted in Paragraph 81.f. In the meantime, the non-TSMR alerts triggered under the current system are first evaluated by EIU personnel and then transmitted, via BlueTeam, to the appropriate supervisor and District command. The supervisors conduct an investigation, including a potential discussion with the designated deputy, and memorialize their actions in BlueTeam. District command staff and an Alert Review Group (ARG), comprised of multiple BIO personnel, review these investigations to ensure that proper investigations are carried out and possible interventions are clearly outlined.

AIU began producing an inspection of EIS Alert Processes in April 2019 that evaluates the timeliness of alert investigation completion and whether discussions, training, or Action Plans might result from the supervisory investigation. The inspection is lagged by one month to allow supervisors 30 days to complete the investigation. The compliance rate for timely completion of investigations was 85% in July, 67% in August, and 90% in September. The low compliance rate in August was due to the fact that only three alerts were closed during this period, and one was not completed within the policy timeframe of 30 days. MCSO has not yet developed a protocol to evaluate how effective the discussions, activities or Action Plans resulting from these investigations have been; however, the Training Division, working in concert with EIU, included in the 2019 SRELE training a refresher course on supervisory responsibilities in conducting alert investigations. This training was delivered during the fall of 2019. Following our January site visit, MCSO also placed on the HUB resource materials for supervisors who may not have conducted alert investigations recently. This material provides supervisors with examples of how to fill out the alert investigation paperwork or contact EIU staff should the need arise.

MCSO is not in Phase 2 compliance with this Paragraph, as the TSMR continues to undergo development and has not yet been placed in production. We will monitor the planned piloting of the TSMR methodology and continue to participate with the Plaintiffs and Plaintiff-Intervenors in regular conference calls about MCSO's progress.

WAI 50814

In addition, we are concerned that the Incident Report Inspections (IRs) found several instances during this reporting period where *Miranda* warnings were not properly administered and/or documented, and the issues were not discovered by supervisors using Incident Memorialization Forms (IMFs). The inspectors issued BIO Action Forms (BAFs) to the Districts for further investigation.

MCSO's Plan to Promote Constitutional Policing (also referred to as the Constitutional Policing Plan, or CPP) was drafted to address systemic issues identified in the Traffic Stop Annual Reports (TSARs). As part of our compliance assessment of this Paragraph, we review documentation submitted by MCSO on the Plan, and obtain updates on the CPP during our site visits. The Plan to Promote Constitutional Policing included nine Goals and a timeline for the completion of the Goals. Our comments in this report pertain to compliance with the Plan during the second quarter of 2020.

In early January 2020, MCSO provided an online link to a newly created spreadsheet titled "2020 Constitutional Policing Plan." The spreadsheet was based on the plan originally agreed to by the Parties and approved by the Court. The spreadsheet provided additional details of MCSO's reported progress on each of the nine CPP Goals: the start date; the projected finish date; and the status of sub-Goals and projects.

We determine compliance with the CPP through several means. First, we have monthly and quarterly document requests pertaining to specific Goals of the CPP, which we review. For example, we have monthly document requests pertaining to projects under Goals 1, 3, 4, and 5. We review meeting agendas and discussion items to verify compliance with the projects noted under those Goals. For the training components of these Goals, MCSO submits training materials that must be reviewed and approved for before delivery. Our standing requests for other Paragraphs of the First and Second Orders also provide information related to some of the CPP Goals. For example, for Goal 1, we review MCSO monthly submissions related to supervisory corrective actions. For Goal 2, in addition to reviewing and approving the components of the new employee performance evaluation process, we also review current Employee Performance Appraisals being completed and advise MCSO of any issues of concern that may be addressed in the new process. For Goal 6, we conduct periodic meetings with MCSO, the Plaintiffs, and Plaintiff-Intervenors related to the evaluation of traffic stop data and associated monthly, quarterly, and annual reports. Second, we review the progress reported in the online spreadsheet and record our findings. Third, we corroborate MCSO's reported progress during our site visits, where we confirm the reported outcomes and ask clarifying questions on projects completed. Our comments below reflect what we learned from all three areas.

Due to ongoing pandemic concerns, we again postponed our in-person site visit for October, but held conference calls with MCSO and the Parties on compliance issues related to the Constitutional Policing Plan. Our comments below reflect what we learned from our review of the online spreadsheet and information provided by MCSO during our October remote site visit.

Goal 1: Implementing an effective Early Intervention System (EIS) with supervisor discussions. MCSO reported an overall 61% completion rate on implementing an effective Early Intervention System (EIS) with supervisory discussions. The supervisory discussion process noted a starting date of April 3, 2018, with a projected completion date of December 31, 2020. The completion

WAI 50815

rate noted was 64%. The Traffic Stop Monthly Report (TSMR) was reported to be in progress, with a 37% completion rate. The expected completion date is December 31, 2020. Information sharing within the Office was noted at 64% on the tracking spreadsheet.

Goal 2: Evaluating supervisors' performances through an effective Employee Performance Appraisal process. Goal 2 noted a completion rate of 40%, a 12% increase from our previous report. The EPA policy revisions and related items were noted at 87%. The training and implementation of the EPA process was listed at 12%, a decrease of 2% from the previously reported progress. MCSO listed a new completion date of June 1, 2021. The system configuration for the revised EPA form is expected to be completed by May 8, 2021. As of our October remote site visit, the system configuration had not started. During our October remote site visit, we discussed with MCSO some of the deficiencies and inconsistencies noted in our reviews of Employee Performance Appraisals. We believe that many of the issues can be improved through training. The expected timeline for the use of the actual EPA template continues to be the end of the first year of an employee's cycle of evaluation under the new policy; it is expected to start in mid-2021. The new Performance Management system evaluation period is expected to begin on July 1, 2021, and the implementation of the new Performance Management form is scheduled to begin on June 31, 2022.

Goal 3: Delivering enhanced implicit bias training. Goal 3 was noted as 67% completed on the tracking spreadsheet; this is a 14% increase from previously reported completion rate. The completion date is still March 31, 2021. During our October remote site visit, we inquired why the Annual Combined Training (ACT) was removed from the spreadsheet. MCSO advised that it was the agency's decision that this training did not belong in the Constitutional Policing Plan due to the non-applicability of the enhanced training. MCSO advised us that roll-call briefings on Implicit Bias had been completed; however, the HUB report documenting compliance had not been completed. In our reviews, we found that MCSO had issued an Administrative Broadcast, requiring roll-call briefings and BlueTeam documentation to be completed by August 3, 2020. BIO conducted an inspection in July (BI2020-0125) to determine how many sworn and reserve employees had received the briefing. A random sample of 75 sworn employees and 15 reserve employees were selected. The inspection found that the compliance rate for sworn was 81.67%, and 66.57% for reserve members, for an overall compliance rate of 78.67%. Clearly, there is still work to be done. MCSO advised us that a procedural justice memorandum issued by the Department of Justice (DOJ) was discussed at the September Captains' meeting. Captains' meetings were noted at 82% completed. Discussions of CPP-related issues at Captains' meetings are scheduled to end on November 24, 2020. We inquired if MCSO plans to continue discussions of CPP goals at Captains' meetings. MCSO advised us that it will evaluate the productivity of these discussions at the end of the year to determine if they will continue. The stand-alone implicit bias training for the pilot program, for the town of Aguila, noted a 74% completion rate on lesson plan development. The completion date changed from November 25, 2020, to December 20, 2020. MCSO advised that the Aguila program has been delayed due to COVID-19. The History of Discrimination Training video project was expected to be completed by March 31, 2020. MCSO advised us that this project may be delayed, but MCSO anticipates a June 2021 completion date.

WAI 50816

Goal 4: Enhanced fair and impartial decision-making training. Goal 4 was noted as 67% completed. This Goal was previously at 54%. The CPP spreadsheet still notes that for 2020 MCSO will develop a stand-alone video/HUB training class with a five-question test on Fair and Impartial Decision Making. This project was listed at 60%. We agree that this course as offered is an introduction to Fair and Impartial Decision-Making. We believe this course will satisfy a sub-component of Goal 4, which contained language identifying this training as a stand-alone video/HUB training class. MCSO further intends to include FIDM content in the 2021 ACT. There are additional training components that will require completion before compliance with Goal 4 is recognized. The curriculum for Fair and Impartial Decision Making has been approved by us and the Plaintiffs. The projected finish date continues to be December 31, 2020. MCSO advised that they are still planning to add four videos to the Training library, per year. MCSO had previously stated that there were 10 videos in the library. MCSO advised us that two of those videos were incorrectly identified as having been used in previous training programs; these were removed. MCSO will resubmit these two videos for approval once the issues are corrected.

Goal 5: Delivering enhanced training on cultural competency and community perspectives on policing. The completion rate for Goal 5 was noted at 59%. The previous completion rate was 50%. Enhanced training for this Goal was previously listed as part of the 2020 Annual Combined Training (ACT). MCSO will now conduct this training separately with roll-call briefings and online training with videos paired and delivered with talking points. The projected start date is September 1, 2020, with the completion date still at December 31, 2020. The annual refresher for FTOs will be a stand-alone training on Cultural Competency. This was previously scheduled for completion by November 25, 2020, but is now scheduled for completion by December 20, 2020. This project was noted at 65% complete, an increase of 43% from our previous report.

According to MCSO, the completion of the community survey is scheduled by December 31, 2020. MCSO developed a 17-question survey, to be administered to selected individuals who have been involved in traffic stops. The completion rate for this project was still at 33% during our October remote site visit. We inquired as to the progress of incorporating cultural competency into the FTO program. MCSO advised us that there were two classes scheduled for October, which all FTOs would attend. As of our October remote site visit, the tracking spreadsheet still noted a completion rate of 57%. The expected date of completion was listed as December 30, 2020.

Goal 6: Improving traffic stop data collection and analysis. Goal 6 was noted as 93% completed on the tracking spreadsheet. The previous completion rate was 90%. MCSO did not have a Traffic Stop Monthly Report (TSMR) methodology in place during the third quarter of 2020. The projected completion date was changed from July 31 to December 6, 2020. As of our October review, the online spreadsheet showed TSMR Phase 1 and Phase 2 at 99%, Phase 3 at 88%, and Phase 4 at 50%. With regard to the quarterly report, MCSO noted a completion rate of 100% on the first quarterly report, and a 98% completion rate on the second quarterly report. The projected completion date of the second quarterly report was changed to December 15, 2020. The third and fourth quarterly reports noted completion rates of 93% and 78%, respectively. We inquired about the projected timeline for completing a quarterly "deep dive" analysis to look at how deputies apply their discretion during traffics stops, and any gaps in data collection that would preclude

WAI 50817

MCSO from conducting the analysis. MCSO reported that this is not on the approved list of projects, and it is still at least 18 months away. MCSO stated that it needs to complete the methodology to gather the information required, and then incorporate the methodology into the traffic stop collection process. We and the Parties continue to meet weekly with MCSO to work out unresolved issues.

Goal 7: Encouraging and commending employees' performance and service to the community. This goal has been completed. This goal was not part of the requirements set by the First Order.

Goal 8: Studying the Peer Intervention Program. This goal has been completed. This goal was not part of the requirements set by the First Order.

Goal 9: Building a workforce that provides constitutional and community-oriented policing and reflects the community we serve. As of our October review, Goal 9 was noted as having a 48% completion rate, a decrease from July when the completion rate was listed as 54%. According to MCSO, its goal is a hiring process that will build a workforce that provides Constitutional policing and reflects the community it serves. The expected completion date on this goal was changed from December 31, 2020 to June 30, 2021. During our October remote site visit, MCSO advised us that due to COVID-19, the agency has not been able to conduct medical exams in the usual manner. MCSO has found it difficult to process applicants, but continues to work toward meeting the agency's hiring goals. MCSO noted that it has been more challenging to attract applicants for Detention positions due to concerns of working in a confined environment such as jails. MCSO advised us that there are two sworn Academy classes graduating in November, with a total of 15 deputy trainees. There is a Detention Academy class of six officer trainees that is scheduled to graduate in mid-December, in addition to a lateral officer that was in training. At the time of our October review, MCSO reported that the agency is processing approximately 100 applicants.

With regard to the RFP for the new promotional assessment for sworn personnel, a proposal is ready to be put out for bid. MCSO anticipates this will occur by the end of 2020, with the new promotional process in place by March 31, 2021. We noted that several projects under Goal 9 that previously had completion dates of December 31, 2020, were moved back to March 31, 2021.

With regard to personnel, at the time of our July remote site visit, there were a total of 443 vacancies, of which 94 were sworn, 172 were Detention, and 177 were civilian. During our October remote site visit, there were a total of 522 vacancies, of which 105 were sworn, 215 were Detention, and 203 were civilian. The reported attrition rates in July were 1.9% for sworn and 3% for Detention. The attrition rates reported in October were 13.25% for sworn, and 9.75% for Detention. As of July 2020, MCSO had 113 voluntary separations, which increased to 197 in October. In our October call, MCSO reported 235 total hires in 2020. These were comprised of 31 sworn positions, 122 Detention positions, and 82 civilian positions. Of the 197 voluntary separations in 2020, 52% were White, 25% were Latino, 12% were African American, 4% were Asian, 2% were Alaskan or Pacific Islander, and 5% were not specified. MCSO reported that the agency has placed a hold on some of their vacant positions. However, MCSO had not been required to eliminate vacant positions, and there has not been any downsizing of personnel.

In summary, during the third quarter MCSO reported progress on Goals 2, 3, 4, 5 and 6, and a regression in Goal 9. With limited time left in the year, MCSO may not meet the expected completion date for Goal 1, Implementing an Effective EIS, with supervisor discussions. The

WAI 50818

completion of Goal 2 is pending completion of the training and implementation of the new EPA process. Delivery of enhanced training on Goal 3 was not completed by the internal deadline imposed, and it is a likely possibility that enhanced training for Goals 4 and 5 may not be completed by expected completion date of the end of the year. There are still issues to be worked out in the collection and analysis of traffic stop data collection, for Goal 6. With regard to Goal 9, personnel statistics reported by MCSO during our April, July, and October remote site visits indicate a negative trend in personnel resources. MCSO reported 410 vacancies in April, 443 vacancies in July, and 552 vacancies in October. With COVID-19 still a concern for the coming months, MCSO could be facing serious personnel issues for an extended period. Even if at some point hiring is able to keep up with attrition, there will be considerable time involved in training new sworn and Detention trainees to the point where they can work independently.

The comparisons below are related to the completion percentages we recorded from the tracking spreadsheet in July, compared to those recorded in October. As of our last review of the CPP spreadsheet in early October, Goal 1 was at 61%, or the same as in July. Goal 2 was at 40% compared to the previous report, which was 28%. Goal 3 was listed as 67%, compared to the previous reported completion rate of 53%. Goal 4 was listed as at 67%, compared to the previous reported completion rate of 54%. Goal 5 was reported at 59%, compared to the previous completion rate of 50%. Goal 6 was reported at 93%, compared to the previous completion rate of 90%. Goal 9 was reported at 48%, or a decrease from 54% reported in July.

*Paragraph 71. In addition to the underlying collected data, the Monitor and Plaintiffs' representatives shall have access to the results of all Supervisor and agency level reviews of the traffic stop and patrol data.*

**In Full and Effective Compliance**

MCSO has provided us with access to existing data from monthly and annual reports.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

While we continue to work with both MCSO and the Parties on specific issues of methodology for Non-Traffic Contact Forms and the Annual, Monthly, and Quarterly Reports for traffic stop data, we have nonetheless been afforded complete access to all requests involving data.

WAI 50819

# Section 8: Early Identification System (EIS)

**COURT ORDER IX. EARLY IDENTIFICATION SYSTEM ("EIS")**

***Paragraph 72.*** *MCSO shall work with the Monitor, with input from the Parties, to develop, implement and maintain a computerized EIS to support the effective supervision and management of MCSO Deputies and employees, including the identification of and response to potentially problematic behaviors, including racial profiling, unlawful detentions and arrests, and improper enforcement of Immigration-Related Laws within one year of the Effective Date. MCSO will regularly use EIS data to promote lawful, ethical and professional police practices; and to evaluate the performance of MCSO Patrol Operations Employees across all ranks, units and shifts.*

**Phase 1:** In compliance

- EA-3 (Non-Traffic Contact), most recently amended on June 28, 2019.

- GH-5 (Early Identification System), most recently amended on May 6, 2020.

**Phase 2:** Not in compliance

As a result of interfaces for remote databases introduced in 2017, the Early Intervention System (EIS) now includes Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), records from the Administrative Office of the Courts (AOC), and training completion and policy acknowledgement records from the Cornerstone software (the HUB). MCSO continues to work on the EIU Operations Manual to memorialize the collection, analysis, and dissemination of relevant data; as well as the responsibilities and roles of departmental and EIU personnel. During this reporting period, MCSO has offered several proposed sections to the manual which are under review by us and the Parties. MCSO has completed approximately 90% of the manual to date. Those sections that are under development pertain to the Traffic Stop Monthly Report (TSMR) and thresholds for triggering potential alert investigations arising from monthly analysis of traffic and patrol functions.

To capture the activities of deputies in non-traffic stops of individuals, MCSO created Non-Traffic Contact Forms (NTCFs), which were interfaced with EIS in mid-2017. MCSO has provided us with access to investigative stops that make up a portion of NTCFs since their inception. Over the past two years, we have suggested that MCSO create a methodology to statistically examine these civilian contacts to ensure that there is no evidence of bias in the manner in which they are conducted. MCSO has produced a preliminary draft of an NTCF inspection methodology that we have returned with comments. In addition, we had requested and received several months of data for all contacts captured using NTCFs in 2019; and we found that the distinction between Field Information and Investigative Stop is not clear to deputies using the forms. MCSO has now proposed to conduct a study of NTCF use by deputies, using the preliminary methodology mentioned previously, to evaluate whether the form, policy, and training associated with stops documented on NTCFs needs to be modified. In a recent request for information, the BIO Captain stated that once the methodology for this one-time study is approved it will take BIO personnel approximately 60-75 days to complete the assessment.

WAI 50820

We will continue to work with MCSO to finalize each of these data analytic methods. MCSO continues to regularly publish a number of reports on deputy activity and supervisory oversight that are not tied to the methodologies of the TSMR, TSQR, or TSAR.

The Audits and Inspections Unit (AIU) produces a monthly report evaluating Supervisory Notes that indicate whether supervisors are reviewing the EIS data of deputies under their command. The inspection looks for indications that supervisors made entries for each person they supervise with regard to two randomly selected BWC videos, provide one EPA note, make two supervisor entries, and indicate that the supervisor has reviewed their deputies' EIS status. The compliance rates reported by MCSO are based on a matrix developed for this inspection. For this quarter, the reported compliance rates range from a high of 100% in September, to 93.12% in July. We calculate our compliance rates based upon what we consider significant deficiencies related to Order requirements and any case reviewed with a significant deficiency impacts the compliance rate. Our computed compliance rate for August and July were 98% and 87.5%, respectively. While these differences in compliance rates are often not large, they may be consequential as indicators of training needs, policy deficiencies, or overall compliance with the Court Order. AIU continues to send BIO Action Forms to the Districts with deficiencies, and we have always had the opportunity to review these forms when requested.

In the Traffic Stop Review and Discussion Inspections for this quarter, we note stable compliance rates above 98% with a slight decline in August to 89% for Discussions. The third traffic-related audit is the Traffic Stop Data Inspection, in which AIU uses a matrix comparing traffic stop information found on Vehicle Stop Contact Forms (VSCFs) with Computer Aided Dispatch (CAD) and body-worn camera (BWC) footage. The compliance rate ranged from 91.4% in July, to 77% in September. The deficiencies noted by the inspector ranged across the organization; however, two instances of particular note included an improper search and a second search that was not properly documented. AIU sent a total of eight BIO Action Forms to the appropriate Districts resulting from the September inspection.

While we can look for trends in deficiencies over each quarter, we have suggested to MCSO that AIU conduct an evaluation of all BIO Action Forms sent to Districts to ensure that there are not long-term trends by Districts or supervisors that cannot be distinguished while looking at shorter timeframes. MCSO conducted a preliminary analysis of BIO Action Forms from January to May 2019 and reported these findings during our July 2019 site visit. MCSO found that there was indeed a small number of deputies who had received several BIO Action Forms. MCSO produced a methodology in June 2020, which we and the Parties returned with comments. MCSO indicates, in response to several questions submitted during our July and October 2020 remote site visits, that the agency continues to refine the methodology for re-submission. We will evaluate this when it is produced in a form for review by us and the Parties.

WAI 50821

EIU also produces a monthly report on alerts triggered within EIS. From March to May, we noted a dramatic increase in Notice of Claim alerts, but none of these were sent to supervisors for investigation. We submitted a series of questions on these issues prior to our July remote site visit. BIO command staff responded by noting that they had recently discovered that there was a backlog of emails from the Legal Liaison Section regarding Notice of Claims. In response to a request for information during our October remote site visit, the lieutenant in charge of EIU advised that the backlog had been eliminated; and that new internal practices had been put into place to ensure that such an oversight would not re-occur.

For all other alerts, EIU personnel review the alerts and disseminate them to supervisors and District command if alerts indicate the potential for biased activity or thresholds are exceeded for particular actions such as external complaints, unexcused absences, data validations, and others. Once the supervisors receive the alert investigation, they employ a template (Attachment B of GH-5 [Early Identification System]) to conduct the investigation and report their findings and results to the chain of command through BlueTeam. MCSO has also created an EIS Alert Review Group (ARG) to evaluate the closure of alert investigations. Our review of alert closures for this quarter resulted in no immediate concerns, but it is clear that given the subset of alerts generated for BAFs, MCSO needs to complete its proposal for an inspection of repetitive BIO Action Forms being received by individuals. MCSO continues to work with us and the Parties on how to evaluate the effectiveness of interventions undertaken to complete the EIS Alerts Inspection.


***Paragraph 73.*** *Within 180 days of the Effective Date, MCSO shall either create a unit, which shall include at least one full-time-equivalent qualified information technology specialist, or otherwise expand the already existing role of the MCSO information technology specialist to facilitate the development, implementation, and maintenance of the EIS. MCSO shall ensure that there is sufficient additional staff to facilitate EIS data input and provide Training and assistance to EIS users. This unit may be housed within Internal Affairs ("IA").*

**In Full and Effective Compliance**

The Bureau of Internal Oversight (BIO) is overseen by a captain and is comprised of three Units designed to achieve different compliance functions. Each is a fully operational Unit headed by a lieutenant with both sworn and civilian staff responsible for diverse but interrelated oversight functions.

The Early Intervention Unit (EIU) coordinates the daily operation of the EIS. This unit evaluates alerts generated by the EIS, reviews them and sends out investigations to District personnel as prescribed by policy.

The Audits and Inspections Unit (AIU) has developed and carries out ongoing inspections to ensure that deputies and supervisors are using the EIS properly and to the fullest extent possible. When AIU discovers deficiencies, it sends out BIO Action Forms to the affected Districts and individuals; and ensures the return of the appropriate forms.

WAI 50822

The Traffic Stop Analysis Unit (TSAU) was most recently created due to the complexities of generating all of the statistical reports related to traffic and patrol functions of MCSO. The leaders of these units respond to specific requests made by us and the Parties and appear collectively during our site visit meetings to answer any questions related to the operation of BIO.

Over the last 18 months the EIS database has been expanded to include Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), records from the Arizona Office of Courts (AOC), and training and policy receipt records from the Cornerstone software program (the HUB). Supervisors now have much more information available to them about the deputies under their command than they ever had in the past.

On October 5, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 74.** *MCSO shall develop and implement a protocol setting out the fields for historical data, deadlines for inputting data related to current and new information, and the individuals responsible for capturing and inputting data.*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on May 6, 2020.
- EIU Operations Manual, currently under revision.

**Phase 2:** In compliance

MCSO has met the requirements of this Paragraph by identifying the data to be collected and the responsibility of persons across the organization to review, verify, and inspect the data making up the early intervention system. These roles and responsibilities are originally developed in GH-5 (Early Identification System) and more comprehensively elaborated in Section 200 (Duties and Responsibilities), approved in August 2019, of the EIU Operations Manual.

MCSO has not yet completed the revision of the EIU Operations Manual. Currently, MCSO has approximately 90% of the manual finalized. The remaining 10% of the manual is comprised of the ongoing development of the methodologies for the Traffic Stop Monthly Reports, as well as the revision of the thresholds dependent on the results from the TSMR and non-traffic threshold analyses being conducted by EIU personnel. The manual sections pertaining to this Paragraph have already been finalized and published; therefore, MCSO has attained Phase 1 compliance.

MCSO has shown progress in the development of a data-handling protocol. These processes have been memorialized in the EIU Operations Manual (Section 306), which was approved in July. Aside from Section 200, noted above, Section 305 (Software Change Control Processes), approved in October 2018, is meant to ensure that all modifications to software or data collection are coordinated in a prospective fashion before any implementation occurs. These software changes are provided to us on a monthly basis through regular document requests and are discussed during the quarterly site visit meetings. Each of these sections of the EIU Operations Manual expands upon policy that has already been approved.

WAI 50823

MCSO has also created a committee of personnel from each unit that handles, or adds to, traffic data before it is analyzed. The reports from the regular monthly meetings of this group are made available to us and show the attention to detail and memorialization of changes put in place to improve data processes.

Finally, EIU produces a monthly report for benchmarks not related to the traffic stop methodologies. We routinely use these monthly tables to evaluate compliance with various Paragraphs within the Court Order. For traffic-related Benchmarks 3 and 8 (Paragraph 67), MCSO documents both traffic stops involving immigration inquiries and data validation errors committed by deputies. During this reporting period, there were no immigration inquiries; however, 13 data validation alerts were triggered within EIS from July to September 2020. As noted in the AIU Traffic Data Inspection reports from this time period, these occur when vehicle information is incomplete/incorrect or where information on the VSCF is inconsistent with what is found in Computer Aided Dispatch (CAD). Several of these have resulted in alert investigations which we review in response to other Paragraph requirements.

**Paragraph 75.** *The EIS shall include a computerized relational database, which shall be used to collect, maintain, integrate, and retrieve:*

a.     *all misconduct Complaints or allegations (and their dispositions), excluding those made by inmates relating to conditions of confinement or conduct of detention officers (i.e., any complaint or allegation relating to a traffic stop shall be collected and subject to this Paragraph even if made by an inmate);*

b.     *all internal investigations of alleged or suspected misconduct;*

c.     *data compiled under the traffic stop data collection and the patrol data collection mechanisms;*

d.     *all criminal proceedings initiated, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the County and/or its Deputies or agents, resulting from MCSO Patrol Operations or the actions of MCSO Patrol Operation Personnel;*

e.     *all arrests;*

f.     *all arrests in which the arresting Deputy fails to articulate probable cause in the arrest report, or where an MCSO Supervisor, court or prosecutor later determines the arrest was not supported by probable cause to believe a crime had been committed, as required by law;*

g.     *all arrests in which the individual was released from custody without formal charges being sought;*

h.     *all Investigatory Stops, detentions, and/or searches, including those found by the Monitor, an MCSO supervisor, court or prosecutor to be unsupported by reasonable suspicion of or probable cause to believe a crime had been committed, as required by law;*

WAI 50824

i.    all instances in which MCSO is informed by a prosecuting authority or a court that a decision to decline prosecution or to dismiss charges, and if available, the reason for such decision;

j.    all disciplinary action taken against employees;

k.    all non-disciplinary corrective action required of employees;

l.    all awards and commendations received by employees;

m.   Training history for each employee; and

n.    bi-monthly Supervisory observations of each employee.

**Phase 1:**  In compliance

- EA-3 (Non-Traffic Contact), most recently amended on June 28, 2019.

- GC-13 (Awards), most recently amended on July 22, 2020.

- GH-5 (Early Identification System), most recently amended on May 6, 2020.

- EIU Operations Manual, currently under revision.

- Professional Services Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

Since 2017, MCSO has placed into production data interfaces for Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), Justice Court turndowns (AOC) and the Cornerstone software program (the HUB) that provides reports for training and policy acknowledgment. MCSO continues to develop some inspections or analytic reports that ensure that personnel are accurately using the EIS data available; however, the data do exist in the EIS and are accessible by personnel we have interviewed during each site visit. We will continue to evaluate and monitor the use of EIS in furtherance of the Orders. During our January site visit, we also reviewed with MCSO representatives how the data for the following Subparagraphs appear on-screen and are accessible to first-line supervisors. We found no issues of concern during this review.

Paragraph 75.a. requires that the database include "all misconduct Complaints or allegations (and their dispositions)," with some exclusions.

EIPro, a web-based software application that allows employees and supervisors to view information in the IAPro case management system, includes the number of misconduct complaints and allegations against deputies.

Since February 2017, both open and closed cases have been viewable by supervisors. PSB controls the ability to view open cases based upon the parties who may be involved. PSB personnel developed a protocol to write the summaries for both open and closed cases that appear in the EIS. This protocol has been approved, and was incorporated into the PSB Operations Manual that was published on December 13, 2018. Each month, we receive a spreadsheet of open and closed external complaints as they appear in EI Pro for supervisors to review. Our examination of these descriptions for July through September found that these summaries meet our expectations. Additionally, during all site visits between 2017 and January 2020, we observed

WAI 50825

that field supervisors could easily access these summaries and understand the types of issues involved in the complaints. Supervisors conducting alert investigations have also routinely referred to a review of complaint summaries as a portion of their investigative process. Supervisors are also advised that they can always contact EIU and PSB for clarification if it is necessary.

MCSO is in compliance with this Subparagraph.

Paragraph 75.b. requires that the database include "all internal investigations of alleged or suspected misconduct."

Corresponding to the discussion above involving external complaints, internal investigation summaries also appear in the IAPro system. All complaint summaries, open and closed, have been viewable since February 2017. PSB uses a standard protocol to develop the case summaries and access limits. This protocol has been approved by us and has been included in the PSB Operations Manual published in December 2018. Each month, we receive a spreadsheet of internal allegations as they appear to supervisors in EIS. Our review of the summaries for July through September found that these summaries are transparent and easily understandable. During our past site visits, we have found that line supervisors are also able to easily access the summaries of open and closed internal investigations pertaining to their subordinates. Supervisors also have referred to these summary fields while conducting alert investigations. Field supervisors always have the option of requesting additional information from EIU and PSB should they deem the summaries insufficient.

MCSO is in compliance with this Subparagraph.

Paragraph 75.c. requires that the database include "data compiled under the traffic stop data collection and the patrol data collection mechanisms."

MCSO has created electronic forms to collect data from traffic stops, incidental contacts and warnings.

MCSO has also created interfaces with EIS for remote databases including Incident Reports (IRs) and Non-Traffic Contact Forms (NTCFs). These reports are readily available to supervisors to review within EIS. Field supervisors have shown that they have the ability to view IRs and NTCFs during our past site visits. AIU already conducts an inspection of IRs and has recently revised the methodology to improve and streamline the inspection process. We have suggested during our last several site visits that MCSO create a similar inspection for NTCFs, as well as propose an analytical strategy to examine whether any racial or ethnic inconsistencies may exist in the incidents documented on the NTCF. MCSO recently produced a brief proposal of the methods they would use to analyze NTCFs based upon these ongoing discussions. We, Plaintiffs, and Plaintiff-Intervenors provided comments on these proposals in early April 2020. Following several conference calls on both the forms and policy, EA-3 (Non-Traffic Contact), MCSO proposed an initial study that would only evaluate how the NTCF form and policy are being used across the agency. MCSO also proposes that following this review of the use of NTCFs, the agency would suggest an appropriate method to determine if disparities exist in the stops documented on these forms. MCSO has made available all investigative stop NTCFs each month. In prior reporting periods, we have noted indications of trends for stops in particular geographic

WAI 50826

areas and for specific types of interactions with community members. Our review of NTCFs for the current quarter did not find any issues of concern; however, a statistical methodology would allow a more comprehensive examination.

This Paragraph requires that the data for such activities exists within EIS; however, Paragraphs 72, 81a., and 81b.vi. require an analysis of these stops. Therefore, while MCSO complies with this Subparagraph, MCSO will not attain compliance for the other Paragraphs until a method of analysis is approved.

MCSO is in compliance with this Subparagraph.

Paragraph 75.d. requires that the database include "all criminal proceedings initiated, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the County and/or its Deputies or agents, resulting from MCSO Patrol Operations or the actions of MCSO Patrol Operation Personnel."

MCSO's Legal Liaison Section receives and forwards this information to EIU for entry into the EIS database. Deputies self-report contacts they have with other agencies, and any two contacts within a rolling six-month period results in an alert requiring a supervisor to investigate. Supervisors have demonstrated the ability to access this information during our site visits. In addition, in one of the monthly production requests involving this Paragraph, we noted that during the prior quarter, January to March, there were 14 "notice of claim" incident type alerts; but none were sent to supervisors for further investigation. During April to June, we noted 67 "notice of claim" incident type alerts with three being sent to supervisors for investigation. During our July remote site visit, we requested clarification on these particular alerts through a document request. BIO command staff responded by noting that they had recently discovered that there was a backlog of emails from the Legal Liaison Section regarding Notice of Claims. The memo also noted that EIU staff were currently working through this backlog. In response to a request by us for an update on this matter in October 2020, the EIU lieutenant noted that the backlog of Notice of Claims had been rectified and that new internal processes were adopted to ensure that such a backlog would not go undetected in the future. As this appears to have been a unique issue that MCSO responded to quickly, we have not removed MCSO from compliance with this Subparagraph.

MCSO is in compliance with this Subparagraph.

Paragraph 75.e. requires that the database include "all arrests."

Arrests may not always occur as a result of a traffic stop. MCSO, therefore, has placed into production an interface between EIS and the Jail Management System (JMS). This interface allows supervisors to easily access information regarding arrest that cannot be viewed through traffic data. During our site visits, supervisors have demonstrated the ability to access the IRs and related arrest information. The timeliness and sufficiency of that review is evaluated under Paragraph 93.

MCSO is in compliance with this Subparagraph.

WAI 50827

Paragraph 75.f. requires that the database include "all arrests in which the arresting Deputy fails to articulate probable cause in the arrest report, or where an MCSO Supervisor, court or prosecutor later determines the arrest was not supported by probable cause to believe a crime had been committed, as required by law."

Incident Reports (IRs) are housed in the TraCS (Traffic and Criminal Software) system. Supervisors must review and sign off on IRs for each deputy involving an arrest or detention of a suspect within 72 hours of the incident. Supervisors are also required to ensure that probable cause exists for each charge or arrest outlined within an IR. AIU additionally conducts an inspection of IRs to ensure that all policy requirements are met.

If a court or prosecutor decides not to prosecute a case, both the deputy and their immediate supervisor are notified. In 2019, MCSO created a new inspection that combined IR and County Attorney Turndown inspections. MCSO's intent is to catch instances of reasonable suspicion and probable cause issues earlier in the process. Other deficiencies result in BIO sending Action Forms to the appropriate District personnel. In the inspections from July through September, there were no cases returned by a County Attorney or local prosecutor due to a lack of articulation of reasonable suspicion/probable cause; however, in July, AIU personnel relayed one instance to us that they had found during an inspection of IRs. We reviewed this case and concurred with the findings and actions of the inspectors. During this reporting period, MCSO reported a compliance rate in excess of 98% using the entire matrix of issues the agency employs to investigate IRs. Our computation of compliance rates is based on significant deficiencies and/or issues with Order-related requirements. Therefore, when inspectors note issues like inadequate articulation, missing elements of a crime, issues regarding *Miranda* warnings or boilerplate language, we consider those cases deficient. Consequently, we found compliance rates of 92.5% for September and July and 90% for August. BIO sent Action Forms to the Districts for both the deficiencies in the original report and the supervisors who failed to find these deficiencies before signing off on the reports. As MCSO continues to review and revise its inspections and audits, we have taken the position that the Order requires all instances where a deputy's reports involve an insufficient articulation of probable cause must be captured in the data system, regardless of actions taken afterward. MCSO has provided individual case reports when they deem them to be a major policy violation; however, in our review of documents we have differed with the determination of MCSO on issues of articulating probable cause, missing elements of a crime in deputies reports and *Miranda* warning issues. For compliance purposes, we consider these serious deficiencies. We continue to work with MCSO on all of the issues.

The inspections show that the data exist within EIS, even though the manner of computing compliance differs between us and MCSO.

MCSO remains in compliance with this Subparagraph.

Paragraph 75.g. requires that the database include "all arrests in which the individual was released from custody without formal charges being sought."

The ability to capture this information depends upon what actually occurred within the context of the interaction. If the suspect was taken into physical custody but released prior to booking, there would be a JMS record, as indicated in Subparagraph 75.e. above. Therefore, MCSO could use the interface described above to pull the relevant data elements into EIS. However, if the incident

WAI 50828

does not rise to the point of physical custody and detention, then it would likely yield an Incident Report, covered under Subparagraph 75.f. above or an Investigatory Stop under Subparagraph 75.h. to follow. The interfaces for IR and NTCF data became operational prior to July 1, 2017. The new inspection process referred to above will also capture elements useful for the evaluation of this Subparagraph.

MCSO is in compliance with this Subparagraph.

Paragraph 75.h. requires that the database include "all Investigatory Stops, detentions, and/or searches, including those found by the Monitor, an MCSO supervisor, court or prosecutor to be unsupported by reasonable suspicion of/or probable cause to believe a crime had been committed, as required by law."

MCSO has created interfaces for both IRs and NTCFs. As noted in 75.f., our inspection of IRs for July through September revealed a compliance rate between 90 and 92.5%. AIU sends BIO Action Forms (BAFs) to Districts with deficiencies. In addition, BIO is working on a separate inspection to track repetitive BAFs received by individuals and Districts.

In July 2017, the interface between EIS and the database for NTCFs was placed into production. MCSO also reissued EA-3 (Non-Traffic Contact) and amended the policy on June 14, 2018 (and further amended it on June 28, 2019). This policy specifies the responsibility of MCSO personnel regarding different types of search occurrences. If the search is related to a traffic stop, it should be captured on the VSCF. Searches occurring within activities resulting in an Incident Report will be captured under Subparagraph 75.e., and NTCF searches fall under this Subparagraph.

Initially, the number of NTCF reports was insignificant; however, since May 2018, we generally receive between 15-25 NTCFs for investigative stops each month. These are all captured within EIS as required by this Subparagraph (as well as 75.c.). Our review of these cases for July through September found no issues of significance for this Subparagraph. During the last quarter of 2019, we also requested a random sample of Field Information stops that were documented using the NTCF. Our review of these indicated that approximately 80% of civilian stops labeled as Field Information could easily have been labeled as Investigative stops. We have apprised MCSO of our findings and have subsequently provided MCSO with our summary evaluation. We have also suggested that MCSO develop a methodology to statistically analyze the collection of NTCFs to look for possible issues of racial or ethnic bias in the way these interactions are conducted. The development of a statistical examination of NTCF stops should be a priority for MCSO once the Traffic Stop Methodologies for the Monthly Analyses are complete. Such an examination is required by Paragraphs 72 and 81.b.vi. MCSO has drafted an initial proposal for the evaluation of how NTCF forms and policy are being used across the agency. We and the Parties have provided extensive comments and will continue to work with MCSO on these issues. Subsequent to this review, MCSO plans to modify, where appropriate, both the policy and forms related to NTCFs; and will undertake a process to ensure that any potential indications of bias are discovered. Since NTCFs and IRs are included in EIS, MCSO is in compliance with this Subparagraph.

Paragraph 75.i. requires that the database include "all instances in which MCSO is informed by a prosecuting authority or a court that a decision to decline prosecution or to dismiss charges, and if available, the reason for such decision."

WAI 50829

The EIS database has included both County Attorney Actions and an interface with the Justice Courts (AOC) since July 2017. MCSO began using a new method that merged the County Attorney Turndown Inspection with the IR inspection. The first inspection was produced in August 2019 using July data. For July through September our computed compliance rates for the IRs was between 90 and 92.5%. MCSO reported a slightly higher compliance rate for each month based upon a matrix of issues they use to evaluate IRs. For this period, the IR inspection did not include any County Attorney Turndowns, as none were received indicating a problem with probable cause. AIU sent several BIO Action Forms to the Districts for review due to the deficiencies found by the inspectors. For this Subparagraph, we also receive a random selection of IRs turned down for prosecution from MCSO. Our review of these indicate that most had been turned down using the generic phrases "no reasonable likelihood of conviction" or "dismissed to aide in prosecution." We found no other significant problems with the reports reviewed. We will continue to evaluate the inspection and IRs in future quarterly status reports.

MCSO is in compliance with this Subparagraph, but risks falling out of compliance if compliance rates remain below 94%.

Paragraph 75.j. requires that the database include "all disciplinary action taken against employees."

MCSO currently tracks disciplinary actions in the IAPro system, which allows supervisors to search the history of their employees in EIS.

AIU produces a monthly alert inspection report relevant to Paragraphs 70, 71, 75, and 81. The possible outcomes from these alert investigations range from no further action to referral to PSB. In the alert inspections report from July through September, there were 10 instances where cases were referred to PSB rather than to supervisors for investigation. Additionally, the Administrative Services Division replies to a monthly request that incorporates this Subparagraph; and the Division's report indicates that no discipline was imposed for bias related incidents between July and September 2020.

MCSO is in compliance with this Subparagraph.

Paragraph 75.k. requires that the database include "all non-disciplinary corrective action required of employees."

MCSO produces a Supervisory Note inspections (in particular, bimonthly reviews of a deputy's performance) and the monthly alert report described in the previous Subparagraph to fulfill the requirements for this Subparagraph. In addition, we also review 15 randomly chosen closed alert inspections conducted by supervisors each month. As noted previously, the majority of cases are closed through a meeting with a supervisor; however, in the EIS Alert Inspection for July, there was one case in which the supervisor recommended an evaluation period of 30, 60, or 90 days as needed. There were also several instances throughout the quarter where supervisors noted a review of the material; but due to an ongoing PSB investigation, they did not pursue the issues any further than discussing the alert issues with the deputies identified when that was not precluded by the PSB investigations.

WAI 50830

Supervisors also are required to make two comments regarding their subordinates each month in their BlueTeam Notes. In the Supervisory Notes inspections for July through September, there were seven instances where supervisors were found deficient. All of these particular deficiencies occurred in July across three Districts. AIU sent BIO Action Forms to those Districts identified as having any issues in this inspection.

MCSO is in compliance with this Subparagraph.

Paragraph 75.l. requires that the database include "all awards and commendations received by employees."

MCSO published GC-13 (Awards) on November 30, 2017 and most recently updated this policy on July 22, 2020. With this publication, MCSO created categories for awards or commendations that could be tracked within the EIS database. With the introduction of the newest version of EIPro, these fields are also searchable by supervisors. During our past site visits, supervisors demonstrated how they could search these fields and locate awards of their subordinates' in the EIS data. According to the monthly alert inspection reports for July through September, there were no commendations recommended by supervisors.

MCSO is in compliance with this Subparagraph.

Paragraph 75.m. requires that the database include the "[t]raining history for each employee."

MCSO has transitioned from the Skills Manager System to the Cornerstone (the HUB) software program. The HUB has replaced the E-Policy and E-Learning programs. The HUB routinely updates recent training and policy reviews for deputies and is visible by immediate supervisors. MCSO also created an interface between the HUB and EIS.

During our past site visits, all field supervisors who we contacted stated that they were familiar with the HUB and were able to access the information contained therein. Several supervisors noted how they assigned training to particular deputies following alert investigations they completed. In addition, during our regular conference calls regarding TSMR methodology, we have placed particular importance on the development of comprehensive supervisor training that would ensure that they will be able to comprehend and interpret the statistical data produced each month in a way that would promote a transparent intervention process. We will continue to evaluate supervisors' ability to easily search and use EIS during future site visits.

MCSO is in compliance with this Subparagraph.

Paragraph 75.n. requires that the database include "bi-monthly Supervisory observations of each employee."

The Audits and Inspections Unit (AIU) conducts a monthly inspection of Supervisory Notes. One of the indicators AIU evaluates is whether supervisors are making two notes per deputy each month. For July through September, AIU reported two instances where supervisors did not make two reviews for each of their subordinates. BIO Action Forms were sent to the Districts where deficiencies were found.

MCSO is in compliance with this Subparagraph.

WAI 50831

With the operationalization of interfaces for Incident Reports, Non-Traffic Contact Forms, the Arizona Office of the Courts, and the HUB, EIS now contains the information required by the Order. MCSO has worked diligently to use some of the data above to investigate compliance rates with the Orders. MCSO continues to develop other inspections or data analytic methods in response to our suggestions.

**Paragraph 76.** *The EIS shall include appropriate identifying information for each involved Deputy (i.e., name, badge number, shift and Supervisor) and civilian (e.g., race and/or ethnicity).*

**Phase 1:** In compliance

- EB-2 (Traffic Stop Data Collection), most recently amended on January 7, 2020.

- GH-5 (Early Identification System), most recently amended on May 6, 2020.

**Phase 2:** In compliance

MCSO has instituted a quality check process for Vehicle Stop Contact Forms (VSCFs) that requires supervisors to review all traffic stop documents within three days of the stop. AIU also conducts an inspection of the timeliness of these reviews as well as a second inspection on Traffic Stop Data. The Traffic Stop Data inspection employs a matrix that ensures that the name, serial number, and unit of the deputy is included on the VSCF. For July, August, and September, the Traffic Stop Data inspections yielded compliance rates of 91.4%, 91.4%, and 77%, respectively. While the overall rate of compliance for the Traffic Stop Data inspections fell below the standard of 94% the matrix information showed that none of the deficiencies had to do with identification of deputies or drivers.

MCSO has incorporated patrol data into the EIS through the creation of interfaces for Incident Report (IR) and Non-Traffic Contact Form (NTCF) documents. Each of these documents lists the required name of the deputy and civilian, as well as the ethnicity of the civilian, in accordance with this Paragraph. AIU conducts an inspection of IRs, including a check for racial/ethnic bias in the reporting documents and the identification of all parties contacted as a result of the incident. The compliance rates reported by MCSO from July through September were above 98%, based upon MCSO's use of its own matrix for the IR inspection. While our calculation of compliance rates is slightly lower than MCSO's, none of the deficiencies were related to the identification of persons contacted or deputies involved. Most deficiencies resulted from the failure to file/sign documents within policy timeframes or the use of conclusory language or failure to adequately articulate elements of the crime.

Non-Traffic Contact Forms contain the same basic information about the identity of the deputy making the contact and the persons being contacted. MCSO does not yet have an inspection of NTCFs, but they do provide us with copies of all the documents for investigative stops and field information. Up to this point, we have not found a repetitive problem with NTCF documentation that includes the criteria required by this Paragraph.

WAI 50832

*Paragraph 77. MCSO shall maintain computer hardware, including servers, terminals and other necessary equipment, in sufficient amount and in good working order to permit personnel, including Supervisors and commanders, ready and secure access to the EIS system to permit timely input and review of EIS data as necessary to comply with the requirements of this Order.*

**In Full and Effective Compliance**

Since our earliest site visits in 2014, we have addressed the issue of "necessary equipment, in sufficient amount and in good working order" with MCSO. As part of our monthly document requests, we receive an accounting, by District, of how many vehicles have functioning TraCS systems.

Since the end of 2015, we have found that all marked patrol vehicles were properly equipped with TraCS equipment. MCSO developed EB-2 (Traffic Stop Data Collection), which states that in the event that a TraCS vehicle is not operational, or available, each District possesses the necessary equipment at the substation for deputies to input his/her traffic stop information before the end of the shift. Due to the mountainous regions throughout Maricopa County, there have always been connectivity issues. However, these areas are well-known to Patrol deputies; and they have demonstrated how they adapt to connectivity problems. The VSCF also allows deputies to note issues with technology on a traffic stop.

During our past visits to the Districts, we regularly spot-checked the facilities and patrol cars; and found that they had functioning TraCS equipment, and that each District office had available computers for any occurrence of system failures with vehicle equipment. We were unable to conduct these inspections in April, July and October as a result of holding our site visits remotely.

At present, the technology and equipment available at MCSO meet the requirements of the Order.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination. We will continue to conduct our spot inspections at the Districts, and MCSO will apprise us of any event that falls within the scope of this Paragraph.


*Paragraph 78. MCSO shall maintain all personally identifiable information about a Deputy included in the EIS for at least five years following the Deputy's separation from the agency. Information necessary for aggregate statistical analysis will be maintained indefinitely in the EIS. On an ongoing basis, MCSO shall enter information into the EIS in a timely, accurate, and complete manner, and shall maintain the data in a secure and confidential manner. No individual within MCSO shall have access to individually identifiable information that is maintained only within EIS and is about a deputy not within that individual's direct command, except as necessary for investigative, technological, or auditing purposes.*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on May 6, 2020.

**Phase 2:** In compliance

WAI 50833

GH-5 (Early Identification System) clearly states that employees only have access to EIS in furtherance of the performance of their duties, and that any other unauthorized access will be addressed under MCSO's discipline policy. The policy also notes that access to individual deputy information will be limited to appropriate supervisory/administrative personnel of that deputy. In addition, the policy states that personal information will be maintained in the database for at least five years following an employee's separation from the agency; however, all other information will be retained in EIS indefinitely

The most recent occurrences of a substantiated misuse of MCSO's computer system occurred in 2011 and 2015. As a result, MCSO published a System Log Audit operating procedure in November 2017 that required PSB to notify the Technology Management Bureau of any investigations involving a system breach. We fully vetted this operating procedure (BAS SOP 17-4) during our January 2018 site visit. MCSO reported no system breaches occurring since our January site visit. In addition, we receive summaries of all internal investigations each month. In March 2019, one case indicated that a deputy was under investigation for potentially misusing the Arizona Criminal Justice Information System (ACJIS); and in another, it was alleged that booking information might have been used for social media. In April 2020, there was an external complaint that a deputy may have run a criminal history check on someone for a relative. These cases have not triggered the operating procedure noted above, according to MCSO during our site visit meetings, because PSB has not yet completed its investigations, or they have found nothing to substantiate the original claims.

MCSO's concern for the integrity of information in EIS is further exemplified by the protocols that PSB has created to meet the requirements of Subparagraphs 75.a. and 75.b. regarding purview of open complaints and internal investigations. PSB not only controls who can view summaries of open investigations, but has created a protocol for creating the summary of open investigations to protect the integrity of the case while it is being processed.

MCSO has also created a work group to ensure the integrity of traffic stop data used for analysis. The protocols used by this work group are incorporated into Section 306 of the EIU Operations Manual. This section has been approved by us and incorporated into the Manual as finalized.

***Paragraph 79.*** *The EIS computer program and computer hardware will be operational, fully implemented, and be used in accordance with policies and protocols that incorporate the requirements of this Order within one year of the Effective Date. Prior to full implementation of the new EIS, MCSO will continue to use existing databases and resources to the fullest extent possible, to identify patterns of conduct by employees or groups of Deputies.*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on May 6, 2020.

**Phase 2:** Not in compliance

The employment of the EIS database remains limited as MCSO has not yet completed and published the results of new methodologies for the Traffic Stop Monthly Report (TSMR). In addition, during our last several site visits, we have also suggested to MCSO that the agency needs

WAI 50834

to create an analytical plan for the Non-Traffic Contact Forms that have accumulated over the past two years. Until these are complete and operational, MCSO will not achieve Phase 2 compliance with this Paragraph. We and the Parties continue to work with MCSO to complete each of these analytic reports.

MCSO published the Fourth and Fifth Traffic Stop Annual Reports (TSARs),which are discussed in other Paragraphs. Although each report concludes that systemic bias in patrol functions through traffic stop outcomes does appear to exist, they have not yet shown a trend of improvement/decline in the level of potential bias. MCSO is developing a plan to ensure that subsequent TSARs are able to track trends in the level of potential bias/disparity found in traffic stop outcomes. MCSO's plan for the analysis of monthly traffic data also stems from the foundation created by the Fourth and Fifth TSARs. MCSO is currently planning pilot analyses to ensure that the new methodologies meet the requirements of the Order. MCSO has also proposed an initial method to analyze NTCFs but these plans remain in a preliminary stage.

In the meantime, EIU and AIU pull together data to produce reports and inspections of both deputy and supervisor activity. The EIS automatically triggers alerts for repetitive actions, such as receiving multiple BIO Action Forms or external complaints. However, for the past two years BIO has been reevaluating the threshold levels that trigger several of these alerts and, in some instances, suspended them during this period. The EIU uses this information to create monthly reports and to determine whether an investigation by a supervisor is required. AIU has most recently published a new inspection on EIS Alert Processes to ensure that alert investigations are conducted within policy timeframes and to summarize the manner in which investigations were closed. The compliance rate for the EIS Alert Inspection for this reporting period ranges from 66% to 90%; however, the 66% is based on three closed alerts with one out of compliance. We anticipate that as this inspection becomes more widely known throughout the organization, and as supervisors are trained to the new processes, District personnel will adjust accordingly and submit their investigations in a timelier fashion. MCSO is developing an extension of this inspection to include the evaluation of the effectiveness of interventions that supervisors recommend. This final component to the inspection is crucial for compliance with other Paragraphs.

AIU also uses the EIS database to generate numerous inspections of traffic stop data, Supervisory Notes, and Incident Report inspections, among many others. When deficiencies are found, AIU sends out BIO Action Forms to the District command to rectify the situation and memorialize what was done. These inspections are crucial to evaluate compliance with several Paragraphs in the Order. AIU has already automated an alert threshold for repeated Action Forms for the same types of events. An initial investigation of repetitive Action Forms, in 2019, showed that a small number of deputies receive three or more Action Forms, while the vast majority receive only one Action Form. However, since that time BIO has been working to implement a less cumbersome process that could be produced twice each year. The BIO Captain has kept us regularly informed on the progress for this audit, and he anticipates submitting a proposal for review shortly. The goal of this inspection is to track deficiencies by Districts, shifts, and squads to focus corrective measures in the most beneficial way. We will review MCSO's proposal as it is made available.

WAI 50835

## b. Training on the EIS

*Paragraph 80. MCSO will provide education and training to all employees, including Deputies, Supervisors and commanders regarding EIS prior to its implementation as appropriate to facilitate proper understanding and use of the system. MCSO Supervisors shall be trained in and required to use EIS to ensure that each Supervisor has a complete and current understanding of the employees under the Supervisor's command. Commanders and Supervisors shall be educated and trained in evaluating and making appropriate comparisons in order to identify any significant individual or group patterns. Following the initial implementation of the EIS, and as experience and the availability of new technology may warrant, MCSO may propose to add, subtract, or modify data tables and fields, modify the list of documents scanned or electronically attached, and add, subtract, or modify standardized reports and queries. MCSO shall submit all such proposals for review by the Monitor pursuant to the process described in Section IV.*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on May 6, 2020.

**Phase 2:** In compliance

MCSO's curriculum for Supervisor Responsibilities: Effective Law Enforcement (SRELE) regularly includes a refresher and updates for supervisors regarding how to most effectively use EIS tools and complete Alert Investigations for their subordinates within policy guidelines. MCSO is also modifying the Traffic Stop Monthly Report (TSMR) analysis and participating in regular conference calls with us and the Parties. A significant portion of these discussions revolve around how to effectively train supervisors to use the TSMR process in the furtherance of their supervisory duties and in accordance with the Court Order. Additionally, MCSO recently published the first and second Traffic Stop Quarterly Reports (TSQR). The conclusions and recommendations of each of these reports could prove useful for the continued refinement of supervisory training conducted by MCSO. We will continue to assist MCSO as it formulates training curriculum to enhance the supervisory functions of the Office.

## c. Protocol for Agency and Supervisory Use of the EIS

*Paragraph 81. MCSO shall develop and implement a protocol for using the EIS and information obtained from it. The protocol for using the EIS shall address data storage, data retrieval, reporting, data analysis, pattern identification, identifying Deputies for intervention, Supervisory use, Supervisory/agency intervention, documentation and audit. Additional required protocol elements include:*

a.     *comparative data analysis, including peer group analysis, to identify patterns of activity by individual Deputies and groups of Deputies;*

b.     *identification of warning signs or other indicia of possible misconduct, including, but not necessarily limited to:*

       i.     *failure to follow any of the documentation requirements mandated pursuant to this Order;*

WAI 50836

ii. *racial and ethnic disparities in the Deputy's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of Deputies' specific duties, or racial or ethnic disparities in traffic stop patterns when compared with data of a Deputy's peers;*

iii. *evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;*

iv. *a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;*

v. *complaints by members of the public or other officers; and*

vi. *other indications of racial or ethnic bias in the exercise of official duties;*

c. *MCSO commander and Supervisor review, on a regular basis, but not less than bimonthly, of EIS reports regarding each officer under the commander or Supervisor's direct command and, at least quarterly, broader, pattern-based reports;*

d. *a requirement that MCSO commanders and Supervisors initiate, implement, and assess the effectiveness of interventions for individual Deputies, Supervisors, and units, based on assessment of the information contained in the EIS;*

e. *identification of a range of intervention options to facilitate an effective response to suspected or identified problems. In any cases where a Supervisor believes a Deputy may be engaging in racial profiling, unlawful detentions or arrests, or improper enforcement of Immigration-Related Laws or the early warning protocol is triggered, the MCSO shall notify the Monitor and Plaintiffs and take reasonable steps to investigate and closely monitor the situation, and take corrective action to remedy the issue. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or other supervised, monitored, and documented action plans and strategies designed to modify activity. All interventions will be documented in writing and entered into the automated system;*

f. *a statement that the decision to order an intervention for an employee or group using EIS data shall include peer group analysis, including consideration of the nature of the employee's assignment, and not solely on the number or percentages of incidents in any category of information recorded in the EIS;*

g. *a process for prompt review by MCSO commanders and Supervisors of the EIS records of all Deputies upon transfer to their supervision or command;*

h. *an evaluation of whether MCSO commanders and Supervisors are appropriately using the EIS to enhance effective and ethical policing and reduce risk; and*

i. *mechanisms to ensure monitored and secure access to the EIS to ensure the integrity, proper use, and appropriate confidentiality of the data.*

WAI 50837

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on May 6, 2020.

**Phase 2:** Not in compliance

MCSO produces a number of reports and inspections that are relevant for this Paragraph. Due to issues with EIS data, methods of analysis and a change in vendors, MCSO has not been able to reliably produce the Traffic Stop Monthly Report (TSMR) based upon the criteria outlined in Paragraph 67.

MCSO has published the Fourth and Fifth Traffic Stop Annual Reports (TSAR); however, the analysis from these reports addresses issues of potential systemic bias across the entire traffic patrol function and cannot be employed to address potential individual-level biased activity. The TSMR, which is currently undergoing a revision and a planned pilot process, will assist MCSO and its supervisors in evaluating the activity of individual deputies with regard to traffic stops and examine any behaviors that might suggest biased activity.

MCSO has also published two TSQRs: the first, evaluated how supervisors review and document traffic stop activity of their subordinates; and the second, surveyed supervisors involved in the Third TSAR interventions about their experience in that process. Each has yielded information that MCSO can use for the development of training, modification of policy, and dissemination of resources to improve supervisory capabilities.

Paragraph 81.a. requires that MCSO's EIS protocols include "comparative data analysis, including peer group analysis, to identify patterns of activity by individual Deputies and groups of Deputies."

The EIU has conducted monthly and annual analyses looking for outliers that may indicate that an individual is behaving in a biased or unprofessional manner, in accordance with Paragraphs 65, 66, and 67. The TSMR has been suspended and under revision since April 2016. MCSO has proposed methodologies in consultation with its new vendor. We and the Parties have had the opportunity during our site visits; and, most recently through regular conference calls, to ask questions and receive additional information. Most importantly, MCSO has created a method to match deputies, in the Annual Reports, using personal and professional characteristics that are intended to go beyond previous strategies that were based upon the geographic location of traffic stops alone. These methods have been met with support from deputies across the organization during meetings between MCSO personnel and the data analysis vendor (CNA). MCSO continues to work toward the finalization of a complimentary method for TSMRs. Once complete, these methods will allow MCSO to identify those deputies whose traffic stop outcomes are significantly different from their peers.

MCSO has published two TSQRs. As noted above, the outcomes and recommendations could promote change in several ways throughout MCSO; however, they were not conducted in a way to compare peer supervisors.

MCSO has also created an interface for Non-Traffic Contact Forms (NTCFs) to be available in the EIS database; however, MCSO has not yet begun to develop a methodology to investigate whether patterns of problematic behavior, action, or bias might be occurring in the stops these

WAI 50838

forms document. We have discussed these issues with MCSO during our site visit meetings since October 2018. We and the Parties have commented on preliminary materials provided by MCSO, and we will continue to work with MCSO to use these civilian contacts to their fullest potential. MCSO has proposed an initial review of how the forms and policy, EA-3 (Non-Traffic Contact), are currently being employed across the organization to create an appropriate statistical methodology that is responsive to the needs of the Order.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.b. requires that MCSO's EIS protocols include "identification of warning signs or other indicia of possible misconduct."

GH-5 (Early Identification System) provides significant direction for employees and supervisors alike to understand what type of behaviors will be viewed as problematic. As noted above, the intent of the TSMR is to identify deputies who might be engaged in biased activity regarding who they stop, cite, warn, or search. MCSO has been developing new methods for the TSMR, and we have collectively engaged in numerous discussions about refinements to future TSARs.

MCSO is also revising the EIU Operations Manual, which will include sections on data protocols and the several analyses based upon the traffic stop and patrol data. The manual also includes thresholds for behavior ranging from failure to arrive on time for work to external complaints. BIO is examining these thresholds to determine why they were set at the present levels. This investigation may result in the modification of thresholds that have proven unproductive over the last several years. Additionally, MCSO is currently investigating threshold levels for the benchmarks for the TSMR outlined in Paragraph 67. As a result, the triggering of alerts for repetitive behavior exceeding several thresholds have been put on hold.

Finally, as noted in Subparagraph 81.a. and 81.b.vi, MCSO should utilize all patrol data to evaluate the behavior of deputies in comparison to their peers. While the volume of Non-Traffic Contact Forms (NTCFs) pales in comparison to traffic stops, there are enough accumulated forms for analyses to commence. As we noted in Paragraph 75, we receive all NTCFs for investigative stops each month. The volume ranges from 15-25 per month. In our review of these interactions, we have noted that they typically involve suspicious behavior, and violations of traffic laws while on bicycles or waterways. These violations are often concentrated in particular locations throughout the County that may make it more likely that minority members are contacted. We have suggested to MCSO that the agency create an analytic method to determine whether there may be trends in activity over time that may require closer examination to eliminate any possibility of bias. Since our July site visit in 2019, we also undertook an evaluation of a random sample of Field Information contacts captured on NTCFs. Our review found a large overlap between civilian contacts labeled as Field Information and those labeled as Investigative Stops. We have engaged MCSO in further discussions clarifying this distinction. Until such time as this is resolved, we will select a combined sample of NTCFs from both categories of civilian interaction. MCSO is currently proposing to investigate how the NTCF forms and policy are being used across the agency. This would be an important first step that could lead to a more thorough analysis looking for potential indications of bias across these stops. We and the Parties continue to engage in discussions with MCSO about these significant issues.

MCSO is not in compliance with this Subparagraph.

WAI 50839

Paragraph 81.c. requires that MCSO's EIS protocols include "MCSO Commander and Supervisor review, on a regular basis, but not less than bimonthly, of EIS reports regarding each officer under the Commander or Supervisor's direct command and, at least quarterly, broader, pattern-based reports."

Supervisory Note inspections include four measures to assess how well supervisors are using EIS information to oversee the activity and behavior of their subordinates: making supervisory comments on deputies; reviewing their body-worn camera footage; making Employee Performance Appraisal (EPA) notations; and reviewing subordinates' EIS profiles. The overall reported compliance average across these criteria by MCSO has remained steady in the mid- to upper 90th percentile for the past year. Our computation of compliance rates is generally slightly lower than those reported by MCSO, as the agency uses a matrix of indicators for inspection, while we evaluate any significant departure from policy as a deficiency for an entire case. Regardless, AIU regularly sends out BIO Action Forms to those Districts with deficiencies noted, no matter the level of compliance. We have also repeatedly requested additional information from MCSO when we encounter an issue of concern and MCSO has always willingly provided the needed information or additional data. Rarely have we noted deficiencies involving the same supervisors in consecutive months. MCSO has already included repetitive BIO Action Form (BAF) deficiencies as an alert allegation. AIU has developed and presented a proposal to better track BAFs by type, individual, and District to ensure that any corrective actions are targeted at the most appropriate level and to be able to determine if there are particular supervisors that appear repeatedly within specified timeframes. It is important to note that in our review of 15 randomly selected alert investigations each month, we have noticed an increase in investigations due to repetitive BAFs. In a response to our request for information following our October 2020 remote site visit, the Captain of BIO indicated via memo that a proposal was being finalized and the tracking study of BAFs was likely to occur when resources allowed. We will evaluate this proposal as it is made available.

MCSO is in compliance with this Subparagraph.

Paragraph 81.d. requires that MCSO's EIS protocols include "a requirement that MCSO Commanders and Supervisors initiate, implement and assess the effectiveness of interventions for individual Deputies, Supervisors, and units, based on assessment of the information contained in the EIS."

The EIS database generates alerts for issues ranging from data entry errors to internal and external complaints; however, many of the potential ongoing alerts are dependent upon the revision of alert thresholds which continue to undergo evaluation by MCSO. From these alerts, EIU personnel send out for investigation those alerts that are not redundant or mischaracterized in some fashion. Supervisors have a set amount of time to return these investigations with a description of their investigation and the outcome. MCSO has created an EIS Alert Review Group (ARG) that evaluates the investigations of supervisors prior to closing an alert. The group ensures that the reports of the supervisors address all aspects of the assigned investigation, and returns those that are deficient to the District for continued revision. Following the creation of the ARG, we have found the supervisors' investigations and summaries to be much more complete and thorough. Over time, the review group's request for additional information has dropped below one third of the investigations evaluated. MCSO has provided us with the original alert

WAI 50840

investigation documents (Attachment B of GH-5 [Early Identification System]), as well as modified ones arising from the ARG's requests. AIU has also created a new inspection for EIS Alert Review Processes. This inspection initially determines whether the investigation was completed within policy timeframes of 30 days. The compliance rate for this quarter ranges from 66% to 90%, although the lower percentage is based on three cases. BIO sent Action Forms to the Districts where supervisors did not complete their investigations within policy guidelines.

MCSO is working to also ascertain whether the interventions undertaken are effective. We will continue to engage MCSO in this evaluation process in accordance with this and other Paragraphs. At present, since there is no mechanism in place to adequately judge the effectiveness of interventions, MCSO is not in compliance with this Subparagraph.

Paragraph 81.e. requires MCSO's EIS protocols to include "identification of a range of intervention options to facilitate an effective response to suspected or identified problems. In any case where a Supervisor believes a Deputy may be engaging in racial profiling, unlawful detentions or arrests, or improper enforcement of Immigration-Related Laws or the early warning protocol is triggered, MCSO shall notify the Monitor and Plaintiffs and take reasonable steps to investigate and closely monitor the situation, and take corrective action to remedy the issue. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or other supervised, monitored, and documented action plans and strategies designed to modify activity. All interventions will be documented in writing and entered into the automated system."

GC-17 (Employee Disciplinary Procedures) and GH-5 (Early Identification System) provide a wide range of options for supervisor interventions, as well as practical guidelines about how to employ those options. As noted above, GH-5 includes Attachment B, "Early Identification Alert Response Form." This form specifies the responsibility of supervisors and serves as a checklist of processes the supervisor should use. EIU also attaches any documents, citations, or BWC recordings the supervisor might need to conduct an inquiry. We began observing the use of these forms in April 2017. Over the past six months, we have found that alert investigations conducted by supervisors has improved. Our inquiries for additional information typically revolve around alert investigations that have been closed as a result of simultaneous PSB inquiries, which take precedent, and/or updates on Action Plans or training recommended by District and EIU personnel.

MCSO has also created an EIS Alert Review Group (ARG) to ensure that the closure of alerts is supported by documentation from supervisors and responsive to the needs of the organization. The number of completed investigations has dropped over the past several months as the ARG has taken a proactive role to communicate with the Districts and individual supervisors about how to effectively complete these investigations. This has meant that when the ARG intervenes, the total time to complete an investigation has increased; however, once complete, these investigations contain sufficient information to support the actions taken by District personnel. We have also worked with MCSO to propose an extension of alert investigation timeframes when documentation issues delay the process. We will evaluate this proposal when it is produced.

MCSO is in compliance with this Subparagraph.

WAI 50841

Paragraph 81.f. requires that MCSO's EIS protocols include "a statement that the decision to order an intervention for an employee or group using EIS data shall include peer group analysis, including consideration of the nature of the employee's assignment, and not solely on the number or percentages of incidents in any category of information recorded in the EIS."

In the development of GH-5 (Early Identification System), MCSO has taken into consideration the nature of the employee's assignment. In prior versions of GH-5, MCSO created an appendix for thresholds that indicated, for example, that the "use of force" threshold was different for Detention and Patrol personnel. Detention personnel are much more likely to need to employ force than their Patrol counterparts. In the current version of GH-5, MCSO refers to thresholds that will be included in the EIU Operations Manual; however, MCSO is evaluating the threshold limits to ensure that they are achieving the goals for which they were originally set. As part of the reevaluation process, MCSO is communicating with other local law enforcement agencies to collect information about current best practices regarding thresholds they employ. As a result, EIU personnel are more closely overseeing repetitive behaviors and have not initiated alert investigations for some threshold levels. When MCSO produces a new threshold appendix, we will evaluate it with regard to this and other portions of the Court Order.

MCSO has also engaged a new outside contractor for analysis of traffic stop data. MCSO proposed and employed an expansion of "peer" comparisons beyond just the location of the traffic stop in the Fourth TSAR. MCSO matched deputies based upon personal and professional characteristics. During the analysis conducted for the Fourth TSAR, a statistical problem arose as the result of these matching characteristics. MCSO overcame this problem, and there were no additional indications of problems in the Fifth TSAR. MCSO is in the midst of planning pilot-testing for the TSMR using these new peer comparison strategies. MCSO will remain out of compliance with this Subparagraph until the TSMR is produced, evaluated, and implemented throughout the organization.

Paragraph 81.g. requires that MCSO's EIS protocols include "a process for prompt review by MCSO Commanders and Supervisors of the EIS records of all Deputies upon transfer to their supervision or command."

MCSO has noted the need for a prompt review in both the "Supervisor Responsibilities" and "Command Staff Responsibilities" sections of GH-5 (Early Identification System). EIU specifically addressed this issue during the EIS and SRELE training completed in November 2017. EIU advised supervisors to document when they conducted their review in Supervisory Notes, as well as how long the deputy had been working in their chain of command when the review was conducted. This was also reiterated in the SRELE training that was approved on September 30, 2019. During our visits to several Districts in 2019 and 2020, MCSO personnel informed us that most command staff attempt to review these materials within the first few days that a deputy, or supervisor, moves to their District. In no cases have we found information where the 14-day limit outlined in policy has been problematic.

MCSO is in compliance with this Subparagraph.

Paragraph 81.h. requires that MCSO's EIS protocols include "an evaluation of whether MCSO Commanders and Supervisors are appropriately using the EIS to enhance effective and ethical policing and reduce risk." EIU has improved the processing and tracking of alert investigations.

WAI 50842

The development of Attachment B to GH-5 (Early Identification System) and training completed in EIS and SRELE has dramatically improved the information provided by supervisors when closing alerts. AIU has also created a new EIS Alert Review Process inspection that specifically looks for indications that supervisors have conducted a thorough examination within appropriate policy timeframes and selected appropriate responses to the allegations included in the alert investigation. At present, this inspection is limited to reviewing whether supervisors are completing alert investigations within the 30-day policy requirements. MCSO's compliance rate for this inspection was below 90% during this quarter. MCSO continues to work on a secondary, but vital, feature of this inspection, which will include criteria to judge the effectiveness of interventions by identifying deputies and supervisors who trigger additional alerts. This inspection will become a valuable component to ensure that supervisors and command staff are using EIS to promote efficiency and ethical policing during the alert investigation process. We found no issues with the conclusions used for closing alert investigations during this quarter. For the cases that were not closed within policy guidelines, BIO sent out Action Forms to the Districts. As this process becomes more routine, we expect that District personnel will adjust to the policy requirements. MCSO has created a Post-Stop Perceived Ethnicity Inspection, which looks specifically at traffic stops where the driver has a traditionally Latino surname but the VSCF indicates a White driver. The inspectors review BWC recordings and evaluate whether the deputy correctly marked the form. Throughout this quarter, the inspection found no deficiencies in the reviews conducted.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.i. requires that MCSO's EIS protocols include "mechanisms to ensure monitored and secure access to the EIS to ensure the integrity, proper use, and appropriate confidentiality of the data."

MCSO has addressed the security and integrity of data in GH-5 (Early Identification System), as well as instituted facility inspections throughout the Districts – including the security of terminals, access to information, and mobile displays. We spot-check technology and security of old forms during each site visit and have found no problems to date. Additionally, on November 6, 2017, MCSO published the operating procedure for System Log Audit Requests; this became effective on November 30, 2017. The procedure outlines how PSB personnel will notify the Technology Management Bureau of any misuse of MCSO information systems allegations and request an audit of the suspected breach. We discussed this operating procedure, BAS SOP 17-4, during our January 2018 site visit meetings; it meets all of the concerns voiced since the February 2017 discovery of two cases where data was compromised, but no one notified the Technology Management Bureau. We believe this procedure has proven effective to this point. In addition, we are provided all internal investigation summaries initiated each month; and found only three instances in which an employee was accused of misusing ACJIS and booking information. Two of these complaints are still under investigation by PSB, and one resulted in a not sustained finding. We will continue to evaluate the effectiveness of MCSO's attention to data integrity.

MCSO is in compliance with this Subparagraph.

WAI 50843

MCSO meets some of the requirements of Paragraph 81, but there remain a variety of activities that are currently ongoing that need to be completed before MCSO will be compliant. These range from the finalization of methods for the TSMR to the completion of revisions to the EIU Operations Manual. AIU has improved the tracking of alert investigations with the creation of the EIS Alert Review Process Inspection; and initiated a preliminary analysis of BIO Action Form tracking. However, each of these is limited because the EIS inspection does not evaluate the effectiveness of interventions; and without an inspection of BAFs over time, MCSO may not be adequately responding to repeated behavior that is difficult to detect with current methods. We have also requested that MCSO devise an audit for the NTCFs that have accumulated over the past two years. We and the Parties remain concerned that we have not noted many instances where supervisors proactively intervene with their subordinates; rather, the supervisors wait until prompted by EIS alerts or the ARG review of completed alert investigations. Command staff have taken a more active role in evaluating the work of supervisors as evidenced by the number of alert investigations returned to supervisors for revision or additional inquiry. MCSO has proposed initiating an evaluation of accumulated NTCFs to examine how the forms and policy are currently being used across the agency. We have provided feedback to this proposal and will evaluate the progression of this methodology as it becomes available. To comply with this and other Paragraphs, however, the methods would also have to be able to statistically indicate whether potential bias might be occurring with regard to how different ethnicities and races are being selected and treated during these encounters. We will continue to evaluate MCSO's progress toward the goals outlined in this Paragraph.

WAI 50844

**COURT ORDER X. SUPERVISION AND EVALUATIONS OF OFFICER PERFORMANCE**

*Paragraph 82. MCSO and the County shall ensure that an adequate number of qualified first-line Supervisors are available to provide the effective supervision necessary to ensure that Deputies are following the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order. First-line Supervisors shall ensure that Deputies are policing actively and effectively, are provided with the instruction necessary to correct mistakes, and are held accountable for misconduct. To achieve these outcomes, MCSO shall undertake the following duties and measures:*

*Paragraph 83. MCSO Supervisors shall provide the effective supervision necessary to direct and guide Deputies. Effective supervision requires that Supervisors: respond to the scene of certain arrests; review each field interview card and incident report; confirm the accuracy and completeness of Deputies' daily activity reports; respond to each Complaint of misconduct; ensure Deputies are working actively to engage the community and increase public trust and safety; provide counseling, redirection, support to Deputies as needed, and are held accountable for performing each of these duties.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

**Phase 2:** In compliance

Due to COVID-19 concerns, we postponed our October 2020 site visit, and therefore we did not conduct any District visits in the third quarter of 2020. Our compliance findings for this reporting period are based on the review of documents submitted as proof of compliance.

We reviewed a sample of 81 Incident Reports for July, for the randomly selected date of July 15. Seventy-nine of 81 Incident Reports were reviewed and memorialized by a supervisor within the required timelines. All of the 11 Arrest Reports received were reviewed and approved by supervisors within the required 72 hours. There were 12 Vehicle Crash Reports submitted in the sample for July, of which 11 included timely documentation of supervisory review. In total, 79 of 81 reports were in compliance, for a compliance rate of 97.53%. We conducted a routine quality review on a 10% random sample of the reports we reviewed and found no significant errors. For July, MCSO reported 63 hours of community policing. This is a considerable decrease from the number of hours MCSO has reported in previous months. We believe this may be a result of revised Patrol protocols due to COVID-19. In our sample reviews of Patrol Activity Logs for the month, we noted one instance where a deputy noted some type of community policing activity. There was no CAD report included, so we could not determine the type of activity that occurred.

WAI 50845

We reviewed all 13 community policing worksheets and noted a total of 5 hours completed, and 23 persons contacted for July. We identified no community policing activities in Aguila or Guadalupe. These are the two areas selected for the first and second phases of stand-alone training with regard to Goals 3 and 5 of the Constitutional Policing Plan (CPP).

We reviewed a representative sample of 98 Incident Reports for August, for the randomly selected date of August 22. Of the 98 Incident Reports, 93 had proper documentation of timely supervisory review. Of the 98 Incident Reports, 15 were vehicle collisions. Of the 15 Vehicle Crash Reports, 13 had documentation that a supervisor had reviewed and approved the reports. The compliance rate for timely supervisory review of Incident Reports in August was 95.88%. No major errors were noted during our quality control review of a sample Incident Reports. Of the 21 Arrest Reports, supervisors reviewed 20 within 72 hours as required. For August, MCSO reported 253 hours of community policing. In our sample reviews of Patrol Activity Logs for August, we noted no community policing events. We reviewed all of the 14 community policing worksheets for August. Deputies reported a total of six hours of community policing, with 509 persons in attendance at community events. A deputy noted one event in the town of Aguila, a drive-by for a child's birthday party.

We reviewed a representative sample of 70 Incident Reports for September, for the randomly selected date of September 12. All of the 70 Incident Reports included documentation that they had been reviewed and approved by supervisors as required by this Paragraph, for a compliance rate of 100%. All of the 20 Arrest Reports had been reviewed and signed by supervisors within the required timeline. There were seven Vehicle Crash Reports submitted in the sample; we confirmed timely supervisory review on all reports. We conducted a quality review of a random sample from the 70 reports reviewed for September and found no significant deficiencies. For September, MCSO reported 385 hours of community policing. In our reviews of Patrol Activity Log samples for September, we did not find any community policing activities reported. For September, we reviewed all 13 community policing worksheets generated for the month. Deputies reported 14.78 hours of community policing, with 991 attendees. Of these 991 attendees, 950 were participants in 911 first responder tributes. We did not note any community policing events in Aguila or Guadalupe.

For each month of the quarter, we selected a supervisor and a squad of deputies from each District. We requested several documents, including Patrol Activity Logs (PALs), for each deputy. We reviewed PALs for each month of the quarter to assess if deputies turned them in by the end of each shift, and if supervisors reviewed each PAL.

For July, we reviewed PALs for 29 deputies and seven supervisors. All 29 deputies' Patrol Activity Logs contained documentation of supervisory review. All seven supervisors' Patrol Activity Logs contained documentation of command-level review. For August, we reviewed Patrol Activity Logs for 28 deputies and seven supervisors. All 28 deputies' PALs contained documentation of supervisory review. All seven supervisors' PALs contained documentation of command-level review. For September, we reviewed Patrol Activity Logs for 33 deputies and seven supervisors. All 33 deputies' PALs contained documentation of supervisory review; all seven sergeants' PALs contained documentation of command-level review. Based on the review of PAL samples selected for July, on a daily basis, deputies completed an average of 0.38 Incident Reports, handled an average of 3.97 calls for service, completed an average of 1.86 self-initiated

WAI 50846

calls, and traveled an average of 92.93 miles. Based on the review of PAL samples selected for August, on a daily basis, deputies completed an average of 0.75 Incident Reports, handled an average of 4.64 calls for service, completed an average of 2.46 self-initiated calls, and traveled an average of 70.71 miles. Based on the review of PAL samples selected for September, on a daily basis, deputies completed an average of 0.97 Incident Reports, handled an average of 5.15 calls for service, completed an average of 2.94 self-initiated calls, and traveled an average of 88.39 miles.

We also reviewed deputies' and supervisors' PALs to determine if supervisors provided on-scene supervision, and if those supervisor-deputy contacts were documented. For the sample dates selected in July, there were 21 supervisor-deputy field contacts reported by deputies and supervisors. For the sample dates selected in August, there were 54 supervisor-deputy field contacts reported by deputies and supervisors. For the sample dates selected in September, there were 26 supervisor-deputy field contacts reported by deputies and supervisors.

For July, August, and September, we reviewed selected samples of non-traffic incidents involving stops and detentions, which were recorded on Non-Traffic Contact Forms (NTCFs). For July, we selected 24 NTCFs for review. All 24 NTCFs had been submitted prior to the end of the shift. All 24 NTCFs were reviewed and approved by supervisors within 72 hours, as required. The compliance rate for timely submission and timely supervisory review of NTCFs in July was 100%. For August, we selected 24 NTCFs to review. All 24 NTCFs were submitted prior to the end of the shift. Twenty-one of the 24 NTCFs were reviewed and approved by supervisors within the required timeframe. The compliance rate for timely submission and timely supervisory review of NTCFs in August was 87.5%. For September, we selected all 23 NTCFs generated, for review. All 23 NTCFs were submitted prior to the end of the shift. Twenty-one of the 23 NTCFs were reviewed and approved by supervisors within the required timeframe. The compliance rate for timely submission and timely supervisory review of NTCFs in September was 91.3%. For this reporting period, compliance with timely submission and timely supervisory review of NTCFs was 92.96%. We assess compliance with this Paragraph, as it relates to NTCFs in conjunction with timely reviews of VSCFs, under Paragraph 90.

Our reviews for this reporting period revealed that in July, of the 24 NTCFs, 21 stops involved White individuals, with a total of 27 White individuals documented in these stops. Three stops involved Latino individuals, with each incident having one individual contacted. Three stops involved Asians or Pacific Islanders. One stop involved an African American individual.

For August, we reviewed 24 NTCFs, of which 17 stops involved White individuals, with a total of 27 White individuals documented in these stops. In one stop, there were eight White individuals contacted in a park. Six stops involved Latinos, with each incident having one individual contacted. One stop involved an African American individual.

WAI 50847

For September, we reviewed 23 NTFCs, of which 15 stops involved White individuals, with a total of 18 White individuals documented in these stops. Three stops involved Latino individuals. Three stops involved African American individuals, with each incident having one individual contacted. White drivers were involved in 53 of the 71 stops, or 74.65%. Latinos were involved in 12 of the 71 stops, or 16.90%. African Americans were involved in five of the 71 stops, or 7%. Asian or Pacific Islanders were involved in three of the 71 stops, or 4%.

**Paragraph 84.** *Within 120 days of the Effective Date, all patrol Deputies shall be assigned to a single, consistent, clearly identified Supervisor. First-line field Supervisors shall be assigned to supervise no more than twelve Deputies.*

**In Full and Effective Compliance**

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the third quarter of 2020. For July, we reviewed a sample of shift rosters from Districts 1, 2, and 3; for August, we reviewed a sample of shift rosters from Districts 4, 6, and 7, and Lake Patrol; and for September, we reviewed a sample of shift rosters from Districts 1, 2, and 3. Our reviews of monthly and daily rosters indicated that deputies were assigned to a single consistent supervisor, and deputies worked the same shifts as their supervisors. For July, there were eight shifts where supervisors exceeded the 1:8 ratio. For each of these shifts where the span of control was exceeded, supervisors wrote memorandums documenting the event. District 1 had two shifts where the span of control was exceeded, and District 2 had six shifts where the span of control was exceeded. For August, there were 12 shifts were supervisors exceeded the 1:8 ratio. Supervisors wrote memorandums documenting each of these events. District 1 had four shifts where the span of control was exceeded, District 2 had seven shifts where the span of control was exceeded, and District 4 had one shift where the span of control was exceeded. For September, there were five shifts were supervisors exceeded the 1:8 ratio. Supervisors wrote memorandums documenting each of these events. All of the shifts where the span of control was exceeded occurred in District 1.

On September 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 85.** *First-line field Supervisors shall be required to discuss individually the stops made by each Deputy they supervise with the respective Deputies no less than one time per month in order to ensure compliance with this Order. This discussion should include, at a minimum, whether the Deputy detained any individuals stopped during the preceding month, the reason for any such detention, and a discussion of any stops that at any point involved any immigration issues.*

**In Full and Effective Compliance**

WAI 50848

To assess MCSO's compliance with this Paragraph, we requested that MCSO provide copies of reports documenting that supervisors are meeting with and discussing individually the stops made by each deputy, at least once per month. We then requested documentation for one randomly selected supervisor from each District, for each month of the reporting period, and the squad of deputies who reports to that supervisor. Supervisors record the discussion of traffic stops by applying the "Discussed with Deputy" option. MCSO documents supervisor-deputy discussions in a spreadsheet, which it submits for inspection. The spreadsheet also documents timely supervisory review of VSCFs. In addition to the spreadsheet, MCSO submits all VSCFs for the month in review. We select a 10% random sample of VSCFs from each District to review for content. We also inspect the sample of VSCFs submitted for review of traffic stops under Paragraphs 25 and 54, as part of compliance with Paragraph 91, to verify if supervisors are addressing deficiencies in the documentation related to the stops.

Paragraph 85 requires that supervisors discuss traffic stops at least once per month with their deputies. To efficiently manage this requirement along with other administrative and operational duties, supervisors generally conduct several traffic stop-related discussions with each deputy during the month. Supervisor-deputy discussions of traffic stops that occurred toward the latter part of the month may not get reviewed until the following month. Our selections for these discussions change every month, so to obtain complete records for each deputy, MCSO holds the submission until all of the information requested for the month is complete. Accordingly, the documentation of supervisory-deputy discussions of traffic stops is submitted 30 days retroactively.

For July, MCSO submitted the June traffic stops for each deputy, by District. The total number of traffic stops for each District was: District 1, 17; District 2, four; District 3, 46; District 4, 29; Lake Patrol, 43; District 6, 27; and District 7, 24. There were a total of 190 traffic-related events for all Districts, and sergeants discussed 187 of these events with the deputies who conducted them, for a compliance rate of 98.42%.

For August, MCSO submitted the July traffic stops for each deputy, by District. The total number of traffic stops for each District were: District 1, 18; District 2, 29; District 3, four; District 4, 27; Lake Patrol, 12; District 6, 126; and District 7, 19. There were a total of 235 traffic-related events for all Districts, and sergeants discussed 234 of these with the deputies that conducted them, for a compliance rate of 99.57%.

For September MCSO submitted the August traffic stops for each deputy, by District. The total number of traffic stops for each District were: District 1, 44; District 2, six; District 3, 57; District 4, 67; Lake Patrol, 49; District 6, 29; and District 7, 35. There were a total of 287 traffic-related events for all Districts, and sergeants discussed all 256 of these events with the deputies who conducted them, for a compliance rate of 89.20%. For this reporting period, there were a total of 712 traffic stops reported. We received documentation that supervisors discussed 677 of these stops with the deputies that conducted them. This is a compliance rate of 95.08%.

On October 5, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 50849

***Paragraph 86.*** *On-duty field Supervisors shall be available throughout their shift to provide adequate on-scene field supervision to Deputies under their direct command and, as needed, to provide Supervisory assistance to other units. Supervisors shall be assigned to and shall actually work the same days and hours as the Deputies they are assigned to supervise, absent exceptional circumstances.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we reviewed a sample of daily shift rosters for the three months of the reporting period. To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the quarter in review. For July, we reviewed a sample of shift rosters from Districts 1, 2, and 3. Our reviews of monthly and daily rosters indicated that deputies were assigned to and worked the same schedules as their supervisors, and supervisors were available to provide on-scene supervision.

MCSO deputies' and sergeants' activities are captured in Patrol Activity Logs (PALs). We selected a random sample of one day per month, and one squad per District, for review. For July we reviewed PALs for seven sergeants and 29 deputies. We noted a total of 21 field supervisor-deputy contacts between the combined deputies' and sergeants' PALs for the selected dates. For August, we requested PALs for 28 deputies and seven sergeants. We received and reviewed all requested PALs, and noted a total of 54 field supervisor-deputy contacts between the combined deputies' and sergeants' PALs for the selected dates. For September, we reviewed PALs for 33 deputies and seven sergeants. We noted a total of 26 field supervisor-deputy contacts between the combined deputies' and sergeants' PALs for the selected dates. We reviewed the monthly shift rosters for each month of the reporting period. Our reviews indicate that supervisors are assigned to work the same hours as the deputies under their supervision. Our reviews of Patrol Activity Logs indicate that supervisors have been available to provide on-scene supervision.

On October 5, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.


***Paragraph 87.*** *MCSO shall hold Commanders and Supervisors directly accountable for the quality and effectiveness of their supervision, including whether commanders and Supervisors identify and effectively respond to misconduct, as part of their performance evaluations and through non-disciplinary corrective action, or through the initiation of formal investigation and the disciplinary process, as appropriate.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

**Phase 2:** Not in compliance

WAI 50850

To assess MCSO's compliance with this Paragraph, we request the names of all deputies and supervisors whose performance appraisals were completed during the reporting period. From the lists of employees submitted, we request a representative sample. The selection of deputies and supervisors whose EPAs are requested is based on the number of requirements set forth in the First and Second Orders. There are a greater number of requirements that supervisory EPAs must address, therefore, a greater number of supervisors' EPAs are reviewed for compliance.

We requested and reviewed performance evaluations submitted for six deputies and nine supervisors whose performance evaluations were completed in July. All six deputy EPAs appropriately addressed the employee's performance; all were in compliance. With regard to our findings on supervisor EPAs, all nine were rated on the quality and effectiveness of supervision. Eight of the nine supervisor EPAs included comments on the supervisor's ability to identify and respond to misconduct. Six of the nine supervisor EPAs appropriately assessed the employees on the quality of their reviews. The EPAs for one captain, one lieutenant, and one sergeant did not properly document the required entries with regard to the quality of reviews of their subordinates' EIS profiles. All supervisor EPAs addressed the quality of reviews of misconduct investigations. All nine supervisor EPAs addressed the requirements of Paragraph 99 with sufficient specificity, including the complaint history and their dispositions, discipline, commendations, awards, civil or administrative claims, lawsuits, training history, assignment and rank history, supervisory actions, and EIS histories. In total, six of the nine supervisor EPAs met all requirements. For July, including both deputy and supervisor EPAs, 12 of 15 EPAs, or 80%, were in compliance.

We requested and reviewed performance evaluations submitted for five deputies and nine supervisors whose EPAs were completed in August. All five deputy EPAs appropriately addressed the employee's performance for the period in review; all were in compliance. All nine supervisor EPAs rated the supervisors on the quality and effectiveness of their supervision. Seven of the nine supervisor EPAs included comments related to the supervisors' ability to identify and respond to misconduct. Six of the nine supervisor EPAs addressed the quality of supervisory reviews. The EPAs for one captain, one lieutenant, and one sergeant did not properly document the required entries with regard to the quality of reviews of their subordinates' EIS profiles. Seven of the nine supervisor EPAs assessed the supervisors' quality of internal investigations and/or the quality of their reviews of internal investigations. One sergeant was not assessed on the quality of his internal investigations, and one captain was not assessed on the quality of his reviews of internal investigations. All 14 EPAs addressed the requirements of Paragraph 99 with sufficient specificity, including complaint histories and the employees' dispositions, discipline, commendations, awards, civil or administrative claims, lawsuits, training history, assignment and rank history, supervisory actions, and EIS histories. In total, six of the nine supervisor EPAs met all requirements. For August, including both deputy and supervisor EPAs, 11 of the 14 EPAs, or 78.57% were in compliance.

We requested and reviewed Employee Performance Appraisals submitted for six deputies and 10 supervisors whose EPAs were completed in September. Five of six deputy EPAs sufficiently addressed all required areas of assessment. We found one deputy EPA where the employee had an open internal misconduct investigation which was not documented in the EPA, and was therefore not in compliance with Paragraph 99. Eight of the 10 supervisor EPAs rated the

WAI 50851

employees on the quality and effectiveness of their supervision, with two supervisors having no direct reports. All 10 supervisor EPAs included comments related to the supervisors' ability to identify and respond to misconduct. All 10 supervisor EPAs addressed the quality of supervisory reviews. All 10 supervisor EPAs addressed the requirements of Paragraph 99 with sufficient specificity, including complaint histories and the employees' dispositions, discipline, commendations, awards, civil or administrative claims, lawsuits, training history, assignment and rank history, supervisory actions, and EIS histories. All eight supervisors who had subordinates were assessed on the quality of their internal affairs investigations and/or the quality of their reviews of internal investigations, as required by Paragraph 176. In total, all of the 10 supervisors' EPAs were in compliance. For September, including both deputy and supervisor EPAs, 15 of 16 EPAs, or 93.75% were in compliance. Of the 45 EPAs reviewed for the third quarter of 2020, 37 were in compliance. The compliance rate for this reporting period was 82.22%.

**Paragraph 88.** *To ensure compliance with the terms of this Order, first-line Supervisors in any Specialized Units enforcing Immigration-Related Laws shall directly supervise the law enforcement activities of new members of the unit for one week by accompanying them in the field, and directly supervise the in-the-field-activities of all members of the unit for at least two weeks every year.*

**In Full and Effective Compliance**

MCSO does not have any specialized units that enforce immigration-related laws. We continue to monitor arrests and detentions as part of our review process to ensure that MCSO is in compliance with its own directives on this issue.

For this reporting period we received lists containing all incidents involving MCSO arrests and criminal citations. For each month, we requested a random sample of arrests and criminal citations. In total, we reviewed 59 incidents involving arrests and 60 incidents involving criminal citations. We also reviewed a random sample of 249 Incident Reports for this reporting period. During our reviews of the documentation provided for this reporting period, we have found no evidence to indicate any violations of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 50852

**Paragraph 89.** *A Deputy shall notify a Supervisor before initiating any immigration status investigation, as discussed in Paragraph 28. Deputies shall also notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration Related Crime, or for any crime related to identity fraud or lack of an identity document. The responding Supervisor shall approve or disapprove the Deputy's investigation or arrest recommendation based on the available information and conformance with MCSO policy. The Supervisor shall take appropriate action to address any deficiencies in Deputies' investigation or arrest recommendations, including releasing the subject, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative investigation.*

## In Full and Effective Compliance

To assess MCSO's compliance with this Paragraph, we requested all reports related to immigration status investigations, any immigration-related crimes, or any incidents or arrests involving lack of identity documents. The Incident Reports requested were for the period in review. Any incident wherein a deputy requests a supervisor's permission to contact Immigration and Customs Enforcement (ICE) or Customs and Border Patrol (CBP) – to ascertain the legal status of an individual involved in a stop, detention, or any incident under investigation by MCSO – falls under the reporting requirements of this request. For this reporting period, there were no reported events that would fall under the requirements of this Paragraph.

For the third quarter of 2020, MCSO submitted one criminal citation that occurred in September. The driver, a Latino, was stopped for a traffic infraction. He did not have a driver's license, registration, or proof of insurance. The driver was cited and released. We noted no issues with this case.

For this reporting period, we received lists noting all incidents involving MCSO arrests and criminal citations. For each month, we requested a random sample of arrests and criminal citations. From each list, we selected a 10% random sample of incidents. In total, we reviewed 59 incidents resulting in arrest and 60 incidents involving criminal citations. In addition, we reviewed 249 Incident Reports for the quarter.

On December 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.


**Paragraph 90.** *MCSO Deputies shall submit documentation of all stops and Investigatory Detentions conducted to their Supervisors by the end of the shift in which the action occurred. Absent exceptional circumstances, within 72 hours of receiving such documentation, a Supervisor shall independently review the information. Supervisors shall review reports and forms for Boilerplate or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct. Appropriate disciplinary action should be taken where Deputies routinely employ Boilerplate or conclusory language.*

WAI 50853

**Phase 1:** In compliance

- EA-11 (Arrest Procedures), most recently amended on May 13, 2020.

**Phase 2:** In compliance

We reviewed 36 incidents involving traffic stops for July 2020. There were 21 stops related to speeding, of which eight resulted in citations and 13 resulted in warnings. There were two stops related to equipment violations. Nine stops were for moving violations other than speeding. Four stops related to registration or license plate violations. Twelve of the stops resulted in citations, and 24 resulted in warnings. All 36 Vehicle Stop Contact Forms we reviewed noted the serial number of the reviewing supervisor, date, and time of supervisory review. All 36 VSCFs were reviewed within the required 72 hours. For July, MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 271 VSCFs. Supervisors reviewed 270 of 271 VSCFs within 72 hours, for a compliance rate of 99.63%.

We reviewed 35 incidents involving traffic stops for August 2020. Twenty-four of the 35 traffic stops related to speeding. Of the 24 stops related to speeding, 12 drivers received citations, and 12 received warnings. One stop related to an equipment violation. Six of the stops involved moving traffic infractions other than speeding. There were four stops related to registration or license plate violations. Of the 35 stops, 14 resulted in citations, and 21 resulted in warnings. Supervisors reviewed all 35 VSCFs within 72 hours. For August, MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 512 VSCFs. Supervisors reviewed 510 of 512 VSCFs within 72 hours, for a compliance rate of 99.60%.

We reviewed 35 incidents involving traffic stops for September 2020. Seventeen of the 35 traffic stops involved speeding violations. Of the 17 stops related to speeding, nine drivers received citations and eight drivers received warnings. Seven stops involved equipment violations. Seven stops involved traffic violations other than speeding. There were four stops related to registration or license plate violations. Of the 35 stops, 13 resulted in citations and 22 resulted in warnings. All 35 Vehicle Stop Contact Forms had timely supervisory reviews. For September, MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 294 VSCFs. We reviewed the data and supervisors reviewed 292 of 294 VSCFs within 72 hours, for a 99.31% compliance rate.

For July August, and September, we reviewed selected samples of non-traffic incidents involving stops and detentions, which were recorded on Non-Traffic Contact Forms (NTCFs). Our assessment of compliance also included reviews of BWC recordings on selected cases, some of which included searches of the individuals detained. For July, we selected 24 NTCFs for review. All 24 NTCFs had been submitted prior to the end of the shift. All of the 24 NTCFs were reviewed and approved by supervisors within 72 hours, as required. The compliance rate for timely submission and timely supervisory review of NTCFs in July was 100%. We reviewed BWC recordings associated with seven incidents and noted no concerns with the stops. For August, we selected 24 NTCFs to review. All 24 NTCFs were submitted prior to the end of the shift. Twenty-one of 24 NTCFs were reviewed and approved by supervisors within the required timeframe. We reviewed BWC recordings associated with six cases and noted no concerns with the stops. For September, we selected 23 NTCFs to review. All NTCFs were turned in before the end of the shift. Twenty-one of 23 NTCFs had supervisory reviews documented within 72 hours. We

WAI 50854

reviewed BWC recordings associated with two incidents and noted no concerns with the stops. For the quarter, 66 of 71 NTCFs reviewed were in compliance with timely supervisory review. The compliance rate was 92.96%.

We take into account all stops and detentions, both traffic and non-traffic, when we determine the compliance rate for this Paragraph. The compliance rate for timely reviews of all combined stops and detentions, from the samples chosen, for this reporting period was 99.13%. For this reporting period, our inspection of the documentation provided has not revealed any evidence of boilerplate or conclusory language, inconsistent or inaccurate information, or lack of articulation, as to the legal basis for stops and detentions.

*Paragraph 91. As part of the Supervisory review, the Supervisor shall document any Investigatory Stops and detentions that appear unsupported by reasonable suspicion or are otherwise in violation of MCSO policy, or stops or detentions that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The Supervisor shall take appropriate action to address all violations or deficiencies in Investigatory Stops or detentions, including recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.*

**Phase 1:** In compliance

- EA-11 (Arrest Procedures), most recently amended on May 13, 2020.
- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on May 28, 2020.
- GF-5 (Incident Report Guidelines), most recently amended on April 30, 2020.

**Phase 2:** In compliance

We reviewed traffic stop data reported by MCSO for its July inspection (BI2020-0089). To determine compliance with this Paragraph, for July, we randomly selected 35 traffic-related events, which BIO then audited for compliance. Of the 35 traffic-related events, MCSO reported that 32 or 91.43%, had no deficiencies. As a result of the inspection, three BIO Action Forms were generated. The first deficiency was attributed to a District 2 deputy. In this stop, the deputy cleared the incident on CAD using the wrong code. The second and third deficiencies were attributed to a deputy in District 6, and a sergeant in District 6. The deputy marked the VSCF as having made no arrest, when the violator was cited criminally and released. The sergeant failed to complete an assisting BWC log. We do not consider any these deficiencies to be of a serious nature, as it relates to the requirements of this Paragraph.

We reviewed a spreadsheet documenting each VSCF by District, for July, to determine if supervisors were reviewing VSCFs within the required 72 hours. We reviewed data for 271 traffic stops, and determined that supervisors had completed timely reviews in 99.63% of the cases. For July, we requested 24 NTCFs from the list that MCSO submitted. We reviewed the NTCFs to determine if supervisors were reviewing them within the required 72 hours. We determined that supervisors had completed timely reviews in 100% of the cases.

WAI 50855

For July, none of the BlueTeam supervisors' corrective actions submitted for our review pertained to the 35 stops selected for the July inspection. For July, we requested a sample of 10 corrective actions generated during the month. Corrective actions are documented on BlueTeam Supervisory Notes. Three corrective actions were associated with inaccurate or missing information on VSCFs, citations, or written warnings. Five corrective actions were taken as a result of procedural or policy violations during traffic stops. One corrective action was associated with a technical failure, and in one corrective action we could not identify a deficiency.

We reviewed traffic stop data reported by MCSO for its August inspection (BI2020-0102). We randomly selected 35 traffic-related events, which BIO then audited for compliance. The inspection report noted that 32 stops, or 91.43%, had no compliance deficiencies. The inspection found compliance deficiencies associated with three stops. All three deficiencies were attributed to District 2 deputies. In the first case, the deputy did not complete an assisting BWC log. In the second case, the deputy cleared the stop using the wrong CAD code. In the third case, the deputy documented the wrong license plate on the VSCF, as well as on the citation. A supervisory review of the documentation associated with this stop should have identified and corrected the error. We consider this a serious deficiency. In the last deficiency identified by the inspection report, the deputy failed to introduce himself when he first approached the violator during the stop.

We reviewed a spreadsheet documenting each VSCF by District, for August, to determine if supervisors were reviewing VSCFs within the required 72 hours. We reviewed 512 VSCFs and determined that supervisors had completed timely reviews in 510 of 512 stops, or in 99.60% of the cases. From the list submitted by MCSO, we requested all 24 NTCFs that were generated in August. We inspected the NTCFs to determine if supervisors were reviewing them within the required 72 hours. We determined that supervisors had completed timely reviews in 91.30% of the cases.

For August, we requested a list of corrective actions. From the list submitted, we selected 10 corrective actions to review. Two corrective actions were associated with inaccurate or missing information on the VSCF, citation, or written warning. Five corrective actions were associated with procedural or policy violations during traffic stops. One corrective action pertained to a policy or procedure violation not associated with a traffic stop. Two corrective actions were associated with technical failures. There were no BlueTeam notes for corrective actions submitted pertaining to the 35 stops selected for August.

We reviewed traffic stop data reported by MCSO for its September inspection (BI2020-0114). We randomly selected 35 traffic-related events, which BIO then audited for compliance. The inspection report noted that 27 stops, or 77.14%, had no compliance deficiencies. The first three deficiencies occurred in District 1. In the first stop, the deputy documented no additional deputies on the scene on the VSCF, when there was one other deputy involved in the stop. In the second stop, the deputy failed to tow the violator's vehicle as required by policy. In the third deficiency, the deputy conducted an improper search of the violator's vehicle. We believe this deficiency was serious and should have been addressed by the deputy's supervisor. The fourth deficiency was attributed to a District 4 deputy who misidentified an Asian male driver as White in the written warning and VSCF. The fifth deficiency was also attributed to a District 4 deputy who failed to complete an assisting BWC log for the traffic stop. The sixth deficiency was attributed

WAI 50856

to a deputy from District 6 who conducted an inventory search of the vehicle, prior to towing, and did not note this in the documentation submitted. The deputy also cleared the incident with the wrong CAD code. These errors were serious and should have been addressed by the supervisor reviewing the documentation. The seventh deficiency was attributed to another District 6 deputy who failed to document an additional deputy on the scene of the traffic stop. The eighth deficiency occurred in Lake Patrol where the same deputy failed to complete an assisting BWC log, and failed to provide incidental contact forms to two individuals involved in the stop. We consider the failure to provide incidental contact forms a serious deficiency which should have been identified and addressed by the supervisor. In total, three of the eight stops had deficiencies that should have been identified and addressed by supervisors, and therefore did not meet the requirements of this Paragraph.

For September, we requested a list of corrective actions. From the list submitted, we selected a sample of 10 corrective actions to review for the month. Of the 10 corrective actions, two were associated with body-worn camera and recording issues: failure to activate the BWC; late activation of the BWC; turning off the camera before the event was concluded; or poor positioning of the BWC. Two corrective actions were associated with inaccurate or missing information on VSCFs, citations, or written warnings. Four corrective actions were associated with procedural or policy violations involving traffic stops. One corrective action was associated with a technical failure, and one corrective action was related to deputy safety. There were no BlueTeam notes for corrective actions pertaining to the 35 stops selected for September.

We reviewed a spreadsheet documenting each VSCF by District, for September to determine if supervisors were reviewing VSCFs within the required 72 hours. We reviewed 287 VSCFs and determined that supervisors had completed timely reviews in 256 VSCFs, or in 89.20% of the cases. For September, we requested all 23 NTCFs generated by Patrol deputies. We reviewed all 23 NTCFs to determine if supervisors were reviewing NTCFs within the required 72 hours. We determined that supervisors had completed timely reviews in 21 of 23 cases, which is 91.30%.

Paragraph 90 requires timely supervisory reviews of documentation pertaining to stops and detentions. Paragraph 91 requires supervisors to identify policy violations, deficiencies, and training issues noted in stops and detentions. Of the sample of 105 stops inspected for this reporting period, there were serious deficiencies and policy violations that occurred in four stops, that supervisors failed to identify and address in their reviews. The compliance rate for Paragraph 91 for this reporting period was 96.19%.


***Paragraph 92.*** *Supervisors shall use EIS to track each subordinate's violations or deficiencies in Investigatory Stops or detentions and the corrective actions taken, in order to identify Deputies needing repeated corrective action. Supervisors shall notify IA. The Supervisor shall ensure that each violation or deficiency is documented in the Deputy's performance evaluations. The quality and completeness of these Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations. MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct complete, thorough, and accurate reviews of Deputies' stops and Investigatory Detentions.*

WAI 50857

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

**Phase 2:** Not in compliance

To determine compliance, we will review the EIS and IAPro histories for each of the employees whose EPAs were selected for review under Paragraph 87. We will then review the information to determine if all violations, deficiencies, PSB investigations, and corrective actions taken pertaining to stops and detentions, which were listed in the employee's EIS and IAPro resumes, were accurately documented in the employee's EPA. Failure to identify and memorialize any issues and actions taken as noted in the employee's EIS and IAPro resumes, reflects on the quality of the supervisor's reviews. By reviewing EIS and IAPro resumes, we will also be able to identify if a deputy has repeated entries of any specific violations, and if subsequent actions taken to correct the issue have been documented in the employee's EPA. For applicable supervisors' EPAs, in addition to the above metric, we will review comments made in reference to the quality of supervisory reviews to ensure that the rater has specific comments addressing this Paragraph's requirements. Both of these requirements must be met for compliance. Deficiencies in quality of EIS reviews, by supervisors, will also reflect in our assessment of compliance for Paragraph 100. In order to ensure fairness to the agency, when we assess compliance with this Paragraph, we also try look at the performance appraisal as a whole to determine if the intent and spirit of the Paragraph under review was captured.

For July, we reviewed six deputy EPAs and nine supervisor EPAs. All six deputy EPAs reviewed were in compliance. We found three supervisor EPAs where the quality of EIS reviews pertaining to stops and detentions was not sufficiently and specifically documented to meet the requirements of this Paragraph. For August, we reviewed five deputy EPAs and nine supervisor EPAs. All five deputy EPAs were in compliance. During our reviews, we found three supervisor EPAs where the quality of EIS reviews pertaining to stops and detentions was not sufficiently and specifically documented to meet the requirements of this Paragraph. For September, we reviewed six deputy EPAs and 10 supervisor EPAs. All deputy EPAs were in compliance. All supervisor EPAs were in compliance. For this quarter, all of the 17 deputy EPAs were in compliance with this Paragraph. Of the 28 supervisor EPAs reviewed for compliance with the requirements of this Paragraph, 22 were in compliance. A total of 39 of 45 EPAs met the requirements of this Paragraph. The compliance rate was 86.67%.

***Paragraph 93.*** *Absent extraordinary circumstances, MCSO Deputies shall complete all incident reports before the end of shift. MCSO field Supervisors shall review incident reports and shall memorialize their review of incident reports within 72 hours of an arrest, absent exceptional circumstances.*

**In Full and Effective Compliance**

We reviewed a representative sample of 81 Incident Reports for July**,** for the randomly selected date of July 15. Of the 81 Incident Reports, we verified documentation of timely supervisory review on 79. Of the 81 Incident Reports, 12 were vehicle collisions. Of the 12 Vehicle Crash Reports, 11 had documentation that a supervisor had reviewed and approved the reports. The

WAI 50858

compliance rate for timely supervisory review of Incident Reports in July was 97.53%. During our quality control review of Incident Reports, we found no significant issues. Of the 11 Arrest Reports, supervisors reviewed all of them within 72 hours as required.

We reviewed a sample of 98 Incident Reports for August, for the randomly selected date of August 22. Ninety-four of the 98 reports were in compliance. Twenty of the 21 Arrest Reports were reviewed and approved within the required 72 hours. There were 15 Vehicle Crash Reports submitted in the sample for August, of which 13 included documentation of supervisory review. The compliance rate for timely submission and review of Incident Reports in August was 95.88%. We conducted a quality review on a 10% random sample of the reports we reviewed, and noted no issues of concern.

We reviewed a representative sample of 70 Incident Reports for September, for the randomly selected date of September 12. All Incident Reports were submitted before the end of the shift. All of the 70 Incident Reports included documentation that they had been reviewed and approved by supervisors as required by this Paragraph, for a compliance rate of 100%. There were 20 Arrest Reports, and all were reviewed and approved by supervisors within the required 72 hours. There were seven Vehicle Crash Reports submitted in the September sample; we confirmed timely supervisory review on all crash reports. We conducted a quality review on a 10% random sample of the reports submitted and found no significant deficiencies.

On March 17, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

***Paragraph 94.*** *As part of the Supervisory review, the Supervisor shall document any arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The Supervisor shall take appropriate action to address violations or deficiencies in making arrests, including notification of prosecuting authorities, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.*

**Phase 1:** In compliance

- EA-11 (Arrest Procedures), most recently amended on May 13, 2020.
- GF-5 (Incident Report Guidelines), most recently amended on April 30, 2020.

**Phase 2:** Not in compliance

To assess compliance with this Paragraph, we will request a list of bookings and criminal citations for the period in review. We will randomly select a sample of 20 bookings and 20 criminal citations, which BIO will then inspect for compliance. In addition, MCSO will review all cases involving immigration arrests, and arrests related to lack of identity documents. MCSO will also review all MCAO turndowns for lack of probable cause, and submit those for our review. The total of cases selected per month will not to exceed 60. We will review Incident Report Inspection reports as part of the documentation to determine compliance with Paragraphs 94 and 96. The

WAI 50859

BIO inspection will review the selected cases, which are retroactive two months. We review the Incident Report Inspection Report and its corresponding Inspection Matrix for each month of the reporting period. Some inspection points in the matrix are given stronger consideration in our reviews than others, as these are fundamental requirements of Paragraph 94; if deficiencies are noted, they may also impact the successful conclusion of the case. In all the cases described below, we relied on the BIO inspector's notations and observations to determine our findings.

For July, we reviewed Incident Report Inspection, BI2020-0069. We selected 20 bookings and 20 criminal citations, which BIO then inspected for compliance. There were no immigration-related arrests, and no cases involving identity theft investigations reported by MCSO. There were no County Attorney turndowns for lack of probable cause. The inspection resulted in a 98.86% compliance rating. We reviewed the inspection report, which noted six deficient cases; and reviewed the matrix used by BIO for the inspection. We determined that there were two cases where the inspector noted deficiencies that fall within the purview of this Paragraph. There were other cases where deficiencies or violations of policy occurred. However, we did not consider these to have any debilitating effect on the cases. We consider two cases noted in our July review as not being in compliance with the requirement that supervisors conduct thorough reviews and identify arrests that are unsupported by probable cause, or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training. The first case was a domestic violence arrest for assault with a deadly weapon. A mallet was used in the assault, and it was seized as evidence and placed into property. The inspector could not find the mallet listed on any property receipt. This error could affect chain of custody for the evidence in this case. The second case involved a stop where the deputy failed to articulate probable cause or reasonable suspicion for detaining and running a check on the subject, who was eventually arrested. The Incident Report and Form 4 charging document lacked articulation with regard to a witness who observed and reported the criminal activity that was used as justification to detain the individual. The BIO matrix noted that there was not a proper investigation, and the report did not articulate reasonable suspicion or probable cause for the initial detention. We determined that the supervisor should have identified and corrected the listed deficiencies. There were no Incident Memorialization Forms generated by the chain of command for the period in review. MCSO submitted seven BIO Action Forms for deficiencies identified in this inspection.

For August, we reviewed Incident Report Inspection, BI2020-0085. We selected 20 bookings and 20 criminal citations, which BIO then inspected for compliance. There were no immigration-related arrests, no cases involving identity theft investigations, and no County Attorney turndowns for lack of probable cause. The BIO inspection listed five incidents where deficiencies were noted.

We reviewed the matrix used by BIO for their inspection and noted that five of the 40 cases had deficiencies that fall within the purview of this Paragraph. We consider these five cases as noncompliant. The first case was related to a traffic stop of an individual suspected of possession of narcotics. The inspector noted that the initial report and supplement had inconsistent information on the location and movement of the vehicle. The second case involved a disorderly conduct/fighting arrest. The inspector noted that the suspect was questioned about the incident after being detained in handcuffs, without *Miranda* warnings. The third case was an assault with

WAI 50860

a deadly weapon; the report lacked documentation for the time when the suspect invoked his right to remain silent and his right to an attorney. The report also lacked articulation of the probable cause for the charges. The fourth case involved an assault committed by a juvenile offender; the deputy submitted the charging document to the wrong court. The fifth case was a trespassing arrest where the report did not articulate the elements of the crime, as required by state statute.

For September, we reviewed Incident Report Inspection, BI2020-0098. We selected 19 bookings and 20 criminal citations, which BIO then inspected for compliance. MCSO did not submit any information regarding immigration-related arrests, cases involving identity theft investigations, and County Attorney turndowns for lack of probable cause. The BIO Inspection Report noted deficiencies in four cases. We reviewed the matrix used by BIO for their inspection and noted that three of the 39 cases had deficiencies that fall within the purview of this Paragraph. We consider these cases noncompliant. The first case involved an assault. The inspector noted that the report did not articulate that there were injuries to the victim. In addition, the assault charges were not supported in the report. The inspector also noted the report lacked details about the assault. The second case was an arrest where the suspect was not handcuffed because he was on crutches; the suspect was searched and questioned without *Miranda* warnings. The legality of the search then became an issue. The third case was an assault where the charging document submitted to County Attorney did not articulate any injuries to the victim, a statutory requirement for the charge.

In our last quarterly status report, we noted that MCSO reported that there were 11 Incident Memorialization Forms (IMFs) in processing. There were no Incident Memorialization Forms submitted for July, August, or September. There were 119 cases selected for inspection during this quarter; we determined that 10 were not in compliance. Of the 119 cases selected for inspection, 109, or 91.60%, were determined to be in compliance.

***Paragraph 95.*** *Supervisors shall use EIS to track each subordinate's violations or deficiencies in the arrests and the corrective actions taken, in order to identify Deputies needing repeated corrective action. The Supervisor shall ensure that each violation or deficiency is noted in the Deputy's performance evaluations. The quality of these supervisory reviews shall be taken into account in the Supervisor's own performance evaluations, promotions, or internal transfers. MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct reviews of adequate and consistent quality.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

**Phase 2:** Not in compliance

WAI 50861

There are two primary areas of assessment for this Paragraph. The first is to determine if supervisors are tracking subordinates' deficiencies and violations in arrests, and accurately documenting these issues along with corrective actions in employees' EPAs. In addition, repeated corrective actions should be addressed in EPAs. The second is to determine if the quality of supervisory reviews of EIS are being addressed in supervisors' EPAs. The quality and effectiveness of interventions, as a result of deficiencies pertaining to stops and detentions, is a requirement which we assess under Paragraph 97.

To determine compliance, we will review the EIS and IAPro histories for each of the employees whose EPAs were selected for review under Paragraph 87. We will then review the information to determine if all violations, deficiencies, IA investigations, and corrective actions taken pertaining to arrests, which were listed in the employee's EIS and IAPro resumes, were accurately documented in the employee's EPA. Failure to identify and memorialize any issues and actions taken as noted in the employee's EIS and IAPro resumes, reflects on the quality of the supervisor's quality of reviews. By reviewing EIS and IAPro resumes, we will also be able to identify if a deputy has repeated entries of any specific violations, and if subsequent actions taken to correct the issue have been documented in the employee's EPA. For applicable supervisors' EPAs, in addition to the above metric, we will review comments made in reference to the quality of supervisory reviews to ensure that the rater has specific comments addressing this Paragraph's requirements. Both of these requirements must be met for compliance. Deficiencies in quality of EIS reviews by supervisors will also reflect in our assessment of compliance for Paragraph 100. In order to ensure fairness to the agency, when we assess compliance with this Paragraph, we also try look at the performance appraisal as a whole to determine if the intent and spirit of the Paragraph under review was captured.

For July, we reviewed six deputy EPAs and nine supervisor EPAs. All six deputy EPAs reviewed were in compliance. We found three supervisor EPAs where the quality of EIS reviews pertaining to arrests was not sufficiently and specifically documented to meet the requirements of this Paragraph. For August, we reviewed five deputy EPAs and nine supervisor EPAs. All five deputy EPAs were in compliance. During our reviews, we found three supervisor EPAs where the quality of EIS reviews pertaining to arrests was not sufficiently and specifically documented to meet the requirements of this Paragraph. For September, we reviewed six deputy EPAs and 10 supervisor EPAs. All deputy EPAs were in compliance. All supervisor EPAs were in compliance. For the period in review, all of the 17 deputy EPAs reviewed were in compliance with this Paragraph. Of the 28 supervisor EPAs reviewed, 22 were in compliance. A total of 39 of 45 EPAs met the requirements of this Paragraph. The compliance rate was 86.67%. In our last quarterly status report, we issued a compliance warning and noted that commanders must ensure that the quality of EIS reviews pertaining to violations and deficiencies in arrests, and corrective actions taken, must be sufficiently and specifically addressed. For this reporting period, MCSO was not in compliance with the requirements of this Paragraph.

WAI 50862

*Paragraph 96. A command-level official shall review, in writing, all Supervisory reviews related to arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The commander's review shall be completed within 14 days of receiving the document reporting the event. The commander shall evaluate the corrective action and recommendations in the Supervisor's written report and ensure that all appropriate corrective action is taken.*

**Phase 1:** In compliance

- EA-11 (Arrest Procedures), most recently amended on May 13, 2020.

**Phase 2:** Not in compliance

This Paragraph requires that a command-level official review a supervisor's investigation of the circumstances pertaining to any arrest that lacks probable cause, is in violation of policy, or where there is a need for corrective action or review of the agency's policy, strategy, tactics, or training.

Our reviews to determine compliance with this Paragraph are associated with the documentation provided for Paragraph 94. If BIO identifies deficient cases in the Incident Report inspection, and the deficiencies fall within any of the four areas noted in Paragraphs 94 and 96, we will review the documentation to determine compliance. Since this Paragraph pertains to command reviews of supervisory investigations of deficient arrests, we will also review Incident Memorialization Forms to determine compliance. Our reviews for compliance with this Paragraph are determined by the command staff's timely reviews of IMFs, once submitted by supervisors, and commanders' evaluation of the corrective actions taken.

There were no Incident Memorialization Forms (IMFs) submitted for this quarter. In several of our previous quarterly status reports, we have documented our concerns with the low number of IMFs completed by Patrol supervisors and commanders. The absence of IMFs, in our estimation, is not conclusive evidence that violations and deficiencies are not occurring in arrests. In fact, BIO findings indicate the opposite. As evidenced in BIO inspection findings for the quarter, there were a number of issues identified in arrests during this reporting period. All of these deficiencies were identified by BIO, not by Patrol supervisors reviewing Arrest Reports. In April, MCSO reported that there were 11 IMFs in processing. None of these have been completed and submitted for our review. In past submissions for this Paragraph, MCSO has advised us of any IMFs that are still in processing. MCSO did not indicate if there were any additional IMFs in processing for this quarter. Our concern with the timely completion of IMFs is not only about prompt identification and correction of issues to ensure a successful prosecution, but also the timeliness of the corrective actions taken so that deputies do not repeat the same mistakes. Commanders have 14 days to complete reviews of their supervisors' reviews of arrests that have deficiencies outlined in this Paragraph's requirements. It is unlikely that commanders are unaware of the deficiencies in arrests that were identified in April. Yet, we have not been able to confirm that these reviews have been completed in a timely manner several months after the violations and deficiencies were first identified. In our last quarterly status report, we noted that MCSO submitted four IMFs, of which three, or 75%, were in compliance. We issued a warning that if MCSO did not meet this Paragraph's requirements for this quarter, compliance would be withdrawn.

WAI 50863

In consideration of our concerns with IMFs, and in addition to deficiencies identified in arrests in BIO inspections during this quarter, MCSO is not in compliance with this Paragraph for this reporting period.

**Paragraph 97.** *MCSO Commanders and Supervisors shall periodically review the EIS reports and information, and initiate, implement, or assess the effectiveness of interventions for individual Deputies, Supervisors, and units based on that review. The obligations of MCSO Commanders and Supervisors in that regard are described above in Paragraphs 81(c)–(h).*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on May 6, 2020.

**Phase 2:** Not in compliance

As per GH-5 (Early Identification System) and GB-2 (Command Responsibility), supervisors are required to conduct EIS reviews twice per month for sworn members. Command review of EIS profiles of supervisory and command personnel began in February 2017. To assess MCSO's compliance with this Paragraph, for every month of the reporting period, we selected a supervisor and a squad of deputies from each District. We then reviewed the documentation provided as verification of compliance with this Paragraph. We also requested that EIS reviews of the commanders responsible for the selected personnel be included. The purpose of conducting EIS reviews is for supervisors to oversee the performance of subordinates and implement and assess necessary interventions. In previous discussions, we have advised MCSO that EIS reviews should be thorough, and completed within a timeframe that allows supervisors to effectively monitor subordinates. MCSO informed us that supervisors would be advised that EIS reviews should be conducted to coincide with pay periods, or approximately every 14 days. While we understand that this exact timeframe may not be feasible for all reviews, we are concerned that EIS reviews conducted within relatively close proximity do not address the intent of this Paragraph, and are being completed perfunctorily to meet policy requirements.

For July, we reviewed the documentation provided for 56 employees – which included the ranks of deputy, sergeant, lieutenant, and captain. Of the 56 employees, 50 had the required two EIS reviews in the month, for an 89.29% compliance rate. For August, we reviewed Supervisory Notes requested as verification of compliance for 50 employees. Of the 50 selected employees, all had appropriate documentation of timely EIS reviews, for a compliance rate of 100%. For September, we received Supervisory Notes as verification of compliance of EIS reviews for the selected 58 employees. Of the 58 employees, 50 had appropriate documentation of compliance with this Paragraph, for a compliance rate of 86.20%. Our reviews for September noted one deputy with no entries, one deputy with two EIS reviews within three days, two deputies with EIS reviews within two days, and four deputies with two EIS reviews on the same day. The EIS reviews conducted for seven of the eight deputies were all completed at the end of the month; and at most, three days after the first review. The timing of these reviews indicates that EIS profiles were not looked at for the first 27 days of the month. Each of these secondary reviews appear to have been solely for satisfying the requirement of two reviews per month. These reviews were of little or no value and failed to meet the requirements of this Paragraph.

WAI 50864

The total compliance rate for the quarter, for periodic supervisory and command EIS reviews, was 91.56%. The reviews of broader pattern-based reports, as required by Paragraph 81.c., and assessments of interventions as required by this Paragraph, have not been sufficiently documented to meet compliance with this Paragraph.

### d. Regular Employee Performance Review and Evaluations

***Paragraph 98.*** *MCSO, in consultation with the Monitor, shall create a system for regular employee performance evaluations that, among other things, track each officer's past performance to determine whether the officer has demonstrated a pattern of behavior prohibited by MCSO policy or this Order.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

**Phase 2:** Not in compliance

To assess compliance with this Paragraph, we review a sample of deputy and supervisor EPAs selected on a monthly basis under Paragraph 87. There are several Paragraphs in the First and Second Orders that have requirements pertaining to the assessment and documentation of performance in Employee Performance Appraisals. Supervisors are also required to identify and track the performance of deputies who have patterns of behavior prohibited by the Order and MCSO policy. Paragraphs 92 and 95 also require assessment of the quality of EIS supervisory reviews. The revised methodologies for Paragraphs 92 and 95 are explained in detail in our reviews of these two Paragraphs.

In our reviews of EPAs for this quarter, we again found performance dimensions related to supervisory EPAs that are not being addressed with enough consistency to establish compliance in those areas. The areas of weakness continue to be the assessment of supervisor effectiveness in identifying and responding to misconduct; the assessment of supervisors' quality of misconduct investigations and command reviews of misconduct investigations; and assessment of the quality of EIS reviews and documentation of deficiencies found in stops, detentions, and arrests. For this reporting period, of the 45 EPAs reviewed, 37 were in compliance. The compliance rate for this reporting period was 82.22%. During our October remote site visit, we addressed these deficiencies with MCSO. In addition. we reiterated the importance of addressing these issues in the next EPA training.

***Paragraph 99.*** *The review shall take into consideration all past Complaint investigations; the results of all investigations; Discipline, if any, resulting from the investigation; citizen Complaints and commendation; awards; civil or administrative claims and lawsuits related to MCSO operations; Training history; assignment and rank history; and past Supervisory actions taken pursuant to the early warning protocol.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

WAI 50865

**Phase 2:** In compliance

To determine compliance with this Paragraph, we review the statement, signed by the supervisor at the conclusion of the EPA, as acknowledgement that the supervisor has done due diligence in researching and documenting the employee's history for the review period, as it pertains to the requirements of Paragraph 99. The areas of review include: complaint investigations and dispositions; discipline; citizen complaints; commendations; awards; civil or administrative claims; and past supervisory actions taken pursuant to EIS alerts. We also verify documentation to ensure that the information provided under Paragraph 99 is accurate. Supervisors completing EPAs are required to document their findings relevant to these areas if their reviews reveal any applicable events or actions. The acknowledgement indicates that if something was discovered, it is included in the appropriate areas of the appraisal. As confirmation, we review EIS and IAPro resumes for each employee whose EPA we received during the quarter, under Paragraphs 87, 92, and 95. We review these resumes and compare them to the notations listed by the supervisor authoring the EPA, under Paragraph 99. We verify that any past actions noted in the resumes are captured in the EPA. We have previously emphasized to MCSO the importance of accurate documentation and thorough reviews of EIS.

In the EPAs reviewed for this quarter, supervisors have documented their findings as it pertains to complaints, discipline, commendations, awards, claims, and supervisory actions with enough consistency to meet the requirements of this Paragraph. For this reporting period, we reviewed Employee Performance Appraisals for 17 deputies and 28 supervisors. We found one deputy EPA where the employee had an open internal misconduct investigation which was not documented in the EPA, and was therefore not in compliance with Paragraph 99. Forty-four of 45 EPAs (97.78%) reviewed sufficiently documented the requirements of this Paragraph.

***Paragraph 100.*** *The quality of Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

**Phase 2:** Not in compliance

We reviewed Employee Performance Appraisals for 28 supervisors and commanders who received EPAs during this reporting period. We previously noted that the requirements of Paragraphs 92 and 95, the quality of supervisory reviews of EIS, is taken into account in the assessment of compliance with this Paragraph. Twenty-four of the 28 supervisor EPAs sufficiently documented the quality of EIS reviews to meet compliance. The quality of reviews of supervisors' misconduct investigations, as per Paragraph 176, is also figured into the assessment of compliance for this Paragraph. For this reporting period, 26 of 28 supervisor EPAs met compliance standards for Paragraph 176. When the compliance results of all related Paragraphs were factored in, 24 of 28 EPAs addressed the requirements of this Paragraph, as it pertains to the quality of supervisory reviews. Since MCSO had previously been in compliance with this Paragraph, in our last quarterly status report we issued a warning for noncompliance. For this reporting period, MCSO is not in compliance with the requirements of this Paragraph.

WAI 50866

***Paragraph 101.*** *Within 180 days of the Effective Date, MCSO shall develop and implement eligibility criteria for assignment to Specialized Units enforcing Immigration-Related Laws. Such criteria and procedures shall emphasize the individual's integrity, good judgment, and demonstrated capacity to carry out the mission of each Specialized Unit in a constitutional, lawful, and bias-free manner. Deputies assigned to a Specialized Unit who are unable to maintain eligibility shall be immediately re-assigned.*

## In Full and Effective Compliance

MCSO does not have any specialized units that enforce immigration-related laws. Therefore, by default, MCSO is in Phase 2 compliance with this Paragraph. We continue to monitor arrests and detentions as part of our review process to ensure that MCSO is in compliance with its own directives on this issue.

For July, August, and September, we received lists containing all incidents involving MCSO arrests and criminal citations. For each month, we requested a random sample of arrests and criminal citations. In total, we reviewed 59 incidents involving arrests and 60 incidents involving criminal citations. We also reviewed a random sample of 249 Incident Reports for this reporting period. During our reviews of the documentation provided for this reporting period, we found no evidence to indicate any violations of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with the Monitor's determination.

WAI 50867

**COURT ORDER XI. MISCONDUCT AND COMPLAINTS**

### a. Internally-Discovered Violations

***Paragraph 102.*** *MCSO shall require all personnel to report without delay alleged or apparent misconduct by other MCSO Personnel to a Supervisor or directly to IA that reasonably appears to constitute: (i) a violation of MCSO policy or this Order; (ii) an intentional failure to complete data collection or other paperwork requirements required by MCSO policy or this Order; (iii) an act of retaliation for complying with any MCSO policy; (iv) or an intentional provision of false information in an administrative investigation or any official report, log or electronic transmittal of information. Failure to voluntarily report or document apparent misconduct described in this Paragraph shall be an offense subject to Discipline.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on July 30, 2020.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on January 24, 2019.

- CP-5 (Truthfulness), most recently amended on September 11, 2020.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

- GC-16 (Employee Grievance Procedures), most recently amended on April 7, 2020.

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

**Phase 2:** In compliance

During our assessments of compliance with this Paragraph, we have reviewed hundreds of misconduct investigations involving MCSO personnel. Many of them have been internally generated.

During this reporting period, we reviewed 146 administrative misconduct investigations. Sixty-seven were generated internally. Twenty-three involved identified sworn personnel, 20 involved identified Detention personnel, and three involved identified civilian personnel. The remaining 21 internally generated investigations were deaths that occurred within MCSO jails where no principal was identified.

MCSO has continued to identify and address misconduct that is raised by other employees or identified by supervisory personnel. While some of these investigations did not meet all requirements for the proper reporting or completion of misconduct investigations, we address these failures in other Paragraphs in this report.

WAI 50868

### b. Audit Checks

**Paragraph 103.** *Within one year of the Effective Date, MCSO shall develop a plan for conducting regular, targeted, and random integrity audit checks to identify and investigate Deputies possibly engaging in improper behavior, including: Discriminatory Policing; unlawful detentions and arrests; improper enforcement of Immigration-Related Laws; and failure to report misconduct.*

**Phase 1:**  In compliance

- Audits and Inspections Unit Operations Manual, Section 303, published on August 27, 2020.
- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on April 30, 2020.

**Phase 2:**  Not in compliance

MCSO's Audits and Inspections Unit (AIU), a unit of the Bureau of Internal Oversight (BIO), is responsible for these requirements. During this reporting period, on August 27, 2020, AIU published a section (Section 303) of the AIU Operations Manual that outlines AIU's fulfilment of the "targeted" Paragraph 103 requirements.

For this reporting period, BIO again submitted several completed inspections in support of the "regular" and "random" elements of this Paragraph. The inspections examined, for example, complaint intake tests, Supervisory Notes, Patrol Activity Logs, traffic stop data, post-stop ethnicity, County Attorney turndown dispositions, and Patrol Shift Rosters. We reviewed these reports and believe that they comport with the Paragraph 103 requirement for "regular" and "random" integrity audit checks.

Now that the relevant section of the AIU Operations Manual has been published, AIU has reported that it plans to begin "targeted" integrity testing during the last quarter of this year.

### c. Complaint Tracking and Investigations

**Paragraph 104.** *Subject to applicable laws, MCSO shall require Deputies to cooperate with administrative investigations, including appearing for an interview when requested by an investigator and providing all requested documents and evidence. Supervisors shall be notified when a Deputy under their supervision is summoned as part of an administrative investigation and shall facilitate the Deputy's appearance, absent extraordinary and documented circumstances.*

**In Full and Effective Compliance**

WAI 50869

In the fall of 2015, MCSO developed a draft checklist and investigative format for administrative investigations. All the requirements in this Paragraph are included in these protocols. The checklist and formats were approved for use in early 2016, and all personnel through the rank of captain were required to attend a training session regarding the use of these forms. Effective June 1, 2016, all administrative investigations were required to use these forms. MCSO has consistently met this requirement, and MCSO has included the checklists in administrative investigations forwarded for our review.

Since that time, the Professional Standards Bureau (PSB) drafted revisions to the investigation checklist and format to provide additional clarification on procedural requirements. We and the Parties reviewed the revisions and provided our feedback. The revised format and investigation checklist were approved for use. The Misconduct Investigative Training for personnel outside of PSB also now includes a discussion of the revisions to these forms.

During the last reporting period, we reviewed 65 administrative misconduct investigations. Thirty-five involved sworn personnel. All 65 were in compliance with the requirements of this Paragraph.

During this reporting period, we reviewed 146 administrative misconduct investigations. Eighty-two involved sworn personnel. All but two were both initiated and completed after July 20, 2016 and included the use of the approved investigative format and checklist. We continue to note that deputies consistently appear for scheduled interviews, provide all required information to investigators, and cooperate with investigations. There were no instances identified where a supervisor failed to facilitate a deputy's attendance at an interview. There were three instances (4%) where there was no indication in the report that the investigator had notified the employee's supervisor of an intended administrative interview. As is our practice, we will discuss these three investigations with PSB during our next site visit.

On March 17, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.


***Paragraph 105.*** *Investigators shall have access to, and take into account as appropriate, the collected traffic stop and patrol data, Training records, Discipline history, and any past Complaints and performance evaluations of involved officers.*

**In Full and Effective Compliance**

Our reviews of investigations conducted by MCSO have verified that the information required for compliance with this Paragraph is consistently provided in the checklist and investigative reports.

As a result of the Second Order and effective July 20, 2016, the PSB Commander makes all preliminary disciplinary decisions. The PSB and Administrative Services Division Commanders created a worksheet that provides information regarding how MCSO makes disciplinary decisions, and how MCSO considers employees' work history. PSB includes this form in the sustained investigation documentation that we receive and review for compliance.

WAI 50870

During this reporting period, we reviewed 38 sustained administrative misconduct investigations. Nineteen of these 38 cases involved misconduct by sworn personnel. Seventeen involved misconduct by Detention personnel, and two involved misconduct by civilian employees. Twenty-nine of the 38 investigations involved personnel still employed by MCSO at the time final findings or discipline decisions were made. In all 29, the PSB Commander determined the findings and presumptive discipline range for the sustained violations. In all but one case we found these preliminary decisions to be consistent with the Discipline Matrices in effect at the time the decisions were made. We also found that generally, where appropriate, discipline history, past complaints, performance evaluations, traffic stop and patrol data, and training records were included in the documents considered for final discipline findings.

On October 5, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

***Paragraph 106.*** *Records of Complaints and investigations shall be maintained and made available, un-redacted, to the Monitor and Plaintiffs' representatives upon request. The Monitor and Plaintiffs' representatives shall maintain the confidentiality of any information therein that is not public record. Disclosure of records of pending investigations shall be consistent with state law.*

## In Full and Effective Compliance

MCSO has two obligations under this Paragraph: to maintain and make records available. The Paragraph also covers the requirement that MCSO make unredacted records of such investigations available to the Plaintiffs' attorneys and Plaintiff-Intervenors as well.

MCSO has been responsive to our requests, and neither the Plaintiffs nor Plaintiff-Intervenors have raised any concerns related to the requirements of this Paragraph for this or the past several reporting periods. MCSO, via its counsel, distributes responses to our document and site visit requests via a document-sharing website. The Plaintiffs' attorneys and Plaintiff-Intervenors have access to this information, including documents applicable to this Paragraph, at the same time as we do.

On June 3, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 50871

**COURT ORDER XII.  COMMUNITY ENGAGEMENT**

*a. Community Outreach Program*

***Paragraph 107.*** *To rebuild public confidence and trust in the MCSO and in the reform process, the MCSO shall work to improve community relationships and engage constructively with the community during the time that this order is in place.  To this end, the MCSO shall conduct the following district community outreach program.*

***Paragraph 109.*** *The Monitor shall hold at least one public meeting per quarter to coincide with the quarterly site visits by the Monitor in a location convenient to the Plaintiffs class.  The meetings shall be for the purpose of reporting the MCSO' progress in implementing this Order. These meetings shall be used to inform community members of the policy changes or other significant actions that the MCSO has taken to implement the provisions of this Order. Summaries of audits and reports completed by the MCSO pursuant to this Order shall be made available.  The meetings shall be under the direction of the Monitor and/or his designee.  The Sheriff and/or the MCSO will participate in the meetings to provide substantive comments related to the Melendres case and the implementation of the orders resulting from it, as well as answer questions related to its implementation, if requested to do so by the Monitor or the community.  If the Sheriff is unable to attend a meeting due to other obligations, he shall notify the Monitor at least 30 days prior to that meeting.  The Monitor shall consult with Plaintiffs' representatives and the Community Advisory Board on the location and content of the meetings.  The Monitor shall clarify for the public at these meetings that MCSO does not enforce immigration laws except to the extent that it is enforcing Arizona and federal criminal laws.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

This Paragraph, per the June 3, 2019 Order (Document 2431), returned the community meetings to the Monitor's supervision and directed the Monitor to hold at least one public meeting per quarter to coincide with the quarterly site visits by the Monitor in a location convenient to the Plaintiffs' class.

We did not travel to Maricopa County in October for our in-person quarterly site visit due to the COVID-19 pandemic.  We will consult with Plaintiffs' representatives or the Community Advisory Board regarding the location and content of our community meetings when we resume our in-person site visits.

WAI 50872

***Paragraph 110.*** *The meetings present an opportunity for the Monitor and MCSO representatives to listen to community members' experiences and concerns about MCSO practices. The Monitor may investigate and respond to those concerns. The Monitor shall inform the public that the purpose of the meeting is to discuss the Melendres case and the orders implementing the relief of that case. To the extent that the Monitor receives concerns at such meetings that are neither within the scope of this order nor useful in determining the Defendant's compliance with this order, it may inform the complainant how to file an appropriate complaint with the MCSO or appropriate law enforcement agency. The Sheriff may respond to non-Melendres questions raised at meetings to the extent, in his sole discretion, if the Sheriff wishes to do so.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

As noted above, we did not travel to Maricopa County in October for an in-person quarterly site visit, and therefore did not hold a community meeting.


***Paragraph 111.*** *English and Spanish-speaking Monitor Personnel shall attend these meetings and be available to answer questions from the public about its publicly available reports concerning MCSO's implementation of this Order and other publicly available information. The Plaintiffs' and Plaintiff-Intervenor's representatives shall be invited to attend and the Monitor shall announce their presence and state their availability to answer questions.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

As noted above, we did not travel to Maricopa County in October for an in-person quarterly site visit, and therefore did not hold a community meeting.


***Paragraph 112.*** *At least ten days before such meetings, the Monitor shall widely publicize the meetings in English and Spanish after consulting with Plaintiffs' representatives and the Community Advisory Board regarding advertising methods. Options for advertising include, but are not limited to, television, radio, print media, internet and social media, and any other means available. Defendants shall either provide a place for such meetings that is acceptable to the Monitor or pay the Monitor the necessary expenses incurred in arranging for such meeting places. The Defendants shall also pay the reasonable expenses of publicizing the meetings as required above, and the additional reasonable personnel and expenses that the Monitor will incur as a result of performing his obligations with respect to the Community Outreach Program. If any party determines there is little interest or participation in such meetings among community members, or that they have otherwise fulfilled their purpose, it can file a request with the Court that this requirement be revised or eliminated.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

WAI 50873

As we did not travel to Maricopa County in October, we did not hold a community meeting. We will consult with Plaintiffs' representatives and the Community Advisory Board regarding community meeting advertising when we resume our in-person site visits.

### b. MCSO Community Liaison

*Paragraph 113. MCSO shall select or hire a Community Liaison who is fluent in English and Spanish. The hours and contact information of the MCSO Community Outreach Division ("COD") shall be made available to the public including on the MCSO website. The COD shall be directly available to the public for communications and questions regarding the MCSO.*

**Phase 1:** In compliance

- GJ-24 (Community Relations and Youth Programs), most recently revised on November 14, 2019.

**Phase 2:** In compliance

This Paragraph requires that MCSO select or hire a Community Liaison who is fluent in English and Spanish; and that MCSO post on its public website the hours and contact information of the Community Outreach Division (COrD), which is responsible for public communications and questions regarding MCSO.

MCSO has a Community Liaison who is fluent in English and Spanish and lists on the MCSO website the hours and contact information for the Community Liaison Officer and other members of the COrD. The MCSO website includes information about the COrD – such as its mission and frequently asked questions regarding MCSO.

*Paragraph 114. The COD shall have the following duties in relation to community engagement:*

*a.     to coordinate the district community meetings described above in Paragraphs 109 to 112;*

*b.     to provide administrative support for, coordinate and attend meetings of the Community Advisory Board described in Paragraphs 117 to 118; and*

*c.     to compile any complaints, concerns and suggestions submitted to the COD by members of the public about the implementation of this Order and the Court's order of December 23, 2011, and its findings of fact and conclusions of law dated May 24, 2013, even if they don't rise to the level of requiring formal action by IA or other component of the MCSO, and to respond to Complainants' concerns; and*

*d.     to communicate concerns received from the community at regular meetings with the Monitor and MCSO leadership.*

**Phase 1:** In compliance

- Court Implementation Division Operations Manual, most recently revised on November 13, 2019.

WAI 50874

- GJ-24 (Community Relations and Youth Programs), most recently revised on November 14, 2019.

**Phase 2:** In compliance

Pursuant to the June 3, 2019 Order (Document 2431), Subparagraphs a. and b. of this Paragraph are no longer applicable.

During this reporting period, the Deputy Chief designated as the CAB's point of contact continued to work with and provide support to the CAB. He distributed policies and other materials for CAB members to review and provide feedback, and tracked and responded to CAB members' inquiries and requests for information about MCSO's implementation of the Orders.

During this reporting period, the CAB did not hold any public meetings. Some CAB members participated in a few of the Monitoring Team's compliance meetings during our October remote site visit, as in the past – including meetings on community engagement, complaint intake testing and integrity testing, and MCSO's Constitutional Policing Plan.

COrD uses a form it created for capturing information on complaints, concerns, and suggestions submitted by members of the public to the COrD. MCSO has provided documentation that all current COrD personnel completed an online Complaint Intake and Processing course, to assist them in receiving and appropriately directing any complaints or concerns from community members they receive, including complaints of potential employee misconduct.

COrD personnel report that they occasionally receive concerns from community members, and that they forward those that are complaints to PSB, and that they sometimes receive inquiries for which COrD staff believe it is appropriate to direct community members to written materials or the MCSO website. During this reporting period, COrD did not submit any MCSO Complaint and Comment Forms for our review. COrD personnel wrote, "[T]he Community Outreach Division received no complaints, concerns or suggestions by members of the public regarding implementation of the Court's Orders. Therefore, the Community Outreach Division prepared no response."

During our upcoming site visit, we will discuss with COrD personnel any complaints, concerns, and suggestions it has received from the public; as well as the requirement that COrD communicate concerns received from the community at regular meetings with the Monitor and MCSO leadership.

WAI 50875

### c. Community Advisory Board

*Paragraph 115. MCSO and Plaintiffs' representatives shall work with community representatives to create a Community Advisory Board ("CAB") to facilitate regular dialogue between the MCSO and the community, and to provide specific recommendations to MCSO and the Monitor about policies and practices that will increase community trust and ensure that the provisions of this Order and other orders entered by the Court in this matter are met. The MCSO shall cooperate with the Monitor to assure that members of the CAB are given appropriate access to relevant material, documents, and training so the CAB can make informed recommendations and commentaries to the Monitor.*

**Phase 1:** In compliance

- Court Implementation Division Operations Manual, most recently revised on November 13, 2019.

**Phase 2:** In compliance

During this reporting period, CAB members and representatives of MCSO – specifically, the Deputy Chief who is the CAB's designated point of contact – exchanged numerous email messages, which we also received. In these messages, among other topics, CAB members provided specific recommendations to MCSO about policies and practices that will increase community trust and ensure that the provisions of this Order and other Orders entered by the Court in this matter are met. During this reporting period, the CAB provided feedback on the draft version of the History of Discrimination Training video, as well as the 17-question survey that MCSO plans to administer to selected individuals who have been involved in traffic stops.

During the last few reporting periods, we have noted some delays in MCSO's responsiveness to CAB members' requests for information; and also some instances where CAB members provided feedback to MCSO and MCSO did not acknowledge receipt. We raised this concern with MCSO during our last two remote site visits, and it appears that this has improved recently. We will continue to monitor MCSO's responsiveness to the CAB. MCSO should ensure that it responds to CAB members in a timely fashion to maintain compliance with this Paragraph.


*Paragraph 116. The CAB shall have five members, two to be selected by MCSO and two to be selected by Plaintiffs' representatives. One member shall be jointly selected by MCSO and Plaintiffs' representatives. Members of the CAB shall not be MCSO Employees or any of the named class representatives nor any of the attorneys involved in this case. The CAB shall continue for at least the length of this Order.*

**Phase 1:** In compliance

- Court Implementation Division Operations Manual, most recently revised on November 13, 2019.

**Phase 2:** In compliance

The CAB is a five-member body – with two members selected by MCSO, two members selected by Plaintiffs' attorneys, and one member jointly selected by MCSO and Plaintiffs' attorneys.

WAI 50876

The CAB currently has five members; none are MCSO employees, named class representatives, or attorneys involved in this case.

**Paragraph 117.** *The CAB shall hold meetings at regular intervals. The meetings may be either public or private as the purpose of the meeting dictates, at the election of the CAB. The Defendants shall provide a suitable place for such meetings. The Monitor shall coordinate the meetings and communicate with CAB members, and provide administrative support for the CAB.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

During this reporting period, the CAB did not hold any public meetings, but the CAB increased some of its other activities. CAB members met regularly as a group, often with members of the Monitoring Team, and also met with the Sheriff to discuss their concerns with the findings of the most recent Traffic Stop Annual Report (TSAR). In addition, during our October remote site visit, some CAB members participated in a few of our compliance meetings. In our regular meetings with CAB members via conference calls and virtual meetings, we have provided information and discussed ways to improve the relationship between the Plaintiffs' class and MCSO.

**Paragraph 118.** *During the meetings of the CAB, members will relay or gather concerns from the community about MCSO practices that may violate the provisions of this Order and the Court's previous injunctive orders entered in this matter and transmit them to the Monitor and the MCSO for investigation and/or action. The Parties will also be given the CAB's reports and recommendations to the Monitor.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

As noted above, during this reporting period, the CAB did not hold any public meetings. As in the past, some CAB members participated in a few of our compliance meetings during our October remote site visit.

During this reporting period, we requested from MCSO documentation of concerns received from the CAB during their meetings about MCSO practices that may be in violation of the Court's Orders that were transmitted to the MCSO for investigation and/or action. According to MCSO, during this reporting period, "[T]he Community Outreach Division received no documentations of concerns from the CAB concerning MCSO practices that may be in violation of the Court's Orders, which were transmitted for investigation and/or action."

WAI 50877

**COURT ORDER XV. MISCONDUCT INVESTIGATIONS, DISCIPLINE, AND GRIEVANCES**

*Paragraph 163. The Sheriff will ensure that all allegations of employee misconduct, whether internally discovered or based on a civilian complaint, are fully, fairly, and efficiently investigated; that all investigative findings are supported by the appropriate standard of proof and documented in writing; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair, consistent, unbiased and provides due process. To achieve these outcomes, the Sheriff shall implement the requirements set out below.*

*A. Policies Regarding Misconduct Investigations, Discipline, and Grievances*

*Paragraph 165. Within one month of the entry of this Order, the Sheriff shall conduct a comprehensive review of all policies, procedures, manuals, and other written directives related to misconduct investigations, employee discipline, and grievances, and shall provide to the Monitor and Plaintiffs new policies and procedures or revise existing policies and procedures. The new or revised policies and procedures that shall be provided shall incorporate all of the requirements of this Order. If there are any provisions as to which the parties do not agree, they will expeditiously confer and attempt to resolve their disagreements. To the extent that the parties cannot agree on any proposed revisions, those matters shall be submitted to the Court for resolution within three months of the date of the entry of this Order. Any party who delays the approval by insisting on provisions that are contrary to this Order is subject to sanction.*

**Phase 1:** Not applicable

**Phase 2:** Deferred

MCSO provided us with the following:

- CP-2 (Code of Conduct), most recently amended on July 30, 2020.
- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on January 24, 2019.
- CP-5 (Truthfulness), most recently amended on September 11, 2020.
- CP-8 (Preventing Racial and Other Bias-Based Profiling), most recently amended on September 4, 2020.
- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.
- EA-2 (Patrol Vehicles), most recently revised on June 30, 2020.
- GA-1 (Development of Written Orders), most recently amended on February 19, 2020.

WAI 50878

- GB-2 (Command Responsibility), most recently amended on June 28, 2019.

- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

- GC-7 (Transfer of Personnel), most recently amended on December 4, 2019.

- GC-11 (Employee Probationary Periods), most recently amended on April 22, 2020.

- GC-12 (Hiring and Promotional Procedures), most recently amended on July 23, 2020.

- GC-16 (Employee Grievance Procedures), most recently amended on April 7, 2020.

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on October 1, 2020.

- GE-4 (Use, Assignment, and Operation of Vehicles), most recently amended on June 25, 2020.

- GG-1 (Peace Officer Training Administration), most recently amended on February 26, 2020.

- GG-2 (Detention/Civilian Training Administration), most recently amended on February 26, 2020.

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on April 30, 2020.

- GH-5 (Early Identification System), most recently amended on May 6, 2020.

- GI-5 (Voiance Language Services), most recently amended on January 4, 2019.

- GJ-24 (Community Relations and Youth Programs), most recently revised on November 14, 2019.

- GJ-26 (Sheriff's Reserve Deputy Program), most recently amended on June 5, 2020.

- GJ-27 (Sheriff's Posse Program), most recently amended on June 19, 2020.

- GJ-35 (Body-Worn Cameras), most recently amended on December 31, 2019.

- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

- Audits and Inspections Unit Operations Manual, currently under revision.

- Body-Worn Camera Operations Manual, published on December 22, 2016.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

- Training Division Operations Manual, most recently amended on March 9, 2020.

WAI 50879

We received a majority of the documents listed above within one month of the entry of the Order. We and the Parties conducted initial reviews and returned the revised documents, with additional recommendations, to MCSO for additional work. MCSO continues to revise the remaining policies and operations manuals related to misconduct investigations, the Sheriff's Posse Program, Audits and Inspections, and Training. Those remaining policies and operations manuals identified by MCSO were in some phase of review by us and the Parties at the end of this reporting period.

This Paragraph implies that the review process and final adoption of the updated policies would take two months to complete, assuming that the new or revised policies were provided within one month of the issuance of the Second Order. The sheer volume of policies, as well as the extensive modifications they contain, rendered that target date unachievable. This is due, in large measure, to researched and well-considered recommendations by the Parties; and robust discussion about policy language, application, and outcomes during our site visit meetings.

**Paragraph 166.** *Such policies shall apply to all misconduct investigations of MCSO personnel.*

**Paragraph 167.** *The policies shall include the following provisions:*

a. *Conflicts of interest in internal affairs investigations or in those assigned by the MCSO to hold hearings and make disciplinary decisions shall be prohibited. This provision requires the following:*

    i. *No employee who was involved in an incident shall be involved in or review a misconduct investigation arising out of the incident.*

    ii. *No employee who has an external business relationship or close personal relationship with a principal or witness in a misconduct investigation may investigate the misconduct. No such person may make any disciplinary decisions with respect to the misconduct including the determination of any grievance or appeal arising from any discipline.*

    iii. *No employee shall be involved in an investigation, whether criminal or administrative, or make any disciplinary decisions with respect to any persons who are superior in rank and in their chain of command. Thus, investigations of the Chief Deputy's conduct, whether civil or criminal, must be referred to an outside authority. Any outside authority retained by the MCSO must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest.*

b. *If an internal affairs investigator or a commander who is responsible for making disciplinary findings or determining discipline has knowledge of a conflict of interest affecting his or her involvement, he or she should immediately inform the Commander of the Professional Standards Bureau or, if the holder of that office also suffers from a conflict, the highest-ranking, non-conflicted chief-level officer at MCSO or, if there is no non-conflicted chief-level officer at MCSO, an outside authority. Any outside authority*

WAI 50880

retained by the MCSO must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest.

c.  Investigations into an employee's alleged untruthfulness can be initiated by the Commander of the Professional Standards Bureau or the Chief Deputy. All decisions not to investigate alleged untruthfulness must be documented in writing.

d.  Any MCSO employee who observes or becomes aware of any act of misconduct by another employee shall, as soon as practicable, report the incident to a Supervisor or directly to the Professional Standards Bureau. During any period in which a Monitor is appointed to oversee any operations of the MCSO, any employee may, without retaliation, report acts of alleged misconduct directly to the Monitor.

e.  Where an act of misconduct is reported to a Supervisor, the Supervisor shall immediately document and report the information to the Professional Standards Bureau.

f.  Failure to report an act of misconduct shall be considered misconduct and may result in disciplinary or corrective action, up to and including termination. The presumptive discipline for a failure to report such allegations may be commensurate with the presumptive discipline for the underlying misconduct.

g.  No MCSO employee with a rank lower than Sergeant will conduct an investigation at the District level.

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on July 30, 2020.
- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on January 24, 2019.
- CP-5 (Truthfulness), most recently amended on September 11, 2020.
- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.
- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- GC-16 (Employee Grievance Procedures), most recently amended on April 7, 2020.
- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.
- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we review administrative misconduct investigations.

WAI 50881

During this reporting period, we reviewed 146 closed administrative misconduct investigations. Sworn or Detention personnel assigned to the Professional Standards Bureau (PSB) conducted 88 of the investigations. Sworn supervisors in Districts or Divisions outside of PSB conducted the remaining 58.

Paragraph 167.a.i-iii. prohibits any employee with any conflicts of interest from participating in, holding hearings on, or making any disciplinary decisions in a misconduct investigation. During this reporting period, there was one instance where a conflict of interest existed with a District supervisor who conducted the investigation. This was identified and addressed by PSB during its review of the investigation.

Paragraph 167.b. requires that if the internal affairs investigator or a commander responsible for making disciplinary decisions identifies a conflict of interest, appropriate notifications must be made immediately. As noted in the above Subparagraph, there was one instance where a supervisor failed to identify a conflict of interest and inappropriately conducted an investigation. This was identified and addressed by PSB during its review of the investigation.

Paragraph 167.c. requires that investigations into truthfulness be initiated by the Chief Deputy or the PSB Commander. MCSO identified five instances during this reporting period where they believed a truthfulness allegation was appropriate and initiated the proper investigation. We did not identify any instances during this reporting period where we believe a truthfulness investigation should have been initiated and was not.

Paragraph 167.d. requires that any MCSO employee who observes or becomes aware of misconduct by another employee shall immediately report such conduct to a supervisor or directly to PSB. Per the requirement, during the period in which the Monitor has authority to oversee any operations of MCSO, any employee may also report alleged misconduct to the Monitor. Of the 146 administrative cases we reviewed for this reporting period, there were 39 investigations where an employee reported potential misconduct by another employee, or a supervisor identified potential employee misconduct. There were no instances identified where an employee failed to immediately report potential misconduct about which he had been notified.

Paragraph 167.e. requires that when supervisors learn of an act of misconduct, the supervisor shall immediately document and report the information to PSB. There were no instances where a supervisor failed to immediately report and document alleged misconduct by another employee.

Paragraph 167.f. provides for the potential for a disciplinary sanction or other corrective action if an employee fails to bring forth an act of misconduct. During this reporting period, there were no instances where an employee failed to immediately complete the proper documentation to notify PSB of potential misconduct.

Paragraph 167.g. requires that a sergeant or higher-ranking employee conduct all misconduct investigations conducted at the District level. All District-level cases that we reviewed for this reporting period complied with this requirement.

WAI 50882

***Paragraph 168.*** *All forms of reprisal, discouragement, intimidation, coercion, or adverse action against any person, civilian, or employee because that person reports misconduct, attempts to make or makes a misconduct complaint in good faith, or cooperates with an investigation of misconduct constitute retaliation and are strictly prohibited. This also includes reports of misconduct made directly to the Monitor, during any period in which a Monitor is appointed to oversee any operations of the MCSO.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on July 30, 2020.
- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on January 24, 2019.
- CP-5 (Truthfulness), most recently amended on September 11, 2020.
- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.
- GC-16 (Employee Grievance Procedures), most recently amended on April 7, 2020.
- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.
- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 146 administrative misconduct investigations that were completed during this reporting period.

During this reporting period, there was one investigation where an employee alleged that another employee had filed a complaint against him because of his cooperation in a separate administrative misconduct investigation. PSB conducted an administrative investigation, and we concur with PSB's findings of unfounded.


***Paragraph 169.*** *Retaliating against any person who reports or investigates alleged misconduct shall be considered a serious offense and shall result in discipline, up to and including termination.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on July 30, 2020.
- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on January 24, 2019.
- CP-5 (Truthfulness), most recently amended on September 11, 2020.
- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

WAI 50883

- GC-16 (Employee Grievance Procedures), most recently amended on April 7, 2020.

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 146 administrative misconduct investigations that were completed during this reporting period.

As noted in Paragraph 168, an employee filed a complaint alleging retaliation due to his having cooperated with a separate misconduct. investigation. The allegation was appropriately unfounded.


***Paragraph 170.*** *The Sheriff shall investigate all complaints and allegations of misconduct, including third-party and anonymous complaints and allegations. Employees as well as civilians shall be permitted to make misconduct allegations anonymously.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 146 completed administrative misconduct investigations submitted during this reporting period. Seventy-nine were initiated as a result of external complaints, and 67 were internally generated. We also reviewed 28 criminal investigations, all of which were generated internally.

Of the 146 administrative misconduct investigations we reviewed for this reporting period, two involved externally generated anonymous complaints. Two others were third-party complaints. None of the criminal misconduct investigations we reviewed during this reporting period were generated due to an anonymous or third-party complaint. We have not become aware of any evidence that indicates that MCSO refused to accept and complete any investigations initiated by third-party or anonymous complainants. None of the 146 administrative misconduct investigations we reviewed during this reporting period included any allegations indicating that any third-party or anonymous complaint was not appropriately accepted and investigated.

WAI 50884

***Paragraph 171.*** *The MCSO will not terminate an administrative investigation solely on the basis that the complainant seeks to withdraw the complaint, or is unavailable, unwilling, or unable to cooperate with an investigation, or because the principal resigns or retires to avoid discipline. The MCSO will continue the investigation and reach a finding, where possible, based on the evidence and investigatory procedures and techniques available.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 146 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

We determined that 12 of the 146 completed administrative investigations involved complainants who sought to withdraw their complaints; or were unavailable, unwilling, or unable to cooperate. MCSO completed all 12 investigations and reached a finding as required. We also found that in 12 of the 146 investigations, the principal left MCSO employment prior to the finalization of the investigation or discipline process. MCSO completed all these investigations and reached a finding. None of the 146 investigations we evaluated for compliance were prematurely terminated.

***Paragraph 172.*** *Employees are required to provide all relevant evidence and information in their custody and control to internal affairs investigators. Intentionally withholding evidence or information from an internal affairs investigator shall result in discipline.*

**Phase 1:** In compliance

- CP-5 (Truthfulness), most recently amended on September 11, 2020.
- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.
- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph during this reporting period, we reviewed 146 completed administrative misconduct investigations conducted by MCSO personnel. There were no investigations identified by MCSO or our Team where an employee failed to accurately provide all information or evidence required during the investigation.

WAI 50885

***Paragraph 173.*** *Any employee who is named as a principal in an ongoing investigation of serious misconduct shall be presumptively ineligible for hire or promotion during the pendency of the investigation. The Sheriff and/or the MCSO shall provide a written justification for hiring or promoting an employee or applicant who is a principal in an ongoing investigation of serious misconduct. This written justification shall be included in the employee's employment file and, during the period that the MCSO is subject to Monitor oversight, provided to the Monitor.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

- GC-11 (Employee Probationary Periods), most recently amended on April 22, 2020.

- GC-12 (Hiring and Promotional Procedures), most recently amended on July 23, 2020.

**Phase 2:** In compliance

MCSO has established a protocol to address the requirements of this Paragraph. When a promotion list is established for sworn or Detention personnel, a copy of the list is forwarded to the Professional Standards Bureau (PSB). Before any promotion is finalized, PSB conducts a check of each employee's disciplinary profile in the automated system (IAPro). As part of the promotional process, MCSO conducts a meeting with command staff to discuss each employee's qualifications. During this meeting, the results of the IAPro checks are provided to the staff for review and consideration. The PSB Commander generally attends the promotion meetings for both Detention and sworn personnel, and clarifies any questions regarding the disciplinary history that the staff may have. When an employee is moved from a civilian employment position to a sworn employment position, MCSO conducts a thorough background investigation. The process involves a review and update of the candidate's PSB files, which is completed by Pre-Employment Services. For Detention employees who are moving to sworn positions, the information in the employee's file is updated to include any revised or new information. Due to the scheduling of our site visits, we inspect personnel files for employees who were promoted during the last month of the preceding quarter, and the first two months of the current reporting period. In our reviews, we ensure that the documentation, as it pertains to compliance with this Paragraph, is included in personnel files.

For this quarter, MCSO reported one promotion that would fall under the reporting requirements of this Paragraph. We reviewed documentation for one Detention Command officer who was promoted in August. The command officer has had an open PSB investigation since 2017. He was one of 18 principals in the investigation, and had a sustained allegation of minor misconduct in 2001. He also had four commendations and a higher award. MCSO noted that the allegations on the open case would likely not be sustained. We reviewed the documentation provided and found no issues of concern.

As we postponed our in-person October remote site visit, we were unable to review employee personnel files. When we resume our in-person site visits, we will follow up on these cases to ensure that the appropriate documentation is included in each employee file.

WAI 50886

***Paragraph 174.*** *Employees' and applicants' disciplinary history shall be considered in all hiring, promotion, and transfer decisions, and this consideration shall be documented. Employees and applicants whose disciplinary history demonstrates multiple sustained allegations of misconduct, or one sustained allegation of a Category 6 or Category 7 offense from MCSO's disciplinary matrices, shall be presumptively ineligible for hire or promotion. MCSO shall provide a written justification for hiring or promoting an employee or applicant who has a history demonstrating multiple sustained allegations of misconduct or a sustained Category 6 or Category 7 offense. This written justification shall be included in the employee's employment file and, during the period that the MCSO is subject to Monitor oversight, provided to the Monitor.*

**Phase 1:** In compliance

- GC-12 (Hiring and Promotional Procedures), most recently amended on July 23, 2020.

**Phase 2:** In compliance

For employees who are promoted, the documentation submitted by MCSO generally includes the disciplinary history for the previous 10 years and any applicable disciplinary actions. MCSO also provides the disciplinary history of Detention and civilian employees who have been upgraded in classification to sworn status.

For July and September, MCSO reported no new hires. For August, MCSO reported hiring one new employee, a Detention officer. We reviewed the documentation MCSO provided and noted no issues of concern. We reviewed documentation for 11 promotions during the review period. The employees promoted included sworn, Detention, and civilian employees.

We reviewed documentation for two civilian promotions in July. One of the employees had a sustained allegation of misconduct in 2014, but this was not involving serious misconduct. We reviewed documentation for one Detention command officer and four Detention first-line supervisors promoted in August. The Command Officer has had an open PSB investigation since 2017. He was one of 18 principals in the investigation. The employee had a sustained allegation of minor misconduct in 2001, as well as four commendations and a higher award. MCSO noted that the allegations on the open case would likely not be sustained. We reviewed the documentation MCSO provided and found no issues of concern. One first-line supervisor promoted had a written reprimand in 2017, and a letter of instruction in 2014. We reviewed the documentation MCSO provided and noted no issues of concern. The remaining three supervisors promoted did not have any record of discipline. We also reviewed the documentation for three civilians promoted in August; none had any record of discipline. For September, we reviewed the documentation provided for two civilian promotions. One was a promotion to an executive position in Information Technology; the other was a promotion to Communications dispatcher. Neither had any record of discipline. We reviewed the documentation and noted no issues of concern. MCSO remains in compliance with this Paragraph.

Due to the postponement of our in-person site visit, we were unable to review personnel files to verify the information provided. We will resume inspection of employee files during our next onsite visit.

WAI 50887

***Paragraph 175.*** *As soon as practicable, commanders shall review the disciplinary history of all employees who are transferred to their command.*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on May 6, 2020.

- GC-7 (Transfer of Personnel), most recently amended on December 4, 2019.

**Phase 2:** In compliance

Per policy, MCSO is to conduct an EIS review within 14 days of an affected employee's transfer. We requested a list of employees that were transferred during this reporting period. From the list, we selected a sample of employees to review and verify that there was documentation of the required EIS reviews. To verify compliance with this Paragraph, we review the transfer request documents that MCSO completes for each employee. The documents memorialize the commander's acknowledgment of review of the transferred employee's disciplinary history, as well as the review of the employee's performance appraisals for the previous five years. This review is generally conducted before the gaining commander accepts the transfer, a few days prior to the transfer becoming effective.

For July, we requested a list of employees who were transferred during the previous month. MCSO submitted a list, and we selected a sample of 13 employees who would fall under the requirements of this Paragraph. The list we requested was comprised of 13 Detention employees. Of the 13 employees requested, all had proper documentation of command review of their EIS profiles. The compliance rate for July was 100%.

For August, we requested a list of employees who were transferred during the previous month. We selected a sample of 25 employees to review. This list was comprised of 20 Detention employees and five sworn employees. Of the 20 Detention employees, all had proper documentation of command review of their EIS profiles. All five sworn employees had proper documentation of command review of their EIS profiles. The compliance rate for August was 100%.

For September, we requested a list of employees who were transferred during the previous month. MCSO submitted a list, and we selected a sample of 27 employees. This list was comprised of 15 Detention employees, 11 sworn employees, and one civilian. Of the 15 Detention Officers, all had proper documentation of command review of their EIS profiles. Of the 11 sworn employees, all had proper documentation of command review of their EIS profiles. The civilian employee also had proper documentation of command review of his EIS profile. The compliance rate for September was 100%. For the quarter, the requirements of this Paragraph were met for the 65 employees reviewed. MCSO is again in compliance with this Paragraph. We encourage MCSO to continue the attention required in addressing timely EIS reviews, and documentation of these reviews, for Detention personnel transfers.

WAI 50888

***Paragraph 176.*** *The quality of investigators' internal affairs investigations and Supervisors' reviews of investigations shall be taken into account in their performance evaluations.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

**Phase 2:** Not in compliance

This Paragraph requires that employees who conduct misconduct investigations have an assessment on the quality of their investigations documented in their Employee Performance Appraisals. This Paragraph also requires that Commanders who review their subordinates' misconduct investigations be assessed on the quality of those reviews, in their own EPAs. To assess compliance with this Paragraph, we look for specific comments by raters completing EPAs. In supervisor EPAs, we look for comments addressing the quality of investigations. In commanders' EPAs, we look for comments assessing the quality of reviews of investigations. In many instances, the employee being rated does not have any subordinates, or has not completed or reviewed any misconduct investigations. In these cases, we look for comments by the rater that indicate why the employee was not rated on this requirement.

We reviewed Employee Performance Appraisals for 28 supervisors and commanders who received EPAs during this reporting period. All 28 EPAs rated the quality and effectiveness of supervision. Twenty-five of the 28 supervisor EPAs contained comments and/or rated the supervisors' demonstrated ability to identify and effectively respond to misconduct. Twenty-four of the 28 EPAs rated supervisors on the quality of their reviews. Twenty-six of the 28 supervisor EPAs assessed the employees' quality of internal investigations and/or the quality of their reviews of internal investigations, as required by this Paragraph. The compliance rate for the previous quarter was 89.29%. The compliance rate for this reporting period was 92.86%.

***Paragraph 177.*** *There shall be no procedure referred to as a "name-clearing hearing." All pre-disciplinary hearings shall be referred to as "pre-determination hearings," regardless of the employment status of the principal.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.
- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 146 administrative misconduct investigations that were completed during this reporting period.

In misconduct investigations that resulted in serious discipline and in which the employee was afforded the opportunity for an administrative hearing, the only reference to the hearing was "pre-determination hearing."

WAI 50889

## B.  Misconduct-Related Training

***Paragraph 178.*** *Within three months of the finalization of these policies consistent with ¶ 65of this Order, the Sheriff will have provided all Supervisors and all personnel assigned to the Professional Standards Bureau with 40 hours of comprehensive training on conducting employee misconduct investigations. This training shall be delivered by a person with subject matter expertise in misconduct investigation who shall be approved by the Monitor. This training will include instruction in:*

a. *investigative skills, including proper interrogation and interview techniques, gathering and objectively analyzing evidence, and data and case management;*

b. *the particular challenges of administrative law enforcement misconduct investigations, including identifying alleged misconduct that is not clearly stated in the complaint, or that becomes apparent during the investigation;*

c. *properly weighing the credibility of civilian witnesses against employees;*

d. *using objective evidence to resolve inconsistent statements;*

e. *the proper application of the appropriate standard of proof;*

f. *report-writing skills;*

g. *requirements related to the confidentiality of witnesses and/or complainants;*

h. *considerations in handling anonymous complaints;*

i. *relevant MCSO rules and policies, including protocols related to administrative investigations of alleged officer misconduct; and*

j. *relevant state and federal law, including Garrity v. New Jersey, and the requirements of this Court's orders.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

MCSO delivered the 2019 Misconduct Investigative Training (PSB40) in August to 12 personnel (10 Detention, two civilian). No personnel required test remediation.

The 2020 PSB40 curriculum was approved during this reporting period.


***Paragraph 179.*** *All Supervisors and all personnel assigned to the Professional Standards Bureau also will receive eight hours of in-service training annually related to conducting misconduct investigations. This training shall be delivered by a person with subject matter expertise in misconduct investigation who shall be approved by the Monitor.*

**Phase 1:** In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on February 26, 2020.

WAI 50890

- GG-2 (Detention/Civilian Training Administration), most recently amended on February 26, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

During October, the 2020 annual eight-hour in-service training was provided for Professional Standards Bureau personnel (PSB8 Internal). Any PSB personnel who were unable to attend are required to attend the annual eight-hour in-service training for District personnel (PSB8 External) when approved. This class was provided by an outside vendor, and focused on Firearms Investigations. Also included were content on interviewing and case planning, development of interview questions, interview strategies and in-depth documentation strategies. A test was provided at the end of the course, with one person requiring remediation. During our October remote site visit, we questioned MCSO on their position regarding vendor provided training. MCSO advised that they are pleased with the product being provided to their personnel and expect to continue seeking outside vendors to deliver these annual programs.

MCSO did not deliver the 2019 PSB8 External training during this reporting period.

MCSO continues to develop 2020 annual eight-hour in-service for District supervisors (PSB8 External).

*Paragraph 180. Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all employees on MCSO's new or revised policies related to misconduct investigations, discipline, and grievances. This training shall include instruction on identifying and reporting misconduct, the consequences for failing to report misconduct, and the consequences for retaliating against a person for reporting misconduct or participating in a misconduct investigation.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on July 30, 2020.
- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on January 24, 2019.
- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.
- GB-2 (Command Responsibility), most recently amended on June 28, 2019.
- GC-16 (Employee Grievance Procedures), most recently amended on April 7, 2020.
- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.
- GG-1 (Peace Officer Training Administration), most recently amended on February 26, 2020.
- GG-2 (Detention/Civilian Training Administration), most recently amended on February 26, 2020.

WAI 50891

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

- GJ-26 (Sheriff's Reserve Deputy Program), most recently amended on June 5, 2020.

- GJ-27 (Sheriff's Posse Program), most recently amended on June 19, 2020.

- Training Division Operations Manual, most recently amended on March 9, 2020.

**Phase 2:** In compliance

MCSO distributes new or annually revised policies via the HUB, an electronic training management system. Each distribution requires all employees to complete personal attestations indicating they have read and understand the policy requirements.

To assess compliance with this Paragraph, we review the HUB generated reports of attestations that identify each individual and their dates of review. Compliance assessments for this Paragraph are based on the review of attestations for the following policies: CP-2 (Code of Conduct); CP-3 (Workplace Professionalism: Discrimination and Harassment); CP-11 (Anti-Retaliation); GB-2 (Command Responsibility); GH-2 (Internal Investigations); GC-16 (Employee Grievance Procedures); and GC-17 (Employee Disciplinary Procedures).

During this reporting period, we reviewed the status of individual reviews for Briefing Board (BB) 20-49 (CP-2), BB 19-04 (CP-3), BB 18-48 (CP-11), BB 19-30 (GB-2), BB 20-39 (GH-2), BB 20-15 (GC-16), and BB 20-39 (GC-17). All employee categories remain in compliance.


***Paragraph 181.*** *Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all employees, including dispatchers, to properly handle civilian complaint intake, including how to provide complaint materials and information, and the consequences for failing to take complaints.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

- GG-1 (Peace Officer Training Administration), most recently amended on February 26, 2020.

- GG-2 (Detention/Civilian Training Administration), most recently amended on February 26, 2020.

- Training Division Operations Manual, most recently amended on March 9, 2020.

**Phase 2:** In compliance

MCSO currently delivers the 2017 Complaint Intake and Reception Training via the HUB to all new hires in all personnel categories. This curriculum has remained under review during the last three reporting periods. This initial training is provided to all new hires and provides all individuals with important guidance when interacting with members of the public desiring to file an external complaint against members of MCSO; as a result, we recommend that revision of this

WAI 50892

curriculum be prioritized and completed during the next reporting period. Development of a long-term planning tool that will include a curriculum review component that assigns specific review periods, sets pre-determined completion dates, and identifies individuals to be held accountable when deadlines are not met would greatly assist MCSO. Previously, MCSO indicated a desire to provide additional in-service training to civilians who may engage with members of the public. We agree with the need for MCSO to provide refresher training for all civilian positions who may interact with the public.

**Paragraph 182.** *Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all Supervisors on their obligations when called to a scene by a subordinate to accept a civilian complaint about that subordinate's conduct and on their obligations when they are phoned or emailed directly by a civilian filing a complaint against one of their subordinates.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

- GG-1 (Peace Officer Training Administration), most recently amended on February 26, 2020.

- GG-2 (Detention/Civilian Training Administration), most recently amended on February 26, 2020.

- Training Division Operations Manual, most recently amended on March 9, 2020.

**Phase 2:** In compliance

Several training programs – the ACT, SRELE, EIS, and the PSB40 – address the requirements of this Paragraph by including policy reference and additional direction when appropriate. Additional direction to supervisors and deputies may not appear in each annual delivery, depending upon the content included. The 2020 SRELE curriculum includes content related to supervisory responsibilities related to Complaint Intake and Investigation.

## C. *Administrative Investigation Review*

**Paragraph 183.** *The Sheriff and the MCSO will conduct objective, comprehensive, and timely administrative investigations of all allegations of employee misconduct. The Sheriff shall put in place and follow the policies set forth below with respect to administrative investigations.*

WAI 50893

**Paragraph 184.** *All findings will be based on the appropriate standard of proof. These standards will be clearly delineated in policies, training, and procedures, and accompanied by detailed examples to ensure proper application by internal affairs investigators.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 146 completed administrative misconduct investigations conducted during this reporting period.

Of the 146 cases we reviewed, 142 (97%) complied with the requirements of this Paragraph. In two, we believe the findings of unfounded were inappropriate and the allegations should have been sustained. In one investigation that was unfounded, we do not believe adequate evidence existed to do so and the allegation should have been not sustained. In one other investigation that was not sustained, we believe sufficient evidence existed to unfound the allegation.

During our next site visit, we will discuss these investigations with PSB personnel.


**Paragraph 185.** *Upon receipt of any allegation of misconduct, whether internally discovered or based upon a civilian complaint, employees shall immediately notify the Professional Standards Bureau.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 146 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period. In all 146, PSB was appropriately notified at the time of the complaint as required. We also reviewed 28 criminal misconduct investigations. PSB was appropriately notified in all of these investigations.

WAI 50894

***Paragraph 186.*** *Effective immediately, the Professional Standards Bureau shall maintain a centralized electronic numbering and tracking system for all allegations of misconduct, whether internally discovered or based upon a civilian complaint. Upon being notified of any allegation of misconduct, the Professional Standards Bureau will promptly assign a unique identifier to the incident. If the allegation was made through a civilian complaint, the unique identifier will be provided to the complainant at the time the complaint is made. The Professional Standards Bureau's centralized numbering and tracking system will maintain accurate and reliable data regarding the number, nature, and status of all misconduct allegations, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status, if requested, and final disposition of the complaint. The system will be used to determine the status of misconduct investigations, as well as for periodic assessment of compliance with relevant policies and procedures and this Order, including requirements of timeliness of investigations. The system also will be used to monitor and maintain appropriate caseloads for internal affairs investigators.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

During numerous site visits, we have met with PSB personnel to discuss and observe the capabilities of IAPro, which serves as the technology instrument that meets the compliance criteria of this Paragraph. IAPro logs critical dates and times, alerts regarding timeframes and deadlines, chronological misconduct investigation status, notifications, and dispositions. The tracking system provides estimates of key timeframes for all investigators to ensure that they learn of previous and upcoming investigative milestones. PSB has confirmed that civil notice claims are entered in the tracking system. The IAPro system integrates exceptionally well with the EIS and BlueTeam technology systems and can be remotely accessed.

PSB has a management analyst dedicated to the administration of the centralized tracking system. The documentation that PSB has provided to us for review, and the direct user access that a member of our Team has to the centralized numbering and tracking system, indicates that the system possesses the functionality as required by this Paragraph and is being used according to the requirements of this Paragraph.

WAI 50895

During this reporting period, we found that all 146 of the administrative misconduct investigations were properly assigned a unique identifier. All but two these investigations were both initiated and completed after July 20, 2016. Seventy-nine involved an external complaint requiring that PSB provide the complainant with this unique identifier. In 75 (95%) of the cases, PSB properly sent the initial letter to the complainant within seven days or provided an acceptable explanation for not doing so. In some cases, anonymous complainants do not provide contact information; and in others, known complainants decline to provide MCSO with adequate contact information. PSB has developed a form that identifies the reason why a required notification letter is not sent, and includes this document in the cases they forward for our review. We identified four cases in this reporting period where PSB failed to send the initial letter within seven days and an acceptable reason was not provided. We will discuss these cases with MCSO during our next site visit.

***Paragraph 187.*** *The Professional Standards Bureau shall maintain a complete file of all documents within the MCSO's custody and control relating to any investigations and related disciplinary proceedings, including pre-determination hearings, grievance proceedings, and appeals to the Maricopa County Law Enforcement Merit System Council or a state court.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** In compliance

To determine compliance with this Paragraph, we have verified that PSB maintains both hardcopy and electronic files intended to contain all the documents required for compliance with this Paragraph.

During our site visits, a member of our Team inspects the file rooms where hardcopies of investigations are stored and randomly reviewed case files to verify compliance. We have verified that criminal and administrative investigation files are stored in separate rooms, and access to these rooms is restricted. Our Team member has also used the access granted to IAPro to randomly select internal affairs case files to verify that all information is being maintained electronically.

In May 2018, PSB relocated to its new offsite facility. We confirmed at that time that PSB maintained both hardcopy and electronic files intended to contain all documents required for compliance with this Paragraph at the new facility.

During our January 2019 site visit, a member of our Team verified continued compliance at the PSB facility by inspecting both the criminal and administrative investigation file rooms and randomly selecting internal affairs case files to verify that all information was also being electronically maintained in IAPro.

WAI 50896

During our October 2019 site visit, a member of our Team verified continued compliance at the PSB facility by inspecting both the criminal and administrative investigation file rooms. We also randomly reviewed both electronic and hard-copy documents to ensure that all information was being maintained as required for compliance with this Paragraph.

***Paragraph 188.*** *Upon being notified of any allegation of misconduct, the Professional Standards Bureau will make an initial determination of the category of the alleged offense, to be used for the purposes of assigning the administrative investigation to an investigator. After initially categorizing the allegation, the Professional Standards Bureau will promptly assign an internal affairs investigator.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review administrative misconduct investigations and service complaints that were forwarded for our review by MCSO personnel during the reporting period.

We previously concurred with MCSO that Phase 2 compliance with this Paragraph would be based on PSB's determination of the initial allegations, and not which category of offense was determined once the investigation is completed.

During this reporting period, MCSO submitted 146 administrative misconduct investigations for our review. All 146 complied with the requirements of this Paragraph.

MCSO completed and submitted 139 service complaints for our review during this reporting period. Of the 139, 125 (90%) met the requirements established in the service complaint process. This is a decrease from 96% during the last reporting period. Sixteen (12%) were appropriately reclassified to administrative misconduct investigations after the complaints were reviewed by PSB. The remaining 123 were classified and handled as service complaints. Of the 123 complaints closed as service complaints, we concurred with PSB's decisions in 109. In one, we believe that misconduct allegations were made and an administrative misconduct investigation should have been conducted. In two others, while we agree they were properly classified as service complaints, there was a failure to complete necessary follow-up, and 11 others lacked a timely response to the complainant.

As we have consistently noted in our review of service complaints, the majority of these complaints involve laws, policies, or procedures where there is no employee misconduct; or are complaints where it is determined that MCSO employees are not involved. During this reporting period, 78 (63%) of the 123 closed service complaints did not involve allegations of misconduct. Twenty (16%) did not involve MCSO employees, 16 (13%) were closed due to lack of specificity, and nine (7%) were closed based on a combination of factors.

WAI 50897

In numerous discussions during our 2018 site visits, PSB advised us that the number of service complaints far exceeded the Bureau's expectations. PSB also noted that, consistently, 20-25% of the service complaints did not involve MCSO employees. Our reviews of completed service complaints confirmed this assertion, and we agreed to review an expedited process for handling complaints where PSB determined that the complaint did not involve MCSO personnel.

In July 2019, PSB pursued its proposal to use an expedited process to handle service complaints where it could be immediately determined that the complaint did not involve MCSO personnel. We and the Parties reviewed and approved the process. We had also discussed with PSB concerns we had found in some service complaints that were completed at the District level and forwarded to PSB for review and approval. In some, PSB determined that a service complaint was inappropriate, and a misconduct investigation should be opened. While PSB has done a good job of identifying those service complaints that should be administrative investigations, as is the case with administrative misconduct investigations conducted by District personnel, PSB is again correcting the work of other personnel. To address this concern and ensure accountability, PSB added a signature line to this revised service complaint form. District and Division Command personnel now note their review and approval of service complaints prior to them being forwarded to PSB for a final review.

Consistent with the provisions of the revised policies on internal investigations and discipline, the PSB Commander now has the discretion to determine that internal complaints alleging minor policy violations can be addressed without a formal investigation if certain criteria exist. If the PSB Commander makes this determination, it must be documented.

During the last reporting period, the PSB Commander determined that 10 internally generated complaints would be addressed without a formal investigation and were eligible for a coaching. We disagreed with the decision of the PSB Commander in two of these cases.

During this reporting period, the PSB Commander determined that four internally generated complaints would be addressed without formal investigation and were eligible for a coaching as allowed in MCSO policy. We concur with the PSB Commander in all four of these cases.

Compliance for this Paragraph is based on our findings for administrative misconduct investigations (146), service complaints (139), and coachings (four) combined; and was 95% for this reporting period.

***Paragraph 189.*** *The Professional Standards Bureau shall administratively investigate:*

a.    *misconduct allegations of a serious nature, including any allegation that may result in suspension, demotion, or termination; and*

b.    *misconduct indicating apparent criminal conduct by an employee.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on July 30, 2020.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on January 24, 2019.

WAI 50898

- CP-5 (Truthfulness), most recently amended on September 11, 2020.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph during this reporting period, we reviewed 146 completed administrative misconduct investigations conducted by MCSO personnel.

Division or District personnel outside of PSB investigated 58 of the 146 administrative misconduct investigations submitted for review during this reporting period. PSB investigated 88 of the cases. PSB also submitted 28 criminal investigations for review. We did not identify any misconduct investigations that were conducted by a District supervisor where we believe that potential additional misconduct discovered during the initial investigation should have resulted in the investigation being forwarded to PSB for completion and was not.


***Paragraph 190.*** *Allegations of employee misconduct that are of a minor nature may be administratively investigated by a trained and qualified Supervisor in the employee's District.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed a total of 174 investigations conducted by MCSO personnel and completed during this reporting period. Of these, 146 were administrative investigations, and 28 were criminal investigations. PSB conducted one of the criminal investigations. Twenty-one criminal investigations involved inmate deaths that occurred within the jail and were investigated by the Jail Crimes Unit. Five were office- involved shootings, and one was an in-custody prisoner death. All six of these criminal investigations were conducted by the Major Crimes Unit. The criminal investigation of one additional officer-involved shooting incident in which MCSO personnel were involved. This was investigated by the Phoenix Police Department as it occurred within their jurisdiction.

Of the 146 administrative misconduct cases we reviewed for this Paragraph, PSB investigators conducted 88. Fifty-eight were investigated at the District or Division level. In one of the 58 investigations conducted by a District supervisor, the case should have been forwarded to PSB for investigation. This case involved an allegation of unbecoming conduct during a traffic stop, and the allegation was made by a member of the Plaintiffs' class. The complainant was not initially identified as a member of the Plaintiffs' class and the investigation was completed at the District level. During the review of the case, PSB identified that the complainant was a member of the Plaintiffs' class and the investigation was then reviewed during a Class Remedial Matters (CRM) meeting that was attended by a member of our Team. There was no indication upon

WAI 50899

review that the complainant had alleged any racial bias or racial comments. The BWC for the deputy was also reviewed and there was no indication or evidence of any bias. While this case should have been investigated by PSB, the investigation conducted was complete and the findings were justified. As is our practice, we will discuss this investigation with PSB during our next site visit.

MCSO has complied with the requirements to train all supervisors who conduct minor misconduct investigations.

**Paragraph 191.** *If at any point during a misconduct investigation an investigating Supervisor outside of the Professional Standards Bureau believes that the principal may have committed misconduct of a serious or criminal nature, he or she shall immediately notify the Professional Standards Bureau, which shall take over the investigation.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 146 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period. Of the 58 administrative misconduct cases investigated at the District or Division level, we did not identify any cases where we believe that potential serious misconduct was discovered by the investigating supervisor and the supervisor failed to forward the case to PSB.

**Paragraph 192.** *The Professional Standards Bureau shall review, at least semi-annually, all investigations assigned outside the Bureau to determine, among the other matters set forth in ¶ 251 below, whether the investigation is properly categorized, whether the investigation is being properly conducted, and whether appropriate findings have been reached.*

**Phase 1:** In compliance

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

PSB command personnel advised us that they continue to review investigations in "real time" as they come into the Bureau. During this reporting period, MCSO provided copies of PSB's reviews of 57 completed Division-level misconduct investigations that were assigned outside of the Bureau. The review template used by PSB includes sections that address whether or not the investigation is properly categorized, whether the investigation is properly conducted, and whether appropriate findings have been reached. Additionally, copies of emails detailing the quality of the investigation, identified deficiencies, and required edits sent electronically to affected Division Commanders were provided for each case reviewed.

WAI 50900

PSB included the information required by this Paragraph in its semi-annual public Misconduct Investigations Report, which is required under Paragraph 251. The most recent report was published on MCSO's website in July 2020. The report covers the period of July 1-December 31, 2019; and contains an analysis as to whether cases assigned outside of PSB were properly categorized, whether the investigations were properly conducted, and whether appropriate findings have been reached. During that review period, there were 50 investigations reviewed. Out of the 50 investigations reviewed, three cases were returned due to the conclusions not being supported by the evidence, seven cases were returned to the Division for formatting or minor corrections, one case was returned for report detail edits, and the remaining 39 cases did not require any revisions.

MCSO remains in compliance with this Paragraph.

**Paragraph 193.** *When a single act of alleged misconduct would constitute multiple separate policy violations, all applicable policy violations shall be charged, but the most serious policy violation shall be used for determining the category of the offense. Exoneration on the most serious offense does not preclude discipline as to less serious offenses stemming from the same misconduct.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.
- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 146 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period. Thirty-eight had sustained allegations against one or more employees. In 29 of these 38 investigations, at least one principal employee was still an MCSO employee at the time the investigation was completed or discipline decisions were made. In all 29, the most serious policy violation was used to determine the final category of the offense for discipline purposes, if more than one policy violation was sustained.

In cases where multiple violations of policy occurred, this information was listed on the preliminary discipline document. There were no cases where the exoneration of any offense precluded discipline for any sustained allegations.

WAI 50901

***Paragraph 194.*** *The Commander of the Professional Standards Bureau shall ensure that investigations comply with MCSO policy and all requirements of this Order, including those related to training, investigators' disciplinary backgrounds, and conflicts of interest.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on July 30, 2020.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on January 24, 2019.

- CP-5 (Truthfulness), most recently amended on September 11, 2020.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- GC-16 (Employee Grievance Procedures), most recently amended on April 7, 2020.

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** Not in compliance

We determine Phase 2 compliance with this Paragraph by a review of completed misconduct investigations conducted by MCSO personnel, the review of attendance by internal investigators at required Misconduct Investigative Training, the disciplinary backgrounds of internal investigators, and the efforts being made by the PSB Commander to reach compliance.

We reviewed 146 administrative misconduct investigations and 28 criminal investigations submitted by MCSO during this reporting period. All 28 of the criminal investigations complied with MCSO policy and the requirements of the Second Order.

Administrative investigations are required to be completed within 60 days if completed outside of PSB and within 85 days if completed by PSB personnel. Of the 146 total investigations reviewed for this reporting period, 74 (51%) were completed within the required timeframes or contained a reasonable extension request that was specific to the investigation, an increase from the 38% compliance for the last reporting period. The remaining 72 (49%) identified general justifications including supervisory responsibilities, workload, prioritization of investigations, training, sitting second chair in investigations, and others. Additional investigations, while completed by the investigator within the required timeframe, were not reviewed and finalized within 180 days. These cases also cited an excessive workload as one of the primary reasons for the lengthy review times. This is a serious issue that continues to worsen quarter after quarter, now resulting in the closure of investigations taking an average of 509 days. As we noted during the last reporting period, we can no longer accept extensions that do not contain reasonable justifications specific to each investigation.

WAI 50902

Of the 146 administrative misconduct cases we reviewed, PSB personnel completed 88. In one of the 27 investigations conducted by sworn investigators, required documentation was not included in the report and in a second, no contact was made with the complainant until two years after the complaint was filed. In six of the 61 investigations conducted by Detention personnel, jail video evidence was not retrieved in a timely manner, resulting in the potential loss of evidence. One contained the wrong category of offense, and one contained contradictory information in the report. With the inclusion of those investigations that were found noncompliant based on our review of extension requests, the overall compliance for the 88 investigations conducted by PSB was 24%. There were no investigations completed by the contract investigator submitted for our review during this reporting period.

Districts or Divisions outside of PSB conducted 58 investigations. Twenty-three investigations, were noncompliant due to improper findings, leading questions, or a combination of investigative and multiple administrative deficiencies. With the inclusion of those investigations found not compliant due to the lack of appropriate extensions, overall compliance for investigations conducted outside of PSB was 26% for this reporting period.

As a result of both investigative deficiencies and administrative deficiencies, including those related to extension compliance, overall compliance for all administrative investigations conducted by MCSO was 24% for this reporting period, an increase from 12% the last reporting period.

There are many factors that impact the PSB Commander's ability to ensure compliance in all cases. One factor is that the PSB Commander must rely on other PSB staff members to conduct case reviews and ensure proper documentation is completed. We continue to find that, in most cases, PSB personnel are identifying and ensuring that corrections are made and all documentation is completed in those cases they review. In some cases, deficiencies cannot be corrected after the fact.

Another factor affecting the PSB Commander's ability to ensure that all investigations are properly completed is that the Appointing Authority – not the PSB Commander – determines the final findings and discipline. During this reporting period, there were no instances where the Appointing Authority overturned a finding made by the PSB Commander.

Of continued concern, and a significant factor in the inability of the PSB Commander to ensure investigations are properly completed, has been the ongoing lack of investigative compliance for those investigations conducted and reviewed by District and Division personnel outside of PSB. While PSB is still identifying the majority of deficiencies in the District and Division cases, during this reporting period, we noted an increased amount of attention being focused on these investigations by both Command and Executive staff, to include Deputy Chiefs now reviewing investigations conducted and reviewed by their personnel. We are hopeful that this increased oversight will result in continuing improvement.

WAI 50903

While PSB continues to experience challenges in ensuring that completed internal investigations are reaching compliance with both MCSO policy and both Court Orders, the Bureau has made efforts to improve compliance. A member of our Team continues to meet with PSB every two weeks to discuss Class Remedial Matters. We also use this opportunity to discuss other ongoing concerns that affect compliance with the Second Order. The ability to discuss investigative or administrative concerns during these meetings continues to result in concerns being immediately addressed; and in some cases, results in necessary actions being taken to resolve those issues that have been identified.

During our site visits, we have continued to meet with PSB personnel and District and Division command personnel to update them on our identification of training and performance issues that adversely affect compliance with the Second Order. Since January 2017, Detention personnel assigned to PSB to oversee investigations have also participated in these meetings. We have used these meetings to discuss concerns with the quality of investigations; opportunities for improvement; and in some cases, investigative protocols.

PSB has taken a number of actions to address both investigative deficiencies, and other concerns with the completion of administrative misconduct investigations that have been identified. Additional oversight was added for Detention investigations; PSB personnel were assigned as liaisons with District personnel; a service complaint process was developed and approved; revisions to witness and complaint interview processes were proposed and approved; a new protocol for the handling of service complaints not involving MCSO personnel was proposed and approved; and the PSB Commander was given the authority to resolve some minor internally generated complaints without the necessity to conduct an administrative misconduct investigation.

In addition to those actions that have been approved to address continuing backlogs and other challenges with administrative misconduct investigations, we have continued to have ongoing discussions with PSB and the Parties during our site visits regarding other potential opportunities to address these challenges. These discussions have included many suggestions and potential modifications to existing protocols, including such changes as: expanding the use of the service complaint process; using alternative types of administrative closures; discontinuing investigations of former employees if the conduct was not criminal in nature, would not affect law enforcement certification, and did not involve current MCSO employees; discretion for the investigation of minor policy violations that occurred more than three years prior to the complaint being filed; implementing an expedited discipline process for sustained cases; and increasing investigative time requirements.

During September 2019, we met with the PSB Executive Chief who has oversight over PSB to discuss ongoing challenges with the completion of misconduct investigations. It was a productive meeting, with good discussion about potential ideas to resolve this ongoing issue. Some of the discussion included topics already discussed with our Team and the Parties, and others were new. The Executive Chief committed to developing a list of the ideas shared, along with more detailed information about how each idea might be implemented. The intent was to then share this information with our Team and the Parties. The Executive Chief informed us that due to ongoing priorities, this information would not be ready for discussion until our January 2020 site visit.

WAI 50904

During our October 2019 site visit, we met with PSB and the Parties to discuss the ongoing issues with the completion of misconduct investigations. We briefly discussed some potential remedies, then tabled the discussion until our January 2020 site visit when MCSO would be prepared to provide more detailed information on any proposals they wanted to bring forward.

During our January 2020 site visit, PSB provided a document containing the Bureau's ideas and recommendations regarding the investigation of alleged employee misconduct. After some discussion, our Team offered to facilitate discussions with MCSO, Plaintiffs, and Plaintiff-Intervenors, to discuss the topics brought forward by MCSO; and any additional ideas that might be brought forward by any other member of the group. We advised all that we would discuss only those items that did not require a change to the Orders. We facilitated this conference call with MCSO and the Parties in February 2020. During this call, MCSO personnel stated that they believed that all of the ideas and recommendations they had brought forward would require a change to the Orders and they had no additional suggestions to add. The representatives of the Plaintiffs and Plaintiff-Intervenors agreed with MCSO and added that they also had no additional suggestions or ideas to bring forward. This has since remained a topic for the Parties to discuss in a meet-and-confer process should they choose that approach.

In 2014, PSB initiated 717 internal investigations. In 2015, PSB initiated 916 cases; and in 2016, 847 cases. There were 1,028 cases initiated in 2017. In 2018, there were 1,114 investigations initiated; 354 service complaints; 716 administrative misconduct investigations; 36 criminal investigations; and eight critical incident investigations. In 2019, there were 615 internal investigations initiated, as well as 453 service complaints. With the inclusion of critical incidents and criminal investigations, the total for 2019 was 1,072 investigations. The overall number of cases is fairly consistent with what we have observed for the past several years. During this reporting period, PSB personnel reported they had opened a total of 897 investigations during the first nine months of 2020, compared to 831 during the same time period in 2019. The total number includes administrative misconduct investigations, service complaints, criminal misconduct investigations, and critical incident investigations – though the majority are administrative misconduct and service complaints. Of the total cases opened for the reporting period, 517 were administrative misconduct investigations, compared to 478 during the same time period in 2019. Service complaints opened for the reporting period totaled 344, compared to 321 for the same time period in 2019.

In 2016, prior to the implementation of the Court's Second Order, PSB investigators were carrying an average active caseload of 12-16 cases each month. By 2018, PSB advised us that the average active caseload each month for sworn investigations was 36; and for Detention investigators, 28. The average closure of a case took 204 days. In 2019, PSB advised us that the average monthly caseloads for all investigators assigned to PSB had risen to 46, there were 1,682 open cases, and the average closure time for an investigation was 499 days in PSB and 444 days for those investigations conducted outside of PSB.

During the last reporting period, MCSO reported having 1954 open investigations. While the total includes administrative misconduct investigations, service complaints, criminal investigations, and critical incident investigations, the majority were administrative misconduct investigations and service complaints. Of the total cases, 1,660 were assigned to PSB and 294 were assigned to Districts and Divisions outside of PSB. The average number of days to complete

WAI 50905

a misconduct investigation in PSB was 552 days; and in Districts or Division outside of PSB, 397 days. The overall closure average for all cases was 501 days. The average active monthly caseload for sworn personnel in PSB was 54 cases; and for Detention personnel, 60 cases.

During our October 2020 remote site visit, PSB advised that the average caseload for Detention investigators was 59, and for sworn investigators, the average was 54. PSB also noted that the three civilian investigators are now investigating cases, and numerous pending cases have been reassigned to them. These investigators now have an average monthly caseload of 37 cases. These large caseloads continue to adversely impact the timely completion of investigations. PSB also informed us during our July 2020 remote site visit that the average number of days to finalize and close a PSB investigation has increased to 570 days, and for District or Division cases, the average is now 409 days. The overall closure average for all cases is 509 days. PSB continues to note that there are a number of older cases that are completed during each reporting period that adversely impacts the overall average time it takes to finalize a case.

During this reporting period, PSB reported a total of 1,992 open cases, an increase from the 1,954 open cases reported during the last reporting period. While the total includes criminal misconduct investigations, critical incident investigations, and outsourced cases, the majority are open administrative misconduct investigations and service complaints. Of the total open cases, 249 are assigned to Districts or Divisions outside of PSB. The remaining 1,743 are assigned to PSB administrative investigators or criminal investigators, or have been outsourced to the contract investigator. This number includes 39 pending critical incident investigations, a decrease from 64 pending critical incident investigations during the last reporting period. PSB has been focusing on completing these investigations and submitted 30 for our review during this reporting period.

Though PSB was authorized 11 new positions in the July 2018 budget, during this reporting period, PSB continued to advise that only one of these positions, a Detention supervisor, has been filled and the funding for a lieutenant was eliminated and the funds transferred to other purposes in PSB. There is still no indication when any of the additional positions will be filled. PSB also advised that no new positions were requested by the Bureau for the fiscal year that commenced on July 1, 2020. Of the civilian positions authorized in the 2019 budget, PSB advised us during our October 2020 remote site visit that all of the positions have been filled. All three of the civilian investigators hired, one, a former Detention sergeant, are now handling investigations. The administrative personnel continue to assist sworn and Detention investigators in PSB by doing much of the research, document preparation, and tracking on open cases. One of the administrative assistants is assigned to assist those PSB supervisors who are assigned to liaison functions with Districts and Divisions. PSB personnel continue to believe that the addition of the civilian staff will relieve a significant amount of the administrative workload and case management currently being handled by investigators, allowing them to focus more time on investigative tasks.

Beyond the addition of administrative staff, PSB has also modified its review process for submitted cases, eliminating some levels of review. PSB believes this will result in more timely reviews, without adversely impacting the quality of the final report. We agree with their decision and are also hopeful this will not adversely impact investigative quality.

WAI 50906

While we continue to agree with PSB that the administrative staff and civilian investigators hired may relieve some of the burden from investigators, and that a reduction in levels of review may result in shorter time periods, the backlog of cases and individual investigator caseloads will not be appreciably relieved by either of these.

In July 2018, we discussed the investigation of the 1,459 identifications that had been impounded at the MCSO Property Room and then checked out by an MCSO sergeant. This investigation was initiated in 2015 but then stalled due to other, more immediate priorities for investigations. Of the 1,459 total identifications, 596 were believed to belong to members of the Plaintiffs' class.

Since July 2018, we have discussed the status of the 1,459 IDs investigation during each site visit. During the last reporting period, the Parties reached a general resolution regarding this investigation. During this reporting period, the Parties finalized their agreement and this investigation has been concluded.

During our past site visits, PSB staff have continued to communicate that they are properly outsourcing those cases where conflicts of interest exist. PSB has contracted with a qualified private vendor to conduct these investigations. Additionally, PSB has outsourced investigations to other law enforcement entities. During our October 2020 site visit, PSB personnel advised us that they are considering retaining additional outside contract investigators, but to date, they have not identified any who meet the hiring criteria.

During this and the past three reporting periods, we have not received or reviewed any investigations completed by the current contract investigator retained by MCSO. Five additional investigations were outsourced to this investigator during this reporting period, and he currently has 21 investigations in progress. One case, outsourced to an outside law enforcement agency, also remains in progress.

After the Second Order was implemented, PSB reviewed the disciplinary backgrounds of all those who might conduct internal investigations and notified us of those supervisors who would be prohibited from conducting such investigations due to their backgrounds. At that time, MCSO identified two supervisors who were ineligible to conduct internal investigations. One is no longer with MCSO and the second remains ineligible to conduct investigations.

During the last reporting period, four additional supervisors were added to the list of those who are ineligible to conduct administrative misconduct investigations. MCSO reported that no additional supervisors were determined to be ineligible during this reporting period.


***Paragraph 195.*** *Within six months of the entry of this Order, the Professional Standards Bureau shall include sufficient trained personnel to fulfill the requirements of this Order.*

**Phase 1:** In compliance

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** Not in compliance

WAI 50907

In conjunction with this Paragraph, Paragraph 178 mandates that within three months of the finalization of policies consistent with Paragraph 165, all PSB personnel would receive 40 hours of comprehensive training. Paragraph 178 requires training of all supervisors within three months of the finalization of policies, and further requires sufficient trained personnel in PSB within six months of the entry of the Order. The first week of the required Misconduct Investigative Training commenced on September 18, 2017 and the training was completed prior to the end of 2017.

During our July and October 2018 site visits, PSB informed us that a total of 11 additional personnel had been approved for PSB in MCSO's July 2018 budget. PSB personnel informed us that due to ongoing staffing shortages they did not believe any of these positions would be filled before 2019.

During our January and April 2019 site visits, PSB personnel informed us that they had not yet received any of the 2018 budgeted positions for PSB. They further noted that it continued to remain unlikely that they would receive any of the positions in the foreseeable future due to ongoing personnel staffing shortages throughout the organization. PSB continued to note that with the continuing influx of new cases, and the ongoing backlog of investigations, even if these personnel were added, the Bureau would still be insufficiently staffed to meet its responsibilities. The PSB budget requests for the July 2019 budget year included only civilian staff. PSB's requests included: two administrative assistants, two management analyst assistants, one special projects manager, and three civilian investigators. PSB personnel believed that the addition of these positions would allow sworn and Detention supervisors to focus more on the investigative process and mitigate some of the administrative requirements currently being handled by these personnel.

During our July 2019 site visit, PSB advised that of the 11 approved positions in the July 2018 budget, one had been filled – that of a Detention sergeant. It was still unknown when any of the remaining 10 positions would be filled.

During our October 2019 site visit, PSB informed us that of the previously approved 11 positions in July 2018, there has still only been one filled. Of the civilian positions approved in the July 2019 budget, one management analyst position had been filled; interviews were in progress for management assistants; and the three civilian investigator positions were in the job-posting phase.

During our January 2020 site visit, PSB advised us again that only one of the 11 approved positions for PSB in the 2018 budget has been filled. Of the eight civilian positions approved in the 2019 budget, one management assistant position had been filled, other administrative positions were in the hiring process, and job offers had been extended to fill the three civilian investigator positions. PSB believed that, given the law enforcement and investigative experience of the three civilian investigators the Bureau had selected, these investigators should not need extensive training, and would likely be qualified to conduct a variety of investigations.

WAI 50908

During our April 2020 site visit, PSB again advised us that only one of the 11 positions approved in the 2018 budget has been filled. PSB had not increased its investigative staff in more than four years, despite the continuing increase in investigator caseloads and backlogs. PSB filled the majority of the civilian positions authorized in the 2019 budget, and began assigning administrative staff to complete a variety of tasks previously completed by investigators. PSB also hired the three civilian investigators – two of whom still needed to attend the 40-hour Misconduct Investigative Training before they would be eligible to conduct investigations.

During our July and October 2020 remote site visits, PSB again advised us that only one of the 11 positions approved in the 2018 budget has been filled. All of the civilian positions authorized in the 2019 budget have now been filled, and the three civilian investigators hired are now conducting investigations. No additional requests for PSB staffing were made for the 2020 fiscal year.

As we have previously noted, hiring of civilian personnel is a positive step, but their hiring will not address what is an unacceptable failure to properly staff PSB with an adequate number of investigators to comply with the Order. The Second Order requires that PSB have "sufficient trained personnel to fulfill the requirements of this Order." MCSO has delivered the required Misconduct Investigative Training, and our focus remains on the ability of PSB staff to carry out its mission. As documented in this and previous reports, PSB, in its command's estimation, is understaffed. We will not find MCSO in compliance with this Paragraph until MCSO addresses PSB's staffing issues.

**Paragraph 196.** *Where appropriate to ensure the fact and appearance of impartiality, the Commander of the Professional Standards Bureau or the Chief Deputy may refer administrative misconduct investigations to another law enforcement agency or may retain a qualified outside investigator to conduct the investigation. Any outside investigator retained by the MCSO must possess the requisite background and level of experience of Internal Affairs investigators and must be free of any actual or perceived conflicts of interest.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

During our April 2017 site visit, the PSB Commander indicated that MCSO had not envisioned any need to retain additional contract investigators beyond the one investigator that had been already retained. A member of PSB's staff serves as MCSO's single point-of-contact to liaise and assist with scheduling for the contract investigator. The contract investigator will advance the investigations to the level of recommending findings.

PSB previously outsourced three misconduct investigations to a separate regional law enforcement agency. Two of these investigations were completed by the outside law enforcement agency and closed by MCSO. One was closed as the Independent Investigator was investigating the same alleged misconduct.

WAI 50909

During this reporting period, PSB advised us that five additional cases were outsourced to the contract investigator retained by MCSO. This investigator now has 21 cases in progress. While the contract investigator has previously completed seven investigations that were forwarded for our review, none have been completed and forwarded for this and the last three reporting periods.

During our October 2020 remote site visit, PSB advised us that while consideration is being given to retaining additional contract investigators, to date, none who meet the criteria for hiring have been identified.

**Paragraph 197.** *The Professional Standards Bureau will be headed by a qualified Commander. The Commander of the Professional Standards Bureau will have ultimate authority within the MCSO for reaching the findings of investigations and preliminarily determining any discipline to be imposed. If the Sheriff declines to designate a qualified Commander of the Professional Standards Bureau, the Court will designate a qualified candidate, which may be a Civilian Director in lieu of a sworn officer.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

In January 2018, MCSO advised that due to reorganizations within the Office, the responsibility to serve as the PSB Commander for purposes of compliance with this Order would be transferred to a captain within PSB. The PSB Deputy Chief, who previously had this responsibility was promoted, but maintains overall oversight of PSB as an Executive Chief.

During our October 2020 remote site visit, and our regularly scheduled meetings with PSB to discuss CRMs and other internal affairs matters during this reporting period, we have had continuing opportunities to interact with the captain now serving as the PSB Commander. He is an experienced PSB investigator and is cognizant of the many requirements and responsibilities of his new position. He continues to be responsive to our input, and we have had a number of productive discussions with him regarding PSB processes and internal investigations. In those cases where we have expressed concerns or requested information, he has generally provided timely responses. We continue to note that MCSO must support the PSB Commander with resources and executive leadership.

WAI 50910

**Paragraph 198.** *To promote independence and the confidentiality of investigations, the Professional Standards Bureau shall be physically located in a facility that is separate from other MCSO facilities, such as a professional office building or commercial retail space. This facility shall be easily accessible to the public, present a non-intimidating atmosphere, and have sufficient space and personnel for receiving members of the public and for permitting them to file complaints.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

In May 2018, PSB moved into the first and second floors of 101 West Jefferson Street. PSB's address is available on the comment and complaint form that is accessible to the public at the Districts and on MCSO's website. PSB's criminal investigators are housed on the first floor, and administrative investigators are housed on the second floor of the building. PSB's off-site facility has two dedicated security personnel assigned during normal business hours of 8:00 a.m.-4:00 p.m., Monday-Friday. MCSO remains in compliance with this requirement.

Maricopa County had previously advised MCSO that its lease for the PSB site was expired and that MCSO would have to vacate the site. MCSO stated that the lease requires that the County provide MCSO with a one-year advance written notification of the requirement to vacate the current PSB facility. As of this reporting period, MCSO has not received written notification from the County regarding the requirement to vacate the current PSB site.


**Paragraph 199.** *The MCSO will ensure that the qualifications for service as an internal affairs investigator shall be clearly defined and that anyone tasked with investigating employee misconduct possesses excellent investigative skills, a reputation for integrity, the ability to write clear reports, and the ability to be fair and objective in determining whether an employee committed misconduct. Employees with a history of multiple sustained misconduct allegations, or one sustained allegation of a Category 6 or Category 7 offense from MCSO's disciplinary matrices, will be presumptively ineligible to conduct misconduct investigations. Employees with a history of conducting deficient investigations will also be presumptively ineligible for these duties.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

WAI 50911

GH-2 reflects the directive of this Paragraph, to ensure that only supervisors who meet the criteria established by this Paragraph are assigned misconduct investigations. The PSB Operations Manual, which formalizes the review process, states that if any supervisor is deemed ineligible, the PSB commander will notify the supervisor's commander in writing, and will ensure that a BlueTeam entry is made to memorialize the supervisor's ineligibility to conduct misconduct investigations. A record of supervisors deemed ineligible to conduct misconduct investigations is maintained in PSB. These procedures were finalized and documented in the PSB Operations Manual, published on December 13, 2018.

During this reporting period, MCSO reported no new additions to the list of employees prohibited from conducting misconduct investigations. MCSO currently has five supervisors who are ineligible to conduct internal administrative investigations. During this reporting period, there were two employees transferred into PSB. All required documents were provided for the incoming employees, including EIS histories, training histories, and assignment histories. We reviewed the documentation for the incoming transfers to ensure that the employees met the qualifications listed in Paragraph 199; both transfers were approved.

***Paragraph 200.*** *In each misconduct investigation, investigators shall:*

a.    *conduct investigations in a rigorous and impartial manner designed to determine the facts;*

b.    *approach investigations without prejudging the facts and without permitting any preconceived impression of the principal or any witness to cloud the investigation;*

c.    *identify, collect, and consider all relevant circumstantial, direct, and physical evidence, including any audio or video recordings;*

d.    *make reasonable attempts to locate and interview all witnesses, including civilian witnesses;*

e.    *make reasonable attempts to interview any civilian complainant in person;*

f.    *audio and video record all interviews;*

g.    *when conducting interviews, avoid asking leading questions and questions that may suggest justifications for the alleged misconduct;*

h.    *make credibility determinations, as appropriate; and*

i.    *attempt to resolve material inconsistencies between employee, complainant, and witness statements.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

WAI 50912

To determine Phase 2 compliance with this Paragraph, we reviewed 146 administrative misconduct investigations that were completed by MCSO personnel during this reporting period. All but two were both initiated and completed after the issuance of the Second Order. PSB investigated 88 of the total cases. District or Division supervisory personnel not assigned to PSB investigated 58 of the cases. Of the cases we reviewed, 79 involved external complaints, and 67 were internally generated.

Paragraph 200.a. requires that misconduct investigations be conducted in a rigorous and impartial manner. During the last reporting period, all investigations complied with the requirements of this Subparagraph. During this reporting period, one investigation (1%) fell short of compliance with this Subparagraph.

Paragraph 200.b. requires that investigations be approached without prejudging the facts or permitting preconceived impressions. During the last reporting period, all investigations reviewed complied with the requirements of this Subparagraph. During this reporting period, one investigation (1%) fell short of compliance with this Subparagraph.

Paragraph 200.c. requires that investigators identify, collect, and consider all relevant evidence. During the last reporting period, one investigation (2%) fell short of compliance with this Subparagraph. During this reporting period, six investigations (4%) fell short of compliance with this Subparagraph.

Paragraph 200.d. requires that investigators make reasonable attempts to locate and interview all witnesses. During the last reporting period, one investigation (2%) fell short of compliance with the requirements of this Subparagraph. During this reporting period, two investigations (1%) fell short of compliance with this Subparagraph.

Paragraph 200.e. requires that investigators make reasonable attempts to interview civilian complainants in person. During the last reporting period, all investigations complied with the requirements of this Subparagraph. During this reporting period, two investigations (1%) fell short of compliance with this Subparagraph.

Paragraph 200.f. requires audio- and video-recording of all interviews. Of the 146 administrative investigations reviewed for this reporting period, there were 33 cases where interviews were not both audio- and video-recorded. In all but two (1%), adequate justification was provided.

Paragraph 200.g. requires that when conducting interviews, investigators avoid asking leading questions or questions that may suggest justification for the alleged misconduct. During the last reporting period, two investigations (2%) fell short of compliance with this Subparagraph. During this reporting period, five investigations (3%) fell short of compliance with this Subparagraph.

Paragraph 200.h. requires that proper credibility determinations be made. During this and the last reporting period, all investigations complied with the requirements of this Subparagraph.

Paragraph 200.i. requires that investigators attempt to resolve all material inconsistencies. During the last reporting period, one investigation (2%) fell short of compliance with this Subparagraph. During this reporting period, all of the investigations reviewed complied with the requirements of this Subparagraph.

WAI 50913

***Paragraph 201.*** *There will be no automatic preference for an employee's statement over a non-employee's statement. Internal affairs investigators will not disregard a witness's statement solely because the witness has some connection to either the complainant or the employee or because the witness or complainant has a criminal history, but may consider the witness's criminal history or any adjudicated findings of untruthfulness in evaluating that witness's statement. In conducting the investigation, internal affairs investigators may take into account the record of any witness, complainant, or officer who has been determined to have been deceptive or untruthful in any legal proceeding, misconduct investigation, or other investigation.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 146 administrative misconduct investigations conducted by MCSO personnel that were completed during this reporting period.

Of the 146 completed administrative misconduct investigations, 79 involved complainants that were not MCSO employees. Thirty-eight of the 146 investigations also included interviews with witnesses or investigative leads who were not MCSO employees. We did not identify any cases where we believe there was an automatic preference for the statement of an employee over a non-employee's statement.

We did not identify any completed investigations where a witness's statement was disregarded solely because of any connection identified in this Paragraph, nor where a witness's criminal history or findings of truthfulness were considered.


***Paragraph 202.*** *Internal affairs investigators will investigate any evidence of potential misconduct uncovered during the course of the investigation, regardless of whether the potential misconduct was part of the original allegation.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 146 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period. In 10 of the 146 investigations, MCSO identified additional potential misconduct during the course of the investigations and properly added additional allegations or initiated new investigations. We did not identify any investigations during this reporting period where we believe additional misconduct may have occurred and was not addressed by MCSO.

WAI 50914

***Paragraph 203.*** *If the person involved in the encounter with the MCSO pleads guilty or is found guilty of an offense, internal affairs investigators will not consider that information alone to be determinative of whether an MCSO employee engaged in misconduct, nor will it by itself justify discontinuing the investigation. MCSO training materials and policies on internal investigations will acknowledge explicitly that the fact of a criminal conviction related to the administrative investigation is not determinative of whether an MCSO employee engaged in misconduct and that the mission of an internal affairs investigator is to determine whether any misconduct occurred.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

There were no indications in any of the completed investigations we reviewed that any MCSO investigators considered alone any pleading or finding of guilty by any person as a reason to make any determination regarding the potential misconduct of any MCSO personnel, nor were any investigations discontinued for this reason.


***Paragraph 204.*** *Internal affairs investigators will complete their administrative investigations within 85 calendar days of the initiation of the investigation (60 calendar days if within a Division). Any request for an extension of time must be approved in writing by the Commander of the Professional Standards Bureau. Reasonable requests for extensions of time may be granted.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** Not in compliance

To determine Phase 2 compliance with this Paragraph, we review administrative misconduct investigations conducted by MCSO personnel.

WAI 50915

PSB conducted 88 of the 146 administrative misconduct investigations we reviewed for this reporting period. Only 29 (33%) of the 88 were completed within the required 85-day timeframe or had an approved extension for a reason specific to the investigation. Of the 58 investigations completed by Districts and Divisions outside of PSB, 45 (78%) were initially submitted to PSB within the required 60-day timeframe or had an approved extension for a reason specific to the investigation. As has been our practice for numerous reporting periods, we determine the 60-day time period compliance findings for those investigations conducted by personnel outside of PSB based on the original date the investigation is approved by the District or Division Commander and forwarded to PSB. In those cases where deficiencies are identified by PSB, the cases will continue to be found noncompliant in other relevant Paragraphs, and specifically in Paragraph 213, which requires the District or Division Commander ensure that investigations conducted by their personnel are complete and the findings are supported by the evidence prior to their submittal to PSB.

As we noted in Paragraph 194, timely completion of administrative investigations has continued to be of concern for many reporting periods. Of the 146 total administrative misconduct investigations submitted for compliance during this reporting period, 74 (51%) investigations were completed and submitted by the investigator within the required 60- or 85-day timeframe or contained an acceptable extension request and approval. This is an increase from the 38% compliance for the last quarter.

In addition to those investigations not completed within 60 or 85 days as required by this Paragraph, of the 146 total investigations, only 42 (29%) were completed within 180 days or had a reasonable extension request and approval.

The average time for full closure of administrative investigations is now reported by MCSO to be 509 days, a slight increase from the 501 days reported for the last reporting period. As we noted in our last quarterly status report, we can no longer accept workload as the justification for the failure to complete investigations in a timely manner. The time it takes to conduct and close investigations remains unacceptable and it is the agency that bears the responsibility to address this issue with decisive action.

MCSO is not in Phase 2 compliance for this Paragraph.


***Paragraph 205.*** *The Professional Standards Bureau shall maintain a database to track all ongoing misconduct cases, and shall generate alerts to the responsible investigator and his or her Supervisor and the Commander of the Professional Standards Bureau when deadlines are not met.*

**Phase 1:** In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 7, 2020.

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

- GH-5 (Early Identification System), most recently amended on May 6, 2020.

WAI 50916

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

We determine compliance with this Paragraph by assigning a member of our Team to observe demonstrations of the IAPro database during our site visits or other meetings with PSB throughout the reporting period. The IAPro technology serves as the centralized electronic numbering and tracking system for all allegations of misconduct, whether internally discovered or based on an external complaint. This database contains the capacity to manage and store information required for compliance with this Paragraph.

During our site visits, we have met with PSB personnel on numerous occasions and observed IAPro to ensure that the system generates appropriate alerts to responsible investigators and PSB commanders if deadlines are not met. We have reviewed emails PSB disseminates each month to Districts and Divisions to identify investigative deadlines. We have also reviewed the BlueTeam Dashboard, which uses a color-coded system to identify investigations that are nearing deadlines or are past deadlines. The information appears in each supervisor's BlueTeam account when they are monitoring open cases.

The civilian PSB Special Projects Manager is primarily responsible for administering the centralized tracking system. In addition, all PSB and Division investigators can access the electronic BlueTeam database – a system that integrates with IAPro – at any time to view the assignment and status of administrative investigations. PSB has also trained two lieutenants to administer the system.

In May 2018, PSB relocated to an offsite location. In July 2018, a member of our Team verified that the existing tracking mechanisms continue to be used for the tracking of investigations at the new facility.

During our January, July, and October 2019 site visits, a member of our Team verified that the tracking mechanisms remain in place. We also continued to receive monthly notifications from PSB regarding closed administrative investigations, and we evaluate these closed investigations for the entirety of a reporting period against a multitude of criteria, including whether the cases were completed in a timely fashion.

During this reporting period, we continued to receive monthly notifications from PSB regarding closed administrative misconduct investigations; and we continue to evaluate these closed investigations for the entirety of a reporting period against a multitude of criteria, including whether the cases were completed in a timely fashion. (See Paragraph 204.)

WAI 50917

***Paragraph 206.*** *At the conclusion of each investigation, internal affairs investigators will prepare an investigation report. The report will include:*

a.    *a narrative description of the incident;*

b.    *documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the incident. In situations in which there are no known witnesses, the report will specifically state this fact. In situations in which witnesses were present but circumstances prevented the internal affairs investigator from determining the identification, phone number, or address of those witnesses, the report will state the reasons why. The report will also include all available identifying information for anyone who refuses to provide a statement;*

c.    *documentation of whether employees were interviewed, and a transcript or recording of those interviews;*

d.    *the names of all other MCSO employees who witnessed the incident;*

e.    *the internal affairs investigator's evaluation of the incident, based on his or her review of the evidence gathered, including a determination of whether the employee's actions appear to be within MCSO policy, procedure, regulations, orders, or other standards of conduct required of MCSO employees;*

f.    *in cases where the MCSO asserts that material inconsistencies were resolved, explicit credibility findings, including a precise description of the evidence that supports or detracts from the person's credibility;*

g.    *in cases where material inconsistencies must be resolved between complainant, employee, and witness statements, explicit resolution of the inconsistencies, including a precise description of the evidence relied upon to resolve the inconsistencies;*

h.    *an assessment of the incident for policy, training, tactical, or equipment concerns, including any recommendations for how those concerns will be addressed;*

i.    *if a weapon was used, documentation that the employee's certification and training for the weapon were current; and*

j.    *documentation of recommendations for initiation of the disciplinary process; and*

k.    *in the instance of an externally generated complaint, documentation of all contacts and updates with the complainant.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 146 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

WAI 50918

Paragraph 206.a. requires a written description on the incident be included in the investigative report. All of the completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.b. requires documentation of evidence gathered, including all known information about witnesses. All of the completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.c. requires documentation of whether employees were interviewed, and a transcript or recording of these interviews. All but one (1%) of the completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.d. requires that the names of all MCSO employees who witnessed the incident be included in the report. All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.e. requires that the internal affairs investigator's evaluation of the incident includes a determination of whether the employee's actions appear to be within MCSO policy, procedure, regulations, orders, or other standards of conduct required of MCSO employees. All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.f. requires that when MCSO asserts that material inconsistencies were resolved, explicit credibility findings, including a precise description of the evidence that supports or detracts from the person's credibility must be provided. All of the completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.g. requires that when material inconsistencies must be resolved, a precise description of the evidence be included in the report. All of the completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.h. requires that assessment of the incident for policy, training, tactical, or equipment concerns be included in the investigative report, to include any recommendations. During this reporting period, all but one (1%) of the completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.i. requires that if a weapon was used, documentation that the employee's certification and training for the weapon must be included in the investigative written report. All but one (1%) of the completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.j. requires that documentation of the initiation of the disciplinary process be included in the investigation. Compliance is achieved when the misconduct investigator completes the investigation with a finding of sustained, when applicable, and the PSB Commander subsequently approves the finding. This is considered the initiation of the disciplinary process. Twenty-nine of the 146 administrative misconduct investigations we reviewed had sustained findings against one or more active MCSO employee. All complied with the requirements of this Subparagraph.

WAI 50919

Paragraph 206.k. requires that any contacts and updates with the complainant be documented in the investigative report. We did not identify any instances during this reporting period where this did not occur.

*Paragraph 207. In assessing the incident for policy, training, tactical, or equipment concerns, investigation reports will include an assessment of whether:*

a.    *the law enforcement action was in compliance with training and legal standards;*

b.    *the use of different tactics should or could have been employed;*

c.    *the incident indicates a need for additional training, counseling, or other non-disciplinary corrective actions; and*

d.    *the incident suggests that the MCSO should revise its policies, strategies, tactics, or training.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

During this reporting period, we reviewed 146 administrative misconduct investigations. MCSO properly assessed and documented whether any of the requirements of this Paragraph were relevant in all but one (1%) of the completed cases we reviewed for this reporting period. MCSO identified five cases where action related to this Paragraph was appropriate; and addressed the concerns with additional training, or where appropriate, policy review.

PSB continues to use an internal tracking form to ensure that those concerns that are forwarded to other Divisions within MCSO for action or review are addressed. We receive and review this tracking document each month. This tracking form contains regularly updated information on the status of concerns that have been identified.

*Paragraph 208. For each allegation of misconduct, internal affairs investigators shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation:*

a.    *"Unfounded," where the investigation determines, by clear and convincing evidence, that the allegation was false or not supported by fact;*

b.    *"Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur and justifies a reasonable conclusion of a policy violation;*

c.    *"Not Sustained," where the investigation determines that there is insufficient evidence to prove or disprove the allegation; or*

WAI 50920

*d.* *"Exonerated," where the investigation determines that the alleged conduct did occur but did not violate MCSO policies, procedures, or training.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review administrative misconduct investigations conducted by MCSO personnel and completed during the reporting period. We evaluate compliance with this Paragraph against the standard of whether a finding was made, and whether the finding was correct.

During the last reporting period, we concurred with the findings of the PSB Commander in 64 (98%) of the 65 cases that were completed.

During this reporting period, we concurred with the findings of the PSB Commander in 142 (97%) of the 146 administrative misconduct investigations we reviewed. In two, we believe allegations of misconduct that were unfounded by MCSO should have been sustained. In one, we disagree with the finding of unfounded and believe the finding should have been not sustained; and in one where MCSO not sustained the allegation, we believe the allegation should have been unfounded. There were no instances where the Appointing Authority changed the findings made by the PSB Commander.

**Paragraph 209.** *For investigations carried out by Supervisors outside of the Professional Standards Bureau, the investigator shall forward the completed investigation report through his or her chain of command to his or her Division Commander. The Division Commander must approve the investigation and indicate his or her concurrence with the findings.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 58 administrative misconduct investigations not conducted by PSB personnel and completed during this reporting period. All 58 were forwarded to PSB as required, and all contained the approval of the responsible District or Division Commander. As noted in previous reporting periods, and again during *this* reporting period, some of the District or Division level investigations were not in compliance with various requirements of the Second Order – as indicated throughout this report. However, we assessed MCSO's compliance with this Paragraph based on these cases being forwarded through the chain of command for approval of the investigation and findings.

WAI 50921

***Paragraph 210.*** *For investigations carried out by the Professional Standards Bureau, the investigator shall forward the completed investigation report to the Commander.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 88 administrative misconduct investigations that were conducted by PSB personnel and completed during this reporting period. All 88 complied with the requirements of this Paragraph.


***Paragraph 211.*** *If the Commander—meaning the Commander of the PSB or the Commander of the Division in which the internal affairs investigation was conducted—determines that the findings of the investigation report are not supported by the appropriate standard of proof, the Commander shall return the investigation to the investigator for correction or additional investigative effort, shall document the inadequacies, and shall include this documentation as an addendum to the original investigation. The investigator's Supervisor shall take appropriate action to address the inadequately supported determination and any investigative deficiencies that led to it. The Commander shall be responsible for the accuracy and completeness of investigation reports prepared by internal affairs investigators under his or her command.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** Not in compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 146 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

PSB personnel investigated 88 of the 146 administrative misconduct investigations we reviewed during this reporting period. In 79 of the cases investigated by PSB personnel, we continued to find the investigations thorough, and the reports well-written. We identified specific concerns with nine investigations (10%). These concerns included: potential evidence was not collected in a timely manner; policy concerns were not addressed; inaccurate policy violations were used; weapons certification information and justification for not conducting witness interviews were not included in the case report; and in one, the misconduct allegation was not addressed until two years after the complaint was filed. There were no investigations completed by the contract investigator that were forwarded for our review during this reporting period. Based on our review of these cases, which includes our assessments of extension requests, 21 investigations (24%) of the 88 total investigations are in compliance.

Of the 58 investigations investigated by Districts or Divisions outside of PSB, we identified 23 investigations (40%) where we had some concerns regarding the investigation or documentation. These concerns included: arriving at an improper finding; using leading questions; failure to complete a proper investigation; failure to identify a conflict of interest; failure to interview all witnesses; and multiple administrative errors. We believe that many of the concerns found in

WAI 50922

these cases could, and should, have been identified at the District or Division level prior to forwarding the cases to PSB for review. We noted, however, during this reporting period, that District and Division Captains identified some of the deficiencies and addressed them with the investigators prior to the investigations being forwarded to PSB. However, when PSB identifies concerns, some cannot be corrected after the fact. We were encouraged by what appears to be increased attention to investigations at the District and Division level. Our assessment of these investigations, which includes our assessments of extension requests, found that 15 (26%) of the 58 investigations are in compliance.

In January 2018, we requested that MCSO begin providing us with documentation that reflects the actions being taken to address deficient misconduct investigations. We requested that PSB and command personnel provide a response to this request on a monthly basis. We have consistently received the requested documentation since March 2018.

During this reporting period, we noted an increase in instances where District Commanders identified investigative deficiencies and, where possible, had them corrected prior to forwarding the investigation to PSB. We also noted increased involvement of Deputy Chiefs with oversight for District Commanders and some instances of one-on-one discussions or Supervisory Note entries regarding the reviews of misconduct investigations. We specifically noted that in Patrol Bureau East, the Deputy Chief met with all the Commanders in his Bureau to discuss administrative misconduct investigations and how they could be improved. Together they identified some additional things that could be done to ensure improved quality in their investigations and reviews. PSB continued to identify deficiencies in District investigations during this reporting period, and forwarded these concerns to the appropriate Commanders or Deputy Chiefs to be addressed. We also noted that there are still numerous deficiency memorandums authored by PSB that were written between March and July 2020 that have yet to be addressed. As in the last reporting period, we urge MCSO Command personnel to address identified deficiencies in a timely manner. We will continue to closely monitor how identified deficiencies are being addressed.

We have noted in numerous prior reporting periods that both the supervisors who complete deficient investigations and the command personnel who approve them must be held accountable if MCSO is to achieve Phase 2 compliance with this Paragraph. Again, during this reporting period, our review of cases completed by PSB personnel continues to indicate PSB's ongoing efforts to achieve compliance, and we remain optimistic that they will continue to do so. Our review of District investigations during this reporting period also identified that more attention is being given to investigations by both District Command personnel and the Deputy Chiefs with oversight. We are hopeful that this increased attention will result in continued improvement.

WAI 50923

***Paragraph 212.*** *Where an internal affairs investigator conducts a deficient misconduct investigation, the investigator shall receive the appropriate corrective and/or disciplinary action. An internal affairs investigator's failure to improve the quality of his or her investigations after corrective and/or disciplinary action is taken shall be grounds for demotion and/or removal from a supervisory position or the Professional Standards Bureau.*

**Phase 1:** In compliance

- GB-2 (Command Responsibility), most recently amended on June 28, 2019.
- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 146 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

The 40-hour Misconduct Investigative Training was completed in late 2017. In January 2018, we requested that MCSO begin providing us with a document that reflects what actions are being taken to address deficient misconduct investigations on a monthly basis. As discussed in Paragraph 211, we have consistently received documentation since March 2018. During this reporting period, PSB identified and documented numerous deficiencies with investigations completed outside of PSB. District Commanders and Division Chiefs also identified and addressed some concerns and deficiencies with investigations conducted or reviewed by their personnel during this reporting period.

We will continue to closely monitor these monthly reports submitted by MCSO command personnel, along with reviewing completed misconduct investigations, to determine if deficiencies are being properly identified and addressed.


***Paragraph 213.*** *Investigations of minor misconduct conducted outside of the Professional Standards Bureau must be conducted by a Supervisor and not by line-level deputies. After such investigations, the investigating Supervisor's Commander shall forward the investigation file to the Professional Standards Bureau after he or she finds that the misconduct investigation is complete and the findings are supported by the evidence. The Professional Standards Bureau shall review the misconduct investigation to ensure that it is complete and that the findings are supported by the evidence. The Professional Standards Bureau shall order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings. Where the findings of the investigation report are not supported by the appropriate standard of proof, the Professional Standards Bureau shall document the reasons for this determination and shall include this documentation as an addendum to the original investigation.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** In compliance

WAI 50924

To assess Phase 2 compliance with this Paragraph, we reviewed 146 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period. Of the 146 investigations, 88 were investigated by PSB personnel. Fifty-eight were investigated by MCSO personnel outside of PSB.

None of the documentation we received regarding investigations conducted outside of PSB indicated that any person below the rank of sergeant was responsible for the investigation.

During the last reporting period, all 26 District or Division level approved cases were forwarded to, and reviewed by, PSB as required. Twelve (46%) of the 26 cases investigated at the District or Division level were returned by PSB personnel for additional investigation, corrections, proper documentation, or other changes.

During this reporting period, all 58 District or Division level investigations were forwarded to and reviewed by PSB as required. Thirteen (22%) were returned to the Districts for corrections or additional information. In 12, PSB identified that findings were not supported by the facts of the investigation and the findings were changed. Our assessment of the 58 investigations, which includes the reasonableness of extension requests, found that 15 investigations (26%) were in compliance with all Second Order requirements.

As is our practice, we will discuss these cases with MCSO during our next site visit.

**Paragraph 214.** *At the discretion of the Commander of the Professional Standards Bureau, a misconduct investigation may be assigned or re-assigned to another Supervisor with the approval of his or her Commander, whether within or outside of the District or Bureau in which the incident occurred, or may be returned to the original Supervisor for further investigation or analysis. This assignment or re-assignment shall be explained in writing.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 146 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

Our analysis for this reporting period revealed that of the 58 investigations conducted outside of PSB, 13 were returned by PSB to the original investigating supervisor for further investigation or analysis. None were reassigned to a different investigator.

**Paragraph 215.** *If, after an investigation conducted outside of the Professional Standards Bureau, an employee's actions are found to violate policy, the investigating Supervisor's Commander shall direct and ensure appropriate discipline and/or corrective action. Where the incident indicates policy, training, tactical, or equipment concerns, the Commander shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.*

WAI 50925

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.
- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 58 administrative misconduct investigations conducted by MCSO personnel outside of PSB and completed during this reporting period.

Nine of the 58 completed misconduct investigations conducted outside of PSB resulted in sustained findings. In all nine cases, the reports included documentation that appropriate discipline or corrective action was taken. In one, PSB also identified and appropriately addressed a policy concern.

***Paragraph 216.*** *If, after an investigation conducted by the Professional Standards Bureau, an employee's actions are found to violate policy, the Commander of the Professional Standards Bureau shall direct and ensure appropriate discipline and/or corrective action. Where the incident indicates policy, training, tactical, or equipment concerns, the Commander of the Professional Standards Bureau shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.
- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 146 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

Eighty-eight of the completed investigations were conducted by PSB personnel. Twenty-nine resulted in a sustained finding against one or more MCSO employee. In 20 of these sustained investigations, the PSB Commander ensured that appropriate discipline and/or corrective action was recommended. In six cases, the involved employees left MCSO employment prior to the completion of the investigation or the determination of discipline. Three investigations resulted in probationary releases for the involved employees. The PSB Commander provided the preliminary determination of the range of discipline in all 20 cases involving current MCSO employees. The PSB Commander cannot ensure that appropriate discipline or corrective action are the final outcome of sustained misconduct investigations, as the Appointing Authority makes the final decisions for discipline in both minor misconduct cases and in serious misconduct cases that result in PDHs. The hearing officer has the authority to change the findings or reduce the discipline.

WAI 50926

***Paragraph 217.*** *The Professional Standards Bureau shall conduct targeted and random reviews of discipline imposed by Commanders for minor misconduct to ensure compliance with MCSO policy and legal standards.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** Not applicable

Based on the requirements of the Second Order, District and Division Commanders will not impose discipline for minor misconduct. In all cases, the PSB Commander will determine the final findings for internal investigations and the presumptive range of discipline for those cases with sustained findings. The Appointing Authority will then make the final determination of discipline.


***Paragraph 218.*** *The Professional Standards Bureau shall maintain all administrative investigation reports and files after they are completed for record-keeping in accordance with applicable law.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine compliance with this Paragraph, we have observed that PSB maintains both hardcopy and electronic files intended to contain all documents required for compliance with this Paragraph.

A member of our Team inspected the file rooms where hardcopies of administrative investigations were stored and randomly reviewed case files to verify compliance on multiple occasions when PSB was housed at MCSO Headquarters. Our Team member also used the access granted to IAPro to randomly select internal affairs case files to verify that all information was being maintained electronically.

PSB completed the move to its new offsite facility in May 2018. Subsequent to the move, a member of our Team conducted an inspection of the file rooms in the new facility; and conducted a review of random internal investigations in IAPro to ensure ongoing compliance.

During our January 2019 site visit, a member of our Team verified continued compliance at the new PSB facility by inspecting both the criminal and administrative investigation file rooms and randomly reviewing internal affairs case files to verify that all information was also being electronically maintained in IAPro.

During our July 2019 site visit, a member of our Team verified, by accessing IAPro and reviewing randomly selected cases, that electronic files were being properly maintained.

WAI 50927

During our October 2019 site visit, a member of our Team again verified compliance at the PSB facility by inspecting both the criminal and administrative investigation file rooms and randomly reviewing internal affairs case files to verify that all information is also being electronically maintained in IAPro.

## D. Discipline

**Paragraph 219.** *The Sheriff shall ensure that discipline for sustained allegations of misconduct comports with due process, and that discipline is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented regardless of the command level of the principal of the investigation.*

**Paragraph 220.** *To ensure consistency in the imposition of discipline, the Sheriff shall review the MCSO's current disciplinary matrices and, upon approval of the parties and the Monitor, will amend them as necessary to ensure that they:*

a.   *establish a presumptive range of discipline for each type of violation;*

b.   *increase the presumptive discipline based on an employee's prior violations;*

c.   *set out defined mitigating and aggravating factors;*

d.   *prohibit consideration of the employee's race, gender, gender identity, sexual orientation, national origin, age, or ethnicity;*

e.   *prohibit conflicts, nepotism, or bias of any kind in the administration of discipline;*

f.   *prohibit consideration of the high (or low) profile nature of the incident, including media coverage or other public attention;*

g.   *clearly define forms of discipline and define classes of discipline as used in policies and operations manuals;*

h.   *provide that corrective action such as coaching or training is not considered to be discipline and should not be used as a substitute for discipline where the matrix calls for discipline;*

i.   *provide that the MCSO will not take only non-disciplinary corrective action in cases in which the disciplinary matrices call for the imposition of discipline;*

j.   *provide that the MCSO will consider whether non-disciplinary corrective action is also appropriate in a case where discipline has been imposed;*

k.   *require that any departures from the discipline recommended under the disciplinary matrices be justified in writing and included in the employee's file; and*

l.   *provide a disciplinary matrix for unclassified management level employees that is at least as demanding as the disciplinary matrix for management level employees.*

**Phase 1:** In compliance

WAI 50928

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, 38 of the 146 administrative misconduct investigations resulted in sustained findings against one or more members of MCSO. In 29 of the sustained cases, one or more of the principal employees were still employed at MCSO at the time findings or discipline decisions were made. Compliance for this Paragraph is based on the discipline findings for both minor and serious discipline. In those cases where only serious discipline is recommended, compliance findings specific to those cases are addressed in Paragraph 226.

Paragraph 220.a. requires a presumptive range of discipline for each type of violation. Of the 38 total sustained cases, 29 involved employees still employed by MCSO at the time discipline decisions were made. The PSB Commander determined and documented the presumptive discipline range in compliance with this Subparagraph.

Paragraph 220.b. requires that presumptive discipline be increased if an employee has prior violations. In 13 of the 29 sustained investigations where discipline was assessed, the employee had prior sustained violations. The PSB Commander considered and increased the presumptive discipline based on the matrices in place at the time of the misconduct.

Paragraph 220.c. requires that mitigating and aggravating factors be defined. Aggravating and mitigating factors are not specifically defined in the internal affairs investigation or discipline policy in effect prior to May 18, 2017. The revised discipline policy, effective May 18, 2017, does define these factors. These aggravating or mitigating factors are not identified by the PSB Commander, but are identified and considered by the Appointing Authority when making the final disciplinary decisions.

During this reporting period, all but one of the sustained cases were initiated after May 18, 2017. The Appointing Authority provided justification and documentation for all factors he considered when making the final discipline decisions for all 29 cases based on the matrices in place at the time of the misconduct. We also found that he continues to specifically identify those instances where there are aggravating or mitigating factors in the justification documents when appropriate.

Paragraph 220.d. prohibits the consideration of any prohibited biases when determining discipline. None of the sustained cases that resulted in discipline that we reviewed during this reporting period included any indication that any biases were considered when determining discipline.

WAI 50929

Paragraph 220.e. prohibits any conflicts, nepotism, or bias of any kind in the administration of discipline. None of the sustained cases we reviewed during this reporting period had any indication of conflicts, nepotism, or bias of any kind when determining the disciplinary sanction.

Paragraph 220.f. prohibits the consideration of the high (or low) profile nature of an incident when determining discipline. None of the sustained cases we reviewed during this reporting period indicated any consideration of the high- or low-profile nature of the incident when considering discipline.

Paragraph 220.g. requires that clearly defined forms of discipline and classes of discipline be defined. Phase 2 compliance is not applicable to this Subparagraph.

Paragraph 220.h. requires that corrective action such as coaching or training is not considered to be discipline and should not be used as a substitute for discipline. In one (3%) of the 29 sustained administrative misconduct investigations where discipline was assessed, coaching was used as a substitute for discipline. In this case, PSB used the wrong category of offense, resulting in the employee's eligibility for a coaching. Had the appropriate category of offense been identified, coaching would not have been the appropriate outcome.

During the last two reporting periods, we found that the PSB Commander had inappropriately approved multiple coachings without an administrative investigation and MCSO was found out of compliance with this Subparagraph. During this reporting period, the PSB Commander approved four coachings without an investigation. In all four, both the category of offense and the offense number were eligible for the coaching. MCSO is again in compliance with this Subparagraph.

Paragraph 220.i. requires that MCSO will not take only non-disciplinary action in cases where the Discipline Matrices call for the imposition of discipline. As noted in 220.h, the PSB Commander issued one coaching for sustained misconduct in an administrative investigation for an act of misconduct that was ineligible to be handled with a coaching.

Paragraph 220.j. requires that MCSO consider whether non-disciplinary corrective action is also appropriate. In one case reviewed during this reporting period, in addition to discipline, additional training was provided to the employee.

Paragraph 220.k. requires that any departure from the discipline recommended under the Discipline Matrices be justified in writing and included in the employee's file.

During the last reporting period, 13 investigations with sustained findings resulted in employee discipline. Eight involved minor discipline; four involved serious discipline; and one resulted in the demotion of a probationary supervisor. In 10 of the cases, the final discipline was the presumptive discipline. In one, the Appointing Authority aggravated the discipline, and in a second, he mitigated the discipline. In a third case, a probationary supervisor was demoted as a result of the sustained misconduct. We agreed with all of the decisions made by the Appointing Authority.

WAI 50930

During this reporting period, there were 29 investigations with sustained findings that resulted in discipline for MCSO employees. Fifteen resulted in minor discipline, and 14 resulted in serious discipline. As we have previously noted, compliance for this Paragraph is based on the final outcome for all sustained investigations. Those instances that involve only serious discipline are specifically covered in Paragraph 226.

Paragraph 220.l. requires that a Discipline Matrix for unclassified management employees be at least as demanding as the Discipline Matrix for management-level employees. We reviewed the approved policies that affect discipline for unclassified management employees, and they comply with this requirement. During this reporting period, MCSO did not complete or submit any administrative investigations involving unclassified management employees.

During this reporting period, all 29 sustained investigations where discipline occurred were both initiated and completed after May 18, 2017; and are subject to all the requirements relative to investigations and disciplinary procedures contained in policies revised on that date. The investigations initiated and completed after May 18, 2017 have both a discipline range and a presumptive discipline. The Appointing Authority provided a written justification in all sustained cases where discipline was imposed.

In 23 of the 29 cases, the final discipline was the presumptive discipline identified in the matrices. In two cases involving minor discipline, the Appointing Authority mitigated the discipline within the range. In one case involving serious discipline, the Appointing Authority also mitigated the discipline within the range. In three other cases, all involving serious discipline, the Appointing Authority aggravated the discipline within the range. We agree with the decisions by the Appointing Authority in all of these cases.

MCSO had been in compliance with the requirements for this Paragraph for numerous reporting periods. However, during the last two reporting periods, MCSO fell below the required Phase 2 compliance for this Paragraph and we withdrew Phase 2 compliance.

For this reporting period, MCSO is again in compliance with the requirements of this Paragraph.


***Paragraph 221.*** *The Sheriff shall mandate that each act or omission that results in a sustained misconduct allegation shall be treated as a separate offense for the purposes of imposing discipline.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed 29 misconduct investigations with sustained allegations that resulted in the recommendation for discipline for current MCSO employees. We found that MCSO again met the requirements for compliance with this Paragraph.

WAI 50931

***Paragraph 222.*** *The Sheriff shall also provide that the Commander of the Professional Standards Bureau shall make preliminary determinations of the discipline to be imposed in all cases and shall document those determinations in writing, including the presumptive range of discipline for the sustained misconduct allegation, and the employee's disciplinary history.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, there were 29 sustained investigations that were completed after July 20, 2016 where discipline was recommended. In all of these cases, the PSB Commander determined and documented in writing the presumptive discipline or presumptive range of discipline based on the policies and Discipline Matrices in effect at the time of the investigation. The documentation submitted for this Paragraph included the category, offense number, and employee's discipline history.


## E.  Pre-Determination Hearings

***Paragraph 223.*** *If the Commander of the Professional Standards Bureau makes a preliminary determination that serious discipline (defined as suspension, demotion, or termination) should be imposed, a designated member of MCSO's command staff will conduct a pre-determination hearing and will provide the employee with an opportunity to be heard.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel where MCSO holds a Pre-Determination Hearing (PDH).

During this reporting period, 29 administrative misconduct investigations resulted in sustained findings against current MCSO employees. Fifteen investigations resulted in the recommendation for serious discipline. In all 15, MCSO scheduled the Pre-Determination Hearings, as required. In one of the 15, the employee did not attend the hearing.

WAI 50932

**Paragraph 224.** *Pre-determination hearings will be audio and video recorded in their entirety, and the recording shall be maintained with the administrative investigation file.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.
- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

**Phase 2:** In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, in the 14 cases where a Pre-Determination Hearing was held, the hearing was audio- and video-recorded as required, included in the administrative file, and reviewed by a member of our Team.


**Paragraph 225.** *If an employee provides new or additional evidence at a pre-determination hearing, the hearing will be suspended and the matter will be returned to the internal affairs investigator for consideration or further investigation, as necessary. If after any further investigation or consideration of the new or additional evidence, there is no change in the determination of preliminary discipline, the matter will go back to the pre-determination hearing. The Professional Standards Bureau shall initiate a separate misconduct investigation if it appears that the employee intentionally withheld the new or additional evidence during the initial misconduct investigation.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.
- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

**Phase 2:** In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, 14 sustained investigations resulted in a Pre-Determination Hearing and we reviewed all the recordings of these hearings. There were no instances where we, or the Appointing Authority, identified any concerns that required additional follow-up related to the requirements of this Paragraph.

WAI 50933

***Paragraph 226.*** *If the designated member of MCSO's command staff conducting the pre-determination hearing does not uphold the charges recommended by the Professional Standards Bureau in any respect, or does not impose the Commander of the Professional Standards Bureau's recommended discipline and/or non-disciplinary corrective action, the Sheriff shall require the designated member of MCSO's command staff to set forth in writing his or her justification for doing so. This justification will be appended to the investigation file.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.
- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

**Phase 2:** In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During every site visit, we meet with the Appointing Authority and the Administrative Services Division to discuss any concerns with final outcomes or decisions that result from Pre-Determination Hearings. We have continued to emphasize to MCSO the need to comply with agency policies when determining disciplinary outcomes.

During our January 2018 site visit, we met with the Appointing Authority and Administrative Services Division personnel to discuss the Pre-Determination Hearing process and the final outcomes of cases. During the meeting, MCSO advised us that the Appointing Authority does not have the authority to reduce discipline based only on timeframe concerns when an employee appeals discipline in these cases. It is the Maricopa County Attorney's Office (MCAO) that reviews these cases and determines whether the cases should go forward. Both the Appointing Authority and the representative from the MCAO advised that they have taken some of these cases forward; but in others, they did not believe it was appropriate to do so, based on the totality of circumstances. The Parties present at the meeting also commented on their concerns regarding cases involving the Plaintiffs' class that might result in reductions in discipline as a result of the failure to complete the case within the 180-day timeframe. We discussed the specific requirements of Arizona Revised Statutes 38-1101, and that the statute only requires a "good faith" attempt to complete cases that result in suspensions, demotions, or dismissals within the 180-day timeframe. Since the time of our discussion in 2018, Arizona law has added a definition of good faith. A.R.S. 38-1101 now defines good faith as "honesty of purpose and absence of intent to defraud."

During that same site visit, we discussed those cases where a decision may be made after a Pre-Determination Hearing that a reduction in discipline will occur, and those cases where a decision to reduce the discipline may occur if an appeal is filed. It is our understanding from our meeting with the Appointing Authority and other staff who were present that MCSO consults with MCAO attorneys in these cases and their input is related to the final outcomes. However, all the documentation we receive and review is authored and signed by the Appointing Authority, so our assessment can only consider any final decisions as his.

WAI 50934

During the last reporting period, all four cases forwarded for consideration of serious discipline resulted in serious discipline. The Appointing Authority provided a justification for the final decisions in all cases, and this information was provided to our Team in the submissions regarding closed internal affairs investigations. The Appointing Authority did not overturn any of the sustained findings by the PSB Commander.

During this reporting period, 14 of the 15 cases forwarded for consideration of serious discipline resulted in serious discipline. In three cases, the Appointing Authority aggravated the discipline within the range, and in one case he mitigated the discipline within the range. We agree with his decisions in all four of these cases. The Appointing Authority consistently provides a justification for the final decisions in all cases, and this information was provided to our Team in the submissions regarding closed internal affairs investigations for this reporting period.

**Paragraph 227.** *The Sheriff shall promulgate MCSO policy which shall provide that the designated member of MCSO's command staff conducting a pre-determination hearing should apply the disciplinary matrix and set forth clear guidelines for the grounds on which a deviation is permitted. The Sheriff shall mandate that the designated member of MCSO's command staff may not consider the following as grounds for mitigation or reducing the level of discipline prescribed by the matrix:*

a.      *his or her personal opinion about the employee's reputation;*

b.      *the employee's past disciplinary history (or lack thereof), except as provided in the disciplinary matrix;*

c.      *whether others were jointly responsible for the misconduct, except that the MCSO disciplinary decision maker may consider the measure of discipline imposed on other employees involved to the extent that discipline on others had been previously imposed and the conduct was similarly culpable.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

**Phase 2:**  In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed 29 administrative misconduct investigations where discipline was recommended. The serious sustained allegations in 15 of these investigations resulted in their referrals for Pre-Determination Hearings.

WAI 50935

Paragraph 227.a. prohibits the designated member of command staff conducting a Pre-Determination Hearing from considering a personal opinion of an employee's reputation when determining discipline. There were no indications in our reviews of these investigations that any personal opinion was considered in making a disciplinary decision.

Paragraph 227.b. prohibits the consideration of the employee's past disciplinary history (or lack thereof), except as provided in the Discipline Matrix. There were no instances where we determined that the member of command staff responsible for conducting the Pre-Determination Hearing considered disciplinary history outside of the requirements of this Paragraph.

Paragraph 227.c. prohibits the consideration of others jointly responsible for misconduct, except that the decision-maker may consider such discipline to the extent that discipline on others had been previously imposed and the conduct was similarly culpable. There were no indications in our reviews that the misconduct of others was improperly considered in the disciplinary decisions that were made.

***Paragraph 228.*** *The Sheriff or his designee has the authority to rescind, revoke or alter any disciplinary decision made by either the Commander of the Professional Standards Bureau or the appointed MCSO disciplinary authority so long as:*

a.  *that decision does not relate to the Sheriff or his designee;*

b.  *the Sheriff or his designee provides a thorough written and reasonable explanation for the grounds of the decision as to each employee involved;*

c.  *the written explanation is placed in the employment files of all employees who were affected by the decision of the Sheriff or his designee; and*

d.  *the written explanation is available to the public upon request.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

**Phase 2:** In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, there were no instances where the Sheriff or his designee rescinded, revoked, or altered any disciplinary decision made by either the Commander of the Professional Standards Bureau or the appointed MCSO disciplinary authority.

WAI 50936

### F.     Criminal Misconduct Investigations

***Paragraph 229.***  *Whenever an internal affairs investigator or Commander finds evidence of misconduct indicating apparent criminal conduct by an employee, the Sheriff shall require that the internal affairs investigator or Commander immediately notify the Commander of the Professional Standards Bureau.   If the administrative misconduct investigation is being conducted by a Supervisor outside of the Professional Standards Bureau, the Sheriff shall require that the Professional Standards Bureau immediately take over the administrative investigation. If the evidence of misconduct pertains to someone who is superior in rank to the Commander of the Professional Standards Bureau and is within the Commander's chain of command, the Sheriff shall require the Commander to provide the evidence directly to what he or she believes is the appropriate prosecuting authority—the Maricopa County Attorney, the Arizona Attorney General, or the United States Attorney for the District of Arizona—without notifying those in his or her chain of command who may be the subject of a criminal investigation.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review completed criminal misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed 28 criminal investigations conducted by MCSO.  All were internally generated.  All but one were initiated and completed after July 20, 2016, and appropriately assigned to criminal investigators in PSB or criminal investigators assigned to the Major Crimes Unit.  In all cases, the investigations were brought to the attention of the PSB Commander as required and an administrative misconduct investigation was also initiated.  None involved someone superior in rank to the PSB Commander.


***Paragraph 230.***  *If a misconduct allegation will be investigated criminally, the Sheriff shall require that the Professional Standards Bureau not compel an interview of the principal pursuant to Garrity v. New Jersey, 385 U.S. 493 (1967), until it has first consulted with the criminal investigator and the relevant prosecuting authority.   No other part of the administrative investigation shall be held in abeyance unless specifically authorized by the Commander of the Professional Standards Bureau in consultation with the entity conducting the criminal investigation. The Sheriff shall require the Professional Standards Bureau to document in writing all decisions regarding compelling an interview, all decisions to hold any aspect of an administrative investigation in abeyance, and all consultations with the criminal investigator and prosecuting authority.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

WAI 50937

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by both criminal and administrative investigators to ensure that they contain appropriate documentation that complies with the requirements of this Paragraph.

We previously determined that in many cases, the administrative investigation is not submitted and reviewed during the same reporting period as the criminal investigation, as generally, administrative investigations are finalized after the completion of the criminal investigation. We discussed this issue with PSB during our January 2017 site visit. To resolve the concern, PSB agreed to provide us with a copy of any criminal investigation when PSB submits the administrative misconduct investigation for our review, even if the criminal investigation has been previously submitted. MCSO has been consistently providing copies of these criminal investigations with the administrative investigation since that time.

During this reporting period, we reviewed 17 administrative misconduct investigations where criminal investigations also occurred. In 13 of the cases, there was a companion criminal investigation completed by MCSO, as required. Four of the criminal investigations were conducted by separate law enforcement agencies as the investigations resulted from conduct within their jurisdictions.

***Paragraph 231.*** *The Sheriff shall require the Professional Standards Bureau to ensure that investigators conducting a criminal investigation do not have access to any statements by the principal that were compelled pursuant to Garrity.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

PSB is divided into criminal and administrative sections. Criminal investigators and administrative investigators are housed on separate floors of the building. Criminal investigators do not have access to the IAPro database for administrative investigations, and there are separate file rooms for criminal and administrative investigative documents and reports. We have previously verified during our site visits that the required separation of criminal and administrative investigations and restricted access to IAPro is in place.

In May 2018, PSB relocated to a new offsite location. After PSB's move to its new facility, we verified that criminal and administrative investigation files were housed on separate floors in the new facility. Criminal investigators do not have access to the IAPro database for administrative investigations, and there are separate and secured file rooms for criminal and administrative documents and reports.

During our October 2019 site visit, a member of our Team again verified that criminal and administrative investigative files are housed on separate floors, there is restricted access to both file rooms, and restricted access to IAPro remains in place.

WAI 50938

***Paragraph 232.*** *The Sheriff shall require the Professional Standards Bureau to complete all such administrative investigations regardless of the outcome of any criminal investigation, including cases in which the prosecuting agency declines to prosecute or dismisses the criminal case after the initiation of criminal charges. The Sheriff shall require that all relevant provisions of MCSO policies and procedures and the operations manual for the Professional Standards Bureau shall remind members of the Bureau that administrative and criminal cases are held to different standards of proof, that the elements of a policy violation differ from those of a criminal offense, and that the purposes of the administrative investigation process differ from those of the criminal investigation process.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine MCSO's compliance with this Paragraph, we review on a monthly basis administrative and criminal investigations conducted by MCSO.

During this reporting period, we reviewed 28 criminal investigations conducted by MCSO personnel. All 28 have a companion administrative misconduct investigation, as required; and are in compliance with the requirements of this Paragraph.

Of the 28 criminal investigations reviewed, only one was investigated by PSB criminal investigators. This investigation was a result of an accidental weapons discharge with injury to the involved deputy. No criminal conduct was established.

Six of the criminal investigations reviewed were conducted by homicide investigators assigned to MCSO's Major Crimes Unit. Five were officer-involved shootings, and one involved an in-custody prisoner death. All six were properly investigated and submitted for review by an appropriate prosecutorial agency. All were exceptionally cleared after prosecutorial review did not identify any criminal conduct on the part of MCSO employees. One additional criminal investigation of an officer-involved shooting involving MCSO personnel was conducted by the Phoenix Police Department. This investigation was also exceptionally cleared after review by the appropriate prosecutorial agency.

Twenty-one of the investigations involved deaths within the jail. Eight were ruled as natural deaths by the Medical Examiner's Office. Six were ruled as suicides and seven were ruled as accidental, due to the ingestion of narcotics. All 21 of these investigations were conducted by Jail Crimes investigators assigned to MCSO's Major Crimes Unit. None identified any criminal conduct by MCSO personnel.

WAI 50939

***Paragraph 233.*** *If the investigator conducting the criminal investigation decides to close the investigation without referring it to a prosecuting agency, this decision must be documented in writing and provided to the Professional Standards Bureau. The Commander of the Professional Standards Bureau shall separately consider whether to refer the matter to a prosecuting agency and shall document the decision in writing.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine MCSO's compliance with this Paragraph, we review criminal misconduct investigations conducted by MCSO on a monthly basis.

During this reporting period, all six criminal cases where a principal was identified were referred to a prosecutorial agency for review. In those deaths occurring in the jail, where no principals were identified, MCSO determined that submittal to a prosecutorial agency was unnecessary. The decisions were supported by the facts of the investigation, interviews, or other investigative follow-up. In all of these cases, the investigators documented their conclusions and decisions to close the cases without submittal and the PSB Commander approved these decisions.

***Paragraph 234.*** *If the investigator conducting the criminal investigation decides to refer the matter to a prosecuting agency, the Professional Standards Bureau shall review the information provided to the prosecuting agency to ensure that it is of sufficient quality and completeness. The Commander of the Professional Standards Bureau shall direct that the investigator conduct additional investigation when it appears that there is additional relevant evidence that may improve the reliability or credibility of the investigation. Such directions shall be documented in writing and included in the investigatory file.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine MCSO's compliance with this Paragraph, we review on a monthly basis criminal misconduct investigations conducted by MCSO.

During this reporting period, we reviewed 28 criminal misconduct investigations conducted by PSB personnel. Six were submitted to a prosecuting agency for review. Five of these investigations involved officer-involved shootings and one involved an in-custody death. In all six, the prosecutorial agency determined there was no criminal conduct by the involved MCSO personnel.

WAI 50940

**Paragraph 235.** *If the prosecuting agency declines to prosecute or dismisses the criminal case after the initiation of criminal charges, the Professional Standards Bureau shall request an explanation for this decision, which shall be documented in writing and appended to the criminal investigation report.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine MCSO's compliance with this Paragraph, we review criminal misconduct investigations conducted by MCSO on a monthly basis.

During this reporting period, six of the criminal investigations we reviewed were submitted to a prosecutorial agency for review. In all six, the prosecutorial agencies determined that no criminal conduct occurred and provided documentation of their decisions to MCSO.


**Paragraph 236.** *The Sheriff shall require the Professional Standards Bureau to maintain all criminal investigation reports and files after they are completed for record-keeping in accordance with applicable law.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine compliance with this Paragraph, we have observed that PSB maintains both hardcopy and electronic files that are intended to contain all the documents required per this Paragraph

During previous site visits at Headquarters, we inspected the file rooms where hardcopies of investigations were stored. Criminal and administrative investigation files were stored in separate rooms, and access to these rooms was restricted. Our random review of criminal investigation case files verified that PSB was maintaining files as required. A member of our Team also has access to IAPro, and has verified that case files are maintained in an electronic format.

During our January 2018 site visit, a member of our Team inspected the file rooms where hardcopies of criminal investigation were stored and randomly reviewed case files to verify compliance.

In May 2018, PSB relocated to a new offsite location. After the move, we verified that PSB was properly maintaining criminal investigation reports and files at its new facility.

WAI 50941

During our October 2019 site visit, a member of our Team again verified – by accessing IAPro and reviewing random cases – that PSB is properly maintaining electronic files of criminal investigations. A random review of hard-copy files securely maintained by criminal investigators was also conducted and found to be compliant.

## G.  Civilian Complaint Intake, Communication, and Tracking

***Paragraph 237.*** *Within six months of the entry of this Order, the Monitor, in consultation with the Community Advisory Board, will develop and implement a program to promote awareness throughout the Maricopa County community about the process for filing complaints about the conduct of MCSO employees.*

**Phase 1**:  Not applicable

**Phase 2:**  Not applicable

We developed and implemented a Complaint Process Community Awareness Program to promote awareness throughout the Maricopa County community about the process for filing complaints about the conduct of MCSO employees. The program provides for distributing brochures describing the complaint process at quarterly community meetings and using public service announcements – made via local media outlets and social media – to provide basic information (in both English and Spanish) about MCSO's complaint process.

We contacted faith organizations and civic groups throughout Maricopa County requesting that they make complaint process information forms available to members of their congregations and groups. The Complaint Process Community Awareness Program incorporates input from the CAB, MCSO, and the ACLU of Arizona.

***Paragraph 238.*** *The Sheriff shall require the MCSO to accept all civilian complaints, whether submitted verbally or in writing; in person, by phone, by mail, or online; by a complainant, someone acting on the complainant's behalf, or anonymously; and with or without a signature from the complainant. MCSO will document all complaints in writing.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:**  In compliance

To assess compliance with this Paragraph, we review all new misconduct complaints received each month and completed misconduct investigations conducted by MCSO personnel. In addition, we review many initial complaint documents or initial telephone calls, BWC videos, traffic stop videos, Supervisory Notes, Compliance and BIO reviews, and consider findings in the complaint testing process.

During the last reporting period, there were no instances where either Court Compliance Unit or BIO personnel identified in their reviews that a supervisor had failed to initiate a complaint when appropriate. We did not identify any instances where MCSO initially failed to accept a complaint

WAI 50942

as required. Of the 65 completed administrative misconduct investigations we reviewed, there were no indications or allegations that the complainant had previously tried unsuccessfully to make a complaint. There were no instances where we identified during our review of MCSO contacts with complainants that a complainant had attempted to make a prior complaint and was refused. There were no instances identified in the complaint intake testing process where an MCSO employee refused to take a complaint.

During this reporting period, we reviewed 146 completed administrative misconduct investigations. We did not identify any completed investigations where there was an allegation that MCSO had failed to initially take a complaint. During one investigation, MCSO identified that the complainant had initially attempted to make a complaint through the Communications Bureau, but the complaint was not accepted at that time. PSB appropriately initiated a new administrative investigation for this misconduct. Our review of traffic stops for this reporting period did not identify any instances where a subject who was arrested made allegations of misconduct by MCSO personnel during his arrest that went unaddressed. Our review of Supervisory Notes during this reporting period did not identify any incidents where there were indications that a complaint had been made but not properly reported. We reviewed numerous complainant contacts, and found no indication that a supervisor initially refused to take a complaint or attempted to dissuade the complainant from making a complaint. Neither CID or BIO identified any instances in their reviews during this reporting period that indicated that a complainant had attempted to file a complaint and been refused. We did not identify any complaint intake tests for this reporting period where MCSO failed to accept a complaint.

We continue to find that MCSO consistently accepts and records complaints as required for compliance with this Paragraph.


***Paragraph 239.*** *In locations clearly visible to members of the public at the reception desk at MCSO headquarters and at all District stations, the Sheriff and the MCSO will post and maintain permanent placards clearly and simply describing the civilian complaint process that is visible to the public at all hours. The placards shall include relevant contact information, including telephone numbers, email addresses, mailing addresses, and Internet sites. The placards shall be in both English and Spanish.*

**Phase 1:** In compliance

- GJ-24 (Community Relations and Youth Programs), most recently revised on November 14, 2019.

**Phase 2:** In compliance

As we did not hold an in-person site visit in October, we were unable to visit MCSO Headquarters and MCSO Districts to determine if the permanent placards were prominently displayed at MCSO Headquarters and Districts. During our October remote site visit, MCSO reported that, during this reporting period, MCSO did not add or eliminate any locations displaying complaint forms and permanent complaint placards. MCSO further reported that, during this reporting period, it has not received any feedback from the community regarding the complaint forms and permanent complaint placards. When inspected during our last in-person site visit, we noted that MCSO's

WAI 50943

placard states that anyone who has a concern regarding the performance of any MCSO employee has the right to file a complaint in English or Spanish or their preferred language, to include American Sign Language; in person at any District facility or at the Professional Standards Bureau, by mail, by telephone, by fax, or online. The placard includes relevant contact information, including telephone numbers, email addresses, mailing addresses, and websites.

In addition to making complaint forms available to the public at MCSO facilities, County offices, and public locations where community groups meet, CAB members have recommended during our site visit compliance meetings that the Community Outreach Division consider making complaint forms available at retail facilities frequented by community members,

**Paragraph 240.** *The Sheriff shall require all deputies to carry complaint forms in their MCSO vehicles. Upon request, deputies will provide individuals with complaint forms and information about how to file a complaint, their name and badge number, and the contact information, including telephone number and email address, of their immediate supervising officer. The Sheriff must provide all supervising officers with telephones. Supervising officers must timely respond to such complaints registered by civilians.*

**Phase 1:** In compliance

- EA-2 (Patrol Vehicles), most recently revised on June 30, 2020.
- GE-4 (Use, Assignment, and Operation of Vehicles), most recently amended on June 25, 2020.
- GJ-24 (Community Relations and Youth Programs), most recently revised on November 14, 2019.

**Phase 2:** In compliance

As we held our October site visit remotely, we were unable to visit District offices to verify that MCSO maintained adequate supplies of complaint forms for deputies to carry in their vehicles. We were also unable to verify that supervisors were in possession of MCSO-issued cellular telephones. We will resume these verifications when we resume our in-person site visits.

**Paragraph 241.** *The Sheriff will ensure that the Professional Standards Bureau facility is easily accessible to members of the public. There shall be a space available for receiving walk-in visitors and personnel who can assist the public with filing complaints and/or answer an individual's questions about the complaint investigation process.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

WAI 50944

In May 2018, PSB moved into the first and second floors of 101 West Jefferson Street. During our July 2018 site visit, we toured the facility. During this reporting period, Monitoring Team members visiting MCSO Districts inspected the placards and comment and complaint forms and noted that they all had been updated to reflect PSB's new address. The address was also updated on the comment and complaint form that is accessible to the public on MCSO's website.

The facility, the former East Court Building Library, is easily accessible to members of the public. The County Court facilities in the building are separate from the PSB reception area and offices. The PSB area is accessible from First Avenue, a major thoroughfare; and there is no required security screening of individuals entering the building through the First Avenue entrance. As we held our October site visit remotely, we were unable to visit the PSB facility during this reporting period. We will visit the facility again when we resume our in-person site visits.

Maricopa County had previously advised MCSO that its lease for the PSB site was expired and that MCSO would have to vacate the site. MCSO stated that the lease requires that the County provide MCSO with a one-year advance written notification of the requirement to vacate the current PSB facility. As of this reporting period, MCSO has not received written notification from the County regarding the requirement to vacate the current PSB site.

**Paragraph 242.** *The Sheriff will also make complaint forms widely available at locations around the County including: the websites of MCSO and Maricopa County government; the lobby of MCSO's headquarters; each patrol District; and the Maricopa County government offices. The Sheriff will ask locations, such as public library branches and the offices and gathering places of community groups, to make these materials available.*

**Phase 1:** In compliance

- GJ-24 (Community Relations and Youth Programs), most recently revised on November 14, 2019.

**Phase 2:** In compliance

MCSO has complaint forms available in English and Spanish on the MCSO and Maricopa County websites. MCSO maintains a list – of MCSO facilities, County offices, and public locations where community groups meet – where Community Outreach Division personnel attempt to make the forms available.

Due to cancellation of our in-person site visit in October, we were unable to verify that complaint forms were in locations in Maricopa County that were included on MCSO's list of facilities where complaint forms are available to the public.

WAI 50945

***Paragraph 243.*** *The Sheriff shall establish a free, 24-hour hotline for members of the public to make complaints.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** In compliance

In July 2016, MCSO established the free 24-hour hotline for members of the public to make complaints; the hotline continued to be operational during this reporting period. A Monitoring Team representative periodically called the hotline during this reporting period; and verified that the hotline is operational in both English and Spanish, and provides instructions in both languages on how to register a complaint. The recording advises callers that if the call is an emergency, they are to call 911. Callers are requested to provide their name, telephone number, and a brief summary of their complaint. If callers leave a recorded message, they are advised that MCSO will contact them as soon as possible. If callers do not wish to leave a recorded message, they are provided with a telephone number to call to speak to a supervisor. That number connects the callers to the MCSO switchboard operator, who will connect the caller to an appropriate supervisor. Callers are further advised of MCSO's operating hours if they wish to contact PSB directly.

The hotline is housed in PSB, and PSB personnel access any recorded messages at the beginning of each business day. PSB personnel reported that, during this reporting period, PSB received the following hotline complaints:

- In the first, the complainant alleged that a deputy did not take a report for an armed robbery and left her stranded with her two children in the middle of the night. This complaint is currently under investigation.

- In the second, the complainant alleged that a deputy did not maintain proper six-foot physical distancing from her during a traffic stop and did not wear gloves, although the deputy wore a mask. Complainant was also upset about being cited for speeding. This complaint is currently under investigation.

In addition to the above hotline complaints received during this reporting period, MCSO reported that there are 13 hotline complaints currently under investigation and two hotline complaints under Command review.

The procedures established and followed by PSB provide for creating a record of every complaint received on the hotline and maintaining a log of follow-up actions regarding referral of the complaint.

WAI 50946

**Paragraph 244.** *The Sheriff shall ensure that the MCSO's complaint form does not contain any language that could reasonably be construed as discouraging the filing of a complaint, such as warnings about the potential criminal consequences for filing false complaints.*

**Phase 1:** In compliance

- GJ-24 (Community Relations and Youth Programs), most recently revised on November 14, 2019.

**Phase 2:** In compliance

Our review of the English and Spanish complaint forms' content did not reveal any language that could reasonably be construed as discouraging the filing of a complaint.

**Paragraph 245.** *Within two months of the entry of this Order, complaint forms will be made available, at a minimum, in English and Spanish. The MCSO will make reasonable efforts to ensure that complainants who speak other languages (including sign language) and have limited English proficiency can file complaints in their preferred language. The fact that a complainant does not speak, read, or write in English, or is deaf or hard of hearing, will not be grounds to decline to accept or investigate a complaint.*

**Phase 1:** In compliance

- GJ-24 (Community Relations and Youth Programs), most recently revised on November 14, 2019.

**Phase 2:** In compliance

Complaint forms in English and Spanish are accessible on MCSO's website. The complaint form states that anyone who has a concern regarding the performance of any MCSO employee has the right to file a complaint – in English or Spanish or their preferred language, to include American Sign Language – in person at any District facility or at the Professional Standards Bureau, by mail, by telephone, by fax, or online. The forms provide street addresses, contact numbers, and website information.

During this reporting period, no grievances were filed that met the criteria for transmitting to the Monitor.

**Paragraph 246.** *In the course of investigating a civilian complaint, the Professional Standards Bureau will send periodic written updates to the complainant including:*

a.      *within seven days of receipt of a complaint, the Professional Standards Bureau will send non-anonymous complainants a written notice of receipt, including the tracking number assigned to the complaint and the name of the investigator assigned. The notice will inform the complainant how he or she may contact the Professional Standards Bureau to inquire about the status of a complaint;*

WAI 50947

b.   when the Professional Standards Bureau concludes its investigation, the Bureau will notify the complainant that the investigation has been concluded and inform the complainant of the Bureau's findings as soon as is permitted by law; and

c.   in cases where discipline is imposed, the Professional Standards Bureau will notify the complainant of the discipline as soon as is permitted by law.

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed 146 administrative misconduct investigations conducted by MCSO personnel. Of these, 79 were externally generated.

Paragraph 246.a. requires that a civilian complainant receive a written notice of receipt of his/her complaint within seven days. This letter must include the tracking number, the name of the investigator assigned, and information regarding how the complainant can inquire about the status of his/her complaint. In all but four (5%) of the externally generated cases where PSB had contact information for the complainant, the letter was sent within seven days as required. All of the letters sent and reviewed included the name of the investigator and information regarding how the complainant could inquire about the status of the complaint.

Paragraph 246.b. requires that PSB notify a civilian complainant of the outcome of the investigation. In all of the externally generated complaints, the complainant was provided a notice of the outcome when contact information was known.

Paragraph 246.c. requires that PSB notify a civilian complainant of any discipline imposed as soon as permitted by law. In all of the externally generated complaints with sustained findings, PSB properly notified the complainant of the sustained findings and the discipline imposed when contact information for the complainant was known.

**Paragraph 247.** *Notwithstanding the above written communications, a complainant and/or his or her representative may contact the Professional Standards Bureau at any time to determine the status of his or her complaint. The Sheriff shall require the MCSO to update the complainant with the status of the investigation.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2**: In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

WAI 50948

During this reporting period, we reviewed 146 administrative misconduct investigations conducted by MCSO. Externally generated complaints resulted in 79 of the investigations. We did not identify any instances where a complainant was discouraged from, or denied, contact with MCSO investigators to determine the status of his/her complaint, or to request and receive an update. MCSO appropriately had contact with complainants as required in Paragraph 246 in all of these cases where the complainant was known and wanted to participate in the investigation. In three of the cases, MCSO personnel reported that they had additional contact with the complainant during the course of the investigation.

***Paragraph 248.*** *The Professional Standards Bureau will track, as a separate category of complaints, allegations of biased policing, including allegations that a deputy conducted an investigatory stop or arrest based on an individual's demographic category or used a slur based on an individual's actual or perceived race, ethnicity, nationality, or immigration status, sex, sexual orientation, or gender identity. The Professional Standards Bureau will require that complaints of biased policing are captured and tracked appropriately, even if the complainant does not so label the allegation.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

Each month, PSB provides a list of new complaints alleging biased policing. PSB also provides all closed investigations where biased policing was alleged. For this Paragraph, only allegations of biased policing that do not affect the Plaintiffs' class are reported. Those complaints alleging bias against members of the Plaintiffs' class are captured in a separate category and reported under Paragraphs 275-288.

During this reporting period, PSB completed five investigations where potential bias was alleged that did not affect members of the Plaintiffs' class. All five investigations were investigated by PSB, completed after July 20, 2016; tracked in a separate category as required by this Paragraph; and reported in Paragraph 33.

***Paragraph 249.*** *The Professional Standards Bureau will track, as a separate category of complaints, allegations of unlawful investigatory stops, searches, seizures, or arrests.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

WAI 50949

To determine Phase 2 compliance for this Paragraph, we review a monthly report from PSB that provides the information required for compliance.

To ensure that we are consistently informed of complaints relative to this Paragraph, PSB provides information concerning these investigations in its monthly document submission relative to this Paragraph.

During the last reporting period, MCSO did not submit for our review any investigations alleging unlawful investigatory stops, searches, seizures, or arrests.

During this reporting period, MCSO submitted for our review one investigation related to this Paragraph. The investigation was tracked in a separate category as required by this Paragraph.

**Paragraph 250.** *The Professional Standards Bureau will conduct regular assessments of the types of complaints being received to identify and assess potential problematic patterns and trends.*

**Phase 1:** In compliance

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

PSB continues to prepare a comprehensive quarterly assessment of the types of complaints received to identify and assess potential problematic patterns or trends. During this reporting period, there were 187 complaints received; 43 complaints alleged rude behavior toward fellow employees, inmates, or members of the public. There were 25 investigations opened involving allegations of discrimination or derogatory or racist comments; 22 investigations opened for inappropriate language/actions toward fellow employees, inmates or members of the public; and 21 investigations opened into allegations of on- or off-duty crime by MCSO employees, with eight involving reports of physical altercations, domestic violence, assault, child abuse, or disorderly conduct; and three investigations involving reports of criminal or civil traffic violations. There were 16 investigations opened involving allegations of biased law enforcement actions or disparaging comments or actions toward members of a protected class. There were 14 complaints alleging that employees failed to properly perform their duties and failed to act when requested by inmates or members of the public. There were 14 complaints alleging workplace professionalism misconduct between employees; and 11 complaints alleging employees making negative statements, spreading rumors and gossip, yelling, and making disparaging or demeaning comments toward other employees.

There were 10 investigations opened alleging unsafe driving or at-fault traffic crashes; eight investigations opened alleging untruthful statements by employees; and seven investigations opened alleging employees not complying with MCSO's office-wide mask directive. There were six investigations opened alleging inappropriate uses of force, of which four occurred in the jail facilities; and six complaints of employees not providing their name and serial numbers when requested by members of the public. There were six investigations opened involving allegations of offensive and political or public statements as official MCSO employees in person or via social media.

WAI 50950

The assessment identified three employees that each had four investigations opened with what appears to be a pattern or trend of alleged misconduct and one employee that had three investigations opened with what appears to be a pattern or trend of alleged misconduct. In addition, the assessment identified five employees that each had two investigations opened with what appears to be a pattern or trend of alleged misconduct.

The assessment identified the Fourth Avenue Jail facility as the Division that received the most complaints during the reporting period. There were 20 complaints received during the reporting period. There were five complaints alleging employees did not conform to established laws; four complaints alleging employees engaged in demeaning and unprofessional behavior toward employees; three complaints alleging the mistreatment of inmates – to include rude behavior, retaliation for filing grievances, and not referring to inmates by their personal pronouns; and two complaints alleging improper uses of force. The additional six complaints did not appear to follow a trend or pattern.

The assessment also included a summary of notable trends and patterns that were identified by PSB at various MCSO Divisions that did not have a high number of complaints.

The contents of the quarterly assessment are discussed at executive staff meetings. PSB also includes the information required by this Paragraph in its public Semi-Annual Misconduct Investigations Report, which is required under Paragraph 251. The most recent Semi-Annual report for the period of July 1-December 31, 2019, contains the issues identified as potentially problematic patterns or trends for that six-month period.

MCSO remains in compliance with this requirement.


## H.   *Transparency Measures*

***Paragraph 251.*** *The Sheriff shall require the Professional Standards Bureau to produce a semi-annual public report on misconduct investigations, including, at a minimum, the following:*

a.   *summary information, which does not name the specific employees involved, about any sustained allegations that an employee violated conflict-of-interest rules in conducting or reviewing misconduct investigations;*

b.   *aggregate data on complaints received from the public, broken down by district; rank of principal(s); nature of contact (traffic stop, pedestrian stop, call for service, etc.); nature of allegation (rudeness, bias-based policing, etc.); complainants' demographic information; complaints received from anonymous complainants or third parties; and principals' demographic information;*

c.   *analysis of whether any increase or decrease in the number of civilian complaints received from reporting period to reporting period is attributable to issues in the complaint intake process or other factors;*

d.   *aggregate data on internally-generated misconduct allegations, broken down by similar categories as those for civilian complaints;*

WAI 50951

e.  *aggregate data on the processing of misconduct cases, including the number of cases assigned to Supervisors outside of the Professional Standards Bureau versus investigators in the Professional Standards Bureau; the average and median time from the initiation of an investigation to its submission by the investigator to his or her chain of command; the average and median time from the submission of the investigation by the investigator to a final decision regarding discipline, or other final disposition if no discipline is imposed; the number of investigations returned to the original investigator due to conclusions not being supported by the evidence; and the number of investigations returned to the original investigator to conduct additional investigation;*

f.  *aggregate data on the outcomes of misconduct investigations, including the number of sustained, not sustained, exonerated, and unfounded misconduct complaints; the number of misconduct allegations supported by the appropriate standard of proof; the number of sustained allegations resulting in a non-disciplinary outcome, coaching, written reprimand, suspension, demotion, and termination; the number of cases in which findings were changed after a pre-determination hearing, broken down by initial finding and final finding; the number of cases in which discipline was changed after a pre-determination hearing, broken down by initial discipline and final discipline; the number of cases in which findings were overruled, sustained, or changed by the Maricopa County Law Enforcement Merit System Council, broken down by the finding reached by the MCSO and the finding reached by the Council; and the number of cases in which discipline was altered by the Council, broken down by the discipline imposed by the MCSO and the disciplinary ruling of the Council; and similar information on appeals beyond the Council; and*

g.  *aggregate data on employees with persistent or serious misconduct problems, including the number of employees who have been the subject of more than two misconduct investigations in the previous 12 months, broken down by serious and minor misconduct; the number of employees who have had more than one sustained allegation of minor misconduct in the previous 12 months, broken down by the number of sustained allegations; the number of employees who have had more than one sustained allegation of serious misconduct in the previous 12 months, broken down by the number of sustained allegations; and the number of criminal prosecutions of employees, broken down by criminal charge.*

**Phase 1:** In compliance

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

The PSB Operations Manual identifies the PSB Commander as responsible for preparing the semi-annual public report on misconduct investigations. The manual also contains provisions for the production of summary information regarding sustained conflict of interest violations; an analysis of the complaint intake process; and aggregate data on complaints (internal and external), processing of misconduct cases, outcomes of misconduct cases, and employees with persistent misconduct problems.

WAI 50952

In July 2019, PSB issued and posted on the MCSO website its semi-annual public report for period of July 1-December 31, 2018. PSB also incorporated information relevant to Paragraph 192 in this report, which requires that PSB review, at least semi-annually, all misconduct investigations that were assigned outside the Bureau to determine whether or not the investigation was properly categorized, whether the investigation was properly conducted, and whether appropriate findings were reached. PSB also incorporated information relevant to Paragraph 250 in this report, which includes an assessment of potential problematic patterns or trends, based on a review on complaints received, for the time period of January 1-June 30, 2019. This report was published in January 2020, and it was posted on MCSO's website.

During our October 2019 site visit, PSB informed us that it developed a voluntary survey for complainants to complete after the conclusion of the investigation; the survey would capture complainants' demographic information. In October 2019, MCSO provided us with a copy of the survey; and we provided our feedback to MCSO. MCSO has identified a funding source for prepaid postage return envelopes. The use of the prepaid postage return envelopes will allow the complainants to mail the survey to MCSO without having to incur any fees. During our January 2020 site visit, PSB informed us that the Bureau commenced distribution of the surveys to complainants for cases that were closed in January 2020. In addition, PSB is also informing complainants of a web-based version of the survey that can be completed online. PSB is now collecting the voluntary surveys that are returned and will include the relevant demographic information in its next semi-annual report.

During the month of July 2020, PSB issued and posted on the MCSO website its semi-annual public report for period of July 1-December 31, 2019. The report was prepared consistent with prior reports prepared by PSB and contains the relevant information pertaining to this Paragraph.

MCSO remains in compliance with this requirement.


***Paragraph 252.*** *The Sheriff shall require the MCSO to make detailed summaries of completed internal affairs investigations readily available to the public to the full extent permitted under state law, in electronic form on a designated section of its website that is linked to directly from the MCSO's home page with prominent language that clearly indicates to the public that the link provides information about investigations of misconduct alleged against MCSO employees.*

**Phase 1:** In compliance

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

PSB publishes detailed summaries each month of completed misconduct investigations in an electronic format that is accessible via MCSO's website. The following data fields have been identified for public disclosure: Internal Affairs Number; Date Opened; Incident Type; Original Complaint; Policy Violation(s) Alleged/Outcome; Discipline; Investigative Summary; and Date Completed. During our April 2017 site visit, we approved the PSB template containing detailed summaries of completed misconduct investigations for placement on the MCSO website. Each reporting period, we conduct a review of the detailed summaries of completed misconduct

WAI 50953

investigations to ensure that the content is consistent with the requirements of this Paragraph. In addition, we verify that the monthly detailed summaries of completed misconduct investigations are posted on MCSO's website for public review.

During this reporting period, PSB made the monthly detailed summaries of completed internal investigations for July, August, and September 2020 available to the public in a designated section on the homepage of MCSO's website. The reports provide significant details regarding alleged misconduct, the findings of the investigation, and, if there is a finding of misconduct, what type of discipline was imposed. MCSO remains in compliance with this requirement.

**Paragraph 253.** *The MCSO Bureau of Internal Oversight shall produce a semi-annual public audit report regarding misconduct investigations. This report shall analyze a stratified random sample of misconduct investigations that were completed during the previous six months to identify any procedural irregularities, including any instances in which:*

a.   *complaint notification procedures were not followed;*

b.   *a misconduct complaint was not assigned a unique identifier;*

c.   *investigation assignment protocols were not followed, such as serious or criminal misconduct being investigated outside of the Professional Standards Bureau;*

d.   *deadlines were not met;*

e.   *an investigation was conducted by an employee who had not received required misconduct investigation training;*

f.   *an investigation was conducted by an employee with a history of multiple sustained misconduct allegations, or one sustained allegation of a Category 6 or Category 7 offense from the MCSO's disciplinary matrices;*

g.   *an investigation was conducted by an employee who was named as a principal or witness in any investigation of the underlying incident;*

h.   *an investigation was conducted of a superior officer within the internal affairs investigator's chain of command;*

i.   *any interviews were not recorded;*

j.   *the investigation report was not reviewed by the appropriate personnel;*

k.   *employees were promoted or received a salary increase while named as a principal in an ongoing misconduct investigation absent the required written justification;*

l.   *a final finding was not reached on a misconduct allegation;*

m.   *an employee's disciplinary history was not documented in a disciplinary recommendation; or*

n.   *no written explanation was provided for the imposition of discipline inconsistent with the disciplinary matrix.*

**Phase 1:** In compliance

WAI 50954

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on April 30, 2020.

**Phase 2:** In compliance

During our January 2018 site visit, the Bureau of Internal Oversight (BIO) Commander reported that the semi-annual public audit report regarding misconduct investigations had not yet been prepared. After a telephone conference between BIO and us on January 10, 2018, it was determined that the semi-annual public audit report would be placed on hold while BIO's Audit and Inspections Unit (AIU) developed the appropriate methodology for conducting the inspection. On June 26, 2018 we approved the methodology for the inspection, which would start with an inspection of investigations that commenced after November 1, 2017. AIU is conducting monthly inspections of misconduct investigations in lieu of conducting a semi-annual audit. During this reporting period, AIU prepared inspection reports for misconduct investigations that closed during May, June, and July 2020.

When perceived deficiencies are identified, AIU requests a BIO Action Form from the specific District/Division Commander to address the issue(s).

MCSO remains in compliance with this requirement.

### I.    *Testing Program for Civilian Complaint Intake*

***Paragraph 254.*** *The Sheriff shall initiate a testing program designed to assess civilian complaint intake. Specifically, the testing program shall assess whether employees are providing civilians appropriate and accurate information about the complaint process and whether employees are notifying the Professional Standards Bureau upon the receipt of a civilian complaint.*

**Phase 1:** In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on April 30, 2020.

**Phase 2:** In compliance

This Paragraph requires that MCSO develop a testing program that assesses "whether employees are providing civilians appropriate and accurate information about the complaint process and whether employees are notifying the Professional Standards Bureau upon the receipt of a civilian complaint." We evaluate MCSO's compliance with this Paragraph based on how the agency responds to the outcomes of the tests, regardless of whether the tests "succeed" or "fail."

To meet the requirements of this Paragraph, AIU contracts with an independent vendor, Progressive Management Resources (PMR), which is responsible for conducting complaint intake testing via telephone, email, U.S. Mail, MCSO's website, and via in-person tests. Until July 2020, AIU contracted with another vendor to conduct in-person tests; PMR has now assumed that responsibility.

WAI 50955

We receive and review documentation of these tests – including any available audio-recorded documentation – as they are completed, as part of our monthly document requests. PMR does not advise AIU of the tests in advance but instead emails AIU once a test has been completed with documentation of the test.

During the last reporting period, we had concerns about one test that was conducted via telephone. In that test, a tester called the MCSO switchboard alleging unsafe and erratic driving by a deputy. The on-duty supervisor, a sergeant, called her back promptly; and the tester described him as "very professional" and "very thorough, which was a signal to me that he took my complaint seriously." However, the sergeant made an administrative error that resulted in a delay in MCSO's response to the tester. When the sergeant entered the complaint into BlueTeam, according to AIU, "A prior complainant having the same name as the one used by the tester appeared…The preexisting complainant had a different phone number than what was provided by the tester. In addition, the preexisting name had an address in Glendale and the tester did not provide an address. Selecting the preexisting complainant of the same name resulted in PSB sending the initial 7-day letter to the wrong individual." Following this complaint, BIO appropriately completed an Action Form on the sergeant due to his failure to provide accurate information on the complainant to PSB.

During this reporting period, PMR conducted four complaint intake tests, all via telephone. We had concerns with two of the tests. In the first, the tester called MCSO to report that a deputy in Fountain Hills was profiling Mexican drivers. The tester intended to contact the Fountain Hills District facility, but she misdialed the number by one digit and instead called the unpublished telephone number of the Sheriff's assistant. The assistant spoke with the tester briefly, and requested the tester's contact information to share with PSB. Approximately 20 minutes later, a PSB employee called the tester directly to elicit additional information about her complaint. During their conversation, in an odd twist, the tester provided her telephone number to the PSB employee, but according to AIU, "When the tester's information was entered into BlueTeam, the tester's phone number was entered incorrectly by one digit. Therefore, PSB was not able to successfully contact the tester to provide her with the IA number and the name of the assigned investigator as required by Policy GH-2, *Internal Investigations*." AIU appropriately handled this test. According to AIU, "BIO followed up with PSB through the BIO Action Form process to address the one Policy GH-2 requirement that was not met."

WAI 50956

In the second test, a tester called MCSO to report that a deputy was sleeping in his marked patrol vehicle in a parking lot. The tester initially reached a Communications dispatcher, and AIU noted two deficiencies in the dispatcher's receipt of the call. According to AIU, "The dispatcher who took the call documented the complaint information and contacted the on-duty supervisor in District 2, who was unable to speak to the tester at that time, so the dispatcher gave the contact information to the District 2 sergeant to call back. The dispatcher informed the tester she would receive a call from a District 2 sergeant regarding her complaint. Policy GI-1, *Radio and Enforcement Communications Procedures*, 12.C.1.a., requires that 'Communications Divisions personnel shall then e-mail the complaint information to the on-duty supervisor of the district or division in which the complaint was directed.' Policy GI-1, 12.C.1.b., further requires that 'Communications Division personnel shall copy the e-mail sent to the on-duty supervisor with the complaint information, to the Early Identification Unit … to ensure the complaints entry is entered into BlueTeam.'" AIU appropriately handled this test by forwarding an Action Form to the Communications Division regarding the missed policy requirements.

Neither we nor AIU identified any deficiencies in the two other tests conducted during this reporting period. In one of the tests, a tester called MCSO to report that she had observed a drunk deputy on a hiking trail; and she wrote on the documentation form that the MCSO personnel with whom she interacted were "professional, patient, and understanding."

As we have noted previously in our quarterly status reports, following several tests in which front-line staff responded inappropriately to complaint intake tests, we have encouraged MCSO to provide refresher training on the complaint process to all employees who interact with the public. In addition, AIU recently developed a complaint intake checklist for administrative staff; we and the Parties provided feedback and approved this checklist. During our October 2020 remote site visit, we inquired with AIU for an update on the implementation of the checklist and any refresher training on the complaint process. According to AIU personnel, the checklist was finalized in mid-September and distributed to the Patrol Divisions for dissemination to their personnel. Following our site visit, AIU provided the finalized version of the checklist.

**Paragraph 255.** *The testing program is not intended to assess investigations of civilian complaints, and the MCSO shall design the testing program in such a way that it does not waste resources investigating fictitious complaints made by testers.*

**Phase 1:** In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on April 30, 2020.

**Phase 2:** In compliance

AIU has informed the vendor it contracts with of this requirement. AIU has created several procedures to ensure that the Complaint Intake Testing Program does not waste resources investigating fictitious complaints made by testers – including setting parameters for the types of

WAI 50957

inquiries that testers make, and creating official identification cards for testers designating them as such. For in-person tests, AIU requires that the vendor inform AIU in advance of all tests; and AIU personnel make themselves available via telephone if testers encounter any issue as they lodge their test complaints.

***Paragraph 256.*** *The testing program shall assess complaint intake for complaints made in person at MCSO facilities, complaints made telephonically, by mail, and complaints made electronically by email or through MCSO's website. Testers shall not interfere with deputies taking law enforcement action. Testers shall not attempt to assess complaint intake in the course of traffic stops or other law enforcement action being taken outside of MCSO facilities.*

**Phase 1:** In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on April 30, 2020.

**Phase 2:** In compliance

AIU has advised the vendor it contracts with that testers shall not interfere with deputies taking law enforcement action, nor shall they attempt to assess complaint intake in the course of traffic stops or other law enforcement action being taken outside of MCSO facilities.

AIU has asked the vendor to inform AIU in advance of all in-person tests, and AIU personnel make themselves available via telephone if testers encounter any issue as they lodge their test complaints.

***Paragraph 257.*** *The testing program shall include sufficient random and targeted testing to assess the complaint intake process, utilizing surreptitious video and/or audio recording, as permitted by state law, of testers' interactions with MCSO personnel to assess the appropriateness of responses and information provided.*

**Phase 1:** In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on April 30, 2020.

**Phase 2:** In compliance

AIU has informed the vendor it contracts with of the requirements of this Paragraph. We receive copies of the recordings following the completion of the tests. Per the agreed-upon methodology, all tests conducted via telephone are audio-recorded; and all in-person testers' interactions with MCSO personnel are video-recorded to assess the appropriateness of responses and information provided.

WAI 50958

**Paragraph 258.**  *The testing program shall also assess whether employees promptly notify the Professional Standards Bureau of civilian complaints and provide accurate and complete information to the Bureau.*

**Phase 1:**  In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on April 30, 2020.

**Phase 2:**  In compliance

AIU has informed the vendor it contracts with of the requirements of this Paragraph so that the tests it conducts shall also assess whether employees promptly notify the PSB of civilian complaints and provide accurate and complete information to the Bureau.

As it receives documentation about completed tests, AIU reviews the information; and issues Action Forms, authors memorandums of concern, or takes other appropriate action if a test fails or raises any concerns about the conduct of MCSO employees.


**Paragraph 259.**  *MCSO shall not permit current or former employees to serve as testers.*

**Phase 1:**  In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on April 30, 2020.

**Phase 2:**  In compliance

AIU has informed the vendor it has contracted with to conduct the tests of this requirement.  AIU personnel have informed us that no current or former employees have served, or will serve in the future, as testers.


**Paragraph 260.**  *The MCSO shall produce an annual report on the testing program.  This report shall include, at a minimum:*

a.      *a description of the testing program, including the testing methodology and the number of tests conducted broken down by type (i.e., in-person, telephonic, mail, and electronic);*

b.      *the number and proportion of tests in which employees responded inappropriately to a tester;*

c.      *the number and proportion of tests in which employees provided inaccurate information about the complaint process to a tester;*

WAI 50959

d.      the number and proportion of tests in which employees failed to promptly notify the
        Professional Standards Bureau of the civilian complaint;

e.      the number and proportion of tests in which employees failed to convey accurate
        information about the complaint to the Professional Standards Bureau;

f.      an evaluation of the civilian complaint intake based upon the results of the testing
        program; and

g.      a description of any steps to be taken to improve civilian complaint intake as a result of
        the testing program.

**Phase 1:**  In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on April 30, 2020.

**Phase 2:**  In compliance

AIU issued its first annual report on the complaint intake testing program on September 14, 2020. We and the Parties previously reviewed and approved the proposed methodology, as well as a draft template, for the report. The annual report covers the 24 tests that were completed between July 1, 2019-June 30, 2020. These tests included: eight in-person tests; three tests conducted via U.S. Mail; eight tests conducted via telephone; three tests conducted via email; and two tests conducted via MCSO's website. With the publication of its first annual report on this program, MCSO achieved compliance with this Paragraph.

Beginning in January 2019, while not required by this Paragraph, AIU began issuing monthly reports on complaint intake testing. We review these reports as they are published, and find that they accurately summarize the results of the complaint intake tests and any follow-up actions taken by MCSO.

During our October 2020 remote site visit, we discussed with MCSO the findings of AIU's first annual report on the complaint intake testing program. We also raised with MCSO how executive staff review the challenges that the report identified and implement the recommendations made by AIU personnel in its annual report and monthly inspections of complaint intake tests. The complaint intake testing program will be most successful if MCSO makes agency-wide adjustments based on what it learns from both the successful and unsuccessful complaint intake tests. During our discussion, MCSO personnel reported that the annual report's findings were shared in internal Town Hall meetings. AIU also plans to explore with the Training Division how to make this information available via the HUB. We will continue to discuss this with MCSO.

WAI 50960

# Section 13: Community Outreach and Community Advisory Board

**COURT ORDER XVI.** **COMMUNITY** **OUTREACH** **AND** **COMMUNITY** **ADVISORY BOARD**

*Paragraph 261.* *The Community Advisory Board may conduct or retain a consultant to conduct a study to identify barriers to the filing of civilian complaints against MCSO personnel.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

During this reporting period, the CAB continued to explore the possibility of retaining a consultant to conduct a study to identify barriers to the filing of civilian complaints against MCSO personnel, by researching polling firms that are experienced in working with Latino populations.

*Paragraph 262.* *In addition to the administrative support provided for in the Supplemental Permanent Injunction, (Doc. 670 ¶ 117), the Community Advisory Board shall be provided with annual funding to support its activities, including but not limited to funds for appropriate research, outreach advertising and website maintenance, stipends for intern support, professional interpretation and translation, and out-of-pocket costs of the Community Advisory Board members for transportation related to their official responsibilities. The Community Advisory Board shall submit a proposed annual budget to the Monitor, not to exceed $15,000, and upon approval of the annual budget, the County shall deposit that amount into an account established by the Community Advisory Board for that purpose. The Community Advisory Board shall be required to keep detailed records of expenditures which are subject to review.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

In July 2018, the Monitor approved CAB's proposed budget. The budget includes the following categories: community meetings; video production (to produce a short video in English and Spanish that provides information about the CAB and the MCSO complaint process); marketing materials; stipends for an assistant to help coordinate CAB meeting logistics; and reimbursement for CAB members' meeting expenses.

Following the Monitor's approval of the CAB's budget, the CAB established a bank account, and the County provided the $15,000. CAB members developed procedures for tracking funds and receiving reimbursement. We meet regularly with CAB members to discuss these procedures and review the CAB's expenditures to date; these records appear to be in order.

WAI 50961

# Section 14: Supervision and Staffing

**COURT ORDER XVII.    SUPERVISION AND STAFFING**

***Paragraph 263.*** *The following Section of this Order represents additions and amendments to Section X of the first Supplemental Permanent Injunction, Supervision and Evaluations of Officer Performance, and the provisions of this Section override any conflicting provisions in Section X of the first Supplemental Permanent Injunction.*

***Paragraph 264.*** *The Sheriff shall ensure that all patrol deputies shall be assigned to a primary, clearly identified, first-line supervisor.*

**Phase 1:** In compliance

- GB-2 (Command Responsibility), most recently amended on June 28, 2019.

**Phase 2:** In compliance

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the third quarter of 2020. For July, we reviewed a sample of shift rosters from Districts 1, 2, and 3; for August, we reviewed a sample of shift rosters from Districts 4, 6, and 7, and Lake Patrol; and for September, we reviewed a sample of shift rosters from Districts 1, 2, and 3. Our reviews of monthly and daily rosters indicated that deputies were assigned to a single consistent supervisor, and deputies worked the same shifts as their supervisors.

***Paragraph 265.*** *First-line patrol supervisors shall be responsible for closely and consistently supervising all deputies under their primary command.*

**Phase 1:** In compliance

- GB-2 (Command Responsibility), most recently amended on June 28, 2019.

**Phase 2:** Not in compliance

Paragraph 265 is a general directive that covers several aspects of supervision. There are several requirements covered in other Paragraphs that directly concern this Paragraph; these requirements must be met before MCSO can establish compliance with Paragraph 265. We have determined that for MCSO to meet the requirements of this Paragraph, MCSO must be in compliance with Paragraphs 83, 85, 89, 90, 91, 93, and 94. During this reporting period, MCSO was in compliance with Paragraphs 83, 85, 89, 90, 91, and 93. During this reporting period, MCSO did not achieve compliance with Paragraph 94. For MCSO to achieve compliance with this Paragraph, it must remain in compliance with Paragraphs 83, 85, 89, 90, 91 and 93; and attain compliance with Paragraph 94.

WAI 50962

***Paragraph 266.*** *First-line patrol supervisors shall be assigned as primary supervisor to no more persons than it is possible to effectively supervise. The Sheriff should seek to establish staffing that permits a supervisor to oversee no more than eight deputies, but in no event should a supervisor be responsible for more than ten persons. If the Sheriff determines that assignment complexity, the geographic size of a district, the volume of calls for service, or other circumstances warrant an increase or decrease in the level of supervision for any unit, squad, or shift, it shall explain such reasons in writing, and, during the period that the MCSO is subject to the Monitor, shall provide the Monitor with such explanations. The Monitor shall provide an assessment to the Court as to whether the reduced or increased ratio is appropriate in the circumstances indicated.*

**Phase 1:** In compliance

- GB-2 (Command Responsibility), most recently amended on June 28, 2019.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed a sample of daily shift rosters for the three months of the reporting period. To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the third quarter of 2020. For July, we reviewed a sample of shift rosters from Districts 1, 2, and 3. Our reviews of monthly and daily rosters indicated that deputies were assigned to and worked the same schedules as their supervisors, and supervisors were available to provide on-scene supervision.

On shifts where the span of control exceeds the 1:8 ratio, supervisors are required to document these shifts in a memorandum to the District Commander. For July, there were eight shifts where supervisors exceeded the 1:8 ratio. For each of these shifts where the span of control was exceeded, supervisors wrote memorandums documenting the event. District 1 had two shifts where the span of control was exceeded, and District 2 had six shifts where the span of control was exceeded. For August, we reviewed a sample of shift rosters from Districts 4, 6, and 7, and Lake Patrol. Our reviews of monthly and daily rosters indicated that deputies were assigned to and worked the same schedules as their supervisors, and supervisors were available to provide on-scene supervision. There were 12 shifts were supervisors exceeded the 1:8 ratio. Supervisors wrote memorandums documenting each of these events. District 1 had four shifts where the span of control was exceeded, District 2 had seven shifts where the span of control was exceeded, and District 4 had one shift where the span of control was exceeded. For September, we reviewed a sample of shift rosters from Districts 1, 2, and 3. Our reviews of monthly and daily rosters indicated that deputies were assigned to and worked the same schedules as their supervisors, and supervisors were available to provide on-scene supervision. There were five shifts were supervisors exceeded the 1:8 ratio. Supervisors wrote memorandums documenting each of these events. All of the shifts where the span of control was exceeded occurred in District 1. MCSO remains in compliance with this Paragraph.

WAI 50963

***Paragraph 267.*** *Supervisors shall be responsible for close and effective supervision of deputies under their command. Supervisors shall ensure that all deputies under their direct command comply with MCSO policy, federal, state and local law, and this Court's orders.*

**Phase 1:** In compliance

- GB-2 (Command Responsibility), most recently amended on June 28, 2019.

**Phase 2:** Not in compliance

Close and effective supervision requires that supervisors consistently apply the concepts established in several Paragraphs of the First Order. There are requirements covered in other Paragraphs that directly concern Paragraph 267, and must therefore be in compliance for MCSO to establish compliance with this Paragraph. We have determined that for MCSO to meet the requirements of this Paragraph, it must achieve compliance with Paragraphs 83, 85, 89, 90, 91, 93, and 96. During this quarter, our reviews found MCSO in compliance with Paragraphs 83, 85, 89, 90, 91, and 93, but not in compliance with Paragraph 96. In our last quarterly status report, we issued a warning with regard to noncompliance with Paragraphs 96 and 267. As a result of our noncompliance findings with Paragraph 96 during this quarter, MCSO is also not in compliance with Paragraph 267.


***Paragraph 268.*** *During the term that a Monitor oversees the Sheriff and the MCSO in this action, any transfer of sworn personnel or supervisors in or out of the Professional Standards Bureau, the Bureau of Internal Oversight, and the Court Implementation Division shall require advanced approval from the Monitor. Prior to any transfer into any of these components, the MCSO shall provide the Court, the Monitor, and the parties with advance notice of the transfer and shall produce copies of the individual's résumé and disciplinary history. The Court may order the removal of the heads of these components if doing so is, in the Court's view, necessary to achieve compliance in a timely manner.*

**Phase 1:** In compliance

- Court Implementation Division Operations Manual, most recently revised on November 13, 2019.
- Professional Standards Bureau Operations Manual, most recently amended on December 13, 2018.

**Phase 2:** In compliance

WAI 50964

During this reporting period, we received and approved two transfers into PSB. All required documents were provided for the incoming employees, including EIS histories, training histories, and assignment histories. The first employee had an open PSB investigation. MCSO reported that the allegations pertaining to this investigation would not likely be sustained, and if sustained, would not result in serious discipline. The employee also had numerous commendations, a Life Saving Medal, and a Meritorious Unit Citation. The second employee had two open PSB investigations. MCSO submitted a justification memorandum in which it reported that none of the allegations in these two cases would likely be sustained. The employee also had numerous commendations and a Meritorious Unit Citation. We reviewed the documentation for the incoming transfers to ensure that the employees met the qualifications listed in Paragraph 199, and the transfers were approved.

During our review of documents provided for the two employees transferred into PSB, we became aware of a lieutenant who was promoted and transferred out of PSB. We were not notified of this transfer prior to it becoming effective, and we had not approved it. Although it is likely we would have approved this transfer, the requirements of this Paragraph were not met. We therefore find that MCSO is not in compliance with the requirements of Paragraph 268 for this reporting period. Pursuant to our methodology, we will issue a warning. If MCSO fails to meet the reporting requirements of this Paragraph in our next review, we will withdraw MCSO's Phase 2 compliance with this Paragraph.

WAI 50965

# Section 15: Document Preservation and Production

**COURT ORDER XVIII.    DOCUMENT PRESERVATION AND PRODUCTION**

***Paragraph 269.*** *The Sheriff shall ensure that when the MCSO receives a document preservation notice from a litigant, the MCSO shall promptly communicate that document preservation notice to all personnel who might possibly have responsive documents.*

**Phase 1:**  In compliance

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on October 1, 2020.

- GD-9 User Guide, published on May 3, 2019.

**Phase 2:**  In compliance

To verify MCSO's Phase 2 compliance with this Paragraph, we reviewed monthly submittals of document preservation notices to MCSO employees.  The data reviewed for this reporting period included June through August 2020; as per an agreement that we reached with MCSO to stagger the document requests for this Paragraph, due to the large volume of data that MCSO had to provide prior to our site visits.

Document preservation is set in motion when a party sends a litigation hold notice or written directive to MCSO requesting the preservation of relevant documents or records and electronically stored information (ESI), in anticipation of future litigation against the agency. MCSO's Legal Liaison Section (LLS) manages litigation holds through Open Axes, a software program.  Upon the receipt of a litigation hold, which is usually sent by the Maricopa County Attorney's Office (MCAO), the LLS inputs the data into Open Axes which conducts a search for responsive documents within MCSO drives.  The system also identifies potential document custodians, which are later filtered by an LLS employee.  The LLS then serves the custodians with a legal hold in electronic format, known as a Document Preservation Notice, within five business days.  Upon receipt of the Open Axes email with the Document Preservation Notice, MCSO custodians must identify responsive documents, both electronic and hardcopies, and preserve them in the manner in which they are kept in the course of business.

In light of the COVID-19 pandemic, we conducted a remote site visit in October 2020.  For this Paragraph, we reviewed all files provided by MCSO through ShareFile.  We reviewed a sample of the third-party source documents that generate the litigation holds that the LLS receives from MCAO.  The Document Preservation Notices have been distributed 100% in a timely manner to the custodians who may have responsive documents.

During the previous quarter, we approved amendments to GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices).  During our October remote site visit, we held a conference call with the LLS and they notified us that the policy had been published on October 1, 2020.  Consequently, for this reporting period. we are assessing compliance for the last time with the previous version of GD-9, which requires that the employee who receives the email document preservation request complete a Document Preservation Acknowledgment form within

WAI 50966

five days of receipt and a Document Preservation Questionnaire within 10 days of receipt. The attestation was returned in a timely manner 98% of the time. The questionnaire was timely returned 99% of the time. We were able to determine that 100% of the time, the questionnaires were properly completed by MCSO personnel.

**Paragraph 270.** *The Sheriff shall ensure that when the MCSO receives a request for documents in the course of litigation, it shall:*

a.  *promptly communicate the document request to all personnel who might possibly be in possession of responsive documents;*

b.  *ensure that all existing electronic files, including email files and data stored on networked drives, are sequestered and preserved through a centralized process; and*

c.  *ensure that a thorough and adequate search for documents is conducted, and that each employee who might possibly be in possession of responsive documents conducts a thorough and adequate search of all relevant physical and electronic files.*

**Phase 1:** In compliance

- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on October 1, 2020.

- GD-9 User Guide, published on May 3, 2019.

- GM-1 (Electronic Communications, Data and Voicemail), most recently amended on February 27, 2020.

**Phase 2:** In compliance

To verify MCSO's Phase 2 compliance with this Paragraph, we reviewed monthly submittals of requests for documents to MCSO employees for the reporting period and documents drafted by the LLS in search of documents from other MCSO Divisions. For this reporting period, we identified a sample of document requests and requested a copy of the responsive documents sequestered and/or produced. The data reviewed for this reporting period included June through August 2020, as per an agreement we reached with MCSO to stagger the document requests for this Paragraph. This was due to the large volume of data that MCSO had to provide prior to our site visits.

WAI 50967

Paragraph 270.a. requires prompt communication of document requests to all personnel who might possibly be in possession of responsive documents. As noted above, we continued to assess compliance with the previous version of GD-9, which requires the LLS to enter the data into a tracking system within five business days and to draft a Document Production Notice within five additional business days. The LLS is required, within five business days, to respond to the request for production if sourced within LLS, or to forward to the required MCSO Division for production. The Divisions have 10 days to produce the data requested. In 96% of the cases, the personnel responded to the Document Production Notices in a timely manner.

Our review revealed that MCSO is manually forwarding the Document Production Notices in a timely manner to all of its Divisions. In addition, MCSO is sending Attachment C, the Document Production Acknowledgement Questionnaire, to all employees. In 100% of the cases, the personnel who provided responsive documents properly completed Attachment C.

Paragraph 270.b. requires that all responsive ESI be stored, sequestered, and preserved by MCSO through a centralized process. MCSO now performs the searches through a centralized process established by the LLS. The preservation of the data is completed at the Division that has the actual document while the notation is made in the Open Axes program, which aids the LLS in the case management. LLS can now create a case, assign a case number, and trigger time alerts to the custodians of documents that LLS identifies through the system. Open Axes searches on the H, W, and U computer hard drives of MCSO, which are shared among Headquarters and the Districts. Documents found in any additional servers are kept in their servers by the document custodians who notify LLS. MCSO continues to manage litigation hold cases through Open Axes; all cases for this reporting period were managed through Open Axes.

The centralized process established by MCSO requires that all electronic data be sequestered and secured so as not to be purged. For this Paragraph, we review the data and visit MCSO areas to ensure that personnel are informed of the duty to preserve the data in both electronic and paper format, and that the employees are preserving the data. For this reporting period, because we were unable to travel to Maricopa County, we were unable to visit areas where hardcopies were kept in different MCSO areas. However, we added a quarterly request from the LLS Director for a certification that MCSO is sequestering the hard copies of documents responsive to the Document Preservation Notices. We randomly identified a sample from the quarterly data for this purpose. On October 8, 2020, the LLS Director certified that that the hard copies were being preserved after reviewing all Document Preservation Questionnaire responses for the listed samples. When we resume our in-person site visits, we will continue to verify that the hardcopies are being preserved.

Paragraph 270.c. requires that MCSO conduct an adequate search for documents, and that each employee who might possibly be in possession of responsive documents conducts a thorough and adequate search of all relevant physical and electronic files. We reviewed a sample of responsive documents for this reporting period, and MCSO identified responsive documents to the document production notices in 100% of the cases we reviewed.

WAI 50968

***Paragraph 271.*** *Within three months of the effective date of this Order, the Sheriff shall ensure that the MCSO Compliance Division promulgates detailed protocols for the preservation and production of documents requested in litigation. Such protocols shall be subject to the approval of the Monitor after a period of comment by the Parties.*

**Phase 1:** In compliance

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on October 1, 2020.

- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

**Phase 2:** In compliance

On June 17, 2019, MCSO published the Administrative Services Division Operations Manual, which details the protocols for the preservation and production of documents requested in litigation. The manual was recently amended on September 2, 2020.


***Paragraph 272.*** *The Sheriff shall ensure that MCSO policy provides that all employees must comply with document preservation and production requirements and that violators of this policy shall be subject to discipline and potentially other sanctions.*

**Phase 1:** In compliance

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on October 1, 2020.

**Phase 2:** In compliance

During this reporting period, no internal investigations were completed against any MCSO employee for failure to preserve or produce documents.

WAI 50969

**COURT ORDER XIX.      ADDITIONAL TRAINING**

***Paragraph 273.*** *Within two months of the entry of this Order, the Sheriff shall ensure that all employees are briefed and presented with the terms of the Order, along with relevant background information about the Court's May 13, 2016 Findings of Fact, (Doc. 1677), upon which this Order is based.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

MCSO previously delivered this training on the E-Policy platform. All personnel (100%) determined to be applicable by CID have received this training.

WAI 50970

# Section 17: Complaints and Misconduct Investigations Relating to Members of the Plaintiff Class

**COURT ORDER XX.    COMPLAINTS AND MISCONDUCT INVESTIGATIONS RELATING TO MEMBERS OF THE PLAINTIFF CLASS**

*Paragraph 274.  In light of the Court's finding that the MCSO, and in particular Sheriff Arpaio and Chief Deputy Sheridan, willfully and systematically manipulated, misapplied, and subverted MCSO's employee disciplinary policies and internal affairs processes to avoid imposing appropriate discipline on MCSO deputies and command staff for their violations of MCSO policies with respect to members of the Plaintiff class, the Court further orders as follows:*

## A.    *Investigations to be Overseen and/or Conducted by the Monitor*

*Paragraph 275.  The Monitor is vested with the authority to supervise and direct all of the MCSO's internal affairs investigations pertaining to Class Remedial Matters.  The Monitor is free from any liability for such matters as is set forth in ¶ 144 of the Supplemental Permanent Injunction.*

*Paragraph 276.  The Monitor shall have the authority to direct and/or approve all aspects of the intake and investigation of Class Remedial Matters, the assignment of responsibility for such investigations including, if necessary, assignment to his own Monitor team or to other independent sources for investigation, the preliminary and final investigation of complaints and/or the determination of whether they should be criminally or administratively investigated, the determination of responsibility and the imposition of discipline on all matters, and any grievances filed in those matters.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

The Second Order requires oversight by the Monitor for all internal investigations determined to be Class Remedial Matters (CRMs).  The Professional Standards Bureau (PSB) now schedules meetings every two weeks to discuss existing and incoming complaints to determine which, if any, could be CRMs.  During these meetings, PSB personnel discuss cases pending a CRM decision, cases determined to be CRMs, and any cases where the decision may be made that the case would not be classified as a CRM.  The PSB Commander determines the classification of the cases.  A member of our Team attends all of these meetings to provide the oversight required for this Paragraph.

At the end of the July-September 2016 reporting period, PSB had reviewed 442 administrative investigations that were open as of July 20, 2016; and determined that 42 of them met the basic criteria for CRMs.  These cases were reviewed during the scheduled CRM meetings.  In addition, a Monitoring Team member randomly selected an additional 52 cases from the 400 remaining

WAI 50971

pending cases; and concurred with PSB's assessment that the cases did not meet the basic criteria for CRMs. In addition to the 42 cases determined to be potential CRMs from the pending case list as of July 20, 2016, PSB identified an additional 10 cases that were potential CRM cases. At the end of the first reporting period after the Court's Second Order, nine cases had been determined to be CRMs; and one other was pending a CRM decision. The remaining cases reviewed were determined not to be CRMs.

At the end of the last reporting period, PSB had reviewed a total of 371 possible CRMs since August 2016. Of these, 82 were classified as CRMs.

During this reporting period, an additional 30 cases were reviewed as possible CRMs. Of these, 7 were determined to be CRMs. At the end of this reporting period, there was a total of 401 cases that have been reviewed as possible CRMs; and 89 cases that have been determined to be CRMs since the July 20, 2016 Court Order.

Since July 20, 2016, MCSO has completed and submitted a total of 68 CRM cases. Seven were closed during this reporting period and forwarded to our Team for review. Three, all involving the same employee, were traffic stops of members of the Plaintiffs' class that occurred between 2005 and 2006. In all three cases, citations were issued to the drivers of vehicles and the licenses were seized. The failure to impound these identifications was brought to the attention of PSB in September 2019, when the identifications were found at the former home of the involved deputy. Violations of MCSO's property and evidence policies were sustained, and the employee received a 24-hour suspension.

In the fourth case, a community member filed a complaint alleging that a deputy had been rude during a contact, and believed that it was attributable to the complainant's race. There were no witnesses to the verbal exchange or other independent evidence. The allegation was appropriately not sustained. PSB identified that this employee has had a number of demeanor complaints, and both one-on-one counseling and training was scheduled for the employee.

In the fifth complaint, when stopped for a traffic violation, the driver of the vehicle told the deputy he had not committed any traffic violation and then commented that perhaps he was being stopped due to his race. The deputy explained the reason for the traffic stop; the complainant recognized that he had, in fact, committed a traffic violation; and the complainant made no further comments regarding race. The deputy self-reported the initial comment by the driver, and PSB initiated an administrative investigation. When contacted, the complainant said that he had no complaint against the deputy, and that after the deputy had explained the violation, he understood why he had been stopped. The investigator also reviewed other traffic stops made by this deputy for the same type of violation. He noted that the deputy had made numerous stops for the same violation and there was no pattern regarding the race of the violators. As in this case, the deputy typically issued a warning for the violation.

In the sixth complaint, the complainant alleged that the deputy pulled up behind her too quickly as he was attempting to stop her for a traffic violation. She made no allegation of bias of any kind, there were no witnesses, and the complaint was appropriately not sustained. Our Team reviewed all six investigations and approved the findings, and where applicable, the discipline.

WAI 50972

In the seventh complaint, the complainant alleged that that an unknown deputy had stopped a family member, a Latino male, and questioned him as to why he was out during the Governor's lockdown due to COVID-19. The investigator conducted extensive research and was not able to identify any MCSO deputy or MCSO vehicle that had been in the area at the time of this traffic stop. The complaint was properly not sustained. Our Team reviewed all seven investigations and approved the findings, and the discipline, where applicable.

Of the 33 CRM cases that have been closed to date with findings of sustained misconduct and reviewed by our Team, 10 have involved employees who are deceased or left MCSO employment prior to the completion of the investigation or the disciplinary process. Twenty-three involved current employees of MCSO. Three of the 20 cases closed to date involved a sustained finding of misconduct involving bias related to the Plaintiffs' class: two sustained allegations of an inappropriate and biased comment; and one sustained allegation of bias-based policing.

During the scheduled meetings, case investigators continue to provide investigative updates on all cases that could be, or are, CRMs. Their briefings are thorough, and they continue to be responsive to any questions or input from members of our Team. In all cases where we have provided oversight since July 20, 2016, we have concurred with the decisions made by the PSB Commander regarding the case classifications and findings. Where appropriate, we have also approved the discipline in all these cases.


**Paragraph 277.** *This authority is effective immediately and shall remain vested in the Monitor until the MCSO's internal affairs investigations reach the benchmarks set forth in ¶ 288 below. With respect to Class Remedial Matters, the Monitor has plenary authority, except where authority is vested in the Independent Investigative and Disciplinary Authorities separately appointed by the Court, as is further set forth in ¶¶ 296–337 below.*


**Paragraph 278.** *The Sheriff shall alert the Monitor in writing to all matters that could be considered Class Remedial Matters, and the Monitor has the authority to independently identify such matters. The Monitor shall provide an effective level of oversight to provide reasonable assurance that all Class Remedial Matters come to his attention.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

Since the first CRM meeting held on August 17, 2016, PSB has consistently completed the required notification to us regarding the cases that could be considered CRMs. A Monitoring Team member has attended every CRM meeting with PSB where these matters are discussed and personally reviewed a number of the cases that were pending on July 20, 2016; and our Team member reviews the new cases that are presented at each meeting. There has been no need for us to independently identify CRMs, as PSB consistently properly identifies and reports these cases as required.

WAI 50973

***Paragraph 279.*** *The Monitor shall have complete authority to conduct whatever review, research, and investigation he deems necessary to determine whether such matters qualify as Class Remedial Matters and whether the MCSO is dealing with such matters in a thorough, fair, consistent, and unbiased manner.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

During the scheduled CRM meetings attended by a Monitoring Team member, PSB has consistently properly identified cases that could be, or are, CRMs. PSB personnel brief each case at these meetings, and their briefings have included all appropriate information. They have been responsive to any questions from our Team members during the meetings, and have responded appropriately to any suggestions we have raised. There has been no need for us to independently conduct any review, research, or investigation; as PSB is consistently properly identifying and investigating these cases.

***Paragraph 280.*** *The Monitor shall provide written notice to the Court and to the parties when he determines that he has jurisdiction over a Class Remedial Matter. Any party may appeal the Monitor's determination as to whether he has jurisdiction over a Class Remedial Matter to this Court within seven days of the Monitor's notice. During the pendency of any such appeal the Monitor has authority to make orders and initiate and conduct investigations concerning Class Remedial Matters and the Sheriff and the MCSO will fully comply with such action by the Monitor.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

During this reporting period, cases involving both sworn and non-sworn members of MCSO have continued to be reviewed as possible CRMs, when appropriate. There were no appeals by any Parties regarding any of the CRM classifications.

***Paragraph 281.*** *Subject to the authority of the Monitor, the Sheriff shall ensure that the MCSO receives and processes Class Remedial Matters consistent with: (1) the requirements of this Order and the previous orders of this Court, (2) MCSO policies promulgated pursuant to this Order, and (3) the manner in which, pursuant to policy, the MCSO handles all other complaints and disciplinary matters. The Sheriff will direct that the Professional Standards Bureau and the members of his appointed command staff arrive at a disciplinary decision in each Class Remedial Matter.*

**Phase 1:** In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 7, 2020.
- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.
- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

WAI 50974

- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** Not in compliance

To evaluate Phase 2 compliance with this Paragraph, a Monitoring Team member has attended each meeting conducted by PSB to discuss Class Remedial Matters. PSB has consistently provided thorough briefings, and the PSB Commander has made appropriate decisions regarding these matters.

PSB submitted seven closed CRM cases for our review this reporting period. Our Team approved the findings in all seven. Three had sustained findings and MCSO arrived at an appropriate discipline decision for the involved employee. We continue to find these investigations to be thorough and well-written, and the findings are supported by the facts of the investigations.

Unlike other administrative investigations where we review the entire case only after it has been completed and closed by MCSO, in the case of CRMs, we meet with PSB every two weeks to identify cases that should be considered CRMs, and to track the progress of those cases being investigated, reviewed and finalized. Each step of the process for CRM cases requires review and approval by our Team. We are therefore more aware of those issues that result in sometimes lengthy and delayed investigations and reviews.

In the three sustained CRM cases involving identifications seized between 2005 and 2007, the investigator expended a significant amount of time attempting to locate documentation related to traffic stops and attempting to find the owners of the identifications. As these were serious sustained violations, all relating to the same employee and same overall circumstances, the review of the investigations, required Pre-Determination Hearings and determination of final discipline all added to the delays in final completion. While not completed within the 85- or 180-day timeframes, we found that the delays were justified and found these three cases in compliance. In an additional case, the delay in completion was also properly justified and found in compliance. In another case, the investigative process and the closure of the case occurred within the required timeframes. Two of the seven cases were not completed within the required timeframes and insufficient justification existed for the delay.

For this reporting period, MCSO is not in Phase 2 compliance with this Paragraph.


***Paragraph 282.*** *The Sheriff and/or his appointee may exercise the authority given pursuant to this Order to direct and/or resolve such Class Remedial Matters, however, the decisions and directives of the Sheriff and/or his designee with respect to Class Remedial Matters may be vacated or overridden in whole or in part by the Monitor. Neither the Sheriff nor the MCSO has any authority, absent further order of this Court, to countermand any directions or decision of the Monitor with respect to Class Remedial Matters by grievance, appeal, briefing board, directive, or otherwise.*

**Phase 1:** In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 7, 2020.

WAI 50975

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

There were no CRM cases completed during this, or previous reporting periods, in which the Sheriff and/or his appointee exercised their authority to resolve CRMs, which we needed to vacate or override.


***Paragraph 283.*** *The Monitor shall review and approve all disciplinary decisions on Class Remedial Matters.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

At the end of this reporting period, MCSO has closed a total of 68 CRM cases since July 20, 2016. Seven were closed during this reporting period. Three of the seven had sustained findings. Of the total completed CRM cases, 33 have resulted in sustained findings. Seven had sustained findings on two separate deputies who are deceased, and three involved sustained findings on deputies who left MCSO employment prior to the determination of discipline. Twenty-three resulted in sustained findings against current MCSO employees. In all of the sustained cases, we have reviewed and approved all of the disciplinary decisions.


***Paragraph 284.*** *The Sheriff and the MCSO shall expeditiously implement the Monitor's directions, investigations, hearings, and disciplinary decisions. The Sheriff and the MCSO shall also provide any necessary facilities or resources without cost to the Monitor to facilitate the Monitor's directions and/or investigations.*

**Phase 1:** In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 7, 2020.

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

WAI 50976

During this and previous reporting periods, a Monitoring Team member has attended all scheduled CRM meetings conducted in an appropriate location determined by MCSO. PSB continues to provide a password and access to the IAPro system to a member of our Team so that we can complete independent case reviews if necessary.

PSB personnel continue to be professional and responsive to all input, questions, or concerns we have raised.

**Paragraph 285.** *Should the Monitor decide to deviate from the Policies set forth in this Order or from the standard application of the disciplinary matrix, the Monitor shall justify the decision in writing and place the written explanation in the affected employee's (or employees') file(s).*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

There were seven completed CRMs forwarded for our review during this reporting period. Three had sustained findings. Since we began monitoring CRM cases in July 2016, there have been a total of 33 cases with sustained findings. Seven have sustained findings on two separate deputies who are deceased, and three involve deputies who left MCSO employment prior to the determination of discipline. Twenty-three cases involve sustained findings against current MCSO employees. All 23 cases resulted in appropriate sanctions based on MCSO policy and the Discipline Matrices in effect at the time the investigations were conducted. No action on our part has been necessary relative to this Paragraph.

**Paragraph 286.** *Should the Monitor believe that a matter should be criminally investigated, he shall follow the procedures set forth in ¶¶ 229–36 above. The Commander of the Professional Standards Bureau shall then either confidentially initiate a Professional Standards Bureau criminal investigation overseen by the Monitor or report the matter directly and confidentially to the appropriate prosecuting agency. To the extent that the matter may involve the Commander of the Professional Standards Bureau as a principal, the Monitor shall report the matter directly and confidentially to the appropriate prosecuting agency. The Monitor shall then coordinate the administrative investigation with the criminal investigation in the manner set forth in ¶¶ 229–36 above.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

During this reporting period, there were no CRM cases submitted for our review where PSB had determined that a criminal misconduct investigation should also be conducted. We did not identify any CRM where we believe a criminal investigation should have been initiated and was not. No action on our part relative to this Paragraph has been necessary.

WAI 50977

***Paragraph 287.*** *Any persons receiving discipline for any Class Remedial Matters that have been approved by the Monitor shall maintain any right they may have under Arizona law or MCSO policy to appeal or grieve that decision with the following alterations:*

a.  *When minor discipline is imposed, a grievance may be filed with the Sheriff or his designee consistent with existing MCSO procedure. Nevertheless, the Sheriff or his designee shall immediately transmit the grievance to the Monitor who shall have authority to and shall decide the grievance. If, in resolving the grievance, the Monitor changes the disciplinary decision in any respect, he shall explain his decision in writing.*

b.  *disciplined MCSO employee maintains his or her right to appeal serious discipline to the Maricopa County Law Enforcement Merit System Council to the extent the employee has such a right. The Council may exercise its normal supervisory authority over discipline imposed by the Monitor.*

**Phase 1:** In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 7, 2020.
- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.
- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

Thirty-three completed CRM cases have had sustained findings of misconduct since the issuance of the Second Order. We concurred with MCSO's decisions in all of these cases.


***Paragraph 288.*** *The Monitor's authority over Class Remedial Matters will cease when both:*

a,  *The final decision of the Professional Standards Bureau, the Division, or the Sheriff, or his designee, on Class Remedial Matters has concurred with the Monitor's independent decision on the same record at least 95% of the time for a period of three years.*

b.  *The Court determines that for a period of three continuous years the MCSO has complied with the complaint intake procedures set forth in this Order, conducted appropriate internal affairs procedures, and adequately investigated and adjudicated all matters that come to its attention that should be investigated no matter how ascertained, has done so consistently, and has fairly applied its disciplinary policies and matrices with respect to all MCSO employees regardless of command level.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

WAI 50978

During this and prior reporting periods, we and PSB agreed on the investigative outcome of each CRM investigation completed.

PSB is responsible for the investigation of all CRM cases, and has continued to appropriately identify cases that could be, or are, CRMs. PSB personnel are professional in our contacts with them and responsive to any concerns or questions we have raised; and they provide detailed information and updates in the scheduled briefings. Their written reports are thoroughly prepared, and the reports have been consistent with the information provided during the twice monthly case briefings.

***Paragraph 289.*** *To make the determination required by subpart (b), the Court extends the scope of the Monitor's authority to inquire and report on all MCSO internal affairs investigations and not those merely that are related to Class Remedial Matters.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

During the last reporting period, we reviewed a total of 68 internal investigations. Three were criminal investigations, and 65 were administrative investigations. All three criminal investigations were in compliance. Of the 65 administrative investigations, Eight (12%) were in compliance with all investigative and administrative requirements over which the PSB Commander has authority. We concurred with all of the discipline decisions made by the Appointing Authority. Overall compliance for all investigations was 16%.

During this reporting period, we reviewed 174 investigations. Twenty-eight were criminal investigations, all of which were found in compliance. Administrative investigations accounted for 146 of the investigations we reviewed.

As previously noted, we assess justifications for any extensions or other delays based on investigative considerations, not workload. Of the 146 total administrative investigations completed, 35 (24%) were completed and submitted by the investigator in the required 60- or 85-day requirement. An additional 38 investigations that were not completed within 60 or 85 days contained specific and acceptable extension requests. Of the 146 total, 72 (49%) were not in compliance with the requirements for investigative completion and submittal of an investigation. Forty-two (29%) were submitted and reached final closure within 180 days or had an acceptable extension request and approval on file.

There was one completed administrative misconduct investigation submitted for compliance with Paragraph 249 (investigatory stops). There were five investigations submitted for compliance with Paragraph 33 (bias policing), and seven submitted in compliance with Paragraph 275 (CRMs) during this reporting period.

We found that PSB was compliant in 21 (24%) of the 88 investigations it conducted. There were no investigations submitted or reviewed by our Team that were conducted by the contract investigator retained by MCSO.

Of the 58 investigations conducted by Divisions and Districts outside of PSB, 15 (26%) were in compliance.

WAI 50979

During our April 2020 remote site visit, we provided detailed information on all misconduct investigations we found noncompliant to PSB personnel. Due to the small number of investigations completed by District and Divisions outside of PSB, we did not meet with District and Division Command personnel during this visit, but we provided all deficiency information on cases completed by their personnel to PSB.

During our July 2020 remote site visit, we met with PSB personnel to discuss the deficiencies in those investigations conducted by both their personnel and Divisions outside PSB. We also met with the Deputy Chiefs who have oversight for investigations conducted outside of PSB. It was our intent to have a meaningful dialogue with these Chiefs regarding the deficiencies we continue to find, the actions they have taken to address the ongoing concerns, and other ideas they might have for addressing future deficiencies. Unfortunately, the involved Chiefs did not offer any substantive input. A member of the Training Division staff also participated in the call, and offered to conduct additional training on how to determine proper findings in investigations, as this is one of the ongoing deficiencies we are finding.

During our October 2020 remote site visit, we met with PSB personnel to discuss the deficiencies in their investigations and those conducted by Districts outside of PSB. For the second site visit in a row, we also met with the Deputy Chiefs who have oversight for investigations conducted outside of PSB. As previously noted in this report, we found the discussion during this site visit to be productive; and we remain hopeful that the added oversight and reviews being conducted on District and Division investigations will result in additional improvement.

Effective with the revisions to internal affairs and discipline policies on May 18, 2017, the PSB Commander may now determine that a received complaint can be classified as a "service complaint" if certain specified criteria exists. Service complaint documentation must then be completed and is reviewed under this Paragraph.

MCSO closed 143 service complaints during the last reporting period. Eight were properly reclassified to administrative misconduct investigations after review by PSB. The remaining 135 were handled as service complaints. Of the 135 total, we found 129 (96%) compliant.

During this reporting period, we reviewed 139 service complaints completed by MCSO. In 16, an administrative misconduct investigation was opened after review by PSB. The remaining 123 were approved by PSB as service complaints. We agree with the handling of the complaints in 109 (87%). In one, we believe that misconduct allegations were made and an administrative misconduct investigation should have been conducted. In two others, while we agree they were properly classified as service complaints, there was a failure to complete necessary follow-up. Eleven others lacked a timely response to the complainant.

Effective with the revisions to the internal affairs and discipline policies, the PSB Commander is now authorized to determine that an internal complaint of misconduct does not necessitate a formal investigation if certain criteria exist. During this reporting period, the PSB Commander used this discretion in four incidents. We concurred that all four meet the criteria for a coaching without a misconduct investigation being conducted.

WAI 50980

*Paragraph 291.  The Monitor shall report to the Court, on a quarterly basis, whether the MCSO has fairly, adequately, thoroughly, and expeditiously assessed, investigated, disciplined, and made grievance decisions in a manner consistent with this Order during that quarter.  This report is to cover all internal affairs matters within the MCSO whether or not the matters are Class Remedial Matters.   The report shall also apprise the Court whether the MCSO has yet appropriately investigated and acted upon the misconduct identified in the Court's Findings of Fact, whether or not such matters constitute Class Remedial Matters.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

This report, including all commentary regarding MCSO's compliance with investigative and disciplinary requirements, serves as our report to the Court on these matters.  An overall summary of our compliance observations and findings is provided below.

During this reporting period, we reviewed 146 administrative misconduct investigations and 28 criminal misconduct investigations.  All 28 criminal investigations were in compliance with the Second Order.  Of the 174 total administrative and criminal misconduct investigations we reviewed, 62 (36%) were in full compliance with the Second Order, an increase from 16% during the last quarter.  Of the 146 administrative investigations, 35 (24%) were in full compliance with the Second Order, an increase from 12% during the last quarter.

During July-December 2016, PSB provided us with a memorandum describing PSB's efforts in meeting the requirements of this Paragraph related to the Court's Findings of Fact.  MCSO had outsourced three cases to another law enforcement agency, and an additional four investigations were pending outsourcing to an outside investigator.  These cases were outsourced due to the involvement of the former Chief Deputy, or other conflicts of interest identified by MCSO, and included the investigations identified in Paragraph 300.  MCSO processed a Request for Proposal and retained an outside investigator who met the requirements of Paragraphs 167.iii and 196 to conduct the investigations identified.  One potential misconduct case identified in the Court's Findings of Fact was retained and investigated by PSB, as no identifiable conflict of interest appeared to exist.

PSB provided us with a document sent by the Independent Investigator assigned by the Court to investigate, or reinvestigate, some of the misconduct that is related to the Plaintiffs' class.  In this document, the Independent Investigator clarified his intent to investigate the matters assigned to him by the Court, as well as the matters that the Court determined were the discretion of the Independent Investigator.  He further clarified that his investigations would include the initial misconduct alleged, as well as any misconduct that might have occurred during the process of review or issuance of discipline by MCSO personnel.

During each site visit, we meet with PSB personnel to discuss the status of those cases that have been outsourced to any contract vendor, other law enforcement agency, or other person or entity, so that we can continue to monitor these investigations and ensure that all misconduct cases, including those identified in the Findings of Fact, are thoroughly investigated.  PSB has continued to keep us apprised of the status of all such investigations.

WAI 50981

During our January 2018 site visit, PSB advised us that two administrative misconduct investigations that had been outsourced to a separate law enforcement agency had been completed and closed. We received and reviewed both investigations. A third investigation that MCSO outsourced to this same law enforcement agency had been previously returned to MCSO without investigation, as the allegations duplicated those already under investigation by the Independent Investigator. MCSO outsourced six additional investigations to the contract investigator.

During our January 2019 site visit, PSB advised us that no additional investigations had been outsourced to the contract vendor. Six cases had been completed and forwarded to PSB for review. None had yet been forwarded to our Team for review. The Independent Investigator continued investigations identified by the Court, and notified us of the status of these cases on a regular basis. We also received closed investigations that he completed.

During our April 2019 site visit, PSB advised that three additional investigations had been outsourced to the contract investigator. The six cases he had completed remained in review by PSB personnel. We had not received any of the investigations completed by this investigator for our review.

During our July 2019 site visit, PSB personnel advised us that they had outsourced an additional four investigations to the contract investigator. We received and reviewed four completed investigations conducted by this investigator. In all four cases, we found the investigations to be thorough and well-written. All, however, were noncompliant as proper extension memorandums were not completed. Additional cases completed by this investigator have been forwarded to PSB for their review prior to forwarding to our Team.

During our October 2019 site visit, PSB personnel advised us that they had not outsourced any additional cases to the contract investigator during the reporting period. We received and reviewed three investigations he had conducted. All three were well-written. However, two were noncompliant, as proper extension memorandums were not completed.

During the last three reporting periods, PSB did not outsource any additional cases to the contract investigator. During this reporting period, PSB outsourced an additional five cases to the contract investigator. He now has 21 investigations pending completion. For this and the last three reporting periods, we have not received any completed investigations by the contract investigator for our review. One additional case remains outsourced to an outside law enforcement agency.

The Independent Investigator has previously completed all of the investigations identified by the Court, as well as those where he initiated new investigations due to potential misconduct he identified during his reviews. All have been reviewed by our Team to ensure they complied with the Order of Court. The Independent Discipline Authority has also previously submitted his final report on those cases that had sustained findings, and we reviewed these findings. We did not make compliance findings on these cases, but determined that both the 12 investigations specifically directed by the Court for reinvestigation, as well as the additional cases where the Independent Investigator determined an investigation should be conducted, were properly completed and addressed the concerns identified by the Court.

WAI 50982

***Paragraph 292.*** *To make this assessment, the Monitor is to be given full access to all MCSO internal affairs investigations or matters that might have been the subject of an internal affairs investigation by the MCSO. In making and reporting his assessment, the Monitor shall take steps to comply with the rights of the principals under investigation in compliance with state law. While the Monitor can assess all internal affairs investigations conducted by the MCSO to evaluate their good faith compliance with this Order, the Monitor does not have authority to direct or participate in the investigations of or make any orders as to matters that do not qualify as Class Remedial Matters.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

PSB personnel continue to inform us of ongoing criminal and administrative misconduct investigations. A member of our Team attends each CRM meeting, reviews the lists of new internal investigations, and has access to PSB's IAPro database. The only cases for which any oversight occurs during the investigative process are those that are determined to be CRMs. We review all other misconduct investigations once they are completed, reviewed, and approved by MCSO personnel.

***Paragraph 293.*** *The Monitor shall append to the quarterly reports it currently produces to the Court its findings on the MCSO's overall internal affairs investigations. The parties, should they choose to do so, shall have the right to challenge the Monitor's assessment in the manner provided in the Court's previous Order. (Doc. 606 ¶¶ 128, 132.)*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

Since we began reviewing internal investigations conducted by MCSO more than four years ago, we have reviewed hundreds of investigations into alleged misconduct by MCSO personnel. During this reporting period we reviewed 146 administrative misconduct investigations, 139 service complaints, four coachings, and 28 criminal investigations that were conducted by MCSO personnel. All of the 28 criminal investigations we reviewed for compliance during this reporting period were investigated by PSB or personnel assigned to the Major Crimes Unit and were in compliance with the requirements of the Second Order.

The investigative quality of PSB administrative investigations has remained high for numerous reporting periods, though District investigations have continued to be problematic. Timelines, regardless of the justifications provided, have continued to increase quarter after quarter. During this reporting period, closure time for an administrative investigation conducted by Divisions or Districts outside of PSB was 407 days, an increase from 397 during the last reporting period; and for those completed by PSB personnel, 570 days, an increase from 552 days during the last reporting period. The failure to complete investigations in a timely manner and the continuing increase in the time it takes to fully close these investigations continues to be unacceptable, and is a disservice to the community and MCSO personnel.

WAI 50983

PSB conducted 88 of the 146 total administrative misconduct investigations we reviewed for this reporting period. Of the total 88 investigations conducted by PSB, 21 (24%) were found to be in compliance. This is an increase from 19% during the last reporting period.

PSB sworn investigators completed 27 of the 88 investigations. In one, required documentation was not contained in the investigative report; and in a second, the complainant was not contacted until two years after the complaint was filed. Based on investigative and administrative deficiencies, 10 (37%) were in compliance.

Detention supervisors conducted 61 of the 88 investigations conducted by PSB. In six of these cases, jail video was not obtained in a timely manner resulting in the potential loss of evidence. In one, the wrong policy violation was used in a sustained finding, resulting in the employee receiving less discipline than would have been the case had the correct policy violation been used. In one additional case, contradictory information was contained in the investigative report. Based on the investigative and administrative deficiencies in these cases, 12 (20%) were in compliance.

Of the 58 investigations conducted by Districts or Divisions outside of PSB, 55 were conducted by District personnel and three were conducted by a Division other than Patrol. Twenty-three of these investigations were found noncompliant due to unsupported findings, leading questions, or failure to address all investigative and overall administrative requirements. In six of these cases, though the deficiencies were identified by the District or Division Commander, they could not be corrected after the fact. PSB identified 20 of the deficiencies upon their review of the investigation. We identified three additional deficiencies during our reviews. In many of those cases where we, or PSB, identified deficiencies, we believe that a more thorough review at the District or Division level could have resulted in the correction of the majority of them prior to the cases being forwarded to PSB. Based on the investigative and administrative deficiencies, we found 15 (26%) of the 58 investigations to be compliant with all Second Order requirements, an increase from 19% during the last reporting period.

MCSO completed delivery of the 40-hour Misconduct Investigative Training at the end of 2017, and all sworn supervisors who investigate administrative misconduct attended the training. Refresher training on misconduct investigations has also been delivered since the initial 40-hour training. The investigative quality of PSB investigations has consistently remained high. While those investigations conducted by Division or Districts outside of PSB continue to have significant investigative deficiencies, we noted that for the 13 investigations initiated, completed and forwarded for our review during 2020, only three (23%) had investigative deficiencies.

PSB personnel continue to be receptive to our input, and we have had many productive meetings and discussions regarding the investigations being conducted and the compliance for both PSB and District and Division Cases. We also discuss compliance concerns with District and Division Command during our site visits. During our next site visit, we will discuss those cases that are noncompliant with MCSO; and again address our concerns about the overall low compliance findings for this reporting period. We continue to stress that compliance is not the sole responsibility of any one individual or Division – but dependent on all those who complete, review, or approve internal investigations.

WAI 50984

We have noted in numerous previous reporting periods that MCSO's executive leadership must take the appropriate action to ensure that adequate resources are dedicated to the completion of administrative and criminal misconduct investigations. PSB has continued to inform us that despite the approval for numerous additional investigative personnel in the July 2018 budget, only one of these positions has been filled and there is no indication that the additional positions will be filled in the foreseeable future. All of the civilian positions, including three civilian investigator positions, authorized in the July 2019 budget have been filled. MCSO advised us that no budget positions for PSB were requested for the July 2020 budget. We noted again during this reporting period that the case backlog in PSB continues to increase.

## B. Investigations to be Conducted by the Independent Investigator and the Independent Disciplinary Authority

**Paragraph 294.** *In its Findings of Fact, (Doc. 1677), the Court identified both: (1) internal affairs investigations already completed by the MCSO that were inadequate or insufficient; (see, e.g., Doc. 1677 at ¶ 903), and (2) misconduct or alleged misconduct that had never been investigated by MCSO that should be or should have been investigated. (Id. at ¶ 904.)*

**Paragraph 295.** *In light of MCSO's failure to appropriately investigate these matters, the Court appoints an Independent Investigator and an Independent Disciplinary Authority from the candidates set forth by the parties, and vests them with the authority to investigate and decide discipline in these matters.*

### 1. The Independent Investigator

**Paragraph 298.** *In assessing the existence of previously uncharged acts of misconduct that may be revealed by the Findings of Fact, the Independent Investigator does not have authority to investigate acts of misconduct that are not sufficiently related to the rights of the members of the Plaintiff class. While the Independent Investigator should identify such acts of misconduct and report those acts to the Commander of the Professional Standards Bureau, and to the Monitor for purposes of making the Monitor's assessment identified in ¶¶ 291–93 above, the Independent Investigator may not independently investigate those matters absent the authorization and the request of the Sheriff.*

**Paragraph 300.** *The following potential misconduct is not sufficiently related to the rights of the members of the Plaintiff class to justify any independent investigation:*

a. *Uninvestigated untruthful statements made to the Court under oath by Chief Deputy Sheridan concerning the Montgomery investigation. (Doc. 1677 at ¶ 385).*

b. *Uninvestigated untruthful statements made to the Court under oath by Chief Deputy Sheridan concerning the existence of the McKessy investigation. (Id. at ¶ 816).*

WAI 50985

c.      *Chief Deputy Sheridan's untruthful statements to Lieutenant Seagraves made during the course of an internal investigation of Detective Mackiewicz to the effect that an investigation into the overtime allegations against Detective Mackiewicz had already been completed.  (Id. at ¶ 823).*

d.      *Other uninvestigated acts of misconduct of Chief Deputy Sheridan, Captain Bailey, Sergeant Tennyson, Detective Zebro, Detective Mackiewicz, or others that occurred during the McKessy investigation.  (Id. at ¶¶ 766–825).*

**Phase 1:**  Not applicable

**Phase 2:**  Deferred

During our January 2017 site visit, the PSB Commander assured us that all acts of misconduct that we identified and discussed during our October 2016 site visit would be provided to a contracted investigator for investigative purposes.

Since that time, the PSB Commander has advised us that MCSO has contracted with a licensed private investigator.  The contract investigator possesses the requisite qualifications and experience to conduct the investigations of misconduct outlined in Paragraph 300 (a.-c.), and the additional misconduct in the Findings of Fact that directly associates with Paragraph 300 (d.).  PSB has not found it necessary to contract with any additional licensed private investigators.

During our April 2017 site visit, we met with PSB command staff and representatives from the Maricopa County Attorney's Office (MCAO) to verify that all of the acts of misconduct that were identified in the Findings of Fact (FOF) are under investigation, either by the Court-appointed Independent Investigator or the private licensed contract investigator.  Before this meeting, PSB command provided us with a roster of related acts of misconduct that PSB intended to be assigned to the contract investigator.  The roster of intended assignments did not include all of the acts of misconduct that we had discussed.  MCAO and PSB command personnel explained that the Court also identified, in Paragraph 301, many of the acts of potential misconduct identified in the FOF as sufficiently related to the rights of members of the Plaintiffs' class.  In Paragraph 301, the Court documented that because of this determination, investigations of the potential misconduct were justified if the Independent Investigator deemed that an investigation was warranted.

The Independent Investigator has completed all 12 of the administrative misconduct investigations specifically identified by the Court in the Second Order, and all other investigations for which he determined an administrative misconduct investigation should be conducted.  The Independent Disciplinary Authority has also completed all of the discipline findings for these cases.  While we did not make compliance findings for these cases, we reviewed them and found that they complied with the direction of the Court.

The contract investigator retained by MCSO continues to complete investigations he has been assigned.  During this reporting period, MCSO outsourced an additional five investigations to this investigator.  This investigator is currently conducting a total of 21 investigations.  Again this reporting period, none were completed and forwarded for our review.  One additional investigation previously outsourced to another law enforcement agency remains under investigation.

WAI 50986

Our ability to verify that all potential misconduct outlined in the FOF has been investigated by PSB, the PSB contract investigator, or the Independent Investigator remains pending until all the investigations are completed. Once this occurs, we can determine if there is any additional misconduct identified in the FOF that still requires investigation. Finally, the PSB Commander and MCAO advised us that the acts of misconduct involving (former) Sheriff Arpaio as identified in the FOF would not be investigated by any entity, as there does not exist any statute that addresses how a Sheriff would be disciplined in the event of a sustained finding resulting from an administrative misconduct investigation.

*Paragraph 310.* *The Monitor and the parties are directed to promptly comply with the Independent Investigator's requests for information. The Monitor and the Independent Investigator may communicate to coordinate their investigations. Nevertheless, each is independently responsible for their respective jurisdiction set forth in this Order, and each should make independent decisions within his own delegated responsibility.*

## 2. The Independent Disciplinary Authority

*Paragraph 337.* *Nevertheless, when discipline is imposed by the Independent Disciplinary Authority, the employee shall maintain his or her appeal rights following the imposition of administrative discipline as specified by Arizona law and MCSO policy with the following exceptions:*

a.   *When minor discipline is imposed, a grievance may be filed with the Sheriff or his designee consistent with existing MCSO procedure. Nevertheless, the Sheriff or his designee shall transmit the grievance to the Monitor who shall have authority to decide the grievance. If in resolving the grievance the Monitor changes the disciplinary decision in any respect, he shall explain his decision in writing.*

b.   *A disciplined MCSO employee maintains his or her right to appeal serious discipline to the Maricopa County Law Enforcement Merit System Council to the extent the employee has such a right. The Council may exercise its normal supervisory authority over discipline imposed by the Independent Disciplinary Authority with one caveat. Arizona law allows the Council the discretion to vacate discipline if it finds that the MCSO did not make a good faith effort to investigate and impose the discipline within 180 days of learning of the misconduct. In the case of any of the disciplinary matters considered by the Independent Disciplinary Authority, the MCSO will not have made that effort. The delay, in fact, will have resulted from MCSO's bad faith effort to avoid the appropriate imposition of discipline on MCSO employees to the detriment of the members of the Plaintiff class. As such, the Council's determination to vacate discipline because it was not timely imposed would only serve to compound the harms imposed by the Defendants and to deprive the members of the Plaintiff class of the remedies to which they are entitled due to the constitutional violations they have suffered at the hands of the Defendants. As is more fully explained above, such a determination by the Council would constitute an undue impediment to the remedy that the Plaintiff class would have received for the*

WAI 50987

*constitutional violations inflicted by the MCSO if the MCSO had complied with its original obligations to this Court. In this rare instance, therefore, the Council may not explicitly or implicitly exercise its discretion to reduce discipline on the basis that the matter was not timely investigated or asserted by the MCSO. If the Plaintiff class believes the Council has done so, it may seek the reversal of such reduction with this Court pursuant to this Order.*

**Phase 1:** In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 7, 2020.

**Phase 2:** In compliance

During this reporting period, no grievances were filed that met the criteria for transmitting to the Monitor.

WAI 50988

# Section 18:  Concluding Remarks

We assess compliance with 94 Paragraphs of the First Order, and 113 Paragraphs of the Second Order, for a total of 207 Paragraphs.  MCSO is in Phase 1 compliance with 78 of the First Order Paragraphs, or 98%; and 103 of the Second Order Paragraphs, or 100%.

Including the 41 Paragraphs in which MCSO is in Full and Effective Compliance, MCSO is in Phase 2, or operational compliance, with 74 of the First Order Paragraphs, or 78%.  MCSO is in Phase 2 compliance with 103 of the Second Order Paragraphs, or 91%.  Combining the requirements of both Orders, MCSO is in Phase 1 compliance with 181 Paragraphs, or 99%; and in Phase 2 compliance with 177 Paragraphs, or 85%.

As we reported in our last quarterly status report, we continue to identify instances where deputies documented that Incidental Contact Receipts were issued to vehicle passengers; however, our reviews of the body-worn camera recordings indicated that the receipts were not provided to the passengers.  We provided MCSO with information on specific cases that were identified during this reporting period, and MCSO concurred with our findings on this issue.  In some instances, MCSO instructed the deputies to mail the Incidental Contact Receipts to the passengers after we informed MCSO of the issue.  MCSO informed us that AIU is developing an inspection to conduct reviews to identify such issues internally going forward.  We encourage MCSO to implement internal inspections such as this to address those areas of compliance that have ongoing issues.

In the last reporting period, we reported that we continued to identify inconsistencies in the effective documentation of seizure of evidence and/or contraband on Vehicle Stop Contact Forms (VSCFs).  During the last reporting period, MCSO's rate of compliance decreased significantly due to these inconsistencies.  During this reporting period, MCSO improved.  However, based on past significant declines in compliance rates in this area, we continue to recommend that supervisors and command personnel re-emphasize the policy requirements to ensure that deputies properly document the seizure of evidence and/or contraband as required.

Paragraph 65 requires MCSO to analyze the collected traffic stop data on a monthly, quarterly and annual basis, and report the findings to the Monitor and the Parties.  MCSO has, to date, completed five Traffic Stop Annual Reports (TSARs).  During this reporting period, MCSO completed its first Traffic Stop Quarterly Report (TSQR) since the issuance of the First Order. We expect that MCSO will continue to publish a TSQR in every quarter going forward.  MCSO developed a list of possible TSQR analyses topics with our input and that of the Plaintiffs and Plaintiff-Intervenors.  Since we have all agreed that quarterly analyses should be reserved for special studies associated with traffic stop data, we consider this list to be flexible with respect to topics as well as the order in which they are analyzed.

WAI 50989

While MCSO has achieved compliance with the publication of annual and quarterly reports, the commencement of Traffic Stop Monthly Reports (TSMRs) remains elusive. We, MCSO, and the Parties have agreed that the focus of the TSMRs should be identifying individual deputies who are exhibiting indicia of potential bias in their traffic stop activity. Up until the Fourth TSAR, such deputies were identified using the analyses of annual traffic stop data. The current vendor assisting MCSO with its analyses changed methodologies for the annual analysis, with our approval and that of the Parties. The annual analyses now focuses exclusively on organizational trends.

Despite ongoing efforts, including weekly calls with all involved, progress toward finalizing the TSMR process has been slow. We have all agreed to a pilot program of testing the different components of the TSMR process. Finalizing and implementing the pilot must be a priority for MCSO. Of the three analyses required by Paragraph 65 – annual, quarterly, and monthly – the monthly analysis is the most critical because of its singular focus on identifying deputies who may be conducting traffic stops in a biased manner, knowingly or not.

Community engagement with Latino residents of Maricopa County is a significant component of the *Melendres* case. Our quarterly community meetings and the participation of the Community Advisory Board (CAB) in this process serve as a meaningful way to assess MCSO's progress with the reforms and to rebuild trust between MCSO and the Latino community. Unfortunately, due to the postponement of our in-person site visits, we recently have been unable to hold community meetings. These meetings, which are held in locations that are convenient to members of the Plaintiffs' class, give community members opportunities to learn about MCSO's progress with the reforms, and to speak and ask questions about their experiences with MCSO. We look forward to holding community meetings again when we resume our onsite visits. Until that time, we are pleased that the CAB continues to be actively engaged.

Over numerous past reporting periods, we noted the consistent quality of investigations conducted by PSB personnel. The quality of investigations conducted by investigators outside of PSB has, however, continued to be problematic. During this reporting period, while investigative compliance still remains low for the District and Division investigations, we observed a notable increase in the number of instances where Command personnel identified concerns in investigations and addressed them prior to their submittal to PSB. Deputy Chiefs with oversight for these Districts and Divisions are now reviewing these investigations, as well. During our October remote site visit, the Deputy Chiefs informed us that they have identified the same deficiencies that we and PSB have identified for numerous reporting periods; and they are now working with their personnel to improve both the quality and the review of these investigations. We are hopeful that this increased focus will result in improvements.

Since the issuance of the Second Order, we have noted an ever-increasing number of open investigations. The number of open investigations increased again this reporting period, to a total of 1,992 cases, of which 1,743 are assigned to PSB. While we have urged MCSO, in both our quarterly reports and site visit meetings, to address this increase, MCSO has assigned virtually no additional investigators to PSB since 2016. Investigations take an average of 509 days to complete.

WAI 50990

On December 10, 2020, MCSO filed a motion seeking relief as a result of our last quarterly status report, which found MCSO out of compliance with Paragraphs 33, 204, and 281, on case extension letters which were based on workload. In its motion, MCSO requested that, pursuant to Paragraphs 128 and 135, the Court find that that Monitor failed to provide 30 days' notice of a change in methodology; and that the Monitor cannot apply the new methodology retroactively. MCSO acknowledged PSB's untenable high caseloads, but argued that the Monitor had acted beyond his powers under the Orders to retroactively apply a new rule with no prior notice.

In response, on December 18, 2020, the Court denied MCSO's motion. The Court *sua sponte* – that is, on its own accord – noted that the result of compliance was not attributable to a change in methodology, but rather our audit of Paragraph 204. The Court noted that the cases have increased in PSB, but not in such a way that would justify a backlog of 1,954 open cases. According to the Court, "At this time, the average time to close a case has risen to 501 days – approximately six times greater than the longest time period provided in the order." Further, the Court noted, "The Monitor is not obliged to sanction what it deems to be unreasonable actions by the MCSO because he had not found previous such requests to be unreasonable, especially when such actions are repeated and, in the Monitor's assessment become unreasonable in the aggregate."

Neither the community nor MCSO employees should have to wait more than 16 months for a complaint to be resolved. MCSO must take decisive action to address this ongoing and increasing problem.

WAI 50991

# Appendix:  Acronyms

The following is a listing of acronyms frequently used in our quarterly status reports:

| | |
|---|---|
| AB | Administrative Broadcast |
| ACJIS | Arizona Criminal Justice Information System |
| ACLU | American Civil Liberties Union |
| ACT | Annual Combined Training |
| AIU | Audits and Inspections Unit |
| AOC | Arizona Office of Courts |
| ARG | Alert Review Group |
| ARS | Arizona Revised Statutes |
| ASU | Arizona State University |
| ATU | Anti-Trafficking Unit |
| BAF | BIO Action Form |
| BB | Briefing Board |
| BIO | Bureau of Internal Oversight |
| BWC | Body-worn camera |
| CAB | Community Advisory Board |
| CAD | Computer Aided Dispatch |
| CBP | Customs and Border Protection |
| CDA | Command Daily Assessment |
| CEU | Criminal Employment Unit |
| CID | Court Implementation Division |
| COrD | Community Outreach Division |
| CORT | Court Order Required Training |
| CRM | Class Remedial Matter |
| DOJ | Department of Justice |
| DSA | Deputy Service Aide |
| DUI | Driving Under the Influence |
| EIS | Early Identification System |

| | |
|---|---|
| EIU | Early Intervention Unit |
| EPA | Employee Performance Appraisal |
| FAEC | Full and Effective Compliance |
| FBI | Federal Bureau of Investigation |
| FEC | Full and Effective Compliance |
| FOF | Findings of Fact |
| FTO | Field Training Officer |
| GI | General Instructor |
| ICE | Immigration and Customs Enforcement |
| IIU | Internal Investigations Unit |
| IMF | Incident Memorialization Form |
| IR | Incident Report |
| JED | Judicial Enforcement Division |
| LOS | Length of stop |
| LLS | Legal Liaison Section |
| MCAO | Maricopa County Attorney's Office |
| MCSO | Maricopa County Sheriff's Office |
| NOI | Notice of Investigation |
| NTCF | Non-Traffic Contact Form |
| PAL | Patrol Activity Log |
| PDH | Pre-Determination Hearing |
| POST | Peace Officers Standards and Training |
| PPMU | Posse Personnel Management Unit |
| PSB | Professional Standards Bureau |
| SID | Special Investigations Division |
| SMS | Skills Manager System |
| SPSS | Statistical Package for the Social Science |
| SRT | Special Response Team |
| TraCS | Traffic Stop Data Collection System |
| TSAR | Traffic Stop Annual Report |

| TSAU | Traffic Stop Analysis Unit |
|------|----------------------------|
| TSMR | Traffic Stop Monthly Report |
| TSQR | Traffic Stop Quarterly Report |
| VSCF | Vehicle Stop Contact Form |

WAI 50994