Pamela S. Karlan
Principal Deputy Assistant Attorney
General
Steven H. Rosenbaum (NY Bar No.
1901958)
Cynthia Coe (DC Bar No. 438792)
Maureen Johnston (WA Bar No.
50037)
Nancy Glass (DC Bar No. 995831)
Beatriz Aguirre (NV Bar No. 14816)
U.S. Department of Justice, Civil
Rights Division
Special Litigation Section
150 M Street NE, 10th Floor,
Washington, D.C. 20002

Attorneys for the United States

Cecillia D. Wang (*pro hac vice*)
ACLU Foundation
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-0775
Email: cwang@aclu.org

Stanley Young (*pro hac vice*)
Covington & Burling LLP
3000 El Camino Real
5 Palo Alto Square
Palo Alto, CA 94306
Telephone: (650) 632-4700
Email: syoung@cov.com

Attorneys for Plaintiffs (*additional
attorneys listed on next page*)

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; *et al.*<br><br>Plaintiffs,<br><br>and<br><br>United States of America<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>Paul Penzone, in his official capacity as Sheriff of Maricopa County, AZ; *et al.*<br><br>Defendants. | No. 2:07-cv-02513-PHX-GMS<br><br>**PLAINTIFFS' AND UNITED STATES' JOINT MOTION TO ENFORCE PARAGRAPH 70 OF SUPPLEMENTAL PERMANENT INJUNCTION/JUDGMENT ORDER**<br><br>**Oral Argument Requested** |

Additional Attorneys for Plaintiffs:

Victoria Lopez (AZ 330042)
Christine Wee (AZ 028535)
Casey Arellano (AZ 031242)
ACLU Foundation of Arizona
3707 North 7th Street, Suite 235
Phoenix, AZ 85014
Telephone: (602) 650-1854
Email: vlopez@acluaz.org
Email: cwee@acluaz.org
Email: carellano@acluaz.org

Hannah M. Chartoff (*pro hac vice*)
Amy S. Heath (*pro hac vice*)
Covington & Burling LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
Telephone: (415) 591-6000
Email: hchartoff@cov.com
Email: aheath@cov.com

Adrian Hernandez (*pro hac vice*)
MALDEF
634 S. Spring St., 11th Floor
Los Angeles, CA 90014
Telephone: (213) 629-2512
Email: ahernandez@maldef.org

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................... 1

II.    BACKGROUND ............................................................................................ 2

    A.    MCSO's Six-Year Effort to Develop a Methodology for the Traffic Stop Monthly Report Analysis Has Failed ............................................... 3

        1.    The 2015 Attempt ............................................................... 3

        2.    The 2017 Attempt ............................................................... 4

        3.    The 2018 Delays .................................................................. 4

        4.    The 2019 Delays .................................................................. 6

        5.    The September 2019 Reset .................................................. 10

        6.    The December 2019 Progress Report ................................. 10

        7.    The 2020 Methodology Testing Process ............................ 11

    B.    MCSO's Traffic Stop Monthly Report Intervention Program Does Not Reflect the Lessons Learned from the Traffic Stop Annual Report Process or Comply with the First Order ............................................ 14

        1.    MCSO Has Produced Traffic Stop Monthly Report Intervention Materials That Are Vague and Fail to Set Standards for Supervisor Conduct ............... 15

        2.    Under the Current Traffic Stop Monthly Report Proposal, Supervisors Have Too Much Discretion and Insufficient Accountability .................................... 16

        3.    Interventions Will Not Be Videotaped ............................. 18

        4.    The Materials Fail to Convey the Serious Purpose of the Traffic Stop Monthly Report and Invite Supervisors to Discount the Analysis ................................. 18

III.   ARGUMENT ...................................................................................................21

   A.   The History of MCSO's Bias Intervention Program Shows the Need for Court
       Oversight ........................................................................................................22

   B.   MCSO's Delays and Resistance Harm the Plaintiff Class ..................................25

IV.   REQUESTED INTERVENTION ...................................................................26

V.   CONCLUSION ...............................................................................................29

ii

# I.    INTRODUCTION

Seven years have passed since this Court entered the Supplemental Permanent Injunction/Judgment Order, Doc. 606 (First Order), assuring residents of Maricopa County that the Sheriff's Office (MCSO) would patrol in an unbiased manner or else answer to this Court. Yet, MCSO remains out of compliance with some of the First Order's most essential requirements designed to prevent discrimination and protect the Plaintiff Class. MCSO has *never* successfully implemented a Traffic Stop Monthly Report (TSMR) analysis in which it scrutinizes traffic-stop data on a monthly basis for signs of discrimination. MCSO currently conducts no deputy-level analysis at all, and it stopped looking for deputy-level bias in traffic-stop data collected after June 2017—nearly 70,000 traffic stops ago.[1] Moreover, despite the existence of a previous deputy intervention program to monitor, counsel, and, if necessary, discipline deputies flagged in MCSO's Traffic Stop Annual Report (TSAR), MCSO has not completed an intervention with an individual deputy to address indicia of bias since early 2019. Meanwhile, MCSO has treated the development of the TSMR intervention program as if it were starting from scratch. MCSO has shelved the intervention protocols and materials that were jointly developed in 2017, and ignored many of the critical lessons that the Parties, the Monitor, and this Court grappled with more than three years ago.

MCSO's delays and resistance have placed the Plaintiff Class at an unacceptable risk of discrimination. Since the last round of interventions, MCSO has issued two comprehensive TSARs, covering 30 months of data. The findings are troubling. The most recent TSAR showed that MCSO deputies issue citations to Latino drivers at a higher rate than white drivers; arrest Latino drivers at a higher rate than white drivers; hold Latino drivers on the roadside longer than white drivers; and are approximately three times as likely to search Latino drivers as white drivers during traffic stops. *See* Doc. 2535-1, TSAR 5 Findings, Jan. 2019–Dec. 2019, at 27–30 (May

---

[1] *See* tabulation of traffic stops at note 31, *infra*.

27, 2020). In short, the substantial and statistically significant racial and ethnic disparities for these stop outcomes suggest that biased policing may remain a systemic problem at MCSO.[2] When faced with such evidence, Paragraph 70 of the First Order compels MCSO to act. But MCSO has failed to do so.

This latest failure fits a pattern where this Court has had to directly intervene and force MCSO to recognize and act on its obligations under the First Order, and under Paragraph 70 in particular. MCSO's persistent failures to develop the systems necessary to address potentially biased policing have allowed MCSO deputies to act without even the risk of being held accountable pursuant to Paragraph 70. Plaintiffs and the United States therefore respectfully move this Court to enforce the requirements of Paragraph 70.

## II.    BACKGROUND

MCSO has never successfully implemented a TSMR program to analyze traffic-stop data on a monthly basis for signs of biased policing and to direct supervisors to address it. Under Paragraph 64 of the First Order, "[w]ithin 180 days of the Effective Date," or March 31, 2014, MCSO was required to "develop a protocol for periodic analysis" of traffic-stop data "to look for warning signs or indicia of possible racial profiling or other improper conduct. . . ."

The First Order makes clear that MCSO must analyze the traffic data "on a monthly, quarterly and annual basis . . . to look for possible individual-level, unit-level

---

[2] Sheriff Penzone has acknowledged the implications of the TSARs. *See* Doc. 2474-1, Message from Sheriff Paul Penzone, at 2 (Oct. 25, 2019) ("These [disparate outcomes] may be indicative of a systemic problem"); *see also* Doc. 2535-2, Sheriff Penzone's Statement on TSAR 5, at 2 (May 27, 2020) ("[T]hese disparate outcomes are warning signs of potential racial bias in our patrol function, which has been and continues to be a major concern for the Office. These may be indicative of a systemic problem within our patrol function."); *see also* Doc. 2569, Independent Monitor's Twenty-Fifth Quarterly Report, at 89–90 (Nov. 16, 2020) (describing the findings of the five TSARs that have evaluated traffic-stop data from mid-2014 to the end of 2019).

or systemic problems." *Id.* at ¶ 65. And when an analysis uncovers evidence of biased policing, whether on an individual level or systemically, the First Order requires MCSO to "take reasonable steps to investigate and closely monitor the situation." *Id.* at ¶ 70. Despite these clear mandates, MSCO has repeatedly failed to develop either a methodology for identifying problematic traffic-stop behavior or a protocol for interventions with those deputies who have been identified.

### A. MCSO's Six-Year Effort to Develop a Methodology for the Traffic Stop Monthly Report Analysis Has Failed

MCSO has still failed to devise or implement a statistical methodology for the TSMR program, despite multiple attempts. Throughout its six-year effort to develop this methodology, MCSO has rejected many of the suggestions from Plaintiffs and the United States, and disregarded many lessons learned along the way.[3]

#### 1. The 2015 Attempt

MCSO's first attempt to develop a TSMR program began in 2015 and had already failed by 2016. The methodology was significantly flawed, and MCSO was unable to provide any reason for why it chose the particular method in the first place. Doc. 1667, Independent Monitor's Seventh Quarterly Report, at 89 (Apr. 19, 2016) ("MCSO does not have the means to explain how current thresholds were established."). Specifically, the methodology stopped short of issuing "Alerts" in the agency's Early Identification System (EIS) for deputies who made fewer than ten traffic stops in a month; the Monitor warned that this would "reduce the chance of finding anyone" who may be engaged in racial profiling. *See* Doc. 1759, Independent Monitor's Eighth Quarterly Report, at 127 (July 21, 2016). The Monitor's view was that the methodology was "arbitrary and based on opinion rather than statistical

---

[3] MCSO has failed to comply with Paragraph 70 notwithstanding the significant efforts of Plaintiffs, the United States, and the Monitor, who have provided specific feedback and recommendations on how to implement the TSMR intervention program with appropriate transparency and accountability throughout MCSO.

validation." *Id*. at 97. Therefore, it was not surprising that, "out of the three months of data analysis for 2016, only one deputy had an alert set for possible racial profiling." *Id*. at 127. For those reasons, MCSO suspended this first attempt in 2016. *See* Doc. 2594, Independent Monitor's Twenty-Sixth Quarterly Report, at 88 (Feb. 9, 2021).

### 2. The 2017 Attempt

MCSO's second attempt to implement the TSMR likewise failed, this time due to a different set of methodological flaws. In April 2017, MCSO introduced a new methodology for the TSMR analysis that was based on the Court's guidance in Paragraph 67 of the First Order. *See id*. at ¶ 67 (describing "warning signs or indicia of possible racial profiling or other misconduct"). MCSO began sending out alerts to supervisors through the EIS, but by July, the methodology had flooded the system with a large number of alerts, "most of which lack sufficient detail to establish a pattern of problematic behavior for the individual deputies flagged by the methodology." Doc. 2279, Independent Monitor's Fifteenth Quarterly Report, at 85 (May 7, 2018). For a second time, MCSO placed the TSMR program on hold because of flawed methodology. *Id*.

### 3. The 2018 Delays

During 2018, MCSO conducted interventions with deputies identified as possibly engaging in biased policing in the second and third TSARs. *See* Doc. 2302, Independent Monitor's Sixteenth Quarterly Report, at 98 (Aug. 6, 2018); Doc. 2419, Independent Monitor's Nineteenth Quarterly Report, at 5 (May 14, 2019). But MCSO's delays and dysfunction undermined the legitimacy of those interventions and the program's central goal—to promptly notify deputies (and their supervisors) that their traffic-stop practices may have been harming minorities and, consequently, that they needed to modify their behavior. The long delays between analysis and intervention meant that MCSO failed to interrupt the flagged deputies' behavior *for years*. For example, while MCSO conducted TSAR interventions in 2018, those

interventions were related to traffic activity that had occurred *years* before.[4] In the meantime, the deputies might have continued to conduct harmful stops, or even received validation from superiors on the very practices that the analysis showed were problematic. The delays also invited deputies and supervisors to believe that the TSAR analysis was not a fair characterization of their *current* performance, and that it could therefore be disregarded. And following the interventions, MCSO conducted no data analysis to determine if the selected intervention strategies were actually effective at modifying deputy activity. Thus, MCSO had no way of knowing whether the interventions were successful by any objective measure.

For those reasons, Plaintiffs and the United States advocated for the swift implementation of the TSMR program in which MCSO would timely intervene when a deputy's traffic-stop activity showed evidence of bias. In July 2018, the United States pointed out the milestones that MCSO should consider in order to validate the TSMR methodology and implement the TSMR interventions, and asked MCSO to share its plan to do so.[5] Plaintiffs concurred, pointing out that MCSO was then four years past

---

[4] While the second TSAR analyzed traffic-stop data collected from July 2015 through June 2016, MCSO did not complete interventions and action plans for flagged deputies until the third quarter of 2018, over two years later. *See* Doc. 2371, Independent Monitor's Eighteenth Quarterly Report, at 109 (Feb. 20, 2019). Similarly, while the third TSAR analyzed traffic-stop data collected from July 2016 through June 2017, MCSO did not complete all related interventions and action plans until the first quarter of 2019. *See* Doc. 2458, Independent Monitor's Twentieth Quarterly Report, at 4 (July 29, 2019).

[5] *See* Ex. A, Email from Maureen Johnston to *Ortega Melendres* distribution list, at 2 (July 9, 2018) ("Beyond the issues with validating the TSMR methodology, we have concerns about the process for implementing the TSMR . . . Has MCSO refined its concept for what the 'intervention' or 'notice' should look like, and who will be involved? . . . Has MCSO developed a strategy or timeline for implementing the TSMR? . . . Has MCSO given thought to what kind of training will be necessary prior to rolling out the TSMR?").

the deadline in the First Order for adopting a protocol to analyze traffic-stop data.[6] In October, MCSO produced a proposed timeline for implementing the TSMR that indicated that the analysis could be up and running as soon as four weeks after the methodology was completed—then set for December 2018. The timeline provided no dates, however, for developing policies for the TSMR intervention program, or training for those employees who would be involved in administering it. *See* Ex. C, Monthly Analysis and Report Completion/Implementation Plan (Oct. 29, 2018).

### 4. The 2019 Delays

By January 2019, MCSO had retained a new statistical expert, CNA, to oversee its statistical analyses, including the TSAR and TSMR. MCSO informed Plaintiffs and the United States that it planned to employ similar statistical techniques for both analyses. *See* Doc. 2483, Independent Monitor's Twenty-First Quarterly Report, at 94 (Nov. 12, 2019). Although the Monitor eventually approved the methodologies, the design and implementation of the methodologies were riddled with errors and delays.

MCSO's first error was distorting its own benchmarking analysis. In broad terms, MCSO planned to employ a statistical technique in which it would match traffic stops with other similarly situated stops and then evaluate whether the outcomes for the people who were stopped differed on the basis of their race or ethnicity.[7] MCSO

---

[6] Plaintiffs explained that "MCSO needs to develop a plan for training regarding monthly alerts; messaging to supervisors and deputies as to monthly alerts; and the nature of analysis and intervention for monthly alerts (including potential analysis and intervention on a unit level). Such a plan will ensure that the monthly alerts are a tool in which deputies and supervisors have confidence—which we think is particularly necessary given the problems with monthly alerts last year." Ex. B, Email from Kate Huddleston to *Ortega Melendres* distribution list (July 17, 2018).

[7] Specifically, the technique that MCSO planned to employ matched several characteristics in addition to stop location and time of day, including 1) whether the stop was conducted as part of a special assignment, 2) the driver's sex, 3) the stop classification, 4) whether the vehicle had out-of-state plates, and several other factors. *See* Ex. D, MCSO/CNA Proposed Analysis Plans, at MELC002273423 (Dec. 21, 2018).

also proposed that, in addition to matching *stop* characteristics, it would match *deputy* characteristics: stops conducted by deputies of a given race, gender, age, productivity level, and tenure at the agency would also be matched with stops conducted by deputies with similar characteristics. *See* Ex. D, MCSO/CNA Proposed Analysis Plans, at MELC0002273423 (Dec. 21, 2018); *see also* Ex. E, Traffic Stop Monthly Report Methodology, at MELC0002578370 (June 4, 2019) (adding "productivity" to the methodology's list of matching characteristics).

Plaintiffs immediately raised concerns that such a comparison using deputy characteristics was improper.[8] The United States agreed.[9] After all, racial profiling could occur regardless of whether a deputy behaved similarly to other deputies of the same race, gender, age, productivity level, or tenure. The inclusion of such characteristics would have actually masked deputy bias, as long as it was shared by deputies with similar traits. The approach would have also improperly subjected deputies of different races to different standards. Academic literature did not support the inclusion of deputy characteristics in a benchmarking analysis, either. It was poor statistical practice to adjust an analysis intended to *identify* deputy bias based on characteristics that might, in fact, contribute to the *source* of the bias.[10]

---

[8] *See* Ex. F, Comments to Traffic Stop Monthly Report Methodology, at WAI 36836 (Jan. 9, 2019) ("Plaintiffs ask why CNA intends to control for deputy characteristics. For example, if female deputies are less biased, why does CNA intend to control for that difference? Adding such a control would, in that hypothetical, make men appear less biased because they would only be compared to their biased male peers. Plaintiffs have the same question for deputy race.").

[9] *See* Ex. G, Letter from Maureen Johnston to Chief Stephanie Cherny (Mar. 18, 2019).

[10] Factors like a deputy's race or gender may affect their policing activity, and particularly their interactions with nonwhite civilians. *See, e.g.*, Bocar A. Ba, Dean Knox, Jonathan Mummolo, and Roman Rivera, *The Role of Officer Race and Gender in Police-Civilian Interactions in Chicago*, 371 SCIENCE 696 (2021), available at https://science.sciencemag.org/content/371/6530/696. For example, if it were true in Maricopa County that white male deputies were more likely than their nonwhite, non-

Plaintiffs and the United States also advised MCSO that the inclusion of these deputy characteristics would reduce the precision of the analysis by unnecessarily shrinking the pool of deputy stops from which comparators could be drawn. In effect, this would have compared deputies based not only on the circumstances of their traffic stops, but also on their own demographic and employment characteristics. In support of these concerns, the United States provided a memorandum for MCSO's consideration from the United States' statistical consultant, Dr. Greg Ridgeway, a professor of criminology and statistics at the University of Pennsylvania and the author of the article on internal benchmarking for traffic stops on which MCSO had based its methodology. *See* Ex. G, Letter from Maureen Johnston to Chief Stephanie Cherny, at 4–6 (Mar. 18, 2019). In fact, MCSO initially attempted to justify the inclusion of deputy characteristics in its benchmarking plan by relying on Dr. Ridgeway's research. This was erroneous. *See* Ex. H, MCSO Response to Comments on Traffic Stop Analysis Proposals, at MELC000229370–71 (Feb. 15, 2019) (stating that the inclusion of deputy characteristics in a matching analysis was "supported by prominent policing researchers," and citing one of Professor Ridgeway's articles). In March 2019, MCSO acknowledged the error of including certain deputy characteristics (race and gender) in the analysis, but MCSO continued to argue that inclusion of the other characteristics "makes theoretical sense in establishing the concept of a deputy's peer." Ex. I, Memorandum from Captain James McFarland to Maureen Johnston, at MELC2575746 (May 22, 2019).

---

male colleagues to police people of color in a biased manner, then a statistical methodology that explicitly compared white male officers *only* to their white male peers (of a similar age, productivity level, and tenure at MCSO, for that matter) would fail to identify true agency-wide outliers. Moreover, if deputies who policed people of color in a biased manner were disproportionately likely to have a high productivity level as indicated by a high number of stops, citations, and/or arrests, then comparing high-productivity deputies *only* to other high-productivity deputies would similarly underpower and bias the analysis.

Nevertheless, the Monitor approved MCSO's methodology despite the benchmarking errors, and authorized MCSO to proceed to test the methodology with data.[11] Plaintiffs and the United States continued to register their objections to MCSO's approach.[12]

The Monitor's approval did not end the TSMR delays, however, as MCSO still needed to develop an intervention program to address the flagged deputies. During 2019, MCSO made no apparent progress in developing those materials or envisioning what the TSMR intervention program ought to look like. In May 2019, the United States again requested information about MCSO's plans to implement the TSMR—"We would be interested to know the proposed timeline . . . for the further development of the TSMR. Would MCSO please provide that information?" Ex. K, Email from Maureen Johnston to *Ortega Melendres* distribution list (May 10, 2019). The United States asked two more times in June for the plan and timeline.[13] But MCSO did not respond with any plan for conducting the TSMR interventions until January 2020, as described below.

---

[11] The Monitor approved the TSAR methodology (which MCSO had proposed would employ a substantially similar methodology as TSMR) on April 30, 2019. *See* Doc. 2519, Independent Monitor's Twenty-Second Quarterly Report, at 107 (Feb. 7, 2020). The Monitor approved the TSMR methodology on July 18, 2019. Ex. J, Email from Commander John Girvin to *Ortega Melendres* distribution list (July 18, 2019).

[12] *See, e.g.*, Ex. K, Email from Maureen Johnston to *Ortega Melendres* distribution list (May 10, 2019).

[13] *See* Ex. L, Email from Maureen Johnston to *Ortega Melendres* distribution list (June 13, 2019) ("In our email of May 10, we made several requests. First, we asked MCSO to provide a timeline for the production of the TSAR and the development of the TSMR. We have not received a response to that request."); *see also* Ex. M, Email from Maureen Johnston to *Ortega Melendres* distribution list (June 25, 2019) ("[W]e are looking forward to receiving MCSO's project plan explaining how the agency expects to implement the monthly traffic stop analysis.").

### 5.  The September 2019 Reset

In September, MCSO reversed its position on the inclusion of the challenged deputy characteristics, and decided to remove them from the analysis after all. As Plaintiffs and the United States had predicted, MCSO "found evidence suggestive that deputy characteristics have differential impact on stop outcomes based on the race of the driver" and therefore recommended "removing all deputy characteristics (age, tenure, and productivity) from the list of matching variables for the purpose of this analysis." Ex. N, Memorandum from the Maricopa County Sheriff's Office and CNA to Chief Robert Warshaw and Commander John Girvin, at 2 (Sept. 6, 2019). Thus, several months had passed, the TSMR methodology again contained open issues in need of resolution, and MCSO still lacked a plan for conducting interventions.

### 6.  The December 2019 Progress Report

In December 2019, MCSO produced a "TSAU [Traffic Stop Analysis Unit] Monthly Analysis Progress Report" that purported to summarize the status of the TSMR analysis and intervention program. There was little progress to report, as the document indicated that 55% of the TSMR project was "not started." Ex. O, Traffic Stop Analysis Unit Monthly Analysis Progress Report, at MELC2733749 (Dec. 2, 2019). The Progress Report also did not include a clear plan for the program to be tested or fully up and running, and any timelines related to "Policy" and "Training" were listed as "TBD." *Id*. at MELC2733748. The United States again noted its concerns about the delays in developing an intervention program.[14] In response, MCSO stated that it was "in the final stages of putting together the Alert process

---

[14] *See* Ex. P, Email from Maureen Johnston to *Ortega Melendres* distribution list (Dec. 16, 2019) ("According to the timeline, the 'Development of the Alert Process' is currently on hold while the parties work through the methodology for the TSMR. In order to lose minimal time between the approval of the TSMR methodology and the roll-out of supervisory interventions, we think it would be best to approach both of the projects in parallel.").

proposal for the new TSMRs." *See* Ex. Q, Email from James McFarland to Maureen Johnston (Dec. 18, 2019). Despite this assurance, the development of the intervention program would in fact consume the next full year, with little success.

### 7. The 2020 Methodology Testing Process

Though MCSO had agreed to remove deputy characteristics from the analysis, MCSO had introduced new deficiencies into the TSMR methodology by early 2020. Plaintiffs and the United States approved of comparing stops to other similarly situated stops, but MCSO's proposed manner for doing so was unnecessarily crude. Instead of matching stops conducted at the same time of day, for example, MCSO's methodology proposed a rough approximation: stops would be matched with other stops conducted during the "daytime" if they took place between 8 a.m. and 8 p.m.; "nighttime" stops were stops that occurred between 8 p.m. and 8 a.m.[15] Consequently, a stop conducted at 7:59 a.m. would be compared with a stop conducted at 8:01 p.m., rather than a match that more accurately reflected traffic patterns throughout the day. Similarly, MCSO's proposed methodology inadequately accounted for a stop's location. A deputy's traffic enforcement practices near an elementary school around the time of student dismissal might legitimately vary from a deputy's practices in a rural location in the middle of the night. Thus, failing to accurately account for the actual time of day or location risked significantly reducing the analytical precision of the study. In January 2020, the United States again pointed out that MCSO's methodology was flawed and offered workable solutions. The United States offered the technical assistance of its statistical consultant, Dr. Ridgeway, who explained that MCSO's rough comparison of "daytime" stops to other "daytime" stops introduced a significant flaw in the analysis: "[M]atching cases that are in truth quite different, is a major

---

[15] *See* Ex. R, Traffic Stops Monthly Report Analytical Plan, at MELC0002772091 (Feb. 18, 2020) ("Stop start time (operationalized as daytime [8am-8pm] or nighttime [8pm-8am].").

problem. That introduces bias." Ex. S, Email from Greg Ridgeway to Zoe Thorkildsen (Jan. 29, 2020). Dr. Ridgeway then provided MCSO with specific guidance on how to implement the TSMR in a manner that would better account for the time and location of a deputy's activities and would conform to modern standards in such analyses. *Id.* Nevertheless, MCSO rejected Dr. Ridgeway's advice.

The delays continued. In August 2020, MCSO notified the Monitor that, in the course of testing the TSMR methodology, it identified a pool of deputies that appeared to be engaged in biased policing. MCSO did not notify Plaintiffs and the United States about these deputies until late September 2020.[16] In response, Plaintiffs and the United States asked MCSO to clarify and to share the basis of its findings—specifically the statistical syntax that then comprised its effort to implement the TSMR. Plaintiffs and the United States also asked MCSO to explain what steps, if any, it had taken or would take to address the deputies who were potentially engaging in biased policing.[17] In response to these concerns, MCSO proposed an "interim" intervention and review process that would utilize Early Identification System policies already in place, as the

---

[16] MCSO notified the Monitor about the outlier deputies on August 21, 2020 but did not notify Plaintiffs and the United States until a conference call on September 23, 2020. MCSO then provided a written explanation on October 5, 2020. *See* Ex. T, Memorandum re: Meeting Document Request from 09/23/2020, at MELC0003024029 (Oct. 1, 2020). (The memorandum was dated October 1, 2020, but was produced on October 5, 2020.) MCSO's October 1 memorandum introduced additional confusion, however, as the information it contained was not consistent with representations MCSO made on the conference call of September 23.

[17] *See* Ex. U, Letter from Stanley Young to Joseph Vigil and Joseph Branco, at 1 (Oct. 1, 2020) ("MCSO recently represented that it has compared data across the last three years and found that some deputies' traffic stop patterns are consistent outliers, year after year"); *see also* Ex. V, Email from Maureen Johnston to *Ortega Melendres* distribution list (Oct. 19, 2020) ("[P]lease describe any actions that the agency has taken to date to address the 22 or more deputies identified as outliers. . . .").

intervention materials were still far from being completed. *See* Ex. W, Email from Kimberly Friday to Chief Robert Warshaw, at 1 (Nov. 17, 2020).[18]

Before MCSO could complete the "interim" interventions, more flaws in MCSO's implementation of the TSMR came to light.[19] When MCSO provided the statistical syntax that it had used to identify the outlier deputies, Dr. Ridgeway again found multiple errors. This time, MCSO's syntax placed too much statistical weight on stops that occurred at times and places where the deputy did not work. This was a significant error that would result in the wrongful identification of outlier deputies. For a third time, Dr. Ridgeway provided specific feedback to MCSO on how to resolve these and other errors. *See* Ex. Y, Email from Maureen Johnston to Commander John Girvin (Dec. 16, 2020).

MCSO made corrections to the statistical syntax in December 2020 to address some of the errors that Dr. Ridgeway identified. Again, Dr. Ridgeway's concerns were confirmed. The corrections showed that, of the 241 flags generated in MCSO's earlier analysis, 127 of them—or 53%—disappeared after Dr. Ridgeway's corrections were implemented.[20] This meant that twenty-seven individual deputies were identified as outliers when they should not have been. Further, the improved methodology generated twenty additional flags that identified four deputies who should have been

---

[18] In response to this proposal, the United States reminded MCSO that a similar intervention approach that was not tailored to address bias had previously failed. Ex. X, Letter from Maureen Johnston to Kimberly Friday, at 4 (Oct. 27, 2020).

[19] Plaintiffs and the United States are not aware of any steps that MCSO took pursuant to the "interim" intervention program, following the discovery of this major statistical error.

[20] MCSO reported that just nine flags occurred in both analyses, which, if true, would mean that 93% of the "outlier" flags dropped out of the analysis following Dr. Ridgeway's corrections. However, MCSO produced conflicting information suggesting that 114 flags occurred in both analyses, yielding the 53% calculation described above. *See* Ex. Z, Spreadsheet re: "Old_New_Comparison_W_FlagType12302020" (Jan. 5, 2021).

identified in the earlier analysis but were not.[21] In other words, were it not for Dr. Ridgeway's input, MCSO may have intervened with deputies whose traffic stop activities were not in fact statistically different from their peers, and failed to intervene with others who were the true outliers. Yet, MCSO continued to reject Dr. Ridgeway's corrections (and proposed solutions) on how to accurately account for a stop's location and time of day, even though Dr. Ridgeway, Plaintiffs, and the United States repeatedly informed MCSO that the failure to do so would also likely result in the wrongful identification of outliers. *See* Ex. BB, Email from James McFarland to Maureen Johnston (Dec. 17, 2020). The United States has continued to lodge its objections, to no avail. *See* Ex. CC, DOJ comments on MCSO Monthly Report Stata Syntax (Jan. 26, 2021).

**B.**   **MCSO's Traffic Stop Monthly Report Intervention Program Does Not Reflect the Lessons Learned from the Traffic Stop Annual Report Process or Comply with the First Order**

In addition to developing a robust TSMR analysis that is effective at flagging deputies in need of intervention, Paragraph 70 of the First Order requires MCSO to also develop an intervention program to respond to those deputies. *See* First Order at ¶ 70 ("MCSO shall take reasonable steps to investigate and closely monitor the situation. Interventions may include but are not limited to counseling, Training,

---

[21] Because the First Order requires MCSO to identify indicia of bias across a number of benchmarks, *see* First Order at ¶ 67, under MCSO's methodology it is possible for a deputy to be flagged on multiple metrics. For example, the same deputy may be flagged for citing Latino drivers at a higher rate *and* for detaining Latino drivers for longer periods on the side of the road. In this case, it appears that the 127 "false positive" flags corresponded to thirty-six unique deputies, of whom just nine were flagged again by the improved methodology, and some of them for different reasons entirely. The improved methodology also generated twenty new flags that had been missing from the earlier analysis. These twenty flags corresponded to ten unique deputies, of whom six had been flagged by the earlier methodology, but some of them for different reasons. *See* Ex. Z; *see also* Ex. AA, Memorandum from Andrew Prelog to Commander John Girvin (Dec. 30, 2020).

Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or of other supervised, monitored, and documented action plans and strategies designed to modify activity."); *see also id.* at ¶ 81(e) (Requiring MCSO to develop a protocol for using the Early Identification System that includes "a range of intervention options to facilitate an effective response to suspected or identified problems."). Though the Parties and the Monitor closely collaborated to develop a TSAR intervention program in 2017, MCSO declined to rely on lessons learned during that process and has treated the TSMR program as if it were starting from scratch. This has resulted in a TSMR intervention program that has been significantly delayed and that still does not fulfill the requirements of the First Order.

### 1. MCSO Has Produced Traffic Stop Monthly Report Intervention Materials That Are Vague and Fail to Set Standards for Supervisor Conduct

In January 2020, MCSO produced a proposal for the TSMR intervention program consisting of just two documents: a two-page "TSMR Alert Resource Guide" and a three-page "TSMR Data Sheet." *See* Ex. DD, TSMR Resource Guide and Data Sheet Proposal (Jan. 6, 2020). The proposal bore little resemblance to the comprehensive TSAR intervention materials that the Parties had jointly developed in 2017. The new materials were not policies or training curricula that described how the program would be administered. Rather, the materials were so vague and incomplete that it was difficult to understand how MCSO envisioned the intervention program to work, or even which employees would be involved in managing it. The "Resource Guide," for example, stated that supervisors who receive alerts would "take appropriate actions based on the information provided in each Alert . . . ." *Id*. at MELC0002746176. But there was no discussion of what an "appropriate action" might be. The Guide also explained that a supervisor might review "pertinent information" before an intervention, but provided no detail on what that review would entail. *Id*. The "TSMR Data Sheet" likewise included vague directives. This document directed

supervisors to "[d]escribe the review taken . . . in response to the TSMR Alert," but failed to describe what an adequate "review" should consist of, or how commanders would assure themselves that such "reviews" were undertaken consistently or in good faith. *Id*. at MELC0002746173.

In response to this initial proposal, Plaintiffs and the United States emphasized the importance of setting "clear expectations" and establishing "appropriate quality-control measures," a theme that Plaintiffs, the United States, and the Monitor would echo throughout the following year. *See* Ex. EE, Email from Maureen Johnston to *Ortega Melendres* distribution list, at 2 (Jan. 23, 2020). The United States re-circulated the prior TSAR intervention and training materials, noting that "MCSO would benefit from revisiting the materials that the TSAR working group refined throughout 2016 and 2017 . . . because it appears that MCSO has not incorporated this prior work . . . ." *Id*. at 2-3.

With the hope that closer coordination would speed the TSMR development, since January 2020, the Parties and the Monitor have participated in twice monthly—and, in the last six months, weekly—calls regarding the TSMR intervention program. Nevertheless, MCSO continued to propose a TSMR intervention program that did not fulfill the requirements of the First Order and contained numerous deficiencies, as discussed below.

**2.      Under the Current Traffic Stop Monthly Report Proposal, Supervisors Have Too Much Discretion and Insufficient Accountability**

Throughout the past year, the materials that MCSO has produced to guide the TSMR program have suggested that supervisors would have near-total discretion in selecting interventions for flagged deputies, a significant departure from the TSAR intervention program. However, MCSO's TSMR materials consistently failed to set adequate standards for supervisors on how to address TSMR alerts. For example, the "Resource Guide" that MCSO initially submitted included "suggestions on the review

of traffic-stop activity, data, and supplemental videos and material," but emphasized that the "resource options" were for supervisors to use "at their discretion." Ex. DD at MELC0002746176.[22] It also suggested that supervisors could themselves determine whether an alert indicated problematic behavior, and all but invited supervisors to discount the alert—"The assignment of a TSMR Alert on any given deputy is not an indication of problematic behavior or indicative of issues that require resolution." *Id*.

In April 2020, nearly two years after the United States raised concerns about the implementation of the TSMR intervention program—*see* Ex. A—MCSO confirmed its intention to completely overhaul the TSAR intervention program in order to place the primary responsibility on supervisors to respond to the TSMR alerts. But it did not provide policies or training materials to convey its proposal. Instead, MCSO provided a two-page spreadsheet that roughly compared the components of the TSAR program with what it envisioned for the TSMR. *See* Ex. FF, TSAR-TSMR Intervention Comparison (Apr. 22, 2020). At the time, in MCSO's view, many of the "requirements" of the TSAR program should become "optional" for supervisors involved in the TSMR program. For example, MCSO suggested that it would be "optional" for supervisors to discuss the review of the deputy's traffic enforcement during an intervention discussion. *Id*. It would also be "optional" for supervisors to discuss the "bias-based pattern" that triggered the alert in the first place. *Id.* In fact, it would be "optional" to discuss any policy violations uncovered during the review at all. *Id.*

Since July 2020, the Parties have exchanged several drafts of MCSO's new proposed protocols and participated in many hours of conference calls. While MCSO has since agreed that some of the intervention tasks should be accomplished by

---

[22] The "resource options" in the guide consisted of just six links to videos produced by the *New York Times* on the topic of implicit bias, and a link to Harvard University's Implicit Association Test, which the Guide "encouraged" the supervisor to take. Ex. DD, at MELC0002746176–77.

independent auditors in MCSO's Bureau of Internal Oversight (as was the practice for TSAR interventions), MCSO has continued to stress the importance of supervisor discretion in selecting and managing intervention strategies without oversight or accountability. The United States has repeatedly notified MCSO that structure and supervisor accountability are essential to the program's success.[23]

### 3. Interventions Will Not Be Videotaped

In April 2020, MCSO also announced another departure from the TSAR intervention program—that it would no longer videotape the intervention discussions, despite this Court's earlier acknowledgement that "videotaping may be among the most valuable of educational tools for both supervisors and those being supervised" to combat confirmation bias in interventions. Doc. 2165, Order, at 4 (Nov. 13, 2017); *see also* Ex. FF. MCSO now claims that videotaping would chill candid conversations between supervisors and deputies and create the atmosphere of an internal investigation—the same argument that this Court considered and rejected in 2017. *See* Doc. 2165, Order, at 4 (Nov. 13, 2017).

### 4. The Materials Fail to Convey the Serious Purpose of the Traffic Stop Monthly Report and Invite Supervisors to Discount the Analysis

The materials that MCSO has produced over the last year have also failed to convey the serious purpose of the TSMR: to identify and eradicate potentially biased policing at MCSO. For example, MCSO has resisted including the word "bias" in materials that will be provided to and used by personnel conducting TSMR

---

[23] Ex. GG, Email from Maureen Johnston to *Ortega Melendres* distribution list, at 1 (Oct. 1, 2020) (noting that confirmation bias had "played a role in each of the previous iterations of traffic stop review in this case. The underlying *Melendres* litigation, as well, included adverse findings about supervisor/manager bias.").

interventions.[24] Plaintiffs raised the concern on July 10, 2020, that the phrasing of certain TSMR materials "minimize[d] the point of the intervention process" by failing to include in the introduction paragraph "a mention of bias, either explicit or implicit, or a recognition that stop behavior flagged in the TSMR report could be an indication of bias." The Monitor agreed, noting that "MCSO needs to address these deficiencies in order to proceed." Ex. HH, TSAU Attachment C with Comments, at 12 (Sept. 16, 2020). In response, MCSO pushed back against even acknowledging this central purpose of the process. According to MCSO, because the document was "not a training document nor a policy," it need not "be 'Strongly Worded' about the BIAS in Traffic Stops." *Id.*

Some of the materials that MCSO produced also appeared to encourage supervisors to diminish the findings of the TSMR, a problem that was repeatedly seen in the TSAR interventions. *See* Doc. 2279, Independent Monitor's Fifteenth Quarterly Report, at 93 (May 7, 2018) (observing that, during TSAR interventions, supervisors "spent an inordinate amount of time trying to refute the findings of the analysis."). For example, MCSO's "Alert Notification Verbiage" minimized the potential seriousness of the notification: "An alert does not constitute discipline, nor does it mean there is necessarily a problem with this employee's behavior. It is merely a system generated indication that a threshold in the IAPro system,[25] related to an employee's behavior, has been reached . . . ." Ex. II, Alert Notification Verbiage, at MELC3134025 (Jan. 6, 2021).

---

[24] Although Plaintiffs and the United States understand and agree that the TSMR interventions must be implemented in a way that keeps deputies open to growth and learning and does not put them on the defensive, MCSO's resistance to mentioning the word "bias" continues a pattern by MCSO that shows a lack of commitment to reform as required by the First Order.

[25] IAPro is a software that MCSO uses to administer its Early Identification System.

As the United States explained in a January 2021 email to MCSO about the TSMR program, "A year has passed, and the materials MCSO recently provided still reflect the problems we previously identified. . . . MCSO's materials must reflect the very real possibility that employees conducting 'reviews' may encounter evidence that officers are selectively enforcing the law, treating residents of Maricopa County differently on the basis of race, or engaged in other misconduct." Ex. JJ, Email from Maureen Johnston to *Ortega Melendres* distribution list (Jan. 21, 2021). Without appropriate expectations, clarity, and an acknowledgement of the purpose of the TSMR intervention program, MCSO will continue to make little progress, and the Plaintiff Class will continue to be exposed to risk of discrimination.

*       *       *       *

In February 2021, MCSO shared its latest round of TSMR materials in an attempt to respond to concerns that Plaintiffs, the United States, and the Monitor have been voicing for over a year. While the materials do appear to represent an improvement from the two-page "Resource Guide" that MCSO produced as its initial offering in January 2020, they do not remedy the flaws outlined above. For example, MCSO now apparently agrees that independent auditors in its Traffic Stop Analysis Unit should conduct their own review of a flagged deputy's activity prior to an intervention—a safeguard that, due to supervisors' confirmation bias, was central to the legitimacy of TSAR interventions conducted in 2018. *See* Doc. 2186, Motion to Extend Deadlines, at 3 (Jan. 25, 2018) (in which MCSO explained that a "parallel review seeks to address concerns related to confirmation bias and provides review of the material by MCSO personnel specially-trained on the relevant inquiries"). But unlike the materials prepared for the TSAR intervention pilot, MCSO's current protocol still fails to set standards for auditors or supervisors on how to conduct and document their reviews.

MCSO's current protocol would also excuse auditors and supervisors from reviewing Early Identification System (EIS) information and other materials highly

relevant to identifying biased policing. For example, the protocol suggests that auditors or supervisors need not consider bias-related alerts stemming from TSAR or TSMR analyses if those alerts are more than three years old. Given MCSO's delays in developing this program, this rule would excuse them from reviewing any prior alerts *at all*. Similarly, auditors and supervisors need not look at disciplinary history or misconduct complaint files that are more than three years old. This would, in effect, relieve MCSO from considering any of the misconduct or biased statements that came to light in the underlying *Ortega Melendres* trial or during the contempt proceeding in 2015.

Regardless, the recent documents do not excuse the egregious delays that have plagued the development of this program, nor do they suggest that MCSO has realized a newfound urgency to address bias in its ranks.

## III. ARGUMENT

Since 2016, MCSO has known that its own statistical analysis of traffic-stop data indicated systemic disparities based on race and ethnicity across its patrol operations and that scores of deputies were flagged as potential culprits.[26] Sheriff Penzone has acknowledged the findings "may be indicative of a systemic problem" and has publicly assured the community and this Court that addressing those findings is a "major concern."[27] But the response of MCSO and its personnel tasked with addressing these problems has been one of denial, delay, and resistance. Because the Court's intervention is needed to ensure MCSO begins to address systemic bias

---

[26] *See* Doc. 2569, Independent Monitor's Twenty-Fifth Quarterly Report, at 89–90 (Nov. 16, 2020) (describing the findings of the five TSARs).

[27] *See* Doc. 2474-1, Message from Sheriff Paul Penzone, at 2 (Oct. 25, 2019); *see also* Doc. 2535-2, Sheriff Penzone's Statement on TSAR 5, at 2 (May 27, 2020).

immediately and effectively, Plaintiffs and the United States respectfully request this Court to enforce the requirements of Paragraph 70 of the First Order.

## A. The History of MCSO's Bias Intervention Program Shows the Need for Court Oversight

MCSO has long known that its deputies may be engaged in biased policing and that its supervisors are ill-equipped to respond without significant structure and oversight. Five years ago, MCSO's first TSAR identified seventy deputies whose traffic-stop activity exhibited indicia of possible racial profiling. Without consulting the Monitor, the Plaintiffs, or the United States, MCSO decided to address those deputies without any adequate program to do so. It sent the supervisors of those deputies an "alert" through the Early Identification System directing supervisors to review the TSAR along with the deputies' traffic stops and other behavior, and to intervene as necessary. MCSO set minimal expectations for the assignment, and provided no training for the supervisors involved. *See* Doc. 1858, Independent Monitor's Ninth Quarterly Report, at 104 (Oct. 28, 2016). The supervisors' response to these alerts was woefully deficient. Not a single supervisor determined that any kind of intervention or remedial or disciplinary measure was necessary. Ex. KK, Memorandum from Deputy Chief Bill Knight to Captain Fred Aldorasi re: 8-30-16 TSAR #11, at MELC1627253 (Aug. 31, 2016); *see also* Ex. LL, Memorandum from Deputy Chief Bill Knight to Captain Fred Aldorasi re: 8-30-16 TSAR #14, at MELC1627258 (Aug. 31, 2016) ("A total of 70 individual reports are being produced under TSAR #4. None of the supervisors during their review concluded the deputy was engaged in biased based or other unlawful or problematic behavior.").

MCSO's handling of the intervention program for the second TSAR in 2017 also resulted in delay and demonstrated that Court supervision was necessary. The second TSAR, released to the Plaintiffs and the United States in October 2016, identified even more deputies whose traffic-stop activity exhibited evidence of biased policing; the report also suggested the bias was systemic across MCSO's patrol

operations.[28] In response, MCSO told the Court that it was "working on a supervisory review process" and that "this is not being ignored." Doc. 1890 (Nov. 10, 2016 Status Conference) at 27–28. The Parties and the Monitor then began collaborating to develop intervention policies and training materials. *See* Doc. 2167, Independent Monitor's Thirteenth Quarterly Report, at 91 (Nov. 19, 2017). At the time, the Court reminded MCSO that "with respect to those outliers that may be identified both in the first ASU [Arizona State University] report and the second ASU report,[29] I would expect rapid action to cure whatever the problem is and whatever is necessary to cure that problem, so we don't have ongoing pressing problems in the MCSO that we're aware about their actually existing." Doc. 1890 (Nov. 10, 2016 Status Conference) at 33–34. Nevertheless, a pilot of the intervention program did not begin until the middle of 2017, and only after this Court intervened to set deadlines for its completion. *See* Doc. 2013, Order (Apr. 19, 2017); *see also* Doc. 2031, Order (May 10, 2017 (ordering the Sheriff's Office to being supervisory interventions by July 14, 2017). But as MCSO began conducting interventions, more evidence came to light showing that supervisors were not up to the task. In November 2017, the Court granted MCSO another extension to complete the interventions, in order to respond to "confirmation bias in the supervisory personnel and/or flawed process of the MCSO that needed to be thoughtfully and intelligently addressed and corrected." Doc. 2165, Order, at 2 (Nov. 13, 2017).

The 2017 extension of time was not the end of MCSO's delays. In January 2018, MCSO revealed that it would need yet another extension because the intervention program had again stalled. *See* Doc. 2186, Motion to Extend Deadlines,

---

[28] MCSO provided the Plaintiffs and the United States with a draft report during the October 2016 site visit, but the second TSAR was not finalized until July 28, 2017. *See* Doc. 2028, Independent Monitor's Eleventh Quarterly Report, at 22, 81 (May 5, 2017).

[29] The "ASU Report" refers to the second TSAR, which was authored by doctorate-level researchers at Arizona State University.

at 5 (Jan. 25, 2018). That the program had broken down internally suggested to the Court a lack of command diligence—Sheriff Penzone himself admitted that he was unaware of the delays until a week before the deadline for completion. *See* Doc. 2220 (Jan. 26, 2018 Status Conference) at 16–18. In response, the Court ordered Sheriff Penzone and members of his command staff to personally report to the Court on a weekly basis until all of the interventions were completed satisfactorily. *See* Doc. 2191, Order, at 3 (Jan. 30, 2018). Following the completion of the second TSAR interventions, MCSO then had to complete interventions and action plans for deputies identified in the third TSAR, a process that did not conclude until the first quarter of 2019. *See* Doc. 2458, Independent Monitor's Twentieth Quarterly Report, at 4 (July 9, 2019). To our knowledge, MCSO has not intervened with a single deputy whose traffic-stop activity exhibits indicia of bias since that time. Nor has MCSO conducted any analysis to determine whether the prior interventions were effective at modifying deputy activity.

MCSO's repeated refusal to acknowledge and correct flaws in its approach also demonstrates that Court intervention is warranted. MCSO refuses to address methodological errors that Dr. Ridgeway has repeatedly pointed out, even though these are errors likely to impact which deputies are flagged as outliers. As a result, some deputies are flagged when they should not be, while other deputies who should be flagged are not. Moreover, more than one year after the Monitor approved the TSMR methodology, Plaintiffs and the United States continue to find errors in MCSO's syntax for implementing that methodology.[30]

_____

[30] For example, the TSMR methodology purports to compare "daytime" stops and "nighttime" stops at twelve-hour intervals, a crude estimation of the time of day, as explained above. But the Stata syntax, as written, actually indicates "daytime" stops occur over an eight-hour period and "nighttime" stops occur over a 16-hour period. *See* Ex. MM, Excerpt of Updated Stata Syntax, at MELC3133986 (Jan. 5, 2021).

In all, the history of the TSAR interventions shows the need for supervisory accountability, role clarity, explicit guidelines, structure, and transparency. It also demonstrates the need for Court intervention and oversight with the TSMR because the same delays, lack of structure, and fundamental deficiencies in methodology have inhibited the development and implementation of this critical program.

**B.      MCSO's Delays and Resistance Harm the Plaintiff Class**

MCSO's failures to conduct the TSMR analysis and to implement an effective intervention program have placed the Plaintiff Class at unacceptable risk of discrimination. As described above, MCSO has known for years that there is systemic bias in its patrol operations, and it knows that scores of deputies have been previously flagged. Nevertheless, MCSO has not completed any individual interventions for bias since 2019, and those interventions were related to traffic activity that occurred *years* before. MCSO has also never analyzed the effectiveness of the earlier interventions, and so it lacks an objective understanding of whether they were successful at modifying behavior. *See* First Order at ¶ 70 ("Interventions may include . . . supervised, monitored, and documented action plans and strategies designed to modify activity."). As a result, MCSO cannot know whether those deputies are still engaging in biased policing to the detriment of the Plaintiff Class.

In addition to failing to monitor the deputies who were previously flagged, MCSO has abandoned efforts to identify deputy-level bias in the thousands of traffic stops that have occurred since the earlier intervention program. MCSO has not conducted any deputy-level analysis on traffic-stop data collected after June 2017. That means that MCSO has failed to scrutinize for individual bias the nearly 70,000 traffic stops that deputies have conducted since that time, even as its own studies were finding substantial and statistically significant racial and ethnic disparities in numerous

stop outcomes across MCSO's patrol operations.[31] This omission allows MCSO deputies to continue to patrol, interacting with—and potentially harming—members of the Plaintiff Class. Indeed, some deputies may have received validation, not intervention, for harmful and biased enforcement practices, making it more difficult to interrupt these patterns in the long run.

MCSO's failure to fulfill its obligation to eliminate biased policing in its ranks has taken a toll on community trust. One member of the Community Advisory Board expressed the community's frustration in February 2020: "As long as MCSO continues to avoid accepting responsibility for racial profiling, we will continue to have a lack of trust in the MCSO among the most impacted community members. The starting point for finally and honestly addressing the racial profiling problem in MCSO traffic stops is to accept bias exists, and accept that employees bring bias into the workplace." Ex. OO, Email from Raul Piña to the Monitor (Feb. 16, 2020). Given MCSO's unfortunate history with the TSAR and TSMR projects, MCSO cannot be trusted to root out systemic and individual bias within its ranks without firm guidance from this Court.

## IV.    REQUESTED INTERVENTION

For the reasons stated above, Plaintiffs and the United States move this Court to enforce Paragraph 70 of the First Order and to order appropriate relief to address

---

[31] From July 2017 through Dec. 2018, MCSO conducted 24,499 traffic stops. *See* Doc. 2467-1, MCSO Traffic Stops Annual Report, July 2017–December 2018, at 8 (Sept. 30, 2019). From January 2019 through December 2019, MCSO conducted 23,630 traffic stops. *See* Doc. 2535-1, MCSO Traffic Stops Annual Report, January 2019–December 2019, at 8 (May 27, 2020). From January 2020 through December 2020, it is estimated that MCSO conducted about 20,400 stops. *See* Ex. NN, Email from Dr. John Carnevale to Maureen Johnston (Jan. 28, 2021). To our knowledge, these stops have not been subjected to an individual-level analysis for the purpose of identifying outliers because, in 2019, MCSO changed its Traffic Stop Annual Report (TSAR) methodology to focus on systemic bias. *See* Ex. I, Memorandum from James McFarland to Maureen Johnston (May 22, 2019).

MCSO's record of noncompliance. "[F]ederal courts are not reduced to issuing injunctions against state officers and hoping for compliance. Once issued, an injunction may be enforced." *Hutto v. Finney*, 437 U.S. 678, 690 (1978); *see also Sharp v. Weston*, 233 F.3d 1166, 1173-74 (9th Cir. 2000). Paragraph 153 of the First Order contemplates that appropriate relief may include "imposition of contempt sanctions." Interventions short of contempt sanctions may include, but are not limited to, "additional oversight, further restrictions on agency activities, and additional Training or reporting requirements." *Id*. at ¶ 153.[32] We respectfully request the Court to order any relief it deems necessary, and specifically the following relief, as described in the proposed order filed with this motion:

**First**, it is imperative for MCSO to establish a clear timeline for implementing the TSMR program and conducting the necessary interventions. Because MCSO has refused to set deadlines, this Court should now impose them. Court-enforceable deadlines have been effective in the past to accelerate MCSO's pace of compliance. Deadlines will provide much-needed structure and accountability to a project that has suffered from the absence of both.[33]

**Second**, where an intervention does not result in changed behavior, this Court should order MCSO to escalate its intervention strategy. Paragraph 70 states that appropriate interventions "may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or of other supervised, monitored, and documented action plans and strategies *designed to modify activity*." *Id*. (emphasis added). If traffic-stop behavior remains unchanged, this Court should require MCSO to escalate the

_____

[32] As required by Paragraph 153, the Parties attempted to meet and confer but could not come to agreement on the material relief requested—a set of stipulated timelines and agreement to escalate the interventions. *See* Ex. PP, Email from Kimberly Friday to Hannah Chartoff (Jan. 6, 2021).

[33] Plaintiffs and the United States' proposed timelines are set out in the proposed order.

27

intervention, including referring the deputy to the disciplinary process, removing the deputy from patrol, or otherwise circumscribing the deputy's discretion in a way that will protect the Plaintiff Class.

**Third**, this Court should order MCSO to videotape intervention discussions, as it did during the prior supervisory interventions. MCSO has argued that videotaping intervention meetings will chill supervisors and deputies from engaging in candid conversations and will result in interventions that are less effective. When MCSO made this same argument in 2017, this Court rejected it, noting that videotaping would add educational value and transparency. *See* Doc. 2165, Order, at 4 (Nov. 13, 2017). The Court should reject MCSO's argument again.

**Fourth**, this Court should order that MCSO require auditors and supervisors to review important Early Identification System information and other critical documentation when preparing for intervention discussions. *See, e.g*., First Order at ¶ 75 (describing information on deputy behavior stored in the EIS). Some of the delays over the past year can be attributed to MCSO's refusal to require sufficient scrutiny of a flagged deputy's activity. To end this logjam, the Court should order MCSO to review and consider the materials listed in the attached Proposed Order prior to conducting a supervisory intervention.

**Finally**, the Court should require MCSO to regularly and directly report to the Court on its progress until such time as the Court is persuaded that MCSO is acting in good faith to meet its obligations under Paragraph 70 of the First Order. The Court's additional oversight is expressly contemplated as a remedy for noncompliance, *see id*. at ¶ 153, and has previously helped to expedite MCSO's compliance. *See* Doc. 2191, Order, at 3 (Jan. 30, 2018) (requiring the Sheriff and members of his command staff to personally report to the Court on a weekly basis until all TSAR 2 interventions were completed satisfactorily).

# V. CONCLUSION

For the reasons set forth above, Plaintiffs and the United States respectfully request this Court to enforce the requirements of Paragraph 70 of the First Order.

Respectfully submitted this 9th day of March, 2021.

Pamela S. Karlan
Principal Deputy Assistant Attorney General
Civil Rights Division

Steven H. Rosenbaum
Chief, Special Litigation Section

Cynthia Coe
Acting Special Counsel (DC Bar No. 438792)

By: /s/ *Maureen Johnston*
Maureen Johnston (WA Bar No. 50037)
Nancy Glass (DC Bar No. 995831)
Beatriz Aguirre (NV Bar No.14816)
Trial Attorneys
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
150 M Street NE, 10th Floor
Washington, D.C. 20002
Tel. (202) 598-9883
maureen.johnston@usdoj.gov

ATTORNEYS FOR THE UNITED STATES

By: /s/ *Casey Arellano*

ACLU Foundation of Arizona
Victoria Lopez (AZ 330042)
Christine K. Wee (AZ 028535)
Casey Arellano (AZ 031242)
3707 North 7th Street, Suite 235

Phoenix, AZ 85014
Telephone: (602) 650-1854
vlopez@acluaz.org
cwee@acluaz.org
carellano@acluaz.org

ACLU Foundation
 Cecillia D. Wang (*pro hac vice*)
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-0775
cwang@aclu.org

Covington & Burling LLP
Stanley Young (*pro hac vice*)
3000 El Camino Real
5 Palo Alto Square
Palo Alto, CA 94306
Telephone: (650) 632-4700
syoung@cov.com
Hannah M. Chartoff (*pro hac vice*)
Amy S. Heath (*pro hac vice*)
415 Mission Street, Suite 5400
San Francisco, CA 94105
Telephone: (415) 591-6000
hchartoff@cov.com
aheath@cov.com

MALDEF
Adrian Hernandez (*pro hac vice*)
634 S. Spring Street, 11th Floor
Los Angeles, CA 90014
Telephone: (213) 629-2512
ahernandez@maldef.org

ATTORNEYS FOR THE PLAINTIFFS

## CERTIFICATE OF SERVICE

I certify that on or about March 9, 2021 I filed the foregoing through the Court's CM/ECF system which will serve a true and correct copy of the filing on counsel of record.

/s/ *Maureen Johnston*