Mary R. O'Grady, 011434
Kimberly I. Friday, 035369
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2100
Phoenix, Arizona 85012-2793
(602) 640-9000
mogrady@omlaw.com
kfriday@omlaw.com

Attorneys for Defendant Paul Penzone

Joseph I. Vigil, 018677
Joseph J. Branco, 031474
Maricopa County Attorney's Office
Civil Services Division
225 West Madison Street
Phoenix, Arizona 85003
Telephone (602) 506-8541
Facsimile (602) 506-4137
vigilj@mcao.maricopa.gov
brancoj@mcao.maricopa.gov
ca-civilmailbox@mcao.maricopa.gov
MCAO Firm No. 00032000

Attorneys for Defendant Paul Penzone and Maricopa County

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel De Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al.,<br><br>          Plaintiffs,<br><br>and<br><br>United States of America,<br><br>          Plaintiff-Intervenor,<br><br>vs.<br><br>Paul Penzone, in his official capacity as Sheriff of Maricopa County, Arizona, et al.,<br><br>          Defendants. | No. CV-07-2513-PHX-GMS<br><br>**DEFENDANTS PAUL PENZONE'S AND MARICOPA COUNTY'S RESPONSE TO PLAINTIFFS' AND UNITED STATES' JOINT MOTION TO ENFORCE PARAGRAPH 70 OF SUPPLEMENTAL PERMANENT INJUNCTION/ JUDGMENT ORDER** |

Defendants Maricopa County Sheriff Paul Penzone and Maricopa County oppose Plaintiffs' and the United States' (collectively, "Plaintiffs") Joint Motion to Enforce Paragraph 70 of Supplemental Permanent Injunction/Judgment Order ("Motion") (Doc. 2607). Plaintiffs' Motion undercuts the pilot project that is underway to use the Traffic Stop Monthly Report ("TSMR") for deputy-level interventions. The Motion should be denied.

I. **Introduction**

The Motion ignores the most important information about the TSMR: what is happening now. After extensive work involving all of the parties, the Monitoring Team approved the methodology for the TSMR in 2020, and a pilot program to use the TSMR data for deputy-level interventions began in April 2021, with the Monitoring Team's approval. There is more work to do, but the Monitor and the parties are continuing to address issues as needed while the pilot proceeds. With the Monitoring Team's approval and with detailed input from all parties, MCSO is moving forward with the deputy-level reviews and interventions in the current pilot program.

In light of the status of the pilot, Plaintiffs' Motion is an odd digression into past grievances. Nobody questions the importance of the TSMR and deputy-level traffic-stop data in fulfilling this Court's Orders. That work is proceeding. Although it has been a slower journey than anyone involved would have preferred, the TSMR pilot is underway. Plaintiffs' Motion and the relief that they seek only undermines the current pilot. The Motion should be denied, and the pilot should be allowed to proceed as planned.

II. **Factual Background**

The work to begin the TSMR pilot has been underway for many months, through a collaborative effort between MCSO, the Monitoring Team, and the Plaintiffs. Although there were disagreements along the way regarding the processes for selecting and conducting interventions on identified deputies, everyone involved shared the same goal: creating an effective program for identifying and correcting deputy behavior.

The TSMR process seeks to understand why a deputy shows disparities in traffic stop outcomes by race or ethnicity when compared to their peers and implement appropriate interventions. Although referral to an administrative investigation will occur if intentional bias is uncovered, the TSMR is not a disciplinary program. Instead, its main purposes are to understand what drives the identified disparities, and then to educate the deputies on how to correct their conduct, using a range of methods such as formal and informal training, supervisor ride-alongs, action plans, review of implicit bias videos, and/or review and discussion of the deputy's own body-worn camera recordings. The TSMR is designed as a companion to the Traffic Stop Annual Report ("TSAR"), which looks at traffic stop outcomes on an agency-wide level. The TSMR is also designed to be complementary to the other traffic stop auditing and review performed every month by MCSO pursuant to the First Order.[1]

MCSO is attempting to do something truly groundbreaking with the TSMR: a monthly deputy-level analysis of traffic stops in law enforcement, followed by timely interventions to correct deputy conduct. There is no historical precedent in other police departments for this initiative, and there are no off-the-shelf products or existing processes to apply. MCSO is confident in the process that has been approved for piloting by the Monitoring Team, and eager to see the pilot move forward as planned.

MCSO fully understands that the TSMR is an important part of the comprehensive program to identify and eliminate biased policing within MCSO. The Sheriff and the office he leads are committed to that mission and to achieving the goals of this Court's Orders. Plaintiffs' assertions to the contrary in their Motion are wrong and do nothing to advance the work toward those goals.

---

[1] Since April 2014, MCSO's Audit and Inspections Unit ("AIU") has conducted monthly inspections of traffic stop data. Monitor's 26th Quarterly Report, Doc. 2594 at 77, 79. AIU also conducts monthly audits of supervisory oversight, confirming that supervisors make a performance appraisal note, review two body-worn camera recordings, and review the Early Identification System profile of their subordinates every month. *Id.* at 97.

### A. The Monitor has approved a TSMR Methodology.

The Motion wrongly asserts that MCSO has "failed to devise or implement a statistical methodology for the TSMR program." Mot. at 7. To the contrary, the Monitor approved the TSMR methodology in January 2020. Monitor's 26th Quarterly Report, Doc. 2594 at 88; *see also id.* at 92 ("MCSO's proposed new TSMR methodology . . . has been approved; and MCSO is implementing a pilot program to operationalize the use of these benchmarks in the new TSMR methodology."). The methodology was a critical component in what the Monitor described as Phase I of the TSMR pilot project. Phase I "involves developing the TSMR analytical plan that includes, among other things, creating the STATA syntax for the methodology and a Dashboard that will present detailed results that will reflect potential deputy level alerts generated." *Id.* at 92. The Monitor approved MCSO's completion of Phase I in June 2020. *Id.*

Rather than focus on where the TSMR project is now, the Motion focuses on the lack of success with earlier efforts. For example, MCSO suspended the TSMR process in 2016 because the Monitoring Team was unsatisfied with the statistical validity of the process. *Id.* at 88. MCSO resumed monthly analyses of traffic stop data in May 2017 using a new methodology. The Monitoring Team suspended this analysis in July 2017 because it generated too many alerts. *Id.*; *see also id.* at 92 ("Simply put, [MCSO's] earlier methodologies produced too many alerts tha[n] MCSO could reasonably manage on an ongoing basis."). Because this has never been done before, MCSO (in consultation with the Monitoring Team's and Plaintiffs' experts) had to engage in some trial and error to figure out how to construct a methodology that works. When a methodology did not work, MCSO went back to the drawing board. MCSO contracted with a new expert, CNA, in August 2018. Declaration of Zoë Thorkildsen ("Thorkildsen Decl.") at ¶ 3. CNA proposed a new methodology that uses a rolling twelve months of data to compare a deputy to their peers. *Id.* at ¶ 6; *see also* Doc. 2594

at 88.[2] The Monitoring Team has approved this methodology. The TSMR methodology is the culmination of months and years of statistical development and analysis of traffic stop data. This methodology was painstakingly crafted with the oversight and approval of the Monitoring Team's experts every step of the way.[3]

Plaintiffs criticize a proposal from three years ago to include deputy characteristics in the methodology. Mot. at 11-12, 14. Although of questionable relevance now, the appropriateness of including deputy characteristics in the methodology was analyzed at the request of the Monitoring Team. Thorkildsen Decl. at ¶ 7. MCSO and CNA found that statistical testing did not support their inclusion, and they were omitted from the methodology. Testing different methods and being willing to discard methods that do not work is the hallmark of the scientific method and is entirely appropriate. *Id.* The methodology approved in 2020 does not consider deputy characteristics.

The progress in 2020 was in large part because, at the January 2020 site visit, the Monitoring Team agreed to hold regular telephonic meetings with MCSO and the Plaintiffs to discuss the contours of the TSMR pilot. Doc. 2594 at 92. These conference calls began as biweekly but then shifted to every week, and continue to the present.

### B. The Monitor closely supervised the process for determining how to use traffic stop data to select deputies for supervisory interventions, and how to conduct those interventions.

After the methodology that comprised Phase I of the TSMR pilot was approved in June 2020, the focus shifted to Phase II, which includes "establishing thresholds for

---

[2] Plaintiffs suggest that CNA's approach is based on an article by DOJ's expert, Dr. Ridgeway. Mot. at 12. This is inaccurate. CNA developed its method independently. Thorkildsen Decl. at ¶ 6.

[3] Plaintiffs cite to Paragraph 64's requirement that MCSO "develop a protocol for periodic analysis" of traffic-stop data "to look for warning signs or indicia of possible racial profiling or other improper conduct . . . ." Mot. at 2 (internal quotation marks omitted). The protocols have been approved, and the Monitor's Third Quarter 2020 Report indicated that Phase I compliance for Paragraph 64 will be achieved when MCSO's protocols are incorporated into the EIU Operations Manual. Doc. 2594 at 87.

flags, allegations, and alerts that will . . . drive the selection of deputies potentially engaging in biased policing." Phase III "lead[s] to the implementation of the intervention process whereby deputies who receive alerts will be subject to supervisory interventions." *Id.* This work involved the regular phone calls with the Monitoring Team and the parties and detailed reviews of MCSO's draft proposals.

During the conference calls, the Monitoring Team and Parties thoroughly discussed the substantive issues involved with selecting deputies for interventions and reviewed the content of the foundational documents that set out the intervention process—Sections 308 and 311 of the Bureau of Internal Oversight Operations Manual; a Supervisor Guide; and "Attachment C," an internal form that will be used by supervisors during the intervention process. Throughout 2020, MCSO submitted drafts of the foundational documents for comments from both the Plaintiffs and the Monitoring Team in iterative rounds of review: MCSO submitted a draft document; Plaintiffs commented on the draft; the Monitoring Team responded to Plaintiffs' comments and provided comments of their own; the comments were discussed on the conference calls; MCSO revised the documents based on the comments and resubmitted them for review, and so on.

The Monitoring Team's active engagement and oversight of the TSMR process was the opposite of a rubber stamp—most of the documents went through five rounds of review and editing before receiving approval from the Monitoring Team. As the Monitor explained in his report on the Third Quarter of 2020:

> We continue to work with MCSO on the development of a monthly traffic stop analysis that would provide information about potential bias of individual deputies when compared with their peers. We, along with the Plaintiff and Plaintiff-Intervenors, have held frequent conference calls addressing a variety of outstanding issues related to the TSMR. MCSO plans to test the methods **collectively developed** in a pilot program, as well as creating training programs and intervention strategies for supervisors, which will subsequently be rolled out to the Office as a whole.

*Id.* at 95 (emphasis added). Through this process, Phases II and III of development of the TSMR pilot have been completed. The Monitoring Team has now approved Section 308 of the Bureau of Internal Oversight Operations Manual, which sets out the process that will flag deputies for interventions, and the other foundational documents that set forth the intervention process for the pilot. *See* Declaration of Kimberly Friday ("Friday Decl."), Exhibits 1-6.

In the course of this work, the Monitoring Team often required modifications to the documents in order to address concerns that Plaintiffs raised, but the Monitoring Team did not adopt all of Plaintiffs' recommendations. For example, Plaintiffs recommended that all interventions with deputies be videotaped. Although the Monitoring Team supported videotaping the previous TSAR interventions, *see* Doc. 2165 at 4, it determined that the TSMR interventions should be audio-recorded instead. Friday Decl. Ex. 3 at 12; *id.* Ex. 4 at 2. Accordingly, the pilot will proceed with the audio recording approved by the Monitoring Team.

Similarly, there was a thorough discussion of the deputy-specific information that the Traffic Stop Analysis Unit ("TSAU") would be required to review for their part of the TSMR pilot as well as the deputy-specific materials that supervisors would be required to review for their part of the process. The list of information was modified through the review process and, eventually, the Monitoring Team approved the materials that TSAU and supervisor would review for the TSMR pilot. *See* Friday Decl. Ex. 3 at 8-11 and 14-15; *id.* Ex. 4 at 11-12. The Monitoring Team did not require a review of all information Plaintiffs had advocated, but the approved list differs from what MCSO originally proposed. For example, Plaintiffs argued that the entire disciplinary history of a deputy should be reviewed as part of the process. *See* Mot. at 25. The Monitoring Team instead approved a review of disciplinary history for the prior three years, with an additional three years of history reviewed if any patterns emerge. In this context, "history" includes both complaints and allegations, and similar

7

allegations, regardless of finding, constitute a pattern. Friday Decl. Ex. 3 at 14 and Ex. 4 at 11.

Plaintiffs also advocated for a reduced role for supervisors, arguing that the TSMR process vests them with too much discretion. *See* Mot. at 20-21. In the TSMR process approved for the pilot, however, all exercises of supervisor discretion must be reviewed and approved. The supervisor chooses an intervention in consultation with the division chain of command and the TSAU, and both must approve the selected intervention as appropriate before it can move forward. Friday Decl. Ex. 3 at 2. The supervisor uses the Attachment C to document the intervention, and that document also must be reviewed and approved by division chain of command and TSAU before the intervention can be closed. *Id.* at 2-3; *see also* Friday Decl. Ex. 6 (Attachment C form). MCSO believes that this supervisory involvement in the TSMR process will aid with developing a robust supervisory culture at MCSO, and is necessary to ensure the success of the process and its establishment as a non-disciplinary practice that seeks to correct the behavior of subordinates.

The Monitoring Team also appropriately considered and rejected Plaintiffs' opinion that the content and messaging of the TSMR documents do not adequately convey the serious concern of bias-based policing. Mot. at 22-23. For example, as approved by the Monitoring Team, the Supervisor Guide clearly informs supervisors that "a TSMR alert reflects TSAU's conclusion, based on a statistical analysis, that there are warning signs or indicia of possible racial or biased-based profiling, unlawful detentions and arrests, or improper enforcement of immigration-related laws. The Alert is therefore an opportunity for supervisors to review that information and work together with deputies and TSAU to correct those patterns." Friday Decl. Ex. 4 at 1. The Attachment C, which the supervisors complete as part of the intervention process, duplicates this language. *Id.* Ex. 6 at 1.[4]

---

[4] As another example, Plaintiffs single out non-final language in the Alert Notification Verbiage as insufficient. Mot. at 23. However, the Monitoring Team has

8

Plaintiffs often used as a model for their TSMR proposals, processes that had been used for deputy-level reviews based on TSARs. While some of those processes work, a monthly process necessarily differs from a process that is only done once a year. These factors were discussed and considered in the course of reviewing and discussing the drafts and comments on regular phone calls with the Monitoring Team and the parties.

### C. The approved TSMR methodology was tested in the Summer 2020.

MCSO conducted a test of the approved TSMR methodology in the summer of 2020. The test used data from a rolling 12-month period for June 2020 and the prior 11 months. Doc. 2594 at 92. Through this testing process, MCSO was able to identify deputies potentially engaging in biased policing. MCSO brought this information to the Monitor's attention and engaged in a series of discussions with the Monitoring Team and the Plaintiffs regarding how to conduct an intervention process for these deputies while the TSMR pilot process remained unapproved. *See* Doc. 2594 at 89 ("[W]e want to credit [MCSO] for identifying deputies for potential alerts from past datasets – most notably the Fifth Traffic Stop Annual Report (TSAR) dataset – and also taking the initiative to report this list of deputies to us and the Parties."). MCSO has notified the deputies' chain of command about the findings, and the Monitor has approved the use of a pre-existing intervention process. *See* Doc. 2611-1 at 40.

As part of this process, the Government's expert, Dr. Ridgeway, reviewed the syntax in the programming and identified an error that resulted in wrongly identifying some deputies as outliers. MCSO corrected the syntax, and the Monitoring Team approved the correction. *See* Thorkildsen Decl. at ¶ 9.

As the complex implementation process moves forward, if errors are identified, they will be corrected. That is part of the purpose of the pilot.

---

since approved language in the Alert Notification Verbiage that states: "This alert is not discipline. TSMR alerts are generated when analysis of a deputy's traffic stop data shows that the deputy's enforcement practices, when compared to their peers, indicate potential biased policing." Friday Decl. Ex. 7 at 2, 6.

9

### D. The pilot for deputy interventions based on TSMR analysis has started.

On the March 3, 2021 weekly TSMR call, the Monitoring Team directed that MCSO target the following month, April 2021, to begin the TSMR pilot. Friday Decl. Ex. 8. A call later that week, on March 5, 2021, confirmed an April start date. *Id.* By that time, most of the substantive issues in the documents were close to resolution. Following the TSMR call on March 31, 2021, MCSO confirmed with the Monitoring Team that it still intended for MCSO to begin the TSMR pilot in April, even though several documents had not yet been approved. The Monitoring Team confirmed its approval for the pilot to begin in April, reasoning that the foundational documents were close to final for purposes of the pilot. The Monitoring Team formally approved the documents (pending one comment) on April 13, 2021. Friday Decl. Ex. 1.

With the approval of the Monitoring Team, MCSO began the pilot in April to identify deputies for interventions using the TSMR data. The April TSMR analysis covers a twelve-month period from April 2020 through March 2021. In analyzing the data, MCSO discovered an error with the location of some stops. The data contained two default locations that dispatch uses when a deputy's location could not be determined by the geo-location system, either because the deputy was not connected to the network or the location was in a rural area not mapped on the geo-location system. *See* Friday Decl. Ex. 9. As a result, when dispatch entered the default location, the TSMR data did not have accurate location information. Once it identified this problem, MCSO manually looked up and mapped the precise coordinates for the traffic stops at issue to make sure the data is accurate, refreshed its data set, and reran the methodology. *See id.* It took less than a week for MCSO to identify the problem, inform the Monitoring Team and the Parties, and resolve the issue.

MCSO has briefed District leadership on the pilot and developed training materials that are under review by the Parties and the Monitor. Because there is more work to do, the Monitoring Team and the parties continue to meet regularly to review

outstanding issues and discuss the status of the pilot. In addition to finalizing training materials, one of the important issues that will be discussed is evaluating the interventions that are used in the pilot. The work continues, and as the TSMR pilot proceeds, the Monitoring Team and the parties can continue to improve the process.

### III. Legal Argument

Plaintiffs' Motion does not "enforce Paragraph 70." Rather, it asks this Court to stop the pilot that is currently being implemented and change the requirements. The Court should decline to do so. MCSO is implementing the pilot based on procedures the Monitoring Team has approved after thorough consultation with all parties. As the pilot proceeds, no doubt problems will be identified and processes will be tweaked. The Court should let this work proceed.

    **A.    The Monitoring Team and MCSO fairly considered and rejected Plaintiffs' proposals.**

For the most part, the relief Plaintiffs seek from this Court was considered and rejected in the course of developing the pilot. Some of Plaintiffs' complaints concern the failure to adopt the recommendations of the Government's expert, Dr. Ridgeway, concerning how to classify the time and location of traffic stops. Mot. 15-16. Both MCSO and the Monitoring Team thoroughly reviewed and considered his proposals (indeed, that is one reason why the process took the time that it did). Thorkildsen Decl. at ¶ 8. Ultimately, they rejected his proposals about the classification of time and location of traffic stops. There is no reason for this Court to override that decision. Reasonable experts can disagree about the best parameters for a statistical model, and they have done so here. Plaintiffs do not provide any basis, besides their own dissatisfaction, to overrule the Monitoring Team's and MCSO's statistical experts.

Moreover, the "time of day" analysis that Plaintiffs now object to, Mot. at 11, was not created solely for the TSMR. It has been used in all previous TSARs developed by CNA. *Id.* at ¶ 10. And Plaintiffs' assertion (at 11) that the analysis fails to accurately account for the stop location, is wrong—the methodology precisely accounts for

11

location with the exact latitude and longitude of every stop, with the modifications adopted to account for the use of default locations entered by dispatch under limited circumstances. *Id.*

If there are problems with the methodology, those issues can be identified during the pilot's implementation and then addressed. This process will be monitored closely by multiple experts. There is no need for this Court to intervene now to modify the methodology that has been approved by the Monitor.

**B.    Plaintiffs' effort to disrupt the current TSMR pilot should be rejected.**

The TSMR pilot is proceeding under the Monitoring Team's supervision, and Plaintiffs' Motion does not justify halting this progress or second-guessing the Monitoring Team's determinations. Plaintiffs' five requests for relief are either unnecessary or directly contradict the Monitoring Team's decisions.

First, Plaintiffs seek "a clear timeline for implementing the TSMR program and conducting the necessary interventions." Mot. at 31. As the pilot has already begun, and the process is closely supervised by the Monitoring Team, a Court-ordered timeline is unnecessary. Nor do Plaintiffs even attempt to explain the arbitrary deadlines inserted without comment into their Proposed Order, which conflict with the timelines for the intervention process that have been approved by the Monitoring Team. *See* Proposed Order (Doc. 2607-2) at 2 and 3 (proposed orders (a) through (e) and (j)). The timelines approved by the Monitoring Team are reflected in the approved documents. *See, e.g.,* Friday Decl. Ex. 5 (Appendix A: Traffic Stop Monthly Report Process).

Second, Plaintiffs ask the Court to "require MCSO to escalate its intervention strategy" where "an intervention does not result in changed behavior." Mot. at 31. The Monitoring Team and Parties have discussed this topic as part of the process of drafting and ultimately receiving approval on the foundational TSMR documents. The approved Supervisor Guide provides guidance to supervisors on how to select an appropriate intervention strategy, including selecting more aggressive options such as

12

an Action Plan, Re-assignment, or disciplinary referral in appropriate situations. Friday Decl. Ex. 4 at 12-18. The Monitoring Team and Parties also continue to discuss how to evaluate the effectiveness of the TSMR program, including how to assess whether deputy conduct has changed.[5] The Court should allow this process to continue.

Third, Plaintiffs seek a Court order that the interventions must be videotaped. Mot. at 32. The Monitoring Team has rejected this proposal, and has instead determined that interventions will be audio-recorded. Friday Decl. Ex. 3 at 12; *id.* Ex. 4 at 2. After the pilot concludes, the Monitoring Team and MCSO may determine that videorecording or some other method is preferred. However, the pilot should be allowed to go forward as approved by the Monitoring Team.

Fourth, Plaintiffs ask the Court to order MCSO to require TSAU auditors to review certain documentation and information from the Early Identification System. Mot. at 32; Proposed Order at 4-5. The Monitoring Team has expressly rejected Plaintiffs' proposals. The approved documents clearly describe and delineate the materials that must be reviewed by TSAU auditors, as compared to the materials that must be reviewed by supervisors. Friday Decl. Ex. 3 at 8-11 and 14-15; *id.* Ex. 4 at 11-12. The pilot process may lead to a recommendation that additional or different materials should be reviewed by TSAU. However, the current process has been approved for the pilot and should be permitted to move forward.

Fifth, Plaintiffs seek to require MCSO to "regularly and directly report to the Court on its progress," and set forth a detailed plan for biweekly meetings with the Court and a procedure for the Court to resolve disagreements between the Parties. Mot. at 32; Proposed Order at 5-6. However, MCSO is already regularly and directly reporting to the Court-appointed Monitor every week, on the TSMR conference calls. The Monitoring Team is closely supervising every aspect of the TSMR pilot and

---

[5] The Monitoring Team rejected Plaintiffs' position that the pilot could not begin until parameters for assessing effectiveness were approved. *See* Friday Decl. Ex. 3 at 29.

MCSO's progress, and is thoroughly engaged in all of the details and issues. In addition, the Monitor submits quarterly reports to the Court, which provide an opportunity for updates to the Court on the TSMR process. Although Plaintiffs disagree with some of the Monitoring Team's determinations concerning the pilot, they have not provided any justification for the Court to overrule the Monitor and stop the process or for the need for additional direct supervision by the Court.[6]

MCSO shares the concern, expressed by all involved in this process, that the creation of the methodology and construction of the TSMR program has taken too long. However, if Plaintiffs' requests are granted the TSMR pilot will be halted and the progress made on the TSMR pilot in the last year will be reversed. The pilot is designed to determine whether the process, as currently structured, needs to be changed before it is implemented as a routine monthly process. It may be that, informed by the findings of the pilot, MCSO seeks approval from the Monitor to make some of the changes requested by the Plaintiffs. However, Plaintiffs' requirements should not be imposed without first allowing the pilot process to move forward.

### C. Plaintiffs' Motion is not necessary to enforce Paragraph 70.

Paragraph 70 of this Court's First Order (Doc. 606) requires that MCSO "take reasonable steps to investigate and closely monitor the situation" if traffic stop data

---

[6] The Plaintiffs also sneak in requests for relief in their Proposed Order that are nowhere discussed in their Motion. *E.g.*, Proposed Order at 5 (seeking an order granting Plaintiffs unlimited access to body-worn camera footage in evidence.com to allow the Plaintiffs to engage in their own "ongoing monitoring" of flagged deputies). Because only "issues which are argued specifically and distinctly in a party's opening brief" are considered, Plaintiffs have waived any arguments that they are entitled to such relief. *Greenwood v. FAA*, 28 F.3d 971, 976 (9th Cir. 1994); *Collins v. D.R. Horton, Inc.*, 361 F. Supp. 2d 1085, 1090 n.1 ("As Collins and Ryan later pointed out, their waiver argument was discussed in Exhibit K to their Motion, though not in the body of their memorandum of facts and law . . . . This is not sufficient to put the Court on notice of the argument."); *see also Berry Law PLLC v. Kraft Foods Grp., Inc.*, 2013 WL 12061613 at *5 (D.D.C. 2013) ("The Court need not consider unsupported, cursory arguments, if the defendants' stray reference in their proposed order could even be considered an 'argument.'").

14

"indicates that a . . . deputy or unit may be engaging in racial profiling, unlawful searches or seizures, or unlawful immigration enforcement, or that there may be systemic problems regarding any of the foregoing." Examples of interventions listed in Paragraph 70 include "counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or . . . other supervised, monitored, and documented action plans and strategies designed to modify activity." *Id.* If problems exist, Paragraph 70 requires MCSO to "take appropriate steps at the agency level, in additional to initiating corrective and/or disciplinary measures." It also requires written documentation of interventions. *Id.*

The pilot project that MCSO is implementing now with the authorization and oversight of the Monitoring Team includes the components that Paragraph 70 requires. In the pilot, MCSO will take "reasonable steps" based on the traffic stop data, including appropriate interventions that are documented in writing. Plaintiffs' motion only disrupts the current process. It does not enforce Rule 70; it merely replaces the current pilot with a process that they prefer. The Court should not permit Plaintiffs to step in at the eleventh hour and undo all the work that has been done and previously approved by the Monitoring Team to begin implementing the TSMR pilot.

**Conclusion**

For the above reasons, the Court should deny the Plaintiffs' motion.

Dated this 23rd day of April, 2021.

                                      OSBORN MALEDON, P.A.

                                      By     s/Kimberly I. Friday
                                                  Mary R. O'Grady
                                                  Kimberly I. Friday
                                                  2929 North Central, Suite 2100
                                                  Phoenix, Arizona 85012-2793

                                      Attorneys for Defendant Paul Penzone

ALLISTER ADEL
MARICOPA COUNTY ATTORNEY


By:   s/Joseph J. Branco (w/permission)
      Joseph I. Vigil (018677)
      Joseph J. Branco (031474)
      Maricopa County Attorney's Office
      Civil Services Division
      225 West Madison Street
      Phoenix, Arizona 85003

Attorneys for Defendant Paul Penzone and Maricopa County

8948974