| | |
|---|---|
| Pamela S. Karlan<br>Principal Deputy Assistant Attorney General<br>Civil Rights Division<br>Steven H. Rosenbaum (NY Bar No. 1901958)<br>Cynthia Coe (DC Bar No. 438792)<br>Maureen Johnston (WA Bar No. 50037)<br>Nancy Glass (DC Bar No. 995831)<br>Beatriz Aguirre (NV Bar No. 14816)<br>Special Litigation Section<br>Civil Rights Division<br>U.S. Department of Justice<br>150 M Street NE, 10th Floor,<br>Washington, D.C. 20002<br>Telephone: +1 (202) 353-1146<br>Email: maureen.johnston@usdoj.gov<br><br>Attorneys for the United States | Cecillia D. Wang (*pro hac vice*)<br>ACLU FOUNDATION<br>39 Drumm Street<br>San Francisco, CA 94111<br>Telephone: + 1 (415) 343-0775<br>Email: cwang@aclu.org<br><br>Stanley Young (*pro hac vice*)<br>COVINGTON & BURLING LLP<br>3000 El Camino Real<br>5 Palo Alto Square, 10th Floor<br>Palo Alto, CA 94306<br>Telephone: + 1 (650) 632-4704<br>Email: syoung@cov.com<br><br>Attorneys for Plaintiffs *(additional attorneys listed on next page)* |

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; *et al.*<br><br>    Plaintiffs,<br>and<br><br>United States of America<br><br>    Plaintiff-Intervenor,<br><br>  v.<br><br>Paul Penzone, in his official capacity as Sheriff of Maricopa County, AZ; *et al*.<br><br>    Defendants. | Civil Case No.: 2:07-cv-2513-PHX-GMS<br><br>**UNITED STATES' AND PLAINTIFFS' JOINT REPLY IN SUPPORT OF PLAINTIFFS' AND UNITED STATES' JOINT MOTION TO ENFORCE PARAGRAPH 70 OF THE SUPPLEMENTAL/PERMANENT INJUNCTION/JUDGMENT ORDER** |

Additional Attorneys for Plaintiffs:
Victoria Lopez (AZ 330042)
Christine Wee (AZ 028535)
Casey Arellano (AZ 031242)
ACLU Foundation of Arizona
3707 North 7th Street, Suite 235
Phoenix, AZ 85014
Telephone: (602) 650-1854
Email: vlopez@acluaz.org
Email: cwee@acluaz.org
Email: carellano@acluaz.org

Hannah Chartoff (*pro hac vice*)
Amy Heath (*pro hac vice*)
COVINGTON & BURLING LLP

Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
Telephone: + 1 (415) 591-6000
Email: hchartoff@cov.com
Email: aheath@cov.com

Belinda Escobosa Helzer (*pro hac vice pending*)
MALDEF
634 South Spring Street, 11th Floor
Los Angeles, CA 90014
Telephone: +1 (213) 629-2512
Email: bescobosa@maldef.org

## INTRODUCTION

Defendants' response to Plaintiffs' and the United States' Joint Motion to Enforce Paragraph 70 (Doc. 2607) (Joint Motion) makes clear that MCSO plans to move forward with deputy interventions, even though MCSO's methodology will flag deputies for behavior that should not be flagged, and fail to flag deputies who should be flagged. MCSO claims that its analysis will lead to an accurate result. Yet, MCSO has intentionally made at least three methodological choices that depart from standard practice and make it far more difficult to identify deputies with extreme enforcement patterns. First, instead of using the customary threshold for statistical significance of 5%, MCSO has used the arbitrary standard of 1%—a threshold *five times* more stringent than the long-established standard. Second, MCSO has inappropriately used a statistical technique that greatly increases the risk of failing to flag deputies who are true outliers. Third, MCSO has failed to properly match deputies making traffic stops at similar times of day and in the same geographic area; this results in improper comparisons between substantially different traffic stops. As a result of these deficiencies, 83.7% of the tests used to flag deputies are so statistically weak that they cannot reliably detect even a twofold disparity between minority and white drivers in a deputy's stop outcomes.

The cumulative impact is dire: MCSO's methodology may result in missing 64% of disparate enforcement behavior that indicates discriminatory policing. And once the TSMR pilot

2

begins based on this erroneous methodology, the problem cannot be fixed—the wrong deputies will receive interventions for the wrong reasons, while true outlier deputies will not, allowing them to continue problematic behavior that should have been addressed.

Rather than face the problems with the methodology and MCSO's poor decisions on implementation, Defendants argue that the Monitor's approval means there is no basis for "second-guessing" that determination. Defendants' Response in Opposition to the Joint Motion at 12 (Doc. 2632) (Defs.' Resp.) at 12. Defendants are wrong. The First Order provides: "The ultimate arbiter of compliance is the Court. . . . [W]here the Parties are not able to resolve issues with the Monitor—including those areas where the Order provides for input from the Monitor—the Parties may submit their grievances directly to the Court for resolution." Supplemental Permanent Injunction/Judgment Order (Doc. 606 at ¶ 128) (First Order). Moreover, although the Monitor authorized MCSO to use the stringent 1% threshold, the Monitor stated on April 28, 2021, that his authorization was based on a mistaken understanding of the number of flags MCSO expected its TSMR analysis to generate in a month—an understanding based on information MCSO had presented. MCSO's use of the 1% threshold for future TSMR analyses is no longer Monitor-approved.

If the purpose of Paragraph 70 is to be achieved, this Court must intervene to ensure that the right deputies are flagged, and for the right reason, and that MCSO responds suitably when that occurs. The Court should grant the Joint Motion to enforce Paragraph 70, or in the alternative, hold an evidentiary hearing to resolve the disagreement regarding the methodology for flagging deputies before MCSO begins interventions based on that methodology.

**I.    MCSO's Traffic Stop Monthly Report (TSMR) fails to flag the right deputies**

Defendants argue that granting the Joint Motion now would "disrupt" the TSMR pilot process. Defendants claim that, because MCSO accelerated its TSMR activities since the Joint Motion was filed, there is no longer need for Court oversight. *See* Defs.' Resp. at 12. But the TSMR is fundamentally flawed. Moving forward without correcting it means that some deputies can be flagged when they should not be, while other deputies who should be flagged may not be. *See* Joint Motion at 11–14. Proceeding with the pilot without confidence that the deputies

receiving interventions actually need them does little to protect the Plaintiff class from discrimination; indeed, it may subject the Plaintiff class to *greater* discrimination if true outliers are not identified. It also sends the unfortunate message to MCSO deputies and supervisors that their employer is not committed to administering the TSMR in an equitable or effective manner.

### A.  MCSO's methodology diverges from commonly accepted statistical practices in three serious ways

Defendants acknowledge that they have rejected the recommendations of one of the United States' statistical consultants, Dr. Greg Ridgeway. Defs.' Resp. at 11. They claim that "[r]easonable experts can disagree about the best parameters for a statistical model, and they have done so here." *Id*. Defendants offer the opinion of their own statistical expert, Zoë Thorkildsen, a researcher from CNA, a consulting group retained by MCSO in 2018 to develop and implement statistical analyses of traffic data. Ms. Thorkildsen offers no substantive defense of her methodological decisions. Rather, she concludes without explanation that MCSO's current approach "leads to a useful and accurate analysis of data." Declaration of Zoë Thorkildsen in support of Defendants' Opposition at ¶ 8 (Doc. 2632-1) (Thorkildsen Decl.).

Reasonable experts can disagree, but that is not what has occurred here. Dr. Ridgeway, a prominent researcher who has implemented similar analyses in other law enforcement agencies across the country, raised legitimate concerns with MCSO's methodology. *See* Joint Motion at 6–14. Defendants failed to address those concerns without explanation. In doing so, Defendants intentionally made analytical choices that are out of step with commonly accepted standards in statistical practice established decades ago.[1]

---

[1] MCSO's methodology actually employs two separate analyses. The "comparative analysis," which is primarily discussed in this Reply Brief, employs propensity score techniques to identify outliers among deputies who have made (1) 20 or more stops in a year; and (2) 5 or more stops per (the specific) minority group being analyzed. The low number of stops can undermine statistical precision or lead to the entirely wrong comparisons being made. Many MCSO deputies make too few traffic stops in a 12-month period to qualify for the "comparative analysis." Declaration of Dr. Dean Knox (Knox Decl.) at ¶ 16. For that reason, Dr. Ridgeway has recommended that, for these deputies, MCSO should extend the timeframe of analysis—perhaps to 18 months instead of 12. *Id*. *See also* Doc. 2607-1 at 125. MCSO has failed to accept

4

Because MCSO departed from standard statistical practice, MCSO's methodology employs methods that researchers have specifically discredited for use in an analysis such as the TSMR. These deficient methods have the combined effect of weakening MCSO's statistical tests in a way that undermines their ability to detect discriminatory enforcement altogether. The deficiencies also lead to improper comparisons of deputies who work in very different locations. As a result, the methodology will miss deputies who are true outliers and flag deputies for discriminatory patterns that did not occur, thereby compromising the integrity of the TSMR process. Knox Decl. at ¶¶ 5–6.

### 1. MCSO departs from basic standards in statistical analysis

MCSO's methodology departs from established statistical practice by using a probability threshold that is five times more stringent than long-established academic standards. This threshold, known in statistics as a "p-value," determines whether a TSMR "flag" is statistically significant, which is necessary for a deputy to qualify for an intervention. Knox Decl. at ¶ 9.[2]

Here, MCSO has rejected the conventional threshold of 5% (i.e. $p \leq 0.05$) in favor of a standard of 1% (i.e. $p \leq 0.01$). This means to be flagged as an outlier, a deputy needs a pattern of discriminatory activity so extreme as to create a 99% probability that the racially disparate outcomes could not be from mere chance. In a number of cases, it is mathematically impossible to achieve this level of certainty with such limited data. Knox Decl. at ¶ 9.[3] In practical terms,

---

this recommendation, to the detriment of the analysis. *See* Knox Decl. at ¶ 16. When deputies do not qualify for the "comparative analysis" because they have too few stops, MCSO analyzes them in a separate analysis, known as the "descriptive analysis." The "descriptive analysis" is an inappropriate comparison that fails to account for important differences between stops made by a deputy and their peers. Knox Decl. ¶ 16(b).

[2] Under the conventional threshold, a pattern is statistically noteworthy if such a disparity could have arisen by mere chance only 5% of the time. This has been the academic standard since, at least, 1925. Knox Decl. at ¶ 9.

[3] The use of a 1% threshold was originally approved by the Monitor, who accepted MCSO's representation that the stringent p-value was warranted because the TSMR analysis generated more flags than could reasonably be vetted. MCSO's representation turned out to be erroneous. MCSO's April 2021 analysis produced only 12 flags, of which 67% were "discounted," meaning that MCSO personnel assessed that the result of the statistical analysis was not

5

this decision to depart from long-established academic standards has the effect of making it far more difficult to identify outlier deputies who exhibit racially disparate enforcement patterns.

### 2. MCSO uses an inappropriate technique that masks the presence of outliers

MCSO next departs from established statistical standards by using a statistical technique, the "Bonferroni correction," that is known to be unsuitable in this context. Statisticians have known for over 30 years that the Bonferroni correction is inappropriate in an analysis such as the TSMR, where it greatly increases the chance of generating "false negatives"—or, as here, true outlier deputies whom the analysis will fail to identify. Knox Decl. at ¶ 10.

Simply put, the purpose of the Bonferroni correction is to account for the fact that conducting multiple statistical tests will increase the chance of finding statistically significant results due to mere chance. But it is inappropriate when the tests are positively correlated. For example, in an analysis like the TSMR, the results of the multiple tests—all of which are intended to identify signs of potential bias—are correlated. *Id*. That is to say, if a deputy treats white drivers preferentially compared to minority drivers, then the deputy would register as an outlier across multiple minority groups. That is the type of behavior that the TSMR should surface, but the Bonferroni correction would mask that behavior.[4]

### 3. MCSO poorly accounts for a stop's location and time of day, and wrongly compares deputies who work in different locations

MCSO next departs from established statistical standards by inappropriately comparing

---

"legitimate," was not "appropriate," or was unable to be "verified." Knox Decl. at ¶ 6(a). In response, the Monitor signaled on April 28, 2021 that use of the 1% threshold was again an open issue in need of resolution, and instructed MCSO to test the threshold of 5% in a future analysis later this year. The Monitor did not direct MCSO to re-run the April 2021 data using the 5% threshold, and MCSO plans to move forward with interventions with deputies flagged under the current erroneous methodology.

[4] In many cases, use of the Bonferroni correction, in combination with the stringent probability threshold of 1% ($p \leq 0.01$), makes it mathematically impossible for a deputy to be flagged on a behavior regardless of their treatment of minority drivers. Knox Decl. at ¶ 12.

deputies who work in very dissimilar locations and at different times of day. Ms. Thorkildsen makes no attempt to defend MCSO's "time of day" analysis but states only that it is a feature of earlier analyses she has implemented for MCSO. Thorkildsen Decl. at ¶ 10. Ms. Thorkildsen also claims that "the TSMR methodology precisely accounts for stop location with the exact latitude and longitude of every stop." *Id*. It is not MCSO's collection of geographic location data that is the problem here;[5] rather, the problem is how MCSO incorporates the location data into its statistical model. Knox Decl. at ¶ 14. Ultimately, MCSO's methodology creates improper comparisons between deputies working in very different locations. *Id*. at ¶ 15. This mismatch can lead not only to erroneous flags, but also to "false negative" errors in which significant disparities are not flagged due to the inappropriate modeling. *Id*. at ¶ 15(c). Exhibit A illustrates the impact of improperly incorporating stop locations for two deputies.

In sum, MCSO has departed from established statistical standards, compromising the integrity of the TSMR process and leading to the likelihood that it will identify the wrong deputy outliers and fail to identify the right ones.

### B. The deficiencies of MCSO's methodology, taken together, mean that MCSO will severely undercount deputies who may be engaging in biased policing

The impact of MCSO's decisions to depart from professionally accepted standards has the effect of severely undercounting deputy flags and improperly subjecting deputies to inappropriate comparisons. In fact, 83.7% of the tests MCSO uses to flag deputies are so statistically weak that they cannot reliably detect even a *twofold disparity* between minority and white drivers in a deputy's stop outcomes. Knox Decl. at ¶ 5. For example, if a deputy were

---

[5] It is not clear that MCSO's data collection efforts can be wholly relied upon either. On April 9, 2021, MCSO admitted that it had improperly collected the geo-locations for 544 stops in the TSMR data set, inaccurately recording some locations as hundreds of miles outside of Maricopa County. *See* Doc. 2632-2 at 114. MCSO explained that the error was not a one-time anomaly, but rather MCSO had been consistently mis-recording some stops' locations for several years. Though MCSO has apparently addressed these errors for the 544 stops in the most recent dataset, *see* Defs.' Resp. at 10, MCSO has not adequately accounted for how these errors occurred in the first place. Nor has MCSO explained how it failed to identify the errors earlier in the process, despite "testing" the TSMR methodology in the summer of 2020. *See id*. at 9.

holding Black drivers on the roadside twice as long as white drivers, that disparity would regularly go undetected. In fact, for arrests and searches, not a single test that MCSO runs is capable of reliably detecting a twofold disparity. *Id*. at ¶ 5(c). When compared to a proper methodology that adheres to best practices in statistical analysis, MCSO's approach may miss 64% of the flags that suggest disparate behavior. *Id*. at ¶ 8. *See also* Ex. B (showing that an appropriate procedure would detect significantly more instances of disparate enforcement, relating to more deputies).

## C. There is no excuse for departing from long-standing standards for identifying outliers

Defendants claim that, with the TSMR, "MCSO is attempting to do something truly groundbreaking" for which there is "no historical precedent in other police departments." Defs.' Resp. at 3. Indeed, Defendants claim that the delays in developing the TSMR (now stretching more than six years) are due, in part, to the fact that "this has never been done before." Defs.' Resp. at 4. And in justifying her rejection of Dr. Ridgeway's recommendations, Ms. Thorkildsen states that "there is no one 'right' way to do it." Thorkildsen Decl. at ¶ 8.

Defendants are incorrect. The statistical methods that MCSO is using to implement the TSMR—propensity score analysis and outlier identification—are very common and well-studied in the field. *See* Knox Decl. at ¶ 17. There is nothing so novel or groundbreaking about the TSMR analysis that MCSO should be excused for getting it wrong.

## D. The TSMR pilot will not surface the errors in MCSO's methodology

Defendants claim that "if there are problems with the methodology, those issues can be identified during the pilot's implementation and then addressed." Defs.' Resp. at 12. This is not so. Running the TSMR analysis is just the first step of the program, which operates on the assumption that the methodology is sound and will identify the correct deputies. Once MCSO executes the analysis and selects the deputies for intervention, there is not an avenue for MCSO to fix the foundational methodological deficiencies. By moving forward with a TSMR process without addressing these fundamental deficiencies, Defendants cannot know whether the deputies receiving interventions actually need them. This will waste time, fail to protect the

Plaintiff class from discrimination, and undermine deputies' and supervisors' confidence in that process.

## II. Defendants' Actions in the Last Two Months Do Not Resolve the Central Problems with the TSMR Nor Negate the Need for Court Oversight

Since Plaintiffs and the United States filed the Joint Motion, Defendants have taken steps to complete materials to guide interventions with deputies flagged by the TSMR and to begin a pilot of the intervention program. Defendants claim that, in light of these developments, there is no reason for the Court to now involve itself in oversight of the TSMR. Defs.' Resp. at 10–12.

Although Defendants' acceleration of their efforts to comply with the First Order is a positive step, these efforts have not eliminated the issues of disagreement. Defendants have done nothing to address the foundational deficiencies that will impact which deputies are selected for interventions. Furthermore, Defendants' recent efforts do not excuse the egregious delays in getting to this point, which highlight the continued need for the clear timelines, transparency, and accountability that Court oversight would provide. *See* Joint Motion at 27.

As one example, MCSO has still not finalized significant components of the TSMR pilot, such as determining how an intervention will be deemed "effective" after it has occurred. Setting the goalposts of what is an "effective" intervention is crucial, especially given that the TSMR analysis is designed to identify outlier patterns of discriminatory enforcement that cannot be explained by mere chance. Contrary to MCSO's previous statements, such disparities do present evidence of bias—*see* Doc. 2504 (Nov. 26, 2019 Status Conference) at 14–15—and evaluating whether MCSO's interventions are actually effective at addressing those disparities is essential to determining whether MCSO has taken "reasonable steps to investigate and closely monitor the situation." *See* First Order at ¶ 70. There is no timeline for finalizing this metric.

Furthermore, Defendants continue to resist measures that will make the interventions more effective by equipping MCSO auditors and supervisors with specific and relevant

information, or by requiring that interventions be videotaped.[6] Joint Motion at 20–21. The Court should exercise oversight to ensure that MCSO's decisions will not undermine the interventions.

### III. The Monitor's Approvals of MCSO's TSMR Materials and Methodology Do Not Preclude This Court from Intervening to Resolve the Dispute

Defendants claim that this Court should not override the Monitor's decision to approve MCSO's TSMR protocols, nor its decision to authorize MCSO to proceed with the pilot notwithstanding the serious methodological issues. *See* Defs.' Resp. at 12. At this point, Plaintiffs and the United States have engaged in collaboration with the Monitor and the Defendants *for years* to develop an intervention program that is statistically sound and designed to modify deputy behavior in a way that will protect the Plaintiff class from harmful encounters with law enforcement. It is entirely appropriate that, from time to time, the Parties may respectfully disagree with the Monitor's determination on a particular issue. In such circumstances, the First Order is clear that the Parties may submit their concerns directly to the Court. First Order at ¶ 128 ("The ultimate arbiter of compliance is the Court. . . . In any areas where the Parties are not able to resolve issues with the Monitor—including those areas where the Order provides for input from the Monitor—the Parties may submit their grievances directly to the Court for resolution."). Given the importance of the issue at stake—whether MCSO has identified the right deputies for intervention and how those interventions will be conducted—this Court should step in to ensure that the purpose of Paragraph 70 is fulfilled.

### IV. The Court Should Grant the Motion to Enforce, or in the Alternative, Hold an Evidentiary Hearing to Ensure that MCSO's Methodology Is Sound

The Proposed Order (Doc. 2607-2) lays out an appropriate procedure for the Court to resolve the remaining issues with the TSMR, including by deciding disagreements about the TSMR methodology and intervention protocols, and setting much-needed court enforceable deadlines. However, the Parties have presented conflicting declarations on the critical question

---

[6] Recording the interventions by video, rather than only audio, will better enable the Parties and the Monitor to determine whether the pilot interventions are effective. *See* Joint Motion at 18.

10

of the validity of MCSO's TSMR methodology. MCSO's expert has submitted a declaration that concludes without explanation that MCSO's current approach "leads to a useful and accurate analysis of data." Thorkildsen Decl. at ¶ 8. The United States' expert disagrees and has described multiple deficiencies in MCSO's methodology. *See* Knox. Decl. These declarations are sufficient for the Court to resolve the dispute and order that the TSMR methodology be revised. If the Court would like a deeper explanation of the statistical methods and deficiencies that Dr. Knox discussed in his declaration, however, the Court may wish to hold an evidentiary hearing to determine whether the TSMR methodology is statistically sound.

## CONCLUSION

For the foregoing reasons, Plaintiffs and the United States respectfully ask the Court to grant their Joint Motion to Enforce Paragraph 70 of the First Order, or in the alternative, order an evidentiary hearing to resolve the parties' disagreement about the TSMR methodology.

Respectfully submitted,

| ATTORNEYS FOR THE UNITED STATES: | ATTORNEYS FOR PLAINTIFFS: COVINGTON & BURLING LLP |
|---|---|
| Pamela S. Karlan<br>Principal Deputy Assistant Attorney General<br>Civil Rights Division<br>Steven H. Rosenbaum<br>Chief, Special Litigation Section<br>Cynthia Coe<br>Acting Special Counsel (DC Bar No. 438792)<br>/s/ Maureen Johnston<br>Maureen Johnston (WA Bar No. 50037)<br>Nancy Glass (DC Bar No. 995831)<br>Beatriz Aguirre (NV Bar No.14816)<br>Trial Attorneys<br>U.S. Department of Justice<br>Civil Rights Division<br>Special Litigation Section<br>150 M Street NE, 10th Floor,<br>Washington, D.C. 20002<br>Telephone: +1 (202) 353-1146<br>maureen.johnston@usdoj.gov | Stanley Young (*pro hac vice*)<br>Covington & Burling LLP<br>Hannah Chartoff (*pro hac vice*)<br>Amy Heath (*pro hac vice*)<br><br>ACLU FOUNDATION<br>Cecillia Wang (*pro hac vice*)<br>ACLU Foundation of Arizona<br>Victoria Lopez (AZ 330042)<br>Christine K.s Wee (AZ 028535)<br>/s/ Casey Arellano<br>Casey Arellano (AZ 031242)<br>3707 North 7th Street, Suite 235<br>Phoenix, AZ 85014<br>Telephone: +1 (602) 650-1854<br>Email: carellano@acluaz.org<br><br>MALDEF<br>Belinda Escobosa Helzer (*pro hac vice pending*) |

## CERTIFICATE OF SERVICE

    I certify that on or about April 30, 2021, I filed the foregoing through the Court's CM/ECF system which will serve a true and correct copy of the filing on counsel of record.

<u>/s/ Maureen Johnston</u>
