# TWENTY-SEVENTH REPORT
## Independent Monitor
## for the
## Maricopa County Sheriff's Office



## Reporting Period – Fourth Quarter 2020
## Chief (Ret.) Robert S. Warshaw
## Independent Monitor
## May 14, 2021

WAI 53289

# Table of Contents

Section 1:  Introduction……………………………………………...…………...3

Section 2:  Methodology and Compliance Summary……………………….............4

Section 3:  Implementation Unit Creation and Documentation Request……………..11

Section 4:  Policies and Procedures………………….……………………………...15

Section 5:  Pre-Planned Operations……………………….…….…………….…..41

Section 6:  Training……………………………………………………...............46

Section 7:  Traffic Stop Documentation and Data Collection…………….…..………59

Section 8:  Early Identification System (EIS)……….……………….…..…............105

Section 9:  Supervision and Evaluation of Officer Performance………….…............129

Section 10:  Misconduct and Complaints……………………………….…..............155

Section 11:  Community Engagement……………………………………..............159

Section 12:  Misconduct Investigations, Discipline, and Grievances………..............166

Section 13:  Community Outreach and Community Advisory Board………………..246

Section 14:  Supervision and Staffing……………………………………..............247

Section 15:  Document Preservation and Production………………………………250

Section 16:  Additional Training………………………………………..............254

Section 17:  Complaints and Misconduct Investigations Relating to
             Members of the Plaintiff Class………………………………..............255

Section 18:  Concluding Remarks………………………………………..............273

Appendix:  Acronyms…………………………………………………...............275

WAI 53290

# Section 1: Introduction

This is the twenty-seventh report issued in my capacity as the Court-appointed Monitor in the case of *Manuel de Jesus Ortega Melendres, et al., v. Paul Penzone, et al.* (No. CV-07-02513-PHX-GMS), and documents activities that occurred during the fourth quarter of 2020, October 1-December 31, 2020.

On May 13, 2016, the Court issued its Findings of Fact in the civil contempt proceedings that commenced in April 2015. This led to the issuance of a Second Supplemental Permanent Injunction/Judgment Order (Second Order) on July 20, 2016, significantly expanding the duties of the Monitor. Our reports cover the additional requirements of the Second Order while continuing to document MCSO's compliance efforts with the First Supplemental Permanent Injunction/Judgment Order (First Order) issued in October 2013. We provide summaries of compliance with both Orders separately, as well as a summary of MCSO's overall, or combined, compliance.

The compliance Paragraphs of the Second Order commence where the First Order ends, and they are numbered from Paragraph 160 through and including Paragraph 337. Not all are subject to our review. For example, the Second Order outlines the duties of the Independent Investigator and the Independent Disciplinary Authority. These are autonomous positions, not subject to oversight of the Court or its Monitor.

The Second Order also delineates in great detail requirements in the areas of misconduct investigations, training, discipline and discipline review, transparency and reporting, community outreach, document preservation, and misconduct investigations involving members of the Plaintiffs' class. The Court granted the Monitor the authority to supervise and direct all of the investigations that fall into the latter category.

As of the last reporting period, MCSO asserted Full and Effective Compliance with 41 Paragraphs of the First Order, as that term is defined in the First Order. After review, I agreed with MCSO's assertions. On December 16, 2020, MCSO asserted Full and Effective Compliance with 22 additional Paragraphs, including Second Order Paragraphs: Paragraphs 22, 43, 44, 47, 57, 76, 102, 244, 245, 247, 248, 249, 264, 266, 273, 276, 278, 279, 287, 288, 292, and 337. On January 15, 2021, I agreed with 17 of MCSO's assertions, granting MCSO in Full and Effective Compliance with 58 total Paragraphs. I disagreed with MCSO's assertions for Paragraphs 22, 43, 44, 47, and 288. (See Section 2 of this report.) MCSO retains the obligation to document that the Office remains in Full and Effective Compliance with the Paragraphs so designated.

Because of the COVID-19 pandemic, we once again conducted our January 2021 site visit remotely, in contrast to our regular practice of conducting onsite compliance visits. Our last in-person site visit was in January 2020. MCSO's compliance status with individual Paragraphs normally subject to in-person inspections will not be adversely impacted by any missed onsite reviews. We hope that circumstances change and we return to onsite visits. In the intervening period, if any adjustments need to be made to assess Paragraph compliance, we will consider additional options that might be available to us.

WAI 53291

# Section 2: Methodology and Compliance Summary

The Monitor's primary responsibility is to determine the status of compliance of the Maricopa County Sheriff's Office (MCSO) with the requirements of the requirements in the Order. To accomplish this, the Monitoring Team makes quarterly visits to Maricopa County to meet with MCSO's Court Implementation Division (CID) and other Office personnel – at Headquarters, in Patrol District offices, or at the office that we occupy when onsite. We also observe Office practices; review Office policies and procedures; collect and analyze data using appropriate sampling and analytic procedures; and inform the Parties and, on a quarterly basis, the Court, about the status of MCSO's compliance.

This report documents compliance with applicable Order requirements, or Paragraphs, in two phases. For Phase 1, we assess compliance according to whether MCSO has developed and approved requisite policies and procedures, and MCSO personnel have received documented training on their contents. For Phase 2 compliance, generally considered operational implementation, MCSO must demonstrate that it is complying with applicable Order requirements more than 94% of the time, or in more than 94% of the instances under review.

We use four levels of compliance: In compliance; Not in compliance; Deferred; and Not applicable. "In compliance" and "Not in compliance" are self-explanatory. We use "Deferred" in circumstances in which we are unable to fully determine the compliance status – due to a lack of data or information, incomplete data, or other reasons that we explain in the narrative of our report. We will also use "Deferred" in situations in which MCSO, in practice, is fulfilling the requirements of a Paragraph, but has not yet memorialized the requirements in a formal policy.

For Phase 1 compliance, we use "Not applicable" for Paragraphs where a policy is not required; for Phase 2 compliance, we use "Not applicable" for Paragraphs that do not necessitate a compliance assessment.

The tables below summarize the compliance status of Paragraphs tracked in this report.[1] This is our eighteenth quarterly status report in which we report on MCSO's compliance with both the First and Second Orders. During this reporting period, MCSO's Phase 1 compliance rate with the **First Order** remained the same as the last reporting period, at 98%. MCSO's Phase 1 compliance rate with the **Second Order** remained the same as the last reporting period, at 100%.

During this reporting period, MCSO's Phase 2 compliance rate with the **First Order** increased by one percentage point, from 78% to 79%. This number includes Paragraphs that we consider to be in compliance and those that are now in Full and Effective Compliance (FAEC), as described above. (See below for the list of Paragraphs that are in Full and Effective Compliance.) During this reporting period, MCSO's Phase 2 compliance rate with the **Second Order** increased by one percentage point from the last reporting period, from 91% to 92%. This number also includes

---

[1] The percent in compliance for Phase 1 is calculated by dividing the number of Order Paragraphs determined to be in compliance by the total number of Paragraphs requiring a corresponding policy or procedure. Paragraphs with the status of Deferred are included in the denominator, while Paragraphs with the status of Not Applicable are not included. Therefore, the number of Paragraphs included in the denominator totals 183 for Phase 1. The number of Paragraphs included in the denominator totals 207 for Phase 2.

WAI 53292

Paragraphs that we consider to be in compliance and those that are now in Full and Effective Compliance (FAEC), as described above.

| Twenty-Seventh Quarterly Status Report | | |
|---|---|---|
| **First Order Summary** | | |
| **Compliance Status** | **Phase 1** | **Phase 2** |
| Not Applicable | 20 | 5 |
| Deferred | 0 | 0 |
| Not in Compliance | 2 | 20 |
| In Compliance | 78 | 75[2] |
| **Percent in Compliance** | **98%** | **79%** |

| Twenty- Seventh Quarterly Status Report | | |
|---|---|---|
| **Second Order Summary** | | |
| **Compliance Status** | **Phase 1** | **Phase 2** |
| Not Applicable | 20 | 10 |
| Deferred | 0 | 2 |
| Not in Compliance | 0 | 7 |
| In Compliance | 103 | 104[3] |
| **Percent in Compliance** | **100%** | **92%** |

---

[2] This number includes those Paragraphs that are deemed in Full and Effective Compliance.
[3] This number includes those Paragraphs that are deemed in Full and Effective Compliance.

WAI 53293

| MCSO's Compliance with the Requirements of the **First Order** *(October 2, 2013)* | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **Report 1** | **Report 2** | **Report 3** | **Report 4** | **Report 5** | **Report 6** | **Report 7** | **Report 8** | **Report 9** | **Report 10** |
| **Phase 1** | 4% | 10% | 44% | 40% | 51% | 57% | 61% | 60% | 67% | 60% |
| **Phase 2** | 0% | 0% | 26% | 25% | 28% | 37% | 38% | 39% | 44% | 49% |

| | **Report 11** | **Report 12** | **Report 13** | **Report 14** | **Report 15** | **Report 16** | **Report 17** | **Report 18** | **Report 19** | **Report 20** |
|---|---|---|---|---|---|---|---|---|---|---|
| **Phase 1** | 63% | 79% | 88% | 85% | 85% | 85% | 85% | 97% | 97% | 97% |
| **Phase 2** | 50% | 57% | 67% | 62% | 65% | 64% | 66% | 77% | 75% | 78% |

| | **Report 21** | **Report 22** | **Report 23** | **Report 24** | **Report 25** | **Report 26** | **Report 27** |
|---|---|---|---|---|---|---|---|
| **Phase 1** | 96% | 96% | 96% | 96% | 96% | 98% | 98% |
| **Phase 2** | 76% | 77% | 79% | 82% | 81% | 78% | 79% |

WAI 53294

| | Report 1 | Report 2 | Report 3 | Report 4 | Report 5 | Report 6 | Report 7 | Report 8 | Report 9 | Report 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| MCSO's Compliance with the Requirements of the **Second Order** *(July 20, 2016)* | | | | | | | | | | |
| **Phase 1** | N/A | | | | | | | | | 1% |
| **Phase 2** | N/A | | | | | | | | | 43% |

| | Report 11 | Report 12 | Report 13 | Report 14 | Report 15 | Report 16 | Report 17 | Report 18 | Report 19 | Report 20 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Phase 1** | 10% | 12% | 72% | 75% | 77% | 77% | 78% | 78% | 99% | 99% |
| **Phase 2** | 46% | 60% | 63% | 66% | 72% | 75% | 80% | 81% | 90% | 89% |

| | Report 21 | Report 22 | Report 23 | Report 24 | Report 25 | Report 26 | Report 27 |
|---|---|---|---|---|---|---|---|
| **Phase 1** | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **Phase 2** | 91% | 90% | 92% | 93% | 90% | 91% | 92% |

WAI 53295

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|---|---|---|
| 9 | 12/28/18 | Concurred on 1/28/19 |
| 10 | 12/28/18 | Concurred on 1/28/19 |
| 11 | 12/28/18 | Concurred on 1/28/19 |
| 12 | 12/28/18 | Concurred on 1/28/19 |
| 13 | 12/28/18 | Concurred on 1/28/19 |
| 21 | 6/22/20 | Concurred on 7/20/20 |
| 22 | 12/16/20 | Did not concur on 1/15/21 |
| 23 | 12/28/18 | Concurred on 1/28/19 |
| 26 | 12/28/18 | Concurred on 1/28/19 |
| 27 | 3/22/19 | Concurred on 4/22/19 |
| 28 | 12/28/18 | Concurred on 1/28/19 |
| 29 | 12/28/18 | Concurred on 1/28/19 |
| 30 | 12/28/18 | Concurred on 1/28/19 |
| 31 | 9/9/19 | Concurred on 10/2/19 |
| 34 | 6/3/19 | Concurred on 6/25/19 |
| 35 | 12/28/18 | Concurred on 1/28/19 |
| 36 | 12/28/18 | Concurred on 1/28/19 |
| 37 | 12/28/18 | Concurred on 1/28/19 |
| 38 | 12/28/18 | Concurred on 1/28/19 |
| 40 | 12/28/18 | Concurred on 1/28/19 |
| 43 | 12/16/20 | Did not concur on 1/15/21 |
| 44 | 12/16/20 | Did not concur on 1/15/21 |
| 45 | 12/9/19 | Concurred on 1/6/20 |
| 46 | 12/9/19 | Concurred on 1/6/20 |
| 47 | 12/16/20 | Did not concur on 1/15/21 |
| 48 | 12/28/18 | Did not concur on 1/28/19 |

WAI 53296

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|---|---|---|
| 49 | 12/28/18 | Did not concur on 1/28/19 |
| 50 | 12/28/18 | Did not concur on 1/28/19 |
| 51 | 12/28/18 | Did not concur on 1/28/19 |
| 55 | 12/28/18 | Concurred on 1/28/19 |
| 57 | 12/16/20 | Concurred on 1/15/21 |
| 58 | 6/22/20 | Concurred on 7/20/20 |
| 59 | 12/28/18 | Concurred on 1/28/19 |
| 60 | 12/28/18 | Concurred on 1/28/19 |
| 61 | 12/9/19 | Concurred on 1/6/20 |
| 63 | 6/22/20 | Concurred on 7/20/20 |
| 68 | 12/28/18 | Concurred on 1/28/19 |
| 71 | 12/28/18 | Concurred on 1/28/19 |
| 73 | 10/5/20 | Concurred on 11/4/20 |
| 76 | 12/16/20 | Concurred on 1/15/21 |
| 77 | 12/28/18 | Concurred on 1/28/19 |
| 84 | 9/9/19 | Concurred on 10/2/19 |
| 85 | 10/5/20 | Concurred on 11/4/20 |
| 86 | 10/5/20 | Concurred on 11/4/20 |
| 88 | 12/28/18 | Concurred on 1/28/19 |
| 89 | 12/9/19 | Concurred on 1/6/20 |
| 93 | 3/17/20 | Concurred on 4/9/20 |
| 101 | 12/28/18 | Concurred on 1/28/19 |
| 102 | 12/16/20 | Concurred on 1/15/21 |
| 104 | 3/17/20 | Concurred on 4/9/20 |
| 105 | 10/5/20 | Concurred on 11/4/20 |
| 106 | 6/3/19 | Concurred on 6/25/19 |
| 244 | 12/16/20 | Concurred on 1/15/21 |

WAI 53297

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|---|---|---|
| 245 | 12/16/20 | Concurred on 1/15/21 |
| 247 | 12/16/20 | Concurred on 1/15/21 |
| 248 | 12/16/20 | Concurred on 1/15/21 |
| 249 | 12/16/20 | Concurred on 1/15/21 |
| 264 | 12/16/20 | Concurred on 1/15/21 |
| 266 | 12/16/20 | Concurred on 1/15/21 |
| 273 | 12/16/20 | Concurred on 1/15/21 |
| 276 | 12/16/20 | Concurred on 1/15/21 |
| 278 | 12/16/20 | Concurred on 1/15/21 |
| 279 | 12/16/20 | Concurred on 1/15/21 |
| 287 | 12/16/20 | Concurred on 1/15/21 |
| 288 | 12/16/20 | Did not concur on 1/15/21 |
| 292 | 12/16/20 | Concurred on 1/15/21 |
| 337 | 12/16/20 | Concurred on 1/15/21 |

WAI 53298

**COURT ORDER III.  MCSO IMPLEMENTATION UNIT AND INTERNAL AGENCY-WIDE ASSESSMENT** *[Court Order wording in italics]*

***Paragraph 9.** Defendants shall hire and retain, or reassign current MCSO employees to form an interdisciplinary unit with the skills and abilities necessary to facilitate implementation of this Order.  This unit shall be called the MCSO Implementation Unit and serve as a liaison between the Parties and the Monitor and shall assist with the Defendants' implementation of and compliance with this Order.  At a minimum, this unit shall: coordinate the Defendants' compliance and implementation activities; facilitate the provision of data, documents, materials, and access to the Defendants' personnel to the Monitor and Plaintiffs representatives; ensure that all data, documents and records are maintained as provided in this Order; and assist in assigning implementation and compliance-related tasks to MCSO Personnel, as directed by the Sheriff or h is designee.  The unit will include a single person to serve as a point of contact in communications with Plaintiffs, the Monitor and the Court.*

**In Full and Effective Compliance**

To verify Phase 2 compliance with this Paragraph, we reviewed the monthly personnel rosters for the Court Implementation Division (CID).  As of this reporting period, CID has seven personnel: one captain; one lieutenant; three sergeants; one management assistant; and one administrative assistant.  CID continues to be supported by MCAO attorneys, who frequently participate in our meetings and telephone calls with Division personnel.

During this reporting period, CID continued to provide documents through MCSO's counsel via an Internet-based application.  We, the Plaintiffs, and the Plaintiff-Intervenors receive all files and documents simultaneously, with only a few exceptions centering on open internal investigations.  CID effectively facilitates our and Parties' access to MCSO's personnel.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 53299

*Paragraph 10.  MCSO shall collect and maintain all data and records necessary to: (1) implement this order, and document implementation of and compliance with this Order, including data and records necessary for the Monitor to conduct reliable outcome assessments, compliance reviews, and audits; and (2) perform ongoing quality assurance in each of the areas addressed by this Order.  At a minimum, the foregoing data collection practices shall comport with current professional standards, with input on those standards from the Monitor.*

**In Full and Effective Compliance**

CID continues to be responsive to our requests.  CID also addresses with immediacy any issues we encounter in the samples we request – be they technical issues, missing documents, or other problems.  MCSO's Bureau of Internal Oversight (BIO) routinely audits the work products of the Office, particularly in the areas that directly affect compliance with the requirements of the Orders.  In many instances, BIO will review the same material we request in our samples, and BIO frequently notes – and addresses – the same deficiencies we identify in our reviews.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.


*Paragraph 11.  Beginning with the Monitor's first quarterly report, the Defendants, working with the unit assigned for implementation of the Order, shall file with the Court, with a copy to the Monitor and Plaintiffs, a status report no later than 30 days before the Monitor's quarterly report is due.  The Defendants' report shall (i) delineate the steps taken by the Defendants during the reporting period to implement this Order; (ii) delineate the Defendants' plans to correct any problems; and (iii) include responses to any concerns raised in the Monitor's previous quarterly report.*

**In Full and Effective Compliance**

MCSO submitted its 27th quarterly compliance report on March 16, 2021.  The report covers the steps MCSO has taken to implement the Court's Orders during the fourth quarter of 2020.  The report also includes any plans to correct difficulties encountered during the quarter and responses to concerns raised in our 26th quarterly status report.

In its report, MCSO asserted Full and Effective Compliance (FEC) with Paragraphs 39, 78, 227, 228, 229, 230, 231, 232, 233, 234, 235, 236, 238, and 239.  Paragraph 39 requires a meeting with the community no more than 40 days after any Significant Operations or Patrols, while Paragraph 78 requires that MCSO maintain all identifiable information about a deputy in the EIS for at least five years after the deputy separated from employment.  The remainder of the Paragraphs address specific aspects of misconduct investigations.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 53300

*Paragraph 12.* *The Defendants, working with the unit assigned for implementation of the Order, shall conduct a comprehensive internal assessment of their Policies and Procedures affecting Patrol Operations regarding Discriminatory Policing and unlawful detentions in the field as well as overall compliance with the Court's orders and this Order on an annual basis. The comprehensive Patrol Operations assessment shall include, but not be limited to, an analysis of collected traffic-stop and high-profile or immigration-related operations data; written Policies and Procedures; Training, as set forth in the Order; compliance with Policies and Procedures; Supervisor review; intake and investigation of civilian Complaints; conduct of internal investigations; Discipline of officers; and community relations. The first assessment shall be conducted within 180 days of the Effective Date. Results of each assessment shall be provided to the Court, the Monitor, and Plaintiffs' representatives.*

**In Full and Effective Compliance**

See Paragraph 13.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.


*Paragraph 13.* *The internal assessments prepared by the Defendants will state for the Monitor and Plaintiffs' representatives the date upon which the Defendants believe they are first in compliance with any subpart of this Order and the date on which the Defendants first assert they are in Full and Effective Compliance with the Order and the reasons for that assertion. When the Defendants first assert compliance with any subpart or Full and Effective Compliance with the Order, the Monitor shall within 30 days determine whether the Defendants are in compliance with the designated subpart(s) or in Full and Effective Compliance with the Order. If either party contests the Monitor's determination it may file an objection with the Court, from which the Court will make the determination. Thereafter, in each assessment, the Defendants will indicate with which subpart(s) of this Order it remains or has come into full compliance and the reasons therefore. The Monitor shall within 30 days thereafter make a determination as to whether the Defendants remain in Full and Effective Compliance with the Order and the reasons therefore. The Court may, at its option, order hearings on any such assessments to establish whether the Defendants are in Full and Effective Compliance with the Order or in compliance with any subpart(s).*

**In Full and Effective Compliance**

We and CID established that the schedule for the submission of comprehensive annual assessments as required by these Paragraphs will run according to MCSO's fiscal year cycle, July 1-June 30. MCSO will submit reports on or before September 15 of each year.

Consistent with this agreement, on September 16, 2020, MCSO filed with the Court its 2020 Annual Compliance Report covering the period of July 1, 2019 through June 30, 2020.

WAI 53301

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 53302

# Section 4: Policies and Procedures

**COURT ORDER V. POLICIES AND PROCEDURES**

*Paragraph 18.  MCSO shall deliver police services consistent with the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order, and with current professional standards.  In conducting its activities, MCSO shall ensure that members of the public receive equal protection of the law, without discriminating based on actual or perceived race or ethnicity, and in a manner that promotes public confidence.*

*Paragraph 19.  To further the goals in this Order, the MCSO shall conduct a comprehensive review of all Patrol Operations Policies and Procedures and make appropriate amendments to ensure that they reflect the Court's permanent injunction and this Order.*

**Phase 1:**  In compliance

- GA-1 (Development of Written Orders), most recently amended on December 31, 2020.

**Phase 2:**  In compliance

MCSO has taken steps toward a comprehensive review of its Patrol Operations Policies and Procedures in four phases.  First, on December 31, 2013, prior to my appointment as Monitor, MCSO filed with the Court all of its policies and procedures, with amendments, that MCSO believed complied with the various Paragraphs of the First Order.  Second, in the internal assessment referenced above, MCSO discussed its ongoing evaluation of Patrol Operations and its development of policies and procedures.  Third, in response to our requests, MCSO provided all of the policies and procedures it maintains are applicable to the First Order for our review and that of the Plaintiffs.  We provided our feedback, which also included the Plaintiffs' comments, on these policies on August 12, 2014.  Based on that feedback, MCSO made adjustments to many of the policies, concentrating first on the policies to be disseminated in Detentions, Arrests, and the Enforcement of Immigration-Related Laws Training; and the Bias Free Policing Training (often referred to as Fourth and Fourteenth Amendment Training) that commenced in early September.  We reviewed MCSO's updated policies and provided our approval for several on August 25, 2014.

Fourth, in discussions during 2016, MCSO requested more specific guidance on what we considered to be Patrol-related policies and procedures.  In response, we provided MCSO with a list of the Patrol-related policies for the purposes of Paragraph 19.  We included on this list policies that were not recently revised or currently under review.  Several policies required changes to comport with the First Order, Second Order, or both.  In 2018, MCSO published the last of the outstanding policies, achieving compliance with this Paragraph.

WAI 53303

*Paragraph 20.* The MCSO shall comply with and operate in accordance with the Policies and Procedures discussed in this Order and shall take all reasonable measures to ensure that all Patrol Operations personnel comply with all such Policies and Procedures.

*Paragraph 21.* The MCSO shall promulgate a new, department-wide policy or policies clearly prohibiting Discriminatory Policing and racial profiling. The policy or policies shall, at a minimum:

a.  define racial profiling as the reliance on race or ethnicity to any degree in making law enforcement decisions, except in connection with a reliable and specific suspect description;

b.  prohibit the selective enforcement or non-enforcement of the law based on race or ethnicity;

c.  prohibit the selection or rejection of particular policing tactics or strategies or locations based to any degree on race or ethnicity;

d.  specify that the presence of reasonable suspicion or probable cause to believe an individual has violated a law does not necessarily mean that an officer's action is race-neutral; and

e.  include a description of the agency's Training requirements on the topic of racial profiling in Paragraphs 48–51, data collection requirements (including video and audio recording of stops as set forth elsewhere in this Order) in Paragraphs 54–63 and oversight mechanisms to detect and prevent racial profiling, including disciplinary consequences for officers who engage in racial profiling.

**In Full and Effective Compliance**

MCSO has developed and published the policies required by Paragraph 21. MCSO distributed these policies and has trained agency personnel during the required Fourth and Fourteenth Amendment training, on an annual basis, since 2014. MCSO's implementation of these policies is covered in other Paragraphs.

On June 22, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

*Paragraph 22.* MCSO leadership and supervising Deputies and detention officers shall unequivocally and consistently reinforce to subordinates that Discriminatory Policing is unacceptable.

**Phase 1:** In compliance

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 4, 2020.

WAI 53304

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on February 25, 2021.

**Phase 2:** In compliance

With input from the Parties, the reinforcement of CP-8 (Preventing Racial and Other Bias-Based Policing) was modified to a two-step process conducted annually. MCSO describes Part 1 of the process as the following: "On an annual basis, within the first six months, supervisors will have discussions, either individual or group, and view videos from the Training library with assigned employees, Reserve deputies, and Posse members. The videos will be available through the HUB and attestation of the training will be through the HUB." Part 2 of the process as described by MCSO: "On an annual basis, within the last six months, supervisors shall ensure that all employees, reserve deputies, and Posse members complete their annual review and acknowledgment of office policy. In addition, employees will be required to view a video from the Sheriff or designee, which reinforces the policy. Acknowledgement is done through the HUB."

As an additional measure, supervisors will have the latitude to review and discuss the policy with their employees, and document the discussion in BlueTeam. MCSO will provide proof of compliance biannually, at the end of the six-month periods, when each of the elements of the process is completed. MCSO will also provide progress reports in the interim.

For the second half of 2020, MCSO provided HUB training reports for all employees and volunteers. The report documented the names of employees and Posse members who received CP-8 training for the second half of the year. The completion rate was as follows: sworn members, 98.90% completion rate; Detention members, 98.03% completion rate; Reserve members, 100% completion rate; civilian members, 96.17% completion rate; and Posse members, 96.92% completion rate. MCSO remains in compliance with this Paragraph.

*Paragraph 23. Within 30 days of the Effective Date, MCSO shall modify its Code of Conduct to prohibit MCSO Employees from utilizing County property, such as County e-mail, in a manner that discriminates against, or denigrates, anyone on the basis of race, color, or national origin.*

**In Full and Effective Compliance**

BIO uses a randomizing program to select samples for each inspection. BIO reviews CAD messages in an effort to identify compliance with CP-2 (Code of Conduct), CP-3 (Workplace Professionalism: Discrimination and Harassment), and GM-1 (Electronic Communications, Data and Voice Mail). In its submission, MCSO includes the specific nature of any potential concerns identified during the audits. We observed the processes BIO uses to conduct CAD and email audits, to ensure that we thoroughly understand the mechanics involved in conducting these audits. For CAD and email audits, we receive copies of the audits completed by BIO, the details of any violations found, and copies of the memoranda of concern or BIO Action Forms that are completed. Email and CAD/Alpha Paging Inspections are completed on a quarterly basis. For Email inspections, MCSO will inspect 50 employees per quarter, and for CAD/Alpha Paging, MCSO will inspect 15 days per quarter.

WAI 53305

For the fourth quarter of 2020, MCSO submitted CAD and Alpha Paging Inspection Report BI2020-0157, as proof of compliance with this Paragraph. MCSO selected a random sample of 15 days in the quarter for inspection. There were a total of 7,034 CAD and Alpha Paging entries for the selected dates. The inspection found that 100% of the inspected messages were in compliance with policies GM-1 (Electronic Communications, Data and Voice Mail), CP-2 (Code of Conduct), CP-3 (Workplace Professionalism: Discrimination and Harassment), and CP-8 (Preventing Racial and Other Biased-Based Profiling).

For the fourth quarter of 2020, we reviewed Employees Emails Inspection Report BI2020-0166 for compliance with this Paragraph. A total of 50 employees were selected for review, with a total of 3,417 emails inspected. The inspection found that 3,417 or 100%, of the emails were in compliance.

For the fourth quarter of 2020, MCSO did not conduct any facility inspections due to ongoing concerns with COVID-19. We will report again on facility inspections when they resume.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

*Paragraph 24. The MCSO shall ensure that its operations are not motivated by or initiated in response to requests for law enforcement action based on race or ethnicity. In deciding to take any law enforcement action, the MCSO shall not rely on any information received from the public, including through any hotline, by mail, email, phone or in person, unless the information contains evidence of a crime that is independently corroborated by the MCSO, such independent corroboration is documented in writing, and reliance on the information is consistent with all MCSO policies.*

**Phase 1:** In compliance

- GI-7 (Processing of Bias-Free Tips), published June 14, 2019.

**Phase 2:** In compliance

MCSO created the Sheriff's Intelligence Leads and Operations (SILO) Unit in the first quarter of 2016. The SILO Unit became operational on September 11, 2017. GI-7 requires that any tips received by MCSO components be forwarded to the SILO Unit for recording and processing. The SILO Unit classifies this information by the type of alleged criminal activity, or service requested, and forwards it to the appropriate Unit for action and response. In some cases, residents email or call with requests for traffic enforcement, or for MCSO to address quality-of-life issues; these are considered calls for service rather than tips on criminal activity. If the information provided pertains to criminal activity in another jurisdiction, MCSO forwards the information to the appropriate law enforcement agency and documents it in the SILO database. We review a monthly tip list report, noting the date received and a general description of each tip. We also review an audit report showing the disposition of tips received. If there is any bias noted in the information received for any tip, MCSO generally closes the tip and takes no action. We review all tips that MCSO closes due to bias.

WAI 53306

During the fourth quarter of 2020, we reviewed 341 tips submitted for October, 288 tips submitted for November, and 293 tips submitted for December. We reviewed a total of 922 tips, which were classified and recorded according to the type of alleged violation or service requested. Our reviews for this reporting period indicated that drug use and drug dealing comprised the most common type of tip called in. This was followed by tips of suspicious persons or activities. The third most frequent type of tip was information on persons who were suspected of having outstanding warrants or were suspected of being fugitives. Again, for this quarter, there were a large number of tips classified as "other." The number of tips related to COVID-19 restriction violations has decreased, but some of these suspected violations are still being called in. There we no tips closed due to bias during this reporting period. MCSO remains in compliance with this Paragraph.

### b. Policies and Procedures to Ensure Bias-Free Traffic Enforcement

**Paragraph 25.** *The MCSO will revise its policy or policies relating to traffic enforcement to ensure that those policies, at a minimum:*

a.  *prohibit racial profiling in the enforcement of traffic laws, including the selection of which vehicles to stop based to any degree on race or ethnicity, even where an officer has reasonable suspicion or probable cause to believe a violation is being or has been committed;*

b.  *provide Deputies with guidance on effective traffic enforcement, including the prioritization of traffic enforcement resources to promote public safety;*

c.  *prohibit the selection of particular communities, locations or geographic areas for targeted traffic enforcement based to any degree on the racial or ethnic composition of the community;*

d.  *prohibit the selection of which motor vehicle occupants to question or investigate based to any degree on race or ethnicity;*

e.  *prohibit the use of particular tactics or procedures on a traffic stop based on race or ethnicity;*

f.  *require deputies at the beginning of each stop, before making contact with the vehicle, to contact dispatch and state the reason for the stop, unless Exigent Circumstances make it unsafe or impracticable for the deputy to contact dispatch;*

g.  *prohibit Deputies from extending the duration of any traffic stop longer than the time that is necessary to address the original purpose for the stop and/or to resolve any apparent criminal violation for which the Deputy has or acquires reasonable suspicion or probable cause to believe has been committed or is being committed;*

h.  *require the duration of each traffic stop to be recorded;*

i.  *provide Deputies with a list and/or description of forms of identification deemed acceptable for drivers and passengers (in circumstances where identification is required*

WAI 53307

*of them) who are unable to present a driver's license or other state-issued identification; and*

j.    *instruct Deputies that they are not to ask for the Social Security number or card of any motorist who has provided a valid form of identification, unless it is needed to complete a citation or report.*

**Phase 1:** In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on February 25, 2021.

- EB-2 (Traffic Stop Data Collection), most recently amended on January 7, 2020.

- GI-1 (Radio and Enforcement Communications Procedures), most recently amended on December 31, 2020.

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 4, 2020.

- EA-11 (Arrest Procedures), most recently amended on May 13, 2020.

**Phase 2:** In compliance

During the finalization of the Fourth and Fourteenth Amendment training curricula required by the Order, the Parties agreed to a list and/or description of forms of identification deemed acceptable for drivers and passengers, as required by this Paragraph. The data required for verification to ensure compliance with these policies is captured by the TraCS system. The system documents the requirements of the Order and MCSO policies. MCSO has continued to make technical changes to the TraCS system to ensure that the mandatory fields on the forms used to collect the data are completed and that deputies are capturing the required information. TraCS is a robust system that allows MCSO to make technical changes to improve how required information is captured.

To verify Phase 2 compliance with this Paragraph, we reviewed MCSO's Vehicle Stop Contact Form (VSCF), Vehicle Stop Contact Form Supplemental Sheet, Incidental Contact Receipt, Written Warning/Repair Form, Arizona Traffic Ticket and Complaint Form, Internet I/Viewer Event Form, Justice Web Interface Form, CAD printout, and any Incident Report generated by the traffic stop. MCSO created many of these forms to capture the requirements of Paragraphs 25 and 54.

Since our July 2015 site visit, there has been significant improvement in the TraCS system that has enhanced the reliability and validity of the data provided by MCSO. This improvement has been buttressed by the introduction of data quality control procedures now being implemented and memorialized in the EIU Operations Manual. (This is further discussed in Paragraph 56, below.) We also compared traffic stop data between Latino and non-Latino drivers in the samples provided to us.

WAI 53308

Paragraph 25.a. prohibits racial profiling in the enforcement of traffic laws, including the selection of which vehicles to stop based to any degree on race or ethnicity, even where a deputy has reasonable suspicion or probable cause to believe a violation is being or has been committed. The selection of the sample size and the sampling methodology employed for drawing our sample is detailed in Section 7: Traffic Stop Documentation and Data Collection.

We review a sample of 105 traffic stops each reporting period to assess this requirement. Our review of the sample of 105 traffic stops that occurred during this reporting period in Districts 1, 2, 3, 4, 6, and 7, and Lake Patrol indicated that MCSO was following protocol, and that the stops did not violate the Order or internal policies. Paragraphs 66 and 67 require an annual comprehensive analysis of all traffic stop data, which will more accurately determine if MCSO is meeting the requirements of this Paragraph. MCSO remains in compliance with this Subparagraph.

Paragraph 25.b. requires MCSO to provide deputies with guidance on effective traffic enforcement, including the prioritization of traffic enforcement resources to promote public safety. EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), Sections A-E, address these concerns. The policy specifies that driving under the influence and speeding are the main causes of accidents, and should be the focus of traffic enforcement. Based on our review of the data provided for this reporting period, the most common traffic stop violations are as follows: 59 stops for speed above the posted limit (55%); 12 stops for equipment violations (11%); 11 stops for failure to obey official traffic control devices (10%); 11 stops for failure to possess valid registrations or tags (10%); 10 stops for other moving violations (9%); and four stops for failing to maintain a lane of traffic (4%).

As the policy specifically identifies speeding violations as one of the contributing factors of traffic accidents, MCSO deputies have targeted this violation. In our review, we break down the specific traffic violation for each stop and use each traffic stop form completed by deputies during the stop to make a determination if the stop is justified and fulfills the requirements of this Paragraph. MCSO remains in compliance with this Subparagraph.

Paragraph 25.c. requires MCSO to prohibit the selection of particular communities, locations, or geographic areas for targeted traffic enforcement based to any degree on the racial or ethnic composition of the community. During our inspection, we document the location of every stop and note the GPS coordinates if available. Our review of the sample data covering all MCSO Districts during this reporting period did not indicate that MCSO was targeting any specific area or ethnicity to conduct traffic stops.

MCSO remains in compliance with this Subparagraph.

Paragraph 25.d. requires MCSO to prohibit the selection of which motor vehicle occupants to question or investigate based, to any degree, on race or ethnicity. We reviewed the demographic data of Maricopa County (according to 2018 U.S. Census data, 31.1% of the population is Latino), and found that the ratio of Latino drivers stopped during this reporting period was lower than in the past reporting period in comparison to the ethnicity of the population in the County. (See Paragraph 54.e.) Twenty (39%) of the 51 stops where passenger contacts occurred involved Latino drivers.

WAI 53309

A review of complaints from the public for this reporting period did not reveal that any complaints were filed alleging that MCSO deputies selected motor vehicle occupants for questioning or investigation, based on the individual's race or ethnicity.

MCSO has fully implemented body-worn cameras, and we review a sample of the recordings each reporting period to verify if deputies are questioning occupants to determine if they are legally in the country. We did not identify any such events during this reporting period.

During this reporting period, we observed that 49 of the 105 stops occurred during nighttime hours. Our review of the sample data indicated that generally, traffic stops were not based on race or ethnicity and reflected the general makeup of the population of the County. In most instances, the deputies document on the VSCF that they were unable to determine the race/ethnicity and gender of the vehicle occupants prior to the stop. MCSO is in compliance with this Subparagraph.

Paragraph 25.e. requires MCSO to prohibit the use of particular tactics or procedures on a traffic stop based on race or ethnicity. We reviewed a sample of CAD audio recordings and CAD printouts where the dispatcher entered the reason for the stop when advised by the deputy in the field. We also reviewed body-worn camera recordings of deputies making traffic stops. The methodology that we employed to select our cases is described in detail in Section 7. In the cases we reviewed, the CAD audio recordings and the body-worn camera recordings revealed that deputies were not making traffic stops using tactics based on race or ethnicity. MCSO remains in compliance with this Subparagraph.

Paragraph 25.f. requires deputies at the beginning of each stop, before making contact with the vehicle, to verbally contact dispatch and state the reason for the stop unless exigent circumstances make it unsafe for the deputy to contact Communications. When the deputy advises Communications of the location, tag number, and reason for the stop, this information is digitally logged on the CAD printout and it is audio recorded. (See Paragraph 54.e.) We reviewed 30 CAD audio recordings and the CAD printouts; in each, the deputy advised dispatch of the reason for the stop. Through our reviews of BWC recordings and CAD printouts, we verified that the reason for the stop was voiced prior to making contact with the drivers in 30 of the 30 cases we reviewed. For the 75 other cases that were part of our sample, we reviewed the VSCFs and the CAD printouts to ensure that deputies properly advised dispatch of the reason for the stop prior to making contact with the violator. In all 75 stops, the deputy properly advised dispatch the reason for the stop. MCSO is in compliance with this Subparagraph.

Paragraph 25.g. prohibits deputies from extending the duration of any traffic stop longer than the time that is necessary to address the original purpose for the stop and/or to resolve any apparent criminal violation for which the deputy has or acquires reasonable suspicion or probable cause to believe has been committed or is being committed. MCSO employs a series of five questions on the VSCF to document the circumstances that might require a stop to be prolonged. In our review of 105 traffic stops, we determined that MCSO documented a response to at least one of the series of five questions in six of the stops. Our review of those stops revealed that, in seven instances, deputies indicated that they experienced technological difficulties. The duration of those seven stops ranged from 12 minutes to 34 minutes. There were two stops that involved a driving under the influence investigation. The duration of those seven stops ranged from one hour and 59

WAI 53310

minutes to two hours and 12 minutes. There were two stops that involved training. The duration of those two stops was from 14 minutes to 18 minutes. There was one stop that involved a language barrier. The duration of that stop was 28 minutes. There was one stop that involved the towing of a vehicle and a driving under the influence investigation. The duration of that stop was two hours and 42 minutes.

MCSO remains in compliance with this Subparagraph.

Paragraph 25.h. requires the duration of each traffic stop to be recorded. The time of the stop and its termination is now auto-populated on the VSCF by the CAD system. To ensure data entry accuracy, MCSO implemented a technical change to the TraCS system on November 29, 2016. The change automatically creates a red field in the stop contact times if the deputy manually changes these times on the VSCF. In our review, we determined that the duration was recorded accurately in all 105 traffic stops. MCSO is in compliance with this Subparagraph, with a compliance rate of 100%.

Paragraph 25.i. requires that MCSO provide deputies with a list and/or description of forms of identification deemed acceptable for drivers and passengers (in circumstances where identification is required of them) who are unable to present a driver's license or other state-issued identification. The Plaintiffs' attorneys and MCSO agreed on acceptable forms of identification, and this information has been included in the Fourth and Fourteenth Amendment training. EA-11 (Arrest Procedures), most recently amended on May 13, 2020, provides a list of acceptable forms of identification if a valid driver's license cannot be produced. During this reporting period's review of the sample of 105 traffic stops, we identified nine cases where the drivers did not present a valid driver's license to the deputies. In two of the cases, the deputies were able to confirm that the drivers' licenses were, in fact, valid. The remaining seven cases are described in detail below:

- A Latino driver was stopped for driving with a trailer without operational taillights. The vehicle was occupied by a Latino passenger. The driver did not have any identification on his person. A records check revealed that his driver's license was in a suspended status. The driver was issued a citation for driving without operational tail lights on the trailer and driving with a suspended driver's license.

- An Asian or Pacific Islander male driver was stopped for a speeding violation. The driver presented an Arizona driver's license. A records check revealed that the license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license.

- A Black male driver was stopped for a speeding violation. The driver did not have any identification on his person. A records check revealed that the driver did not have a valid driver's license. The driver was issued a citation for driving without a valid driver's license.

WAI 53311

- A Latino driver was stopped for a speeding violation. The driver presented an Arizona identification card. A records check revealed that the driver did not have a valid driver's license. The driver was issued a citation for speeding, no evidence of insurance, no registration, and driving without a valid driver's license.

- A Latino driver was stopped for failing to maintain a lane of traffic. The driver presented an Arizona identification card. A records check revealed that the driver's license was in a suspended status. The driver was arrested for driving under the influence. The driver was issued a citation for driving with a suspended driver's license and no evidence of insurance, and operating a vehicle without an interlock (breathalyzer) device. The deputy prepared a report for the review by the Maricopa County Attorney's Office of potential charges for driving under the influence.

- A Black male driver was stopped for a speeding violation. The driver did not have any identification on his person. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for speeding, driving with a suspended driver's license, and no registration.

- A Latina driver was stopped for driving without a visible license plate. The vehicle was occupied by a Latino passenger. The driver did not have any identification on her person. A records check revealed that she did not have a valid driver's license. The driver was issued a citation for driving with no license plate and driving without a valid driver's license.

In our review of the sample of cases to assess compliance with Paragraph 54.k., searches of persons, we identified 20 cases where the drivers did not present a valid driver's license to the deputies. In seven of the cases, the deputies were able to confirm that the drivers' licenses were, in fact, valid. The remaining 13 cases are described in detail below:

- A white male driver was stopped for driving a motorcycle without a license plate. The driver produced an Arizona driver's license, and a records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license, no evidence of insurance, and no registration.

- A white male driver was stopped for a stop sign violation. The driver presented an Arizona identification card, and a records check revealed that the driver's license was in an expired status. The driver was arrested and processed for driving under the influence. The driver was issued a citation for driving without a valid driver's license and driving under the influence.

- A white female driver was stopped for a stop sign violation. The driver did not have any identification on her person, and a records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license and failing to stop at a stop sign.

WAI 53312

- A white male driver was stopped for a speeding violation. The driver presented an Arizona identification card, and records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license and a warning for the speeding violation.

- A Latino driver was stopped for a stop sign violation. The driver produced a Mexican passport for identification purposes, and a records check revealed that the driver had not obtained a driver's license. The driver was arrested and processed for driving under the influence. The driver was issued a citation for driving under the influence, failing to stop at a stop sign, and driving without a valid driver's license.

- A white male driver was stopped for driving without a visible license plate. The driver did not have any identification on his person. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license, no evidence of insurance, and failure to display a license plate on a motor vehicle.

- A white female driver was stopped for driving with an expired registration. The driver did not have any identification on her person. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license and not having a current registration.

- A Latino driver was stopped for driving with one headlight. The driver presented an Arizona driver's license, and informed the deputy that the license was in a suspended status. A records check confirmed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license.

- A Black male driver was stopped for reckless driving. The driver did not have any identification on his person, and initially provided the deputy with a false name. Once the deputy obtained the driver's true identity, a records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license and reckless driving.

- A Black male driver was stopped for a speeding violation. The driver did not have any identification on his person. A records check revealed that the driver had not obtained a driver's license. The driver was issued a citation for speeding and driving without a valid driver's license.

- A white male driver was stopped for driving with a fictitious license plate. The driver did not have any identification on his person. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license.

- A white female driver was stopped for a stop sign violation. The driver presented an Arizona driver's license. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for the stop sign violation, driving with a suspended driver's license, and displaying a fictitious license plate.

WAI 53313

- A Latino driver was stopped for a speeding violation. The driver did not have any identification on his person. A records check revealed that he did not have a valid driver's license. The driver was arrested for outstanding warrants. The driver was issued a citation driving without a valid driver's license and issued a warning for the speeding violation.

In our review of the sample of cases to assess compliance with Paragraphs 25.d. and 54.g., passenger contacts, we identified 32 cases where the drivers did not present a valid driver's license to the deputies. In six of the cases, the deputies were able to confirm that the driver's licenses were, in fact, valid. The remaining 26 cases are described in detail below:

- A white male driver was stopped for a stop sign violation. The vehicle was occupied by a white male passenger. The driver presented an Arizona identification card. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license.

- A 15-year-old Latino driver was stopped for failing to maintain a lane of traffic. The vehicle was occupied by a Latino passenger. The driver did not have any identification on his person. A records check revealed that the driver had never obtained a driver's license or learner's permit. The driver was issued a citation for failing to maintain a lane of traffic and driving without a valid driver's license.

- A white male driver was stopped for a stop sign violation. The vehicle was occupied by a two white female passengers. The driver did not have any identification on his person. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license.

- A white male driver was stopped for a speeding violation. The vehicle was occupied by a white female passenger. The driver presented an Arizona driver's license. A records check revealed that the driver's license was in a suspended status. The driver was arrested and processed for driving under the influence. The driver was issued a citation an Incidental Contact Receipt. The deputy prepared a report for the review by the Maricopa County Attorney's Office of potential charges for driving under the influence.

- A Latino driver was stopped for failing to maintain a lane of traffic. The vehicle was occupied by a Latina passenger. The driver did not have any identification on his person. A records check revealed that the driver had never obtained a driver's license. The driver was arrested and processed for driving under the influence. The driver was issued a citation for failing to maintain a lane of traffic and driving without a valid driver's license. The deputy prepared a report for the review by the Maricopa County Attorney's Office of potential charges for driving under the influence.

- A Latina driver was stopped for a speeding violation. The vehicle was occupied by a Latina passenger. The driver presented an Arizona driver's license. A records check revealed that the driver's license was in an expired status. The driver was issued a warning for the speeding violation.

WAI 53314

- A Latino driver was stopped for a speeding violation. The vehicle was occupied by a Latina passenger. The driver presented an Arizona identification card. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license and speeding.

- A white male driver was stopped for driving with one headlight. The vehicle was occupied by a white male passenger and a white female passenger. The driver presented an Arizona identification card. A records check revealed that the driver had never obtained a driver's license. The driver was issued a citation for driving without a valid driver's license, without evidence of insurance, and without registration.

- A Latino driver was stopped for a speeding violation. The vehicle was occupied by two Latino passengers. The driver presented an Arizona identification card, and a records check revealed that the driver's license was in a suspended status. The driver was arrested and processed for driving under the influence. The driver was issued a citation. The deputy prepared a report for the review by the Maricopa County Attorney's Office of potential charges for driving under the influence.

- A Latino driver was stopped for failing to signal prior to making a right turn. The vehicle was occupied by a Latino passenger. The driver presented an Arizona identification card. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license.

- A Latino driver was stopped for failing to wear a seat belt device. The vehicle was occupied by a Latina passenger. The driver did not have any identification on his person, and a records check revealed that the driver had never obtained a driver's license. The driver was issued a citation for driving without a valid driver's license and failure to wear a seat belt.

- A Latino driver was stopped for making a prohibited left turn. The vehicle was occupied by a Latina passenger. The driver presented a paper copy of an Arizona identification card, and a records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license and for making a prohibited left turn.

- A Black male driver was stopped for passing in a no passing zone. The vehicle was occupied by two Black male passengers and a Black female passenger. The driver produced an Alabama driver's license, and a records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license.

- A Latino driver was stopped for a speeding violation. The vehicle was occupied by a Latino passenger. The driver did not have any identification on his person, and a records check revealed that the driver's license was in a suspended status. The driver was arrested and processed for driving under the influence. The deputy prepared a report for the review by the Maricopa County Attorney's Office of potential charges for driving under the influence.

WAI 53315

- A Black male driver was stopped for a stop sign violation. The vehicle was occupied by a Black female passenger. The driver did not have any identification on his person, and a records check revealed that the driver had never obtained a driver's license. The driver was issued a citation for driving without a valid driver's license, a stop sign violation, and no evidence of insurance.

- A Latino driver was stopped for driving with an expired license plate. The driver produced a Mexican passport for identification purposes. The driver stated that he has a valid Mexican driver's license. The deputy was unable to determine if the driver had a valid driver's license from Mexico. The deputy noted that the license plate sticker obscured one of the numbers on the license plate, causing the deputy to misread the license plate information. It was determined that the license plate was not expired. The driver was issued a warning for driving with an obscured license plate.

- A Latino driver was stopped for a stop sign violation. The vehicle was occupied by a Latina passenger, a Latino passenger, and a Latino infant passenger, unknown gender. The driver did not have any identification on his person, and a records check revealed that the driver had never obtained a driver's license. The driver was issued a citation for driving without a valid driver's license and for a stop sign violation.

- A Black female driver was stopped for driving with an expired license plate. The vehicle was occupied by two Black female passengers and one Black male passenger. The driver presented an Arizona identification card, and a records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license, no registration, and no evidence of insurance.

- A 16-year-old Black male driver, was stopped for failing to maintain a lane of traffic. The vehicle was occupied by a Black male passenger, the driver's older brother. The driver did not have any identification on his person. The driver's brother explained that he was teaching his brother to drive. A records check revealed that the driver had never obtained a driver's license or learner's permit. The driver was issued a warning for failure to maintain a lane of traffic.

- An American Indian/Alaskan Native male driver was stopped for making a prohibited left turn. The vehicle was occupied by a Latina passenger. The driver presented an Arizona identification card, and a records check revealed that the driver's license was in a suspended status. The driver was arrested and processed for driving under the influence. The deputy prepared a report for the review by the Maricopa County Attorney's Office of potential charges for driving under the influence.

- A 15-year-old white male driver was stopped for reckless driving. The vehicle was occupied by a Latina passenger, a white male passenger, and two white female passengers. The driver did not have any identification on his person. A records check revealed that he did not have a driver's license or a leaner's permit. The driver was arrested for reckless driving and driving under the influence. The driver was provided with an Incidental Contact Form. The deputy prepared a report for the review by the Maricopa County Attorney's Office of potential charges for driving under the influence.

WAI 53316

- A Latina driver was stopped for driving with no headlights and taillights activated. The vehicle was occupied by a Black male passenger. The driver did not have any identification on her person, and a records check revealed that the driver had never obtained a driver's license. The driver, who was nine months pregnant, was issued a warning for driving without the headlights and taillights activated.

- A white male driver was stopped for driving with a fictitious license plate. The vehicle was occupied by a white female passenger. The driver produced an Arizona driver's license, and a records check revealed that the driver's license was in a suspended status. The driver was arrested and processed for driving with a fictitious license plate and driving with multiple suspensions on his driver's license. The driver was issued a citation for driving with a fictitious license plate, driving with a suspended driver's license, and no evidence of insurance.

- A white male driver was stopped for failing to maintain a lane of traffic. The vehicle was occupied by a white female passenger. The driver produced an Arizona driver's license, and a records check revealed that the driver's license was in a suspended status. The driver was arrested for an outstanding warrant. The driver was issued a citation for driving with a suspended driver's license.

- A white female passenger was stopped for driving with no headlights activated. The vehicle was occupied by a white male passenger. The driver presented an Arizona identification card for identification purposes, and a records check revealed that the driver had never obtained a driver's license. The driver was issued a warning for driving without the headlights activated.

- A Latina driver was stopped for driving with no license plate light. The vehicle was occupied by two Latino passengers. The driver produced an Arizona driver's license. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license, no evidence of insurance, and no registration.

MCSO remains in compliance with this Subparagraph.

Paragraph 25.j. requires MCSO to instruct deputies that they are not to ask for the Social Security Number or card of any motorist who has provided a valid form of identification, unless it is needed to complete a citation or report. EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) prohibits deputies from asking for the Social Security Number of any motorist who has provided a valid form of identification. During this reporting period's review of the sample of 105 traffic stops, we identified that deputies requested a driver's Social Security Number in incidents that either involved the arrest of the driver for the purpose of completing an Incident Report, or incidents where the driver did not produce a valid form of identification, both of which are permissible under this Subparagraph.

WAI 53317

During our review of the sample of traffic stops reviewed for Paragraph 54.k. and Paragraphs 25.d. and 54.g. during this reporting period, we identified that deputies requested a driver's Social Security Number in incidents that either involved the arrest of the driver for the purpose of completing an Incident Report, or incidents where the driver did not produce a valid form of identification, both of which are permissible under this Subparagraph.

MCSO remains in compliance with this Subparagraph.

**Paragraph 26.** *The MCSO shall revise its policy or policies relating to Investigatory Detentions and arrests to ensure that those policies, at a minimum:*

a. *require that Deputies have reasonable suspicion that a person is engaged in, has committed, or is about to commit, a crime before initiating an investigatory seizure;*

b. *require that Deputies have probable cause to believe that a person is engaged in, has committed, or is about to commit, a crime before initiating an arrest;*

c. *provide Deputies with guidance on factors to be considered in deciding whether to cite and release an individual for a criminal violation or whether to make an arrest;*

d. *require Deputies to notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration-Related Crime, or for any crime by a vehicle passenger related to lack of an identity document;*

e. *prohibit the use of a person's race or ethnicity as a factor in establishing reasonable suspicion or probable cause to believe a person has, is, or will commit a crime, except as part of a reliable and specific suspect description; and*

f. *prohibit the use of quotas, whether formal or informal, for stops, citations, detentions, or arrests (though this requirement shall not be construed to prohibit the MCSO from reviewing Deputy activity for the purpose of assessing a Deputy's overall effectiveness or whether the Deputy may be engaging in unconstitutional policing).*

**In Full and Effective Compliance**

To assess compliance with Paragraph 26, we request documentation of arrests and investigations associated with the requirements specified in this Paragraph. In addition to the review of any reported cases, we receive booking lists and criminal citation lists for each month of the reporting period, and request a random sample of cases to review.

For the fourth quarter of 2020, MCSO did not report any arrests or investigatory detentions that would fall under the reporting requirements of this Paragraph. For this reporting period, we requested and reviewed 20 bookings and 20 criminal citations for each month of the quarter. In total, we reviewed 60 incidents resulting in arrest and 60 incidents in which criminal citations were issued. In addition, we reviewed 261 Incident Reports for the quarter. All of the documentation we reviewed during this reporting period indicates that MCSO is in compliance with this Paragraph.

WAI 53318

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

### d. Policies and Procedures Governing the Enforcement of Immigration-Related Laws

**Paragraph 27.** *The MCSO shall remove discussion of its LEAR Policy from all agency written Policies and Procedures, except that the agency may mention the LEAR Policy in order to clarify that it is discontinued.*

### In Full and Effective Compliance

MCSO asserts that it does not have an agency LEAR policy. We have verified, through our document reviews and site compliance visits, that MCSO does not have a LEAR policy.

On March 22, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 28.** *The MCSO shall promulgate a new policy or policies, or will revise its existing policy or policies, relating to the enforcement of Immigration-Related Laws to ensure that they, at a minimum:*

a.  *specify that unauthorized presence in the United States is not a crime and does not itself constitute reasonable suspicion or probable cause to believe that a person has committed or is committing any crime;*

b.  *prohibit officers from detaining any individual based on actual or suspected "unlawful presence," without something more; prohibit officers from initiating a pre-textual vehicle stop where an officer has reasonable suspicion or probable cause to believe a traffic or equipment violation has been or is being committed in order to determine whether the driver or passengers are unlawfully present;*

c.  *prohibit the Deputies from relying on race or apparent Latino ancestry to any degree to select whom to stop or to investigate for an Immigration-Related Crime (except in connection with a specific suspect description); prohibit Deputies from relying on a suspect's speaking Spanish, or speaking English with an accent, or appearance as a day laborer as a factor in developing reasonable suspicion or probable cause to believe a person has committed or is committing any crime, or reasonable suspicion to believe that an individual is in the country without authorization;*

d.  *unless the officer has reasonable suspicion that the person is in the country unlawfully and probable cause to believe the individual has committed or is committing a crime, the MCSO shall prohibit officers from (a) questioning any individual as to his/her alienage or immigration status; (b) investigating an individual's identity or searching the individual in order to develop evidence of unlawful status; or (c) detaining an individual while contacting ICE/CBP with an inquiry about immigration status or awaiting a*

WAI 53319

*response from ICE/CBP. In such cases, the officer must still comply with Paragraph 25(g) of this Order. Notwithstanding the foregoing, an officer may (a) briefly question an individual as to his/her alienage or immigration status; (b) contact ICE/CBP and await a response from federal authorities if the officer has reasonable suspicion to believe the person is in the country unlawfully and reasonable suspicion to believe the person is engaged in an Immigration-Related Crime for which unlawful immigration status is an element, so long as doing so does not unreasonably extend the stop in violation of Paragraph 25(g) of this Order;*

e. *prohibit Deputies from transporting or delivering an individual to ICE/CBP custody from a traffic stop unless a request to do so has been voluntarily made by the individual;*

f. *Require that, before any questioning as to alienage or immigration status or any contact with ICE/CBP is initiated, an officer check with a Supervisor to ensure that the circumstances justify such an action under MCSO policy and receive approval to proceed. Officers must also document, in every such case, (a) the reason(s) for making the immigration-status inquiry or contacting ICE/CBP, (b) the time approval was received, (c) when ICE/CBP was contacted, (d) the time it took to receive a response from ICE/CBP, if applicable, and (e) whether the individual was then transferred to ICE/CBP custody.*

## In Full and Effective Compliance

For this reporting period, there were no reported instances of deputies having contact with Immigration and Customs Enforcement (ICE) or Customs and Border Protection (CBP) for the purpose of making an immigration status inquiry, and there were no reported arrests for any immigration-related investigations, or for any immigration-related crimes. The reviews of documentation submitted for this reporting period indicate that MCSO has complied with the reporting requirements related to Paragraph 28. In our reviews of incidents involving contact with the public, including traffic stops, arrests, and investigative stops, we monitor deputies' actions to verify compliance with this Order.

In addition to the documentation requested from MCSO, to determine compliance with this Paragraph, our reviews of documentation provided for other Paragraphs of the Order have found no evidence to indicate a violation of this Paragraph. In total, we reviewed 60 Arrest Reports, 60 criminal citations, 291 traffic stops, 75 NTCFs, and 261 Incident Reports for this reporting period. We found no issues of concern, as it relates to this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 53320

### e. Policies and Procedures Generally

***Paragraph 29.*** *MCSO Policies and Procedures shall define terms clearly, comply with applicable law and the requirements of this Order, and comport with current professional standards.*

**In Full and Effective Compliance**

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

See Paragraph 30.


***Paragraph 30.*** *Unless otherwise noted, the MCSO shall submit all Policies and Procedures and amendments to Policies and Procedures provided for by this Order to the Monitor for review within 90 days of the Effective Date pursuant to the process described in Section IV. These Policies and Procedures shall be approved by the Monitor or the Court prior to their implementation.*

**In Full and Effective Compliance**

MCSO continues to provide us, the Plaintiffs' attorneys, and the Plaintiff-Intervenors with drafts of its Order-related policies and procedures prior to publication, as required by the Order. We, the Plaintiffs' attorneys, and the Plaintiff-Intervenors review the policies to ensure that they define terms clearly, comply with applicable law and the requirements of the Order, and comport with current professional standards. Once drafts are finalized, incorporating feedback from us, Plaintiffs' attorneys, and the Plaintiff-Intervenors, MCSO provides them to us for final review and approval. As this process has been followed for the Order-related policies published thus far, MCSO is in compliance with this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.


***Paragraph 31.*** *Within 60 days after such approval, MCSO shall ensure that all relevant MCSO Patrol Operation Personnel have received, read, and understand their responsibilities pursuant to the Policy or Procedure. The MCSO shall ensure that personnel continue to be regularly notified of any new Policies and Procedures or changes to Policies and Procedures. The Monitor shall assess and report to the Court and the Parties on whether he/she believes relevant personnel are provided sufficient notification of and access to, and understand each policy or procedure as necessary to fulfill their responsibilities.*

**In Full and Effective Compliance**

WAI 53321

GA-1 indicates that Office personnel shall be notified of new policies and changes to existing policies via Briefing Boards and via the HUB, Maricopa County's adaptation of the online training software program, Cornerstone, that MCSO implemented in July 2017 to replace its E-Policy system. Employees are required to complete personal attestations that indicate that they have read and understand policies; the HUB routinely updates recent training and policy reviews for deputies and is visible by immediate supervisors. Per GA-1, "Prior to some policies being revised, time-sensitive changes are often announced in the Briefing Board until the entire policy can be revised and finalized." As noted previously, we recognize the authority of Briefing Boards and understand their utility in publishing critical policy changes quickly; but we have advised MCSO that we generally do not grant Phase 1 compliance for an Order requirement until the requirement is memorialized in a more formal policy.

During this reporting period, MCSO issued (or issued revisions of) three Order-related policies: GA-1 (Development of Written Orders); GF-3 (Criminal History Record Information and Public Records); and GI-1 (Radio and Enforcement Communications Procedures). During this reporting period, MCSO also issued several Briefing Boards and Administrative Broadcasts that touched on Order-related topics and revised the language of General Orders. MCSO did not publish any Order-related operations manuals during this reporting period.

On September 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 32.** *The MCSO shall require that all Patrol Operation personnel report violations of policy; that Supervisors of all ranks shall be held accountable for identifying and responding to policy or procedure violations by personnel under their command; and that personnel be held accountable for policy and procedural violations. The MCSO shall apply policies uniformly.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on July 30, 2020.
- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on March 4, 2021.
- CP-5 (Truthfulness), most recently amended on September 11, 2020.
- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.
- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- GC-16 (Employee Grievance Procedures), most recently amended on April 7, 2020.
- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.
- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

WAI 53322

**Phase 2:** Not in compliance

Since we began reviewing internal investigations conducted by MCSO, we have reviewed hundreds of administrative misconduct investigations submitted to our Team for this Paragraph. During our reviews, we have continued to note that the investigations conducted by PSB have consistently been thorough and well-written, and arrived at the appropriate findings. Compliance for investigations conducted at the District level, which had decreased for multiple reporting periods, has seen some improvement in the investigative quality of those cases we reviewed for this and the last two reporting periods.

During our site visits, we have met with the Professional Standards Bureau (PSB) and District and Division Command personnel to provide them with information regarding the cases that were deficient in structure, format, investigation, or reporting requirements. We have also highlighted cases we found to be properly investigated and in compliance with Order requirements. In 2016, PSB developed and implemented the use of an investigative checklist and specific format for the completion of internal investigations. MCSO trained all supervisors who conduct investigations in the use of these documents. Since June 1, 2016, the use of these investigative protocol documents has been required for all administrative investigations.

PSB personnel have remained responsive to our feedback, and the investigations they submit for compliance with this Paragraph continue to be examples of complete and thorough investigations. PSB's reviews of investigations conducted by District personnel continue to be thorough and they have identified and addressed many concerns and deficiencies they have found.

We have continued to be concerned with District case compliance, particularly because MCSO has been conducting misconduct investigations under the Court's Second Order since 2016. In 2017, MCSO made major revisions to both GH-2 (Internal Investigations) and GC-16 (Employee Grievance Procedures). By the end of December 2017, all supervisory personnel responsible for conducting misconduct investigations had attended the 40-hour Misconduct Investigative Training. Since the initial training, supervisors have attended additional training on the proper completion of these investigations.

During this reporting period, there were 35 investigations conducted by District personnel that were submitted for our review. Of the 35 submitted for this Paragraph, we or PSB identified investigative and administrative deficiencies with 13 (37%), not including extension concerns. Numerous investigations were returned to District personnel by PSB to address improper findings, leading questions, insufficient investigations, or multiple administrative errors.

During our site visits, our Team has made numerous visits to MCSO Districts, where we have discussed the completion of administrative misconduct investigations by District personnel. We have specifically discussed those areas of the investigations where we continue to find deficiencies and have provided input regarding the proper completion of investigations. We have also sought information from District supervisors regarding their experience with the investigation process and any ongoing concerns they may have.

WAI 53323

During our visits to Districts 1, 2, and 6 in January 2020, District supervisors identified several reasons for ongoing deficiencies including lower experience level of supervisors due to the number of promotions being made, and the continuing need to balance administrative time with time out on the street supervising their personnel. In one District, personnel had added a second supervisor to observe interviews and had questions prepared and reviewed in advance of interviews. Personnel had also added an additional level of review in the District, prior to sending the investigations to PSB. We were encouraged by these efforts, and hopeful that the investigative process would improve as a result.

Since March 2018, we have requested and reviewed a monthly report from District Command personnel that documents any actions they have taken to assist their personnel in the completion of administrative misconduct investigations and any actions they have taken to address any deficiencies they have identified. During the last reporting period, we noted multiple instances where District Command personnel identified and addressed deficiencies in investigations conducted by their personnel, and several additional instances where Deputy Chiefs met with District Command personnel to address deficient investigations.

During this reporting period, we continued to observe instances where District Command personnel identified and addressed deficiencies in investigations by their personnel prior to forwarding the investigations to PSB. While again, in some cases, the deficiencies could not be corrected after the fact, we continue to be encouraged by these efforts. We also noted several instances where Deputy Chiefs met with District command personnel to address deficiencies in administrative investigations. We note, however, that again for this reporting period, PSB identified the majority of the deficiencies upon its review of the District investigations.

As we have continued to note, timely corrective actions are critical to ensuring that concerns are addressed and resolved before additional deficiencies of the same kind occur. During the last reporting period we noted that the tracking document maintained by PSB continued to list multiple deficiency memorandums authored by PSB personnel for District investigations between March and October 2020 that were still pending resolution. We documented this in our report and brought it to the attention of MCSO during our January 2021 remote site visit. Since that time, MCSO has addressed all of the delinquent deficiency memorandums and documented their actions. We will continue to closely monitor both interventions and deficiency memos, and continue to encourage Executive Staff and Command personnel to address deficiencies that have been identified in a timely manner

During the last reporting period, we reviewed all 68 administrative misconduct investigations submitted for compliance with this Paragraph and made our compliance findings based on the investigative and administrative requirements for the completion of these investigations. District supervisors completed 55 investigations. Fifteen (28%) were found in compliance. PSB conducted the remaining 15. Three (20%) of these 15 investigations were in compliance.

During this reporting period, we reviewed all 42 administrative misconduct investigations submitted for compliance with this Paragraph. PSB conducted seven of these investigations, and District personnel conducted the remaining 35. Sworn supervisors with the rank of sergeant or higher completed all the investigations conducted at the District level. There were 76 potential policy violations included in the 42 cases. Thirty-six of the investigations resulted from external

WAI 53324

complaints, and six were internally generated. All but one of the 42 investigations were initiated after May 17, 2017, when MCSO revised all of its internal investigation policies; and after the completion of the 40-hour Misconduct Investigative training that concluded in late 2017.

Of the 42 administrative investigations we reviewed for this Paragraph, 15 resulted in sustained findings against one or more employees. We concur with the sustained findings in all 15 of these investigations. In three, all involved employees resigned prior to the completion of the investigation or disciplinary process. Discipline in the 12 remaining cases involved 15 employees and included four coachings, six written reprimands, and five suspensions. In all 12, the PSB Commander properly identified the category and offense number, as well as the presumptive discipline or range of discipline for the sustained allegations. The Appointing Authority did not overturn any of the findings, but in five mitigated the final discipline within the range. We agree with his decision to do so in all five cases.

District personnel outside PSB conducted 35 of the investigations that MCSO submitted for review for this Paragraph. All were completed after July 20, 2016. Seven of the investigations were noncompliant due to improper findings or leading questions; four of the investigations were not thoroughly conducted; and in two, there were numerous administrative deficiencies. We did not identify any instances where a District investigation failed to appropriately address a training or policy concern during this reporting period. Where appropriate, deficient cases were returned to the Districts by PSB for additional investigation or corrections. All but one of the cases investigated by District personnel this reporting period were initiated after several years of working under the requirements of the Court Orders, after training in how to conduct misconduct investigations (the 40-hour Misconduct Investigative Training completed in late 2017), and after numerous site visit meetings where our Team has identified the same kinds of deficiencies we again found during this reporting period.

During this and the last two reporting periods, we have met with the Deputy Chiefs responsible for oversight of Districts and Divisions outside of PSB during our remote site visits to discuss our concerns with the quality of investigations being conducted by their personnel. During our first meeting in July 2020, we were disappointed with their responses. They did not provide any substantive thoughts or comments on how investigations could be improved, or how they would address any ongoing deficiencies. After discussion of the ongoing problems with arriving at proper investigative findings, a supervisor from the Training Division committed to including additional clarification on this topic in future training.

Our meeting with the Deputy Chiefs during our October 2020 remote site visit was significantly better, and we had a good discussion about needed improvement in the quality of investigations. The Deputy Chiefs advised us that after our July remote site visit, they had started reviewing the administrative misconduct investigations conducted by their personnel and had identified many of the same types of concerns that both we and PSB had identified. They informed us that they were working with their personnel to improve the quality of investigations and discussing not only the quality issues, but also how to ensure that thorough reviews were being conducted at the District level prior to forwarding the investigations to PSB. We were encouraged by the actions that Deputy Chiefs were taking, and hopeful that we would see continuing improvement as a result.

WAI 53325

During our remote site visit in January 2021, we again met with the Deputy Chiefs responsible for oversight of Districts and Divisions outside of PSB. The Deputy Chiefs advised us that they believed they were seeing more thorough investigations and that their personnel were doing a better job of identifying allegations and findings. Though not mandated, in some Districts investigative plans and outlines are being created prior to conducting the investigations. In their reviews, the Deputy Chiefs noted they are finding some continuing need for clarification in the reports, or the need to further discuss proposed findings, but in general they believe improvement is taking place.

The overall investigative quality for cases investigated by PSB and submitted for compliance with this Paragraph has remained high. None of the seven completed investigations conducted by PSB and submitted for compliance this reporting period had any investigative or administrative concerns, except for timely extensions.

All 42 cases we reviewed for this Paragraph were completed on or after July 20, 2016. Of the seven investigations conducted by PSB, three (43%) were completed within the 85-day timeframe. or had an approved extension related to the specific investigation. Of the 35 investigations conducted at the District level, 23 (66%) were initially completed within the 60-day timeframe or had an approved extension related to the specific investigation, though many of these cases were returned to the Districts for further work after review by PSB.

Of the 42 total investigations submitted for compliance with this Paragraph, 26 (52%) were either submitted within the required 60- or 85-day timeframe, or included an acceptable justification for an extension, a decrease from 68% during the last quarter. Of the 42 total investigations reviewed for compliance with this Paragraph, 19 (45%) were finalized and closed with 180 days or included an acceptable extension approval. This is an increase from the 34% compliance that we found during the last reporting period. MCSO's failure to complete investigations in a timely manner remains unacceptable. General workload issues are insufficient justification for the failure to complete investigations in a reasonably timely manner. To be considered compliant with the requirements for the completion of administrative misconduct investigations, extension requests and justifications must be submitted in a timely manner and be reasonably related to the specific investigation.

Based on the identified deficiencies in District investigations and our assessment of the reasonability of the requested extensions, 10 (29%) of the 35 investigations conducted by District personnel were found in compliance, a slight increase from 28% during the last reporting period. One (14%) of the seven investigations conducted by PSB were in compliance, a decrease from 20% during the last quarter. Overall compliance for the 42 investigations submitted for this Paragraph was 24%, a slight decrease from 26% during the last quarter.

As is our practice, we will discuss those cases that we found noncompliant with MCSO personnel during our next site visit.

WAI 53326

*Paragraph 33.* *MCSO Personnel who engage in Discriminatory Policing in any context will be subjected to administrative Discipline and, where appropriate, referred for criminal prosecution. MCSO shall provide clear guidelines, in writing, regarding the disciplinary consequences for personnel who engage in Discriminatory Policing.*

**Phase 1:** In compliance

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 4, 2020.

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

**Phase 2:** Not in compliance

The investigations that we review for compliance with this Paragraph do not include biased policing complaints involving the Plaintiffs' class. Those investigations have additional compliance requirements and are discussed in Paragraphs 275-283.

During the last reporting period, there were five investigations submitted by PSB that contained allegations of discriminatory policing.

During this reporting period, there were again five investigations where the alleged bias did not involve members of the Plaintiffs' class. Four involved allegations of inappropriate and potentially biased comments made within the jail setting. Three of these four were sustained; and in two, MCSO assessed discipline. In the third, the employee resigned prior to the conclusion of the investigation. In the fourth case, the allegation was properly not sustained. The fifth investigation involved off-duty conduct by Detention personnel and was sustained; and MCSO assessed discipline.

PSB conducted thorough investigations, and we agree with their findings in all five cases. While MCSO is in compliance regarding the investigative quality and findings, only one of the five was submitted and approved within the required timeframes. Based on our assessment, these cases are not in compliance with the requirements for timely completion of administrative investigations; and therefore not in compliance with the requirements for completion of investigations covered in this Paragraph.

While discriminatory policing allegations that involve members of the Plaintiffs' class are not reported in this Paragraph, we note that MCSO did not complete any investigations for this reporting period that were determined to be Class Remedial Matters.

WAI 53327

***Paragraph 34.*** *MCSO shall review each policy and procedure on an annual basis to ensure that the policy or procedure provides effective direction to MCSO Personnel and remains consistent with this Order, current law and professional standards. The MCSO shall document such annual review in writing. MCSO also shall review Policies and Procedures as necessary upon notice of a policy deficiency during audits or reviews. MCSO shall revise any deficient policy as soon as practicable.*

**In Full and Effective Compliance**

MCSO continues to review on an annual basis all critical policies and all policies relevant to the Court Orders for consistency with Constitutional policing, current law, and professional standards.

During this reporting period, MCSO conducted its annual review on seven (15%) of the 48 required policies. These policies included: CP-11 (Anti-Retaliation); ED-2 (Covert Operations; ED-3 (Review of Cases Declined for Prosecution); GA-1 (Development of Written Orders); GC-13 (Awards); GF-3 (Criminal History Record Information and Public Records); and GI-1 (Radio Enforcement Communications).

On June 3, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 53328

# Section 5: Pre-Planned Operations

***Paragraph 35.*** *The Monitor shall regularly review the mission statement, policies and operations documents of any Specialized Unit within the MCSO that enforces Immigration-Related Laws to ensure that such unit(s) is/are operating in accordance with the Constitution, the laws of the United States and State of Arizona, and this Order.*

**In Full and Effective Compliance**

To verify Phase 2 compliance with this Paragraph, we previously verified that the Criminal Employment Unit (CEU) was disbanded and removed from the Special Investigations Division organizational chart. The Human Smuggling Unit (HSU) was also disbanded and personnel reassigned to the Anti-Trafficking Unit (ATU).

During our review of the arrests made by the Special Investigations Division ATU between March 2015-March 2017, we did not note any arrests for immigration or human smuggling violations. The cases submitted by MCSO and reviewed for the ATU were primarily related to narcotics trafficking offenses.

MCSO reported in April 2017 that it had disbanded the Anti-Trafficking Unit and formed a new unit, Fugitive Apprehension and Tactical Enforcement (FATE). The primary mission of FATE is to locate and apprehend violent fugitives. We reviewed FATE's mission statement and objectives, as well as the organizational chart for the Special Investigations Division. MCSO had removed the ATU from the organizational chart, and the mission of FATE did not include any reference to the enforcement of Immigration-Related Laws.

The revised organizational chart for SID and documentation MCSO provided regarding the implementation of FATE supported that the ATU no longer existed, and that there were no specialized Units in MCSO that enforced Immigration-Related Laws.

We previously received and reviewed the Special Investigations Division Operations Manual and organizational chart. Both confirmed that MCSO has no specialized Units that enforce Immigration-Related Laws, that the Human Smuggling Unit (HSU) was disbanded, and the Anti-Trafficking Unit (ATU) no longer exists.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

***Paragraph 36.*** *The MCSO shall ensure that any Significant Operations or Patrols are initiated and carried out in a race-neutral fashion. For any Significant Operation or Patrol involving 10 or more MCSO personnel, excluding posse members, the MCSO shall develop a written protocol including a statement of the operational motivations and objectives, parameters for supporting documentation that shall be collected, operations plans, and provide instructions to supervisors, deputies and posse members. That written protocol shall be provided to the Monitor in advance of any Significant Operation or Patrol.*

WAI 53329

**In Full and Effective Compliance**

Since the requirements for conducting Significant Operations were implemented, MCSO has reported conducting only one Significant Operation that invoked the requirements of this Paragraph. "Operation Borderline" was conducted from October 20-27, 2014, to interdict the flow of illegal narcotics into Maricopa County. MCSO met all the requirements of this Paragraph during the operation.

In February 2016, we became aware of "Operation No Drug Bust Too Small" when it was reported in the media, and requested details on this operation from MCSO. After reviewing the documentation MCSO provided, we were satisfied that it did not meet the reporting requirements of this Paragraph.

In October 2016, we became aware of "Operation Gila Monster" when it was reported in the media. According to media reports, this was a two-week operation conducted by a special operations Unit in MCSO and was intended to interdict the flow of illegal drugs into Maricopa County. We requested all documentation regarding this operation for review. The documentation indicated that this operation was conducted from October 17-23, 2016. The documentation MCSO provided was sufficient for us to determine that this operation did not meet the reporting criteria for this, or other Paragraphs, related to Significant Operations. The Plaintiffs also reviewed the documentation submitted by MCSO on this operation and agreed that the operation did not invoke the requirements of this Paragraph. We and the Plaintiffs noted that "Operation Gila Monster" involved traffic stops of Latinos, and that those arrested were undocumented Latinos.

We continue to review documentation submitted for this Paragraph by all Districts, the Enforcement Support Division, and the Investigations Division on a monthly basis. During this reporting period, and since October 2014, MCSO continues to report that it has not conducted any additional Significant Operations. In addition, we have not learned of any potential Significant Operation through media releases or other sources during this reporting period. We will continue to monitor and review any operations we become aware of to ensure continued compliance with this and other Paragraphs related to Significant Operations. During this reporting period, we did not learn of any Significant Operations conducted by MCSO.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 37.** *The MCSO shall submit a standard template for operations plans and standard instructions for supervisors, deputies and posse members applicable to all Significant Operations or Patrols to the Monitor for review pursuant to the process described in Section IV within 90 days of the Effective Date. In Exigent Circumstances, the MCSO may conduct Significant Operations or Patrols during the interim period but such patrols shall be conducted in a manner that is in compliance with the requirement of this Order. Any Significant Operations or Patrols thereafter must be in accordance with the approved template and instructions.*

WAI 53330

**In Full and Effective Compliance**

In late 2014, we reviewed all the documentation submitted by MCSO regarding the Significant Operation conducted from October 24-27, 2014. This operation was intended to interdict the flow of illegal narcotics into Maricopa County and fully complied with the requirements of this Paragraph.

MCSO continues to report that it has not conducted any operations that invoke the requirements of this Paragraph since October 2014.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

During this reporting period, we did not become aware of any Significant Operations conducted by MCSO. MCSO remains in Full and Effective Compliance with this Paragraph.

(Note: Unchanged language is presented in *italicized font*. Additions are indicated by underlined font. Deletions are indicated by ~~crossed-out font~~.)

*Paragraph 38. If the MCSO conducts any Significant Operations or Patrols involving 10 or more MCSO Personnel excluding posse members, it shall create the following documentation and provide it to the Monitor and Plaintiffs within 30 days after the operation:*

a. *documentation of the specific justification/reason for the operation, certified as drafted prior to the operation (this documentation must include analysis of relevant, reliable, and comparative crime data);*

b. *information that triggered the operation and/or selection of the particular site for the operation;*

c. *documentation of the steps taken to corroborate any information or intelligence received from non-law enforcement personnel;*

d. *documentation of command staff review and approval of the operation and operations plans;*

e. *a listing of specific operational objectives for the patrol;*

f. *documentation of specific operational objectives and instructions as communicated to participating MCSO Personnel;*

g. *any operations plans, other instructions, guidance or post-operation feedback or debriefing provided to participating MCSO Personnel;*

h. *a post-operation analysis of the patrol, including a detailed report of any significant events that occurred during the patrol;*

i. *arrest lists, officer participation logs and records for the patrol; and*

WAI 53331

j.   data about each contact made during the operation, including whether it resulted in a citation or arrest.

**In Full and Effective Compliance**

Since the initial publication of GJ-33, MCSO has reported that it has conducted only one Significant Operation, "Operation Borderline," in October 2014.  At the time of this operation, we reviewed MCSO's compliance with policy; attended the operational briefing; and verified the inclusion of all the required protocols, planning checklists, supervisor daily checklists, and post-operation reports.  MCSO was in full compliance with this Paragraph for this operation.

During this reporting period, MCSO again reported that it did not conduct any Significant Operations invoking the requirements of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

During this reporting period, we did not become aware of any Significant Operations conducted by MCSO.  MCSO remains in Full and Effective Compliance with this Paragraph.


**Paragraph 39.**  *The MCSO shall hold a community outreach meeting no more than 40 days after any Significant Operations or Patrols in the affected District(s).  MCSO shall work with the Community Advisory Board to ensure that the community outreach meeting adequately communicates information regarding the objectives and results of the operation or patrol.  The community outreach meeting shall be advertised and conducted in English and Spanish.*

**Phase 1:**  In compliance

- GJ-33 (Significant Operations), most recently amended on April 2, 2019.

**Phase 2:**  In compliance

The Amendments to the Supplemental Permanent Injunction/Judgment Order (Document 2100) issued on August 3, 2017 returned the responsibility for compliance with this Paragraph to MCSO.

During this reporting period, MCSO did not report conducting any Significant Operations that would invoke the requirements of this Paragraph.

WAI 53332

**Paragraph 40.** *The MCSO shall notify the Monitor and Plaintiffs within 24 hours of any immigration related traffic enforcement activity or Significant Operation involving the arrest of 5 or more people unless such disclosure would interfere with an on-going criminal investigation in which case the notification shall be provided under seal to the Court, which may determine that disclosure to the Monitor and Plaintiffs would not interfere with an on-going criminal investigation. In any event, as soon as disclosure would no longer interfere with an on-going criminal investigation, MCSO shall provide the notification to the Monitor and Plaintiffs. To the extent that it is not already covered above by Paragraph 38, the Monitor and Plaintiffs may request any documentation related to such activity as they deem reasonably necessary to ensure compliance with the Court's orders.*

**In Full and Effective Compliance**

Since MCSO first developed GJ-33 (Significant Operations) in 2014, MCSO has reported conducting only one operation, "Operation Borderline," that required compliance with this Paragraph. We verified that MCSO employed the appropriate protocols and made all required notifications. MCSO was in full compliance with this Paragraph during this operation.

Based on a concern raised by the Plaintiffs, and to provide clarification regarding the portion of this Paragraph that addresses the requirement for MCSO to notify the Monitor and Plaintiffs within 24 hours of any immigration-related traffic enforcement activity or Significant Operations involving "the arrest of 5 or more persons," we requested during our October 2015 site visit that MCSO provide a statement regarding this requirement each month. MCSO began including this information in its November 2015 submission and continues to do so.

MCSO continues to report that it has not conducted any operations that meet the reporting requirements for this Paragraph since October 2014. During this reporting period, we did not learn of any traffic-related enforcement or Significant Operations conducted by MCSO that would invoke the requirements of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 53333

# Section 6: Training

**COURT ORDER VII.  TRAINING**

### a.  General Provisions

***Paragraph 41.***  *To ensure that the Policies and Procedures provided for by this Order are effectuated, the MCSO shall implement the following requirements regarding Training.*

***Paragraph 42.***  *The persons presenting this Training in each area shall be competent instructors with significant experience and expertise in the area.  Those presenting Training on legal matters shall also hold a law degree from an accredited law school and be admitted to a Bar of any state and/or the District of Columbia.*

**Phase 1:**  In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on March 31, 2021.

- GG-2 (Detention/Civilian Training Administration), most recently amended on March 31, 2021.

- Training Division Operations Manual, most recently amended on March 9, 2020.

**Phase 2:**  In compliance

MCSO uses three types of instructors to deliver Order-related training:  They are either assigned to the Training Division as full-time staff; assigned to field assignments outside of the Training Division; or are paid vendors.  The Training Division manually maintains individual instructor folders for Training Division staff, field instructors, and Field Training Officers (FTOs).  MCSO policy requires that instructor folders include annually updated CVs, General Instructor (GI) certificates, and either an annual or 30-day Misconduct and Disciplinary Review, as applicable. Additionally, instructors who have received prior sustained discipline or who are currently involved with an ongoing Professional Standards Bureau (PSB) investigation may request a Waiver of Presumptive Ineligibility for approval to teach from the Training Division Commander. A waiver request should provide the Training Division Commander with ample justification to overcome presumptive ineligibility.  Waiver requests require the Training Division Commander to produce written justifications for the approval or denial of each request.  We verify compliance with this Paragraph by reviewing all instructor folders, waiver requests, and justifications.

WAI 53334

During this reporting period, Training Division personnel advised us that they approved 13 new individuals as GIs. This was not accurate. In actuality, all of these individuals were approved as FTOs. Our review indicated that all received Training Instructor Misconduct and Disciplinary Reviews as Field Training Officers (FTO). According to our most recent roster of FTOs, six of the 12 individuals were newly proposed FTOs; and MCSO should have provided additional information – including a written recommendation from the deputy's immediate supervisor, documentation of a minimum of two years' experience as a peace officer, and the last two consecutive EPAs demonstrating the meeting of minimum performance standards.

GG-1 provides that if there is a pending administrative investigation for a serious offense, the employee is presumptively ineligible to be utilized as an FTO until that investigation has concluded. In those cases, the Training Commander may submit a written justification for a waiver of presumptive ineligibility to the PSB; and the PSB Commander shall indicate concurrence or disagreement with the justification. No waivers were received for these personnel. Of the 12 proposed FTOs, six (50%) were named in eight active administrative misconduct investigations. One individual was named in three of the eight active investigations. All investigations were for violations of CP-1 (Use of Force) and CP-2 (Code of Conduct). Four of the eight cases alleged charges against the individuals with violations of Unbecoming Conduct and Public Demeanor, Failure to Meet Standards, Dereliction of Duty, and Conformance to Laws. We were unable to determine the allegations for the four remaining cases, which were identified only as Use of Force and Code of Conduct. On the review form, each of these cases included a note by the Training Division Captain stating that "Open cases are not Serious Offenses as per GG-1." Subsequently, all 13 individuals were approved.

GG-1 defines a "serious offense" as an offense for which Office personnel have been disciplined or are the subject of an ongoing investigation that would bar that individual from serving as an instructor. The listed offenses include, but are not limited to: engaging in discrimination that violates law or policy; failure to follow the requirements of Court orders; criminal acts; providing false information in a misconduct investigation; and failing to report observed misconduct of another Office employee or volunteer. The policy language specifies the list is not all-inclusive and does not limit serious offenses to only the listed few. It clearly identifies five violations with direction that the definition is not be limited to the five violations. We requested the Training Division identify the correct categories of personnel the reviews were intended – FTO or GI – and summaries of the pending allegations.

The additional documentation clarified that all individuals received misconduct reviews as FTOs and identified specific allegations including summaries for the alleged activities of the six deputies in question. Each of the reviews contained handwritten notes indicating that the charges were "Not a serious offense as per GG-1." The pending allegations indicated failures to identify oneself, inaccurate reporting, social media postings, off-duty actions, intimidation and civil rights violations, dereliction of duty, and inappropriate financial activities. Each of these, if sustained after investigation, would result in discipline and/or suspension.

WAI 53335

We do not agree with the Training Division Captain that the disciplinary histories and underlying alleged misconduct of six of the identified FTOs are not serious offenses as defined in MCSO policy. We recommend that the approval of these individuals be reconsidered, pending adjudication of the pending allegations. We advise MCSO to recognize that the agency's policy does not limit serious offenses to only those listed within the definition. We recognize the problems MCSO is experiencing with identifying qualified FTOs, but believe it is more important that individuals with significant disciplinary histories or pending allegations of serious offenses not be selected to instruct and/or guide new Officers in Training (OITs). Continued disregarding of the intent of the misconduct and disciplinary reviews outlined in GG-1 may result in withdrawal of Phase 2 compliance.

During this reporting period, MCSO provided a newly developed Instructor Evaluation Form for review. The new form is proposed to standardize an evaluation process for all instructors by Training Division staff. Prior to its development, the Training Division sought information from other law enforcement agencies, educational institutions, and private industry to better inform their development process and final product. The submitted tool provides information on the categories of appearance, demeanor, knowledge, abilities to convey information, and instructor experience. MCSO considers the form as meeting "Industry Standards" and consistent with "Best Practices" within law enforcement. This form is currently under review.

**Paragraph 43.** *The Training shall include at least 60% live training (i.e., with a live instructor), which includes an interactive component, and no more than 40% on-line training. The Training shall also include testing and/or writings that indicate that MCSO Personnel taking the Training comprehend the material taught whether via live training or via on-line training.*

**Phase 1:** In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on March 31, 2021.

- GG-2 (Detention/Civilian Training Administration), most recently amended on March 31, 2021.

- Training Division Operations Manual, most recently amended on March 9, 2020.

**Phase 2:** In compliance

We verify compliance with this Paragraph by reviewing all individual test failures; individual retests; failure remediation efforts, and test analyses by training class; for both live and HUB delivered Order-related training.

During this reporting period, MCSO delivered the following programs: Bias-Free Policing and Fourth and Fourteenth Amendment Training (Fourth and Fourteenth Amendment Training 20 hours); 2017 Early Identification System (EIS); 2017 Employee Performance Appraisal (EPA); 2015 BlueTeam (BT); 2019 Body-Worn Camera (BWC); 2020 Supervisor Responsibilities: Effective Law Enforcement (SRELE); and the 2019 Traffic and Criminal Software (TraCS).

WAI 53336

MCSO delivered the Fourth and Fourteenth Amendment 20-hour classroom training twice in November to 33 personnel (15 sworn, 11 Posse, seven Deputy Service Aide [DSA]). No personnel required test remediation.

MCSO delivered the 2020 ACT Train-the-Trainer in December to 12 sworn personnel. No personnel required test remediation.

MCSO delivered the 2015 BT eight-hour classroom training twice in November to nine personnel (one sworn, eight DSAs). No personnel required test remediation.

MCSO delivered the 2019 BWC training twice in November to 21 sworn personnel. No personnel required test remediation.

MCSO delivered the 2017 EIS once in November to 10 personnel (eight DSAs, two civilian). One individual required test remediation.

MCSO delivered the 2017 EPA once in November to 10 personnel (eight DSAs, two civilian). No personnel required test remediation.

MCSO delivered the 2020 SRELE once during November to six sworn personnel. No personnel required test remediation.

MCSO delivered the 2019 TraCS once during November to 16 sworn personnel. No personnel required test remediation.

We, the Plaintiffs, and the Plaintiff-Intervenors have continued to identify concerns with test development and lack of test difficulty for Order-related trainings. During our January 2021 remote site visit, we sought additional information from the Training Division to clarify responsibilities and internal review processes for test development. MCSO informed us that tests and curriculum are developed concurrently with and relate to course objectives. Training Division personnel further advised that course developers rely primarily on multiple-choice and minimal use of true-and-false test questions for ease of test delivery through the HUB. The course developer is responsible for creating test questions, and supervisors review questions within the Advanced Officer Training command structure. Training Division personnel acknowledged that their tests could be more challenging, but they place an internal emphasis on what they term "not tricking students."

We requested additional HUB testing documentation identifying the date and time stamps for login time and completion time for each individual student for all Order-related training delivered during this reporting period. We believe this information provides an illustration of the amount of time students require to complete testing, and insight into the level of difficulty experienced by students while completing tests.

We reviewed tests from the Fourth and Fourteenth Amendment (20 hours), BlueTeam, BWC, EIS, EPA, and SRELE training programs. The average test completion time for the Fourth and Fourteenth Amendment (20-hour) class was 18 minutes for the Fourth Amendment content and seven minutes for Bias-Free content; completion time for all BlueTeam tests was one minute; the average test completion time for BWC was five minutes; the average test completion time for EIS was six minutes; the average test completion time for EPA was two minutes; and the average test

WAI 53337

completion time for SRELE was six minutes. We sought a general indicator for the level of difficulty associated with tests that are intended to gauge comprehension and mastery of the learning objectives as required by this Paragraph and MCSO policy. This data informed an opinion as to why we identify so few test remediations. We recognize that tests for each of these programs vary in total number of questions. They do not vary in format. All are multiple-choice. Two of the programs – Fourth and Fourteenth Amendment (20-hour) and the SRELE training – program provide foundational content for training required by the Order. We, the Plaintiffs, and the Plaintiff-Intervenors continue to encourage MCSO to place a greater emphasis on the process for test development, modify test formats as appropriate to content, and ensure that the level of difficulty is commensurate with the content provided to better measure students' mastery of learning objectives.

**Paragraph 44.** *Within 90 days of the Effective Date, MCSO shall set out a schedule for delivering all Training required by this Order. Plaintiffs' Representative and the Monitor shall be provided with the schedule of all Trainings and will be permitted to observe all live trainings and all on-line training. Attendees shall sign in at each live session. MCSO shall keep an up-to-date list of the live and on-line Training sessions and hours attended or viewed by each officer and Supervisor and make that available to the Monitor and Plaintiffs.*

**Phase 1:** In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on March 31, 2021.

- GG-2 (Detention/Civilian Training Administration), most recently amended on March 31, 2021.

- Training Division Operations Manual, most recently amended on March 9, 2020.

**Phase 2:** In compliance

The Training Division maintains a three-month Training Calendar. MCSO posts the Master Training Calendar to the MCSO website to inform the public of tentative training dates, classes, and locations. The calendar displays 90-day increments and includes a legend specifically identifying Order-related training.

Master Personnel Rosters determine the number of personnel requiring Order-related training. At the end of this reporting period, MCSO reported that 652 sworn members; 14 Reserve members; 24 retired Reserve members; 203 Posse members; 1,896 Detention members; and 772 civilian employees require Order-related instruction. We have requested that MCSO include an additional category of Deputy Service Aides. These categories vary by reporting period, because of the attrition in the organization.

WAI 53338

**Paragraph 45.** *The Training may incorporate adult-learning methods that incorporate roleplaying scenarios, interactive exercises, as well as traditional lecture formats.*

**In Full and Effective Compliance**

The Training Division routinely incorporates videos and small group discussions in its training classes. We encourage MCSO to continue increasing its use of role-plays, simulations, practice demonstrations, or physical activities – which we believe lead to a stronger learning environment and better retention of lesson content by adult learners. MCSO will benefit by further challenging the knowledge gained by deputies during training programs with more than a written test. We did not see any changes in the ways in which MCSO employed adult-learning methods during this reporting period.

On December 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.


**Paragraph 46.** *The curriculum and any materials and information on the proposed instructors for the Training provided for by this Order shall be provided to the Monitor within 90 days of the Effective Date for review pursuant to the process described in Section IV. The Monitor and Plaintiffs may provide resources that the MCSO can consult to develop the content of the Training, including names of suggested instructors.*

**In Full and Effective Compliance**

During our January remote site visit, we discussed the status of all Order-required training curricula. The 2015 BlueTeam, 2017 EIS, Employee Performance Management Training, and the 2017 Complaint Intake and Reception HUB training curricula remain under review by the Training and other Divisions.

Fourth and Fourteenth Amendment Training revisions were approved during this reporting period.

The 2020 ACT HUB delivery was approved during this reporting period.

The History of Discrimination Training video remains under development.

The Aguila Community Video remains under development.

The 2020 BlueTeam-Civilian Training remains under development.

The 2020 BlueTeam-Detention, Deputy, Lateral Training remains under development.

The 2019 BWC Training was previously approved for delivery.

The 2019 BWC HUB Training was previously approved. MCSO has indicated an intention to remove this training from the HUB. Removal did not occur during this reporting period.

The 2017 EIS Training continues to require an annual review and update.

The 2020 Employee Performance Management Training remains under development.

An introduction to Fair and Impartial Decision-Making (FIDM) HUB curriculum was approved for delivery.

The annual refresher training for FTOs, Privilege and Bias Workshop, four-hour content was delivered by vendor during this reporting period.

The 2020 SRELE was previously approved for delivery.

The 2020 PSB8 External was approved during this reporting period.

The 2020 PSB8 Internal curriculum was previously approved and vendor delivered.

The 2019 TraCS Training was previously approved.

The 2019 TraCS for Supervisors Training was previously approved.

Traffic Stop Monthly Review (TSMR) Training remains under development.

On December 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 47.** *MCSO shall regularly update the Training to keep up with developments in the law and to take into account feedback from the Monitor, the Court, Plaintiffs and MCSO Personnel.*

**Phase 1:** In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on March 31, 2021.

- GG-2 (Detention/Civilian Training Administration), most recently amended on March 31, 2021.

- Training Division Operations Manual, most recently amended on March 9, 2020.

**Phase 2:** In compliance

The Training Division routinely provides all new and revised lesson plans for our and the Parties' review. These reviews address the requirements of this Paragraph.

The 2017 EIS training curriculum has not been revised since its original approval. This initial program provides new supervisors with formal and technical direction on how MCSO expects them to utilize the EIS system. Additionally, it is intended to help supervisors have difficult conversations with subordinates and formulate action plans in response to EIS Alerts to modify deputies' behaviors. MCSO should refresh critical components, such as supervisor analysis of data and how to engage objectively with the data being reviewed. We urge MCSO to prioritize the revision of this lesson plan during the next reporting period.

During our January remote site visit, we further discussed the FTO Cultural Competency Workshop delivered by a vendor on October 23, 2020. A total of 74 personnel attended the workshop; 50 were FTOs. Three FTOs did not attend due to concerns about the pandemic, and

one individual was removed from the FTO cadre. MCSO did not develop an alternative plan for training the two FTOs unable to attend. The workshop consisted of a vendor-provided four-hour block of instruction contained within the required 10-hour FTO Annual Refresher. MCSO advised us that the agency has no plans to incorporate this type of content into the basic FTO Training Program, and that the delivery of this program was intended only to satisfy requirements included within the CPP. Although this workshop was delivered by a vendor, we recommend that MCSO reconsider their decision and incorporate this type of content within the basic FTO Training Program to better develop the agency's Officers in Training (OITs).

The History of Discrimination Training video remains under development.

The Aguila Community Video remains under development.

We will continue to advise MCSO upon first review of a training offering if we do not consider it to be enhanced. MCSO can continue to expect that we and the Parties will continue to observe training sessions and provide appropriate feedback.


### b. Bias-Free Policing Training

***Paragraph 48.*** *The MCSO shall provide all sworn Deputies, including Supervisors and chiefs, as well as all posse members, with 12 hours of comprehensive and interdisciplinary Training on bias-free policing within 240 days of the Effective Date, or for new Deputies or posse members, within 90 days of the start of their service, and at least 6 hours annually thereafter.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

MCSO delivers Fourth and Fourteenth Amendment Training (Bias-Free Policing Training) to all new deputies during POST Academy training. The Fourth and Fourteenth Amendment 20-hour classroom training was delivered twice in November to 33 personnel (15 sworn, 11 Posse, and seven DSAs).


***Paragraph 49.*** *The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:*

a.    *definitions of racial profiling and Discriminatory Policing;*

b.    *examples of the type of conduct that would constitute Discriminatory Policing as well as examples of the types of indicators Deputies may properly rely upon;*

c.    *the protection of civil rights as a central part of the police mission and as essential to effective policing;*

d.    *an emphasis on ethics, professionalism and the protection of civil rights as a central part of the police mission and as essential to effective policing;*

WAI 53341

e.  constitutional and other legal requirements related to equal protection, unlawful discrimination, and restrictions on the enforcement of Immigration-Related Laws, including the requirements of this Order;

f.  MCSO policies related to Discriminatory Policing, the enforcement of Immigration-Related Laws and traffic enforcement, and to the extent past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;

g.  MCSO's protocol and requirements for ensuring that any significant pre-planned operations or patrols are initiated and carried out in a race-neutral fashion;

h.  police and community perspectives related to Discriminatory Policing;

i.  the existence of arbitrary classifications, stereotypes, and implicit bias, and the impact that these may have on the decision-making and behavior of a Deputy;

j.  methods and strategies for identifying stereotypes and implicit bias in Deputy decision-making;

k.  methods and strategies for ensuring effective policing, including reliance solely on non-discriminatory factors at key decision points;

l.  methods and strategies to reduce misunderstanding, resolve and/or de-escalate conflict, and avoid Complaints due to perceived police bias or discrimination;

m.  cultural awareness and how to communicate with individuals in commonly encountered scenarios;

n.  problem-oriented policing tactics and other methods for improving public safety and crime prevention through community engagement;

o.  the benefits of actively engaging community organizations, including those serving youth and immigrant communities;

p.  the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;

q.  background information on the Melendres v. Arpaio litigation, as well as a summary and explanation of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in Melendres v. Arpaio, the parameters of the Court's permanent injunction, and the requirements of this Order; and

r.  Instruction on the data collection protocols and reporting requirements of this Order.

**Phase 1:** Not applicable

**Phase 2:** In compliance

The Fourth and Fourteenth Amendment Training curriculum was approved for delivery during the previous reporting period.

WAI 53342

### c. Training on Detentions, Arrests, and the Enforcement of Immigration-Related Laws

***Paragraph 50.*** *In addition to the Training on bias-free policing, the MCSO shall provide all sworn personnel, including Supervisors and chiefs, as well as all posse members, with 6 hours of Training on the Fourth Amendment, including on detentions, arrests and the enforcement of Immigration-Related Laws within 180 days of the effective date of this Order, or for new Deputies or posse members, within 90 days of the start of their service. MCSO shall provide all Deputies with 4 hours of Training each year thereafter.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

MCSO delivers training on Fourth and Fourteenth Amendment (Detentions, Arrests, and the Enforcement of Immigration-Related Laws) to all new deputies during POST Academy training. MCSO delivered the Fourth and Fourteenth Amendment 20-hour classroom training twice in November to 33 personnel (15 sworn, 11 Posse, and seven DSAs).

***Paragraph 51.*** *The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:*

a. *an explanation of the difference between various police contacts according to the level of police intrusion and the requisite level of suspicion; the difference between reasonable suspicion and mere speculation; and the difference between voluntary consent and mere acquiescence to police authority;*

b. *guidance on the facts and circumstances that should be considered in initiating, expanding or terminating an Investigatory Stop or detention;*

c. *guidance on the circumstances under which an Investigatory Detention can become an arrest requiring probable cause;*

d. *constitutional and other legal requirements related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, including the requirements of this Order;*

e. *MCSO policies related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, and the extent to which past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;*

f. *the circumstances under which a passenger may be questioned or asked for identification;*

g. *the forms of identification that will be deemed acceptable if a driver or passenger (in circumstances where identification is required of them) is unable to present an Arizona driver's license;*

h. *the circumstances under which an officer may initiate a vehicle stop in order to investigate a load vehicle;*

WAI 53343

i.    the circumstances under which a Deputy may question any individual as to his/her alienage or immigration status, investigate an individual's identity or search the individual in order to develop evidence of unlawful status, contact ICE/CBP, await a response from ICE/CBP and/or deliver an individual to ICE/CBP custody;

j.    a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause to believe that a vehicle or an individual is involved in an immigration-related state crime, such as a violation of the Arizona Human Smuggling Statute, as drawn from legal precedent and updated as necessary; the factors shall not include actual or apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a Hispanic day laborer;

k.    a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause that an individual is in the country unlawfully, as drawn from legal precedent and updated as necessary; the factors shall not include actual or apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a day laborer;

l.    an emphasis on the rule that use of race or ethnicity to any degree, except in the case of a reliable, specific suspect description, is prohibited;

m.    the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;

n.    Provide all trainees a copy of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in Melendres v. Arpaio and this Order, as well as a summary and explanation of the same that is drafted by counsel for Plaintiffs or Defendants and reviewed by the Monitor or the Court; and

o.    Instruction on the data collection protocols and reporting requirements of this Order, particularly reporting requirements for any contact with ICE/CBP.

**Phase 1:** Not applicable

**Phase 2:** In compliance

The Fourth and Fourteenth Amendment Training curriculum was approved for delivery during the previous reporting period.

### d. Supervisor and Command Level Training

***Paragraph 52.*** *MCSO shall provide Supervisors with comprehensive and interdisciplinary Training on supervision strategies and supervisory responsibilities under the Order. MCSO shall provide an initial mandatory supervisor training of no less than 6 hours, which shall be completed prior to assuming supervisory responsibilities or, for current MCSO Supervisors, within 180 days of the Effective Date of this Order. In addition to this initial Supervisor Training, MCSO shall require each Supervisor to complete at least 4 hours of Supervisor-specific Training annually thereafter. As needed, Supervisors shall also receive Training and updates as required by changes in pertinent developments in the law of equal protection, Fourth Amendment, the enforcement of Immigration-Related Laws, and other areas, as well as Training in new skills.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

MCSO delivered the 2020 SRELE once in November to six sworn personnel.

***Paragraph 53.*** *The Supervisor-specific Training shall address or include, at a minimum:*

a.  *techniques for effectively guiding and directing Deputies, and promoting effective and constitutional police practices in conformity with the Policies and Procedures in Paragraphs 18–34 and the Fourth and Fourteenth Amendment Training in Paragraphs 48–51;*

b.  *how to conduct regular reviews of subordinates;*

c.  *operation of Supervisory tools such as EIS;*

d.  *evaluation of written reports, including how to identify conclusory, "canned," or perfunctory language that is not supported by specific facts;*

e.  *how to analyze collected traffic stop data, audio and visual recordings, and patrol data to look for warning signs or indicia of possible racial profiling or unlawful conduct;*

f.  *how to plan significant operations and patrols to ensure that they are race-neutral and how to supervise Deputies engaged in such operations;*

g.  *incorporating integrity-related data into COMSTAT reporting;*

h.  *how to respond to calls from Deputies requesting permission to proceed with an investigation of an individual's immigration status, including contacting ICE/CBP;*

i.  *how to respond to the scene of a traffic stop when a civilian would like to make a Complaint against a Deputy;*

j.  *how to respond to and investigate allegations of Deputy misconduct generally;*

k.  *evaluating Deputy performance as part of the regular employee performance evaluation; and*

WAI 53345

*l.*      *building community partnerships and guiding Deputies to do the Training for Personnel Conducting Misconduct Investigations.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

The 2020 SRELE was approved for delivery during the third quarter. The train-the-trainer was conducted in August, with most classes delivered by the end of the month. MCSO completed delivery during this reporting period.

WAI 53346

**COURT ORDER VIII.    TRAFFIC STOP DOCUMENTATION AND DATA COLLECTION AND REVIEW**

For Paragraphs 54 and 55, in particular, we request traffic stop data from MCSO. The following describes how we made that request and how we handled the data once we received it. These data may also be referred to in other areas of Section 7 and the report as a whole.

In selecting traffic stop cases for our compliance review, we modified our statistical technique in that, rather than selecting a representative random sample of 100 cases per quarter, we instead pulled a sample of 35 cases per month (or 105 cases per quarter). Our original selection of a sample size of 35 cases was based on information from MCSO TraCS data that reported the average number of traffic stops per month was fewer than 2,000 during the April 2014-June 2015 time period when TraCS data were first available. The selection of 35 reflects a sample based on this average per month. This gave us a 95 percent confidence level (the certainty associated with our conclusion).

We continue to pull our monthly sample of traffic stop cases from the six Districts (Districts 1, 2, 3, 4, 6, and 7) and Lake Patrol. Once we received files each month containing traffic stop case numbers from MCSO, denoting from which area they came, we selected a sample of up to 35 cases representing the areas and then selected a subsample averaging 10 cases, from the 35 selected cases, to obtain CAD audiotapes and body-worn camera recordings. Our sampling process involved selecting a sample of cases stratified by the areas according to the proportion of specific area cases relative to the total area cases. Stratification of the data was necessary to ensure that each area was represented proportionally in our review. Randomization of the cases and the selection of the final cases for CAD review were achieved using a statistical software package (IBM SPSS Version 22), which contains a specific function that randomly selects cases and that also allows cases to be weighted by the areas. Our use of SPSS required that we first convert the MCSO Excel spreadsheet into a format that would be readable in SPSS. We next pulled the stratified sample each month for the areas and then randomly selected a CAD audio subsample from the selected cases.

In February 2016, we began pulling cases for our body-worn camera review from the audio subsample. Since that time, we began pulling additional samples for passenger contacts and persons' searches (10 each per month). The unique identifiers for these two samples were relayed back to MCSO personnel, who produced documentation for the selected sample (including the CAD documentation for the subsample).

On October 10, 2014, the Court issued an Order Granting Stipulation to Amend Supplemental/Permanent Injunction/Judgment Order (Document 748). The stipulation affects Paragraphs 57, 61, 62, and 1.r.xv.; and has been incorporated in the body of this report. The stipulation referenced amends the First Order, and will be addressed in Section 7.

WAI 53347

### a. Collection of Traffic Stop Data

**Paragraph 54.** *Within 180 days of the Effective Date, MCSO shall develop a system to ensure that Deputies collect data on all vehicle stops, whether or not they result in the issuance of a citation or arrest. This system shall require Deputies to document, at a minimum:*

a. *the name, badge/serial number, and unit of each Deputy and posse member involved;*

b. *the date, time and location of the stop, recorded in a format that can be subject to geocoding;*

c. *the license plate state and number of the subject vehicle;*

d. *the total number of occupants in the vehicle;*

e. *the Deputy's subjective perceived race, ethnicity and gender of the driver and any passengers, based on the officer's subjective impression (no inquiry into an occupant's ethnicity or gender is required or permitted);*

f. *the name of any individual upon whom the Deputy runs a license or warrant check (including subject's surname);*

g. *an indication of whether the Deputy otherwise contacted any passengers, the nature of the contact, and the reasons for such contact;*

h. *the reason for the stop, recorded prior to contact with the occupants of the stopped vehicle, including a description of the traffic or equipment violation observed, if any, and any indicators of criminal activity developed before or during the stop;*

i. *time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; time a release was made without citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere or Deputy's departure from the scene;*

j. *whether any inquiry as to immigration status was conducted and whether ICE/CBP was contacted, and if so, the facts supporting the inquiry or contact with ICE/CBP, the time Supervisor approval was sought, the time ICE/CBP was contacted, the time it took to complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual;*

k. *whether any individual was asked to consent to a search (and the response), whether a probable cause search was performed on any individual, or whether a pat-and-frisk search was performed on any individual;*

l. *whether any contraband or evidence was seized from any individual, and nature of the contraband or evidence; and*

m. *The final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without citation.*

**Phase 1:** In compliance

WAI 53348

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 4, 2020.

- EA-11 (Arrest Procedures), most recently amended on May 13, 2020.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on February 25, 2021.

- EB-2 (Traffic Stop Data Collection), most recently amended on January 7, 2020.

- GI-1 (Radio and Enforcement Communications Procedures), most recently amended on December 31, 2020.

- GJ-3 (Search and Seizure), most recently amended on May 22, 2020.

**Phase 2:** Not in compliance

To verify the information required for this Paragraph, MCSO created, and we reviewed, the Vehicle Stop Contact Form (VSCF), the Vehicle Stop Contact Form Supplemental Sheet, the Incidental Contact Receipt, and the Written Warning/Repair Order, all in electronic form, for those motorists who, during this reporting period, committed a traffic violation or operated a vehicle with defective equipment and received a warning. We also reviewed the Arizona Traffic Ticket and Complaint Forms issued for violations of Arizona Statutes, Internet I/Viewer Event Unit printout, Justice Web Interface printout, and any Incident Report associated with the event. We selected a sample of 105 traffic stops conducted by deputies from October 1-December 31, 2020, for the purposes of this review; and assessed the collected data from the above-listed documents for compliance with Subparagraphs 54.a.-54.m. All of the listed documentation was used for our review of the following subsections of this Paragraph.

The Paragraph requires that MCSO create a system for data collection. The data collected pursuant to this Paragraph will be captured in the Early Identification System, which we discuss further in this report.

Paragraph 54.a. requires MCSO to document the name, badge/serial number, and unit of each deputy and Posse member involved.

For this reporting period, all of the primary deputies indicated their own serial numbers for every stop they initiated. We review the VSCF, I/Viewer Event document, the Justice Web Interface, and the CAD printout to determine which units were on the scene. If back-up units arrive on a scene and do not announce their presence to dispatch, CAD does not capture this information. MCSO made a TraCS change to the VSCF during 2016 to secure this information. MCSO added a drop-down box so the deputy could enter the number of units on the scene and the appropriate fields would be added for the additional deputies. While this addition is an improvement, if the deputy fails to enter the number of additional units on the form, the drop-down boxes do not appear. In addition, MCSO policy requires deputies to prepare the Assisting Deputy and Body-Worn Camera Log in instances where deputies respond and assist at a traffic stop. The log contains the relevant information required by this Subparagraph for any additional deputies involved in a traffic stop other than the primary deputy. During our April 2019 site visit, we discussed with MCSO, the Plaintiffs, and the Plaintiff-Intervenors the method of evaluating this

WAI 53349

requirement. We determined that in instances where a deputy's name, serial number and unit number may have been omitted on the VSCF, yet the deputy prepared the Assisting Deputy and Body-Worn Camera Log, the requirements of this Subparagraph will have been met.

During our review of the sample of 105 vehicle traffic stops, we identified 18 cases where the deputy's unit had another deputy assigned to the vehicle or one or more other deputy units or Posse members were on the scene. In each of 18 cases in which there were multiple units or deputies on a stop, the deputy properly documented the name, badge, and serial number of the deputies and Posse members on the VSCF, or the information was captured on the Assisting Deputy and Body-Worn Camera Log.

Of the cases we reviewed for passenger contacts under Subparagraph 54.g., there were 43 cases where the deputy's unit had another deputy assigned to the vehicle or one or more other deputy units or Posse members were on the scene. In 41 of the 43 cases, the deputy properly documented the required information on the VSCF or the information was captured on the Assisting Deputy and Body-Worn Camera Log. In two cases, there were assisting deputies that were not listed on the VSCF and the Assisting Deputy and Body-Worn Camera Logs were not prepared by the deputies.

Of the cases we reviewed for searches of persons under Subparagraph 54.k., there were 62 cases where the deputy's unit had another deputy assigned to the vehicle, or one or more other deputies or Posse members were on the scene. In 60 of the 62 cases, the deputies properly documented the required information on the VSCFs or the information was captured on the Assisting Deputy and Body-Worn Camera Logs. In two cases, there were assisting deputies that were not listed on the VSCF and the Assisting Deputy and Body-Worn Camera Logs were not prepared by the assisting deputies.

We continue to identify cases where the assisting deputies have not prepared the Assisting Deputy and Body-Worn Camera Log when required by MCSO policy. We encourage MCSO to provide guidance to supervisors to be attentive to this issue during their reviews of traffic stop documentation.

During the first reporting period of 2020, MCSO attained a compliance rating of 97%. During the second reporting period of 2020, MCSO attained a compliance rating of 94%. During the third reporting period of 2020, MCSO attained a compliance rating of 99%. During this reporting period, MCSO attained a compliance rating of 97%. MCSO remains in compliance with this requirement.

Paragraph 54.b. requires MCSO to document the date, time, and location of the stop, recorded in a format that can be subject to geocoding. Our reviews of the CAD printout for all 105 traffic stops in our sample indicated that the date, time, and location is captured with the time the stop is initiated and the time the stop is cleared. In previous reporting periods, we noted instances where the GPS coordinates could not be located on the documentation received (CAD printout/I/Viewer). We contacted MCSO about this issue, and MCSO now provides us with the GPS coordinates via a separate document that lists the coordinates for the traffic stop sample we provide. MCSO uses GPS to determine location for the CAD system. GPS collects coordinates from three or more satellites to enhance the accuracy of location approximation. The data from

WAI 53350

the satellites can be decoded to determine the longitude and latitude of traffic stop locations should that be necessary. The CAD system was upgraded in 2014 to include geocoding of traffic stops. CID continues to provide us with a printout of all case numbers in the sample containing the associated coordinates. For this reporting period, the CAD or I/Viewer system contained the coordinates in 70% of the cases. In a separate spreadsheet, MCSO provided GPS coordinates for all 105 cases we reviewed, for 100% compliance with this portion of the Subparagraph.

When we review the sample traffic stops from across all Districts, we note the locations of the stops contained on the VSCF, the CAD printout, and the I/Viewer system to ensure that they are accurate. We continue to identify a limited number of instances where the location of the stop contained on the VSCF and the location of the stop contained on the CAD printout are inconsistent. Reviewing supervisors are not identifying and addressing this issue. We recommend that reviewing supervisors closely review the VSCFs and CAD printouts and address such deficiencies. The number of inconsistencies did not affect MCSO's rate of compliance.

During our April 2016 site visit, we discussed with MCSO the possibility of using the CAD printout instead of the TraCS data to determine stop times. We determined that using the CAD system to determine stop end times created additional challenges. However, MCSO decided to use the CAD printout to determine traffic stop beginning and ending times for data analysis. MCSO issued Administrative Broadcast 16-62 on June 29, 2016, which indicated that, beginning with the July 2016 traffic stop data collection, the stop times captured on the CAD system would be used for reporting and analytical purposes.

Occasionally, the CAD time of stop and end of stop time do not exactly match those listed on the Vehicle Stop Contact Form, due to extenuating circumstances the deputy may encounter. During this reporting period, we did not find any instances where the end time on the VSCF Contact differed significantly from the CAD printout. In monthly audits of traffic stop data, the Audits and Inspections Unit (AIU) reviews the beginning/ending times of the stops and requires that BIO Action Forms are generated by the Districts when there are discrepancies. The CAD system is more reliable than the VSCF in determining stop times, as it is less prone to human error. When the deputy verbally advises dispatch that s/he is conducting a traffic stop, the information is digitally time-stamped into the CAD system without human input; and when the deputy clears the stop, s/he again verbally advises dispatch.

MCSO remains in compliance with this Subparagraph.

Paragraph 54.c. requires MCSO to document the license plate and state of the subject vehicle. During this reporting period, we identified two cases in which the deputies had improperly documented the license plate information on the VSCFs and the citations prepared for the stops. AIU identified the same issues and required that the Districts prepare BIO Action Forms to document the corrective actions taken. In the remaining 103 stops reviewed, the deputies properly recorded the vehicle license plate information.

MCSO remains in compliance with this Subparagraph, with a compliance rate of 98%.

WAI 53351

Paragraph 54.d. requires MCSO to document the total number of occupants in the vehicle when a stop is conducted. The VSCF, completed by the deputy on every traffic stop, is used to capture the total number of occupants and contains a separate box on the form for that purpose. EB-2 (Traffic Stop Data Collection) requires deputies to collect data on all traffic stops using the VSCF; this includes incidental contacts with motorists.

In 36 of the 105 traffic stops we reviewed, the driver had one or more passengers in the vehicle (79 total passengers). In 35 of the 36 cases, the deputies properly documented the total number of occupants in the vehicles. In one stop, the deputy did not document the presence of a passenger on the VSCF. AIU identified the same issue and required that the District prepare a BIO Action Form to document the corrective action taken.

With a compliance rate of 99%, MCSO remains in compliance with this Subparagraph.

Paragraph 54.e. requires MCSO to document the perceived race, ethnicity, and gender of the driver and any passengers, based on the deputy's subjective impression. (No inquiry into the occupant's ethnicity or gender is required or permitted.) In 36 of the 105 stops from the traffic stop data sample, there was more than one occupant in the vehicle (79 total passengers).

Seventy-nine, or 74%, of the 105 traffic stops involved white drivers. Twenty-one, or 23%, of the 105 stops involved Latino drivers. Ten, or 10%, of the 105 traffic stops involved Black drivers. Two, or 2%, of the 105 traffic stops involved Asian or Pacific Islander drivers. Fifty-two traffic stops, or 50%, resulted in citations. The breakdown of those motorists issued citations is as follows: 35 white drivers (67% of the drivers who were issued citations); 12 Latino drivers (23% of the drivers who were issued citations); four Black drivers (8% of the drivers who were issued citations); and one Asian or Pacific Islander driver (1% of the drivers who were issued citations). Fifty-five, or 52%, of the 105 traffic stops we reviewed resulted in a written warning. The breakdown of those motorists issued warnings is as follows: 39 white drivers (71% of the drivers who were issued warnings); nine Latino drivers (16% of the drivers who were issued warnings); six Black drivers (11% of the drivers who were issued warnings); one Asian or Pacific Islander driver (1% of the drivers who were issued warnings).

In our sample of 30 traffic stops that contained body-worn camera recordings, we identified one stop in which the deputy did not accurately document the presence of a passenger in the vehicle. Based on our review of the body-worn camera recording, there was a white female passenger in the vehicle. The deputy indicated on the VSCF that the driver was the only occupant of the vehicle. AIU identified the same issue and required that the District document the corrective action taken on an Action Form. In our review of cases to assess compliance with Paragraphs 25.d. and 54.g., passenger contacts, we identified two stops in which the deputy did not accurately document the gender of the vehicle occupants. In one case, the VSCF indicates that the two passengers are female. Based on our review of the body-worn camera recording, one of the passengers should have been classified as male. In one case, the VSCF indicates that the driver is male. Based on our review of the body-worn camera recording, as well as a review of the driver's name, we determined that the driver should have been classified as female.

WAI 53352

In our review of cases to assess compliance with Paragraph 54.k., searches of persons, we did not identify any stops in which the deputy did not accurately document the race, ethnicity, and gender of the driver or passenger. We provided MCSO with the information regarding the results of our review of these two cases. MCSO conducted a review the body-worn camera recordings and concurred with our findings.

This Paragraph requires deputies to document the perceived race, ethnicity, and gender of any passengers whether contact is made with them or not. There were some instances where deputies indicated that they were unable to determine the gender and ethnicity of a passenger and listed the passenger as "unknown-vision obscured." During our review of the body-worn camera recordings, we were also unable to get a clear view of the some of the passengers, often due to vehicle being equipped with dark tinted windows combined with the stop occurring during night time hours; or due to vehicle being equipped with dark tinted windows combined with the glare of the sun during daytime hours.

During the second quarter of 2019, AIU commenced conducting the Post-Stop Perceived Ethnicity Inspection. This inspection is conducted on a monthly basis and includes: 1) a review of traffic stops where the deputy documented the driver as being white and the driver's surname is Latino; 2) a review of traffic stops where the deputy documented that the driver has a Latino surname with a passenger listed as "unknown-vision obscured;" and 3) a review of traffic stops where the deputy documented that the driver was Latino and the passengers were listed with a designated ethnicity on the VSCF. This inspection was initiated by AIU in response to previous issues identified where deputies failed to properly document the ethnicity of the vehicle occupants. AIU's inspection reports for October and December 2020 did not identify any instances where the deputies did not properly document the race, ethnicity, and gender of the drivers and passengers. The inspection report for November 2020 identified two stops where the perceived race, ethnicity, and gender were not properly documented. In one case, the deputy listed the passenger's perceived race/ethnicity as "unknown-vision obstructed on the VSCF." AIU's review of the body-worn camera recording determined that the passenger appeared to be white. In one case, the deputy listed the passenger's perceived race/ethnicity as "unknown-vision obstructed," with the gender listed as female on the VSCF. AIU's review of the body-worn camera recording determined that the passenger appeared to be Latino. AIU has requested that the Districts provide BIO Action Forms to document any corrective actions taken in these two cases.

MCSO remains in compliance with this requirement.

Paragraph 54.f. requires that MCSO record the name of any individual upon whom the deputy runs a license or warrant check (including the subject's surname). In addition, MCSO's policy requires that deputies perform a license plate check on each vehicle stopped by its deputies, as well as warrant checks on every driver stopped by its deputies. Our reviews have found that deputies regularly record the name of each driver and passenger on the VSCF in each instance where they have run a driver's license or warrant check.

WAI 53353

MCSO policy requires that during each traffic stop, deputies are to conduct a records check on the license plate and a wants/warrant check on each driver. For this reporting period, we found that of the 105 traffic stops we reviewed, each of the 105 stops included a check on the license plate. There were 101 stops where the deputies ran warrant checks on the drivers in accordance with MCSO policy.

MCSO's compliance rate with this requirement is 100%. MCSO remains in compliance with this Subparagraph.

Paragraph 54.g. requires the deputy to document whether contact was made with any passengers, the nature of the contact, and the reasons for the contact. During the third quarter of 2019, MCSO requested that we increase the number of cases reviewed in an effort to identify additional stops that fit the criteria of this Paragraph. The sample size of cases to be reviewed was increased from 10 stops each month to 35 stops each month, commencing with August 2019. During some months, the number of traffic stops that involve deputies having contact with passenger is fewer than 35 traffic stops.

During our assessment, we specifically review traffic stops that include any instance where the deputy asks any questions of a passenger beyond a greeting, including asking passengers to identify themselves for any reason or requesting that they submit to a Preliminary Breath Test. In such instances, we determine if the passenger was issued one of the following: Incidental Contact Receipt, citation, or a warning. If the passenger was not issued any one of the following documents, it adversely impacts MCSO's compliance with this requirement. It is also important to note that in such instances where a deputy fails to issue one of the required documents after being involved in a passenger contact, it is a violation of MCSO's policy.

To ensure that deputies are accurately capturing passenger information and to verify if passengers are contacted, we compare the number of passengers listed by the deputy with the number of passengers entered in the passenger drop-down box on the Vehicle Stop Contact Form. We also review any Incidental Contact Receipts, citations, or warnings, issued to passengers by deputies. We also review the deputies' notes on the VSCF, the Arizona Citation, and the CAD printout for any information involving the passengers. We review MCSO's I/Viewer System and the Justice Web Interface (JWI) to verify if a record check was requested for the driver or any passengers.

All passenger contacts in the traffic stops we reviewed for Paragraphs 25.d. and 54.g were noted in the VSCFs. For this reporting period, we identified 51 traffic stops where the deputy had interaction with one or more passengers; which required the issuance of either an Incidental Contact Receipt, a citation, or a warning. Of the 51 stops, there were seven where we determined that a passenger, or passengers, were not provided with either an Incidental Contact Receipt, a citation, or a warning, as required by MCSO policy. In some instances, the deputies prepared Incidental Contact Receipts after the traffic stop concluded; yet they were not provided to the passengers. We informed MCSO of this issue, and the agency conducted a review of some of the stops where such instances occurred and they either concurred with our assessment or they provided additional information regarding actions taken subsequent to the traffic stop.

WAI 53354

MCSO has also informed us that AIU is developing an inspection to review its own sample of passenger contacts in traffic stops so that AIU can identify such issues and issue Action Forms to address any deficiencies. The 10 cases that we identified potential compliance issues with are described in detail below. For some of the stops, we provided MCSO with our concerns and MCSO provided feedback regarding those concerns, which is included in the summaries below.

- A Latino driver was stopped for failure to maintain a lane of traffic. The vehicle was occupied by a Latina passenger. The driver was arrested for two warrants for parole violation. The driver also was found to be in possession of narcotics. The deputy obtained the passenger's name and conducted a records check. The passenger was not provided with an Incidental Contact Receipt. We informed MCSO of this issue, and the agency conducted a review of the stop and concurred with our assessment. MCSO reported that the District 7 command staff discussed the issue with the deputy and documented the discussion in BlueTeam. The deputy subsequently mailed an Incidental Contact Receipt to the passenger.

- A white male driver was stopped for a stop sign violation. The vehicle was occupied by two white female passengers. The driver had a suspended driver's license. The deputy contacted one of the passengers to determine if she had a valid driver's license to drive the vehicle. A records check determined that the passenger had a valid driver's license. The passenger was not provided with an Incidental Contact Receipt during the traffic stop. We informed MCSO of this issue and the agency conducted a review of the stop. It was determined that shortly after the conclusion of the traffic stop, the deputy prepared an Incidental Contact Receipt and mailed it to the passenger.

- A Latina driver was stopped for driving without a license plate light. The vehicle was occupied by two Latino passengers. Prior to the stop, the deputy was informed that a vehicle matching the description was involved in a domestic violence call for service. One of the passengers was arrested for domestic violence. The deputy obtained the name of the passenger and conducted a records check. Based on our review of the body-worn camera recordings, the passenger was not provided with an Incidental Contact Receipt; however, MCSO provided an Incidental Contact Receipt to us for review. We informed MCSO of this issue, and the agency conducted a review of the stop. It was determined that the deputy prepared an Incidental Contact Receipt after the conclusion of the stop and later provided it to the passenger, and that another body-worn camera recording that was not provided to us captured the serving of the receipt.

- A Latino driver was stopped for failure to maintain a lane of traffic and driving slower than the posted speed limit. The vehicle was occupied by a Latina passenger. The deputy obtained the name of the passenger. Based on our review of the body-worn camera recordings, the passenger was not provided with an Incidental Contact Receipt; however, MCSO provided an Incidental Contact Receipt to us for review. We informed MCSO of this issue and the agency conducted a review of the stop. It was determined that the supervisor identified that the deputy did not provide the Incidental Contact Receipt and on the same date of the traffic stop. The deputy prepared and mailed the receipt to the passenger at the direction of the supervisor.

WAI 53355

- A Latino driver was stopped for speeding. The vehicle was occupied by a Latino passenger. The driver was driving with a learner's permit. The deputy obtained the passenger's driver's license to verify if the driver is operating a vehicle with a properly licensed driver, and conducted a records check. The passenger was not provided with an Incidental Contact Receipt.

- A Latino driver was stopped for failure to maintain a lane of traffic. The vehicle was occupied by a Latina passenger. The driver was arrested for outstanding warrants and driving under the influence. The deputy obtained the name of the passenger and conducted a records check. The passenger was not provided with an Incidental Contact Receipt prior to the conclusion of the traffic stop. We informed MCSO of this issue, and the agency conducted a review of the stop and concurred with our assessment. However, MCSO determined that the reviewing supervisor identified that the deputy did not provide the Incidental Contact Receipt and on the same date of the traffic stop. The deputy prepared and mailed the receipt to the passenger at the direction of the supervisor.

- A Latino driver was stopped for a speeding violation. The vehicle was occupied by a Latino passenger. The driver was arrested and processed for driving under the influence. The deputy obtained the passenger's name and conducted a records check. The passenger was not provided with an Incidental Contact Receipt. We informed MCSO of this issue, and the agency conducted a review of the stop and concurred with our assessment. Based on our inquiry, District 5 staff ensured that an Incidental Contact Receipt was prepared and mailed to the passenger.

- A white male driver was stopped for a stop sign violation. The vehicle was occupied by a white female passenger. The driver was arrested and processed for driving under the influence. The deputy obtained the passenger's name and conducted a records check. The passenger was not provided with an Incidental Contact Receipt. We informed MCSO of this issue, and the agency conducted a review of the stop. It was determined that the deputy prepared and mailed an Incidental Contact Receipt to the passenger four days after the traffic stop. MCSO was unable to determine what prompted the deputy to mail the receipt four days after the traffic stop.

- A Latino driver was stopped for driving with an expired license plate. The driver was arrested for an outstanding warrant. The deputy obtained the passenger's name and conducted a records check. The passenger was not provided with an Incidental Contact Receipt. We informed MCSO of this issue, and the agency conducted a review of the stop and concurred with our assessment. Based on our inquiry, District 4 staff ensured that an Incidental Contact Receipt was prepared and mailed to the passenger.

- A white male driver was stopped for a speeding violation. The vehicle was occupied by a white female passenger. The driver was arrested and processed for driving under the influence. An Arizona Department of Public Safety trooper assisted with this traffic stop. The trooper obtained the passenger's name and provided it to the deputy. In addition, the trooper had the passenger perform a Preliminary Breath Test in the presence of the deputy. The passenger was not provided with an Incidental Contact Receipt. We informed MCSO

WAI 53356

of this issue, and the agency conducted a review of the stop and concurred with our assessment. Based on our inquiry, District 5 staff ensured that an Incidental Contact Receipt was prepared and mailed to the passenger.

There was one case identified in the stops that we reviewed for Paragraph 54.k. in which the passengers were contacted which required the issuance of either an Incidental Contact Receipt, a citation, or a warning. In that case, the driver was issued an Incidental Contact Receipt as required.

There was one case identified in the stops that we reviewed for Paragraphs 25 and 54 in which the passenger was contacted, which required that the passenger be issued either an Incidental Contact Receipt, a citation, or a warning. In that case, the driver was issued an Incidental Contact Receipt as required.

As noted in some of the cases above, deputies have not been consistent in preparing and providing passengers with Incidental Contact Receipts during traffic stops in which the passenger is contacted and asked by the deputy to provide identification. It was noted during this reporting period that in two incidents, a Non-Traffic Contact Form was prepared when an Incidental Contact Receipt should have been prepared and provided to the passengers. Supervisors should identify such errors and omissions during their reviews of the VSCFs and take corrective action. During previous site visits, we discussed with MCSO that we have noted an increase in the number of passengers being contacted and not being provided with an Incidental Contact Receipt. MCSO has informed us that the TraCS system has been modified so that when a deputy prepares the Vehicle Stop Contact Form and uses the passenger contact field, a prompt will appear to instruct the deputy to prepare the Incidental Contact Receipt.

During this first reporting period of 2020, MCSO provided the Incidental Contact Receipt, a citation, or a warning, when required in 73% of the cases. During the second reporting period of 2020, MCSO provided the Incidental Contact Receipt, a citation, or a warning, when required in 67% of the cases. During the third reporting period of 2020, MCSO provided the Incidental Contact Receipt, a citation, or a warning, when required, in 66% of the cases. During this reporting period, MCSO provided the Incidental Contact Receipt, a citation, or a warning, when required in 50% of the cases. MCSO is not in compliance with this Subparagraph.

Paragraph 54.h. requires deputies to record, prior to the stop, the reason for the vehicle stop, including a description of the traffic or equipment violation observed, and any indicators of criminal activity developed before or during the stop. For this reporting period, we identified a random sample of 10 cases from the 35 cases we initially requested each month, and requested CAD audio and body-worn camera (BWC) footage for those cases. We listened to CAD dispatch audio recordings, reviewed the CAD printouts, and reviewed body-worn camera recordings for 30 traffic stops from the sample of 105 traffic stops used for this review; and found that the deputies advised Communications of the reason for the stop, location of the stop, license plate, and state of registration for all 30 stops.

For the remaining 75 traffic stops where body-worn camera recordings and CAD audiotapes were not requested, we review the CAD printout and the VSCF to ensure that the reason for the stop has been captured. These forms are included in our monthly sample requests. The dispatcher

WAI 53357

enters the reason for the stop in the system as soon as the deputy verbally advises Communications of the stop, location, and tag number. The VSCF and the CAD printout documents the time the stop begins and when it is concluded – either by arrest, citation, or warning. Deputies need to be precise when advising dispatch of the reason for the traffic stop, and likewise entering that information on the appropriate forms.

MCSO's compliance rating for this Subparagraph is 100%.

Paragraph 54.i. requires deputies to document the time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; the time a release was made without a citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere, or the deputy's departure from the scene. In our review of the documentation provided by MCSO, the CAD printouts, the Vehicle Stop Contact Forms, along with the E-Ticketing system and the Arizona Ticket and Complaint Form, the information required is effectively captured. As we noted in Subparagraph 54.b., the stop times on the CAD printout and the Vehicle Stop Contact Form vary slightly on occasion. We understand that this may occur due to extenuating circumstances, and we will report on those instances where there is a difference of five minutes or more from either the initial stop time or the end time.

We review the circumstances of each stop and the activities of the deputies during each stop to assess whether the length of the stop was justified. During this reporting period, we did not identify any stops that were extended for an unreasonable amount of time.

Supervisors are required to conduct reviews of the VSCFs within 72 hours of the stop. In 102 of the 105 VSCFs reviewed, supervisors conducted timely reviews. There were three instances where the supervisors conducted reviews of the VSCFs in excess of 72 hours. Deputies accurately entered beginning and ending times of traffic stops in all 105 cases reviewed. MCSO accurately entered the time citations and warnings were issued in all 105 cases.

MCSO remains in compliance with this Subparagraph.

Paragraph 54.j. requires MCSO to document whether any inquiry as to immigration status was conducted and whether ICE/CBP was contacted, and if so, the facts supporting the inquiry or contact with ICE/CBP, the time supervisor approval was sought, the time ICE/CBP was contacted, the time it took to complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual.

On November 7, 2014, a United States District Court Judge issued an Order permanently enjoining enforcement of Arizona Revised Statute (A.R.S.) 13-2319, commonly referred to as the Arizona Human Smuggling Act. On November 17, 2014, MCSO issued Administrative Broadcast 14-75, prohibiting deputies from enforcing the above state statute, including arresting, detaining, or questioning persons for suspected (or even known) violations of the act and from extending the duration of traffic stops or other deputy-civilian encounters to do so.

We reviewed 105 traffic stops submitted for this Paragraph, and found that none of the stops involved any contacts with ICE/CBP. None of the stops we reviewed involved any inquires as to immigration status. In addition, our reviews of Incident Reports and Arrest Reports conducted as

WAI 53358

part of the audits for Paragraphs 89 and 101 revealed no immigration status investigations. MCSO remains in compliance with this Subparagraph. In addition, we monitor any complaints involve any traffic stops that contain an allegation that the race/ethnicity of the driver was a factor in how a driver was treated. During this reporting period, one such complaint investigation was closed by the Professional Standards Bureau (PSB). In that case, which occurred in 2009 with an investigation initiated in 2020, it was alleged that the deputy did not have a lawful reason to stop the vehicle and that the reason for the stop was because the occupants were of Latino heritage. It was also alleged that the deputy was rude and yelled at the two vehicle occupants. The investigation determined that there was insufficient evidence to prove or disprove that the deputy was rude or used race as a factor when conducting the traffic stop. (This case is further described under Paragraph 281.) This case was summarized on PSB's summary of closed cases for December 2020, which is posted on MCSO's website for public review.

Paragraph 54.k. requires MCSO to document whether any individual was asked to consent to a search (and the response), whether a probable-cause search was performed on any individual, or whether a pat-and-frisk search was performed on any individual. During our January 2018 site visit, we discussed with MCSO whether any other method may be feasible to identify a larger population of searches of individuals specific to the requirements of this Paragraph. MCSO's response was that the current method is appropriate, and that there may be more cases identified once deputies properly document the searches of persons consistent with this Paragraph.

MCSO provided training to deputies specific to consent searches during the 2019 Annual Combined Training on the Fourth and Fifth Amendment, which included a video that contained a scenario with a verbal exchange between a driver and a deputy who requested a consent search. In addition, on March 10, 2020, MCSO issued Administrative Broadcast Number 20-20, which reemphasized the training segment in relation to consent searches.

The method MCSO currently employs to identify our sample of cases to review is to identify the population of all traffic stops in which searches of individuals were documented on the VSCF. Once that population was identified, a random sample of 35 traffic stops from each month is identified for review. During some months, the number traffic stops that involve searches of persons is less than 35 traffic stops. In addition, we also review any cases in which the deputies performed searches of individuals in the sample of 105 traffic stops reviewed to assess compliance with Paragraphs 25 and 54 and the sample of traffic stops reviewed to assess compliance with Subparagraphs 25.d. and 54.g. When we identify issues that impact compliance or where MCSO policy was not followed, we provide the list of cases to MCSO for review. In the sample of traffic stops that we reviewed to assess compliance with Subparagraph 54.k, there were 10 stops identified that met the criteria of this Subparagraph:

- A white male driver was stopped for driving a motorcycle without a license plate. The driver's license was suspended, and he did not have a registration and evidence of insurance for the vehicle. The deputy requested consent to conduct a pat-and-frisk search of the driver. The driver granted consent and the deputy conducted the search. No contraband was found. The deputy did not inform the driver of the right to refuse the search or revoke the consent at any time, as required by MCSO policy. The deputy properly documented the search on the VSCF.

WAI 53359

- A Latina driver was stopped for a speeding violation. The deputy detected the odor of marijuana and asked the driver to exit the vehicle. The deputy requested consent to search the driver's pockets. The driver produced a prescription bottle with medication, and explained that she was the caregiver for the person who was named on the medication bottle. The driver granted consent and the deputy conducted the search. No contraband was found. The deputy did not inform the driver of the right to refuse the search or revoke the consent at any time, as required by MCSO policy. The deputy properly documented the search on the VSCF.

- A Latino deriver was stopped for driving with one headlight. The driver informed the deputy that his driver's license was in a suspended status. The deputy requested consent to conduct a pat-and-frisk search of the driver. The driver granted consent and the deputy conducted the search. No contraband was found. The deputy did not inform the driver of the right to refuse the search or revoke the consent at any time, as required by MCSO policy. The type of search conducted documented on the VSCF as a protective sweep, even though it was a consent search.

- A Black male driver was stopped for a speeding violation. The driver was investigated for driving under the influence. During the investigation, the deputy asked for the driver's consent to conduct a pat-and-frisk search of the driver. The driver gave his consent and the deputy conducted the search. No contraband was found. The deputy did not inform the driver of the right to refuse the search or revoke the consent at any time, as required by MCSO policy. The driver was subsequently arrested for driving under the influence. The deputy properly documented the search on the VSCF.

- A Black male driver was stopped for a speeding violation. The deputy detected the odor of marijuana. The driver was investigated for driving under the influence. During the investigation, the deputy asked for the driver's consent to conduct a pat-and-frisk search of the driver. The driver gave his consent and the deputy conducted a pat-and-frisk search of the driver's waist area. No contraband was found. The deputy did not inform the driver of the right to refuse the search or revoke the consent at any time, as required by MCSO policy. The deputy properly documented the search on the VSCF.

- A white female driver was stopped for a stop sign violation. The driver stopped in the driveway of a residence. The deputy was informed by the dispatcher that the license plate was not registered to the vehicle being stopped. As the deputy approached the vehicle, the driver exited the vehicle. The driver stated that she did not live at the residence and was there to visit an acquaintance. The deputy questioned the driver regarding the vehicle registration and the license plate. During the stop, the deputy requested and obtained consent from the driver to search her person. The deputy informed the driver that she can tell him to stop and he will discontinue the search. The deputy conducted the search and no contraband was found. A records check revealed that the driver had an outstanding warrant. The driver was arrested. The deputy properly documented the search on the VSCF.

WAI 53360

- A Black male driver was stopped for making an improper left turn. The vehicle was occupied by a white female passenger and a Latino passenger. During the stop, the deputy conducted a pat-and-frisk search of the driver. No contraband was found. The deputy did not document the existence of reasonable suspicion that the driver may be armed and may be dangerous as the premise for conducting the pat-and-frisk search. The deputy properly documented the search on the VSCF.

- A Latino driver was stopped for impeding traffic. The vehicle was occupied by a white male passenger and a Latino passenger. The driver was transporting the passengers as a ride-share driver. During the stop, the deputy conducted a pat-and-frisk search of the driver. No contraband was found. The deputy did not document the existence of reasonable suspicion that the driver may be armed and may be dangerous as the premise for conducting the pat-and-frisk search. The deputy properly documented the search on the VSCF.

- A white male driver was stopped for a speeding violation. The driver was investigated for driving under the influence. As the deputy prepared to conduct standard field sobriety tests, he asked the driver for a consent search of his person and asked the driver if he had any weapons on his person. The driver gave the deputy consent to search his person and stated that he did not have any weapons. No contraband was found. The driver was later searched incident to arrest for driving under the influence. The deputy did not document the consent search on the VSCF. The deputy documented the search incident to arrest properly on the VSCF.

- A Latino driver was stopped for driving with an expired registration. The vehicle was occupied by two Latina passengers. The driver informed the deputy that he had a knife on his person. As the deputy prepared to conduct standard field sobriety tests, the deputy asked the driver where the knife was located. The driver raised his arms and pointed to an inside pocket of his jacket. The deputy temporarily seized the knife. The deputy listed the search as a consent search.

During this reporting period, there were not any searches of persons identified in the sample of traffic stops reviewed to assess compliance with Paragraphs 25 and 54 and Subparagraphs 25.d. and 54.g.

WAI 53361

During this reporting period, there were no traffic stops identified in which deputies presented the Consent to Search Forms to document when consent was requested and obtained to search any vehicle occupants. MCSO has indicated that it does not require its deputies to use Consent to Search Forms as the primary means for documenting consent searches. MCSO requires that deputies document requests to conduct consent searches by way of video-recording the event via the BWCs. In the event the BWC is not operational, MCSO policy requires deputies to document requests to conduct consent searches on the Consent to Search Form. We continue to recommend that MCSO revisit the requirements of this section of the policy and require deputies to read the Consent to Search Form to the subject and require a signature from the individual for every request for consent to search. Due to the small population of cases that we and MCSO identified, it is important that deputies accurately document each search and/or request to a consent search, as required by this Subparagraph, to attain and maintain compliance with the requirement.

During the first reporting period of 2020, we determined that MCSO attained a compliance rating of 77%. During the second reporting period of 2020, we determined that MCSO attained a compliance rating of 75%. During the third reporting period of 2020, we determined that MCSO attained a compliance rating of 87%. During this reporting period, we determined that MCSO attained a compliance rating of 80%. MCSO is not in compliance with this requirement.

Paragraph 54.l. requires MCSO to document whether any contraband or evidence was seized from any individual, and the nature of the contraband or evidence. Generally, deputies seize the following types of contraband and/or evidence, which is documented on the VSCF, a Property Receipt, and an Incident Report: license plates; driver's licenses; alcoholic beverages; narcotics; narcotic paraphernalia; weapons; and ammunition. We conduct a review of the relevant documents and review the VSCF to ensure that deputies properly document the seizure of the evidence and/or contraband.

During our review of the collected traffic stop data (our sample of 105) during this reporting period, there were three items seized by deputies and placed into evidence. In all three cases, the items were properly documented on the VSCF.

In the cases we reviewed for searches of individuals under Subparagraph 54.k., there were 43 items seized by deputies and placed into evidence. Of those 43 items, there were three items that were seized and placed into evidence and the items were not properly listed on the VSCFs, as required by MCSO policy.

In the cases we reviewed for passenger contacts under Subparagraph 54.g., there were 21 items seized by deputies and placed into evidence. In all 21 cases, the items were properly documented on the VSCF.

In previous reporting periods, we noted an increase in the number of errors and omissions by deputies documenting the seizure of contraband or evidence on VSCFs. These issues have improved during this reporting period. During the first reporting period of 2020, MCSO attained a compliance rate of greater than 94%. During the second reporting period of 2020, MCSO attained a compliance rate of 78%; and we reported that MCSO would remain in compliance with this requirement during that reporting period. However, MCSO would be required to attain a compliance rate of greater the 94% during the third reporting period to maintain compliance with

WAI 53362

this requirement. During the third reporting period of 2020, MCSO attained a compliance rating of greater than 94%. During this reporting period, MCSO attained a compliance rating of 96%. MCSO remains in compliance with this requirement.

Paragraph 54.m. requires the documentation of the final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without a citation. In all 105 cases we reviewed, we found documentation indicating the final disposition of the stop; and whether the deputy made an arrest, issued a citation, issued a warning, or made a release without a citation. MCSO remains in compliance with this Subparagraph.

MCSO has failed to achieve compliance with all of the Subparagraphs of Paragraph 54. MCSO is not in compliance with Paragraph 54.


***Paragraph 55.*** *MCSO shall assign a unique ID for each incident/stop so that any other documentation (e.g., citations, incident reports, tow forms) can be linked back to the stop.*

**In Full and Effective Compliance**

To verify compliance for this Paragraph, we reviewed a sample of the Vehicle Stop Contact Forms, CAD printouts, I/Viewer documentation, citations, warning forms, and any Incident Report that may have been generated as a result of the traffic stop.

The unique identifier "went live" in September 2013 when the CAD system was implemented. This number provides the mechanism to link all data related to a specific traffic stop. The number is automatically generated by the CAD software and is sent to the deputy's MDT at the time the deputy advises Communications of the traffic stop. The unique identifier is visible and displayed at the top of the CAD printout and also visible on the Vehicle Stop Contact Form, the Arizona Traffic Citation, and the Warning/Repair Form.

Once the deputy scans the motorist's driver's license, the system automatically populates most of the information into one or more forms required by the Order. If the data cannot be entered into TraCS from the vehicle (due to malfunctioning equipment), policy requires the deputy to enter the written traffic stop data electronically prior to the end of the shift. The start and end times of the traffic stop are now auto-populated into the Vehicle Stop Contact Form from the CAD system.

Since our first visit for monitoring purposes in June 2014, TraCS has been implemented in all Districts; and the unique identifier (CFS number) is automatically entered from the deputy's MDT. No user intervention is required.

WAI 53363

To determine compliance with this requirement, we reviewed 105 traffic stop cases and reviewed the CAD printouts and the Vehicle Stop Contact Forms for all stops. We reviewed the Warning/Repair Forms, when applicable, for those stops where a warning was issued or the vehicle had defective equipment. The unique identification number assigned to each event was listed on correctly on all CAD printouts for every stop. A review was conducted of the Tow Sheets prepared by deputies in instances where a driver's vehicle is towed. In each instance, the unique identification number assigned to each event was listed correctly on the Tow Sheet. A review of the Incident Reports prepared by deputies in instances where policy requires the preparation of the report was conducted. In each instance, the unique identification number assigned to each event was listed correctly on the Incident Report. MCSO remains in compliance with this requirement.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 56.** *The traffic stop data collection system shall be subject to regular audits and quality control checks. MCSO shall develop a protocol for maintaining the integrity and accuracy of the traffic stop data, to be reviewed by the Monitor pursuant to the process described in Section IV.*

**Phase 1:** Not in compliance

- EB-2 (Traffic Stop Data Collection), most recently amended on January 7, 2020.

- EIU Operations Manual, currently under revision.

**Phase 2:** Not in compliance

To verify compliance for this Paragraph, we reviewed the monthly audits of the traffic stop data conducted by BIO on the monthly samples we select. While audits require in-depth analysis, our quality control checks serve as an inspection or spot-check of traffic stop data. We reviewed the BIO traffic stop audits for the October 1-December 31, 2020 time period, and found that the audits were thorough and captured most deficiencies. During our review of the sample dataset, we brought some deficiencies to the attention of CID during our January 2021 remote site visit; we identify them in other areas of this report.

The draft EIU Operations Manual, which includes procedures for traffic stop data quality assurance, has 27 of the 30 sections approved. The remaining sections under development cannot be finalized until the Traffic Stop Monthly Report (TSMR) methodology related to the analyses of traffic stop data is finalized and determined to be reliable and valid in accordance with the requirements of Paragraphs 66 and 67. The TSMR methodology is being piloted by MCSO. (See below.) The remaining sections of the EIU Operations Manual also require procedures for the Traffic Stop Annual Report (TSAR) methodology, which is approved. The remaining task for MCSO regarding TSAR is to include the procedures for implementing the approved methodology into the EIU Operations Manual. Phase 1 compliance with this Paragraph requires that all sections of the EIU Operations Manual have been reviewed and approved.

WAI 53364

On September 8, 2015, MCSO issued Administrative Broadcast 15-96, which addressed the security of paper traffic stop forms. The procedure requires that paper forms (related to traffic stop data that may be handwritten by deputies in the field if the TraCS system is nonoperational due to maintenance or lack of connectivity) be stored in a locked cabinet and overseen by the Division Commander. Because of the COVID-19 pandemic, we were unable to travel to Maricopa County and visit the Districts to confirm that all records were locked and secure, that logs were properly maintained, and that only authorized personnel had access to these files. This activity will be delayed until we are able to resume our in-person site visits. However, we note that MCSO has a consistent track record of complying with this Order requirement.

MCSO began auditing traffic stop data in January 2014; since April 2014, MCSO has conducted audits of the data monthly and provided those results to us. MCSO conducts audits of the 105 traffic stop sample that we request each reporting period. MCSO also conducts a more expansive review of 30 of the 105 sample pulls we request each reporting period to include passenger contacts and persons' searches. EB-2 also requires regularly scheduled audits of traffic stop data on a monthly basis. We reviewed BIO's monthly audits of the traffic samples from July 1- September 30, 2020, and found them to be satisfactory.

To achieve Phase 1 compliance with this Paragraph, MCSO must finalize the EIU Operations Manual to cover all matters applicable to this Paragraph. To achieve Phase 2 compliance with this Paragraph, MCSO must demonstrate ongoing use of the procedures to ensure traffic stop data quality assurance.

***Paragraph 57.*** *MCSO shall explore the possibility of relying on the CAD and/or MDT systems to check if all stops are being recorded and relying on on-person recording equipment to check whether Deputies are accurately reporting stop length. In addition, MCSO shall implement a system for Deputies to provide motorists with a copy of non-sensitive data recorded for each stop (such as a receipt) with instructions for how to report any inaccuracies the motorist believes are in the data, which can then be analyzed as part of any audit. The receipt will be provided to motorists even if the stop does not result in a citation or arrest.*

**In Full and Effective Compliance**

To verify compliance for this Paragraph, we reviewed all TraCS forms for each traffic stop that were included in the sample. In addition, we reviewed a subset of CAD audio recordings and body-worn camera footage of the stops.

The system for providing "receipts" is outlined in EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) and EB-2 (Traffic Stop Data Collection). GJ-35 addresses the requirement that supervisors review recordings to check whether deputies are accurately reporting stop length. In addition to GJ-35, BIO developed a Body-Worn Camera Matrix for its inspectors to review camera recordings.

WAI 53365

The deputy should provide every person contacted on a traffic stop with an Arizona Traffic Ticket or Complaint (Citation), a Written Warning/Repair Order (Warning), or an MCSO Incidental Contact Receipt. For this reporting period, deputies issued citations or written warnings in all 105 cases we reviewed.

We did not identify any issues with the citations, warnings, and Incidental Contact Receipts issued to drivers for the cases reviewed under Subparagraphs 25.d. and 54.g., contact with passengers, and Subparagraph 54.k., searches of persons.

MCSO's compliance rate with this requirement is 100%. MCSO remains in compliance with this portion of the Subparagraph.

The approved policies dictate that the CAD system will be used for verification of the recording of the initiation and conclusion of the traffic stop and that MCSO will explore the possibility of relying on the BWC recordings to verify that the stop times reported by deputies are accurate. The deputy verbally announces the stops initiation and termination on the radio, and then CAD permanently records this information. In May 2016, MCSO advised us that all deputies and sergeants who make traffic stops had been issued body-worn cameras and that they were fully operational. We verified this assertion during our July 2016 site visit; and since that time, we have been reviewing the BWC recordings to determine if stop times indicated by CAD were accurate. MCSO's Audit and Inspections Unit (AIU) conducts monthly inspections of traffic stop data, which includes an assessment as to whether the BWC video captured the traffic stop in its entirety; to verify the time the stop began; and to verify if all information on forms prepared for each traffic stop match the BWC video. AIU conducts reviews of 30 body-worn camera recordings each reporting period.

During this reporting period, we requested from MCSO 30 body-worn camera recordings for our review. We are able to use the BWC recordings that were provided for each stop to assess whether deputies are accurately reporting the stop length. The compliance rate for the sample of 30 cases selected from the 105 stops reviewed for using the BWC to determine if deputies are accurately reporting stop length is 100%. MCSO remains in compliance with this requirement.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 58.** *The MCSO shall ensure that all databases containing individual-specific data comply with federal and state privacy standards governing personally identifiable information. MCSO shall develop a process to restrict database access to authorized, identified users who are accessing the information for a legitimate and identified purpose as defined by the Parties. If the Parties cannot agree, the Court shall make the determination.*

**In Full and Effective Compliance**

WAI 53366

To verify compliance for this Paragraph, we reviewed the applicable policies and requested that Technology Management Bureau personnel provide us with information regarding any unauthorized access and/or illegitimate access to any of MCSO's database systems that had been investigated by PSB. The policies state that the dissemination of Criminal History Record Information (CHRI) is based on federal guidelines, Arizona statutes, the Department of Public Safety (ASDPS), and the Arizona Criminal Justice Information System (ACJIS); and that any violation is subject to fine. No secondary dissemination is allowed. The policies require that the Professional Standards Bureau (PSB) provide written notification to the System Security Officer whenever it has been determined that an employee has violated the policy by improperly accessing any Office computer database system. Every new recruit class receives three hours of training on this topic during initial Academy training.

During this reporting period, we inquired whether there had been any instances of unauthorized access to and/or any improper uses of the database systems. MCSO informed us that during this reporting period, PSB did not identify any closed cases in which there was a finding that there was unauthorized access to and/or any improper uses of MCSO's database systems. MCSO remains in compliance with this requirement.

On June 22, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 59.** *Notwithstanding the foregoing, the MCSO shall provide full access to the collected data to the Monitor and Plaintiffs' representatives, who shall keep any personal identifying information confidential. Every 180 days, MCSO shall provide the traffic stop data collected up to that date to the Monitor and Plaintiffs' representatives in electronic form. If proprietary software is necessary to view and analyze the data, MCSO shall provide a copy of the same. If the Monitor or the Parties wish to submit data with personal identifying information to the Court, they shall provide the personally identifying information under seal.*

### In Full and Effective Compliance

Electronic traffic stop data capture began on April 1, 2014. The forms created by MCSO capture the traffic stop details required by MCSO policy and Paragraphs 25 and 54. BIO provides the traffic stop data on a monthly basis, which includes a spreadsheet of all traffic stops for the reporting period, listing Event Numbers as described at the beginning of Section 7. All marked patrol vehicles used for traffic stops are now equipped with the automated TraCS system, and all Patrol deputies have been trained in TraCS data entry. MCSO has provided full access to all available electronic and written collected data since April 1, 2014. MCSO did not collect electronic data before this time. During this reporting period, MCSO has continued to provide full access to the traffic stop data.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 53367

### b. Electronic Data Entry

***Paragraph 60.*** *Within one year of the Effective Date, the MCSO shall develop a system by which Deputies can input traffic stop data electronically. Such electronic data system shall have the capability to generate summary reports and analyses, and to conduct searches and queries. MCSO will explore whether such data collection capability is possible through the agency's existing CAD and MDT systems, or a combination of the CAD and MDT systems with a new data collection system. Data need not all be collected in a single database; however, it should be collected in a format that can be efficiently analyzed together. Before developing an electronic system, the MCSO may collect data manually but must ensure that such data can be entered into the electronic system in a timely and accurate fashion as soon as practicable.*

### In Full and Effective Compliance

To verify compliance with this Paragraph, we reviewed the documents generated electronically that capture the required traffic stop data. The electronic data entry of traffic stop data by deputies in the field went online on April 1, 2015. If TraCS experiences a malfunction in the field, there is a protocol that requires the deputy to electronically enter the traffic stop data prior to the end of the shift.

MCSO continues to conduct monthly traffic stop inspections and forwards them for our review. Initially, the traffic stop data was captured on handwritten forms created by MCSO, completed by the deputy in the field, and manually entered in the database by administrative personnel located at each District. Now all traffic stop data is entered electronically, whether in the field or at MCSO District offices. Occasionally, connectivity is lost in the field due to poor signal quality, and citations are handwritten. Per policy, deputies must enter electronically any written traffic stop data they have created by the end of the shift in which the event occurred. As noted in our Paragraph 90 review, VSCFs are routinely entered into the system by the end of the shift.

Deputies have demonstrated their ability to access and use TraCS, as evidenced by the fact that their total time on a traffic stop averages 16 minutes or less.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

### c. Audio-Video Recording of Traffic Stops

***Paragraph 61.*** *The MCSO will issue functional video and audio recording equipment to all patrol deputies and sergeants who make traffic stops, and shall commence regular operation and maintenance of such video and audio recording equipment. Such issuance must be complete within 120 days of the approval of the policies and procedures for the operation, maintenance, and data storage for such on-person body cameras and approval of the purchase of such equipment and related contracts by the Maricopa County Board of Supervisors. Subject to Maricopa County code and the State of Arizona's procurement law, The Court shall choose the vendor for the video and audio recording equipment if the Parties and the Monitor cannot agree on one.*

WAI 53368

**In Full and Effective Compliance**

During our September 2014 site visit, we met with two MCSO Deputy Chiefs and other personnel to discuss MCSO's progress of acquiring in-car video and audio equipment for all patrol vehicles used to conduct traffic stops. MCSO had initially set out to purchase fixed in-car cameras as required by the Order, but expressed an interest in acquiring body-worn video and audio recording devices for deputies. The Court issued an Order providing an amendment/stipulation on October 10, 2014, requiring on-body cameras. This was a prudent decision, in that it allows for capturing additional data, where a fixed mounted camera has limitations. We have documented MCSO's transition from in-car to body-worn cameras (BWC) in our previous quarterly status reports.

Records indicate that MCSO began distribution of body-worn cameras on September 14, 2015, and full implementation occurred on May 16, 2016. The body-worn camera recordings are stored in a cloud-based system (on evidence.com) that can be easily accessed by supervisors and command personnel. The retention requirement for the recordings is three years. In July 2019, MCSO began distribution of the newer version of body-worn cameras to deputies. During our October 2019 site visit, MCSO reported that deputies assigned to the Districts have all been equipped with the new body-worn cameras; and that deputies in specialized assignments were being equipped with the new devices. The new version of body-worn cameras purchased by MCSO is mounted on the chest area via a magnetic mount. In addition, the devices are self-contained, meaning that the device does not have any cords or wires that may become disconnected, which had been a recurring problem with the previous devices.

To verify that all Patrol deputies have been issued body-worn cameras, and properly use the devices, we review random samples of the traffic stops as described in Paragraphs 25 and 54. In addition, during our District visits in January 2020, we observed that deputies were equipped with body-worn cameras. Because of the COVID-19 pandemic, we were unable to travel to Maricopa County and visit the Districts to observe deputies being equipped with the body-worn cameras. However, it is clear that MCSO maintains a robust deployment of BWCs, given the ready availability of recordings for our review, and our observations of deputies properly wearing the cameras in the videos we inspect. Our inspections will commence once we are able to resume our in-person site visits.

On December 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 53369

**Paragraph 62.** *Deputies shall turn on any video and audio recording equipment as soon the decision to initiate the stop is made and continue recording through the end of the stop. MCSO shall repair or replace all non-functioning video or audio recording equipment, as necessary for reliable functioning. Deputies who fail to activate and to use their recording equipment according to MCSO policy or notify MCSO that their equipment is nonfunctioning within a reasonable time shall be subject to Discipline.*

**Phase 1:** In compliance

- GJ-35 (Body-Worn Cameras), most recently amended on December 31, 2019.

- Body-Worn Camera Operations Manual, published on December 22, 2016.

**Phase 2**: In compliance

MCSO evaluated on-person body cameras from other jurisdictions and selected a vendor (TASER International, now known as Axon). Body-worn cameras have been implemented in all Districts since May 2016 and are fully operational. As mentioned under Paragraph 61, MCSO has obtained, and has equipped the deputies in the Districts with new body-worn cameras, also provided by Axon.

To verify compliance for this Paragraph, we reviewed the body-worn camera recordings included in our monthly samples. This includes the stops reviewed each month for Paragraphs 25 and 54; the stops reviewed each month for Subparagraph 54.k.; and the stops reviewed each month for Subparagraph 54.g. For purposes of calculating compliance, we exclude any stops where the deputies documented on the VSCF that the BWCs malfunctioned during the stop.

For our selection of a sample to review BWC recordings, we used the same sample of 30 cases we selected for the CAD audio request. In 29 of the 30 cases in which we requested BWC recordings, the deputies properly activated the body-worn cameras during the traffic stop events. In one case, MCSO was unable to locate a body-worn camera for the traffic stop. There was no documentation of any malfunction of the body-worn camera or any exigent circumstances that prevented the activation of the body-worn camera. AIU's inspection identified this issue, as well, and sent a BIO Action Form to the District to document any corrective action taken.

In our sample of body-worn camera recordings reviewed for Subparagraph 54.k., we identified three cases where MCSO was unable to locate body-worn camera recordings for the traffic stops. In each of the cases, there was no documentation of any malfunction of the body-worn cameras or any exigent circumstances that prevented the activation of the body-worn cameras.

In our sample of body-worn camera recordings for Subparagraph 54.g., we identified one case where there was no body-worn camera recording for the traffic stop. There was no documentation of any malfunction of the body-worn camera or any exigent circumstances that prevented the activation of the body-worn camera. In one case, the deputy activated the body-worn camera as he approached the driver's side of the vehicle, just prior to his contact with the driver. The deputy did not make any notation that provided an explanation for the late activation. There was no documentation of any malfunction of the body-worn camera or any exigent circumstances that prevented the timely activation of the body-worn camera.

WAI 53370

The remainder of the cases were in compliance, with the deputy activating the video- and audio-recording equipment as soon as the deputy decided to initiate the stop, and continuing to record through the end of the stop. We continue to provide MCSO with the information on the cases where issues are identified for its review.

MCSO's compliance rate for this requirement is 98%.

There are still a number of instances in which deputies respond to assist at traffic stops and do not complete the Assisting Deputy and Body-Worn Camera Log. With the issuance of GJ-35 (Body-Worn Cameras), effective on December 31, 2019, the policy is now consistent with EB-2 (Traffic Stop Data Collection), which requires that each deputy assisting on a traffic stop prepare the Assisting Deputy and Body-Worn Camera Log. We had anticipated that the policy clarification, coupled with effective supervisory reviews, would assist deputies to understand when they are required to complete the log. However, we continue to identify instances where the log was not prepared when required.

Our reviews of the body-worn camera recordings often reveal instances of deputies exhibiting positive, model behavior; and, at times, instances of deputies making errors, or exhibiting less than model behavior – all of which would be useful for training purposes. We also reviewed the Professional Standards Bureau's monthly summary of closed cases for October, November, and December 2020. The following cases were identified that involve the review of body-worn camera recordings to assist in the determination of whether the allegations were valid or not:

- In one case, it was alleged that a deputy was rude at the scene of a traffic crash. A review of the body-worn camera recording revealed that the complainant interfered with an on-scene traffic crash and that the deputy addressed the complainant in a direct and authoritative manner. It was determined that the deputy's actions were proper.

- In one case, it was alleged that a deputy did not properly investigate a traffic crash and that the deputy communicated with the complainant in a condescending and verbally aggressive manner on the telephone. A review of the body-worn camera recording revealed that the deputy did not conduct a proper investigation of the traffic crash and that the deputy failed to properly communicate with the complainant. The deputy was disciplined with the issuance of a written reprimand.

- In one case, it was alleged that a deputy used excessive force, failed to provide a warning prior to using a Taser, failed to photograph the Taser signature marks, conducted an improper search of the subject, and failed to make a reasonable decision regarding the subject's care. It was also alleged that the deputy was untruthful when preparing an incident report and a use of force form. A review of the body-worn camera recordings of the incident, and an investigation into the incident, revealed that, with the exception of the search of the subject, that the allegations had merit. The deputy was not disciplined as he has resigned from MCSO.

WAI 53371

- In one case, it was alleged that a deputy did not conduct a proper investigation and that he acted in an unprofessional manner toward the complainant. A review of the body-worn camera recording revealed that the deputy conducted a proper investigation and that he acted in a professional manner toward the complainant.

- In one case, it was alleged that a deputy was sleeping while on duty. Based on a review of the body-worn camera recording and the patrol vehicle's GPS data, it was determined that the deputy was not sleeping on duty as was alleged.

- It was alleged that a deputy, failed to stop at a red signal and that he did not use his siren, which nearly caused a traffic crash. Based on a review of the body-worn camera recording and statements obtained by witnesses, it was determined that the deputy had activated his patrol vehicle's emergency lights and siren as he neared the intersection and that he came to a controlled stop before entering the intersection.

- In one case, it was alleged that a deputy was rude and aggressive toward the complainant who was attempting to gain access to a lake for boating purposes. A review of the body-worn camera recording revealed that the deputy acted in a professional manner toward the complainant and that the deputy supported the park staff who denied the complainant access to the lake.

- In one case, an anonymous complainant alleged that a deputy was unprofessional and confrontational when speaking to a group of cyclists. A review of the body-worn camera recording revealed that the allegations against the deputy were false.

- In one case, it was alleged that a deputy used a racial slur toward a complainant and attempted to trip the complainant while handcuffed. The complainant also alleged that statements in the deputy's report were inaccurate. A review of the body-worn camera recording revealed that that the allegations that the deputy used a racial slur and attempted to trip the complainant were false. In addition, the review also revealed that the deputy included information in his report based on the facts known to deputy at the time of the incident.

- In one case, it was alleged that a deputy acted in a rude and harsh manner during a traffic stop. A review of the body-worn camera recording revealed that the allegations that the deputy acted in a rude and harsh manner during the traffic stop were false.

- In one case, it was alleged that a deputy did not take proper action on a call for service based on a person's race. A review of the body-worn camera recording revealed that the deputy did not have probable cause to take action based on the circumstances and that the allegation that the deputy used race as a factor was not supported by fact.

- In one case, it was alleged that a deputy was rude and treated the complainant like a suspect because of her race. A review of the body-worn camera recording revealed that the deputy acted in a professional manner and provided assistance in accordance with MCSO policy. The investigation determined that the allegations of rude and racially biased behavior were false.

WAI 53372

- In one case, it was alleged that a deputy was rude to the complainant's daughter during a call for service. A review of the body-worn camera recording revealed that the deputy acted in a professional manner during the entire interaction while at the call for service.

As demonstrated with the aforementioned examples, body-worn cameras recordings have proven to be invaluable in resolving complaints alleging misconduct by deputies.


***Paragraph 63.*** *MCSO shall retain traffic stop written data for a minimum of 5 years after it is created, and shall retain in-car camera recordings for a minimum of 3 years unless a case involving the traffic stop remains under investigation by the MCSO or the Monitor, or is the subject of a Notice of Claim, civil litigation or criminal investigation, for a longer period, in which case the MCSO shall maintain such data or recordings for at least one year after the final disposition of the matter, including appeals. MCSO shall develop a formal policy, to be reviewed by the Monitor and the Parties pursuant to the process described in Section IV and subject to the District Court, to govern proper use of the on-person cameras; accountability measures to ensure compliance with the Court's orders, including mandatory activation of video cameras for traffic stops; review of the camera recordings; responses to public records requests in accordance with the Order and governing law; and privacy protections. The MCSO shall submit such proposed policy for review by the Monitor and Plaintiff's counsel within 60 days of the Court's issuance of an order approving the use of on-body cameras as set forth in this stipulation. The MCSO shall submit a request for funding to the Maricopa County Board of Supervisors within 45 days of the approval by the Court or the Monitor of such policy and the equipment and vendor(s) for such on-body cameras.*

**In Full and Effective Compliance**

MCSO developed and issued a protocol and policy that requires the original hardcopy form of any handwritten documentation of data collected during a traffic stop to be stored at the District level and filed separately for each deputy. When a deputy is transferred, his/her written traffic stop information follows the deputy to his/her new assignment. During our January 2020 site visit, we inspected the traffic stop written data files at District 2 and District 6 to ensure that hardcopies of traffic stop cases are stored for a minimum of five years. We found that the records were in order and properly secured. Because of the COVID-19 pandemic, we were unable to travel to Maricopa County and visit the Districts to confirm that all traffic stop written data is being kept in a locked and secure manner and that only authorized personnel have access to the files. Our inspections will commence once we are able to resume our in-person site visits. MCSO remains in compliance with this requirement.

On June 22, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 53373

### d. Review of Traffic Stop Data

***Paragraph 64.*** *Within 180 days of the Effective Date, MCSO shall develop a protocol for periodic analysis of the traffic stop data described above in Paragraphs 54 to 59 ("collected traffic stop data") and data gathered for any Significant Operation as described in this Order ("collected patrol data") to look for warning signs or indicia or possible racial profiling or other improper conduct under this Order.*

**Phase 1:** Not in compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on February 25, 2021.

- EB-2 (Traffic Stop Data Collection), most recently amended on January 7, 2020.

- GJ-33 (Significant Operations), most recently amended on May 10, 2018.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

- GH-5 (Early Identification System), most recently amended on March 3, 2021.

- EIU Operations Manual, currently under revision.

**Phase 2:** Not in compliance

MCSO will achieve Phase 1 compliance with this Paragraph when it incorporates its protocols for periodic analyses of the traffic stop data into the EIU Operations Manual. To achieve Phase 2 compliance with this Paragraph, MCSO must demonstrate ongoing use of the methodologies delineated in the protocol established for Phase 1 compliance for the periodic analyses used to identify racial profiling or other bias-based problems.


***Paragraph 65.*** *MCSO shall designate a group with the MCSO Implementation Unit, or other MCSO Personnel working under the supervision of a Lieutenant or higher-ranked officer, to analyze the collected data on a monthly, quarterly and annual basis, and report their findings to the Monitor and the Parties. This review group shall analyze the data to look for possible individual-level, unit-level or systemic problems. Review group members shall not review or analyze collected traffic stop data or collected patrol data relating to their own activities.*

**Phase 1:** In compliance

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

- GH-5 (Early Identification System), most recently amended on March 3, 2021.

**Phase 2:** Not in compliance

WAI 53374

The Traffic Stop Analysis Unit (TSAU) is directly responsible for analyses of traffic stop data on a monthly, quarterly, and annual basis to identify warning signs or indicia or possible racial profiling or other improper conduct as required by Paragraph 64. MCSO must report TSAU's findings from its analyses to the Monitor and the Parties.

Paragraph 65 requires quarterly analyses of traffic stop data. MCSO submitted its first quarterly report, Maricopa County Sheriff's Office Traffic Stop Quarterly Review (TSQR1), on October 22, 2020. TSQR1 was intended to be completed during the third quarter of calendar year 2020, but due to an internal miscommunication problem within MCSO, it was not shared with us and the Parties until October. Based on our discussions with MCSO, we agreed to treat TSQR1 as being completed during the third quarter of calendar year 2020.

MCSO understands that once it starts conducting quarterly analyses, it must do so continuously every quarter to maintain compliance.

TSQR1 reported two global findings. The first is that supervisors are inconsistent in their approach to reviewing, documenting, and discussing monthly traffic stop reviews. The second is that supervisors are unclear on MCSO's expectations about the review process. In our view, TSQR1 makes a strong case for improved training, clarification from MCSO about expectations for supervisors responsible for conducting monthly traffic stop reviews, and increased guidance for supervisors about how to standardize traffic stop review practices.

MCSO completed its second quarterly report on October 16, 2020. The report is titled "Supervisor Survey of TSAR3 Intervention (TSQR2)." MCSO sought supervisor feedback from those who had participated in the most recent intervention process (associated with the Third TSAR) regarding time spent, support received, perception of the process, and overall lessons learned during the intervention process from the perspective of the field. In general, the study's conclusions fall into four areas: 1) there is a need for much improved training; 2) there is a need for substantial improvement in the supervisor and deputy orientation process; 3) there is a need to ensure that those alerted for intervention be well-founded and properly vetted before interventions are expected; 4) supervisors indicated the intervention process was time-consuming and required excessive review and documentation that took them away from other responsibilities; and 5) there is a need for a more extensive and systematic evaluation about the impact of the interventions, besides using supervisor perceptions about employee performance.

Paragraph 65 also requires MCSO to conduct monthly analyses of traffic stop data. MCSO's original monthly process to analyze traffic stop data began in 2015, but was suspended in May 2016 because of our determination that the original process lacked statistical validity and required significant refinement to improve the identification of potential alerts in EIS. MCSO resumed monthly analyses of traffic stop data in May 2017 using a new methodology that was statistically based, but generated a substantial number of alerts, many of which did not demonstrate a pattern of potential bias sufficient to warrant the setting of an alert in EIS. Because of this problem, we suspended the process during our July 2017 site visit to allow EIU time to consider possible refinements to the existing methodology.

WAI 53375

MCSO's vendor, CNA, proposed a new methodology for the monthly analysis of traffic stop data (TSMR) that involves using a comparative analysis involving propensity score weighting for those deputies making more than 20 stops over a rolling 12-month period. For those deputies making fewer than 20 stops over the same period, the methodology involves using descriptive statistics to compare a deputy to their peers – meaning in this particular instance, those who are also in the pool of deputies making fewer than 20 stops. The TSMR methodology's general approach was approved in January 2020. MCSO provided more detail about the implementation of the TSMR methodology, which was approved in April 2020. The TSMR methodology is now approved and will be implemented in a pilot program, currently under development.

The piloting of the TSMR methodology will involve developing thresholds for benchmarks required by Paragraph 67, below. These thresholds are the means to generate deputy-level alerts representing warning signs or indicia or possible racial profiling or other improper conduct as required by Paragraph 64. We and the Parties have worked with MCSO on an ongoing basis with periodic telephonic meetings to maintain momentum of the implementation of TSMR and to track the progress of the pilot.

MCSO uses annual analyses of traffic stop data to look for evidence of systemic bias. (See Paragraph 66.)

MCSO will achieve Phase 2 compliance with this Paragraph when its periodic analyses involve the consistent use of a statistical methodology designed to identify patterns of deputy behavior at odds with their peers.


***Paragraph 66.*** *MCSO shall conduct one agency-wide comprehensive analysis of the data per year, which shall incorporate analytical benchmarks previously reviewed by the Monitor pursuant to the process described in Section IV. The benchmarks may be derived from the EIS or IA-PRO system, subject to Monitor approval. The MCSO may hire or contract with an outside entity to conduct this analysis. The yearly comprehensive analysis shall be made available to the public and at no cost to the Monitor and Plaintiffs.*

**Phase 1:** In compliance

- EB-2 (Traffic Stop Data Collection), most recently amended on January 7, 2020.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

- GH-5 (Early Identification System), most recently amended on March 3, 2021.

**Phase 2:** In compliance

MCSO has completed five comprehensive annual Traffic Stop Annual Reports (TSARs) analyzing traffic stop data to look for systemic evidence of racial profiling or other bias-based policing. The first three TSARs were conducted by MCSO's first contract vendor, Arizona State University. The latest two TSARs were conducted by MCSO's current vendor, CNA.

WAI 53376

MCSO released the first TSAR in May 2016 titled, "Preliminary Yearly Report for the Maricopa County's Sheriff's Office, Years 2014-2015." It found that there are deputies engaged in racially-biased policing when compared to the average behavior of their peers.

MCSO released the second TSAR in March 2017. This evaluation confirmed the first report's main finding that racially-biased policing within MCSO appears to be both a deputy- and organizational-level problem.

MCSO released its third TSAR in May 2018, which reported the same results of its two predecessor reports: racially-biased policing persists within MCSO at the organizational level.

MCSO released its fourth TSAR in September 2019, employing a new methodology that we approved in April 2019. It reported disparate outcomes by race of driver, but the report never explained what these findings indicated with regard to systemic bias. More specifically, unlike the previous three TSARs that reported the presence of systemic bias within the Patrol Division of MCSO, the Fourth TSAR failed to make a determination on whether the findings of disparate outcomes were a systemic problem. We, MCSO, and the Parties all agreed that such conclusionary statement was required. In October 2019, the Sheriff issued a statement that read, "The 4th Traffic Stop Annual Report continues to show disparate outcomes in our traffic stops of minorities. These disparate outcomes are warning signs of potential racial bias in our patrol function, which has been and continues to be a major concern for the Office. These may be indicative of a systemic problem. We will continue to work with the Monitor and the Parties on how best to determine the cause of these disparate outcomes and how best to address racial bias in our patrol function, where it exists. We will remain diligent, continue to develop our internal oversight, accountability and consequences to properly address and root out any behaviors in conflict with our commitment to ethical, constitutional policing practices."

In May 2020, MCSO released its fifth report, which reported findings that are consistent with past TSARs. The Fifth TSAR found that there were statistically significant disparities comparing Latino to whites for all post-stop outcomes, except seizures. It also reported that the disparities were potential indicia of bias as described in the First Order. In a statement subsequent to the release of TSAR5, the Sheriff issued a statement that read: "[TSAR5] [s]hows disparate outcomes in our traffic stops of minorities similar to the outcomes……[and that]…these disparate outcomes are warning signs of potential racial bias in our patrol function…." The Sheriff committed to determining the cause of the disparate outcomes and working to address them.


**Paragraph 67.** *In this context, warning signs or indicia of possible racial profiling or other misconduct include, but are not limited to:*

a.     *racial and ethnic disparities in deputies', units' or the agency's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of deputies' duties, or racial or ethnic disparities in traffic stop patterns when compared with data of deputies' peers;*

WAI 53377

b.        *evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;*

c.        *a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;*

d.        *indications that deputies, units or the agency is not complying with the data collection requirements of this Order; and*

e.        *other indications of racial or ethnic bias in the exercise of official duties.*

**Phase 1:** In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on February 25, 2021.

- EB-2 (Traffic Stop Data Collection), most recently amended on January 7, 2020.

- GH-5 (Early Identification System), most recently amended on March 3, 2021.

**Phase 2:** Not in compliance

MCSO has conducted monthly and annual analyses of traffic stop data and provided documents discussing how the benchmarks required by this Paragraph are used to set alerts for possible cases of racial profiling or other deputy misconduct involving traffic stops. Discussion about the monthly and annual analyses are incorporated into Paragraphs 65 and 66.

We have discussed in our previous quarterly status reports that MCSO has achieved Phase 1 compliance with this Paragraph as a result of its intent to implement the individual benchmarks required by this Paragraph. These benchmarks are highlighted below and are generally referred to as post-stop outcomes in the TSMR and TSAR methodologies.

Paragraph 67.a. identifies three benchmarks pertaining to racial and ethnic disparities. The first benchmark references disparities or increases in stops for minor traffic violations (Benchmark 1). The second benchmark addresses disparities or increases in arrests following traffic stops (Benchmark 2). The third benchmark addresses disparities or increases in immigration status inquiries (Benchmark 3). Since these three benchmarks are incorporated into the EIU Operations Manual and are incorporated as post-stop outcomes in the TSMR methodology being piloted, MCSO is in compliance with Paragraph 67.a.

Paragraph 67.b. identifies a benchmark pertaining to evidence of an extended traffic stop involving Latino drivers or passengers (Benchmark 4). Since this benchmark is now incorporated into the EIU Operations Manual and is incorporated in the TSMR methodology being piloted, MCSO is in compliance with Paragraph 67.b.

WAI 53378

Paragraph 67.c. identifies three benchmarks. The first benchmark pertains to the rate of citations (Benchmark 5): MCSO is required to identify citation rates for traffic stops that are outliers when compared to a deputy's peers. The second benchmark (Benchmark 6) pertains to seizures of contraband: MCSO is required to identify low rates of seizures of contraband following a search or investigation. The third benchmark in Paragraph 67.c. (Benchmark 7) is similar to Benchmark 6, but it pertains to arrests following a search or investigation. This is also the case for Benchmark 7. Since the three benchmarks are now incorporated into the EIU Operations Manual and are incorporated as post-stop outcomes in the TSMR methodology being piloted, MCSO is in compliance with Paragraph 67.c.

Paragraph 67.d. establishes a benchmark pertaining to agency, unit, or deputy noncompliance with the data collection requirements under the First Order (Benchmark 8). This benchmark requires that any cases involving noncompliance with data collection requirements results in an alert in EIS. EIU published an Administrative Broadcast on November 28, 2016 to instruct supervisors how to validate data in TraCS for those cases involving duplicate traffic stop records to deliver timely data validation for our review. MCSO's draft EIS Project Plan 4.0 reported that MCSO began the data validation process for this benchmark on November 28, 2016. Therefore, MCSO is in compliance with Paragraph 67.d.

Paragraph 67.e. allows for other benchmarks to be used beyond those prescribed by Paragraph 67.a.-d. MCSO has three benchmarks under Paragraph 67.e. Benchmark 9 is defined as racial or ethnic disparities in search rates. Benchmark 10 is defined as a racial or ethnic disparity in passenger contact rates. Benchmark 11 is defined for non-minor traffic stops. Benchmarks 9-11 are incorporated into the EIU Operations Manual, as well as the TSMR methodology now being piloted. Therefore, MCSO is in compliance with Paragraph 67.e.

While MCSO has completed operationalizing the benchmarks required by this Paragraph, we have discussed the problems with MCSO's previous methodologies. (See Paragraph 65.) As noted earlier, MCSO's proposed new TSMR methodology, which incorporates these benchmarks, is approved; and MCSO is implementing it in a pilot program.

The new TSMR methodology is being piloted in four Phases. Each Phase requires the approval of specific items by the Parties and us to ensure it is compliant with the First Order's intent. Phase I involves developing the TSMR analytical plan that includes, among other things, creating the STATA syntax for the methodology and a Dashboard that will present detailed results that will reflect potential deputy-level alerts generated. MCSO completed Phase I in June 2020. Phase II began in June 2020; and includes establishing thresholds for flags, allegations, and alerts that will eventually drive the selection of deputies potentially engaging in biased policing. The TSMR methodology for Phase II is completed and approved as a pilot. Phase III will lead to the implementation of the intervention process, whereby deputies who receive alerts will be subject to supervisory interventions. The details surrounding Phase III are still under review. Finally, Phase IV will focus on developing training protocols to apprise MCSO staff of the process and expected outcomes from TSMR. Phase IV is also under review.

WAI 53379

During our January 2020 site visit, we agreed to hold regular telephonic meetings during the pilot to identify potential problems and solutions to expedite the resumption of the analysis of traffic stop data to look for possible cases of biased policing at the individual deputy level. These telephonic meetings continued during this reporting period.

As noted previously, MCSO is in the midst of piloting the TSMR methodology and finalizing the intervention process. While the TSMR methodology is approved for the pilot, the final approval of it and the intervention process depends on the pilot's findings. MCSO will achieve Phase 2 compliance with this Paragraph once MCSO demonstrates consistent use of these benchmarks in both the TSAR and TSMR methodologies.

*Paragraph 68.* *When reviewing collected patrol data, MCSO shall examine at least the following:*

a.    *the justification for the Significant Operation, the process for site selection, and the procedures followed during the planning and implementation of the Significant Operation;*

b.    *the effectiveness of the Significant Operation as measured against the specific operational objectives for the Significant Operation, including a review of crime data before and after the operation;*

c.    *the tactics employed during the Significant Operation and whether they yielded the desired results;*

d.    *the number and rate of stops, Investigatory Detentions and arrests, and the documented reasons supporting those stops, detentions and arrests, overall and broken down by Deputy, geographic area, and the actual or perceived race and/or ethnicity and the surname information captured or provided by the persons stopped, detained or arrested;*

e.    *the resource needs and allocation during the Significant Operation; and*

f.    *any Complaints lodged against MCSO Personnel following a Significant Operation.*

**In Full and Effective Compliance**

MCSO has not conducted a Significant Operation that met the requirements of the Order since Operation Borderline in December 2014. Subsequent activities (i.e., Operation Gila Monster in October 2016) have not met the criteria for review under this or other Paragraphs.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

As a result of this determination, MCSO District command staff – as well as Investigations and Enforcement Support – will no longer be required to submit monthly statements that they have not participated in Significant Operations as defined by this and other Paragraphs; however, they are required to notify us should staff become involved in a Significant Operation. We will continue to assess Phase 2 compliance through interviews with command and District staff during our regular site visits. During our site visits prior to, and including, January 2020, we routinely

WAI 53380

inquired of Administrative Staff, District personnel and the Deputy Chiefs of Patrol Bureaus East and West whether any Significant Operations had occurred since the prior site visit. In response, MCSO personnel indicated that no Significant Operations had occurred within their jurisdictional boundaries, nor had any of their staff participated in such operations with other departments. Subsequently, during our remote site visits since April 2020, MCSO administrative personnel have continued to advise us that there were no new Significant Operations conducted by MCSO or any of its personnel.

***Paragraph 69.*** *In addition to the agency-wide analysis of collected traffic stop and patrol data, MCSO Supervisors shall also conduct a review of the collected data for the Deputies under his or her command on a monthly basis to determine whether there are warning signs or indicia of possible racial profiling, unlawful detentions and arrests, or improper enforcement of Immigration-Related Laws by a Deputy. Each Supervisor will also report his or her conclusions based on such review on a monthly basis to a designated commander in the MCSO Implementation Unit.*

**Phase 1:** In compliance

- EA-3 (Non-Traffic Contact), most recently amended on June 28, 2019.
- GH-5 (Early Identification System), most recently amended on March 3, 2021.

**Phase 2:** Not in compliance

MCSO has placed into production database interfaces with EIS, inclusive of Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), Arizona Office of Courts (AOC) records, and the Cornerstone software program (referred to as "the HUB"), that includes training and policy records for MCSO. Supervisors have demonstrated the ability to access these during our site visits. Most audits and inspections of supervisory oversight activities indicate compliance but several continue to show fluctuating trends of use or completion over time, and MCSO has yet to fully develop some inspections that would allow a determination of compliance under this Paragraph. MCSO continues to develop the Traffic Stop Monthly Report (TSMR) that will provide supervisors the ability to review and respond to data pertinent to the performance of deputies under their command with respect to the requirements of Paragraph 67. MCSO has published the first two Traffic Stop Quarterly Reports (TSQR) for the third and fourth quarters of 2020. In addition, MCSO has made progress in revising the proposed quarterly reports for the first two quarters of 2021.

MCSO has automated the dissemination and responses to alert investigations initiated for repetitive deficiencies discovered during audit and inspection processes; however, many of these processes have been placed on hold as MCSO reevaluates the thresholds for the triggering of alerts. In April 2020, we requested that MCSO provide an update on their progress toward the development of new/revised alert threshold triggers that are not tied to the Traffic Stop Monthly Analysis. The EIU lieutenant responded that MCSO was continuing to collect information from similar agencies regarding the thresholds they employ, and MCSO is also developing a survey to be sent to MCSO field personnel to assess the current practices of the organization. When the

WAI 53381

survey is presented to us, we will provide feedback as necessary. Nonetheless, AIU developed an inspection that tracks EIS alert investigations from the time that they are assigned from EIU to District personnel and make their way back through the chain of command for final approval of a disposition. The protocol for this inspection is included in the EIU Operations Manual, Section 302 (EIS Alert Processes), and was approved on March 27, 2019. In October, the percentage of investigations completed within policy timeframes was 92%. The percentage rose to 93% in November, and then dipped to 87% in December. AIU sent BIO Action Forms (BAFs) to the Units with deficiencies. We will continue to track these trends. Additionally, AIU notes that for the alert investigations that exceeded policy timeframes, two supervisors requested extensions per GH-5 guidelines and two did not; the two cases in which extensions were granted were not deficient as they were completed within the extension guidelines. A review of the closed alerts themselves shows that the majority were completed with a meeting between the supervisor and their subordinate. We have also noted an increasing number of investigations involve repetitive BAFs. The outcome of these investigations is typically meeting with a supervisor.

Since there have been no closures that have not been adequately documented during this quarter, we did not schedule a telephonic site visit conference with MCSO on alert closures. We have requested that MCSO provide an update on the progress the agency has made in implementing an inspection evaluating the effect of alert investigation outcomes, as well as an audit of repetitive BIO Action Forms for specific Districts and personnel. MCSO has already conducted a pilot tracking analysis of BIO Action Forms that were sent out between January and May 2019. MCSO continues to use the insights gained from this initial analysis to refine and develop a repeatable process that is less labor-intensive than the first effort. In response to a request submitted following our October remote site visit, MCSO did produce a BIO Action Form tracking proposal in December. We sent our collective comments back to MCSO and await further developments. MCSO has not yet developed a means of measuring the effect of alert intervention outcomes but is developing a method that will eventually be included in the monthly EIS Alert Inspection. We will continue to work with MCSO on these processes and evaluate the proposals as they are provided. In this way, BIO will be able to discover if Districts, or individual supervisors, are experiencing repetitive problems that need to be addressed to ensure compliance with this Paragraph, as well as those covered in Paragraphs 81, 94, and 95.

The Fourth and Fifth Traffic Stop Annual Reports (TSAR) were published and available to the public on MCSO's website. These reports focus on organizational trends in traffic stop activity and do not allow an examination of potential individual bias in traffic stop outcomes. The methodology employed for the Fourth and Fifth TSARs was also intended to create a foundation for the Traffic Stop Monthly Report (TSMR). We continue to work with MCSO on the development of a monthly traffic stop analysis that would provide information about potential bias of individual deputies when compared with their peers. We, along with the Plaintiff and Plaintiff-Intervenors, have held frequent conference calls addressing a variety of outstanding issues related to the TSMR. MCSO plans to test the methods collectively developed in a pilot program, as well as creating training programs and intervention strategies for supervisors, which will subsequently be rolled out to the Office as a whole. The previous monthly traffic stop analysis was suspended because the benchmarks and thresholds were not grounded in either acceptable theory or analytic rigor that would make them consistently useful.

WAI 53382

As noted above MCSO has produced Traffic Stop Quarterly Reports for both the third and fourth quarters of 2020. In TSQR1, MCSO investigated how supervisors conduct traffic stop reviews and discussions with their subordinates through interviews with 12 supervisors and observations of six other supervisors. In general, MCSO reported that the manner in which supervisors conducted reviews and discussions varied across the agency and those supervisors interviewed indicated a lack of understanding regarding the expectations of the organization. While the study reported the diligence of supervisors in evaluating traffic stops and body-worn camera footage, there was also a collective finding that supervisors would like more training in this aspect of their roles, more explicit direction from the organization regarding expectations of them and more clearly defined concepts and training regarding bias-based policing, bias-based/racial profiling, and discriminatory policing as used throughout the organization's policies.

In TSQR2, MCSO investigated the perceptions and experiences of supervisors who participated in interventions for deputies stemming from the Third Traffic Stop Annual Report. While the majority of supervisor-respondents to the survey felt that the time, documentation requirements and intervention options available were within expectations, there was a small minority of respondents who felt that the time requirements of interventions impeded their other functions as supervisors; that deputies targeted for interventions were not adequately vetted; and that the types of interventions to which the supervisors were limited was unreasonable. While these were final reports published by MCSO, we and the Parties provided comments on each of the studies. MCSO has noted that the agency anticipates using the results of each of these studies in the modification of policies and the development of training. In addition, MCSO will use these studies to inform the ongoing development of methods and protocol for the TSMR, which will take the place of the annual reports in identifying deputies who exhibit potentially biased behavior in the way that they conduct traffic stops. We will continue to assist MCSO in each of those objectives.

MCSO continues to provide us access each month to all Non-Traffic Contact Forms (NTCFs) involving investigative stops and field information; however, MCSO has only begun planning to conduct more thorough statistical analyses of these for this and other Paragraphs. At times over the past year our review of the NTCFs provided each month indicated that a higher proportion of Latinos are being contacted in particular areas of the County for relatively minor infractions. Our review of NTCFs for this quarter did not raise particular concern about disparate treatment. MCSO has proposed an initial study of how this form (NTCFs), and the related policy, are being used across the agency. While this proposed analysis falls short of the requirements of this Paragraph, as it does not investigate potential indications of bias in how these stops are conducted by deputies or evaluated by supervisors, it will give some insight into the modifications needed in both the form and policy going forward.

We continue to evaluate the effectiveness of supervisory investigations into non-traffic stop alerts each month by selecting a random sample of 15 cases. Over the past year, we have found that most supervisors are completing these investigations in a timely fashion and addressing the deficiencies raised.

WAI 53383

MCSO has created an EIS Alert Review Group (ARG) that evaluates the investigations of supervisors prior to closing an alert. The ARG ensures that the reports of the supervisors address all aspects of the assigned investigation, and returns those that are deficient to the District for continued revision. Over the past several months, we have noted that the proportion of completed alert investigations being sent back to the Districts by the ARG has fallen below one-third of all cases we evaluate. MCSO has emphasized supervisory investigations in the past years' training, as well as the creation of liaisons between BIO and the Districts to ensure that supervisors receive the necessary support and information to complete these investigations. In addition, EIU has developed online supervisory resource material for alert investigations that was placed on the HUB in January 2020.

The Audit and Inspections Unit (AIU) conducts monthly audits of supervisory oversight via the Supervisory Notes made for each deputy. Minimally, each month, supervisors should be making a performance appraisal note, reviewing two body-worn camera recordings, and reviewing the EIS profile of their subordinates. During the fourth quarter, the compliance rate was above 99% in both October and December, though it slipped to of 93.5% in November due to deficiencies found in reviews conducted by lieutenants and above. AIU sent BIO Action Forms (BAFs) to the Districts with deficiencies.

AIU also conducts three inspections of traffic stop information: two of these pertain to the timely review and discussion of traffic stops by supervisors for each subordinate; and the third is an inspection regarding the correct completion of traffic forms and the coordination of these forms with databases like CAD and the review of body-worn camera footage. For all three inspections, MCSO reported compliance rates in the high 90th percentile throughout the quarter, except for the October Traffic Stop Data Inspection, which yielded a rate of 94.3%. More importantly, the deficiencies found across all three inspection types were minor deviations from the matrices used to evaluate compliance. AIU sent BIO Action Forms to those Districts where deficiencies were found.

MCSO has developed a new Incident Report Inspection that has been approved following several revisions. The inspection should include instances where prosecuting authorities turned cases down due to a lack of probable cause, among other matrix items developed by MCSO. MCSO reports compliance rates for September to November above 98%, with no instances of cases being turned down due to a lack of probable cause. Our review of inspection materials concurs with the conclusions of MCSO. The deficiencies noted were nearly all due to missing the deadline for submission or review of the forms submitted. For those deficiencies discovered during the inspection process, AIU sent BIO Action Forms to the appropriate Districts for additional review and action. The inspections of supervisory oversight continue to show fluctuations that MCSO is investigating and addressing with BAFs, training, and policy evaluation. Additionally, MCSO is also developing an inspection of repetitive BAFs so that they might intervene for supervisors who evidence recurring problems. We have found that measures like the creation of the Alert Review Group have greatly enhanced the accountability of Districts and individual supervisors in the completion of their roles.

WAI 53384

***Paragraph 70.*** *If any one of the foregoing reviews and analyses of the traffic stop data indicates that a particular Deputy or unit may be engaging in racial profiling, unlawful searches or seizures, or unlawful immigration enforcement, or that there may be systemic problems regarding any of the foregoing, MCSO shall take reasonable steps to investigate and closely monitor the situation. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or of other supervised, monitored, and documented action plans and strategies designed to modify activity. If the MCSO or the Monitor concludes that systemic problems of racial profiling, unlawful searches or seizures, or unlawful immigration enforcement exist, the MCSO shall take appropriate steps at the agency level, in addition to initiating corrective and/or disciplinary measures against the appropriate Supervisor(s) or Command Staff. All interventions shall be documented in writing.*

**Phase 1:** In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on February 25, 2021.

- EB-2 (Traffic Stop Data Collection), most recently amended on January 7, 2020.

- GH-5 (Early Identification System), most recently amended on March 3, 2021.

**Phase 2:** Not in compliance

MCSO continues to develop the methodology and related plans for the Traffic Stop Monthly Reports (TSMRs). The TSMR is intended to be a more timely response to potential indications of bias at the deputy level through the examination of 12-month traffic stop data. We, the Parties, and MCSO have conducted frequent conference calls to ensure that the methodologies adopted will be effective in replacing the intervention processes emanating from prior Traffic Stop Annual Reports (TSARs). MCSO is planning a pilot program process to evaluate and assist in the refinement of each aspect related to the TSMR.

MCSO continues to develop the EIU Operations Manual. The sections of the manual that remain under development are those related to statistical methodologies for the TSMR and the thresholds that may trigger alert inquiries for all alert investigations. MCSO has received approval to move forward on several TSQR projects and published two of these reports for the third and fourth quarters of 2020.

WAI 53385

MCSO has published the Fifth Traffic Stop Annual Report and continues to find in the examination of traffic stop outcomes disparities "that may indicate a systemic bias within the patrol function" that needs to be ameliorated. The analytic methods used in the Annual Reports are not able to identify individual deputy activity, but form the basis for organizational strategies to address systemic biases through training and policy. In refining the TSMR methodology, which will be used to identify potential bias for individual deputies, MCSO has employed data from 2019 and 2020. During this process, MCSO notified us that several deputies have been found to be outliers in comparison to their peers. As a result, we held several conference calls, including with the Plaintiffs and Plaintiff-Intervenors, to discuss these findings and how MCSO should address this issue given that the TSMR process has not yet been approved. MCSO has proposed a plan utilizing existing systems combined with some elements from previous TSAR processes. We will report on the outcomes of MCSO's efforts as they are made available to us.

A portion of the monthly alert report produced by EIU depends upon the TSMR, which remains under development. However, the EIS also produces alerts for numerous activities, ranging from repetitive data entry errors to internal and external complaints. Many of these ongoing alerts are dependent upon the revision of alert thresholds which continue to undergo evaluation by MCSO. While we acknowledge that the revision of these thresholds entails time consuming research and surveys of line personnel, we believe the delay of nearly two years has hampered the effective use of the EIS to track repetitive behavior that may be deleterious to the organization and the community it serves. BIO personnel continue to evaluate and update the thresholds used to trigger these alerts to ensure that they are sufficient to detect behaviors that might indicate bias on the part of deputies, taking into consideration the current assignment of the deputies as noted in Paragraph 81.f. In the meantime, the non-TSMR alerts triggered under the current system are first evaluated by EIU personnel and then transmitted, via BlueTeam, to the appropriate supervisor and District command. The supervisors conduct an investigation, including a potential discussion with the designated deputy, and memorialize their actions in BlueTeam. District command staff and an Alert Review Group (ARG), comprised of multiple BIO personnel, review these investigations to ensure that proper investigations are carried out and possible interventions are clearly outlined.

AIU began producing an inspection of EIS Alert Processes in April 2019 that evaluates the timeliness of alert investigation completion and whether discussions, training, or Action Plans might result from the supervisory investigation. The inspection is lagged by one month to allow supervisors 30 days to complete the investigation. The compliance rate for timely completion of investigations for this quarter range from 93% in November to 87% in December. MCSO has not yet developed a protocol to evaluate the effect of the discussions, activities or Action Plans resulting from these investigations. The Training Division, working in concert with EIU, included in the 2019 SRELE training a refresher course on supervisory responsibilities in conducting alert investigations. This training was delivered during the fall of 2019. Following our January site visit, MCSO also placed on the HUB resource materials for supervisors who may not have conducted alert investigations recently. This material provides supervisors with examples of how to fill out the alert investigation paperwork or contact EIU staff should the need arise.

WAI 53386

MCSO is not in Phase 2 compliance with this Paragraph, as the TSMR, and other relevant inspections, continue to undergo development and have not yet been placed in production. We will monitor the planned piloting of the TSMR methodology and continue to participate with the Plaintiffs and Plaintiff-Intervenors in regular conference calls about MCSO's progress.

MCSO's Plan to Promote Constitutional Policing (also referred to as the Constitutional Policing Plan, or CPP) was drafted to address systemic issues identified in the Traffic Stop Annual Reports (TSARs). The CPP included nine Goals and a timeline for the completion of the Goals. Our comments in this report pertain to compliance with the Plan during the fourth quarter of 2020. MCSO created an online progress tracking tool and provided a link to the application in January 2020. The online spreadsheet was based on the plan originally agreed to by the Parties and approved by the Court. The spreadsheet provided additional details of MCSO's reported progress on each of the nine CPP Goals: the start date; the projected completion date; and the status of sub-Goals and projects.

We determine compliance with the CPP through several means. First, we issue monthly and quarterly document requests pertaining to specific Goals of the CPP, which we review. For example, we have monthly document requests pertaining to projects under Goals 1, 3, 4, and 5. We review meeting agendas and discussion items to verify compliance with the projects noted under those Goals. For the training components of these Goals, MCSO submits training materials that must be reviewed and approved for before delivery. Our standing requests for other Paragraphs of the First and Second Orders also provide information related to some of the CPP Goals. For example, for Goal 1, we review MCSO monthly submissions related to supervisory corrective actions. For Goal 2, in addition to reviewing and approving the components of the new employee performance evaluation process, we also review current Employee Performance Appraisals being completed and advise MCSO of any issues of concern that may be addressed in the new process. For Goal 6, we conduct periodic meetings with MCSO, the Plaintiffs, and Plaintiff-Intervenors related to the evaluation of traffic stop data and associated monthly, quarterly, and annual reports. Second, we review the progress reported in the online spreadsheet and record our findings. Third, we corroborate MCSO's reported progress during our site visits, where we confirm the reported outcomes and ask clarifying questions on projects completed. Our comments below reflect what we learned from all three areas.

During our January 2021 remote site visit, we discussed MCSO's compliance with the Constitutional Policing Plan. Our comments in this report reflect what we ascertained from our review of documentation, including the online spreadsheet, and information provided during our remote site visit meeting.

Goal 1: Implementing an effective Early Intervention System (EIS) with supervisor discussions. MCSO reported an overall 61% completion rate in implementing an effective Early Intervention System (EIS) with supervisory discussions, the same as in our last review. The supervisory discussion process noted a starting date of April 3, 2018, with a projected completion date of December 31, 2020, and noted the completion rate of 64%, the same as the last reporting period. With regard to the EIS Alerts Inspections, MCSO reported that old alerts are "creeping into the analysis" and bringing the numbers down, but the numbers have been improving since BIO started tracking alerts. MCSO noted that the Traffic Stop Monthly Report (TSMR) had a 37%

completion rate, the same as last quarter. Information-sharing within the Office was previously noted at 64%, and revised to 57%, per our January review of the spreadsheet. During our remote site visit meeting, MCSO reported that it held three town halls in 2020. Because of COVID-19 restrictions, participants met in smaller groups in each of the Districts. The groups met in District briefing rooms, and the more manageable size was reportedly more productive.

Goal 2: Evaluating supervisors' performances through an effective Employee Performance Appraisal process. For this reporting period, Goal 2 noted a completion rate of 40%, the same as the last quarter's completion rate. MCSO reported that the agency is working on the EPA curriculum. MCSO is evaluating options to determine if it will continue to use Praxis, which is the application currently in use for EPAs, or another tool that will provide better functionality. MCSO reported that the agency intends to have all supervisors trained on the initial concepts of the new process by the time it implements the performance management tool. Training will be conducted in two parts, with concepts being covered first, followed by hands-on training on the application. The initial concepts training is expected to begin on July 1, 2021, with a projected completion date of June 31, 2022.

Goal 3: Delivering enhanced implicit bias training. Goal 3 was noted as 82% completed on the tracking spreadsheet; this is a 15% increase from previously reported completion rate of 67%. The projected completion date is still March 31, 2021. During our October remote site visit, MCSO advised us that roll-call briefings on Implicit Bias had been completed; but the HUB report documenting compliance had not been finalized. To verify the completion of roll-call briefings, to assess compliance with the training component, we reviewed a report for an inspection that BIO conducted in September (BI2020-0125), in which it selected a random sample of 60 sworn employees and 15 Reserve employees. This inspection resulted in completion rates of 81.67% for sworn and 66.67% for Reserve deputies. BIO conducted two subsequent inspections in November and December. The November inspection (BI2020-0138) resulted in a 98.33% completion rate for sworn, with an 86.67% completion rate for Reserve deputies. The December inspection (BI2021-0001) resulted in a 100% compliance rating for both sworn and Reserve deputies.

The stand-alone implicit bias training for the pilot program, for the town of Aguila, noted an 88% completion rate on lesson plan development. The completion date changed from November 25, 2020, to December 13, 2020, a date that had already passed at the time of our January remote site visit. It appears that this project has been delayed. The History of Discrimination Training video project noted a 64% completion rate, with an expected completion date of March 31, 2021. MCSO had previously advised us that this project could be delayed due to COVID-19 concerns. MCSO reported that the agency had conducted interviews with stakeholders from Guadalupe, which is the next subject of training. The lesson plan for Guadalupe is currently under development, which, according to the Training Division, should put MCSO back on track to complete one District lesson plan per year. MCSO intends to select one community per District, per year, until all Districts have been covered. MCSO will speak to members from the selected communities to learn what implicit biases they may have been subjected to. MCSO considers this ground-up approach demonstrably different than previous methodologies emphasizing the

WAI 53388

typical academic approach. The discussion of CPP topics at Captains' meetings in 2020, which includes the topic of Implicit Bias, is addressed in Goal 5.

Goal 4: Enhanced fair and impartial decision-making training. Goal 4 was noted to have increased from 67%, as indicated in our last report, to 82%. The CPP spreadsheet notes a 76% completion rate for the stand-alone video/HUB training class with a five-question test on Fair and Impartial Decision Making. This project was previously listed at 60% in our last review. We were advised that MCSO has a second Fair and Impartial Decision-Making video. This topic will be included in roll-call briefings in 2021. The discussion of CPP topics at Captains' meetings in 2020, which includes the topic of Fair and Impartial Decision Making, is addressed in Goal 5.

Goal 5: Delivering enhanced training on cultural competency and community perspectives on policing. The completion rate for Goal 5, previously noted at 59%, had increased to 78% as of our January review. During our January remote site visit, MCSO advised us that the spreadsheet should have shown roll-call briefings at 100% complete. The cultural competency briefing and roll-call video was approved and disseminated to all Districts. MCSO stated that there still remain a couple of issues with the Traffic Stop Survey that need to be discussed. As soon as the survey receives final approval, MCSO will start the roll-out. MCSO stated that the agency can initiate the survey 30 days after final approval. The annual refresher training for FTOs was completed, and Cultural Competency was a component of the FTO training. MCSO has indicated that there are no plans to incorporate Cultural Competency or other bias-related policing topics into FTO training, which we find problematic considering the impact that FTOs have on new deputies in training. We recommend that MCSO reconsider this decision. There are projects under Goal 5 that need further work. With regard to discussion of CPP topics at Captains' meetings, the CPP spreadsheet notes that CPP topics were discussed in Captains' meetings in January, February, September, and November. Cultural Competency was covered in the November Captains' meeting. The Captains' meetings of March, April, May, June, and July were conducted telephonically; and covered operational issues and topics other than the CPP. The Captains' meetings of August and October were cancelled. The December Captains' meeting is not listed in the spreadsheet. During our January remote site visit, we inquired if MCSO planned to continue to discuss CPP topics during Captains' monthly meetings. In response to our site visit request, MCSO informed us that Captains will discuss topics related to Implicit Bias, Fair and Impartial Decision Making, and Cultural Competency in three of the monthly meetings in 2021.

Goal 6: Improving traffic stop data collection and analysis. Goal 6 was noted as 97% completed on the tracking spreadsheet. In our last review, MCSO listed the completion rate as 93%. MCSO did not have a Traffic Stop Monthly Report (TSMR) methodology in place during the fourth quarter of 2020. The projected completion date has been changed from July 31, 2020, to December 6, 2020, to January 13, 2021. As of our January review, the online spreadsheet still had TSMR Phases 1 and 2 at 99%. Phase 3 was increased to 91% from the previous 88%, and Phase 4 was decreased to 25% from the previous 50%. We concur with the completion rates of Phases 1 and 2. However, we believe that Phases 3 and 4 still require a significant amount of work. With regard to the quarterly reports, MCSO noted the first two quarterly reports were completed, with the third and fourth quarterly reports having completion rates of 93% and 77%, respectively.

WAI 53389

Goal 7: Encouraging and commending employees' performance and service to the community. This goal has been completed. This goal was not part of the requirements set by the First Order.

Goal 8: Studying the Peer Intervention Program. This goal has been completed. This goal was not part of the requirements set by the First Order.

Goal 9: Building a workforce that provides Constitutional and community-oriented policing and reflects the community we serve. MCSO's goal is to have a hiring process that will build a workforce that provides Constitutional policing and reflects the community it serves. As of our January review, Goal 9 was noted as having a 49% completion rate, slightly above the 48% completion rate reported in our last review. The expected completion date on this goal had been changed in our last review from December 31, 2020 to June 30, 2021. During our January remote site visit, MCSO advised us that the career planning program and the selection process projects have not made much progress. MCSO hired two additional Human Resources analysts to assist with onboarding. The spreadsheet noted the progress of the new promotional process at 20%, with a due date of March 31, 2021. MCSO advised us they are reviewing proposals from vendors for the new promotional process, and they are confident that they will select a vendor in the near future. However, MCSO reported that the agency will likely not have a new promotional process by the expected completion date of March 31, 2021.

With regard to personnel, at the time of our January remote site visit, there were a total of 566 vacancies, as opposed to the 443 vacancies reported in October 2020. Of the 566 current vacancies, 90 are sworn, 281 are Detention, and 195 are civilian. This is in comparison to October 2020, when there were 94 sworn vacancies, 172 Detention vacancies, and 177 civilian vacancies. MCSO reported a total of 302 hires for calendar year 2020. Of those, 47 were sworn, 139 were Detention, and 116 were civilian hires. The racial and ethnic makeup of new sworn employees is 72% white, 21% Hispanic/Latino, 3% Black, and 4% other. The racial and ethnic makeup of new Detention employees is 48% white, 35% Hispanic/Latino, 8% Black, and 9% other. The racial and ethnic makeup of the new civilian employees is 57% white, 23% Hispanic/Latino, 8% Black, 5% Asian, and 7% other. With regard to separations, MCSO had 256 voluntary separations, not including retirements. Of those voluntary separations, 29 were sworn employees, 147 were Detention, and 80 were civilians. The racial and ethnic makeup of the separations was 49% white, 27% Hispanic/Latino, 12% Black, and 11% other.

With regard to Academy classes, MCSO reported that a sworn Academy class started in December 2020, with 19 trainees. A sworn Academy class started in January 2021, with 15 trainees. Another sworn Academy class is scheduled to start in March 2021, with 20 trainees. MCSO reported that a Detention class started in January 2021, with 20 trainees. In addition, a lateral Detention class with five trainees also started in January. We inquired as to the minimum number of trainees required to hold Academy classes. In response to our site visit request, MCSO advised that the agency has never been unable to hold a sworn Academy class due to not having enough trainees. MCSO is a regional training Academy that includes trainees from other local agencies. With regard to Detention, MCSO requires at least five trainees to hold a class. MCSO reiterated its continued difficulty with hiring Detention trainees due to applicants' concerns of working in an enclosed environment, and the increased likelihood of contracting airborne communicable diseases. MCSO advised that as soon as applicants clear the background process,

WAI 53390

they are being hired and placed in temporary positions until the Academy starts. This is increasing the chances of hiring, since there is significant competition from other law enforcement agencies for the same candidates.

In summary, during the fourth quarter of 2020, MCSO reported progress on Goals 3, 4, 5, 6, and 9. Goals 1 and 2 remained at the same completion rate according to the spreadsheet. The projected date of completion for Goal 1 (61%) was December 31, 2020, so this Goal appears to be behind schedule. The completion date of Goal 2 (40%) is identified as June 1, 2021; work continues on the new EPA process and training materials. Goal 3 is shown on the spreadsheet as 82% complete, with a due date of March 31, 2021. Roll-call briefings on Implicit Bias and Cultural Competency were completed. There are other projects in Goal 3 that remain in progress. Goal 4 had a projected completion date of December 31, 2020, and was noted at 82%, so this Goal is also behind schedule. As previously noted, Goal 5 shows at 78% completion on the spreadsheet. During our January 2021 remote site visit, MCSO advised us that roll-call briefings on Implicit Bias and Cultural Competency had been completed. We noted our concerns with regard to MCSO's decision not to incorporate biased policing topics into the FTO training curriculum. Goal 6 has a revised completion date of January 13, 2021, and a reported 97% completion rate; we noted our observations that a significant amount of work is required with regard to TSMR Phases 3 and 4. MCSO has had some difficulty in making progress in Goal 9 due to COVID-19 related issues. The expected date of completion was changed from December 31, 2020, to June 30, 2021. The spreadsheet noted a 1% increase in the completion rate; yet the number of total vacancies has been increasing in each quarter since the first quarter of 2020. The continued negative trend in personnel resources could ultimately cause MCSO serious issues.

The CPP was created to address systemic issues identified in Traffic Stop Annual Reports (TSARs). With the exception of Goals 7 and 8, which were not Order requirements, none of the CPP Goals have been completed. The MCSO online tracking tool indicates that some projects under specific Goals have been completed, many of which we have verified through documentation. The completion of these projects is encouraging; it indicates that MCSO is working toward fulfilling its obligations. However, we also note that some components of the CPP have fallen behind schedule. While the completion of projects are positive steps, the ultimate proof of the success of the Plan is determined by the results of the TSARs. TSARs have continued to show disparity in the outcomes of traffic stops, and the indication is that the Plaintiffs' class is being adversely impacted. Each project listed in the CPP is a component of the Plan, and each completed project should contribute to the desired end result. As projects are completed, and as the Goals of the Plan are achieved, the success of the work put in should be evidenced in the results of the TSARs. The results of the projects that have been completed so far have not been significant enough to manifest the desired results in the TSARs.

WAI 53391

***Paragraph 71.*** *In addition to the underlying collected data, the Monitor and Plaintiffs' representatives shall have access to the results of all Supervisor and agency level reviews of the traffic stop and patrol data.*

**In Full and Effective Compliance**

MCSO has provided us with access to existing data from monthly and annual reports.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

While we continue to work with both MCSO and the Parties on specific issues of methodology for Non-Traffic Contact Forms and the Annual, Monthly, and Quarterly Reports for traffic stop data, we have nonetheless been afforded complete access to all requests involving data.

WAI 53392

# Section 8: Early Identification System (EIS)

**COURT ORDER IX. EARLY IDENTIFICATION SYSTEM ("EIS")**

***Paragraph 72.*** *MCSO shall work with the Monitor, with input from the Parties, to develop, implement and maintain a computerized EIS to support the effective supervision and management of MCSO Deputies and employees, including the identification of and response to potentially problematic behaviors, including racial profiling, unlawful detentions and arrests, and improper enforcement of Immigration-Related Laws within one year of the Effective Date. MCSO will regularly use EIS data to promote lawful, ethical and professional police practices; and to evaluate the performance of MCSO Patrol Operations Employees across all ranks, units and shifts.*

**Phase 1:** In compliance

- EA-3 (Non-Traffic Contact), most recently amended on June 28, 2019.

- GH-5 (Early Identification System), most recently amended on March 3, 2021.

**Phase 2:** Not in compliance

As a result of interfaces for remote databases introduced in 2017, the Early Intervention System (EIS) now includes Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), records from the Administrative Office of the Courts (AOC), and training completion and policy acknowledgement records from the Cornerstone software (the HUB). MCSO continues to work on the EIU Operations Manual to memorialize the collection, analysis, and dissemination of relevant data; as well as the responsibilities and roles of departmental and EIU personnel. During this reporting period, MCSO has offered several proposed sections to the manual which are under review by us and the Parties. MCSO has completed approximately 90% of the manual to date. Those sections that are under development pertain to the Traffic Stop Monthly Report (TSMR) and thresholds for triggering potential alert investigations arising from monthly analysis of traffic and patrol functions.

To capture the activities of deputies in non-traffic stops of individuals, MCSO created Non-Traffic Contact Forms (NTCFs), which were interfaced with EIS in mid-2017. MCSO has provided us with access to investigative stops that make up a portion of NTCFs since their inception. Over the past two years, we have suggested that MCSO create a methodology to statistically examine these civilian contacts to ensure that there is no evidence of bias in the manner in which they are conducted. MCSO has produced a preliminary draft of an NTCF inspection methodology that we have returned with comments. In addition, we had requested and received several months of data for all contacts captured using NTCFs in 2019; and we found that the distinction between Field Information and Investigative Stop is not clear to deputies using the forms. MCSO has now proposed to conduct a study of NTCF use by deputies, using the preliminary methodology mentioned previously, to evaluate whether the form, policy, and training associated with stops documented on NTCFs needs to be modified. In a recent request for information, the BIO Captain stated that once the methodology for this one-time study is

WAI 53393

approved, BIO personnel will complete the assessment in approximately 60-75 days. Until the study and analytic proposals are complete, we will continue to review both investigative stops and field interviews collected on the existing forms. MCSO supplies us with a list of these non-traffic stops each month.

We will continue to work with MCSO to finalize each of these data analytic methods. MCSO continues to regularly publish a number of reports on deputy activity and supervisory oversight that are not tied to the methodologies of the TSMR, TSQR, or TSAR.

The Audits and Inspections Unit (AIU) produces a monthly report evaluating Supervisory Notes that indicate whether supervisors are reviewing the EIS data of deputies under their command. The inspection looks for indications that supervisors made entries for each person they supervise with regard to two randomly selected BWC videos, provide one EPA note, make two supervisor entries, and indicate that the supervisor has reviewed their deputies' EIS status. The compliance rates reported by MCSO are based on a matrix developed for this inspection. For this quarter, the reported compliance rates range from a high of 100% in December, to 93.5% in November. In October, the rate was 99.5%. We calculate our compliance rates based upon what we consider significant deficiencies related to Order requirements and any case reviewed with a significant deficiency impacts the compliance rate; however, during this reporting period, our computations align with those of MCSO. AIU continues to send BIO Action Forms to the Districts with deficiencies, and we have always had the opportunity to review these forms when requested.

In the Traffic Stop Review and Discussion Inspections for this quarter, we note stable compliance rates above 97%. The third traffic-related audit is the Traffic Stop Data Inspection, in which AIU uses a matrix comparing traffic stop information found on Vehicle Stop Contact Forms (VSCFs) with Computer Aided Dispatch (CAD) and body-worn camera (BWC) footage. The compliance rate ranged from 94.4% in October, to 99.4% in December. The deficiencies noted by the inspector ranged across the organization, and involved minor form or recordkeeping practice issues. AIU sent 14 BIO Action Forms to the appropriate Districts for this quarter.

While we can look for trends in deficiencies over each quarter, we have suggested to MCSO that AIU conduct an evaluation of all BIO Action Forms sent to Districts to ensure that there are not long-term trends by Districts or supervisors that cannot be distinguished while looking at shorter timeframes. MCSO conducted a preliminary analysis of BIO Action Forms from January to May 2019 and reported these findings during our July 2019 site visit. MCSO found that there was indeed a small number of deputies who had received several BIO Action Forms. MCSO produced a methodology in June 2020, which we and the Parties returned with comments. MCSO refined the methodology and resubmitted it in December 2020. The proposed methodology has been returned to MCSO with few issues remaining.

EIU also produces a monthly report on alerts triggered within EIS. From March to May, we noted a dramatic increase in Notice of Claim alerts. In response to questions we submitted regarding this issue, BIO command staff advised that they had recently discovered that there was a backlog of emails from the Legal Liaison Section regarding Notices of Claims. During our October 2020 remote site visit, the EIU lieutenant advised that the backlog had been eliminated; and that new internal practices had been put into place to ensure that such an oversight would not re-occur.

WAI 53394

For all other alerts, EIU personnel review the alerts and disseminate them to supervisors and District command if alerts indicate the potential for biased activity or thresholds are exceeded for particular actions such as external complaints, unexcused absences, data validations, and others. Once the supervisors receive the alert investigation, they employ a template (Attachment B of GH-5 [Early Identification System]) to conduct the investigation and report their findings and results to the chain of command through BlueTeam. MCSO has also created an EIS Alert Review Group (ARG) to evaluate the closure of alert investigations. We had no immediate concerns with our review of alert closures for this quarter; however, the compliance rate for time to complete these within policy timeframes ranged from 87% to 93%. MCSO continues to work with us and the Parties on how to evaluate the effect of interventions undertaken to complete the EIS Alerts Inspection.

**Paragraph 73.** *Within 180 days of the Effective Date, MCSO shall either create a unit, which shall include at least one full-time-equivalent qualified information technology specialist, or otherwise expand the already existing role of the MCSO information technology specialist to facilitate the development, implementation, and maintenance of the EIS. MCSO shall ensure that there is sufficient additional staff to facilitate EIS data input and provide Training and assistance to EIS users. This unit may be housed within Internal Affairs ("IA").*

**In Full and Effective Compliance**

The Bureau of Internal Oversight (BIO) is overseen by a captain and is comprised of three Units designed to achieve different compliance functions. Each is a fully operational Unit headed by a lieutenant with both sworn and civilian staff responsible for diverse but interrelated oversight functions.

The Early Intervention Unit (EIU) coordinates the daily operation of the EIS. This unit evaluates alerts generated by the EIS, reviews them and sends out investigations to District personnel as prescribed by policy.

The Audits and Inspections Unit (AIU) has developed and carries out ongoing inspections to ensure that deputies and supervisors are using the EIS properly and to the fullest extent possible. When AIU discovers deficiencies, it sends out BIO Action Forms to the affected Districts and individuals; and ensures the return of the appropriate forms.

The Traffic Stop Analysis Unit (TSAU) was most recently created due to the complexities of generating all of the statistical reports related to traffic and patrol functions of MCSO. The leaders of these units respond to specific requests made by us and the Parties and appear collectively during our site visit meetings to answer any questions related to the operation of BIO.

Over the last 18 months the EIS database has been expanded to include Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), records from the Arizona Office of Courts (AOC), and training and policy receipt records from the Cornerstone software program (the HUB). Supervisors now have much more information available to them about the deputies under their command than they ever had in the past.

WAI 53395

On October 5, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 74.** *MCSO shall develop and implement a protocol setting out the fields for historical data, deadlines for inputting data related to current and new information, and the individuals responsible for capturing and inputting data.*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on March 3, 2021.

- EIU Operations Manual, currently under revision.

**Phase 2:** In compliance

MCSO has met the requirements of this Paragraph by identifying the data to be collected and the responsibility of persons across the organization to review, verify, and inspect the data making up the early intervention system. These roles and responsibilities are originally developed in GH-5 (Early Identification System) and more comprehensively elaborated in Section 200 (Duties and Responsibilities), approved in August 2019, of the EIU Operations Manual.

MCSO has not yet completed the revision of the EIU Operations Manual. Currently, MCSO has approximately 90% of the manual finalized. The remaining 10% of the manual is comprised of the ongoing development of the methodologies for the Traffic Stop Monthly Reports, as well as the revision of the thresholds dependent on the results from the TSMR and non-traffic threshold analyses being coordinated by EIU personnel. The manual sections pertaining to this Paragraph have already been finalized and published; therefore, MCSO has attained Phase 1 compliance.

MCSO has shown progress in the development of a data-handling protocol. These processes have been memorialized in the EIU Operations Manual (Section 306), which was approved in July 2020. Aside from Section 200, noted above, Section 305 (Software Change Control Processes), approved in October 2018, is intended to ensure that all modifications to software or data collection are coordinated in a prospective fashion before any implementation occurs. These software changes are provided to us on a monthly basis through regular document requests and are discussed during the quarterly site visit meetings. Each of these sections of the EIU Operations Manual expands upon policy that has already been approved.

MCSO has also created a committee of personnel from each unit that handles, or adds to, traffic data before it is analyzed. The reports from the regular monthly meetings of this group are made available to us and show the attention to detail and memorialization of changes put in place to improve data processes.

WAI 53396

Finally, EIU produces a monthly report for benchmarks not related to the traffic stop methodologies. We routinely use these monthly tables to evaluate compliance with various Paragraphs within the Court Order. For traffic-related Benchmarks 3 and 8 (Paragraph 67), MCSO documents both traffic stops involving immigration inquiries and data validation errors committed by deputies. During this reporting period, there were no immigration inquiries; and only one data validation alert that was sent to a supervisor for investigation.

**Paragraph 75.** *The EIS shall include a computerized relational database, which shall be used to collect, maintain, integrate, and retrieve:*

a. *all misconduct Complaints or allegations (and their dispositions), excluding those made by inmates relating to conditions of confinement or conduct of detention officers (i.e., any complaint or allegation relating to a traffic stop shall be collected and subject to this Paragraph even if made by an inmate);*

b. *all internal investigations of alleged or suspected misconduct;*

c. *data compiled under the traffic stop data collection and the patrol data collection mechanisms;*

d. *all criminal proceedings initiated, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the County and/or its Deputies or agents, resulting from MCSO Patrol Operations or the actions of MCSO Patrol Operation Personnel;*

e. *all arrests;*

f. *all arrests in which the arresting Deputy fails to articulate probable cause in the arrest report, or where an MCSO Supervisor, court or prosecutor later determines the arrest was not supported by probable cause to believe a crime had been committed, as required by law;*

g. *all arrests in which the individual was released from custody without formal charges being sought;*

h. *all Investigatory Stops, detentions, and/or searches, including those found by the Monitor, an MCSO supervisor, court or prosecutor to be unsupported by reasonable suspicion of or probable cause to believe a crime had been committed, as required by law;*

i. *all instances in which MCSO is informed by a prosecuting authority or a court that a decision to decline prosecution or to dismiss charges, and if available, the reason for such decision;*

j. *all disciplinary action taken against employees;*

k. *all non-disciplinary corrective action required of employees;*

l. *all awards and commendations received by employees;*

m. *Training history for each employee; and*

n. *bi-monthly Supervisory observations of each employee.*

WAI 53397

**Phase 1:**  In compliance

- EA-3 (Non-Traffic Contact), most recently amended on June 28, 2019.

- GC-13 (Awards), most recently amended on July 22, 2020.

- GH-5 (Early Identification System), most recently amended on March 3, 2021.

- EIU Operations Manual, currently under revision.

- Professional Services Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

Since 2017, MCSO has placed into production data interfaces for Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), Justice Court turndowns (AOC) and the Cornerstone software program (the HUB) that provides reports for training and policy acknowledgment.  MCSO continues to develop some inspections or analytic reports that ensure that personnel are accurately using the EIS data available; however, the data do exist in the EIS and are accessible by personnel we have interviewed during each site visit.  We will continue to evaluate and monitor the use of EIS in furtherance of the Orders.  During our January site visit, we also reviewed with MCSO representatives how the data for the following Subparagraphs appear on-screen and are accessible to first-line supervisors.  We found no issues of concern during this review.

Paragraph 75.a. requires that the database include "all misconduct Complaints or allegations (and their dispositions)," with some exclusions.

EIPro, a web-based software application that allows employees and supervisors to view information in the IAPro case management system, includes the number of misconduct complaints and allegations against deputies.

Since February 2017, both open and closed cases have been viewable by supervisors.  PSB controls the ability to view open cases based upon the parties who may be involved.  PSB personnel developed a protocol to write the summaries for both open and closed cases that appear in the EIS.  This protocol has been approved, and was incorporated into the PSB Operations Manual that was published on December 13, 2018.  Each month, we receive a spreadsheet of open and closed external complaints as they appear in EI Pro for supervisors to review.  Our examination of these descriptions for October through December found that these summaries meet our expectations.  Additionally, during all site visits between 2017 and January 2020, we observed that field supervisors could easily access these summaries and understand the types of issues involved in the complaints.  Supervisors conducting alert investigations have also routinely referred to a review of complaint summaries as a portion of their investigative process.  Supervisors are also advised that they can always contact EIU and PSB for clarification if it is necessary.

MCSO is in compliance with this Subparagraph.

Paragraph 75.b. requires that the database include "all internal investigations of alleged or suspected misconduct."

WAI 53398

Corresponding to the discussion above involving external complaints, internal investigation summaries also appear in the IAPro system. All complaint summaries, open and closed, have been viewable since February 2017. PSB uses a standard protocol to develop the case summaries and access limits. We approved this protocol, and it is included in the PSB Operations Manual. Each month, we receive a spreadsheet of internal allegations as they appear to supervisors in EIS. Our review of the summaries for October through December found these summaries to be transparent and easily understandable. During our past site visits, we have found that line supervisors are also able to easily access the summaries of open and closed internal investigations pertaining to their subordinates. Supervisors also have referred to these summary fields while conducting alert investigations. Field supervisors always have the option of requesting additional information from EIU and PSB should they deem the summaries insufficient.

MCSO is in compliance with this Subparagraph.

Paragraph 75.c. requires that the database include "data compiled under the traffic stop data collection and the patrol data collection mechanisms."

MCSO has created electronic forms to collect data from traffic stops, incidental contacts and warnings.

MCSO has also created interfaces with EIS for remote databases including Incident Reports (IRs) and Non-Traffic Contact Forms (NTCFs). These reports are readily available to supervisors to review within EIS. Field supervisors have shown that they have the ability to view IRs and NTCFs during our past site visits. AIU already conducts an inspection of IRs and has recently revised the methodology to improve and streamline the inspection process. We have suggested during our last several site visits that MCSO create a similar inspection for NTCFs, as well as propose an analytical strategy to examine whether any racial or ethnic inconsistencies may exist in the incidents documented on the NTCF. MCSO recently produced a brief proposal of the methods they would use to analyze NTCFs based upon these ongoing discussions. We, the Plaintiffs, and the Plaintiff-Intervenors provided comments on these proposals in early April 2020. Following several conference calls on both the forms and policy, EA-3 (Non-Traffic Contact), MCSO proposed an initial study that would only evaluate how the NTCF form and policy are being used across the agency. MCSO also proposes that following this review of the use of NTCFs, the agency will suggest an appropriate method to determine if disparities exist in the stops documented on these forms. MCSO has made available all investigative stop and field interview NTCFs each month. Our review of NTCFs for the current quarter did not find any issues of concern; however, a statistical methodology would allow a more comprehensive examination.

This Paragraph requires that the data for such activities exists within EIS; however, Paragraphs 72, 81a., and 81b.vi. require an analysis of these stops. Therefore, while MCSO complies with this Subparagraph, MCSO will not attain compliance for the other Paragraphs until a method of analysis is approved.

MCSO is in compliance with this Subparagraph.

WAI 53399

Paragraph 75.d. requires that the database include "all criminal proceedings initiated, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the County and/or its Deputies or agents, resulting from MCSO Patrol Operations or the actions of MCSO Patrol Operation Personnel."

MCSO's Legal Liaison Section receives and forwards this information to EIU for entry into the EIS database. Deputies self-report contacts they have with other agencies, and any two contacts within a rolling six-month period results in an alert requiring a supervisor to investigate. Supervisors have demonstrated the ability to access this information during our site visits. In addition, in one of the monthly production requests involving this Paragraph, we noted that during the prior quarter, January to March, there were 14 "notice of claim" incident type alerts; but none were sent to supervisors for further investigation. During April to June, we noted 67 "notice of claim" incident type alerts with three being sent to supervisors for investigation. During our July remote site visit, we requested clarification on these particular alerts through a document request. BIO command staff advised that they had recently discovered that there was a backlog of emails from the Legal Liaison Section regarding Notice of Claims. In October 2020, the EIU lieutenant noted that the backlog of Notice of Claims had been rectified and that new internal processes were adopted to ensure that such a backlog would not go undetected in the future. As this appears to have been a unique issue that MCSO responded to quickly, we have not removed MCSO from compliance with this Subparagraph.

MCSO is in compliance with this Subparagraph.

Paragraph 75.e. requires that the database include "all arrests."

Arrests may not always occur as a result of a traffic stop. MCSO, therefore, has placed into production an interface between EIS and the Jail Management System (JMS). This interface allows supervisors to easily access information regarding arrest that cannot be viewed through traffic data. During our site visits, supervisors have demonstrated the ability to access the IRs and related arrest information. The timeliness and sufficiency of that review is evaluated under Paragraph 93.

MCSO is in compliance with this Subparagraph.

Paragraph 75.f. requires that the database include "all arrests in which the arresting Deputy fails to articulate probable cause in the arrest report, or where an MCSO Supervisor, court or prosecutor later determines the arrest was not supported by probable cause to believe a crime had been committed, as required by law."

Incident Reports (IRs) are housed in the TraCS (Traffic and Criminal Software) system. Supervisors must review and sign off on IRs for each deputy involving an arrest or detention of a suspect within 72 hours of the incident. Supervisors are also required to ensure that probable cause exists for each charge or arrest outlined within an IR. AIU additionally conducts an inspection of IRs to ensure that all policy requirements are met.

If a court or prosecutor decides not to prosecute a case, both the deputy and their immediate supervisor are notified. In 2019, MCSO created a new inspection that combined IR and County Attorney Turndown inspections. MCSO's intent is to catch instances of reasonable suspicion and

WAI 53400

probable cause issues earlier in the process. Other deficiencies result in BIO sending Action Forms to the appropriate District personnel. In the inspections from October through December, there were no cases returned by a County Attorney or local prosecutor due to a lack of articulation of reasonable suspicion/probable cause. During this reporting period, MCSO reported a compliance rate in excess of 97%, using the entire matrix of issues the agency employs to investigate IRs. We concur with these rates, as we found no instances of significant deficiencies and/or issues with Order-related requirements during this quarter. BIO sent Action Forms to the Districts for both the deficiencies in the original report and the supervisors who failed to find these deficiencies before signing off on the reports.

The inspections show that the data exist within EIS, even though the manner of computing compliance differs between us and MCSO.

MCSO remains in compliance with this Subparagraph.

Paragraph 75.g. requires that the database include "all arrests in which the individual was released from custody without formal charges being sought."

The ability to capture this information depends upon what actually occurred within the context of the interaction. If the suspect was taken into physical custody but released prior to booking, there would be a JMS record, as indicated in Subparagraph 75.e. above. Therefore, MCSO could use the interface described above to pull the relevant data elements into EIS. However, if the incident does not rise to the point of physical custody and detention, then it would likely yield an Incident Report, covered under Subparagraph 75.f. above or an Investigatory Stop under Subparagraph 75.h. to follow. The interfaces for IR and NTCF data became operational prior to July 1, 2017. The new inspection process referred to above will also capture elements useful for the evaluation of this Subparagraph.

MCSO is in compliance with this Subparagraph.

Paragraph 75.h. requires that the database include "all Investigatory Stops, detentions, and/or searches, including those found by the Monitor, an MCSO supervisor, court or prosecutor to be unsupported by reasonable suspicion of/or probable cause to believe a crime had been committed, as required by law."

MCSO has created interfaces for both IRs and NTCFs. As noted in 75.f., our inspection of IRs for October through December revealed a compliance rate over 97%. AIU sends BIO Action Forms (BAFs) to Districts with deficiencies. In addition, BIO is working on a separate inspection to track repetitive BAFs received by individuals and Districts.

In July 2017, the interface between EIS and the database for NTCFs was placed into production. MCSO also reissued EA-3 (Non-Traffic Contact) and amended the policy on June 14, 2018 (and further amended it on June 28, 2019). This policy specifies the responsibility of MCSO personnel regarding different types of search occurrences. If the search is related to a traffic stop, it should be captured on the VSCF. Searches occurring within activities resulting in an Incident Report will be captured under Subparagraph 75.e., and NTCF searches fall under this Subparagraph.

WAI 53401

Initially, the number of NTCF reports was insignificant; however, since May 2018, we generally receive between 15-25 NTCFs for investigative stops each month. These are all captured within EIS as required by this Subparagraph (as well as 75.c.). During the last quarter of 2019, we also requested a random sample of Field Information stops that were documented using the NTCF. Our review of these indicated that approximately 80% of civilian stops labeled as Field Information could easily have been labeled as Investigative stops. We apprised MCSO of our findings and have subsequently provided MCSO with our summary evaluation. We have also suggested that MCSO develop a methodology to statistically analyze the collection of NTCFs to look for possible issues of racial or ethnic bias in the way these interactions are conducted. The development of a statistical examination of NTCF stops should be a priority for MCSO once the Traffic Stop Methodologies for the Monthly Analyses are complete. Such an examination is required by Paragraphs 72 and 81.b.vi. MCSO has drafted an initial proposal for the evaluation of how NTCF forms and policy are being used across the agency. We and the Parties have provided extensive comments and will continue to work with MCSO on these issues. Subsequent to this review, MCSO plans to modify, where appropriate, both the policy and forms related to NTCFs; and will undertake a process to ensure that any potential indications of bias are discovered. Since NTCFs and IRs are included in EIS, MCSO is in compliance with this Subparagraph. Our review of investigative stops and field interviews during this quarter yielded no issues of concern.

MCSO is in compliance with this Subparagraph.

Paragraph 75.i. requires that the database include "all instances in which MCSO is informed by a prosecuting authority or a court that a decision to decline prosecution or to dismiss charges, and if available, the reason for such decision."

The EIS database has included both County Attorney Actions and an interface with the Justice Courts (AOC) since July 2017. MCSO began using a new method that merged the County Attorney Turndown Inspection with the IR inspection. The first inspection was produced in August 2019 using July data. For October through December, our computed compliance rates for the IRs exceeded 97%. For this period, the IR inspection did not include any County Attorney Turndowns, as none were received indicating a problem with probable cause. AIU sent several BIO Action Forms to the Districts for review due to the deficiencies found by the inspectors. For this Subparagraph, we also receive a random selection of IRs turned down for prosecution from MCSO and the Justice Courts. Our review of these indicate that most had been turned down using the generic phrases "no reasonable likelihood of conviction" or "dismissed to aide in prosecution." We found no other significant problems with the reports reviewed. We will continue to evaluate the inspection and IRs in future quarterly status reports.

MCSO is in compliance with this Subparagraph.

Paragraph 75.j. requires that the database include "all disciplinary action taken against employees."

MCSO currently tracks disciplinary actions in the IAPro system, which allows supervisors to search the history of their employees in EIS.

WAI 53402

AIU produces a monthly alert inspection report relevant to Paragraphs 70, 71, 75, and 81. The possible outcomes from these alert investigations range from no further action to referral to PSB. In the alert inspection reports from October to December, there were 45 instances where cases were referred to PSB rather than to supervisors for investigation. Additionally, the Administrative Services Division replies to a monthly request that incorporates this Subparagraph; and the Division's report indicates that no discipline was imposed for bias related incidents between October through December 2020.

MCSO is in compliance with this Subparagraph.

Paragraph 75.k. requires that the database include "all non-disciplinary corrective action required of employees."

MCSO produces a Supervisory Note inspections (in particular, bimonthly reviews of a deputy's performance) and the monthly alert report described in the previous Subparagraph to fulfill the requirements for this Subparagraph. In addition, we also review 15 randomly chosen closed alert inspections conducted by supervisors each month. As noted previously, the majority of cases are closed through a meeting with a supervisor.

Supervisors also are required to make two comments regarding their subordinates each month in their BlueTeam Notes. In the Supervisory Notes inspections for October through December, there were four instances where supervisors were found deficient. All of these particular deficiencies occurred in November. AIU sent BIO Action Forms to those Districts identified as having any issues in this inspection.

MCSO is in compliance with this Subparagraph.

Paragraph 75.l. requires that the database include "all awards and commendations received by employees."

MCSO published GC-13 (Awards) on November 30, 2017 and most recently updated this policy on July 22, 2020. With this publication, MCSO created categories for awards or commendations that could be tracked within the EIS database. With the introduction of the newest version of EIPro, these fields are also searchable by supervisors. During our past site visits, supervisors demonstrated how they could search these fields and locate awards of their subordinates' in the EIS data. According to the monthly alert inspection reports for October through December, there were no commendations recommended by supervisors.

MCSO is in compliance with this Subparagraph.

Paragraph 75.m. requires that the database include the "[t]raining history for each employee."

MCSO has transitioned from the Skills Manager System to the Cornerstone (the HUB) software program. The HUB has replaced the E-Policy and E-Learning programs. The HUB routinely updates recent training and policy reviews for deputies and is visible by immediate supervisors. MCSO also created an interface between the HUB and EIS.

WAI 53403

During our past site visits, all field supervisors who we contacted stated that they were familiar with the HUB and were able to access the information contained therein. Several supervisors noted how they assigned training to particular deputies following alert investigations they completed. In addition, during our regular conference calls regarding TSMR methodology, we have placed particular importance on the development of comprehensive supervisor training that would ensure that they will be able to comprehend and interpret the statistical data produced each month in a way that would promote a transparent intervention process. MCSO personnel have assured us that supervisors have ready access to the training and policy reviews of their subordinates. We will continue to evaluate supervisors' ability to easily search and use EIS during future site visits.

MCSO is in compliance with this Subparagraph.

Paragraph 75.n. requires that the database include "bi-monthly Supervisory observations of each employee."

The Audits and Inspections Unit (AIU) conducts a monthly inspection of Supervisory Notes. One of the indicators AIU evaluates is whether supervisors are making two notes per deputy each month. For October through December, AIU reported four instances where supervisors did not make two reviews for each of their subordinates. These all occurred during the October inspection and involved personnel at the rank of lieutenant and above. BIO Action Forms were sent to the Districts where deficiencies were found.

MCSO is in compliance with this Subparagraph.

With the operationalization of interfaces for Incident Reports, Non-Traffic Contact Forms, the Arizona Office of the Courts, and the HUB, EIS now contains the information required by the Order. MCSO has worked diligently to use some of the data above to investigate compliance rates with the Orders. MCSO continues to develop other inspections or data analytic methods in response to our suggestions. During our regular conference calls with MCSO, Plaintiffs, and Plaintiff-Intervenors, we have continued to clarify how MCSO utilizes the data being collected and recommended ways it might gain further transparency in the ways it analyzes and presents information gleaned from these analyses.

**Paragraph 76.** *The EIS shall include appropriate identifying information for each involved Deputy (i.e., name, badge number, shift and Supervisor) and civilian (e.g., race and/or ethnicity).*

### In Full and Effective Compliance

MCSO has instituted a quality check process for Vehicle Stop Contact Forms (VSCFs) that requires supervisors to review all traffic stop documents within three days of the stop. AIU also conducts an inspection of the timeliness of these reviews as well as a second inspection on Traffic Stop Data. The Traffic Stop Data inspection employs a matrix that ensures that the name, serial number, and unit of the deputy is included on the VSCF in addition to the identity and race/ethnicity of the driver. While the overall rate of compliance for the Traffic Stop Data inspections at times has fallen below the standard of 94%, the monthly matrix information showed that none of the deficiencies had to do with identification of deputies or drivers.

WAI 53404

MCSO has incorporated patrol data into the EIS through the creation of interfaces for Incident Report (IR) and Non-Traffic Contact Form (NTCF) documents. Each of these documents lists the required name of the deputy and civilian, as well as the ethnicity of the civilian, in accordance with this Paragraph. AIU conducts an inspection of IRs, including a check for racial/ethnic bias in the reporting documents and the identification of all parties contacted as a result of the incident. We have found no recent instances where the identify of a deputy or persons contacted was not included on these forms. Non-Traffic Contact Forms contain the same basic information about the identity of the deputy making the contact and the persons being contacted. While MCSO does not yet have an inspection of NTCFs, they do provide us with copies of all the documents for investigative stops and field information. Up to this point, we have not found a repetitive problem with NTCF documentation that includes the criteria required by this Paragraph.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.


**Paragraph 77.** *MCSO shall maintain computer hardware, including servers, terminals and other necessary equipment, in sufficient amount and in good working order to permit personnel, including Supervisors and commanders, ready and secure access to the EIS system to permit timely input and review of EIS data as necessary to comply with the requirements of this Order.*

**In Full and Effective Compliance**

Since our earliest site visits in 2014, we have addressed the issue of "necessary equipment, in sufficient amount and in good working order" with MCSO. As part of our monthly document requests, we receive an accounting, by District, of how many vehicles have functioning TraCS systems.

Since the end of 2015, we have found that all marked patrol vehicles were properly equipped with TraCS equipment. MCSO developed EB-2 (Traffic Stop Data Collection), which states that in the event that a TraCS vehicle is not operational, or available, each District possesses the necessary equipment at the substation for deputies to input his/her traffic stop information before the end of the shift. Due to the mountainous regions throughout Maricopa County, there have always been connectivity issues. However, these areas are well-known to Patrol deputies; and they have demonstrated how they adapt to connectivity problems. The VSCF also allows deputies to note issues with technology on a traffic stop.

During our past visits to the Districts, we regularly spot-checked the facilities and patrol cars; and found that they had functioning TraCS equipment, and that each District office had available computers for any occurrence of system failures with vehicle equipment. We have been unable to conduct these inspections since January 2020 as a result of holding our site visits remotely.

At present, the technology and equipment available at MCSO meet the requirements of the Order.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 53405

We will continue to conduct our spot inspections at the Districts, and MCSO will apprise us of any event that falls within the scope of this Paragraph.

**Paragraph 78.** *MCSO shall maintain all personally identifiable information about a Deputy included in the EIS for at least five years following the Deputy's separation from the agency. Information necessary for aggregate statistical analysis will be maintained indefinitely in the EIS. On an ongoing basis, MCSO shall enter information into the EIS in a timely, accurate, and complete manner, and shall maintain the data in a secure and confidential manner. No individual within MCSO shall have access to individually identifiable information that is maintained only within EIS and is about a deputy not within that individual's direct command, except as necessary for investigative, technological, or auditing purposes.*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on March 3, 2021.

**Phase 2:** In compliance

GH-5 (Early Identification System) clearly states that employees only have access to EIS in furtherance of the performance of their duties, and that any other unauthorized access will be addressed under MCSO's discipline policy. The policy also notes that access to individual deputy information will be limited to appropriate supervisory/administrative personnel of that deputy. In addition, the policy states that personal information will be maintained in the database for at least five years following an employee's separation from the agency; however, all other information will be retained in EIS indefinitely

The most recent occurrences of a substantiated misuse of MCSO's computer system occurred in 2011 and 2015. As a result, MCSO published a System Log Audit operating procedure in November 2017 that required PSB to notify the Technology Management Bureau of any investigations involving a system breach. We fully vetted this operating procedure (BAS SOP 17-4) during our January 2018 site visit. MCSO reported no system breaches occurring since our January site visit. In addition, we receive summaries of all internal investigations each month. In March 2019, one case indicated that a deputy was under investigation for potentially misusing the Arizona Criminal Justice Information System (ACJIS); and in another, it was alleged that booking information might have been used for social media. In April 2020, there was an external complaint that a deputy may have run a criminal history check on someone of a relative. These cases have not triggered the operating procedure noted above, according to MCSO during our site visit meetings, because PSB has not yet completed its investigations, or they have found nothing to substantiate the original claims.

MCSO's concern for the integrity of information in EIS is further exemplified by the protocols that PSB has created to meet the requirements of Subparagraphs 75.a. and 75.b. regarding purview of open complaints and internal investigations. PSB not only controls who can view summaries of open investigations, but has created a protocol for creating the summary of open investigations to protect the integrity of the case while it is being processed.

WAI 53406

MCSO has also created a work group to ensure the integrity of traffic stop data used for analysis. The protocols used by this work group are incorporated into Section 306 of the EIU Operations Manual. We have approved this section, and it has been incorporated into the manual as finalized.

**Paragraph 79.** *The EIS computer program and computer hardware will be operational, fully implemented, and be used in accordance with policies and protocols that incorporate the requirements of this Order within one year of the Effective Date. Prior to full implementation of the new EIS, MCSO will continue to use existing databases and resources to the fullest extent possible, to identify patterns of conduct by employees or groups of Deputies.*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on March 3, 2021.

**Phase 2:** Not in compliance

The employment of the EIS database remains limited as MCSO has not yet completed and published the results of new methodologies for the Traffic Stop Monthly Report (TSMR). In addition, during our last several site visits, we have also suggested to MCSO that the agency needs to create an analytical plan for the Non-Traffic Contact Forms that have accumulated over the past two years. Until these are complete and operational, MCSO will not achieve Phase 2 compliance with this Paragraph. We and the Parties continue to work with MCSO to complete each of these analytic reports.

MCSO published the Fifth Traffic Stop Annual Report (TSARs),which is discussed in other Paragraphs. Although the report concludes that systemic bias in patrol functions through traffic stop outcomes does appear to exist, they have not yet shown a trend of improvement/decline in the level of potential bias. MCSO is developing a plan to ensure that subsequent TSARs are able to track trends in the level of potential bias/disparity found in traffic stop outcomes. A recent Traffic Stop Quarterly Report (TSQR) proposal included the means by which MCSO would investigate and evaluate the success of such trend analyses. We will provide of summary of this when it is produced.

MCSO's plan for the analysis of monthly traffic data also stems from the foundation created by the more recent Fourth and Fifth TSARs. MCSO is currently planning pilot analyses to ensure that the new methodologies meet the requirements of the Order. MCSO has also proposed an initial method to analyze NTCFs but these plans remain in a preliminary stage.

In the meantime, EIU and AIU pull together data to produce reports and inspections of both deputy and supervisor activity. The EIS automatically triggers alerts for repetitive actions, such as receiving multiple BIO Action Forms or external complaints. However, for the past two years BIO has been reevaluating the threshold levels that trigger several of these alerts and, in some instances, suspended them during this period. The EIU uses this information to create monthly reports and to determine whether an investigation by a supervisor is required. AIU has most recently published a new inspection on EIS Alert Processes to ensure that alert investigations are conducted within policy timeframes and to summarize the manner in which investigations were closed. The compliance rate for the EIS Alert Inspection for this reporting period ranges from

WAI 53407

87% to 93%. This represents improvement from the widely varying compliance rates in past quarters, but is still below the threshold that is expected. MCSO is developing an extension of this inspection to include an evaluation of the effect of interventions that supervisors recommend and implement. This final component to the inspection is crucial for compliance with other Paragraphs.

AIU also uses the EIS database to generate numerous inspections of traffic stop data, Supervisory Notes, and Incident Report inspections, among many others. When deficiencies are found, AIU sends out BIO Action Forms to the District command to rectify the situation and memorialize what actions are taken. These inspections are crucial to evaluate compliance with several Paragraphs in the Order. AIU has already automated an alert threshold for repeated Action Forms for the same types of events. An initial investigation of repetitive Action Forms, in 2019, showed that a small number of deputies receive three or more Action Forms, while the vast majority receive only one Action Form. However, since that time BIO has been working to implement a less cumbersome process that could be produced twice each year. The BIO Captain has kept us regularly informed on the progress for this audit and submitted a proposal in December that we returned with additional feedback. The goal of this inspection is to track deficiencies by Districts, shifts, and squads to focus corrective measures in the most beneficial way. We will continue to review refinements to MCSO's proposal as they are made available.

### b. Training on the EIS

*Paragraph 80. MCSO will provide education and training to all employees, including Deputies, Supervisors and commanders regarding EIS prior to its implementation as appropriate to facilitate proper understanding and use of the system. MCSO Supervisors shall be trained in and required to use EIS to ensure that each Supervisor has a complete and current understanding of the employees under the Supervisor's command. Commanders and Supervisors shall be educated and trained in evaluating and making appropriate comparisons in order to identify any significant individual or group patterns. Following the initial implementation of the EIS, and as experience and the availability of new technology may warrant, MCSO may propose to add, subtract, or modify data tables and fields, modify the list of documents scanned or electronically attached, and add, subtract, or modify standardized reports and queries. MCSO shall submit all such proposals for review by the Monitor pursuant to the process described in Section IV.*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on March 3, 2021.

**Phase 2:** In compliance

MCSO's curriculum for Supervisor Responsibilities: Effective Law Enforcement (SRELE) regularly includes a refresher and updates for supervisors regarding how to most effectively use EIS tools and complete Alert Investigations for their subordinates within policy guidelines. MCSO is also modifying the Traffic Stop Monthly Report (TSMR) analysis and participating in regular conference calls with us and the Parties. A significant portion of these discussions revolve around how to effectively train supervisors to use the TSMR process in the furtherance of their

WAI 53408

supervisory duties and in accordance with the Court Order. Additionally, MCSO recently published the first and second Traffic Stop Quarterly Reports (TSQR). The conclusions and recommendations of each of these reports could prove useful for the continued refinement of supervisory training conducted by MCSO. We will continue to assist MCSO as it formulates training curriculum to enhance the supervisory functions of the Office.

### c. Protocol for Agency and Supervisory Use of the EIS

**Paragraph 81.** *MCSO shall develop and implement a protocol for using the EIS and information obtained from it. The protocol for using the EIS shall address data storage, data retrieval, reporting, data analysis, pattern identification, identifying Deputies for intervention, Supervisory use, Supervisory/agency intervention, documentation and audit. Additional required protocol elements include:*

a.  *comparative data analysis, including peer group analysis, to identify patterns of activity by individual Deputies and groups of Deputies;*

b.  *identification of warning signs or other indicia of possible misconduct, including, but not necessarily limited, to:*

     i.  *failure to follow any of the documentation requirements mandated pursuant to this Order;*

     ii.  *racial and ethnic disparities in the Deputy's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of Deputies' specific duties, or racial or ethnic disparities in traffic stop patterns when compared with data of a Deputy's peers;*

     iii.  *evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;*

     iv.  *a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;*

     v.  *complaints by members of the public or other officers; and*

     vi.  *other indications of racial or ethnic bias in the exercise of official duties;*

c.  *MCSO commander and Supervisor review, on a regular basis, but not less than bimonthly, of EIS reports regarding each officer under the commander or Supervisor's direct command and, at least quarterly, broader, pattern-based reports;*

d.  *a requirement that MCSO commanders and Supervisors initiate, implement, and assess the effectiveness of interventions for individual Deputies, Supervisors, and units, based on assessment of the information contained in the EIS;*

WAI 53409

e.    *identification of a range of intervention options to facilitate an effective response to suspected or identified problems.  In any cases where a Supervisor believes a Deputy may be engaging in racial profiling, unlawful detentions or arrests, or improper enforcement of Immigration-Related Laws or the early warning protocol is triggered, the MCSO shall notify the Monitor and Plaintiffs and take reasonable steps to investigate and closely monitor the situation, and take corrective action to remedy the issue.  Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or other supervised, monitored, and documented action plans and strategies designed to modify activity.  All interventions will be documented in writing and entered into the automated system;*

f.    *a statement that the decision to order an intervention for an employee or group using EIS data shall include peer group analysis, including consideration of the nature of the employee's assignment, and not solely on the number or percentages of incidents in any category of information recorded in the EIS;*

g.    *a process for prompt review by MCSO commanders and Supervisors of the EIS records of all Deputies upon transfer to their supervision or command;*

h.    *an evaluation of whether MCSO commanders and Supervisors are appropriately using the EIS to enhance effective and ethical policing and reduce risk; and*

i.    *mechanisms to ensure monitored and secure access to the EIS to ensure the integrity, proper use, and appropriate confidentiality of the data.*

**Phase 1:**  In compliance

- GH-5 (Early Identification System), most recently amended on March 3, 2021.

**Phase 2:**  Not in compliance

MCSO produces a number of reports and inspections that are relevant for this Paragraph.  Due to issues with EIS data, methods of analysis and a change in vendors, MCSO has not been able to reliably produce the Traffic Stop Monthly Report (TSMR) based upon the criteria outlined in Paragraph 67.

MCSO has published the Fourth and Fifth Traffic Stop Annual Reports (TSAR); however, the analysis from these reports addresses issues of potential systemic bias across the entire traffic patrol function and cannot be employed to address potential individual-level biased activity.  The TSMR, which is currently undergoing a revision and a planned pilot process, will assist MCSO and its supervisors in evaluating the activity of individual deputies with regard to traffic stops and examine any behaviors that might suggest biased activity.

MCSO has also published two TSQRs: the first, evaluated how supervisors review and document traffic stop activity of their subordinates; and the second, surveyed supervisors involved in the Third TSAR interventions about their experience in that process.  Each has yielded information that MCSO can use for the development of training, modification of policy and dissemination of resources to improve supervisory capabilities.

WAI 53410

Paragraph 81.a. requires that MCSO's EIS protocols include "comparative data analysis, including peer group analysis, to identify patterns of activity by individual Deputies and groups of Deputies."

The EIU has conducted monthly and annual analyses looking for outliers that may indicate that an individual is behaving in a biased or unprofessional manner, in accordance with Paragraphs 65, 66, and 67. The TSMR has been suspended and under revision since April 2016. MCSO has proposed methodologies in consultation with its data analyses vendor. We and the Parties have had the opportunity during our site visits; and, most recently through regular conference calls, to ask questions and receive additional information. Most importantly, MCSO has created a method to match deputies, in the Annual Reports, using personal and professional characteristics that are intended to go beyond previous strategies that were based upon the geographic location of traffic stops alone. These methods have been met with support from deputies across the organization during meetings between MCSO personnel and the data analysis vendor (CNA). MCSO continues to work toward the finalization of a complimentary method for TSMRs. Once complete, these methods will allow MCSO to identify those deputies whose traffic stop outcomes are significantly different from their peers.

MCSO has published two TSQRs. As noted above, the outcomes and recommendations could promote change in several ways throughout MCSO; however, they were not conducted in a way to compare peer supervisors.

MCSO has also created an interface for Non-Traffic Contact Forms (NTCFs) to be available in the EIS database; however, MCSO has not yet begun to develop a methodology to investigate whether patterns of problematic behavior, action, or bias might be occurring in the stops these forms document. We have discussed these issues with MCSO during our site visit meetings since October 2018. We and the Parties have commented on preliminary materials provided by MCSO, and we will continue to work with MCSO to use these civilian contacts to their fullest potential. MCSO has proposed an initial review of how the forms and policy, EA-3 (Non-Traffic Contact), are currently being employed across the organization to create an appropriate statistical methodology that is responsive to the needs of the Order.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.b. requires that MCSO's EIS protocols include "identification of warning signs or other indicia of possible misconduct."

GH-5 (Early Identification System) provides significant direction for employees and supervisors alike to understand what type of behaviors will be viewed as problematic. As noted above, the intent of the TSMR is to identify deputies who might be engaged in biased activity regarding who they stop, cite, warn, or search. MCSO has been developing new methods for the TSMR, and we have collectively engaged in numerous discussions about refinements to future TSARs.

MCSO is also revising the EIU Operations Manual, which will include sections on data protocols and the several analyses based upon the traffic stop and patrol data. The manual also includes thresholds for behavior ranging from failure to arrive on time for work to external complaints. BIO is examining these thresholds to determine why they were set at the present levels. This investigation may result in the modification of thresholds that have proven unproductive over the

WAI 53411

last several years. Additionally, MCSO is currently investigating threshold levels for the benchmarks for the TSMR outlined in Paragraph 67. As a result, the triggering of alerts for repetitive behavior exceeding several thresholds have been put on hold.

Finally, as noted in Subparagraph 81.a. and 81.b.vi, MCSO should utilize all patrol data to evaluate the behavior of deputies in comparison to their peers. While the volume of Non-Traffic Contact Forms (NTCFs) pales in comparison to traffic stops, there are enough accumulated forms for analyses to commence. As we noted in Paragraph 75, we had originally received all NTCFs for investigative stops each month. The volume ranges from 15-25 per month. In our review of these interactions, we have noted that they typically involve suspicious behavior, and violations of traffic laws while on bicycles or waterways. These violations are often concentrated in particular locations throughout the County that may make it more likely that minority members are contacted. We have suggested to MCSO that the agency create an analytic method to determine whether there may be trends in activity over time that may require closer examination to eliminate any possibility of bias. Since our July site visit in 2019, we also undertook an evaluation of a random sample of Field Information contacts captured on NTCFs. Our review found a large overlap between civilian contacts labeled as Field Information and those labeled as Investigative Stops. We have engaged MCSO in further discussions clarifying this distinction. Until such time as this is resolved, we will select a combined sample of NTCFs from both categories of civilian interaction. MCSO is currently proposing to investigate how the NTCF forms and policy are being used across the agency. This would be an important first step that could lead to a more thorough analysis looking for potential indications of bias across these stops. We and the Parties continue to engage in discussions with MCSO about these significant issues.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.c. requires that MCSO's EIS protocols include "MCSO Commander and Supervisor review, on a regular basis, but not less than bimonthly, of EIS reports regarding each officer under the Commander or Supervisor's direct command and, at least quarterly, broader, pattern-based reports."

Supervisory Note inspections include four measures to assess how well supervisors are using EIS information to oversee the activity and behavior of their subordinates: making supervisory comments on deputies; reviewing their body-worn camera footage; making Employee Performance Appraisal (EPA) notations; and reviewing subordinates' EIS profiles. The overall compliance rate from October to December has ranged between 93.5% and 100%. In November, with a compliance rate of 93.5%, the inspection indicated that lieutenants and command staff had not recorded the required notes per month or reviewed their subordinates EIS information. AIU sent out BIO Action Forms to those Districts with deficiencies noted, no matter the level of compliance. We have also repeatedly requested additional information from MCSO when we encounter an issue of concern and MCSO has always willingly provided the needed information or additional data. Rarely have we noted deficiencies involving the same supervisors in consecutive months. MCSO has already included repetitive BIO Action Form (BAF) deficiencies as an alert allegation. AIU has developed and presented a proposal to better track BAFs by type, individual, and District to ensure that any corrective actions are targeted at the most appropriate level and to be able to determine if there are particular supervisors that appear repeatedly within

WAI 53412

specified timeframes. It is important to note that in our review of 15 randomly selected alert investigations each month, we have noticed an increase in investigations due to repetitive BAFs. In that vein, MCSO has produced a revised proposal, in December 2020, for the tracking of BAFs. We have evaluated this proposal and returned it to MCSO. We will continue to report on the development of this proposal as it is made available.

MCSO is in compliance with this Subparagraph.

Paragraph 81.d. requires that MCSO's EIS protocols include "a requirement that MCSO Commanders and Supervisors initiate, implement and assess the effectiveness of interventions for individual Deputies, Supervisors, and units, based on assessment of the information contained in the EIS."

The EIS database generates alerts for issues ranging from data entry errors to internal and external complaints; however, many of the potential ongoing alerts are dependent upon the revision of alert thresholds which continue to undergo evaluation by MCSO. From these alerts, EIU personnel send out for investigation those alerts that are not redundant or mischaracterized in some fashion. Supervisors have a set amount of time to return these investigations with a description of their investigation and the outcome. MCSO has created an EIS Alert Review Group (ARG) that evaluates the investigations of supervisors prior to closing an alert. The group ensures that the reports of the supervisors address all aspects of the assigned investigation, and returns those that are deficient to the District for continued revision. Following the creation of the ARG, we have found the supervisors' investigations and summaries to be much more complete and thorough. Over time, the review group's request for additional information has dropped below one third of the investigations evaluated. MCSO has provided us with the original alert investigation documents (Attachment B of GH-5 [Early Identification System]), as well as modified ones arising from the ARG's requests. AIU has also created a new inspection for EIS Alert Review Processes. This inspection initially determines whether the investigation was completed within policy timeframes of 30 days. The compliance rate for this quarter ranges from 87% to 93%. BIO sent Action Forms to the Districts where supervisors did not complete their investigations within policy guidelines.

MCSO is working to also ascertain whether the interventions undertaken are successful. We will continue to engage MCSO in this evaluation process in accordance with this and other Paragraphs. At present, since there is no mechanism in place to adequately judge the effect of interventions, MCSO is not in compliance with this Subparagraph.

Paragraph 81.e. requires MCSO's EIS protocols to include "identification of a range of intervention options to facilitate an effective response to suspected or identified problems. In any case where a Supervisor believes a Deputy may be engaging in racial profiling, unlawful detentions or arrests, or improper enforcement of Immigration-Related Laws or the early warning protocol is triggered, MCSO shall notify the Monitor and Plaintiffs and take reasonable steps to investigate and closely monitor the situation, and take corrective action to remedy the issue. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or other supervised, monitored, and documented action plans and strategies designed to modify activity. All interventions will be documented in writing and entered into the automated system."

WAI 53413

GC-17 (Employee Disciplinary Procedures) and GH-5 (Early Identification System) provide a wide range of options for supervisor interventions, as well as practical guidelines about how to employ those options. As noted above, GH-5 includes Attachment B, "Early Identification Alert Response Form." This form specifies the responsibility of supervisors and serves as a checklist of processes the supervisor should use. EIU also attaches any documents, citations, or BWC recordings the supervisor might need to conduct an inquiry. We began observing the use of these forms in April 2017. Over the past six months, we have found that alert investigations conducted by supervisors has improved. Our inquiries for additional information typically revolve around alert investigations that have been closed as a result of simultaneous PSB inquiries, which take precedent, and/or updates on training recommended by District and EIU personnel.

MCSO has also created an EIS Alert Review Group (ARG) to ensure that the closure of alerts is supported by documentation from supervisors and responsive to the needs of the organization. We have also worked with MCSO to propose an extension of alert investigation timeframes when documentation issues delay the process. During the last quarter, our review of alert closures indicated two investigations involving a request for an extension that was granted, and two that failed to meet policy timelines where no extension was requested. We will continue to evaluate these documents as they are produced.

MCSO is in compliance with this Subparagraph.

Paragraph 81.f. requires that MCSO's EIS protocols include "a statement that the decision to order an intervention for an employee or group using EIS data shall include peer group analysis, including consideration of the nature of the employee's assignment, and not solely on the number or percentages of incidents in any category of information recorded in the EIS."

In the development of GH-5 (Early Identification System), MCSO has taken into consideration the nature of the employee's assignment. In prior versions of GH-5, MCSO created an appendix for thresholds that indicated, for example, that the "use of force" threshold was different for Detention and Patrol personnel. Detention personnel are much more likely to need to employ force than their Patrol counterparts. In the current version of GH-5, MCSO refers to thresholds that will be included in the EIU Operations Manual; however, MCSO has been evaluating the threshold limits to ensure that they are achieving the goals for which they were originally set for nearly two years. As part of the reevaluation process, MCSO is communicating with other local law enforcement agencies to collect information about current best practices regarding thresholds they employ. As a result, EIU personnel are more closely overseeing repetitive behaviors and have not initiated alert investigations for some threshold levels. When MCSO produces a new threshold appendix, we will evaluate it with regard to this and other portions of the Court Order.

MCSO and its data analysis vendor proposed and employed an expansion of "peer" comparisons beyond just the location of the traffic stop in the Fourth TSAR. MCSO matched deputies based upon personal and professional characteristics. During the analysis conducted for the Fourth TSAR, a statistical problem arose as the result of these matching characteristics. MCSO overcame this problem, and there were no additional indications of problems in the Fifth TSAR. MCSO is in the midst of planning pilot-testing for the TSMR using these new peer comparison strategies. MCSO will remain out of compliance with this Subparagraph until the TSMR is produced, evaluated, and implemented throughout the organization.

WAI 53414

MCSO is not in compliance with this Subparagraph.

Paragraph 81.g. requires that MCSO's EIS protocols include "a process for prompt review by MCSO Commanders and Supervisors of the EIS records of all Deputies upon transfer to their supervision or command."

MCSO has noted the need for a prompt review in both the "Supervisor Responsibilities" and "Command Staff Responsibilities" sections of GH-5 (Early Identification System). EIU specifically addressed this issue during the EIS and SRELE training completed in November 2017. EIU advised supervisors to document when they conducted their review in Supervisory Notes, as well as how long the deputy had been working in their chain of command when the review was conducted. This was also reiterated in the SRELE training that was approved on September 30, 2019. During our visits to several Districts in 2019 and 2020, MCSO personnel informed us that most command staff attempt to review these materials within the first few days that a deputy, or supervisor, moves to their District. In no cases have we found information where the 14-day limit outlined in policy has been problematic.

MCSO is in compliance with this Subparagraph.

Paragraph 81.h. requires that MCSO's EIS protocols include "an evaluation of whether MCSO Commanders and Supervisors are appropriately using the EIS to enhance effective and ethical policing and reduce risk."

EIU has improved the processing and tracking of alert investigations. The development of Attachment B to GH-5 (Early Identification System) and training completed in EIS and SRELE has dramatically improved the information provided by supervisors when closing alerts. AIU has also created a new EIS Alert Review Process inspection that specifically looks for indications that supervisors have conducted a thorough examination within appropriate policy timeframes and selected appropriate responses to the allegations included in the alert investigation. At present, this inspection is limited to reviewing whether supervisors are completing alert investigations within the 30-day policy requirements. MCSO's compliance rate for this inspection ranged from 87% to 93% during this quarter. MCSO continues to work on a secondary, but vital, feature of this inspection, which will include criteria to judge the success of interventions by identifying deputies and supervisors who trigger additional alerts. This inspection will become a valuable component to ensure that supervisors and command staff are using EIS to promote efficiency and ethical policing during the alert investigation process. We found no issues with the conclusions used for closing alert investigations during this quarter. For the cases that were not closed within policy guidelines, BIO sent out Action Forms to the Districts. As this process becomes more routine, we expect that District personnel will adjust to the policy requirements. MCSO has created a Post-Stop Perceived Ethnicity Inspection, which looks specifically at traffic stops where the driver has a traditionally Latino surname but the VSCF indicates a white driver. The inspectors review BWC recordings and evaluate whether the deputy correctly marked the form. Throughout this quarter, out of 80 traffic stops reviewed, two were not in compliance. The paperwork completed by the deputy for these stops indicated that a view of the passenger race/ethnicity was "unknown-vision obstructed" whereas the inspector, in viewing the BWC footage, was able to identify one passenger as a white male and the other a Hispanic/Latino male. BIO Action Forms were sent to the Districts for these two stops.

WAI 53415

MCSO is not in compliance with this Subparagraph.

Paragraph 81.i. requires that MCSO's EIS protocols include "mechanisms to ensure monitored and secure access to the EIS to ensure the integrity, proper use, and appropriate confidentiality of the data."

MCSO has addressed the security and integrity of data in GH-5 (Early Identification System), as well as instituted facility inspections throughout the Districts – including the security of terminals, access to information, and mobile displays. We spot-check technology and security of old forms during each site visit and have found no problems to date. Additionally, on November 6, 2017, MCSO published the operating procedure for System Log Audit Requests; this became effective on November 30, 2017. The procedure outlines how PSB personnel will notify the Technology Management Bureau of any misuse of MCSO information systems allegations and request an audit of the suspected breach. We discussed this operating procedure, BAS SOP 17-4, during our January 2018 site visit meetings; it meets all of the concerns voiced since the February 2017 discovery of two cases where data was compromised, but no one notified the Technology Management Bureau. We believe this procedure has proven effective to this point. In addition, we are provided all internal investigation summaries initiated each month; and found only three instances in which an employee was accused of misusing ACJIS and booking information. Two of these complaints are still under investigation by PSB, and one resulted in a not sustained finding. We will continue to evaluate the effectiveness of MCSO's attention to data integrity.

MCSO is in compliance with this Subparagraph.

MCSO meets some of the requirements of Paragraph 81, but there remain a variety of activities that are currently ongoing that need to be completed before MCSO will be compliant. These range from the finalization of methods for the TSMR to the completion of revisions to the EIU Operations Manual. AIU has improved the tracking of alert investigations with the creation of the EIS Alert Review Process Inspection; and initiated a preliminary analysis of BIO Action Form tracking. However, each of these is limited because the EIS inspection does not evaluate the success of interventions; and without an inspection of BAFs over time, MCSO may not be adequately responding to repeated behavior that is difficult to detect with current methods. We have also requested that MCSO devise an audit for the NTCFs that have accumulated over the past two years. We and the Parties remain concerned that we have not noted many instances where supervisors proactively intervene with their subordinates; rather, the supervisors wait until prompted by EIS alerts or the ARG review of completed alert investigations. Command staff have taken a more active role in evaluating the work of supervisors as evidenced by the number of alert investigations returned to supervisors for revision or additional inquiry. MCSO has proposed initiating an evaluation of accumulated NTCFs to examine how the forms and policy are currently being used across the agency. We have provided feedback to this proposal and will evaluate the progression of this methodology as it becomes available. To comply with this and other Paragraphs, however, the methods would also have to be able to statistically indicate whether potential bias might be occurring with regard to how different ethnicities and races are being selected and treated during these encounters. We will continue to evaluate MCSO's progress toward the goals outlined in this Paragraph.

WAI 53416

# Section 9: Supervision and Evaluation of Officer Performance

**COURT ORDER X. SUPERVISION AND EVALUATIONS OF OFFICER PERFORMANCE**

*Paragraph 82. MCSO and the County shall ensure that an adequate number of qualified first-line Supervisors are available to provide the effective supervision necessary to ensure that Deputies are following the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order. First-line Supervisors shall ensure that Deputies are policing actively and effectively, are provided with the instruction necessary to correct mistakes, and are held accountable for misconduct. To achieve these outcomes, MCSO shall undertake the following duties and measures:*

*Paragraph 83. MCSO Supervisors shall provide the effective supervision necessary to direct and guide Deputies. Effective supervision requires that Supervisors: respond to the scene of certain arrests; review each field interview card and incident report; confirm the accuracy and completeness of Deputies' daily activity reports; respond to each Complaint of misconduct; ensure Deputies are working actively to engage the community and increase public trust and safety; provide counseling, redirection, support to Deputies as needed, and are held accountable for performing each of these duties.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

**Phase 2:** In compliance

Due to COVID-19 concerns, we postponed our January 2021 site visit. Therefore, we did not conduct any District visits in the first quarter of 2021. Our compliance findings for this reporting period are based on the review of documents submitted as proof of compliance.

We reviewed a sample of 86 Incident Reports for October, for the randomly selected date of October 24. Eighty-five of 86 Incident Reports were reviewed and memorialized by a supervisor within the required timeframes. All of the 12 Arrest Reports received were reviewed and approved by supervisors within the required 72 hours. There were 16 Vehicle Crash Reports submitted in the sample for October, of which all included timely documentation of supervisory review. In total, 85 of 86 reports were in compliance, for a compliance rate of 99%. We continued our reviews for quality, examining a 10% sample of the total reports submitted. We found no issues of concern. For October, MCSO reported 472 hours of community policing. From our reviews of all 14 of the community policing worksheets, Patrol deputies documented 10.28 hours of community policing. We reviewed a sample of 29 Patrol Activity Logs for October; there was one documented community policing activity. There were no community policing events reported in Aguila or Guadalupe.

WAI 53417

We reviewed a representative sample of 84 Incident Reports for November, for the randomly selected date of November 13. Of the 84 Incident Reports, all had proper documentation of timely supervisory review. Of the 84 Incident Reports, 21 were vehicle collisions, and all had documentation of supervisory review and approval. The compliance rate for timely supervisory review of Incident Reports in November was 100%. Supervisors reviewed and approved all six Arrest Reports within required timeframes. Our sample reviews for quality noted no issues of concern. For November, MCSO reported 555 hours of community policing. In our sample reviews of Patrol Activity Logs for November, we noted one community policing event. We reviewed all of the 14 community policing worksheets for November. Deputies reported a total of 12.7 hours of community policing, with 672 persons in attendance at community events. There were no community policing events reported in Aguila or Guadalupe.

We reviewed a representative sample of 91 Incident Reports for December, for the randomly selected date of December 7. All of the 91 Incident Reports included documentation that they had been reviewed and approved by supervisors as required by this Paragraph, for a compliance rate of 100%. All of the five Arrest Reports had been reviewed and signed by supervisors within the required timeframe. There were nine Vehicle Crash Reports submitted in the sample; we confirmed timely supervisory review on all reports. We conducted reviews for quality, examining a 10% sample of the total reports submitted for December. We found no issues of concern. For December, MCSO reported 485 hours of community policing. In our reviews of Patrol Activity Log samples for December, we saw one community policing event documented. For December, we reviewed all 26 community policing worksheets generated for the month. Deputies reported 22.23 hours of community policing. There was one community policing event noted in Aguila and two community policing events noted in Guadalupe.

For each month of the quarter, we selected a supervisor and a squad of deputies from each District. We requested several documents, including Patrol Activity Logs (PALs), for each deputy. We reviewed PALs for each month of the quarter to assess if deputies turned them in by the end of each shift, and if supervisors reviewed each PAL.

For October, we reviewed PALs for 29 deputies and seven supervisors. All 29 deputies' Patrol Activity Logs contained documentation of supervisory review. All seven supervisors' Patrol Activity Logs contained documentation of command-level review. For November, we reviewed Patrol Activity Logs for 29 deputies and seven supervisors. All 29 deputies' PALs contained documentation of supervisory review. All seven supervisors' PALs contained documentation of command-level review. For December, we reviewed Patrol Activity Logs for 28 deputies and seven supervisors. All 28 deputies' PALs contained documentation of supervisory review; all seven sergeants' PALs contained documentation of command-level review.

WAI 53418

Based on the review of PAL samples selected for October, on a daily basis, deputies completed an average of 1.14 Incident Reports, handled an average of 6.24 calls for service, completed an average of 1.55 self-initiated calls, and traveled an average of 72.9 miles. Based on the review of PAL samples selected for November, on a daily basis, deputies completed an average of 0.62 Incident Reports, handled an average of 3.2 calls for service, completed an average of 1.9 self-initiated calls, and traveled an average of 74.58 miles. Based on the review of PAL samples selected for December, on a daily basis, deputies completed an average of 0.54 Incident Reports, handled an average of 3.61 calls for service, completed an average of 1.96 self-initiated calls, and traveled an average of 54.43 miles.

We also reviewed deputies' and supervisors' PALs to determine if supervisors provided on-scene supervision, and if those supervisor-deputy contacts were documented. For the sample dates selected in October, there were 18 supervisor-deputy field contacts reported by deputies and supervisors. For the sample dates selected in November, there were 28 supervisor-deputy field contacts reported by deputies and supervisors. For the sample dates selected in December, there were 18 supervisor-deputy field contacts reported by deputies and supervisors.

For October, November, and December, we reviewed selected samples of non-traffic incidents involving stops and detentions, which were recorded on Non-Traffic Contact Forms (NTCFs). For October, we selected 26 NTCFs for review. All 26 NTCFs had been submitted prior to the end of the shift. All 26 NTCFs were reviewed and approved by supervisors within 72 hours, as required. The compliance rate for timely submission and timely supervisory review of NTCFs in October was 100%. For November, we selected 24 NTCFs to review. All 24 NTCFs were submitted prior to the end of the shift. All 24 NTCFs were reviewed and approved by supervisors within the required timeframe. The compliance rate for timely submission and timely supervisory review of NTCFs in November was 100%. For December, we selected 25 NTCFs for review. All 25 NTCFs were submitted prior to the end of the shift. Twenty-four of 25 NTCFs were reviewed and approved by supervisors within the required timeframe. The compliance rate for timely submission and timely supervisory review of NTCFs in December was 96%. For this reporting period, compliance with timely submission and timely supervisory review of NTCFs was 98.67%. We assess compliance with this Paragraph, as it relates to NTCFs in conjunction with timely reviews of VSCFs, under Paragraph 90.

Our reviews for this reporting period revealed that in October, of the 26 NTCFs, 10 stops involved white individuals, with a total of 13 white individuals documented in these stops. Six NTCFs documented one Latino individual in each stop. One of these six stops was actually a vehicle stop in which the deputy initially documented the stop in a NTCF, but subsequently generated a VSCF to document the stop. One stop involved two Asians or Pacific Islanders. Two stops involved a total of three Black individuals. One Black individual was contacted in the first stop and two Black individuals were contacted in the second stop.

For November, we reviewed 24 NTCFs, of which 17 stops involved white individuals, with a total of 27 white individuals documented in these stops. Five NTCFs documented one Latino individual in each stop. Three stops involved Black individuals, with a total of four Black individuals contacted. One stop involved an Asian or Pacific Islander.

WAI 53419

For December, we reviewed 25 NTFCs, of which 17 stops involved white individuals, with a total of 19 white individuals documented in these stops. Five NTCFs documented one Latino individual in each stop. Three NTCFs documented one Black individual in each stop. One stop involved an Asian or Pacific Islander. White individuals were involved in 44 of the 75 stops, or 58.67%. Latino individuals were involved in 16 of the 75 stops, or 21.33%. Black individuals were involved in eight of the 75 stops, or 10.67%. Asian or Pacific Islanders were involved in three of the 75 stops, or 4%.

**Paragraph 84.** *Within 120 days of the Effective Date, all patrol Deputies shall be assigned to a single, consistent, clearly identified Supervisor. First-line field Supervisors shall be assigned to supervise no more than twelve Deputies.*

## In Full and Effective Compliance

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the fourth quarter of 2020. For October, we reviewed a sample of shift rosters from Districts 4, 6, and 7, and Lake Patrol. For November, we reviewed a sample of shift rosters from Districts 1, 2, and 3. For December, we reviewed a sample of shift rosters from Districts 4, 6, and 7, and Lake Patrol. Our reviews of monthly and daily rosters indicated that deputies were assigned to a single consistent supervisor, and deputies worked the same shifts as their supervisors. For October, there were 10 shifts where supervisors exceeded the 1:8 sworn ratio. For each of these shifts where the span of control was exceeded, supervisors wrote memorandums documenting the event. District 1 had four shifts where the span of control was exceeded, and District 2 had six shifts where the span of control was exceeded. For November, there were five shifts were supervisors exceeded the 1:8 sworn ratio. Supervisors wrote memorandums documenting each of these events. District 1 had three shifts where the span of control was exceeded, and District 2 had two shifts where the span of control was exceeded. For December, there were two shifts were supervisors exceeded the 1:8 sworn ratio. District 2 had one shift where the span of control was exceeded, and District 4 had one shift where the span of control was exceeded. Supervisors wrote memorandums documenting each of these events.

On September 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 85.** *First-line field Supervisors shall be required to discuss individually the stops made by each Deputy they supervise with the respective Deputies no less than one time per month in order to ensure compliance with this Order. This discussion should include, at a minimum, whether the Deputy detained any individuals stopped during the preceding month, the reason for any such detention, and a discussion of any stops that at any point involved any immigration issues.*

## In Full and Effective Compliance

WAI 53420

To assess MCSO's compliance with this Paragraph, we requested that MCSO provide copies of reports documenting that supervisors are meeting with and discussing individually the stops made by each deputy, at least once per month. We then requested documentation for one randomly selected supervisor from each District, for each month of the reporting period, and the squad of deputies who reports to that supervisor. Supervisors record the discussion of traffic stops by applying the "Discussed with Deputy" option. MCSO documents supervisor-deputy discussions in a spreadsheet, which it submits for inspection. The spreadsheet also documents timely supervisory review of VSCFs. In addition to the spreadsheet, MCSO submits all VSCFs for the month in review. We select a 10% random sample of VSCFs from each District to review for content. We also inspect the sample of VSCFs submitted for review of traffic stops under Paragraphs 25 and 54, as part of compliance with Paragraph 91, to verify if supervisors are addressing deficiencies in the documentation related to the stops.

Paragraph 85 requires that supervisors discuss traffic stops at least once per month with their deputies. To efficiently manage this requirement along with other administrative and operational duties, supervisors generally conduct several traffic stop-related discussions with each deputy during the month. Supervisor-deputy discussions of traffic stops that occurred toward the latter part of the month may not get reviewed until the following month. Our selections for these discussions change every month, so to obtain complete records for each deputy, MCSO holds the submission until all of the information requested for the month is complete. Accordingly, the documentation of supervisory-deputy discussions of traffic stops is submitted 30 days retroactively.

For October, MCSO submitted the September traffic stops for each deputy, by District. The total number of traffic stops for each District was: District 1, 30; District 2, 16; District 3, five; District 4, 15; Lake Patrol, four; District 6, 56; and District 7, 31. There were a total of 157 traffic-related events for all Districts, and sergeants discussed 154 of these events with the deputies who conducted them, for a compliance rate of 98.1%.

For November, MCSO submitted the October traffic stops for each deputy, by District. The total number of traffic stops for each District were: District 1, 19; District 2, 19; District 3, one; District 4, 20; Lake Patrol, 15; District 6, 34; and District 7, nine. There were a total of 117 traffic-related events for all Districts, and sergeants discussed 114 of these with the deputies that conducted them, for a compliance rate of 97.44%.

For December, MCSO submitted the November traffic stops for each deputy, by District. The total number of traffic stops for each District were: District 1, one; District 2, six; District 3, eight; District 4, 28; Lake Patrol, seven; District 6, 36; and District 7, 22. There were a total of 108 traffic-related events for all Districts, and sergeants discussed all 108 of these events with the deputies who conducted them, for a compliance rate of 100%. For this reporting period, there were a total of 382 traffic stops reported. We received documentation that supervisors discussed 376 of these stops with the deputies that conducted them. This is a compliance rate of 98.43%.

On October 5, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 53421

***Paragraph 86.*** *On-duty field Supervisors shall be available throughout their shift to provide adequate on-scene field supervision to Deputies under their direct command and, as needed, to provide Supervisory assistance to other units. Supervisors shall be assigned to and shall actually work the same days and hours as the Deputies they are assigned to supervise, absent exceptional circumstances.*

**In Full and Effective Compliance**

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the fourth quarter of 2020. For October, we reviewed a sample of shift rosters from Districts 4, 6, and 7, and Lake Patrol. For November, we reviewed a sample of shift rosters from Districts 1, 2, and 3. For December, we reviewed a sample of shift rosters from Districts 4, 6, and 7, and Lake Patrol. Our reviews of monthly and daily rosters indicated that deputies were assigned to and worked the same schedules as their supervisors, and supervisors were available to provide on-scene supervision.

MCSO deputies' and sergeants' activities are captured in Patrol Activity Logs (PALs). We selected a random sample of one day per month, and one squad per District, for review. For October, we reviewed PALs for seven sergeants and 29 deputies. We noted a total of 18 field supervisor-deputy contacts between the combined deputies' and sergeants' PALs for the selected dates. For November, we requested PALs for 29 deputies and seven sergeants. We received and reviewed all requested PALs, and noted a total of 28 field supervisor-deputy contacts between the combined deputies' and sergeants' PALs for the selected dates. For December, we reviewed PALs for 28 deputies and seven sergeants. We noted a total of 18 field supervisor-deputy contacts between the combined deputies' and sergeants' PALs for the selected dates. We reviewed the monthly shift rosters for each month of the reporting period. Our reviews indicate that supervisors are assigned to work the same hours as the deputies under their supervision. Our reviews of Patrol Activity Logs indicate that supervisors have been available to provide on-scene supervision.

On October 5, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

***Paragraph 87.*** *MCSO shall hold Commanders and Supervisors directly accountable for the quality and effectiveness of their supervision, including whether commanders and Supervisors identify and effectively respond to misconduct, as part of their performance evaluations and through non-disciplinary corrective action, or through the initiation of formal investigation and the disciplinary process, as appropriate.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

**Phase 2:** Not in compliance

WAI 53422

To assess MCSO's compliance with this Paragraph, we request the names of all deputies and supervisors whose performance appraisals were completed during the reporting period. From the lists of employees submitted, we request a representative sample. The selection of deputies and supervisors whose EPAs are requested is based on the number of requirements set forth in the First and Second Orders. There are a greater number of requirements that supervisory EPAs must address, therefore, a greater number of supervisors' EPAs are reviewed for compliance.

We requested and reviewed Employee Performance Appraisals submitted for six deputies and eight supervisors whose EPAs were completed in October. All six deputy EPAs appropriately addressed each employee's performance for the period in review, and all were in compliance. All eight supervisor EPAs rated the supervisors on the quality and effectiveness of their supervision. Seven of the eight supervisor EPAs included comments related to the supervisors' ability to identify and respond to misconduct. Four of the eight supervisor EPAs addressed the all the requirements needed for compliance, as it pertains to quality of supervisory reviews. The EPAs for four sergeants did not properly document the required entries with regard to the quality of reviews of their subordinates' EIS profiles. All eight supervisor EPAs assessed the supervisors' quality of misconduct investigations, as well as the quality of their reviews of internal investigations. Thirteen of 14 EPAs addressed the requirements of Paragraph 99 with sufficient specificity, including complaint histories and the employees' dispositions, discipline, commendations, awards, civil or administrative claims, lawsuits, training history, assignment and rank history, supervisory actions, and EIS histories. We found one supervisor EPA where the employee had an open internal misconduct investigation which was not documented in the EPA, and was therefore not in compliance with Paragraph 99. In total, four of the eight supervisor EPAs met all requirements. For October, including both deputy and supervisor EPAs, 10 of the 14 EPAs, or 71.43% were in compliance.

We requested and reviewed Employee Performance Appraisals submitted for five deputies and nine supervisors whose performance evaluations were completed in November. All five deputy EPAs appropriately addressed each employee's performance; all were in compliance. With regard to our findings on supervisor EPAs, all nine were rated on the quality and effectiveness of supervision. Eight of the nine supervisor EPAs included comments on the supervisor's ability to identify and respond to misconduct. Eight of the nine supervisor EPAs appropriately assessed the employees on the quality of their reviews. The EPA for one sergeant did not properly document the required entries with regard to the quality of reviews of their subordinates' EIS profiles. All supervisor EPAs addressed the quality of misconduct investigations, as well as reviews of misconduct investigations. All nine supervisor EPAs addressed the requirements of Paragraph 99 with sufficient specificity, including the complaint history and their dispositions, discipline, commendations, awards, civil or administrative claims, lawsuits, training history, assignment and rank history, supervisory actions, and EIS histories. In total, eight of the nine supervisor EPAs met all requirements. For November, including both deputy and supervisor EPAs, 13, or 92.86%, of 14, were in compliance.

We requested and reviewed Employee Performance Appraisals submitted for six deputies and 10 supervisors whose EPAs were completed in December. All six deputy EPAs sufficiently addressed all required areas of assessment. All 10 supervisor EPAs rated the employees on the

WAI 53423

quality and effectiveness of their supervision, with one supervisor having no direct reports. Seven of the 10 supervisor EPAs included comments related to the supervisors' ability to identify and respond to misconduct. Six of the 10 supervisor EPAs addressed the quality of supervisory reviews. Nine of 10 supervisor EPAs addressed the requirements of Paragraph 99 with sufficient specificity, including complaint histories and the employees' dispositions, discipline, commendations, awards, civil or administrative claims, lawsuits, training history, assignment and rank history, supervisory actions, and EIS histories. We found one supervisor EPA where the employee had an open internal misconduct investigation that was not documented in the EPA, and was therefore not in compliance with Paragraph 99. Eight of the nine supervisors who had subordinates were assessed on the quality of their misconduct investigations, as well as the quality of their reviews of misconduct investigations, as required by Paragraph 176. In total, six of the 10 supervisors' EPAs were in compliance. For December, including both deputy and supervisor EPAs, 12 of 16 EPAs, or 75% were in compliance. Of the 44 EPAs reviewed for the fourth quarter of 2020, 35 were in compliance. The compliance rate for this reporting period was 79.55%.

*Paragraph 88. To ensure compliance with the terms of this Order, first-line Supervisors in any Specialized Units enforcing Immigration-Related Laws shall directly supervise the law enforcement activities of new members of the unit for one week by accompanying them in the field, and directly supervise the in-the-field-activities of all members of the unit for at least two weeks every year.*

**In Full and Effective Compliance**

MCSO does not have any specialized units that enforce immigration-related laws. We continue to monitor arrests and detentions as part of our review process to ensure that MCSO is in compliance with its own directives on this issue.

For this reporting period we received lists containing all incidents involving MCSO arrests and criminal citations. For each month, we requested a random sample of arrests and criminal citations. In total, we reviewed 60 incidents involving arrests and 60 incidents involving criminal citations. We also reviewed a random sample of 261 Incident Reports for this reporting period. During our reviews of the documentation provided for this reporting period, we have found no evidence to indicate any violations of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 53424

***Paragraph 89.*** *A Deputy shall notify a Supervisor before initiating any immigration status investigation, as discussed in Paragraph 28. Deputies shall also notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration Related Crime, or for any crime related to identity fraud or lack of an identity document. The responding Supervisor shall approve or disapprove the Deputy's investigation or arrest recommendation based on the available information and conformance with MCSO policy. The Supervisor shall take appropriate action to address any deficiencies in Deputies' investigation or arrest recommendations, including releasing the subject, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative investigation.*

**In Full and Effective Compliance**

To assess MCSO's compliance with this Paragraph, we requested all reports related to immigration status investigations, any immigration-related crimes, or any incidents or arrests involving lack of identity documents. The Incident Reports requested were for the period in review. Any incident wherein a deputy requests a supervisor's permission to contact Immigration and Customs Enforcement (ICE) or Customs and Border Patrol (CBP) – to ascertain the legal status of an individual involved in a stop, detention, or any incident under investigation by MCSO – falls under the reporting requirements of this request.

For the fourth quarter of 2020, MCSO did not submit any incidents that fall within the requirements of this Paragraph. For this reporting period, we received lists noting all incidents involving MCSO arrests and criminal citations. For each month, we requested a random sample of arrests and criminal citations. From each list, we selected a 10% random sample of incidents. In total, we reviewed 60 incidents resulting in arrest and 60 incidents involving criminal citations. In addition, we reviewed 261 Incident Reports for the quarter.

On December 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.


***Paragraph 90.*** *MCSO Deputies shall submit documentation of all stops and Investigatory Detentions conducted to their Supervisors by the end of the shift in which the action occurred. Absent exceptional circumstances, within 72 hours of receiving such documentation, a Supervisor shall independently review the information. Supervisors shall review reports and forms for Boilerplate or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct. Appropriate disciplinary action should be taken where Deputies routinely employ Boilerplate or conclusory language.*

**Phase 1:** In compliance

- EA-11 (Arrest Procedures), most recently amended on May 13, 2020.

**Phase 2:** In compliance

WAI 53425

We reviewed 35 incidents involving traffic stops for October 2020. There were 18 stops related to speeding, of which 13 resulted in citations and five resulted in warnings. There were two stops related to equipment violations. Ten stops were for moving violations other than speeding. Five stops related to registration or license plate violations. Twenty of the stops resulted in citations, and 15 resulted in warnings. All 35 Vehicle Stop Contact Forms we reviewed noted the serial number of the reviewing supervisor, date, and time of supervisory review. All 35 VSCFs were reviewed within the required 72 hours. For October, MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 227 VSCFs. Supervisors reviewed 224 of 227 VSCFs within 72 hours, for a compliance rate of 98.68%.

We reviewed 35 incidents involving traffic stops for November 2020. Twenty of the 35 traffic stops related to speeding. Of the 20 stops related to speeding, 11 drivers received citations, and nine received warnings. Five stops related to equipment violations. Six of the stops involved moving traffic infractions other than speeding. There were four stops related to registration or license plate violations. Of the 35 stops, 13 resulted in citations, and 22 resulted in warnings. Supervisors reviewed all 35 VSCFs within 72 hours. For November, MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 125 VSCFs. Supervisors reviewed 120 of 125 VSCFs within 72 hours, for a compliance rate of 96%.

We reviewed 35 incidents involving traffic stops for December 2020. Eighteen of the 35 traffic stops involved speeding violations. Of the 18 stops related to speeding, 12 drivers received citations and six drivers received warnings. Six stops involved equipment violations. Nine stops involved traffic violations other than speeding. There were two stops related to registration or license plate violations. Of the 35 stops, 16 resulted in citations and 19 resulted in warnings. All 35 Vehicle Stop Contact Forms had timely supervisory reviews. For December, MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 135 VSCFs. We reviewed the data and supervisors reviewed 132 of 135 VSCFs within 72 hours, for a 97.78% compliance rate.

For October, November, and December, we reviewed selected samples of non-traffic incidents involving stops and detentions, which were recorded on Non-Traffic Contact Forms (NTCFs). Our assessment of compliance also included reviews of BWC recordings on selected cases, some of which included searches of the individuals detained. For October, we selected 26 NTCFs for review. All 26 NTCFs had been submitted prior to the end of the shift. All of the 26 NTCFs were reviewed and approved by supervisors within 72 hours, as required. The compliance rate for timely submission and timely supervisory review of NTCFs in October was 100%. We reviewed BWC recordings associated with four incidents and noted no concerns. One of the stops submitted was actually a traffic stop, and the stop was documented in a VSCF. This stop appears to have been misidentified and documented initially in an NTCF. The supervisor noticed the error and the issue was addressed. For November, we selected 24 NTCFs to review. All 24 NTCFs were submitted prior to the end of the shift. All of the 24 NTCFs were reviewed and approved by supervisors within the required timeframe. The compliance rate for timely submission and timely supervisory review of NTCFs in November was 100%. We reviewed BWC recordings associated with six cases and noted no concerns with the stops. For December, we selected 25 NTCFs to review. All NTCFs were turned in before the end of the shift. Twenty-four of the 25 NTCFs had supervisory reviews documented within 72 hours. The compliance rate for timely

WAI 53426

submission and timely supervisory review of NTCFs in December was 96%. There was one incident that was documented in a VSCF. It appears that this stop was originally documented in a NTCF, which was voided, and the stop was revised and documented in the correct form. We reviewed BWC recordings associated with three incidents and noted no concerns with the stops. For the quarter, 74 of 75 NTCFs reviewed were in compliance with timely supervisory review. The compliance rate was 98.67%.

We take into account all stops and detentions, both traffic and non-traffic, when we determine the compliance rate for this Paragraph. The compliance rate for timely reviews of all combined stops and detentions, from the samples chosen, for this reporting period was 97.86%. For this reporting period, our inspection of the documentation provided did not reveal any evidence of boilerplate or conclusory language, inconsistent or inaccurate information, or lack of articulation, as to the legal basis for stops and detentions.

***Paragraph 91.*** *As part of the Supervisory review, the Supervisor shall document any Investigatory Stops and detentions that appear unsupported by reasonable suspicion or are otherwise in violation of MCSO policy, or stops or detentions that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The Supervisor shall take appropriate action to address all violations or deficiencies in Investigatory Stops or detentions, including recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.*

**Phase 1:** In compliance

- EA-11 (Arrest Procedures), most recently amended on May 13, 2020.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on February 25, 2021.

- GF-5 (Incident Report Guidelines), most recently amended on April 30, 2020.

**Phase 2:** In compliance

We reviewed traffic stop data reported by MCSO for its October inspection (BI2020-0130). To determine compliance with this Paragraph, for October, we randomly selected 35 traffic-related events, which BIO then audited for compliance. Of the 35 traffic-related events, MCSO reported that 33, or 94.30%, had no deficiencies. As a result of the inspection, BIO generated three Action Forms. The first deficiency was attributed to a District 1 deputy. In this stop, the deputy documented one occupant in the vehicle, but a review of the body-worn camera recording showed two occupants. The second deficiency involved a traffic stop where the deputy did not provide a self-introduction upon initial contact. The third deficiency was attributed to a deputy from Lake Patrol who used a wrong code to close out the incident. We do not consider any these deficiencies to be of a serious nature, as they relate to the requirements of this Paragraph. For October, we consider that all 35 stops were in compliance with this Paragraph.

WAI 53427

We reviewed a spreadsheet documenting each VSCF by District, for October, to determine if supervisors were reviewing VSCFs within the required 72 hours. We reviewed data for 226 traffic stops, and determined that supervisors had completed timely reviews in 98.67% of the cases. For October, we requested 26 NTCFs from the list that MCSO submitted. We reviewed the NTCFs to determine if supervisors were reviewing them within the required 72 hours. We determined that supervisors had completed timely reviews in 100% of the cases.

For October, none of the BlueTeam supervisors' corrective actions submitted for our review pertained to the 35 stops selected for the October inspection. For October, we requested a sample of 10 corrective actions generated during the month. Corrective actions are documented on BlueTeam Supervisory Notes. Three corrective actions were associated with BWC: Two resulted from late activation of the BWC; and one was the result of the seat belt covering the deputy's BWC lens. One corrective action was associated with inaccurate or missing information on VSCFs, citations, or written warnings involving several stops made by the same deputy. Four corrective actions were taken as a result of procedural or policy violations during traffic stops. One corrective action was associated with deputy safety; and in one corrective action, we could not identify a deficiency.

We reviewed traffic stop data reported by MCSO for its November inspection (BI2020-0143). We randomly selected 35 traffic-related events, which BIO then audited for compliance. The inspection resulted in a 99.24% compliance rating. Our review of the inspection report found that four stops were listed as having deficiencies. All four stops with deficiencies were attributed to Lake Patrol deputies. There were several issues noted in the first stop. First, the deputy did not complete an assisting deputy BWC log, which we do not consider a serious deficiency. The other two deficiencies associated with this stop were serious. The deputy wrote down the wrong license plate on reports, and did not provide the driver with a property receipt after seizing the driver's license. A supervisory review of the documentation associated with this first stop should have identified and corrected these errors. In the second stop, the deputy documented the wrong license plate on the VSCF and citation. A supervisory review of the documentation associated with this second stop should have identified and corrected the error. We consider this a serious deficiency. In the third stop, the deputy marked a criminal traffic violation on the VSCF, when the violation actually resulted in a civil citation. In the fourth stop, the sergeant who conducted the traffic stop closed out the incident with the wrong code. We do not consider the last two deficiencies to be of a serious nature, as it relates to the requirements of this Paragraph. For November, we consider that 33 of 35 stops were in compliance with this Paragraph.

We reviewed a spreadsheet documenting each VSCF by District, for November, to determine if supervisors were reviewing VSCFs within the required 72 hours. We reviewed 125 VSCFs and determined that supervisors had completed timely reviews in 120 of 125 stops, or in 96% of the cases. From the list submitted by MCSO, we requested 24 NTCFs that were generated in November. We inspected the NTCFs to determine if supervisors were reviewing them within the required 72 hours. We determined that supervisors had completed timely reviews in 100% of the cases.

WAI 53428

For November, we requested a list of corrective actions. From the list submitted, we selected 10 corrective actions to review. Two corrective actions were associated with late activation of the BWC. One corrective action was associated with missing information on the VSCF. Two corrective actions were associated with procedural or policy violations during traffic stops. Two corrective actions pertained to policy or procedure violations not associated with a traffic stop. One corrective action was associated with deputy safety. Two corrective actions were associated with technical failures. There were no BlueTeam notes for corrective actions submitted pertaining to the 35 stops selected for November.

We reviewed traffic stop data reported by MCSO for its December inspection (BI2020-0156). We randomly selected 35 traffic-related events, which BIO then audited for compliance. The compliance rate for the December inspection was 99.44%. The first deficiency was attributed to a District 2 deputy who documented the wrong license plate on the VSCF and written warning. This was confirmed through BWC review. We do not consider this a serious deficiency, as it pertains to this Paragraph, since this stop did not result in a citation. The second deficiency was attributed to a supervisor from District 4, where no BWC was found for the traffic stop. We consider this a serious issue that should have been identified and addressed by the commanding officer. The third deficiency was a result of a District 7 deputy that documented the wrong statute on the VCSF, for the voiced reason for the stop. We do not consider this a serious deficiency. The fourth deficiency was related to a Lake Patrol deputy who did not complete an incidental contact form on a passenger. We do not consider this a serious deficiency, as it relates to the requirements of this Paragraph. The fifth deficiency was attributed to a Lake Patrol deputy that started the BWC recording after the vehicle was stopped for the violation. We do not consider this a serious deficiency. In total, one of the five deficient stops identified in the inspection had issues that should have been identified and addressed by supervisors; we consider that 34 of the 35 stops were in compliance with this Paragraph.

For December, we requested a list of corrective actions. From the list submitted, we selected all six corrective actions that were generated for the month. Of the six corrective actions, one was issued to a supervisor who failed to activate his BWC during an incident. Two corrective actions were associated with inaccurate or missing information on VSCFs, citations, or written warnings. Three corrective actions were associated with procedural or policy violations involving traffic stops. There were no BlueTeam notes for corrective actions pertaining to the 35 stops selected for December.

We reviewed a spreadsheet documenting each VSCF by District, for December to determine if supervisors were reviewing VSCFs within the required 72 hours. We reviewed 135 VSCFs and determined that supervisors had completed timely reviews in 132 VSCFs, or in 97.78% of the cases. For December, we requested 25 NTCFs generated by Patrol deputies. We reviewed all 25 NTCFs to determine if supervisors were reviewing NTCFs within the required 72 hours. We determined that supervisors had completed timely reviews in 24 of 25 cases, which is 96%.

WAI 53429

Paragraph 90 requires timely supervisory reviews of documentation pertaining to stops and detentions. Paragraph 91 requires supervisors to identify policy violations, deficiencies, and training issues noted in stops and detentions. Of the sample of 105 stops inspected for this reporting period, there were serious deficiencies and policy violations that occurred in three stops, that supervisors failed to identify and address in their reviews. The compliance rate for Paragraph 91 for this reporting period was 97.14%.

**Paragraph 92.** *Supervisors shall use EIS to track each subordinate's violations or deficiencies in Investigatory Stops or detentions and the corrective actions taken, in order to identify Deputies needing repeated corrective action. Supervisors shall notify IA. The Supervisor shall ensure that each violation or deficiency is documented in the Deputy's performance evaluations. The quality and completeness of these Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations. MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct complete, thorough, and accurate reviews of Deputies' stops and Investigatory Detentions.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

**Phase 2:** Not in compliance

To determine compliance, we will review the EIS and IAPro histories for each of the employees whose EPAs were selected for review under Paragraph 87. We will then review the information to determine if all violations, deficiencies, PSB investigations, and corrective actions taken pertaining to stops and detentions, which were listed in the employee's EIS and IAPro resumes, were accurately documented in the employee's EPA. Failure to identify and memorialize any issues and actions taken as noted in the employee's EIS and IAPro resumes, reflects on the quality of the supervisor's reviews. By reviewing EIS and IAPro resumes, we will also be able to identify if a deputy has repeated entries of any specific violations, and if subsequent actions taken to correct the issue have been documented in the employee's EPA. For applicable supervisors' EPAs, in addition to the above metric, we will review comments made in reference to the quality of supervisory reviews to ensure that the rater has specific comments addressing this Paragraph's requirements. Both of these requirements must be met for compliance. Deficiencies in quality of EIS reviews, by supervisors, will also reflect in our assessment of compliance for Paragraph 100. To ensure fairness to the agency, when we assess compliance with this Paragraph, we also try look at the performance appraisal as a whole to determine if the intent and spirit of the Paragraph under review was captured.

WAI 53430

For October, we reviewed six deputy EPAs and eight supervisor EPAs. All six deputy EPAs reviewed were in compliance. We found four supervisor EPAs where the quality of EIS reviews pertaining to stops and detentions was not sufficiently and specifically documented to meet the requirements of this Paragraph. For November, we reviewed five deputy EPAs and nine supervisor EPAs. All five deputy EPAs were in compliance. During our reviews, we found one supervisor EPA where the quality of EIS reviews pertaining to stops and detentions was not sufficiently and specifically documented to meet the requirements of this Paragraph. For December, we reviewed six deputy EPAs and 10 supervisor EPAs. All six deputy EPAs were in compliance. Six of 10 supervisor EPAs were in compliance.

For this quarter, all 17 deputy EPAs reviewed were in compliance with this Paragraph. Of the 27 supervisor EPAs reviewed, 18, or 66.67%, were in compliance. Including deputy and supervisor EPAs, there were a total of 44 EPAs, of which 35 met the requirements of this Paragraph. The compliance rate was 79.55%.

**Paragraph 93.** *Absent extraordinary circumstances, MCSO Deputies shall complete all incident reports before the end of shift. MCSO field Supervisors shall review incident reports and shall memorialize their review of incident reports within 72 hours of an arrest, absent exceptional circumstances.*

### In Full and Effective Compliance

We reviewed a representative sample of 86 Incident Reports for October, for the randomly selected date of October 24. Of the 86 Incident Reports, we verified documentation of timely supervisory review on 85. Of the 86 Incident Reports, 16 were vehicle collisions. Of the 16 Vehicle Crash Reports, all had documentation that a supervisor had reviewed and approved the reports. The compliance rate for timely supervisory review of Incident Reports in October was 99%. During our quality control review of Incident Reports, we found no significant issues. Of the 12 Arrest Reports, supervisors reviewed all of them within 72 hours as required.

We reviewed a sample of 84 Incident Reports for November, for the randomly selected date of November 13. All 84 Incident Reports were in compliance. All of the six Arrest Reports were reviewed and approved within the required 72 hours. There were 21 Vehicle Crash Reports submitted in the sample for November, of which all included documentation of supervisory review. The compliance rate for timely submission and review of Incident Reports in November was 100%. We conducted a quality review on a 10% random sample of the reports we reviewed, and noted no issues of concern.

We reviewed a representative sample of 91 Incident Reports for December, for the randomly selected date of December 7. We confirmed that 89 of 91 Incident Reports were submitted before the end of the shift, and all had been reviewed and approved by supervisors as required by this Paragraph. The compliance rate was 97.8%. There were five Arrest Reports, and all were reviewed and approved by supervisors within the required 72 hours. There were nine Vehicle Crash Reports submitted in the December sample; we confirmed timely supervisory review on all crash reports. We conducted a quality review on a 10% random sample of the reports submitted and found no significant deficiencies.

WAI 53431

On March 17, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 94.** *As part of the Supervisory review, the Supervisor shall document any arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The Supervisor shall take appropriate action to address violations or deficiencies in making arrests, including notification of prosecuting authorities, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.*

**Phase 1:** In compliance

- EA-11 (Arrest Procedures), most recently amended on May 13, 2020.

- GF-5 (Incident Report Guidelines), most recently amended on April 30, 2020.

**Phase 2:** Not in compliance

To assess compliance with this Paragraph, we will request a list of bookings and criminal citations for the period in review. We will randomly select a sample of 20 bookings and 20 criminal citations, which BIO will then inspect for compliance. In addition, MCSO will review all cases involving immigration arrests, and arrests related to lack of identity documents. MCSO will also review all MCAO turndowns for lack of probable cause, and submit those for our review. The total of cases selected per month will not exceed 60. We will review Incident Report Inspection reports as part of the documentation to determine compliance with Paragraphs 94 and 96. The BIO inspection will review the selected cases, which are retroactive two months. We review the Incident Report Inspection Report and its corresponding Inspection Matrix for each month of the reporting period. Some inspection points in the matrix are given stronger consideration in our reviews than others, as these are fundamental requirements of Paragraph 94; if deficiencies are noted, they may also impact the successful conclusion of the case. In all the cases described below, we relied on the BIO inspector's notations and observations to determine our findings.

In addition to documentation described above, we review all Incident Memorialization Forms (IMFs) submitted for the quarter. The Incident Memorialization Form is used by supervisors to document deficient arrests and corrective actions taken. In accordance with this Paragraph and MCSO policy, supervisors are required to document arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The supervisor generating the IMF, and the commander reviewing the IMF, should ensure that the documentation includes the corrective action taken to resolve issues caused by the deficiency, as well as the remedial action taken to prevent future reoccurrence.

For October, we reviewed the September Incident Report Inspection, BI2020-0110. We selected 20 bookings and 20 criminal citations, which BIO then inspected for compliance. MCSO did not submit any immigration-related arrests, cases involving identity theft investigations, or County

WAI 53432

Attorney turndowns for lack of probable cause. The inspection resulted in a 99.69% compliance rating. The BIO Inspection Report noted deficiencies in two cases, which resulted in one BIO action form. The two deficient reports were the result of supervisors not reviewing the arrest reports within 72 hours. We reviewed the matrix used by BIO for their inspection and noted that none of the 40 cases had deficiencies that fall within the purview of this Paragraph.

For November, we reviewed the October Incident Report Inspection, BI2020-0126. We selected 20 bookings and 20 criminal citations, which BIO then inspected for compliance. There were no immigration-related arrests, and no cases involving identity theft investigations reported by MCSO. There were no County Attorney turndowns for lack of probable cause. The inspection resulted in a 97.99% compliance rating. We reviewed the inspection report, which noted five deficient cases; and reviewed the matrix used by BIO for the inspection. We determined that there were three cases where the inspector noted deficiencies that fall within the purview of this Paragraph. There were two other cases where deficiencies or violations of policy occurred. However, we do not consider that these deficiencies had any debilitating effect on the cases. We consider three cases from our October review as not being in compliance with the requirement that supervisors conduct thorough reviews and identify arrests that are unsupported by probable cause, or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training.

The first case involved an arrest where the subject was charged with several offenses, including aggravated assault with a deadly weapon and endangerment. The subject was questioned and made several admissions, but sometime during the interview he invoked his right to remain silent and his right to an attorney. The inspection noted that the report supplement did not document the time when these rights were invoked. The BIO matrix noted that the arrest report was deficient. We consider this case not to be in compliance. The second case was a traffic stop that led to the arrest of the driver. The sergeant instructed the deputy to cite the driver for speeding; however, BIO determined that reckless driving was the appropriate charge. There was also a discrepancy involving the search of the subject. The arresting deputy indicated in his report that the subject was searched incident to arrest. The deputy's sergeant indicated there was no search conducted on the subject, as documented on a supplemental report and on the VSCF. The BIO matrix noted that the report lacked the elements of the crime, that the charge was inappropriate, and that there was conflicting information regarding the search. We consider this case non-complaint. The third case was an arrest for knowingly displaying a fictitious license plate. The notes on the inspection matrix indicate that the report was incomplete, and that there was no supervisor review or approval documented. In our review of the documents associated with this case, we also noted an incomplete narrative and no documentation of supervisor review on the Incident Report. This case was not compliant with the requirements of this Paragraph. MCSO submitted eight BIO Action Forms for deficiencies identified in this inspection. There were no Incident Memorialization Forms generated by the chain of command for the cases associated with this inspection. In total, for the November review, 37 of 40 cases were in compliance.

For December, we reviewed the November Incident Report Inspection, BI2020-0139. We selected 20 bookings and 20 criminal citations, which BIO then inspected for compliance. There were no immigration-related arrests, no cases involving identity theft investigations, and no

WAI 53433

County Attorney turndowns for lack of probable cause. The inspection resulted in a 98.83% compliance rating. The BIO inspection listed eight incidents where deficiencies were noted. We reviewed the matrix used by BIO for their inspection and noted that one of the 40 cases had deficiencies that fall within the purview of this Paragraph. We consider this case as noncompliant. Three reports were not submitted before the end of the shift, and four reports were not reviewed by supervisors within 72 hours. We did not consider these issues to have any debilitating effect on the cases. The one case we found noncompliant was an arrest where the subject invoked his *Miranda* rights, but the deputy failed to note the time when the rights were invoked. The BIO matrix marked the report as deficient. In addition, no Incident Memorialization Form was generated to document the deficiency and corrective action. For the December review, 39 of 40 cases were in compliance.

Of the total 120 cases selected for review, 116 were in compliance. In our last quarterly status report we stated that there were no Incident Memorialization Forms (IMFs) submitted for the third and fourth quarters of 2020. We also mentioned that MCSO reported in April 2020 that there were 11 IMFs still in processing. For this reporting period, MCSO provided a total of 10 IMFs, which we reviewed for compliance with Paragraphs 94 and 96. In total, to assess compliance with this Paragraph, we reviewed 130 arrests. Of the 10 IMFs submitted for review during this reporting period, we found that none of them were in compliance with this Paragraph. Details of these reviews are found under Paragraph 96. Of the total 130 arrests reviewed for this reporting period, 116, or 89.23%, were in compliance.

**Paragraph 95.** *Supervisors shall use EIS to track each subordinate's violations or deficiencies in the arrests and the corrective actions taken, in order to identify Deputies needing repeated corrective action. The Supervisor shall ensure that each violation or deficiency is noted in the Deputy's performance evaluations. The quality of these supervisory reviews shall be taken into account in the Supervisor's own performance evaluations, promotions, or internal transfers. MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct reviews of adequate and consistent quality.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

**Phase 2:** Not in compliance

There are two primary areas of assessment for this Paragraph. The first is to determine if supervisors are tracking subordinates' deficiencies and violations in arrests, and accurately documenting these issues along with corrective actions in employees' EPAs. In addition, repeated corrective actions should be addressed in EPAs. The second is to determine if the quality of supervisory reviews of EIS are being addressed in supervisors' EPAs. The quality and effectiveness of interventions, as a result of deficiencies pertaining to stops and detentions, is a requirement which we assess under Paragraph 97.

WAI 53434

To determine compliance, we will review the EIS and IAPro histories for each of the employees whose EPAs were selected for review under Paragraph 87. We will then review the information to determine if all violations, deficiencies, IA investigations, and corrective actions taken pertaining to arrests, which were listed in the employee's EIS and IAPro resumes, were accurately documented in the employee's EPA. Failure to identify and memorialize any issues and actions taken as noted in the employee's EIS and IAPro resumes, reflects on the quality of the supervisor's quality of reviews. By reviewing EIS and IAPro resumes, we will also be able to identify if a deputy has repeated entries of any specific violations, and if subsequent actions taken to correct the issue have been documented in the employee's EPA. For applicable supervisors' EPAs, in addition to the above metric, we will review comments made in reference to the quality of supervisory reviews to ensure that the rater has specific comments addressing this Paragraph's requirements. Both of these requirements must be met for compliance. Deficiencies in quality of EIS reviews by supervisors will also reflect in our assessment of compliance for Paragraph 100. To ensure fairness to the agency, when we assess compliance with this Paragraph, we also try look at the performance appraisal as a whole to determine if the intent and spirit of the Paragraph under review was captured.

For October, we reviewed six deputy EPAs and eight supervisor EPAs. All six deputy EPAs reviewed were in compliance. We found four supervisor EPAs where the quality of EIS reviews pertaining to arrests was not sufficiently and specifically documented to meet the requirements of this Paragraph. For November, we reviewed five deputy EPAs and nine supervisor EPAs. All five deputy EPAs were in compliance. We found one supervisor EPA where the quality of EIS reviews pertaining to arrests was not sufficiently and specifically documented to meet the requirements of this Paragraph. For December, we reviewed six deputy EPAs and 10 supervisor EPAs. All six deputy EPAs were in compliance. Six of the 10 supervisor EPAs were in compliance. For the period in review, all of the 17 deputy EPAs reviewed were in compliance with this Paragraph. Of the 27 supervisor EPAs reviewed, 18 were in compliance. A total of 35 of 44 EPAs met the requirements of this Paragraph. The compliance rate was 79.55%. For this reporting period, MCSO was not in compliance with the requirements of this Paragraph.

**Paragraph 96.** *A command-level official shall review, in writing, all Supervisory reviews related to arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The commander's review shall be completed within 14 days of receiving the document reporting the event. The commander shall evaluate the corrective action and recommendations in the Supervisor's written report and ensure that all appropriate corrective action is taken.*

**Phase 1:** In compliance

- EA-11 (Arrest Procedures), most recently amended on May 13, 2020.

**Phase 2:** Not in compliance

This Paragraph requires that a command-level official review a supervisor's investigation of the circumstances pertaining to any arrest that lacks probable cause, is in violation of policy, or where there is a need for corrective action or review of the agency's policy, strategy, tactics, or training.

WAI 53435

This Paragraph also requires that the commander evaluate the corrective action and recommendations to ensure that these are appropriate.

Our reviews to determine compliance with this Paragraph are associated with the documentation provided for Paragraph 94. If BIO identifies deficient cases in the Incident Report inspection, and the deficiencies fall within any of the four areas noted in Paragraphs 94 and 96, we will review the documentation to determine compliance. Since this Paragraph pertains to command reviews of supervisory investigations of deficient arrests, we will also review Incident Memorialization Forms to determine compliance. Our reviews for compliance with this Paragraph are determined by the command staff's timely reviews of IMFs, once submitted by supervisors, and commanders' evaluation of the corrective actions taken.

In our previous quarterly status report, we noted our concerns with the lack of IMFs submitted for review in response to our document requests for this Paragraph. During this reporting period, we reviewed 10 IMFs for compliance with Paragraphs 94 and 96. We found that none of the 10 IMFs met compliance requirements; many of them were non-compliant due to the timeliness of the submissions. Below is a review of each of the IMFs submitted for the fourth quarter of 2020.

The first IMF involved an arrest for the theft of a motorcycle. A review of the arrest report by a commanding officer determined that the deputy used a wrong statute to charge the subject. The report was determined to lack articulation of probable cause for the arrest; in addition, the facts of the case supported a lesser charge. During a review of the arrest and a discussion with the deputy, the deputy indicated that he had planned to use a lesser charge, but was directed to use a statute with a higher burden of proof by his sergeant. It is concerning that the supervisor was not able to provide the needed guidance on this arrest. The commanding officer appropriately documented corrective actions for both employees. This incident occurred on July 31, 2019. The IMF was created on November 16, 2019, by a commanding officer. The IMF was submitted for our review in February 2021. This IMF was not submitted for our review in accordance with our monthly document request. We do not consider this case to be in compliance with Paragraphs 94 or 96.

The second IMF involved an arrest for domestic violence. This incident occurred on December 28, 2019. MCSO became aware of the deficient arrest through a Maricopa County Attorney turndown report, and the IMF was created and completed on January 1, 2020. The case was declined for prosecution because deputies made an unauthorized entry into a dwelling and arrested the subject, in violation of search and seizure law. Although the deputies had probable cause for the arrest, the subject was inside a house, and there were no exigent circumstances to justify a forced entry. The deputies obtained a key from the landlord, who was related to the victim; entered the premises; and effected the arrest. The deputies' supervisor approved the arrest without addressing the deficiencies. The commanding officer generating the IMF properly documented the corrective action. However, this was a December 2019 case that was submitted for our review in February 2021. This IMF should have been completed and submitted for our review in a timely manner. We do not consider this case to be in compliance with Paragraphs 94 or 96.

WAI 53436

The third IMF was authored by a commanding officer who received notification of a deficient arrest through BlueTeam. The incident date was November 30, 2019. The IMF was created on December 9, 2019, and finalized with command review on December 12, 2019. The commander reviewed the incident and found several deficiencies including lack of documentation of the time of the incident in the report narrative. The review also found an improper request for a consent search, lack of articulation on why the subject was asked to step out of the vehicle, no description of a knife taken from the subject, and a poor description of the drugs located inside the vehicle. The deputy's supervisor approved the deficient arrest report. The commanding officer who generated the IMF took decisive corrective action and documented it in the IMF. This was a November 2019 arrest and we received the IMF for review in February 2021. This IMF was not in compliance with Paragraph 94 and 96 due to the timeliness of the submission.

The fourth IMF we reviewed involved a Posse member who observed a subject urinating in public. The Posse member informed a deputy, who cited the subject for a violation of a state statute. The statute requires abusive or offensive language or gestures to have been used toward another person to provoke a physical altercation. The offender's actions, as noted in the arrest report, did not support the charge. Upon review of the arrest, the deputy stated that he used the closest offense he could find to fit the action. The reviewing supervisor determined that there was insufficient probable cause for the charge. The supervisor instructed the deputy to write a memo to the County Attorney asking for dismissal of the charges. The IMF did not document what, if any, remedial action was taken to ensure that the deputy understands the elements needed to make an arrest for the charge used. The incident occurred on March 26, 2020, the IMF was created on March 30, 2020, and command review was April 2, 2020. This incident occurred in March 2020 and submitted for our review 11 months after the incident. This IMF was not in compliance with Paragraphs 94 or 96.

The fifth IMF reviewed was entered on March 21, 2020. A deputy submitted a charging document for an aggravated DUI, for an incident that occurred on November 29, 2019. The charging document was submitted after the blood alcohol concentration report was received by MCSO. Upon review of the charging document, the deputy's supervisor noted several mistakes that rendered the evidence obtained for the case inadmissible. The most concerning issue was that the deputy used another deputy's DUI arrest report as a starting point, and cut and pasted parts on the report, but left the previous defendant's name on parts of his report. This resulted in a confusing arrest report that was riddled with boilerplate and conclusory language. In addition, the warrant secured for the blood draw was not returned within three days as required by state statute. The corrective actions taken on the deputy were appropriately documented. This IMF was created on March 21, 2020, with command review on March 25, 2020. The IMF was submitted for our review in February 2021. This IMF was not in compliance with Paragraphs 94 and 96 due to the timeliness of the submission.

The sixth IMF reviewed involved an arrest for drug paraphernalia that lacked probable cause for the charges; this incident occurred on February 27, 2020. This incident was identified in a BIO inspection, not by the deputy's supervisor. An IMF was created on March 14, 2020, after a BIO Action Form was sent to the supervisor. The deputy arrested an individual for possession of drug paraphernalia, but the arrest report was vague and did not establish probable cause. The deputy

WAI 53437

failed to submit the confiscated pipe for analysis, for traces of illegal drugs. The deputy also did not provide the subject with a receipt for the property taken. Both the sergeant and the deputy were identified as part of the deficient arrest; the deputy for not properly documenting probable cause, and the supervisor for failing to identify the deficient report. This entry was made by a commanding officer, who properly documented the corrective action taken. However, this is another March 2020 IMF submitted for our review in February 2021. This IMF was not in compliance with Paragraphs 94 and 96 due to the timeliness of the submission.

The seventh IMF reviewed involved an arrest for shoplifting that lacked documentation of the elements of the crime; more specifically, a necessary mental state of intent. The arrest therefore lacked probable cause for the charge. This incident occurred on January 4, 2020. The IMF was created on February 9, 2020, by a commanding officer, and finalized on February 17, 2020. The arrest was made by a sergeant, and a review by his commander determined that the sergeant had reasonable suspicion to investigate, but had no probable cause to arrest the individual. The corrective action was sufficiently documented in the IMF. However, this case was from January 2020, and was submitted for our review in February 2021. This IMF was not in compliance with Paragraphs 94 and 96 due to the timeliness of the submission.

The eighth IMF reviewed was an incident that occurred on December 4, 2019, and involved a disorderly conduct arrest. The deficient arrest report was reviewed and approved by the deputy's supervisor. The stop and detention of the individual was determined to be within policy. The problem occurred when the subject was searched before he was placed under arrest. The search of the subject discovered several small bottles of alcohol. The IMF was created and completed on December 17, 2019, by a commanding officer. Both the deputy and supervisor were counselled; the deputy for the improper search, and the supervisor for approving the deficient arrest report. The corrective action involved reviewing search and seizure policies and applicable laws with the deputy and supervisor. This IMF was not in compliance with Paragraphs 94 and 96 due to the timeliness of the submission.

The ninth IMF reviewed was for a deficient arrest found during a BIO Inspection and submitted to the deputy's supervisor for action. The incident occurred on September 30, 2019. The IMF was created on December 16, 2019, with command review on December 18, 2019. The BIO inspection found that the report lacked specificity for the charge regarding a fictitious plate, and lacked specificity on the drug offense charged. The arrest report was determined to lack articulation of probable cause for the charges submitted. The IMF was completed by the supervisor, who was also identified by the BIO inspection as having approved the deficient report. A commanding officer should have completed this IMF – not the sergeant who was also implicated in this deficient arrest. A commanding officer should have documented corrective actions on both the deputy and the supervisor. This incident occurred in December 2019, and the IMF was completed on June 30, 2020. This IMF was submitted for our review in February 2021. This IMF was not in compliance with Paragraphs 94 and 96.

The tenth IMF reviewed involved a trespassing arrest. The deputy's supervisor reviewed the arrest report and determined that the deputy had not read *Miranda* to the individual, prior to questioning. The individual was in custody when the deputy asked if the individual had knowledge of being previously admonished for trespassing, a required element of the charge. A subsequent review

WAI 53438

of the BWC recording confirmed that the deputy had not read *Miranda* prior to questioning. In this case, the subject had been detained and was not free to leave, so *Miranda* was applicable. The supervisor documented the incident, as well as the subsequent corrective action. Command review of the IMF was completed within the required timeframe. This incident occurred on June 23, 2020, and the IMF was completed on June 30, 2020. This IMF was submitted for our review in January 2021. This IMF was not in compliance with Paragraphs 94 and 96 due to the timing of the submission.

***Paragraph 97.*** *MCSO Commanders and Supervisors shall periodically review the EIS reports and information, and initiate, implement, or assess the effectiveness of interventions for individual Deputies, Supervisors, and units based on that review. The obligations of MCSO Commanders and Supervisors in that regard are described above in Paragraphs 81(c)–(h).*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on March 3, 2021.

**Phase 2:** Not in compliance

As per GH-5 (Early Identification System) and GB-2 (Command Responsibility), supervisors are required to conduct EIS reviews twice per month for sworn members. Command review of EIS profiles of supervisory and command personnel began in February 2017. To assess MCSO's compliance with this Paragraph, for every month of the reporting period, we selected a supervisor and a squad of deputies from each District. We then reviewed the documentation provided as verification of compliance with this Paragraph. We also requested that EIS reviews of the commanders responsible for the selected personnel be included. The purpose of conducting EIS reviews is for supervisors to oversee the performance of subordinates, and take appropriate action on issues that need to be corrected. This Paragraph also requires that the effectiveness of interventions be evaluated. EIS reviews should be thorough, and completed in a timeframe that allows supervisors to monitor performance and address any concerns noted, in a timely manner. We believe that periodic EIS reviews should be conducted on a schedule that maximizes their usefulness. We understand that an exact 14-day timeframe may not be possible for all EIS reviews; and we will therefore conduct our reviews using a standard of reasonableness. Two EIS reviews conducted within a short period of time, on the same employee, lead to questions regarding the purpose and quality of the reviews. EIS reviews conducted too close to each other do not address the intent of this Paragraph. We will review documentation to determine if EIS reviews are being conducted in accordance with the requirements of this Paragraph, or if they are being conducted perfunctorily without regard for usefulness or quality.

For October, we reviewed the documentation provided for 53 employees – which included the ranks of deputy, sergeant, lieutenant, and captain. Of the 53 employees, 49 had the required two EIS reviews in the month, for a 92.45% compliance rate. For November, we reviewed Supervisory Notes requested as verification of compliance for 51 employees. Of the 51 selected employees, 42 had appropriate documentation of timely EIS reviews, for a compliance rate of 82.36%. For September, we received Supervisory Notes as verification of compliance of EIS reviews for the selected 54 employees. Of the 54 employees, 49 had appropriate documentation

WAI 53439

of compliance with this Paragraph, for a compliance rate of 90.74%. The total compliance rate for the quarter, for periodic supervisory and command EIS reviews, was 87.34%. The reviews of broader pattern-based reports, as required by Paragraph 81.c., and assessments of interventions as required by this Paragraph, have not been sufficiently documented to meet compliance with this Paragraph.

### d. Regular Employee Performance Review and Evaluations

***Paragraph 98.*** *MCSO, in consultation with the Monitor, shall create a system for regular employee performance evaluations that, among other things, track each officer's past performance to determine whether the officer has demonstrated a pattern of behavior prohibited by MCSO policy or this Order.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

**Phase 2:** Not in compliance

To assess compliance with this Paragraph, we review a sample of deputy and supervisor EPAs selected on a monthly basis under Paragraph 87. There are several Paragraphs in the First and Second Orders that have requirements pertaining to the assessment and documentation of performance in Employee Performance Appraisals. Supervisors are also required to identify and track the performance of deputies who have patterns of behavior prohibited by the Order and MCSO policy. Paragraphs 92 and 95 also require assessment of the quality of EIS supervisory reviews. The revised methodologies for Paragraphs 92 and 95 are explained in detail in our reviews of these two Paragraphs.

In our reviews of EPAs for this quarter, we again found performance dimensions related to supervisory EPAs that are not being addressed with enough consistency to establish compliance in those areas. We continue to review EPAs where comments are not documented for the assessment of supervisor effectiveness in identifying and responding to misconduct. We reviewed one EPA where the assessment of supervisors' quality of misconduct investigations and command reviews of misconduct investigations was not documented, so this aspect has improved. However, the assessment of the quality of EIS reviews and documentation of deficiencies found in stops, detentions, and arrests has not been consistently and sufficiently documented in supervisor EPAs. For this reporting period, of the 44 EPAs reviewed, 35 were in compliance. The compliance rate for this reporting period was 79.55%.

***Paragraph 99.*** *The review shall take into consideration all past Complaint investigations; the results of all investigations; Discipline, if any, resulting from the investigation; citizen Complaints and commendation; awards; civil or administrative claims and lawsuits related to MCSO operations; Training history; assignment and rank history; and past Supervisory actions taken pursuant to the early warning protocol.*

**Phase 1:** In compliance

WAI 53440

- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

**Phase 2:** In compliance

The current EPA has an acknowledgement at the conclusion that supervisors are required to sign, to affirm that they have done due diligence in researching and documenting the employee's history for the review period, as it pertains to the requirements of Paragraph 99. Supervisors completing EPAs are required to document their findings relevant to these areas, if their reviews reveal any applicable events or actions. The areas of review include: complaint investigations and dispositions; discipline; citizen complaints; commendations; awards; civil or administrative claims; and past supervisory actions taken pursuant to EIS alerts. We do not rely solely on the supervisor's affirmation that a thorough review was completed. We verify supporting documentation to ensure the supervisor has done a thorough review and that the information provided under Paragraph 99 is accurate. We review EIS and IAPro resumes for each employee whose EPA we received during the quarter, under Paragraphs 87, 92, and 95. We review these resumes and compare them to the notations listed by the supervisor authoring the EPA, under Paragraph 99. We verify that any past actions noted in the resumes are captured in the EPA. We have previously emphasized to MCSO the importance of accurate documentation and thorough reviews of EIS.

In the EPAs reviewed for this quarter, supervisors have documented their findings as it pertains to complaints, discipline, commendations, awards, claims, and supervisory actions with enough consistency to meet the requirements of this Paragraph. For this reporting period, we reviewed Employee Performance Appraisals for 17 deputies and 27 supervisors. We reviewed two supervisor EPAs where open misconduct investigations were not documented in the employees' EPAs. Forty-two of 44 EPAs, or 95.45% of the EPAs reviewed, sufficiently documented the requirements of this Paragraph.

***Paragraph 100.*** *The quality of Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

**Phase 2:** Not in compliance

WAI 53441

We reviewed Employee Performance Appraisals for 27 supervisors and commanders who received EPAs during this reporting period. We have previously noted that we take into account the requirements of Paragraphs 92 and 95, the quality of supervisory reviews of EIS, in our assessment of compliance with this Paragraph. Nineteen of the 27 supervisor EPAs sufficiently documented the quality of EIS reviews to meet compliance. The quality of reviews of supervisors' misconduct investigations, as per Paragraph 176, is also figured into the assessment of compliance for this Paragraph. For this reporting period, 26 of the 27 supervisor EPAs met compliance standards for Paragraph 176. When the compliance results of all related Paragraphs were factored in, 19 of 27 EPAs, or 70.37%, addressed the requirements of this Paragraph, as it pertains to the quality of supervisory reviews. For this reporting period, MCSO was not in compliance with the requirements of this Paragraph.

***Paragraph 101.*** *Within 180 days of the Effective Date, MCSO shall develop and implement eligibility criteria for assignment to Specialized Units enforcing Immigration-Related Laws. Such criteria and procedures shall emphasize the individual's integrity, good judgment, and demonstrated capacity to carry out the mission of each Specialized Unit in a constitutional, lawful, and bias-free manner. Deputies assigned to a Specialized Unit who are unable to maintain eligibility shall be immediately re-assigned.*

**In Full and Effective Compliance**

MCSO does not have any specialized units that enforce immigration-related laws. Therefore, by default, MCSO is in Phase 2 compliance with this Paragraph. We continue to monitor arrests and detentions as part of our review process to ensure that MCSO is in compliance with its own directives on this issue.

For October, November, and December, we received lists containing all incidents involving MCSO arrests and criminal citations. For each month, we requested a random sample of arrests and criminal citations. In total, we reviewed 60 incidents involving arrests and 60 incidents involving criminal citations. We also reviewed a random sample of 261 Incident Reports for this reporting period. During our reviews of the documentation provided for this reporting period, we found no evidence to indicate any violations of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with the Monitor's determination.

WAI 53442

## COURT ORDER XI. MISCONDUCT AND COMPLAINTS

### *a. Internally-Discovered Violations*

*Paragraph 102. MCSO shall require all personnel to report without delay alleged or apparent misconduct by other MCSO Personnel to a Supervisor or directly to IA that reasonably appears to constitute: (i) a violation of MCSO policy or this Order; (ii) an intentional failure to complete data collection or other paperwork requirements required by MCSO policy or this Order; (iii) an act of retaliation for complying with any MCSO policy; (iv) or an intentional provision of false information in an administrative investigation or any official report, log or electronic transmittal of information. Failure to voluntarily report or document apparent misconduct described in this Paragraph shall be an offense subject to Discipline.*

**In Full and Effective Compliance**

During our assessments of compliance with this Paragraph, we have reviewed hundreds of misconduct investigations involving MCSO personnel. Many of them have been internally generated.

During this reporting period, we reviewed 87 administrative misconduct investigations. Twenty-five were generated internally. Seven involved identified sworn personnel, and 18 involved identified Detention personnel.

MCSO has continued to identify and address misconduct that is raised by other employees or identified by supervisory personnel. While some of these investigations did not meet all requirements for the proper reporting or completion of misconduct investigations, we address these failures in other Paragraphs in this report.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

### *b. Audit Checks*

*Paragraph 103. Within one year of the Effective Date, MCSO shall develop a plan for conducting regular, targeted, and random integrity audit checks to identify and investigate Deputies possibly engaging in improper behavior, including: Discriminatory Policing; unlawful detentions and arrests; improper enforcement of Immigration-Related Laws; and failure to report misconduct.*

**Phase 1:** In compliance

- Audits and Inspections Unit Operations Manual, Section 303, published on August 27, 2020.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

WAI 53443

**Phase 2:** In compliance

MCSO's Audits and Inspections Unit (AIU), a unit of the Bureau of Internal Oversight (BIO), is responsible for these requirements. This Paragraph requires that MCSO conduct "regular, targeted, and random integrity audit checks." We have long acknowledged MCSO's compliance with the "regular" and "random" elements of this Paragraph, due to AIU's publication of several completed inspection reports. For this reporting period, the inspections examined, for example, complaint intake tests, Supervisory Notes, Patrol Activity Logs, traffic stop data, post-stop ethnicity, County Attorney turndown dispositions, and Patrol Shift Rosters.

This is the first reporting period in which AIU has conducted an audit check that fulfills the "targeted" Paragraph 103 requirements. In December, AIU published its first Targeted Integrity Inspection. As noted in its inspection report, AIU "will conduct targeted integrity inspections on an as needed basis to examine a specific employee or group of employees who have been identified through an analysis of the Bureau of Internal Oversight (BIO), the Professional Standards Bureau (PSB), the Early Identification System (EIS), or other data collection methods, as displaying potential indications or concerns of involvement in improper or illegal behavior." The December report details the results of a test in which AIU reviewed drivers' post-stop perceived ethnicity information from Vehicle Stop Contact Forms (VSCFs) submitted from January 1-October 31, 2020, along with a U.S. Census list of Hispanic surnames. In its review, AIU sought to "determine if drivers with Hispanic surnames documented as 'White' on the VSCF is correct based on a reasonable person standard," and "if there is an indication of continual and repetitive improper identification of the post-race ethnicity of Hispanic drivers." AIU selected as its focus a deputy who had the highest proportion of stops in which he identified drivers with Hispanic surnames as white (12 of 171 total stops). AIU examined body-worn camera video footage from the deputy's 12 stops, and agreed that the deputy's "perception was reasonable" in 10. AIU concluded that this test passed, and it also submitted a BIO Action Form to the deputy's chain of command to reassess the post-stop ethnicity of the drivers in the two stops in which it did not determine that the deputy's perception was reasonable.

MCSO is now in compliance with this Paragraph. Paragraph 103 does not set frequency standards for integrity tests; during our January 2021 remote site visit, AIU personnel informed us that AIU intends to conduct, at least one, and as many as two or three tests, each quarter. We will review those tests to determine if MCSO will maintain continued compliance with this Paragraph. We look forward to discussing AIU's plans for future integrity tests during our upcoming site visit.

### c. Complaint Tracking and Investigations

***Paragraph 104.*** *Subject to applicable laws, MCSO shall require Deputies to cooperate with administrative investigations, including appearing for an interview when requested by an investigator and providing all requested documents and evidence. Supervisors shall be notified when a Deputy under their supervision is summoned as part of an administrative investigation and shall facilitate the Deputy's appearance, absent extraordinary and documented circumstances.*

**In Full and Effective Compliance**

WAI 53444

In the fall of 2015, MCSO developed a draft checklist and investigative format for administrative investigations. All the requirements in this Paragraph are included in these protocols. The checklist and formats were approved for use in early 2016, and all personnel through the rank of captain were required to attend a training session regarding the use of these forms. Effective June 1, 2016, all administrative investigations were required to use these forms. MCSO has consistently met this requirement, and MCSO has included the checklists in administrative investigations forwarded for our review.

Since that time, the Professional Standards Bureau (PSB) drafted revisions to the investigation checklist and format to provide additional clarification on procedural requirements. We and the Parties reviewed the revisions and provided our feedback. The revised format and investigation checklist were approved for use. The Misconduct Investigative Training for personnel outside of PSB also now includes a discussion of the revisions to these forms.

During the last reporting period, we reviewed 146 administrative misconduct investigations. All but three of these investigations were in compliance with the requirements of this Paragraph.

During this reporting period, we reviewed 87 administrative misconduct investigations. Fifty-two involved sworn personnel. All 52 were both initiated and completed after July 20, 2016 and included the use of the approved investigative format and checklist. We continue to note that deputies consistently appear for scheduled interviews, provide all required information to investigators, and cooperate with investigations. There were no instances identified where a supervisor failed to facilitate a deputy's attendance at an interview or where the investigator had failed to notify the employee's supervisor of an intended administrative interview.

On March 17, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 105.** *Investigators shall have access to, and take into account as appropriate, the collected traffic stop and patrol data, Training records, Discipline history, and any past Complaints and performance evaluations of involved officers.*

### In Full and Effective Compliance

Our reviews of investigations conducted by MCSO have verified that the information required for compliance with this Paragraph is consistently provided in the checklist and investigative reports.

As a result of the Second Order and effective July 20, 2016, the PSB Commander makes all preliminary disciplinary decisions. The PSB and Administrative Services Division Commanders created a worksheet that provides information regarding how MCSO makes disciplinary decisions, and how MCSO considers employees' work history. PSB includes this form in the sustained investigation documentation that we receive and review for compliance.

WAI 53445

During this reporting period, we reviewed 33 sustained administrative misconduct investigations. Sixteen of these 33 cases involved misconduct by sworn personnel. Seventeen involved misconduct by Detention personnel. Twenty-nine of the 33 investigations involved personnel still employed by MCSO at the time final findings or discipline decisions were made. In all 29, the PSB Commander determined the findings and presumptive discipline range for the sustained violations. We found these preliminary decisions to be consistent with the Discipline Matrices in effect at the time the decisions were made. We also found that generally, where appropriate, discipline history, past complaints, performance evaluations, traffic stop and patrol data, and training records were included in the documents considered for final discipline findings.

On October 5, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

***Paragraph 106.*** *Records of Complaints and investigations shall be maintained and made available, un-redacted, to the Monitor and Plaintiffs' representatives upon request. The Monitor and Plaintiffs' representatives shall maintain the confidentiality of any information therein that is not public record. Disclosure of records of pending investigations shall be consistent with state law.*

**In Full and Effective Compliance**

MCSO has two obligations under this Paragraph: to maintain and make records available. The Paragraph also covers the requirement that MCSO make unredacted records of such investigations available to the Plaintiffs' attorneys and Plaintiff-Intervenors as well.

MCSO has been responsive to our requests, and neither the Plaintiffs nor Plaintiff-Intervenors have raised any concerns related to the requirements of this Paragraph for this or the past several reporting periods. MCSO, via its counsel, distributes responses to our document and site visit requests via a document-sharing website. The Plaintiffs' attorneys and Plaintiff-Intervenors have access to this information, including documents applicable to this Paragraph, at the same time as we do.

On June 3, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 53446

# Section 11: Community Engagement

**COURT ORDER XII. COMMUNITY ENGAGEMENT**

### a. Community Outreach Program

**Paragraph 107.** *To rebuild public confidence and trust in the MCSO and in the reform process, the MCSO shall work to improve community relationships and engage constructively with the community during the time that this order is in place. To this end, the MCSO shall conduct the following district community outreach program.*

**Paragraph 109.** *The Monitor shall hold at least one public meeting per quarter to coincide with the quarterly site visits by the Monitor in a location convenient to the Plaintiffs class. The meetings shall be for the purpose of reporting the MCSO' progress in implementing this Order. These meetings shall be used to inform community members of the policy changes or other significant actions that the MCSO has taken to implement the provisions of this Order. Summaries of audits and reports completed by the MCSO pursuant to this Order shall be made available. The meetings shall be under the direction of the Monitor and/or his designee. The Sheriff and/or the MCSO will participate in the meetings to provide substantive comments related to the Melendres case and the implementation of the orders resulting from it, as well as answer questions related to its implementation, if requested to do so by the Monitor or the community. If the Sheriff is unable to attend a meeting due to other obligations, he shall notify the Monitor at least 30 days prior to that meeting. The Monitor shall consult with Plaintiffs' representatives and the Community Advisory Board on the location and content of the meetings. The Monitor shall clarify for the public at these meetings that MCSO does not enforce immigration laws except to the extent that it is enforcing Arizona and federal criminal laws.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

This Paragraph, per the June 3, 2019 Order (Document 2431), returned the community meetings to the Monitor's supervision and directed the Monitor to hold at least one public meeting per quarter to coincide with the quarterly site visits by the Monitor in a location convenient to the Plaintiffs' class.

We did not travel to Maricopa County in January for our in-person quarterly site visit due to the COVID-19 pandemic. We will consult with Plaintiffs' representatives or the Community Advisory Board regarding the location and content of our community meetings when we resume our in-person site visits. We are also exploring the possibility of holding a virtual community meeting that would be accessible and interpreted into Spanish for the affected community.

WAI 53447

***Paragraph 110.*** *The meetings present an opportunity for the Monitor and MCSO representatives to listen to community members' experiences and concerns about MCSO practices. The Monitor may investigate and respond to those concerns. The Monitor shall inform the public that the purpose of the meeting is to discuss the Melendres case and the orders implementing the relief of that case. To the extent that the Monitor receives concerns at such meetings that are neither within the scope of this order nor useful in determining the Defendant's compliance with this order, it may inform the complainant how to file an appropriate complaint with the MCSO or appropriate law enforcement agency. The Sheriff may respond to non-Melendres questions raised at meetings to the extent, in his sole discretion, if the Sheriff wishes to do so.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

As noted above, we did not travel to Maricopa County in January for an in-person quarterly site visit, and therefore did not hold a community meeting.


***Paragraph 111.*** *English and Spanish-speaking Monitor Personnel shall attend these meetings and be available to answer questions from the public about its publicly available reports concerning MCSO's implementation of this Order and other publicly available information. The Plaintiffs' and Plaintiff-Intervenor's representatives shall be invited to attend and the Monitor shall announce their presence and state their availability to answer questions.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

As noted above, we did not travel to Maricopa County in January for an in-person quarterly site visit, and therefore did not hold a community meeting.


***Paragraph 112.*** *At least ten days before such meetings, the Monitor shall widely publicize the meetings in English and Spanish after consulting with Plaintiffs' representatives and the Community Advisory Board regarding advertising methods. Options for advertising include, but are not limited to, television, radio, print media, internet and social media, and any other means available. Defendants shall either provide a place for such meetings that is acceptable to the Monitor or pay the Monitor the necessary expenses incurred in arranging for such meeting places. The Defendants shall also pay the reasonable expenses of publicizing the meetings as required above, and the additional reasonable personnel and expenses that the Monitor will incur as a result of performing his obligations with respect to the Community Outreach Program. If any party determines there is little interest or participation in such meetings among community members, or that they have otherwise fulfilled their purpose, it can file a request with the Court that this requirement be revised or eliminated.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

WAI 53448

As we did not travel to Maricopa County in January, we did not hold a community meeting. We will consult with Plaintiffs' representatives and the Community Advisory Board regarding community meeting advertising when we resume our in-person site visits.

### b. MCSO Community Liaison

*Paragraph 113. MCSO shall select or hire a Community Liaison who is fluent in English and Spanish. The hours and contact information of the MCSO Community Outreach Division ("COD") shall be made available to the public including on the MCSO website. The COD shall be directly available to the public for communications and questions regarding the MCSO.*

**Phase 1:** In compliance

- GJ-24 (Community Relations and Youth Programs), most recently revised on March 11, 2021.

**Phase 2:** In compliance

This Paragraph requires that MCSO select or hire a Community Liaison who is fluent in English and Spanish. MCSO's Community Outreach Division (COrD) has two Community Liaison Officers who are fluent in English and Spanish. The COrD uses the term "Community Liaison" for these two individuals and its other staff members, though not all of them are bilingual as required by this Paragraph.

The MCSO website lists the hours and contact information of the COrD and its staff – as well as the COrD's mission and overarching goals, and frequently asked questions regarding MCSO.

*Paragraph 114. The COD shall have the following duties in relation to community engagement:*

*a.     to coordinate the district community meetings described above in Paragraphs 109 to 112;*

*b.     to provide administrative support for, coordinate and attend meetings of the Community Advisory Board described in Paragraphs 117 to 118; and*

*c.     to compile any complaints, concerns and suggestions submitted to the COD by members of the public about the implementation of this Order and the Court's order of December 23, 2011, and its findings of fact and conclusions of law dated May 24, 2013, even if they don't rise to the level of requiring formal action by IA or other component of the MCSO, and to respond to Complainants' concerns; and*

*d.     to communicate concerns received from the community at regular meetings with the Monitor and MCSO leadership.*

**Phase 1:** In compliance

- Court Implementation Division Operations Manual, most recently revised on November 13, 2019.

WAI 53449

- GJ-24 (Community Relations and Youth Programs), most recently revised on March 11, 2021.

**Phase 2:** In compliance

Pursuant to the June 3, 2019 Order (Document 2431), Subparagraphs a. and b. of this Paragraph are no longer applicable.

During this reporting period, the Deputy Chief designated as the CAB's point of contact continued to work with and provide support to the CAB. He distributed policies and other materials for CAB members to review and provide feedback, and tracked and responded to CAB members' inquiries and requests for information about MCSO's implementation of the Orders.

During this reporting period, the CAB did not hold any public meetings. Some CAB members participated in a few of our compliance meetings during our January remote site visit, as in the past – including meetings on community engagement, complaint intake testing and integrity testing, the Traffic Stop Monthly Reports, and MCSO's Constitutional Policing Plan.

COrD uses a form it created for capturing information on complaints, concerns, and suggestions submitted by members of the public to the COrD. MCSO has provided documentation that all current COrD personnel completed an online Complaint Intake and Processing course, to assist them in receiving and appropriately directing any complaints or concerns from community members they receive, including complaints of potential employee misconduct. The COrD recently added a new staff member to the Division, and, upon our request following our January 2021 remote site visit, submitted verification that this member had received the appropriate training.

In the past, COrD personnel have reported that they occasionally receive concerns from community members, and that they forward those that are complaints to PSB; and that they sometimes receive inquiries for which COrD staff believe it is appropriate to direct community members to written materials or the MCSO website. COrD personnel did not submit any MCSO Complaint and Comment Forms for our review during this reporting period. In its submission for this reporting period, COrD personnel wrote, "From October 1, 2020-December 31, 2020 the Community Outreach Division received no complaints, concerns or suggestions by members of the public regarding implementation of the Court's Orders. Therefore, the Community Outreach Division prepared no response."

During our upcoming site visit, we will discuss with COrD personnel any complaints, concerns, and suggestions it has received from the public; as well as the requirement that COrD communicate any concerns received from the community at regular meetings with the Monitor and MCSO leadership.

WAI 53450

### c. Community Advisory Board

*Paragraph 115. MCSO and Plaintiffs' representatives shall work with community representatives to create a Community Advisory Board ("CAB") to facilitate regular dialogue between the MCSO and the community, and to provide specific recommendations to MCSO and the Monitor about policies and practices that will increase community trust and ensure that the provisions of this Order and other orders entered by the Court in this matter are met. The MCSO shall cooperate with the Monitor to assure that members of the CAB are given appropriate access to relevant material, documents, and training so the CAB can make informed recommendations and commentaries to the Monitor.*

**Phase 1:** In compliance

- Court Implementation Division Operations Manual, most recently revised on November 13, 2019.

**Phase 2:** In compliance

During this reporting period, CAB members and representatives of MCSO – specifically, the Deputy Chief who is the CAB's designated point of contact – exchanged numerous email messages, which we also received. In these messages, among other topics, CAB members provided specific recommendations to MCSO about policies and practices that will increase community trust and ensure that the provisions of this Order and other Orders entered by the Court in this matter are met. During this reporting period, the CAB provided feedback on several MCSO policies.

After some delays in MCSO's responsiveness to CAB members' requests for information, and some instances where CAB members provided feedback to MCSO and MCSO did not acknowledge receipt, we discussed our concerns with MCSO. During this reporting period, MCSO's responsiveness to CAB members improved. We will continue to monitor this, as MCSO should ensure that it responds to CAB members in a timely fashion to maintain compliance with this Paragraph. We will also continue to monitor MCSO personnel's interactions with CAB members during our site visit meetings. Some CAB members have expressed concerns that when they have shared their opinions with MCSO personnel during these meetings, they have been met with a brusque tone by some MCSO personnel.

During this reporting period, the CAB met with COrD personnel to discuss MCSO's placement of complaint forms. During our site visit discussions, CAB members have recommended that the COrD place complaint forms in locations including grocery and other retail stores that are located in communities where members of the Plaintiffs' class live and work. We encourage the COrD to incorporate the CAB's feedback and recommendations. (See Paragraph 242.)

*Paragraph 116. The CAB shall have five members, two to be selected by MCSO and two to be selected by Plaintiffs' representatives. One member shall be jointly selected by MCSO and Plaintiffs' representatives. Members of the CAB shall not be MCSO Employees or any of the named class representatives nor any of the attorneys involved in this case. The CAB shall continue for at least the length of this Order.*

WAI 53451

**Phase 1:** In compliance

- Court Implementation Division Operations Manual, most recently revised on November 13, 2019.

**Phase 2:** In compliance

The CAB is a five-member body – with two members selected by MCSO, two members selected by Plaintiffs' attorneys, and one member jointly selected by MCSO and Plaintiffs' attorneys.

The CAB currently has five members; none are MCSO employees, named class representatives, or attorneys involved in this case.


***Paragraph 117.*** *The CAB shall hold meetings at regular intervals.  The meetings may be either public or private as the purpose of the meeting dictates, at the election of the CAB.  The Defendants shall provide a suitable place for such meetings.  The Monitor shall coordinate the meetings and communicate with CAB members, and provide administrative support for the CAB.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

During this reporting period, the CAB did not hold any public meetings, but the CAB participated in several other activities.  CAB members met regularly as a group, often with members of the Monitoring Team, and also met with the Sheriff to discuss their concerns with the timeliness of Professional Standards Bureau (PSB) investigations and with the indications of racial bias found in the agency's most recent Traffic Stop Annual Report (TSAR).  CAB members also met with representatives of community organizations to discuss their concerns with MCSO.  In addition, during our January remote site visit, some CAB members participated in a few of our compliance meetings.  In our regular meetings with CAB members via conference calls and virtual meetings, we have provided information and discussed ways to improve the relationship between the Plaintiffs' class and MCSO.


***Paragraph 118.*** *During the meetings of the CAB, members will relay or gather concerns from the community about MCSO practices that may violate the provisions of this Order and the Court's previous injunctive orders entered in this matter and transmit them to the Monitor and the MCSO for investigation and/or action.  The Parties will also be given the CAB's reports and recommendations to the Monitor.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

WAI 53452

As noted above, during this reporting period, the CAB did not hold any public meetings. As in the past, some CAB members participated in a few of our compliance meetings during our January remote site visit.

During this reporting period, we requested from MCSO documentation of concerns received from the CAB during their meetings about MCSO practices that may be in violation of the Court's Orders that were transmitted to the MCSO for investigation and/or action. According to MCSO, during this reporting period, "[T]he Community Outreach Division received no documentations of concerns from the CAB concerning MCSO practices that may be in violation of the Court's Orders, which were transmitted for investigation and/or action."

WAI 53453

## Section 12: Misconduct Investigations, Discipline, and Grievances

**COURT ORDER XV.     MISCONDUCT INVESTIGATIONS, DISCIPLINE, AND GRIEVANCES**

*Paragraph 163.  The Sheriff will ensure that all allegations of employee misconduct, whether internally discovered or based on a civilian complaint, are fully, fairly, and efficiently investigated; that all investigative findings are supported by the appropriate standard of proof and documented in writing; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair, consistent, unbiased and provides due process.  To achieve these outcomes, the Sheriff shall implement the requirements set out below.*

### A.  Policies Regarding Misconduct Investigations, Discipline, and Grievances

*Paragraph 165.  Within one month of the entry of this Order, the Sheriff shall conduct a comprehensive review of all policies, procedures, manuals, and other written directives related to misconduct investigations, employee discipline, and grievances, and shall provide to the Monitor and Plaintiffs new policies and procedures or revise existing policies and procedures. The new or revised policies and procedures that shall be provided shall incorporate all of the requirements of this Order.  If there are any provisions as to which the parties do not agree, they will expeditiously confer and attempt to resolve their disagreements.  To the extent that the parties cannot agree on any proposed revisions, those matters shall be submitted to the Court for resolution within three months of the date of the entry of this Order.  Any party who delays the approval by insisting on provisions that are contrary to this Order is subject to sanction.*

**Phase 1:**  Not applicable

**Phase 2:**  Deferred

MCSO provided us with the following:

- CP-2 (Code of Conduct), most recently amended on July 30, 2020.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on March 4, 2021.

- CP-5 (Truthfulness), most recently amended on September 11, 2020.

- CP-8 (Preventing Racial and Other Bias-Based Profiling), most recently amended on September 4, 2020.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- EA-2 (Patrol Vehicles), most recently revised on March 3, 2021.

- GA-1 (Development of Written Orders), most recently amended on December 31, 2020.

- GB-2 (Command Responsibility), most recently amended on June 28, 2019.

- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

- GC-7 (Transfer of Personnel), most recently amended on December 4, 2019.

- GC-11 (Employee Probationary Periods), most recently amended on April 22, 2020.

- GC-12 (Hiring and Promotional Procedures), most recently amended on July 23, 2020.

- GC-16 (Employee Grievance Procedures), most recently amended on April 7, 2020.

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on October 1, 2020.

- GE-4 (Use, Assignment, and Operation of Vehicles), most recently amended on June 25, 2020.

- GG-1 (Peace Officer Training Administration), most recently amended on March 31, 2021.

- GG-2 (Detention/Civilian Training Administration), most recently amended on March 31, 2021.

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

- GH-5 (Early Identification System), most recently amended on March 3, 2021.

- GI-5 (Voiance Language Services), most recently amended on January 4, 2019.

- GJ-24 (Community Relations and Youth Programs), most recently revised on March 11, 2021.

- GJ-26 (Sheriff's Reserve Deputy Program), most recently amended on June 5, 2020.

- GJ-27 (Sheriff's Posse Program), most recently amended on June 19, 2020.

- GJ-35 (Body-Worn Cameras), most recently amended on December 31, 2019.

- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

- Audits and Inspections Unit Operations Manual, currently under revision.

- Body-Worn Camera Operations Manual, published on December 22, 2016.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

- Training Division Operations Manual, most recently amended on March 9, 2020.

WAI 53455

We received a majority of the documents listed above within one month of the entry of the Order. We and the Parties conducted initial reviews and returned the revised documents, with additional recommendations, to MCSO for additional work. MCSO continues to revise the remaining policies and operations manuals related to misconduct investigations, the Sheriff's Posse Program, Audits and Inspections, and Training. Those remaining policies and operations manuals identified by MCSO were in some phase of review by us and the Parties at the end of this reporting period.

This Paragraph implies that the review process and final adoption of the updated policies would take two months to complete, assuming that the new or revised policies were provided within one month of the issuance of the Second Order. The sheer volume of policies, as well as the extensive modifications they contain, rendered that target date unachievable. This is due, in large measure, to researched and well-considered recommendations by the Parties; and robust discussion about policy language, application, and outcomes during our site visit meetings.

**Paragraph 166.** *Such policies shall apply to all misconduct investigations of MCSO personnel.*

**Paragraph 167.** *The policies shall include the following provisions:*

a. *Conflicts of interest in internal affairs investigations or in those assigned by the MCSO to hold hearings and make disciplinary decisions shall be prohibited. This provision requires the following:*

    i. *No employee who was involved in an incident shall be involved in or review a misconduct investigation arising out of the incident.*

    ii. *No employee who has an external business relationship or close personal relationship with a principal or witness in a misconduct investigation may investigate the misconduct. No such person may make any disciplinary decisions with respect to the misconduct including the determination of any grievance or appeal arising from any discipline.*

    iii. *No employee shall be involved in an investigation, whether criminal or administrative, or make any disciplinary decisions with respect to any persons who are superior in rank and in their chain of command. Thus, investigations of the Chief Deputy's conduct, whether civil or criminal, must be referred to an outside authority. Any outside authority retained by the MCSO must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest.*

b. *If an internal affairs investigator or a commander who is responsible for making disciplinary findings or determining discipline has knowledge of a conflict of interest affecting his or her involvement, he or she should immediately inform the Commander of the Professional Standards Bureau or, if the holder of that office also suffers from a conflict, the highest-ranking, non-conflicted chief-level officer at MCSO or, if there is no*

WAI 53456

*non-conflicted chief-level officer at MCSO, an outside authority. Any outside authority retained by the MCSO must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest.*

c. *Investigations into an employee's alleged untruthfulness can be initiated by the Commander of the Professional Standards Bureau or the Chief Deputy. All decisions not to investigate alleged untruthfulness must be documented in writing.*

d. *Any MCSO employee who observes or becomes aware of any act of misconduct by another employee shall, as soon as practicable, report the incident to a Supervisor or directly to the Professional Standards Bureau. During any period in which a Monitor is appointed to oversee any operations of the MCSO, any employee may, without retaliation, report acts of alleged misconduct directly to the Monitor.*

e. *Where an act of misconduct is reported to a Supervisor, the Supervisor shall immediately document and report the information to the Professional Standards Bureau.*

f. *Failure to report an act of misconduct shall be considered misconduct and may result in disciplinary or corrective action, up to and including termination. The presumptive discipline for a failure to report such allegations may be commensurate with the presumptive discipline for the underlying misconduct.*

g. *No MCSO employee with a rank lower than Sergeant will conduct an investigation at the District level.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on July 30, 2020.
- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on March 4, 2021.
- CP-5 (Truthfulness), most recently amended on September 11, 2020.
- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.
- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- GC-16 (Employee Grievance Procedures), most recently amended on April 7, 2020.
- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.
- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we review administrative misconduct investigations.

WAI 53457

During this reporting period, we reviewed 87 closed administrative misconduct investigations. Sworn or Detention personnel assigned to the Professional Standards Bureau (PSB) conducted 49 of the investigations. Sworn supervisors in Districts or Divisions outside of PSB conducted the remaining 38.

Paragraph 167.a.i-iii. prohibits any employee with any conflicts of interest from participating in, holding hearings on, or making any disciplinary decisions in a misconduct investigation. During this reporting period, there was one instance where a conflict of interest existed with a District supervisor who conducted the investigation. This was identified and addressed by PSB during its review of the investigation.

Paragraph 167.b. requires that if the internal affairs investigator or a commander responsible for making disciplinary decisions identifies a conflict of interest, appropriate notifications must be made immediately. As noted in the above Subparagraph, there was one instance where a supervisor failed to identify a conflict of interest and inappropriately conducted an investigation. This was identified and addressed by PSB during its review of the investigation.

Paragraph 167.c. requires that investigations into truthfulness be initiated by the Chief Deputy or the PSB Commander. MCSO identified five instances during this reporting period where they believed a truthfulness allegation was appropriate and initiated the proper investigation. We did not identify any instances during this reporting period where we believe a truthfulness investigation should have been initiated and was not.

Paragraph 167.d. requires that any MCSO employee who observes or becomes aware of misconduct by another employee shall immediately report such conduct to a supervisor or directly to PSB. Per the requirement, during the period in which the Monitor has authority to oversee any operations of MCSO, any employee may also report alleged misconduct to the Monitor. Of the 87 administrative cases we reviewed for this reporting period, there were 23 investigations where an employee reported potential misconduct by another employee, or a supervisor identified potential employee misconduct. There were no instances identified where an employee failed to immediately report potential misconduct about which he had been notified.

Paragraph 167.e. requires that when supervisors learn of an act of misconduct, the supervisor shall immediately document and report the information to PSB. There were no instances where a supervisor failed to immediately report and document alleged misconduct by another employee.

Paragraph 167.f. provides for the potential for a disciplinary sanction or other corrective action if an employee fails to bring forth an act of misconduct. During this reporting period, there were no instances where an employee failed to immediately complete the proper documentation to notify PSB of potential misconduct.

Paragraph 167.g. requires that a sergeant or higher-ranking employee conduct all misconduct investigations conducted at the District level. All District-level cases that we reviewed for this reporting period complied with this requirement.

WAI 53458

***Paragraph 168.*** *All forms of reprisal, discouragement, intimidation, coercion, or adverse action against any person, civilian, or employee because that person reports misconduct, attempts to make or makes a misconduct complaint in good faith, or cooperates with an investigation of misconduct constitute retaliation and are strictly prohibited. This also includes reports of misconduct made directly to the Monitor, during any period in which a Monitor is appointed to oversee any operations of the MCSO.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on July 30, 2020.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on March 4, 2021.

- CP-5 (Truthfulness), most recently amended on September 11, 2020.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- GC-16 (Employee Grievance Procedures), most recently amended on April 7, 2020.

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 87 administrative misconduct investigations that were completed during this reporting period.

During this reporting period, there were three investigations where employees alleged that another employee had filed a complaint against them because of cooperation in a separate administrative misconduct investigation. PSB conducted administrative investigations in all three, and we concur with PSB's findings.

***Paragraph 169.*** *Retaliating against any person who reports or investigates alleged misconduct shall be considered a serious offense and shall result in discipline, up to and including termination.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on July 30, 2020.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on March 4, 2021.

- CP-5 (Truthfulness), most recently amended on September 11, 2020.

WAI 53459

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- GC-16 (Employee Grievance Procedures), most recently amended on April 7, 2020.

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 87 administrative misconduct investigations that were completed during this reporting period.

As noted in Paragraph 168, three employees filed complaints alleging retaliation due to having cooperated with a separate misconduct investigation. The allegations were appropriately unfounded.


*Paragraph 170. The Sheriff shall investigate all complaints and allegations of misconduct, including third-party and anonymous complaints and allegations. Employees as well as civilians shall be permitted to make misconduct allegations anonymously.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 87 completed administrative misconduct investigations submitted during this reporting period. Sixty-two were initiated as a result of external complaints, and 25 were internally generated. We also reviewed 3 criminal investigations, two of which were generated externally.

Of the 87 administrative misconduct investigations we reviewed for this reporting period, eight involved externally generated anonymous complaints. Five others were third-party complaints. None of the criminal misconduct investigations we reviewed during this reporting period were generated due to an anonymous or third-party complaint. We have not become aware of any evidence that indicates that MCSO refused to accept and complete any investigations initiated by third-party or anonymous complainants. None of the 87 administrative misconduct investigations we reviewed during this reporting period included any allegations indicating that any third-party or anonymous complaint was not appropriately accepted and investigated.

WAI 53460

***Paragraph 171.*** *The MCSO will not terminate an administrative investigation solely on the basis that the complainant seeks to withdraw the complaint, or is unavailable, unwilling, or unable to cooperate with an investigation, or because the principal resigns or retires to avoid discipline. The MCSO will continue the investigation and reach a finding, where possible, based on the evidence and investigatory procedures and techniques available.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 87 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

We determined that 21 of the 87 completed administrative investigations involved complainants who sought to withdraw their complaints; or were unavailable, unwilling, or unable to cooperate. MCSO completed all 21 investigations and reached a finding as required. We also found that in 11 of the 87 investigations, the principal left MCSO employment prior to the finalization of the investigation or discipline process. MCSO completed all these investigations and reached a finding. None of the 87 investigations we evaluated for compliance were prematurely terminated.


***Paragraph 172.*** *Employees are required to provide all relevant evidence and information in their custody and control to internal affairs investigators. Intentionally withholding evidence or information from an internal affairs investigator shall result in discipline.*

**Phase 1:** In compliance

- CP-5 (Truthfulness), most recently amended on September 11, 2020.
- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.
- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph during this reporting period, we reviewed 87 completed administrative misconduct investigations conducted by MCSO personnel. There were two investigations identified by MCSO where an employee failed to accurately provide all information or evidence required during the investigation. In both, the employees resigned before the disciplinary process was completed.

WAI 53461

***Paragraph 173.*** *Any employee who is named as a principal in an ongoing investigation of serious misconduct shall be presumptively ineligible for hire or promotion during the pendency of the investigation. The Sheriff and/or the MCSO shall provide a written justification for hiring or promoting an employee or applicant who is a principal in an ongoing investigation of serious misconduct. This written justification shall be included in the employee's employment file and, during the period that the MCSO is subject to Monitor oversight, provided to the Monitor.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

- GC-11 (Employee Probationary Periods), most recently amended on April 22, 2020.

- GC-12 (Hiring and Promotional Procedures), most recently amended on July 23, 2020.

**Phase 2:** In compliance

MCSO has established a protocol to address the requirements of this Paragraph. When a promotion list is established for sworn or Detention personnel, a copy of the list is forwarded to the Professional Standards Bureau (PSB). Before any promotion is finalized, PSB conducts a check of each employee's disciplinary profile in the automated system (IAPro). As part of the promotional process, MCSO conducts a meeting with command staff to discuss each employee's qualifications. During this meeting, the results of the IAPro checks are provided to the staff for review and consideration. The PSB Commander generally attends the promotion meetings for both Detention and sworn personnel, and clarifies any questions regarding the disciplinary history that the staff may have. When an employee is moved from a civilian employment position to a sworn employment position, MCSO conducts a thorough background investigation. The process involves a review and update of the candidate's PSB files, which is completed by Pre-Employment Services. For Detention employees who are moving to sworn positions, the information in the employee's file is updated to include any revised or new information. Due to the scheduling of our site visits, we inspect personnel files for employees who were promoted during the last month of the preceding quarter, and the first two months of the current reporting period. In our reviews, we ensure that the documentation, as it pertains to compliance with this Paragraph, is included in personnel files.

For the fourth quarter of 2020, MCSO did not report any new hires or promotions that would fall under the reporting requirements of this Paragraph. As we held our January 2021 site visit remotely, we were unable to review employee personnel files. When we resume our in-person site visits, we will follow up on these cases to ensure that the appropriate documentation is included in each employee file.

WAI 53462

***Paragraph 174.*** *Employees' and applicants' disciplinary history shall be considered in all hiring, promotion, and transfer decisions, and this consideration shall be documented. Employees and applicants whose disciplinary history demonstrates multiple sustained allegations of misconduct, or one sustained allegation of a Category 6 or Category 7 offense from MCSO's disciplinary matrices, shall be presumptively ineligible for hire or promotion. MCSO shall provide a written justification for hiring or promoting an employee or applicant who has a history demonstrating multiple sustained allegations of misconduct or a sustained Category 6 or Category 7 offense. This written justification shall be included in the employee's employment file and, during the period that the MCSO is subject to Monitor oversight, provided to the Monitor.*

**Phase 1:** In compliance

- GC-12 (Hiring and Promotional Procedures), most recently amended on July 23, 2020.

**Phase 2:** In compliance

For employees who are promoted, the documentation submitted by MCSO generally includes the disciplinary history for the previous 10 years and any applicable disciplinary actions. MCSO also provides the disciplinary history of Detention and civilian employees who have been upgraded in classification to sworn status.

For the fourth quarter of 2020, MCSO did not report any new hires or promotions that would fall under the reporting requirements of this Paragraph. As we held our January 2021 site visit remotely, we were unable to review personnel files to verify the information provided. We will resume inspection of employee files during our next onsite visit.


***Paragraph 175.*** *As soon as practicable, commanders shall review the disciplinary history of all employees who are transferred to their command.*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on March 3, 2021.

- GC-7 (Transfer of Personnel), most recently amended on December 4, 2019.

**Phase 2:** In compliance

Per policy, MCSO is to conduct an EIS review within 14 days of an affected employee's transfer. We requested a list of employees that were transferred during this reporting period. From the list, we selected a sample of employees to review and verify that there was documentation of the required EIS reviews. To verify compliance with this Paragraph, we review the transfer request documents that MCSO completes for each employee. The documents memorialize the commander's acknowledgment of review of the transferred employee's disciplinary history, as well as the review of the employee's performance appraisals for the previous five years. This review is generally conducted before the gaining commander accepts the transfer, a few days prior to the transfer becoming effective.

WAI 53463

For October, we requested a list of employees who were transferred during the previous month. MCSO submitted a list, and we selected a sample of 25 employees who would fall under the requirements of this Paragraph. The list we requested was comprised of 12 Detention employees and 13 sworn employees. Of the 25 employees requested, all had proper documentation of command review of their EIS profiles. The compliance rate for October was 100%.

For November, we requested a list of employees who were transferred during the previous month. We selected a sample of 27 employees to review. This list was comprised of 21 Detention employees, four sworn employees, and two civilian employees. Of the 21 Detention employees, 20 had proper documentation of command review of their EIS profiles. All four sworn employees, and both civilian employees, had proper documentation of command review of their EIS profiles. The compliance rate for November was 100%.

For December, we requested a list of employees who were transferred during the previous month. MCSO submitted a list, and we selected all 14 employees transferred. This list was comprised of four Detention employees and 10 sworn employees. Of the four Detention Officers, all had proper documentation of command review of their EIS profiles. Of the 10 sworn employees, all had proper documentation of command review of their EIS profiles. The compliance rate for December was 100%. For the fourth quarter of 2020, the requirements of this Paragraph were met for 65 of 66 employees reviewed. The compliance rate for the quarter was 98.48%

**Paragraph 176.** *The quality of investigators' internal affairs investigations and Supervisors' reviews of investigations shall be taken into account in their performance evaluations.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

**Phase 2:** In compliance

This Paragraph requires that employees who conduct misconduct investigations have an assessment on the quality of their investigations documented in their Employee Performance Appraisals. This Paragraph also requires that Commanders who review their subordinates' misconduct investigations be assessed on the quality of those reviews, in their own EPAs. To assess compliance with this Paragraph, we look for specific comments by raters completing EPAs. In supervisor EPAs, we look for comments addressing the quality of investigations. In commanders' EPAs, we look for comments assessing the quality of reviews of investigations. In many instances, the employee being rated does not have any subordinates, or has not completed or reviewed any misconduct investigations. In these cases, we look for comments by the rater that indicate why the employee was not rated on this requirement.

WAI 53464

We reviewed Employee Performance Appraisals for 27 supervisors and commanders who received EPAs during this reporting period. All 27 EPAs rated the quality and effectiveness of supervision. Twenty-two of the 27 supervisor EPAs contained comments and/or rated the supervisors' demonstrated ability to identify and effectively respond to misconduct. Nineteen of the 27 supervisor EPAs rated the employees on the quality of their reviews. Twenty-six of the 27 supervisor EPAs assessed the employees' quality of internal investigations and/or the quality of their reviews of internal investigations, as required by this Paragraph. The compliance rate for this reporting period was 96.30%.

***Paragraph 177.*** *There shall be no procedure referred to as a "name-clearing hearing." All pre-disciplinary hearings shall be referred to as "pre-determination hearings," regardless of the employment status of the principal.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 87 administrative misconduct investigations that were completed during this reporting period.

In misconduct investigations that resulted in serious discipline and in which the employee was afforded the opportunity for an administrative hearing, the only reference to the hearing was "pre-determination hearing."

## B.  *Misconduct-Related Training*

***Paragraph 178.*** *Within three months of the finalization of these policies consistent with ¶ 65of this Order, the Sheriff will have provided all Supervisors and all personnel assigned to the Professional Standards Bureau with 40 hours of comprehensive training on conducting employee misconduct investigations. This training shall be delivered by a person with subject matter expertise in misconduct investigation who shall be approved by the Monitor. This training will include instruction in:*

a.  *investigative skills, including proper interrogation and interview techniques, gathering and objectively analyzing evidence, and data and case management;*

b.  *the particular challenges of administrative law enforcement misconduct investigations, including identifying alleged misconduct that is not clearly stated in the complaint, or that becomes apparent during the investigation;*

c.  *properly weighing the credibility of civilian witnesses against employees;*

d.  *using objective evidence to resolve inconsistent statements;*

e.  *the proper application of the appropriate standard of proof;*

WAI 53465

f.    report-writing skills;

g.    requirements related to the confidentiality of witnesses and/or complainants;

h.    considerations in handling anonymous complaints;

i.    relevant MCSO rules and policies, including protocols related to administrative investigations of alleged officer misconduct; and

j.    relevant state and federal law, including Garrity v. New Jersey, and the requirements of this Court's orders.

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

The 2020 Misconduct Investigative Training (PSB40) was approved late in the quarter, and was not delivered during this reporting period.


**Paragraph 179.**  *All Supervisors and all personnel assigned to the Professional Standards Bureau also will receive eight hours of in-service training annually related to conducting misconduct investigations.  This training shall be delivered by a person with subject matter expertise in misconduct investigation who shall be approved by the Monitor.*

**Phase 1:**  In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on March 31, 2021.

- GG-2 (Detention/Civilian Training Administration), most recently amended on March 31, 2021.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

The 2020 annual eight-hour in-service training for the Professional Standards Bureau personnel (PSB8 Internal) was delivered during October to 43 personnel (20 sworn, 21 Detention, two civilian).  One individual required test remediation.

The 2020 annual eight-hour in-service training for District supervisors (PSB8 External) was approved but not delivered during this reporting period.


**Paragraph 180.**  *Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all employees on MCSO's new or revised policies related to misconduct investigations, discipline, and grievances.  This training shall include instruction on identifying and reporting misconduct, the consequences for failing to report misconduct, and the consequences for retaliating against a person for reporting misconduct or participating in a misconduct investigation.*

WAI 53466

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on July 30, 2020.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on March 4, 2021.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- GB-2 (Command Responsibility), most recently amended on June 28, 2019.

- GC-16 (Employee Grievance Procedures), most recently amended on April 7, 2020.

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

- GG-1 (Peace Officer Training Administration), most recently amended on March 31, 2021.

- GG-2 (Detention/Civilian Training Administration), most recently amended on March 31, 2021.

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

- GJ-26 (Sheriff's Reserve Deputy Program), most recently amended on June 5, 2020.

- GJ-27 (Sheriff's Posse Program), most recently amended on June 19, 2020.

- Training Division Operations Manual, most recently amended on March 9, 2020.

**Phase 2:** In compliance

MCSO distributes new or annually revised policies via the HUB, an electronic training management system. Each distribution requires all employees to complete personal attestations indicating they have read and understand the policy requirements.

To assess compliance with this Paragraph, we review the HUB generated reports of attestations that identify each individual and their dates of review. Compliance assessments for this Paragraph are based on the review of attestations for the following policies: CP-2 (Code of Conduct); CP-3 (Workplace Professionalism: Discrimination and Harassment); CP-11 (Anti-Retaliation); GB-2 (Command Responsibility); GH-2 (Internal Investigations); GC-16 (Employee Grievance Procedures); and GC-17 (Employee Disciplinary Procedures).

During this reporting period, we reviewed the status of individual reviews for Briefing Board (BB) 20-49 (CP-2), BB 19-04 (CP-3), BB 18-48 (CP-11), BB 20-60 (GB-2), BB 20-39 (GH-2), BB 20-15 (GC-16), and BB 20-39 (GC-17). All employee categories remain in compliance.

WAI 53467

***Paragraph 181.*** *Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all employees, including dispatchers, to properly handle civilian complaint intake, including how to provide complaint materials and information, and the consequences for failing to take complaints.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

- GG-1 (Peace Officer Training Administration), most recently amended on March 31, 2021.

- GG-2 (Detention/Civilian Training Administration), most recently amended on March 31, 2021.

- Training Division Operations Manual, most recently amended on March 9, 2020.

**Phase 2:** In compliance

MCSO currently delivers the 2017 Complaint Intake and Reception Training via the HUB to all new hires in all personnel categories. This curriculum has remained under review during the last four reporting periods. This initial training is provided to all new hires, and provides them with important guidance when interacting with members of the public who wish to file a complaint against MCSO personnel. We continue to recommend that revision of this curriculum be prioritized and completed expeditiously.

***Paragraph 182.*** *Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all Supervisors on their obligations when called to a scene by a subordinate to accept a civilian complaint about that subordinate's conduct and on their obligations when they are phoned or emailed directly by a civilian filing a complaint against one of their subordinates.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

- GG-1 (Peace Officer Training Administration), most recently amended on March 31, 2021.

- GG-2 (Detention/Civilian Training Administration), most recently amended on March 31, 2021.

- Training Division Operations Manual, most recently amended on March 9, 2020.

**Phase 2:** In compliance

WAI 53468

Several training programs – the ACT, SRELE, EIS, and the PSB40 – address the requirements of this Paragraph by including policy reference and additional direction when appropriate. Additional direction to supervisors and deputies may not appear in each annual delivery, depending upon the content included. The 2020 PSB8 External curriculum includes content related to supervisory responsibilities related to Complaint Intake and Investigation.

## C.  *Administrative Investigation Review*

**Paragraph 183.**  *The Sheriff and the MCSO will conduct objective, comprehensive, and timely administrative investigations of all allegations of employee misconduct. The Sheriff shall put in place and follow the policies set forth below with respect to administrative investigations.*

**Paragraph 184.**  *All findings will be based on the appropriate standard of proof. These standards will be clearly delineated in policies, training, and procedures, and accompanied by detailed examples to ensure proper application by internal affairs investigators.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 87 completed administrative misconduct investigations conducted during this reporting period.

Of the 87 cases we reviewed, 83 (95%) complied with the requirements of this Paragraph. In two, we believe the findings of unfounded were inappropriate and the allegations should have been sustained. In one investigation that was not sustained, we believe that adequate evidence existed to sustain the allegation. In another, PSB failed to identify all principals in the investigation. Had PSB done so, sustained findings might have been appropriate for these employees.

During our next site visit, we will discuss these investigations with PSB personnel.

**Paragraph 185.**  *Upon receipt of any allegation of misconduct, whether internally discovered or based upon a civilian complaint, employees shall immediately notify the Professional Standards Bureau.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:**  In compliance

WAI 53469

To determine Phase 2 compliance with this Paragraph, we reviewed 87 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period. In all 87, PSB was appropriately notified at the time of the complaint as required. We also reviewed three criminal misconduct investigations. PSB was appropriately notified in all three of these investigations.

**Paragraph 186.** *Effective immediately, the Professional Standards Bureau shall maintain a centralized electronic numbering and tracking system for all allegations of misconduct, whether internally discovered or based upon a civilian complaint. Upon being notified of any allegation of misconduct, the Professional Standards Bureau will promptly assign a unique identifier to the incident. If the allegation was made through a civilian complaint, the unique identifier will be provided to the complainant at the time the complaint is made. The Professional Standards Bureau's centralized numbering and tracking system will maintain accurate and reliable data regarding the number, nature, and status of all misconduct allegations, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status, if requested, and final disposition of the complaint. The system will be used to determine the status of misconduct investigations, as well as for periodic assessment of compliance with relevant policies and procedures and this Order, including requirements of timeliness of investigations. The system also will be used to monitor and maintain appropriate caseloads for internal affairs investigators.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

During numerous site visits, we have met with PSB personnel to discuss and observe the capabilities of IAPro, which serves as the technology instrument that meets the compliance criteria of this Paragraph. IAPro logs critical dates and times, alerts regarding timeframes and deadlines, chronological misconduct investigation status, notifications, and dispositions. The tracking system provides estimates of key timeframes for all investigators to ensure that they learn of previous and upcoming investigative milestones. PSB has confirmed that civil notice claims are entered in the tracking system. The IAPro system integrates exceptionally well with the EIS and BlueTeam technology systems and can be remotely accessed.

PSB has a management analyst dedicated to the administration of the centralized tracking system. The documentation that PSB has provided to us for review, and the direct user access that a member of our Team has to the centralized numbering and tracking system, indicates that the system possesses the functionality as required by this Paragraph and is being used according to the requirements of this Paragraph.

During this reporting period, we found that all 87 of the administrative misconduct investigations were properly assigned a unique identifier. All were both initiated and completed after July 20, 2016. Sixty-two involved an external complaint requiring that PSB provide the complainant with

WAI 53470

this unique identifier. In 60 (97%) of the cases, PSB properly sent the initial letter to the complainant within seven days or provided an acceptable explanation for not doing so. In some cases, anonymous complainants do not provide contact information; and in others, known complainants decline to provide MCSO with adequate contact information. PSB has developed a form that identifies the reason why a required notification letter is not sent, and includes this document in the cases they forward for our review. We identified two cases in this reporting period where PSB failed to send the initial letter within seven days and an acceptable reason was not provided. We will discuss these cases with MCSO during our next site visit.

**Paragraph 187.** *The Professional Standards Bureau shall maintain a complete file of all documents within the MCSO's custody and control relating to any investigations and related disciplinary proceedings, including pre-determination hearings, grievance proceedings, and appeals to the Maricopa County Law Enforcement Merit System Council or a state court.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** In compliance

To determine compliance with this Paragraph, we have verified that PSB maintains both hardcopy and electronic files intended to contain all the documents required for compliance with this Paragraph.

During our site visits, a member of our Team inspects the file rooms where hardcopies of investigations are stored and randomly reviewed case files to verify compliance. We have verified that criminal and administrative investigation files are stored in separate rooms, and access to these rooms is restricted. Our Team member has also used the access granted to IAPro to randomly select internal affairs case files to verify that all information is being maintained electronically.

In May 2018, PSB relocated to its new offsite facility. We confirmed at that time that PSB maintained both hardcopy and electronic files intended to contain all documents required for compliance with this Paragraph at the new facility.

During our January 2019 site visit, a member of our Team verified continued compliance at the PSB facility by inspecting both the criminal and administrative investigation file rooms and randomly selecting internal affairs case files to verify that all information was also being electronically maintained in IAPro.

During our October 2019 site visit, a member of our Team verified continued compliance at the PSB facility by inspecting both the criminal and administrative investigation file rooms. We also randomly reviewed both electronic and hard-copy documents to ensure that all information was being maintained as required for compliance with this Paragraph.

WAI 53471

***Paragraph 188.*** *Upon being notified of any allegation of misconduct, the Professional Standards Bureau will make an initial determination of the category of the alleged offense, to be used for the purposes of assigning the administrative investigation to an investigator. After initially categorizing the allegation, the Professional Standards Bureau will promptly assign an internal affairs investigator.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review administrative misconduct investigations and service complaints that were forwarded for our review by MCSO personnel during the reporting period.

We previously concurred with MCSO that Phase 2 compliance with this Paragraph would be based on PSB's determination of the initial allegations, and not which category of offense was determined once the investigation is completed.

During this reporting period, MCSO submitted 87 administrative misconduct investigations for our review. All 87 complied with the requirements of this Paragraph.

MCSO completed and submitted 155 service complaints for our review during this reporting period. Of the 155, 150 (97%) met the requirements established in the service complaint process. This is an increase from 90% during the last reporting period. Sixteen (10%) were appropriately reclassified to administrative misconduct investigations either by the initiating District or Division, or after the complaints were reviewed by PSB. The remaining 139 were classified and handled as service complaints. Of the 139 complaints closed as service complaints, we concurred with PSB's decisions in 134. In two, we believe that misconduct allegations were made and an administrative misconduct investigation should have been conducted. In three others, while we agree they were properly classified as service complaints, they lacked a timely response to the complainant.

As we have consistently noted in our review of service complaints, the majority of these complaints involve laws, policies, or procedures where there is no employee misconduct; or are complaints where it is determined that MCSO employees are not involved. During this reporting period, 82 (59%) of the 139 closed service complaints did not involve allegations of misconduct. Thirty-one (22%) did not involve MCSO employees, 21 (15%) were closed due to lack of specificity, and five (4%) were closed based on a combination of factors.

In numerous discussions during our 2018 site visits, PSB advised us that the number of service complaints far exceeded the Bureau's expectations. PSB also noted that, consistently, 20-25% of the service complaints did not involve MCSO employees. Our reviews of completed service complaints confirmed this assertion, and we agreed to review an expedited process for handling complaints where PSB determined that the complaint did not involve MCSO personnel.

WAI 53472

In July 2019, PSB pursued its proposal to use an expedited process to handle service complaints where it could be immediately determined that the complaint did not involve MCSO personnel. We and the Parties reviewed and approved the process. We had also discussed with PSB concerns we had found in some service complaints that were completed at the District level and forwarded to PSB for review and approval. In some, PSB determined that a service complaint was inappropriate, and a misconduct investigation should be opened. While PSB has done a good job of identifying those service complaints that should be administrative investigations, as is the case with administrative misconduct investigations conducted by District personnel, PSB is again correcting the work of other personnel. To address this concern and ensure accountability, PSB added a signature line to this revised service complaint form. District and Division Command personnel now note their review and approval of service complaints prior to them being forwarded to PSB for a final review.

Consistent with the provisions of the revised policies on internal investigations and discipline, the PSB Commander now has the discretion to determine that internal complaints alleging minor policy violations can be addressed without a formal investigation if certain criteria exist. If the PSB Commander makes this determination, it must be documented.

During the last reporting period, the PSB Commander determined that four internally generated complaints would be addressed without a formal investigation and were eligible for a coaching. We agreed with the decision of the PSB Commander in all four cases.

During this reporting period, the PSB Commander did not determine that any internally generated complaints would be addressed without formal investigation and were eligible for a coaching as allowed in MCSO policy.

Compliance for this Paragraph is based on our findings for administrative misconduct investigations (87), service complaints (155), and coachings (none) combined; and was 97% for this reporting period.

***Paragraph 189.*** *The Professional Standards Bureau shall administratively investigate:*

a. *misconduct allegations of a serious nature, including any allegation that may result in suspension, demotion, or termination; and*

b. *misconduct indicating apparent criminal conduct by an employee.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on July 30, 2020.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on March 4, 2021.

- CP-5 (Truthfulness), most recently amended on September 11, 2020.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph during this reporting period, we reviewed 87 completed administrative misconduct investigations conducted by MCSO personnel.

Division or District personnel outside of PSB investigated 38 of the 87 administrative misconduct investigations submitted for review during this reporting period. PSB investigators conducted 48 of the investigations, and one was investigated by the contract investigator. PSB also submitted three criminal investigations for review. We did not identify any misconduct investigations that were conducted by a District supervisor where we believe that potential additional misconduct discovered during the initial investigation should have resulted in the investigation being forwarded to PSB for completion and was not.

**Paragraph 190.** *Allegations of employee misconduct that are of a minor nature may be administratively investigated by a trained and qualified Supervisor in the employee's District.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed a total of 90 investigations conducted by MCSO personnel and completed during this reporting period. Of these, 87 were administrative investigations, and three were criminal investigations. PSB conducted all three of the criminal investigations.

Of the 87 administrative misconduct cases we reviewed for this Paragraph, PSB investigators conducted 48 and the contract investigator conducted one. Thirty-eight were investigated at the District or Division level. We did not identify any instances where a District or Division supervisor conducted any investigation that should have been conducted by PSB.

MCSO has complied with the requirements to train all supervisors who conduct minor misconduct investigations.

**Paragraph 191.** *If at any point during a misconduct investigation an investigating Supervisor outside of the Professional Standards Bureau believes that the principal may have committed misconduct of a serious or criminal nature, he or she shall immediately notify the Professional Standards Bureau, which shall take over the investigation.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** In compliance

WAI 53474

To determine Phase 2 compliance with this Paragraph, we reviewed 87 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period. Of the 38 administrative misconduct cases investigated at the District or Division level, we did not identify any cases where we believe that potential serious misconduct was discovered by the investigating supervisor and the supervisor failed to forward the case to PSB.

**Paragraph 192.** *The Professional Standards Bureau shall review, at least semi-annually, all investigations assigned outside the Bureau to determine, among the other matters set forth in ¶ 251 below, whether the investigation is properly categorized, whether the investigation is being properly conducted, and whether appropriate findings have been reached.*

**Phase 1:** In compliance

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

PSB command personnel advised us that they continue to review investigations in "real time" as they come into the Bureau. During this reporting period, MCSO provided copies of PSB's reviews of 39 completed Division-level misconduct investigations that were assigned outside of the Bureau. The review template used by PSB includes sections that address whether or not the investigation is properly categorized, whether the investigation is properly conducted, and whether appropriate findings have been reached. Additionally, copies of emails detailing the quality of the investigation, identified deficiencies, and required edits sent electronically to affected Division Commanders were provided for each case reviewed.

PSB included the information required by this Paragraph in its semi-annual public Misconduct Investigations Report, which is required under Paragraph 251. The most recent report was published on MCSO's website in January 2021. The report covers the period of January 1-June 30, 2020; and contains an analysis as to whether cases assigned outside of PSB were properly categorized, whether the investigations were properly conducted, and whether appropriate findings have been reached. During that review period, there were 44 investigations reviewed. Out of the 44 investigations reviewed, four cases were returned due to the conclusions not being supported by the evidence, and two cases were returned for corrective investigations. There were six cases returned to the assigned investigator for report edits, and one was returned for formatting and minor corrections. The remaining 31 cases did not require any revisions.

MCSO remains in compliance with this Paragraph.

**Paragraph 193.** *When a single act of alleged misconduct would constitute multiple separate policy violations, all applicable policy violations shall be charged, but the most serious policy violation shall be used for determining the category of the offense. Exoneration on the most serious offense does not preclude discipline as to less serious offenses stemming from the same misconduct.*

**Phase 1:** In compliance

WAI 53475

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 87 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period. Thirty-three had sustained allegations against one or more employees. In 29 of these 33 investigations, at least one principal employee was still an MCSO employee at the time the investigation was completed or discipline decisions were made. In all 29, the most serious policy violation was used to determine the final category of the offense for discipline purposes, if more than one policy violation was sustained.

In cases where multiple violations of policy occurred, this information was listed on the preliminary discipline document. There were no cases where the exoneration of any offense precluded discipline for any sustained allegations.

**Paragraph 194.** *The Commander of the Professional Standards Bureau shall ensure that investigations comply with MCSO policy and all requirements of this Order, including those related to training, investigators' disciplinary backgrounds, and conflicts of interest.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on July 30, 2020.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on March 4, 2021.

- CP-5 (Truthfulness), most recently amended on September 11, 2020.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- GC-16 (Employee Grievance Procedures), most recently amended on April 7, 2020.

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** Not in compliance

WAI 53476

We determine Phase 2 compliance with this Paragraph by a review of completed misconduct investigations conducted by MCSO personnel, the review of attendance by internal investigators at required Misconduct Investigative Training, the disciplinary backgrounds of internal investigators, and the efforts being made by the PSB Commander to reach compliance.

We reviewed 87 administrative misconduct investigations and three criminal investigations submitted by MCSO during this reporting period. All three of the criminal investigations complied with MCSO policy and the requirements of the Second Order.

Administrative investigations are required to be completed within 60 days if completed outside of PSB and within 85 days if completed by PSB personnel. Of the 87 total investigations reviewed for this reporting period, 44 (51%) were completed within the required timeframes or contained a reasonable extension request that was specific to the investigation, the same percentage as the last reporting period. The remaining investigations identified general justifications including supervisory responsibilities, workload, prioritization of investigations, training, sitting second chair in investigations, and others. Additional investigations, while completed by the investigator within the required timeframe, were not reviewed and finalized within 180 days. These cases also cited an excessive workload as one of the primary reasons for the lengthy review times. This is a serious issue that continues to worsen quarter after quarter, now resulting in the closure of investigations taking an average of 524 days – an increase from 509 days during the last reporting period. As we noted during the last reporting period, we can no longer accept extensions that do not contain reasonable justifications specific to each investigation.

Of the 87 administrative misconduct cases we reviewed, PSB personnel completed 48. Eight investigations were conducted by sworn investigators. We found no investigative deficiencies in these cases. In one of the 35 investigations conducted by Detention personnel, we believe sustained findings should have been made and were not. In a second, we believe the investigator failed to identify all the principals in the investigation. Had he done so, additional sustained violations might have resulted. One additional investigation was conducted by the contract investigator, and had no investigative deficiencies. With the inclusion of those investigations that were found noncompliant based on our review of extension requests, the overall compliance for the 49 investigations conducted by PSB was 18%.

Districts or Divisions outside of PSB conducted 35 investigations. Fifteen were noncompliant due to improper findings, leading questions, or a combination of investigative and multiple administrative deficiencies. With the inclusion of those investigations found not compliant due to the lack of appropriate extensions, the overall compliance for investigations conducted outside of PSB was 20% for this reporting period.

As a result of both investigative deficiencies and administrative deficiencies, including those related to extension compliance, overall compliance for all administrative investigations conducted by MCSO was 22% for this reporting period, a slight decrease from 24% the last reporting period.

There are many factors that impact the PSB Commander's ability to ensure compliance in all cases. One factor is that the PSB Commander must rely on other PSB staff members to conduct case reviews and ensure proper documentation is completed. We continue to find that, in most

WAI 53477

cases, PSB personnel are identifying and ensuring that corrections are made and all documentation is completed in those cases they review. In some cases, deficiencies cannot be corrected after the fact.

Another factor affecting the PSB Commander's ability to ensure that all investigations are properly completed is that the Appointing Authority – not the PSB Commander – determines the final findings and discipline. During this reporting period, there were no instances where the Appointing Authority overturned a finding made by the PSB Commander.

Of continued concern, and a significant factor in the inability of the PSB Commander to ensure investigations are properly completed, has been the ongoing lack of investigative compliance for those investigations conducted and reviewed by District and Division personnel outside of PSB. While PSB is still identifying the majority of deficiencies in the District and Division cases, for the second reporting period, we noted an increased amount of attention focused on these investigations by both Command and Executive staff, to include Deputy Chiefs now reviewing investigations conducted and reviewed by their personnel. We are hopeful that this increased oversight will result in continuing improvement.

While PSB continues to experience challenges in ensuring that completed internal investigations are reaching compliance with both MCSO policy and both Court Orders, the Bureau has made efforts to improve compliance. A member of our Team continues to meet with PSB every two weeks to discuss Class Remedial Matters. We also use this opportunity to discuss other ongoing concerns that affect compliance with the Second Order. The ability to discuss investigative or administrative concerns during these meetings continues to result in concerns being immediately addressed; and in some cases, results in necessary actions being taken to resolve those issues that have been identified.

During our site visits, we have continued to meet with PSB personnel and District and Division command personnel to update them on our identification of training and performance issues that adversely affect compliance with the Second Order. Since January 2017, Detention personnel assigned to PSB to oversee investigations have also participated in these meetings. We have used these meetings to discuss concerns with the quality of investigations; opportunities for improvement; and in some cases, investigative protocols.

PSB has taken a number of actions to address both investigative deficiencies, and other concerns with the completion of administrative misconduct investigations that have been identified. Additional oversight was added for Detention investigations; PSB personnel were assigned as liaisons with District personnel; a service complaint process was developed and approved; revisions to witness and complaint interview processes were proposed and approved; a new protocol for the handling of service complaints not involving MCSO personnel was proposed and approved; and the PSB Commander was given the authority to resolve some minor internally generated complaints without the necessity to conduct an administrative misconduct investigation.

WAI 53478

In addition to those actions that have been approved to address continuing backlogs and other challenges with administrative misconduct investigations, we have had ongoing discussions with PSB and the Parties during our site visits regarding other potential opportunities to address these challenges. These discussions have included many suggestions and potential modifications to existing protocols, including such changes as: expanding the use of the service complaint process; using alternative types of administrative closures; discontinuing investigations of former employees if the conduct was not criminal in nature, would not affect law enforcement certification, and did not involve current MCSO employees; discretion for the investigation of minor policy violations that occurred more than three years prior to the complaint being filed; implementing an expedited discipline process for sustained cases; and increasing investigative time requirements.

In September 2019, we met with the Executive Chief who has oversight over PSB to discuss ongoing challenges with the completion of misconduct investigations. It was a productive meeting, with good discussion about potential ideas to resolve this ongoing issue. Some of the discussion included topics already discussed with our Team and the Parties, and others were new. The Executive Chief committed to developing a list of the ideas shared, along with more detailed information about how each idea might be implemented. The intent was to then share this information with our Team and the Parties. The Executive Chief informed us that due to other priorities, this information would not be ready for discussion until our January 2020 site visit.

During our October 2019 site visit, we met with PSB and the Parties to discuss the ongoing issues with the completion of misconduct investigations. We briefly discussed some potential remedies, and then tabled the discussion until our January 2020 site visit when MCSO would be prepared to provide more detailed information on any proposals the agency wished to bring forward.

During our January 2020 site visit, PSB provided a document containing the Bureau's ideas and recommendations regarding the investigation of alleged employee misconduct. After some discussion, our Team offered to facilitate discussions with MCSO, Plaintiffs, and Plaintiff-Intervenors, to discuss the topics brought forward by MCSO; and any additional ideas that might be brought forward by any other member of the group. We advised all that we would discuss only those items that did not require a change to the Orders. We facilitated this conference call with MCSO and the Parties in February 2020. During this call, MCSO personnel stated that they believed that all of the ideas and recommendations they had brought forward would require a change to the Orders and they had no additional suggestions to add. The representatives of the Plaintiffs and Plaintiff-Intervenors agreed with MCSO and added that they also had no additional suggestions or ideas to bring forward. This has since remained a topic for the Parties to discuss in a meet-and-confer process.

In 2014, PSB initiated 717 internal investigations. In 2015, PSB initiated 916 cases; and in 2016, 847 cases. There were 1,028 cases initiated in 2017. In 2018, there were 1,114 investigations initiated; 354 service complaints; 716 administrative misconduct investigations; 36 criminal investigations; and eight critical incident investigations. In 2019, PSB initiated a total of 1,072 investigations.

WAI 53479

During our January 2021 remote site visit, PSB personnel reported they had opened a total of 1,204 investigations in 2020, compared to 1,072 opened in 2019. The total number includes administrative misconduct investigations, service complaints, criminal misconduct investigations, and critical incident investigations – though the majority are administrative misconduct and service complaints. Of the total cases opened in 2020, 704 were administrative misconduct investigations, compared to 576 in 2019. Service complaints opened for 2020 totaled 452, compared to 453 in 2019.

In 2016, prior to the implementation of the Court's Second Order, PSB investigators were carrying an average active caseload of 12-16 cases each month. By 2018, PSB advised us that the average active caseload each month for sworn investigations was 36; and for Detention investigators, 28. The average closure of a case took 204 days. At the end of 2019, PSB advised us that the average monthly caseloads for all investigators assigned to PSB had risen to 46, there were 1,682 open cases, and the average closure time for an investigation was 499 days in PSB and 444 days for those investigations conducted outside of PSB. PSB investigators closed an average of 16 cases each during 2019.

During our January 2021 remote site visit, PSB advised that at the end of 2020, the average active caseload in PSB had increased to 61 for Detention investigators, 75 for sworn investigators, and 47 for civilian investigators. The average closure time for an administrative misconduct investigation conducted in PSB increased to 624 days for sworn cases and 666 days for Detention cases. The average completion time for an investigation conducted outside of PSB was 398 days. The overall average completion time for an investigation in 2020 increased to 524 days. Investigators assigned to PSB closed an average of 17 cases each during 2020.

At the end of 2020, there were 2,010 pending investigations – an increase from 1,617 at the end of 2019. While the total includes administrative misconduct investigations, service complaints, criminal investigations, and critical incident investigations, the majority are administrative misconduct investigations and service complaints. Of the pending 1,681 administrative misconduct investigations, 1,561 are assigned to PSB. Of the 266 pending service complaints, 179 are assigned to PSB. All 17 of the pending criminal investigations, and all 46 of the pending critical incident investigations are assigned to PSB. In total, 1,803 of the pending 2,010 investigations are being investigated by PSB. MCSO closed a total of 995 investigations in 2020, compared to 727 in 2019. We noted, however, that the increase in closures in 2020 is primarily a result of an increase in service complaint closures, not administrative misconduct investigations.

Though PSB was authorized 11 new positions in the July 2018 budget, during this reporting period, PSB continued to advise that only one of these positions, a Detention supervisor, has been filled and the funding for a lieutenant was eliminated and the funds transferred to other purposes in PSB. There is still no indication when or if any of the additional positions will be filled. PSB also advised that no new positions were requested by the Bureau for the fiscal year that commenced on July 1, 2020. Of the civilian positions authorized in the 2019 budget, PSB advised us during our October 2020 remote site visit that all of the positions have been filled. All three of the civilian investigators hired, one, a former Detention sergeant, are now handling investigations. The administrative personnel continue to assist sworn and Detention investigators in PSB by doing much of the research, document preparation, and tracking on open cases. One

WAI 53480

of the administrative assistants is assigned to assist those PSB supervisors who are assigned to liaison functions with Districts and Divisions. PSB personnel continue to believe that the addition of the civilian staff will relieve a significant amount of the administrative workload and case management currently being handled by investigators, allowing them to focus more time on investigative tasks.

Beyond the addition of administrative staff, PSB has also modified its review process for submitted cases, eliminating some levels of review. PSB believes this will result in more timely reviews, without adversely impacting the quality of the final report. We agree with their decision and are also hopeful this will not adversely impact investigative quality.

While we continue to agree with PSB that the administrative staff and civilian investigators hired may relieve some of the burden from investigators, and that a reduction in levels of review may result in shorter time periods, the backlog of cases and individual investigator caseloads will not be appreciably relieved by either of these.

In July 2018, we discussed the investigation of the 1,459 identifications that had been impounded at the MCSO Property Room and then checked out by an MCSO sergeant. This investigation was initiated in 2015 but then stalled due to other, more immediate priorities for investigations. Of the 1,459 total identifications, 596 were believed to belong to members of the Plaintiffs' class.

Beginning in July 2018, we discussed the status of the 1,459 IDs investigation during each site visit. During the last reporting period, the Parties finalized their agreement regarding these identifications; and this investigation was concluded.

During our past site visits, PSB staff have continued to communicate that they are properly outsourcing those cases where conflicts of interest exist. PSB has contracted with a qualified private vendor to conduct these investigations. Additionally, PSB has outsourced investigations to other law enforcement entities. During our January 2021 remote site visit, PSB personnel advised us that they are considering retaining additional outside contract investigators, but to date, they have not identified any who meet the hiring criteria. PSB is also considering outsourcing additional investigations to the current contract investigator if he has the staff to accept additional investigations.

During this reporting period, we reviewed one investigation completed by the current contract investigator retained by MCSO. No additional investigations were outsourced to this investigator during this reporting period, and he currently has 22 investigations in progress. One case, outsourced to an outside law enforcement agency, also remains in progress.

After the Second Order was implemented, PSB reviewed the disciplinary backgrounds of all those who might conduct internal investigations and notified us of those supervisors who would be prohibited from conducting such investigations due to their backgrounds. At that time, MCSO identified two supervisors who were ineligible to conduct internal investigations. One is no longer with MCSO and the second remains ineligible to conduct investigations. Since that time, four additional supervisors were added to the list of those ineligible to conduct administrative misconduct investigations.

WAI 53481

MCSO reported during this reporting period that no additional supervisors were determined to be ineligible to conduct administrative misconduct investigations.

**Paragraph 195.** *Within six months of the entry of this Order, the Professional Standards Bureau shall include sufficient trained personnel to fulfill the requirements of this Order.*

**Phase 1:** In compliance

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** Not in compliance

In conjunction with this Paragraph, Paragraph 178 mandates that within three months of the finalization of policies consistent with Paragraph 165, all PSB personnel would receive 40 hours of comprehensive training. Paragraph 178 requires training of all supervisors within three months of the finalization of policies, and further requires sufficient trained personnel in PSB within six months of the entry of the Order. The first week of the required Misconduct Investigative Training commenced on September 18, 2017 and the training was completed prior to the end of 2017.

During our July and October 2018 site visits, PSB informed us that a total of 11 additional personnel had been approved for PSB in MCSO's July 2018 budget. PSB personnel informed us that due to ongoing staffing shortages they did not believe any of these positions would be filled before 2019.

During our January and April 2019 site visits, PSB personnel informed us that they had not yet received any of the 2018 budgeted positions for PSB. They further noted that it continued to remain unlikely that they would receive any of the positions in the foreseeable future due to ongoing personnel staffing shortages throughout the organization. PSB continued to note that with the continuing influx of new cases, and the ongoing backlog of investigations, even if these personnel were added, the Bureau would still be insufficiently staffed to meet its responsibilities. The PSB budget requests for the July 2019 budget year included only civilian staff. PSB's requests included: two administrative assistants, two management analyst assistants, one special projects manager, and three civilian investigators. PSB personnel believed that the addition of these positions would allow sworn and Detention supervisors to focus more on the investigative process and mitigate some of the administrative requirements currently being handled by these personnel.

During our July 2019 site visit, PSB advised that of the 11 approved positions in the July 2018 budget, one had been filled – that of a Detention sergeant. It was still unknown when any of the remaining 10 positions would be filled.

During our October 2019 site visit, PSB informed us that of the previously approved 11 positions in July 2018, there had still only been one filled. Of the civilian positions approved in the July 2019 budget, one management analyst position had been filled; interviews were in progress for management assistants; and the three civilian investigator positions were in the job-posting phase.

WAI 53482

During our January 2020 site visit, PSB advised us again that only one of the 11 approved positions for PSB in the 2018 budget had been filled. Of the eight civilian positions approved in the 2019 budget, one management assistant position had been filled, other administrative positions were in the hiring process, and job offers had been extended to fill the three civilian investigator positions. PSB believed that, given the law enforcement and investigative experience of the three civilian investigators the Bureau had selected, these investigators should not need extensive training, and would likely be qualified to conduct a variety of investigations.

During our April 2020 remote site visit, PSB again advised us that only one of the 11 positions approved in the 2018 budget had been filled. PSB had not increased its investigative staff in more than four years, despite the continuing increase in investigator caseloads and backlogs. PSB filled the majority of the civilian positions authorized in the 2019 budget, and began assigning administrative staff to complete a variety of tasks previously completed by investigators. PSB also hired the three civilian investigators – two of whom still needed to attend the 40-hour Misconduct Investigative Training before they would be eligible to conduct investigations.

During our July and October 2020 remote site visits, PSB again advised us that only one of the 11 positions approved in the 2018 budget had been filled. All of the civilian positions authorized in the 2019 budget had been filled, and the three civilian investigators hired were now conducting investigations. No additional requests for PSB staffing were made for the 2020 fiscal year.

During our January 2021 remote site visit, we discussed PSB staffing and determined that again, no additional staff has been allocated to PSB. There has been no measurable change in the number of investigators assigned to PSB since 2016, despite the continuous increase in workload and backlog. The number of investigators assigned to PSB has remained between 24 and 26 since 2016. At the end of 2019, PSB had nine sworn investigators and 15 Detention investigators, a total of 24. At the end of 2020, PSB had a total of 25 investigators. Of these, seven are sworn, 15 Detention, and three are civilian investigators. It is clear from the backlog of more than 2,000 cases, an average caseload per investigator that is in excess of 50 cases, and a continuing influx of new cases, that MCSO continues to fail to address the insufficient resources assigned to PSB.

The Second Order requires that PSB have "sufficient trained personnel to fulfill the requirements of this Order." MCSO has delivered the required Misconduct Investigative Training, and our focus remains on the ability of PSB staff to carry out its mission. As documented in this and previous reports, PSB, in its command's estimation, is understaffed. We will not find MCSO in compliance with this Paragraph until MCSO addresses PSB's staffing issues.

*Paragraph 196. Where appropriate to ensure the fact and appearance of impartiality, the Commander of the Professional Standards Bureau or the Chief Deputy may refer administrative misconduct investigations to another law enforcement agency or may retain a qualified outside investigator to conduct the investigation. Any outside investigator retained by the MCSO must possess the requisite background and level of experience of Internal Affairs investigators and must be free of any actual or perceived conflicts of interest.*

**Phase 1:** In compliance

WAI 53483

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

During our April 2017 site visit, the PSB Commander indicated that MCSO had not envisioned any need to retain additional contract investigators beyond the one investigator that had been already retained. A member of PSB's staff serves as MCSO's single point-of-contact to liaise and assist with scheduling for the contract investigator. The contract investigator will advance the investigations to the level of recommending findings.

PSB previously outsourced three misconduct investigations to a separate regional law enforcement agency. Two of these investigations were completed by the outside law enforcement agency and closed by MCSO. One was closed as the Independent Investigator was investigating the same alleged misconduct.

During this reporting period, PSB advised us that no additional cases were outsourced to the contract investigator retained by MCSO. One investigation, conducted by the contract investigator was completed and reviewed during this reporting period. This investigator has 22 cases in progress.

During our January 2021 remote site visit, PSB advised us that they could outsource additional investigations to the current contract investigator if he had additional staff. MCSO is discussing this possibility with the investigator. Additionally, they have issued Requests for Proposals (RFPs) in an attempt to identify additional contract investigators, but have not been able to identify any who meet the criteria for hiring.

*Paragraph 197. The Professional Standards Bureau will be headed by a qualified Commander. The Commander of the Professional Standards Bureau will have ultimate authority within the MCSO for reaching the findings of investigations and preliminarily determining any discipline to be imposed. If the Sheriff declines to designate a qualified Commander of the Professional Standards Bureau, the Court will designate a qualified candidate, which may be a Civilian Director in lieu of a sworn officer.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.
- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

WAI 53484

In January 2018, MCSO advised that due to reorganizations within the Office, the responsibility to serve as the PSB Commander for purposes of compliance with this Order would be transferred to a captain within PSB. The PSB Deputy Chief, who previously had this responsibility was promoted, but maintains overall oversight of PSB as an Executive Chief.

During our January 2021 remote site visit, and our regularly scheduled meetings with PSB to discuss CRMs and other internal affairs matters during this reporting period, we have had continuing opportunities to interact with the captain now serving as the PSB Commander. He is an experienced PSB investigator and is cognizant of the many requirements and responsibilities of his new position. He continues to be responsive to our input, and we have had a number of productive discussions with him regarding PSB processes and internal investigations. In those cases where we have expressed concerns or requested information, he has generally provided timely responses. We continue to note that MCSO must support the PSB Commander with resources and executive leadership.


***Paragraph 198.*** *To promote independence and the confidentiality of investigations, the Professional Standards Bureau shall be physically located in a facility that is separate from other MCSO facilities, such as a professional office building or commercial retail space. This facility shall be easily accessible to the public, present a non-intimidating atmosphere, and have sufficient space and personnel for receiving members of the public and for permitting them to file complaints.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

In May 2018, PSB moved into the first and second floors of 101 West Jefferson Street. PSB's address is available on the comment and complaint form that is accessible to the public at the Districts and on MCSO's website. PSB's criminal investigators are housed on the first floor, and administrative investigators are housed on the second floor of the building. PSB's off-site facility has two dedicated security personnel assigned during normal business hours of 8:00 a.m.-4:00 p.m., Monday-Friday. MCSO remains in compliance with this requirement.

Maricopa County had previously advised MCSO that its lease for the PSB site was expired and that MCSO would have to vacate the site. MCSO stated that the lease requires that the County provide MCSO with a one-year advance written notification of the requirement to vacate the current PSB facility. As of this reporting period, MCSO has not received written notification from the County regarding the requirement to vacate the current PSB site.

WAI 53485

*Paragraph 199.* *The MCSO will ensure that the qualifications for service as an internal affairs investigator shall be clearly defined and that anyone tasked with investigating employee misconduct possesses excellent investigative skills, a reputation for integrity, the ability to write clear reports, and the ability to be fair and objective in determining whether an employee committed misconduct. Employees with a history of multiple sustained misconduct allegations, or one sustained allegation of a Category 6 or Category 7 offense from MCSO's disciplinary matrices, will be presumptively ineligible to conduct misconduct investigations. Employees with a history of conducting deficient investigations will also be presumptively ineligible for these duties.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

GH-2 reflects the directive of this Paragraph, to ensure that only supervisors who meet the criteria established by this Paragraph are assigned misconduct investigations. The PSB Operations Manual, which formalizes the review process, states that if any supervisor is deemed ineligible, the PSB commander will notify the supervisor's commander in writing, and will ensure that a BlueTeam entry is made to memorialize the supervisor's ineligibility to conduct misconduct investigations. A record of supervisors deemed ineligible to conduct misconduct investigations is maintained in PSB. These procedures were finalized and documented in the PSB Operations Manual, published on December 13, 2018.

During this reporting period, MCSO reported no new additions to the list of employees prohibited from conducting misconduct investigations. MCSO currently has five supervisors who are ineligible to conduct internal administrative investigations. During the fourth quarter of 2020, there were no employees transferred into PSB.


*Paragraph 200.* *In each misconduct investigation, investigators shall:*

a. *conduct investigations in a rigorous and impartial manner designed to determine the facts;*

b. *approach investigations without prejudging the facts and without permitting any preconceived impression of the principal or any witness to cloud the investigation;*

c. *identify, collect, and consider all relevant circumstantial, direct, and physical evidence, including any audio or video recordings;*

d. *make reasonable attempts to locate and interview all witnesses, including civilian witnesses;*

e. *make reasonable attempts to interview any civilian complainant in person;*

f. *audio and video record all interviews;*

WAI 53486

g.   *when conducting interviews, avoid asking leading questions and questions that may suggest justifications for the alleged misconduct;*

h.   *make credibility determinations, as appropriate; and*

i.   *attempt to resolve material inconsistencies between employee, complainant, and witness statements.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 87 administrative misconduct investigations that were completed by MCSO personnel during this reporting period.  All were both initiated and completed after the issuance of the Second Order.  PSB investigated 48 of the total cases, and the contract investigator investigated one.  District or Division supervisory personnel not assigned to PSB investigated 38 of the cases.  Of the cases we reviewed, 52 involved external complaints, and 25 were internally generated.

Paragraph 200.a. requires that misconduct investigations be conducted in a rigorous and impartial manner.  During the last reporting period, one investigation (1%) fell short of compliance with the requirements of this Subparagraph.  During this reporting period, four investigations (5%) fell short of compliance with this Subparagraph.

Paragraph 200.b. requires that investigations be approached without prejudging the facts or permitting preconceived impressions.  During the last reporting period, one investigation (1%) fell short of compliance with this Subparagraph.  During this reporting period, four investigations (5%) fell short of compliance with this Subparagraph.

Paragraph 200.c. requires that investigators identify, collect, and consider all relevant evidence.  During the last reporting period, six investigation (4%) fell short of compliance with this Subparagraph.  During this reporting period, all investigations reviewed complied with the requirements of this Subparagraph.

Paragraph 200.d. requires that investigators make reasonable attempts to locate and interview all witnesses.  During the last reporting period, two investigation (1%) fell short of compliance with the requirements of this Subparagraph.  During this reporting period, two investigations (2%) again fell short of compliance with this Subparagraph.

Paragraph 200.e. requires that investigators make reasonable attempts to interview civilian complainants in person.  During the last reporting period, two investigations (1%) fell short of compliance with this Subparagraph.

During this reporting period, there were numerous investigations in which investigators did not make attempts to interview complainants in person.  All were attributed to concerns related to COVID-19, and the investigators provided specific documentation justifying phone interviews.

WAI 53487

Paragraph 200.f. requires audio- and video-recording of all interviews. Of the 87 administrative investigations reviewed for this reporting period, there were 21 cases where interviews were not both audio- and video-recorded. In all 21, adequate justification was provided.

Paragraph 200.g. requires that when conducting interviews, investigators avoid asking leading questions or questions that may suggest justification for the alleged misconduct. During the last reporting period, five investigations (3%) fell short of compliance with this Subparagraph. During this reporting period, five investigations (6%) again fell short of compliance with this Subparagraph. MCSO is not in compliance with this Subparagraph.

Paragraph 200.h. requires that proper credibility determinations be made. During the last reporting period, all investigations complied with the requirements of this Subparagraph. During this reporting period, one investigation (1%) fell short of compliance with this Subparagraph.

Paragraph 200.i. requires that investigators attempt to resolve all material inconsistencies. During this and the last reporting period, all of the investigations reviewed complied with the requirements of this Subparagraph.

MCSO had been in compliance with the requirements of this Paragraph for numerous reporting periods. However, MCSO fell below the required Phase 2 compliance for this reporting period. Should MCSO fail to comply with the requirements of this Paragraph in the next reporting period, we will withdraw Phase 2 compliance.


***Paragraph 201.*** *There will be no automatic preference for an employee's statement over a non-employee's statement. Internal affairs investigators will not disregard a witness's statement solely because the witness has some connection to either the complainant or the employee or because the witness or complainant has a criminal history, but may consider the witness's criminal history or any adjudicated findings of untruthfulness in evaluating that witness's statement. In conducting the investigation, internal affairs investigators may take into account the record of any witness, complainant, or officer who has been determined to have been deceptive or untruthful in any legal proceeding, misconduct investigation, or other investigation.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 87 administrative misconduct investigations conducted by MCSO personnel that were completed during this reporting period.

Of the 87 completed administrative misconduct investigations, 62 involved complainants that were not identified as MCSO employees. Twenty-three of the 87 investigations also included interviews with witnesses or investigative leads who were not MCSO employees. We identified one case where we believe there was an automatic preference for the statement of an employee over a non-employee's statement.

WAI 53488

We did not identify any completed investigations where a witness's statement was disregarded solely because of any connection identified in this Paragraph, nor where a witness's criminal history or findings of truthfulness were considered.

**Paragraph 202.**  *Internal affairs investigators will investigate any evidence of potential misconduct uncovered during the course of the investigation, regardless of whether the potential misconduct was part of the original allegation.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 87 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.  In eight of the 87 investigations, MCSO identified additional potential misconduct during the course of the investigations and properly added additional allegations or initiated new investigations. We identified one investigation during this reporting period where we believe additional misconduct may have occurred and was not addressed by MCSO.

**Paragraph 203.**  *If the person involved in the encounter with the MCSO pleads guilty or is found guilty of an offense, internal affairs investigators will not consider that information alone to be determinative of whether an MCSO employee engaged in misconduct, nor will it by itself justify discontinuing the investigation.  MCSO training materials and policies on internal investigations will acknowledge explicitly that the fact of a criminal conviction related to the administrative investigation is not determinative of whether an MCSO employee engaged in misconduct and that the mission of an internal affairs investigator is to determine whether any misconduct occurred.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

There were no indications in any of the completed investigations we reviewed that any MCSO investigators considered alone any pleading or finding of guilty by any person as a reason to make any determination regarding the potential misconduct of any MCSO personnel, nor were any investigations discontinued for this reason.

WAI 53489

**Paragraph 204.** *Internal affairs investigators will complete their administrative investigations within 85 calendar days of the initiation of the investigation (60 calendar days if within a Division). Any request for an extension of time must be approved in writing by the Commander of the Professional Standards Bureau. Reasonable requests for extensions of time may be granted.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** Not in compliance

To determine Phase 2 compliance with this Paragraph, we review administrative misconduct investigations conducted by MCSO personnel.

PSB conducted 49 of the 87 administrative misconduct investigations we reviewed for this reporting period. Nineteen (39%) of the 49 were completed within the required 85-day timeframe or had an approved extension for a reason specific to the investigation, an increase from 33% the last quarter. Of the 38 investigations completed by Districts and Divisions outside of PSB, 26 (68%) were initially submitted to PSB within the required 60-day timeframe or had an approved extension for a reason specific to the investigation, a decrease from the 78% the last quarter. As has been our practice for numerous reporting periods, we determine the 60-day time period compliance findings for those investigations conducted by personnel outside of PSB based on the original date the investigation is approved by the District or Division Commander and forwarded to PSB. In those cases where deficiencies are identified by PSB, the cases will continue to be found noncompliant in other relevant Paragraphs, and specifically in Paragraph 213, which requires the District or Division Commander ensure that investigations conducted by their personnel are complete and the findings are supported by the evidence prior to their submittal to PSB.

As we noted in Paragraph 194, timely completion of administrative investigations has continued to be of concern for many reporting periods. Of the 87 total administrative misconduct investigations submitted for compliance during this reporting period, 45 (52%) investigations were completed and submitted by the investigator within the required 60- or 85-day timeframe or contained an acceptable extension request and approval. This is a slight increase from the 51% compliance for the last quarter.

In addition to those investigations not completed within 60 or 85 days as required by this Paragraph, of the 87 total investigations, 31 (36%) were completed within 180 days or had a reasonable extension request and approval, an increase from 29% the last quarter.

The average time for full closure of administrative investigations is now reported by MCSO to be 524 days, an increase from the 509 days reported for the last reporting period. As we have noted in our last two quarterly status reports, we can no longer accept workload as the justification for the failure to complete investigations in a timely manner. The time it takes to conduct and close investigations remains unacceptable and it is the agency that bears the responsibility to address this issue with decisive action.

MCSO is not in Phase 2 compliance for this Paragraph.

WAI 53490

***Paragraph 205.*** *The Professional Standards Bureau shall maintain a database to track all ongoing misconduct cases, and shall generate alerts to the responsible investigator and his or her Supervisor and the Commander of the Professional Standards Bureau when deadlines are not met.*

**Phase 1:** In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 7, 2020.

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

- GH-5 (Early Identification System), most recently amended on March 3, 2021.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

We determine compliance with this Paragraph by assigning a member of our Team to observe demonstrations of the IAPro database during our site visits or other meetings with PSB throughout the reporting period. The IAPro technology serves as the centralized electronic numbering and tracking system for all allegations of misconduct, whether internally discovered or based on an external complaint. This database contains the capacity to manage and store information required for compliance with this Paragraph.

During our site visits, we have met with PSB personnel on numerous occasions and observed IAPro to ensure that the system generates appropriate alerts to responsible investigators and PSB commanders if deadlines are not met. We have reviewed emails PSB disseminates each month to Districts and Divisions to identify investigative deadlines. We have also reviewed the BlueTeam Dashboard, which uses a color-coded system to identify investigations that are nearing deadlines or are past deadlines. The information appears in each supervisor's BlueTeam account when they are monitoring open cases.

The civilian PSB Special Projects Manager is primarily responsible for administering the centralized tracking system. In addition, all PSB and Division investigators can access the electronic BlueTeam database – a system that integrates with IAPro – at any time to view the assignment and status of administrative investigations. PSB has also trained two lieutenants to administer the system.

In May 2018, PSB relocated to an offsite location. In July 2018, a member of our Team verified that the existing tracking mechanisms continue to be used for the tracking of investigations at the new facility.

During our January, July, and October 2019 site visits, a member of our Team verified that the tracking mechanisms remain in place. We also continued to receive monthly notifications from PSB regarding closed administrative investigations, and we evaluate these closed investigations for the entirety of a reporting period against a multitude of criteria, including whether the cases were completed in a timely fashion.

WAI 53491

During this reporting period, we continued to receive monthly notifications from PSB regarding closed administrative misconduct investigations; and we continue to evaluate these closed investigations for the entirety of a reporting period against a multitude of criteria, including whether the cases were completed in a timely fashion. (See Paragraph 204.)

**Paragraph 206.** *At the conclusion of each investigation, internal affairs investigators will prepare an investigation report. The report will include:*

a.   *a narrative description of the incident;*

b.   *documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the incident. In situations in which there are no known witnesses, the report will specifically state this fact. In situations in which witnesses were present but circumstances prevented the internal affairs investigator from determining the identification, phone number, or address of those witnesses, the report will state the reasons why. The report will also include all available identifying information for anyone who refuses to provide a statement;*

c.   *documentation of whether employees were interviewed, and a transcript or recording of those interviews;*

d.   *the names of all other MCSO employees who witnessed the incident;*

e.   *the internal affairs investigator's evaluation of the incident, based on his or her review of the evidence gathered, including a determination of whether the employee's actions appear to be within MCSO policy, procedure, regulations, orders, or other standards of conduct required of MCSO employees;*

f.   *in cases where the MCSO asserts that material inconsistencies were resolved, explicit credibility findings, including a precise description of the evidence that supports or detracts from the person's credibility;*

g.   *in cases where material inconsistencies must be resolved between complainant, employee, and witness statements, explicit resolution of the inconsistencies, including a precise description of the evidence relied upon to resolve the inconsistencies;*

h.   *an assessment of the incident for policy, training, tactical, or equipment concerns, including any recommendations for how those concerns will be addressed;*

i.   *if a weapon was used, documentation that the employee's certification and training for the weapon were current; and*

j.   *documentation of recommendations for initiation of the disciplinary process; and*

k.   *in the instance of an externally generated complaint, documentation of all contacts and updates with the complainant.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

WAI 53492

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 87 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

Paragraph 206.a. requires a written description on the incident be included in the investigative report. All of the completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.b. requires documentation of evidence gathered, including all known information about witnesses. All of the completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.c. requires documentation of whether employees were interviewed, and a transcript or recording of these interviews. All of the completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.d. requires that the names of all MCSO employees who witnessed the incident be included in the report. All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.e. requires that the internal affairs investigator's evaluation of the incident includes a determination of whether the employee's actions appear to be within MCSO policy, procedure, regulations, orders, or other standards of conduct required of MCSO employees. All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.f. requires that when MCSO asserts that material inconsistencies were resolved, explicit credibility findings, including a precise description of the evidence that supports or detracts from the person's credibility must be provided. All but one of the completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.g. requires that when material inconsistencies must be resolved, a precise description of the evidence be included in the report. All but one of the completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.h. requires that assessment of the incident for policy, training, tactical, or equipment concerns be included in the investigative report, to include any recommendations. During this reporting period, all of the completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.i. requires that if a weapon was used, documentation that the employee's certification and training for the weapon must be included in the investigative written report. All of the completed investigations that we reviewed complied with the requirements of this Subparagraph.

WAI 53493

Paragraph 206.j. requires that documentation of the initiation of the disciplinary process be included in the investigation. Compliance is achieved when the misconduct investigator completes the investigation with a finding of sustained, when applicable, and the PSB Commander subsequently approves the finding. This is considered the initiation of the disciplinary process. Twenty-nine of the 87 administrative misconduct investigations we reviewed had sustained findings against one or more active MCSO employee. All complied with the requirements of this Subparagraph.

Paragraph 206.k. requires that any contacts and updates with the complainant be documented in the investigative report. We did not identify any instances during this reporting period where this did not occur.

**Paragraph 207.** *In assessing the incident for policy, training, tactical, or equipment concerns, investigation reports will include an assessment of whether:*

a.   *the law enforcement action was in compliance with training and legal standards;*

b.   *the use of different tactics should or could have been employed;*

c.   *the incident indicates a need for additional training, counseling, or other non-disciplinary corrective actions; and*

d.   *the incident suggests that the MCSO should revise its policies, strategies, tactics, or training.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

During this reporting period, we reviewed 87 administrative misconduct investigations. MCSO properly assessed and documented whether any of the requirements of this Paragraph were relevant in all of the completed cases we reviewed for this reporting period. MCSO identified 11 cases where action related to this Paragraph was appropriate; and addressed the concerns with additional training, or where appropriate, policy review.

PSB continues to use an internal tracking form to ensure that those concerns that are forwarded to other Divisions within MCSO for action or review are addressed. We receive and review this tracking document each month. This tracking form contains regularly updated information on the status of concerns that have been identified.

WAI 53494

***Paragraph 208.*** *For each allegation of misconduct, internal affairs investigators shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation:*

a. *"Unfounded," where the investigation determines, by clear and convincing evidence, that the allegation was false or not supported by fact;*

b. *"Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur and justifies a reasonable conclusion of a policy violation;*

c. *"Not Sustained," where the investigation determines that there is insufficient evidence to prove or disprove the allegation; or*

d. *"Exonerated," where the investigation determines that the alleged conduct did occur but did not violate MCSO policies, procedures, or training.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review administrative misconduct investigations conducted by MCSO personnel and completed during the reporting period. We evaluate compliance with this Paragraph against the standard of whether a finding was made, and whether the finding was correct.

During the last reporting period, we concurred with the findings of the PSB Commander in 142 (97%) of the 146 cases that were completed.

During this reporting period, we concurred with the findings of the PSB Commander in 83 (95%) of the 87 administrative misconduct investigations we reviewed. In two, we believe the findings of unfounded were inappropriate and the allegations should have been sustained. In one investigation that was not sustained, we believe that adequate evidence existed to sustain the allegation; and in the other, we believe that the PSB failed to identify all principals in the investigation. Had PSB done so, sustained findings might have been appropriate for these employees.

There were no instances where the Appointing Authority changed the findings made by the PSB Commander.


***Paragraph 209.*** *For investigations carried out by Supervisors outside of the Professional Standards Bureau, the investigator shall forward the completed investigation report through his or her chain of command to his or her Division Commander. The Division Commander must approve the investigation and indicate his or her concurrence with the findings.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

WAI 53495

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 38 administrative misconduct investigations not conducted by PSB personnel and completed during this reporting period. All 38 were forwarded to PSB as required, and all contained the approval of the responsible District or Division Commander. As noted in previous reporting periods, and again during *this* reporting period, some of the District or Division level investigations were not in compliance with various requirements of the Second Order – as indicated throughout this report. However, we assessed MCSO's compliance with this Paragraph based on these cases being forwarded through the chain of command for approval of the investigation and findings.

**Paragraph 210.** *For investigations carried out by the Professional Standards Bureau, the investigator shall forward the completed investigation report to the Commander.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 49 administrative misconduct investigations that were conducted by PSB personnel or the contract investigator and completed during this reporting period. All 49 complied with the requirements of this Paragraph.

**Paragraph 211.** *If the Commander—meaning the Commander of the PSB or the Commander of the Division in which the internal affairs investigation was conducted—determines that the findings of the investigation report are not supported by the appropriate standard of proof, the Commander shall return the investigation to the investigator for correction or additional investigative effort, shall document the inadequacies, and shall include this documentation as an addendum to the original investigation. The investigator's Supervisor shall take appropriate action to address the inadequately supported determination and any investigative deficiencies that led to it. The Commander shall be responsible for the accuracy and completeness of investigation reports prepared by internal affairs investigators under his or her command.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** Not in compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 87 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

PSB investigated 49 of the 87 administrative misconduct investigations we reviewed during this reporting period. Forty-eight were investigated by PSB personnel, and one was investigated by the contract investigator who completes cases for PSB when there is a conflict. In 47 of the cases, we found the investigations to be thorough, and the reports were well-written. We identified specific concerns with two investigations (4%). In one, we believe findings of sustained should

WAI 53496

have been made and were not. In the second, we believe that additional principals should have been identified and were not. Based on our review of these cases, which includes our assessments of extension requests, 10 investigations (20%) of the 44 total investigations are in compliance.

Of the 38 investigations investigated by Districts or Divisions outside of PSB, we identified 15 investigations (39%) where we had some concerns regarding the investigation or documentation. These concerns included: arriving at an improper finding; using leading questions; failure to complete a proper investigation; failure to identify a conflict of interest; failure to interview all witnesses; and multiple administrative errors. As we have noted in our prior reports, we believe that many of the concerns found in these cases could, and should, have been identified at the District or Division level prior to forwarding the cases to PSB for review. We noted again during this reporting period, that District and Division Captains identified some of the deficiencies and addressed them with the investigators prior to the investigations being forwarded to PSB. However, some could not be corrected after the fact; and others were not identified prior to submittal to PSB. Our assessment of these investigations, which includes our assessments of extension requests, found that 11 (29%) of the 38 investigations are in compliance, an increase from 26% during the last reporting period.

In January 2018, we requested that MCSO begin providing us with documentation that reflects the actions being taken to address deficient misconduct investigations. We requested that PSB and command personnel provide a response to this request on a monthly basis. We have consistently received the requested documentation since March 2018.

During this reporting period, we continued to note instances where District Commanders identified investigative deficiencies; and, where possible, had them corrected prior to forwarding the investigation to PSB. We also continued to note increased involvement of Deputy Chiefs with oversight for District Commanders and some instances of one-on-one discussions or Supervisory Note entries regarding the reviews of misconduct investigations. PSB continued to identify deficiencies in District and Division investigations during this reporting period, and forwarded these concerns to the appropriate Commanders or Deputy Chiefs to be addressed. We also noted that the numerous deficiency memorandums authored by PSB that had not been addressed at the end of the last reporting period have now been properly dealt with and documented. We will continue to closely monitor whether identified deficiencies are being addressed in a timely manner.

We have noted in numerous prior reporting periods that both the supervisors who complete deficient investigations and the command personnel who approve them must be held accountable if MCSO is to achieve Phase 2 compliance with this Paragraph. Again, during this reporting period, our review of cases completed by PSB personnel continues to indicate PSB's ongoing efforts to achieve compliance, and we remain optimistic that they will continue to do so. Our review of District investigations during this reporting period identified that while more attention is being given to investigations by both District Command personnel and the Deputy Chiefs with oversight, compliance remains low. We remain hopeful that sustained oversight and review will result in continued improvement.

WAI 53497

*Paragraph 212. Where an internal affairs investigator conducts a deficient misconduct investigation, the investigator shall receive the appropriate corrective and/or disciplinary action. An internal affairs investigator's failure to improve the quality of his or her investigations after corrective and/or disciplinary action is taken shall be grounds for demotion and/or removal from a supervisory position or the Professional Standards Bureau.*

**Phase 1:** In compliance

- GB-2 (Command Responsibility), most recently amended on June 28, 2019.
- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 87 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

The 40-hour Misconduct Investigative Training was completed in late 2017. In January 2018, we requested that MCSO begin providing us with a document that reflects what actions are being taken to address deficient misconduct investigations on a monthly basis. As discussed in Paragraph 211, we have consistently received documentation since March 2018. During this reporting period, PSB identified and documented numerous deficiencies with investigations. District Commanders and Division Chiefs also identified and addressed some concerns and deficiencies with investigations conducted or reviewed by their personnel during this reporting period.

We will continue to closely monitor these monthly reports submitted by MCSO command personnel, along with reviewing completed misconduct investigations, to determine if deficiencies are being properly identified and addressed.


*Paragraph 213. Investigations of minor misconduct conducted outside of the Professional Standards Bureau must be conducted by a Supervisor and not by line-level deputies. After such investigations, the investigating Supervisor's Commander shall forward the investigation file to the Professional Standards Bureau after he or she finds that the misconduct investigation is complete and the findings are supported by the evidence. The Professional Standards Bureau shall review the misconduct investigation to ensure that it is complete and that the findings are supported by the evidence. The Professional Standards Bureau shall order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings. Where the findings of the investigation report are not supported by the appropriate standard of proof, the Professional Standards Bureau shall document the reasons for this determination and shall include this documentation as an addendum to the original investigation.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** In compliance

WAI 53498

To assess Phase 2 compliance with this Paragraph, we reviewed 87 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period. Of the 87 investigations, 49 were investigated by PSB personnel. Thirty-eight were investigated by MCSO personnel outside of PSB.

None of the documentation we received regarding investigations conducted outside of PSB indicated that any person below the rank of sergeant was responsible for the investigation.

During the last reporting period, all 58 District or Division-level approved cases were forwarded to, and reviewed by, PSB as required. Thirteen (22%) of the 58 cases investigated at the District or Division level were returned by PSB personnel for additional investigation, corrections, proper documentation, or other changes.

During this reporting period, all 38 District or Division-level investigations were forwarded to and reviewed by PSB as required. Fifteen investigations (39%) had deficiencies identified by PSB or our Team. Five were returned to the Districts for corrections or additional information. In five others, PSB identified that findings were not supported by the facts of the investigation and the findings were changed. Our assessment of the 38 investigations, which includes the reasonableness of extension requests, found that 11 investigations (29%) were in compliance with all Second Order requirements, an increase from 26% the last reporting period.

As is our practice, we will discuss these cases with MCSO during our next site visit.

**Paragraph 214.** *At the discretion of the Commander of the Professional Standards Bureau, a misconduct investigation may be assigned or re-assigned to another Supervisor with the approval of his or her Commander, whether within or outside of the District or Bureau in which the incident occurred, or may be returned to the original Supervisor for further investigation or analysis. This assignment or re-assignment shall be explained in writing.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 87 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

Our analysis for this reporting period revealed that of the 38 investigations conducted outside of PSB, five were returned by PSB to the original investigating supervisor for further investigation or analysis. None were reassigned to a different investigator.

WAI 53499

***Paragraph 215.*** *If, after an investigation conducted outside of the Professional Standards Bureau, an employee's actions are found to violate policy, the investigating Supervisor's Commander shall direct and ensure appropriate discipline and/or corrective action. Where the incident indicates policy, training, tactical, or equipment concerns, the Commander shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.
- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 38 administrative misconduct investigations conducted by MCSO personnel outside of PSB and completed during this reporting period.

Ten of the 38 completed misconduct investigations conducted outside of PSB resulted in sustained findings. In nine, the reports included documentation that appropriate discipline or corrective action was taken. In one, the employee resigned prior to the completion of the discipline process. Command personnel also appropriately addressed the trainings need that were identified in two of the investigations.


***Paragraph 216.*** *If, after an investigation conducted by the Professional Standards Bureau, an employee's actions are found to violate policy, the Commander of the Professional Standards Bureau shall direct and ensure appropriate discipline and/or corrective action. Where the incident indicates policy, training, tactical, or equipment concerns, the Commander of the Professional Standards Bureau shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.
- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 87 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

Forty-nine of the completed investigations were conducted by PSB. Twenty-three resulted in a sustained finding against one or more MCSO employee. In 19 of these sustained investigations, the PSB Commander ensured that appropriate discipline and/or corrective action was recommended. In four cases, the involved employees left MCSO employment prior to the completion of the investigation or the determination of discipline. One investigation resulted in

WAI 53500

the probationary release of the involved employee. The PSB Commander provided the preliminary determination of the range of discipline in all 19 cases involving current MCSO employees. The PSB Commander cannot ensure that appropriate discipline or corrective action are the final outcome of sustained misconduct investigations, as the Appointing Authority makes the final decisions for discipline in both minor misconduct cases and in serious misconduct cases that result in PDHs. The hearing officer has the authority to change the findings or reduce the discipline.

**Paragraph 217.** *The Professional Standards Bureau shall conduct targeted and random reviews of discipline imposed by Commanders for minor misconduct to ensure compliance with MCSO policy and legal standards.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** Not applicable

Based on the requirements of the Second Order, District and Division Commanders will not impose discipline for minor misconduct. In all cases, the PSB Commander will determine the final findings for internal investigations and the presumptive range of discipline for those cases with sustained findings. The Appointing Authority will then make the final determination of discipline.

**Paragraph 218.** *The Professional Standards Bureau shall maintain all administrative investigation reports and files after they are completed for record-keeping in accordance with applicable law.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine compliance with this Paragraph, we have observed that PSB maintains both hardcopy and electronic files intended to contain all documents required for compliance with this Paragraph.

A member of our Team inspected the file rooms where hardcopies of administrative investigations were stored and randomly reviewed case files to verify compliance on multiple occasions when PSB was housed at MCSO Headquarters. Our Team member also used the access granted to IAPro to randomly select internal affairs case files to verify that all information was being maintained electronically.

WAI 53501

PSB completed the move to its new offsite facility in May 2018. Subsequent to the move, a member of our Team conducted an inspection of the file rooms in the new facility; and conducted a review of random internal investigations in IAPro to ensure ongoing compliance.

During our January 2019 site visit, a member of our Team verified continued compliance at the new PSB facility by inspecting both the criminal and administrative investigation file rooms and randomly reviewing internal affairs case files to verify that all information was also being electronically maintained in IAPro.

During our July 2019 site visit, a member of our Team verified, by accessing IAPro and reviewing randomly selected cases, that electronic files were being properly maintained.

During our October 2019 site visit, a member of our Team again verified compliance at the PSB facility by inspecting both the criminal and administrative investigation file rooms and randomly reviewing internal affairs case files to verify that all information is also being electronically maintained in IAPro.


### D. Discipline

**Paragraph 219.** *The Sheriff shall ensure that discipline for sustained allegations of misconduct comports with due process, and that discipline is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented regardless of the command level of the principal of the investigation.*


**Paragraph 220.** *To ensure consistency in the imposition of discipline, the Sheriff shall review the MCSO's current disciplinary matrices and, upon approval of the parties and the Monitor, will amend them as necessary to ensure that they:*

a.      *establish a presumptive range of discipline for each type of violation;*

b.      *increase the presumptive discipline based on an employee's prior violations;*

c.      *set out defined mitigating and aggravating factors;*

d.      *prohibit consideration of the employee's race, gender, gender identity, sexual orientation, national origin, age, or ethnicity;*

e.      *prohibit conflicts, nepotism, or bias of any kind in the administration of discipline;*

f.      *prohibit consideration of the high (or low) profile nature of the incident, including media coverage or other public attention;*

g.      *clearly define forms of discipline and define classes of discipline as used in policies and operations manuals;*

h.      *provide that corrective action such as coaching or training is not considered to be discipline and should not be used as a substitute for discipline where the matrix calls for discipline;*

WAI 53502

*i.* *provide that the MCSO will not take only non-disciplinary corrective action in cases in which the disciplinary matrices call for the imposition of discipline;*

*j.* *provide that the MCSO will consider whether non-disciplinary corrective action is also appropriate in a case where discipline has been imposed;*

*k.* *require that any departures from the discipline recommended under the disciplinary matrices be justified in writing and included in the employee's file; and*

*l.* *provide a disciplinary matrix for unclassified management level employees that is at least as demanding as the disciplinary matrix for management level employees.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, 33 of the 87 administrative misconduct investigations resulted in sustained findings against one or more members of MCSO. In 29 of the sustained cases, one or more of the principal employees were still employed at MCSO at the time findings or discipline decisions were made. Compliance for this Paragraph is based on the discipline findings for both minor and serious discipline. In those cases where only serious discipline is recommended, compliance findings specific to those cases are addressed in Paragraph 226.

Paragraph 220.a. requires a presumptive range of discipline for each type of violation. Of the 33 total sustained cases, 29 involved employees still employed by MCSO at the time discipline decisions were made. The PSB Commander determined and documented the presumptive discipline range in compliance with this Subparagraph.

Paragraph 220.b. requires that presumptive discipline be increased if an employee has prior violations. In 12 of the 29 sustained investigations where discipline was assessed, the employee had prior sustained violations. The PSB Commander considered and increased the presumptive discipline based on the matrices in place at the time of the misconduct.

Paragraph 220.c. requires that mitigating and aggravating factors be defined. Aggravating and mitigating factors are not specifically defined in the internal affairs investigation or discipline policy in effect prior to May 18, 2017. The revised discipline policy, effective May 18, 2017, does define these factors. These aggravating or mitigating factors are not identified by the PSB Commander, but are identified and considered by the Appointing Authority when making the final disciplinary decisions.

WAI 53503

During this reporting period, all of the sustained cases were initiated after May 18, 2017. The Appointing Authority provided justification and documentation for all factors he considered when making the final discipline decisions for all 29 cases based on the matrices in place at the time of the misconduct. We also found that he continues to specifically identify those instances where there are aggravating or mitigating factors in the justification documents when appropriate.

Paragraph 220.d. prohibits the consideration of any prohibited biases when determining discipline. None of the sustained cases that resulted in discipline that we reviewed during this reporting period included any indication that any biases were considered when determining discipline.

Paragraph 220.e. prohibits any conflicts, nepotism, or bias of any kind in the administration of discipline. None of the sustained cases we reviewed during this reporting period had any indication of conflicts, nepotism, or bias of any kind when determining the disciplinary sanction.

Paragraph 220.f. prohibits the consideration of the high (or low) profile nature of an incident when determining discipline. None of the sustained cases we reviewed during this reporting period indicated any consideration of the high- or low-profile nature of the incident when considering discipline.

Paragraph 220.g. requires that clearly defined forms of discipline and classes of discipline be defined. Phase 2 compliance is not applicable to this Subparagraph.

Paragraph 220.h. requires that corrective action such as coaching or training is not considered to be discipline, and should not be used as a substitute for discipline. There were no instances identified during this reporting period where a coaching was used as a substitute for discipline.

Paragraph 220.i. requires that MCSO will not take only non-disciplinary action in cases where the Discipline Matrices call for the imposition of discipline. There were no instances this reporting period where non-disciplinary action was taken for an act of misconduct that was ineligible to be handled as a coaching.

Paragraph 220.j. requires that MCSO consider whether non-disciplinary corrective action is also appropriate. In three case reviewed during this reporting period, in addition to discipline, additional training was provided to the involved employees.

Paragraph 220.k. requires that any departure from the discipline recommended under the Discipline Matrices be justified in writing and included in the employee's file. investigations with sustained findings resulted in employee discipline. Fifteen resulted in minor discipline, and 14 resulted in serious discipline. We agreed with all of the final decisions made by the Appointing Authority.

During this reporting period, there were 29 investigations with sustained findings that resulted in discipline for MCSO employees. Seventeen resulted in minor discipline, 11 resulted in serious discipline, and one resulted in the probationary release of the employee. As we have previously noted, compliance for this Paragraph is based on the final outcome for all sustained investigations. Those instances that involve only serious discipline are specifically covered in Paragraph 226.

WAI 53504

Paragraph 220.l. requires that a Discipline Matrix for unclassified management employees be at least as demanding as the Discipline Matrix for management-level employees. We reviewed the approved policies that affect discipline for unclassified management employees, and they comply with this requirement. During this reporting period, MCSO did not complete or submit any administrative investigations involving unclassified management employees.

During this reporting period, all 29 sustained investigations where discipline occurred were both initiated and completed after May 18, 2017; and are subject to all the requirements relative to investigations and disciplinary procedures contained in policies revised on that date. The investigations initiated and completed after May 18, 2017 have both a discipline range and a presumptive discipline. The Appointing Authority provided a written justification in all sustained cases where discipline was imposed.

In 21 of the 29 cases, the final discipline was the presumptive discipline identified in the matrices. In three cases involving minor discipline, the Appointing Authority mitigated the discipline within the range. In five cases involving serious discipline, the Appointing Authority also mitigated the discipline within the range. We agree with the decisions by the Appointing Authority in all of these cases.


***Paragraph 221.*** *The Sheriff shall mandate that each act or omission that results in a sustained misconduct allegation shall be treated as a separate offense for the purposes of imposing discipline.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.
- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed 29 misconduct investigations with sustained allegations that resulted in the recommendation for discipline for current MCSO employees. We found that MCSO again met the requirements for compliance with this Paragraph.


***Paragraph 222.*** *The Sheriff shall also provide that the Commander of the Professional Standards Bureau shall make preliminary determinations of the discipline to be imposed in all cases and shall document those determinations in writing, including the presumptive range of discipline for the sustained misconduct allegation, and the employee's disciplinary history.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.
- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

WAI 53505

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, there were 29 sustained investigations that resulted in recommendations for discipline. In all of these cases, the PSB Commander determined and documented in writing the presumptive range of discipline based on the policies and Discipline Matrices in effect at the time of the investigation. The documentation submitted for this Paragraph included the category, offense number, and employee's discipline history.

### E.    Pre-Determination Hearings

***Paragraph 223.*** *If the Commander of the Professional Standards Bureau makes a preliminary determination that serious discipline (defined as suspension, demotion, or termination) should be imposed, a designated member of MCSO's command staff will conduct a pre-determination hearing and will provide the employee with an opportunity to be heard.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.
- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel where MCSO holds a Pre-Determination Hearing (PDH).

During this reporting period, 29 administrative misconduct investigations resulted in sustained findings against current MCSO employees. Thirteen investigations resulted in the recommendation for serious discipline. In all 13, MCSO scheduled the Pre-Determination Hearings, as required. In one of the 13, the employee did not attend the hearing.

***Paragraph 224.*** *Pre-determination hearings will be audio and video recorded in their entirety, and the recording shall be maintained with the administrative investigation file.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.
- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

**Phase 2:** In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

WAI 53506

During this reporting period, in the 12 cases where a Pre-Determination Hearing was held, the hearing was audio- and video-recorded as required, included in the administrative file, and reviewed by a member of our Team.

*Paragraph 225.* *If an employee provides new or additional evidence at a pre-determination hearing, the hearing will be suspended and the matter will be returned to the internal affairs investigator for consideration or further investigation, as necessary. If after any further investigation or consideration of the new or additional evidence, there is no change in the determination of preliminary discipline, the matter will go back to the pre-determination hearing. The Professional Standards Bureau shall initiate a separate misconduct investigation if it appears that the employee intentionally withheld the new or additional evidence during the initial misconduct investigation.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.
- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

**Phase 2:** In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, 12 sustained investigations resulted in a Pre-Determination Hearing and we reviewed all the recordings of these hearings. There were no instances where we, or the Appointing Authority, identified any concerns that required additional follow-up related to the requirements of this Paragraph.

*Paragraph 226.* *If the designated member of MCSO's command staff conducting the pre-determination hearing does not uphold the charges recommended by the Professional Standards Bureau in any respect, or does not impose the Commander of the Professional Standards Bureau's recommended discipline and/or non-disciplinary corrective action, the Sheriff shall require the designated member of MCSO's command staff to set forth in writing his or her justification for doing so. This justification will be appended to the investigation file.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.
- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

**Phase 2:** In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

WAI 53507

During every site visit, we meet with the Appointing Authority and the Administrative Services Division to discuss any concerns with final outcomes or decisions that result from Pre-Determination Hearings. We have continued to emphasize to MCSO the need to comply with agency policies when determining disciplinary outcomes.

During our January 2018 site visit, we met with the Appointing Authority and Administrative Services Division personnel to discuss the Pre-Determination Hearing process and the final outcomes of cases. During the meeting, MCSO advised us that the Appointing Authority does not have the authority to reduce discipline based only on timeframe concerns when an employee appeals discipline in these cases. It is the Maricopa County Attorney's Office (MCAO) that reviews these cases and determines whether the cases should go forward. Both the Appointing Authority and the representative from the MCAO advised that they have taken some of these cases forward; but in others, they did not believe it was appropriate to do so, based on the totality of circumstances. The Parties present at the meeting also commented on their concerns regarding cases involving the Plaintiffs' class that might result in reductions in discipline as a result of the failure to complete the case within the 180-day timeframe. We discussed the specific requirements of Arizona Revised Statutes 38-1101, and that the statute only requires a "good faith" attempt to complete cases that result in suspensions, demotions, or dismissals within the 180-day timeframe. Since the time of our discussion in 2018, Arizona law has added a definition of good faith. A.R.S. 38-1101 now defines good faith as "honesty of purpose and absence of intent to defraud."

During that same site visit, we discussed those cases where a decision may be made after a Pre-Determination Hearing that a reduction in discipline will occur, and those cases where a decision to reduce the discipline may occur if an appeal is filed. It is our understanding from our meeting with the Appointing Authority and other staff who were present that MCSO consults with MCAO attorneys in these cases and their input is related to the final outcomes. However, all the documentation we receive and review is authored and signed by the Appointing Authority, so our assessment can only consider any final decisions as his.

During the last reporting period, all cases forwarded for consideration of serious discipline resulted in serious discipline. The Appointing Authority provided a justification for the final decisions in all cases, and this information was provided to our Team in the submissions regarding closed internal affairs investigations. The Appointing Authority did not overturn any of the sustained findings by the PSB Commander.

During this reporting period, 11 of the 13 cases forwarded for consideration of serious discipline resulted in serious discipline. In five of the cases, the Appointing Authority mitigated the discipline within the range. We agree with his decisions in all five of these cases. The Appointing Authority consistently provides a justification for the final decisions in all cases, and this information was provided to our Team in the submissions regarding closed internal affairs investigations for this reporting period.

WAI 53508

**Paragraph 227.** *The Sheriff shall promulgate MCSO policy which shall provide that the designated member of MCSO's command staff conducting a pre-determination hearing should apply the disciplinary matrix and set forth clear guidelines for the grounds on which a deviation is permitted. The Sheriff shall mandate that the designated member of MCSO's command staff may not consider the following as grounds for mitigation or reducing the level of discipline prescribed by the matrix:*

a.  *his or her personal opinion about the employee's reputation;*

b.  *the employee's past disciplinary history (or lack thereof), except as provided in the disciplinary matrix;*

c.  *whether others were jointly responsible for the misconduct, except that the MCSO disciplinary decision maker may consider the measure of discipline imposed on other employees involved to the extent that discipline on others had been previously imposed and the conduct was similarly culpable.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.
- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

**Phase 2:** In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed 29 administrative misconduct investigations where discipline was recommended. The serious sustained allegations in 13 of these investigations resulted in their referrals for Pre-Determination Hearings.

Paragraph 227.a. prohibits the designated member of command staff conducting a Pre-Determination Hearing from considering a personal opinion of an employee's reputation when determining discipline. There were no indications in our reviews of these investigations that any personal opinion was considered in making a disciplinary decision.

Paragraph 227.b. prohibits the consideration of the employee's past disciplinary history (or lack thereof), except as provided in the Discipline Matrix. There were no instances where we determined that the member of command staff responsible for conducting the Pre-Determination Hearing considered disciplinary history outside of the requirements of this Paragraph.

Paragraph 227.c. prohibits the consideration of others jointly responsible for misconduct, except that the decision-maker may consider such discipline to the extent that discipline on others had been previously imposed and the conduct was similarly culpable. There were no indications in our reviews that the misconduct of others was improperly considered in the disciplinary decisions that were made.

WAI 53509

*Paragraph 228.* *The Sheriff or his designee has the authority to rescind, revoke or alter any disciplinary decision made by either the Commander of the Professional Standards Bureau or the appointed MCSO disciplinary authority so long as:*

a.      *that decision does not relate to the Sheriff or his designee;*

b.      *the Sheriff or his designee provides a thorough written and reasonable explanation for the grounds of the decision as to each employee involved;*

c.      *the written explanation is placed in the employment files of all employees who were affected by the decision of the Sheriff or his designee; and*

d.      *the written explanation is available to the public upon request.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

**Phase 2:**  In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, there were no instances where the Sheriff or his designee rescinded, revoked, or altered any disciplinary decision made by either the Commander of the Professional Standards Bureau or the appointed MCSO disciplinary authority.


**F.      *Criminal Misconduct Investigations***

*Paragraph 229.*  *Whenever an internal affairs investigator or Commander finds evidence of misconduct indicating apparent criminal conduct by an employee, the Sheriff shall require that the internal affairs investigator or Commander immediately notify the Commander of the Professional Standards Bureau.  If the administrative misconduct investigation is being conducted by a Supervisor outside of the Professional Standards Bureau, the Sheriff shall require that the Professional Standards Bureau immediately take over the administrative investigation. If the evidence of misconduct pertains to someone who is superior in rank to the Commander of the Professional Standards Bureau and is within the Commander's chain of command, the Sheriff shall require the Commander to provide the evidence directly to what he or she believes is the appropriate prosecuting authority—the Maricopa County Attorney, the Arizona Attorney General, or the United States Attorney for the District of Arizona—without notifying those in his or her chain of command who may be the subject of a criminal investigation.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review completed criminal misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed three criminal investigations conducted by MCSO. One was internally generated, and two were externally generated. All three were initiated and completed after July 20, 2016, and appropriately assigned to criminal investigators in PSB. The investigations were brought to the attention of the PSB Commander as required and an administrative misconduct investigation was also initiated. None involved someone superior in rank to the PSB Commander.

**Paragraph 230.** *If a misconduct allegation will be investigated criminally, the Sheriff shall require that the Professional Standards Bureau not compel an interview of the principal pursuant to Garrity v. New Jersey, 385 U.S. 493 (1967), until it has first consulted with the criminal investigator and the relevant prosecuting authority. No other part of the administrative investigation shall be held in abeyance unless specifically authorized by the Commander of the Professional Standards Bureau in consultation with the entity conducting the criminal investigation. The Sheriff shall require the Professional Standards Bureau to document in writing all decisions regarding compelling an interview, all decisions to hold any aspect of an administrative investigation in abeyance, and all consultations with the criminal investigator and prosecuting authority.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by both criminal and administrative investigators to ensure that they contain appropriate documentation that complies with the requirements of this Paragraph.

We previously determined that in many cases, the administrative investigation is not submitted and reviewed during the same reporting period as the criminal investigation, as generally, administrative investigations are finalized after the completion of the criminal investigation. We discussed this issue with PSB during our January 2017 site visit. To resolve the concern, PSB agreed to provide us with a copy of any criminal investigation when PSB submits the administrative misconduct investigation for our review, even if the criminal investigation has been previously submitted. MCSO has been consistently providing copies of these criminal investigations with the administrative investigation since that time.

During this reporting period, we reviewed three administrative misconduct investigations where criminal conduct may have occurred. In all three, there was a companion criminal investigation completed by MCSO, as required.

WAI 53511

***Paragraph 231.*** *The Sheriff shall require the Professional Standards Bureau to ensure that investigators conducting a criminal investigation do not have access to any statements by the principal that were compelled pursuant to Garrity.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

PSB is divided into criminal and administrative sections. Criminal investigators and administrative investigators are housed on separate floors of the building. Criminal investigators do not have access to the IAPro database for administrative investigations, and there are separate file rooms for criminal and administrative investigative documents and reports. We have previously verified during our site visits that the required separation of criminal and administrative investigations and restricted access to IAPro is in place.

In May 2018, PSB relocated to a new offsite location. After PSB's move to its new facility, we verified that criminal and administrative investigation files were housed on separate floors in the new facility. Criminal investigators do not have access to the IAPro database for administrative investigations, and there are separate and secured file rooms for criminal and administrative documents and reports.

During our October 2019 site visit, a member of our Team again verified that criminal and administrative investigative files are housed on separate floors, there is restricted access to both file rooms, and restricted access to IAPro remains in place.

***Paragraph 232.*** *The Sheriff shall require the Professional Standards Bureau to complete all such administrative investigations regardless of the outcome of any criminal investigation, including cases in which the prosecuting agency declines to prosecute or dismisses the criminal case after the initiation of criminal charges. The Sheriff shall require that all relevant provisions of MCSO policies and procedures and the operations manual for the Professional Standards Bureau shall remind members of the Bureau that administrative and criminal cases are held to different standards of proof, that the elements of a policy violation differ from those of a criminal offense, and that the purposes of the administrative investigation process differ from those of the criminal investigation process.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

WAI 53512

To determine MCSO's compliance with this Paragraph, we review on a monthly basis administrative and criminal investigations conducted by MCSO.

During this reporting period, we reviewed three criminal investigations conducted by MCSO personnel. All three have a companion administrative misconduct investigation, as required; and are in compliance with the requirements of this Paragraph.

**Paragraph 233.** *If the investigator conducting the criminal investigation decides to close the investigation without referring it to a prosecuting agency, this decision must be documented in writing and provided to the Professional Standards Bureau. The Commander of the Professional Standards Bureau shall separately consider whether to refer the matter to a prosecuting agency and shall document the decision in writing.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine MCSO's compliance with this Paragraph, we review criminal misconduct investigations conducted by MCSO on a monthly basis.

During this reporting period, two of the three criminal investigations were closed without submittal to a prosecutorial agency. The decisions were supported by the facts of the investigation, interviews, or other investigative follow-up. In both cases, the investigators documented their conclusions and decisions to close the cases without submittal and the PSB Commander approved these decisions.

**Paragraph 234.** *If the investigator conducting the criminal investigation decides to refer the matter to a prosecuting agency, the Professional Standards Bureau shall review the information provided to the prosecuting agency to ensure that it is of sufficient quality and completeness. The Commander of the Professional Standards Bureau shall direct that the investigator conduct additional investigation when it appears that there is additional relevant evidence that may improve the reliability or credibility of the investigation. Such directions shall be documented in writing and included in the investigatory file.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine MCSO's compliance with this Paragraph, we review on a monthly basis criminal misconduct investigations conducted by MCSO.

WAI 53513

During this reporting period, we reviewed three criminal misconduct investigations conducted by PSB personnel. One was submitted to a prosecuting agency for review.


**Paragraph 235.** *If the prosecuting agency declines to prosecute or dismisses the criminal case after the initiation of criminal charges, the Professional Standards Bureau shall request an explanation for this decision, which shall be documented in writing and appended to the criminal investigation report.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine MCSO's compliance with this Paragraph, we review criminal misconduct investigations conducted by MCSO on a monthly basis.

During this reporting period, one criminal investigation we reviewed was submitted to a prosecutorial agency for review. The prosecutorial agency declined to prosecute and provided documentation of its decision to MCSO.


**Paragraph 236.** *The Sheriff shall require the Professional Standards Bureau to maintain all criminal investigation reports and files after they are completed for record-keeping in accordance with applicable law.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine compliance with this Paragraph, we have observed that PSB maintains both hardcopy and electronic files that are intended to contain all the documents required per this Paragraph

During previous site visits at Headquarters, we inspected the file rooms where hardcopies of investigations were stored. Criminal and administrative investigation files were stored in separate rooms, and access to these rooms was restricted. Our random review of criminal investigation case files verified that PSB was maintaining files as required. A member of our Team also has access to IAPro, and has verified that case files are maintained in an electronic format.

During our January 2018 site visit, a member of our Team inspected the file rooms where hardcopies of criminal investigation were stored and randomly reviewed case files to verify compliance.

WAI 53514

In May 2018, PSB relocated to a new offsite location. After the move, we verified that PSB was properly maintaining criminal investigation reports and files at its new facility.

During our October 2019 site visit, a member of our Team again verified – by accessing IAPro and reviewing random cases – that PSB is properly maintaining electronic files of criminal investigations. A random review of hard-copy files securely maintained by criminal investigators was also conducted and found to be compliant.

### G.    Civilian Complaint Intake, Communication, and Tracking

***Paragraph 237.*** *Within six months of the entry of this Order, the Monitor, in consultation with the Community Advisory Board, will develop and implement a program to promote awareness throughout the Maricopa County community about the process for filing complaints about the conduct of MCSO employees.*

**Phase 1**: Not applicable

**Phase 2**: Not applicable

We developed and implemented a Complaint Process Community Awareness Program to promote awareness throughout the Maricopa County community about the process for filing complaints about the conduct of MCSO employees. The program provides for distributing brochures describing the complaint process at quarterly community meetings and using public service announcements – made via local media outlets and social media – to provide basic information (in both English and Spanish) about MCSO's complaint process.

We contacted faith organizations and civic groups throughout Maricopa County requesting that they make complaint process information forms available to members of their congregations and groups. The Complaint Process Community Awareness Program incorporates input from the CAB, MCSO, and the ACLU of Arizona.

***Paragraph 238.*** *The Sheriff shall require the MCSO to accept all civilian complaints, whether submitted verbally or in writing; in person, by phone, by mail, or online; by a complainant, someone acting on the complainant's behalf, or anonymously; and with or without a signature from the complainant. MCSO will document all complaints in writing.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** In compliance

To assess compliance with this Paragraph, we review all new misconduct complaints received each month and completed misconduct investigations conducted by MCSO personnel. In addition, we review many initial complaint documents or initial telephone calls, BWC videos, traffic stop videos, Supervisory Notes, Compliance and BIO reviews, and consider findings in the complaint testing process.

WAI 53515

During the last reporting period, we reviewed 146 administrative misconduct investigations. We identified one instance where MCSO initially failed to accept a complaint as required. When discovered by MCSO, the appropriate investigation was opened. PSB also initiated an additional investigation for the failure to accept the complaint. There were no instances where either the Court Compliance Unit or BIO personnel identified in their reviews that a supervisor had failed to initiate a complaint when appropriate. There were no instances identified in our review of supervisory notes, traffic stops, or the complaint intake testing process where an MCSO employee refused to take a complaint.

During this reporting period, we reviewed 87 completed administrative misconduct investigations. We did not identify any completed investigations where there was an any external allegation that MCSO had failed to initially take a complaint.

Our review of traffic stops for this reporting period did not identify any instances where a subject who was arrested made allegations of misconduct by MCSO personnel during his arrest that went unaddressed. Our review of Supervisory Notes during this reporting period did not identify any incidents where there were indications that a complaint had been made but not properly reported. We reviewed numerous complainant contacts, and found no indication that a supervisor initially refused to take a complaint or attempted to dissuade the complainant from making a complaint. Neither CID or BIO identified any instances in their reviews during this reporting period that indicated that a complainant had attempted to file a complaint and been refused. We did not identify any complaint intake tests for this reporting period where MCSO failed to accept a complaint.

We continue to find that MCSO consistently accepts and records complaints as required for compliance with this Paragraph.

**Paragraph 239.** *In locations clearly visible to members of the public at the reception desk at MCSO headquarters and at all District stations, the Sheriff and the MCSO will post and maintain permanent placards clearly and simply describing the civilian complaint process that is visible to the public at all hours. The placards shall include relevant contact information, including telephone numbers, email addresses, mailing addresses, and Internet sites. The placards shall be in both English and Spanish.*

**Phase 1:** In compliance

- GJ-24 (Community Relations and Youth Programs), most recently revised on March 11, 2021.

**Phase 2:** In compliance

As we did not hold an in-person site visit in January, we were unable to visit MCSO Headquarters and MCSO Districts to determine if the permanent placards were prominently displayed at MCSO Headquarters and Districts. During our January remote site visit, MCSO reported that, during this reporting period, MCSO did not add or eliminate any locations displaying permanent complaint placards. MCSO further reported that, during this reporting period, it has not received any feedback from the community regarding the permanent complaint placards. When inspected

WAI 53516

during our last in-person site visit, we noted that MCSO's placard states that anyone who has a concern regarding the performance of any MCSO employee has the right to file a complaint in English or Spanish or their preferred language, to include American Sign Language; in person at any District facility or at the Professional Standards Bureau, by mail, by telephone, by fax, or online. The placard includes relevant contact information, including telephone numbers, email addresses, mailing addresses, and websites.

**Paragraph 240.** *The Sheriff shall require all deputies to carry complaint forms in their MCSO vehicles. Upon request, deputies will provide individuals with complaint forms and information about how to file a complaint, their name and badge number, and the contact information, including telephone number and email address, of their immediate supervising officer. The Sheriff must provide all supervising officers with telephones. Supervising officers must timely respond to such complaints registered by civilians.*

**Phase 1:** In compliance

- EA-2 (Patrol Vehicles), most recently revised on March 3, 2021.
- GE-4 (Use, Assignment, and Operation of Vehicles), most recently amended on June 25, 2020.
- GJ-24 (Community Relations and Youth Programs), most recently revised on March 11, 2021.

**Phase 2:** In compliance

As we held our January site visit remotely, we were unable to visit District offices to verify that MCSO maintained adequate supplies of complaint forms for deputies to carry in their vehicles. We were also unable to verify that supervisors were in possession of MCSO-issued cellular telephones. We will resume these verifications when we resume our in-person site visits.

**Paragraph 241.** *The Sheriff will ensure that the Professional Standards Bureau facility is easily accessible to members of the public. There shall be a space available for receiving walk-in visitors and personnel who can assist the public with filing complaints and/or answer an individual's questions about the complaint investigation process.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

The PSB facility, the former East Court Building Library, located at 101 West Jefferson Street in Phoenix, is easily accessible to members of the public. The County Court facilities in the building are separate from the PSB reception area and offices. The PSB area is accessible from First Avenue, a major thoroughfare; and there is no required security screening of individuals entering the building through the First Avenue entrance. As we held our January site visit remotely, we were unable to visit the PSB facility during this reporting period. We will visit the facility again when we resume our in-person site visits.

WAI 53517

Maricopa County had previously advised MCSO that its lease for the PSB site was expired and that MCSO would have to vacate the site. MCSO stated that the lease requires that the County provide MCSO with a one-year advance written notification of the requirement to vacate the current PSB facility. As of this reporting period, MCSO has not received written notification from the County regarding the requirement to vacate the current PSB site.

MCSO's placards and comment and complaint forms – including the complaint form that is accessible via MCSO's website – all reflect PSB's current address.

**Paragraph 242.** *The Sheriff will also make complaint forms widely available at locations around the County including: the websites of MCSO and Maricopa County government; the lobby of MCSO's headquarters; each patrol District; and the Maricopa County government offices. The Sheriff will ask locations, such as public library branches and the offices and gathering places of community groups, to make these materials available.*

**Phase 1:** In compliance

- GJ-24 (Community Relations and Youth Programs), most recently revised on March 11, 2021.

**Phase 2:** In compliance

MCSO has complaint forms available in English and Spanish on the MCSO and Maricopa County websites. MCSO maintains a list – of MCSO facilities, County offices, and public locations where community groups meet – where Community Outreach Division personnel attempt to make the forms available.

Due to cancellation of our in-person site visit in January, we were unable to verify that complaint forms were in locations in Maricopa County that were included on MCSO's list of facilities where complaint forms are available to the public. During this reporting period, we requested that the Community Outreach Division (COrD) provide its proposed changes to the list of locations throughout Maricopa County displaying Comment and Complaint Forms to make the forms more accessible to community members. Community Advisory Board (CAB) members have recommended during our site visit discussions that the COrD place complaint forms in locations including grocery and other retail stores that are located in communities where members of the Plaintiffs' class live and work. To follow up, COrD personnel met with CAB members to receive their input on possible community locations. We are currently awaiting COrD's proposal that incorporates the CAB's feedback and recommendations.

**Paragraph 243.** *The Sheriff shall establish a free, 24-hour hotline for members of the public to make complaints.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** In compliance

WAI 53518

In July 2016, MCSO established the free 24-hour hotline for members of the public to make complaints; the hotline continued to be operational during this reporting period. A Monitoring Team member periodically called the hotline during this reporting period; and verified that the hotline is operational in both English and Spanish, and provides instructions in both languages on how to register a complaint. The recording advises callers that if the call is an emergency, they are to call 911. Callers are requested to provide their name, telephone number, and a brief summary of their complaint. If callers leave a recorded message, they are advised that MCSO will contact them as soon as possible. If callers do not wish to leave a recorded message, they are provided with a telephone number to call to speak to a supervisor. That number connects the callers to the MCSO switchboard operator, who will connect the caller to an appropriate supervisor. Callers are further advised of MCSO's operating hours if they wish to contact PSB directly.

The hotline is housed in PSB, and PSB personnel access any recorded messages at the beginning of each business day. PSB personnel reported that, during this reporting period, PSB did not receive any new hotline complaints.

MCSO reported that there are 10 hotline complaints currently under investigation and five hotline complaints under Command review.

The procedures established and followed by PSB provide for creating a record of every complaint received on the hotline and maintaining a log of follow-up actions regarding referral of the complaint.


**Paragraph 244.** *The Sheriff shall ensure that the MCSO's complaint form does not contain any language that could reasonably be construed as discouraging the filing of a complaint, such as warnings about the potential criminal consequences for filing false complaints.*

**In Full and Effective Compliance**

Our review of the English and Spanish complaint forms' content did not reveal any language that could reasonably be construed as discouraging the filing of a complaint.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.


**Paragraph 245.** *Within two months of the entry of this Order, complaint forms will be made available, at a minimum, in English and Spanish. The MCSO will make reasonable efforts to ensure that complainants who speak other languages (including sign language) and have limited English proficiency can file complaints in their preferred language. The fact that a complainant does not speak, read, or write in English, or is deaf or hard of hearing, will not be grounds to decline to accept or investigate a complaint.*

**In Full and Effective Compliance**

WAI 53519

Complaint forms in English and Spanish are accessible on MCSO's website. The complaint form states that anyone who has a concern regarding the performance of any MCSO employee has the right to file a complaint – in English or Spanish or their preferred language, to include American Sign Language – in person at any District facility or at the Professional Standards Bureau, by mail, by telephone, by fax, or online. The forms provide street addresses, contact numbers, and website information.

During this reporting period, no grievances were filed that met the criteria for transmitting to the Monitor.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 246.** *In the course of investigating a civilian complaint, the Professional Standards Bureau will send periodic written updates to the complainant including:*

a. *within seven days of receipt of a complaint, the Professional Standards Bureau will send non-anonymous complainants a written notice of receipt, including the tracking number assigned to the complaint and the name of the investigator assigned. The notice will inform the complainant how he or she may contact the Professional Standards Bureau to inquire about the status of a complaint;*

b. *when the Professional Standards Bureau concludes its investigation, the Bureau will notify the complainant that the investigation has been concluded and inform the complainant of the Bureau's findings as soon as is permitted by law; and*

c. *in cases where discipline is imposed, the Professional Standards Bureau will notify the complainant of the discipline as soon as is permitted by law.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

**Phase 2:** In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed 87 administrative misconduct investigations conducted by MCSO personnel. Of these, 57 were externally generated.

Paragraph 246.a. requires that a civilian complainant receive a written notice of receipt of his/her complaint within seven days. This letter must include the tracking number, the name of the investigator assigned, and information regarding how the complainant can inquire about the status of his/her complaint. In all but two (4%) of the externally generated cases where PSB had contact information for the complainant, the letter was sent within seven days as required. All of the letters sent and reviewed included the name of the investigator and information regarding how the complainant could inquire about the status of the complaint.

WAI 53520

Paragraph 246.b. requires that PSB notify a civilian complainant of the outcome of the investigation. In all of the externally generated complaints, the complainant was provided a notice of the outcome when contact information was known.

Paragraph 246.c. requires that PSB notify a civilian complainant of any discipline imposed as soon as permitted by law. In all of the externally generated complaints with sustained findings, PSB properly notified the complainant of the sustained findings and the discipline imposed when contact information for the complainant was known.

**Paragraph 247.** *Notwithstanding the above written communications, a complainant and/or his or her representative may contact the Professional Standards Bureau at any time to determine the status of his or her complaint. The Sheriff shall require the MCSO to update the complainant with the status of the investigation.*

**In Full and Effective Compliance**

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed 87 administrative misconduct investigations conducted by MCSO. Sixty-two were externally generated. We did not identify any instances where a complainant was discouraged from, or denied, contact with MCSO investigators to determine the status of his/her complaint, or to request and receive an update. MCSO appropriately had contact with complainants as required in Paragraph 246 in all of these cases where the complainant was known and wished to participate in the investigation. In four of the cases, MCSO personnel reported that they had additional contact with the complainant during the course of the investigation.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 248.** *The Professional Standards Bureau will track, as a separate category of complaints, allegations of biased policing, including allegations that a deputy conducted an investigatory stop or arrest based on an individual's demographic category or used a slur based on an individual's actual or perceived race, ethnicity, nationality, or immigration status, sex, sexual orientation, or gender identity. The Professional Standards Bureau will require that complaints of biased policing are captured and tracked appropriately, even if the complainant does not so label the allegation.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

WAI 53521

Each month, PSB provides a list of new complaints alleging biased policing. PSB also provides all closed investigations where biased policing was alleged. For this Paragraph, only allegations of biased policing that do not affect the Plaintiffs' class are reported. Those complaints alleging bias against members of the Plaintiffs' class are captured in a separate category and reported under Paragraphs 275-288.

During this reporting period, PSB completed five investigations where potential bias was alleged that did not affect members of the Plaintiffs' class. All five investigations were investigated by PSB, completed after July 20, 2016; tracked in a separate category as required by this Paragraph; and reported in Paragraph 33.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 249.** *The Professional Standards Bureau will track, as a separate category of complaints, allegations of unlawful investigatory stops, searches, seizures, or arrests.*

**In Full and Effective Compliance**

To determine Phase 2 compliance for this Paragraph, we review a monthly report from PSB that provides the information required for compliance.

To ensure that we are consistently informed of complaints relative to this Paragraph, PSB provides information concerning these investigations in its monthly document submission relative to this Paragraph.

During this reporting period, MCSO submitted for our review one investigation related to this Paragraph. The investigation was tracked in a separate category as required by this Paragraph.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 250.** *The Professional Standards Bureau will conduct regular assessments of the types of complaints being received to identify and assess potential problematic patterns and trends.*

**Phase 1:** In compliance

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

PSB continues to prepare a comprehensive quarterly assessment of the types of complaints received to identify and assess potential problematic patterns or trends. During this reporting period, there were 187 complaints received; 40 complaints alleged that employees used inappropriate language or took inappropriate actions toward employees and members of the

WAI 53522

public. There were 34 complaints alleging rude behavior toward members of the public. There were 20 complaints that alleged on- or off-duty criminal acts by MCSO employees, with five involving allegations of sexual assault; three reports alleging an assault; two involving allegations of harassment; two reports of alleged illegal use of drugs; and two reports of employees driving under the influence. There were six allegations that involved threats of harm, forgery, impersonating a police officer, property damage, consumption of alcohol in a restaurant while carrying a firearm, and illegal kickbacks.

There were 22 complaints alleging that employees failed to comply with MCSO's policies. There were 18 complaints that alleged that inmates were mistreated. There were 18 investigations opened with allegations that involved biased law enforcement actions, racial slurs, and disparaging comments or actions toward members of a protected class. There were 13 allegations of inappropriate uses of force.

There were 10 allegations involving employees engaging in behavior that included belittling, humiliating, disrespecting other employees, and spreading rumors and gossip. There were nine allegations that deputies had mishandled investigations or calls for service. There were nine investigations opened involving allegations of employees driving unsafely or being in at-fault traffic crashes. There were eight allegations of employees providing untruthful statements. There were eight allegations of employees being derelict in their assigned duties; eight allegations of workplace professionalism misconduct between employees; and seven allegations of employees abusing their authority.

The assessment identified one employee that received three complaints during the reporting period; however, none of the complaints followed a trend or pattern. Another employee was identified as being named in three complaints; two of which involved sleeping while on duty. In addition, the assessment identified six employees that each had two investigations opened with what appears to be a pattern or trend of alleged misconduct.

The assessment identified the Lower Buckeye Jail facility as the Division that received the highest number of complaints during the reporting period. There were 23 complaints received during the reporting period. There were four complaints alleging employees used unprofessional and inappropriate language, actions, and gestures while in the workplace toward or around inmates; three allegations regarding retaliation for inmate grievances; three alleging that inmates were not provided medical attention; two allegations of employees exhibiting demeaning behavior toward subordinate employees; and two allegations of inappropriate uses of force. The additional nine complaints did not appear to follow a trend or pattern.

The assessment also included a summary of notable trends and patterns that were identified by PSB at various MCSO Divisions that did not have a high number of complaints.

The contents of the quarterly assessment are discussed at executive staff meetings. PSB also includes the information required by this Paragraph in its public Semi-Annual Misconduct Investigations Report, which is required under Paragraph 251. The most recent Semi-Annual report for the period of January 1-June 30, 2020, contains the issues identified as potentially problematic patterns or trends for that six-month period.

MCSO remains in compliance with this requirement.

WAI 53523

## H. Transparency Measures

**Paragraph 251.** *The Sheriff shall require the Professional Standards Bureau to produce a semi-annual public report on misconduct investigations, including, at a minimum, the following:*

a. *summary information, which does not name the specific employees involved, about any sustained allegations that an employee violated conflict-of-interest rules in conducting or reviewing misconduct investigations;*

b. *aggregate data on complaints received from the public, broken down by district; rank of principal(s); nature of contact (traffic stop, pedestrian stop, call for service, etc.); nature of allegation (rudeness, bias-based policing, etc.); complainants' demographic information; complaints received from anonymous complainants or third parties; and principals' demographic information;*

c. *analysis of whether any increase or decrease in the number of civilian complaints received from reporting period to reporting period is attributable to issues in the complaint intake process or other factors;*

d. *aggregate data on internally-generated misconduct allegations, broken down by similar categories as those for civilian complaints;*

e. *aggregate data on the processing of misconduct cases, including the number of cases assigned to Supervisors outside of the Professional Standards Bureau versus investigators in the Professional Standards Bureau; the average and median time from the initiation of an investigation to its submission by the investigator to his or her chain of command; the average and median time from the submission of the investigation by the investigator to a final decision regarding discipline, or other final disposition if no discipline is imposed; the number of investigations returned to the original investigator due to conclusions not being supported by the evidence; and the number of investigations returned to the original investigator to conduct additional investigation;*

f. *aggregate data on the outcomes of misconduct investigations, including the number of sustained, not sustained, exonerated, and unfounded misconduct complaints; the number of misconduct allegations supported by the appropriate standard of proof; the number of sustained allegations resulting in a non-disciplinary outcome, coaching, written reprimand, suspension, demotion, and termination; the number of cases in which findings were changed after a pre-determination hearing, broken down by initial finding and final finding; the number of cases in which discipline was changed after a pre-determination hearing, broken down by initial discipline and final discipline; the number of cases in which findings were overruled, sustained, or changed by the Maricopa County Law Enforcement Merit System Council, broken down by the finding reached by the MCSO and the finding reached by the Council; and the number of cases in which discipline was altered by the Council, broken down by the discipline imposed by the MCSO and the disciplinary ruling of the Council; and similar information on appeals beyond the Council; and*

WAI 53524

g.  *aggregate data on employees with persistent or serious misconduct problems, including the number of employees who have been the subject of more than two misconduct investigations in the previous 12 months, broken down by serious and minor misconduct; the number of employees who have had more than one sustained allegation of minor misconduct in the previous 12 months, broken down by the number of sustained allegations; the number of employees who have had more than one sustained allegation of serious misconduct in the previous 12 months, broken down by the number of sustained allegations; and the number of criminal prosecutions of employees, broken down by criminal charge.*

**Phase 1:**  In compliance

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

The PSB Operations Manual identifies the PSB Commander as responsible for preparing the semi-annual public report on misconduct investigations.  The manual also contains provisions for the production of summary information regarding sustained conflict of interest violations; an analysis of the complaint intake process; and aggregate data on complaints (internal and external), processing of misconduct cases, outcomes of misconduct cases, and employees with persistent misconduct problems.

Since July 2019, PSB has issued and posted on MCSO's website its semi-annual public report. PSB also incorporates information relevant to Paragraph 192 in its semi-annual report, which requires that PSB review, at least semi-annually, all misconduct investigations that were assigned outside the Bureau to determine whether or not the investigation was properly categorized, whether the investigation was properly conducted, and whether appropriate findings were reached.  PSB also incorporates information relevant to Paragraph 250 in this report, which includes an assessment of potential problematic patterns or trends, based on a review on complaints received.

During our October 2019 site visit, PSB informed us that it developed a voluntary survey for complainants to complete after the conclusion of the investigation; the survey would capture complainants' demographic information.  In October 2019, MCSO provided us with a copy of the survey; and we provided our feedback to MCSO.  MCSO has identified a funding source for prepaid postage return envelopes.  The use of the prepaid postage return envelopes will allow the complainants to mail the survey to MCSO without having to incur any fees.  PSB commenced distribution of the surveys to complainants for cases that were closed during January 2020.  In addition, PSB is also informing complainants of a web-based version of the survey that may be completed online.  PSB is now collecting the voluntary surveys that are returned.  PSB included the relevant demographic information in the most recently published semi-annual report.

In January 2021, PSB issued and posted on the MCSO website its semi-annual public report for period of January 1-June 30 31, 2020.  The report was prepared consistent with prior reports prepared by PSB and contains the relevant information pertaining to this Paragraph.

MCSO remains in compliance with this requirement.

WAI 53525

***Paragraph 252.*** *The Sheriff shall require the MCSO to make detailed summaries of completed internal affairs investigations readily available to the public to the full extent permitted under state law, in electronic form on a designated section of its website that is linked to directly from the MCSO's home page with prominent language that clearly indicates to the public that the link provides information about investigations of misconduct alleged against MCSO employees.*

**Phase 1:** In compliance

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

PSB publishes detailed summaries each month of completed misconduct investigations in an electronic format that is accessible via MCSO's website. The following data fields have been identified for public disclosure: Internal Affairs Number; Date Opened; Incident Type; Original Complaint; Policy Violation(s) Alleged/Outcome; Discipline; Investigative Summary; and Date Completed. During our April 2017 site visit, we approved the PSB template containing detailed summaries of completed misconduct investigations for placement on the MCSO website. Each reporting period, we conduct a review of the detailed summaries of completed misconduct investigations to ensure that the content is consistent with the requirements of this Paragraph. In addition, we verify that the monthly detailed summaries of completed misconduct investigations are posted on MCSO's website for public review.

During this reporting period, PSB made the monthly detailed summaries of completed internal investigations for October, November, and December 2020 available to the public in a designated section on the homepage of MCSO's website. The reports provide significant details regarding alleged misconduct, the findings of the investigation, and, if there is a finding of misconduct, what type of discipline was imposed. MCSO remains in compliance with this requirement.


***Paragraph 253.*** *The MCSO Bureau of Internal Oversight shall produce a semi-annual public audit report regarding misconduct investigations. This report shall analyze a stratified random sample of misconduct investigations that were completed during the previous six months to identify any procedural irregularities, including any instances in which:*

*a.  complaint notification procedures were not followed;*

*b.  a misconduct complaint was not assigned a unique identifier;*

*c.  investigation assignment protocols were not followed, such as serious or criminal misconduct being investigated outside of the Professional Standards Bureau;*

*d.  deadlines were not met;*

*e.  an investigation was conducted by an employee who had not received required misconduct investigation training;*

WAI 53526

*f.*     *an investigation was conducted by an employee with a history of multiple sustained misconduct allegations, or one sustained allegation of a Category 6 or Category 7 offense from the MCSO's disciplinary matrices;*

*g.*     *an investigation was conducted by an employee who was named as a principal or witness in any investigation of the underlying incident;*

*h.*     *an investigation was conducted of a superior officer within the internal affairs investigator's chain of command;*

*i.*     *any interviews were not recorded;*

*j.*     *the investigation report was not reviewed by the appropriate personnel;*

*k.*     *employees were promoted or received a salary increase while named as a principal in an ongoing misconduct investigation absent the required written justification;*

*l.*     *a final finding was not reached on a misconduct allegation;*

*m.*     *an employee's disciplinary history was not documented in a disciplinary recommendation; or*

*n.*     *no written explanation was provided for the imposition of discipline inconsistent with the disciplinary matrix.*

**Phase 1:** In compliance

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

**Phase 2:** In compliance

On June 26, 2018, we approved the methodology developed by AIU for the inspection that would address the requirements of this Paragraph, which would start with an inspection of investigations that commenced after November 1, 2017. AIU has opted to conduct monthly inspections of misconduct investigations in lieu of conducting a semi-annual audit. During this reporting period, AIU prepared inspection reports for misconduct investigations that closed during August, September, and November 2020.

When perceived deficiencies are identified, AIU requests a BIO Action Form from the specific District/Division Commander to address the issue(s).

MCSO remains in compliance with this requirement.

WAI 53527

### I.    Testing Program for Civilian Complaint Intake

***Paragraph 254.***  *The Sheriff shall initiate a testing program designed to assess civilian complaint intake.  Specifically, the testing program shall assess whether employees are providing civilians appropriate and accurate information about the complaint process and whether employees are notifying the Professional Standards Bureau upon the receipt of a civilian complaint.*

**Phase 1:**  In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.
- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

**Phase 2:**  In compliance

This Paragraph requires that MCSO develop a testing program that assesses "whether employees are providing civilians appropriate and accurate information about the complaint process and whether employees are notifying the Professional Standards Bureau upon the receipt of a civilian complaint."  We evaluate MCSO's compliance with this Paragraph based on how the agency responds to the outcomes of the tests, regardless of whether the tests "succeed" or "fail."

To meet the requirements of this Paragraph, AIU contracts with an independent vendor, Progressive Management Resources (PMR), which is responsible for conducting complaint intake testing via telephone, email, U.S. Mail, MCSO's website, and via in-person tests.  We receive and review documentation of these tests – including any available audio-recorded documentation – as they are completed, as part of our monthly document requests.  PMR does not advise AIU of the tests in advance but instead emails AIU once a test has been completed with documentation of the test.

During the last reporting period, we had concerns about two complaint intake tests, both conducted via telephone.  In one, an MCSO employee entered the tester's contact information incorrectly, leading PSB to be unable to contact the tester; in the other, a dispatcher did not follow the proper procedures outlined in GI-1 (Radio and Enforcement Communications Procedures).  As we discussed with MCSO during our January 2021 remote site visit, AIU appropriately handled both tests by issuing BIO Action Forms to address the deficiencies.

During this reporting period, PMR conducted three tests:  one via MCSO's website; one via U.S Mail; and one via telephone, to MCSO's Lake Patrol.

In the website complaint, the tester, who was alleging racial profiling by a deputy, noted on the tester documentation that she had difficulty locating MCSO's complaint form online.  She wrote, "It seems this process for arriving at the comment/complaint form could be easier, more transparent."  AIU agreed with her assessment and contacted MCSO's website design team to recommend some changes, which the team made.  AIU recontacted the tester, who agreed that the changes improved the usability of the website complaint form.

WAI 53528

In the U.S. Mail complaint, the tester, who contacted MCSO to allege that a deputy was driving "crazy," noted on the tester documentation that she received an email notification acknowledging her complaint seven days after she mailed it. The tester wrote, "In a significant complaint this would result in lost investigation time that could be detrimental. Perhaps analysis of processing of mailed complaints would be beneficial to assess if efficiencies could be improved." AIU noted in its review of this test, "Although the complaint was mailed locally, PSB's operations are not open on weekends and mail addressed to PSB is routed first to a mailroom before being delivered to PSB." While we understand that this processing may have contributed to the seven days that the tester had to wait for a response, we recommend that AIU pay close attention to more significant or unexplainable delays, as the tester is correct that any delays could lead to lost investigation time.

In the telephone complaint to Lake Patrol, the tester, who called to allege rudeness by a deputy, noted that one of the MCSO staff members with whom she interacted was informal; the staff member introduced herself merely by her first name. AIU noted in its review of this test that this employee was new and was still in training, and that she transferred the call to her supervisor, who took the complaint.

Following the outcome of several tests in which front-line staff responded inappropriately to complaint intake tests, we have encouraged MCSO to provide refresher training on the complaint process to all employees who interact with the public. AIU developed a useful complaint intake checklist for administrative staff, which we and the Parties reviewed and approved; MCSO distributed the checklist to the Patrol Divisions for dissemination to their personnel in mid-September, and the checklist is available to all employees via the agency's shared internal hard drive. During our January 2021 remote site visit, we discussed with AIU refresher training on the complaint process. AIU personnel has discussed with Training Division staff some possible changes to the complaint intake training, including making it more useful for administrative staff. According to AIU, this revised training is still in progress; AIU expects to share a new version with us and the Parties within the second quarter of 2021.

**Paragraph 255.** *The testing program is not intended to assess investigations of civilian complaints, and the MCSO shall design the testing program in such a way that it does not waste resources investigating fictitious complaints made by testers.*

**Phase 1:** In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

**Phase 2:** In compliance

WAI 53529

AIU has informed its complaint intake testing vendor of this requirement. AIU has created several procedures to ensure that the Complaint Intake Testing Program does not waste resources investigating fictitious complaints made by testers – including setting parameters for the types of inquiries that testers make, and creating official identification cards for testers designating them as such. For in-person tests, AIU requires that the vendor inform AIU in advance of all tests; and AIU personnel make themselves available via telephone if testers encounter any issue as they lodge their test complaints.

***Paragraph 256.*** *The testing program shall assess complaint intake for complaints made in person at MCSO facilities, complaints made telephonically, by mail, and complaints made electronically by email or through MCSO's website. Testers shall not interfere with deputies taking law enforcement action. Testers shall not attempt to assess complaint intake in the course of traffic stops or other law enforcement action being taken outside of MCSO facilities.*

**Phase 1:** In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

**Phase 2:** In compliance

AIU has advised its complaint intake testing vendor that testers shall not interfere with deputies taking law enforcement action, nor shall they attempt to assess complaint intake in the course of traffic stops or other law enforcement action being taken outside of MCSO facilities.

AIU has asked the vendor to inform AIU in advance of all in-person tests, and AIU personnel make themselves available via telephone if testers encounter any issue as they lodge their test complaints.

***Paragraph 257.*** *The testing program shall include sufficient random and targeted testing to assess the complaint intake process, utilizing surreptitious video and/or audio recording, as permitted by state law, of testers' interactions with MCSO personnel to assess the appropriateness of responses and information provided.*

**Phase 1:** In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

**Phase 2:** In compliance

WAI 53530

AIU has informed its complaint intake testing vendor of the requirements of this Paragraph. We receive copies of the recordings following the completion of the tests. Per the agreed-upon methodology, all tests conducted via telephone are audio-recorded; and all in-person testers' interactions with MCSO personnel are video-recorded to assess the appropriateness of responses and information provided.

**Paragraph 258.** *The testing program shall also assess whether employees promptly notify the Professional Standards Bureau of civilian complaints and provide accurate and complete information to the Bureau.*

**Phase 1:** In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

**Phase 2:** In compliance

AIU has informed its complaint intake testing vendor of the requirements of this Paragraph so that the tests it conducts shall also assess whether employees promptly notify the PSB of civilian complaints and provide accurate and complete information to the Bureau.

As it receives documentation about completed tests, AIU reviews the information; and issues Action Forms, authors memorandums of concern, or takes other appropriate action if a test fails or raises any concerns about the conduct of MCSO employees.

**Paragraph 259.** *MCSO shall not permit current or former employees to serve as testers.*

**Phase 1:** In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

**Phase 2:** In compliance

AIU has informed its complaint intake testing vendor of this requirement. AIU personnel have informed us that no current or former employees have served, or will serve in the future, as testers.

WAI 53531

***Paragraph 260.*** *The MCSO shall produce an annual report on the testing program.  This report shall include, at a minimum:*

a.      *a description of the testing program, including the testing methodology and the number of tests conducted broken down by type (i.e., in-person, telephonic, mail, and electronic);*

b.      *the number and proportion of tests in which employees responded inappropriately to a tester;*

c.      *the number and proportion of tests in which employees provided inaccurate information about the complaint process to a tester;*

d.      *the number and proportion of tests in which employees failed to promptly notify the Professional Standards Bureau of the civilian complaint;*

e.      *the number and proportion of tests in which employees failed to convey accurate information about the complaint to the Professional Standards Bureau;*

f.      *an evaluation of the civilian complaint intake based upon the results of the testing program; and*

g.      *a description of any steps to be taken to improve civilian complaint intake as a result of the testing program.*

**Phase 1:**  In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

**Phase 2:**  In compliance

AIU issued its first annual report on the complaint intake testing program on September 14, 2020. We discussed with MCSO the report's findings during our October 2020 remote site visit.  We and the Parties previously reviewed and approved the proposed methodology, as well as a draft template, for the report.  The annual report covers the 24 tests that were completed between July 1, 2019-June 30, 2020.  These tests included: eight in-person tests; three tests conducted via U.S. Mail; eight tests conducted via telephone; three tests conducted via email; and two tests conducted via MCSO's website.  With the publication of its first annual report on this program, MCSO achieved compliance with this Paragraph.

Beginning in January 2019, while not required by this Paragraph, AIU began issuing monthly reports on complaint intake testing.  We review these reports as they are published, and find that they accurately summarize the results of the complaint intake tests and any follow-up actions taken by MCSO.

WAI 53532

During our site visits, we continue to discuss with MCSO how executive staff review the challenges that the report identified and implement the recommendations made by AIU personnel in its annual report and monthly inspections of complaint intake tests. The complaint intake testing program will be most successful if MCSO makes agency-wide adjustments based on what it learns from both the successful and unsuccessful complaint intake tests. MCSO personnel have reported that the annual report's findings were shared in internal Town Hall meetings. AIU also plans to explore with the Training Division how to make this information available via the HUB. We will continue to discuss this with MCSO.

WAI 53533

# Section 13: Community Outreach and Community Advisory Board

**COURT ORDER XVI.** **COMMUNITY** **OUTREACH** **AND** **COMMUNITY** **ADVISORY BOARD**

*Paragraph 261.* *The Community Advisory Board may conduct or retain a consultant to conduct a study to identify barriers to the filing of civilian complaints against MCSO personnel.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

During this reporting period, the CAB continued to explore the possibility of retaining a consultant to conduct a study to identify barriers to the filing of civilian complaints against MCSO personnel, by researching polling firms that are experienced in working with Latino populations.

*Paragraph 262.* *In addition to the administrative support provided for in the Supplemental Permanent Injunction, (Doc. 670 ¶ 117), the Community Advisory Board shall be provided with annual funding to support its activities, including but not limited to funds for appropriate research, outreach advertising and website maintenance, stipends for intern support, professional interpretation and translation, and out-of-pocket costs of the Community Advisory Board members for transportation related to their official responsibilities. The Community Advisory Board shall submit a proposed annual budget to the Monitor, not to exceed $15,000, and upon approval of the annual budget, the County shall deposit that amount into an account established by the Community Advisory Board for that purpose. The Community Advisory Board shall be required to keep detailed records of expenditures which are subject to review.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

In July 2018, the Monitor approved CAB's proposed budget. The budget includes categories for expenses including community meetings; video production (to produce a short video in English and Spanish that provides information about the CAB and the MCSO complaint process); marketing materials; stipends for an assistant to help coordinate CAB meeting logistics; and reimbursement for CAB members' meeting expenses.

Following the Monitor's approval of the CAB's budget, the CAB established a bank account, and the County provided the $15,000. CAB members developed procedures for tracking funds and receiving reimbursement. We meet regularly with CAB members to discuss these procedures and review the CAB's expenditures to date; these records appear to be in order.

WAI 53534

# Section 14: Supervision and Staffing

## COURT ORDER XVII.    SUPERVISION AND STAFFING

**Paragraph 263.** *The following Section of this Order represents additions and amendments to Section X of the first Supplemental Permanent Injunction, Supervision and Evaluations of Officer Performance, and the provisions of this Section override any conflicting provisions in Section X of the first Supplemental Permanent Injunction.*

**Paragraph 264.** *The Sheriff shall ensure that all patrol deputies shall be assigned to a primary, clearly identified, first-line supervisor.*

### In Full and Effective Compliance

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the fourth quarter of 2020. For October, we reviewed a sample of shift rosters from Districts 4, 6, and 7, and Lake Patrol; for November, we reviewed a sample of shift rosters from Districts 1, 2, and 3; and for December, we reviewed a sample of shift rosters from Districts 4, 6, and 7, and Lake Patrol. Our reviews of monthly and daily rosters indicated that deputies were assigned to a single consistent supervisor, and deputies worked the same shifts as their supervisors.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 265.** *First-line patrol supervisors shall be responsible for closely and consistently supervising all deputies under their primary command.*

**Phase 1:** In compliance

- GB-2 (Command Responsibility), most recently amended on June 28, 2019.

**Phase 2:** Not in compliance

Paragraph 265 is a general directive that covers several aspects of supervision. There are several requirements covered in other Paragraphs that directly concern this Paragraph; these requirements must be met before MCSO can establish compliance with Paragraph 265. We have determined that for MCSO to meet the requirements of this Paragraph, MCSO must be in compliance with Paragraphs 83, 85, 89, 90, 91, 93, and 94. During this reporting period, MCSO was in compliance with Paragraphs 83, 85, 89, 90, 91, and 93. The compliance rating for Paragraph 94 for this reporting period was 89.23%. MCSO has not achieved compliance with Paragraph 94, and therefore has not met compliance requirements for Paragraph 265.

WAI 53535

*Paragraph 266.  First-line patrol supervisors shall be assigned as primary supervisor to no more persons than it is possible to effectively supervise.  The Sheriff should seek to establish staffing that permits a supervisor to oversee no more than eight deputies, but in no event should a supervisor be responsible for more than ten persons.  If the Sheriff determines that assignment complexity, the geographic size of a district, the volume of calls for service, or other circumstances warrant an increase or decrease in the level of supervision for any unit, squad, or shift, it shall explain such reasons in writing, and, during the period that the MCSO is subject to the Monitor, shall provide the Monitor with such explanations.  The Monitor shall provide an assessment to the Court as to whether the reduced or increased ratio is appropriate in the circumstances indicated.*

### In Full and Effective Compliance

To assess Phase 2 compliance with this Paragraph, we review a sample of daily shift rosters for the three months of the reporting period.  We examine rosters to ensure that Patrol supervisors are not assigned more personnel than they can effectively supervise.  We also review rosters to ensure supervisors oversee no more than eight deputies, and we ensure that supervisors oversee no more than 10 persons; this could include a combination of deputies, Deputy Service Aides (DSAs), and Posse members.  In addition, we review monthly submissions to determine if Patrol supervisors generated any memorandums to document instances where the span of control exceeded the established ratios.  As per MCSO policy, supervisors are required to document shifts where the span of control was exceeded, in a memorandum to the District Commander.

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the fourth quarter of 2020.  For October, we reviewed a sample of shift rosters from Districts 4, 6, and 7, and Lake Patrol; for November, we reviewed a sample of shift rosters from Districts 1, 2, and 3; and for December, we reviewed a sample of shift rosters from Districts 4, 6, and 7, and Lake Patrol.  Our reviews of monthly and daily rosters indicated that deputies were assigned to and worked the same schedules as their supervisors, and supervisors were available to provide on-scene supervision.

For October, there were 10 shifts where supervisors exceeded the 1:8 sworn ratio.  For each of these shifts where the span of control was exceeded, supervisors wrote memorandums documenting the event.  District 1 had four shifts where the span of control was exceeded, and District 2 had six shifts where the span of control was exceeded.  For November, there were five shifts were supervisors exceeded the 1:8 sworn ratio.  Supervisors wrote memorandums documenting each of these events.  District 1 had three shifts where the span of control was exceeded, and District 2 had two shifts where the span of control was exceeded.  For December, there were two shifts were supervisors exceeded the 1:8 ratio.  Supervisors wrote memorandums documenting each of these events.  District 2 had one shift where the span of control was exceeded, and District 4 had one shift where the span of control was exceeded.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 53536

***Paragraph 267.*** *Supervisors shall be responsible for close and effective supervision of deputies under their command. Supervisors shall ensure that all deputies under their direct command comply with MCSO policy, federal, state and local law, and this Court's orders.*

**Phase 1:** In compliance

- GB-2 (Command Responsibility), most recently amended on June 28, 2019.

**Phase 2:** Not in compliance

Close and effective supervision requires that supervisors consistently apply the concepts established in several Paragraphs of the First Order. There are requirements covered in other Paragraphs that directly concern Paragraph 267, and must therefore be in compliance for MCSO to establish compliance with this Paragraph. We have determined that for MCSO to meet the requirements of this Paragraph, it must achieve compliance with Paragraphs 83, 85, 89, 90, 91, 93, and 96. During the fourth quarter of 2020, our reviews found MCSO in compliance with Paragraphs 83, 85, 89, 90, 91, and 93, but not in compliance with Paragraph 96. MCSO is not in compliance with Paragraph 267.


***Paragraph 268.*** *During the term that a Monitor oversees the Sheriff and the MCSO in this action, any transfer of sworn personnel or supervisors in or out of the Professional Standards Bureau, the Bureau of Internal Oversight, and the Court Implementation Division shall require advanced approval from the Monitor. Prior to any transfer into any of these components, the MCSO shall provide the Court, the Monitor, and the parties with advance notice of the transfer and shall produce copies of the individual's résumé and disciplinary history. The Court may order the removal of the heads of these components if doing so is, in the Court's view, necessary to achieve compliance in a timely manner.*

**Phase 1:** In compliance

- Court Implementation Division Operations Manual, most recently revised on November 13, 2019.
- Professional Standards Bureau Operations Manual, most recently amended on December 13, 2018.

**Phase 2:** In compliance

During this reporting period, we received and approved one employee transfer into the Bureau of Internal Oversight (BIO). We reviewed the documentation for the employee and noted no issues of concern. The transfer was approved.

WAI 53537

# Section 15: Document Preservation and Production

**COURT ORDER XVIII.    DOCUMENT PRESERVATION AND PRODUCTION**

*Paragraph 269.  The Sheriff shall ensure that when the MCSO receives a document preservation notice from a litigant, the MCSO shall promptly communicate that document preservation notice to all personnel who might possibly have responsive documents.*

**Phase 1:**  In compliance

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on October 1, 2020.

- GD-9 User Guide, published on May 3, 2019.

**Phase 2:**  In compliance

To verify MCSO's Phase 2 compliance with this Paragraph, we reviewed monthly submittals of document preservation notices to MCSO employees.  The data reviewed for this reporting period included September through November 2020; as per an agreement that we reached with MCSO to stagger the document requests for this Paragraph, due to the large volume of data that MCSO had to provide prior to our site visits.

Document preservation is set in motion when a party sends a litigation hold notice or written directive to MCSO requesting the preservation of relevant documents or records and electronically stored information (ESI), in anticipation of future litigation against the agency. MCSO's Legal Liaison Section (LLS) manages litigation holds through Open Axes, a software program.  Upon the receipt of a litigation hold, which is usually sent by the Maricopa County Attorney's Office (MCAO), the LLS inputs the data into Open Axes which conducts a search for responsive documents within MCSO drives.  The system also identifies potential document custodians, which are later filtered by an LLS employee.  The LLS then serves the custodians with a legal hold in electronic format, known as a Document Preservation Notice, within five business days.  Upon receipt of the Open Axes email with the Document Preservation Notice, MCSO custodians must acknowledge receipt of the request and then complete a questionnaire that identifies responsive documents, both electronic and hardcopies; and preserve them in the manner in which they are kept in the course of business.

In light of the COVID-19 pandemic, we conducted a remote site visit in January 2021.  For this Paragraph, we reviewed all files provided by MCSO through ShareFile.  We reviewed a sample of the third-party source documents that generate the litigation holds that the LLS receives from MCAO.  The Document Preservation Notices have been distributed 100% in a timely manner to the custodians who may have responsive documents.

On October 1, 2020, MCSO published the most recent approved amendments to GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices).  As part of this revision, MCSO eliminated Attachment A (Document Preservation Acknowledgement), because it was emailing personnel the Document Preservation Notice and requesting the completion of

WAI 53538

Attachment B (Document Preservation Questionnaire) via Open Axes. The Document Preservation Questionnaire requires employees to: 1) acknowledge receipt of the document preservation; 2) acknowledge their responsibility to preserve records; 3) provide details regarding what they have done to research responsive records, documents, or ESI; and 4) identify what records, documents, or ESI they are preserving. GD-9 still requires that the Document Preservation Questionnaire be completed within 10 business days and provides a warning regarding the consequences of not preserving records. For September, prior to the new amendments to GD-9, MCSO remained in compliance returning Attachment A (eliminated as of October 1, 2020) in a timely fashion in 96% of instances, and Attachment B (renamed Attachment A as of October 1, 2020) in 98% of instances. We evaluated these for October and November 2020 with the new amendments to GD-9, and found MCSO employees to have returned Attachment A within the required 10 business days 95% of the time. The LLS found a few questionnaires that were not properly completed by MCSO personnel; LLS returned them, and they were resubmitted to the LLS. After resubmission, we found that 100% of the questionnaires were properly completed by MCSO personnel.

**Paragraph 270.** *The Sheriff shall ensure that when the MCSO receives a request for documents in the course of litigation, it shall:*

a. *promptly communicate the document request to all personnel who might possibly be in possession of responsive documents;*

b. *ensure that all existing electronic files, including email files and data stored on networked drives, are sequestered and preserved through a centralized process; and*

c. *ensure that a thorough and adequate search for documents is conducted, and that each employee who might possibly be in possession of responsive documents conducts a thorough and adequate search of all relevant physical and electronic files.*

**Phase 1:** In compliance

- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on October 1, 2020.

- GD-9 User Guide, published on May 3, 2019.

- GM-1 (Electronic Communications, Data and Voicemail), most recently amended on February 25, 2021.

**Phase 2:** In compliance

To verify MCSO's Phase 2 compliance with this Paragraph, we reviewed monthly submittals of requests for documents to MCSO employees for the reporting period and documents drafted by the LLS in search of documents from other MCSO Divisions. For this reporting period, we identified a sample of document requests and requested a copy of the responsive documents

sequestered and/or produced. The data reviewed for this reporting period included September through November 2020, as per an agreement we reached with MCSO to stagger the document requests for this Paragraph. This was due to the large volume of data that MCSO had to provide prior to our site visits.

Paragraph 270.a. requires prompt communication of document requests to all personnel who could possibly be in possession of responsive documents. GD-9 requires the LLS to enter the data into a tracking system within five business days of receipt and to draft a Document Production Notice within five additional business days. The LLS is required, within five business days, to respond to the request for production if sourced within LLS, or to forward to the required MCSO Division for production. The Divisions have 10 days to produce the data requested. In 100% of the cases, the LLS promptly communicated document requests to personnel who might be in possession of responsive documents.

Our review revealed that MCSO is manually forwarding the Document Production Notices in a timely manner to all of its Divisions. In addition, MCSO is sending the Document Production Acknowledgement Questionnaire (formerly Attachment C, now Attachment B), to all employees. In 100% of the cases, the personnel who provided responsive documents properly completed Attachment B.

Paragraph 270.b. requires that all responsive ESI be stored, sequestered, and preserved by MCSO through a centralized process. MCSO performs the searches through a centralized process established by the LLS. The preservation of the data is completed at the Division that has the actual document while the notation is made in the Open Axes program, which aids the LLS in the case management. LLS can now create a case, assign a case number, and trigger time alerts to the custodians of documents that LLS identifies through the system. Open Axes searches on the H, W, and U computer hard drives of MCSO, which are shared among Headquarters and the Districts. Documents found in any additional servers are kept in their servers by the document custodians who notify LLS. MCSO continues to manage litigation hold cases through Open Axes; all cases for this reporting period were managed through Open Axes.

The centralized process established by MCSO requires that all electronic data be sequestered and secured so as not to be purged. For this Paragraph, we review the data and visit MCSO areas to ensure that personnel are informed of the duty to preserve the data in both electronic and paper format, and that the employees are preserving the data. For this reporting period, because we were unable to travel to Maricopa County, we were unable to visit areas where hardcopies were kept in different MCSO areas. However, we added a quarterly request from the LLS Director for a certification that MCSO is sequestering the hard copies of documents responsive to the Document Preservation Notices. We randomly identified a sample from the quarterly data for this purpose. On January 13, 2020, the LLS Director certified that that the hardcopies for this reporting period were being preserved after reviewing all Document Preservation Questionnaire responses for the listed samples. When we resume our in-person site visits, we will continue to verify that the hardcopies are being preserved.

WAI 53540

Paragraph 270.c. requires that MCSO conduct an adequate search for documents, and that each employee who might possibly be in possession of responsive documents conducts a thorough and adequate search of all relevant physical and electronic files. We reviewed a sample of responsive documents for this reporting period, and MCSO identified responsive documents to the document production notices in 100% of the cases we reviewed.

**Paragraph 271.** *Within three months of the effective date of this Order, the Sheriff shall ensure that the MCSO Compliance Division promulgates detailed protocols for the preservation and production of documents requested in litigation. Such protocols shall be subject to the approval of the Monitor after a period of comment by the Parties.*

**Phase 1:** In compliance

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on October 1, 2020.
- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

**Phase 2:** In compliance

On June 17, 2019, MCSO published the Administrative Services Division Operations Manual, which details the protocols for the preservation and production of documents requested in litigation. The manual was recently amended on September 2, 2020.

**Paragraph 272.** *The Sheriff shall ensure that MCSO policy provides that all employees must comply with document preservation and production requirements and that violators of this policy shall be subject to discipline and potentially other sanctions.*

**Phase 1:** In compliance

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on October 1, 2020.

**Phase 2:** In compliance

During this reporting period, the data revealed that no internal investigations were completed against any MCSO employee for failure to preserve or produce documents.

WAI 53541

**COURT ORDER XIX.     ADDITIONAL TRAINING**

***Paragraph 273.***  *Within two months of the entry of this Order, the Sheriff shall ensure that all employees are briefed and presented with the terms of the Order, along with relevant background information about the Court's May 13, 2016 Findings of Fact, (Doc. 1677), upon which this Order is based.*

**In Full and Effective Compliance**

MCSO previously delivered this training on the E-Policy platform.  All personnel (100%) determined to be applicable by CID have received this training.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 53542

# Section 17: Complaints and Misconduct Investigations Relating to Members of the Plaintiff Class

**COURT ORDER XX.     COMPLAINTS AND MISCONDUCT INVESTIGATIONS RELATING TO MEMBERS OF THE PLAINTIFF CLASS**

*Paragraph 274. In light of the Court's finding that the MCSO, and in particular Sheriff Arpaio and Chief Deputy Sheridan, willfully and systematically manipulated, misapplied, and subverted MCSO's employee disciplinary policies and internal affairs processes to avoid imposing appropriate discipline on MCSO deputies and command staff for their violations of MCSO policies with respect to members of the Plaintiff class, the Court further orders as follows:*

### A.     Investigations to be Overseen and/or Conducted by the Monitor

*Paragraph 275.   The Monitor is vested with the authority to supervise and direct all of the MCSO's internal affairs investigations pertaining to Class Remedial Matters.  The Monitor is free from any liability for such matters as is set forth in ¶ 144 of the Supplemental Permanent Injunction.*

*Paragraph 276.   The Monitor shall have the authority to direct and/or approve all aspects of the intake and investigation of Class Remedial Matters, the assignment of responsibility for such investigations including, if necessary, assignment to his own Monitor team or to other independent sources for investigation, the preliminary and final investigation of complaints and/or the determination of whether they should be criminally or administratively investigated, the determination of responsibility and the imposition of discipline on all matters, and any grievances filed in those matters.*

**In Full and Effective Compliance**

The Second Order requires oversight by the Monitor for all internal investigations determined to be Class Remedial Matters (CRMs).  The Professional Standards Bureau (PSB) now schedules meetings every two weeks to discuss existing and incoming complaints to determine which, if any, could be CRMs.  During these meetings, PSB personnel discuss cases pending a CRM decision, cases determined to be CRMs, and any cases where the decision may be made that the case would not be classified as a CRM.  The PSB Commander determines the classification of the cases.  A member of our Team attends all of these meetings to provide the oversight required for this Paragraph.

At the end of the July-September 2016 reporting period, PSB had reviewed 442 administrative investigations that were open as of July 20, 2016; and determined that 42 of them met the basic criteria for CRMs.  These cases were reviewed during the scheduled CRM meetings.  In addition, a Monitoring Team member randomly selected an additional 52 cases from the 400 remaining pending cases; and concurred with PSB's assessment that the cases did not meet the basic criteria

WAI 53543

for CRMs. In addition to the 42 cases determined to be potential CRMs from the pending case list as of July 20, 2016, PSB identified an additional 10 cases that were potential CRM cases. At the end of the first reporting period after the Court's Second Order, nine cases had been determined to be CRMs; and one other was pending a CRM decision. The remaining cases reviewed were determined not to be CRMs.

At the end of the last reporting period, PSB had reviewed a total of 401 possible CRMs since August 2016. Of these, 89 were classified as CRMs.

During this reporting period, an additional 38 cases were reviewed as possible CRMs. Of these, eight were determined to be CRMs. At the end of this reporting period, there was a total of 439 cases that have been reviewed as possible CRMs; and 97 cases that have been determined to be CRMs since the July 20, 2016 Court Order.

Since July 20, 2016, MCSO has completed and submitted a total of 82 CRM cases. Five were closed and submitted for our review during this reporting period.

Of the 33 CRM cases that have been closed to date with findings of sustained misconduct and reviewed by our Team, 10 have involved employees who are deceased or left MCSO employment prior to the completion of the investigation or the disciplinary process. Twenty-three involved current employees of MCSO. Three of the 33 cases closed to date involved a sustained finding of misconduct involving bias related to the Plaintiffs' class: two sustained allegations of an inappropriate and biased comment; and one sustained allegation of bias-based policing.

During the scheduled meetings, case investigators continue to provide investigative updates on all cases that could be, or are, CRMs. Their briefings are thorough, and they continue to be responsive to any questions or input from members of our Team. In all cases where we have provided oversight since July 20, 2016, we have concurred with the decisions made by the PSB Commander regarding the case classifications and findings. Where appropriate, we have also approved the discipline in all these cases.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.


**Paragraph 277.** *This authority is effective immediately and shall remain vested in the Monitor until the MCSO's internal affairs investigations reach the benchmarks set forth in ¶ 288 below. With respect to Class Remedial Matters, the Monitor has plenary authority, except where authority is vested in the Independent Investigative and Disciplinary Authorities separately appointed by the Court, as is further set forth in ¶¶ 296–337 below.*


**Paragraph 278.** *The Sheriff shall alert the Monitor in writing to all matters that could be considered Class Remedial Matters, and the Monitor has the authority to independently identify such matters. The Monitor shall provide an effective level of oversight to provide reasonable assurance that all Class Remedial Matters come to his attention.*

WAI 53544

**In Full and Effective Compliance**

Since the first CRM meeting held on August 17, 2016, PSB has consistently completed the required notification to us regarding the cases that could be considered CRMs. A Monitoring Team member has attended every CRM meeting with PSB where these matters are discussed and personally reviewed a number of the cases that were pending on July 20, 2016; and our Team member reviews the new cases that are presented at each meeting. There has been no need for us to independently identify CRMs, as PSB consistently properly identifies and reports these cases as required.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

*Paragraph 279. The Monitor shall have complete authority to conduct whatever review, research, and investigation he deems necessary to determine whether such matters qualify as Class Remedial Matters and whether the MCSO is dealing with such matters in a thorough, fair, consistent, and unbiased manner.*

**In Full and Effective Compliance**

During the scheduled CRM meetings attended by a Monitoring Team member, PSB has consistently properly identified cases that could be, or are, CRMs. PSB personnel brief each case at these meetings, and their briefings have included all appropriate information. They have been responsive to any questions from our Team members during the meetings, and have responded appropriately to any suggestions we have raised. There has been no need for us to independently conduct any review, research, or investigation; as PSB is consistently properly identifying and investigating these cases.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

*Paragraph 280. The Monitor shall provide written notice to the Court and to the parties when he determines that he has jurisdiction over a Class Remedial Matter. Any party may appeal the Monitor's determination as to whether he has jurisdiction over a Class Remedial Matter to this Court within seven days of the Monitor's notice. During the pendency of any such appeal the Monitor has authority to make orders and initiate and conduct investigations concerning Class Remedial Matters and the Sheriff and the MCSO will fully comply with such action by the Monitor.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

WAI 53545

During this reporting period, cases involving both sworn and non-sworn members of MCSO have continued to be reviewed as possible CRMs, when appropriate. There were no appeals by any Parties regarding any of the CRM classifications.

**Paragraph 281.** *Subject to the authority of the Monitor, the Sheriff shall ensure that the MCSO receives and processes Class Remedial Matters consistent with: (1) the requirements of this Order and the previous orders of this Court, (2) MCSO policies promulgated pursuant to this Order, and (3) the manner in which, pursuant to policy, the MCSO handles all other complaints and disciplinary matters. The Sheriff will direct that the Professional Standards Bureau and the members of his appointed command staff arrive at a disciplinary decision in each Class Remedial Matter.*

**Phase 1:** In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 7, 2020.

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** Not in compliance

To evaluate Phase 2 compliance with this Paragraph, a Monitoring Team member has attended each meeting conducted by PSB to discuss Class Remedial Matters. PSB has consistently provided thorough briefings, and the PSB Commander has made appropriate decisions regarding these matters.

For the last reporting period, PSB submitted seven closed CRM cases for our review and our Team approved the findings in all seven. Two of the seven cases were not compliant as they were not completed within the required timeframes and insufficient justification existed for the delay. We found MCSO to be not in compliance with this Paragraph.

During this reporting period, MCSO completed and submitted for our review five CRM cases. We approved the findings in all five. None had sustained findings. We continued to find these investigations to be thorough and the findings supported by the facts of the investigation.

Unlike other administrative investigations where we review the entire case only after it has been completed and closed by MCSO, in the case of CRMs, we meet with PSB every two weeks to identify cases that should be considered CRMs. We also track the progress of those cases being investigated, reviewed, and finalized. Each step of the process requires review and approval by our Team. Of the five finalized CRM investigations we reviewed this reporting period, only two were completed by the investigator with the required 85-day timeframe. Only one was reviewed and finalized within the 180-day timeframe. We noted that for these five CRM cases, the average completion time for the investigation was 98 days, and for finalization of the case, 159 days.

WAI 53546

While these timeframes still exceed those required by the Orders, their completion time is significantly less than the overall average time for completion of all cases investigated by PSB, which MCSO reported was in excess of 600 days at the end of 2020.

Four of the cases reviewed resulted in findings of unfounded. In three, the complainant alleged bias against members of the Plaintiffs' class; and in the other, the complainant alleged bias in favor of members of the Plaintiffs' class. The findings by PSB were supported by appropriate evidence, and we concurred with the findings.

One of the five cases was closed with not sustained findings. This investigation involved a traffic stop conducted by an MCSO deputy in 2009. At that time, there were different requirements for traffic stops, TraCS data was not available as it is currently, and deputies did not have body-worn cameras. In this case, a member of the media requested to interview an MCSO employee regarding information they had received from another party about this 2009 traffic stop. Though this was not a complaint, based on the content of the request, PSB researched the traffic stop and identified the stop in question. PSB then appropriately initiated an administrative investigation, reaching of finding of not sustained. We concurred with the findings in this case.

***Paragraph 282.*** *The Sheriff and/or his appointee may exercise the authority given pursuant to this Order to direct and/or resolve such Class Remedial Matters, however, the decisions and directives of the Sheriff and/or his designee with respect to Class Remedial Matters may be vacated or overridden in whole or in part by the Monitor. Neither the Sheriff nor the MCSO has any authority, absent further order of this Court, to countermand any directions or decision of the Monitor with respect to Class Remedial Matters by grievance, appeal, briefing board, directive, or otherwise.*

**Phase 1:** In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 7, 2020.

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

There were no CRM cases completed during this, or previous reporting periods, in which the Sheriff and/or his appointee exercised their authority to resolve CRMs, which we needed to vacate or override.

WAI 53547

***Paragraph 283.*** *The Monitor shall review and approve all disciplinary decisions on Class Remedial Matters.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

At the end of this reporting period, MCSO has completed a total of 82 CRM cases since July 20, 2016. Five were closed during this reporting period.

***Paragraph 284.*** *The Sheriff and the MCSO shall expeditiously implement the Monitor's directions, investigations, hearings, and disciplinary decisions. The Sheriff and the MCSO shall also provide any necessary facilities or resources without cost to the Monitor to facilitate the Monitor's directions and/or investigations.*

**Phase 1:** In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 7, 2020.

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 25, 2020.

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.

- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

During this and previous reporting periods, a Monitoring Team member has attended all scheduled CRM meetings conducted in an appropriate location determined by MCSO. PSB continues to provide a password and access to the IAPro system to a member of our Team so that we can complete independent case reviews if necessary.

PSB personnel continue to be professional and responsive to all input, questions, or concerns we have raised.

***Paragraph 285.*** *Should the Monitor decide to deviate from the Policies set forth in this Order or from the standard application of the disciplinary matrix, the Monitor shall justify the decision in writing and place the written explanation in the affected employee's (or employees') file(s).*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

Since we began monitoring CRM cases in July 2016, there have been a total of 33 cases with sustained findings. Seven have sustained findings on two separate deputies who are deceased, and three involve deputies who left MCSO employment prior to the determination of discipline. Twenty-three cases involve sustained findings against current MCSO employees. All 23 cases

WAI 53548

resulted in appropriate sanctions based on MCSO policy and the Discipline Matrices in effect at the time the investigations were conducted. No action on our part has been necessary relative to this Paragraph.

During this reporting period, there were five CRM cases forwarded for our review. None resulted in sustained findings against any employee.

**Paragraph 286.** *Should the Monitor believe that a matter should be criminally investigated, he shall follow the procedures set forth in ¶¶ 229–36 above. The Commander of the Professional Standards Bureau shall then either confidentially initiate a Professional Standards Bureau criminal investigation overseen by the Monitor or report the matter directly and confidentially to the appropriate prosecuting agency. To the extent that the matter may involve the Commander of the Professional Standards Bureau as a principal, the Monitor shall report the matter directly and confidentially to the appropriate prosecuting agency. The Monitor shall then coordinate the administrative investigation with the criminal investigation in the manner set forth in ¶¶ 229–36 above.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on June 25, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

During this reporting period, there were five CRM cases submitted for our review. No action on our part relative to this Paragraph was necessary.

**Paragraph 287.** *Any persons receiving discipline for any Class Remedial Matters that have been approved by the Monitor shall maintain any right they may have under Arizona law or MCSO policy to appeal or grieve that decision with the following alterations:*

a.   *When minor discipline is imposed, a grievance may be filed with the Sheriff or his designee consistent with existing MCSO procedure. Nevertheless, the Sheriff or his designee shall immediately transmit the grievance to the Monitor who shall have authority to and shall decide the grievance. If, in resolving the grievance, the Monitor changes the disciplinary decision in any respect, he shall explain his decision in writing.*

b.   *disciplined MCSO employee maintains his or her right to appeal serious discipline to the Maricopa County Law Enforcement Merit System Council to the extent the employee has such a right. The Council may exercise its normal supervisory authority over discipline imposed by the Monitor.*

**In Full and Effective Compliance**

Thirty-three completed CRM cases have had sustained findings of misconduct since the issuance of the Second Order. We concurred with MCSO's decisions in all of these cases.

WAI 53549

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 288.** *The Monitor's authority over Class Remedial Matters will cease when both:*

a,   *The final decision of the Professional Standards Bureau, the Division, or the Sheriff, or his designee, on Class Remedial Matters has concurred with the Monitor's independent decision on the same record at least 95% of the time for a period of three years.*

b.   *The Court determines that for a period of three continuous years the MCSO has complied with the complaint intake procedures set forth in this Order, conducted appropriate internal affairs procedures, and adequately investigated and adjudicated all matters that come to its attention that should be investigated no matter how ascertained, has done so consistently, and has fairly applied its disciplinary policies and matrices with respect to all MCSO employees regardless of command level.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

During this and prior reporting periods, we and PSB have agreed on the investigative outcome of each CRM investigation completed.

PSB is responsible for the investigation of all CRM cases, and has continued to appropriately identify cases that could be, or are, CRMs. PSB personnel are professional in our contacts with them and responsive to any concerns or questions we have raised; and they provide detailed information and updates in the scheduled briefings. Their written reports are thoroughly prepared, and the reports have been consistent with the information provided during the twice monthly case briefings.

**Paragraph 289.** *To make the determination required by subpart (b), the Court extends the scope of the Monitor's authority to inquire and report on all MCSO internal affairs investigations and not those merely that are related to Class Remedial Matters.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

During the last reporting period, we reviewed a total of 174 internal investigations. Twenty-eight were criminal investigations, and 146 were administrative investigations. All 28 criminal investigations were in compliance. Of the 146 administrative investigations, Eight (24%) were in compliance with all investigative and administrative requirements over which the PSB Commander has authority. We concurred with all of the discipline decisions made by the Appointing Authority.

WAI 53550

During this reporting period, we reviewed 90 investigations. Three were criminal investigations, all of which were found in compliance. Administrative investigations accounted for 87 of the investigations we reviewed.

As previously noted, we assess justifications for any extensions or other delays based on investigative considerations, not workload. Of the 87 total administrative investigations completed, 23 (26%) were completed and submitted by the investigator in the required 60- or 85-day requirement. An additional 22 investigations that were not completed within 60 or 85 days contained specific and acceptable extension requests. Of the 87 total, 42 (48%) were not in compliance with the requirements for investigative completion and submittal of an investigation. Thirty-one (36%) were submitted and reached final closure within 180 days or had an acceptable extension request and approval on file.

There was one completed administrative misconduct investigation submitted for compliance with Paragraph 249 (investigatory stops). There were five investigations submitted for compliance with Paragraph 33 (bias policing). Five were completed and submitted for compliance with Paragraph 275 (CRMs) during this reporting period.

We found that PSB was compliant in 9 (19%) of the 48 investigations it conducted. There was one investigation submitted and reviewed by our Team that was conducted by the contract investigator retained by MCSO that was found not in compliance.

Of the 38 investigations conducted by Divisions and Districts outside of PSB, 10 (26%) were in compliance. Overall compliance for all administrative misconduct investigations reviewed during this reporting period was 22%.

During our July 2020 remote site visit, we met with PSB personnel to discuss the deficiencies in those investigations conducted by both their personnel and Divisions outside PSB. We also met with the Deputy Chiefs who have oversight for investigations conducted outside of PSB. It was our intent to have a meaningful dialogue with these Chiefs regarding the deficiencies we continue to find, the actions they have taken to address the ongoing concerns, and other ideas they might have for addressing future deficiencies. Unfortunately, the involved Chiefs did not offer any substantive input. A member of the Training Division staff also participated in the call, and offered to conduct additional training on how to determine proper findings in investigations, as this is one of the ongoing deficiencies we are finding.

During our October 2020 remote site visit, we met with PSB personnel to discuss the deficiencies in their investigations and those conducted by Districts outside of PSB. For the second site visit in a row, we also met with the Deputy Chiefs who have oversight for investigations conducted outside of PSB. We found the discussions during this site visit to be productive.

WAI 53551

During our January 2021 remote site visit, we again met with PSB personnel to discuss the deficiencies in their investigations. We also met with the Deputy Chiefs who have oversight for investigations conducted outside of PSB. As previously noted, during this site visit, we again found our discussions with PSB and the Deputy Chiefs to be productive. We continue to note added oversight and reviews being conducted on District and Division investigations and are seeing improvement in the quality of investigations being completed. We did note, however, that in some cases, the additional oversight and review by District Command personnel and Deputy Chiefs is creating increased delays in the completion of investigations. We agree with the need to conduct additional reviews at this time, despite the increased time delay, but are hopeful that in the future, such extensive review will become unnecessary and the quality of the investigations and the first level review will be sufficient to ensure compliance.

Effective with the revisions to internal affairs and discipline policies on May 18, 2017, the PSB Commander may now determine that a received complaint can be classified as a "service complaint" if certain specified criteria exists. Service complaint documentation must then be completed and is reviewed under this Paragraph.

During this reporting period, we reviewed 155 service complaints completed by MCSO. In 16, an administrative misconduct investigation was opened after review by PSB. The remaining 139 were approved by PSB as service complaints. We agree with the handling of these complaints in 134 (96%). In two, we believe that misconduct allegations were made and an administrative misconduct investigation should have been conducted. In three others, while we agree they were properly classified as service complaints, they lacked a timely response to the complainant.

Effective with the revisions to the internal affairs and discipline policies, the PSB Commander is now authorized to determine that an internal complaint of misconduct does not necessitate a formal investigation if certain criteria exist. During this reporting period, the PSB Commander did not use this discretion for any complaints.

*Paragraph 291. The Monitor shall report to the Court, on a quarterly basis, whether the MCSO has fairly, adequately, thoroughly, and expeditiously assessed, investigated, disciplined, and made grievance decisions in a manner consistent with this Order during that quarter. This report is to cover all internal affairs matters within the MCSO whether or not the matters are Class Remedial Matters. The report shall also apprise the Court whether the MCSO has yet appropriately investigated and acted upon the misconduct identified in the Court's Findings of Fact, whether or not such matters constitute Class Remedial Matters.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

This report, including all commentary regarding MCSO's compliance with investigative and disciplinary requirements, serves as our report to the Court on these matters. An overall summary of our compliance observations and findings is provided below.

WAI 53552

During this reporting period, we reviewed 87 administrative misconduct investigations and three criminal misconduct investigations. All three criminal investigations were in compliance with the Second Order. Of the 90 total administrative and criminal misconduct investigations we reviewed, 22 (24%) were in full compliance with the Second Order, an increase from 16% during the last quarter. Of the 87 administrative investigations, 19 (22%) were in full compliance with the Second Order.

During July-December 2016, PSB provided us with a memorandum describing PSB's efforts in meeting the requirements of this Paragraph related to the Court's Findings of Fact. MCSO had outsourced three cases to another law enforcement agency, and an additional four investigations were pending outsourcing to an outside investigator. These cases were outsourced due to the involvement of the former Chief Deputy, or other conflicts of interest identified by MCSO, and included the investigations identified in Paragraph 300. MCSO processed a Request for Proposal and retained an outside investigator who met the requirements of Paragraphs 167.iii and 196 to conduct the investigations identified. One potential misconduct case identified in the Court's Findings of Fact was retained and investigated by PSB, as no identifiable conflict of interest appeared to exist.

PSB provided us with a document sent by the Independent Investigator assigned by the Court to investigate, or reinvestigate, some of the misconduct that is related to the Plaintiffs' class. In this document, the Independent Investigator clarified his intent to investigate the matters assigned to him by the Court, as well as the matters that the Court determined were the discretion of the Independent Investigator. He further clarified that his investigations would include the initial misconduct alleged, as well as any misconduct that might have occurred during the process of review or issuance of discipline by MCSO personnel.

During each site visit, we meet with PSB personnel to discuss the status of those cases that have been outsourced to any contract vendor, other law enforcement agency, or other person or entity, so that we can continue to monitor these investigations and ensure that all misconduct cases, including those identified in the Findings of Fact, are thoroughly investigated. PSB has continued to keep us apprised of the status of all such investigations.

During our January 2018 site visit, PSB advised us that two administrative misconduct investigations that had been outsourced to a separate law enforcement agency had been completed and closed. We received and reviewed both investigations. A third investigation that MCSO outsourced to this same law enforcement agency had been previously returned to MCSO without investigation, as the allegations duplicated those already under investigation by the Independent Investigator. MCSO outsourced six additional investigations to the contract investigator.

During our January 2019 site visit, PSB advised us that no additional investigations had been outsourced to the contract vendor. Six cases had been completed and forwarded to PSB for review. None had yet been forwarded to our Team for review. The Independent Investigator continued investigations identified by the Court, and notified us of the status of these cases on a regular basis. We also received closed investigations that he completed.

WAI 53553

During our April 2019 site visit, PSB advised that three additional investigations had been outsourced to the contract investigator. The six cases he had completed remained in review by PSB personnel. We had not received any of the investigations completed by this investigator for our review.

During our July 2019 site visit, PSB personnel advised us that they had outsourced an additional four investigations to the contract investigator. We received and reviewed four completed investigations conducted by this investigator. In all four cases, we found the investigations to be thorough and well-written. All, however, were noncompliant as proper extension memorandums were not completed. Additional cases completed by this investigator have been forwarded to PSB for their review prior to forwarding to our Team.

During our October 2019 site visit, PSB personnel advised us that they had not outsourced any additional cases to the contract investigator during the reporting period. We received and reviewed three investigations he had conducted. All three were well-written. However, two were noncompliant, as proper extension memorandums were not completed.

During this and the last three reporting periods, PSB did not outsource any additional cases to the contract investigator. During this reporting period, we reviewed one completed investigation conducted by this contractor. He has 22 investigations pending completion. One additional case remains outsourced to an outside law enforcement agency.

The Independent Investigator has previously completed all of the investigations identified by the Court, as well as those where he initiated new investigations due to potential misconduct he identified during his reviews. All have been reviewed by our Team to ensure they complied with the Order of Court. The Independent Discipline Authority has also previously submitted his final report on those cases that had sustained findings, and we reviewed these findings. We did not make compliance findings on these cases, but determined that both the 12 investigations specifically directed by the Court for reinvestigation, as well as the additional cases where the Independent Investigator determined an investigation should be conducted, were properly completed and addressed the concerns identified by the Court.


***Paragraph 292.*** *To make this assessment, the Monitor is to be given full access to all MCSO internal affairs investigations or matters that might have been the subject of an internal affairs investigation by the MCSO. In making and reporting his assessment, the Monitor shall take steps to comply with the rights of the principals under investigation in compliance with state law. While the Monitor can assess all internal affairs investigations conducted by the MCSO to evaluate their good faith compliance with this Order, the Monitor does not have authority to direct or participate in the investigations of or make any orders as to matters that do not qualify as Class Remedial Matters.*

**In Full and Effective Compliance**

PSB personnel continue to inform us of ongoing criminal and administrative misconduct investigations. A member of our Team attends each CRM meeting, reviews the lists of new internal investigations, and has access to PSB's IAPro database. The only cases for which any

WAI 53554

oversight occurs during the investigative process are those that are determined to be CRMs. We review all other misconduct investigations once they are completed, reviewed, and approved by MCSO personnel.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 293.** *The Monitor shall append to the quarterly reports it currently produces to the Court its findings on the MCSO's overall internal affairs investigations. The parties, should they choose to do so, shall have the right to challenge the Monitor's assessment in the manner provided in the Court's previous Order. (Doc. 606 ¶¶ 128, 132.)*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

Since we began reviewing internal investigations conducted by MCSO more than five years ago, we have reviewed hundreds of investigations into alleged misconduct by MCSO personnel. During this reporting period, we reviewed 87 administrative misconduct investigations, 155 service complaints, and three criminal misconduct investigations that were conducted by MCSO personnel. All three of the criminal investigations we reviewed for compliance during this reporting period were investigated by PSB and were in compliance with the requirements of the Second Order.

The investigative quality of PSB administrative investigations has remained high for numerous reporting periods, though District investigations have continued to be problematic. Overall timeliness, regardless of the justifications provided, has continued to improve quarter after quarter. During this reporting period, closure time for an administrative investigation conducted by Divisions or Districts outside of PSB was 398 days, a slight decrease from 401 during the last reporting period. The average completion time for investigations completed by sworn personnel in PSB was 544 days; and for investigations conducted by Detention personnel in PSB, 666 days. For all administrative investigations conducted by MCSO, the average completion time was 524 days, an increase from 509 days during the last reporting period. The failure to complete investigations in a timely manner and the continuing increase in the time it takes to fully close these investigations continues to be unacceptable, and is a disservice to the community and MCSO personnel.

PSB was responsible for conducting 49 of the 87 total administrative misconduct investigations we reviewed for this reporting period. Of the total 49 investigations conducted by PSB, nine (18%) were found to be in compliance.

Sworn investigators completed 13 of the 49 investigations conducted by PSB. Based on investigative and administrative deficiencies, two (15%) were in compliance. One was conducted by the contract investigator and was found noncompliant.

WAI 53555

Detention supervisors conducted 35 of the 44 investigations conducted by PSB. In one of these cases, we believe a finding of sustained should have been made and was not. In a second investigation, we believe the investigator failed to identify all principals in the investigation. Based on the investigative and administrative deficiencies in these cases, seven (20%) were in compliance.

Thirty-eight investigations were conducted by Districts or Divisions outside of PSB, 35 by District personnel and three by a Division other than Patrol. Fifteen of these investigations were found noncompliant due to unsupported findings, leading questions, or failure to address all investigative and overall administrative requirements. In many of those cases where we, or PSB, identified deficiencies, we believe that a more thorough review at the District or Division level could have resulted in the correction of the majority of them prior to the cases being forwarded to PSB. Based on the investigative and administrative deficiencies, we found 10 (26%) of the 38 investigations to be compliant with all Second Order requirements.

MCSO completed delivery of the 40-hour Misconduct Investigative Training at the end of 2017, and all sworn supervisors who investigate administrative misconduct attended the training. Refresher training on misconduct investigations has also been delivered since the initial 40-hour training. The investigative quality of PSB investigations has consistently remained high. Of the 38 investigations we reviewed that were completed outside of PSB, 15 were initiated prior to 2020. Of those, seven (47%) had investigative deficiencies. For those 23 investigations initiated after January 1, 2020, nine (39%) had investigative deficiencies. While those investigations conducted by Division or Districts outside of PSB continue to have significant investigative deficiencies, we noted that the 23 investigations initiated and completed during 2020 had fewer overall deficiencies than those initiated prior to 2020, an indication that the increased oversight is resulting in some improvement.

PSB personnel continue to be receptive to our input, and we have had many productive meetings and discussions regarding the investigations being conducted and the compliance for both PSB and District and Division Cases. We also discuss compliance concerns with District and Division Command during our site visits. During our next site visit, we will discuss those cases that are noncompliant with MCSO; and again address our concerns about the overall low compliance findings for this reporting period. We continue to stress that compliance is not the sole responsibility of any one individual or Division – but dependent on all those who complete, review, or approve internal investigations.

We have noted in numerous previous reporting periods that MCSO's executive leadership must take the appropriate action to ensure that adequate resources are dedicated to the completion of administrative and criminal misconduct investigations. PSB has continued to inform us that despite the approval for numerous additional investigative personnel in the July 2018 budget, only one of these positions has been filled and there is no indication that the additional positions will be filled in the foreseeable future. All of the civilian positions, including three civilian investigator positions, authorized in the July 2019 budget have been filled. MCSO advised us that no budget positions for PSB were requested for the July 2020 budget. We noted again during this reporting period that the case backlog in PSB continues to increase.

WAI 53556

**B.** **Investigations to be Conducted by the Independent Investigator and the Independent Disciplinary Authority**

**Paragraph 294.** *In its Findings of Fact, (Doc. 1677), the Court identified both: (1) internal affairs investigations already completed by the MCSO that were inadequate or insufficient; (see, e.g., Doc. 1677 at ¶ 903), and (2) misconduct or alleged misconduct that had never been investigated by MCSO that should be or should have been investigated. (Id. at ¶ 904.)*

**Paragraph 295.** *In light of MCSO's failure to appropriately investigate these matters, the Court appoints an Independent Investigator and an Independent Disciplinary Authority from the candidates set forth by the parties, and vests them with the authority to investigate and decide discipline in these matters.*

**1.** **The Independent Investigator**

**Paragraph 298.** *In assessing the existence of previously uncharged acts of misconduct that may be revealed by the Findings of Fact, the Independent Investigator does not have authority to investigate acts of misconduct that are not sufficiently related to the rights of the members of the Plaintiff class. While the Independent Investigator should identify such acts of misconduct and report those acts to the Commander of the Professional Standards Bureau, and to the Monitor for purposes of making the Monitor's assessment identified in ¶¶ 291–93 above, the Independent Investigator may not independently investigate those matters absent the authorization and the request of the Sheriff.*

**Paragraph 300.** *The following potential misconduct is not sufficiently related to the rights of the members of the Plaintiff class to justify any independent investigation:*

a. *Uninvestigated untruthful statements made to the Court under oath by Chief Deputy Sheridan concerning the Montgomery investigation. (Doc. 1677 at ¶ 385).*

b. *Uninvestigated untruthful statements made to the Court under oath by Chief Deputy Sheridan concerning the existence of the McKessy investigation. (Id. at ¶ 816).*

c. *Chief Deputy Sheridan's untruthful statements to Lieutenant Seagraves made during the course of an internal investigation of Detective Mackiewicz to the effect that an investigation into the overtime allegations against Detective Mackiewicz had already been completed. (Id. at ¶ 823).*

d. *Other uninvestigated acts of misconduct of Chief Deputy Sheridan, Captain Bailey, Sergeant Tennyson, Detective Zebro, Detective Mackiewicz, or others that occurred during the McKessy investigation. (Id. at ¶¶ 766–825).*

**Phase 1:** Not applicable

**Phase 2:** Deferred

WAI 53557

During our January 2017 site visit, the PSB Commander assured us that all acts of misconduct that we identified and discussed during our October 2016 site visit would be provided to a contracted investigator for investigative purposes.

Since that time, the PSB Commander has advised us that MCSO has contracted with a licensed private investigator. The contract investigator possesses the requisite qualifications and experience to conduct the investigations of misconduct outlined in Paragraph 300 (a.-c.), and the additional misconduct in the Findings of Fact that directly associates with Paragraph 300 (d.). PSB has not found it necessary to contract with any additional licensed private investigators.

During our April 2017 site visit, we met with PSB command staff and representatives from the Maricopa County Attorney's Office (MCAO) to verify that all of the acts of misconduct that were identified in the Findings of Fact (FOF) are under investigation, either by the Court-appointed Independent Investigator or the private licensed contract investigator. Before this meeting, PSB command provided us with a roster of related acts of misconduct that PSB intended to be assigned to the contract investigator. The roster of intended assignments did not include all of the acts of misconduct that we had discussed. MCAO and PSB command personnel explained that the Court also identified, in Paragraph 301, many of the acts of potential misconduct identified in the FOF as sufficiently related to the rights of members of the Plaintiffs' class. In Paragraph 301, the Court documented that because of this determination, investigations of the potential misconduct were justified if the Independent Investigator deemed that an investigation was warranted.

The Independent Investigator has completed all 12 of the administrative misconduct investigations specifically identified by the Court in the Second Order, and all other investigations for which he determined an administrative misconduct investigation should be conducted. The Independent Disciplinary Authority has also completed all of the discipline findings for these cases. While we did not make compliance findings for these cases, we reviewed them and found that they complied with the direction of the Court.

The contract investigator retained by MCSO continues to complete investigations that he has been assigned. During this reporting period, MCSO did not outsource any additional investigations to this contractor. One investigation conducted by this contractor was completed and forwarded for our review during this reporting period; 22 investigations are still in progress. One additional investigation previously outsourced to another law enforcement agency also remains under investigation.

Our ability to verify that all potential misconduct outlined in the FOF has been investigated by PSB, the PSB contract investigator, or the Independent Investigator remains pending until all the investigations are completed. Once this occurs, we can determine if there is any additional misconduct identified in the FOF that still requires investigation. Finally, the PSB Commander and MCAO advised us that the acts of misconduct involving (former) Sheriff Arpaio as identified in the FOF would not be investigated by any entity, as there does not exist any statute that addresses how a Sheriff would be disciplined in the event of a sustained finding resulting from an administrative misconduct investigation.

WAI 53558

***Paragraph 310.*** *The Monitor and the parties are directed to promptly comply with the Independent Investigator's requests for information. The Monitor and the Independent Investigator may communicate to coordinate their investigations. Nevertheless, each is independently responsible for their respective jurisdiction set forth in this Order, and each should make independent decisions within his own delegated responsibility.*

### 2. The Independent Disciplinary Authority

***Paragraph 337.*** *Nevertheless, when discipline is imposed by the Independent Disciplinary Authority, the employee shall maintain his or her appeal rights following the imposition of administrative discipline as specified by Arizona law and MCSO policy with the following exceptions:*

a.  *When minor discipline is imposed, a grievance may be filed with the Sheriff or his designee consistent with existing MCSO procedure. Nevertheless, the Sheriff or his designee shall transmit the grievance to the Monitor who shall have authority to decide the grievance. If in resolving the grievance the Monitor changes the disciplinary decision in any respect, he shall explain his decision in writing.*

b.  *A disciplined MCSO employee maintains his or her right to appeal serious discipline to the Maricopa County Law Enforcement Merit System Council to the extent the employee has such a right. The Council may exercise its normal supervisory authority over discipline imposed by the Independent Disciplinary Authority with one caveat. Arizona law allows the Council the discretion to vacate discipline if it finds that the MCSO did not make a good faith effort to investigate and impose the discipline within 180 days of learning of the misconduct. In the case of any of the disciplinary matters considered by the Independent Disciplinary Authority, the MCSO will not have made that effort. The delay, in fact, will have resulted from MCSO's bad faith effort to avoid the appropriate imposition of discipline on MCSO employees to the detriment of the members of the Plaintiff class. As such, the Council's determination to vacate discipline because it was not timely imposed would only serve to compound the harms imposed by the Defendants and to deprive the members of the Plaintiff class of the remedies to which they are entitled due to the constitutional violations they have suffered at the hands of the Defendants. As is more fully explained above, such a determination by the Council would constitute an undue impediment to the remedy that the Plaintiff class would have received for the constitutional violations inflicted by the MCSO had it complied with its original obligations to this Court. In this rare instance, therefore, the Council may not explicitly or implicitly exercise its discretion to reduce discipline on the basis that the matter was not timely investigated or asserted by the MCSO. If the Plaintiff class believes the Council has done so, it may seek the reversal of such reduction with this Court pursuant to this Order.*

## In Full and Effective Compliance

During this reporting period, no grievances were filed that met the criteria for transmitting to the Monitor.

WAI 53559

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 53560

# Section 18: Concluding Remarks

We assess compliance with 94 Paragraphs of the First Order, and 113 Paragraphs of the Second Order, for a total of 207 Paragraphs. MCSO is in Phase 1 compliance with 78 of the First Order Paragraphs, or 98%; and 103 of the Second Order Paragraphs, or 100%.

Including the 58 total Paragraphs in which MCSO is in Full and Effective Compliance, MCSO is in Phase 2, or operational compliance, with 75 of the First Order Paragraphs, or 79%. MCSO is in Phase 2 compliance with 104 of the Second Order Paragraphs, or 92%. Combining the requirements of both Orders, MCSO is in Phase 1 compliance with 181 Paragraphs, or 99%; and in Phase 2 compliance with 179 Paragraphs, or 86%.

MCSO published its second Traffic Stop Monthly Report (TSQR), and has now attained compliance with its obligations to conduct annual and quarterly traffic stop analyses. Despite ongoing efforts, including weekly calls with all involved, progress toward finalizing the TSMR process remains slow. The monthly analyses required by the First Order are perhaps the most critical, as their focus is on individual deputies and their patterns relative to traffic stops when compared to their peers. The feedback to MCSO on the TSMR process from us, the Plaintiffs, and the Plaintiff-Intervenors has been extensive, and MCSO must make bringing this project to its implementation phase a top priority.

As we reported in the last two reporting periods, we identified instances where deputies documented that Incidental Contact Receipts were issued to passengers during traffic stops; however, based on our reviews of the body-worn camera recordings, we determined that the receipts were not provided to the passengers. We provided MCSO with information on specific cases that we identified during this reporting period, and MCSO concurred with our findings. In some instances, MCSO instructed the deputies to mail the Incidental Contact Receipts to the passengers after we informed MCSO of the issue. During this reporting period, we identified additional instances where the deputies did not provide the passengers with the Incidental Contact Receipts. In some of those cases, MCSO informed us that the deputies prepared and provided the receipts to the passengers after the conclusion of the traffic stop – either via mail or the deputy delivered them in person. We encourage MCSO to provide guidance to deputies and supervisors on this topic to ensure that the receipts are provided to the passengers prior to the conclusion of the traffic stops.

MCSO has improved its rate of compliance with the documentation of the seizure of contraband and evidence on the Vehicle Stop Contact Forms during the last two reporting periods. However, based on MCSO's past challenges with attaining and maintaining compliance with this requirement, we continue to recommend that supervisors and executives reemphasize the policy requirements in this area.

In calendar year 2020, MCSO reported considerable personnel losses. Since April 2020, MCSO has reported an increase in the number of vacancies in every quarter of 2020. In April, MCSO reported 139 vacancies; in July, MCSO reported 443 vacancies; and in October, MCSO reported 522 total vacancies. During our January 2021 remote site visit, MCSO advised that there were 566 vacancies as of December 31, 2020. These vacancies included 90 sworn, 281 Detention, and 195 civilian vacancies. We are concerned that the number of positions being filled is not keeping

WAI 53561

up with attrition. While all three classifications are important to the law enforcement mission, sworn and Detention positions are of critical importance; and considering the amount of time that it takes to train employees for these positions, MCSO must consider all avenues in an attempt to address its personnel resource dilemma. MCSO advised us that prospective applicants are often reluctant to work in closed jail environments during the ongoing COVID-19 pandemic; MCSO has reported that this has presented difficulty in recruiting applicants for Detention positions. We believe MCSO may reach a critical point with Detention personnel in the near future if the agency and County do not find a viable solution.

During this reporting period, we continued to note that the investigative quality of the investigations conducted by PSB remains high. While investigative quality remains low in the investigations conducted outside of PSB, there does appear to be increased attention to these investigations by Command and Executive personnel. As we have noted throughout this report, in addition to the quality of investigations, we remain greatly concerned that, quarter after quarter, MCSO has failed to address the ever-increasing numbers of pending investigations. As of our January 2021 remote site visit, PSB reported that the number of pending administrative misconduct investigations in PSB had increased to 1,561; the time it takes to complete an investigation in PSB has increased to 544 days; and the average monthly caseloads of PSB investigators has increased to more than 60. Despite these continuing increases, MCSO has assigned virtually no additional investigative staff to PSB since 2016. This is simply indefensible, and a disservice to both community members and MCSO personnel.

WAI 53562

# Appendix: Acronyms

The following is a listing of acronyms frequently used in our quarterly status reports:

| | |
|---|---|
| AB | Administrative Broadcast |
| ACJIS | Arizona Criminal Justice Information System |
| ACLU | American Civil Liberties Union |
| ACT | Annual Combined Training |
| AIU | Audits and Inspections Unit |
| AOC | Arizona Office of Courts |
| ARG | Alert Review Group |
| ARS | Arizona Revised Statutes |
| ASU | Arizona State University |
| ATU | Anti-Trafficking Unit |
| BAF | BIO Action Form |
| BB | Briefing Board |
| BIO | Bureau of Internal Oversight |
| BWC | Body-worn camera |
| CAB | Community Advisory Board |
| CAD | Computer Aided Dispatch |
| CBP | Customs and Border Protection |
| CDA | Command Daily Assessment |
| CEU | Criminal Employment Unit |
| CID | Court Implementation Division |
| COrD | Community Outreach Division |
| CORT | Court Order Required Training |
| CRM | Class Remedial Matter |
| DOJ | Department of Justice |
| DSA | Deputy Service Aide |
| DUI | Driving Under the Influence |

WAI 53563

| EIS | Early Identification System |
|------|------|
| EIU | Early Intervention Unit |
| EPA | Employee Performance Appraisal |
| ESI | Electronically stored information |
| FAEC | Full and Effective Compliance |
| FBI | Federal Bureau of Investigation |
| FEC | Full and Effective Compliance |
| FOF | Findings of Fact |
| FTO | Field Training Officer |
| GI | General Instructor |
| ICE | Immigration and Customs Enforcement |
| IIU | Internal Investigations Unit |
| IMF | Incident Memorialization Form |
| IR | Incident Report |
| JED | Judicial Enforcement Division |
| LOS | Length of stop |
| LLS | Legal Liaison Section |
| MCAO | Maricopa County Attorney's Office |
| MCSO | Maricopa County Sheriff's Office |
| NOI | Notice of Investigation |
| NTCF | Non-Traffic Contact Form |
| PAL | Patrol Activity Log |
| PDH | Pre-Determination Hearing |
| POST | Peace Officers Standards and Training |
| PPMU | Posse Personnel Management Unit |
| PSB | Professional Standards Bureau |
| SID | Special Investigations Division |
| SMS | Skills Manager System |
| SPSS | Statistical Package for the Social Science |
| SRT | Special Response Team |

| | |
|---|---|
| TraCS | Traffic Stop Data Collection System |
| TSAR | Traffic Stop Annual Report |
| TSAU | Traffic Stop Analysis Unit |
| TSMR | Traffic Stop Monthly Report |
| TSQR | Traffic Stop Quarterly Report |
| VSCF | Vehicle Stop Contact Form |