# TWENTY-EIGHTH REPORT
## Independent Monitor
## for the
## Maricopa County Sheriff's Office



Reporting Period – First Quarter 2021

Chief (Ret.) Robert S. Warshaw

Independent Monitor

August 25, 2021

WAI 56246

# Table of Contents

Section 1: Introduction…………………………………………………...…………...3

Section 2: Methodology and Compliance Summary…………………………...............4

Section 3: Implementation Unit Creation and Documentation Request……………...11

Section 4: Policies and Procedures…………………….……………………………...15

Section 5: Pre-Planned Operations…………………….……….……………...44

Section 6: Training…………………………………………………….....................49

Section 7: Traffic Stop Documentation and Data Collection……………..…………60

Section 8: Early Identification System (EIS)…………….…………………..................107

Section 9: Supervision and Evaluation of Officer Performance…………...................132

Section 10: Misconduct and Complaints…………………………………....................163

Section 11: Community Engagement……………………………………….................168

Section 12: Misconduct Investigations, Discipline, and Grievances………..................175

Section 13: Community Outreach and Community Advisory Board………………256

Section 14: Supervision and Staffing……………………………………….................257

Section 15: Document Preservation and Production……………………………261

Section 16: Additional Training………………………………………………...........266

Section 17: Complaints and Misconduct Investigations Relating to

Members of the Plaintiff Class……………………………….................267

Section 18: Concluding Remarks…………………………………………..................285

Appendix: Acronyms……………………………………………..............287

WAI 56247

# Section 1: Introduction

This is the twenty-eighth report issued in my capacity as the Court-appointed Monitor in the case of *Manuel de Jesus Ortega Melendres, et al., v. Paul Penzone, et al.* (No. CV-07-02513-PHX-GMS), and documents activities that occurred during the first quarter of 2021, January 1-March 31, 2021.

On May 13, 2016, the Court issued its Findings of Fact in the civil contempt proceedings that commenced in April 2015. This led to the issuance of a Second Supplemental Permanent Injunction/Judgment Order (Second Order) on July 20, 2016, significantly expanding the duties of the Monitor. Our reports cover the additional requirements of the Second Order while continuing to document MCSO's compliance efforts with the First Supplemental Permanent Injunction/Judgment Order (First Order) issued in October 2013. We provide summaries of compliance with both Orders separately, as well as a summary of MCSO's overall, or combined, compliance.

The compliance Paragraphs of the Second Order commence where the First Order ends, and they are numbered from Paragraph 160 through and including Paragraph 337. Not all are subject to our review. For example, the Second Order outlines the duties of the Independent Investigator and the Independent Disciplinary Authority. These are autonomous positions, not subject to oversight of the Court or its Monitor.

The Second Order also delineates in great detail requirements in the areas of misconduct investigations, training, discipline and discipline review, transparency and reporting, community outreach, document preservation, and misconduct investigations involving members of the Plaintiffs' class. The Court granted the Monitor the authority to supervise and direct all of the investigations that fall into the latter category.

As of the last reporting period, MCSO asserted Full and Effective Compliance with 58 Paragraphs of the First Order, as that term is defined in the First Order. After review, I agreed with MCSO's assertions. On March 16, 2021, MCSO asserted Full and Effective Compliance with 14 additional Paragraphs, including Second Order Paragraphs: Paragraphs 39; 78; 227; 228; 229; 230; 231; 232; 233; 234; 235; 236; 238; and 239. On April 16, 2021, I agreed with MCSO's assertions, granting MCSO in Full and Effective Compliance with 72 total Paragraphs. (See Section 2 of this report.) MCSO retains the obligation to document that the Office remains in Full and Effective Compliance with the Paragraphs so designated.

Because of the COVID-19 pandemic, we once again conducted our April 2021 site visit remotely, in contrast to our regular practice of conducting onsite compliance visits. Our last in-person site visit was in January 2020. MCSO's compliance status with individual Paragraphs normally subject to in-person inspections will not be adversely impacted by any missed onsite reviews. We hope that circumstances change and we return to onsite visits. In the intervening period, if any adjustments need to be made to assess Paragraph compliance, we will consider additional options that might be available to us.

WAI 56248

# Section 2: Methodology and Compliance Summary

The Monitor's primary responsibility is to determine the status of compliance of the Maricopa County Sheriff's Office (MCSO) with the requirements of the requirements in the Order. To accomplish this, the Monitoring Team makes quarterly visits to Maricopa County to meet with MCSO's Court Implementation Division (CID) and other Office personnel – at Headquarters, in Patrol District offices, or at the office that we occupy when onsite. We also observe Office practices; review Office policies and procedures; collect and analyze data using appropriate sampling and analytic procedures; and inform the Parties and, on a quarterly basis, the Court, about the status of MCSO's compliance.

This report documents compliance with applicable Order requirements, or Paragraphs, in two phases. For Phase 1, we assess compliance according to whether MCSO has developed and approved requisite policies and procedures, and MCSO personnel have received documented training on their contents. For Phase 2 compliance, generally considered operational implementation, MCSO must demonstrate that it is complying with applicable Order requirements more than 94% of the time, or in more than 94% of the instances under review.

We use four levels of compliance: In compliance; Not in compliance; Deferred; and Not applicable. "In compliance" and "Not in compliance" are self-explanatory. We use "Deferred" in circumstances in which we are unable to fully determine the compliance status – due to a lack of data or information, incomplete data, or other reasons that we explain in the narrative of our report. We will also use "Deferred" in situations in which MCSO, in practice, is fulfilling the requirements of a Paragraph, but has not yet memorialized the requirements in a formal policy.

For Phase 1 compliance, we use "Not applicable" for Paragraphs where a policy is not required; for Phase 2 compliance, we use "Not applicable" for Paragraphs that do not necessitate a compliance assessment.

The tables below summarize the compliance status of Paragraphs tracked in this report.[1] This is our nineteenth quarterly status report in which we report on MCSO's compliance with both the First and Second Orders. During this reporting period, MCSO's Phase 1 compliance rate with the **First Order** remained the same as the last reporting period, at 98%. MCSO's Phase 1 compliance rate with the **Second Order** remained the same as the last reporting period, at 100%.

---

[1] The percent in compliance for Phase 1 is calculated by dividing the number of Order Paragraphs determined to be in compliance by the total number of Paragraphs requiring a corresponding policy or procedure. Paragraphs with the status of Deferred are included in the denominator, while Paragraphs with the status of Not Applicable are not included. Therefore, the number of Paragraphs included in the denominator totals 183 for Phase 1. The number of Paragraphs included in the denominator totals 207 for Phase 2.

WAI 56249

During this reporting period, MCSO's Phase 2 compliance rate with the **First Order** decreased by two percentage points from the last reporting period, from 79% to 77%. This number includes Paragraphs that we consider to be in compliance and those that are now in Full and Effective Compliance (FEC), as described above. (See below for the list of Paragraphs that are in Full and Effective Compliance.) During this reporting period, MCSO's Phase 2 compliance rate with the **Second Order** decreased by two percentage points from the last reporting period, from 92% to 90%. This number also includes Paragraphs that we consider to be in compliance and those that are now in Full and Effective Compliance (FEC), as described above.

| Twenty-Eighth Quarterly Status Report First Order Summary | | |
|---|---|---|
| **Compliance Status** | **Phase 1** | **Phase 2** |
| Not Applicable | 20 | 5 |
| Deferred | 0 | 1 |
| Not in Compliance | 2 | 21 |
| In Compliance | 78 | 73[2] |
| **Percent in Compliance** | **98%** | **77%** |

| Twenty-Eighth Quarterly Status Report Second Order Summary | | |
|---|---|---|
| **Compliance Status** | **Phase 1** | **Phase 2** |
| Not Applicable | 20 | 10 |
| Deferred | 0 | 4 |
| Not in Compliance | 0 | 7 |
| In Compliance | 103 | 102[3] |
| **Percent in Compliance** | **100%** | **90%** |

---

[2] This number includes those Paragraphs that are deemed in Full and Effective Compliance.

[3] This number includes those Paragraphs that are deemed in Full and Effective Compliance.

WAI 56250

| | Report 1 | Report 2 | Report 3 | Report 4 | Report 5 | Report 6 | Report 7 | Report 8 | Report 9 | Report 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Phase 1** | 4% | 10% | 44% | 40% | 51% | 57% | 61% | 60% | 67% | 60% |
| **Phase 2** | 0% | 0% | 26% | 25% | 28% | 37% | 38% | 39% | 44% | 49% |

| | Report 11 | Report 12 | Report 13 | Report 14 | Report 15 | Report 16 | Report 17 | Report 18 | Report 19 | Report 20 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Phase 1** | 63% | 79% | 88% | 85% | 85% | 85% | 85% | 97% | 97% | 97% |
| **Phase 2** | 50% | 57% | 67% | 62% | 65% | 64% | 66% | 77% | 75% | 78% |

| | Report 21 | Report 22 | Report 23 | Report 24 | Report 25 | Report 26 | Report 27 | Report 28 |
|---|---|---|---|---|---|---|---|---|
| **Phase 1** | 96% | 96% | 96% | 96% | 96% | 98% | 98% | 98% |
| **Phase 2** | 76% | 77% | 79% | 82% | 81% | 78% | 79% | 77% |

MCSO's Compliance with the Requirements of the **First Order** *(October 2, 2013)*

WAI 56251

| | MCSO's Compliance with the Requirements of the **Second Order** *(July 20, 2016)* | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Report 1 | Report 2 | Report 3 | Report 4 | Report 5 | Report 6 | Report 7 | Report 8 | Report 9 | Report 10 |
| **Phase 1** | N/A | | | | | | | | | 1% |
| **Phase 2** | N/A | | | | | | | | | 43% |

| | Report 11 | Report 12 | Report 13 | Report 14 | Report 15 | Report 16 | Report 17 | Report 18 | Report 19 | Report 20 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Phase 1** | 10% | 12% | 72% | 75% | 77% | 77% | 78% | 78% | 99% | 99% |
| **Phase 2** | 46% | 60% | 63% | 66% | 72% | 75% | 80% | 81% | 90% | 89% |

| | Report 21 | Report 22 | Report 23 | Report 24 | Report 25 | Report 26 | Report 27 | Report 28 |
|---|---|---|---|---|---|---|---|---|
| **Phase 1** | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **Phase 2** | 91% | 90% | 92% | 93% | 90% | 91% | 92% | 90% |

WAI 56252

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|---|---|---|
| 9 | 12/28/18 | Concurred on 1/28/19 |
| 10 | 12/28/18 | Concurred on 1/28/19 |
| 11 | 12/28/18 | Concurred on 1/28/19 |
| 12 | 12/28/18 | Concurred on 1/28/19 |
| 13 | 12/28/18 | Concurred on 1/28/19 |
| 21 | 6/22/20 | Concurred on 7/20/20 |
| 22 | 12/16/20 | Did not concur on 1/15/21 |
| 23 | 12/28/18 | Concurred on 1/28/19 |
| 26 | 12/28/18 | Concurred on 1/28/19 |
| 27 | 3/22/19 | Concurred on 4/22/19 |
| 28 | 12/28/18 | Concurred on 1/28/19 |
| 29 | 12/28/18 | Concurred on 1/28/19 |
| 30 | 12/28/18 | Concurred on 1/28/19 |
| 31 | 9/9/19 | Concurred on 10/2/19 |
| 34 | 6/3/19 | Concurred on 6/25/19 |
| 35 | 12/28/18 | Concurred on 1/28/19 |
| 36 | 12/28/18 | Concurred on 1/28/19 |
| 37 | 12/28/18 | Concurred on 1/28/19 |
| 38 | 12/28/18 | Concurred on 1/28/19 |
| 39 | 3/16/21 | Concurred on 4/16/21 |
| 40 | 12/28/18 | Concurred on 1/28/19 |
| 43 | 12/16/20 | Did not concur on 1/15/21 |
| 44 | 12/16/20 | Did not concur on 1/15/21 |
| 45 | 12/9/19 | Concurred on 1/6/20 |
| 46 | 12/9/19 | Concurred on 1/6/20 |
| 47 | 12/16/20 | Did not concur on 1/15/21 |
| 48 | 12/28/18 | Did not concur on 1/28/19 |

WAI 56253

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|---|---|---|
| 49 | 12/28/18 | Did not concur on 1/28/19 |
| 50 | 12/28/18 | Did not concur on 1/28/19 |
| 51 | 12/28/18 | Did not concur on 1/28/19 |
| 55 | 12/28/18 | Concurred on 1/28/19 |
| 57 | 12/16/20 | Concurred on 1/15/21 |
| 58 | 6/22/20 | Concurred on 7/20/20 |
| 59 | 12/28/18 | Concurred on 1/28/19 |
| 60 | 12/28/18 | Concurred on 1/28/19 |
| 61 | 12/9/19 | Concurred on 1/6/20 |
| 63 | 6/22/20 | Concurred on 7/20/20 |
| 68 | 12/28/18 | Concurred on 1/28/19 |
| 71 | 12/28/18 | Concurred on 1/28/19 |
| 73 | 10/5/20 | Concurred on 11/4/20 |
| 76 | 12/16/20 | Concurred on 1/15/21 |
| 77 | 12/28/18 | Concurred on 1/28/19 |
| 78 | 3/16/21 | Concurred on 4/16/21 |
| 84 | 9/9/19 | Concurred on 10/2/19 |
| 85 | 10/5/20 | Concurred on 11/4/20 |
| 86 | 10/5/20 | Concurred on 11/4/20 |
| 88 | 12/28/18 | Concurred on 1/28/19 |
| 89 | 12/9/19 | Concurred on 1/6/20 |
| 93 | 3/17/20 | Concurred on 4/9/20 |
| 101 | 12/28/18 | Concurred on 1/28/19 |
| 102 | 12/16/20 | Concurred on 1/15/21 |
| 104 | 3/17/20 | Concurred on 4/9/20 |
| 105 | 10/5/20 | Concurred on 11/4/20 |
| 106 | 6/3/19 | Concurred on 6/25/19 |
| 227 | 3/16/21 | Concurred on 4/16/21 |

WAI 56254

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|---|---|---|
| 228 | 3/16/21 | Concurred on 4/16/21 |
| 229 | 3/16/21 | Concurred on 4/16/21 |
| 230 | 3/16/21 | Concurred on 4/16/21 |
| 231 | 3/16/21 | Concurred on 4/16/21 |
| 232 | 3/16/21 | Concurred on 4/16/21 |
| 233 | 3/16/21 | Concurred on 4/16/21 |
| 234 | 3/16/21 | Concurred on 4/16/21 |
| 235 | 3/16/21 | Concurred on 4/16/21 |
| 236 | 3/16/21 | Concurred on 4/16/21 |
| 238 | 3/16/21 | Concurred on 4/16/21 |
| 239 | 3/16/21 | Concurred on 4/16/21 |
| 244 | 12/16/20 | Concurred on 1/15/21 |
| 245 | 12/16/20 | Concurred on 1/15/21 |
| 247 | 12/16/20 | Concurred on 1/15/21 |
| 248 | 12/16/20 | Concurred on 1/15/21 |
| 249 | 12/16/20 | Concurred on 1/15/21 |
| 264 | 12/16/20 | Concurred on 1/15/21 |
| 266 | 12/16/20 | Concurred on 1/15/21 |
| 273 | 12/16/20 | Concurred on 1/15/21 |
| 276 | 12/16/20 | Concurred on 1/15/21 |
| 278 | 12/16/20 | Concurred on 1/15/21 |
| 279 | 12/16/20 | Concurred on 1/15/21 |
| 287 | 12/16/20 | Concurred on 1/15/21 |
| 288 | 12/16/20 | Did not concur on 1/15/21 |
| 292 | 12/16/20 | Concurred on 1/15/21 |
| 337 | 12/16/20 | Concurred on 1/15/21 |

WAI 56255

**COURT ORDER III.  MCSO IMPLEMENTATION UNIT AND INTERNAL AGENCY-WIDE ASSESSMENT** *[Court Order wording in italics]*

*Paragraph 9.  Defendants shall hire and retain, or reassign current MCSO employees to form an interdisciplinary unit with the skills and abilities necessary to facilitate implementation of this Order.  This unit shall be called the MCSO Implementation Unit and serve as a liaison between the Parties and the Monitor and shall assist with the Defendants' implementation of and compliance with this Order.  At a minimum, this unit shall: coordinate the Defendants' compliance and implementation activities; facilitate the provision of data, documents, materials, and access to the Defendants' personnel to the Monitor and Plaintiffs representatives; ensure that all data, documents and records are maintained as provided in this Order; and assist in assigning implementation and compliance-related tasks to MCSO Personnel, as directed by the Sheriff or h is designee.  The unit will include a single person to serve as a point of contact in communications with Plaintiffs, the Monitor and the Court.*

**In Full and Effective Compliance**

To verify Phase 2 compliance with this Paragraph, we reviewed the monthly personnel rosters for the Court Implementation Division (CID).  CID is currently staffed with one captain, one lieutenant, three sergeants, two deputies, one management assistant, two administrative assistants, and one management analyst.  CID continues to be supported by MCAO attorneys, who frequently participate in our meetings and telephone calls with Division personnel.

During this reporting period, CID continued to provide documents through MCSO's counsel via an Internet-based application.  We, the Plaintiffs, and the Plaintiff-Intervenors receive all files and documents simultaneously, with only a few exceptions centering on open internal investigations.  CID effectively facilitates our and Parties' access to MCSO's personnel.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

*Paragraph 10.  MCSO shall collect and maintain all data and records necessary to: (1) implement this order, and document implementation of and compliance with this Order, including data and records necessary for the Monitor to conduct reliable outcome assessments, compliance reviews, and audits; and (2) perform ongoing quality assurance in each of the areas addressed by this Order.  At a minimum, the foregoing data collection practices shall comport with current professional standards, with input on those standards from the Monitor.*

**In Full and Effective Compliance**

WAI 56256

CID continues to be responsive to our requests. CID also addresses with immediacy any issues we encounter in the samples we request – be they technical issues, missing documents, or other problems. MCSO's Bureau of Internal Oversight (BIO) routinely audits the work products of the Office, particularly in the areas that directly affect compliance with the requirements of the Orders. In many instances, BIO will review the same material we request in our samples, and BIO frequently notes – and addresses – the same deficiencies we identify in our reviews.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 11.** *Beginning with the Monitor's first quarterly report, the Defendants, working with the unit assigned for implementation of the Order, shall file with the Court, with a copy to the Monitor and Plaintiffs, a status report no later than 30 days before the Monitor's quarterly report is due. The Defendants' report shall (i) delineate the steps taken by the Defendants during the reporting period to implement this Order; (ii) delineate the Defendants' plans to correct any problems; and (iii) include responses to any concerns raised in the Monitor's previous quarterly report.*

## In Full and Effective Compliance

MCSO submitted its 28th quarterly compliance report on June 18, 2021. The report covers the steps MCSO has taken to implement the Court's Orders during the first quarter of 2021. The report also includes any plans to correct difficulties encountered during the quarter and responses to concerns raised in our 27th quarterly status report.

In its report, MCSO asserted Full and Effective Compliance (FEC) with Paragraphs 24, 52, 53, 177, 182, 184, 185, 186, 187, and 188. Paragraph 24 requires that MCSO ensure that its operations are not motivated by or initiated in response to requests for law enforcement actions based on race or ethnicity. Paragraph 52 requires that MCSO provide supervisors with comprehensive and interdisciplinary training on supervision strategies and supervisory responsibilities under the Order. Paragraph 53 identifies at a minimum what the supervisor-specific training should include, while Paragraph 182 requires adequate training to supervisors on their obligations on accepting civilian complaints. The remainder of the Paragraphs address specific aspects of misconduct investigations and PSB such as the standard of proof, pre-determination hearings, maintaining an electronic centralized process, and the requirement to notify PSB of any complaint filed.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 56257

***Paragraph 12.*** *The Defendants, working with the unit assigned for implementation of the Order, shall conduct a comprehensive internal assessment of their Policies and Procedures affecting Patrol Operations regarding Discriminatory Policing and unlawful detentions in the field as well as overall compliance with the Court's orders and this Order on an annual basis. The comprehensive Patrol Operations assessment shall include, but not be limited to, an analysis of collected traffic-stop and high-profile or immigration-related operations data; written Policies and Procedures; Training, as set forth in the Order; compliance with Policies and Procedures; Supervisor review; intake and investigation of civilian Complaints; conduct of internal investigations; Discipline of officers; and community relations. The first assessment shall be conducted within 180 days of the Effective Date. Results of each assessment shall be provided to the Court, the Monitor, and Plaintiffs' representatives.*

**In Full and Effective Compliance**

See Paragraph 13.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.


***Paragraph 13.*** *The internal assessments prepared by the Defendants will state for the Monitor and Plaintiffs' representatives the date upon which the Defendants believe they are first in compliance with any subpart of this Order and the date on which the Defendants first assert they are in Full and Effective Compliance with the Order and the reasons for that assertion. When the Defendants first assert compliance with any subpart or Full and Effective Compliance with the Order, the Monitor shall within 30 days determine whether the Defendants are in compliance with the designated subpart(s) or in Full and Effective Compliance with the Order. If either party contests the Monitor's determination it may file an objection with the Court, from which the Court will make the determination. Thereafter, in each assessment, the Defendants will indicate with which subpart(s) of this Order it remains or has come into full compliance and the reasons therefore. The Monitor shall within 30 days thereafter make a determination as to whether the Defendants remain in Full and Effective Compliance with the Order and the reasons therefore. The Court may, at its option, order hearings on any such assessments to establish whether the Defendants are in Full and Effective Compliance with the Order or in compliance with any subpart(s).*

**In Full and Effective Compliance**

We and CID established that the schedule for the submission of comprehensive annual assessments as required by these Paragraphs will run according to MCSO's fiscal year cycle, July 1-June 30. MCSO will submit reports on or before September 15 of each year.

Consistent with this agreement, on September 16, 2020, MCSO filed with the Court its 2020 Annual Compliance Report covering the period of July 1, 2019 through June 30, 2020.

WAI 56258

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 56259

# Section 4: Policies and Procedures

**COURT ORDER V. POLICIES AND PROCEDURES**

*Paragraph 18. MCSO shall deliver police services consistent with the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order, and with current professional standards. In conducting its activities, MCSO shall ensure that members of the public receive equal protection of the law, without discriminating based on actual or perceived race or ethnicity, and in a manner that promotes public confidence.*

*Paragraph 19. To further the goals in this Order, the MCSO shall conduct a comprehensive review of all Patrol Operations Policies and Procedures and make appropriate amendments to ensure that they reflect the Court's permanent injunction and this Order.*

**Phase 1:** In compliance

- GA-1 (Development of Written Orders), most recently amended on December 31, 2020.

**Phase 2:** In compliance

MCSO has taken steps toward a comprehensive review of its Patrol Operations Policies and Procedures in four phases. First, on December 31, 2013, prior to my appointment as Monitor, MCSO filed with the Court all of its policies and procedures, with amendments, that MCSO believed complied with the various Paragraphs of the First Order. Second, in the internal assessment referenced above, MCSO discussed its ongoing evaluation of Patrol Operations and its development of policies and procedures. Third, in response to our requests, MCSO provided all of the policies and procedures it maintains are applicable to the First Order for our review and that of the Plaintiffs. We provided our feedback, which also included the Plaintiffs' comments, on these policies on August 12, 2014. Based on that feedback, MCSO made adjustments to many of the policies, concentrating first on the policies to be disseminated in Detentions, Arrests, and the Enforcement of Immigration-Related Laws Training; and the Bias Free Policing Training (often referred to as Fourth and Fourteenth Amendment Training) that commenced in early September. We reviewed MCSO's updated policies and provided our approval for several on August 25, 2014.

Fourth, in discussions during 2016, MCSO requested more specific guidance on what we considered to be Patrol-related policies and procedures. In response, we provided MCSO with a list of the Patrol-related policies for the purposes of Paragraph 19. We included on this list policies that were not recently revised or currently under review. Several policies required changes to comport with the First Order, Second Order, or both. In 2018, MCSO published the last of the outstanding policies, achieving compliance with this Paragraph.

WAI 56260

***Paragraph 20.*** *The MCSO shall comply with and operate in accordance with the Policies and Procedures discussed in this Order and shall take all reasonable measures to ensure that all Patrol Operations personnel comply with all such Policies and Procedures.*

***Paragraph 21.*** *The MCSO shall promulgate a new, department-wide policy or policies clearly prohibiting Discriminatory Policing and racial profiling. The policy or policies shall, at a minimum:*

a.  *define racial profiling as the reliance on race or ethnicity to any degree in making law enforcement decisions, except in connection with a reliable and specific suspect description;*

b.  *prohibit the selective enforcement or non-enforcement of the law based on race or ethnicity;*

c.  *prohibit the selection or rejection of particular policing tactics or strategies or locations based to any degree on race or ethnicity;*

d.  *specify that the presence of reasonable suspicion or probable cause to believe an individual has violated a law does not necessarily mean that an officer's action is race-neutral; and*

e.  *include a description of the agency's Training requirements on the topic of racial profiling in Paragraphs 48–51, data collection requirements (including video and audio recording of stops as set forth elsewhere in this Order) in Paragraphs 54–63 and oversight mechanisms to detect and prevent racial profiling, including disciplinary consequences for officers who engage in racial profiling.*

**In Full and Effective Compliance**

MCSO has developed and published the policies required by Paragraph 21. MCSO distributed these policies and has trained agency personnel during the required Fourth and Fourteenth Amendment training, on an annual basis, since 2014. MCSO's implementation of these policies is covered in other Paragraphs.

On June 22, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 56261

***Paragraph 22.*** *MCSO leadership and supervising Deputies and detention officers shall unequivocally and consistently reinforce to subordinates that Discriminatory Policing is unacceptable.*

**Phase 1:**  In compliance

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 4, 2020.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on February 25, 2021.

**Phase 2:**  In compliance

With input from the Parties, the reinforcement of CP-8 (Preventing Racial and Other Bias-Based Policing) was modified to a two-step process conducted annually.  MCSO describes Part 1 of the process as the following: "On an annual basis, within the first six months, supervisors will have discussions, either individual or group, and view videos from the Training library with assigned employees, Reserve deputies, and Posse members.  The videos will be available through the HUB and attestation of the training will be through the HUB."  Part 2 of the process as described by MCSO: "On an annual basis, within the last six months, supervisors shall ensure that all employees, reserve deputies, and Posse members complete their annual review and acknowledgment of office policy.  In addition, employees will be required to view a video from the Sheriff or designee, which reinforces the policy.  Acknowledgement is done through the HUB."

As an additional measure, supervisors will have the latitude to review and discuss the policy with their employees, and document the discussion in BlueTeam.  MCSO will provide proof of compliance biannually, at the end of the six-month periods, when each of the elements of the process is completed.  MCSO will also provide progress reports in the interim.

MCSO provided updated HUB training reports for all employees and volunteers for the second half of 2020.  The report documented the names of employees and Posse members who received CP-8 training for the second half of the year.  The completion rate was as follows: sworn members, 99.03% completion rate; Detention members, 98.80%% completion rate; Reserve members, 100% completion rate; civilian members, 97.20% completion rate; and Posse members, 100% completion rate.  We will review HUB training reports for the first half of 2021 at the conclusion of the training cycle, at the end of June.  MCSO remains in compliance with this Paragraph.

WAI 56262

***Paragraph 23.*** *Within 30 days of the Effective Date, MCSO shall modify its Code of Conduct to prohibit MCSO Employees from utilizing County property, such as County e-mail, in a manner that discriminates against, or denigrates, anyone on the basis of race, color, or national origin.*

**In Full and Effective Compliance**

BIO uses a randomizing program to select samples for each inspection. BIO reviews CAD messages to verify compliance with CP-2 (Code of Conduct), CP-3 (Workplace Professionalism: Discrimination and Harassment), and GM-1 (Electronic Communications, Data and Voice Mail). In its submission, MCSO includes the specific nature of any potential concerns identified during the audits. We observed the processes BIO uses to conduct CAD and email audits, to ensure that we thoroughly understand the mechanics involved in conducting these audits. For CAD and email audits, we receive copies of the audits completed by BIO, the details of any violations found, and copies of the memoranda of concern or BIO Action Forms that are completed. Email and CAD/Alpha Paging inspections are completed on a quarterly basis. For email inspections, MCSO will inspect 50 employees per quarter, and for CAD/Alpha Paging, MCSO will inspect 15 days per quarter.

For the first quarter of 2021, we reviewed CAD and Alpha Paging Inspection Report BI2021-0033, as proof of compliance with this Paragraph. MCSO selected a random sample of 15 days in the quarter for inspection. There were a total of 8,357 CAD and Alpha Paging entries for the selected dates. The inspection found that 100% of the inspected messages were in compliance with policies GM-1 (Electronic Communications, Data and Voice Mail), CP-2 (Code of Conduct), CP-3 (Workplace Professionalism: Discrimination and Harassment), and CP-8 (Preventing Racial and Other Biased-Based Profiling).

For the first quarter of 2021, we reviewed employees' Emails Inspection Report BI2021-0042, as proof of compliance with this Paragraph. BIO selected a total of 50 employees for review, and inspected a total of 13,784 emails. The inspection found that 13,779, or 99.96%, of the emails were in compliance. Two Detention officers sent emails that contained offensive or profane language. BIO generated Action Forms for the deficiencies.

For the first quarter of 2021, MCSO did not report any facility inspections due to ongoing concerns with COVID-19. We will report again on facility inspections when they resume.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 56263

***Paragraph 24.*** *The MCSO shall ensure that its operations are not motivated by or initiated in response to requests for law enforcement action based on race or ethnicity. In deciding to take any law enforcement action, the MCSO shall not rely on any information received from the public, including through any hotline, by mail, email, phone or in person, unless the information contains evidence of a crime that is independently corroborated by the MCSO, such independent corroboration is documented in writing, and reliance on the information is consistent with all MCSO policies.*

**Phase 1:** In compliance

- GI-7 (Processing of Bias-Free Tips), published June 4, 2021.

**Phase 2:** In compliance

MCSO created the Sheriff's Intelligence Leads and Operations (SILO) Unit in the first quarter of 2016. The SILO Unit became operational on September 11, 2017. GI-7 requires that any tips received by MCSO components be forwarded to the SILO Unit for recording and processing. The SILO Unit classifies this information by the type of alleged criminal activity, or service requested, and forwards it to the appropriate Unit for action and response. In some cases, community members email or call with requests for traffic enforcement, or for MCSO to address quality-of-life issues; these are considered calls for service rather than tips on criminal activity. If the information provided pertains to criminal activity in another jurisdiction, MCSO forwards the information to the appropriate law enforcement agency and documents it in the SILO database. We review a monthly tip list report, noting the date received and a general description of each tip. We also review an audit report showing the disposition of tips received. If there is any bias noted in the information received for any tip, MCSO generally closes the tip and takes no action. We review all tips that MCSO closes due to bias.

During the first quarter of 2021, we reviewed 213 tips submitted for January, 194 tips submitted for February, and 475 tips submitted for March. We reviewed a total of 882 tips, which were classified and recorded according to the type of alleged violation or service requested. Our reviews for this reporting period indicated that drugs, suspicious activities, and individuals with warrants were the most frequent concerns reported by the community. Drug use and drug dealing comprised the most common type of tip called in, followed by warrants. There was an unusually high number of tips regarding assaults reported in March. Reports of COVID restriction violations tapered off substantially in this quarter. During the first quarter of 2021, MCSO did not report any tips closed due to bias. MCSO remains in compliance with this Paragraph.

WAI 56264

**b. Policies and Procedures to Ensure Bias-Free Traffic Enforcement**

***Paragraph 25.*** *The MCSO will revise its policy or policies relating to traffic enforcement to ensure that those policies, at a minimum:*

a.   *prohibit racial profiling in the enforcement of traffic laws, including the selection of which vehicles to stop based to any degree on race or ethnicity, even where an officer has reasonable suspicion or probable cause to believe a violation is being or has been committed;*

b.   *provide Deputies with guidance on effective traffic enforcement, including the prioritization of traffic enforcement resources to promote public safety;*

c.   *prohibit the selection of particular communities, locations or geographic areas for targeted traffic enforcement based to any degree on the racial or ethnic composition of the community;*

d.   *prohibit the selection of which motor vehicle occupants to question or investigate based to any degree on race or ethnicity;*

e.   *prohibit the use of particular tactics or procedures on a traffic stop based on race or ethnicity;*

f.   *require deputies at the beginning of each stop, before making contact with the vehicle, to contact dispatch and state the reason for the stop, unless Exigent Circumstances make it unsafe or impracticable for the deputy to contact dispatch;*

g.   *prohibit Deputies from extending the duration of any traffic stop longer than the time that is necessary to address the original purpose for the stop and/or to resolve any apparent criminal violation for which the Deputy has or acquires reasonable suspicion or probable cause to believe has been committed or is being committed;*

h.   *require the duration of each traffic stop to be recorded;*

i.   *provide Deputies with a list and/or description of forms of identification deemed acceptable for drivers and passengers (in circumstances where identification is required of them) who are unable to present a driver's license or other state-issued identification; and*

j.   *instruct Deputies that they are not to ask for the Social Security number or card of any motorist who has provided a valid form of identification, unless it is needed to complete a citation or report.*

**Phase 1:** In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on February 25, 2021.

- EB-2 (Traffic Stop Data Collection), most recently amended on June 15, 2021.

- GI-1 (Radio and Enforcement Communications Procedures), most recently amended on December 31, 2020.

WAI 56265

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 4, 2020.

- EA-11 (Arrest Procedures), most recently amended on May 28, 2021.

**Phase 2:** Deferred

During the finalization of the Fourth and Fourteenth Amendment training curricula required by the Order, the Parties agreed to a list and/or description of forms of identification deemed acceptable for drivers and passengers, as required by this Paragraph. The data required for verification to ensure compliance with these policies is captured by the TraCS system. The system documents the requirements of the Order and MCSO policies. MCSO has continued to make technical changes to the TraCS system to ensure that the mandatory fields on the forms used to collect the data are completed and that deputies are capturing the required information. TraCS is a robust system that allows MCSO to make technical changes to improve how required information is captured.

To verify Phase 2 compliance with this Paragraph, we reviewed MCSO's Vehicle Stop Contact Form (VSCF), Vehicle Stop Contact Form Supplemental Sheet, Incidental Contact Receipt, Written Warning/Repair Form, Arizona Traffic Ticket and Complaint Form, Internet I/Viewer Event Form, Justice Web Interface Form, CAD printout, and any Incident Report generated by the traffic stop. MCSO created many of these forms to capture the requirements of Paragraphs 25 and 54.

Since our July 2015 site visit, there has been significant improvement in the TraCS system that has enhanced the reliability and validity of the data provided by MCSO. This improvement has been buttressed by the introduction of data quality control procedures now being implemented and memorialized in the EIU Operations Manual. (This is further discussed in Paragraph 56, below.) We also compared traffic stop data between Latino and non-Latino drivers in the samples provided to us.

Paragraph 25.a. prohibits racial profiling in the enforcement of traffic laws, including the selection of which vehicles to stop based to any degree on race or ethnicity, even where a deputy has reasonable suspicion or probable cause to believe a violation is being or has been committed. The selection of the sample size and the sampling methodology employed for drawing our sample is detailed in Section 7: Traffic Stop Documentation and Data Collection.

We review a sample of 105 traffic stops each reporting period to assess this requirement. Our review of the sample of 105 traffic stops that occurred during this reporting period in Districts 1, 2, 3, 4, 6, and 7, and Lake Patrol indicated that MCSO was following protocol, and that the stops did not violate the Order or internal policies. Paragraphs 66 and 67 require an annual comprehensive analysis of all traffic stop data, which will more accurately determine if MCSO is meeting the requirements of this Paragraph. MCSO has achieved Phase 1 and 2 compliance with Paragraph 66, and Phase 1 compliance with Paragraph 67. Although we have previously reported that MCSO has achieved compliance with this Subparagraph, we must take into consideration that MCSO has not yet achieved Phase 2 compliance with Paragraph 67. Accordingly, the compliance status of this Subparagraph is deferred.

WAI 56266

Paragraph 25.b. requires MCSO to provide deputies with guidance on effective traffic enforcement, including the prioritization of traffic enforcement resources to promote public safety. EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), Sections A-E, address these concerns. The policy specifies that driving under the influence and speeding are the main causes of accidents, and should be the focus of traffic enforcement. Based on our review of the data provided for this reporting period, the most common traffic stop violations are as follows: 55 stops for speed above the posted limit (52%); 13 stops for failure to possess valid registrations or tags (12%); 12 stops for failure to obey official traffic control devices (11%); 10 stops for equipment violations (10%); and 15 stops for other moving violations (14%).

As the policy specifically identifies speeding violations as one of the contributing factors of traffic accidents, MCSO deputies have targeted this violation. In our review, we break down the specific traffic violation for each stop and use each traffic stop form completed by deputies during the stop to make a determination if the stop is justified and fulfills the requirements of this Paragraph. MCSO remains in compliance with this Subparagraph.

Paragraph 25.c. requires MCSO to prohibit the selection of particular communities, locations, or geographic areas for targeted traffic enforcement based to any degree on the racial or ethnic composition of the community. During our inspection, we document the location of every stop and note the GPS coordinates if available. Our review of the sample data covering all MCSO Districts during this reporting period did not indicate that MCSO was targeting any specific area or ethnicity to conduct traffic stops.

MCSO remains in compliance with this Subparagraph.

Paragraph 25.d. requires MCSO to prohibit the selection of which motor vehicle occupants to question or investigate based, to any degree, on race or ethnicity. We reviewed the demographic data of Maricopa County (according to 2018 U.S. Census data, 31.1% of the population is Latino), and found that the ratio of Latino drivers stopped during this reporting period was lower than in the past reporting period in comparison to the ethnicity of the population in the County. (See Paragraph 54.e.) Twenty (39%) of the 51 stops where passenger contacts occurred involved Latino drivers.

A review of complaints from the public for this reporting period did not reveal that any complaints were filed alleging that MCSO deputies selected motor vehicle occupants for questioning or investigation, based on the individual's race or ethnicity.

MCSO has fully implemented body-worn cameras, and we review a sample of the recordings each reporting period to verify if deputies are questioning occupants to determine if they are legally in the country. We did not identify any such events during this reporting period.

During this reporting period, we observed that 39 of the 105 stops occurred during nighttime hours. Our review of the sample data indicated that generally, traffic stops were not based on race or ethnicity and reflected the general makeup of the population of the County. In most instances, the deputies document on the VSCF that they were unable to determine the race/ethnicity and gender of the vehicle occupants prior to the stop. MCSO is in compliance with this Subparagraph.

WAI 56267

Paragraph 25.e. requires MCSO to prohibit the use of particular tactics or procedures on a traffic stop based on race or ethnicity. We reviewed a sample of CAD audio recordings and CAD printouts where the dispatcher entered the reason for the stop when advised by the deputy in the field. We also reviewed body-worn camera recordings of deputies making traffic stops. The methodology that we employed to select our cases is described in detail in Section 7. In the cases we reviewed, the CAD audio recordings and the body-worn camera recordings revealed that deputies were not making traffic stops using tactics based on race or ethnicity. MCSO remains in compliance with this Subparagraph.

Paragraph 25.f. requires deputies at the beginning of each stop, before making contact with the vehicle, to verbally contact dispatch and state the reason for the stop unless exigent circumstances make it unsafe for the deputy to contact Communications. When the deputy advises Communications of the location, tag number, and reason for the stop, this information is digitally logged on the CAD printout and it is audio recorded. (See Paragraph 54.e.) We reviewed 30 CAD audio recordings and the CAD printouts; in each, the deputy advised dispatch of the reason for the stop. Through our reviews of BWC recordings and CAD printouts, we verified that the reason for the stop was voiced prior to making contact with the drivers in 30 of the 30 cases we reviewed. For the 75 other cases that were part of our sample, we reviewed the VSCFs and the CAD printouts to ensure that deputies properly advised dispatch of the reason for the stop prior to making contact with the violator. In all 75 stops, the deputy properly advised dispatch the reason for the stop. MCSO is in compliance with this Subparagraph.

Paragraph 25.g. prohibits deputies from extending the duration of any traffic stop longer than the time that is necessary to address the original purpose for the stop and/or to resolve any apparent criminal violation for which the deputy has or acquires reasonable suspicion or probable cause to believe has been committed or is being committed. MCSO employs a series of five questions on the VSCF to document the circumstances that might require a stop to be prolonged. In our review of 105 traffic stops, we determined that MCSO documented a response to at least one of the series of five questions in nine of the stops. Our review of those stops revealed that, in five instances, deputies indicated that they experienced technological difficulties. The duration of those five stops ranged from 12 minutes to 21 minutes. There was one stop that involved a driving under the influence investigation and the towing of a vehicle. The duration of that stop was two hours and 30 minutes. There was one stop that involved training. The duration of that stop was 13 minutes. There was one stop that involved a language barrier. The duration of that stop was 12 minutes. There was one stop that involved a technological difficulty and a language barrier. The duration of that stop was 33 minutes.

MCSO remains in compliance with this Subparagraph.

Paragraph 25.h. requires the duration of each traffic stop to be recorded. The time of the stop and its termination is now auto-populated on the VSCF by the CAD system. To ensure data entry accuracy, MCSO implemented a technical change to the TraCS system on November 29, 2016. The change automatically creates a red field in the stop contact times if the deputy manually changes these times on the VSCF. In our review, we determined that the duration was recorded accurately in all 105 traffic stops. MCSO is in compliance with this Subparagraph, with a compliance rate of 100%.

WAI 56268

Paragraph 25.i. requires that MCSO provide deputies with a list and/or description of forms of identification deemed acceptable for drivers and passengers (in circumstances where identification is required of them) who are unable to present a driver's license or other state-issued identification. The Plaintiffs' attorneys and MCSO agreed on acceptable forms of identification, and this information has been included in the Fourth and Fourteenth Amendment training. EA-11 (Arrest Procedures), most recently amended on May 28, 2021, provides a list of acceptable forms of identification if a valid driver's license cannot be produced. During this reporting period's review of the sample of 105 traffic stops, we identified six cases where the drivers did not present a valid driver's license to the deputies. In two of the cases, the deputies were able to confirm that the drivers' licenses were, in fact, valid. The remaining four cases are described in detail below:

- A Latino driver was stopped for a speeding violation. The driver did not have any identification on his person. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license.

- A white male driver was stopped for driving with the vehicle's high beam lights activated toward oncoming traffic. The driver produced an Arizona driver's license. A records check revealed that his driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license and failure to dim the vehicle's high beam lights. The deputy seized the driver's license.

- A Black male driver was stopped for a speeding violation. The driver produced an Arizona driver's license. A records check revealed that his driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license and the speeding violation. The deputy seized the driver's license.

- A Latino driver was stopped for driving an all-terrain vehicle with no license plate. The deputy determined that the driver, a 13 year old, was not eligible for a driver's license due to his age. The driver was issued a citation for driving with no license plate. The driver's parent responded to the location of the stop, and the deputy informed the parent of the traffic violation.

In our review of the sample of cases to assess compliance with Paragraph 54.k., searches of persons, we identified 31 cases where the drivers did not present a valid driver's license to the deputies. In three of the cases, the deputies were able to confirm that the driver's licenses were, in fact, valid. The remaining 28 cases where the drivers did not present a valid driver's license to the deputies are described in detail below:

- A Latino driver was stopped for failing to maintain a lane of traffic. The driver did not have any identification on his person. A records check revealed that the driver had never obtained a driver's license. The driver was issued a citation for driving without a valid driver's license, driving under the influence, and failing to maintain a lane of traffic.

WAI 56269

- A white male driver was stopped for driving with an expired license plate. The driver did not have any identification on his person. A records check revealed that his driver's license was in a canceled status. The driver was issued a citation for driving with a canceled driver's license and no registration.

- A Black male driver was stopped for driving with no license plate. The driver did not have any identification on his person. A records check revealed that the driver had never obtained a driver's license. The driver was issued a warning for no current registration.

- A white female driver was stopped for driving with an expired license plate. The driver presented an Arizona identification card. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license, no current registration, and no insurance. The driver was arrested for an outstanding warrant.

- A white male driver was stopped for failing to maintain a lane of traffic. A records check revealed that the license plate on the vehicle was reported stolen. The driver presented an Arizona identification card. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license, knowingly driving with a fictitious license plate, and no insurance.

- A Latino driver was stopped for a speeding violation. The driver presented an Arizona driver's license. A records check revealed that the driver's license was in a revoked status. The driver was issued a citation for driving with a revoked driver's license, speeding, and operating a motor vehicle without an ignition interlock device being installed.

- A Latino driver was stopped for failing to maintain a lane of traffic. The driver did not have any identification on his person. A records check revealed that the driver had a suspended driver's license. The driver was issued a citation for driving with a suspended driver's license.

- An American Indian/Alaskan Native male driver was stopped for a speeding violation. The driver did not have any identification on his person. A records check revealed that his driver's license was in a suspended status. The driver was issued a citation for the speeding violation. The driver was arrested and processed for driving under the influence.

- A Latino driver was stopped for failing to maintain a lane of traffic. The driver presented a Mexican passport. A records check revealed that the driver had never obtained a driver's license. The driver was issued a citation for driving without a valid driver's license.

- A Latino driver was stopped for driving with no operational license plate light. The driver presented an Arizona driver's license. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license. The driver's license was seized by the deputy.

WAI 56270

- A white male driver was stopped for driving with no license plate. The driver did not have any identification on his person. A records check revealed that the driver had never been issued a driver's license and that the driver was wanted on outstanding warrants. The driver was arrested and issued a citation for driving with no license plate, no insurance, and no red tail lamps.

- A white male driver was stopped for a speeding violation. The driver presented an Arizona driver's license. A records check revealed that the driver's license was in a suspended status and that the driver was wanted on an outstanding warrant. The driver was arrested; and he was issued a citation for driving with a suspended driver's license, speeding, and operating a motor vehicle without an ignition interlock device being installed. The driver's license was seized by the deputy.

- A white male driver was stopped for a speeding violation. The driver presented an Arizona driver's license. A records check revealed that the driver's license was in a suspended status and that the driver was wanted on an outstanding warrant. The driver was arrested; and he was issued a citation for driving with a suspended driver's license, speeding, and no registration. The driver's license was seized by the deputy.

- A Latino driver was stopped for a speeding violation. The driver did not have any identification on his person. A records check revealed that the driver had never obtained a driver's license. The driver was issued a citation for driving without a valid driver's license and the speeding violation.

- A white male driver was stopped for a red light violation. The driver presented an Arizona identification card. A records check revealed that the driver had never obtained a driver's license and that he had an outstanding warrant for his arrest. The driver was arrested; and issued a citation for the red light violation, no insurance, and driving without a valid driver's license.

- A white male driver was stopped for a red light violation. The driver did not have any identification on his person. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license.

- A white male driver was stopped for having an improper license plate on the vehicle. The driver presented an Arizona driver's license. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license, no insurance, and no registration. The deputy seized the driver's license and the license plate.

- A Latino driver was stopped for an expired license plate. The driver did not have any identification on his person. A records check revealed that the driver had never obtained a driver's license. The driver was arrested for driving under the influence. The driver was issued a citation for driving under the influence, driving without a valid driver's license, and no registration.

WAI 56271

- A Latina driver was stopped after being observed driving an unsafe vehicle, as a front tire was missing and the vehicle's rim was in contact with the pavement. The driver presented a driver's license issued from the state of New Mexico. A records check revealed that the driver's license was in a suspended status. The driver was arrested for driving under the influence. The deputy prepared reports for the review of the Maricopa County Attorney's Office for consideration of potential criminal charges.

- A Latino driver was stopped for driving with one headlight. The driver presented an Arizona identification card. A records check revealed that the driver's license was in a revoked status. The driver was issued a citation for driving with a revoked driver's license, no registration, and for displaying a suspended license plate.

- A white male driver was stopped for a speeding violation. The driver presented an Arizona identification card. A records check revealed that the driver's license was in a suspended status and that the driver had an outstanding warrant for his arrest. The driver was arrested and he was issued a citation for driving with a suspended driver's license, speeding, and no insurance.

- A Latino driver was stopped for making an improper left turn. The driver presented an Arizona identification card. A records check revealed that the driver's license was in a suspended status. The driver explained that he was experiencing a medical emergency and the deputy assisted the driver getting transportation to a nearby hospital. The deputy issued the driver an Incidental Contact Receipt. The deputy also conducted an investigation to determine whether the driver was driving under the influence.

- A white male driver was stopped for driving with an expired license plate. The driver presented an Arizona identification card. A records check revealed that the driver's license was in a suspended status and that the driver had an outstanding warrant for his arrest. The driver was arrested and he was issued a citation for driving with a suspended driver's license and no registration.

- A Latino driver was stopped for failing to yield. The driver produced a Mexican voter identification card. A records check revealed that the driver had never obtained a driver's license. The driver was issued a citation for driving without a valid driver's license, no insurance, and failure to yield.

- A white male driver was stopped for driving with a brake light not being operational. The driver did not have any identification on his person. A records check revealed that the driver's license was in a suspended status and that the driver had an outstanding warrant for his arrest. The driver was arrested and he was issued a citation for driving with a suspended driver's license.

- A Latino driver was stopped for driving with one headlight. The driver produced a Mexican passport. A records check revealed that the driver had never obtained a driver's license. The driver was issued a citation for driving without a valid driver's license.

WAI 56272

- A Latina driver was stopped for a red light violation. The license plate on the vehicle was reported stolen. The driver presented an Arizona identification card. A records check revealed that the driver had never obtained a driver's license. The driver was issued a citation for driving without a valid driver's license, no registration, and for the red light violation. The deputy seized the license plate.

- A Latino driver was stopped for failing to signal prior to making a turn. The driver did not have any identification on his person. A records check revealed that the driver had never obtained a driver's license. The driver was arrested for driving under the influence and he was issued a citation for driving without a valid driver's license and failing to signal prior to making a turn. The deputy prepared reports for the review of the Maricopa County Attorney's Office for consideration of potential criminal charges.

In our review of the sample of cases to assess compliance with Paragraphs 25.d. and 54.g., passenger contacts, we identified 39 cases where the drivers did not present a valid driver's license to the deputies. In seven of the cases, the deputies were able to confirm that the drivers' licenses were, in fact, valid. The remaining 32 cases are described in detail below:

- A white female driver was stopped for driving with no headlights and tail lights activated. The driver did not have any identification on her person. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license.

- A Black male driver was stopped for a speeding violation. The driver presented an Arizona identification card. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license and he was issued a warning for the speeding violation

- A white male driver was stopped for a speeding violation. The driver presented a driver's license. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license and for the speeding violation. The driver was arrested for an outstanding warrant.

- A Black male driver was stopped for a speeding violation. The driver presented a Michigan identification card. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license and for the speeding violation.

- A Latino driver was stopped for a speeding violation. The driver did not have any identification on her person. A records check revealed that the driver's license was in an expired status. The driver was issued a citation for driving without a valid driver's license and for the speeding violation.

- A Latino driver was stopped for driving with one headlight. The driver presented an Arizona identification card. A records check revealed that the driver had never obtained a driver's license. The driver was issued a citation for driving without a valid driver's license.

WAI 56273

- A Latino driver was stopped for driving with no license plate. The driver did not have any identification on her person. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license, no evidence of insurance, and no registration.

- A Latina driver was stopped for driving with no headlights activated. The driver did not have any identification on her person. A records check revealed that the driver had never obtained a driver's license. The driver was issued a warning for driving with no headlights activated.

- A Latino driver was stopped for driving with one headlight. The driver did not have any identification on his person. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license.

- A Latina driver was stopped for driving with one headlight. The driver produced an Arizona driver's license. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license. The driver's license was seized by the deputy.

- A Latino driver was stopped for failing to maintain a lane of traffic. The driver produced a Mexican passport. A records check revealed that the driver had never obtained a driver's license. The driver was issued a citation for driving with no valid driver's license, no evidence of insurance, and failing to maintain a lane of traffic.

- A white male driver was stopped for a red light violation. The driver did not have any identification on his person. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license.

- A Black male driver was stopped for a speeding violation. The driver produced an Arizona identification card. A records check revealed that the driver had an Illinois driver's license that was in a suspended status. The driver was issued a citation for driving with a suspended driver's license and the speeding violation.

- A Latina driver was stopped for an expired registration. The driver presented an Arizona identification card. A records check revealed that the driver had never obtained a driver's license. The driver was issued a citation for driving with no valid driver's license, no current registration, and no evidence of insurance.

- A Black male driver was stopped for a speeding violation. The driver produced a South Carolina driver's license. A records check revealed that the driver's license was in a suspended status. The driver was issued a warning for driving with a suspended driver's license and the speeding violation.

WAI 56274

- A Black female driver was stopped for a speeding violation. The driver produced an Arizona driver's license. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license, speeding, and no evidence of insurance. The driver's license was seized by the deputy.

- A Black male driver was stopped for failing to obey a traffic control device, improper U-turn. The driver produced a Nevada identification card. A records check revealed that the driver's license from Nevada was in a suspended status. The driver was issued a citation for failing to obey a traffic control device.

- A Latina driver was stopped for driving with no headlights activated. The driver did not have any identification on her person. A records check revealed that the driver had never obtained a driver's license. The driver was issued a citation for driving without a valid driver's license.

- An American Indian/Alaskan Native male driver was stopped for driving with one headlight. The driver did not have any identification on his person. A records check revealed that his driver's license was in a revoked status. The driver was issued a citation for driving with a revoked driver's license.

- A Latina driver was stopped for driving with one headlight. The driver produced a Mexican passport. A records check revealed that the driver had never obtained a driver's license. The driver was issued a citation for driving without a valid driver's license.

- A white male driver was stopped for driving with one headlight. The driver produced an Arizona driver's license. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license. The driver's license was seized by the deputy.

- A Latino driver was stopped for an expired registration. The driver produced a driver's license issued from the state of Utah, which was expired. The driver was issued a citation for driving without a valid driver's license and no current registration.

- A Latino driver was stopped for a speeding violation. The driver produced a driver's license issue from Mexico, which was expired. The driver was issued a citation for the speeding violation.

- A white male driver was stopped for driving with no license plate. The driver did not have any identification on his person. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license, no evidence of insurance, no registration, and driving with no license plate.

- A Latino driver was stopped for driving with no tail lights. The driver did not have any identification on his person. A records check revealed that the driver's license was in an expired status. The driver had paperwork demonstrating that he had applied to renew his driver's license. The driver was issued a warning for driving with no tail lights.

WAI 56275

- A white male driver was stopped for driving an all-terrain vehicle on the roadway in a manner to create dust. The driver did not have any identification on his person. A records check revealed that the driver had never obtained a driver's license. The driver was issued a citation for driving in a manner to create dust in the roadway.

- A Latino driver was stopped for driving without a license plate. The driver did not have any identification on his person. A records check revealed that the driver had never obtained a driver's license. The driver was issued a citation for driving without a valid driver's license and no registration.

- A Black male driver was stopped for a speeding violation. The driver did not have any identification on his person. A records check revealed that the driver had never obtained a driver's license. The driver was issued a citation for driving without a valid driver's license, speeding, and driving under the influence.

- A white male driver was stopped for an expired registration. The driver produced an Arizona driver's license. A records check revealed that the driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license, no registration, and no evidence of insurance. The driver's license was seized by the deputy.

- A Latino driver was stopped for a speeding violation. The driver produced an Illinois identification card. A records check revealed that the driver did not have a valid driver's license. The driver was issued a citation for driving without a valid driver's license.

- A Latina driver was stopped for driving on the shoulder of the roadway. The driver did not have any identification on her person. A records check revealed that the driver had never obtained a driver's license. The driver was issued a citation for driving without a valid driver's license.

- A Latina driver was stopped for a speeding violation. The driver did not have any identification on her person. A records check revealed that the driver had never obtained a driver's license. The driver was issued a citation for driving without a valid driver's license and the speeding violation.

MCSO remains in compliance with this Subparagraph.

Paragraph 25.j. requires MCSO to instruct deputies that they are not to ask for the Social Security Number or card of any motorist who has provided a valid form of identification, unless it is needed to complete a citation or report. EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) prohibits deputies from asking for the Social Security Number of any motorist who has provided a valid form of identification. During this reporting period's review of the sample of 105 traffic stops, we identified that deputies requested a driver's Social Security Number in incidents that either involved the arrest of the driver for the purpose of completing an Incident Report, or incidents where the driver did not produce a valid form of identification, both of which are permissible under this Subparagraph.

WAI 56276

During this reporting period's review of the sample of traffic stops reviewed for Paragraph 54.k. and Paragraphs 25.d. and 54.g., we identified that deputies requested a driver's Social Security Number in incidents that either involved the arrest of the driver for the purpose of completing an Incident Report, or incidents where the driver did not produce a valid form of identification, both of which are permissible under this Subparagraph. MCSO remains in compliance with this Subparagraph.

Although MCSO has achieved compliance with several components of Paragraph 25, we have determined that the compliance status of Subparagraph 25.a. is in a deferred status. Accordingly, the compliance status for Paragraph 25 is deferred.

***Paragraph 26.*** *The MCSO shall revise its policy or policies relating to Investigatory Detentions and arrests to ensure that those policies, at a minimum:*

a. *require that Deputies have reasonable suspicion that a person is engaged in, has committed, or is about to commit, a crime before initiating an investigatory seizure;*

b. *require that Deputies have probable cause to believe that a person is engaged in, has committed, or is about to commit, a crime before initiating an arrest;*

c. *provide Deputies with guidance on factors to be considered in deciding whether to cite and release an individual for a criminal violation or whether to make an arrest;*

d. *require Deputies to notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration-Related Crime, or for any crime by a vehicle passenger related to lack of an identity document;*

e. *prohibit the use of a person's race or ethnicity as a factor in establishing reasonable suspicion or probable cause to believe a person has, is, or will commit a crime, except as part of a reliable and specific suspect description; and*

f. *prohibit the use of quotas, whether formal or informal, for stops, citations, detentions, or arrests (though this requirement shall not be construed to prohibit the MCSO from reviewing Deputy activity for the purpose of assessing a Deputy's overall effectiveness or whether the Deputy may be engaging in unconstitutional policing).*

**In Full and Effective Compliance**

To assess compliance with Paragraph 26, we request documentation of arrests and investigations associated with the requirements specified in this Paragraph. In addition to the review of any reported cases, we receive booking lists and criminal citation lists for each month of the reporting period, and request a random sample of cases to review.

WAI 56277

For the first quarter of 2021, MCSO did not report any arrests or investigatory detentions that would fall under the reporting requirements of this Paragraph. For this reporting period, we requested and reviewed 20 bookings and 20 criminal citations for each month of the quarter. In total, we reviewed 60 incidents resulting in arrest and 60 incidents in which criminal citations were issued. In addition, we reviewed 258 Incident Reports for the quarter. All of the documentation we reviewed during this reporting period indicates that MCSO is in compliance with this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

### d. Policies and Procedures Governing the Enforcement of Immigration-Related Laws

**Paragraph 27.** *The MCSO shall remove discussion of its LEAR Policy from all agency written Policies and Procedures, except that the agency may mention the LEAR Policy in order to clarify that it is discontinued.*

**In Full and Effective Compliance**

MCSO asserts that it does not have an agency LEAR policy. We have verified, through our document reviews and site compliance visits, that MCSO does not have a LEAR policy.

On March 22, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 28.** *The MCSO shall promulgate a new policy or policies, or will revise its existing policy or policies, relating to the enforcement of Immigration-Related Laws to ensure that they, at a minimum:*

a.  *specify that unauthorized presence in the United States is not a crime and does not itself constitute reasonable suspicion or probable cause to believe that a person has committed or is committing any crime;*

b.  *prohibit officers from detaining any individual based on actual or suspected "unlawful presence," without something more; prohibit officers from initiating a pre-textual vehicle stop where an officer has reasonable suspicion or probable cause to believe a traffic or equipment violation has been or is being committed in order to determine whether the driver or passengers are unlawfully present;*

WAI 56278

c.  prohibit the Deputies from relying on race or apparent Latino ancestry to any degree to select whom to stop or to investigate for an Immigration-Related Crime (except in connection with a specific suspect description); prohibit Deputies from relying on a suspect's speaking Spanish, or speaking English with an accent, or appearance as a day laborer as a factor in developing reasonable suspicion or probable cause to believe a person has committed or is committing any crime, or reasonable suspicion to believe that an individual is in the country without authorization;

d.  unless the officer has reasonable suspicion that the person is in the country unlawfully and probable cause to believe the individual has committed or is committing a crime, the MCSO shall prohibit officers from (a) questioning any individual as to his/her alienage or immigration status; (b) investigating an individual's identity or searching the individual in order to develop evidence of unlawful status; or (c) detaining an individual while contacting ICE/CBP with an inquiry about immigration status or awaiting a response from ICE/CBP. In such cases, the officer must still comply with Paragraph 25(g) of this Order. Notwithstanding the foregoing, an officer may (a) briefly question an individual as to his/her alienage or immigration status; (b) contact ICE/CBP and await a response from federal authorities if the officer has reasonable suspicion to believe the person is in the country unlawfully and reasonable suspicion to believe the person is engaged in an Immigration-Related Crime for which unlawful immigration status is an element, so long as doing so does not unreasonably extend the stop in violation of Paragraph 25(g) of this Order;

e.  prohibit Deputies from transporting or delivering an individual to ICE/CBP custody from a traffic stop unless a request to do so has been voluntarily made by the individual;

f.  Require that, before any questioning as to alienage or immigration status or any contact with ICE/CBP is initiated, an officer check with a Supervisor to ensure that the circumstances justify such an action under MCSO policy and receive approval to proceed. Officers must also document, in every such case, (a) the reason(s) for making the immigration-status inquiry or contacting ICE/CBP, (b) the time approval was received, (c) when ICE/CBP was contacted, (d) the time it took to receive a response from ICE/CBP, if applicable, and (e) whether the individual was then transferred to ICE/CBP custody.

**In Full and Effective Compliance**

For this reporting period, there were no reported instances of deputies having contact with Immigration and Customs Enforcement (ICE) or Customs and Border Protection (CBP) for the purpose of making an immigration status inquiry, and there were no reported arrests for any immigration-related investigations, or for any immigration-related crimes. The reviews of documentation submitted for this reporting period indicate that MCSO has complied with the reporting requirements related to Paragraph 28. In our reviews of incidents involving contact with the public, including traffic stops, arrests, and investigative stops, we monitor deputies' actions to verify compliance with this Order.

WAI 56279

In addition to the documentation requested from MCSO, to determine compliance with this Paragraph, our reviews of documentation provided for other Paragraphs of the Order have found no evidence to indicate a violation of this Paragraph. For this reporting period, we reviewed 60 Arrest Reports, 60 criminal citations, 284 traffic stops, 64 NTCFs, and 258 Incident Reports. We found no issues of concern, as it relates to this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.


### e. Policies and Procedures Generally

***Paragraph 29.*** *MCSO Policies and Procedures shall define terms clearly, comply with applicable law and the requirements of this Order, and comport with current professional standards.*

**In Full and Effective Compliance**

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

See Paragraph 30.


***Paragraph 30.*** *Unless otherwise noted, the MCSO shall submit all Policies and Procedures and amendments to Policies and Procedures provided for by this Order to the Monitor for review within 90 days of the Effective Date pursuant to the process described in Section IV. These Policies and Procedures shall be approved by the Monitor or the Court prior to their implementation.*

**In Full and Effective Compliance**

MCSO continues to provide us, the Plaintiffs' attorneys, and the Plaintiff-Intervenors with drafts of its Order-related policies and procedures prior to publication, as required by the Order. We, the Plaintiffs' attorneys, and the Plaintiff-Intervenors review the policies to ensure that they define terms clearly, comply with applicable law and the requirements of the Order, and comport with current professional standards. Once drafts are finalized, incorporating feedback from us, Plaintiffs' attorneys, and the Plaintiff-Intervenors, MCSO provides them to us for final review and approval. As this process has been followed for the Order-related policies published thus far, MCSO is in compliance with this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 56280

***Paragraph 31.*** *Within 60 days after such approval, MCSO shall ensure that all relevant MCSO Patrol Operation Personnel have received, read, and understand their responsibilities pursuant to the Policy or Procedure. The MCSO shall ensure that personnel continue to be regularly notified of any new Policies and Procedures or changes to Policies and Procedures. The Monitor shall assess and report to the Court and the Parties on whether he/she believes relevant personnel are provided sufficient notification of and access to, and understand each policy or procedure as necessary to fulfill their responsibilities.*

**In Full and Effective Compliance**

GA-1 indicates that Office personnel shall be notified of new policies and changes to existing policies via Briefing Boards and via the HUB, Maricopa County's adaptation of the online training software program, Cornerstone, that MCSO implemented in July 2017 to replace its E-Policy system. Employees are required to complete personal attestations that indicate that they have read and understand policies; the HUB routinely updates recent training and policy reviews for deputies and is visible by immediate supervisors. Per GA-1, "Prior to some policies being revised, time-sensitive changes are often announced in the Briefing Board until the entire policy can be revised and finalized." As noted previously, we recognize the authority of Briefing Boards and understand their utility in publishing critical policy changes quickly; but we have advised MCSO that we generally do not grant Phase 1 compliance for an Order requirement until the requirement is memorialized in a more formal policy.

During this reporting period, MCSO issued (or issued revisions of) nine Order-related policies: CP-3 (Workplace Professionalism); EA-2 (Patrol Vehicles); EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance); GG-1 (Peace Officer Training Administration); GG-2 (Detention/Civilian Training Administration); GH-4 (Bureau of Internal Oversight Audits and Inspections); GH-5 (Early Identification System); GJ-24 (Community Relations and Youth Programs); and GM-1 (Electronic Communications, Data and Voicemail). During this reporting period, MCSO also issued several Briefing Boards and Administrative Broadcasts that touched on Order-related topics and revised the language of General Orders. MCSO did not publish any Order-related operations manuals during this reporting period.

On September 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

***Paragraph 32.*** *The MCSO shall require that all Patrol Operation personnel report violations of policy; that Supervisors of all ranks shall be held accountable for identifying and responding to policy or procedure violations by personnel under their command; and that personnel be held accountable for policy and procedural violations. The MCSO shall apply policies uniformly.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on July 30, 2020.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on March 4, 2021.

WAI 56281

- CP-5 (Truthfulness), most recently amended on September 11, 2020.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

- GC-16 (Employee Grievance Procedures), most recently amended on April 7, 2020.

- GC-17 (Employee Disciplinary Procedures), most recently amended on May 28, 2021.

- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** Not in compliance

Since we began reviewing internal investigations conducted by MCSO, we have reviewed hundreds of administrative misconduct investigations submitted to our Team for this Paragraph. During our reviews, we have continued to note that the investigations conducted by PSB have consistently been thorough and well-written, and arrived at the appropriate findings. Compliance for investigations conducted at the District level, which had decreased for multiple reporting periods, had seen some improvement in investigative quality for the last three reporting periods. We did not note any additional improvement during this reporting period.

During our site visits, we have met with the Professional Standards Bureau (PSB) and District and Division Command personnel to provide them with information regarding the cases that were deficient in structure, format, investigation, or reporting requirements. We have also highlighted cases we found to be properly investigated and in compliance with Order requirements. In 2016, PSB developed and implemented the use of an investigative checklist and specific format for the completion of internal investigations. MCSO trained all supervisors who conduct investigations in the use of these documents. Since June 1, 2016, the use of these investigative protocol documents has been required for all administrative investigations.

PSB personnel have remained responsive to our feedback, and the investigations they submit for compliance with this Paragraph continue to be complete and thorough. PSB's reviews of investigations conducted by District personnel continue to be thorough, and PSB has identified and addressed many concerns and deficiencies they have found.

We have continued to be concerned with District case compliance, particularly because MCSO has been conducting misconduct investigations under the Court's Second Order since 2016. In 2017, MCSO made major revisions to both GH-2 (Internal Investigations) and GC-16 (Employee Grievance Procedures). By the end of December 2017, all supervisory personnel responsible for conducting misconduct investigations had attended the 40-hour Misconduct Investigative Training. Since the initial training, supervisors have attended additional training on the proper completion of these investigations.

During this reporting period, there were 30 investigations conducted by District personnel that were submitted for our review. Of the 30, we or PSB identified investigative and administrative deficiencies with 12 (40%), not including timeliness and extension concerns. This is an increase

WAI 56282

from 37% the last reporting period. Investigations were returned to District personnel by PSB to address improper findings, leading questions, insufficient investigations, or failure to interview all witnesses.

During our site visits, our Team has made numerous visits to MCSO Districts, where we have discussed the completion of administrative misconduct investigations by District personnel. We have specifically discussed those areas of the investigations where we continue to find deficiencies and have provided input regarding the proper completion of investigations. We have also sought information from District supervisors regarding their experience with the investigation process and any ongoing concerns they may have.

During our visits to Districts 1, 2, and 6 in January 2020, District supervisors identified several reasons for ongoing deficiencies including lower experience level of supervisors due to the number of promotions being made, and the continuing need to balance administrative time with time out on the street supervising their personnel. In one District, personnel had added a second supervisor to observe interviews and had questions prepared and reviewed in advance of interviews. Personnel had also added an additional level of review in the District, prior to sending the investigations to PSB. We were encouraged by these efforts, and hopeful that the investigative process would improve as a result.

Since March 2018, we have requested and reviewed a monthly report from District Command personnel that documents any actions they have taken to assist their personnel in the completion of administrative misconduct investigations and any actions they have taken to address any deficiencies they have identified. During the last reporting period, we noted multiple instances where District Command personnel identified and addressed deficiencies in investigations conducted by their personnel, and several additional instances where Deputy Chiefs met with District Command personnel to address deficient investigations.

During this reporting period, we observed two instances where District Command personnel identified and addressed deficiencies in investigations by their personnel prior to forwarding the investigations to PSB. We did not observe any instances where Deputy Chiefs identified deficiencies in administrative investigations conducted by their personnel. Again during this reporting period, PSB identified the majority of the deficiencies upon its review of the District investigations. We note that the majority of the investigative deficiencies identified by PSB were for investigations that were initiated and completed prior to the increased review and oversight by District and Division Command personnel.

As we have noted previously, timely corrective actions are critical to ensuring that concerns are addressed and resolved before additional deficiencies of the same kind occur. PSB continues to maintain a tracking document to identify deficiencies and ensure that appropriate follow-up or intervention is taking place. We will continue to closely monitor both interventions and deficiency memos, and continue to encourage executive staff and Command personnel to address deficiencies that have been identified in a timely manner.

During the last reporting period, we reviewed all 42 administrative misconduct investigations submitted for compliance with this Paragraph and made our compliance findings based on the investigative and administrative requirements for the completion of these investigations. Thirty-

WAI 56283

five of these were conducted by District personnel. Based on the identified deficiencies in these investigations and our assessment of the reasonableness of requested extensions, 10 (29%) of the 35 investigations conducted by District personnel were found in compliance. One (14%) of the seven investigations conducted by PSB was in compliance.

During this reporting period, we reviewed all administrative misconduct investigations submitted for compliance with this Paragraph. PSB conducted 12 of these investigations, and District personnel conducted the remaining 30. Sworn supervisors with the rank of sergeant or higher completed all the investigations conducted at the District level. There was 86 potential policy violations included in the 42 cases. Thirty-six of the investigations resulted from external complaints, and six were internally generated. All 42 investigations were initiated after May 17, 2017, when MCSO revised all of its internal investigation policies; and all were initiated after the completion of the 40-hour Misconduct Investigative Training that concluded in late 2017.

Of the 42 administrative investigations we reviewed for this Paragraph, 17 resulted in sustained findings against one or more employees. We concur with the sustained findings in all 17 of these investigations. In three, the involved employees resigned or retired prior to the completion of the investigation or disciplinary process. In one, due to an administrative error, minor misconduct that resulted in a sustained finding was determined not to require discipline. Discipline in the 13 remaining cases included three coachings, six written reprimands, two suspensions, and two dismissals. In 10 of the 13 cases, the PSB Commander properly identified the category and offense number, as well as the presumptive discipline or range of discipline for the sustained allegations. In three, we believe the category of offense determined by the PSB Commander was inconsistent with the Matrices in place at the time of the offenses. We will discuss these cases with PSB during our next site visit.

District personnel outside PSB conducted 30 of the investigations that MCSO submitted for review for this Paragraph. All were completed after July 20, 2016. Seven of the investigations were noncompliant due to improper allegations or findings and five investigations were not thoroughly conducted. We did not identify any instances where a District investigator failed to appropriately address a training or policy concern during this reporting period. Where appropriate, deficient cases were returned to the Districts by PSB for additional investigation or corrections. All of the cases investigated by District personnel this reporting period were initiated after several years of working under the requirements of the Court Orders, after training in how to conduct misconduct investigations (the 40-hour Misconduct Investigative Training completed in late 2017), and after numerous site visit meetings where our Team has identified the same kinds of deficiencies we again found during this reporting period.

During this and the last three reporting periods, we have met with the Deputy Chiefs responsible for oversight of Districts and Divisions outside of PSB during our remote site visits to discuss our concerns with the quality of investigations being conducted by their personnel.

Our meeting with the Deputy Chiefs during our October 2020 remote site visit resulted in a useful discussion about needed improvement in the quality of investigations. The Deputy Chiefs advised us that after our July remote site visit, they had started reviewing the administrative misconduct investigations conducted by their personnel and had identified many of the same types of concerns that both we and PSB had identified. They informed us that they were working with their

WAI 56284

personnel to improve the quality of investigations and discussing not only the quality issues, but also how to ensure that thorough reviews were being conducted at the District level prior to forwarding the investigations to PSB. We were encouraged by the actions that Deputy Chiefs were taking, and hopeful that we would see continuing improvement as a result.

We met with the Deputy Chiefs responsible for oversight of Districts and Divisions outside of PSB during our January 2021 remote site visit. The Deputy Chiefs advised us they believed they were seeing more thorough investigations and that their personnel had improved in identifying allegations and findings. Though not mandated, in some Districts, investigative plans and outlines were created prior to conducting the investigations. In their reviews, the Deputy Chiefs noted they were finding some continuing need for clarification in the reports, or the need to further discuss proposed findings; but in general, they believed improvement was taking place.

During our April 2021 remote site visit, we again met with Deputy Chiefs responsible for Districts and Divisions outside of PSB. The Chiefs advised us that while they would continue to do some reviews, they would rely more on reviews done by District Commanders and would be holding these Commanders accountable for any deficiencies that were found. They have also been conducting a pilot program in two Districts where a single assigned investigator conducts all misconduct investigations in the District. We advised PSB that we had noted that this single investigator pilot has created noticeable delays in the completion of investigations. PSB advised us that it is addressing the delay issues and hopes to have investigations completed in "real time" moving forward.

The overall investigative quality for cases investigated by PSB and submitted for compliance with this Paragraph has remained high. For this reporting period, PSB conducted 12 investigations submitted for compliance with this Paragraph. We identified three instances where we disagree with the category of offense determined by the PSB Commander. In all three, which involved the unintentional discharge of a weapon, while all were sustained, the category of offense determined by the PSB Commander was inconsistent with the Matrices in place at the time of the conduct or the initiation of the investigations. We acknowledge that the Matrix used was the current Matrix which has reclassified offenses of these kind. However, all three of these incidents occurred more than a year prior to the implementation of the current Matrix. That MCSO was in the process of recommending a change in classification does not allow an unapproved Matrix to be used. The remaining nine cases (75%) were in compliance with investigative and administrative requirements, except for timely extensions.

All 42 cases we reviewed for this Paragraph were completed on or after July 20, 2016. Of the 12 investigations conducted by PSB, three (25%) were completed within the 85-day timeframe or had an approved extension related to the specific investigation. Of the 30 investigations conducted at the District level, 11 (37%) were initially completed within the 60-day timeframe or had an approved extension related to the specific investigation, though many of these cases were returned to the Districts for further work after review by PSB.

Of the 42 total investigations submitted for compliance with this Paragraph, 14 (33%) were either submitted within the required 60- or 85-day timeframe, or included an acceptable justification for an extension, a decrease from 52% during the last quarter. Of the 42 total investigations reviewed for compliance with this Paragraph, 11 (26%) were finalized and closed with 180 days or included

WAI 56285

an acceptable extension approval. This is a decrease from the 45% compliance that we found during the last reporting period. MCSO's failure to complete investigations in a timely manner remains unacceptable. General workload issues are insufficient justification for the failure to complete investigations in a reasonably timely manner. To be considered compliant with the requirements for the completion of administrative misconduct investigations, extension requests and justifications must be submitted in a timely manner and be reasonably related to the specific investigation.

Based on the identified deficiencies in District investigations and our assessment of the reasonability of the requested extensions, four (13%) of the 30 investigations conducted by District personnel were found in compliance, a decrease from 29% during the last reporting period. Though there were fewer investigative deficiencies in those cases reviewed by District and Division Command personnel prior to submittal to PSB, this same review caused extremely lengthy delays in their completion. During this reporting period, we saw a significant number of cases where multiple extensions were requested at the District level prior to forwarding the cases to PSB. More than half of these extension requests were a result of the District/Division review process. Six of the cases initiated after this extended review was implemented were not forwarded to PSB until after the 180-day timeframe had expired. This has resulted in an increased number of investigations being found not compliant with timeline requirements. While we have supported the increased review, we are concerned that the review process in some cases took months to complete. MCSO's recent decision to assign the review to the District Commanders may have some effect on the timelines.

Three (25%) of the 12 investigations conducted by PSB were in compliance, an increase from 14% during the last quarter. Overall compliance for the 42 investigations submitted for this Paragraph was 17%, a decrease from 24% during the last quarter.

As is our practice, we will discuss those cases that we found noncompliant with MCSO personnel during our next site visit.


***Paragraph 33.*** *MCSO Personnel who engage in Discriminatory Policing in any context will be subjected to administrative Discipline and, where appropriate, referred for criminal prosecution. MCSO shall provide clear guidelines, in writing, regarding the disciplinary consequences for personnel who engage in Discriminatory Policing.*

**Phase 1:** In compliance

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 4, 2020.
- GH-2 (Internal Investigations), most recently amended on May 28, 2021.
- GC-17 (Employee Disciplinary Procedures), most recently amended on May 28, 2021.

**Phase 2:** Not in compliance

WAI 56286

The investigations that we review for compliance with this Paragraph do not include biased policing complaints involving the Plaintiffs' class. Those investigations have additional compliance requirements; we discuss them in Paragraphs 275-283.

During the last reporting period, there were five investigations submitted by PSB that contained allegations of discriminatory policing.

During this reporting period, there were seven investigations where alleged bias did not involve members of the Plaintiffs' class. Three involved allegations of inappropriate and potentially biased comments made within the jail setting. One was sustained and MCSO assessed discipline. One was unfounded; and another was not sustained. A fourth complaint involved alleged bias during a traffic stop; PSB conducted an investigation, and the allegation was unfounded. In the fifth case, an allegation against a civilian employee for a biased comment was sustained and discipline assessed. The sixth complaint alleged bias in the hiring process. One of the allegations was not sustained and two were unfounded. The seventh case alleged bias by a sworn employee. After the investigation was initiated, PSB determined that the allegations did not involve MCSO employees but members of another law enforcement agency. The complaint was unfounded and forwarded to the appropriate agency.

PSB conducted thorough investigations, and we agree with their findings in all seven cases. While MCSO is in compliance regarding the investigative quality and findings, none of the cases were submitted and approved within the required timeframes. Based on our assessment, these cases are not in compliance with the requirements for timely completion of administrative investigations; and therefore, not in compliance with the requirements for completion of investigations covered in this Paragraph.

While discriminatory policing allegations that involve members of the Plaintiffs' class are not reported in this Paragraph, we note that MCSO did complete six investigations for this reporting period that were determined to be Class Remedial Matters. (We address these in Paragraphs 275-288.)

***Paragraph 34.*** *MCSO shall review each policy and procedure on an annual basis to ensure that the policy or procedure provides effective direction to MCSO Personnel and remains consistent with this Order, current law and professional standards. The MCSO shall document such annual review in writing. MCSO also shall review Policies and Procedures as necessary upon notice of a policy deficiency during audits or reviews. MCSO shall revise any deficient policy as soon as practicable.*

**In Full and Effective Compliance**

MCSO continues to review on an annual basis all critical policies and all policies relevant to the Court Orders for consistency with Constitutional policing, current law, and professional standards.

During this reporting period, MCSO conducted its annual review on 22 (45%) of the 48 required policies. These policies included: CP-3 (Workplace Professionalism, Discrimination and Harassment); EA-2 (Patrol Vehicles); EA-11 (Arrest Procedures); EB-1 (Traffic Enforcement,

Violator Contacts, Citation Issuance); EB-2 (Traffic Stop Data Collection); EB-7 (Traffic Control and Services); GC-17 (Employee Disciplinary Procedures); GE-4 (Use, Assignment, and Operation of Vehicles); GF-1 (Criminal Justice Systems); GG-1 (Peace Officer Training Administration); GG-2 (Detention/Civilian Training Administration); GH-2 (Internal Investigations); GH-4 (Bureau of Internal Oversight); GH-5 (Early Warning System); GI-7 (Processing of Bias-Free Tips); GJ-3 (Search and Seizure); GJ-5 (Crime Scene Management); GJ-24 (Community Relations and Youth Programs); GJ-36 (Use of Digital Recording Devices); and GM-1 (Electronic Communications).

Also during this reporting period, we rejected MCSO's statement of annual review for EA-3 (Non-Traffic Contact) that indicated no major changes were needed to the policy. The revisions to EA-3 have been open for some time; although MCSO's work on the policy has apparently stalled, and we have not received a draft since March 17, 2020. At one point, MCSO was considering redesigning the Non-Traffic Contact Form and reexamining its use. We urge MCSO to resume work on this project, as the analysis of the stops documented on these forms is relevant to other Paragraph requirements.

On June 3, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 56288

***Paragraph 35.*** *The Monitor shall regularly review the mission statement, policies and operations documents of any Specialized Unit within the MCSO that enforces Immigration-Related Laws to ensure that such unit(s) is/are operating in accordance with the Constitution, the laws of the United States and State of Arizona, and this Order.*

**In Full and Effective Compliance**

To verify Phase 2 compliance with this Paragraph, we previously verified that the Criminal Employment Unit (CEU) was disbanded and removed from the Special Investigations Division organizational chart. The Human Smuggling Unit (HSU) was also disbanded, and personnel were reassigned to the Anti-Trafficking Unit (ATU).

During our review of the arrests made by the Special Investigations Division ATU between March 2015-March 2017, we did not note any arrests for immigration or human smuggling violations. The cases submitted by MCSO and reviewed for the ATU were primarily related to narcotics trafficking offenses.

MCSO reported in April 2017 that it had disbanded the Anti-Trafficking Unit and formed a new unit, Fugitive Apprehension and Tactical Enforcement (FATE). The primary mission of FATE is to locate and apprehend violent fugitives. We reviewed FATE's mission statement and objectives, as well as the organizational chart for the Special Investigations Division. MCSO had removed the ATU from the organizational chart, and the mission of FATE did not include any reference to the enforcement of Immigration-Related Laws.

The revised organizational chart for SID and documentation MCSO provided regarding the implementation of FATE supported that the ATU no longer existed, and that there were no specialized Units in MCSO that enforced Immigration-Related Laws.

We previously received and reviewed the Special Investigations Division Operations Manual and organizational chart. Both confirmed that MCSO has no specialized Units that enforce Immigration-Related Laws, that the Human Smuggling Unit (HSU) was disbanded, and the Anti-Trafficking Unit (ATU) no longer exists.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 56289

***Paragraph 36.*** *The MCSO shall ensure that any Significant Operations or Patrols are initiated and carried out in a race-neutral fashion. For any Significant Operation or Patrol involving 10 or more MCSO personnel, excluding posse members, the MCSO shall develop a written protocol including a statement of the operational motivations and objectives, parameters for supporting documentation that shall be collected, operations plans, and provide instructions to supervisors, deputies and posse members. That written protocol shall be provided to the Monitor in advance of any Significant Operation or Patrol.*

**In Full and Effective Compliance**

Since the requirements for conducting Significant Operations were implemented, MCSO has reported conducting only one Significant Operation that invoked the requirements of this Paragraph. MCSO conducted "Operation Borderline" from October 20-27, 2014, to interdict the flow of illegal narcotics into Maricopa County. MCSO met all the requirements of this Paragraph during the operation.

In February 2016, we became aware of "Operation No Drug Bust Too Small" when it was reported in the media, and requested details on this operation from MCSO. After reviewing the documentation MCSO provided, we were satisfied that it did not meet the reporting requirements of this Paragraph.

In October 2016, we became aware of "Operation Gila Monster" when it was reported in the media. According to media reports, this was a two-week operation conducted by a special operations Unit in MCSO and was intended to interdict the flow of illegal drugs into Maricopa County. We requested all documentation regarding this operation for review. The documentation indicated that this operation was conducted from October 17-23, 2016. The documentation MCSO provided was sufficient for us to determine that this operation did not meet the reporting criteria for this, or other Paragraphs, related to Significant Operations. The Plaintiffs also reviewed the documentation submitted by MCSO on this operation and agreed that the operation did not invoke the requirements of this Paragraph. We and the Plaintiffs noted that "Operation Gila Monster" involved traffic stops of Latinos, and that those arrested were undocumented Latinos.

We continue to review documentation submitted for this Paragraph by all Districts, the Enforcement Support Division, and the Investigations Division on a monthly basis. During this reporting period, and since October 2014, MCSO continues to report that it has not conducted any additional Significant Operations. In addition, we have not learned of any potential Significant Operation through media releases or other sources during this reporting period. We will continue to monitor and review any operations we become aware of to ensure continued compliance with this and other Paragraphs related to Significant Operations. During this reporting period, we did not learn of any Significant Operations conducted by MCSO.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 56290

***Paragraph 37.*** *The MCSO shall submit a standard template for operations plans and standard instructions for supervisors, deputies and posse members applicable to all Significant Operations or Patrols to the Monitor for review pursuant to the process described in Section IV within 90 days of the Effective Date. In Exigent Circumstances, the MCSO may conduct Significant Operations or Patrols during the interim period but such patrols shall be conducted in a manner that is in compliance with the requirement of this Order. Any Significant Operations or Patrols thereafter must be in accordance with the approved template and instructions.*

**In Full and Effective Compliance**

In late 2014, we reviewed all the documentation submitted by MCSO regarding the Significant Operation conducted from October 24-27, 2014. This operation was intended to interdict the flow of illegal narcotics into Maricopa County and fully complied with the requirements of this Paragraph.

MCSO continues to report that it has not conducted any operations that invoke the requirements of this Paragraph since October 2014.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

During this reporting period, we did not become aware of any Significant Operations conducted by MCSO. MCSO remains in Full and Effective Compliance with this Paragraph.


**(Note: Unchanged language is presented in *italicized font*. Additions are indicated by underlined font. Deletions are indicated by** ~~crossed-out font~~**.)**

***Paragraph 38.*** *If the MCSO conducts any Significant Operations or Patrols involving 10 or more MCSO Personnel excluding posse members, it shall create the following documentation and provide it to the Monitor and Plaintiffs within 30 days after the operation:*

a. *documentation of the specific justification/reason for the operation, certified as drafted prior to the operation (this documentation must include analysis of relevant, reliable, and comparative crime data);*

b. *information that triggered the operation and/or selection of the particular site for the operation;*

c. *documentation of the steps taken to corroborate any information or intelligence received from non-law enforcement personnel;*

d. *documentation of command staff review and approval of the operation and operations plans;*

e. *a listing of specific operational objectives for the patrol;*

f. *documentation of specific operational objectives and instructions as communicated to participating MCSO Personnel;*

WAI 56291

g.     *any operations plans, other instructions, guidance or post-operation feedback or debriefing provided to participating MCSO Personnel;*

h.     *a post-operation analysis of the patrol, including a detailed report of any significant events that occurred during the patrol;*

i.     *arrest lists, officer participation logs and records for the patrol; and*

j.     *data about each contact made during the operation, including whether it resulted in a citation or arrest.*

**In Full and Effective Compliance**

Since the initial publication of GJ-33, MCSO has reported that it has conducted only one Significant Operation, "Operation Borderline," in October 2014. At the time of this operation, we reviewed MCSO's compliance with policy; attended the operational briefing; and verified the inclusion of all the required protocols, planning checklists, supervisor daily checklists, and post-operation reports. MCSO was in full compliance with this Paragraph for this operation.

During this reporting period, MCSO again reported that it did not conduct any Significant Operations invoking the requirements of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

During this reporting period, we did not become aware of any Significant Operations conducted by MCSO. MCSO remains in Full and Effective Compliance with this Paragraph.


***Paragraph 39.*** *The MCSO shall hold a community outreach meeting no more than 40 days after any Significant Operations or Patrols in the affected District(s). MCSO shall work with the Community Advisory Board to ensure that the community outreach meeting adequately communicates information regarding the objectives and results of the operation or patrol. The community outreach meeting shall be advertised and conducted in English and Spanish.*

**In Full and Effective Compliance**

The Amendments to the Supplemental Permanent Injunction/Judgment Order (Document 2100) issued on August 3, 2017 returned the responsibility for compliance with this Paragraph to MCSO.

During this reporting period, MCSO did not report conducting any Significant Operations that would invoke the requirements of this Paragraph.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 56292

**Paragraph 40.**  *The MCSO shall notify the Monitor and Plaintiffs within 24 hours of any immigration related traffic enforcement activity or Significant Operation involving the arrest of 5 or more people unless such disclosure would interfere with an on-going criminal investigation in which case the notification shall be provided under seal to the Court, which may determine that disclosure to the Monitor and Plaintiffs would not interfere with an on-going criminal investigation.  In any event, as soon as disclosure would no longer interfere with an on-going criminal investigation, MCSO shall provide the notification to the Monitor and Plaintiffs.  To the extent that it is not already covered above by Paragraph 38, the Monitor and Plaintiffs may request any documentation related to such activity as they deem reasonably necessary to ensure compliance with the Court's orders.*

**In Full and Effective Compliance**

Since MCSO first developed GJ-33 (Significant Operations) in 2014, MCSO has reported conducting only one operation, "Operation Borderline," that required compliance with this Paragraph.  We verified that MCSO employed the appropriate protocols and made all required notifications.  MCSO was in full compliance with this Paragraph during this operation.

Based on a concern raised by the Plaintiffs, and to provide clarification regarding the portion of this Paragraph that addresses the requirement for MCSO to notify the Monitor and Plaintiffs within 24 hours of any immigration-related traffic enforcement activity or Significant Operations involving "the arrest of 5 or more persons," we requested during our October 2015 site visit that MCSO provide a statement regarding this requirement each month.  MCSO began including this information in its November 2015 submission and continues to do so.

MCSO continues to report that it has not conducted any operations that meet the reporting requirements for this Paragraph since October 2014.  During this reporting period, we did not learn of any traffic-related enforcement or Significant Operations conducted by MCSO that would invoke the requirements of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 56293

# Section 6: Training

**COURT ORDER VII.  TRAINING**

## a. General Provisions

***Paragraph 41.*** *To ensure that the Policies and Procedures provided for by this Order are effectuated, the MCSO shall implement the following requirements regarding Training.*

***Paragraph 42.*** *The persons presenting this Training in each area shall be competent instructors with significant experience and expertise in the area.  Those presenting Training on legal matters shall also hold a law degree from an accredited law school and be admitted to a Bar of any state and/or the District of Columbia.*

**Phase 1:**  In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on March 31, 2021.

- GG-2 (Detention/Civilian Training Administration), most recently amended on March 31, 2021.

- Training Division Operations Manual, most recently amended on April 5, 2021.

**Phase 2:**  In compliance

MCSO uses three types of instructors to deliver Order-related training:  They are either assigned to the Training Division as full-time staff; assigned to field assignments outside of the Training Division; or are paid vendors.  The Training Division manually maintains individual instructor folders for Training Division staff, field instructors, and Field Training Officers (FTOs).  MCSO policy requires that instructor folders include annually updated CVs, General Instructor (GI) certificates, and either an annual or 30-day Misconduct and Disciplinary Review, as applicable. Additionally, instructors who have received prior sustained discipline or who are currently involved with an ongoing Professional Standards Bureau (PSB) investigation may request a Waiver of Presumptive Ineligibility for approval to teach from the Training Division Commander. A waiver request should provide the Training Division Commander with ample justification to overcome presumptive ineligibility.  Waiver requests require the Training Division Commander to produce written justifications for the approval or denial of each request.  We verify compliance with this Paragraph by reviewing all instructor folders, waiver requests, and justifications.

During this reporting period, the Training Division approved three new FTOs and four new GIs. Our review indicated that all seven individuals met the appropriate criteria as described in GG-1. Additionally, everyone received the prescribed PSB review and were approved by the Training Division Captain.

The newly developed Instructor Evaluation Form was approved for use during this quarter.  No instructors were evaluated using this new tool during this reporting period.

***Paragraph 43.**  The Training shall include at least 60% live training (i.e., with a live instructor), which includes an interactive component, and no more than 40% on-line training.  The Training shall also include testing and/or writings that indicate that MCSO Personnel taking the Training comprehend the material taught whether via live training or via on-line training.*

**Phase 1:**  In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on March 31, 2021.

- GG-2 (Detention/Civilian Training Administration), most recently amended on March 31, 2021.

- Training Division Operations Manual, most recently amended on April 5, 2021.

**Phase 2:**  In compliance

We verify compliance with this Paragraph by reviewing all individual test failures; individual retests; failure remediation efforts, and test analyses by training class; for both live and HUB-delivered Order-related training.

During this reporting period, MCSO delivered the following programs:  Bias-Free Policing and Fourth and Fourteenth Amendment Training; 2015 Blue Team (BT); 2019 Body-Worn Camera (BWC); 2017 Early Identification System (EIS); 2020 Fair and Impartial Decision Making (FIDM); 2017 Employee Performance Appraisal (EPA); 2020 Supervisor Responsibilities: Effective Law Enforcement (SRELE); and the 2019 Traffic and Criminal Software (TraCS).

MCSO delivered the 20-hour Fourth and Fourteenth Amendment classroom training once in February to 11 personnel (four sworn, seven Posse).  One individual required test remediation.

MCSO began HUB delivery of the 2020 ACT in March.  During our April remote site visit, we discussed this program further.  The Training Division anticipates completion of this delivery in June 2021.  The HUB course has been delivered to 467 personnel (348 sworn, 17 Reserve, 92 Posse, 10 Deputy Service Aides [DSAs]).  Currently, the Training Division is aware of at least five personnel requiring test remediation; and plans to schedule an in-person classroom remediation.  MCSO experienced difficulties in delivering this course on the HUB.  Several personnel, after signing into the test on the HUB, were removed from the system and required reentry.  This resulted in duplicate test results that MCSO advised us will be easily identified on the HUB test reporting documents.

MCSO delivered the eight-hour 2015 BT classroom training twice during this reporting period to 40 personnel (four sworn, 36 Detention).  No personnel required test remediation.

MCSO delivered the 2019 BWC training once in February to four sworn personnel.  No personnel required test remediation.

MCSO delivered the 2017 EIS once in February to 13 sworn personnel.  No personnel required test remediation.

MCSO delivered the 2017 EPA once in February to 13 sworn personnel.  No personnel required test remediation.

WAI 56295

MCSO delivered the 2020 FIDM during this reporting period. As of this writing, 625 (588 sworn, 37 Reserve) personnel have completed the online HUB class. Eleven personnel required test remediation.

MCSO delivered the 2020 SRELE once during February to 15 sworn personnel. No personnel required test remediation.

MCSO delivered the 2019 TraCS twice during this reporting period; January to three sworn personnel and March to two sworn personnel. No personnel required test remediation.

The number of tests administered, and each test result by individual and class, are compiled within the HUB. The document lists test dates and starting times under the Attempt Date column. A second column, Transcript Completed Date, indicates the date and time that the test score is memorialized. During our reviews, we have observed that individuals have failed the initial test, and then begun a second test before the score has been documented within the HUB. This may indicate that students who fail the initial test begin the second test before any remediation. We will revisit this issue during our next site visit.

While reviewing newly developed and revised curricula, both we and the Plaintiffs requested information regarding the Training Division's test remediation process, which we discussed during our April remote site visit. Both GG-1 and the Training Division Operations Manual provide limited information on how the process works, and who is responsible for conducting test remediation. The Training Division Captain advised us that he intends to address this during the next reporting period by revising the Training Division Operations Manual to better inform personnel on this process. Currently, test remediation is only discussed verbally among instructors from the Training Division. No written process exists for all instructors to follow. We note that the current list of approximately 97 GIs who are not assigned to the Training Division have not been included in these discussions. Training programs such as the Fourth and Fourteenth Amendment training are delivered by vendor attorneys. Currently, MCSO contracts with a single attorney for all these deliveries. The Training Division lieutenant has discussed this process with the vendor. In addition, Training Division instructors lead or assist with most Order-related training programs. The Training Division has assured us during our virtual site visit discussions that all Training Division instructors use consistent methodology for test remediation; and that this process will be memorialized in the next iteration of the Training Division Operations Manual.

We, the Plaintiffs, and the Plaintiff-Intervenors have continued to identify concerns with test development and level of difficulty for Order-related trainings. During this reporting period, we and the Parties commented on a test developed for a new training program on Cultural Competency. We had encouraged MCSO to pursue a nontraditional test within the capabilities of the HUB, while still challenging deputies to engage in critical thinking. The Training Division successfully incorporated the provided recommendations and produced a test that more effectively assesses the critical thinking of deputies by using varied question types. We recommend that MCSO apply these same efforts to tests for all Order-related training.

WAI 56296

MCSO maintained that the Covid-19 pandemic required the normal classroom delivery of the 2020 ACT to be delivered via the HUB. After consultation with MCSO, Plaintiffs, and Plaintiff-Intervenors, we approved the delivery of the 2020 ACT via the HUB. MCSO normally contracts with a single outside vendor attorney to instruct this class and maintained that a classroom delivery under these conditions was not in the best interest of the participants and the instructors. During this reporting period, eight of the nine Order-related trainings were delivered via live classroom delivery. The HUB delivery of the ACT did not negatively affect compliance with the requirements of this Paragraph.

***Paragraph 44.*** *Within 90 days of the Effective Date, MCSO shall set out a schedule for delivering all Training required by this Order. Plaintiffs' Representative and the Monitor shall be provided with the schedule of all Trainings and will be permitted to observe all live trainings and all on-line training. Attendees shall sign in at each live session. MCSO shall keep an up-to-date list of the live and on-line Training sessions and hours attended or viewed by each officer and Supervisor and make that available to the Monitor and Plaintiffs.*

**Phase 1:** In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on March 31, 2021.

- GG-2 (Detention/Civilian Training Administration), most recently amended on March 31, 2021.

- Training Division Operations Manual, most recently amended on April 5, 2021.

**Phase 2:** In compliance

The Training Division maintains a three-month Training Calendar. MCSO posts the Master Training Calendar to the MCSO website to inform the public of tentative training dates, classes, and locations. The calendar displays 90-day increments and includes a legend specifically identifying Order-related training.

Master Personnel Rosters document the number of personnel requiring Order-related training. At the end of this reporting period, MCSO reported that 639 sworn members, 13 Reserve members, 28 retired Reserve members, 207 Posse members, 10 DSAs, 1,877 Detention members, and 773 civilian employees should receive Order-related instruction. These categories vary by reporting period, due to attrition in the organization.

WAI 56297

***Paragraph 45.*** *The Training may incorporate adult-learning methods that incorporate roleplaying scenarios, interactive exercises, as well as traditional lecture formats.*

**In Full and Effective Compliance**

The Training Division routinely incorporates videos and small group discussions in its training classes. We encourage MCSO to continue increasing its use of role-plays, simulations, practice demonstrations, or physical activities – which we believe lead to a stronger learning environment and better retention of lesson content by adult learners. MCSO will benefit by further challenging the knowledge gained by deputies during training programs with more than a written test. We did not see any changes in the ways in which MCSO employed adult-learning methods during this reporting period.

On December 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.


***Paragraph 46.*** *The curriculum and any materials and information on the proposed instructors for the Training provided for by this Order shall be provided to the Monitor within 90 days of the Effective Date for review pursuant to the process described in Section IV. The Monitor and Plaintiffs may provide resources that the MCSO can consult to develop the content of the Training, including names of suggested instructors.*

**In Full and Effective Compliance**

During our April remote site visit, we discussed the status of all Order-required training curricula.

The 2017 EIS and the 2017 Complaint Intake and Reception HUB training curricula remain under review by the Training and other Divisions.

Fourth and Fourteenth Amendment Training was previously approved.

The 2020 ACT HUB delivery was previously approved.

The History of Discrimination Training video, now titled the History and Impact of Discriminatory Policing in Maricopa County, was completed.

The Aguila Community Video was completed during this reporting period.

The 2021 Blue Team-Civilian Training was approved during this reporting period.

The 2021 Blue Team-Detention, Deputy, Lateral Training was approved during this reporting period.

The 2019 BWC Training requires annual review.

The 2017 EIS Training is under revision.

The 2021 Employee Performance Management Training was approved during this reporting period.

WAI 56298

An introduction to Fair and Impartial Decision-Making (FIDM) HUB curriculum was previously approved.

The 2021 SRELE is under development.

The 2020 PSB8 External was approved during this reporting period.

The 2021 PSB8 Internal curriculum was provided and will be delivered by a vendor.

The 2019 TraCS Training requires annual review.

The 2019 TraCS for Supervisors Training requires annual review.

Traffic Stop Monthly Review (TSMR) Training remains under development.

On December 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.


*Paragraph 47.* *MCSO shall regularly update the Training to keep up with developments in the law and to take into account feedback from the Monitor, the Court, Plaintiffs and MCSO Personnel.*

**Phase 1:** In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on March 31, 2021.

- GG-2 (Detention/Civilian Training Administration), most recently amended on March 31, 2021.

- Training Division Operations Manual, most recently amended on April 5, 2021.

**Phase 2:** In compliance

The Training Division routinely provides all new and revised lesson plans for our and the Parties' review. These reviews address the requirements of this Paragraph.

The 2017 EIS training curriculum is currently being revised. This program provides supervisors with their initial formal and technical direction for use of the EIS system. The training includes content to assist supervisors with difficult conversations of performance issues with subordinates, and MCSO's expectations for the design of action plans for responding to EIS Alerts and deputy behavior. We discussed this curriculum during our April remote site visit. The Training Division reported that the lesson plan and supporting documents are currently in development. The final curriculum is expected for initial review during the next reporting period.

The History and Impact of Discriminatory Policing in Maricopa County video was completed during this reporting period.

The Aguila Community Video was completed during this reporting period.

WAI 56299

We will continue to advise MCSO upon first review of a training offering if we do not consider it to be enhanced. MCSO can continue to expect that we and the Parties will continue to observe training sessions and provide appropriate feedback.

### b. Bias-Free Policing Training

*Paragraph 48. The MCSO shall provide all sworn Deputies, including Supervisors and chiefs, as well as all posse members, with 12 hours of comprehensive and interdisciplinary Training on bias-free policing within 240 days of the Effective Date, or for new Deputies or posse members, within 90 days of the start of their service, and at least 6 hours annually thereafter.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

MCSO delivers Fourth and Fourteenth Amendment Training (Bias-Free Policing Training) to all new deputies during POST Academy training. The Fourth and Fourteenth Amendment 20-hour classroom training was delivered once in February to 11 personnel (four sworn, seven Posse).

*Paragraph 49. The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:*

a.     *definitions of racial profiling and Discriminatory Policing;*

b.     *examples of the type of conduct that would constitute Discriminatory Policing as well as examples of the types of indicators Deputies may properly rely upon;*

c.     *the protection of civil rights as a central part of the police mission and as essential to effective policing;*

d.     *an emphasis on ethics, professionalism and the protection of civil rights as a central part of the police mission and as essential to effective policing;*

e.     *constitutional and other legal requirements related to equal protection, unlawful discrimination, and restrictions on the enforcement of Immigration-Related Laws, including the requirements of this Order;*

f.     *MCSO policies related to Discriminatory Policing, the enforcement of Immigration-Related Laws and traffic enforcement, and to the extent past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;*

g.     *MCSO's protocol and requirements for ensuring that any significant pre-planned operations or patrols are initiated and carried out in a race-neutral fashion;*

h.     *police and community perspectives related to Discriminatory Policing;*

i.     *the existence of arbitrary classifications, stereotypes, and implicit bias, and the impact that these may have on the decision-making and behavior of a Deputy;*

WAI 56300

j.      methods and strategies for identifying stereotypes and implicit bias in Deputy decision-making;

k.      methods and strategies for ensuring effective policing, including reliance solely on non-discriminatory factors at key decision points;

l.      methods and strategies to reduce misunderstanding, resolve and/or de-escalate conflict, and avoid Complaints due to perceived police bias or discrimination;

m.      cultural awareness and how to communicate with individuals in commonly encountered scenarios;

n.      problem-oriented policing tactics and other methods for improving public safety and crime prevention through community engagement;

o.      the benefits of actively engaging community organizations, including those serving youth and immigrant communities;

p.      the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;

q.      background information on the Melendres v. Arpaio litigation, as well as a summary and explanation of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in Melendres v. Arpaio, the parameters of the Court's permanent injunction, and the requirements of this Order; and

r.      Instruction on the data collection protocols and reporting requirements of this Order.

**Phase 1:** Not applicable

**Phase 2:** In compliance

The Fourth and Fourteenth Amendment Training curriculum was previously approved for delivery.


### c. Training on Detentions, Arrests, and the Enforcement of Immigration-Related Laws

*Paragraph 50.* *In addition to the Training on bias-free policing, the MCSO shall provide all sworn personnel, including Supervisors and chiefs, as well as all posse members, with 6 hours of Training on the Fourth Amendment, including on detentions, arrests and the enforcement of Immigration-Related Laws within 180 days of the effective date of this Order, or for new Deputies or posse members, within 90 days of the start of their service. MCSO shall provide all Deputies with 4 hours of Training each year thereafter.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

WAI 56301

MCSO delivers training on Fourth and Fourteenth Amendment (Detentions, Arrests, and the Enforcement of Immigration-Related Laws) to all new deputies during POST Academy training. MCSO delivered the Fourth and Fourteenth Amendment 20-hour classroom training once in February to 11 personnel (four sworn, seven Posse).

**Paragraph 51.** *The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:*

a.  *an explanation of the difference between various police contacts according to the level of police intrusion and the requisite level of suspicion; the difference between reasonable suspicion and mere speculation; and the difference between voluntary consent and mere acquiescence to police authority;*

b.  *guidance on the facts and circumstances that should be considered in initiating, expanding or terminating an Investigatory Stop or detention;*

c.  *guidance on the circumstances under which an Investigatory Detention can become an arrest requiring probable cause;*

d.  *constitutional and other legal requirements related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, including the requirements of this Order;*

e.  *MCSO policies related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, and the extent to which past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;*

f.  *the circumstances under which a passenger may be questioned or asked for identification;*

g.  *the forms of identification that will be deemed acceptable if a driver or passenger (in circumstances where identification is required of them) is unable to present an Arizona driver's license;*

h.  *the circumstances under which an officer may initiate a vehicle stop in order to investigate a load vehicle;*

i.  *the circumstances under which a Deputy may question any individual as to his/her alienage or immigration status, investigate an individual's identity or search the individual in order to develop evidence of unlawful status, contact ICE/CBP, await a response from ICE/CBP and/or deliver an individual to ICE/CBP custody;*

j.  *a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause to believe that a vehicle or an individual is involved in an immigration-related state crime, such as a violation of the Arizona Human Smuggling Statute, as drawn from legal precedent and updated as necessary; the factors shall not include actual or apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a Hispanic day laborer;*

WAI 56302

k.  a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause that an individual is in the country unlawfully, as drawn from legal precedent and updated as necessary; the factors shall not include actual or apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a day laborer;

l.  an emphasis on the rule that use of race or ethnicity to any degree, except in the case of a reliable, specific suspect description, is prohibited;

m.  the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;

n.  Provide all trainees a copy of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in Melendres v. Arpaio and this Order, as well as a summary and explanation of the same that is drafted by counsel for Plaintiffs or Defendants and reviewed by the Monitor or the Court; and

o.  Instruction on the data collection protocols and reporting requirements of this Order, particularly reporting requirements for any contact with ICE/CBP.

**Phase 1:** Not applicable

**Phase 2:** In compliance

The Fourth and Fourteenth Amendment Training curriculum was previously approved for delivery.


### d. Supervisor and Command Level Training

***Paragraph 52.*** *MCSO shall provide Supervisors with comprehensive and interdisciplinary Training on supervision strategies and supervisory responsibilities under the Order. MCSO shall provide an initial mandatory supervisor training of no less than 6 hours, which shall be completed prior to assuming supervisory responsibilities or, for current MCSO Supervisors, within 180 days of the Effective Date of this Order. In addition to this initial Supervisor Training, MCSO shall require each Supervisor to complete at least 4 hours of Supervisor-specific Training annually thereafter. As needed, Supervisors shall also receive Training and updates as required by changes in pertinent developments in the law of equal protection, Fourth Amendment, the enforcement of Immigration-Related Laws, and other areas, as well as Training in new skills.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

MCSO delivered the 2020 SRELE once in February to 15 sworn personnel. No personnel required test remediation. The class was provided to available supervisory personnel (173/184, 94%).

WAI 56303

*Paragraph 53.*  *The Supervisor-specific Training shall address or include, at a minimum:*

a.  *techniques for effectively guiding and directing Deputies, and promoting effective and constitutional police practices in conformity with the Policies and Procedures in Paragraphs 18–34 and the Fourth and Fourteenth Amendment Training in Paragraphs 48–51;*

b.  *how to conduct regular reviews of subordinates;*

c.  *operation of Supervisory tools such as EIS;*

d.  *evaluation of written reports, including how to identify conclusory, "canned," or perfunctory language that is not supported by specific facts;*

e.  *how to analyze collected traffic stop data, audio and visual recordings, and patrol data to look for warning signs or indicia of possible racial profiling or unlawful conduct;*

f.  *how to plan significant operations and patrols to ensure that they are race-neutral and how to supervise Deputies engaged in such operations;*

g.  *incorporating integrity-related data into COMSTAT reporting;*

h.  *how to respond to calls from Deputies requesting permission to proceed with an investigation of an individual's immigration status, including contacting ICE/CBP;*

i.  *how to respond to the scene of a traffic stop when a civilian would like to make a Complaint against a Deputy;*

j.  *how to respond to and investigate allegations of Deputy misconduct generally;*

k.  *evaluating Deputy performance as part of the regular employee performance evaluation; and*

l.  *building community partnerships and guiding Deputies to do the Training for Personnel Conducting Misconduct Investigations.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

The 2020 SRELE was approved for delivery during the third quarter of 2020.  In February, MCSO delivered this course to 15 newly promoted sergeants.  No personnel required test remediation.

WAI 56304

# Section 7: Traffic Stop Documentation and Data Collection

**COURT ORDER VIII.    TRAFFIC STOP DOCUMENTATION AND DATA COLLECTION AND REVIEW**

For Paragraphs 54 and 55, in particular, we request traffic stop data from MCSO. The following describes how we made that request and how we handled the data once we received it. These data may also be referred to in other areas of Section 7 and the report as a whole.

In selecting traffic stop cases for our compliance review, we modified our statistical technique in that, rather than selecting a representative random sample of 100 cases per quarter, we instead pulled a sample of 35 cases per month (or 105 cases per quarter). Our original selection of a sample size of 35 cases was based on information from MCSO TraCS data that reported the average number of traffic stops per month was fewer than 2,000 during the April 2014-June 2015 period when TraCS data were first available. The selection of 35 cases reflects a sample based on this average per month. This gave us a 95 percent confidence level (the certainty associated with our conclusion).

We continue to pull our monthly sample of traffic stop cases from the six Districts (Districts 1, 2, 3, 4, 6, and 7) and Lake Patrol. Once we received files each month containing traffic stop case numbers from MCSO, denoting from which area they came, we selected a sample of up to 35 cases representing the areas and then selected a subsample averaging 10 cases, from the 35 selected cases, to obtain CAD audiotapes and body-worn camera recordings. Our sampling process involved selecting a sample of cases stratified by the areas according to the proportion of specific area cases relative to the total area cases. Stratification of the data was necessary to ensure that each area was represented proportionally in our review. Randomization of the cases and the selection of the final cases for CAD review were achieved using a statistical software package (IBM SPSS Version 22), which contains a specific function that randomly selects cases and that also allows cases to be weighted by the areas. Our use of SPSS required that we first convert the MCSO Excel spreadsheet into a format that would be readable in SPSS. We next pulled the stratified sample each month for the areas and then randomly selected a CAD audio subsample from the selected cases.

In February 2016, we began pulling cases for our body-worn camera review from the audio subsample. Since that time, we began pulling additional samples for passenger contacts and persons' searches (10 each per month). The unique identifiers for these two samples were relayed back to MCSO personnel, who produced documentation for the selected sample (including the CAD documentation for the subsample).

On October 10, 2014, the Court issued an Order Granting Stipulation to Amend Supplemental/Permanent Injunction/Judgment Order (Document 748). The stipulation affects Paragraphs 57, 61, 62, and 1.r.xv.; and has been incorporated in the body of this report. The stipulation referenced amends the First Order, and will be addressed in Section 7.

WAI 56305

### a. Collection of Traffic Stop Data

**Paragraph 54.** *Within 180 days of the Effective Date, MCSO shall develop a system to ensure that Deputies collect data on all vehicle stops, whether or not they result in the issuance of a citation or arrest. This system shall require Deputies to document, at a minimum:*

a. *the name, badge/serial number, and unit of each Deputy and posse member involved;*

b. *the date, time and location of the stop, recorded in a format that can be subject to geocoding;*

c. *the license plate state and number of the subject vehicle;*

d. *the total number of occupants in the vehicle;*

e. *the Deputy's subjective perceived race, ethnicity and gender of the driver and any passengers, based on the officer's subjective impression (no inquiry into an occupant's ethnicity or gender is required or permitted);*

f. *the name of any individual upon whom the Deputy runs a license or warrant check (including subject's surname);*

g. *an indication of whether the Deputy otherwise contacted any passengers, the nature of the contact, and the reasons for such contact;*

h. *the reason for the stop, recorded prior to contact with the occupants of the stopped vehicle, including a description of the traffic or equipment violation observed, if any, and any indicators of criminal activity developed before or during the stop;*

i. *time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; time a release was made without citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere or Deputy's departure from the scene;*

j. *whether any inquiry as to immigration status was conducted and whether ICE/CBP was contacted, and if so, the facts supporting the inquiry or contact with ICE/CBP, the time Supervisor approval was sought, the time ICE/CBP was contacted, the time it took to complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual;*

k. *whether any individual was asked to consent to a search (and the response), whether a probable cause search was performed on any individual, or whether a pat-and-frisk search was performed on any individual;*

l. *whether any contraband or evidence was seized from any individual, and nature of the contraband or evidence; and*

m. *The final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without citation.*

**Phase 1:** In compliance

WAI 56306

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 4, 2020.

- EA-11 (Arrest Procedures), most recently amended on May 28, 2021.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on February 25, 2021.

- EB-2 (Traffic Stop Data Collection), most recently amended on June 15, 2021.

- GI-1 (Radio and Enforcement Communications Procedures), most recently amended on December 31, 2020.

- GJ-3 (Search and Seizure), most recently amended on June 4, 2021.

**Phase 2:** Not in compliance

To verify the information required for this Paragraph, MCSO created, and we reviewed, the Vehicle Stop Contact Form (VSCF), the Vehicle Stop Contact Form Supplemental Sheet, the Incidental Contact Receipt, and the Written Warning/Repair Order, all in electronic form, for those motorists who, during this reporting period, committed a traffic violation or operated a vehicle with defective equipment and received a warning. We also reviewed the Arizona Traffic Ticket and Complaint Forms issued for violations of Arizona Statutes, Internet I/Viewer Event Unit printout, Justice Web Interface printout, and any Incident Report associated with the event. We selected a sample of 105 traffic stops conducted by deputies from January 1-March 31, 2021, for the purposes of this review; and assessed the collected data from the above-listed documents for compliance with Subparagraphs 54.a.-54.m. All of the listed documentation was used for our review of the following subsections of this Paragraph.

The Paragraph requires that MCSO create a system for data collection. The data collected pursuant to this Paragraph will be captured in the Early Identification System, which we discuss further in this report.

Paragraph 54.a. requires MCSO to document the name, badge/serial number, and unit of each deputy and Posse member involved.

For this reporting period, all of the primary deputies indicated their own serial numbers for every stop they initiated. We review the VSCF, I/Viewer Event document, the Justice Web Interface, and the CAD printout to determine which units were on the scene. If back-up units arrive on a scene and do not announce their presence to dispatch, CAD does not capture this information. MCSO made a TraCS change to the VSCF during 2016 to secure this information. MCSO added a drop-down box so the deputy could enter the number of units on the scene and the appropriate fields would be added for the additional deputies. While this addition is an improvement, if the deputy fails to enter the number of additional units on the form, the drop-down boxes do not appear. In addition, MCSO policy requires deputies to prepare the Assisting Deputy and Body-Worn Camera Log in instances where deputies respond and assist at a traffic stop. The log contains the relevant information required by this Subparagraph for any additional deputies involved in a traffic stop other than the primary deputy. During our April 2019 site visit, we discussed with MCSO, the Plaintiffs, and the Plaintiff-Intervenors the method of evaluating this

WAI 56307

requirement. We determined that in instances where a deputy's name, serial number and unit number may have been omitted on the VSCF, yet the deputy prepared the Assisting Deputy and Body-Worn Camera Log, the requirements of this Subparagraph will have been met.

During our review of the sample of 105 vehicle traffic stops, we identified 20 cases where the deputy's unit had another deputy assigned to the vehicle or one or more other deputy units or Posse members were on the scene. In 19 of the 20 cases in which there were multiple units or deputies on a stop, the deputy properly documented the name, badge, and serial number of the deputies and Posse members on the VSCF, or the information was captured on the Assisting Deputy and Body-Worn Camera Log. In one case, the deputy did not document the assisting deputy's call sign on the VSCF and an Assisting Deputy and Body-Worn Camera Log was not prepared.

Of the cases we reviewed for passenger contacts under Subparagraph 54.g., there were 49 cases where the deputy's unit had another deputy assigned to the vehicle or one or more other deputy units or Posse members were on the scene. In each of the 49 cases, the deputy properly documented the required information on the VSCF or the information was captured on the Assisting Deputy and Body-Worn Camera Log. In two cases, there were assisting deputies that were not listed on the VSCF and the Assisting Deputy and Body-Worn Camera Logs were not prepared by the deputies.

Of the cases we reviewed for searches of persons under Subparagraph 54.k., there were 62 cases where the deputy's unit had another deputy assigned to the vehicle, or one or more other deputies or Posse members were on the scene. In 51 of the 54 cases, the deputies properly documented the required information on the VSCFs or the information was captured on the Assisting Deputy and Body-Worn Camera Logs. In three cases, there were assisting deputies that were not listed on the VSCF and the Assisting Deputy and Body-Worn Camera Logs were not prepared by the assisting deputies.

We continue to identify cases where the assisting deputies have not prepared the Assisting Deputy and Body-Worn Camera Log when required by MCSO policy. We encourage MCSO to provide guidance to supervisors to be attentive to this issue during their reviews of traffic stop documentation.

During the second reporting period of 2020, MCSO attained a compliance rating of 94%. During the third reporting period of 2020, MCSO attained a compliance rating of 99%. During the fourth reporting period of 2020, MCSO attained a compliance rating of 97%. During this reporting period, MCSO attained a compliance rating of 96%. MCSO remains in compliance with this requirement.

Paragraph 54.b. requires MCSO to document the date, time, and location of the stop, recorded in a format that can be subject to geocoding. Our reviews of the CAD printout for all 105 traffic stops in our sample indicated that the date, time, and location is captured with the time the stop is initiated and the time the stop is cleared. In previous reporting periods, we noted instances where the GPS coordinates could not be located on the documentation received (CAD printout/I/Viewer). We contacted MCSO about this issue, and MCSO now provides us with the GPS coordinates via a separate document that lists the coordinates for the traffic stop sample we

WAI 56308

provide. MCSO uses GPS to determine location for the CAD system. GPS collects coordinates from three or more satellites to enhance the accuracy of location approximation. The data from the satellites can be decoded to determine the longitude and latitude of traffic stop locations should that be necessary. The CAD system was upgraded in 2014 to include geocoding of traffic stops. CID continues to provide us with a printout of all case numbers in the sample containing the associated coordinates. For this reporting period, the CAD or I/Viewer system contained the coordinates in 63% of the cases. In a separate spreadsheet, MCSO provided GPS coordinates for all 105 cases we reviewed, for 100% compliance with this portion of the Subparagraph.

When we review the sample traffic stops from across all Districts, we note the locations of the stops contained on the VSCF, the CAD printout, and the I/Viewer system to ensure that they are accurate. We continue to identify a limited number of instances where the location of the stop contained on the VSCF and the location of the stop contained on the CAD printout are inconsistent. Reviewing supervisors are not identifying and addressing this issue. We recommend that reviewing supervisors closely review the VSCFs and CAD printouts and address such deficiencies. The number of inconsistencies did not affect MCSO's rate of compliance.

During our April 2016 site visit, we discussed with MCSO the possibility of using the CAD printout instead of the TraCS data to determine stop times. We determined that using the CAD system to determine stop end times created additional challenges. However, MCSO decided to use the CAD printout to determine traffic stop beginning and ending times for data analysis. MCSO issued Administrative Broadcast 16-62 on June 29, 2016, which indicated that, beginning with the July 2016 traffic stop data collection, the stop times captured on the CAD system would be used for reporting and analytical purposes.

Occasionally, the CAD time of stop and end of stop time do not exactly match those listed on the Vehicle Stop Contact Form, due to extenuating circumstances the deputy may encounter. During this reporting period, we did not find any instances where the end time on the VSCF Contact differed significantly from the CAD printout. In monthly audits of traffic stop data, the Audits and Inspections Unit (AIU) reviews the beginning/ending times of the stops and requires that BIO Action Forms are generated by the Districts when there are discrepancies. The CAD system is more reliable than the VSCF in determining stop times, as it is less prone to human error. When the deputy verbally advises dispatch that s/he is conducting a traffic stop, the information is digitally time-stamped into the CAD system without human input; and when the deputy clears the stop, s/he again verbally advises dispatch.

MCSO remains in compliance with this Subparagraph.

Paragraph 54.c. requires MCSO to document the license plate and state of the subject vehicle. During this reporting period, in 104 of the 105 stops that were reviewed, the deputies properly documented the license plate information on the VSCFs and the citations prepared for the stops. In one case, the license plate listed in the CAD printout document was different than the license plate documented on the VSCF and the warning that was issued to the driver. We informed MCSO of this issue, and will follow up to assess what corrective action was taken.

WAI 56309

MCSO remains in compliance with this Subparagraph, with a compliance rate of 99%.

Paragraph 54.d. requires MCSO to document the total number of occupants in the vehicle when a stop is conducted. The VSCF, completed by the deputy on every traffic stop, is used to capture the total number of occupants and contains a separate box on the form for that purpose. EB-2 (Traffic Stop Data Collection) requires deputies to collect data on all traffic stops using the VSCF; this includes incidental contacts with motorists.

In 36 of the 105 traffic stops we reviewed, the driver had one or more passengers in the vehicle (88 total passengers). In 35 of the 36 cases, the deputies properly documented the total number of occupants in the vehicles. In one stop, the deputy listed that the driver was the sole occupant of the vehicle. Based on our review of the body-worn camera recording, there was a passenger in the front seat of the vehicle. We provided MCSO with this information. MCSO reviewed the stop and concurred with our assessment. MCSO is having the deputy's assigned Division address the issue with the deputy and indicated that a corrected VSCF will be prepared. In one stop, the deputy listed a person in the VSCF's passenger field area even though he was not a vehicle occupant. In that case, the deputy listed name of the parent of the driver after he was called to respond to the location of the traffic stop. We provided with MCSO with this information and we will follow up to assess what corrective action is taken.

In our review of traffic stops in relation to Paragraph 54.k., searches of persons, we identified one stop in which one vehicle occupant was not listed on the VSCF. In that stop, the deputy listed on the VSCF that the driver was the sole occupant of the vehicle. Based on our review of the body-worn camera recording, there was a passenger in the front seat of the vehicle. We provided MCSO with this information. MCSO reviewed the stop and concurred with our assessment. MCSO is having the deputy's assigned Division address the issue with the deputy and indicated that a corrected VSCF will be prepared.

With a compliance rate of 94%, MCSO remains in compliance with this Subparagraph.

Paragraph 54.e. requires MCSO to document the perceived race, ethnicity, and gender of the driver and any passengers, based on the deputy's subjective impression. (No inquiry into the occupant's ethnicity or gender is required or permitted.) In 36 of the 105 stops from the traffic stop data sample, there was more than one occupant in the vehicle (88 total passengers).

Sixty-five, or 62%, of the 105 traffic stops involved white drivers. Twenty-six, or 25%, of the 105 stops involved Latino drivers. Nine, or 9%, of the 105 traffic stops involved Black drivers. Three, or 4%, of the 105 traffic stops involved American Indian/Alaskan Native drivers. Two, or 2%, of the 105 traffic stops involved Asian or Pacific Islander drivers. Fifty-four traffic stops, or 51%, resulted in citations. The breakdown of those motorists issued citations is as follows: 34 white drivers (63% of the drivers who were issued citations); 11 Latino drivers (20% of the drivers who were issued citations); six Black drivers (11% of the drivers who were issued citations); two Asian or Pacific Islander drivers (4% of the drivers who were issued citations) and one American Indian/Alaskan Native driver (2% of the drivers who were issued citations). Fifty, or 48%, of the 105 traffic stops we reviewed resulted in a written warning. The breakdown of those motorists issued warnings is as follows: 30 white drivers (60% of the drivers who were issued warnings); 15 Latino drivers (30% of the drivers who were issued warnings); three Black drivers (6% of the

WAI 56310

drivers who were issued warnings); and two American Indian/Alaskan Native drivers (4% of the drivers who were issued warnings). There was one traffic stop in which the driver was issued an Incidental Contact Receipt. In that stop, which involved a white driver, it was determined that a traffic violation did not occur.

In our sample of 30 traffic stops that contained body-worn camera recordings, we did not identify any stops where the deputy did not accurately document the perceived race, ethnicity, and gender of the driver and any passengers in the vehicle. In our review of cases to assess compliance with Paragraphs 25.d. and 54.g., passenger contacts, we identified one stop in which the deputy did not accurately document the gender of the vehicle occupants. In that one case, the VSCF indicates that the passenger was a Black female in the pre-stop perceived fields; however, the same passenger was then listed as unknown-vision obstructed in the post-stop perceived fields. We provided MCSO with this information. MCSO reviewed the stop and concurred with our assessment. MCSO had the deputy's assigned Division address the issue with the deputy and indicated that the error was that the deputy had transposed the information in the two fields.

This Paragraph requires deputies to document the perceived race, ethnicity, and gender of any passengers whether contact is made with them or not. There were some instances where deputies indicated that they were unable to determine the gender and ethnicity of a passenger and listed the passenger as "unknown-vision obscured." During our review of the body-worn camera recordings, we were also unable to get a clear view of the some of the passengers, often due to vehicle being equipped with dark tinted windows combined with the stop occurring during night time hours; or due to vehicle being equipped with dark tinted windows combined with the glare of the sun during daytime hours.

During the second quarter of 2019, AIU commenced conducting the Post-Stop Perceived Ethnicity Inspection. This inspection is conducted on a monthly basis and includes: 1) a review of traffic stops where the deputy documented the driver as being white and the driver's surname is Latino; 2) a review of traffic stops where the deputy documented that the driver has a Latino surname with a passenger listed as "unknown-vision obscured;" and 3) a review of traffic stops where the deputy documented that the driver was Latino and the passengers were listed with a designated ethnicity on the VSCF. This inspection was initiated by AIU in response to previous issues identified where deputies failed to properly document the ethnicity of the vehicle occupants. AIU's inspection reports for January, February, and March 2021 did not identify any instances where the deputies did not properly document the race, ethnicity, and gender of the drivers and passengers.

MCSO remains in compliance with this requirement.

Paragraph 54.f. requires that MCSO record the name of any individual upon whom the deputy runs a license or warrant check (including the subject's surname). In addition, MCSO's policy requires that deputies perform a license plate check on each vehicle stopped by its deputies, as well as warrant checks on every driver stopped by its deputies. Our reviews have found that deputies regularly record the name of each driver and passenger on the VSCF in each instance where they have run a driver's license or warrant check.

WAI 56311

MCSO policy requires that during each traffic stop, deputies are to conduct a records check on the license plate and a wants/warrant check on each driver. For this reporting period, we found that of the 10 traffic stops we reviewed, each of the 105 stops included a check on the license plate. There were 104 stops where the deputies ran warrant checks on the drivers in accordance with MCSO policy.

MCSO's compliance rate with this requirement is 100%. MCSO remains in compliance with this Subparagraph.

Paragraph 54.g. requires the deputy to document whether contact was made with any passengers, the nature of the contact, and the reasons for the contact. During the third quarter of 2019, MCSO requested that we increase the number of cases reviewed to identify additional stops that fit the criteria of this Paragraph. The sample size of cases to be reviewed was increased from 10 stops each month to 35 stops each month, commencing with August 2019. During some months, the number of traffic stops that involve deputies having contact with passenger is fewer than 35 traffic stops.

During our assessment, we specifically review traffic stops that include any instance where the deputy asks any questions of a passenger beyond a greeting, including asking passengers to identify themselves for any reason or requesting that they submit to a Preliminary Breath Test. In such instances, we determine if the passenger was issued one of the following: Incidental Contact Receipt, citation, or a warning. If the passenger was not issued any one of the following documents, it adversely impacts MCSO's compliance with this requirement. It is also important to note that in such instances where a deputy fails to issue one of the required documents after being involved in a passenger contact, it is a violation of MCSO's policy.

To ensure that deputies are accurately capturing passenger information and to verify if passengers are contacted, we compare the number of passengers listed by the deputy with the number of passengers entered in the passenger drop-down box on the Vehicle Stop Contact Form. We also review any Incidental Contact Receipts, citations, or warnings, issued to passengers by deputies. We also review the deputies' notes on the VSCF, the Arizona Citation, and the CAD printout for any information involving the passengers. We review MCSO's I/Viewer System and the Justice Web Interface (JWI) to verify if a records check was requested for the driver or any passengers.

All passenger contacts in the traffic stops we reviewed for Paragraphs 25.d. and 54.g were noted in the VSCFs. For this reporting period, we identified 46 traffic stops where the deputy had interaction with one or more passengers which required the issuance of either an Incidental Contact Receipt, a citation, or a warning. Of the 46 stops, there were 12 where we determined that a passenger, or passengers, were not provided with either an Incidental Contact Receipt, a citation, or a warning, as required by MCSO policy. We informed MCSO of this issue, and the agency reviewed some of the stops where such instances occurred and they either concurred with our assessment or they provided additional information regarding actions taken subsequent to the traffic stop.

WAI 56312

MCSO has also informed us that AIU is developing an inspection to review its own sample of passenger contacts in traffic stops so that AIU can identify such issues and issue Action Forms to address any deficiencies. The 12 cases that we identified potential compliance issues with are described in detail below. For some of the stops, we provided MCSO with our concerns and MCSO provided feedback regarding those concerns, which is included in the summaries below.

- A white female driver was stopped for driving with no headlights and taillights activated. The vehicle was occupied by two Latina passengers, a Latino passenger, and a white female passenger. The driver did not have any identification on her person. A records check revealed that her driver's license was in a suspended status. The driver was issued a citation for driving with a suspended driver's license. One of the Latina passengers informed the deputy that she had a valid driver's license. The deputy conducted a records check and determined that the passenger had a valid driver's license. The passenger was not provided with an Incidental Contact Receipt as required. We provided this information to MCSO. MCSO reported that the deputies involved in the stop incorrectly believed that documenting the passenger's name of the VSCF was all that was required. Their supervisor documented a discussion with the deputies regarding this issue in a Supervisory Note and ensured that an Incidental Contact Receipt was prepared and mailed to the passenger.

- A Latino driver was stopped for driving with no license plate. The vehicle was occupied by a Latina passenger and a Latino passenger. The assisting deputy obtained the passenger's identification and conducted a records check. The assisting deputy then asked the primary deputy to provide the passenger with an Incidental Contact Receipt. The primary deputy did not provide the passenger with an Incidental Contact Receipt. We provided MCSO with this information. MCSO reported that the assisting deputy responded to a priority traffic situation as he left the stop and requested that the primary deputy to provide the receipt. After our inquiry into the matter, the assisting deputy has since prepared and mailed an Incidental Contact Receipt to the passenger and the primary deputy corrected the VSCF regarding the contact with the passenger. A supervisor documented a discussion with the primary deputy regarding this issue in a Supervisory Note.

- A white male driver was stopped for a stop sign violation. The vehicle was occupied by a white male passenger and a white female passenger. The white passenger stated that he was the registered owner of the vehicle. The deputy obtained the white male passenger's name and conducted a records check. The passenger was not provided with an incidental contact receipt. We provided MCSO with this information. MCSO reported that the deputy prepared an Incidental Contact Receipt on the date of the traffic stop; however, there was no record that the receipt had been provided to the passenger. After our inquiry into the matter, the deputy has since mailed an Incidental Contact Receipt to the passenger. The deputy's supervisor had a discussion with the deputy reminding her of the requirement as to when to issue an Incidental Contact Receipt.

WAI 56313

- A deputy conducted a stop of two motor vehicles in a parking lot for reckless driving. One vehicle was occupied by a white male driver and a white female passenger. The other vehicle was occupied by a white male driver and two white female passengers. The teenage passengers in the vehicles were investigated for violation of curfew hours and their names were obtained. The three passengers were not provided with Incidental Contact receipts. We provided MCSO with this information. MCSO reported that after our inquiry, the deputy's supervisor was instructed to have the deputy prepare and mail Incidental Contact Receipts to the passengers and to conduct a review of the policy with deputy and document the training and deficiency on a Supervisory Note.

- A Latino driver was stopped for driving with one headlight. The vehicle was occupied by two Latina passengers. The deputy obtained identification from one of the passengers and conducted a records check. During our review of the documents provided for this stop, we reviewed an Incidental Contact Receipt; however, based on our review of the body-worn camera recording, the receipt was not provided to the passenger. We provided this information to MCSO, which reviewed the documentation; MCSO determined that an Incidental Contact Receipt was initially prepared and then voided with comments that the receipt was not required since the passenger's name was listed on the VSCF. MCSO reported that the supervisor and the deputy have been reinstructed on the policy for issuing Incidental Contact Receipts and Supervisory Notes were generated documenting the reinstruction. In addition, an Incidental Contact Receipt was mailed to the passenger.

- A Latina driver was stopped for driving with no headlights activated. The vehicle was occupied by a Latina passenger and three Latino passengers. The VSCF indicates that the contact with the passenger consisted of general conversation. The deputy made contact with one of the Latino passengers and obtained his name, date of birth, and the last four numbers of his social security number. The deputy did not provide the passenger with an Incidental Contact Receipt. We informed MCSO of this issue, and we will follow up with MCSO to assess what corrective action is taken.

- A white male driver was stopped for a speeding violation. The vehicle was occupied by a white female passenger. The deputy requested and obtained the driver's license of the passenger and documented the information on the VSCF; however, the deputy did not provide the passenger with an Incidental Contact Receipt. We informed MCSO of this issue, and we will follow up with MCSO to assess what corrective action is taken.

- A Black male driver was stopped for driving with an expired registration. The vehicle was occupied by a white male passenger. The deputy requested that the passenger submit to a preliminary breath test to determine if he was sober. The passenger consented to the preliminary breath test and it was determined that he was sober. The deputy documented the name of the passenger on the Incident Report; however, the contact with the passenger was not documented on the VSCF and an Incidental Contact Receipt was not issued to the passenger. We informed MCSO of this issue, and we will follow up with MCSO to assess what corrective action is taken.

WAI 56314

- A Latino driver was stopped for driving with no tail lights. The vehicle was occupied by a white female passenger. The deputy obtained a photocopy of the passenger's driver's license and conducted a records check. The passenger was not provided with an Incidental Contact Receipt. We informed MCSO of this issue, and we will follow up with MCSO to assess what corrective action is taken.

- A white male driver was stopped for creating dust on the roadway while operating an all-terrain vehicle. The vehicle was occupied by a Latina passenger. The deputy contacted the passenger to verify that she had a valid driver's license once it was determined that the driver was unlicensed. The passenger was not provided with an Incidental Contact Receipt. We informed MCSO of this issue, and we will follow up with MCSO to assess what corrective action is taken.

- A Latino driver was stopped for driving with no license plate. The driver was the sole occupant of the vehicle. The parent of the driver responded to the stop location. The deputy listed the father on the VSCF as a passenger contact. We informed MCSO of this issue, and we will follow up with MCSO to assess what corrective action is taken.

- An American Indian/Alaskan Native male driver was stopped for driving with one headlight. The vehicle was occupied by an American Indian/Alaskan Native female passenger and a Latina passenger. The vehicle being stopped was reported stolen. All three of the occupants were detained and questioned regarding the vehicle. We were provided with Incidental Contact Receipts for the two passengers; however, based on our review of the body-worn camera recording, we did not observe the passengers being provided with the Incidental Contact Receipts. We informed MCSO of this issue, and we will follow up with MCSO to assess what corrective action is taken.

There were five cases identified in the stops that we reviewed for Paragraph 54.k. in which the passengers were contacted which required the issuance of either an Incidental Contact Receipt, a citation, or a warning. There were four cases where we identified potential compliance issues with, which are described in detail below. For some of the stops, we provided MCSO with our concerns and MCSO provided feedback regarding those concerns, which is included in the summaries below.

- An American Indian/Alaskan Native male driver was stopped for a speeding violation. The vehicle was occupied by an American Indian/Alaskan Native female passenger. The passenger was informed that if she was determined to be sober that she would be permitted to drive the vehicle. The passenger consented to submitting to a preliminary breath test, which was conducted by another law enforcement officer from another jurisdiction that was at the stop location. The VSCF indicates that there was no contact with the passenger and an Incidental Contact Receipt was not provided to the passenger. We informed MCSO of this issue. MCSO reported that after our inquiry, the deputy's supervisor was instructed to have the deputy prepare and mail an Incidental Contact Receipt to the passenger and to correct the VSCF to indicate the contact with the passenger. In addition, MCSO reported that the deputy's supervisor is being directed to conduct a review of the policy with the deputy and document the training and deficiency on a Supervisory Note.

WAI 56315

- A white male driver was stopped for a speeding violation. The vehicle was occupied by a white male passenger. The VSCF indicates that the passenger was not contacted during the stop. Based on our review of the body-worn camera recording, the passenger was questioned regarding whether narcotics were present; and he was requested to consent to a search of his person, which he agreed to; no contraband was found. The passenger was not provided with an Incidental Contact Receipt. We informed MCSO of this issue and we will follow up with MCSO to assess what corrective action is taken.

- A white male driver was stopped for a speeding violation. The vehicle was occupied by a white female passenger. The VSCF indicates that the passenger was not contacted during the stop. Based on our review of the body-worn camera recording and the documentation provided, the deputy obtained the passenger's identification and conducted a records check. The passenger was not provided with an Incidental Contact Receipt. We informed MCSO of this issue and we will follow up to assess what corrective action is taken.

- A white male driver was stopped for following another vehicle too closely. The vehicle was occupied by a white male passenger. We were provided with an Incidental Contact Receipt, with the name field left blank; however, based on our review of the body-worn camera recording, the receipt was not provided to the passenger. We informed MCSO of this issue and we will follow up with MCSO to assess what corrective action is taken.

There were four cases identified in the stops that we reviewed for Paragraphs 25 and 54 in which the passenger was contacted, which required that the passenger be issued either an Incidental Contact Receipt, a citation, or a warning. There were three cases that we identified potential compliance issues with, which are described in detail below. AIU identified the same issues during their inspections of traffic stop data and AIU has requested that BIO Action Forms are generated by the Districts regarding the identified issues.

- A Black male driver was stopped for a failure to signal a turn. The vehicle was occupied by a Black female passenger. The deputy conducted a records check of the passenger. The VSCF indicates that there was no contact with the passenger. The passenger was not provided with an Incidental Contact Receipt.

- A Latino driver was stopped for a speeding violation. The vehicle was occupied by two Latina passengers. The deputy obtained the name of one of the passengers to determine if she had a valid driver's license and conducted a records check. The passenger was not provided with an Incidental Contact Receipt.

- A Latina driver was stopped for driving with an expired registration. The vehicle was occupied by a Latino passenger. The deputy obtained the name of the passenger to determine if he had a valid driver's license and conducted a records check. The passenger was not provided with an Incidental Contact Receipt.

As noted in some of the cases above, deputies have not been consistent in preparing and providing passengers with Incidental Contact Receipts during traffic stops in which the passenger is contacted and asked by the deputy to provide identification. It was noted during this reporting

WAI 56316

period that in two incidents, a Non-Traffic Contact Form was prepared when an Incidental Contact Receipt should have been prepared and provided to the passengers. Supervisors should identify such errors and omissions during their reviews of the VSCFs and take corrective action. During previous site visits, we discussed with MCSO that we have noted an increase in the number of passengers being contacted and not being provided with an Incidental Contact Receipt.

MCSO has previously informed us that the TraCS system was modified so that when a deputy prepares the Vehicle Stop Contact Form and uses the passenger contact field, a prompt will appear to instruct the deputy to prepare the Incidental Contact Receipt. MCSO has recently informed us that the modifications to the TraCS system are still in the development and review stages, along with other modifications to the TraCS system.

During the second reporting period of 2020, MCSO provided the Incidental Contact Receipt, a citation, or a warning, when required in 67% of the cases. During the third reporting period of 2020, MCSO provided the Incidental Contact Receipt, a citation, or a warning, when required, in 66% of the cases. During the fourth reporting period of 2020, MCSO provided the Incidental Contact Receipt, a citation, or a warning, when required in 50% of the cases. During this reporting period, MCSO provided the Incidental Contact Receipt, a citation, or a warning, when required in 67% of the cases. MCSO is not in compliance with this Subparagraph.

Paragraph 54.h. requires deputies to record, prior to the stop, the reason for the vehicle stop, including a description of the traffic or equipment violation observed, and any indicators of criminal activity developed before or during the stop. For this reporting period, we identified a random sample of 10 cases from the 35 cases we initially requested each month, and requested CAD audio and body-worn camera (BWC) footage for those cases. We listened to CAD dispatch audio recordings, reviewed the CAD printouts, and reviewed body-worn camera recordings for 30 traffic stops from the sample of 105 traffic stops used for this review; and found that the deputies advised Communications of the reason for the stop, location of the stop, license plate, and state of registration for all 30 stops.

For the remaining 75 traffic stops where body-worn camera recordings and CAD audiotapes were not requested, we review the CAD printout and the VSCF to ensure that the reason for the stop has been captured. These forms are included in our monthly sample requests. The dispatcher enters the reason for the stop in the system as soon as the deputy verbally advises Communications of the stop, location, and tag number. The VSCF and the CAD printout documents the time the stop begins and when it is concluded – either by arrest, citation, or warning. Deputies need to be precise when advising dispatch of the reason for the traffic stop, and likewise entering that information on the appropriate forms.

MCSO's compliance rating for this Subparagraph is 100%.

WAI 56317

Paragraph 54.i. requires deputies to document the time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; the time a release was made without a citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere, or the deputy's departure from the scene. In our review of the documentation provided by MCSO, the CAD printouts, the Vehicle Stop Contact Forms, along with the E-Ticketing system and the Arizona Ticket and Complaint Form, the information required is effectively captured. As we noted in Subparagraph 54.b., the stop times on the CAD printout and the Vehicle Stop Contact Form vary slightly on occasion. We understand that this may occur due to extenuating circumstances, and we will report on those instances where there is a difference of five minutes or more from either the initial stop time or the end time.

We review the circumstances of each stop and the activities of the deputies during each stop to assess whether the length of the stop was justified. During this reporting period, we did not identify any stops that were extended for an unreasonable amount of time.

Supervisors are required to conduct reviews of the VSCFs within 72 hours of the stop. In 102 of the 105 VSCFs reviewed, supervisors conducted timely reviews. There were three instances where the supervisors conducted reviews of the VSCFs in excess of 72 hours. Deputies accurately entered beginning and ending times of traffic stops in all 105 cases reviewed. MCSO accurately entered the time citations and warnings were issued in all 105 cases.

MCSO remains in compliance with this Subparagraph.

Paragraph 54.j. requires MCSO to document whether any inquiry as to immigration status was conducted and whether ICE/CBP was contacted, and if so, the facts supporting the inquiry or contact with ICE/CBP, the time supervisor approval was sought, the time ICE/CBP was contacted, the time it took to complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual.

On November 7, 2014, a United States District Court Judge issued an Order permanently enjoining enforcement of Arizona Revised Statute (A.R.S.) 13-2319, commonly referred to as the Arizona Human Smuggling Act. On November 17, 2014, MCSO issued Administrative Broadcast 14-75, prohibiting deputies from enforcing the above state statute, including arresting, detaining, or questioning persons for suspected (or even known) violations of the act and from extending the duration of traffic stops or other deputy-civilian encounters to do so.

We reviewed 105 traffic stops submitted for this Paragraph, and found that none of the stops involved any contacts with ICE/CBP. None of the stops we reviewed involved any inquires as to immigration status. In addition, our reviews of Incident Reports and Arrest Reports conducted as part of the audits for Paragraphs 89 and 101 revealed no immigration status investigations. MCSO remains in compliance with this Subparagraph. In addition, we monitor any complaints involve any traffic stops that contain an allegation that the race/ethnicity of the driver was a factor in how a driver was treated. There were no such allegations identified during this reporting period.

WAI 56318

Paragraph 54.k. requires MCSO to document whether any individual was asked to consent to a search (and the response), whether a probable-cause search was performed on any individual, or whether a pat-and-frisk search was performed on any individual. During our January 2018 site visit, we discussed with MCSO whether any other method may be feasible to identify a larger population of searches of individuals specific to the requirements of this Paragraph. MCSO's response was that the current method is appropriate, and that there may be more cases identified once deputies properly document the searches of persons consistent with this Paragraph.

MCSO provided training to deputies specific to consent searches during the 2019 Annual Combined Training on the Fourth and Fifth Amendment, which included a video that contained a scenario with a verbal exchange between a driver and a deputy who requested a consent search. In addition, on March 10, 2020, MCSO issued Administrative Broadcast Number 20-20, which reemphasized the training segment in relation to consent searches.

The method MCSO currently employs to identify our sample of cases to review is to identify the population of all traffic stops in which searches of individuals were documented on the VSCF. Once that population was identified, a random sample of 35 traffic stops from each month is identified for review. During some months, the number traffic stops that involve searches of persons is less than 35 traffic stops. In addition, we also review any cases in which the deputies performed searches of individuals in the sample of 105 traffic stops reviewed to assess compliance with Paragraphs 25 and 54 and the sample of traffic stops reviewed to assess compliance with Subparagraphs 25.d. and 54.g. When we identify issues that impact compliance or where MCSO policy was not followed, we provide the list of cases to MCSO for review. In the sample of traffic stops that we reviewed to assess compliance with Subparagraph 54.k, there were 11 stops identified that met the criteria of this Subparagraph. The following four cases are where we identified compliance issues:

- The deputy documented the search of a driver as a search incident to arrest on the VSCF. However, the search of the driver was listed as a pat-and-frisk search. Based on our review of the body-worn camera recording, the deputy conducted a pat-and-frisk search of the driver. We provided this information to MCSO, which reviewed the stop documentation and concurred with our assessment. MCSO reported that the deputy's supervisor provided the deputy additional training on the subject and documented the information in a Supervisory Note.

- The deputy documented that a consent search was conducted of a driver on the VSCF. Based on our review of the body-worn camera recording, the deputy conducted a search of the driver incident to arrest. We provided this information to MCSO, which reviewed the stop documentation and concurred with our assessment. MCSO reported that the deputy's supervisor discussed the issue with the deputy and documented the information in a Supervisory Note.

- The deputy documented that a consent search was conducted of a driver on the VSCF. Based on our review of the body-worn camera recording, the deputy conducted a pat-and-frisk search of the driver. We provided this information to MCSO, which reviewed the stop documentation and concurred with our assessment. MCSO reported that the deputy's

WAI 56319

supervisor discussed the issue with the deputy. The deputy admitted that he believed that he had requested consent to search the driver; however, after reviewing the body-worn camera recording, he realized that he did not request consent. The supervisor documented the meeting and discussion information in a Supervisory Note.

- The deputy prepared a VSCF that indicated that he conducted a consent search of a driver. Based on our review of the body-worn camera recording, the deputy conducted a pat-and-frisk search of the driver. We provided this information to MCSO, which reviewed the stop documentation and concurred with our assessment. MCSO reported that the deputy's supervisor is being instructed to conduct a discussion with the deputy concerning this traffic stop.

During this reporting period, there were two cases of searches of persons identified in the sample of traffic stops reviewed to assess compliance with Subparagraphs 25.d. and 54.g. We identified compliance issues with the following case:

- The deputy prepared a VSCF that indicated that he did not conduct a search of the driver that was arrested. Based on our review of the body-worn camera recording, the deputy conducted a consent search of the driver; however, the deputy did not inform the driver of the right to refuse and/or revoke the consent. In addition, the driver was also searched incident to arrest. We provided this information to MCSO, and we will follow up to assess what corrective action was taken.

During this reporting period, there was one case of a search of a person identified in the sample of traffic stops reviewed to assess compliance with Paragraphs 25 and 54. We identified compliance issues with the following case:

- The deputy prepared a VSCF that indicated that he did not conduct a search of a driver. Based on our review of the body-worn camera recording, the deputy conducted a consent search of the driver; however, the deputy did not inform the driver of the right to refuse and/or revoke the consent. AIU identified this issue during its inspection of traffic stop data. AIU has requested that the District prepare a BIO Action Form documenting any corrective action taken.

During this reporting period, there were no traffic stops identified in which deputies presented the Consent to Search Forms to document when consent was requested and obtained to search any vehicle occupants. MCSO has indicated that it does not require its deputies to use Consent to Search Forms as the primary means for documenting consent searches. MCSO requires that deputies document requests to conduct consent searches by way of video-recording the event via the BWCs. In the event the BWC is not operational, MCSO policy requires deputies to document requests to conduct consent searches on the Consent to Search Form. We continue to recommend that MCSO revisit the requirements of this section of the policy and require deputies to read the Consent to Search Form to the subject and require a signature from the individual for every request for consent to search. Due to the small population of cases that we and MCSO identified, it is important that deputies accurately document each search and/or request to a consent search, as required by this Subparagraph, to attain and maintain compliance with the requirement.

WAI 56320

During the second reporting period of 2020, we determined that MCSO attained a compliance rating of 75%. During the third reporting period of 2020, we determined that MCSO attained a compliance rating of 87%. During fourth reporting period of 2020, we determined that MCSO attained a compliance rating of 80%. During this reporting period of 2020, we determined that MCSO attained a compliance rating of 43%. MCSO is not in compliance with this requirement.

Paragraph 54.l. requires MCSO to document whether any contraband or evidence was seized from any individual, and the nature of the contraband or evidence. Generally, deputies seize the following types of contraband and/or evidence, which is documented on the VSCF, a Property Receipt, and an Incident Report: license plates; driver's licenses; alcoholic beverages; narcotics; narcotic paraphernalia; weapons; and ammunition. We conduct a review of the relevant documents and review the VSCF to ensure that deputies properly document the seizure of the evidence and/or contraband.

During our review of the collected traffic stop data (our sample of 105) during this reporting period, there were three items seized by deputies and placed into evidence. In all three cases, the items were properly documented on the VSCF.

In the cases we reviewed for searches of individuals under Subparagraph 54.k., there were 37 items seized by deputies and placed into evidence. Of those 37 items, there were six items that were seized and placed into evidence and the items were not properly listed on the VSCFs, as required by MCSO policy.

In the cases we reviewed for passenger contacts under Subparagraph 54.g., there were seven items seized by deputies and placed into evidence. In all seven cases, the items were properly documented on the VSCF.

In previous reporting periods, we noted an increase in the number of errors and omissions by deputies documenting the seizure of contraband or evidence on VSCFs. These issues have improved during this reporting period. During the second reporting period of 2020, MCSO attained a compliance rate of 78%; and we reported that MCSO would remain in compliance with this requirement during that reporting period. However, MCSO would be required to attain a compliance rate of greater the 94% during the third reporting period to maintain compliance with this requirement. During the third reporting period of 2020, MCSO attained a compliance rating of greater than 94%. During the fourth reporting period of 2020, MCSO attained a compliance rating of 96%. During this reporting period, MCSO attained a compliance rating of 87%. MCSO remains in compliance with this requirement during this reporting period; however, MCSO is required to attain a compliance rate of greater the 94% during the next reporting period to retain compliance.

Paragraph 54.m. requires the documentation of the final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without a citation. In all 105 cases we reviewed, we found documentation indicating the final disposition of the stop; and whether the deputy made an arrest, issued a citation, issued a warning, or made a release without a citation. MCSO remains in compliance with this Subparagraph.

MCSO has failed to achieve compliance with all of the Subparagraphs of Paragraph 54. MCSO is not in compliance with Paragraph 54.

WAI 56321

***Paragraph 55.*** *MCSO shall assign a unique ID for each incident/stop so that any other documentation (e.g., citations, incident reports, tow forms) can be linked back to the stop.*

**In Full and Effective Compliance**

To verify compliance for this Paragraph, we reviewed a sample of the Vehicle Stop Contact Forms, CAD printouts, I/Viewer documentation, citations, warning forms, and any Incident Report that may have been generated as a result of the traffic stop.

The unique identifier "went live" in September 2013 when the CAD system was implemented. This number provides the mechanism to link all data related to a specific traffic stop. The number is automatically generated by the CAD software and is sent to the deputy's MDT at the time the deputy advises Communications of the traffic stop. The unique identifier is visible and displayed at the top of the CAD printout and also visible on the Vehicle Stop Contact Form, the Arizona Traffic Citation, and the Warning/Repair Form.

Once the deputy scans the motorist's driver's license, the system automatically populates most of the information into one or more forms required by the Order. If the data cannot be entered into TraCS from the vehicle (due to malfunctioning equipment), policy requires the deputy to enter the written traffic stop data electronically prior to the end of the shift. The start and end times of the traffic stop are now auto-populated into the Vehicle Stop Contact Form from the CAD system.

Since our first visit for monitoring purposes in June 2014, TraCS has been implemented in all Districts; and the unique identifier (CFS number) is automatically entered from the deputy's MDT. No user intervention is required.

To determine compliance with this requirement, we reviewed 105 traffic stop cases and reviewed the CAD printouts and the Vehicle Stop Contact Forms for all stops. We reviewed the Warning/Repair Forms, when applicable, for those stops where a warning was issued or the vehicle had defective equipment. The unique identification number assigned to each event was listed on correctly on all CAD printouts for every stop. A review was conducted of the Tow Sheets prepared by deputies in instances where a driver's vehicle is towed. In each instance, the unique identification number assigned to each event was listed correctly on the Tow Sheet. A review of the Incident Reports prepared by deputies in instances where policy requires the preparation of the report was conducted. In each instance, the unique identification number assigned to each event was listed correctly on the Incident Report. MCSO remains in compliance with this requirement.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 56322

***Paragraph 56.*** *The traffic stop data collection system shall be subject to regular audits and quality control checks. MCSO shall develop a protocol for maintaining the integrity and accuracy of the traffic stop data, to be reviewed by the Monitor pursuant to the process described in Section IV.*

**Phase 1:** Not in compliance

- EB-2 (Traffic Stop Data Collection), most recently amended on June 15, 2021.

- EIU Operations Manual, currently under revision.

**Phase 2:** Not in compliance

To verify compliance for this Paragraph, we reviewed the monthly audits of the traffic stop data conducted by BIO on the monthly samples we select. While audits require in-depth analysis, our quality control checks serve as an inspection or spot-check of traffic stop data. We reviewed the BIO traffic stop audits for the January 1-March 31, 2021 period, and found that the audits were thorough and captured most deficiencies. During our review of the sample dataset, we brought some deficiencies to the attention of CID during our April 2021 remote site visit; we identify them in other areas of this report.

The draft EIU Operations Manual, which includes procedures for traffic stop data quality assurance, has 27 of the 30 sections approved. The remaining sections under development cannot be finalized until the Traffic Stop Monthly Report (TSMR) methodology related to the analyses of traffic stop data is finalized and determined to be reliable and valid in accordance with the requirements of Paragraphs 66 and 67. The TSMR methodology is being piloted by MCSO. (See below.) The remaining sections of the EIU Operations Manual also require procedures for the Traffic Stop Annual Report (TSAR) methodology, which is approved. The remaining task for MCSO regarding TSAR is to include the procedures for implementing the approved methodology into the EIU Operations Manual. Phase 1 compliance with this Paragraph requires that all sections of the EIU Operations Manual have been reviewed and approved.

Administrative Broadcast 15-96 addresses the security of paper traffic stop forms. The procedure requires that paper forms (related to traffic stop data that may be handwritten by deputies in the field if the TraCS system is nonoperational due to maintenance or lack of connectivity) be stored in a locked cabinet and overseen by the Division Commander. Because of the COVID-19 pandemic, we were unable to travel to Maricopa County and visit the Districts to confirm that all records were locked and secure, that logs were properly maintained, and that only authorized personnel had access to these files. This activity will be delayed until we are able to resume our in-person site visits. However, we note that MCSO has a consistent track record of complying with this Order requirement.

Since April 2014, MCSO has conducted audits of the data monthly and provided those results to us. MCSO conducts audits of the 105 traffic stop sample that we request each reporting period. MCSO also conducts a more expansive review of 30 of the 105 sample pulls we request each reporting period to include passenger contacts and persons' searches. EB-2 also requires regularly scheduled audits of traffic stop data on a monthly basis. We reviewed BIO's monthly audits of the traffic samples from January 1-March 31, 2021, and found them to be satisfactory.

WAI 56323

To achieve Phase 1 compliance with this Paragraph, MCSO must finalize the EIU Operations Manual to cover all matters applicable to this Paragraph. To achieve Phase 2 compliance with this Paragraph, MCSO must demonstrate ongoing use of the procedures to ensure traffic stop data quality assurance.

***Paragraph 57.*** *MCSO shall explore the possibility of relying on the CAD and/or MDT systems to check if all stops are being recorded and relying on on-person recording equipment to check whether Deputies are accurately reporting stop length. In addition, MCSO shall implement a system for Deputies to provide motorists with a copy of non-sensitive data recorded for each stop (such as a receipt) with instructions for how to report any inaccuracies the motorist believes are in the data, which can then be analyzed as part of any audit. The receipt will be provided to motorists even if the stop does not result in a citation or arrest.*

**In Full and Effective Compliance**

To verify compliance for this Paragraph, we reviewed all TraCS forms for each traffic stop that were included in the sample. In addition, we reviewed a subset of CAD audio recordings and body-worn camera footage of the stops.

The system for providing "receipts" is outlined in EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) and EB-2 (Traffic Stop Data Collection). GJ-35 addresses the requirement that supervisors review recordings to check whether deputies are accurately reporting stop length. In addition to GJ-35, BIO developed a Body-Worn Camera Matrix for its inspectors to review camera recordings.

The deputy should provide every person contacted on a traffic stop with an Arizona Traffic Ticket or Complaint (Citation), a Written Warning/Repair Order (Warning), or an MCSO Incidental Contact Receipt. For this reporting period, deputies issued citations or written warnings in all 105 cases we reviewed.

We did not identify any issues with the citations, warnings, and Incidental Contact Receipts issued to drivers for the cases reviewed under Subparagraphs 25.d. and 54.g., contact with passengers, and Subparagraph 54.k., searches of persons.

MCSO's compliance rate with this requirement is 100%. MCSO remains in compliance with this portion of the Subparagraph.

The approved policies dictate that the CAD system will be used for verification of the recording of the initiation and conclusion of the traffic stop and that MCSO will explore the possibility of relying on the BWC recordings to verify that the stop times reported by deputies are accurate. The deputy verbally announces the stops initiation and termination on the radio, and then CAD permanently records this information. In May 2016, MCSO advised us that all deputies and sergeants who make traffic stops had been issued body-worn cameras and that they were fully operational. We verified this assertion during our July 2016 site visit; and since that time, we have been reviewing the BWC recordings to determine if stop times indicated by CAD were accurate. MCSO's Audit and Inspections Unit (AIU) conducts monthly inspections of traffic stop data, which includes an assessment as to whether the BWC video captured the traffic stop in its

WAI 56324

entirety; to verify the time the stop began; and to verify if all information on forms prepared for each traffic stop match the BWC video. AIU conducts reviews of 30 body-worn camera recordings each reporting period.

During this reporting period, we requested from MCSO 30 body-worn camera recordings for our review. We are able to use the BWC recordings that were provided for each stop to assess whether deputies are accurately reporting the stop length. The compliance rate for the sample of 30 cases selected from the 105 stops reviewed for using the BWC to determine if deputies are accurately reporting stop length is 100%. MCSO remains in compliance with this requirement.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 58.** *The MCSO shall ensure that all databases containing individual-specific data comply with federal and state privacy standards governing personally identifiable information. MCSO shall develop a process to restrict database access to authorized, identified users who are accessing the information for a legitimate and identified purpose as defined by the Parties. If the Parties cannot agree, the Court shall make the determination.*

**In Full and Effective Compliance**

To verify compliance for this Paragraph, we reviewed the applicable policies and requested that Technology Management Bureau personnel provide us with information regarding any unauthorized access and/or illegitimate access to any of MCSO's database systems that had been investigated by PSB. The policies state that the dissemination of Criminal History Record Information (CHRI) is based on federal guidelines, Arizona statutes, the Department of Public Safety (ASDPS), and the Arizona Criminal Justice Information System (ACJIS); and that any violation is subject to fine. No secondary dissemination is allowed. The policies require that the Professional Standards Bureau (PSB) provide written notification to the System Security Officer whenever it has been determined that an employee has violated the policy by improperly accessing any Office computer database system. Every new recruit class receives three hours of training on this topic during initial Academy training.

During this reporting period, we inquired whether there had been any instances of unauthorized access to and/or any improper uses of the database systems. MCSO informed us that during this reporting period, PSB notified the Technology Management Bureau of a closed case in which it was determined that a deputy had inappropriately accessed the Arizona Criminal Justice Information System to conduct a license plate inquiry for no legitimate law enforcement purpose. In addition, the investigation revealed that the deputy provided inaccurate information and withheld information from PSB investigators in an effort to mislead the investigators. The deputy was disciplined in this matter. There were no other closed cases in which there was a finding that there was unauthorized access to and/or any improper uses of MCSO's database systems. MCSO remains in compliance with this requirement.

WAI 56325

On June 22, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

***Paragraph 59.*** *Notwithstanding the foregoing, the MCSO shall provide full access to the collected data to the Monitor and Plaintiffs' representatives, who shall keep any personal identifying information confidential. Every 180 days, MCSO shall provide the traffic stop data collected up to that date to the Monitor and Plaintiffs' representatives in electronic form. If proprietary software is necessary to view and analyze the data, MCSO shall provide a copy of the same. If the Monitor or the Parties wish to submit data with personal identifying information to the Court, they shall provide the personally identifying information under seal.*

**In Full and Effective Compliance**

Electronic traffic stop data capture began on April 1, 2014. The forms created by MCSO capture the traffic stop details required by MCSO policy and Paragraphs 25 and 54. BIO provides the traffic stop data on a monthly basis, which includes a spreadsheet of all traffic stops for the reporting period, listing Event Numbers as described at the beginning of Section 7. All marked patrol vehicles used for traffic stops are now equipped with the automated TraCS system, and all Patrol deputies have been trained in TraCS data entry. MCSO has provided full access to all available electronic and written collected data since April 1, 2014. MCSO did not collect electronic data before this time. During this reporting period, MCSO has continued to provide full access to the traffic stop data.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

***b. Electronic Data Entry***

***Paragraph 60.*** *Within one year of the Effective Date, the MCSO shall develop a system by which Deputies can input traffic stop data electronically. Such electronic data system shall have the capability to generate summary reports and analyses, and to conduct searches and queries. MCSO will explore whether such data collection capability is possible through the agency's existing CAD and MDT systems, or a combination of the CAD and MDT systems with a new data collection system. Data need not all be collected in a single database; however, it should be collected in a format that can be efficiently analyzed together. Before developing an electronic system, the MCSO may collect data manually but must ensure that such data can be entered into the electronic system in a timely and accurate fashion as soon as practicable.*

**In Full and Effective Compliance**

WAI 56326

To verify compliance with this Paragraph, we reviewed the documents generated electronically that capture the required traffic stop data. The electronic data entry of traffic stop data by deputies in the field went online on April 1, 2015. If TraCS experiences a malfunction in the field, there is a protocol that requires the deputy to electronically enter the traffic stop data prior to the end of the shift.

MCSO continues to conduct monthly traffic stop inspections and forwards them for our review. Initially, the traffic stop data was captured on handwritten forms created by MCSO, completed by the deputy in the field, and manually entered in the database by administrative personnel located at each District. Now all traffic stop data is entered electronically, whether in the field or at MCSO District offices. Occasionally, connectivity is lost in the field due to poor signal quality, and citations are handwritten. Per policy, deputies must enter electronically any written traffic stop data they have created by the end of the shift in which the event occurred. As noted in our Paragraph 90 review, VSCFs are routinely entered into the system by the end of the shift.

Deputies have demonstrated their ability to access and use TraCS, as evidenced by the fact that their total time on a traffic stop averages 16 minutes or less.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

### c. Audio-Video Recording of Traffic Stops

*Paragraph 61. The MCSO will issue functional video and audio recording equipment to all patrol deputies and sergeants who make traffic stops, and shall commence regular operation and maintenance of such video and audio recording equipment. Such issuance must be complete within 120 days of the approval of the policies and procedures for the operation, maintenance, and data storage for such on-person body cameras and approval of the purchase of such equipment and related contracts by the Maricopa County Board of Supervisors. Subject to Maricopa County code and the State of Arizona's procurement law, The Court shall choose the vendor for the video and audio recording equipment if the Parties and the Monitor cannot agree on one.*

**In Full and Effective Compliance**

During our September 2014 site visit, we met with two MCSO Deputy Chiefs and other personnel to discuss MCSO's progress of acquiring in-car video and audio equipment for all patrol vehicles used to conduct traffic stops. MCSO had initially set out to purchase fixed in-car cameras as required by the Order, but expressed an interest in acquiring body-worn video and audio recording devices for deputies. The Court issued an Order providing an amendment/stipulation on October 10, 2014, requiring on-body cameras. This was a prudent decision, in that it allows for capturing additional data, where a fixed mounted camera has limitations. We have documented MCSO's transition from in-car to body-worn cameras (BWC) in our previous quarterly status reports.

WAI 56327

Records indicate that MCSO began distribution of body-worn cameras on September 14, 2015, and full implementation occurred on May 16, 2016. The body-worn camera recordings are stored in a cloud-based system (on evidence.com) that can be easily accessed by supervisors and command personnel. The retention requirement for the recordings is three years. In July 2019, MCSO began distribution of the newer version of body-worn cameras to deputies. During our October 2019 site visit, MCSO reported that deputies assigned to the Districts have all been equipped with the new body-worn cameras; and that deputies in specialized assignments were being equipped with the new devices. The new version of body-worn cameras purchased by MCSO is mounted on the chest area via a magnetic mount. In addition, the devices are self-contained, meaning that the device does not have any cords or wires that may become disconnected, which had been a recurring problem with the previous devices.

To verify that all Patrol deputies have been issued body-worn cameras, and properly use the devices, we review random samples of the traffic stops as described in Paragraphs 25 and 54. In addition, during our District visits in January 2020, we observed that deputies were equipped with body-worn cameras. Because of the COVID-19 pandemic, we were unable to travel to Maricopa County and visit the Districts to observe deputies being equipped with the body-worn cameras. However, it is clear that MCSO maintains a robust deployment of BWCs, given the ready availability of recordings for our review, and our observations of deputies properly wearing the cameras in the videos we inspect. Our inspections will commence once we are able to resume our in-person site visits.

On December 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.


**Paragraph 62.** *Deputies shall turn on any video and audio recording equipment as soon the decision to initiate the stop is made and continue recording through the end of the stop. MCSO shall repair or replace all non-functioning video or audio recording equipment, as necessary for reliable functioning. Deputies who fail to activate and to use their recording equipment according to MCSO policy or notify MCSO that their equipment is nonfunctioning within a reasonable time shall be subject to Discipline.*

**Phase 1:** In compliance

- GJ-35 (Body-Worn Cameras), most recently amended on December 31, 2019.
- Body-Worn Camera Operations Manual, published on December 22, 2016.

**Phase 2**: In compliance

MCSO evaluated on-person body cameras from other jurisdictions and selected a vendor (TASER International, now known as Axon). Body-worn cameras have been implemented in all Districts since May 2016 and are fully operational. As mentioned under Paragraph 61, MCSO has obtained, and has equipped the deputies in the Districts with new body-worn cameras, also provided by Axon.

WAI 56328

To verify compliance for this Paragraph, we reviewed the body-worn camera recordings included in our monthly samples. This includes the stops reviewed each month for Paragraphs 25 and 54; the stops reviewed each month for Subparagraph 54.k.; and the stops reviewed each month for Subparagraph 54.g. For purposes of calculating compliance, we exclude any stops where the deputies documented on the VSCF that the BWCs malfunctioned during the stop.

For our selection of a sample to review BWC recordings, we used the same sample of 30 cases we selected for the CAD audio request. In each of the stops that we reviewed, the deputies properly activated the body-worn cameras during traffic stop events.

In our sample of body-worn camera recordings reviewed for Subparagraph 54.k., in each of the stops that we reviewed, the deputies properly activated the body-worn cameras during traffic stop events.

In our sample of body-worn camera recordings for Subparagraph 54.g., we identified one case where there was no body-worn camera recording in relation to an assisting deputy for the traffic stop. There was no documentation of any malfunction of the body-worn camera or any exigent circumstances that prevented the activation of the body-worn camera.

The remainder of the cases were in compliance, with the deputy activating the video- and audio-recording equipment as soon as the deputy decided to initiate the stop, and continuing to record through the end of the stop. We continue to provide MCSO with the information on the cases where issues are identified for their review.

MCSO's compliance rate for this requirement is 99%.

There are still a number of instances in which deputies respond to assist at traffic stops and do not complete the Assisting Deputy and Body-Worn Camera Log. With the issuance of GJ-35 (Body-Worn Cameras), effective on December 31, 2019, the policy is now consistent with EB-2 (Traffic Stop Data Collection), which requires that each deputy assisting on a traffic stop prepare the Assisting Deputy and Body-Worn Camera Log. We had anticipated that the policy clarification, coupled with effective supervisory reviews, would assist deputies to understand when they are required to complete the log. However, we continue to identify instances where the log was not prepared when required.

Our reviews of the body-worn camera recordings often reveal instances of deputies exhibiting positive, model behavior; and, at times, instances of deputies making errors, or exhibiting less than model behavior – all of which would be useful for training purposes. We also reviewed the Professional Standards Bureau's monthly summary of closed cases for January, February, and March 2021. The following cases were identified that involve the review of body-worn camera recordings to assist in the determination of whether the allegations were valid or not:

- In one case, it was alleged that a deputy yelled at and made fun of the complainant during a call for service. The complainant also alleged that the deputy belittled her by the type of questions that the deputy posed. A review of the body-worn camera recording revealed that the deputy did not yell or make fun of the complainant, and that he only questioned the complainant as he did to assess her welfare.

WAI 56329

- In one case, it was alleged that a deputy lifted the complainant up and slammed him onto the ground. A review of the body-worn camera recording revealed that the allegation was false.

- In one case, the complainant alleged that two deputies used their patrol vehicles to box in her fiancé, and that the deputies acted aggressively toward her fiancé. It was also alleged that one of the deputies used his personal cell phone to photograph the complainant while she was wearing a swimsuit. A review of the body-worn camera recording revealed that the deputies did not box in the complainant's fiancé, and that the allegation that the deputies acted in an aggressive manner toward her fiancé were false. It was also determined that one deputy was acting within MCSO policy when he took a photograph of the complainant's face with a MCSO-issued cell phone for evidentiary purposes.

- In one case, it was alleged that a deputy accessed a crime report and improperly discussed the contents of the report to a member of the public. A review of the body-worn camera recording revealed that the allegation was false.

- In one case, the complainant alleged that a deputy dismissed her concerns due to her being a minority living in her neighborhood. A review of the body-worn camera recording revealed that the deputy acted in a professional manner and provided assistance to the complainant in accordance with MCSO policy. The allegation that the deputy dismissed her claims due to her race or ethnicity was found to be false.

- In one case, it was alleged that a deputy did not allow the driver to speak or respond during a traffic stop. It was also alleged that the deputy issued a citation with incorrect information and that the stop was unnecessarily long. A review of the body-worn camera recording revealed that the deputy did allow the driver to speak and respond. It was also determined that the deputy amended the citation to correct the stop location and that technical issues contributed to length of the stop being extended. It was determined that the deputy's actions were within MCSO policy.

- In one case, it was alleged that a deputy exhibited an unprofessional attitude and behavior during a call for service. A review of the body-worn camera recording revealed that the deputy acted in a calm and professional manner during the call for service.

- In one case, it was alleged that a deputy, during a call for service, did not conduct a welfare check on a child inside of a residence. A review of the body-worn camera recording revealed that the deputy was not asked to perform a welfare check on the child. It was also determined that the complainant was not on the scene of the call for service.

- In one case, it was alleged that a deputy was rude, condescending, and mocked and laughed at the complainant while speaking with her via telephone regarding a family issue. A review of the body-worn camera recording revealed that the deputy acted in a professional manner during the telephone call and that the allegations were false.

- In one case, it was alleged that a deputy took a criminal damage report via telephone instead of responding to the residence. It was also alleged that the deputy questioned the complainant regarding her green card to determine her legal status. A review of the body-

WAI 56330

worn camera recording revealed that the deputy did not ask the complainant about her green card or her legal status. It was also determined that the deputy acted within MCSO policy when he took the criminal damage report via telephone.

- In one case, it was alleged that a deputy cited the complainant because of his race. Based on a review of the body-worn camera recording, coupled with statements made by the complainant and the deputy, it was determined that the allegation was false.

- In one case, it was alleged that a deputy targeted her due to her race and that the deputy made her take a breathalyzer test. The complainant also alleged that the deputy applied handcuffs too tightly, and allowed the complainant's breasts to be exposed while handcuffed. A review of the body-worn camera recording revealed that the complainant, along with another person, approached the deputy, and that the deputy did not target the complainant. The recording revealed that the complainant consented to the taking of a breathalyzer test. The recording also revealed the deputy placed the handcuffs on the complainant according to MCSO's policies; and that when she complained that they were too tight, the deputy loosened them for her. The recording revealed that the complainant's breasts were not exposed as she alleged.

- In one case, it was alleged that a deputy was rude, displayed a bad attitude and demeanor, and made unprofessional statements, during a service call. It was also alleged that the deputy failed to properly investigate the call for service properly. A review of the body-worn camera recording revealed that the deputy did not exhibit rude behavior and that the statements he made were descriptive of the complainant's behavior and did not violate MCSO's policies. The investigation revealed that the deputy properly investigated the call for service.

- In one case, it was alleged that deputies did not take a statement from the complainant after she was assaulted at work. A review of the body-worn camera recording revealed that the deputies were requested to remove an unwanted subject from the location and that the deputies were not informed of an assault.

- In one case, it was alleged that a deputy was rude and did not show empathy during a call for service. Based on a review of the body-worn camera recording, and witness statements, it was determined that the allegation was false.

- In one case, it was alleged that during a call for service the deputies were rude, laughed along with the neighbors at the complainants, and that the deputies failed to conduct a proper investigation and make an arrest. A review of the body-worn camera recording revealed that the deputies did not act in a rude manner and did not laugh at the complainants. The investigation revealed that the determination by the deputy to not make an arrest until the investigation was concluded was proper.

WAI 56331

- In one case, it was alleged a deputy was rude, swore at him, and belittled the complainant while he was being arrested. The complainant alleged that the deputy stomped on his foot and another deputy fastened the handcuffs too tight and purposely pulled on the complainant's injured shoulder. A review of the body-worn camera recording revealed that the deputies did not use excessive force when handcuffing and placing the complainant in custody and that the allegations were false.

- In one case, it was alleged that during a call for service a deputy was rude, aggressive, and treated her poorly. It was also alleged that the deputy did not handle the call for service properly and that one deputy did not activate his body-worn camera. The investigation determined that one deputy failed to inform other deputies of the complainant's report of an assault and failed to document the other deputies at the call for service. A review of the body-worn camera recordings revealed that the deputy did not act in a rude manner or treat the complainant poorly. It was determined that one deputy did not activate his body-worn camera.

- In one case, it was alleged that during a call for service deputies failed to enforce an order of protection and that one deputy was rude and unprofessional. The investigation determined that the order of protection was missing the complainant's address which caused confusion as to whether the order of protection prohibited the complainant's ex-spouse from being present at the location and that the deputies acted in accordance with MCSO's policies. A review of the body-worn camera recording revealed that the allegation that a deputy was rude and unprofessional toward the complainant was false.

As demonstrated with the aforementioned examples, body-worn cameras recordings have proven to be invaluable in resolving complaints alleging misconduct by deputies.

*Paragraph 63. MCSO shall retain traffic stop written data for a minimum of 5 years after it is created, and shall retain in-car camera recordings for a minimum of 3 years unless a case involving the traffic stop remains under investigation by the MCSO or the Monitor, or is the subject of a Notice of Claim, civil litigation or criminal investigation, for a longer period, in which case the MCSO shall maintain such data or recordings for at least one year after the final disposition of the matter, including appeals. MCSO shall develop a formal policy, to be reviewed by the Monitor and the Parties pursuant to the process described in Section IV and subject to the District Court, to govern proper use of the on-person cameras; accountability measures to ensure compliance with the Court's orders, including mandatory activation of video cameras for traffic stops; review of the camera recordings; responses to public records requests in accordance with the Order and governing law; and privacy protections. The MCSO shall submit such proposed policy for review by the Monitor and Plaintiff's counsel within 60 days of the Court's issuance of an order approving the use of on-body cameras as set forth in this stipulation. The MCSO shall submit a request for funding to the Maricopa County Board of Supervisors within 45 days of the approval by the Court or the Monitor of such policy and the equipment and vendor(s) for such on-body cameras.*

**In Full and Effective Compliance**

WAI 56332

MCSO developed and issued a protocol and policy that requires the original hardcopy form of any handwritten documentation of data collected during a traffic stop to be stored at the District level and filed separately for each deputy. When a deputy is transferred, his/her written traffic stop information follows the deputy to his/her new assignment. During our January 2020 site visit, we inspected the traffic stop written data files at District 2 and District 6 to ensure that hardcopies of traffic stop cases are stored for a minimum of five years. We found that the records were in order and properly secured. Because of the COVID-19 pandemic, we were unable to travel to Maricopa County and visit the Districts to confirm that all traffic stop written data is being kept in a locked and secure manner and that only authorized personnel have access to the files. Our inspections will commence once we are able to resume our in-person site visits. MCSO remains in compliance with this requirement.

On June 22, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.


### d. Review of Traffic Stop Data

**Paragraph 64.** *Within 180 days of the Effective Date, MCSO shall develop a protocol for periodic analysis of the traffic stop data described above in Paragraphs 54 to 59 ("collected traffic stop data") and data gathered for any Significant Operation as described in this Order ("collected patrol data") to look for warning signs or indicia or possible racial profiling or other improper conduct under this Order.*

**Phase 1:** Not in compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on February 25, 2021.

- EB-2 (Traffic Stop Data Collection), most recently amended on June 15, 2021.

- GJ-33 (Significant Operations), most recently amended on May 10, 2018.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

- GH-5 (Early Identification System), most recently amended on March 3, 2021.

- EIU Operations Manual, currently under revision.

**Phase 2:** Not in compliance

MCSO will achieve Phase 1 compliance with this Paragraph when it incorporates its protocols for periodic analyses of the traffic stop data into the EIU Operations Manual. To achieve Phase 2 compliance with this Paragraph, MCSO must demonstrate ongoing use of the methodologies delineated in the protocols established for Phase 1 compliance for the periodic analyses used to identify racial profiling or other bias-based policing problems.

WAI 56333

***Paragraph 65.*** *MCSO shall designate a group with the MCSO Implementation Unit, or other MCSO Personnel working under the supervision of a Lieutenant or higher-ranked officer, to analyze the collected data on a monthly, quarterly and annual basis, and report their findings to the Monitor and the Parties. This review group shall analyze the data to look for possible individual-level, unit-level or systemic problems. Review group members shall not review or analyze collected traffic stop data or collected patrol data relating to their own activities.*

**Phase 1:** In compliance

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

- GH-5 (Early Identification System), most recently amended on March 3, 2021.

**Phase 2:** Not in compliance

The Traffic Stop Analysis Unit (TSAU) is directly responsible for analyses of traffic stop data on a monthly, quarterly, and annual basis to identify warning signs or indicia or possible racial profiling or other improper conduct as required by Paragraph 64. MCSO must report TSAU's findings from its analyses to the Monitor and the Parties.

Paragraph 65 requires quarterly analyses of traffic stop data. MCSO completed its first quarterly report (TSQR1) on October 22, 2020. The report, "Supervisor Review Findings and Recommendations," provides information on how supervisors conduct their reviews of their deputies' traffic stops. MCSO completed its second quarterly report on October 16, 2020. The report, "Supervisor Survey of TSAR3 Intervention (TSQR2)," provides supervisor feedback from those supervisors who had participated in the intervention process associated with the Third TSAR. (We discussed the findings of these two TSQRs in our previous quarterly status reports.)

MCSO completed its third quarterly report on March 31, 2021 (TSQR3). The report, "Extended Traffic Stop Indicator Use," sought to determine if the seven extended traffic stop indicators were being used efficiently for purposes of identifying extended traffic stops. By way of background, five extended traffic stop indicators are incorporated in the TraCS drop-down menu and two others are captured from TraCS data used in the TSMR and TSAR methodologies: the indicators are "arrests" and "searches not incidental to an arrest." Information on the reasons for an extended traffic stop contribute to our understanding of the variance in the length of a traffic stop, which is important information for the annual and monthly analyses. There are seven extended stop indicators: DUI investigations; training; language barriers; technical issues; vehicles towed; searches; and arrests. The following presents the highlights from TSQR3:

- Almost one in five traffic stops involves the use of at least one extended traffic stop indicator;

- There is a positive relationship between the length of a stop and the number of extended traffic stop indicators identified by a deputy during a traffic stop – i.e., the more extended stop indicators checked during a stop, the longer the length of the traffic stop;

WAI 56334

- There is variation in the use of extended stop indicators across Districts, with District 5 accounting for the most frequent use of extended traffic stop indicators (25%); and District 7 accounting for the lowest frequency of use (10%);

- Technical issues were found to be used most often;

- Consistent with TSAR findings, arrests and searches were significantly higher among African Americans, Latinos, and Native American drivers when compared to whites; and

- A validity test involving a manual review of body-worn camera footage using a sample of 60 stops found that 95 percent of extended traffic stop indicators were used correctly.

The report makes recommendations to refine the extended traffic stop indicators, particularly those related to what is classified as an extended stop for technical reasons. Any proposed changes to the extended traffic stop indicators must be approved by us after input from the Plaintiffs and Plaintiff-Intervenors.

Paragraph 65 also requires MCSO to conduct monthly analyses of traffic stop data. MCSO's original monthly process to analyze traffic stop data began in 2015, but was suspended in May 2016 because of our determination that the original process lacked statistical validity and required significant refinement to improve the identification of potential alerts in EIS. MCSO resumed monthly analyses of traffic stop data in May 2017 using a new methodology that was statistically based, but generated a substantial number of alerts, many of which did not demonstrate a pattern of potential bias sufficient to warrant the setting of an alert in EIS. Because of this problem, we suspended the process during our July 2017 site visit to allow EIU time to consider possible refinements to the existing methodology.

MCSO's vendor, CNA, proposed a methodology for the monthly analysis of traffic stop data that involved using propensity score weighting to define a deputy's comparison group to look for evidence of individual-level bias. What is known as the Traffic Stop Monthly Report (TSMR) methodology was proposed to be the basis of the effort to compare the stop outcomes for an individual deputy to his/her peers. Defining a deputy's peers is central to the analytic objective of identifying deputies potentially engaging in biased policing. The TSMR methodology was first approved in July 2019. However, during our January 2020 site visit, we discussed matters affecting how CNA initially proposed to identify a deputy's peers in the TSMR methodology that arose. We subsequently approved the proposed revision to the TSMR methodology on January 27, 2020.

MCSO and CNA continued to test and refine the TSMR methodology after its approval in January 2020. Consequently, further refinements to the TSMR methodology were identified. Proposed refinements included how MCSO and CNA thought it best to conduct the descriptive and comparative analyses (using a 20 deputy stop threshold); adding bunching analysis; adding beat groups to the propensity weighting methodology; adding caveats about how the model would manage non-convergence issues; and other adjustments to stop classification information. These refinements were approved on April 29, 2020. Since then, more adjustments to the methodology were identified during regular virtual meetings about the methodology. These include refining the TSMR model to correct for a misspecification of the logistic regression in the TSMR

WAI 56335

methodology, changes to the confidence intervals to bring consistency between the descriptive analysis and the comparative analysis, and a change in a statistical test used to improve the validity of stop outcomes that are flagged.

The TSMR methodology being piloted involves using a comparative analysis involving propensity score weighting for those deputies making 20 stops or more over a rolling 12-month period. For those deputies making fewer than 20 stops over the same period, the methodology involves using descriptive statistics to compare a deputy to their peers. The TSMR methodology "flags" deputies who are statistical outliers when compared to their peers. The TSMR methodology then involves an extensive vetting process by TSAU, which is tasked with reviewing flagged deputies to determine which of these deputies will be subject to an intervention.

The piloting of the TSMR methodology involves developing thresholds for benchmarks required by Paragraph 67, below. These thresholds are the means to generate deputy-level alerts representing warning signs or indicia or possible racial profiling or other improper conduct as required by Paragraph 64. We and the Parties have worked with MCSO on an ongoing basis with weekly telephonic meetings to discuss the implementation of TSMR and to track the progress of the pilot.

For point of clarification, MCSO conducts annual analyses of traffic stop data (the Traffic Stop Annual Report; TSAR) to look for evidence of systemic bias. (See Paragraph 66.) TSARs are not used to look for individual-level bias.

MCSO will achieve Phase 2 compliance with this Paragraph when its periodic analyses involve the consistent use of a statistical methodology designed to identify patterns of deputy behavior at odds with their peers.


**Paragraph 66.** *MCSO shall conduct one agency-wide comprehensive analysis of the data per year, which shall incorporate analytical benchmarks previously reviewed by the Monitor pursuant to the process described in Section IV. The benchmarks may be derived from the EIS or IA-PRO system, subject to Monitor approval. The MCSO may hire or contract with an outside entity to conduct this analysis. The yearly comprehensive analysis shall be made available to the public and at no cost to the Monitor and Plaintiffs.*

**Phase 1:** In compliance

- EB-2 (Traffic Stop Data Collection), most recently amended on June 15, 2021.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

- GH-5 (Early Identification System), most recently amended on March 3, 2021.

**Phase 2:** In compliance

WAI 56336

MCSO has completed five comprehensive annual Traffic Stop Annual Reports (TSARs) analyzing traffic stop data to look for systemic evidence of racial profiling or other bias-based policing. The first three TSARs were conducted by MCSO's first contract vendor, Arizona State University. The latest two TSARs were conducted by MCSO's current vendor, CNA.

MCSO released the first TSAR in May 2016 titled, "Preliminary Yearly Report for the Maricopa County's Sheriff's Office, Years 2014-2015." It found that there are deputies engaged in racially-biased policing when compared to the average behavior of their peers.

MCSO released the second TSAR in March 2017. This evaluation confirmed the first report's main finding that racially-biased policing within MCSO appears to be both a deputy- and organizational-level problem.

MCSO released its third TSAR in May 2018, which reported the same results of its two predecessor reports: racially-biased policing persists within MCSO at the organizational level.

MCSO released its fourth TSAR in September 2019, employing a new methodology that we approved in April 2019. It reported disparate outcomes by race of driver, but the report never explained what these findings indicated with regard to systemic bias. More specifically, unlike the previous three TSARs that reported the presence of systemic bias within the Patrol Division of MCSO, the Fourth TSAR failed to make a determination on whether the findings of disparate outcomes were a systemic problem. We, MCSO, and the Parties all agreed that such conclusory statement was required. In October 2019, the Sheriff issued a statement that read, "The 4th Traffic Stop Annual Report continues to show disparate outcomes in our traffic stops of minorities. These disparate outcomes are warning signs of potential racial bias in our patrol function, which has been and continues to be a major concern for the Office. These may be indicative of a systemic problem. We will continue to work with the Monitor and the Parties on how best to determine the cause of these disparate outcomes and how best to address racial bias in our patrol function, where it exists. We will remain diligent, continue to develop our internal oversight, accountability and consequences to properly address and root out any behaviors in conflict with our commitment to ethical, constitutional policing practices."

In May 2020, MCSO released its fifth report, which reported findings that are consistent with past TSARs. The Fifth TSAR found that there were statistically significant disparities comparing Latino to whites for all post-stop outcomes, except seizures. It also reported that the disparities were potential indicia of bias as described in the First Order. In a statement subsequent to the release of TSAR5, the Sheriff issued a statement that read: "[TSAR5] [s]hows disparate outcomes in our traffic stops of minorities similar to the outcomes……[and that]…these disparate outcomes are warning signs of potential racial bias in our patrol function…." The Sheriff committed to determining the cause of the disparate outcomes and working to address them.

WAI 56337

***Paragraph 67.*** *In this context, warning signs or indicia of possible racial profiling or other misconduct include, but are not limited to:*

a.  *racial and ethnic disparities in deputies', units' or the agency's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of deputies' duties, or racial or ethnic disparities in traffic stop patterns when compared with data of deputies' peers;*

b.  *evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;*

c.  *a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;*

d.  *indications that deputies, units or the agency is not complying with the data collection requirements of this Order; and*

e.  *other indications of racial or ethnic bias in the exercise of official duties.*

**Phase 1:** In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on February 25, 2021.

- EB-2 (Traffic Stop Data Collection), most recently amended on June 15, 2021.

- GH-5 (Early Identification System), most recently amended on March 3, 2021.

**Phase 2:** Not in compliance

MCSO has conducted monthly and annual analyses of traffic stop data and provided documents discussing how the benchmarks required by this Paragraph are used to set alerts for possible cases of racial profiling or other deputy misconduct involving traffic stops. Discussion about the monthly and annual analyses are incorporated into Paragraphs 65 and 66.

We have discussed in our previous quarterly status reports that MCSO has achieved Phase 1 compliance with this Paragraph as a result of its intent to implement the individual benchmarks required by this Paragraph. These benchmarks are highlighted below and are generally referred to as post-stop outcomes in the TSMR and TSAR methodologies.

Paragraph 67.a. identifies three benchmarks pertaining to racial and ethnic disparities. The first benchmark references disparities or increases in stops for minor traffic violations (Benchmark 1). The second benchmark addresses disparities or increases in arrests following traffic stops (Benchmark 2). The third benchmark addresses disparities or increases in immigration status inquiries (Benchmark 3). Since these three benchmarks are incorporated into the EIU Operations Manual and are incorporated as post-stop outcomes in the TSMR methodology being piloted, MCSO is in compliance with Paragraph 67.a.

WAI 56338

Paragraph 67.b. identifies a benchmark pertaining to evidence of an extended traffic stop involving Latino drivers or passengers (Benchmark 4). Since this benchmark is now incorporated into the EIU Operations Manual and is incorporated in the TSMR methodology, MCSO is in compliance with Paragraph 67.b.

Paragraph 67.c. identifies three benchmarks. The first benchmark pertains to the rate of citations (Benchmark 5): MCSO is required to identify citation rates for traffic stops that are outliers when compared to a deputy's peers. The second benchmark (Benchmark 6) pertains to seizures of contraband: MCSO is required to identify low rates of seizures of contraband following a search or investigation. The third benchmark in Paragraph 67.c. (Benchmark 7) is similar to Benchmark 6, but it pertains to arrests following a search or investigation. This is also the case for Benchmark 7. Since the three benchmarks are now incorporated into the EIU Operations Manual and are incorporated as post-stop outcomes in the TSMR methodology, MCSO is in compliance with Paragraph 67.c.

Paragraph 67.d. establishes a benchmark pertaining to agency, unit, or deputy noncompliance with the data collection requirements under the First Order (Benchmark 8). This benchmark requires that any cases involving noncompliance with data collection requirements results in an alert in EIS. EIU published an Administrative Broadcast on November 28, 2016 to instruct supervisors how to validate data in TraCS for those cases involving duplicate traffic stop records to deliver timely data validation for our review. MCSO's draft EIS Project Plan 4.0 reported that MCSO began the data validation process for this benchmark on November 28, 2016. Therefore, MCSO is in compliance with Paragraph 67.d.

Paragraph 67.e. allows for other benchmarks to be used beyond those prescribed by Paragraph 67.a.-d. MCSO has three benchmarks under Paragraph 67.e. Benchmark 9 is defined as racial or ethnic disparities in search rates. Benchmark 10 is defined as a racial or ethnic disparity in passenger contact rates. Benchmark 11 is defined for non-minor traffic stops. Benchmarks 9-11 are incorporated into the EIU Operations Manual, as well as the TSMR methodology. Therefore, MCSO is in compliance with Paragraph 67.e.

While MCSO has completed operationalizing the benchmarks required by this Paragraph, we have discussed the problems with MCSO's previous methodologies. (See Paragraph 65.) As noted earlier, the TSMR methodology, which incorporates these benchmarks, is approved for piloting.

During our January 2020 site visit, we agreed to hold regular telephonic meetings during the pilot to identify potential problems and solutions to expedite the resumption of the analysis of traffic stop data to look for possible cases of biased policing at the individual deputy level. These telephonic meetings continued during this reporting period.

While the TSMR methodology is approved for the pilot, its final approval depends on the pilot's findings. MCSO will achieve Phase 2 compliance with this Paragraph once MCSO demonstrates consistent use of these benchmarks in both the TSAR and TSMR methodologies.

WAI 56339

*Paragraph 68.* When reviewing collected patrol data, MCSO shall examine at least the following:

a.  the justification for the Significant Operation, the process for site selection, and the procedures followed during the planning and implementation of the Significant Operation;

b.  the effectiveness of the Significant Operation as measured against the specific operational objectives for the Significant Operation, including a review of crime data before and after the operation;

c.  the tactics employed during the Significant Operation and whether they yielded the desired results;

d.  the number and rate of stops, Investigatory Detentions and arrests, and the documented reasons supporting those stops, detentions and arrests, overall and broken down by Deputy, geographic area, and the actual or perceived race and/or ethnicity and the surname information captured or provided by the persons stopped, detained or arrested;

e.  the resource needs and allocation during the Significant Operation; and

f.  any Complaints lodged against MCSO Personnel following a Significant Operation.

**In Full and Effective Compliance**

MCSO has not conducted a Significant Operation that met the requirements of the Order since Operation Borderline in December 2014. Subsequent activities (i.e., Operation Gila Monster in October 2016) have not met the criteria for review under this or other Paragraphs.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

As a result of this determination, MCSO District command staff – as well as Investigations and Enforcement Support – will no longer be required to submit monthly statements that they have not participated in Significant Operations as defined by this and other Paragraphs; however, they are required to notify us should staff become involved in a Significant Operation. We will continue to assess Phase 2 compliance through interviews with command and District staff during our regular site visits. During our site visits prior to, and including, January 2020, we routinely inquired of Administrative Staff, District personnel and the Deputy Chiefs of Patrol Bureaus East and West whether any Significant Operations had occurred since the prior site visit. In response, MCSO personnel indicated that no Significant Operations had occurred within their jurisdictional boundaries, nor had any of their staff participated in such operations with other departments. Subsequently, during our remote site visits since April 2020, MCSO administrative personnel have continued to advise us that there were no new Significant Operations conducted by MCSO or any of its personnel.

WAI 56340

***Paragraph 69.*** *In addition to the agency-wide analysis of collected traffic stop and patrol data, MCSO Supervisors shall also conduct a review of the collected data for the Deputies under his or her command on a monthly basis to determine whether there are warning signs or indicia of possible racial profiling, unlawful detentions and arrests, or improper enforcement of Immigration-Related Laws by a Deputy. Each Supervisor will also report his or her conclusions based on such review on a monthly basis to a designated commander in the MCSO Implementation Unit.*

**Phase 1:** In compliance

- EA-3 (Non-Traffic Contact), most recently amended on June 28, 2019.

- GH-5 (Early Identification System), most recently amended on March 3, 2021.

**Phase 2:** Not in compliance

MCSO has placed into production database interfaces with EIS, inclusive of Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), Arizona Office of Courts (AOC) records, and the Cornerstone software program (referred to as "the HUB"), that includes training and policy records for MCSO. Supervisors have demonstrated the ability to access these during our site visits. Most audits and inspections of supervisory oversight activities indicate compliance but several continue to show fluctuating trends of use or completion over time, and MCSO has yet to fully develop some inspections that would allow a determination of compliance under this Paragraph. MCSO continues to develop the Traffic Stop Monthly Report (TSMR) that will provide supervisors the ability to review and respond to data pertinent to the performance of deputies under their command with respect to the requirements of Paragraph 67. MCSO has published three Traffic Stop Quarterly Reports (TSQR): the first two for the third and fourth quarters of 2020; and the third for the first quarter of 2021.

MCSO has automated the dissemination and responses to alert investigations initiated for repetitive deficiencies discovered during audit and inspection processes; however, many of these processes have been placed on hold as MCSO reevaluates the thresholds for the triggering of alerts. In April 2020, we requested that MCSO provide an update on their progress toward the development of new/revised alert threshold triggers that are not tied to the Traffic Stop Monthly Analysis. The EIU lieutenant responded that MCSO was continuing to collect information from similar agencies regarding the thresholds they employ, and MCSO is developing a survey to be sent to MCSO field personnel to assess the current practices of the organization. When the survey is presented to us, we will provide feedback as necessary. Nonetheless, AIU developed an inspection that tracks EIS Alert investigations from the time that they are assigned from EIU to District personnel and make their way back through the chain of command for final approval of a disposition. The protocol for this inspection is included in the EIU Operations Manual, Section 302 (EIS Alert Processes), and was approved on March 27, 2019. In January and February, 100% of investigations were completed within policy timeframes, while the completion rate for March was 87%. In March, three cases were found to take more than the allotted 30 days to complete; however, in one case the supervisor had asked for, and received, an extension and completed the investigation within the extended time provided. AIU sent BIO Action Forms (BAFs) to the Units with deficiencies. We will continue to track these trends. A review of the

WAI 56341

closed alerts for this quarter shows that the majority were completed with a meeting between the supervisor and their subordinate. We have also noted an increasing number of investigations involve repetitive BAFs. The outcome of these investigations is typically meeting with a supervisor.

Since there have been no closures that have not been adequately documented during this quarter, we did not schedule a telephonic site visit conference with MCSO on alert closures. We have requested that MCSO provide an update on the progress the agency has made in implementing an inspection evaluating the effectiveness of alert investigation outcomes, as well as an audit of repetitive BIO Action Forms for specific Districts and personnel. MCSO has already conducted a pilot tracking analysis of BIO Action Forms that were sent out between January and May 2019. MCSO continues to use the insights gained from this initial analysis to refine and develop a repeatable process that is less labor-intensive than the first effort. In response to a request submitted following our October remote site visit, MCSO did produce a BIO Action Form tracking proposal in December. We sent our collective comments back to MCSO and await further developments. MCSO has not yet developed a means of measuring the effect of alert intervention outcomes but is developing a method that will eventually be included in the monthly EIS Alert Inspection. We will continue to work with MCSO on these processes and evaluate the proposals as they are provided. In this way, BIO will be able to discover if Districts, or individual supervisors, are experiencing repetitive problems that need to be addressed to ensure compliance with this Paragraph, as well as those covered in Paragraphs 81, 94, and 95.

The Fourth and Fifth Traffic Stop Annual Reports (TSAR) were published and available to the public on MCSO's website. These reports focus on organizational trends in traffic stop activity and do not allow an examination of potential individual bias in traffic stop outcomes. The methodology employed for the Fourth and Fifth TSARs was also intended to create a foundation for the Traffic Stop Monthly Report (TSMR). We continue to work with MCSO on the development of a monthly traffic stop analysis that would provide information about potential bias of individual deputies when compared with their peers. We, along with the Plaintiff and Plaintiff-Intervenors, have held frequent conference calls addressing a variety of outstanding issues related to the TSMR. MCSO began the pilot TSMR process in April 2021 using March traffic data. We will discuss the process, interventions and modifications in subsequent quarterly reports. As noted previously, the previous monthly traffic stop analysis were suspended because the benchmarks and thresholds were not grounded in either acceptable theory or analytic rigor that would make them consistently useful.

As noted above, MCSO has produced Traffic Stop Quarterly Reports for the third and fourth quarters of 2020 and the first quarter of 2021. In TSQR1, MCSO investigated how supervisors conduct traffic stop reviews and discussions with their subordinates through interviews with 12 supervisors and observations of six other supervisors. In general, MCSO reported that the manner in which supervisors conducted reviews and discussions varied across the agency and those supervisors interviewed indicated a lack of understanding regarding the expectations of the organization. While the study reported the diligence of supervisors in evaluating traffic stops and body-worn camera footage, there was also a collective finding that supervisors would like more training in this aspect of their roles, more explicit direction from the organization regarding

WAI 56342

expectations of them and more clearly defined concepts and training regarding bias-based policing, bias-based/racial profiling, and discriminatory policing as used throughout the organization's policies.

In TSQR2, MCSO investigated the perceptions and experiences of supervisors who participated in interventions for deputies stemming from the Third Traffic Stop Annual Report. While the majority of supervisor-respondents to the survey felt that the time, documentation requirements and intervention options available were within expectations, there was a small minority of respondents who felt that the time requirements of interventions impeded their other functions as supervisors; that deputies targeted for interventions were not adequately vetted; and that the types of interventions to which the supervisors were limited was unreasonable.

In TSQR3, MCSO investigated the use of Extended Traffic Stop Indicators (ETSIs) by deputies in 2020. The report found that slightly over 18% of traffic stops involved the use of one or more ETSIs, and a test of the validity of ETSIs, by comparison with body-worn camera videos, exceeded 95%. Consistent with past TSAR findings, ETSIs were significantly higher among African Americans, Latinos, and Native American drivers when compared to Whites. While these were final reports published by MCSO, we and the Parties provided comments on each of the studies. MCSO has noted that the agency anticipates using the results of each of these studies in the modification of policies and the development of training. In addition, MCSO will use these studies to inform the ongoing development of methods and protocols for the TSMR, which will take the place of the annual reports in identifying individual deputies who exhibit potentially biased behavior in the manner in which they conduct traffic stops. We will continue to assist MCSO in each of those objectives.

MCSO continues to provide us access each month to all Non-Traffic Contact Forms (NTCFs) involving investigative stops and field information; however, MCSO has only begun planning to conduct more thorough statistical analyses of these for this and other Paragraphs. At times over the past year our review of the NTCFs provided each month indicated that a higher proportion of Latinos are being contacted in particular areas of the County for relatively minor infractions. Our review of NTCFs for this quarter did not raise particular concern about disparate treatment. Several months ago, MCSO proposed an initial study of how this form (NTCF) and the related policy are being used across the agency. While this proposed analysis does not investigate potential indications of bias in how these stops are conducted by deputies or evaluated by supervisors, it will give some insight into the modifications needed in both the form and policy going forward.

We continue to evaluate the effectiveness of supervisory investigations into non-traffic stop alerts each month by selecting a random sample of 15 cases. Over the past year, we have found that most supervisors are completing these investigations in a timely fashion and addressing the deficiencies raised.

MCSO has created an EIS Alert Review Group (ARG) that evaluates the investigations of supervisors prior to closing an alert. The ARG ensures that the reports of the supervisors address all aspects of the assigned investigation, and returns those that are deficient to the District for continued revision. Over the past several months, we have noted that the proportion of completed alert investigations being sent back to the Districts by the ARG has fallen below one-third of all

WAI 56343

cases we evaluate. MCSO has emphasized supervisory investigations in the past years' training, as well as the creation of liaisons between BIO and the Districts to ensure that supervisors receive the necessary support and information to complete these investigations. In addition, EIU has developed online supervisory resource material for alert investigations that was placed on the HUB in January 2020. MCSO has not yet developed a method of evaluating whether and how the interventions triggered by these alert investigations may, or may not, be mitigating the problems to begin with.

The Audit and Inspections Unit (AIU) conducts monthly audits of supervisory oversight via the Supervisory Notes made for each deputy. Minimally, each month, supervisors should be making a performance appraisal note, reviewing two body-worn camera recordings, and reviewing the EIS profile of their subordinates. During the first quarter of 2021, the compliance rate was 100% in each month.

AIU also conducts three inspections of traffic stop information: two of these pertain to the timely review and discussion of traffic stops by supervisors for each subordinate; and the third is an inspection regarding the correct completion of traffic forms and the coordination of these forms with databases like CAD and the review of body-worn camera footage. For all three inspections, MCSO reported compliance rates in the high 90th percentile throughout the quarter. More importantly, the deficiencies found across all three inspections were minor deviations from the matrices used to evaluate compliance. AIU sent BIO Action Forms to those Districts where it found deficiencies.

MCSO has developed a new Incident Report Inspection that has been approved following several revisions. The inspection should include instances where prosecuting authorities turned cases down due to a lack of probable cause, among other matrix items developed by MCSO. MCSO reports compliance rates for January through March of 98.7% and above, with no instances of cases being turned down due to a lack of probable cause. Our review of inspection materials differs slightly from the conclusions of MCSO, in that the inspectors found one case each month in which a deputy failed to adequately articulate probable cause in his/her report, resulting in our computed compliance rate of 97.5% each month. None of these three cases were turned down due to the lack of probable cause as evaluated by prosecutors; however, our computations of compliance take into account those instances where deputies have not fully articulated probable cause or collected enough information for prosecution or properly listed information relevant to fulfill statute requirements. For those deficiencies discovered during the inspection process, AIU sent BIO Action Forms to the appropriate Districts for additional review and action. The inspectors also noted that there was no indication that the immediate supervisors found these deficiencies within their own review of these IRs. The inspections of supervisory oversight show relatively minor fluctuations that MCSO is investigating and addressing with BAFs, training, and policy evaluation. Additionally, MCSO is also developing an inspection of repetitive BAFs so that they might intervene for supervisors who evidence recurring problems. We have found that measures like the creation of the Alert Review Group have greatly enhanced the accountability of Districts and individual supervisors in the completion of their roles.

WAI 56344

**Paragraph 70.**  *If any one of the foregoing reviews and analyses of the traffic stop data indicates that a particular Deputy or unit may be engaging in racial profiling, unlawful searches or seizures, or unlawful immigration enforcement, or that there may be systemic problems regarding any of the foregoing, MCSO shall take reasonable steps to investigate and closely monitor the situation.  Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or of other supervised, monitored, and documented action plans and strategies designed to modify activity.  If the MCSO or the Monitor concludes that systemic problems of racial profiling, unlawful searches or seizures, or unlawful immigration enforcement exist, the MCSO shall take appropriate steps at the agency level, in addition to initiating corrective and/or disciplinary measures against the appropriate Supervisor(s) or Command Staff.  All interventions shall be documented in writing.*

**Phase 1:**  In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on February 25, 2021.

- EB-2 (Traffic Stop Data Collection), most recently amended on June 15, 2021.

- GH-5 (Early Identification System), most recently amended on March 3, 2021.

**Phase 2:**  Not in compliance

MCSO continues to develop the methodology and related plans for the Traffic Stop Monthly Reports (TSMRs).  The TSMR is intended to be a more timely response to potential indications of bias at the deputy level through the examination of a rolling 12-months of traffic stop data for each deputy.  We, the Parties, and MCSO have conducted frequent conference calls to ensure that the methodologies adopted will be effective in replacing the intervention processes emanating from prior Traffic Stop Annual Reports (TSARs).  MCSO initiated a pilot program to evaluate and assist in the refinement of each aspect related to the TSMR in April 2021.  We and the Parties are reviewing results as they are produced and recommending modifications as issues arise.  A more thorough description will be provided in subsequent quarterly reports.

MCSO continues to develop the EIU Operations Manual.  The sections of the manual that remain under development are those related to statistical methodologies for the TSMR and the thresholds that may trigger alert inquiries for all alert investigations.  MCSO has received approval to move forward on several TSQR projects and published three of these reports for the third and fourth quarters of 2020, as well as the first quarter of 2021.

MCSO has published the Fifth Traffic Stop Annual Report and continues to find in the examination of traffic stop outcomes disparities "that may indicate a systemic bias within the patrol function" that needs to be ameliorated.  The analytic methods used in the Annual Reports are not able to identify individual deputy activity, but form the basis for organizational strategies to address systemic biases through training and policy.  In refining the TSMR methodology, which will be used to identify potential bias for individual deputies, MCSO has employed data from 2019 and 2020.  During this process, MCSO notified us that several deputies have been found to be outliers in comparison to their peers.  As a result, we held several conference calls,

WAI 56345

including with the Plaintiffs and Plaintiff-Intervenors, to discuss these findings and how MCSO should address this issue given that the TSMR process has not yet been approved. MCSO has proposed a plan using existing systems, combined with some elements from previous TSAR processes. We will report on the outcomes of MCSO's efforts as they are made available to us.

A portion of the monthly alert report produced by EIU depends upon the TSMR, which remains under development. However, the EIS also produces alerts for numerous activities, ranging from repetitive data entry errors to internal and external complaints. Many of these ongoing alerts are dependent upon the revision of alert thresholds which continue to undergo evaluation by MCSO. While we acknowledge that the revision of these thresholds entails time consuming research and surveys of line personnel, we believe the delay of nearly two years has hampered the effective use of the EIS to track repetitive behavior that may be deleterious to the organization and the community it serves. BIO personnel continue to evaluate and update the thresholds used to trigger these alerts to ensure that they are sufficient to detect behaviors that might indicate bias on the part of deputies, taking into consideration the current assignment of the deputies as noted in Paragraph 81.f. In the meantime, the non-TSMR alerts triggered under the current system are first evaluated by EIU personnel and then transmitted, via BlueTeam, to the appropriate supervisor and District command. The supervisors conduct an investigation, including a potential discussion with the designated deputy, and memorialize their actions in BlueTeam. District command staff and an Alert Review Group (ARG), comprised of multiple BIO personnel, review these investigations to ensure that proper investigations are carried out and possible interventions are clearly outlined.

AIU began producing an inspection of EIS Alert Processes in April 2019 that evaluates the timeliness of alert investigation completion and whether discussions, training, or Action Plans might result from the supervisory investigation. The inspection is lagged by one month to allow supervisors 30 days to complete the investigation. The compliance rate for timely completion of investigations for this quarter range from 100% in January and February, to 87% in March. MCSO has not yet developed a protocol to evaluate the effect of the discussions, activities or Action Plans resulting from these investigations. The Training Division, working in concert with EIU, included in the 2019 SRELE training a refresher course on supervisory responsibilities in conducting alert investigations. This training was delivered during the fall of 2019. Following our January 2020 site visit, MCSO also placed on the HUB resource materials for supervisors who may not have conducted alert investigations recently. This material provides supervisors with examples of how to fill out the alert investigation paperwork or contact EIU staff should the need arise.

MCSO is not in Phase 2 compliance with this Paragraph, as the TSMR, and other relevant inspections, continue to undergo development and have not yet been placed in production. We will monitor the planned piloting of the TSMR methodology and continue to participate with the Plaintiffs and Plaintiff-Intervenors in regular conference calls about MCSO's progress.

MCSO's Plan to Promote Constitutional Policing (also referred to as the Constitutional Policing Plan, or CPP) was drafted to address systemic issues identified in the Traffic Stop Annual Reports (TSARs). The CPP included nine Goals and a timeline for the completion of the Goals. Our comments in this report pertain to compliance with the Plan during the first quarter of 2021.

WAI 56346

MCSO created an online progress tracking tool and provided a link to the application in April 2020. The online spreadsheet was based on the plan originally agreed to by the Parties and approved by the Court. The spreadsheet provided additional details of MCSO's reported progress on each of the nine CPP Goals: the start date; the projected completion date; and the status of sub-Goals and projects.

We determine compliance with the CPP through several means. First, we issue monthly and quarterly document requests pertaining to specific Goals of the CPP, which we review. For example, we have monthly document requests pertaining to projects under Goals 1, 3, 4, and 5. We review meeting agendas and discussion items to verify compliance with the projects noted under those Goals. For the training components of these Goals, MCSO submits training materials that must be reviewed and approved for before delivery. Our standing requests for other Paragraphs of the First and Second Orders also provide information related to some of the CPP Goals. For example, for Goal 1, we review MCSO monthly submissions related to supervisory corrective actions. For Goal 2, in addition to reviewing and approving the components of the new employee performance evaluation process, we also review current Employee Performance Appraisals being completed and advise MCSO of any issues of concern that may be addressed in the new process. For Goal 6, we conduct periodic meetings with MCSO, the Plaintiffs, and Plaintiff-Intervenors related to the evaluation of traffic stop data and associated monthly, quarterly, and annual reports. Second, we review the progress reported in the online spreadsheet and record our findings. Third, we corroborate MCSO's reported progress during our site visits, where we confirm the reported outcomes and ask clarifying questions on projects completed. Our comments below reflect what we learned from all three areas.

During our April 2021 remote site visit, we discussed MCSO's compliance with the Constitutional Policing Plan. Our comments in this report reflect what we ascertained from our review of documentation, including the online spreadsheet, and information provided during our remote site visit meeting.

<u>Goal 1: Implementing an effective Early Intervention System (EIS) with supervisor discussions.</u>
For the first quarter of 2021, MCSO again reported an overall 61% completion rate for Goal 1, the same as in our two previous reviews. The sub-goal noted as the supervisory discussion process had a starting date of April 3, 2018, with a completion date of December 31, 2020; this sub-goal had a completion rate of 64%, the same as the last two reporting periods. Work continues on the other sub-goals. For the Traffic Stop Monthly Report (TSMR), the spreadsheet noted a 37% completion rate, the same as the last two quarters. Information-sharing within the Office was at 57%, the same completion rate as in our January review. During our April remote site visit meeting, MCSO reported that there were four Town Halls during the first quarter of 2021 – in Districts 2, 3, 6, and 7. These Town Halls were focused on the TSMR, more specifically to explain the TSMR pilot process. A total of 18 employees participated; attendees were mostly comprised of command staff. MCSO reported that the agency has not yet planned Town Halls for the rest of the year, but that the TSMR will be discussed in future Town Halls. District liaisons, whose responsibilities are to facilitate the exchange of information between BIO and the Patrol Districts as it relates to TSAR and TSMR, are still working in that capacity, with a small shift in their responsibilities.

WAI 56347

Goal 2: Evaluating supervisors' performances through an effective Employee Performance Appraisal process. For this reporting period, Goal 2 noted a completion rate of 54%, a 14% increase over the last quarter's completion rate. MCSO reported that the agency has finalized an agreement with a vendor who will be assisting MCSO to create a replacement system to Praxis. MCSO still has some EPAs currently in Praxis, and will likely have some left in the Praxis system when the agency begins with the new platform; but the intent is to eventually close out EPAs in the Praxis system. MCSO reported that there is a possibility that completion of the system configuration for the new process could be delayed. The projected date on the MCSO Smartsheet to begin delivery of the new Performance Management System is February 1, 2022. We note that there are still areas of underperformance among supervisor EPAs. Our reviews of supervisor EPAs completed during the first quarter of 2021 are covered under other Paragraphs of this report.

Goal 3: Delivering enhanced implicit bias training. Goal 3 was noted as 95% completed on the tracking spreadsheet; this is a 13% increase from previously reported completion rate of 82%. Implicit bias training was completed for all supervisors during the first quarter of 2021. Briefing notes to document the completion of the training were due April 15, 2021. BIO will conduct an inspection on the briefing notes to determine the degree of compliance. MCSO reported that a Captains' meeting was scheduled for April 27, 2021; implicit bias was one of the topics on the agenda. The information discussed at the Captains' meeting will be subsequently disseminated to employees at each level, with documentation of employees receiving the information captured in BlueTeam. MCSO is tentatively scheduling a discussion on fair and impartial decision making for the Captains' Meeting in August 2021, followed by a discussion on cultural competency in the December Captains' Meeting. At the time of our April site visit, MCSO reported that the Aguila training video had not been deployed due to the amount of other training that was currently under way. We inquired, but there was no update available on the Guadalupe project.

Goal 4: Enhanced fair and impartial decision-making training. Goal 4 was noted to have increased from 82%, as indicated in our last report, to 92%. The CPP spreadsheet notes a 94% completion rate for the stand-alone video/HUB training class on Fair and Impartial Decision Making. MCSO stated that the agency was finalizing the 2021 video submission and talking points for Fair and Impartial Decision Making. MCSO reported that the video and talking points should be completed in April, with submission expected by end of April 2021. MCSO also noted that the agency has several videos that were previously approved in 2020. MCSO was considering selecting one of the approved videos for deployment, since some of these have not been previously used for training. MCSO reported that Fair and Impartial Decision-Making had been deployed via the HUB.

Goal 5: Delivering enhanced training on cultural competency and community perspectives on policing. The completion rate for Goal 5, previously noted at 78%, had increased to 88% as of our April review. The stand-alone training recently completed by MCSO covered CPP training topics for Goals 3 and 5. Supervisors were directed to complete briefing notes for their subordinates by April 15, 2021. MCSO reported that the Traffic Stop Survey had been approved in both English and Spanish, and that they were currently testing the website. MCSO noted that the tentative start date for the survey was May 1, 2021. With regard to cultural competency, MCSO provided a one-time training session for FTOs. During our April remote site visit, we

inquired about future plans for training FTOs in cultural competency. MCSO advised that the Office viewed this training project as a one-time delivery, which was completed. MCSO added that the agency would consider providing training for new FTOs on an as-needed basis.

Goal 6: Improving traffic stop data collection and analysis. Goal 6 was noted as 96% completed on the tracking spreadsheet. In our last review, MCSO listed the completion rate as 97%. The projected completion date has been changed from July 31, 2020, to December 6, 2020, to January 13, 2021, to June 30, 2021. As of our April review, the online spreadsheet noted TSMR Phases 1 and 2 at 100%. Phase 3 was still at 91%, the same as our previous review. Phase 4 was increased from 25% to 50%.

Goal 7: Encouraging and commending employees' performance and service to the community. This goal has been completed. This goal was not part of the requirements set by the First Order.

Goal 8: Studying the Peer Intervention Program. This goal has been completed. This goal was not part of the requirements set by the First Order.

Goal 9: Building a workforce that provides Constitutional and community-oriented policing and reflects the community we serve. MCSO's goal is to have a hiring process that will build a workforce that provides Constitutional policing and reflects the community it serves. As of our April review, Goal 9 was noted as having a 56% completion rate, a 7% increase from the previously reported completion rate of 49%. The expected completion date on this goal has been changed from December 31, 2020, to June 30, 2021, to the current date of December 31, 2021.

MCSO reported that 77 new employees were hired in the first quarter of 2021. MCSO is still having difficulty recruiting Detention Officers. MCSO advised that applicant numbers have been much lower than in prior years. To mitigate that, MCSO renewed its contract with the marketing firm the agency had been using and approved a new advertising campaign. MCSO reported that it continues to participate in virtual job fairs and events, and has continued to post advertisements on social media. MCSO is working with a local Arizona workforce development center to engage with residents. MCSO plans to present an employee referral incentive program to Maricopa County leadership in the near future. Under this proposal, if a current Detention employee refers someone who is ultimately hired, the employee will receive a monetary incentive. This proposal needs to be approved by the Maricopa County Board of Supervisors.

MCSO noted that there is high interest in Detention Officers upgrading to Deputy Sheriff. The pipeline for that classification continues to be steady and forward-moving. On the civilian side, MCSO is struggling with hiring skilled technical positions due to competition from the private sector. MCSO reported that the Office is continuing to work on some of the sub-goals that pertain to employee retention. MCSO reported 589 vacancies as of March 31, 2021, of which 85 were sworn, 303 were Detention, and 201 were civilian. Of the 77 employees hired in the first quarter, 18 were sworn, 33 were Detention, and 26 were civilian. The ethnic breakdown for the 18 sworn employees was 44% white, 44% Hispanic, 6% Asian, and 6% not specified. The ethnic breakdown for the 33 Detention employees was 27% white, 48% Hispanic, 12% Black, 9% not specified, and 3% American Indian or Alaskan Native. The ethnic breakdown for the 26 civilian employees was 35% white, 31% Hispanic, 23% Black, 8% not specified, and 4% American Indian or Alaskan Native. With regard to voluntary separations, MCSO reported that Office has noted

WAI 56349

no disparities by race or ethnicity. As it pertains to voluntary separations for sworn, MCSO reported nine separations, with the breakdown being 67% white and 33% Hispanic. There were 36 voluntary separations for Detention, with 44% being White, 33% Hispanic, 17% Black, and 6% American Indian or Alaskan Native. For civilians, MCSO reported 16 voluntary separations. Of those, 56% were white, 25% were Hispanic, 13% were Black, and 6% were not specified. MCSO reported a 1% increase in Hispanic supervisors. Presently, 19% of all supervisors are Hispanic. MCSO also reported a 1% increase in Black supervisors, with 5% of all MCSO supervisors being Black. MCSO reported two Detention Academy classes in progress, and one starting in May, for a total of 26 trainees. For sworn, MCSO reported three academy classes in progress, for a total of 41 Deputy Sheriff trainees. An academy class that is scheduled to start in August has 11 Deputy Sheriff trainees. MCSO reported that the ethnic/racial makeup of the 47 sworn trainees in the academy was 53.19% white, 42.55% Hispanic, 2.13% Black, and 2.13% two or more races. Of the 21 Detention trainees in the academy, MCSO reported that 53.38% were Hispanic, 28.57% were white, 9.52% were Black, 4.76% were Asian, and 4.76% were two or more races.

During the first quarter of 2021, MCSO reported progress on Goals 2, 3, 4, 5, and 9. In MCSO's response to our draft quarterly status report, MCSO stated that the online Smartsheet had not been properly updated in April, and some of the completion percentages we included in this report were not accurate. MCSO indicated that Goal 1, noted as having a completion rate of 61% during our reviews, was actually at 92%. In addition, the TSMR, noted on the Smartsheet at 37% in April, was actually at 80%. Information-sharing within the Office was noted on the Smartsheet as having a completion rate of 57% in April, which MCSO stated was actually at 100%. The District Liaison program, which in April was listed as 64%, was updated to 100%. Our reviews of the Smartsheet in early July noted Goal 1 at 62%, TSMR at 37%, information-sharing at 60%, and the District Liaison program was still at 64%, These figures were not corrected on the Smartsheet until after our reviews for our July site visit, so we are not certain when the reported progress was made.

MCSO has revised the completion date for Goal 2, but MCSO has demonstrated slow but steady progress in its implementation of the new EPA process. However, we continue to note areas of underperformance in supervisor EPAs. The training components of Goals 3, 4, and 5 show completion percentages of 95%, 92%, and 88%, respectively. What remains to be verified is whether or not the training was effective in producing desired changes in the outcome of the TSARs. Goal 6 showed a 1% decrease, to 96%. The projected completion date for Goal 6 has been revised several times, reflecting the difficulty MCSO has experienced in completing this Goal.

WAI 56350

MCSO continues to struggle with hiring, although we understand that some of the factors may be beyond the agency's control. The total number of vacancies has significantly increased from last year. For the first quarter of 2020, MCSO reported 139 total vacancies. For the first quarter of 2021, MCSO reported 589 total vacancies. The number of sworn vacancies decreased from 90 in the fourth quarter of 2020, to 85 in the first quarter of 2021. However, MCSO continues to experience difficulty in recruiting and hiring Detention personnel. For the fourth quarter of 2020, MCSO reported 281 Detention vacancies. For the first quarter of 2021, MCSO reported 303 Detention vacancies, or 22 more than the previous quarter.

**Paragraph 71.** *In addition to the underlying collected data, the Monitor and Plaintiffs' representatives shall have access to the results of all Supervisor and agency level reviews of the traffic stop and patrol data.*

**In Full and Effective Compliance**

MCSO has provided us with access to existing data from monthly and annual reports.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

While we continue to work with both MCSO and the Parties on specific issues of methodology for Non-Traffic Contact Forms and the Annual, Monthly, and Quarterly Reports for traffic stop data, we have nonetheless been afforded complete access to all requests involving data. Most recently, MCSO discovered during tests of the TSMR methodology that over 500 traffic stops from April 2020-March of 2021 had been assigned incorrect coordinates for the locations of the stops. This typically occurs as a result of communication problems or other technical issues involving the transmission of data that may arise during a traffic stop. Traditionally, these incorrect locations are corrected by dispatch staff at the end of each shift; however, during this time period, the corrections were missed. Upon making the discovery, MCSO notified us and the Parties and began manually correcting these locations to use the data fully. In addition, MCSO is modifying its data quality procedures to catch and correct these issues in a timely fashion. These corrections will also be made for the data to be included in the sixth Traffic Stop Annual Report.

WAI 56351

# Section 8: Early Identification System (EIS)

**COURT ORDER IX.  EARLY IDENTIFICATION SYSTEM ("EIS")**

*Paragraph 72.  MCSO shall work with the Monitor, with input from the Parties, to develop, implement and maintain a computerized EIS to support the effective supervision and management of MCSO Deputies and employees, including the identification of and response to potentially problematic behaviors, including racial profiling, unlawful detentions and arrests, and improper enforcement of Immigration-Related Laws within one year of the Effective Date.  MCSO will regularly use EIS data to promote lawful, ethical and professional police practices; and to evaluate the performance of MCSO Patrol Operations Employees across all ranks, units and shifts.*

**Phase 1:**  In compliance

- EA-3 (Non-Traffic Contact), most recently amended on June 28, 2019.

- GH-5 (Early Identification System), most recently amended on March 3, 2021.

**Phase 2:**  Not in compliance

As a result of interfaces for remote databases introduced in 2017, the Early Intervention System (EIS) now includes Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), records from the Administrative Office of the Courts (AOC), and training completion and policy acknowledgement records from the Cornerstone software (the HUB).  MCSO continues to work on the EIU Operations Manual to memorialize the collection, analysis, and dissemination of relevant data; as well as the responsibilities and roles of agency and EIU personnel.  During this reporting period, MCSO offered several proposed sections to the manual dealing with the Traffic Stop Monthly Report which are under review by us and the Parties.  MCSO has completed approximately 90% of the manual to date.  Those sections that are under development pertain to the Traffic Stop Monthly Report (TSMR) and thresholds for triggering potential alert investigations arising from monthly analysis of traffic and patrol functions.

To capture the activities of deputies in non-traffic stops of individuals, MCSO created Non-Traffic Contact Forms (NTCFs), which were interfaced with EIS in mid-2017.  MCSO has provided us with access to investigative stops that make up a portion of NTCFs since their inception.  Over the past two years, we have suggested that MCSO create a methodology to statistically examine these civilian contacts to ensure that there is no evidence of bias in the manner in which they are conducted.  MCSO has produced a preliminary draft of an NTCF inspection methodology that we have returned with comments.  In addition, we had requested and received several months of data for all contacts captured using NTCFs in 2019; and we found that the distinction between Field Information and Investigative Stop is not clear to deputies using the forms.  MCSO has now proposed to conduct a study of NTCF use by deputies, using the preliminary methodology mentioned previously, to evaluate whether the form, policy, and training associated with stops documented on NTCFs needs to be modified.  In a recent request for information, the BIO Captain stated that once the methodology for this one-time study is

WAI 56352

approved, BIO personnel will complete the assessment in approximately 60-75 days. Until the study and analytic proposals are complete, we will continue to review both investigative stops and field interviews collected on the existing forms. MCSO supplies us with a list of these non-traffic stops each month.

We will continue to work with MCSO to finalize each of these data analytic methods. MCSO continues to regularly publish a number of reports on deputy activity and supervisory oversight that are not tied to the methodologies of the TSMR, TSQR, or TSAR.

The Audits and Inspections Unit (AIU) produces a monthly report evaluating Supervisory Notes that indicate whether supervisors are reviewing the EIS data of deputies under their command. The inspection looks for indications that supervisors made entries for each person they supervise with regard to two randomly selected BWC videos, provide one EPA note, make two supervisor entries, and indicate that the supervisor has reviewed their deputies' EIS status. The compliance rates reported by MCSO are based on a matrix developed for this inspection. For this quarter, the reported compliance rates reported were 100% for each month. We calculate our compliance rates based upon what we consider significant deficiencies related to Order requirements and any case reviewed with a significant deficiency impacts the compliance rate; however, during this reporting period, our computations align with those of MCSO. AIU continues to send BIO Action Forms to the Districts with deficiencies, and we have always had the opportunity to review these forms when requested.

In the Traffic Stop Review and Discussion Inspections for this quarter, we note stable compliance rates at or near 99%. The third traffic-related audit is the Traffic Stop Data Inspection, in which AIU uses a matrix comparing traffic stop information found on Vehicle Stop Contact Forms (VSCFs) with Computer Aided Dispatch (CAD) and body-worn camera (BWC) footage. The compliance rates during this quarter were all in excess of 99%. The deficiencies noted by the inspector ranged across the organization, and involved minor form or recordkeeping practice issues. AIU sent BIO Action Forms to the appropriate Districts for this quarter.

While we can look for trends in deficiencies over each quarter, we have suggested to MCSO that AIU conduct an evaluation of all BIO Action Forms sent to Districts to ensure that there are not long-term trends by Districts or supervisors that cannot be distinguished while looking at shorter timeframes. MCSO conducted a preliminary analysis of BIO Action Forms from January to May 2019 and reported these findings during our July 2019 site visit. MCSO found that there was indeed a small number of deputies who had received several BIO Action Forms. MCSO produced a methodology in June 2020, which we and the Parties returned with comments. MCSO refined the methodology and resubmitted it in December 2020. The proposed methodology has been returned to MCSO with few issues remaining.

EIU also produces a monthly report on non-traffic alerts triggered within EIS. From March to May of 2020, we noted a dramatic increase in Notice of Claim Alerts. In response to questions we submitted regarding this issue, BIO command staff advised that they had recently discovered that there was a backlog of emails from the Legal Liaison Section regarding Notices of Claims. During our October 2020 remote site visit, the EIU lieutenant advised that the backlog had been eliminated; and that MCSO had implemented new internal practices to ensure that such an oversight would not reoccur.

WAI 56353

For all other alerts, EIU personnel review the alerts and disseminate them to supervisors and District command if alerts indicate the potential for biased activity or thresholds are exceeded for particular actions such as external complaints, unexcused absences, data validations, and others. Once the supervisors receive the alert investigation, they employ a template (Attachment B of GH-5 [Early Identification System]) to conduct the investigation and report their findings and results to the chain of command through BlueTeam. MCSO has also created an EIS Alert Review Group (ARG) to evaluate the closure of alert investigations. We had no immediate concerns with our review of alert closures for this quarter; however, the compliance rate for the time to complete these within policy timeframes ranged from 100% for January and February, to 87% in March. MCSO continues to work with us and the Parties on how to evaluate the effect of interventions undertaken to complete the EIS Alerts Inspection.

***Paragraph 73.*** *Within 180 days of the Effective Date, MCSO shall either create a unit, which shall include at least one full-time-equivalent qualified information technology specialist, or otherwise expand the already existing role of the MCSO information technology specialist to facilitate the development, implementation, and maintenance of the EIS. MCSO shall ensure that there is sufficient additional staff to facilitate EIS data input and provide Training and assistance to EIS users. This unit may be housed within Internal Affairs ("IA").*

**In Full and Effective Compliance**

The Bureau of Internal Oversight (BIO) is overseen by a captain and is comprised of three Units designed to achieve different compliance functions. Each is a fully operational Unit headed by a lieutenant with both sworn and civilian staff responsible for diverse but interrelated oversight functions.

The Early Intervention Unit (EIU) coordinates the daily operation of the EIS. This unit evaluates alerts generated by the EIS, reviews them and sends out investigations to District personnel as prescribed by policy.

The Audits and Inspections Unit (AIU) has developed and carries out ongoing inspections to ensure that deputies and supervisors are using the EIS properly and to the fullest extent possible. When AIU discovers deficiencies, it sends out BIO Action Forms to the affected Districts and individuals; and ensures the return of the appropriate forms.

The Traffic Stop Analysis Unit (TSAU) was most recently created due to the complexities of generating all of the statistical reports related to traffic and patrol functions of MCSO. The leaders of these units respond to specific requests made by us and the Parties and appear collectively during our site visit meetings to answer any questions related to the operation of BIO.

Over the last 18 months the EIS database has been expanded to include Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), records from the Arizona Office of Courts (AOC), and training and policy receipt records from the Cornerstone software program (the HUB). Supervisors now have much more information available to them about the deputies under their command than they ever had in the past.

WAI 56354

On October 5, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

***Paragraph 74.*** *MCSO shall develop and implement a protocol setting out the fields for historical data, deadlines for inputting data related to current and new information, and the individuals responsible for capturing and inputting data.*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on March 3, 2021.

- EIU Operations Manual, currently under revision.

**Phase 2:** In compliance

MCSO has met the requirements of this Paragraph by identifying the data to be collected and the responsibility of persons across the organization to review, verify, and inspect the data making up the early intervention system. These roles and responsibilities are originally developed in GH-5 (Early Identification System) and more comprehensively elaborated in Section 200 (Duties and Responsibilities), approved in August 2019, of the EIU Operations Manual.

MCSO has not yet completed the revision of the EIU Operations Manual. Currently, MCSO has approximately 90% of the manual finalized. The remaining 10% of the manual is comprised of the ongoing development of the methodologies and responsibilities for the Traffic Stop Monthly Reports, as well as the revision of the thresholds dependent on the results from the TSMR and non-traffic threshold analyses being coordinated by EIU personnel. The manual sections pertaining to this Paragraph have already been finalized and published; therefore, MCSO has attained Phase 1 compliance.

MCSO has shown progress in the development of a data-handling protocol. These processes have been memorialized in the EIU Operations Manual (Section 306), which was approved in July 2020. Aside from Section 200, noted above, Section 305 (Software Change Control Processes), approved in October 2018, is intended to ensure that all modifications to software or data collection are coordinated in a prospective fashion before any implementation occurs. These software changes are provided to us on a monthly basis through regular document requests and are discussed during the quarterly site visit meetings. Each of these sections of the EIU Operations Manual expands upon policy that has already been approved.

MCSO has also created a committee of personnel from each unit that handles, or adds to, traffic data before it is analyzed. The reports from the regular monthly meetings of this group are made available to us and show the attention to detail and memorialization of changes put in place to improve data processes. Nonetheless, during the analysis of data related to the initial runs of the TSMR process, MCSO discovered over 500 traffic stops that had inaccurate traffic stop location coordinates assigned to them. Traditionally, dispatchers are to make note of traffic stops involving inaccurate coordinates and manually adjust these at the end of each shift. This procedure was not performed during April 2020-March 2021. Upon discovery during the

WAI 56355

analysis, MCSO notified us and the Parties of this problem and immediately began manually correcting the inaccurate coordinates so that these stops could be used in both the TSMR and TSAR analyses. MCSO is also investigating what led to this oversight and will be proposing protocol modifications to ensure it does not occur again.

Finally, EIU produces a monthly report for benchmarks not related to the traffic stop methodologies. We routinely use these monthly tables to evaluate compliance with various Paragraphs within the Court Order. For traffic-related Benchmarks 3 and 8 (Paragraph 67), MCSO documents both traffic stops involving immigration inquiries and data validation errors committed by deputies. During this reporting period, there were no immigration inquiries or data validation alerts.

**Paragraph 75.** *The EIS shall include a computerized relational database, which shall be used to collect, maintain, integrate, and retrieve:*

a.  *all misconduct Complaints or allegations (and their dispositions), excluding those made by inmates relating to conditions of confinement or conduct of detention officers (i.e., any complaint or allegation relating to a traffic stop shall be collected and subject to this Paragraph even if made by an inmate);*

b.  *all internal investigations of alleged or suspected misconduct;*

c.  *data compiled under the traffic stop data collection and the patrol data collection mechanisms;*

d.  *all criminal proceedings initiated, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the County and/or its Deputies or agents, resulting from MCSO Patrol Operations or the actions of MCSO Patrol Operation Personnel;*

e.  *all arrests;*

f.  *all arrests in which the arresting Deputy fails to articulate probable cause in the arrest report, or where an MCSO Supervisor, court or prosecutor later determines the arrest was not supported by probable cause to believe a crime had been committed, as required by law;*

g.  *all arrests in which the individual was released from custody without formal charges being sought;*

h.  *all Investigatory Stops, detentions, and/or searches, including those found by the Monitor, an MCSO supervisor, court or prosecutor to be unsupported by reasonable suspicion of or probable cause to believe a crime had been committed, as required by law;*

i.  *all instances in which MCSO is informed by a prosecuting authority or a court that a decision to decline prosecution or to dismiss charges, and if available, the reason for such decision;*

j.  *all disciplinary action taken against employees;*

k.  *all non-disciplinary corrective action required of employees;*

WAI 56356

*l.*    *all awards and commendations received by employees;*

*m.*    *Training history for each employee; and*

*n.*    *bi-monthly Supervisory observations of each employee.*

**Phase 1:**  In compliance

- EA-3 (Non-Traffic Contact), most recently amended on June 28, 2019.

- GC-13 (Awards), most recently reviewed on December 7, 2020.

- GH-5 (Early Identification System), most recently amended on March 3, 2021.

- EIU Operations Manual, currently under revision.

- Professional Services Bureau Operations Manual, most recently amended on December 21, 2020.

**Phase 2:**  In compliance

Since 2017, MCSO has placed into production data interfaces for Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), Justice Court turndowns (AOC) and the Cornerstone software program (the HUB) that provides reports for training and policy acknowledgment.  MCSO continues to develop some inspections or analytic reports that ensure that personnel are accurately using the EIS data available; however, the data do exist in the EIS and are accessible by personnel we have interviewed during each site visit.  We will continue to evaluate and monitor the use of EIS in furtherance of the Orders.  During our January 2020 site visit, we also reviewed with MCSO representatives how the data for the following Subparagraphs appear on-screen and are accessible to first-line supervisors.  We found no issues of concern during this review.  We anticipate conducting a similar review as soon as in-person site visits are resumed.

Paragraph 75.a. requires that the database include "all misconduct Complaints or allegations (and their dispositions)," with some exclusions.

EIPro, a web-based software application that allows employees and supervisors to view information in the IAPro case management system, includes the number of misconduct complaints and allegations against deputies.

Since February 2017, both open and closed cases have been viewable by supervisors.  PSB controls the ability to view open cases based upon the parties who may be involved.  PSB personnel developed a protocol to write the summaries for both open and closed cases that appear in the EIS.  This protocol has been approved, and was incorporated into the PSB Operations Manual that was published on December 13, 2018.  Each month, we receive a spreadsheet of open and closed external complaints as they appear in EI Pro for supervisors to review.  Our examination of these descriptions for January through March found that these summaries meet our expectations.  Additionally, during all site visits between 2017 and January 2020, we observed that field supervisors could easily access these summaries and understand the types of issues involved in the complaints.  Supervisors conducting alert investigations have also routinely referred to a review of complaint summaries as a portion of their investigative process.

WAI 56357

Supervisors are also advised that they can always contact EIU and PSB for clarification if it is necessary.

MCSO is in compliance with this Subparagraph.

Paragraph 75.b. requires that the database include "all internal investigations of alleged or suspected misconduct."

Corresponding to the discussion above involving external complaints, internal investigation summaries also appear in the IAPro system. All complaint summaries, open and closed, have been viewable since February 2017. PSB uses a standard protocol to develop the case summaries and access limits. We approved this protocol, and it is included in the PSB Operations Manual. Each month, we receive a spreadsheet of internal allegations as they appear to supervisors in EIS. Our review of the summaries for January to March found these summaries to be transparent and easily understandable. During our past site visits, we have found that line supervisors are also able to easily access the summaries of open and closed internal investigations pertaining to their subordinates. Supervisors also have referred to these summary fields while conducting alert investigations. Field supervisors always have the option of requesting additional information from EIU and PSB should they deem the summaries insufficient.

MCSO is in compliance with this Subparagraph.

Paragraph 75.c. requires that the database include "data compiled under the traffic stop data collection and the patrol data collection mechanisms."

MCSO has created electronic forms to collect data from traffic stops, incidental contacts and warnings.

MCSO has also created interfaces with EIS for remote databases including Incident Reports (IRs) and Non-Traffic Contact Forms (NTCFs). These reports are readily available to supervisors to review within EIS. Field supervisors have shown that they have the ability to view IRs and NTCFs during our past site visits. AIU already conducts an inspection of IRs and has recently revised the methodology to improve and streamline the inspection process. We have suggested during our last several site visits that MCSO create a similar inspection for NTCFs, as well as propose an analytical strategy to examine whether any racial or ethnic inconsistencies may exist in the incidents documented on the NTCF. MCSO recently produced a brief proposal of the methods they would use to analyze NTCFs based upon these ongoing discussions. We, the Plaintiffs, and the Plaintiff-Intervenors provided comments on these proposals in early April 2020. Following several conference calls on both the forms and policy, EA-3 (Non-Traffic Contact), MCSO proposed an initial study that would only evaluate how the NTCF form and policy are being used across the agency. MCSO also proposes that following this review of the use of NTCFs, the agency would suggest an appropriate method to determine if disparities exist in the stops documented on these forms. MCSO has made available all investigative stop and field interview NTCFs each month. Our review of NTCFs for the current quarter did not find any issues of concern; however, a statistical methodology would allow a more comprehensive examination.

WAI 56358

This Paragraph requires that the data for such activities exists within EIS; however, Paragraphs 72, 81a., and 81b.vi. require an analysis of these stops. Therefore, while MCSO complies with this Subparagraph, MCSO will not attain compliance for the other Paragraphs until a method of analysis is approved.

MCSO is in compliance with this Subparagraph.

Paragraph 75.d. requires that the database include "all criminal proceedings initiated, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the County and/or its Deputies or agents, resulting from MCSO Patrol Operations or the actions of MCSO Patrol Operation Personnel."

MCSO's Legal Liaison Section receives and forwards this information to EIU for entry into the EIS database. Deputies self-report contacts they have with other agencies, and any two contacts within a rolling six-month period results in an alert requiring a supervisor to investigate. Supervisors have demonstrated the ability to access this information during our site visits. In addition, in one of the monthly production requests involving this Paragraph, we noted that during the January to March of 2020, there were 14 "notice of claim" incident type alerts; but none were sent to supervisors for further investigation. During April to June of the same year, we noted 67 "notice of claim" incident type alerts with three being sent to supervisors for investigation. During our July 2020 remote site visit, we requested clarification on these particular alerts through a document request. BIO command staff advised that they had recently discovered that there was a backlog of emails from the Legal Liaison Section regarding Notice of Claims. In October 2020, the EIU lieutenant noted that the backlog of Notice of Claims had been rectified and that new internal processes were adopted to ensure that such a backlog would not go undetected in the future. As this appears to have been a unique issue that MCSO responded to quickly, we have not removed MCSO from compliance with this Subparagraph.

MCSO is in compliance with this Subparagraph.

Paragraph 75.e. requires that the database include "all arrests."

Arrests may not always occur as a result of a traffic stop. MCSO, therefore, has placed into production an interface between EIS and the Jail Management System (JMS). This interface allows supervisors to easily access information regarding arrest that cannot be viewed through traffic data. During our site visits, supervisors have demonstrated the ability to access the IRs and related arrest information. The timeliness and sufficiency of that review is evaluated under Paragraph 93.

MCSO is in compliance with this Subparagraph.

Paragraph 75.f. requires that the database include "all arrests in which the arresting Deputy fails to articulate probable cause in the arrest report, or where an MCSO Supervisor, court or prosecutor later determines the arrest was not supported by probable cause to believe a crime had been committed, as required by law."

WAI 56359

Incident Reports (IRs) are housed in the TraCS (Traffic and Criminal Software) system. Supervisors must review and sign off on IRs for each deputy involving an arrest or detention of a suspect within 72 hours of the incident. Supervisors are also required to ensure that probable cause exists for each charge or arrest outlined within an IR. AIU additionally conducts an inspection of IRs to ensure that all policy requirements are met.

If a court or prosecutor decides not to prosecute a case, both the deputy and their immediate supervisor are notified. In 2019, MCSO created a new inspection that combined IR and County Attorney Turndown inspections. MCSO's intent is to catch instances of reasonable suspicion and probable cause issues earlier in the process. Other deficiencies result in BIO sending Action Forms to the appropriate District personnel. In the IR inspections from January to March, there were no cases returned by a County Attorney or local prosecutor due to a lack of articulation of reasonable suspicion/probable cause. During this reporting period, MCSO reported a compliance rate in excess of 98%, using the entire matrix of issues the agency employs to investigate IRs. We computed a slightly lower rate of 97.5% each month due to the inspector, noting a case each month in which a deputy did not include all elements necessary for a crime to be alleged, or did not adequately articulate probable cause in their report. None of these issues had been discovered by supervisory personnel previously. BIO sent Action Forms to the Districts for both the deficiencies in the original report and the supervisors who failed to find these deficiencies before signing off on the reports.

The inspections show that the data exist within EIS, even though the manner of computing compliance differs between us and MCSO.

MCSO remains in compliance with this Subparagraph.

Paragraph 75.g. requires that the database include "all arrests in which the individual was released from custody without formal charges being sought."

The ability to capture this information depends upon what actually occurred within the context of the interaction. If the suspect was taken into physical custody but released prior to booking, there would be a JMS record, as indicated in Subparagraph 75.e. above. Therefore, MCSO could use the interface described above to pull the relevant data elements into EIS. However, if the incident does not rise to the point of physical custody and detention, then it would likely yield an Incident Report, covered under Subparagraph 75.f. above or an Investigatory Stop under Subparagraph 75.h. to follow. The interfaces for IR and NTCF data became operational prior to July 1, 2017. The new inspection process referred to above will also capture elements useful for the evaluation of this Subparagraph.

MCSO is in compliance with this Subparagraph.

Paragraph 75.h. requires that the database include "all Investigatory Stops, detentions, and/or searches, including those found by the Monitor, an MCSO supervisor, court or prosecutor to be unsupported by reasonable suspicion of/or probable cause to believe a crime had been committed, as required by law."

WAI 56360

MCSO has created interfaces for both IRs and NTCFs. As noted in 75.f., our inspection of IRs for January through March revealed a compliance rate over 97.5%. AIU sends BIO Action Forms (BAFs) to Districts with deficiencies. In addition, BIO is working on a separate inspection to track repetitive BAFs received by individuals and Districts.

In July 2017, the interface between EIS and the database for NTCFs was placed into production. MCSO also reissued EA-3 (Non-Traffic Contact) and amended the policy on June 14, 2018 (and further amended it on June 28, 2019). This policy specifies the responsibility of MCSO personnel regarding different types of search occurrences. If the search is related to a traffic stop, it should be captured on the VSCF. Searches occurring within activities resulting in an Incident Report will be captured under Subparagraph 75.e., and NTCF searches fall under this Subparagraph.

Initially, the number of NTCF reports was insignificant; however, since May 2018, we generally receive between 15-25 NTCFs for investigative stops each month. These are all captured within EIS as required by this Subparagraph (as well as 75.c.). During the last quarter of 2019, we also requested a random sample of Field Information stops that were documented using the NTCF. Our review of these indicated that approximately 80% of civilian stops labeled as Field Information could easily have been labeled as Investigative stops. We apprised MCSO of our findings and have subsequently provided MCSO with our summary evaluation. We have also suggested that MCSO develop a methodology to statistically analyze the collection of NTCFs to look for possible issues of racial or ethnic bias in the way these interactions are conducted. The development of a statistical examination of NTCF stops should be a priority for MCSO once the Traffic Stop Methodologies for the Monthly Analyses are complete. Such an examination is required by Paragraphs 72 and 81.b.vi. MCSO has drafted an initial proposal for the evaluation of how NTCF forms and policy are being used across the agency. We and the Parties have provided extensive comments and will continue to work with MCSO on these issues. Subsequent to this review, MCSO plans to modify, where appropriate, both the policy and forms related to NTCFs; and will undertake a process to ensure that any potential indications of bias are discovered. Since NTCFs and IRs are included in EIS, MCSO is in compliance with this Subparagraph. Our review of investigative stops and field interviews during this quarter yielded no issues of concern.

MCSO is in compliance with this Subparagraph.

Paragraph 75.i. requires that the database include "all instances in which MCSO is informed by a prosecuting authority or a court that a decision to decline prosecution or to dismiss charges, and if available, the reason for such decision."

WAI 56361

The EIS database has included both County Attorney Actions and an interface with the Justice Courts (AOC) since July 2017. MCSO began using a new method that merged the County Attorney Turndown Inspection with the IR inspection. The first inspection was produced in August 2019 using July data. For January-March, our computed compliance rates for the IRs exceeded 97.5%. For this period, the IR inspection did not include any County Attorney Turndowns, as none were received indicating a problem with probable cause. AIU sent several BIO Action Forms to the Districts for review due to the deficiencies found by the inspectors. For this Subparagraph, we also receive a random selection of IRs turned down for prosecution from MCSO and the Justice Courts. Our review of these indicate that most had been turned down using the generic phrases "no reasonable likelihood of conviction" or "dismissed to aide in prosecution." We found no other significant problems with the reports reviewed. We will continue to evaluate the inspection and IRs in future quarterly status reports.

MCSO is in compliance with this Subparagraph.

Paragraph 75.j. requires that the database include "all disciplinary action taken against employees."

MCSO currently tracks disciplinary actions in the IAPro system, which allows supervisors to search the history of their employees in EIS.

AIU produces a monthly alert inspection report relevant to Paragraphs 70, 71, 75, and 81. The possible outcomes from these alert investigations range from no further action to referral to PSB. In the alert inspection reports from January-March, there were 26 instances where cases were referred to PSB rather than to supervisors for investigation. Additionally, the Administrative Services Division replies to a monthly request that incorporates this Subparagraph; and the Division's report indicates that no discipline was imposed for bias related incidents between January through March 2021.

MCSO is in compliance with this Subparagraph.

Paragraph 75.k. requires that the database include "all non-disciplinary corrective action required of employees."

MCSO produces a Supervisory Note inspection (in particular, bimonthly reviews of a deputy's performance) and the monthly alert report described in the previous Subparagraph to fulfill the requirements for this Subparagraph. In addition, we also review 15 randomly chosen closed alert inspections conducted by supervisors each month. As noted previously, the majority of cases are closed through a meeting with a supervisor.

Supervisors also are required to make two comments regarding their subordinates each month in their BlueTeam Notes. In the Supervisory Notes inspections for January-March, there were no instances where supervisors were found deficient.

MCSO is in compliance with this Subparagraph.

Paragraph 75.l. requires that the database include "all awards and commendations received by employees."

WAI 56362

MCSO first published GC-13 (Awards) on November 30, 2017, and most recently reviewed this policy on December 7, 2020. With this publication, MCSO created categories for awards or commendations that could be tracked within the EIS database. With the introduction of the newest version of EIPro, these fields are also searchable by supervisors. During our past site visits, supervisors demonstrated how they could search these fields and locate awards of their subordinates' in the EIS data. According to the monthly alert inspection reports for January through March, there were no commendations recommended by supervisors.

MCSO is in compliance with this Subparagraph.

Paragraph 75.m. requires that the database include the "[t]raining history for each employee."

MCSO has transitioned from the Skills Manager System to the Cornerstone (the HUB) software program. The HUB has replaced the E-Policy and E-Learning programs. The HUB routinely updates recent training and policy reviews for deputies and is visible by immediate supervisors. MCSO also created an interface between the HUB and EIS.

During our past site visits, all field supervisors who we contacted stated that they were familiar with the HUB and were able to access the information contained therein. Several supervisors noted how they assigned training to particular deputies following alert investigations they completed. In addition, during our regular conference calls regarding TSMR methodology, we have placed particular importance on the development of comprehensive supervisor training that would ensure that they will be able to comprehend and interpret the statistical data produced each month in a way that would promote a transparent intervention process. MCSO personnel have assured us that supervisors have ready access to the training and policy reviews of their subordinates. We will continue to evaluate supervisors' ability to easily search and use EIS during future site visits. As noted above, this will include not only a review with EIU technical staff but field supervisors at the Districts when we resume our in-person site visits.

MCSO is in compliance with this Subparagraph.

Paragraph 75.n. requires that the database include "bi-monthly Supervisory observations of each employee."

The Audits and Inspections Unit (AIU) conducts a monthly inspection of Supervisory Notes. One of the indicators AIU evaluates is whether supervisors are making two notes per deputy each month. For January through March, AIU reported no instances where supervisors failed to make two reviews for each of their subordinates.

MCSO is in compliance with this Subparagraph.

With the operationalization of interfaces for Incident Reports, Non-Traffic Contact Forms, the Arizona Office of the Courts, and the HUB, EIS now contains the information required by the Order. MCSO has worked diligently to use some of the data above to investigate compliance rates with the Orders. MCSO continues to develop other inspections or data analytic methods in response to our suggestions. During our regular conference calls with MCSO, Plaintiffs, and Plaintiff-Intervenors, we have continued to clarify how MCSO uses the data being collected and recommended ways it might gain further transparency in the ways it analyzes and presents information gleaned from these analyses.

WAI 56363

***Paragraph 76.*** *The EIS shall include appropriate identifying information for each involved Deputy (i.e., name, badge number, shift and Supervisor) and civilian (e.g., race and/or ethnicity).*

**In Full and Effective Compliance**

MCSO has instituted a quality check process for Vehicle Stop Contact Forms (VSCFs) that requires supervisors to review all traffic stop documents within three days of the stop. AIU also conducts an inspection of the timeliness of these reviews as well as a second inspection on Traffic Stop Data. The Traffic Stop Data inspection employs a matrix that ensures that the name, serial number, and unit of the deputy is included on the VSCF in addition to the identity and race/ethnicity of the driver. While the overall rate of compliance for the Traffic Stop Data inspections at times has fallen below the standard of 94%, the monthly matrix information showed that none of the deficiencies had to do with identification of deputies or drivers. In the most recent quarter the Traffic Stop Data Inspection also showed compliance rates above 99%.

MCSO has incorporated patrol data into the EIS through the creation of interfaces for Incident Report (IR) and Non-Traffic Contact Form (NTCF) documents. Each of these documents lists the required name of the deputy and civilian, as well as the ethnicity of the civilian, in accordance with this Paragraph. AIU conducts an inspection of IRs, including a check for racial/ethnic bias in the reporting documents and the identification of all parties contacted as a result of the incident. We have found no recent instances where the identify of a deputy or persons contacted was not included on these forms. Non-Traffic Contact Forms contain the same basic information about the identity of the deputy making the contact and the persons being contacted. While MCSO does not yet have an inspection of NTCFs, they do provide us with copies of all the documents for investigative stops and field information. Up to this point, we have not found a repetitive problem with NTCF documentation that includes the criteria required by this Paragraph.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

***Paragraph 77.*** *MCSO shall maintain computer hardware, including servers, terminals and other necessary equipment, in sufficient amount and in good working order to permit personnel, including Supervisors and commanders, ready and secure access to the EIS system to permit timely input and review of EIS data as necessary to comply with the requirements of this Order.*

**In Full and Effective Compliance**

Since our earliest site visits in 2014, we have addressed the issue of "necessary equipment, in sufficient amount and in good working order" with MCSO. As part of our monthly document requests, we receive an accounting, by District, of how many vehicles have functioning TraCS systems.

WAI 56364

Since the end of 2015, we have found that all marked patrol vehicles were properly equipped with TraCS equipment. MCSO developed EB-2 (Traffic Stop Data Collection), which states that in the event that a TraCS vehicle is not operational, or available, each District possesses the necessary equipment at the substation for deputies to input his/her traffic stop information before the end of the shift. Due to the mountainous regions throughout Maricopa County, there have always been connectivity issues. However, these areas are well-known to Patrol deputies; and they have demonstrated how they adapt to connectivity problems. The VSCF also allows deputies to note issues with technology on a traffic stop.

During our past visits to the Districts, we regularly spot-checked the facilities and patrol cars; and found that they had functioning TraCS equipment, and that each District office had available computers for any occurrence of system failures with vehicle equipment. We have been unable to conduct these inspections since January 2020 as a result of holding our site visits remotely; however, we will conduct these reviews when we resume in-person site visits.

At present, the technology and equipment available at MCSO meet the requirements of the Order.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

We will continue to conduct our spot inspections at the Districts, and MCSO will apprise us of any event that falls within the scope of this Paragraph.


***Paragraph 78.*** *MCSO shall maintain all personally identifiable information about a Deputy included in the EIS for at least five years following the Deputy's separation from the agency. Information necessary for aggregate statistical analysis will be maintained indefinitely in the EIS. On an ongoing basis, MCSO shall enter information into the EIS in a timely, accurate, and complete manner, and shall maintain the data in a secure and confidential manner. No individual within MCSO shall have access to individually identifiable information that is maintained only within EIS and is about a deputy not within that individual's direct command, except as necessary for investigative, technological, or auditing purposes.*

**In Full and Effective Compliance**

GH-5 (Early Identification System) clearly states that employees only have access to EIS in furtherance of the performance of their duties, and that any other unauthorized access will be addressed under MCSO's discipline policy. The policy also notes that access to individual deputy information will be limited to appropriate supervisory/administrative personnel of that deputy. In addition, the policy states that personal information will be maintained in the database for at least five years following an employee's separation from the agency; however, all other information will be retained in EIS indefinitely.

The most recent occurrences of a substantiated misuse of MCSO's computer system occurred in 2011 and 2015. As a result, MCSO published a System Log Audit operating procedure in November 2017 that required PSB to notify the Technology Management Bureau of any investigations involving a system breach. We fully vetted this operating procedure (BAS SOP

WAI 56365

17-4) during our January 2018 site visit. MCSO reported no system breaches occurring since our January 2020 site visit. In addition, we receive summaries of all internal investigations each month. In March 2019, one case indicated that a deputy was under investigation for potentially misusing the Arizona Criminal Justice Information System (ACJIS); and in another, it was alleged that booking information might have been used for social media. In April 2020, there was an external complaint that a deputy may have run a criminal history check on someone for a relative. These cases have not triggered the operating procedure noted above, according to MCSO during our recent remote site visit meetings, because PSB has not yet completed its investigations, or they have found nothing to substantiate the original claims.

MCSO's concern for the integrity of information in EIS is further exemplified by the protocols that PSB has created to meet the requirements of Subparagraphs 75.a. and 75.b. regarding purview of open complaints and internal investigations. PSB not only controls who can view summaries of open investigations, but has created a protocol for creating the summary of open investigations to protect the integrity of the case while it is being processed.

MCSO has also created a work group to ensure the integrity of traffic stop data used for analysis. The protocols used by this work group are incorporated into Section 306 of the EIU Operations Manual. We have approved this section, and it has been incorporated into the manual as finalized.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.


**Paragraph 79.** *The EIS computer program and computer hardware will be operational, fully implemented, and be used in accordance with policies and protocols that incorporate the requirements of this Order within one year of the Effective Date. Prior to full implementation of the new EIS, MCSO will continue to use existing databases and resources to the fullest extent possible, to identify patterns of conduct by employees or groups of Deputies.*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on March 3, 2021.

**Phase 2:** Not in compliance

The employment of the EIS database remains limited as MCSO has not yet completed and published the results of new methodologies for the Traffic Stop Monthly Report (TSMR). In addition, during our last several (in-person and remote) site visits, we have also recommended to MCSO that the agency needs to create an analytical plan for the Non-Traffic Contact Forms that have accumulated over the past several years. Until these are complete and operational, MCSO will not achieve Phase 2 compliance with this Paragraph. We and the Parties continue to work with MCSO to complete each of these analytic reports.

MCSO published the Fifth Traffic Stop Annual Report (TSAR), which is discussed in other Paragraphs. Although the report concludes that systemic bias in patrol functions through traffic stop outcomes does appear to exist, they have not yet shown a trend of improvement/decline in

WAI 56366

the level of potential bias. MCSO is developing a plan to ensure that subsequent TSARs are able to track trends in the level of potential bias/disparity found in traffic stop outcomes. A recent Traffic Stop Quarterly Report (TSQR) proposal included the means by which MCSO would investigate and evaluate the success of such trend analyses. We will provide of summary of this when it is produced.

MCSO's plan for the analysis of monthly traffic data also stems from the foundation created by the more recent Fourth and Fifth TSARs. MCSO is currently initiating a pilot analyses to ensure that the new methodologies meet the requirements of the Order. MCSO has also proposed an initial method to analyze NTCFs, but these plans remain in a preliminary stage. We will comment on the TSMR pilot processes as they progress in future quarterly reports.

In the meantime, EIU and AIU pull together data to produce reports and inspections of both deputy and supervisor activity. The EIS automatically triggers alerts for repetitive actions, such as receiving multiple BIO Action Forms or external complaints. However, for the past two years BIO has been reevaluating the threshold levels that trigger several of these alerts and, in some instances, suspended them during this period. The EIU uses this information to create monthly reports and to determine whether an investigation by a supervisor is required. AIU has most recently published a new inspection on EIS Alert Processes to ensure that alert investigations are conducted within policy timeframes and to summarize the manner in which investigations were closed. The compliance rate for the EIS Alert Inspection for this reporting period ranges from 87% in March to 100% in both January and February. This represents improvement from the widely varying compliance rates in past quarters, but is still below the threshold that is expected. MCSO is developing an extension of this inspection to include an evaluation of the effect of interventions that supervisors recommend and implement. This final component to the inspection is crucial for compliance with other Paragraphs.

AIU also uses the EIS database to generate numerous inspections of traffic stop data, Supervisory Notes, and Incident Report inspections, among many others. When deficiencies are found, AIU sends out BIO Action Forms to the District command to rectify the situation and memorialize what actions are taken. These inspections are crucial to evaluate compliance with several Paragraphs in the Order. AIU has already automated an alert threshold for repeated Action Forms for the same types of events. An initial investigation of repetitive Action Forms in 2019 showed that a small number of deputies receive three or more Action Forms, while the vast majority of deputies receive only one Action Form. However, since that time BIO has been working to implement a less cumbersome process that could be produced twice each year. The BIO Captain has kept us regularly informed on the progress for this audit and submitted a proposal that we returned with additional feedback. The goal of this inspection is to track deficiencies by Districts, shifts, and squads to focus corrective measures in the most beneficial way. We will continue to review refinements to MCSO's proposal as they are made available.

WAI 56367

### b. Training on the EIS

***Paragraph 80.*** *MCSO will provide education and training to all employees, including Deputies, Supervisors and commanders regarding EIS prior to its implementation as appropriate to facilitate proper understanding and use of the system. MCSO Supervisors shall be trained in and required to use EIS to ensure that each Supervisor has a complete and current understanding of the employees under the Supervisor's command. Commanders and Supervisors shall be educated and trained in evaluating and making appropriate comparisons in order to identify any significant individual or group patterns. Following the initial implementation of the EIS, and as experience and the availability of new technology may warrant, MCSO may propose to add, subtract, or modify data tables and fields, modify the list of documents scanned or electronically attached, and add, subtract, or modify standardized reports and queries. MCSO shall submit all such proposals for review by the Monitor pursuant to the process described in Section IV.*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on March 3, 2021.

**Phase 2:** In compliance

MCSO's curriculum for Supervisor Responsibilities: Effective Law Enforcement (SRELE) regularly includes a refresher and updates for supervisors regarding how to most effectively use EIS tools and complete Alert Investigations for their subordinates within policy guidelines. MCSO is also modifying the Traffic Stop Monthly Report (TSMR) analysis and participating in regular conference calls with us and the Parties. A significant portion of these discussions revolve around how to effectively train supervisors to use the TSMR process in the furtherance of their supervisory duties and in accordance with the Court Order. Additionally, MCSO recently published the first three Traffic Stop Quarterly Reports (TSQRs). The conclusions and recommendations of each of these reports could prove useful for the continued refinement of supervisory training conducted by MCSO. We will continue to assist MCSO as it formulates training curriculum to enhance the supervisory functions of the Office.

### c. Protocol for Agency and Supervisory Use of the EIS

***Paragraph 81.*** *MCSO shall develop and implement a protocol for using the EIS and information obtained from it. The protocol for using the EIS shall address data storage, data retrieval, reporting, data analysis, pattern identification, identifying Deputies for intervention, Supervisory use, Supervisory/agency intervention, documentation and audit. Additional required protocol elements include:*

a.     *comparative data analysis, including peer group analysis, to identify patterns of activity by individual Deputies and groups of Deputies;*

b.     *identification of warning signs or other indicia of possible misconduct, including, but not necessarily limited to:*

      i.     *failure to follow any of the documentation requirements mandated pursuant to this Order;*

WAI 56368

ii.    *racial and ethnic disparities in the Deputy's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of Deputies' specific duties, or racial or ethnic disparities in traffic stop patterns when compared with data of a Deputy's peers;*

iii.    *evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;*

iv.    *a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;*

v.    *complaints by members of the public or other officers; and*

vi.    *other indications of racial or ethnic bias in the exercise of official duties;*

c.    *MCSO commander and Supervisor review, on a regular basis, but not less than bimonthly, of EIS reports regarding each officer under the commander or Supervisor's direct command and, at least quarterly, broader, pattern-based reports;*

d.    *a requirement that MCSO commanders and Supervisors initiate, implement, and assess the effectiveness of interventions for individual Deputies, Supervisors, and units, based on assessment of the information contained in the EIS;*

e.    *identification of a range of intervention options to facilitate an effective response to suspected or identified problems. In any cases where a Supervisor believes a Deputy may be engaging in racial profiling, unlawful detentions or arrests, or improper enforcement of Immigration-Related Laws or the early warning protocol is triggered, the MCSO shall notify the Monitor and Plaintiffs and take reasonable steps to investigate and closely monitor the situation, and take corrective action to remedy the issue. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or other supervised, monitored, and documented action plans and strategies designed to modify activity. All interventions will be documented in writing and entered into the automated system;*

f.    *a statement that the decision to order an intervention for an employee or group using EIS data shall include peer group analysis, including consideration of the nature of the employee's assignment, and not solely on the number or percentages of incidents in any category of information recorded in the EIS;*

g.    *a process for prompt review by MCSO commanders and Supervisors of the EIS records of all Deputies upon transfer to their supervision or command;*

h.    *an evaluation of whether MCSO commanders and Supervisors are appropriately using the EIS to enhance effective and ethical policing and reduce risk; and*

WAI 56369

*i.*   *mechanisms to ensure monitored and secure access to the EIS to ensure the integrity, proper use, and appropriate confidentiality of the data.*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on March 3, 2021.

**Phase 2:** Not in compliance

MCSO produces a number of reports and inspections that are relevant for this Paragraph. Due to issues with EIS data, methods of analysis and a change in vendors, MCSO has not been able to reliably produce the Traffic Stop Monthly Report (TSMR) based upon the criteria outlined in Paragraph 67.

MCSO has published the Fourth and Fifth Traffic Stop Annual Reports (TSAR); however, the analysis from these reports addresses issues of potential systemic bias across the entire traffic patrol function and cannot be employed to address potential individual-level biased activity. The TSMR, which is currently undergoing a revision and pilot-testing, will assist MCSO and its supervisors in evaluating the activity of individual deputies with regard to traffic stops and examine any behaviors that might suggest biased activity. We will evaluate these processes and reports as they are made available in future quarterly reports.

MCSO has also published three TSQRs: the first, evaluated how supervisors review and document traffic stop activity of their subordinates; the second, surveyed supervisors involved in the Third TSAR interventions about their experience in that process; and the third examined how deputies employ the Extended Traffic Stop Indicators (ETSIs) on the Vehicle Stop Contact Form (VSCF). Each has yielded information that MCSO can use for the development of training, modification of policy and dissemination of resources to improve supervisory capabilities.

Paragraph 81.a. requires that MCSO's EIS protocols include "comparative data analysis, including peer group analysis, to identify patterns of activity by individual Deputies and groups of Deputies."

The EIU has conducted monthly and annual analyses looking for outliers that may indicate that an individual is behaving in a biased or unprofessional manner, in accordance with Paragraphs 65, 66, and 67. The TSMR has been suspended and under revision since April 2016. MCSO has proposed methodologies in consultation with its data analyses vendor. We and the Parties have had the opportunity during our site visits; and, most recently through regular conference calls, to ask questions and receive additional information. Most importantly, MCSO has created a method to match deputies, in the Annual and Monthly Reports, using personal and professional characteristics that are intended to go beyond previous strategies that were based upon the geographic location of traffic stops alone. These methods have been met with support from deputies across the organization during meetings between MCSO personnel and the data analysis vendor (CNA). MCSO is currently pilot-testing the TSMR methodology. Once the pilot process is complete, these methods will allow MCSO to identify those deputies whose traffic stop outcomes are significantly different from their peers.

WAI 56370

MCSO has published three TSQRs. As noted above, the outcomes and recommendations could promote change in several ways throughout MCSO; however, they were not conducted in a way to compare peer supervisors.

MCSO has also created an interface for Non-Traffic Contact Forms (NTCFs) to be available in the EIS database; however, MCSO has not yet begun to develop a methodology to investigate whether patterns of problematic behavior, action, or bias might be occurring in the stops these forms document. We have discussed these issues with MCSO during our site visit meetings since October 2018. We and the Parties have commented on preliminary materials provided by MCSO, and we will continue to work with MCSO to use these civilian contacts to their fullest potential. MCSO has proposed an initial review of how the forms and policy, EA-3 (Non-Traffic Contact), are currently being employed across the organization to create an appropriate statistical methodology that is responsive to the needs of the Order.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.b. requires that MCSO's EIS protocols include "identification of warning signs or other indicia of possible misconduct."

GH-5 (Early Identification System) provides significant direction for employees and supervisors alike to understand what type of behaviors will be viewed as problematic. As noted above, the intent of the TSMR is to identify deputies who might be engaged in biased activity regarding who they arrest, cite, warn, or search. MCSO has also been developing new methods for the TSMR.

MCSO is also revising the EIU Operations Manual, which will include sections on data protocols and the several analyses based upon the traffic stop and patrol data. The manual also includes thresholds for behavior ranging from failure to arrive on time for work to external complaints. BIO is examining these thresholds to determine why they were set at the present levels. This investigation may result in the modification of thresholds that have proven unproductive over the last several years. Additionally, MCSO is currently investigating threshold levels for the benchmarks for the TSMR outlined in Paragraph 67. As a result, the triggering of alerts for repetitive behavior exceeding several thresholds have been put on hold.

Finally, as noted in Subparagraph 81.a. and 81.b.vi, MCSO should utilize all patrol data to evaluate the behavior of deputies in comparison to their peers. While the volume of Non-Traffic Contact Forms (NTCFs) pales in comparison to traffic stops, there are enough accumulated forms for analyses to commence. As we noted in Paragraph 75, we had originally received all NTCFs for investigative stops each month. The volume ranges from 15-25 per month. In our review of these interactions, we have noted that they typically involve suspicious behavior, and violations of traffic laws while on bicycles or waterways. These violations are often concentrated in particular locations throughout the County that may make it more likely that minority members are contacted. We have suggested to MCSO that the agency create an analytic method to determine whether there may be trends in activity over time that may require closer examination to eliminate any possibility of bias. Since our July site visit in 2019, we also undertook an evaluation of a random sample of Field Information contacts captured on NTCFs. Our review found a large overlap between civilian contacts labeled as Field Information and those labeled as Investigative Stops. We have engaged MCSO in further discussions clarifying this distinction.

WAI 56371

Until such time as this is resolved, we will select a combined sample of NTCFs from both categories of civilian interaction. MCSO is currently proposing to investigate how the NTCF forms and policy are being used across the agency. This would be an important first step that could lead to a more thorough analysis looking for potential indications of bias across these stops. We and the Parties continue to engage in discussions with MCSO about these significant issues.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.c. requires that MCSO's EIS protocols include "MCSO Commander and Supervisor review, on a regular basis, but not less than bimonthly, of EIS reports regarding each officer under the Commander or Supervisor's direct command and, at least quarterly, broader, pattern-based reports."

Supervisory Note inspections include four measures to assess how well supervisors are using EIS information to oversee the activity and behavior of their subordinates: making supervisory comments on deputies; reviewing their body-worn camera footage; making Employee Performance Appraisal (EPA) notations; and reviewing subordinates' EIS profiles. The overall compliance rate from January to March was 100% each month. When deficiencies are found AIU sends out BIO Action Forms to those Districts, no matter the level of compliance. We have also repeatedly requested additional information from MCSO when we encounter an issue of concern and MCSO has always willingly provided the needed information or additional data. Rarely have we noted deficiencies involving the same supervisors in consecutive months. MCSO has already included repetitive BIO Action Form (BAF) deficiencies as an alert allegation. AIU has developed and presented a proposal to better track BAFs by type, individual, and District to ensure that any corrective actions are targeted at the most appropriate level and to be able to determine if there are particular supervisors that appear repeatedly within specified timeframes. It is important to note that in our review of 15 randomly selected alert investigations each month, we have noticed an increase in investigations due to repetitive BAFs. In that vein, MCSO has produced a revised proposal, in December 2020, for the tracking of BAFs. We have evaluated this proposal and returned it to MCSO. We will continue to report on the development of this proposal as it is made available.

MCSO is in compliance with this Subparagraph.

Paragraph 81.d. requires that MCSO's EIS protocols include "a requirement that MCSO Commanders and Supervisors initiate, implement and assess the effectiveness of interventions for individual Deputies, Supervisors, and units, based on assessment of the information contained in the EIS."

The EIS database generates alerts for issues ranging from data entry errors to internal and external complaints; however, many of the potential ongoing alerts are dependent upon the revision of alert thresholds which continue to undergo evaluation by MCSO. From these alerts, EIU personnel send out for investigation those alerts that are not redundant or mischaracterized in some fashion. Supervisors have a set amount of time to return these investigations with a description of their investigation and the outcome. MCSO has created an EIS Alert Review Group (ARG) that evaluates the investigations of supervisors prior to closing an alert. The group ensures that the reports of the supervisors address all aspects of the assigned investigation, and returns

WAI 56372

those that are deficient to the District for continued revision. Following the creation of the ARG, we have found the supervisors' investigations and summaries to be more complete and thorough. Over time, the review group's request for additional information has dropped below one third of the investigations evaluated. MCSO has provided us with the original alert investigation documents (Attachment B of GH-5 [Early Identification System]), as well as modified ones arising from the ARG's requests. AIU has also created a new inspection for EIS Alert Review Processes. This inspection initially determines whether the investigation was completed within policy timeframes of 30 days. The compliance rate for this quarter ranges from 87% in March, to 100% in January and February. BIO sent Action Forms to the Districts where supervisors did not complete their investigations within policy guidelines.

MCSO is working to also ascertain whether the interventions undertaken are successful. We will continue to engage MCSO in this evaluation process in accordance with this and other Paragraphs. At present, there is no mechanism in place to adequately judge the effect of interventions. A portion of the TSMR process also includes an evaluation of the success of interventions. These discussions are ongoing and will be discussed in future quarterly reports as they are finalized and placed into production.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.e. requires MCSO's EIS protocols to include "identification of a range of intervention options to facilitate an effective response to suspected or identified problems. In any case where a Supervisor believes a Deputy may be engaging in racial profiling, unlawful detentions or arrests, or improper enforcement of Immigration-Related Laws or the early warning protocol is triggered, MCSO shall notify the Monitor and Plaintiffs and take reasonable steps to investigate and closely monitor the situation, and take corrective action to remedy the issue. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or other supervised, monitored, and documented action plans and strategies designed to modify activity. All interventions will be documented in writing and entered into the automated system."

GC-17 (Employee Disciplinary Procedures) and GH-5 (Early Identification System) provide a wide range of options for supervisor interventions, as well as practical guidelines about how to employ those options. As noted above, GH-5 includes Attachment B, "Early Identification Alert Response Form." This form specifies the responsibility of supervisors and serves as a checklist of processes the supervisor should use. EIU also attaches any documents, citations, or BWC recordings the supervisor might need to conduct an inquiry. We began observing the use of these forms in April 2017. Over the past six months, we have found that alert investigations conducted by supervisors has improved. Our inquiries for additional information typically revolve around alert investigations that have been closed as a result of simultaneous PSB inquiries, which take precedent, and/or updates on training recommended by District and EIU personnel.

WAI 56373

MCSO has also created an EIS Alert Review Group (ARG) to ensure that the closure of alerts is supported by documentation from supervisors and responsive to the needs of the organization. We have also worked with MCSO to propose an extension of alert investigation timeframes when documentation issues delay the process. During the last quarter, our review of alert closures indicated one investigation involving a request for an extension that was granted, and two that failed to meet policy timelines where no extension was requested. We will continue to evaluate these documents as they are produced.

MCSO is in compliance with this Subparagraph.

Paragraph 81.f. requires that MCSO's EIS protocols include "a statement that the decision to order an intervention for an employee or group using EIS data shall include peer group analysis, including consideration of the nature of the employee's assignment, and not solely on the number or percentages of incidents in any category of information recorded in the EIS."

In the development of GH-5 (Early Identification System), MCSO has taken into consideration the nature of the employee's assignment. In prior versions of GH-5, MCSO created an appendix for thresholds that indicated, for example, that the "use of force" threshold was different for Detention and Patrol personnel. Detention personnel are much more likely to need to employ force than their Patrol counterparts. In the current version of GH-5, MCSO refers to thresholds that will be included in the EIU Operations Manual; however, MCSO has been evaluating the threshold limits to ensure that they are achieving the goals for which they were originally set for nearly two years. As part of the reevaluation process, MCSO is communicating with other local law enforcement agencies to collect information about current best practices regarding thresholds they employ. As a result, EIU personnel are more closely overseeing repetitive behaviors and have not initiated alert investigations for some threshold levels. When MCSO produces a new threshold appendix, we will evaluate it with regard to this and other portions of the Order.

MCSO and its data analysis vendor proposed and employed an expansion of "peer" comparisons beyond just the location of the traffic stop in the Fourth TSAR. MCSO matched deputies based upon personal and professional characteristics. During the analysis conducted for the Fourth TSAR, a statistical problem arose as the result of these matching characteristics. MCSO overcame this problem, and there were no additional indications of problems in the Fifth TSAR. MCSO is in the midst of initiating the pilot-testing for the TSMR using these new peer comparison strategies. MCSO will remain out of compliance with this Subparagraph until the TSMR is produced, evaluated, and implemented throughout the organization.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.g. requires that MCSO's EIS protocols include "a process for prompt review by MCSO Commanders and Supervisors of the EIS records of all Deputies upon transfer to their supervision or command."

MCSO has noted the need for a prompt review in both the "Supervisor Responsibilities" and "Command Staff Responsibilities" sections of GH-5 (Early Identification System). EIU specifically addressed this issue during the EIS and SRELE training completed in November 2017 and updated each year thereafter. EIU advised supervisors to document when they conducted their review in Supervisory Notes, as well as how long the deputy had been working in their chain

WAI 56374

of command when the review was conducted. As noted, this was also reiterated in the SRELE training that was approved on September 30, 2019. During our visits to several Districts in 2019 and 2020, MCSO personnel informed us that most command staff attempt to review these materials within the first few days that a deputy, or supervisor, moves to their District. In no cases have we found information where the 14-day limit outlined in policy has been problematic.

MCSO is in compliance with this Subparagraph.

Paragraph 81.h. requires that MCSO's EIS protocols include "an evaluation of whether MCSO Commanders and Supervisors are appropriately using the EIS to enhance effective and ethical policing and reduce risk."

EIU has improved the processing and tracking of alert investigations. The development of Attachment B to GH-5 (Early Identification System) and training completed in EIS and SRELE has dramatically improved the information provided by supervisors when closing alerts. AIU has also created a new EIS Alert Review Process inspection that specifically looks for indications that supervisors have conducted a thorough examination within appropriate policy timeframes and selected appropriate responses to the allegations included in the alert investigation. At present, this inspection is limited to reviewing whether supervisors are completing alert investigations within the 30-day policy requirements. MCSO's compliance rate for this inspection ranged from 100% in January and February, to 87% in March. MCSO continues to work on a secondary, but vital, feature of this inspection, which will include criteria to judge the success of interventions by identifying deputies and supervisors who trigger additional alerts. This inspection will become a valuable component to ensure that supervisors and command staff are using EIS to promote efficiency and ethical policing during the alert investigation process. We found no issues with the conclusions used for closing alert investigations during this quarter. For the cases that were not closed within policy guidelines, BIO sent out Action Forms to the Districts. As this process becomes more routine, we expect that District personnel will adjust to the policy requirements. MCSO has created a Post-Stop Perceived Ethnicity Inspection, which looks specifically at traffic stops where the driver has a traditionally Latino surname but the VSCF indicates a white driver. The inspectors review BWC recordings and evaluate whether the deputy correctly marked the form. Throughout this quarter, there were no traffic stops that were out of compliance.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.i. requires that MCSO's EIS protocols include "mechanisms to ensure monitored and secure access to the EIS to ensure the integrity, proper use, and appropriate confidentiality of the data."

MCSO has addressed the security and integrity of data in GH-5 (Early Identification System), as well as instituted facility inspections throughout the Districts – including the security of terminals, access to information, and mobile displays. We spot-check technology and security of old forms during each site visit and have found no problems to date. Additionally, on November 6, 2017, MCSO published the operating procedure for System Log Audit Requests; this became effective on November 30, 2017. The procedure outlines how PSB personnel will notify the Technology Management Bureau of any misuse of MCSO information systems allegations and request an audit of the suspected breach. We discussed this operating procedure, BAS SOP 17-4, during our

WAI 56375

January 2018 site visit meetings; it meets all of the concerns voiced since the February 2017 discovery of two cases where data was compromised, but no one notified the Technology Management Bureau. We believe this procedure has proven effective to this point. In addition, we are provided all internal investigation summaries initiated each month; and found only three instances in which an employee was accused of misusing ACJIS and booking information. Two of these complaints are still under investigation by PSB, or being reviewed by MCSO Administration. In addition, we have approved the claim of Full and Effective Compliance with Paragraph 78 above. Nonetheless, we will continue to evaluate the effectiveness of MCSO's attention to data integrity.

MCSO is in compliance with this Subparagraph.

MCSO meets some of the requirements of Paragraph 81, but there remain a variety of activities that are currently ongoing that need to be completed before MCSO will be compliant. These range from the finalization of methods for the TSMR to the completion of revisions to the EIU Operations Manual. AIU has improved the tracking of alert investigations with the creation of the EIS Alert Review Process Inspection; and initiated a preliminary analysis of BIO Action Form tracking. However, each of these is limited because the EIS inspection does not evaluate the success of interventions; and without an inspection of BAFs over time, MCSO may not be adequately responding to repeated behavior that is difficult to detect with current methods. We have also requested that MCSO devise an audit for the NTCFs that have accumulated over the past several years. We and the Parties remain concerned that we have not noted many instances where supervisors proactively intervene with their subordinates; rather, the supervisors wait until prompted by EIS Alerts or the ARG review of completed alert investigations. Command staff have taken a more active role in evaluating the work of supervisors as evidenced by the number of alert investigations returned to supervisors for revision or additional inquiry. MCSO has proposed initiating an evaluation of accumulated NTCFs to examine how the forms and policy are currently being used across the agency. We have provided feedback to this proposal and will evaluate the progression of this methodology as it becomes available. To comply with this and other Paragraphs, however, the methods would also have to be able to statistically indicate whether potential bias might be occurring with regard to how different ethnicities and races are being selected and treated during these encounters. We will continue to evaluate MCSO's progress toward the goals outlined in this Paragraph.

WAI 56376

# Section 9: Supervision and Evaluation of Officer Performance

**COURT ORDER X. SUPERVISION AND EVALUATIONS OF OFFICER PERFORMANCE**

***Paragraph 82.*** *MCSO and the County shall ensure that an adequate number of qualified first-line Supervisors are available to provide the effective supervision necessary to ensure that Deputies are following the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order. First-line Supervisors shall ensure that Deputies are policing actively and effectively, are provided with the instruction necessary to correct mistakes, and are held accountable for misconduct. To achieve these outcomes, MCSO shall undertake the following duties and measures:*

***Paragraph 83.*** *MCSO Supervisors shall provide the effective supervision necessary to direct and guide Deputies. Effective supervision requires that Supervisors: respond to the scene of certain arrests; review each field interview card and incident report; confirm the accuracy and completeness of Deputies' daily activity reports; respond to each Complaint of misconduct; ensure Deputies are working actively to engage the community and increase public trust and safety; provide counseling, redirection, support to Deputies as needed, and are held accountable for performing each of these duties.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on May 28, 2021.

**Phase 2:** In compliance

Due to ongoing COVID-19 concerns, we conducted our April 2021 site visit remotely. Therefore, we did not conduct any District visits for this assessment. Our compliance findings for this reporting period are based on the review of documents submitted as proof of compliance.

We reviewed a sample of 87 Incident Reports for January for the randomly selected date of January 30. All 87 Incident Reports were reviewed and memorialized by a supervisor within the required timeframes. All of the 10 Arrest Reports received were reviewed and approved by supervisors within the required 72 hours. There were 15 Vehicle Crash Reports submitted in the sample for January, of which all included timely documentation of supervisory review. We reviewed a 10% sample of the reports for January, for quality. We found one sexual assault report with a narrative that was fragmented and skipped from one topic to another without proper explanation. Considering the seriousness of the allegations, this report should have been reviewed more carefully by the approving supervisor. This appeared to be an exception, as most reports we reviewed were reasonably well-written. In total, 86 of 87 reports were in compliance, for a compliance rate of 98.85%. For January, MCSO reported 451 hours of community policing. From our reviews of all seven of the community policing worksheets submitted for the month, Patrol deputies documented 6.76 hours of community policing, with 70 persons in attendance.

WAI 56377

We reviewed a sample of 27 deputy Patrol Activity Logs for January; there were two documented community policing activities recorded by Patrol deputies.

We reviewed a representative sample of 94 Incident Reports for February, for the randomly selected date of February 20. Of the 94 Incident Reports, all had proper documentation of timely supervisory review. Of the 94 Incident Reports, 14 were vehicle collisions, and all had documentation of supervisory review and approval. The compliance rate for timely supervisory review of Incident Reports in February was 100%. Supervisors reviewed and approved all 13 Arrest Reports within required timeframes. Our reviews for quality noted no issues with the sample of reports reviewed for February. For February, MCSO reported 568 hours of community policing. In our sample reviews of Patrol Activity Logs, we noted no community policing events reported by Patrol deputies. We reviewed all of the 11 community policing worksheets for February. Deputies reported a total of 7.08 hours of community policing, with 121 persons in attendance at community events. There was one community policing event reported in Aguila.

We reviewed a representative sample of 77 Incident Reports for March, for the randomly selected date of March 7. Seventy-five of the 77 Incident Reports included documentation that they had been reviewed and approved by supervisors as required by this Paragraph. One of the 10 arrest reports was not reviewed within the 72-hour required timeframe, and one of 14 vehicle crash reports had no documentation of supervisory review. The compliance rate for March was 97.40%. We conducted reviews for quality, examining a 10% sample of the total reports submitted for March. We found one report narrative where the deputy noted his personal feelings pertaining to the information provided by the person reporting the incident. This should be been identified and addressed by the reviewing supervisor. For March, MCSO reported 521 hours of community policing. In our reviews of Patrol Activity Log samples for March, we saw no community policing events reported by deputies. For March, we reviewed all 11 community policing worksheets generated for the month. Deputies reported 14.97 hours of community policing, with 725 attendees. The biggest event was an annual car show in Queen Creek with 500 reported in attendance. No events were reported in Aguila or Guadalupe.

For each month of the quarter, we selected a supervisor and a squad of deputies from each District. We requested several documents, including Patrol Activity Logs (PALs), for each deputy. We reviewed PALs for each month of the quarter to assess if deputies turned them in by the end of each shift, and if supervisors reviewed each PAL.

For January, we reviewed PALs for 27 deputies and six supervisors. All 27 deputies' Patrol Activity Logs contained documentation of supervisory review. All six supervisors' Patrol Activity Logs contained documentation of command-level review. For February, we reviewed Patrol Activity Logs for 27 deputies and seven supervisors. All 27 deputies' PALs contained documentation of supervisory review. All seven supervisors' PALs contained documentation of command-level review. For March, we reviewed Patrol Activity Logs for 28 deputies and eight supervisors. All 28 deputies' PALs contained documentation of supervisory review; all eight sergeants' PALs contained documentation of command-level review. Based on the review of PAL samples selected for January, on a daily basis, deputies completed an average of 0.93 Incident Reports, handled an average of 3.81 calls for service, completed an average of 1.96 self-initiated calls, and traveled an average of 92.37 miles. Based on the review of PAL samples

WAI 56378

selected for February, on a daily basis, deputies completed an average of 0.81 Incident Reports, handled an average of 4.29 calls for service, completed an average of 1.33 self-initiated calls, and traveled an average of 71.74 miles. Based on the review of PAL samples selected for March, on a daily basis, deputies completed an average of 0.82 Incident Reports, handled an average of 5.07 calls for service, completed an average of 1.5 self-initiated calls, and traveled an average of 82.17 miles.

We also reviewed deputies' and supervisors' PALs to determine if supervisors provided on-scene supervision, and if those supervisor-deputy contacts were documented. For the sample dates selected in January, there were 36 supervisor-deputy field contacts reported by deputies and supervisors. For the sample dates selected in February, there were 13 supervisor-deputy field contacts reported by deputies and supervisors. For the sample dates selected in March, there were 72 supervisor-deputy field contacts reported by deputies and supervisors.

For January, February, and March, we reviewed selected samples of non-traffic incidents involving stops and detentions, which were recorded on Non-Traffic Contact Forms (NTCFs). For January we selected 25 NTCFs for review. All 25 NTCFs had been submitted prior to the end of the shift. Twenty-four of the 25 NTCFs were reviewed and approved by supervisors within 72 hours, as required. The compliance rate for timely submission and timely supervisory review of NTCFs in January was 99%. For February, we selected all 23 NTCFs generated, to review. All 23 NTCFs had been submitted prior to the end of the shift. Twenty of the 23 NTCFs were reviewed and approved by supervisors within the required timeframe. The compliance rate for timely supervisory review of NTCFs in February was 86.96%. For March, we selected all 16 NTCFs generated, for review. All 16 NTCFs were submitted prior to the end of the shift, and all 16 NTCFs were reviewed and approved by supervisors within the required timeframe. The compliance rate for timely submission and timely supervisory review of NTCFs in March was 100%. For the first quarter of 2021, the compliance rate for timely submission and timely supervisory review of NTCFs was 93.75%. We assess compliance with this Paragraph, as it relates to NTCFs in conjunction with timely reviews of VSCFs, under Paragraph 90.

Our reviews for this reporting period revealed that in January, of the 25 NTCFs, 19 stops involved white individuals, with a total of 23 white individuals documented in these stops. Two NTCFs documented one Latino individual in each stop. Two NTCFs documented one Asian or Pacific Islander in each stop. There were no Black individuals involved in any of the stops. One of the incidents involved a traffic stop, which was appropriately documented in a VSCF. The deputy completed a NTCF for a passenger instead of an Incidental Contact Form. The reviewing supervisor appropriately identified the issue, discussed it with the deputy, and voided the erroneous form.

For February, we reviewed 23 NTCFs, of which 15 stops involved white individuals, with a total of 17 white individuals documented in these stops. Six NTCFs documented one Latino individual in each stop. Two stops involved Asian or Pacific Islanders, and one stop involved a Black individual.

WAI 56379

For March, we reviewed 16 NTFCs, of which eight stops involved white individuals, with a total of 14 White individuals documented in these stops. Four NTCFs documented one Latino individual in each stop. Two NTCFs documented one Black individual in each stop. One stop involved an Asian or Pacific Islander. White individuals were involved in 42 of the 64 stops, or 65.63%. Latino individuals were involved in 12 of the 64 stops, or 18.75%. Black individuals were involved in two of the 64 stops, or 3.1%. Asian or Pacific Islanders were involved in five of the 64 stops, or 7.8%.

**Paragraph 84.** *Within 120 days of the Effective Date, all patrol Deputies shall be assigned to a single, consistent, clearly identified Supervisor. First-line field Supervisors shall be assigned to supervise no more than twelve Deputies.*

## In Full and Effective Compliance

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the first quarter of 2021. For January, we reviewed a sample of shift rosters from Districts 1, 2, and 3. For February, we reviewed a sample of shift rosters from Districts 4, 6, and 7, and Lake Patrol. For March, we reviewed a sample of shift rosters from Districts 1, 2, and 3. Our reviews of monthly and daily rosters indicated that deputies were assigned to a single consistent supervisor, and deputies worked the same shifts as their supervisors.

For January, District 1 submitted 17 memos concerning span of control. We determined that in eight of the 17 documented instances, the span of control exceeded the 1:8 sworn ratio. For each of these shifts where the span of control was exceeded, supervisors wrote memorandums documenting the event. Districts 2 and 3 each submitted a span of control memorandum, indicating there was one shift during the month where the span of control was exceeded. For February, District 1 submitted one span of control memorandum, but upon review, we determined that the span of control for sworn was not exceeded. District 2 submitted eight span of control memos where the span of control exceeded the 1:8 sworn ratio. In each instance, supervisors documented the event in memorandums to their commanding officer. District 4 submitted two memorandums documenting two shifts during the month in which the span of control exceeded the 1:8 sworn ratio. For March, District 1 submitted one span of control memo documenting one shift in which the span of control was exceeded. District 2 submitted eight span of control memos, indicating that the span of control was exceeded during eight shifts of the month. District 4 submitted one memorandum documenting one shift during the month in which the span of control exceeded the 1:8 sworn ratio.

On September 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 56380

*Paragraph 85. First-line field Supervisors shall be required to discuss individually the stops made by each Deputy they supervise with the respective Deputies no less than one time per month in order to ensure compliance with this Order. This discussion should include, at a minimum, whether the Deputy detained any individuals stopped during the preceding month, the reason for any such detention, and a discussion of any stops that at any point involved any immigration issues.*

**In Full and Effective Compliance**

To assess MCSO's compliance with this Paragraph, we requested that MCSO provide copies of reports documenting that supervisors are meeting with and discussing individually the stops made by each deputy, at least once per month. We then requested documentation for one randomly selected supervisor from each District, for each month of the reporting period, and the squad of deputies who reports to that supervisor. Supervisors record the discussion of traffic stops by applying the "Discussed with Deputy" option. MCSO documents supervisor-deputy discussions in a spreadsheet, which it submits for inspection. The spreadsheet also documents timely supervisory review of VSCFs. In addition to the spreadsheet, MCSO submits all VSCFs for the month in review. We select a 10% random sample of VSCFs from each District to review for content. We also inspect the sample of VSCFs submitted for review of traffic stops under Paragraphs 25 and 54, as part of compliance with Paragraph 91, to verify if supervisors are addressing deficiencies in the documentation related to the stops.

Paragraph 85 requires that supervisors discuss traffic stops at least once per month with their deputies. To efficiently manage this requirement along with other administrative and operational duties, supervisors generally conduct several traffic stop-related discussions with each deputy during the month. Supervisor-deputy discussions of traffic stops that occurred toward the latter part of the month may not get reviewed until the following month. Our selections for these discussions change every month, so to obtain complete records for each deputy, MCSO holds the submission until all of the information requested for the month is complete. Accordingly, the documentation of supervisory-deputy discussions of traffic stops is submitted 30 days retroactively.

For January, MCSO submitted the December traffic stops for each deputy, by District. The total number of traffic stops for each District was: District 1, 32; District 2, 26; District 3, seven; District 4, seven; Lake Patrol, 122; District 6, 40; and District 7, 76. There were a total of 310 traffic-related events for all Districts, and sergeants discussed 309 of these events with the deputies who conducted them, for a compliance rate of 99.57%.

For February, MCSO submitted the January traffic stops for each deputy, by District. The total number of traffic stops for each District were: District 1, 46; District 2, five; District 3, two; District 4, one; Lake Patrol, 14; District 6, 19; and District 7, 96. There were a total of 183 traffic-related events for all Districts, and sergeants discussed all of these with the deputies that conducted them, for a compliance rate of 100%.

For March, MCSO submitted the February traffic stops for each deputy, by District. The total number of traffic stops for each District were: District 1, five; District 2, 21; District 3, 16; District 4, 10; Lake Patrol, 28; District 6, 39; and District 7, 19. There were a total of 138 traffic-related

WAI 56381

events for all Districts, and sergeants discussed all of these events with the deputies who conducted them, for a compliance rate of 100%. For this reporting period, there were a total of 631 traffic stops reported. We received documentation that supervisors discussed 630 of these stops with the deputies that conducted them. This is a compliance rate of 99.84%.

On October 5, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 86.** *On-duty field Supervisors shall be available throughout their shift to provide adequate on-scene field supervision to Deputies under their direct command and, as needed, to provide Supervisory assistance to other units. Supervisors shall be assigned to and shall actually work the same days and hours as the Deputies they are assigned to supervise, absent exceptional circumstances.*

**In Full and Effective Compliance**

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the first quarter of 2021. For January, we reviewed a sample of shift rosters from Districts 1, 2, and 3. For February, we reviewed a sample of shift rosters from Districts 4, 6, and 7, and Lake Patrol. For March, we reviewed a sample of shift rosters from Districts 1, 2, and 3. Our reviews of monthly and daily rosters indicated that deputies were assigned to and worked the same schedules as their supervisors, and supervisors were available to provide on-scene supervision.

MCSO deputies' and sergeants' activities are captured in Patrol Activity Logs (PALs). We selected a random sample of one day per month, and one squad per District, for review. For January, we reviewed PALs for six sergeants and 27 deputies. We noted a total of 36 field supervisor-deputy contacts between the combined deputies' and sergeants' PALs for the selected dates. For February, we requested PALs for 27 deputies and seven sergeants. We received and reviewed all requested PALs, and noted a total of 13 field supervisor-deputy contacts between the combined deputies' and sergeants' PALs for the selected dates. For March, we reviewed PALs for 28 deputies and eight sergeants. We noted a total of 72 field supervisor-deputy contacts between the combined deputies' and sergeants' PALs for the selected dates. We reviewed the monthly shift rosters for each month of the reporting period. Our reviews indicate that supervisors are assigned to work the same hours as the deputies under their supervision. Our reviews of Patrol Activity Logs indicate that supervisors have been available to provide on-scene supervision.

On October 5, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 56382

**Paragraph 87.** *MCSO shall hold Commanders and Supervisors directly accountable for the quality and effectiveness of their supervision, including whether commanders and Supervisors identify and effectively respond to misconduct, as part of their performance evaluations and through non-disciplinary corrective action, or through the initiation of formal investigation and the disciplinary process, as appropriate.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

- GC-17 (Employee Disciplinary Procedures), most recently amended on May 28, 2021.

**Phase 2:** Not in compliance

To assess MCSO's compliance with this Paragraph, we request the names of all deputies and supervisors whose performance appraisals were completed during the reporting period. From the lists of employees submitted, we request a representative sample. The selection of deputies and supervisors whose EPAs are requested is based on the number of requirements set forth in the First and Second Orders. There are a greater number of requirements that supervisory EPAs must address, therefore, a greater number of supervisors' EPAs are reviewed for compliance.

We requested and reviewed Employee Performance Appraisals submitted for four deputies and 11 supervisors whose EPAs were completed in January. All four deputy EPAs appropriately addressed each employee's performance for the period in review, and all were in compliance. All 11 supervisor EPAs rated the supervisors on the quality and effectiveness of their supervision. All 11 supervisor EPAs included comments related to the supervisors' ability to identify and respond to misconduct. All 11 supervisor EPAs addressed the requirements needed for compliance, as it pertains to quality of supervisory reviews. All 11 supervisor EPAs documented the required entries with regard to the quality of reviews of their subordinates' EIS profiles. All 11 supervisor EPAs assessed the supervisors' quality of misconduct investigations, as well as the quality of their reviews of internal investigations. In total, all of the 11 supervisor EPAs met Paragraph requirements. Fourteen of 15 EPAs addressed the requirements of Paragraph 99 with sufficient specificity, including complaint histories and the employees' dispositions, discipline, commendations, awards, civil and/or administrative claims, lawsuits, training history, assignment and rank history, supervisory actions, and EIS histories. One supervisor EPA failed to list a misconduct complaint opened during the evaluation period. This EPA was not in compliance with Paragraph 99, and is included in our assessment of compliance for that Paragraph. For January, including both deputy and supervisor EPAs, 15 of 15 EPAs, or 100% were in compliance with this Paragraph.

We requested and reviewed Employee Performance Appraisals submitted for five deputies and 10 supervisors whose performance evaluations were completed in February. All five deputy EPAs appropriately addressed each employee's performance; all were in compliance. With regard to our findings on supervisor EPAs, all 10 were rated on the quality and effectiveness of supervision. All 10 supervisor EPAs included comments on the supervisor's ability to identify and respond to misconduct. All 10 supervisor EPAs appropriately assessed the employees on the quality of their reviews. All 10 supervisor EPAs properly documented the required entries with regard to the quality of reviews of their subordinates' EIS profiles. All supervisor EPAs addressed

WAI 56383

the quality of misconduct investigations, as well as reviews of misconduct investigations. Fourteen of 15 EPAs addressed the requirements of Paragraph 99 with sufficient specificity, including complaint histories and the employees' dispositions, discipline, commendations, awards, civil and/or administrative claims, lawsuits, training history, assignment and rank history, supervisory actions, and EIS histories. One deputy EPA failed to list a misconduct complaint opened during the evaluation period. This EPA was not in compliance with Paragraph 99, and is included in our assessment of compliance for that Paragraph. All supervisor EPAs met Paragraph 87 requirements. For February, including both deputy and supervisor EPAs, 15 of 15 EPAs, or 100% were in compliance with this Paragraph.

We requested and reviewed Employee Performance Appraisals submitted for five deputies and 10 supervisors whose EPAs were completed in March. All deputy EPAs sufficiently addressed all required areas of assessment. Seven supervisor EPAs appropriately rated the employees on the quality and effectiveness of their supervision. One supervisor EPA had "yes" responses to several guide questions, in several rating dimensions, without further comment or explanation. Two supervisor EPAs submitted for this month, completed by the same commanding officer for two different employees, shared the same comments in several dimensions. One of these two EPAs was also an annual evaluation that reflected the same comments as the six-month EPA, with minor additions. The annual EPA lacked an overall assessment of employee performance for the year in review. Seven of the 10 supervisor EPAs included comments related to the supervisors' ability to identify and respond to misconduct. Two of the 10 supervisor EPAs addressed the quality of supervisory reviews. Nine of the 10 supervisor EPAs addressed the requirements of Paragraph 99 with sufficient specificity, including complaint histories and the employees' dispositions, discipline, commendations, awards, civil or administrative claims, lawsuits, training history, assignment and rank history, supervisory actions, and EIS histories. We found one supervisor EPA where the employee had two open internal misconduct investigations that were not documented in the EPA; this EPA was therefore not in compliance with Paragraph 99. Nine of the 10 supervisor EPAs assessed the employees on the quality of their misconduct investigations, or the quality of their reviews of misconduct investigations, as required by Paragraph 176. In total, two of the 10 supervisors' EPAs were in compliance. Fourteen of 15 EPAs addressed the requirements of Paragraph 99 with sufficient specificity, including complaint histories and the employees' dispositions, discipline, commendations, awards, civil and/or administrative claims, lawsuits, training history, assignment and rank history, supervisory actions, and EIS histories. One supervisor EPA failed to list misconduct investigations opened during the evaluation period. This EPA review is included in our assessment of compliance for Paragraph 99. For March, including both deputy and supervisor EPAs, seven of 15 EPAs, or 46.67% in compliance.

We continue to note inconsistencies in supervisor EPAs. Some commanders have become proficient at completing EPAs. But, there are still command level employees who do not consistently address all the requirements of EPA related Paragraphs. All the EPAs we reviewed for January and February were in compliance with this Paragraph, while only two of the supervisor EPAs that were completed in March met all requirements. We look for the EPA to address how well the employee performed in each rating dimension for the rating period, supported by examples documented in BlueTeam. We agree that BlueTeam notes are an essential

WAI 56384

part of the supporting documentation, but our main focus is on the overall assessment of each dimension. We also review to ensure EPA related requirements are addressed, and that the information documented in EPAs is consistent with EIS profiles. We will continue to closely review EPAs to ensure MCSO has addressed these issues, which we have previously noted in our reports and discussed in site visits. Of the 45 EPAs reviewed for the first quarter of 2021, 37 were in compliance. The compliance rate for this reporting period was 82.22%.

**Paragraph 88.** *To ensure compliance with the terms of this Order, first-line Supervisors in any Specialized Units enforcing Immigration-Related Laws shall directly supervise the law enforcement activities of new members of the unit for one week by accompanying them in the field, and directly supervise the in-the-field-activities of all members of the unit for at least two weeks every year.*

### In Full and Effective Compliance

MCSO does not have any specialized units that enforce immigration-related laws. We continue to monitor arrests and detentions as part of our review process to ensure that MCSO is in compliance with its own directives on this issue.

For this reporting period we received lists containing all incidents involving MCSO arrests and criminal citations. For each month, we requested a random sample of arrests and criminal citations. In total, we reviewed 60 incidents involving arrests and 60 incidents involving criminal citations. We also reviewed a random sample of 258 Incident Reports for this reporting period. During our reviews of the documentation provided for this reporting period, we have found no evidence to indicate any violations of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 89.** *A Deputy shall notify a Supervisor before initiating any immigration status investigation, as discussed in Paragraph 28. Deputies shall also notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration Related Crime, or for any crime related to identity fraud or lack of an identity document. The responding Supervisor shall approve or disapprove the Deputy's investigation or arrest recommendation based on the available information and conformance with MCSO policy. The Supervisor shall take appropriate action to address any deficiencies in Deputies' investigation or arrest recommendations, including releasing the subject, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative investigation.*

### In Full and Effective Compliance

WAI 56385

To assess MCSO's compliance with this Paragraph, we requested all reports related to immigration status investigations, any immigration-related crimes, or any incidents or arrests involving lack of identity documents. The Incident Reports requested were for the period in review. Any incident wherein a deputy requests a supervisor's permission to contact Immigration and Customs Enforcement (ICE) or Customs and Border Patrol (CBP) – to ascertain the legal status of an individual involved in a stop, detention, or any incident under investigation by MCSO – falls under the reporting requirements of this request.

For the first quarter of 2021, MCSO did not submit any incidents that fall within the requirements of this Paragraph. For this reporting period, we received lists noting all incidents involving MCSO arrests and criminal citations. For each month, we requested a random sample of arrests and criminal citations. From each list, we selected a 10% random sample of incidents. In total, we reviewed 60 incidents resulting in arrest and 60 incidents involving criminal citations. In addition, we reviewed 258 Incident Reports for the quarter.

On December 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

***Paragraph 90.*** *MCSO Deputies shall submit documentation of all stops and Investigatory Detentions conducted to their Supervisors by the end of the shift in which the action occurred. Absent exceptional circumstances, within 72 hours of receiving such documentation, a Supervisor shall independently review the information. Supervisors shall review reports and forms for Boilerplate or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct. Appropriate disciplinary action should be taken where Deputies routinely employ Boilerplate or conclusory language.*

**Phase 1:** In compliance

- EA-11 (Arrest Procedures), most recently amended on May 28, 2021.

**Phase 2:** In compliance

We reviewed 35 incidents involving traffic stops for January 2021. There were 14 stops related to speeding, of which eight resulted in citations and six resulted in warnings. There were three stops related to equipment violations. Thirteen stops were for moving violations other than speeding. Five stops related to registration or license plate violations. Eighteen of the stops resulted in citations, and 17 resulted in warnings. All 35 Vehicle Stop Contact Forms we reviewed noted the serial number of the reviewing supervisor, date, and time of supervisory review. All 35 VSCFs were reviewed within the required 72 hours. For January, MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 188 VSCFs. Supervisors reviewed 186 of 188 VSCFs within 72 hours, for a compliance rate of 98.93%.

We reviewed 35 incidents involving traffic stops for February 2021. Nineteen of the 35 traffic stops related to speeding. Of the 19 stops related to speeding, 15 drivers received citations, and four received warnings. Five stops related to equipment violations. Six of the stops involved

WAI 56386

moving traffic infractions other than speeding. There were four stops related to registration or license plate violations. Of the 35 stops, 18 resulted in citations, and 17 resulted in warnings. Supervisors reviewed all 35 VSCFs within 72 hours. For February, MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 152 VSCFs. Supervisors reviewed all 152 VSCFs within 72 hours, for a compliance rate of 100%.

We reviewed 35 incidents involving traffic stops for March 2021. Twenty-two of the 35 traffic stops involved speeding violations. Of the 22 stops related to speeding, 13 drivers received citations and nine drivers received warnings. Three stops involved equipment violations. Seven stops involved traffic violations other than speeding. There were two stops related to registration or license plate violations. Of the 35 stops, 19 resulted in citations and 15 resulted in warnings. In one traffic stop, the deputy took no enforcement action and did not issue a written warning. The supervisor met with and discussed the concern with the deputy; this was documented on the VSCF. All 35 Vehicle Stop Contact Forms had timely supervisory reviews. For March, MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 168 VSCFs. We reviewed the data and supervisors reviewed 167 of 168 VSCFs within 72 hours, for a 99.40% compliance rate.

For January, February, and March, we reviewed selected samples of non-traffic incidents involving stops and detentions, which were recorded on Non-Traffic Contact Forms (NTCFs). Our assessment of compliance also included reviews of BWC recordings on selected cases, some of which included searches of the individuals detained. For January, we selected 25 NTCFs for review. All 25 NTCFs had been submitted prior to the end of the shift. Twenty-four of the 25 NTCFs were reviewed and approved by supervisors within 72 hours, as required. The compliance rate for timely submission and timely supervisory review of NTCFs in January was 96%. We reviewed BWC recordings submitted with four of the incidents and noted no concerns. For February, we selected 23 NTCFs to review. All 23 NTCFs were submitted prior to the end of the shift. Twenty of the 23 NTCFs were reviewed and approved by supervisors within the required timeframe. The compliance rate for timely submission and timely supervisory review of NTCFs in February was 86.96%. We reviewed BWC recordings associated with four cases and noted no concerns with the stops. For March, we reviewed all 16 NTCFs generated during the month. All NTCFs were turned in before the end of the shift, and all NTCFs had supervisory reviews documented within 72 hours. The compliance rate for timely submission and timely supervisory review of NTCFs in March was 100%. We reviewed BWC recordings associated with seven incidents and noted no concerns with the stops. For the quarter, 60 of 64 NTCFs reviewed were in compliance with timely supervisory review. The compliance rate was 93.75%.

We take into account all stops and detentions, both traffic and non-traffic, when we determine the compliance rate for this Paragraph. The compliance rate for timely reviews of all combined stops and detentions, from the samples chosen, for this reporting period was 98.64%. For this reporting period, our inspection of the documentation provided did not reveal any evidence of boilerplate or conclusory language, inconsistent or inaccurate information, or lack of articulation, as to the legal basis for stops and detentions.

WAI 56387

***Paragraph 91.*** *As part of the Supervisory review, the Supervisor shall document any Investigatory Stops and detentions that appear unsupported by reasonable suspicion or are otherwise in violation of MCSO policy, or stops or detentions that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The Supervisor shall take appropriate action to address all violations or deficiencies in Investigatory Stops or detentions, including recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.*

**Phase 1:** In compliance

- EA-11 (Arrest Procedures), most recently amended on May 28, 2021.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on February 25, 2021.

- GF-5 (Incident Report Guidelines), most recently amended on May 21, 2021.

**Phase 2:** In compliance

We reviewed traffic stop data reported by MCSO for its January inspection (BI2021-0006). To determine compliance with this Paragraph, for January, we randomly selected 35 traffic-related events, which BIO then audited for compliance. Of the 35 traffic-related events, MCSO reported a 99.19% compliance rate. As a result of the inspection, BIO generated five Action Forms. The first deficiency was attributed to a District 1 deputy. In this stop, the deputy failed to complete an incidental contact form on a passenger who was the subject of a warrants check. The second deficiency involved a traffic stop where the deputy did not record on the VSCF an assisting deputy on the scene. The third deficiency was attributed to a deputy from District 2 who failed to complete an incidental contact form on a passenger who was the subject of a warrants check. The fourth deficiency involved a traffic stop in District 6; the deputy used the wrong disposition code to close out the incident. The fifth deficiency was attributed to another District 6 deputy who failed to complete an incidental contact form on the driver of a second vehicle involved in the stop; the deputy contacted the second driver for a warrants check. Another deficiency identified as "other" on the inspection report was a deputy who did not advise his supervisor of a driver not having a license in their possession. We do not consider any these deficiencies to be of a serious nature, as they relate to the requirements of this Paragraph. For January, we consider that all 35 stops were in compliance with this Paragraph.

We reviewed a spreadsheet documenting each VSCF by District, for January, to determine if supervisors were reviewing VSCFs within the required 72 hours. We reviewed data for 188 traffic stops, and determined that supervisors had completed timely reviews of VSCFs in 186, or 98.93% of the cases. For January, we requested 25 NTCFs from the list that MCSO submitted. We reviewed the NTCFs to determine if supervisors were reviewing them within the required 72 hours. Twenty-three of the 25 NTCFs were reviewed within the required timeframe, for a compliance rate of 92%.

For January, none of the BlueTeam supervisors' corrective actions submitted for our review pertained to the 35 stops selected for the January inspection. For January, we requested a sample of 10 corrective actions generated during the month. Corrective actions are documented on

WAI 56388

BlueTeam Supervisory Notes. Five corrective actions were associated with BWC; all were the result of late activation of the BWC recording. One corrective action was associated with inaccurate or missing information on VSCFs, citations, or written warning. Two corrective actions were taken as a result of procedural or policy violations during traffic stops, and two corrective actions were related to policy or procedural violations not involving traffic stops.

We reviewed traffic stop data reported by MCSO for its February inspection (BI2021-0019). We randomly selected 35 traffic-related events, which BIO then audited for compliance. The inspection resulted in a 99.30% compliance rating. Our review of the inspection report found that three stops were listed as having deficiencies, resulting in three BIO Action Forms. The first deficiency was attributed to a District 3 deputy. In this stop, the deputy failed to note that there was a search conducted during the stop; this was confirmed through review of the BWC recording. In addition, the deputy did not inform the driver that he could revoke the consent to search at any time. We consider this a serious deficiency. The second deficiency involved a District 4 deputy who did not submit the VSCF before the end of the shift as required. The VSCF was submitted four days after the incident. In addition, the deputy did not mark the arrest time or transport time on the VSCF. The reviewing supervisor noted the late submittal in a BlueTeam entry but did not note the other deficiencies with the missing arrest and transport times. We consider these deficiencies to be serious. The third deficiency was attributed to a deputy from Lake Patrol who failed to activate his BWC when the decision to make the stop was made. For February, we consider that 33 of the 35 stops were in compliance with the requirements of this Paragraph.

We reviewed a spreadsheet documenting each VSCF by District, for February, to determine if supervisors were reviewing VSCFs within the required 72 hours. We reviewed 152 VSCFs and determined that supervisors had completed timely reviews in all 152 stops, or in 100% of the cases. From the list submitted by MCSO, we requested all 23 NTCFs that were generated in February. We inspected the NTCFs to determine if supervisors were reviewing them within the required 72 hours. We determined that supervisors had completed timely reviews in 20 of the 23 NTCFs, or in 86.96% of the cases.

For February, we requested a list of corrective actions. From the list submitted, we selected all five corrective actions generated for the month, which was a small number compared to previous months. One corrective action resulted from a deputy who failed to record a traffic stop. In one corrective action, the deputy failed to note the race of the driver on the VSCF. Two corrective actions were associated with procedural or policy violations during traffic stops. One was for uttering profanity on the BWC, but not in front of the driver. The second corrective action was for chewing tobacco on duty. One corrective action was associated with deputy performance; the deputy was not up to date on traffic laws related to the use of cell phones while driving. We do not consider any of these deficiencies to be of a serious nature, as they relate to the requirements of this Paragraph. There were no BlueTeam notes for corrective actions submitted pertaining to the 35 stops selected for February.

We reviewed traffic stop data reported by MCSO for its March inspection (BI2021-0032). We randomly selected 35 traffic-related events, which BIO then audited for compliance. The compliance rate for the March inspection was 99.29%. Our review of the inspection report found that six stops were listed as having deficiencies, resulting in five BIO Action Forms. The first

WAI 56389

deficiency was attributed to a District 1 deputy who closed the incident with the wrong disposition code. The second deficiency was attributed to a District 1 deputy who failed to conduct a warrants check on the driver. The third deficiency was attributed to a District 2 deputy who did not list the assisting deputy on the VSCF. The fourth deficiency was attributed to a District 2 deputy who did not complete an Assisting Deputy and BWC Camera Log. The fifth deficiency identified was attributed to a District 3 deputy who documented the wrong license plate on the VSCF and warning, and did not list the assisting deputy on the VSCF. The sixth deficiency was attributed to a District 6 deputy who closed the incident with the wrong disposition code. We do not consider any of these deficiencies to be of a serious nature, as they relate to the requirements of this Paragraph. There were no BlueTeam notes for corrective actions submitted pertaining to the 35 stops selected for March.

For March, we requested a list of corrective actions. From the list submitted, we selected 10 corrective actions that were generated for the month. Three corrective actions were associated with BWC; one was the result of late activation of the BWC recording, and two were for failing to turn on the BWC during the traffic stops. One corrective action was associated with inaccurate or missing information on the VSCF. Five corrective actions were taken as a result of procedural or policy violations during traffic stops. One corrective action was related to deputy safety, for not wearing a seat belt. There were no BlueTeam notes for corrective actions pertaining to the 35 stops selected for March.

We reviewed a spreadsheet documenting each VSCF by District, for March to determine if supervisors were reviewing VSCFs within the required 72 hours. We reviewed 168 VSCFs and determined that supervisors had completed timely reviews in 167 VSCFs, or in 99.40% of the cases. For March, we requested 16 NTCFs generated by Patrol deputies. We reviewed all 16 NTCFs to determine if supervisors were reviewing NTCFs within the required 72 hours. We determined that supervisors had completed timely reviews in all 16 cases, which is 100% compliance.

Paragraph 90 requires timely supervisory reviews of documentation pertaining to stops and detentions. Paragraph 91 requires supervisors to identify policy violations, deficiencies, and training issues noted in stops and detentions. Of the sample of 105 stops inspected for this reporting period, there were serious deficiencies and policy violations that occurred in two stops, that supervisors failed to identify and address in their reviews. The compliance rate for Paragraph 91 for this reporting period was 98.1%.


*Paragraph 92. Supervisors shall use EIS to track each subordinate's violations or deficiencies in Investigatory Stops or detentions and the corrective actions taken, in order to identify Deputies needing repeated corrective action. Supervisors shall notify IA. The Supervisor shall ensure that each violation or deficiency is documented in the Deputy's performance evaluations. The quality and completeness of these Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations. MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct complete, thorough, and accurate reviews of Deputies' stops and Investigatory Detentions.*

WAI 56390

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

**Phase 2:** Not in compliance

To determine compliance, we will review the EIS and IAPro histories for each of the employees whose EPAs were selected for review under Paragraph 87. We will then review the information to determine if all violations, deficiencies, PSB investigations, and corrective actions taken pertaining to stops and detentions, which were listed in the employee's EIS and IAPro resumes, were accurately documented in the employee's EPA. Failure to identify and memorialize any issues and actions taken as noted in the employee's EIS and IAPro resumes, reflects on the quality of the supervisor's reviews. By reviewing EIS and IAPro resumes, we will also be able to identify if a deputy has repeated entries of any specific violations, and if subsequent actions taken to correct the issue have been documented in the employee's EPA. For applicable supervisors' EPAs, in addition to the above metric, we will review comments made in reference to the quality of supervisory reviews to ensure that the rater has specific comments addressing this Paragraph's requirements. Both of these requirements must be met for compliance. Deficiencies in quality of EIS reviews, by supervisors, will also reflect in our assessment of compliance for Paragraph 100. To ensure fairness to the agency, when we assess compliance with this Paragraph, we also try look at the performance appraisal as a whole to determine if the intent and spirit of the Paragraph under review was captured.

For January, we reviewed four deputy EPAs and 11 supervisor EPAs. All four deputy EPAs reviewed were in compliance, and all 11 supervisor EPAs were in compliance. For February, we reviewed five deputy EPAs and 10 supervisor EPAs. All five deputy EPAs were in compliance, and all 10 supervisor EPAs were in compliance. For March, we reviewed five deputy EPAs and 10 supervisor EPAs. All five deputy EPAs were in compliance. Only three of the 10 supervisor EPAs specifically and sufficiently addressed the quality and completeness of EIS reviews to meet the requirements of this Paragraph.

For this quarter, all 14 deputy EPAs reviewed were in compliance with this Paragraph. Of the 31 supervisor EPAs reviewed, 24, or 77.41%%, were in compliance. Including deputy and supervisor EPAs, there were a total of 45 EPAs, of which 38 met the requirements of this Paragraph. The compliance rate was 84.44%.

***Paragraph 93.*** *Absent extraordinary circumstances, MCSO Deputies shall complete all incident reports before the end of shift. MCSO field Supervisors shall review incident reports and shall memorialize their review of incident reports within 72 hours of an arrest, absent exceptional circumstances.*

**In Full and Effective Compliance**

We reviewed a representative sample of 87 Incident Reports for January for the randomly selected date of January. Of the 87 Incident Reports, we verified documentation of timely supervisory review on 86. Of the 87 Incident Reports, 15 were vehicle collisions. Of the 15 Vehicle Crash Reports, all had documentation that a supervisor had reviewed and approved the reports. The

WAI 56391

compliance rate for timely supervisory review of Incident Reports in January was 98.85%. During our quality control review of Incident Reports, we found one report where the narrative was confusing, and the deputy did not follow a logical transition from one subject to another. This deficiency should have been addressed by the reviewing supervisor. Supervisors reviewed all 10 Arrest Reports within 72 hours as required.

We reviewed a sample of 94 Incident Reports for February, for the randomly selected date of February 20. All 94 Incident Reports were in compliance. All of the 13 Arrest Reports were reviewed and approved within the required 72 hours. There were 14 Vehicle Crash Reports submitted in the sample for February, of which all included documentation of supervisory review. The compliance rate for timely submission and review of Incident Reports in February was 100%. We conducted a quality review on a 10% random sample of the reports we reviewed, and noted no issues of concern.

We reviewed a representative sample of 77 Incident Reports for March, for the randomly selected date of March 7. We confirmed that all Incident Reports were submitted before the end of the shift, and 76 of 77 had been reviewed and approved by supervisors as required by this Paragraph. The compliance rate was 98.66%. There were 10 Arrest Reports, of which nine had been reviewed and approved by supervisors within the required 72 hours. There were 14 Vehicle Crash Reports submitted in the March sample; we confirmed timely supervisory review on 13 of 14 crash reports. We conducted a quality review on a 10% random sample of the reports submitted, and found one report that noted the deputy's personal opinion in the narrative; all others had no issues of concern.

On March 17, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

*Paragraph 94. As part of the Supervisory review, the Supervisor shall document any arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The Supervisor shall take appropriate action to address violations or deficiencies in making arrests, including notification of prosecuting authorities, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.*

**Phase 1:** In compliance

- EA-11 (Arrest Procedures), most recently amended on May 28, 2021.

- GF-5 (Incident Report Guidelines), most recently amended on May 21, 2021.

**Phase 2:** Not in compliance

To assess compliance with this Paragraph, we will request a list of bookings and criminal citations for the period in review. We will randomly select a sample of 20 bookings and 20 criminal citations, which BIO will then inspect for compliance. In addition, MCSO will review all cases

WAI 56392

involving immigration arrests, and arrests related to lack of identity documents. MCSO will also review all MCAO turndowns for lack of probable cause, and submit those for our review. The total of cases selected per month will not to exceed 60. We will review Incident Report Inspection reports as part of the documentation to determine compliance with Paragraphs 94 and 96. The BIO inspection will review the selected cases, which are retroactive two months. We review the Incident Report Inspection Report and its corresponding Inspection Matrix for each month of the reporting period. Some inspection points in the matrix are given stronger consideration in our reviews than others, as these are fundamental requirements of Paragraph 94; if deficiencies are noted, they may also impact the successful conclusion of the case. In all the cases described below, we relied on the BIO inspector's notations and observations to determine our findings.

In addition to documentation described above, we review all Incident Memorialization Forms (IMFs) submitted for the quarter. The Incident Memorialization Form is used by supervisors to document deficient arrests and corrective actions taken. In accordance with this Paragraph and MCSO policy, supervisors are required to document arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The supervisor generating the IMF, and the commander reviewing the IMF, should ensure that the documentation includes the corrective action taken to resolve issues caused by the deficiency, as well as the remedial action taken to prevent future reoccurrence.

For January, we reviewed the December 2020 Incident Report Inspection, BI2020-0152. We selected 20 bookings and 20 criminal citations, which BIO then inspected for compliance. MCSO did not submit any immigration-related arrests, cases involving identity theft investigations, or County Attorney turndowns for lack of probable cause. The inspection resulted in a 98.41% compliance rating. The BIO Inspection Report noted deficiencies in 10 cases, which resulted in 10 BIO action forms. Six of the deficient reports were the result of supervisors not reviewing the arrest reports within 72 hours. Two of the deficient reports were instances where deputies failed to turn in the report by the end of the shift. One report contained conclusory language, and lacked information regarding evidence and witnesses. One report lacked documentation that *Miranda* rights were read to a subject who was questioned while in custody. We reviewed the BIO inspection report and the corresponding matrix. We noted that of the 40 cases selected, the last two cases discussed had deficiencies that fall within the purview of this Paragraph, and were therefore non-complaint. There were eight other cases where deficiencies or violations of policy occurred. However, we do not believe that these deficiencies had any debilitating effect on the cases.

For February, we reviewed the January Incident Report Inspection, BI2021-0002. We selected 20 bookings and 20 criminal citations, which BIO then inspected for compliance. There were no immigration-related arrests, and no cases involving identity theft investigations reported by MCSO. There were no County Attorney turndowns for lack of probable cause. The inspection resulted in a 98.70% compliance rating. We reviewed the inspection report, which noted four deficient cases, and reviewed the matrix used by BIO for the inspection. We determined that there was one case where the inspector noted deficiencies that fall within the purview of this Paragraph. There were three other cases where deficiencies or violations of policy occurred.

WAI 56393

However, we do not consider that these deficiencies had any debilitating effect on the cases. Two of the deficient reports were the result of the deputies failing to turn in the reports by the end of the shift. In addition, one of these late reports was also not reviewed by the supervisor within 72 hours. One additional report was not reviewed by the supervisor within required timeframes. One arrest report lacked articulation of the culpable mental state required for the charge. The deputy's supervisor reviewed and approved this report with the noted deficiency. We consider this case non-compliant. There was one non-complaint case and three cases where deficiencies or violations of policy occurred, but the deficiencies had no debilitating effect on the cases.

For March, we reviewed the February Incident Report Inspection, BI2021-0015. We selected 20 bookings and 20 criminal citations, which BIO then inspected for compliance. There were no immigration-related arrests, and no cases involving identity theft investigations reported by MCSO. There were no County Attorney turndowns for lack of probable cause. The inspection resulted in a 99.03% compliance rating. We reviewed the inspection report, which noted five deficient cases, and reviewed the matrix used by BIO for the inspection. We determined that there was one case where the inspector noted deficiencies that fall within the purview of this Paragraph. There were four other cases where deficiencies or violations of policy occurred. However, we do not consider that these deficiencies had any debilitating effect on the cases. Two of the deficient reports were the result of supervisors failing to review the arrest reports within 72 hours. One of the deficient reports was the result of the deputy failing to turn in the report by the end of the shift. In one case, the inspector was unable to locate a property receipt for items that were impounded for safekeeping. One arrest report lacked articulation of the charge submitted. The deputy's supervisor reviewed and approved this report with the noted deficiency. We consider this case non-compliant.

Of the total 120 cases selected for review, 116 were in compliance, or 96.67%. For this reporting period MCSO submitted 30 Incident Memorialization Forms. Upon closer review, we found that three IMFs had been previously submitted for the fourth quarter of 2020. We also found that in four cases, the IMFs submitted reported the same incidents as other IMFs. We are uncertain why this duplication occurred. We did not take into account the three IMFs submitted previously for another quarter, and we counted IMFs generated for the same incident as one submission. The net result, not counting previously submitted IMFs or repeated entries, was 23 IMFs. Of the 23 IMFs we reviewed, we consider four to be in compliance. Details of these reviews are found under Paragraph 96.

In total, to assess compliance with this Paragraph, we reviewed 143 incidents involving arrests: 120 arrest reports and 23 IMFs. Of the 23 IMFs reviewed for this reporting period, we found that four were in compliance with this Paragraph. Of the cases 120 reviewed by BIO, we consider that 116 were in compliance. Of the total 143 arrests reviewed for this reporting period, 120, or 83.92%, were in compliance.

WAI 56394

***Paragraph 95.*** *Supervisors shall use EIS to track each subordinate's violations or deficiencies in the arrests and the corrective actions taken, in order to identify Deputies needing repeated corrective action. The Supervisor shall ensure that each violation or deficiency is noted in the Deputy's performance evaluations. The quality of these supervisory reviews shall be taken into account in the Supervisor's own performance evaluations, promotions, or internal transfers. MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct reviews of adequate and consistent quality.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

**Phase 2:** Not in compliance

There are two primary areas of assessment for this Paragraph. The first is to determine if supervisors are tracking subordinates' deficiencies and violations in arrests, and accurately documenting these issues along with corrective actions in employees' EPAs. In addition, repeated corrective actions should be addressed in EPAs. The second is to determine if the quality of supervisory reviews of EIS are being addressed in supervisors' EPAs. The quality and effectiveness of interventions, as a result of deficiencies pertaining to stops and detentions, is a requirement which we assess under Paragraph 97.

To determine compliance, we will review the EIS and IAPro histories for each of the employees whose EPAs were selected for review under Paragraph 87. We will then review the information to determine if all violations, deficiencies, IA investigations, and corrective actions taken pertaining to arrests, which were listed in the employee's EIS and IAPro resumes, were accurately documented in the employee's EPA. Failure to identify and memorialize any issues and actions taken as noted in the employee's EIS and IAPro resumes, reflects on the quality of the supervisor's quality of reviews. By reviewing EIS and IAPro resumes, we will also be able to identify if a deputy has repeated entries of any specific violations, and if subsequent actions taken to correct the issue have been documented in the employee's EPA. For applicable supervisors' EPAs, in addition to the above metric, we will review comments made in reference to the quality of supervisory reviews to ensure that the rater has specific comments addressing this Paragraph's requirements. Both of these requirements must be met for compliance. Deficiencies in quality of EIS reviews by supervisors will also reflect in our assessment of compliance for Paragraph 100. To ensure fairness to the agency, when we assess compliance with this Paragraph, we also try look at the performance appraisal as a whole to determine if the intent and spirit of the Paragraph under review was captured.

WAI 56395

For January, we reviewed four deputy EPAs and 11 supervisor EPAs. All four deputy EPAs reviewed were in compliance. All 11 supervisor EPAs were in compliance. For February, we reviewed five deputy EPAs and 10 supervisor EPAs. All five deputy EPAs were in compliance. All 11 supervisor EPAs were in compliance. For March, we reviewed five deputy EPAs and 10 supervisor EPAs. All five deputy EPAs were in compliance. Three of the 10 supervisor EPAs were in compliance. For the period in review, all of the 14 deputy EPAs reviewed were in compliance with this Paragraph. Of the 31 supervisor EPAs reviewed, 24 were in compliance. A total of 38 of 45 EPAs met the requirements of this Paragraph. The compliance rate was 84.44%. For this reporting period, MCSO did not meet the compliance requirements of this Paragraph.

***Paragraph 96.*** *A command-level official shall review, in writing, all Supervisory reviews related to arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The commander's review shall be completed within 14 days of receiving the document reporting the event. The commander shall evaluate the corrective action and recommendations in the Supervisor's written report and ensure that all appropriate corrective action is taken.*

**Phase 1:** In compliance

- EA-11 (Arrest Procedures), most recently amended on May 28, 2021.

**Phase 2:** Not in compliance

This Paragraph requires that a command-level official review a supervisor's investigation of the circumstances pertaining to any arrest that lacks probable cause, is in violation of policy, or where there is a need for corrective action or review of the agency's policy, strategy, tactics, or training. This Paragraph also requires that the commander evaluate the corrective action and recommendations to ensure that these are appropriate.

Our reviews to determine compliance with this Paragraph are associated with the documentation provided for Paragraph 94. If BIO identifies deficient cases in the Incident Report inspection, and the deficiencies fall within any of the four areas noted in Paragraphs 94 and 96, we will review the documentation to determine compliance. Since this Paragraph pertains to command reviews of supervisory investigations of deficient arrests, we will also review Incident Memorialization Forms to determine compliance. Our reviews for compliance with this Paragraph are determined by the command staff's timely reviews of IMFs, once submitted by supervisors, and commanders' evaluation of the corrective actions taken.

The first IMF was generated for a kidnapping investigation where SWAT had to make a forced entry to rescue a kidnapped child. The entire detective squad from the District responded on the Saturday in which the incident occurred. All detectives were instructed to return the following day to complete required documents, to submit to MCAO (Maricopa County Attorney's Office). One detective failed to show up to work on Sunday. The required paperwork was not completed, and consequently not submitted to the County Attorney on time. Once the detective returned to work, the supplemental report that he generated to document the execution of the search warrant was inaccurate and was rejected. The supervisor wrote that it was evident that the detective was

WAI 56396

not paying attention during the briefing; the detective also wrote inaccurate information on his report. In addition, the detective failed to read *Miranda* warnings to a suspect. The supervisor documented the failings in an IMF generated on August 26, 2017. The IMF was not reviewed by a commanding officer of the District until August 2, 2020. This case involved serious failures, and possibly misconduct. This deficiency and the resulting corrective action were not handled appropriately. MCSO submitted a second IMF documenting the same incident; we counted both incidents as one submission. This IMF was not in compliance.

The second IMF was generated in June of 2018, to document a problem with an investigation, but was not reviewed by a commanding officer until August of 2020, or over two years later. The case involved a domestic violence incident where a detective was sent to the hospital to interview the suspect. In reviewing the charging document, the supervisor noted several errors, including issues with cutting and pasting of information. The supervisor looked into the matter further and found that the same detective made several *Miranda* warning mistakes. In addition, the detective also wrote erroneous and misleading information in other reports. The supervisor concluded that the detective "was in over his head" and he was transferred to an administrative position in the District. It is concerning that this detective wrote inaccurate and misleading information in official reports and this was not investigated as misconduct. This IMF was not in compliance.

The third IMF was generated as a result of an MCAO turndown. The incident occurred on June 9, 2019. This incident involved a large disturbance in a sports bar, in which seven individuals were involved in a physical altercation. The MCAO turndown report noted that the case was turned down due to "no likelihood of conviction." A subsequent command review noted that there were eight suspects charged with assault, but the report listed no victims or witnesses. The property owner/manager of the bar should have been listed on the report as a victim, but was not. All suspects and victims indicated that they did not want to pursue charges, except one. This one individual was not listed as a victim. The deputy authoring the report noted that except for the one victim, none of the others involved in the fight wanted to press charges. Yet, the deputy informed all of the individuals involved in the fight that assault charges would be submitted to MCAO. The commander reviewing the report noted that there was no probable cause for charging seven of the individuals. The IMF notes that the deputy authoring the report was in training and his FTO was responsible for reviewing and correcting any deficiencies. We concur, but in addition, the supervisor reviewing the report should have identified the deficient report. The IMF identified the deficiencies, but did not address what corrective action, if any, was taken to address the failures. MCSO submitted another IMF in May 2021 for the same incident, with a different IMF number. The second IMF documented the commander's meeting with the supervisor who had reviewed and approved the arrest report with the noted deficiencies. We consider this the same incident, with failures on both the deputy and reviewing supervisor. This IMF correctly identified the deficiencies, but was missing the corrective actions taken on the deputy and reviewing supervisor.

The fourth IMF involved an incident that occurred on February 18, 2021. The issues were identified by a detective sergeant working in one of the Patrol Districts. The detective sergeant advised a Patrol Commander that he had reviewed an arrest that had not been submitted to MCAO within the required 48 Hours. The supervisor also stated that there were several issues involving

WAI 56397

the arrest. The Patrol Commander reviewed the arrest reports, as well as the BWC, and found that the report failed to establish probable cause for the arrest. MCAO was contacted by the reviewing commander, who informed the prosecutor that there was no probable cause for the arrest, or for the criminal citation for Domestic Violence. MCSO policy prohibits criminally citing anyone for Domestic Violence. In this case, if probable cause existed, the deputy should have submitted charges using the standard "long form" report. PSB was contacted and the Patrol commander was advised that an internal investigation should be initiated through BlueTeam. In this incident, there was a formal misconduct investigation initiated. The corrective action is pending the outcome of the investigation. This IMF was in compliance.

The fifth IMF involved an incident that occurred on June 5, 2020, and the arrest report was identified as deficient on the same date. This incident involved a physical altercation between a 49-year-old individual and his 16-year-old son. Command review identified that Domestic Violence protocols were not followed in this investigation. Photographs were taken, but not documented in the incident report. Although some photographs were taken, some of the required photographs to document the victim's injuries were not taken. The photographs were not uploaded into the evidence collection system as required. Another issue identified is that the deputy provided incomplete information to the detective supervisor on the scene. The father was not questioned about some of the injuries alleged by the victim. This IMF properly documented the corrective action taken. This IMF was completed in July 2020, and should have been submitted as part of the third quarter documentation requested for Paragraphs 94 and 96. This IMF was not submitted for our review until March 2021. Due to the delay, this IMF was not in compliance.

The sixth IMF involved a burglary in progress, in which the victim chased the fleeing offender. The victim provided MCSO a description of the suspect. A search of the area failed to discover the whereabouts of the offender. The deputy who handled the burglary call responded to a "person down" call, close to the scene of the burglary. The individual matched the description of the burglary suspect. The deputy detained the female suspect, searched her purse, and found items belonging to the burglary victim. The reviewing supervisor noted that the deputy had reasonable suspicion to detain the suspect, but did not have probable cause for the search of the purse. The supervisor had a meeting with the deputy and discussed how he could have obtained probable cause to search the purse, and how to properly articulate his findings on the incident report. This IMF was completed in June 2020, but not submitted for our review until March 2021. Due to the delay, this IMF was not in compliance.

The seventh IMF involved an alleged hit and run that was witnessed by a third party. The subject allegedly involved in the hit and run was located a few minutes after the call came in. Deputies confronted the individual, who resisted being detained, but was subsequently handcuffed. The subject was bitten by an MCSO K-9 unit, arrested, and transported to the hospital for treatment. A subsequent review of the incident by a commanding officer revealed that there was no probable cause for the arrest. The subject, at most, went over a curb, but caused no property damage. The commanding officer determined that deputies had reasonable suspicion to detain the subject, but lacked probable cause for the arrest. The commanding officer determined that the supervisor on the scene should have recognized that there was insufficient probable cause for the arrest as it

WAI 56398

pertains to leaving the scene of an accident, and should have released the individual. The subject was subsequently released from custody. An internal investigation was initiated into how the supervisor handled the incident. This IMF was completed in June 2020, and included some measure of counselling for the deputy and supervisor. This IMF was not submitted for our review until March 2021. Due to the delay, this IMF was not in compliance.

The eighth IMF was generated by a supervisor who discovered a potential *Miranda* rights issue during the review of an arrest report. The supervisor confirmed the violation by watching the BWC video of the incident. The subject was detained in handcuffs while the deputy asked questions about the incident, prior to advising the subject of his *Miranda* rights. The reviewing supervisor wrote that the information gained during the interview was vague. Probable cause was established through independent interviews of three other individuals involved. The detective supervisor, assisted by a Patrol supervisor, met with and discussed the incident with the deputy who made the arrest. The supervisors reviewed the BWC video with the deputy, pointed out the issues of concern, and provided clear direction on the correct procedural requirements for interviews related to arrests. This deficiency was handled correctly, and in a timely manner. This IMF was in compliance.

The ninth IMF was generated for a faulty arrest where two subjects were charged with trespassing and possession of drug paraphernalia. The IMF noted that deputies, in the past, could previously field test narcotics and make arrests based on the results. If the charges were contested, then the evidence would be submitted to the lab for analysis. The IMF stated that deputies are no longer performing field tests for narcotics. The IMF indicated that the evidence should have been submitted for analysis before charges were presented. Criminal charges, if appropriate, should have been submitted once lab reports confirmed the presence of illegal substances. The supervisor initially recorded the incident in a BlueTeam supervisory note instead of an IMF. The IMF stated that the deputy was counselled by the supervisor as to the appropriate procedures. This IMF was completed in October 2020 but not submitted for our review until May 2021. MCSO submitted a second IMF for the same incident; we counted both as one submission. This IMF was not in compliance.

The tenth IMF was generated by a commanding officer who discovered an issue with a supplemental report made by a supervisor. The incident involved a criminal traffic citation. The reviewing commander noted that the deputy's report was incomplete, and was rejected by the supervisor without an explanation. The driver was issued a criminal citation with an incorrect statute. The commanding officer directed the supervisor to submit a request for dismissal of the charges to the Court. This IMF appropriately documented the deficiency and action taken. It was completed in October, but not submitted for our review until May 2021. Due to the delay, this IMF was not in compliance.

The eleventh IMF was generated when a supervisor noted a deficiency in an arrest report. A subject was arrested pursuant to an arrest warrant. During the search, a deputy found a small bag of pills in his pocket. The deputy questioned the suspect about how the pills were obtained, prior to reading *Miranda* warnings. Although the deputy eventually read the subject *Miranda* rights, the questioning with regard to the pills occurred before the *Miranda* warnings were given. The supervisor met with and discussed the deficiency with the deputy. This IMF appropriately

identified the deficiency and corrective action. However, this incident occurred in August. The IMF was completed in October, but not submitted for our review until May 2021. Due to the delay, this IMF was not in compliance.

The twelfth IMF was generated by a patrol lieutenant, as a result of a review of a reckless driving report written by a sergeant. The sergeant identified the driver as a juvenile and charged the juvenile with two criminal offenses, on the citation. The lieutenant approved the report but later realized that one of the offenses needed to be submitted on a juvenile referral form, and not on a criminal citation. The supervisor was directed to contact the court to have the charge taken off the citation, and to complete a referral for the second violation. This IMF was completed in November, but not submitted for our review until May 2021. Due to the delay, this IMF was not in compliance.

The thirteenth IMF was completed in response to an MCAO turndown, pertaining to an arrest for drug possession. The arrest had been made by two deputies and a sergeant. The deputies had responded to a domestic dispute involving an Order of Protection. One of the individuals involved was staying at the home of a third party who gave deputies permission to look in the room where the individual was staying. In the room, the sergeant observed drug paraphernalia. The sergeant the proceeded to search in the drawers of a nightstand, where he found suspected narcotics. The search of the drawers was conducted without a warrant and was therefore deemed unreasonable. The commanding officer reviewing the case met with the supervisor and discussed warrantless searches, as well as other Fourth Amendment requirements. This IMF was completed in November, but not submitted for our review until May 2021. Due to the delay, this IMF was not in compliance.

The fourteenth IMF was generated by a supervisor who reviewed an arrest report involving multiple victims and multiple charges, and determined that some of the charges had improper statute numbers. The oversight was not discovered prior to booking, but was corrected afterwards in a submittal to the County Attorney. The supervisor met with the detective and discussed the mistakes made. The discovery and action taken were appropriate and timely. This IMF was completed in November, but not submitted for our review until May 2021. Due to the delay, this IMF was not in compliance.

The fifteenth IMF was generated as the result of a shoplifting arrest. A deputy arrested a subject for felony shoplifting based on the subject having had multiple arrests for shoplifting. A judge found that the deputy failed to include the incident numbers of the associated cases that were used to substantiate the felony charge. The supervisor met with the deputy and discussed the need to document each previous shoplifting case, including all the information pertaining to each case, to support the felony charge. The discovery and action taken were appropriate. This IMF was completed in November, but not submitted for our review until May 2021. Due to the delay, this IMF was not in compliance.

WAI 56400

The sixteenth IMF was completed in response to an MCAO turndown. A supervisor reviewed the arrest report, which included the charges of burglary and trafficking in stolen property. The reviewing supervisor found that there was probable cause for the trafficking in stolen property charge, but there was insufficient probable cause for the burglary charge. The supervisor met with the deputy and discussed the required elements of the crime. This was a 2019 case. The IMF was completed in early December 2020 but not submitted for our review until May 2021. Due to the delay, this IMF was not in compliance.

The seventeenth IMF was generated after a supervisor reviewed the arrest report of a suspect who was arrested for a warrant and possession of drug paraphernalia, a pipe. The subject was taken to the station, processed for the warrant, and released with a criminal citation for the drug paraphernalia charge. After the arrest, the deputies realized that they had given the evidence back to the suspect, and the suspect had already left. The deputies then responded to the suspect's home to recover the pipe, but were told that the pipe was broken and the suspect had flushed it down the toilet. The District Captain noted that this was a mistake and needed no further action with regard to the deputies involved. This incident occurred in October 2020. The IMF was completed in early December 2020, but not submitted for our review until May 2021. Due to the delay, this IMF was not in compliance.

The eighteenth IMF was generated by a supervisor, who wrote that he was advised of the deficiencies in the incident report. Deputies responded to a call regarding shots fired. Deputies located a subject inside a vehicle and subsequently arrested the subject for misconduct with weapons and endangerment. The supervisor was advised of several deficiencies in the report about two weeks after the arrest, but the IMF was not clear on who originally identified the deficiencies. It would have been the reviewing supervisor's responsibility to identify any issues with the report. Supervisory review confirmed that the deputy used wrong statute numbers, and that the report did not support probable cause for the charges submitted. The deputy was instructed to write a memorandum to the County Attorney requesting dismissal of the citation. No corrective action with regard to deputy training was noted on the IMF. This incident occurred in October 2020. The IMF was completed in early December 2020, but not submitted for our review until May 2021. Due to the delay, this IMF was not in compliance.

The nineteenth IMF was related to an incident involving a subject who was trespassing. A supervisory review of the incident report revealed that the deputy questioned the subject without providing *Miranda* warnings; the deputy also conducted an improper search of the subject. The subject was ultimately allowed to leave. The supervisor met with the deputy and provided copies of search and seizure policies, and arrest policies. This incident occurred in December. The IMF was completed in December 2020, but not submitted for our review until May 2021. Due to the delay, this IMF was not in compliance.

The twentieth IMF involved a deputy who responded to a call with a suicidal subject. The deputy attempted to place the subject into protective custody, but the individual resisted. The subject was taken to the ground and handcuffed. After handcuffing, the deputy reached into the individual's pockets and emptied them, conducting a full search. The search was not legally justified since the subject was merely detained and not under arrest, and there were no exigent circumstances. The reviewing supervisor failed to identify the improper search and approved the

WAI 56401

incident report and the use of force report. The reviewing commander met with the supervisor and discussed the issue, which resulted from the supervisor not reviewing the BWC footage in its entirety. This incident occurred in December 2020. IMF was completed in December 2020, but not submitted for our review until May 2021. Due to the delay, this IMF was not in compliance.

The twenty-first IMF involved a traffic stop made by a deputy in October 2020. A commander who reviewed the incident report generated the IMF. The driver in question had a suspended driver's license from another state. The male driver also had an Order of Protection issued against him, and the female who had requested the Order of Protection was also in the vehicle. The female indicated that she was attempting to get the order dismissed. After verifying that the female passenger was not under duress, the deputy completed a report, issued the driver a citation, and released both parties. After the deputy released the subjects, he realized that he needed to have completed an Incidental Contact Form on the passenger. The deputy completed the Incidental Contact Form after he had cleared the call, and had the form mailed to the last known address of the female. The reviewing commander determined that the Incidental Contact Form should have been completed and provided to the passenger during the stop. The other issue noted was the couple had a domestic violence past, and the deputy did not complete the required documentation, as per the MCSO Domestic Violence policy. The commander instructed a supervisor to meet with the deputy and review MCSO policy requirements on domestic violence. This incident was appropriately handled. This IMF was completed in January and submitted for our review just after the closing of the first quarter. We consider this IMF to be in compliance.

The twenty-second IMF was generated by a commanding officer to memorialize a faulty supervisory review of an arrest involving a domestic violence case. The deputy failed to include required information on the incident report, and the supervisor failed to identify the deficiencies in his review of the report. The commander addressed the issue with the supervisor with regard to the thoroughness of his reviews. The IMF only identified the incomplete review by the supervisor and did not address how the domestic violence report was corrected, or what corrective action was taken on the deputy. This IMF was not in compliance due to the missing corrective action.

The twenty-third IMF was generated as a result of a review an incident report, where a supervisor noted a concern with a welfare check that one of his deputies handled. A caller had advised that an adult male, who appeared to be a transient, was walking with a young girl that did not appear to be any relation to the adult. The deputy responded to the call, stopped the individual, and told him he had to provide identification. The individual became agitated and told the deputy that was his daughter, that and they were out for a walk. The deputy advised the individual that it was MCSO policy that required him to provide identification. The deputy failed to find a more appropriate way of persuading the individual to cooperate with the inquiry, and he failed to articulate reasonable suspicion for the legal basis of any action. The supervisor met with the deputy and discussed the deficiency, as well as becoming more acquainted with the residents of the area he patrols. This incident occurred in November 2020. The IMF was completed in mid-December and provided for our review in May 2021. Pursuant to our document request, this IMF should have been provided in the January 2021 submission. Since this IMF was provided shortly after the close of the quarter, we will consider this submission in compliance.

WAI 56402

We have identified several issues that need to be addressed by MCSO. Some issues are related to the timeliness of the IMF process, and the timeliness of the submissions pursuant to our document requests. Paragraphs 94 and 96 require that deficiencies related to arrests be identified, that corrective action be taken, and that a commander conduct timely reviews and evaluation of the corrective action. These requirements are not being met consistently. We also noted repeated entries with different IMF numbers on the same incident; we suggest that for tracking purposes it may be more efficient to use the same IMF number. During this reporting period, MCSO submitted more IMFs than at any time in the past. We are encouraged by the increased emphasis in correcting issues related to deficiencies in arrests. Hopefully, this increased attention will result in deputies learning from their mistakes and improving their work products.

***Paragraph 97.*** *MCSO Commanders and Supervisors shall periodically review the EIS reports and information, and initiate, implement, or assess the effectiveness of interventions for individual Deputies, Supervisors, and units based on that review. The obligations of MCSO Commanders and Supervisors in that regard are described above in Paragraphs 81(c)–(h).*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on May 6, 2020.

**Phase 2:** Not in compliance

As per GH-5 (Early Identification System) and GB-2 (Command Responsibility), supervisors are required to conduct EIS reviews twice per month for sworn members. Command review of EIS profiles of supervisory and command personnel began in February 2017. To assess MCSO's compliance with this Paragraph, for every month of the reporting period, we selected a supervisor and a squad of deputies from each District. We then reviewed the documentation provided as verification of compliance with this Paragraph. We also requested that EIS reviews of the commanders responsible for the selected personnel be included. The purpose of conducting EIS reviews is for supervisors to oversee the performance of subordinates, and take appropriate action on issues that need to be corrected. This Paragraph also requires that the effectiveness of interventions be evaluated. EIS reviews should be thorough, and completed in a timeframe that allows supervisors to monitor performance and address any concerns noted, in a timely manner. We believe that periodic EIS reviews should be conducted on a schedule that maximizes their usefulness. We understand that an exact 14-day timeframe may not be possible for all EIS reviews; and we will therefore conduct our reviews using a standard of reasonableness. Two EIS reviews conducted within a short time period, on the same employee, lead to questions regarding the purpose and quality of the reviews. EIS reviews conducted too close to each other do not address the intent of this Paragraph. We will review documentation to determine if EIS reviews are being conducted in accordance with the requirements of this Paragraph, or if they are being conducted perfunctorily without regard for usefulness or quality.

For January, we reviewed the documentation provided for 56 employees – which included the ranks of deputy, sergeant, lieutenant, and captain. Of the 56 employees, 48 had the required two EIS reviews in the month, for an 85.71% compliance rate. For February, we reviewed Supervisory Notes requested as verification of compliance for 54 employees. Of the 54 selected

WAI 56403

employees, 48 had appropriate documentation of timely EIS reviews, for a compliance rate of 88.89%. For March, we received Supervisory Notes as verification of compliance of EIS reviews for the selected 59 employees. Of the 59 employees, 53 had appropriate documentation of compliance with this Paragraph, for a compliance rate of 89.83%. The total compliance rate for the quarter, for periodic supervisory and command EIS reviews, was 88.17%. The reviews of broader pattern-based reports, as required by Paragraph 81.c., and assessments of interventions as required by this Paragraph, have not been sufficiently documented to meet compliance with this Paragraph.

### d. Regular Employee Performance Review and Evaluations

*Paragraph 98. MCSO, in consultation with the Monitor, shall create a system for regular employee performance evaluations that, among other things, track each officer's past performance to determine whether the officer has demonstrated a pattern of behavior prohibited by MCSO policy or this Order.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

**Phase 2:** Not in compliance

To assess compliance with this Paragraph, we review a sample of deputy and supervisor EPAs selected on a monthly basis under Paragraph 87. There are several Paragraphs in the First and Second Orders that have requirements pertaining to the assessment and documentation of performance in Employee Performance Appraisals. Supervisors are also required to identify and track the performance of deputies who have patterns of behavior prohibited by the Order and MCSO policy. Paragraphs 92 and 95 also require assessment of the quality of EIS supervisory reviews. The revised methodologies for Paragraphs 92 and 95 are explained in detail in our reviews of these two Paragraphs.

Our reviews of EPAs for the first quarter of 2021 found issues with the consistency of information documented in EPAs. We found that all EPAs we reviewed in January and February met all requirements, but our reviews of the EPAs submitted for March again found deficiencies in supervisor EPAs. The issue of performance assessments not being properly documented in this review period were primarily related to the quality of supervisory reviews. We also noted issues with raters using the same comments, for the same rating dimensions, for different employees. The assessment of the quality of EIS reviews, and documentation of deficiencies found in stops, detentions, and arrests have not been consistently and sufficiently documented in supervisor EPAs. It is possible that supervisors are reviewing EIS profiles before the evaluation period is complete, and could be missing EIS entries that occur toward the end of the rating period. For the first quarter of 2021, of the 45 EPAs reviewed, 37 were in compliance, or 82.22%

WAI 56404

***Paragraph 99.*** *The review shall take into consideration all past Complaint investigations; the results of all investigations; Discipline, if any, resulting from the investigation; citizen Complaints and commendation; awards; civil or administrative claims and lawsuits related to MCSO operations; Training history; assignment and rank history; and past Supervisory actions taken pursuant to the early warning protocol.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

**Phase 2:** In compliance

The current EPA has an acknowledgement at the conclusion that supervisors are required to sign, to affirm that they have done due diligence in researching and documenting the employee's history for the review period, as it pertains to the requirements of Paragraph 99. Supervisors completing EPAs are required to document their findings relevant to these areas, if their reviews reveal any applicable events or actions. The areas of review include: complaint investigations and dispositions; discipline; citizen complaints; commendations; awards; civil or administrative claims; and past supervisory actions taken pursuant to EIS Alerts. We do not rely solely on the supervisor's affirmation that a thorough review was completed. We verify supporting documentation to ensure the supervisor has done a thorough review and that the information provided under Paragraph 99 is accurate. We review EIS and IAPro resumes for each employee whose EPA we received during the quarter, under Paragraphs 87, 92, and 95. We review these resumes and compare them to the notations listed by the supervisor authoring the EPA, under Paragraph 99. We verify that any past actions noted in the resumes are captured in the EPA. We have previously emphasized to MCSO the importance of accurate documentation and thorough reviews of EIS.

For this reporting period, we reviewed Employee Performance Appraisals for 14 deputies and 31 supervisors. In our reviews we noted one deputy EPA where the rater failed to document a misconduct investigation that was initiated during the review period. We also noted that there were two supervisor EPAs where commanders failed to document misconduct investigations that were opened during the review period. Forty-two of 45 EPAs, or 93.33% of the EPAs reviewed, sufficiently documented the requirements of this Paragraph. As stated in our reviews of Paragraph 98, it is possible that supervisors are conducting their queries for the requirements of this Paragraph before all the EIS entries for the rating period are completed. MCSO has been in compliance with this Paragraph; consistent with our past practice, if MCSO fails to meet this Paragraph's requirements in our next review, we will withdraw Phase 2 compliance for this Paragraph.

WAI 56405

***Paragraph 100.*** *The quality of Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

**Phase 2:** Not in compliance

The current EPA form has a rating dimension where supervisors are required to document the quality of supervisory reviews and supervisor accountability. This Paragraph only pertains to supervisor EPAs, and we review comments to ensure that the rater has addressed all areas associated with the quality of supervisory reviews. We have previously noted that we take into account the requirements of Paragraphs 92 and 95, as it pertains to the quality of supervisory reviews of EIS. The quality of reviews of supervisors' misconduct investigations, as per Paragraph 176, is also figured into the assessment of compliance for this Paragraph.

We reviewed Employee Performance Appraisals for 31 supervisors and commanders who received EPAs during this reporting period. The quality of reviews of supervisors' misconduct investigations was documented sufficiently during this period. However, only 23 of the 31 supervisor EPAs sufficiently documented the quality of EIS reviews to meet compliance. When the compliance results of all related Paragraphs were factored in, 23 of the 31 EPAs, or 74.19%, addressed the requirements of this Paragraph, as it pertains to the quality of supervisory reviews. For this reporting period, MCSO was not in compliance with the requirements of this Paragraph.


***Paragraph 101.*** *Within 180 days of the Effective Date, MCSO shall develop and implement eligibility criteria for assignment to Specialized Units enforcing Immigration-Related Laws. Such criteria and procedures shall emphasize the individual's integrity, good judgment, and demonstrated capacity to carry out the mission of each Specialized Unit in a constitutional, lawful, and bias-free manner. Deputies assigned to a Specialized Unit who are unable to maintain eligibility shall be immediately re-assigned.*

**In Full and Effective Compliance**

MCSO does not have any specialized units that enforce immigration-related laws. Therefore, by default, MCSO is in Phase 2 compliance with this Paragraph. We continue to monitor arrests and detentions as part of our review process to ensure that MCSO is in compliance with its own directives on this issue.

For January, February, and March, we received lists containing all incidents involving MCSO arrests and criminal citations. For each month, we requested a random sample of arrests and criminal citations. In total, we reviewed 60 incidents involving arrests and 60 incidents involving criminal citations. We also reviewed a random sample of 258 Incident Reports for this reporting period. During our reviews of the documentation provided for this reporting period, we found no evidence to indicate any violations of this Paragraph.

WAI 56406

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with the Monitor's determination.

WAI 56407

# Section 10: Misconduct and Complaints

## COURT ORDER XI.  MISCONDUCT AND COMPLAINTS

### a. Internally-Discovered Violations

***Paragraph 102.*** *MCSO shall require all personnel to report without delay alleged or apparent misconduct by other MCSO Personnel to a Supervisor or directly to IA that reasonably appears to constitute: (i) a violation of MCSO policy or this Order; (ii) an intentional failure to complete data collection or other paperwork requirements required by MCSO policy or this Order; (iii) an act of retaliation for complying with any MCSO policy; (iv) or an intentional provision of false information in an administrative investigation or any official report, log or electronic transmittal of information.  Failure to voluntarily report or document apparent misconduct described in this Paragraph shall be an offense subject to Discipline.*

**In Full and Effective Compliance**

During our assessments of compliance with this Paragraph, we have reviewed hundreds of misconduct investigations involving MCSO personnel.  Many of them have been internally generated.

During this reporting period, we reviewed 93 administrative misconduct investigations.  Twenty-seven were generated internally.  Six involved identified sworn personnel, 17 involved identified Detention personnel, and four involved identified civilian personnel

MCSO has continued to identify and address misconduct that is raised by other employees or identified by supervisory personnel.  While some of these investigations did not meet all requirements for the proper reporting or completion of misconduct investigations, we address these failures in other Paragraphs in this report.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

### b. Audit Checks

***Paragraph 103.*** *Within one year of the Effective Date, MCSO shall develop a plan for conducting regular, targeted, and random integrity audit checks to identify and investigate Deputies possibly engaging in improper behavior, including: Discriminatory Policing; unlawful detentions and arrests; improper enforcement of Immigration-Related Laws; and failure to report misconduct.*

**Phase 1:**  In compliance

- Audits and Inspections Unit Operations Manual, Section 303, published on August 27, 2020.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

WAI 56408

**Phase 2:** In compliance

MCSO's Audits and Inspections Unit (AIU), a unit of the Bureau of Internal Oversight (BIO), is responsible for these requirements. This Paragraph requires that MCSO conduct "regular, targeted, and random integrity audit checks." We have long acknowledged MCSO's compliance with the "regular" and "random" elements of this Paragraph, due to AIU's publication of several completed inspection reports. For this reporting period, the inspections examined, for example, complaint intake tests, Supervisory Notes, Patrol Activity Logs, traffic stop data, post-stop ethnicity, County Attorney turndown dispositions, and Patrol Shift Rosters.

During the last reporting period, AIU conducted its first audit check that fulfilled the "targeted" Paragraph 103 requirements. The report detailed the results of a test in which AIU sought to "determine' if drivers with Hispanic surnames documented as 'White' on the VSCF [Vehicle Stop Contact Form] is correct based on a reasonable person standard," and "if there is an indication of continual and repetitive improper identification of the post-race ethnicity of Hispanic drivers." AIU selected as its focus a deputy who had the highest proportion of stops in which he identified drivers with Hispanic surnames as white (12 of 171 total stops). AIU examined body-worn camera video footage from the deputy's 12 stops, and agreed that the deputy's "perception was reasonable" in 10. AIU concluded that this test passed, and it also submitted a BIO Action Form to the deputy's chain of command to reassess the post-stop ethnicity of the drivers in the two stops in which it did not determine that the deputy's perception was reasonable.

During this reporting period, AIU conducted its second audit check that fulfills the "targeted" Paragraph 103 requirements. In this report, AIU discusses a test in which it examined the deputy with the highest percentage of VSCFs in which passengers in traffic stops were identified as "Unknown/Vision Obstructed." This deputy used this identification for more than 50% of passengers in traffic stops in 2020, and AIU sought to determine if this was reasonable or if there was a pattern of "repetitive improper identification." AIU personnel reviewed body-worn camera footage of the deputy's stops; and considered the use of "Unknown/Vision Obstructed" unreasonable in three out of nine, or 33.3%, of the deputy's traffic stops. As a result, AIU concluded that this test was a "procedural" failure, which according to Section 303 of the Audits and Inspections Unit Operations Manual, means "The employee's actions were not in accordance with the procedures set forth in Office Policy, but the actions do not rise to the level of criminal or serious misconduct." BIO issued an Action Form to document the deficiency.

As we have previously noted, Paragraph 103 does not set frequency standards for integrity tests; AIU personnel have informed us that AIU intends to conduct at least one, and as many as two or three tests, each quarter. We will review those tests to determine if MCSO will maintain continued compliance with this Paragraph.

WAI 56409

### c. Complaint Tracking and Investigations

**Paragraph 104.** *Subject to applicable laws, MCSO shall require Deputies to cooperate with administrative investigations, including appearing for an interview when requested by an investigator and providing all requested documents and evidence. Supervisors shall be notified when a Deputy under their supervision is summoned as part of an administrative investigation and shall facilitate the Deputy's appearance, absent extraordinary and documented circumstances.*

### In Full and Effective Compliance

In the fall of 2015, MCSO developed a draft checklist and investigative format for administrative investigations. All the requirements in this Paragraph are included in these protocols. The checklist and formats were approved for use in early 2016, and all personnel through the rank of captain were required to attend a training session regarding the use of these forms. Effective June 1, 2016, all administrative investigations were required to use these forms. MCSO has consistently met this requirement, and MCSO has included the checklists in administrative investigations forwarded for our review.

Since that time, the Professional Standards Bureau (PSB) drafted revisions to the investigation checklist and format to provide additional clarification on procedural requirements. We and the Parties reviewed the revisions and provided our feedback. The revised format and investigation checklist were approved for use. The Misconduct Investigative Training for personnel outside of PSB also now includes a discussion of the revisions to these forms.

During the last reporting period, we reviewed 87 administrative misconduct investigations. All of these investigations were in compliance with the requirements of this Paragraph.

During this reporting period, we reviewed 93 administrative misconduct investigations. Fifty-two involved sworn personnel. All 52 were both initiated and completed after July 20, 2016 and included the use of the approved investigative format and checklist. We continue to note that deputies consistently appear for scheduled interviews, provide all required information to investigators, and cooperate with investigations. There were no instances identified where a supervisor failed to facilitate a deputy's attendance at an interview or where the investigator had failed to notify the employee's supervisor of an intended administrative interview.

On March 17, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 56410

***Paragraph 105.*** *Investigators shall have access to, and take into account as appropriate, the collected traffic stop and patrol data, Training records, Discipline history, and any past Complaints and performance evaluations of involved officers.*

**In Full and Effective Compliance**

Our reviews of investigations conducted by MCSO have verified that the information required for compliance with this Paragraph is consistently provided in the checklist and investigative reports.

As a result of the Second Order and effective July 20, 2016, the PSB Commander makes all preliminary disciplinary decisions. The PSB and Administrative Services Division Commanders created a worksheet that provides information regarding how MCSO makes disciplinary decisions, and how MCSO considers employees' work history. PSB includes this form in the sustained investigation documentation that we receive and review for compliance.

During this reporting period, we reviewed 38 sustained administrative misconduct investigations. Sixteen of these 38 cases involved misconduct by sworn personnel. Eighteen involved misconduct by Detention personnel, and four involved civilian personnel. Twenty-nine of the 38 investigations involved personnel still employed by MCSO at the time final findings or discipline decisions were made. In 28 of the 29, the PSB Commander determined the findings and presumptive discipline range for the sustained violations. We found that generally, where appropriate, discipline history, past complaints, performance evaluations, traffic stop and patrol data, and training records were included in the documents considered for discipline findings. In one investigation, an administrative error was made resulting in a minor misconduct complaint being inappropriately exonerated. When this was discovered by PSB 18 months later, PSB determined that although the complaint should be sustained, due to the minor conduct involved, and the fact that the investigation had been previously closed, PSB would not assess discipline in this case. PSB sent an updated findings letter to the complainant that the complaint had been sustained. Based on the documents we reviewed, we have questions about the process and the final documentation in this case. We will discuss this with MCSO during our next site visit.

On October 5, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

***Paragraph 106.*** *Records of Complaints and investigations shall be maintained and made available, un-redacted, to the Monitor and Plaintiffs' representatives upon request. The Monitor and Plaintiffs' representatives shall maintain the confidentiality of any information therein that is not public record. Disclosure of records of pending investigations shall be consistent with state law.*

**In Full and Effective Compliance**

MCSO has two obligations under this Paragraph: to maintain and make records available. The Paragraph also covers the requirement that MCSO make unredacted records of such investigations available to the Plaintiffs' attorneys and Plaintiff-Intervenors as well.

WAI 56411

MCSO has been responsive to our requests, and neither the Plaintiffs nor Plaintiff-Intervenors have raised any concerns related to the requirements of this Paragraph for this or the past several reporting periods. MCSO, via its counsel, distributes responses to our document and site visit requests via a document-sharing website. The Plaintiffs' attorneys and Plaintiff-Intervenors have access to this information, including documents applicable to this Paragraph, at the same time as we do.

On June 3, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 56412

# Section 11: Community Engagement

**COURT ORDER XII.  COMMUNITY ENGAGEMENT**

### a. Community Outreach Program

***Paragraph 107.*** *To rebuild public confidence and trust in the MCSO and in the reform process, the MCSO shall work to improve community relationships and engage constructively with the community during the time that this order is in place.  To this end, the MCSO shall conduct the following district community outreach program.*

***Paragraph 109.*** *The Monitor shall hold at least one public meeting per quarter to coincide with the quarterly site visits by the Monitor in a location convenient to the Plaintiffs class.  The meetings shall be for the purpose of reporting the MCSO' progress in implementing this Order. These meetings shall be used to inform community members of the policy changes or other significant actions that the MCSO has taken to implement the provisions of this Order. Summaries of audits and reports completed by the MCSO pursuant to this Order shall be made available.  The meetings shall be under the direction of the Monitor and/or his designee.  The Sheriff and/or the MCSO will participate in the meetings to provide substantive comments related to the Melendres case and the implementation of the orders resulting from it, as well as answer questions related to its implementation, if requested to do so by the Monitor or the community.  If the Sheriff is unable to attend a meeting due to other obligations, he shall notify the Monitor at least 30 days prior to that meeting.  The Monitor shall consult with Plaintiffs' representatives and the Community Advisory Board on the location and content of the meetings.  The Monitor shall clarify for the public at these meetings that MCSO does not enforce immigration laws except to the extent that it is enforcing Arizona and federal criminal laws.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

This Paragraph, per the June 3, 2019 Order (Document 2431), returned the community meetings to the Monitor's supervision and directed the Monitor to hold at least one public meeting per quarter to coincide with the quarterly site visits by the Monitor in a location convenient to the Plaintiffs' class.

We did not travel to Maricopa County in April for our in-person quarterly site visit due to the COVID-19 pandemic.  We will consult with Plaintiffs' representatives or the Community Advisory Board regarding the location and content of our community meetings when we resume our in-person site visits.

WAI 56413

***Paragraph 110.*** *The meetings present an opportunity for the Monitor and MCSO representatives to listen to community members' experiences and concerns about MCSO practices. The Monitor may investigate and respond to those concerns. The Monitor shall inform the public that the purpose of the meeting is to discuss the Melendres case and the orders implementing the relief of that case. To the extent that the Monitor receives concerns at such meetings that are neither within the scope of this order nor useful in determining the Defendant's compliance with this order, it may inform the complainant how to file an appropriate complaint with the MCSO or appropriate law enforcement agency. The Sheriff may respond to non-Melendres questions raised at meetings to the extent, in his sole discretion, if the Sheriff wishes to do so.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

As noted above, we did not travel to Maricopa County in April for an in-person quarterly site visit, and therefore did not hold a community meeting.


***Paragraph 111.*** *English and Spanish-speaking Monitor Personnel shall attend these meetings and be available to answer questions from the public about its publicly available reports concerning MCSO's implementation of this Order and other publicly available information. The Plaintiffs' and Plaintiff-Intervenor's representatives shall be invited to attend and the Monitor shall announce their presence and state their availability to answer questions.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

As noted above, we did not travel to Maricopa County in April for an in-person quarterly site visit, and therefore did not hold a community meeting.


***Paragraph 112.*** *At least ten days before such meetings, the Monitor shall widely publicize the meetings in English and Spanish after consulting with Plaintiffs' representatives and the Community Advisory Board regarding advertising methods. Options for advertising include, but are not limited to, television, radio, print media, internet and social media, and any other means available. Defendants shall either provide a place for such meetings that is acceptable to the Monitor or pay the Monitor the necessary expenses incurred in arranging for such meeting places. The Defendants shall also pay the reasonable expenses of publicizing the meetings as required above, and the additional reasonable personnel and expenses that the Monitor will incur as a result of performing his obligations with respect to the Community Outreach Program. If any party determines there is little interest or participation in such meetings among community members, or that they have otherwise fulfilled their purpose, it can file a request with the Court that this requirement be revised or eliminated.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

WAI 56414

As we did not travel to Maricopa County in April, we did not hold a community meeting. We will consult with Plaintiffs' representatives and the Community Advisory Board regarding community meeting advertising when we resume our in-person site visits.

### b. MCSO Community Liaison

***Paragraph 113.** MCSO shall select or hire a Community Liaison who is fluent in English and Spanish. The hours and contact information of the MCSO Community Outreach Division ("COD") shall be made available to the public including on the MCSO website. The COD shall be directly available to the public for communications and questions regarding the MCSO.*

**Phase 1:** In compliance

- GJ-24 (Community Relations and Youth Programs), most recently revised on March 11, 2021.

**Phase 2:** In compliance

This Paragraph requires that MCSO select or hire a Community Liaison who is fluent in English and Spanish. MCSO's Community Outreach Division (COrD) has two Community Liaison Officers who are fluent in English and Spanish. The COrD uses the term "Community Liaison" for these two individuals and its other staff members, though not all of them are bilingual as required by this Paragraph.

The MCSO website lists the hours and contact information of the COrD and its staff – as well as the COrD's mission and overarching goals, and frequently asked questions regarding MCSO.

***Paragraph 114.** The COD shall have the following duties in relation to community engagement:*

*a.     to coordinate the district community meetings described above in Paragraphs 109 to 112;*

*b.     to provide administrative support for, coordinate and attend meetings of the Community Advisory Board described in Paragraphs 117 to 118; and*

*c.     to compile any complaints, concerns and suggestions submitted to the COD by members of the public about the implementation of this Order and the Court's order of December 23, 2011, and its findings of fact and conclusions of law dated May 24, 2013, even if they don't rise to the level of requiring formal action by IA or other component of the MCSO, and to respond to Complainants' concerns; and*

*d.     to communicate concerns received from the community at regular meetings with the Monitor and MCSO leadership.*

**Phase 1:** In compliance

- Court Implementation Division Operations Manual, most recently revised on November 13, 2019.

WAI 56415

- GJ-24 (Community Relations and Youth Programs), most recently revised on March 11, 2021.

**Phase 2:** In compliance

Pursuant to the June 3, 2019 Order (Document 2431), Subparagraphs a. and b. of this Paragraph are no longer applicable.

During this reporting period, the Deputy Chief designated as the CAB's point of contact continued to work with and provide support to the CAB. He distributed policies and other materials for CAB members to review and provide feedback, and tracked and responded to CAB members' inquiries and requests for information about MCSO's implementation of the Orders.

During this reporting period, the CAB did not hold any public meetings. Some CAB members participated in a few of our compliance meetings during our April remote site visit, as in the past – including meetings on community engagement, complaint intake testing and integrity testing, the Traffic Stop Monthly Reports, and MCSO's Constitutional Policing Plan.

COrD uses a form it created for capturing information on complaints, concerns, and suggestions submitted by members of the public to the COrD. MCSO has provided documentation that all current COrD personnel completed an online Complaint Intake and Processing course, to assist them in receiving and appropriately directing any complaints or concerns from community members they receive, including complaints of potential employee misconduct.

In the past, COrD personnel have reported that they occasionally receive concerns from community members, and that they forward those that are complaints to PSB; and that they sometimes receive inquiries for which COrD staff believe it is appropriate to direct community members to written materials or the MCSO website. COrD personnel did not submit any MCSO Complaint and Comment Forms for our review during this reporting period. In its submission for this reporting period, COrD personnel wrote, "From January 1, 2020-March 31, 2021 the Community Outreach Division received no complaints, concerns or suggestions by members of the public regarding implementation of the Court's Orders. Therefore, the Community Outreach Division prepared no response."

During our upcoming site visit, we will discuss with COrD personnel any complaints, concerns, and suggestions it has received from the public; as well as the requirement that COrD communicate any concerns received from the community at regular meetings with the Monitor and MCSO leadership.

WAI 56416

### c. Community Advisory Board

***Paragraph 115.*** *MCSO and Plaintiffs' representatives shall work with community representatives to create a Community Advisory Board ("CAB") to facilitate regular dialogue between the MCSO and the community, and to provide specific recommendations to MCSO and the Monitor about policies and practices that will increase community trust and ensure that the provisions of this Order and other orders entered by the Court in this matter are met. The MCSO shall cooperate with the Monitor to assure that members of the CAB are given appropriate access to relevant material, documents, and training so the CAB can make informed recommendations and commentaries to the Monitor.*

**Phase 1:** In compliance

- Court Implementation Division Operations Manual, most recently revised on November 13, 2019.

**Phase 2:** Not in compliance

CAB members continue to provide specific recommendations to MCSO about policies and practices that will increase community trust and ensure that the provisions of this Order and other Orders entered by the Court in this matter are met. During this reporting period, the CAB provided feedback on several MCSO policies.

During our last few site visits, we discussed with MCSO our concerns related to delays in MCSO's responsiveness to CAB members' requests for information, including some instances where CAB members provided feedback to MCSO and MCSO did not acknowledge receipt. For a few reporting periods after we first made MCSO aware of this concern, MCSO's responsiveness appeared to improve. However, during this reporting period, we noted some significant delays in MCSO's responsiveness – and, in some cases, lack of responsiveness – to CAB members.

We also continue to monitor MCSO personnel's interactions with CAB members during our site visit meetings. Some CAB members have expressed concerns that when they have shared their opinions with MCSO personnel during these meetings, they have been met with a brusque tone by some MCSO personnel. This is deeply concerning, as CAB members are volunteers who represent the Plaintiffs' class in this case. If MCSO is going to rebuild trust with the affected communities in this case, it would be advisable for MCSO representatives to begin this process by cultivating a positive and collaborative relationship with the CAB.

In addition, during the last reporting period, the CAB met with COrD personnel to discuss MCSO's placement of complaint forms at community locations throughout Maricopa County, per Paragraph 242. CAB members have, on several occasions during our site visit meetings, recommended that the COrD place complaint forms in locations including grocery stores, pharmacies, and other retail stores that are located in communities where members of the Plaintiffs' class live and work. Despite these suggestions, the COrD has not taken any steps to incorporate the CAB's feedback and recommendations. (See Paragraph 242.)

MCSO is not in compliance with this Paragraph.

WAI 56417

**Paragraph 116.** *The CAB shall have five members, two to be selected by MCSO and two to be selected by Plaintiffs' representatives. One member shall be jointly selected by MCSO and Plaintiffs' representatives. Members of the CAB shall not be MCSO Employees or any of the named class representatives nor any of the attorneys involved in this case. The CAB shall continue for at least the length of this Order.*

**Phase 1:** In compliance

- Court Implementation Division Operations Manual, most recently revised on November 13, 2019.

**Phase 2:** In compliance

The CAB is a five-member body – with two members selected by MCSO, two members selected by Plaintiffs' attorneys, and one member jointly selected by MCSO and Plaintiffs' attorneys.

The CAB currently has five members; none are MCSO employees, named class representatives, or attorneys involved in this case.


**Paragraph 117.** *The CAB shall hold meetings at regular intervals. The meetings may be either public or private as the purpose of the meeting dictates, at the election of the CAB. The Defendants shall provide a suitable place for such meetings. The Monitor shall coordinate the meetings and communicate with CAB members, and provide administrative support for the CAB.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

During this reporting period, the CAB did not hold any public meetings, but the CAB participated in several other activities. CAB members met regularly as a group, often with members of the Monitoring Team, and also met with the Sheriff to discuss their concerns. In addition, during our April remote site visit, some CAB members participated in a few of our compliance meetings. In our regular interactions with CAB members via conference calls and virtual meetings, we have provided information about MCSO's progress achieving compliance with the Orders and discussed ways to improve the relationship between the Plaintiffs' class and MCSO.


**Paragraph 118.** *During the meetings of the CAB, members will relay or gather concerns from the community about MCSO practices that may violate the provisions of this Order and the Court's previous injunctive orders entered in this matter and transmit them to the Monitor and the MCSO for investigation and/or action. The Parties will also be given the CAB's reports and recommendations to the Monitor.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

WAI 56418

As noted above, during this reporting period, the CAB did not hold any public meetings. As in the past, some CAB members participated in a few of our compliance meetings during our April remote site visit.

During this reporting period, we requested from MCSO documentation of concerns received from the CAB during their meetings about MCSO practices that may be in violation of the Court's Orders that were transmitted to the MCSO for investigation and/or action. According to MCSO, during this reporting period, "[T]he Community Outreach Division received no documentations of concerns from the CAB concerning MCSO practices that may be in violation of the Court's Orders, which were transmitted for investigation and/or action."

WAI 56419

**COURT ORDER XV.      MISCONDUCT INVESTIGATIONS, DISCIPLINE, AND GRIEVANCES**

*Paragraph 163.  The Sheriff will ensure that all allegations of employee misconduct, whether internally discovered or based on a civilian complaint, are fully, fairly, and efficiently investigated; that all investigative findings are supported by the appropriate standard of proof and documented in writing; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair, consistent, unbiased and provides due process.  To achieve these outcomes, the Sheriff shall implement the requirements set out below.*

### A.  Policies Regarding Misconduct Investigations, Discipline, and Grievances

*Paragraph 165.  Within one month of the entry of this Order, the Sheriff shall conduct a comprehensive review of all policies, procedures, manuals, and other written directives related to misconduct investigations, employee discipline, and grievances, and shall provide to the Monitor and Plaintiffs new policies and procedures or revise existing policies and procedures. The new or revised policies and procedures that shall be provided shall incorporate all of the requirements of this Order.  If there are any provisions as to which the parties do not agree, they will expeditiously confer and attempt to resolve their disagreements.  To the extent that the parties cannot agree on any proposed revisions, those matters shall be submitted to the Court for resolution within three months of the date of the entry of this Order.  Any party who delays the approval by insisting on provisions that are contrary to this Order is subject to sanction.*

**Phase 1:**  Not applicable

**Phase 2:**  Deferred

MCSO provided us with the following:

- CP-2 (Code of Conduct), most recently amended on July 30, 2020.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on March 4, 2021.

- CP-5 (Truthfulness), most recently amended on September 11, 2020.

- CP-8 (Preventing Racial and Other Bias-Based Profiling), most recently amended on September 4, 2020.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- EA-2 (Patrol Vehicles), most recently revised on March 3, 2021.

- GA-1 (Development of Written Orders), most recently amended on December 31, 2020.

- GB-2 (Command Responsibility), most recently amended on June 28, 2019.

- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

- GC-7 (Transfer of Personnel), most recently amended on December 4, 2019.

- GC-11 (Employee Probationary Periods), most recently amended on June 25, 2021.

- GC-12 (Hiring and Promotional Procedures), most recently amended on July 22, 2021.

- GC-16 (Employee Grievance Procedures), most recently amended on April 7, 2020.

- GC-17 (Employee Disciplinary Procedures), most recently amended on May 28, 2021.

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on October 1, 2020.

- GE-4 (Use, Assignment, and Operation of Vehicles), most recently amended on May 28, 2021.

- GG-1 (Peace Officer Training Administration), most recently amended on March 31, 2021.

- GG-2 (Detention/Civilian Training Administration), most recently amended on March 31, 2021.

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

- GH-5 (Early Identification System), most recently amended on March 3, 2021.

- GI-5 (Voiance Language Services), most recently amended on January 4, 2019.

- GJ-24 (Community Relations and Youth Programs), most recently revised on March 11, 2021.

- GJ-26 (Sheriff's Reserve Deputy Program), most recently amended on June 9, 2021.

- GJ-27 (Sheriff's Posse Program), most recently amended on June 25, 2021.

- GJ-35 (Body-Worn Cameras), most recently amended on December 31, 2019.

- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

- Audits and Inspections Unit Operations Manual, currently under revision.

- Body-Worn Camera Operations Manual, published on December 22, 2016.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

- Training Division Operations Manual, most recently amended on April 5, 2021.

WAI 56421

We received a majority of the documents listed above within one month of the entry of the Order. We and the Parties conducted initial reviews and returned the revised documents, with additional recommendations, to MCSO for additional work. MCSO continues to revise the remaining policies and operations manuals related to misconduct investigations, the Sheriff's Posse Program, Audits and Inspections, and Training. Those remaining policies and operations manuals identified by MCSO were in some phase of review by us and the Parties at the end of this reporting period.

This Paragraph implies that the review process and final adoption of the updated policies would take two months to complete, assuming that the new or revised policies were provided within one month of the issuance of the Second Order. The sheer volume of policies, as well as the extensive modifications they contain, rendered that target date unachievable. This is due, in large measure, to researched and well-considered recommendations by the Parties; and robust discussion about policy language, application, and outcomes during our site visit meetings.

**Paragraph 166.** *Such policies shall apply to all misconduct investigations of MCSO personnel.*

**Paragraph 167.** *The policies shall include the following provisions:*

a. *Conflicts of interest in internal affairs investigations or in those assigned by the MCSO to hold hearings and make disciplinary decisions shall be prohibited. This provision requires the following:*

    i. *No employee who was involved in an incident shall be involved in or review a misconduct investigation arising out of the incident.*

    ii. *No employee who has an external business relationship or close personal relationship with a principal or witness in a misconduct investigation may investigate the misconduct. No such person may make any disciplinary decisions with respect to the misconduct including the determination of any grievance or appeal arising from any discipline.*

    iii. *No employee shall be involved in an investigation, whether criminal or administrative, or make any disciplinary decisions with respect to any persons who are superior in rank and in their chain of command. Thus, investigations of the Chief Deputy's conduct, whether civil or criminal, must be referred to an outside authority. Any outside authority retained by the MCSO must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest.*

b. *If an internal affairs investigator or a commander who is responsible for making disciplinary findings or determining discipline has knowledge of a conflict of interest affecting his or her involvement, he or she should immediately inform the Commander of the Professional Standards Bureau or, if the holder of that office also suffers from a conflict, the highest-ranking, non-conflicted chief-level officer at MCSO or, if there is no*

WAI 56422

*non-conflicted chief-level officer at MCSO, an outside authority. Any outside authority retained by the MCSO must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest.*

c. *Investigations into an employee's alleged untruthfulness can be initiated by the Commander of the Professional Standards Bureau or the Chief Deputy. All decisions not to investigate alleged untruthfulness must be documented in writing.*

d. *Any MCSO employee who observes or becomes aware of any act of misconduct by another employee shall, as soon as practicable, report the incident to a Supervisor or directly to the Professional Standards Bureau. During any period in which a Monitor is appointed to oversee any operations of the MCSO, any employee may, without retaliation, report acts of alleged misconduct directly to the Monitor.*

e. *Where an act of misconduct is reported to a Supervisor, the Supervisor shall immediately document and report the information to the Professional Standards Bureau.*

f. *Failure to report an act of misconduct shall be considered misconduct and may result in disciplinary or corrective action, up to and including termination. The presumptive discipline for a failure to report such allegations may be commensurate with the presumptive discipline for the underlying misconduct.*

g. *No MCSO employee with a rank lower than Sergeant will conduct an investigation at the District level.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on July 30, 2020.
- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on March 4, 2021.
- CP-5 (Truthfulness), most recently amended on September 11, 2020.
- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.
- GH-2 (Internal Investigations), most recently amended on May 28, 2021.
- GC-16 (Employee Grievance Procedures), most recently amended on April 7, 2020.
- GC-17 (Employee Disciplinary Procedures), most recently amended on May 28, 2021.
- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we review administrative misconduct investigations.

WAI 56423

During this reporting period, we reviewed 93 closed administrative misconduct investigations. Sworn or Detention personnel assigned to the Professional Standards Bureau (PSB) conducted 60 of the investigations. Sworn supervisors in Districts or Divisions outside of PSB conducted the remaining 33.

Paragraph 167.a.i-iii. prohibits any employee with any conflicts of interest from participating in, holding hearings on, or making any disciplinary decisions in a misconduct investigation. During this reporting period, there were no instances where a conflict of interest was identified.

Paragraph 167.b. requires that if the internal affairs investigator or a commander responsible for making disciplinary decisions identifies a conflict of interest, appropriate notifications must be made immediately. There were no instances where a supervisor failed to identify a conflict of interest and inappropriately conducted an investigation.

Paragraph 167.c. requires that investigations into truthfulness be initiated by the Chief Deputy or the PSB Commander. MCSO identified five instances during this reporting period where they believed a truthfulness allegation was appropriate and initiated the proper investigation. We did not identify any instances during this reporting period where we believe a truthfulness investigation should have been initiated and was not.

Paragraph 167.d. requires that any MCSO employee who observes or becomes aware of misconduct by another employee shall immediately report such conduct to a supervisor or directly to PSB. Per the requirement, during the period in which the Monitor has authority to oversee any operations of MCSO, any employee may also report alleged misconduct to the Monitor. Of the 93 administrative cases we reviewed for this reporting period, there were 31 investigations where an employee reported potential misconduct by another employee, or a supervisor identified potential employee misconduct. There were no instances identified where an employee failed to immediately report potential misconduct about which he had been notified.

Paragraph 167.e. requires that when supervisors learn of an act of misconduct, the supervisor shall immediately document and report the information to PSB. There were no instances where a supervisor failed to immediately report and document alleged misconduct by another employee.

Paragraph 167.f. provides for the potential for a disciplinary sanction or other corrective action if an employee fails to bring forth an act of misconduct. During this reporting period, there were no instances where an employee failed to immediately complete the proper documentation to notify PSB of potential misconduct.

Paragraph 167.g. requires that a sergeant or higher-ranking employee conduct all misconduct investigations conducted at the District level. All District-level cases that we reviewed for this reporting period complied with this requirement.

WAI 56424

*Paragraph 168.* *All forms of reprisal, discouragement, intimidation, coercion, or adverse action against any person, civilian, or employee because that person reports misconduct, attempts to make or makes a misconduct complaint in good faith, or cooperates with an investigation of misconduct constitute retaliation and are strictly prohibited. This also includes reports of misconduct made directly to the Monitor, during any period in which a Monitor is appointed to oversee any operations of the MCSO.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on July 30, 2020.
- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on March 4, 2021.
- CP-5 (Truthfulness), most recently amended on September 11, 2020.
- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.
- GC-16 (Employee Grievance Procedures), most recently amended on April 7, 2020.
- GC-17 (Employee Disciplinary Procedures), most recently amended on May 28, 2021.
- GH-2 (Internal Investigations), most recently amended on May 28, 2021.
- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 93 administrative misconduct investigations that were completed during this reporting period.

During this reporting period, there were no investigations where any allegations applicable to compliance with this Paragraph were made.


*Paragraph 169.* *Retaliating against any person who reports or investigates alleged misconduct shall be considered a serious offense and shall result in discipline, up to and including termination.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on July 30, 2020.
- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on March 4, 2021.
- CP-5 (Truthfulness), most recently amended on September 11, 2020.
- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.
- GC-16 (Employee Grievance Procedures), most recently amended on April 7, 2020.

WAI 56425

- GC-17 (Employee Disciplinary Procedures), most recently amended on May 28, 2021.

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 93 administrative misconduct investigations that were completed during this reporting period.

During this reporting period, there were no allegations of retaliation made against any person who reports or investigates alleged misconduct.

*Paragraph 170.* *The Sheriff shall investigate all complaints and allegations of misconduct, including third-party and anonymous complaints and allegations. Employees as well as civilians shall be permitted to make misconduct allegations anonymously.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on May 28, 2021.

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 93 completed administrative misconduct investigations submitted during this reporting period. Sixty-six were initiated as a result of external complaints, and 27 were internally generated. We also reviewed three criminal investigations conducted by MCSO, two of which were generated externally. A fourth investigation that was an externally generated anonymous criminal misconduct complaint had been outsourced to another law enforcement agency. It was returned to MCSO after the agency made the determination that there was no substance to the allegation, and they had closed the case without a written report; this information was provided to MCSO in writing. The administrative investigation related to this complaint was outsourced to the outside investigator under contract with MCSO.

Of the 93 administrative misconduct investigations we reviewed for this reporting period, five involved externally generated anonymous complaints. Four others were third-party complaints. One of the four criminal misconduct investigations we reviewed was also generated due to an anonymous complaint. We have not become aware of any evidence indicating that MCSO refused to accept and complete any investigations initiated by third-party or anonymous complainants. None of the 93 administrative misconduct investigations we reviewed during this reporting period included any allegations indicating that any third-party or anonymous complaint was not appropriately accepted and investigated.

WAI 56426

***Paragraph 171.*** *The MCSO will not terminate an administrative investigation solely on the basis that the complainant seeks to withdraw the complaint, or is unavailable, unwilling, or unable to cooperate with an investigation, or because the principal resigns or retires to avoid discipline. The MCSO will continue the investigation and reach a finding, where possible, based on the evidence and investigatory procedures and techniques available.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 93 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

We determined that 12 of the 93 completed administrative investigations involved complainants who sought to withdraw their complaints; or were unavailable, unwilling, or unable to cooperate. MCSO completed all 12 investigations and reached a finding as required. We also found that in 14 of the 93 investigations, the principal left MCSO employment prior to the finalization of the investigation or discipline process. MCSO completed all of these investigations and reached a finding. None of the 93 investigations we evaluated for compliance were prematurely terminated.

***Paragraph 172.*** *Employees are required to provide all relevant evidence and information in their custody and control to internal affairs investigators. Intentionally withholding evidence or information from an internal affairs investigator shall result in discipline.*

**Phase 1:** In compliance

- CP-5 (Truthfulness), most recently amended on September 11, 2020.
- GC-17 (Employee Disciplinary Procedures), most recently amended on May 28, 2021.
- GH-2 (Internal Investigations), most recently amended on May 28, 2021.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph during this reporting period, we reviewed 93 completed administrative misconduct investigations conducted by MCSO personnel. There were two investigations identified by MCSO where an employee failed to accurately provide all information or evidence required during the investigation. In both, truthfulness investigations were initiated, and allegations sustained against the employees, resulting in their dismissal from the agency.

WAI 56427

***Paragraph 173.*** *Any employee who is named as a principal in an ongoing investigation of serious misconduct shall be presumptively ineligible for hire or promotion during the pendency of the investigation. The Sheriff and/or the MCSO shall provide a written justification for hiring or promoting an employee or applicant who is a principal in an ongoing investigation of serious misconduct. This written justification shall be included in the employee's employment file and, during the period that the MCSO is subject to Monitor oversight, provided to the Monitor.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

- GC-11 (Employee Probationary Periods), most recently amended on June 25, 2021.

- GC-12 (Hiring and Promotional Procedures), most recently amended on July 22, 2021.

**Phase 2:** In compliance

MCSO has established a protocol to address the requirements of this Paragraph. When a promotion list is established for sworn or Detention personnel, a copy of the list is forwarded to the Professional Standards Bureau (PSB). Before any promotion is finalized, PSB conducts a check of each employee's disciplinary profile in the automated system (IAPro). As part of the promotional process, MCSO conducts a meeting with command staff to discuss each employee's qualifications. During this meeting, the results of the IAPro checks are provided to the staff for review and consideration. The PSB Commander generally attends the promotion meetings for both Detention and sworn personnel, and clarifies any questions regarding the disciplinary history that the staff may have. When an employee is moved from a civilian employment position to a sworn employment position, MCSO conducts a thorough background investigation. The process involves a review and update of the candidate's PSB files, which is completed by Pre-Employment Services. For Detention employees who are moving to sworn positions, the information in the employee's file is updated to include any revised or new information. Due to the scheduling of our site visits, we inspect personnel files for employees who were promoted during the last month of the preceding quarter, and the first two months of the current reporting period. In our reviews, we ensure that the documentation, as it pertains to compliance with this Paragraph, is included in personnel files.

For the first quarter of 2021, MCSO reported the hire of a former employee who was in a different classification. The employee retired and was rehired as a civilian background investigations supervisor. The employee had a pending workplace grievance, which we do not believe involves serious misconduct. There were also two deputy trainees who upgraded from their former Detention Officer classification; each had one open internal investigation for allegations that, if sustained, would not result in serious discipline. None of the 18 employees promoted during this review period had any open internal investigations. We have been unable to review personnel files since January of 2020, due to the fact that we have conducted our site visits remotely. When we resume our in-person site visits, we will follow up on these cases to ensure that the appropriate documentation is included in each employee file.

WAI 56428

***Paragraph 174.*** *Employees' and applicants' disciplinary history shall be considered in all hiring, promotion, and transfer decisions, and this consideration shall be documented. Employees and applicants whose disciplinary history demonstrates multiple sustained allegations of misconduct, or one sustained allegation of a Category 6 or Category 7 offense from MCSO's disciplinary matrices, shall be presumptively ineligible for hire or promotion. MCSO shall provide a written justification for hiring or promoting an employee or applicant who has a history demonstrating multiple sustained allegations of misconduct or a sustained Category 6 or Category 7 offense. This written justification shall be included in the employee's employment file and, during the period that the MCSO is subject to Monitor oversight, provided to the Monitor.*

**Phase 1:** In compliance

- GC-12 (Hiring and Promotional Procedures), most recently amended on July 22, 2021.

**Phase 2:** In compliance

For employees who are promoted, the documentation submitted by MCSO generally includes the disciplinary history for the previous 10 years and any applicable disciplinary actions. MCSO also provides the disciplinary history of Detention and civilian employees who have been upgraded in classification to sworn status.

For the first quarter of 2021, MCSO did not report any new hires or promotions that would fall under the reporting requirements of this Paragraph. We have been unable to review personnel files since January 2020 due to COVID-19 restrictions. When we resume our in-person site visits, we will follow up on these cases to ensure that the appropriate documentation is included in each employee file.


***Paragraph 175.*** *As soon as practicable, commanders shall review the disciplinary history of all employees who are transferred to their command.*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on May 6, 2020.
- GC-7 (Transfer of Personnel), most recently amended on December 4, 2019.

**Phase 2:** In compliance

Per policy, MCSO is to conduct an EIS review within 14 days of an affected employee's transfer. We requested a list of employees that were transferred during this reporting period. From the list, we selected a sample of employees to review and verify that there was documentation of the required EIS reviews. To verify compliance with this Paragraph, we review the transfer request documents that MCSO completes for each employee. The documents memorialize the commander's acknowledgment of review of the transferred employee's disciplinary history, as well as the review of the employee's performance appraisals for the previous five years. This review is generally conducted before the gaining commander accepts the transfer, a few days prior to the transfer becoming effective.

WAI 56429

For January, we requested a list of employees who were transferred during the previous month. MCSO submitted a list, and we selected a sample of 24 employees who would fall under the requirements of this Paragraph. The list we requested was comprised of 11 Detention employees and 13 sworn employees. Of the 24 employees requested, all had proper documentation of command review of their EIS profiles. The compliance rate for January was 100%.

For February, we requested a list of employees who were transferred during the previous month. We selected a sample of 23 employees to review. This list was comprised of 11 Detention employees and 12 sworn employees. Of the 11 Detention employees, 10 had proper documentation of command review of their EIS profiles. Of the 12 sworn employees, all had proper documentation of command review of their EIS profiles. The compliance rate for February was 95.65%.

For March, we requested a list of employees who were transferred during the previous month. MCSO submitted a list, and we selected all 17 employees transferred. This list was comprised of 14 Detention employees and three sworn employees. All of the 14 Detention Officers had proper documentation of command review of their EIS profiles, and all three sworn employees had proper documentation of command review of their EIS profiles. The compliance rate for March was 100%. For the first quarter of 2021, 64 of 65 employees transferred had proper documentation of command review of their EIS profiles. The compliance rate for the quarter was 98.46%.

**Paragraph 176.** *The quality of investigators' internal affairs investigations and Supervisors' reviews of investigations shall be taken into account in their performance evaluations.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

**Phase 2:** In compliance

This Paragraph requires that employees who conduct misconduct investigations have an assessment on the quality of their investigations documented in their Employee Performance Appraisals. This Paragraph also requires that Commanders who review their subordinates' misconduct investigations be assessed on the quality of those reviews, in their own EPAs. To assess compliance with this Paragraph, we look for specific comments by raters completing EPAs. In supervisor EPAs, we look for comments addressing the quality of investigations. In commanders' EPAs, we look for comments assessing the quality of reviews of investigations. In many instances, the employee being rated does not have any subordinates, or has not completed or reviewed any misconduct investigations. In these cases, we look for comments by the rater that indicate why the employee was not rated on this requirement.

We reviewed Employee Performance Appraisals for 31 supervisors and commanders who received EPAs during this reporting period. Twenty-eight of 31 supervisor EPAs rated the quality and effectiveness of supervision. Twenty-eight of 31 supervisor EPAs contained comments and/or rated the supervisors' demonstrated ability to identify and effectively respond to misconduct. Twenty-three of 31 supervisor EPAs sufficiently commented on the supervisors'

WAI 56430

quality of their reviews. Thirty of 31 supervisor EPAs assessed the employees' quality of internal investigations and/or the quality of their reviews of internal investigations, as required by this Paragraph. The compliance rate for this reporting period was 96.77%.

**Paragraph 177.** *There shall be no procedure referred to as a "name-clearing hearing." All pre-disciplinary hearings shall be referred to as "pre-determination hearings," regardless of the employment status of the principal.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on May 28, 2021.
- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 93 administrative misconduct investigations that were completed during this reporting period.

In misconduct investigations that resulted in serious discipline and in which the employee was afforded the opportunity for an administrative hearing, the only reference to the hearing was "pre-determination hearing."

**B.**     ***Misconduct-Related Training***

**Paragraph 178.** *Within three months of the finalization of these policies consistent with ¶ 65of this Order, the Sheriff will have provided all Supervisors and all personnel assigned to the Professional Standards Bureau with 40 hours of comprehensive training on conducting employee misconduct investigations. This training shall be delivered by a person with subject matter expertise in misconduct investigation who shall be approved by the Monitor. This training will include instruction in:*

a.    *investigative skills, including proper interrogation and interview techniques, gathering and objectively analyzing evidence, and data and case management;*

b.    *the particular challenges of administrative law enforcement misconduct investigations, including identifying alleged misconduct that is not clearly stated in the complaint, or that becomes apparent during the investigation;*

c.    *properly weighing the credibility of civilian witnesses against employees;*

d.    *using objective evidence to resolve inconsistent statements;*

e.    *the proper application of the appropriate standard of proof;*

f.    *report-writing skills;*

g.    *requirements related to the confidentiality of witnesses and/or complainants;*

h.    *considerations in handling anonymous complaints;*

WAI 56431

i.      relevant MCSO rules and policies, including protocols related to administrative investigations of alleged officer misconduct; and

j.      relevant state and federal law, including Garrity v. New Jersey, and the requirements of this Court's orders.

**Phase 1:** Not applicable

**Phase 2:** In compliance

MCSO conducted the train-the-trainer for the 2020 Misconduct Investigative Training (PSB40) in March. A combination of 13 sworn and one Detention personnel attended the train-the-trainer. All personnel successfully completed testing. This course is reserved for delivery to newly identified individuals for promotion to sergeant on an as-needed basis.


***Paragraph 179.*** *All Supervisors and all personnel assigned to the Professional Standards Bureau also will receive eight hours of in-service training annually related to conducting misconduct investigations. This training shall be delivered by a person with subject matter expertise in misconduct investigation who shall be approved by the Monitor.*

**Phase 1:** In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on March 31, 2021.

- GG-2 (Detention/Civilian Training Administration), most recently amended on March 31, 2021.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

The 2020 annual eight-hour in-service training for the Professional Standards Bureau personnel (PSB8 Internal) was previously delivered to all 43 PSB personnel (100%).

The 2020 annual eight-hour in-service training for District supervisors (PSB8 External) was previously approved for delivery. During this reporting period, the curriculum was delivered six times to 129 of 181 sworn personnel (71%). One individual required test remediation.

WAI 56432

***Paragraph 180.*** *Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all employees on MCSO's new or revised policies related to misconduct investigations, discipline, and grievances. This training shall include instruction on identifying and reporting misconduct, the consequences for failing to report misconduct, and the consequences for retaliating against a person for reporting misconduct or participating in a misconduct investigation.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on July 30, 2020.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on March 4, 2021.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- GB-2 (Command Responsibility), most recently amended on June 28, 2019.

- GC-16 (Employee Grievance Procedures), most recently amended on April 7, 2020.

- GC-17 (Employee Disciplinary Procedures), most recently amended on May 28, 2021.

- GG-1 (Peace Officer Training Administration), most recently amended on March 31, 2021.

- GG-2 (Detention/Civilian Training Administration), most recently amended on March 31, 2021.

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

- GJ-26 (Sheriff's Reserve Deputy Program), most recently amended on June 9, 2021.

- GJ-27 (Sheriff's Posse Program), most recently amended on June 25, 2021.

- Training Division Operations Manual, most recently amended on April 5, 2021.

**Phase 2:** In compliance

MCSO distributes new or annually revised policies via the HUB, an electronic training management system. Each distribution requires all employees to complete personal attestations indicating they have read and understand the policy requirements.

To assess compliance with this Paragraph, we review the HUB generated reports of attestations that identify each individual and their dates of review. Compliance assessments for this Paragraph are based on the review of attestations for the following policies: CP-2 (Code of Conduct); CP-3 (Workplace Professionalism: Discrimination and Harassment); CP-11 (Anti-Retaliation); GB-2 (Command Responsibility); GH-2 (Internal Investigations); GC-16 (Employee Grievance Procedures); and GC-17 (Employee Disciplinary Procedures).

During this reporting period, we reviewed the status of individual reviews for Briefing Board (BB) 20-49 (CP-2), BB 21-13 (CP-3), BB 18-48 (CP-11), BB 20-60 (GB-2), BB 20-39 (GH-2), BB 20-15 (GC-16), and BB 20-39 (GC-17). All employee categories remain in compliance.

WAI 56433

***Paragraph 181.*** *Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all employees, including dispatchers, to properly handle civilian complaint intake, including how to provide complaint materials and information, and the consequences for failing to take complaints.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on May 28, 2021.

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

- GG-1 (Peace Officer Training Administration), most recently amended on March 31, 2021.

- GG-2 (Detention/Civilian Training Administration), most recently amended on March 31, 2021.

- Training Division Operations Manual, most recently amended on April 5, 2021.

**Phase 2:**  In compliance

MCSO currently delivers the 2017 Complaint Intake and Reception Training via the HUB to all new hires in all personnel categories.  This initial training provides important guidance when interacting with members of the public who wish to file a complaint against MCSO personnel.  In March, MCSO distributed this curriculum for first review to us and the Parties.  The curriculum remains under review.


***Paragraph 182.*** *Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all Supervisors on their obligations when called to a scene by a subordinate to accept a civilian complaint about that subordinate's conduct and on their obligations when they are phoned or emailed directly by a civilian filing a complaint against one of their subordinates.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on May 28, 2021.

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

- GG-1 (Peace Officer Training Administration), most recently amended on March 31, 2021.

- GG-2 (Detention/Civilian Training Administration), most recently amended on March 31, 2021.

- Training Division Operations Manual, most recently amended on April 5, 2021.

**Phase 2:**  In compliance

WAI 56434

Several training programs – the ACT, SRELE, EIS, and the PSB40 – address the requirements of this Paragraph by including policy reference and additional direction when appropriate. Additional direction to supervisors and deputies may not appear in each annual delivery, depending upon the content included. We will review all newly developed or revised curriculum for 2021 for content related to Complaint Intake and Investigation.

### C. Administrative Investigation Review

**Paragraph 183.** *The Sheriff and the MCSO will conduct objective, comprehensive, and timely administrative investigations of all allegations of employee misconduct. The Sheriff shall put in place and follow the policies set forth below with respect to administrative investigations.*

**Paragraph 184.** *All findings will be based on the appropriate standard of proof. These standards will be clearly delineated in policies, training, and procedures, and accompanied by detailed examples to ensure proper application by internal affairs investigators.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 93 completed administrative misconduct investigations conducted during this reporting period.

Of the 93 cases we reviewed, 91 (98%) complied with the requirements of this Paragraph. In one, we believe a finding of not sustained for one of the alleged violations was inappropriate and the allegation should have been sustained. In a second investigation that was unfounded, we believe a finding of not sustained should have been made.

During our next site visit, we will discuss these investigations with PSB personnel.

**Paragraph 185.** *Upon receipt of any allegation of misconduct, whether internally discovered or based upon a civilian complaint, employees shall immediately notify the Professional Standards Bureau.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 93 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period. In all 93, PSB was appropriately notified at the time of the complaint as required. We also reviewed three criminal misconduct investigations conducted by MCSO. PSB was appropriately notified in all three of these investigations.

WAI 56435

**Paragraph 186.** *Effective immediately, the Professional Standards Bureau shall maintain a centralized electronic numbering and tracking system for all allegations of misconduct, whether internally discovered or based upon a civilian complaint. Upon being notified of any allegation of misconduct, the Professional Standards Bureau will promptly assign a unique identifier to the incident. If the allegation was made through a civilian complaint, the unique identifier will be provided to the complainant at the time the complaint is made. The Professional Standards Bureau's centralized numbering and tracking system will maintain accurate and reliable data regarding the number, nature, and status of all misconduct allegations, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status, if requested, and final disposition of the complaint. The system will be used to determine the status of misconduct investigations, as well as for periodic assessment of compliance with relevant policies and procedures and this Order, including requirements of timeliness of investigations. The system also will be used to monitor and maintain appropriate caseloads for internal affairs investigators.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

During numerous site visits, we have met with PSB personnel to discuss and observe the capabilities of IAPro, which serves as the technology instrument that meets the compliance criteria of this Paragraph. IAPro logs critical dates and times, alerts regarding timeframes and deadlines, chronological misconduct investigation status, notifications, and dispositions. The tracking system provides estimates of key timeframes for all investigators to ensure that they learn of previous and upcoming investigative milestones. PSB has confirmed that civil notice claims are entered in the tracking system. The IAPro system integrates exceptionally well with the EIS and BlueTeam technology systems and can be remotely accessed.

PSB has a management analyst dedicated to the administration of the centralized tracking system. The documentation that PSB has provided to us for review, and the direct user access that a member of our Team has to the centralized numbering and tracking system, indicates that the system possesses the functionality as required by this Paragraph and is being used according to the requirements of this Paragraph.

During this reporting period, we found that all 93 administrative misconduct investigations were properly assigned a unique identifier. All were both initiated and completed after July 20, 2016. Sixty-six involved an external complaint requiring that PSB provide the complainant with this unique identifier. In all of the cases, PSB sent an initial letter to the complainant or provided an acceptable reason for not doing so. In some cases, anonymous complainants do not provide contact information; and in others, known complainants decline to provide MCSO with adequate contact information. PSB has developed a form that identifies the reason why a required notification letter is not sent, and includes this document in the cases it forwards for our review.

WAI 56436

**Paragraph 187.** *The Professional Standards Bureau shall maintain a complete file of all documents within the MCSO's custody and control relating to any investigations and related disciplinary proceedings, including pre-determination hearings, grievance proceedings, and appeals to the Maricopa County Law Enforcement Merit System Council or a state court.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

**Phase 2:** In compliance

To determine compliance with this Paragraph, we have verified that PSB maintains both hardcopy and electronic files intended to contain all the documents required for compliance with this Paragraph.

During our site visits, a member of our Team inspects the file rooms where hardcopies of investigations are stored and randomly reviewed case files to verify compliance. We have verified that criminal and administrative investigation files are stored in separate rooms, and access to these rooms is restricted. Our Team member has also used the access granted to IAPro to randomly select internal affairs case files to verify that all information is being maintained electronically.

In May 2018, PSB relocated to its new offsite facility. We confirmed at that time that PSB maintained both hardcopy and electronic files intended to contain all documents required for compliance with this Paragraph at the new facility.

During our January 2019 site visit, a member of our Team verified continued compliance at the PSB facility by inspecting both the criminal and administrative investigation file rooms and randomly selecting internal affairs case files to verify that all information was also being electronically maintained in IAPro.

During our October 2019 site visit, a member of our Team verified continued compliance at the PSB facility by inspecting both the criminal and administrative investigation file rooms. We also randomly reviewed both electronic and hard-copy documents to ensure that all information was being maintained as required for compliance with this Paragraph.


**Paragraph 188.** *Upon being notified of any allegation of misconduct, the Professional Standards Bureau will make an initial determination of the category of the alleged offense, to be used for the purposes of assigning the administrative investigation to an investigator. After initially categorizing the allegation, the Professional Standards Bureau will promptly assign an internal affairs investigator.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

WAI 56437

To assess Phase 2 compliance with this Paragraph, we review administrative misconduct investigations and service complaints that were forwarded for our review by MCSO personnel during the reporting period.

We previously concurred with MCSO that Phase 2 compliance with this Paragraph would be based on PSB's determination of the initial allegations, and not which category of offense was determined once the investigation is completed.

During this reporting period, MCSO submitted 93 administrative misconduct investigations for our review. All 93 complied with the requirements of this Paragraph.

MCSO completed and submitted 109 service complaints for our review during this reporting period. Of these, 101 (93%) met the requirements established in the service complaint process. This is a decrease from 97% during the last reporting period. Thirteen (12%) were appropriately reclassified to administrative misconduct investigations either by the initiating District or Division, or after the complaints were reviewed by PSB. The remaining 96 were classified and handled as service complaints. Of the 96 complaints closed as service complaints, we found MCSO compliant in 88. In one, we believe that misconduct allegations were made, and an administrative misconduct investigation should have been conducted. In a second, while the complaint was appropriately classified and investigated as a service complaint, no contact was made with the complainant. In six cases, we concur with the service complaint designation and the outcome; but all six lacked a timely response to the complainant.

As we have consistently noted in our review of service complaints, the majority of these complaints involve laws, policies, or procedures where there is no employee misconduct; or are complaints where it is determined that MCSO employees are not involved. During this reporting period, 63 (66%) of the 96 closed service complaints did not involve allegations of misconduct. Twenty-one (22%) did not involve MCSO employees, nine (9%) were closed due to lack of specificity, and five (5%) were closed based on a combination of factors.

In numerous discussions during our 2018 site visits, PSB advised us that the number of service complaints far exceeded the Bureau's expectations. PSB also noted that, consistently, 20-25% of the service complaints did not involve MCSO employees. Our reviews of completed service complaints confirmed this assertion, and we agreed to review an expedited process for handling complaints where PSB determined that the complaint did not involve MCSO personnel.

WAI 56438

In July 2019, PSB pursued its proposal to use an expedited process to handle service complaints where it could be immediately determined that the complaint did not involve MCSO personnel. We and the Parties reviewed and approved the process. We had also discussed with PSB concerns we had found in some service complaints that were completed at the District level and forwarded to PSB for review and approval. In some, PSB determined that a service complaint was inappropriate, and a misconduct investigation should be opened. While PSB has identified those service complaints that should be administrative investigations, as is the case with administrative misconduct investigations conducted by District personnel, PSB is again correcting the work of other personnel. To address this concern and ensure accountability, PSB added a signature line to this revised service complaint form. District and Division Command personnel now note their review and approval of service complaints prior to them being forwarded to PSB for a final review.

Consistent with the provisions of the revised policies on internal investigations and discipline, the PSB Commander now has the discretion to determine that internal complaints alleging minor policy violations can be addressed without a formal investigation if certain criteria exist. If the PSB Commander makes this determination, it must be documented.

During the last reporting period, the PSB Commander did not determine that any internally generated complaint would be addressed without a formal investigation.

During this reporting period, the PSB Commander determined that two internally generated complaints met the criteria to be handled without a formal investigation and were eligible for a coaching. We concur with this decision.

Compliance for this Paragraph is based on our findings for administrative misconduct investigations (93), service complaints (109), and coachings (two) combined; and was 96% for this reporting period.

**Paragraph 189.** *The Professional Standards Bureau shall administratively investigate:*

a. *misconduct allegations of a serious nature, including any allegation that may result in suspension, demotion, or termination; and*

b. *misconduct indicating apparent criminal conduct by an employee.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on July 30, 2020.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on March 4, 2021.

- CP-5 (Truthfulness), most recently amended on September 11, 2020.

- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on May 28, 2021.

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

WAI 56439

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph during this reporting period, we reviewed 93 completed administrative misconduct investigations conducted by MCSO personnel.

Division or District personnel outside of PSB investigated 33 of the 93 administrative misconduct investigations submitted for review during this reporting period. PSB investigators conducted 60 of the investigations. PSB also submitted three criminal investigations for review. We did not identify any misconduct investigations that were conducted by a District supervisor where we believe that potential additional misconduct discovered during the initial investigation should have resulted in the investigation being forwarded to PSB for completion and was not.

***Paragraph 190.*** *Allegations of employee misconduct that are of a minor nature may be administratively investigated by a trained and qualified Supervisor in the employee's District.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed a total of 96 investigations conducted by MCSO personnel and completed during this reporting period. Of these, 93 were administrative investigations, and three were criminal investigations.

Of the 93 administrative misconduct cases we reviewed for this Paragraph, PSB investigators conducted 60. Thirty-three were investigated at the District or Division level. We did not identify any instances where a District or Division supervisor conducted any investigation that should have been conducted by PSB.

MCSO has complied with the requirements to train all supervisors who conduct minor misconduct investigations.

***Paragraph 191.*** *If at any point during a misconduct investigation an investigating Supervisor outside of the Professional Standards Bureau believes that the principal may have committed misconduct of a serious or criminal nature, he or she shall immediately notify the Professional Standards Bureau, which shall take over the investigation.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

**Phase 2:** In compliance

WAI 56440

To determine Phase 2 compliance with this Paragraph, we reviewed 93 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period. Of the 33 administrative misconduct cases investigated at the District or Division level, we did not identify any cases where we believe that potential serious misconduct was discovered by the investigating supervisor and the supervisor failed to forward the case to PSB.

**Paragraph 192.** *The Professional Standards Bureau shall review, at least semi-annually, all investigations assigned outside the Bureau to determine, among the other matters set forth in ¶ 251 below, whether the investigation is properly categorized, whether the investigation is being properly conducted, and whether appropriate findings have been reached.*

**Phase 1:** In compliance

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

PSB command personnel advised us that they continue to review investigations in "real time" as they come into the Bureau. During this reporting period, MCSO provided copies of PSB's reviews of 39 completed Division-level misconduct investigations that were assigned outside of the Bureau. The review template used by PSB includes sections that address whether or not the investigation is properly categorized, whether the investigation is properly conducted, and whether appropriate findings have been reached. Additionally, copies of emails detailing the quality of the investigation, identified deficiencies, and required edits sent electronically to affected Division Commanders were provided for each case reviewed.

PSB included the information required by this Paragraph in its semi-annual public Misconduct Investigations Report, which is required under Paragraph 251. The most recent report was published on MCSO's website in January 2021. The report covers the period of January 1-June 30, 2020; and contains an analysis as to whether cases assigned outside of PSB were properly categorized, whether the investigations were properly conducted, and whether appropriate findings have been reached.

MCSO remains in compliance with this Paragraph.

**Paragraph 193.** *When a single act of alleged misconduct would constitute multiple separate policy violations, all applicable policy violations shall be charged, but the most serious policy violation shall be used for determining the category of the offense. Exoneration on the most serious offense does not preclude discipline as to less serious offenses stemming from the same misconduct.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on May 28, 2021.

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

WAI 56441

- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 93 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period. Thirty-eight had sustained allegations against one or more employees. In 29 of these investigations, at least one principal employee was still an MCSO employee at the time the investigation was completed or discipline decisions were made. In 28, the most serious policy violation was used to determine the final category of the offense for discipline purposes, if more than one policy violation was sustained. In one, no discipline was assessed due to an administrative error.

In cases where multiple violations of policy occurred, this information was listed on the preliminary discipline document. There were no cases where the exoneration of any offense precluded discipline for any sustained allegations.

***Paragraph 194.***  *The Commander of the Professional Standards Bureau shall ensure that investigations comply with MCSO policy and all requirements of this Order, including those related to training, investigators' disciplinary backgrounds, and conflicts of interest.*

**Phase 1:**  In compliance

- CP-2 (Code of Conduct), most recently amended on July 30, 2020.
- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on March 4, 2021.
- CP-5 (Truthfulness), most recently amended on September 11, 2020.
- CP-11 (Anti-Retaliation), most recently amended on December 13, 2018.
- GC-16 (Employee Grievance Procedures), most recently amended on April 7, 2020.
- GC-17 (Employee Disciplinary Procedures), most recently amended on May 28, 2021.
- GH-2 (Internal Investigations), most recently amended on May 28, 2021.
- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  Not in compliance

We determine Phase 2 compliance with this Paragraph by a review of completed misconduct investigations conducted by MCSO personnel, the review of attendance by internal investigators at required Misconduct Investigative Training, the disciplinary backgrounds of internal investigators, and the efforts being made by the PSB Commander to reach compliance.

WAI 56442

We reviewed 93 administrative misconduct investigations and three criminal investigations submitted by MCSO during this reporting period. All three of the criminal investigations complied with MCSO policy and the requirements of the Second Order.

Administrative investigations are required to be completed within 60 days if completed outside of PSB and within 85 days if completed by PSB personnel. Of the 93 total investigations reviewed for this reporting period, 33 (35%) were completed within the required timeframes or contained a reasonable extension request that was specific to the investigation, a decrease from 51% during the last reporting period. The remaining investigations continued to identify general justifications including supervisory responsibilities, workload, prioritization of investigations, training, sitting second chair in investigations, and others. Additional investigations, while completed by the investigator within the required timeframe, were not reviewed and finalized within 180 days. These cases also cited an excessive workload as one of the primary reasons for the lengthy review times. This is a serious issue that continues to worsen quarter after quarter, now resulting in the closure of investigations taking an average of 604 days – an increase from 524 days during the last reporting period. As we have noted in the last three reporting periods, we no longer accept extensions that do not contain reasonable justifications specific to each investigation.

Of the 93 administrative misconduct cases we reviewed, PSB personnel completed 60. Twenty-five investigations were conducted by sworn investigators. Thirty-two investigations were conducted by Detention investigators and three were conducted by civilian investigators. We found deficiencies other than extensions in six (10%) of the total 60 investigations. In three of the investigations conducted by sworn personnel, while we concur with the findings of sustained in the investigations, we disagree with the determination of the category of offense for the violations. All three were related to unintentional weapons discharges. The PSB Commander erred in determining that these were Category 2 violations. The Matrix that reclassified these type violations to Category 2 was not approved until more than a year after these incidents occurred. The Matrices in effect at the time of the alleged misconduct and investigation should have been used. In another case conducted by a sworn investigator, we believe insufficient evidence existed to unfound the complaint and it should have been not sustained. In one case investigated by a civilian investigator, there were numerous leading questions asked during the interview of the principal in the investigation; and in one investigated by a Detention investigator, we believe there were allegations that should have been sustained and were not. With the inclusion of those investigations that were found noncompliant based on our review of extension requests, the overall compliance for the 60 investigations conducted by PSB was 17% – a slight decrease from 18% during the last reporting period.

Districts or Divisions outside of PSB conducted 33 investigations. Thirteen were noncompliant due to improper findings, leading questions, or a combination of investigative and administrative deficiencies. With the inclusion of those investigations found not compliant due to the lack of appropriate extensions, the overall compliance for investigations conducted outside of PSB was 15% for this reporting period, a decrease from 20% during the last quarter.

WAI 56443

As a result of both investigative deficiencies and administrative deficiencies, including those related to extension compliance, overall compliance for all administrative investigations conducted by MCSO was 16% for this reporting period, a decrease from 22% the last reporting period.

There are many factors that impact the PSB Commander's ability to ensure compliance in all cases. One factor is that the PSB Commander must rely on other PSB staff members to conduct case reviews and ensure proper documentation is completed. We continue to find that, in most cases, PSB personnel are identifying and ensuring that corrections are made and all documentation is completed in those cases they review. In some cases, deficiencies cannot be corrected after the fact.

Another factor affecting the PSB Commander's ability to ensure that all investigations are properly completed is that the Appointing Authority – not the PSB Commander – determines the final findings and discipline. During this reporting period, there were no instances where the Appointing Authority overturned a finding made by the PSB Commander.

Of continued concern, and a significant factor in the inability of the PSB Commander to ensure investigations are properly completed, has been the ongoing lack of investigative compliance for those investigations conducted and reviewed by District and Division personnel outside of PSB. While PSB is still identifying the majority of deficiencies in the District and Division cases, for this reporting period, we noted an increased amount of attention focused on these investigations by both Command and Executive staff, to include Deputy Chiefs now reviewing investigations conducted and reviewed by their personnel. While this review has significantly extended the amount of time it takes for completed investigations to be forwarded to PSB, resulting in increased deficiencies with timeline requirements, we have noted improvement in the investigative quality of cases forwarded to PSB since this review process started.

While PSB continues to experience challenges in ensuring that completed internal investigations are reaching compliance with both MCSO policy and both Court Orders, the Bureau has made efforts to improve compliance. A member of our Team continues to meet with PSB every two weeks to discuss Class Remedial Matters. We also use this opportunity to discuss other ongoing concerns that affect compliance with the Second Order.

During our site visits, we have continued to meet with PSB personnel and District and Division command personnel to update them on our identification of training and performance issues that adversely affect compliance with the Second Order. Since January 2017, Detention personnel assigned to PSB to oversee investigations have also participated in these meetings. We have used these meetings to discuss concerns with the quality of investigations; opportunities for improvement; and in some cases, investigative protocols.

PSB has taken a number of actions to address both investigative deficiencies, and other concerns with the completion of administrative misconduct investigations that have been identified. Additional oversight was added for Detention investigations; PSB personnel were assigned as liaisons with District personnel; a service complaint process was developed and approved; revisions to witness and complaint interview processes were proposed and approved; a new protocol for the handling of service complaints not involving MCSO personnel was proposed and

WAI 56444

approved; and the PSB Commander was given the authority to resolve some minor internally generated complaints without the necessity to conduct an administrative misconduct investigation.

In addition to those actions that have been approved to address continuing backlogs and other challenges with administrative misconduct investigations, we have had ongoing discussions with PSB and the Parties during our site visits regarding other potential opportunities to address these challenges. These discussions have included many suggestions and potential modifications to existing protocols, including such changes as: expanding the use of the service complaint process; using alternative types of administrative closures; discontinuing investigations of former employees if the conduct was not criminal in nature, would not affect law enforcement certification, and did not involve current MCSO employees; discretion for the investigation of minor policy violations that occurred more than three years prior to the complaint being filed; implementing an expedited discipline process for sustained cases; and increasing investigative time requirements.

In September 2019, we met with the Executive Chief who has oversight of PSB to discuss ongoing challenges with the completion of misconduct investigations. Some of our discussion included topics already discussed with our Team and the Parties, and others were new. The Executive Chief committed to developing a list of the ideas shared, along with more detailed information about how each idea might be implemented. The intent was to then share this information with our Team and the Parties. The Executive Chief informed us that due to other priorities, this information would not be ready for discussion until our January 2020 site visit.

During our October 2019 site visit, we met with PSB and the Parties to discuss the ongoing issues with the completion of misconduct investigations. We briefly discussed some potential remedies, and then tabled the discussion until our January 2020 site visit when MCSO would be prepared to provide more detailed information on any proposals the agency wished to bring forward.

During our January 2020 site visit, PSB provided a document containing the Bureau's ideas and recommendations regarding the investigation of alleged employee misconduct. After some discussion, our Team offered to facilitate discussions with MCSO, Plaintiffs, and Plaintiff-Intervenors, to discuss the topics brought forward by MCSO; and any additional ideas that might be brought forward by any other member of the group. We advised all that we would discuss only those items that did not require a change to the Orders. We facilitated this conference call with MCSO and the Parties in February 2020. During this call, MCSO personnel stated that they believed that all of the ideas and recommendations they had brought forward would require a change to the Orders and they had no additional suggestions to add. The representatives of the Plaintiffs and Plaintiff-Intervenors agreed with MCSO and added that they also had no additional suggestions or ideas to bring forward. The Parties have continued to address this issue in both the meet-and-confer and other processes.

In 2014, PSB initiated 717 internal investigations. In 2015, PSB initiated 916 cases; and in 2016, 847 cases. There were 1,028 cases initiated in 2017. In 2018, there were 1,114 investigations initiated; 354 service complaints; 716 administrative misconduct investigations; 36 criminal investigations; and eight critical incident investigations. In 2019, PSB initiated a total of 1,072 investigations.

WAI 56445

During our January 2021 remote site visit, PSB personnel reported that PSB had opened a total of 1,204 investigations in 2020, compared to 1,072 opened in 2019. Of the total cases opened in 2020, 704 were administrative misconduct investigations, compared to 576 in 2019. Service complaints opened for 2020 totaled 452, compared to 453 in 2019.

During our April 2021 remote site visit, PSB personnel reported that PSB had opened 269 total investigations for the first three months of 2021, compared to 266 during the same three-month period in 2020. The total number includes administrative misconduct investigations, service complaints, criminal misconduct investigations, and critical incident investigations – though the majority are administrative misconduct investigations and service complaints. Of the total opened, 163 were administrative misconduct investigations compared to 144 during the same period in 2020. Service complaints opened for the first three months of 2021 were 88, compared to 109 during the same period in 2020.

In 2016, prior to the implementation of the Court's Second Order, PSB investigators were carrying an average active caseload of 12-16 cases each month. By 2018, PSB advised us that the average active caseload each month for sworn investigations was 36; and for Detention investigators, 28. The average closure of a case took 204 days. At the end of 2019, PSB advised us that the average monthly caseloads for all investigators assigned to PSB had risen to 46, there were 1,682 open cases, and the average closure time for an investigation was 499 days in PSB and 444 days for those investigations conducted outside of PSB. PSB investigators closed an average of 16 cases each during 2019.

During our January 2021 remote site visit, PSB advised that at the end of 2020, the average active caseload in PSB had increased to 61 for Detention investigators, 75 for sworn investigators, and 47 for civilian investigators. The average closure time for an administrative misconduct investigation conducted in PSB increased to 624 days for sworn cases and 666 days for Detention cases. The average completion time for an investigation conducted outside of PSB was 398 days. The overall average completion time for an investigation in 2020 increased to 524 days.

During our April 2021 remote site visit, PSB advised that the average active administrative misconduct investigation caseload at the end of March 2021 was 69 cases for sworn investigators in PSB, 64 for Detention investigations, and 49 for the civilian investigators who are now handling full caseloads. The average completion time for an administrative misconduct investigation conducted in PSB at the end of March 2021 was 674 days. For an investigation conducted outside of PSB, the average completion time was 470 days.

At the end of 2020, there were 2,010 pending investigations – an increase from 1,617 at the end of 2019. While the total included administrative misconduct investigations, service complaints, criminal investigations, and critical incident investigations, the majority were administrative misconduct investigations and service complaints. Of the pending 1,681 administrative misconduct investigations, 1,561 were assigned to PSB. Of the 266 pending service complaints, 179 were assigned to PSB. All 17 of the pending criminal investigations, and all 46 of the pending critical incident investigations were assigned to PSB. In total, 1,803 of the pending 2,010 investigations were being investigated by PSB. MCSO closed a total of 995 investigations in 2020, compared to 727 in 2019. We noted, however, that the increase in closures in 2020 was

WAI 56446

primarily a result of an increase in service complaint closures, not administrative misconduct investigations.

At the end of the first three months of 2021, PSB reported that there were 2,082 pending investigations in all categories, with the majority being administrative misconduct investigations and service complaints, an increase from 2,010 at the end of 2020. Of these 2,082, 1,755 were administrative misconduct investigations, 1,655 of which were assigned to PSB investigators for completion. The remaining 100 were assigned to Districts or Divisions outside of PSB. Of the 249 service complaints that were pending, 172 were assigned to PSB, and the remaining 77 were assigned to District or Divisions outside of PSB.

PSB was authorized 11 new positions in the July 2018 budget. PSB has continued to advise us that only one of these positions, a Detention supervisor, has been filled. Funding for a lieutenant position was eliminated and the funds transferred to other purposes in PSB. Of the civilian positions authorized in the 2019 budget, all have been filled and the three civilian investigators are now handling full caseloads. The administrative personnel continue to assist sworn and Detention investigators in PSB by doing much of the research, document preparation, and tracking on open cases. One of the administrative assistants is assigned to assist those PSB supervisors who are assigned to liaison functions with Districts and Divisions. PSB has also previously advised that no new positions were requested by the Bureau for the fiscal year that commenced on July 1, 2020. PSB personnel continue to believe that the addition of the civilian staff will relieve a significant amount of the administrative workload and case management currently being handled by investigators, allowing them to focus more time on investigative tasks.

During our April 2021 remote site visit, PSB personnel told us that PSB has now converted some of the unfilled sergeant positions from the 2018 budget to civilian positions and have obtained approval to hire three additional civilian investigators and four additional administrative staff. There will still be three unfilled sergeant positions from the 2018 budget allocation.

Beyond the addition of administrative staff, PSB has also modified its review process for submitted cases, eliminating some levels of review. PSB believes this will result in more timely reviews, without adversely impacting the quality of the final report. We agree with their decision and are also hopeful this will not adversely impact investigative quality.

During our past site visits, PSB staff have continued to communicate that they are properly outsourcing those cases where conflicts of interest exist. PSB has contracted with a qualified private vendor to conduct these investigations. Additionally, PSB has previously outsourced investigations to other law enforcement entities. During our January 2021 remote site visit, PSB personnel advised us that they were considering retaining additional outside contract investigators but had not identified any who met the hiring criteria. PSB was also considering outsourcing additional investigations to the current contract investigator if he has the staff to accept additional investigations.

During our April 2021 remote site visit, PSB personnel told us that PSB outsourced an additional four cases to the current contract investigator. None were forwarded to us for review during this reporting period. The contract investigator currently has 24 cases in progress. One criminal misconduct case, outsourced to an outside agency, was closed this reporting period with a

WAI 56447

determination that there was no substance to the allegation. PSB personnel also informed us during this reporting period that they have outsourced an additional 25 cases to another entity for investigation. PSB considers this a pilot program and will provide additional information at our next site visit.

After the Second Order was implemented, PSB reviewed the disciplinary backgrounds of all those who might conduct internal investigations and notified us of those supervisors who would be prohibited from conducting such investigations due to their backgrounds. At that time, MCSO identified two supervisors who were ineligible to conduct internal investigations. One is no longer with MCSO and the second remains ineligible to conduct investigations. Since that time, four additional supervisors were added to the list of those ineligible to conduct administrative misconduct investigations.

MCSO reported during this reporting period that no additional supervisors were determined to be ineligible to conduct administrative misconduct investigations.

**Paragraph 195.** *Within six months of the entry of this Order, the Professional Standards Bureau shall include sufficient trained personnel to fulfill the requirements of this Order.*

**Phase 1:** In compliance

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** Not in compliance

In conjunction with this Paragraph, Paragraph 178 mandates that within three months of the finalization of policies consistent with Paragraph 165, all PSB personnel would receive 40 hours of comprehensive training. Paragraph 178 requires training of all supervisors within three months of the finalization of policies, and further requires sufficient trained personnel in PSB within six months of the entry of the Order. The first week of the required Misconduct Investigative Training commenced on September 18, 2017 and the training was completed prior to the end of 2017.

During our July and October 2018 site visits, PSB informed us that a total of 11 additional personnel had been approved for PSB in MCSO's July 2018 budget. PSB personnel informed us that due to ongoing staffing shortages they did not believe any of these positions would be filled before 2019.

During our January and April 2019 site visits, PSB personnel informed us that they had not yet received any of the 2018 budgeted positions for PSB. They further noted that it continued to remain unlikely that they would receive any of the positions in the foreseeable future due to ongoing personnel staffing shortages throughout the organization. PSB continued to note that with the continuing influx of new cases, and the ongoing backlog of investigations, even if these personnel were added, the Bureau would still be insufficiently staffed to meet its responsibilities. The PSB budget requests for the July 2019 budget year included only civilian staff. PSB's requests included: two administrative assistants, two management analyst assistants, one special projects manager, and three civilian investigators. PSB personnel believed that the addition of

WAI 56448

these positions would allow sworn and Detention supervisors to focus more on the investigative process and mitigate some of the administrative requirements currently being handled by these personnel.

During our July 2019 site visit, PSB advised that of the 11 approved positions in the July 2018 budget, one had been filled – that of a Detention sergeant. It was still unknown when any of the remaining 10 positions would be filled.

During our October 2019 site visit, PSB informed us that of the previously approved 11 positions in July 2018, there had still only been one filled. Of the civilian positions approved in the July 2019 budget, one management analyst position had been filled; interviews were in progress for management assistants; and the three civilian investigator positions were in the job-posting phase.

During our January 2020 site visit, PSB advised us again that only one of the 11 approved positions for PSB in the 2018 budget had been filled. Of the eight civilian positions approved in the 2019 budget, one management assistant position had been filled, other administrative positions were in the hiring process, and job offers had been extended to fill the three civilian investigator positions. PSB believed that, given the law enforcement and investigative experience of the three civilian investigators the Bureau had selected, these investigators should not need extensive training, and would likely be qualified to conduct a variety of investigations.

During our April 2020 remote site visit, PSB again advised us that only one of the 11 positions approved in the 2018 budget had been filled. PSB had not increased its investigative staff in more than four years, despite the continuing increase in investigator caseloads and backlogs. PSB filled the majority of the civilian positions authorized in the 2019 budget and began assigning administrative staff to complete a variety of tasks previously completed by investigators. PSB also hired the three civilian investigators – two of whom still needed to attend the 40-hour Misconduct Investigative Training before they would be eligible to conduct investigations.

During our July and October 2020 remote site visits, PSB again advised us that only one of the 11 positions approved in the 2018 budget had been filled. All of the civilian positions authorized in the 2019 budget had been filled, and the three civilian investigators hired were now conducting investigations. No additional requests for PSB staffing were made for the 2020 fiscal year.

During our January 2021 remote site visit, we discussed PSB staffing and determined that again, no additional staff has been allocated to PSB. There had been no measurable change in the number of investigators assigned to PSB since 2016, despite the continuous increase in workload and backlog. The number of investigators assigned to PSB has remained between 24 and 26 since 2016. At the end of 2019, PSB had nine sworn investigators and 15 Detention investigators, a total of 24. At the end of 2020, PSB had a total of 25 investigators. Of these, seven were sworn, 15 were Detention, and three were civilian investigators.

WAI 56449

During our April 2021 remote site visit, we again discussed PSB staffing. PSB had a total of 54 staff members at the end of March 2021. Of these, eight were sworn investigators and 15 were Detention investigators. This number (23) compares with 24 investigators assigned at the end of the last reporting period. The three civilian investigators also now have full caseloads, bringing the total of assigned investigators to 26. The remaining 28 staff members in PSB are supervisory staff (nine), administrative staff (10), criminal investigators and staff (five), Division case reviewers (two), and building security staff (two). As we have noted in numerous previous reporting periods, while administrative staff have increased over the past several years, the number of investigative staff has remained between 24 and 26. It is clear from the backlog of nearly 2,100 cases, an average monthly caseload per investigator that falls between 49-69, and a continuing influx of new cases, that MCSO continues to fail to address the insufficient resources assigned to PSB.

PSB personnel advised us during our April remote site visit that they have converted seven of the unfilled sergeant positions from 2018 to civilian positions. PSB has received approval to hire three additional civilian investigators and four additional administrative staff. There will still be three unfilled sergeant positions from the 2018 budget allocation.

The Second Order requires that PSB have "sufficient trained personnel to fulfill the requirements of this Order." MCSO has delivered the required Misconduct Investigative Training, and our focus remains on the ability of PSB staff to carry out its mission. As documented in this and previous reports, PSB, in its command's estimation, is understaffed. We will not find MCSO in compliance with this Paragraph until MCSO addresses PSB's staffing issues.


***Paragraph 196.*** *Where appropriate to ensure the fact and appearance of impartiality, the Commander of the Professional Standards Bureau or the Chief Deputy may refer administrative misconduct investigations to another law enforcement agency or may retain a qualified outside investigator to conduct the investigation. Any outside investigator retained by the MCSO must possess the requisite background and level of experience of Internal Affairs investigators and must be free of any actual or perceived conflicts of interest.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

During our April 2017 site visit, the PSB Commander indicated that MCSO had not envisioned any need to retain additional contract investigators beyond the one investigator that had been already retained. A member of PSB's staff serves as MCSO's single point-of-contact to liaise and assist with scheduling for the contract investigator. The contract investigator advances the investigations to the level of recommending findings.

WAI 56450

PSB previously outsourced three misconduct investigations to a separate regional law enforcement agency. Two of these investigations were completed by the outside law enforcement agency and closed by MCSO. One was closed as the Independent Investigator was investigating the same alleged misconduct.

During our January 2021 remote site visit, PSB advised us that they could outsource additional investigations to the current contract investigator if he had additional staff. MCSO was discussing this possibility with the investigator. Additionally, they had issued Requests for Proposals (RFPs) in an attempt to identify additional contract investigators, but had not been able to identify any who meet the criteria for hiring.

During our April 2021 remote site visit, PSB personnel advised us that PSB outsourced an additional four cases to the current contract investigator during this reporting period. The contract investigator currently has 24 cases in progress. Twenty-five administrative misconduct cases were also outsourced to another outside firm in what was described as a "pilot" program by PSB. We will have additional conversation with PSB during our next site visit to discuss this pilot program and the feasibility of using this investigative resource on an ongoing basis.

***Paragraph 197.*** *The Professional Standards Bureau will be headed by a qualified Commander. The Commander of the Professional Standards Bureau will have ultimate authority within the MCSO for reaching the findings of investigations and preliminarily determining any discipline to be imposed. If the Sheriff declines to designate a qualified Commander of the Professional Standards Bureau, the Court will designate a qualified candidate, which may be a Civilian Director in lieu of a sworn officer.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on May 28, 2021.

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

In January 2018, MCSO advised that due to reorganizations within the Office, the responsibility to serve as the PSB Commander for purposes of compliance with this Order would be transferred to a captain within PSB. The PSB Deputy Chief, who previously had this responsibility was promoted, but maintains overall oversight of PSB as an Executive Chief.

WAI 56451

During our April 2021 remote site visit, and our regularly scheduled meetings with PSB to discuss CRMs and other internal affairs matters during this reporting period, we have had continuing opportunities to interact with the Captain now serving as the PSB Commander. He is responsive to our input, and we have had a number of discussions with him regarding PSB processes and internal investigations. In those cases where we have expressed concerns or requested information, he has provided timely responses. As we have noted previously, MCSO must support the PSB Commander with resources and executive leadership.

**Paragraph 198.** *To promote independence and the confidentiality of investigations, the Professional Standards Bureau shall be physically located in a facility that is separate from other MCSO facilities, such as a professional office building or commercial retail space. This facility shall be easily accessible to the public, present a non-intimidating atmosphere, and have sufficient space and personnel for receiving members of the public and for permitting them to file complaints.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

In May 2018, PSB moved into the first and second floors of 101 West Jefferson Street. PSB's address is available on the comment and complaint form that is accessible to the public at the Districts and on MCSO's website. PSB's criminal investigators are housed on the first floor, and administrative investigators are housed on the second floor of the building. PSB's off-site facility has two dedicated security personnel assigned during normal business hours of 8:00 a.m.-4:00 p.m., Monday-Friday. MCSO remains in compliance with this requirement.

Maricopa County had previously advised MCSO that its lease for the PSB site was expired and that MCSO would have to vacate the site. MCSO stated that the lease requires that the County provide MCSO with a one-year advance written notification of the requirement to vacate the current PSB facility. As of this reporting period, MCSO has not received written notification from the County regarding the requirement to vacate the current PSB site.

**Paragraph 199.** *The MCSO will ensure that the qualifications for service as an internal affairs investigator shall be clearly defined and that anyone tasked with investigating employee misconduct possesses excellent investigative skills, a reputation for integrity, the ability to write clear reports, and the ability to be fair and objective in determining whether an employee committed misconduct. Employees with a history of multiple sustained misconduct allegations, or one sustained allegation of a Category 6 or Category 7 offense from MCSO's disciplinary matrices, will be presumptively ineligible to conduct misconduct investigations. Employees with a history of conducting deficient investigations will also be presumptively ineligible for these duties.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

WAI 56452

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

GH-2 reflects the directive of this Paragraph, to ensure that only supervisors who meet the criteria established by this Paragraph are assigned misconduct investigations. The PSB Operations Manual, which formalizes the review process, states that if any supervisor is deemed ineligible, the PSB commander will notify the supervisor's commander in writing, and will ensure that a BlueTeam entry is made to memorialize the supervisor's ineligibility to conduct misconduct investigations. A record of supervisors deemed ineligible to conduct misconduct investigations is maintained in PSB. These procedures were finalized and documented in the PSB Operations Manual, published on December 13, 2018.

During this reporting period, MCSO reported no new additions to the list of employees prohibited from conducting misconduct investigations. MCSO currently has five supervisors who are ineligible to conduct internal administrative investigations. During the first quarter of 2021, three new employees, including a new PSB commander, were transferred into PSB. We discuss these transfers in our reviews for Paragraph 268.

***Paragraph 200.*** *In each misconduct investigation, investigators shall:*

a.  *conduct investigations in a rigorous and impartial manner designed to determine the facts;*

b.  *approach investigations without prejudging the facts and without permitting any preconceived impression of the principal or any witness to cloud the investigation;*

c.  *identify, collect, and consider all relevant circumstantial, direct, and physical evidence, including any audio or video recordings;*

d.  *make reasonable attempts to locate and interview all witnesses, including civilian witnesses;*

e.  *make reasonable attempts to interview any civilian complainant in person;*

f.  *audio and video record all interviews;*

g.  *when conducting interviews, avoid asking leading questions and questions that may suggest justifications for the alleged misconduct;*

h.  *make credibility determinations, as appropriate; and*

i.  *attempt to resolve material inconsistencies between employee, complainant, and witness statements.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

WAI 56453

To determine Phase 2 compliance with this Paragraph, we reviewed 93 administrative misconduct investigations that were completed by MCSO personnel during this reporting period. All were both initiated and completed after the issuance of the Second Order. PSB investigated 60 of the total cases. District or Division supervisory personnel not assigned to PSB investigated 33 of the cases. Of the cases we reviewed, 66 involved external complaints, and 27 were internally generated.

Paragraph 200.a. requires that misconduct investigations be conducted in a rigorous and impartial manner. During the last reporting period, four investigations (5%) fell short of compliance with the requirements of this Subparagraph. During this reporting period, one investigation (1%) fell short of compliance with this Subparagraph.

Paragraph 200.b. requires that investigations be approached without prejudging the facts or permitting preconceived impressions. During the last reporting period, four investigations (5%) fell short of compliance with this Subparagraph. During this reporting period, one investigation (1%) fell short of compliance with this Subparagraph.

Paragraph 200.c. requires that investigators identify, collect, and consider all relevant evidence. During this and the last reporting period, all investigations reviewed complied with the requirements of this Subparagraph.

Paragraph 200.d. requires that investigators make reasonable attempts to locate and interview all witnesses. During the last reporting period, two investigations (2%) fell short of compliance with the requirements of this Subparagraph. During this reporting period, one investigation (1%) fell short of compliance with this Subparagraph.

Paragraph 200.e. requires that investigators make reasonable attempts to interview civilian complainants in person. During this and the last reporting period, there were numerous investigations in which investigators did not make attempts to interview complainants in person. The majority were attributed to concerns related to COVID-19, and the investigators provided specific documentation justifying telephone interviews. In one investigation (1%), the investigator did not make sufficient efforts to contact the complainant either electronically or in person.

Paragraph 200.f. requires audio- and video-recording of all interviews. Of the 93 administrative investigations reviewed for this reporting period, there were 34 cases where interviews were not both audio- and video-recorded. In all 34, adequate justification was provided.

Paragraph 200.g. requires that when conducting interviews, investigators avoid asking leading questions or questions that may suggest justification for the alleged misconduct. During the last reporting period, five investigations (6%) fell short of compliance with this Subparagraph. During this reporting period, three investigations (3%) fell short of compliance with this Subparagraph.

Paragraph 200.h. requires that proper credibility determinations be made. During the last reporting period, one investigation (1%) fell short of compliance with the requirements of this Subparagraph. During this reporting period, one investigation (1%) again fell short of compliance with this Subparagraph.

Paragraph 200.i. requires that investigators attempt to resolve all material inconsistencies. During this and the last two reporting periods, all of the investigations reviewed complied with the requirements of this Subparagraph.

MCSO had been in compliance with the requirements of this Paragraph for numerous reporting periods. However, MCSO fell below the required Phase 2 compliance during the last reporting period; and we warned MCSO that should the agency fail to comply with the requirements of this Paragraph for this reporting period, we would withdraw Phase 2 compliance for this Paragraph.

During this reporting period, MCSO met the requirements of this Paragraph and remains in compliance.


**Paragraph 201.** *There will be no automatic preference for an employee's statement over a non-employee's statement. Internal affairs investigators will not disregard a witness's statement solely because the witness has some connection to either the complainant or the employee or because the witness or complainant has a criminal history, but may consider the witness's criminal history or any adjudicated findings of untruthfulness in evaluating that witness's statement. In conducting the investigation, internal affairs investigators may take into account the record of any witness, complainant, or officer who has been determined to have been deceptive or untruthful in any legal proceeding, misconduct investigation, or other investigation.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 93 administrative misconduct investigations conducted by MCSO personnel that were completed during this reporting period.

Of the 93 investigations, 66 involved complainants that were not identified as MCSO employees. Twenty-three of the investigations included interviews with witnesses or investigative leads who were not MCSO employees. We identified one case where we believe there was an automatic preference for the statement of an employee over a non-employee's statement.

We did not identify any completed investigations where a witness's statement was disregarded solely because of any connection identified in this Paragraph, nor where a witness's criminal history or findings of truthfulness were considered.


**Paragraph 202.** *Internal affairs investigators will investigate any evidence of potential misconduct uncovered during the course of the investigation, regardless of whether the potential misconduct was part of the original allegation.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

WAI 56455

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 93 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period. In 12 of the 93 investigations, MCSO identified additional potential misconduct during the investigations and properly added additional allegations or initiated new investigations. We identified one investigation during this reporting period where we believe additional misconduct may have occurred and was not addressed by MCSO.

**Paragraph 203.** *If the person involved in the encounter with the MCSO pleads guilty or is found guilty of an offense, internal affairs investigators will not consider that information alone to be determinative of whether an MCSO employee engaged in misconduct, nor will it by itself justify discontinuing the investigation. MCSO training materials and policies on internal investigations will acknowledge explicitly that the fact of a criminal conviction related to the administrative investigation is not determinative of whether an MCSO employee engaged in misconduct and that the mission of an internal affairs investigator is to determine whether any misconduct occurred.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

There were no indications in any of the completed investigations we reviewed that any MCSO investigators considered alone any pleading or finding of guilty by any person as a reason to make any determination regarding the potential misconduct of any MCSO personnel, nor were any investigations discontinued for this reason.

**Paragraph 204.** *Internal affairs investigators will complete their administrative investigations within 85 calendar days of the initiation of the investigation (60 calendar days if within a Division). Any request for an extension of time must be approved in writing by the Commander of the Professional Standards Bureau. Reasonable requests for extensions of time may be granted.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

**Phase 2:** Not in compliance

To determine Phase 2 compliance with this Paragraph, we review administrative misconduct investigations conducted by MCSO personnel.

WAI 56456

PSB conducted 60 of the 93 administrative misconduct investigations we reviewed for this reporting period. Nineteen (32%) of the 60 were completed within the required 85-day timeframe or had an approved extension for a reason specific to the investigation, a decrease from 35% during the last quarter. Of the 33 investigations completed by Districts and Divisions outside of PSB, 14 (42%) were initially submitted to PSB within the required 60-day timeframe or had an approved extension for a reason specific to the investigation, a decrease from the 68% during the last quarter. As has been our practice for numerous reporting periods, we determine the 60-day period compliance findings for those investigations conducted by personnel outside of PSB based on the original date the investigation is approved by the District or Division Commander and forwarded to PSB. In those cases where deficiencies are identified by PSB, the cases will continue to be found noncompliant in other relevant Paragraphs, and specifically in Paragraph 213, which requires the District or Division Commander ensure that investigations conducted by their personnel are complete and the findings are supported by the evidence prior to their submittal to PSB. We saw a significant increase in the number of cases that had multiple extension requests at the District level, many of which included review time by District Command personnel or Deputy Chiefs. While we support the necessary review that will improve the quality of investigations submitted to PSB, the decrease in compliance based on the time it takes to complete these reviews is concerning.

As we noted in Paragraph 194, timely completion of administrative investigations has continued to be of concern for many reporting periods. Of the 93 total administrative misconduct investigations submitted for compliance during this reporting period, 33 investigations (35%) were completed and submitted by the investigator within the required 60- or 85-day timeframe or contained an acceptable extension request and approval. This is a decrease from the 52% compliance for the last quarter.

In addition to those investigations not completed within 60 or 85 days as required by this Paragraph, of the 93 total investigations, only 19 (20%) were completed within 180 days or had an acceptable extension request or approval.

The average time for full closure of administrative investigations is now reported by MCSO to be 604 days, an increase from the 524 days reported for the last reporting period. As we have noted in our last three quarterly status reports, we no longer accept workload as the justification for the failure to complete investigations in a timely manner. The time it takes to conduct and close investigations remains unacceptable and it is the agency that bears the responsibility to address this issue with decisive action.

MCSO is not in Phase 2 compliance for this Paragraph.

WAI 56457

***Paragraph 205.*** *The Professional Standards Bureau shall maintain a database to track all ongoing misconduct cases, and shall generate alerts to the responsible investigator and his or her Supervisor and the Commander of the Professional Standards Bureau when deadlines are not met.*

**Phase 1:** In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 7, 2020.

- GC-17 (Employee Disciplinary Procedures), most recently amended on May 28, 2021.

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

- GH-5 (Early Identification System), most recently amended on March 3, 2021.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

We determine compliance with this Paragraph by assigning a member of our Team to observe demonstrations of the IAPro database during our site visits or other meetings with PSB throughout the reporting period. The IAPro technology serves as the centralized electronic numbering and tracking system for all allegations of misconduct, whether internally discovered or based on an external complaint. This database contains the capacity to manage and store information required for compliance with this Paragraph.

During our site visits, we have met with PSB personnel on numerous occasions and observed IAPro to ensure that the system generates appropriate alerts to responsible investigators and PSB commanders if deadlines are not met. We have reviewed emails PSB disseminates each month to Districts and Divisions to identify investigative deadlines. We have also reviewed the BlueTeam Dashboard, which uses a color-coded system to identify investigations that are nearing deadlines or are past deadlines. The information appears in each supervisor's BlueTeam account when they are monitoring open cases.

The civilian PSB Special Projects Manager is primarily responsible for administering the centralized tracking system. In addition, all PSB and Division investigators can access the electronic BlueTeam database – a system that integrates with IAPro – at any time to view the assignment and status of administrative investigations. PSB has also trained two lieutenants to administer the system.

In May 2018, PSB relocated to an offsite location. In July 2018, a member of our Team verified that the existing tracking mechanisms continue to be used for the tracking of investigations at the new facility.

During our January, July, and October 2019 site visits, a member of our Team verified that the tracking mechanisms remain in place. We also continued to receive monthly notifications from PSB regarding closed administrative investigations, and we evaluate these closed investigations for the entirety of a reporting period against a multitude of criteria, including whether the cases were completed in a timely fashion.

WAI 56458

During this reporting period, we continued to receive monthly notifications from PSB regarding closed administrative misconduct investigations; and we continue to evaluate these closed investigations for the entirety of a reporting period against a multitude of criteria, including whether the cases were completed in a timely fashion. (See Paragraph 204.)

**Paragraph 206.** *At the conclusion of each investigation, internal affairs investigators will prepare an investigation report. The report will include:*

a.    *a narrative description of the incident;*

b.    *documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the incident. In situations in which there are no known witnesses, the report will specifically state this fact. In situations in which witnesses were present but circumstances prevented the internal affairs investigator from determining the identification, phone number, or address of those witnesses, the report will state the reasons why. The report will also include all available identifying information for anyone who refuses to provide a statement;*

c.    *documentation of whether employees were interviewed, and a transcript or recording of those interviews;*

d.    *the names of all other MCSO employees who witnessed the incident;*

e.    *the internal affairs investigator's evaluation of the incident, based on his or her review of the evidence gathered, including a determination of whether the employee's actions appear to be within MCSO policy, procedure, regulations, orders, or other standards of conduct required of MCSO employees;*

f.    *in cases where the MCSO asserts that material inconsistencies were resolved, explicit credibility findings, including a precise description of the evidence that supports or detracts from the person's credibility;*

g.    *in cases where material inconsistencies must be resolved between complainant, employee, and witness statements, explicit resolution of the inconsistencies, including a precise description of the evidence relied upon to resolve the inconsistencies;*

h.    *an assessment of the incident for policy, training, tactical, or equipment concerns, including any recommendations for how those concerns will be addressed;*

i.    *if a weapon was used, documentation that the employee's certification and training for the weapon were current; and*

j.    *documentation of recommendations for initiation of the disciplinary process; and*

k.    *in the instance of an externally generated complaint, documentation of all contacts and updates with the complainant.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 93 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

Paragraph 206.a. requires a written description on the incident be included in the investigative report. All of the completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.b. requires documentation of evidence gathered, including all known information about witnesses. All of the completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.c. requires documentation of whether employees were interviewed, and a transcript or recording of these interviews. All of the completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.d. requires that the names of all MCSO employees who witnessed the incident be included in the report. All completed investigations we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.e. requires that the internal affairs investigator's evaluation of the incident includes a determination of whether the employee's actions appear to be within MCSO policy, procedure, regulations, orders, or other standards of conduct required of MCSO employees. All completed investigations we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.f. requires that when MCSO asserts that material inconsistencies were resolved, explicit credibility findings, including a precise description of the evidence that supports or detracts from the person's credibility must be provided. All completed investigations we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.g. requires that when material inconsistencies must be resolved, a precise description of the evidence be included in the report. All completed investigations we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.h. requires that assessment of the incident for policy, training, tactical, or equipment concerns be included in the investigative report, to include any recommendations. During this reporting period, all completed investigations we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.i. requires that if a weapon was used, documentation that the employee's certification and training for the weapon must be included in the investigative written report. One of the completed investigations we reviewed failed to comply with the requirements of this Subparagraph.

WAI 56460

Paragraph 206.j. requires that documentation of the initiation of the disciplinary process be included in the investigation. Compliance is achieved when the misconduct investigator completes the investigation with a finding of sustained, when applicable, and the PSB Commander subsequently approves the finding. This is considered the initiation of the disciplinary process. Twenty-nine of the 93 administrative misconduct investigations we reviewed had sustained findings against one or more active MCSO employee. All complied with the requirements of this Subparagraph.

Paragraph 206.k. requires that any contacts and updates with the complainant be documented in the investigative report. We did not identify any instances during this reporting period where this did not occur.

**Paragraph 207.** *In assessing the incident for policy, training, tactical, or equipment concerns, investigation reports will include an assessment of whether:*

a.    *the law enforcement action was in compliance with training and legal standards;*

b.    *the use of different tactics should or could have been employed;*

c.    *the incident indicates a need for additional training, counseling, or other non-disciplinary corrective actions; and*

d.    *the incident suggests that the MCSO should revise its policies, strategies, tactics, or training.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

During this reporting period, we reviewed 93 administrative misconduct investigations. MCSO properly assessed and documented whether any of the requirements of this Paragraph were relevant in all of the completed cases we reviewed for this reporting period. MCSO identified 12 cases where action related to this Paragraph was appropriate; and addressed the concerns with additional training, or where appropriate, policy review.

PSB continues to use an internal tracking form to ensure that those concerns that are forwarded to other Divisions within MCSO for action or review are addressed. We receive and review this tracking document each month. While this tracking form is regularly updated, we note that there are a number of concerns that have not yet reached closure. Though we understand that some matters – particularly those that may involve potential policy revisions – may take an extended time to complete, we urge MCSO to review the tracking document, and where possible resolve the identified concerns.

WAI 56461

***Paragraph 208.*** *For each allegation of misconduct, internal affairs investigators shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation:*

a.  *"Unfounded," where the investigation determines, by clear and convincing evidence, that the allegation was false or not supported by fact;*

b.  *"Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur and justifies a reasonable conclusion of a policy violation;*

c.  *"Not Sustained," where the investigation determines that there is insufficient evidence to prove or disprove the allegation; or*

d.  *"Exonerated," where the investigation determines that the alleged conduct did occur but did not violate MCSO policies, procedures, or training.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review administrative misconduct investigations conducted by MCSO personnel and completed during the reporting period. We evaluate compliance with this Paragraph against the standard of whether a finding was made, and whether the finding was correct.

During the last reporting period, we concurred with the findings of the PSB Commander in 83 (95%) of the 87 cases that were completed.

During this reporting period, we concurred with the findings of the PSB Commander in 91 (98%) of the 93 administrative misconduct investigations we reviewed. In one investigation that was not sustained, we believe adequate evidence existed to sustain the allegation; and in another, we believe that there was insufficient evidence to arrive at a finding of unfounded and the allegation should have been not sustained.

There were no instances where the Appointing Authority changed the findings made by the PSB Commander.


***Paragraph 209.*** *For investigations carried out by Supervisors outside of the Professional Standards Bureau, the investigator shall forward the completed investigation report through his or her chain of command to his or her Division Commander. The Division Commander must approve the investigation and indicate his or her concurrence with the findings.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

**Phase 2:** In compliance

WAI 56462

To assess Phase 2 compliance with this Paragraph, we reviewed 33 administrative misconduct investigations not conducted by PSB personnel and completed during this reporting period. All 33 were forwarded to PSB as required, and all contained the approval of the responsible District or Division Commander. As noted in previous reporting periods, and again during *this* reporting period, some of the District or Division level investigations were not in compliance with various requirements of the Second Order – as indicated throughout this report. However, we assessed MCSO's compliance with this Paragraph based on these cases being forwarded through the chain of command for approval of the investigation and findings.

**Paragraph 210.** *For investigations carried out by the Professional Standards Bureau, the investigator shall forward the completed investigation report to the Commander.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 60 administrative misconduct investigations that were conducted by PSB personnel. All 60 complied with the requirements of this Paragraph.

**Paragraph 211.** *If the Commander—meaning the Commander of the PSB or the Commander of the Division in which the internal affairs investigation was conducted—determines that the findings of the investigation report are not supported by the appropriate standard of proof, the Commander shall return the investigation to the investigator for correction or additional investigative effort, shall document the inadequacies, and shall include this documentation as an addendum to the original investigation. The investigator's Supervisor shall take appropriate action to address the inadequately supported determination and any investigative deficiencies that led to it. The Commander shall be responsible for the accuracy and completeness of investigation reports prepared by internal affairs investigators under his or her command.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

**Phase 2:** Not in compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 93 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

WAI 56463

PSB investigated 60 of the 93 administrative misconduct investigations we reviewed during this reporting period. In 58 of the cases, we found the investigations to be thorough, and the reports were well-written. We identified specific concerns with two investigations (3%). In one, we believe findings of sustained should have been made and were not. In the second, there was insufficient evidence to arrive at a finding of unfounded and the allegation should have been not sustained. Based on our review of these cases, which includes all compliance requirements, 10 investigations (17%) of the 60 total investigations are in compliance.

Of the 33 investigations investigated by Districts or Divisions outside of PSB, we identified 13 investigations (39%) where we had some concerns regarding the investigation or documentation. This is the same percentage as the last reporting period. These concerns included: arriving at an improper finding; asking leading questions; failure to complete a proper investigation; failure to interview all witnesses; or a combination of investigative and administrative deficiencies. We noted again during this reporting period that District and Division Captains identified some of the deficiencies and addressed them with the investigators prior to the investigations being forwarded to PSB. However, some could not be corrected after the fact; and others were not identified prior to submittal to PSB. Our assessment of these investigations, which includes our assessment of extension requests, found that 5 (15%) of the 33 investigations are in compliance, a decrease from 29% during the last reporting period. As we noted previously, we found a significant increase in the amount of time investigations are taking to be completed and reviewed within the Patrol Division. This appears to be responsible for much of the decrease in overall compliance for these cases.

In January 2018, we requested that MCSO begin providing us with documentation that reflects the actions being taken to address deficient misconduct investigations. We requested that PSB and command personnel provide a response to this request on a monthly basis. We have consistently received the requested documentation since March 2018.

During this reporting period, we identified two instances where District Commanders identified investigative deficiencies; and, where possible, had them corrected prior to forwarding the investigation to PSB. While we noted increased review by Deputy Chiefs, we did not identify any investigations where they initiated a deficiency memorandum for their personnel. PSB continued to identify the majority of deficiencies in District and Division investigations during this reporting period and forwarded these concerns to the appropriate Commanders or Deputy Chiefs to be addressed. During previous reporting periods, we have noted that the numerous deficiency memorandums authored by PSB had not been addressed in a timely manner. During this reporting period, we found that deficiencies are being addressed in a more timely manner, and few remain pending resolution. We will continue to closely monitor whether identified deficiencies are addressed in a timely manner.

WAI 56464

We have noted in numerous prior reporting periods that both the supervisors who complete deficient investigations and the command personnel who approve them must be held accountable if MCSO is to achieve Phase 2 compliance with this Paragraph. During this reporting period, our review of cases completed by PSB personnel, continues to indicate PSB's ongoing efforts to achieve compliance. Our review of District investigations during this reporting period identified that while more attention is being given to investigations by both District Command personnel and the Deputy Chiefs with oversight, compliance remains low.

**Paragraph 212.** *Where an internal affairs investigator conducts a deficient misconduct investigation, the investigator shall receive the appropriate corrective and/or disciplinary action. An internal affairs investigator's failure to improve the quality of his or her investigations after corrective and/or disciplinary action is taken shall be grounds for demotion and/or removal from a supervisory position or the Professional Standards Bureau.*

**Phase 1:** In compliance

- GB-2 (Command Responsibility), most recently amended on June 28, 2019.

- GC-4 (Employee Performance Appraisals), most recently amended on July 25, 2019.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 93 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

The 40-hour Misconduct Investigative Training was completed in late 2017. In January 2018, we requested that MCSO begin providing us with a document that reflects what actions are being taken to address deficient misconduct investigations on a monthly basis. As discussed in Paragraph 211, we have consistently received documentation since March 2018. During this reporting period, PSB identified and documented numerous deficiencies with investigations. District Commanders and Division Chiefs also identified and addressed some concerns and deficiencies with investigations conducted or reviewed by their personnel during this reporting period.

We will continue to closely monitor these monthly reports submitted by MCSO command personnel, along with reviewing completed misconduct investigations, to determine if deficiencies are being properly identified and addressed.

**Paragraph 213.** *Investigations of minor misconduct conducted outside of the Professional Standards Bureau must be conducted by a Supervisor and not by line-level deputies. After such investigations, the investigating Supervisor's Commander shall forward the investigation file to the Professional Standards Bureau after he or she finds that the misconduct investigation is complete and the findings are supported by the evidence. The Professional Standards Bureau shall review the misconduct investigation to ensure that it is complete and that the findings are supported by the evidence. The Professional Standards Bureau shall order additional investigation when it appears that there is additional relevant evidence that may assist in*

WAI 56465

*resolving inconsistencies or improving the reliability or credibility of the findings. Where the findings of the investigation report are not supported by the appropriate standard of proof, the Professional Standards Bureau shall document the reasons for this determination and shall include this documentation as an addendum to the original investigation.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 93 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period. Of the 93 investigations, 60 were investigated by PSB personnel. Thirty-three were investigated by MCSO personnel outside of PSB.

None of the documentation we received regarding investigations conducted outside of PSB indicated that any person below the rank of sergeant was responsible for the investigation.

During the last reporting period, all 38 District or Division-level approved cases were forwarded to, and reviewed by, PSB as required. Fifteen (39%) of the 58 cases investigated at the District or Division level were returned by PSB personnel for additional investigation, corrections, proper documentation, or other changes.

During this reporting period, all 33 District or Division-level investigations were forwarded to and reviewed by PSB as required. Thirteen investigations (39%) had deficiencies identified by PSB or our Team. Six were returned to the Districts for corrections or additional information. In five others, PSB identified that findings were not supported by the facts of the investigation and the findings were changed. Our assessment of the 33 investigations, which includes the reasonableness of extension requests, found that five investigations (15%) were in compliance with all Second Order requirements, a decrease from 29% the last reporting period.

As is our practice, we will discuss these cases with MCSO during our next site visit.

*__Paragraph 214.__ At the discretion of the Commander of the Professional Standards Bureau, a misconduct investigation may be assigned or re-assigned to another Supervisor with the approval of his or her Commander, whether within or outside of the District or Bureau in which the incident occurred, or may be returned to the original Supervisor for further investigation or analysis. This assignment or re-assignment shall be explained in writing.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 93 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

WAI 56466

Our analysis for this reporting period revealed that of the 33 investigations conducted outside of PSB, six were returned by PSB to the original investigating supervisor for further investigation or analysis. None were reassigned to a different investigator.

**Paragraph 215.** *If, after an investigation conducted outside of the Professional Standards Bureau, an employee's actions are found to violate policy, the investigating Supervisor's Commander shall direct and ensure appropriate discipline and/or corrective action. Where the incident indicates policy, training, tactical, or equipment concerns, the Commander shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on May 28, 2021.
- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 33 administrative misconduct investigations conducted by MCSO personnel outside of PSB and completed during this reporting period.

Nine of the 33 completed misconduct investigations conducted outside of PSB resulted in sustained findings. In seven, the reports included documentation that discipline or corrective action was taken. In one, the employee resigned prior to the completion of the investigation. In a second, though the findings were sustained for minor misconduct, due to an administrative error, discipline was not assessed. There were no instances where other actions by Command personnel were necessary.

**Paragraph 216.** *If, after an investigation conducted by the Professional Standards Bureau, an employee's actions are found to violate policy, the Commander of the Professional Standards Bureau shall direct and ensure appropriate discipline and/or corrective action. Where the incident indicates policy, training, tactical, or equipment concerns, the Commander of the Professional Standards Bureau shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on May 28, 2021.
- GH-2 (Internal Investigations), most recently amended on May 28, 2021.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 93 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

WAI 56467

Sixty of the completed investigations were conducted by PSB. Twenty-nine resulted in a sustained finding against one or more MCSO employees. In 18 of these sustained investigations, the PSB Commander ensured that appropriate discipline and/or corrective action was recommended. In eight cases, the involved employees left MCSO employment prior to the completion of the investigation or the determination of discipline. In three other cases, we believe the Category of Offense was inappropriate and though discipline resulted, it was not consistent with the Matrices in place at the time of the offense. The PSB Commander provided the preliminary determination of the range of discipline in all 21 cases involving current MCSO employees. We disagree with the discipline determination in three as it was based on an incorrect category of offense.

We continue to note that the PSB Commander cannot ensure that appropriate discipline or corrective action are the final outcome of sustained misconduct investigations, as the Appointing Authority makes the final decisions for discipline in both minor misconduct cases and in serious misconduct cases that result in PDHs. This hearing officer has the authority to change the findings or reduce the discipline. In the three cases where we disagree with the category and offense number determined by the PSB Commander, the Appointing Authority had the final authority and could have overturned or changed the discipline determinations by the PSB Commander.

MCSO has been in compliance with this Paragraph for numerous reporting periods but fell below compliance during this reporting period. Should MCSO again fall short of compliance during the next reporting period, we will withdraw Phase 2 compliance for this Paragraph.

***Paragraph 217.*** *The Professional Standards Bureau shall conduct targeted and random reviews of discipline imposed by Commanders for minor misconduct to ensure compliance with MCSO policy and legal standards.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** Not applicable

Based on the requirements of the Second Order, District and Division Commanders will not impose discipline for minor misconduct. In all cases, the PSB Commander will determine the final findings for internal investigations and the presumptive range of discipline for those cases with sustained findings. The Appointing Authority will then make the final determination of discipline.

***Paragraph 218.*** *The Professional Standards Bureau shall maintain all administrative investigation reports and files after they are completed for record-keeping in accordance with applicable law.*

**Phase 1:** In compliance

WAI 56468

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

To determine compliance with this Paragraph, we have observed that PSB maintains both hardcopy and electronic files intended to contain all documents required for compliance with this Paragraph.

A member of our Team inspected the file rooms where hardcopies of administrative investigations were stored and randomly reviewed case files to verify compliance on multiple occasions when PSB was housed at MCSO Headquarters. Our Team member also used the access granted to IAPro to randomly select internal affairs case files to verify that all information was being maintained electronically.

PSB completed the move to its new offsite facility in May 2018. Subsequent to the move, a member of our Team conducted an inspection of the file rooms in the new facility; and reviewed a random sample of internal investigations in IAPro to verify ongoing compliance.

During our January 2019 site visit, a member of our Team verified continued compliance at the new PSB facility by inspecting both the criminal and administrative investigation file rooms and randomly reviewing internal affairs case files to verify that all information was also being electronically maintained in IAPro.

During our July 2019 site visit, a member of our Team verified, by accessing IAPro and reviewing randomly selected cases, that electronic files were being properly maintained.

During our October 2019 site visit, a member of our Team again verified compliance at the PSB facility by inspecting both the criminal and administrative investigation file rooms and randomly reviewing internal affairs case files to verify that all information is also being electronically maintained in IAPro.

## D.    Discipline

***Paragraph 219.*** *The Sheriff shall ensure that discipline for sustained allegations of misconduct comports with due process, and that discipline is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented regardless of the command level of the principal of the investigation.*

***Paragraph 220.*** *To ensure consistency in the imposition of discipline, the Sheriff shall review the MCSO's current disciplinary matrices and, upon approval of the parties and the Monitor, will amend them as necessary to ensure that they:*

*a.      establish a presumptive range of discipline for each type of violation;*

*b.      increase the presumptive discipline based on an employee's prior violations;*

WAI 56469

c.     set out defined mitigating and aggravating factors;

d.     prohibit consideration of the employee's race, gender, gender identity, sexual orientation, national origin, age, or ethnicity;

e.     prohibit conflicts, nepotism, or bias of any kind in the administration of discipline;

f.     prohibit consideration of the high (or low) profile nature of the incident, including media coverage or other public attention;

g.     clearly define forms of discipline and define classes of discipline as used in policies and operations manuals;

h.     provide that corrective action such as coaching or training is not considered to be discipline and should not be used as a substitute for discipline where the matrix calls for discipline;

i.     provide that the MCSO will not take only non-disciplinary corrective action in cases in which the disciplinary matrices call for the imposition of discipline;

j.     provide that the MCSO will consider whether non-disciplinary corrective action is also appropriate in a case where discipline has been imposed;

k.     require that any departures from the discipline recommended under the disciplinary matrices be justified in writing and included in the employee's file; and

l.     provide a disciplinary matrix for unclassified management level employees that is at least as demanding as the disciplinary matrix for management level employees.

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on May 28, 2021.

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, 38 of the 93 administrative misconduct investigations resulted in sustained findings against one or more members of MCSO.  In 29 of the sustained cases, one or more of the principal employees were still employed at MCSO at the time findings or discipline decisions were made.  Compliance for this Paragraph is based on the discipline findings for both minor and serious discipline.  In those cases where only serious discipline is recommended, compliance findings specific to those cases are addressed in Paragraph 226.

Paragraph 220.a. requires a presumptive range of discipline for each type of violation.  Of the 38 total sustained cases, 29 involved employees still employed by MCSO at the time discipline

WAI 56470

decisions were made. The PSB Commander determined and documented the presumptive discipline range in compliance with this Subparagraph in all but one of these cases. In one, involving a minor misconduct violation, due to an administrative error, discipline was not assessed.

Paragraph 220.b. requires that presumptive discipline be increased if an employee has prior violations. In 13 of the 29 sustained investigations where discipline was assessed, the employee had prior sustained violations. The PSB Commander considered and increased the presumptive discipline based on the Matrices in place at the time of the misconduct.

Paragraph 220.c. requires that mitigating and aggravating factors be defined. Aggravating and mitigating factors are not specifically defined in the internal affairs investigation or discipline policy in effect prior to May 18, 2017. The revised discipline policy, effective May 18, 2017, does define these factors. These aggravating or mitigating factors are not identified by the PSB Commander, but are identified and considered by the Appointing Authority when making the final disciplinary decisions.

During this reporting period, all of the sustained cases were initiated after May 18, 2017. The Appointing Authority provided justification and documentation for all factors he considered when making the final discipline decisions for all 28 cases based on the Matrices in place at the time of the misconduct. We also found that he continues to specifically identify those instances where there are aggravating or mitigating factors in the justification documents when appropriate.

Paragraph 220.d. prohibits the consideration of any prohibited biases when determining discipline. None of the sustained cases that resulted in discipline that we reviewed during this reporting period included any indication that any biases were considered when determining discipline.

Paragraph 220.e. prohibits any conflicts, nepotism, or bias of any kind in the administration of discipline. None of the sustained cases we reviewed during this reporting period had any indication of conflicts, nepotism, or bias of any kind when determining the disciplinary sanction.

Paragraph 220.f. prohibits the consideration of the high (or low) profile nature of an incident when determining discipline. None of the sustained cases we reviewed during this reporting period indicated any consideration of the high- or low-profile nature of the incident when considering discipline.

Paragraph 220.g. requires that clearly defined forms of discipline and classes of discipline be defined. Phase 2 compliance is not applicable to this Subparagraph.

Paragraph 220.h. requires that corrective action such as coaching or training is not considered to be discipline, and should not be used as a substitute for discipline. There were no instances identified during this reporting period where a coaching was used as a substitute for discipline.

Paragraph 220.i. requires that MCSO will not take only non-disciplinary action in cases where the Discipline Matrices call for the imposition of discipline. There were no instances this reporting period where non-disciplinary action was taken for an act of misconduct that was ineligible to be handled as a coaching.

WAI 56471

Paragraph 220.j. requires that MCSO consider whether non-disciplinary corrective action is also appropriate. In one case reviewed during this reporting period, in addition to discipline, additional training was provided to the involved employees.

Paragraph 220.k. requires that any departure from the discipline recommended under the Discipline Matrices be justified in writing and included in the employee's file. Twenty-eight investigations with sustained findings resulted in employee discipline. Twelve resulted in minor discipline, and 16 resulted in serious discipline. In three cases resulting in minor discipline and two resulting in serious discipline, the Appointing Authority mitigated the discipline and provided appropriate written justification for doing so.

As we have previously noted, compliance for this Paragraph is based on the final outcome for all sustained investigations. Those instances that involve only serious discipline are specifically covered in Paragraph 226.

Paragraph 220.l. requires that a Discipline Matrix for unclassified management employees be at least as demanding as the Discipline Matrix for management-level employees. We reviewed the approved policies that affect discipline for unclassified management employees, and they comply with this requirement. During this reporting period, MCSO did not complete or submit any administrative investigations involving unclassified management employees.

During this reporting period, all 28 sustained investigations where discipline occurred were both initiated and completed after May 18, 2017; and are subject to all the requirements relative to investigations and disciplinary procedures contained in policies revised on that date. The investigations initiated and completed after May 18, 2017 have both a discipline range and a presumptive discipline. The Appointing Authority provided a written justification in all sustained cases where discipline was imposed.

In 23 of the cases, the final discipline was the presumptive discipline identified by the PSB Commander. In three cases involving minor discipline, the Appointing Authority mitigated the discipline within the range. In two cases involving serious discipline, the Appointing Authority also mitigated the discipline within the range. We agree with the decisions by the Appointing Authority in these cases.

***Paragraph 221.*** *The Sheriff shall mandate that each act or omission that results in a sustained misconduct allegation shall be treated as a separate offense for the purposes of imposing discipline.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on May 28, 2021.

- GH-2 (Internal Investigations), most recently amended on GH-2 (Internal Investigations), most recently amended on May 28, 2021.

**Phase 2:** In compliance

WAI 56472

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed 28 misconduct investigations with sustained allegations that resulted in the recommendation for discipline for current MCSO employees. We found that MCSO again met the requirements for compliance with this Paragraph.

**Paragraph 222.** *The Sheriff shall also provide that the Commander of the Professional Standards Bureau shall make preliminary determinations of the discipline to be imposed in all cases and shall document those determinations in writing, including the presumptive range of discipline for the sustained misconduct allegation, and the employee's disciplinary history.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on May 28, 2021.

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, there were 28 sustained investigations that resulted in recommendations for discipline. In all but three of these cases, the PSB Commander determined and documented in writing the presumptive range of discipline based on the policies and Discipline Matrices in effect at the time of the investigation. The documentation submitted for this Paragraph included the category, offense number, and employee's discipline history. As we have previously noted, in three cases, the Matrix used for determining the category of offense was one that had not been approved at the time the discipline decisions were made.

MCSO has been in compliance with this Paragraph for numerous reporting periods but fell below compliance during this reporting period. Should MCSO again fall short of compliance during the next reporting period, we will withdraw Phase 2 compliance for this Paragraph.

**E.    Pre-Determination Hearings**

**Paragraph 223.** *If the Commander of the Professional Standards Bureau makes a preliminary determination that serious discipline (defined as suspension, demotion, or termination) should be imposed, a designated member of MCSO's command staff will conduct a pre-determination hearing and will provide the employee with an opportunity to be heard.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on May 28, 2021.

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

**Phase 2:** In compliance

WAI 56473

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel where MCSO holds a Pre-Determination Hearing (PDH).

During this reporting period, 28 administrative misconduct investigations resulted in sustained findings against current MCSO employees. Sixteen investigations resulted in the recommendation for serious discipline. In all 16, MCSO scheduled the Pre-Determination Hearings, as required. In two of the 16, the employees chose not to attend the hearing.

**Paragraph 224.** *Pre-determination hearings will be audio and video recorded in their entirety, and the recording shall be maintained with the administrative investigation file.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on May 28, 2021.
- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

**Phase 2:** In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, in the 14 cases where a Pre-Determination Hearing was held, the hearing was audio- and video-recorded as required, included in the administrative file, and reviewed by a member of our Team.

**Paragraph 225.** *If an employee provides new or additional evidence at a pre-determination hearing, the hearing will be suspended and the matter will be returned to the internal affairs investigator for consideration or further investigation, as necessary. If after any further investigation or consideration of the new or additional evidence, there is no change in the determination of preliminary discipline, the matter will go back to the pre-determination hearing. The Professional Standards Bureau shall initiate a separate misconduct investigation if it appears that the employee intentionally withheld the new or additional evidence during the initial misconduct investigation.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on May 28, 2021.
- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

**Phase 2:** In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

WAI 56474

During this reporting period, 14 sustained investigations resulted in a Pre-Determination Hearing and we reviewed all of the recordings of these hearings. There were no instances where we, or the Appointing Authority, identified any concerns that required additional follow-up related to the requirements of this Paragraph.

**Paragraph 226.** *If the designated member of MCSO's command staff conducting the pre-determination hearing does not uphold the charges recommended by the Professional Standards Bureau in any respect, or does not impose the Commander of the Professional Standards Bureau's recommended discipline and/or non-disciplinary corrective action, the Sheriff shall require the designated member of MCSO's command staff to set forth in writing his or her justification for doing so. This justification will be appended to the investigation file.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on May 28, 2021.
- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

**Phase 2:** In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During every site visit, we meet with the Appointing Authority and the Administrative Services Division to discuss any concerns with final outcomes or decisions that result from Pre-Determination Hearings. We have continued to emphasize to MCSO the need to comply with agency policies when determining disciplinary outcomes.

During our January 2018 site visit, we met with the Appointing Authority and Administrative Services Division personnel to discuss the Pre-Determination Hearing process and the final outcomes of cases. During the meeting, MCSO advised us that the Appointing Authority does not have the authority to reduce discipline based only on timeframe concerns when an employee appeals discipline in these cases. It is the Maricopa County Attorney's Office (MCAO) that reviews these cases and determines whether the cases should go forward. Both the Appointing Authority and the representative from the MCAO advised that they have taken some of these cases forward; but in others, they did not believe it was appropriate to do so, based on the totality of circumstances. The Parties present at the meeting also commented on their concerns regarding cases involving the Plaintiffs' class that might result in reductions in discipline as a result of the failure to complete the case within the 180-day timeframe. We discussed the specific requirements of Arizona Revised Statutes 38-1101, and that the statute only requires a "good faith" attempt to complete cases that result in suspensions, demotions, or dismissals within the 180-day timeframe. Since the time of our discussion in 2018, Arizona law has added a definition of good faith. A.R.S. 38-1101 now defines good faith as "honesty of purpose and absence of intent to defraud."

WAI 56475

During that same site visit, we discussed those cases where a decision may be made after a Pre-Determination Hearing that a reduction in discipline will occur, and those cases where a decision to reduce the discipline may occur if an appeal is filed. It is our understanding from our meeting with the Appointing Authority and other staff who were present that MCSO consults with MCAO attorneys in these cases and their input is related to the final outcomes. However, all the documentation we receive and review is authored and signed by the Appointing Authority, so our assessment can only consider any final decisions as his.

During the last reporting period, 11 of the 13 cases forwarded for consideration of serious discipline resulted in serious discipline. The Appointing Authority provided a justification for the final decisions in all cases, and this information was provided to our Team in the submissions regarding closed internal affairs investigations. The Appointing Authority did not overturn any of the sustained findings by the PSB Commander.

During this reporting period, 14 of the 16 cases forwarded for consideration of serious discipline resulted in serious discipline. In two of the cases, the Appointing Authority mitigated the discipline within the range. We agree with his decisions in both of these cases. The Appointing Authority consistently provides a justification for the final decisions in all cases, and this information was provided to our Team in the submissions regarding closed internal affairs investigations for this reporting period.

*Paragraph 227.* *The Sheriff shall promulgate MCSO policy which shall provide that the designated member of MCSO's command staff conducting a pre-determination hearing should apply the disciplinary matrix and set forth clear guidelines for the grounds on which a deviation is permitted. The Sheriff shall mandate that the designated member of MCSO's command staff may not consider the following as grounds for mitigation or reducing the level of discipline prescribed by the matrix:*

a.      *his or her personal opinion about the employee's reputation;*

b.      *the employee's past disciplinary history (or lack thereof), except as provided in the disciplinary matrix;*

c.      *whether others were jointly responsible for the misconduct, except that the MCSO disciplinary decision maker may consider the measure of discipline imposed on other employees involved to the extent that discipline on others had been previously imposed and the conduct was similarly culpable.*

**In Full and Effective Compliance**

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed 28 administrative misconduct investigations where discipline was recommended. The serious sustained allegations in 16 of these investigations resulted in their referrals for Pre-Determination Hearings.

WAI 56476

Paragraph 227.a. prohibits the designated member of command staff conducting a Pre-Determination Hearing from considering a personal opinion of an employee's reputation when determining discipline. There were no indications in our reviews of these investigations that any personal opinion was considered in making a disciplinary decision.

Paragraph 227.b. prohibits the consideration of the employee's past disciplinary history (or lack thereof), except as provided in the Discipline Matrix. There were no instances where we determined that the member of command staff responsible for conducting the Pre-Determination Hearing considered disciplinary history outside of the requirements of this Paragraph.

Paragraph 227.c. prohibits the consideration of others jointly responsible for misconduct, except that the decision-maker may consider such discipline to the extent that discipline on others had been previously imposed and the conduct was similarly culpable. There were no indications in our reviews that the misconduct of others was improperly considered in the disciplinary decisions that were made.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 228.** *The Sheriff or his designee has the authority to rescind, revoke or alter any disciplinary decision made by either the Commander of the Professional Standards Bureau or the appointed MCSO disciplinary authority so long as:*

a. *that decision does not relate to the Sheriff or his designee;*

b. *the Sheriff or his designee provides a thorough written and reasonable explanation for the grounds of the decision as to each employee involved;*

c. *the written explanation is placed in the employment files of all employees who were affected by the decision of the Sheriff or his designee; and*

d. *the written explanation is available to the public upon request.*

**In Full and Effective Compliance**

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, there were no instances where the Sheriff or his designee rescinded, revoked, or altered any disciplinary decision made by either the Commander of the Professional Standards Bureau or the appointed MCSO disciplinary authority.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 56477

### F.    Criminal Misconduct Investigations

***Paragraph 229.***   *Whenever an internal affairs investigator or Commander finds evidence of misconduct indicating apparent criminal conduct by an employee, the Sheriff shall require that the internal affairs investigator or Commander immediately notify the Commander of the Professional Standards Bureau.   If the administrative misconduct investigation is being conducted by a Supervisor outside of the Professional Standards Bureau, the Sheriff shall require that the Professional Standards Bureau immediately take over the administrative investigation. If the evidence of misconduct pertains to someone who is superior in rank to the Commander of the Professional Standards Bureau and is within the Commander's chain of command, the Sheriff shall require the Commander to provide the evidence directly to what he or she believes is the appropriate prosecuting authority—the Maricopa County Attorney, the Arizona Attorney General, or the United States Attorney for the District of Arizona—without notifying those in his or her chain of command who may be the subject of a criminal investigation.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we review completed criminal misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed three criminal investigations conducted by MCSO. Two were internally generated, and one was externally generated.  All three were initiated and completed after July 20, 2016, and appropriately assigned to criminal investigators in PSB.  The investigations were brought to the attention of the PSB Commander as required and an administrative misconduct investigation was also initiated.  None involved someone superior in rank to the PSB Commander.   We also noted that one criminal misconduct investigation, externally generated and outsourced to an outside agency, was returned to MCSO after a determination that the allegation was not substantive.    The administrative misconduct investigation for this same alleged misconduct was outsourced to the outside investigator under contract with MCSO.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.


***Paragraph 230.***   *If a misconduct allegation will be investigated criminally, the Sheriff shall require that the Professional Standards Bureau not compel an interview of the principal pursuant to Garrity v. New Jersey, 385 U.S. 493 (1967), until it has first consulted with the criminal investigator and the relevant prosecuting authority.   No other part of the administrative investigation shall be held in abeyance unless specifically authorized by the Commander of the Professional Standards Bureau in consultation with the entity conducting the criminal investigation.  The Sheriff shall require the Professional Standards Bureau to document in writing all decisions regarding compelling an interview, all decisions to hold any aspect of an administrative investigation in abeyance, and all consultations with the criminal investigator and prosecuting authority.*

WAI 56478

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by both criminal and administrative investigators to ensure that they contain appropriate documentation that complies with the requirements of this Paragraph.

We previously determined that in many cases, the administrative investigation is not submitted and reviewed during the same reporting period as the criminal investigation, as generally, administrative investigations are finalized after the completion of the criminal investigation. We discussed this issue with PSB during our January 2017 site visit. To resolve the concern, PSB agreed to provide us with a copy of any criminal investigation when PSB submits the administrative misconduct investigation for our review, even if the criminal investigation has been previously submitted. MCSO has been consistently providing copies of these criminal investigations with the administrative investigation since that time.

During this reporting period, we reviewed nine administrative misconduct investigations where criminal conduct may have occurred. In six, there was a companion criminal investigation completed by MCSO, as required. In the remaining three, the criminal investigations were conducted by a law enforcement agency with jurisdiction where the alleged criminal conduct occurred.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 231.** *The Sheriff shall require the Professional Standards Bureau to ensure that investigators conducting a criminal investigation do not have access to any statements by the principal that were compelled pursuant to Garrity.*

**In Full and Effective Compliance**

PSB is divided into criminal and administrative sections. Criminal investigators and administrative investigators are housed on separate floors of the building. Criminal investigators do not have access to the IAPro database for administrative investigations, and there are separate file rooms for criminal and administrative investigative documents and reports. We have previously verified during our site visits that the required separation of criminal and administrative investigations and restricted access to IAPro is in place.

In May 2018, PSB relocated to a new offsite location. After PSB's move to its new facility, we verified that criminal and administrative investigation files were housed on separate floors in the new facility. Criminal investigators do not have access to the IAPro database for administrative investigations, and there are separate and secured file rooms for criminal and administrative documents and reports.

During our October 2019 site visit, a member of our Team again verified that criminal and administrative investigative files are housed on separate floors, there is restricted access to both file rooms, and restricted access to IAPro remains in place.

WAI 56479

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 232.** *The Sheriff shall require the Professional Standards Bureau to complete all such administrative investigations regardless of the outcome of any criminal investigation, including cases in which the prosecuting agency declines to prosecute or dismisses the criminal case after the initiation of criminal charges. The Sheriff shall require that all relevant provisions of MCSO policies and procedures and the operations manual for the Professional Standards Bureau shall remind members of the Bureau that administrative and criminal cases are held to different standards of proof, that the elements of a policy violation differ from those of a criminal offense, and that the purposes of the administrative investigation process differ from those of the criminal investigation process.*

**In Full and Effective Compliance**

To determine MCSO's compliance with this Paragraph, we review on a monthly basis administrative and criminal investigations conducted by MCSO.

During this reporting period, we reviewed three criminal investigations conducted by MCSO personnel. All three have a companion administrative misconduct investigation, as required; and are in compliance with the requirements of this Paragraph. A fourth criminal investigation, outsourced to an outside agency, also has the required administrative misconduct investigation. The administration investigation was outsourced to the outside investigator under contract with MCSO.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 233.** *If the investigator conducting the criminal investigation decides to close the investigation without referring it to a prosecuting agency, this decision must be documented in writing and provided to the Professional Standards Bureau. The Commander of the Professional Standards Bureau shall separately consider whether to refer the matter to a prosecuting agency and shall document the decision in writing.*

**In Full and Effective Compliance**

To determine MCSO's compliance with this Paragraph, we review criminal misconduct investigations conducted by MCSO on a monthly basis.

During this reporting period, two of the three criminal investigations investigated by PSB were closed without submittal to a prosecutorial agency. The decisions were supported by the facts of the investigation, interviews, or other investigative follow-up. In both cases, the investigators documented their conclusions and decisions to close the cases without submittal and the PSB Commander approved these decisions.

WAI 56480

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 234.** *If the investigator conducting the criminal investigation decides to refer the matter to a prosecuting agency, the Professional Standards Bureau shall review the information provided to the prosecuting agency to ensure that it is of sufficient quality and completeness. The Commander of the Professional Standards Bureau shall direct that the investigator conduct additional investigation when it appears that there is additional relevant evidence that may improve the reliability or credibility of the investigation. Such directions shall be documented in writing and included in the investigatory file.*

### In Full and Effective Compliance

To determine MCSO's compliance with this Paragraph, we review on a monthly basis criminal misconduct investigations conducted by MCSO.

During this reporting period, we reviewed three criminal misconduct investigations conducted by PSB personnel. One was submitted to a prosecuting agency for review.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 235.** *If the prosecuting agency declines to prosecute or dismisses the criminal case after the initiation of criminal charges, the Professional Standards Bureau shall request an explanation for this decision, which shall be documented in writing and appended to the criminal investigation report.*

### In Full and Effective Compliance

To determine MCSO's compliance with this Paragraph, we review criminal misconduct investigations conducted by MCSO on a monthly basis.

During this reporting period, one criminal investigation we reviewed was submitted to a prosecutorial agency for review. The prosecutorial agency declined to prosecute and provided documentation of its decision to MCSO.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 56481

***Paragraph 236.*** *The Sheriff shall require the Professional Standards Bureau to maintain all criminal investigation reports and files after they are completed for record-keeping in accordance with applicable law.*

**In Full and Effective Compliance**

To determine compliance with this Paragraph, we have observed that PSB maintains both hardcopy and electronic files that are intended to contain all the documents required per this Paragraph

During our previous visits to MCSO Headquarters, we inspected the file rooms where hardcopies of investigations were stored. Criminal and administrative investigation files were stored in separate rooms, and access to these rooms was restricted. Our random review of criminal investigation case files verified that PSB was maintaining files as required. A member of our Team also has access to IAPro, and has verified that case files are maintained in an electronic format.

During our January 2018 site visit, a member of our Team inspected the file rooms where hardcopies of criminal investigation were stored and randomly reviewed case files to verify compliance.

In May 2018, PSB relocated to a new offsite location. After the move, we verified that PSB was properly maintaining criminal investigation reports and files at its new facility.

During our October 2019 site visit, a member of our Team again verified – by accessing IAPro and reviewing random cases – that PSB is properly maintaining electronic files of criminal investigations. A random review of hard-copy files securely maintained by criminal investigators was also conducted and found to be compliant.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

## G.  *Civilian Complaint Intake, Communication, and Tracking*

***Paragraph 237.*** *Within six months of the entry of this Order, the Monitor, in consultation with the Community Advisory Board, will develop and implement a program to promote awareness throughout the Maricopa County community about the process for filing complaints about the conduct of MCSO employees.*

**Phase 1**: Not applicable

**Phase 2:**  Not applicable

WAI 56482

We developed and implemented a Complaint Process Community Awareness Program to promote awareness throughout the Maricopa County community about the process for filing complaints about the conduct of MCSO employees. The program provides for distributing brochures describing the complaint process at quarterly community meetings and using public service announcements – made via local media outlets and social media – to provide basic information (in both English and Spanish) about MCSO's complaint process.

We contacted faith organizations and civic groups throughout Maricopa County requesting that they make complaint process information forms available to members of their congregations and groups. The Complaint Process Community Awareness Program incorporates input from the CAB, MCSO, and the ACLU of Arizona.

***Paragraph 238.*** *The Sheriff shall require the MCSO to accept all civilian complaints, whether submitted verbally or in writing; in person, by phone, by mail, or online; by a complainant, someone acting on the complainant's behalf, or anonymously; and with or without a signature from the complainant. MCSO will document all complaints in writing.*

**In Full and Effective Compliance**

To assess compliance with this Paragraph, we review all new misconduct complaints received each month and completed misconduct investigations conducted by MCSO personnel. In addition, we review many initial complaint documents or initial telephone calls, BWC videos, traffic stop videos, Supervisory Notes, Compliance and BIO reviews, and consider findings in the complaint testing process.

During the last reporting period, we reviewed 87 administrative misconduct investigations. We did not identify any completed investigations where there was an any external allegation that MCSO had failed to initially take a complaint.

During this reporting period, we reviewed 93 completed administrative misconduct investigations. We did not identify any completed investigations where there was an any external allegation that MCSO had failed to initially take a complaint.

Our review of traffic stops for this reporting period did not identify any instances where a subject who was arrested made allegations of misconduct by MCSO personnel during his arrest that went unaddressed. Our review of Supervisory Notes during this reporting period did not identify any incidents where there were indications that a complaint had been made but not properly reported. We reviewed numerous complainant contacts, and found no indication that a supervisor initially refused to take a complaint or attempted to dissuade the complainant from making a complaint. Neither CID or BIO identified any instances in their reviews during this reporting period that indicated that a complainant had attempted to file a complaint and been refused. We did not identify any complaint intake tests for this reporting period where MCSO failed to accept a complaint.

We continue to find that MCSO consistently accepts and records complaints as required for compliance with this Paragraph.

WAI 56483

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 239.** *In locations clearly visible to members of the public at the reception desk at MCSO headquarters and at all District stations, the Sheriff and the MCSO will post and maintain permanent placards clearly and simply describing the civilian complaint process that is visible to the public at all hours. The placards shall include relevant contact information, including telephone numbers, email addresses, mailing addresses, and Internet sites. The placards shall be in both English and Spanish.*

**In Full and Effective Compliance**

As we did not hold an in-person site visit in April, we were unable to visit MCSO Headquarters and MCSO Districts to determine if the permanent placards were prominently displayed at MCSO Headquarters and Districts. During our April remote site visit, MCSO reported that, during this reporting period, MCSO did not add or eliminate any locations displaying permanent complaint placards. MCSO further reported that, during this reporting period, it has not received any feedback from the community regarding the permanent complaint placards. When inspected during our last in-person site visit, we noted that MCSO's placard states that anyone who has a concern regarding the performance of any MCSO employee has the right to file a complaint in English or Spanish or their preferred language, to include American Sign Language; in person at any District facility or at the Professional Standards Bureau, by mail, by telephone, by fax, or online. The placard includes relevant contact information, including telephone numbers, email addresses, mailing addresses, and websites.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 240.** *The Sheriff shall require all deputies to carry complaint forms in their MCSO vehicles. Upon request, deputies will provide individuals with complaint forms and information about how to file a complaint, their name and badge number, and the contact information, including telephone number and email address, of their immediate supervising officer. The Sheriff must provide all supervising officers with telephones. Supervising officers must timely respond to such complaints registered by civilians.*

**Phase 1:** In compliance

- EA-2 (Patrol Vehicles), most recently revised on March 3, 2021.

- GE-4 (Use, Assignment, and Operation of Vehicles), most recently amended on May 28, 2021.

- GJ-24 (Community Relations and Youth Programs), most recently revised on March 11, 2021.

WAI 56484

**Phase 2:** In compliance

As we held our April site visit remotely, we were unable to visit District offices to verify that MCSO maintained adequate supplies of complaint forms for deputies to carry in their vehicles. We were also unable to verify that supervisors were in possession of MCSO-issued cellular telephones. We will resume these verifications when we resume our in-person site visits.

*Paragraph 241. The Sheriff will ensure that the Professional Standards Bureau facility is easily accessible to members of the public. There shall be a space available for receiving walk-in visitors and personnel who can assist the public with filing complaints and/or answer an individual's questions about the complaint investigation process.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

The PSB facility, the former East Court Building Library, located at 101 West Jefferson Street in Phoenix, is easily accessible to members of the public. The County Court facilities in the building are separate from the PSB reception area and offices. The PSB area is accessible from First Avenue, a major thoroughfare; and there is no required security screening of individuals entering the building through the First Avenue entrance. As we held our April site visit remotely, we were unable to visit the PSB facility during this reporting period. We will visit the facility again when we resume our in-person site visits.

Maricopa County had previously advised MCSO that its lease for the PSB site was expired and that MCSO would have to vacate the site. MCSO stated that the lease requires that the County provide MCSO with a one-year advance written notification of the requirement to vacate the current PSB facility. As of this reporting period, MCSO has not received written notification from the County regarding the requirement to vacate the current PSB site.

MCSO's placards and comment and complaint forms – including the complaint form that is accessible via MCSO's website – all reflect PSB's current address.

*Paragraph 242. The Sheriff will also make complaint forms widely available at locations around the County including: the websites of MCSO and Maricopa County government; the lobby of MCSO's headquarters; each patrol District; and the Maricopa County government offices. The Sheriff will ask locations, such as public library branches and the offices and gathering places of community groups, to make these materials available.*

**Phase 1:** In compliance

- GJ-24 (Community Relations and Youth Programs), most recently revised on March 11, 2021.

**Phase 2:** In compliance

WAI 56485

MCSO has complaint forms available in English and Spanish on the MCSO and Maricopa County websites. MCSO maintains a list – of MCSO facilities, County offices, and public locations where community groups meet – where Community Outreach Division personnel attempt to make the forms available.

Due to the cancellation of our in-person site visit in April, we were unable to verify that MCSO placed complaint forms in locations that were included on MCSO's list of facilities where complaint forms are available to the public. During this reporting period, we requested that the Community Outreach Division (COrD) provide its proposed changes to the list of locations throughout Maricopa County displaying Comment and Complaint Forms to make the forms more accessible to community members. Community Advisory Board (CAB) members have recommended during our site visit discussions that the COrD place complaint forms in locations including grocery stores, pharmacies, and other retail stores that are located in communities where members of the Plaintiffs' class live and work. To follow up, we recommended that COrD personnel meet with CAB members to receive their input on possible community locations. We currently await COrD's proposal.

**Paragraph 243.** *The Sheriff shall establish a free, 24-hour hotline for members of the public to make complaints.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

**Phase 2:** In compliance

In July 2016, MCSO established the free 24-hour hotline for members of the public to make complaints; the hotline continued to be operational during this reporting period. A Monitoring Team member periodically called the hotline during this reporting period; and verified that the hotline is operational in both English and Spanish, and provides instructions in both languages on how to register a complaint. The recording advises callers that if the call is an emergency, they are to call 911. Callers are requested to provide their name, telephone number, and a brief summary of their complaint. If callers leave a recorded message, they are advised that MCSO will contact them as soon as possible. If callers do not wish to leave a recorded message, they are provided with a telephone number to call to speak to a supervisor. That number connects the callers to the MCSO switchboard operator, who will connect the caller to an appropriate supervisor. Callers are further advised of MCSO's operating hours if they wish to contact PSB directly.

The hotline is housed in PSB, and PSB personnel access any recorded messages at the beginning of each business day. PSB personnel reported that, during this reporting period, PSB received two new hotline complaints, both of which were Service Complaints.

MCSO reported that there are 14 hotline complaints currently under investigation and three hotline complaints under Command review.

WAI 56486

The procedures established and followed by PSB provide for creating a record of every complaint received on the hotline and maintaining a log of follow-up actions regarding referral of the complaint.

**Paragraph 244.** *The Sheriff shall ensure that the MCSO's complaint form does not contain any language that could reasonably be construed as discouraging the filing of a complaint, such as warnings about the potential criminal consequences for filing false complaints.*

### In Full and Effective Compliance

Our review of the English and Spanish complaint forms' content did not reveal any language that could reasonably be construed as discouraging the filing of a complaint.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 245.** *Within two months of the entry of this Order, complaint forms will be made available, at a minimum, in English and Spanish. The MCSO will make reasonable efforts to ensure that complainants who speak other languages (including sign language) and have limited English proficiency can file complaints in their preferred language. The fact that a complainant does not speak, read, or write in English, or is deaf or hard of hearing, will not be grounds to decline to accept or investigate a complaint.*

### In Full and Effective Compliance

Complaint forms in English and Spanish are accessible on MCSO's website. The complaint form states that anyone who has a concern regarding the performance of any MCSO employee has the right to file a complaint – in English or Spanish or their preferred language, to include American Sign Language – in person at any District facility or at the Professional Standards Bureau, by mail, by telephone, by fax, or online. The forms provide street addresses, contact numbers, and website information.

During this reporting period, no grievances were filed that met the criteria for transmitting to the Monitor.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 56487

***Paragraph 246.*** *In the course of investigating a civilian complaint, the Professional Standards Bureau will send periodic written updates to the complainant including:*

*a.* *within seven days of receipt of a complaint, the Professional Standards Bureau will send non-anonymous complainants a written notice of receipt, including the tracking number assigned to the complaint and the name of the investigator assigned. The notice will inform the complainant how he or she may contact the Professional Standards Bureau to inquire about the status of a complaint;*

*b.* *when the Professional Standards Bureau concludes its investigation, the Bureau will notify the complainant that the investigation has been concluded and inform the complainant of the Bureau's findings as soon as is permitted by law; and*

*c.* *in cases where discipline is imposed, the Professional Standards Bureau will notify the complainant of the discipline as soon as is permitted by law.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

**Phase 2:** In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed 93 administrative misconduct investigations conducted by MCSO personnel. Of these, 66 were externally generated.

Paragraph 246.a. requires that a civilian complainant receive a written notice of receipt of his/her complaint within seven days. This letter must include the tracking number, the name of the investigator assigned, and information regarding how the complainant can inquire about the status of his/her complaint. In all but three (5%) of the externally generated cases where PSB had contact information for the complainant, the letter was sent within seven days as required. In one, the letter was not sent in a timely manner and no explanation was provided. An additional two were originally handled as service complaints resulting in a significant delay in notifying the complainant that the complaint had been received and an administrative investigation would be conducted. All of the letters sent and reviewed included the name of the investigator and information regarding how the complainant could inquire about the status of the complaint.

Paragraph 246.b. requires that PSB notify a civilian complainant of the outcome of the investigation. In all of the externally generated complaints, the complainant was provided a notice of the outcome when contact information was known.

Paragraph 246.c. requires that PSB notify a civilian complainant of any discipline imposed as soon as permitted by law. In all of the externally generated complaints with sustained findings, PSB properly notified the complainant of the sustained findings and the discipline imposed when contact information for the complainant was known.

WAI 56488

***Paragraph 247.*** *Notwithstanding the above written communications, a complainant and/or his or her representative may contact the Professional Standards Bureau at any time to determine the status of his or her complaint. The Sheriff shall require the MCSO to update the complainant with the status of the investigation.*

**In Full and Effective Compliance**

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed 93 administrative misconduct investigations conducted by MCSO. Sixty-six were externally generated. We did not identify any instances where a complainant was discouraged from, or denied, contact with MCSO investigators to determine the status of his/her complaint, or to request and receive an update. MCSO appropriately had contact with complainants as required in Paragraph 246 in all of these cases where the complainant was known and wished to participate in the investigation. In four of the cases, MCSO personnel reported that they had additional contact with the complainant during the course of the investigation.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.


***Paragraph 248.*** *The Professional Standards Bureau will track, as a separate category of complaints, allegations of biased policing, including allegations that a deputy conducted an investigatory stop or arrest based on an individual's demographic category or used a slur based on an individual's actual or perceived race, ethnicity, nationality, or immigration status, sex, sexual orientation, or gender identity. The Professional Standards Bureau will require that complaints of biased policing are captured and tracked appropriately, even if the complainant does not so label the allegation.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

Each month, PSB provides a list of new complaints alleging biased policing. PSB also provides all closed investigations where biased policing was alleged. For this Paragraph, only allegations of biased policing that do not affect the Plaintiffs' class are reported. Those complaints alleging bias against members of the Plaintiffs' class are captured in a separate category and reported under Paragraphs 275-288.

During this reporting period, PSB completed seven investigations where potential bias was alleged that did not affect members of the Plaintiffs' class. All seven investigations were investigated by PSB, completed after July 20, 2016; tracked in a separate category as required by this Paragraph; and reported in Paragraph 33.

WAI 56489

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 249.** *The Professional Standards Bureau will track, as a separate category of complaints, allegations of unlawful investigatory stops, searches, seizures, or arrests.*

### In Full and Effective Compliance

To determine Phase 2 compliance for this Paragraph, we review a monthly report from PSB that provides the information required for compliance.

To ensure that we are consistently informed of complaints relative to this Paragraph, PSB provides information concerning these investigations in its monthly document submission relative to this Paragraph.

During this reporting period, there were no investigations related to this Paragraph submitted for our review.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 250.** *The Professional Standards Bureau will conduct regular assessments of the types of complaints being received to identify and assess potential problematic patterns and trends.*

**Phase 1:** In compliance

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

PSB continues to prepare a comprehensive quarterly assessment of the types of complaints received to identify and assess potential problematic patterns or trends. During this reporting period, there were 163 complaints received. There were 24 complaints alleging rude behavior toward members of the public. There were 15 complaints alleging that deputies engaged in biased law enforcement actions, used racial slurs, used disparaging comments, or took actions toward members of a protected class. There were 13 complaints that alleged on- or off-duty criminal acts by MCSO employees, with four reports involving allegations of sexual assault and three reports involving allegations of employees driving under the influence. There were 14 investigations opened alleging that employees operated motor vehicles unsafely or that they were involved in at-fault traffic crashes.

There were 12 complaints alleging that employees failed to comply with MCSO's policies, with 10 of the complaints related to detention functions. There were 12 complaints that alleged that inmates were mistreated. There were 12 allegations of workplace professionalism misconduct between employees.

WAI 56490

There were 10 complaints made alleging inappropriate use of language or inappropriate actions toward members of the public. There were 10 complaints made alleging that deputies failed to properly handle a call for service or an investigation. There were 10 complaints alleging inappropriate uses of force. There were 10 complaints alleging that certain employees did not properly work their scheduled shift or work hours.

The assessment identified several employees where there were two complaints received during the reporting period, and there was a potential pattern or trend of misconduct that was noted.

The assessment identified the Lower Buckeye Jail facility as the Division that received the highest number of complaints during the reporting period. There were 24 complaints stemming from the Lower Buckeye Jail during the reporting period. There were three complaints alleging employees not wearing a mask as directed and three complaints alleging on- or off-duty criminal activity; two involving allegations of employees driving under the influence and one allegation of an employee being involved in contraband being brought into the facility. There were two complaints alleging employees used rude and inappropriate language toward inmates; two allegations regarding allowing inmate on inmate assaults; two allegations of employees either manipulating or not providing diet-restricted meals; and two allegations of inappropriate uses of force. There were two complaints alleging supervisors having sexual or romantic relationships with subordinate employees and two complaints alleging employees abandoning their job duties. The additional six complaints did not appear to follow a trend or pattern.

The assessment also included a summary of notable trends and patterns that were identified by PSB at various MCSO Divisions that did not have a high number of complaints.

The contents of the quarterly assessment are discussed at executive staff meetings. PSB also includes the information required by this Paragraph in its public Semi-Annual Misconduct Investigations Report, which is required under Paragraph 251. The most recent Semi-Annual report for the period of January 1-June 30, 2020, contains the issues identified as potentially problematic patterns or trends for that six-month period.

MCSO remains in compliance with this requirement.


## H. Transparency Measures

**Paragraph 251.** *The Sheriff shall require the Professional Standards Bureau to produce a semi-annual public report on misconduct investigations, including, at a minimum, the following:*

a.      *summary information, which does not name the specific employees involved, about any sustained allegations that an employee violated conflict-of-interest rules in conducting or reviewing misconduct investigations;*

b.      *aggregate data on complaints received from the public, broken down by district; rank of principal(s); nature of contact (traffic stop, pedestrian stop, call for service, etc.); nature of allegation (rudeness, bias-based policing, etc.); complainants' demographic information; complaints received from anonymous complainants or third parties; and principals' demographic information;*

WAI 56491

c.    analysis of whether any increase or decrease in the number of civilian complaints received from reporting period to reporting period is attributable to issues in the complaint intake process or other factors;

d.    aggregate data on internally-generated misconduct allegations, broken down by similar categories as those for civilian complaints;

e.    aggregate data on the processing of misconduct cases, including the number of cases assigned to Supervisors outside of the Professional Standards Bureau versus investigators in the Professional Standards Bureau; the average and median time from the initiation of an investigation to its submission by the investigator to his or her chain of command; the average and median time from the submission of the investigation by the investigator to a final decision regarding discipline, or other final disposition if no discipline is imposed; the number of investigations returned to the original investigator due to conclusions not being supported by the evidence; and the number of investigations returned to the original investigator to conduct additional investigation;

f.    aggregate data on the outcomes of misconduct investigations, including the number of sustained, not sustained, exonerated, and unfounded misconduct complaints; the number of misconduct allegations supported by the appropriate standard of proof; the number of sustained allegations resulting in a non-disciplinary outcome, coaching, written reprimand, suspension, demotion, and termination; the number of cases in which findings were changed after a pre-determination hearing, broken down by initial finding and final finding; the number of cases in which discipline was changed after a pre-determination hearing, broken down by initial discipline and final discipline; the number of cases in which findings were overruled, sustained, or changed by the Maricopa County Law Enforcement Merit System Council, broken down by the finding reached by the MCSO and the finding reached by the Council; and the number of cases in which discipline was altered by the Council, broken down by the discipline imposed by the MCSO and the disciplinary ruling of the Council; and similar information on appeals beyond the Council; and

g.    aggregate data on employees with persistent or serious misconduct problems, including the number of employees who have been the subject of more than two misconduct investigations in the previous 12 months, broken down by serious and minor misconduct; the number of employees who have had more than one sustained allegation of minor misconduct in the previous 12 months, broken down by the number of sustained allegations; the number of employees who have had more than one sustained allegation of serious misconduct in the previous 12 months, broken down by the number of sustained allegations; and the number of criminal prosecutions of employees, broken down by criminal charge.

**Phase 1:**  In compliance

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

WAI 56492

The PSB Operations Manual identifies the PSB Commander as responsible for preparing the semi-annual public report on misconduct investigations. The manual also contains provisions for the production of summary information regarding sustained conflict of interest violations; an analysis of the complaint intake process; and aggregate data on complaints (internal and external), processing of misconduct cases, outcomes of misconduct cases, and employees with persistent misconduct problems.

Since July 2019, PSB has issued and posted on MCSO's website its semi-annual public report. PSB also incorporates information relevant to Paragraph 192 in its semi-annual report, which requires that PSB review, at least semi-annually, all misconduct investigations that were assigned outside the Bureau to determine whether or not the investigation was properly categorized, whether the investigation was properly conducted, and whether appropriate findings were reached. PSB also incorporates information relevant to Paragraph 250 in this report, which includes an assessment of potential problematic patterns or trends, based on a review on complaints received.

During our October 2019 site visit, PSB informed us that it developed a voluntary survey for complainants to complete after the conclusion of the investigation; the survey would capture complainants' demographic information. In October 2019, MCSO provided us with a copy of the survey; and we provided our feedback to MCSO. MCSO has identified a funding source for prepaid postage return envelopes. The use of the prepaid postage return envelopes will allow the complainants to mail the survey to MCSO without having to incur any fees. PSB commenced distribution of the surveys to complainants for cases that were closed during January 2020. In addition, PSB is also informing complainants of a web-based version of the survey that may be completed online. PSB is now collecting the voluntary surveys that are returned. PSB included the relevant demographic information in the most recently published semi-annual report.

In January 2021, PSB issued and posted on the MCSO website its semi-annual public report for period of January 1-June 30 31, 2020. The report was prepared consistent with prior reports prepared by PSB and contains the relevant information pertaining to this Paragraph.

MCSO remains in compliance with this requirement.

***Paragraph 252.*** *The Sheriff shall require the MCSO to make detailed summaries of completed internal affairs investigations readily available to the public to the full extent permitted under state law, in electronic form on a designated section of its website that is linked to directly from the MCSO's home page with prominent language that clearly indicates to the public that the link provides information about investigations of misconduct alleged against MCSO employees.*

**Phase 1:** In compliance

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

WAI 56493

PSB publishes detailed summaries each month of completed misconduct investigations in an electronic format that is accessible via MCSO's website. The following data fields have been identified for public disclosure: Internal Affairs Number; Date Opened; Incident Type; Original Complaint; Policy Violation(s) Alleged/Outcome; Discipline; Investigative Summary; and Date Completed. During our April 2017 site visit, we approved the PSB template containing detailed summaries of completed misconduct investigations for placement on the MCSO website. Each reporting period, we conduct a review of the detailed summaries of completed misconduct investigations to ensure that the content is consistent with the requirements of this Paragraph. In addition, we verify that the monthly detailed summaries of completed misconduct investigations are posted on MCSO's website for public review.

During this reporting period, PSB made the monthly detailed summaries of completed internal investigations for January, February, March 2021 available to the public in a designated section on the homepage of MCSO's website. The reports provide significant details regarding alleged misconduct, the findings of the investigation, and, if there is a finding of misconduct, what type of discipline was imposed. MCSO remains in compliance with this requirement.

*Paragraph 253.* *The MCSO Bureau of Internal Oversight shall produce a semi-annual public audit report regarding misconduct investigations. This report shall analyze a stratified random sample of misconduct investigations that were completed during the previous six months to identify any procedural irregularities, including any instances in which:*

a.    *complaint notification procedures were not followed;*

b.    *a misconduct complaint was not assigned a unique identifier;*

c.    *investigation assignment protocols were not followed, such as serious or criminal misconduct being investigated outside of the Professional Standards Bureau;*

d.    *deadlines were not met;*

e.    *an investigation was conducted by an employee who had not received required misconduct investigation training;*

f.    *an investigation was conducted by an employee with a history of multiple sustained misconduct allegations, or one sustained allegation of a Category 6 or Category 7 offense from the MCSO's disciplinary matrices;*

g.    *an investigation was conducted by an employee who was named as a principal or witness in any investigation of the underlying incident;*

h.    *an investigation was conducted of a superior officer within the internal affairs investigator's chain of command;*

i.    *any interviews were not recorded;*

j.    *the investigation report was not reviewed by the appropriate personnel;*

k.    *employees were promoted or received a salary increase while named as a principal in an ongoing misconduct investigation absent the required written justification;*

WAI 56494

l.     *a final finding was not reached on a misconduct allegation;*

m.    *an employee's disciplinary history was not documented in a disciplinary recommendation; or*

n.    *no written explanation was provided for the imposition of discipline inconsistent with the disciplinary matrix.*

**Phase 1:** In compliance

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

**Phase 2:** In compliance

On June 26, 2018, we approved the methodology developed by AIU for the inspection that would address the requirements of this Paragraph, which would start with an inspection of investigations that commenced after November 1, 2017. AIU has opted to conduct monthly inspections of misconduct investigations in lieu of conducting a semi-annual audit. During this reporting period, AIU prepared inspection reports for misconduct investigations that closed during November 2020, December 2020, and January 2021.

When perceived deficiencies are identified, AIU requests a BIO Action Form from the specific District/Division Commander to address the issue(s).

MCSO remains in compliance with this requirement.

### I.    *Testing Program for Civilian Complaint Intake*

***Paragraph 254.*** *The Sheriff shall initiate a testing program designed to assess civilian complaint intake. Specifically, the testing program shall assess whether employees are providing civilians appropriate and accurate information about the complaint process and whether employees are notifying the Professional Standards Bureau upon the receipt of a civilian complaint.*

**Phase 1:** In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

**Phase 2:** In compliance

This Paragraph requires that MCSO develop a testing program that assesses "whether employees are providing civilians appropriate and accurate information about the complaint process and whether employees are notifying the Professional Standards Bureau upon the receipt of a civilian complaint." We evaluate MCSO's compliance with this Paragraph based on how the agency responds to the outcomes of the tests, regardless of whether the tests "succeed" or "fail."

WAI 56495

To meet the requirements of this Paragraph, AIU contracts with an independent vendor, Progressive Management Resources (PMR), which is responsible for conducting complaint intake testing via telephone, email, U.S. Mail, MCSO's website, and via in-person tests. We receive and review documentation of these tests – including any available audio-recorded documentation – as they are completed, as part of our monthly document requests. PMR does not advise AIU of the tests in advance but instead emails AIU once a test has been completed with documentation of the test.

During the last reporting period, we did not have any concerns with the complaint intake tests that were conducted.

During this reporting period, PMR conducted three tests: two via email; and one via telephone, to District 4. We did not have concerns with MCSO's receipt or handling of any of the tests. In the first test, the tester emailed an MCSO District Captain alleging that her friend, a monolingual Spanish speaker, approached a deputy to report a suspicious vehicle in his neighborhood, but the deputy rudely dismissed him because the deputy did not speak Spanish. The tester wrote on her test documentation form that the test "went very well" and that she received a "[v]ery quick response" from MCSO.

In the second test, the tester emailed an MCSO District Captain, presenting as an African American man who was married to a white woman, alleging unprofessionalism and rudeness by a deputy following their apparent jaywalking. After the tester did not receive any response or acknowledgement for 14 days, the tester contacted AIU, which learned that the email had been "placed in quarantine by the anti-spam software program" managed by the County. Concerned that this could occur again, AIU appropriately asked PMR to temporarily suspend its tests that involved direct emails to Commanders.

In the third test, the tester called District 4 to report that she had observed a "possibly intoxicated" deputy get into his vehicle and drive. The tester described the District sergeant with whom she spoke as "very professional and friendly." She wrote on her test documentation form, "He asked me many questions and even when I didn't want to provide info he was still very professional and kind."

Following our April 2021 remote site visit, we requested from AIU information about any updates that PMR made recently to its complaint intake methodology or guidance for testers. In response to our request, AIU wrote, "PMR recently updated the Tester Manual it utilizes as training and guidance for its testers in conducting in-person complaint intake testing. The updated material includes what to do in the event the entrance to a district lobby happens to be locked, i.e., they are to return to their car and call MCSO's non-emergency number using a specific application on their cell phones. Patrol district offices may be closed to the public due to COVID-19 restrictions. The updated manual also includes photos of MCSO deputy uniforms and vehicles to assist testers in conducting in-person tests." We will continue to ask AIU for any updates to PMR's complaint intake methodology or guidance for testers.

Following the outcome of several tests in which front-line staff responded inappropriately to complaint intake tests, we have encouraged MCSO to provide refresher training on the complaint process to all employees who interact with the public. AIU developed a useful complaint intake

WAI 56496

checklist for administrative staff, which we and the Parties reviewed and approved; MCSO distributed the checklist to the Patrol Divisions for dissemination to their personnel in mid-September, and the checklist is available to all employees via the agency's shared internal hard drive.

Earlier this year, AIU personnel recommended some possible changes to the complaint intake training, to make it more useful for administrative staff. We and the Parties are currently reviewing this revised training.

***Paragraph 255.*** *The testing program is not intended to assess investigations of civilian complaints, and the MCSO shall design the testing program in such a way that it does not waste resources investigating fictitious complaints made by testers.*

**Phase 1:** In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

**Phase 2:** In compliance

AIU has informed its complaint intake testing vendor of this requirement. AIU has created several procedures to ensure that the Complaint Intake Testing Program does not waste resources investigating fictitious complaints made by testers – including setting parameters for the types of inquiries that testers make, and creating official identification cards for testers designating them as such. For in-person tests, AIU requires that the vendor inform AIU in advance of all tests; and AIU personnel make themselves available via telephone if testers encounter any issue as they lodge their test complaints.

***Paragraph 256.*** *The testing program shall assess complaint intake for complaints made in person at MCSO facilities, complaints made telephonically, by mail, and complaints made electronically by email or through MCSO's website. Testers shall not interfere with deputies taking law enforcement action. Testers shall not attempt to assess complaint intake in the course of traffic stops or other law enforcement action being taken outside of MCSO facilities.*

**Phase 1:** In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

**Phase 2:** In compliance

WAI 56497

AIU has advised its complaint intake testing vendor that testers shall not interfere with deputies taking law enforcement action, nor shall they attempt to assess complaint intake in the course of traffic stops or other law enforcement action being taken outside of MCSO facilities.

AIU has asked the vendor to inform AIU in advance of all in-person tests, and AIU personnel make themselves available via telephone if testers encounter any issue as they lodge their test complaints.

**Paragraph 257.** *The testing program shall include sufficient random and targeted testing to assess the complaint intake process, utilizing surreptitious video and/or audio recording, as permitted by state law, of testers' interactions with MCSO personnel to assess the appropriateness of responses and information provided.*

**Phase 1:** In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.
- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

**Phase 2:** In compliance

AIU has informed its complaint intake testing vendor of the requirements of this Paragraph. We receive copies of the recordings following the completion of the tests. Per the agreed-upon methodology, all tests conducted via telephone are audio-recorded; and all in-person testers' interactions with MCSO personnel are video-recorded to assess the appropriateness of responses and information provided.

**Paragraph 258.** *The testing program shall also assess whether employees promptly notify the Professional Standards Bureau of civilian complaints and provide accurate and complete information to the Bureau.*

**Phase 1:** In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.
- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

**Phase 2:** In compliance

AIU has informed its complaint intake testing vendor of the requirements of this Paragraph so that the tests it conducts shall also assess whether employees promptly notify the PSB of civilian complaints and provide accurate and complete information to the Bureau.

WAI 56498

As it receives documentation about completed tests, AIU reviews the information; and issues Action Forms, authors memorandums of concern, or takes other appropriate action if a test fails or raises any concerns about the conduct of MCSO employees.

**Paragraph 259.** *MCSO shall not permit current or former employees to serve as testers.*

**Phase 1:** In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.
- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

**Phase 2:** In compliance

AIU has informed its complaint intake testing vendor of this requirement. AIU personnel have informed us that no current or former employees have served, or will serve in the future, as testers.

**Paragraph 260.** *The MCSO shall produce an annual report on the testing program. This report shall include, at a minimum:*

a.  *a description of the testing program, including the testing methodology and the number of tests conducted broken down by type (i.e., in-person, telephonic, mail, and electronic);*

b.  *the number and proportion of tests in which employees responded inappropriately to a tester;*

c.  *the number and proportion of tests in which employees provided inaccurate information about the complaint process to a tester;*

d.  *the number and proportion of tests in which employees failed to promptly notify the Professional Standards Bureau of the civilian complaint;*

e.  *the number and proportion of tests in which employees failed to convey accurate information about the complaint to the Professional Standards Bureau;*

f.  *an evaluation of the civilian complaint intake based upon the results of the testing program; and*

g.  *a description of any steps to be taken to improve civilian complaint intake as a result of the testing program.*

**Phase 1:** In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.
- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

WAI 56499

**Phase 2:** In compliance

AIU issued its first annual report on the complaint intake testing program on September 14, 2020. We discussed with MCSO the report's findings during our October 2020 remote site visit. We and the Parties previously reviewed and approved the proposed methodology, as well as a draft template, for the report. The annual report covers the 24 tests that were completed between July 1, 2019-June 30, 2020. These tests included: eight in-person tests; three tests conducted via U.S. Mail; eight tests conducted via telephone; three tests conducted via email; and two tests conducted via MCSO's website. With the publication of its first annual report on this program, MCSO achieved compliance with this Paragraph.

Beginning in January 2019, while not required by this Paragraph, AIU began issuing monthly reports on complaint intake testing. We review these reports as they are published, and find that they accurately summarize the results of the complaint intake tests and any follow-up actions taken by MCSO.

During our site visits, we continue to discuss with MCSO how executive staff review the challenges that the report identified and implement the recommendations made by AIU personnel in its annual report and monthly inspections of complaint intake tests. The complaint intake testing program will be most successful if MCSO makes agency-wide adjustments based on what it learns from both the successful and unsuccessful complaint intake tests. MCSO personnel have reported that the annual report's findings were shared in internal Town Hall meetings. AIU also plans to explore with the Training Division how to make this information available via the HUB. We will continue to discuss this with MCSO.

WAI 56500

# Section 13: Community Outreach and Community Advisory Board

**COURT ORDER XVI.    COMMUNITY    OUTREACH    AND    COMMUNITY ADVISORY BOARD**

**Paragraph 261.** *The Community Advisory Board may conduct or retain a consultant to conduct a study to identify barriers to the filing of civilian complaints against MCSO personnel.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

During this reporting period, the CAB continued to explore the possibility of retaining a consultant to conduct a study to identify barriers to the filing of civilian complaints against MCSO personnel, by researching polling firms that are experienced in working with Latino populations.

**Paragraph 262.** *In addition to the administrative support provided for in the Supplemental Permanent Injunction, (Doc. 670 ¶ 117), the Community Advisory Board shall be provided with annual funding to support its activities, including but not limited to funds for appropriate research, outreach advertising and website maintenance, stipends for intern support, professional interpretation and translation, and out-of-pocket costs of the Community Advisory Board members for transportation related to their official responsibilities. The Community Advisory Board shall submit a proposed annual budget to the Monitor, not to exceed $15,000, and upon approval of the annual budget, the County shall deposit that amount into an account established by the Community Advisory Board for that purpose. The Community Advisory Board shall be required to keep detailed records of expenditures which are subject to review.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

The CAB's approved budget includes categories for expenses including community meetings; video production (to produce a short video in English and Spanish that provides information about the CAB and the MCSO complaint process); marketing materials; stipends for an assistant to help coordinate CAB meeting logistics; and reimbursement for CAB members' meeting expenses.

Following the Monitor's approval of the CAB's budget, the CAB established a bank account, and the County provided the $15,000. CAB members developed procedures for tracking funds and receiving reimbursement. We meet regularly with CAB members to discuss these procedures and review the CAB's expenditures to date; these records appear to be in order.

WAI 56501

**COURT ORDER XVII.** **SUPERVISION AND STAFFING**

***Paragraph 263.*** *The following Section of this Order represents additions and amendments to Section X of the first Supplemental Permanent Injunction, Supervision and Evaluations of Officer Performance, and the provisions of this Section override any conflicting provisions in Section X of the first Supplemental Permanent Injunction.*

***Paragraph 264.*** *The Sheriff shall ensure that all patrol deputies shall be assigned to a primary, clearly identified, first-line supervisor.*

**In Full and Effective Compliance**

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the first quarter of 2021. For January, we reviewed a sample of shift rosters from Districts 1, 2, and 3. For February, we reviewed a sample of shift rosters from Districts 4, 6, and 7, and Lake Patrol. For March, we reviewed a sample of shift rosters from Districts 1, 2, and 3. Our reviews of monthly and daily rosters indicated that deputies were assigned to a primary, clearly identified supervisor, and that deputies worked the same shifts as their supervisors.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

***Paragraph 265.*** *First-line patrol supervisors shall be responsible for closely and consistently supervising all deputies under their primary command.*

**Phase 1:** In compliance

- GB-2 (Command Responsibility), most recently amended on June 28, 2019.

**Phase 2:** Not in compliance

Paragraph 265 is a general directive that covers several aspects of supervision. There are several requirements covered in other Paragraphs that directly concern this Paragraph; these requirements must be met before MCSO can establish compliance with Paragraph 265. We have determined that for MCSO to meet the requirements of this Paragraph, MCSO must be in compliance with Paragraphs 83, 85, 89, 90, 91, 93, and 94. During this reporting period, MCSO was in compliance with Paragraphs 83, 85, 89, 90, 91, and 93. The compliance rating for Paragraph 94 for this reporting period was 92.19%. MCSO has not achieved compliance with Paragraph 94, and therefore has not met compliance requirements for Paragraph 265.

WAI 56502

***Paragraph 266.*** *First-line patrol supervisors shall be assigned as primary supervisor to no more persons than it is possible to effectively supervise. The Sheriff should seek to establish staffing that permits a supervisor to oversee no more than eight deputies, but in no event should a supervisor be responsible for more than ten persons. If the Sheriff determines that assignment complexity, the geographic size of a district, the volume of calls for service, or other circumstances warrant an increase or decrease in the level of supervision for any unit, squad, or shift, it shall explain such reasons in writing, and, during the period that the MCSO is subject to the Monitor, shall provide the Monitor with such explanations. The Monitor shall provide an assessment to the Court as to whether the reduced or increased ratio is appropriate in the circumstances indicated.*

### In Full and Effective Compliance

To assess Phase 2 compliance with this Paragraph, we review a sample of daily shift rosters for the three months of the reporting period. We examine rosters to ensure that Patrol supervisors are not assigned more personnel than they can effectively supervise. We also review rosters to ensure supervisors oversee no more than eight deputies, and we ensure that supervisors oversee no more than 10 persons; this could include a combination of deputies, Deputy Service Aides (DSAs), and Posse members. In addition, we review monthly submissions to determine if Patrol supervisors generated any memorandums to document instances where the span of control exceeded the established ratios. As per MCSO policy, supervisors are required to document shifts where the span of control was exceeded, in a memorandum to the District Commander.

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the first quarter of 2021. For January, we reviewed a sample of shift rosters from Districts 1, 2, and 3. For February, we reviewed a sample of shift rosters from Districts 4, 6, and 7, and Lake Patrol. For March, we reviewed a sample of shift rosters from Districts 1, 2, and 3. Our reviews of monthly and daily rosters indicated that deputies were assigned to and worked the same schedules as their supervisors, and supervisors were available to provide on-scene supervision.

For January, District 1 submitted 17 span of control memos. In eight of the 17 documented instances, the span of control exceeded the 1:8 sworn ratio. For each of these shifts where the span of control was exceeded, supervisors wrote memorandums documenting the circumstances. Districts 2 and 3 each submitted one span of control memo, indicating that there was one shift during the month where the span of control exceeded the 1:8 ratio. For February, District 1 submitted one span of control memorandum, but upon review, we determined that the span of control for sworn was not exceeded. District 2 submitted eight span of control memos where the span of control exceeded the 1:8 sworn ratio. In each instance, supervisors documented the circumstances in memorandums to their commanding officer. District 4 submitted two memorandums documenting two shifts during the month in which the span of control exceeded the 1:8 sworn ratio. For March, District 1 submitted one span of control memo documenting one shift in which the span of control was exceeded. District 2 submitted eight memos, indicating that the span of control was exceed during eight shifts of the month. District 4 submitted one memorandum documenting one shift where the span of control exceeded the 1:8 sworn ratio. In each shift where the span of control was exceeded, supervisors documented the circumstances in memorandums to their respective commanders.

WAI 56503

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 267.** *Supervisors shall be responsible for close and effective supervision of deputies under their command. Supervisors shall ensure that all deputies under their direct command comply with MCSO policy, federal, state and local law, and this Court's orders.*

**Phase 1:** In compliance

- GB-2 (Command Responsibility), most recently amended on June 28, 2019.

**Phase 2:** Not in compliance

Close and effective supervision requires that supervisors consistently apply the concepts established in several Paragraphs of the First Order. There are requirements covered in other Paragraphs that directly concern Paragraph 267, and must therefore be in compliance for MCSO to establish compliance with this Paragraph. We have determined that for MCSO to meet the requirements of this Paragraph, it must achieve compliance with Paragraphs 83, 85, 89, 90, 91, 93, and 96. During the first quarter of 2021, our reviews found MCSO in compliance with Paragraphs 83, 85, 89, 90, 91, and 93, but not in compliance with Paragraph 96. MCSO is therefore not in compliance with Paragraph 267.

**Paragraph 268.** *During the term that a Monitor oversees the Sheriff and the MCSO in this action, any transfer of sworn personnel or supervisors in or out of the Professional Standards Bureau, the Bureau of Internal Oversight, and the Court Implementation Division shall require advanced approval from the Monitor. Prior to any transfer into any of these components, the MCSO shall provide the Court, the Monitor, and the parties with advance notice of the transfer and shall produce copies of the individual's résumé and disciplinary history. The Court may order the removal of the heads of these components if doing so is, in the Court's view, necessary to achieve compliance in a timely manner.*

**Phase 1:** In compliance

- Court Implementation Division Operations Manual, most recently revised on November 13, 2019.

- Professional Standards Bureau Operations Manual, most recently amended on December 13, 2018.

**Phase 2:** In compliance

WAI 56504

During this reporting period, we received and approved three transfers into the Professional Standards Bureau (PSB), of which one was the new PSB commander.  There was one employee promoted, who remained in PSB.  Two employees were transferred out of PSB, which included a supervisor and the outgoing PSB commander.  Three employees were transferred into the Bureau of Internal Oversight (BIO), and three employees were transferred out of BIO.  One employee was transferred into the Court Implementation Division (CID), and a new CID point of contract was designated.  We reviewed the documentation for all of the employees transferred in and out these units, and noted no issues of concern.

WAI 56505

# Section 15: Document Preservation and Production

## COURT ORDER XVIII.    DOCUMENT PRESERVATION AND PRODUCTION

***Paragraph 269.*** *The Sheriff shall ensure that when the MCSO receives a document preservation notice from a litigant, the MCSO shall promptly communicate that document preservation notice to all personnel who might possibly have responsive documents.*

**Phase 1:**  In compliance

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on October 1, 2020.

- GD-9 User Guide, published on May 3, 2019.

**Phase 2:**  Deferred

To verify MCSO's Phase 2 compliance with this Paragraph, we reviewed monthly submissions of document preservation notices to MCSO employees.  The data reviewed for this reporting period included December 2020-February 2021, as per an agreement that we reached with MCSO to stagger the document requests for this Paragraph due to the large volume of data that MCSO had to provide prior to our site visits.

Document preservation is set in motion when a party sends a litigation hold notice or written directive to MCSO requesting the preservation of relevant documents or records and electronically stored information (ESI), in anticipation of future litigation against the agency. MCSO's Legal Liaison Section (LLS) manages litigation holds through Open Axes, a software program.  Upon the receipt of a litigation hold, which is usually sent by the Maricopa County Attorney's Office (MCAO), the LLS inputs the data into Open Axes which conducts a search for responsive documents within MCSO drives.  The system also identifies potential document custodians, which are later filtered by an LLS employee.  The LLS then serves the custodians with a legal hold in electronic format, known as a Document Preservation Notice, within five business days.  Upon receipt of the Open Axes email with the Document Preservation Notice, MCSO custodians must acknowledge receipt of the request and then complete a questionnaire that identifies responsive documents, both electronic and hardcopies; and preserve them in the manner in which they are kept in the course of business.

In light of the COVID-19 pandemic, we conducted a remote site visit in April 2021.  For this Paragraph, we reviewed all files provided by MCSO through ShareFile.  We reviewed a sample of the third-party source documents that generate the litigation holds that the LLS receives from MCAO.  The Document Preservation Notices have been distributed 100% in a timely manner to the custodians who may have responsive documents.

On October 1, 2020, MCSO published the most recent approved amendments to GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices).  As part of this revision, MCSO eliminated the Document Preservation Acknowledgement, because it was emailing personnel the Document Preservation Notice and requesting the completion of the Document

WAI 56506

Preservation Questionnaire via Open Axes. The Document Preservation Questionnaire requires employees to: 1) acknowledge receipt of the document preservation; 2) acknowledge their responsibility to preserve records; 3) provide details regarding what they have done to research responsive records, documents, or ESI; and 4) identify what records, documents, or ESI they are preserving. GD-9 requires that the Document Preservation Questionnaire be completed within 10 business days and provides a warning regarding the consequences of not preserving records. During this reporting period, MCSO employees have returned the Document Preservation Questionnaire, within the required 10 business days 97% of the time. The LLS found a few questionnaires that were not properly completed by MCSO personnel; LLS returned them, and they were resubmitted to the LLS. After resubmission, we found that 100% of the questionnaires were properly completed by MCSO personnel.

MCSO recently notified us that in February 2021, the agency learned that due to a technical issue caused by the migration of data from the legacy system to One Drive and a new on-premise storage array (Qumulo), Open Axes was not able to perform searches into the documents moved to One Drive and Qumulo. Consequently, from August 2020-February 2021, documents on these new platforms were not searched by the software for potentially responsive documents to preservation requests. The data migration was required because legacy hardware had reached the end of its lifecycle and was beginning to degrade.

The LLS has been working with the Technology Management Bureau and the vendor; and it informed us that by the end of June 2021, Open Axes will be able to perform the searches in the new systems going forward. To address any potential data that may have been missed in the searches performed between August 2020 through June 2021, the LLS will perform a rerun of all the searches initiated during that time. We will add a quarterly request to review this additional data.

In light of this technical issue which affects compliance for this quarter, we will defer compliance until such time as MCSO is able to verify that OA is searching in all drives and LLS has finalized the rerun through June 2021.

**Paragraph 270.** *The Sheriff shall ensure that when the MCSO receives a request for documents in the course of litigation, it shall:*

a.  *promptly communicate the document request to all personnel who might possibly be in possession of responsive documents;*

b.  *ensure that all existing electronic files, including email files and data stored on networked drives, are sequestered and preserved through a centralized process; and*

c.  *ensure that a thorough and adequate search for documents is conducted, and that each employee who might possibly be in possession of responsive documents conducts a thorough and adequate search of all relevant physical and electronic files.*

**Phase 1:** In compliance

WAI 56507

- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on October 1, 2020.

- GD-9 User Guide, published on May 3, 2019.

- GM-1 (Electronic Communications, Data and Voicemail), most recently amended on February 25, 2021.

**Phase 2:** Deferred

To verify MCSO's Phase 2 compliance with this Paragraph, we reviewed monthly submissions of requests for documents to MCSO employees for the reporting period and documents drafted by the LLS in search of documents from other MCSO Divisions. For this reporting period, we identified a sample of document requests and requested a copy of the responsive documents sequestered and/or produced. The data reviewed for this reporting period included December 2020-February 2021, as per an agreement we reached with MCSO to stagger the document requests for this Paragraph. This was due to the large volume of data that MCSO had to provide prior to our site visits.

Paragraph 270.a. requires prompt communication of document requests to all personnel who could possibly be in possession of responsive documents. GD-9 requires the LLS to enter the data into a tracking system within five business days of receipt and to draft a Document Production Notice within five additional business days. The LLS is required, within five business days, to respond to the request for production if sourced within LLS, or to forward to the required MCSO Division for production. The Divisions have 10 days to produce the data requested. In 100% of the cases, the LLS promptly communicated document requests to personnel who might be in possession of responsive documents.

Our review revealed that MCSO is manually forwarding the Document Production Notices in a timely manner to all of its Divisions. In addition, MCSO is sending the Document Production Acknowledgement Questionnaire (Attachment B), to all employees. In 95% of the cases, the personnel who provided responsive documents properly completed Attachment B.

Paragraph 270.b. requires that all responsive ESI be stored, sequestered, and preserved by MCSO through a centralized process. MCSO performs the searches through a centralized process established by the LLS. The preservation of the data is completed at the Division that has the actual document while the notation is made in the Open Axes program, which aids the LLS in the case management. LLS can now create a case, assign a case number, and trigger time alerts to the custodians of documents that LLS identifies through the system. Open Axes searches on the H, W, and U computer hard drives of MCSO, which are shared among Headquarters and the Districts. Documents found in any additional servers are kept in their servers by the document custodians who notify LLS. MCSO continues to manage litigation hold cases through Open Axes; all cases for this reporting period were managed through Open Axes.

WAI 56508

The centralized process established by MCSO requires that all electronic data be sequestered and secured so as not to be purged. For this Paragraph, we review the data and visit MCSO areas to ensure that personnel are informed of the duty to preserve the data in both electronic and paper format, and that the employees are preserving the data. For this reporting period, because we were unable to travel to Maricopa County, we were unable to visit areas where hardcopies were kept in different MCSO areas. However, we added a quarterly request from the LLS Director for a certification that MCSO is sequestering the hard copies of documents responsive to the Document Preservation Notices. We randomly identified a sample from the quarterly data for this purpose. On April 13, 2021, the LLS Director certified that that the hardcopies for this reporting period were being preserved after reviewing all Document Preservation Questionnaire responses for the listed samples. When we resume our in-person site visits, we will continue to verify that the hardcopies are being preserved.

Paragraph 270.c. requires that MCSO conduct an adequate search for documents, and that each employee who might possibly be in possession of responsive documents conducts a thorough and adequate search of all relevant physical and electronic files. We reviewed a sample of responsive documents for this reporting period, and MCSO identified responsive documents to the document production notices in 100% of the cases we reviewed.

In light of the technical issue described above, we will defer compliance until such time as MCSO is able to verify that OA is searching in all drives and LLS has finalized the rerun through June 2021.

**Paragraph 271.** *Within three months of the effective date of this Order, the Sheriff shall ensure that the MCSO Compliance Division promulgates detailed protocols for the preservation and production of documents requested in litigation. Such protocols shall be subject to the approval of the Monitor after a period of comment by the Parties.*

**Phase 1:** In compliance

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on October 1, 2020.
- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

**Phase 2:** In compliance

On June 17, 2019, MCSO published the Administrative Services Division Operations Manual, which details the protocols for the preservation and production of documents requested in litigation. The manual was recently amended on September 2, 2020.

WAI 56509

***Paragraph 272.*** *The Sheriff shall ensure that MCSO policy provides that all employees must comply with document preservation and production requirements and that violators of this policy shall be subject to discipline and potentially other sanctions.*

**Phase 1:** In compliance

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on October 1, 2020.

**Phase 2:** In compliance

During this reporting period, the data revealed that no internal investigations were completed against any MCSO employee for failure to preserve or produce documents.

WAI 56510

**COURT ORDER XIX.     ADDITIONAL TRAINING**

***Paragraph 273.*** *Within two months of the entry of this Order, the Sheriff shall ensure that all employees are briefed and presented with the terms of the Order, along with relevant background information about the Court's May 13, 2016 Findings of Fact, (Doc. 1677), upon which this Order is based.*

**In Full and Effective Compliance**

MCSO previously delivered this training on the E-Policy platform. All personnel (100%) determined to be applicable by CID have received this training.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 56511

# Section 17: Complaints and Misconduct Investigations Relating to Members of the Plaintiff Class

**COURT ORDER XX.    COMPLAINTS AND MISCONDUCT INVESTIGATIONS RELATING TO MEMBERS OF THE PLAINTIFF CLASS**

*Paragraph 274. In light of the Court's finding that the MCSO, and in particular Sheriff Arpaio and Chief Deputy Sheridan, willfully and systematically manipulated, misapplied, and subverted MCSO's employee disciplinary policies and internal affairs processes to avoid imposing appropriate discipline on MCSO deputies and command staff for their violations of MCSO policies with respect to members of the Plaintiff class, the Court further orders as follows:*

## A.    Investigations to be Overseen and/or Conducted by the Monitor

*Paragraph 275. The Monitor is vested with the authority to supervise and direct all of the MCSO's internal affairs investigations pertaining to Class Remedial Matters. The Monitor is free from any liability for such matters as is set forth in ¶ 144 of the Supplemental Permanent Injunction.*

*Paragraph 276. The Monitor shall have the authority to direct and/or approve all aspects of the intake and investigation of Class Remedial Matters, the assignment of responsibility for such investigations including, if necessary, assignment to his own Monitor team or to other independent sources for investigation, the preliminary and final investigation of complaints and/or the determination of whether they should be criminally or administratively investigated, the determination of responsibility and the imposition of discipline on all matters, and any grievances filed in those matters.*

**In Full and Effective Compliance**

The Second Order requires oversight by the Monitor for all internal investigations determined to be Class Remedial Matters (CRMs). The Professional Standards Bureau (PSB) now schedules meetings every two weeks to discuss existing and incoming complaints to determine which, if any, could be CRMs. During these meetings, PSB personnel discuss cases pending a CRM decision, cases determined to be CRMs, and any cases where the decision may be made that the case would not be classified as a CRM. The PSB Commander determines the classification of the cases. A member of our Team attends all of these meetings to provide the oversight required for this Paragraph.

At the end of the July-September 2016 reporting period, PSB had reviewed 442 administrative investigations that were open as of July 20, 2016; and determined that 42 of them met the basic criteria for CRMs. These cases were reviewed during the scheduled CRM meetings. In addition, a Monitoring Team member randomly selected an additional 52 cases from the 400 remaining pending cases; and concurred with PSB's assessment that the cases did not meet the basic criteria

WAI 56512

for CRMs. In addition to the 42 cases determined to be potential CRMs from the pending case list as of July 20, 2016, PSB identified an additional 10 cases that were potential CRM cases. At the end of the first reporting period after the Court's Second Order, nine cases had been determined to be CRMs; and one other was pending a CRM decision. The remaining cases reviewed were determined not to be CRMs.

At the end of the last reporting period, PSB had reviewed a total of 439 possible CRMs since August 2016. Of these, 97 were classified as CRMs.

During this reporting period, an additional 24 cases were reviewed as possible CRMs. Of these, one was determined to be a CRM. At the end of this reporting period, there was a total of 463 cases that have been reviewed as possible CRMs; and 98 cases that have been determined to be CRMs since the July 20, 2016 Court Order.

Since July 20, 2016, MCSO has completed and submitted a total of 88 CRM cases. Six were closed and submitted for our review during this reporting period. None of these six had sustained misconduct.

Of the 33 CRM cases that have been closed to date with findings of sustained misconduct and reviewed by our Team, 10 have involved employees who are deceased or left MCSO employment prior to the completion of the investigation or the disciplinary process. Twenty-three involved current employees of MCSO. Three of the 33 cases closed to date involved a sustained finding of misconduct involving bias related to the Plaintiffs' class: two sustained allegations of an inappropriate and biased comment; and one sustained allegation of bias-based policing.

During the scheduled meetings, case investigators continue to provide investigative updates on all cases that could be, or are, CRMs. Their briefings are thorough, and they continue to be responsive to any questions or input from members of our Team. In all cases where we have provided oversight since July 20, 2016, we have concurred with the decisions made by the PSB Commander regarding the case classifications and findings. Where appropriate, we have also approved the discipline in all these cases.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.


**Paragraph 277.** *This authority is effective immediately and shall remain vested in the Monitor until the MCSO's internal affairs investigations reach the benchmarks set forth in ¶ 288 below. With respect to Class Remedial Matters, the Monitor has plenary authority, except where authority is vested in the Independent Investigative and Disciplinary Authorities separately appointed by the Court, as is further set forth in ¶¶ 296–337 below.*

WAI 56513

***Paragraph 278.*** *The Sheriff shall alert the Monitor in writing to all matters that could be considered Class Remedial Matters, and the Monitor has the authority to independently identify such matters. The Monitor shall provide an effective level of oversight to provide reasonable assurance that all Class Remedial Matters come to his attention.*

**In Full and Effective Compliance**

Since the first CRM meeting held on August 17, 2016, PSB has consistently completed the required notification to us regarding the cases that could be considered CRMs. A Monitoring Team member has attended every CRM meeting with PSB where these matters are discussed and personally reviewed a number of the cases that were pending on July 20, 2016; and our Team member reviews the new cases that are presented at each meeting. There has been no need for us to independently identify CRMs, as PSB consistently properly identifies and reports these cases as required.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

***Paragraph 279.*** *The Monitor shall have complete authority to conduct whatever review, research, and investigation he deems necessary to determine whether such matters qualify as Class Remedial Matters and whether the MCSO is dealing with such matters in a thorough, fair, consistent, and unbiased manner.*

**In Full and Effective Compliance**

During the scheduled CRM meetings attended by a Monitoring Team member, PSB has consistently properly identified cases that could be, or are, CRMs. PSB personnel brief each case at these meetings, and their briefings have included all appropriate information. They have been responsive to any questions from our Team members during the meetings, and have responded appropriately to any suggestions we have raised. There has been no need for us to independently conduct any review, research, or investigation. On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

***Paragraph 280.*** *The Monitor shall provide written notice to the Court and to the parties when he determines that he has jurisdiction over a Class Remedial Matter. Any party may appeal the Monitor's determination as to whether he has jurisdiction over a Class Remedial Matter to this Court within seven days of the Monitor's notice. During the pendency of any such appeal the Monitor has authority to make orders and initiate and conduct investigations concerning Class Remedial Matters and the Sheriff and the MCSO will fully comply with such action by the Monitor.*

**Phase 1:** Not applicable

WAI 56514

**Phase 2:** Not applicable

During this reporting period, cases involving both sworn and non-sworn members of MCSO have continued to be reviewed as possible CRMs, when appropriate. There were no appeals by any Parties regarding any of the CRM classifications.

***Paragraph 281.*** *Subject to the authority of the Monitor, the Sheriff shall ensure that the MCSO receives and processes Class Remedial Matters consistent with: (1) the requirements of this Order and the previous orders of this Court, (2) MCSO policies promulgated pursuant to this Order, and (3) the manner in which, pursuant to policy, the MCSO handles all other complaints and disciplinary matters. The Sheriff will direct that the Professional Standards Bureau and the members of his appointed command staff arrive at a disciplinary decision in each Class Remedial Matter.*

**Phase 1:** In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 7, 2020.

- GC-17 (Employee Disciplinary Procedures), most recently amended on May 28, 2021.

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** Not in compliance

To evaluate Phase 2 compliance with this Paragraph, a Monitoring Team member has attended each meeting conducted by PSB to discuss Class Remedial Matters. PSB has consistently provided thorough briefings, and the PSB Commander has made appropriate decisions regarding these matters.

For the last reporting period, PSB submitted five closed CRM cases for our review and our Team approved the findings in all five. None had sustained findings. All five were not compliant as they were not completed within the required timeframes and insufficient justification existed for the delay. We found MCSO to be not in compliance with this Paragraph.

During this reporting period, MCSO completed and submitted for our review six CRM cases. We approved the findings in all six. None had sustained findings. We continued to find these investigations to be thorough and the findings supported by the facts of the investigation.

Unlike other administrative investigations where we review the entire case only after it has been completed and closed by MCSO, in the case of CRMs, we meet with PSB every two weeks to identify cases that should be considered CRMs. We also track the progress of those cases being investigated, reviewed, and finalized. Each step of the process requires review and approval by our Team. Of the six finalized CRM investigations we reviewed this reporting period, three were completed by the investigator with the required 85-day timeframe or had an acceptable extension.

WAI 56515

Only two were reviewed and finalized within the 180-day timeframe. We noted that for these six CRM cases, the average completion time for the investigation was 229 days, and for finalization of the case, 264 days. While these timeframes still far exceed those required by the Orders, their completion time is significantly less than the overall average time for completion of all cases investigated by PSB, which MCSO reported was 674 days at the end of March 2021.

In addition to timeframe deficiencies, we found that in one CRM case, the interview of the employee was problematic and included numerous leading questions. While we do not believe that this necessarily affected the outcome of this case, the investigation is, nonetheless, not in compliance. We noted that this investigation was conducted by one of the new civilian investigators hired by MCSO. We urge PSB to ensure that investigators brought into the agency and assigned to conduct misconduct investigations are fully trained and understand the requirements of MCSO policy and the Court's Orders prior to having them conduct investigations. We further recommend that if a "second chair" investigator is assigned, that it be an experienced member of PSB.

Five of the cases reviewed resulted in findings of unfounded or exonerated. The findings by PSB were supported by appropriate evidence, and we concurred with the findings. One case was not sustained as the investigator had insufficient information to determine if the conduct occurred and we concurred with the finding in this case.

**Paragraph 282.** *The Sheriff and/or his appointee may exercise the authority given pursuant to this Order to direct and/or resolve such Class Remedial Matters, however, the decisions and directives of the Sheriff and/or his designee with respect to Class Remedial Matters may be vacated or overridden in whole or in part by the Monitor. Neither the Sheriff nor the MCSO has any authority, absent further order of this Court, to countermand any directions or decision of the Monitor with respect to Class Remedial Matters by grievance, appeal, briefing board, directive, or otherwise.*

**Phase 1:** In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 7, 2020.

- GC-17 (Employee Disciplinary Procedures), most recently amended on May 28, 2021.

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.

- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

There were no CRM cases completed during this, or previous reporting periods, in which the Sheriff and/or his appointee exercised their authority to resolve CRMs, which we needed to vacate or override.

*Paragraph 283.* *The Monitor shall review and approve all disciplinary decisions on Class Remedial Matters.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

At the end of this reporting period, MCSO has completed a total of 88 CRM cases since July 20, 2016. Six were closed during this reporting period.

*Paragraph 284.* *The Sheriff and the MCSO shall expeditiously implement the Monitor's directions, investigations, hearings, and disciplinary decisions. The Sheriff and the MCSO shall also provide any necessary facilities or resources without cost to the Monitor to facilitate the Monitor's directions and/or investigations.*

**Phase 1:** In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 7, 2020.
- GC-17 (Employee Disciplinary Procedures), most recently amended on May 28, 2021.
- GH-2 (Internal Investigations), most recently amended on May 28, 2021.
- Administrative Services Division Operations Manual, most recently amended on September 2, 2020.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

During this and previous reporting periods, a Monitoring Team member has attended all scheduled CRM meetings conducted in an appropriate location determined by MCSO. PSB continues to provide a password and access to the IAPro system to a member of our Team so that we can complete independent case reviews if necessary.

PSB personnel continue to be professional and responsive to all input, questions, or concerns we have raised.

*Paragraph 285.* *Should the Monitor decide to deviate from the Policies set forth in this Order or from the standard application of the disciplinary matrix, the Monitor shall justify the decision in writing and place the written explanation in the affected employee's (or employees') file(s).*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

WAI 56517

Since we began monitoring CRM cases in July 2016, there have been a total of 33 cases with sustained findings. Seven have sustained findings on two separate deputies who are deceased, and three involve deputies who left MCSO employment prior to the determination of discipline. Twenty-three cases involve sustained findings against current MCSO employees. All 23 cases resulted in appropriate sanctions based on MCSO policy and the Discipline Matrices in effect at the time the investigations were conducted. No action on our part has been necessary relative to this Paragraph.

During this reporting period, there were six CRM cases forwarded for our review. None resulted in sustained findings against any employee.

**Paragraph 286.** *Should the Monitor believe that a matter should be criminally investigated, he shall follow the procedures set forth in ¶¶ 229–36 above. The Commander of the Professional Standards Bureau shall then either confidentially initiate a Professional Standards Bureau criminal investigation overseen by the Monitor or report the matter directly and confidentially to the appropriate prosecuting agency. To the extent that the matter may involve the Commander of the Professional Standards Bureau as a principal, the Monitor shall report the matter directly and confidentially to the appropriate prosecuting agency. The Monitor shall then coordinate the administrative investigation with the criminal investigation in the manner set forth in ¶¶ 229–36 above.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 28, 2021.
- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:** In compliance

During this reporting period, there were six CRM cases submitted for our review. No action on our part relative to this Paragraph was necessary.

**Paragraph 287.** *Any persons receiving discipline for any Class Remedial Matters that have been approved by the Monitor shall maintain any right they may have under Arizona law or MCSO policy to appeal or grieve that decision with the following alterations:*

a. *When minor discipline is imposed, a grievance may be filed with the Sheriff or his designee consistent with existing MCSO procedure. Nevertheless, the Sheriff or his designee shall immediately transmit the grievance to the Monitor who shall have authority to and shall decide the grievance. If, in resolving the grievance, the Monitor changes the disciplinary decision in any respect, he shall explain his decision in writing.*

b. *disciplined MCSO employee maintains his or her right to appeal serious discipline to the Maricopa County Law Enforcement Merit System Council to the extent the employee has such a right. The Council may exercise its normal supervisory authority over discipline imposed by the Monitor.*

WAI 56518

**In Full and Effective Compliance**

Thirty-three completed CRM cases have had sustained findings of misconduct since the issuance of the Second Order. We concurred with MCSO's decisions in all of these cases.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

**Paragraph 288.** *The Monitor's authority over Class Remedial Matters will cease when both:*

a, *The final decision of the Professional Standards Bureau, the Division, or the Sheriff, or his designee, on Class Remedial Matters has concurred with the Monitor's independent decision on the same record at least 95% of the time for a period of three years.*

b. *The Court determines that for a period of three continuous years the MCSO has complied with the complaint intake procedures set forth in this Order, conducted appropriate internal affairs procedures, and adequately investigated and adjudicated all matters that come to its attention that should be investigated no matter how ascertained, has done so consistently, and has fairly applied its disciplinary policies and matrices with respect to all MCSO employees regardless of command level.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

During this and prior reporting periods, we and PSB have agreed on the investigative outcome of each CRM investigation completed.

PSB is responsible for the investigation of all CRM cases, and has continued to appropriately identify cases that could be, or are, CRMs. PSB personnel are professional in our contacts with them and responsive to any concerns or questions we have raised; and they provide detailed information and updates in the scheduled briefings. Their written reports are thoroughly prepared, and the reports have been consistent with the information provided during the twice monthly case briefings.

**Paragraph 289.** *To make the determination required by subpart (b), the Court extends the scope of the Monitor's authority to inquire and report on all MCSO internal affairs investigations and not those merely that are related to Class Remedial Matters.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

During this reporting period, we reviewed 96 investigations. Three were criminal investigations, all of which were found in compliance. Administrative investigations accounted for 93 of the investigations we reviewed.

WAI 56519

As we have noted previously, we assess justifications for any extensions or other delays based on investigative considerations, not workload. Of the 93 total administrative investigations completed, 13 (14%) were completed and submitted by the investigator within the 60- or 85-day requirement. An additional 20 investigations that were not completed within 60 or 85 days contained specific and acceptable extension requests. Of the 93 total, 60 (65%) were not in compliance with the requirements for investigative completion and submission of an investigation. Nineteen (20%) were submitted and reached final closure within 180 days or had an acceptable extension request and approval on file.

There were no completed administrative misconduct investigation submitted for compliance with Paragraph 249 (investigatory stops). There were seven investigations submitted for compliance with Paragraph 33 (bias policing). Six were completed and submitted for compliance with Paragraph 275 (CRMs) during this reporting period.

We found that PSB was compliant in 10 (17%) of the 60 investigations it conducted. Of the 33 investigations conducted by Divisions and Districts outside of PSB, 5 (15%) were in compliance. Overall compliance for all administrative misconduct investigations reviewed during this reporting period was 16% – a decrease from 22% during the last reporting period.

During our July 2020 remote site visit, we met with PSB personnel to discuss the deficiencies in those investigations conducted by both their personnel and Divisions outside PSB. We also met with the Deputy Chiefs who have oversight for investigations conducted outside of PSB. It was our intent to have a meaningful dialogue with these Chiefs regarding the deficiencies we continue to find, the actions they have taken to address the ongoing concerns, and other ideas they might have for addressing future deficiencies. Unfortunately, the involved Chiefs did not offer any substantive input. A member of the Training Division staff also participated in the call; and offered to conduct additional training on how to determine proper findings in investigations, as this is one of the ongoing deficiencies we are finding.

During our October 2020 and January 2021 remote site visits, we met with PSB personnel to discuss the deficiencies in their investigations and those conducted by Districts outside of PSB. We also met with the Deputy Chiefs who have oversight for investigations conducted outside of PSB. During these discussions, we noted that, despite some improvement in the quality of investigations, in some cases, the additional oversight and review by District Command personnel and Deputy Chiefs was creating increased delays in the completion of investigations. We agreed with the need to conduct additional reviews, despite the increased time delay; but were hopeful that such extensive review would become unnecessary, and the quality of the investigations and the first level review would be sufficient to ensure compliance.

During our April 2021 site visit, we again met with both PSB and the Deputy Chiefs who have oversight of District and Division investigations. During the meeting, the Deputy Chiefs advised us that they were continuing to see improvement in investigations conducted by their personnel; and they would be moving away from doing their own reviews and relying on the District and Division Commanders to handle these reviews. They assured us they would hold these Commanders accountable for any deficiencies that were identified. We do not disagree with this decision, as long as there is accountability for deficiencies. We expressed our concern that the additional reviews being conducted for cases submitted during this reporting period created

WAI 56520

significant additional delays, and a reduction in District and Division compliance with timelines. We also expressed our concern that in some Districts, a single supervisor is conducting the majority of administrative misconduct investigations for the District. This practice has also resulted in significant delays in their completion. The Deputy Chiefs told us that in the two Districts where this is occurring, it is a pilot program and they are addressing the delays, hoping to get to a more "real time" completion and review of investigations.

Effective with the revisions to internal affairs and discipline policies on May 18, 2017, the PSB Commander may now determine that a received complaint can be classified as a "service complaint" if certain specified criteria exists. Service complaint documentation must then be completed and is reviewed under this Paragraph.

During this reporting period, we reviewed 109 service complaints completed by MCSO. In 13, an administrative misconduct investigation was opened. The remaining 96 were approved by PSB as service complaints. We agree with the overall handling of service complaints in 101 (93%) of the 109. In one, we believe that misconduct allegations were made and an administrative misconduct investigation should have been conducted. In a second case, while the complaint was appropriately classified and investigated as a service complaint, no contact was made with the complainant. In six cases, we agree with the service complaint designation and the outcome, but all six lacked a timely response to the complainant.

Effective with the revisions to the internal affairs and discipline policies, the PSB Commander is now authorized to determine that an internal complaint of misconduct does not necessitate a formal investigation if certain criteria exist. During this reporting period, the PSB Commander did not use this discretion for any complaints.

**Paragraph 291.** *The Monitor shall report to the Court, on a quarterly basis, whether the MCSO has fairly, adequately, thoroughly, and expeditiously assessed, investigated, disciplined, and made grievance decisions in a manner consistent with this Order during that quarter. This report is to cover all internal affairs matters within the MCSO whether or not the matters are Class Remedial Matters. The report shall also apprise the Court whether the MCSO has yet appropriately investigated and acted upon the misconduct identified in the Court's Findings of Fact, whether or not such matters constitute Class Remedial Matters.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

This report, including all commentary regarding MCSO's compliance with investigative and disciplinary requirements, serves as our report to the Court on these matters. An overall summary of our compliance observations and findings is provided below.

WAI 56521

During this reporting period, we reviewed 93 administrative misconduct investigations and three criminal misconduct investigations. All three criminal investigations were in compliance with the Second Order. Of the 96 total administrative and criminal misconduct investigations we reviewed, 18 (19%) were in full compliance with the Second Order, a decrease from 24% during the last quarter. Of the 93 administrative investigations, 15 (16%) were in full compliance with the Second Order, a decrease from 22% during the last reporting period.

During July-December 2016, PSB provided us with a memorandum describing PSB's efforts in meeting the requirements of this Paragraph related to the Court's Findings of Fact. MCSO had outsourced three cases to another law enforcement agency, and an additional four investigations were pending outsourcing to an outside investigator. These cases were outsourced due to the involvement of the former Chief Deputy, or other conflicts of interest identified by MCSO, and included the investigations identified in Paragraph 300. MCSO processed a Request for Proposal and retained an outside investigator who met the requirements of Paragraphs 167.iii and 196 to conduct the investigations identified. One potential misconduct case identified in the Court's Findings of Fact was retained and investigated by PSB, as no identifiable conflict of interest appeared to exist.

PSB provided us with a document sent by the Independent Investigator assigned by the Court to investigate, or reinvestigate, some of the misconduct that is related to the Plaintiffs' class. In this document, the Independent Investigator clarified his intent to investigate the matters assigned to him by the Court, as well as the matters that the Court determined were the discretion of the Independent Investigator. He further clarified that his investigations would include the initial misconduct alleged, as well as any misconduct that might have occurred during the process of review or issuance of discipline by MCSO personnel.

During each site visit, we meet with PSB personnel to discuss the status of those cases that have been outsourced to any contract vendor, other law enforcement agency, or other person or entity, so that we can continue to monitor these investigations and ensure that all misconduct cases, including those identified in the Findings of Fact, are thoroughly investigated. PSB has continued to keep us apprised of the status of all such investigations.

During our January 2018 site visit, PSB advised us that two administrative misconduct investigations that had been outsourced to a separate law enforcement agency had been completed and closed. We received and reviewed both investigations. A third investigation that MCSO outsourced to this same law enforcement agency had been previously returned to MCSO without investigation, as the allegations duplicated those already under investigation by the Independent Investigator. MCSO outsourced six additional investigations to the contract investigator.

During our January 2019 site visit, PSB advised us that no additional investigations had been outsourced to the contract vendor. Six cases had been completed and forwarded to PSB for review. None had yet been forwarded to our Team for review. The Independent Investigator continued investigations identified by the Court, and notified us of the status of these cases on a regular basis. We also received closed investigations that he completed.

WAI 56522

During our April 2019 site visit, PSB advised that three additional investigations had been outsourced to the contract investigator. The six cases he had completed remained in review by PSB personnel. We had not received any of the investigations completed by this investigator for our review.

During our July 2019 site visit, PSB personnel advised us that they had outsourced an additional four investigations to the contract investigator. We received and reviewed four completed investigations conducted by this investigator. In all four cases, we found the investigations to be thorough and well-written. All, however, were noncompliant, as proper extension memorandums were not completed. Additional cases completed by this investigator have been forwarded to PSB for their review prior to forwarding to our Team.

During our October 2019 site visit, PSB personnel advised us that they had not outsourced any additional cases to the contract investigator during the reporting period. We received and reviewed three investigations he had conducted. All three were well-written. However, two were noncompliant, as proper extension memorandums were not completed.

During the last four reporting periods, PSB did not outsource any additional cases to the contract investigator. During this reporting period, PSB outsourced an additional four cases to this contract investigator. The contract investigator currently has a total of 24 cases pending completion. There were no completed cases by the contract investigator that were forwarded for our review during this reporting period. One case, a criminal investigation outsourced to an outside law enforcement agency, was returned to MCSO as completed. PSB also advised us during our April 2021 site visit that it has outsourced 25 cases to a newly contracted entity, and PSB considers this to be a pilot program. We will follow up on this with PSB during our next site visit.

The Independent Investigator has previously completed all of the investigations identified by the Court, as well as those where he initiated new investigations due to potential misconduct he identified during his reviews. All have been reviewed by our Team to ensure they complied with the Order of Court. The Independent Discipline Authority has also previously submitted his final report on those cases that had sustained findings, and we reviewed these findings. We did not make compliance findings on these cases, but determined that both the 12 investigations specifically directed by the Court for reinvestigation, as well as the additional cases where the Independent Investigator determined an investigation should be conducted, were properly completed and addressed the concerns identified by the Court.

**Paragraph 292.** *To make this assessment, the Monitor is to be given full access to all MCSO internal affairs investigations or matters that might have been the subject of an internal affairs investigation by the MCSO. In making and reporting his assessment, the Monitor shall take steps to comply with the rights of the principals under investigation in compliance with state law. While the Monitor can assess all internal affairs investigations conducted by the MCSO to evaluate their good faith compliance with this Order, the Monitor does not have authority to direct or participate in the investigations of or make any orders as to matters that do not qualify as Class Remedial Matters.*

WAI 56523

**In Full and Effective Compliance**

PSB personnel continue to inform us of ongoing criminal and administrative misconduct investigations. A member of our Team attends each CRM meeting, reviews the lists of new internal investigations, and has access to PSB's IAPro database. The only cases for which any oversight occurs during the investigative process are those that are determined to be CRMs. We review all other misconduct investigations once they are completed, reviewed, and approved by MCSO personnel.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

*Paragraph 293. The Monitor shall append to the quarterly reports it currently produces to the Court its findings on the MCSO's overall internal affairs investigations. The parties, should they choose to do so, shall have the right to challenge the Monitor's assessment in the manner provided in the Court's previous Order. (Doc. 606 ¶¶ 128, 132.)*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

Since we began reviewing internal investigations conducted by MCSO, we have reviewed hundreds of investigations into alleged misconduct by MCSO personnel. During this reporting period, we reviewed 93 administrative misconduct investigations, 109 service complaints, and three criminal misconduct investigations that were conducted by MCSO personnel. All three of the criminal investigations we reviewed for compliance during this reporting period were investigated by PSB and were in compliance with the requirements of the Second Order. A fourth criminal investigation, outsourced to an outside law enforcement agency, has also been closed.

The investigative quality of PSB administrative investigations has remained high for numerous reporting periods, though District investigations have continued to be problematic. Overall timeliness, regardless of the justifications provided, have continued to climb quarter after quarter. During this reporting period, closure time for an administrative investigation conducted by Divisions or Districts outside of PSB was 470 days. The average completion time for investigations completed by sworn personnel in PSB was 587 days; investigations conducted by Detention personnel in PSB was 792 days; and investigations conducted by civilian investigators was 329 days. For all administrative investigations conducted by MCSO, the average completion time was 604 days. The failure to complete investigations in a timely manner and the continuing increase in the time it takes to fully close these investigations continues to be unacceptable, and is a disservice to the community and MCSO personnel.

PSB was responsible for conducting 60 of the 93 total administrative misconduct investigations we reviewed for this reporting period. Of the 60 investigations conducted by PSB, six (10%) had deficiencies not including timeliness. With the inclusion of extensions, only 10 investigations (17%) were found to be in compliance. This is a slight decrease from the 18% compliance for the last reporting period.

WAI 56524

Sworn investigators completed 25 of the 60 investigations conducted by PSB. Based on investigative and administrative deficiencies, four (16%) were in compliance. Detention supervisors conducted 32 of the 60 investigations conducted by PSB. Based on the investigative and administrative deficiencies in these cases, five (16%) were in compliance. Of the three investigations conducted by civilian investigators, one (33%) was in compliance.

Thirty-three were conducted by Districts or Divisions outside of PSB: 31 by District personnel and two by a Division other than Patrol. Five (15%) of these investigations were found in compliance, a decrease from the 26% during the last reporting period.

MCSO completed delivery of the 40-hour Misconduct Investigative Training at the end of 2017, and all sworn supervisors who investigate administrative misconduct attended the training. Refresher training on misconduct investigations has also been delivered since the initial 40-hour training. The investigative quality of PSB investigations has remained high. Of the 33 investigations we reviewed that were completed outside of PSB, 12 were initiated prior to 2020. Of those, 10 (83%) had investigative deficiencies. With the inclusion of extensions, none were in compliance. For those 21 investigations initiated after January 1, 2020, only five (24%) had investigative deficiencies. With the inclusion of extensions, 16 (76%) of these 21 were not compliant. While those investigations conducted by Division or Districts outside of PSB continue to have deficiencies, we noted that those investigations initiated and completed during 2020 had fewer overall deficiencies than those initiated prior to 2020, an indication that the increased oversight is resulting in improvement. As noted previously, however, this increased oversight is also resulting in significant delays in the completion of these same investigations.

PSB personnel continue to be receptive to our input, and we have had many meetings and discussions regarding the investigations being conducted and the compliance for both PSB and District and Division Cases. We also discuss compliance concerns with District and Division Command during our site visits. During our next site visit, we will discuss those cases that are noncompliant with MCSO; and address our concerns about the overall low compliance findings for this reporting period. We continue to stress that compliance is not the sole responsibility of any one individual or Division – but dependent on all those who complete, review, or approve internal investigations.

We have noted in numerous previous reporting periods that MCSO's executive leadership must take the appropriate action to ensure that adequate resources are dedicated to the completion of administrative and criminal misconduct investigations. PSB has continued to inform us that despite the approval for numerous additional investigative personnel in the July 2018 budget, only one of these positions has been filled and there is no indication that the additional positions will be filled in the foreseeable future. All of the civilian positions, including three civilian investigator positions, authorized in the July 2019 budget have been filled. There were no budget positions for PSB requested for the July 2020 budget. During our April 2021 remote site visit, PSB personnel informed us that PSB has converted seven unfilled sergeants' positions in PSB to civilian positions, and has obtained approval for three additional civilian investigators and four additional administrative personnel. We noted again during this reporting period that the case backlog in PSB continues to increase.

WAI 56525

## B. Investigations to be Conducted by the Independent Investigator and the Independent Disciplinary Authority

**Paragraph 294.** *In its Findings of Fact, (Doc. 1677), the Court identified both: (1) internal affairs investigations already completed by the MCSO that were inadequate or insufficient; (see, e.g., Doc. 1677 at ¶ 903), and (2) misconduct or alleged misconduct that had never been investigated by MCSO that should be or should have been investigated. (Id. at ¶ 904.)*

**Paragraph 295.** *In light of MCSO's failure to appropriately investigate these matters, the Court appoints an Independent Investigator and an Independent Disciplinary Authority from the candidates set forth by the parties, and vests them with the authority to investigate and decide discipline in these matters.*

### 1. The Independent Investigator

**Paragraph 298.** *In assessing the existence of previously uncharged acts of misconduct that may be revealed by the Findings of Fact, the Independent Investigator does not have authority to investigate acts of misconduct that are not sufficiently related to the rights of the members of the Plaintiff class. While the Independent Investigator should identify such acts of misconduct and report those acts to the Commander of the Professional Standards Bureau, and to the Monitor for purposes of making the Monitor's assessment identified in ¶¶ 291–93 above, the Independent Investigator may not independently investigate those matters absent the authorization and the request of the Sheriff.*

**Paragraph 300.** *The following potential misconduct is not sufficiently related to the rights of the members of the Plaintiff class to justify any independent investigation:*

a. *Uninvestigated untruthful statements made to the Court under oath by Chief Deputy Sheridan concerning the Montgomery investigation. (Doc. 1677 at ¶ 385).*

b. *Uninvestigated untruthful statements made to the Court under oath by Chief Deputy Sheridan concerning the existence of the McKessy investigation. (Id. at ¶ 816).*

c. *Chief Deputy Sheridan's untruthful statements to Lieutenant Seagraves made during the course of an internal investigation of Detective Mackiewicz to the effect that an investigation into the overtime allegations against Detective Mackiewicz had already been completed. (Id. at ¶ 823).*

d. *Other uninvestigated acts of misconduct of Chief Deputy Sheridan, Captain Bailey, Sergeant Tennyson, Detective Zebro, Detective Mackiewicz, or others that occurred during the McKessy investigation. (Id. at ¶¶ 766–825).*

**Phase 1:** Not applicable

**Phase 2:** Deferred

WAI 56526

During our January 2017 site visit, the PSB Commander assured us that all acts of misconduct that we identified and discussed during our October 2016 site visit would be provided to a contracted investigator for investigative purposes.

Since that time, the PSB Commander has advised us that MCSO has contracted with a licensed private investigator. The contract investigator possesses the requisite qualifications and experience to conduct the investigations of misconduct outlined in Paragraph 300 (a.-c.), and the additional misconduct in the Findings of Fact that directly associates with Paragraph 300 (d.). PSB has not found it necessary to contract with any additional licensed private investigators.

During our April 2017 site visit, we met with PSB command staff and representatives from the Maricopa County Attorney's Office (MCAO) to verify that all of the acts of misconduct that were identified in the Findings of Fact (FOF) are under investigation, either by the Court-appointed Independent Investigator or the private licensed contract investigator. Before this meeting, PSB command provided us with a roster of related acts of misconduct that PSB intended to be assigned to the contract investigator. The roster of intended assignments did not include all of the acts of misconduct that we had discussed. MCAO and PSB command personnel explained that the Court also identified, in Paragraph 301, many of the acts of potential misconduct identified in the FOF as sufficiently related to the rights of members of the Plaintiffs' class. In Paragraph 301, the Court documented that because of this determination, investigations of the potential misconduct were justified if the Independent Investigator deemed that an investigation was warranted.

The Independent Investigator has completed all 12 of the administrative misconduct investigations specifically identified by the Court in the Second Order, and all other investigations for which he determined an administrative misconduct investigation should be conducted. The Independent Disciplinary Authority has also completed all of the discipline findings for these cases. While we did not make compliance findings for these cases, we reviewed them and found that they complied with the direction of the Court.

The contract investigator retained by MCSO continues to complete investigations that he has been assigned. During this reporting period, MCAO outsourced four additional investigations to this contractor. None investigated by this contractor were completed and forwarded for our review during this reporting period; 24 investigations are in progress. PSB also advised us during our April 2021 virtual site visit that it has outsourced 25 cases to a newly contracted entity and PSB considers this a pilot program. We will follow up on this with PSB during our next site visit. One additional investigation previously outsourced to another law enforcement agency has been closed.

Our ability to verify that all potential misconduct outlined in the FOF has been investigated by PSB, the PSB contract investigator, or the Independent Investigator remains pending until all the investigations are completed. Once this occurs, we can determine if there is any additional misconduct identified in the FOF that still requires investigation. Finally, the PSB Commander and MCAO advised us that the acts of misconduct involving (former) Sheriff Arpaio as identified in the FOF would not be investigated by any entity, as there does not exist any statute that addresses how a Sheriff would be disciplined in the event of a sustained finding resulting from an administrative misconduct investigation.

WAI 56527

**Paragraph 310.** *The Monitor and the parties are directed to promptly comply with the Independent Investigator's requests for information. The Monitor and the Independent Investigator may communicate to coordinate their investigations. Nevertheless, each is independently responsible for their respective jurisdiction set forth in this Order, and each should make independent decisions within his own delegated responsibility.*

## 2. The Independent Disciplinary Authority

**Paragraph 337.** *Nevertheless, when discipline is imposed by the Independent Disciplinary Authority, the employee shall maintain his or her appeal rights following the imposition of administrative discipline as specified by Arizona law and MCSO policy with the following exceptions:*

a. *When minor discipline is imposed, a grievance may be filed with the Sheriff or his designee consistent with existing MCSO procedure. Nevertheless, the Sheriff or his designee shall transmit the grievance to the Monitor who shall have authority to decide the grievance. If in resolving the grievance the Monitor changes the disciplinary decision in any respect, he shall explain his decision in writing.*

b. *A disciplined MCSO employee maintains his or her right to appeal serious discipline to the Maricopa County Law Enforcement Merit System Council to the extent the employee has such a right. The Council may exercise its normal supervisory authority over discipline imposed by the Independent Disciplinary Authority with one caveat. Arizona law allows the Council the discretion to vacate discipline if it finds that the MCSO did not make a good faith effort to investigate and impose the discipline within 180 days of learning of the misconduct. In the case of any of the disciplinary matters considered by the Independent Disciplinary Authority, the MCSO will not have made that effort. The delay, in fact, will have resulted from MCSO's bad faith effort to avoid the appropriate imposition of discipline on MCSO employees to the detriment of the members of the Plaintiff class. As such, the Council's determination to vacate discipline because it was not timely imposed would only serve to compound the harms imposed by the Defendants and to deprive the members of the Plaintiff class of the remedies to which they are entitled due to the constitutional violations they have suffered at the hands of the Defendants. As is more fully explained above, such a determination by the Council would constitute an undue impediment to the remedy that the Plaintiff class would have received for the constitutional violations inflicted by the MCSO if the MCSO had complied with its original obligations to this Court. In this rare instance, therefore, the Council may not explicitly or implicitly exercise its discretion to reduce discipline on the basis that the matter was not timely investigated or asserted by the MCSO. If the Plaintiff class believes the Council has done so, it may seek the reversal of such reduction with this Court pursuant to this Order.*

**In Full and Effective Compliance**

WAI 56528

During this reporting period, no grievances were filed that met the criteria for transmitting to the Monitor.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenors disagreed with our determination.

WAI 56529

# Section 18: Concluding Remarks

We assess compliance with 94 Paragraphs of the First Order, and 113 Paragraphs of the Second Order, for a total of 207 Paragraphs. MCSO is in Phase 1 compliance with 78 of the First Order Paragraphs, or 98%; and 103 of the Second Order Paragraphs, or 100%.

Including the 72 total Paragraphs in which MCSO is in Full and Effective Compliance, MCSO is in Phase 2, or operational compliance, with 73 of the First Order Paragraphs, or 77%; and MCSO is in Phase 2 compliance with 102 of the Second Order Paragraphs, or 90%. Combining the requirements of both Orders, MCSO is in Phase 1 compliance with 181 Paragraphs, or 99%; and in Phase 2 compliance with 175 Paragraphs, or 84%.

MCSO published its Third Traffic Stop Quarterly Report (TSQR), and has now achieved compliance with its obligations to conduct annual and quarterly traffic stop analyses. This report reviewed the use of the extended traffic stop indicators (ETSIs) contained in the Vehicle Stop Contact Forms. The study involved reviewing body-worn camera footage of stops which occurred in 2020 in which ETSIs were indicated, to ascertain if deputies use these indicators as intended for documenting reasons for extended traffic stops. ETSIs were selected in 18% of the 2020 stops, and the study found that the ETSIs were properly applied over 95% of the time. The study also identified potential areas where these indicators, particularly the one related to technical problems, could be refined to improve understanding of the circumstances that lead to a traffic stop being extended.

Work continues on the implementation of the Traffic Stop Monthly Report (TSMR) process, which is designed to identify individual deputies who exhibit disparate outcomes in their traffic stop activity when compared to their peers. The process is being implemented as a pilot project; that is, the various components are being tested before the entire process is finalized. The Monitoring Team, the Plaintiffs, and the Plaintiff-Intervenors have worked with MCSO on the development of the process. The pilot commenced in April, and we and the Parties continue to provide oversight of its implementation via weekly calls and extensive document review.

MCSO uses the software Open Axes to assist in meeting its document preservation requirements as provided by the Second Order. MCSO recently notified us that in February 2021, the agency learned that due to a technical issue caused by the migration of accounts from its existing system to One Drive as required by the County, Open Axes was not able to perform searches into the documents moved to One Drive and another platform. Consequently, from August 2020-February 2021, documents on these platforms were not searched by the software for potentially responsive documents to preservation requests. MCSO advises that its manual process to search for responsive documents across the Office was not impacted by this issue and continued throughout this period. MCSO's Technology Management Bureau is working with the vendor to address the issue, and MCSO has committed to rerunning all applicable searches from August 2020 once a solution is implemented.

WAI 56530

We have previously commented on our concerns with the quality of supervisory reviews pertaining to arrests and detentions. We have also previously commented on the low number of Incident Memorialization Forms and the timeliness of their submissions. Incident Memorialization Forms generally involve violations of policy and serious training issues related to arrests and detentions. We noted a significant increase in IMF submissions during this reporting period, which is a positive step. However, as noted in our reviews of Paragraph 96, many of the IMFs were completed several months prior to submission; and they were inexplicably held after completion. Consequently, IMFs are not being processed and submitted for our review in the most expeditious manner. We also noted two IMFs during this review period that involved possible serious policy violations, that perhaps should have resulted in internal misconduct investigations. We recommend that MCSO work to address and resolve these issues.

During this reporting period, we again identified serious concerns with the increasing backlog of administrative misconduct investigations. The agency-wide number has grown from 1,883 during the last reporting period, to 2,082 this reporting period. The average time to complete an investigation has increased from 499 days to 604 days. PSB had a backlog of 1,561 administrative investigations at the end of the last reporting period, but now has a backlog of 1,755 cases. The time it takes to complete an investigation in PSB has increased from 544 days to 674 days. These numbers continue to increase quarter after quarter, without MCSO implementing sufficient remedies. Community members and MCSO employees alike have a right to expect appropriate and timely investigations. These ongoing failures must be addressed.

WAI 56531

# Appendix: Acronyms

The following is a listing of acronyms frequently used in our quarterly status reports:

| | |
|---|---|
| AB | Administrative Broadcast |
| ACJIS | Arizona Criminal Justice Information System |
| ACLU | American Civil Liberties Union |
| ACT | Annual Combined Training |
| AIU | Audits and Inspections Unit |
| AOC | Arizona Office of Courts |
| ARG | Alert Review Group |
| ARS | Arizona Revised Statutes |
| ASU | Arizona State University |
| ATU | Anti-Trafficking Unit |
| BAF | BIO Action Form |
| BB | Briefing Board |
| BIO | Bureau of Internal Oversight |
| BWC | Body-worn camera |
| CAB | Community Advisory Board |
| CAD | Computer Aided Dispatch |
| CBP | Customs and Border Protection |
| CDA | Command Daily Assessment |
| CEU | Criminal Employment Unit |
| CID | Court Implementation Division |
| COrD | Community Outreach Division |
| CORT | Court Order Required Training |
| CRM | Class Remedial Matter |
| DOJ | Department of Justice |
| DSA | Deputy Service Aide |
| DUI | Driving Under the Influence |

WAI 56532

| | |
|---|---|
| EIS | Early Identification System |
| EIU | Early Intervention Unit |
| EPA | Employee Performance Appraisal |
| ESI | Electronically stored information |
| FBI | Federal Bureau of Investigation |
| FEC | Full and Effective Compliance |
| FOF | Findings of Fact |
| FTO | Field Training Officer |
| GI | General Instructor |
| ICE | Immigration and Customs Enforcement |
| IIU | Internal Investigations Unit |
| IMF | Incident Memorialization Form |
| IR | Incident Report |
| JED | Judicial Enforcement Division |
| LOS | Length of stop |
| LLS | Legal Liaison Section |
| MCAO | Maricopa County Attorney's Office |
| MCSO | Maricopa County Sheriff's Office |
| NOI | Notice of Investigation |
| NTCF | Non-Traffic Contact Form |
| PAL | Patrol Activity Log |
| PDH | Pre-Determination Hearing |
| POST | Peace Officers Standards and Training |
| PPMU | Posse Personnel Management Unit |
| PSB | Professional Standards Bureau |
| SID | Special Investigations Division |
| SMS | Skills Manager System |
| SPSS | Statistical Package for the Social Science |
| SRT | Special Response Team |
| TraCS | Traffic Stop Data Collection System |

| | |
|---|---|
| TSAR | Traffic Stop Annual Report |
| TSAU | Traffic Stop Analysis Unit |
| TSMR | Traffic Stop Monthly Report |
| TSQR | Traffic Stop Quarterly Report |
| VSCF | Vehicle Stop Contact Form |