# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, et al., <br><br> Plaintiffs, <br><br> v. <br><br> County of Maricopa, et al., <br><br> Defendants. | No. CV-07-02513-PHX-GMS <br><br> **ORDER** |

Pending before the Court is the Plaintiff class and United States' ("Plaintiff–Intervenor") Joint Motion to Enforce Paragraph 70 of Supplemental Permanent Injunction/Judgment Order (Doc. 2607). After holding a conference with experts from the Maricopa County Sheriff's Office ("MCSO") and the Plaintiff–Intervenor, the Court issues the following order.[1]

## BACKGROUND

In October 2013, this Court entered a permanent injunction ("First Order") requiring the MCSO to, among other things, collect traffic-stop data from MCSO deputies "to look for warning signs or indicia [of] possible racial profiling or other improper conduct under this Order." (Doc. 606 at 31.) Under the First Order, the MCSO was to "analyze the collected data on a monthly, quarterly and annual basis, and report their findings to the Monitor and the Parties." (Doc. 606 at 31.) Paragraph 70 of the First Order—at issue

---
[1] Unless otherwise noted, the following facts are taken from the conference with the parties' experts held on October 27, 2021.

here—states:

> If any one of the foregoing reviews and analyses of the traffic stop data indicates that a particular Deputy or unit may be engaging in racial profiling, unlawful searches or seizures, or unlawful immigration enforcement, or that there may be systemic problems regarding any of the foregoing, MCSO shall take reasonable steps to investigate and closely monitor the situation. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or of other supervised, monitored, and documented action plans and strategies designed to modify activity. If the MCSO or the Monitor concludes that systemic problems of racial profiling, unlawful searches or seizures, or unlawful immigration enforcement exist, the MCSO shall take appropriate steps at the agency level, in addition to initiating corrective and/or disciplinary measures against the appropriate Supervisor(s) or Command Staff. All interventions shall be documented in writing.

(Doc. 606 at 33.)

The required monthly analysis, called the Traffic Stop Monthly Report ("TSMR"), is intended to screen traffic-stop data for indicia of "outlier" racial bias. (Doc. 2632 at 2-3.) The analysis compares the traffic-stop data of an individual MCSO deputy against comparable stops conducted by similarly situated peer officers. If the individual deputy's traffic stops differ from the comparison stops in a statistically significant way, the analysis "flags" the deputy for further review. MCSO then "vets" the flag to determine whether the deputy should be investigated and an "intervention"[2] provided. This monthly analysis began last April, and its statistical apparatus was the culmination of years of effort by Dr. Greg Ridgeway, representing the Plaintiffs and Plaintiff–Intervenor; with MCSO being represented at various times throughout this process by ASU, CNA, and then Dr. Andrew Prelog; and Commander John Girvin and Dr. John Carnevale coordinating and implementing this effort on behalf of the Monitor. (Doc. 2632 at 2, 5–6, 9.) The Court understands the effort to have largely been a collaborative one and appreciates the efforts expended in getting the TSMR coordinated and functioning. It has taken a long time. But

---

[2] An "intervention" educates deputies on "how to correct their conduct, using a range of methods such as formal and informal training, supervisor ride-alongs, action plans, review of implicit bias videos, and/or review and discussion of the deputy's own body-worn camera recordings." (Doc. 2632 at 3.)

it remains, as Dr. Carnevale mentioned, a pilot program and is not impervious to testing and improvement.

It was after the effort was in large part complete, that Plaintiff–Intervenor hired Dr. Dean Knox to review the overall effort independent of Dr. Ridgeway. Plaintiff–Intervenor then filed this motion. If, as MCSO asserts, the Motion has been somewhat of a moving target, it is also true that during the pendency of this Motion, at least two of the improvements that Plaintiffs sought through it have been agreed to by the Parties. Plaintiff–Intervenor continues to assert, however, that the TSMR's current methodology for flagging potentially problematic officers is flawed because it (1) fails to properly accommodate for location and time in generating comparison stops, resulting in false positive and false negative results; and (2) employs a descriptive rather than comparative analysis on the data from deputies who perform less than twenty stops in a twelve-month period—approximately 40% of all MCSO deputies. (Doc. 2635 at 4–5 & n.1.) The Court held a conference on these issues in October 2021, where it heard from Plaintiff–Intervenor's expert Dr. Dean Knox and MCSO's expert Dr. Andrew Prelog as well as the Monitor's subject-matter expert Dr. John Carnevale. Dr. Greg Ridgeway was not present.

**DISCUSSION**

While the Court understands after listening to Dr. Knox's testimony that it might be possible to use location and time-logging techniques that make each stop a closer comparative match to other stops, the Court continues to have questions whether the implementation of such a system would: (a) generate enough data to make comparisons statistically significant; (b) make a sufficiently practical difference in terms of the "hits" that the system generates of deputies that actually prove to need corrective intervention; or (c) require additional testing to determine whether individual subdivisions of the MCSO are engaging in patterns of bias different from other subdivisions, as well as the time, expense and feasibility of such tests.

As it pertains to adjusting the period to obtain comparative stops for those who do not make twenty traffic stops in a year, the Court understands concerns expressed by the

Monitor and MCSO about fairness among deputies, timeliness of the analysis, and whether any gains made in officers subject to comparison prove to be marginal in terms of the number of "hits" that the system generates of deputies that need corrective intervention. The Court also wonders whether it is not better to assess deputies whose performance escapes comparative analysis by descriptive analysis rather than no analysis at all. The Court recognizes that some of these are "policy" and pragmatic issues rather than issues related to what might be a theoretically optimal comparative analysis.

Because this project has been largely collaborative and the Court would like to keep it so, and because the Plaintiff–Intervenor has not supplied this Court with sufficient information upon which to order any adjustments, the Court declines to order any adjustments at this time. Nevertheless, all parties express a willingness to evaluate the critiques provided by Dr. Knox (and perhaps earlier by Dr. Ridgeway.) And this program is a pilot program, and thus, especially in its initial stages, is subject to reasonable adjustments to improve the performance of the pilot. Dr. Knox believes he could quickly determine the answers to the statistical questions posed above by the Court (and presumably other reasonable inquiries presented by the parties) should he be given access to the relevant data. There is no question among the parties that he is entitled to it. And the parties are open to cooperation and coordination with Dr. Knox in conducting such research. However, it became clear during the conference that because of data flaws and differences in the statistical software used, the experts have had difficulty in understanding and verifying each other's work. The Court therefore orders the parties to work with each other and the Monitor to bridge this communication gap and to evaluate feasible and practically desirable improvements to the current methodology. The Court expects this to be a collaborative process between the parties, the experts, and the Monitoring team. Although the Court will hear any disagreements the parties may have with the Monitor's decision, the Monitor shall make implementation decisions before these issues reach the Court, and any challenges to those decisions should be promptly brought.

**CONCLUSION**

MCSO should timely supply the relevant data to Plaintiff–Intervenor and Dr. Knox. However, in the meantime, MCSO should continue with the current TSMR methodology, implementing changes when so instructed by the Monitoring team. The Court declines to alter the methods at this time.

Dated this 29th day of October, 2021.

G. Murray Snow
Chief United States District Judge