



FILED ☒  LODGED ☐

**July 26, 2022**

CLERK U.S. DISTRICT COURT
DISTRICT OF ARIZONA

323-821-0586
7142 Trask Avenue
Playa del Rey, CA 90293
OIRGroup.com

# REPORT ON UNTIMELINESS OF MARICOPA COUNTY SHERIFF'S OFFICE INTERNAL INVESTIGATIONS: CHALLENGES AND POTENTIAL SOLUTIONS

*<u>Melendres, et al. and United States of America, Plaintiff-Intervenor v. Paul Penzone, Sheriff of Maricopa County, Arizona</u>; et al. No. CV-07-2513-PHX-GMS*

July 2022


Submitted by:

Michael Gennaco, OIR Group, Court Management Expert

1

## Introduction

This Report addresses one significant, and currently pending, issue in the longstanding effort to resolve obligations of the Maricopa County Sheriff's Office ("MSCO") under federal court proceedings.  *Melendres, et al. and United States of America, Plaintiff-Intervenor v. Paul Penzone, Sheriff of Maricopa County, Arizona; et al. No. CV-07-2513-PHX-GMS.* The problem itself is easy enough to identify: a massive backlog in MSCO's administrative investigations into allegations of employee misconduct.  More complex is what the best approaches are to rectify the current situation. On September 7, 2021, this writer was appointed by United States Chief District Judge Murray Snow as a management expert to provide the Court with recommendations on how best MCSO can achieve compliance with the Court's Order pertaining to the time limits for completing internal investigations and remain in compliance with such limits as required by the Court's previously issued Order and thereafter by best practices and state law. This Report is intended to be responsive to that assignment.

As is often true of large-scale challenges that have lasted for many years and gone through various phases, the people close to the MCSO timeliness controversy who offer differing – and sometimes conflicting – assessments as to root causes and needed solutions.  Years of well-recognized excesses on the part of MCSO, in conjunction with a history of recalcitrance and defiance in the face of federal intervention, have left the plaintiffs in the underlying litigation with deep skepticism about the agency's willingness and ability to reform without stringent outside control.  Conversely, the MCSO's new leadership understandably is attempting to distinguish itself from the dysfunctional paradigms that created the need for the Court's involvement.  It believes that it should be given more latitude to prove itself and asserts that ongoing compliance obligations are actually – and ironically – hindering its ability to address misconduct allegations in the most effective ways.

The assessment that follows takes the competing concerns into consideration, weighs in on their respective validity where appropriate, and seeks ways to reconcile them. Perhaps most usefully, the Report draws on input from the parties and the Court-appointed Monitor to craft recommendations that address the timeliness issue concretely.

An encouraging starting point is the complete consensus that exists regarding one idea: the unacceptability of the status quo and the concerted attention necessary to rectify it. This Report takes the position that one key recommendation – the creation of a new Constitutional Policing Advisor role – can potentially increase external confidence in legitimacy and thereby serve as a springboard for other streamlining adjustments to the current system.

That concept, and the related benefits that could arise from it, are discussed more fully below.  But the success of any specific measures will depend in part on the continued rigor of outside scrutiny and the good faith of MCSO in implementation.  The hope is that the findings and recommendations offered here will be of assistance in accomplishing these goals.

## Procedural History

On July 26, 2016, the Court issued an injunction (the "Second Order") which required reforms to MCSO's internal investigation procedures.  The Second Order requires the Sheriff to ensure that "all allegations of employee misconduct, whether internally discovered or based on a civilian complaint, are fully, fairly, and efficiently investigated", and that the Sheriff and MCSO "conduct objective, comprehensive, and timely administrative investigations of all allegations of employee misconduct," Specifically, per the Order, investigators must complete the administrative investigations "within 85 calendar days of the initiation of the investigation (60 calendar days if within a Division)." Requests for extensions of time must be approved by the Commander of the Professional Standards Bureau ("PSB") and may only be granted if reasonable.

On July 10, 2020, the Monitor sent a letter to Sheriff Penzone expressing continued concern over the growing backlog of complaint investigations.  In that letter, in addition to identifying a number of concerns, the Monitor noted the following:

- Staffing in PSB had not increased since 2016, expressly noting that approved budgeted positions for PSB had gone unfulfilled.
- Despite a specific request, MCSO had not prepared detailed suggestions on how the Order might be changed.

On August 12, 2021, the Court granted a motion by the plaintiffs and intervenor United States to show cause as to why Sheriff Penzone and Maricopa County should not be held in contempt for violating the Second Court Order.[1]  The Court found that the Sheriff and the County have continually failed to complete internal investigations in a timely manner. The Court cited evidence from the Independent Monitor for the MCSO

---

[1] On June 3, 2021, the Court held a hearing on the joint motion. During the hearing, the Court discussed its thoughts on Defendants' response, which provided Defendants' justifications for noncompliance. The Court stated that, even if it accepted everything in Defendants' response as true, it would hold Sheriff Penzone in contempt. Based on this observation, the Court offered Defendants the option to concede liability and focus the order to show cause hearing on what remedies to impose. In a joint report following the hearing, Defendants stated they would not present any further substantive merits defense and opted to focus on remedies.

("Monitor") reports that showed the average closure of a case took 204 days in 2018, 499 days in 2019, and 552 days in 2020.  The Court found that the average closures far exceeded the deadlines for completion set forth in the Second Order and were also in gross violation of State law A.R.S. § 38-1110, which sets a 180-day time limit for completing an investigation.[2]

The Court further noted that the Monitor found MSCO in non-compliance with the Second Order's paragraph 204 requirements in its November 2020 and February 2021 reports.  In its November 2020 report, the Monitor found that, of the 65 administrative misconduct investigations submitted for compliance review, only 11 investigations were completed within the 60- or 85-day time frame.  Moreover, of the remaining 54 investigations, only 14 contained acceptable justification for extensions of time.  The Monitor's February 2021 report had detailed comparable shortcomings: of the 146 administrative misconduct investigations submitted for compliance review, only 74 investigations were completed within the required time frame or contained an acceptable extension request and approval.

MCSO's systemic tardy completion rate negatively impacts the quality and efficacy of the internal investigations. As the Court observed in its December 18, 2020, Order, delays in investigation have an inherent tendency to deny justice.  This not only because the unresolved nature of allegations is intrinsically unsatisfying, but also because the passage of time can compromise investigative quality as memories fade, and witnesses become unavailable.  The Court further found that, pursuant to MCSO policy, the appeals board "may dismiss […] discipline if it determines that the [MCSO] did not make a good faith effort to complete the investigation within 180 calendar days."

## Methodology

Consistent with the Court's appointment order, the Court's Management Expert studied the situation by engaging in discussions principally with plaintiffs' representatives, intervenor's representatives, members of the MCSO, including the Sheriff himself.  This writer also checked in with the Monitor's Team for background and context.  This writer further studied relevant court filings, policies, case reports, and other materials relevant to the issue.  Finally, the Management Expert attended relevant portions of the Monitor' team virtual site visits that occurred during the review of this matter.  During these engagements, we found all parties candid and extremely accommodating to our requests.

In April 2022, this writer prepared a Preliminary Report setting out initial findings and recommendations and forwarded to the parties for their review.  Subsequently, this writer met a number of times with the parties to discuss issues set out in the Preliminary

---

[2] The State law provides specifies certain exceptions to this limit.

Report.  And per their request, the parties provided written comments and reactions to the Preliminary Report.  This writer then considered the feedback received from the parties and the Monitoring team in crafting this final Report.

To the degree this Report provides any insights and a path forward, it would not have been possible without the cooperation and interest of all parties and stakeholders.[3]

## The Exponential Growth of the Complaint Investigation Backlog

As data collected by the parties and presented to the Monitor shows, as MCSO initiation of investigations increased, the number of pending investigations also similarly increased.

*Initiation of Internal Investigations by PSB*

| Year | Number |
|------|--------|
| 2014 | 717 |
| 2015 | 916 |
| 2016 | 847 |
| 2017 | 1,028 |
| 2018 | 1,114 |
| 2019 | 1,072 |
| 2020 | 1,204 |
| 2021 | 1,172 |
|  |  |

**Pending Investigations**

|  |  |
|------|--------|
| December 31, 2019 | 1,617 |
| December 31, 2020 | 2,010 |
| September 1, 2021 | 2,133 |
| March 30, 2022 | 2,086 |

[3] In its written response, the Plaintiffs and the United States assert that while they are "open" to many of this writer's Recommendations, they expressed concern that they do not set a clear path to eliminate the backlog by a reasonable date or create a PSB capable of completing thorough investigations within court-ordered deadlines.  This writer respectfully disagrees with this pessimistic view; provided the parties are amenable to the Recommendations set forth herein, a path forward is provided toward reduction and elimination of the backlog by both increasing resources and creating strategies to ensure that allegations of misconduct are addressed by MCSO in the most effective and timely way.

In short, as the number of new cases grew by more than 50% over seven years, the timely processing of that expanded volume was simultaneously challenged by heightened expectations as to quality and objectivity in the investigations themselves, as established by the Court's Second Order.  That investigative strategy chosen by MCSO to respond to the appropriate close review by the Monitor and the parties, (designed to ensure that compliance is occurring), has contributed significantly to the growing backlog of individual cases.

Indeed, MCSO has lagged woefully behind regarding the Order's timeliness requirements.  As the below chart indicates, the "average" amount of days to complete an internal investigation has risen to almost four times longer than state requirements and over eight times longer than requirements of the Court.

**Average Days to Close Investigations**

| | |
|---|---|
| Third Quarter  2020 | 520 |
| Second Quarter 2021 | 663 |
| Third Quarter 2021 | 655 |
| First Quarter 2022 | 611 |

And as the below charts show[4], while the brunt of the lack of timeliness is attributable to lags between the initiation of a new case and the ability of investigators to actually start working on them, significant time is also spent during the review process for completed cases at both the lieutenant and captain level.  In fact, the combined average review period of 85 days reflected in the most recent evaluation period (and depicted in the below charts) means that even one day of investigation would push MCSO beyond the compliance period.  Clearly, both duration of both the investigative and review process need to be reduced drastically in order for MCSO to meet the timeliness requirements of the Court order.[5]

---

[4] These charts constitute PSB investigations only.

[5] MCSO advised this writer that the average days for an investigator to submit an investigation will be high while the investigators close out the older cases.  A very old case will heavily skew the average even if several cases were timely completed.  For that reason, it may be helpful for MCSO to prepare charts showing the *mean* of completion.







## The Impact of Untimely Complaint Investigations on Accountability

The impact of untimely internal investigations on law enforcement accountability – and public confidence in policing – is significant and very much worthy of each agency's attention.  It is an issue that has both internal implications (for the organization and its functionality) and external ones (for members of the public who are participating in or monitoring the process.

The influence of punctual, efficient handling of misconduct allegations is multi-faceted. A prompt investigative interview with a complainant, for example, will help to frame the investigative direction of the case, including the scope of possible violations and the proper inclusion of potential involved members.  Not insignificantly, it also reinforces the idea that the agency is appropriately responsive and taking the matter seriously.

There is similar value to the timely gathering of evidence before it is lost or degraded, and the timely interviewing of witnesses while recollections are still fresh and availability is still likely.  Finally, interviews of the involved employees must occur before their recollection of events is compromised – either actually or strategically – by extended delay.

Clearly, the converse of these principles is also true, and the ability to conduct an effective investigation decreases exponentially over time.  Crucial external evidence (such as commercial surveillance video of an event) may be lost if not retrieved right away.  Witnesses and involved members can more fairly claim to "not remember" particular aspects of the event if interviews are conducted months after the incident. Crucial witnesses may not be locatable.

But even if the substantive outcome of a case were somehow not compromised by delay, the collateral consequences are themselves worthy of being avoided.

Complaints are a mechanism for individual people's concerns to be vindicated, and an important source of feedback as to public perception, officer performance, and the potential need for remediation. Given the issues of historical mistrust between law enforcement and some communities of color, and given the socioeconomic vulnerability or language barriers that some people must overcome in order to engage with the system and even lodge a complaint, it is all the more important for the process to have legitimacy. Timeliness affects the perception of that legitimacy, and therefore should be a priority.

Understandably, a current or prospective complainant's confidence in the process, and inclination to participate in the first place, is significantly diminished if it takes months or years before a complaint is resolved. The unspoken message is that you are welcome to share your concerns but addressing and resolving them are simply not agency priorities. Endemic and structural untimeliness undermines any faith in the integrity of the process; justice delayed does in fact amount to justice being denied.

Moreover, MCSO should have a deep and vested interest in ensuring that complaints are timely investigated. A complaint provides real notice to the agency that an employee may have violated the organization's expectations as set out in law or policy. Until an investigation and review are completed, the agency remains in the dark about issues that may require intervention. For those offenses that are serious and call for potential termination or long-term suspension, the agency either has to relieve the employee of duty – with pay – or run the risk of his or her continued service.

Even for offenses that are relatively minor, a timely course correction is important so that agency expectations are immediately reinforced. Throughout the pendency of the process, employees will continue to work in their assignments without relevant feedback and may be more likely to reoffend as the initial allegation lays stuck in the investigation queue. Similarly, any appropriate individual or systemic intervention (such as a targeted training opportunity) is postponed to the detriment of its value.

Tardy internal investigations also impact the health of the organization in other crucial ways. An involved employee is required to endure the stress of a delayed investigation while it languishes in the system. And the unresolved nature of the case has potential impacts on the employee's ability to promote, transfer, or otherwise advance within the organization while the inquiry is stalled within the system.

Meanwhile, MCSO's own Professional Standards Bureau has been left to navigate both years of intense criticism *and* a workload that is essentially self-defeating. The Monitor has reported that in 2016, prior to the implementation of the Court's Second Order, PSB investigators were carrying an average active caseload of 12-16 cases each month, consistent with industry standards. As of April 2021, however, the average active caseload in PSB had burgeoned to 76 for detention investigators, 56 for sworn

investigators, and 45 for civilian investigators.  When each investigator has such an unmanageable case load, it breeds feelings of hopelessness about any ability to control one's cases.  The resultant low morale necessarily eventually erodes even the most committed investigator's dedication to the mission of accountability.

Ultimately, an agency that routinely cannot timely complete internal investigations undermines its own operational effectiveness, strains the morale of employees, and weakens public trust in its commitment to meaningful accountability.  Each of these consequences is fundamentally harmful to legitimacy.

## The "Root Causes" of the Backlog

The Court proceedings demonstrated that during the years in question, particularly under the leadership of Sheriff Joe Arpaio, there was no consistent or effective handling by MCSO of internal affairs investigations.  In issuing its Second Supplemental Permanent Injunction, the Court, while referencing its May 2016 Findings of Fact noted that:

> Defendants, or their proxies, named disciplinary officers who were biased in their favor and had conflicts, Defendants remained in control of investigations in which they themselves had conflicts, Defendants promulgated special inequitable disciplinary policies pertaining only to Melendres-related internal investigations, Defendants delayed investigations so as to justify the imposition of lesser or no discipline, Defendants misapplied their own disciplinary policies, and Defendants asserted intentional misstatements of fact to their own investigators and to the court-appointed Monitor. The Court found that Defendants were "manipulating the operation of their disciplinary processes to minimize or altogether avoid imposing fair and equitable internal discipline for misconduct committed against members of the Plaintiff class".

The Court found that "the violation permeates the internal affairs investigatory processes, which have been manipulated to provide impunity to those who violate the rights of the Plaintiff class".  Accordingly, the Court issued a Second Order, setting out detailed requirements for how allegations of misconduct were to be handled.

Since that time, MCSO has endeavored to produce internal investigations that were designed to comply with the Court's Second Order as to quality, objectivity, and thoroughness.  And to a significant extent, there is evidence that such effort has succeeded, at least with regard to producing fair and thorough investigations.  For example, in its 28th Report (covering First Quarter 2021) the Monitor reported that the "overall investigative quality for cases investigated by PSB and submitted for compliance has remained high".

However, while the Monitor has found improvement in the quality of PSB investigations, the positive results in that area have been eclipsed by the development of an unacceptable backlog of cases as detailed above.  MCSO has candidly admitted that it

prioritized quality over timeliness in its efforts to improve the cadre of investigations and the review process.  One strategy employed by MCSO was to endeavor to follow a spreadsheet of investigative tasks that was provided by the Monitor's Team, at MCSO's request, and ensure that every investigation complied with the spreadsheet criteria.[6] While doing so increases the likelihood that an investigation will be found in compliance, it has resulted in a significantly longer timeline to complete each investigative task.  The result was investigative work that was likely not "necessary" in order to fully assess the misconduct allegations but was done in order to better ensure that the case would be found "in compliance".[7]

Moreover, as detailed below, the greater resource demands needed to achieve the investigative quality set out in the Court's Second Order, were not sufficiently addressed by MCSO.  Clearly, since more was expected to ensure that an investigation was thorough, there should have been a concomitant increase in resources by MCSO to ensure there were sufficient investigators to do the additional work without sacrificing timeliness.  As soon as 2017, instead of increasing PSB's investigative resources, MCSO began to push back on the changes required by the Court's Orders.  As a result, the quality control issue was soon eclipsed by the timeliness issue.  The burgeoning backlog eventually led to the aforementioned contempt findings for Sheriff Penzone and the County.[8]

---

[6] The spreadsheet was a tool developed by the Monitor's team and was used for internal purposes.  The spreadsheet is simply a reduction of the investigative requirements set out by the Court Order.

[7] Plaintiffs and the United States have suggested a need for a more intensive "file review" to determine whether changes to investigatory practices may free up PSB resources.  However, such an exercise would be resource intensive, and add further delays to moving forward on the recommendations set out here. MCSO has admitted that its investigators largely follow the expectations they believe are necessary for the investigation to be found in compliance rather than making case by case adjustments to the investigative plan, which is the most significant reason investigations currently take so long.  And the Recommendations offered below are precisely intended to address this phenomenon by providing some flexibility on how an allegation of misconduct is handled.  That being said, it would be expected that one of the initial tasks of the CPA would be to further examine the flow of cases through the investigative, review, and, when relevant, disciplinary process to identify additional strategies to streamline the case processing protocols.

[8] Plaintiffs and the United States have suggested a further review of data to determine the following:
       Identifying "slow" investigators
       Whether PSB is assigning investigations with overlapping facts to the same investigator
       Whether PSB is streamlining time-consuming tasks
       Whether additional training would reduce the volume of complaints
       Whether vindictive employees are weaponizing PSB
Again, this deeper dive into data is unnecessary to determine the remedies identified in this Report and would unnecessarily delay moving to a consideration and implementation phase of

As it is, while certainly the underpinnings of the multitude of Constitutional violations identified in this case, including the wholesale corruption of the internal investigative process and accountability function lay at the feet of former Sheriff Arpaio, it has been over five years since Sheriff Penzone has been at the helm of MCSO.  Accordingly, the current intolerable backlog of cases is now his responsibility and to date, insufficient resources have been committed to ensure quality, fair *and* timely investigations of misconduct allegations.

As further detailed below, there were periods prior to the installation of the current Captain in which significant delays in the review process were causing investigations to languish without any meaningful activity.  The new PSB Commander eventually discovered a stack of files that had not been reviewed and learned that PSB supervisors had been provided the ability to grant themselves extensions, resulting in a serious delay in the review process.  The lack of internal controls by prior PSB leadership and a lack of focus on the timeliness issue were contributing causes to the development of the backlog.[9]

And as detailed below, another significant contributing cause to the backlog was the inability of PSB to more effectively address allegations of misconduct through modified investigative protocols or non-investigative interventions.  While the Monitor has appropriately provided relief for non-investigative interventions in a limited number of cases, the parties have been unable to reach a consensus with regard to other reasonable accommodations designed to more effectively address certain types of misconduct allegations.  And the inability of the parties to agree to any significant accommodations led to MCSO seeking direct relief from the Court from certain aspects of the Court Order.  The failure of the parties to obtain additional consensus on more effective ways to handle certain allegations of misconduct is also a significant contributing factor to the case backlog.

In the next section this writer sets forth adjustments that *have* been made over the course of judicial supervision intended to alleviate the timeliness issue as well as sets out MCSO's additional efforts and suggestions to alleviate the backlog.  Following that discussion is this writer's Recommendations intended to address and remedy the root

the offered Recommendations.  Moreover, as set out elsewhere in the Report, certain strategies have been used by the current PSB Captain to streamline tasks within the limited discretion currently afforded him.  And it is hard to know how one would perform some of these suggested tasks; such as how to know through file reviews whether additional training would reduce the volume of complaints.

[9] The Plaintiffs and the United States suggest that there be further review to determine the particular reasons for the slowness of the review process.  Again, this writer believes this additional work would not be fruitful and is unnecessary at this point.  In fact, as noted below, one of the key Recommendations is the development of internal mechanisms to monitor the length of PSB review process, which could be a primary function of the Captain, aided by the expertise of the CPA.

causes set out here, namely, the failure of MCSO to increase investigative resources to handle the increased expectations of the Second Order and the failure of the parties to develop a path toward more effectively and efficiently addressing certain allegations of misconduct.

# Adjustments Intended to Alleviate the Timeliness Issue

## Service Complaints

Service complaints involve allegations where there is no employee misconduct; or are complaints where it is determined that MCSO employees are not involved.  The use of the service complaint protocols designed to handle allegations more effectively when there is no ascertainable employee misconduct commenced in 2017.  In July 2019, the Monitoring Team and the Parties approved MCSO's proposal to use an expedited process to handle complaints where it could be immediately determined that the complaint did not involve MCSO personnel.  A significant percentage of "complaints" received by MCSO are classified as service complaints.  For example, the Monitoring Team's Thirty First Quarterly Report (Fourth Quarter 2021) found that MCSO had closed 98 service complaints during that reporting period.

## Supervisor-Initiated Interventions

The Monitor and the Parties also approved revised policies that permit supervisor-initiated interventions such as "coaching" to address minor misconduct in certain limited situations.[10]  MCSO maintains that because the "carve out" is narrow, the process had not been used as frequently as anticipated.  MCSO reports that in 2020, the PSB Commander converted 84 internal complaints into supervisor-initiated interventions.

## Telephonic Interviews/Relaxation of Witness Interview Requirements

And in December 2018, the Monitor and the Parties also approved revisions to the witness and complaint interview processes designed to assist with streamlining investigations.  Under the revised protocols, PSB investigators must offer to conduct witness and complainant interviews in person but are permitted to conduct them by phone.  PSB investigators may also seek approval from the PSB Commander to be excused from the obligation to interview *all* witnesses in certain circumstances.

These sensible adjustments to MCSO's investigative protocols have reduced the investigative resource burden on the Sheriff's Office.  Yet as detailed below, additional

---

[10]Specifically, as set out in MCSO's Policy GH-2, Internal Investigations relating to "Minor Misconduct": To address these employee behaviors, supervisors may initiate an intervention method, as specified in Office Policy GH-5, Early Identification System, to include: squad briefing; meeting with supervisor; employee services; supervisor ride-along/work along; training; supervisor evaluation period; action plan; meeting with the commander; re-assignment; and coaching.

potential adjustments have stalled as a result of the Parties' inability to develop a consensus on their appropriate parameters.

## MCSO's Additional Efforts to Address the Timeliness Issue

MCSO has advised the Court and this writer of its continued efforts (and suggestions) to address the timeliness issue. This report now turns to those representations and provides further analysis of the complexities therein:

### Hiring of Staff

MCSO maintains that the Sheriff's Office PSB has more than doubled in size since 2015, when it had a total staff of 25.  According to MCSO filings from 2021, it projects a total staffing of 60 positions at PSB. While this is significant on its face, a closer review indicates that little of this expansion has occurred in the category of actual investigators, where the bulk of the Bureau's burgeoning workload must be addressed.

In its most recent quarterly report, the Monitor found that PSB had not increased its investigative staff in more than four years, despite the rapid increase in investigator caseloads and backlogs. The Monitor reported, however, that PSB filled the majority of the civilian positions authorized in the 2019 budget and began assigning administrative staff to complete a variety of tasks previously completed by investigators. The Monitor further reported that PSB had also hired three civilian investigators.

The Monitor further reported that during the July and October 2020 remote site visits, PSB advised that only one of the 11 positions approved in the 2018 budget had been filled. All of the civilian positions authorized in the 2019 budget had been filled, and the three civilian investigators hired were now conducting investigations.  According to the Monitor, no additional requests for PSB staffing were made for the July 2020 fiscal year.

The Monitor reported that during the January 2021 remote site visit, PSB staffing was discussed yet the Monitor determined that again, no additional staff had been allocated to PSB. The Monitor reported that there had still been no measurable change in the number of investigators assigned to PSB since 2016, despite the demonstrable increase in workload and backlog. The Monitor reported that the number of investigators assigned to PSB had remained between 24 and 26 since 2016. At the end of 2019, PSB had nine sworn investigators and 15 Detention investigators, a total of 24. At the end of 2020, PSB had a total of 25 investigators. Of these, seven were sworn, 15 were detention, and three were civilian investigators.

The Monitor reported that PSB had a total of 54 staff members at the end of March 2021. Of these, eight were sworn investigators and 15 were Detention investigators. The three civilian investigators also had full caseloads, bringing the total of assigned investigators to 26. The remaining 28 staff members in PSB were supervisory staff (nine), administrative staff (10), criminal investigators and staff (five), Division case reviewers (two), and building security staff (two). PSB personnel also advised that it had

converted seven of the unfilled sergeant positions from 2018 to civilian positions and had received approval to hire three additional civilian investigators and four additional administrative staff. The Monitor reported that there were still three unfilled sergeant positions from the 2018 budget allocation.

The Monitor reported that during the July 2021 site visit, PSB advised that there were 56 employees assigned to PSB. Of these, nine were sworn investigators, 14 were Detention investigators, and three were civilian investigators. The Monitor concluded then that the total number of investigators (26) was essentially still the same number of investigators that have been assigned to PSB since 2016.

The Monitor reported that during the October 2021 site visit, the Bureau advised that there were 55 employees assigned to PSB. Of these, eight were sworn investigators, 13 were Detention investigators, and six were civilian investigators. The Monitor again concluded that the total number of investigators, 27, remained essentially the same as it has been since 2016. Tellingly, the Monitor reported that "as documented in this and previous reports, PSB, in its command's estimation, is understaffed."[11]

MCSO reported at the April site visit that there were 58 employees assigned to PSB:

| | |
|---|---|
| Sworn Investigators | 11 |
| Detention Investigators | 15 |
| Civilian Investigators | 6 |
| Supervisory Staff | 6 |
| Administrative Functions Staff | 12 |
| Division Review | 1 |
| Criminal Investigators | 2 |
| Criminal Review | 1 |
| Criminal Support | 2 |
| Security | 2 |

More significantly, MCSO reported that PSB currently has seven vacancies that are authorized by its current budget but have not been filled for years. Accordingly, even without a request for increased resources from the Board of Supervisors, the real difficulty is MCSO's stated difficulty in filling the current vacancies that are budgeted. If even that were accomplished, it would result in a serious increase in PSB investigative resources and align at least PSB with the staffing it is intended to have. Cognizant that MCSO has significant sergeant vacancies throughout the organization, the Court Order and the erosion of trust created by the serious backlog make it imperative that MCSO at least bring PSB to its currently allotted budgetary level.

---

[11] MCSO reported that as of December 31, 2021, overall PSB staffing of 54 included 31 investigators.

As detailed above, the case load per investigator has only continued to balloon.  In order to close the current case load of more than 2,000 open cases, and assuming that its investigators could close 25 cases per year (well above the current average of 17 per year), the Sheriff's Office would need at least 40 total investigators in order to address the backlog.  Moreover, during those two years, and based on recent trends, another 2,000 *new* investigations would presumably be initiated – an additional volume that would require another 40 investigators to address.[12]

Clearly, then, the existing staffing level is inadequate to the task that confronts MSCO.  But at the same time, it should be noted that any proposed solution is not happening in a vacuum; rather, it must be reconciled with other operational – and Court ordered – imperatives that relate to the reform process.

It has been suggested, for example, that the Sheriff's Office simply transfer the requisite number of sergeants into PSB (50+ based on current projections) so that it could address the backlog of pending cases in the next two years.  However, as MCSO has pointed out, there are logistical challenges to that approach.

First, MCSO maintains that current high vacancy rates make it difficult to move sergeants from field assignments to PSB.  MCSO further notes that the Court's Order relating to field span of control also complicates MCSO's ability to move sergeants out of patrol assignments.  Paragraph 266 of the Order requires that first-line patrol supervisors shall be assigned as primary supervisor to no more than eight persons and in no event more than ten persons.  MCSO's concern that taking sergeants out of the field in an effort to comply with one aspect of the Order could create compliance issues with Paragraph 266 is not a hollow one: indeed, as MCSO has already been challenged with remaining in compliance with this provision.  In fact, a recent Monitor's report expressly stated that MCSO will lose compliance – including Full and Effective Compliance –if the MCSO's compliance numbers with Paragraph 266 span of control requirement's again fall short.  As the Monitor indicated: "The increase in the shifts where supervisors have had more deputies than Order requirements permit is concerning."

One related question that is not addressed in any papers filed by MCSO is whether the current field deployment of deputies and sergeants is "right-sized" for the Sheriff's Office responsibilities in fulfilling its public safety responsibilities.  In other words, the Sheriff's Office assumes that its current deployment of sergeants and deputies in patrol and the jails is necessary to provide sufficient resources, yet there has not been a recent staffing study to evaluate whether those expectations match up with current deployment.  Commissioning such a study would assist Sheriff's Office leadership (as

---

[12] In a January 2020 Memorandum submitted to the Monitoring team, PSB projected that it would need a total of 123 investigators to remain on par with the appropriate investigator/caseload ratio.

well as the Monitor and the parties) with determining whether a reduction in resources could be accomplished without serious sacrifice of its public safety responsibilities.[13]

Another frequent stopgap used by law enforcement when there is a shortage of resources is the use of overtime funding.  However, by reviewing the monies paid PSB investigators for overtime, it is apparent that they are already working significant amounts of overtime:

| YEAR | TOTAL OVERTIME PAID TO PSB INVESTIGATORS |
|---|---|
| 2019 | $657,718.93 |
| 2020 | $413,512.56 |
| 2021 | $508,148.52 |
| 2022 (as of April 30) | $147,213.00 |
| | |

This amount of overtime expenditures for the unit is already high.  More significantly, relying on investigators working significant amounts of overtime is not sustainable year to year; instead, there is an inevitable employee "burnout" and a concomitant decline in the dedication to and quality of work.[14]

**Use of Private Contractors**

In April 2021, MCSO advised the Monitor that it had hired five private contractors to assist with the Sheriff's Office caseload as a "pilot project". While the additional resources could help reduce the caseload, the initial results have been modest.  As of October 2021, 25 cases had been assigned to contract investigators and only eight had

---

[13] The Monitor regularly reviews sample Patrol Activity Logs ("PAL"s) which is one metric with which to consider MCSO patrol activity. In its 30th Report, based on those PAL samples, the Monitor reported the following:

| Date | Incident Reports | Calls for Service | Self-Initiated Calls | Arrests | Travel Distance |
|---|---|---|---|---|---|
| July 2021 | .73 | 4.64 | 1.33 | .06 | 60.9 |
| August 2021 | .97 | 4.44 | 0.97 | .00 | 89.56 |
| September 2021 | 1.11 | 5.39 | 1.89 | [Missing from data set] | 70.35 |
| | | | | | |

[14] It should be noted that some of the overtime paid to PSB investigators includes field assignment responsibilities.  Considering the current backlog, PSB investigators should be protected from such assignments so that they can focus on addressing their caseload.

been completed and finalized, while an additional five had been completed and returned to MCSO for review and finalization. While one would expect an uptick in the number of cases closed by the private contractors once they become more familiar with PSB's General Orders and the Order's investigative expectations, this commitment of resources have yet to make a significant impact on the current caseload.[15]

**Policy Revisions**

MCSO notes in filings with the Court that in 2017, it revised its internal policies to allow the PSB Commander to classify certain complaints as "service complaints."  Under the process approved by the Monitoring Team, service complaints may be handled by district supervisors, subject to PSB's and ultimately the Monitor's review.

**Changes in Internal Procedures**

MCSO reports that PSB has used strategic techniques to process and triage its caseload and other aspects of the process in order to shorten the timeline for completion.  For example, greater use has been made of non-investigative personnel to obtain documents and other records in order to unburden investigators with such tasks. Another more recent example is to reassign PSB personnel who were involved in complaint intake to investigative responsibilities.

As another example, PSB used to serve notice of disciplinary action to deputies but now have employees travel to PSB to pick up the notice.  Changes in protocol that transfer non-investigative responsibilities away from investigators are helpful time-saving measures that must continue to be identified.

**District and Division Investigations**

MCSO reports that Patrol Districts and Divisions closed 133 Internal Affairs investigations in 2020.  Greater use of the patrol districts and division supervisors may offer an opportunity to address the backlog of cases, but it would require assurances that such a move does not sacrifice quality of investigations.  Very recently, MCSO has reported an intent to actually decrease reliance on district and division supervisors to conduct internal investigations due to the extended review process that occurs at the District and Division level.  This move will potentially create a greater burden on already overburdened PSB investigators.[16]  If MCSO determines to retain a greater percentage or all cases with PSB, the change may concomitantly reduce resource burdens from

---

[15] As MCSO has reminded this writer, there are considerable costs associated with the use of private contractors and there are challenges in identifying and retaining qualified investigators.

[16] MCSO maintains that the potential impact on PSB is uncertain in that the change would decrease the burden on PSB that results from sending cases back to the districts for multiple corrections.  MCSO further maintains that the change considered the burdens that would be added to PSB as well as the burdens that would be lifted from PSB and that the approach taken will lead to a greater percentage of compliant investigations.

Districts and Divisions.  Any burden reduction for the Districts and Divisions should potentially allow for the transfer of sergeants to fill the outstanding vacancies at PSB.[17]

**Use of Human Resources Bureau**

MCSO reported that it recently created the Employee Retention Performance Division ("ERPD") within its Human Resources Bureau.  MCSO further reports that it has started a pilot program designed to determine whether appropriate complaints could be handled by ERPD.  It estimated that one hundred complaints annually might be able to be handled through this process – a noteworthy redistribution of the larger total. However, there is currently no offloading of PSB cases to ERPD.

**The MCSO's Request for Relief from the Court Order**

MCSO maintains that the Order that was crafted to address the constitutional violations found by the Court has played a role in contributing to the massive backlog of internal investigations.  Ultimately, the Court will determine what relief, if any, will be granted to the existing Order.  But the following possibilities were raised to this writer during the course of the review preceding this report (with plaintiff input included where relevant):

*Changing Definitional Timelines for Untimely Cases*

MCSO suggests changing the current timelines for completion of internal investigations (85 days for PSB/60 days for District) to align with the state law timeline of 180 days. This new standard would obviously increase the likelihood of a given case being finished "on time."  But, as discussed below, it would seemingly be more a matter of form over substance in terms of addressing the underlying problems that have fueled the delays – many of which extend well beyond the 180-day mark as it is.

*Increased PSB Commander Discretion*

MCSO has requested that the PSB Commander be provided discretion on whether to open and close Internal Affairs investigations.  Currently, the PSB Commander has the responsibility for "making an initial determination of the category of the alleged offense" and assigning complaints to an investigator.  The Second Order authorizes the PSB Commander to have any complaints involving minor misconduct to be investigated at the employee's District.  Current MCSO policy permits supervisor interventions for internal complaints alleging "minor misconduct", but no interventions are permitted for external complaints.

---

[17] MCSO maintains that it is premature to consider transferring sergeants from Districts and Divisions to PSB because the field units still have investigations to complete.  MCSO also notes that the sergeants in the field who work on investigations also have other enforcement and administrative responsibilities beyond investigations.

*Misconduct Allegations that Occurred More Than a Year Before the Complaint was Filed.*

Currently, MCSO is required to investigate all complaints of employee misconduct, regardless of when it occurred.  MCSO has asked that the Order be modified to permit the PSB Commander discretion not to open an Internal Affairs investigation for complaints alleging conduct that occurred over a year prior to receipt of the complaint.[18]

MCSO suggests that such discretion would not apply to allegations involving a member of the Plaintiff class, allegations of criminal misconduct, allegations of bias, or allegations in which a sustained violation would result in revocation of the principal's AZPost certification.  MCSO suggests that factors relevant to the exercise of discretion should include the severity of the alleged misconduct, whether the allegation involved a supervisor's failure to properly supervisor or take corrective action, and whether there was good cause for the delay in filing a complaint.

*Complaints about Former Employees*

MCSO suggests that it be afforded discretionary authority over opening an investigation into a complaint alleging misconduct solely by former employees as well as discretion to close a complaint if an employee leaves MCSO before the investigation is completed. MCSO proposes that "significant complaints," including all complaints involving members of the Plaintiff class, would still be investigated.[19]

Regarding the proposal, Plaintiffs and the United States expressed concern that a person may retire or resign solely because of the pending investigation.  This outcome could potentially diminish accountability in the very way that Plaintiffs and the United States have cautioned against.

---

[18] Initially, PSB suggested that cases that occurred more than six months prior to receipt of the complaint should be subject to administrative closure.  In a Memorandum provided to the Monitoring team in January 2020, PSB projected that with a six month window, 8% of pending investigations could be administrative closed.  PSB provided no detailed data supporting this projection.

[19] In a Memorandum provided to the Monitoring team in January 2020, PSB projected that 12% of pending investigations in which the Principal is no longer employed by the MCSO could potentially be administratively closed.  MCSO provided no detailed data supporting this projection.

*Complaints that Are Withdrawn or Where the Complainant is Unwilling to Cooperate*

MCSO requests that the PSB Commander be afforded discretion to close investigations if the complainant withdraws the complaint or is unwilling to cooperate with the investigation.[20]

*Complaints Alleging Minor Misconduct*

MCSO requests that the PSB Commander be afforded discretion to refer allegations of minor misconduct for supervisor interventions without the need for a formal internal affairs investigation.  Currently the Second Order permits allegations of minor misconduct to be administratively investigated by a supervisor in the employee's district. Supervisory interventions are currently allowed for allegations of "minor misconduct" that have not been received as an external complaint or have not already been assigned to PSB.  MCSO suggests that the existing protocol be expanded to encompass those external complaints that are substantively minor in nature.

Plaintiffs indicated no objection to using supervisory interventions for a "specific, narrow category of minor policy violation" that does not directly involve interactions between MCSO and members of the community.  The plaintiffs contend that such categories could include allegations of uniform violations, tardiness, delays in completing paperwork, or other minor issues.

Plaintiffs and the United States has suggested that MCSO should specifically identify the policy violations that would be eligible for this process. They have further indicated that additional accountability measures would also be necessary, including some PSB oversight, auditing for consistency across the agency, and a means to escalate performance issues to PSB when appropriate.  DOJ has further suggested that it would also be prudent for MCSO to test this initiative in a pilot, perhaps designed for six months' time.

MCSO maintains that "minor misconduct" that might be eligible for non-investigative interventions should also potentially include external complaints from members of the public, provided they do not involve the plaintiff class or involve allegations of bias.[21]

---

[20]  In a January 2020 Memorandum provided to the Monitoring team, PSB estimated that 8% of the pending cases could potentially be administratively closed on this basis.  No backup data was provided to support this estimate.

[21]  In a January 2020 Memorandum provided to the Monitoring team, PSB estimated that 26% of the pending cases could potentially be reclassified for a supervisor intervention. No backup data was provided to support this estimate.

*Plaintiffs and the United States' Concern about Providing PSB Commander Additional Discretion.*

Plaintiffs and the United States had indicated a reluctance to institute new systems that would centrally rely on the judgment or discretion of the PSB Commander.  Plaintiffs and the United States reference the prior recalcitrance of MCSO and repeated examples of how discretion was "abused" historically by the organization as forming a basis for this inherent lack of trust in its ability to appropriately exercise discretion in the internal investigation arena.

# Management Expert's Recommendations

The backlog of cases continues to grow, as does the inordinate case load assigned to PSB investigators, and complainants are waiting for years to have their concerns investigated and addressed.  As detailed above, the reasons for this are multi-faceted. Accordingly, the situation calls for creative approaches that address the backlog while ensuring that internal investigations of misconduct meet the expectations set out in the Court's Orders and are consistent with industry standards. This writer offers the following recommendations designed to address the intolerable backlog.

## A Need to Increase Investigative Resources

*Increase the Number of PSB Investigators by Filling All Current Vacancies*

Considering that there are currently 27 investigators assigned to PSB, and that the agency's current entire cadre of sergeants is just about 350, almost 8% of all MCSO supervisors are already assigned to PSB.  This is inordinately high for any law enforcement agency, and this writer is also mindful of the competing Court Order requirements mentioned above as to maintaining an effective span of control in the field. Still, as detailed in the Monitor's reports cited above, the past five years has not seen a significant increase in the number of investigators assigned to the unit – even as the backlog continues to grow and the problem of unresolved cases undermines MCSO credibility.

As a demonstration of recognition of the inadequacy of current PSB investigative resources, it is recommended that MCSO increase the size of PSB so that the seven current vacancies are immediately filled by either sworn or civilian investigators, at least, until the backlog returns to manageable numbers.[22] However, as explained above, this considerable increase of size of PSB will not resolve the current backlog alone.[23]  For

---

[22] If MCSO opts to staff the vacancies with civilian investigators, it should at least ensure that PSB is enhanced by at least seven individual investigators.

[23] Plaintiffs and the United States have indicated support for this Recommendation but express concern that the limited additional investigators would not be sufficient to clear the backlog.  We share those concerns and say so explicitly, hence the Recommendations designed to make PSB more efficient while ensuring misconduct allegations are fully addressed.  As stated above,

that reason, and as detailed below, much more must be considered to address the massive challenges identified by the Court, the Monitor, and the parties.[24]

*Increased Use of Contract Investigators*

MCSO has retained five contract investigators as a pilot project in an effort to address the intolerable case load backlog.  While that admirable expense and effort has yet to significantly impact the backlog, the tenure of the contract investigators has been relatively brief.  With time and further guidance, their output and impact on the outstanding case load can be expected to increase.  For that reason, MCSO should maintain the program and bring on three additional contract investigators as supplemental resources to PSB.

*The Critical Need for MCSO to Commit to Dedication of Investigative Resources*

The above-noted recommendations, if implemented, will increase MCSO's investigative resources for internal investigations by nearly 30%, a sizeable jump that should make a considerable impact in addressing the timeliness issue.  However, should future data reveal that even more investigators are needed to appropriately *and* timely investigate allegations of misconduct, the Sheriff must exhibit a commitment to finding those resources so that Constitutional expectations of accountability are met.

## Methods Designed to Increase the Efficiency of MCSO's Internal Investigative Function Without Sacrificing Accountability

*Creation of Internal Oversight of PSB Functions: The Concept of a Constitutional Policing Advisor*

As detailed above, one of the major concerns expressed by plaintiffs is the lack of trust in MCSO's investigative process as a result of the agency's legacy of abuse of its discretion in this arena.  The judicial proceedings that resulted in the Orders established that there was little interest in MCSO leadership at the time in ensuring that complaint

---

this writer agrees with Plaintiffs and the United States that MCSO should retain the discretion to fill the vacancies with civilian positions, provides there are the same or more investigators assigned to PSB when those positions are filled.  And if the reforms and the additional dedication of resources do not "bend the curve" of the backlog, additional staffing may be an appropriate remedy.  In this writer's view, Plaintiffs and the United States recommended consideration of an "external team" to be solely responsible for clearing the backlog would engender other issues of selection, training, and quality control and is not a feasible alternative.

[24] As noted above, MCSO has expressed concern about transferring sergeants to PSB with the potential risk of violating the Court's Order regarding span of supervisory control and the concerns about undermining its public safety responsibilities to County residents.  We understand that MCSO has not undertaken a patrol staffing study in recent history.  We recommend that MCSO commission such a study so that it can learn the appropriate level of staffing for its patrol responsibilities.

allegations would be objectively and fairly handled through a robust internal investigative process.  Importantly, current MCSO leadership has recognized the truth of that legacy.  While the Monitor has indicated in its reports that the quality of the PSB internal investigative process is better positioned now to meet industry standards, it is understandable that the moving parties in the litigation retain a measure of distrust and are reluctant to cede increased discretion to MCSO.

However hard-earned the plaintiffs' perspective may be, one of the consequences of it is a perpetuation of the cycle of delay.  PSB dutifully opens cases under the current paradigm and generally applies the metrics set out in the Order to predict whether each investigation will be deemed compliant by the Monitor (and the parties).  To date, the strategy of the Sheriff's Office has been to try to ensure that each investigation will meet the Order's requirements – with timeliness taking a back seat to the other elements of the standard.  While that emphasis on quality is in some ways admirable, the work needed to complete the extra requirements has caused the backlog to increase to a point at which the integrity of the investigative process itself is imperiled.[25]  If internal investigations are taking years to complete, the fact that those investigations are "compliant" with the remaining substantive requirements of the Order is of little moment.

In order to best determine how to extricate the Sheriff's Office from the growing quagmire of delayed cases, it is helpful to consider the objectives of the complaint investigative process.  When an allegation of misconduct is received, it is incumbent on a law enforcement agency to conduct sufficient inquiry to determine whether the misconduct occurred in order to usually remediate or, in rare occasions, separate the employee from service depending on the egregiousness of the transgression.  In addition, complaints of misconduct should also be used by an agency as sources of information regarding deficiencies in training, policy, guidance, supervision, and equipment.  An internal inquiry that is sufficient to accomplish these paramount objectives is fundamental to an agency's operational well-being.

However, that does not necessarily mean that every internal investigation needs to incorporate the same investigative steps in order to achieve these goals.  On the contrary, as explained below, some allegations of misconduct may need no or minimal investigation to achieve these ultimate objectives.  For example, in cases where there is no dispute about what occurred, there is little need for a full-fledged investigation.  Moreover, cases that are redirected to a restorative justice approach may not require formal fact-finding.  And some allegations may not need a formal investigation where coaching or less formal interventions can ensure an appropriate course correction for the subject employee.

---

[25] This writer also notes related conversations with plaintiffs' representatives, who raised concerns that PSB was deliberately treating the requirements as an excuse to drag out the process by "working to rule" rather than as a constructive check on quality.  That suspicion goes to larger issues of trust that are addressed below.  MCSO strongly refutes this allegation.

Effective internal accountability systems recognize that the appropriate response among these options is dependent on the nature of the allegations and a review of any pre-existing information collected during the initial phase of the inquiry.  Those same systems invest more time and effort in the initial review of the allegations, the appropriate scoping of those allegations, and the development of an action plan to address them.  Effective intake work would identify the potential policy violations, potential subjects, and whether the case is assigned for investigation by PSB, the Districts, or handled another way as explained in further detail below.  Those responsible for the intake and initial review are imbued with sufficient discretion to direct each allegation down a path that will achieve those overarching objectives of accountability and agency improvement.

As explained above, MCSO believes that the discretion of the PSB Commander to craft an appropriate action plan for each allegation received has been undercut – to the detriment of overall effectiveness – by the investigative requirements set out in the Order as interpreted by the Monitor.  However, to the degree that this belief has any purchase, it is also important to note that the incursion on MCSO's discretion emerged as a response to the systemic abuse of that discretion and the resultant (and well-documented) Constitutional violations identified by the judicial proceedings.  During the pendency of the current judicial supervision, it is understandable why there is concern about providing increased discretion to PSB on how best to handle misconduct allegations.

One way forward has been established in other jurisdictions, where agencies have addressed challenges to their ability to direct the investigative process by agreeing to incorporate an objective entity into the process.  For example, under the judicial oversight of United States District Judge Thelton Henderson, a central intake process was designed to address the backlog and poor quality of internal investigations conducted by the California Department of Corrections and Rehabilitation.[26]  A key aspect of the process that resulted in "buy in" by the plaintiff class was the insertion of representatives of the California Department of Justice Inspector General into the intake process.  As a result of this reform (and many others), CDCR was able to create a more functional internal investigative process that ensured timely investigations.

Other law enforcement agencies have replicated this concept by including an independent Constitutional Policing Advisor ("CPA") into the central intake process.  Under this model, the CPA is an individual who has experience in the oversight or management of internal investigations and is given the authority to participate and weigh in on critical initial decisions about a case:  whether to open an investigation, whether the allegations can be best handled another way, and what will be needed in

---

[26]The Inspector General reported that prior to judicial intervention and a crafting of a remedial plan, 40% of investigations were not timely completed, resulting in CDCR not being able to hold subject employees accountable in those cases.

order to ensure accountability and learning from each allegation.  The CPA is provided unfettered access to all materials and participates in real time in the "central intake" process described in further detail below.  The CPA also functions as an independent quality control check as investigations move forward, in vital areas such as timeliness, thoroughness, and objectivity.[27]

An entity of this sort could certainly be helpful to the pending situation in Maricopa County, and its mission could be tailored to the specific circumstances of MCSO and the ongoing judicial supervision. Ideally, the CPA would also be provided with the responsibility to publicly report on what it is finding, and the degree to which MCSO is accepting of her/his recommendations for how each particular allegation is to be handled.[28]  And finally, the CPA should be afforded the ability to interact with the Community Advisory Board ("CAB") to explain its role, report on what it is finding, and hear any concerns that the CAB might have.[29]

Ideally, the CPA would be on a contract basis with the County and provided space within PSB to perform the central intake function and be readily available as an "on-site" resource.  The CPA's qualifications would include experience with internal law enforcement investigations and Constitutional law.  Prior to selecting the CPA, the County should solicit input on potential candidates from its served communities, the Community Advisory Board, the Monitoring team and the parties.

Plaintiffs and the United States have cautioned that if MCSO is provided full discretion on the selection of the CPA, it would necessarily reduce its independence.  They have suggested that the County be the selectee of the CPA.[30]  They have further suggested that the hiring and firing of the CPA require Court approval.   MCSO has indicated that it

---

[27] During our multiple visits with the parties and after the submission of our Preliminary Report, we encouraged their representatives to meet with individuals who are currently serving as CPA's or who were involved in developing a central intake process with independent entities providing input.  To its credit, representatives of MCSO did meet with individuals who are performing or who have overseen such functions.

[28] Plaintiffs and the United States recommend that the CPA be able to "overrule" classification decisions under the presumption that public reporting will be insufficient to incentivize MCSO to fairly consider CPA's input.  One effective way that we have employed to allay those concerns in similar contexts is to provide the CPA the ability to "appeal" any classification decision it finds unreasonable within MCSO, including up to the Sheriff himself.  However, this writer does not agree that the CPA should have the ultimate authority to dictate classification decisions.

[29] MCSO expressed a concern that for the CPA to report to CAB would be inconsistent with CAB's current role.  To be clear, the intent here is for the CPA to simply report to CAB on what will be progress on the timeliness issue, a key communication channel in restoring the trust of the communities served by MCSO.

[30] In our role providing law enforcement oversight to County entities, we generally contact with the Board of Supervisors.

is amenable to having the County select the CPA provided it has the ability to recommend candidate(s) for consideration.  And MCSO has expressed no opposition to a situation where the Court approves the CPA candidate selected by the County.[31] This writer believes that an independent CPA would increase trust of the parties, the Monitor, the community, and the Court in how MCSO decides how to handle each allegation of misconduct.  That trust might allow for consideration of relaxing current investigative requirements so that MCSO (as checked by the CPA) is afforded more discretion on how to handle allegations that are received.  With that additional discretion, MCSO would be better positioned to utilize its investigative resources more effectively while continuing to serve the larger goals of the process.  In addition to creating a path toward reducing and eventually eliminating the overdue case load, the presence of the CPA could result in a functioning and robust internal investigative unit that will eventually satisfy the applicable requirements of the Order.  And if MCSO were to recognize the inherent value of the CPA function in achieving compliance, it could retain the function into the future as an integrated and necessary entity of the organization.[32]

The CPA is not intended to usurp or infringe in any way upon the responsibilities of the Monitoring team but is intended to provide an objective independent voice on intake and routing decisions of allegations of misconduct.  The CPA's role would not involve a review of completed investigations since that responsibility is being performed by the Monitoring team and, at times, the United States.  And the focus of the CPA's role is not to review intake and classification decisions by the PSB incident commander after they have been made (as the Monitoring team does) but to weigh in on those decisions in real-time as they are being made.  The CPA's role in providing a real-time independent view on how certain allegations would best be handled is a distinct role from those of the Monitoring team and the parties.[33]

---

[31] Plaintiffs and the United States further suggest that the CPA not be terminated without the approval of the Court.  This writer agrees that this is a sound suggestion further contributing to the CPA's independence.

[32] MCSO maintains that through a variety of changes, including a new Sheriff and its progress toward compliance, it has been endeavoring to regain the trust that was lost as a result of the wrongful conduct that led to the Orders.  MCSO indicates its doubt that it will ever regain the trust of opposing parties' counsel regardless of what is does and has concomitant concerns about creating a CPA position based on that lack of trust.  This writer understands the hesitancy but maintains that an independent CPA would create increased trust on classification and referral decisions made by PSB.

[33] The Second Order requires a more intense oversight role for the Monitoring team in a small but critical class of cases involving investigations, namely all internal investigations determined to be Class Remedial Matters (CRMs). PSB currently schedules meetings every two weeks to discuss existing and incoming complaints to determine which, if any, could be CRMs. During these meetings, PSB personnel discuss cases pending a CRM decision, cases determined to be CRMs, and any cases where the decision may be made that the case would not be classified as a CRM. The PSB Commander determines the classification of the cases. A member of the

*Formalization of Central Intake Process*

This writer has learned from experience that the work that is done on the front end of an "allegation review" is pivotal to the ultimate efficacy of the investigation and its results. Critical decisions at the "intake" phase of the process include whether the allegations indicate a potential violation of policy, identification of potential policy violations, and the potential subjects (including supervisors) of the allegations.  Triage efforts during the intake process can also identify allegations which may not require an internal investigation, either because the facts are not in dispute or an alternative intervention (as discussed in greater detail below) may better address the relevant concerns.  We have been advised that the current leadership of PSB is devoting more consideration at the intake phase on evaluating allegations to determine how to proceed.

This writer envisions a central intake process whereby the Captain of PSB reviews the allegation and initial supporting information. With input from the CPA as described above, the Captain could then determine which of the allegations will be opened and investigated by PSB, which will be sent to the Districts for an investigation (or other intervention), and which might be handled through other methods as detailed below. During that intake process, an investigative or intervention plan will be devised by the PSB Captain in conjunction with the CPA. In some cases, direction may be given to conduct additional work (document collection, limited interviews, body camera or other recording reviews) before determining the type of investigation or intervention best suited to address the allegation.  With such a functioning system, the finite resources that do exist at PSB could be applied most effectively to ensure quality and timely investigations.  Moreover, the thoughtful re-routing of other allegations to other vehicles for resolution (including other investigative entities, a more limited inquiry, or other non-investigative interventions), will help reduce caseload and allow for both robust investigation *and* an appropriate emphasis on timely resolution.

The Plaintiffs and the United States have suggested an alternative scheme whereby the intake and classification of complaints to an internal "civilianized" classification unit with the CPA taking a more limited role of reviewer/auditor. The rationale for this approach is that the CPA should not be evaluating decisions in which it is participating.  However, this is the current arrangement of many such entities.  For example, the Central Intake situation at the Inspector General's Office relating to the CDCR, the largest prison system in the country this writer is not aware of any articulated concern about the IG making recommendations regarding classification decisions and then reporting on them. Most significantly, Plaintiffs and the United States' alternative proposal would marginalize the impact of the CPA and require identifying, developing and training a

---

Monitoring Team attends all of these meetings to provide the oversight required by the Order. Because of the real-time review of pending cases by the Monitoring team and to avoid duplication or overlap of responsibilities, it is recommended that the CPA not be involved in the CRM matters.

whole new team of individuals to make intake and classification decisions.  To the degree that plaintiffs are concerned about capacity, the CPA should be free to recommend additional resources, if necessary, to fulfill his or her responsibilities.

*Use of Direct Action*

As noted above, some allegations can be proven or disproven without the need for a full investigation.  The prototypical incident is one in which a complainant alleges that a deputy was rude and profane during the vehicle detention of the complainant.  An initial review of the body camera footage captures the entire encounter and either proves or disproves the allegations of rudeness and profanity.  In this case, other than a full interview of the complainant (to ensure that all of the concerns are catalogued) there is no need to interview other witnesses or even the deputy to determine whether a violation of policy and Departmental expectations occurred.  Such cases are better handled as "direct actions" whereby the case directly moves to the review phase.  When the evidence establishes a violation, appropriate action is then taken; when it disproves the allegation, no additional action is necessary.

In cases in which external evidence clearly establishes a violation of policy, some agencies will interview the subject deputy in order to learn the degree to which the member accepts responsibility for the transgression.  In cases in which a deputy takes responsibility, the penalty for the violation may be mitigated for that recognition of culpability.

It is important that "direct action" be used in cases only where the external evidence is clear that a policy violation either did or did not occur.  But a modified version of "direct action" has been used by some agencies effectively whereby a more limited investigative plan is devised that will either establish or refute the allegations.

*Use of the Non-investigative Intervention*

For allegations of minor misconduct, the "coaching" intervention may provide a more effective alternative intervention.[34]  Similar to the direct action process described above, supervisory interventions are intended to promptly address the received concern without the need for a full-blown investigation.

As noted above, such interventions have already been authorized for PSB to deploy in some limited situations.  MCSO maintains that there could and should be a wider array of scenarios for which direct intervention could be used.  Should a CPA be instilled as part of the real-time case vetting intake process, additional categories of cases might be considered as candidates for the non-investigative intervention option.

---

[34] We use "coaching" as a short-hand for other interventions that are available to MCSO for these types of allegations.

MCSO suggests that this writer identify which types of complaints might best be handled through non-investigative detentions.  This writer believes that it is premature to do so, considering that any increase in the types of complaints eligible for non-investigative interventions should be reliant on the creation of a CPA.  The vision here is that the CPA would be instrumental in working with the parties and the Monitoring team to develop protocols on which additional allegations would be appropriate for handling through supervisory interventions.[35]

*Reconsideration of Routing Investigations to the Districts or Division for Handling*

As noted above, over the years PSB has assigned cases to the Districts or Divisions (hereinafter "District") for handling.  However, recently MCSO has reconsidered whether it is effective and efficient to continue to do so.  The review and quality control needed for PSB to ensure that a District investigation meets industry standards may create inefficiencies that do not exist if an investigation stays within the Bureau.  Moreover, the District's own internal review process slows down the completion of such investigations.

There are direct and collateral advantages to having some investigations handled by the Districts and Divisions, beyond the mere need to bring "all hands on deck" to address the untimely case load.  With careful supervision to ensure quality control and the appropriate approach, District and Division sergeants assigned to internal investigations learn a valuable skill set and gain increased integration into the organization's overall accountability process.

The notion of the discipline process as a shared management responsibility, rather than an unpleasant task relegated to a small group and ideally kept at a distance, is important to creating a culture in which standards and accountability matter.  These advantages to sharing MCSO employee accountability responsibility with field supervisors and command staff should be considered in determining the advisability of removing the investigative responsibility from the Districts and Divisions.[36]

If MCSO is determined to eliminate these referrals, it will potentially put additional burdens on PSB.  At the same time, it will reduce the need for the Districts to assign

---

[35] Plaintiffs and the United States have suggested that MCSO identify minor policy violations that would be appropriate for supervisory intervention.  Instead of relying entirely on classes of violations, a more effective approach is to use the "Category Classification" as only one factor in determining whether an allegation would be appropriate for non-supervisory interventions.  Plaintiffs and the United States further suggest that this writer evaluate how MCSO supervisors have used the discretion already received.  This writer notes that the Monitor has assumed this responsibility and regularly report on how this discretion is being used.  See e.g., the Monitor's 30th Quarterly Report (Approving of MCSO's decision to send seven cases to non-investigative interventions.)

[36] One way in which Districts and Divisions will continue to be necessarily involved in the accountability process is their central role in ensuring effective non-disciplinary interventions.

investigators to conduct such investigations.  That reduction in workload should result in MCSO being able to free up some District-assigned sergeant to PSB.[37]

*Handling of Allegations Received over a Year After the Incident*

As set out above, MCSO has suggested that the PSB should have discretion not to open investigations into allegations received over a year after the incident complained of.  MCSO does recognize that certain allegations necessarily should be investigated no matter when received.  While older allegations do create challenges to the investigative process (locating witnesses, memory and recall issues, physical evidence no longer exists), there should not be a bright-line rule that would automatically reject allegations simply because they were not timely received.  For example, if the complainant has a reasonable explanation for why she did not file a complaint sooner, the case should be investigated.  Moreover, if there are sufficiently detailed leads relating to the allegations, an investigation designed to pursue those leads should be crafted.

This writer recommends that allegations in this "delayed submission" category be specially handled.  For those allegations involving a member of the Plaintiff class, allegations of criminal misconduct, allegations of bias, or allegations for which a sustained violation would result in revocation of the principal's AZPost certification, an investigation should be opened.  For other allegations received a year or longer after the incident complained of, the PSB Commander should consider whether to open an investigation (in consultation with the CPA) or potentially work with the CPA to customize the investigation considering the following factors:

- The age of the allegation;
- The nature of the complaint;
- The reason for the delayed filing;
- What physical evidence exists relating to the allegation and incident;
- Whether the subject is identified in the complaint or during a complainant interview;
- What additional leads may be available to investigate.[38]

---

[37] MCSO suggests that it is premature to presume that there would be a shift in burdens between the field and PSB if investigations stop being assigned to field supervisors.  MCSO suggests that any recommendation in this area reflect this uncertainty until and if MCSO makes this change permanent.

[38] For this type of complaints and those involving former employees, Plaintiffs and the United States indicated they are open to modifications except for the following type of complaints:
    Allegations of excessive force with serious injury or the failure to report force;
    Dishonesty or other potential Brady violations;
    Concealing of serious misconduct;
    Allegations in which the penalty is 80 hours of discipline or dismissal;
    Allegations for which an employee could be decertified.

*Addressing Complaints about Former Employees*

As noted above, MCSO has sought the discretion not to open an investigation if an allegation is received involving a former employee, or to summarily close an investigation if an employee leaves the organization.  In its proposal, MCSO indicates that "significant" investigations would be opened even if the named subject is no longer employed.[39]

For cases in which an allegation is received that involves a named employee who is no longer employed by the organization, it may be appropriate to afford the PSB Commander (in consultation with the CPA) discretion not to open the investigation.  For allegations involving a member of the Plaintiff class, allegations of criminal misconduct, allegations of bias, or allegations for which a sustained violation would result in revocation of the principal's AZPost certification, an investigation should be opened. Moreover, for cases in which the allegations suggest weaknesses in systemic issues such as training or policy, a modified inquiry should be designed (in consultation with the CPA) so that such issues can be identified and remediated.[40]

Meanwhile, cases in which the focused employee leaves the agency during the pendency of an open case should not be summarily closed.  While the investigation may be challenged by the unavailability of the former employee to sit for a subject interview, and there may be a need to alter the investigative plan as a result of the employee departure, the case should not be summarily aborted simply based on the employee's separation from service.  There are benefits to completing the process that extend beyond the employment status of an individual member of the agency.

---

MCSO urges immediate adoption of this proposal so that change can occur in short order. However, the factors set out here presuppose a process where the CPA is involved in the ultimate routing and classification decision.

[39] MCSO suggested in its filing that factors relevant to the exercise of discretion would include: the severity of the alleged misconduct and whether the allegation involves a supervisor's failure to properly supervise and/or take corrective action for misconduct that the supervisor knew or reasonably should have known about. MCSO advised that such discretion would not apply to allegations involving a member of the Plaintiff class, allegations of criminal misconduct, allegations of bias, allegations involving others who are current MCSO employees, or allegations for which a sustained violation would result in revocation of the former employee's AZPOST certification. Under MCSO's proposal, the Commander of the PSB would document the reasons for not initiating an investigation.

[40] MCSO urges immediate implementation of this proposal.  Again, the Recommendation presupposes the participation of a CPA as indispensable to the process prior to implementation.

*Addressing Complaints that Are Withdrawn, or Where the Complainant is Unwilling to Cooperate*

As noted above, MCSO seeks the discretion to close investigations where the complaint is withdrawn, or the complainant is unwilling to cooperate.[41]  In this writer's view, the mere fact that the complainant withdraws her complaint is not a sufficient basis to close an investigation.  Complainants may be motivated in a number of ways to "withdraw" a complaint, many of them having nothing to do with the legitimacy of the complaint.  Just as a plainly frivolous complaint is not made substantively meritorious by the intensity of a complainant's interest in it, a withdrawn complaint does not inherently obviate the existence of issues that warrant the agency's attention.

When a complainant is unwilling to cooperate with an investigation, it admittedly presents challenges to a full collection of facts for the investigator.  However, the mere lack of cooperation should not be the basis for a summary closing of the complaint.  In such cases, the PSB Commander should consult with the CPA and consider first whether the intercession of the CPA might regain cooperation of the complainant.  If such efforts prove unsuccessful, the PSB Commander should consult with the CPA to consider whether a modification in the investigative plan is in order but should not close out a case simply due to the complainant's lack of cooperation.[42]

*Addressing Anonymous Complaints*

Anonymous complaints create special challenges for investigators.  First, the inability to gain further information from the complainant often leaves investigators with non-specific allegations and few leads.  For anonymous complaints, the investigative plan should be specially tailored.  When the allegations provide detailed allegations with discrete leads, the investigation should pursue those leads.  In cases in which the

---

[41] MCSO suggested in its filing that factors relevant to the exercise of discretion regarding whether to terminate an investigation under this subparagraph would include: the severity of the alleged misconduct, whether the allegation involves criminal misconduct, whether the allegation involves a supervisor's failure to properly supervise and/or take corrective action for misconduct that the supervisor knew or reasonably should have known about, and whether the allegation involves additional principals who are current MCSO employees.  MCSO's proposed that this discretion would not apply to complaints that involve a member of the Plaintiff class, allegations of bias, or allegations that would result in revocation of AZPOST certification if sustained. Under MCSO's proposal, the Commander of the PSB would document the reasons for terminating an administrative investigation.

[42] MCSO urges prompt adoption of this change.  While, as stated above, this writer supports additional discretion on how to handle such allegations, it again presupposes the participation of an independent CPA in the process prior to adoption.

allegations provide little to pursue, the PSB Commander, in consultation with the CPA, should develop a modified plan following what leads may exist.[43]

*Creation of Internal Mechanisms to Monitor Length of PSB Review*

Last year, after a change in leadership at PSB, it was learned that *completed* PSB investigations often languished for months without any meaningful activity.  It was discovered that PSB supervisors responsible for review were also delegated responsibility for requesting the case extensions and were more than willing to grant themselves extensions.  As a result, instead of conducting timely reviews, those supervisors continued to request extensions, resulting in an extraordinary delay of the review process.

While the change in PSB leadership has rescinded that delegation of responsibility for extension requests, there is no formal internal expectation for how long a reviewer has to complete the process.  With the development of such expectations, the PSB commander could better monitor the pace of the review process and hold reviewers accountable when such expectations are not met.  In addition to the creation of such internal timelines for review, the PSB commander should also create monthly lists of each case under review and flag those cases that are tardy with appropriate intervention.[44]

*Diversion of HR Cases to HR Investigators*

Currently, cases involving allegations of discrimination, harassment, creating a hostile work environment, or retaliation are investigated by PSB.  However, PSB has no particular expertise in these types of allegations emanating from workplace relationships.  Many law enforcement agencies have recognized that this type of investigation, while crucial in identifying and addressing serious misconduct, is best handled by civilians with special training in workplace issues.  The most effective models include referring such matters to individuals with special training in the laws of discrimination, harassment, and retaliation.  Potential candidates for such investigations might include Human Relations ("HR") staff who are trained and experienced in workplace investigations, contract HR professionals with relevant training, as well as attorneys who have specialties and experience in the area.  These third parties could not only initiate investigations and uncover facts that either corroborate or refute the particular allegations, but also could work with MCSO to create a workplace

---

[43] MCSO urges prompt adoption of this change.  While, as detailed above, this writer supports additional discretion on how to handle these types of allegations, it again presupposes the participation of an independent CPA in the process prior to adoption.

[44] PSB uses a database called IAPRO to track its cases.  However, PSB has yet to take full advantage of those tracking capabilities that are available in the database.

environment through training and other proactive interventions that will reduce the likelihood that such corrosive activity will reoccur.[45]

*Developing a Restorative Justice Alternative Dispute Resolution Program*

An increasing number of jurisdictions are offering a restorative justice approach to addressing complaints in lieu of the traditional investigative model.  This approach, also known as alternative dispute resolution or mediation, provides an opportunity for the complainant and the law enforcement officer to meet in a neutral and confidential setting, with the assistance of a professional facilitator.  The voluntary nature of the process allows both sides to be heard. Complainants talk about the behaviors they felt were harmful or discourteous and help law enforcement officers see the incident from their perspectives.

Sheriffs Office employees have the opportunity to explain what happened from their point of view as well, and often share what kind of information they had going into the situation as well as relevant policies and procedures that may have impacted their decisions. The mediator facilitates the conversation in a safe space, allowing both parties the ability to bring closure to the encounter.  Jurisdictions who have implemented a restorative justice program have spoken approvingly of the effectiveness of the process.  According to their reports, most complainants who participate in the process do feel that they were heard and that their participation impacted deputy future behavior.

In addition to the innate value of having an alternative system for resolving complaints, the creation of a restorative justice system would alleviate the need to investigate some complaints of minor misconduct, such as rudeness, discourtesy, and profanity.[46] Restorative justice could provide a way to resolve disputes more meaningfully and promptly and simultaneously relieve PSB of the need to investigate such allegations.[47]

---

[45] We noted above the exploration already done by MCSO to see whether its Human Resources Bureau might provide an effective off ramp to investigate and address these types of allegations.  Plaintiffs and the United States have indicated that they are open to this modification and agree that attorneys with special training in discrimination, harassment, and retaliation may be better situated than PSB to investigate allegations emanating from workplace relationships.

[46] MCSO recommends that minor misconduct that do not involve the plaintiff class or allegations of bias be eligible for this program and requests additional specificity regarding which complaints would be eligible.  While this report provides a broad description on which types of allegations typically are eligible for this type of interventions, it is premature to provide more specificity without discussions among the Monitor, the parties, and the CPA.

[47] While stating that there has not been a demonstrated need for such a program to reduce the backlog, Plaintiffs and the United States indicated openness to a restorative justice proposal that would be administered by a neutral third party.

*Delegation of Jail In-Custody Death Investigations to Different Entities*

In this writer's experience, for deaths in the jail due to natural causes, the preliminary information in the majority of cases indicates that there are no apparent misconduct or performance issues relating to custody staff.  PSB is not necessarily the best equipped investigative body to investigate such matters.  Some jails with comparable responsibilities have turned over the initial review to the medical leadership in their facilities since the majority of such deaths have an overriding medical component.  If that initial or subsequent review identifies potential misconduct, the matter could always be referred to PSB for an investigation.  However, short of such indicia, such incidents would not require a formal PSB investigation.[48]

*Handling Shooting of Animals Differently*

Currently, when deputies shoot an animal, it is investigated similarly to a shooting at a person.  MCSO reports that it is currently revising its policies to streamline such investigations.  Assuming that there are sufficient investigative efforts to ensure that deputies have met the Sheriff's Office and Court's expectations, such modifications could reduce the investigative resources needed for these incidents.[49]

*Changing the Time-Line for Determining Timeliness of Investigations*

MCSO has requested a modification of the Order so that the measure of timeliness uses the State law metrics of 180 days rather than the shorter periods of 85 days for PSB cases and 60 days for District assigned cases.  Considering the degree of untimely MCSO investigations as set out above, changing the timeliness metric would do nothing to address the fact that cases are concerningly or even egregiously late, even if the 180- day deadline was substituted.  The current time limits were derived from MCSO's own internal guidelines and expectations for completion of investigations.  Moving the goalposts for timeliness would do nothing to address the realities that MCSO is consistently late under either metric, and is not recommended by this writer.

---

[48] MCSO has advised this writer that there has been work started internally to revise policies for investigating in-custody deaths. Plaintiffs and the United States have indicated agreement that entities other than PSB may be better situated to investigate jail in-custody deaths that were due to natural causes.  They indicate openness to reviewing a proposal for how County medical staff would investigate in-custody deaths with considerations to include ensuring that where potential misconduct is present, the investigation is not delayed, and that deaths found to be due to natural causes are still subject to a review to identify all contributing factors.

[49] Plaintiffs and the United States indicate opposition to changing the manner in which MCSO investigates animal shootings and asserts that the proposed changes would not significantly impact the backlog since there are few such shootings.  Those observations notwithstanding, industry standards show the vast majority of law enforcement organizations have different investigative protocols for deadly force incidents when the intended target is an animal as opposed to a person.

## Implementation Costs and Plan: Next Steps

The Court's Order indicates that the Management Expert will be expected to make reasonable efforts to approximate implementation costs.  Costs to implement the above-noted recommendations are not anticipated to be extensive.  Because the County has already budgeted for the vacant positions at PSB, filling those vacancies should not result in a need for increased funding.  Accordingly, the significant outlays to implement the recommendations would be:

- Funding for the Constitutional Policing Advisor position
- The additional 2-3 contract investigators
- Staffing for the Restorative Justice program
- Staffing for Human Resources
- Staffing for Medical Review of natural in-custody deaths

Moreover, the recommendations, if effectively implemented, would result in complaint handling efficiencies that do not currently exist, eventually reducing the resources MCSO would need to satisfactorily ensure that complaints are appropriately handled consistent with the Court's Orders and state law.

With regard to developing an implementation plan, ideally, the parties and the Monitor team would work together to develop the specifics on how to best implement the Recommendations set out above.  Plaintiffs and the United States suggest that the Recommendations be more specific but this writer believes that there is sufficient specificity identified above to develop protocols to implement the Recommendations. And it is expected that the CPA would play a key role in developing the protocols and policies that would effectuate the Recommendations.

That being said, this writer has been informed by the largely failed results of the inter-party discussions on these issues.  Accordingly, this writer further recommends that if the discussions between the parties does not result in any consensus, the CPA develop specific protocols for implementation of the Recommendation and submit to the Court for consideration.

Plaintiffs and the United States suggest that any modifications be subject to a six-month pilot with detailed reporting requirements for the CPA and MCSO.  Plaintiffs and the United States further suggest that MCSO should collect and report data related to the efficacy of its efforts to clear the backlog. This writer disagrees for the need to label any implementation of these Recommendations as subject to a pilot program.  Should the Recommendations fail to deliver the anticipated results, the parties, the Monitor, and the Court can always move to fashion additional modifications to the investigative requirements.  However, this writer does agree that the suggestion by Plaintiffs and the United States for public reporting by both the CPA and MCSO on its efforts to address the backlog would be helpful to ensure ownership of the issue and provide MCSO's

public important information on what it is doing to reduce the timeline for completed cases.[50]

## Projections for "Curing" the Backlog: An Unnecessary Exercise in Speculation

Plaintiffs and the United States maintain that it is essential that there be a projection for when the backlog will be eliminated if the recommendations are adopted.  Moreover, they aver that there should be an estimated projection for the impact each recommended change might have on the backlog.  However, this writer believes that because of the many variables that exist as to which Recommendations will be implemented and when, as well as yet undefined contours of which allegations would be eligible for a non-standard investigative or other response, the request would be an exercise in speculation resulting in non-reliable projections.  As detailed above, the addition of a CPA is crucial to the recommended path forward advanced by this writer, and even if accepted, it is also unclear how long it would take to identify, select, and engage a CPA.  The Central Intake process is also an important aspect of the recommendations, yet it cannot begin as envisioned here until a CPA is on board.  Finally, to the degree that the Recommendations call for an increase in PSB resources, even if accepted immediately, it is unclear when additional investigators could be identified, selected, trained, and assigned cases.

In its papers seeking relief from the Second Order, MCSO endeavored to provide projections but has advised this writer that there is little data support for those numbers.  Moreover, the projection of percentage reductions provided to the Monitoring team and set out above were not supported by detailed data analysis.  Nor have plaintiffs or the United States advanced any projections on how many additional investigators they believe are necessary to eliminate the backlog or how any of the suggestions by either MCSO or this writer would "bend the curve" of the backlog.

Instead of further delaying progress on addressing the backlog by engaging in this "projection" exercise, this writer opts for moving the process forward.  As detailed above, each Recommendation is sound and consistent with best industry practices regarding how best to address allegations of misconduct and create an internal investigative unit that is sufficiently nimble yet responsible to ensure that each complaint is fairly addressed.  The fact that some reforms may have a greater impact on the backlog than others is an academic exercise and does not mean that less impactful reforms should be ignored or discarded.  And certainly, once the reforms are implemented, those responsible for addressing the matter, particularly the CPA, would

---

[50] This writer does not agree with the onerous requirements suggested by Plaintiffs and the United States with regard to MCSO's and the CPA's public reporting, leaving those details to be initially developed by MCSO and the CPA (with input from the parties and the Monitoring team).

be responsible for providing progress reports on how any adopted reforms are impacting the backlog.

## Increasing the Role of the Monitoring Team: An Alternative Remedy

As detailed above, most of the Recommendations advanced by this writer depend on the involvement of an independent Constitutional Policing Advisor to provide a level of trust in affording the PSB Incident Commander more discretion in determining how allegations received are best handled.  While the parties have expressed general support for the concept (albeit with the expressed reservations set out herein), an alternative remedy would be to increase the responsibility of the Monitoring Team to assume the duties of a CPA, as set out in this Report.  Should the CPA Recommendation prove unfeasible, the writer suggests this path as an alternative remedy.

## Conclusion

As discussed above, the existing situation is the product of dynamics that are both complicated and years in the making.  It will not be resolved overnight.

The legacy of past issues also merits continued attention, as does the prevailing national trend toward new paradigms of law enforcement transparency and outside oversight.  While the troubled aspects of MCSO's recent history give added weight to arguments that robust monitoring continues to be necessary, progressive police agencies around the country have come to see it as a potential advantage:  a boon to public confidence and a source of input that might genuinely make their organizations better.

In MCSO's case, the addition of a new Constitutional Policing Advisor could shift the landscape to something constructive and collaborative, even as it enhances external perceptions – and facilitates other needed adjustments to a critical but underperforming process.  We hope this Report will move the parties closer to initiating that step, as well as others that will gain viability in its wake.

## Recommendations

**Recommendation One:  MCSO should increase the size of its PSB investigators by immediately moving to fill all current investigator vacancies.**

**Recommendation Two:  MCSO should increase the size of its contract investigators by at least 2-3 additional personnel.**

**Recommendation Three: MCSO should commission an independent Office-wide staffing study to determine whether the current deployment of line employees**

and first level supervisors is "right sized" considering the requirements and expectations of its served communities.

**Recommendation Four:** The County should retain a Constitutional Policing Advisor to provide internal oversight to its case intake process.

**Recommendation Five:** MCSO should work with the Monitor, the parties, and the CPA to formalize a central intake process for evaluation and assignment of all allegations of misconduct.

**Recommendation Six:** MCSO should work with the Monitor, the parties, and the CPA to formalize a process for direct action.

**Recommendation Seven:** MCSO should work with the Monitor, the parties, and the CPA to determine how greater use might be made of the non-investigative intervention.

**Recommendation Eight:** If MCSO is intent on permanently ending investigation referrals to the District or Division, it should transfer District resources no longer needed to do field investigations to PSB.

**Recommendation Nine:** MCSO should work with the Monitor, the parties, and the CPA to create a new protocol for handling of allegations received over a year after the incident.

**Recommendation Ten:** MCSO should work with the Monitor, the parties, and the CPA to create a new protocol for handling allegations relating to former employees.

**Recommendation Eleven:** MCSO should work with the Monitor, the parties, and the CPA to develop a new protocol for the handling of investigations where the initial complainant is unwilling or unable to cooperate.

**Recommendation Twelve:** MCSO should work with the Monitor, the parties, and the CPA to develop a new protocol for the handling of anonymous complaints.

**Recommendation Thirteen:** MCSO should work with the CPA to create internal mechanisms to further streamline the length of PSB review.

**Recommendation Fourteen:** MCSO should work with the Monitor, the parties, and the CPA to develop a protocol for diverting allegations of work-place violations (i.e., discrimination, harassment, hostile work environment, retaliation) to more skilled entities for investigation.

**Recommendation Fifteen:**  MCSO should work with the Monitor, the parties, and the CPA to develop a Restorative Justice program for alternative dispute resolutions of certain complaints.

**Recommendation Sixteen:  MCSO should work with the Monitor, the parties, and the CPA to have health-related in-custody jail deaths investigated by County medical staff.**

**Recommendation Seventeen: MCSO should work with the Monitor, the parties, and the CPA to create a different investigative protocol for the shooting of animals.**

**Recommendation Eighteen: If the parties cannot achieve a consensus on implementation of these recommendations, the CPA should submit a specific plan for implementation to the Court for consideration.**

**Recommendation Nineteen: Should the CPA concept prove unfeasible, alternatively the Monitoring Team should assume the duties of the CPA as set out in this Report.**

**Recommendation Twenty: MCSO should commit to meeting the deadlines for completion of internal investigations set out in the Second Order**.