Kristen Clarke
Assistant Attorney General
Steven H. Rosenbaum (NY Bar No. 1901958)
Maureen Johnston (WA Bar No. 50037)
Nancy Glass (DC Bar No. 995831)
Beatriz Aguirre (NV Bar No. 14816)
Suraj Kumar (NY Bar No. 5620745)
Special Litigation Section
Civil Rights Division
U.S. Department of Justice
150 M Street NE, 10th Floor,
Washington, D.C. 20002
Telephone: +1 (202) 598-0139
Email: nancy.glass@usdoj.gov

Attorneys for the United States

Cecilia D. Wang (*pro hac vice*)
ACLU FOUNDATION
39 Drumm Street
San Francisco, CA 94111
Telephone: + 1 (415) 343-0775
Email: cwang@aclu.org

Stanley Young (*pro hac vice*)
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306
Telephone: + 1 (650) 632-4704
Email: syoung@cov.com

Attorneys for Plaintiffs (*additional attorneys listed on next page*)

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; *et al.* <br><br> Plaintiffs, <br> and <br><br> United States of America <br><br> Plaintiff-Intervenor, <br><br> v. <br><br> Paul Penzone, in his official capacity as Sheriff of Maricopa County, AZ; *et al*. <br><br> Defendants. | Civil Case No.: 2:07-cv-2513-PHX-GMS <br><br> **JOINT RESPONSE OF THE UNITED STATES AND THE PLAINTIFF CLASS TO THE COURT-APPOINTED EXPERT'S REPORT ON DEFENDANTS' UNTIMELY INVESTIGATIONS** |

Additional Attorneys for Plaintiffs:
Victoria Lopez (AZ 330042)
Christine Wee (AZ 028535)
Benjamin Rundall (AZ 031661)
ACLU Foundation of Arizona
3707 North 7th Street, Suite 235
Phoenix, AZ 85014
Telephone: (602) 650-1854
Email: vlopez@acluaz.org

Amy Heath (*pro hac vice*)
COVINGTON & BURLING LLP

Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
Telephone: + 1 (415) 591-6000
Email: aheath@cov.com

Andres Holguin-Flores (*pro hac vice*)
MALDEF
634 South Spring Street, 11th Floor
Los Angeles, CA 90014
Telephone: +1 (213) 629-2512
Email: AHolguin-Flores@maldef.org

## INTRODUCTION

Over one year ago, this Court issued an Order to Show Cause to address the Defendants' longstanding violation of the Court's injunction requiring that internal investigations be "fully, fairly, and efficiently investigated." Dkt. 2681, Order of Aug. 12, 2021, at 2. The evidence was so overwhelming that Defendants conceded liability for contempt and agreed that any further proceedings should focus on remedies. Dkt. 2663, Joint Report of June 10, 2021, at 2. The Court then selected Michael Gennaco as the Court's management expert to "determine the causes of Maricopa County Sheriff's Office's noncompliance with this Court's injunction and propose measures the Court could order to ensure future completion of internal investigations within the timeframe contemplated by the injunction and state law." Dkt. 2694, Order to Appoint Michael Gennaco, at 2. At that time, MCSO had a backlog of 2,133 cases, with an average of 655 days for the Professional Standards Bureau (PSB) to complete an investigation. Dkt. 2790, Report on Untimeliness of Maricopa County Sheriff's Office Internal Investigations: Challenges and Potential Solutions (Report) (July 2022), at 5-6.

One year later, MCSO has not made meaningful progress in addressing the backlog. As of June 2022, MCSO had a backlog of 2,137 cases, with PSB taking an average of 596 days to complete an investigation—over three times the length allowed by state law, and over six times the length allowed by this Court's orders. *See* Ex. A, PSB Staffing, at 2-3.[1] MCSO continues to

---

[1] Counsel for Defendants agreed that Ex. A could be filed publicly with limited redactions.

leave budgeted positions at PSB unfilled for no legitimate reason. And despite clear requirements in the Court's Second Amended Second Supplemental Permanent Injunction/Judgment Order, Dkt. 1765 (Second Order), supervisory oversight and case management is in shambles—as the Report explains, there are still no expectations for how long a reviewer should take to evaluate a case, no internal timelines for review, and no organized effort to identify what cases are behind schedule and which MCSO personnel are responsible. Report at 34. If nothing changes, PSB will continue to close fewer cases each year than it opens, and the backlog will continue to grow.[2]





Plaintiffs and the United States recommend that the Court build on many of the recommendations in the Report and augment them with oversight necessary to motivate MCSO to achieve lasting compliance as soon as feasible. The Court should issue an order finding Sheriff Penzone in contempt, and establish remedies that address the agency's longstanding resistance to the requirements of the Second Order. First, the Court should create a Constitutional Policing Authority (CPA) and structure the role to address the leadership failures that led to the PSB backlog. The CPA should have independent authority to make decisions about complaint intake and routing, and the CPA's authority should be subject to the review of this Court—not Sheriff Penzone. Second, the Court should require MCSO to address PSB's staffing shortages or face sanctions. MCSO must immediately set deadlines to hire competent candidates to the budgeted but unfilled PSB positions while also taking steps to sustain PSB for

---

[2] The figures above are based on data reported by Mr. Gennaco. *See* Report at 5-6.

the long term. Third, the Court should allow MCSO to prove whether some of the modifications it has long sought will actually reduce the backlog and improve efficiency at PSB. Before ordering modifications to the Second Order, however, the Court should evaluate the effectiveness of the modifications during a pilot, and should require MCSO to regularly report on its progress or lack of progress.

## I.      The Remedy Should Address the MCSO Leadership Failures.

A failure in leadership at MCSO is responsible for the backlog, which has been "years in the making." Report at 39. The Monitor alerted MCSO to a "very substantial backlog of incomplete investigations" in May of 2017. Dkt. 2028, Eleventh Report of the Independent Monitor for the Maricopa County Sheriff's Office (May 5, 2017), at 176. Instead of increasing resources at PSB, MCSO began to seek Plaintiffs' and the United States' agreement to vacate some of the requirements of the Second Order itself. Report at 11. The backlog grew and MCSO still failed to act, despite repeated warnings from the parties, the Monitor, and even, in late 2020, a warning from the Court itself. Dkt. 2576, Order of Dec. 18, 2020, at 2. The Court's comments then are still true now: "Rather than taking the necessary substantive steps to resolve the backlog and process the complaints within the time period specified by the Order, however, the MCSO has repeatedly granted itself . . . extensions . . . while the backlogs continued to increase." *Id*. Since Defendants conceded contempt in June 2021, MCSO has still failed to implement the most basic remedial measure: staffing PSB. MCSO has not even marginally increased the number of investigators assigned to PSB, even though budgeted positions have sat vacant for years. Report at 15.

The Report's key recommendation to address leadership failures is through the appointment of a Constitutional Policing Advisor (CPA) to "potentially increase external confidence in legitimacy and thereby serve as a springboard for other streamlining adjustments to the current system." Report at 2. We agree that the CPA could be one part of an effective remedy to make PSB more efficient and accountable, but the CPA selection and role must reflect the circumstances that led to this predicament. Current leadership is unquestionably responsible for allowing the backlog to grow exponentially while failing to staff PSB

adequately. Thus, any CPA brought in to provide legitimate oversight of PSB should have the independence and authority necessary to change the status quo.

A.    The CPA should be independent.

For the CPA to exercise meaningful oversight of MCSO, this position should have structural independence from the agency. The United States retained Andrew Brunsden, an expert in oversight and organizational management, to advise on potential remedies to address the backlog.[3] In Mr. Brunsden's view, independence is "a cornerstone" of government oversight aimed at reform. *See* Ex. B, Declaration of Andrew Brunsden (Brunsden Decl.), at ¶ 10. To support that independence, the Court should appoint the CPA, after considering recommendations from the Parties, and any requests to fire the CPA should be subject to Court approval. The CPA must also have adequate resources to maintain its independence. The Report suggests the CPA may "recommend additional resources, if necessary, to fulfill his or her responsibilities." Report at 29. In our view, Defendants must appropriately staff and fund the CPA, and the CPA should be able to apply to the Court to compel Defendants to provide additional resources.

B.    The CPA should have appropriate authority.

The CPA should be granted the necessary authority to oversee certain PSB activities, including complaint intake and routing. MCSO has long sought modifications to the Second Order, including expanded discretion to route certain complaints away from PSB altogether. As explained below, the United States and Plaintiffs are open to a process where MCSO may prove that certain modifications will reduce the backlog. *See* Section III, *infra*. But any changes to PSB practices must not sacrifice quality or accountability. Robust auditing of PSB's initial classification decisions by a CPA would reduce the risk that any expanded discretion may be abused.

The Report "envisions a central intake process" in which the PSB Captain classifies and routes the complaint "[w]ith input from the CPA." Report at 28. The Report explains the "work

---

[3] Mr. Brunsden is available to present his opinion to the Court if the Court wishes.

that is done on the front end" is "pivotal to the ultimate efficacy of the investigation and its results." Report at 28. The CPA's role would be to provide "an objective independent voice on intake and routing decisions of allegations of misconduct." Report at 27. But the Report does not recommend a system in which MCSO would be actually required to heed that advice. Instead, the CPA would be able to "appeal" decisions "within MCSO, including up to the Sheriff himself." Report at 26 n.28. The CPA could also issue public reports highlighting its disagreements with PSB. Report at 26.

The Court should structure the CPA's role to ensure that MCSO cannot unreasonably reject appropriate recommendations. The United States and Plaintiffs object to any structure where the CPA's complaint intake authority would be subservient to the Sheriff. The CPA should have independent authority.  It should not be styled as a Constitutional Policing Advisor, but rather as a Constitutional Policing Authority, with the power to resolve disagreements with PSB over complaint intake and classification, or whether MCSO should open an investigation at all. *See* Brunsden Decl. at ¶ 10. Without this authority, MCSO could simply disregard the CPA's input, as it has previously disregarded other recommendations from the parties and the Monitor. Although the Report is correct that the CPA's public reporting is important, Report at 26, there is no reason to think that the CPA's public reports alone would influence MCSO's conduct when five years of public reports by the Monitor have not. The Court's appointment of Daniel Giaquinto as an independent investigator serves as a model for this form of outside review. *See* Second Order at ¶ 296. There, MCSO had demonstrated an inability to conduct certain misconduct investigations in a thorough, objective, or timely manner. The Court properly appointed Mr. Giaquinto to independently see to it that those cases were investigated and findings were reached. Mr. Giaquinto worked with MCSO to conclude the investigations, but his findings were subject to the review of this Court, not Sheriff Penzone. Thus, if the Court appoints a CPA to address the investigation backlog, it should order the following measures:

- Plaintiffs, the United States, and Defendants may recommend candidates for the position, but the appointment of the CPA will be subject to Court approval. The CPA may be removed only for good cause and subject to Court approval.

- The CPA will have the appropriate authority to make intake, classification, and routing decisions.
- Where Plaintiffs, the United States, and Defendants disagree with any decision made by the CPA, they will meet and confer and attempt to resolve disagreements in good faith. Where disagreements cannot be resolved, a party may raise the issue for resolution with the Court.
- The CPA must have adequate resources to fulfill the assigned duties and maintain independence. Defendants must appropriately staff and fund the CPA, and the CPA should be able to apply to the Court for additional resources if Defendants fail to provide them.
- MCSO must provide the CPA with direct access to investigative files and data.
- Based on a review of MCSO files and data, the CPA will make recommendations on how MCSO may improve investigative practices to maximize impact on the backlog.
- The CPA will also evaluate PSB's current practices to identify additional investigative practices that could be improved.
- Where the CPA identifies practices to make PSB activities more efficient that do not require modifications to the Second Order, the CPA will present those recommendations to the parties as proposed policy changes.
- On a monthly basis, the CPA will meet with the parties to report on its activities.
- The CPA will issue public reports on its activities. These reports will not take the place of any public reporting regarding misconduct investigations that MCSO is required to do.

## II.     The Remedy Should Require MCSO to Staff PSB Immediately.

Over one year ago, the Court raised the possibility of sanctioning MCSO as a means to increase PSB's staff. The Court suggested that the Sheriff may need to "realign his personnel" between patrol and PSB because "things may be out of kilter there." *See* Hr'g Tr. (June 3, 2021), at 18:11-18:13. The Court proposed that, once appropriate staffing levels are set, "for every month the sheriff is out of compliance, additional transfers be made into PSB, or a fine is entered against Maricopa County, and that fine will be dedicated to a fund to hire more PSB,

whether external or internal." *Id.* at 18:23-19:2. A year has passed, and MCSO has failed to add any PSB investigators, despite having the funding to do so. Despite the Court's comments, MCSO has not even taken steps to determine how many additional staff are needed to make a dent in the backlog and reduce delays.[4] Before the Court issued the Order to Show Cause and appointed Mr. Gennaco, there were seven vacant investigator positions in PSB. There are *still* seven vacant positions. MCSO has not provided a legitimate reason why these positions remain unfilled. Instead, MCSO has claimed that "additional personnel is [not] the only or best answer to the growing caseload," and insisted that the only path toward compliance was to modify the Second Order. *See* Dkt. 2616.1, Declaration of Kimberly Friday in Support of Def's. Opp. to Mot. for Order to Show Cause, Ex. A, at 2; *see* Report at 11. To our knowledge, however, MCSO has offered no analysis to support this claim. As described in Section III below, we believe MCSO may be given the opportunity to demonstrate the effectiveness of some of its desired modifications. But regardless of the success of any of those endeavors, there is no doubt that PSB is understaffed now.

The Court should not allow MCSO to again postpone addressing PSB's most basic need. To start, the Court should order MCSO to immediately fill the seven vacant investigator PSB positions or face sanctions.

The law supports such a remedy. A coercive civil sanction "intended to deter, generally take[s] the form of conditional fines." *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 629-30 (9th Cir. 2016) (upholding daily fines where contemnors could have complied at any time). Here, MCSO has failed to staff PSB adequately since at least 2017. *See* Dkt. 2167, Independent Monitor's Thirteenth Quarterly Report (Nov. 19, 2017), at 175. It is no surprise that the Report found MCSO's failure to staff PSB adequately is a root cause of the backlog. Report

---

[4] Unfortunately, the Report does not provide this information either. Instead, the Report suggests commissioning a "staffing study," and poses the same question the Court asked a year ago – "whether current field deployment of deputies and sergeants is 'right-sized' for the Sheriff's Office." Report at 16.

at 11. Imposing conditional fines would incentivize MCSO to staff PSB while also guarding against the possibility that MCSO will choose not to do so.

Given the extent of the backlog, seven investigators alone will not solve the problem of MCSO's non-compliance with the Second Order.[5] *See* Report at 15-16. Therefore, the Court should also require MCSO to take steps to regularly build up PSB's investigative strength to a level that will sustain it in the long-term.

The Court should order the following measures:

- Within 60 days, MCSO will fill the currently budgeted vacant positions at PSB through hiring or internal transfer.

- If, after 60 days, MCSO has not filled the vacant positions, MCSO will pay a weekly fine until the positions are filled. The size of the fine will conform to the amount needed to recruit, hire, train, and compensate for one year a new full-time PSB investigator. The fine will be held in a "PSB Staffing Fund" which MCSO may use to recruit, hire, train and compensate new PSB personnel. Within 14 calendar days, MCSO will make an evidentiary showing to the Court to establish the size of the weekly fine.

- MCSO is not permitted to offset the amount of the fine from PSB's existing budget.

- MCSO must maintain current budgeted staffing levels at PSB. After six months, MCSO shall report to the Court on its plan to adequately staff PSB for the long term. The plan may include plans to transfer staff internally or hire additional investigators. The plan will also set out any known barriers to recruiting and hiring high-quality candidates for the positions, as well as plans for overcoming those barriers. Upon consideration of MCSO's plan, the Court shall set additional deadlines.

---

[5] Indeed, at current case closure rates, the backlog will continue to grow each year, even with seven additional investigators. PSB investigators close approximately 17 cases each year. Dkt. 2616, Defs. Resp. in Opp. to Mot. for Order to Show Cause, at 9. PSB has 34 investigators and opens approximately 1,000 cases each year. Report at 5, 15. If 41 investigators work at the current rate, the 697 investigations they would complete each year would not keep up with new cases.

III.    **The Remedies Should Address Poor Investigative Practices that Resulted in Delays, and Remedies Increasing MCSO's Discretion Should Have Accountability Measures.**

The Second Order sets out a roadmap for MCSO on how to efficiently conduct and supervise internal investigations. It contains measures to govern complaint intake, the impartiality of investigators, supervision, case management, and transparency. Yet MCSO claims that it has "prioritized quality over timeliness," and that supervisors instructed investigators to follow a "spreadsheet of investigative tasks" that the monitoring team created for internal purposes. Report at 11. The Report concludes that, as a result, investigators perform "investigative work that was likely not 'necessary' . . . in order to better ensure that the case would be found 'in compliance.'" *Id.* It should be no surprise, when MCSO is requiring investigators to complete unnecessary tasks against their better judgment, that investigations are taking too long.

The Court should require MCSO to correct deficient investigative practices that have led it to this place. The Report describes a variety of recommendations intended to make case management more efficient. But for the most part, the Report declines to explain how, specifically, MCSO should implement the changes. Report at 30.

In our view, the recommendations fall into two categories: (A) changes to investigative strategies that require no modification of the Second Order; and (B) measures that would increase PSB discretion on when to open investigations and therefore require modification of the Second Order. Any changes should be implemented with bright-line rules and accountability.

A.    Recommendations for how to streamline and supervise investigations consistent with the Second Order.

The Report explains that certain types of complaints—when external evidence, such as body-worn camera video is dispositive; when the complainant is "unwilling or unable to cooperate;" and when the complainant is anonymous—would benefit from streamlined investigations focusing on the relevant issues. Report at 29, 33-34, 40. We agree. We have seen evidence that PSB investigators systemically overwork cases, or undertake investigative steps

that are irrelevant or unnecessary to resolve the allegations at issue. Case records we have reviewed indicate a lack of sufficient planning, likely leading to delays that could have been avoided. Brunsden Decl. at ¶¶ 6-7.

In our view, PSB investigators should follow investigative plans that focus on steps likely to uncover evidence that is probative of material disputed facts. The Second Order requires nothing contrary to this reasonable approach. To the extent MCSO takes the position that that the Monitor will find MCSO out of compliance if investigators omit steps that are unnecessary, *see* Report at 11, the Court should order MCSO to identify the purportedly burdensome compliance metrics for consideration initially by the parties and the Monitor.[6]

The Report also recommends that MCSO address supervisory failures within PSB. Because slow supervisory review delays investigations, the Report recommends that PSB establish formal internal expectations for how long review should take, and that the PSB commander create monthly lists of cases under review, responding to untimely investigations with interventions. Report at 34. We agree. These remedies should include improved supervision of open investigations, as the Second Order already requires. Second Order at ¶ 205 (requiring PSB to track ongoing misconduct cases and generate "alerts" to investigators and supervisors when deadlines are not met.). PSB files reflect little evidence of hands-on supervision. Brunsden Decl. at ¶ 6. Investigative planning and direction from supervisors during investigations can help investigators troubleshoot challenges, avoid unnecessary steps, and adjust plans as the investigation progresses. *Id.*

The Court should order the following measures:

- PSB investigators must begin planning their investigations with investigative plans, which must be reviewed by supervisors.

---

[6] The United States has previously requested that MCSO identify the monitoring requirements that it believes are onerous or otherwise require investigators to undertake unnecessary tasks. Dkt. 2616.1, Declaration of Kimberly Friday in Support of Def's. Opp. to Mot. for Order to Show Cause, Ex. D, at 4-6. To date, MCSO has not done so.

- Within 14 days, MCSO must identify for the parties and the Monitor any compliance requirements that MCSO believes require it to take unnecessary investigative steps. The parties shall work collaboratively to resolve these issues and shall bring the matter to the Court for resolution in the event they are unable to reach agreement.

- Once in place, the CPA will regularly audit and report on allegations that are handled through supervisory interventions without investigations overseen by PSB.

- Within 30 days, MCSO shall produce a plan for eliminating undue delays caused by supervisory review. The plan shall include internal expectations for how long each step of the review process shall take, a procedure for producing monthly lists of cases under review by supervisors, and interventions the PSB commander will use to respond to untimely investigations and supervision.

- Once in place, the CPA will assess MCSO's compliance in these areas, determine whether training on investigative planning and supervision is needed, and make recommendations to MCSO to improve MCSO's procedures, as needed.

    B.   <u>Measures that would expand PSB discretion should be implemented with clear requirements and accountability.</u>

The Report recommends that the Second Order be modified to afford greater discretion to the PSB commander to address certain types of complaints without a full investigation. The Second Order was tailored to address MCSO's abuse of discretion and failure to respond to misconduct, and changes to increase PSB discretion may require modifying multiple requirements. *See*, e.g., Second Order at ¶¶ 170, 162 (requiring the MCSO to "investigate all complaints and allegations of misconduct," and defining "misconduct" as any violation of MCSO policies.). The Report does not provide specific recommendations for how to implement the recommended changes, but suggests that the details should be worked out with input from the CPA. In large part, we agree that, in certain circumstances, it would be appropriate for PSB to exercise greater discretion. In our view, so long as there will be a CPA in place by a date certain, some of these modifications need not wait until the CPA is in place. Instead, they should be subject to a pilot, transparency requirements, and assessments before being made final. It is

appropriate to have in place the safeguard of CPA auditing functions and to require MCSO to prove the effectiveness of these modifications before making permanent changes to the Second Order.

First, the Report recommends that PSB should have discretion not to open cases if the alleged conduct occurred more than a year before the complaint was made; or where the allegation involves a former MCSO employee. The Report recognizes that there should not be a categorical rule in these situations. If, for example, there is a good reason for the delay (such as when the complainant is incarcerated), PSB should still open an investigation. And if a principal leaves MCSO while a case is pending, the investigation should not be summarily closed. *See* Second Order at ¶ 171. Regardless, PSB must always open an investigation into certain allegations of serious misconduct.[7] And the PSB commander must always consider certain factors, such as the nature of the allegation and the available physical evidence, when deciding whether to open an investigation. Report at 31 (listing factors).

In large part, we agree that PSB may exercise discretion within these parameters. However, the types of complaints for which MCSO should still be required to open an investigation should be expanded to include: allegations for which a sustained violation *could* result in revocation of the principal's AZPOST certification,[8] allegations of excessive force with serious injury or the failure to report force, allegations concerning dishonesty or other potential *Brady* violations, allegations of concealing serious misconduct, and allegations for which the penalty is 40+ hours of discipline or dismissal. In addition, if the PSB commander decides not to open an investigation under these circumstances, the reasons for the decision must be in writing.

---

[7] The Report recommends that MCSO should still open an investigation for the following allegations: allegations involving a member of the Plaintiff class, allegations of criminal misconduct, allegations of bias, allegations for which a sustained violation *would* result in revocation of the principal's Arizona Peace Officer Standards and Training Board (AZPOST) certification.

[8] Under state law, revocation of certification is rarely mandatory. AZ Admin. Code R. 13-4-109.

The Report also suggests that in cases where external evidence is dispositive of whether misconduct occurred, some law enforcement agencies allow principals to receive a mitigated penalty if they accept responsibility. Report at 29. We suggest that this idea be included in the pilot. In our view, MCSO should have discretion to offer principals the option of receiving the minimum discipline within the applicable discipline matrix range if principals waive their procedural rights and admit culpability for the charged offenses. Certain complaints should not be eligible for mitigated penalties in exchange for admissions.[9]

The Report next suggests that cases emanating from workplace relationships be investigated by HR professionals with special training in discrimination, harassment, and retaliation. Report at 34. We agree with this idea and are open to reviewing a proposal for how MCSO would divert these cases. Existing and new complaints could be diverted in this manner.

Finally, the Report recommends that PSB be permitted to handle certain *external* complaints of minor misconduct through supervisory interventions, rather than assigning investigators to complete a full investigation. Report at 29-30. The Report further recommends that the PSB commander should be able to determine on a case-by-case basis which external complaints of minor misconduct would be eligible for such treatment. Report at 30 n.35.

Under current policy, PSB already has discretion to address certain *internal* Category 1 and 2 allegations through supervisory interventions,[10] an accommodation to which the parties

---

[9] Due to the seriousness of the conduct, the following allegations should not be eligible for mitigated penalties in exchange for admissions: allegations involving a member of the Plaintiff class, allegations of criminal misconduct, allegations of bias, allegations for which a sustained violation could result in revocation of the principal's AZPOST certification, allegations of excessive force with serious injury or the failure to report force, allegations concerning dishonesty or other potential *Brady* violations, allegations of concealing serious misconduct, and allegations for which the penalty is 40+ hours of discipline or dismissal.

[10] The PSB commander has discretion to handle an *internal* complaint of minor misconduct with a supervisory intervention (rather than an investigation) so long as (1) the conduct does not exceed a Category 1, First or Second Offense or a Category 2, First Offense, and (2) the complaint has not already been assigned to PSB. *See* GH-2, *Internal Investigations*, available at https://www.mcso.org/home/showpublisheddocument/500/637583997311970000.

and the Monitor already agreed in 2018.[11] But in our view, it is inappropriate to give PSB discretion to handle all such *external* allegations with supervisory interventions, particularly at the intake stage, when information describing the allegations may be minimal. Category 2 offenses include conduct involving interactions with the public (e.g., improper complaint intake; rude or insulting language; offensive conduct; and unintentionally losing someone's property) and may come to MCSO in the form of an external complaint. Full investigations of these types of complaints may be important to the complainant who feels wronged, and may uncover more serious conduct, such as evidence of bias or retaliation, that would not be appropriate for supervisory intervention and that would not be apparent at the outset of the investigation. Indeed, complaints that allege profiling or disparate treatment due to race or ethnicity may be misclassified as "discourtesy" in the first place, as rudeness or discourtesy can be evidence of racial bias. MCSO itself recognizes the overlap between these areas: MCSO's policy against racial profiling requires deputies to "Avoid[] [the] Perception of Bias" by being "courteous and polite."  CP-8, *Preventing Racial and Other Bias-Based Profiling*, available at https://www.mcso.org/home/showpublisheddocument/218/637898334021800000.

On the other hand, some Category 1 and 2 external offenses are not related to the core issues in this case, such as allegations relating to MCSO personnel misusing County equipment or not using their time productively. MCSO should identify specific additional minor policy violations that it believes would be appropriate for supervisory interventions, as the United States has requested.[12] *See* Dkt. 2617, Joint Reply to Defs.' Resp. in Opp. to Joint Mot. for

---

[11] The change is reflected in a variety of MCSO policies. *See, e.g.*, GH-2, *Internal Investigations*, available at https://www.mcso.org/home/showpublisheddocument/500/637583997311970000.

[12] Requiring MCSO to be specific about the conduct that it believes should be appropriate for supervisory interventions is consistent with this Court's past instructions to MCSO. At a 2018 hearing on MCSO's request to handle minor misconduct through Traffic Stop Annual Report interventions, the Court directed MCSO to identify the specific conduct it wished to handle in this manner: "But I'm not going to resolve it now when you're giving me examples of things without, really, specifics. I love specifics when I have to resolve things." *See* Hr'g Tr. (Feb. 8, 2018), at 27:11-27:14.

Order to Show Cause, at 6-7. The United States and Plaintiffs disagree with the Report's view that the PSB commander consider multiple factors on a case-by-case basis to determine whether an investigation is warranted. Instead, a bright-line rule making specific offenses eligible for supervisory interventions would be more straightforward to implement and fair to deputies.

The Court should order the following measures:

- Within 14 days, MCSO must identify for the parties and the Monitor any Category 1 and 2 external allegations that MCSO believes should be eligible for supervisory interventions. The parties shall work collaboratively to propose a list of eligible allegations for the Court's consideration. In the event the parties are not able to reach agreement, the Court will consider proposals from the parties and will resolve the matter.

- Subject to the pilot and transparency measures described in more detail below, the PSB commander shall have discretion not to open cases where the alleged conduct occurred more than a year before the complaint was made, and for allegations concerning former employees (excluding instances where an employee leaves while an investigation is pending). PSB shall set factors the PSB commander will consider in applying this discretion, and will record the bases for his decisions in writing.

- Within 30 days, MSCO will submit a plan to the Court for an entity other than PSB that could investigate internal allegations emanating from workplace relationships.

- Subject to the pilot and transparency measures described in more detail below, in cases where external evidence is dispositive, the PSB commander will have discretion to offer principals a mitigated penalty if they accept responsibility. The mitigated penalty shall be no lower than the minimum discipline within the applicable discipline matrix range for the charged offenses.

- The PSB commander must continue to open investigations for the following allegations: allegations involving a member of the Plaintiff class, allegations of criminal misconduct, allegations of bias, allegations for which a sustained violation could result in revocation of the principal's AZPOST certification, allegations of excessive force with serious injury or the failure to report force, allegations concerning dishonesty or other potential *Brady*

16

violations, allegations of concealing serious misconduct, and allegations for which the penalty is 40+ hours of discipline or dismissal.

## IV. Any Remedy Should Be Evaluated to Determine Its Actual Impact.

Finally, the Court should consider the potential effectiveness of any remedy at reducing the backlog and the likelihood that it will make PSB more efficient in the long-term. *See Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994). Here, the Report does not assess the potential impact of its recommendations on the PSB backlog. Instead, the Report assigns that role to the CPA, who would "be responsible for providing progress reports on how any adopted reforms are impacting the backlog." Report at 39. If any of the measures "fail to deliver the anticipated results, the parties, the Monitor, and the Court can always move to fashion additional modifications to the investigative requirements." Report at 37.

In our view, before modifying the Second Order, the Court should evaluate the effectiveness of the remedies during a pilot.

### A. Make all remedies subject to a pilot.

Any remedies involving procedural changes or modifications of the Second Order should be subject to a six-month pilot. Setting a defined period for evaluating the efficacy of remedies would help MCSO set benchmarks for decreasing the backlog. Aggressive deadlines may ensure that MCSO makes "serious, vigorous attempts to fulfill its statutory responsibilities." *South Carolina v. United States*, 907 F.3d 742, 765 (4th Cir. 2018); *Melendres*, Dkt. 2191, Order of Jan. 30, 2018, at 3 (requiring MCSO command staff to appear in person at weekly status conferences after the agency failed to meet stipulated deadlines for intervening with "outlier" deputies). A pilot would also provide the parties with an opportunity to closely evaluate MCSO's implementation.

### B. Require transparency measures.

MCSO should also regularly report to the parties and the Court on what progress it is making to address the backlog, including its efforts to staff PSB as described in Section II above. Increased transparency measures would help hold MCSO accountable for making progress, and should not impose an extra burden on MCSO, as it should already be collecting

and considering relevant data on how PSB is conducting its work. *See* Second Order at ¶ 186 (requiring MCSO to maintain "accurate and reliable data regarding the number, nature, and status of all misconduct allegations, from initial intake to final disposition, including investigation timeliness," to "determine the status of misconduct investigations," and to "monitor and maintain appropriate caseloads for internal affairs investigators.").[13]

The Court should order the following measures:

- With regard to any changes in classification procedures, the intake unit should be required during the pilot to prepare a written explanation of the basis for any decision not to open a misconduct investigation. MCSO shall provide the written explanations and related investigative files to Plaintiffs and the United States on a monthly basis.

- During the pilot, MCSO shall report monthly on the size of the backlog, the median length of time for investigations closed during the month, the number and types of complaints it has received and how they were classified, the numbers of investigators and reviewers who have failed to meet deadlines, and whether any failures have been addressed by supervisors.

- After the pilot, the Court should hold a status conference, with the parties submitting status conference statements evaluating the pilot. Following the status conference, the Court could decide whether to finalize any modifications and whether any additional remedies, including additional deadlines to staff PSB, are necessary.

## V.     The Court Should Defer Consideration of Proposed Remedies that are Unlikely to Reduce the Backlog.

The Report makes additional recommendations, including suggesting MCSO change the way it investigates deaths in custody and animal shootings, and recommending that MCSO create a restorative justice program to handle some complaints of minor misconduct. Report at

---

[13] Under ¶ 186, the data should already be available to MCSO in IAPro, the software program that MCSO uses to manage its internal accountability system.

35. In our view, the Court should not adopt these proposals without more information on their actual impact, as they would likely require significant resources to implement.

Restorative justice programs can be an alternative way to resolve conflicts between community members and law enforcement through communication and face to face dialogue. But it is not clear how such a program would reduce the current PSB backlog, and the Report declines to opine on what types of complaints might be suitable.[14] Further, where reliable external evidence proves or disproves an allegation, PSB can resolve the matter through a targeted, efficient investigation. If there is no external evidence, and the deputy denies the allegation, the matter is not appropriate for referral to a restorative justice program, as the complainant is unlikely to obtain a satisfactory resolution from a mediation session with the deputy. If there is no external evidence, and the deputy admits the allegation, further investigation is not required. Plaintiffs and the United States are open to considering a proposal for a restorative justice program administered by a neutral third party, such as a community organization with experience in mediation. But the Court should not require MCSO to devote resources to standing up such a program at this time given the limited impact on the backlog.

The Report also proposes that entities other than PSB may be better situated to investigate jail in-custody deaths that were due to natural causes, and that MCSO change the manner in which it investigates animal shootings. Report at 36. Again, it is not clear what appreciable impact these changes will have upon the PSB backlog. And recent changes MCSO is making, with the cooperation of Plaintiffs and the United States, to its policies governing MCSO's response to jail in-custody deaths and animal shootings may have resolved MCSO's concerns about the burden these incidents impose on PSB.[15]

---

[14] For such a program to be successful, community members and deputies alike must volunteer to participate, and a system must be developed to determine what complaints or deputies are suitable for participation. Such work would be extensive, and the Report did not evaluate whether handling any cases currently pending would be appropriate.

[15] To the extent MCSO contends further changes are warranted, the Court should require Defendants to show why they are needed to decrease the backlog. There appear to be very few

## CONCLUSION

For the foregoing reasons, the United States and Plaintiffs request that the Court appoint a Constitutional Policing Authority; order MCSO to immediately fill the seven investigator vacancies in PSB or else face sanctions; implement changes to PSB practices identified in Section III, subject to a six-month pilot; and require MCSO to demonstrate the impact of any of these remedies through regular reports to the Court.

Respectfully submitted this 16th day of August, 2022.

ATTORNEYS FOR THE UNITED STATES:

Kristen Clarke
Assistant Attorney General
Civil Rights Division
Steven H. Rosenbaum
Chief, Special Litigation Section
Maureen Johnston
Acting Deputy Chief (WA Bar No. 50037)
By: /s/ Nancy Glass
Nancy Glass (DC Bar No. 995831)
Beatriz Aguirre (NV Bar No.14816)
Suraj Kumar (NY Bar No. 5620745)
Trial Attorneys
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
150 M Street NE, 10th Floor,
Washington, D.C. 20002
Telephone: +1 (202) 598-0139
nancy.glass@usdoj.gov

ATTORNEYS FOR PLAINTIFFS:
By: /s/ Cecillia D. Wang
Cecillia D. Wang (pro hac vice)
ACLU FOUNDATION
39 Drumm Street

San Francisco, CA 94111
Telephone: + 1 (415) 343-0775
Email: cwang@aclu.org

COVINGTON & BURLING LLP
Stanley Young (pro hac vice)
Covington & Burling LLP
Amy Heath (pro hac vice)

ACLU Foundation of Arizona
Victoria Lopez (AZ 330042)
Christine K. Wee (AZ 028535)
Benjamin Rundall (AZ 031661)
3707 North 7th Street, Suite 235
Phoenix, AZ 85014
Telephone: +1 (602) 650-1854
Email: vlopez@acluaz.org

MALDEF
Andres Holguin-Flores (pro hac vice)
MALDEF
634 South Spring Street, 11th Floor
Los Angeles, CA 90014
Telephone: +1 (213) 629-2512
Email: AHolguin-Flores@maldef.org

---

animal shootings, for example, so any changes to investigations of these incidents are unlikely to affect the backlog or timely completion of investigations.

<u>CERTIFICATE OF SERVICE</u>

I certify that on or about August 16, 2022, I filed the foregoing through the Court's CM/ECF system which will serve a true and correct copy of the filing on counsel of record.


*/s/ Nancy Glass*