# Exhibit A

CONFIDENTIAL - ATTORNEY'S EYES ONLY



# Maricopa County Sheriff's Office
Paul Penzone, Sheriff

*Court Implementation Division*

# SITE VISIT PRODUCTION REQUEST

**FOR THE SITE VISIT OF:** July 2022

**SITE VISIT REQUEST #: 1**

**REQUEST:**

"PSB Statistics and Staffing Information for the time period beginning April 1, 2022, and ending June 30, 2022."

**RESPONSE:**

The below listed items are attached as requested:

**PRELIMINARY JULY 2022 SITE VISIT INFORMATION**

**SUBJECT: PSB Statistics and Staffing Information April 1, 2022- June 30, 2022**

**INITIATED INVESTIGATIONS:**
How many total investigations were initiated? (Include all types)- **260**
How many were administrative misconduct investigations? - **161**

- How many were externally generated? **106**
- How many were internally generated? **55**
- How many were assigned to PSB? **260**
- How many were assigned to Districts/Divisions outside of PSB? **0**

How many were critical incidents? **13**

- Were all assigned to PSB? **Yes**
- How many were externally generated? **0**
- How many were internally generated? **13**

How many were criminal misconduct investigations? **4**

- Were all assigned to PSB? **Yes**
- How many were externally generated? **1**
- How many were internally generated? **3**

MELC0003660159



CONFIDENTIAL - ATTORNEY'S EYES ONLY

# Maricopa County Sheriff's Office
**Paul Penzone, Sheriff**

*Court Implementation Division*

How many were service complaints? **82**

- How many were assigned to PSB? **82**
- How many were assigned to Districts or Divisions outside of PSB? **0**

**PENDING INVESTIGATIONS:**
How many total investigations were pending? (Include all types) **2137**
How many were administrative misconduct investigations? **1956**

- How many were assigned to PSB? **1859**
- How many were assigned to PSB sworn investigators? **651**
- How many were assigned to PSB detention investigators? **970**
- How many were assigned to PSB civilian investigators? **238**
- How many were assigned to Districts or Divisions outside of PSB? **116**
- How many were critical incident investigations? **73**
- How many were assigned to PSB sworn investigators? **17**
- How many were assigned to PSB detention investigators? **56**

How many were criminal misconduct investigations? **11**

- How many were assigned to PSB? **11**
- How many were outsourced to an outside agency? **0**

How many were service complaints? **97**

- How many were assigned to PSB? **78**
- How many were assigned to PSB sworn investigators? **27**
- How many were assigned to PSB detention investigators? **0**
- How many were assigned to civilian investigators? **51**
- How many were assigned to PSB criminal investigators? **0**
- How many were assigned to Districts or Divisions outside of PSB? **19**

**CLOSED INVESTIGATIONS:**
How many total investigations were closed? (Include all types) **220**

- How many were administrative misconduct investigations? **113**
- How many were closed by PSB? **94**
- How many were closed by PSB sworn investigators? **26**
- How many were closed by PSB detention investigators? **55**
- How many were closed by PSB civilian investigators? **13**
- How many were closed by Districts or Divisions outside of PSB? **19**

MELC0003660160



CONFIDENTIAL - ATTORNEY'S EYES ONLY

# Maricopa County Sheriff's Office
**Paul Penzone, Sheriff**

*Court Implementation Division*

How many were service complaints? **100**

- How many were closed by PSB? **80**
- How many were closed by PSB sworn investigators? **8**
- How many were closed by PSB detention investigators? **10**
- How many were closed by PSB civilian investigators? **62**
- How many were closed by PSB criminal investigators? **0**
- How many were closed by Districts or Divisions outside of PSB? **20**

How many were critical incidents? **4**

- How many were closed by PSB sworn investigators? **1**
- How many were closed by PSB detention investigators? **3**
- How many were criminal misconduct investigations closed by PSB criminal investigators? **0**

**COMPLETION OF ADMINISTRATIVE MISCONDUCT INVESTIGATIONS:**
What was the average number of days to complete all administrative misconduct investigations?
**562 with Critical Incidents and 553 without Critical incidents**
What was the average number of days to complete PSB administrative misconduct?
investigations? **596 with Critical Incidents and 586 without Critical incidents**

- What was the average number of days for PSB sworn investigators?
  **919 with Critical Incidents and 882 without Critical incidents**
- What was the average number of days for PSB detention investigators?
  **518 with Critical Incidents and 522 without Critical incidents**
- What was the average number of days for PSB civilian investigators? **266**
- What was the average number of days to complete administrative misconduct investigations by District and Division personnel outside of PSB? **386**

**PSB CASELOADS**
What was the average caseload for all PSB investigators? (Include all incident types) **60**

- What was the average PSB sworn investigator caseload? **54**
- What was the average PSB detention investigator caseload? **68**
- What was the average PSB civilian investigator caseload? **48**

**PSB STAFFING**
What was PSB's overall staffing? **57**

- How many were sworn investigators? **12**
- How many were detention investigators? **15**
- How many were civilian investigators? **6**
- How many were supervisory staff? **5**

MELC0003660161

CONFIDENTIAL - ATTORNEY'S EYES ONLY



# Maricopa County Sheriff's Office
**Paul Penzone, Sheriff**

*Court Implementation Division*

- How many were administrative functions staff? **11**
- How many were assigned to the review of District and Division cases? **1**
- How many were criminal investigators? **2**
- How many were assigned to criminal case review? **1**
- How many were assigned as criminal support personnel? **2**
- How many were security personnel? **2**

**Author of Response:** ▬▬▬▬▬▬

**Bureau/Division:** Professional Standards Bureau

**Date of Response:** 07/07/2022

**ATTACHMENTS:**

- None

MELC0003660162

# Exhibit B

| | |
|---|---|
| Kristen Clarke<br>Assistant Attorney General<br>Steven H. Rosenbaum (NY Bar No. 1901958)<br>Maureen Johnston (WA Bar No. 50037)<br>Nancy Glass (DC Bar No. 995831)<br>Beatriz Aguirre (NV Bar No. 14816)<br>Suraj Kumar (NY Bar No. 5620745)<br>Special Litigation Section<br>Civil Rights Division<br>U.S. Department of Justice<br>150 M Street NE, 10th Floor,<br>Washington, D.C. 20002<br>Telephone: +1 (202) 598-0139<br>Email: nancy.glass@usdoj.gov<br><br>Attorneys for the United States | Cecillia D. Wang (*pro hac vice*)<br>ACLU FOUNDATION<br>39 Drumm Street<br>San Francisco, CA 94111<br>Telephone: + 1 (415) 343-0775<br>Email: cwang@aclu.org<br><br>Stanley Young (*pro hac vice*)<br>COVINGTON & BURLING LLP<br>3000 El Camino Real<br>5 Palo Alto Square, 10th Floor<br>Palo Alto, CA 94306<br>Telephone: + 1 (650) 632-4704<br>Email: syoung@cov.com<br><br>Attorneys for Plaintiffs *(additional attorneys listed on next page)* |

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; *et al.*<br><br>                    Plaintiffs,<br>and<br><br>United States of America<br><br>                    Plaintiff-Intervenor,<br><br>        v.<br><br>Paul Penzone, in his official capacity as Sheriff of Maricopa County, AZ; *et al.*<br><br>                    Defendants. | Civil Case No.: 2:07-cv-2513-PHX-GMS<br><br>**DECLARATION OF ANDREW BRUNSDEN IN SUPPORT OF JOINT RESPONSE OF THE UNITED STATES AND THE PLAINTIFF CLASS TO THE COURT-APPOINTED EXPERT'S REPORT ON DEFENDANTS' UNTIMELY INVESTIGATIONS** |

Additional Attorneys for Plaintiffs:
Victoria Lopez (AZ 330042)
Christine Wee (AZ 028535)
Benjamin Rundall (AZ 031661)
ACLU Foundation of Arizona
3707 North 7th Street, Suite 235
Phoenix, AZ 85014
Telephone: (602) 650-1854
Email: vlopez@acluaz.org

Amy Heath (*pro hac vice*)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
Telephone: + 1 (415) 591-6000
Email: aheath@cov.com

Andres Holguin-Flores (*pro hac vice*)
MALDEF
634 South Spring Street, 11th Floor
Los Angeles, CA 90014
Telephone: +1 (213) 629-2512
Email: AHolguin-Flores@maldef.org

I, Andrew Brunsden, declare as follows:

1. I am Deputy Commissioner of Legal Affairs and General Counsel for the New York City Department of Investigation (DOI), the City's independent oversight agency. In this position, I serve as the agency's chief legal officer and Inspector General (IG) for internal investigations. I have been at DOI since 2013 and was previously an IG for City agencies for over eight years. As IG, I supervised units of investigators, attorneys, and auditors on criminal and administrative investigations of fraud, waste, abuse, and ethics and policy violations. In addition to individual misconduct cases, I have managed systemic investigations that identified operational deficiencies and recommended corrective action, including review of the New York City Police Department's response to protests after the killing of George Floyd. Before DOI, I was a law firm associate and a law clerk to judges on the U.S. Court of Appeals for the Second Circuit and the U.S. District Court for the Central District of California. I received my J.D. from UCLA School of Law, M.Litt. in Philosophy and Anthropology from the University of St. Andrews, and B.A. in Political Science and Philosophy from the University of Michigan. Currently, I am an Adjunct Professor of Law at New York Law School, and have spoken at conferences and published articles on oversight and investigations, including a recent law review article on the core value of independence to the performance of government oversight. For additional background, see https://www1.nyc.gov/site/doi/about/bio-andrew-brunsden2.page. The views I express in this declaration are my own.

2. I was retained in 2022 by the Department of Justice Civil Rights Division (hereinafter DOJ) to consult on recommending remedies for the Maricopa County Sheriff Office's (MCSO) backlog of internal investigations and compliance with the Court's orders in *Ortega Melendres v. Penzone*.

3. I conducted a review of MCSO internal investigations. Specifically, I reviewed 31 case files. This review included a sample of 21 cases, which had been opened on various dates between 2018 and 2020. I selected these cases from MCSO's spreadsheet of cases closed between January 1, 2020 and December 31, 2021 based on several categories, including cases assigned to investigators with both high and low numbers of closed cases related to patrol and detention; cases

involving unbecoming conduct and bias allegations, as well as multiple allegations; and cases with individuals ranked above Sergeant or posse members as principals. The review also included the 10 cases that MCSO produced to the Court Management Expert (ME). I have reviewed other relevant materials including all materials that MCSO provided to the ME, court orders and filings, MCSO policies, PSB trainings, PSB semi-annual reports, Bureau of Internal Oversight audits of PSB, MCSO's 2021 annual report on the complaint intake testing program, correspondence among the parties, and sections of Monitor reports. I also reviewed the ME's Report to the Court. This declaration represents a brief summary of my initial findings on the backlog, not a full report.

4.  Based on my review and background in investigations, I conclude that systemic failures in MCSO's management of internal investigations have driven the backlog of cases. However, I provide this opinion with the qualification that the record lacks sufficient information to provide a complete analysis of the factors creating the backlog or full evaluation of proposed solutions. This qualification highlights limitations in the findings and recommendations of the ME Report, as well as the need for case file assessment, data analysis, and further clarification of MCSO's current investigative practices to pinpoint the backlog's causes with specificity, design remedies tailored to those causes, and project their impact on reducing the backlog.

5.  The ME found MCSO's stated prioritization of compliance with "quality over timeliness" requirements likely resulted in unnecessary investigative steps, ME Report at 10-11, but he did not identify specific investigative practices that may contribute to delays.[1] Case file review is an important tool to determine these causes. My file review to date identified MCSO case management decisions that undermine timeliness.

6.  First, case records indicate a lack of sufficient planning by investigators and active management by MCSO supervisors. I did not find any evidence of specific investigative plans developed at the onset of cases in consultation with supervisors or regular case review meetings between investigators and supervisors during investigations. In my experience, investigators who

---

[1] Although the ME Report points to the MCSO checklist of investigative steps, it does not itemize which checklist steps – most are documentation and retention requirements – cause delays. *See* ME Report at 11.

4

develop plans tailored to a particular case and consult with supervisors on such plans are more likely to perform effective and efficient investigations. Records suggested that supervisors' involvement is limited to tasks such as granting extension requests and reviewing completed investigations. In my view, closer supervision during open investigations can assist investigators in developing skills and ensure that they are using their time efficiently. Regular case review meetings allow supervisors to set and enforce deadlines, troubleshoot challenges, adjust plans, avoid unnecessary steps, and address priorities across an investigator's caseload. While I found examples of case work involving adequate steps, I also found instances of shortcomings, including the following:

- Delays scheduling interviews, such as a case (IA2017-0468) where the complainant was interviewed more than two years after the complaint, when the matter was reassigned to a new investigator; a case (IA2018-0458) involving a one-and-a-half year delay between the witness and principal interviews; and another case (IA2018-0343) involving an apparent gap of four months between conducting a principal interview and completion of most other steps.
- Delays requesting information, such as a case (IA2018-0343) with a request for a dispatch call after the six-month retention period expired.
- Unnecessary or tangential research, such as a case (IA2020-0517) alleging a detention officer's utterance of the "N-word" where the investigator searched online dictionary definitions of the term; a case (IA2020-0700) alleging concerns about off-duty MCSO officers providing traffic control for a parade during the COVID-19 pandemic where the investigator conducted online legal research on law enforcement authority to enforce local emergency declarations; and another case (IA2021-0405) alleging rudeness by a responding officer where the investigator had body worn camera footage of the interaction, but nonetheless obtained immaterial information, such as street maps.
- Insufficient application or synthesis of facts in closing reports, as discussed further below.

Closer supervision and proper planning during ongoing investigations could help address such issues. Documentation of plans, case reviews, and deadlines also enhance accountability and productivity.

7. In addition, case files revealed that investigators often write long closing memoranda. I calculated the average length of closing reports in these cases to be approximately 33 pages, excluding attachments.[2] Given the nature of the allegations and the facts, I estimate that the reports in most of these cases could have been reasonably streamlined to a length in the range of approximately 3 to 10 pages. Instead, the closing reports often included extensive descriptions of witness interviews that approached verbatim transcriptions and discussed details that had little to no bearing on resolving the allegations, rather than focus on summarizing key statements and applying the facts to resolve the allegations. This was done despite investigators recording the interviews and, in some cases, already having full transcriptions of the interviews separately documented. The level of detail in these prolix reports was rarely tied to the complexity of allegations and was usually unnecessary to explain findings, justify determinations, or facilitate supervisory review. Consequently, investigators appear to utilize valuable time writing excessively detailed reports, rather than investigating cases, and supervisors appear to be mired in review of these reports. Concise reports and more active supervision can both support findings and expedite timely completion.

8. Data analysis is another important tool to determine the causes of delay that could help to pinpoint additional ways an investigation is delayed and estimate the overall impact of those delays. While the ME properly recognizes the need for additional resources, ME Report at 22-23, consideration of available data on existing resources is useful to analyze investigator assignments and performance.

9. The ME's key recommendation is the appointment of a Constitutional Policing Advisor (CPA), who would oversee the process of implementing other recommended changes to PSB practices. ME Report at 23-27.

---

[2] This calculation does not include the shortest (10 pages) and longest (195 pages) reports.

10. Appointment of a CPA with clearly defined responsibilities could promote efficiency and confidence in classification decisions under a modified intake system and other efforts to address the backlog. The critical question is how best to structure the CPA's oversight role related to MCSO in light of the persistent management issues that have led to the backlog. Independence is a cornerstone of oversight directed at reforming deficient government practices. Independence requires that the oversight actor have a sufficient degree of insulation from outside interference or pressure in order to provide objective review and determinations. A separation of duties between programmatic and oversight responsibilities is standard practice to promote such independence. Accordingly, if an independent CPA is sought, I propose that the CPA should operate as an auditor who reviews MCSO's intake classification decisions, as well as other changes to address the backlog. To the extent that classification decisions reside with the PSB Commander, the CPA would review such decisions, rather than participate in them in the first instance. Nonetheless, independence does not require disengagement, as the ME states in describing a vision for the CPA. Part of the auditor function may involve attending MCSO intake meetings and consulting on criteria for classification decisions. Another component of independent oversight that will be crucial for any CPA to succeed in an auditor role is sufficient authority to pursue remedies when the CPA identifies deficiencies. Oversight entities that serve an auditor function often have authority to monitor an agency's performance and make recommendations that address deficiencies to which the agency is required to respond. Here, in light of MCSO's prior compliance failures and continued challenges with the backlog, additional authority to compel or correct action in certain contexts, such as classification decisions which the CPA deems erroneous, is a valid consideration to enforce appropriate reform.[3]

11. In light of MCSO's longstanding compliance issues, for a remedy to be effective, it should be tailored to a comprehensive understanding of the deficiencies. While the ME's findings

---

[3] In addition to the independence rationale for an auditor function, resource constraints suggest it is unrealistic to expect that a CPA with review responsibilities will also have the capacity to be involved in processing the high volume of intakes, classifying the allegations, and developing investigative plans.

and recommendations are a useful point of departure, my opinion is that additional file review, data analysis, and evidence gathering is necessary to identify the specific reforms that will address the MCSO management and leadership failures at the heart of the problem. Upon adoption of reforms, MCSO, and any CPA, should be directed to collect data related to implementation in order to track the progress of efforts to reduce the backlog and ensure reporting documents those efforts. This would include data on complaint classification under a central intake process, investigator assignments and closed case rates, supervisor assignments and length of the review process, and other relevant data points. To pursue accountability and transparency in addressing the backlog, it is imperative that reforms target the systemic defects in MCSO's investigative and review practices, and then regularly document and report on reform efforts.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief, and that this Declaration was executed this 15th day of August, 2022.

By: /s/ *Andrew Brunsden*
Andrew Brunsden