# Comments on the Draft Thirty-Second Report of the Independent Monitor for the Maricopa County Sheriff's Office provided by the Plaintiff Class
## August 3, 2022

Pursuant to Paragraph 132 of the Court's First Supplemental Permanent Injunction/Judgment Order (First Order), Doc. 606, Plaintiffs' comments on the draft of the Thirty-Second Report of the Independent Monitor for the Maricopa County Sheriff's Office (32nd Draft Report), which covers the first quarter of 2022, January 1-March 31, 2022.

## Introduction

Plaintiffs focus their comments on issues of Training (Section 6), Traffic Stop Documentation and Data Collection (Section 7), Early Identification System (EIS) (Section 8), Supervision and Evaluation of Officer Performance (Section 9), Community Engagement (Section 11), Misconduct Investigations, Discipline, and Grievances (Section 12), and Community Outreach and Community Advisory Board (Section 13). As we have seen over the past reporting periods, these sections continue to prove challenging for MCSO in meeting the requirements for compliance as outlined by the Court. Plaintiffs also draw specific attention to the continued, severe PSB backlog which frustrates remediation of class wide issues. As a final note, Plaintiffs are alarmed at the findings in the Sixth Traffic Stop Annual Report (TSAR 6) and more recently with the TSAR 7 (the subsequent seventh report) which still highlight ongoing discrimination in MCSO traffic stops.

## Training

Plaintiffs echo the Independent Monitor's concerns and finding that MCSO is not in compliance concerning Paragraph 42. Draft 32nd Report at 42-43. Plaintiffs find the Monitor's statement that the Training Division did not observe any instructors during the reporting period concerning and echo the Monitor's recommendation that the training division conduct observations at every opportunity to ensure selected instructors continue to demonstrate competency, experience, and expertise. Draft Report at 42. Plaintiffs also echo the Independent Monitor's concerns regarding its inability to determine MCSO's adherence to policy GG-1 and that the Training Division responded to the Independent Monitor that "current staffing levels would delay production of the information" that the Independent Monitor requested especially since the Monitor did not receive any response from the prior reporting period. *Id.* at 43. Finally, Plaintiffs agree with the Independent Monitor's concerns that MCSO is not following its policies as it pertains to Field Training Officers. *Id.*

Regarding Paragraph 43, MCSO should incorporate more role-playing and group discussions into their lesson plans. Plaintiffs recommend that the 32nd Report include information as to why the percentage of classroom instruction went from 93% in the last report to 64% this reporting period, which is close to the 60% minimum requirement for live instruction. *Id.* at 44-45.

With regard to Paragraph 44, MSCO identified 3,266 individuals who require Order-related instructions, which will reportedly occur "by the end of this reporting period." *Id.* at 45. However,

the Monitor did not indicate whether any training has commenced for any of these individuals or when the training will take place in the reporting period. Plaintiffs will find it helpful to include this information in future reportings since the Training Calendar is available.

Finally, with regard to Paragraph 46, the 32nd Draft Report indicates several trainings that require annual review but does not indicate when the annual review will take place or if MCSO has commenced the annual reviews. *See id.* at 46.

**<u>Traffic Stop and Data Collection</u>**

Plaintiffs generally agree with the Monitor's findings in Section 7 of the Draft Report but would note the models used to test for bias as a part of the TSMR pilot are still premature. While much progress has been made to develop an objective model to track bias in traffic stops, the models employed still need significant testing to ensure their reliability and validity. In short, they cannot be considered fully operational as of the date of this report. Plaintiffs also note the following regarding specific paragraphs MCSO must meet to achieve compliance with the Court's order:

<u>Paragraph 54</u> – This paragraph is composed of several subparagraphs detailing information MCSO must collect during traffic stops. The information required to be collected includes basic information such as the "name…of each deputy" up to and including more detailed information like "the Deputy's perceived race, ethnicity and gender of the driver and any passengers based on the officer's subjective impression." This information not only creates a literal (and figurative) paper trail which can be qualitatively and quantitatively monitored for unconstitutional policing concerns, but also serves to provide further answers for why racially biased policing continues to occur at MCSO.

In regard to Paragraph 54.g, Plaintiffs agree with the Monitor's determination MCSO is not in compliance. Plaintiffs note their concern MCSO is still failing to provide required documentation in the form of Incidental Contact Receipts (ICRs) to passengers during stops (and failing to document all stops involving passengers). While Plaintiffs are encouraged to see the compliance rate improve, they would note their concern MCSO deputies found not in compliance are seemingly escaping discipline for a breach of MCSO policy regarding providing these forms during stops.

As to the to the other subparagraphs in this section, Plaintiffs continue to voice concern about some MCSO deputies failing to comply with basic elements of a traffic stop (as required by MCSO policy). Indeed, throughout the report, the Monitor highlights issues with deputies failing to accurately note information in the Vehicle Stop Contact Forms (VSCFs). For example, deputies sometimes forgot to put in information about passengers, the presence of additional deputies on scene, or whether a person was searched (in one case). As indicated above, the VSCF system was created to routinize stops and eliminate bias. If MCSO deputies are unable to meet the basic recording requirements required by the VSCF, they risk undermining a foundational aspect of compliance to reduce pretextual stops.

<u>Paragraph 62</u> – Paragraph 62 requires deputies to turn on body cameras during stops. When deputies turn on their body camera, they must document doing so via a log. Deputies who respond

to assist traffic stops must complete an Assisting Deputy and Body-Worn Camera Log. The Monitor noted that MCSO deputies only had a 75% compliance rate in filling out this log when assisting a traffic stop. Because this log is integral to ensuring compliance with Paragraph 62, Plaintiffs disagree MCSO is in compliance with Paragraph 62.

Paragraph 70 – The Sixth Traffic Stop Annual Report (TSAR) (published by MCSO in June 2021) confirmed Plaintiffs' suspicions that disparities still exist in MCSO's stops which "may indicate a systemic bias within the patrol function" that targets the Latino community. And more recently with the Seventh Traffic Stop Annual Report (published by MCSO in June 2022) which concluded "that there is evidence of disparate outcomes by driver race or ethnicity in traffic stops on most stop outcomes." Plaintiff agrees MCSO is not in full compliance with this section but believes MCSO has not adequately responded to the objective conclusion a "systemic bias" persists at the agency. Indeed, during the last site visit, MCSO seemed to suggest such bias is universal across law enforcement agencies without even acknowledging or addressing the systemic bias that exists agency wide. Plaintiffs disagree the problem is universal, but rather continue to highlight MCSO has failed to expedite training and sincere community engagement to include outreach to members of the Plaintiff Class who are undocumented which will ameliorate bias within the office and cultivated through years of leadership which encouraged racial targeting of the Latino community. Even if Plaintiffs were to assume as true that systemic bias exists within all law enforcement agencies, how does this point get MCSO closer to a goal of eliminating racial bias during traffic stops?

MCSO's Constitutional Policing Plan – While Plaintiffs believe training about the LGBTQ community is important, they also believe MCSO should be required to undergo implicit bias training regarding the Latino community in light of the findings of the Sixth and Seventh TSARs. Additionally, Plaintiffs do not know of any measures employed by MCSO to identify deputy bias against the LGBTQ community. If MCSO pursues enhanced implicit bias training about the LGBTQ community, Plaintiffs believe an objective measure would be valuable to determine if MCSO is reducing implicit bias.

**Early Identification System (EIS)**

While Plaintiffs note that MCSO remains out of Phase 2 compliance with Paragraphs 70 and 72 (Draft Report at 85, 95). a significant aspect of compliance is dependent on the agency to successfully implement an effective EIS with supervisor discussions. As we have highlighted in prior quarters, the EIS program is fundamental for MCSO to successfully identify and stop biased policing on an individual basis and systemically, agency wide. As of early February 2022, MCSO's initial evaluation of NTCF (Non-Traffic Contact Forms) use was approved. MCSO is investigating how these forms are being used across the agency but have not completed this investigation. This is noted to be a key first step that could lead to a more thorough analysis of potential bias across these stops. Draft Report at 116. MCSO has remained at a 95% completion rate since last quarter with regards to implementing an effective Early Intervention System (EIS). Draft Report at 96. MCSO remains at an 80% completion rate for the Traffic Stop Monthly Report. *Id.* at 91.

Plaintiffs urge MCSO to continue to focus on implementing an EIS that is streamlined, easy to use and standardized across the agency. There was a "dramatic increase in Notice of Claim Alerts" from March – May 2020 and there was a backlog of emails regarding those claims. Draft Report at 97. MCSO implemented new internal practices in an effort to avoid such a backlog in the future. It is important that the Legal Liaison Section have efficient and timely communications regarding the claims filed and that this be monitored.

An efficient EIS would ultimately result in supervisors who would be able to identify deputy misconduct consistently and effectively and intervene before further harm is done on the Plaintiff class. Since the EIS database remains limited, MCSO remains out of compliance. Draft Report at 110, 114.

**Supervision and Evaluation of Officer Performance**

It is concerning that MCSO is out of compliance with Paragraph 87. The supervision of Commanders and Supervisors remains an issue because the total compliance rate is 68.89%. Draft Report at 129. MCSO is also out of compliance with Paragraph 92. Deputy and Supervisor EPAs were reviewed and there was a total compliance rate of only 77.78%. *Id.* at 136.

It further continues to be of great concern to the Plaintiffs that MCSO is out of compliance with Paragraphs 95, 97, 98, 99 and 100. As it is still the case, supervisors, agency wide have not been able to demonstrate that they can produce quality supervisory reviews of their deputies. This concern goes together with Plaintiffs' earlier comments on the importance of the Monitor independently ensuring that the EIS is being properly utilized by supervisors in their reviews of subordinates.

In this quarter the EPAs reviewed were at 77.78% compliance. *Id.* at 143. There were four EPAs this quarter where misconduct was alleged and the investigation in the appraisal period was not documented in the EPA. *Id.* The ongoing delay in implementing a database and EIS interferes with the goals of the Court Order to safeguard from practices resulting in discriminatory treatment or profiling.

Last quarter, Plaintiffs noted ongoing concerns with MCSO's deficiencies in holding supervisors accountable for their reviews of subordinates and objected to the Monitor's determination of Phase 2 compliance for Paragraph 99. MCSO is now deemed to be out of compliance with Paragraph 99. *Id.* at 144. It is noted that of the total 45 EPAs reviewed for the quarter, 41 met the requirements. Id. The overall compliance rate was 91.11%. Id.

**Misconduct Investigations, Discipline, and Grievances**

As it has been reported in previous quarters, Plaintiffs agree with the Draft Report's suggestion that upcoming PSB40 revisions and PSB8 (External) training focus on requirements (c), (d), and (e) of Paragraph 178, which focus on weighing credibility, resolving inconsistent statements, and applying the proper burden of proof, as well as the added report requirements of Paragraph 206 (f) and (g) for explicit and precise findings detailing credibility assessments and the standard of proof required to substantiate a finding. Draft Report at 169-70. In past quarters,

4

Plaintiffs repeatedly found that investigations failed to make explicit credibility determinations and failed to resolve inconsistencies. As a result, Plaintiffs agree that additional training on these topics would be beneficial.

Plaintiffs remain concerned that a low percentage of administrative investigations are being completed within the timelines required by the Second Order. This period, only 21% of the investigations reviewed were completed within the required timeframes or contained a reasonable extension request that was specific to the investigation. Draft Report at 180, 193 (¶¶194, 204). Just as significantly, investigations on average take 611 days to close, which is more than seven times as long as the Second Order allows for investigations completed within PSB. *Id.* at 180 (¶¶194, 204). This is a minor decrease compared to the 650 days reported last quarter.

It is also concerning that MCSO remains out of compliance with ¶195 and is understaffed with regards to PSB investigators. Although it has slightly increased the number of investigators in recent months to a total of 32 investigators, the average caseload per investigator remains too high and contributes to the severe backlog of cases. *Id.* at 184-85. The prolonged time for administrative investigation closure also results in evidence being lost, diminished memories, erosion of community trust, and a lack of timely due process for complaining witnesses, including members of the public. This unacceptable delay should be of utmost concern to the agency, which should prioritize immediate measures to reduce the time it takes to complete an investigation.

Plaintiffs share in the Monitor's concern of the PSB Commander's decision to temporarily stop sending cases to the Districts and Divisions for investigations. *Id.* at 187. While the Commander noted that "it will eliminate the need for [PSB] to review these outside cases…" there are negative "short and long-term effects" that will undoubtedly occur. *Id.* There will be an increased workload to an already over-stretched and over-burdened division which will only add to the severe backlog of cases. *Id.* Further, field supervisors need to be proficient at conducting a misconduct investigation. Keeping all cases within PSB, even for a temporary period of time will only have a detrimental effect on PSB and the Districts and Divisions.

Class Remedial Matters (CRMs) continue to be a key priority for the Plaintiff Class. After Plaintiffs' review of the one CRM closed for this quarter, we continue to see PSB investigators failing to investigate evidence of misconduct (¶202) (for example, PSB investigators failing to identify and investigate when deputies conduct an illegal search of a vehicle for contraband and not an inventory search as incorrectly documented in their reports) and improperly applying the evidentiary standard (¶208(b)).

**Community Engagement/Community Outreach Program**

With regard to Paragraphs 109 through 114, the explanations in the 32nd Draft Report are nearly identical to, if not the same as, the 30th and 31st Reports, which suggests no material changes from the last two reporting periods. Draft Report at 151-55. Therefore, Plaintiffs reiterate their comments from the last reporting period regarding paragraphs 109 and 114:

Plaintiffs again object to the Monitor's Phase 2 compliance finding of Paragraph 109. Under this Paragraph, the Court directs the Monitor to "hold at least one public meeting

5

per quarter to coincide with the quarterly site visits by the Monitor in a location convenient to the Plaintiffs class." *Id.* at 151. Plaintiffs believe that a "Deferred" status would have been appropriate given that the site visit took place remotely and the community meeting did not take place. Plaintiffs understand the Monitor's concerns regarding travel due to the COVID-19 pandemic. Plaintiffs have expressed numerous times that a virtual community meeting via a platform like Zoom is feasible. Plaintiffs urge the Monitor to hold a virtual meeting if an in-person one cannot be accommodated due to the ongoing public health crisis.

As with Paragraph 109, Plaintiffs request that Paragraphs 110-112 which pertain to the requirements of public meetings, be changed to "Deferred" status. The Monitor made "Not applicable" findings because the public meetings did not take place due to the ongoing public health crisis. Plaintiffs believe that a "Deferred" finding is appropriate because the Monitor was unable to determine compliance since a community meeting did not take place due to the ongoing pandemic. The Plaintiffs urge the Monitor to hold virtual community meetings if in-person meetings continue to be affected by COVID-19 public health concerns.

With regard to paragraph 114, while the Community Outreach Division (COrD) did not receive any complaints, concerns, or suggestions by members of the public regarding the implementation of the Court's Orders for this reporting period, Plaintiffs urge the COrD to proactively conduct outreach activities in the impacted communities such as hosting virtual meetings. This way, MCSO can hear directly from community members on questions and concerns they may have.

With regard to Paragraph 115 and based on the latest Quarterly Site Visit, Plaintiffs recommend that the 32nd Draft Report include a proposed date by when MCSO responds to CAB members' specific recommendations and feedback Draft Report at 156. For several months now, CAB members have repeatedly asked MCSO and the County, directly and through the monitoring team, to provide updated information on the expenditures of the case. During the latest Quarterly Site Visit, one CAB member in attendance shared the CAB's frustration with recent delays in obtaining a substantive response from MCSO especially with the delays in obtaining the County's to date expenditures on the case. Most notably, the CAB postponed their community meeting due to MCSO's failure to provide the CAB with the requested budget information. Instead of providing the requested County budget information, MCSO directed the CAB to file a FOIA request to obtain the information.

**Community Engagement/MCSO Community Liaison and Community Advisory Board (CAB)**

With regard to paragraph 261, the 30th, 31st, and 32nd Draft Reports appear to have deleted the language in *italics* from the 28th Report without explanation: "CAB continues to explore the possibility of retaining a consultant to conduct a study to identify barriers to the filing of civilian complaints against MSCO personnel, *by researching polling firms that are experienced in working with Latino populations*." *Id.* at 234, *See* 28th Monitor Report at 256. Plaintiffs recommend that

6

the Report indicate whether CAB continues to explore whether it will retain a polling firm with experience working with Latino communities.

With regard to Paragraph 262, the explanation in the 32nd Draft Report is identical to the 30th and 31st reports, which suggests no material changes from the last three reports