# THIRTY-THIRD REPORT

Independent Monitor

for the

Maricopa County Sheriff's Office



Reporting Period – Second Quarter 2022

Chief (Ret.) Robert S. Warshaw

Independent Monitor

December 5, 2022

# Table of Contents

Section 1:  Introduction…………………………………………...…………...3

Section 2:  Methodology and Compliance Summary……………………...............4

Section 3:  Implementation Unit Creation and Documentation Request……………..13

Section 4:  Policies and Procedures……………….…………………………...17

Section 5:  Pre-Planned Operations……………………….…….……………...37

Section 6:  Training……………………………………………………...............42

Section 7:  Traffic Stop Documentation and Data Collection………………...….53

Section 8:  Early Identification System (EIS)…………….……………………...94

Section 9:  Supervision and Evaluation of Officer Performance……….…..............122

Section 10:  Misconduct and Complaints……………………………...............147

Section 11:  Community Engagement……………………………………...........151

Section 12:  Misconduct Investigations, Discipline, and Grievances………...............158

Section 13:  Community Outreach and Community Advisory Board………………237

Section 14:  Supervision and Staffing……………………………………...........238

Section 15:  Document Preservation and Production………………………….242

Section 16:  Additional Training……………………………………...............247

Section 17:  Complaints and Misconduct Investigations Relating to
            Members of the Plaintiff Class…………………………...............248

Section 18:  Concluding Remarks…………………………………...............265

Appendix:  Acronyms……………………………………………...............268

WAI 64929

# Section 1:  Introduction

This is the thirty-third report issued in my capacity as the Court-appointed Monitor in the case of *Manuel de Jesus Ortega Melendres, et al., v. Paul Penzone, et al.* (No. CV-07-02513-PHX-GMS), and documents activities that occurred during the second quarter of 2022, April 1-June 31, 2022.

On May 13, 2016, the Court issued its Findings of Fact in the civil contempt proceedings that commenced in April 2015.  This led to the issuance of a Second Supplemental Permanent Injunction/Judgment Order (Second Order) on July 20, 2016, significantly expanding the duties of the Monitor.  Our reports cover the additional requirements of the Second Order while continuing to document MCSO's compliance efforts with the First Supplemental Permanent Injunction/Judgment Order (First Order) issued in October 2013.  We provide summaries of compliance with both Orders separately, as well as a summary of MCSO's overall, or combined, compliance.

The compliance Paragraphs of the Second Order commence where the First Order ends, and they are numbered from Paragraph 160 through and including Paragraph 337.  Not all are subject to our review.

The Second Order also delineates in great detail requirements in the areas of misconduct investigations, training, discipline and discipline review, transparency and reporting, community outreach, document preservation, and misconduct investigations involving members of the Plaintiffs' class.  The Court granted the Monitor the authority to supervise and direct all of the investigations that fall into the latter category.

As of the last reporting period, MCSO asserted Full and Effective Compliance with 117 Paragraphs of the First and Second Orders, as that term is defined in the First Order.  After review, I agreed with MCSO's assertions.  On June 17, 2022, MCSO asserted Full and Effective Compliance with 10 additional Paragraphs: Paragraphs 42, 43, 47, 113, 114, 173, 174, 178, 179, and 180.  On July 15, 2022, I agreed with all but two of MCSO's assertions, granting MCSO in Full and Effective Compliance with 125 total Paragraphs.  (See Section 2 of this report.)  MCSO retains the obligation to document that the Office remains in Full and Effective Compliance with the Paragraphs so designated.

Because of the COVID-19 pandemic, we once again conducted our July 2022 site visit remotely, in contrast to our regular practice of conducting onsite compliance visits.  Our last in-person site visit was in January 2020.  MCSO's compliance status with individual Paragraphs normally subject to in-person inspections will not be adversely impacted by any missed onsite reviews.  We hope that circumstances change and we return to onsite visits.  In the intervening period, if any adjustments need to be made to assess Paragraph compliance, we will consider additional options that might be available to us.

WAI 64930

## Section 2: Methodology and Compliance Summary

The Monitor's primary responsibility is to determine the status of compliance of the Maricopa County Sheriff's Office (MCSO) with the requirements of the requirements in the Order. To accomplish this, the Monitoring Team makes quarterly visits to Maricopa County to meet with MCSO's Court Implementation Division (CID) and other Office personnel – at Headquarters, in Patrol District offices, or at the office that we occupy when onsite. We also observe Office practices; review Office policies and procedures; collect and analyze data using appropriate sampling and analytic procedures; and inform the Parties and, on a quarterly basis, the Court, about the status of MCSO's compliance.

This report documents compliance with applicable Order requirements, or Paragraphs, in two phases. For Phase 1, we assess compliance according to whether MCSO has developed and approved requisite policies and procedures, and MCSO personnel have received documented training on their contents. For Phase 2 compliance, generally considered operational implementation, MCSO must demonstrate that it is complying with applicable Order requirements more than 94% of the time, or in more than 94% of the instances under review.

We use four levels of compliance: In compliance; Not in compliance; Deferred; and Not applicable. "In compliance" and "Not in compliance" are self-explanatory. We use "Deferred" in circumstances in which we are unable to fully determine the compliance status – due to a lack of data or information, incomplete data, or other reasons that we explain in the narrative of our report. We will also use "Deferred" in situations in which MCSO, in practice, is fulfilling the requirements of a Paragraph, but has not yet memorialized the requirements in a formal policy.

For Phase 1 compliance, we use "Not applicable" for Paragraphs where a policy is not required; for Phase 2 compliance, we use "Not applicable" for Paragraphs that do not necessitate a compliance assessment.

The tables below summarize the compliance status of Paragraphs tracked in this report.[1] During this reporting period, MCSO's Phase 1 compliance rate with the **First Order** remained the same as the last reporting period, at 99%. MCSO's Phase 1 compliance rate with the **Second Order** also remained the same as the last reporting period, at 100%.

---

[1] The percent in compliance for Phase 1 is calculated by dividing the number of Order Paragraphs determined to be in compliance by the total number of Paragraphs requiring a corresponding policy or procedure. Paragraphs with the status of Deferred are included in the denominator, while Paragraphs with the status of Not Applicable are not included. Therefore, the number of Paragraphs included in the denominator totals 183 for Phase 1. The number of Paragraphs included in the denominator totals 208 for Phase 2.

WAI 64931

During this reporting period, MCSO's Phase 2 compliance rate with the **First Order** decreased by two percentage points from the last reporting period, to 78%. This number includes Paragraphs that we consider to be in compliance and those that are now in Full and Effective Compliance (FEC), as described above. (See below for the list of Paragraphs that are in Full and Effective Compliance.) During this reporting period, MCSO's Phase 2 compliance rate with the **Second Order** remained the same as the last reporting period, at 93%. This number also includes Paragraphs that we consider to be in compliance and those that are now in Full and Effective Compliance (FEC), as described above.

| Thirty-Third Quarterly Status Report<br>**First Order Summary** | | |
|---|---|---|
| **Compliance Status** | **Phase 1** | **Phase 2** |
| Not Applicable | 20 | 6 |
| Deferred | 0 | 3 |
| Not in Compliance | 1 | 18 |
| In Compliance | 79 | 73[2] |
| **Percent in Compliance** | **99%** | **78%** |

| Thirty-Third Quarterly Status Report<br>**Second Order Summary** | | |
|---|---|---|
| **Compliance Status** | **Phase 1** | **Phase 2** |
| Not Applicable | 20 | 9 |
| Deferred | 0 | 3 |
| Not in Compliance | 0 | 5 |
| In Compliance | 103 | 106[3] |
| **Percent in Compliance** | **100%** | **93%** |

---

[2] This number includes those Paragraphs that are deemed in Full and Effective Compliance.

[3] This number includes those Paragraphs that are deemed in Full and Effective Compliance.

WAI 64932

| MCSO's Compliance with the Requirements of the **First Order** *(October 2, 2013)* | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Report 1 | Report 2 | Report 3 | Report 4 | Report 5 | Report 6 | Report 7 | Report 8 | Report 9 | Report 10 |
| **Phase 1** | 4% | 10% | 44% | 40% | 51% | 57% | 61% | 60% | 67% | 60% |
| **Phase 2** | 0% | 0% | 26% | 25% | 28% | 37% | 38% | 39% | 44% | 49% |

| | Report 11 | Report 12 | Report 13 | Report 14 | Report 15 | Report 16 | Report 17 | Report 18 | Report 19 | Report 20 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Phase 1** | 63% | 79% | 88% | 85% | 85% | 85% | 85% | 97% | 97% | 97% |
| **Phase 2** | 50% | 57% | 67% | 62% | 65% | 64% | 66% | 77% | 75% | 78% |

| | Report 21 | Report 22 | Report 23 | Report 24 | Report 25 | Report 26 | Report 27 | Report 28 | Report 29 | Report 30 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Phase 1** | 96% | 96% | 96% | 96% | 96% | 98% | 98% | 98% | 98% | 99% |
| **Phase 2** | 76% | 77% | 79% | 82% | 81% | 78% | 79% | 77% | 77% | 79% |

| | Report 31 | Report 32 | Report 33 |
|---|---|---|---|
| **Phase 1** | 99% | 99% | 99% |
| **Phase 2** | 81% | 80% | 78% |

WAI 64933

| MCSO's Compliance with the Requirements of the **Second Order** *(July 20, 2016)* | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Report 1 | Report 2 | Report 3 | Report 4 | Report 5 | Report 6 | Report 7 | Report 8 | Report 9 | Report 10 |
| **Phase 1** | N/A | | | | | | | | | 1% |
| **Phase 2** | N/A | | | | | | | | | 43% |

| | Report 11 | Report 12 | Report 13 | Report 14 | Report 15 | Report 16 | Report 17 | Report 18 | Report 19 | Report 20 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Phase 1** | 10% | 12% | 72% | 75% | 77% | 77% | 78% | 78% | 99% | 99% |
| **Phase 2** | 46% | 60% | 63% | 66% | 72% | 75% | 80% | 81% | 90% | 89% |

| | Report 21 | Report 22 | Report 23 | Report 24 | Report 25 | Report 26 | Report 27 | Report 28 | Report 29 | Report 30 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Phase 1** | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **Phase 2** | 91% | 90% | 92% | 93% | 90% | 91% | 92% | 90% | 89% | 91% |

| | Report 31 | Report 32 | Report 33 |
|---|---|---|---|
| **Phase 1** | 100% | 100% | 100% |
| **Phase 2** | 92% | 93% | 93% |

WAI 64934

Below is the list of Paragraphs for which MCSO asserted Full and Effective Compliance, and the Monitor's response to MCSO's assertion.

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|---|---|---|
| 9 | 12/28/18 | Concurred on 1/28/19 |
| 10 | 12/28/18 | Concurred on 1/28/19 |
| 11 | 12/28/18 | Concurred on 1/28/19 |
| 12 | 12/28/18 | Concurred on 1/28/19 |
| 13 | 12/28/18 | Concurred on 1/28/19 |
| 21 | 6/22/20 | Concurred on 7/20/20 |
| 22 | 12/16/20 | Did not concur on 1/15/21 |
| 23 | 12/28/18 | Concurred on 1/28/19 |
| 24 | 6/18/21 | Concurred on 7/19/21 |
| 26 | 12/28/18 | Concurred on 1/28/19 |
| 27 | 3/22/19 | Concurred on 4/22/19 |
| 28 | 12/28/18 | Concurred on 1/28/19 |
| 29 | 12/28/18 | Concurred on 1/28/19 |
| 30 | 12/28/18 | Concurred on 1/28/19 |
| 31 | 9/9/19 | Concurred on 10/2/19 |
| 34 | 6/3/19 | Concurred on 6/25/19 |
| 35 | 12/28/18 | Concurred on 1/28/19 |
| 36 | 12/28/18 | Concurred on 1/28/19 |
| 37 | 12/28/18 | Concurred on 1/28/19 |
| 38 | 12/28/18 | Concurred on 1/28/19 |
| 39 | 3/16/21 | Concurred on 4/16/21 |
| 40 | 12/28/18 | Concurred on 1/28/19 |
| 42 | 6/17/22 | Did not concur on 7/15/22 |
| 43 (first submission) | 12/16/20 | Did not concur on 1/15/21 |
| 43 (second submission) | 6/17/22 | Concurred on 7/15/22 |

WAI 64935

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|---|---|---|
| 44 | 12/16/20 | Did not concur on 1/15/21 |
| 45 | 12/9/19 | Concurred on 1/6/20 |
| 46 | 12/9/19 | Concurred on 1/6/20 |
| 47 (first submission) | 12/16/20 | Did not concur on 1/15/21 |
| 47 (second submission) | 6/17/22 | Concurred on 7/15/22 |
| 48 | 4/1/22 | Concurred on 4/29/22 |
| 49 | 4/1/22 | Concurred on 4/29/22 |
| 50 | 4/1/22 | Concurred on 4/29/22 |
| 51 | 4/1/22 | Concurred on 4/29/22 |
| 52 | 6/18/21 | Concurred on 7/19/21 |
| 53 | 6/18/21 | Concurred on 7/19/21 |
| 55 | 12/28/18 | Concurred on 1/28/19 |
| 57 | 12/16/20 | Concurred on 1/15/21 |
| 58 | 6/22/20 | Concurred on 7/20/20 |
| 59 | 12/28/18 | Concurred on 1/28/19 |
| 60 | 12/28/18 | Concurred on 1/28/19 |
| 61 | 12/9/19 | Concurred on 1/6/20 |
| 63 | 6/22/20 | Concurred on 7/20/20 |
| 68 | 12/28/18 | Concurred on 1/28/19 |
| 71 | 12/28/18 | Concurred on 1/28/19 |
| 73 | 10/5/20 | Concurred on 11/4/20 |
| 76 | 12/16/20 | Concurred on 1/15/21 |
| 77 | 12/28/18 | Concurred on 1/28/19 |
| 78 | 3/16/21 | Concurred on 4/16/21 |
| 84 | 9/9/19 | Concurred on 10/2/19 |
| 85 | 10/5/20 | Concurred on 11/4/20 |
| 86 | 10/5/20 | Concurred on 11/4/20 |
| 88 | 12/28/18 | Concurred on 1/28/19 |

WAI 64936

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|---|---|---|
| 89 | 12/9/19 | Concurred on 1/6/20 |
| 93 | 3/17/20 | Concurred on 4/9/20 |
| 101 | 12/28/18 | Concurred on 1/28/19 |
| 102 | 12/16/20 | Concurred on 1/15/21 |
| 104 | 3/17/20 | Concurred on 4/9/20 |
| 105 | 10/5/20 | Concurred on 11/4/20 |
| 106 | 6/3/19 | Concurred on 6/25/19 |
| 113 | 6/17/22 | Concurred on 7/15/22 |
| 114 | 6/17/22 | Concurred on 7/15/22 |
| 167 | 12/23/21 | Concurred on 1/24/22 |
| 168 | 12/23/21 | Concurred on 1/24/22 |
| 169 | 12/23/21 | Concurred on 1/24/22 |
| 170 | 12/23/21 | Concurred on 1/24/22 |
| 171 | 12/23/21 | Concurred on 1/24/22 |
| 172 | 12/23/21 | Concurred on 1/24/22 |
| 173 | 6/17/22 | Did not concur on 7/15/22 |
| 174 | 6/17/22 | Concurred on 7/15/22 |
| 177 | 6/18/21 | Concurred on 7/19/21 |
| 178 | 6/17/22 | Concurred on 7/15/22 |
| 179 | 6/17/22 | Concurred on 7/15/22 |
| 180 | 6/17/22 | Concurred on 7/15/22 |
| 182 | 9/24/21 | Concurred on 10/25/21 |
| 184 | 6/18/21 | Concurred on 7/19/21 |
| 185 | 6/18/21 | Concurred on 7/19/21 |
| 186 | 6/18/21 | Concurred on 7/19/21 |
| 187 | 6/18/21 | Concurred on 7/19/21 |
| 188 | 6/18/21 | Concurred on 7/19/21 |
| 189 | 12/23/21 | Concurred on 1/24/22 |

WAI 64937

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|---|---|---|
| 191 | 12/23/21 | Concurred on 1/24/22 |
| 193 | 12/23/21 | Concurred on 1/24/22 |
| 196 | 12/23/21 | Concurred on 1/24/22 |
| 199 | 12/23/21 | Concurred on 1/24/22 |
| 201 | 12/23/21 | Concurred on 1/24/22 |
| 210 | 9/24/21 | Concurred on 10/25/21 |
| 214 | 9/24/21 | Concurred on 10/25/21 |
| 215 | 9/24/21 | Concurred on 10/25/21 |
| 217 | 9/24/21 | Concurred on 10/25/21 |
| 218 | 9/24/21 | Concurred on 10/25/21 |
| 221 | 9/24/21 | Concurred on 10/25/21 |
| 223 | 9/24/21 | Concurred on 10/25/21 |
| 224 | 9/24/21 | Concurred on 10/25/21 |
| 225 | 9/24/21 | Concurred on 10/25/21 |
| 227 | 3/16/21 | Concurred on 4/16/21 |
| 228 | 3/16/21 | Concurred on 4/16/21 |
| 229 | 3/16/21 | Concurred on 4/16/21 |
| 230 | 3/16/21 | Concurred on 4/16/21 |
| 231 | 3/16/21 | Concurred on 4/16/21 |
| 232 | 3/16/21 | Concurred on 4/16/21 |
| 233 | 3/16/21 | Concurred on 4/16/21 |
| 234 | 3/16/21 | Concurred on 4/16/21 |
| 235 | 3/16/21 | Concurred on 4/16/21 |
| 236 | 3/16/21 | Concurred on 4/16/21 |
| 238 | 3/16/21 | Concurred on 4/16/21 |
| 239 | 3/16/21 | Concurred on 4/16/21 |
| 244 | 12/16/20 | Concurred on 1/15/21 |
| 245 | 12/16/20 | Concurred on 1/15/21 |

WAI 64938

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|---|---|---|
| 247 | 12/16/20 | Concurred on 1/15/21 |
| 248 | 12/16/20 | Concurred on 1/15/21 |
| 249 | 12/16/20 | Concurred on 1/15/21 |
| 250 | 4/1/22 | Concurred on 4/29/22 |
| 251 | 4/1/22 | Concurred on 4/29/22 |
| 252 | 4/1/22 | Concurred on 4/29/22 |
| 253 | 4/1/22 | Concurred on 4/29/22 |
| 254 | 4/1/22 | Concurred on 4/29/22 |
| 255 | 4/1/22 | Concurred on 4/29/22 |
| 256 | 4/1/22 | Concurred on 4/29/22 |
| 257 | 4/1/22 | Concurred on 4/29/22 |
| 258 | 4/1/22 | Concurred on 4/29/22 |
| 259 | 4/1/22 | Concurred on 4/29/22 |
| 264 | 12/16/20 | Concurred on 1/15/21 |
| 266 | 12/16/20 | Concurred on 1/15/21 |
| 273 | 12/16/20 | Concurred on 1/15/21 |
| 276 | 12/16/20 | Concurred on 1/15/21 |
| 278 | 12/16/20 | Concurred on 1/15/21 |
| 279 | 12/16/20 | Concurred on 1/15/21 |
| 287 | 12/16/20 | Concurred on 1/15/21 |
| 288 | 12/16/20 | Did not concur on 1/15/21 |
| 292 | 12/16/20 | Concurred on 1/15/21 |
| 337 | 12/16/20 | Concurred on 1/15/21 |

WAI 64939

# First Supplemental Permanent Injunction/Judgment Order

## Section 3: Implementation Unit Creation and Documentation Requests

**COURT ORDER III.  MCSO IMPLEMENTATION UNIT AND INTERNAL AGENCY-WIDE ASSESSMENT** *[Court Order wording in italics]*

***Paragraph 9.*** *Defendants shall hire and retain, or reassign current MCSO employees to form an interdisciplinary unit with the skills and abilities necessary to facilitate implementation of this Order.  This unit shall be called the MCSO Implementation Unit and serve as a liaison between the Parties and the Monitor and shall assist with the Defendants' implementation of and compliance with this Order.  At a minimum, this unit shall: coordinate the Defendants' compliance and implementation activities; facilitate the provision of data, documents, materials, and access to the Defendants' personnel to the Monitor and Plaintiffs representatives; ensure that all data, documents and records are maintained as provided in this Order; and assist in assigning implementation and compliance-related tasks to MCSO Personnel, as directed by the Sheriff or h is designee.  The unit will include a single person to serve as a point of contact in communications with Plaintiffs, the Monitor and the Court.*

**In Full and Effective Compliance**

To verify Phase 2 compliance with this Paragraph, we reviewed the monthly personnel rosters for the Court Implementation Division (CID).  CID is currently staffed with one captain, one lieutenant, three sergeants, two deputies, one management assistant, two administrative assistants, and one management analyst.  CID continues to be supported by Maricopa County Attorney's Office (MCAO) attorneys, who frequently participate in our meetings and telephone calls with Division personnel.

During this reporting period, CID continued to provide documents through MCSO's counsel via an Internet-based application.  We, the Plaintiffs, and the Plaintiff-Intervenor receive all files and documents simultaneously, with only a few exceptions centering on open internal investigations.  CID effectively facilitates our and Parties' access to MCSO's personnel.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 64940

*Paragraph 10.   MCSO shall collect and maintain all data and records necessary to: (1) implement this order, and document implementation of and compliance with this Order, including data and records necessary for the Monitor to conduct reliable outcome assessments, compliance reviews, and audits; and (2) perform ongoing quality assurance in each of the areas addressed by this Order.  At a minimum, the foregoing data collection practices shall comport with current professional standards, with input on those standards from the Monitor.*

**In Full and Effective Compliance**

CID continues to be responsive to our requests.  CID also addresses with immediacy any issues we encounter in the samples we request – be they technical issues, missing documents, or other problems.  MCSO's Bureau of Internal Oversight (BIO) routinely audits the work products of the Office, particularly in the areas that directly affect compliance with the requirements of the Orders.  In many instances, BIO will review the same material we request in our samples, and BIO frequently notes – and addresses – the same deficiencies we identify in our reviews.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

*Paragraph 11.   Beginning with the Monitor's first quarterly report, the Defendants, working with the unit assigned for implementation of the Order, shall file with the Court, with a copy to the Monitor and Plaintiffs, a status report no later than 30 days before the Monitor's quarterly report is due.  The Defendants' report shall (i) delineate the steps taken by the Defendants during the reporting period to implement this Order; (ii) delineate the Defendants' plans to correct any problems; and (iii) include responses to any concerns raised in the Monitor's previous quarterly report.*

**In Full and Effective Compliance**

MCSO submitted its 33rd quarterly compliance report on September 30, 2022.  See Paragraph 13.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 64941

*Paragraph 12.   The Defendants, working with the unit assigned for implementation of the Order, shall conduct a comprehensive internal assessment of their Policies and Procedures affecting Patrol Operations regarding Discriminatory Policing and unlawful detentions in the field as well as overall compliance with the Court's orders and this Order on an annual basis.   The comprehensive Patrol Operations assessment shall include, but not be limited to, an analysis of collected traffic-stop and high-profile or immigration-related operations data; written Policies and Procedures; Training, as set forth in the Order; compliance with Policies and Procedures; Supervisor review; intake and investigation of civilian Complaints; conduct of internal investigations; Discipline of officers; and community relations.   The first assessment shall be conducted within 180 days of the Effective Date.   Results of each assessment shall be provided to the Court, the Monitor, and Plaintiffs' representatives.*

**In Full and Effective Compliance**

We and CID established that the schedule for the submission of comprehensive annual assessments as required by these Paragraphs will run according to MCSO's fiscal year cycle, July 1-June 30.  MCSO will submit reports on or before September 15 of each year.

Consistent with this agreement, on September 15, 2022, MCSO filed with the Court its 2021 Annual Compliance Report covering the period of July 1, 2021 through June 30, 2022.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

*Paragraph 13.   The internal assessments prepared by the Defendants will state for the Monitor and Plaintiffs' representatives the date upon which the Defendants believe they are first in compliance with any subpart of this Order and the date on which the Defendants first assert they are in Full and Effective Compliance with the Order and the reasons for that assertion.  When the Defendants first assert compliance with any subpart or Full and Effective Compliance with the Order, the Monitor shall within 30 days determine whether the Defendants are in compliance with the designated subpart(s) or in Full and Effective Compliance with the Order.  If either party contests the Monitor's determination it may file an objection with the Court, from which the Court will make the determination.  Thereafter, in each assessment, the Defendants will indicate with which subpart(s) of this Order it remains or has come into full compliance and the reasons therefore.  The Monitor shall within 30 days thereafter make a determination as to whether the Defendants remain in Full and Effective Compliance with the Order and the reasons therefore. The Court may, at its option, order hearings on any such assessments to establish whether the Defendants are in Full and Effective Compliance with the Order or in compliance with any subpart(s).*

**In Full and Effective Compliance**

WAI 64942

MCSO submitted its 33rd quarterly compliance report on September 30, 2022. The report covers the steps MCSO has taken to implement the Court's Orders during the second quarter of 2022. The report also includes any plans to correct difficulties encountered during the quarter and responses to concerns raised in our 32nd quarterly status report.

In its report, MCSO asserted Full and Effective Compliance (FEC) with 13 additional Paragraphs: 44, 80, 83, 190, 192, 198, 200, 202, 203, 206, 222, 243, and 272. Paragraph 44 requires that MCSO set out a schedule for delivering all training required by the Order and that all training be provided to the Parties and the Monitor. Paragraph 80, also related to training, requires that MCSO provide education and training to all employees regarding EIS prior to its implementation. MCSO must provide effective supervision to guide deputies on arrests, incident reports, activity reports, misconduct investigations and community trust among others, consistent with Paragraph 83. Paragraph 272 requires that MCSO policies comply with document preservation and production requirements and that violators of this policy will be subject to discipline and potentially other sanctions.

The majority of the Paragraphs address misconduct investigations: Paragraph 190 requires that allegations of employee misconduct that are of minor nature may be administratively investigated by a trained and qualified supervisor in the employee's District; Paragraph 192 requires that the PSB review at least semi-annually all investigations assigned outside of the Bureau to determine if the investigation is properly conducted and whether appropriate findings have been reached; Paragraph 198 requires PSB to be physically located separate from MCSO's other facilities. The remaining Paragraphs address how investigators conduct investigations: Paragraph 200 details the work that investigators must perform in each misconduct investigation; Paragraph 202 requires that an internal affairs investigator investigate any evidence of potential misconduct uncovered during the course of the investigation; Paragraph 203 states that if the person involved in the encounter with the MCSO pleads guilty or is found guilty of an offense, internal affairs investigators will nevertheless continue the investigation; Paragraph 206 requires that an investigative report be prepared; and Paragraph 222 requires that the Commander of the Professional Standards Bureau makes preliminary determinations of discipline in writing. Finally, Paragraph 243 requires MCSO to establish a free, 24-hour hotline for members of the public to make complaints.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 64943

## Section 4:  Policies and Procedures

**COURT ORDER V. POLICIES AND PROCEDURES**

*Paragraph 18.  MCSO shall deliver police services consistent with the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order, and with current professional standards.  In conducting its activities, MCSO shall ensure that members of the public receive equal protection of the law, without discriminating based on actual or perceived race or ethnicity, and in a manner that promotes public confidence.*

*Paragraph 19.  To further the goals in this Order, the MCSO shall conduct a comprehensive review of all Patrol Operations Policies and Procedures and make appropriate amendments to ensure that they reflect the Court's permanent injunction and this Order.*

**Phase 1:**  In compliance

- GA-1 (Development of Written Orders), most recently amended on January 12, 2022.

**Phase 2:**  In compliance

MCSO has taken steps toward a comprehensive review of its Patrol Operations Policies and Procedures in four phases.  First, on December 31, 2013, prior to my appointment as Monitor, MCSO filed with the Court all of its policies and procedures, with amendments, that MCSO believed complied with the various Paragraphs of the First Order.  Second, in the internal assessment referenced above, MCSO discussed its ongoing evaluation of Patrol Operations and its development of policies and procedures.  Third, in response to our requests, MCSO provided all of the policies and procedures it maintains are applicable to the First Order for our review and that of the Plaintiffs.  We provided our feedback, which also included the Plaintiffs' comments, on these policies on August 12, 2014.  Based on that feedback, MCSO made adjustments to many of the policies, concentrating first on the policies to be disseminated in Detentions, Arrests, and the Enforcement of Immigration-Related Laws Training; and the Bias Free Policing Training (often referred to as Fourth and Fourteenth Amendment Training) that commenced in early September.  We reviewed MCSO's updated policies and provided our approval for several on August 25, 2014.

Fourth, in discussions during 2016, MCSO requested more specific guidance on what we considered to be Patrol-related policies and procedures.  In response, we provided MCSO with a list of the Patrol-related policies for the purposes of Paragraph 19.  We included on this list policies that were not recently revised or currently under review.  Several policies required changes to comport with the First Order, Second Order, or both.  In 2018, MCSO published the last of the outstanding policies, achieving compliance with this Paragraph.

WAI 64944

**Paragraph 20.**  *The MCSO shall comply with and operate in accordance with the Policies and Procedures discussed in this Order and shall take all reasonable measures to ensure that all Patrol Operations personnel comply with all such Policies and Procedures.*

### a.  Policies and Procedures to Ensure Bias-Free Policing

**Paragraph 21.**  *The MCSO shall promulgate a new, department-wide policy or policies clearly prohibiting Discriminatory Policing and racial profiling.  The policy or policies shall, at a minimum:*

a.   *define racial profiling as the reliance on race or ethnicity to any degree in making law enforcement decisions, except in connection with a reliable and specific suspect description;*

b.   *prohibit the selective enforcement or non-enforcement of the law based on race or ethnicity;*

c.   *prohibit the selection or rejection of particular policing tactics or strategies or locations based to any degree on race or ethnicity;*

d.   *specify that the presence of reasonable suspicion or probable cause to believe an individual has violated a law does not necessarily mean that an officer's action is race-neutral; and*

e.   *include a description of the agency's Training requirements on the topic of racial profiling in Paragraphs 48–51, data collection requirements (including video and audio recording of stops as set forth elsewhere in this Order) in Paragraphs 54–63 and oversight mechanisms to detect and prevent racial profiling, including disciplinary consequences for officers who engage in racial profiling.*

**In Full and Effective Compliance**

MCSO has developed and published the policies required by Paragraph 21.  MCSO distributed these policies and has trained agency personnel during the required Fourth and Fourteenth Amendment training, on an annual basis, since 2014.  MCSO's implementation of these policies is covered in other Paragraphs.

On June 22, 2020, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 64945

*Paragraph 22.   MCSO leadership and supervising Deputies and detention officers shall unequivocally and consistently reinforce to subordinates that Discriminatory Policing is unacceptable.*

**Phase 1:**  In compliance

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on October 13, 2022.
- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on April 27, 2022.

**Phase 2:**  In compliance

With input from the Parties, the reinforcement of CP-8 (Preventing Racial and Other Bias-Based Policing) was modified to a two-step process conducted annually.  MCSO describes Part 1 of the process as the following: "On an annual basis, within the first six months, supervisors will have discussions, either individual or group, and view videos from the Training library with assigned employees, Reserve deputies, and Posse members.  The videos will be available through the HUB and attestation of the training will be through the HUB."  Part 2 of the process as described by MCSO: "On an annual basis, within the last six months, supervisors shall ensure that all employees, reserve deputies, and Posse members complete their annual review and acknowledgment of office policy.  In addition, employees will be required to view a video from the Sheriff or designee, which reinforces the policy.  Acknowledgement is done through the HUB."

As an additional measure, supervisors will have the latitude to review and discuss the policy with their employees and document their discussions in BlueTeam.  MCSO will provide proof of compliance biannually, at the end of the six-month periods, when each of the elements of the process is completed.  MCSO will also provide progress reports in the interim.

For the first six months of 2022, MCSO submitted updated training compliance reports for all classifications.  HUB reports documented a compliance rate of 98.32% for sworn, 98.75% for Detention, 98.87% for civilian, 100% for reserve members, and 99.37% for Posse volunteers.  The overall compliance rate for training, for the first half of 2022, was 99.06%.  MCSO remains in compliance with this Paragraph.

*Paragraph 23.  Within 30 days of the Effective Date, MCSO shall modify its Code of Conduct to prohibit MCSO Employees from utilizing County property, such as County e-mail, in a manner that discriminates against, or denigrates, anyone on the basis of race, color, or national origin.*

**In Full and Effective Compliance**

BIO uses a randomizing program to select samples for each inspection.  BIO reviews CAD messages to verify compliance with CP-2 (Code of Conduct), CP-3 (Workplace Professionalism: Discrimination and Harassment), and GM-1 (Electronic Communications, Data and Voice Mail).  In its submission, MCSO includes the specific nature of any potential concerns identified during the audits.  We observed the processes BIO uses to conduct CAD and email audits, to ensure that

WAI 64946

we thoroughly understand the mechanics involved in conducting these audits. For CAD and email audits, we receive copies of the audits completed by BIO, the details of any violations found, and copies of the memoranda of concern or BIO Action Forms that are completed. Email and CAD/Alpha Paging inspections are completed on a quarterly basis. For email inspections, MCSO will inspect 50 employees per quarter, and for CAD/Alpha Paging, MCSO will inspect 15 days per quarter.

For the second quarter of 2022, we reviewed CAD and Alpha Paging Inspection Report (BI2022-0084), as proof of compliance with this Paragraph. MCSO selected a random sample of 15 days in the quarter for inspection. There was a total of 7,308 CAD and Alpha Paging entries for the selected dates. The inspection found that 100% of the inspected messages were in compliance with policies GM-1 (Electronic Communications, Data and Voice Mail), CP-2 (Code of Conduct), CP-3 (Workplace Professionalism: Discrimination and Harassment), and CP-8 (Preventing Racial and Other Biased-Based Profiling).

For the second quarter of 2022, we reviewed employees' Emails Inspection Report (BI2022-0093), as proof of compliance with this Paragraph. BIO selected a total of 50 employees for review, and inspected a total of 18,069 emails. The inspection found that 18,067, or 99.99% of the emails inspected were in compliance. Two employees from Watkins Jail were found to have sent emails that did not comply with policy requirements. Two BIO Action Forms were generated for the policy violations.

For the second quarter of 2022, MCSO did not conduct any facility inspections.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 24.** *The MCSO shall ensure that its operations are not motivated by or initiated in response to requests for law enforcement action based on race or ethnicity. In deciding to take any law enforcement action, the MCSO shall not rely on any information received from the public, including through any hotline, by mail, email, phone or in person, unless the information contains evidence of a crime that is independently corroborated by the MCSO, such independent corroboration is documented in writing, and reliance on the information is consistent with all MCSO policies.*

**In Full and Effective Compliance**

MCSO created the Sheriff's Intelligence Leads and Operations (SILO) Unit in the first quarter of 2016. The SILO Unit became operational on September 11, 2017. GI-7 requires that any tips received by MCSO components be forwarded to the SILO Unit for recording and processing. The SILO Unit classifies this information by the type of alleged criminal activity, or service requested, and forwards it to the appropriate Unit for action and response. In some cases, community members email or call with requests for traffic enforcement, or for MCSO to address quality-of-life issues; these are considered calls for service rather than tips on criminal activity. If the information provided pertains to criminal activity in another jurisdiction, MCSO forwards the

WAI 64947

information to the appropriate law enforcement agency and documents it in the SILO database. We review a monthly tip list report, noting the date received and a general description of each tip. We also review an audit report showing the disposition of tips received. If there is any bias noted in the information received for any tip, MCSO generally closes the tip and takes no action. We review all tips that MCSO closes due to bias.

During the second quarter of 2022, we reviewed 486 tips submitted for April, 465 tips submitted for May, and 402 tips submitted for June. We reviewed a total of 1,353 tips, which were classified and recorded according to the type of alleged violation or service requested. The tip reports submitted indicate continued community concerns with drug activities and fugitives from the law. Reports of suspected assaults and homicides were also relatively high. Traffic-related complaints received were in the approximate range we have noted in the past. We reviewed one tip that was closed due to bias, in April. We reviewed the documentation provided and concluded that MCSO followed appropriate protocols for closing the tip.

On June 18, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

### b. Policies and Procedures to Ensure Bias-Free Traffic Enforcement

**Paragraph 25.** *The MCSO will revise its policy or policies relating to traffic enforcement to ensure that those policies, at a minimum:*

a.     *prohibit racial profiling in the enforcement of traffic laws, including the selection of which vehicles to stop based to any degree on race or ethnicity, even where an officer has reasonable suspicion or probable cause to believe a violation is being or has been committed;*

b.     *provide Deputies with guidance on effective traffic enforcement, including the prioritization of traffic enforcement resources to promote public safety;*

c.     *prohibit the selection of particular communities, locations or geographic areas for targeted traffic enforcement based to any degree on the racial or ethnic composition of the community;*

d.     *prohibit the selection of which motor vehicle occupants to question or investigate based to any degree on race or ethnicity;*

e.     *prohibit the use of particular tactics or procedures on a traffic stop based on race or ethnicity;*

f.     *require deputies at the beginning of each stop, before making contact with the vehicle, to contact dispatch and state the reason for the stop, unless Exigent Circumstances make it unsafe or impracticable for the deputy to contact dispatch;*

WAI 64948

g.    *prohibit Deputies from extending the duration of any traffic stop longer than the time that is necessary to address the original purpose for the stop and/or to resolve any apparent criminal violation for which the Deputy has or acquires reasonable suspicion or probable cause to believe has been committed or is being committed;*

h.    *require the duration of each traffic stop to be recorded;*

i.    *provide Deputies with a list and/or description of forms of identification deemed acceptable for drivers and passengers (in circumstances where identification is required of them) who are unable to present a driver's license or other state-issued identification; and*

j.    *instruct Deputies that they are not to ask for the Social Security number or card of any motorist who has provided a valid form of identification, unless it is needed to complete a citation or report.*

**Phase 1:** In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on April 27, 2022.
- EB-2 (Traffic Stop Data Collection), most recently amended on June 15, 2021.
- GI-1 (Radio and Enforcement Communications Procedures), most recently amended on December 8, 2021.
- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on October 13, 2022.
- EA-11 (Arrest Procedures), most recently amended on April 5, 2022.

**Phase 2:** Deferred

During the finalization of the Fourth and Fourteenth Amendment training curricula required by the Order, the Parties agreed to a list and/or description of forms of identification deemed acceptable for drivers and passengers, as required by this Paragraph. The data required for verification to ensure compliance with these policies is captured by the TraCS system. The system documents the requirements of the Order and MCSO policies. MCSO has continued to make technical changes to the TraCS system to ensure that the mandatory fields on the forms used to collect the data are completed and that deputies are capturing the required information. TraCS is a robust system that allows MCSO to make technical changes to improve how required information is captured.

To verify Phase 2 compliance with this Paragraph, we reviewed MCSO's Vehicle Stop Contact Form (VSCF), Vehicle Stop Contact Form Supplemental Sheet, Incidental Contact Receipt, Written Warning/Repair Form, Arizona Traffic Ticket and Complaint Form, Internet I/Viewer Event Form, Justice Web Interface Form, CAD printout, and any Incident Report generated by the traffic stop. MCSO created many of these forms to capture the requirements of Paragraphs 25 and 54.

WAI 64949

Since our July 2015 site visit, there has been significant improvement in the TraCS system that has enhanced the reliability and validity of the data provided by MCSO. This improvement has been buttressed by the introduction of data quality control procedures now being implemented and memorialized in the EIU Operations Manual. (This is further discussed in Paragraph 56, below.) We also compared traffic stop data between Latino and non-Latino drivers in the samples provided to us.

Paragraph 25.a. prohibits racial profiling in the enforcement of traffic laws, including the selection of which vehicles to stop based to any degree on race or ethnicity, even where a deputy has reasonable suspicion or probable cause to believe a violation is being or has been committed. The selection of the sample size and the sampling methodology employed for drawing our sample is detailed in Section 7: Traffic Stop Documentation and Data Collection.

We review a sample of 105 traffic stops each reporting period to assess this requirement. Our review of the sample of 105 traffic stops that occurred during this reporting period in Districts 1, 2, 3, 4, and 7, and Lake Patrol indicated that MCSO was following protocol, and that the stops did not violate the Order or internal policies. The District formerly known as District 6 no longer exists, as it is now patrolled by the newly created Queen Creek Police Department, which commenced operating fully in that area on January 11, 2022. Paragraphs 66 and 67 require an annual comprehensive analysis of all traffic stop data, which will more accurately determine if MCSO is meeting the requirements of this Paragraph. MCSO remains in compliance with this Subparagraph.

Paragraph 25.b. requires MCSO to provide deputies with guidance on effective traffic enforcement, including the prioritization of traffic enforcement resources to promote public safety. EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), Sections A-E, address these concerns. The policy specifies that driving under the influence and speeding are the main causes of accidents, and should be the focus of traffic enforcement. Based on our review of the data provided for this reporting period, the most common traffic stop violations are as follows: 48 stops for speed above the posted limit (46%); 18 stops for failure to obey official traffic control devices (17%); 13 stops for failure to possess valid registrations or tags (12%); 10 stops for equipment violations (10%); five stops for failing to maintain a lane of traffic (5%); and 11 stops for other moving violations (10%).

As the policy specifically identifies speeding violations as one of the contributing factors of traffic accidents, MCSO deputies have targeted this violation. In our review, we break down the specific traffic violation for each stop and use each traffic stop form completed by deputies during the stop to determine if the stop is justified and fulfills the requirements of this Paragraph. MCSO remains in compliance with this Subparagraph.

Paragraph 25.c. requires MCSO to prohibit the selection of particular communities, locations, or geographic areas for targeted traffic enforcement based to any degree on the racial or ethnic composition of the community. During our inspection, we document the location of every stop and note the GPS coordinates if available. Our review of the sample data covering all MCSO Districts during this reporting period did not indicate that MCSO was targeting any specific area or ethnicity to conduct traffic stops.

WAI 64950

MCSO remains in compliance with this Subparagraph.

Paragraph 25.d. requires MCSO to prohibit the selection of which motor vehicle occupants to question or investigate based, to any degree, on race or ethnicity. We reviewed the demographic data of Maricopa County (according to 2018 U.S. Census data, 31.1% of the population is Latino), and found that the ratio of Latino drivers stopped during this reporting period was lower than in the past reporting period in comparison to the ethnicity of the population in the County. (See Paragraph 54.e.)

A review of complaint investigations closed during this reporting period did not reveal that any complaints were filed alleging that MCSO deputies selected motor vehicle occupants for questioning or investigation, based on the individual's race or ethnicity.

MCSO has fully implemented body-worn cameras, and we review a sample of the recordings each reporting period to verify if deputies are questioning occupants to determine if they are legally in the country. We did not identify any such events during this reporting period.

During this reporting period, we observed that 33 of the 105 stops occurred during nighttime hours. Our review of the sample data indicated that generally, traffic stops were not based on race or ethnicity and reflected the general makeup of the population of the County. In most instances, the deputies document on the VSCF that they were unable to determine the race/ethnicity and gender of the vehicle occupants prior to the stop. MCSO is in compliance with this Subparagraph.

Paragraph 25.e. requires MCSO to prohibit the use of particular tactics or procedures on a traffic stop based on race or ethnicity. We reviewed a sample of CAD audio recordings and CAD printouts where the dispatcher entered the reason for the stop when advised by the deputy in the field. We also reviewed body-worn camera recordings of deputies making traffic stops. The methodology that we employed to select our cases is described in detail in Section 7. In the cases we reviewed, the CAD audio recordings and the body-worn camera recordings revealed that deputies were not making traffic stops using tactics based on race or ethnicity. MCSO has achieved Phase 1 and Phase 2 compliance with Paragraph 66, and Phase 1 compliance with Paragraph 67; however, MCSO has not yet achieved Phase 2 compliance with Paragraph 67. Accordingly, we are deferring our compliance assessment of this Subparagraph.

Paragraph 25.f. requires deputies at the beginning of each stop, before making contact with the vehicle, to verbally contact dispatch and state the reason for the stop unless exigent circumstances make it unsafe for the deputy to contact Communications. When the deputy advises Communications of the location, tag number, and reason for the stop, this information is digitally logged on the CAD printout and it is audio recorded. (See Paragraph 54.e.) We reviewed 30 CAD audio recordings and the CAD printouts; in each, the deputy advised dispatch of the reason for the stop. Through our reviews of body-worn camera recordings and CAD printouts, we verified that the reason for the stop was voiced prior to making contact with the drivers in 30 of the 30 cases we reviewed. For the 75 other cases that were part of our sample, we reviewed the VSCFs and the CAD printouts to ensure that deputies properly advised dispatch of the reason for the stop prior to making contact with the violator. In all 75 stops, the deputy properly advised dispatch the reason for the stop. MCSO is in compliance with this Subparagraph.

WAI 64951

Paragraph 25.g. prohibits deputies from extending the duration of any traffic stop longer than the time that is necessary to address the original purpose for the stop and/or to resolve any apparent criminal violation for which the deputy has or acquires reasonable suspicion or probable cause to believe has been committed or is being committed.  MCSO employs a series of seven questions on the VSCF to document the circumstances that might require a stop to be prolonged.  Deputies are to indicate whether they experienced technological difficulties; whether the stop required the towing of a vehicle; whether the stop involved training; whether the stop involved a language barrier; whether the stop involved a driving under the influence investigation; or whether the stop involved issues related to the status of the drivers' license, insurance, or registration.  In each of the stops where the deputies documented these events, the duration of the stop was determined to be reasonable.

MCSO remains in compliance with this Subparagraph.

Paragraph 25.h. requires the duration of each traffic stop to be recorded.  The time of the stop and its termination is now auto-populated on the VSCF by the CAD system.  To ensure data entry accuracy, MCSO implemented a technical change to the TraCS system on November 29, 2016.  The change automatically creates a red field in the stop contact times if the deputy manually changes these times on the VSCF.  In our review, we determined that the duration was recorded accurately in all 105 traffic stops.  MCSO is in compliance with this Subparagraph, with a compliance rate of 100%.

Paragraph 25.i. requires that MCSO provide deputies with a list and/or description of forms of identification deemed acceptable for drivers and passengers (in circumstances where identification is required of them) who are unable to present a driver's license or other state-issued identification.  The Plaintiffs' attorneys and MCSO agreed on acceptable forms of identification, and this information has been included in the Fourth and Fourteenth Amendment training.  EA-11 (Arrest Procedures) provides a list of acceptable forms of identification if a valid driver's license cannot be produced.  During this reporting period's review of the sample of 105 traffic stops, we identified 11 cases where the drivers did not present a valid driver's license to the deputies.  In three of the cases, the deputies were able to confirm that the drivers' licenses were, in fact, valid.  In the remaining eight cases, a records check revealed that the drivers did not have valid driver's licenses.

In our review of the sample of cases to assess compliance with Paragraph 54.k., searches of persons, we identified 26 cases where the drivers did not present a valid driver's license to the deputies.  In one of the cases, the deputy was able to confirm that the driver's license was, in fact, valid.  In the remaining 23 cases, the drivers either presented an identification card or had no identification in their possession; and a records check revealed that the drivers did not have valid driver's licenses.

In our review of the sample of cases to assess compliance with Paragraphs 25.d. and 54.g., passenger contacts, we identified 37 cases where the drivers did not present a valid driver's license to the deputies.  In three of the cases, the deputies were able to confirm that the drivers' licenses were, in fact, valid.  In the remaining 34 cases, the drivers either presented an identification card or they had no identification in their possession and a records check revealed that the drivers did not have valid driver's licenses.

WAI 64952

MCSO remains in compliance with this Subparagraph.

Paragraph 25.j. requires MCSO to instruct deputies that they are not to ask for the Social Security Number or card of any motorist who has provided a valid form of identification, unless it is needed to complete a citation or report.  EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) prohibits deputies from asking for the Social Security Number of any motorist who has provided a valid form of identification.  During this reporting period's review of the sample of 105 traffic stops, as well as for Paragraph 54.k. and Paragraphs 25.d. and 54.g., we identified that deputies requested a driver's Social Security Number in incidents that either involved the arrest of the driver for the purpose of completing an Incident Report, or incidents where the driver did not produce a valid form of identification, both of which are permissible under this Subparagraph. MCSO remains in compliance with this Subparagraph.

Although MCSO has achieved compliance with several components of Paragraph 25, Subparagraph 25.e. is in a deferred status.  Accordingly, the compliance status for Paragraph 25 is deferred.

### c. Policies and Procedures to Ensure Bias-Free Detentions and Arrests

**Paragraph 26.**  *The MCSO shall revise its policy or policies relating to Investigatory Detentions and arrests to ensure that those policies, at a minimum:*

a.     *require that Deputies have reasonable suspicion that a person is engaged in, has committed, or is about to commit, a crime before initiating an investigatory seizure;*

b.     *require that Deputies have probable cause to believe that a person is engaged in, has committed, or is about to commit, a crime before initiating an arrest;*

c.     *provide Deputies with guidance on factors to be considered in deciding whether to cite and release an individual for a criminal violation or whether to make an arrest;*

d.     *require Deputies to notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration-Related Crime, or for any crime by a vehicle passenger related to lack of an identity document;*

e.     *prohibit the use of a person's race or ethnicity as a factor in establishing reasonable suspicion or probable cause to believe a person has, is, or will commit a crime, except as part of a reliable and specific suspect description; and*

f.     *prohibit the use of quotas, whether formal or informal, for stops, citations, detentions, or arrests (though this requirement shall not be construed to prohibit the MCSO from reviewing Deputy activity for the purpose of assessing a Deputy's overall effectiveness or whether the Deputy may be engaging in unconstitutional policing).*

**In Full and Effective Compliance**

WAI 64953

To assess compliance with Paragraph 26, we request documentation of arrests and investigations associated with the requirements specified in this Paragraph.  In addition to the review of any reported cases, we receive booking lists and criminal citation lists for each month of the reporting period, and request a random sample of cases to review.

For the second quarter of 2022, MCSO submitted one arrest that occurred in April, that fell under the reporting requirements of this Paragraph.  A Latina female driver was stopped for running a stop sign.  The deputy approached the driver and requested to see her driver's license, registration, and proof of insurance.  The driver became belligerent and refused to provide the documents.  Additional deputies arrived and assisted, and one deputy was able to find out the name and date of birth of the driver.  A records check revealed that the driver's license had been suspended for refusal to provide a breath sample in a Driving Under the Influence (DUI) investigation.  The driver was cited for three violations, including failure to show identification, and released.  We reviewed all documents provided for this case and found no issues of concern.

For this reporting period, we also requested and reviewed 20 bookings and 20 criminal citations for each month of the quarter, for a total of 60 bookings and 60 criminal citations.  In addition, we reviewed 249 Incident Reports for the quarter.  All of the documentation we reviewed during this reporting period indicates that MCSO is in compliance with this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.


### d. Policies and Procedures Governing the Enforcement of Immigration-Related Laws

*Paragraph 27.*  *The MCSO shall remove discussion of its LEAR Policy from all agency written Policies and Procedures, except that the agency may mention the LEAR Policy in order to clarify that it is discontinued.*

**In Full and Effective Compliance**

MCSO asserts that it does not have an agency LEAR policy.  We have verified, through our document reviews and site compliance visits, that MCSO does not have a LEAR policy.

On March 22, 2019, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 64954

***Paragraph 28.***   The MCSO shall promulgate a new policy or policies, or will revise its existing policy or policies, relating to the enforcement of Immigration-Related Laws to ensure that they, at a minimum:

a.   specify that unauthorized presence in the United States is not a crime and does not itself constitute reasonable suspicion or probable cause to believe that a person has committed or is committing any crime;

b.   prohibit officers from detaining any individual based on actual or suspected "unlawful presence," without something more; prohibit officers from initiating a pre-textual vehicle stop where an officer has reasonable suspicion or probable cause to believe a traffic or equipment violation has been or is being committed in order to determine whether the driver or passengers are unlawfully present;

c.   prohibit the Deputies from relying on race or apparent Latino ancestry to any degree to select whom to stop or to investigate for an Immigration-Related Crime (except in connection with a specific suspect description); prohibit Deputies from relying on a suspect's speaking Spanish, or speaking English with an accent, or appearance as a day laborer as a factor in developing reasonable suspicion or probable cause to believe a person has committed or is committing any crime, or reasonable suspicion to believe that an individual is in the country without authorization;

d.   unless the officer has reasonable suspicion that the person is in the country unlawfully and probable cause to believe the individual has committed or is committing a crime, the MCSO shall prohibit officers from (a) questioning any individual as to his/her alienage or immigration status; (b) investigating an individual's identity or searching the individual in order to develop evidence of unlawful status; or (c) detaining an individual while contacting ICE/CBP with an inquiry about immigration status or awaiting a response from ICE/CBP.  In such cases, the officer must still comply with Paragraph 25(g) of this Order.  Notwithstanding the foregoing, an officer may (a) briefly question an individual as to his/her alienage or immigration status; (b) contact ICE/CBP and await a response from federal authorities if the officer has reasonable suspicion to believe the person is in the country unlawfully and reasonable suspicion to believe the person is engaged in an Immigration-Related Crime for which unlawful immigration status is an element, so long as doing so does not unreasonably extend the stop in violation of Paragraph 25(g) of this Order;

e.   prohibit Deputies from transporting or delivering an individual to ICE/CBP custody from a traffic stop unless a request to do so has been voluntarily made by the individual;

f.   Require that, before any questioning as to alienage or immigration status or any contact with ICE/CBP is initiated, an officer check with a Supervisor to ensure that the circumstances justify such an action under MCSO policy and receive approval to proceed. Officers must also document, in every such case, (a) the reason(s) for making the immigration-status inquiry or contacting ICE/CBP, (b) the time approval was received, (c) when ICE/CBP was contacted, (d) the time it took to receive a response from ICE/CBP, if applicable, and (e) whether the individual was then transferred to ICE/CBP custody.

WAI 64955

**In Full and Effective Compliance**

For this reporting period, there were no reported instances of deputies having contact with Immigration and Customs Enforcement (ICE) or Customs and Border Protection (CBP) for the purpose of making an immigration status inquiry, and there were no reported arrests for any immigration-related investigations, or for any immigration-related crimes. The reviews of documentation submitted for this reporting period indicate that MCSO has complied with the reporting requirements related to Paragraph 28. In our reviews of incidents involving contact with the public, including traffic stops, arrests, and investigative stops, we monitor deputies' actions to verify compliance with this Order.

In addition to the documentation requested from MCSO, to determine compliance with this Paragraph, our reviews of documentation provided for other Paragraphs of the Order have found no evidence to indicate a violation of this Paragraph. For this reporting period, we reviewed 60 Arrest Reports, 60 criminal citations, 289 traffic stops, 45 NTCFs, and 249 Incident Reports. We found no issues of concern, as it relates to this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

### e. Policies and Procedures Generally

**Paragraph 29.** *MCSO Policies and Procedures shall define terms clearly, comply with applicable law and the requirements of this Order, and comport with current professional standards.*

**In Full and Effective Compliance**

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

See Paragraph 30.

**Paragraph 30.** *Unless otherwise noted, the MCSO shall submit all Policies and Procedures and amendments to Policies and Procedures provided for by this Order to the Monitor for review within 90 days of the Effective Date pursuant to the process described in Section IV. These Policies and Procedures shall be approved by the Monitor or the Court prior to their implementation.*

**In Full and Effective Compliance**

MCSO continues to provide us, the Plaintiffs' attorneys, and the Plaintiff-Intervenor with drafts of its Order-related policies and procedures prior to publication, as required by the Order. We, the Plaintiffs' attorneys, and the Plaintiff-Intervenor review the policies to ensure that they define terms clearly, comply with applicable law and the requirements of the Order, and comport with current professional standards. Once drafts are finalized, MCSO incorporates feedback from us,

WAI 64956

Plaintiffs' attorneys, and the Plaintiff-Intervenor, and then provides them to us for final review and approval. As this process has been followed for the Order-related policies published thus far, MCSO is in compliance with this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 31.** *Within 60 days after such approval, MCSO shall ensure that all relevant MCSO Patrol Operation Personnel have received, read, and understand their responsibilities pursuant to the Policy or Procedure. The MCSO shall ensure that personnel continue to be regularly notified of any new Policies and Procedures or changes to Policies and Procedures. The Monitor shall assess and report to the Court and the Parties on whether he/she believes relevant personnel are provided sufficient notification of and access to, and understand each policy or procedure as necessary to fulfill their responsibilities.*

**In Full and Effective Compliance**

GA-1 indicates that Office personnel shall be notified of new policies and changes to existing policies via Briefing Boards and via the HUB, Maricopa County's adaptation of the online training software program, Cornerstone, that MCSO implemented in July 2017 to replace its E-Policy system. Employees are required to complete personal attestations that indicate that they have read and understand policies; the HUB routinely updates recent training and policy reviews for deputies and is visible by immediate supervisors. Per GA-1, "Prior to some policies being revised, time-sensitive changes are often announced in the Briefing Board until the entire policy can be revised and finalized." As noted previously, we recognize the authority of Briefing Boards and understand their utility in publishing critical policy changes quickly; but we have advised MCSO that we generally do not grant Phase 1 compliance for an Order requirement until the requirement is memorialized in a more formal policy.

During this reporting period, MCSO issued (or issued revisions of) the following Order-related policies: CP-2 (Code of Conduct); EA-11 (Arrest Procedures); EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance); ED-2 (Covert Operations); GC-4 (Employee Performance Appraisals); GC-12 (Hiring and Promotional Procedures); GC-17 (Employee Disciplinary Procedures); GE-3 (Property Management and Evidence Control); GE-4 (Use, Assignment, and Operation of Vehicles); GJ-3 (Search and Seizure); GJ-5 (Crime Scene Management); GJ-24 (Community Relations and Youth Programs); and GJ-33 (Significant Operations). In addition to those policies, during this reporting period, MCSO issued several Briefing Boards and Administrative Broadcasts that touched on Order-related topics and revised the language of General Orders. MCSO also published a revised version of the Training Division Operations Manual during this reporting period.

On September 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 64957

*Paragraph 32.* *The MCSO shall require that all Patrol Operation personnel report violations of policy; that Supervisors of all ranks shall be held accountable for identifying and responding to policy or procedure violations by personnel under their command; and that personnel be held accountable for policy and procedural violations. The MCSO shall apply policies uniformly.*

**Phase 1:**  In compliance

- CP-2 (Code of Conduct), most recently amended on April 27, 2022.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on December 16, 2021.

- CP-5 (Truthfulness), most recently amended on March 3, 2022.

- CP-11 (Anti-Retaliation), most recently amended on January 6, 2022.

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.

- GC-16 (Employee Grievance Procedures), most recently amended on December 8, 2021.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2022.

- Administrative Services Division Operations Manual, most recently amended on October 27, 2021.

- Professional Standards Bureau Operations Manual, most recently amended on December 31, 2019.

**Phase 2:**  Not in compliance

Since we began reviewing internal investigations conducted by MCSO, we have reviewed hundreds of administrative misconduct investigations submitted to our Team for this Paragraph. During our reviews, we have continued to note that the investigations conducted by PSB have generally been well-written, and arrived at the appropriate findings. During the last reporting period, we noted some improvement in those investigations conducted at the District level. Unfortunately, District compliance declined from 68% to 58% during this reporting period.

MCSO has trained all investigators who conduct misconduct investigations; and during our site visits, we continue to meet with the Professional Standards Bureau (PSB) and District and Division Command personnel to provide them with information regarding the cases that we have found deficient in structure, format, investigation, or reporting requirements.

PSB personnel have remained responsive to our feedback, and the investigations they submit for compliance with this Paragraph in most cases continue to be complete and thorough. PSB's reviews of investigations conducted by District personnel continue to be thorough, and PSB has identified and addressed many concerns and deficiencies they have found.

WAI 64958

We have continued to be concerned with District case compliance, particularly because MCSO has been conducting misconduct investigations under the Court's Second Order since 2016. In 2017, MCSO made major revisions to both GH-2 (Internal Investigations) and GC-16 (Employee Grievance Procedures). By the end of December 2017, all supervisory personnel responsible for conducting misconduct investigations had attended the 40-hour Misconduct Investigative Training. Since the initial training, supervisors have attended additional training on the proper completion of these investigations.

During this reporting period, there were 19 investigations conducted by District personnel that we reviewed. Of the 19, we or PSB identified investigative and administrative deficiencies with eight (42%), not including timeliness and extension concerns. This is an increase in deficiencies from 32% in the last reporting period. The investigative deficiencies continue to include making inappropriate findings, asking leading questions, using improper allegations, failing to interview all witnesses, or not completing a thorough investigation.

Since March 2018, we have requested and reviewed a monthly report from District Command personnel that documents any actions they have taken to assist their personnel in the completion of administrative misconduct investigations and any actions they have taken to address any deficiencies they have identified. During the last reporting period, we noted two instances where District Command personnel or Deputy Chiefs identified and documented an investigative deficiency in response to the protocols put in in place to comply with the requirements of Paragraph 211.

During this reporting period, we noted three instances where District Command personnel or Deputy Chiefs identified and documented investigative deficiencies in response to the protocols put in place to comply with the requirements of Paragraph 211.

As we have noted previously, timely corrective actions are critical to ensuring that concerns are addressed and resolved before additional deficiencies of the same kind occur. PSB continues to maintain a tracking document to identify deficiencies and ensure that appropriate follow-up or intervention is taking place. We continue to find deficiencies on this list that have not yet been fully addressed or documented by those Districts with the responsibility for follow-up. We will continue to monitor both interventions and deficiency memos, and we will discuss our ongoing concerns with these deficiencies during our next site visit.

During the last reporting period, we reviewed 32 administrative misconduct investigations to determine compliance with this Paragraph and made our compliance findings based on the investigative and administrative requirements for the completion of these investigations. Twenty investigations were conducted by District personnel and 12 were conducted by PSB. Based on the identified deficiencies in District investigations and our assessment of the reasonability of the requested extensions, only one (5%) of the 20 investigations conducted by District personnel was found in compliance. One (8%) of the 12 investigations conducted by PSB were in compliance with all requirements for the completion of misconduct investigations. Overall compliance for the 32 investigations we reviewed for this Paragraph was 6%.

WAI 64959

During this reporting period, we reviewed 38 administrative misconduct investigations to determine compliance with this Paragraph. PSB conducted 19 of these investigations, and District personnel conducted the remaining 19. Sworn supervisors with the rank of sergeant or higher completed all the investigations conducted at the District level. There were 78 potential policy violations in the 38 cases. Thirty of the investigations resulted from external complaints. Eight, including one critical incident, were internally generated. All but one of the 38 investigations were initiated after May 17, 2017, when MCSO revised its internal investigation policies; and all were initiated after the completion of the 40-hour Misconduct Investigative Training that concluded in late 2017.

During this and the last seven reporting periods, we have met with the Deputy Chiefs responsible for oversight of Districts and Divisions outside of PSB during our remote site visits to discuss our concerns with the quality of investigations being conducted by their personnel. These meetings have resulted in useful discussion about needed improvement in the quality of District investigations. After these meetings began, District and Division command personnel began providing more oversight on the completion of these cases. For multiple reporting periods, we noted improvement in the quality of the cases submitted. During the last reporting period, compliance increased from 50% to 68%. During this reporting period, compliance for District cases dropped to 58%. This is particularly concerning, as each of these investigations was reviewed by one or more District or Division Command personnel prior to submitting the case to PSB. Some of these cases remained in this review process for months. In most of the cases, we believe that the deficiencies could and should have been identified during the review process.

District personnel outside PSB conducted 19 of the investigations that we reviewed for compliance with this Paragraph during this reporting period. Eight (42%) of the investigations were noncompliant due to concerns other than timely completion, an increase from 32% during the last reporting period. These deficiencies continue to include improper findings, leading questions, inappropriate allegations, failure to thoroughly conduct the investigation, and numerous administrative concerns. We did not identify any instances where a District investigator failed to appropriately address a training or policy concern during this reporting period. All of the cases investigated by District personnel that we reviewed for this reporting period were initiated after several years of working under the requirements of the Court Orders, after training in how to conduct misconduct investigations (the 40-hour Misconduct Investigative Training completed in late 2017), and after numerous site visit meetings where our Team has provided input on identified deficiencies.

The overall investigative quality for cases investigated by PSB and reviewed by our Team for compliance with this Paragraph has remained high. For this reporting period, PSB conducted 19 of the investigations we reviewed for compliance with this Paragraph. With the exception of timely extensions, all but one of the 19 (95%) were found compliant with those requirements over which the PSB Commander has authority. Four cases (21%) were in full compliance including required timelines. This is an increase from the 8% compliance during the last reporting period.

Of the 38 administrative investigations we reviewed for this Paragraph, 16 resulted in sustained findings. We concur with the sustained findings in all 16. In three of the cases, the employees resigned prior to the completion of the investigation or imposition of discipline. The remaining

WAI 64960

13 sustained cases resulted in six written reprimands, and seven coachings.  In all of these cases, the PSB Commander identified the category and offense number, as well as the presumptive discipline or range of discipline for the sustained allegations.

Of the 38 total investigations we reviewed to determine compliance with this Paragraph, seven (18%) were either submitted within the required 60- or 85-day timeframe, or included an acceptable justification for an extension, an increase from 9% during the last quarter.  Of the 38 total investigations we reviewed for compliance with this Paragraph, six (16%) were finalized and closed with 180 days or included an acceptable extension approval.  This is a decrease from the 25% compliance we found during the last reporting period.  As we have previously noted in our reports, general workload issues are insufficient justification for the failure to complete investigations in a reasonably timely manner.  To be considered compliant with the requirements for the completion of administrative misconduct investigations, extension requests and justifications must be submitted in a timely manner and be reasonably related to the specific investigation.

Based on the identified deficiencies in District investigations and our assessment of the reasonability of the requested extensions, only one (5%) of the 19 investigations were in full compliance with all requirements for the completion of misconduct investigations.  Eight of the investigations were noncompliant based on deficiencies other than timeliness.  As has been the case for multiple reporting periods, we again noted a significant number of cases where multiple extensions were requested at the District level prior to forwarding the cases to PSB, and some were still in the District review process at the end of the 180-day timeframe.

Four (21%) of the 19 investigations conducted by PSB were in compliance with all requirements for the completion of misconduct investigations.  This is an increase from the 8% compliance during the last reporting period.  Fourteen of the 19 investigations were found noncompliant due only to extension requirements.  Overall compliance for the 38 investigations we reviewed for this Paragraph was 13%, an increase from 6% during the last quarter.

As is our practice, we will discuss those cases that we found noncompliant with MCSO personnel during our next site visit.

**Paragraph 33.**  *MCSO Personnel who engage in Discriminatory Policing in any context will be subjected to administrative Discipline and, where appropriate, referred for criminal prosecution. MCSO shall provide clear guidelines, in writing, regarding the disciplinary consequences for personnel who engage in Discriminatory Policing.*

**Phase 1:**  In compliance

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on October 13, 2022.

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2022.

**Phase 2:**  Not in compliance

WAI 64961

The investigations that we review for compliance with this Paragraph do not include biased policing complaints involving the Plaintiffs' class.  Those investigations have additional compliance requirements; we discuss them in Paragraphs 275-283.

During the last reporting period, there were six investigations that were reviewed by our Team that contained allegations of discriminatory policing.  All six were in compliance with investigative requirements.  None were in compliance with timeline requirements.

During this reporting period, there were three investigations reviewed where alleged bias did not involve members of the Plaintiffs' class.  One involved actions by a Detention employee in a jail facility who was alleged to have an inappropriate item and signage on a vehicle.  The employee was sustained for misconduct and received discipline.  The second involved actions of a sworn employee at a call for service.  The complainant alleged that the employee made decisions on the handling of the call based on race.  There were no sustained findings in this case.  Both of these cases were properly investigated, and we concur with the findings in both.

A third case involved allegations of inappropriate and biased comments made in the jail setting.  While PSB sustained some of the allegations, we found multiple deficiencies in this investigation.  These deficiencies included failure to make an appropriate credibility determination and failure to attempt to resolve material inconsistencies.

Only one of the three cases was in compliance with the requirements for the timely completion of administrative investigations.

While discriminatory policing allegations that involve members of the Plaintiffs' class are not reported in this Paragraph, we note that MCSO did complete six investigations for this reporting period that were determined to be Class Remedial Matters.  (We address this case in Paragraphs 275-288.)


***Paragraph 34.***  *MCSO shall review each policy and procedure on an annual basis to ensure that the policy or procedure provides effective direction to MCSO Personnel and remains consistent with this Order, current law and professional standards.  The MCSO shall document such annual review in writing.  MCSO also shall review Policies and Procedures as necessary upon notice of a policy deficiency during audits or reviews.  MCSO shall revise any deficient policy as soon as practicable.*

**In Full and Effective Compliance**

MCSO continues to review on an annual basis all critical policies and all policies relevant to the Court Orders for consistency with Constitutional policing, current law, and professional standards.

During this reporting period, MCSO continued its annual review, sending six (12%) of the 48 required policies.  MCSO submitted ED-2 (Covert Operations); GE-3 (Property Management and Evidence Control); GH-2 (Internal Investigations); GI-1 (Radio and Enforcement Communications Procedures); GJ-2 (Critical Incident Response); and GJ-35 (Body-Worn Cameras).

WAI 64962

On June 3, 2019, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 64963

## Section 5: Pre-Planned Operations

***Paragraph 35.*** *The Monitor shall regularly review the mission statement, policies and operations documents of any Specialized Unit within the MCSO that enforces Immigration-Related Laws to ensure that such unit(s) is/are operating in accordance with the Constitution, the laws of the United States and State of Arizona, and this Order.*

**In Full and Effective Compliance**

To verify Phase 2 compliance with this Paragraph, we previously verified that the Criminal Employment Unit (CEU) was disbanded and removed from the Special Investigations Division organizational chart. The Human Smuggling Unit (HSU) was also disbanded, and personnel were reassigned to the Anti-Trafficking Unit (ATU).

During our review of the arrests made by the Special Investigations Division ATU between March 2015-March 2017, we did not note any arrests for immigration or human smuggling violations. The cases submitted by MCSO and reviewed for the ATU were primarily related to narcotics trafficking offenses.

MCSO reported in April 2017 that it had disbanded the Anti-Trafficking Unit and formed a new unit, Fugitive Apprehension and Tactical Enforcement (FATE). The primary mission of FATE is to locate and apprehend violent fugitives. We reviewed FATE's mission statement and objectives, as well as the organizational chart for the Special Investigations Division. MCSO had removed the ATU from the organizational chart, and the mission of FATE did not include any reference to the enforcement of Immigration-Related Laws.

The revised organizational chart for SID and documentation MCSO provided regarding the implementation of FATE supported that the ATU no longer existed, and that there were no specialized Units in MCSO that enforced Immigration-Related Laws.

We previously received and reviewed the Special Investigations Division Operations Manual and organizational chart. Both confirmed that MCSO has no specialized Units that enforce Immigration-Related Laws, that the Human Smuggling Unit (HSU) was disbanded, and the Anti-Trafficking Unit (ATU) no longer exists.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

***Paragraph 36.*** *The MCSO shall ensure that any Significant Operations or Patrols are initiated and carried out in a race-neutral fashion. For any Significant Operation or Patrol involving 10 or more MCSO personnel, excluding posse members, the MCSO shall develop a written protocol including a statement of the operational motivations and objectives, parameters for supporting documentation that shall be collected, operations plans, and provide instructions to supervisors, deputies and posse members. That written protocol shall be provided to the Monitor in advance of any Significant Operation or Patrol.*

WAI 64964

**In Full and Effective Compliance**

Since the requirements for conducting Significant Operations were implemented, MCSO has reported conducting only one Significant Operation that invoked the requirements of this Paragraph. MCSO conducted "Operation Borderline" from October 20-27, 2014, to interdict the flow of illegal narcotics into Maricopa County. MCSO met all the requirements of this Paragraph during the operation.

In February 2016, we became aware of "Operation No Drug Bust Too Small" when it was reported in the media, and requested details on this operation from MCSO. After reviewing the documentation MCSO provided, we were satisfied that it did not meet the reporting requirements of this Paragraph.

In October 2016, we became aware of "Operation Gila Monster" when it was reported in the media. According to media reports, this was a two-week operation conducted by a special operations Unit in MCSO and was intended to interdict the flow of illegal drugs into Maricopa County. We requested all documentation regarding this operation for review. The documentation indicated that MCSO conducted this operation from October 17-23, 2016. The documentation MCSO provided was sufficient for us to determine that this operation did not meet the reporting criteria for this, or other Paragraphs, related to Significant Operations. The Plaintiffs also reviewed the documentation submitted by MCSO on this operation and agreed that the operation did not invoke the requirements of this Paragraph. We and the Plaintiffs noted that "Operation Gila Monster" involved traffic stops of Latinos, and that those arrested were undocumented Latinos.

Since October 2014, MCSO has continued to report that it has not conducted any Significant Operations. In addition, we have not learned of any potential Significant Operation through media releases or other sources during this reporting period. We will continue to monitor and review any operations we become aware of to ensure continued compliance with this and other Paragraphs related to Significant Operations.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 37.** *The MCSO shall submit a standard template for operations plans and standard instructions for supervisors, deputies and posse members applicable to all Significant Operations or Patrols to the Monitor for review pursuant to the process described in Section IV within 90 days of the Effective Date. In Exigent Circumstances, the MCSO may conduct Significant Operations or Patrols during the interim period but such patrols shall be conducted in a manner that is in compliance with the requirement of this Order. Any Significant Operations or Patrols thereafter must be in accordance with the approved template and instructions.*

**In Full and Effective Compliance**

WAI 64965

In late 2014, we reviewed all the documentation submitted by MCSO regarding the Significant Operation conducted from October 24-27, 2014. This operation was intended to interdict the flow of illegal narcotics into Maricopa County and fully complied with the requirements of this Paragraph.

MCSO continues to report that it has not conducted any operations that invoke the requirements of this Paragraph since October 2014.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

During this reporting period, we did not become aware of any Significant Operations conducted by MCSO.

**(Note: Unchanged language is presented in *italicized font*. Additions are indicated by underlined font. Deletions are indicated by ~~crossed-out font~~.)**

*Paragraph 38. If the MCSO conducts any Significant Operations or Patrols involving 10 or more MCSO Personnel excluding posse members, it shall create the following documentation and provide it to the Monitor and Plaintiffs within 30 days after the operation:*

a.   *documentation of the specific justification/reason for the operation, certified as drafted prior to the operation (this documentation must include analysis of relevant, reliable, and comparative crime data);*

b.   *information that triggered the operation and/or selection of the particular site for the operation;*

c.   *documentation of the steps taken to corroborate any information or intelligence received from non-law enforcement personnel;*

d.   *documentation of command staff review and approval of the operation and operations plans;*

e.   *a listing of specific operational objectives for the patrol;*

f.   *documentation of specific operational objectives and instructions as communicated to participating MCSO Personnel;*

g.   *any operations plans, other instructions, guidance or post-operation feedback or debriefing provided to participating MCSO Personnel;*

h.   *a post-operation analysis of the patrol, including a detailed report of any significant events that occurred during the patrol;*

i.   *arrest lists, officer participation logs and records for the patrol; and*

j.   *data about each contact made during the operation, including whether it resulted in a citation or arrest.*

WAI 64966

**In Full and Effective Compliance**

Since the initial publication of GJ-33, MCSO has reported that it has conducted only one Significant Operation, "Operation Borderline," in October 2014. At the time of this operation, we reviewed MCSO's compliance with policy; attended the operational briefing; and verified the inclusion of all the required protocols, planning checklists, supervisor daily checklists, and post-operation reports. MCSO was in full compliance with this Paragraph for this operation. Since October 2014, MCSO has not reported that it conducted any Significant Operations invoking the requirements of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 39.** *The MCSO shall hold a community outreach meeting no more than 40 days after any Significant Operations or Patrols in the affected District(s). MCSO shall work with the Community Advisory Board to ensure that the community outreach meeting adequately communicates information regarding the objectives and results of the operation or patrol. The community outreach meeting shall be advertised and conducted in English and Spanish.*

**In Full and Effective Compliance**

The Amendments to the Supplemental Permanent Injunction/Judgment Order (Document 2100) issued on August 3, 2017 returned the responsibility for compliance with this Paragraph to MCSO.

During this reporting period, MCSO did not report conducting any Significant Operations that would invoke the requirements of this Paragraph.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 40.** *The MCSO shall notify the Monitor and Plaintiffs within 24 hours of any immigration related traffic enforcement activity or Significant Operation involving the arrest of 5 or more people unless such disclosure would interfere with an on-going criminal investigation in which case the notification shall be provided under seal to the Court, which may determine that disclosure to the Monitor and Plaintiffs would not interfere with an on-going criminal investigation. In any event, as soon as disclosure would no longer interfere with an on-going criminal investigation, MCSO shall provide the notification to the Monitor and Plaintiffs. To the extent that it is not already covered above by Paragraph 38, the Monitor and Plaintiffs may request any documentation related to such activity as they deem reasonably necessary to ensure compliance with the Court's orders.*

**In Full and Effective Compliance**

WAI 64967

Since MCSO first developed GJ-33 (Significant Operations) in 2014, MCSO has reported conducting only one operation, "Operation Borderline," that required compliance with this Paragraph.  We verified that MCSO employed the appropriate protocols and made all required notifications.  MCSO was in full compliance with this Paragraph during this operation.

Based on a concern raised by the Plaintiffs, and to provide clarification regarding the portion of this Paragraph that addresses the requirement for MCSO to notify the Monitor and Plaintiffs within 24 hours of any immigration-related traffic enforcement activity or Significant Operations involving "the arrest of 5 or more persons," we requested during our October 2015 site visit that MCSO provide a statement regarding this requirement each month.  MCSO began including this information in November 2015.

MCSO has not reported conducting any operations that meet the reporting requirements for this Paragraph since October 2014.  During this reporting period, we did not learn of any traffic-related enforcement or Significant Operations conducted by MCSO that would invoke the requirements of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 64968

## Section 6: Training

**COURT ORDER VII.  TRAINING**

*a.  General Provisions*

*Paragraph 41.  To ensure that the Policies and Procedures provided for by this Order are effectuated, the MCSO shall implement the following requirements regarding Training.*

*Paragraph 42.  The persons presenting this Training in each area shall be competent instructors with significant experience and expertise in the area.  Those presenting Training on legal matters shall also hold a law degree from an accredited law school and be admitted to a Bar of any state and/or the District of Columbia.*

**Phase 1:**  In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on March 31, 2021.

- GG-2 (Detention/Civilian Training Administration), most recently amended on March 31, 2021.

- Training Division Operations Manual, most recently amended on April 4, 2022.

**Phase 2:**  Not in compliance

MCSO uses three types of instructors to deliver Order-related training:  They are either assigned to the Training Division as full-time staff; assigned to field assignments outside of the Training Division; or are paid vendors.  We and Parties approve instructors presenting training on legal matters for their compliance with the requirements of this Paragraph.  The Training Division manually maintains individual instructor folders for Training Division staff, field instructors, Field Training Officers (FTOs), and vendors.  MCSO policy requires that instructor folders include annually updated CVs, General Instructor (GI) certificates, and either an annual or 30-day Misconduct and Disciplinary Review, as applicable.  Additionally, instructors who have received prior sustained discipline or who are currently involved with an ongoing Professional Standards Bureau (PSB) investigation may request a Waiver of Presumptive Ineligibility for approval to teach from the Training Division Commander.  A waiver request should provide the Training Division Commander with ample justification to overcome presumptive ineligibility.  Waiver requests require the Training Division Commander to produce written justifications for the approval or denial of each request.  We verify compliance with this Paragraph by reviewing all instructor folders, waiver requests, and justifications.

WAI 64969

During this reporting period, the Training Division did not conduct any instructor observations. MCSO policy does not direct the frequency of these observations – only that observations are included in the Training Division database. We continue to recommend that the Training Division conduct observations at every opportunity to ensure that selected instructors demonstrate competency, experience, and expertise.

During this reporting period, MCSO supplied documentation for three individuals approved as FTOs. We do not believe these individuals meet the requirements of GG-1, as their PSB misconduct and disciplinary reviews did not meet the 30-day requirement to receive an OIT assignment. Additionally, two of the three individuals are the subjects of ongoing investigations that, if sustained, could constitute serious misconduct as defined by policy. We discussed this observation with the Captain of the Training Division during our July site visit and questioned if she would seek or had sought advice from the PSB Commander to aid in deciding suitability as FTOs. She advised that she would not seek advice from the PSB Commander under these circumstances, but indicated that she would not approve individuals with such open investigations. However, they were inexplicably approved.

Additionally, in May, MCSO delivered a 2021 EIS classroom training train-the-trainer session. In February 2022, MCSO had provided our Team with instructor folders for 11 personnel identified as the EIS instructional cadre. After review, all 11 were approved; and we advised MCSO that PSB misconduct and disciplinary reviews were needed prior to instructional assignment. either lead instructor received the proper PSB review prior to conducting this training session.

Monthly reporting shows that MCSO is still not following its policies as it pertains to FTO and General Instructor (GI) qualifications. MCSO is not in compliance with this Paragraph.

**Paragraph 43.** *The Training shall include at least 60% live training (i.e., with a live instructor), which includes an interactive component, and no more than 40% on-line training. The Training shall also include testing and/or writings that indicate that MCSO Personnel taking the Training comprehend the material taught whether via live training or via on-line training.*

**In Full and Effective Compliance**

We verify compliance with this Paragraph by reviewing all individual test failures; individual retests; failure remediation efforts, and test analyses by training class; for both live and HUB-delivered Order-related training.

During this reporting period, MCSO delivered the following programs: 2022 Bias-Free Policing and Fourth and Fourteenth Amendment Training (20-Hour Fourth and Fourteenth Amendment Training); 2022 Annual Combined Training (ACT); 2021 Blue Team (BT Sworn); 2021 Body-Worn Camera (BWC); 2021 Early Identification System (EIS); and the 2021 Traffic and Criminal Software (TraCS).

MCSO delivered the 20-hour Fourth and Fourteenth Amendment classroom training once during this reporting period to all eight personnel (five sworn, three Posse) requiring training. No personnel needed test remediation.

WAI 64970

MCSO delivered the 2022 ACT five times during this reporting period to 136 personnel (119/601 sworn, 5/42 reserve, 10/184 posse, 2/9 Deputy Service Aides [DSAs]) requiring this training. In May, 24 sworn instructors took part in the train-the-trainer session. In June the class was delivered four times. One reserve employee needed test remediation.

MCSO delivered the 2021 BT Sworn) classroom training three times during this reporting period to 18 personnel (five sworn, 12 Detention, one civilian). No personnel needed test remediation.

MCSO delivered the 2021 BWC classroom training once during this reporting period to five sworn personnel. No personnel required test remediation.

MCSO delivered the 2021 EIS classroom training once during this reporting period to 12 personnel (four sworn, four Detention, four civilian). This was a train-the-trainer session for the eight sworn and four Detention personnel requiring this training. The four civilian personnel attended the course to assist in their analyst duties, but they will not be used in an instructional capacity and were not required to attend. No personnel required test remediation.

MCSO delivered the 2021 TraCS classroom training once during this reporting period to six sworn personnel. No personnel required test remediation.

MCSO delivered six of 14 Order-related training programs during this reporting period. Each of these were delivered in the classroom for 100% of classroom training.

While there are always opportunities for the testing to be more robust, MCSO incorporates tests with all Order-related training that demonstrate that personnel who have completed the training comprehend the material.

On June 17, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.


***Paragraph 44.*** *Within 90 days of the Effective Date, MCSO shall set out a schedule for delivering all Training required by this Order. Plaintiffs' Representative and the Monitor shall be provided with the schedule of all Trainings and will be permitted to observe all live trainings and all on-line training. Attendees shall sign in at each live session. MCSO shall keep an up-to-date list of the live and on-line Training sessions and hours attended or viewed by each officer and Supervisor and make that available to the Monitor and Plaintiffs.*

**Phase 1:** In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on March 31, 2021.

- GG-2 (Detention/Civilian Training Administration), most recently amended on March 31, 2021.

- Training Division Operations Manual, most recently amended on April 4, 2022.

**Phase 2:** In compliance

WAI 64971

The Training Division maintains a three-month Training Calendar.  MCSO posts the Master Training Calendar to its website to inform the public of tentative training dates, classes, and locations.  The calendar displays 90-day increments and includes a legend specifically identifying Order-related training.

Master Personnel Rosters document the number of personnel requiring Order-related training. MCSO reported that 601 sworn members, 12 reserve members, 30 retired reserve members, 184 Posse members, nine DSAs, 1,619 Detention members, and 763 civilian employees should receive Order-related instruction by the end of this reporting period.  These categories vary by reporting period, due to attrition in the organization.

**Paragraph 45.**  *The Training may incorporate adult-learning methods that incorporate roleplaying scenarios, interactive exercises, as well as traditional lecture formats.*

**In Full and Effective Compliance**

MCSO continues to look for and incorporate adult-learning methods in its curricula – including an increased use of videos, both externally and internally created.  We have also noted new learning activities designed to change with each iteration of the curriculum and address issues specific to the Plaintiffs' class and others.  These learning activities are designed to change from year to year.

On December 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 46.**  *The curriculum and any materials and information on the proposed instructors for the Training provided for by this Order shall be provided to the Monitor within 90 days of the Effective Date for review pursuant to the process described in Section IV.  The Monitor and Plaintiffs may provide resources that the MCSO can consult to develop the content of the Training, including names of suggested instructors.*

**In Full and Effective Compliance**

During our July remote site visit, we discussed the status of all Order-required training curricula.

The 2022 Fourth and Fourteenth Amendment Training was previously approved for delivery.

The 2022 ACT was previously approved for delivery.

The 2021 Blue Team (BT) Civilian received annual 2022 review and required no change.

The 2021 BT Deputy, Lateral training received annual 2022 review and required no change.

The 2019 Body-Worn Camera (BWC) Training received annual 2022 review and required no change.

The 2021 Early Identification System (EIS) received annual 2022 review and required no change.

WAI 64972

The 2021 Employee Performance Appraisals (EPA) Training (currently delivered only to civilian personnel) received annual 2022 review and required no change.

The 2021 EEPM (currently delivered only to sworn personnel) received 2022 annual review.

The 2021 Complaint Intake and Reception HUB training needs 2022 annual review.

The 2022 SRELE is under development.

The 2022 Administrative Misconduct Investigation Refresher (PSB8) External remains under development.

The 2021 Traffic and Criminal Software (TraCS) Training received annual 2022 and required no changes.

The 2021 TraCS for Supervisors Training received annual 2022 review and required no changes.

On December 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.


***Paragraph 47.*** *MCSO shall regularly update the Training to keep up with developments in the law and to take into account feedback from the Monitor, the Court, Plaintiffs and MCSO Personnel.*

**In Full and Effective Compliance**

MCSO conducts annual curriculum revisions and updates to keep current with developments in the law and to address feedback from us, the Plaintiffs, the Plaintiff-Intervenor, and MCSO personnel.

The Training Division routinely supplies all new and revised lesson plans for our and the Parties' review. These reviews address the requirements of this Paragraph.

Previously, MCSO proposed a 2022 iteration of Enhanced Training for the Constitutional Policing Plan. The first focus of the approved video project focused on the LGBTQ community, which included members of the Plaintiffs' class. MCSO experienced difficulties in gaining the support and participation of this community for this project. During this reporting period, MCSO requested and was granted approval to change the subject of this training to Gila Bend.

We will continue to advise MCSO upon first review of a training offering if we do not consider it to be enhanced. When onsite compliance visits resume, MCSO should expect that we and the Parties will continue observing training sessions and provide appropriate feedback.

On June 17, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 64973

### b. Bias-Free Policing Training

***Paragraph 48.*** *The MCSO shall provide all sworn Deputies, including Supervisors and chiefs, as well as all posse members, with 12 hours of comprehensive and interdisciplinary Training on bias-free policing within 240 days of the Effective Date, or for new Deputies or posse members, within 90 days of the start of their service, and at least 6 hours annually thereafter.*

**In Full and Effective Compliance**

MCSO has combined the Order required Bias-Free Policing Training and the Training on Detentions, Arrests, and the Enforcement of Immigration Laws into a single 20-hour training class titled Fourth and Fourteenth Amendment Training. MCSO mandates that all new deputies, Posse members, and Deputy Service Aides (DSA) receive this Court-ordered training within the first 90 days of their employment or volunteer service.

MCSO delivered the 20-hour Fourth and Fourteenth Amendment (Bias-Free Policing) classroom training once during this reporting period to all eight personnel (five sworn, three Posse) requiring training.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

***Paragraph 49.*** *The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:*

a. *definitions of racial profiling and Discriminatory Policing;*

b. *examples of the type of conduct that would constitute Discriminatory Policing as well as examples of the types of indicators Deputies may properly rely upon;*

c. *the protection of civil rights as a central part of the police mission and as essential to effective policing;*

d. *an emphasis on ethics, professionalism and the protection of civil rights as a central part of the police mission and as essential to effective policing;*

e. *constitutional and other legal requirements related to equal protection, unlawful discrimination, and restrictions on the enforcement of Immigration-Related Laws, including the requirements of this Order;*

f. *MCSO policies related to Discriminatory Policing, the enforcement of Immigration-Related Laws and traffic enforcement, and to the extent past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;*

g. *MCSO's protocol and requirements for ensuring that any significant pre-planned operations or patrols are initiated and carried out in a race-neutral fashion;*

h. *police and community perspectives related to Discriminatory Policing;*

WAI 64974

i.    the existence of arbitrary classifications, stereotypes, and implicit bias, and the impact that these may have on the decision-making and behavior of a Deputy;

j.    methods and strategies for identifying stereotypes and implicit bias in Deputy decision-making;

k.    methods and strategies for ensuring effective policing, including reliance solely on non-discriminatory factors at key decision points;

l.    methods and strategies to reduce misunderstanding, resolve and/or de-escalate conflict, and avoid Complaints due to perceived police bias or discrimination;

m.    cultural awareness and how to communicate with individuals in commonly encountered scenarios;

n.    problem-oriented policing tactics and other methods for improving public safety and crime prevention through community engagement;

o.    the benefits of actively engaging community organizations, including those serving youth and immigrant communities;

p.    the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;

q.    background information on the Melendres v. Arpaio litigation, as well as a summary and explanation of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in Melendres v. Arpaio, the parameters of the Court's permanent injunction, and the requirements of this Order; and

r.    Instruction on the data collection protocols and reporting requirements of this Order.

**In Full and Effective Compliance**

The Fourth and Fourteenth Amendment Training curriculum was previously approved for delivery. The curriculum requires an annual review in 2022.

MCSO delivered the 20-hour Fourth and Fourteenth Amendment classroom training once during this reporting period to all eight personnel (five sworn, three Posse) requiring training.

The 2022 ACT curriculum was approved during the previous reporting period.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 64975

### c. *Training on Detentions, Arrests, and the Enforcement of Immigration-Related Laws*

***Paragraph 50.*** *In addition to the Training on bias-free policing, the MCSO shall provide all sworn personnel, including Supervisors and chiefs, as well as all posse members, with 6 hours of Training on the Fourth Amendment, including on detentions, arrests and the enforcement of Immigration-Related Laws within 180 days of the effective date of this Order, or for new Deputies or posse members, within 90 days of the start of their service.  MCSO shall provide all Deputies with 4 hours of Training each year thereafter.*

**In Full and Effective Compliance**

MCSO has combined the Order required Bias-Free Policing Training and the Training on Detentions, Arrests, and the Enforcement of Immigration Laws into a single 20-hour training class titled Fourth and Fourteenth Amendment Training.  MCSO mandates that all new deputies, Posse members, and Deputy Service Aides (DSA) receive this Court Ordered training within the first 90 days of their employment or volunteer service.

MCSO delivered the 20-hour Fourth and Fourteenth Amendment (Training on Detentions, Arrests, and the Enforcement of Immigration-Related Laws) classroom training once during this reporting period to all eight personnel (five sworn, three Posse) requiring training.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

***Paragraph 51.*** *The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:*

a.     *an explanation of the difference between various police contacts according to the level of police intrusion and the requisite level of suspicion; the difference between reasonable suspicion and mere speculation; and the difference between voluntary consent and mere acquiescence to police authority;*

b.     *guidance on the facts and circumstances that should be considered in initiating, expanding or terminating an Investigatory Stop or detention;*

c.     *guidance on the circumstances under which an Investigatory Detention can become an arrest requiring probable cause;*

d.     *constitutional and other legal requirements related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, including the requirements of this Order;*

e.     *MCSO policies related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, and the extent to which past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;*

f.     *the circumstances under which a passenger may be questioned or asked for identification;*

WAI 64976

g.    the forms of identification that will be deemed acceptable if a driver or passenger (in circumstances where identification is required of them) is unable to present an Arizona driver's license;

h.    the circumstances under which an officer may initiate a vehicle stop in order to investigate a load vehicle;

i.    the circumstances under which a Deputy may question any individual as to his/her alienage or immigration status, investigate an individual's identity or search the individual in order to develop evidence of unlawful status, contact ICE/CBP, await a response from ICE/CBP and/or deliver an individual to ICE/CBP custody;

j.    a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause to believe that a vehicle or an individual is involved in an immigration-related state crime, such as a violation of the Arizona Human Smuggling Statute, as drawn from legal precedent and updated as necessary; the factors shall not include actual or apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a Hispanic day laborer;

k.    a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause that an individual is in the country unlawfully, as drawn from legal precedent and updated as necessary; the factors shall not include actual or apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a day laborer;

l.    an emphasis on the rule that use of race or ethnicity to any degree, except in the case of a reliable, specific suspect description, is prohibited;

m.    the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;

n.    Provide all trainees a copy of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in Melendres v. Arpaio and this Order, as well as a summary and explanation of the same that is drafted by counsel for Plaintiffs or Defendants and reviewed by the Monitor or the Court; and

o.    Instruction on the data collection protocols and reporting requirements of this Order, particularly reporting requirements for any contact with ICE/CBP.

**In Full and Effective Compliance**

The Fourth and Fourteenth Amendment Training curriculum was previously approved for delivery.  The curriculum will require an annual review in 2022.

The 2022 ACT curriculum was approved during the previous reporting period.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 64977

### d. Supervisor and Command Level Training

**Paragraph 52.**   *MCSO shall provide Supervisors with comprehensive and interdisciplinary Training on supervision strategies and supervisory responsibilities under the Order.  MCSO shall provide an initial mandatory supervisor training of no less than 6 hours, which shall be completed prior to assuming supervisory responsibilities or, for current MCSO Supervisors, within 180 days of the Effective Date of this Order.  In addition to this initial Supervisor Training, MCSO shall require each Supervisor to complete at least 4 hours of Supervisor-specific Training annually thereafter.  As needed, Supervisors shall also receive Training and updates as required by changes in pertinent developments in the law of equal protection, Fourth Amendment, the enforcement of Immigration-Related Laws, and other areas, as well as Training in new skills.*

**In Full and Effective Compliance**

The 2022 SRELE classroom training has been approved for delivery.

On June 18, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 53.**   *The Supervisor-specific Training shall address or include, at a minimum:*

a.      *techniques for effectively guiding and directing Deputies, and promoting effective and constitutional police practices in conformity with the Policies and Procedures in Paragraphs 18–34 and the Fourth and Fourteenth Amendment Training in Paragraphs 48–51;*

b.      *how to conduct regular reviews of subordinates;*

c.      *operation of Supervisory tools such as EIS;*

d.      *evaluation of written reports, including how to identify conclusory, "canned," or perfunctory language that is not supported by specific facts;*

e.      *how to analyze collected traffic stop data, audio and visual recordings, and patrol data to look for warning signs or indicia of possible racial profiling or unlawful conduct;*

f.      *how to plan significant operations and patrols to ensure that they are race-neutral and how to supervise Deputies engaged in such operations;*

g.      *incorporating integrity-related data into COMSTAT reporting;*

h.      *how to respond to calls from Deputies requesting permission to proceed with an investigation of an individual's immigration status, including contacting ICE/CBP;*

i.      *how to respond to the scene of a traffic stop when a civilian would like to make a Complaint against a Deputy;*

j.      *how to respond to and investigate allegations of Deputy misconduct generally;*

WAI 64978

k.    *evaluating Deputy performance as part of the regular employee performance evaluation; and*

l.    *building community partnerships and guiding Deputies to do the Training for Personnel Conducting Misconduct Investigations.*

**In Full and Effective Compliance**

The 2022 SRELE classroom training has been approved for delivery.

On June 18, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 64979

# Section 7: Traffic Stop Documentation and Data Collection

**COURT ORDER VIII.    TRAFFIC STOP DOCUMENTATION AND DATA COLLECTION AND REVIEW**

For Paragraphs 54 and 55, in particular, we request traffic stop data from MCSO. The following describes how we made that request and how we handled the data once we received it. These data may also be referred to in other areas of Section 7 and the report as a whole.

In selecting traffic stop cases for our compliance review, we modified our statistical technique in that, rather than selecting a representative random sample of 100 cases per quarter, we instead pulled a sample of 35 cases per month (or 105 cases per quarter). Our original selection of a sample size of 35 cases was based on information from MCSO TraCS data that reported the average number of traffic stops per month was fewer than 2,000 during the April 2014-June 2015 period when TraCS data were first available. The selection of 35 cases reflects a sample based on this average per month. This gave us a 95 percent confidence level (the certainty associated with our conclusion).

We continue to pull our monthly sample of traffic stop cases from the MCSO's five Districts (Districts 1, 2, 3, 4, and 7) and Lake Patrol. As mentioned earlier, District 6 is no longer operational as of January 11, 2022, as the Queen Creek Police Department commenced full operations and is now the primary law enforcement agency for that jurisdiction. Once we received files each month containing traffic stop case numbers from MCSO, denoting from which area they came, we selected a sample of up to 35 cases representing the areas and then selected a subsample averaging 10 cases, from the 35 selected cases, to obtain CAD audiotapes and body-worn camera recordings. Our sampling process involved selecting a sample of cases stratified by the areas according to the proportion of specific area cases relative to the total area cases. Stratification of the data was necessary to ensure that each area was represented proportionally in our review. Randomization of the cases and the selection of the final cases for CAD review were achieved using a statistical software package (IBM SPSS Version 22), which contains a specific function that randomly selects cases and that also allows cases to be weighted by the areas. Our use of SPSS required that we first convert the MCSO Excel spreadsheet into a format that would be readable in SPSS. We next pulled the stratified sample each month for the areas and then randomly selected a CAD audio subsample from the selected cases.

In February 2016, we began pulling cases for our body-worn camera review from the audio subsample. Since that time, we began pulling additional samples for passenger contacts and persons' searches (10 each per month). The unique identifiers for these two samples were relayed back to MCSO personnel, who produced documentation for the selected sample (including the CAD documentation for the subsample).

On October 10, 2014, the Court issued an Order Granting Stipulation to Amend Supplemental/Permanent Injunction/Judgment Order (Document 748). The stipulation affects Paragraphs 57, 61, 62, and 1.r.xv.; and has been incorporated in the body of this report. The stipulation referenced amends the First Order, and will be addressed in Section 7.

WAI 64980

### a. Collection of Traffic Stop Data

**Paragraph 54.**  *Within 180 days of the Effective Date, MCSO shall develop a system to ensure that Deputies collect data on all vehicle stops, whether or not they result in the issuance of a citation or arrest.  This system shall require Deputies to document, at a minimum:*

a.    *the name, badge/serial number, and unit of each Deputy and posse member involved;*

b.    *the date, time and location of the stop, recorded in a format that can be subject to geocoding;*

c.    *the license plate state and number of the subject vehicle;*

d.    *the total number of occupants in the vehicle;*

e.    *the Deputy's subjective perceived race, ethnicity and gender of the driver and any passengers, based on the officer's subjective impression (no inquiry into an occupant's ethnicity or gender is required or permitted);*

f.    *the name of any individual upon whom the Deputy runs a license or warrant check (including subject's surname);*

g.    *an indication of whether the Deputy otherwise contacted any passengers, the nature of the contact, and the reasons for such contact;*

h.    *the reason for the stop, recorded prior to contact with the occupants of the stopped vehicle, including a description of the traffic or equipment violation observed, if any, and any indicators of criminal activity developed before or during the stop;*

i.    *time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; time a release was made without citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere or Deputy's departure from the scene;*

j.    *whether any inquiry as to immigration status was conducted and whether ICE/CBP was contacted, and if so, the facts supporting the inquiry or contact with ICE/CBP, the time Supervisor approval was sought, the time ICE/CBP was contacted, the time it took to complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual;*

k.    *whether any individual was asked to consent to a search (and the response), whether a probable cause search was performed on any individual, or whether a pat-and-frisk search was performed on any individual;*

l.    *whether any contraband or evidence was seized from any individual, and nature of the contraband or evidence; and*

m.    *The final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without citation.*

**Phase 1:**  In compliance

WAI 64981

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on October 13, 2022.

- EA-11 (Arrest Procedures), most recently amended on April 5, 2022.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on April 27, 2022.

- EB-2 (Traffic Stop Data Collection), most recently amended on June 15, 2021.

- GI-1 (Radio and Enforcement Communications Procedures), most recently amended on December 8, 2021.

- GJ-3 (Search and Seizure), most recently amended on May 5, 2022.

**Phase 2:**  Not in compliance

To verify the information required for this Paragraph, MCSO created, and we reviewed, the Vehicle Stop Contact Form (VSCF), the Vehicle Stop Contact Form Supplemental Sheet, the Incidental Contact Receipt, and the Written Warning/Repair Order, all in electronic form, for those motorists who, during this reporting period, committed a traffic violation or operated a vehicle with defective equipment and received a warning.  We also reviewed the Arizona Traffic Ticket and Complaint Forms issued for violations of Arizona Statutes, Internet I/Viewer Event Unit printout, Justice Web Interface printout, and any Incident Report associated with the event. We selected a sample of 105 traffic stops conducted by deputies from April 1-June 30, 2022 for the purposes of this review; and assessed the collected data from the above-listed documents for compliance with Subparagraphs 54.a.-54.m.  All of the listed documentation was used for our review of the following subsections of this Paragraph.

The Paragraph requires that MCSO create a system for data collection.  The data collected pursuant to this Paragraph will be captured in the Early Identification System, which we discuss further in this report.

In our reviews of the following requirements, we consider whether any compliance issues were identified and addressed by supervisory personnel during the regular review of documents by supervisors.  If any such instances are identified, we include such information in this report.

Paragraph 54.a. requires MCSO to document the name, badge/serial number, and unit of each deputy and Posse member involved.

For this reporting period, all of the primary deputies indicated their own serial numbers for every stop they initiated.  We review the VSCF, I/Viewer Event document, the Justice Web Interface, and the CAD printout to determine which units were on the scene.  If back-up units arrive on a scene and do not announce their presence to dispatch, CAD does not capture this information. MCSO made a TraCS change to the VSCF during 2016 to secure this information.  MCSO added a drop-down box so the deputy could enter the number of units on the scene and the appropriate fields would be added for the additional deputies.  While this addition is an improvement, if the deputy fails to enter the number of additional units on the form, the drop-down boxes do not appear.  In addition, MCSO policy requires deputies to prepare the Assisting Deputy and Body-Worn Camera Log in instances where deputies respond and assist at a traffic stop.  The log

WAI 64982

contains the relevant information required by this Subparagraph for any additional deputies involved in a traffic stop other than the primary deputy. During our April 2019 site visit, we discussed with MCSO, the Plaintiffs, and the Plaintiff-Intervenor the method of evaluating this requirement. We determined that in instances where a deputy's name, serial number and unit number may have been omitted on the VSCF, yet the deputy prepared the Assisting Deputy and Body-Worn Camera Log, the requirements of this Subparagraph will have been met.

During our review of the sample of 105 vehicle traffic stops, we identified 31 cases where the deputy's unit had another deputy assigned to the vehicle or one or more other deputy units or Posse members were on the scene. In 30 of the 31 cases, the deputies properly documented the name, serial number, and unit number of the deputies and Posse members on the VSCF, or the information was captured on the Assisting Deputy and Body-Worn Camera Log. In one case, an assisting deputy was omitted from the VSCF; and the assisting deputy failed to prepare an Assisting Deputy and Body-Worn Camera Log. AIU identified this issue as well, and requested that the District prepare an Action Form to address the issue.

Of the cases we reviewed for passenger contacts under Subparagraph 54.g., there were 47 cases where the deputy's unit had another deputy assigned to the vehicle, or one or more other deputy units or Posse members were on the scene. In each of the 47 cases, the deputies properly documented the required information on the VSCFs, or the information was captured on the Assisting Deputy and Body-Worn Camera Log.

Of the cases we reviewed for searches of persons under Subparagraph 54.k., there were 62 cases where the deputy's unit had another deputy assigned to the vehicle, or one or more other deputies or Posse members were on the scene. In each of the 62 cases, the deputies properly documented the required information on the VSCFs or the information was captured on the Assisting Deputy and Body-Worn Camera Logs.

We continue to identify cases where the assisting deputies have not prepared the Assisting Deputy and Body-Worn Camera Log when required by MCSO policy. We encourage MCSO to provide guidance to supervisors to be attentive to this issue during their reviews of traffic stop documentation.

During the third reporting period of 2021, MCSO achieved a compliance rating of 96%. During the fourth reporting period of 2021, MCSO achieved a compliance rating of 100%. During the first reporting period of 2022, MCSO achieved a compliance rating of 99%. During this reporting period, MCSO achieved a compliance rating of 99%. MCSO remains in compliance with this requirement.

Paragraph 54.b. requires MCSO to document the date, time, and location of the stop, recorded in a format that can be subject to geocoding. Our reviews of the CAD printout for all 105 traffic stops in our sample indicated that the date, time, and location is captured with the time the stop is initiated and the time the stop is cleared. In previous reporting periods, we noted instances where the GPS coordinates could not be located on the documentation received (CAD printout/I/Viewer). We contacted MCSO about this issue, and MCSO now provides us with the GPS coordinates via a separate document that lists the coordinates for the traffic stop sample we provide. MCSO uses GPS to determine location for the CAD system. GPS collects coordinates

WAI 64983

from three or more satellites to enhance the accuracy of location approximation. The data from the satellites can be decoded to determine the longitude and latitude of traffic stop locations should that be necessary. The CAD system was upgraded in 2014 to include geocoding of traffic stops. CID continues to provide us with a printout of all case numbers in the sample containing the associated coordinates. For this reporting period, the CAD or I/Viewer system contained the coordinates in 69% of the cases. In a separate spreadsheet, MCSO provided GPS coordinates for all 105 cases we reviewed, for 100% compliance with this portion of the Subparagraph.

When we review the sample traffic stops from across all Districts, we note the locations of the stops contained on the VSCF, the CAD printout, and the I/Viewer system to ensure that they are accurate. We continue to identify a limited number of instances where the location of the stop contained on the VSCF and the location of the stop contained on the CAD printout are inconsistent. We continue to recommend that reviewing supervisors closely review the VSCFs and CAD printouts and address such deficiencies. The number of inconsistencies did not affect MCSO's rate of compliance.

During our April 2016 site visit, we discussed with MCSO the possibility of using the CAD printout instead of the TraCS data to determine stop times. We determined that using the CAD system to determine stop end times created additional challenges. However, MCSO decided to use the CAD printout to determine traffic stop beginning and ending times for data analysis. MCSO issued Administrative Broadcast 16-62 on June 29, 2016, which indicated that, beginning with the July 2016 traffic stop data collection, the stop times captured on the CAD system would be used for reporting and analytical purposes.

Occasionally, the CAD time of stop and end of stop time do not exactly match those listed on the Vehicle Stop Contact Form, due to extenuating circumstances the deputy may encounter. During this reporting period, we did not find any instances where the end time on the VSCF Contact differed significantly from the CAD printout. In monthly audits of traffic stop data, the Audits and Inspections Unit (AIU) reviews the beginning/ending times of the stops and requires that BIO Action Forms are generated by the Districts when there are discrepancies. The CAD system is more reliable than the VSCF in determining stop times, as it is less prone to human error. When the deputy verbally advises dispatch that s/he is conducting a traffic stop, the information is digitally time-stamped into the CAD system without human input; and when the deputy clears the stop, s/he again verbally advises dispatch.

MCSO remains in compliance with this Subparagraph.

Paragraph 54.c. requires MCSO to document the license plate and state of the subject vehicle. During this reporting period, in 101 of the 105 stops that were reviewed, the deputies properly documented the license plate information on the VSCFs and the citations prepared for the stops. In four cases, the license plates listed in the CAD printout documents were different than the license plates documented on the VSCFs and the warnings and/or citations that were issued to the drivers. AIU identified these same four cases and requested that Action Forms be completed at the Districts to address the identified deficiencies.

MCSO remains in compliance with this Subparagraph, with a compliance rate of 96%.

WAI 64984

Paragraph 54.d. requires MCSO to document the total number of occupants in the vehicle when a stop is conducted. The VSCF, completed by the deputy on every traffic stop, is used to capture the total number of occupants and contains a separate box on the form for that purpose. EB-2 (Traffic Stop Data Collection) requires deputies to collect data on all traffic stops using the VSCF; this includes incidental contacts with motorists.

In 48 of the 105 traffic stops we reviewed, the driver had one or more passengers in the vehicle (63 total passengers). In each of the 48 cases, our review determined that the deputies properly documented the total number of occupants in the vehicles. However, AIU conducted a further review of one of the cases where a deputy indicated that the passengers fled from the vehicle and the number of passengers was not ascertained. AIU reviewed the body-worn camera recording and determined that the passengers were observed standing near the vehicle during the stop. AIU has requested that an Action Form be completed to address the inconsistency identified on this traffic stop.

With a compliance rate of 99%, MCSO remains in compliance with this Subparagraph.

Paragraph 54.e. requires MCSO to document the perceived race, ethnicity, and gender of the driver and any passengers, based on the deputy's subjective impression. (No inquiry into the occupant's ethnicity or gender is required or permitted.) In 48 of the 105 stops from the traffic stop data sample, there was more than one occupant in the vehicle (63 total passengers).

Fifty-seven, or 54%, of the 105 traffic stops involved white drivers. Thirty-six, or 34%, of the 105 stops involved Latino drivers. Seven, or 7%, of the 105 traffic stops involved Black drivers. Two, or 2%, of the 105 traffic stops involved an American Indian/Alaskan Native American driver. Three, or 3%, of the 105 traffic stops involved Asian or Pacific Islander drivers. Fifty traffic stops, or 48%, resulted in citations. The breakdown of those motorists issued citations is as follows: 29 white drivers (58% of the drivers who were issued citations); 15 Latino drivers (30% of the drivers who were issued citations); four Black drivers (8% of the drivers who were issued citations); one Asian or Pacific Islander drivers (2% of the drivers who were issued citations); and one American Indian/Alaskan Native American driver (2% of the drivers who were issued citations). Fifty-five, or 52%, of the 105 traffic stops we reviewed resulted in a written warning. The breakdown of those motorists issued warnings is as follows: 28 white drivers (51% of the drivers who were issued warnings); 22 Latino drivers (40% of the drivers who were issued warnings); three Black drivers (5% of the drivers who were issued warnings); two Asian or Pacific Islander drivers (4% of the drivers who were issued warnings); and one American Indian/Alaskan Native American driver (2% of the drivers who were issued warnings).

In our sample of 30 traffic stops that contained body-worn camera recordings, we did not identify any stops where the deputy did not accurately document the perceived race, ethnicity, and gender of the driver and any passengers in the vehicle. In our review of cases to assess compliance with Paragraph 54.k., we did not identify any stops in which the deputies did not accurately document the perceived race, ethnicity, and gender of the vehicle occupants. In our review of cases to assess compliance with Paragraphs 25.d. and 54.g., passenger contacts, we did not identify any stops in which the deputies did not accurately document the perceived race, ethnicity, and gender of the vehicle occupants.

WAI 64985

This Paragraph requires deputies to document the perceived race, ethnicity, and gender of any passengers whether contact is made with them or not.  There were some instances where deputies indicated that they were unable to determine the gender and ethnicity of a passenger and listed the passenger as "unknown-vision obscured."  During our review of the body-worn camera recordings, we were also unable to get a clear view of the some of the passengers, often due to vehicle being equipped with dark tinted windows combined with the stop occurring during nighttime hours; or due to vehicle being equipped with dark tinted windows combined with the glare of the sun during daytime hours.

During the second quarter of 2019, AIU commenced conducting the Post-Stop Perceived Ethnicity Inspection.  This inspection is conducted on a monthly basis and includes: 1) a review of traffic stops where the deputy documented the driver as being white and the driver's surname is Latino; 2) a review of traffic stops where the deputy documented that the driver has a Latino surname with a passenger listed as "unknown-vision obscured;" and 3) a review of traffic stops where the deputy documented that the driver was Latino and the passengers were listed with a designated ethnicity on the VSCF.  AIU continues to conduct these inspections on a monthly basis.  AIU requires that the Districts prepare Action Forms to address any issues identified.

MCSO remains in compliance with this requirement.

Paragraph 54.f. requires that MCSO record the name of any individual upon whom the deputy runs a license or warrant check (including the subject's surname).  In addition, MCSO's policy requires that deputies perform a license plate check on each vehicle stopped by its deputies, as well as warrant checks on every driver stopped by its deputies.  Our reviews have found that deputies regularly record the name of each driver and passenger on the VSCF in each instance where they have run a driver's license or warrant check.

MCSO policy requires that during each traffic stop, deputies are to conduct records checks on the license plate and a wants/warrant check on each driver.  For this reporting period, we found that of the 105 traffic stops we reviewed, each of the 105 stops included a check on the license plate.  There were 102 stops where the deputies ran warrant checks on the drivers in accordance with MCSO policy.

MCSO's compliance rate with this requirement is 100%.  MCSO remains in compliance with this Subparagraph.

Paragraph 54.g. requires the deputy to document whether contact was made with any passengers, the nature of the contact, and the reasons for the contact.  During the third quarter of 2019, MCSO requested that we increase the number of cases reviewed to identify additional stops that fit the criteria of this Paragraph.  The sample size of cases to be reviewed was increased from 10 stops each month to 35 stops each month, commencing with August 2019.  During some months, the number of traffic stops that involve deputies having contact with passenger is fewer than 35 traffic stops.

WAI 64986

During our assessment, we specifically review traffic stops that include any instance where the deputy asks any questions of a passenger beyond a greeting, including asking passengers to identify themselves for any reason or requesting that they submit to a Preliminary Breath Test. In such instances, we determine if the passenger was issued one of the following: Incidental Contact Receipt, citation, or a warning.  If the passenger was not issued any one of the following documents, it adversely impacts MCSO's compliance with this requirement.  It is also important to note that in such instances where a deputy fails to issue one of the required documents after being involved in a passenger contact, it is a violation of MCSO's policy.

To ensure that deputies are accurately capturing passenger information and to verify if passengers are contacted, we compare the number of passengers listed by the deputy with the number of passengers entered in the passenger drop-down box on the Vehicle Stop Contact Form.  We also review any Incidental Contact Receipts, citations, or warnings, issued to passengers by deputies. We also review the deputies' notes on the VSCF, the Arizona Citation, and the CAD printout for any information involving the passengers.  We review MCSO's I/Viewer System and the Justice Web Interface (JWI) to verify if a records check was requested for the driver or any passengers.

All passenger contacts in the traffic stops we reviewed for Paragraphs 25.d. and 54.g were noted in the VSCFs.  For this reporting period, we identified 55 traffic stops where the deputy had interaction with one or more passengers which required the issuance of either an Incidental Contact Receipt, a citation, or a warning.  Of the 55 stops, there were 10 stops where we determined that a passenger, or passengers, were not provided with either an Incidental Contact Receipt, a citation, or a warning, as required by MCSO policy.  For the remaining 45 stops, the passengers were properly provided with either an Incidental Contact Receipt, a citation, or a warning.  We continue to be provided with Incidental Contact Receipts for some of the stops; however, based on our reviews of the body-worn camera recordings, the documents were not provided to the passengers prior to the conclusion of the stop; and there were no exigent or unusual circumstances that precluded the issuance of the documents.

There were 13 cases identified in the stops that we reviewed for Paragraph 54.k. in which the passengers were contacted which required the issuance of either an Incidental Contact Receipt, a citation, or a warning.  In three cases, the passengers were not provided with either an Incidental Contact Receipt, a citation, or a warning, as required by MCSO policy.

There was one case identified in the stops that we reviewed for Paragraphs 25 and 54 in which a passenger was contacted, which required the issuance of either an Incidental Contact Receipt, a citation, or a warning.  In that one case, the deputy provided an Incidental Contact Receipt to the passenger.

MCSO has commenced conducting internal inspections to review its own sample of passenger contacts in traffic stops.  In any instances where issues are identified, AIU is issuing Action Forms to address those deficiencies.

WAI 64987

As noted in some of the cases above, deputies have not been consistent in preparing and providing passengers with Incidental Contact Receipts during traffic stops in which the passenger is contacted and asked by the deputy to provide identification. Supervisors should identify such errors and omissions during their reviews of the VSCFs and take corrective action. In previous reporting periods, MCSO has informed us that some supervisors have identified incidents where deputies have failed to provide the Incidental Contact Receipts and then had the deputies mail the receipts. However, the documentation that the receipts have been mailed is not listed on the VSCFs. MCSO previously informed us that the TraCS system was modified so that when a deputy prepares the Vehicle Stop Contact Form and uses the passenger contact field, a prompt will appear to instruct the deputy to prepare the Incidental Contact Receipt. MCSO recently informed us that the modifications to the TraCS system are still in the development and review stages, along with other modifications to the TraCS system.

MCSO has commenced conducting internal inspections to review its own sample of searches of vehicle occupants during in traffic stops. In any instances where issues are identified, AIU is issuing Action Forms to address those deficiencies.

During the third reporting period of 2021, MCSO provided the Incidental Contact Receipt, a citation, or a warning, when required in 81% of the cases. During the fourth reporting period of 2021, MCSO provided the Incidental Contact Receipt, a citation, or a warning, when required in 81% of the cases. During the first reporting period of 2022, MCSO provided the Incidental Contact Receipt, a citation, or a warning, when required in 87% of the cases. During this reporting period, MCSO provided the Incidental Contact Receipt, a citation, or a warning, when required in 81% of the cases. MCSO is not in compliance with this Subparagraph.

Paragraph 54.h. requires deputies to record, prior to the stop, the reason for the vehicle stop, including a description of the traffic or equipment violation observed, and any indicators of criminal activity developed before or during the stop. For this reporting period, we identified a random sample of 10 cases from the 35 cases we initially requested each month, and requested CAD audio and body-worn camera footage for those cases. We listened to CAD dispatch audio recordings, reviewed the CAD printouts, and reviewed body-worn camera recordings for 30 traffic stops from the sample of 105 traffic stops used for this review; and found that the deputies advised Communications of the reason for the stop, location of the stop, license plate, and state of registration for all 30 stops.

For the remaining 75 traffic stops where body-worn camera recordings and CAD audiotapes were not requested, we review the CAD printout and the VSCF to ensure that the reason for the stop has been captured. These forms are included in our monthly sample requests. The dispatcher enters the reason for the stop in the system as soon as the deputy verbally advises Communications of the stop, location, and tag number. The VSCF and the CAD printout documents the time the stop begins and when it is concluded – either by arrest, citation, or warning. Deputies need to be precise when advising dispatch of the reason for the traffic stop, and likewise entering that information on the appropriate forms.

MCSO's compliance rating for this Subparagraph is 100%.

WAI 64988

Paragraph 54.i. requires deputies to document the time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; the time a release was made without a citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere, or the deputy's departure from the scene.  In our review of the documentation provided by MCSO, the CAD printouts, the Vehicle Stop Contact Forms, along with the E-Ticketing system and the Arizona Ticket and Complaint Form, the information required is effectively captured.  As we noted in Subparagraph 54.b., the stop times on the CAD printout and the Vehicle Stop Contact Form vary slightly on occasion.  We understand that this may occur due to extenuating circumstances, and we will report on those instances where there is a difference of five minutes or more from either the initial stop time or the end time.

We review the circumstances of each stop and the activities of the deputies during each stop to assess whether the length of the stop was justified.  During this reporting period, we did not identify any stops that were extended for an unreasonable amount of time.

Supervisors are required to conduct reviews of the VSCFs within 72 hours of the stop.  In 102 of the 105 VSCFs reviewed, the supervisors conducted timely reviews.  In four cases, there was documentation that provided explanations for the delays in the reviews of the VSCFs.  Deputies accurately entered beginning and ending times of traffic stops in all 105 cases reviewed.  MCSO accurately entered the time citations and warnings were issued in each of the 105 cases reviewed.

MCSO remains in compliance with this Subparagraph.

Paragraph 54.j. requires MCSO to document whether any inquiry as to immigration status was conducted and whether ICE/CBP was contacted, and if so, the facts supporting the inquiry or contact with ICE/CBP, the time supervisor approval was sought, the time ICE/CBP was contacted, the time it took to complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual.

On November 7, 2014, a United States District Court Judge issued an Order permanently enjoining enforcement of Arizona Revised Statute (A.R.S.) 13-2319, commonly referred to as the Arizona Human Smuggling Act.   On November 17, 2014, MCSO issued Administrative Broadcast 14-75, prohibiting deputies from enforcing the above state statute, including arresting, detaining, or questioning persons for suspected (or even known) violations of the act and from extending the duration of traffic stops or other deputy-civilian encounters to do so.

We reviewed 105 traffic stops submitted for this Paragraph, and found that none of the stops involved any contacts with ICE/CBP.  None of the stops we reviewed involved any inquires as to immigration status.  In addition, our reviews of Incident Reports and Arrest Reports conducted as part of the audits for Paragraphs 89 and 101 revealed no immigration status investigations.  MCSO remains in compliance with this Subparagraph.  In addition, we monitor any complaints involve any traffic stops that contain an allegation that the race/ethnicity of the driver was a factor in how a driver was treated.  There were no such allegations identified during this reporting period.

WAI 64989

Paragraph 54.k. requires MCSO to document whether any individual was asked to consent to a search (and the response), whether a probable-cause search was performed on any individual, or whether a pat-and-frisk search was performed on any individual.  During our January 2018 site visit, we discussed with MCSO whether any other method may be feasible to identify a larger population of searches of individuals specific to the requirements of this Paragraph.  MCSO's response was that the current method is appropriate, and that there may be more cases identified once deputies properly document the searches of persons consistent with this Paragraph.

MCSO provided training to deputies specific to consent searches during the 2019 Annual Combined Training on the Fourth and Fifth Amendment, which included a video that contained a scenario with a verbal exchange between a driver and a deputy who requested a consent search. In addition, on March 10, 2020, MCSO issued Administrative Broadcast Number 20-20, which reemphasized the training segment in relation to consent searches.

The method MCSO currently employs to identify our sample of cases to review is to identify the population of all traffic stops in which searches of individuals were documented on the VSCF. Once that population was identified, a random sample of 35 traffic stops from each month is identified for review.  During some months, the number traffic stops that involve searches of persons is less than 35 traffic stops.  In addition, we also review any cases in which the deputies performed searches of individuals in the sample of 105 traffic stops reviewed to assess compliance with Paragraphs 25 and 54 and the sample of traffic stops reviewed to assess compliance with Subparagraphs 25.d. and 54.g.  When we identify issues that impact compliance or where MCSO policy was not followed, we provide the list of cases to MCSO for review.  In the sample of traffic stops that we reviewed to assess compliance with Subparagraph 54.k, there were four stops which met the criteria of this Subparagraph.  In each of the cases, the searches were properly documented on the VSCFs.  We also identified one additional case where it was indicated that a consent search was conducted of the driver; however, based on our review of the body-worn camera recordings, the search of the driver was conducted and no consent was requested.  MCSO was provided information on this traffic stop and noted that the deputy was in the Field Training Officer Program, and the issue was subsequently addressed by the District by reinstructing the deputy on the proper procedures.

During this reporting period, there was one stop involving the search of two persons identified in the sample of traffic stops reviewed to assess compliance with Subparagraphs 25.d. and 54.g.  In that one case, the deputy properly documented the searches on the VSCF.

During this reporting period, there were no cases involving the searches of persons identified in the sample of traffic stops reviewed to assess compliance with Paragraphs 25 and 54.

The total number of searches of persons assessed during this reporting period was five.  In each of the five cases, the deputies properly documented the searches of the vehicle occupants on the VSCFs.  The one case where the deputy erroneously documented a consent search of the driver was not included, as it was not actually a consent search.

WAI 64990

During this reporting period, there were no traffic stops identified in which deputies presented the Consent to Search Forms to document when consent was requested and obtained to search any vehicle occupants. MCSO has indicated that it does not require its deputies to use Consent to Search Forms as the primary means for documenting consent searches. MCSO requires that deputies document requests to conduct consent searches by way of video-recording the event via the body-worn cameras. In the event the body-worn camera is not operational, MCSO policy requires deputies to document requests to conduct consent searches on the Consent to Search Form. We continue to recommend that MCSO revisit the requirements of this section of the policy and require deputies to read the Consent to Search Form to the subject and require a signature from the individual for every request for consent to search.

During the third reporting period of 2021, MCSO achieved a compliance rating of 100%. During the fourth reporting period of 2021, MCSO achieved a compliance rating of 100%. During the first reporting period of 2022, MCSO achieved a compliance rating of 91%. We reported that MCSO would remain in compliance with this requirement for that reporting period; however, in order to remain in compliance in the next reporting period, MCSO would need to attain a compliance rating of greater than 94. During this reporting period, MCSO attained a compliance rating of 100%. MCSO remains in compliance with this requirement.

Paragraph 54.l. requires MCSO to document whether any contraband or evidence was seized from any individual, and the nature of the contraband or evidence. Generally, deputies seize the following types of contraband and/or evidence, which is documented on the VSCF, a Property Receipt, and an Incident Report: license plates; driver's licenses; alcoholic beverages; narcotics; narcotic paraphernalia; weapons; and ammunition. We conduct a review of the relevant documents and review the VSCF to ensure that deputies properly document the seizure of the evidence and/or contraband.

During our review of the collected traffic stop data (our sample of 105) during this reporting period, there was one item seized and placed into evidence by a deputy. The item was properly documented on the VSCF, as required by MCSO policy.

In the cases we reviewed for searches of individuals under Subparagraph 54.k., there were 35 items seized by deputies and placed into evidence. Of those 35 items, there were three items that were seized and placed into evidence and the items were not properly listed on the VSCFs, as required by MCSO policy.

In the cases we reviewed for passenger contacts under Subparagraph 54.g., there were 16 items seized by deputies and placed into evidence. Of those 16 items, there was one item seized and placed into evidence that was not properly listed on the VSCF, as required by MCSO policy.

In previous reporting periods, we noted an increase in the number of errors and omissions by deputies documenting the seizure of contraband or evidence on VSCFs. These issues have improved during this reporting period. During the third reporting period of 2021, MCSO achieved a compliance rating of 82%. We reported that MCSO would remain in compliance with this requirement during the third reporting period of 2021; however, MCSO would be required to attain a compliance rating of greater than 94% in the fourth reporting period to maintain compliance with this requirement. During the fourth reporting period, MCSO achieved a

WAI 64991

compliance rating of 73%, and was not in compliance with this requirement. During the first reporting period of 2022, MCSO attained a compliance rating of 92%. During this reporting period, MCSO attained a compliance rating of 92%. MCSO is not in compliance with this requirement.

Paragraph 54.m. requires the documentation of the final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without a citation. In all 105 cases we reviewed, we found documentation indicating the final disposition of the stop; and whether the deputy made an arrest, issued a citation, issued a warning, or made a release without a citation. MCSO remains in compliance with this Subparagraph.

MCSO has failed to achieve compliance with all of the Subparagraphs of Paragraph 54. MCSO is not in compliance with Paragraph 54.


**Paragraph 55.** *MCSO shall assign a unique ID for each incident/stop so that any other documentation (e.g., citations, incident reports, tow forms) can be linked back to the stop.*

**In Full and Effective Compliance**

To verify compliance for this Paragraph, we reviewed a sample of the Vehicle Stop Contact Forms, CAD printouts, I/Viewer documentation, citations, warning forms, and any Incident Report that may have been generated as a result of the traffic stop.

The unique identifier "went live" in September 2013 when the CAD system was implemented. This number provides the mechanism to link all data related to a specific traffic stop. The number is automatically generated by the CAD software and is sent to the deputy's MDT at the time the deputy advises Communications of the traffic stop. The unique identifier is visible and displayed at the top of the CAD printout and also visible on the Vehicle Stop Contact Form, the Arizona Traffic Citation, and the Warning/Repair Form.

Once the deputy scans the motorist's driver's license, the system automatically populates most of the information into one or more forms required by the Order. If the data cannot be entered into TraCS from the vehicle (due to malfunctioning equipment), policy requires the deputy to enter the written traffic stop data electronically prior to the end of the shift. The start and end times of the traffic stop are now auto-populated into the Vehicle Stop Contact Form from the CAD system.

Since our first visit for monitoring purposes in June 2014, TraCS has been implemented in all Districts; and the unique identifier (CFS number) is automatically entered from the deputy's MDT. No user intervention is required.

To determine compliance with this requirement, we reviewed 105 traffic stop cases and reviewed the CAD printouts and the Vehicle Stop Contact Forms for all stops. We reviewed the Warning/Repair Forms, when applicable, for those stops where a warning was issued or the vehicle had defective equipment. The unique identification number assigned to each event was listed on correctly on all CAD printouts for every stop. A review was conducted of the Tow Sheets prepared by deputies in instances where a driver's vehicle is towed. In each instance, the unique identification number assigned to each event was listed correctly on the Tow Sheet. A

WAI 64992

review of the Incident Reports prepared by deputies in instances where policy requires the preparation of the report was conducted. In each instance, the unique identification number assigned to each event was listed correctly on the Incident Report. MCSO remains in compliance with this requirement.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 56.** *The traffic stop data collection system shall be subject to regular audits and quality control checks. MCSO shall develop a protocol for maintaining the integrity and accuracy of the traffic stop data, to be reviewed by the Monitor pursuant to the process described in Section IV.*

**Phase 1:** In compliance

- EB-2 (Traffic Stop Data Collection), most recently amended on June 15, 2021.

- Traffic Stop Analysis Unit Operations Manual, Section 304, published on June 8, 2018.

- Traffic Stop Analysis Unit Operations Manual, Section 305, published on November 7, 2018.

- Traffic Stop Analysis Unit Operations Manual, Section 306, published on August 5, 2019.

**Phase 2:** In compliance

As discussed in Paragraph 25, improvements since 2015 in the TraCS system have enhanced the reliability and validity of the traffic stop data. These improvements were memorialized in the Traffic Stop Analysis Unit (TSAU) Operations Manual. While the manual is not fully approved, Sections 304 305, and 306 – which pertain to the data quality control processes – have been approved since 2018 and 2019. These processes include three distinct areas. One is the data-handling procedures (Section 304), which involve the transfer of data files between administrative units with MCSO for the purpose of data analysis and reporting to ensure that data variables are properly understood. Another process involves the software change control processes (Section 305), which is used by MCSO's Technology Management Bureau to manage software changes that affect traffic stop data variables. Finally, the other process involves the data verification process (Section 306), which involves validating data variables used for the periodic analyses (monthly, quarterly, and annual) discussed in Paragraphs 64, 65, and 66. In general, the EIU and Technology Management Bureau hold monthly meetings (de-confliction meetings) focused on the data-handling procedures and the software changes. EIU manages the data validation process before running periodic analyses.

With the advent of the TSMR pilot in 2021, EIU refined its data-cleaning procedures to ensure a timelier review of the monthly data to correct problems with certain traffic stop location information (X,Y coordinates). Additionally, MCSO adopted alternative methods, following months of discussions between representative experts, in February 2022 for refining stop location and the timing of stops (spline procedures) that make comparisons between deputy stops much

WAI 64993

more accurate.   More recently, MCSO found that special assignment traffic stops were undercounted in past annual reports and is investigating the extent of the undercount; the impact this has had on past annual and monthly reports; and how to improve training and policy to more easily identify such stops in future analyses.  The cleaning procedures MCSO has adopted are an enhancement of the quality control process and ensure timely reviews of data to support monthly analyses of traffic stop data.  (See Paragraph 64.)  MCSO consistently advises us of problems it identifies from these reviews and actions it takes to ensure data veracity following the specific protocols delineated in the TSAU Operations Manual.

MCSO also conducts audits of the 105 traffic stop sample that we request each reporting period. MCSO is also expanding its audits to include a more expansive review of 30 of the 105 sample pulls we request each reporting period to include passenger contacts and persons' searches.  EB-2 (Traffic Stop Data Collection) also requires regularly scheduled audits of traffic stop data on a monthly basis.  We reviewed BIO's monthly audits of the traffic samples for this quarter and found them to be satisfactory.  Administrative Broadcast 15-96 addresses the security of paper traffic stop forms.  The procedure requires that paper forms (related to traffic stop data that may be handwritten by deputies in the field if the TraCS system is nonoperational due to maintenance or lack of connectivity) be stored in a locked cabinet and overseen by the Division Commander. Because of the COVID-19 pandemic, we have been unable to travel to Maricopa County and visit the Districts to confirm that all records were locked and secure, that logs were properly maintained, and that only authorized personnel had access to these files.  This activity will be delayed until we are able to resume our in-person site visits.  However, we note that MCSO has a consistent and long-standing track record of complying with this requirement.

**Paragraph 57.**  *MCSO shall explore the possibility of relying on the CAD and/or MDT systems to check if all stops are being recorded and relying on on-person recording equipment to check whether Deputies are accurately reporting stop length.  In addition, MCSO shall implement a system for Deputies to provide motorists with a copy of non-sensitive data recorded for each stop (such as a receipt) with instructions for how to report any inaccuracies the motorist believes are in the data, which can then be analyzed as part of any audit.  The receipt will be provided to motorists even if the stop does not result in a citation or arrest.*

**In Full and Effective Compliance**

To verify compliance for this Paragraph, we reviewed all TraCS forms for each traffic stop that were included in the sample.  In addition, we reviewed a subset of CAD audio recordings and body-worn camera footage of the stops.

The system for providing "receipts" is outlined in EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) and EB-2 (Traffic Stop Data Collection).  GJ-35 addresses the requirement that supervisors review recordings to check whether deputies are accurately reporting stop length. In addition to GJ-35, BIO developed a Body-Worn Camera Matrix for its inspectors to review camera recordings.

WAI 64994

The deputy should provide every person contacted on a traffic stop with an Arizona Traffic Ticket or Complaint (Citation), a Written Warning/Repair Order (Warning), or an Incidental Contact Receipt. For this reporting period, deputies issued either citations, written warnings or Incidental Contact Receipts in each of the 105 cases we reviewed.

For the cases reviewed under Subparagraphs 25.d. and 54.g., contact with passengers, we did not identify any issues with the citations, warnings, and Incidental Contact Receipts issued to drivers.

For the cases reviewed under Subparagraph 54.k., searches of persons, we did not identify any issues with the citations, warnings, and Incidental Contact Receipts issued to drivers.

MCSO's compliance rate with this requirement is 100%. MCSO remains in compliance with this portion of the Subparagraph.

The approved policies dictate that the CAD system will be used for verification of the recording of the initiation and conclusion of the traffic stop and that MCSO will explore the possibility of relying on the body-worn camera recordings to verify that the stop times reported by deputies are accurate. The deputy verbally announces the stops initiation and termination on the radio, and then CAD permanently records this information. In May 2016, MCSO advised us that all deputies and sergeants who make traffic stops had been issued body-worn cameras and that they were fully operational. We verified this assertion during our July 2016 site visit; and since that time, we have been reviewing the body-worn camera recordings to determine if stop times indicated by CAD were accurate. MCSO's Audit and Inspections Unit (AIU) conducts monthly inspections of traffic stop data, which includes an assessment as to whether the body-worn camera video captured the traffic stop in its entirety; to verify the time the stop began; and to verify if all information on forms prepared for each traffic stop match the body-worn camera video. AIU conducts reviews of 30 body-worn camera recordings each reporting period.

During this reporting period, we requested from MCSO 30 body-worn camera recordings for our review. We are able to use the body-worn camera recordings that were provided for each stop to assess whether deputies are accurately reporting the stop length. The compliance rate for the sample of 30 cases selected from the 105 stops reviewed for using the body-worn camera recordings to determine if deputies are accurately reporting stop length is 100%. MCSO remains in compliance with this requirement.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 58.** *The MCSO shall ensure that all databases containing individual-specific data comply with federal and state privacy standards governing personally identifiable information. MCSO shall develop a process to restrict database access to authorized, identified users who are accessing the information for a legitimate and identified purpose as defined by the Parties. If the Parties cannot agree, the Court shall make the determination.*

**In Full and Effective Compliance**

WAI 64995

To verify compliance for this Paragraph, we reviewed the applicable policies and requested that Technology Management Bureau personnel provide us with information regarding any unauthorized access and/or illegitimate access to any of MCSO's database systems that had been investigated by PSB. The policies state that the dissemination of Criminal History Record Information (CHRI) is based on federal guidelines, Arizona statutes, the Department of Public Safety (ASDPS), and the Arizona Criminal Justice Information System (ACJIS); and that any violation is subject to fine. No secondary dissemination is allowed. The policies require that the Professional Standards Bureau (PSB) provide written notification to the System Security Officer whenever it has been determined that an employee has violated the policy by improperly accessing any Office computer database system. Every new recruit class receives three hours of training on this topic during initial Academy training.

During this reporting period, we inquired whether there had been any instances of unauthorized access to and/or any improper uses of the database systems. MCSO informed us that during this reporting period there were no closed cases in which there was a finding that there was unauthorized access to and/or any improper uses of MCSO's database systems. MCSO remains in compliance with this requirement.

On June 22, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 59.** *Notwithstanding the foregoing, the MCSO shall provide full access to the collected data to the Monitor and Plaintiffs' representatives, who shall keep any personal identifying information confidential. Every 180 days, MCSO shall provide the traffic stop data collected up to that date to the Monitor and Plaintiffs' representatives in electronic form. If proprietary software is necessary to view and analyze the data, MCSO shall provide a copy of the same. If the Monitor or the Parties wish to submit data with personal identifying information to the Court, they shall provide the personally identifying information under seal.*

### In Full and Effective Compliance

Electronic traffic stop data capture began on April 1, 2014. The forms created by MCSO capture the traffic stop details required by MCSO policy and Paragraphs 25 and 54. BIO provides the traffic stop data on a monthly basis, which includes a spreadsheet of all traffic stops for the reporting period, listing Event Numbers as described at the beginning of Section 7. All marked patrol vehicles used for traffic stops are now equipped with the automated TraCS system, and all Patrol deputies have been trained in TraCS data entry. MCSO has provided full access to all available electronic and written collected data since April 1, 2014. MCSO did not collect electronic data before this time. During this reporting period, MCSO has continued to provide full access to the traffic stop data.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 64996

### b. Electronic Data Entry

**Paragraph 60.** *Within one year of the Effective Date, the MCSO shall develop a system by which Deputies can input traffic stop data electronically. Such electronic data system shall have the capability to generate summary reports and analyses, and to conduct searches and queries. MCSO will explore whether such data collection capability is possible through the agency's existing CAD and MDT systems, or a combination of the CAD and MDT systems with a new data collection system. Data need not all be collected in a single database; however, it should be collected in a format that can be efficiently analyzed together. Before developing an electronic system, the MCSO may collect data manually but must ensure that such data can be entered into the electronic system in a timely and accurate fashion as soon as practicable.*

**In Full and Effective Compliance**

To verify compliance with this Paragraph, we reviewed the documents generated electronically that capture the required traffic stop data. The electronic data entry of traffic stop data by deputies in the field went online on April 1, 2015. If TraCS experiences a malfunction in the field, there is a protocol that requires the deputy to electronically enter the traffic stop data prior to the end of the shift.

MCSO continues to conduct monthly traffic stop inspections and forwards them for our review. Initially, the traffic stop data was captured on handwritten forms created by MCSO, completed by the deputy in the field, and manually entered in the database by administrative personnel located at each District. Now all traffic stop data is entered electronically, whether in the field or at MCSO District offices. Occasionally, connectivity is lost in the field due to poor signal quality, and citations are handwritten. Per policy, deputies must enter electronically any written traffic stop data they have created by the end of the shift in which the event occurred. As noted in our Paragraph 90 review, VSCFs are routinely entered into the system by the end of the shift.

Deputies have demonstrated their ability to access and use TraCS, as evidenced by the fact that their total time on a traffic stop averages 16 minutes or less.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

### c. Audio-Video Recording of Traffic Stops

**Paragraph 61.** *The MCSO will issue functional video and audio recording equipment to all patrol deputies and sergeants who make traffic stops, and shall commence regular operation and maintenance of such video and audio recording equipment. Such issuance must be complete within 120 days of the approval of the policies and procedures for the operation, maintenance, and data storage for such on-person body cameras and approval of the purchase of such equipment and related contracts by the Maricopa County Board of Supervisors. Subject to Maricopa County code and the State of Arizona's procurement law, The Court shall choose the vendor for the video and audio recording equipment if the Parties and the Monitor cannot agree on one.*

WAI 64997

**In Full and Effective Compliance**

During our September 2014 site visit, we met with two MCSO Deputy Chiefs and other personnel to discuss MCSO's progress of acquiring in-car video and audio equipment for all patrol vehicles used to conduct traffic stops. MCSO had initially set out to purchase fixed in-car cameras as required by the Order, but expressed an interest in acquiring body-worn video and audio recording devices for deputies. The Court issued an Order providing an amendment/stipulation on October 10, 2014, requiring on-body cameras. This was a prudent decision, in that it allows for capturing additional data, where a fixed mounted camera has limitations. We have documented MCSO's transition from in-car to body-worn cameras in our previous quarterly status reports.

Records indicate that MCSO began distribution of body-worn cameras on September 14, 2015, and full implementation occurred on May 16, 2016. The body-worn camera recordings are stored in a cloud-based system (on evidence.com) that can be easily accessed by supervisors and command personnel. The retention requirement for the recordings is three years. In July 2019, MCSO began distribution of the newer version of body-worn cameras to deputies. During our October 2019 site visit, MCSO reported that deputies assigned to the Districts have all been equipped with the new body-worn cameras; and that deputies in specialized assignments were being equipped with the new devices. The new version of body-worn cameras purchased by MCSO is mounted on the chest area via a magnetic mount. In addition, the devices are self-contained, meaning that the device does not have any cords or wires that may become disconnected, which had been a recurring problem with the previous devices.

To verify that all Patrol deputies have been issued body-worn cameras, and properly use the devices, we review random samples of the traffic stops as described in Paragraphs 25 and 54. In addition, during our District visits in January 2020, we observed that deputies were equipped with body-worn cameras. Because of the COVID-19 pandemic, we were unable to travel to Maricopa County and visit the Districts to observe deputies being equipped with the body-worn cameras. However, it is clear that MCSO maintains a robust deployment of body-worn cameras, given the ready availability of recordings for our review, and our observations of deputies properly wearing the cameras in the videos we inspect. Our inspections will commence once we are able to resume our in-person site visits.

On December 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 64998

***Paragraph 62.***  *Deputies shall turn on any video and audio recording equipment as soon the decision to initiate the stop is made and continue recording through the end of the stop.  MCSO shall repair or replace all non-functioning video or audio recording equipment, as necessary for reliable functioning.  Deputies who fail to activate and to use their recording equipment according to MCSO policy or notify MCSO that their equipment is nonfunctioning within a reasonable time shall be subject to Discipline.*

**Phase 1:**  In compliance

- GJ-35 (Body-Worn Cameras), most recently amended on February 2, 2022.

- Body-Worn Camera Operations Manual, published on December 22, 2016.

**Phase 2**:  In compliance

MCSO evaluated on-person body cameras from other jurisdictions and selected a vendor (TASER International, now known as Axon).  Body-worn cameras have been implemented in all Districts since May 2016 and are fully operational.  As mentioned under Paragraph 61, MCSO has obtained, and has equipped the deputies in the Districts with new body-worn cameras, also provided by Axon.

To verify compliance for this Paragraph, we reviewed the body-worn camera recordings included in our monthly samples.  This includes the stops reviewed each month for Paragraphs 25 and 54; the stops reviewed each month for Subparagraph 54.k.; and the stops reviewed each month for Subparagraph 54.g.  For purposes of calculating compliance, we exclude any stops where the deputies documented on the VSCF that the body-worn cameras malfunctioned during the stop.

For our selection of a sample to review body-worn camera recordings, we used the same sample of 30 cases we selected for the CAD audio request.  There was one traffic stop event identified where deputy documented that the body-worn camera did not initially activate properly and that the traffic stop event was not recorded.  In each of the remaining 29 stops that we reviewed, the deputies properly activated the body-worn cameras during the traffic stop events.

In our sample of body-worn camera recordings reviewed for Subparagraph 54.k., in each of the stops that were reviewed, the deputies properly activated the body-worn cameras during the traffic stop events.

In our sample of body-worn camera recordings for Subparagraph 54.g., in each of the stops that were reviewed, the deputies properly activated the body-worn cameras during the traffic stop events.

MCSO's compliance rate for this requirement is 100%.

There are still a number of instances in which deputies respond to assist at traffic stops and do not complete the Assisting Deputy and Body-Worn Camera Log.  We include this assessment, although it is only a MCSO's policy requirement and not a requirement of this Paragraph, to provide MCSO with the issues that we have identified on this topic.  With the issuance of GJ-35 (Body-Worn Cameras), effective on December 31, 2019, the policy is now consistent with EB-2 (Traffic Stop Data Collection), which requires that each deputy assisting on a traffic stop prepare the Assisting Deputy and Body-Worn Camera Log.  We had anticipated that the policy

WAI 64999

clarification, coupled with effective supervisory reviews, would assist deputies to understand when they are required to complete the log. However, we continue to identify instances where the log was not prepared when required. In our review of traffic stops in relation to Paragraphs 25 and 54, we noted that there were 19 assisting deputies who properly prepared the Assisting Deputy and Body-Worn Camera Log, and seven assisting deputies that failed to prepare Assisting Deputy and Body-Worn Camera Log. In our review of the traffic stops in relation to Paragraph 54.k., we noted that 78 assisting deputies properly prepared the Assisting Deputy and Body-Worn Camera Log and that 52 assisting deputies did not prepare the Assisting Deputy and Body-Worn Camera Log. In our review of traffic stops in relation to Paragraphs 25.d. and 54.g., we noted that 54 assisting deputies properly prepared the Assisting Deputy and Body-Worn Camera Log and that 13 assisting deputies did not prepare the Assisting Deputy and Body-Worn Camera Log. The rate of deputies complying with MCSO's policy requiring to complete the Assisting Deputy and Body-Worn Camera Log is 68%. We continue to request that MCSO supervisors hold deputies accountable for preparing the Assisting Deputy and Body-Worn Camera Log as required by MCSO policy.

Our reviews of the body-worn camera recordings often reveal instances of deputies exhibiting positive, model behavior; and, at times, instances of deputies making errors, or exhibiting less than model behavior – all of which would be useful for training purposes. We also reviewed the Professional Standards Bureau's monthly summaries of closed cases for April-June 2022. There continue to be examples of body-worn camera recordings assisting the investigators in making determinations as to whether deputies acted in accordance with MCSO policy, and cases where it was determined that the allegations against the deputies were false. Body-worn cameras recordings have proven to be invaluable in resolving complaints alleging misconduct by deputies.

**Paragraph 63.** *MCSO shall retain traffic stop written data for a minimum of 5 years after it is created, and shall retain in-car camera recordings for a minimum of 3 years unless a case involving the traffic stop remains under investigation by the MCSO or the Monitor, or is the subject of a Notice of Claim, civil litigation or criminal investigation, for a longer period, in which case the MCSO shall maintain such data or recordings for at least one year after the final disposition of the matter, including appeals. MCSO shall develop a formal policy, to be reviewed by the Monitor and the Parties pursuant to the process described in Section IV and subject to the District Court, to govern proper use of the on-person cameras; accountability measures to ensure compliance with the Court's orders, including mandatory activation of video cameras for traffic stops; review of the camera recordings; responses to public records requests in accordance with the Order and governing law; and privacy protections. The MCSO shall submit such proposed policy for review by the Monitor and Plaintiff's counsel within 60 days of the Court's issuance of an order approving the use of on-body cameras as set forth in this stipulation. The MCSO shall submit a request for funding to the Maricopa County Board of Supervisors within 45 days of the approval by the Court or the Monitor of such policy and the equipment and vendor(s) for such on-body cameras.*

**In Full and Effective Compliance**

WAI 65000

MCSO developed and issued a protocol and policy that requires the original hardcopy form of any handwritten documentation of data collected during a traffic stop to be stored at the District level and filed separately for each deputy.  When a deputy is transferred, his/her written traffic stop information follows the deputy to his/her new assignment.  During our January 2020 site visit, we inspected the traffic stop written data files at District 2 and District 6 to ensure that hardcopies of traffic stop cases are stored for a minimum of five years.  We found that the records were in order and properly secured.  Because of the COVID-19 pandemic, we were unable to travel to Maricopa County and visit the Districts to confirm that all traffic stop written data is being kept in a locked and secure manner and that only authorized personnel have access to the files.  Our inspections will commence once we are able to resume our in-person site visits.  MCSO remains in compliance with this requirement.

On June 22, 2020, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.


### d. Review of Traffic Stop Data

**Paragraph 64.**  *Within 180 days of the Effective Date, MCSO shall develop a protocol for periodic analysis of the traffic stop data described above in Paragraphs 54 to 59 ("collected traffic stop data") and data gathered for any Significant Operation as described in this Order ("collected patrol data") to look for warning signs or indicia or possible racial profiling or other improper conduct under this Order.*

**Phase 1:**  Not in compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on April 27, 2022.

- EB-2 (Traffic Stop Data Collection), most recently amended on June 15, 2021.

- GJ-33 (Significant Operations), most recently amended on April 6, 2022.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

- GH-5 (Early Identification System), most recently amended on December 16, 2021.

- Traffic Stop Analysis Unit Operations Manual, currently under revision.

**Phase 2:**  Not in compliance

WAI 65001

MCSO will achieve Phase 1 compliance with this Paragraph when it incorporates its protocols for all of the periodic analyses (monthly, quarterly, annual) of the traffic stop data into the Traffic Stop Analysis Unit Operations Manual.  MCSO is currently revising the documents and protocols related to the ongoing pilot for the Traffic Stop Monthly Reports (TSMR) and investigating potential amendments to policy and practice in the quarterly research being conducted.   To achieve Phase 2 compliance with this Paragraph, MCSO must demonstrate ongoing use of the methodologies delineated in the protocols established for Phase 1 compliance for the periodic analyses used to identify racial profiling or other bias-based policing problems.

***Paragraph 65.***  *MCSO shall designate a group with the MCSO Implementation Unit, or other MCSO Personnel working under the supervision of a Lieutenant or higher-ranked officer, to analyze the collected data on a monthly, quarterly and annual basis, and report their findings to the Monitor and the Parties.  This review group shall analyze the data to look for possible individual-level, unit-level or systemic problems.  Review group members shall not review or analyze collected traffic stop data or collected patrol data relating to their own activities.*

**Phase 1:**  In compliance

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.
- GH-5 (Early Identification System), most recently amended on December 16, 2021.

**Phase 2:**  Not in compliance

The Traffic Stop Analysis Unit (TSAU) is directly responsible for analyses of traffic stop data on a monthly, quarterly, and annual basis to identify warning signs or indicia or possible racial profiling or other improper conduct as required by Paragraph 64.  MCSO must report TSAU's findings from its analyses to the Monitor and the Parties.

Paragraph 65 requires quarterly analyses of traffic stop data.  MCSO completed its first quarterly report (TSQR1) on October 22, 2020.  MCSO has completed six other quarterly reports since that time.  (We discussed the findings of these TSQRs in our previous quarterly status reports.)

MCSO's latest quarterly report, TSQR7, was released on June 30, 2022.  The report, "2019-2021 Arrest Activity," investigated in more detail the disparities in arrests between Hispanic and white drivers discovered during the past three TSARs.  As expected, MCSO found "consistent disparities between White and Hispanic drivers across all arrest types and years, but they did not present any identifiable pattern. This is indicative that arrest disparities cannot be explained by a single type of arrest or district in the county. The one exception to this was District 5 (Lake Patrol), which had higher arrest rates, for both Hispanic and White drivers, than any other district across the majority of compared categories for each of the three years."   From this report, MCSO has also proposed a closer examination of special assignments that may yield potential patterns not uncovered in this analysis.

WAI 65002

TSQR6 was released on March 31, 2022.  The report, "Traffic Stop Quarterly Review: Citations and Warnings," examined in more detail the findings from prior Traffic Stop Annual Reports (TSARs) regarding racial and ethnic differences in traffic stop outcomes.  In particular, MCSO sought to explore characteristics of traffic stops that were not included in TSAR analyses – including the impact of total citations emanating from a traffic stop, citation experiences between Latinos and whites for issues unrelated to the reason for the original stop, among others.  In general, MCSO reported similar findings to those of prior TSARs in that they continued to find that Latino drivers were more likely to be cited than white drivers.  However, they also found that Latino drivers were significantly more likely to be cited for license and registration issues than white drivers, which followed with the finding that Latino drivers had more violations per traffic stop than white drivers across the entire County.  MCSO indicated that there are internal training issues that could arise from these findings, as well as opportunities to inform the public of licensing and registration requirements which leave little discretion to deputies when it comes to enforcement decisions.  We discussed this study at length with MCSO, the Plaintiffs, and the Plaintiff-Intervenor; and identified the possibility of exploring some of the findings more thoroughly in our future quarterly status reports.

Paragraph 65 also requires MCSO to conduct monthly analyses of traffic stop data.  MCSO's original monthly process to analyze traffic stop data began in 2015, but was suspended in May 2016 because of our determination that the original process lacked statistical validity and required significant refinement to improve the identification of potential alerts in EIS.  MCSO resumed monthly analyses of traffic stop data in May 2017 using a new methodology that was statistically based, but generated a substantial number of alerts, many of which did not demonstrate a pattern of potential bias sufficient to warrant the setting of an alert in EIS.  Because of this problem, we suspended the process during our July 2017 site visit to allow EIU time to consider possible refinements to the existing methodology.

MCSO's vendor, CNA, proposed a methodology for the monthly analysis of traffic stop data that involved using propensity score weighting to define a deputy's comparison group to look for evidence of individual-level bias.  What is known as the Traffic Stop Monthly Report (TSMR) methodology was first proposed in July 2019 to be the basis of the effort to compare the stop outcomes for an individual deputy to his/her peers.  Subsequent revisions and refinements of the TSMR methodology have occurred and are documented in our previous quarterly reports.  In April 2021, MCSO began the piloting of the TSMR methodology, using 12 months of traffic stop data for the data period that closed in March 2021.  Since that time, several more review cycles have occurred.  MCSO runs the data and analyzes the results every month, except when agreed to by the Parties and us so that MCSO can make modifications to the methodology based upon experiences from earlier cycles.

The purpose of the TSMR pilot is to test the efficacy of the TSMR methodology, which essentially includes two distinct components.  One component is quantitative: It includes sophisticated statistical models designed to identify deputies who are potentially engaging in biased policing.  It is important to note that being flagged by the statistical component of the TSMR methodology does not necessarily constitute evidence of potentially biased behavior.  There may be logical explanations for flags generated by the statistical models that can only be discovered by an

WAI 65003

investigation into the data that generated the flags in the first place. This is where the second component of the TSMR pilot methodology enters the process, which we label as the qualitative component of the TSMR methodology. The qualitative component includes an extensive review process by TSAU to determine the validity of the flags and determine the types of interventions that might be recommended for each deputy identified by the TSMR statistical model.

Ongoing concerns with issues relevant to the statistical component of the TSMR methodology was the subject of an October 27, 2021 Court hearing. The Court ordered that MCSO continue to use the approved TSMR methodology, but also instructed MCSO, the Parties, and us to work collaboratively to explore remaining technical issues concerning how information about the time and location of a traffic stop is incorporated into the TSMR methodology. Following the hearing, a group of experts was formed to explore technical options. The group of experts has continued to meet to evaluate possible feasible and practical improvements to the methodology.

In February 2022, for example, several months of discussion led MCSO to introduce a new means of using time and location (splining) of traffic stops to compare deputies' activity more equitably.

MCSO will achieve Phase 2 compliance with this Paragraph when the TSMR process moves from its pilot phase to fully operational, including the finalization of appropriate guiding documents.

**Paragraph 66.** *MCSO shall conduct one agency-wide comprehensive analysis of the data per year, which shall incorporate analytical benchmarks previously reviewed by the Monitor pursuant to the process described in Section IV. The benchmarks may be derived from the EIS or IA-PRO system, subject to Monitor approval. The MCSO may hire or contract with an outside entity to conduct this analysis. The yearly comprehensive analysis shall be made available to the public and at no cost to the Monitor and Plaintiffs.*

**Phase 1:**  In compliance

- EB-2 (Traffic Stop Data Collection), most recently amended on June 15, 2021.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

- GH-5 (Early Identification System), most recently amended on December 16, 2021.

**Phase 2:**  In compliance

MCSO has completed seven comprehensive annual TSARs analyzing traffic stop data to look for systemic evidence of racial profiling or other bias-based policing. MCSO's first contract vendor, Arizona State University, conducted the first three TSARs. MCSO's current vendor, CNA, conducted the last three TSARs.

MCSO released the first TSAR in May 2016 titled, "Preliminary Yearly Report for the Maricopa County's Sheriff's Office, Years 2014-2015." It found that there are deputies engaged in racially-biased policing when compared to the average behavior of their peers.

WAI 65004

MCSO released the second TSAR in March 2017. This evaluation confirmed the first report's main finding that racially biased policing within MCSO appears to be both a deputy- and organizational-level problem.

MCSO released its third TSAR in May 2018, which reported the same results of its two predecessor reports: racially biased policing persists within MCSO at the organizational level.

MCSO released its fourth TSAR in September 2019, employing a new methodology that we approved in April 2019. It reported disparate outcomes by race of driver, but the report never explained what these findings indicated with regard to systemic bias. More specifically, unlike the previous three TSARs that reported the presence of systemic bias within the Patrol Division of MCSO, the Fourth TSAR failed to determine whether the findings of disparate outcomes reflected a systemic problem. We, MCSO, and the Parties all agreed that such a conclusory statement was required. In October 2019, the Sheriff issued a statement that, among other things, said that the disparate outcomes are warning signs of potential racial bias in MCSO's patrol function, which may be indicative of a systemic problem.

In May 2020, MCSO released its fifth report, which reported findings that are consistent with past TSARs. The Fifth TSAR found that there were statistically significant disparities comparing Latinos to whites for all post-stop outcomes, except seizures. It also reported that the disparities were potential indicia of bias as described in the First Order. In a statement subsequent to the release of TSAR5, the Sheriff issued a statement that read, "[TSAR5] [s]hows disparate outcomes in our traffic stops of minorities similar to the outcomes…[and that]…these disparate outcomes are warning signs of potential racial bias in our patrol function."

TSAR6, was released in June 2021. Its main findings are consistent with the previous TSARs. It reports evidence of disparate outcomes by driver race in traffic stops on most stop outcomes. We note that this year's TSAR addressed the issue of systemic bias directly in the report. The Conclusion section of the report (on page 27) said that "while the observed disparities are relatively small...they are very concerning to the MCSO because they identify possible systemic racial bias and its effect on our community. In a June 8, 2021 statement, the Sheriff expressed his concern about possible systemic racial bias in [MCSO's] patrol function and requested that, among other things, that we work with MCSO for an approval of a methodology to look at the disparities in citation rates. We received that methodology shortly before our July 2021 virtual site visit and provided written comments to MCSO in September. That methodology was approved during the fourth quarter of 2021.

TSAR 7 was published on June 30, 2022, and, as noted in the Sheriff's statement published in conjunction with the analytic report, the findings of disparities continue to identify possible systemic racial bias the patrol function. The Sheriff notes that some of the disparities are reduced from prior years, but emphasizes that investigating the presence of the continued disparities will remain a priority for TSAU in both quarterly and monthly analytic reports.

WAI 65005

***Paragraph 67.***  *In this context, warning signs or indicia of possible racial profiling or other misconduct include, but are not limited to:*

a.      *racial and ethnic disparities in deputies', units' or the agency's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of deputies' duties, or racial or ethnic disparities in traffic stop patterns when compared with data of deputies' peers;*

b.      *evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;*

c.      *a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;*

d.      *indications that deputies, units or the agency is not complying with the data collection requirements of this Order; and*

e.       *other indications of racial or ethnic bias in the exercise of official duties.*

**Phase 1:**  In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on April 27, 2022.

- EB-2 (Traffic Stop Data Collection), most recently amended on June 15, 2021.

- GH-5 (Early Identification System), most recently amended on December 16, 2021.

**Phase 2:**  Not in compliance

MCSO has conducted monthly and annual analyses of traffic stop data and provided documents discussing how the benchmarks required by this Paragraph are used to set alerts for possible cases of racial profiling or other deputy misconduct involving traffic stops.  Discussion about the monthly and annual analyses are incorporated into Paragraphs 65 and 66.

We have discussed in our previous quarterly status reports that MCSO has achieved Phase 1 compliance with this Paragraph as a result of its intent to implement the individual benchmarks required by this Paragraph.  These benchmarks are highlighted below and are generally referred to as post-stop outcomes in the TSMR and TSAR methodologies.

Paragraph 67.a. identifies three benchmarks pertaining to racial and ethnic disparities.  The first benchmark references disparities or increases in stops for minor traffic violations (Benchmark 1).  The second benchmark addresses disparities or increases in arrests following traffic stops (Benchmark 2).  The third benchmark addresses disparities or increases in immigration status inquiries (Benchmark 3).  Since these three benchmarks are incorporated into the EIU Operations Manual and are incorporated as post-stop outcomes in the TSMR methodology being piloted, MCSO is in compliance with Paragraph 67.a.

WAI 65006

Paragraph 67.b. identifies a benchmark pertaining to evidence of an extended traffic stop involving Latino drivers or passengers (Benchmark 4). Since this benchmark is now incorporated into the EIU Operations Manual and is incorporated in the TSMR methodology, MCSO is in compliance with Paragraph 67.b.

Paragraph 67.c. identifies three benchmarks. The first benchmark pertains to the rate of citations (Benchmark 5): MCSO is required to identify citation rates for traffic stops that are outliers when compared to a deputy's peers. The second benchmark (Benchmark 6) pertains to seizures of contraband: MCSO is required to identify low rates of seizures of contraband following a search or investigation. The third benchmark in Paragraph 67.c. (Benchmark 7) is similar to Benchmark 6, but it pertains to arrests following a search or investigation. This is also the case for Benchmark 7. Since the three benchmarks are now incorporated into the EIU Operations Manual and are incorporated as post-stop outcomes in the TSMR methodology, MCSO is in compliance with Paragraph 67.c.

Paragraph 67.d. establishes a benchmark pertaining to agency, unit, or deputy noncompliance with the data collection requirements under the First Order (Benchmark 8). This benchmark requires that any cases involving noncompliance with data collection requirements results in an alert in EIS. EIU published an Administrative Broadcast on November 28, 2016 to instruct supervisors how to validate data in TraCS for those cases involving duplicate traffic stop records to deliver timely data validation for our review. MCSO's draft EIS Project Plan 4.0 reported that MCSO began the data validation process for this benchmark on November 28, 2016. Therefore, MCSO is in compliance with Paragraph 67.d.

Paragraph 67.e. allows for other benchmarks to be used beyond those prescribed by Paragraph 67.a.-d. MCSO has three benchmarks under Paragraph 67.e. Benchmark 9 is defined as racial or ethnic disparities in search rates. Benchmark 10 is defined as a racial or ethnic disparity in passenger contact rates. Benchmark 11 is defined for non-minor traffic stops. Benchmarks 9-11 are incorporated into the EIU Operations Manual, as well as the TSMR methodology. Therefore, MCSO is in compliance with Paragraph 67.e.

While MCSO has completed operationalizing the benchmarks required by this Paragraph, we have discussed the problems with MCSO's previous methodologies. (See Paragraph 65.) As noted earlier, the TSMR methodology, which incorporates these benchmarks, is approved for piloting.

During our January 2020 virtual site visit, we committed to holding regular telephonic meetings to continue our collaborative efforts to identify potential problems and solutions identified during the TSMR pilot. These telephonic meetings have continued throughout the pilot process, and we have also incorporated technical meetings of representative experts to discuss more fine-grained statistical or methodological issues. Phase 2 compliance will depend upon the successful completion of the TSMR pilot and the consistent production of TSMR analyses thereafter. In addition, for the pilot to be successfully completed, MCSO must finalize all of the protocols and processes in the operational manuals, as well as any relevant policies related to the TSMR.

WAI 65007

*Paragraph 68.* *When reviewing collected patrol data, MCSO shall examine at least the following:*

a.   *the justification for the Significant Operation, the process for site selection, and the procedures followed during the planning and implementation of the Significant Operation;*

b.   *the effectiveness of the Significant Operation as measured against the specific operational objectives for the Significant Operation, including a review of crime data before and after the operation;*

c.   *the tactics employed during the Significant Operation and whether they yielded the desired results;*

d.   *the number and rate of stops, Investigatory Detentions and arrests, and the documented reasons supporting those stops, detentions and arrests, overall and broken down by Deputy, geographic area, and the actual or perceived race and/or ethnicity and the surname information captured or provided by the persons stopped, detained or arrested;*

e.   *the resource needs and allocation during the Significant Operation; and*

f.    *any Complaints lodged against MCSO Personnel following a Significant Operation.*

**In Full and Effective Compliance**

MCSO has not conducted a Significant Operation that met the requirements of the Order since Operation Borderline in December 2014.  Subsequent activities (i.e., Operation Gila Monster in October 2016) have not met the criteria for review under this or other Paragraphs.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

As a result of this determination, MCSO District command staff – as well as Investigations and Enforcement Support – will no longer be required to submit monthly statements that they have not participated in Significant Operations as defined by this and other Paragraphs; however, they are required to notify us should staff become involved in a Significant Operation.  We will continue to assess Phase 2 compliance through interviews with command and District staff during our regular site visits.  During our site visits prior to, and including, January 2020, we routinely inquired of administrative staff, District personnel, and the Deputy Chiefs of Patrol Bureaus East and West whether any Significant Operations had occurred since the prior site visit.  In response, MCSO personnel indicated that no Significant Operations had occurred within their jurisdictional boundaries, nor had any of their staff participated in such operations with other departments. Subsequently, during our remote site visits since April 2020, MCSO administrative personnel have continued to advise us that there were no new Significant Operations conducted by MCSO or any of its personnel.

WAI 65008

*Paragraph 69. In addition to the agency-wide analysis of collected traffic stop and patrol data, MCSO Supervisors shall also conduct a review of the collected data for the Deputies under his or her command on a monthly basis to determine whether there are warning signs or indicia of possible racial profiling, unlawful detentions and arrests, or improper enforcement of Immigration-Related Laws by a Deputy. Each Supervisor will also report his or her conclusions based on such review on a monthly basis to a designated commander in the MCSO Implementation Unit.*

**Phase 1:** In compliance

- EA-3 (Non-Traffic Contact), most recently amended on June 28, 2019.
- GH-5 (Early Identification System), most recently amended on December 16, 2021.

**Phase 2:** In compliance

MCSO has placed into production database interfaces with EIS, inclusive of Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), Arizona Office of Courts (AOC) records, and the Cornerstone software program (referred to as "the HUB"), that includes training and policy records for MCSO. Supervisors have demonstrated the ability to access these during our site visits. Most audits and inspections of supervisory oversight activities indicate compliance, but several continue to show fluctuating trends of use or completion over time. MCSO has yet to fully develop some inspections that would allow a determination of compliance under this Paragraph. MCSO continues to develop the Traffic Stop Monthly Report (TSMR) that will provide supervisors the ability to review and respond to data pertinent to the performance of deputies under their command with respect to the requirements of Paragraph 67. MCSO has published seven Traffic Stop Quarterly Reports (TSQRs): the first two for the third and fourth quarters of 2020; and the third through fifth for the first three quarters of 2021. The publication of the sixth TSQR was delayed until the first quarter of 2022 due to the amount of work required and the extended approval processes involved. Finally, the seventh, investigating disparities by ethnicity/race across several arrest types, was published in June 2022.

MCSO has automated the dissemination and responses to alert investigations initiated for repetitive deficiencies discovered during audit and inspection processes; however, many of these processes have been placed on hold as MCSO reevaluates the thresholds for the triggering of alerts. In October 2021, MCSO produced a Threshold Analysis Review Proposal to be conducted annually, as well as an EIS Alert Research/Background document for review. We returned these documents with questions/comments and a presentation of the document and its use. We will continue to work with MCSO and the Parties on these issues. Nonetheless, AIU developed an inspection that tracks EIS Alert investigations from the time that they are assigned from EIU to District personnel and make their way back through the chain of command for final approval of a disposition. The protocol for this inspection is included in the EIU Operations Manual, Section 302 (EIS Alert Processes), and was approved on March 27, 2019.

During this quarter, the completion of investigations fell within policy timeframes for April and June (100%) but in May, due to one case involving late completion without an extension, MCSO only achieved 93% compliance. MCSO has suggested moving to a quarterly review of these investigations due to the low number of investigations per month where one missed deadline

WAI 65009

would place the agency out of compliance. We agree with this approach. MCSO is currently modifying the protocol to move to a quarterly inspection that includes an evaluation of the effect of any intervention undertaken. We will elaborate on this when the protocol is approved. A review of the closed alerts for this quarter shows that most interventions were completed with a meeting between the supervisor and their subordinate; however, we also note that one investigation resulted in an action plan, two included additional training, and one involved a squad briefing.

Since there have been no closures that have not been adequately documented during this quarter, we did not schedule a telephonic site visit conference with MCSO on alert closures. We have requested that MCSO provide an update on the audit of repetitive BIO Action Forms for specific Districts and personnel. MCSO continues to use the insights gained from this initial analysis to refine and develop a repeatable process that is less labor-intensive than the first effort.

In response to a request submitted following our October remote site visit, MCSO produced a BIO Action Form tracking proposal in December 2021 that was largely based upon a pilot tracking analysis of BIO Action Forms conducted in 2020 based upon 2019 data. We sent our collective comments back to MCSO in January 2022 and await the completion of the first BAF inspection report. In this way, BIO will be able to discover if Districts, or individual supervisors, are experiencing repetitive problems that need to be addressed to ensure compliance with this Paragraph, as well as those covered in Paragraphs 81, 94, and 95.

The Traffic Stop Annual Reports (TSARs) are published and available to the public on MCSO's website. The TSAR7 was placed on the website in June 2022. These reports focus on organizational trends in traffic stop activity and do not allow an examination of potential individual bias in traffic stop outcomes. The methodology employed for the Fourth through Seventh TSARs was also intended to create a foundation for the Traffic Stop Monthly Report (TSMR). We continue to work with MCSO on the development of a monthly traffic stop analysis that would provide information about potential bias of individual deputies when compared with their peers. We, along with the Plaintiff and Plaintiff-Intervenor, have held frequent conference calls addressing a variety of outstanding issues related to the TSMR. MCSO began the pilot TSMR process in April 2021 using March traffic data and has repeated this process of analyses through 13 cycles of data, with some modifications being explored and discussed through the second quarter of 2022. MCSO has initiated a detailed vetting process as a result of these analyses. The vetting of cases that flag as outliers leads MCSO to recommend that some cases are discounted, while others result in memos to District staff, and still others receive intermediate or full interventions depending on the findings of TSAU staff. During the pilot process, we and the Parties are given time to review and comment on these decisions before they are finalized.

As noted above, MCSO has produced seven Traffic Stop Quarterly Reports. The insights from several of these investigations have resulted in findings that will influence future analyses.

In TSQR7, "Traffic Stop Quarterly Report: 2019-2021 Arrests Activity," MCSO investigated in more detail the disparities in arrests between Latino and white drivers discovered during the past three TSARs. As expected, MCSO found "consistent disparities between White and Hispanic drivers across all arrest types and years, but they did not present any identifiable pattern. This is indicative that arrest disparities cannot be explained by a single type of arrest or district in the

WAI 65010

County.  The one exception to this was District 5 (Lake Patrol), which had higher arrest rates, for both Hispanic and White drivers, than any other district across the majority of compared categories for each of the three years."  From this report, MCSO has also proposed a closer examination of special assignments that may yield potential patterns not uncovered in this analysis.

In TSQR6, "Traffic Stop Quarterly Review: Citations and Warnings," MCSO examined in more detail the findings from prior Traffic Stop Annual Reports (TSARs) regarding racial and ethnic differences in traffic stop outcomes.  In particular, MCSO sought to explore characteristics of traffic stops that were not included in TSAR analyses – including the impact of total citations emanating from a traffic stop, citation experiences between Latinos and whites for issues unrelated to the reason for the original stop, among others.  In general, MCSO reported similar findings to those of prior TSARs in that they continued to find that Latino drivers were more likely to be cited than white drivers.  However, MCSO also found that Latino drivers were significantly more likely to be cited for license and registration issues than white drivers, which followed with the finding that Latino drivers had more violations per traffic stop than white drivers across the entire County.

In response to these findings, MCSO indicated that there may be opportunities to develop further training for deputies, and also to inform the public of licensing and registration requirements that leave little discretion to deputies when it comes to enforcement decisions.  We discussed this study at length with MCSO, the Plaintiffs, and the Plaintiff-Intervenor; including the possibility of exploring some of the findings more thoroughly in our future quarterly status reports.

In TSQR5, MCSO investigated in more depth the organization-wide disparities in traffic stop outcomes and found that a few Districts accounted for certain aspects of these disparities.  From a policy perspective, this quarterly report offers insight into planned activities by TSAU to work with each District to mitigate potential systemic bias.  During our April site visit, MCSO reported that it held meetings at each District to share the findings from this quarterly report with command staff and personnel.  MCSO noted that several meetings took longer, and entailed more presentations and documentation, depending upon the specific findings for those particular Districts.

MCSO continues to provide us access each month to all Non-Traffic Contact Forms (NTCFs) involving investigative stops and field information; however, MCSO has only begun planning to conduct more thorough statistical analyses of these for this and other Paragraphs.  At times over the past year our review of the NTCFs provided each month indicated that a higher proportion of Latinos are being contacted in particular areas of the County for relatively minor infractions.  Our review of NTCFs for this quarter did not raise particular concern about disparate treatment. Several months ago, MCSO proposed an initial study of how this form (NTCF) and the related policy are being used across the agency.  While this proposed analysis does not investigate potential indications of bias in how these stops are conducted by deputies or evaluated by supervisors, it will give some insight into the modifications needed in both the form and policy going forward.  We, MCSO, and the Parties held a conference call in early February 2022 to reiterate the importance of understanding how NTCFs are used by deputies; and MCSO has committed to move forward with the first stage of the proposed study.

WAI 65011

We continue to evaluate supervisory investigations into non-traffic stop alerts each month by selecting a random sample of 15 cases, when the number of completed investigations exceeds that amount. Over the past year, we have found that most supervisors are completing these investigations in a timely fashion and addressing the deficiencies raised as we have noted above. MCSO has proposed, and we have agreed in principle, to convert the alert inspection to a quarterly process that includes an evaluation of the effectiveness of the interventions undertaken. Once placed into production, we will examine the additional information gained from the modifications being proposed.

MCSO has created an EIS Alert Review Group (ARG) that evaluates the investigations of supervisors prior to closing an alert. The ARG ensures that the reports of the supervisors address all aspects of the assigned investigations and returns those that are deficient to the District for continued revision. Over the past several months, we have noted that the proportion of completed alert investigations being sent back to the Districts by the ARG has fallen below one-third of all cases we evaluate. MCSO has emphasized supervisory investigations in the past years' training, as well as the creation of liaisons between BIO and the Districts to ensure that supervisors receive the necessary support and information to complete these investigations.

In addition, EIU has developed online supervisory resource material for alert investigations that was placed on the HUB in January 2020. MCSO has not yet developed a method of evaluating whether and how the interventions triggered by these alert investigations may, or may not, be mitigating the problems to begin with; however, as noted above, the examination of effectiveness is part of the modification from a monthly to quarterly process now proceeding through the approval process.

The Audit and Inspections Unit (AIU) conducts monthly audits of supervisory oversight via the Supervisor Notes made for each deputy. Minimally, each month, supervisors should be making a performance appraisal note, reviewing two body-worn camera recordings, and reviewing the EIS profile of their subordinates. During the second quarter, MCSO reported compliance rates ranging between 94.04% to 100%. MCSO computes its compliance rates based upon a matrix of items; they are based upon randomized samples that we draw. Our computation of compliance is slightly lower than that reported by MCSO, as we judge an entire case reviewed as noncompliant if any of the key components making up the inspection are late or missing at the time of the inspection. Our computed compliance rate for April was 88.6% and June was 90%, while we concur with the 100% compliance rate reported for May.

WAI 65012

AIU also conducts three inspections of traffic stop information: two of these pertain to the timely review and discussion of traffic stops by supervisors for each subordinate; and the third is an inspection regarding the correct completion of traffic forms and the coordination of these forms with databases such as CAD and the review of body-worn camera footage. For the traffic review and traffic data inspections, MCSO reported compliance rates ranging from 98% to 100% for April through June of the second quarter. The deficiencies that did exist were minor deviations from the matrices used to evaluate compliance. For the traffic discussion inspection, MCSO notes that there were significant lapses in April and May leading to compliance rates below 85%. The lapses noted for the discussion inspections were due to two supervisors who failed to carry out and document the required discussion processes. Each of these inspections was based upon a stratified random sample of all traffic stops drawn by the Monitor and provided to MCSO. AIU sent BIO Action Forms to those Districts where it found deficiencies.

MCSO has developed an Incident Report Inspection that has been approved following several revisions. The inspection should include instances where prosecuting authorities turned cases down due to a lack of probable cause, among other matrix items developed by MCSO. MCSO reported compliance rates for April through June exceeding 98th percentiles, with one instance of a case being turned down due to a lack of probable cause in both April and June. Our compliance rates differ slightly due to the fact that we do not employ a matrix but judge a case as deficient if any serious deficiency arises. Therefore, our compliance rate for April through June ranges from 95% to 97.5% – 97.5% for April, 97.5% for May, and 95% for June. For those deficiencies discovered during the inspection process, AIU sent BIO Action Forms to the appropriate Districts for additional review and action. Most importantly, the inspectors noted that there was no indication that the immediate supervisors found these deficiencies within their own review of these IRs.

MCSO is also developing an inspection of repetitive BAFs so that they might intervene for supervisors who evidence recurring problems. We have found that measures such as the creation of the Alert Review Group have greatly enhanced the accountability of Districts and individual supervisors in the completion of their roles.

**Paragraph 70.** *If any one of the foregoing reviews and analyses of the traffic stop data indicates that a particular Deputy or unit may be engaging in racial profiling, unlawful searches or seizures, or unlawful immigration enforcement, or that there may be systemic problems regarding any of the foregoing, MCSO shall take reasonable steps to investigate and closely monitor the situation. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or of other supervised, monitored, and documented action plans and strategies designed to modify activity. If the MCSO or the Monitor concludes that systemic problems of racial profiling, unlawful searches or seizures, or unlawful immigration enforcement exist, the MCSO shall take appropriate steps at the agency level, in addition to initiating corrective and/or disciplinary measures against the appropriate Supervisor(s) or Command Staff. All interventions shall be documented in writing.*

**Phase 1:** In compliance

WAI 65013

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on April 27, 2022.

- EB-2 (Traffic Stop Data Collection), most recently amended on June 15, 2021.

- GH-5 (Early Identification System), most recently amended on December 16, 2021.

**Phase 2:**  Not in compliance

MCSO continues to develop the methodology and related plans for the Traffic Stop Monthly Reports (TSMRs).  The TSMR is intended to provide a timelier response to potential indications of bias at the deputy level through the examination of a rolling 12-months of traffic stop data for each deputy.  We, the Parties, and MCSO have conducted frequent conference calls to ensure that the methodologies adopted will be effective in replacing the intervention processes emanating from prior Traffic Stop Annual Reports (TSARs).  MCSO initiated a pilot program to evaluate and assist in the refinement of each aspect related to the TSMR in April 2021.  MCSO has conducted 13 monthly cycles of traffic stop data and identified deputies deemed outliers in comparison to their peers.  MCSO has refined the vetting process for those cases where a deputy flags in the analysis and has recommended outcomes ranging from the discounting of a flag to the onset of full interventions, which would entail remedies based upon the findings of TSAU.  We, along with the Parties, continue to review results and documentation as they are produced and recommend modifications as issues arise.

MCSO continues to develop the EIU Operations Manual.  The sections of the manual that remain under development are those related to statistical methodologies for the TSMR and the thresholds that may trigger alert inquiries for all alert investigations.  MCSO has recently produced a proposal for the modification of thresholds as well as an annual plan to evaluate the thresholds once they are put into production.  We have provided comments on these proposals, as well as a demonstration of the processes proposed and will work with MCSO in the refinement of these.  MCSO has received approval to move forward on several TSQR projects and published seven of these reports through the second quarter of 2022.

MCSO published the Seventh Traffic Stop Annual Report in June 2022 and continues to find in the examination of traffic stop outcomes disparities "that may indicate a systemic bias within the patrol function" that needs to be ameliorated.  In TSQR5, MCSO further investigated these disparities and found that particular Districts were associated with certain traffic stop outcome disparities.  Subsequently, BIO reported that they held command staff and personnel meetings in each District outlining the particular disparities found for each District.  This information was relayed to us and the Parties during our April site visit meeting.  Overall, the analytic methods used in the TSARs are not able to identify individual deputy activity, but form the basis for organizational strategies to address systemic biases through training and policy; the actions taken following the publication of TSQR5 were encouraging.

A portion of the monthly alert report produced by EIU depends upon the TSMR, which remains under development during the pilot phase.  However, the EIS also produces alerts for numerous activities, ranging from repetitive data entry errors to internal and external complaints.  Many of these ongoing alerts are dependent upon the revision of alert thresholds which we noted above continue to undergo evaluation by MCSO.  While we acknowledge that the revision of these

WAI 65014

thresholds entails time consuming research and surveys of line personnel, we believe the delay of nearly two years has hampered the effective use of the EIS to track repetitive behavior that may be deleterious to the organization and the community it serves.  BIO personnel continue to evaluate and update the thresholds used to trigger these alerts to ensure that they are sufficient to detect behaviors that might indicate bias on the part of deputies, taking into consideration the current assignment of the deputies as noted in Paragraph 81.f.  In the meantime, the non-TSMR alerts triggered under the current system are first evaluated by EIU personnel and then transmitted, via BlueTeam, to the appropriate supervisor and District command.  The supervisors conduct investigations, including a potential discussion with the designated deputy, and memorialize their actions in BlueTeam.  District command staff and an Alert Review Group (ARG), comprised of multiple BIO personnel, review these investigations to ensure that proper investigations are carried out and possible interventions are clearly outlined.

AIU began producing an inspection of EIS Alert Processes in April 2019 that evaluates the timeliness of alert investigation completion and whether discussions, training, or Action Plans might result from the supervisory investigation.  The inspection is lagged by one month to allow supervisors 30 days to complete the investigation.  The compliance rate for timely completion of investigations for this quarter ranged from 100% in April and June, to 93% in May.  The interventions implemented for this quarter include the creation of an Action Plan in April, added training in both April and May, and a squad briefing in June, among others.  MCSO has suggested converting these inspections to quarterly, rather than monthly, so that the compliance rates are not impacted by single cases that do not meet policy timeframes.  MCSO has proposed a modified protocol to evaluate the effect of the discussions, activities or Action Plans resulting from these investigations.  The quarterly proposal remains under review, and we will discuss the outcome in future quarterly reports.  The Training Division, working in concert with EIU, included in the 2019 SRELE training a refresher course on supervisory responsibilities in conducting alert investigations.  This training was delivered during the fall of 2019.  Following our January 2020 site visit, MCSO also placed on the HUB resource materials for supervisors who may not have conducted alert investigations recently.  This material provides supervisors with examples of how to complete the alert investigation paperwork or contact EIU staff should the need arise.

MCSO is not in Phase 2 compliance with this Paragraph, as the TSMR, and other relevant inspections, continue to undergo development and have not yet been placed in production.  We will monitor the planned piloting of the TSMR methodology and continue to participate with the Plaintiffs and Plaintiff-Intervenor in regular conference calls about MCSO's progress.

MCSO's Plan to Promote Constitutional Policing (also referred to as the Constitutional Policing Plan, or CPP) was drafted to address systemic issues identified in the Traffic Stop Annual Reports (TSARs).  The CPP includes nine Goals and a timeline for the completion of the Goals.  Our comments in this report pertain to compliance with the Plan during the second quarter of 2022.  MCSO created an online progress tracking tool (Smartsheet) and provided a link to the application in April 2020.  The online spreadsheet is based on the plan originally agreed to by the Parties and approved by the Court.  The spreadsheet provides additional details of MCSO's reported progress on each of the nine CPP Goals: the start date; the projected completion date; and the status of sub-Goals and projects.

WAI 65015

We determine compliance with the CPP through several means.  First, we issue monthly and quarterly document requests pertaining to specific Goals of the CPP, which we review.  We have monthly document requests pertaining to projects under Goals 1, 3, 4, and 5.  We review meeting agendas and discussion items to verify compliance with the projects noted under those Goals.  For the training components of these Goals, MCSO submits training materials that must be reviewed and approved for before delivery.  We confirm completion of training requirements through HUB reports and reviews of BIO inspections of supervisor notes documenting briefings.  Our standing requests for other Paragraphs of the First and Second Orders also provide information related to some of the CPP Goals.  For Goal 1, we review MCSO monthly submissions related to supervisory corrective actions.  For Goal 2, we review a selected sample of deputy and supervisor Employee Performance Appraisals (EPAs).  For Goal 6, we conduct periodic meetings with MCSO, the Plaintiffs, and Plaintiff-Intervenor related to the evaluation of traffic stop data and associated monthly, quarterly, and annual reports.  For Goal 9, we request statistical information, and compare these statistics to the previous quarter to determine if MCSO is making progress.  We review the progress reported for all Goals and projects in the online spreadsheet and record our findings.  We corroborate MCSO's reported progress during our site visits, where we confirm the reported outcomes and ask clarifying questions on projects completed.  Our comments below reflect what we learned as a result of our reviews of documentation during the second quarter of 2022, and pursuant to our inquiries during our July 2022 remote site visit.

Goal 1: Implementing an effective Early Intervention System (EIS) with supervisor discussions. For the second quarter of 2022, MCSO continued to report an overall 96% completion rate for Goal 1, the same completion rate reported in the first quarter of 2022.  The sub-goal noted as the supervisory discussion process had a starting date of April 3, 2018, with the projected completion date listed as December 31, 2021.  As of our July 2022 review, the completion rate for this sub-goal remained at 92%.  The Traffic Stop Monthly Report (TSMR) continues to show an 80% completion rate, the same as our first quarter status report.  During our July virtual site visit, MCSO reported two Town Halls in the second quarter, held in Districts 2 and 4.  The topic discussed at the Town Halls were trends observed in traffic stops, particularly the causes of extended stops.  MCSO staff also discussed BlueTeam applications.

Goal 2: Evaluating supervisors' performances through an effective Employee Performance Appraisal process.  For the second quarter, Goal 2 noted a completion rate of 79%, or a 16% decrease from our last review.  On the online spreadsheet, the completion date for this Goal was previously revised and continues to show a date of May 31, 2023.  Human Resources personnel advised us that they had completed a final draft of Part 2 of the Management Training Guide.  The draft was sent to the Training Division for review and feedback.  MCSO stated that a draft of the Management Training Guide should be ready for our review in the next few weeks following our July virtual site visit.  Human Resources reported some delays related to implementation.  MCSO is currently working on the system configuration for the Perform application.  MCSO will be ready to do final testing and final configuration on the system, and will be prepared for training in Phase 2 materials towards the end of 2022.  Human Resources reported that they have completed Phase 1 of the project and they are currently working on Phase 2.  MCSO stated they anticipate the completion of training materials by the end of July or early August.  MCSO explained that they hope to roll out the new EPA system in October.  We raised a concern with

WAI 65016

documentation contained in performance evaluations regarding the quality of misconduct investigations and reviews of misconduct investigations. MCSO responded that one of the training sessions will be more hands-on, focusing on ensuring that supervisors address different sections that include commentary and review. MCSO noted that they will work to ensure supervisors understand the functionality of the system. Human Resources stated that they plan to conduct quality control reviews of EPAs, and will continue to emphasize the different areas that need to be rated for the EPA to be in compliance. The stand-alone checklist will continue to be used as an aid in the completion of EPAs.

Goal 3: Delivering enhanced implicit bias training. Goal 3 was noted as 91% completed on the tracking spreadsheet, for the second quarter of 2022. MCSO had previously requested that the topic of stand-alone training for Goals 3 and 5 be the LGBTQ community, but due to unexpected difficulties, they requested a change in topic. MCSO requested that the topic of training be changed to Gila Bend. The new topic for training has been approved. MCSO reported that the agency has submitted the interview questions and is prepared to move forward after approval is received. MCSO stated that although the topic of training for Goals 3 and 5 was changed to Gila Bend, they still have interest in training on the LGBTQ community, and will request that the LGBTQ community be the topic of training in 2023. MCSO reported that the next Captains' meeting, where bias topics are discussed, will be in August.

Goal 4: Enhanced Fair and Impartial Decision-Making training (FIDM). Goal 4 was noted at as 89% completed on the tracking spreadsheet, for the second quarter of 2022. During our July virtual site visit, MCSO noted that FIDM training was ongoing, and was approximately 75% completed. MCSO noted that they intended to complete the training by August 31.

Goal 5: Delivering enhanced training on cultural competency and community perspectives on policing. The completion rate for Goal 5 was noted at 94%, for the second quarter of 2022. Training for Goal 5 will be incorporated with Goal 3, as noted above, and will be provided once the training materials are approved. During our July virtual site visit, once again we inquired about the Traffic Stop Survey. MCSO stated that they have received a total of 29 surveys from approximately 21,000 traffic stops. During our July virtual site visit, MCSO reported that they had 19 new surveys. MCSO reported that they adjusted the time for drivers to complete the survey, and as a result, there was a slight increase in the number of surveys. MCSO reported that they were considering adding a QR code, or a barcode, to simplify user access to the survey. The driver can scan the code on a cellular phone and be directed to the survey. MCSO reported that the agency was conducting a social media campaign to promote the survey. MCSO will also use promotional videos to inform drivers of the survey. MCSO reported that the videos were in the production phase. MCSO stated that they will provide more information on the social media campaign and videos during our October site visit. Subsequent to our July virtual site visit, we requested copies of the traffic surveys and received a spreadsheet listing 15 surveys. Fourteen responders were white, and one was Latino. Ten responders were male and five were female. As to the final question on the survey, which asked if participants were satisfied that they were treated without bias, 11 were satisfied, three were not satisfied, and one was neutral. The one Latino male who responded to the survey agreed that he was treated without bias.

WAI 65017

<u>Goal 6:  Improving traffic stop data collection and analysis.</u>  As of our July review, Goal 6 was noted as 98% completed on the tracking spreadsheet.  In our previous review in April the progress was noted at 97%.  We note that the completion rates are MCSO's internal accounting metrics, and we do not necessarily concur.  Over the past two years, we have held 69 TSMR conference calls and eight of them have focused on respective "experts" to work on specific alternatives or modifications to the original methodology.  We believe these calls have been productive and resulted in several changes to the methodology, including issues related to how the time and location of stops are specified in the methodology, as well as more general concerns about data quality and preparation.  The TSMR methodology has undergone 12 pilot cycles, which resulted in closer examination of traffic stops for those deputies whose traffic stops appear outside the norm when compared to the traffic stops of their peers.  From this statistical examination, MCSO has conducted more in-depth analyses of the traffic stops for those deputies who have the highest, or multiple, disparities for traffic stop outcomes.  MCSO's statistical and in-depth analysis has been regularly shared with us and Parties, and has resulted in several interventions.  During our July 2022 virtual site visit, it was agreed that the TSMR methodology was at a point where all parties believe that any remaining modifications going forward would be minor, and MCSO should focus on the completion of the revision of guiding documents for the TSMR and any training protocols that needed to be developed.  We established a target of October 1, 2022, to have the guiding documents and training protocols approved.

<u>Goal 7: Encouraging and commending employees' performance and service to the community.</u>  This goal has been completed.  This goal was not part of the requirements set by the First Order.

<u>Goal 8: Studying the Peer Intervention Program.</u>  This goal has been completed.  This goal was not part of the requirements set by the First Order.

<u>Goal 9: Building a workforce that provides Constitutional and community-oriented policing and reflects the community we serve.</u>  MCSO's goal is to establish a hiring process that will build a workforce that provides Constitutional policing and reflects the community it serves.  As of our July 2022 review, Goal 9 was noted as having a 77% completion rate, a 2% increase from the previously reported completion rate.  The expected completion date on this goal has been revised several times from the initial date of December 31, 2020, to the current date of September 30, 2022.

During our July virtual site visit, MCSO reported that hiring efforts continue to move forward. MCSO reported that they have implemented market increases and sign-on bonuses, although the amount approved was lower than desired.  MCSO reported that they were looking at different strategies for recruitment and retention, but the competition from other local law enforcement agencies is a factor they must contend with.  MCSO stated they were considering expanding solutions such as virtual job fairs, in addition to taking steps to streamline the application process. MCSO noted that video ride-alongs are also under consideration.  MCSO reported that the agency was contacting former employees who left in good standing to gauge their interest in returning, and to inform them of the increase in salary and benefits.  MCSO reported that the agency has initiated a public records request for contact information for licensed security guards throughout the state.  That request resulted in approximately 22,000 email addresses.  MCSO plans to contact the individuals on the list to promote the open positions in MCSO.  MCSO is also considering

WAI 65018

implementing a text messaging application to contact applicants, to keep them informed of their progress once they apply.  We inquired if any of the new legislative bills passed at the state government level will adversely impact MCSO's hiring efforts.  MCSO responded that there has been no adverse impact, and some of the proposed changes may actually help with hiring and retention.  MCSO reported that there were two Detention Academy classes in progress; one class has six trainees and the other has three trainees.

MCSO reported that 73 new employees were hired as of June 30, 2022.  There were 11 sworn employees, 12 Detention employees, and 50 civilian employees hired during the first and second quarters.  The ethnic breakdown for the sworn is 63.64% white, 27.27% Latino, and 9.09% not specified.  The ethnic breakdown for Detention employees is 41.64% white, 50% Latino, 8.33% Black, and .03% not specified.  The ethnic breakdown for the civilian hires is 54% white, 24% Latino, 12% Black, 2% Alaskan Native/American Indian, 2% Asian/Pacific Islander, 2% two or more races, and 4% not specified.

Supervisor demographics for sworn were reported as 78.21% white, 17.32% Latino, 2.79% Black, 1.12% Asian, and .56% two or more races.  Supervisor demographics for Detention were reported as 67.94% white, 23.66% Latino, 4.2% Black, 2.67% Asian, 0.38% Native Hawaiian or Pacific Islander, 0.38% American Indian/Alaskan Native, and 0.77% two or more races.  Supervisor demographics for civilian employees were reported as 64% white, 19% Latino, 11% Black, 0.74% Native American, 2.94% two or more races, and 2.32% not specified.

During our April virtual site visit, MCSO reported a total number of 838 vacancies, as of March 31, 2022.  During our July virtual site visit, MCSO reported a total of 903 vacancies, as of June 30, 2022.  That is an additional 65 vacancies incurred in the second quarter.  The vacancies consisted of 103 sworn, 569 Detention, and 231 civilian vacancies.  Compared to the 524 Detention vacancies previously reported, 569 vacancies indicate a continued negative trend in personnel staffing in Custody Services.  Sworn vacancies also increased by 13.  Of the reported 97 voluntary separations, 12 were sworn, 44 were Detention, and 41 were civilian.  Although MCSO appears to be making a good faith effort to address personnel shortages, we still have serious concerns with the dwindling numbers in Custody Services.  With regard to implicit bias training topics, MCSO has continued to work with us and the Parties to get training materials approved.  As to solutions to address quality of data analysis and supervisor interventions, there has been slow but steady progress, with input from us, the Plaintiffs, and the Plaintiff-Intervenor.

**Paragraph 71.**  *In addition to the underlying collected data, the Monitor and Plaintiffs' representatives shall have access to the results of all Supervisor and agency level reviews of the traffic stop and patrol data.*

**In Full and Effective Compliance**

MCSO has provided us with access to existing data from monthly and annual reports.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 65019

While we continue to work with both MCSO and the Parties on specific issues of methodology for Non-Traffic Contact Forms and the Annual, Monthly, and Quarterly Reports for traffic stop data, we have nonetheless been afforded complete access to all requests involving data.  Recently, MCSO discovered during tests of the TSMR methodology that over 500 traffic stops from April 2020-March 2021 had been assigned incorrect coordinates for the locations of the stops.  This typically occurs as a result of communication problems or other technical issues involving the transmission of data that may arise during a traffic stop.  Traditionally, these incorrect locations are corrected by dispatch staff at the end of each shift; however, during this time period, the corrections were missed.  Upon making the discovery, MCSO notified us and the Parties and began manually correcting these locations to use the data fully.  Furthermore, as a result of a closer examination of stops that occur during special assignments, in preparing a quarterly report proposal, MCSO found that there was an undercounting of special assignment stops included in both Annual and Monthly analyses.  MCSO's proposal includes an evaluation of the impact this may have had on conclusions developed for these reports.  We will discuss this in more detail once approved and completed.  However, MCSO has been forthcoming when they recognize any deficiencies.  MCSO is modifying its data quality procedures to catch and correct these issues in a timely fashion.  These location corrections were also made for the data used in the Sixth and Seventh Traffic Stop Annual Reports, and the undercounting of special assignment stops will be evaluated as described.  TSAU continues to monitor stop locations and correct the default locations as they arise.  We will review additional data quality procedures as they are made available to us.

WAI 65020

## Section 8: Early Identification System (EIS)

**COURT ORDER IX.  EARLY IDENTIFICATION SYSTEM ("EIS")**

### a. Development and Implementation of the EIS

**Paragraph 72.**  *MCSO shall work with the Monitor, with input from the Parties, to develop, implement and maintain a computerized EIS to support the effective supervision and management of MCSO Deputies and employees, including the identification of and response to potentially problematic behaviors, including racial profiling, unlawful detentions and arrests, and improper enforcement of Immigration-Related Laws within one year of the Effective Date.  MCSO will regularly use EIS data to promote lawful, ethical and professional police practices; and to evaluate the performance of MCSO Patrol Operations Employees across all ranks, units and shifts.*

**Phase 1:**  In compliance

- EA-3 (Non-Traffic Contact), most recently amended on June 28, 2019.

- GH-5 (Early Identification System), most recently reviewed on December 16, 2021.

**Phase 2:**  Not in compliance

As a result of interfaces for remote databases introduced in 2017, the Early Intervention System (EIS) now includes Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), records from the Administrative Office of the Courts (AOC), and training completion and policy acknowledgement records from the Cornerstone software (the HUB).  MCSO continues to work on the EIU Operations Manual to memorialize the collection, analysis, and dissemination of relevant data; as well as the responsibilities and roles of agency and EIU personnel.  MCSO has completed approximately 90% of the manual to date.  Those sections that are under development pertain to the Traffic Stop Monthly Report (TSMR) and thresholds for triggering potential alert investigations arising from monthly analysis of traffic and patrol functions.  MCSO has produced a proposal to modify the thresholds and review them annually.  We have commented on these proposals and will continue to work with MCSO on refining these.  MCSO is also proposing modifying the EIS inspection from a monthly to a quarterly report that also will include an evaluation of the effectiveness of interventions undertaken.

To capture the activities of deputies in non-traffic stops of individuals, MCSO created Non-Traffic Contact Forms (NTCFs), which were interfaced with EIS in mid-2017.  MCSO has provided us with access to investigative stops that make up a portion of NTCFs since their inception.  Over the past two years, we have suggested that MCSO create a methodology to statistically examine these civilian contacts to ensure that there is no evidence of bias in the way they are conducted.  MCSO has produced a preliminary draft of an NTCF inspection methodology that we have returned with comments.  In addition, we had requested and received several months of data for all contacts captured using NTCFs in 2019; and we found that the distinction between Field Information and Investigative Stop is not clear to deputies using the forms.  MCSO has now proposed to conduct a study of NTCF use by deputies, using the preliminary methodology

WAI 65021

mentioned previously, to evaluate whether the form, policy, and training associated with stops documented on NTCFs needs to be modified. In a recent request for information, the BIO Captain stated that once the methodology for this one-time study is approved, BIO personnel will complete the assessment in approximately 60-75 days. Until the study and analytic proposals are complete, we will continue to review both investigative stops and field interviews collected on the existing forms. MCSO supplies us with a list of these non-traffic stops each month. A conference call between us, MCSO, and the Parties in early February 2022 resulted in the approval of MCSO's initial evaluation of NTCF use.

We will continue to work with MCSO to finalize each of these data analytic methods. MCSO continues to regularly publish a number of reports on deputy activity and supervisory oversight that are not tied to the methodologies of the TSMR, TSQR, or TSAR.

The Audits and Inspections Unit (AIU) produces a monthly report evaluating Supervisor Notes based upon a random sample we draw that indicates whether the selected supervisors are reviewing the EIS data of deputies under their command. The inspection looks for indications that supervisors made entries for each person they supervise with regard to two randomly selected BWC videos, provide one EPA note, make two supervisor entries, and indicate that the supervisor has reviewed their deputies' EIS status. The compliance rates reported by MCSO are based on a matrix developed for this inspection. For this quarter, the compliance rates reported by MCSO were 94% or higher each month. Our calculation, in contrast, counts individual cases as out of compliance for any missed policy timeframes or requirements. For April, we calculated a compliance rate of 88.6%; for May, we concurred with the 100% reported by MCSO; and for June, our compliance calculation was 90%. AIU continues to send BIO Action Forms to the Districts with deficiencies, and we have always had the opportunity to review these forms when requested.

In the Traffic Stop Review Inspection for this quarter, we note stable compliance rates at 98% or above. The compliance rates for the Traffic Stop Discussion Inspections indicates the inspectors found significant groups of traffic stops that were not completed by two supervisors in District 4. This resulted in compliance rates in the 70 and 80th percentiles. The third traffic-related audit is the Traffic Stop Data Inspection, in which AIU uses a matrix comparing traffic stop information found on Vehicle Stop Contact Forms (VSCFs) with Computer Aided Dispatch (CAD) and body-worn camera (BWC) footage. The compliance rates reported by MCSO during this quarter were all in excess of 98%. We compute compliance based upon specific policy requirements and rule as noncompliant any case that has missing or incorrect information. Therefore, our rate of compliance was 97% for April, 92% for May, and 91.4% for June. All of the inspections for traffic stops are based upon stratified random samples that we draw on a monthly basis. The deficiencies noted by the inspectors resulted in BIO Action Forms being sent to the appropriate Districts for this quarter.

While we can look for trends in deficiencies over each quarter, we have suggested to MCSO that AIU conduct an evaluation of all BIO Action Forms sent to Districts to ensure that there are not long-term trends by Districts or supervisors that cannot be distinguished while looking at shorter timeframes. MCSO conducted a preliminary analysis of BIO Action Forms from January to May 2019 and reported these findings during our July 2019 site visit. MCSO found that there was

WAI 65022

indeed a small number of deputies who had received several BIO Action Forms.  MCSO produced a methodology in June 2020, which we and the Parties returned with comments.  MCSO refined the methodology and resubmitted it in December 2020.  The proposed methodology has been returned to MCSO with a few issues remaining and continues to be in the process of review or revision.  According to MCSO's 29th through 32nd Quarterly Reports, the issues related to the TSMR and TSQR have taken priority; and due to limitations, the agency has put the BAF completion on a temporary hold.  MCSO provided an updated proposal in December 2021 that responded to the few issues that remained.  The proposal was returned to MCSO, and we await the initial publication of this inspection.

EIU also produces a monthly report on non-traffic alerts triggered within EIS.  From March to May 2020, we noted a dramatic increase in Notice of Claim Alerts.  In response to questions we submitted regarding this issue, BIO command staff advised that they had recently discovered that there was a backlog of emails from the Legal Liaison Section regarding Notices of Claims.  During our October 2020 remote site visit, the EIU lieutenant advised that the backlog had been eliminated; and that MCSO had implemented new internal practices to ensure that such an oversight would not reoccur.  MCSO will be updating the EIS Operations Manual in accordance with these changes, and we will review those processes when the document is made available.

For all other alerts, EIU personnel review the alerts and disseminate them to supervisors and District command if alerts indicate the potential for biased activity or thresholds are exceeded for particular actions such as external complaints, data validations, and others.  Once the supervisors receive the alert investigation, they employ a template (Attachment B of GH-5 [Early Identification System]) to conduct the investigation and report their findings and results to the chain of command through BlueTeam.  MCSO has also created an EIS Alert Review Group (ARG) to evaluate the closure of alert investigations.  We had no immediate concerns with our review of alert closures for this quarter; however, the compliance rate for the time to complete these within policy timeframes ranged from 100% in April and June, to 93% in May.  MCSO has recommended, to overcome such discrepancies based on the low number of investigations completed each month, that this inspection be conducted quarterly.  We agree with that recommendation.  MCSO has produced a proposal to modify the monthly report to a quarterly inspection that includes the evaluation of the effect of any interventions undertaken.  We will discuss this more once final approval is granted.  Finally, while most investigations result in a meeting with a supervisor, there were two during this quarter that also resulted in training, another that resulted in the creation of an action plan, and one in June that resulted in a squad briefing.

***Paragraph 73.***  *Within 180 days of the Effective Date, MCSO shall either create a unit, which shall include at least one full-time-equivalent qualified information technology specialist, or otherwise expand the already existing role of the MCSO information technology specialist to facilitate the development, implementation, and maintenance of the EIS.  MCSO shall ensure that there is sufficient additional staff to facilitate EIS data input and provide Training and assistance to EIS users.  This unit may be housed within Internal Affairs ("IA").*

**In Full and Effective Compliance**

WAI 65023

The Bureau of Internal Oversight (BIO) is overseen by a captain and is comprised of three Units designed to achieve different compliance functions.  Each is a fully operational Unit headed by a lieutenant with both sworn and civilian staff responsible for diverse but interrelated oversight functions.

The Early Intervention Unit (EIU) coordinates the daily operation of the EIS.  This unit evaluates alerts generated by the EIS, reviews them and sends out investigations to District personnel as prescribed by policy.

The Audits and Inspections Unit (AIU) has developed and carries out ongoing inspections to ensure that deputies and supervisors are using the EIS properly and to the fullest extent possible. When AIU discovers deficiencies, it sends out BIO Action Forms to the affected Districts and individuals; and ensures the return of the appropriate forms.

The Traffic Stop Analysis Unit (TSAU) was most recently created due to the complexities of generating all of the statistical reports related to traffic and patrol functions of MCSO.  The leaders of these units respond to specific requests made by us and the Parties and appear collectively during our site visit meetings to answer any questions related to the operation of BIO.

Over the last 18 months the EIS database has been expanded to include Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), records from the Arizona Office of Courts (AOC), and training and policy receipt records from the Cornerstone software program (the HUB). Supervisors now have much more information available to them about the deputies under their command than they ever had in the past.

On October 5, 2020, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.


**Paragraph 74.**  *MCSO shall develop and implement a protocol setting out the fields for historical data, deadlines for inputting data related to current and new information, and the individuals responsible for capturing and inputting data.*

**Phase 1:**  In compliance

- GH-5 (Early Identification System), most recently reviewed on December 16, 2021.

- EIU Operations Manual, currently under revision.

**Phase 2:**  In compliance

MCSO has met the requirements of this Paragraph by identifying the data to be collected and the responsibility of persons across the organization to review, verify, and inspect the data making up the early intervention system.  These roles and responsibilities are originally developed in GH-5 (Early Identification System) and more comprehensively elaborated in Section 200 (Duties and Responsibilities), approved in August 2019, of the EIU Operations Manual.

WAI 65024

MCSO has not yet completed the revision of the EIU Operations Manual.  Currently, MCSO has approximately 90% of the manual finalized.  The remaining 10% of the manual is comprised of the ongoing development of the methodologies and responsibilities for the Traffic Stop Monthly Reports, as well as the revision of the thresholds dependent on the results from the TSMR and non-traffic threshold analyses being coordinated by EIU personnel.  The manual sections pertaining to this Paragraph have already been finalized and published; therefore, MCSO has achieved Phase 1 compliance.

MCSO has shown progress in the development of a data-handling protocol since the publication of earlier TSARs, which were fraught with problems.  These processes have been memorialized in the EIU Operations Manual (Section 306), which was approved in July 2020.  Aside from Section 200, noted above, Section 305 (Software Change Control Processes), approved in October 2018, is intended to ensure that all modifications to software or data collection are coordinated in a prospective fashion before any implementation occurs.  These software changes are provided to us on a monthly basis through regular document requests and are discussed during the quarterly site visit meetings.  Each of these sections of the EIU Operations Manual expands upon policy that has already been approved.

MCSO has also created a committee of personnel from each unit that handles, or adds to, traffic data before it is analyzed.  The reports from the regular monthly meetings of this group are made available to us and show the attention to detail and memorialization of changes put in place to improve data processes.  Nonetheless, during the analysis of data related to the initial runs of the TSMR process in late 2020 and early 2021, MCSO discovered over 500 traffic stops that had inaccurate traffic stop location coordinates assigned to them.  Traditionally, dispatchers are to make note of traffic stops involving inaccurate coordinates and manually adjust these at the end of each shift.  This procedure was not performed during April 2020-March 2021.  Upon discovery of this oversight during the analysis of traffic stop data, MCSO notified us and the Parties of this problem and immediately began manually correcting the inaccurate coordinates so that these stops could be used in both the TSMR and TSAR6 analyses.  MCSO is also investigating what led to this oversight and will be proposing protocol modifications to ensure it does not occur again.  At present, TSAU personnel are routinely checking to ensure that no default locations are included in data produced for analytic purposes on a monthly basis.  We will review the process modifications when they are produced.

Finally, EIU produces a monthly report for benchmarks not related to the traffic stop methodologies.  We routinely use these monthly tables to evaluate compliance with various Paragraphs within the Court Order.  For traffic-related Benchmarks 3 and 8 (Paragraph 67), MCSO documents both traffic stops involving immigration inquiries and data validation errors committed by deputies.  During this reporting period, there were no immigration inquiries, and there were 10 data validation alerts: four in April and six in May.

WAI 65025

*Paragraph 75.*  *The EIS shall include a computerized relational database, which shall be used to collect, maintain, integrate, and retrieve:*

a.  *all misconduct Complaints or allegations (and their dispositions), excluding those made by inmates relating to conditions of confinement or conduct of detention officers (i.e., any complaint or allegation relating to a traffic stop shall be collected and subject to this Paragraph even if made by an inmate);*

b.  *all internal investigations of alleged or suspected misconduct;*

c.  *data compiled under the traffic stop data collection and the patrol data collection mechanisms;*

d.  *all criminal proceedings initiated, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the County and/or its Deputies or agents, resulting from MCSO Patrol Operations or the actions of MCSO Patrol Operation Personnel;*

e.  *all arrests;*

f.  *all arrests in which the arresting Deputy fails to articulate probable cause in the arrest report, or where an MCSO Supervisor, court or prosecutor later determines the arrest was not supported by probable cause to believe a crime had been committed, as required by law;*

g.  *all arrests in which the individual was released from custody without formal charges being sought;*

h.  *all Investigatory Stops, detentions, and/or searches, including those found by the Monitor, an MCSO supervisor, court or prosecutor to be unsupported by reasonable suspicion of or probable cause to believe a crime had been committed, as required by law;*

i.  *all instances in which MCSO is informed by a prosecuting authority or a court that a decision to decline prosecution or to dismiss charges, and if available, the reason for such decision;*

j.  *all disciplinary action taken against employees;*

k.  *all non-disciplinary corrective action required of employees;*

l.  *all awards and commendations received by employees;*

m.  *Training history for each employee; and*

n.  *bi-monthly Supervisory observations of each employee.*

**Phase 1:**  In compliance

- EA-3 (Non-Traffic Contact), most recently amended on June 28, 2019.

- GC-13 (Awards), most recently reviewed on March 17, 2022.

- GH-5 (Early Identification System), most recently reviewed on December 16, 2021.

- EIU Operations Manual, currently under revision.

WAI 65026

- Professional Services Bureau Operations Manual, most recently amended on December 21, 2020.

**Phase 2:**  In compliance

Since 2017, MCSO has placed into production data interfaces for Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), Justice Court turndowns (AOC) and the Cornerstone software program (the HUB) that provides reports for training and policy acknowledgment.  MCSO continues to develop some inspections or analytic reports that ensure that personnel are accurately using the EIS data available; however, the data do exist in the EIS and are accessible by personnel we have interviewed during each site visit.  We will continue to evaluate and monitor the use of EIS in furtherance of the Orders.  During our last in-person site visit, in January 2020, we also reviewed with MCSO representatives how the data for the following Subparagraphs appear on-screen and are accessible to first-line supervisors.  We found no issues of concern during this review.  We anticipate conducting a similar review when we resume our in-person site visits.

Paragraph 75.a. requires that the database include "all misconduct Complaints or allegations (and their dispositions)," with some exclusions.

EIPro, a web-based software application that allows employees and supervisors to view information in the IAPro case management system, includes the number of misconduct complaints and allegations against deputies.  Since February 2017, both open and closed cases have been viewable by supervisors.  PSB controls the ability to view open cases based upon the parties who may be involved.  PSB personnel developed a protocol to write the summaries for both open and closed cases that appear in the EIS.  This protocol has been approved and was incorporated into the PSB Operations Manual that was published on December 13, 2018.  Each month, we receive a spreadsheet of open and closed external complaints as they appear in EI Pro for supervisors to review.  Our examination of these descriptions for April-June found that these summaries meet our expectations.  Additionally, during all site visits between 2017 and January 2020, we observed that field supervisors could easily access these summaries and understand the types of issues involved in the complaints.  Supervisors conducting alert investigations have also routinely referred to a review of complaint summaries as a portion of their investigative process.  Supervisors are also advised that they can always contact EIU and PSB for clarification if it is necessary.

MCSO is in compliance with this Subparagraph.

Paragraph 75.b. requires that the database include "all internal investigations of alleged or suspected misconduct."

Corresponding to the discussion above involving external complaints, internal investigation summaries also appear in the IAPro system.  All complaint summaries, open and closed, have been viewable since February 2017.  PSB uses a standard protocol to develop the case summaries and access limits.  We approved this protocol, and it is included in the PSB Operations Manual.  Each month, we receive a spreadsheet of internal allegations as they appear to supervisors in EIS.  Our review of the summaries for April through June found these summaries to be transparent and easily understandable.  During our past site visits, we have found that line supervisors are also able to easily access the summaries of open and closed internal investigations pertaining to their

WAI 65027

subordinates.  Supervisors also have referred to these summary fields while conducting alert investigations.  Field supervisors always have the option of requesting additional information from EIU and PSB should they deem the summaries insufficient.

MCSO is in compliance with this Subparagraph.

Paragraph 75.c. requires that the database include "data compiled under the traffic stop data collection and the patrol data collection mechanisms."

MCSO has created electronic forms to collect data from traffic stops, incidental contacts and warnings.

MCSO has also created interfaces with EIS for remote databases including Incident Reports (IRs) and Non-Traffic Contact Forms (NTCFs).  These reports are readily available to supervisors to review within EIS.  Field supervisors have shown that they have the ability to view IRs and NTCFs during our past site visits.  AIU already conducts an inspection of IRs and has revised the methodology to improve and streamline the inspection process.  We have suggested, over the past two years, that MCSO create a similar inspection for NTCFs, as well as propose an analytical strategy to examine whether any racial or ethnic inconsistencies may exist in the incidents documented on the NTCF.  MCSO produced a brief proposal of the methods they would use to analyze NTCFs based upon these ongoing discussions.  We, the Plaintiffs, and the Plaintiff-Intervenor provided comments on these proposals in early April 2020.  Following several conference calls on both the forms and policy, EA-3 (Non-Traffic Contact), MCSO proposed an initial study that would only evaluate how the NTCF form and policy are being used across the agency.  MCSO also proposes that following this review of the use of NTCFs, the agency will suggest an appropriate method to determine if disparities exist in the stops documented on these forms.  While this evaluation has been placed on hold due to the importance of TSMR and TSQR planning and methods, we and the Parties conducted a conference call in early February 2022 and gave approval to the initial evaluation of NTCFs.  MCSO has made available all investigative stop and field interview NTCFs each month.  Our review of NTCFs for the current quarter did not find any issues of concern; however, a statistical methodology would allow a more comprehensive examination.

This Paragraph requires that the data for such activities exists within EIS; however, Paragraphs 72, 81a., and 81b.vi. require an analysis of these stops.  Therefore, while MCSO complies with this Subparagraph, MCSO will not achieve compliance for the other Paragraphs until a method of analysis is approved.

MCSO is in compliance with this Subparagraph.

Paragraph 75.d. requires that the database include "all criminal proceedings initiated, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the County and/or its Deputies or agents, resulting from MCSO Patrol Operations or the actions of MCSO Patrol Operation Personnel."

MCSO's Legal Liaison Section receives and forwards this information to EIU for entry into the EIS database.  Supervisors have demonstrated the ability to access this information during our site visits.  In addition, in one of the monthly production requests involving this Paragraph, we

WAI 65028

noted that during the January to March 2020 time period, there were 14 "notice of claim" incident type alerts; but none were sent to supervisors for further investigation. During April through June of the same year, we noted 67 "notice of claim" incident type alerts with three being sent to supervisors for investigation.

During our July 2020 remote site visit, we requested clarification on these particular alerts through a document request. BIO command staff advised that they had recently discovered that there was a backlog of emails from the Legal Liaison Section regarding Notice of Claims. In October 2020, the EIU lieutenant noted that the backlog of Notice of Claims had been rectified and that new internal processes were adopted to ensure that such a backlog would not go undetected in the future. As this appears to have been a unique issue that MCSO responded to quickly, we have not removed MCSO from compliance with this Subparagraph. We have not observed any similar spike in activity regarding this Subparagraph and will periodically request an examination of the notice of claims review process. To date, no new issues have occurred.

MCSO is in compliance with this Subparagraph.

Paragraph 75.e. requires that the database include "all arrests."

Arrests may not always occur as a result of a traffic stop. MCSO, therefore, has placed into production an interface between EIS and the Jail Management System (JMS). This interface allows supervisors to easily access information regarding arrests that cannot be viewed through traffic data. During our site visits, supervisors have demonstrated the ability to access the IRs and related arrest information. The timeliness and sufficiency of that review is evaluated under Paragraph 93.

MCSO is in compliance with this Subparagraph.

Paragraph 75.f. requires that the database include "all arrests in which the arresting Deputy fails to articulate probable cause in the arrest report, or where an MCSO Supervisor, court or prosecutor later determines the arrest was not supported by probable cause to believe a crime had been committed, as required by law."

Incident Reports (IRs) are housed in the TraCS (Traffic and Criminal Software) system. Supervisors must review and sign off on IRs for each deputy involving an arrest or detention of a suspect within 72 hours of the incident. Supervisors are also required to ensure that probable cause exists for each charge or arrest outlined within an IR. AIU additionally conducts an inspection of IRs to ensure that all policy requirements are met.

If a court or prosecutor decides not to prosecute a case, both the deputy and their immediate supervisor are notified. In 2019, MCSO created a new inspection that combined IR and County Attorney Turndown inspections. MCSO's intent is to catch instances of reasonable suspicion and probable cause issues earlier in the process. Other deficiencies result in BIO sending Action Forms to the appropriate District personnel.

During this reporting period, MCSO reported a compliance rate in excess of 98%, using the entire matrix of issues the agency employs to investigate IRs. We computed a slightly lower rate for April (97.5% compliance), due to that fact that inspectors found one instance in which deputies had not properly articulated probable cause; and one case in May (97.5% compliance), in which

WAI 65029

a deputy used conclusory language in their report.  In June (95% compliance), there was both a case lacking articulation of probable cause and one lacking articulation of the elements of a crime. Additionally, supervisory personnel had not discovered these issues during their reviews.  BIO sent Action Forms to the Districts for the deficiencies in the original report and the supervisors who failed to find these deficiencies before signing off on the reports.

The inspections show that the data exist within EIS, even though the manner of computing compliance differs between us and MCSO.

MCSO remains in compliance with this Subparagraph.

Paragraph 75.g. requires that the database include "all arrests in which the individual was released from custody without formal charges being sought."

The ability to capture this information depends upon what actually occurred within the context of the interaction.  If the suspect was taken into physical custody but released prior to booking, there would be a JMS record, as indicated in Subparagraph 75.e. above.  Therefore, MCSO could use the interface described above to pull the relevant data elements into EIS.  However, if the incident does not rise to the point of physical custody and detention, then it would likely yield an Incident Report, covered under Subparagraph 75.f. above or an Investigatory Stop under Subparagraph 75.h. to follow.  The interfaces for IR and NTCF data became operational prior to July 1, 2017. The new inspection process referred to above will also capture elements useful for the evaluation of this Subparagraph.

MCSO is in compliance with this Subparagraph.

Paragraph 75.h. requires that the database include "all Investigatory Stops, detentions, and/or searches, including those found by the Monitor, an MCSO supervisor, court or prosecutor to be unsupported by reasonable suspicion of/or probable cause to believe a crime had been committed, as required by law."

MCSO has created interfaces for both IRs and NTCFs.  As noted in 75.f., our compliance calculation for inspection of IRs for this reporting period exceeds 95%.  AIU sent BIO Action Forms (BAFs) to Districts with deficiencies.  In addition, BIO is working on a separate inspection to track repetitive BAFs received by individuals and Districts.

In July 2017, the interface between EIS and the database for NTCFs was placed into production. MCSO also reissued EA-3 (Non-Traffic Contact) and amended the policy on June 14, 2018 (and further amended it on June 28, 2019).  This policy specifies the responsibility of MCSO personnel regarding different types of search occurrences.  If the search is related to a traffic stop, it should be captured on the VSCF.  Searches occurring within activities resulting in an Incident Report will be captured under Subparagraph 75.e., and NTCF searches fall under this Subparagraph.

Initially, the number of NTCF reports was insignificant; however, since May 2018, we generally receive between 15-25 NTCFs for investigative stops each month.  These are all captured within EIS as required by this Subparagraph (as well as 75.c.).  During the last quarter of 2019, we also requested a random sample of Field Information stops that were documented using the NTCF. Our review of these indicated that approximately 80% of civilian stops labeled as Field Information could easily have been labeled as Investigative stops.  We apprised MCSO of our

WAI 65030

findings and have subsequently provided MCSO with our summary evaluation. We have also suggested that MCSO develop a methodology to statistically analyze the collection of NTCFs to look for possible issues of racial or ethnic bias in the way these interactions are conducted. The development of a statistical examination of NTCF stops should be a priority for MCSO once the Traffic Stop Methodologies for the Monthly Analyses are complete. Such an examination is required by Paragraphs 72 and 81.b.vi. MCSO has drafted an initial proposal for the evaluation of how NTCF forms and policy are being used across the agency. We revisited this initial proposal during a conference call in early February 2022, and granted MCSO the approval to move ahead with that inquiry. Depending upon the outcome of that review, MCSO noted that the agency is ready to modify, where appropriate, both the policy and forms related to NTCFs; and will undertake a process to ensure that any potential indications of bias are discovered. Since NTCFs and IRs are included in EIS, MCSO is in compliance with this Subparagraph. Our review of investigative stops and field interviews during this quarter yielded no issues of concern.

MCSO is in compliance with this Subparagraph.

Paragraph 75.i. requires that the database include "all instances in which MCSO is informed by a prosecuting authority or a court that a decision to decline prosecution or to dismiss charges, and if available, the reason for such decision."

The EIS database has included both County Attorney Actions and an interface with the Justice Courts (AOC) since July 2017. MCSO began using a new method that merged the County Attorney Turndown Inspection with the IR inspection. The first inspection was produced in August 2019 using July data. For this quarter, our computed compliance rates for the IRs exceeded 95. These compliance rates are slightly lower than those reported by MCSO in due to the fact that we evaluate each instance of a failure to properly articulate charges as a lack of compliance, while MCSO employs an extensive matrix to evaluate compliance, treating all deficiencies equally. For this period, the IR inspection did not include any County Attorney Turndowns, as none were received indicating a problem with probable cause; however, AIU inspectors found one case in April and June that lacked sufficient probable cause, and one case in May that included conclusory language. Also in June, the inspector noted a second case in which the elements necessary for a crime were not adequately articulated. AIU sent several BIO Action Forms to the Districts for review due to the deficiencies found by the inspectors. For this Subparagraph, we also receive a random selection of IRs turned down for prosecution from MCSO and the Justice Courts. Our review of these indicate that most had been turned down using the generic phrases "no reasonable likelihood of conviction" or "dismissed to aide in prosecution." We found no other significant problems with the reports reviewed. We will continue to evaluate the inspection and IRs in future quarterly status reports.

MCSO is in compliance with this Subparagraph.

Paragraph 75.j. requires that the database include "all disciplinary action taken against employees."

MCSO currently tracks disciplinary actions in the IAPro system (for this and Paragraphs 26, 28, 69, and 89), which allows supervisors to search the history of their employees in EIS.

WAI 65031

AIU produces a monthly alert inspection report relevant to Paragraphs 70, 71, 75, and 81. The possible outcomes from these alert investigations range from no further action to referral to PSB. In the alert inspection reports from January through March, there were 12 instances where cases were referred to PSB for investigation.

Additionally, the Administrative Services Division replies to a monthly request that incorporates this Subparagraph; and the Division's report indicates that no discipline was imposed for bias-related incidents between April through June 2022.

MCSO is in compliance with this Subparagraph.

Paragraph 75.k. requires that the database include "all non-disciplinary corrective action required of employees."

MCSO produces a Supervisory Note inspection (in particular, bimonthly reviews of a deputy's performance) and the monthly alert report described in the previous Subparagraph to fulfill the requirements for this Subparagraph. In addition, we also review up to 15 closed alert inspections conducted by supervisors each month. (If there are more than 15, the cases are randomly selected from the total.) As noted previously, the majority of cases are closed through a meeting with a supervisor; however, during this reporting period, there was one case where an Action Plan was created, two cases requesting additional training, and one case where a supervisor conducted a squad briefing.

Supervisors also are required to make two comments regarding their subordinates each month in their BlueTeam Notes. In the Supervisor Notes inspections for this quarter, there were 5 instances where supervisors were found deficient, and BIO sent out Action Forms to the respective command personnel.

MCSO is in compliance with this Subparagraph.

Paragraph 75.l. requires that the database include "all awards and commendations received by employees."

MCSO first published GC-13 (Awards) on November 30, 2017, and most recently revised this policy on March 17, 2022. With this publication, MCSO created categories for awards or commendations that could be tracked within the EIS database. With the introduction of the newest version of EIPro, these fields are also searchable by supervisors. During our past site visits, supervisors demonstrated how they could search these fields and locate awards of their subordinates in the EIS data. According to the monthly alert inspection reports for April through June, there were no commendations recommended by a supervisor.

MCSO is in compliance with this Subparagraph.

Paragraph 75.m. requires that the database include the "[t]raining history for each employee."

MCSO has transitioned from the Skills Manager System to the Cornerstone (the HUB) software program. The HUB has replaced the E-Policy and E-Learning programs. The HUB routinely updates recent training and policy reviews for deputies and is visible by immediate supervisors. MCSO also created an interface between the HUB and EIS.

WAI 65032

During our past site visits, all field supervisors who we contacted stated that they were familiar with the HUB and were able to access the information contained therein. Several supervisors noted how they assigned training to particular deputies following alert investigations they completed. During this reporting period, there were two alert investigations where the supervisor recommended additional training for their subordinates. In addition, during our regular conference calls regarding TSMR methodology, we have placed particular importance on the development of comprehensive supervisor training that would ensure that they will be able to comprehend and interpret the statistical data produced each month in a way that would promote a transparent intervention process. MCSO personnel have assured us that supervisors have ready access to the training and policy reviews of their subordinates. We will continue to evaluate supervisors' ability to easily search and use EIS during future site visits. As noted above, this will include not only a review with EIU technical staff but field supervisors at the Districts when we resume our in-person site visits.

MCSO is in compliance with this Subparagraph.

Paragraph 75.n. requires that the database include "bi-monthly Supervisory observations of each employee."

The Audits and Inspections Unit (AIU) conducts a monthly inspection of Supervisor Notes. One of the indicators AIU evaluates is whether supervisors are making two notes per deputy each month. For April through June, AIU reported seven instances where supervisors failed to make two reviews for each of their subordinates, and sent BIO Action Forms to the relevant Districts for processing.

MCSO is in compliance with this Subparagraph.

With the operationalization of interfaces for Incident Reports, Non-Traffic Contact Forms, the Arizona Office of the Courts, and the HUB, EIS now contains the information required by the Order. MCSO has worked diligently to use some of the data above to investigate compliance rates with the Orders. MCSO continues to develop other inspections or data analytic methods in response to our recommendations. During our regular conference calls with MCSO, Plaintiffs, and Plaintiff-Intervenor, we have continued to clarify how MCSO utilizes the data being collected and recommended ways it might gain further transparency in the ways it analyzes and presents information gleaned from these analyses.

**Paragraph 76.** *The EIS shall include appropriate identifying information for each involved Deputy (i.e., name, badge number, shift and Supervisor) and civilian (e.g., race and/or ethnicity).*

**In Full and Effective Compliance**

MCSO has instituted a quality check process for Vehicle Stop Contact Forms (VSCFs) that requires supervisors to review all traffic stop documents within three days of the stop. AIU also conducts an inspection of the timeliness of these reviews as well as a second inspection on Traffic Stop Data. Each of these inspections are based upon a stratified random sample of traffic stops that we conducted. The Traffic Stop Data inspection employs a matrix that ensures that the name, serial number, and unit of the deputy is included on the VSCF in addition to the identity and

WAI 65033

race/ethnicity of the driver. The overall rate of compliance for the Traffic Stop Data inspections reported by MCSO exceeded 98.9% for this reporting period, and none of the deficiencies involved identification of deputies or drivers. As previously noted, our compliance calculations for this period were slightly lower due to the fact that we do not employ a matrix to assess compliance, but rather judge individual cases as deficient if any significant information is determined not to be consistent across traffic stop forms or CAD.

MCSO has incorporated patrol data into the EIS through the creation of interfaces for Incident Report (IR) and Non-Traffic Contact Form (NTCF) documents. Each of these documents lists the required name of the deputy and civilian, as well as the ethnicity of the civilian, in accordance with this Paragraph. AIU conducts an inspection of IRs, including a check for racial/ethnic bias in the reporting documents and the identification of all parties contacted as a result of the incident. We have found no recent instances where the identify of a deputy or persons contacted was not included on these forms. Non-Traffic Contact Forms contain the same basic information about the identity of the deputy making the contact and the persons being contacted. While MCSO does not yet have an inspection of NTCFs, they do provide us with copies of all the documents for investigative stops and field information. Up to this point, we have not found a repetitive problem with NTCF documentation that includes the criteria required by this Paragraph.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 77.** *MCSO shall maintain computer hardware, including servers, terminals and other necessary equipment, in sufficient amount and in good working order to permit personnel, including Supervisors and commanders, ready and secure access to the EIS system to permit timely input and review of EIS data as necessary to comply with the requirements of this Order.*

### In Full and Effective Compliance

Since our earliest site visits in 2014, we have addressed the issue of "necessary equipment, in sufficient amount and in good working order" with MCSO. As part of our monthly document requests, we receive an accounting, by District, of how many vehicles have functioning TraCS systems.

Since the end of 2015, we have found that all marked patrol vehicles were properly equipped with TraCS equipment. MCSO developed EB-2 (Traffic Stop Data Collection), which states that in the event that a TraCS vehicle is not operational, or available, each District possesses the necessary equipment at the substation for deputies to input his/her traffic stop information before the end of the shift. Due to the mountainous regions throughout Maricopa County, there have always been connectivity issues. However, these areas are well-known to Patrol deputies; and they have demonstrated how they adapt to connectivity problems. The VSCF also allows deputies to note issues with technology on a traffic stop.

WAI 65034

During our past visits to the Districts, we regularly spot-checked the facilities and patrol cars; and found that they had functioning TraCS equipment, and that each District office had available computers for any occurrence of system failures with vehicle equipment. We have been unable to conduct these inspections since January 2020 as a result of holding our site visits remotely; however, we will conduct these reviews when we resume in-person site visits.

At present, the technology and equipment available at MCSO meet the requirements of the Order.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

We will continue to conduct our spot inspections at the Districts, and MCSO will apprise us of any event that falls within the scope of this Paragraph.

***Paragraph 78.*** *MCSO shall maintain all personally identifiable information about a Deputy included in the EIS for at least five years following the Deputy's separation from the agency. Information necessary for aggregate statistical analysis will be maintained indefinitely in the EIS. On an ongoing basis, MCSO shall enter information into the EIS in a timely, accurate, and complete manner, and shall maintain the data in a secure and confidential manner. No individual within MCSO shall have access to individually identifiable information that is maintained only within EIS and is about a deputy not within that individual's direct command, except as necessary for investigative, technological, or auditing purposes.*

**In Full and Effective Compliance**

GH-5 (Early Identification System) clearly states that employees only have access to EIS in furtherance of the performance of their duties, and that any other unauthorized access will be addressed under MCSO's discipline policy. The policy also notes that access to individual deputy information will be limited to appropriate supervisory/administrative personnel of that deputy. In addition, the policy states that personal information will be maintained in the database for at least five years following an employee's separation from the agency; however, all other information will be retained in EIS indefinitely.

The most recent occurrences of a substantiated misuse of MCSO's computer system occurred in 2011 and 2015. As a result, MCSO published a System Log Audit operating procedure in November 2017 that required PSB to notify the Technology Management Bureau of any investigations involving a system breach. We fully vetted this operating procedure (BAS SOP 17-4) during our January 2018 site visit. MCSO reported no system breaches occurring since our January 2020 site visit. In addition, we receive summaries of all internal investigations each month. In March 2019, one case indicated that a deputy was under investigation for potentially misusing the Arizona Criminal Justice Information System (ACJIS); and in another, it was alleged that booking information might have been used for social media.

WAI 65035

In April 2020, there was an external complaint that a deputy may have run a criminal history check on someone for a relative. These cases have not triggered the operating procedure noted above and, according to MCSO, PSB has either not yet completed its investigations, or they have found nothing to substantiate the original claims.

MCSO's concern for the integrity of information in EIS is further exemplified by the protocols that PSB has created to meet the requirements of Subparagraphs 75.a. and 75.b. regarding purview of open complaints and internal investigations. PSB not only controls who can view summaries of open investigations but has created a protocol for creating the summaries of open investigations to protect the integrity of the cases while they are being processed.

MCSO has also created a work group to ensure the integrity of traffic stop data used for analysis. The protocols used by this work group are incorporated into Section 306 of the EIU Operations Manual. We have approved this section, and it has been incorporated into the manual as finalized.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 79.** *The EIS computer program and computer hardware will be operational, fully implemented, and be used in accordance with policies and protocols that incorporate the requirements of this Order within one year of the Effective Date. Prior to full implementation of the new EIS, MCSO will continue to use existing databases and resources to the fullest extent possible, to identify patterns of conduct by employees or groups of Deputies.*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on December 16, 2021.

**Phase 2:** Not in compliance

The employment of the EIS database remains limited as MCSO has not yet completed and published the results of new methodologies for the Traffic Stop Monthly Report (TSMR). In addition, during our last several (in-person and remote) site visits, we have also recommended to MCSO that the agency needs to create an analytical plan for the Non-Traffic Contact Forms that have accumulated over the past several years. Until these are complete and operational, MCSO will not achieve Phase 2 compliance with this Paragraph. We and the Parties continue to work with MCSO to complete each of these analytic reports.

MCSO published the Seventh Traffic Stop Annual Report (TSAR), which is discussed in other Paragraphs. Although the report concludes that systemic bias in patrol functions through traffic stop outcomes does appear to exist, they have not yet shown a statistically significant change in the level of potential bias. For instance, for stop length, MCSO reported a decline from 2018 to 2019 for Latinos and minorities combined, but an increase from 2019 to 2020 and a decrease from 2020 to 2021. A similar trend was found for searches of Latinos and minorities combined. Additionally, MCSO reported an increasing citation rate for Latinos from 2018 to 2019 and 2020; however, a decline occurred for 2021 for all minorities grouped together and Latinos compared

WAI 65036

separately.  MCSO is developing a plan to ensure that subsequent TSARs are able to track trends in the level of potential bias/disparity found in traffic stop outcomes.  A recent Traffic Stop Quarterly Report (TSQR) proposal included the means by which MCSO would investigate and evaluate the success of such trend analyses.  We will provide of summary of this when it is approved and produced.

MCSO's plan for the analysis of monthly traffic data also stems from the foundation created by the more recent Fourth through Seventh TSARs.  MCSO is currently implementing a pilot analysis to ensure that the new methodologies meet the requirements of the Order.  The information from these analyses has been used to inform and refine the vetting processes developed in conjunction with us and the Parties.  Based on the vetting processes, TSAU recommends actions ranging from discounting of flags to full intervention processes involving remedies for the particular issues that arose during the vetting process.  We and the Parties have been involved in each step of these processes.  MCSO has also proposed an initial method to analyze NTCFs and received approval to proceed with the initial evaluation of NTCFs during a conference call in February 2022.  We will comment on the TSMR pilot processes and NTCF review as they progress in future quarterly reports.

In the meantime, EIU and AIU pull together data to produce reports and inspections of both deputy and supervisor activity.  The EIS automatically triggers alerts for repetitive actions, such as receiving multiple BIO Action Forms or external complaints.  However, for the past two years BIO has been reevaluating the threshold levels that trigger several of these alerts and, in some instances, suspended them during this period.  The EIU uses this information to create monthly reports and to determine whether an investigation by a supervisor is required.  AIU publishes an inspection on EIS Alert Processes to ensure that alert investigations are conducted within policy timeframes and to summarize the manner in which investigations were closed.  The compliance rate for the EIS Alert Inspection for this reporting period was 100% in April and June, and 93% in May.  The rate for May was due to the late completion of one investigation.  MCSO has recommended making the EIS Alert Inspection quarterly, rather than monthly, due to the impact that single cases can have on compliance findings.  We concur with this recommendation.  During this quarter, one investigation led to an Action Plan; while two have resulted in additional training for specific deputies.  One supervisor chose a squad briefing as a result of the alert investigation.  MCSO is developing an extension of this inspection, to include an evaluation of the effect of interventions that supervisors recommend and implement.  This final component to the inspection is crucial for compliance with other Paragraphs.

AIU also uses the EIS database to generate numerous inspections of traffic stop data, Supervisor Notes, and Incident Report inspections, among many others.  When deficiencies are found, AIU sends out BIO Action Forms to the District command to rectify the situation and memorialize what actions are taken.  These inspections are critical to evaluate compliance with several Paragraphs in the Order.  AIU has already automated an alert threshold for repeated Action Forms for the same types of events.  An initial investigation of repetitive Action Forms in 2019 showed that a small number of deputies receive three or more Action Forms, while the vast majority of deputies receive only one Action Form.  However, since that time BIO has been working to implement a less cumbersome process that could be produced twice each year.  The BIO Captain

WAI 65037

has kept us regularly informed on the progress for this audit and submitted a proposal that we returned with additional feedback.  The goal of this inspection is to track deficiencies by Districts, shifts, and squads to focus corrective measures in the most beneficial way.  We will continue to review refinements to MCSO's proposal as they are made available.

### b. Training on the EIS

**Paragraph 80.**  *MCSO will provide education and training to all employees, including Deputies, Supervisors and commanders regarding EIS prior to its implementation as appropriate to facilitate proper understanding and use of the system.  MCSO Supervisors shall be trained in and required to use EIS to ensure that each Supervisor has a complete and current understanding of the employees under the Supervisor's command.  Commanders and Supervisors shall be educated and trained in evaluating and making appropriate comparisons in order to identify any significant individual or group patterns.  Following the initial implementation of the EIS, and as experience and the availability of new technology may warrant, MCSO may propose to add, subtract, or modify data tables and fields, modify the list of documents scanned or electronically attached, and add, subtract, or modify standardized reports and queries.  MCSO shall submit all such proposals for review by the Monitor pursuant to the process described in Section IV.*

**Phase 1:**  In compliance

- GH-5 (Early Identification System), most recently reviewed on December 16, 2021.

**Phase 2:**  In compliance

MCSO's curriculum for Supervisor Responsibilities: Effective Law Enforcement (SRELE) regularly includes a refresher and updates for supervisors regarding how most effectively to use EIS tools and complete Alert Investigations for their subordinates within policy guidelines. MCSO is also modifying the Traffic Stop Monthly Report (TSMR) analysis and participating in regular conference calls with us and the Parties.  A significant portion of these discussions revolve around how to effectively train supervisors to use the TSMR process in the furtherance of their supervisory duties and in accordance with the Court Order.  Additionally, MCSO recently published the first seven Traffic Stop Quarterly Reports (TSQRs).  As we have noted in earlier Paragraphs, the conclusions and recommendations of each of these reports could prove useful for the continued refinement of supervisory training conducted by MCSO.  We will continue to assist MCSO as it formulates training curriculum to enhance the supervisory functions of the Office.

WAI 65038

*c. Protocol for Agency and Supervisory Use of the EIS*

**Paragraph 81.** *MCSO shall develop and implement a protocol for using the EIS and information obtained from it. The protocol for using the EIS shall address data storage, data retrieval, reporting, data analysis, pattern identification, identifying Deputies for intervention, Supervisory use, Supervisory/agency intervention, documentation and audit. Additional required protocol elements include:*

a.     *comparative data analysis, including peer group analysis, to identify patterns of activity by individual Deputies and groups of Deputies;*

b.     *identification of warning signs or other indicia of possible misconduct, including, but not necessarily limited, to:*

   i.     *failure to follow any of the documentation requirements mandated pursuant to this Order;*

   ii.     *racial and ethnic disparities in the Deputy's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of Deputies' specific duties, or racial or ethnic disparities in traffic stop patterns when compared with data of a Deputy's peers;*

   iii.     *evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;*

   iv.     *a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;*

   v.     *complaints by members of the public or other officers; and*

   vi.     *other indications of racial or ethnic bias in the exercise of official duties;*

c.     *MCSO commander and Supervisor review, on a regular basis, but not less than bimonthly, of EIS reports regarding each officer under the commander or Supervisor's direct command and, at least quarterly, broader, pattern-based reports;*

d.     *a requirement that MCSO commanders and Supervisors initiate, implement, and assess the effectiveness of interventions for individual Deputies, Supervisors, and units, based on assessment of the information contained in the EIS;*

e.     *identification of a range of intervention options to facilitate an effective response to suspected or identified problems. In any cases where a Supervisor believes a Deputy may be engaging in racial profiling, unlawful detentions or arrests, or improper enforcement of Immigration-Related Laws or the early warning protocol is triggered, the MCSO shall notify the Monitor and Plaintiffs and take reasonable steps to investigate and closely monitor the situation, and take corrective action to remedy the issue. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or other*

WAI 65039

*supervised, monitored, and documented action plans and strategies designed to modify activity. All interventions will be documented in writing and entered into the automated system;*

f.    *a statement that the decision to order an intervention for an employee or group using EIS data shall include peer group analysis, including consideration of the nature of the employee's assignment, and not solely on the number or percentages of incidents in any category of information recorded in the EIS;*

g.    *a process for prompt review by MCSO commanders and Supervisors of the EIS records of all Deputies upon transfer to their supervision or command;*

h.    *an evaluation of whether MCSO commanders and Supervisors are appropriately using the EIS to enhance effective and ethical policing and reduce risk; and*

i.    *mechanisms to ensure monitored and secure access to the EIS to ensure the integrity, proper use, and appropriate confidentiality of the data.*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently reviewed on December 16, 2021.

**Phase 2:** Not in compliance

MCSO produces a number of reports and inspections that are relevant for this Paragraph. Due to issues with EIS data, methods of analysis and a change in vendors, MCSO has not been able to reliably produce the Traffic Stop Monthly Report (TSMR) based upon the criteria outlined in Paragraph 67.

MCSO has published the Seventh Traffic Stop Annual Report (TSAR); however, the analysis from these reports addresses issues of potential systemic bias across the entire traffic patrol function and cannot be employed to address potential individual-level biased activity. The TSMR, which is currently undergoing a revision and pilot-testing, will assist MCSO and its supervisors in evaluating the activity of individual deputies with regard to traffic stops and examine any behaviors that might suggest biased activity. MCSO continues to share the results of its monthly analyses with us and the Parties as we collectively work through the pilot implementation. During this quarter, MCSO recommended actions ranging from discounting of flags to full interventions involving remedies suitable to the findings of the vetting process.

MCSO has also published seven TSQRs: the first, evaluated how supervisors review and document traffic stop activity of their subordinates; the second, surveyed supervisors involved in the Third TSAR interventions about their experience in that process; the third examined how deputies employ the Extended Traffic Stop Indicators (ETSIs) on the Vehicle Stop Contact Form (VSCF); the fourth examined long non-extended traffic stops (LNETs) to determine if there are particular deputies or areas of the County where these lengthy stops occur; the fifth expanded upon the Sixth TSAR to determine if particular traffic stop outcome disparities were more or less prevalent in certain Districts; the sixth explored in more detail the disparities found for citations and warnings for Latino drivers in prior TSARs; and the seventh examined disparities across arrest types. Of these, the fourth and sixth reports indicated a significant disparity for minority

WAI 65040

members, as opposed to whites, for particular equipment violations and licensure infractions; and the fifth report showed that the disparities in several outcomes were more pronounced in particular Districts. Each has yielded information that MCSO has proposed to use for the development of training, modification of policy, and dissemination of resources to improve supervisory capabilities and deputy performance.

Paragraph 81.a. requires that MCSO's EIS protocols include "comparative data analysis, including peer group analysis, to identify patterns of activity by individual Deputies and groups of Deputies."

The EIU has conducted monthly and annual analyses looking for outliers that may indicate that an individual is behaving in a biased or unprofessional manner, in accordance with Paragraphs 65, 66, and 67. The Traffic Stop Monthly Reports had been suspended for several years beginning in 2016. However, MCSO worked closely with us and the Parties to develop a robust process to analyze potential traffic stop disparities at the deputy level; and during the past year, MCSO resumed TSMRs on a pilot basis. MCSO has proposed methodologies in consultation with its data analyses vendor. We and the Parties have had the opportunity during our site visits; and, most recently through regular conference calls, to ask questions, receive additional information and recommend modifications to the methodologies employed. Most importantly, MCSO has created a method to match deputies in the Annual and Monthly Reports using personal and professional characteristics that are intended to go beyond previous strategies that were based upon the geographic location of traffic stops alone. These methods have been met with support from deputies across the organization during meetings between MCSO personnel and the data analysis vendor (CNA). Once the pilot process is complete, these methods will allow MCSO to identify those deputies whose traffic stop outcomes are significantly different from their peers.

MCSO has published seven TSQRs. As noted above, the outcomes and recommendations could promote change in several ways throughout MCSO; however, they were not conducted in a way to compare peer supervisors.

MCSO has also created an interface for Non-Traffic Contact Forms (NTCFs) to be available in the EIS database; however, MCSO has not yet begun to develop a methodology to investigate whether patterns of problematic behavior, action, or bias might be occurring in the stops these forms document. We have discussed these issues with MCSO during our site visit meetings since October 2018. We and the Parties have commented on preliminary materials provided by MCSO, and we will continue to work with MCSO to use these civilian contacts to their fullest potential. MCSO has proposed an initial review of how the forms and policy, EA-3 (Non-Traffic Contact), are currently being employed across the organization to create an appropriate statistical methodology that is responsive to the needs of the Order. Most recently, in February 2022, we gave approval to MCSO to proceed with an initial inquiry into how NTCF forms have been used by deputies. In future reports, we will summarize the findings of this investigation.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.b. requires that MCSO's EIS protocols include "identification of warning signs or other indicia of possible misconduct."

WAI 65041

GH-5 (Early Identification System) provides significant direction for employees and supervisors alike to understand what type of behaviors will be viewed as problematic. As noted above, the intent of the TSMR is to identify deputies who might be engaged in biased activity regarding who they arrest, cite, warn, or search; and MCSO has been working with us and the Parties on the implementation of the TSMR process as a pilot program.

MCSO is also revising the EIU Operations Manual, which will include sections on data protocols and the several analyses based upon the traffic stop and patrol data. The manual also includes thresholds for behavior ranging from failure to arrive on time for work to external complaints. BIO is examining these thresholds to determine why they were set at the present levels. This investigation may result in the modification of thresholds that have proven unproductive over the last several years. Additionally, MCSO is currently investigating threshold levels for the benchmarks for the TSMR outlined in Paragraph 67. As a result, the triggering of alerts for repetitive behavior exceeding several thresholds have been put on hold. MCSO has recently produced an EIS Alert Threshold Research/Background document and a proposal for an annual Threshold Analysis Review. We have commented on these documents and requested a demonstration of the involved processes. We will continue to work with MCSO to refine and implement these new processes.

Finally, as noted in Subparagraph 81.a. and 81.b.vi, MCSO should utilize all patrol data to evaluate the behavior of deputies in comparison to their peers. While the volume of Non-Traffic Contact Forms (NTCFs) pales in comparison to traffic stops, there are enough accumulated forms for analyses to commence. As we noted in Paragraph 75, we had originally received all NTCFs for investigative stops each month. The volume ranges from 15-25 per month. In our review of these interactions, we have noted that they typically involve suspicious behavior, and violations of traffic laws while on bicycles or waterways. These violations are often concentrated in particular locations throughout the County that may make it more likely that minority members are contacted. We have suggested to MCSO that the agency create an analytic method to determine whether there may be trends in activity over time that may require closer examination to eliminate any possibility of bias. Since our July site visit in 2019, we also undertook an evaluation of a random sample of Field Information contacts captured on NTCFs. Our review found a large overlap between civilian contacts labeled as Field Information and those labeled as Investigative Stops. We have engaged MCSO in further discussions clarifying this distinction. Until such time as this is resolved, we will select a combined sample of NTCFs from both categories of civilian interaction. MCSO is currently proposing to investigate how the NTCF forms and policy are being used across the agency. We provided approval for this examination in February 2022. This would be an important first step that could lead to a more thorough analysis looking for potential indications of bias across these stops. We and the Parties continue to engage in discussions with MCSO about these significant issues.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.c. requires that MCSO's EIS protocols include "MCSO Commander and Supervisor review, on a regular basis, but not less than bimonthly, of EIS reports regarding each officer under the Commander or Supervisor's direct command and, at least quarterly, broader, pattern-based reports."

WAI 65042

Supervisory Note inspections include four measures to assess how well supervisors are using EIS information to oversee the activity and behavior of their subordinates: making supervisory comments on deputies; reviewing their body-worn camera footage; making Employee Performance Appraisal (EPA) notations; and reviewing subordinates' EIS profiles. The overall compliance rate reported by MCSO for this quarter exceeds 94% based upon a random sample drawn by the Monitoring Team. Our evaluation of compliance differs from MCSO, as the agency employs a matrix of indicators per case, whereas we determine noncompliance for certain major issues identified in a case review. For April through June 2022, MCSO found 7 instances where supervisors failed to make two comments per month on their deputies EIS profiles. Our computation of compliance for April is 88% and June is 90%, while May remained at 100% due to no deficiencies found. When deficiencies are found, AIU sends out BIO Action Forms to those Districts, no matter the level of compliance. We have also repeatedly requested additional information from MCSO when we encounter an issue of concern and MCSO has always willingly provided the needed information or additional data. Rarely have we noted deficiencies involving the same supervisors in consecutive months. MCSO has already included repetitive BIO Action Form (BAF) deficiencies as an alert allegation. AIU has developed and presented a proposal to better track BAFs by type, individual, and District to ensure that any corrective actions are targeted at the most appropriate level and to be able to determine if there are particular supervisors that appear repeatedly within specified timeframes.

It is important to note that in our review of 15 randomly selected alert investigations each month, we have noticed an increase in investigations due to repetitive BAFs. In that vein, MCSO has produced a revised proposal, in December 2021, for the tracking of BAFs. We have evaluated this proposal and returned it to MCSO. We will continue to report on the development of this proposal as it is made available.

MCSO is in compliance with this Subparagraph.

Paragraph 81.d. requires that MCSO's EIS protocols include "a requirement that MCSO Commanders and Supervisors initiate, implement and assess the effectiveness of interventions for individual Deputies, Supervisors, and units, based on assessment of the information contained in the EIS."

The EIS database generates alerts for issues ranging from data entry errors to internal and external complaints; however, many of the potential ongoing alerts are dependent upon the revision of alert thresholds which continue to undergo evaluation by MCSO as noted above. From these alerts, EIU personnel send out for investigation those alerts that are not redundant or mischaracterized in some fashion. Supervisors have a set amount of time – 30 days – to return these investigations with a description of their investigation and the outcome.

WAI 65043

MCSO has created an EIS Alert Review Group (ARG) that evaluates the investigations of supervisors prior to closing an alert. The group ensures that the reports of the supervisors address all aspects of the assigned investigation and returns those that are deficient to the District for continued revision. Following the creation of the ARG, we have found the supervisors' investigations and summaries to be more complete and thorough. Over time, the review group's request for additional information has dropped below one third of the investigations evaluated. MCSO has provided us with the original alert investigation documents (Attachment B of GH-5 [Early Identification System]), as well as modified ones arising from the ARG's requests.

AIU has also created an inspection for EIS Alert Review Processes. This inspection initially determines whether the investigation was completed within policy timeframes of 30 days. The compliance rate for this quarter varies from 100% in April and June, to 93% in May. The latter result was due to a single investigation that was returned after the 30-day period. BIO sent Action Forms to the Districts where supervisors did not complete their investigations within policy guidelines.

MCSO has suggested that the EIS Alert Inspection be conducted on a quarterly basis to overcome the impact that low numbers of cases completed have on compliance rates. We concur with this recommendation. MCSO has subsequently produced a proposal that also includes an evaluation of the effectiveness of interventions. We will continue to engage MCSO in this evaluation process in accordance with this and other Paragraphs. At present, there is no mechanism in place to adequately judge the effect of interventions.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.e. requires MCSO's EIS protocols to include "identification of a range of intervention options to facilitate an effective response to suspected or identified problems. In any case where a Supervisor believes a Deputy may be engaging in racial profiling, unlawful detentions or arrests, or improper enforcement of Immigration-Related Laws or the early warning protocol is triggered, MCSO shall notify the Monitor and Plaintiffs and take reasonable steps to investigate and closely monitor the situation and take corrective action to remedy the issue. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or other supervised, monitored, and documented action plans and strategies designed to modify activity. All interventions will be documented in writing and entered into the automated system."

GC-17 (Employee Disciplinary Procedures) and GH-5 (Early Identification System) provide a wide range of options for supervisor interventions, as well as practical guidelines about how to employ those options. As noted above, GH-5 includes Attachment B, "Early Identification Alert Response Form." This form specifies the responsibility of supervisors and serves as a checklist of processes the supervisor should use. EIU also attaches any documents, citations, or BWC recordings the supervisor might need to conduct an inquiry. We began observing the use of these forms in April 2017. Over the past six months, we have found that alert investigations conducted by supervisors has improved. During this quarter, supervisors recommended one Action Plan, two instances of training, and a squad briefing as a result of the alert investigation they conducted.

WAI 65044

MCSO has also created an EIS Alert Review Group (ARG) to ensure that the closure of alerts is supported by documentation from supervisors and responsive to the needs of the organization. We have also worked with MCSO to propose an extension of alert investigation timeframes when documentation issues delay the process.  We will continue to evaluate these documents as they are produced.

MCSO is in compliance with this Subparagraph.

Paragraph 81.f. requires that MCSO's EIS protocols include "a statement that the decision to order an intervention for an employee or group using EIS data shall include peer group analysis, including consideration of the nature of the employee's assignment, and not solely on the number or percentages of incidents in any category of information recorded in the EIS."

In the development of GH-5 (Early Identification System), MCSO has taken into consideration the nature of the employee's assignment.  In prior versions of GH-5, MCSO created an appendix for thresholds that indicated, for example, that the "use of force" threshold was different for Detention and Patrol personnel.  Detention personnel are much more likely to need to employ force than their Patrol counterparts.  In the current version of GH-5, MCSO refers to thresholds that will be included in the EIU Operations Manual; however, MCSO has been evaluating the threshold limits to ensure that they are achieving the goals for which they were originally set for nearly two years.  As part of the reevaluation process, MCSO is communicating with other local law enforcement agencies to collect information about current best practices regarding thresholds they employ.  As a result, EIU personnel are more closely overseeing repetitive behaviors and have not initiated alert investigations for some threshold levels.  When MCSO produces a new threshold appendix, we will evaluate it with regard to this and other portions of the Court Order. During the first quarter MCSO produced a Threshold Analysis Review Proposal which we have commented on; additionally, we requested and received a demonstration of the processes outlined in that proposal.

MCSO and its data analysis vendor proposed and employed an expansion of "peer" comparisons beyond just the location of the traffic stop in the Fourth TSAR and has made modifications where necessary in the Fifth through the Seventh TSARs.  MCSO matched deputies based upon personal and professional characteristics.  During the analysis conducted for the Fourth TSAR, a statistical problem arose as the result of these matching characteristics.  MCSO overcame this problem, and there were no additional indications of problems in the Fifth TSAR.  MCSO is in the midst of pilot-testing for the TSMR using these new peer comparison strategies.  As a result of these experiences, MCSO also added refinements to the time and location of traffic stops that more precisely allows for comparisons of similarly situated deputies through a statistical splining procedure.  MCSO continues to make progress; however, the agency will remain not in compliance with this Subparagraph until the TSMR process moves from its pilot phase to become fully operational, including the finalization of appropriate guiding documents.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.g. requires that MCSO's EIS protocols include "a process for prompt review by MCSO Commanders and Supervisors of the EIS records of all Deputies upon transfer to their supervision or command."

WAI 65045

MCSO has noted the need for a prompt review in both the "Supervisor Responsibilities" and "Command Staff Responsibilities" sections of GH-5 (Early Identification System). EIU specifically addressed this issue during the EIS and SRELE training completed in November 2017 and updated each year thereafter. EIU advised supervisors to document when they conducted their review in Supervisor Notes, as well as how long the deputy had been working in their chain of command when the review was conducted. As noted, this was also reiterated in the SRELE training that was approved on September 30, 2019. During our visits to several Districts in 2019 and 2020, MCSO personnel informed us that most command staff attempt to review these materials within the first few days that a deputy, or supervisor, moves to their District. In no cases have we found information where the 14-day limit outlined in policy has been problematic.

MCSO is in compliance with this Subparagraph.

Paragraph 81.h. requires that MCSO's EIS protocols include "an evaluation of whether MCSO Commanders and Supervisors are appropriately using the EIS to enhance effective and ethical policing and reduce risk."

EIU has improved the processing and tracking of alert investigations. The development of Attachment B to GH-5 (Early Identification System) and training completed in EIS and SRELE has dramatically improved the information provided by supervisors when closing alerts. AIU has also created an EIS Alert Review Process inspection that specifically looks for indications that supervisors have conducted a thorough examination within policy timeframes and selected appropriate responses to the allegations included in the alert investigation. At present, this inspection is limited to reviewing whether supervisors are completing alert investigations within the 30-day policy requirements. MCSO's compliance rate for this inspection varies from 100% in April and June, and 93% in May. It is important to note that the rate for May was due to one investigation that took longer than 30 days to complete. MCSO has recommended making the EIS Alert Inspection a quarterly process to eliminate such instances based on the low number of cases being evaluated. We concur with this recommendation. MCSO's proposal to move this to a quarterly inspection also includes a secondary, but vital, feature of this inspection, which will include criteria to judge the success of interventions by identifying deputies and supervisors who trigger additional alerts. This inspection will become a valuable component to ensure that supervisors and command staff are using EIS to promote efficiency and ethical policing during the alert investigation process. We will evaluate this proposal as it moves forward.

We found no issues with the conclusions used for closing alert investigations during this quarter. In fact, we have noted two instances where training was recommended for deputies, another instance of an Action Plan being created, and one supervisor who held a squad briefing as a result of the alert investigation conducted. For the cases that were not closed within policy guidelines, BIO sent out Action Forms to the Districts. As this process becomes more routine, we expect that District personnel will adjust to the policy requirements.

WAI 65046

MCSO has created a Post-Stop Perceived Ethnicity Inspection, which looks specifically at traffic stops where the driver has a traditionally Latino surname, but the VSCF indicates a white driver. The inspectors review BWC recordings and evaluate whether the deputy correctly marked the form for the driver and any potential passengers within the vehicle stopped. MCSO reported compliance rates of 100% for April and May and 87.5% in June due to one instance of a driver who was misidentified as white and one passenger being misidentified. BIO Action Forms were sent to the Districts for these deficiencies.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.i. requires that MCSO's EIS protocols include "mechanisms to ensure monitored and secure access to the EIS to ensure the integrity, proper use, and appropriate confidentiality of the data."

MCSO has addressed the security and integrity of data in GH-5 (Early Identification System), as well as instituted facility inspections throughout the Districts – including the security of terminals, access to information, and mobile displays. We spot-check technology and security of old forms during each site visit and have found no problems to date. Additionally, on November 6, 2017, MCSO published the operating procedure for System Log Audit Requests; this became effective on November 30, 2017. The procedure outlines how PSB personnel will notify the Technology Management Bureau of any misuse of MCSO information systems allegations and request an audit of the suspected breach. We discussed this operating procedure, BAS SOP 17-4, during our January 2018 site visit meetings; it meets all of the concerns voiced since the February 2017 discovery of two cases where data was compromised, but no one notified the Technology Management Bureau. We believe this procedure has proven effective to this point. In addition, we are provided all internal investigation summaries initiated each month; and found only three instances in which an employee was accused of misusing ACJIS and booking information. Two of these complaints are still under investigation by PSB or are being reviewed by MCSO administration. In addition, we have approved the claim of Full and Effective Compliance with Paragraph 78 above. Nonetheless, we will continue to evaluate the effectiveness of MCSO's attention to data integrity.

MCSO is in compliance with this Subparagraph.

MCSO meets some of the requirements of Paragraph 81, but there remain a variety of activities that are currently ongoing that need to be completed before MCSO will be fully compliant. These range from the finalization of methods for the TSMR to the completion of revisions to the EIU Operations Manual. AIU has improved the tracking of alert investigations with the creation of the EIS Alert Review Process Inspection; and initiated a preliminary analysis of BIO Action Form tracking. However, each of these is limited because the EIS inspection does not evaluate the success of interventions; and without an inspection of BAFs over time (which is currently in proposal form), MCSO may not be adequately responding to repeated behavior that is difficult to detect with current methods. We have also requested that MCSO devise an audit for the NTCFs that have accumulated over the past several years. We and the Parties remain concerned that we have not noted many instances where supervisors proactively intervene with their subordinates; rather, the supervisors wait until prompted by EIS Alerts or the ARG review of completed alert investigations. Command staff have taken a more active role in evaluating the work of

WAI 65047

supervisors as evidenced by the number of alert investigations returned to supervisors for revision or additional inquiry.  MCSO has proposed initiating an evaluation of accumulated NTCFs to examine how the forms and policy are currently being used across the agency.  We approved this initial evaluation in February 2022, and we will evaluate the progression of this methodology as it becomes available.  To comply with this and other Paragraphs, however, the methods would also have to be able to indicate statistically whether potential bias might be occurring, with regard to how different ethnicities and races are being selected and treated during these encounters.  We will continue to evaluate MCSO's progress toward the goals outlined in this Paragraph.

WAI 65048

## Section 9: Supervision and Evaluation of Officer Performance

**COURT ORDER X. SUPERVISION AND EVALUATIONS OF OFFICER PERFORMANCE**

*Paragraph 82. MCSO and the County shall ensure that an adequate number of qualified first-line Supervisors are available to provide the effective supervision necessary to ensure that Deputies are following the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order. First-line Supervisors shall ensure that Deputies are policing actively and effectively, are provided with the instruction necessary to correct mistakes, and are held accountable for misconduct. To achieve these outcomes, MCSO shall undertake the following duties and measures:*

*a. General Duties of Supervisors*

*Paragraph 83. MCSO Supervisors shall provide the effective supervision necessary to direct and guide Deputies. Effective supervision requires that Supervisors: respond to the scene of certain arrests; review each field interview card and incident report; confirm the accuracy and completeness of Deputies' daily activity reports; respond to each Complaint of misconduct; ensure Deputies are working actively to engage the community and increase public trust and safety; provide counseling, redirection, support to Deputies as needed, and are held accountable for performing each of these duties.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2022.

**Phase 2:** In compliance

We conducted our July 2022 site visit remotely. We did not conduct any District visits for this assessment. Our compliance findings for this reporting period are based on the review of documentation submitted as proof of compliance.

We reviewed a sample of 97 Incident Reports for April, for the randomly selected date of April 22. Ninety-six of the 97 Incident Reports were reviewed and memorialized by supervisors within the required timeframes. All 12 Arrest Reports received were reviewed and approved by supervisors within the required 72 hours. There were 13 Vehicle Crash Reports submitted in the April sample, and we verified timely supervisory review on all of them. We conducted a review of a 10% sample of the Incident Reports submitted for the date requested, to determine quality and completeness, and found one report with spelling errors. Otherwise, we noted no issues of concern. In total, 96 of the 97 Incident Reports we reviewed were in compliance, for a compliance rate of 98.97%.

For April, MCSO reported a total of 427 staff hours dedicated to community policing. MCSO reported 189 occasions of community policing throughout its components, with 171 of those attributed to deputies in the Patrol function. The April report from COrD documented 37 events

WAI 65049

in which MCSO staff met with and interacted with members of different community organizations. MCSO met with representatives of drug prevention coalitions from Buckeye, Tempe, Peoria, and Apache Junction. In addition, MCSO met with the Guadalupe Community Partnership Coalition and South Mountain Works Coalition. MCSO also participated in job fairs in Scottsdale, Avondale, and Mesa. From our reviews of the 23 community policing worksheets submitted for the month, Patrol deputies reported 45.7 hours of community policing, with 4,808 community members involved with those activities. MCSO reported community policing activities in Phoenix, Mesa, Apache Junction, Morristown, Tolleson, Laveen, Cave Creek, Scottsdale, Litchfield Park, Anthem, Sun City, Gila Bend, Goodyear, and Glendale.

We reviewed a representative sample of 70 Incident Reports for May, for the randomly selected date of May 13. Of the 70 Incident Reports, 69 had proper documentation of timely supervisory review. Of the 70 Incident Reports, 15 were vehicle collisions, and all had documentation of supervisory review and approval. There were 10 arrest reports submitted for the month, and all had proper documentation of supervisory review. The overall compliance rate for timely supervisory review of Incident Reports in May was 98.57%. We conducted a review of a 10% sample of the Incident Reports submitted for the date requested, to determine quality and completeness, and noted no issues of concern. For May, MCSO reported a total of 322 staff hours dedicated to community policing. MCSO reported 163 occasions of community policing throughout its components, with 156 of those attributed to deputies in the Patrol function. The May report from COrD documented 38 events in which MCSO staff met with and interacted with members of several groups representing varied community interests. MCSO reported community policing activities in Buckeye, Tempe, Guadalupe, Peoria, Glendale, Morristown, and Apache Junction. MCSO also met with several local business groups and drug prevention groups. MCSO reported a Coffee With a Cop event in Guadalupe, and an event with representatives of the Arizona Black Law Enforcement Employees. In our reviews of 23 community policing worksheets, deputies reported a total of 40.56 hours of community policing, with 2,037 community members involved with those activities. These activities occurred in Guadalupe, Scottsdale, Goodyear, Buckeye, Tonopah, Surprise, Gilbert, Morristown, Wittman, Queen Creek, Peoria, Phoenix, and Anthem. In our sample reviews of Patrol Activity Logs, we noted one community policing activity reported in Gavilan Peak.

We reviewed a representative sample of 82 Incident Reports for June, for the randomly selected date of June 5. Seventy-eight of the 82 Incident Reports included documentation that they had been reviewed and approved by supervisors as required by this Paragraph. The compliance rate for June was 97.59%. Nine of 10 vehicle crash reports were in compliance. Twenty-one of 24 arrest reports were in compliance. Three arrest reports were not reviewed within the required 72 hours. We conducted a review of a 10% sample of the Incident Reports submitted for June 5, to determine quality and completeness. We noted some spelling errors, but we noted no serious issues of concern. For June, MCSO reported a total of 299 staff hours dedicated to community policing. MCSO reported 158 occasions of community policing throughout its components, with 147 of those attributed to deputies in the Patrol function. The June report from COrD documented 27 events in which MCSO staff participated in community meetings and events. The activities included participation in summer camps, meetings with crime prevention groups, meetings with several drug coalitions and community associations, including the Guadalupe Community

WAI 65050

Partnership Coalition.  In our reviews of Patrol Activity Log samples for the month, we noted two documented community policing activities.  For June, we reviewed all of the 20 community policing worksheets submitted for June.  Deputies reported community policing activities in Guadalupe, Sun City West, Phoenix, Peoria, Morristown, Youngtown, Mesa, Sun Lakes, and Anthem.  Eleven of the 20 reported activities occurred in Guadalupe.  On the community policing worksheets, deputies reported 35 hours of community policing, with 575 community members involved with those activities.

For each month of the quarter, we selected a supervisor and a squad of deputies from each District.  We requested several documents, including Patrol Activity Logs (PALs), for each deputy.  We reviewed PALs for each month of the quarter to assess if deputies turned them in by the end of each shift, and if supervisors reviewed each PAL.

For April, we reviewed PALs for 24 deputies and six supervisors.  All 24 deputies' Patrol Activity Logs contained documentation of supervisory review.  All six supervisors' Patrol Activity Logs contained documentation of command-level review.  For May, we reviewed Patrol Activity Logs for 19 deputies and six supervisors.  All 19 deputies' PALs contained documentation of supervisory review.  All six supervisors' PALs contained documentation of command-level review.  For June, we reviewed Patrol Activity Logs for 18 deputies and six supervisors.  All 18 deputies' PALs contained documentation of supervisory review; all six sergeants' PALs contained documentation of command-level review.

Based on the review of PAL samples selected for 24 deputies in April, on a daily basis, deputies completed an average of 1.38 Incident Reports, handled an average of 5.63 calls for service, completed an average of 2.29 self-initiated calls, made an average of 0.21 arrests, and traveled an average of 85 miles.  Based on the review of PAL samples selected for 19 deputies in May, on a daily basis, deputies completed an average of 0.79 Incident Reports, handled an average of 4.95 calls for service, completed an average of 2.47 self-initiated calls, made 0.05 arrests, and traveled an average of 65.05 miles.  Based on the review of PAL samples selected for 18 deputies in June, on a daily basis, deputies completed an average of 1.0 Incident Report, handled an average of 4.06 calls for service, completed an average of 2.89 self-initiated calls, made an average of 0.06 arrests, and traveled an average of 79.94 miles.

We also reviewed deputies' and supervisors' PALs to determine if supervisors provided on-scene supervision, and if those supervisor-deputy contacts were documented.  For the sample dates selected in April, there were 42 supervisor-deputy field contacts reported by deputies and supervisors.  For the sample dates selected in May, there were 18 supervisor-deputy field contacts reported by deputies and supervisors.  For the sample dates selected in June, there were 17 supervisor-deputy field contacts reported by deputies and supervisors.

For April, May, and June, we reviewed selected samples of non-traffic incidents involving stops and detentions, which were recorded on Non-Traffic Contact Forms (NTCFs).  For April, we selected 15 NTCFs for review.  All NTCFs had proper documentation of timely supervisor review.  The compliance rate for NTCFs in April was 100%.  For May, we selected 14 NTCFs to review.  All 14 NTCFs were in compliance with timely submission and timely supervisory review.  The compliance rate in May was 100%.  For June we selected 16 NTCFs for review.  All 16 NTCFs were submitted prior to the end of the shift, and all 16 NTCFs were reviewed and

WAI 65051

approved by supervisors within the required timeframe.  The compliance rate for timely submission and timely supervisory review of NTCFs in June was 100%.  For the second quarter of 2022, the compliance rate for timely submission and timely supervisory review of NTCFs was 100%.  We assess compliance with this Paragraph, as it relates to NTCFs, in conjunction with timely reviews of VSCFs, under Paragraph 90.

Our reviews for this reporting period revealed that in April, of the 15 NTCFs, nine stops involved white individuals, with a total of 10 white individuals documented in these stops.  Thee stops involved Asians or Pacific Islanders who were contacted in separate incidents.  Two stops involved two Black individuals who were contacted in separate incidents.  In one stop, the deputy could not determine ethnicity.  For May, we reviewed 14 NTCFs, of which seven stops involved white individuals contacted in separate incidents.  Seven stops involved Latino individuals, with a total of nine Latino individuals involved in those incidents.  For June, we reviewed 16 NTFCs, of which 12 stops documented white individuals who were contacted in separate incidents.  Three stops involved Latino individuals who were contacted in separate incidents.  One interaction involved a Black individual.

Our reviews of NTCFs for this quarter revealed that white individuals were involved in 28 of the 45 stops, or 62.22%.  Latino individuals were involved in 10 of the 45 stops, or 22.22%.  Black individuals were involved in three of the 45 stops, or 6.67%.  Asian/Pacific Islanders were involved in three of the 45 stops, or 6.67%.

**Paragraph 84.**  *Within 120 days of the Effective Date, all patrol Deputies shall be assigned to a single, consistent, clearly identified Supervisor.  First-line field Supervisors shall be assigned to supervise no more than twelve Deputies.*

**In Full and Effective Compliance**

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the second quarter of 2022.  For April, we reviewed a sample of shift rosters from Districts 4 and 7, and Lake Patrol.  For May we reviewed a sample of shift rosters from Districts 1, 2, and 3.  For June, we reviewed a sample of shift rosters from Districts 4 and 7, and Lake Patrol.  Our reviews of monthly and daily rosters indicated that deputies were assigned to a single consistent supervisor, and deputies worked the same shifts as their supervisors.  Our reviews of shift rosters for this quarter did not reveal any violations of this Paragraph.  Additional reviews of span of control requirements are found under Paragraph 266.

On September 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 65052

***Paragraph 85.*** *First-line field Supervisors shall be required to discuss individually the stops made by each Deputy they supervise with the respective Deputies no less than one time per month in order to ensure compliance with this Order. This discussion should include, at a minimum, whether the Deputy detained any individuals stopped during the preceding month, the reason for any such detention, and a discussion of any stops that at any point involved any immigration issues.*

### In Full and Effective Compliance

To assess MCSO's compliance with this Paragraph, we requested that MCSO provide copies of reports documenting that supervisors are meeting with and discussing individually the stops made by each deputy, at least once per month. We then requested documentation for one randomly selected supervisor from each District, for each month of the reporting period, and the squad of deputies who reports to that supervisor. Supervisors record the discussion of traffic stops by applying the "Discussed with Deputy" option. MCSO documents supervisor-deputy discussions in a spreadsheet, which it submits for inspection. The spreadsheet also documents timely supervisory review of VSCFs. In addition to the spreadsheet, MCSO submits all VSCFs for the month in review. We select a 10% random sample of VSCFs from each District to review for content. We also inspect the sample of VSCFs submitted for review of traffic stops under Paragraphs 25 and 54, as part of compliance with Paragraph 91, to verify if supervisors are addressing deficiencies in the documentation related to the stops.

Paragraph 85 requires that supervisors discuss traffic stops at least once per month with their deputies. To efficiently manage this requirement along with other administrative and operational duties, supervisors generally conduct several traffic stop-related discussions with each deputy during the month. Supervisor-deputy discussions of traffic stops that occurred toward the latter part of the month may not get reviewed until the following month. Our selections for these discussions change every month, so to obtain complete records for each deputy, MCSO holds the submission until all of the information requested for the month is complete. Accordingly, the documentation of supervisory-deputy discussions of traffic stops is submitted 30 days retroactively.

For April, MCSO submitted the March traffic stops for each deputy, by District. The total number of traffic stops for each District was: District 1, 12; District 2, zero; District 3, 36; District 4, 14; Lake Patrol, 76; and District 7, 42. There was a total of 180 traffic-related events for all Districts, and sergeants discussed all 171 of these events with the deputies who conducted them, for a compliance rate of 95%.

For May, MCSO submitted the April traffic stops for each deputy, by District. The total number of traffic stops for each District was: District 1, 13; District 2, 17; District 3, 24; District 4, 96; Lake Patrol, 15; and District 7, 32. There was a total of 197 traffic-related events for all Districts, and sergeants discussed 144 of these with the deputies that conducted them, for a compliance rate of 73.1%.

WAI 65053

For June, MCSO submitted the May traffic stops for each deputy, by District. The total number of traffic stops for each District was: District 1, 12; District 2, 43; District 3, 10; District 4, 38; Lake Patrol, 22; and District 7, 93. There was a total of 218 traffic-related events for all Districts, and sergeants discussed 217 of these events with the deputies who conducted them, for a compliance rate of 99.1%.

For this reporting period, there was a total of 595 traffic stops reported. We received documentation that supervisors discussed 531 of these stops with the deputies that conducted them. This is a compliance rate of 89.24%.

On October 5, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

MCSO has been in Full and Effective Compliance with this Paragraph since that time. However, due to a large number of traffic stops that were not discussed, as required, MCSO did not meet the requirements of this Paragraph for this reporting period. If MCSO fails to meet the requirements of this Paragraph in the next quarter, we will withdraw Full and Effective Compliance.


***Paragraph 86.*** *On-duty field Supervisors shall be available throughout their shift to provide adequate on-scene field supervision to Deputies under their direct command and, as needed, to provide Supervisory assistance to other units. Supervisors shall be assigned to and shall actually work the same days and hours as the Deputies they are assigned to supervise, absent exceptional circumstances.*

**In Full and Effective Compliance**

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the second quarter of 2022. For April, we reviewed a sample of shift rosters from Districts 4 and 7, and Lake Patrol. For May, we reviewed a sample of shift rosters from Districts 1, 2, and 3. For June, we reviewed a sample of shift rosters from Districts 4 and 7, and Lake Patrol. Our reviews of monthly and daily rosters indicated that deputies were assigned to and worked the same schedules as their supervisors, and supervisors were available to provide on-scene supervision.

MCSO deputies' and sergeants' activities are captured in Patrol Activity Logs (PALs). We selected a random sample of one day per month, and one squad per District, for review. For April, we reviewed PALs for seven sergeants and 24 deputies. We noted a total of 42 field supervisor-deputy contacts between the combined deputies' and sergeants' PALs for the selected dates. For May, we requested PALs for six sergeants and 19 deputies. We received and reviewed all requested PALs, and noted a total of 18 field supervisor-deputy contacts between the combined deputies' and sergeants' PALs for the selected dates. For June, we reviewed PALs for 18 deputies and six sergeants. We noted a total of 17 field supervisor-deputy contacts between the combined deputies' and sergeants' PALs for the selected dates. We reviewed the monthly shift rosters for each month of the reporting period.

WAI 65054

Our reviews indicate that supervisors are assigned to work the same hours as the deputies under their supervision.  Our reviews of Patrol Activity Logs indicate that supervisors have been available to provide on-scene supervision.

On October 5, 2020, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

***Paragraph 87.*** *MCSO shall hold Commanders and Supervisors directly accountable for the quality and effectiveness of their supervision, including whether commanders and Supervisors identify and effectively respond to misconduct, as part of their performance evaluations and through non-disciplinary corrective action, or through the initiation of formal investigation and the disciplinary process, as appropriate.*

**Phase 1:**  In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on April 27, 2022.

- GC-4 (S) (Employee Performance Management), most recently amended on November 10, 2021.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2022.

**Phase 2:**  Not in compliance

To assess MCSO's compliance with this Paragraph, we request the names of all deputies and supervisors whose performance appraisals were completed during the reporting period.  From the lists of employees submitted, we request a representative sample.  The selection of deputies and supervisors whose EPAs are requested is based on the number of requirements set forth in the First and Second Orders.  There are a greater number of requirements that supervisory EPAs must address, therefore, a greater number of supervisors' EPAs are reviewed for compliance.

We requested and reviewed Employee Performance Appraisals submitted for five deputies and 10 supervisors whose EPAs were completed in April.  All five deputy EPAs appropriately addressed each employee's performance for the period under review.  Nine of the 10 supervisor EPAs met compliance requirements for this Paragraph.  All of the 10 supervisor EPAs rated the supervisors on the quality and effectiveness of their supervision.  All of the 10 supervisor EPAs included comments related to the supervisors' ability to identify and respond to misconduct.  Nine of the 10 supervisor EPAs addressed the requirements needed for compliance with regard to quality of supervisory reviews.  One supervisor EPA failed to sufficiently address the quality of supervisory reviews; this was the result of the rater failing to address the requirements of Paragraphs 92 and 95.  We reviewed 10 supervisor EPAs to determine if raters had assessed each supervisor's quality of work product in misconduct investigations; for commanders, we assessed the quality of reviews of misconduct investigations, as required by Paragraph 176.  We found that all 10 supervisor EPAs addressed the requirements of Paragraph 176.  For April, including both deputy and supervisor EPAs, 14 of 15 EPAs, or 93.33% were in compliance with this Paragraph.

WAI 65055

We requested and reviewed Employee Performance Appraisals submitted for six deputies and eight supervisors whose performance evaluations were completed in May.  All six deputy EPAs were in compliance, and six of the eight supervisor EPAs met Paragraph 87 requirements.  We found that all eight supervisor EPAs addressed the quality and effectiveness of supervision.  All eight supervisor EPAs included comments on the supervisor's ability to identify and respond to misconduct.  Six of the eight supervisor EPAs had required entries with regard to the quality of reviews of their subordinates' EIS profiles, as required by Paragraphs 92 and 95.  All eight supervisor EPAs addressed the quality of misconduct investigations, as well as reviews of misconduct investigations.  For May, including both deputy and supervisor EPAs, 12 of 14 EPAs, or 85.72% were in compliance with this Paragraph.

We requested and reviewed Employee Performance Appraisals submitted for five deputies and 10 supervisors whose EPAs were completed in June.  Four of the five deputy EPAs sufficiently addressed all required areas of assessment, and seven of the 10 supervisor EPAs met the requirements of Paragraph 87.  One deputy EPA failed to document a misconduct investigation that was initiated during the evaluation period, and was therefore noncompliant.  All 10 supervisor EPAs appropriately rated the employees on the quality and effectiveness of their supervision.  All 10 supervisor EPAs included comments related to the supervisors' ability to identify and respond to misconduct.  Seven of the 10 supervisor EPAs had required entries with regard to the quality of reviews of their subordinates' EIS profiles, as required by Paragraphs 92 and 95.  The quality of supervisory reviews of subordinates' EIS profiles reflects on the overall quality of supervisory reviews as per Paragraph 100.  Nine of the 10 supervisor EPAs were in compliance with Paragraph 176.  For June, including both deputy and supervisor EPAs, 11 of 15 EPAs were in compliance, or 73.33%.

For the second quarter of 2022, we reviewed EPAs for 16 deputies and 28 supervisors.  As it pertains to the requirements of this Paragraph, 15 of the 16 deputy EPAs were in compliance and 22 of the 28 supervisor EPAs were in compliance.  For this review period, 38 of 44 EPAs reviewed were in compliance with the requirements of this Paragraph, for a compliance rate of 86.36%.


### b. Additional Supervisory Measures

**Paragraph 88.**  *To ensure compliance with the terms of this Order, first-line Supervisors in any Specialized Units enforcing Immigration-Related Laws shall directly supervise the law enforcement activities of new members of the unit for one week by accompanying them in the field, and directly supervise the in-the-field-activities of all members of the unit for at least two weeks every year.*

**In Full and Effective Compliance**

MCSO does not have any specialized units that enforce immigration-related laws.  We continue to monitor arrests and detentions as part of our review process to ensure that MCSO is in compliance with its own directives on this issue.

WAI 65056

For this reporting period, we received lists containing all incidents involving MCSO arrests and criminal citations. For each month, we requested a random sample of arrests and criminal citations. In total, we reviewed 60 incidents involving arrests and 60 incidents involving criminal citations. We also reviewed a random sample of 249 Incident Reports for this reporting period. During our reviews of the documentation provided for this reporting period, we have found no evidence to indicate any violations of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 89.** *A Deputy shall notify a Supervisor before initiating any immigration status investigation, as discussed in Paragraph 28. Deputies shall also notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration Related Crime, or for any crime related to identity fraud or lack of an identity document. The responding Supervisor shall approve or disapprove the Deputy's investigation or arrest recommendation based on the available information and conformance with MCSO policy. The Supervisor shall take appropriate action to address any deficiencies in Deputies' investigation or arrest recommendations, including releasing the subject, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative investigation.*

**In Full and Effective Compliance**

To assess MCSO's compliance with this Paragraph, we requested all reports related to immigration status investigations, any immigration-related crimes, or any incidents or arrests involving lack of identity documents. The Incident Reports requested were for the period in review. Any incident wherein a deputy requests a supervisor's permission to contact Immigration and Customs Enforcement (ICE) or Customs and Border Patrol (CBP) – to ascertain the legal status of an individual involved in a stop, detention, or any incident under investigation by MCSO – falls under the reporting requirements of this request.

For the second quarter of 2022, MCSO submitted one arrest that fell under the reporting requirements of this Paragraph. In April, a Latina female driver was stopped for running a stop sign. The deputy approached the driver and requested to see her driver's license, registration, and proof of insurance. The driver became belligerent and refused to provide the documents. Additional deputies arrived and assisted, and one deputy was able to find out the name and date of birth of the driver. A search of the Arizona Department of Transportation database revealed that the driver's license had been suspended for refusal to provide a breath sample in a DUI investigation. The driver was cited for three violations, including failure to show identification, and released. We reviewed all documents provided for this case and found no issues of concern.

For this reporting period, we requested 20 bookings and 20 criminal citations for each month of the reporting period. In total, we reviewed 60 bookings and 60 criminal citations. In addition, we reviewed 249 Incident Reports for the quarter. Our reviews found no violations of this Paragraph.

WAI 65057

On December 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

***Paragraph 90.*** *MCSO Deputies shall submit documentation of all stops and Investigatory Detentions conducted to their Supervisors by the end of the shift in which the action occurred. Absent exceptional circumstances, within 72 hours of receiving such documentation, a Supervisor shall independently review the information. Supervisors shall review reports and forms for Boilerplate or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct. Appropriate disciplinary action should be taken where Deputies routinely employ Boilerplate or conclusory language.*

**Phase 1:** In compliance

- EA-11 (Arrest Procedures), most recently amended on April 5, 2022.

**Phase 2:** In compliance

We reviewed 35 incidents involving traffic stops for April 2022. There were 14 stops related to speeding, of which seven resulted in citations and seven resulted in warnings. Fourteen stops were for moving violations other than speeding. Four stops related to registration or license plate violations. Three stops were due to equipment violations. Fifteen of the stops resulted in citations, and 20 resulted in written warnings. All 35 Vehicle Stop Contact Forms we reviewed noted the serial number of the reviewing supervisor, date, and time of supervisory review. For April, MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 245 VSCFs. Supervisors reviewed 243 of 245 VSCFs within 72 hours, for a compliance rate of 99.18%.

We reviewed 35 incidents involving traffic stops for May 2022. Seventeen of the 35 traffic stops related to speeding. Of the 17 stops related to speeding, 11 drivers received citations, and six received warnings. One stop was due to an equipment violation. Eleven of the stops involved moving traffic infractions other than speeding. There were six stops related to registration or license plate violations. Of the 35 stops, 20 resulted in citations, and 15 resulted in written warnings. For May, MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 157 VSCFs. Supervisors reviewed all 157 VSCFs within 72 hours, for a compliance rate of 100%.

We reviewed 35 incidents involving traffic stops for June 2022**.** Sixteen of the 35 traffic stops involved speeding violations. Of the 16 stops related to speeding, nine drivers received citations and seven drivers received warnings. Four stops involved equipment violations. Eleven stops involved traffic violations other than speeding. Four stops were associated with registration or license plate violations. Of the 35 stops, 15 resulted in citations and 20 resulted in warnings. For June, MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 189 VSCFs. We reviewed the data and supervisors reviewed all 189 VSCFs within 72 hours, for a 100% compliance rate.

WAI 65058

For every month of the review period, we reviewed selected samples of non-traffic incidents involving stops and detentions, which were recorded on Non-Traffic Contact Forms (NTCFs). Our assessment of compliance also included reviews of BWC recordings on selected cases, some of which included searches of the individuals detained. For April, we selected 15 NTCFs for review. All 15 NTCFs had been submitted prior to the end of the shift. All 15 NTCFs were reviewed and approved by supervisors within 72 hours, as required. We reviewed BWC recordings submitted with three of the incidents and noted no concerns. The compliance rate for timely submission and timely supervisory review of NTCFs in April was 100%. For May, we selected 14 NTCFs to review. All 14 NTCFs were submitted prior to the end of the shift. All 14 NTCFs were reviewed and approved by supervisors within the required timeframe. We reviewed body-worn camera recordings associated with six cases and noted no concerns with the stops. The compliance rate for timely submission and timely supervisory review of NTCFs in May was 100%. For June, we reviewed 16 NTCFs generated during the month. All 16 NTCFs were turned in before the end of the shift, and 14 of the 16 NTCFs had supervisory reviews documented within 72 hours. We reviewed body-worn camera recordings associated with three incidents and noted no concerns with the stops. The compliance rate for timely submission and timely supervisory review of NTCFs in June was 87.50%. For the second quarter of 2022, 43 of 45 NTCFs reviewed were in compliance with timely supervisory review. The overall compliance rate was 95.56%.

We take into account all stops and detentions, both traffic and non-traffic, when we determine the compliance rate for this Paragraph. For the second quarter of 2022, 692 of 696 VSCFs reviewed were in compliance with timely supervisory review. The compliance rate for timely reviews of all combined stops and detentions, from the samples chosen, for this reporting period was 99.43%. For this reporting period, our inspection of the documentation provided did not reveal any evidence of boilerplate or conclusory language, inconsistent or inaccurate information, or lack of articulation, as to the legal basis for stops and detentions.

***Paragraph 91.*** *As part of the Supervisory review, the Supervisor shall document any Investigatory Stops and detentions that appear unsupported by reasonable suspicion or are otherwise in violation of MCSO policy, or stops or detentions that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The Supervisor shall take appropriate action to address all violations or deficiencies in Investigatory Stops or detentions, including recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.*

**Phase 1:**  In compliance

- EA-11 (Arrest Procedures), most recently amended on April 5, 2022.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on April 27, 2022.

- GF-5 (Incident Report Guidelines), most recently amended on March 24, 2022.

**Phase 2:**  In compliance

WAI 65059

We reviewed traffic stop data reported by MCSO for its April inspection (BI2022-0051). To determine compliance with this Paragraph, for April, we randomly selected 35 traffic-related events, which BIO then audited for compliance. Of the 35 traffic-related events, MCSO reported a 99.70% compliance rate. As a result of the inspection, four BIO Action Forms were generated. The first deficiency was attributed to a District 2 deputy who documented only one occupant of the vehicle involved in the stop, when there were several occupants. The second deficiency was attributed to a District 3 deputy who failed to document an additional deputy who was on the scene. The third deficiency was attributed to a District 3 deputy who failed to complete an Assisting Deputy and Body Worn Camera Log. The fourth deficiency was attributed to a District 4 deputy who did not properly document the location of the traffic stop. We do not consider any of these to be serious deficiencies. For April, all 35 stops reviewed were in compliance with this Paragraph.

We reviewed a spreadsheet documenting each VSCF by District, for April, to determine if supervisors were reviewing VSCFs within the required 72 hours. We reviewed data for 245 traffic stops and determined that supervisors had completed timely reviews of 243 of the 245 VSCFs, or 98.18% of the cases. For April, we requested 15 NTCFs from the list that MCSO submitted. We reviewed the NTCFs to determine if supervisors were reviewing them within the required 72 hours. All 15 NTCFs reviewed were in compliance with timely and quality of reviews, for a compliance rate of 100%.

For April, we requested a sample of 10 corrective actions generated during the month. Corrective actions are documented on BlueTeam Supervisor Notes. One corrective action was the result of late activation of the Body Worn Camera (BWC). Two corrective actions were the result of erroneous or missing information required on traffic stop documentation. One corrective action was the result of a policy violation not related to a traffic stop. One corrective action was the result of a deputy safety issue. In one submission, we did not find any deficiency or corrective action taken. For the month in review, we requested all corrective actions relative to the sample of 35 traffic stops that were selected for the monthly Traffic Stop Data Collection Inspection. There were no BlueTeam corrective actions submitted pertaining to the 35 stops selected for April.

WAI 65060

We reviewed traffic stop data reported by MCSO for its May inspection (BI2022-0068). We randomly selected 35 traffic-related events, which BIO then audited for compliance. The inspection resulted in a 99.40% compliance rating. Our review of the inspection report found that six stops were listed as having deficiencies, resulting in six BIO Action Forms. The first deficiency was attributed to a District 1 deputy who failed to complete an Assisting Deputy and Body Worn Camera Log. The second deficiency was attributed to a District 2 deputy who documented the wrong city in the VSCF. The third deficiency was attributed to a District 3 deputy who documented the wrong license plate on the written warning. The fourth deficiency was attributed to a Lake Patrol deputy who made several documentation errors on the VSCF. The fifth deficiency was attributed to a Lake Patrol deputy who did not provide an Incidental Contact Form to a passenger, after asking investigatory questions. The sixth deficiency was attributed to a Lake Patrol deputy who documented the wrong license plate of the violator's vehicle on the citation and VSCF. We consider this last deficiency as serious error that should have been addressed by the reviewing supervisor. For May, 34 of the 35 stops reviewed were in compliance with the requirements of this Paragraph.

We reviewed a spreadsheet documenting each VSCF by District, for May to determine if supervisors were reviewing VSCFs within the required 72 hours. We reviewed 157 VSCFs and determined that supervisors had completed timely reviews of documentation in all 157 stops, or in 100% of the cases. From the list submitted by MCSO, we requested all 14 NTCFs that were generated in May. We inspected the NTCFs to determine if supervisors were reviewing them within the required 72 hours. We determined that supervisors had completed timely reviews in all 14 NTCFs, for 100% compliance.

For May, we requested a list of corrective actions. From the list submitted, we selected 10 corrective actions generated for the month. Three corrective actions were the result of late activation, or policy violations associated with the BWC. Five corrective actions were the result of erroneous or missing information required on traffic stop documentation. Two corrective actions were taken as a result of procedural or policy violations during traffic stops. For the month in review, we requested all corrective actions relative to the sample of 35 traffic stops that were selected for the monthly Traffic Stop Data Collection Inspection. There were no BlueTeam corrective action notes submitted pertaining to the 35 stops selected for May.

We reviewed traffic stop data reported by MCSO for its June inspection (BI2022-0083). We randomly selected 35 traffic-related events, which BIO then audited for compliance. The inspection resulted in a 98.90% compliance rating. Our review of the inspection report found that 11 stops were listed as having deficiencies. As a result of the inspection, 11 BIO Action Forms were generated. The first deficiency was attributed to District 1 deputy who documented the wrong license plate on the VSCF and written warning. The second deficiency was attributed to a District 2 deputy who documented the wrong Patrol vehicle number on the VSCF. The third deficiency was attributed to a District 2 deputy who used the wrong disposition code for the traffic stop. The fourth deficiency was attributed to a District 2 deputy who failed to conduct a license/warrants check on the driver. The fifth deficiency was attributed to a District 3 deputy who documented the wrong Patrol vehicle number on the VSCF. The sixth deficiency was attributed to a District 4 deputy who did not activate the BWC when a decision to make the stop

WAI 65061

was made and did not provide a self-introduction.  The seventh deficiency was attributed to a District 4 deputy who did not did not activate the BWC upon arrival, did not advise dispatch of his arrival on the scene, and did not complete an Assisting Deputy and Body Worn Camera Log. The eighth deficiency was attributed to a District 7 deputy who documented the wrong Patrol vehicle number on the VSCF.  The ninth deficiency was attributed to a Lake Patrol Supervisor who did not complete an Assisting Deputy and Body Worn Camera Log.  The tenth deficiency was attributed to Lake Patrol deputy who documented the wrong location for the stop.  The eleventh deficiency was attributed to a Lake Patrol deputy who documented the wrong license plate of the violator's vehicle on the citation and VSCF.  We believe that this was a serious deficiency that should have been addressed by the reviewing supervisor. Of the 35 stops reviewed for June, 34 were in compliance with the requirements of this Paragraph.

For June, we requested a list of corrective actions.  From the list submitted, we selected 10 corrective actions that were generated for the month.  Two corrective actions were issued for late activation or deficiencies associated with the operation of the BWC.  Two corrective actions were taken as a result of procedural or policy violations during traffic stops.  Four corrective actions were associated with deficiencies and violations of policies or procedures observed during reviews of traffic stops.  Two corrective actions documented deputy safety concerns.  For the month in review, we requested all corrective actions relative to the sample of 35 traffic stops that were selected for the monthly Traffic Stop Data Collection inspection.  There were no documented corrective actions pertaining to any of the 35 stops selected for June.

We reviewed a spreadsheet documenting each VSCF by District.  For June, we reviewed 294 VSCFs and determined that supervisors had completed timely reviews in 292 of the 294 VSCFs, or in 99.32% of the cases.  For June we requested 16 NTCFs generated by Patrol deputies.  We reviewed all 16 NTCFs to determine if supervisors were reviewing NTCFs within the required 72 hours.  We determined that supervisors had completed timely reviews in 14 of 16 NTCFs.  This is a compliance rate of 87.75%.

Paragraph 90 requires timely supervisory reviews of documentation pertaining to stops and detentions.  Paragraph 91 requires supervisors to identify policy violations, deficiencies, and training issues noted in stops and detentions.  Of the sample of 105 stops inspected for this reporting period, there was one stop in May, and one stop in June, with serious deficiencies or policy violations that supervisors failed to address.  The compliance rate for Paragraph 91 for this reporting period was 98.10%.


***Paragraph 92.****  Supervisors shall use EIS to track each subordinate's violations or deficiencies in Investigatory Stops or detentions and the corrective actions taken, in order to identify Deputies needing repeated corrective action.  Supervisors shall notify IA.  The Supervisor shall ensure that each violation or deficiency is documented in the Deputy's performance evaluations.  The quality and completeness of these Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations.  MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct complete, thorough, and accurate reviews of Deputies' stops and Investigatory Detentions.*

WAI 65062

**Phase 1:**  In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on April 27, 2022.
- GC-4 (S) (Employee Performance Management), most recently amended on November 10, 2021.

**Phase 2:**  Not in compliance

To determine compliance, we will review the EIS and IAPro histories for each of the employees whose EPAs were selected for review under Paragraph 87.  We will then review the information to determine if all violations, deficiencies, PSB investigations, and corrective actions taken pertaining to stops and detentions, which were listed in the employee's EIS and IAPro resumes, were accurately documented in the employee's EPA.  Failure to identify and memorialize any issues and actions taken as noted in the employee's EIS and IAPro resumes, reflects on the quality of the supervisor's reviews.  By reviewing EIS and IAPro resumes, we will also be able to identify if a deputy has repeated entries of any specific violations, and if subsequent actions taken to correct the issue have been documented in the employee's EPA.  For applicable supervisors' EPAs, in addition to the above metric, we will review comments made in reference to the quality of supervisory reviews to ensure that the rater has specific comments addressing this Paragraph's requirements.  Both of these requirements must be met for compliance.  Deficiencies in quality of EIS reviews, by supervisors, will also reflect in our assessment of compliance for Paragraph 100.  To ensure fairness to the agency, when we assess compliance with this Paragraph, we also look at the performance appraisal as a whole to determine if the intent and spirit of the Paragraph under review was captured.

For April, we reviewed five deputy EPAs and 10 supervisor EPAs.  All five deputy EPAs reviewed were in compliance, and nine of the 10 supervisor EPAs were in compliance.  One supervisor EPA did not have specific comments addressing EIS reviews, as it pertains to the requirements of this Paragraph.  For May, we reviewed six deputy EPAs and eight supervisor EPAs.  All six deputy EPAs were in compliance, and six of the eight supervisor EPAs were in compliance.  Two supervisor EPAs failed to address the requirements of this Paragraph.  For June, we reviewed five deputy EPAs and 10 supervisor EPAs.  All five deputy EPAs were in compliance.  Eight of the 10 supervisor EPAs addressed the quality and completeness of EIS reviews, which are requirements of this Paragraph.

For this quarter, all 16 deputy EPAs reviewed were in compliance with this Paragraph, for a 100% compliance rate.  Of the 28 supervisor EPAs reviewed, 23 or 92% were in compliance.  Including deputy and supervisor EPAs, there was a total of 44 EPAs, of which 39 met the requirements of this Paragraph.  The compliance rate for this reporting period was 88.64%.  For the period in review, MCSO was not in compliance with the requirements of this Paragraph.

WAI 65063

*Paragraph 93.  Absent extraordinary circumstances, MCSO Deputies shall complete all incident reports before the end of shift.  MCSO field Supervisors shall review incident reports and shall memorialize their review of incident reports within 72 hours of an arrest, absent exceptional circumstances.*

**In Full and Effective Compliance**

We reviewed a representative sample of 97 Incident Reports for April, for the randomly selected date of April 22.  Of the 97 Incident Reports, we verified documentation of timely supervisory review on all 96 reports.  Of the 97 Incident Reports, 13 were vehicle collisions.  Of the 13 Vehicle Crash Reports, all had documentation that a supervisor had reviewed and approved the reports.  The compliance rate for timely supervisory review of Incident Reports in April was 98.97%.  We reviewed a sample of the Incident Reports submitted for quality.  We did not find any issues of concern.  All 12 arrest reports reviewed were in compliance.

We reviewed a sample of 70 Incident Reports for May, for the randomly selected date of May 13.  Sixty-nine of the 70 reports were in compliance.  There was no Incident Report submitted for one incident.  There were 10 arrests submitted for review.  All of the 10 Arrest Reports were reviewed and approved within the required 72 hours.  There were 15 Vehicle Crash Reports submitted in the sample for May, of which all included documentation of supervisory review.  The compliance rate for timely submission and review of Incident Reports for May was 98.97%.  We conducted a quality review on a 10% random sample of the reports we reviewed.  We found no issues of concern.

We reviewed a representative sample of 82 Incident Reports for June**,** for the randomly selected date of June 5.  We confirmed that all Incident Reports were submitted before the end of the shift, and 78 of 82 reports had been reviewed and approved by supervisors as required by this Paragraph.  The compliance rate was 95.12%.  There were 24 Arrest Reports, and 21 of 24 Arrest Reports had been reviewed and approved by supervisors within the required 72 hours.  There were 10 Vehicle Crash Reports submitted in the June sample; we confirmed timely supervisory review on nine of 10 crash reports.  We conducted a quality review on a 10% random sample of the reports submitted and found no issues of concern.

On March 17, 2020, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

*Paragraph 94.  As part of the Supervisory review, the Supervisor shall document any arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training.  The Supervisor shall take appropriate action to address violations or deficiencies in making arrests, including notification of prosecuting authorities, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.*

**Phase 1:**  In compliance

WAI 65064

- EA-11 (Arrest Procedures), most recently amended on April 5, 2022.
- GF-5 (Incident Report Guidelines), most recently amended on March 24, 2022.

**Phase 2:**   In compliance

To assess compliance with this Paragraph, we will request a list of bookings and criminal citations for the period in review.  We will randomly select a sample of 20 bookings and 20 criminal citations, which BIO will then inspect for compliance.  In addition, MCSO will review all cases involving immigration arrests, and arrests related to lack of identity documents.  MCSO will also review all Maricopa County Attorney's Office (MCAO) turndowns for lack of probable cause and submit those for our review.  The total of cases selected per month will not exceed 60.  We will review Incident Report Inspection reports as part of the documentation to determine compliance with Paragraphs 94 and 96.  The BIO inspection will review the selected cases, which are retroactive two months.   We review the Incident Report Inspection Report and its corresponding Inspection Matrix for each month of the reporting period.  Some inspection points in the matrix are given stronger consideration in our reviews than others, as these are fundamental requirements of Paragraph 94; if deficiencies are noted, they may also impact the successful conclusion of the case.  In all the cases described below, we relied on the BIO inspector's notations and observations to determine our findings.

In addition to documentation described above, we review all Incident Memorialization Forms (IMFs) submitted for the quarter.  The Incident Memorialization Form is used by supervisors to document deficient arrests and corrective actions taken.  In accordance with this Paragraph and MCSO policy, supervisors are required to document arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training.  The supervisor generating the IMF, and the commander reviewing the IMF, should ensure that the documentation includes the corrective action taken to resolve issues caused by the deficiency, as well as the remedial action taken to prevent future reoccurrence.

For April, we reviewed the March Incident Report Inspection (BI2022-0029).  We selected 20 bookings and 20 criminal citations, which BIO then inspected for compliance.  There was a total of 40 reports inspected for compliance.  MCSO did not submit any immigration-related arrests, cases involving identity theft investigations, or County Attorney turndowns for lack of probable cause.  The inspection resulted in a 99.28% compliance rating.  The BIO Inspection Report noted deficiencies in six cases, which resulted in five BIO Action Forms.  As a result of our review of all the documentation submitted, including the matrix, we determined that all six cases had minor deficiencies that would not affect compliance with this Paragraph.  The first deficiency involved a District 1 arrest where the report was not submitted prior to the end of the shift, as required by policy.  The second deficiency involved a District 1 arrest where evidence was impounded, but the inspector could not locate a property receipt for the item.  The third deficiency involved a District 3 arrest where the report was not reviewed by a supervisor within the required 72 hours.  The fourth deficiency involved a District 4 arrest where the inspector could not locate a property receipt for impounded evidence.  The fifth deficiency involved an arrest where a deputy, assigned to Training, improperly marked the VSCF to indicate no items were seized, when in actuality a

WAI 65065

driver's license was seized and returned to the Department of Motor Vehicles. The sixth deficiency involved attributed to a supervisor from BIO, where and arrest report was not reviewed within the required 72 hours. In total, we reviewed 40 cases of which all were in compliance.

For May, we reviewed the April Incident Report Inspection (BI2022-0047). We selected 20 bookings and 20 criminal citations, which BIO then inspected for compliance. There were no immigration-related arrests, and no cases involving identity theft investigations reported by MCSO. There were no County Attorney turndowns for lack of probable cause. The inspection resulted in a 98.53% compliance rating. We reviewed the inspection report, which noted nine deficient cases, and reviewed the matrix used by BIO for the inspection. As a result of our review of all the documentation submitted, including the matrix, we determined eight cases had minor deficiencies, and one case was noncompliant. The first deficiency involved an arrest from District 3 where the arrest report was not reviewed within policy timeframes. The second, third, and fourth cases also involved arrests from District 3 where the arrest reports were not reviewed within the required 72 hours. The fifth deficiency involved an arrest from District 4 where the report was not submitted prior to the end of the shift. The sixth, seventh, and eighth cases involved arrests from Lake Patrol where the arrest reports were not reviewed within policy timeframes. The ninth case was an arrest by a deputy from the Major Crimes Division that lacked articulation of probable cause for the listed charges. We consider this case to be noncompliant with the requirements of this Paragraph. In total, 39 of 40 cases were in compliance.

For June, we reviewed the May Incident Report Inspection (BI2022-0062). We selected 20 bookings and 20 criminal citations, which BIO then inspected for compliance. There were no immigration-related arrests, and no cases involving identity theft investigations reported by MCSO. There were no County Attorney turndowns for lack of probable cause. The inspection resulted in a 99.46% compliance rating. We reviewed the inspection report, which noted three deficient cases, and reviewed the matrix used by BIO for the inspection. As a result of our review of all the documentation submitted, including the matrix, we determined two cases had minor deficiencies, and one case was noncompliant. The first deficiency was attributed to a District 1 arrest that was not reviewed by a supervisor within the required 72 hours. The second deficiency was attributed to a District 2 arrest that was not reviewed by a supervisor within the required 72 hours. The third deficiency was attributed to a Lake Patrol arrest that contained conclusory language. We believe this was a serious deficiency that should have been addressed as part of the supervisory review process. For June, 39 of 40 cases reviewed were in compliance with this Paragraph.

For this quarter, of the total 120 cases selected for review, 118 were in compliance. The compliance rate for this quarter was 98.33%. There were no Incident Memorialization Forms submitted for this quarter.

WAI 65066

***Paragraph 95.*** *Supervisors shall use EIS to track each subordinate's violations or deficiencies in the arrests and the corrective actions taken, in order to identify Deputies needing repeated corrective action. The Supervisor shall ensure that each violation or deficiency is noted in the Deputy's performance evaluations. The quality of these supervisory reviews shall be taken into account in the Supervisor's own performance evaluations, promotions, or internal transfers. MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct reviews of adequate and consistent quality.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on April 27, 2022.
- GC-4 (S) (Employee Performance Management), most recently amended on November 10, 2021.

**Phase 2:** Not in compliance

There are two primary areas of assessment for this Paragraph. The first is to determine if supervisors are tracking subordinates' deficiencies and violations in arrests, and accurately documenting these issues along with corrective actions in employees' EPAs. In addition, repeated corrective actions should be addressed in EPAs. The second is to determine if the quality of supervisory reviews of EIS are being addressed in supervisors' EPAs. The quality and effectiveness of interventions, as a result of deficiencies pertaining to stops and detentions, is a requirement which we assess under Paragraph 97.

To determine compliance, we will review the EIS and IAPro histories for each of the employees whose EPAs were selected for review under Paragraph 87. We will then review the information to determine if all violations, deficiencies, IA investigations, and corrective actions taken pertaining to arrests, which were listed in the employee's EIS and IAPro resumes, were accurately documented in the employee's EPA. Failure to identify and memorialize any issues and actions taken as noted in the employee's EIS and IAPro resumes, reflects on the quality of the supervisor's quality of reviews. By reviewing EIS and IAPro resumes, we will also be able to identify if a deputy has repeated entries of any specific violations, and if subsequent actions taken to correct the issue have been documented in the employee's EPA. For applicable supervisors' EPAs, in addition to the above metric, we will review comments made in reference to the quality of supervisory reviews to ensure that the rater has specific comments addressing this Paragraph's requirements. Both of these requirements must be met for compliance. Deficiencies in quality of EIS reviews by supervisors will also reflect in our assessment of compliance for Paragraph 100. To ensure fairness to the agency, when we assess compliance with this Paragraph, we also try look at the performance appraisal as a whole to determine if the intent and spirit of the Paragraph under review was captured.

WAI 65067

For this quarter, we reviewed 16 deputy EPAs and 28 supervisor EPAs.  Fifteen of the 16 deputy EPAs we reviewed, or 93.75%, were in compliance with this Paragraph.  Twenty-three of the 28 supervisor EPAs we reviewed, or 82.14%, were in compliance with this Paragraph.  Five supervisor EPAs failed to note specific comments addressing the quality of EIS reviews, as it pertains to the requirements of this Paragraph.  Including deputy and supervisor EPAs, there was a total of 44 EPAs, of which 39 met the requirements of this Paragraph.  The compliance rate for this reporting period was 88.64%.  For the period in review, MCSO was not in compliance with the requirements of this Paragraph.

**Paragraph 96.**  *A command-level official shall review, in writing, all Supervisory reviews related to arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training.  The commander's review shall be completed within 14 days of receiving the document reporting the event.  The commander shall evaluate the corrective action and recommendations in the Supervisor's written report and ensure that all appropriate corrective action is taken.*

**Phase 1:**  In compliance

- EA-11 (Arrest Procedures), most recently amended on April 5, 2022.

**Phase 2:**  Deferred

This Paragraph requires that a command-level official review a supervisor's investigation of the circumstances pertaining to any arrest that lacks probable cause, is in violation of policy, or where there is a need for corrective action or review of the agency's policy, strategy, tactics, or training.  This Paragraph also requires that the commander evaluate the corrective action and recommendations to ensure that these are appropriate.

Our reviews to determine compliance with this Paragraph are associated with the documentation provided for Paragraph 94.  If BIO identifies deficient cases in the Incident Report inspection, and the deficiencies fall within any of the four areas noted in Paragraphs 94 and 96, we will review the documentation to determine compliance.  Since this Paragraph pertains to command reviews of supervisory investigations of deficient arrests, we will also review Incident Memorialization Forms to determine compliance.  Our reviews for compliance with this Paragraph are determined by the command staff's timely reviews of IMFs, once submitted by supervisors, and commanders' evaluation of the corrective actions taken.

There were no Incident Memorialization Forms submitted for the second quarter of 2022.  Since we have no data on which to base our assessment of compliance for this Paragraph, we will defer compliance determination for this quarter.  In our reviews of documentation for compliance with Paragraph 94, we found two arrests with deficiencies where Incident Memorialization Forms should have been completed.  One arrest was not supported by probable cause.  In the other arrest, the arrest report contained conclusory language.  These incidents were documented in Incident Report Inspections BI2022-0047 and BI2022-0062, respectively.  We have previously commented that the low number, or lack of, submissions for this Paragraph, does not necessarily indicate that deputies are not making deficient arrests or violating policy.

WAI 65068

*Paragraph 97.  MCSO Commanders and Supervisors shall periodically review the EIS reports and information, and initiate, implement, or assess the effectiveness of interventions for individual Deputies, Supervisors, and units based on that review.  The obligations of MCSO Commanders and Supervisors in that regard are described above in Paragraphs 81(c)–(h).*

**Phase 1:**  In compliance

- GH-5 (Early Identification System), most recently amended on December 16, 2021.

**Phase 2:**  Not in compliance

As per GH-5 (Early Identification System) and GB-2 (Command Responsibility), supervisors are required to conduct EIS reviews twice per month for sworn members.  Command review of EIS profiles of supervisory and command personnel began in February 2017.  To assess MCSO's compliance with this Paragraph, for every month of the reporting period, we selected a supervisor and a squad of deputies from each District.  We then reviewed the documentation provided as verification of compliance with this Paragraph.  We also requested that EIS reviews of the commanders responsible for the selected personnel be included.  The purpose of conducting EIS reviews is for supervisors to oversee the performance of subordinates, and take appropriate action on issues that need to be corrected.

This Paragraph also requires that the effectiveness of interventions be evaluated.  EIS reviews should be thorough, and completed in a timeframe that allows supervisors to monitor performance and address any concerns noted, in a timely manner.  We believe that periodic EIS reviews should be conducted on a schedule that maximizes their usefulness.  We understand that an exact 14-day timeframe may not be possible for all EIS reviews; and we will therefore conduct our reviews using a standard of reasonableness.  Two EIS reviews conducted within a short time period, on the same employee, lead to questions regarding the purpose and quality of the reviews.  EIS reviews conducted too close to each other do not address the intent of this Paragraph.  We will review documentation to determine if EIS reviews are being conducted in accordance with the requirements of this Paragraph, or if they are being conducted perfunctorily without regard for usefulness or quality.

For April, we reviewed the documentation provided for 45 employees – which included the ranks of deputy, sergeant, lieutenant, and captain.  Of the 45 employees, 40 had documentation that met compliance requirements.  Four employees did not have the required two EIS reviews in the month.  The fifth employee had two EIS reviews completed within close timeframes.  The compliance rate for April was 88.89%.  For May, we reviewed Supervisor Notes requested as verification of compliance for 45 employees.  Of the 45 selected employees, 43 had appropriate documentation of timely EIS reviews, for a compliance rate of 95.56%.  Two employees had EIS reviews completed within close timeframes.  For June, we received Supervisor Notes as verification of compliance of EIS reviews for the selected 44 employees.  Of the 44 employees, 40 had appropriate documentation of compliance with this Paragraph, for a compliance rate of 90.91%.  Four employees did not have documentation of the two required EIS reviews.  In total, for the quarter, we reviewed Supervisor Notes for 134 employees, of which 123 had proper documentation.  The compliance rate for the quarter, for periodic supervisory and command EIS reviews, was 91.79%.  For this reporting period, MCSO was not in compliance.  We also note

WAI 65069

that although MCSO continues to develop the supervisory review process that is part of the TSMR pilot program, the reviews of broader pattern-based reports and assessments of interventions as required by this Paragraph have not been sufficiently documented to meet compliance with this Paragraph.

### d. Regular Employee Performance Review and Evaluations

**Paragraph 98.**  *MCSO, in consultation with the Monitor, shall create a system for regular employee performance evaluations that, among other things, track each officer's past performance to determine whether the officer has demonstrated a pattern of behavior prohibited by MCSO policy or this Order.*

**Phase 1:**  In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on April 27, 2022.

- GC-4 (S) (Employee Performance Management), most recently amended on November 10, 2021.

**Phase 2:**  Not in compliance

To assess compliance with this Paragraph, we review a sample of deputy and supervisor EPAs selected on a monthly basis under Paragraph 87.  There are several Paragraphs in the First and Second Orders that have requirements pertaining to the assessment and documentation of performance in Employee Performance Appraisals.  Supervisors are also required to identify and track the performance of deputies who have patterns of behavior prohibited by the Order and MCSO policy.  The methodologies for the assessment of compliance with Paragraphs that are related to EPAs are explained under each of those Paragraphs.

We reviewed a total of 44 EPAs for the second quarter of 2022.  With regard to supervisor EPAs, the number of requirements that must be met are significantly more than those of line employees.  There are several EPA-related Paragraphs that are interdependent.  As we have previously commented, a failure in one Paragraph may impact compliance with another Paragraph.  We continue to see more consistency in addressing requirements as a result of the EPA checklist provided to supervisors.  However, we note that supervisor EPAs are not consistently addressing the requirements of Paragraphs 92 and 95.  In addition, we are still finding EPAs where the rater did not follow the requirements outlined in Paragraph 99.  The most common deficiency is failure document misconduct investigations that were opened or closed during the appraisal period.  As noted in our previous quarterly status report, supervisors have access to the same documents we review for compliance, so we are not sure why these deficiencies are still occurring.  For the second quarter of 2022, MCSO was not in compliance with the requirements of this Paragraph.

WAI 65070

***Paragraph 99.*** *The review shall take into consideration all past Complaint investigations; the results of all investigations; Discipline, if any, resulting from the investigation; citizen Complaints and commendation; awards; civil or administrative claims and lawsuits related to MCSO operations; Training history; assignment and rank history; and past Supervisory actions taken pursuant to the early warning protocol.*

**Phase 1:**   In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on April 27, 2022.

- GC-4 (S) (Employee Performance Management), most recently amended on November 10, 2021.

**Phase 2:**   Not in compliance

The current EPA has an acknowledgement at the conclusion that supervisors are required to sign, to affirm that they have done due diligence in researching and documenting the employee's history for the review period, as it pertains to the requirements of Paragraph 99.  Supervisors completing EPAs are required to document their findings relevant to these areas, if their reviews reveal any applicable events or actions.  The areas of review include: complaint investigations and dispositions; discipline; citizen complaints; commendations; awards; civil or administrative claims; and past supervisory actions taken pursuant to EIS Alerts.  We do not rely solely on the supervisor's affirmation that a thorough review was completed.  We verify supporting documentation to ensure the supervisor has conducted a thorough review and that the information provided under Paragraph 99 is accurate.  We review EIS and IAPro resumes for each employee whose EPA we received during the quarter, under Paragraphs 87, 92, and 95.  We review these resumes and compare them to the notations listed by the supervisor authoring the EPA, under Paragraph 99.  We verify that any past actions noted in the resumes are captured in the EPA.  We have emphasized to MCSO the importance of accurate documentation and thorough reviews of EIS profiles.

For this reporting period, we reviewed Employee Performance Appraisals for 16 deputies and 28 supervisors.  For April, we found all five deputy EPAs, and nine of the 10 supervisor EPAs in compliance.  One supervisor EPA failed to document two misconduct investigations initiated during the review period.  For May, we found all six deputy EPAs in compliance, and seven of the eight supervisor EPAs in compliance.  One supervisor EPA failed to document a misconduct investigation initiated during the review period.  For June, four of the five deputy EPAs were in compliance, and nine of the 10 supervisor EPAs were in compliance.  One deputy EPA failed to document two misconduct investigations initiated during the review period, and one supervisor EPA failed to document a misconduct investigation initiated during the review period.  Of the total 44 EPAs reviewed for this quarter, 40 met the requirements of this Paragraph, for a compliance rate of 90.91%.  For the second quarter of 2022, MCSO was not in compliance with the requirements of this Paragraph.

WAI 65071

***Paragraph 100.*** *The quality of Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations.*

**Phase 1:**  In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on April 27, 2022.

- GC-4 (S) (Employee Performance Management), most recently amended on November 10, 2021.

**Phase 2:**  Not in compliance

The current EPA form has a rating dimension where supervisors are required to document the quality of supervisory reviews and supervisor accountability. This Paragraph only pertains to supervisor EPAs, and we review comments to ensure that the rater has addressed all areas associated with the quality of supervisory reviews. We have previously noted that we take into account the requirements of Paragraphs 92 and 95, as it pertains to the quality of supervisory reviews of EIS. The quality of reviews of supervisors' misconduct investigations, as per Paragraph 176, is also figured into the assessment of compliance for this Paragraph.

We reviewed Employee Performance Appraisals for 28 supervisors and commanders who received EPAs during this reporting period. For April, one of the 10 supervisor EPAs failed to specifically and sufficiently document the requirements of Paragraphs 92 and 95, which require supervisors to review and track violations and corrective actions in EIS. For May, two of the eight supervisor EPAs failed to specifically and sufficiently document the requirements of Paragraphs 92 and 95. For June, three of the 10 supervisor EPAs failed to specifically and sufficiently document the requirements of Paragraphs 92 and 95. Of the 28 supervisor EPAs reviewed for this quarter, 22 were in compliance with the requirements of this Paragraph, or 78.57%. For this reporting period, MCSO was not in compliance with the requirements of this Paragraph.

***Paragraph 101.*** *Within 180 days of the Effective Date, MCSO shall develop and implement eligibility criteria for assignment to Specialized Units enforcing Immigration-Related Laws. Such criteria and procedures shall emphasize the individual's integrity, good judgment, and demonstrated capacity to carry out the mission of each Specialized Unit in a constitutional, lawful, and bias-free manner. Deputies assigned to a Specialized Unit who are unable to maintain eligibility shall be immediately re-assigned.*

**In Full and Effective Compliance**

MCSO does not have any specialized units that enforce immigration-related laws. Therefore, by default, MCSO is in Phase 2 compliance with this Paragraph. We continue to monitor arrests and detentions as part of our review process to ensure that MCSO is in compliance with its own directives on this issue.

For April, May, and June, we received lists containing all incidents involving MCSO arrests and criminal citations. For each month, we requested a random sample of arrests and criminal citations. In total, we reviewed 60 incidents involving arrests and 60 incidents involving criminal

WAI 65072

citations.  We also reviewed a random sample of 249 Incident Reports for this reporting period. During our reviews of the documentation provided for this reporting period, we found no evidence to indicate any violations of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with the Monitor's determination.

WAI 65073

## Section 10: Misconduct and Complaints

### COURT ORDER XI.  MISCONDUCT AND COMPLAINTS

#### a. Internally-Discovered Violations

*Paragraph 102.  MCSO shall require all personnel to report without delay alleged or apparent misconduct by other MCSO Personnel to a Supervisor or directly to IA that reasonably appears to constitute: (i) a violation of MCSO policy or this Order; (ii) an intentional failure to complete data collection or other paperwork requirements required by MCSO policy or this Order; (iii) an act of retaliation for complying with any MCSO policy; (iv) or an intentional provision of false information in an administrative investigation or any official report, log or electronic transmittal of information.  Failure to voluntarily report or document apparent misconduct described in this Paragraph shall be an offense subject to Discipline.*

**In Full and Effective Compliance**

During our assessments of compliance with this Paragraph, we have reviewed hundreds of misconduct investigations involving MCSO personnel.  Many of them have been internally generated.

During this reporting period, we reviewed 117 administrative misconduct investigations.  Fifty-one were generated internally.  MCSO has continued to identify and address misconduct that is raised by other employees or identified by supervisory personnel.  While some of these investigations did not meet all requirements for the proper reporting or completion of misconduct investigations, we address these failures in other Paragraphs in this report.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

#### b. Audit Checks

*Paragraph 103.  Within one year of the Effective Date, MCSO shall develop a plan for conducting regular, targeted, and random integrity audit checks to identify and investigate Deputies possibly engaging in improper behavior, including: Discriminatory Policing; unlawful detentions and arrests; improper enforcement of Immigration-Related Laws; and failure to report misconduct.*

**Phase 1:**  In compliance

- Audits and Inspections Unit Operations Manual, Section 303, published on August 27, 2020.
- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

**Phase 2:**  In compliance

WAI 65074

Paragraph 103 requires that MCSO conduct "regular, targeted, and random integrity audit checks." MCSO's Audits and Inspections Unit (AIU), a unit of the Bureau of Internal Oversight (BIO), is responsible for these requirements. This Paragraph does not set frequency standards for integrity tests. During this reporting period, AIU published several completed inspection reports to fulfill the "regular" and "random" elements of this Paragraph. AIU's inspections examined complaint intake tests, Early Identification System (EIS) alerts, Supervisor Notes, Patrol Activity Logs, traffic stop data, post-stop ethnicity, passenger contacts, County Attorney turndown dispositions, Patrol Shift Rosters, and others.

For this reporting period, AIU submitted one inspection to fulfill the "targeted" requirements of Paragraph 103. This inspection, BI2022-0046, examined the 18 external and internal service complaints received via telephone by the MCSO Communications Division from January 1-March 31, 2022 to determine if dispatchers handled these calls in accordance with MCSO policy. GI-1 (Radio and Enforcement Communications Procedures) requires that dispatchers email notification of any received complaints to both the on-duty supervisor and Early Identification System (EIS) email inbox. AIU found that dispatchers followed this protocol in 12 of the 18 complaints received. Accordingly, AIU considers this targeted inspection to be a "procedural fail," meaning that AIU identified deficiencies that did not rise to the level of criminal or other serious misconduct. Following the test, AIU appropriately issued BIO Action Forms for the six involved dispatchers.

We will continue to review AIU's tests to verify that MCSO maintains continued compliance with this Paragraph. We will also discuss with AIU its plans for upcoming targeted audits during our next site visit.

### c. Complaint Tracking and Investigations

***Paragraph 104.*** *Subject to applicable laws, MCSO shall require Deputies to cooperate with administrative investigations, including appearing for an interview when requested by an investigator and providing all requested documents and evidence. Supervisors shall be notified when a Deputy under their supervision is summoned as part of an administrative investigation and shall facilitate the Deputy's appearance, absent extraordinary and documented circumstances.*

### In Full and Effective Compliance

In the fall of 2015, MCSO developed a draft checklist and investigative format for administrative investigations. All the requirements in this Paragraph are included in these protocols. The checklist and formats were approved for use in early 2016, and all personnel through the rank of captain were required to attend a training session regarding the use of these forms. Effective June 1, 2016, all administrative investigations were required to use these forms. MCSO has consistently met this requirement, and MCSO has included the checklists in administrative investigations forwarded for our review.

WAI 65075

Since that time, the Professional Standards Bureau (PSB) drafted revisions to the investigation checklist and format to provide additional clarification on procedural requirements. We and the Parties reviewed the revisions and provided our feedback. The revised format and investigation checklist were approved for use.

During the last reporting period, we reviewed 101 administrative misconduct investigations. Forty-six involved sworn personnel. All of these investigations were in compliance with the requirements of this Paragraph.

During this reporting period, we reviewed 117 administrative misconduct investigations. Forty-nine involved sworn personnel. All 49 included the use of the approved investigative format and checklist. We continue to note that deputies consistently appear for scheduled interviews, provide all required information to investigators, and cooperate with investigations. There were no instances identified where a supervisor failed to facilitate a deputy's attendance at an interview or where the investigator had failed to notify the employee's supervisor of an intended administrative interview.

On March 17, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 105.** *Investigators shall have access to, and take into account as appropriate, the collected traffic stop and patrol data, Training records, Discipline history, and any past Complaints and performance evaluations of involved officers.*

**In Full and Effective Compliance**

Our reviews of investigations conducted by MCSO have verified that the information required for compliance with this Paragraph is consistently provided in the checklist and investigative reports.

As a result of the Second Order and effective July 20, 2016, the PSB Commander makes all preliminary disciplinary decisions. The PSB and Administrative Services Division Commanders created a worksheet that provides information regarding how MCSO makes disciplinary decisions, and how MCSO considers employees' work history. PSB includes this form in the sustained investigation documentation that we receive and review for compliance.

During this reporting period, we reviewed 61 sustained administrative misconduct investigations. Nineteen of these involved misconduct by sworn personnel. Thirty-four involved misconduct by Detention personnel, seven involved misconduct by civilian personnel, one involved misconduct by a reserve, and one involved misconduct by both Detention and civilian personnel. In 21 cases, the involved employees were no longer employed at MCSO at the time of the completion of the investigation or the discipline process. Forty of the investigations involved identified personnel still employed by MCSO at the time final findings or discipline decisions were made.

WAI 65076

In all 40, the PSB Commander determined the findings and presumptive range for the sustained violations. Two of the 40 resulted in probationary releases of the employees instead of discipline. We found that generally, where appropriate, discipline history, past complaints, performance evaluations, traffic stop and patrol data, and training records were included in the documents considered for discipline findings. Thirty-eight were referred for discipline or other corrective action.

On October 5, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

***Paragraph 106.*** *Records of Complaints and investigations shall be maintained and made available, un-redacted, to the Monitor and Plaintiffs' representatives upon request. The Monitor and Plaintiffs' representatives shall maintain the confidentiality of any information therein that is not public record. Disclosure of records of pending investigations shall be consistent with state law.*

**In Full and Effective Compliance**

MCSO has two obligations under this Paragraph: to maintain and make records available. The Paragraph also covers the requirement that MCSO make unredacted records of such investigations available to the Plaintiffs' attorneys and Plaintiff-Intervenor as well.

MCSO has been responsive to our requests, and neither the Plaintiffs nor Plaintiff-Intervenor have raised any concerns related to the requirements of this Paragraph for this or the past several reporting periods. MCSO, via its counsel, distributes responses to our document and site visit requests via a document-sharing website. The Plaintiffs' attorneys and Plaintiff-Intervenor have access to this information, including documents applicable to this Paragraph, at the same time as we do.

On June 3, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 65077

# Section 11: Community Engagement

## COURT ORDER XII.  COMMUNITY ENGAGEMENT

### a. Community Outreach Program

**Paragraph 107.**  *To rebuild public confidence and trust in the MCSO and in the reform process, the MCSO shall work to improve community relationships and engage constructively with the community during the time that this order is in place.  To this end, the MCSO shall conduct the following district community outreach program.*

**Paragraph 109.**  *The Monitor shall hold at least one public meeting per quarter to coincide with the quarterly site visits by the Monitor in a location convenient to the Plaintiffs class.  The meetings shall be for the purpose of reporting the MCSO' progress in implementing this Order.  These meetings shall be used to inform community members of the policy changes or other significant actions that the MCSO has taken to implement the provisions of this Order.  Summaries of audits and reports completed by the MCSO pursuant to this Order shall be made available.  The meetings shall be under the direction of the Monitor and/or his designee.  The Sheriff and/or the MCSO will participate in the meetings to provide substantive comments related to the Melendres case and the implementation of the orders resulting from it, as well as answer questions related to its implementation, if requested to do so by the Monitor or the community.  If the Sheriff is unable to attend a meeting due to other obligations, he shall notify the Monitor at least 30 days prior to that meeting.  The Monitor shall consult with Plaintiffs' representatives and the Community Advisory Board on the location and content of the meetings.  The Monitor shall clarify for the public at these meetings that MCSO does not enforce immigration laws except to the extent that it is enforcing Arizona and federal criminal laws.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

This Paragraph, per the June 3, 2019 Order (Document 2431), returned the community meetings to the Monitor's supervision and directed the Monitor to hold at least one public meeting per quarter to coincide with the quarterly site visits by the Monitor in a location convenient to the Plaintiffs' class.

The requirement to hold a community meeting is not applicable for MCSO as it applies to the Monitor and not MCSO.  We did not travel to Maricopa County in July for our in-person quarterly site visit due to the COVID-19 pandemic.  We will consult with Plaintiffs' representatives and the Community Advisory Board regarding the location and content of our community meetings when we resume our in-person site visits.

WAI 65078

***Paragraph 110.***  *The meetings present an opportunity for the Monitor and MCSO representatives to listen to community members' experiences and concerns about MCSO practices.  The Monitor may investigate and respond to those concerns.  The Monitor shall inform the public that the purpose of the meeting is to discuss the Melendres case and the orders implementing the relief of that case.  To the extent that the Monitor receives concerns at such meetings that are neither within the scope of this order nor useful in determining the Defendant's compliance with this order, it may inform the complainant how to file an appropriate complaint with the MCSO or appropriate law enforcement agency.  The Sheriff may respond to non-Melendres questions raised at meetings to the extent, in his sole discretion, if the Sheriff wishes to do so.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

The requirements of this Paragraph are not applicable as they apply to actions that the Monitor, not MCSO, is required to take regarding community meetings.  As noted above, we did not travel to Maricopa County in July for an in-person quarterly site visit, and therefore did not hold a community meeting.

***Paragraph 111.***  *English and Spanish-speaking Monitor Personnel shall attend these meetings and be available to answer questions from the public about its publicly available reports concerning MCSO's implementation of this Order and other publicly available information.  The Plaintiffs' and Plaintiff-Intervenor's representatives shall be invited to attend and the Monitor shall announce their presence and state their availability to answer questions.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

The requirements of this Paragraph are not applicable to MCSO as they apply to actions that the Monitor, not MCSO, is required to take regarding community meetings.  As noted above, we did not travel to Maricopa County in July for an in-person quarterly site visit, and therefore did not hold a community meeting.

WAI 65079

*Paragraph 112.   At least ten days before such meetings, the Monitor shall widely publicize the meetings in English and Spanish after consulting with Plaintiffs' representatives and the Community Advisory Board regarding advertising methods.  Options for advertising include, but are not limited to, television, radio, print media, internet and social media, and any other means available.  Defendants shall either provide a place for such meetings that is acceptable to the Monitor or pay the Monitor the necessary expenses incurred in arranging for such meeting places.  The Defendants shall also pay the reasonable expenses of publicizing the meetings as required above, and the additional reasonable personnel and expenses that the Monitor will incur as a result of performing his obligations with respect to the Community Outreach Program.  If any party determines there is little interest or participation in such meetings among community members, or that they have otherwise fulfilled their purpose, it can file a request with the Court that this requirement be revised or eliminated.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

The requirements of this Paragraph are not applicable as they apply to actions that the Monitor, not MCSO, is required to take regarding community meetings.  As we did not travel to Maricopa County in July, we did not hold a community meeting.  We will consult with Plaintiffs' representatives and the Community Advisory Board regarding community meeting advertising when we resume our in-person site visits.


### b. MCSO Community Liaison

*Paragraph 113.   MCSO shall select or hire a Community Liaison who is fluent in English and Spanish.  The hours and contact information of the MCSO Community Outreach Division ("COD") shall be made available to the public including on the MCSO website.  The COD shall be directly available to the public for communications and questions regarding the MCSO.*

**In Full and Effective Compliance**

This Paragraph requires that MCSO select or hire a Community Liaison who is fluent in English and Spanish.  MCSO's Community Outreach Division (COrD) has two Community Liaison Officers who are fluent in English and Spanish.  The COrD uses the term "Community Liaison" for these two individuals and its other staff members, though not all of them are bilingual.

MCSO's website lists the hours and contact information of the COrD and its staff – as well as the COrD's mission and overarching goals, and frequently asked questions regarding MCSO.

On June 17, 2022, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 65080

**Paragraph 114.**  *The COD shall have the following duties in relation to community engagement:*

a.    *to coordinate the district community meetings described above in Paragraphs 109 to 112;*

b.    *to provide administrative support for, coordinate and attend meetings of the Community Advisory Board described in Paragraphs 117 to 118; and*

c.    *to compile any complaints, concerns and suggestions submitted to the COD by members of the public about the implementation of this Order and the Court's order of December 23, 2011, and its findings of fact and conclusions of law dated May 24, 2013, even if they don't rise to the level of requiring formal action by IA or other component of the MCSO, and to respond to Complainants' concerns; and*

d.    *to communicate concerns received from the community at regular meetings with the Monitor and MCSO leadership.*

**In Full and Effective Compliance**

Pursuant to the June 3, 2019 Order (Document 2431), Subparagraphs a. and b. of this Paragraph are no longer applicable.

During the last reporting period, on February 2, 2022, the CAB held a public meeting for members of the Plaintiffs' class and representatives of community groups.  At the meeting, CAB members presented their concerns with investigative timeliness issues in the Professional Standards Bureau (PSB), noting that the delays cause problems for complainants and subject employees alike; and their concerns with the findings of the most recent Traffic Stop Annual Report.  The CAB members also allowed the participants to ask questions and share feedback.  The meeting was conducted in English and Spanish.

As in the past, some CAB members participated in a few of our compliance meetings during our July remote site visit – including meetings on MCSO's interaction with the CAB and community engagement and MCSO's Constitutional Policing Plan.

MCSO has provided documentation that all current COrD personnel completed an online Complaint Intake and Processing course, to assist them in receiving and appropriately directing any complaints or concerns they receive from community members, including complaints of potential employee misconduct.  When new personnel are assigned to the COrD, we request and review documentation that the new staff members have completed this training.

In the past, COrD personnel have reported that they occasionally receive concerns from community members, and that they forward those that are complaints to PSB; and that they sometimes receive inquiries for which COrD staff believe it is appropriate to direct community members to written materials or MCSO's website.

WAI 65081

COrD has developed a form for capturing information on complaints, concerns, and suggestions submitted by members of the public to the COrD; however, COrD personnel maintain that they did not receive any *Melendres*-related complaints, concerns, or suggestions from the public during this reporting period.  In its submission for this reporting period, COrD personnel wrote, "The Community Outreach Division did not receive any complaints, concerns or suggestions by members of the public regarding the implementation of the Court's Orders during April 1, through June 30, 2022.  Therefore, no response was prepared."

During our upcoming site visit, we will discuss with COrD personnel any complaints, concerns, and suggestions it has received from the public; as well as the requirement that COrD communicate any concerns received from the community at regular meetings with the Monitor and MCSO leadership.

On June 17, 2022, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.


### c. Community Advisory Board

**Paragraph 115.**   *MCSO and Plaintiffs' representatives shall work with community representatives to create a Community Advisory Board ("CAB") to facilitate regular dialogue between the MCSO and the community, and to provide specific recommendations to MCSO and the Monitor about policies and practices that will increase community trust and ensure that the provisions of this Order and other orders entered by the Court in this matter are met.  The MCSO shall cooperate with the Monitor to assure that members of the CAB are given appropriate access to relevant material, documents, and training so the CAB can make informed recommendations and commentaries to the Monitor.*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, most recently revised on November 13, 2019.

**Phase 2:**  In compliance

It is important that MCSO personnel interact with CAB members in a respectful and timely manner, and we continue to monitor MCSO personnel's interactions with CAB members between and during our site visit meetings.

WAI 65082

While during this reporting period, MCSO's responsiveness to the CAB's inquiries and requests for information continued to meet the requirements of this Paragraph, CAB members have expressed considerable concern about the measure and quality of the communications they have with MCSO. Two reporting periods ago, MCSO returned to compliance with this Paragraph after three reporting periods of noncompliance due to several instances in which CAB members emailed the CAB's designated point of contact for information or materials from MCSO and did not receive a response in a timely manner. We will closely watch the measure to which MCSO facilitates a better working relationship with the CAB and make compliance assessments accordingly.

CAB members continue to provide specific recommendations to MCSO about policies and practices that will increase community trust and ensure that the provisions of this Order and other Orders entered by the Court in this matter are met. During this reporting period, the CAB reviewed and provided feedback on policies and MCSO's community survey.

***Paragraph 116.*** *The CAB shall have five members, two to be selected by MCSO and two to be selected by Plaintiffs' representatives. One member shall be jointly selected by MCSO and Plaintiffs' representatives. Members of the CAB shall not be MCSO Employees or any of the named class representatives nor any of the attorneys involved in this case. The CAB shall continue for at least the length of this Order.*

**Phase 1:** In compliance

- Court Implementation Division Operations Manual, most recently revised on November 13, 2019.

**Phase 2:** Deferred

The CAB is designed to be a five-member body – with two members selected by MCSO, two members selected by Plaintiffs' attorneys, and one member jointly selected by MCSO and Plaintiffs' attorneys. During this reporting period, two CAB members resigned, leaving the CAB with only three members. None of the CAB members are MCSO employees, named class representatives, or attorneys involved in this case.

The CAB is waiting for MCSO to appoint one new member, and for MCSO and the Plaintiffs' attorneys to jointly appoint one new member, to resume its full strength. For the CAB to be a viable part of the reform effort, it is essential that it has a full panel. We are following this closely and will report further on this in our next quarterly status report. For this reporting period, we are deferring compliance with this Paragraph.

WAI 65083

*Paragraph 117.  The CAB shall hold meetings at regular intervals.  The meetings may be either public or private as the purpose of the meeting dictates, at the election of the CAB.  The Defendants shall provide a suitable place for such meetings.  The Monitor shall coordinate the meetings and communicate with CAB members, and provide administrative support for the CAB.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

The requirements of this Paragraph do not require any action on the part of MCSO; thus, they are not applicable.  During this reporting period, the CAB did not hold any public meetings, but the CAB participated in several other activities.  CAB members met regularly as a group, often with members of the Monitoring Team.  A member of the Monitoring Team coordinated the meetings and provided administrative support for the CAB.  In addition, during our July remote site visit, some CAB members participated in a few of our compliance meetings – including meetings on the Constitutional Policing Plan, community engagement/CAB, and other topics.  In our regular interactions with CAB members via conference calls and virtual meetings, we have provided information about MCSO's progress achieving compliance with the Orders and discussed ways to improve the relationship between the Plaintiffs' class and MCSO.

*Paragraph 118.  During the meetings of the CAB, members will relay or gather concerns from the community about MCSO practices that may violate the provisions of this Order and the Court's previous injunctive orders entered in this matter and transmit them to the Monitor and the MCSO for investigation and/or action.  The Parties will also be given the CAB's reports and recommendations to the Monitor.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

The requirements of this Paragraph do not require any action on the part of MCSO; thus, they are not applicable.  As noted above, during this reporting period, the CAB did not hold any public meetings.  As in the past, some CAB members participated in a few of our compliance meetings during our July remote site visit.

We requested from MCSO documentation of concerns received from CAB members during their meetings about MCSO practices that may be in violation of the Court's Orders that were transmitted to the MCSO for investigation and/or action during this reporting period.  According to MCSO, "The Community Outreach Division did not receive documentation of concerns from the Community Advisory Board concerning MCSO practices that may be in violation of the Court's Orders, which were transmitted for investigation and/or action during the quarter of April 1, 2022, through June 30, 2022."

WAI 65084

## Second Supplemental Permanent Injunction/Judgment Order

### Section 12: Misconduct Investigations, Discipline, and Grievances

**COURT ORDER XV.    MISCONDUCT INVESTIGATIONS, DISCIPLINE, AND GRIEVANCES**

*Paragraph 163.  The Sheriff will ensure that all allegations of employee misconduct, whether internally discovered or based on a civilian complaint, are fully, fairly, and efficiently investigated; that all investigative findings are supported by the appropriate standard of proof and documented in writing; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair, consistent, unbiased and provides due process.  To achieve these outcomes, the Sheriff shall implement the requirements set out below.*

### A. Policies Regarding Misconduct Investigations, Discipline, and Grievances

*Paragraph 165.  Within one month of the entry of this Order, the Sheriff shall conduct a comprehensive review of all policies, procedures, manuals, and other written directives related to misconduct investigations, employee discipline, and grievances, and shall provide to the Monitor and Plaintiffs new policies and procedures or revise existing policies and procedures. The new or revised policies and procedures that shall be provided shall incorporate all of the requirements of this Order.  If there are any provisions as to which the parties do not agree, they will expeditiously confer and attempt to resolve their disagreements.  To the extent that the parties cannot agree on any proposed revisions, those matters shall be submitted to the Court for resolution within three months of the date of the entry of this Order.  Any party who delays the approval by insisting on provisions that are contrary to this Order is subject to sanction.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

MCSO provided us with the following:

- CP-2 (Code of Conduct), most recently amended on April 27, 2022.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on December 16, 2021.

- CP-5 (Truthfulness), most recently amended on March 3, 2022.

- CP-8 (Preventing Racial and Other Bias-Based Profiling), most recently amended on October 13, 2022.

- CP-11 (Anti-Retaliation), most recently amended on January 6, 2022.

- EA-2 (Patrol Vehicles), most recently revised on March 16, 2022.

- GA-1 (Development of Written Orders), most recently amended on January 12, 2022.

WAI 65085

- GB-2 (Command Responsibility), most recently amended on June 28, 2019.

- GC-4 (Employee Performance Appraisals), most recently amended on April 27, 2022.

- GC-4 (S) (Employee Performance Management), most recently amended on November 10, 2021.

- GC-7 (Transfer of Personnel), most recently amended on October 29, 2021.

- GC-11 (Employee Probationary Periods and Unclassified Employees), most recently amended on January 12, 2022.

- GC-12 (Hiring and Promotional Procedures), most recently amended on April 13, 2022.

- GC-16 (Employee Grievance Procedures), most recently amended on December 8, 2021.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2022.

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on September 15, 2021.

- GE-4 (Use, Assignment, and Operation of Vehicles), most recently amended on April 6 2022.

- GG-1 (Peace Officer Training Administration), most recently amended on March 31, 2021.

- GG-2 (Detention/Civilian Training Administration), most recently amended on March 31, 2021.

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

- GH-5 (Early Identification System), most recently amended on December 16, 2021.

- GI-5 (Voiance Language Services), most recently amended on December 8, 2021.

- GJ-24 (Community Relations and Youth Programs), most recently revised on April 7, 2022.

- GJ-26 (Sheriff's Reserve Deputy Program), most recently amended on June 9, 2021.

- GJ-27 (Sheriff's Posse Program), most recently amended on June 25, 2021.

- GJ-35 (Body-Worn Cameras), most recently amended on February 2, 2022.

- Administrative Services Division Operations Manual, most recently amended on October 27, 2021.

- Audits and Inspections Unit Operations Manual, currently under revision.

- Body-Worn Camera Operations Manual, published on December 22, 2016.

WAI 65086

- Professional Standards Bureau Operations Manual, published on December 13, 2018.
- Training Division Operations Manual, most recently amended on April 4, 2022.

This Paragraph implies that the review process and final adoption of the updated policies would take two months to complete, assuming that the new or revised policies were provided within one month of the issuance of the Second Order. This is due, in some measure, to researched and well-considered recommendations by the Parties; and robust discussion about policy language, application, and outcomes during our site visit meetings.

We received a majority of the documents listed above within one month of the entry of the Order. We and the Parties conducted initial reviews and returned the revised documents, with additional recommendations, to MCSO for additional work. MCSO continues provide us and the Parties with any new and revised policies for review and recommendations. MCSO is in compliance with this Paragraph.

**Paragraph 166.**  *Such policies shall apply to all misconduct investigations of MCSO personnel.*

**Paragraph 167.**  *The policies shall include the following provisions:*

a.   *Conflicts of interest in internal affairs investigations or in those assigned by the MCSO to hold hearings and make disciplinary decisions shall be prohibited. This provision requires the following:*

   i.   *No employee who was involved in an incident shall be involved in or review a misconduct investigation arising out of the incident.*

   ii.   *No employee who has an external business relationship or close personal relationship with a principal or witness in a misconduct investigation may investigate the misconduct. No such person may make any disciplinary decisions with respect to the misconduct including the determination of any grievance or appeal arising from any discipline.*

   iii.   *No employee shall be involved in an investigation, whether criminal or administrative, or make any disciplinary decisions with respect to any persons who are superior in rank and in their chain of command. Thus, investigations of the Chief Deputy's conduct, whether civil or criminal, must be referred to an outside authority. Any outside authority retained by the MCSO must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest.*

b.   *If an internal affairs investigator or a commander who is responsible for making disciplinary findings or determining discipline has knowledge of a conflict of interest affecting his or her involvement, he or she should immediately inform the Commander of the Professional Standards Bureau or, if the holder of that office also suffers from a conflict, the highest-ranking, non-conflicted chief-level officer at MCSO or, if there is no*

WAI 65087

*non-conflicted chief-level officer at MCSO, an outside authority.  Any outside authority retained by the MCSO must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest.*

c.    *Investigations into an employee's alleged untruthfulness can be initiated by the Commander of the Professional Standards Bureau or the Chief Deputy.  All decisions not to investigate alleged untruthfulness must be documented in writing.*

d.    *Any MCSO employee who observes or becomes aware of any act of misconduct by another employee shall, as soon as practicable, report the incident to a Supervisor or directly to the Professional Standards Bureau.  During any period in which a Monitor is appointed to oversee any operations of the MCSO, any employee may, without retaliation, report acts of alleged misconduct directly to the Monitor.*

e.    *Where an act of misconduct is reported to a Supervisor, the Supervisor shall immediately document and report the information to the Professional Standards Bureau.*

f.    *Failure to report an act of misconduct shall be considered misconduct and may result in disciplinary or corrective action, up to and including termination.  The presumptive discipline for a failure to report such allegations may be commensurate with the presumptive discipline for the underlying misconduct.*

g.    *No MCSO employee with a rank lower than Sergeant will conduct an investigation at the District level.*

**In Full and Effective Compliance**

To determine Phase 2 compliance with this Paragraph, we review administrative misconduct investigations.

During this reporting period, we reviewed 117 closed administrative misconduct investigations, including one classified as a critical incident.  Sworn, Detention, or civilian personnel assigned to the Professional Standards Bureau (PSB) conducted 93 of the investigations we reviewed.  PSB outsourced five investigations to an outside vendor.  Sworn supervisors in Districts or Divisions outside of PSB conducted the remaining 19.

Paragraph 167.a.i-iii. prohibits any employee with any conflicts of interest from participating in, holding hearings on, or making any disciplinary decisions in a misconduct investigation.  During this reporting period, there were no instances where a conflict of interest was identified.

Paragraph 167.b. requires that if the internal affairs investigator or a commander responsible for making disciplinary decisions identifies a conflict of interest, appropriate notifications must be made immediately.  There were no instances during this reporting period where a supervisor failed to identify a conflict of interest and inappropriately conducted an investigation.

WAI 65088

Paragraph 167.c. requires that investigations into truthfulness be initiated by the Chief Deputy or the PSB Commander.  MCSO identified 16 instances during this reporting period where PSB believed that a truthfulness allegation was appropriate and conducted the proper investigation.  In one case we reviewed, we believe that MCSO should have initiated an investigation into truthfulness – and failed to do so.

Paragraph 167.d. requires that any MCSO employee who observes or becomes aware of misconduct by another employee shall immediately report such conduct to a supervisor or directly to PSB.  Per the requirement, during the period in which the Monitor has authority to oversee any operations of MCSO, any employee may also report alleged misconduct to the Monitor.  Of the 117 administrative cases we reviewed for this reporting period, there were 47 investigations where an employee reported potential misconduct by another employee, or a supervisor identified potential employee misconduct.  There were five instances where it was alleged an employee failed to immediately report potential misconduct about which the employee was aware.  In three of these, PSB took the appropriate action.  In two, the failure of an employee to report misconduct was not identified or properly addressed by MCSO.

Paragraph 167.e. requires that when supervisors learn of an act of misconduct, the supervisor shall immediately document and report the information to PSB.  There were no investigations during this reporting period where a supervisor failed to document and report potential misconduct they were aware of.

Paragraph 167.f. provides for the potential for a disciplinary sanction or other corrective action if an employee fails to bring forth an act of misconduct.  As noted in Subparagraph 167.d, there were five instances where an employee was alleged to have failed to immediately report misconduct as required.  PSB took the appropriate action in three.  In two investigations we reviewed, we believe PSB did not properly identify and address an employee's failure to report misconduct.

Paragraph 167.g. requires that a sergeant or higher-ranking employee conduct all misconduct investigations conducted at the District level.  All District-level cases that we reviewed for this reporting period complied with this requirement.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.


**Paragraph 168.**  *All forms of reprisal, discouragement, intimidation, coercion, or adverse action against any person, civilian, or employee because that person reports misconduct, attempts to make or makes a misconduct complaint in good faith, or cooperates with an investigation of misconduct constitute retaliation and are strictly prohibited.  This also includes reports of misconduct made directly to the Monitor, during any period in which a Monitor is appointed to oversee any operations of the MCSO.*

**In Full and Effective Compliance**

WAI 65089

To assess Phase 2 compliance with this Paragraph, we reviewed 117 administrative misconduct investigations that were completed during this reporting period.

There were five investigations where allegations applicable to compliance with this Paragraph were made.  None of the five had sustained findings for any violation addressed by this Paragraph, and we concurred with all findings.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 169.**  *Retaliating against any person who reports or investigates alleged misconduct shall be considered a serious offense and shall result in discipline, up to and including termination.*

### In Full and Effective Compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 117 administrative misconduct investigations that were completed during this reporting period.

There were five investigations where allegations applicable to compliance with this Paragraph were made.  None of the five had sustained findings for any violation addressed by this Paragraph, and we concurred with all findings.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 170.**  *The Sheriff shall investigate all complaints and allegations of misconduct, including third-party and anonymous complaints and allegations.  Employees as well as civilians shall be permitted to make misconduct allegations anonymously.*

### In Full and Effective Compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 117 administrative misconduct investigations during this reporting period.  Sixty-six were initiated as a result of external complaints, and 51 were internally generated.  We also reviewed three criminal investigations conducted by MCSO.  Two of these were initiated as a result of external complaints, and one was internally generated.

Of the 117 administrative misconduct investigations we reviewed for this reporting period, six involved anonymous complaints.  Nine others were complaints from identified third-party complainants.  We have not become aware of any evidence indicating that MCSO refused to accept and complete any investigations initiated by third-party or anonymous complainants. None of the 117 administrative misconduct investigations we reviewed during this reporting period included any allegations indicating that any third-party or anonymous complaint was not appropriately accepted and investigated.

WAI 65090

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 171.** *The MCSO will not terminate an administrative investigation solely on the basis that the complainant seeks to withdraw the complaint, or is unavailable, unwilling, or unable to cooperate with an investigation, or because the principal resigns or retires to avoid discipline. The MCSO will continue the investigation and reach a finding, where possible, based on the evidence and investigatory procedures and techniques available.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we reviewed 117 administrative misconduct investigations during this reporting period.

We determined that eight of the 117 completed administrative investigations we reviewed involved complainants who sought to withdraw their complaints; or were unavailable, unwilling, or unable to cooperate. MCSO completed all eight investigations and reached a finding as required. We also found that in 29 of the 117 investigations, one or more of the principals left MCSO employment prior to the finalization of the investigation or discipline process. MCSO completed all of these investigations and reached a finding. None of the 117 investigations we evaluated for compliance were prematurely terminated.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 172.** *Employees are required to provide all relevant evidence and information in their custody and control to internal affairs investigators. Intentionally withholding evidence or information from an internal affairs investigator shall result in discipline.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph during this reporting period, we reviewed 117 completed administrative misconduct investigations. There were two investigations where PSB identified that an employee had failed to accurately provide all information or evidence required during the investigation. PSB initiated a truthfulness investigation in both and the allegations were sustained. One employee resigned prior to completion of the discipline process and the other was dismissed from MCSO employment.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 65091

*Paragraph 173.  Any employee who is named as a principal in an ongoing investigation of serious misconduct shall be presumptively ineligible for hire or promotion during the pendency of the investigation.  The Sheriff and/or the MCSO shall provide a written justification for hiring or promoting an employee or applicant who is a principal in an ongoing investigation of serious misconduct.  This written justification shall be included in the employee's employment file and, during the period that the MCSO is subject to Monitor oversight, provided to the Monitor.*

**Phase 1:**  In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on April 27, 2022.

- GC-4 (S) (Employee Performance Management), most recently amended on November 10, 2021.

- GC-11 (Employee Probationary Periods and Unclassified Employees), most recently amended on January 12, 2022.

- GC-12 (Hiring and Promotional Procedures), most recently amended on April 13, 2022.

**Phase 2:**  In compliance

MCSO has established a protocol to address the requirements of this Paragraph.  When a promotion list is established for sworn or Detention personnel, a copy of the list is forwarded to the Professional Standards Bureau (PSB).  Before any promotion is finalized, PSB conducts a check of each employee's disciplinary profile in the automated system (IAPro).  As part of the promotional process, MCSO conducts a meeting with command staff to discuss each employee's qualifications.  During this meeting, the results of the IAPro checks are provided to the staff for review and consideration.  The PSB Commander generally attends the promotion meetings for both Detention and sworn personnel, and clarifies any questions regarding the disciplinary history that the staff may have.  When an employee is moved from a civilian employment position to a sworn employment position, MCSO conducts a thorough background investigation. The process involves a review and update of the candidate's PSB files, which is completed by Pre-Employment Services.  For Detention employees who are moving to sworn positions, the information in the employee's file is updated to include any revised or new information.  Due to the scheduling of our site visits, we inspect personnel files for employees who were promoted during the last month of the preceding quarter, and the first two months of the current reporting period.  In our reviews, we ensure that the documentation, as it pertains to compliance with this Paragraph, is included in personnel files.

MCSO reported a total of 44 promotions during this review period.  The promotions included 15 sworn employees, 13 Detention employees, and 16 civilian employees.  One sworn promotion to sergeant was an employee who had a history of misconduct, as well as three open misconduct investigations.  The most recent disciplinary action was an eight-hour suspension in 2020.  The employee also served an eight-hour suspension in 2018 for another sustained violation, and was issued a written reprimand in 2015.  The EIU Employee Report noted eight external complaints and four internal complaints, for a total of 12 complaints since 2015.  The employee has 17 commendations.  However, there is a pattern of allegations of misconduct related to performance and public demeanor, of which three have been sustained since 2015.  There was a justification

WAI 65092

memorandum submitted, noting that in the past five years the employee has been displaying leadership and management skills. We are still concerned with this promotion, in view of the three still-open misconduct investigations which involve performance and public demeanor allegations. Five other sworn employees promoted had open misconduct investigations, two of which included justification memos. We reviewed the two justification memos for the other promoted employees, and did not note serious issues of concern. The sustained allegations for these two employees were for incidents that occurred in 2012 and 2013. The other three promoted sworn employees had open minor misconduct investigations that did not require justification memos. Of the Detention employees promoted, one employee promoted to sergeant had a disciplinary history. This promotion is discussed in our assessment for Paragraph 174. Of the civilian employees promoted, one had an open misconduct allegation from 2017. The comments on the promotional documentation for the civilian employee stated that PSB indicated that the open case would not prevent the promotion. We note that the complaint came from a member of the public who alleged that the employee, who was a communications call-taker at the time, put information in the call that the caller did not say. While this could have been a misunderstanding between the employee and the caller, we are concerned that the allegation is noted as a CP-5 (Truthfulness) violation. If sustained, the employee would face termination. There was no justification memorandum submitted for this promotion, so we are unclear about the facts in this case.

During this quarter, MCSO asserted Full and Effective Compliance with this Paragraph. We did not concur. We have had ongoing concerns with the promotion of employees who had previous discipline and/or had open misconduct investigations. MCSO was not in compliance with this Paragraph in the fourth quarter of 2017, and we have issued noncompliance warnings in the second quarter of 2018, the fourth quarter of 2018, and the second quarter of 2020. We also expressed concerns with a command-level promotion in our quarterly status report for the third quarter of 2021. Again, for this quarter, we note concerns with the promotion of employees with open misconduct investigations.

We have been unable to review personnel files since January 2020, due to the fact that we have conducted our site visits remotely. When we resume our in-person site visits, we will follow up on these cases to ensure that the appropriate documentation is included in each employee's file.

**Paragraph 174.** *Employees' and applicants' disciplinary history shall be considered in all hiring, promotion, and transfer decisions, and this consideration shall be documented. Employees and applicants whose disciplinary history demonstrates multiple sustained allegations of misconduct, or one sustained allegation of a Category 6 or Category 7 offense from MCSO's disciplinary matrices, shall be presumptively ineligible for hire or promotion. MCSO shall provide a written justification for hiring or promoting an employee or applicant who has a history demonstrating multiple sustained allegations of misconduct or a sustained Category 6 or Category 7 offense. This written justification shall be included in the employee's employment file and, during the period that the MCSO is subject to Monitor oversight, provided to the Monitor.*

**In Full and Effective Compliance**

WAI 65093

For employees who are promoted, the documentation submitted by MCSO generally includes the disciplinary history for the previous 10 years and any applicable disciplinary actions. MCSO also provides the disciplinary history of Detention and civilian employees who have been upgraded in classification to sworn status.

For the second quarter of 2022, MCSO reported hiring 16 new employees – including two deputy sheriff trainees, seven Detention officers, and seven civilian employees. Five of the Detention employees were rehired employees. In our review of the documents provided, there were no serious disciplinary issues noted with any of the newly-hired Detention personnel. One civilian employee, a Records Specialist who was rehired, had an open misconduct investigation from 2019 related to minor misconduct.

Of the 15 sworn employees promoted, two had serious discipline documented. One employee served an 80-hour suspension for a 2012 sustained allegation, and the other employee served a 16-hour suspension for a 2013 sustained allegation. There has been enough time since the discipline was issued for the employees to have corrected past behavior that led to the sustained allegations. From all indications noted in our review, there have been no additional sustained allegations of misconduct noted for these employees. Of the Detention employees promoted, one employee promoted to sergeant had a 16-hour suspension. We have previously reviewed the misconduct investigation for this employee, so we are familiar with the circumstances surrounding the case. The employee admitted fault and accepted responsibility for his actions. In addition, this was a 2018 case; and we are not aware of any other issues of concern. We reviewed the information provided and noted no concerns with this promotion.

On June 17, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 175.** *As soon as practicable, commanders shall review the disciplinary history of all employees who are transferred to their command.*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on December 16, 2021.

- GC-7 (Transfer of Personnel), most recently amended on October 29, 2021.

**Phase 2:** In compliance

WAI 65094

Per policy, MCSO is to conduct an EIS review within 14 days of an affected employee's transfer. We requested a list of employees that were transferred during this reporting period. From the list, we selected a sample of employees to review and verify that there was documentation of the required EIS review. To verify compliance with this Paragraph, we review the transfer request documents that MCSO completes for each employee. The documents memorialize the commander's acknowledgment of review of the transferred employee's disciplinary history, as well as the review of the employee's performance appraisals for the previous five years. This review is generally conducted before the gaining commander accepts the transfer, a few days prior to the transfer becoming effective.

For April, we requested a list of all employees who were transferred during the month. MCSO submitted a list, and we selected a sample of 24 employees who would fall under the requirements of this Paragraph. The list we requested was comprised of seven Detention employees and 17 sworn employees. Of the seven Detention employees requested, all had proper documentation of command review of their EIS profiles. Of the 17 sworn employees requested, all had proper documentation of command review of their EIS profiles. For May, we requested documentation for all 22 employees who were transferred during the month. This list was comprised of 20 Detention employees and two sworn employees. All 20 Detention employees had proper documentation of command review of their EIS profiles. The two sworn employees' EIS reviews were conducted 21 days after the transfer was effective and were therefore not in compliance with MCSO policy. For June, we requested a list of all employees who were transferred during the month. MCSO submitted a list, and we selected a sample of 25 employees to review. This list was comprised of 13 Detention employees and 12 sworn employees. All of the 13 Detention Officers had proper documentation of command review of their EIS profiles, and all 12 sworn employees had proper documentation of command review of their EIS profiles. For the second quarter of 2022, 68 of 71 employees transferred had proper documentation of timely command review of their EIS profiles. The compliance rate for the quarter was 95.77%. For the second quarter of 2022, MCSO was in compliance with the requirements of this Paragraph.

**Paragraph 176.** *The quality of investigators' internal affairs investigations and Supervisors' reviews of investigations shall be taken into account in their performance evaluations.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on April 27, 2022.
- GC-4 (S) (Employee Performance Management), most recently amended on November 10, 2021.

**Phase 2:** In compliance

This Paragraph requires that employees who conduct misconduct investigations have an assessment on the quality of their investigations documented in their Employee Performance Appraisals. This Paragraph also requires that Commanders who review their subordinates' misconduct investigations be assessed on the quality of those reviews, in their own EPAs. To assess compliance with this Paragraph, we look for specific comments by raters completing EPAs.

WAI 65095

In supervisor EPAs, we look for comments addressing the quality of investigations. In commanders' EPAs, we look for comments assessing the quality of reviews of investigations. In many instances, the employee being rated does not have any subordinates, or has not completed or reviewed any misconduct investigations. In these cases, we look for comments by the rater that indicate why the employee was not rated on this requirement. In addition, we review a list of all PSB memos indicating investigative deficiencies in misconduct investigations. If we find a pattern of deficiencies that corresponds to the employee's evaluation period, we expect that pattern to be identified in the employee's EPA. If the rater fails to document these deficiencies, it would affect compliance with the requirements of this Paragraph.

We reviewed Employee Performance Appraisals for 28 supervisors and commanders who received EPAs during this reporting period. All of the 28 supervisor EPAs rated the quality and effectiveness of supervision. All of the 28 supervisor EPAs contained comments and/or rated the supervisors' demonstrated ability to identify and effectively respond to misconduct. Twenty-seven of the 28 supervisor EPAs sufficiently commented on the supervisors' quality of internal affairs investigations or the quality of their reviews of internal affairs investigations. For supervisors who did not conduct any internal affairs investigations during the appraisal period, this information was appropriately documented on their EPAs. As it pertains to this Paragraph, one of the 28 supervisor EPAs was not in compliance. This was a commanders' EPA that did not have the appropriate assessment of the quality of reviews of misconduct investigations. We reviewed all deficiency memos submitted for the supervisors whose EPAs were selected during this quarter. We found two command-level supervisors listed as reviewers in two separate deficient cases. We did not identify any patterns of poor performance pertaining to quality that should have been considered in their EPAs as required by this Paragraph. The compliance rate for this reporting period was 96.43%. For this reporting period, MCSO was in compliance with the requirements of this Paragraph.

**Paragraph 177.** *There shall be no procedure referred to as a "name-clearing hearing." All pre-disciplinary hearings shall be referred to as "pre-determination hearings," regardless of the employment status of the principal.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we reviewed 117 administrative misconduct investigations during this reporting period.

In misconduct investigations that resulted in serious discipline and in which the employee was afforded the opportunity for an administrative hearing, the only reference to the hearing was "pre-determination hearing."

On June 18, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 65096

### B.      Misconduct-Related Training

**Paragraph 178.**  *Within three months of the finalization of these policies consistent with ¶ 65of this Order, the Sheriff will have provided all Supervisors and all personnel assigned to the Professional Standards Bureau with 40 hours of comprehensive training on conducting employee misconduct investigations.  This training shall be delivered by a person with subject matter expertise in misconduct investigation who shall be approved by the Monitor.  This training will include instruction in:*

a.      *investigative skills, including proper interrogation and interview techniques, gathering and objectively analyzing evidence, and data and case management;*

b.      *the particular challenges of administrative law enforcement misconduct investigations, including identifying alleged misconduct that is not clearly stated in the complaint, or that becomes apparent during the investigation;*

c.      *properly weighing the credibility of civilian witnesses against employees;*

d.      *using objective evidence to resolve inconsistent statements;*

e.      *the proper application of the appropriate standard of proof;*

f.      *report-writing skills;*

g.      *requirements related to the confidentiality of witnesses and/or complainants;*

h.      *considerations in handling anonymous complaints;*

i.      *relevant MCSO rules and policies, including protocols related to administrative investigations of alleged officer misconduct; and*

j.      *relevant state and federal law, including Garrity v. New Jersey, and the requirements of this Court's orders.*

### In Full and Effective Compliance

MCSO supplied the PSB40 curriculum to all personnel assigned to PSB and District supervisors when it was first developed.  Subsequently, all promotional candidates receive this curriculum in the Supervisors' Program prior to or shortly after their promotion.

The PSB40 curriculum was not delivered during this reporting period.

This course is reserved for delivery on an as-needed basis to new sergeants.

The PSB40 continues to need a 2022 annual review.  We recommend that the training expand on requirements (c), (d), and (e) of this Paragraph, and the added report requirements of Paragraph 206 (f) and (g) for explicit and precise findings detailing credibility assessments, and the standard of proof required to substantiate a finding.  Additionally, we recommend that MCSO instruct new investigators on pertinent case law that might assist them in their investigations.

On June 17, 2022, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

WAI 65097

***Paragraph 179.*** *All Supervisors and all personnel assigned to the Professional Standards Bureau also will receive eight hours of in-service training annually related to conducting misconduct investigations. This training shall be delivered by a person with subject matter expertise in misconduct investigation who shall be approved by the Monitor.*

**In Full and Effective Compliance**

MCSO provides the PSB8 External curriculum, which consists of eight hours of annual in-service training, to District supervisors. Additionally, MCSO provides the PSB8 Internal curriculum, which consists of eight hours of annual in-service training, to PSB personnel. This is commonly delivered by external vendors. When an external vendor cannot be obtained for any reason, PSB personnel must attend the PSB8 External classroom training.

The 2021 annual eight-hour in-service training for District supervisors (PSB8 External) was not delivered during this reporting period. The 2022 curriculum remains under development. We recommend that MCSO include content on requirements (c), (d), and (e) of this Paragraph; the added report requirements of Paragraph 206 (f) and (g) for explicit and precise findings detailing credibility assessments; and the standard of proof required to substantiate a finding. Additionally, we recommend that MCSO instruct new investigators on pertinent case law that might assist them in their investigations.

During the previous reporting period, we received a vendor-proposed training syllabus for PSB personnel for the 2022 PSB8 (Internal) curriculum. Following our obligations for this Paragraph, we approved the vendor to provide the training. We requested all associated videos, handouts, and guides prior to delivery. The vendor provided a new training syllabus, test, and 12 videos to be used within this training class. The vendor specifically named the areas of training directly addressing our recommendation to include content on requirements (c), (d), and (e) of this Paragraph; the added reporting requirements of Paragraph 206 (f) and (g) for explicit and precise findings detailing credibility assessments; and the standard of proof required to substantiate a finding. The course includes content on pertinent case law that might help PSB personnel in their investigations.

On June 17, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 180.*** *Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all employees on MCSO's new or revised policies related to misconduct investigations, discipline, and grievances. This training shall include instruction on identifying and reporting misconduct, the consequences for failing to report misconduct, and the consequences for retaliating against a person for reporting misconduct or participating in a misconduct investigation.*

**In Full and Effective Compliance**

WAI 65098

MCSO distributes new or annually revised policies via the HUB, an electronic training management system. This training includes updates to all policies related to misconduct investigations, discipline, and grievances. Each distribution requires all employees to complete personal attestations to demonstrate that they have read and understand the policy requirements.

To assess compliance with this Paragraph, we review the HUB generated reports of attestations that identify each individual and their dates of review. Compliance assessments for this Paragraph are based on the review of attestations for the following policies: CP-2 (Code of Conduct); CP-3 (Workplace Professionalism: Discrimination and Harassment); CP-11 (Anti-Retaliation); GB-2 (Command Responsibility); GH-2 (Internal Investigations); GC-16 (Employee Grievance Procedures); and GC-17 (Employee Disciplinary Procedures).

During this reporting period, we reviewed the status of individual reviews for Briefing Board (BB) 22-34 (CP-2), BB 21-70 (CP-3), BB 22-01 (CP-11), BB 22-08 (GB-2), BB 20-39 (GH-2), BB 21-66 (GC-16), and BB 22-25 (GC-17). All employee categories remain in compliance.

On June 17, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

***Paragraph 181.*** *Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all employees, including dispatchers, to properly handle civilian complaint intake, including how to provide complaint materials and information, and the consequences for failing to take complaints.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2022.

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.

- GG-1 (Peace Officer Training Administration), most recently amended on March 31, 2021.

- GG-2 (Detention/Civilian Training Administration), most recently amended on March 31, 2021.

- Training Division Operations Manual, most recently amended on April 4, 2022.

**Phase 2:** In compliance

MCSO currently delivers the 2021 Complaint Intake and Reception Training via the HUB to all new hires in all personnel categories. This initial training provides important guidance when interacting with members of the public who wish to file a complaint against MCSO personnel. The 2021 Complaint Intake and Reception training requires a 2022 annual review.

WAI 65099

MCSO previously informed us of efforts to notify delinquent personnel. Email notifications were sent to supervisors of delinquent employees to alert both the supervisor and employee that course completion was needed. These efforts have been successful. Documentation provided during this reporting period indicate proper compliance levels for all employee categories.

**Paragraph 182.** *Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all Supervisors on their obligations when called to a scene by a subordinate to accept a civilian complaint about that subordinate's conduct and on their obligations when they are phoned or emailed directly by a civilian filing a complaint against one of their subordinates.*

**In Full and Effective Compliance**

This Paragraph requires that all supervisors receive training on their obligations when responding to a scene by a subordinate to accept a civilian complaint, or when they receive a complaint by telephone or email. All existing and new supervisors receive this initial training content within the Misconduct Investigative Training (PSB40) and the Complaint Reception and Processing training; and it is covered in subsequent annual Supervisors' Responsibilities: Effective Law Enforcement (SRELE) and Annual Combined Training (ACT) programs. All active supervisors receive this training at least once; and in most cases, more than once.

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

## C.    *Administrative Investigation Review*

**Paragraph 183.** *The Sheriff and the MCSO will conduct objective, comprehensive, and timely administrative investigations of all allegations of employee misconduct. The Sheriff shall put in place and follow the policies set forth below with respect to administrative investigations.*

**Paragraph 184.** *All findings will be based on the appropriate standard of proof. These standards will be clearly delineated in policies, training, and procedures, and accompanied by detailed examples to ensure proper application by internal affairs investigators.*

**In Full and Effective Compliance**

To determine Phase 2 compliance with this Paragraph, we reviewed 117 administrative misconduct investigations during this reporting period.

WAI 65100

Of the 117 cases we reviewed, 114 (97%) complied with the requirements of this Paragraph. In two, we believe findings of sustained should have been made and were not. In a third case, we believe the PSB Commander had inadequate information on which to base his findings. Additional investigation should have occurred which may have impacted the outcome of this investigation. As is our practice, we will discuss these cases with MCSO during our next site vi

On June 18, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

***Paragraph 185.*** *Upon receipt of any allegation of misconduct, whether internally discovered or based upon a civilian complaint, employees shall immediately notify the Professional Standards Bureau.*

**In Full and Effective Compliance**

To determine Phase 2 compliance with this Paragraph, we reviewed 117 administrative misconduct investigations during this reporting period. There were no instances where PSB was not appropriately notified at the time of complaint as required. We also reviewed three criminal misconduct investigations conducted by MCSO. PSB was appropriately notified in all three of these investigations.

On June 18, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

***Paragraph 186.*** *Effective immediately, the Professional Standards Bureau shall maintain a centralized electronic numbering and tracking system for all allegations of misconduct, whether internally discovered or based upon a civilian complaint. Upon being notified of any allegation of misconduct, the Professional Standards Bureau will promptly assign a unique identifier to the incident. If the allegation was made through a civilian complaint, the unique identifier will be provided to the complainant at the time the complaint is made. The Professional Standards Bureau's centralized numbering and tracking system will maintain accurate and reliable data regarding the number, nature, and status of all misconduct allegations, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status, if requested, and final disposition of the complaint. The system will be used to determine the status of misconduct investigations, as well as for periodic assessment of compliance with relevant policies and procedures and this Order, including requirements of timeliness of investigations. The system also will be used to monitor and maintain appropriate caseloads for internal affairs investigators.*

**In Full and Effective Compliance**

During numerous site visits, we have met with PSB personnel to discuss and observe the capabilities of IAPro, which serves as the technology instrument that meets the compliance criteria of this Paragraph.  IAPro logs critical dates and times, alerts regarding timeframes and deadlines, chronological misconduct investigation status, notifications, and dispositions.  The tracking system provides estimates of key timeframes for all investigators to ensure that they learn of previous and upcoming investigative milestones.  PSB has confirmed that civil notice claims are entered in the tracking system.  The IAPro system integrates exceptionally well with the EIS and BlueTeam technology systems and can be remotely accessed.

PSB has a management analyst dedicated to the administration of the centralized tracking system.  The documentation that PSB has provided to us for review, and the direct user access that a member of our Team has to the centralized numbering and tracking system, indicates that the system possesses the functionality as required by this Paragraph and is being used according to the requirements of this Paragraph.

During this reporting period, we found that all 117 administrative misconduct investigations we reviewed were properly assigned a unique identifier.  Sixty-six involved an external complaint requiring that PSB provide the complainant with this unique identifier.  In all of the 66 cases, PSB sent an initial letter to the complainant or provided an acceptable reason for not doing so.  In some cases, anonymous complainants do not provide contact information; and in others, known complainants decline to provide MCSO with adequate contact information.  PSB has developed a form that identifies the reason why a required notification letter is not sent and includes this document in the cases it forwards for our review.

On June 18, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

***Paragraph 187.***  *The Professional Standards Bureau shall maintain a complete file of all documents within the MCSO's custody and control relating to any investigations and related disciplinary proceedings, including pre-determination hearings, grievance proceedings, and appeals to the Maricopa County Law Enforcement Merit System Council or a state court.*

**In Full and Effective Compliance**

To determine compliance with this Paragraph, we have verified that PSB maintains both hardcopy and electronic files intended to contain all the documents required for compliance with this Paragraph.

During our site visits, a member of our Team inspects the file rooms where hardcopies of investigations are stored and randomly reviewed case files to verify compliance.  We have verified that criminal and administrative investigation files are stored in separate rooms, and access to these rooms is restricted.  Our Team member has also used the access granted to IAPro to randomly select internal affairs case files to verify that all information is being maintained electronically.

WAI 65102

In May 2018, PSB relocated to its new offsite facility.  We confirmed at that time that PSB maintained both hardcopy and electronic files intended to contain all documents required for compliance with this Paragraph at the new facility.

During our January 2019 site visit, a member of our Team verified continued compliance at the PSB facility by inspecting both the criminal and administrative investigation file rooms and randomly selecting internal affairs case files to verify that all information was also being electronically maintained in IAPro.

During our October 2019 site visit, a member of our Team verified continued compliance at the PSB facility by inspecting both the criminal and administrative investigation file rooms.  We also randomly reviewed both electronic and hard-copy documents to ensure that all information was being maintained as required for compliance with this Paragraph.

On June 18, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.


**Paragraph 188.** *Upon being notified of any allegation of misconduct, the Professional Standards Bureau will make an initial determination of the category of the alleged offense, to be used for the purposes of assigning the administrative investigation to an investigator.  After initially categorizing the allegation, the Professional Standards Bureau will promptly assign an internal affairs investigator.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we review administrative misconduct investigations, service complaints, and PSB diversions.

We previously concurred with MCSO that Phase 2 compliance with this Paragraph would be based on PSB's determination of the initial allegations, and not which category of offense was determined once the investigation is completed.

During this reporting period, we reviewed 117 administrative misconduct investigations.  All 117 complied with the requirements of this Paragraph.  Sixty-six were externally generated and 51 were internally generated.

We reviewed 99 service complaints during this reporting period.  All but three were externally generated complaints.  In 97 (98%) of the 99, PSB made the appropriate decision regarding categorizing the complaint.  Fifteen (15%) were appropriately reclassified to administrative misconduct investigations either by the initiating District or Division, or after the complaints were reviewed by PSB.  In two of the 84 cases classified as service complaints, we believe there was insufficient information to do so at the time the decision was made; and additional follow-up should have been conducted.  In three others, though we concur that they were appropriately classified as service complaints, complainants were not contacted in a timely manner.  Of the total 99 service complaints, 94 (95%) met the requirements established in the service complaint process

WAI 65103

As we have consistently noted in our review of service complaints, the majority of these complaints involve laws, policies, or procedures where there is no employee misconduct; or are complaints where it is determined that MCSO employees are not involved.  During this reporting period, 44 (52%) of the 84 closed service complaints did not involve allegations of misconduct.  Eighteen (21%) did not involve MCSO employees, 12 (14%) were closed due to lack of specificity, and 10 (12%) were closed based on a combination of factors.

In July 2019, we and the Parties approved MCSO's proposal to use an expedited process to handle service complaints where it could be immediately determined that the complaint did not involve MCSO personnel.  During this same time period, we discussed concerns we found in some service complaints that were completed at the District level and forwarded to PSB for review and approval, where PSB subsequently determined that a service complaint was inappropriate, and a misconduct investigation should be opened.  PSB was again correcting the work of other personnel.  To address this concern and ensure accountability, PSB added a signature line to this revised service complaint form.  District and Division Command personnel now note their review and approval of service complaints prior to them being forwarded to PSB for a final review.

Consistent with the provisions of policies on internal investigations and discipline, the PSB Commander has had the discretion to determine if internal complaints alleging minor policy violations can be addressed without a formal investigation if certain criteria exist through the use of a coaching.  If the PSB Commander makes this determination, it must be documented.

In May 2021, revisions to GH-2 (Internal Investigations) modified the authority of the PSB Commander as it relates to internal complaints that meet certain criteria.  The revised policy allows the PSB Commander to address qualifying internal complaints through the use of an approved supervisor-initiated intervention and is no longer limited to only coaching.

During the last reporting period, we reviewed four instances where the PSB Commander determined that an internal complaint could be handled with an approved supervisor-initiated intervention.  In three, coachings were issued; and in one, it was determined no misconduct had occurred.  We concurred with the decision of the PSB Commander in all four cases.

During this reporting period, the PSB Commander determined that 28 internally generated complaints could be handled with approved supervisor-initiated interventions.  All were approved by the PSB Commander as required.  For ease of tracking, PSB has combined coachings and other approved supervisor-initiated interventions into a single tracking system they now refer to as "PSB Diversions."  We have no objection to this method of tracking.

In 25 of the 28 PSB diversions we reviewed for this reporting period, we agree with the decision of the PSB Commander.  In 14 of these 25, coachings were issued to one or more employees.  In the remaining 11, meetings were held with involved employees, supervisor notes entries were made, or additional training was provided to the employees.  In three of the 28 diversions, we believe that the misconduct alleged, or the prior misconduct of the employee, made these incidents ineligible for the PSB Diversion Process.

WAI 65104

During this reporting period, we have had several discussions with PSB regarding appropriate use of the diversion process. We have reviewed with them the requirements for eligibility for a diversion, appropriate tracking, and the need for detailed documentation. They have been very responsive to our concerns. We will continue to work with them to identify and address concerns as they arise.

Compliance with this Paragraph for this reporting period was based on our findings for administrative misconduct investigations (117), service complaints (99), and PSB diversions (24) combined; and was 96% for this reporting period.

On June 18, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 189.** *The Professional Standards Bureau shall administratively investigate:*

a.      *misconduct allegations of a serious nature, including any allegation that may result in suspension, demotion, or termination; and*

b.      *misconduct indicating apparent criminal conduct by an employee.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph during this reporting period, we reviewed 117 completed administrative misconduct investigations conducted by MCSO personnel.

Division or District personnel outside of PSB investigated 19 of the 117 administrative misconduct investigations we reviewed during this reporting period. PSB investigators conducted 93 of the investigations, and five were outsourced to an outside investigator. PSB also submitted three criminal investigations for review. We did not identify any misconduct investigations that a District supervisor conducted where we believe that potential additional misconduct discovered during the initial investigation should have resulted in the investigation being forwarded to PSB for completion and was not.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 190.** *Allegations of employee misconduct that are of a minor nature may be administratively investigated by a trained and qualified Supervisor in the employee's District.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.

**Phase 2:** In compliance

WAI 65105

To determine Phase 2 compliance with this Paragraph, we reviewed a total of 120 employee misconduct investigations during this reporting period.  Of these, 117 were administrative investigations, and three were criminal investigations.  All three of the criminal investigations were conducted by PSB.

Of the 117 administrative misconduct cases we reviewed for this Paragraph, PSB investigators conducted 93.  PSB outsourced five, and 19 were investigated at the District or Division level. We did not identify any instances where a District or Division supervisor conducted any investigation that should have been conducted by PSB.

MCSO has complied with the requirements to train all supervisors who conduct minor misconduct investigations.

**Paragraph 191.**  *If at any point during a misconduct investigation an investigating Supervisor outside of the Professional Standards Bureau believes that the principal may have committed misconduct of a serious or criminal nature, he or she shall immediately notify the Professional Standards Bureau, which shall take over the investigation.*

**In Full and Effective Compliance**

To determine Phase 2 compliance with this Paragraph, we reviewed 117 administrative misconduct investigations during this reporting period.  Of the 19 administrative misconduct cases investigated at the District or Division level, we did not identify any cases where we believe that potential serious misconduct was discovered by the investigating supervisor and the supervisor failed to forward the case to PSB.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 192.**  *The Professional Standards Bureau shall review, at least semi-annually, all investigations assigned outside the Bureau to determine, among the other matters set forth in ¶ 251 below, whether the investigation is properly categorized, whether the investigation is being properly conducted, and whether appropriate findings have been reached.*

**Phase 1:**  In compliance

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

**Phase 2:**  In compliance

WAI 65106

PSB command personnel advised us that they continue to review investigations in "real time" as they come into the Bureau.  During this reporting period, MCSO provided copies of PSB's reviews of 19 completed Division-level misconduct investigations that were assigned outside of the Bureau.  The review template used by PSB includes sections that address whether or not the investigation is properly categorized, whether the investigation is properly conducted, and whether appropriate findings have been reached.  Additionally, copies of emails detailing the quality of the investigation, identified deficiencies, and required edits sent electronically to affected Division Commanders were provided for each case reviewed.

PSB included the information required by this Paragraph in its semi-annual public Misconduct Investigations Report, which is required under Paragraph 251.  The most recent report was published on MCSO's website in August 2022.  The report covers the period of July 1-December 31, 2021; and contains an analysis as to whether cases assigned outside of PSB were properly categorized, whether the investigations were properly conducted, and whether appropriate findings have been reached.

MCSO remains in compliance with this Paragraph.

***Paragraph 193.***  *When a single act of alleged misconduct would constitute multiple separate policy violations, all applicable policy violations shall be charged, but the most serious policy violation shall be used for determining the category of the offense.  Exoneration on the most serious offense does not preclude discipline as to less serious offenses stemming from the same misconduct.*

**In Full and Effective Compliance**

To determine Phase 2 compliance with this Paragraph, we reviewed 117 administrative misconduct investigations during this reporting period.  Sixty-one had sustained allegations against one or more employees.  In 40 of these investigations, at least one principal employee was still an MCSO employee at the time the investigation was completed or discipline decisions were made.  In all 40, the most serious policy violation was used to determine the final category of the offense for discipline purposes, if more than one policy violation was sustained.

In cases where multiple violations of policy occurred, this information was listed on the preliminary discipline document.  There were no cases where the exoneration of any offense precluded discipline for any sustained allegations.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 65107

*Paragraph 194.*   *The Commander of the Professional Standards Bureau shall ensure that investigations comply with MCSO policy and all requirements of this Order, including those related to training, investigators' disciplinary backgrounds, and conflicts of interest.*

**Phase 1:**  In compliance

- CP-2 (Code of Conduct), most recently amended on April 27, 2022.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on December 16, 2021.

- CP-5 (Truthfulness), most recently amended on March 3, 2022.

- CP-11 (Anti-Retaliation), most recently amended on January 6, 2022.

- GC-16 (Employee Grievance Procedures), most recently amended on December 8, 2021.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2022.

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.

- Administrative Services Division Operations Manual, most recently amended on October 27, 2021.

- Professional Standards Bureau Operations Manual, most recently amended on December 31, 2019.

**Phase 2:**  Not in compliance

We determine Phase 2 compliance with this Paragraph by a review of completed misconduct investigations conducted by MCSO, the review of attendance by internal investigators at required Misconduct Investigative Training, the disciplinary backgrounds of internal investigators, and the efforts being made by the PSB Commander to reach compliance.

We reviewed 117 administrative misconduct investigations, one of which was a critical incident, and three criminal investigations during this reporting period.  All three of the criminal investigations complied with MCSO policy and the requirements of the Second Order.

Administrative investigations are required to be completed within 60 days if completed outside of PSB and within 85 days if completed by PSB personnel.  Of the 117 investigations reviewed for this reporting period, 39 (33%) were completed within the required timeframes or contained a reasonable extension request that was specific to the investigation, an increase from 22% during the last reporting period.  The remaining investigations continued to identify general justifications including supervisory responsibilities, workload, prioritization of investigations, training, sitting second chair in investigations, and others.

During our April 2022 site visit, PSB personnel informed us that the average number of days to complete administrative investigations was 611 days, a decrease from 650 days reported in January 2022.  During our July 2022 site visit, PSB told us that the overall average days for completion was 562 days, compared to 611 in April of 2022.  This is the third consecutive quarter where the number of days to complete an investigation has decreased.  While these delays in completion of investigations remain unacceptable, we note the reduction of time for this and the

WAI 65108

last reporting period and are hopeful that this trend will continue.  As we have noted in the last eight reporting periods, we no longer accept extensions that do not contain reasonable justifications specific to each investigation.

Of the 117 administrative misconduct cases we reviewed, PSB personnel completed 93.  Twenty-six were conducted by sworn investigators.  Fifty investigations were conducted by Detention investigators and 17 were conducted by civilian investigators.  We found deficiencies other than extensions in three (3%) of the total 93 investigations.  With the inclusion of those investigations that were found noncompliant based on our review of extension requests, 31 (33%) of the 93 investigations conducted by PSB were in overall compliance – an increase from 20% in the last reporting period.

We reviewed five investigations that PSB outsourced to an outside investigator.  All were outsourced to address the backlog of investigations.  Of these, one (20%) was found noncompliant due to investigative concerns.  Only one of the five was in overall compliance due to timeliness.

Districts or Divisions outside of PSB conducted 19 investigations.  Eight (42%) were not compliant due to investigative and administrative deficiencies.  This is an increase in noncompliance from the 32% for the last reporting period.  With the inclusion of those investigations found not compliant due to timelines, only one (5%) of the 19 cases were in overall compliance, the same percentage as the last reporting period.

As a result of both investigative deficiencies and administrative deficiencies, including those related to extension compliance, overall compliance for all administrative investigations conducted by MCSO that are within the purview of the PSB Commander was 28% for this reporting period, an increase from 15% during the last reporting period.

There are many factors that impact the PSB Commander's ability to determine compliance in all cases.  One factor is that the PSB Commander must rely on other PSB staff members to conduct case reviews and ensure proper documentation is completed.  We continue to find that PSB personnel are identifying and ensuring that corrections are made and all documentation is completed in those cases they review.  In some cases, deficiencies cannot be corrected after the fact.

Another factor affecting the PSB Commander's ability to ensure that all investigations are properly completed is that the Appointing Authority – not the PSB Commander – determines the final findings and discipline.  During this reporting period, there were no instances where any actions taken by the Appointing Authority affected our compliance findings.

The investigative quality of District and Division cases has continued to have an adverse impact on the ability of the PSB Commander to ensure investigations are properly completed.  While investigative noncompliance decreased from 47% to 32% during the last reporting period, during this reporting period noncompliance increased to 48%.  There has been no sustained improvement in these investigations, despite training and increased oversight.  We believe that in most of the cases, the deficiencies could and should have been identified prior to the cases being forwarded to PSB.  We will discuss our concerns with MCSO during our next site visit.

WAI 65109

Since 2016, PSB has taken a number of actions to address both investigative deficiencies and other concerns with the completion of administrative investigations. We have continued to meet with PSB and District and Division personnel since that time to update them on our identification of training and performance issues that adversely affect compliance with the Second Order. Members of our Team also meet with PSB every two weeks to discuss Class Remedial Matters, and we use this opportunity to discuss other ongoing concerns that affect compliance. In our meetings with PSB and the Parties during site visits, we have also discussed additional opportunities and potential remedies to address the challenges of completing quality investigations within the required timelines. The Parties have also addressed this issue in both the meet-and-confer process and ongoing litigation. The Court appointed an outside expert to examine issues relevant to the deficiencies associated with PSB investigations. The expert's recommendations have been reviewed by the Parties and the Court.

In 2014, PSB initiated 717 internal investigations. In 2015, PSB initiated 916 cases: and in 2016, 847 cases. There were 1,028 cases initiated in 2017. In 2018, there were 1,114 investigations initiated. In 2019, PSB initiated a total of 1,072 investigations and in 2020, PSB opened a total of 1204 investigations. In 2021, PSB opened a total of 1172 investigations, a small decrease from 2020.

In 2016, prior to the implementation of the Court's Second Order, PSB investigators were carrying an average active caseload of 12-16 cases each month. By the end of 2021, the average monthly caseload in PSB was 74 cases per investigator. The average days to complete an administrative investigation in PSB at the end of 2021 was 704 days. For investigations completed outside of PSB, the average number of days to complete an investigation was 439 days. These numbers have continued to grow since the implementation of the Second Order.

At the end of 2020, there were 2,010 pending investigations – an increase from 1,617 at the end of 2019. By the end of 2021, the number of pending investigations had increased to 2,149. While the total included administrative misconduct investigations, service complaints, criminal investigations, and critical incident investigations, the majority continued to be administrative misconduct investigations and service complaints. Of the 1,903 administrative misconduct investigations pending at the end of 2021, 1,769 (93%) were assigned to PSB, an increase from 1,561 at the end of 2020. Of the 179 pending service complaints, 114 were assigned to PSB. This was a decrease from the number of pending service complaints from 2020 and likely a result of the addition of a second civilian investigator in PSB to address these complaints. All five of the pending criminal investigations, and all 62 of the pending critical incident investigations were assigned to PSB. In total, 1,950 (91%) of the pending 2,149 investigations were being investigated by PSB at the end of 2021. MCSO closed a total of 995 investigations in 2020, compared to 727 in 2019. We noted, however, that the increase in closures in 2020 was primarily a result of an increase in service complaint closures, not administrative misconduct investigations. MCSO closed a total of 1,021 cases in 2021, an increase from the 995 closed in 2020. Administrative misconduct investigation closure increased from 364 in 2020 to 430 in 2021. Service complaint closures still accounted for more than half of the total closures.

WAI 65110

During our April 2022 site visit, PSB advised that the Bureau had initiated 226 cases in 2022. Of these, 115 were administrative misconduct investigations. The number of all pending cases had decreased slightly since the 2,149 cases noted at the end of 2021. Of the 2,086 pending cases reported in April 2022, 1,908 were administrative misconduct investigations. Of these 1,908, 1,790 were assigned to PSB for completion. PSB also had 63 critical incidents, 65 service complaints and nine criminal cases assigned for investigation. Of the total 2,086 pending cases, 1,927 (92%) were being handled by PSB. Only 159 cases were being conducted by a District or Division outside of PSB. Of these 159, 118 were administrative misconduct investigations and 41 were service complaints.

During our July 2022 site visit, PSB personnel advised that the Bureau had initiated 260 investigations during this reporting period. Of these, 161 were administrative misconduct investigations. The number of all pending cases increased from 2,086 in March of 2022 to 2,137 in June of 2022. Of the total pending cases, 1,956 are administrative misconduct investigations, 1,859 (95%) of which are assigned to PSB. PSB also has 73 pending critical incidents, 78 service complaints, and 11 criminal cases assigned for investigation. Of the total 2,137 investigations, only 116 (5%) are assigned to a District or Division outside of PSB. The percentage of all cases being investigated by PSB increased from 92% the last quarter to 95% during this quarter.

PSB was authorized 12 new positions in the July 2018 budget. The positions included both sworn and Detention personnel. Between July 2018 and January 2021, only one of these positions, a Detention supervisor, was filled. One lieutenant position was also eliminated, and the funds were transferred to other purposes in PSB. By the end of 2021, there were still six remaining positions that were not filled. The funds for the remaining five positions had been used to hire civilian investigators and administrative personnel.

PSB was authorized eight new positions – all civilian – in the July 2019 budget. Those positions were all filled and included three civilian investigators along with administrative staff. MCSO did not request any new positions for PSB in either the July 2020 or the July 2021 budget process.

During our January 2022 remote site visit, PSB personnel informed us that they had six civilian investigators and were in the process of filling the two open administrative positions, The PSB Commander advised us that they had filled two of the open sworn investigators' positions, but that ongoing retirements and transfers continued to cause the overall filled position numbers to fluctuate. During our April 2022 site visit, PSB advised us that, despite filling some positions, the Bureau still had nine vacancies as a result of transfers, retirements, and promotions.

The original budget authorization for PSB in 2018 included two sworn lieutenants, six sworn sergeant positions, and four Detention sergeant positions. To determine the final status of these budget allocations, we requested specific information on each of these authorized positions at our July site visit meeting. PSB personnel advised us that one sworn lieutenant position was fille,d and one was converted to fill other PSB positions in 2020. Two of the sworn sergeant positions were filled, two were converted to other PSB positions in 2021, and two are vacant. All four of the Detention sergeant positions have been filled. Of the total 12 positions, only two sworn sergeant positions remain unfilled. There also continues to be other vacancies in PSB as a result of ongoing promotions, transfers, and retirements.

WAI 65111

During our past site visits, PSB staff have continued to communicate that they are outsourcing those cases where conflicts of interest exist. PSB has contracted with a qualified private vendor to conduct these investigations. During our January 2021 remote site visit, PSB personnel advised us that they were considering retaining additional outside contract investigators but had not identified any who met the hiring criteria. PSB was also considering outsourcing additional investigations to the current contract investigator if he had the staff to accept additional investigations. During our April 2021 site visit, PSB personnel advised us that they had identified another vendor and outsourced 25 cases to this entity as a pilot program.

During our October 2021 remote site visit, PSB personnel informed us that PSB had outsourced one additional case to the current contract investigator. Four investigations by this investigator were completed and forwarded to us for review during the reporting period. This investigator had 21 cases still in progress. Of the 25 cases outsourced to the new vendor, eight had been completed. The PSB Commander advised us that, overall, they were pleased with the quality of the investigations, though there were still some issues to address involving structure, format, and Court Order requirements. We reviewed seven of these investigations during the last reporting period and identified a number of concerns with the investigations that we have since discussed with PSB.

During our January 2022 site visit, PSB advised that the original contract vendor currently had 20 cases pending. The second vendor had 11 cases pending. No additional cases were outsourced during the reporting period.

During our April 2022 site visit, PSB advised that the original contract investigator had 18 pending cases. Two of the cases being handled by this contractor had been transferred to the second vendor PSB is using. No new investigations were outsourced to the original contractor. No new cases were assigned to the second vendor during the reporting period, but we did review four investigations they had completed.

During our July 2022 site visit, PSB advised that the original contract investigator continues to have 18 pending cases. Again this quarter, none were completed and forwarded for our review. No new investigations were outsourced to this, or any other vendor, due to the identification of any potential conflict of interest. The second vendor hired by MCSO has had a total of 38 investigations assigned for completion. Of those, 23 have been completed; 15 remain pending. We reviewed five investigations conducted by this vendor during this reporting period.

After the Second Order was implemented, PSB reviewed the disciplinary backgrounds of all those who might conduct internal investigations and notified us of those supervisors who would be prohibited from conducting such investigations due to their backgrounds. At that time, MCSO identified two supervisors who were ineligible to conduct internal investigations. Neither of these two employees are still employed at MCSO. MCSO has since identified additional supervisors who are ineligible to conduct administrative investigations, and there are currently three supervisors who remain on this list.

MCSO reported during this reporting period that no additional supervisors were determined to be ineligible to conduct administrative misconduct investigations.

WAI 65112

***Paragraph 195.*** *Within six months of the entry of this Order, the Professional Standards Bureau shall include sufficient trained personnel to fulfill the requirements of this Order.*

**Phase 1:**  In compliance

- Professional Standards Bureau Operations Manual, most recently amended on December 31, 2019.

**Phase 2:**  Not in compliance

In conjunction with this Paragraph, Paragraph 178 mandates that within three months of the finalization of policies consistent with Paragraph 165, all PSB personnel would receive 40 hours of comprehensive training.  Paragraph 178 requires training of all supervisors within three months of the finalization of policies, and further requires sufficient trained personnel in PSB within six months of the entry of the Order.  The first week of the required Misconduct Investigative Training commenced on September 18, 2017, and the training was completed prior to the end of 2017.

In October 2018, PSB personnel advised us that a total of 11 additional sworn and Detention personnel had been approved for PSB in the July 2018 MCSO budget.  They did not, however, believe the positions would be filled until sometime in 2019 due to ongoing staffing shortages throughout the agency.  During our April 2019 site visit, PSB informed us that even if those positions were filled, the Bureau would still be insufficiently staffed to meet its responsibilities.  By the end of 2021, six of these 11 positions were still unfilled.  Five had been converted to civilian positions and filled.

In October 2019, PSB advised us that eight civilian positions had been approved for PSB in the July 2019 budget.  By the end of 2021, all of these positions had been filled.

During our October 2020 remote site visit, PSB advised us that no additional requests for PSB staffing were made for the July 2020 fiscal year.  In October 2021, we learned that no new positions had been requested for the July 2021 budget year.

Between 2016 and 2021, the number of investigators assigned to PSB remained between 24 and 26 – despite an increase in initiated cases that grew from 847 in 2016 to 1,072 in 2021; a growing backlog of cases; and an average investigator monthly caseload that had grown from 12 cases to 74 cases.

In January 2022, PSB reported that with the addition of the three additional civilian investigators, they had a total of 29 investigators, though they continued to have some ongoing vacancies due to promotions, transfers, and retirements.  During our April 2022 site visit, PSB advised that the Bureau had made some staffing reassignments and now has a total of 32 investigators, including 11 sworn, 15 Detention, and six civilian.

During our July 2022 site visit, PSB advised us that they had a total of 33 investigators authorized, including 12 sworn, 15 Detention, and six civilian.  While the total number of investigators has increased from 29 in January 2022 to 33 in July of 2022, the number still remains insufficient to meet PSB's responsibilities.

WAI 65113

The Second Order requires that PSB have "sufficient trained personnel to fulfill the requirements of this Order." MCSO has delivered the required Misconduct Investigative Training, and our focus remains on the ability of PSB staff to carry out its mission. As documented in this and previous reports, PSB, in its command's estimation, is understaffed. We will not find MCSO in compliance with this Paragraph until MCSO addresses PSB's staffing issues.

**Paragraph 196.** *Where appropriate to ensure the fact and appearance of impartiality, the Commander of the Professional Standards Bureau or the Chief Deputy may refer administrative misconduct investigations to another law enforcement agency or may retain a qualified outside investigator to conduct the investigation. Any outside investigator retained by the MCSO must possess the requisite background and level of experience of Internal Affairs investigators and must be free of any actual or perceived conflicts of interest.*

**In Full and Effective Compliance**

During our April 2017 site visit, the PSB Commander indicated that MCSO had not envisioned any need to retain additional contract investigators beyond the one investigator that had been already retained. A member of PSB's staff serves as MCSO's single point-of-contact to liaise and assist with scheduling for the contract investigator. The contract investigator advances the investigations to the level of recommending findings.

During our January 2021 remote site visit, PSB personnel advised us that they could outsource additional investigations to the current contract investigator if he had additional staff. MCSO was discussing this possibility with the investigator. Additionally, MCSO had issued Requests for Proposals (RFPs) in an attempt to identify additional contract investigators; but had not been able to identify any who met the criteria for hiring.

During our April 2021 remote site visit, PSB personnel advised us that PSB outsourced an additional four cases to the current contract investigator during the reporting period. The contract investigator had 24 cases in progress. Twenty-five administrative misconduct cases were also outsourced to another outside firm in what was described as a "pilot" program by PSB.

During our October 2021 remote site visit, PSB personnel advised that the Bureau had outsourced one additional case to the original contract investigator. The investigator had 21 pending cases. This investigator had considered adding additional staff to allow him to accept additional cases from MCSO, but had decided not to proceed in that direction.

Of the 25 cases outsourced to the firm hired by MCSO in the pilot program, eight had been completed and finalized. An additional five had been completed by the investigator and returned to MCSO for review and finalization. The additional cases being investigated by this firm were still in progress. The PSB Commander said that overall, the Bureau was satisfied with the quality of the investigations and found them to be completed in an objective manner. He did note that there were some "growing pains" with structure, format, and Court Order requirements that PSB staff were addressing. In our initial reviews of investigations outsourced to this new vendor, we found multiple cases with investigative deficiencies. We addressed these concerns with PSB.

WAI 65114

During our January 2022 site visit, PSB personnel advised us that the Bureau had not outsourced any additional investigations during the reporting period. There were no investigations submitted for our review by the original outside contractor. We reviewed seven investigations conducted by the new outside vendor during the reporting period. We did note improvement in the investigative quality in these seven cases. Only one of the seven was noncompliant due to an investigative concern. None were compliant with the required timelines.

During our April 2022 site visit, PSB personnel advised that no additional investigations had been outsourced to any vendor during this reporting period. They were transferring two cases from the original contract vendor to the second vendor. We reviewed four cases investigated by the second vendor during the reporting period. One of the four had investigative deficiencies. None of the four were completed within the required timelines. The PSB Commander advised us during our site visit that the Bureau intended to outsource additional cases to the second vendor; a new contract was pending.

During our July 2022 site visit, PSB personnel advised us that no investigations had been outsourced to any outside vendor due to an identified conflict of interest during this reporting period. The original outside vendor has 18 investigations in progress. None were completed and forwarded for our review during this reporting period. The second outside vendor has been assigned a total of 38 cases for investigation as of the end of June 2022. Twenty-three of these have been completed. Five were forwarded for our review during this reporting period.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

***Paragraph 197.*** *The Professional Standards Bureau will be headed by a qualified Commander. The Commander of the Professional Standards Bureau will have ultimate authority within the MCSO for reaching the findings of investigations and preliminarily determining any discipline to be imposed. If the Sheriff declines to designate a qualified Commander of the Professional Standards Bureau, the Court will designate a qualified candidate, which may be a Civilian Director in lieu of a sworn officer.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2022.

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.

- Administrative Services Division Operations Manual, most recently amended on October 27, 2021.

- Professional Standards Bureau Operations Manual, most recently amended on December 31, 2019.

**Phase 2:** In compliance

WAI 65115

In January 2018, MCSO advised that due to reorganizations within the Office, the responsibility to serve as the PSB Commander for purposes of compliance with this Order would be transferred to a captain within PSB.  The PSB Deputy Chief, who previously had this responsibility was promoted, but maintains overall oversight of PSB as an Executive Chief.

During this reporting period, we have continued to have numerous opportunities to interact with the Captain now serving as the PSB Commander.  In additional to our regularly scheduled meetings to discuss CRMs and other internal affairs matters, we have had additional meetings to discuss overall concerns with investigations, case specific concerns, and concerns with PSB processes and protocols when appropriate.  The Captain continues to be responsive to our input regarding PSB investigations and processes.  He continues to discuss with us both his immediate priorities and his continuing efforts to improve where necessary.  He is noticeably organized and continues to be focused on ensuring that wherever possible, he is addressing and streamlining the efforts of PSB personnel, while still ensuring the quality of investigations.  In those cases where we have expressed concerns or requested information, he has provided timely responses.

Again, during this reporting period we noted that the PSB Commander continues to ensure older cases, some initiated as far back as 2016, are resolved.  While the time delays in completing these investigations do have an adverse impact on compliance, particularly adherence to timelines, we agree that these cases must be completed.  We continue to be hopeful that as PSB is able to resolve more of the older cases, compliance moving forward will improve.

During our April 2022 site visit, the PSB Commander informed us that he has made additional staffing adjustments resulting in additional personnel being focused on investigations rather than on intake or reviews.  He also advised us that he had, at least temporarily, stopped sending cases to Districts and Divisions for investigation.  He noted that he was "giving them a break" and he believed this might have a positive impact on the PSB workload because it would eliminate the need to review these outside cases and, where necessary, return them for additional investigation, or making corrections to the cases in PSB.  When asked, he said they might continue this process and that would be determined in the future.

During our site visit meeting in July 2022, the PSB Commander told us that the Bureau has continued its practice of not assigning any administrative misconduct investigations to personnel outside of PSB.  PSB still considers this to be a temporary practice and has made no decision about making it permanent.  As we noted in our last report, we understand the action being taken regarding the investigation of cases, but continue to have serious concerns about both the short- and long-term effects of doing all investigations in PSB.  Most importantly, we believe this action reduces the accountability of field supervisors and negates multiple years of field supervisors gaining experience on how to properly conduct investigations.  PSB is now completing 95% of all investigations, an increase from 92% reported during the last reporting period, without adequate personnel to do so.  For multiple reporting periods, the Deputy Chiefs for the Districts have taken the position that using a single investigator in each District to conduct investigations will result in overall better field investigations and will create a of pool of qualified supervisors for assignment to PSB.  We continue to believe that all field supervisors should be able to conduct a misconduct investigation.  If PSB conducts all investigations, it effectively negates the advantages put forward by the Deputy Chiefs; and over time there will be fewer supervisors

WAI 65116

outside of PSB with the appropriate knowledge and experience in how to conduct investigations. We again urge PSB to consider both the short- and long-term adverse impacts of having only PSB investigators conduct investigations.

***Paragraph 198.*** *To promote independence and the confidentiality of investigations, the Professional Standards Bureau shall be physically located in a facility that is separate from other MCSO facilities, such as a professional office building or commercial retail space. This facility shall be easily accessible to the public, present a non-intimidating atmosphere, and have sufficient space and personnel for receiving members of the public and for permitting them to file complaints.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

In May 2018, PSB moved into the first and second floors of 101 West Jefferson Street. PSB's address is available on the comment and complaint form that is accessible to the public at the Districts and on MCSO's website. PSB's criminal investigators are housed on the first floor, and administrative investigators are housed on the second floor of the building. PSB's off-site facility has two dedicated security personnel assigned during normal business hours of 8:00 a.m.-4:00 p.m., Monday-Friday. MCSO remains in compliance with this requirement.

***Paragraph 199.*** *The MCSO will ensure that the qualifications for service as an internal affairs investigator shall be clearly defined and that anyone tasked with investigating employee misconduct possesses excellent investigative skills, a reputation for integrity, the ability to write clear reports, and the ability to be fair and objective in determining whether an employee committed misconduct. Employees with a history of multiple sustained misconduct allegations, or one sustained allegation of a Category 6 or Category 7 offense from MCSO's disciplinary matrices, will be presumptively ineligible to conduct misconduct investigations. Employees with a history of conducting deficient investigations will also be presumptively ineligible for these duties.*

**In Full and Effective Compliance**

GH-2 reflects the directive of this Paragraph, to ensure that only supervisors who meet the criteria established by this Paragraph are assigned misconduct investigations. The PSB Operations Manual, which formalizes the review process, states that if any supervisor is deemed ineligible, the PSB commander will notify the supervisor's commander in writing, and will ensure that a BlueTeam entry is made to memorialize the supervisor's ineligibility to conduct misconduct investigations. A record of supervisors deemed ineligible to conduct misconduct investigations is maintained in PSB. These procedures were finalized and documented in the PSB Operations Manual, published on December 13, 2018.

WAI 65117

During this reporting period, MCSO reported no new additions to the list of employees prohibited from conducting misconduct investigations. MCSO currently has four supervisors who are ineligible to conduct internal administrative investigations. During the second quarter of 2022, there were no transfers into PSB.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 200.** *In each misconduct investigation, investigators shall:*

a.    *conduct investigations in a rigorous and impartial manner designed to determine the facts;*

b.    *approach investigations without prejudging the facts and without permitting any preconceived impression of the principal or any witness to cloud the investigation;*

c.    *identify, collect, and consider all relevant circumstantial, direct, and physical evidence, including any audio or video recordings;*

d.    *make reasonable attempts to locate and interview all witnesses, including civilian witnesses;*

e.    *make reasonable attempts to interview any civilian complainant in person;*

f.    *audio and video record all interviews;*

g.    *when conducting interviews, avoid asking leading questions and questions that may suggest justifications for the alleged misconduct;*

h.    *make credibility determinations, as appropriate; and*

i.    *attempt to resolve material inconsistencies between employee, complainant, and witness statements.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.
- Professional Standards Bureau Operations Manual, most recently amended on December 31, 2019.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 117 administrative misconduct investigations during this reporting period. All but one was initiated and completed after the new IA and discipline policies became effective in May 2017. PSB investigated 93 of the cases, five were outsourced, and District or Division supervisory personnel investigated 19 of the cases. Of the cases we reviewed, 66 involved external complaints, and 51 were internally generated.

WAI 65118

Paragraph 200.a. requires that misconduct investigations be conducted in a rigorous and impartial manner. During the last reporting period, all completed investigations that we reviewed complied with the requirements of this Subparagraph. During this reporting period, two investigations (2%) fell short of compliance with this Subparagraph.

Paragraph 200.b. requires that investigations be approached without prejudging the facts or permitting preconceived impressions. During the last reporting period, all completed investigations we reviewed complied with the requirements of this Subparagraph. During this reporting period, all completed investigations we reviewed again complied with the requirements of this Subparagraph.

Paragraph 200.c. requires that investigators identify, collect, and consider all relevant evidence. During the last reporting period, all completed investigations we reviewed complied with the requirements of this Subparagraph. During this reporting period, one investigation (1%) we reviewed failed to comply with the requirements of this Subparagraph.

Paragraph 200.d. requires that investigators make reasonable attempts to locate and interview all witnesses. During the last reporting period, two investigations (2%) fell short of compliance with the requirements of this Subparagraph. During this reporting period, all investigations we reviewed complied with the requirements of this Subparagraph.

Paragraph 200.e. requires that investigators make reasonable attempts to interview civilian complainants in person. During this and previous reporting periods, there have been numerous investigations in which investigators did not make attempts to interview complainants in person. The majority have been consistently attributed to concerns related to COVID-19. Again, this reporting period, there were investigations without attempts to conduct in-person interviews due to COVID-19 restrictions in place. We did not identify any investigations where PSB did not make any attempts to conduct an in-person interview; and no explanation was provided for not doing so. PSB discontinued the authorization to conduct telephone interviews based on COVID restrictions, effective May 1, 2022.

Paragraph 200.f. requires audio- and video-recording of all interviews. Of the 117 administrative investigations reviewed for this reporting period, there were 28 cases where interviews were not both audio- and video-recorded. Nineteen were the result of COVID-19 restrictions. The remaining nine were a result of complainants who were located out of state or preferred a telephone interview.

Paragraph 200.g. requires that when conducting interviews, investigators avoid asking leading questions or questions that may suggest justification for the alleged misconduct. During the last reporting period, two investigations (2%) fell short of compliance with this Subparagraph. During this reporting period, three investigations (3%) fell short of compliance with this Subparagraph.

Paragraph 200.h. requires that proper credibility determinations be made. During the last reporting period, one investigation (1%) fell short of compliance with this Subparagraph. During this reporting period, one investigation (1%) again fell short of compliance with this Subparagraph.

WAI 65119

Paragraph 200.i. requires that investigators attempt to resolve all material inconsistencies. During the last reporting period, one investigation (1%) fell short of compliance with this Subparagraph. During this reporting period, one investigation (1%) again fell short of compliance with this Subparagraph.

**Paragraph 201.** *There will be no automatic preference for an employee's statement over a non-employee's statement. Internal affairs investigators will not disregard a witness's statement solely because the witness has some connection to either the complainant or the employee or because the witness or complainant has a criminal history, but may consider the witness's criminal history or any adjudicated findings of untruthfulness in evaluating that witness's statement. In conducting the investigation, internal affairs investigators may take into account the record of any witness, complainant, or officer who has been determined to have been deceptive or untruthful in any legal proceeding, misconduct investigation, or other investigation.*

**In Full and Effective Compliance**

To determine Phase 2 compliance with this Paragraph, we reviewed 117 administrative misconduct investigations during this reporting period.

Of the 117 investigations, 66 involved complainants that were not identified as MCSO employees. Twenty-nine of the investigations included interviews with witnesses or investigative leads who were not MCSO employees. We did not identify any case where we believe there was an automatic preference for the statement of an employee over a non-employee's statement.

We did not identify any completed investigations where a witness's statement was disregarded solely because of any connection identified in this Paragraph, nor where a witness's criminal history or findings of truthfulness were considered.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 202.** *Internal affairs investigators will investigate any evidence of potential misconduct uncovered during the course of the investigation, regardless of whether the potential misconduct was part of the original allegation.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.
- Professional Standards Bureau Operations Manual, most recently amended on December 31, 2019.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 117 administrative misconduct investigations during this reporting period. In 23 of the 117 investigations, MCSO identified additional potential misconduct during the investigations and properly added additional

WAI 65120

allegations, initiated new investigations, or addressed the violations with an appropriate supervisor intervention. We identified five investigations (4%) during this reporting period where we believe that additional misconduct may have occurred and was not addressed by MCSO.

**Paragraph 203.** *If the person involved in the encounter with the MCSO pleads guilty or is found guilty of an offense, internal affairs investigators will not consider that information alone to be determinative of whether an MCSO employee engaged in misconduct, nor will it by itself justify discontinuing the investigation. MCSO training materials and policies on internal investigations will acknowledge explicitly that the fact of a criminal conviction related to the administrative investigation is not determinative of whether an MCSO employee engaged in misconduct and that the mission of an internal affairs investigator is to determine whether any misconduct occurred.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.
- Professional Standards Bureau Operations Manual, most recently amended on December 31, 2019.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed administrative misconduct investigations during this reporting period.

There were no indications in any of the completed investigations we reviewed that any MCSO investigators considered alone any pleading or finding of guilty by any person as a reason to make any determination regarding the potential misconduct of any MCSO personnel, nor were any investigations discontinued for this reason.

**Paragraph 204.** *Internal affairs investigators will complete their administrative investigations within 85 calendar days of the initiation of the investigation (60 calendar days if within a Division). Any request for an extension of time must be approved in writing by the Commander of the Professional Standards Bureau. Reasonable requests for extensions of time may be granted.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.

**Phase 2:** Not in compliance

To determine Phase 2 compliance with this Paragraph, we review administrative misconduct investigations conducted by MCSO.

WAI 65121

PSB conducted 93 of the 117 administrative misconduct investigations we reviewed for this reporting period. Thirty-five (38%) of the 93 were completed within the required 85-day timeframe or had an approved extension for a reason specific to the investigation, an improvement from 27% for the last reporting period. Five of the completed investigations had been outsourced to an outside entity by PSB. One (20%) was completed within the required timeframe or had an acceptable extension justification.

Of the 19 investigations completed by Districts and Divisions outside of PSB, three (16%) were initially submitted to PSB within the required timeframe or had an acceptable extension justification, an improvement from 9% the last reporting period. As has been our practice for numerous reporting periods, we determine the 60-day period compliance findings for those investigations conducted by personnel outside of PSB based on the original date the investigation is approved by the District or Division Commander and forwarded to PSB. In those cases where deficiencies are identified, the cases will continue to be found noncompliant in other relevant Paragraphs, and specifically in Paragraph 213, which requires the District or Division Commander ensure that investigations conducted by their personnel are complete and the findings are supported by the evidence prior to their submittal to PSB.

As we noted in Paragraph 194, timely completion of administrative investigations has continued to be of concern for many reporting periods. Of the 117 administrative misconduct investigations we reviewed during this reporting period, 39 investigations (33%) were completed and submitted by the investigator within the required 60- or 85-day timeframe or contained an acceptable extension request and approval. This is an increase in compliance from 22% during the last reporting period.

In addition to those investigations not completed within 60 or 85 days as required by this Paragraph, of the 117 total investigations, 78 (67%) were not completed within 180 days and did not have an acceptable extension request or approval. This is a decrease in noncompliance from 78% during the last reporting period.

During our July 2022 site visit, PSB advised that the average time for full closure of administrative investigations was 562 days, a decrease from the 611 days reported during our April 2022 site visit and the 650 days reported at our January 2022 site visit. We are hopeful that this trend will continue. As we have noted in our last eight quarterly status reports, we no longer accept workload as the justification for the failure to complete investigations in a timely manner. The time it takes to conduct and close investigations remains unacceptable and it is the agency that bears the responsibility to address this issue with decisive action.

MCSO is not in Phase 2 compliance for this Paragraph.

WAI 65122

***Paragraph 205.***  *The Professional Standards Bureau shall maintain a database to track all ongoing misconduct cases, and shall generate alerts to the responsible investigator and his or her Supervisor and the Commander of the Professional Standards Bureau when deadlines are not met.*

**Phase 1:**  In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on December 8, 2021.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2022.

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.

- GH-5 (Early Identification System), most recently amended on December 16, 2021.

- Professional Standards Bureau Operations Manual, most recently amended on December 31, 2019.

**Phase 2:**  In compliance

We determine compliance with this Paragraph by assigning a member of our Team to observe demonstrations of the IAPro database during our site visits or other meetings with PSB throughout the reporting period.  The IAPro technology serves as the centralized electronic numbering and tracking system for all allegations of misconduct, whether internally discovered or based on an external complaint.  This database contains the capacity to manage and store information required for compliance with this Paragraph.

During our site visits, we have met with PSB personnel on numerous occasions and observed IAPro to ensure that the system generates appropriate alerts to responsible investigators and PSB commanders if deadlines are not met.  We have reviewed emails PSB disseminates each month to Districts and Divisions to identify investigative deadlines.  We have also reviewed the BlueTeam Dashboard, which uses a color-coded system to identify investigations that are nearing deadlines or are past deadlines.  The information appears in each supervisor's BlueTeam account when they are monitoring open cases.

The civilian PSB Special Projects Manager is primarily responsible for administering the centralized tracking system.  In addition, all PSB and Division investigators can access the electronic BlueTeam database – a system that integrates with IAPro – at any time to view the assignment and status of administrative investigations.  PSB has also trained two lieutenants to administer the system.

In May 2018, PSB relocated to an offsite location.  In July 2018, a member of our Team verified that the existing tracking mechanisms continue to be used for the tracking of investigations at the new facility.

During our January, July, and October 2019 site visits, a member of our Team verified that the tracking mechanisms remain in place.  We also continued to receive monthly notifications from PSB regarding closed administrative investigations, and we evaluate these closed investigations for the entirety of a reporting period against a multitude of criteria, including whether the cases were completed in a timely fashion.

WAI 65123

During this reporting period, we continued to receive monthly notifications from PSB regarding closed administrative misconduct investigations; and we continue to evaluate these closed investigations for the entirety of a reporting period against a multitude of criteria, including whether the cases were completed in a timely fashion.  (See Paragraph 204.)

**Paragraph 206.**   *At the conclusion of each investigation, internal affairs investigators will prepare an investigation report.  The report will include:*

a.    *a narrative description of the incident;*

b.    *documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the incident.  In situations in which there are no known witnesses, the report will specifically state this fact.  In situations in which witnesses were present but circumstances prevented the internal affairs investigator from determining the identification, phone number, or address of those witnesses, the report will state the reasons why.  The report will also include all available identifying information for anyone who refuses to provide a statement;*

c.    *documentation of whether employees were interviewed, and a transcript or recording of those interviews;*

d.    *the names of all other MCSO employees who witnessed the incident;*

e.    *the internal affairs investigator's evaluation of the incident, based on his or her review of the evidence gathered, including a determination of whether the employee's actions appear to be within MCSO policy, procedure, regulations, orders, or other standards of conduct required of MCSO employees;*

f.    *in cases where the MCSO asserts that material inconsistencies were resolved, explicit credibility findings, including a precise description of the evidence that supports or detracts from the person's credibility;*

g.    *in cases where material inconsistencies must be resolved between complainant, employee, and witness statements, explicit resolution of the inconsistencies, including a precise description of the evidence relied upon to resolve the inconsistencies;*

h.    *an assessment of the incident for policy, training, tactical, or equipment concerns, including any recommendations for how those concerns will be addressed;*

i.    *if a weapon was used, documentation that the employee's certification and training for the weapon were current; and*

j.    *documentation of recommendations for initiation of the disciplinary process; and*

k.    *in the instance of an externally generated complaint, documentation of all contacts and updates with the complainant.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.

WAI 65124

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 117 administrative misconduct investigations during this reporting period.

Paragraph 206.a. requires a written description on the incident be included in the investigative report.  All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.b. requires documentation of evidence gathered, including all known information about witnesses.  All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.c. requires documentation of whether employees were interviewed, and a transcript or recording of these interviews.  All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.d. requires that the names of all MCSO employees who witnessed the incident be included in the report.  All completed investigations we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.e. requires that the internal affairs investigator's evaluation of the incident includes a determination of whether the employee's actions appear to be within MCSO policy, procedure, regulations, orders, or other standards of conduct required of MCSO employees.  All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.f. requires that when MCSO asserts that material inconsistencies were resolved, explicit credibility findings, including a precise description of the evidence that supports or detracts from the person's credibility must be provided.  During this reporting period, we identified one investigation (1%) where sufficient credibility assessments were not provided.  We continue to meet with PSB Command staff to discuss the importance of clearly identifying these requirements in investigative reports and will continue to closely monitor compliance with this Subparagraph.

Paragraph 206.g. requires that when material inconsistencies must be resolved, a precise description of the evidence be included in the report.  During this reporting period, we identified one investigation (1%) where we do not believe material inconsistencies were properly resolved.  We continue to meet with PSB Command staff to discuss the importance of clearly identifying these requirements in investigative reports and will continue to closely monitor compliance with this Subparagraph.

Paragraph 206.h. requires that assessment of the incident for policy, training, tactical, or equipment concerns be included in the investigative report, to include any recommendations.  All of the completed investigations that we reviewed complied with the requirements of this Subparagraph.

WAI 65125

Paragraph 206.i. requires that if a weapon was used, documentation that the employee's certification and training for the weapon must be included in the investigative written report. All of the completed investigations we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.j. requires that documentation of the initiation of the disciplinary process be included in the investigation. Compliance is achieved when the misconduct investigator completes the investigation with a finding of sustained, when applicable, and the PSB Commander subsequently approves the finding. This is considered the initiation of the disciplinary process. Forty of the 117 administrative misconduct investigations we reviewed had sustained findings against one or more active MCSO employee. All complied with the requirements of this Subparagraph.

Paragraph 206.k. requires that any contacts and updates with the complainant be documented in the investigative report. We did not identify any instances during this reporting period where this did not occur.

**Paragraph 207.** *In assessing the incident for policy, training, tactical, or equipment concerns, investigation reports will include an assessment of whether:*

a.   *the law enforcement action was in compliance with training and legal standards;*

b.   *the use of different tactics should or could have been employed;*

c.   *the incident indicates a need for additional training, counseling, or other non-disciplinary corrective actions; and*

d.   *the incident suggests that the MCSO should revise its policies, strategies, tactics, or training.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.
- Professional Standards Bureau Operations Manual, most recently amended on December 31, 2019.

**Phase 2:** In compliance

During this reporting period, we reviewed 117 administrative misconduct investigations. MCSO properly assessed and documented whether any of the requirements of this Paragraph were relevant in all of the completed cases we reviewed for this reporting period. MCSO identified 15 cases where action related to this Paragraph was appropriate; and addressed the concerns with memos of concern, additional training, or where appropriate, policy review.

PSB continues to use an internal tracking form to ensure that those concerns that are forwarded to other Divisions within MCSO for action or review are addressed. We receive and review this tracking document each month. During the last reporting period, we identified numerous pending concerns that need to be addressed, many of which were related to policy review or other administrative concerns. During this reporting period, many of our concerns – which continue to

WAI 65126

involve policy review, equipment, or procedural issues – continue to show that many matters are still pending, in some cases for several years. While we acknowledge that some concerns may take longer to address, MCSO should make additional effort to resolve these concerns. We also noted during this reporting period that there are some pending concerns that involve specific employees. We will address these issues during our next site visit.

***Paragraph 208.*** *For each allegation of misconduct, internal affairs investigators shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation:*

a.      *"Unfounded," where the investigation determines, by clear and convincing evidence, that the allegation was false or not supported by fact;*

b.      *"Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur and justifies a reasonable conclusion of a policy violation;*

c.      *"Not Sustained," where the investigation determines that there is insufficient evidence to prove or disprove the allegation; or*

d.      *"Exonerated," where the investigation determines that the alleged conduct did occur but did not violate MCSO policies, procedures, or training.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review administrative misconduct investigations conducted by MCSO personnel and completed during the reporting period. We evaluate compliance with this Paragraph against the standard of whether a finding was made, and whether the finding was correct.

During the last reporting period, we concurred with the findings of the PSB Commander in 97 (97%) of the 101 cases that we reviewed.

During this reporting period, we concurred with the findings of the PSB Commander in 114 (97%) of the 117 administrative misconduct investigations we reviewed. In two investigations, we believe that MCSO should have made sustained findings but did not. In one investigation, we believe that the PSB Commander determined findings without ensuring that all investigative work was completed; and we do not concur with his findings.

WAI 65127

***Paragraph 209.***  *For investigations carried out by Supervisors outside of the Professional Standards Bureau, the investigator shall forward the completed investigation report through his or her chain of command to his or her Division Commander.  The Division Commander must approve the investigation and indicate his or her concurrence with the findings.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 19 administrative misconduct investigations conducted by Districts or Divisions outside of PSB.  All 19 were forwarded to PSB as required, and all contained the approval of the responsible District or Division Commander.  As noted in previous reporting periods, and again during *this* reporting period, some of the District or Division level investigations were not in compliance with various requirements of the Second Order – as indicated throughout this report.  However, we assessed MCSO's compliance with this Paragraph based on these cases being forwarded through the chain of command for approval of the investigation and findings.

***Paragraph 210.***  *For investigations carried out by the Professional Standards Bureau, the investigator shall forward the completed investigation report to the Commander.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we reviewed 93 administrative misconduct investigations that were conducted by PSB personnel.  All 93 complied with the requirements of this Paragraph.  The five investigations outsourced by PSB also complied with the requirements of this Paragraph.

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

***Paragraph 211.***  *If the Commander—meaning the Commander of the PSB or the Commander of the Division in which the internal affairs investigation was conducted—determines that the findings of the investigation report are not supported by the appropriate standard of proof, the Commander shall return the investigation to the investigator for correction or additional investigative effort, shall document the inadequacies, and shall include this documentation as an addendum to the original investigation.  The investigator's Supervisor shall take appropriate action to address the inadequately supported determination and any investigative deficiencies that led to it.  The Commander shall be responsible for the accuracy and completeness of investigation reports prepared by internal affairs investigators under his or her command.*

WAI 65128

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.

**Phase 2:** Not in compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 117 administrative misconduct investigations conducted by MCSO and completed during this reporting period.

PSB investigated 93 of the 117 administrative misconduct investigations we reviewed during this reporting period and outsourced an additional four. In 90 (97%) of the 93 investigations conducted by PSB, we found the investigations to be thorough, and the reports were well-written. We identified specific concerns with three investigations. In two, we believe PSB arrived at an inappropriate finding, and in the third, we believe PSB determined a finding without conducting an appropriate investigation. Based on our review of these cases, which includes all compliance requirements, 30 investigations (32%) of the 93 total investigations are in compliance, an increase from 19% in the last quarter.

PSB outsourced five of the completed investigations we reviewed for this reporting period. All five were outsourced to the new vendor under the pilot program initiated to address some of the case backlog. Four (80%) were found to be appropriately investigated and the reports thorough, an increase from the 75% in investigative compliance during the last reporting period. In one, we believe additional misconduct may have occurred and was not addressed. Based on our review of these cases, which includes all compliance requirements, one (20%) of the five cases was in full compliance.

Of the 19 investigations investigated by Districts or Divisions outside of PSB, we identified eight investigations (42%) where we had some concerns regarding the investigation or documentation. This is an increase from 32% in the last reporting period. These concerns, again, included: arriving at an improper finding; asking leading questions; failure to complete a proper investigation; failure to address all potential misconduct, or a combination of investigative and administrative deficiencies. Our assessment of these investigations, which includes our assessment of extension requests, found that only one (5%) of the 19 investigations was in compliance. This is the same percentage as the last reporting period.

In January 2018, we requested that MCSO begin providing us with documentation that reflects the actions being taken to address deficient misconduct investigations. We requested that PSB and command personnel provide a response to this request on a monthly basis. We have consistently received the requested documentation since March 2018.

During this reporting period, based on the response documents provided for this Paragraph, there were three instances where District Command personnel identified deficiencies in investigations completed by their personnel that needed to be addressed. We will continue to monitor whether identified deficiencies are being addressed in a timely manner.

We have noted in numerous prior reporting periods that both the supervisors who complete deficient investigations and the command personnel who approve them must be held accountable if MCSO is to achieve Phase 2 compliance with this Paragraph. During this reporting period, our review of cases completed by PSB personnel continues to indicate PSB's ongoing efforts to

WAI 65129

achieve compliance.  PSB's investigative compliance was 97%.  During the last reporting period, we noted an increase in compliance from 53% to 68% for those cases completed by Districts and Divisions outside of PSB.  During this reporting period, investigative compliance for these cases decreased to 58%; and we continue to see the same types of concerns we have noted over multiple reporting periods.

***Paragraph 212.***   *Where an internal affairs investigator conducts a deficient misconduct investigation, the investigator shall receive the appropriate corrective and/or disciplinary action. An internal affairs investigator's failure to improve the quality of his or her investigations after corrective and/or disciplinary action is taken shall be grounds for demotion and/or removal from a supervisory position or the Professional Standards Bureau.*

**Phase 1:**  In compliance

- GB-2 (Command Responsibility), most recently amended on June 28, 2019.

- GC-4 (Employee Performance Appraisals), most recently amended on April 27, 2022.

- GC-4 (S) (Employee Performance Management), most recently amended on November 10, 2021.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 117 administrative misconduct investigations during this reporting period.

The 40-hour Misconduct Investigative Training was completed in late 2017.  In January 2018, we requested that MCSO begin providing us with a document that reflects what actions are being taken to address deficient misconduct investigations on a monthly basis.  As discussed in Paragraph 211, we have consistently received documentation since March 2018.  During this reporting period, PSB identified and documented numerous deficiencies with investigations. District Commanders and Division Chiefs identified and addressed three instances where deficiencies were found in investigations conducted by their personnel.

We will continue to closely monitor these monthly reports submitted by MCSO command personnel, along with reviewing completed misconduct investigations, to ensure deficiencies are being properly identified and addressed.

WAI 65130

***Paragraph 213.*** *Investigations of minor misconduct conducted outside of the Professional Standards Bureau must be conducted by a Supervisor and not by line-level deputies. After such investigations, the investigating Supervisor's Commander shall forward the investigation file to the Professional Standards Bureau after he or she finds that the misconduct investigation is complete and the findings are supported by the evidence. The Professional Standards Bureau shall review the misconduct investigation to ensure that it is complete and that the findings are supported by the evidence. The Professional Standards Bureau shall order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings. Where the findings of the investigation report are not supported by the appropriate standard of proof, the Professional Standards Bureau shall document the reasons for this determination and shall include this documentation as an addendum to the original investigation.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 117 administrative misconduct investigations during this reporting period. Of the 117 investigations, 93 were investigated by PSB personnel, five were outsourced, and 19 were investigated by MCSO personnel outside of PSB.

None of the documentation we received regarding investigations conducted outside of PSB indicated that any person below the rank of sergeant was responsible for the investigation.

During the last reporting period, all 22 District or Division-level approved cases were forwarded to, and reviewed by, PSB as required. Seven investigations (32%) had identified deficiencies.

During this reporting period, all 19 District or Division-level investigations we reviewed were forwarded to and reviewed by PSB as required. Eight investigations (42%) had identified deficiencies, an increase from 32% during the last reporting period. As we have noted over numerous reporting periods, deficiencies continue to include leading questions, failure to conduct a thorough investigation, or a combination of investigative and administrative deficiencies. We also note that all of these investigations were initiated in 2020 or 2021, after the increased oversight began; and all were reviewed for compliance by one or more members of District or Division command staff prior to forwarding them to PSB. Many of the concerns found in these investigations could and should have been identified and addressed prior to forwarding them to PSB. Our assessment of the 19 investigations, which includes the reasonableness of extension requests, found that only one (5%) of the 19 investigations was in compliance, the same percentage as the last reporting period.

As is our practice, we will discuss these cases with MCSO during our next site visit.

WAI 65131

*Paragraph 214.  At the discretion of the Commander of the Professional Standards Bureau, a misconduct investigation may be assigned or re-assigned to another Supervisor with the approval of his or her Commander, whether within or outside of the District or Bureau in which the incident occurred, or may be returned to the original Supervisor for further investigation or analysis.  This assignment or re-assignment shall be explained in writing.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we reviewed 117 administrative misconduct investigations during this reporting period.

Our analysis for this reporting period revealed that of the 19 investigations conducted outside of PSB, none were returned by PSB to the original investigating supervisor for further investigation or analysis.  None were reassigned to a different investigator.

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

*Paragraph 215.  If, after an investigation conducted outside of the Professional Standards Bureau, an employee's actions are found to violate policy, the investigating Supervisor's Commander shall direct and ensure appropriate discipline and/or corrective action.  Where the incident indicates policy, training, tactical, or equipment concerns, the Commander shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we reviewed 19 administrative misconduct investigations conducted by MCSO personnel outside of PSB and completed during this reporting period.

Eight of the 19 completed misconduct investigations conducted outside of PSB resulted in sustained findings.  In six, the reports included documentation that discipline or corrective action was taken.   In two, the involved employees left MCSO prior to the completion of the investigations.   There were no instances where other actions by Command personnel were necessary.

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 65132

*Paragraph 216.  If, after an investigation conducted by the Professional Standards Bureau, an employee's actions are found to violate policy, the Commander of the Professional Standards Bureau shall direct and ensure appropriate discipline and/or corrective action.  Where the incident indicates policy, training, tactical, or equipment concerns, the Commander of the Professional Standards Bureau shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2022.

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.

- Professional Standards Bureau Operations Manual, most recently amended on December 31, 2019.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 117 administrative misconduct investigations during this reporting period.

Ninety-three of the completed investigations were conducted by PSB.  The five outsourced cases are also included here as PSB maintains responsibility for these cases.  Thirty-four of these cases resulted in sustained findings against current MCSO employees.  In all 34, the PSB Commander ensured that appropriate discipline and/or corrective action was recommended for the sustained allegations.

We continue to note that the PSB Commander cannot ensure that appropriate discipline or corrective action are the final outcome of sustained misconduct investigations, as the Appointing Authority makes the final decisions for discipline in both minor misconduct cases and in serious misconduct cases that result in PDHs.  This hearing officer has the authority to change the findings or reduce the discipline.  In seven cases we reviewed this reporting period, the Appointing Authority mitigated the discipline for the sustained allegations.  In all seven, he provided justification and documentation.  In five, mitigation fell within the established range of discipline and is therefore in compliance.  In two, the Appointing Authority mitigated the discipline outside of the range.  He provided adequate justification for doing so, and we concur with his decision.

*Paragraph 217.  The Professional Standards Bureau shall conduct targeted and random reviews of discipline imposed by Commanders for min or misconduct to ensure compliance with MCSO policy and legal standards.*

**In Full and Effective Compliance**

Based on the requirements of the Second Order, District and Division Commanders will not impose discipline for minor misconduct.  In all cases, the PSB Commander will determine the final findings for internal investigations and the presumptive range of discipline for those cases with sustained findings.  The Appointing Authority will then make the final determination of discipline.

WAI 65133

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 218.**   *The Professional Standards Bureau shall maintain all administrative investigation reports and files after they are completed for record-keeping in accordance with applicable law.*

### In Full and Effective Compliance

To determine compliance with this Paragraph, we have observed that PSB maintains both hardcopy and electronic files intended to contain all documents required for compliance with this Paragraph.

A member of our Team inspected the file rooms where hardcopies of administrative investigations were stored and randomly reviewed case files to verify compliance on multiple occasions when PSB was housed at MCSO Headquarters.  Our Team member also used the access granted to IAPro to randomly select internal affairs case files to verify that all information was being maintained electronically.

PSB completed the move to its new offsite facility in May 2018.  Subsequent to the move, a member of our Team conducted an inspection of the file rooms in the new facility; and reviewed a random sample of internal investigations in IAPro to verify ongoing compliance.

During our January 2019 site visit, a member of our Team verified continued compliance at the new PSB facility by inspecting both the criminal and administrative investigation file rooms and randomly reviewing internal affairs case files to verify that all information was also being electronically maintained in IAPro.

During our July 2019 site visit, a member of our Team verified, by accessing IAPro and reviewing randomly selected cases, that electronic files were being properly maintained.

During our October 2019 site visit, a member of our Team again verified compliance at the PSB facility by inspecting both the criminal and administrative investigation file rooms and randomly reviewing internal affairs case files to verify that all information is also being electronically maintained in IAPro.

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 65134

### D.   Discipline

**Paragraph 219.**   *The Sheriff shall ensure that discipline for sustained allegations of misconduct comports with due process, and that discipline is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented regardless of the command level of the principal of the investigation.*

**Paragraph 220.**   *To ensure consistency in the imposition of discipline, the Sheriff shall review the MCSO's current disciplinary matrices and, upon approval of the parties and the Monitor, will amend them as necessary to ensure that they:*

a.   *establish a presumptive range of discipline for each type of violation;*

b.   *increase the presumptive discipline based on an employee's prior violations;*

c.   *set out defined mitigating and aggravating factors;*

d.   *prohibit consideration of the employee's race, gender, gender identity, sexual orientation, national origin, age, or ethnicity;*

e.   *prohibit conflicts, nepotism, or bias of any kind in the administration of discipline;*

f.   *prohibit consideration of the high (or low) profile nature of the incident, including media coverage or other public attention;*

g.   *clearly define forms of discipline and define classes of discipline as used in policies and operations manuals;*

h.   *provide that corrective action such as coaching or training is not considered to be discipline and should not be used as a substitute for discipline where the matrix calls for discipline;*

i.   *provide that the MCSO will not take only non-disciplinary corrective action in cases in which the disciplinary matrices call for the imposition of discipline;*

j.   *provide that the MCSO will consider whether non-disciplinary corrective action is also appropriate in a case where discipline has been imposed;*

k.   *require that any departures from the discipline recommended under the disciplinary matrices be justified in writing and included in the employee's file; and*

l.   *provide a disciplinary matrix for unclassified management level employees that is at least as demanding as the disciplinary matrix for management level employees.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2022.

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.

WAI 65135

- Administrative Services Division Operations Manual, most recently amended on October 27, 2021.
- Professional Standards Bureau Operations Manual, most recently amended on December 31, 2019.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations.

During this reporting period, the PSB Commander sustained misconduct against one or more identified employees in 61 of the 117 administrative misconduct investigations we reviewed. In 40 of the sustained investigations, one or more of the principal employees were still employed at MCSO at the time findings or discipline decisions were made. In two of these, probationary releases occurred. Of the remaining 38, 12 resulted in coachings, and 26 resulted in discipline. Compliance for this Paragraph is based on the discipline findings for both minor and serious discipline. In those cases where only serious discipline is recommended, compliance findings specific to those cases are addressed in Paragraph 226.

Paragraph 220.a. requires a presumptive range of discipline for each type of violation. Of the 61 total sustained cases, 40 involved known employees still employed by MCSO at the time discipline decisions were made. The PSB Commander determined and documented the presumptive discipline range in compliance with this Subparagraph in all of these cases.

Paragraph 220.b. requires that presumptive discipline be increased if an employee has prior violations. In six of the 40 sustained investigations, the employee had prior sustained violations. The PSB Commander considered and increased the presumptive discipline based on the Matrices in place at the time of the misconduct.

Paragraph 220.c. requires that mitigating and aggravating factors be defined. Aggravating and mitigating factors are not specifically defined in the internal affairs investigation or discipline policy in effect prior to May 18, 2017. The revised discipline policy, effective May 18, 2017, defined these factors. These aggravating or mitigating factors are not identified by the PSB Commander – but by the Appointing Authority when making the final disciplinary decisions.

During this reporting period, all of the sustained cases were initiated after May 18, 2017. The Appointing Authority provided justification and documentation for all factors considered when making the final decisions in all of the cases based on the Matrices in place at the time of the misconduct. We also found that he continues to specifically identify those instances where there are aggravating or mitigating factors in the justification documents when appropriate.

Paragraph 220.d. prohibits the consideration of any prohibited biases when determining discipline. None of the sustained cases that resulted in discipline that we reviewed during this reporting period included any indication that any biases were considered when determining discipline.

WAI 65136

Paragraph 220.e. prohibits any conflicts, nepotism, or bias of any kind in the administration of discipline.   None of the sustained cases we reviewed during this reporting period had any indication of conflicts, nepotism, or bias of any kind when determining the disciplinary sanction.

Paragraph 220.f. prohibits the consideration of the high (or low) profile nature of an incident when determining discipline.   None of the sustained cases we reviewed during this reporting period indicated any consideration of the high- or low-profile nature of the incident when considering discipline.

Paragraph 220.g. requires that clearly defined forms of discipline and classes of discipline be defined.  Phase 2 compliance is not applicable to this Subparagraph.

Paragraph 220.h. requires that corrective action such as coaching or training is not considered to be discipline and should not be used as a substitute for discipline.   There were no instances identified during this reporting period where a coaching was used as a substitute for discipline.

Paragraph 220.i. requires that MCSO will not take only non-disciplinary action in cases where the Discipline Matrices call for the imposition of discipline.   There were no instances during this reporting period where non-disciplinary action was taken for an act of misconduct that was ineligible to be handled as a coaching.

Paragraph 220.j. requires that MCSO consider whether non-disciplinary corrective action is also appropriate.   There was one case reviewed during this reporting period where MCSO determined that non-disciplinary corrective action was also appropriate and proper actions were taken.

Paragraph 220.k. requires that any departure from the discipline recommended under the Discipline Matrices be justified in writing and included in the employee's file.   Thirty-eight investigations with sustained findings resulted in employee discipline or other approved corrective action.  Of the 38 cases with discipline or other corrective action, 12 resulted in minor discipline, and 13 resulted in serious discipline for one or more of the involved employees. Thirteen cases resulted in coachings.  In seven of the cases, the Appointing Authority mitigated the discipline and provided written justification for doing so.  In five, he mitigated the discipline within the range and is therefore in compliance; though in three of these we have concerns about the final discipline.   In two others, he mitigated the discipline outside of the range.  Based on the justification provided, we concur with his decision to do so.

As we have previously noted, compliance for this Paragraph is based on the final outcome for all sustained investigations.   Those instances that involve only serious discipline are specifically covered in Paragraph 226.

Paragraph 220.l. requires that a Discipline Matrix for unclassified management employees be at least as demanding as the Discipline Matrix for management-level employees.  We reviewed the approved policies that affect discipline for unclassified management employees, and they comply with this requirement.   During this reporting period, MCSO did not complete or submit any administrative investigations involving unclassified management employees.

WAI 65137

During this reporting period, all of the sustained investigations were both initiated and completed after May 18, 2017; and are subject to all the requirements relative to investigations and disciplinary procedures contained in policies revised on that date and have both a discipline range and a presumptive discipline. The Appointing Authority provided a written justification in all sustained cases where he made the final decision.

In 31 cases, the final sanction was the presumptive identified by the PSB Commander or another designated employee. In seven cases, the Appointing Authority mitigated the discipline as allowed by MCSO policy.

***Paragraph 221.*** *The Sheriff shall mandate that each act or omission that results in a sustained misconduct allegation shall be treated as a separate offense for the purposes of imposing discipline.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations.

During this reporting period, we reviewed 38 misconduct investigations with sustained allegations that resulted in the recommendation for corrective action or discipline for MCSO employees. We found that MCSO met the requirements for compliance with this Paragraph.

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

***Paragraph 222.*** *The Sheriff shall also provide that the Commander of the Professional Standards Bureau shall make preliminary determinations of the discipline to be imposed in all cases and shall document those determinations in writing, including the presumptive range of discipline for the sustained misconduct allegation, and the employee's disciplinary history.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2022.
- GH-2 (Internal Investigations), most recently amended on October 25, 2022.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations.

During this reporting period, there were 38 sustained investigations that resulted in recommendations for discipline. In all 38, the PSB Commander determined and documented in writing the presumptive range of discipline based on the policies and Discipline Matrices in effect at the time of the investigation. The documentation submitted for this Paragraph included the category, offense number, and employee's discipline history.

WAI 65138

### E.     Pre-Determination Hearings

***Paragraph 223.*** *If the Commander of the Professional Standards Bureau makes a preliminary determination that serious discipline (defined as suspension, demotion, or termination) should be imposed, a designated member of MCSO's command staff will conduct a pre-determination hearing and will provide the employee with an opportunity to be heard.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel where MCSO holds a Pre-Determination Hearing (PDH).

During this reporting period, 40 administrative misconduct investigations resulted in sustained findings against current MCSO employees.  Eighteen of the sustained investigations resulted in recommendations for serious discipline.  In 16 of these, a PDH was held.  In two, a PDH was not held as the involved employees declined to attend.

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

***Paragraph 224.***  *Pre-determination hearings will be audio and video recorded in their entirety, and the recording shall be maintained with the administrative investigation file.*

**In Full and Effective Compliance**

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, in the 16 cases where a Pre-Determination Hearing was held, the hearing was audio- and video-recorded as required, included in the administrative file, and reviewed by a member of our Team.

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

***Paragraph 225.***  *If an employee provides new or additional evidence at a pre-determination hearing, the hearing will be suspended and the matter will be returned to the internal affairs investigator for consideration or further investigation, as necessary.  If after any further investigation or consideration of the new or additional evidence, there is no change in the determination of preliminary discipline, the matter will go back to the pre-determination hearing. The Professional Standards Bureau shall initiate a separate misconduct investigation if it appears that the employee intentionally withheld the new or additional evidence during the initial misconduct investigation.*

**In Full and Effective Compliance**

WAI 65139

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, 16 sustained investigations resulted in a Pre-Determination Hearing and we reviewed all of the recordings of these hearings. There were no instances where we, or the Appointing Authority, identified any concerns that required additional follow-up related to the requirements of this Paragraph.

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 226.**  *If the designated member of MCSO's command staff conducting the pre-determination hearing does not uphold the charges recommended by the Professional Standards Bureau in any respect, or does not impose the Commander of the Professional Standards Bureau's recommended discipline and/or non-disciplinary corrective action, the Sheriff shall require the designated member of MCSO's command staff to set forth in writing his or her justification for doing so.  This justification will be appended to the investigation file.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2022.
- Administrative Services Division Operations Manual, most recently amended on October 27, 2021.

**Phase 2:**  In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During our site visits, we have met with the Appointing Authority and the Administrative Services Division as necessary to discuss any concerns we have with final outcomes or decisions that result from Pre-Determination Hearings.  During these meetings, we have discussed that the Appointing Authority does not have the authority to reduce discipline based only on timeframe concerns when an employee appeals discipline in these cases.  It is the Maricopa County Attorney's Office (MCAO) that reviews these cases and determines whether the cases should go forward.  Both the Appointing Authority and the representative from the MCAO advised that they have taken some of these cases forward; but in others, they did not believe it was appropriate to do so, based on the totality of circumstances.  The Parties have commented on their concerns regarding cases involving the Plaintiffs' class that might result in reductions in discipline as a result of the failure to complete the case within the 180-day timeframe.  We have discussed the specific requirements of Arizona Revised Statutes 38-1101, and that the statute only requires a "good faith" attempt to complete cases that result in suspensions, demotions, or dismissals within the 180-day timeframe. Since the time of our first discussions in 2018, Arizona law has added a definition of good faith. A.R.S. 38-1101 now defines good faith as "honesty of purpose and absence of intent to defraud."

WAI 65140

We have also discussed those cases where a decision may be made after a Pre-Determination Hearing that a reduction in discipline will occur, and those cases where a decision to reduce the discipline may occur if an appeal is filed. It is our understanding from our meetings with the Appointing Authority and other staff who have been present that MCSO consults with MCAO attorneys in these cases and their input is related to the final outcomes. We continue to note that all the documentation we receive and review is authored and signed by the Appointing Authority, so our assessment can only consider any final decisions as his.

During the last reporting period, 10 cases forwarded for consideration of serious discipline resulted in serious discipline. In two, the Appointing Authority mitigated the discipline within the range, and we concurred with this decision.

During this reporting period, nine cases that were forwarded for consideration of serious discipline resulted in serious discipline. In all nine, the Appointing Authority provided a justification for the final decisions; and this information was provided to our Team in the submissions regarding closed internal affairs investigations. In five cases, the Appointing Authority mitigated the discipline within the range, and is therefore in compliance. However, in three of these five cases, though the discipline fell within the range, we believe the final discipline was not appropriate for the offenses. We will discuss our concerns with these three cases during our next site visit. In two cases, the discipline was mitigated outside the range. Based on the totality of circumstances for these two cases and the justification provided, we concur with this decision.

**Paragraph 227.** *The Sheriff shall promulgate MCSO policy which shall provide that the designated member of MCSO's command staff conducting a pre-determination hearing should apply the disciplinary matrix and set forth clear guidelines for the grounds on which a deviation is permitted. The Sheriff shall mandate that the designated member of MCSO's command staff may not consider the following as grounds for mitigation or reducing the level of discipline prescribed by the matrix:*

a.      *his or her personal opinion about the employee's reputation;*

b.      *the employee's past disciplinary history (or lack thereof), except as provided in the disciplinary matrix;*

c.      *whether others were jointly responsible for the misconduct, except that the MCSO disciplinary decision maker may consider the measure of discipline imposed on other employees involved to the extent that discipline on others had been previously imposed and the conduct was similarly culpable.*

**In Full and Effective Compliance**

To assess compliance with this Paragraph, we review completed misconduct investigations.

During this reporting period, we reviewed 38 administrative misconduct investigations where discipline was recommended. The serious sustained allegations in 18 of these investigations resulted in their referrals for Pre-Determination Hearings.

WAI 65141

Paragraph 227.a. prohibits the designated member of command staff conducting a Pre-Determination Hearing from considering a personal opinion of an employee's reputation when determining discipline. There were no indications in our reviews of these investigations that any personal opinion was considered in making a disciplinary decision.

Paragraph 227.b. prohibits the consideration of the employee's past disciplinary history (or lack thereof), except as provided in the Discipline Matrix. There were no instances where we determined that the member of command staff responsible for conducting the Pre-Determination Hearing considered disciplinary history outside of the requirements of this Paragraph.

Paragraph 227.c. prohibits the consideration of others jointly responsible for misconduct, except that the decision-maker may consider such discipline to the extent that discipline on others had been previously imposed and the conduct was similarly culpable. There were no indications in our reviews that the misconduct of others was improperly considered in the disciplinary decisions that were made.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 228.** *The Sheriff or his designee has the authority to rescind, revoke or alter any disciplinary decision made by either the Commander of the Professional Standards Bureau or the appointed MCSO disciplinary authority so long as:*

a.    *that decision does not relate to the Sheriff or his designee;*

b.    *the Sheriff or his designee provides a thorough written and reasonable explanation for the grounds of the decision as to each employee involved;*

c.    *the written explanation is placed in the employment files of all employees who were affected by the decision of the Sheriff or his designee; and*

d.    *the written explanation is available to the public upon request.*

## In Full and Effective Compliance

To assess compliance with this Paragraph, we review completed misconduct investigations.

During this reporting period, we did not review any cases where the Sheriff or his designee rescinded, revoked, or altered any disciplinary decision made by either the Commander of the Professional Standards Bureau or the appointed MCSO disciplinary authority.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 65142

### F.      Criminal Misconduct Investigations

**Paragraph 229.**  *Whenever an internal affairs investigator or Commander finds evidence of misconduct indicating apparent criminal conduct by an employee, the Sheriff shall require that the internal affairs investigator or Commander immediately notify the Commander of the Professional Standards Bureau.   If the administrative misconduct investigation is being conducted by a Supervisor outside of the Professional Standards Bureau, the Sheriff shall require that the Professional Standards Bureau immediately take over the administrative investigation. If the evidence of misconduct pertains to someone who is superior in rank to the Commander of the Professional Standards Bureau and is within the Commander's chain of command, the Sheriff shall require the Commander to provide the evidence directly to what he or she believes is the appropriate prosecuting authority—the Maricopa County Attorney, the Arizona Attorney General, or the United States Attorney for the District of Arizona—without notifying those in his or her chain of command who may be the subject of a criminal investigation.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we review completed criminal misconduct investigations.

During this reporting period, we reviewed three criminal investigations.  Two were externally generated and one was internally generated.  All three were appropriately assigned to criminal investigators in PSB.  The investigations were brought to the attention of the PSB Commander as required and an administrative misconduct investigation was also initiated.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.


**Paragraph 230.**  *If a misconduct allegation will be investigated criminally, the Sheriff shall require that the Professional Standards Bureau not compel an interview of the principal pursuant to Garrity v. New Jersey, 385 U.S. 493 (1967), until it has first consulted with the criminal investigator and the relevant prosecuting authority.   No other part of the administrative investigation shall be held in abeyance unless specifically authorized by the Commander of the Professional Standards Bureau in consultation with the entity conducting the criminal investigation.  The Sheriff shall require the Professional Standards Bureau to document in writing all decisions regarding compelling an interview, all decisions to hold any aspect of an administrative investigation in abeyance, and all consultations with the criminal investigator and prosecuting authority.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by both criminal and administrative investigators to ensure that they contain appropriate documentation that complies with the requirements of this Paragraph.

WAI 65143

We previously determined that in many cases, the administrative investigation is not submitted and reviewed during the same reporting period as the criminal investigation, as generally, administrative investigations are finalized after the completion of the criminal investigation. We discussed this issue with PSB during our January 2017 site visit. To resolve the concern, PSB agreed to provide us with a copy of any criminal investigation when PSB submits the administrative misconduct investigation for our review, even if the criminal investigation has been previously submitted. MCSO has been consistently providing copies of these criminal investigations with the administrative investigation since that time.

During this reporting period, we reviewed three administrative misconduct investigations where criminal conduct may have occurred. In all three, there was a companion criminal investigation completed by MCSO, as required.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.


**Paragraph 231.** *The Sheriff shall require the Professional Standards Bureau to ensure that investigators conducting a criminal investigation do not have access to any statements by the principal that were compelled pursuant to Garrity.*

**In Full and Effective Compliance**

PSB is divided into criminal and administrative sections. Criminal investigators and administrative investigators are housed on separate floors of the building. Criminal investigators do not have access to the IAPro database for administrative investigations, and there are separate file rooms for criminal and administrative investigative documents and reports. We have previously verified during our site visits that the required separation of criminal and administrative investigations and restricted access to IAPro is in place.

In May 2018, PSB relocated to a new offsite location. After PSB's move to its new facility, we verified that criminal and administrative investigation files were housed on separate floors in the new facility. Criminal investigators do not have access to the IAPro database for administrative investigations, and there are separate and secured file rooms for criminal and administrative documents and reports.

During our October 2019 site visit, a member of our Team again verified that criminal and administrative investigative files are housed on separate floors, there is restricted access to both file rooms, and restricted access to IAPro remains in place.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

*Paragraph 232. The Sheriff shall require the Professional Standards Bureau to complete all such administrative investigations regardless of the outcome of any criminal investigation, including cases in which the prosecuting agency declines to prosecute or dismisses the criminal case after the initiation of criminal charges. The Sheriff shall require that all relevant provisions of MCSO policies and procedures and the operations manual for the Professional Standards Bureau shall remind members of the Bureau that administrative and criminal cases are held to different standards of proof, that the elements of a policy violation differ from those of a criminal offense, and that the purposes of the administrative investigation process differ from those of the criminal investigation process.*

**In Full and Effective Compliance**

To determine MCSO's compliance with this Paragraph, we review administrative misconduct and criminal investigations.

During this reporting period, we reviewed three criminal investigations conducted by MCSO personnel. All three have a companion administrative misconduct investigation, as required; and are in compliance with the requirements of this Paragraph.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

*Paragraph 233. If the investigator conducting the criminal investigation decides to close the investigation without referring it to a prosecuting agency, this decision must be documented in writing and provided to the Professional Standards Bureau. The Commander of the Professional Standards Bureau shall separately consider whether to refer the matter to a prosecuting agency and shall document the decision in writing.*

**In Full and Effective Compliance**

To determine MCSO's compliance with this Paragraph, we review criminal misconduct investigations.

During this reporting period, investigators documented their conclusions and decisions to close all three criminal investigations we reviewed without submittal to a prosecuting agency and the PSB Commander approved these decisions.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 65145

***Paragraph 234.*** *If the investigator conducting the criminal investigation decides to refer the matter to a prosecuting agency, the Professional Standards Bureau shall review the information provided to the prosecuting agency to ensure that it is of sufficient quality and completeness. The Commander of the Professional Standards Bureau shall direct that the investigator conduct additional investigation when it appears that there is additional relevant evidence that may improve the reliability or credibility of the investigation. Such directions shall be documented in writing and included in the investigatory file.*

**In Full and Effective Compliance**

To determine MCSO's compliance with this Paragraph, we review criminal misconduct investigations.

During this reporting period, we reviewed three criminal misconduct investigations conducted by PSB personnel. None were submitted to a prosecutorial agency for review.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

***Paragraph 235.*** *If the prosecuting agency declines to prosecute or dismisses the criminal case after the initiation of criminal charges, the Professional Standards Bureau shall request an explanation for this decision, which shall be documented in writing and appended to the criminal investigation report.*

**In Full and Effective Compliance**

To determine MCSO's compliance with this Paragraph, we review criminal misconduct investigations.

During this reporting period, none of three criminal investigations we reviewed was submitted to a prosecutorial agency for review.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

***Paragraph 236.*** *The Sheriff shall require the Professional Standards Bureau to maintain all criminal investigation reports and files after they are completed for record-keeping in accordance with applicable law.*

**In Full and Effective Compliance**

To determine compliance with this Paragraph, we have observed that PSB maintains both hardcopy and electronic files that are intended to contain all the documents required per this Paragraph.

WAI 65146

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

### G.    Civilian Complaint Intake, Communication, and Tracking

**Paragraph 237.**  *Within six months of the entry of this Order, the Monitor, in consultation with the Community Advisory Board, will develop and implement a program to promote awareness throughout the Maricopa County community about the process for filing complaints about the conduct of MCSO employees.*

**Phase 1**:  Not applicable

**Phase 2:**  Not applicable

We developed and implemented a Complaint Process Community Awareness Program to promote awareness throughout the Maricopa County community about the process for filing complaints about the conduct of MCSO employees.  The program provides for distributing brochures describing the complaint process at quarterly community meetings and using public service announcements – made via local media outlets and social media – to provide basic information (in both English and Spanish) about MCSO's complaint process.

We contacted faith organizations and civic groups throughout Maricopa County requesting that they make complaint process information forms available to members of their congregations and groups.  The Complaint Process Community Awareness Program incorporates input from the CAB, MCSO, and the ACLU of Arizona.

**Paragraph 238.**  *The Sheriff shall require the MCSO to accept all civilian complaints, whether submitted verbally or in writing; in person, by phone, by mail, or online; by a complainant, someone acting on the complainant's behalf, or anonymously; and with or without a signature from the complainant.  MCSO will document all complaints in writing.*

**In Full and Effective Compliance**

To assess compliance with this Paragraph, we review all new misconduct complaints received each month and completed misconduct investigations conducted by MCSO personnel.  In addition, we review many initial complaint documents or initial telephone calls, BWC videos, traffic stop videos, Supervisor Notes, Compliance and BIO reviews, and consider findings in the complaint testing process.

During the last reporting period, we reviewed 101 administrative misconduct investigations.  We did not identify any completed investigations where there was an any external allegation that MCSO had failed to initially take a complaint.

During this reporting period, we reviewed 117 completed administrative misconduct investigations.  We identified one instance where an employee did not accept a complaint from a community member.  We will discuss this case with MCSO during our next site visit.

WAI 65147

Our review of traffic stops for this reporting period did not identify any instances where a subject who was arrested made allegations of misconduct by MCSO personnel during his arrest that went unaddressed.  Our review of Supervisor Notes during this reporting period did not identify any incidents where there were indications that a complaint had been made but not properly reported. We reviewed numerous complainant contacts and found no indication that a supervisor initially refused to take a complaint or attempted to dissuade the complainant from making a complaint. Neither CID nor BIO identified any instances in their reviews during this reporting period that indicated that a complainant had attempted to file a complaint and been refused.  We did not identify any complaint intake tests for this reporting period where MCSO failed to accept a complaint.  (See Paragraph 254.)

We continue to find that MCSO consistently accepts and records complaints as required for compliance with this Paragraph.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.


***Paragraph 239.***  *In locations clearly visible to members of the public at the reception desk at MCSO headquarters and at all District stations, the Sheriff and the MCSO will post and maintain permanent placards clearly and simply describing the civilian complaint process that is visible to the public at all hours.  The placards shall include relevant contact information, including telephone numbers, email addresses, mailing addresses, and Internet sites.  The placards shall be in both English and Spanish.*

**In Full and Effective Compliance**

As we did not hold an in-person site visit in July, we were unable to visit MCSO Headquarters and MCSO Districts to determine if the permanent placards were prominently displayed at MCSO Headquarters and Districts.  During our July remote site visit, MCSO reported that, during this reporting period, MCSO did not add or eliminate any locations displaying permanent complaint placards.  MCSO further reported that, during this reporting period, it did not receive any feedback from the community regarding the permanent complaint placards.  When inspected during our last in-person site visit, we noted that MCSO's placard states that anyone who has a concern regarding the performance of any MCSO employee has the right to file a complaint in English or Spanish or their preferred language, to include American Sign Language; in person at any District facility or at the Professional Standards Bureau, by mail, by telephone, by fax, or online.  The placard includes relevant contact information, including telephone numbers, email addresses, mailing addresses, and websites.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 65148

***Paragraph 240.***  *The Sheriff shall require all deputies to carry complaint forms in their MCSO vehicles.  Upon request, deputies will provide individuals with complaint forms and information about how to file a complaint, their name and badge number, and the contact information, including telephone number and email address, of their immediate supervising officer.   The Sheriff must provide all supervising officers with telephones.  Supervising officers must timely respond to such complaints registered by civilians.*

**Phase 1:**  In compliance

- EA-2 (Patrol Vehicles), most recently revised on March 16, 2022.

- GE-4 (Use, Assignment, and Operation of Vehicles), most recently amended on April 6, 2022.

- GJ-24 (Community Relations and Youth Programs), most recently revised on April 7, 2022.

**Phase 2:**  In compliance

As we held our July site visit remotely, we were unable to visit District offices to verify that MCSO maintained adequate supplies of complaint forms for deputies to carry in their vehicles. We were also unable to verify that supervisors were in possession of MCSO-issued cellular telephones.  We will resume these verifications when we resume our in-person site visits.


***Paragraph 241.***  *The Sheriff will ensure that the Professional Standards Bureau facility is easily accessible to members of the public.  There shall be a space available for receiving walk-in visitors and personnel who can assist the public with filing complaints and/or answer an individual's questions about the complaint investigation process.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

The PSB facility, the former East Court Building Library, located at 101 West Jefferson Street in Phoenix, is easily accessible to members of the public.  The County Court facilities in the building are separate from the PSB reception area and offices.  The PSB area is accessible from First Avenue, a major thoroughfare; and there is no required security screening of individuals entering the building through the First Avenue entrance.  As we held our July site visit remotely, we were unable to visit the PSB facility during this reporting period.  We will visit the facility again when we resume our in-person site visits.

MCSO's placards and comment and complaint forms – including the complaint form that is accessible via MCSO's website – all reflect PSB's current address.

WAI 65149

*Paragraph 242.* *The Sheriff will also make complaint forms widely available at locations around the County including: the websites of MCSO and Maricopa County government; the lobby of MCSO's headquarters; each patrol District; and the Maricopa County government offices. The Sheriff will ask locations, such as public library branches and the offices and gathering places of community groups, to make these materials available.*

**Phase 1:** In compliance

- GJ-24 (Community Relations and Youth Programs), most recently revised on April 7, 2022.

**Phase 2:** In compliance

MCSO has complaint forms available in English and Spanish on the MCSO and Maricopa County websites. MCSO maintains a list – of MCSO facilities, County offices, and public locations where community groups meet – where Community Outreach Division personnel attempt to make the forms available.

Due to the cancellation of our in-person site visit in July due to the ongoing COVID-19 pandemic, we were unable to verify that MCSO placed complaint forms in locations that were included on MCSO's list of facilities where complaint forms are available to the public. During this reporting period, we requested that the Community Outreach Division (COrD) provide its proposed changes to the list of locations throughout Maricopa County displaying Comment and Complaint Forms to make the forms more accessible to community members.

As we have noted previously, during our site visit discussions, Community Advisory Board (CAB) members have recommended that the COrD place complaint forms in locations including grocery stores, pharmacies, and other retail stores that are located in communities where members of the Plaintiffs' class live and work. COrD staff reported that they inquired with other businesses, but their corporate offices would not permit the forms to be displayed in their stores. We encourage the COrD to continue to explore other possible locations, as recommended by the CAB, including small businesses without corporate offices.

*Paragraph 243.* *The Sheriff shall establish a free, 24-hour hotline for members of the public to make complaints.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.

**Phase 2:** In compliance

In July 2016, MCSO established the free 24-hour hotline for members of the public to make complaints; the hotline continued to be operational during this reporting period. A Monitoring Team member periodically called the hotline during this reporting period; and verified that the hotline is operational in both English and Spanish, and provides instructions in both languages on how to register a complaint. The recording advises callers that if the call is an emergency, they are to call 911. Callers are requested to provide their name, telephone number, and a brief

WAI 65150

summary of their complaint.  If callers leave a recorded message, they are advised that MCSO will contact them as soon as possible.  If callers do not wish to leave a recorded message, they are provided with a telephone number to call to speak to a supervisor.  That number connects the callers to the MCSO switchboard operator, who will connect the caller to an appropriate supervisor.  Callers are further advised of MCSO's operating hours if they wish to contact PSB directly.

The hotline is housed in PSB, and PSB personnel access any recorded messages at the beginning of each business day.  PSB personnel reported that the only new hotline complaint received during this reporting period was a complaint intake test from BIO.  (The most recently received hotline complaint that remains open was received on May 12, 2021.)  Currently, there are 10 hotline complaints under investigation, two of which are under Command review.  None of the 10 complaints are deemed service complaints.

The procedures established and followed by PSB provide for creating a record of every complaint received on the hotline and maintaining a log of follow-up actions regarding referral of the complaint.

**Paragraph 244.**  *The Sheriff shall ensure that the MCSO's complaint form does not contain any language that could reasonably be construed as discouraging the filing of a complaint, such as warnings about the potential criminal consequences for filing false complaints.*

**In Full and Effective Compliance**

Our review of the English and Spanish complaint forms' content did not reveal any language that could reasonably be construed as discouraging the filing of a complaint.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 245.**  *Within two months of the entry of this Order, complaint forms will be made available, at a minimum, in English and Spanish.  The MCSO will make reasonable efforts to ensure that complainants who speak other languages (including sign language) and have limited English proficiency can file complaints in their preferred language.  The fact that a complainant does not speak, read, or write in English, or is deaf or hard of hearing, will not be grounds to decline to accept or investigate a complaint.*

**In Full and Effective Compliance**

Complaint forms in English and Spanish are accessible on MCSO's website.  The complaint form states that anyone who has a concern regarding the performance of any MCSO employee has the right to file a complaint – in English or Spanish or their preferred language, to include American Sign Language – in person at any District facility or at the Professional Standards Bureau, by mail, by telephone, by fax, or online.  The forms provide street addresses, contact numbers, and website information.

WAI 65151

During this reporting period, no grievances were filed that met the criteria for transmitting to the Monitor.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 246.**  *In the course of investigating a civilian complaint, the Professional Standards Bureau will send periodic written updates to the complainant including:*

a.      *within seven days of receipt of a complaint, the Professional Standards Bureau will send non-anonymous complainants a written notice of receipt, including the tracking number assigned to the complaint and the name of the investigator assigned.  The notice will inform the complainant how he or she may contact the Professional Standards Bureau to inquire about the status of a complaint;*

b.      *when the Professional Standards Bureau concludes its investigation, the Bureau will notify the complainant that the investigation has been concluded and inform the complainant of the Bureau's findings as soon as is permitted by law; and*

c.      *in cases where discipline is imposed, the Professional Standards Bureau will notify the complainant of the discipline as soon as is permitted by law.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.

**Phase 2:**  In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations.

During this reporting period, we reviewed 117 administrative misconduct investigations.  Of these, 66 were externally generated.

Paragraph 246.a. requires that a civilian complainant receive a written notice of receipt of his/her complaint within seven days.  This letter must include the tracking number, the name of the investigator assigned, and information regarding how the complainant can inquire about the status of his/her complaint.  In 65 of the 66 externally generated cases where PSB had contact information for the complainant, the letter was sent within seven days as required.  In one, though a letter was sent, it was not sent within the required timeframe.  All of the letters sent and reviewed included the name of the investigator and information regarding how the complainant could inquire about the status of the complaint.

Paragraph 246.b. requires that PSB notify a civilian complainant of the outcome of the investigation.  In all of the externally generated complaints, the complainant was provided a notice of the outcome when contact information was known.

WAI 65152

Paragraph 246.c. requires that PSB notify a civilian complainant of any discipline imposed as soon as permitted by law.  In all of the externally generated complaints with sustained findings, PSB properly notified the complainant of the sustained findings and the discipline imposed when contact information for the complainant was known.

**Paragraph 247.**  *Notwithstanding the above written communications, a complainant and/or his or her representative may contact the Professional Standards Bureau at any time to determine the status of his or her complaint.  The Sheriff shall require the MCSO to update the complainant with the status of the investigation.*

### In Full and Effective Compliance

To assess compliance with this Paragraph, we review completed misconduct investigations.

During this reporting period, we reviewed 117 administrative misconduct investigations.  Sixty-six were externally generated.  We did not identify any instances where a complainant was discouraged from, or denied, contact with MCSO investigators to determine the status of his/her complaint, or to request and receive an update.  MCSO appropriately had contact with complainants as required in Paragraph 246 in all of these cases where the complainant was known and wished to participate in the investigation.  In one of the cases, MCSO personnel reported that they had additional contact with the complainant during the course of the investigation.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 248.**  *The Professional Standards Bureau will track, as a separate category of complaints, allegations of biased policing, including allegations that a deputy conducted an investigatory stop or arrest based on an individual's demographic category or used a slur based on an individual's actual or perceived race, ethnicity, nationality, or immigration status, sex, sexual orientation, or gender identity.  The Professional Standards Bureau will require that complaints of biased policing are captured and tracked appropriately, even if the complainant does not so label the allegation.*

### In Full and Effective Compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations.

Each month, PSB provides a list of new complaints alleging biased policing.  PSB also provides all closed investigations where biased policing was alleged.  For this Paragraph, only allegations of biased policing that do not affect the Plaintiffs' class are reported.  Those complaints alleging bias against members of the Plaintiffs' class are captured in a separate category and reported under Paragraphs 275-288.

WAI 65153

During this reporting period, we reviewed three investigations where potential bias was alleged that did not affect members of the Plaintiffs' class.  All three were investigated by PSB, tracked in a separate category as required by this Paragraph, and reported in Paragraph 33.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 249.**  *The Professional Standards Bureau will track, as a separate category of complaints, allegations of unlawful investigatory stops, searches, seizures, or arrests.*

**In Full and Effective Compliance**

To determine Phase 2 compliance for this Paragraph, we review a monthly report from PSB that provides the information required for compliance.

To ensure that we are consistently informed of complaints relative to this Paragraph, PSB provides information concerning these investigations in its monthly document submission relative to this Paragraph.  During the last reporting period, there were no investigations related to this Paragraph submitted for our review.  Again this reporting period, there were no investigations submitted for review for this Paragraph.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 250.**  *The Professional Standards Bureau will conduct regular assessments of the types of complaints being received to identify and assess potential problematic patterns and trends.*

**In Full and Effective Compliance**

PSB continues to prepare a comprehensive quarterly assessment of the types of complaints received to identify and assess potential problematic patterns or trends.  During this reporting period, PSB received 234 complaints.  PSB's assessment identifies the Divisions that received the highest number of complaints during the quarter, notable patterns and trends identified within MCSO Divisions, a summary of all of the misconduct allegations made during the quarter, and identifies employees with potentially problematic patterns or trends of misconduct during the quarter.

The contents of the quarterly assessment are discussed at executive staff meetings.  PSB also includes the information required by this Paragraph in its public Semi-Annual Misconduct Investigations Report, which is required under Paragraph 251.  The most recent Semi-Annual Report for the period of July 1–December 31, 2021, contains the issues identified as potentially problematic patterns or trends.

WAI 65154

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.  The Plaintiff-Intervenor disagreed, but after a careful review of the Plaintiff-Intervenor's concerns and MCSO's response, MCSO's assertion was upheld.

## H.      Transparency Measures

**Paragraph 251.**  *The Sheriff shall require the Professional Standards Bureau to produce a semi-annual public report on misconduct investigations, including, at a minimum, the following:*

a.      *summary information, which does not name the specific employees involved, about any sustained allegations that an employee violated conflict-of-interest rules in conducting or reviewing misconduct investigations;*

b.      *aggregate data on complaints received from the public, broken down by district; rank of principal(s); nature of contact (traffic stop, pedestrian stop, call for service, etc.); nature of allegation (rudeness, bias-based policing, etc.); complainants' demographic information; complaints received from anonymous complainants or third parties; and principals' demographic information;*

c.      *analysis of whether any increase or decrease in the number of civilian complaints received from reporting period to reporting period is attributable to issues in the complaint intake process or other factors;*

d.      *aggregate data on internally-generated misconduct allegations, broken down by similar categories as those for civilian complaints;*

e.      *aggregate data on the processing of misconduct cases, including the number of cases assigned to Supervisors outside of the Professional Standards Bureau versus investigators in the Professional Standards Bureau; the average and median time from the initiation of an investigation to its submission by the investigator to his or her chain of command; the average and median time from the submission of the investigation by the investigator to a final decision regarding discipline, or other final disposition if no discipline is imposed; the number of investigations returned to the original investigator due to conclusions not being supported by the evidence; and the number of investigations returned to the original investigator to conduct additional investigation;*

f.      *aggregate data on the outcomes of misconduct investigations, including the number of sustained, not sustained, exonerated, and unfounded misconduct complaints; the number of misconduct allegations supported by the appropriate standard of proof; the number of sustained allegations resulting in a non-disciplinary outcome, coaching, written reprimand, suspension, demotion, and termination; the number of cases in which findings were changed after a pre-determination hearing, broken down by initial finding and final finding; the number of cases in which discipline was changed after a pre-determination hearing, broken down by initial discipline and final discipline; the number of cases in which findings were overruled, sustained, or changed by the Maricopa County Law Enforcement Merit System Council, broken down by the finding reached by the MCSO*

WAI 65155

*and the finding reached by the Council; and the number of cases in which discipline was altered by the Council, broken down by the discipline imposed by the MCSO and the disciplinary ruling of the Council; and similar information on appeals beyond the Council; and*

g.       *aggregate data on employees with persistent or serious misconduct problems, including the number of employees who have been the subject of more than two misconduct investigations in the previous 12 months, broken down by serious and minor misconduct; the number of employees who have had more than one sustained allegation of minor misconduct in the previous 12 months, broken down by the number of sustained allegations; the number of employees who have had more than one sustained allegation of serious misconduct in the previous 12 months, broken down by the number of sustained allegations; and the number of criminal prosecutions of employees, broken down by criminal charge.*

**In Full and Effective Compliance**

The PSB Operations Manual identifies the PSB Commander as responsible for preparing the semi-annual public report on misconduct investigations.  The manual also contains provisions for the production of summary information regarding sustained conflict of interest violations; an analysis of the complaint intake process; and aggregate data on complaints (internal and external), processing of misconduct cases, outcomes of misconduct cases, and employees with persistent misconduct problems.

Since July 2019, PSB has issued and posted on MCSO's website its semi-annual public report.  PSB also incorporates information relevant to Paragraph 192 in its semi-annual report, which requires that PSB review, at least semi-annually, all misconduct investigations that were assigned outside the Bureau to determine whether or not the investigation was properly categorized, whether the investigation was properly conducted, and whether appropriate findings were reached.  PSB also incorporates information relevant to Paragraph 250 in this report, which includes an assessment of potential problematic patterns or trends, based on a review on complaints received.

During our October 2019 site visit, PSB informed us that it developed a voluntary survey for complainants to complete after the conclusion of the investigation; the survey would capture complainants' demographic information.  In October 2019, MCSO provided us with a copy of the survey; and we provided our feedback to MCSO.  MCSO has identified a funding source for prepaid postage return envelopes.  The use of the prepaid postage return envelopes will allow the complainants to mail the survey to MCSO without having to incur any fees.  PSB commenced distribution of the surveys to complainants for cases that were closed during January 2020.  In addition, PSB is also informing complainants of a web-based version of the survey that may be completed online.  PSB is now collecting the voluntary surveys that are returned.  PSB continues to include the relevant demographic information in the most recently published semi-annual report.

WAI 65156

In August 2022, PSB issued and posted on MCSO's website its semi-annual public report for period of July 1–December 31, 2021.  The report was prepared consistent with prior reports prepared by PSB and contains the relevant information pertaining to this Paragraph.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 252.**  *The Sheriff shall require the MCSO to make detailed summaries of completed internal affairs investigations readily available to the public to the full extent permitted under state law, in electronic form on a designated section of its website that is linked to directly from the MCSO's home page with prominent language that clearly indicates to the public that the link provides information about investigations of misconduct alleged against MCSO employees.*

**In Full and Effective Compliance**

PSB publishes detailed summaries each month of completed misconduct investigations in an electronic format that is accessible via MCSO's website.  The following data fields have been identified for public disclosure:  Internal Affairs Number; Date Opened; Incident Type; Original Complaint; Policy Violation(s) Alleged/Outcome; Discipline; Investigative Summary; and Date Completed.  During our April 2017 site visit, we approved the PSB template containing detailed summaries of completed misconduct investigations for placement on MCSO's website.  Each reporting period, we conduct a review of the detailed summaries of completed misconduct investigations to ensure that the content is consistent with the requirements of this Paragraph.  In addition, we verify that the monthly detailed summaries of completed misconduct investigations are posted on MCSO's website for public review.

During this reporting period, PSB made the monthly detailed summaries of completed internal investigations for April, May, and June 2022 available to the public in a designated section on the homepage of MCSO's website.  The reports provide significant details regarding alleged misconduct, the findings of the investigation, and, if there is a finding of misconduct, what type of discipline was imposed.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 65157

*Paragraph 253. The MCSO Bureau of Internal Oversight shall produce a semi-annual public audit report regarding misconduct investigations. This report shall analyze a stratified random sample of misconduct investigations that were completed during the previous six months to identify any procedural irregularities, including any instances in which:*

a.      *complaint notification procedures were not followed;*

b.      *a misconduct complaint was not assigned a unique identifier;*

c.      *investigation assignment protocols were not followed, such as serious or criminal misconduct being investigated outside of the Professional Standards Bureau;*

d.      *deadlines were not met;*

e.      *an investigation was conducted by an employee who had not received required misconduct investigation training;*

f.      *an investigation was conducted by an employee with a history of multiple sustained misconduct allegations, or one sustained allegation of a Category 6 or Category 7 offense from the MCSO's disciplinary matrices;*

g.      *an investigation was conducted by an employee who was named as a principal or witness in any investigation of the underlying incident;*

h.      *an investigation was conducted of a superior officer within the internal affairs investigator's chain of command;*

i.      *any interviews were not recorded;*

j.      *the investigation report was not reviewed by the appropriate personnel;*

k.      *employees were promoted or received a salary increase while named as a principal in an ongoing misconduct investigation absent the required written justification;*

l.      *a final finding was not reached on a misconduct allegation;*

m.      *an employee's disciplinary history was not documented in a disciplinary recommendation; or*

n.      *no written explanation was provided for the imposition of discipline inconsistent with the disciplinary matrix.*

**In Full and Effective Compliance**

On June 26, 2018, we approved the methodology developed by AIU for the inspection that would address the requirements of this Paragraph, which would start with an inspection of investigations that commenced after November 1, 2017. AIU has opted to conduct monthly inspections of misconduct investigations in lieu of conducting a semi-annual audit. During this reporting period, AIU prepared inspection reports for misconduct investigations that closed during the months of February, March, and April 2022.

When perceived deficiencies are identified, AIU requests a BIO Action Form from the specific District/Division Commander to address the issue(s).

WAI 65158

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion. The Plaintiff-Intervenor disagreed, but after a careful review of the Plaintiff-Intervenor's concerns and MCSO's response, MCSO's assertion was upheld.

## I.    Testing Program for Civilian Complaint Intake

**Paragraph 254.** *The Sheriff shall initiate a testing program designed to assess civilian complaint intake. Specifically, the testing program shall assess whether employees are providing civilians appropriate and accurate information about the complaint process and whether employees are notifying the Professional Standards Bureau upon the receipt of a civilian complaint.*

**In Full and Effective Compliance**

This Paragraph requires that MCSO develop a testing program to assess "whether employees are providing civilians appropriate and accurate information about the complaint process and whether employees are notifying the Professional Standards Bureau upon the receipt of a civilian complaint." We evaluate MCSO's compliance with this Paragraph based on how the agency responds to the outcomes of the tests, regardless of whether the tests "succeed" or "fail."

To meet the requirements of this Paragraph, AIU contracts with an external vendor, Progressive Management Resources (PMR), which is responsible for conducting complaint intake testing via telephone, email, U.S. Mail, MCSO's website, and in-person tests. We receive and review documentation of these tests – including any available audio-recorded documentation – as they are completed, as part of our monthly document requests. PMR does not advise AIU of the tests in advance but instead emails AIU once a test has been completed with documentation of the test.

During the last reporting period, we did not have any concerns with the eight tests conducted by PMR. In seven of the eight tests, MCSO personnel responded appropriately and in a timely fashion; and we did not note any deficiencies. In the eighth test, a tester who emailed the Professional Standards Bureau (PSB) alleging that a deputy drove an MCSO boat recklessly on Lake Pleasant did not receive a response for eight days. According to AIU, there was a technical issue with PSB's mailbox. AIU appropriately followed up with MCSO's Technology Management Bureau and also verified that the issue was resolved.

During this reporting period, PMR conducted eight tests – all in-person. The tests were conducted in Districts 1, 2 (two tests), 3, 4, and 7, and Lakes (two tests). PMR did not conduct any tests via U.S. Mail, email, MCSO's website, or telephone during this reporting period. In seven of the eight tests that were conducted, MCSO personnel responded appropriately and in a timely fashion, and we did not note any deficiencies. In the eighth test, a tester who went to a District office to complain that she observed a deputy driving unsafely, interacted with a deputy who informed her that an on-duty supervisor was not available. The deputy did not, as required by policy, obtain additional information from the tester about her complaint. Following the test, AIU appropriately issued a BIO Action Form for this deputy.

In one test, the tester, who was new, experienced difficulty with the video-recording equipment and was unable to record the interaction.  In the same test, the tester inadvertently provided the MCSO employee who interviewed her with an incorrect telephone number; however, the tester later called PSB and received the IA number and the case investigator's contact information.

In another test, in which the tester alleged that she observed a deputy leave the scene after hitting a parked bicycle with his vehicle, the tester wrote on her testing form, "It did feel like an interrogation with many questions, many that were repeated more than once…I felt that the Sgt. was interrogating me, rather than letting me file a complaint."  However, based on the recording of their interaction, we and AIU personnel believe that the sergeant handled this appropriately and in accordance with MCSO policy.

Following the outcome of several past complaint intake tests in which front-line staff responded inappropriately, AIU developed a useful complaint intake checklist for administrative staff, which we and the Parties reviewed and approved.  MCSO distributed the checklist to the Patrol Divisions for dissemination to their personnel who interact with the public, and the checklist is available to all employees via the agency's shared internal hard drive.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.


***Paragraph 255.*** *The testing program is not intended to assess investigations of civilian complaints, and the MCSO shall design the testing program in such a way that it does not waste resources investigating fictitious complaints made by testers.*

### In Full and Effective Compliance

AIU has informed its complaint intake testing vendor of this requirement.  AIU has created several procedures to ensure that the Complaint Intake Testing Program does not waste resources investigating fictitious complaints made by testers – including setting parameters for the types of inquiries that testers make, and creating official identification cards for testers designating them as such.  For in-person tests, AIU requires that the vendor inform AIU in advance of all tests; and AIU personnel make themselves available via telephone if testers encounter any issue as they lodge their test complaints.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 65160

***Paragraph 256.*** *The testing program shall assess complaint intake for complaints made in person at MCSO facilities, complaints made telephonically, by mail, and complaints made electronically by email or through MCSO's website.  Testers shall not interfere with deputies taking law enforcement action.  Testers shall not attempt to assess complaint intake in the course of traffic stops or other law enforcement action being taken outside of MCSO facilities.*

**In Full and Effective Compliance**

AIU has advised its complaint intake testing vendor that testers shall not interfere with deputies taking law enforcement action, nor shall they attempt to assess complaint intake in the course of traffic stops or other law enforcement action being taken outside of MCSO facilities.

AIU has asked the vendor to inform AIU in advance of all in-person tests, and AIU personnel make themselves available via telephone if testers encounter any issue as they lodge their test complaints.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

***Paragraph 257.*** *The testing program shall include sufficient random and targeted testing to assess the complaint intake process, utilizing surreptitious video and/or audio recording, as permitted by state law, of testers' interactions with MCSO personnel to assess the appropriateness of responses and information provided.*

**In Full and Effective Compliance**

AIU has informed its complaint intake testing vendor of the requirements of this Paragraph.  We receive copies of the recordings following the completion of the tests.  Per the agreed-upon methodology, all tests conducted via telephone are audio-recorded; and all in-person testers' interactions with MCSO personnel are video-recorded to assess the appropriateness of responses and information provided.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

***Paragraph 258.*** *The testing program shall also assess whether employees promptly notify the Professional Standards Bureau of civilian complaints and provide accurate and complete information to the Bureau.*

**In Full and Effective Compliance**

AIU has informed its complaint intake testing vendor of the requirements of this Paragraph so that the tests it conducts shall also assess whether employees promptly notify the PSB of civilian complaints and provide accurate and complete information to the Bureau.

WAI 65161

As it receives documentation about completed tests, AIU reviews the information; and issues Action Forms, authors memorandums of concern, or takes other appropriate action if a test fails or raises any concerns about the conduct of MCSO employees.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 259.**  *MCSO shall not permit current or former employees to serve as testers.*

**In Full and Effective Compliance**

AIU has informed its complaint intake testing vendor of this requirement.  AIU personnel have informed us that no current or former employees have served, or will serve in the future, as testers.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 260.**  *The MCSO shall produce an annual report on the testing program.  This report shall include, at a minimum:*

a.  *a description of the testing program, including the testing methodology and the number of tests conducted broken down by type (i.e., in-person, telephonic, mail, and electronic);*

b.  *the number and proportion of tests in which employees responded inappropriately to a tester;*

c.  *the number and proportion of tests in which employees provided inaccurate information about the complaint process to a tester;*

d.  *the number and proportion of tests in which employees failed to promptly notify the Professional Standards Bureau of the civilian complaint;*

e.  *the number and proportion of tests in which employees failed to convey accurate information about the complaint to the Professional Standards Bureau;*

f.  *an evaluation of the civilian complaint intake based upon the results of the testing program; and*

g.  *a description of any steps to be taken to improve civilian complaint intake as a result of the testing program.*

**Phase 1:**  In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

WAI 65162

**Phase 2:**  In compliance

AIU issued its third annual report on the complaint intake testing program on July 20, 2022.  The annual report covers the 24 tests that were completed by its external vendor between July 1, 2021-June 30, 2022.  These tests included: 12 in-person tests; two tests conducted via U.S. Mail; four tests conducted via telephone; three tests conducted via email; and three tests conducted via MCSO's website.  The report also notes that during this time period, MCSO's vendor experienced challenges when some testers attempting to file complaints in-person encountered District offices that remained closed due to COVID-19 restrictions.  In response, AIU worked with its vendor, and in consultation with our Team, developed guidelines to assist testers in these circumstances.

While not required by this Paragraph, AIU also continues to issue monthly reports on complaint intake testing.  We review these reports as they are published, and find that they accurately summarize the results of the complaint intake tests and any follow-up actions taken by AIU.

As we have noted to MCSO, the complaint intake testing program is most useful when MCSO makes agency-wide adjustments based on what it learns from both the successful and unsuccessful complaint intake tests.  MCSO personnel have reported that the annual report's findings are shared in internal Town Hall meetings, and AIU also plans to explore with the Training Division how to make this information available via the HUB.  We will continue to discuss this with MCSO during our site visit meetings.

WAI 65163

## Section 13: Community Outreach and Community Advisory Board

**COURT ORDER XVI.    COMMUNITY    OUTREACH    AND    COMMUNITY ADVISORY BOARD**

**Paragraph 261.**  *The Community Advisory Board may conduct or retain a consultant to conduct a study to identify barriers to the filing of civilian complaints against MCSO personnel.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

The CAB continues to explore the possibility of retaining a consultant to conduct a study to identify barriers to the filing of civilian complaints against MCSO personnel.  The CAB is particularly interested in learning more about any barriers to filing complaints that may exist for members of the Plaintiffs' class.

**Paragraph 262.**  *In addition to the administrative support provided for in the Supplemental Permanent Injunction, (Doc. 670 ¶ 117), the Community Advisory Board shall be provided with annual funding to support its activities, including but not limited to funds for appropriate research, outreach advertising and website maintenance, stipends for intern support, professional interpretation and translation, and out-of-pocket costs of the Community Advisory Board members for transportation related to their official responsibilities.  The Community Advisory Board shall submit a proposed annual budget to the Monitor, not to exceed $15,000, and upon approval of the annual budget, the County shall deposit that amount into an account established by the Community Advisory Board for that purpose.  The Community Advisory Board shall be required to keep detailed records of expenditures which are subject to review.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

The CAB's approved budget includes categories for expenses including community meetings; video production (to produce a short video in English and Spanish that provides information about the CAB and the MCSO complaint process); marketing materials; stipends for an assistant to help coordinate CAB meeting logistics; and reimbursement for CAB members' meeting expenses.

Following the Monitor's approval of the CAB's budget, the CAB established a bank account, and the County provided the $15,000.  CAB members developed procedures for tracking funds and receiving reimbursement.  We meet regularly with CAB members to discuss these procedures and review the CAB's expenditures to date; these records appear to be in order.

WAI 65164

## Section 14: Supervision and Staffing

**COURT ORDER XVII.     SUPERVISION AND STAFFING**

*Paragraph 263.  The following Section of this Order represents additions and amendments to Section X of the first Supplemental Permanent Injunction, Supervision and Evaluations of Officer Performance, and the provisions of this Section override any conflicting provisions in Section X of the first Supplemental Permanent Injunction.*

*Paragraph 264.  The Sheriff shall ensure that all patrol deputies shall be assigned to a primary, clearly identified, first-line supervisor.*

**In Full and Effective Compliance**

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the second quarter of 2022.  For April, we reviewed a sample of shift rosters from Districts 4 and 7, and Lake Patrol.  For May we reviewed a sample of shift rosters from Districts 1, 2, and 3. For June, we reviewed a sample of shift rosters from Districts 4 and 7, and Lake Patrol.  Our reviews of monthly and daily rosters indicated that deputies were assigned to a single consistent supervisor, and deputies worked the same shifts as their supervisors.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

*Paragraph 265.  First-line patrol supervisors shall be responsible for closely and consistently supervising all deputies under their primary command.*

**Phase 1:**  In compliance

- GB-2 (Command Responsibility), most recently amended on June 28, 2019.

**Phase 2:**  In compliance

Paragraph 265 is a general directive that covers several aspects of supervision.  There are several requirements covered in other Paragraphs that directly concern this Paragraph; these requirements must be met before MCSO can establish compliance with Paragraph 265.  We have determined that for MCSO to meet the requirements of this Paragraph, MCSO must be in compliance with Paragraphs 83, 85, 89, 90, 91, 93, and 94.   During this reporting period, we issued a noncompliance warning for Paragraph 85.  Since we have determined that this Paragraph requires that MCSO be in compliance with several Paragraphs, including Paragraph 85, we must issue a noncompliance warning for Paragraph 265.  If MCSO fails to meet the requirements of this Paragraph in the next quarter, we will withdraw compliance.

WAI 65165

*Paragraph 266.* *First-line patrol supervisors shall be assigned as primary supervisor to no more persons than it is possible to effectively supervise. The Sheriff should seek to establish staffing that permits a supervisor to oversee no more than eight deputies, but in no event should a supervisor be responsible for more than ten persons. If the Sheriff determines that assignment complexity, the geographic size of a district, the volume of calls for service, or other circumstances warrant an increase or decrease in the level of supervision for any unit, squad, or shift, it shall explain such reasons in writing, and, during the period that the MCSO is subject to the Monitor, shall provide the Monitor with such explanations. The Monitor shall provide an assessment to the Court as to whether the reduced or increased ratio is appropriate in the circumstances indicated.*

**In Full and Effective Compliance**

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

To assess Phase 2 compliance with this Paragraph, we review a sample of daily shift rosters for the three months of the reporting period. We examine rosters to ensure that Patrol supervisors are not assigned more personnel than they can effectively supervise. We base our findings on the sample of rosters requested for the quarter. We review rosters to ensure supervisors oversee no more than 10 persons; this could include a combination of deputies, Deputy Service Aides (DSAs), and Posse members. We consider any shift where a supervisor had more than 10 persons to be noncompliant, as per this Paragraph's requirement. In addition, we monitor submissions by Patrol supervisors indicating the shifts where the span of control was exceeded. As per MCSO policy, supervisors are required to document shifts where the span of control was exceeded in a memorandum to the District Commander.

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the second quarter of 2022. For April, we reviewed a sample of shift rosters from Districts 4 and 7, and Lake Patrol. For May we reviewed a sample of shift rosters from Districts 1, 2, and 3. For June, we reviewed a sample of shift rosters from Districts 4 and 7, and Lake Patrol. Our reviews of monthly and daily rosters indicated that deputies were assigned to a single consistent supervisor, and deputies worked the same shifts as their supervisors. Our reviews of shift rosters for this quarter did not reveal any violations of this Paragraph.

For April, our reviews of the sample of 18 shift rosters did not reveal any violations of this Paragraph. For April, District 1 did not submit any span of control memos. District 2 submitted one span of control memo for a shift where a supervisor had nine deputies. Districts 3, 4, and 7 and Lake Patrol did not submit any span of control memos for April.

For May, our reviews of the sample of 18 shift rosters did not reveal any violations of this Paragraph. District 1 submitted one span of control memo for one shift where a supervisor had 12 deputies. District 2 submitted one span of control memo where a supervisor had nine deputies during the shift. Districts 2, 4, and 7 and Lake Patrol did not submit any span of control memos for May.

WAI 65166

For June, our reviews of the sample of 18 shift rosters did not reveal any violations of this Paragraph. District 1 submitted three span of control memos.  In one shift, a District 1 supervisor had nine deputies.  On another shift, a District 1 supervisor had eight deputies and one Posse member.  The third memo documented a shift where a District 1 supervisor had 11 deputies. District 3 submitted two span of control memos.  Both memos documented shifts where a supervisor had seven deputies and three Posse members.  Districts 2, 4, and 7 and Lake Patrol did not submit any span of control memos for June.

For the second quarter of 2022, we reviewed 54 shifts to determine compliance.  In our sample reviews, we found that all of the 54 shifts met the requirements of this Paragraph.  The compliance rate for this quarter was 100%.  For the second quarter of 2022, MCSO was in compliance with the requirements of this Paragraph.

**Paragraph 267.**  *Supervisors shall be responsible for close and effective supervision of deputies under their command.  Supervisors shall ensure that all deputies under their direct command comply with MCSO policy, federal, state and local law, and this Court's orders.*

**Phase 1:**  In compliance

- GB-2 (Command Responsibility), most recently amended on June 28, 2019.

**Phase 2:**  In compliance

Close and effective supervision requires that supervisors consistently apply the concepts established in several Paragraphs of the First Order.  There are requirements covered in other Paragraphs that directly concern Paragraph 267, and must therefore be in compliance for MCSO to establish compliance with this Paragraph.  We have determined that for MCSO to meet the requirements of this Paragraph, it must achieve compliance with Paragraphs 83, 85, 89, 90, 91, 93, and 96.  During the second quarter of 2022, our reviews found that MCSO was not in compliance with all of the required Paragraphs.  Paragraph 267 requires that MCSO be in compliance with several Paragraphs, including Paragraph 85.  During this reporting period, we issued a noncompliance warning for Paragraph 85.  Therefore, we must issue a noncompliance warning for Paragraph 267.  If MCSO fails to meet the requirements of this Paragraph in the next quarter, compliance will be withdrawn.

**Paragraph 268.**  *During the term that a Monitor oversees the Sheriff and the MCSO in this action, any transfer of sworn personnel or supervisors in or out of the Professional Standards Bureau, the Bureau of Internal Oversight, and the Court Implementation Division shall require advanced approval from the Monitor.  Prior to any transfer into any of these components, the MCSO shall provide the Court, the Monitor, and the parties with advance notice of the transfer and shall produce copies of the individual's résumé and disciplinary history.  The Court may order the removal of the heads of these components if doing so is, in the Court's view, necessary to achieve compliance in a timely manner.*

**Phase 1:**  In compliance

WAI 65167

- Court Implementation Division Operations Manual, most recently revised on November 13, 2019.
- Professional Standards Bureau Operations Manual, most recently amended on December 13, 2018.

**Phase 2:**  In compliance

During this reporting period, we received and approved two transfers into BIO and one transfer out of BIO.  We reviewed all the documentation associated with the two incoming transfers and noted no concerns.  We reviewed the documentation for the outgoing transfer and concluded that that the transfer met the requirements of this Paragraph, and was therefore approved.

WAI 65168

## Section 15: Document Preservation and Production

**COURT ORDER XVIII.    DOCUMENT PRESERVATION AND PRODUCTION**

***Paragraph 269.*** *The Sheriff shall ensure that when the MCSO receives a document preservation notice from a litigant, the MCSO shall promptly communicate that document preservation notice to all personnel who might possibly have responsive documents.*

**Phase 1:**  In compliance

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on September 15, 2021.

- GD-9 User Guide, most recently amended on November 5, 2020.

**Phase 2:**  Deferred

To verify MCSO's Phase 2 compliance with this Paragraph, we reviewed monthly submissions of document preservation notices to MCSO employees. The data reviewed for this reporting period included March, April, and May 2022, as per an agreement that we reached with MCSO to stagger our document requests for this Paragraph due to the large volume of data that MCSO had to provide prior to our site visits.

Document preservation is set in motion when a party sends a litigation hold notice or written directive to MCSO requesting the preservation of relevant documents or records and electronically stored information (ESI), in anticipation of future litigation against the agency. MCSO's Legal Liaison Section (LLS) manages litigation holds through Open Axes, a software program. Upon the receipt of a litigation hold, which is usually sent by the Maricopa County Attorney's Office (MCAO), the LLS inputs the data into Open Axes which conducts a search for responsive documents within MCSO drives. The system also identifies potential document custodians, which are later filtered by an LLS employee. The LLS then serves the custodians with a legal hold in electronic format, known as a Document Preservation Notice, within five business days. Upon receipt of the Open Axes email with the Document Preservation Notice, MCSO custodians must acknowledge receipt of the request and then complete a questionnaire that identifies responsive documents, both electronic and hardcopies; and preserve them in the manner in which they are kept in the course of business.

In light of the COVID-19 pandemic, we conducted a remote site visit in July 2022. For this Paragraph, we reviewed all files provided by MCSO through ShareFile. We reviewed a sample of the third-party source documents that generate the litigation holds that the LLS receives from MCAO and third parties. The Document Preservation Notices have been distributed 100% in a timely manner to the custodians who may have responsive documents.

The LLS emails the Document Preservation Notice and requests the completion of the Document Preservation Questionnaire via Open Axes. The Document Preservation Questionnaire requires employees to: 1) acknowledge receipt of the document preservation; 2) acknowledge their responsibility to preserve records; 3) provide details regarding what they have done to research

WAI 65169

responsive records, documents, or ESI; and 4) identify what records, documents, or ESI they are preserving.  GD-9 requires that the Document Preservation Questionnaire be completed within 10 business days and provides a warning regarding the consequences of not preserving records.  During this reporting period, MCSO employees have returned the Document Preservation Questionnaire, within the required 10 business days 97% of the time.

In February 2021, MCSO learned that due to a technical issue caused by the migration of data from the legacy system to One Drive and a new on-premise storage array (Qumulo), Open Axes was not able to perform searches into the documents moved to One Drive and Qumulo.  Consequently, from August 2020-February 2021, documents on these new platforms were not searched by the software for potentially responsive documents to preservation requests.  According to MCSO, the data migration was required because legacy hardware had reached the end of its lifecycle and was beginning to degrade.  The LLS has been working with the Technology Management Bureau and the vendor; and MCSO informed us that by the end of June 2021, Open Axes will be able to perform the searches in the new systems going forward.  To address any potential data that may have been missed in the searches performed between August 2020-June 2021, the LLS opted to rerun all the searches initiated during that time.

In January 2022, MCSO informed us that the agency had a delay in the rerun of searches because it had to wait for code from the Open Axes vendor to be able to start the refresh, because it had to run parallel with the Global Index (previously the U and W drives).  The searching of OneDrive accounts had an issue with the filters not showing the files found, although the Open Axes technicians noted that the files existed.  In April 2022, MCSO informed us that the agency was in the process of indexing the two last folders, and then the agency would begin the rerun of searches once completed.  On July 5, 2022, MCSO informed us that it has yet to complete the indexing of the files in Qumolo.

Due to this technical issue, we have been deferring compliance with this Paragraph since our twenty-eighth quarterly status report, filed on August 25, 2021, over one year ago.  In the event that MCSO fails to complete the indexing of the folders by the next review, we will withdraw Phase 2 compliance for this Paragraph.  At such time, we expect that the rerun of searches be underway.

**Paragraph 270.**  *The Sheriff shall ensure that when the MCSO receives a request for documents in the course of litigation, it shall:*

a.    *promptly communicate the document request to all personnel who might possibly be in possession of responsive documents;*

b.    *ensure that all existing electronic files, including email files and data stored on networked drives, are sequestered and preserved through a centralized process; and*

c.    *ensure that a thorough and adequate search for documents is conducted, and that each employee who might possibly be in possession of responsive documents conducts a thorough and adequate search of all relevant physical and electronic files.*

**Phase 1:**  In compliance

WAI 65170

- Administrative Services Division Operations Manual, most recently amended on October 27, 2021.

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on September 15, 2021.

- GD-9 User Guide, most recently amended on November 5, 2020.

- GM-1 (Electronic Communications, Data and Voicemail), most recently amended on January 12, 2022.

**Phase 2:** Deferred

To verify MCSO's Phase 2 compliance with this Paragraph, we reviewed monthly submissions of requests for documents to MCSO employees for the reporting period and documents drafted by the LLS in search of documents from other MCSO Divisions. For this reporting period, we identified a sample of document requests and requested a copy of the responsive documents sequestered and/or produced. The data reviewed for this reporting period included March, April, and May 2022, as per an agreement we reached with MCSO to stagger our document requests for this Paragraph. This was due to the large volume of data that MCSO had to provide prior to our site visits.

Paragraph 270.a. requires prompt communication of document requests to all personnel who could possibly be in possession of responsive documents. GD-9 requires the LLS to enter the data into a tracking system within five business days of receipt and to draft a Document Production Notice within five additional business days. The LLS is required, within five business days, to respond to the request for production if sourced within LLS, or to forward to the required MCSO Division for production. The Divisions have 10 days to produce the data requested. In 100% of the cases, the LLS promptly communicated document requests to personnel who might be in possession of responsive documents.

Our review revealed that MCSO is manually forwarding the Document Production Notices in a timely manner to all of its Divisions. In addition, MCSO is sending the Document Production Acknowledgement Questionnaire (Attachment B), to all employees. In 100% of the cases, the personnel who provided responsive documents properly completed Attachment B.

Paragraph 270.b. requires that all responsive ESI be stored, sequestered, and preserved by MCSO through a centralized process. MCSO performs the searches through a centralized process established by the LLS. The preservation of the data is completed at the Division that has the actual document while the notation is made in the Open Axes program, which aids the LLS in the case management. LLS can now create a case, assign a case number, and trigger time alerts to the custodians of documents that LLS identifies through the system. Open Axes searches on the H, W, and U computer hard drives of MCSO, which are shared among Headquarters and the Districts. Documents found in any additional servers are kept in their servers by the document custodians who notify LLS. MCSO continues to manage litigation hold cases through Open Axes; all cases for this reporting period were managed through Open Axes.

WAI 65171

The centralized process established by MCSO requires that all electronic data be sequestered and secured so as not to be purged.  For this Paragraph, we review the data and visit MCSO areas to ensure that personnel are informed of the duty to preserve the data in both electronic and paper format, and that the employees are preserving the data.  For this reporting period, because we were unable to travel to Maricopa County, we were unable to visit areas where hardcopies were kept in different MCSO areas.  However, we added a quarterly request from the LLS Director for a certification that MCSO is sequestering the hard copies of documents responsive to the Document Preservation Notices.  We randomly identified a sample from the quarterly data for this purpose.  On July 28, 2022, the LLS Director informed us that MCSO properly preserved the hardcopies for this reporting period with the exception of two files, for a 60% compliance.  When we resume our in-person site visits, we will continue to verify that the hardcopies are being preserved.

Paragraph 270.c. requires that MCSO conduct an adequate search for documents, and that each employee who might possibly be in possession of responsive documents conducts a thorough and adequate search of all relevant physical and electronic files.  We reviewed a sample of responsive documents for this reporting period, and MCSO identified responsive documents to the document production notices in all cases we reviewed.

Due to this technical issue, we have been deferring compliance with this Paragraph since our twenty-eighth quarterly status report, filed on August 25, 2021, over one year ago.  In the event that MCSO fails to complete the indexing of the folders by the next review, we will withdraw Phase 2 compliance for this Paragraph.  At such time, we expect that the rerun of searches be underway.

**Paragraph 271.**  *Within three months of the effective date of this Order, the Sheriff shall ensure that the MCSO Compliance Division promulgates detailed protocols for the preservation and production of documents requested in litigation.  Such protocols shall be subject to the approval of the Monitor after a period of comment by the Parties.*

**Phase 1:**  In compliance

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on September 15, 2021.

- Administrative Services Division Operations Manual, most recently amended on October 27, 2021.

**Phase 2:**  In compliance

On June 17, 2019, MCSO published the Administrative Services Division Operations Manual, which details the protocols for the preservation and production of documents requested in litigation.  The manual was amended on October 27, 2021.

WAI 65172

***Paragraph 272.*** *The Sheriff shall ensure that MCSO policy provides that all employees must comply with document preservation and production requirements and that violators of this policy shall be subject to discipline and potentially other sanctions.*

**Phase 1:**  In compliance

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on September 15, 2021.

 **Phase 2:**  In compliance

During this reporting period, the data revealed that no internal investigations were completed against any MCSO employee for failure to preserve or produce documents.

WAI 65173

## Section 16: Additional Training

**COURT ORDER XIX.        ADDITIONAL TRAINING**

***Paragraph 273.*** *Within two months of the entry of this Order, the Sheriff shall ensure that all employees are briefed and presented with the terms of the Order, along with relevant background information about the Court's May 13, 2016 Findings of Fact, (Doc. 1677), upon which this Order is based.*

**In Full and Effective Compliance**

MCSO previously delivered this training on the E-Policy platform.   All personnel (100%) determined to be applicable by CID have received this training.

After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 65174

## Section 17: Complaints and Misconduct Investigations Relating to Members of the Plaintiff Class

**COURT ORDER XX.        COMPLAINTS AND MISCONDUCT INVESTIGATIONS RELATING TO MEMBERS OF THE PLAINTIFF CLASS**

*Paragraph 274.  In light of the Court's finding that the MCSO, and in particular Sheriff Arpaio and Chief Deputy Sheridan, willfully and systematically manipulated, misapplied, and subverted MCSO's employee disciplinary policies and internal affairs processes to avoid imposing appropriate discipline on MCSO deputies and command staff for their violations of MCSO policies with respect to members of the Plaintiff class, the Court further orders as follows:*

*A.        Investigations to be Overseen and/or Conducted by the Monitor*

*Paragraph 275.   The Monitor is vested with the authority to supervise and direct all of the MCSO's internal affairs investigations pertaining to Class Remedial Matters.  The Monitor is free from any liability for such matters as is set forth in ¶ 144 of the Supplemental Permanent Injunction.*

*Paragraph 276.  The Monitor shall have the authority to direct and/or approve all aspects of the intake and investigation of Class Remedial Matters, the assignment of responsibility for such investigations including, if necessary, assignment to his own Monitor team or to other independent sources for investigation, the preliminary and final investigation of complaints and/or the determination of whether they should be criminally or administratively investigated, the determination of responsibility and the imposition of discipline on all matters, and any grievances filed in those matters.*

**In Full and Effective Compliance**

The Second Order requires oversight by the Monitor for all internal investigations determined to be Class Remedial Matters (CRMs).  The Professional Standards Bureau (PSB) now schedules meetings every two weeks to discuss existing and incoming complaints to determine which, if any, could be CRMs.  During these meetings, PSB personnel discuss cases pending a CRM decision, cases determined to be CRMs, and any cases where the decision may be made that the case would not be classified as a CRM.  The PSB Commander determines the classification of the cases.  A member of our Team attends all of these meetings to provide the oversight required for this Paragraph.

At the end of the July-September 2016 reporting period, PSB had reviewed 442 administrative investigations that were open as of July 20, 2016; and determined that 42 of them met the basic criteria for CRMs.  These cases were reviewed during the scheduled CRM meetings.  In addition, a Monitoring Team member randomly selected an additional 52 cases from the 400 remaining pending cases; and concurred with PSB's assessment that the cases did not meet the basic criteria

WAI 65175

for CRMs.  In addition to the 42 cases determined to be potential CRMs from the pending case list as of July 20, 2016, PSB identified an additional 10 cases that were potential CRM cases.  At the end of the first reporting period after the Court's Second Order, nine cases had been determined to be CRMs; and one other was pending a CRM decision.  The remaining cases reviewed were determined not to be CRMs.

At the end of this reporting period, there was a total of 552 cases that have been reviewed as possible CRMs; and 118 cases that have been determined to be CRMs since the July 20, 2016 Court Order.  At the end of this reporting period, MCSO had completed and submitted a total of 105 CRM cases.  Thirteen were pending completion.

Of the CRM cases that have been closed to date with findings of sustained misconduct and reviewed by our Team, 11 have involved employees who are deceased or left MCSO employment prior to the completion of the investigation or the disciplinary process.  Thirty-four have involved current employees of MCSO.  Six of the cases closed to date involved a sustained finding of misconduct involving bias related to the Plaintiffs' class: four sustained allegations of an inappropriate and biased comment; and two sustained allegations of bias-based policing.

During the scheduled meetings, case investigators continue to provide investigative updates on all cases that could be, or are, CRMs.  Their briefings are thorough, and they continue to be responsive to any questions or input from members of our Team.  In all cases where we have provided oversight since July 20, 2016, we concurred with the decisions made by the PSB Commander regarding the case classifications and findings based on the briefings provided during the CRM meetings.  Where appropriate, we also approved the discipline in these cases.  During this reporting period, we have continued discussions with PSB personnel regarding areas of improvement that may enhance investigations, as well as the resolutions of these cases.  We plan to continue holding these meetings moving forward.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.


**Paragraph 277.**  *This authority is effective immediately and shall remain vested in the Monitor until the MCSO's internal affairs investigations reach the benchmarks set forth in ¶ 288 below.  With respect to Class Remedial Matters, the Monitor has plenary authority, except where authority is vested in the Independent Investigative and Disciplinary Authorities separately appointed by the Court, as is further set forth in ¶¶ 296–337 below.*


**Paragraph 278.**  *The Sheriff shall alert the Monitor in writing to all matters that could be considered Class Remedial Matters, and the Monitor has the authority to independently identify such matters.  The Monitor shall provide an effective level of oversight to provide reasonable assurance that all Class Remedial Matters come to his attention.*

**In Full and Effective Compliance**

WAI 65176

Since the first CRM meeting held on August 17, 2016, PSB has consistently completed the required notification to us regarding the cases that could be considered CRMs. A Monitoring Team member has attended every CRM meeting with PSB where these matters are discussed and personally reviewed a number of the cases that were pending on July 20, 2016; and our Team member reviews the new cases that are presented at each meeting. There has been no need for us to independently identify CRMs, as PSB consistently properly identifies and reports these cases as required.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 279.** *The Monitor shall have complete authority to conduct whatever review, research, and investigation he deems necessary to determine whether such matters qualify as Class Remedial Matters and whether the MCSO is dealing with such matters in a thorough, fair, consistent, and unbiased manner.*

**In Full and Effective Compliance**

During the scheduled CRM meetings attended by a Monitoring Team member, PSB has consistently properly identified cases that could be, or are, CRMs. PSB personnel brief each case at these meetings, and their briefings have included all appropriate information. They have been responsive to any questions from our Team members during the meetings, and have responded appropriately to the recommendations we have offered. There has been no need for us to independently conduct any review, research, or investigation.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 280.** *The Monitor shall provide written notice to the Court and to the parties when he determines that he has jurisdiction over a Class Remedial Matter. Any party may appeal the Monitor's determination as to whether he has jurisdiction over a Class Remedial Matter to this Court within seven days of the Monitor's notice. During the pendency of any such appeal the Monitor has authority to make orders and initiate and conduct investigations concerning Class Remedial Matters and the Sheriff and the MCSO will fully comply with such action by the Monitor.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

During this reporting period, cases involving both sworn and non-sworn members of MCSO have continued to be reviewed as possible CRMs, when appropriate. There were no appeals by any Parties regarding any of the CRM classifications.

WAI 65177

*Paragraph 281.  Subject to the authority of the Monitor, the Sheriff shall ensure that the MCSO receives and processes Class Remedial Matters consistent with: (1) the requirements of this Order and the previous orders of this Court, (2) MCSO policies promulgated pursuant to this Order, and (3) the manner in which, pursuant to policy, the MCSO handles all other complaints and disciplinary matters.  The Sheriff will direct that the Professional Standards Bureau and the members of his appointed command staff arrive at a disciplinary decision in each Class Remedial Matter.*

**Phase 1:**  In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on December 8, 2021.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2022.

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.

- Administrative Services Division Operations Manual, most recently amended on October 27, 2021.

- Professional Standards Bureau Operations Manual, most recently amended on December 31, 2019.

**Phase 2:**  Not in compliance

To evaluate Phase 2 compliance with this Paragraph, a Monitoring Team member has attended each meeting conducted by PSB to discuss Class Remedial Matters.

The Plaintiffs and the Plaintiff-Intervenor have previously forwarded to us concerns about certain CRM investigations submitted by MCSO for our review.  Upon further review of the cases they provided, we concluded that, in some, additional scrutiny of these investigations by PSB was warranted.  We continue to meet with PSB to discuss concerns and provide information regarding areas where we believe improvements can be made.  Our discussions continue to include: ensuring that credibility assessments, where appropriate, are conducted and well-documented in reports; that the appropriate standard of proof is considered and properly documented in reports; that in the event disparate treatment is at issue in a case, the employee's history is reviewed to determine if there is any pattern, and where necessary, additional interview questions are asked; and that if a single employee has repeated allegations of similar misconduct, a review is conducted to determine if there is any pattern that needs to be addressed.  We have also discussed potential training opportunities for PSB investigators on both disparate treatment and credibility assessments.  We will continue to meet with PSB to address any concerns we may identify with CRM investigations and to discuss opportunities to improve the overall quality of these and all other administrative investigations.

During the last reporting period, we reviewed one CRM case completed by MCSO.  We concurred with the findings of the PSB Commander.  During this reporting period, we reviewed six CRM cases completed by PSB.  In all six cases, we concur with the findings of the PSB Commander.

WAI 65178

We meet with PSB every two weeks to identify cases that should be considered CRMs. We also track the progress of those cases as they are investigated, reviewed, and finalized. Each step of the process requires review and approval by our Team. Of the six finalized CRM investigations we reviewed for this reporting period, one (17%) was completed within the 85-day timeframe. Two (33%) were finalized with the 180-day timeframe.

Two of the CRM cases we reviewed for this reporting period resulted in findings of not sustained or unfounded. One of the investigations involved a traffic stop by a sworn employee. The complaint was made by an anonymous third party. PSB conducted a thorough investigation, and we agree with the findings of unfounded in this case. In the second case, juvenile inmates alleged that an MCSO employee made an inappropriate biased comment. PSB conducted a thorough investigation, and we concur with the findings of not sustained in this case.

Four of the CRM cases we reviewed resulted in sustained findings. Two of these four had sustained findings for inappropriate and biased comments. One had sustained findings for failure to conform to Office directives, and one had sustained findings for multiple violations of MCSO policy. In all four of these investigations, we believe the investigations were thorough and that the findings of PSB supported by the appropriate standard of proof. All four resulted in discipline that is consistent with MCSO policies.

***Paragraph 282.*** *The Sheriff and/or his appointee may exercise the authority given pursuant to this Order to direct and/or resolve such Class Remedial Matters, however, the decisions and directives of the Sheriff and/or his designee with respect to Class Remedial Matters may be vacated or overridden in whole or in part by the Monitor. Neither the Sheriff nor the MCSO has any authority, absent further order of this Court, to countermand any directions or decision of the Monitor with respect to Class Remedial Matters by grievance, appeal, briefing board, directive, or otherwise.*

**Phase 1:** In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on December 8, 2021.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2022.

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.

- Administrative Services Division Operations Manual, most recently amended on October 27, 2021.

- Professional Standards Bureau Operations Manual, most recently amended on December 31, 2019.

**Phase 2:** In compliance

There were no CRM cases completed during this, or previous reporting periods, in which the Sheriff and/or his appointee exercised their authority to resolve CRMs, which we needed to vacate or override.

WAI 65179

*Paragraph 283.   The Monitor shall review and approve all disciplinary decisions on Class Remedial Matters.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

At the end of this reporting period, MCSO has completed a total of 105 CRM cases since July 20, 2016.  We reviewed six of these during this reporting period.  Four of the completed cases had sustained findings.  In all four, we approved MCSO's disciplinary decisions.

*Paragraph 284.   The Sheriff and the MCSO shall expeditiously implement the Monitor's directions, investigations, hearings, and disciplinary decisions.  The Sheriff and the MCSO shall also provide any necessary facilities or resources without cost to the Monitor to facilitate the Monitor's directions and/or investigations.*

**Phase 1:**  In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on December 8, 2021.
- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2022.
- GH-2 (Internal Investigations), most recently amended on October 25, 2022.
- Administrative Services Division Operations Manual, most recently amended on October 27, 2021.
- Professional Standards Bureau Operations Manual, most recently amended on December 31, 2019.

**Phase 2:**  In compliance

During this and previous reporting periods, a Monitoring Team member has attended all scheduled CRM meetings conducted in an appropriate location determined by MCSO.  PSB continues to provide a password and access to the IAPro system to a member of our Team so that we can complete independent case reviews if necessary.

PSB personnel continue to be professional and responsive to all input, questions, or concerns we have raised.

*Paragraph 285.   Should the Monitor decide to deviate from the Policies set forth in this Order or from the standard application of the disciplinary matrix, the Monitor shall justify the decision in writing and place the written explanation in the affected employee's (or employees') file(s).*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

WAI 65180

Since we began monitoring CRM cases in July 2016, there have been a total of 45 cases with sustained findings. Seven have sustained findings on two separate deputies who are deceased, and four involve deputies who left MCSO employment prior to the determination of discipline. Thirty-four cases involve sustained findings against current MCSO employees. All 34 cases resulted in appropriate sanctions based on MCSO policy and the Discipline Matrices in effect at the time the investigations were conducted. No action on our part has been necessary relative to this Paragraph.

**Paragraph 286.** *Should the Monitor believe that a matter should be criminally investigated, he shall follow the procedures set forth in ¶¶ 229–36 above. The Commander of the Professional Standards Bureau shall then either confidentially initiate a Professional Standards Bureau criminal investigation overseen by the Monitor or report the matter directly and confidentially to the appropriate prosecuting agency. To the extent that the matter may involve the Commander of the Professional Standards Bureau as a principal, the Monitor shall report the matter directly and confidentially to the appropriate prosecuting agency. The Monitor shall then coordinate the administrative investigation with the criminal investigation in the manner set forth in ¶¶ 229–36 above.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.
- Professional Standards Bureau Operations Manual, most recently amended on December 31, 2019.

**Phase 2:**  In compliance

During this reporting period, there were six CRM cases submitted for our review. None of the six had potential criminal violations. No action on our part relative to this Paragraph was necessary.

**Paragraph 287.** *Any persons receiving discipline for any Class Remedial Matters that have been approved by the Monitor shall maintain any right they may have under Arizona law or MCSO policy to appeal or grieve that decision with the following alterations:*

a.  *When minor discipline is imposed, a grievance may be filed with the Sheriff or his designee consistent with existing MCSO procedure. Nevertheless, the Sheriff or his designee shall immediately transmit the grievance to the Monitor who shall have authority to and shall decide the grievance. If, in resolving the grievance, the Monitor changes the disciplinary decision in any respect, he shall explain his decision in writing.*

b.  *disciplined MCSO employee maintains his or her right to appeal serious discipline to the Maricopa County Law Enforcement Merit System Council to the extent the employee has such a right. The Council may exercise its normal supervisory authority over discipline imposed by the Monitor.*

WAI 65181

**In Full and Effective Compliance**

Forty-five completed CRM cases have had sustained findings of misconduct since the issuance of the Second Order.  We concurred with all of MCSO's sustained findings.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 288.**  *The Monitor's authority over Class Remedial Matters will cease when both:*

a,   *The final decision of the Professional Standards Bureau, the Division, or the Sheriff, or his designee, on Class Remedial Matters has concurred with the Monitor's independent decision on the same record at least 95% of the time for a period of three years.*

b.   *The Court determines that for a period of three continuous years the MCSO has complied with the complaint intake procedures set forth in this Order, conducted appropriate internal affairs procedures, and adequately investigated and adjudicated all matters that come to its attention that should be investigated no matter how ascertained, has done so consistently, and has fairly applied its disciplinary policies and matrices with respect to all MCSO employees regardless of command level.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

PSB is responsible for the investigation of all CRM cases and has continued to appropriately identify cases that could be, or are, CRMs.  PSB personnel are responsive to any concerns or questions we have raised, and they provide detailed information and updates in the scheduled briefings.

During this reporting period, we reviewed six completed CRM case, and did not identify any substantive investigative deficiencies with these investigation.

MCSO is in compliance with the requirements of this Paragraph.

**Paragraph 289.**  *To make the determination required by subpart (b), the Court extends the scope of the Monitor's authority to inquire and report on all MCSO internal affairs investigations and not those merely that are related to Class Remedial Matters.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

During this reporting period, we reviewed 117 administrative misconduct investigations, 99 service complaints, 28 PSB diversions and three criminal misconduct investigations.  We found all three criminal investigations in compliance with all requirements.  Of the 99 service complaints, after initial review by District or PSB personnel, 15 were appropriately converted to administrative misconduct investigations.  Of the remaining 84 service complaints, we concurred

WAI 65182

with the decision of the PSB Commander in 79.  In two of the 84, we believe additional follow-up should have been conducted; and in three others, though we concur with their designation as service complaints, complainants were not contacted in a timely manner.  Of the total 99 service complaints, 94 (95%) were appropriately handled by PSB.

PSB used the authorized diversion process to address 28 internally generated complaints.  We concurred with the handling of these complaints in 25 (89%) of the 28.  In three, we believe that the misconduct alleged, or the prior sustained misconduct of the involved employee, made them ineligible to be handled as a diversion.  We have had ongoing discussions with PSB regarding employee eligibility for a diversion.

Of the 117 administrative misconduct investigations we reviewed, 39 (33%) were completed and submitted by the investigator within the 60- or 85-day requirement or had an acceptable extension request.  As we have noted previously, we assess justifications for any extensions or other delays based on investigative considerations, not workload.  This was an increase from the 22% compliance during the last reporting period.

There were no completed administrative misconduct investigations submitted for compliance with Paragraph 249 (investigatory stops).  There were three investigations we reviewed for compliance with Paragraph 33 (bias policing).  Six were also completed and reviewed for compliance with Paragraph 275 (CRMs) during this reporting period.

We found that PSB was in overall compliance in 31 (33%) of the 93 investigations we reviewed.  Of the five investigations we reviewed that were conducted by outside vendors, one (20%) was in full compliance.  Of the 19 investigations we reviewed that were conducted by Divisions and Districts outside of PSB, one (5%) was in full compliance.  Overall compliance for all administrative misconduct investigations reviewed during this reporting period was 28%, a notable increase from the 15% compliance during the last reporting period.

During each of our site visits, we meet with PSB personnel to discuss the deficiencies in those investigations conducted by both their personnel and Divisions outside PSB.  In July 2020, we also began meeting with the Deputy Chiefs who have oversight for investigations conducted outside of PSB.  Our intent for these meetings is to have meaningful discussion about deficiencies we continue to find, the actions being taken to address the ongoing concerns, and other ideas MCSO might have for addressing future deficiencies.  These meetings have resulted in good dialogue about our concerns and the efforts of MCSO personnel to correct identified deficiencies.  Although increased review by both District and Division Command staff has been occurring, District and Division cases still require improvement.

**Paragraph 291.**  *The Monitor shall report to the Court, on a quarterly basis, whether the MCSO has fairly, adequately, thoroughly, and expeditiously assessed, investigated, disciplined, and made grievance decisions in a manner consistent with this Order during that quarter.  This report is to cover all internal affairs matters within the MCSO whether or not the matters are Class Remedial Matters.  The report shall also apprise the Court whether the MCSO has yet appropriately investigated and acted upon the misconduct identified in the Court's Findings of Fact, whether or not such matters constitute Class Remedial Matters.*

WAI 65183

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

This report, including all commentary regarding MCSO's compliance with investigative and disciplinary requirements, serves as our report to the Court on these matters.  An overall summary of our compliance observations and findings is provided below.

During this reporting period, we reviewed 117 administrative misconduct investigations and four criminal misconduct investigations.  All three of the criminal investigations were in compliance with the Second Order.  Of the 120 total administrative and criminal misconduct investigations we reviewed, 36 (30%) were in full compliance with the Second Order, an increase in overall compliance from the 18% during the last quarter.  Of the 117 administrative investigations, 33 (28%) were in full compliance with the Second Order, an increase from 15% during the last reporting period.

In 2016, PSB provided us with a memorandum describing PSB's efforts in meeting the requirements of this Paragraph related to the Court's Findings of Fact.  MCSO had outsourced three cases to another law enforcement agency, and an additional four investigations were pending outsourcing to an outside investigator.  These cases were outsourced due to the involvement of the former Chief Deputy, or other conflicts of interest identified by MCSO, and included the investigations identified in Paragraph 300.  MCSO processed a Request for Proposal and retained an outside investigator who met the requirements of Paragraphs 167.iii and 196 to conduct the investigations identified.  One potential misconduct case identified in the Court's Findings of Fact was retained and investigated by PSB, as no identifiable conflict of interest appeared to exist.

PSB provided us with a document sent by the Independent Investigator assigned by the Court to investigate, or reinvestigate, some of the misconduct that is related to the Plaintiffs' class.  In this document, the Independent Investigator clarified his intent to investigate the matters assigned to him by the Court, as well as the matters that the Court determined were the discretion of the Independent Investigator.  He further clarified that his investigations would include the initial misconduct alleged, as well as any misconduct that might have occurred during the process of review or issuance of discipline by MCSO personnel.

During each site visit, we meet with PSB personnel to discuss the status of those cases that have been outsourced to any contract vendor, other law enforcement agency, or other person or entity, so that we can continue to monitor these investigations and ensure that all misconduct cases, including those identified in the Findings of Fact, are thoroughly investigated.  PSB has continued to keep us apprised of the status of all such investigations.

During our July 2021 site visit, PSB outsourced one additional case to the contract investigator.  The contract investigator had a total of 25 cases pending completion.  There were no completed cases by the contract investigator that were forwarded for our review during the last reporting period.  This investigator continued to review acts of potential misconduct related to the Court's Findings of Fact in 2016, related to both this Paragraph and Paragraph 300.  PSB also updated us on the status of the 25 investigations outsourced to the new contract investigation entity as part of a pilot program.  One had been completed and returned to PSB.  At the time of our site visit, PSB was in the process of reviewing this investigation.

WAI 65184

During our October 2021 site visit, PSB advised that one additional case was outsourced to the contract investigator.  He had 21 cases pending.  Of the 25 cases outsourced as part of the pilot program, PSB advised that eight had been completed.

During our January 2022 site visit, PSB advised us that it had not outsourced any additional investigations to any outside vendor.  The contract investigator had 20 cases pending.  PSB advised that several of these are related to the Court's Findings of Fact in 2016 and remain in progress.  Of the 25 cases outsourced as part of the pilot program with a new vendor, 14 were pending.

During our April 2022 site visit, PSB advised that they had not outsourced any additional cases to either outside vendor.  The initial contract vendor had 18 cases pending, as two of his cases had been transferred to the second contract vendor for completion.  We did not review any cases completed by this vendor during this reporting period.  The second contract vendor completed four cases during this reporting period.  MCSO was renewing the contract with this vendor.

During our July 2022 site visit, PSB advised that the Bureau had not outsourced any additional cases to either outside vendor due to potential conflicts of interest.  The initial contract vendor continues to have 18 cases pending.  None were completed and submitted for our review during this reporting period.  The second contract vendor has been assigned a total of 38 cases.  Twenty-five have been completed, and five were completed and submitted for our review during this reporting period.

The Independent Investigator has previously completed all of the investigations identified by the Court, as well as those where he initiated new investigations due to potential misconduct he identified during his reviews.  All have been reviewed by our Team to ensure they complied with the Order of Court.  The Independent Discipline Authority has also previously submitted his final report on those cases that had sustained findings, and we reviewed these findings.  We did not make compliance findings on these cases, but determined that both the 12 investigations specifically directed by the Court for reinvestigation, as well as the additional cases where the Independent Investigator determined an investigation should be conducted, were properly completed, and addressed the concerns identified by the Court.

***Paragraph 292.***  *To make this assessment, the Monitor is to be given full access to all MCSO internal affairs investigations or matters that might have been the subject of an internal affairs investigation by the MCSO.  In making and reporting his assessment, the Monitor shall take steps to comply with the rights of the principals under investigation in compliance with state law.  While the Monitor can assess all internal affairs investigations conducted by the MCSO to evaluate their good faith compliance with this Order, the Monitor does not have authority to direct or participate in the investigations of or make any orders as to matters that do not qualify as Class Remedial Matters.*

**In Full and Effective Compliance**

WAI 65185

PSB personnel continue to inform us of ongoing criminal and administrative misconduct investigations. A member of our Team attends each CRM meeting, reviews the lists of new internal investigations, and has access to PSB's IAPro database. The only cases for which any oversight occurs during the investigative process are those that are determined to be CRMs. We review all other misconduct investigations once they are completed, reviewed, and approved by MCSO personnel.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 293.** *The Monitor shall append to the quarterly reports it currently produces to the Court its findings on the MCSO's overall internal affairs investigations. The parties, should they choose to do so, shall have the right to challenge the Monitor's assessment in the manner provided in the Court's previous Order. (Doc. 606 ¶¶ 128, 132.)*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

Since we began reviewing internal investigations conducted by MCSO, we have reviewed hundreds of investigations into alleged misconduct by MCSO personnel. During this reporting period, we reviewed 117 administrative misconduct investigations, 99 service complaints, 28 PSB diversions and three criminal misconduct investigations. The criminal investigations were compliant. Of the service complaints we reviewed, 94 (95%) were in compliance. Of the 28 diversions, 25 (89%) were in compliance.

The investigative quality of PSB administrative investigations has remained high for numerous reporting periods, and we noted some improvement in District and Division cases during the last reporting period. For these cases completed outside of PSB, noncompliance increased from 32% the last reporting period to 42% this reporting period. Despite training, multiple years of experience with the requirements for the completion of investigations, and increased oversight, MCSO has been unable to sustain improvement in those cases investigated outside of PSB.

During our July 2022 site visit, PSB advised that the closure time for an administrative investigation conducted by Divisions or Districts outside of PSB during this reporting period was 386 days, a decrease from 427 days during the last reporting period. The average completion time for investigations completed by sworn personnel in PSB was 919 days, an increase from 831 days during the last reporting period; investigations conducted by Detention personnel in PSB was 518 days, a decrease from 603 during the last reporting period; and investigations conducted by civilian investigators, who began conducting investigations in 2021, was 266 days a decrease from 416 days at the end of 2021. For all administrative investigations conducted by MCSO, the average completion time was 596 days, a decrease from 654 days during the last reporting period.

WAI 65186

We continue to note that in some of these delayed investigations, potential evidence has been lost; investigators have been unable to locate and contact complainants, witnesses, and investigative leads; and employees' memories have been adversely impacted by the delay in their interviews. Quarter after quarter, the failure to complete investigations in a timely manner has continued to be unacceptable and a disservice to all stakeholders.

PSB was responsible for conducting 93 of the 117 total administrative misconduct investigations we reviewed for this reporting period. Of the 93 investigations conducted by PSB, three (33%) had deficiencies not including timeliness. With the inclusion of extensions, 31 (33%) were found to be in compliance. This is an increase from the 19% compliance for the last reporting period. Of the five investigations outsourced by PSB, one (20%) had investigative deficiencies. With the inclusion of timeliness, only one of the five investigations was in compliance.

Nineteen investigations were conducted outside of PSB and all 19 were reported in Paragraph 32. One (5%) of these investigations was found in compliance, the same percentage as the last reporting period.

MCSO completed delivery of the 40-hour Misconduct Investigative Training at the end of 2017, and all sworn supervisors who investigate administrative misconduct attended the training. Refresher training on misconduct investigations has also been delivered since the initial 40-hour training. The investigative quality of PSB investigations has remained generally high. Of the 93 investigations completed by PSB, 23 were initiated between 2016 and 2019. Of these 23, 22 (96%) were compliant with all requirements – with the exception of extensions and timelines. With the consideration of timelines and extensions, none of these 23 investigations were in full compliance. For the 70 investigations initiated on or after January 1, 2020, 68 (97%) were compliant with all requirements of the Court's Orders, with the exclusion of timelines and extensions. With the consideration of timelines, 31 (44%) of these 70 were in compliance, an increase from 29% the last reporting period. Overall compliance for all 93 investigations, taking into account timelines and extensions, was 33%, an increase from 18% during the last reporting period.

Of the 19 investigations completed outside of PSB, all were initiated after January 1, 2020, and completed in 2021 or 2022, after the increased oversight at the District and Division level began. Of the 19, eight (42%) had investigative deficiencies. This is a 10% increase in deficiencies from the last reporting period. With the inclusion of extensions and timelines, only one (5%) of the investigations was in compliance, the same percentage as the last quarter.

As we noted in our previous reports, we must consider all requirements for investigations at the time they are submitted for our review, including their timely completion. MCSO's inability to address timely completion of investigations is an ongoing issue that continues to adversely impact the agency's compliance findings.

PSB personnel continue to be receptive to our input, and we have had many meetings and discussions regarding the investigations being conducted and the compliance for both PSB and District and Division Cases. We also discuss compliance concerns with District and Division Command personnel during our site visits. During our next site visit, we will discuss those cases that are noncompliant with MCSO; and address our concerns about the compliance findings for

WAI 65187

this reporting period.  We continue to stress that compliance is not the sole responsibility of any one individual or Division – but dependent on all those who complete, review, or approve internal investigations.

We have noted in numerous previous reporting periods that MCSO's executive leadership must take the appropriate action to ensure that adequate resources are dedicated to the completion of administrative and criminal misconduct investigations.  According to a document that PSB recently provided, two sworn positions from the 2018 budget still remain unfilled.  In the July 2019 budget, only civilian positions were authorized and filled.  This budget approval did include three civilian investigators for PSB.  There were no budget positions requested for PSB for the July 2020 or 2021 budget.

Between 2016 and 2021, the number of investigator positions assigned to PSB averaged between 24 and 26.  With the addition of new civilian investigator positions and the restructuring of PSB that has returned several staff to investigative functions, PSB now has 33 investigator positions – though ongoing transfers, promotions, and retirements cause this number to continue to fluctuate.  The additional personnel hired over the last several years have not made any significant impact on the overall backlog of cases and PSB still remains critically understaffed.

### B.    Investigations to be Conducted by the Independent Investigator and the Independent Disciplinary Authority

**Paragraph 294.**  *In its Findings of Fact, (Doc. 1677), the Court identified both: (1) internal affairs investigations already completed by the MCSO that were inadequate or insufficient; (see, e.g., Doc. 1677 at ¶ 903), and (2) misconduct or alleged misconduct that had never been investigated by MCSO that should be or should have been investigated.  (Id. at ¶ 904.)*

**Paragraph 295.**  *In light of MCSO's failure to appropriately investigate these matters, the Court appoints an Independent Investigator and an Independent Disciplinary Authority from the candidates set forth by the parties, and vests them with the authority to investigate and decide discipline in these matters.*

### 1.    The Independent Investigator

**Paragraph 298.**  *In assessing the existence of previously uncharged acts of misconduct that may be revealed by the Findings of Fact, the Independent Investigator does not have authority to investigate acts of misconduct that are not sufficiently related to the rights of the members of the Plaintiff class.  While the Independent Investigator should identify such acts of misconduct and report those acts to the Commander of the Professional Standards Bureau, and to the Monitor for purposes of making the Monitor's assessment identified in ¶¶ 291–93 above, the Independent Investigator may not independently investigate those matters absent the authorization and the request of the Sheriff.*

WAI 65188

*Paragraph 300.  The following potential misconduct is not sufficiently related to the rights of the members of the Plaintiff class to justify any independent investigation:*

a.   *Uninvestigated untruthful statements made to the Court under oath by Chief Deputy Sheridan concerning the Montgomery investigation.  (Doc. 1677 at ¶ 385).*

b.   *Uninvestigated untruthful statements made to the Court under oath by Chief Deputy Sheridan concerning the existence of the McKessy investigation.  (Id. at ¶ 816).*

c.   *Chief Deputy Sheridan's untruthful statements to Lieutenant Seagraves made during the course of an internal investigation of Detective Mackiewicz to the effect that an investigation into the overtime allegations against Detective Mackiewicz had already been completed.  (Id. at ¶ 823).*

d.   *Other uninvestigated acts of misconduct of Chief Deputy Sheridan, Captain Bailey, Sergeant Tennyson, Detective Zebro, Detective Mackiewicz, or others that occurred during the McKessy investigation.  (Id. at ¶¶ 766–825).*

**Phase 1:**  Not applicable

**Phase 2:**  Deferred

During our January 2017 site visit, the PSB Commander assured us that all acts of misconduct that we identified and discussed during our October 2016 site visit would be provided to a contracted investigator for investigative purposes.

Since that time, MCSO has contracted with a licensed private investigator.  The contract investigator possesses the requisite qualifications and experience to conduct the investigations of misconduct outlined in Paragraph 300 (a.-c.), and the additional misconduct in the Findings of Fact that directly associates with Paragraph 300 (d

During our April 2017 site visit, we met with PSB command staff and representatives from the Maricopa County Attorney's Office (MCAO) to verify that all of the acts of misconduct that were identified in the Findings of Fact (FOF) are under investigation, either by the Court-appointed Independent Investigator or the private licensed contract investigator.  Before this meeting, PSB command provided us with a roster of related acts of misconduct that PSB intended to be assigned to the contract investigator.  The roster of intended assignments did not include all of the acts of misconduct that we had discussed.  MCAO and PSB command personnel explained that the Court also identified, in Paragraph 301, many of the acts of potential misconduct identified in the FOF as sufficiently related to the rights of members of the Plaintiffs' class.  In Paragraph 301, the Court documented that because of this determination, investigations of the potential misconduct were justified if the Independent Investigator deemed that an investigation was warranted.

WAI 65189

The Independent Investigator has completed all 12 of the administrative misconduct investigations specifically identified by the Court in the Second Order, and all other investigations for which he determined an administrative misconduct investigation should be conducted. The Independent Disciplinary Authority has also completed all of the discipline findings for these cases. While we did not make compliance findings for these cases, we reviewed them and found that they complied with the direction of the Court. The contract investigator retained by MCSO is still in the process of investigating several cases that were identified by the Court in 2016.

Our ability to verify that all potential misconduct outlined in the FOF has been investigated by PSB, the PSB contract investigator, or the Independent Investigator remains pending until all the investigations are completed. Once this occurs, we can determine if there is any additional misconduct identified in the FOF that still requires investigation. Finally, the PSB Commander and MCAO advised us that the acts of misconduct involving (former) Sheriff Arpaio as identified in the FOF would not be investigated by any entity, as there does not exist any statute that addresses how a Sheriff would be disciplined in the event of a sustained finding resulting from an administrative misconduct investigation.

*Paragraph 310.   The Monitor and the parties are directed to promptly comply with the Independent Investigator's requests for information.   The Monitor and the Independent Investigator may communicate to coordinate their investigations.   Nevertheless, each is independently responsible for their respective jurisdiction set forth in this Order, and each should make independent decisions within his own delegated responsibility.*

### *2. The Independent Disciplinary Authority*

*Paragraph 337.   Nevertheless, when discipline is imposed by the Independent Disciplinary Authority, the employee shall maintain his or her appeal rights following the imposition of administrative discipline as specified by Arizona law and MCSO policy with the following exceptions:*

a. *When minor discipline is imposed, a grievance may be filed with the Sheriff or his designee consistent with existing MCSO procedure.   Nevertheless, the Sheriff or his designee shall transmit the grievance to the Monitor who shall have authority to decide the grievance. If in resolving the grievance the Monitor changes the disciplinary decision in any respect, he shall explain his decision in writing.*

b. *A disciplined MCSO employee maintains his or her right to appeal serious discipline to the Maricopa County Law Enforcement Merit System Council to the extent the employee has such a right.   The Council may exercise its normal supervisory authority over discipline imposed by the Independent Disciplinary Authority with one caveat.   Arizona law allows the Council the discretion to vacate discipline if it finds that the MCSO did not make a good faith effort to investigate and impose the discipline within 180 days of learning of the misconduct.   In the case of any of the disciplinary matters considered by the Independent Disciplinary Authority, the MCSO will not have made that effort.   The*

WAI 65190

*delay, in fact, will have resulted from MCSO's bad faith effort to avoid the appropriate imposition of discipline on MCSO employees to the detriment of the members of the Plaintiff class. As such, the Council's determination to vacate discipline because it was not timely imposed would only serve to compound the harms imposed by the Defendants and to deprive the members of the Plaintiff class of the remedies to which they are entitled due to the constitutional violations they have suffered at the hands of the Defendants. As is more fully explained above, such a determination by the Council would constitute an undue impediment to the remedy that the Plaintiff class would have received for the constitutional violations inflicted by the MCSO if the MCSO had complied with its original obligations to this Court. In this rare instance, therefore, the Council may not explicitly or implicitly exercise its discretion to reduce discipline on the basis that the matter was not timely investigated or asserted by the MCSO. If the Plaintiff class believes the Council has done so, it may seek the reversal of such reduction with this Court pursuant to this Order.*

**In Full and Effective Compliance**

During this reporting period, no grievances were filed that met the criteria for transmitting to the Monitor.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 65191

# Section 18:  Concluding Remarks

We assess compliance with 94 Paragraphs of the First Order, and 114 Paragraphs of the Second Order, for a total of 208 Paragraphs.  MCSO is in Phase 1 compliance with 79 of the First Order Paragraphs, or 99%; and 103 of the Second Order Paragraphs, or 100%.

Including the Paragraphs in which MCSO is in Full and Effective Compliance, MCSO is in Phase 2, or operational compliance, with 73 of the First Order Paragraphs, or 78%.  This is a decrease of two percentage points from the last reporting period.  MCSO is in Phase 2 compliance with 106 of the Second Order Paragraphs, or 93%.

Combining the requirements of both Orders, MCSO is in Phase 1 compliance with 182 Paragraphs, or 99%; and in Phase 2 compliance with 179 Paragraphs, or 86%.

The First Order requires three separate analyses of MCSO's traffic stops:  the annual analysis (TSAR), the quarterly analysis (TSQR), and the monthly analysis (TSMR).  MCSO has successfully implemented two of the three: the TSAR and the TSQR.  During this reporting period, MCSO published the Seventh TSQR, which analyzed the disparities in arrest outcomes which were identified in the last three TSARs.  We and the Parties also began extensive discussions regarding the Sixth TSQR, which continued into the next reporting period and ultimately led to modifications to that Report.  This will be discussed in greater detail in our next report.

During this reporting period, progress continued on the required monthly analysis, or TSMR.  MCSO began piloting the analysis in April 2021, with extensive input and oversight by us and the Parties.  As noted in our last report, the TSMR methodology was approved during the last reporting period, approximately one year after the pilot began, and after extensive input from all involved – including several virtual meetings with experts representing MCSO, the Plaintiffs, the Plaintiff-Intervenor, and us.  Once the methodology was approved and operational, MCSO began finalizing the policies and guiding documents for the TSMR process.  These reflect the lessons learned during the pilot process.  During our July site visit, we established our next site visit (October 2022) as the target to have the policies and associated training finalized and approved, thus ending the pilot phase of the TSMR implementation.

MCSO continues to examine its data collection practices and notify us as soon as discrepancies are discovered.  In the past, the agency has completed this for location of traffic stops; and during the current quarter, MCSO identified the undercounting of special assignment stops.  As a result, MCSO is working on new processes to capture all such stops in the future and also examining whether the undercounting of these types of stops may have had an impact on previous published reports.

WAI 65192

In February 2021, MCSO learned that due to a technical issue caused by the migration of data from one data storage system to another, their document preservation software, Open Axes, was not able to perform certain searches for documents in response to document preservation requests. MCSO's Legal Liaison Section (LLS) has been working with the Technology Management Bureau and the vendor to resolve this issue. Well over one year has passed since this issue was discovered; and if MCSO does not resolve this issue during the next reporting period, it will adversely affect the agency's compliance with Paragraphs 269 and 270.

MCSO has continued to have a rather high compliance rating in relation to the proper documentation of seized contraband. However, the agency has not attained and maintained compliance with this requirement. There continue to be instances where contraband items are seized by deputies during traffic stops, yet they are not properly documented on Vehicle Stop Contact Forms. Thorough supervisory reviews of traffic stop documentation should address the issue and continue the positive trend towards compliance with this Order requirement.

As of the end of this reporting period, after the resignation of two members in March 2022, the Community Advisory Board (CAB) has only three members (of five possible members). The CAB continues to be actively engaged in this case in various ways – including holding successful community meetings in February and August, reviewing and providing feedback on MCSO policies, participating in our quarterly site visit meetings, offering recommendations to MCSO to improve its relationship with the Plaintiffs' class, and meeting regularly with us for updates on compliance issues, among other activities. The CAB is now waiting for MCSO to appoint one new member, and for MCSO and the Plaintiffs' attorneys to jointly appoint one new member, to return to its full strength. We are following this closely and will report further on this in our next quarterly status report.

While PSB investigations are of high quality, the timelines are problematic. Also, MCSO has been unable to sustain improvement in investigations conducted outside of PSB. Compliance for these cases decreased from 68% the last reporting period, to 58% this reporting period. PSB advised us that again for this reporting period, new investigations were not assigned to Districts or Divisions outside of PSB. PSB is now handling 95% of all investigations, an increase from 92% the last reporting period. We reiterate our concerns from our last report about exacerbating an already overly burdensome workload for PSB investigators and again urge PSB to consider the advisability of continuing this practice.

The outside expert appointed by the Court to examine issues relevant to the deficiencies associated with administrative investigations has completed his report. The Court is now considering the recommendations made by this expert.

For the last two years, we have been reporting on issues of concern related to personnel resources. During our quarterly site visits, we have obtained updates on hiring and attrition, and we have been apprised of initiatives by Human Resources to increase employee retention and hiring. In our quarterly status reports we have been documenting the continued negative trend in personnel staffing. While we recognize that MCSO has some challenges, we also note that the solutions implemented so far have had limited impact on either retention or hiring. The loss of personnel, and the need to hire a sufficient number of employees, is an issue that the agency will continually need to address.

WAI 65193

While MCSO may not be the only local law enforcement agency in this predicament, MCSO is the only agency in Maricopa County with the responsibility to house and secure individuals accused of breaking the law.  We are most concerned with the severe shortages in Custody Services.  Personnel shortages in the jails can have serious consequences for both inmates and Detention personnel, and the agency must find remedies for this.

WAI 65194

# Appendix:  Acronyms

The following is a listing of acronyms frequently used in our quarterly status reports:

| AB | Administrative Broadcast |
|---|---|
| ACJIS | Arizona Criminal Justice Information System |
| ACLU | American Civil Liberties Union |
| ACT | Annual Combined Training |
| AIU | Audits and Inspections Unit |
| AOC | Arizona Office of Courts |
| ARG | Alert Review Group |
| ARS | Arizona Revised Statutes |
| ASU | Arizona State University |
| ATU | Anti-Trafficking Unit |
| BAF | BIO Action Form |
| BB | Briefing Board |
| BIO | Bureau of Internal Oversight |
| BWC | Body-worn camera |
| CAB | Community Advisory Board |
| CAD | Computer Aided Dispatch |
| CBP | Customs and Border Protection |
| CDA | Command Daily Assessment |
| CEU | Criminal Employment Unit |
| CID | Court Implementation Division |
| COrD | Community Outreach Division |
| CORT | Court Order Required Training |
| CRM | Class Remedial Matter |
| DOJ | Department of Justice |
| DSA | Deputy Service Aide |
| DUI | Driving Under the Influence |

WAI 65195

| EEPM | Effective Employee Performance Management |
|------|-------------------------------------------|
| EIS | Early Identification System |
| EIU | Early Intervention Unit |
| EPA | Employee Performance Appraisal |
| ESI | Electronically stored information |
| ETSI | Extended Traffic Stop Indicator |
| FBI | Federal Bureau of Investigation |
| ESTI | Extended traffic stop indicator |
| FEC | Full and Effective Compliance |
| FIDM | Fair and Impartial Decision Making |
| FOF | Findings of Fact |
| FTO | Field Training Officer |
| GI | General Instructor |
| ICE | Immigration and Customs Enforcement |
| IIU | Internal Investigations Unit |
| IMF | Incident Memorialization Form |
| IR | Incident Report |
| JED | Judicial Enforcement Division |
| LNET | Long non-extended traffic stop |
| LOS | Length of stop |
| LLS | Legal Liaison Section |
| MCAO | Maricopa County Attorney's Office |
| MCSO | Maricopa County Sheriff's Office |
| NETS | Non-extended traffic stops |
| NOI | Notice of Investigation |
| NTCF | Non-Traffic Contact Form |
| OIT | Officer in Training |
| PAL | Patrol Activity Log |
| PDH | Pre-Determination Hearing |
| POST | Peace Officers Standards and Training |

WAI 65196

| PPMU | Posse Personnel Management Unit |
|------|-------------------------------|
| PSB | Professional Standards Bureau |
| SID | Special Investigations Division |
| SMS | Skills Manager System |
| SPSS | Statistical Package for the Social Science |
| SRT | Special Response Team |
| TraCS | Traffic Stop Data Collection System |
| TSAR | Traffic Stop Annual Report |
| TSAU | Traffic Stop Analysis Unit |
| TSMR | Traffic Stop Monthly Report |
| TSQR | Traffic Stop Quarterly Report |
| VSCF | Vehicle Stop Contact Form |

WAI 65197