THIRTY-SEVENTH REPORT

Independent Monitor

for the

Maricopa County Sheriff's Office



Reporting Period – Second Quarter 2023

Chief (Ret.) Robert S. Warshaw

Independent Monitor

November 27, 2023

WAI 70484

# Table of Contents

Section 1:  Introduction…………………………………………………...…………..3

Section 2: Methodology and Compliance Summary………………………...............4

Section 3:  Implementation Unit Creation and Documentation Request……………..17

Section 4:  Policies and Procedures……………………..…………………………...21

Section 5:  Pre-Planned Operations………………………….……..…..…………...40

Section 6:  Training……………………………………………………...............45

Section 7: Traffic Stop Documentation and Data Collection…………….…………55

Section 8:  Early Identification System (EIS)……………….…………....…………93

Section 9:  Supervision and Evaluation of Officer Performance………….…............119

Section 10:  Misconduct and Complaints……………………………….................144

Section 11:  Community Engagement…………………………………….............148

Section 12:  Misconduct Investigations, Discipline, and Grievances………..............155

Section 13:  Community Outreach and Community Advisory Board………………234

Section 14:  Supervision and Staffing…………………………………….................235

Section 15:  Document Preservation and Production………………………………239

Section 16:  Additional Training……………………………………….............244

Section 17:  Complaints and Misconduct Investigations Relating to
             Members of the Plaintiff Class……………………………..............245

Section 18:  Concluding Remarks……………………………………….............276

Appendix:  Acronyms…………………………………………………...............278

WAI 70485

# Section 1:  Introduction

This is the thirty-seventh report issued in my capacity as the Court-appointed Monitor in the case of *Manuel de Jesus Ortega Melendres, et al., v. Paul Penzone, et al.* (No. CV-07-02513-PHX-GMS), and documents activities that occurred during the second quarter of 2023, April 1-June 30, 2023.

On May 24, 2013, the Court issued its Findings of Fact and Conclusions of Law after conducting a bench trial in this matter.  On October 2, 2013, the Court issued a Supplemental Permanent Injunction/Judgment Order (First Order) in this case, outlining the requirements which the Maricopa County Sheriff's Office (MCSO) must comply with as a result of the Court's findings. On May 13, 2016, the Court issued its Findings of Fact in the civil contempt proceedings that commenced in April 2015.  This led to the issuance of a Second Supplemental Permanent Injunction/Judgment Order (Second Order) on July 20, 2016, significantly expanding the duties of the Monitor.  On November 8, 2022, the Court issued its Third Supplemental Permanent Injunction/Judgment Order (Third Order), adding requirements related to MCSO's Professional Standards Bureau (PSB) function.

The Second Order delineates in great detail requirements in the areas of misconduct investigations, training, discipline and discipline review, transparency and reporting, community outreach, document preservation, and misconduct investigations involving members of the Plaintiffs' class.  The Court granted the Monitor the authority to supervise and direct all of the investigations that fall into the latter category.  The Third Order imposes additional requirements on MCSO as they pertain to PSB.

Our reports cover the requirements of all three Orders and document MCSO's compliance efforts with these requirements.  We provide summaries of compliance with the three Orders separately, as well as a summary of MCSO's overall, or combined, compliance.

The compliance Paragraphs of the Second Order commence where the First Order ends, and they are numbered from Paragraph 160 through and including Paragraph 337.  Not all are subject to our review.  The compliance Paragraphs of the Third Order commence where the Second Order ends, and they are numbered from Paragraph 338 through and including Paragraph 368.  Again, not all are subject to our review.

As of the last reporting period, MCSO asserted and was granted Full and Effective Compliance with 152 Paragraphs of the First and Second Orders, as that term is defined in the First Order.  On June 23, 2023, MCSO asserted Full and Effective Compliance with four additional Paragraphs: Paragraphs 91, 173, 205, and 212.  On July 21, 2023, I agreed with three of MCSO's assertions, granting MCSO in Full and Effective Compliance with 155 total Paragraphs.  (See Section 2 of this report.)   MCSO retains the obligation to document that the Office remains in Full and Effective Compliance with the Paragraphs so designated.

We once again conducted our July 2023 site visit remotely.  Our last in-person site visit to Maricopa County was in January 2020.  MCSO's compliance status with individual Paragraphs normally subject to in-person inspections will not be adversely impacted by any missed onsite reviews.  We will return to onsite visits in October 2023.

WAI 70486

## Section 2: Methodology and Compliance Summary

The Monitor's primary responsibility is to determine the status of compliance of the Maricopa County Sheriff's Office (MCSO) with the requirements in the Orders. To accomplish this, the Monitoring Team makes quarterly visits to Maricopa County to meet with MCSO's Court Implementation Division (CID) and other Office personnel – at Headquarters, in Patrol District offices, or at the office that we occupy when onsite. (Due to the COVID-19 pandemic, we have been conducting our site visits remotely, in contrast to our regular practice of conducting onsite compliance visits.) We also observe Office practices; review Office policies and procedures; collect and analyze data using appropriate sampling and analytic procedures; and inform the Parties and, on a quarterly basis, the Court, about the status of MCSO's compliance.

This report documents compliance with applicable Order requirements, or Paragraphs, in two phases. For Phase 1, we assess compliance according to whether MCSO has developed and approved requisite policies and procedures, and MCSO personnel have received documented training on their contents. For Phase 2 compliance, generally considered operational implementation, MCSO must demonstrate that it is complying with applicable Order requirements more than 94% of the time, or in more than 94% of the instances under review.

We use four levels of compliance: In compliance; Not in compliance; Deferred; and Not applicable. "In compliance" and "Not in compliance" are self-explanatory. We use "Deferred" in circumstances in which we are unable to fully determine the compliance status – due to a lack of data or information, incomplete data, or other reasons that we explain in the narrative of our report. We will also use "Deferred" in situations in which MCSO, in practice, is fulfilling the requirements of a Paragraph, but has not yet memorialized the requirements in a formal policy.

For Phase 1 compliance, we use "Not applicable" for Paragraphs where a policy is not required; for Phase 2 compliance, we use "Not applicable" for Paragraphs that do not necessitate a compliance assessment.

The tables below summarize the compliance status of Paragraphs tracked in this report.[1] During this reporting period, MCSO's Phase 1 compliance rate with the **First and Second Orders** remained the same as the last reporting period, both at 100%. MCSO's Phase 1 compliance rate with the **Third Order** increased by five percentage points from the last reporting period, to 25%.

---

[1] The percent in compliance for Phase 1 is calculated by dividing the number of Order Paragraphs determined to be in compliance by the total number of Paragraphs requiring a corresponding policy or procedure. Paragraphs with the status of Deferred are included in the denominator, while Paragraphs with the status of Not Applicable are not included. Therefore, the number of Paragraphs included in the denominator totals 188 for Phase 1; the number of Paragraphs included in the denominator totals 225 for Phase 2.

WAI 70487

During this reporting period, MCSO's Phase 2 compliance rate with the **First Order** increased by six percentage points from the last reporting period, to 88%. This number includes Paragraphs that we consider to be in compliance and those that are now in Full and Effective Compliance (FEC), as described above. (See below for the list of Paragraphs that are in Full and Effective Compliance.) During this reporting period, MCSO's Phase 2 compliance rate with the **Second Order** remained the same as the last reporting period, at 93%. This number also includes Paragraphs that we consider to be in compliance and those that are now in Full and Effective Compliance (FEC), as described above. During this reporting period, MCSO's Phase 2 compliance rate with the **Third Order** increased by three percentage points from the last reporting period, to 53%.

| Thirty-Seventh Quarterly Status Report | | |
|---|---|---|
| **First Order Summary** | | |
| **Compliance Status** | **Phase 1** | **Phase 2** |
| Not Applicable | 1 | 6 |
| Deferred | 0 | 0 |
| Not in Compliance | 0 | 11 |
| In Compliance | 80 | **83**[2] |
| **Percent in Compliance** | **100%** | **88%** |

| Thirty-Seventh Quarterly Status Report | | |
|---|---|---|
| **Second Order Summary** | | |
| **Compliance Status** | **Phase 1** | **Phase 2** |
| Not Applicable | 19 | 9 |
| Deferred | 0 | 3 |
| Not in Compliance | 0 | 5 |
| In Compliance | 104 | 106[3] |
| **Percent in Compliance** | **100%** | **93%** |

---

[2] This number includes those Paragraphs that are deemed in Full and Effective Compliance.
[3] This number includes those Paragraphs that are deemed in Full and Effective Compliance.

WAI 70488

| Thirty-Seventh Quarterly Status Report | | |
|---|---|---|
| **Third Order Summary** | | |
| **Compliance Status** | **Phase 1** | **Phase 2** |
| Not Applicable | 21 | 8 |
| Deferred | 3 | 8 |
| Not in Compliance | 0 | 0 |
| In Compliance | 1 | 9[4] |
| **Percent in Compliance** | **25%** | **53%** |

---

[4] This number includes those Paragraphs that are deemed in Full and Effective Compliance.

WAI 70489

| MCSO's Compliance with the Requirements of the **First Order** *(October 2, 2013)* | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Report 1 | Report 2 | Report 3 | Report 4 | Report 5 | Report 6 | Report 7 | Report 8 | Report 9 | Report 10 |
| **Phase 1** | 4% | 10% | 44% | 40% | 51% | 57% | 61% | 60% | 67% | 60% |
| **Phase 2** | 0% | 0% | 26% | 25% | 28% | 37% | 38% | 39% | 44% | 49% |

| | Report 11 | Report 12 | Report 13 | Report 14 | Report 15 | Report 16 | Report 17 | Report 18 | Report 19 | Report 20 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Phase 1** | 63% | 79% | 88% | 85% | 85% | 85% | 85% | 97% | 97% | 97% |
| **Phase 2** | 50% | 57% | 67% | 62% | 65% | 64% | 66% | 77% | 75% | 78% |

| | Report 21 | Report 22 | Report 23 | Report 24 | Report 25 | Report 26 | Report 27 | Report 28 | Report 29 | Report 30 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Phase 1** | 96% | 96% | 96% | 96% | 96% | 98% | 98% | 98% | 98% | 99% |
| **Phase 2** | 76% | 77% | 79% | 82% | 81% | 78% | 79% | 77% | 77% | 79% |

| | Report 31 | Report 32 | Report 33 | Report 34 | Report 35 | Report 36 | Report 37 |
|---|---|---|---|---|---|---|---|
| **Phase 1** | 99% | 99% | 99% | 99% | 99% | 100% | 100% |
| **Phase 2** | 81% | 80% | 78% | 79% | 80% | 82% | 88% |

WAI 70490

| MCSO's Compliance with the Requirements of the **Second Order** *(July 20, 2016)* | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Report 1 | Report 2 | Report 3 | Report 4 | Report 5 | Report 6 | Report 7 | Report 8 | Report 9 | Report 10 |
| **Phase 1** | N/A | | | | | | | | | 1% |
| **Phase 2** | N/A | | | | | | | | | 43% |

| | Report 11 | Report 12 | Report 13 | Report 14 | Report 15 | Report 16 | Report 17 | Report 18 | Report 19 | Report 20 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Phase 1** | 10% | 12% | 72% | 75% | 77% | 77% | 78% | 78% | 99% | 99% |
| **Phase 2** | 46% | 60% | 63% | 66% | 72% | 75% | 80% | 81% | 90% | 89% |

| | Report 21 | Report 22 | Report 23 | Report 24 | Report 25 | Report 26 | Report 27 | Report 28 | Report 29 | Report 30 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Phase 1** | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **Phase 2** | 91% | 90% | 92% | 93% | 90% | 91% | 92% | 90% | 89% | 91% |

| | Report 31 | Report 32 | Report 33 | Report 34 | Report 35 | Report 36 | Report 37 |
|---|---|---|---|---|---|---|---|
| **Phase 1** | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **Phase 2** | 92% | 93% | 93% | 93% | 93% | 93% | 93% |

WAI 70491

| MCSO's Compliance with the Requirements of the **Third Order** *(July 20, 2016)* | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Report 1 | Report 2 | Report 3 | Report 4 | Report 5 | Report 6 | Report 7 | Report 8 | Report 9 | Report 10 |
| **Phase 1** | N/A | | | | | | | | | |
| **Phase 2** | N/A | | | | | | | | | |

| | Report 11 | Report 12 | Report 13 | Report 14 | Report 15 | Report 16 | Report 17 | Report 18 | Report 19 | Report 20 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Phase 1** | N/A | | | | | | | | | |
| **Phase 2** | N/A | | | | | | | | | |

| | Report 21 | Report 22 | Report 23 | Report 24 | Report 25 | Report 26 | Report 27 | Report 28 | Report 29 | Report 30 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Phase 1** | N/A | | | | | | | | | |
| **Phase 2** | N/A | | | | | | | | | |

| | Report 31 | Report 32 | Report 33 | Report 34 | Report 35 | Report 36 | Report 37 |
|---|---|---|---|---|---|---|---|
| **Phase 1** | N/A | | | | 25% | 20% | 25% |
| **Phase 2** | N/A | | | | 53% | 50% | 53% |

WAI 70492

Below is the list of Paragraphs for which MCSO asserted Full and Effective Compliance, and the Monitor's response to MCSO's assertion.

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|---|---|---|
| 9 | 12/28/18 | Concurred on 1/28/19 |
| 10 | 12/28/18 | Concurred on 1/28/19 |
| 11 | 12/28/18 | Concurred on 1/28/19 |
| 12 | 12/28/18 | Concurred on 1/28/19 |
| 13 | 12/28/18 | Concurred on 1/28/19 |
| 19 | 3/31/23 | Concurred on 4/27/23 |
| 21 | 6/22/20 | Concurred on 7/20/20 |
| 22 | 12/16/20 | Did not concur on 1/15/21 |
| 23 | 12/28/18 | Concurred on 1/28/19 |
| 24 | 6/18/21 | Concurred on 7/19/21 |
| 26 | 12/28/18 | Concurred on 1/28/19 |
| 27 | 3/22/19 | Concurred on 4/22/19 |
| 28 | 12/28/18 | Concurred on 1/28/19 |
| 29 | 12/28/18 | Concurred on 1/28/19 |
| 30 | 12/28/18 | Concurred on 1/28/19 |
| 31 | 9/9/19 | Concurred on 10/2/19 |
| 34 | 6/3/19 | Concurred on 6/25/19 |
| 35 | 12/28/18 | Concurred on 1/28/19 |
| 36 | 12/28/18 | Concurred on 1/28/19 |
| 37 | 12/28/18 | Concurred on 1/28/19 |
| 38 | 12/28/18 | Concurred on 1/28/19 |
| 39 | 3/16/21 | Concurred on 4/16/21 |
| 40 | 12/28/18 | Concurred on 1/28/19 |
| 42 | 6/17/22 | Did not concur on 7/15/22 |
| 43 *(first submission)* | 12/16/20 | Did not concur on 1/15/21 |

WAI 70493

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|---|---|---|
| 43 *(second submission)* | 6/17/22 | Concurred on 7/15/22 |
| 44 *(first submission)* | 12/16/20 | Did not concur on 1/15/21 |
| 44 *(second submission)* | 9/30/22 | Concurred on 10/31/22 |
| 45 | 12/9/19 | Concurred on 1/6/20 |
| 46 | 12/9/19 | Concurred on 1/6/20 |
| 47 *(first submission)* | 12/16/20 | Did not concur on 1/15/21 |
| 47 *(second submission)* | 6/17/22 | Concurred on 7/15/22 |
| 48 | 4/1/22 | Concurred on 4/29/22 |
| 49 | 4/1/22 | Concurred on 4/29/22 |
| 50 | 4/1/22 | Concurred on 4/29/22 |
| 51 | 4/1/22 | Concurred on 4/29/22 |
| 52 | 6/18/21 | Concurred on 7/19/21 |
| 53 | 6/18/21 | Concurred on 7/19/21 |
| 55 | 12/28/18 | Concurred on 1/28/19 |
| 57 | 12/16/20 | Concurred on 1/15/21 |
| 58 | 6/22/20 | Concurred on 7/20/20 |
| 59 | 12/28/18 | Concurred on 1/28/19 |
| 60 | 12/28/18 | Concurred on 1/28/19 |
| 61 | 12/9/19 | Concurred on 1/6/20 |
| 62 | 1/6/23 | Concurred on 2/6/23 |
| 63 | 6/22/20 | Concurred on 7/20/20 |
| 66 | 3/31/23 | Concurred on 4/27/23 |
| 68 | 12/28/18 | Concurred on 1/28/19 |
| 71 | 12/28/18 | Concurred on 1/28/19 |
| 73 | 10/5/20 | Concurred on 11/4/20 |
| 76 | 12/16/20 | Concurred on 1/15/21 |
| 77 | 12/28/18 | Concurred on 1/28/19 |
| 78 | 3/16/21 | Concurred on 4/16/21 |

WAI 70494

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|---|---|---|
| 80 | 9/30/22 | Concurred on 10/31/22 |
| 83 | 9/30/22 | Concurred on 10/31/22 |
| 84 | 9/9/19 | Concurred on 10/2/19 |
| 85 | 10/5/20 | Concurred on 11/4/20 |
| 86 | 10/5/20 | Concurred on 11/4/20 |
| 88 | 12/28/18 | Concurred on 1/28/19 |
| 89 | 12/9/19 | Concurred on 1/6/20 |
| 91 | 6/23/23 | Concurred on 7/21/23 |
| 93 | 3/17/20 | Concurred on 4/9/20 |
| 101 | 12/28/18 | Concurred on 1/28/19 |
| 102 | 12/16/20 | Concurred on 1/15/21 |
| 104 | 3/17/20 | Concurred on 4/9/20 |
| 105 | 10/5/20 | Concurred on 11/4/20 |
| 106 | 6/3/19 | Concurred on 6/25/19 |
| 113 | 6/17/22 | Concurred on 7/15/22 |
| 114 | 6/17/22 | Concurred on 7/15/22 |
| 167 | 12/23/21 | Concurred on 1/24/22 |
| 168 | 12/23/21 | Concurred on 1/24/22 |
| 169 | 12/23/21 | Concurred on 1/24/22 |
| 170 | 12/23/21 | Concurred on 1/24/22 |
| 171 | 12/23/21 | Concurred on 1/24/22 |
| 172 | 12/23/21 | Concurred on 1/24/22 |
| 173 | 6/17/22 | Did not concur on 7/15/22 |
| 173 *(second submission)* | 6/23/23 | Did not concur on 7/21/23 |
| 174 | 6/17/22 | Concurred on 7/15/22 |
| 177 | 6/18/21 | Concurred on 7/19/21 |
| 178 | 6/17/22 | Concurred on 7/15/22 |

WAI 70495

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|---|---|---|
| 179 | 6/17/22 | Concurred on 7/15/22 |
| 180 | 6/17/22 | Concurred on 7/15/22 |
| 181 | 1/6/23 | Did not concur on 2/6/23 |
| 182 | 9/24/21 | Concurred on 10/25/21 |
| 184 | 6/18/21 | Concurred on 7/19/21 |
| 185 | 6/18/21 | Concurred on 7/19/21 |
| 186 | 6/18/21 | Concurred on 7/19/21 |
| 187 | 6/18/21 | Concurred on 7/19/21 |
| 188 | 6/18/21 | Concurred on 7/19/21 |
| 189 | 12/23/21 | Concurred on 1/24/22 |
| 190 | 9/30/22 | Concurred on 10/31/22 |
| 191 | 12/23/21 | Concurred on 1/24/22 |
| 192 | 9/30/22 | Concurred on 10/31/22 |
| 193 | 12/23/21 | Concurred on 1/24/22 |
| 196 | 12/23/21 | Concurred on 1/24/22 |
| 197 | 1/6/23 | Concurred on 2/6/23 |
| 198 | 9/30/22 | Concurred on 10/31/22 |
| 199 | 12/23/21 | Concurred on 1/24/22 |
| 200 | 9/30/22 | Concurred on 10/31/22 |
| 201 | 12/23/21 | Concurred on 1/24/22 |
| 202 | 9/30/22 | Concurred on 10/31/22 |
| 203 | 9/30/22 | Concurred on 10/31/22 |
| 205 | 6/23/23 | Concurred on 7/21/23 |
| 206 | 9/30/22 | Concurred on 10/31/22 |
| 208 | 1/6/23 | Concurred on 2/6/23 |
| 210 | 9/24/21 | Concurred on 10/25/21 |
| 212 | 6/23/23 | Concurred on 7/21/23 |
| 214 | 9/24/21 | Concurred on 10/25/21 |

WAI 70496

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|---|---|---|
| 215 | 9/24/21 | Concurred on 10/25/21 |
| 216 | 1/6/23 | Did not concur on 2/6/23 |
| 217 | 9/24/21 | Concurred on 10/25/21 |
| 218 | 9/24/21 | Concurred on 10/25/21 |
| 221 | 9/24/21 | Concurred on 10/25/21 |
| 222 | 9/30/22 | Concurred on 10/31/22 |
| 223 | 9/24/21 | Concurred on 10/25/21 |
| 224 | 9/24/21 | Concurred on 10/25/21 |
| 225 | 9/24/21 | Concurred on 10/25/21 |
| 226 | 1/6/23 | Concurred on 2/6/23 |
| 227 | 3/16/21 | Concurred on 4/16/21 |
| 228 | 3/16/21 | Concurred on 4/16/21 |
| 229 | 3/16/21 | Concurred on 4/16/21 |
| 230 | 3/16/21 | Concurred on 4/16/21 |
| 231 | 3/16/21 | Concurred on 4/16/21 |
| 232 | 3/16/21 | Concurred on 4/16/21 |
| 233 | 3/16/21 | Concurred on 4/16/21 |
| 234 | 3/16/21 | Concurred on 4/16/21 |
| 235 | 3/16/21 | Concurred on 4/16/21 |
| 236 | 3/16/21 | Concurred on 4/16/21 |
| 238 | 3/16/21 | Concurred on 4/16/21 |
| 239 | 3/16/21 | Concurred on 4/16/21 |
| 240 | 3/31/23 | Concurred on 4/27/23 |
| 241 | 1/6/23 | Concurred on 2/6/23 |
| 242 | 3/31/23 | Concurred on 4/27/23 |
| 243 | 9/30/22 | Concurred on 10/31/22 |
| 244 | 12/16/20 | Concurred on 1/15/21 |
| 245 | 12/16/20 | Concurred on 1/15/21 |

WAI 70497

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|---|---|---|
| 246 | 1/6/23 | Concurred on 2/6/23 |
| 247 | 12/16/20 | Concurred on 1/15/21 |
| 248 | 12/16/20 | Concurred on 1/15/21 |
| 249 | 12/16/20 | Concurred on 1/15/21 |
| 250 | 4/1/22 | Concurred on 4/29/22 |
| 251 | 4/1/22 | Concurred on 4/29/22 |
| 252 | 4/1/22 | Concurred on 4/29/22 |
| 253 | 4/1/22 | Concurred on 4/29/22 |
| 254 | 4/1/22 | Concurred on 4/29/22 |
| 255 | 4/1/22 | Concurred on 4/29/22 |
| 256 | 4/1/22 | Concurred on 4/29/22 |
| 257 | 4/1/22 | Concurred on 4/29/22 |
| 258 | 4/1/22 | Concurred on 4/29/22 |
| 259 | 4/1/22 | Concurred on 4/29/22 |
| 264 | 12/16/20 | Concurred on 1/15/21 |
| 266 | 12/16/20 | Concurred on 1/15/21 |
| 268 | 1/6/23 | Concurred on 2/6/23 |
| 271 | 1/6/23 | Did not concur on 2/6/23 |
| 272 | 9/30/22 | Concurred on 10/31/22 |
| 273 | 12/16/20 | Concurred on 1/15/21 |
| 276 | 12/16/20 | Concurred on 1/15/21 |
| 278 | 12/16/20 | Concurred on 1/15/21 |
| 279 | 12/16/20 | Concurred on 1/15/21 |
| 282 | 1/6/23 | Concurred on 2/6/23 |
| 284 | 1/6/23 | Concurred on 2/6/23 |
| 286 | 1/6/23 | Concurred on 2/6/23 |
| 287 | 12/16/20 | Concurred on 1/15/21 |
| 288 | 12/16/20 | Did not concur on 1/15/21 |

WAI 70498

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|-----------|---------------------------------------------|-------------------------|
| 292 | 12/16/20 | Concurred on 1/15/21 |
| 337 | 12/16/20 | Concurred on 1/15/21 |

WAI 70499

# First Supplemental Permanent Injunction/Judgment Order

## Section 3: Implementation Unit Creation and Documentation Requests

**COURT ORDER III.  MCSO IMPLEMENTATION UNIT AND INTERNAL AGENCY-WIDE ASSESSMENT** *[Court Order wording in italics]*

***Paragraph 9.*** *Defendants shall hire and retain, or reassign current MCSO employees to form an interdisciplinary unit with the skills and abilities necessary to facilitate implementation of this Order.  This unit shall be called the MCSO Implementation Unit and serve as a liaison between the Parties and the Monitor and shall assist with the Defendants' implementation of and compliance with this Order.   At a minimum, this unit shall: coordinate the Defendants' compliance and implementation activities; facilitate the provision of data, documents, materials, and access to the Defendants' personnel to the Monitor and Plaintiffs representatives; ensure that all data, documents and records are maintained as provided in this Order; and assist in assigning implementation and compliance-related tasks to MCSO Personnel, as directed by the Sheriff or his designee.  The unit will include a single person to serve as a point of contact in communications with Plaintiffs, the Monitor and the Court.*

**In Full and Effective Compliance**

To verify Phase 2 compliance with this Paragraph, we reviewed the monthly personnel rosters for the Court Implementation Division (CID).  CID is currently staffed with one captain, one lieutenant, three sergeants, two deputies, one management assistant, two administrative assistants, and one management analyst.  CID continues to be supported by Maricopa County Attorney's Office (MCAO) attorneys, as well as outside counsel, who frequently participate in our meetings and telephone calls with Division personnel.

During this reporting period, CID continued to provide documents through MCSO's counsel via an Internet-based application.  We, the Plaintiffs, and the Plaintiff-Intervenor receive all files and documents simultaneously, with only a few exceptions centering on open internal investigations.  CID effectively facilitates our and the Parties' access to MCSO's personnel.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70500

*Paragraph 10.   MCSO shall collect and maintain all data and records necessary to: (1) implement this order, and document implementation of and compliance with this Order, including data and records necessary for the Monitor to conduct reliable outcome assessments, compliance reviews, and audits; and (2) perform ongoing quality assurance in each of the areas addressed by this Order.  At a minimum, the foregoing data collection practices shall comport with current professional standards, with input on those standards from the Monitor.*

**In Full and Effective Compliance**

CID continues to be responsive to our requests.  CID also addresses with immediacy any issues we encounter in the samples we request – be they technical issues, missing documents, or other problems.  MCSO's Bureau of Internal Oversight (BIO) routinely audits the work products of the Office, particularly in the areas that directly affect compliance with the requirements of the Orders.  In many instances, BIO will review the same material we request in our samples, and BIO frequently notes – and addresses – the same deficiencies we identify in our reviews.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

*Paragraph 11.   Beginning with the Monitor's first quarterly report, the Defendants, working with the unit assigned for implementation of the Order, shall file with the Court, with a copy to the Monitor and Plaintiffs, a status report no later than 30 days before the Monitor's quarterly report is due.  The Defendants' report shall (i) delineate the steps taken by the Defendants during the reporting period to implement this Order; (ii) delineate the Defendants' plans to correct any problems; and (iii) include responses to any concerns raised in the Monitor's previous quarterly report.*

**In Full and Effective Compliance**

See Paragraph 13.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70501

***Paragraph 12.*** *The Defendants, working with the unit assigned for implementation of the Order, shall conduct a comprehensive internal assessment of their Policies and Procedures affecting Patrol Operations regarding Discriminatory Policing and unlawful detentions in the field as well as overall compliance with the Court's orders and this Order on an annual basis. The comprehensive Patrol Operations assessment shall include, but not be limited to, an analysis of collected traffic-stop and high-profile or immigration-related operations data; written Policies and Procedures; Training, as set forth in the Order; compliance with Policies and Procedures; Supervisor review; intake and investigation of civilian Complaints; conduct of internal investigations; Discipline of officers; and community relations. The first assessment shall be conducted within 180 days of the Effective Date. Results of each assessment shall be provided to the Court, the Monitor, and Plaintiffs' representatives.*

**In Full and Effective Compliance**

See Paragraph 13.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.


***Paragraph 13.*** *The internal assessments prepared by the Defendants will state for the Monitor and Plaintiffs' representatives the date upon which the Defendants believe they are first in compliance with any subpart of this Order and the date on which the Defendants first assert they are in Full and Effective Compliance with the Order and the reasons for that assertion. When the Defendants first assert compliance with any subpart or Full and Effective Compliance with the Order, the Monitor shall within 30 days determine whether the Defendants are in compliance with the designated subpart(s) or in Full and Effective Compliance with the Order. If either party contests the Monitor's determination it may file an objection with the Court, from which the Court will make the determination. Thereafter, in each assessment, the Defendants will indicate with which subpart(s) of this Order it remains or has come into full compliance and the reasons therefore. The Monitor shall within 30 days thereafter make a determination as to whether the Defendants remain in Full and Effective Compliance with the Order and the reasons therefore. The Court may, at its option, order hearings on any such assessments to establish whether the Defendants are in Full and Effective Compliance with the Order or in compliance with any subpart(s).*

**In Full and Effective Compliance**

We and CID established that the schedule for the submission of comprehensive annual assessments as required by these Paragraphs will run according to MCSO's fiscal year cycle, July 1-June 30. MCSO will submit reports on or before September 15 of each year.

Consistent with this agreement, on September 15, 2023, MCSO filed with the Court its 2022 Annual Compliance Report covering the period of July 1, 2022 through June 30, 2023.

MCSO submitted its 37th quarterly compliance report on September 25, 2023. The report covers the steps MCSO has taken to implement the Court's Orders during the second quarter of 2023.

WAI 70502

The report also includes any plans to correct difficulties encountered during the quarter and responses to concerns raised in our 36th quarterly status report.

In its report, MCSO asserted Full and Effective Compliance (FEC) with three additional Paragraphs: 22, 74, and 209.  Paragraph 22 requires MCSO leadership and supervising deputies and Detention Officers to reinforce unequivocally and consistently to subordinates that discriminatory policing is unacceptable.  Under Paragraph 74, MCSO is required to develop and implement a protocol setting out the fields for the early intervention system historical data, deadlines for inputting data related to current and new information, and the individuals responsible for capturing and inputting data.   Finally, Paragraph 209 requires that any investigations carried out by supervisors outside of the Professional Standards Bureau be forwarded to the chain of command to a Division Commander, who must approve the investigation and indicate concurrence with the findings.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70503

# Section 4:  Policies and Procedures

**COURT ORDER V. POLICIES AND PROCEDURES**

*Paragraph 18.*  *MCSO shall deliver police services consistent with the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order, and with current professional standards.  In conducting its activities, MCSO shall ensure that members of the public receive equal protection of the law, without discriminating based on actual or perceived race or ethnicity, and in a manner that promotes public confidence.*

*Paragraph 19.*  *To further the goals in this Order, the MCSO shall conduct a comprehensive review of all Patrol Operations Policies and Procedures and make appropriate amendments to ensure that they reflect the Court's permanent injunction and this Order.*

**In Full and Effective Compliance**

MCSO has taken steps toward a comprehensive review of its Patrol Operations Policies and Procedures in four phases.  First, on December 31, 2013, prior to my appointment as Monitor, MCSO filed with the Court all of its policies and procedures, with amendments, that MCSO believed complied with the various Paragraphs of the First Order.  Second, in the internal assessment referenced above, MCSO discussed its ongoing evaluation of Patrol Operations and its development of policies and procedures.  Third, in response to our requests, MCSO provided all of the policies and procedures it maintains are applicable to the First Order for our review and that of the Plaintiffs.  We provided our feedback, which also included the Plaintiffs' comments, on these policies on August 12, 2014.  Based on that feedback, MCSO made adjustments to many of the policies, concentrating first on the policies to be disseminated in Detentions, Arrests, and the Enforcement of Immigration-Related Laws Training; and the Bias Free Policing Training (often referred to as Fourth and Fourteenth Amendment Training) that commenced in early September.  We reviewed MCSO's updated policies and provided our approval for several on August 25, 2014.

Fourth, in discussions during 2016, MCSO requested more specific guidance on what we considered to be Patrol-related policies and procedures.  In response, we provided MCSO with a list of the Patrol-related policies for the purposes of Paragraph 19.  We included on this list policies that were not recently revised or currently under review.  Several policies required changes to comport with the First Order, Second Order, or both.  In 2018, MCSO published the last of the outstanding policies, achieving compliance with this Paragraph.

On March 31, 2023, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70504

***Paragraph 20.***  *The MCSO shall comply with and operate in accordance with the Policies and Procedures discussed in this Order and shall take all reasonable measures to ensure that all Patrol Operations personnel comply with all such Policies and Procedures.*

### a.  Policies and Procedures to Ensure Bias-Free Policing

***Paragraph 21.***  *The MCSO shall promulgate a new, department-wide policy or policies clearly prohibiting Discriminatory Policing and racial profiling.  The policy or policies shall, at a minimum:*

a.   *define racial profiling as the reliance on race or ethnicity to any degree in making law enforcement decisions, except in connection with a reliable and specific suspect description;*

b.   *prohibit the selective enforcement or non-enforcement of the law based on race or ethnicity;*

c.   *prohibit the selection or rejection of particular policing tactics or strategies or locations based to any degree on race or ethnicity;*

d.   *specify that the presence of reasonable suspicion or probable cause to believe an individual has violated a law does not necessarily mean that an officer's action is race-neutral; and*

e.   *include a description of the agency's Training requirements on the topic of racial profiling in Paragraphs 48–51, data collection requirements (including video and audio recording of stops as set forth elsewhere in this Order) in Paragraphs 54–63 and oversight mechanisms to detect and prevent racial profiling, including disciplinary consequences for officers who engage in racial profiling.*

**In Full and Effective Compliance**

MCSO has developed and published the policies required by Paragraph 21.  MCSO distributed these policies and has trained agency personnel during the required Fourth and Fourteenth Amendment training, on an annual basis, since 2014.  MCSO's implementation of these policies is covered in other Paragraphs.

On June 22, 2020, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70505

***Paragraph 22.*** *MCSO leadership and supervising Deputies and detention officers shall unequivocally and consistently reinforce to subordinates that Discriminatory Policing is unacceptable.*

**Phase 1:**   In compliance

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on October 13, 2022.
- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on April 27, 2022.

**Phase 2:**   In compliance

With input from the Parties, the reinforcement of CP-8 (Preventing Racial and Other Bias-Based Policing) was modified to a two-step process conducted annually. MCSO describes Part 1 of the process as the following: "On an annual basis, within the first six months of the calendar year, supervisors shall conduct a group or individual discussion with their assigned employees, reserve deputies, or posse members, which will in part, requires viewing videos from a library created by the Training Division. The supervisors shall use the message in the video and the approved discussion points, specific to the employee's job classification, to personalize the reinforcement that racial and bias-based profiling and/or discriminatory policing are unacceptable. The videos shall be announced by the Training Division through The Training Bulletin or an MCSO Administrative Broadcast and be accessible on TheHub." MCSO describes Part 2 of the process as described as the following: "On an annual basis, within the last six months of the calendar year, supervisors shall ensure that all employees, reserve deputies, and posse members assigned to them successfully complete their annual review and acknowledgment of this Office Policy, upon Office distribution through The Briefing Board announcement. In addition, employees will be required to view a video from the Sheriff or designee, which will reinforce that racial and bias-based profiling and/or discriminatory policing are unacceptable. Employees, reserve deputies, and posse members shall complete acknowledgement through TheHub."

As an additional measure, supervisors will have the latitude to review and discuss the policy with their employees and document their discussions in BlueTeam. MCSO will provide proof of compliance biannually, at the end of the six-month periods, when each of the elements of the process is completed. MCSO will also provide progress reports in the interim.

For the second quarter, MCSO provided HUB training reports for CP-8 training for the first half of 2023. We reviewed the HUB reports to verify compliance. For sworn employees, compliance was reported as 99.76% for line personnel and 99.44% for supervisors. For Detention employees, compliance was reported as 98.74% for line personnel and 99.60% for supervisors. For civilian employees, compliance was reported as 99.01% for line personnel and 99.25% for supervisors. For Reserve deputies, compliance was reported as 100%. For Posse members, compliance was reported as 97.62%. For DSAs, compliance was reported as 100%. The overall compliance rating for the first half of 2023, was 99.26%. MCSO remains in compliance with this Paragraph.

WAI 70506

***Paragraph 23.*** *Within 30 days of the Effective Date, MCSO shall modify its Code of Conduct to prohibit MCSO Employees from utilizing County property, such as County e-mail, in a manner that discriminates against, or denigrates, anyone on the basis of race, color, or national origin.*

**In Full and Effective Compliance**

BIO uses a randomizing program to select samples for each inspection.  BIO reviews CAD messages to verify compliance with CP-2 (Code of Conduct), CP-3 (Workplace Professionalism: Discrimination and Harassment), and GM-1 (Electronic Communications, Data and Voice Mail).  In its submission, MCSO includes the specific nature of any potential concerns identified during the audits.  We observed the processes BIO uses to conduct CAD and email audits, to ensure that we thoroughly understand the mechanics involved in conducting these audits.  For CAD and email audits, we receive copies of the audits completed by BIO, the details of any violations found, and copies of the memoranda of concern or BIO Action Forms that are completed.  Email and CAD/Alpha Paging inspections are completed on a quarterly basis.  For email inspections, MCSO will inspect 50 employees per quarter, and for CAD/Alpha Paging, MCSO will inspect 15 days per quarter.

For the second quarter of 2023, we reviewed CAD and Alpha Paging Inspection Report (BI2023-0093) as proof of compliance with this Paragraph.  MCSO selected a random sample of 15 days in the quarter for inspection.  There was a total of 6,824 CAD and Alpha Paging entries for the selected dates.  The inspection found that 100% of the inspected messages were in compliance with policies GM-1 (Electronic Communications, Data and Voice Mail), CP-2 (Code of Conduct), CP-3 (Workplace Professionalism: Discrimination and Harassment), and CP-8 (Preventing Racial and Other Biased-Based Profiling).

For the second quarter of 2023, we reviewed employees' Emails Inspection Report (BI2023-0096), as proof of compliance with this Paragraph.  BIO selected a total of 50 employees for review, and inspected a total of 23,894 emails.  The inspection found that 23,894, or 100% of the emails inspected were in compliance.

For the second quarter of 2023, MCSO conducted three Facility and Property inspections.  The first inspection (BI2023-0062) was conducted for the Special Response Team (SRT), which operates from the Fourth Avenue Jail.  The SRT is under the command of the Fourth Avenue Jail Captain; and is tasked with providing 24-hour support for high-risk operations, critical incidents, and emergency situations.  For 2022, SRT responded to 420 calls for service and conducted over 12,000 searches in MCSO jails.  The inspection found that all aspects of administration and supervision, facility and operations, and property and evidence were in full compliance.  The inspection resulted in a 100% compliance rating.  The second facility and property inspection (BI2023-0076) was conducted for the Aviation Services Division (ASD).  The Aviation Services Division is under the command of a Captain; and is staffed by a Flight Crew Supervisor, a Chief Pilot, three Tactical Flight Officers, six pilots, three mechanics, and one administrative assistant.  The Aviation Services Division provides support for all MCSO law enforcement activities, as well as search and rescue.  Inspectors found the facilities were secure, with access limited to only assigned personnel.  The facilities were well maintained and orderly.  All required documents were clearly identified, organized, and properly secured.  The inspection resulted in a 100% compliance rating.  The third facility and property inspection (BI2023-0094) was conducted in

WAI 70507

the Intake, Transfer, and Release (ITR) facility.  The ITR is designed for processing inmates prior to and after court appearances, and houses inmates waiting for transfer to other MCSO detention facilities.  The ITR is commanded by a Captain; and is staffed by 27 supervisors, 137 Detention officers, six Field Training Officers, and one civilian employee.  The inspection found that all aspects of administration and supervision, facility and operations, and property and evidence were in full compliance.  The inspection resulted in a 100% compliance rating.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 24.**  *The MCSO shall ensure that its operations are not motivated by or initiated in response to requests for law enforcement action based on race or ethnicity.  In deciding to take any law enforcement action, the MCSO shall not rely on any information received from the public, including through any hotline, by mail, email, phone or in person, unless the information contains evidence of a crime that is independently corroborated by the MCSO, such independent corroboration is documented in writing, and reliance on the information is consistent with all MCSO policies.*

**In Full and Effective Compliance**

MCSO created the Sheriff's Intelligence Leads and Operations (SILO) Unit in the first quarter of 2016.  The SILO Unit became operational on September 11, 2017.  GI-7 requires that any tips received by MCSO components be forwarded to the SILO Unit for recording and processing.  The SILO Unit classifies this information by the type of alleged criminal activity, or service requested, and forwards it to the appropriate Unit for action and response.  In some cases, community members email or call with requests for traffic enforcement, or for MCSO to address quality-of-life issues; these are considered calls for service rather than tips on criminal activity.  If the information provided pertains to criminal activity in another jurisdiction, MCSO forwards the information to the appropriate law enforcement agency and documents it in the SILO database. We review a monthly tip list report, noting the date received and a general description of each tip. We also review an audit report showing the disposition of tips received.  If there is any bias noted in the information received for any tip, MCSO generally closes the tip and takes no action.  We review all tips that MCSO closes due to bias.

During the second quarter of 2023, we reviewed 774 tips submitted for April, 767 tips submitted for May, and 819 tips submitted for June.  We reviewed a total of 2,360 tips, which were classified and recorded according to the type of alleged violation or service requested.  Tips pertaining to firearms violations continued to be relatively high, as compared to other types of reported community concerns.  For the second quarter, there were 996 tips related to firearms violations. For the first quarter, there were 1,079 tips involving firearms violations.  We note that the concerns with this type of violation continues, along with concerns with tips involving assaults. Tips regarding drugs and fugitives also remained high.  During this quarter, MCSO closed one tip due to bias.  We reviewed the information provided by MCSO and concluded that proper procedures were followed for closing out the tip.

WAI 70508

On June 18, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

### b. Policies and Procedures to Ensure Bias-Free Traffic Enforcement

**Paragraph 25.** *The MCSO will revise its policy or policies relating to traffic enforcement to ensure that those policies, at a minimum:*

a.    *prohibit racial profiling in the enforcement of traffic laws, including the selection of which vehicles to stop based to any degree on race or ethnicity, even where an officer has reasonable suspicion or probable cause to believe a violation is being or has been committed;*

b.    *provide Deputies with guidance on effective traffic enforcement, including the prioritization of traffic enforcement resources to promote public safety;*

c.    *prohibit the selection of particular communities, locations or geographic areas for targeted traffic enforcement based to any degree on the racial or ethnic composition of the community;*

d.    *prohibit the selection of which motor vehicle occupants to question or investigate based to any degree on race or ethnicity;*

e.    *prohibit the use of particular tactics or procedures on a traffic stop based on race or ethnicity;*

f.    *require deputies at the beginning of each stop, before making contact with the vehicle, to contact dispatch and state the reason for the stop, unless Exigent Circumstances make it unsafe or impracticable for the deputy to contact dispatch;*

g.    *prohibit Deputies from extending the duration of any traffic stop longer than the time that is necessary to address the original purpose for the stop and/or to resolve any apparent criminal violation for which the Deputy has or acquires reasonable suspicion or probable cause to believe has been committed or is being committed;*

h.    *require the duration of each traffic stop to be recorded;*

i.    *provide Deputies with a list and/or description of forms of identification deemed acceptable for drivers and passengers (in circumstances where identification is required of them) who are unable to present a driver's license or other state-issued identification; and*

j.    *instruct Deputies that they are not to ask for the Social Security number or card of any motorist who has provided a valid form of identification, unless it is needed to complete a citation or report.*

**Phase 1:**  In compliance

WAI 70509

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on June 15, 2023.

- EB-2 (Traffic Stop Data Collection), most recently amended on February 22, 2023.

- GI-1 (Radio and Enforcement Communications Procedures), most recently amended on December 8, 2021.

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on October 13, 2022.

- EA-11 (Arrest Procedures), most recently amended on April 5, 2022.

**Phase 2:**  In compliance

During the finalization of the Fourth and Fourteenth Amendment training curricula required by the Order, the Parties agreed to a list and/or description of forms of identification deemed acceptable for drivers and passengers, as required by this Paragraph.  The data required for verification to ensure compliance with these policies is captured by the Traffic and Criminal Software (TraCS) system.  The system documents the requirements of the Order and MCSO policies.  MCSO has continued to make technical changes to the TraCS system to ensure that the mandatory fields on the forms used to collect the data are completed and that deputies are capturing the required information.  TraCS is a robust system that allows MCSO to make technical changes to improve how required information is captured.

To verify Phase 2 compliance with this Paragraph, we reviewed MCSO's Vehicle Stop Contact Forms (VSCFs), Vehicle Stop Contact Form Supplemental Sheets, Incidental Contact Receipts, Written Warning/Repair Forms, Arizona Traffic Ticket and Complaint Forms, Internet I/Viewer Event Forms, Justice Web Interface Forms, CAD printouts, and any Incident Reports generated by traffic stops.  MCSO created many of these forms to capture the requirements of Paragraphs 25 and 54.

Since our July 2015 site visit, there has been significant improvement in the TraCS system that has enhanced the reliability and validity of the data provided by MCSO.  This improvement has been buttressed by the introduction of data quality control procedures now being implemented and memorialized in the EIU Operations Manual.  (This is further discussed in Paragraph 56, below.)  We also compared traffic stop data between Latino and non-Latino drivers in the samples provided to us.

Paragraph 25.a. prohibits racial profiling in the enforcement of traffic laws, including the selection of which vehicles to stop based to any degree on race or ethnicity, even where a deputy has reasonable suspicion or probable cause to believe a violation is being or has been committed.  The selection of the sample size and the sampling methodology employed for drawing our sample is detailed in Section 7: Traffic Stop Documentation and Data Collection.

We review a sample of 105 traffic stops each reporting period to assess this requirement.  Our review of the sample of 105 traffic stops that occurred during this reporting period in Districts 1, 2, 3, 4, and 7, and Lake Patrol indicated that MCSO was following protocol, and that the stops did not violate the Order or internal policies.  The District formerly known as District 6 no longer

WAI 70510

exists, as it is now patrolled by the Queen Creek Police Department, which commenced operating fully in that area on January 11, 2022.  Paragraphs 66 and 67 require an annual comprehensive analysis of all traffic stop data, which will more accurately determine if MCSO is meeting the requirements of this Paragraph.  MCSO remains in compliance with this Subparagraph.

Paragraph 25.b. requires MCSO to provide deputies with guidance on effective traffic enforcement, including the prioritization of traffic enforcement resources to promote public safety.  EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), Sections A-E, address these concerns.  The policy specifies that driving under the influence and speeding are the main causes of accidents, and should be the focus of traffic enforcement.  Based on our review of the data provided for this reporting period, the most common traffic stop violations are as follows: 65 stops for speeding above the posted limit (62%); 11 stops for failure to obey official traffic control devices (10%); 11 stops for failure to possess valid registrations or tags (10%); five stops for equipment violations (5%); and 13 stops for other moving violations (12%).

As the policy specifically identifies speeding violations as one of the contributing factors of traffic accidents, MCSO deputies have targeted this violation.  In our review, we break down the specific traffic violation for each stop and use each traffic stop form completed by deputies during the stop to determine if the stop is justified and fulfills the requirements of this Paragraph.  MCSO remains in compliance with this Subparagraph.

Paragraph 25.c. requires MCSO to prohibit the selection of particular communities, locations, or geographic areas for targeted traffic enforcement based to any degree on the racial or ethnic composition of the community.  During our inspection, we document the location of every stop and note the GPS coordinates if available.  Our review of the sample data covering all MCSO Districts during this reporting period did not indicate that MCSO was targeting any specific area or ethnicity to conduct traffic stops.

MCSO remains in compliance with this Subparagraph.

Paragraph 25.d. requires MCSO to prohibit the selection of which motor vehicle occupants to question or investigate based, to any degree, on race or ethnicity.  We reviewed the demographic data of Maricopa County (according to 2020 U.S. Census data, 32% of the population is Latino), and found that the ratio of Latino drivers stopped during this reporting period was lower than in the past reporting period in comparison to the ethnicity of the population in the County.  (See Paragraph 54.e.)

A review of complaint investigations closed during this reporting period did not reveal that any complaints were filed alleging that MCSO deputies selected motor vehicle occupants for questioning or investigation based on the individual's race or ethnicity.

MCSO has fully implemented body-worn cameras, and we review a sample of the recordings each reporting period to verify if deputies are questioning occupants to determine if they are legally in the country.  We did not identify any such events during this reporting period.

During this reporting period, we observed that 30 of the 105 stops occurred during nighttime hours.  Our review of the sample data indicated that generally, traffic stops were not based on race or ethnicity and reflected the general makeup of the population of the County.  In most

WAI 70511

instances, the deputies document on the VSCF that they were unable to determine the race/ethnicity and gender of the vehicle occupants prior to the stop. MCSO is in compliance with this Subparagraph.

Paragraph 25.e. requires MCSO to prohibit the use of particular tactics or procedures on a traffic stop based on race or ethnicity. We reviewed a sample of CAD audio recordings and CAD printouts where the dispatcher entered the reason for the stop when advised by the deputy in the field. We also reviewed body-worn camera recordings of deputies making traffic stops. The methodology that we employed to select our cases is described in detail in Section 7. In the cases we reviewed, the CAD audio recordings and the body-worn camera recordings revealed that deputies were not making traffic stops using tactics based on race or ethnicity. MCSO previously achieved Phase 1 and Phase 2 compliance with Paragraph 66, and only Phase 1 compliance with Paragraph 67. During this reporting period, MCSO achieved Phase 2 compliance with Paragraph 67. Previously, we deferred our compliance assessment of this Subparagraph, as MCSO had not yet obtained full compliance with Paragraph 67. MCSO is now in compliance with this Subparagraph.

Paragraph 25.f. requires deputies at the beginning of each stop, before making contact with the vehicle, to verbally contact dispatch and state the reason for the stop unless exigent circumstances make it unsafe for the deputy to contact Communications. When the deputy advises Communications of the location, tag number, and reason for the stop, this information is digitally logged on the CAD printout and it is audio recorded. (See Paragraph 54.e.) We reviewed 30 CAD audio recordings and the CAD printouts; in each, the deputy advised dispatch of the reason for the stop. Through our reviews of body-worn camera recordings and CAD printouts, we verified that the reason for the stop was voiced prior to making contact with the drivers in 30 of the 30 cases we reviewed. For the 75 other cases that were part of our sample, we reviewed the VSCFs and the CAD printouts to ensure that deputies properly advised dispatch of the reason for the stop prior to making contact with the violator. In all 75 stops, the deputy properly advised dispatch the reason for the stop. MCSO is in compliance with this Subparagraph.

Paragraph 25.g. prohibits deputies from extending the duration of any traffic stop longer than the time that is necessary to address the original purpose for the stop and/or to resolve any apparent criminal violation for which the deputy has or acquires reasonable suspicion or probable cause to believe has been committed or is being committed. MCSO employs a series of seven questions on the VSCF to document the circumstances that might require a stop to be prolonged. Deputies are to indicate whether they experienced technological difficulties; whether the stop required the towing of a vehicle; whether the stop involved training; whether the stop involved a language barrier; whether the stop involved a driving under the influence investigation; or whether the stop involved issues related to the status of the drivers' license, insurance, or registration. In each of the stops where the deputies documented these events, the duration of the stop was determined to be reasonable.

MCSO remains in compliance with this Subparagraph.

Paragraph 25.h. requires the duration of each traffic stop to be recorded. The time of the stop and its termination is now auto-populated on the VSCF by the CAD system. To ensure data entry accuracy, MCSO implemented a technical change to the TraCS system on November 29, 2016.

WAI 70512

The change automatically creates a red field in the stop contact times if the deputy manually changes these times on the VSCF. In our review, we determined that the duration was recorded accurately in all 105 traffic stops. MCSO is in compliance with this Subparagraph, with a compliance rate of 100%.

Paragraph 25.i. requires that MCSO provide deputies with a list and/or description of forms of identification deemed acceptable for drivers and passengers (in circumstances where identification is required of them) who are unable to present a driver's license or other state-issued identification. The Plaintiffs' attorneys and MCSO agreed on acceptable forms of identification, and this information has been included in the Fourth and Fourteenth Amendment training. EA-11 (Arrest Procedures) provides a list of acceptable forms of identification if a valid driver's license cannot be produced. During this reporting period's review of the sample of 105 traffic stops, we identified four cases where the drivers did not present valid driver's licenses to the deputies. In each of the four cases, the drivers either presented an acceptable form of identification or had no identification in their possession; and records checks revealed that the drivers did not have valid driver's licenses.

In our review of the sample of cases to assess compliance with Paragraph 54.k., searches of persons, we identified 26 cases where the drivers did not present a valid driver's license to the deputies. In each of the 26 cases, the drivers either presented an acceptable form of identification or they had no identification in their possession; and a records check revealed that the drivers did not have valid driver's licenses.

In our review of the sample of cases to assess compliance with Paragraphs 25.d. and 54.g., passenger contacts, we identified 42 cases where the drivers did not present a valid driver's license to the deputies. In each of the 42 cases, the drivers either presented an acceptable form of identification or had no identification in their possession; and a records check revealed that the drivers did not have valid driver's licenses.

MCSO remains in compliance with this Subparagraph.

Paragraph 25.j. requires MCSO to instruct deputies that they are not to ask for the Social Security Number or card of any motorist who has provided a valid form of identification, unless it is needed to complete a citation or report. EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) prohibits deputies from asking for the Social Security Number of any motorist who has provided a valid form of identification. During this reporting period's review of the sample of 105 traffic stops, as well as for Paragraph 54.k. and Paragraphs 25.d. and 54.g., we identified that deputies requested a driver's Social Security Number in incidents that either involved the arrest of the driver for the purpose of completing an Incident Report, or incidents where the driver did not produce a valid form of identification, both of which are permissible under this Subparagraph. MCSO remains in compliance with this Subparagraph.

MCSO achieved compliance with each of the components of Paragraph 25 during this reporting period. MCSO is now in compliance with Paragraph 25.

WAI 70513

### c. Policies and Procedures to Ensure Bias-Free Detentions and Arrests

**Paragraph 26.**  *The MCSO shall revise its policy or policies relating to Investigatory Detentions and arrests to ensure that those policies, at a minimum:*

a.    *require that Deputies have reasonable suspicion that a person is engaged in, has committed, or is about to commit, a crime before initiating an investigatory seizure;*

b.    *require that Deputies have probable cause to believe that a person is engaged in, has committed, or is about to commit, a crime before initiating an arrest;*

c.    *provide Deputies with guidance on factors to be considered in deciding whether to cite and release an individual for a criminal violation or whether to make an arrest;*

d.    *require Deputies to notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration-Related Crime, or for any crime by a vehicle passenger related to lack of an identity document;*

e.    *prohibit the use of a person's race or ethnicity as a factor in establishing reasonable suspicion or probable cause to believe a person has, is, or will commit a crime, except as part of a reliable and specific suspect description; and*

f.    *prohibit the use of quotas, whether formal or informal, for stops, citations, detentions, or arrests (though this requirement shall not be construed to prohibit the MCSO from reviewing Deputy activity for the purpose of assessing a Deputy's overall effectiveness or whether the Deputy may be engaging in unconstitutional policing).*

**In Full and Effective Compliance**

To assess compliance with Paragraph 26, we request documentation of arrests and investigations associated with the requirements specified in this Paragraph.  In addition to the review of any reported cases, we receive booking lists and criminal citation lists for each month of the reporting period and request a random sample of cases to review.

For the second quarter of 2023, MCSO did not submit any investigatory detentions or arrests that fell within the reporting requirements of this Paragraph.  For this reporting period, we also requested and reviewed 20 bookings and 20 criminal citations for each month of the quarter.  In addition, we reviewed 265 Incident Reports for the quarter.  All of the documentation we reviewed during this reporting period indicates that MCSO is in compliance with this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70514

#### d. Policies and Procedures Governing the Enforcement of Immigration-Related Laws

*Paragraph 27.* *The MCSO shall remove discussion of its LEAR Policy from all agency written Policies and Procedures, except that the agency may mention the LEAR Policy in order to clarify that it is discontinued.*

**In Full and Effective Compliance**

MCSO asserts that it does not have an agency LEAR policy. We have verified through our document reviews and site compliance visits that MCSO does not have a LEAR policy.

On March 22, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

*Paragraph 28.* *The MCSO shall promulgate a new policy or policies, or will revise its existing policy or policies, relating to the enforcement of Immigration-Related Laws to ensure that they, at a minimum:*

a.   *specify that unauthorized presence in the United States is not a crime and does not itself constitute reasonable suspicion or probable cause to believe that a person has committed or is committing any crime;*

b.   *prohibit officers from detaining any individual based on actual or suspected "unlawful presence," without something more; prohibit officers from initiating a pre-textual vehicle stop where an officer has reasonable suspicion or probable cause to believe a traffic or equipment violation has been or is being committed in order to determine whether the driver or passengers are unlawfully present;*

c.   *prohibit the Deputies from relying on race or apparent Latino ancestry to any degree to select whom to stop or to investigate for an Immigration-Related Crime (except in connection with a specific suspect description); prohibit Deputies from relying on a suspect's speaking Spanish, or speaking English with an accent, or appearance as a day laborer as a factor in developing reasonable suspicion or probable cause to believe a person has committed or is committing any crime, or reasonable suspicion to believe that an individual is in the country without authorization;*

d.   *unless the officer has reasonable suspicion that the person is in the country unlawfully and probable cause to believe the individual has committed or is committing a crime, the MCSO shall prohibit officers from (a) questioning any individual as to his/her alienage or immigration status; (b) investigating an individual's identity or searching the individual in order to develop evidence of unlawful status; or (c) detaining an individual while contacting ICE/CBP with an inquiry about immigration status or awaiting a response from ICE/CBP. In such cases, the officer must still comply with Paragraph 25(g) of this Order. Notwithstanding the foregoing, an officer may (a) briefly question an individual as to his/her alienage or immigration status; (b) contact ICE/CBP and await a response from federal authorities if the officer has reasonable suspicion to believe the*

WAI 70515

*person is in the country unlawfully and reasonable suspicion to believe the person is engaged in an Immigration-Related Crime for which unlawful immigration status is an element, so long as doing so does not unreasonably extend the stop in violation of Paragraph 25(g) of this Order;*

e.     *prohibit Deputies from transporting or delivering an individual to ICE/CBP custody from a traffic stop unless a request to do so has been voluntarily made by the individual;*

f.      *Require that, before any questioning as to alienage or immigration status or any contact with ICE/CBP is initiated, an officer check with a Supervisor to ensure that the circumstances justify such an action under MCSO policy and receive approval to proceed. Officers must also document, in every such case, (a) the reason(s) for making the immigration-status inquiry or contacting ICE/CBP, (b) the time approval was received, (c) when ICE/CBP was contacted, (d) the time it took to receive a response from ICE/CBP, if applicable, and (e) whether the individual was then transferred to ICE/CBP custody.*

**In Full and Effective Compliance**

For this reporting period, there were no reported instances of deputies having contact with Immigration and Customs Enforcement (ICE) or Customs and Border Protection (CBP) for the purpose of making an immigration status inquiry, and there were no reported arrests stemming from any immigration-related investigations, or for any immigration-related crimes. The reviews of documentation submitted for this reporting period indicate that MCSO has complied with the reporting requirements related to Paragraph 28. In our reviews of incidents involving contact with the public, including traffic stops, arrests, and investigative stops, we monitor deputies' actions to verify compliance with this Order.

In addition to the documentation requested from MCSO to determine compliance with this Paragraph, our reviews of documentation provided for other Paragraphs of the Order have found no evidence to indicate a violation of this Paragraph. For this reporting period, we reviewed a total of 120 Arrest Reports, 286 traffic stops, 45 Non-Traffic Contact Forms (NTCFs), and 265 Incident Reports. We found no issues of concern as it relates to this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

### e. Policies and Procedures Generally

**Paragraph 29.** *MCSO Policies and Procedures shall define terms clearly, comply with applicable law and the requirements of this Order, and comport with current professional standards.*

**In Full and Effective Compliance**

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

See Paragraph 30.

WAI 70516

***Paragraph 30.*** *Unless otherwise noted, the MCSO shall submit all Policies and Procedures and amendments to Policies and Procedures provided for by this Order to the Monitor for review within 90 days of the Effective Date pursuant to the process described in Section IV. These Policies and Procedures shall be approved by the Monitor or the Court prior to their implementation.*

**In Full and Effective Compliance**

MCSO continues to provide us, the Plaintiffs' attorneys, and the Plaintiff-Intervenor with drafts of its Order-related policies and procedures prior to publication, as required by the Order. We, the Plaintiffs' attorneys, and the Plaintiff-Intervenor review the policies to ensure that they define terms clearly, comply with applicable law and the requirements of the Order, and comport with current professional standards. Once drafts are finalized, MCSO incorporates feedback from us, Plaintiffs' attorneys, and the Plaintiff-Intervenor, and then provides them to us for final review and approval. As MCSO has followed this process for the Order-related policies published thus far, the agency is in compliance with this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

***Paragraph 31.*** *Within 60 days after such approval, MCSO shall ensure that all relevant MCSO Patrol Operation Personnel have received, read, and understand their responsibilities pursuant to the Policy or Procedure. The MCSO shall ensure that personnel continue to be regularly notified of any new Policies and Procedures or changes to Policies and Procedures. The Monitor shall assess and report to the Court and the Parties on whether he/she believes relevant personnel are provided sufficient notification of and access to, and understand each policy or procedure as necessary to fulfill their responsibilities.*

**In Full and Effective Compliance**

GA-1 indicates that Office personnel shall be notified of new policies and changes to existing policies via Briefing Boards and via the HUB, Maricopa County's adaptation of the online training software program, Cornerstone, that MCSO implemented in July 2017 to replace its E-Policy system. Employees are required to complete personal attestations that indicate that they have read and understand policies; the HUB routinely updates recent training and policy reviews for deputies and is visible by immediate supervisors. Per GA-1, "Prior to some policies being revised, time-sensitive changes are often announced in the Briefing Board until the entire policy can be revised and finalized." As noted previously, we recognize the authority of Briefing Boards and understand their utility in publishing critical policy changes quickly; but we have advised MCSO that we generally do not grant Phase 1 compliance for an Order requirement until the requirement is memorialized in a more formal policy.

During this reporting period, MCSO issued or issued revisions of the following Order-related policies: EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance); EB-7 (Traffic Control and Services); GC-4 (Detention/Civilian Employee Performance Appraisals); GC-4(S)

WAI 70517

(Sworn Employee Performance Appraisals and Management); GC-7 (Transfer of Personnel); GC-11 (Employee Probationary Periods, Unclassified Employees, and Releases); GE-3 (Property Management and Evidence Control); GF-5 (Incident Report Guidelines); GJ-27 (Sheriff's Posse Program); GJ-35 (Body-Worn Cameras); and GJ-36 (Use of Digital Recording Devices [Non Body-Worn Cameras]).  In addition, MCSO issued several Briefing Boards and Administrative Broadcasts that touched on Order-related topics and revised the language of General Orders. MCSO did not revise or publish any operations manuals during this reporting period.

On September 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.


***Paragraph 32.***  *The MCSO shall require that all Patrol Operation personnel report violations of policy; that Supervisors of all ranks shall be held accountable for identifying and responding to policy or procedure violations by personnel under their command; and that personnel be held accountable for policy and procedural violations.  The MCSO shall apply policies uniformly.*

**Phase 1:**  In compliance

- CP-2 (Code of Conduct), most recently amended on February 14, 2023.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on December 16, 2021.

- CP-5 (Truthfulness), most recently amended on November 17, 2022.

- CP-11 (Anti-Retaliation), most recently amended on January 6, 2022.

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.

- GC-16 (Employee Grievance Procedures), most recently amended on December 8, 2021.

- GC-17 (Employee Disciplinary Procedures), most recently amended on November 17, 2022.

- Administrative Services Division Operations Manual, most recently amended on November 14, 2022.

- Professional Standards Bureau Operations Manual, most recently amended on December 31, 2019.

**Phase 2:**  Not in compliance

Since we began reviewing internal investigations conducted by MCSO, we have reviewed hundreds of administrative misconduct investigations submitted to our Team for this Paragraph. During our reviews, we have continued to note that the investigations conducted by PSB have generally been well-written and arrived at the appropriate findings.  Although investigations conducted by Districts have demonstrated improvement during some reporting periods, that improvement has not been consistently sustained.

WAI 70518

MCSO has trained all investigators who conduct misconduct investigations; and during our site visits, we have continued to meet with the Professional Standards Bureau (PSB) and District and Division Command personnel to provide them with information regarding the cases that we have found deficient in structure, format, investigation, or reporting requirements.

During this and the last 11 reporting periods, we also met during our site visits with the Deputy Chiefs responsible for oversight of Districts and Divisions outside of PSB to discuss our concerns with the quality of investigations being conducted by their personnel. These meetings have resulted in useful discussion about needed improvement in the quality of investigations. After these meetings began, District and Division command personnel began providing more oversight on the completion of these cases.

PSB personnel have remained responsive to our feedback, and the investigations they submit for compliance with this Paragraph continue to be complete and thorough. PSB's reviews of investigations conducted by District personnel continue to be thorough, and PSB has identified and addressed many concerns and deficiencies they have found.

During the last reporting period, we reviewed 31 administrative misconduct investigations to determine overall compliance with this Paragraph and made our compliance findings based on the investigative and administrative requirements for the completion of these investigations. Fifteen investigations were conducted by District personnel and 16 were conducted by PSB. Based on the identified deficiencies in District investigations and our assessment of the reasonability of the requested extensions, none of the 15 conducted by District personnel were found in full compliance. Six of the 16 investigations conducted by PSB were in compliance with all requirements for the completion of misconduct investigations. Overall compliance for the 31 investigations we reviewed for this Paragraph was 19%.

During this reporting period, we reviewed 52 administrative misconduct investigations to determine compliance with this Paragraph. PSB conducted 16 of these investigations, and District or Division personnel outside of PSB conducted the remaining 36. Sworn supervisors with the rank of sergeant or higher completed all the investigations conducted at the Division level. Forty-eight of the investigations resulted from external complaints. Four were internally generated. All of the investigations were initiated after May 17, 2017, when MCSO revised its internal investigation policies; and all were initiated after the completion of the 40-hour Misconduct Investigative Training that concluded in late 2017.

During the last reporting period, we noted an increase in investigative compliance for those investigations conducted by District personnel. Nine (60%) of the 15 cases we reviewed were found to be in compliance with investigative requirements. This was an increase from 46% investigative compliance the prior reporting period. The average time for submission to PSB was 475 days. All of the investigations had been reviewed and approved by one or more District or Division Command personnel prior to the submission of the cases to PSB.

During this reporting period, we reviewed 36 investigations submitted for compliance with this Paragraph that had been completed by District or Division personnel outside PSB. Twenty-two (61%) were in investigative compliance, a slight increase from the 60% compliance during the last reporting period. The average time for the submission of a case to PSB was 380 days, a

WAI 70519

decrease from 475 days the last reporting period.  As has been the case in past reviews, we identified deficiencies included leading questions, failure to conduct thorough investigations, and unsupported findings.

Based on the identified deficiencies in these investigations and our assessment of the reasonability of the requested extensions, six of the 36 investigations were in full compliance with all requirements for the completion of misconduct investigations.  Sixteen were not compliant due only to required timelines.  Fourteen of the investigations were noncompliant based on deficiencies other than timeliness.  As has been the case for multiple reporting periods, we again noted a significant number of cases where multiple extensions were requested at the District level prior to forwarding the cases to PSB, and 27 of the 36 cases were still in the Division investigation or review process at the end of the 180-day timeframe.

All of the cases investigated by District personnel that we reviewed for the reporting period were initiated after numerous years of working under the requirements of the Court Orders, after training in how to conduct misconduct investigations (the 40-hour Misconduct Investigative Training completed in late 2017), after numerous site visit meetings where our Team has provided input on identified deficiencies, and after the implementation of additional review and oversight by Command personnel.  This is the first quarter in which we have observed sustained improvement from the previous reporting period.  We are hopeful this will continue moving forward.

The overall investigative quality for cases investigated by PSB and reviewed by our Team for compliance with this Paragraph has remained high.  For this reporting period, PSB conducted 16 of the investigations we reviewed for compliance with this Paragraph.  With the exception of timely extensions, 15 (94%) of the 16 were found compliant with those requirements over which the PSB Commander has authority.  In one case, we believe that PSB arrived at findings that were not supported by the facts of the investigation.  Only one case (7%) was in full compliance including required timelines.  This is a decrease in compliance from 38% during the last reporting period.

Of the 52 total investigations we reviewed to determine compliance with this Paragraph, 10 (19%) were submitted within the required 60- or 85-day timeframe.  This is the same percentage as the last reporting period.  None of the remaining 42 had a timely, justifiable extension.  Of the total 52 investigations, 13 (25%) were finalized and closed with 180 days.  This is an increase from 19% during the last reporting period.  As we have previously noted in our reports, general workload issues are insufficient justification for the failure to complete investigations in a reasonably timely manner.  To be considered compliant with the requirements for the completion of administrative misconduct investigations, extension requests and justifications must be submitted in a timely manner and be reasonably related to the specific investigation.

Overall compliance for the 52 investigations we reviewed for this Paragraph was 17%, a slight decrease from 19% during the last quarter.

As is our practice, we will discuss those cases that we found noncompliant with MCSO personnel during our next site visit.

WAI 70520

*Paragraph 33.*  *MCSO Personnel who engage in Discriminatory Policing in any context will be subjected to administrative Discipline and, where appropriate, referred for criminal prosecution. MCSO shall provide clear guidelines, in writing, regarding the disciplinary consequences for personnel who engage in Discriminatory Policing.*

**Phase 1:**  In compliance

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on October 13, 2022.

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.

- GC-17 (Employee Disciplinary Procedures), most recently amended on November 17, 2022.

**Phase 2:**  Not in compliance

The investigations that we review for compliance with this Paragraph do not include biased policing complaints involving the Plaintiffs' class.  Those investigations have additional compliance requirements; we discuss them in Paragraphs 275-283.

During the last reporting period, there were five investigations that were reviewed by our Team that contained allegations of discriminatory policing.  All five cases were properly investigated, and we agreed with the findings in all five.  Two of the five cases were in compliance with the requirements for timely completion of administrative investigations.

During this reporting period, there were five investigations reviewed where alleged bias did not involve members of the Plaintiffs' class.  Three involved allegations of bias by jail personnel. Two of these three cases were properly unfounded.  One of the three had a finding of sustained, and it resulted in appropriate discipline.  Two investigations involved alleged bias by a sworn member of the agency; both resulted in findings of sustained.   In both of these cases, the employees resigned from MCSO prior to the completion of the investigation or discipline process. All five cases were properly investigated, and we agree with all findings.  None of the five cases were in compliance with the requirements for timely completion of administrative investigations.

While discriminatory policing allegations that involve members of the Plaintiffs' class are not reported in this Paragraph, we note that MCSO did complete six investigations for this reporting period that were determined to be Class Remedial Matters.  (See Paragraphs 275-288.)

WAI 70521

***Paragraph 34.*** *MCSO shall review each policy and procedure on an annual basis to ensure that the policy or procedure provides effective direction to MCSO Personnel and remains consistent with this Order, current law and professional standards. The MCSO shall document such annual review in writing. MCSO also shall review Policies and Procedures as necessary upon notice of a policy deficiency during audits or reviews. MCSO shall revise any deficient policy as soon as practicable.*

**In Full and Effective Compliance**

On an annual basis, MCSO reviews all critical policies and all policies relevant to the Court Orders for consistency with Constitutional policing, current law, and professional standards.

During this reporting period, MCSO continued its annual review, submitting nine (18%) of the 48 required policies to our Team. MCSO submitted; EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance); GB-2 (Command Responsibility); GC-7 (Transfer of Personnel); GC-11 (Employee Probationary Periods); GE-3 (Property Management and Evidence Control); GF-5 (Incident Report Guidelines); GJ-2 (Critical Incidents); GJ-3 (Search & Seizure); and GJ-35 (Body-Worn Cameras).

On June 3, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70522

# Section 5: Pre-Planned Operations

**Paragraph 35.** *The Monitor shall regularly review the mission statement, policies and operations documents of any Specialized Unit within the MCSO that enforces Immigration-Related Laws to ensure that such unit(s) is/are operating in accordance with the Constitution, the laws of the United States and State of Arizona, and this Order.*

**In Full and Effective Compliance**

To verify Phase 2 compliance with this Paragraph, we previously verified that the Criminal Employment Unit (CEU) was disbanded and removed from the Special Investigations Division organizational chart. The Human Smuggling Unit (HSU) was also disbanded, and personnel were reassigned to the Anti-Trafficking Unit (ATU).

During our review of the arrests made by the Special Investigations Division ATU between March 2015-March 2017, we did not note any arrests for immigration or human smuggling violations. The cases submitted by MCSO and reviewed for the ATU were primarily related to narcotics trafficking offenses.

MCSO reported in April 2017 that it had disbanded the Anti-Trafficking Unit and formed a new unit, Fugitive Apprehension and Tactical Enforcement (FATE). The primary mission of FATE is to locate and apprehend violent fugitives. We reviewed FATE's mission statement and objectives, as well as the organizational chart for the Special Investigations Division. MCSO had removed the ATU from the organizational chart, and the mission of FATE did not include any reference to the enforcement of Immigration-Related Laws.

The revised organizational chart for SID and documentation MCSO provided regarding the implementation of FATE supported that the ATU no longer existed, and that there were no specialized Units in MCSO that enforced Immigration-Related Laws.

We previously received and reviewed the Special Investigations Division Operations Manual and organizational chart. Both confirmed that MCSO has no specialized Units that enforce Immigration-Related Laws, that the Human Smuggling Unit (HSU) was disbanded, and the Anti-Trafficking Unit (ATU) no longer exists.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70523

***Paragraph 36.***  *The MCSO shall ensure that any Significant Operations or Patrols are initiated and carried out in a race-neutral fashion.  For any Significant Operation or Patrol involving 10 or more MCSO personnel, excluding posse members, the MCSO shall develop a written protocol including a statement of the operational motivations and objectives, parameters for supporting documentation that shall be collected, operations plans, and provide instructions to supervisors, deputies and posse members.  That written protocol shall be provided to the Monitor in advance of any Significant Operation or Patrol.*

**In Full and Effective Compliance**

Since the requirements for conducting Significant Operations were implemented, MCSO has reported conducting only one Significant Operation that invoked the requirements of this Paragraph.  MCSO conducted "Operation Borderline" from October 20-27, 2014, to interdict the flow of illegal narcotics into Maricopa County.  MCSO met all the requirements of this Paragraph during the operation.

In February 2016, we became aware of "Operation No Drug Bust Too Small" when it was reported in the media, and requested details on this operation from MCSO.  After reviewing the documentation MCSO provided, we were satisfied that it did not meet the reporting requirements of this Paragraph.

In October 2016, we became aware of "Operation Gila Monster" when it was reported in the media.  According to media reports, this was a two-week operation conducted by a special operations Unit in MCSO and was intended to interdict the flow of illegal drugs into Maricopa County.  We requested all documentation regarding this operation for review.  The documentation indicated that MCSO conducted this operation from October 17-23, 2016.  The documentation MCSO provided was sufficient for us to determine that this operation did not meet the reporting criteria for this, or other Paragraphs, related to Significant Operations.  The Plaintiffs also reviewed the documentation submitted by MCSO on this operation and agreed that the operation did not invoke the requirements of this Paragraph.  We and the Plaintiffs noted that "Operation Gila Monster" involved traffic stops of Latinos, and that those arrested were undocumented Latinos.

Since October 2014, MCSO has continued to report that it has not conducted any Significant Operations.  In addition, we have not learned of any potential Significant Operation through media releases or other sources during this reporting period.  We will continue to monitor and review any operations we become aware of to ensure continued compliance with this and other Paragraphs related to Significant Operations.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70524

*Paragraph 37.   The MCSO shall submit a standard template for operations plans and standard instructions for supervisors, deputies and posse members applicable to all Significant Operations or Patrols to the Monitor for review pursuant to the process described in Section IV within 90 days of the Effective Date.   In Exigent Circumstances, the MCSO may conduct Significant Operations or Patrols during the interim period but such patrols shall be conducted in a manner that is in compliance with the requirement of this Order.   Any Significant Operations or Patrols thereafter must be in accordance with the approved template and instructions.*

**In Full and Effective Compliance**

In late 2014, we reviewed all the documentation submitted by MCSO regarding the Significant Operation conducted from October 24-27, 2014.   This operation was intended to interdict the flow of illegal narcotics into Maricopa County and fully complied with the requirements of this Paragraph.

MCSO continues to report that it has not conducted any operations that invoke the requirements of this Paragraph since October 2014.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

During this reporting period, we did not become aware of any Significant Operations conducted by MCSO.

**(Note: Unchanged language is presented in *italicized font*.   Additions are indicated by underlined font.   Deletions are indicated by ~~crossed-out font~~.)**

*Paragraph 38.   If the MCSO conducts any Significant Operations or Patrols involving 10 or more MCSO Personnel excluding posse members, it shall create the following documentation and provide it to the Monitor and Plaintiffs within 30 days after the operation:*

a.      *documentation of the specific justification/reason for the operation, certified as drafted prior to the operation (this documentation must include analysis of relevant, reliable, and comparative crime data);*

b.      *information that triggered the operation and/or selection of the particular site for the operation;*

c.      *documentation of the steps taken to corroborate any information or intelligence received from non-law enforcement personnel;*

d.      *documentation of command staff review and approval of the operation and operations plans;*

e.      *a listing of specific operational objectives for the patrol;*

f.      *documentation of specific operational objectives and instructions as communicated to participating MCSO Personnel;*

WAI 70525

g.     *any operations plans, other instructions, guidance or post-operation feedback or debriefing provided to participating MCSO Personnel;*

h.     *a post-operation analysis of the patrol, including a detailed report of any significant events that occurred during the patrol;*

i.     *arrest lists, officer participation logs and records for the patrol; and*

j.     *data about each contact made during the operation, including whether it resulted in a citation or arrest.*

**In Full and Effective Compliance**

Since the initial publication of GJ-33, MCSO has reported that it has conducted only one Significant Operation, "Operation Borderline," in October 2014. At the time of this operation, we reviewed MCSO's compliance with policy; attended the operational briefing; and verified the inclusion of all the required protocols, planning checklists, supervisor daily checklists, and post-operation reports. MCSO was in full compliance with this Paragraph for this operation. Since October 2014, MCSO has not reported that it conducted any Significant Operations invoking the requirements of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 39.** *The MCSO shall hold a community outreach meeting no more than 40 days after any Significant Operations or Patrols in the affected District(s). MCSO shall work with the Community Advisory Board to ensure that the community outreach meeting adequately communicates information regarding the objectives and results of the operation or patrol. The community outreach meeting shall be advertised and conducted in English and Spanish.*

**In Full and Effective Compliance**

The Amendments to the Supplemental Permanent Injunction/Judgment Order (Document 2100) issued on August 3, 2017 returned the responsibility for compliance with this Paragraph to MCSO.

During this reporting period, MCSO did not report conducting any Significant Operations that would invoke the requirements of this Paragraph.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70526

***Paragraph 40.*** *The MCSO shall notify the Monitor and Plaintiffs within 24 hours of any immigration related traffic enforcement activity or Significant Operation involving the arrest of 5 or more people unless such disclosure would interfere with an on-going criminal investigation in which case the notification shall be provided under seal to the Court, which may determine that disclosure to the Monitor and Plaintiffs would not interfere with an on-going criminal investigation. In any event, as soon as disclosure would no longer interfere with an on-going criminal investigation, MCSO shall provide the notification to the Monitor and Plaintiffs. To the extent that it is not already covered above by Paragraph 38, the Monitor and Plaintiffs may request any documentation related to such activity as they deem reasonably necessary to ensure compliance with the Court's orders.*

**In Full and Effective Compliance**

Since MCSO first developed GJ-33 (Significant Operations) in 2014, MCSO has reported conducting only one operation, "Operation Borderline," that required compliance with this Paragraph. We verified that MCSO employed the appropriate protocols and made all required notifications. MCSO was in full compliance with this Paragraph during this operation.

Based on a concern raised by the Plaintiffs, and to provide clarification regarding the portion of this Paragraph that addresses the requirement for MCSO to notify the Monitor and Plaintiffs within 24 hours of any immigration-related traffic enforcement activity or Significant Operations involving "the arrest of or more persons," we requested during our October 2015 site visit that MCSO provide a statement regarding this requirement each month. MCSO began including this information in November 2015.

MCSO has not reported conducting any operations that meet the reporting requirements for this Paragraph since October 2014. During this reporting period, we did not learn of any traffic-related enforcement or Significant Operations conducted by MCSO that would invoke the requirements of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70527

# Section 6: Training

**COURT ORDER VII.  TRAINING**

### a. General Provisions

*Paragraph 41.  To ensure that the Policies and Procedures provided for by this Order are effectuated, the MCSO shall implement the following requirements regarding Training.*

*Paragraph 42.  The persons presenting this Training in each area shall be competent instructors with significant experience and expertise in the area.  Those presenting Training on legal matters shall also hold a law degree from an accredited law school and be admitted to a Bar of any state and/or the District of Columbia.*

**Phase 1:**  In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on November 17, 2022.

- GG-2 (Detention/Civilian Training Administration), most recently amended on November 17, 2022.

- Training Division Operations Manual, most recently amended on April 4, 2022.

**Phase 2:**  Not in compliance

MCSO uses three types of instructors to deliver Order-related training:  They are either assigned to the Training Division as full-time staff; assigned to field assignments outside of the Training Division; or are paid vendors.  We approve instructors presenting training on legal matters for their compliance with the requirements of this Paragraph.  The Training Division manually keeps individual instructor folders for Training Division staff, field instructors, Field Training Officers (FTOs), and vendors.  MCSO policy requires that instructor folders include annually updated CVs, General Instructor (GI) certificates, and either an annual or 30-day Misconduct and Disciplinary Review, as applicable.  Additionally, instructors who have received prior sustained discipline or who are currently involved with an ongoing Professional Standards Bureau (PSB) investigation may request a Waiver of Presumptive Ineligibility for approval to teach from the Training Division Commander.  A waiver request should provide the Training Division Commander with ample justification to overcome presumptive ineligibility.  Waiver requests require the Training Division Commander to produce written justifications for the approval or denial of each request.  We verify compliance with this Paragraph by reviewing all instructor folders, waiver requests, and justifications.

During this reporting period, MCSO did not submit any personnel for General Instructor (GI) consideration.

There were no GI or FTO waiver requests during this reporting period.

WAI 70528

Six new Field Training Officers (FTOs) were added during this reporting period.  All individuals met the criteria of GG-1.  We discussed the PSB Misconduct and Disciplinary Review(s) of one individual during our July site visit.  Upon initial review, it appeared that approval of this individual should have been reconsidered.

Eight administrative investigations appeared on the May 15, 2023 misconduct and disciplinary review for this individual.  Two cases involving the Use/Operation of Vehicles were sustained with suspensions of eight and 16 hours, respectively.  There were six remaining open administrative investigations for multiple allegations of Failure to Meet Standards, Unbecoming Conduct and Public Demeanor, Property Management, and Incident Report Guidelines.

After previous reviews dating back to 2021, Training Division Captains rejected this individual due to the number of pending administrative investigations and allegations.  The current review document indicated that the Training Division Captain had conferred with an unidentified PSB instructor regarding all pending allegations and investigations.  This conversation did not conform to policy requirements.  We requested that MCSO provide case summaries for all pending investigations and documentation of a conference between the Training Division Captain and the PSB Captain to assess suitability and policy compliance.  When we received the requested documents, we determined that the Training Division Captain had conferred by email with the PSB Captain to determine suitability of the individual for only one of the six remaining cases.  Both agreed that if the single case was sustained, the allegations would result in minor discipline only.  There was no request for review or further discussion provided for the remaining five cases.

The Training Division sergeant advised us that although this individual was approved to participate in the FTO program, no OIT has been assigned.  The sergeant intends to continue to monitor this FTO's activities going forward without assigning him an OIT.

MCSO provided the requested case summaries for our review.  Inaccurate documentation regarding FTO selection has been continually problematic since our thirty-second quarterly status report.

After receiving the additional requested documentation, we do not disagree with the consideration MCSO has shown to this individual.

MCSO provided an update on the FTO program.  Currently there are a total of 55 FTOs.  A change to the FTO program was initiated during this reporting period to better accommodate training needs.  Currently OITs graduate from the Academy and attend a two-week Court-Ordered Required Training (CORT) class update.  OITs are then sent to the field for Phase I training.  After Phase I, OITs return to the academy for a two-week period to receive Academy updates.  OITs are then returned to the filed for their Phase II training.  MCSO believes this schedule better balances the organization's needs.  The 2023 Annual FTO Training is scheduled for the third quarter of this year.

During this reporting period, the Training Division did not conduct any instructor observations.

MCSO is not in compliance with this Paragraph.

WAI 70529

*Paragraph 43.  The Training shall include at least 60% live training (i.e., with a live instructor), which includes an interactive component, and no more than 40% on-line training.  The Training shall also include testing and/or writings that indicate that MCSO Personnel taking the Training comprehend the material taught whether via live training or via on-line training.*

**In Full and Effective Compliance**

We verify compliance with this Paragraph by reviewing all individual test failures; individual retests; failure remediation efforts and test analyses by training class, for both live and HUB-delivered Order-related training.

During this reporting period, MCSO delivered the following programs:  2022 Fourth and Fourteenth Amendment; 2021 Blue Team 2 Sworn/Detention (BT2); 2021 Body-Worn Camera (BWC); and 2021 Traffic and Criminal Software (TraCS).

MCSO delivered the 2022 Fourth and Fourteenth Amendment classroom training once during this reporting period to 27 personnel (13 sworn, 13 Posse, one DSA).  No personnel needed test remediation.

MCSO delivered the 2021 BT2 Sworn/Detention classroom training three times during this reporting period to 28 personnel (10 sworn, 18 Detention).  One individual needed test remediation.

MCSO delivered the 2021 BWC classroom training four times during this reporting period to 20 personnel (10 sworn, 53 Posse).  No personnel needed test remediation.

MCSO delivered the 2021 TraCS classroom training once during this reporting period to 10 sworn personnel.  No personnel needed test remediation.

MCSO delivered four of 14 Order-related training programs during this reporting period.  Each of these were delivered in the classroom (100% classroom training).

On June 17, 2022, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

*Paragraph 44.  Within 90 days of the Effective Date, MCSO shall set out a schedule for delivering all Training required by this Order.  Plaintiffs' Representative and the Monitor shall be provided with the schedule of all Trainings and will be permitted to observe all live trainings and all on-line training.  Attendees shall sign in at each live session.  MCSO shall keep an up-to-date list of the live and on-line Training sessions and hours attended or viewed by each officer and Supervisor and make that available to the Monitor and Plaintiffs.*

**In Full and Effective Compliance**

The Training Division keeps a three-month Training Calendar.  MCSO posts the Master Training Calendar to the agency's website to inform the public of tentative training dates, classes, and locations.  The calendar displays 90-day increments and includes a legend specifically identifying Order-related training.

WAI 70530

Master Personnel Rosters document the number of personnel requiring Order-related training. MCSO reported that 595 sworn members, 41 reserve members, 169 Posse members, 10 DSAs, 1,459 Detention members, and 818 civilian employees should have received Order-related instruction by the end of this reporting period. These categories vary by reporting period, due to attrition in the organization. All MCSO employee categories are still within compliance assessment levels for all Order-related training.

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 45.**  *The Training may incorporate adult-learning methods that incorporate roleplaying scenarios, interactive exercises, as well as traditional lecture formats.*

**In Full and Effective Compliance**

MCSO continues to look for and incorporate adult-learning methods in its curricula – including an increased use of videos, both externally and internally created. We have also noted new learning activities designed to change with each iteration of the curriculum and address issues specific to the Plaintiffs' class and others.

During this reporting period, MCSO proposed a change in the development and delivery of enhanced training relative to implicit bias, cultural competency, and fair and impartial decision making. Their proposal aims to reduce repetitiveness, create more focused content on the Plaintiffs' class, and address disparities exposed by the Traffic Stop Annual Reports. Plaintiffs, the Plaintiff-Intervenor, and we were receptive to the proposal as a means to better direct enhanced training programs.

On December 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 46.**  *The curriculum and any materials and information on the proposed instructors for the Training provided for by this Order shall be provided to the Monitor within 90 days of the Effective Date for review pursuant to the process described in Section IV.  The Monitor and Plaintiffs may provide resources that the MCSO can consult to develop the content of the Training, including names of suggested instructors.*

**In Full and Effective Compliance**

During our July remote site visit, we discussed the status of all Order-required training curricula. The following curricula are under review or development for 2023 delivery:

- The 2023 Annual Combined Training (ACT) classroom training was approved for delivery.

- The 2023 Early Identification System (EIS) classroom training was approved for delivery.

WAI 70531

- The 2023 Supervisor Responsibilities: Effective Law Enforcement (SRELE) classroom training is in review by the Parties and Monitoring Team.
- The 2020 PSB40 requires annual review.
- The 2023 Administrative Misconduct Investigation Refresher (PSB8) External is under development.

On December 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 47.** *MCSO shall regularly update the Training to keep up with developments in the law and to take into account feedback from the Monitor, the Court, Plaintiffs and MCSO Personnel.*

**In Full and Effective Compliance**

MCSO conducts annual curriculum revisions and updates to keep current with developments in the law and to address feedback from us, the Plaintiffs, the Plaintiff-Intervenor, and MCSO personnel.

The Training Division routinely supplies all new and revised lesson plans for our and the Parties' review. These reviews address the requirements of this Paragraph.

We will continue to advise MCSO upon first review of a training offering if we do not consider it to be enhanced, as referenced in the current Constitutional Policing Plan. (See Paragraph 70.) When onsite compliance visits resume, MCSO should expect that we and the Parties will continue to observe training sessions and provide feedback.

On June 17, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**b. Bias-Free Policing Training**

**Paragraph 48.** *The MCSO shall provide all sworn Deputies, including Supervisors and chiefs, as well as all posse members, with 12 hours of comprehensive and interdisciplinary Training on bias-free policing within 240 days of the Effective Date, or for new Deputies or posse members, within 90 days of the start of their service, and at least 6 hours annually thereafter.*

**In Full and Effective Compliance**

MCSO has combined the Order required Bias-Free Policing Training and the Training on Detentions, Arrests, and the Enforcement of Immigration Laws into a single 20-hour training class titled Fourth and Fourteenth Amendment Training. MCSO mandates that all new deputies, Posse members, and Deputy Service Aides (DSA) receive this Court-ordered training within the first 90 days of their employment or volunteer service.

WAI 70532

MCSO delivered the 2022 Fourth and Fourteenth Amendment classroom training once during this reporting period to 27 personnel (13 sworn, 13 Posse, one DSA).

The 2023 ACT was approved for delivery during this reporting period.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 49.** *The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:*

a. *definitions of racial profiling and Discriminatory Policing;*

b. *examples of the type of conduct that would constitute Discriminatory Policing as well as examples of the types of indicators Deputies may properly rely upon;*

c. *the protection of civil rights as a central part of the police mission and as essential to effective policing;*

d. *an emphasis on ethics, professionalism and the protection of civil rights as a central part of the police mission and as essential to effective policing;*

e. *constitutional and other legal requirements related to equal protection, unlawful discrimination, and restrictions on the enforcement of Immigration-Related Laws, including the requirements of this Order;*

f. *MCSO policies related to Discriminatory Policing, the enforcement of Immigration-Related Laws and traffic enforcement, and to the extent past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;*

g. *MCSO's protocol and requirements for ensuring that any significant pre-planned operations or patrols are initiated and carried out in a race-neutral fashion;*

h. *police and community perspectives related to Discriminatory Policing;*

i. *the existence of arbitrary classifications, stereotypes, and implicit bias, and the impact that these may have on the decision-making and behavior of a Deputy;*

j. *methods and strategies for identifying stereotypes and implicit bias in Deputy decision-making;*

k. *methods and strategies for ensuring effective policing, including reliance solely on non-discriminatory factors at key decision points;*

l. *methods and strategies to reduce misunderstanding, resolve and/or de-escalate conflict, and avoid Complaints due to perceived police bias or discrimination;*

m. *cultural awareness and how to communicate with individuals in commonly encountered scenarios;*

WAI 70533

| n. | problem-oriented policing tactics and other methods for improving public safety and crime prevention through community engagement; |
|---|---|
| o. | the benefits of actively engaging community organizations, including those serving youth and immigrant communities; |
| p. | the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy; |
| q. | background information on the Melendres v. Arpaio litigation, as well as a summary and explanation of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in Melendres v. Arpaio, the parameters of the Court's permanent injunction, and the requirements of this Order; and |
| r. | Instruction on the data collection protocols and reporting requirements of this Order. |

**In Full and Effective Compliance**

The 2023 ACT was approved for delivery during this reporting period.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.


### c. Training on Detentions, Arrests, and the Enforcement of Immigration-Related Laws

**Paragraph 50.** *In addition to the Training on bias-free policing, the MCSO shall provide all sworn personnel, including Supervisors and chiefs, as well as all posse members, with 6 hours of Training on the Fourth Amendment, including on detentions, arrests and the enforcement of Immigration-Related Laws within 180 days of the effective date of this Order, or for new Deputies or posse members, within 90 days of the start of their service. MCSO shall provide all Deputies with 4 hours of Training each year thereafter.*

**In Full and Effective Compliance**

MCSO has combined the Order required Bias-Free Policing Training and the Training on Detentions, Arrests, and the Enforcement of Immigration Laws into a single 20-hour training class titled Fourth and Fourteenth Amendment Training. MCSO mandates that all new deputies, Posse members, and Deputy Service Aides (DSA) receive this Court-ordered training within the first 90 days of their employment or volunteer service.

MCSO delivered the 2022 Fourth and Fourteenth Amendment classroom training once during this reporting period to 27 personnel (13 sworn, 13 Posse, one DSA).

As previously reported, the 2023 ACT was approved for delivery during this reporting period.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70534

**Paragraph 51.**   *The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:*

a.   *an explanation of the difference between various police contacts according to the level of police intrusion and the requisite level of suspicion; the difference between reasonable suspicion and mere speculation; and the difference between voluntary consent and mere acquiescence to police authority;*

b.   *guidance on the facts and circumstances that should be considered in initiating, expanding or terminating an Investigatory Stop or detention;*

c.   *guidance on the circumstances under which an Investigatory Detention can become an arrest requiring probable cause;*

d.   *constitutional and other legal requirements related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, including the requirements of this Order;*

e.   *MCSO policies related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, and the extent to which past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;*

f.   *the circumstances under which a passenger may be questioned or asked for identification;*

g.   *the forms of identification that will be deemed acceptable if a driver or passenger (in circumstances where identification is required of them) is unable to present an Arizona driver's license;*

h.   *the circumstances under which an officer may initiate a vehicle stop in order to investigate a load vehicle;*

i.   *the circumstances under which a Deputy may question any individual as to his/her alienage or immigration status, investigate an individual's identity or search the individual in order to develop evidence of unlawful status, contact ICE/CBP, await a response from ICE/CBP and/or deliver an individual to ICE/CBP custody;*

j.   *a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause to believe that a vehicle or an individual is involved in an immigration-related state crime, such as a violation of the Arizona Human Smuggling Statute, as drawn from legal precedent and updated as necessary; the factors shall not include actual or apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a Hispanic day laborer;*

k.   *a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause that an individual is in the country unlawfully, as drawn from legal precedent and updated as necessary; the factors shall not include actual or apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a day laborer;*

l.   *an emphasis on the rule that use of race or ethnicity to any degree, except in the case of a reliable, specific suspect description, is prohibited;*

WAI 70535

m.     the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;

n.     Provide all trainees a copy of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in Melendres v. Arpaio and this Order, as well as a summary and explanation of the same that is drafted by counsel for Plaintiffs or Defendants and reviewed by the Monitor or the Court; and

o.     Instruction on the data collection protocols and reporting requirements of this Order, particularly reporting requirements for any contact with ICE/CBP.

**In Full and Effective Compliance**

The Fourth and Fourteenth Amendment Training curriculum was approved for 2023 delivery.

The 2023 ACT curriculum was approved for delivery during this reporting period.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

### d. Supervisor and Command Level Training

**Paragraph 52.** MCSO shall provide Supervisors with comprehensive and interdisciplinary Training on supervision strategies and supervisory responsibilities under the Order. MCSO shall provide an initial mandatory supervisor training of no less than 6 hours, which shall be completed prior to assuming supervisory responsibilities or, for current MCSO Supervisors, within 180 days of the Effective Date of this Order. In addition to this initial Supervisor Training, MCSO shall require each Supervisor to complete at least 4 hours of Supervisor-specific Training annually thereafter. As needed, Supervisors shall also receive Training and updates as required by changes in pertinent developments in the law of equal protection, Fourth Amendment, the enforcement of Immigration-Related Laws, and other areas, as well as Training in new skills.

**In Full and Effective Compliance**

The 2023 SRELE curriculum remains in development.

On June 18, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70536

***Paragraph 53.*** *The Supervisor-specific Training shall address or include, at a minimum:*

a. *techniques for effectively guiding and directing Deputies, and promoting effective and constitutional police practices in conformity with the Policies and Procedures in Paragraphs 18–34 and the Fourth and Fourteenth Amendment Training in Paragraphs 48–51;*

b. *how to conduct regular reviews of subordinates;*

c. *operation of Supervisory tools such as EIS;*

d. *evaluation of written reports, including how to identify conclusory, "canned," or perfunctory language that is not supported by specific facts;*

e. *how to analyze collected traffic stop data, audio and visual recordings, and patrol data to look for warning signs or indicia of possible racial profiling or unlawful conduct;*

f. *how to plan significant operations and patrols to ensure that they are race-neutral and how to supervise Deputies engaged in such operations;*

g. *incorporating integrity-related data into COMSTAT reporting;*

h. *how to respond to calls from Deputies requesting permission to proceed with an investigation of an individual's immigration status, including contacting ICE/CBP;*

i. *how to respond to the scene of a traffic stop when a civilian would like to make a Complaint against a Deputy;*

j. *how to respond to and investigate allegations of Deputy misconduct generally;*

k. *evaluating Deputy performance as part of the regular employee performance evaluation; and*

l. *building community partnerships and guiding Deputies to do the Training for Personnel Conducting Misconduct Investigations.*

**In Full and Effective Compliance**

The 2023 SRELE classroom training remains in development.

On June 18, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70537

# Section 7: Traffic Stop Documentation and Data Collection

**COURT ORDER VIII.    TRAFFIC STOP DOCUMENTATION AND DATA COLLECTION AND REVIEW**

For Paragraphs 54 and 55, in particular, we request traffic stop data from MCSO. The following describes how we made that request and how we handled the data once we received it. These data may also be referred to in other areas of Section 7 and the report as a whole.

In selecting traffic stop cases for our compliance review, we modified our statistical technique in that, rather than selecting a representative random sample of 100 cases per quarter, we instead pulled a sample of 35 cases per month (or 105 cases per quarter). Our original selection of a sample size of 35 cases was based on information from MCSO TraCS data that reported the average number of traffic stops per month was fewer than 2,000 during the April 2014-June 2015 period when TraCS data were first available. The selection of 35 cases reflects a sample based on this average per month. This gave us a 95 percent confidence level (the certainty associated with our conclusion).

We continue to pull our monthly sample of traffic stop cases from the MCSO's five Districts (Districts 1, 2, 3, 4, and 7) and Lake Patrol. As noted previously, District 6 is no longer operational as of January 11, 2022, as the Queen Creek Police Department commenced full operations and is now the primary law enforcement agency for that jurisdiction. Once we received files each month containing traffic stop case numbers from MCSO, denoting from which area they came, we selected a sample of up to 35 cases representing the areas and then selected a subsample averaging 10 cases, from the 35 selected cases, to obtain CAD audiotapes and body-worn camera recordings. Our sampling process involved selecting a sample of cases stratified by the areas according to the proportion of specific area cases relative to the total area cases. Stratification of the data was necessary to ensure that each area was represented proportionally in our review. Randomization of the cases and the selection of the final cases for CAD review were achieved using a statistical software package (IBM SPSS Version 22), which contains a specific function that randomly selects cases and that also allows cases to be weighted by the areas. Our use of SPSS required that we first convert the MCSO Excel spreadsheet into a format that would be readable in SPSS. We next pulled the stratified sample each month for the areas and then randomly selected a CAD audio subsample from the selected cases.

In February 2016, we began pulling cases for our body-worn camera review from the audio subsample. Since that time, we began pulling additional samples for passenger contacts and persons' searches (10 each per month). The unique identifiers for these two samples were relayed back to MCSO personnel, who produced documentation for the selected sample (including the CAD documentation for the subsample).

On October 10, 2014, the Court issued an Order Granting Stipulation to Amend Supplemental/Permanent Injunction/Judgment Order (Document 748). The stipulation affects Paragraphs 57, 61, 62, and 1.r.xv.; and has been incorporated in the body of this report. The stipulation referenced amends the First Order, and will be addressed in Section 7.

WAI 70538

*a. Collection of Traffic Stop Data*

**Paragraph 54.** *Within 180 days of the Effective Date, MCSO shall develop a system to ensure that Deputies collect data on all vehicle stops, whether or not they result in the issuance of a citation or arrest.  This system shall require Deputies to document, at a minimum:*

a.    *the name, badge/serial number, and unit of each Deputy and posse member involved;*

b.    *the date, time and location of the stop, recorded in a format that can be subject to geocoding;*

c.    *the license plate state and number of the subject vehicle;*

d.    *the total number of occupants in the vehicle;*

e.    *the Deputy's subjective perceived race, ethnicity and gender of the driver and any passengers, based on the officer's subjective impression (no inquiry into an occupant's ethnicity or gender is required or permitted);*

f.    *the name of any individual upon whom the Deputy runs a license or warrant check (including subject's surname);*

g.    *an indication of whether the Deputy otherwise contacted any passengers, the nature of the contact, and the reasons for such contact;*

h.    *the reason for the stop, recorded prior to contact with the occupants of the stopped vehicle, including a description of the traffic or equipment violation observed, if any, and any indicators of criminal activity developed before or during the stop;*

i.    *time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; time a release was made without citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere or Deputy's departure from the scene;*

j.    *whether any inquiry as to immigration status was conducted and whether ICE/CBP was contacted, and if so, the facts supporting the inquiry or contact with ICE/CBP, the time Supervisor approval was sought, the time ICE/CBP was contacted, the time it took to complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual;*

k.    *whether any individual was asked to consent to a search (and the response), whether a probable cause search was performed on any individual, or whether a pat-and-frisk search was performed on any individual;*

l.    *whether any contraband or evidence was seized from any individual, and nature of the contraband or evidence; and*

m.    *The final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without citation.*

**Phase 1:**  In compliance

WAI 70539

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on October 13, 2022.

- EA-11 (Arrest Procedures), most recently amended on April 5, 2022.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on June 15, 2023.

- EB-2 (Traffic Stop Data Collection), most recently amended on February 22, 2023.

- GI-1 (Radio and Enforcement Communications Procedures), most recently amended on December 8, 2021.

- GJ-3 (Search and Seizure), most recently amended on May 5, 2022.

**Phase 2:**  Not in compliance

To verify the information required for this Paragraph, MCSO created, and we reviewed, the Vehicle Stop Contact Forms (VSCFs), the Vehicle Stop Contact Form Supplemental Sheets, the Incidental Contact Receipts, and the Written Warning/Repair Orders, all in electronic form, for a sample of those motorists who, during this reporting period, committed a traffic violation or operated a vehicle with defective equipment and received a warning.  We also reviewed the Arizona Traffic Ticket and Complaint Forms issued for violations of Arizona Statutes, Internet I/Viewer Event Unit printout, Justice Web Interface printout, and any Incident Report associated with these events.  We selected a sample of 105 traffic stops conducted by deputies from April 1-June 30, 2023 for the purposes of this review; and assessed the collected data from the above-listed documents for compliance with Subparagraphs 54.a.-54.m.  All of the listed documentation was used for our review of the following subsections of this Paragraph.

The Paragraph requires that MCSO create a system for data collection.  The data collected pursuant to this Paragraph is captured in the Early Identification System, which we discuss further in this report.

In our reviews of the following requirements, we consider whether any compliance issues were identified and addressed by supervisory personnel during the regular review of documents by supervisors.  During this reporting period, we identified several instances where supervisors identified compliance related issues and addressed the deputies by way of re-instruction or by requiring that the deputies correct the VSCF.  Following are some examples of issues identified:

- A supervisor identified that a deputy contacted a rear-seat adult passenger regarding the use of a seat belt.  The supervisor reinstructed the deputy that it was not a violation for the adult to not wear a seat belt as a rear-seat passenger.

- A supervisor identified that a deputy prepared a Non-Traffic Contact Form instead of an Incidental Contact Receipt in relation to a contact with a passenger.

- A supervisor directed a deputy to correct the VSCF where the search of the driver was improperly documented.

WAI 70540

- A supervisor identified that the deputy did not issue Incidental Contact Receipts to the passengers and noted that there was no contact information obtained that would allow the deputy to mail them or otherwise provide the forms to the passengers.

- A supervisor directed a deputy to correct a VSCF regarding errors involving the issuance of an Incidental Contact Receipt, the search of the driver, and the search of the vehicle.

- A supervisor directed a deputy to correct a VSCF to reflect the type of search conducted of the driver.

- A supervisor directed a deputy to make several changes to a VSCF to address errors that were identified.

Paragraph 54.a. requires MCSO to document the name, badge/serial number, and unit of each deputy and Posse member involved.

For this reporting period, all of the primary deputies indicated their own serial numbers for every stop they initiated. We review the VSCF, I/Viewer Event document, the Justice Web Interface, and the CAD printout to determine which units were on the scene. If back-up units arrive on a scene and do not announce their presence to dispatch, CAD does not capture this information. MCSO made a TraCS change to the VSCF during 2016 to secure this information. MCSO added a drop-down box so the deputy could enter the number of units on the scene and the appropriate fields would be added for the additional deputies. While this addition is an improvement, if the deputy fails to enter the number of additional units on the form, the drop-down boxes do not appear. In addition, MCSO policy requires deputies to prepare the Assisting Employee and/or Volunteer Log in instances where deputies respond and assist at a traffic stop. The log contains the relevant information required by this Subparagraph for any additional deputies involved in a traffic stop other than the primary deputy. During our April 2019 site visit, we discussed with MCSO, the Plaintiffs, and the Plaintiff-Intervenor the method of evaluating this requirement. We determined that in instances where a deputy's name, serial number and unit number may have been omitted on the VSCF, yet the deputy prepared the Assisting Employee and/or Volunteer Log, the requirements of this Subparagraph will have been met.

During our review of the sample of 105 vehicle traffic stops, we identified 21 cases where the deputy's unit had another deputy assigned to the vehicle or one or more other deputy units or Posse members were on the scene. In 20 of the 21 cases, the deputies properly documented the name, serial number, and unit number of the deputies and Posse members on the VSCF, or the information was captured on the Assisting Employee and/or Volunteer Log. In one case, an assisting deputy was not listed on the VSCF and the Assisting Employee and/or Volunteer Log was not prepared. AIU identified this issue during its inspection and requested that the District document any corrective measures taken on a BIO Action Form.

WAI 70541

Of the cases we reviewed for passenger contacts under Subparagraph 54.g., there were 62 cases where the deputy's unit had another deputy assigned to the vehicle, or one or more other deputy units or Posse members were on the scene.  In 61 of the 62 cases, the deputies properly documented the required information on the VSCFs, or the information was captured on the Assisting Employee and/or Volunteer Log.  In one case, the deputy that conducted the stop was not listed on the VSCF; instead, one of the assisting deputies was listed twice on the document – once as the deputy that conducted the stop, and once as the assisting deputy.

Of the cases we reviewed for searches of persons under Subparagraph 54.k., there were 57 cases where the deputy's unit had another deputy assigned to the vehicle, or one or more other deputies or Posse members were on the scene.  In each of the 57 cases, the deputies properly documented the required information on the VSCFs, or the information was captured on the Assisting Employee and/or Volunteer Log.

We continue to identify cases where the assisting deputies have not prepared the Assisting Employee and/or Volunteer Log when required by MCSO policy.  We encourage MCSO to provide guidance to supervisors to be attentive to this issue during their reviews of traffic stop documentation.

During this reporting period, MCSO achieved a compliance rating of 99%.  MCSO remains in compliance with this requirement.

Paragraph 54.b. requires MCSO to document the date, time, and location of the stop, recorded in a format that can be subject to geocoding.  Our reviews of the CAD printout for all 105 traffic stops in our sample indicated that the date, time, and location is captured with the time the stop is initiated and the time the stop is cleared.  In previous reporting periods, we noted instances where the GPS coordinates could not be located on the documentation received (CAD printout/I/Viewer).  We contacted MCSO about this issue, and MCSO now provides us with the GPS coordinates via a separate document that lists the coordinates for the traffic stop sample we provide.  MCSO uses GPS to determine location for the CAD system.  GPS collects coordinates from three or more satellites to enhance the accuracy of location approximation.  The data from the satellites can be decoded to determine the longitude and latitude of traffic stop locations should that be necessary.  The CAD system was upgraded in 2014 to include geocoding of traffic stops.  CID continues to provide us with a printout of all case numbers in the sample containing the associated coordinates.  For this reporting period, the CAD or I/Viewer system contained the coordinates in 71% of the cases.  In a separate spreadsheet, MCSO provided GPS coordinates for all 105 cases we reviewed, for 100% compliance with this portion of the Subparagraph.

When we review the sample traffic stops from across all Districts, we note the locations of the stops contained on the VSCF, the CAD printout, and the I/Viewer system to ensure that they are accurate.  We continue to identify a limited number of instances where the location of the stop contained on the VSCF and the location of the stop contained on the CAD printout are inconsistent.  We continue to recommend that reviewing supervisors closely review the VSCFs and CAD printouts and address such deficiencies.  The number of inconsistencies did not affect MCSO's rate of compliance.

WAI 70542

During our April 2016 site visit, we discussed with MCSO the possibility of using the CAD printout instead of the TraCS data to determine stop times. We determined that using the CAD system to determine stop end times created additional challenges. However, MCSO decided to use the CAD printout to determine traffic stop beginning and ending times for data analysis. MCSO issued Administrative Broadcast 16-62 on June 29, 2016, which indicated that, beginning with the July 2016 traffic stop data collection, the stop times captured on the CAD system would be used for reporting and analytical purposes.

Occasionally, the CAD time of stop and end of stop time do not exactly match those listed on the Vehicle Stop Contact Form, due to extenuating circumstances the deputy may encounter. During this reporting period, we did not find any instances where the end time on the VSCF Contact differed significantly from the CAD printout. In monthly audits of traffic stop data, the Audits and Inspections Unit (AIU) reviews the beginning/ending times of the stops and requires that BIO Action Forms are generated by the Districts when there are discrepancies. The CAD system is more reliable than the VSCF in determining stop times, as it is less prone to human error. When the deputy verbally advises dispatch that s/he is conducting a traffic stop, the information is digitally time-stamped into the CAD system without human input; and when the deputy clears the stop, s/he again verbally advises dispatch.

MCSO remains in compliance with this Subparagraph.

Paragraph 54.c. requires MCSO to document the license plate and state of the subject vehicle. During this reporting period, in each of the 105 stops that were reviewed, the deputies properly documented the license plate information on the VSCFs and the citations prepared for the stops.

MCSO remains in compliance with this Subparagraph, with a compliance rate of 100%.

Paragraph 54.d. requires MCSO to document the total number of occupants in the vehicle when a stop is conducted. The VSCF, completed by the deputy on every traffic stop, is used to capture the total number of occupants and contains a separate box on the form for that purpose. EB-2 (Traffic Stop Data Collection) requires deputies to collect data on all traffic stops using the VSCF; this includes incidental contacts with motorists.

In 34 of the 105 traffic stops we reviewed, the driver had one or more passengers in the vehicle (47 total passengers). In 33 of the 34 cases, our review determined that the deputies properly documented the total number of occupants in the vehicles. In one case, there were two passengers that were not listed on the VSCF. The driver was listed as the sole occupant.

With a compliance rate of 97%, MCSO remains in compliance with this Subparagraph.

Paragraph 54.e. requires MCSO to document the perceived race, ethnicity, and gender of the driver and any passengers, based on the deputy's subjective impression. (No inquiry into the occupant's ethnicity or gender is required or permitted.) In 34 of the 105 stops from the traffic stop data sample, there was more than one occupant in the vehicle (55 total passengers).

Fifty-six, or 53%, of the 105 traffic stops involved white drivers. Thirty-one, or 30%, of the 105 stops involved Latino drivers. Ten, or 10%, of the 105 traffic stops involved Black drivers. Five, or 5%, of the 105 traffic stops involved Asian or Pacific Islander drivers. Three, or 3%, of the 105 traffic stops involved an American Indian/Alaskan Native American driver. Fifty-seven

WAI 70543

traffic stops, or 54%, resulted in citations.  The breakdown of those motorists issued citations is as follows: 27 white drivers (47% of the drivers who were issued citations); 17 Latino drivers (30% of the drivers who were issued citations); eight Black drivers (14% of the drivers who were issued citations); three Asian or Pacific Islander drivers (5% of the drivers who were issued citations); and two American Indian/Alaskan Native American drivers (4% of the drivers who were issued citations).  Forty-eight, or 46%, of the 105 traffic stops we reviewed resulted in a written warning.  The breakdown of those motorists issued warnings is as follows: 29 white drivers (60% of the drivers who were issued warnings); 14 Latino drivers (30% of the drivers who were issued warnings); two Black drivers (4% of the drivers who were issued warnings); two Asian or Pacific Islander drivers (4% of the drivers who were issued warnings); and one American Indian/Alaskan Native American driver (2% of the drivers who were issued warnings).

In our sample of 30 traffic stops that contained body-worn camera recordings, we determined that the deputies accurately documented the perceived race, ethnicity, and gender of the passengers in each of the stops.  In our review of cases to assess compliance with Paragraphs 25 and 54, we identified one stop where the deputy indicated that the driver was the only occupant of the vehicle. Based on our review, there were two passengers in the rear seat, a male and a female.  AIU identified this issue as well and required that a BIO Action Form be prepared documenting any corrective action taken.  In our review of cases to assess compliance with Paragraph 54.k., passenger contacts, we identified one stop in which a deputy did not accurately document the perceived gender of one of the vehicle's passengers.  In that case, the deputy requested the passenger's driver's license, which the passenger did not have.  The passenger's gender was listed as a female.  However, based on our review of the body-worn camera video recording, the passenger appeared to be a male.  In addition, during the stop the deputy made a reference to the passenger, identifying the passenger as a male.  We notified MCSO of this error, and MCSO informed us that the deputy corrected the VSCF to reflect the proper gender of the passenger.

This Paragraph requires deputies to document the perceived race, ethnicity, and gender of any passengers whether contact is made with them or not.  There were some instances where deputies indicated that they were unable to determine the gender and ethnicity of a passenger and listed the passenger as "unknown-vision obscured."  During our review of the body-worn camera recordings, we were also unable to get a clear view of the some of the passengers, often due to vehicle being equipped with dark tinted windows combined with the stop occurring during nighttime hours; or due to vehicle being equipped with dark tinted windows combined with the glare of the sun during daytime hours.

During the second quarter of 2019, AIU commenced conducting the Post-Stop Perceived Ethnicity Inspection.  This inspection is conducted on a monthly basis and includes: 1) a review of traffic stops where the deputy documented the driver as being white and the driver's surname is Latino; 2) a review of traffic stops where the deputy documented that the driver has a Latino surname with a passenger listed as "unknown-vision obscured;" and 3) a review of traffic stops where the deputy documented that the driver was Latino and the passengers were listed with a designated ethnicity on the VSCF.  AIU continues to conduct these inspections on a monthly basis.  AIU requires that the Districts prepare BIO Action Forms to address any issues identified.

MCSO remains in compliance with this requirement.

WAI 70544

Paragraph 54.f. requires that MCSO record the name of any individual upon whom the deputy runs a license or warrant check (including the subject's surname). Our review determined that the deputies properly documented the name of each individual on the VSCF when a license or warrant check was conducted.

MCSO's compliance rate with this requirement is 100%. MCSO remains in compliance with this Subparagraph.

Paragraph 54.g. requires the deputy to document whether contact was made with any passengers, the nature of the contact, and the reasons for the contact. During the third quarter of 2019, MCSO requested that we increase the number of cases reviewed to identify additional stops that fit the criteria of this Paragraph. The sample size of cases to be reviewed was increased from 10 stops each month to 35 stops each month, commencing with August 2019. During some months, the number of traffic stops that involve deputies having contact with passenger is fewer than 35 traffic stops.

During our assessment, we specifically review traffic stops that include any instance where the deputy asks any questions of a passenger beyond a greeting, including asking passengers to identify themselves for any reason or requesting that they submit to a Preliminary Breath Test. In such instances, we determine if the passenger was issued one of the following: Incidental Contact Receipt, citation, or a warning. If the passenger was not issued any one of the following documents, it adversely impacts MCSO's compliance with this requirement. It is also important to note that in such instances where a deputy fails to issue one of the required documents after being involved in a passenger contact, it is a violation of MCSO's policy.

To ensure that deputies are accurately capturing passenger information and to verify if passengers are contacted, we compare the number of passengers listed by the deputy with the number of passengers entered in the passenger drop-down box on the Vehicle Stop Contact Form. We also review any Incidental Contact Receipts, citations, or warnings issued to passengers by deputies. We also review the deputies' notes on the VSCF, the Arizona Citation, and the CAD printout for any information involving the passengers. We review MCSO's I/Viewer System and the Justice Web Interface (JWI) to verify if a records check was requested for the driver or any passengers.

All passenger contacts in the traffic stops we reviewed for Paragraphs 25.d. and 54.g were noted in the VSCFs. For this reporting period, we identified 78 traffic stops where the deputy had interaction with one or more passengers which required the issuance of either an Incidental Contact Receipt, a citation, or a warning. Of the 78 stops, there were 14 stops where we determined that a passenger, or passengers, were not provided with either an Incidental Contact Receipt, a citation, or a warning, as required by MCSO policy. For the remaining 64 stops, the passengers were properly provided with either an Incidental Contact Receipt, a citation, or a warning. Although not as frequently as in the past, we continue to be provided with Incidental Contact Receipts for some of the stops when, based on our reviews of the body-worn camera recordings, the documents were not provided to the passengers prior to the conclusion of the stop. In these instances, there were no exigent or unusual circumstances that precluded the issuance of the documents.

WAI 70545

There were 11 cases identified in the stops that we reviewed for Paragraph 54.k. in which the passengers were contacted which required the issuance of either an Incidental Contact Receipt, a citation, or a warning.  In each of the 11 stops, we determined that the passenger or passengers were properly provided with either an Incidental Contact Receipt, a citation, or a warning, as required by MCSO policy.

There were not any cases identified in the stops that we reviewed for Paragraphs 25 and 54 in which passengers were contacted, which required the issuance of either an Incidental Contact Receipt, a citation, or a warning.

MCSO continues to conduct internal inspections to review its own sample of passenger contacts during traffic stops.  In any instances where issues are identified, AIU issues BIO Action Forms to the Districts to address those deficiencies.

As noted in some of the cases above, deputies have not been consistent in preparing and providing passengers with Incidental Contact Receipts during traffic stops in which the passenger is contacted and asked by the deputy to provide identification.  Supervisors should identify such errors and omissions during their reviews of the VSCFs and take corrective action.  In previous reporting periods, MCSO has informed us that some supervisors have identified incidents where deputies have failed to provide the Incidental Contact Receipts and then had the deputies mail the receipts.  However, the documentation that the receipts have been mailed is not listed on the VSCFs.  During this reporting period, MCSO informed us that a request has been made to modify the TraCS system so that when a deputy prepares the Vehicle Stop Contact Form and uses the passenger contact field, a prompt will appear to instruct the deputy to prepare the Incidental Contact Receipt.  We will follow up with MCSO regarding the status of the requested modifications.

During the third quarter of 2022, MCSO provided the Incidental Contact Receipt, a citation, or a warning, when required in 85% of the cases.  During the first quarter of 2023, MCSO provided the Incidental Contact Receipt, a citation, or a warning, when required in 85% of the cases.  During this reporting period, MCSO provided the Incidental Contact Receipt, a citation, or a warning, when required in 84% of the cases.  MCSO is not in compliance with this Subparagraph.

Paragraph 54.h. requires deputies to record, prior to the stop, the reason for the vehicle stop, including a description of the traffic or equipment violation observed, and any indicators of criminal activity developed before or during the stop.  For this reporting period, we identified a random sample of 10 cases from the 35 cases we initially requested each month, and requested CAD audio and body-worn camera footage for those cases.  We listened to CAD dispatch audio recordings, reviewed the CAD printouts, and reviewed body-worn camera recordings for 30 traffic stops from the sample of 105 traffic stops used for this review; and found that the deputies advised Communications of the reason for the stop, location of the stop, license plate, and state of registration for all 30 stops.

For the remaining 75 traffic stops where body-worn camera recordings and CAD audiotapes were not requested, we review the CAD printout and the VSCF to ensure that the reason for the stop has been captured.  These forms are included in our monthly sample requests.  The dispatcher enters the reason for the stop in the system as soon as the deputy verbally advises Communications

WAI 70546

of the stop, location, and tag number.  The VSCF and the CAD printout document the time the stop begins and when it is concluded – either by arrest, citation, or warning.  Deputies need to be precise when advising dispatch of the reason for the traffic stop, and likewise entering that information on the appropriate forms.

MCSO's compliance rating for this Subparagraph is 100%.

Paragraph 54.i. requires deputies to document the time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; the time a release was made without a citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere, or the deputy's departure from the scene.  In our review of the documentation provided by MCSO, the CAD printouts, the Vehicle Stop Contact Forms, along with the E-Ticketing system and the Arizona Ticket and Complaint Form, the information required is effectively captured.  As we noted in Subparagraph 54.b., the stop times on the CAD printout and the Vehicle Stop Contact Form vary slightly on occasion.  We understand that this may occur due to extenuating circumstances, and we will report on those instances where there is a difference of five minutes or more from either the initial stop time or the end time.

We review the circumstances of each stop and the activities of the deputies during each stop to assess whether the length of the stop was justified.  During this reporting period, we did not identify any stops that were extended for an unreasonable amount of time.

Supervisors are required to conduct reviews of the VSCFs within 72 hours of the stop.  In each of the 105 VSCFs reviewed, the supervisors conducted timely reviews.  Deputies accurately entered beginning and ending times of traffic stops in all 105 cases reviewed.  MCSO accurately entered the time citations and warnings were issued in each of the 105 cases reviewed.

MCSO remains in compliance with this Subparagraph.

Paragraph 54.j. requires MCSO to document whether any inquiry as to immigration status was conducted and whether ICE/CBP was contacted, and if so, the facts supporting the inquiry or contact with ICE/CBP, the time supervisor approval was sought, the time ICE/CBP was contacted, the time it took to complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual.

On November 7, 2014, a United States District Court Judge issued an Order permanently enjoining enforcement of Arizona Revised Statute (A.R.S.) 13-2319, commonly referred to as the Arizona Human Smuggling Act.  On November 17, 2014, MCSO issued Administrative Broadcast 14-75, prohibiting deputies from enforcing the above state statute, including arresting, detaining, or questioning persons for suspected (or even known) violations of the act and from extending the duration of traffic stops or other deputy-civilian encounters to do so.

We reviewed 105 traffic stops submitted for this Paragraph, and found that none of the stops involved any contacts with ICE/CBP.  None of the stops we reviewed involved any inquiries as to immigration status.  In addition, our reviews of Incident Reports and Arrest Reports conducted as part of the audits for Paragraphs 89 and 101 revealed no immigration status investigations.  MCSO remains in compliance with this Subparagraph.  In addition, we monitor any complaints

WAI 70547

involving any traffic stops that contain an allegation that the race/ethnicity of the driver was a factor in how a driver was treated. There were no such allegations identified during this reporting period.

Paragraph 54.k. requires MCSO to document whether any individual was asked to consent to a search (and the response), whether a probable-cause search was performed on any individual, or whether a pat-and-frisk search was performed on any individual.

MCSO provided training to deputies specific to consent searches during the 2019 Annual Combined Training, which included a video that contained a scenario with a verbal exchange between a driver and a deputy who requested a consent search. In addition, on March 10, 2020, MCSO issued Administrative Broadcast Number 20-20, which reemphasized the training segment in relation to consent searches. MCSO's 2022 Annual Combined Training included a lesson plan discussion regarding searches and consent searches; however, the training did not include any specific learning activities or videos specific to consent searches. We continue to recommend that MCSO consider implementing more comprehensive training to ensure that deputies are aware of the proper procedures for conducting consent searches.

The method MCSO currently employs to identify our sample of cases to review is to identify the population of all traffic stops in which searches of individuals were documented on the VSCF. Once that population is identified, a random sample of 35 traffic stops from each month is identified for review. During some months, the number traffic stops that involve searches of persons is less than 35 traffic stops. In addition, we also review any cases in which deputies performed searches of individuals in the sample of 105 traffic stops reviewed to assess compliance with Paragraphs 25 and 54 and the sample of traffic stops reviewed to assess compliance with Subparagraphs 25.d. and 54.g. When we identify issues that impact compliance or where MCSO policy was not followed, we provide the list of cases to MCSO for review.

In the sample of traffic stops that we reviewed to assess compliance with Subparagraph 54.k, we identified 11 stops involving the search of the drivers and/or passengers. In 10 of the 11 cases, the deputies properly documented the searches on the VSCF. In one case, a deputy conducted a pat-and-frisk search of the driver. The search was not documented on the VSCF.

During this reporting period, there were four stops involving the search of a person identified in the sample of traffic stops reviewed to assess compliance with Subparagraphs 25.d. and 54.g. In each of the four cases, the deputies properly documented the searches on the VSCF.

During this reporting period, there was one stop involving the search of a person identified in the sample of traffic stops reviewed to assess compliance with Paragraphs 25 and 54. The deputy properly documented the search on the VSCF.

The total number of searches of persons assessed during this reporting period was six. In each of the six cases, the deputies properly documented the searches of the vehicle occupants on the VSCFs.

MCSO continues to conduct internal inspections to review its own sample of searches of vehicle occupants during traffic stops. In any instances where issues are identified, AIU issues BIO Action Forms to the Districts to address those deficiencies.

WAI 70548

During the third quarter of 2022, MCSO attained a compliance rating of 100% and MCSO remained in compliance with this requirement.  During the fourth quarter of 2022, MCSO attained a compliance rating of 100%.  During this first quarter of 2023, MCSO attained a compliance rating of 100%.  During this reporting period, MCSO attained a compliance rating of 94%.  MCSO remains in compliance with this requirement.

Paragraph 54.l. requires MCSO to document whether any contraband or evidence was seized from any individual, and the nature of the contraband or evidence.  Generally, deputies seize the following types of contraband and/or evidence, which is documented on the VSCF, a Property Receipt, and an Incident Report: license plates; driver's licenses; alcoholic beverages; narcotics; narcotic paraphernalia; weapons; and ammunition.  We conduct a review of the relevant documents and review the VSCF to ensure that deputies properly document the seizure of the evidence and/or contraband.

During our review of the collected traffic stop data (our sample of 105) during this reporting period, there were six items seized and placed into evidence by deputies.  All six of the seized items were properly documented on the VSCFs, as required by MCSO policy.

In the cases we reviewed for searches of individuals under Subparagraph 54.k., there were 40 items seized by deputies and placed into evidence.  Of those 40 items, there were six items that were seized and placed into evidence and the items were not properly listed on the VSCFs, as required by MCSO policy.

In the cases we reviewed for passenger contacts under Subparagraph 54.g., there were 19 items seized by deputies and placed into evidence.  Of those 19 items, there was one item that was seized and placed into evidence and the item was not properly listed on the VSCF, as required by MCSO policy.

During the third quarter of 2022, MCSO attained a compliance rating of 93%.  During the fourth quarter of 2022, MCSO attained a compliance rating of 87%.  During the first quarter of 2023, MCSO attained a compliance rating of 88%.  During this reporting period, MCSO attained a compliance rating of 89%.  MCSO is not in compliance with this requirement.

Paragraph 54.m. requires the documentation of the final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without a citation.  In all 105 cases we reviewed, we found documentation indicating the final disposition of the stop; and whether the deputy made an arrest, issued a citation, issued a warning, or made a release without a citation.  MCSO remains in compliance with this Subparagraph.

MCSO has failed to achieve compliance with all of the Subparagraphs of Paragraph 54.  MCSO is not in compliance with Paragraph 54.

WAI 70549

***Paragraph 55.*** *MCSO shall assign a unique ID for each incident/stop so that any other documentation (e.g., citations, incident reports, tow forms) can be linked back to the stop.*

**In Full and Effective Compliance**

To verify compliance for this Paragraph, we reviewed a sample of the Vehicle Stop Contact Forms, CAD printouts, I/Viewer documentation, citations, warning forms, and any Incident Report that may have been generated as a result of the traffic stop.

The unique identifier "went live" in September 2013 when the CAD system was implemented. This number provides the mechanism to link all data related to a specific traffic stop. The number is automatically generated by the CAD software and is sent to the deputy's MDT at the time the deputy advises Communications of the traffic stop. The unique identifier is visible and displayed at the top of the CAD printout and also visible on the Vehicle Stop Contact Form, the Arizona Traffic Citation, and the Warning/Repair Form.

Once the deputy scans the motorist's driver's license, the system automatically populates most of the information into one or more forms required by the Order. If the data cannot be entered into TraCS from the vehicle (due to malfunctioning equipment), policy requires the deputy to enter the written traffic stop data electronically prior to the end of the shift. The start and end times of the traffic stop are now auto-populated into the Vehicle Stop Contact Form from the CAD system.

Since our first visit for monitoring purposes in June 2014, TraCS has been implemented in all Districts; and the unique identifier (CFS number) is automatically entered from the deputy's MDT. No user intervention is required.

To determine compliance with this requirement, we reviewed 105 traffic stop cases and reviewed the CAD printouts and the Vehicle Stop Contact Forms for all stops. We reviewed the Warning/Repair Forms, when applicable, for those stops where a warning was issued or the vehicle had defective equipment. The unique identification number assigned to each event was listed correctly on all CAD printouts for every stop. A review was conducted of the Tow Sheets prepared by deputies in instances where a driver's vehicle was towed. In each instance, the unique identification number assigned to each event was listed correctly on the Tow Sheet. A review of the Incident Reports prepared by deputies in instances where policy requires the preparation of the report was conducted. In each instance, the unique identification number assigned to each event was listed correctly on the Incident Report. MCSO remains in compliance with this requirement.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70550

***Paragraph 56.*** *The traffic stop data collection system shall be subject to regular audits and quality control checks. MCSO shall develop a protocol for maintaining the integrity and accuracy of the traffic stop data, to be reviewed by the Monitor pursuant to the process described in Section IV.*

**Phase 1:** In compliance

- EB-2 (Traffic Stop Data Collection), most recently amended on February 22, 2023.

- Traffic Stop Analysis Unit Operations Manual, published on October 13, 2022.

**Phase 2:** In compliance

As discussed in Paragraph 25, improvements since 2015 to the TraCS system have enhanced the reliability and validity of the traffic stop data. These improvements were memorialized in the Traffic Stop Analysis Unit (TSAU) Operations Manual, which was finalized following the successful completion of the TSMR pilot program in October 2022 and the publication of all relevant sections of this document. The most significant portions of the manual that address data quality control processes – Sections 304, 305, and 306 – have been approved since 2018 and 2019. These processes include three distinct areas. One is the data-handling procedures (Section 304), which involve the transfer of data files between administrative units with MCSO for the purpose of data analysis and reporting to ensure that data variables are properly understood. Another process involves the software change control processes (Section 305), which is used by MCSO's Technology Management Bureau to manage software changes that affect traffic stop data variables. Finally, the other process involves the data verification process (Section 306), which involves validating data variables used for the periodic analyses (monthly, quarterly, and annual) discussed in Paragraphs 64, 65, and 66. In general, the EIU and Technology Management Bureau hold monthly meetings (de-confliction meetings) focused on the data-handling procedures and the software changes. In addition, each month, MCSO produces documents generated from the deconfliction meetings to apprise us and the Parties of any issues or modifications to the data processes. During this quarter there were no issues that arose, but we were informed that new applications were completed for CAD and GIS data. EIU manages the data validation process before running periodic analyses.

With the advent of the TSMR pilot in 2021, EIU refined its data-cleaning procedures to ensure a timelier review of the monthly data to correct problems with certain traffic stop location information (X,Y coordinates). Additionally, following months of discussions between representative experts, in February 2022, MCSO adopted alternative methods for refining stop location and the timing of stops (spline procedures) that make comparisons between deputy stops much more accurate. More recently, MCSO found that special assignment traffic stops were undercounted in past annual reports and has published an analysis (Traffic Stop Quarterly Report 9), discussing the undercount, the impact this has had on past annual and monthly reports, and how to improve training and policy to identify such stops more easily in future analyses. The cleaning procedures MCSO has adopted are an enhancement of the quality control process and ensure timely reviews of data to support monthly analyses of traffic stop data. (See Paragraph 64.) MCSO consistently advises us of problems it identifies from these reviews and actions it takes to ensure data veracity following the specific protocols delineated in the TSAU Operations

WAI 70551

Manual.  As such, based upon findings from prior Quarterly Traffic Stop Reports (TSQRs 3 and 4), MCSO added two new Extended Traffic Stop Indicators (ETSIs) to the drop-down box on VSCFs (license and "other issues") that identify issues that may elongate traffic stops.  MCSO also amended the data dictionary to include a new special assignment field on the VSCF that will more accurately collect special assignment dates.  Deputies are expected to explain these extended stops and special assignment stops with clarifying comments.  We will continue to examine the use of these fields in our reviews of the traffic stop samples selected each month.

MCSO also conducts audits of the 105 traffic stop sample that we request each reporting period. MCSO conducts more expansive reviews of 30 of the 105 sample pulls we request each reporting period to include passenger contacts and persons' searches.  EB-2 (Traffic Stop Data Collection) also requires regularly scheduled audits of traffic stop data on a monthly basis.  We reviewed BIO's monthly audits of the traffic samples for this quarter and found them to be thorough.  Our compliance calculations for this period were slightly lower due to the fact that we do not employ a matrix to assess compliance, but rather deem individual cases as deficient if any significant information is determined not to be consistent across traffic stop forms or CAD data.  MCSO reported compliance rates exceeding 99% for the quarter, while our calculations were 85.8%, 94.1%, and 91.4% respectively for April-June.  The deficiencies pertained to reasons for the stop, missing or incorrect contact conclusions, and license plate mismatches.

Administrative Broadcast 15-96 addresses the security of paper traffic stop forms.  The procedure requires that paper forms (traffic stop documentation that may be handwritten by deputies in the field if the TraCS system is nonoperational due to maintenance or lack of connectivity) be stored in a locked cabinet and overseen by the Division Commander.  Because of the COVID-19 pandemic, we have been unable to travel to Maricopa County and visit the Districts to verify that all records remain locked and secure, that logs are properly maintained, and that only authorized personnel have access to these files.  However, we note that MCSO has a consistent and long-standing track record of complying with this requirement.

***Paragraph 57.***  *MCSO shall explore the possibility of relying on the CAD and/or MDT systems to check if all stops are being recorded and relying on on-person recording equipment to check whether Deputies are accurately reporting stop length.  In addition, MCSO shall implement a system for Deputies to provide motorists with a copy of non-sensitive data recorded for each stop (such as a receipt) with instructions for how to report any inaccuracies the motorist believes are in the data, which can then be analyzed as part of any audit.  The receipt will be provided to motorists even if the stop does not result in a citation or arrest.*

**In Full and Effective Compliance**

To verify compliance for this Paragraph, we reviewed all TraCS forms for each traffic stop that were included in the sample.  In addition, we reviewed a subset of CAD audio recordings and body-worn camera footage of the stops.

WAI 70552

The system for providing "receipts" is outlined in EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) and EB-2 (Traffic Stop Data Collection).  GJ-35 addresses the requirement that supervisors review recordings to check whether deputies are accurately reporting stop length.  In addition to GJ-35, BIO developed a Body-Worn Camera Matrix for its inspectors to review camera recordings.

The deputy should provide every person contacted on a traffic stop with an Arizona Traffic Ticket or Complaint (Citation), a Written Warning/Repair Order (Warning), or an Incidental Contact Receipt.  For this reporting period, in each of the 105 cases reviewed, deputies issued either citations, written warnings or Incidental Contact Receipts.

For the cases reviewed under Subparagraphs 25.d. and 54.g., contact with passengers, we did not identify any issues with the citations, warnings, and Incidental Contact Receipts issued to drivers.

For the cases reviewed under Subparagraph 54.k., searches of persons, we did not identify any issues with the citations, warnings, and Incidental Contact Receipts issued to drivers.

MCSO's compliance rate with this requirement is 100%.  MCSO remains in compliance with this portion of the Subparagraph.

The approved policies dictate that the CAD system will be used for verification of the recording of the initiation and conclusion of the traffic stop and that MCSO will explore the possibility of relying on the body-worn camera recordings to verify that the stop times reported by deputies are accurate.  The deputy verbally announces the stop's initiation and termination on the radio, and then CAD permanently records this information.  In May 2016, MCSO advised us that all deputies and sergeants who make traffic stops had been issued body-worn cameras and that they were fully operational.  We verified this assertion during our July 2016 site visit; and since that time, we have been reviewing the body-worn camera recordings to determine if stop times indicated by CAD were accurate.  MCSO's Audit and Inspections Unit (AIU) conducts monthly inspections of traffic stop data, which includes an assessment as to whether the body-worn camera video captured the traffic stop in its entirety; to verify the time the stop began; and to verify if all information on forms prepared for each traffic stop match the body-worn camera video.  AIU conducts reviews of 30 body-worn camera recordings each reporting period.

During this reporting period, we requested from MCSO 30 body-worn camera recordings for our review.  We are able to use the body-worn camera recordings that were provided for each stop to assess whether deputies are accurately reporting the stop length.  The compliance rate for the sample of 30 cases selected from the 105 stops reviewed for using the body-worn camera recordings to determine if deputies are accurately reporting stop length is 100%.  MCSO remains in compliance with this requirement.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70553

***Paragraph 58.*** *The MCSO shall ensure that all databases containing individual-specific data comply with federal and state privacy standards governing personally identifiable information. MCSO shall develop a process to restrict database access to authorized, identified users who are accessing the information for a legitimate and identified purpose as defined by the Parties. If the Parties cannot agree, the Court shall make the determination.*

**In Full and Effective Compliance**

To verify compliance for this Paragraph, we reviewed the applicable policies and requested that Technology Management Bureau personnel provide us with information regarding any unauthorized access and/or illegitimate access to any of MCSO's database systems that had been investigated by PSB. The policies state that the dissemination of Criminal History Record Information (CHRI) is based on federal guidelines, Arizona statutes, the Department of Public Safety (AZDPS), and the Arizona Criminal Justice Information System (ACJIS); and that any violation is subject to fine. No secondary dissemination is allowed. The policies require that the Professional Standards Bureau (PSB) provide written notification to the System Security Officer whenever it has been determined that an employee has violated the policy by improperly accessing any Office computer database system. Every new recruit class receives three hours of training on this topic during initial Academy training.

During this reporting period, we inquired whether there had been any instances of unauthorized access to and/or any improper uses of the database systems. MCSO informed us that there were three cases identified that met the criteria for this Paragraph. In each of the three cases, there was a finding of improper conduct; however, each of the employees resigned before discipline could be imposed.

On June 22, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

***Paragraph 59.*** *Notwithstanding the foregoing, the MCSO shall provide full access to the collected data to the Monitor and Plaintiffs' representatives, who shall keep any personal identifying information confidential. Every 180 days, MCSO shall provide the traffic stop data collected up to that date to the Monitor and Plaintiffs' representatives in electronic form. If proprietary software is necessary to view and analyze the data, MCSO shall provide a copy of the same. If the Monitor or the Parties wish to submit data with personal identifying information to the Court, they shall provide the personally identifying information under seal.*

**In Full and Effective Compliance**

Electronic traffic stop data capture began on April 1, 2014. The forms created by MCSO capture the traffic stop details required by MCSO policy and Paragraphs 25 and 54. BIO provides the traffic stop data on a monthly basis, which includes a spreadsheet of all traffic stops for the reporting period, listing Event Numbers as described at the beginning of Section 7. All marked patrol vehicles used for traffic stops are now equipped with the automated TraCS system, and all Patrol deputies have been trained in TraCS data entry. MCSO has provided full access to all

WAI 70554

available electronic and written data collected since April 1, 2014. MCSO did not collect electronic data before this time. During this reporting period, MCSO has continued to provide full access to the traffic stop data.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

### b. Electronic Data Entry

**Paragraph 60.** *Within one year of the Effective Date, the MCSO shall develop a system by which Deputies can input traffic stop data electronically. Such electronic data system shall have the capability to generate summary reports and analyses, and to conduct searches and queries. MCSO will explore whether such data collection capability is possible through the agency's existing CAD and MDT systems, or a combination of the CAD and MDT systems with a new data collection system. Data need not all be collected in a single database; however, it should be collected in a format that can be efficiently analyzed together. Before developing an electronic system, the MCSO may collect data manually but must ensure that such data can be entered into the electronic system in a timely and accurate fashion as soon as practicable.*

**In Full and Effective Compliance**

To verify compliance with this Paragraph, we reviewed the documents generated electronically that capture the required traffic stop data. The electronic data entry of traffic stop data by deputies in the field went online on April 1, 2015. If TraCS experiences a malfunction in the field, there is a protocol that requires the deputy to electronically enter the traffic stop data prior to the end of the shift.

MCSO continues to conduct monthly traffic stop inspections and forwards them for our review. Initially, the traffic stop data was captured on handwritten forms created by MCSO, completed by the deputy in the field, and manually entered into the database by administrative personnel located at each District. Now all traffic stop data is entered electronically, whether in the field or at MCSO District offices. Occasionally, connectivity is lost in the field due to poor signal quality, and citations are handwritten. Per policy, deputies must enter electronically any written traffic stop data they have created by the end of the shift in which the event occurred. As noted in our Paragraph 90 review, VSCFs are routinely entered into the system by the end of the shift.

Deputies have demonstrated their ability to access and use TraCS, as evidenced by the fact that their total time on a traffic stop averages 16 minutes or less.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70555

*c. Audio-Video Recording of Traffic Stops*

***Paragraph 61.*** *The MCSO will issue functional video and audio recording equipment to all patrol deputies and sergeants who make traffic stops, and shall commence regular operation and maintenance of such video and audio recording equipment. Such issuance must be complete within 120 days of the approval of the policies and procedures for the operation, maintenance, and data storage for such on-person body cameras and approval of the purchase of such equipment and related contracts by the Maricopa County Board of Supervisors. Subject to Maricopa County code and the State of Arizona's procurement law, The Court shall choose the vendor for the video and audio recording equipment if the Parties and the Monitor cannot agree on one.*

**In Full and Effective Compliance**

During our September 2014 site visit, we met with two MCSO Deputy Chiefs and other personnel to discuss MCSO's progress of acquiring in-car video and audio equipment for all patrol vehicles used to conduct traffic stops. MCSO had initially set out to purchase fixed in-car cameras as required by the Order, but expressed an interest in acquiring body-worn video and audio recording devices for deputies. The Court issued an Order providing an amendment/stipulation on October 10, 2014, requiring on-body cameras. This was a prudent decision, in that it allows for capturing additional data, where a fixed mounted camera has limitations. We have documented MCSO's transition from in-car to body-worn cameras in our previous quarterly status reports.

Records indicate that MCSO began distribution of body-worn cameras on September 14, 2015, and full implementation occurred on May 16, 2016. The body-worn camera recordings are stored in a cloud-based system (on evidence.com) that can be easily accessed by supervisors and command personnel. The retention requirement for the recordings is three years. In July 2019, MCSO began distribution of the newer version of body-worn cameras to deputies. During our October 2019 site visit, MCSO reported that deputies assigned to the Districts have all been equipped with the new body-worn cameras; and that deputies in specialized assignments were being equipped with the new devices. The new version of body-worn cameras purchased by MCSO is mounted on the chest area via a magnetic mount.

To verify that all Patrol deputies have been issued body-worn cameras, and that they properly use the devices, we review random samples of the traffic stops as described in Paragraphs 25 and 54. In addition, during our District visits in January 2020, we observed that deputies were equipped with body-worn cameras. Since that time, we have been unable to travel to Maricopa County and visit the Districts to observe deputies being equipped with the body-worn cameras. However, it is clear that MCSO maintains a robust deployment of body-worn cameras, given the ready availability of recordings for our review, and our observations of deputies properly wearing the cameras in the videos we inspect. Our inspections will commence once our in-person site visits resume.

On December 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70556

***Paragraph 62.*** *Deputies shall turn on any video and audio recording equipment as soon the decision to initiate the stop is made and continue recording through the end of the stop.  MCSO shall repair or replace all non-functioning video or audio recording equipment, as necessary for reliable functioning.  Deputies who fail to activate and to use their recording equipment according to MCSO policy or notify MCSO that their equipment is nonfunctioning within a reasonable time shall be subject to Discipline.*

**In Full and Effective Compliance**

MCSO evaluated on-person body cameras from other jurisdictions and selected a vendor (TASER International, now known as Axon).  Body-worn cameras have been implemented in all Districts since May 2016 and are fully operational.  As mentioned under Paragraph 61, MCSO has obtained, and has equipped the deputies in the Districts with new body-worn cameras, also provided by Axon.

To verify compliance for this Paragraph, we reviewed the body-worn camera recordings included in our monthly samples.  This includes the stops reviewed each month for Paragraphs 25 and 54; the stops reviewed each month for Subparagraph 54.k.; and the stops reviewed each month for Subparagraph 54.g.  For purposes of calculating compliance, we exclude any stops where the deputies documented on the VSCF that the body-worn cameras malfunctioned during the stop.

For our selection of a sample to review body-worn camera recordings, we used the same sample of 30 cases we selected for the CAD audio request.  In each of the stops that were reviewed, the deputies properly activated the body-worn cameras during the traffic stop events.

In our sample of body-worn camera recordings reviewed for Subparagraph 54.k., in each of the stops that were reviewed, the deputies properly activated the body-worn cameras during the traffic stop events.

In our sample of body-worn camera recordings for Subparagraph 54.g., in each of the stops that were reviewed, the deputies properly activated the body-worn cameras during the traffic stop events.

MCSO's compliance rate for this requirement is 100%.

There are still a number of instances in which deputies respond to assist at traffic stops and do not complete the Assisting Employee and/or Volunteer Log.  We include this assessment, although it is only a MCSO policy requirement and not a requirement of this Paragraph, to provide MCSO with the issues that we have identified on this topic.  With the issuance of GJ-35 (Body-Worn Cameras), effective on December 31, 2019, the policy is now consistent with EB-2 (Traffic Stop Data Collection), which requires that each deputy assisting on a traffic stop prepare the Assisting Employee and/or Volunteer Log.  We had anticipated that the policy clarification, coupled with effective supervisory reviews, would assist deputies in understanding when they are required to complete the log.  However, we continue to identify instances where the log was not prepared when required.  In our review of traffic stops in relation to Paragraphs 25 and 54, we noted that there were 20 assisting deputies who properly prepared the Assisting Employee and/or Volunteer Log, and three assisting deputies that failed to prepare the Assisting Employee and/or Volunteer Log.  In our review of the traffic stops in relation to Paragraph 54.k., we noted that 87 assisting

WAI 70557

deputies properly prepared the Assisting Employee and/or Volunteer Log and that 24 assisting deputies did not prepare the Assisting Employee and/or Volunteer Log.  In our review of traffic stops in relation to Paragraphs 25.d. and 54.g., we noted that 91 assisting deputies properly prepared the Assisting Employee and/or Volunteer Log and that 19 assisting deputies did not prepare the Assisting Employee and/or Volunteer Log.  The rate of deputies complying with MCSO's policy requiring completion of the Assisting Employee and/or Volunteer Log is 82%. We continue to request that MCSO supervisors hold deputies accountable for preparing the Assisting Employee and/or Volunteer Log as required by MCSO policy.

Our reviews of the body-worn camera recordings often reveal instances of deputies exhibiting positive, model behavior; and, at times, instances of deputies making errors, or exhibiting less than model behavior – all of which would be useful for training purposes.  We also reviewed the Professional Standards Bureau's monthly summaries of closed cases for April-June 2023.  There continue to be examples of body-worn camera recordings assisting the investigators in making determinations as to whether deputies acted in accordance with MCSO policy.  In some instances, deputies were found to have acted inconsistent with policy; and in some instances, it was determined that the allegations against the deputies were false.  Body-worn cameras recordings have proven to be invaluable in resolving complaints alleging misconduct by deputies.

On January 6, 2023, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

**Paragraph 63.**  *MCSO shall retain traffic stop written data for a minimum of 5 years after it is created, and shall retain in-car camera recordings for a minimum of 3 years unless a case involving the traffic stop remains under investigation by the MCSO or the Monitor, or is the subject of a Notice of Claim, civil litigation or criminal investigation, for a longer period, in which case the MCSO shall maintain such data or recordings for at least one year after the final disposition of the matter, including appeals.  MCSO shall develop a formal policy, to be reviewed by the Monitor and the Parties pursuant to the process described in Section IV and subject to the District Court, to govern proper use of the on-person cameras; accountability measures to ensure compliance with the Court's orders, including mandatory activation of video cameras for traffic stops; review of the camera recordings; responses to public records requests in accordance with the Order and governing law; and privacy protections.  The MCSO shall submit such proposed policy for review by the Monitor and Plaintiff's counsel within 60 days of the Court's issuance of an order approving the use of on-body cameras as set forth in this stipulation.  The MCSO shall submit a request for funding to the Maricopa County Board of Supervisors within 45 days of the approval by the Court or the Monitor of such policy and the equipment and vendor(s) for such on-body cameras.*

**In Full and Effective Compliance**

MCSO developed and issued a protocol and policy that requires the original hardcopy form of any handwritten documentation of data collected during a traffic stop to be stored at the District level and filed separately for each deputy.  When a deputy is transferred, his/her written traffic stop information follows the deputy to his/her new assignment.  During our January 2020 site

WAI 70558

visit, we inspected the traffic stop written data files at District 2 and District 6 to ensure that hardcopies of traffic stop cases are stored for a minimum of five years.  We found that the records were in order and properly secured.  Since that time, we have been unable to travel to Maricopa County and visit the Districts to confirm that all traffic stop written data is being kept in a locked and secure manner and that only authorized personnel have access to the files.  Our inspections will commence once our in-person site visits resume.  MCSO remains in compliance with this requirement.

On June 22, 2020, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

### d. Review of Traffic Stop Data

**Paragraph 64.**  *Within 180 days of the Effective Date, MCSO shall develop a protocol for periodic analysis of the traffic stop data described above in Paragraphs 54 to 59 ("collected traffic stop data") and data gathered for any Significant Operation as described in this Order ("collected patrol data") to look for warning signs or indicia or possible racial profiling or other improper conduct under this Order.*

**Phase 1:**  In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on April 27, 2022.

- EB-2 (Traffic Stop Data Collection), most recently amended on February 22, 2023.

- GJ-33 (Significant Operations), most recently amended on April 6, 2022.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

- GH-5 (Early Identification System), most recently amended on March 28, 2023.

- Traffic Stop Analysis Unit Operations Manual, published October 13, 2022.

**Phase 2:**  In compliance

Due to the incorporation during the first quarter of agreed-upon changes to GH-5 (Early Identification System) that stem from the completion of the TSMR pilot, Attachment A (Event Entry Types), and Attachment C (Supervisor EIS Alert Form), MCSO achieved Phase 1 compliance with this Paragraph.  Since the completion of the TSMR pilot in October 2022, MCSO has continued to share the vetting decisions from the TSMR analysis in a timely fashion, as well as providing documentation each month for closed TSMR cases that proceed beyond the vetting stage.  As a result, MCSO has achieved Phase 2 compliance with this Paragraph.  We will continue to monitor the production of both the vetting and closed case documents as they are produced by MCSO.

WAI 70559

***Paragraph 65.*** *MCSO shall designate a group with the MCSO Implementation Unit, or other MCSO Personnel working under the supervision of a Lieutenant or higher-ranked officer, to analyze the collected data on a monthly, quarterly and annual basis, and report their findings to the Monitor and the Parties.  This review group shall analyze the data to look for possible individual-level, unit-level or systemic problems.  Review group members shall not review or analyze collected traffic stop data or collected patrol data relating to their own activities.*

**Phase 1:**  In compliance

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

- GH-5 (Early Identification System), most recently amended on March 28, 2023.

**Phase 2:**  In compliance

The Traffic Stop Analysis Unit (TSAU) is directly responsible for analyses of traffic stop data on a monthly, quarterly, and annual basis to identify warning signs or indicia or possible racial profiling or other improper conduct as required by Paragraph 64.  MCSO must report TSAU's findings from its analyses to the Monitor and the Parties.

Paragraph 65 requires annual analyses of traffic stop data.  Traffic Stop Annual Report 8 (TSAR8) was published on June 30, 2023; and, as noted in the Sheriff's statement published in conjunction with the analytic report, the findings of disparities continue to identify possible systemic racial bias in MCSO's patrol function.  The Sheriff's statement notes that some of the disparities have been reduced from prior years, and that no disparities were significantly worse than the prior year.  The Sheriff's statement emphasized that investigating the presence of the continued disparities will remain a priority for TSAU in both quarterly and monthly analytic reports.  TSARs are further discussed in Paragraph 66, which requires "one agency-wide comprehensive analysis of the data per year."

Paragraph 65 requires quarterly analyses of traffic stop data.  MCSO completed its first quarterly report (TSQR1) on October 22, 2020.  MCSO has published nine other quarterly reports since that time.

MCSO's latest quarterly report, TSQR11, Low Stop Volume Deputies, was published on June 30, 2023.  The report examines whether the traffic stop outcomes of low-volume deputies differs from their high-volume counterparts.  The report found that 41% of deputies make under 20 stops per year, and those stops (970) represent approximately 5% of all traffic stops for the agency during the year.  MCSO found that low-volume deputies had a lower citation rate than their high-volume counterparts (35.88% vs. 52.41%) but in the process, low-volume deputies contacted a higher proportion of Hispanic drivers (33.4% vs. 23.50%).  However, these differences did not result in findings of significantly greater disparities in the outcomes of white and Hispanic drivers among low-volume deputies, or, in disparities in comparison to their high-volume counterparts.  In essence, the report concluded that any racial or ethnic disparities that do exist, occur amongst both high and low-volume deputies.  MCSO states that the agency intends to continue exploring ways to reduce disparities across ethnicities through its inspections and TSMR reviews.

WAI 70560

TSQR10, "Searches," was published on March 31, 2023. The report indicates that, out of all traffic stops, slightly more than 1.5% result in searches of persons and 1.4% result in searches of vehicles. More importantly, MCSO found through the examination of body-worn cameras (BWCs) that in a large minority of cases, deputies incorrectly identified searches as discretionary or nondiscretionary. MCSO used these findings to correct the data that was used in TSAR8. Additionally, MCSO has modified the VSCF to correctly capture the types of searches being conducted by deputies, provided updated training to deputies regarding searches, had TSAU liaisons attend District roll-calls to summarize the research findings and the changes being made to the VSCFs, and had command staff evaluate potential changes to policy to mitigate future potential disparities without compromising officer safety. We discussed TSQR10 at length with MCSO and the Parties during our April site visit.

We have discussed previous TSQRs in detail in our previous quarterly status reports.

Paragraph 65 also requires MCSO to conduct monthly analyses of traffic stop data. MCSO's original monthly process to analyze traffic stop data began in 2015, but was suspended in May 2016 because of our determination that the original process lacked statistical validity and required significant refinement to improve the identification of potential alerts in EIS. That commenced nearly a seven-year effort to identify the best methodology to identify potential bias in traffic stops at the individual deputy level, which is the focus of the monthly analysis. The process to finally arrive at an agreed upon and approved methodology has been documented in great detail in our prior quarterly status reports.

In April 2021, MCSO began testing what was then the best version of the methodology in a pilot project. One of the key components of the methodology is using the prior 12 months of traffic stop data in the analysis each month. This "rolling" 12-month period was chosen to provide the most recent data available, but also provide a sufficient number of traffic stops for meaningful analysis. MCSO conducted 15 review cycles during the pilot period ending in October 2022. MCSO performed this every month, except when agreed to by us and the Parties so that MCSO could make modifications based upon experiences from earlier cycles. During this time, the methodology was collaboratively modified based on the input of experts from our Team, MCSO, the Plaintiffs, and Plaintiff-Intervenor.

At the conclusion of the pilot, MCSO began the process of finalizing the policies that govern the implementation of the TSMR process. These policies were approved during the first quarter of 2023; and include updates to the TSAU Operations GH-5 (Early Identification System), including the update of Attachments relevant to the TSMR process.

MCSO continues to share the monthly vetting of traffic stop data with us and the Parties. We noted in our prior quarterly report that the vetting for the November and December TSMR cycles was not delivered within the timeframes established by policy. During the first quarter of 2023, both the January and March vetting materials were provided in a timely fashion, but there was some delay in the delivery of the February materials. The delays resulted from misunderstandings regarding expectations of when material would be produced, and it has since been corrected. During the current quarter, all vetting materials were received within the timelines laid out in the TSAU Operations Manual. For this reporting period, MCSO evaluated 37 flags as the result of the statistical analysis (monthly vetting). Of these, five were forwarded for a more complete

WAI 70561

review; and 32 were discounted. We concurred with the findings of the vetting process and notified MCSO within days of receiving the vetting materials. We will continue to monitor and report on these issues.

MCSO has also continued sharing the closure documents for those cases that were flagged as a result of the analysis. During the post-vetting review, MCSO can discount additional cases if it is determined that the potential bias found in the statistical analysis is no longer significant when similar stops (speeding, non-moving, licensure, etc.) are compared across ethnic/racial categories. However, even for those cases that are discounted, MCSO can recommend that a memo be sent to the District, if the in-depth review discovers minor policy or process issues. These issues, however, cannot be related to the race/ethnicity of the persons stopped. MCSO can recommend an intermediate intervention if the reviewer finds that while the statistical differences are minimized, there are still potential concerns regarding how individual drivers are treated that may be based on race or ethnicity. Finally, MCSO can recommend a full intervention if the more in-depth review of stops does not mitigate the potential bias found during the statistical analyses.

During this reporting period, MCSO provided the closure documents for 15 cases. Some of these cases occurred during the pilot process, and some occurred after the pilot closed in October 2022. Out of these 15 cases, MCSO recommended memos in 12 instances, intermediate interventions in one case, and a full intervention in two cases. We evaluated each of the memos and found that the message to the District was clear and the response by District personnel met the expectations of the review conducted. For the intermediate and full interventions, we and the Parties received the expected documents, as outlined in the TSAU Operations Manual, as well as an audio-recording of the meeting between TSAU personnel, the deputy, and the deputy's supervisor. Now that the TSMR process is operational, we will provide specific feedback regarding our review of completed TSMR cases, as we did during our April and July site visits.

Since the TSMR is fully operational and the associated guiding documents were published during the first quarter of 2023, MCSO has achieved Phase 1 compliance. In addition, due to the timely submission of all vetting materials and closing documents for cases that moved beyond the vetting stage, MCSO is now in Phase 2 compliance with this Paragraph.


***Paragraph 66.*** *MCSO shall conduct one agency-wide comprehensive analysis of the data per year, which shall incorporate analytical benchmarks previously reviewed by the Monitor pursuant to the process described in Section IV. The benchmarks may be derived from the EIS or IA-PRO system, subject to Monitor approval. The MCSO may hire or contract with an outside entity to conduct this analysis. The yearly comprehensive analysis shall be made available to the public and at no cost to the Monitor and Plaintiffs.*

**In Full and Effective Compliance**

MCSO has completed eight comprehensive Traffic Stop Annual Reports (TSARs) analyzing traffic stop data to look for systemic evidence of racial profiling or other bias-based policing. MCSO's first contract vendor, Arizona State University, produced the first three TSARs. MCSO's current vendor, CNA, produced the last five TSARs.

WAI 70562

The most recent TSAR8 was published on June 30, 2023, and, as noted in the Sheriff's statement published in conjunction with the analytic report, the findings of disparities continue to identify possible systemic racial bias in the patrol function. The Sheriff notes that some of the disparities were reduced from the prior year, and that there were no significantly worse indicators in comparison to 2021. The Sheriff's statement emphasized that investigating the presence of the continued disparities will remain a priority for TSAU in both quarterly and monthly analytic reports. The Sheriff noted a dramatic reduction in stop length for Hispanic drivers when compared to white drivers, but we note that two new extended stop indicators were added during 2022. The addition of these two indicators resulted in a 7% increase in stops being classified as justified extended stops. Moreover, in the calculation of average stop length, all stops with extended stop indicators are removed from the analysis. We raised this issue with MCSO during our July site visit, but the agency had not yet conducted an analysis to determine if that was the reason for the reduction in Hispanic stop lengths.

MCSO proposed some changes to the methodology employed in TSAR8 that were accepted by us and the Parties after review. Many of these changes result from analytic findings from the TSMRs and others have been the result of TSQRs. The modifications adopted show the ability of MCSO to expand and broaden its methodology when new information uncovers potential improvements in the investigation of disparities in traffic stop outcomes, including findings from TSMR and TSQR analyses.

On March 31, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 67.** *In this context, warning signs or indicia of possible racial profiling or other misconduct include, but are not limited to:*

a. *racial and ethnic disparities in deputies', units' or the agency's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of deputies' duties, or racial or ethnic disparities in traffic stop patterns when compared with data of deputies' peers;*

b. *evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;*

c. *a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;*

d. *indications that deputies, units or the agency is not complying with the data collection requirements of this Order; and*

e. *other indications of racial or ethnic bias in the exercise of official duties.*

**Phase 1:** In compliance

WAI 70563

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on April 27, 2022.

- EB-2 (Traffic Stop Data Collection), most recently amended on February 22, 2023.

- GH-5 (Early Identification System), most recently amended on December 16, 2021.

**Phase 2:**  In compliance

MCSO has conducted monthly and annual analyses of traffic stop data and provided documents discussing how the benchmarks required by this Paragraph are used to set alerts for possible cases of racial profiling or other deputy misconduct involving traffic stops.  Discussion about the monthly and annual analyses are incorporated into Paragraphs 65 and 66.

We have discussed in our previous quarterly status reports that MCSO has achieved Phase 1 compliance with this Paragraph with the publication of appropriate guiding policies.  The benchmarks are highlighted below and are generally referred to as post-stop outcomes in the TSMR and TSAR methodologies.

Paragraph 67.a. identifies three benchmarks pertaining to racial and ethnic disparities.  The first benchmark references disparities or increases in stops for minor traffic violations (Benchmark 1).  The second benchmark addresses disparities or increases in arrests following traffic stops (Benchmark 2).  The third benchmark addresses disparities or increases in immigration status inquiries (Benchmark 3).  Since these three benchmarks are incorporated into the EIU Operations Manual and are incorporated as post-stop outcomes in the TSMR methodology, MCSO is in compliance with Paragraph 67.a.

Paragraph 67.b. identifies a benchmark pertaining to evidence of an extended traffic stop involving Latino drivers or passengers (Benchmark 4).  Since this benchmark is now incorporated into the EIU Operations Manual and is incorporated in the TSMR methodology, MCSO is in compliance with Paragraph 67.b.

Paragraph 67.c. identifies three benchmarks.  The first benchmark pertains to the rate of citations (Benchmark 5):  MCSO is required to identify citation rates for traffic stops that are outliers when compared to a deputy's peers.  The second benchmark (Benchmark 6) pertains to seizures of contraband.  MCSO is required to identify low rates of seizures of contraband following a search or investigation.  The third benchmark in Paragraph 67.c. (Benchmark 7) is similar to Benchmark 6, but it pertains to arrests following a search or investigation.  Since the three benchmarks are now incorporated into the EIU Operations Manual and are incorporated as post-stop outcomes in the TSMR methodology, MCSO is in compliance with Paragraph 67.c.

Paragraph 67.d. establishes a benchmark pertaining to agency, unit, or deputy noncompliance with the data collection requirements under the First Order (Benchmark 8).  This benchmark requires that any cases involving noncompliance with data collection requirements results in an alert in EIS.  EIU published an Administrative Broadcast on November 28, 2016 to instruct supervisors how to validate data in TraCS for those cases involving duplicate traffic stop records to deliver timely data validation for our review.  MCSO's draft EIS Project Plan 4.0 reported that MCSO began the data validation process for this benchmark on November 28, 2016.  Therefore, MCSO is in compliance with Paragraph 67.d.

WAI 70564

Paragraph 67.e. allows for other benchmarks to be used beyond those prescribed by Paragraph 67.a.-d. MCSO has three benchmarks under Paragraph 67.e. Benchmark 9 is defined as racial or ethnic disparities in search rates. Benchmark 10 is defined as a racial or ethnic disparity in passenger contact rates. Benchmark 11 is defined for non-minor traffic stops. Benchmarks 9-11 are incorporated into the EIU Operations Manual, as well as the TSMR methodology. Therefore, MCSO is in compliance with Paragraph 67.e.

As noted earlier, the TSMR methodology, which incorporates these benchmarks, was approved following the completion of a lengthy pilot project in October 2022. MCSO finalized the guiding documents (TSAU Operations Manual and GH-5, including Attachment A [Definitions and Event Entry Types] and Attachment C [Supervisor EIS Traffic Stop Alert Form]) late in quarter 1 of 2023. MCSO regularly publishes inspections for several of these benchmarks in addition to continuing to produce the monthly TSMR according to the guiding documents. As a result, MCSO has Phase 2 compliance with this Paragraph.


***Paragraph 68.***  *When reviewing collected patrol data, MCSO shall examine at least the following:*

a.     *the justification for the Significant Operation, the process for site selection, and the procedures followed during the planning and implementation of the Significant Operation;*

b.     *the effectiveness of the Significant Operation as measured against the specific operational objectives for the Significant Operation, including a review of crime data before and after the operation;*

c.     *the tactics employed during the Significant Operation and whether they yielded the desired results;*

d.     *the number and rate of stops, Investigatory Detentions and arrests, and the documented reasons supporting those stops, detentions and arrests, overall and broken down by Deputy, geographic area, and the actual or perceived race and/or ethnicity and the surname information captured or provided by the persons stopped, detained or arrested;*

e.     *the resource needs and allocation during the Significant Operation; and*

f.     *any Complaints lodged against MCSO Personnel following a Significant Operation.*

## In Full and Effective Compliance

MCSO has not conducted a Significant Operation that met the requirements of the Order since Operation Borderline in December 2014. Subsequent activities (i.e., Operation Gila Monster in October 2016) have not met the criteria for review under this or other Paragraphs.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70565

As a result of this determination, MCSO District command staff – as well as Investigations and Enforcement Support – will no longer be required to submit monthly statements that they have not participated in Significant Operations as defined by this and other Paragraphs; however, MCSO is required to notify us should staff become involved in a Significant Operation. We will continue to assess Phase 2 compliance through interviews with command and District staff during our regular site visits. During our site visits prior to, and including, January 2020, we routinely inquired of administrative staff, District personnel, and the Deputy Chiefs of Patrol Bureaus East and West whether any Significant Operations had occurred since the prior site visit. MCSO has not conducted any operations that meet the reporting requirements for this Paragraph since October 2014.

**Paragraph 69.**  *In addition to the agency-wide analysis of collected traffic stop and patrol data, MCSO Supervisors shall also conduct a review of the collected data for the Deputies under his or her command on a monthly basis to determine whether there are warning signs or indicia of possible racial profiling, unlawful detentions and arrests, or improper enforcement of Immigration-Related Laws by a Deputy. Each Supervisor will also report his or her conclusions based on such review on a monthly basis to a designated commander in the MCSO Implementation Unit.*

**Phase 1:**  In compliance

- EA-3 (Non-Traffic Contact), most recently amended on June 28, 2019.
- GH-5 (Early Identification System), most recently amended on March 28, 2023.

**Phase 2:**  In compliance

MCSO has placed into production database interfaces with EIS, inclusive of Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), Arizona Office of Courts (AOC) records, and the Cornerstone software program (referred to as "the HUB"), that includes training and policy records for MCSO. Supervisors have demonstrated the ability to access these during our site visits. Most audits and inspections of supervisory oversight activities indicate compliance, but several continue to show fluctuating trends of use or completion over time which we regularly monitor.

MCSO continues to provide us access each month to all Non-Traffic Contact Forms (NTCFs) involving investigative stops and field information. At times over the past year our review of the NTCFs provided each month indicated that a higher proportion of Latinos are being contacted in particular areas of the County for relatively minor infractions. Our review of NTCFs for this quarter did not raise particular concern about disparate treatment, although the number of bike related stops for lighting and other issues continue to show that Latinos represent a high proportion of those contacted. Several months ago, MCSO proposed an initial study of how this form (NTCF) and the related policy are being used across the agency. Following a conference call between MCSO, us and the Parties in February 2022, MCSO committed to conducting the first portion of the inquiry. The NTCF study was published in February 2023. While this analysis did not investigate potential indications of bias in how these stops are conducted by deputies or

WAI 70566

evaluated by supervisors, it did provide some insight into the modifications needed in both the form and policy going forward. We have provided MCSO with our comments and concerns regarding the initial study and MCSO has responded. Currently, MCSO is utilizing the initial study to review the NTCF form and policy (EA-3 [Non-Traffic Contact]) with the intent of suggesting modifications. We will evaluate these when they are produced.

We continue to evaluate supervisory investigations into non-traffic stop alerts each month by selecting a random sample of 15 cases, when the number of completed investigations exceeds that amount. Over the past year, we have found that most supervisors are completing these investigations in a timely fashion and addressing the deficiencies raised as we have noted above. MCSO has proposed, and we have agreed in principle, to convert the alert inspection to a quarterly process that includes an evaluation of the effectiveness of the interventions undertaken. As discussed below, MCSO produced this evaluation for the first time during the third and fourth quarters of 2022, and has continued to provide these to us in 2023.

MCSO has created an EIS Alert Review Group (ARG) that evaluates the investigations of supervisors prior to closing an alert. The ARG ensures that the reports of the supervisors address all aspects of the assigned investigations and returns those that are deficient to the District for continued revision. Over the past several months, we have noted that the proportion of completed alert investigations being sent back to the Districts by the ARG has fallen below one-third of all cases we evaluate. MCSO has emphasized supervisory investigations in the past years' training, as well as the creation of liaisons between BIO and the Districts to ensure that supervisors receive the necessary support and information to complete these investigations.

In addition, EIU has developed online supervisory resource material for alert investigations that was placed on the HUB in January 2020. In the fourth quarter of 2022, MCSO produced an EIS Alerts Inspection, which included a method of evaluating whether the interventions triggered by alert investigations may, or may not, be mitigating the problems resulting in the original alert. To do this, they began with the alerts investigated in the first quarter of 2022, and examined the alerts triggered in the following two quarters to determine if there were any recurring alerts. AIU found that five deputies had new alerts during the second and third quarters of 2022. Of these five, four were for new external complaints and one was due to a new BIO Action Form naming the deputy. The report also indicated that follow-up on the latter case had already occurred but the external complaints were under the purview of PSB so there was no additional investigation conducted. During the first quarter of 2023, MCSO's EIS Alerts Inspection continued to show that "Meeting With a Supervisor" was the most frequent intervention; but there were also cases handled with reassignment, employee services, training, and referrals to PSB. During our July site visit, we discussed the inspection and the need to ensure that repeat interventions for any deputy follow the graduated process outlined in policy. MCSO noted the agency will continue to evaluate the effect interventions have on the triggering of new alert cases. This addition to the quarterly EIS Alert Inspection fulfills the need to ensure that repetitive problematic behavior is being flagged and addressed appropriately.

The Audit and Inspections Unit (AIU) conducts monthly audits of supervisory oversight via the Supervisor Notes made for each deputy. Minimally, each month, supervisors should be making a performance appraisal note, reviewing two body-worn camera recordings, and reviewing the

WAI 70567

EIS profile of their subordinates.  During the second quarter, MCSO reported compliance rates of 98.71 in April, 92.21% in May, and 98.06% in June.  MCSO computes its compliance rates based upon a matrix of items; they are based upon randomized samples that we draw.  Our computation of compliance is slightly lower than that reported by MCSO, as we judge an entire case reviewed as noncompliant if any of the key components making up the inspection are late or missing at the time of the inspection.  Our computed compliance rate for April and June was 97.7%, and for May it was 81.81%.  In May, one supervisor failed to make the required notes and BWC reviews for six deputies, which resulted in the low compliance rate computed by us.  We will continue to monitor these reports and will withdraw compliance for this Paragraph if our computed rates remain below 94%.

AIU also conducts three inspections of traffic stop information: two of these pertain to the timely review and discussion of traffic stops by supervisors for each subordinate; and the third is an inspection regarding the correct completion of traffic forms and the coordination of these forms with databases such as CAD and the review of body-worn camera footage.  For the traffic discussion inspections, MCSO reported compliance rates of 100% for the quarter and for the traffic review inspections, MCSO reported rates in excess of 99%.  We concur with those rates reported by MCSO.  For the traffic data inspection, MCSO reported compliance rates exceeding 99% for the quarter.  Our compliance calculations for this period for the traffic data inspections were slightly lower, due to the fact that we do not employ a matrix to assess compliance; but rather judge individual cases as deficient if any significant information is determined not to be consistent across traffic stop forms or CAD.  Our compliance rates were 85.8%, 94.1%, and 94.1% respectively.  The lapses found for the data inspections were due to incongruent information on the VSCF and CAD for extra units at the stop location, reasons for the stop and correct contact conclusion, among others.  Each of the three inspections was based upon a stratified random sample of all traffic stops drawn by the Monitor and provided to MCSO.  AIU sent BIO Action Forms to those Districts where it found deficiencies.  As noted above, we will continue to monitor these reports and will withdraw compliance if our combined computed rates drop below 94%.

MCSO has developed an Incident Report Inspection that has been approved following several revisions.  The inspection should include instances where prosecuting authorities turned cases down due to a lack of probable cause, among other matrix items developed by MCSO.  MCSO reported compliance rates exceeding 99% for this quarter, with no instance of a case being turned down due to a lack of probable cause.  We concur with the latter point but differ in the compliance rates for April through June due to instances of deputies' using boilerplate language and missing documentation to support the charges.  Our compliance rates for the quarter are 95.0%, 97.5%, and 97.5% respectively.  For those deficiencies discovered during the inspection process, AIU sent BIO Action Forms to the appropriate Districts for additional review and action.  Most importantly, the inspectors noted that there was no indication that the immediate supervisors found these deficiencies within their own review of these IRs.

WAI 70568

In our last quarterly status report, we issued a warning regarding compliance with this Paragraph as several inspections showed compliance rates under 94%. In the current quarter, we found that significant improvement with low compliance rates for two traffic stop data inspections and one supervisor notes inspection. We will continue to monitor these trends and will withdraw compliance if MCSO fails to meet the requirements of this Paragraph.

***Paragraph 70.*** *If any one of the foregoing reviews and analyses of the traffic stop data indicates that a particular Deputy or unit may be engaging in racial profiling, unlawful searches or seizures, or unlawful immigration enforcement, or that there may be systemic problems regarding any of the foregoing, MCSO shall take reasonable steps to investigate and closely monitor the situation. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or of other supervised, monitored, and documented action plans and strategies designed to modify activity. If the MCSO or the Monitor concludes that systemic problems of racial profiling, unlawful searches or seizures, or unlawful immigration enforcement exist, the MCSO shall take appropriate steps at the agency level, in addition to initiating corrective and/or disciplinary measures against the appropriate Supervisor(s) or Command Staff. All interventions shall be documented in writing.*

**Phase 1:** In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on April 27, 2022.

- EB-2 (Traffic Stop Data Collection), most recently amended on February 22, 2023.

- GH-5 (Early Identification System), most recently amended on March 28, 2023.

**Phase 2:** Not in compliance

MCSO has finalized protocol and training related plans for the Traffic Stop Monthly Reports (TSMRs) and memorialized these in the TSAU Operations Manual. MCSO has also modified GH-5 and incorporated the necessary documents from TSMR into that policy. The TSMR is intended to provide a timelier response to potential indications of bias at the deputy level through the examination of a rolling 12 months of traffic stop data for each deputy. MCSO has refined the vetting process for those cases where a deputy flags in the analysis and has recommended outcomes ranging from the discounting of a flag to the onset of full interventions, which would entail remedies based upon the findings of TSAU. MCSO has continued producing the monthly vetting analyses for ongoing review, as well as documentation of any cases that are closed as a result of the completion of TSMR processes.

MCSO continues to develop the EIU Operations Manual. During the first quarter of 2023, MCSO updated Appendix A "EIS Allegation and Incident Thresholds," as well as conducted threshold analyses for Vehicle Pursuits and Accidents to apply to Appendix A. We will continue to work with MCSO on the refinement of these materials. MCSO has received approval to move forward on several TSQR projects and published 11 of these reports through the second quarter of 2023.

WAI 70569

MCSO published its eighth Traffic Stop Annual Report in June 2023 and continues to find in the examination of traffic stop outcomes disparities "that may indicate a systemic bias within the patrol function" that need to be addressed. In TSQR5, MCSO further investigated these disparities and found that particular Districts were associated with certain traffic stop outcome disparities. Subsequently, BIO personnel reported that they held command staff and personnel meetings in each District outlining the particular disparities found for each District. Overall, the analytic methods used in the TSARs are not able to identify individual deputy activity, but form the basis for organizational strategies to address systemic biases through training and policy.

MCSO's Plan to Promote Constitutional Policing (also referred to as the Constitutional Policing Plan, or CPP) was drafted to address systemic issues identified in the Traffic Stop Annual Reports (TSARs). The CPP includes nine Goals and a timeline for the completion of the Goals. Our comments in this report pertain to compliance with the Plan during the second quarter of 2023. MCSO created an online progress tracking tool (Smartsheet) and provided a link to the application in April 2020. The online spreadsheet is based on the plan originally agreed to by the Parties and approved by the Court. The spreadsheet provides additional details of MCSO's reported progress on each of the nine CPP Goals: the start date; the projected completion date; and the status of sub-Goals and projects.

We determine compliance with the CPP through several means. First, we issue monthly and quarterly document requests pertaining to specific Goals of the CPP, which we review. We have monthly document requests pertaining to projects under Goals 1, 3, 4, and 5. We review meeting agendas and discussion items to verify compliance with the projects noted under those Goals. For the training components of these Goals, MCSO submits training materials that must be reviewed and approved before delivery. We confirm completion of training requirements through HUB reports and reviews of BIO inspections of supervisor notes documenting briefings. Our standing requests for other Paragraphs of the First and Second Orders also provide information related to some of the CPP Goals. For Goal 1, we review MCSO monthly submissions related to supervisory corrective actions. For Goal 2, we review a selected sample of deputy and supervisor Employee Performance Appraisals (EPAs). For Goal 6, we conduct periodic meetings with MCSO, the Plaintiffs, and Plaintiff-Intervenor related to the evaluation of traffic stop data and associated monthly, quarterly, and annual reports. For Goal 9, we request statistical information, and compare these statistics to the previous quarter to determine if MCSO is making progress. We review the progress reported for all Goals and projects in the online spreadsheet and record our findings. We corroborate MCSO's reported progress during our site visits, where we confirm the reported outcomes and ask clarifying questions on projects completed. Our comments below reflect what we learned as a result of our reviews of documentation during the second quarter of 2023, and pursuant to our inquiries during our July 2023 remote site visit.

Goal 1: Implementing an effective Early Intervention System (EIS) with supervisor discussions. For the second quarter of 2023, MCSO reported an overall 99% completion rate for Goal 1, the same as the last quarter. The sub-goal noted as the supervisory discussion process had a starting date of April 3, 2018. The completion date for this sub-goal was revised to October 1, 2022. As of our July 2023 review, this sub-goal shows completed. The Traffic Stop Monthly Report (TSMR) shows a revised completion date of October 1, 2022. As of our July 2023 review, this

WAI 70570

sub-goal shows completed.  During our July site visit, MCSO reported two Town Halls, which were conducted in June 2023.  The first Town Hall was conducted on June 14 at District 2.  The topics of discussion were Body Worn Camera (BWC) activations, searches, and the mentoring program.  The second Town Hall was conducted on June 28, at the Training Center.  The topic of discussion was the Traffic Stop Annual Report (TSAR).

Goal 2: Evaluating supervisors' performances through an effective Employee Performance Appraisal process.  For the second quarter 2023, Goal 2 noted a 98% completion rate, or 3% greater than the previous quarter.  On the online spreadsheet, the completion date for this Goal was revised to October 16, 2023.  During our July site visit, MCSO reported that 376 sworn EPAs had been completed in the Perform application.  MCSO reported that the vendor had completed an enhancement to integrate BlueTeam supervisor notes into Perform, and Human Resources personnel were in the process of testing the functionality.  MCSO stated that the Perform application is working as expected.  We inquired if the new EPA system will be used for Detention and civilian personnel.  MCSO advised that the agency would consider that possibility in the future.  We advised MCSO that our reviews of EPAs found that compliance numbers have increased for some EPA related Paragraphs.  However, there still areas that we would like to see improvement in.  As of our July virtual site visit, some EPAs were still not addressing the requirements of Paragraphs 92 and 95.  In addition, some rating supervisors were not properly documenting the EPA rating period.

Goal 3: Delivering enhanced implicit bias training.  Goal 3 was noted as 95% completed on the tracking spreadsheet.  During the second quarter, we had discussions with MCSO regarding their proposal to focus the upcoming training cycle, for Goals 3 and 5, on the findings of the TSAR.  In addition, we discussed the proposal during our July virtual site visit.  MCSO will tailor the upcoming training to the areas of concern identified in the Eighth TSAR.  We agreed with the proposal as presented by the Training Division.  This request to deviate from the previous approved training topic was also discussed with and approved by the Plaintiffs and Plaintiff-Intervenor.

Goal 4: Enhanced Fair and Impartial Decision-Making training (FIDM).  Goal 4 was noted at as 96% completed on the tracking spreadsheet.  MCSO reported that FIDM training will be part of the 2023 ACT.  MCSO reported that a Captains' meeting took place on April 24, in which Fair and Impartial Decision Making was the topic of discussion.  There was a presentation on procedural justice, and the information was passed on to the rank and file through roll-call briefings.  MCSO reported that the overall completion rate for dissemination of the information covered in the April Captains' meeting was 98.4%.  The next Captains' meeting, which was scheduled for August, will cover cultural competency.  The information will be disseminated to MCSO staff in September.

Goal 5: Delivering enhanced training on cultural competency and community perspectives on policing.  The completion rate for Goal 5 was noted at 93%.  Training for Goals 3 and 5 will be combined for 2023 and is covered in our review of Goal 3.  During our July site visit, we inquired about the Traffic Stop Survey.  MCSO stated that the agency had received nine new surveys in the second quarter of 2023.  Since the survey's inception, MCSO stated that the agency had received a total of 77 surveys out of 40,121 traffic stops.  We requested copies of the surveys

WAI 70571

completed during the second quarter, and MCSO submitted a spreadsheet summarizing nine surveys.  Of the nine individuals who responded to the survey, five identified as white, and four identified as Hispanic. Seven responders identified as male, and two identified as female.  On the final question of the survey, which asks if the responder was satisfied that they were treated without bias, four agreed and five were neutral.  Of the four individuals who believed they were treated without bias, three identified as white, and one identified as Hispanic.  Of the five neutral responses, two identified as white and three identified as Hispanic.

<u>Goal 6:  Improving traffic stop data collection and analysis.</u>  As of our April review, Goal 6 was noted as 98% completed, or 1% lower than the completion rate of the previous quarter.  The TSMR pilot analysis was completed during the fourth quarter of 2022.  The relevant policies and protocols were updated and published prior to the end of the first quarter of 2023.  During the second quarter of 2023, we reviewed 15 closed TSMR investigations, resulting in 14 memos to the District and one intermediate intervention.  For all of these investigations, we found the materials, documents, and processes to meet our expectations.  We discussed several of these cases with MCSO during our July site visit.

<u>Goal 7: Encouraging and commending employees' performance and service to the community.</u>  This goal has been completed.  This goal was not part of the requirements set by the First Order.

<u>Goal 8: Studying the Peer Intervention Program.</u>  This goal has been completed.  This goal was not part of the requirements set by the First Order.

<u>Goal 9: Building a workforce that provides Constitutional and community-oriented policing and reflects the community we serve.</u>  MCSO's goal is to establish a hiring process that will build a workforce that provides Constitutional policing and reflects the community it serves.  As of our April 2023 review, Goal 9 was listed as having a 77% completion rate, a 3% increase over the completion rate of the previous quarter.  The expected completion date on this goal has been revised several times from the initial date of December 31, 2020, to the current date of June 30, 2023.

During our July virtual site visit, MCSO provided updates on MCSO's efforts to complete the projects listed under Goal 9.  MCSO stated that the agency is continuing to advertise for job openings through the same media outlets as they had previously.  In addition, transit and bus adds are being placed in Phoenix and Tucson, and MCSO is considering expanding to Flagstaff.  The recruiting vendor is building a social media presence on Facebook, Twitter, and LinkedIn.  MCSO reported 15 outreach events in the second quarter.  In a recruiting event in June, there were 42 attendees, and 35 applications went to Backgrounds for processing.

With regard to the EyeDetect system which was being considered as an alternative to a polygraph, MCSO confirmed that there were 46 individuals that went through the process and were subsequently administered polygraph examinations.  MCSO was evaluating the results of the two processes and will make a determination on the feasibility of using EyeDetect for Detention applicants, after the evaluation is completed.  There were no updates provided on Career Planning and Development.

WAI 70572

During our July site visit, MCSO reported a total of 1,069 overall vacancies as of June 30, 2023. MCSO previously reported 999 vacancies in the first quarter of 2023, 971 vacancies for the fourth quarter of 2022, 938 vacancies in the third quarter, 903 vacancies in the second quarter, and 838 vacancies in the first quarter of 2022. The vacancies reported for the second quarter of 2023 were 104 sworn, 701 Detention, and 264 civilian. MCSO reported 71 voluntary separations during the second quarter. MCSO reported six voluntary separations of sworn personnel, of which the demographics were 50% white, 30.33% were Latino, 16.67% were Black, and 3% were unknown. MCSO reported 33 voluntary separations of Detention personnel, of which the demographics were reported as 54.55% white, 21.21% Latino, 6.06% American Indian/Alaskan Native, 12.12% Black, 3.03% Asian, and 3.03% two or more races. MCSO reported 32 civilian voluntary separations, with the demographics reported as 40.36% white, 40.36% Latino, 6.25% Black, 6.25% Asian, 3.13% two or more races, and 3.65% were unknown.

With regard to the number of new hires for the second quarter of 2023, MCSO reported 108 new employees hired. Of those, four were sworn, 38 were Detention, and 66 were civilian. The demographics for new sworn personnel were reported as 50% white and 50% Asian. The demographics for new Detention personnel were reported as 34.21% white, 34.21% Latino, 23.68% Black, 2.63% Asian, 2.63% two or more races, and 2.64% were not specified. The demographics for new civilian personnel were reported as 34.85% white, 28.79% Latino, 13.64% Black, 9.09% Asian, 4.55% two or more races, and 9.09% not specified.

MCSO reported four Academy classes for Detention personnel. Class 980 was scheduled to graduate 11 Detention Officers on August 3, 2023. Class 981 was scheduled to graduate 17 Detention Officers on September 21, 2023. Class 982 has a tentative graduation date of November 2, and Class 983 has a tentative graduation date of December 21. At the time of our July virtual site visit, there had been six trainees identified for the latter two Detention classes. With regard to sworn Academy classes, Class 161 started on June 19; and was scheduled to graduate 13 deputies on December 1, 2023. Class 162 was still a work in progress at the time of our July site visit, with eight recruits hired. Class 162 was scheduled to start on September 11 and graduate on February 23, 2024.

Current supervisor demographics for sworn were reported as 75.54% white, 19.02% Latino, 3.26% Black, 1.09% two or more races, and 1.09% Asian. Supervisor demographics for Detention were reported as 66.80% white, 24.61% Latino, 3.91% Black, 2.34% Asian, 0.78% Native Hawaiian or Pacific Islander, 0.39% American Indian/Alaskan Native, and 1.17% two or more races. Supervisor demographics for civilian employees were reported as 59.03% white, 21.53% Latino, 9.72% Black, .69% American Indian or Alaskan Native, and 4.17% Asian, 3.47% two or more races, and 1.39% not specified.

MCSO has recently proposed a different approach to meet the training requirements of the Constitutional Policing Plan. MCSO previously formulated a seven-year plan which was to focus on specific communities in each of the Districts. Although MCSO completed part of this plan, it became evident that a new approach may yield better outcomes with regard to the findings of disparate outcomes that have been previously identified in TSARs. MCSO consulted with the Monitoring Team and the Parties and discussed the new training proposal in which MCSO will select training topics based on issues identified in the TSARs. We concur that this approach of

WAI 70573

identifying training topics for the CPP is appropriate and in line with the requirements of Paragraph 70. With regard to the evaluation of supervisor performance, our reviews indicate that progress is being made in addressing the shortcomings we have identified in our quarterly status reports, and in our site visits. We are hopeful that compliance with all EPA-related Paragraphs will be achieved in the near future. In terms of addressing personnel shortages, MCSO is still working on finding a solution. For the second quarter of 2023, MCSO reported an additional 70 vacancies in all classifications, of which 33 were Detention personnel who voluntarily separated. MCSO will need to consider all possible solutions in order to mitigate future serious consequences.

The CPP, in effect since 2017, was intended to address potential systemic bias in traffic stops involving members of the Plaintiffs' class. As this Plan was a joint agreement between MCSO and the Parties, we again recommend that the Parties hold discussions regarding the CPP and the requirements of Paragraph 70 to move forward.

**Paragraph 71.** *In addition to the underlying collected data, the Monitor and Plaintiffs' representatives shall have access to the results of all Supervisor and agency level reviews of the traffic stop and patrol data.*

**In Full and Effective Compliance**

MCSO has provided us with access to existing data from monthly and annual reports.

While we continue to work with both MCSO and the Parties on specific issues of methodology for Non-Traffic Contact Forms and the Annual, Monthly, and Quarterly Reports for traffic stop data, we have nonetheless been afforded complete access to all requests involving data. MCSO has published TSQR9 "2021: Special Assignments" (discussed in Paragraphs 65 and 69), and the agency put into place mechanisms to ensure that the undercounting of stops conducted during special assignments does not reoccur. MCSO has also suggested actions which could improve the consistency of traffic stop actions taken by deputies regardless of assignment. MCSO reported some differences in the magnitude of significant findings between TSAR7 and TSQR9, but otherwise the findings of potential bias were unchanged as it relates to those special assignment stops that were previously undercounted. In TSQR10 (Searches), MCSO found that nearly two dozen searches had been coded incorrectly as either discretionary or non-discretionary searches. This was largely due to a deputy having indicated multiple search types during an incident which the coding syntax could not adequately address. The agency has used this discovery to modify the data prior to any analysis for the eighth annual report. Finally, MCSO's latest quarterly report, TSQR11, Low Stop Volume Deputies, was published on June 30, 2023. The report examines whether the traffic stop outcomes of low-volume deputies differ from their high-volume counterparts. The report found that 41% of deputies make under 20 stops per year and those stops (970) represent approximately 5% of all traffic stops for the agency during the year. MCSO found that low-volume deputies had a lower citation rate than their high-volume counterparts (35.88% vs. 52.41%) but in the process low-volume deputies contacted a higher proportion of Hispanic drivers (33.4% vs. 23.50%). However, these differences did not result in findings of significantly greater disparities in the outcomes of white and Hispanic drivers for low-

WAI 70574

stop deputies, or disparities in comparison to their high-volume counterparts.  In essence, the report concluded that any disparities that do arise are not dependent upon the volume of traffic stops made by deputies.  MCSO states that the agency intends to continue exploring ways to reduce disparities across ethnicities through its inspections and TSMR reviews.

MCSO has been forthcoming when the agency recognizes any data deficiencies and has modified data quality procedures when issues arise.  We will review additional data quality procedures as they are made available to us.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70575

## Section 8: Early Identification System (EIS)

**COURT ORDER IX.  EARLY IDENTIFICATION SYSTEM ("EIS")**

### a. Development and Implementation of the EIS

***Paragraph 72.*** *MCSO shall work with the Monitor, with input from the Parties, to develop, implement and maintain a computerized EIS to support the effective supervision and management of MCSO Deputies and employees, including the identification of and response to potentially problematic behaviors, including racial profiling, unlawful detentions and arrests, and improper enforcement of Immigration-Related Laws within one year of the Effective Date.  MCSO will regularly use EIS data to promote lawful, ethical and professional police practices; and to evaluate the performance of MCSO Patrol Operations Employees across all ranks, units and shifts.*

**Phase 1:**  In compliance

- EA-3 (Non-Traffic Contact), most recently amended on June 28, 2019.

- GH-5 (Early Identification System), most recently amended on March 28, 2023.

**Phase 2:**  Not in compliance

As a result of interfaces for remote databases introduced in 2017, the Early Intervention System (EIS) now includes Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), records from the Administrative Office of the Courts (AOC), and training completion and policy acknowledgement records from the Cornerstone software (the HUB).  MCSO continues to update the EIU Operations Manual to memorialize the collection, analysis, and dissemination of relevant data, as well as the responsibilities and roles of agency and EIU personnel.  During the first quarter of 2023, MCSO updated Appendix A, "EIS Allegations and Incident Thresholds" following extensive review of the thresholds, as well as EIS Alert Process (302).  In addition, MCSO conducted threshold analyses on vehicle pursuits and deputy accidents and applied the results accordingly to the Appendix.  Going forward, MCSO has produced a plan to modify and review the thresholds annually.  During the third and fourth quarters of 2022, MCSO also modified the EIS Alert inspection from a monthly to a quarterly report and included in the latter quarter an evaluation of the effectiveness of interventions undertaken.  Each of these additions or modifications has improved the process of oversight and evaluation of potential bias and provides needed tools for early intervention should such issues arise.

To capture the activities of deputies in non-traffic stops of individuals, MCSO created Non-Traffic Contact Forms (NTCFs), which were interfaced with EIS in mid-2017.  MCSO has provided us with access to investigative stops that make up a portion of NTCFs since their inception.  Over the past two years, we have suggested that MCSO create a methodology to statistically examine these civilian contacts to ensure that there is no evidence of bias in the way they are conducted.  Several months ago, MCSO proposed an initial study of how the NTCFs and the related policy are being used across the agency.  Following a conference call among MCSO, us, and the Parties in February 2022, MCSO committed to conducting the first portion of the

WAI 70576

inquiry.  The NTCF study was published in February 2023.  While this analysis did not investigate potential indications of bias in how these stops are conducted by deputies or evaluated by supervisors, it did provide some insight into the modifications needed in both the form and policy going forward.  We have provided MCSO with our comments and concerns regarding the initial study and MCSO has responded.  Currently, MCSO is utilizing the initial study to review the NTCF form and policy (EA-3 [Non-Traffic Contact]) with the intent of suggesting modifications. We will evaluate these when they are produced.

We will continue to work with MCSO to finalize each of these data analytic methods.  MCSO continues to regularly publish a number of reports on deputy activity and supervisory oversight that are not tied to the methodologies of the TSMR, TSQR, or TSAR.

The Audits and Inspections Unit (AIU) produces a monthly report evaluating Supervisor Notes based upon a random sample we draw that indicates whether the selected supervisors are reviewing the EIS data of deputies under their command.  The inspection looks for indications that supervisors made entries for each person they supervise with regard to two randomly selected BWC videos, provide one EPA note, make two supervisor entries, and indicate that the supervisor has reviewed their deputies' EIS status.  The compliance rates reported by MCSO are based on a matrix developed for this inspection.  For this quarter, the compliance rates reported by MCSO were 98.1%, 92.2% and 98.06% respectively using a matrix of information.  Our calculations, in contrast, count individual cases as out of compliance for any missed policy timeframes or requirements.  For April and June, we calculated a compliance rate of 97.7% due to one supervisor missing two EIS checks and two supervisor note entries.  For May, one supervisor failed to make supervisor notes on EPA and BWC reviews for six deputies under their command.  Our compliance calculation for May was 88.81%.  AIU continues to send BIO Action Forms to the Districts with deficiencies, and we have always had the opportunity to review these forms when requested.

In the Traffic Stop Data Inspection for this quarter, MCSO reported compliance rates in excess of 99%.  Our calculations are slightly lower each month due to several missing notations as to how contacts were concluded, the number of units at each stop, and the reason for the stop, among others.  As a result, our compliance rates are 85.8%, 94.1%, and 91.4% respectively.  The compliance rates for the Traffic Stop Discussion Inspections were all at 100% throughout the quarter, and the rates reported by MCSO for the Traffic Stop Review inspection of forms submitted by deputies exceeded 99%.  We concur with these findings.  All the inspections for traffic stops are based upon stratified random samples that we draw on a monthly basis.  The deficiencies noted by the inspectors resulted in BIO Action Forms being sent to the appropriate Districts for this quarter.

While we can look for trends in deficiencies over each quarter, we have suggested to MCSO that AIU conduct an evaluation of all BIO Action Forms sent to Districts to ensure that there are not long-term trends by Districts or supervisors that cannot be distinguished while looking at shorter timeframes.  MCSO conducted a preliminary analysis of BIO Action Forms from January to May 2019 and reported these findings during our July 2019 site visit.  MCSO found that there was indeed a small number of deputies who had received several BIO Action Forms.  With the review of us and the Parties, MCSO produced a methodology to conduct a repeatable inspection of BIO

WAI 70577

Action Forms.  In September 2022, MCSO published the first BAF tracking inspection covering 2021.  In May 2023, MCSO published the second BIO Action Form Study.  We note similarities between the first and second BAF inspection studies.  First, the highest deficiency category is Lack of Documentation.  Second, Lake Patrol stood out for problems of incorrect documentation in the Traffic Stop Data Inspection.  Finally, the report concluded that IR and Traffic Stop Data Inspections were again in the top three inspections with the most issues.  The third inspection related to CP-8 (Preventing Racial & Other Biased-Based Policing).  This study was discussed during our July site visit.  MCSO concluded that personnel were not meeting deadlines for the required review of CP-8 materials.  We also noted that in the discussion of issues potentially causing an increase in BAFs, several Districts were struggling to address the impact of staffing and shift adjustments during the data year.  Finally, in the discussion regarding high incident supervisors (those supervisors with a disproportionate number of BAFs), MCSO notes that it does not appear that any one deputy created repetitive problems but that some supervisors had issues arise amongst a number of their subordinates.  MCSO has suggested that rather than have supervisors implement individual interventions, a more effective strategy would be squad interventions.  During our July site visit, MCSO noted that the agency continues to study this suggestion.  MCSO will conduct the BAF inspection every six months using one year of data that overlaps the prior reporting period by six months.

EIU also produces a monthly report on non-traffic alerts triggered within EIS.  EIU personnel review the alerts and disseminate them to supervisors and District command if alerts indicate the potential for biased activity or thresholds are exceeded for particular actions such as external complaints, data validations, and others.  Once the supervisors receive the alert investigation, they employ a template (Attachment B of GH-5 [Early Identification System]) to conduct the investigation and report their findings and results to the chain of command through BlueTeam.  MCSO has also created an EIS Alert Review Group (ARG) to evaluate the closure of alert investigations.  We had no immediate concerns with our review of alert closures for the second quarter.


***Paragraph 73.***  *Within 180 days of the Effective Date, MCSO shall either create a unit, which shall include at least one full-time-equivalent qualified information technology specialist, or otherwise expand the already existing role of the MCSO information technology specialist to facilitate the development, implementation, and maintenance of the EIS.  MCSO shall ensure that there is sufficient additional staff to facilitate EIS data input and provide Training and assistance to EIS users.  This unit may be housed within Internal Affairs ("IA").*

**In Full and Effective Compliance**

The Bureau of Internal Oversight (BIO) is overseen by a captain and is comprised of three Units designed to achieve different compliance functions.  Each is a fully operational Unit headed by a lieutenant with both sworn and civilian staff responsible for diverse but interrelated oversight functions.

WAI 70578

The Early Intervention Unit (EIU) coordinates the daily operation of the EIS. This unit evaluates alerts generated by the EIS, reviews them, and sends out investigations to District personnel as prescribed by policy.

The Audits and Inspections Unit (AIU) has developed and carries out ongoing inspections to ensure that deputies and supervisors are using the EIS properly and to the fullest extent possible. When AIU discovers deficiencies, it sends out BIO Action Forms to the affected Districts and individuals; and ensures the return of the appropriate forms.

The Traffic Stop Analysis Unit (TSAU) was most recently created due to the complexities of generating all the statistical reports related to traffic and patrol functions of MCSO. The leaders of these units respond to specific requests made by us and the Parties and appear collectively during our site visit meetings to answer any questions related to the operation of BIO.

Over the last 18 months, the EIS database has been expanded to include Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), records from the Arizona Office of Courts (AOC), and training and policy receipt records from the Cornerstone software program (the HUB). Supervisors now have much more information available to them about the deputies under their command than they ever had in the past.

On October 5, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.


***Paragraph 74.*** *MCSO shall develop and implement a protocol setting out the fields for historical data, deadlines for inputting data related to current and new information, and the individuals responsible for capturing and inputting data.*

**Phase 1:**  In compliance

- GH-5 (Early Identification System), most recently amended on March 28, 2023.

- EIU Operations Manual, currently under revision.

**Phase 2:**  In compliance

MCSO has met the requirements of this Paragraph by identifying the data to be collected and the responsibility of persons across the organization to review, verify, and inspect the data making up the early intervention system. These roles and responsibilities are originally developed in GH-5 (Early Identification System) and more comprehensively elaborated in Section 200 (Duties and Responsibilities), approved in August 2019, of the EIU Operations Manual.

During the first quarter of 2023, MCSO continued to revise the EIU Operations Manual with the revision of the appendix for alert thresholds, EIS Alert Process (Section 302), and modifications to several other appendices. The manual sections pertaining to this Paragraph have already been finalized and published; as a result, MCSO has achieved Phase 1 compliance.

WAI 70579

MCSO has continually refined the data-handling protocol since the publication of earlier TSARs, which were fraught with problems. These processes have been memorialized in the EIU Operations Manual (Section 306), which was approved in July 2020. Aside from Section 200, noted above, Section 305 (Software Change Control Processes), approved in October 2018, is intended to ensure that all modifications to software or data collection are coordinated in a prospective fashion before any implementation occurs. These software changes are provided to us on a monthly basis through regular document requests and are discussed during the quarterly site visit meetings. For example, during the fourth quarter of 2022, MCSO introduced a Special Assignment update that allows deputies to identify traffic stops that occur during DUI, Aggressive driving, Click It and Ticket, or other special assignment patrols. Deputies are also provided the ability to add clarifying comments to their selections. In the third quarter of 2022, MCSO introduced two new drop-down items for extended stops as a result of findings in prior TSQR analyses. The first is the ability of deputies to note license issues arising during the stop, and the second is a broader "other issue" that may lead to extended stops. The deputies are required to elaborate in comment fields what those issues may involve. Each of these sections of the EIU Operations Manual expands upon policy that has already been approved.

MCSO has also created a committee of personnel from each unit that handles, or adds to, traffic data before it is analyzed. The reports from the regular monthly meetings of this group are made available to us and show the attention to detail and memorialization of changes put in place to improve data processes. During the current quarter, MCSO reported that new applications for CAD and GIS were implemented.

Additionally, in TSQR10, "Searches," published in March 2023, MCSO found that nearly two dozen searches had been coded incorrectly as either discretionary or non-discretionary searches. This was largely due to a deputy having indicated multiple search types during an incident, which the coding syntax could not adequately address. As a result, MCSO recoded the data prior to any analysis for TSAR8. The agency is also reviewing the training, policy, and analytic syntax related to searches to ensure that such miscoding does not occur again.

Finally, EIU produces a monthly report for benchmarks not related to the traffic stop methodologies. We routinely use these monthly tables to evaluate compliance with various Paragraphs within the Court Order. For traffic-related Benchmarks 3 and 8 (Paragraph 67), MCSO documents both traffic stops involving immigration inquiries and data validation errors committed by deputies. During this reporting period, there were no immigration inquiries, and there were 15 data validation alerts: three in April; three in May; and nine in June.

WAI 70580

*Paragraph 75.* *The EIS shall include a computerized relational database, which shall be used to collect, maintain, integrate, and retrieve:*

a.    *all misconduct Complaints or allegations (and their dispositions), excluding those made by inmates relating to conditions of confinement or conduct of detention officers (i.e., any complaint or allegation relating to a traffic stop shall be collected and subject to this Paragraph even if made by an inmate);*

b.    *all internal investigations of alleged or suspected misconduct;*

c.    *data compiled under the traffic stop data collection and the patrol data collection mechanisms;*

d.    *all criminal proceedings initiated, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the County and/or its Deputies or agents, resulting from MCSO Patrol Operations or the actions of MCSO Patrol Operation Personnel;*

e.    *all arrests;*

f.    *all arrests in which the arresting Deputy fails to articulate probable cause in the arrest report, or where an MCSO Supervisor, court or prosecutor later determines the arrest was not supported by probable cause to believe a crime had been committed, as required by law;*

g.    *all arrests in which the individual was released from custody without formal charges being sought;*

h.    *all Investigatory Stops, detentions, and/or searches, including those found by the Monitor, an MCSO supervisor, court or prosecutor to be unsupported by reasonable suspicion of or probable cause to believe a crime had been committed, as required by law;*

i.    *all instances in which MCSO is informed by a prosecuting authority or a court that a decision to decline prosecution or to dismiss charges, and if available, the reason for such decision;*

j.    *all disciplinary action taken against employees;*

k.    *all non-disciplinary corrective action required of employees;*

l.    *all awards and commendations received by employees;*

m.    *Training history for each employee; and*

n.    *bi-monthly Supervisory observations of each employee.*

**Phase 1:**  In compliance

- EA-3 (Non-Traffic Contact), most recently amended on June 28, 2019.

- GC-13 (Awards), most recently amended on February 14, 2023.

- GH-5 (Early Identification System), most recently amended on March 28, 2023.

- EIU Operations Manual, currently under revision.

WAI 70581

- Professional Services Bureau Operations Manual, most recently amended on December 21, 2020.

**Phase 2:**  In compliance

Since 2017, MCSO has placed into production data interfaces for Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), Justice Court turndowns (AOC) and the Cornerstone software program (the HUB) that provides reports for training and policy acknowledgment.  MCSO continues to develop some inspections or analytic reports that ensure that personnel are accurately using the EIS data available; however, the data do exist in the EIS and are accessible by personnel we have interviewed during site visits.  We will continue to evaluate and monitor the use of EIS in furtherance of the Orders.  During our last in-person site visit, in January 2020, we also reviewed with MCSO representatives how the data for the following Subparagraphs appear on-screen and are accessible to first-line supervisors.  We found no issues of concern during this review.  We anticipate conducting a similar review when we resume our in-person site visits.

Paragraph 75.a. requires that the database include "all misconduct Complaints or allegations (and their dispositions)," with some exclusions.

EIPro, a web-based software application that allows employees and supervisors to view information in the IAPro case management system, includes the number of misconduct complaints and allegations against deputies.  Since February 2017, both open and closed cases have been viewable by supervisors.  PSB controls the ability to view open cases based upon the parties who may be involved.  PSB personnel developed a protocol to write the summaries for both open and closed cases that appear in the EIS.  This protocol has been approved and incorporated into the PSB Operations Manual that was published on December 13, 2018.  Each month, we receive a spreadsheet of open and closed external complaints as they appear in EI Pro for supervisors to review.  Our examination of these descriptions for April through June found that these summaries met our expectations.  Additionally, during our site visits between 2017 and January 2020, we observed that field supervisors could easily access these summaries and understand the types of issues involved in the complaints.  Supervisors conducting alert investigations have also routinely referred to a review of complaint summaries as a portion of their investigative process.  Supervisors also advised us that they can always contact EIU and PSB for clarification if it is necessary.

MCSO is in compliance with this Subparagraph.

Paragraph 75.b. requires that the database include "all internal investigations of alleged or suspected misconduct."

Corresponding to the discussion above involving external complaints, internal investigation summaries also appear in the IAPro system.  All complaint summaries, open and closed, have been viewable since February 2017.  PSB uses a standard protocol to develop the case summaries and access limits.  We approved this protocol, and it is included in the PSB Operations Manual.  Each month, we receive a spreadsheet of internal allegations as they appear to supervisors in EIS.  Our review of the summaries for April through June found these summaries to be transparent and easily understandable.  During our past site visits, we have found that line supervisors are also able to easily access the summaries of open and closed internal investigations pertaining to their

WAI 70582

subordinates. Supervisors also have referred to these summary fields while conducting alert investigations. Field supervisors always have the option of requesting additional information from EIU and PSB should they deem the summaries insufficient.

MCSO is in compliance with this Subparagraph.

Paragraph 75.c. requires that the database include "data compiled under the traffic stop data collection and the patrol data collection mechanisms."

MCSO has created electronic forms to collect data from traffic stops, incidental contacts, and warnings.

MCSO has also created interfaces with EIS for remote databases including Incident Reports (IRs) and Non-Traffic Contact Forms (NTCFs). These reports are readily available to supervisors to review within EIS. Field supervisors have shown that they have the ability to view IRs and NTCFs during our past in-person site visits. AIU already conducts an inspection of IRs and has revised the methodology to improve and streamline the inspection process. We have suggested that MCSO create a similar inspection for NTCFs, as well as propose an analytical strategy to examine whether any racial or ethnic inconsistencies may exist in the incidents documented on the NTCF. MCSO produced a brief proposal of the methods they would use to analyze NTCFs based upon these ongoing discussions. We, the Plaintiffs, and the Plaintiff-Intervenor provided comments on these proposals in early April 2020. Following several conference calls on both the forms and policy, EA-3 (Non-Traffic Contact), MCSO proposed an initial study that would evaluate how the NTCF form and policy are being used across the agency. The NTCF study was published in February 2023. While this analysis did not investigate potential indications of bias in how these stops are conducted by deputies or evaluated by supervisors, it did provide some insight into the modifications needed in both the form and policy going forward. We have provided MCSO with our comments and concerns regarding the initial study and MCSO has responded. Currently, MCSO is utilizing the initial study to review the NTCF form and policy (EA-3 [Non-Traffic Contact]) with the intent of suggesting modifications. We will evaluate these when they are produced. MCSO has made available all investigative stop and field interview NTCFs each month. Our review of NTCFs for the current quarter did not find any issues of concern, although we continue to notice that most bike related stops are of Hispanic operators. However, a statistical methodology would allow a more comprehensive examination. We will continue to work with MCSO as this process moves forward.

This Paragraph requires that the data for such activities exists within EIS; however, Paragraphs 72, 81a., and 81b.vi. require an analysis of these stops. Therefore, while MCSO complies with this Subparagraph, MCSO will not achieve compliance for the other Paragraphs until a method of analysis is approved.

MCSO is in compliance with this Subparagraph.

Paragraph 75.d. requires that the database include "all criminal proceedings initiated, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the County and/or its Deputies or agents, resulting from MCSO Patrol Operations or the actions of MCSO Patrol Operation Personnel."

WAI 70583

MCSO's Legal Liaison Section receives and forwards this information to EIU for entry into the EIS database. Supervisors have demonstrated the ability to access this information during our site visits. During the first quarter of 2023, MCSO also updated Appendix G (Unique Incident Procedures) of the EIU Operations Manual to include instructions on how to handle Notice of Claims.

MCSO is in compliance with this Subparagraph.

Paragraph 75.e. requires that the database include "all arrests."

Arrests may not always occur as a result of a traffic stop. MCSO, therefore, has placed into production an interface between EIS and the Jail Management System (JMS). This interface allows supervisors to easily access information regarding arrests that cannot be viewed through traffic data. During our site visits, supervisors have demonstrated the ability to access the IRs and related arrest information. The timeliness and sufficiency of that review is evaluated under Paragraph 93.

MCSO is in compliance with this Subparagraph.

Paragraph 75.f. requires that the database include "all arrests in which the arresting Deputy fails to articulate probable cause in the arrest report, or where an MCSO Supervisor, court or prosecutor later determines the arrest was not supported by probable cause to believe a crime had been committed, as required by law."

Incident Reports (IRs) are housed in the TraCS (Traffic and Criminal Software) system. Supervisors must review and sign off on IRs for each deputy involving an arrest or detention of a suspect within 72 hours of the incident. Supervisors are also required to ensure that probable cause exists for each charge or arrest outlined within an IR. AIU additionally conducts an inspection of IRs to ensure that all policy requirements are met. During this quarter, MCSO reported IR compliance rates in excess of 99%, using a matrix to assess compliance. Our findings were slightly lower as we deem a case to be non-compliant if any major issues are found during the review. During this quarter, there were two instances of deputies using boilerplate language, one instance of missing documentation, and one instance of a missing property receipt. However, we concur with MCSO that no probable cause issues were found this quarter. Our compliance rates for the quarter were 95% or greater.

If a court or prosecutor decides not to prosecute a case, both the deputy and their immediate supervisor are notified. In 2019, MCSO created a new inspection that combined IR and County Attorney Turndown inspections. MCSO's intent is to catch instances of reasonable suspicion and probable cause issues earlier in the process. Other deficiencies result in BIO sending Action Forms to the appropriate District personnel.

MCSO is in compliance with this Subparagraph.

Paragraph 75.g. requires that the database include "all arrests in which the individual was released from custody without formal charges being sought."

WAI 70584

The ability to capture this information depends upon what actually occurred within the context of the interaction. If the suspect was taken into physical custody but released prior to booking, there would be a JMS record, as indicated in Subparagraph 75.e. above. Therefore, MCSO could use the interface described above to pull the relevant data elements into EIS. However, if the incident does not rise to the point of physical custody and detention, then it would likely yield an Incident Report, covered under Subparagraph 75.f. above or an Investigatory Stop under Subparagraph 75.h. to follow. The interfaces for IR and NTCF data became operational prior to July 1, 2017. The new inspection process referred to above will also capture elements useful for the evaluation of this Subparagraph.

MCSO is in compliance with this Subparagraph.

Paragraph 75.h. requires that the database include "all Investigatory Stops, detentions, and/or searches, including those found by the Monitor, an MCSO supervisor, court or prosecutor to be unsupported by reasonable suspicion of/or probable cause to believe a crime had been committed, as required by law."

MCSO has created interfaces for both IRs and NTCFs. As noted in 75.f., our compliance calculation for inspection of IRs were slightly lower than those of MCSO. AIU sent BIO Action Forms (BAFs) to Districts with deficiencies. In addition, AIU published two BIO Action Form Tracking Studies that includes an evaluation of IR practices by supervisors. We have discussed that in detail in other Paragraphs, but this inspection does provide additional information for evaluating the compliance of MCSO with this Paragraph.

In July 2017, the interface between EIS and the database for NTCFs was placed into production. MCSO also reissued EA-3 (Non-Traffic Contact) and amended the policy on June 14, 2018 (and further amended it on June 28, 2019). This policy specifies the responsibility of MCSO personnel regarding different types of search occurrences. If the search is related to a traffic stop, it should be captured on the VSCF. Searches occurring within activities resulting in an Incident Report will be captured under Subparagraph 75.e., and NTCF searches fall under this Subparagraph.

Initially, the number of NTCF reports was insignificant; however, since May 2018, we generally receive between 15-25 NTCFs for investigative stops each month. These are all captured within EIS as required by this Subparagraph (as well as 75.c.). During the last quarter of 2019, we also requested a random sample of Field Information stops that were documented using the NTCF. Our review of these indicated that approximately 80% of civilian stops labeled as Field Information could easily have been labeled as Investigative stops. We apprised MCSO of our findings and have subsequently provided MCSO with our summary evaluation. We have also suggested that MCSO develop a methodology to statistically analyze the collection of NTCFs to look for possible issues of racial or ethnic bias in the way these interactions are conducted. The development of a statistical examination of NTCF stops should be a priority for MCSO now that the Traffic Stop Methodologies for the Monthly Analyses are complete. Such an examination is required by Paragraphs 72 and 81.b.vi.

Since NTCFs and IRs are included in EIS, MCSO is in compliance with this Subparagraph. Our review of investigative stops and field interviews during this quarter yielded no issues of concern.

MCSO is in compliance with this Subparagraph.

WAI 70585

Paragraph 75.i. requires that the database include "all instances in which MCSO is informed by a prosecuting authority or a court that a decision to decline prosecution or to dismiss charges, and if available, the reason for such decision."

The EIS database has included both County Attorney Actions and an interface with the Justice Courts (AOC) since July 2017. MCSO began using a method that merged the County Attorney Turndown Inspection with the IR inspection. The first inspection was produced in August 2019 using July data. For this quarter, our computed compliance rates for the IRs were slightly lower than those of MCSO (Subparagraph 75f). The IR inspection did not include any County Attorney Turndowns, as none were received indicating a problem with probable cause. AIU sent several BIO Action Forms relating to the use of boilerplate language or missing documents to the Districts for review due to the deficiencies found by the inspectors. For this Subparagraph, we also receive a random selection of IRs turned down for prosecution from MCSO and the Justice Courts. Our review of these indicate that most had been turned down using the generic phrases "no reasonable likelihood of conviction," "dismissed to aide in prosecution," or "self-defense/mutual combat." We found no significant problems with the reports reviewed. We will continue to evaluate the inspection and IRs in future quarterly status reports.

MCSO is in compliance with this Subparagraph.

Paragraph 75.j. requires that the database include "all disciplinary action taken against employees."

MCSO currently tracks disciplinary actions in the IAPro system (for this and Paragraphs 26, 28, 69, and 89), which allows supervisors to search the history of their employees in EIS.

Additionally, the Administrative Services Division replies to a monthly request that incorporates this Subparagraph; and the Division's report indicates that no discipline was imposed for bias-related incidents between April and June 2023.

MCSO is in compliance with this Subparagraph.

Paragraph 75.k. requires that the database include "all non-disciplinary corrective action required of employees."

The information required by this Subparagraph is captured in the EIS. MCSO produces a Supervisory Note inspection (in particular, bimonthly reviews of a deputy's performance) and the monthly alert report described in the previous Subparagraph to fulfill the requirements for this Subparagraph. In addition, we also review up to 15 closed alert inspections conducted by supervisors each month. (If there are more than 15, the cases are randomly selected from the total.) As noted previously, the majority of cases are closed through a meeting with a supervisor.

Supervisors also are required to make two comments regarding their subordinates each month in their BlueTeam Notes. In the Supervisor Notes inspections for this quarter, there was one deficiency found in both April and June, and six in May.

MCSO is in compliance with this Subparagraph.

Paragraph 75.l. requires that the database include "all awards and commendations received by employees."

WAI 70586

MCSO first published GC-13 (Awards) on November 30, 2017, and most recently revised this policy on February 14, 2023.  With this publication, MCSO created categories for awards or commendations that could be tracked within the EIS database.  With the introduction of the newest version of EIPro, these fields are also searchable by supervisors.  During our past site visits, supervisors demonstrated how they could search these fields and locate awards of their subordinates in the EIS data.  According to the monthly alert inspection reports for April through June, there were two commendation recommendations this quarter.

MCSO is in compliance with this Subparagraph.

Paragraph 75.m. requires that the database include the "[t]raining history for each employee."

MCSO has transitioned from the Skills Manager System to the Cornerstone (the HUB) software program.  The HUB has replaced the E-Policy and E-Learning programs.  The HUB routinely updates recent training and policy reviews for deputies and is visible by immediate supervisors.  MCSO also created an interface between the HUB and EIS.

During our past site visits, all field supervisors who we contacted stated that they were familiar with the HUB and were able to access the information contained therein.  Several supervisors noted how they assigned training to particular deputies following alert investigations they completed.  MCSO personnel informed us that supervisors have ready access to the training and policy reviews of their subordinates.  We will continue to evaluate supervisors' ability to easily search and use EIS during future site visits.  As noted above, this will include not only a review with EIU technical staff but field supervisors at the Districts when we resume our in-person site visits.

MCSO is in compliance with this Subparagraph.

Paragraph 75.n. requires that the database include "bi-monthly Supervisory observations of each employee."

The Audits and Inspections Unit (AIU) conducts a monthly inspection of Supervisor Notes.  One of the indicators AIU evaluates is whether supervisors are making two notes per deputy each month.  For this quarter, AIU reported two instances where supervisors failed to make two reviews for each of their subordinates and sent BIO Action Forms to the relevant Districts for processing.

MCSO is in compliance with this Subparagraph.

With the operationalization of interfaces for Incident Reports, Non-Traffic Contact Forms, the Arizona Office of the Courts, and the HUB, EIS contains the information required by the Order.  MCSO has worked diligently to use some of the data above to investigate compliance rates with the Orders.  MCSO continues to develop other inspections or data analytic methods in response to our recommendations.

WAI 70587

***Paragraph 76.*** *The EIS shall include appropriate identifying information for each involved Deputy (i.e., name, badge number, shift and Supervisor) and civilian (e.g., race and/or ethnicity).*

**In Full and Effective Compliance**

MCSO has instituted a quality check process for Vehicle Stop Contact Forms (VSCFs) that requires supervisors to review all traffic stop documents within three days of the stop. AIU also conducts an inspection of the timeliness of these reviews as well as a second inspection on Traffic Stop Data. Each of these inspections are based upon a stratified random sample of traffic stops that we conducted. The Traffic Stop Data inspection employs a matrix that ensures that the name, serial number, and unit of the deputy is included on the VSCF in addition to the identity and race/ethnicity of the driver. The overall rate of compliance for the Traffic Stop Data inspections reported by MCSO exceeded 99% for this reporting period, and none of the deficiencies involved identification of deputies or drivers. As previously noted, our compliance calculations for this period were slightly lower due to the fact that we do not employ a matrix to assess compliance, but rather judge individual cases as deficient if any significant information is determined not to be consistent across traffic stop forms or CAD.

MCSO has incorporated patrol data into the EIS through the creation of interfaces for Incident Report (IR) and Non-Traffic Contact Form (NTCF) documents. Each of these documents lists the required name of the deputy and civilian, as well as the ethnicity of the civilian, in accordance with this Paragraph. AIU conducts an inspection of IRs, including a check for racial/ethnic bias in the reporting documents and the identification of all parties contacted as a result of the incident. We have found no recent instances where the identity of a deputy or persons contacted was not included on these forms. Non-Traffic Contact Forms contain the same basic information about the identity of the deputy making the contact and the persons being contacted. While MCSO does not yet have an inspection of NTCFs, they do provide us with copies of all the documents for investigative stops and field information. Up to this point, we have not found a repetitive problem with NTCF documentation that includes the criteria required by this Paragraph.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

***Paragraph 77.*** *MCSO shall maintain computer hardware, including servers, terminals and other necessary equipment, in sufficient amount and in good working order to permit personnel, including Supervisors and commanders, ready and secure access to the EIS system to permit timely input and review of EIS data as necessary to comply with the requirements of this Order.*

**In Full and Effective Compliance**

Since our earliest site visits in 2014, we have addressed the issue of "necessary equipment, in sufficient amount and in good working order" with MCSO. As part of our monthly document requests, we receive an accounting, by District, of how many vehicles have functioning TraCS systems.

WAI 70588

Since the end of 2015, we have found that all marked patrol vehicles were properly equipped with TraCS equipment. MCSO developed EB-2 (Traffic Stop Data Collection), which states that in the event that a TraCS vehicle is not operational, or available, each District possesses the necessary equipment at the substation for deputies to input his/her traffic stop information before the end of the shift. Due to the mountainous regions throughout Maricopa County, there have always been connectivity issues. However, these areas are well-known to Patrol deputies; and they have demonstrated how they adapt to connectivity problems. The VSCF also allows deputies to note issues with technology on a traffic stop.

During our past visits to the Districts, we regularly spot-checked the facilities and patrol cars; and found that they had functioning TraCS equipment, and that each District office had available computers for any occurrence of system failures with vehicle equipment. We have been unable to conduct these inspections since January 2020 as a result of holding our site visits remotely; however, we will conduct these reviews when we resume in-person site visits.

At present, the technology and equipment available at MCSO meet the requirements of the Order.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 78.** *MCSO shall maintain all personally identifiable information about a Deputy included in the EIS for at least five years following the Deputy's separation from the agency. Information necessary for aggregate statistical analysis will be maintained indefinitely in the EIS. On an ongoing basis, MCSO shall enter information into the EIS in a timely, accurate, and complete manner, and shall maintain the data in a secure and confidential manner. No individual within MCSO shall have access to individually identifiable information that is maintained only within EIS and is about a deputy not within that individual's direct command, except as necessary for investigative, technological, or auditing purposes.*

**In Full and Effective Compliance**

GH-5 (Early Identification System) clearly states that employees only have access to EIS in furtherance of the performance of their duties, and that any other unauthorized access will be addressed under MCSO's discipline policy. The policy also notes that access to individual deputy information will be limited to appropriate supervisory/administrative personnel associated with that deputy. In addition, the policy states that personal information will be maintained in the database for at least five years following an employee's separation from the agency; however, all other information will be retained in EIS indefinitely.

WAI 70589

The most recent occurrences of a substantiated misuse of MCSO's computer system occurred in 2011 and 2015. As a result, MCSO published a System Log Audit operating procedure in November 2017 that required PSB to notify the Technology Management Bureau of any investigations involving a system breach. We fully vetted this operating procedure (BAS SOP 17-4) during our January 2018 site visit. MCSO reported no system breaches occurring since our January 2020 site visit. In addition, we receive summaries of all internal investigations each month.

In March 2019, one case indicated that a deputy was under investigation for potentially misusing the Arizona Criminal Justice Information System (ACJIS); and in another, it was alleged that booking information might have been used for social media. In April 2020, there was an external complaint that a deputy may have run a criminal history check on someone for a relative. More recently, a November 2022 case included an allegation of an employee photographing and texting information from the database; and in January 2023, there was an allegation of potential misuse of the ADP system. These cases have not triggered the operating procedure noted above and, according to MCSO; PSB has either not yet completed its investigations in three instances, and the Division has found nothing to substantiate the original claims in the fourth.

MCSO's concern for the integrity of information in EIS is further exemplified by the protocols that PSB has created to meet the requirements of Subparagraphs 75.a. and 75.b. regarding purview of open complaints and internal investigations. PSB not only controls who can view summaries of open investigations but has created a protocol for creating the summaries of open investigations to protect the integrity of the cases while they are being processed.

MCSO has also created a work group to ensure the integrity of traffic stop data used for analysis. The protocols used by this work group are incorporated into Section 306 of the EIU Operations Manual. We have approved this section, and it has been incorporated into the manual as finalized.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**_Paragraph 79._** _The EIS computer program and computer hardware will be operational, fully implemented, and be used in accordance with policies and protocols that incorporate the requirements of this Order within one year of the Effective Date. Prior to full implementation of the new EIS, MCSO will continue to use existing databases and resources to the fullest extent possible, to identify patterns of conduct by employees or groups of Deputies._

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on March 28, 2023.

**Phase 2:** Not in compliance

During the fourth quarter of 2022, MCSO completed the pilot project for the Traffic Stop Monthly Report (TSMR); however, the finalization of guiding policies did not take place until late March 2023. During our last several (in-person and remote) site visits, we have also recommended to

WAI 70590

MCSO that the agency needs to create an analytical plan for the Non-Traffic Contact Forms that have accumulated over the past several years. Until this analysis is complete and operational, MCSO will not achieve Phase 2 compliance with this Paragraph. MCSO did publish the first stage review of NTCFs in February 2023. This study focused on how deputies employ the NTCF form and understand the associated policy; however, this analysis did not investigate potential indications of bias in how these stops are conducted by deputies or evaluated by supervisors. It did provide some insight into the modifications needed in both the form and the policy going forward. We have provided MCSO with our comments and concerns regarding the initial study and MCSO has responded. Currently, MCSO is using the initial study to review the NTCF form and policy (EA-3 Non-Traffic Contact) with the intent of suggesting modifications. We will evaluate these when they are produced.

MCSO published its eighth Traffic Stop Annual Report (TSAR), which is discussed in other Paragraphs. Although the report concludes that systemic bias in patrol functions through traffic stop outcomes does appear to exist, they have not yet shown a statistically significant change in the level of potential bias. For instance, for stop length, MCSO reported a decline from 2018 to 2019 for Latinos and minorities combined, but an increase from 2019 to 2020 and a decrease from 2020 to 2021. A similar trend was found for searches of Latinos and minorities combined. Additionally, MCSO reported an increasing citation rate for Latinos from 2018 to 2019 and 2020; however, a decline occurred for 2021 for all minorities grouped together and Latinos compared separately. In a recent Traffic Stop Quarterly Report (TSQR8) "Disparities Over Time," MCSO investigated the disparities between stop length, citations, arrests, and searches over time. The agency analyzed data from the time period 2017 to 2021 in a variety of ways and found some positive and some negative changes. MCSO summarized these findings in the conclusions: "The results of the analyses performed do not demonstrate a clear pattern of disparities consistently increasing or decreasing over time." MCSO also noted that the agency believes that the lack of longer-term trends may be due to the fact that many changes to practice and policy occurred prior to 2017. We will continue to work with MCSO on the issue of trend analyses.

MCSO's plan for the analysis of monthly traffic data also stems from the foundation created by the fourth through the seventh TSARs. MCSO completed a pilot program for TSMR in October 2022. The methodologies and processes have been modified each time a problem with the analysis or intervention occurred. The information from these analyses has been used to inform and refine the vetting processes developed in conjunction with us and the Parties. Based on the vetting processes, TSAU recommends actions ranging from discounting of flags to full intervention processes involving remedies for the particular issues that arose during the vetting process. We and the Parties have been involved in each step of these processes.

EIU and AIU pull together data to produce reports and inspections of both deputy and supervisor activity. The EIS automatically triggers alerts for repetitive actions, such as receiving multiple BIO Action Forms or external complaints. For the past two years BIO has been reevaluating the threshold levels that trigger several of these alerts and, in some instances, suspended them during this period. During the first quarter of 2023, MCSO published Appendix A (EIS Allegation and Incident Thresholds) to the EIU Operations Manual as well as producing two threshold analyses for vehicle pursuits and accidents. The EIU uses this information to create monthly reports and

to determine whether an investigation by a supervisor is required. AIU publishes a quarterly inspection on EIS Alert Processes to ensure that alert investigations are conducted within policy timeframes and to summarize the manner in which investigations were closed. The EIS Alert report for the third and fourth quarters of 2022 noted 100% compliance with the policy timelines. We concurred with these findings. During the fourth quarter, one investigation led to a meeting with a commander; another resulted in the additional training for a deputy; and a third was referred to PSB. The majority of cases are resolved with a meeting between the deputy and a supervisor. MCSO has also developed an extension of this inspection, to include an evaluation of the effect of interventions that supervisors recommend and implement. Our review of this inspection for the fourth quarter found that it met expectations. MCSO also published a quarterly report for the first quarter of 2023. The report noted that all EIS Alert investigations were completed within policy timeframes, although three supervisors requested – and were granted – extensions. Similar to the fourth quarter report, the majority of interventions involved meeting with a supervisor, although there was one reassignment, one training, and one supervisor requesting an extended evaluation period for a deputy. The report concluded that of the interventions evaluated, 96% resulted in no new alerts. We concur with the findings of this report.

AIU also uses the EIS database to generate numerous inspections of traffic stop data, Supervisor Notes, and Incident Report inspections, among many others. When deficiencies are found, AIU sends out BIO Action Forms to the District command to rectify the situation and memorialize what actions are taken. These inspections are critical to evaluate compliance with several Paragraphs in the Order. AIU has already automated an alert threshold for repeated Action Forms for the same types of events. An initial investigation of repetitive Action Forms in 2019 showed that a small number of deputies receive three or more Action Forms, while the vast majority of deputies receive only one Action Form. In May 2023, MCSO published the second BIO Action Form Tracking Study covering the last half of 2021 and the first six months of 2022. The study found that the majority of deputy deficiencies involved the failure to follow approved practices and policies related to data entry, documentation, and time management issues. BIO also examined more closely those deputies and supervisors with the highest rate of deficiencies and recommended reasonable solutions.

### b. Training on the EIS

**Paragraph 80.** *MCSO will provide education and training to all employees, including Deputies, Supervisors and commanders regarding EIS prior to its implementation as appropriate to facilitate proper understanding and use of the system. MCSO Supervisors shall be trained in and required to use EIS to ensure that each Supervisor has a complete and current understanding of the employees under the Supervisor's command. Commanders and Supervisors shall be educated and trained in evaluating and making appropriate comparisons in order to identify any significant individual or group patterns. Following the initial implementation of the EIS, and as experience and the availability of new technology may warrant, MCSO may propose to add, subtract, or modify data tables and fields, modify the list of documents scanned or electronically attached, and add, subtract, or modify standardized reports and queries. MCSO shall submit all such proposals for review by the Monitor pursuant to the process described in Section IV.*

WAI 70592

**In Full and Effective Compliance**

MCSO's curriculum for Supervisor Responsibilities: Effective Law Enforcement (SRELE) regularly includes a refresher and updates for supervisors regarding how most effectively to use EIS tools and complete Alert Investigations for their subordinates within policy guidelines. MCSO has modified the Traffic Stop Monthly Report (TSMR) analysis and participated in regular conference calls with us and the Parties during the TSMR pilot, which was completed in October 2022. Additionally, MCSO recently published the first nine Traffic Stop Quarterly Reports (TSQRs). As we have noted in earlier Paragraphs, the conclusions and recommendations of each of these reports could prove useful for the continued refinement of supervisory training conducted by MCSO. We will continue to assist MCSO as it formulates training curriculum to enhance the supervisory functions of the Office.

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

### c. Protocol for Agency and Supervisory Use of the EIS

*Paragraph 81. MCSO shall develop and implement a protocol for using the EIS and information obtained from it. The protocol for using the EIS shall address data storage, data retrieval, reporting, data analysis, pattern identification, identifying Deputies for intervention, Supervisory use, Supervisory/agency intervention, documentation and audit. Additional required protocol elements include:*

a. *comparative data analysis, including peer group analysis, to identify patterns of activity by individual Deputies and groups of Deputies;*

b. *identification of warning signs or other indicia of possible misconduct, including, but not necessarily limited, to:*

   i. *failure to follow any of the documentation requirements mandated pursuant to this Order;*

   ii. *racial and ethnic disparities in the Deputy's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of Deputies' specific duties, or racial or ethnic disparities in traffic stop patterns when compared with data of a Deputy's peers;*

   iii. *evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;*

   iv. *a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;*

   v. *complaints by members of the public or other officers; and*

WAI 70593

       vi.    *other indications of racial or ethnic bias in the exercise of official duties;*

c.    *MCSO commander and Supervisor review, on a regular basis, but not less than bimonthly, of EIS reports regarding each officer under the commander or Supervisor's direct command and, at least quarterly, broader, pattern-based reports;*

d.    *a requirement that MCSO commanders and Supervisors initiate, implement, and assess the effectiveness of interventions for individual Deputies, Supervisors, and units, based on assessment of the information contained in the EIS;*

e.    *identification of a range of intervention options to facilitate an effective response to suspected or identified problems. In any cases where a Supervisor believes a Deputy may be engaging in racial profiling, unlawful detentions or arrests, or improper enforcement of Immigration-Related Laws or the early warning protocol is triggered, the MCSO shall notify the Monitor and Plaintiffs and take reasonable steps to investigate and closely monitor the situation, and take corrective action to remedy the issue. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or other supervised, monitored, and documented action plans and strategies designed to modify activity. All interventions will be documented in writing and entered into the automated system;*

f.    *a statement that the decision to order an intervention for an employee or group using EIS data shall include peer group analysis, including consideration of the nature of the employee's assignment, and not solely on the number or percentages of incidents in any category of information recorded in the EIS;*

g.    *a process for prompt review by MCSO commanders and Supervisors of the EIS records of all Deputies upon transfer to their supervision or command;*

h.    *an evaluation of whether MCSO commanders and Supervisors are appropriately using the EIS to enhance effective and ethical policing and reduce risk; and*

i.    *mechanisms to ensure monitored and secure access to the EIS to ensure the integrity, proper use, and appropriate confidentiality of the data.*

**Phase 1:**  In compliance

- GH-5 (Early Identification System), most recently amended on March 28, 2023.

**Phase 2:**  Not in compliance

WAI 70594

MCSO completed the Traffic Stop Monthly Report (TSMR) pilot program and published all related documents and protocols during the fourth quarter of 2022 in the TSAU Operations Manual.  Late in the first quarter of 2023, MCSO modified GH-5 (Early Identification System) with the TSMR materials and appendices.  The TSMRs will assist MCSO and its supervisors in evaluating the activity of individual deputies with regard to traffic stops and examine any behaviors that might suggest biased activity.  MCSO will continue to share the results of its monthly vetting analyses with us and the Parties, in addition to providing all documents related to the closing of any cases that have gone beyond the initial vetting process.  During this quarter, MCSO recommended actions ranging from discounting of flags to full interventions.

MCSO has also published 11 TSQRs.  The topics of these analyses and their findings have been discussed in detail in other sections of this report, and in our previous quarterly reports.  Each of these analyses has yielded information that informs the development of training, modification of policy, future analyses, and the dissemination of resources to improve supervisory capabilities and deputy performance.

Paragraph 81.a. requires that MCSO's EIS protocols include "comparative data analysis, including peer group analysis, to identify patterns of activity by individual Deputies and groups of Deputies."

The EIU has conducted monthly and annual analyses looking for outliers that may indicate that an individual is behaving in a biased or unprofessional manner, in accordance with Paragraphs 65, 66, and 67.  The Traffic Stop Monthly Reports had been suspended for several years beginning in 2016.  However, in conjunction with us and the Parties, MCSO completed an 18-month pilot of the TSMR in October 2022 and MCSO finalized all relevant documents, protocols, and policies in the TSAU Operations Manual.  As noted above, MCSO has also modified GH-5 (Early Identification System) with those protocols that are pertinent from the completion of the TSMR pilot.  Both the TSAR and TSMR employ comparative peer group analyses to identify any indications that deputies may be conducting traffic stops in potentially discriminatory ways.

MCSO has also created an interface for Non-Traffic Contact Forms (NTCFs) to be available in the EIS database; however, MCSO has not yet begun to develop a methodology to investigate whether patterns of problematic behavior, action, or bias might be occurring in the stops these forms document.  In February 2023, MCSO had published an initial inquiry into how deputies use NTCFs.  We commented on this initial inquiry.  There was no evaluation in this initial study evaluating potential bias in the contacts between deputies and citizens.  MCSO also reported that an evaluation of EA-3 (Non-Traffic Contact) is underway following this initial investigation.  Following this portion of the inquiry, MCSO is expected to propose an appropriate statistical methodology that is responsive to the requirements of the Order.  We will evaluate the review of EA-3 and the proposed methodology once they are published.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.b. requires that MCSO's EIS protocols include "identification of warning signs or other indicia of possible misconduct."

WAI 70595

GH-5 (Early Identification System) provides significant direction for employees and supervisors alike to understand what type of behaviors will be viewed as problematic. As noted above, the intent of the TSMR is to identify deputies who might be engaged in biased activity regarding who they arrest, cite, warn, or search. MCSO completed the TSMR pilot program in October 2022 and have been providing all expected analyses and documentation since that time.

MCSO has also revised the EIU Operations Manual, which includes sections on data protocols and the several analyses based upon the traffic stop and patrol data. In particular, MCSO has recently modified and published Appendix A (EIS Allegations and Incident Thresholds) along with new threshold analyses for vehicle pursuits and accidents. MCSO has also updated the EIS Alert Process (Section 302) along with several other appendices. We will continue to work with MCSO to refine and implement these new processes, as well as evaluate any additional modifications to the Operations Manual.

Finally, as noted in Subparagraph 81.a. and 81.b.vi, MCSO should utilize all patrol data to evaluate the behavior of deputies in comparison to their peers. While the volume of Non-Traffic Contact Forms (NTCFs) pales in comparison to traffic stops, there are enough accumulated forms for analyses to commence. Following the publication of the initial inquiry into the use of NTCFs by deputies, MCSO reports that the agency has begun an evaluation of EA-3 (Non-Traffic Contact).

MCSO is not in compliance with this Subparagraph.

Paragraph 81.c. requires that MCSO's EIS protocols include "MCSO Commander and Supervisor review, on a regular basis, but not less than bimonthly, of EIS reports regarding each officer under the Commander or Supervisor's direct command and, at least quarterly, broader, pattern-based reports."

Supervisory Note inspections include four measures to assess how well supervisors are using EIS information to oversee the activity and behavior of their subordinates: making supervisory comments on deputies; reviewing their body-worn camera footage; making Employee Performance Appraisal (EPA) notations; and reviewing subordinates' EIS profiles. The overall compliance rate reported by MCSO for this quarter was 98.71% in April, 92.21% in May and 98.06% in June. Our calculations are slightly lower, as we evaluate any case as deficient if a significant issue or process is incomplete, whereas MCSO employs a matrix. Our compliance calculations for the quarter are 97.7%, 81.81%, and 97.7% respectively. In May, MCSO reported that a single supervisor had failed to evaluate in a timely fashion the actions of several subordinates. Since MCSO has been out of compliance (below 94% overall) with this Subparagraph for two reporting periods, we are withdrawing compliance with this Subparagraph.

When deficiencies are found, AIU sends out BIO Action Forms to those Districts, no matter the level of compliance. We have also repeatedly requested additional information from MCSO when we encounter an issue of concern and MCSO has always willingly provided the needed information or additional data. Rarely have we noted deficiencies involving the same supervisors in consecutive months. MCSO has already included repetitive BIO Action Form (BAF) deficiencies as an alert allegation. AIU has developed and placed into production a means to better track BAFs by type, individual, and District to ensure that any corrective actions are

WAI 70596

targeted at the most appropriate level and to be able to determine if there are particular supervisors that appear repeatedly within specified timeframes. We have noted in our review of 15 randomly selected alert investigations each month, that there appears to have been an increase in investigations due to repetitive BAFs. We believe the first and second BAF tracking inspections completed in September 2022 and May 2023, discussed in prior Paragraphs, will be instrumental for MCSO in evaluating and adjusting the actions of deputy and supervisory personnel.

MCSO is in compliance with this Subparagraph.

Paragraph 81.d. requires that MCSO's EIS protocols include "a requirement that MCSO Commanders and Supervisors initiate, implement and assess the effectiveness of interventions for individual Deputies, Supervisors, and units, based on assessment of the information contained in the EIS."

The EIS database generates alerts for issues ranging from data entry errors to internal and external complaints. From these alerts, EIU personnel send out for investigation those alerts that are not redundant or mischaracterized in some fashion. Supervisors have a set amount of time – 30 days – to return these investigations with a description of their investigation and the outcome.

MCSO has created an EIS Alert Review Group (ARG) that evaluates the investigations of supervisors prior to closing an alert. The group ensures that the reports of the supervisors address all aspects of the assigned investigation and returns those that are deficient to the District for continued revision. Following the creation of the ARG, we have found the supervisors' investigations and summaries to be more complete and thorough. Over time, the review group's request for additional information has dropped below one third of the investigations evaluated. MCSO has provided us with the original alert investigation documents (Attachment B of GH-5 [Early Identification System]), as well as modified ones arising from the ARG's requests.

AIU has also created an inspection for EIS Alert Review Processes. This inspection initially determines whether the investigation was completed within policy timeframes of 30 days. The compliance rate for the third and fourth quarters was 100%. We concur with these findings. In the fourth quarter of 2022, MCSO also produced an EIS Alerts Inspection which included a method of evaluating whether the interventions triggered by alert investigations may, or may not, be mitigating the problematic activity giving rise to the original alert. To do this, they began with the alerts investigated in the first quarter of 2022, and examined the alerts triggered in the following two quarters to determine if there were any recurring alerts. AIU found that five deputies had new alerts during the second and third quarters of 2022. Of these five, four were for new external complaints and one was due to a new BIO Action Form naming the deputy. The report also indicated that follow-up on the latter case had already occurred, but the external complaints were under the purview of PSB, so there was no additional investigation conducted.

MCSO published a quarterly report for the first quarter of 2023 and found that all investigations had been completed within policy timeframes. MCSO also reported that the intervention most often employed was meeting with a supervisor, although there was also one reassignment, one case requiring additional training, and one in which the supervisor suggested additional supervisory oversight. The report also noted that in 96% of all investigations evaluated, there was no reoccurrence of the original alert. MCSO noted they will continue to evaluate the effect

WAI 70597

interventions have on the triggering of new alert cases. This addition to the quarterly EIS Alert Inspection fulfills the need to ensure that repetitive problematic behavior is being flagged and addressed appropriately.

MCSO is in compliance with this Subparagraph.

Paragraph 81.e. requires MCSO's EIS protocols to include "identification of a range of intervention options to facilitate an effective response to suspected or identified problems. In any case where a Supervisor believes a Deputy may be engaging in racial profiling, unlawful detentions or arrests, or improper enforcement of Immigration-Related Laws or the early warning protocol is triggered, MCSO shall notify the Monitor and Plaintiffs and take reasonable steps to investigate and closely monitor the situation and take corrective action to remedy the issue. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or other supervised, monitored, and documented action plans and strategies designed to modify activity. All interventions will be documented in writing and entered into the automated system."

GC-17 (Employee Disciplinary Procedures) and GH-5 (Early Identification System) provide a wide range of options for supervisor interventions, as well as practical guidelines about how to employ those options. As noted above, GH-5 includes Attachment B, "Early Identification Alert Response Form." This form specifies the responsibility of supervisors and serves as a checklist of processes the supervisor should use. EIU also attaches any documents, citations, or BWC recordings the supervisor might need to conduct an inquiry. We began observing the use of these forms in April 2017. Over the past year, we have found that alert investigations conducted by supervisors has improved. During the fourth quarter of 2022, supervisors recommended over one dozen meetings with a supervisor, one meeting with a commander, and one reassignment of a deputy. In the first quarter of 2023, supervisors recommended over one dozen meetings with a supervisor, one reassignment, one additional training, and one extended supervisor evaluation period.

MCSO has also created an EIS Alert Review Group (ARG) to ensure that the closure of alerts is supported by documentation from supervisors and responsive to the needs of the organization. MCSO has established an extension protocol for alert investigation timeframes when documentation issues delay the process. We will continue to evaluate these as they are produced.

MCSO is in compliance with this Subparagraph.

Paragraph 81.f. requires that MCSO's EIS protocols include "a statement that the decision to order an intervention for an employee or group using EIS data shall include peer group analysis, including consideration of the nature of the employee's assignment, and not solely on the number or percentages of incidents in any category of information recorded in the EIS."

In the development of GH-5 (Early Identification System), MCSO has taken into consideration the nature of the employee's assignment. In prior versions of GH-5, MCSO created an appendix for thresholds that indicated, for example, that the "use of force" threshold was different for Detention and Patrol personnel. Detention personnel are much more likely to need to employ force than their Patrol counterparts. During the first quarter of 2022, MCSO produced a Threshold Analysis Review Proposal which was approved. MCSO used the approved proposal

WAI 70598

to modify Appendix A (EIS Allegations and Incident Thresholds) to the EIU Operations manual as well as conducting threshold reviews of traffic accident and pursuit policies during the first quarter of 2023.

MCSO and its data analysis vendor proposed and employed an expansion of "peer" comparisons beyond just the location of the traffic stop in the fourth TSAR and has made modifications where necessary in the fifth through the seventh TSARs.  MCSO has also concluded the pilot-testing for the TSMR using these new peer comparison strategies.  As a result of these experiences, MCSO also added refinements to the time and location of traffic stops that more precisely allows for comparisons of similarly situated deputies through a statistical splining procedure.  As a result of the completion of the pilot and operationalization of the TSMR, MCSO is now in compliance with the Subparagraph.

MCSO is in compliance with this Subparagraph.

Paragraph 81.g. requires that MCSO's EIS protocols include "a process for prompt review by MCSO Commanders and Supervisors of the EIS records of all Deputies upon transfer to their supervision or command."

MCSO has noted the need for a prompt review in both the "Supervisor Responsibilities" and "Command Staff Responsibilities" sections of GH-5 (Early Identification System).  EIU specifically addressed this issue during the EIS and SRELE training completed in November 2017 and updated each year thereafter.  EIU advised supervisors to document when they conducted their review in Supervisor Notes, as well as how long the deputy had been working in their chain of command when the review was conducted.  As noted, this was also reiterated in the SRELE training that was approved on September 30, 2019.  During our visits to several Districts in 2019 and 2020, MCSO personnel informed us that most command staff attempt to review these materials within the first few days that a deputy, or supervisor, moves to their District.  In no cases have we found information where the 14-day limit outlined in policy has been problematic.

MCSO is in compliance with this Subparagraph.

Paragraph 81.h. requires that MCSO's EIS protocols include "an evaluation of whether MCSO Commanders and Supervisors are appropriately using the EIS to enhance effective and ethical policing and reduce risk."

EIU has improved the processing and tracking of alert investigations.  The development of Attachment B to GH-5 (Early Identification System) and training completed in EIS and SRELE has dramatically improved the information provided by supervisors when closing alerts.  AIU also created an EIS Alert Review Process inspection that specifically looks for indications that supervisors have conducted a thorough examination within policy timeframes and selected appropriate responses to the allegations included in the alert investigation.  Initially, this inspection was limited to reviewing whether supervisors were completing alert investigations within the 30-day policy requirements.  MCSO's compliance rate for EIS inspections for the third and fourth quarter of 2022, and the first quarter of 2023, was 100%.  This rate matches up with our own review.

WAI 70599

As noted above, MCSO has also implemented a process following the closure of an investigation to ensure that no similar alerts are triggered within the next two quarters. This inspection will become a valuable component to ensure that supervisors and command staff are using EIS to promote efficiency and ethical policing during the alert investigation process. We will continue to evaluate these inspections as they become available.

We found no issues with the conclusions used for closing alert investigations during this quarter. In fact, we have noted two instances where the interventions went beyond the normal meeting with a supervisor. In one instance the deputy met with command staff, and in another the deputy was reassigned.

MCSO has also created a Post-Stop Perceived Ethnicity Inspection, which looks specifically at traffic stops where the driver has a traditionally Latino surname, but the VSCF indicates a white driver. The inspectors review BWC recordings and evaluate whether the deputy correctly marked the form for the driver and any potential passengers within the vehicle stopped. MCSO reported compliance rates of in excess of 94% for each month in the second quarter of 2023. We concurred with these findings.

MCSO is in compliance with this Subparagraph.

Paragraph 81.i. requires that MCSO's EIS protocols include "mechanisms to ensure monitored and secure access to the EIS to ensure the integrity, proper use, and appropriate confidentiality of the data."

MCSO has addressed the security and integrity of data in GH-5 (Early Identification System), as well as instituting facility inspections throughout the Districts – including the security of terminals, access to information, and mobile displays. We spot-check technology and security of old forms during our in-person site visits and have found no problems to date. Additionally, on November 6, 2017, MCSO published the operating procedure for System Log Audit Requests; this became effective on November 30, 2017. The procedure outlines how PSB personnel will notify the Technology Management Bureau of any allegations of misuse of MCSO information systems and request an audit of the suspected breach. We discussed this operating procedure, BAS SOP 17-4, during our January 2018 site visit meetings; it meets all of the concerns voiced since the February 2017 discovery of two cases where data was compromised, but no one notified the Technology Management Bureau. We believe this procedure has proven effective to this point. In addition, we are provided all internal investigation summaries initiated each month; and found only three instances in which an employee was accused of misusing ACJIS and booking information. Two of these complaints are still under investigation by PSB or are being reviewed by MCSO administration. In addition, we have approved the claim of Full and Effective Compliance with Paragraph 78 above. Nonetheless, we will continue to evaluate the effectiveness of MCSO's attention to data integrity.

MCSO is in compliance with this Subparagraph.

MCSO meets some of the requirements of Paragraph 81, but there remain a variety of activities that are currently ongoing that need to be completed before MCSO will be fully compliant. AIU has improved the tracking of alert investigations with the creation of the EIS Alert Review Process Inspection; and initiated an analysis of BIO Action Form tracking. Since the fourth quarter of

WAI 70600

2022, MCSO has also produced an analysis of whether there are recurring alerts for deputies who have previously experienced an intervention.  We will continue to evaluate the new inspections. We have also requested that MCSO devise an audit for the NTCFs that have accumulated over the past several years.  MCSO has completed an initial evaluation of how deputies use the NTCF form and is currently evaluating EA-3 (Non-Traffic Contact).  We will evaluate the review of EA-3 when it is made available.  Command staff have taken a more active role in evaluating the work of supervisors as evidenced by the number of alert investigations returned to supervisors for revision or additional inquiry.  To comply with this and other Paragraphs, however, the methods would also have to be able to indicate statistically whether potential bias might be occurring with regard to how different ethnicities and races are being selected and treated during these encounters captured on the NTCFs.  We will continue to evaluate MCSO's progress toward the goals outlined in this Paragraph.

WAI 70601

## Section 9: Supervision and Evaluation of Officer Performance

**COURT ORDER   X.   SUPERVISION   AND   EVALUATIONS   OF   OFFICER PERFORMANCE**

*Paragraph 82.   MCSO and the County shall ensure that an adequate number of qualified first-line Supervisors are available to provide the effective supervision necessary to ensure that Deputies are following the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order.   First-line Supervisors shall ensure that Deputies are policing actively and effectively, are provided with the instruction necessary to correct mistakes, and are held accountable for misconduct.   To achieve these outcomes, MCSO shall undertake the following duties and measures:*

### a. General Duties of Supervisors

*Paragraph 83.   MCSO Supervisors shall provide the effective supervision necessary to direct and guide Deputies.   Effective supervision requires that Supervisors: respond to the scene of certain arrests; review each field interview card and incident report; confirm the accuracy and completeness of Deputies' daily activity reports; respond to each Complaint of misconduct; ensure Deputies are working actively to engage the community and increase public trust and safety; provide counseling, redirection, support to Deputies as needed, and are held accountable for performing each of these duties.*

**In Full and Effective Compliance**

We conducted our July 2023 site visit remotely.   We did not conduct any District visits for this assessment.   Our compliance findings for this reporting period are based on the review of documentation submitted as proof of compliance.

We reviewed a sample of 85 Incident Reports for April, for the randomly selected date of April 17, 2023.   All of the 85 Incident Reports were submitted before the end of the shift, and all were reviewed and memorialized by supervisors within the required timeframes.   All 13 Arrest Reports received were reviewed and approved by supervisors within the required 72 hours.   There were 14 Vehicle Crash Reports submitted in the April sample, and we verified timely supervisory reviews on all of them.   We conducted a review of a 10% sample of the Incident Reports submitted for the date requested, to determine quality and completeness, and found no significant issues of concern.   In total, all 85 Incident Reports we reviewed were in compliance, for a compliance rate of 100%.

For April, MCSO reported a total of 541 staff hours dedicated to community policing.   MCSO reported 317 occasions of community policing throughout its components, with 288 of those attributed to deputies in the Patrol function.   The April report from Community Outreach Division (COrD) documented 42 events in which MCSO staff met with and interacted with members of different community organizations.   MCSO met with representatives from several community organizations, drug prevention coalitions, and educational institutions.   From our reviews of the

WAI 70602

20 community policing worksheets selected for the month, Patrol deputies reported 30.32 hours of community policing, with 1,872 community members involved with those activities.  MCSO reported community policing activities in Cave Creek, Sun City, Litchfield Park, Peoria, Tempe, Morristown, Guadalupe, Tonopah, and Gila Bend.

We reviewed a representative sample of 91 Incident Reports for May for the randomly selected date of May 26, 2023.  Ninety of 91 Incident Reports had proper documentation of timely submission and supervisory review.  In one incident, only the event history printout was provided; there was no incident report submitted for our review.  Of the 91 Incident Reports, 15 were vehicle collisions, of which all had documentation of supervisory review and approval.  There were 29 Arrest Reports submitted for the month, and all had proper documentation of supervisory review. The overall compliance rate for timely submission and review of Incident Reports in May was 98.90%.  We conducted a review of a 10% sample of the Incident Reports submitted for the date requested, to determine quality and completeness.  Of that 10% sample, none of the Incident Reports reviewed had any major deficiencies.

For May, MCSO reported a total of 420 staff hours dedicated to community policing.  MCSO reported 276 occasions of community policing throughout its components, with 255 of those attributed to deputies in the Patrol function.  The May report from COrD documented 33 events in which MCSO staff met with and interacted with members of several groups from Maricopa County.  These groups included foreign consuls, neighborhood watch groups, drug prevention coalitions, religious organizations, and local educational institutions.  In our reviews of a sample of 20 community policing worksheets, deputies reported a total of 27.93 hours of community policing, with 800 community members involved with those activities.  MCSO reported community policing activities in Mesa, Tonto National Forest, Fountain Hills, Tonopah, Peoria, Anthem, Lake Pleasant Park, Guadalupe, Litchfield Park, and Waddell.

We reviewed a representative sample of 90 Incident Reports for June, for the randomly selected date of June 10.  Eighty-nine of the 90 Incident Reports had documentation that they had been submitted before the end of the shift, and 89 of 90 Incident Reports were reviewed and approved by supervisors as required by this Paragraph.  The compliance rate for June was 98.89%.  All eight Vehicle Crash Reports were in compliance.  All 19 Arrest Reports were in compliance.  We conducted a review of a 10% sample of the Incident Reports submitted to determine quality and completeness.  We found no significant issues of concern.

For June, MCSO reported a total of 236 staff hours dedicated to community policing.  MCSO reported 180 occasions of community policing throughout its components, with 166 of those attributed to deputies in the Patrol function.  The June report from COrD documented 44 events in which MCSO staff participated in community meetings and events.  MCSO reported meeting with representatives of several summer camps and programs, drug prevention coalitions, behavioral health organizations, and community outreach groups.  For June, we reviewed all 15 community policing worksheets submitted for the month.   On the community policing worksheets, deputies reported 21.78 hours of community policing, with 280 community members involved with those activities.  MCSO reported community policing activities in Youngtown, Mesa, Guadalupe, Phoenix, Sun City West, Scottsdale, and Cave Creek.

WAI 70603

For each month of the quarter, we selected a supervisor and a squad of deputies from each District. We requested several documents, including Patrol Activity Logs (PALs), for each deputy. We reviewed PALs for each month of the quarter to assess if deputies turned them in by the end of each shift, and if supervisors reviewed each PAL.

For April, we reviewed PALs for 26 deputies and six supervisors. All 26 deputies' Patrol Activity Logs contained documentation of supervisory review. All six supervisors' Patrol Activity Logs contained documentation of command-level review. For May, we reviewed Patrol Activity Logs for 25 deputies and six supervisors. All 25 deputies' PALs contained documentation of supervisory review. All six supervisors' PALs contained documentation of command-level review. For June, we reviewed Patrol Activity Logs for 24 deputies and six supervisors. All 24 deputies' PALs contained documentation of supervisory review; all six sergeants' PALs contained documentation of command-level review.

Based on the review of PAL samples selected for 26 deputies in April, on a daily basis, deputies completed an average of one Incident Report, handled an average of 4.54 calls for service, completed an average of 2.46 self-initiated calls, made no arrests, and traveled an average of 73.73 miles. There was one community policing event documented in one of the 26 PALs reviewed for April. Based on the review of PAL samples selected for 25 deputies in May, on a daily basis, deputies completed an average of 0.6 Incident Reports, handled an average of 3.16 calls for service, completed an average of 2.92 self-initiated calls, made 0.12 arrests, and traveled an average of 92.44 miles. There were two community policing events documented in one of the 25 PALs reviewed for May. Based on the review of PAL samples selected for 24 deputies in June, on a daily basis, deputies completed an average of 0.88 Incident Reports, handled an average of 2.71 calls for service, completed an average of 2.21 self-initiated calls, made no arrests, and traveled an average of 85.25 miles.

We also reviewed deputies' and supervisors' PALs to determine if supervisors provided on-scene supervision, and if those supervisor-deputy contacts were documented. For the sample dates selected in April, there were 20 supervisor-deputy field contacts reported by deputies and supervisors. For the sample dates selected in May, there were 16 supervisor-deputy field contacts reported by deputies and supervisors. For the sample dates selected in June, there were 22 supervisor-deputy field contacts reported by deputies and supervisors.

WAI 70604

For April, May, and June, we reviewed selected samples of non-traffic incidents involving stops and detentions, which were recorded on Non-Traffic Contact Forms (NTCFs). For April, we selected a sample of 15 NTCFs for review. The compliance rate for timely submission and review of NTCFs in April was 100%. For May, we selected 15 NTCFs to review. All 15 NTCFs were submitted prior to the end of the shift, and all 15 NTCFs were reviewed and approved by supervisors within the required timeframe. The compliance rate in May was 100%. For June, we selected 15 NTCFs for review. All 15 NTCFs were submitted prior to the end of the shift, and all 15 NTCFs were reviewed and approved by supervisors within the required timeframe. The compliance rate for timely submission and timely supervisory review of NTCFs in June was 100%. For the second quarter of 2023, the compliance rate for timely submission and timely supervisory review of NTCFs was 100%. For the period in review, MCSO was in compliance with the requirements of this Paragraph. We assess compliance with this Paragraph as it relates to NTCFs, in conjunction with timely reviews of VSCFs, under Paragraph 90.

Our reviews for this reporting period revealed that in April, of the 15 NTCFs we reviewed, six stops involved white individuals who were contacted in separate incidents. Nine stops involved Latino individuals, with a total of 10 Latino individuals involved in those incidents. For May, we reviewed 15 NTCFs. Of the 15 stops we reviewed, seven stops involved white individuals, with a total of nine white individuals involved in those incidents. Eight stops involved Latino individuals contacted in separate incidents. For June, we reviewed 15 NTFCs, of which four stops documented white individuals contacted in separate incidents. Nine stops involved Latino individuals, with a total of 15 Latino individuals involved in those incidents. Three stops involved Black individuals who were contacted in separate incidents.

Our reviews of NTCFs for this quarter revealed that white individuals were involved in approximately 37% of the stops. Latino individuals were involved in approximately 57% of the stops. Black individuals were involved in approximately 6% of the stops.

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion. Following our assessment in our last quarterly status report, we issued a noncompliance warning. For this reporting period, MCSO remains in Full and Effective Compliance with the requirements of this Paragraph.

WAI 70605

***Paragraph 84.*** *Within 120 days of the Effective Date, all patrol Deputies shall be assigned to a single, consistent, clearly identified Supervisor. First-line field Supervisors shall be assigned to supervise no more than twelve Deputies.*

**In Full and Effective Compliance**

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the second quarter of 2023. For April, we reviewed a sample of shift rosters from Districts 4 and 7, and Lake Patrol. For May, we reviewed a sample of shift rosters from Districts 1, 2, and 3. For June, we reviewed a sample of shift rosters from Districts 4 and 7, and Lake Patrol. Our reviews of monthly and daily rosters indicated that deputies were assigned to a single consistent supervisor, and deputies worked the same shifts as their supervisors. Our reviews of shift rosters for this quarter did not reveal any violations of this Paragraph. Additional reviews of span of control requirements are found under Paragraph 266.

On September 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

***Paragraph 85.*** *First-line field Supervisors shall be required to discuss individually the stops made by each Deputy they supervise with the respective Deputies no less than one time per month in order to ensure compliance with this Order. This discussion should include, at a minimum, whether the Deputy detained any individuals stopped during the preceding month, the reason for any such detention, and a discussion of any stops that at any point involved any immigration issues.*

**In Full and Effective Compliance**

To assess MCSO's compliance with this Paragraph, we requested that MCSO provide copies of reports documenting that supervisors are meeting with and discussing individually the stops made by each deputy, at least once per month. We then requested documentation for one randomly selected supervisor from each District, for each month of the reporting period, and the squad of deputies who reports to that supervisor. Supervisors record the discussion of traffic stops by applying the "Discussed with Deputy" option. MCSO documents supervisor-deputy discussions in a spreadsheet, which it submits for inspection. The spreadsheet also documents timely supervisory review of VSCFs. In addition to the spreadsheet, MCSO submits all VSCFs for the month in review. We select a 10% random sample of VSCFs from each District to review for content. We also inspect the sample of VSCFs submitted for review of traffic stops under Paragraphs 25 and 54, as part of compliance with Paragraph 91, to verify if supervisors are addressing deficiencies in the documentation related to the stops.

Paragraph 85 requires that supervisors discuss traffic stops at least once per month with their deputies. To efficiently manage this requirement along with other administrative and operational duties, supervisors generally conduct several traffic stop-related discussions with each deputy during the month. Supervisor-deputy discussions of traffic stops that occurred toward the latter part of the month may not get reviewed until the following month. Our selections for these

WAI 70606

discussions change every month, so to obtain complete records for each deputy, MCSO holds the submission until all of the information requested for the month is complete. Accordingly, the documentation of supervisory-deputy discussions of traffic stops is submitted 30 days retroactively.

For April, MCSO submitted the March traffic stops for each deputy, by District. The total number of traffic stops for each District was: District 1, 12; District 2, 26; District 3, 11; District 4, eight; Lake Patrol, 48; and District 7, 65. There was a total of 170 traffic-related events for all Districts, and sergeants discussed all 170 of these events with the deputies who conducted them, for a compliance rate of 100%.

For May, MCSO submitted the April traffic stops for each deputy, by District. The total number of traffic stops for each District was: District 1, 14; District 2, 22; District 3, four; District 4, 21; Lake Patrol, four; and District 7, 28. There was a total of 93 traffic-related events for all Districts, and sergeants discussed all 93 of these with the deputies that conducted them, for a compliance rate of 100%. For June, MCSO submitted the May traffic stops for each deputy, by District. The total number of traffic stops for each District was: District 1, two; District 2, 12; District 3, 24; District 4, 16; Lake Patrol, six; and District 7, 32. There was a total of 92 traffic-related events for all Districts, and sergeants discussed all of these events with the deputies who conducted them, for a compliance rate of 100%.

For this reporting period, there was a total of 355 traffic stops reported. We received documentation that supervisors discussed all 355 of these stops with the deputies that conducted them. This is a compliance rate of 100%.

On October 5, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

MCSO remains in Full and Effective Compliance with this Paragraph.


***Paragraph 86.*** *On-duty field Supervisors shall be available throughout their shift to provide adequate on-scene field supervision to Deputies under their direct command and, as needed, to provide Supervisory assistance to other units. Supervisors shall be assigned to and shall actually work the same days and hours as the Deputies they are assigned to supervise, absent exceptional circumstances.*

**In Full and Effective Compliance**

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the second quarter of 2023. For April, we reviewed a sample of shift rosters from Districts 4 and 7, and Lake Patrol. For May, we reviewed a sample of shift rosters from Districts 1, 2, and 3. For June, we reviewed a sample of shift rosters from Districts 4 and 7, and Lake Patrol.

MCSO deputies' and sergeants' activities are captured in Patrol Activity Logs (PALs). We selected a random sample of one day per month, and one squad per District, for review. For April, we reviewed PALs for six sergeants and 26 deputies. We noted a total of 20 field supervisor-

WAI 70607

deputy contacts between the combined deputies' and sergeants' PALs for the selected dates. For May, we requested PALs for six sergeants and 25 deputies. We received and reviewed all requested PALs, and noted a total of 16 field supervisor-deputy contacts between the combined deputies' and sergeants' PALs for the selected dates. For June, we reviewed PALs for six sergeants and 24 deputies. We noted a total of 22 field supervisor-deputy contacts between the combined deputies' and sergeants' PALs for the selected dates.

We reviewed the monthly shift rosters for each month of the reporting period. Our reviews indicate that supervisors are assigned to work the same hours as the deputies under their supervision. Our reviews of Patrol Activity Logs indicate that supervisors have been available to provide on-scene supervision.

On October 5, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 87.** *MCSO shall hold Commanders and Supervisors directly accountable for the quality and effectiveness of their supervision, including whether commanders and Supervisors identify and effectively respond to misconduct, as part of their performance evaluations and through non-disciplinary corrective action, or through the initiation of formal investigation and the disciplinary process, as appropriate.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on April 27, 2022.
- GC-4 (S) (Employee Performance Management), most recently amended on November 10, 2021.
- GC-17 (Employee Disciplinary Procedures), most recently amended on November 17, 2022.

**Phase 2:** Not in compliance

To assess MCSO's compliance with this Paragraph, we request the names of all deputies and supervisors whose performance appraisals were completed during this reporting period. From the lists of employees submitted, we request a representative sample. The selection of deputies and supervisors whose EPAs are requested is based on the number of requirements set forth in the First and Second Orders. There are a greater number of requirements that supervisor EPAs must address; therefore, we review a greater number of supervisor EPAs.

We requested and reviewed Employee Performance Appraisals submitted for six deputies and nine supervisors whose EPAs were completed in April. All six deputy EPAs appropriately addressed each employee's performance for the period under review. Seven of the nine supervisor EPAs met compliance requirements for this Paragraph. All of the nine supervisor EPAs rated the supervisors on the quality and effectiveness of their supervision. One supervisor EPA failed to document an open misconduct investigation that was initiated during the rating period. Two supervisor EPAs failed to sufficiently address the quality of supervisory reviews, in

WAI 70608

part, because the EPAs failed to address the requirements of Paragraphs 92 and 95.  We reviewed nine supervisor EPAs to determine if raters had assessed each supervisor's quality of work product in misconduct investigations; for commanders, we assessed the quality of reviews of misconduct investigations, as required by Paragraph 176.  We found that all nine supervisor EPAs addressed the requirements of Paragraph 176.  For April, including both deputy and supervisor EPAs, 13 of 15 EPAs, or 86.67% were in compliance with Paragraph 87.

We requested and reviewed Employee Performance Appraisals submitted for seven deputies and eight supervisors whose performance evaluations were completed in May.  Five of the seven deputy EPAs were in compliance, and all eight supervisor EPAs met Paragraph 87 requirements.  Two deputy EPAs failed to list misconduct investigations that were initiated during the rating period.  We found that all eight supervisor EPAs addressed the quality and effectiveness of supervision.  All of the eight supervisor EPAs included comments on the supervisors' abilities to identify and respond to misconduct.  All of the eight supervisor EPAs addressed the requirements of Paragraphs 92 and 95.  All eight supervisor EPAs addressed the quality of misconduct investigations, or reviews of misconduct investigations for command personnel.  For May, including both deputy and supervisor EPAs, 13 of 15 EPAs, or 86.67%, were in compliance with this Paragraph.

We requested and reviewed Employee Performance Appraisals submitted for five deputies and 10 supervisors whose EPAs were completed in June.  All five deputy EPAs sufficiently addressed all required areas of assessment, and all of the 10 supervisor EPAs met the requirements of Paragraph 87.  All 10 supervisor EPAs appropriately rated the employees on the quality and effectiveness of their supervision.  Each of the 10 supervisor EPAs included comments related to the supervisor's ability to identify and respond to misconduct.  All of the 10 supervisor EPAs sufficiently documented required entries with regard to the quality of reviews of their subordinates' EIS profiles, as required by Paragraphs 92 and 95.  For June, including both deputy and supervisor EPAs, all 15 EPAs were in compliance, or 100%.

For the second quarter of 2023, we reviewed EPAs for 18 deputies and 27 supervisors.  As it pertains to the requirements of this Paragraph, 16 of the 18 deputy EPAs were in compliance, and 25 of the 27 supervisor EPAs were in compliance.  For this review period, 41 of the 45 EPAs reviewed were in compliance with the requirements of this Paragraph, for a compliance rate of 91.11%.

For the period in review, we found consistent improvement in meeting the requirements of this Paragraph.  Although not enough to attain compliance during this quarter, there has been a concerted effort to address past deficiencies in EPAs.  During this quarterly review, again we found four EPAs where the rating period was not properly documented.  We use specific dates to assess compliance with the requirements of Paragraph 99, so we encourage supervisors to be mindful of proper documentation of the employee's rating period.

WAI 70609

**b. Additional Supervisory Measures**

**Paragraph 88.**   *To ensure compliance with the terms of this Order, first-line Supervisors in any Specialized Units enforcing Immigration-Related Laws shall directly supervise the law enforcement activities of new members of the unit for one week by accompanying them in the field, and directly supervise the in-the-field-activities of all members of the unit for at least two weeks every year.*

**In Full and Effective Compliance**

MCSO does not have any specialized units that enforce immigration-related laws.  We continue to monitor arrests and detentions as part of our review process to ensure that MCSO is in compliance with its own directives on this issue.

For this reporting period we received lists containing all incidents involving MCSO arrests and criminal citations.  For each month, we requested a random sample of arrests and criminal citations.  In total, we reviewed 60 incidents involving arrests and 60 incidents involving criminal citations.  We also reviewed a random sample of 266 Incident Reports for this reporting period.  During our reviews of the documentation provided for this reporting period, we have found no evidence to indicate any violations of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 89.**   *A Deputy shall notify a Supervisor before initiating any immigration status investigation, as discussed in Paragraph 28.   Deputies shall also notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration Related Crime, or for any crime related to identity fraud or lack of an identity document.   The responding Supervisor shall approve or disapprove the Deputy's investigation or arrest recommendation based on the available information and conformance with MCSO policy.   The Supervisor shall take appropriate action to address any deficiencies in Deputies' investigation or arrest recommendations, including releasing the subject, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative investigation.*

**In Full and Effective Compliance**

To assess MCSO's compliance with this Paragraph, we requested all reports related to immigration status investigations, any immigration-related crimes, or any incidents or arrests involving lack of identity documents.  The Incident Reports requested were for the period in review.  Any incident wherein a deputy requests a supervisor's permission to contact Immigration and Customs Enforcement (ICE) or Customs and Border Patrol (CBP) – to ascertain the legal status of an individual involved in a stop, detention, or any incident under investigation by MCSO – falls under the reporting requirements of this request.

WAI 70610

For the second quarter of 2023, MCSO did not submit any arrests or investigations pursuant to the reporting requirements of this Paragraph. For this reporting period, we reviewed 60 bookings and 60 criminal citations. In addition, we reviewed 266 Incident Reports for the quarter. Our reviews found no violations of this Paragraph.

On December 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 90.** *MCSO Deputies shall submit documentation of all stops and Investigatory Detentions conducted to their Supervisors by the end of the shift in which the action occurred. Absent exceptional circumstances, within 72 hours of receiving such documentation, a Supervisor shall independently review the information. Supervisors shall review reports and forms for Boilerplate or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct. Appropriate disciplinary action should be taken where Deputies routinely employ Boilerplate or conclusory language.*

**Phase 1:** In compliance

- EA-11 (Arrest Procedures), most recently amended on April 5, 2022.

**Phase 2:** In compliance

We reviewed 35 incidents involving traffic stops for April 2023. There were 23 stops related to speeding, of which 13 resulted in citations and 10 resulted in warnings. Four stops were for moving violations other than speeding. Five stops related to registration or license plate violations. Three stops were due to equipment violations. Eighteen of the 35 stops resulted in citations, and 17 resulted in written warnings. All 35 Vehicle Stop Contact Forms we reviewed noted the serial number of the reviewing supervisor, date, and time of supervisory review. For April, MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 159 VSCFs. Supervisors reviewed all 159 VSCFs within 72 hours, for a compliance rate of 100%.

We reviewed 35 incidents involving traffic stops for May 2023. Twenty-four of the 35 traffic stops related to speeding. Of the 24 stops related to speeding, 19 drivers received citations, and five received warnings. Two stops were due to equipment violations. Six of the stops involved moving traffic infractions other than speeding. Three stops related to registration or license plate violations. Of the 35 stops, 22 resulted in citations, and 12 resulted in written warnings. One stop resulted in no action, since the deputy was reassigned to an emergency call. For May, MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 176 VSCFs. Supervisors reviewed 175 of 176 VSCFs within 72 hours, for a compliance rate of 99%.

We reviewed 35 incidents involving traffic stops for June 2023. Nineteen of the 35 traffic stops involved speeding violations. Of the 19 stops related to speeding, 11 drivers received citations and eight drivers received warnings. One stop involved an equipment violation. Eight stops involved traffic violations other than speeding. Seven stops involved registration or license plate violations. Of the 35 stops, 18 resulted in citations and 17 resulted in warnings. For June, MCSO

WAI 70611

submitted a spreadsheet documenting each VSCF by District, for a total of 128 VSCFs. We reviewed the data and supervisors reviewed all 127 of 128 VSCFs within 72 hours, for a 99% compliance rate.

For every month of the review period, we reviewed selected samples of non-traffic incidents involving stops and detentions, which were recorded on Non-Traffic Contact Forms (NTCFs). Our assessment of compliance also included reviews of BWC recordings on selected cases, some of which included searches of the individuals detained. For April, we selected all 15 NTCFs to review. All 15 NTCFs had been submitted prior to the end of the shift. All 15 NTCFs were reviewed and approved by supervisors within 72 hours, as required. We reviewed BWC recordings submitted with five of the incidents and noted no issues of concern. The compliance rate for timely submission and timely supervisory review of NTCFs in April was 100%. For May, we selected a sample of 15 NTCFs to review. All 15 NTCFs were submitted prior to the end of the shift. All of the 15 NTCFs were reviewed and approved by supervisors within the required timeframe. We reviewed body-worn camera recordings associated with two cases and noted no issues of concern. The compliance rate for timely submission and timely supervisory review of NTCFs in May was 100%. For June, we reviewed a sample of 15 NTCFs generated during the month. All 15 NTCFs were turned in before the end of the shift, and all had supervisory reviews documented within 72 hours. We reviewed body-worn camera recordings associated with three incidents and noted no issues of concern. The compliance rate for timely submission and timely supervisory review of NTCFs in June was 100%. For the second quarter of 2023, all 45 NTCFs reviewed were in compliance with timely supervisory review. The overall compliance rate was 100%.

We take into account all stops and detentions, both traffic and non-traffic, when we determine the compliance rate for this Paragraph. For the second quarter of 2023, 461 of 463 VSCFs reviewed were in compliance, and all NTCFs reviewed were in compliance. The compliance rate for timely reviews of all combined stops and detentions, from the samples chosen for this reporting period, was 99.61%. For this reporting period, our inspection of the documentation provided did not reveal any evidence of boilerplate or conclusory language, inconsistent or inaccurate information, or lack of articulation, as to the legal basis for stops and detentions.

***Paragraph 91.*** *As part of the Supervisory review, the Supervisor shall document any Investigatory Stops and detentions that appear unsupported by reasonable suspicion or are otherwise in violation of MCSO policy, or stops or detentions that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The Supervisor shall take appropriate action to address all violations or deficiencies in Investigatory Stops or detentions, including recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.*

**In Full and Effective Compliance**

We reviewed traffic stop data reported by MCSO for its April inspection (BI2023-0049). To determine compliance with this Paragraph, we randomly selected 35 traffic-related events, which BIO then audited for compliance. Of the 35 traffic-related events, MCSO reported a 99.69%

WAI 70612

compliance rate.  As a result of the inspection, three BIO Action Forms were generated.  The first deficiency was attributed to a District 1 deputy who cleared a call with the wrong code.  The second deficiency was attributed to a Lake Patrol deputy who did not complete an Assisting Deputy and Body-Worn Camera Log.  The third deficiency was attributed to a Lake Patrol deputy who did not document an assisting deputy on the VSCF.  For April, all 35 stops we reviewed were in compliance with this Paragraph.

We reviewed a spreadsheet documenting each VSCF by District for April, to determine if supervisors were reviewing VSCFs within the required 72 hours.  We reviewed data for 159 traffic stops and determined that supervisors had completed timely reviews of all 159 VSCFs, or 100% of the cases.  For April, we requested a sample of 15 NTCFs generated for the month, from the list that MCSO submitted.  We reviewed the 15 NTCFs to determine if supervisors were reviewing them within the required 72 hours and determined that all reviews, or 100%, were in compliance.

For April, we requested a sample of 10 corrective actions generated during the month.  Corrective actions are documented on BlueTeam Supervisor Notes.  Two corrective actions were related to Body-Worn Camera (BWC) issues.  One corrective action was the result of late activation of the Body-Worn Camera, and the other was the result of deactivating the camera before the conclusion of the stop.  Four corrective actions were the result of erroneous or missing information required on traffic stop documentation.  Four corrective actions were the result of policy violations related to traffic stops.  For the month in review, we requested all corrective actions relative to the sample of 35 traffic stops that were selected for the monthly Traffic Stop Data Collection Inspection.  There were no BlueTeam corrective actions submitted pertaining to the 35 stops selected for April.

We reviewed traffic stop data reported by MCSO for its May inspection (BI2023-0065).  We randomly selected 35 traffic-related events, which BIO then audited for compliance.  The inspection resulted in a 99.58% compliance rating.  Our review of the inspection report found that five stops were listed as having deficiencies, resulting in five BIO Action Forms.  The first deficiency was attributed to a District 1 deputy who failed to complete an Assisting Employee and/or Volunteer Form.  The second deficiency was attributed to a District 1 deputy who had several deficiencies in his traffic stop documentation.  The deputy failed to list the total number of additional employees and/or volunteers on the VSCF.  The deputy did not document the Incident Report number on the citation and failed to document a search of a vehicle that was towed.  The reviewing supervisor should have addressed these deficiencies; this case was noncompliant.  The third deficiency was attributed to a District 1 deputy who documented one occupant in a vehicle stop, but there were two individuals observed in the Body-Worn Camera (BWC) video.  The fourth deficiency was attributed to a District 1 deputy who documented the driver as Hispanic in the VSCF, but noted the driver as white on the citation.  The fifth deficiency was attributed to a District 2 deputy who did not include the reason for the stop on the citation.  For May we found 34 of 35 stops in compliance with the requirements of this Paragraph.

We reviewed a spreadsheet documenting each VSCF by District for May, to determine if supervisors were reviewing VSCFs within the required 72 hours.  We reviewed 176 VSCFs and determined that supervisors had completed timely reviews of documentation in 175 of 176 stops,

WAI 70613

or in 99% of the cases. From the list submitted by MCSO, we requested 15 NTCFs that were generated in May. We inspected the NTCFs to determine if supervisors were reviewing them within the required 72 hours. We determined that supervisors had completed timely reviews of all 15 NTCFs, for 100% compliance.

For May, we requested a list of corrective actions. From the list submitted, we selected a sample of 10 corrective actions generated for the month. Four corrective actions were the result of late activation, or policy violations associated with the BWC. Three corrective actions were the result of erroneous or missing information required on traffic stop documentation. Two corrective actions were the result of policy violations related to traffic stops. One corrective action documented a technical failure related to the uploading of BWC video. For the month in review, we requested all corrective actions relative to the sample of 35 traffic stops that were selected for the monthly Traffic Stop Data Collection Inspection. There were no BlueTeam corrective action notes submitted pertaining to the 35 stops selected for May.

We reviewed traffic stop data reported by MCSO for its June inspection (BI2023-0079). We randomly selected 35 traffic-related events, which BIO then audited for compliance. The inspection resulted in a 99.20% compliance rating. Our review of the inspection report found that 11 stops were listed as having deficiencies. As a result of the inspection, 11 BIO Action Forms were generated. The first deficiency was attributed to a District 1 deputy who failed to document on the VSCF that a criminal citation had been issued. The second deficiency was attributed to a District 1 deputy who failed to complete an Assisting Employee and/or Volunteer Form. The third deficiency was attributed to a District 2 sergeant who failed to activate his BWC during the stop. The sergeant also cleared the call with the wrong code. The fourth deficiency was attributed to a District 3 deputy whose BWC was not activated during the stop. The fifth deficiency was attributed to District 3 deputy who failed to conduct a license and warrants check on the driver. The sixth and seventh deficiencies were both attributed to District 4 deputies who failed to conduct license and warrants checks on the drivers. The eighth deficiency was attributed to a District 7 deputy who failed to document an assisting deputy on the VSCF. The ninth deficiency was attributed to a Lake Patrol deputy who had conflicting information of the location of the stop in the VSCF and Written Warning. The tenth deficiency was attributed to a Lake Patrol deputy who had conflicting license plate information in the VSCF and citation. The eleventh deficiency was attributed to a Lake Patrol deputy whose vehicle number did not match the information in CAD (Computer Aided Dispatch). For June, we found all 35 stops in compliance with the requirements of this Paragraph.

For June, we requested a list of corrective actions. From the list submitted, we selected a sample of 10 corrective actions that were generated for the month. One corrective action was the result of the deputy terminating the BWC recording before the stop was concluded. Two corrective actions were the result of erroneous or missing information required on traffic stop documentation. Two corrective actions were the result of a policy violations related to traffic stops. Three corrective actions resulted from policy or procedure violations not associated with traffic stops. One corrective action was the result of a deficiency related to deputy safety. One corrective action was the result of a deficiency noted in a Patrol Activity Log. There were no documented corrective actions pertaining to any of the 35 stops selected for June.

WAI 70614

We reviewed a spreadsheet documenting each VSCF by District.  For June, we reviewed 128 VSCFs and determined that supervisors had completed timely reviews of 127 of 128 VSCFs, or in 99% of the cases.  For June, we requested 15 NTCFs generated by Patrol deputies.  We reviewed all 15 NTCFs to determine if supervisors were reviewing NTCFs within the required 72 hours.  We determined that supervisors had completed timely reviews in all 15 NTCFs.  This is a compliance rate of 100%.

Paragraph 90 requires timely supervisory reviews of documentation pertaining to stops and detentions.  Paragraph 91 requires supervisors to identify policy violations, deficiencies, and training issues noted in stops and detentions.  Of the sample of 105 stops inspected for this reporting period, we found that 104 of 105 stops were in compliance with this Paragraph.  The compliance rate for Paragraph 91 for this reporting period was 99%.

On June 23, 2023, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.


***Paragraph 92.***  *Supervisors shall use EIS to track each subordinate's violations or deficiencies in Investigatory Stops or detentions and the corrective actions taken, in order to identify Deputies needing repeated corrective action.  Supervisors shall notify IA.  The Supervisor shall ensure that each violation or deficiency is documented in the Deputy's performance evaluations.  The quality and completeness of these Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations.  MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct complete, thorough, and accurate reviews of Deputies' stops and Investigatory Detentions.*

**Phase 1:**  In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on April 27, 2022.
- GC-4 (S) (Employee Performance Management), most recently amended on November 10, 2021.

**Phase 2:**  In compliance

To determine compliance, we review the EIS and IAPro histories for each of the employees whose EPAs were selected for review under Paragraph 87.  We then review the information to determine if all violations, deficiencies, PSB investigations, and corrective actions taken pertaining to stops and detentions, which were listed in the employee's EIS and IAPro resumes, were accurately documented in the employee's EPA.  Failure to identify and memorialize any issues and actions taken as noted in the employee's EIS and IAPro resumes reflects on the quality of the supervisor's reviews.  By reviewing EIS and IAPro resumes, we also can identify if a deputy has repeated entries of any specific violations, and if subsequent actions taken to correct the issue have been documented in the employee's EPA.  For applicable supervisors' EPAs, in addition to the above metric, we review comments made in reference to the quality of supervisory reviews to ensure that the rater has specific comments addressing this Paragraph's requirements.  Both of these requirements must be met for compliance.  Deficiencies in quality of EIS reviews by supervisors

WAI 70615

will also impact our assessment of compliance for Paragraph 100.  To ensure fairness to the agency, when we assess compliance with this Paragraph, we also look at the performance appraisal as a whole to determine if the intent and spirit of the Paragraph under review was captured.

For April, we reviewed six deputy EPAs and nine supervisor EPAs.  All six deputy EPAs reviewed were in compliance, and seven of the nine supervisor EPAs were in compliance.  Two first-line supervisor EPAs did not have specific comments addressing EIS reviews, as it pertains to the requirements of this Paragraph.  For May, we reviewed seven deputy EPAs and eight supervisor EPAs.  All seven deputy EPAs were in compliance, and all eight supervisor EPAs were in compliance.  For June, we reviewed five deputy EPAs and 10 supervisor EPAs.  All five deputy EPAs were in compliance.  All 10 supervisor EPAs addressed the quality and completeness of EIS reviews, which are requirements of this Paragraph.

For this quarter, all 18 deputy EPAs reviewed were in compliance with this Paragraph, for a 100% compliance rate.  Of the 27 supervisor EPAs reviewed, 25 or 92.6%, were in compliance.  Including deputy and supervisor EPAs, there was a total of 45 EPAs, of which 43 met the requirements of this Paragraph.  The compliance rate for this reporting period was 95.56%.  For the second quarter of 2023, MCSO was in compliance with the requirements of this Paragraph.

**Paragraph 93.**  *Absent extraordinary circumstances, MCSO Deputies shall complete all incident reports before the end of shift.  MCSO field Supervisors shall review incident reports and shall memorialize their review of incident reports within 72 hours of an arrest, absent exceptional circumstances.*

### In Full and Effective Compliance

We reviewed a representative sample of 90 Incident Reports for April, for the randomly selected date of April 17.  Of the 90 Incident Reports, we verified documentation of timely supervisory reviews on all 90 reports.  Of the 90 Incident Reports, 14 were vehicle collisions.  Of the 14 Vehicle Crash Reports, all had documentation that a supervisor had reviewed and approved the reports.  We reviewed 13 Arrest Reports, and all were in compliance.  The compliance rate for timely supervisory review of Incident Reports in April was 100%.  We reviewed a 10% sample of the Incident Reports submitted, for quality.  We did not find any issues of concern in our April reviews.

We reviewed a sample of 91 Incident Reports for May, for the randomly selected date of May 26.  Ninety of 91 reports were in compliance with timely submission and timely supervisor reviews.  There were 29 arrests submitted for review and all Arrest Reports were reviewed within 72 hours.  There were 15 Vehicle Crash Reports submitted in the sample for May, and all had documentation of timely supervisor review.  The compliance rate for timely submission and review of Incident Reports for May was 99%.  We conducted a quality review on a 10% random sample of the reports we reviewed.  There was one incident where only a CAD printout was provided.  Of the reports reviewed for quality, we noted no serious deficiencies.

WAI 70616

We reviewed a representative sample of 90 Incident Reports for June**,** for the randomly selected date of June 10.  Eighty-nine of 90 Incident Reports were in compliance.  There was one hit and run incident that was not submitted or reviewed within the required timeframe.  The compliance rate for June was 99%.  There were 19 Arrest Reports, and all had been reviewed and approved by supervisors within the required 72 hours.  There were eight Vehicle Crash Reports submitted in the June sample; we confirmed timely supervisory reviews on seven of eight crash reports.  We conducted a quality review on a 10% random sample of the reports submitted and found no issues of concern.  For the second quarter of 2023, we found that 264 of 266 Incident Reports were in compliance, or 99.25%.

On March 17, 2020, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

***Paragraph 94.***  *As part of the Supervisory review, the Supervisor shall document any arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training.  The Supervisor shall take appropriate action to address violations or deficiencies in making arrests, including notification of prosecuting authorities, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.*

**Phase 1:**  In compliance

- EA-11 (Arrest Procedures), most recently amended on April 5, 2022.
- GF-5 (Incident Report Guidelines), most recently amended on March 24, 2022.

**Phase 2:**  In compliance

To assess compliance with this Paragraph, we request a list of bookings and criminal citations for the period in review.  We randomly select a sample of 20 bookings and 20 criminal citations, which BIO then inspects for compliance.  In addition, MCSO reviews all cases involving immigration arrests, and arrests related to lack of identity documents.  MCSO also reviews all Maricopa County Attorney's Office (MCAO) turndowns for lack of probable cause and submits those for our review.  The total of cases selected per month does not exceed 60.  We review Incident Report Inspection reports as part of the documentation to determine compliance with Paragraphs 94 and 96.  The BIO inspection covers the selected cases, which are retroactive two months.  We review the Incident Report Inspection Report and its corresponding Inspection Matrix for each month of the reporting period.  Some inspection points in the matrix are given stronger consideration in our reviews than others, as these are fundamental requirements of Paragraph 94; if deficiencies are noted, they may also impact the successful conclusion of the case.  In all the cases described below, we relied on the BIO inspector's notations and observations to determine our findings.

WAI 70617

In addition to documentation described above, we review all Incident Report Memorialization (IRM) forms submitted for the quarter. The Incident Report Memorialization form is used by supervisors to document deficient arrests and corrective actions taken. In accordance with this Paragraph and MCSO policy, supervisors are required to document arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training. The supervisor generating the IRM, and the commander reviewing the IRM, should ensure that the documentation includes the corrective action taken to resolve issues caused by the deficiency, as well as the remedial action taken to prevent future reoccurrence.

For April, we reviewed the March Incident Report Inspection (BI2022-0040). We selected 20 bookings and 20 criminal citations, which BIO then inspected for compliance. MCSO did not submit any immigration-related arrests, cases involving identity theft investigations, or County Attorney turndowns for lack of probable cause. The inspection resulted in a 99.48% compliance rating. The BIO Inspection Report noted four deficiencies in two cases, which resulted in four BIO Action Forms. In these two cases, the reviewing supervisors approved the deficient reports. As a result of our review of all the documentation submitted, including the matrix, we determined that five cases had serious deficiencies that should have been addressed by first-line supervisors, and therefore were not in compliance with this Paragraph. The inspection report only noted two deficient cases, whereas the inspection matrix had comments indicating that five cases had major deficiencies. Our review of the March Incident Inspection Report indicated that the first deficiency was an arrest from District 3 where an incorrect subsection of the state statute was used to charge the suspect. The reviewing supervisor approved the report with the noted deficiency. We consider this case noncompliant. The second deficient case noted in the inspection report was a Court Security arrest where the narrative appears to contain inaccurate boilerplate information. This case was not in compliance. In addition to the previously mentioned cases, which were documented and reported in the inspection, our reviews of the inspection matrix noted three additional arrests where the matrix noted serious deficiencies, but the inspection report did not list these cases as deficient. The first of those three arrests included an arrest report that did not contain all the required elements for the crime. We consider this case noncompliant. Our review of the matrix found another arrest where the inspector noted that the report lacked articulation to support a drug possession charge and the evidence was not submitted for testing. We consider this case noncompliant. Our review of the matrix noted a third arrest where the inspector noted that the arrest report lacked articulation to support probable cause for a criminal trespass charge, as well as an assault charge. We consider this case noncompliant. In total we reviewed 40 cases, of which 35 were in compliance.

For May, we reviewed the April Incident Report Inspection (BI2023-0058). We selected 20 bookings and 20 criminal citations, which BIO then inspected for compliance. There were no immigration-related arrests, and no cases involving identity theft investigations reported by MCSO. There were no County Attorney turndowns for lack of probable cause. The inspection resulted in a 99.49% compliance rating. We reviewed the inspection report, which noted three deficient cases, and reviewed the matrix used by BIO for the inspection. The first deficiency was an arrest from District 2 where an incorrect subsection of the state statute was used to charge the suspect and the report lacked documentation of injuries sustained, as required by state statute.

WAI 70618

The reviewing supervisor approved the report with the noted deficiencies. This case was not in compliance. The second noted deficient report was completed by a Lake Patrol deputy. This report was not submitted prior to the end of the shift. The third deficient report was an arrest from District 7 where the deputy did not complete an incident report and did not include the information for a criminal offense in the citation. This case was not in compliance. In total we reviewed 40 cases, of which 38 were in compliance.

For June, we reviewed the May Incident Report Inspection (BI2023-0074). We selected 20 bookings and 20 criminal citations, which BIO then inspected for compliance. There were no immigration-related arrests, and no cases involving identity theft investigations reported by MCSO. There were no County Attorney turndowns for lack of probable cause. The inspection resulted in a 99.49% compliance rating. We reviewed the inspection report, which noted four deficient cases, and reviewed the matrix used by BIO for the inspection. A total of four BIO Action Forms were generated for the deficiencies. As a result of our review of all the documentation submitted, including the matrix, we determined that all four cases had minor deficiencies. The first deficiency was an arrest from District 1 where the report was not submitted prior to the end of the shift. The second deficiency was an arrest from District 1 where the inspector was unable to locate a property receipt for items impounded for safekeeping. The third deficiency was an arrest from District 3 where the report was not submitted prior to the end of the shift. The fourth deficiency was an arrest by the Special Investigations Division where the supervisor did not review the report with the required timeframe. In total we reviewed 40 cases and we found all 40 to be in compliance.

For this quarter, of the total 120 cases selected for review, 113 were in compliance. There was one Incident Report Memorialization (IRM) form submitted for the second quarter of 2023, which we found to be in compliance with content, as per Paragraph 94; but not in compliance with timely command review, as per Paragraph 96. After our reviews of the BIO Incident Report inspections for this quarter, as well as the corresponding Inspection Matrices, we determined that seven arrest cases were noncompliant. We also note that in each of the seven cases where deficiencies were found, the inspector was unable to find any documentation, such as an IRM, that the deficiencies were identified and addressed. Of the 121 total cases reviewed for this quarter, 114 were in compliance. The compliance rating for the second quarter of 2023 was 94.21%. For the period in review, MCSO was in compliance with this Paragraph.

**Paragraph 95.** *Supervisors shall use EIS to track each subordinate's violations or deficiencies in the arrests and the corrective actions taken, in order to identify Deputies needing repeated corrective action. The Supervisor shall ensure that each violation or deficiency is noted in the Deputy's performance evaluations. The quality of these supervisory reviews shall be taken into account in the Supervisor's own performance evaluations, promotions, or internal transfers. MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct reviews of adequate and consistent quality.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on April 27, 2022.

WAI 70619

- GC-4 (S) (Employee Performance Management), most recently amended on November 10, 2021.

**Phase 2:**  In compliance

There are two primary areas of assessment for this Paragraph.  The first is to determine if supervisors are tracking subordinates' deficiencies and violations in arrests, and accurately documenting these issues along with corrective actions in employees' EPAs.  In addition, repeated corrective actions should be addressed in EPAs.  The second is to determine if the quality of supervisory EIS reviews are being addressed in supervisors' EPAs.  The quality and effectiveness of interventions, as a result of deficiencies pertaining to stops and detentions, is a requirement which we assess under Paragraph 97.

To determine compliance, we will review the EIS and IAPro histories for each of the employees whose EPAs were selected for review under Paragraph 87.  We will then review the information to determine if all violations, deficiencies, IA investigations, and corrective actions taken pertaining to arrests, which were listed in the employee's EIS and IAPro resumes, were accurately documented in the employee's EPA.  Failure to identify and memorialize any issues and actions taken as noted in the employee's EIS and IAPro resumes, reflects on the quality of the supervisor's reviews.  By reviewing EIS and IAPro resumes, we will also be able to identify if a deputy has repeated entries of any specific violations, and if subsequent actions taken to correct the issue have been documented in the employee's EPA.  For applicable supervisors' EPAs, in addition to the above metric, we will review comments made in reference to the quality of supervisory reviews to ensure that the rater has specific comments addressing this Paragraph's requirements.  Both of these requirements must be met for compliance.  Deficiencies in quality of EIS reviews by supervisors will also reflect in our assessment of compliance for Paragraph 100.  To ensure fairness to the agency, when we assess compliance with this Paragraph, we also try look at the performance appraisal as a whole to determine if the intent and spirit of the Paragraph under review was captured.

For this quarter, we reviewed 18 deputy EPAs and 27 supervisor EPAs.  All 18 deputy EPAs we reviewed, or 100%, were in compliance with this Paragraph.  Twenty-five of the 27 supervisor EPAs we reviewed, or 92.59%, were in compliance with this Paragraph.  Two supervisor EPAs failed to note specific comments addressing the quality of EIS reviews, as it pertains to the requirements of this Paragraph.  Including deputy and supervisor EPAs, there was a total of 45 EPAs, of which 43 met the requirements of this Paragraph.  The overall compliance rate for this reporting period was 95.56%.  For this reporting period, MCSO was in compliance with the requirements of this Paragraph.

WAI 70620

***Paragraph 96.*** *A command-level official shall review, in writing, all Supervisory reviews related to arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The commander's review shall be completed within 14 days of receiving the document reporting the event. The commander shall evaluate the corrective action and recommendations in the Supervisor's written report and ensure that all appropriate corrective action is taken.*

**Phase 1:** In compliance

- EA-11 (Arrest Procedures), most recently amended on April 5, 2022.

**Phase 2:** In compliance

This Paragraph requires that a command-level official review a supervisor's investigation of the circumstances pertaining to any arrest that lacks probable cause, is in violation of policy, or where there is a need for corrective action or review of the agency's policy, strategy, tactics, or training. This Paragraph also requires that the commander evaluate the corrective action and recommendations to ensure that these are appropriate.

Our reviews to determine compliance with this Paragraph are associated with the documentation provided for Paragraph 94. If BIO identifies deficient cases in the Incident Report inspection, and the deficiencies fall within any of the four areas noted in Paragraphs 94 and 96, we will review the documentation to determine compliance. Since this Paragraph pertains to command reviews of supervisory investigations of deficient arrests, we will also review Incident Report Memorialization (IRM) forms to determine compliance. Our reviews for compliance with this Paragraph are determined by the command staff's timely reviews of IRMs once submitted by supervisors, and commanders' evaluation of the corrective actions taken.

For the second quarter of 2023, MCSO submitted one Incident Report Memorialization (IRM) form. Deputies were dispatched to a call of a possible burglary to a vehicle. Upon arrival at the location, deputies found the suspect inside a vehicle, which was parked in the driveway of a residence. The suspect took off running but was later apprehended. The subject was able to be handcuffed after he initially resisted. While in custody and after Miranda warnings, the subject admitted that he been recently released from jail and that he had a drug problem. A blue pill marked M30 was found on his person, along with drug paraphernalia with suspected fentanyl residue. In addition, the suspect had several items stolen from the vehicle, including a credit card. The suspect also admitted to the break-in of another vehicle in the neighborhood. The lead deputy charged the suspect with three counts of second-degree burglary, one count of resisting arrest, and one count of possession of drug paraphernalia. The narcotics and paraphernalia were seized and entered as property for destruction. The supervisor reviewing the arrest report found that the deputy charged the suspect with the wrong statute, did not enter the narcotics paraphernalia as evidence, and did not submit the suspected narcotics for testing. The supervisor met with the deputy and discussed the deficiencies. The report was amended to reflect the correct statute, and the items seized were entered as evidence and sent to the lab. We found this IRM in compliance with the requirements of Paragraph 94. However, the command review did not occur in a timely manner, within the required 14 days, as per policy. The documentation submitted indicates this IRM was submitted by the sergeant on February 13, 2023, but command review did not occur

until March 29, 2023.  Since MCSO has been in compliance with this Paragraph, we will issue a warning.  If MCSO fails to meet the requirements of this Paragraph in the next quarter, compliance will be withdrawn.

***Paragraph 97.***  *MCSO Commanders and Supervisors shall periodically review the EIS reports and information, and initiate, implement, or assess the effectiveness of interventions for individual Deputies, Supervisors, and units based on that review.  The obligations of MCSO Commanders and Supervisors in that regard are described above in Paragraphs 81(c)–(h).*

**Phase 1:**  In compliance

- GH-5 (Early Identification System), most recently amended on December 16, 2021.

**Phase 2:**  In compliance

As per GH-5 (Early Identification System) and GB-2 (Command Responsibility), supervisors are required to conduct EIS reviews twice per month for sworn members.  Command review of EIS profiles of supervisory and command personnel began in February 2017.  To assess MCSO's compliance with this Paragraph, for every month of the reporting period, we select a supervisor and a squad of deputies from each District.  We then review the documentation provided as verification of compliance with this Paragraph.  We also request that EIS reviews of the commanders responsible for the selected personnel be included.  The purpose of conducting EIS reviews is for supervisors to oversee the performance of subordinates, and take appropriate action on issues that need to be corrected.  This Paragraph also requires that the effectiveness of interventions be evaluated.  EIS reviews should be thorough and completed within a timeframe that allows supervisors to monitor performance and address any concerns noted in a timely manner.  We believe that periodic EIS reviews should be conducted on a schedule that maximizes their usefulness.  We understand that an exact 14-day timeframe may not be possible for all EIS reviews; and we will therefore conduct our reviews using a standard of reasonableness.  Two EIS reviews conducted within a short time period, on the same employee, lead to questions regarding the purpose and quality of the reviews.  EIS reviews conducted too close to each other do not address the intent of this Paragraph.  We review documentation to determine if EIS reviews are being conducted in accordance with the requirements of this Paragraph, or if they are being conducted perfunctorily without regard for usefulness or quality.

For April, we reviewed Supervisor Notes requested as verification of compliance for 45 employees.  Of the 45 selected employees, 43 had appropriate documentation of timely EIS reviews, for a compliance rate of 95.56%.  One employee had only one EIS review conducted for the month.  The second employee had two EIS reviews conducted within a span of three days.  For May, we received Supervisor Notes as verification of compliance of EIS reviews for the selected 44 employees.  Of the 44 employees, 41 had appropriate documentation of compliance with this Paragraph, for a compliance rate of 93.18%.  Two employees had only one EIS review conducted for the month.  The third employee had two EIS reviews conducted within a span of two days.  For June, we received Supervisor Notes as verification of compliance of EIS reviews for the selected 44 employees.  Of the 44 employees, 42 had appropriate documentation of compliance with this Paragraph, for a compliance rate of 93.33%.  Two employees had only one

WAI 70622

EIS review conducted for the month. The other employee had two EIS reviews conducted within a span of two days. For the second quarter of 2023, we reviewed the documentation provided for 133 employees – which included the ranks of deputy, sergeant, lieutenant, and captain. Of the 133 employees, 126 had documentation that met compliance requirements. The compliance rate for the fourth quarter was 94.74%.

MCSO completed the TSMR pilot phase during the fourth quarter of 2022. MCSO completed the production and publication of all guiding documents for the TSMR during the first quarter of 2023, including the required modifications to GH-5 (Early Identification System). During the second quarter of 2023, we reviewed 15 closed TSMR investigations which resulted in 14 memos to the District and one intermediate intervention. For all of these investigations, we found the appropriate documentation in the files. Several of these cases were discussed with MCSO during our July site visit. For this reporting period, MCSO was in compliance with the requirements of this Paragraph.

### d. Regular Employee Performance Review and Evaluations

***Paragraph 98.*** *MCSO, in consultation with the Monitor, shall create a system for regular employee performance evaluations that, among other things, track each officer's past performance to determine whether the officer has demonstrated a pattern of behavior prohibited by MCSO policy or this Order.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on April 27, 2022.
- GC-4 (S) (Employee Performance Management), most recently amended on November 10, 2021.

**Phase 2:** Not in compliance

To assess compliance with this Paragraph, we review a sample of deputy and supervisor EPAs selected on a monthly basis under Paragraph 87. There are several Paragraphs in the First and Second Orders that have requirements pertaining to the assessment and documentation of performance in Employee Performance Appraisals. Supervisors have a greater number of requirements that must be met; therefore, we review a greater number of supervisor performance appraisals for compliance. Command personnel are responsible for completing supervisor EPAs and should ensure that the requirements of all EPA related Paragraphs are addressed. First-line supervisors are required to identify and track the performance of deputies who have patterns of behavior prohibited by the Orders and MCSO policy. The methodologies for the assessment of compliance with Paragraphs that require documentation of performance in EPAs are explained under each of those Paragraphs.

We reviewed a total of 45 EPAs for the second quarter of 2023. Forty-one of 45 EPAs met compliance requirements with Paragraph 87. This is a compliance rate of 91.11%. We have previously commented that this Paragraph requires that MCSO take a systematic approach to employee performance evaluations. During this quarter, MCSO achieved compliance with

WAI 70623

Paragraphs 92 and 95, but fell short of compliance with Paragraph 99, a Paragraph that had previously been in compliance; a warning has been issued.  In addition, MCSO was not in compliance with Paragraph 100 during this review period.  During our July virtual site visit we discussed areas where we are still finding deficiencies.  Although we believe that the new EPA process will be successful, we need to see consistency in the completion of EPAs.  We have noted overall improvement, but for the period in review, MCSO was not in compliance with this Paragraph.

***Paragraph 99.*** *The review shall take into consideration all past Complaint investigations; the results of all investigations; Discipline, if any, resulting from the investigation; citizen Complaints and commendation; awards; civil or administrative claims and lawsuits related to MCSO operations; Training history; assignment and rank history; and past Supervisory actions taken pursuant to the early warning protocol.*

**Phase 1:**  In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on April 27, 2022.
- GC-4 (S) (Employee Performance Management), most recently amended on November 10, 2021.

**Phase 2:**  In compliance

The new EPA form has an acknowledgement at the conclusion that supervisors are required to include in their performance appraisal, affirming that they have done due diligence in researching and documenting the requirements of Paragraph 99.  Supervisors completing EPAs are required to document their findings relevant to these areas, if their reviews reveal any applicable events or actions.  The areas of review include: complaint investigations and dispositions; discipline; citizen complaints; commendations; awards; civil or administrative claims; and past supervisory actions taken pursuant to EIS Alerts.  We do not rely solely on the supervisor's affirmation that a thorough review was completed.  We verify supporting documentation to ensure the supervisor has conducted a thorough review and that the information provided under Paragraph 99 is accurate.  We review EIS and IAPro resumes for each employee whose EPA we received during the quarter, under Paragraphs 87, 92, and 95.  We review these resumes and compare them to the notations listed by the supervisor authoring the EPA, under Paragraph 99.  We verify that any past actions noted in the resumes are captured in the EPA.  We have emphasized to MCSO the importance of accurate documentation and thorough reviews of EIS profiles.

For this reporting period, we reviewed Employee Performance Appraisals for 18 deputies and 27 supervisors.  For April, we found all six deputy EPAs, and eight of the nine supervisor EPAs in compliance.  One supervisor EPA failed to document a misconduct investigation that was initiated during the employee's EPA rating period.  For May, we found five of seven deputy EPAs and all eight supervisor EPAs in compliance.  Two deputy EPAs failed to document misconduct investigations that were initiated during the employees' EPA rating periods.  For June, we found all five deputy EPAs in compliance.  We found all 10 supervisor EPAs in compliance.

WAI 70624

For the second quarter of 2023, from a total of 45 EPAs reviewed, 42 were in compliance. The compliance rate was 93.33%. For this reporting period, MCSO was not in compliance with this Paragraph. Since MCSO was previously in compliance with this Paragraph, we will issue a warning. If MCSO fails to meet the requirements of this Paragraph in the next quarter, compliance will be withdrawn.

***Paragraph 100.*** *The quality of Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on April 27, 2022.

- GC-4 (S) (Employee Performance Management), most recently amended on November 10, 2021.

**Phase 2:** Not in compliance

The current EPA form has a rating dimension where supervisors are required to document the quality of supervisory reviews and supervisor accountability. This Paragraph only pertains to supervisor EPAs, and we review comments to ensure that the rater has addressed all areas associated with the quality of supervisory reviews. We have previously noted that we take into account the requirements of Paragraphs 92 and 95, as it pertains to the quality of supervisory reviews of EIS. The quality of reviews of supervisors' misconduct investigations, as per Paragraph 176, is also factored into the assessment of compliance for this Paragraph.

We reviewed Employee Performance Appraisals for 27 supervisors and commanders who received EPAs during this reporting period. Paragraphs 92 and 95 require supervisors to review and track violations and corrective actions in EIS. For April, two of the nine supervisor EPAs failed to document the requirements of Paragraphs 92 and 95 specifically and sufficiently. For May, all eight supervisor EPAs were in compliance. For June, all 10 supervisor EPAs were in compliance. Of the 27 supervisor EPAs reviewed for this quarter, 25 were in compliance with the requirements of this Paragraph, or 92.59%. For this reporting period, MCSO was not in compliance with the requirements of this Paragraph.

WAI 70625

***Paragraph 101.*** *Within 180 days of the Effective Date, MCSO shall develop and implement eligibility criteria for assignment to Specialized Units enforcing Immigration-Related Laws. Such criteria and procedures shall emphasize the individual's integrity, good judgment, and demonstrated capacity to carry out the mission of each Specialized Unit in a constitutional, lawful, and bias-free manner. Deputies assigned to a Specialized Unit who are unable to maintain eligibility shall be immediately re-assigned.*

**In Full and Effective Compliance**

MCSO does not have any specialized units that enforce immigration-related laws. Therefore, by default, MCSO is in Phase 2 compliance with this Paragraph. We continue to monitor arrests and detentions as part of our review process to ensure that MCSO is in compliance with its own directives on this issue.

For April, May, and June, we received lists containing all incidents involving MCSO arrests and criminal citations. For each month, we requested a random sample of arrests and criminal citations. In total, we reviewed 60 incidents involving arrests and 60 incidents involving criminal citations. We also reviewed a random sample of 266 Incident Reports for this reporting period. During our reviews of the documentation provided for this reporting period, we found no evidence to indicate any violations of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with the Monitor's determination.

WAI 70626

## Section 10: Misconduct and Complaints

**COURT ORDER XI.  MISCONDUCT AND COMPLAINTS**

### *a. Internally-Discovered Violations*

***Paragraph 102.*** *MCSO shall require all personnel to report without delay alleged or apparent misconduct by other MCSO Personnel to a Supervisor or directly to IA that reasonably appears to constitute: (i) a violation of MCSO policy or this Order; (ii) an intentional failure to complete data collection or other paperwork requirements required by MCSO policy or this Order; (iii) an act of retaliation for complying with any MCSO policy; (iv) or an intentional provision of false information in an administrative investigation or any official report, log or electronic transmittal of information.  Failure to voluntarily report or document apparent misconduct described in this Paragraph shall be an offense subject to Discipline.*

**In Full and Effective Compliance**

During our assessments of compliance with this Paragraph, we have reviewed hundreds of misconduct investigations involving MCSO personnel.  Many of them have been internally generated.

During this reporting period, we reviewed 152 administrative misconduct investigations.  Thirty-six were generated internally.  MCSO has continued to identify and address misconduct that is raised by other employees or identified by supervisory personnel.  While some of these investigations did not meet all requirements for the proper reporting or completion of misconduct investigations, we address these failures in other Paragraphs in this report.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

### *b. Audit Checks*

***Paragraph 103.*** *Within one year of the Effective Date, MCSO shall develop a plan for conducting regular, targeted, and random integrity audit checks to identify and investigate Deputies possibly engaging in improper behavior, including: Discriminatory Policing; unlawful detentions and arrests; improper enforcement of Immigration-Related Laws; and failure to report misconduct.*

**Phase 1:**  In compliance

- Audits and Inspections Unit Operations Manual, Section 303, published on August 27, 2020.
- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

**Phase 2:**  In compliance

WAI 70627

Paragraph 103 requires that MCSO conduct "regular, targeted, and random integrity audit checks." MCSO's Audits and Inspections Unit (AIU), a unit of the Bureau of Internal Oversight (BIO), is responsible for these requirements. This Paragraph does not set frequency standards for integrity tests. During this reporting period, AIU published several completed inspection reports to fulfill the "regular" and "random" elements of this Paragraph. AIU's inspections examined complaint intake tests, Early Identification System (EIS) alerts, Supervisor Notes, Patrol Activity Logs, traffic stop data, post-stop ethnicity, passenger contacts, County Attorney turndown dispositions, Patrol Shift Rosters, and others.

For this reporting period, AIU did not submit any inspections to fulfill the "targeted" requirements of Paragraph 103. We will continue to review AIU's tests to verify that MCSO maintains continued compliance with this Paragraph. We will also discuss with AIU its plans for upcoming targeted audits during our next site visit.

### c. Complaint Tracking and Investigations

***Paragraph 104.*** *Subject to applicable laws, MCSO shall require Deputies to cooperate with administrative investigations, including appearing for an interview when requested by an investigator and providing all requested documents and evidence. Supervisors shall be notified when a Deputy under their supervision is summoned as part of an administrative investigation and shall facilitate the Deputy's appearance, absent extraordinary and documented circumstances.*

**In Full and Effective Compliance**

In the fall of 2015, MCSO developed a draft checklist and investigative format for administrative investigations. All the requirements in this Paragraph were included in these protocols and approved for use in 2016. Effective June 1, 2016, all administrative investigations have been required to include these forms. Since that time, the forms have been revised to provide additional clarification on procedural requirements. MCSO has consistently met the requirement to use these forms, and includes the checklists in administrative investigation files forwarded for our review.

During this reporting period, we reviewed 152 administrative misconduct investigations. Eighty-one involved sworn personnel. All 81 included the use of the approved investigative format and checklist. We continue to note that deputies consistently appear for scheduled interviews, provide all required information to investigators, and cooperate with investigations. There were no instances identified where a supervisor failed to facilitate a deputy's attendance at an interview or where an investigator failed to notify the employee's supervisor of an intended administrative interview.

On March 17, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70628

***Paragraph 105.*** *Investigators shall have access to, and take into account as appropriate, the collected traffic stop and patrol data, Training records, Discipline history, and any past Complaints and performance evaluations of involved officers.*

**In Full and Effective Compliance**

Our reviews of investigations conducted by MCSO have verified that the information required for compliance with this Paragraph is consistently provided in the checklist and investigative reports.

As a result of the Second Order and effective July 20, 2016, the PSB Commander makes all preliminary disciplinary decisions. The PSB and Administrative Services Division Commanders created a worksheet that provides information regarding how MCSO makes disciplinary decisions, and how MCSO considers employees' work history. PSB includes this form in the sustained investigation documentation that we receive and review for compliance.

During this reporting period, we reviewed 72 sustained administrative misconduct investigations. Forty-two of these involved misconduct by sworn personnel only. Twenty-two involved misconduct by Detention personnel only, five involved misconduct by civilian personnel only, one involved misconduct by a reserve deputy only, and two involved misconduct by both Detention and civilian personnel. In 22 of the cases, none of the involved employees were still employed by MCSO at the time of the completion of the investigation or the discipline process. Fifty of the sustained investigations identified one or more principal still employed by MCSO at the time final findings or discipline decisions were made.

In all 50 of the sustained allegations involving known MCSO personnel, the PSB Commander determined the findings and presumptive range of discipline for the sustained violations. We found that generally, where appropriate, discipline history, past complaints, performance evaluations, traffic stop and patrol data, and training records were included in the documents considered for discipline findings. All 50 were referred for discipline or other corrective action.

On October 5, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.


***Paragraph 106.*** *Records of Complaints and investigations shall be maintained and made available, un-redacted, to the Monitor and Plaintiffs' representatives upon request. The Monitor and Plaintiffs' representatives shall maintain the confidentiality of any information therein that is not public record. Disclosure of records of pending investigations shall be consistent with state law.*

**In Full and Effective Compliance**

MCSO has two obligations under this Paragraph: to maintain and make records available. The Paragraph also covers the requirement that MCSO make unredacted records of such investigations available to the Plaintiffs' attorneys and Plaintiff-Intervenor as well.

WAI 70629

MCSO has been responsive to our requests, and neither the Plaintiffs nor Plaintiff-Intervenor have raised any concerns related to the requirements of this Paragraph for this or the past several reporting periods.  MCSO, via its counsel, distributes responses to our document and site visit requests via a document-sharing website.  The Plaintiffs' attorneys and Plaintiff-Intervenor have access to this information, including documents applicable to this Paragraph, at the same time as we do.

On June 3, 2019, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70630

# Section 11: Community Engagement

**COURT ORDER XII.  COMMUNITY ENGAGEMENT**

*a. Community Outreach Program*

**Paragraph 107.**  *To rebuild public confidence and trust in the MCSO and in the reform process, the MCSO shall work to improve community relationships and engage constructively with the community during the time that this order is in place.  To this end, the MCSO shall conduct the following district community outreach program.*

**Paragraph 109.**  *The Monitor shall hold at least one public meeting per quarter to coincide with the quarterly site visits by the Monitor in a location convenient to the Plaintiffs class.  The meetings shall be for the purpose of reporting the MCSO' progress in implementing this Order.  These meetings shall be used to inform community members of the policy changes or other significant actions that the MCSO has taken to implement the provisions of this Order.  Summaries of audits and reports completed by the MCSO pursuant to this Order shall be made available.  The meetings shall be under the direction of the Monitor and/or his designee.  The Sheriff and/or the MCSO will participate in the meetings to provide substantive comments related to the Melendres case and the implementation of the orders resulting from it, as well as answer questions related to its implementation, if requested to do so by the Monitor or the community.  If the Sheriff is unable to attend a meeting due to other obligations, he shall notify the Monitor at least 30 days prior to that meeting.  The Monitor shall consult with Plaintiffs' representatives and the Community Advisory Board on the location and content of the meetings.  The Monitor shall clarify for the public at these meetings that MCSO does not enforce immigration laws except to the extent that it is enforcing Arizona and federal criminal laws.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

This Paragraph, per the June 3, 2019 Order (Document 2431), returned the community meetings to the Monitor's supervision and directed the Monitor to hold at least one public meeting per quarter to coincide with the quarterly site visits by the Monitor in a location convenient to the Plaintiffs' class.

The requirement to hold a community meeting is not applicable for MCSO as it applies to the Monitor and not MCSO.  We did not travel to Maricopa County in July for our quarterly site visit.  We will consult with Plaintiffs' representatives and the Community Advisory Board regarding the location and content of our community meetings when we resume our in-person site visits.

WAI 70631

***Paragraph 110.***  *The meetings present an opportunity for the Monitor and MCSO representatives to listen to community members' experiences and concerns about MCSO practices.  The Monitor may investigate and respond to those concerns.  The Monitor shall inform the public that the purpose of the meeting is to discuss the Melendres case and the orders implementing the relief of that case.  To the extent that the Monitor receives concerns at such meetings that are neither within the scope of this order nor useful in determining the Defendant's compliance with this order, it may inform the complainant how to file an appropriate complaint with the MCSO or appropriate law enforcement agency.  The Sheriff may respond to non-Melendres questions raised at meetings to the extent, in his sole discretion, if the Sheriff wishes to do so.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

The requirements of this Paragraph are not applicable as they apply to actions that the Monitor, not MCSO, is required to take regarding community meetings.  As noted above, we did not travel to Maricopa County in July for an in-person quarterly site visit, and therefore did not hold a community meeting.

***Paragraph 111.***  *English and Spanish-speaking Monitor Personnel shall attend these meetings and be available to answer questions from the public about its publicly available reports concerning MCSO's implementation of this Order and other publicly available information.  The Plaintiffs' and Plaintiff-Intervenor's representatives shall be invited to attend and the Monitor shall announce their presence and state their availability to answer questions.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

The requirements of this Paragraph are not applicable to MCSO as they apply to actions that the Monitor, not MCSO, is required to take regarding community meetings.  As noted above, we did not travel to Maricopa County in July for an in-person quarterly site visit, and therefore did not hold a community meeting.

WAI 70632

*Paragraph 112.   At least ten days before such meetings, the Monitor shall widely publicize the meetings in English and Spanish after consulting with Plaintiffs' representatives and the Community Advisory Board regarding advertising methods.  Options for advertising include, but are not limited to, television, radio, print media, internet and social media, and any other means available.  Defendants shall either provide a place for such meetings that is acceptable to the Monitor or pay the Monitor the necessary expenses incurred in arranging for such meeting places.  The Defendants shall also pay the reasonable expenses of publicizing the meetings as required above, and the additional reasonable personnel and expenses that the Monitor will incur as a result of performing his obligations with respect to the Community Outreach Program.  If any party determines there is little interest or participation in such meetings among community members, or that they have otherwise fulfilled their purpose, it can file a request with the Court that this requirement be revised or eliminated.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

The requirements of this Paragraph are not applicable as they apply to actions that the Monitor, not MCSO, is required to take regarding community meetings.  As we did not travel to Maricopa County in July, we did not hold a community meeting.  We will consult with Plaintiffs' representatives and the Community Advisory Board regarding community meeting advertising when we resume our in-person site visits.

### b. MCSO Community Liaison

*Paragraph 113.   MCSO shall select or hire a Community Liaison who is fluent in English and Spanish.  The hours and contact information of the MCSO Community Outreach Division ("COD") shall be made available to the public including on the MCSO website.  The COD shall be directly available to the public for communications and questions regarding the MCSO.*

**In Full and Effective Compliance**

This Paragraph requires that MCSO select or hire a Community Liaison who is fluent in English and Spanish.  MCSO's Community Outreach Division (COrD) has two Community Liaison Officers who are fluent in English and Spanish.  The COrD uses the term "Community Liaison" for these two individuals and its other staff members, though not all of them are bilingual.

The MCSO website lists the hours and contact information of the COrD and its staff – as well as the COrD's mission and overarching goals, and frequently asked questions regarding MCSO.  Based on a recommendation from the Plaintiff-Intervenor, MCSO recently updated its website to include information about the language abilities of COrD's Community Liaison Officers.

On June 17, 2022, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70633

**Paragraph 114.** *The COD shall have the following duties in relation to community engagement:*

a.      *to coordinate the district community meetings described above in Paragraphs 109 to 112;*

b.      *to provide administrative support for, coordinate and attend meetings of the Community Advisory Board described in Paragraphs 117 to 118; and*

c.      *to compile any complaints, concerns and suggestions submitted to the COD by members of the public about the implementation of this Order and the Court's order of December 23, 2011, and its findings of fact and conclusions of law dated May 24, 2013, even if they don't rise to the level of requiring formal action by IA or other component of the MCSO, and to respond to Complainants' concerns; and*

d.      *to communicate concerns received from the community at regular meetings with the Monitor and MCSO leadership.*

**In Full and Effective Compliance**

Pursuant to the June 3, 2019 Order (Document 2431), Subparagraphs a. and b. of this Paragraph are no longer applicable.

During this reporting period, as in the past, some CAB members participated in a few of our compliance meetings during our July remote site visit – including meetings on MCSO's interaction with the CAB and community engagement, and MCSO's Constitutional Policing Plan.

MCSO has provided documentation that all current COrD personnel completed an online Complaint Intake and Processing course, to assist them in receiving and appropriately directing any complaints or concerns they receive from community members, including complaints of potential employee misconduct.  When new personnel are assigned to the COrD, we request and review documentation that the new staff members have completed this training.  During our most recent site visit, COrD personnel reported that no new personnel were assigned to the Division within the last quarter.

In the past, COrD personnel have reported that they occasionally receive concerns from community members, and that they forward those that are complaints to PSB; and that they sometimes receive inquiries for which COrD staff believe it is appropriate to direct community members to written materials or MCSO's website.  In addition, COrD has developed a form for capturing information on complaints, concerns, and suggestions submitted by members of the public to the COrD; however, COrD personnel maintain that they did not receive any *Melendres*-related complaints, concerns, or suggestions from the public during this reporting period.  In its submission for this reporting period, COrD personnel wrote, "The Community Outreach Division did not receive any complaints, concerns or suggestions by members of the public regarding the implementation of the Court's Orders during April 1st, through June 30th, 2023.  Therefore, no response was prepared."

During our upcoming site visit, we will discuss with COrD personnel any complaints, concerns, and suggestions it has received from the public; as well as the requirement that COrD communicate any concerns received from the community at regular meetings with the Monitor and MCSO leadership.

WAI 70634

On June 17, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

### c. Community Advisory Board

***Paragraph 115.*** *MCSO and Plaintiffs' representatives shall work with community representatives to create a Community Advisory Board ("CAB") to facilitate regular dialogue between the MCSO and the community, and to provide specific recommendations to MCSO and the Monitor about policies and practices that will increase community trust and ensure that the provisions of this Order and other orders entered by the Court in this matter are met. The MCSO shall cooperate with the Monitor to assure that members of the CAB are given appropriate access to relevant material, documents, and training so the CAB can make informed recommendations and commentaries to the Monitor.*

**Phase 1:** In compliance

- Court Implementation Division Operations Manual, most recently revised on January 3, 2023.

**Phase 2:** In compliance

MCSO's responsiveness to the CAB's inquiries and requests for information continues to meet the requirements of this Paragraph. At the end of this reporting period, the Deputy Chief serving as MCSO's liaison to the CAB retired from the agency; and MCSO appointed a new liaison, a Captain, to serve in this capacity. CAB members continue to provide recommendations to MCSO about policies and practices that will increase community trust and ensure that the provisions of the Orders entered by the Court in this matter are met. During this reporting period, CAB members provided feedback on MCSO policies GC-13 (Awards), GH-2 (Internal Investigations), and GI-5 (Voiance Language Services). We continue to closely monitor the measure to which MCSO facilitates a good working relationship with the CAB.

WAI 70635

***Paragraph 116.*** *The CAB shall have five members, two to be selected by MCSO and two to be selected by Plaintiffs' representatives. One member shall be jointly selected by MCSO and Plaintiffs' representatives. Members of the CAB shall not be MCSO Employees or any of the named class representatives nor any of the attorneys involved in this case. The CAB shall continue for at least the length of this Order.*

**Phase 1:** In compliance

- Court Implementation Division Operations Manual, most recently revised on January 3, 2023.

**Phase 2:** In compliance

The CAB is a five-member body – with two members selected by MCSO, two members selected by Plaintiffs' attorneys, and one member jointly selected by MCSO and Plaintiffs' attorneys. None of the CAB members are MCSO employees, named class representatives, or attorneys involved in this case.

***Paragraph 117.*** *The CAB shall hold meetings at regular intervals. The meetings may be either public or private as the purpose of the meeting dictates, at the election of the CAB. The Defendants shall provide a suitable place for such meetings. The Monitor shall coordinate the meetings and communicate with CAB members, and provide administrative support for the CAB.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

The requirements of this Paragraph do not require any action on the part of MCSO; thus, they are not applicable. During this reporting period, CAB members met regularly as a group, often with members of the Monitoring Team. A member of the Monitoring Team coordinated the meetings and provided administrative support for the CAB. In addition, during our July remote site visit, some CAB members participated in a few of our compliance meetings – including meetings on the Constitutional Policing Plan, community engagement/CAB, and other topics. In our regular interactions with CAB members via conference calls and virtual meetings, we have provided information about MCSO's progress achieving compliance with the Orders and discussed ways to improve the relationship between the Plaintiffs' class and MCSO.

***Paragraph 118.*** *During the meetings of the CAB, members will relay or gather concerns from the community about MCSO practices that may violate the provisions of this Order and the Court's previous injunctive orders entered in this matter and transmit them to the Monitor and the MCSO for investigation and/or action. The Parties will also be given the CAB's reports and recommendations to the Monitor.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

WAI 70636

The requirements of this Paragraph do not require any action on the part of MCSO; thus, they are not applicable.  As noted above, during this reporting period, as in the past, some CAB members participated in a few of our compliance meetings during our July remote site visit.

We requested from MCSO documentation of concerns received from CAB members during their meetings about MCSO practices that may be in violation of the Court's Orders that were transmitted to the MCSO for investigation and/or action during this reporting period.  MCSO did not report any such concerns during this reporting period.  We will continue to encourage the CAB to share community concerns with MCSO.

WAI 70637

# Second Supplemental Permanent Injunction/Judgment Order

## Section 12: Misconduct Investigations, Discipline, and Grievances

**COURT ORDER XV.       MISCONDUCT INVESTIGATIONS, DISCIPLINE, AND GRIEVANCES**

*Paragraph 163.   The Sheriff will ensure that all allegations of employee misconduct, whether internally discovered or based on a civilian complaint, are fully, fairly, and efficiently investigated; that all investigative findings are supported by the appropriate standard of proof and documented in writing; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair, consistent, unbiased and provides due process.   To achieve these outcomes, the Sheriff shall implement the requirements set out below.*

### A.  Policies Regarding Misconduct Investigations, Discipline, and Grievances

*Paragraph 165.   Within one month of the entry of this Order, the Sheriff shall conduct a comprehensive review of all policies, procedures, manuals, and other written directives related to misconduct investigations, employee discipline, and grievances, and shall provide to the Monitor and Plaintiffs new policies and procedures or revise existing policies and procedures. The new or revised policies and procedures that shall be provided shall incorporate all of the requirements of this Order.  If there are any provisions as to which the parties do not agree, they will expeditiously confer and attempt to resolve their disagreements.  To the extent that the parties cannot agree on any proposed revisions, those matters shall be submitted to the Court for resolution within three months of the date of the entry of this Order.  Any party who delays the approval by insisting on provisions that are contrary to this Order is subject to sanction.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

MCSO provided us with the following:

- CP-2 (Code of Conduct), most recently amended on February 14, 2023.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on December 16, 2021.

- CP-5 (Truthfulness), most recently amended on November 17, 2022.

- CP-8 (Preventing Racial and Other Bias-Based Profiling), most recently amended on October 13, 2022.

- CP-11 (Anti-Retaliation), most recently amended on January 6, 2022.

- EA-2 (Patrol Vehicles), most recently revised on March 16, 2022.

- GA-1 (Development of Written Orders), most recently amended on January 12, 2022.

WAI 70638

- GB-2 (Command Responsibility), most recently amended on June 28, 2019.

- GC-4 (Employee Performance Appraisals), most recently amended on April 13, 2023.

- GC-4 (S) (Employee Performance Management), most recently amended on April 13, 2023.

- GC-7 (Transfer of Personnel), most recently amended on June 15, 2023.

- GC-11 (Employee Probationary Periods and Unclassified Employees), most recently amended on May 2, 2023.

- GC-12 (Hiring and Promotional Procedures), most recently amended on November 17, 2022.

- GC-16 (Employee Grievance Procedures), most recently amended on December 8, 2021.

- GC-17 (Employee Disciplinary Procedures), most recently amended on November 17, 2022.

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on September 15, 2021.

- GE-4 (Use, Assignment, and Operation of Vehicles), most recently amended on February 22, 2023.

- GG-1 (Peace Officer Training Administration), most recently amended on November 17, 2022.

- GG-2 (Detention/Civilian Training Administration), most recently amended on November 17, 2022.

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

- GH-5 (Early Identification System), most recently amended on March 28, 2023.

- GI-5 (Voiance Language Services), most recently amended on December 8, 2021.

- GJ-24 (Community Relations and Youth Programs), most recently revised on April 7, 2022.

- GJ-26 (Sheriff's Reserve Deputy Program), most recently amended on March 16, 2023.

- GJ-27 (Sheriff's Posse Program), most recently amended on May 19, 2023.

- GJ-35 (Body-Worn Cameras), most recently amended on May 19, 2023.

- Administrative Services Division Operations Manual, most recently amended on November 14, 2022.

- Audits and Inspections Unit Operations Manual, currently under revision.

WAI 70639

- Body-Worn Camera Operations Manual, published on December 22, 2016.

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

- Training Division Operations Manual, most recently amended on April 4, 2022.

This Paragraph implies that the review process and final adoption of the updated policies would take two months to complete, assuming that the new or revised policies were provided within one month of the issuance of the Second Order. This is due, in some measure, to researched and well-considered recommendations by the Parties; and robust discussion about policy language, application, and outcomes during our site visit meetings.

We received a majority of the documents listed above within one month of the entry of the Order. We and the Parties conducted initial reviews and returned the revised documents, with additional recommendations, to MCSO for additional work. MCSO continues provide us and the Parties with any new and revised policies for review and recommendations. MCSO remains in compliance with this Paragraph.

**Paragraph 166.** *Such policies shall apply to all misconduct investigations of MCSO personnel.*

**Paragraph 167.** *The policies shall include the following provisions:*

a. *Conflicts of interest in internal affairs investigations or in those assigned by the MCSO to hold hearings and make disciplinary decisions shall be prohibited. This provision requires the following:*

   i. *No employee who was involved in an incident shall be involved in or review a misconduct investigation arising out of the incident.*

   ii. *No employee who has an external business relationship or close personal relationship with a principal or witness in a misconduct investigation may investigate the misconduct. No such person may make any disciplinary decisions with respect to the misconduct including the determination of any grievance or appeal arising from any discipline.*

   iii. *No employee shall be involved in an investigation, whether criminal or administrative, or make any disciplinary decisions with respect to any persons who are superior in rank and in their chain of command. Thus, investigations of the Chief Deputy's conduct, whether civil or criminal, must be referred to an outside authority. Any outside authority retained by the MCSO must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest.*

b. *If an internal affairs investigator or a commander who is responsible for making disciplinary findings or determining discipline has knowledge of a conflict of interest affecting his or her involvement, he or she should immediately inform the Commander of the Professional Standards Bureau or, if the holder of that office also suffers from a*

WAI 70640

*conflict, the highest-ranking, non-conflicted chief-level officer at MCSO or, if there is no non-conflicted chief-level officer at MCSO, an outside authority. Any outside authority retained by the MCSO must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest.*

c.   *Investigations into an employee's alleged untruthfulness can be initiated by the Commander of the Professional Standards Bureau or the Chief Deputy. All decisions not to investigate alleged untruthfulness must be documented in writing.*

d.   *Any MCSO employee who observes or becomes aware of any act of misconduct by another employee shall, as soon as practicable, report the incident to a Supervisor or directly to the Professional Standards Bureau. During any period in which a Monitor is appointed to oversee any operations of the MCSO, any employee may, without retaliation, report acts of alleged misconduct directly to the Monitor.*

e.   *Where an act of misconduct is reported to a Supervisor, the Supervisor shall immediately document and report the information to the Professional Standards Bureau.*

f.   *Failure to report an act of misconduct shall be considered misconduct and may result in disciplinary or corrective action, up to and including termination. The presumptive discipline for a failure to report such allegations may be commensurate with the presumptive discipline for the underlying misconduct.*

g.   *No MCSO employee with a rank lower than Sergeant will conduct an investigation at the District level.*

**In Full and Effective Compliance**

To determine Phase 2 compliance with this Paragraph, we review administrative misconduct investigations.

During this reporting period, we reviewed 152 closed administrative misconduct investigations. Sworn, Detention, or civilian personnel assigned to PSB conducted 92 of the investigations we reviewed. PSB outsourced 20 of the investigations to outside vendors. Sworn supervisors in Districts or Divisions outside of PSB conducted the remaining 40.

Paragraph 167.a.i-iii. prohibits any employee with any conflicts of interest from participating in, holding hearings on, or making any disciplinary decisions in a misconduct investigation. During this reporting period, there were two instances where a potential conflict of interest was identified and the investigations were outsourced to an outside vendor as required.

Paragraph 167.b. requires that if the internal affairs investigator or a commander responsible for making disciplinary decisions identifies a conflict of interest, appropriate notifications must be made immediately. There were no instances during this reporting period where a supervisor failed to identify a conflict of interest and inappropriately conducted an investigation.

WAI 70641

Paragraph 167.c. requires that investigations into truthfulness be initiated by the Chief Deputy or the PSB Commander.  MCSO identified nine instances during this reporting period where PSB believed that a truthfulness allegation was appropriate and conducted the proper investigation.  We did not identify any investigations during this reporting period where we believe that MCSO should have initiated an investigation into truthfulness – and failed to do so.

Paragraph 167.d. requires that any MCSO employee who observes or becomes aware of misconduct by another employee shall immediately report such conduct to a supervisor or directly to PSB.  Per the requirement, during the period in which the Monitor has authority to oversee any operations of MCSO, any employee may also report alleged misconduct to the Monitor.  Of the 152 administrative cases we reviewed for this reporting period, there were 32 investigations where an employee reported potential misconduct by another employee, or a supervisor identified potential employee misconduct.  We did not identify any instances where a supervisor failed to identify and report potential misconduct as required.  There were three complaints sent directly to our Team.  These were forwarded to MCSO and investigated as required.

Paragraph 167.e. requires that when supervisors learn of an act of misconduct, the supervisor shall immediately document and report the information to PSB.  We did not identify any instances where a supervisor failed to document and report potential misconduct as required.

Paragraph 167.f. provides for the potential for a disciplinary sanction or other corrective action if an employee fails to bring forth an act of misconduct.  We did not identify any instances where a supervisor failed to bring forward misconduct as required.

Paragraph 167.g. requires that a sergeant or higher-ranking employee conduct all misconduct investigations conducted at the District level.  All District-level cases that we reviewed for this reporting period complied with this requirement.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 168.**  *All forms of reprisal, discouragement, intimidation, coercion, or adverse action against any person, civilian, or employee because that person reports misconduct, attempts to make or makes a misconduct complaint in good faith, or cooperates with an investigation of misconduct constitute retaliation and are strictly prohibited.  This also includes reports of misconduct made directly to the Monitor, during any period in which a Monitor is appointed to oversee any operations of the MCSO.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we reviewed 152 administrative misconduct investigations that were completed during this reporting period.

WAI 70642

There were five investigations where allegations applicable to compliance with this Paragraph were made. Two of the five had sustained findings related to this Paragraph. In one of these, the principal resigned prior to the completion of the investigation; and in the second, the employee was dismissed from the agency. We agree with the findings in all five of the investigations.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 169.** *Retaliating against any person who reports or investigates alleged misconduct shall be considered a serious offense and shall result in discipline, up to and including termination.*

## In Full and Effective Compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 152 administrative misconduct investigations that were completed during this reporting period.

There were five investigations where allegations applicable to compliance with this Paragraph were made. Two of these investigations had sustained findings, and MCSO took the appropriate actions. We agree with the findings in all five.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 170.** *The Sheriff shall investigate all complaints and allegations of misconduct, including third-party and anonymous complaints and allegations. Employees as well as civilians shall be permitted to make misconduct allegations anonymously.*

## In Full and Effective Compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 152 administrative misconduct investigations during this reporting period. Thirty-six were initiated as a result of internal complaints, and 116 were externally generated. We also reviewed eight criminal investigations conducted by MCSO. Three were initiated as a result of an external complaint, and five were internally generated.

Of the 152 administrative misconduct investigations we reviewed for this reporting period, 12 involved anonymous complaints. Thirteen others were complaints from identified third-party complainants. We have not become aware of any evidence indicating that MCSO refused to accept and complete any investigations initiated by third-party or anonymous complainants. None of the 152 administrative misconduct investigations we reviewed during this reporting period included any allegations indicating that any third-party or anonymous complaint was not appropriately accepted and investigated.

WAI 70643

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 171.** *The MCSO will not terminate an administrative investigation solely on the basis that the complainant seeks to withdraw the complaint, or is unavailable, unwilling, or unable to cooperate with an investigation, or because the principal resigns or retires to avoid discipline. The MCSO will continue the investigation and reach a finding, where possible, based on the evidence and investigatory procedures and techniques available.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we reviewed 152 administrative misconduct investigations during this reporting period.

We determined that 31 of the 152 completed administrative investigations we reviewed involved complainants who sought to withdraw their complaints; or were unavailable, unwilling, or unable to cooperate. MCSO completed all 31 investigations and reached a finding as required. We also found that in 39 of the 152 investigations, one or more of the principals left MCSO employment prior to the finalization of the investigation or discipline process. MCSO completed all of these investigations and reached a finding as required. Twenty-two of these 39 investigations resulted in a sustained finding for one or more policy violations. The remaining 17 did not result in any sustained findings. None of the 152 investigations we evaluated for compliance were prematurely terminated.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 172.** *Employees are required to provide all relevant evidence and information in their custody and control to internal affairs investigators. Intentionally withholding evidence or information from an internal affairs investigator shall result in discipline.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph during this reporting period, we reviewed 152 completed administrative misconduct investigations. There were three investigations where PSB identified that an employee had failed to accurately provide all information or evidence required during the investigation. In all three, PSB initiated truthfulness investigations, the allegations were sustained, and the employees were dismissed from MCSO employment.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70644

***Paragraph 173.*** *Any employee who is named as a principal in an ongoing investigation of serious misconduct shall be presumptively ineligible for hire or promotion during the pendency of the investigation. The Sheriff and/or the MCSO shall provide a written justification for hiring or promoting an employee or applicant who is a principal in an ongoing investigation of serious misconduct. This written justification shall be included in the employee's employment file and, during the period that the MCSO is subject to Monitor oversight, provided to the Monitor.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on April 27, 2022.

- GC-4 (S) (Employee Performance Management), most recently amended on November 10, 2021.

- GC-11 (Employee Probationary Periods and Unclassified Employees), most recently amended on January 12, 2022.

- GC-12 (Hiring and Promotional Procedures), most recently amended on November 17, 2022.

**Phase 2:** In compliance

MCSO has established a protocol to address the requirements of this Paragraph. When a promotion list is established for sworn or Detention personnel, a copy of the list is forwarded to the Professional Standards Bureau (PSB). Before any promotion is finalized, PSB conducts a check of each employee's disciplinary profile in the automated system (IAPro). As part of the promotional process, members of MCSO's command staff meet to discuss each employee's qualifications. During this meeting, the results of the IAPro checks are provided to the staff for review and consideration. The PSB Commander generally attends the promotion meetings for both Detention and sworn personnel, and clarifies any questions regarding the disciplinary history that the staff may have. When an employee is moved from a civilian employment position to a sworn employment position, MCSO conducts a thorough background investigation. The process involves a review and update of the candidate's PSB files, which is completed by Pre-Employment Services. For Detention employees who are moving to sworn positions, the information in the employee's file is updated to include any revised or new information. Due to the scheduling of our site visits, we inspect personnel files for employees who were promoted during the last month of the preceding quarter, and the first two months of the current reporting period. In our reviews, we ensure that the documentation, as it pertains to compliance with this Paragraph, is included in personnel files.

MCSO reported a total of 41 promotions during this review period. There were seven sworn promotions, 12 Detention promotions, and 22 civilian promotions. For sworn, there were six promotions to sergeant and one promotion to lieutenant. Three of the sworn sergeants had open misconduct investigations; however, the allegations were not of a serious nature. Two of the sworn sergeants had previous minor discipline. The sworn employee promoted to lieutenant had three separate instances of minor discipline. There were 12 Detention promotions, seven of which were sergeants, four were lieutenants, and one was a captain's promotion. One Detention sergeant had an open critical incident, and one Detention sergeant had an open misconduct investigation

WAI 70645

that was not expected to be sustained.  The remainder of the Detention sergeants had no record of discipline.  One Detention lieutenant had an open minor misconduct investigation and had previous minor discipline issued.  One Detention lieutenant had an eight-hour suspension, along with other minor discipline.  The remaining Detention lieutenants had no disciplinary histories.  The Detention captain did not have a disciplinary history.  There were 22 civilian promotions to different ranks.  Two civilians had open misconduct investigations.  Both civilians had minor allegations which would not preclude their promotions.  We reviewed the documentation provided for all promotions and determined that none of the employees with open allegations would likely incur serious discipline if the allegations were sustained.  We also determined that the employees with minor discipline in their profile should not be precluded from their promotions.

MCSO reported hiring 20 employees during the second quarter, of which 12 were sworn, three were Detention, and five were civilian.  All Detention and civilian employees were rehires.  None of the newly hired employees had any record of discipline.  We did not have any concerns with any of the new employees.

We have been unable to review personnel files since January 2020, as we have conducted our site visits remotely.  When we resume our in-person site visits, we will follow up on these cases to ensure that the appropriate documentation is included in each employee's file.

**Paragraph 174.**  *Employees' and applicants' disciplinary history shall be considered in all hiring, promotion, and transfer decisions, and this consideration shall be documented. Employees and applicants whose disciplinary history demonstrates multiple sustained allegations of misconduct, or one sustained allegation of a Category 6 or Category 7 offense from MCSO's disciplinary matrices, shall be presumptively ineligible for hire or promotion.  MCSO shall provide a written justification for hiring or promoting an employee or applicant who has a history demonstrating multiple sustained allegations of misconduct or a sustained Category 6 or Category 7 offense. This written justification shall be included in the employee's employment file and, during the period that the MCSO is subject to Monitor oversight, provided to the Monitor.*

## In Full and Effective Compliance

For employees who are promoted, the documentation submitted by MCSO generally includes the disciplinary history for the previous 10 years and any applicable disciplinary actions.  MCSO also provides the disciplinary history of Detention and civilian employees who have been upgraded in classification to sworn status.

WAI 70646

For the second quarter of 2023, MCSO reported hiring 20 new employees. The new hires consisted of 12 sworn employees, three Detention employees, and five civilian employees. All new Detention and civilian employees were former employees who were rehired. We reviewed the documentation provided for all the new employees. None of the new 20 employees had any record of discipline. We reviewed the documentation provided for 41 employees promoted during the second quarter. Two of the promoted employees had minor discipline and one employee had a previous eight-hour suspension. Detailed reviews are noted under Paragraph 173. We reviewed the documentation provided, and concluded that their disciplinary histories should not preclude their promotions.

On June 17, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

***Paragraph 175.*** *As soon as practicable, commanders shall review the disciplinary history of all employees who are transferred to their command.*

**Phase 1:**  In compliance

- GH-5 (Early Identification System), most recently amended on December 16, 2021.
- GC-7 (Transfer of Personnel), most recently amended on October 29, 2021.

**Phase 2:**  In compliance

Per policy, MCSO is to conduct an EIS review within 14 days of an affected employee's transfer. We requested a list of employees that were transferred during this reporting period. From the list, we selected a sample of employees to review and verify that there was documentation of the required EIS reviews. To verify compliance with this Paragraph, we review the transfer request documents that MCSO completes for each employee. The documents memorialize the commander's acknowledgment of review of the transferred employee's disciplinary history, as well as the review of the employee's performance appraisals for the previous five years. This review is generally conducted before the gaining commander accepts the transfer, a few days prior to the transfer becoming effective.

For April, we requested a list of all employees who were transferred during the month. MCSO submitted a list, and we selected a sample of 25 employees who would fall under the requirements of this Paragraph. The list we requested was comprised of 15 Detention employees and 10 sworn employees. Of the 15 Detention employees requested, all had proper documentation of command review of their EIS profiles. Of the 10 sworn employees requested, all had proper documentation of command review of their EIS profiles. For April all 25 employee transfers were in compliance with timely command review of the employees' EIS profiles. For May, we requested documentation for all 13 employees who were transferred during the month. This list was comprised of nine Detention employees and four sworn employees. We reviewed the documentation submitted for all the transfers. Of the nine Detention employees requested, all had proper documentation of command review of their EIS profiles. Of the four sworn employees requested, all had proper documentation of command review of their EIS profiles. For May, all

WAI 70647

13 transfers were in compliance with the requirements of this Paragraph. For June, we requested a list of all employees who were transferred during the month. From the list, we selected all 22 employees to review. This list was comprised of five Detention employees and 17 sworn employees. All of the five Detention employees had proper documentation of command review of their EIS profiles. Of the 17 sworn employees, all had proper documentation of command review of their EIS profiles. For June, all employee transfers reviewed were in compliance.

For the second quarter of 2023, all 60 employees transferred had proper documentation of timely command review of their EIS profiles. The compliance rate for the second quarter was 100%. In our last report, we issued a noncompliance warning. For this reporting period, MSCO is again in compliance with the requirements of this Paragraph.

***Paragraph 176.*** *The quality of investigators' internal affairs investigations and Supervisors' reviews of investigations shall be taken into account in their performance evaluations.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on April 27, 2022.
- GC-4 (S) (Employee Performance Management), most recently amended on November 10, 2021.

**Phase 2:** In compliance

This Paragraph requires that employees who conduct misconduct investigations have an assessment on the quality of their investigations documented in their Employee Performance Appraisals. This Paragraph also requires that Commanders who review their subordinates' misconduct investigations be assessed on the quality of those reviews in their own EPAs. To assess compliance with this Paragraph, we look for specific comments by raters completing EPAs. In supervisor EPAs, we look for comments addressing the quality of investigations. In commanders' EPAs, we look for comments assessing the quality of reviews of investigations. In many instances, the employee being rated does not have any subordinates, or has not completed or reviewed any misconduct investigations. In these cases, we look for comments by the rater that indicate why the employee was not rated on this requirement. In addition, we review a list of all PSB memos indicating investigative deficiencies in misconduct investigations. If we find any deficiencies that correspond to the employee's evaluation period, we expect those to be identified in the employee's EPA. If we find documented deficiencies for the employee who is being evaluated, and the rater fails to note these deficiencies in the EPA, it will affect compliance with the requirements of this Paragraph.

We reviewed Employee Performance Appraisals for 27 supervisors and commanders who received EPAs during this reporting period. All 27 supervisor EPAs that we reviewed for this quarter had assessments of the supervisors' quality of internal affairs investigations or the quality of their reviews of internal affairs investigations. For supervisors who did not conduct any internal affairs investigations or reviewed any internal affairs investigations during the appraisal period, this information was appropriately documented on their EPAs. There were two supervisors who had deficiency memos issued by PSB, related to deficient misconduct

WAI 70648

investigations.  We reviewed their assessments under Paragraph 176 and compared them to the deficiency memos submitted by PSB.  The documentation in their respective EPAs was consistent with what we found in in our reviews of PSB deficiency memos.  The rating supervisors appropriately documented the issues noted with regard to deficiencies found in misconduct investigations.  For this reporting period, all 27 supervisor EPAs reviewed were in compliance with the requirements of this Paragraph, for a 100% compliance rating.

***Paragraph 177.***  *There shall be no procedure referred to as a "name-clearing hearing."  All pre-disciplinary hearings shall be referred to as "pre-determination hearings," regardless of the employment status of the principal.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we reviewed 152 administrative misconduct investigations during this reporting period.

In misconduct investigations that resulted in serious discipline and in which the employee was afforded the opportunity for an administrative hearing, the only reference to the hearing was "pre-determination hearing."

On June 18, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

### B.   *Misconduct-Related Training*

***Paragraph 178.***  *Within three months of the finalization of these policies consistent with ¶ 65of this Order, the Sheriff will have provided all Supervisors and all personnel assigned to the Professional Standards Bureau with 40 hours of comprehensive training on conducting employee misconduct investigations.   This training shall be delivered by a person with subject matter expertise in misconduct investigation who shall be approved by the Monitor.   This training will include instruction in:*

a.    *investigative skills, including proper interrogation and interview techniques, gathering and objectively analyzing evidence, and data and case management;*

b.    *the particular challenges of administrative law enforcement misconduct investigations, including identifying alleged misconduct that is not clearly stated in the complaint, or that becomes apparent during the investigation;*

c.    *properly weighing the credibility of civilian witnesses against employees;*

d.    *using objective evidence to resolve inconsistent statements;*

e.    *the proper application of the appropriate standard of proof;*

f.    *report-writing skills;*

g.    *requirements related to the confidentiality of witnesses and/or complainants;*

WAI 70649

h.      *considerations in handling anonymous complaints;*

i.      *relevant MCSO rules and policies, including protocols related to administrative investigations of alleged officer misconduct; and*

j.      *relevant state and federal law, including Garrity v. New Jersey, and the requirements of this Court's orders.*

**In Full and Effective Compliance**

MCSO supplied the PSB40 curriculum to all personnel assigned to PSB and District supervisors when it was first developed.  Subsequently, all promotional candidates receive this curriculum in the Supervisors' Program prior to or shortly after their promotion.

MCSO did not deliver the PSB40 curriculum during this reporting period.

This course is reserved for delivery on an as-needed basis to new sergeants and newly hired civilian investigators.

The PSB40 remains under annual review.  During our July site visit, we discussed this curriculum and its relationship to the PSB8 Internal and External.  MCSO notified us that it was the agency's intention for revisions for this course to be secondary to the development of the PSB8 Internal and External.  All PSB curriculums will require changes to mirror the policy and procedure changes, and investigatory processes as directed by the Third Order once they are approved.

On June 17, 2022, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.


**Paragraph 179.**  *All Supervisors and all personnel assigned to the Professional Standards Bureau also will receive eight hours of in-service training annually related to conducting misconduct investigations.  This training shall be delivered by a person with subject matter expertise in misconduct investigation who shall be approved by the Monitor.*

**In Full and Effective Compliance**

MCSO supplies the PSB8 External curriculum, which consists of eight hours of annual in-service training, to District supervisors.  Additionally, MCSO supplies the PSB8 Internal curriculum, which consists of eight hours of annual in-service training, to PSB personnel.  External vendors commonly deliver this.  When an external vendor cannot be obtained for any reason, PSB personnel must attend the PSB8 External classroom training.

During this reporting period, MCSO advised us that all 2023 PSB Training will focus on changes to policy and procedures, and investigatory processes as mandated by the Third Order.  MCSO intends to combine the 2023 PSB8 Internal and External curriculums into a single curriculum for delivery to both PSB personnel and Division/District personnel engaged in misconduct investigations.

In anticipation of the 2024 delivery of the PSB8 Internal, MCSO requested input from us and the Parties for relevant proposed topics and vendors.  We have recommended to PSB that any training provided include topics such as documenting credibility assessments within investigative reports;

WAI 70650

identifying and applying the appropriate standard of proof; and when disparate treatment is identified, documenting adequate historical reviews to determine possible patterns or repeat allegations of similar misconduct.

During our July site visit, we also discussed potential vendor provided training programs, and we provided two options for MCSO to research further. Neither program currently includes the specific topics we had discussed with MCSO, but both are proven vendors with the ability to modify any curriculum to meet MCSO's needs. We will continue to assist MCSO in seeking training programs with content specific to the agency's needs.

On June 17, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 180.** Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all employees on MCSO's new or revised policies related to misconduct investigations, discipline, and grievances. This training shall include instruction on identifying and reporting misconduct, the consequences for failing to report misconduct, and the consequences for retaliating against a person for reporting misconduct or participating in a misconduct investigation.*

## In Full and Effective Compliance

MCSO distributes new or annually revised policies via the HUB, an electronic training management system. This training includes updates to all policies related to misconduct investigations, discipline, and grievances. Each distribution requires all employees to complete personal attestations to indicate that they have read and understand the policy requirements.

To assess compliance with this Paragraph, we review the HUB generated reports of attestations that identify each individual and their dates of review. Compliance assessments for this Paragraph are based on the review of attestations for the following policies: CP-2 (Code of Conduct); CP-3 (Workplace Professionalism: Discrimination and Harassment); CP-11 (Anti-Retaliation); GB-2 (Command Responsibility); GH-2 (Internal Investigations); GC-16 (Employee Grievance Procedures); and GC-17 (Employee Disciplinary Procedures).

During this reporting period, we reviewed the status of individual reviews for Briefing Board (BB) 23-04 (CP-2), BB 21-70 (CP-3), BB 22-01 (CP-11), BB 23-12 (GB-2), BB 22-56 (GH-2), BB 21-66 (GC-16), and BB 22-58 (GC-17). All employee categories remain in compliance.

On June 17, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70651

*Paragraph 181. Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all employees, including dispatchers, to properly handle civilian complaint intake, including how to provide complaint materials and information, and the consequences for failing to take complaints.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on November 17, 2022.

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.

- GG-1 (Peace Officer Training Administration), most recently amended on November 17, 2022.

- GG-2 (Detention/Civilian Training Administration), most recently amended on November 17, 2022.

- Training Division Operations Manual, most recently amended on April 4, 2022.

**Phase 2:**  In compliance

On January 11, 2023, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we did not concur with this assertion.

MCSO currently delivers the 2021 Complaint Intake and Reception Training via the HUB to all new hires in all personnel categories.  This first training provides important guidance when interacting with members of the public who wish to file a complaint against MCSO personnel. We discussed this curriculum during our April site visit.  The 2021 Complaint Intake and Reception curriculum previously received annual review.  All employee classes are still in compliance.

*Paragraph 182. Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all Supervisors on their obligations when called to a scene by a subordinate to accept a civilian complaint about that subordinate's conduct and on their obligations when they are phoned or emailed directly by a civilian filing a complaint against one of their subordinates.*

**In Full and Effective Compliance**

This Paragraph requires that all supervisors receive training on their obligations when responding to a scene by a subordinate to accept a civilian complaint, or when they receive a complaint by telephone or email.  All existing and new supervisors receive this first training content within the Misconduct Investigative Training (PSB40) and the Complaint Reception and Processing training; and it is covered in subsequent annual Supervisors' Responsibilities: Effective Law Enforcement (SRELE) and Annual Combined Training (ACT) programs.  All active supervisors receive this training at least once; and in most cases, more than once.

WAI 70652

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

### C.    Administrative Investigation Review

**Paragraph 183.**  *The Sheriff and the MCSO will conduct objective, comprehensive, and timely administrative investigations of all allegations of employee misconduct.  The Sheriff shall put in place and follow the policies set forth below with respect to administrative investigations.*

**Paragraph 184.**  *All findings will be based on the appropriate standard of proof.  These standards will be clearly delineated in policies, training, and procedures, and accompanied by detailed examples to ensure proper application by internal affairs investigators.*

**In Full and Effective Compliance**

To determine Phase 2 compliance with this Paragraph, we reviewed 152 administrative misconduct investigations during this reporting period.

Of the 152 cases we reviewed, 148 (97%) complied with the requirements of this Paragraph.  In two, we believe findings of sustained should have been made and were not.  In one, we believe the facts of the investigation did not support a finding of unfounded and the finding should have been not sustained.  In one additional case, while we agree with the sustained findings related to the identified principal employee, we believe PSB failed to identify or address misconduct by an additional employee involved in the incident.  As is our practice, we will discuss these cases with MCSO during our next site visit.

On June 18, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 185.**  *Upon receipt of any allegation of misconduct, whether internally discovered or based upon a civilian complaint, employees shall immediately notify the Professional Standards Bureau.*

**In Full and Effective Compliance**

To determine Phase 2 compliance with this Paragraph, we reviewed 152 administrative misconduct investigations during this reporting period.  There were no instances where PSB was not appropriately notified at the time of complaint as required.  We also reviewed eight criminal misconduct investigations conducted by MCSO.  PSB was appropriately notified in all eight of these investigations.

On June 18, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70653

*Paragraph 186. Effective immediately, the Professional Standards Bureau shall maintain a centralized electronic numbering and tracking system for all allegations of misconduct, whether internally discovered or based upon a civilian complaint. Upon being notified of any allegation of misconduct, the Professional Standards Bureau will promptly assign a unique identifier to the incident. If the allegation was made through a civilian complaint, the unique identifier will be provided to the complainant at the time the complaint is made. The Professional Standards Bureau's centralized numbering and tracking system will maintain accurate and reliable data regarding the number, nature, and status of all misconduct allegations, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status, if requested, and final disposition of the complaint. The system will be used to determine the status of misconduct investigations, as well as for periodic assessment of compliance with relevant policies and procedures and this Order, including requirements of timeliness of investigations. The system also will be used to monitor and maintain appropriate caseloads for internal affairs investigators.*

**In Full and Effective Compliance**

During numerous site visits, we have met with PSB personnel to discuss and observe the capabilities of IAPro, which serves as the technology instrument that meets the compliance criteria of this Paragraph. IAPro logs critical dates and times, alerts regarding timeframes and deadlines, chronological misconduct investigation status, notifications, and dispositions. The tracking system provides estimates of key timeframes for all investigators to ensure that they learn of previous and upcoming investigative milestones. PSB has confirmed that civil notice claims are entered in the tracking system. The IAPro system integrates exceptionally well with the EIS and BlueTeam technology systems and can be remotely accessed.

PSB has a management analyst dedicated to the administration of the centralized tracking system. The documentation that PSB has provided to us for review, and the direct user access that a member of our Team has to the centralized numbering and tracking system, indicates that the system possesses the functionality as required by this Paragraph and is being used according to the requirements of this Paragraph.

During this reporting period, we found that all 152 administrative misconduct investigations we reviewed were properly assigned a unique identifier. Of the 152, 116 involved an external complaint requiring that PSB provide the complainant with this unique identifier. In all but one of these 116 cases, PSB sent an initial letter to the complainant providing the case number or provided an acceptable reason for not doing so. In some cases, anonymous complainants do not provide contact information; and in others, known complainants decline to provide MCSO with adequate contact information. PSB has developed a form that identifies the reason why a required notification letter is not sent and includes this document in the cases it forwards for our review.

On June 18, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70654

*Paragraph 187.   The Professional Standards Bureau shall maintain a complete file of all documents within the MCSO's custody and control relating to any investigations and related disciplinary proceedings, including pre-determination hearings, grievance proceedings, and appeals to the Maricopa County Law Enforcement Merit System Council or a state court.*

**In Full and Effective Compliance**

To determine compliance with this Paragraph, we have verified that PSB maintains both hardcopy and electronic files intended to contain all the documents required for compliance with this Paragraph.

During our site visits, a member of our Team inspects the file rooms where hardcopies of investigations are stored and randomly reviewed case files to verify compliance.  We have verified that criminal and administrative investigation files are stored in separate rooms, and access to these rooms is restricted.  Our Team member has also used the access granted to IAPro to randomly select internal affairs case files to verify that all information is being maintained electronically.

In May 2018, PSB relocated to its new offsite facility.  We confirmed at that time that PSB maintained both hardcopy and electronic files intended to contain all documents required for compliance with this Paragraph at the new facility.

During our January 2019 site visit, a member of our Team verified continued compliance at the PSB facility by inspecting both the criminal and administrative investigation file rooms and randomly selecting internal affairs case files to verify that all information was also being electronically maintained in IAPro.

During our October 2019 site visit, a member of our Team verified continued compliance at the PSB facility by inspecting both the criminal and administrative investigation file rooms.  We also randomly reviewed both electronic and hard-copy documents to ensure that all information was being maintained as required for compliance with this Paragraph.

On June 18, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

*Paragraph 188.  Upon being notified of any allegation of misconduct, the Professional Standards Bureau will make an initial determination of the category of the alleged offense, to be used for the purposes of assigning the administrative investigation to an investigator.  After initially categorizing the allegation, the Professional Standards Bureau will promptly assign an internal affairs investigator.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we review administrative misconduct investigations, Service Complaints, and PSB Diversions.

WAI 70655

We previously concurred with MCSO that Phase 2 compliance with this Paragraph would be based on PSB's determination of the initial allegations, and not which category of offense was determined once the investigation is completed.

During this reporting period, we reviewed 152 administrative misconduct investigations. All 152 complied with the requirements of this Paragraph. Thirty-six were internally generated and 116 were externally generated.

We reviewed 105 Service Complaints during this reporting period. Ninety-one were externally generated and 14 were internally generated. In all but one of the 105, PSB made the appropriate decision regarding categorizing the complaint. Eleven (10%) were appropriately reclassified to administrative misconduct investigations either by the initiating District or Division, or after the complaints were reviewed by PSB. In one of the remaining 94 service complaints, we believe allegations of misconduct were made and a misconduct investigation should have been initiated. Of the total 105 Service Complaints, 104 (99%) met the requirements established in the Service Complaint process.

As we have consistently noted in our review of Service Complaints, the majority of these complaints involve laws, policies, or procedures where there is no employee misconduct; or are complaints where it is determined that MCSO employees are not involved. During this reporting period, 48 (51%) of the 94 closed Service Complaints did not involve misconduct. Thirty-four (36%) did not involve MCSO employees, and 12 (13%) were closed due to lack of specificity.

In July 2019, we and the Parties approved MCSO's proposal to use an expedited process to handle Service Complaints where it could be immediately determined that the complaint did not involve MCSO personnel, and the Service Complaint form was revised. PSB also added a signature line to this revised form requiring District and Division Command personnel to review and approve Service Complaints completed by their personnel prior to them being forwarded to PSB for a final review.

Consistent with the provisions of policies on internal investigations and discipline, the PSB Commander has had the discretion to determine if internal complaints alleging minor policy violations could be addressed through the use of a coaching without a formal investigation if certain criteria existed. If the PSB Commander makes this determination, it must be documented.

In May 2021, revisions to GH-2 (Internal Investigations) modified the authority of the PSB Commander as it relates to internal complaints that meet certain criteria. The revised policy allows the PSB Commander to address qualifying internal complaints through the use of an approved supervisor-initiated intervention and is no longer limited to only coaching. This is now referred to as the PSB Diversion process.

During the last reporting period, the PSB Commander used his discretion to determine that four internally generated complaints were eligible for the PSB Diversion process. We found all four in compliance.

During this reporting period, we reviewed one instance where the PSB Commander determined that an internal complaint could be handled with an approved Diversion. We found this Diversion to be in compliance.

WAI 70656

Compliance with this Paragraph was based on our findings for administrative misconduct investigations (152), Service Complaints (105), and PSB Diversions (1) and was 99%.

On June 18, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 189.** *The Professional Standards Bureau shall administratively investigate:*

a.   *misconduct allegations of a serious nature, including any allegation that may result in suspension, demotion, or termination; and*

b.   *misconduct indicating apparent criminal conduct by an employee.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph during this reporting period, we reviewed 152 completed administrative misconduct investigations conducted by MCSO personnel.

Division or District personnel outside of PSB investigated 40 of the 152 administrative misconduct investigations we reviewed during this reporting period. PSB investigators conducted 92 of the investigations, and 20 were outsourced to an outside investigator. PSB also submitted eight criminal investigations for review. We did not identify any misconduct investigations that a District supervisor conducted where we believe that potential additional misconduct discovered during the initial investigation should have resulted in the investigation being forwarded to PSB for completion and was not.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 190.** *Allegations of employee misconduct that are of a minor nature may be administratively investigated by a trained and qualified Supervisor in the employee's District.*

**In Full and Effective Compliance**

To determine Phase 2 compliance with this Paragraph, we reviewed a total of 160 employee misconduct investigations during this reporting period. Of these, 152 were administrative investigations, and eight were criminal investigations. All eight of the criminal investigations were conducted by PSB.

Of the 152 administrative misconduct cases we reviewed for this Paragraph, PSB investigators conducted 92. PSB outsourced 20, and 40 were investigated at the District or Division level. We did not identify any instances where a District or Division supervisor conducted any investigation that should have been conducted by PSB.

MCSO has complied with the requirements to train all supervisors who conduct minor misconduct investigations.

WAI 70657

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

***Paragraph 191.*** *If at any point during a misconduct investigation an investigating Supervisor outside of the Professional Standards Bureau believes that the principal may have committed misconduct of a serious or criminal nature, he or she shall immediately notify the Professional Standards Bureau, which shall take over the investigation.*

### In Full and Effective Compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 152 administrative misconduct investigations during this reporting period. Of the 40 administrative misconduct cases investigated at the District or Division level, we did not identify any cases where we believe that potential serious misconduct was discovered by the investigating supervisor and the supervisor failed to forward the case to PSB.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

***Paragraph 192.*** *The Professional Standards Bureau shall review, at least semi-annually, all investigations assigned outside the Bureau to determine, among the other matters set forth in ¶ 251 below, whether the investigation is properly categorized, whether the investigation is being properly conducted, and whether appropriate findings have been reached.*

### In Full and Effective Compliance

PSB command personnel advised us that they continue to review investigations in "real time" as they come into the Bureau. During this reporting period, MCSO continued to provide copies of PSB's reviews of completed Division-level misconduct investigations that were assigned outside of the Bureau. The review template used by PSB includes sections that address whether or not the investigation is properly categorized, whether the investigation is properly conducted, and whether appropriate findings have been reached. Additionally, copies of emails detailing the quality of the investigation, identified deficiencies, and required edits sent electronically to affected Division Commanders were provided for each case reviewed.

PSB included the information required by this Paragraph in its semi-annual public Misconduct Investigations Report, which is required under Paragraph 251. The reports have routinely contained an analysis as to whether cases assigned outside of PSB were properly categorized, whether the investigations were properly conducted, and whether appropriate findings have been reached.

In the past, MCSO has published the semi-annual report just over six months from the end of the semi-annual period; however, the June 30-December 31, 2021 report was published in August 2022, over seven months from the end of the semi-annual period. The report for the semi-annual

WAI 70658

period of January 1-June 30, 2022, was published in March 2023, over eight months after the conclusion of the semi-annual period.  We discussed this issue with MCSO during our July 2023 site visit and informed them that MSCO must ensure that the reports are published in a consistent and timely manner going forward; otherwise, it will affect MCSO's compliance status with this requirement.  MCSO informed us that future reports will be published in a much more timely manner.

MCSO published the report for the period of July 1-December 31, 2022, in August 2023.  We will provide our assessment of that report in the next reporting period.

MCSO remains in compliance with this Paragraph.  However, if the next report is not published in a timely manner, it will affect MCSO's compliance with this Paragraph.

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 193.***  *When a single act of alleged misconduct would constitute multiple separate policy violations, all applicable policy violations shall be charged, but the most serious policy violation shall be used for determining the category of the offense.  Exoneration on the most serious offense does not preclude discipline as to less serious offenses stemming from the same misconduct.*

**In Full and Effective Compliance**

To determine Phase 2 compliance with this Paragraph, we reviewed 152 administrative misconduct investigations during this reporting period.  Seventy-two had sustained allegations against one or more employees.  In 50 of these investigations, at least one principal employee was still an MCSO employee at the time the investigation was completed or discipline decisions were made.  In all 50, the most serious policy violation was used to determine the final category of the offense for discipline purposes, if more than one policy violation was sustained.

In cases where multiple violations of policy occurred, this information was listed on the preliminary discipline document.  There were no cases where the exoneration of any offense precluded discipline for any sustained allegations.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70659

*Paragraph 194.   The Commander of the Professional Standards Bureau shall ensure that investigations comply with MCSO policy and all requirements of this Order, including those related to training, investigators' disciplinary backgrounds, and conflicts of interest.*

**Phase 1:**  In compliance

- CP-2 (Code of Conduct), most recently amended on February 14, 2023.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on December 16, 2021.

- CP-5 (Truthfulness), most recently amended on November 17, 2022.

- CP-11 (Anti-Retaliation), most recently amended on January 6, 2022.

- GC-16 (Employee Grievance Procedures), most recently amended on December 8, 2021.

- GC-17 (Employee Disciplinary Procedures), most recently amended on November 17, 2022.

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.

- Administrative Services Division Operations Manual, most recently amended on November 14, 2022.

- Professional Standards Bureau Operations Manual, most recently amended on December 31, 2019.

**Phase 2:**  Not in compliance

We determine Phase 2 compliance with this Paragraph by a review of completed misconduct investigations conducted by MCSO, the review of attendance by internal investigators at required Misconduct Investigative Training, the disciplinary backgrounds of internal investigators, and the efforts being made by the PSB Commander to reach compliance.

We reviewed 152 administrative misconduct investigations and eight criminal investigations during this reporting period.  All eight of the criminal investigations complied with MCSO policy and the requirements of the Second Order.

Administrative investigations are required to be completed within 60 days if completed outside of PSB and within 85 days if completed by PSB personnel.  Of the 152 investigations reviewed for this reporting period, 38 (25%) were completed within the required timeframes or contained a reasonable extension request that was specific to the investigation, a decrease in compliance from 30% during the last reporting period.  The extension requests for the remaining investigations continued to identify general justifications including supervisory responsibilities, workload, prioritization of investigations, training, and others.

WAI 70660

Of the 152 administrative misconduct cases we reviewed, PSB personnel completed 92. Twenty-six were conducted by sworn investigators. Sixty-one investigations were conducted by Detention investigators, and five were conducted by civilian investigators. We found deficiencies other than extensions in two (2%) of the total 92 investigations. With the inclusion of those investigations that were found noncompliant based on our review of extension requests, 20 (22%) of the 92 investigations conducted by PSB were in overall compliance – a decrease from 36% in the last reporting period.

We reviewed 20 investigations that PSB outsourced to an outside investigator. Of these, only one (5%) was found noncompliant due to investigative concerns. This is a slight decrease in noncompliance from 8% during the last reporting period. With the inclusion of those investigations found noncompliant due to timelines, three (15%) of the 20 cases were in overall compliance, a decrease from 23% during the last reporting period.

Districts or Divisions outside of PSB conducted 40 investigations. Fourteen (35%) of the 40 were noncompliant due to investigative and administrative deficiencies. This is a decrease in noncompliance from 40% for the last reporting period. With the inclusion of those investigations found noncompliant due to timelines, 33 (82%) of the 40 cases were not in overall compliance. We do note that for the first time in multiple reporting periods, some cases completed by Districts and Divisions were in full compliance. Seven (18%) of the 40 were in full compliance with all requirements for the completion of misconduct investigations for this reporting period.

As a result of both investigative deficiencies and administrative deficiencies, including those related to extension compliance, overall compliance for all administrative investigations conducted by MCSO that are within the purview of the PSB Commander was 20% for this reporting period, a decrease from 30% during the last reporting period.

There are many factors that impact the PSB Commander's ability to determine compliance in all cases. One factor is that the PSB Commander must rely on other PSB staff members to conduct case reviews and ensure proper documentation is completed. We continue to find that PSB personnel are identifying and ensuring that corrections are made, and all documentation is completed in those cases that they review. In some cases, deficiencies cannot be corrected after the fact.

Another factor affecting the PSB Commander's ability to ensure that all investigations are properly completed is that the Appointing Authority – not the PSB Commander – determines the final findings and discipline. During this reporting period, there was one instance where the Appointing Authority changed the findings of an investigation. There were six cases where he mitigated the discipline within the range. We agreed with all but one of these decisions.

WAI 70661

The investigative quality of District and Division cases has continued to have an adverse impact on the ability of the PSB Commander to ensure investigations are properly completed. During the last reporting period, we observed improvement in the compliance for these cases, from 46% to 60%. During this reporting period, we noted continued improvement, with overall compliance being 65%. We also found for the first time in numerous reporting periods that multiple investigations were in full compliance with all requirements for the administrative investigation of misconduct, including timeliness. We are hopeful that the improvement we have observed during this and the last reporting period will continue.

Since 2016, PSB has taken a number of actions to address both investigative deficiencies and other concerns with the completion of administrative investigations. We have continued to meet with PSB and District and Division personnel since that time to update them on our identification of training and performance issues that adversely affect compliance with the Second Order. Members of our Team also meet with PSB every two weeks to discuss Class Remedial Matters, and we use this opportunity to discuss other ongoing concerns that affect compliance. In our meetings with PSB and the Parties during site visits, we have also discussed additional opportunities and potential remedies to address the challenges of completing quality investigations within the required timelines. The Parties have also addressed this issue in both the meet-and-confer process and litigation. The Court appointed an outside expert to examine issues relevant to the deficiencies associated with PSB investigations. The expert's recommendations were reviewed by the Parties, and the Court issued its Third Order in November 2022. Since that time, revised draft policies and procedures have been proposed and reviewed, and many recommendations have been made. These policies and procedures remain pending finalization and approval by the Court.

In 2014, PSB initiated 717 internal investigations. In 2015, PSB initiated 916 cases: and in 2016, 847 cases. There were 1,028 cases initiated in 2017. In 2018, there were 1,114 investigations initiated. In 2019, PSB initiated a total of 1,072 investigations and in 2020, PSB opened a total of 1,204 investigations. In 2021, PSB opened a total of 1,172 investigations, a small decrease from 2020. In 2022, PSB opened a total of 1,062 cases.

In 2016, prior to the entry of the Second Order, PSB investigators were carrying an average active caseload of 12-16 cases each month. By the end of 2021, the average monthly caseload in PSB was 74 cases per investigator. The average days to complete an administrative investigation in PSB at the end of 2021 was 704 days. For investigations completed outside of PSB, the average number of days to complete an investigation was 439 days.

The number of pending investigations has continued to increase each year. By the end of 2020, there were 2,010 pending investigations. At the end of 2021, the number of pending investigations had increased to 2,149. While the total numbers included administrative misconduct investigations, Service Complaints, criminal investigations, and critical incident investigations, the majority continued to be administrative misconduct investigations and Service Complaints. By the end of 2022, the total number of pending investigations was 2,375. The vast majority of these cases continue to be assigned to PSB for completion.

WAI 70662

Our concerns with the growing number of cases and MCSO's inability to conduct timely investigations has been articulated in our reports for numerous years. Despite training, efforts to streamline processes, and the creation of alternative methods to handle some complaints, the problem has continued to grow. MCSO simply has not had enough personnel assigned to PSB to address these investigations. While some budget requests have been made to increase staffing in PSB, approved requests were often not filled in a timely manner; and even when filled, the number of authorized positions remained insufficient to address the growing need. In late 2022, the Court interceded and placed requirements on MCSO regarding the minimum number of investigative personnel to be assigned to PSB.

During our April 2023 site visit, PSB advised that the total number of pending investigations was 2,370 for the first quarter of 2023. This was a slight decrease from the 2,375 investigations pending at the end of 2022. Of the 2,370, 2,191 were administrative misconduct investigations. The average completion time for a PSB investigation was 482 days and the average active caseload per investigator was 49 cases per month. During our April site visit, we agreed that future review of timelines would consider both investigative time and full closure time for misconduct investigations.

During our July 2023 site visit, PSB advised us that the total number of pending investigations was 2,334 at the end of the second quarter of 2023, a decrease from 2,370 at the end of the first quarter. Of the 2,334, 2,206 were administrative misconduct investigations. The average time from initiation of a complaint until full closure, which includes review and associated discipline or other administrative actions, was 587 days, an increase from 494 days at the end of the first quarter. The average investigative time was 489 days. For those cases assigned to PSB, the average investigative time was 511 days, and the average full completion time was 547 days. Whether we consider investigative or full closure times, the amount of time it takes to investigate and close these investigations remains unacceptable.

The average caseload for a PSB investigator at the end of this reporting period was 48.5 active cases per month, only a minimal decrease from 49 during the last reporting period.

As a result of the Court's Third Order, we have agreed with MCSO that those cases that would be considered to be administrative misconduct backlog cases would be those administrative investigations and critical incidents where required investigative actions were still pending and the investigation had not been completed in accordance with the timelines established in Paragraph 204, and an extension had not been granted as per Paragraph 365. An investigation would be considered complete when all investigative actions have been completed and the PSB commander has signed off in concurrence. The date the PSB Commander signs off on the investigation would be the date the investigation was no longer counted as part of the backlog, irrespective of the findings. At the end of June 2023, of the total pending administrative misconduct cases, 1,842 met the agreed upon definition for a backlog case.

During our past site visits, PSB staff have continued to communicate that they are outsourcing those cases where conflicts of interest exist. PSB contracts with a qualified private vendor to conduct these investigations. During our January 2021 remote site visit, PSB personnel advised us that they were considering retaining additional outside contract investigators but had not identified any who met the hiring criteria. PSB was also considering outsourcing additional

WAI 70663

investigations to the current contract investigator if he had the staff to accept additional investigations. During our April 2021 site visit, PSB personnel advised us that they had identified another vendor and outsourced 25 cases to this entity as a pilot program. Since April 2021, PSB has continued to outsource investigations to this second vendor.

During this reporting period, PSB advised us that 13 new cases had been outsourced to an outside vendor and 67 outsourced cases were pending completion. We received and reviewed 20 cases conducted by the outside vendors during this reporting period.

After the Second Order was implemented, PSB reviewed the disciplinary backgrounds of all those who might conduct internal investigations and notified us of those supervisors who would be prohibited from conducting such investigations due to their backgrounds. At that time, MCSO identified two supervisors who were ineligible to conduct internal investigations. Neither of these two employees are still employed at MCSO. MCSO has since identified additional supervisors who are ineligible to conduct administrative investigations. There is currently one active supervisor on this list.

MCSO reported during this reporting period that no additional supervisors were determined to be ineligible to conduct administrative misconduct investigations.


***Paragraph 195.*** *Within six months of the entry of this Order, the Professional Standards Bureau shall include sufficient trained personnel to fulfill the requirements of this Order.*

**Phase 1:**  In compliance

- Professional Standards Bureau Operations Manual, most recently amended on December 31, 2019.

**Phase 2:**  Not in compliance

In conjunction with this Paragraph, Paragraph 178 mandates that within three months of the finalization of policies consistent with Paragraph 165, all PSB personnel would receive 40 hours of comprehensive training. Paragraph 178 requires training of all supervisors within three months of the finalization of policies, and further requires sufficient trained personnel in PSB within six months of the entry of the Order. The first week of the required Misconduct Investigative Training commenced on September 18, 2017, and the training was completed prior to the end of 2017.

Between 2016 and 2021, the number of investigators assigned to PSB remained between 24 and 26 – despite an increase in initiated cases that grew from 847 in 2016 to 1,072 in 2021; a backlog of cases that had grown to 2,149 cases; and an average investigator monthly caseload that had grown from 12 cases to 74 cases.

Between January 2022 and December 2022, the number of pending cases continued to increase. By the end of 2022, the pending case list had grown to 2,375 cases, and the average caseload for an investigator in PSB was 65 cases.

WAI 70664

During our January 2023 site visit and after intervention by the Court, PSB advised us that the Bureau's total number of investigators at the end of December 2022 was 40: 12 sworn investigators, 17 Detention investigators, and 11 civilian investigations.  The only vacancies remaining in PSB were three civilian administrative positions.

During our April 2023 site visit, PSB advised that the Bureau's total number of investigators at the end of March 2023 had grown to 44: 12 sworn investigators, 17 Detention investigators, and 15 civilian investigators.  The only vacancies in PSB at the end of March 2023 were the three civilian administrative positions.

During our July 2023 site visit, PSB advised that the Bureau's total number of investigators at the end of June 2023 remained at 44: 11 sworn investigators, 17 Detention investigators, and 16 civilian investigators.  The only vacancies were three civilian administrative positions.

The Second Order requires that PSB have "sufficient trained personnel to fulfill the requirements of this Order."  MCSO has delivered the required Misconduct Investigative Training, and our focus remains on the ability of PSB staff to carry out its mission.  As we have documented in numerous previous reports, MCSO has remained understaffed for years.  While we continue to acknowledge that staffing levels in PSB have increased, until MCSO is able to demonstrate that this level of staffing is sufficient to address the investigative caseload assigned to their personnel and results in timely investigations, we will not find MCSO in compliance with this Paragraph.

***Paragraph 196.*** *Where appropriate to ensure the fact and appearance of impartiality, the Commander of the Professional Standards Bureau or the Chief Deputy may refer administrative misconduct investigations to another law enforcement agency or may retain a qualified outside investigator to conduct the investigation.  Any outside investigator retained by the MCSO must possess the requisite background and level of experience of Internal Affairs investigators and must be free of any actual or perceived conflicts of interest.*

**In Full and Effective Compliance**

As a result of the Second Order, MCSO retained an outside contractor to conduct some investigations identified in the Court's Findings of Facts and has continued to outsource additional cases to this vendor, primarily those for which a potential conflict of interest exists.  In 2017, the PSB Commander indicated that MCSO did not envision any need to retain additional contract investigators beyond the one investigator that had been already retained.

In 2021, due to the increasing case backlog, MCSO contracted with a second vendor to assist with reducing the backlog.  PSB began outsourcing cases due to both potential conflicts of interest and to assist MCSO in reducing the number of pending cases.  This second vendor employs multiple investigators who are assigned cases by PSB.  These investigators were initially assigned older cases that had minimal additional follow up needed, but PSB now assigns them current investigations as well.

WAI 70665

During our July 2023 site visit, PSB advised that there were 67 outsourced cases pending. The original vendor had 15 pending cases. We did receive and review one investigation by this vendor during this reporting period. The second vendor had 52 pending cases. We reviewed 19 investigations completed by this vendor during this reporting period.

While we continue to be supportive of outsourcing cases to qualified vendors, we are concerned that these outsourced cases are not being completed in a timely manner. For this reporting period, the average completion time for the initial contract vendor doing conflict cases has continued to average nearly 700 days, and one case is still pending from 2014. For the second vendor, from the time the case is sent to this vendor, the average completion time was 183 days. This is an improvement from the 294 days reported during the last reporting period, but still far above the 85-day timeline required. We have discussed our concerns with PSB and continue to urge the Bureau to monitor and address the timeliness of investigations conducted by these outside vendors.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 197.** *The Professional Standards Bureau will be headed by a qualified Commander. The Commander of the Professional Standards Bureau will have ultimate authority within the MCSO for reaching the findings of investigations and preliminarily determining any discipline to be imposed. If the Sheriff declines to designate a qualified Commander of the Professional Standards Bureau, the Court will designate a qualified candidate, which may be a Civilian Director in lieu of a sworn officer.*

**In Full and Effective Compliance**

In January 2018, MCSO advised us that due to reorganizations within the Office, the responsibility to serve as the PSB Commander for purposes of compliance with this Order would be transferred to a captain within PSB. An Executive Chief would maintain overall oversight of PSB.

During this reporting period, we continued to interact with the Captain now serving as the PSB Commander. In addition to our regularly scheduled meetings to discuss CRMs and other internal affairs matters, we have had additional meetings to discuss overall concerns with investigations, case specific concerns, and concerns with PSB processes and protocols when appropriate. We have also had multiple discussions regarding the Third Order, potential policy revisions, and the implementation of any new processes. The Captain continues to be responsive to our input regarding PSB investigations and processes. He continues to discuss with us both his immediate priorities and his continuing efforts to improve processes and quality where necessary. In those cases where we have expressed concerns or requested information, he has provided timely responses.

WAI 70666

During prior site visit discussions, we have noted that this Commander has made numerous efforts to improve and enhance the operations of PSB. These efforts have included staffing changes that allow more personnel to be focused on investigations rather than reviews, development of a strategic plan to guide the Bureau, update of the intake process, implementation of a fast-track team to address those incoming cases that can be resolved without a significant amount of investigative time, ensuring that older cases, some initiated as far back as 2016, are being resolved, using administrative staff to assist with case preparation, and examining the Bureau's processes and workflow. As a result of discussion and direction by the Monitoring Team, PSB also resumed the practice of assigning administrative misconduct investigations to Districts and Divisions outside PSB when appropriate.

During our July 2023 site visit, the PSB Commander informed us that the fast-track team concept continues to work well; administrative personnel in PSB are now being sent to the PSB training to give them a broader knowledge base; PSB is continuing to work on hiring employees for the vacant civilian positions; and the Bureau is also creating eligibility lists for sworn and Detention investigators to fill any vacancies that may occur.

On January 6, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 198.** *To promote independence and the confidentiality of investigations, the Professional Standards Bureau shall be physically located in a facility that is separate from other MCSO facilities, such as a professional office building or commercial retail space. This facility shall be easily accessible to the public, present a non-intimidating atmosphere, and have sufficient space and personnel for receiving members of the public and for permitting them to file complaints.*

### In Full and Effective Compliance

In May 2018, PSB moved into the first and second floors of 101 West Jefferson Street. PSB's address is available on the comment and complaint form that is accessible to the public at the Districts and on MCSO's website. PSB's criminal investigators are housed on the first floor, and administrative investigators are housed on the second floor of the building. PSB's off-site facility has two dedicated security personnel assigned during normal business hours of 8:00 a.m.-4:00 p.m., Monday-Friday. MCSO remains in compliance with this requirement. MCSO informed us during this reporting period that a lease for a different location, also an off-site location, is being negotiated for housing PSB. We discussed the issue with MCSO during our July 2023 site visit. We will continue to monitor the plans going forward to ensure any change of location is in compliance with this requirement.

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70667

***Paragraph 199.*** *The MCSO will ensure that the qualifications for service as an internal affairs investigator shall be clearly defined and that anyone tasked with investigating employee misconduct possesses excellent investigative skills, a reputation for integrity, the ability to write clear reports, and the ability to be fair and objective in determining whether an employee committed misconduct. Employees with a history of multiple sustained misconduct allegations, or one sustained allegation of a Category 6 or Category 7 offense from MCSO's disciplinary matrices, will be presumptively ineligible to conduct misconduct investigations. Employees with a history of conducting deficient investigations will also be presumptively ineligible for these duties.*

**In Full and Effective Compliance**

This Paragraph requires that any individual who is assigned to investigate employee misconduct meet the qualifications of an internal affairs investigator, as noted in this Paragraph. We verify compliance by reviewing documentation submitted for employees transferred into PSB, as well as employees hired for assignment to PSB as internal affairs investigators. In addition, we ensure that none of the misconduct investigations we review for compliance are completed by any employee on the PSB ineligibility list. Any employee who has a history of conducting deficient investigations, or has multiple sustained misconduct allegations, or has one sustained allegation of a Category 6 or Category 7 offense, is presumptively ineligible to conduct misconduct investigations. GH-2 reflects the directive of this Paragraph, to ensure that only supervisors who meet the criteria established by this Paragraph are assigned misconduct investigations. The PSB Operations Manual, which formalizes the review process, states that if any supervisor is deemed ineligible, the PSB commander will notify the supervisor's commander in writing, and will ensure that a BlueTeam entry is made to memorialize the supervisor's ineligibility to conduct misconduct investigations. A record of supervisors deemed ineligible to conduct misconduct investigations is maintained in PSB. These procedures were finalized and documented in the PSB Operations Manual, published on December 13, 2018.

During the second quarter of 2023, there was one sworn supervisor listed as ineligible to conduct internal affairs investigations. For the period in review, there were four transfers into PSB; these are discussed in our review of Paragraph 268.

During the second quarter of 2023, MCSO hired six civilian PSB investigators. MCSO hired four individuals from outside the agency as PSB civilian investigators. MCSO provided information for these individuals, including resumes, past discipline history, training, and experience. We reviewed the documentation provided for these four individuals and the documentation appears to satisfy some of requirements of this Paragraph. However, the assessment of all the qualifications required by this Paragraph was not complete. MCSO included an attestation for each employee that the individual met the requirements of Paragraph 199, but there was insufficient documentation for the basis of that determination. In several communications with MCSO, we addressed our expectations with regard to the level of details needed. After discussion, we determined that these individuals met the minimum qualifications required.

WAI 70668

Two of the individuals hired as PSB investigators were current employees who were working in other classifications. MCSO included attestations that these candidates met the requirements of Paragraph 199, but there was insufficient documentation provided that established the basis for that determination. One individual was a criminal intelligence analyst with the General Crimes Division. We reviewed the information provided and concluded that the individual had an adequate combination of formal education and training, and there were no concerns with the disciplinary history. The second internal hire was an individual working in an administrative capacity for MCSO. We were particularly concerned with this hire because the documentation submitted for this individual did not list any investigative training or any experience investigating misconduct. We reviewed all the information provided by MCSO for these two candidates, and based on the documentation reviewed, we concluded that the first candidate met minimum requirements. However, there was insufficient information to establish that the second candidate met the qualifications for service as an internal affairs investigator, as required by Paragraph 199. During one of our regularly scheduled meetings with PSB, we discussed our concerns regarding the lack of supporting documentation for the second candidate. MCSO agreed to provide more information and subsequently submitted a memorandum with additional details pertaining to the level of experience of the candidate we had concerns with. This memorandum was followed up with additional information we requested for clarification. After review of the documentation, we concluded that the candidate met the minimum qualifications required.

During this reporting period, we communicated on several occasions with MCSO regarding what this Paragraph requires, and what our expectations were with regard to how MCSO establishes that individuals meet the qualifications of an internal affairs investigator. MCSO was receptive and agreed to provide more thorough documentation in the future. We again remind MCSO that for internal affairs investigators, including civilian PSB investigators, we will be looking for an assessment of their qualifications, and how MCSO determined that the candidate met those qualifications. A simple attestation stating that the candidates met the requirements of Paragraph 199, without supporting documentation as to how MCSO arrived at that decision, is not sufficient.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 200.** *In each misconduct investigation, investigators shall:*

a.   *conduct investigations in a rigorous and impartial manner designed to determine the facts;*

b.   *approach investigations without prejudging the facts and without permitting any preconceived impression of the principal or any witness to cloud the investigation;*

c.   *identify, collect, and consider all relevant circumstantial, direct, and physical evidence, including any audio or video recordings;*

d.   *make reasonable attempts to locate and interview all witnesses, including civilian witnesses;*

WAI 70669

e.      *make reasonable attempts to interview any civilian complainant in person;*

f.      *audio and video record all interviews;*

g.      *when conducting interviews, avoid asking leading questions and questions that may suggest justifications for the alleged misconduct;*

h.      *make credibility determinations, as appropriate; and*

i.      *attempt to resolve material inconsistencies between employee, complainant, and witness statements.*

**In Full and Effective Compliance**

To determine Phase 2 compliance with this Paragraph, we reviewed 152 administrative misconduct investigations during this reporting period.  All but two were initiated and completed after the new IA and discipline policies became effective in May 2017.  PSB investigated 92 of the cases, 20 were outsourced, and District or Division supervisory personnel investigated 40 of the cases.  Of the cases we reviewed, 116 involved external complaints, and 36 were internally generated.

Paragraph 200.a. requires that misconduct investigations be conducted in a rigorous and impartial manner.  During the last reporting period, all completed investigation that we reviewed complied with the requirements of this Subparagraph.  During this reporting period, one (1%) completed investigation we reviewed failed to comply with the requirements of this Subparagraph.

Paragraph 200.b. requires that investigations be approached without prejudging the facts or permitting preconceived impressions.  We carefully review completed investigations; examining statements made by complainants, witnesses, investigative leads, and principal employees, along with reviewing available documentation and independent evidence to ensure that allegations of misconduct are properly resolved.  We focus on the process followed by the investigators, and the completeness of the investigation, and verify that all conclusions are based on the evidence presented.  During this and the last four reporting periods, all completed investigations we reviewed complied with the requirements of this Subparagraph.

Paragraph 200.c. requires that investigators identify, collect, and consider all relevant evidence.  During this and the last four reporting periods, all completed investigations we reviewed complied with the requirements of this Subparagraph.

Paragraph 200.d. requires that investigators make reasonable attempts to locate and interview all witnesses.  During the last reporting period, all investigations we reviewed complied with this Subparagraph.  During this reporting period, three (2%) of the completed investigations we reviewed failed to comply with the requirements of this Subparagraph.

Paragraph 200.e. requires that investigators make reasonable attempts to interview civilian complainants in person.  During this and previous reporting periods, there have been numerous investigations in which investigators did not make attempts to interview complainants in person.  Again, this reporting period, there were investigations without attempts to conduct in-person interviews due to COVID-19 restrictions in place prior to May 1, 2022.  There were also investigations where complainants were out of state, a criminal interview had already been

WAI 70670

conducted, or the complainant requested the interview be conducted telephonically. We did identify one investigation (1%) where attempts were not made to conduct an in-person interview; and no explanation was provided.  PSB discontinued the authorization to conduct telephone interviews based on COVID restrictions, effective May 1, 2022.

Paragraph 200.f. requires audio- and video-recording of all interviews.  Of the 152 administrative investigations reviewed for this reporting period, there were 40 cases where interviews were not both audio- and video-recorded.  In all but three (2%), an acceptable explanation was provided by the investigator.

Paragraph 200.g. requires that when conducting interviews, investigators avoid asking leading questions or questions that may suggest justification for the alleged misconduct.  During the last reporting period, two investigations (2%) fell short of compliance with this Subparagraph.  During this reporting period, four investigations (3%) fell short of compliance with this Subparagraph.

Paragraph 200.h. requires that proper credibility determinations be made.  During the last reporting period, one investigation we reviewed failed to comply with the requirements of this Subparagraph.  During this reporting period, all investigations reviewed complied with the requirements of this Subparagraph.

Paragraph 200.i. requires that investigators attempt to resolve all material inconsistencies.  During the last reporting period, all investigations we reviewed complied with the requirements of this Subparagraph.  During this reporting period, one investigation (1%) fell short of compliance with this Subparagraph.

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 201.**  *There will be no automatic preference for an employee's statement over a non-employee's statement.  Internal affairs investigators will not disregard a witness's statement solely because the witness has some connection to either the complainant or the employee or because the witness or complainant has a criminal history, but may consider the witness's criminal history or any adjudicated findings of untruthfulness in evaluating that witness's statement.  In conducting the investigation, internal affairs investigators may take into account the record of any witness, complainant, or officer who has been determined to have been deceptive or untruthful in any legal proceeding, misconduct investigation, or other investigation.*

**In Full and Effective Compliance**

To determine Phase 2 compliance with this Paragraph, we reviewed 152 administrative misconduct investigations during this reporting period.

Of the 152 investigations, 116 involved complainants that were not identified as MCSO employees.  Thirty-three investigations included interviews with witnesses or investigative leads who were not MCSO employees.  We did not identify any case where we believe there was an automatic preference for the statement of an employee over a non-employee's statement.

We did not identify any completed investigations where a witness's statement was disregarded solely because of any connection identified in this Paragraph, nor where a witness's criminal history or findings of truthfulness were considered.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 202.** *Internal affairs investigators will investigate any evidence of potential misconduct uncovered during the course of the investigation, regardless of whether the potential misconduct was part of the original allegation.*

**In Full and Effective Compliance**

To determine Phase 2 compliance with this Paragraph, we reviewed 152 administrative misconduct investigations during this reporting period.  In 30 of the 152 investigations, MCSO identified additional potential misconduct during the investigations and properly added additional allegations, initiated new investigations, or addressed the violations with an appropriate supervisor intervention.  We identified two investigations (1%) during this reporting period where we believe that additional misconduct may have occurred and was not addressed by MCSO.

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 203.** *If the person involved in the encounter with the MCSO pleads guilty or is found guilty of an offense, internal affairs investigators will not consider that information alone to be determinative of whether an MCSO employee engaged in misconduct, nor will it by itself justify discontinuing the investigation.  MCSO training materials and policies on internal investigations will acknowledge explicitly that the fact of a criminal conviction related to the administrative investigation is not determinative of whether an MCSO employee engaged in misconduct and that the mission of an internal affairs investigator is to determine whether any misconduct occurred.*

**In Full and Effective Compliance**

To determine Phase 2 compliance with this Paragraph, we reviewed administrative misconduct investigations during this reporting period.

There were no indications in any of the completed investigations we reviewed that any MCSO investigators considered alone any pleading or finding of guilty by any person as a reason to make any determination regarding the potential misconduct of any MCSO personnel, nor were any investigations discontinued for this reason.

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70672

***Paragraph 204.***  *Internal affairs investigators will complete their administrative investigations within 85 calendar days of the initiation of the investigation (60 calendar days if within a Division).  Any request for an extension of time must be approved in writing by the Commander of the Professional Standards Bureau.  Reasonable requests for extensions of time may be granted.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.

**Phase 2:**  Not in compliance

To determine Phase 2 compliance with this Paragraph, we review administrative misconduct investigations conducted by MCSO.

PSB conducted 92 of the 152 administrative misconduct investigations we reviewed for this reporting period.  Twenty-four (26%) of the 92 were completed within the required 85-day timeframe or had an approved extension for a reason specific to the investigation, a decrease from 36% compliance for the last reporting period.  Twenty investigations were outsourced to an outside entity by PSB.  Four (20%) were completed within the required timeframe, a decrease in compliance from 23% during the last reporting period.

Of the 40 investigations completed by Districts and Divisions outside of PSB, 10 (25%) were initially submitted to PSB within the required timeframe or had an acceptable extension justification.  This is a significant improvement from the three previous quarters where none of their cases were submitted within the required timeframe.  As has been our practice for numerous reporting periods, we determine the 60-day period compliance findings for those investigations conducted by personnel outside of PSB based on the original date the investigation is approved by the District or Division Commander and forwarded to PSB.  In those cases where deficiencies are identified, the cases will continue to be found noncompliant in other relevant Paragraphs, and specifically in Paragraph 213, which requires the District or Division Commander ensure that investigations conducted by their personnel are complete and the findings are supported by the evidence prior to their submittal to PSB.

As we noted in Paragraph 194, timely completion of administrative investigations has continued to be of concern for many reporting periods.  Of the total 152 administrative misconduct investigations we reviewed during this reporting period, 38 investigations (25%) were completed and submitted by the investigator within the required 60- or 85-day timeframe or contained an acceptable extension request and approval.  This is a decrease in compliance from 30% during the last reporting period.

In addition to those investigations not completed within 60 or 85 days as required by this Paragraph, of the 152 total investigations, 92 (61%) were not completed within 180 days and did not have an acceptable extension request or approval.

During our April 2023 site visit, PSB advised us that the average time for full closure of administrative misconduct investigations was 494 days, a decrease from 593 days in January 2023.  We also discussed that the closure numbers we received were from the initiation of the investigation until final disposition, which includes the time needed for review by the Conduct

WAI 70673

Resolution Section and any associated discipline or other administrative actions. To ensure that we delineate investigative time from full closure time, we agreed that future statistics reported would include both full closure information as well as investigative time.

During our July 2023 site visit, PSB advised us that the average time from initiation of a complaint until full closure, which includes review and associated discipline or other administrative actions, was 587 days. This is an increase from 494 days at the end of April 2023. The average investigative time was 489 days. This time period covers the time from the initiation of the investigation until it is approved by the PSB Commander.

As we have noted in our last 12 quarterly status reports, we no longer accept workload as the justification for the failure to complete investigations in a timely manner. Regardless of the breakdown between investigative and closure time, it continues to be clear from our reviews during this and prior reporting period that the time it takes to conduct administrative misconduct investigations remains unacceptable.

MCSO is not in Phase 2 compliance for this Paragraph.


**Paragraph 205.** *The Professional Standards Bureau shall maintain a database to track all ongoing misconduct cases, and shall generate alerts to the responsible investigator and his or her Supervisor and the Commander of the Professional Standards Bureau when deadlines are not met.*

**In Full and Effective Compliance**

We determine compliance with this Paragraph by assigning a member of our Team to observe demonstrations of the IAPro database during our site visits or other meetings with PSB throughout the reporting period. The IAPro technology serves as the centralized electronic numbering and tracking system for all allegations of misconduct, whether internally discovered or based on an external complaint. This database contains the capacity to manage and store information required for compliance with this Paragraph.

During our site visits, we have met with PSB personnel on numerous occasions and observed IAPro to ensure that the system generates appropriate alerts to responsible investigators and PSB commanders if deadlines are not met. We have reviewed emails PSB disseminates each month to Districts and Divisions to identify investigative deadlines. We have also reviewed the BlueTeam Dashboard, which uses a color-coded system to identify investigations that are nearing deadlines or are past deadlines. The information appears in each supervisor's BlueTeam account when they are monitoring open cases.

The civilian PSB Special Projects Manager is primarily responsible for administering the centralized tracking system. In addition, all PSB and Division investigators can access the electronic BlueTeam database – a system that integrates with IAPro – at any time to view the assignment and status of administrative investigations. PSB has also trained two lieutenants to administer the system.

WAI 70674

In May 2018, PSB relocated to an offsite location.  In July 2018, a member of our Team verified that the existing tracking mechanisms continue to be used for the tracking of investigations at the new facility.

During our January, July, and October 2019 site visits, a member of our Team verified that the tracking mechanisms remain in place.  We also continued to receive monthly notifications from PSB regarding closed administrative investigations, and we evaluate these closed investigations for the entirety of a reporting period against a multitude of criteria, including whether the cases were completed in a timely fashion.

During this reporting period, we continued to receive monthly notifications from PSB regarding closed administrative misconduct investigations; and we continue to evaluate these closed investigations for the entirety of a reporting period against a multitude of criteria, including whether the cases were completed in a timely fashion.  (See Paragraph 204.)

On June 23, 2023, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

**Paragraph 206.**  *At the conclusion of each investigation, internal affairs investigators will prepare an investigation report.  The report will include:*

a.  *a narrative description of the incident;*

b.  *documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the incident.  In situations in which there are no known witnesses, the report will specifically state this fact.  In situations in which witnesses were present but circumstances prevented the internal affairs investigator from determining the identification, phone number, or address of those witnesses, the report will state the reasons why.  The report will also include all available identifying information for anyone who refuses to provide a statement;*

c.  *documentation of whether employees were interviewed, and a transcript or recording of those interviews;*

d.  *the names of all other MCSO employees who witnessed the incident;*

e.  *the internal affairs investigator's evaluation of the incident, based on his or her review of the evidence gathered, including a determination of whether the employee's actions appear to be within MCSO policy, procedure, regulations, orders, or other standards of conduct required of MCSO employees;*

f.  *in cases where the MCSO asserts that material inconsistencies were resolved, explicit credibility findings, including a precise description of the evidence that supports or detracts from the person's credibility;*

g.  *in cases where material inconsistencies must be resolved between complainant, employee, and witness statements, explicit resolution of the inconsistencies, including a precise description of the evidence relied upon to resolve the inconsistencies;*

WAI 70675

h.      an assessment of the incident for policy, training, tactical, or equipment concerns, including any recommendations for how those concerns will be addressed;

i.      if a weapon was used, documentation that the employee's certification and training for the weapon were current; and

j.      documentation of recommendations for initiation of the disciplinary process; and

k.      in the instance of an externally generated complaint, documentation of all contacts and updates with the complainant.

**In Full and Effective Compliance**

Paragraph 206.a. requires a written description on the incident be included in the investigative report.  All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.b. requires documentation of evidence gathered, including all known information about witnesses.  All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.c. requires documentation of whether employees were interviewed, and a transcript or recording of these interviews.  All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.d. requires that the names of all MCSO employees who witnessed the incident be included in the report.  All completed investigations we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.e. requires that the internal affairs investigator's evaluation of the incident includes a determination of whether the employee's actions appear to be within MCSO policy, procedure, regulations, orders, or other standards of conduct required of MCSO employees.  All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.f. requires that when MCSO asserts that material inconsistencies were resolved, explicit credibility findings, including a precise description of the evidence that supports or detracts from the person's credibility must be provided.  During this reporting period, we did not identify any investigations where we believe MCSO failed to provide sufficient credibility assessments as required.  We continue to meet with PSB Command staff to discuss the importance of continuing to clearly identify these requirements in investigative reports and will continue to closely monitor compliance with this Subparagraph.

Paragraph 206.g. requires that when material inconsistencies must be resolved, a precise description of the evidence be included in the report.  During this reporting period, we did identify one investigation where we believe MCSO failed to properly resolve material inconsistencies when it was possible to do so.  We continue to meet with PSB Command staff to discuss the ongoing importance of clearly identifying these requirements in investigative reports and will continue to closely monitor compliance with this Subparagraph.

WAI 70676

Paragraph 206.h. requires that assessment of the incident for policy, training, tactical, or equipment concerns be included in the investigative report, to include any recommendations. All of the completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.i. requires that if a weapon was used, documentation that the employee's certification and training for the weapon must be included in the investigative written report. All of the completed investigations we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.j. requires that documentation of the initiation of the disciplinary process be included in the investigation. Compliance is achieved when the misconduct investigator completes the investigation with a finding of sustained, when applicable, and the PSB Commander subsequently approves the finding. This is considered the initiation of the disciplinary process. Fifty of the 152 administrative misconduct investigations we reviewed had sustained findings against one or more active MCSO employee. All complied with the requirements of this Subparagraph.

Paragraph 206.k. requires that any contacts and updates with the complainant be documented in the investigative report. We did not identify any instances during this reporting period where this did not occur.

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.


***Paragraph 207.*** *In assessing the incident for policy, training, tactical, or equipment concerns, investigation reports will include an assessment of whether:*

a.    *the law enforcement action was in compliance with training and legal standards;*

b.    *the use of different tactics should or could have been employed;*

c.    *the incident indicates a need for additional training, counseling, or other non-disciplinary corrective actions; and*

d.    *the incident suggests that the MCSO should revise its policies, strategies, tactics, or training.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.
- Professional Standards Bureau Operations Manual, most recently amended on December 31, 2019.

**Phase 2:** In compliance

WAI 70677

During this reporting period, we reviewed 152 administrative misconduct investigations. MCSO properly assessed and documented whether any of the requirements of this Paragraph were relevant in all of the completed cases we reviewed for this reporting period. MCSO identified 14 cases where action related to this Paragraph was appropriate. Memorandums of Concern were generated and forwarded to the appropriate Division for resolution.

PSB continues to use an internal tracking form to ensure that those concerns that are forwarded to other Divisions within MCSO for action or review are addressed. We receive and review this tracking document each month. During our January 2023 site visit meeting, we discussed our ongoing concerns with the number of issues that had not been addressed, and the way the tracking system was being used. We requested that PSB provide a presentation during our next site visit meeting to clarify the processes involved with addressing these concerns and explain why there is such a large number of concerns that have not yet been resolved.

During our April 2023 site visit, we met with MCSO Command personnel to discuss our ongoing concerns with the resolution of those issues PSB had documented and forwarded to Divisions outside of PSB. In some cases, MCSO advised us that the concern had been addressed but had just not been documented. In others, there was no explanation for the failure to resolve the noted concern.

During our July 2023 site visit, we again discussed the tracking form used to document and address concerns that have been identified during an investigation. While PSB has continued to properly document the concerns and forward them to the appropriate Division for resolution, there continue to be numerous concerns that have not been properly addressed.

This Paragraph addresses only the requirement for an assessment and documentation by the investigator of policy, training, tactical, or equipment concerns; and we continue to find this Paragraph in compliance. Our concern with resolution of these concerns, once identified, is addressed in Paragraph 216.

***Paragraph 208.*** *For each allegation of misconduct, internal affairs investigators shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation:*

a.    *"Unfounded," where the investigation determines, by clear and convincing evidence, that the allegation was false or not supported by fact;*

b.    *"Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur and justifies a reasonable conclusion of a policy violation;*

c.    *"Not Sustained," where the investigation determines that there is insufficient evidence to prove or disprove the allegation; or*

d.    *"Exonerated," where the investigation determines that the alleged conduct did occur but did not violate MCSO policies, procedures, or training.*

**In Full and Effective Compliance**

WAI 70678

To assess Phase 2 compliance with this Paragraph, we review administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period. We evaluate compliance with this Paragraph against the standard of whether a finding was made, and whether the finding was correct.

During the last reporting period, we concurred with the findings of the PSB Commander in 113 (98%) of the 115 cases that we reviewed.

During this reporting period, we concurred with the findings of the PSB Commander in 148 (97%) on the 152 investigations we reviewed for compliance with this Paragraph. In two, we believe findings of sustained should have been made and were not. In one, we believe the facts of the investigation did not support a finding of unfounded and the finding should have been not sustained. In one additional case, while we agree with the sustained findings related to the identified principal employee, we believe PSB failed to identify or address misconduct by an additional employee involved in the incident. As is our practice, we will discuss these cases with MCSO during our next site visit.

On January 6, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 209.** *For investigations carried out by Supervisors outside of the Professional Standards Bureau, the investigator shall forward the completed investigation report through his or her chain of command to his or her Division Commander. The Division Commander must approve the investigation and indicate his or her concurrence with the findings.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 40 administrative misconduct investigations conducted by Districts or Divisions outside of PSB. All 40 were forwarded to PSB as required, and all contained the approval of the responsible District or Division Commander. As noted in previous reporting periods, and again during *this* reporting period, some of the District or Division level investigations were not in compliance with various requirements of the Second Order – as indicated throughout this report. However, we assessed MCSO's compliance with this Paragraph based on these cases being forwarded through the chain of command for approval of the investigation and findings.

WAI 70679

***Paragraph 210.*** *For investigations carried out by the Professional Standards Bureau, the investigator shall forward the completed investigation report to the Commander.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we reviewed 92 administrative misconduct investigations that were conducted by PSB personnel. All 92 complied with the requirements of this Paragraph. The 20 investigations outsourced by PSB also complied with the requirements of this Paragraph.

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

***Paragraph 211.*** *If the Commander—meaning the Commander of the PSB or the Commander of the Division in which the internal affairs investigation was conducted—determines that the findings of the investigation report are not supported by the appropriate standard of proof, the Commander shall return the investigation to the investigator for correction or additional investigative effort, shall document the inadequacies, and shall include this documentation as an addendum to the original investigation. The investigator's Supervisor shall take appropriate action to address the inadequately supported determination and any investigative deficiencies that led to it. The Commander shall be responsible for the accuracy and completeness of investigation reports prepared by internal affairs investigators under his or her command.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.

**Phase 2:** Not in compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 152 administrative misconduct investigations conducted by MCSO and completed during this reporting period.

PSB investigated 92 of the 152 administrative misconduct investigations we reviewed during this reporting period and outsourced an additional 20. In 90 (98%) of the 92 investigations conducted by PSB, we found the investigations to be thorough, the reports well-written and we agreed with the findings. We identified specific concerns with two investigations conducted by PSB. In one, we believe the investigation did not support a finding of unfounded and should have been not sustained. In the second, while we agree with the sustained findings related to the identified principal employee, we believe PSB failed to identify and address misconduct by an additional employee involved in the incident. Based on our review of these cases, which includes all compliance requirements, 20 investigations (22%) of the total investigations are in compliance, a decrease from 36% in the last quarter.

PSB outsourced 20 of the completed investigations we reviewed for this reporting period. Nineteen were outsourced to the new vendor contracted to assist in reducing the backlog of cases and one was completed by the original vendor. Four (20%) of the 20 were completed within the required 85-day timeline or had an approved extension. Three (15%) were in full compliance

WAI 70680

with all requirements, including timelines. Sixteen (80%) were not compliant due only to timeliness. In one (5%), we disagree with the not sustained findings and believe the findings should have been sustained. We will discuss this case with PSB during our next site visit. During our meetings with the PSB Commander to discuss the quality and timeliness of outsourced cases, he has informed us that one-on-one meetings continue to be held when deficiencies are being identified, and they are authoring deficiency memos for investigations conducted by contract vendors when appropriate.

Of the 40 investigations investigated by Districts or Divisions outside of PSB, we identified 14 investigations (35%) where we had some concerns regarding the investigation. This is a decrease in non-compliance from 40% in the last reporting period. The concerns we identified during this reporting period included leading questions, failure to conduct all appropriate follow-up, and unsupported findings. Based on our assessment of these investigations, which includes our assessment of extension requests, we found seven investigations (18%) in full compliance with all requirements, including extensions. This is the first time in multiple reporting periods where District and Divisions have had any cases in full compliance. While 33 (82%) of the cases are still not compliant with the inclusion of timelines, we are encouraged by the number of cases found in full compliance.

In January 2018, we requested that MCSO begin providing us with documentation that reflects the actions being taken to address deficient misconduct investigations. We requested that PSB and command personnel provide a response to this request on a monthly basis. We have consistently received the requested documentation since March 2018.

During this reporting period, we noted multiple instances where District Command personnel, Deputy Chiefs, or an Executive Chief either identified or addressed deficiencies brought to their attention in response to the protocols put in place to comply with the requirements of Paragraph 211. We also identified some instances where deficiencies in investigations were identified and addressed prior to forwarding the investigations to PSB. While in some cases, the investigations were still not compliant, we are encouraged to see District and Division command personnel properly addressing deficiencies.

We have noted in numerous prior reporting periods that both the supervisors who complete deficient investigations and the command personnel who approve them must be held accountable if MCSO is to achieve Phase 2 compliance with this Paragraph. During this reporting period, our review of cases completed by PSB personnel continues to indicate PSB's ongoing efforts to achieve compliance. PSB's investigative compliance was again 98%. Investigative compliance for those cases investigated by Districts and Divisions outside PSB improved from 60% to 65%. We are hopeful this compliance can be sustained and improved upon.

In previous reporting periods, we have addressed the necessity for MCSO to address deficient investigations in a timely manner. Since then, we have noted an increase in Commander deficiencies being identified and properly addressed by the responsible command officers.

WAI 70681

***Paragraph 212.*** *Where an internal affairs investigator conducts a deficient misconduct investigation, the investigator shall receive the appropriate corrective and/or disciplinary action. An internal affairs investigator's failure to improve the quality of his or her investigations after corrective and/or disciplinary action is taken shall be grounds for demotion and/or removal from a supervisory position or the Professional Standards Bureau.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we reviewed 152 administrative misconduct investigations during this reporting period.

The 40-hour Misconduct Investigative Training was completed in late 2017. In January 2018, we requested that MCSO begin providing us with a document that reflects what actions are being taken to address deficient misconduct investigations on a monthly basis. As discussed in Paragraph 211, we have consistently received documentation since March 2018. During this reporting period, PSB identified and documented some deficiencies with investigations. District Commanders and Division Chiefs also identified and addressed several investigations where deficiencies were found in investigations conducted by their personnel.

PSB investigators consistently complete thorough investigations as has been demonstrated by their high compliance rate over numerous reporting periods. While there are occasional errors made, or disagreements with outcomes, we have not identified any investigator in PSB who we believe does not conduct a quality investigation on any ongoing basis.

In the case of investigations conducted outside of PSB, some Districts use a single supervisor to conduct all investigations for the District when possible to do so. We previously identified that two of these assigned supervisors had completed multiple deficient investigations over several reporting periods. We brought those to the attention of MCSO. One has since left employment with MCSO, and the other is no longer assigned to conduct District investigations.

For this reporting period, we reviewed 40 investigations conducted by supervisors in Districts and Divisions outside of PSB. As some Districts continue to use a single supervisor to investigate all misconduct investigations assigned to the District, there were four different supervisors who conducted multiple investigations. In the case of these supervisors, we found deficiencies in some of the investigations conducted, and found others in full compliance with all requirements other than timeliness. The deficiencies were all identified and addressed either during the review of the investigations prior to forwarding them to PSB, or by PSB upon their review. We also noted that one District has a former PSB investigator now assigned to the District sit in on investigations with two different supervisors to assist in ensuring that they are conducting quality interviews.

As we have previously noted during our reviews over multiple reporting periods, even experienced supervisors sometimes have little experience in conducting administrative misconduct investigations and in other cases, investigations are conducted by newly promoted supervisors, who have no experience in conducting administrative misconduct investigations. We have not observed any instances of repetitive deficiencies by District or Division supervisors who conduct administrative misconduct investigations that we believe would be cause for discipline or other administrative actions.

WAI 70682

On June 23, 2023, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

**Paragraph 213.**  *Investigations of minor misconduct conducted outside of the Professional Standards Bureau must be conducted by a Supervisor and not by line-level deputies.  After such investigations, the investigating Supervisor's Commander shall forward the investigation file to the Professional Standards Bureau after he or she finds that the misconduct investigation is complete and the findings are supported by the evidence.  The Professional Standards Bureau shall review the misconduct investigation to ensure that it is complete and that the findings are supported by the evidence.   The Professional Standards Bureau shall order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings.  Where the findings of the investigation report are not supported by the appropriate standard of proof, the Professional Standards Bureau shall document the reasons for this determination and shall include this documentation as an addendum to the original investigation.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 152 administrative misconduct investigations during this reporting period.  Of the 152 investigations, 92 were investigated by PSB personnel, 20 were outsourced, and 40 were investigated by MCSO personnel outside of PSB.

None of the documentation we received regarding investigations conducted outside of PSB indicated that any person below the rank of sergeant was responsible for conducting the investigation.

During the last reporting period, all 15 District or Division-level approved cases were forwarded to, and reviewed by, PSB as required.  Six investigations (40%) had identified deficiencies.

During this reporting period, all 40 District or Division-level investigations we reviewed were forwarded to and reviewed by PSB as required.  Fourteen investigations (35%) had identified deficiencies, a decrease from 40% during the last reporting period.  Deficiencies included leading questions, failure to conduct a thorough investigation, and unsupported findings.  All of these investigations were initiated in 2020 or 2021, after the increased oversight began; and all were reviewed for compliance by one or more members of District or Division command staff prior to forwarding them to PSB.

WAI 70683

While we continue to remain concerned about the quality of investigations conducted outside of PSB, we note that this is the second reporting period in a row where there was an increase in overall compliance. We also found that seven (18%) of the 40 cases were in full compliance with the requirements for the investigation of misconduct, a significant increase from the last reporting period, where there were no cases found in overall compliance.  We are hopeful that the improvements we observed during this reporting period will be maintained and increased moving forward.

As is our practice, we will discuss those cases with deficiencies with MCSO during our next site visit.

**Paragraph 214.**  *At the discretion of the Commander of the Professional Standards Bureau, a misconduct investigation may be assigned or re-assigned to another Supervisor with the approval of his or her Commander, whether within or outside of the District or Bureau in which the incident occurred, or may be returned to the original Supervisor for further investigation or analysis.  This assignment or re-assignment shall be explained in writing.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we reviewed 152 administrative misconduct investigations during this reporting period.

Our analysis for this reporting period revealed that of the 40 investigations conducted outside of PSB, two were returned by PSB to the original investigating supervisor for further investigation or analysis, and one was reassigned to a different investigator.

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 215.**  *If, after an investigation conducted outside of the Professional Standards Bureau, an employee's actions are found to violate policy, the investigating Supervisor's Commander shall direct and ensure appropriate discipline and/or corrective action.  Where the incident indicates policy, training, tactical, or equipment concerns, the Commander shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we reviewed 40 administrative misconduct investigations conducted by MCSO personnel outside of PSB and completed during this reporting period.

Twelve of the 40 completed misconduct investigations conducted outside of PSB resulted in sustained findings against personnel still employed by MCSO.  In all 12, the reports included documentation that discipline or corrective action was taken.  There were no instances where other actions by Command personnel were necessary.

WAI 70684

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

***Paragraph 216.*** *If, after an investigation conducted by the Professional Standards Bureau, an employee's actions are found to violate policy, the Commander of the Professional Standards Bureau shall direct and ensure appropriate discipline and/or corrective action. Where the incident indicates policy, training, tactical, or equipment concerns, the Commander of the Professional Standards Bureau shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on November 17, 2022.

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.

- Professional Standards Bureau Operations Manual, most recently amended on December 31, 2019.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 152 administrative misconduct investigations during this reporting period.

Ninety-two of the completed investigations were conducted by PSB. Twenty outsourced cases are also included here as PSB maintains responsibility for these cases. Thirty-eight of these 112 cases resulted in sustained findings against current MCSO employees. In all 38, the PSB Commander ensured that appropriate discipline and/or corrective action was recommended for the sustained allegations.

We continue to note that the PSB Commander cannot ensure that appropriate discipline or corrective action are the final outcome of sustained misconduct investigations, as the Appointing Authority makes the final decisions for discipline in both minor misconduct cases and in serious misconduct cases that result in PDHs. This hearing officer has the authority to change the findings or reduce the discipline. In 44 of the 50 sustained cases, the final sanction was the presumptive discipline identified by the PSB Commander or another designated employee. In six cases, the Appointing Authority mitigated the discipline as allowed by MCSO policy. In one of these six, while we disagree that mitigation was appropriate, the final discipline fell within the identified range and is therefore compliant. We will discuss this case with PSB during our next site visit.

The PSB Commander has consistently ensured that, when appropriate, policy, training, tactical, and equipment concerns are identified. PSB then forwards these concerns to the appropriate Division for follow-up or resolution. PSB personnel maintain a list of these concerns and track the progress of each concern that was forwarded. While investigators have been properly identifying these concerns and authoring appropriate memos of concern, many of the concerns have remained unaddressed by those responsible for doing so. We have acknowledged that while

WAI 70685

the nature of some of these concerns, particularly those that may require policy revision, may take a lengthy amount of time to resolve, many of these have remained pending for several years according to the tracking document provided by PSB. Concerns regarding training, tactical, and equipment have also remained pending for lengthy periods of time. We have discussed this issue with MCSO during multiple site visit meetings, and we have also discussed this under Paragraph 207.

During our January 2023 site visit, we discussed this concern and urged MCSO to take action on these pending concerns. We also asked PSB to provide greater detail on the status of these concerns at our April 2023 site visit.

During our April 2023 site visit, we met with MCSO Command personnel to discuss our ongoing concerns with the resolution of those issues PSB had documented and forwarded to Divisions outside of PSB. In some cases, MCSO advised us that the concern had been addressed but had just not been documented. In others, there was no explanation for the failure to resolve the noted concern. The PSB Commander reported that he was reviewing the entire list; he understood that there were more than 99 unresolved concerns; he was working on a better tracking system; and he intended to incorporate the use of Blue Team to track these in the future.

During our July 2023 site visit, we met with the MCSO Command personnel who oversee Divisions and Bureaus that have responsibility for resolution of those concerns identified and forwarded to them by PSB. These personnel provided detailed information on how concerns are addressed, as well as acknowledging that in some cases, there was a lengthy delay in addressing concerns, and in other cases, there did not appear to have been a response as required.

During this meeting, the two Executive Chiefs with oversight over Divisions and Bureaus provided input on efforts being made to address this issue, along with information on improvements they would be directing to address and resolve these concerns. They also noted that moving forward, all concerns identified would be forwarded directly to Deputy Chiefs to ensure they are properly addressed and resolved in a timely manner. The PSB Commander also advised of the continued efforts being made in PSB to review all pending concerns, research what needed to be done, and ensure that appropriate follow up was conducted and documented.

PSB has been taking appropriate actions to identify and track these concerns. The breakdown has occurred in ensuring that once identified, concerns are properly addressed by those Divisions responsible for doing so. We appreciate that all stakeholders are now focused on ensuring properly handling of identified concerns moving forward, but we still have not observed a substantive improvement in the number of concerns pending. Should we fail to see both an improved process and a substantial reduction in the number of concerns pending during the next reporting period, we will withdraw MCSO's Phase 2 compliance with this Paragraph.

WAI 70686

*Paragraph 217.*  *The Professional Standards Bureau shall conduct targeted and random reviews of discipline imposed by Commanders for min or misconduct to ensure compliance with MCSO policy and legal standards.*

**In Full and Effective Compliance**

Based on the requirements of the Second Order, District and Division Commanders will not impose discipline for minor misconduct.  In all cases, the PSB Commander will determine the final findings for internal investigations and the presumptive range of discipline for those cases with sustained findings.  The Appointing Authority will then make the final determination of discipline.

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.


*Paragraph 218.*  *The Professional Standards Bureau shall maintain all administrative investigation reports and files after they are completed for record-keeping in accordance with applicable law.*

**In Full and Effective Compliance**

To determine compliance with this Paragraph, we have observed that PSB maintains both hardcopy and electronic files intended to contain all documents required for compliance with this Paragraph.

A member of our Team inspected the file rooms where hardcopies of administrative investigations were stored and randomly reviewed case files to verify compliance on multiple occasions when PSB was housed at MCSO Headquarters.  Our Team member also used the access granted to IAPro to randomly select internal affairs case files to verify that all information was being maintained electronically.

PSB completed the move to its new offsite facility in May 2018.  Subsequent to the move, a member of our Team conducted an inspection of the file rooms in the new facility; and reviewed a random sample of internal investigations in IAPro to verify ongoing compliance.

During our January 2019 site visit, a member of our Team verified continued compliance at the new PSB facility by inspecting both the criminal and administrative investigation file rooms and randomly reviewing internal affairs case files to verify that all information was also being electronically maintained in IAPro.

During our July 2019 site visit, a member of our Team verified, by accessing IAPro and reviewing randomly selected cases, that electronic files were being properly maintained.

During our October 2019 site visit, a member of our Team again verified compliance at the PSB facility by inspecting both the criminal and administrative investigation file rooms and randomly reviewing internal affairs case files to verify that all information is also being electronically maintained in IAPro.

WAI 70687

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.


### D.   Discipline

**Paragraph 219.**  *The Sheriff shall ensure that discipline for sustained allegations of misconduct comports with due process, and that discipline is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented regardless of the command level of the principal of the investigation.*


**Paragraph 220.**  *To ensure consistency in the imposition of discipline, the Sheriff shall review the MCSO's current disciplinary matrices and, upon approval of the parties and the Monitor, will amend them as necessary to ensure that they:*

a.     *establish a presumptive range of discipline for each type of violation;*

b.     *increase the presumptive discipline based on an employee's prior violations;*

c.     *set out defined mitigating and aggravating factors;*

d.     *prohibit consideration of the employee's race, gender, gender identity, sexual orientation, national origin, age, or ethnicity;*

e.     *prohibit conflicts, nepotism, or bias of any kind in the administration of discipline;*

f.     *prohibit consideration of the high (or low) profile nature of the incident, including media coverage or other public attention;*

g.     *clearly define forms of discipline and define classes of discipline as used in policies and operations manuals;*

h.     *provide that corrective action such as coaching or training is not considered to be discipline and should not be used as a substitute for discipline where the matrix calls for discipline;*

i.     *provide that the MCSO will not take only non-disciplinary corrective action in cases in which the disciplinary matrices call for the imposition of discipline;*

j.     *provide that the MCSO will consider whether non-disciplinary corrective action is also appropriate in a case where discipline has been imposed;*

k.     *require that any departures from the discipline recommended under the disciplinary matrices be justified in writing and included in the employee's file; and*

l.     *provide a disciplinary matrix for unclassified management level employees that is at least as demanding as the disciplinary matrix for management level employees.*

**Phase 1:**  In compliance

WAI 70688

- GC-17 (Employee Disciplinary Procedures), most recently amended on November 17, 2022.

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.

- Administrative Services Division Operations Manual, most recently amended on November 14, 2022.

- Professional Standards Bureau Operations Manual, most recently amended on December 31, 2019.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations.

During this reporting period, the PSB Commander sustained misconduct against one or more identified employees in 72 of the 152 administrative misconduct investigations we reviewed.  In 50 of the sustained investigations, one or more of the known principal employees were still employed at MCSO at the time findings or discipline decisions were made.  Seven sustained investigations resulted in the dismissal of an employee, eight resulted in suspensions, 21 in written reprimands, and 14 in coachings.  Compliance for this Paragraph is based on the discipline findings for both minor and serious discipline.  In those cases where only serious discipline is recommended, compliance findings specific to those cases are addressed in Paragraph 226.

Paragraph 220.a. requires a presumptive range of discipline for each type of violation.  Of the 72 total sustained cases, 50 involved known employees still employed by MCSO at the time discipline decisions were made.   The PSB Commander determined and documented the presumptive discipline range in compliance with this Subparagraph in all of these cases.

Paragraph 220.b. requires that presumptive discipline be increased if an employee has prior violations.  In 15 of the 50 sustained investigations, an employee had prior sustained violations. The PSB Commander considered and increased the presumptive discipline based on the Matrices in place at the time of the misconduct.

Paragraph 220.c. requires that mitigating and aggravating factors be defined.  Aggravating and mitigating factors are not specifically defined in the internal affairs investigation or discipline policy in effect prior to May 18, 2017.  The revised discipline policy, effective May 18, 2017, defined these factors.  These aggravating or mitigating factors are not identified by the PSB Commander – but by the Appointing Authority when making the final disciplinary decisions.

During this reporting period, all but two of the sustained cases were initiated after May 18, 2017.  In all 50, the Appointing Authority provided justification and documentation for all factors considered when making the final decisions in all of the cases based on the Matrices in place at the time of the misconduct.  We also found that he continues to specifically identify those instances where there are aggravating or mitigating factors in the justification documents when appropriate.

WAI 70689

Paragraph 220.d. prohibits the consideration of any prohibited biases when determining discipline. None of the sustained cases that resulted in discipline that we reviewed during this reporting period included any indication that any biases were considered when determining discipline.

Paragraph 220.e. prohibits any conflicts, nepotism, or bias of any kind in the administration of discipline. None of the sustained cases we reviewed during this reporting period had any indication of conflicts, nepotism, or bias of any kind when determining the disciplinary sanction.

Paragraph 220.f. prohibits the consideration of the high (or low) profile nature of an incident when determining discipline. None of the sustained cases we reviewed during this reporting period indicated any consideration of the high- or low-profile nature of the incident when considering discipline.

Paragraph 220.g. requires that clearly defined forms of discipline and classes of discipline be defined. Phase 2 compliance is not applicable to this Subparagraph.

Paragraph 220.h. requires that corrective action such as coaching or training is not considered to be discipline and should not be used as a substitute for discipline. There were no instances identified during this reporting period where a coaching was used as a substitute for discipline.

Paragraph 220.i. requires that MCSO will not take only non-disciplinary action in cases where the Discipline Matrices call for the imposition of discipline. There were no instances during this reporting period where non-disciplinary action was taken for an act of misconduct that was ineligible to be handled as a coaching.

Paragraph 220.j. requires that MCSO consider whether non-disciplinary corrective action is also appropriate. There were no instances during this reporting period where non-disciplinary actions were also found to be appropriate.

Paragraph 220.k. requires that any departure from the discipline recommended under the Discipline Matrices be justified in writing and included in the employee's file. Fifty investigations with sustained findings resulted in employee discipline or other approved corrective action. Of the 50 cases with discipline or other corrective action, seven sustained investigations resulted in the dismissal of an employee. Eight resulted in suspensions and 21 resulted in written reprimands. Fourteen cases resulted in coachings.

The Appointing Authority overturned one sustained finding made by PSB during this reporting period. We do not disagree with his decision to do so. In six cases, the Appointing Authority mitigated the discipline for the sustained allegations. The Appointing Authority provided justification and documentation as required.

As we have previously noted, compliance for this Paragraph is based on the final outcome for all sustained investigations. Those instances that involve only serious discipline are specifically covered in Paragraph 226.

WAI 70690

Paragraph 220.l. requires that a Discipline Matrix for unclassified management employees be at least as demanding as the Discipline Matrix for management-level employees. We reviewed the approved policies that affect discipline for unclassified management employees, and they comply with this requirement. During this reporting period, MCSO did not complete or submit any administrative investigations involving unclassified management employees.

During this reporting period, all but two of the sustained investigations were both initiated and completed after May 18, 2017; and are subject to all the requirements relative to investigations and disciplinary procedures contained in policies revised on that date and have both a discipline range and a presumptive discipline. The Appointing Authority provided a written justification in all sustained cases where he made the final decision.

In 44 of the 50 cases, the final sanction was the presumptive discipline identified by the PSB Commander or another designated employee. In six cases, the Appointing Authority mitigated the discipline as allowed by MCSO policy. In one of these six, while we disagree that mitigation was justified, the final discipline fell within the identified range and is therefore compliant. We will discuss this case with PSB during our next site visit.

***Paragraph 221.*** *The Sheriff shall mandate that each act or omission that results in a sustained misconduct allegation shall be treated as a separate offense for the purposes of imposing discipline.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations.

During this reporting period, we reviewed 50 misconduct investigations with sustained allegations that resulted in the recommendation for corrective action or discipline for MCSO employees. We found that MCSO met the requirements for compliance with this Paragraph.

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

***Paragraph 222.*** *The Sheriff shall also provide that the Commander of the Professional Standards Bureau shall make preliminary determinations of the discipline to be imposed in all cases and shall document those determinations in writing, including the presumptive range of discipline for the sustained misconduct allegation, and the employee's disciplinary history.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations.

WAI 70691

During this reporting period, there were 50 investigations with sustained findings that resulted in recommendations for discipline. In all 50, the PSB Commander determined and documented in writing the presumptive range of discipline based on the policies and Discipline Matrices in effect at the time of the investigation. The documentation submitted for this Paragraph included the category, offense number, and employee's discipline history.

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

### E.    Pre-Determination Hearings

***Paragraph 223.*** *If the Commander of the Professional Standards Bureau makes a preliminary determination that serious discipline (defined as suspension, demotion, or termination) should be imposed, a designated member of MCSO's command staff will conduct a pre-determination hearing and will provide the employee with an opportunity to be heard.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel where MCSO holds a Pre-Determination Hearing (PDH).

During this reporting period, 50 administrative misconduct investigations resulted in sustained findings against current MCSO employees. Seventeen of the sustained investigations resulted in recommendations for serious discipline. In 16 of these, a PDH was held. In one, the employee did not appear for the PDH, but provided a written response to the Appointing Authority.

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

***Paragraph 224.*** *Pre-determination hearings will be audio and video recorded in their entirety, and the recording shall be maintained with the administrative investigation file.*

**In Full and Effective Compliance**

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, in the 16 cases where a Pre-Determination Hearing was held, the hearing was audio- and video-recorded as required, included in the administrative file, and reviewed by a member of our Team.

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70692

*Paragraph 225.   If an employee provides new or additional evidence at a pre-determination hearing, the hearing will be suspended and the matter will be returned to the internal affairs investigator for consideration or further investigation, as necessary.   If after any further investigation or consideration of the new or additional evidence, there is no change in the determination of preliminary discipline, the matter will go back to the pre-determination hearing. The Professional Standards Bureau shall initiate a separate misconduct investigation if it appears that the employee intentionally withheld the new or additional evidence during the initial misconduct investigation.*

**In Full and Effective Compliance**

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, 16 sustained investigations resulted in a Pre-Determination Hearing and we reviewed all of the recordings of these hearings.   There were no instances where we, or the Appointing Authority, identified any concerns that required additional follow-up related to the requirements of this Paragraph.

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

*Paragraph 226.   If the designated member of MCSO's command staff conducting the pre-determination hearing does not uphold the charges recommended by the Professional Standards Bureau in any respect, or does not impose the Commander of the Professional Standards Bureau's recommended discipline and/or non-disciplinary corrective action, the Sheriff shall require the designated member of MCSO's command staff to set forth in writing his or her justification for doing so.   This justification will be appended to the investigation file.*

**In Full and Effective Compliance**

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During our site visits, we have met with the Appointing Authority and the Administrative Services Division as necessary to discuss any concerns we have with final outcomes or decisions that result from Pre-Determination Hearings.   During these meetings, we have discussed that the Appointing Authority does not have the authority to reduce discipline based only on timeframe concerns when an employee appeals discipline in these cases.   It is the Maricopa County Attorney's Office (MCAO) that reviews these cases and determines whether the cases should go forward.   Both the Appointing Authority and the representative from the MCAO advised us that they have taken some of these cases forward; but in others, they did not believe it was appropriate to do so, based on the totality of circumstances.   The Parties have commented on their concerns regarding cases involving the Plaintiffs' class that might result in reductions in discipline as a result of the failure to complete the case within the 180-day timeframe.   We have discussed the specific requirements of Arizona Revised Statutes 38-1101, and that the statute only requires a "good faith" attempt to

complete cases that result in suspensions, demotions, or dismissals within the 180-day timeframe. Since the time of our first discussions in 2018, Arizona law has added a definition of good faith. A.R.S. 38-1101 now defines good faith as "honesty of purpose and absence of intent to defraud."

We have also discussed those cases where a decision may be made after a Pre-Determination Hearing that a reduction in discipline will occur, and those cases where a decision to reduce the discipline may occur if an appeal is filed.  It is our understanding from our meetings with the Appointing Authority and other staff who have been present that MCSO consults with MCAO attorneys in these cases and their input is related to the final outcomes.  We continue to note that all the documentation we receive and review is authored and signed by the Appointing Authority, so our assessment can only consider any final decisions as his.

During the last reporting period, five cases forwarded for consideration of serious discipline resulted in serious discipline or dismissal of the employee.  In all five, the Appointing Authority provided a justification for the final decisions; and this information was provided to our Team in the submissions regarding closed internal affairs investigations.

During this reporting period, 17 cases were forwarded for consideration of serious discipline. Fifteen resulted in serious discipline.  In two cases, the Appointing Authority mitigated the discipline.  The Appointing Authority provided a justification for all final decisions; and this information was provided to our Team in the submissions regarding closed administrative misconduct investigations.

On January 6, 2023, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.


***Paragraph 227.***   *The Sheriff shall promulgate MCSO policy which shall provide that the designated member of MCSO's command staff conducting a pre-determination hearing should apply the disciplinary matrix and set forth clear guidelines for the grounds on which a deviation is permitted.  The Sheriff shall mandate that the designated member of MCSO's command staff may not consider the following as grounds for mitigation or reducing the level of discipline prescribed by the matrix:*

a.      *his or her personal opinion about the employee's reputation;*

b.      *the employee's past disciplinary history (or lack thereof), except as provided in the disciplinary matrix;*

c.      *whether others were jointly responsible for the misconduct, except that the MCSO disciplinary decision maker may consider the measure of discipline imposed on other employees involved to the extent that discipline on others had been previously imposed and the conduct was similarly culpable.*

**In Full and Effective Compliance**

To assess compliance with this Paragraph, we review completed misconduct investigations.

WAI 70694

During this reporting period, we reviewed 50 administrative misconduct investigations where discipline was recommended.  The serious sustained allegations in 17 of these investigations resulted in their referrals for Pre-Determination Hearings.

Paragraph 227.a. prohibits the designated member of command staff conducting a Pre-Determination Hearing from considering a personal opinion of an employee's reputation when determining discipline.  There were no indications in our reviews of these investigations that any personal opinion was considered in making a disciplinary decision.

Paragraph 227.b. prohibits the consideration of the employee's past disciplinary history (or lack thereof), except as provided in the Discipline Matrix.  There were no instances where we determined that the member of command staff responsible for conducting the Pre-Determination Hearing considered disciplinary history outside of the requirements of this Paragraph.

Paragraph 227.c. prohibits the consideration of others jointly responsible for misconduct, except that the decision-maker may consider such discipline to the extent that discipline on others had been previously imposed and the conduct was similarly culpable.  There were no indications in our reviews that the misconduct of others was improperly considered in the disciplinary decisions that were made.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

*Paragraph 228.  The Sheriff or his designee has the authority to rescind, revoke or alter any disciplinary decision made by either the Commander of the Professional Standards Bureau or the appointed MCSO disciplinary authority so long as:*

a.    *that decision does not relate to the Sheriff or his designee;*

b.    *the Sheriff or his designee provides a thorough written and reasonable explanation for the grounds of the decision as to each employee involved;*

c.    *the written explanation is placed in the employment files of all employees who were affected by the decision of the Sheriff or his designee; and*

d.    *the written explanation is available to the public upon request.*

**In Full and Effective Compliance**

To assess compliance with this Paragraph, we review completed misconduct investigations.

During this reporting period, we did not review any cases where the Sheriff or his designee rescinded, revoked, or altered any disciplinary decision made by either the Commander of the Professional Standards Bureau or the appointed MCSO disciplinary authority.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70695

### F.    Criminal Misconduct Investigations

**Paragraph 229.**   *Whenever an internal affairs investigator or Commander finds evidence of misconduct indicating apparent criminal conduct by an employee, the Sheriff shall require that the internal affairs investigator or Commander immediately notify the Commander of the Professional Standards Bureau.   If the administrative misconduct investigation is being conducted by a Supervisor outside of the Professional Standards Bureau, the Sheriff shall require that the Professional Standards Bureau immediately take over the administrative investigation. If the evidence of misconduct pertains to someone who is superior in rank to the Commander of the Professional Standards Bureau and is within the Commander's chain of command, the Sheriff shall require the Commander to provide the evidence directly to what he or she believes is the appropriate prosecuting authority—the Maricopa County Attorney, the Arizona Attorney General, or the United States Attorney for the District of Arizona—without notifying those in his or her chain of command who may be the subject of a criminal investigation.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we review completed criminal misconduct investigations.

During this reporting period, we reviewed eight criminal investigations.  Three were externally generated, and five were internally generated.  All eight were appropriately assigned to criminal investigators in PSB.  The investigations were brought to the attention of the PSB Commander as required and an administrative misconduct investigation was also initiated.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.


**Paragraph 230.**   *If a misconduct allegation will be investigated criminally, the Sheriff shall require that the Professional Standards Bureau not compel an interview of the principal pursuant to Garrity v. New Jersey, 385 U.S. 493 (1967), until it has first consulted with the criminal investigator and the relevant prosecuting authority.   No other part of the administrative investigation shall be held in abeyance unless specifically authorized by the Commander of the Professional Standards Bureau in consultation with the entity conducting the criminal investigation. The Sheriff shall require the Professional Standards Bureau to document in writing all decisions regarding compelling an interview, all decisions to hold any aspect of an administrative investigation in abeyance, and all consultations with the criminal investigator and prosecuting authority.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by both criminal and administrative investigators to ensure that they contain appropriate documentation that complies with the requirements of this Paragraph.

WAI 70696

We previously determined that in many cases, the administrative investigation is not submitted and reviewed during the same reporting period as the criminal investigation, as generally, administrative investigations are finalized after the completion of the criminal investigation. We discussed this issue with PSB during our January 2017 site visit. To resolve the concern, PSB agreed to provide us with a copy of any criminal investigation when PSB submits the administrative misconduct investigation for our review, even if the criminal investigation has been previously submitted. MCSO has been consistently providing copies of these criminal investigations with the administrative investigation since that time.

During this reporting period, we reviewed seven administrative misconduct investigations where criminal conduct may have occurred. In six, the cases had also been investigated by PSB criminal investigators. In one, the criminal investigation was conducted by another law enforcement agency with jurisdiction where the offense was alleged to have occurred.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 231.** *The Sheriff shall require the Professional Standards Bureau to ensure that investigators conducting a criminal investigation do not have access to any statements by the principal that were compelled pursuant to Garrity.*

## In Full and Effective Compliance

PSB is divided into criminal and administrative sections. Criminal investigators and administrative investigators are housed on separate floors of the building. Criminal investigators do not have access to the IAPro database for administrative investigations, and there are separate file rooms for criminal and administrative investigative documents and reports. We have previously verified during our site visits that the required separation of criminal and administrative investigations and restricted access to IAPro is in place.

In May 2018, PSB relocated to a new offsite location. After PSB's move to its new facility, we verified that criminal and administrative investigation files were housed on separate floors in the new facility. Criminal investigators do not have access to the IAPro database for administrative investigations, and there are separate and secured file rooms for criminal and administrative documents and reports.

During our October 2019 site visit, a member of our Team again verified that criminal and administrative investigative files are housed on separate floors, there is restricted access to both file rooms, and restricted access to IAPro remains in place.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70697

*Paragraph 232. The Sheriff shall require the Professional Standards Bureau to complete all such administrative investigations regardless of the outcome of any criminal investigation, including cases in which the prosecuting agency declines to prosecute or dismisses the criminal case after the initiation of criminal charges. The Sheriff shall require that all relevant provisions of MCSO policies and procedures and the operations manual for the Professional Standards Bureau shall remind members of the Bureau that administrative and criminal cases are held to different standards of proof, that the elements of a policy violation differ from those of a criminal offense, and that the purposes of the administrative investigation process differ from those of the criminal investigation process.*

**In Full and Effective Compliance**

To determine MCSO's compliance with this Paragraph, we review administrative misconduct and criminal investigations.

During this reporting period, we reviewed eight criminal misconduct investigations conducted by MCSO personnel. All eight have a companion administrative misconduct investigation, as required; and are in compliance with the requirements of this Paragraph.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

*Paragraph 233. If the investigator conducting the criminal investigation decides to close the investigation without referring it to a prosecuting agency, this decision must be documented in writing and provided to the Professional Standards Bureau. The Commander of the Professional Standards Bureau shall separately consider whether to refer the matter to a prosecuting agency and shall document the decision in writing.*

**In Full and Effective Compliance**

To determine MCSO's compliance with this Paragraph, we review criminal misconduct investigations.

During this reporting period, investigators documented their conclusions and decisions to close four of the eight criminal investigations we reviewed without submittal to a prosecuting agency and the PSB Commander approved these decisions.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70698

***Paragraph 234.*** *If the investigator conducting the criminal investigation decides to refer the matter to a prosecuting agency, the Professional Standards Bureau shall review the information provided to the prosecuting agency to ensure that it is of sufficient quality and completeness. The Commander of the Professional Standards Bureau shall direct that the investigator conduct additional investigation when it appears that there is additional relevant evidence that may improve the reliability or credibility of the investigation. Such directions shall be documented in writing and included in the investigatory file.*

**In Full and Effective Compliance**

To determine MCSO's compliance with this Paragraph, we review criminal misconduct investigations.

During this reporting period, we reviewed eight criminal misconduct investigations conducted by PSB personnel. Four were reviewed by the PSB Commander and then submitted to a prosecutorial agency for review. In three, criminal charges were filed. In the fourth, the prosecuting agency declined prosecution, citing inadequate evidence or corroboration. There was no indication that there were any investigative deficiencies or that additional follow-up could have resulted in charges being filed.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.


***Paragraph 235.*** *If the prosecuting agency declines to prosecute or dismisses the criminal case after the initiation of criminal charges, the Professional Standards Bureau shall request an explanation for this decision, which shall be documented in writing and appended to the criminal investigation report.*

**In Full and Effective Compliance**

To determine MCSO's compliance with this Paragraph, we review criminal misconduct investigations.

During this reporting period, four of the criminal investigations we reviewed were submitted to a prosecutorial agency for review. In three, criminal charges were filed. In the fourth, the prosecuting agency declined prosecution, citing inadequate evidence or corroboration.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70699

*Paragraph 236.   The Sheriff shall require the Professional Standards Bureau to maintain all criminal investigation reports and files after they are completed for record-keeping in accordance with applicable law.*

**In Full and Effective Compliance**

To determine compliance with this Paragraph, we have observed that PSB maintains both hardcopy and electronic files that are intended to contain all the documents required per this Paragraph.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

### G.   *Civilian Complaint Intake, Communication, and Tracking*

*Paragraph 237.   Within six months of the entry of this Order, the Monitor, in consultation with the Community Advisory Board, will develop and implement a program to promote awareness throughout the Maricopa County community about the process for filing complaints about the conduct of MCSO employees.*

**Phase 1**:  Not applicable

**Phase 2:**  Not applicable

We developed and implemented a Complaint Process Community Awareness Program to promote awareness throughout the Maricopa County community about the process for filing complaints about the conduct of MCSO employees.  The program provides for distributing brochures describing the complaint process at quarterly community meetings and using public service announcements – made via local media outlets and social media – to provide basic information (in both English and Spanish) about MCSO's complaint process.

We contacted faith organizations and civic groups throughout Maricopa County requesting that they make complaint process information forms available to members of their congregations and groups.  The Complaint Process Community Awareness Program incorporates input from the CAB, MCSO, and the ACLU of Arizona.

WAI 70700

*Paragraph 238.   The Sheriff shall require the MCSO to accept all civilian complaints, whether submitted verbally or in writing; in person, by phone, by mail, or online; by a complainant, someone acting on the complainant's behalf, or anonymously; and with or without a signature from the complainant.   MCSO will document all complaints in writing.*

**In Full and Effective Compliance**

To assess compliance with this Paragraph, we review all new misconduct complaints received each month and completed misconduct investigations conducted by MCSO personnel.   In addition, we review many initial complaint documents or initial telephone calls, BWC videos, traffic stop videos, Supervisor Notes, Compliance and BIO reviews, and consider findings in the complaint testing process.

During this reporting period, we reviewed 152 completed administrative misconduct investigations.   We did not identify any instances where an employee did not accept a complaint from a community member as required.

Our review of traffic stops for this reporting period did not identify any instances where a subject who was arrested made allegations of misconduct by MCSO personnel during his arrest that went unaddressed.   Our review of Supervisor Notes during this reporting period did not identify any incidents where there were indications that a complaint had been made but not properly reported. We reviewed numerous complainant contacts and found no indication that a supervisor initially refused to take a complaint or attempted to dissuade the complainant from making a complaint. Neither CID nor BIO identified any instances in their reviews during this reporting period that indicated that a complainant had attempted to file a complaint and been refused.   We did not identify any complaint intake tests for this reporting period where MCSO failed to accept a complaint.   (See Paragraph 254.)

We continue to find that MCSO consistently accepts and records complaints as required for compliance with this Paragraph.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.   After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.


*Paragraph 239.   In locations clearly visible to members of the public at the reception desk at MCSO headquarters and at all District stations, the Sheriff and the MCSO will post and maintain permanent placards clearly and simply describing the civilian complaint process that is visible to the public at all hours.   The placards shall include relevant contact information, including telephone numbers, email addresses, mailing addresses, and Internet sites.   The placards shall be in both English and Spanish.*

**In Full and Effective Compliance**

As we did not hold an in-person site visit in July, we were unable to visit MCSO Headquarters and MCSO Districts to determine if the permanent placards were prominently displayed at MCSO Headquarters and Districts.   During our July remote site visit, MCSO reported that, during this

WAI 70701

reporting period, the agency had created new placards which no longer list Queen Creek as a location for Comment and Complaints Forms as the City of Queen Creek has employed its own law enforcement agency.  MCSO further advised that the address of District 2 was updated, as a new District was opened replacing the old District.  MCSO also reported that, during this reporting period, it did not receive any feedback from the community regarding the permanent complaint placards.  When inspected during our last in-person site visit, we noted that MCSO's placard states that anyone who has a concern regarding the performance of any MCSO employee has the right to file a complaint in English or Spanish or their preferred language, to include American Sign Language; in person at any District facility or at the Professional Standards Bureau, by mail, by telephone, by fax, or online.  The placard includes relevant contact information, including telephone numbers, email addresses, mailing addresses, and websites.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

***Paragraph 240.***  *The Sheriff shall require all deputies to carry complaint forms in their MCSO vehicles.  Upon request, deputies will provide individuals with complaint forms and information about how to file a complaint, their name and badge number, and the contact information, including telephone number and email address, of their immediate supervising officer.  The Sheriff must provide all supervising officers with telephones.  Supervising officers must timely respond to such complaints registered by civilians.*

**In Full and Effective Compliance**

As we held our July site visit remotely, we were unable to visit District offices to verify that MCSO maintained adequate supplies of complaint forms for deputies to carry in their vehicles.  We were also unable to verify that supervisors were in possession of MCSO-issued cellular telephones.  We will resume these verifications when we resume our in-person site visits.  MCSO's complaint intake testing program – in which an external vendor conducts 24 complaint intake tests via telephone, email, U.S. Mail, MCSO's website, and in-person tests annually – has mostly found that MCSO personnel respond in accordance with agency policy and in a timely fashion to a diverse group of complainants.  Where the complaint intake tests have identified deficiencies, MCSO has taken appropriate corrective steps, such as issuing BIO Action Forms or conducting other follow-up.  (See Paragraphs 254-260.)

On March 31, 2023, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

WAI 70702

***Paragraph 241.*** *The Sheriff will ensure that the Professional Standards Bureau facility is easily accessible to members of the public. There shall be a space available for receiving walk-in visitors and personnel who can assist the public with filing complaints and/or answer an individual's questions about the complaint investigation process.*

**In Full and Effective Compliance**

The PSB facility, the former East Court Building Library, located at 101 West Jefferson Street in Phoenix, is easily accessible to members of the public. The County Court facilities in the building are separate from the PSB reception area and offices. The PSB area is accessible from First Avenue, a major thoroughfare; and there is no required security screening of individuals entering the building through the First Avenue entrance. As we held our July site visit remotely, we were unable to visit the PSB facility during this reporting period. We will visit the facility again when we resume our in-person site visits.

MCSO's placards and comment and complaint forms – including the complaint form that is accessible via MCSO's website – all reflect PSB's current address.

On January 6, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.


***Paragraph 242.*** *The Sheriff will also make complaint forms widely available at locations around the County including: the websites of MCSO and Maricopa County government; the lobby of MCSO's headquarters; each patrol District; and the Maricopa County government offices. The Sheriff will ask locations, such as public library branches and the offices and gathering places of community groups, to make these materials available.*

**In Full and Effective Compliance**

MCSO has complaint forms available in English and Spanish on the MCSO and Maricopa County websites. MCSO maintains a list – of MCSO facilities, County offices, and public locations where community groups meet – where Community Outreach Division personnel attempt to make the forms available.

As we held our site visit in July remotely, we were unable to verify that MCSO placed complaint forms in locations that were included on MCSO's list of facilities where complaint forms are available to the public. During this reporting period, the Community Outreach Division (COrD) provided an updated list of 107 locations throughout Maricopa County displaying Comment and Complaint Forms to make the forms more accessible to community members. We encourage the COrD to continue to explore other possible locations – as recommended by the Community Advisory Board (CAB) and community organizations – including grocery stores, pharmacies, and other retail stores that are located in communities where members of the Plaintiffs' class live and work.

On March 31, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 70703

*Paragraph 243.  The Sheriff shall establish a free, 24-hour hotline for members of the public to make complaints.*

**In Full and Effective Compliance**

In July 2016, MCSO established the free 24-hour hotline for members of the public to make complaints; the hotline continued to be operational during this reporting period.  We periodically called the hotline during this reporting period; and verified that the hotline is operational in both English and Spanish, and provides instructions in both languages on how to register a complaint.  The recording advises callers that if the call is an emergency, they are to call 911.  Callers are requested to provide their name, telephone number, and a brief summary of their complaint.  If callers leave a recorded message, they are advised that MCSO will contact them as soon as possible.  If callers do not wish to leave a recorded message, they are provided with a telephone number to call to speak to a supervisor.  That number connects the callers to the MCSO switchboard operator, who will connect the caller to an appropriate supervisor.  Callers are further advised of MCSO's operating hours if they wish to contact PSB directly.

The hotline is housed in PSB, and PSB personnel access any recorded messages at the beginning of each business day.  The most recently received hotline complaint that remains open was received on October 18, 2022.  Currently, there are nine hotline complaints under investigation, none of which are under Command review.  None of the nine complaints are deemed Service Complaints.

The procedures established and followed by PSB provide for creating a record of every complaint received on the hotline and maintaining a log of follow-up actions regarding referral of the complaint.

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.


*Paragraph 244.  The Sheriff shall ensure that the MCSO's complaint form does not contain any language that could reasonably be construed as discouraging the filing of a complaint, such as warnings about the potential criminal consequences for filing false complaints.*

**In Full and Effective Compliance**

Our review of the English and Spanish complaint forms' content did not reveal any language that could reasonably be construed as discouraging the filing of a complaint.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70704

***Paragraph 245.*** *Within two months of the entry of this Order, complaint forms will be made available, at a minimum, in English and Spanish. The MCSO will make reasonable efforts to ensure that complainants who speak other languages (including sign language) and have limited English proficiency can file complaints in their preferred language. The fact that a complainant does not speak, read, or write in English, or is deaf or hard of hearing, will not be grounds to decline to accept or investigate a complaint.*

**In Full and Effective Compliance**

Complaint forms in English and Spanish are accessible on MCSO's website. The complaint form states that anyone who has a concern regarding the performance of any MCSO employee has the right to file a complaint – in English or Spanish or their preferred language, to include American Sign Language – in person at any District facility or at the Professional Standards Bureau, by mail, by telephone, by fax, or online. The forms provide street addresses, contact numbers, and website information.

During this reporting period, no grievances were filed that met the criteria for transmitting to the Monitor.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.


***Paragraph 246.*** *In the course of investigating a civilian complaint, the Professional Standards Bureau will send periodic written updates to the complainant including:*

a.     *within seven days of receipt of a complaint, the Professional Standards Bureau will send non-anonymous complainants a written notice of receipt, including the tracking number assigned to the complaint and the name of the investigator assigned. The notice will inform the complainant how he or she may contact the Professional Standards Bureau to inquire about the status of a complaint;*

b.     *when the Professional Standards Bureau concludes its investigation, the Bureau will notify the complainant that the investigation has been concluded and inform the complainant of the Bureau's findings as soon as is permitted by law; and*

c.     *in cases where discipline is imposed, the Professional Standards Bureau will notify the complainant of the discipline as soon as is permitted by law.*

**In Full and Effective Compliance**

To assess compliance with this Paragraph, we review completed misconduct investigations.

During this reporting period, we reviewed 152 administrative misconduct investigations. Of these, 116 were externally generated.

Paragraph 246.a. requires that a civilian complainant receive a written notice of receipt of his/her complaint within seven days. This letter must include the tracking number, the name of the investigator assigned, and information regarding how the complainant can inquire about the status

WAI 70705

of his/her complaint.  In all but one of the externally generated cases where PSB had contact information for the complainant, the letter was sent within seven days as required.  All of the letters sent and reviewed included the name of the investigator and information regarding how the complainant could inquire about the status of the complaint.

Paragraph 246.b. requires that PSB notify a civilian complainant of the outcome of the investigation.  In all of the externally generated complaints, the complainant was provided a notice of the outcome when contact information was known.

Paragraph 246.c. requires that PSB notify a civilian complainant of any discipline imposed as soon as permitted by law.  In all of the externally generated complaints with sustained findings, PSB properly notified the complainant of the sustained findings and the discipline imposed when contact information for the complainant was known.

On January 6, 2023, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.


**Paragraph 247.**  *Notwithstanding the above written communications, a complainant and/or his or her representative may contact the Professional Standards Bureau at any time to determine the status of his or her complaint.  The Sheriff shall require the MCSO to update the complainant with the status of the investigation.*

**In Full and Effective Compliance**

To assess compliance with this Paragraph, we review completed misconduct investigations.

During this reporting period, we reviewed 152 administrative misconduct investigations.  Of these, 116 were externally generated.  We did not identify any instances where a complainant was discouraged from, or denied, contact with MCSO investigators to determine the status of his/her complaint, or to request and receive an update.  MCSO appropriately had contact with complainants as required in Paragraph 246 in all of these cases where the complainant was known and wished to participate in the investigation.  In three of the cases, MCSO personnel reported that they had additional contact with the complainant during the course of the investigation.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70706

*Paragraph 248.   The Professional Standards Bureau will track, as a separate category of complaints, allegations of biased policing, including allegations that a deputy conducted an investigatory stop or arrest based on an individual's demographic category or used a slur based on an individual's actual or perceived race, ethnicity, nationality, or immigration status, sex, sexual orientation, or gender identity.   The Professional Standards Bureau will require that complaints of biased policing are captured and tracked appropriately, even if the complainant does not so label the allegation.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations.

Each month, PSB provides a list of new complaints alleging biased policing.  PSB also provides all closed investigations where biased policing was alleged.  For this Paragraph, only allegations of biased policing that do not affect the Plaintiffs' class are reported.  Those complaints alleging bias against members of the Plaintiffs' class are captured in a separate category and reported under Paragraphs 275-288.

During this reporting period, we reviewed five investigations where potential bias was alleged that did not affect members of the Plaintiffs' class.  PSB tracked these investigations in a separate category as required by this Paragraph, and reported them in Paragraph 33.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

*Paragraph 249.   The Professional Standards Bureau will track, as a separate category of complaints, allegations of unlawful investigatory stops, searches, seizures, or arrests.*

**In Full and Effective Compliance**

To determine Phase 2 compliance for this Paragraph, we review a monthly report from PSB that provides the information required for compliance.

To ensure that we are consistently informed of complaints relative to this Paragraph, PSB provides information concerning these investigations in its monthly document submission relative to this Paragraph.  During this reporting period, there were three investigations submitted for review for this Paragraph.  As required, the complaints were tracked in a separate category of complaints.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70707

*Paragraph 250.  The Professional Standards Bureau will conduct regular assessments of the types of complaints being received to identify and assess potential problematic patterns and trends.*

**In Full and Effective Compliance**

PSB continues to prepare a comprehensive quarterly assessment of the types of complaints received to identify and assess potential problematic patterns or trends.  PSB's assessment identifies the Divisions that received the highest number of complaints during the quarter, notable patterns and trends identified within MCSO Divisions, a summary of all of the misconduct allegations made during the quarter, and identifies employees with potentially problematic patterns or trends of misconduct during the quarter.

The contents of the quarterly assessment are discussed at executive staff meetings.  PSB also includes the information required by this Paragraph in its public Semi-Annual Misconduct Investigations Report, which is required under Paragraph 251.  The most recent Semi-Annual Report for the period of July 1-December 31, 2022, contains the issues identified as potentially problematic patterns or trends.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

*H.      Transparency Measures*

*Paragraph 251.  The Sheriff shall require the Professional Standards Bureau to produce a semi-annual public report on misconduct investigations, including, at a minimum, the following:*

a.      *summary information, which does not name the specific employees involved, about any sustained allegations that an employee violated conflict-of-interest rules in conducting or reviewing misconduct investigations;*

b.      *aggregate data on complaints received from the public, broken down by district; rank of principal(s); nature of contact (traffic stop, pedestrian stop, call for service, etc.); nature of allegation (rudeness, bias-based policing, etc.); complainants' demographic information; complaints received from anonymous complainants or third parties; and principals' demographic information;*

c.      *analysis of whether any increase or decrease in the number of civilian complaints received from reporting period to reporting period is attributable to issues in the complaint intake process or other factors;*

d.      *aggregate data on internally-generated misconduct allegations, broken down by similar categories as those for civilian complaints;*

e.      *aggregate data on the processing of misconduct cases, including the number of cases assigned to Supervisors outside of the Professional Standards Bureau versus investigators in the Professional Standards Bureau; the average and median time from the initiation of an investigation to its submission by the investigator to his or her chain of command; the average and median time from the submission of the investigation by the investigator to a*

WAI 70708

*final decision regarding discipline, or other final disposition if no discipline is imposed; the number of investigations returned to the original investigator due to conclusions not being supported by the evidence; and the number of investigations returned to the original investigator to conduct additional investigation;*

f.   *aggregate data on the outcomes of misconduct investigations, including the number of sustained, not sustained, exonerated, and unfounded misconduct complaints; the number of misconduct allegations supported by the appropriate standard of proof; the number of sustained allegations resulting in a non-disciplinary outcome, coaching, written reprimand, suspension, demotion, and termination; the number of cases in which findings were changed after a pre-determination hearing, broken down by initial finding and final finding; the number of cases in which discipline was changed after a pre-determination hearing, broken down by initial discipline and final discipline; the number of cases in which findings were overruled, sustained, or changed by the Maricopa County Law Enforcement Merit System Council, broken down by the finding reached by the MCSO and the finding reached by the Council; and the number of cases in which discipline was altered by the Council, broken down by the discipline imposed by the MCSO and the disciplinary ruling of the Council; and similar information on appeals beyond the Council; and*

g.   *aggregate data on employees with persistent or serious misconduct problems, including the number of employees who have been the subject of more than two misconduct investigations in the previous 12 months, broken down by serious and minor misconduct; the number of employees who have had more than one sustained allegation of minor misconduct in the previous 12 months, broken down by the number of sustained allegations; the number of employees who have had more than one sustained allegation of serious misconduct in the previous 12 months, broken down by the number of sustained allegations; and the number of criminal prosecutions of employees, broken down by criminal charge.*

**In Full and Effective Compliance**

The PSB Operations Manual identifies the PSB Commander as responsible for preparing the semi-annual public report on misconduct investigations.  The manual also contains provisions for the production of summary information regarding sustained conflict of interest violations; an analysis of the complaint intake process; and aggregate data on complaints (internal and external), processing of misconduct cases, outcomes of misconduct cases, and employees with persistent misconduct problems.

Since July 2019, PSB has issued and posted on MCSO's website its semi-annual public report. PSB also incorporates information relevant to Paragraph 192 in its semi-annual report, which requires that PSB review, at least semi-annually, all misconduct investigations that were assigned outside the Bureau to determine whether or not the investigation was properly categorized, whether the investigation was properly conducted, and whether appropriate findings were reached.  PSB also incorporates information relevant to Paragraph 250 in this report, which includes an assessment of potential problematic patterns or trends, based on a review of complaints received.

WAI 70709

During our October 2019 site visit, PSB informed us that it developed a voluntary survey for complainants to complete after the conclusion of the investigation; the survey would capture complainants' demographic information. MCSO utilizes prepaid postage return envelopes when mailing to the surveys to the complainants. The use of the prepaid postage return envelopes allows the complainants to mail the survey to MCSO without having to incur any fees. PSB commenced distribution of the surveys to complainants for cases that were closed during January 2020. In addition, PSB is also informing complainants of a web-based version of the survey that may be completed online. PSB is now collecting the voluntary surveys that are returned. PSB continues to include the relevant demographic information in the most recently published semi-annual report.

In March 2023, PSB issued and posted on the MCSO website its semi-annual public report for period of January 1–June 30, 2022. The report was prepared consistent with prior reports prepared by PSB and contains the relevant information pertaining to this Paragraph.

In the past, MCSO has published the semi-annual report just over six months from the end of the semi-annual period; however, the June 30-December 31, 2021 report was published in August 2022, over seven months from the end of the semi-annual period. The report for the semi-annual period of January 1-June 30, 2022, was published in March 2023, over eight months after the conclusion of the semi-annual period. We discussed this issue with MCSO during our July 2023 site visit and informed the agency that MSCO must ensure that the reports are published in a consistent and timely manner going forward; otherwise, it will affect MCSO's compliance status with this requirement.

MCSO published the report for the semi-annual period of July 1-December 31, 2022, in August 2023. We will provide our assessment of that report in our next quarterly status report.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 70710

***Paragraph 252.*** *The Sheriff shall require the MCSO to make detailed summaries of completed internal affairs investigations readily available to the public to the full extent permitted under state law, in electronic form on a designated section of its website that is linked to directly from the MCSO's home page with prominent language that clearly indicates to the public that the link provides information about investigations of misconduct alleged against MCSO employees.*

**In Full and Effective Compliance**

PSB publishes detailed summaries each month of completed misconduct investigations in an electronic format that is accessible via MCSO's website. The following data fields have been identified for public disclosure: Internal Affairs Number; Date Opened; Incident Type; Original Complaint; Policy Violation(s) Alleged and the Outcome; Discipline; Investigative Summary; and Date Completed. During our April 2017 site visit, we approved the PSB template containing detailed summaries of completed misconduct investigations for placement on the MCSO website. Each reporting period, we conduct a review of the detailed summaries of completed misconduct investigations to ensure that the content is consistent with the requirements of this Paragraph. In addition, we verify that the monthly detailed summaries of completed misconduct investigations are posted on MCSO's website for public review.

During this reporting period, PSB made the monthly detailed summaries of completed internal investigations for April, May, and June 2023 available to the public in a designated section on the homepage of MCSO's website. The reports provide significant details regarding alleged misconduct, the findings of the investigation, and, if there is a finding of misconduct, what type of discipline was imposed.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

***Paragraph 253.*** *The MCSO Bureau of Internal Oversight shall produce a semi-annual public audit report regarding misconduct investigations. This report shall analyze a stratified random sample of misconduct investigations that were completed during the previous six months to identify any procedural irregularities, including any instances in which:*

a.   *complaint notification procedures were not followed;*

b.   *a misconduct complaint was not assigned a unique identifier;*

c.   *investigation assignment protocols were not followed, such as serious or criminal misconduct being investigated outside of the Professional Standards Bureau;*

d.   *deadlines were not met;*

e.   *an investigation was conducted by an employee who had not received required misconduct investigation training;*

f.   *an investigation was conducted by an employee with a history of multiple sustained misconduct allegations, or one sustained allegation of a Category 6 or Category 7 offense from the MCSO's disciplinary matrices;*

g.   an investigation was conducted by an employee who was named as a principal or witness in any investigation of the underlying incident;

h.   an investigation was conducted of a superior officer within the internal affairs investigator's chain of command;

i.   any interviews were not recorded;

j.   the investigation report was not reviewed by the appropriate personnel;

k.   employees were promoted or received a salary increase while named as a principal in an ongoing misconduct investigation absent the required written justification;

l.   a final finding was not reached on a misconduct allegation;

m.   an employee's disciplinary history was not documented in a disciplinary recommendation; or

n.   no written explanation was provided for the imposition of discipline inconsistent with the disciplinary matrix.

**In Full and Effective Compliance**

On June 26, 2018, we approved the methodology developed by AIU for the inspection that would address the requirements of this Paragraph, which would start with an inspection of investigations that commenced after November 1, 2017.  AIU has opted to conduct monthly inspections of misconduct investigations in lieu of conducting a semi-annual audit.  During this reporting period, AIU prepared inspection reports for misconduct investigations that closed during the months of February, March, and April 2023.

When perceived deficiencies are identified, AIU requests a BIO Action Form from the specific District/Division Commander to address the issue(s).

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

WAI 70712

I.      *Testing Program for Civilian Complaint Intake*

**Paragraph 254.**  *The Sheriff shall initiate a testing program designed to assess civilian complaint intake.  Specifically, the testing program shall assess whether employees are providing civilians appropriate and accurate information about the complaint process and whether employees are notifying the Professional Standards Bureau upon the receipt of a civilian complaint.*

## In Full and Effective Compliance

To meet the requirements of this Paragraph, AIU contracts with an external vendor, Progressive Management Resources (PMR), which is responsible for conducting complaint intake testing via telephone, email, U.S. Mail, MCSO's website, and in-person tests.  We receive and review documentation of these tests – including any available audio-recorded documentation – as they are completed, as part of our monthly document requests.  Unless the test is an in-person test, PMR does not advise AIU of the tests in advance but instead emails AIU once a test has been completed with documentation of the test.

We evaluate MCSO's compliance with this Paragraph based on how the agency responds to the outcomes of the tests, regardless of whether the tests "succeed" or "fail."

During the last reporting period, PMR conducted seven tests: one via MCSO's website; two via email; two via telephone; one via U.S. Mail; and one in person.  In one test, AIU appropriately noted that, when the tester called a District facility to complain that a deputy asked her and her husband racially motivated questions, the person who assisted her did not immediately refer the complainant to an on-duty supervisor.  This was a violation of GH-2 (Internal Investigations).  To follow up, BIO personnel spoke with the District 3 Command staff and also redistributed the complaint intake guide for civilian staff to all Patrol District administrative personnel.

During this reporting period, PMR conducted five tests: one via U.S. Mail; and four in-person (at Districts 2, 4, and 7; and Lake Patrol).  For all of the tests, we reviewed the documentation forms submitted by the testers, as well as AIU's Complaint Intake Testing Inspections covering the tests conducted during this reporting period.  We and AIU noted deficiencies in one of the tests, in which a tester visited District 4 to report a deputy's aggressive driving and speeding.  When the tester went to the District facility, it was closed, so he called the telephone number that was posted on the facility door.   The Communications dispatcher who answered his call took the complainant's information and called the on-duty supervisor; however, she did not also email the on-duty supervisor and the Early Intervention Unit (EIU), as required by GI-1 (Radio and Enforcement Communications Procedures).  To follow up, BIO personnel appropriately issued a BIO Action Form.

In all other tests during this reporting period, MCSO personnel responded appropriately and in a timely fashion, and we did not note any deficiencies.

Following the outcome of several past complaint intake tests in which front-line staff responded inappropriately, AIU developed a useful complaint intake checklist for administrative staff, which we and the Parties reviewed and approved.  MCSO distributed the checklist to the Patrol Divisions for dissemination to their personnel who interact with the public, and the checklist is available to all employees via the agency's shared internal hard drive.

WAI 70713

Following our July site visit, PMR advised MCSO that it would not renew its contract for providing complaint intake testing. MCSO informed us that it would begin a new procurement process to select a new vendor. We will inquire about the status of this process during our upcoming site visit.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 255.** *The testing program is not intended to assess investigations of civilian complaints, and the MCSO shall design the testing program in such a way that it does not waste resources investigating fictitious complaints made by testers.*

**In Full and Effective Compliance**

AIU has informed its complaint intake testing vendor of this requirement. AIU has created several procedures to ensure that the Complaint Intake Testing Program does not waste resources investigating fictitious complaints made by testers – including setting parameters for the types of inquiries that testers make, and creating official identification cards for testers designating them as such. For in-person tests, AIU requires that the vendor inform AIU in advance of all tests; and AIU personnel make themselves available via telephone if testers encounter any issue as they lodge their test complaints.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 256.** *The testing program shall assess complaint intake for complaints made in person at MCSO facilities, complaints made telephonically, by mail, and complaints made electronically by email or through MCSO's website. Testers shall not interfere with deputies taking law enforcement action. Testers shall not attempt to assess complaint intake in the course of traffic stops or other law enforcement action being taken outside of MCSO facilities.*

**In Full and Effective Compliance**

AIU has advised its complaint intake testing vendor that testers shall not interfere with deputies taking law enforcement action, nor shall they attempt to assess complaint intake in the course of traffic stops or other law enforcement action being taken outside of MCSO facilities.

AIU has asked its vendor to inform AIU in advance of all in-person tests, and AIU personnel make themselves available via telephone if testers encounter any issue as they lodge their test complaints.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70714

*Paragraph 257.   The testing program shall include sufficient random and targeted testing to assess the complaint intake process, utilizing surreptitious video and/or audio recording, as permitted by state law, of testers' interactions with MCSO personnel to assess the appropriateness of responses and information provided.*

**In Full and Effective Compliance**

AIU has informed its complaint intake testing vendor of the requirements of this Paragraph. We receive copies of the recordings following the completion of the tests. Per the agreed-upon methodology, all tests conducted via telephone are audio-recorded; and all in-person testers' interactions with MCSO personnel are video-recorded to assess the appropriateness of responses and information provided.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

*Paragraph 258.   The testing program shall also assess whether employees promptly notify the Professional Standards Bureau of civilian complaints and provide accurate and complete information to the Bureau.*

**In Full and Effective Compliance**

AIU has informed its complaint intake testing vendor of the requirements of this Paragraph so that the tests it conducts shall also assess whether employees promptly notify the PSB of civilian complaints and provide accurate and complete information to the Bureau.

As it receives documentation about completed tests, AIU reviews the information; and issues BIO Action Forms, authors memorandums of concern, or takes other appropriate action if a test fails or raises any concerns about the conduct of MCSO employees.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

*Paragraph 259.   MCSO shall not permit current or former employees to serve as testers.*

**In Full and Effective Compliance**

AIU has informed its complaint intake testing vendor of this requirement. AIU personnel have informed us that no current or former employees have served, or will serve in the future, as testers.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70715

***Paragraph 260.*** *The MCSO shall produce an annual report on the testing program. This report shall include, at a minimum:*

a.  *a description of the testing program, including the testing methodology and the number of tests conducted broken down by type (i.e., in-person, telephonic, mail, and electronic);*

b.  *the number and proportion of tests in which employees responded inappropriately to a tester;*

c.  *the number and proportion of tests in which employees provided inaccurate information about the complaint process to a tester;*

d.  *the number and proportion of tests in which employees failed to promptly notify the Professional Standards Bureau of the civilian complaint;*

e.  *the number and proportion of tests in which employees failed to convey accurate information about the complaint to the Professional Standards Bureau;*

f.  *an evaluation of the civilian complaint intake based upon the results of the testing program; and*

g.  *a description of any steps to be taken to improve civilian complaint intake as a result of the testing program.*

**Phase 1:** In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.
- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

**Phase 2:** In compliance

AIU issued its third annual report on the complaint intake testing program on September 5, 2023. The annual report covers the 25 tests that were completed by its external vendor between July 1, 2022-June 30, 2023. These tests included: 12 in-person tests; two tests conducted via U.S. Mail; five tests conducted via telephone; three tests conducted via email; and three tests conducted via MCSO's website. The report summarizes the tests, which we have discussed in our quarterly status reports. In all tests in which AIU identified deficiencies, it followed up appropriately using BIO Action Forms or other corrective actions.

The report also notes that MCSO and its vendor maintained a good working relationship during the time period covered by the report. As noted above, we learned recently that PMR advised MCSO that it would not renew its contract for providing complaint intake testing. MCSO intends to begin a new procurement process to select a new vendor. We will inquire about the status of this process during our upcoming site visit.

While not required by this Paragraph, AIU also continues to issue monthly reports on complaint intake testing. We review these reports and find that they accurately summarize the results of the complaint intake tests and any follow-up actions taken by AIU.

WAI 70716

## Section 13: Community Outreach and Community Advisory Board

**COURT ORDER XVI.     COMMUNITY     OUTREACH     AND     COMMUNITY ADVISORY BOARD**

***Paragraph 261.*** *The Community Advisory Board may conduct or retain a consultant to conduct a study to identify barriers to the filing of civilian complaints against MCSO personnel.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

The CAB continues to explore the possibility of retaining a consultant to conduct a study to identify barriers to the filing of civilian complaints against MCSO personnel. The CAB is particularly interested in learning more about any barriers to filing complaints that may exist for members of the Plaintiffs' class.

***Paragraph 262.*** *In addition to the administrative support provided for in the Supplemental Permanent Injunction, (Doc. 670 ¶ 117), the Community Advisory Board shall be provided with annual funding to support its activities, including but not limited to funds for appropriate research, outreach advertising and website maintenance, stipends for intern support, professional interpretation and translation, and out-of-pocket costs of the Community Advisory Board members for transportation related to their official responsibilities. The Community Advisory Board shall submit a proposed annual budget to the Monitor, not to exceed $15,000, and upon approval of the annual budget, the County shall deposit that amount into an account established by the Community Advisory Board for that purpose. The Community Advisory Board shall be required to keep detailed records of expenditures which are subject to review.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

The CAB's approved budget includes categories for expenses including community meetings; video production (to produce a short video in English and Spanish that provides information about the CAB and the MCSO complaint process); marketing materials; stipends for an assistant to help coordinate CAB meeting logistics; and reimbursement for CAB members' meeting expenses.

Following the Monitor's approval of the CAB's budget, the CAB established a bank account, and the County provided the $15,000. CAB members developed procedures for tracking funds and receiving reimbursement. We meet regularly with CAB members to discuss these procedures and review the CAB's expenditures to date; these records appear to be in order.

WAI 70717

# Section 14: Supervision and Staffing

**COURT ORDER XVII.      SUPERVISION AND STAFFING**

***Paragraph 263.*** *The following Section of this Order represents additions and amendments to Section X of the first Supplemental Permanent Injunction, Supervision and Evaluations of Officer Performance, and the provisions of this Section override any conflicting provisions in Section X of the first Supplemental Permanent Injunction.*

***Paragraph 264.*** *The Sheriff shall ensure that all patrol deputies shall be assigned to a primary, clearly identified, first-line supervisor.*

**In Full and Effective Compliance**

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the second quarter of 2023.  For April, we reviewed a sample of shift rosters from Districts 4 and 7, and Lake Patrol.  For May, we reviewed a sample of shift rosters from Districts 1, 2, and 3.  For June, we reviewed a sample of shift rosters from Districts 4 and 7, and Lake Patrol.  Our reviews of monthly and daily rosters indicated that deputies were assigned to a single consistent supervisor, and deputies worked the same shifts as their supervisors.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

***Paragraph 265.*** *First-line patrol supervisors shall be responsible for closely and consistently supervising all deputies under their primary command.*

**Phase 1:**  In compliance

- GB-2 (Command Responsibility), most recently amended on June 28, 2019.

**Phase 2:**  In compliance

Paragraph 265 is a general directive that covers several aspects of supervision.  There are several requirements covered in other Paragraphs that directly concern this Paragraph; these requirements must be met before MCSO can establish compliance with Paragraph 265.  We have determined that for MCSO to meet the requirements of this Paragraph, MCSO must be in compliance with Paragraphs 83, 85, 89, 90, 91, 93, and 94.  For the second quarter of 2023, MCSO was in compliance with all the required Paragraphs.  MCSO remains in compliance with this Paragraph.

WAI 70718

***Paragraph 266.*** *First-line patrol supervisors shall be assigned as primary supervisor to no more persons than it is possible to effectively supervise. The Sheriff should seek to establish staffing that permits a supervisor to oversee no more than eight deputies, but in no event should a supervisor be responsible for more than ten persons. If the Sheriff determines that assignment complexity, the geographic size of a district, the volume of calls for service, or other circumstances warrant an increase or decrease in the level of supervision for any unit, squad, or shift, it shall explain such reasons in writing, and, during the period that the MCSO is subject to the Monitor, shall provide the Monitor with such explanations. The Monitor shall provide an assessment to the Court as to whether the reduced or increased ratio is appropriate in the circumstances indicated.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we review a sample of daily shift rosters for the three months of the reporting period. We examine rosters to ensure that Patrol supervisors are not assigned more personnel than they can effectively supervise. We base our findings on the sample of rosters requested for the quarter. We review rosters to ensure supervisors oversee no more than 10 persons; this could include a combination of deputies, Deputy Service Aides (DSAs), and Posse members. We consider any shift where a supervisor had more than 10 persons to be noncompliant, as per this Paragraph's requirement. In addition, we monitor submissions by Patrol supervisors indicating the shifts where the span of control was exceeded. As per MCSO policy, supervisors are required to document shifts where the span of control was exceeded in a memorandum to the District Commander. We review each memo to determine if the reasons for exceeding the span of control were reasonable and unforeseen. If the circumstances leading to the span of control being exceeded are acceptable and correctly documented, we consider that shift to be in compliance.

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the second quarter of 2023. For April, we reviewed a sample of shift rosters from Districts 4 and 7, and Lake Patrol. For May, we reviewed a sample of shift rosters from Districts 1, 2, and 3. For June, we reviewed a sample of shift rosters from Districts 4 and 7, and Lake Patrol. Our reviews of monthly and daily rosters indicated that deputies were assigned to a single consistent supervisor, and deputies worked the same shifts as their supervisors.

For April, our reviews of the sample of 18 shift rosters did not reveal any violations of this Paragraph. For April, District 2 submitted three span of control memos. In one shift, a supervisor had nine deputies. In one shift, a supervisor had 10 deputies and one DSA. On the following day, the same supervisor again had 10 deputies and one DSA. District 3 submitted three span of control memos. During one shift, a supervisor had nine deputies. On another shift, a supervisor had eight deputies and one DSA. On another shift, a supervisor had 10 deputies. We reviewed the information provided and determined that all span of control memos were in compliance. Districts 1, 4, and 7, and Lake Patrol did not submit any span of control memos for April.

WAI 70719

For May, our reviews of the sample of 18 shift rosters did not reveal any violations of this Paragraph. District 2 submitted one span of control memo for the month. During one shift, a supervisor oversaw 10 deputies. District 3 submitted one span of control memo. During one shift, a supervisor oversaw 10 deputies. Districts 1, 4, 7, and Lake Patrol did not submit any span of control memos for May.

For June, our reviews of the sample of 18 shift rosters did not reveal any violations of this Paragraph. District 2 submitted two span of control memos. During one shift, a supervisor had nine deputies. On another shift, a supervisor had eight deputies and two Posse members. District 3 submitted two span of control memos. During one shift, a supervisor had nine deputies. On another shift, a different supervisor had nine deputies. Districts 1, 4, and 7, and Lake Patrol did not submit any span of control memos.

For the second quarter of 2023, we reviewed 54 shifts to determine compliance. In our sample reviews, we found that all of the 54 shifts met the requirements of this Paragraph. The compliance rate for this quarter was 100%. For this reporting period, MCSO was in compliance with the requirements of this Paragraph.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

***Paragraph 267.*** *Supervisors shall be responsible for close and effective supervision of deputies under their command. Supervisors shall ensure that all deputies under their direct command comply with MCSO policy, federal, state and local law, and this Court's orders.*

**Phase 1:**  In compliance

- GB-2 (Command Responsibility), most recently amended on June 28, 2019.

**Phase 2:**  In compliance

Close and effective supervision requires that supervisors consistently apply the concepts established in several Paragraphs of the First Order. There are requirements covered in other Paragraphs that directly concern Paragraph 267, and must therefore be in compliance for MCSO to establish compliance with this Paragraph. We have determined that for MCSO to meet the requirements of this Paragraph, it must achieve compliance with Paragraphs 83, 85, 89, 90, 91, 93, and 96. For this reporting period, MCSO was in compliance with this Paragraph. However, we issued a noncompliance warning for Paragraph 96 for the second quarter. If we withdraw compliance for Paragraph 96 in the next quarter, it will affect MCSO's compliance with this Paragraph.

WAI 70720

***Paragraph 268.*** *During the term that a Monitor oversees the Sheriff and the MCSO in this action, any transfer of sworn personnel or supervisors in or out of the Professional Standards Bureau, the Bureau of Internal Oversight, and the Court Implementation Division shall require advanced approval from the Monitor. Prior to any transfer into any of these components, the MCSO shall provide the Court, the Monitor, and the parties with advance notice of the transfer and shall produce copies of the individual's résumé and disciplinary history. The Court may order the removal of the heads of these components if doing so is, in the Court's view, necessary to achieve compliance in a timely manner.*

**In Full and Effective Compliance**

During the second quarter of 2023, MCSO requested the transfer of one lieutenant into the Court Implementation Division. We reviewed the documentation for the employee, and found no issues of concern. MCSO requested the transfer of one lieutenant into the Bureau of Internal Oversight, but subsequently rescinded the request.

On January 6, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70721

## Section 15: Document Preservation and Production

**COURT ORDER XVIII.    DOCUMENT PRESERVATION AND PRODUCTION**

***Paragraph 269.*** *The Sheriff shall ensure that when the MCSO receives a document preservation notice from a litigant, the MCSO shall promptly communicate that document preservation notice to all personnel who might possibly have responsive documents.*

**Phase 1:**  In compliance

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on September 15, 2021.

- GD-9 User Guide, most recently amended on November 5, 2020.

**Phase 2:**  Deferred

To verify MCSO's Phase 2 compliance with this Paragraph, we reviewed monthly submissions of document preservation notices to MCSO employees.  The data reviewed for this reporting period included March through May 2023, as per an agreement that we reached with MCSO to stagger our document requests for this Paragraph due to the large volume of data that MCSO had to provide prior to our site visits.

Document preservation is set in motion when a party sends a litigation hold notice or written directive to MCSO requesting the preservation of relevant documents or records and electronically stored information (ESI), in anticipation of future litigation against the agency.  MCSO's Legal Liaison Section (LLS) manages litigation holds through Open Axes, a software program.  Upon the receipt of a litigation hold, which is usually sent by the Maricopa County Attorney's Office (MCAO), the LLS inputs the data into Open Axes which conducts a search for responsive documents within MCSO computer drives.  The system also identifies potential document custodians, which are later filtered by an LLS employee.  The LLS then serves the custodians with a legal hold in electronic format, known as a Document Preservation Notice, within five business days.  Upon receipt of the Open Axes email with the Document Preservation Notice, MCSO custodians must acknowledge receipt of the request and then complete a questionnaire that identifies responsive documents, both electronic and hardcopies; and preserve them in the manner in which they are kept in the course of business.

We conducted our site visit remotely in July 2023.  For this Paragraph, we reviewed all files provided by MCSO through ShareFile.  We reviewed a sample of the third-party source documents that generate the litigation holds that the LLS receives from MCAO and third parties.  The Document Preservation Notices that were sent out were all distributed in a timely manner to the custodians who may have responsive documents.

The LLS emails the Document Preservation Notice and requests the completion of the Document Preservation Questionnaire via Open Axes.  The Document Preservation Questionnaire requires employees to: 1) acknowledge receipt of the document preservation; 2) acknowledge their responsibility to preserve records; 3) provide details regarding what they have done to research

WAI 70722

responsive records, documents, or ESI; and 4) identify what records, documents, or ESI they are preserving.  GD-9 requires that the Document Preservation Questionnaire be completed within 10 business days and provides a warning regarding the consequences of not preserving records. During this reporting period, MCSO employees have returned the Document Preservation Questionnaire within the required 10 business days 98.6% of the time.

In February 2021, MCSO learned that due to a technical issue caused by the migration of data from the legacy system to One Drive and a new, on-premise storage array (Qumulo), Open Axes (OA) was not able to perform searches into the documents moved to One Drive and Qumulo. Consequently, from August 2020-February 2021, documents on these new platforms were not searched by the software for potentially responsive documents to preservation requests. According to MCSO, the data migration was required because legacy hardware had reached the end of its lifecycle and was beginning to degrade.  The LLS has been working with the Technology Management Bureau and the vendor; and MCSO informed us that by the end of June 2021, Open Axes would be able to perform the searches in the new systems going forward.  To address any potential data that may have been missed in the searches performed between August 2020-June 2021, the LLS opted to rerun all the searches initiated during that time.

In January 2022, MCSO informed us that the agency had a delay in the rerun of searches because it had to wait for the Open Axes vendor to be able to start the refresh, so it could run parallel with the Global Index (previously the U and W drives).  The searching of OneDrive accounts had an issue with the filters not showing the files found, although the Open Axes technicians noted that the files existed.  In April and July 2022, MCSO informed us that the agency was in the process of indexing the two last folders, and then the agency would begin the rerun of searches once completed.  On October 5, 2022, MCSO informed us that it was working with the vendor to address outstanding issues with the search and tagging functions within the system.

During the second quarter of 2022, we warned MCSO that if it failed to complete the indexing of the folders and had not commenced the rerun of searches, we would withdraw compliance for this Paragraph.  We withdrew MCSO's compliance during the last quarter of 2022.  The reruns commenced on the first quarter of 2023 and are currently ongoing.  MCSO has provided a breakdown of the additional data identified through the reruns performed.

MCSO is procuring a different product and vendor for document production and preservation as a result of the problems encountered with Open Axes and its vendor.  The most recent information provided by the LLS was that it was in the process of vetting different products and vendors.

Given that MCSO has addressed the reruns, coupled with the agency addressing the vendor issue, we are deferring compliance with this Paragraph until the reruns are complete and the new vendor has been identified.

WAI 70723

***Paragraph 270.***  *The Sheriff shall ensure that when the MCSO receives a request for documents in the course of litigation, it shall:*

a.    *promptly communicate the document request to all personnel who might possibly be in possession of responsive documents;*

b.    *ensure that all existing electronic files, including email files and data stored on networked drives, are sequestered and preserved through a centralized process; and*

c.    *ensure that a thorough and adequate search for documents is conducted, and that each employee who might possibly be in possession of responsive documents conducts a thorough and adequate search of all relevant physical and electronic files.*

**Phase 1:**  In compliance

- Administrative Services Division Operations Manual, most recently amended on November 14, 2022.

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on September 15, 2021.

- GD-9 User Guide, most recently amended on November 5, 2020.

- GM-1 (Electronic Communications, Data and Voicemail), most recently amended on January 12, 2022.

**Phase 2:**  Deferred

To verify MCSO's Phase 2 compliance with this Paragraph, we reviewed monthly submissions of requests for documents to MCSO employees for the reporting period, and documents drafted by the LLS in search of documents from other MCSO Divisions.  For this reporting period, we identified a sample of document requests and requested a copy of the responsive documents sequestered and/or produced.  The data reviewed for this reporting period included March through May 2023, as per an agreement we reached with MCSO to stagger our document requests for this Paragraph.  This was due to the large volume of data that MCSO had to provide prior to our site visits.

Paragraph 270.a. requires prompt communication of document requests to all personnel who could possibly be in possession of responsive documents.  GD-9 requires the LLS to enter the data into a tracking system within five business days of receipt and to draft a Document Production Notice within five additional business days.  The LLS is required, within five business days, to respond to the request for production if sourced within LLS, or to forward to the required MCSO Division for production.  The Divisions have 10 days to produce the data requested.  During this reporting period, we found that in 100% of the cases, the LLS promptly communicated document requests to personnel who might be in possession of responsive documents.

WAI 70724

Our review revealed that MCSO is manually forwarding the Document Production Notices in a timely manner to all of its Divisions.  In addition, MCSO is sending the Document Production Acknowledgement Questionnaire (Attachment B), to all employees.  In 100% of the cases, the personnel who provided responsive documents properly completed Attachment B.

Paragraph 270.b. requires that all responsive ESI be stored, sequestered, and preserved by MCSO through a centralized process.  MCSO performs the searches through a centralized process established by the LLS.  The preservation of the data is completed at the Division that has the actual document while the notation is made in the Open Axes program, which aids the LLS in the case management.  LLS can create a case, assign a case number, and trigger time alerts to the custodians of documents that LLS identifies through the system.  Open Axes performs searches on MCSO's OneDrive and on-premises storage arrays, which are shared among Headquarters and the Districts.  Documents found in any additional servers are kept in their servers by the document custodians who notify LLS.  MCSO continues to manage litigation hold cases through Open Axes; all cases for this reporting period were managed through Open Axes.

The centralized process established by MCSO requires that all electronic data be sequestered and secured so as not to be purged.  For this Paragraph, we review the data and visit MCSO areas to ensure that personnel are informed of the duty to preserve the data in both electronic and paper format, and that the employees are preserving the data.  For this reporting period, because we were unable to travel to Maricopa County, we were unable to visit areas where hardcopies were kept in different MCSO areas.  However, we added a quarterly request from the LLS Commander for a certification that MCSO is sequestering the hard copies of documents responsive to the Document Preservation Notices.  On July 26, 2023, the LLS Commander informed us that MCSO properly preserved the hardcopies for this reporting period with the exception of one, for a 94% compliance.  When we resume our in-person site visits, we will continue to verify that the hardcopies are being preserved.

Paragraph 270.c. requires that MCSO conduct an adequate search for documents, and that each employee who might possibly be in possession of responsive documents conducts a thorough and adequate search of all relevant physical and electronic files.  We reviewed a sample of responsive documents for this reporting period, and MCSO identified responsive documents to the document production notices in all cases we reviewed.

Due to technical issues, we have been deferring compliance with this Paragraph since our twenty-eighth quarterly status report, filed on August 25, 2021, in excess of one year and one half.  During the second quarter of 2022, we warned MCSO that if it failed to complete the indexing of the folders and had not commenced the rerun of searches, we would withdraw compliance.  We withdrew MCSO's compliance during the last quarter of 2022.  The reruns commenced during the first quarter of 2023 and are currently ongoing.  MCSO has provided a breakdown of the additional data identified through the reruns performed.

MCSO is procuring a different product and vendor for document production and preservation as a result of the problems encountered with Open Axes and its vendor.  The most recent information provided by the LLS was that it was in the process of vetting different products and vendors.

WAI 70725

Given that MCSO has addressed the reruns, coupled with the agency addressing the vendor issue, we are deferring compliance with this Paragraph until the reruns are complete and the new vendor has been identified.

***Paragraph 271.*** *Within three months of the effective date of this Order, the Sheriff shall ensure that the MCSO Compliance Division promulgates detailed protocols for the preservation and production of documents requested in litigation.  Such protocols shall be subject to the approval of the Monitor after a period of comment by the Parties.*

**Phase 1:**  In compliance

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on September 15, 2021.
- Administrative Services Division Operations Manual, most recently amended on November 14, 2022.

**Phase 2:**  In compliance

On June 17, 2019, MCSO published the Administrative Services Division Operations Manual, which details the protocols for the preservation and production of documents requested in litigation.  The manual was last amended on November 14, 2022.

***Paragraph 272.*** *The Sheriff shall ensure that MCSO policy provides that all employees must comply with document preservation and production requirements and that violators of this policy shall be subject to discipline and potentially other sanctions.*

**In Full and Effective Compliance**

During this reporting period, the data revealed that no internal investigations were completed against any MCSO employee for failure to preserve or produce documents.

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

## Section 16: Additional Training

**COURT ORDER XIX.        ADDITIONAL TRAINING**

***Paragraph 273.*** *Within two months of the entry of this Order, the Sheriff shall ensure that all employees are briefed and presented with the terms of the Order, along with relevant background information about the Court's May 13, 2016 Findings of Fact, (Doc. 1677), upon which this Order is based.*

**In Full and Effective Compliance**

MCSO previously delivered this training on the E-Policy platform.   All personnel (100%) determined to be applicable by CID have received this training.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70727

# Section 17: Complaints and Misconduct Investigations Relating to Members of the Plaintiff Class

**COURT ORDER XX.       COMPLAINTS AND MISCONDUCT INVESTIGATIONS RELATING TO MEMBERS OF THE PLAINTIFF CLASS**

*Paragraph 274. In light of the Court's finding that the MCSO, and in particular Sheriff Arpaio and Chief Deputy Sheridan, willfully and systematically manipulated, misapplied, and subverted MCSO's employee disciplinary policies and internal affairs processes to avoid imposing appropriate discipline on MCSO deputies and command staff for their violations of MCSO policies with respect to members of the Plaintiff class, the Court further orders as follows:*

*A.       Investigations to be Overseen and/or Conducted by the Monitor*

*Paragraph 275. The Monitor is vested with the authority to supervise and direct all of the MCSO's internal affairs investigations pertaining to Class Remedial Matters. The Monitor is free from any liability for such matters as is set forth in ¶ 144 of the Supplemental Permanent Injunction.*

*Paragraph 276. The Monitor shall have the authority to direct and/or approve all aspects of the intake and investigation of Class Remedial Matters, the assignment of responsibility for such investigations including, if necessary, assignment to his own Monitor team or to other independent sources for investigation, the preliminary and final investigation of complaints and/or the determination of whether they should be criminally or administratively investigated, the determination of responsibility and the imposition of discipline on all matters, and any grievances filed in those matters.*

**In Full and Effective Compliance**

The Second Order requires oversight by the Monitor for all internal investigations determined to be Class Remedial Matters (CRMs). The Professional Standards Bureau (PSB) schedules meetings every two weeks to discuss existing and incoming complaints to determine which, if any, could be CRMs. During these meetings, PSB personnel discuss cases pending a CRM decision, cases determined to be CRMs, and any cases where the decision may be made that the case would not be classified as a CRM. The PSB Commander determines the classification of the cases. A member of our Team attends all of these meetings to provide the oversight required for this Paragraph.

At the end of the July-September 2016 reporting period, PSB had reviewed 442 administrative investigations that were open as of July 20, 2016; and determined that 42 of them met the basic criteria for CRMs. These cases were reviewed during the scheduled CRM meetings. In addition, we randomly selected an additional 52 cases from the 400 remaining pending cases; and concurred with PSB's assessment that the cases did not meet the basic criteria for CRMs. In

WAI 70728

addition to the 42 cases determined to be potential CRMs from the pending case list as of July 20, 2016, PSB identified an additional 10 cases that were potential CRM cases. At the end of the first reporting period after the entry of the Second Order, nine cases had been determined to be CRMs; and one other was pending a CRM decision. The remaining cases reviewed were determined not to be CRMs.

At the end of this reporting period, there was a total of 680 cases that have been reviewed as possible CRMs; and 139 cases that have been determined to be CRMs since the entry of the Second Order (July 20, 2016). At the end of this reporting period, MCSO had completed and submitted a total of 133 CRM cases. Six were pending completion.

Of the CRM cases that have been closed to date with findings of sustained misconduct and reviewed by our Team, 15 have involved employees who are deceased or left MCSO employment prior to the completion of the investigation or the disciplinary process. Forty-three have involved current employees of MCSO. Eight of the cases closed to date involved a sustained finding of misconduct involving bias related to the Plaintiffs' class: six sustained allegations of an inappropriate and biased comment; and two sustained allegations of bias-based policing.

During the scheduled meetings, case investigators continue to provide investigative updates on all cases that could be, or are, CRMs. Their briefings are thorough, and they continue to be responsive to any questions or input from members of our Team. In all cases where we have provided oversight since July 20, 2016, we concurred with the decisions made by the PSB Commander regarding the case classifications and findings based on the briefings provided during the CRM meetings. Where appropriate, we also approved the discipline in these cases. During this reporting period, we have continued discussions with PSB personnel regarding areas of improvement that may enhance investigations, as well as the resolutions of these cases. We plan to continue holding these meetings moving forward.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

**Paragraph 277.** *This authority is effective immediately and shall remain vested in the Monitor until the MCSO's internal affairs investigations reach the benchmarks set forth in ¶ 288 below. With respect to Class Remedial Matters, the Monitor has plenary authority, except where authority is vested in the Independent Investigative and Disciplinary Authorities separately appointed by the Court, as is further set forth in ¶¶ 296–337 below.*

WAI 70729

*Paragraph 278.  The Sheriff shall alert the Monitor in writing to all matters that could be considered Class Remedial Matters, and the Monitor has the authority to independently identify such matters.  The Monitor shall provide an effective level of oversight to provide reasonable assurance that all Class Remedial Matters come to his attention.*

**In Full and Effective Compliance**

Since the first CRM meeting held on August 17, 2016, PSB has consistently completed the required notification to us regarding the cases that could be considered CRMs.  A Monitoring Team member has attended every CRM meeting with PSB where these matters are discussed and personally reviewed a number of the cases that were pending on July 20, 2016; and our Team member reviews the new cases that are presented at each meeting.  There has been no need for us to independently identify CRMs, as PSB consistently properly identifies and reports these cases as required.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

*Paragraph 279.  The Monitor shall have complete authority to conduct whatever review, research, and investigation he deems necessary to determine whether such matters qualify as Class Remedial Matters and whether the MCSO is dealing with such matters in a thorough, fair, consistent, and unbiased manner.*

**In Full and Effective Compliance**

During the scheduled CRM meetings attended by a Monitoring Team member, PSB has consistently properly identified cases that could be, or are, CRMs.  PSB personnel brief each case at these meetings, and their briefings have included all appropriate information.  They have been responsive to questions from our Team members during the meetings, and they have responded appropriately to the recommendations we have offered.  There has been no need for us to independently conduct any review, research, or investigation.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70730

*Paragraph 280.  The Monitor shall provide written notice to the Court and to the parties when he determines that he has jurisdiction over a Class Remedial Matter.  Any party may appeal the Monitor's determination as to whether he has jurisdiction over a Class Remedial Matter to this Court within seven days of the Monitor's notice.  During the pendency of any such appeal the Monitor has authority to make orders and initiate and conduct investigations concerning Class Remedial Matters and the Sheriff and the MCSO will fully comply with such action by the Monitor.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

During this reporting period, cases involving both sworn and non-sworn members of MCSO have continued to be reviewed as CRMs when appropriate, and written notice has been provided to the Court.  There were no appeals by any Parties regarding any of the CRM classifications.


*Paragraph 281.  Subject to the authority of the Monitor, the Sheriff shall ensure that the MCSO receives and processes Class Remedial Matters consistent with: (1) the requirements of this Order and the previous orders of this Court, (2) MCSO policies promulgated pursuant to this Order, and (3) the manner in which, pursuant to policy, the MCSO handles all other complaints and disciplinary matters.  The Sheriff will direct that the Professional Standards Bureau and the members of his appointed command staff arrive at a disciplinary decision in each Class Remedial Matter.*

**Phase 1:**  In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on December 8, 2021.
- GC-17 (Employee Disciplinary Procedures), most recently amended on November 17, 2022.
- GH-2 (Internal Investigations), most recently amended on October 25, 2022.
- Administrative Services Division Operations Manual, most recently amended on November 14, 2022.
- Professional Standards Bureau Operations Manual, most recently amended on December 31, 2019.

**Phase 2:**  Not in compliance

To evaluate Phase 2 compliance with this Paragraph, a Monitoring Team member has attended each meeting conducted by PSB to discuss Class Remedial Matters.

The Plaintiffs and the Plaintiff-Intervenor have forwarded to us concerns about certain CRM investigations submitted by MCSO for our review.  Upon further review of some of the cases they have provided, we concluded that, in some, additional scrutiny of these investigations by PSB was warranted.  We continue to meet with PSB to discuss concerns and provide information regarding areas where we believe improvements can be made.  Our discussions continue to

WAI 70731

include: ensuring that credibility assessments, where appropriate, are conducted and well-documented in reports; that the appropriate standard of proof is considered and properly documented in reports; that in the event disparate treatment is at issue in a case, the employee's history is reviewed to determine if there is any pattern, and where necessary, additional interview questions are asked; and that if a single employee has repeated allegations of similar misconduct, a review is conducted to determine if there is any pattern that needs to be addressed. We have also discussed potential training opportunities for PSB investigators on both disparate treatment and credibility assessments. We were hopeful that some appropriate training could be identified and delivered as part of the required eight-hour training for PSB investigators this year.

In a meeting with PSB in May 2023, the PSB Commander informed us that the Bureau had not yet located any potential training that he believed would be appropriate regarding either disparate treatment or conducting credibility assessments. He again advised us that the annual training for this year would be dedicated to the new requirements of the Third Order and those policies and protocols that will be revised as a result. We recommended that PSB continue to look for training to address the specific focus areas we have identified. We have since confirmed that on June 9, 2023, the MCSO Training Division reached out to the Parties and the Monitoring Team to request input on proposed topics and potential vendors for the 2024 PSB-8 internal training. The PSB Commander has also advised us that he has located one possible training course on credibility assessments, and he is continuing to look into this training.

We will continue to meet with PSB to address any concerns we may identify with CRM investigations and to discuss opportunities to improve the overall quality of these and all other administrative investigations.

During the last reporting period, we reviewed 10 CRM cases completed by MCSO. We concurred with the findings of the PSB Commander in all but one.

During this reporting period, we reviewed six CRM cases completed by PSB. We meet with PSB every two weeks to identify cases that should be considered CRMs. We also track the progress of those cases as they are investigated, reviewed, and finalized. Each step of the process requires review and approval by our Team. None of the six cases we reviewed during this reporting period were completed within the 85-day timeframe. Four were finalized within the 180-day timeframe. The average days to complete the investigative portion of these cases was 129 days, a decrease from 187 days during the last reporting period. These investigations were finalized in an average of 150 days, a decrease from 240 days during the last reporting period. The overall average investigative time for all administrative misconduct investigations at the end of this reporting period was 489 days and the overall average number of days to close an investigation was 542 days. While CRM cases are still not compliant with timelines, it is clear that PSB is improving the timeliness of these investigations.

Two of the CRM cases reviewed for this reporting period involved allegations of misconduct by Detention employees in the jail setting.

- The complainant alleged that an employee used profanity and was biased against the complainant due to his race. A thorough investigation was conducted, an appropriate

finding of sustained was made for the inappropriate language, and the employee received appropriate discipline. No evidence of bias was found.

- The complainant alleged that an employee used profanity and made an inappropriate racial comment. The allegations were sustained, and the employee received appropriate discipline.

Four of the CRM cases reviewed for this reporting period involved allegations of misconduct by sworn employees.

- As a result of a separate investigation into alleged misconduct by an employee, the investigator identified that similar misconduct may have occurred in other instances. During a review of this employee's traffic stops, the investigator identified another traffic stop with similar conduct and internally initiated this investigation. The employee was sustained for multiple violations and dismissal was recommended. The employee resigned prior to the completion of the discipline process. In this investigation, a supervisor was also sustained for failure to properly review this traffic stop and received appropriate discipline.

- The original complainant, who was not present at the scene, alleged that employees who conducted a traffic stop of a family member conducted an improper search and violated the vehicle driver's rights. When contacted, the vehicle driver reiterated the same complaint and added allegations that no probable cause had existed for her arrest. MCSO conducted a thorough investigation, and all allegations were appropriately unfounded. No allegations of racial bias or racial comments were made by either the original complainant or the driver of the vehicle, nor was any such conduct identified during the investigation.

- The complainant alleged that proper enforcement action was not taken at a call for service due to the cultural bias of a supervisor on scene. A thorough investigation was conducted and the allegation was appropriately unfounded.

- The complainant alleged that an employee used race as a factor during an arrest and used unreasonable force while affecting the arrest. A thorough investigation was conducted and the allegations were appropriately unfounded.

We concurred with the findings in all six of the investigations we reviewed.

WAI 70733

*Paragraph 282. The Sheriff and/or his appointee may exercise the authority given pursuant to this Order to direct and/or resolve such Class Remedial Matters, however, the decisions and directives of the Sheriff and/or his designee with respect to Class Remedial Matters may be vacated or overridden in whole or in part by the Monitor. Neither the Sheriff nor the MCSO has any authority, absent further order of this Court, to countermand any directions or decision of the Monitor with respect to Class Remedial Matters by grievance, appeal, briefing board, directive, or otherwise.*

**In Full and Effective Compliance**

There were no CRM cases completed during this, or previous reporting periods, in which the Sheriff and/or his appointee exercised their authority to resolve CRMs, which we needed to vacate or override.

On January 6, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

*Paragraph 283. The Monitor shall review and approve all disciplinary decisions on Class Remedial Matters.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

At the end of this reporting period, MCSO had completed a total of 133 CRM cases since July 20, 2016. We reviewed six of these during this reporting period. Three of the completed cases had sustained findings. We approved MCSO's disciplinary recommendations in all three.

*Paragraph 284. The Sheriff and the MCSO shall expeditiously implement the Monitor's directions, investigations, hearings, and disciplinary decisions. The Sheriff and the MCSO shall also provide any necessary facilities or resources without cost to the Monitor to facilitate the Monitor's directions and/or investigations.*

**In Full and Effective Compliance**

During this and previous reporting periods, a Monitoring Team member has attended all scheduled CRM meetings conducted in an appropriate location determined by MCSO. PSB continues to provide a password and access to the IAPro system to a member of our Team so that we can complete independent case reviews if necessary.

PSB personnel continue to be professional and responsive to all input, questions, or concerns we have raised.

On January 6, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70734

***Paragraph 285.*** *Should the Monitor decide to deviate from the Policies set forth in this Order or from the standard application of the disciplinary matrix, the Monitor shall justify the decision in writing and place the written explanation in the affected employee's (or employees') file(s).*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

Since we began monitoring CRM cases in July 2016, there have been numerous cases with sustained findings.  In all cases, we have concurred with the disciplinary findings of MCSO; and there has been no action necessary on our part relative to this Paragraph.

***Paragraph 286.*** *Should the Monitor believe that a matter should be criminally investigated, he shall follow the procedures set forth in ¶¶ 229–36 above.  The Commander of the Professional Standards Bureau shall then either confidentially initiate a Professional Standards Bureau criminal investigation overseen by the Monitor or report the matter directly and confidentially to the appropriate prosecuting agency.  To the extent that the matter may involve the Commander of the Professional Standards Bureau as a principal, the Monitor shall report the matter directly and confidentially to the appropriate prosecuting agency.  The Monitor shall then coordinate the administrative investigation with the criminal investigation in the manner set forth in ¶¶ 229–36 above.*

**In Full and Effective Compliance**

During this reporting period, there were six CRM cases submitted for our review.  None of them involved potential criminal violations.  No action on our part relative to this Paragraph was necessary.

On January 6, 2023, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

***Paragraph 287.*** *Any persons receiving discipline for any Class Remedial Matters that have been approved by the Monitor shall maintain any right they may have under Arizona law or MCSO policy to appeal or grieve that decision with the following alterations:*

a.      *When minor discipline is imposed, a grievance may be filed with the Sheriff or his designee consistent with existing MCSO procedure.  Nevertheless, the Sheriff or his designee shall immediately transmit the grievance to the Monitor who shall have authority to and shall decide the grievance.  If, in resolving the grievance, the Monitor changes the disciplinary decision in any respect, he shall explain his decision in writing.*

b.      *disciplined MCSO employee maintains his or her right to appeal serious discipline to the Maricopa County Law Enforcement Merit System Council to the extent the employee has such a right.  The Council may exercise its normal supervisory authority over discipline imposed by the Monitor.*

WAI 70735

**In Full and Effective Compliance**

Fifty-eight completed CRM cases have had sustained findings of misconduct since the issuance of the Second Order.  We have concurred with all of MCSO's sustained findings.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

*Paragraph 288.  The Monitor's authority over Class Remedial Matters will cease when both:*

a,  *The final decision of the Professional Standards Bureau, the Division, or the Sheriff, or his designee, on Class Remedial Matters has concurred with the Monitor's independent decision on the same record at least 95% of the time for a period of three years.*

b.  *The Court determines that for a period of three continuous years the MCSO has complied with the complaint intake procedures set forth in this Order, conducted appropriate internal affairs procedures, and adequately investigated and adjudicated all matters that come to its attention that should be investigated no matter how ascertained, has done so consistently, and has fairly applied its disciplinary policies and matrices with respect to all MCSO employees regardless of command level.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

PSB is responsible for the investigation of all CRM cases and has continued to appropriately identify cases that could be, or are, CRMs.  PSB personnel are responsive to any concerns or questions we have raised, and they provide detailed information and updates in the scheduled briefings.

During the last reporting period, we reviewed 10 completed CRM cases.  We found nine complied with all requirements and concurred with their outcomes.   In one, we identified that the investigation did not clearly resolve one of the concerns brought forth by the complainant; and we issued a compliance warning to MCSO.

During this reporting period, we did not find any substantive concerns with any of the six CRM cases we reviewed.  MCSO is in compliance with this Paragraph.

*Paragraph 289.  To make the determination required by subpart (b), the Court extends the scope of the Monitor's authority to inquire and report on all MCSO internal affairs investigations and not those merely that are related to Class Remedial Matters.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

During this reporting period, we reviewed 152 administrative misconduct investigations, 105 Service Complaints, one PSB Diversion, and eight criminal misconduct investigations.

WAI 70736

We found all eight criminal investigations in compliance with all requirements.  Of the 105 Service Complaints, after initial review by District or PSB personnel, 11 were appropriately converted to administrative misconduct investigations.  Of the remaining 94 Service Complaints, 93 were in compliance.  In one, we believe misconduct was alleged and an administrative misconduct investigation should have been initiated.  We found the one PSB Diversion we reviewed to be in compliance.  Of the 152 administrative misconduct investigations we reviewed, 38 (25%) were completed and submitted by the investigator within the 60- or 85-day requirement or had an acceptable extension request.  As we have noted previously, we assess justifications for any extensions or other delays based on investigative considerations, not workload.  This was a decrease in compliance from 30% during the last reporting period.

There were three completed administrative misconduct investigations submitted for compliance with Paragraph 249 (investigatory stops).  There were five investigations we reviewed for compliance with Paragraph 33 (bias policing).  Six were also reviewed for compliance with Paragraph 275 (CRMs) during this reporting period.

We found that PSB was in overall compliance in 20 (22%) of the 92 investigations we reviewed.  Of the 20 investigations we reviewed that were conducted by outside vendors, three (15%) were in full compliance.  Of the 40 investigations we reviewed that were conducted by Divisions and Districts outside of PSB, seven (18%) were in full compliance.  Overall compliance for all administrative misconduct investigations reviewed during this reporting period was 20%, a decrease from the 30% compliance during the last reporting period.

During each of our site visits, we meet with PSB personnel to discuss the deficiencies in those investigations conducted by both their personnel, outside vendors, and Divisions outside PSB.  In July 2020, we also began meeting with the Deputy Chiefs who have oversight for investigations conducted outside of PSB.  Our intent for these meetings is to have meaningful discussion about deficiencies we continue to find, the actions being taken to address the ongoing concerns, and other ideas MCSO might have for addressing future deficiencies.  These meetings have continued to result in good dialogue about our concerns and the efforts of MCSO personnel to correct identified deficiencies.  During this reporting period, we noted continued attention being paid to addressing deficiencies by District and Division Command personnel and continued improvement in investigative compliance in those cases investigated outside of PSB.

**Paragraph 291.**  *The Monitor shall report to the Court, on a quarterly basis, whether the MCSO has fairly, adequately, thoroughly, and expeditiously assessed, investigated, disciplined, and made grievance decisions in a manner consistent with this Order during that quarter.  This report is to cover all internal affairs matters within the MCSO whether or not the matters are Class Remedial Matters.  The report shall also apprise the Court whether the MCSO has yet appropriately investigated and acted upon the misconduct identified in the Court's Findings of Fact, whether or not such matters constitute Class Remedial Matters.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

WAI 70737

This report, including all commentary regarding MCSO's compliance with investigative and disciplinary requirements, serves as our report to the Court on these matters. An overall summary of our compliance observations and findings is provided below.

During this reporting period, we reviewed 152 administrative misconduct investigations and eight criminal misconduct investigations. All eight of the criminal investigations were in compliance with the Second Order. Of the 160 total administrative and criminal misconduct investigations we reviewed, 38 (24%) were in full compliance with the Second Order, a decrease in overall compliance from 32% during the last quarter. Of the 152 administrative investigations, 30 (20%) were in full compliance with the Second Order, a decrease from 30% during the last reporting period.

In 2016, PSB provided us with a memorandum describing PSB's efforts in meeting the requirements of this Paragraph related to the Court's Findings of Fact. MCSO had outsourced three cases to another law enforcement agency, and an additional four investigations were pending outsourcing to an outside investigator. These cases were outsourced due to the involvement of the former Chief Deputy, or other conflicts of interest identified by MCSO, and included the investigations identified in Paragraph 300. MCSO processed a Request for Proposal and retained an outside investigator who met the requirements of Paragraphs 167.iii and 196 to conduct the investigations identified. One potential misconduct case identified in the Court's Findings of Fact was retained and investigated by PSB, as no identifiable conflict of interest appeared to exist.

Since 2016, MCSO has continued to outsource cases to this contract investigator and in 2021 began outsourcing cases to a second outside vendor to assist with the backlog of cases. During each site visit, we meet with PSB personnel to discuss the status of those cases that have been outsourced to any contract vendor, other law enforcement agency, or other person or entity, so that we can continue to monitor these investigations and ensure that all misconduct cases, including those identified in the Findings of Fact, are thoroughly investigated. PSB has continued to keep us apprised of the status of all such investigations.

During our July 2023 site visit, PSB advised us that the Bureau outsourced one conflict case to the initial contract investigator during this reporting period. This investigator still had 15 cases pending. One was completed and submitted for our review during this reporting period. Twelve cases were outsourced to the second vendor being used by MCSO to assist with reduction of the backlog of cases during this reporting period. Nineteen were completed and submitted for our review. Sixty-seven total cases were pending completion by outside vendors at the end of this reporting period.

The Independent Investigator has previously completed all of the investigations identified by the Court, as well as those where he initiated new investigations due to potential misconduct he identified during his reviews. All have been reviewed by our Team to ensure they complied with the Order of Court. The Independent Discipline Authority has also previously submitted his final report on those cases that had sustained findings, and we reviewed these findings. We did not make compliance findings on these cases, but we determined that the 12 investigations specifically directed by the Court for reinvestigation, as well as the additional cases where the Independent Investigator determined an investigation should be conducted, were properly completed, and addressed the concerns identified by the Court.

WAI 70738

***Paragraph 292.*** *To make this assessment, the Monitor is to be given full access to all MCSO internal affairs investigations or matters that might have been the subject of an internal affairs investigation by the MCSO. In making and reporting his assessment, the Monitor shall take steps to comply with the rights of the principals under investigation in compliance with state law. While the Monitor can assess all internal affairs investigations conducted by the MCSO to evaluate their good faith compliance with this Order, the Monitor does not have authority to direct or participate in the investigations of or make any orders as to matters that do not qualify as Class Remedial Matters.*

**In Full and Effective Compliance**

PSB personnel continue to inform us of ongoing criminal and administrative misconduct investigations. A member of our Team attends each CRM meeting, reviews the lists of new internal investigations, and has access to PSB's IAPro database. The only cases for which any oversight occurs during the investigative process are those that are determined to be CRMs. We review all other misconduct investigations once they are completed, reviewed, and approved by MCSO personnel.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

***Paragraph 293.*** *The Monitor shall append to the quarterly reports it currently produces to the Court its findings on the MCSO's overall internal affairs investigations. The parties, should they choose to do so, shall have the right to challenge the Monitor's assessment in the manner provided in the Court's previous Order. (Doc. 606 ¶¶ 128, 132.)*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

Since we began reviewing internal investigations conducted by MCSO, we have reviewed hundreds of investigations into alleged misconduct by MCSO personnel. During this reporting period, we reviewed 152 administrative misconduct investigations, 105 Service Complaints, one PSB Diversion, and eight criminal misconduct investigations. All eight criminal investigations were compliant. Of the Service Complaints we reviewed, all but one were in compliance. The one PSB Diversion was found in compliance.

The investigative quality of PSB administrative investigations has remained high for numerous reporting periods, and we noted sustained improvement in District and Division cases from the last reporting period. For this reporting period, 26 (65%) of the 40 investigations conducted by District or Division supervisors were found in investigative compliance, an increase from 60% the last reporting period. This is the second consecutive reporting period where we have found an increase in compliant cases conducted by Districts and Divisions outside of PSB.

WAI 70739

During our April 2023 site visit, we agreed that moving forward we would review both the amount of time it takes to complete and close an administrative misconduct investigation and the amount of time it takes to complete only the investigative portion of the investigation.  The 60–85-day time requirement applies only to the actual investigative time – not any review time or disciplinary actions taken by Conduct Resolution once the investigative portion is completed and approved.

During our July 2023 site visit, PSB advised us that the average time from initiation of a complaint until full closure, which includes review and associated discipline or other administrative actions, was 587 days, an increase from 494 days at the end of April 2023.  The average investigative time was 489 days.  This time period covers the time from the initiation of the investigation until it is approved by the PSB Commander.  For investigations conducted by PSB, the average investigative time was 511 days and the average number of days for full closure was 547 days. For investigations conducted by Districts and Divisions outside of PSB, the average investigative time was 435 days and the average number of days for full closure was 555 days.

Regardless of whether we consider only the investigative time or the full closure time of an administrative misconduct investigation, it is clear that misconduct investigations are not being addressed in a timely manner.  We continue to note that in some of these delayed investigations, potential evidence has been lost; investigators have been unable to locate and contact complainants, witnesses, and investigative leads; employees' memories have been adversely impacted by the delay in their interviews; and in some cases, serious misconduct had been left unaddressed for lengthy periods of time.  Quarter after quarter, the failure to complete investigations in a timely manner has continued to be unacceptable and a disservice to all stakeholders.

PSB was responsible for conducting 92 of the 152 total administrative misconduct investigations we reviewed for this reporting period.  Of the 92 investigations conducted by PSB, two (2%) had deficiencies not including timeliness.  With the inclusion of timeliness, 20 (22%) were found to be in compliance.  This is a decrease from the 36% compliance for the last reporting period.  Of the 20 investigations outsourced by PSB, one (5%) had investigative deficiencies.  With the inclusion of timeliness, three of the 20 investigations were in compliance.

Forty investigations were conducted outside of PSB.  For the past three reporting periods, we had not found any of the cases conducted by Districts and Divisions outside of PSB in full compliance. During this reporting period, we found seven (18%) of the 40 cases completed outside of PSB in full compliance with the requirements of the Courts' Orders.  Fourteen (35%) had investigative deficiencies.  This is a notable improvement from prior reporting periods, and we are hopeful that this improvement will be sustained.

MCSO completed delivery of the 40-hour Misconduct Investigative Training at the end of 2017, and all sworn supervisors who investigate administrative misconduct attended the training. Refresher training on misconduct investigations has also been delivered since the initial 40-hour training.  The investigative quality of PSB investigations has remained generally high.  Of the 92 investigations completed by PSB, 90 (98%) were in compliance with all requirements other than timelines.

WAI 70740

Of the 40 investigations completed outside of PSB, all were initiated after January 1, 2020, and completed in 2021 or 2022, after the increased oversight at the District and Division level began. Of the 40, 14 (35%) had investigative deficiencies.  This is a decrease in deficiencies from the 40% during the last reporting period.  With the inclusion of extensions and timelines, seven cases (18%) were in full compliance.

As we noted in our previous reports, we must consider all requirements for investigations at the time they are submitted for our review, including their timely completion.  MCSO's inability to address timely completion of investigations is an ongoing issue that continues to adversely impact the agency's compliance findings.

PSB personnel continue to be receptive to our input, and we have had many meetings and discussions regarding the investigations being conducted and the compliance for both PSB and District and Division Cases.  We also discuss compliance concerns with District and Division Command personnel during our site visits.  During our next site visit, we will discuss those cases that are noncompliant with MCSO; and address our concerns about the compliance findings for this reporting period.  We continue to stress that compliance is not the sole responsibility of any one individual or Division – but dependent on all those who complete, review, or approve internal investigations.

Between 2016 and 2021, the number of investigator positions assigned to PSB averaged between 24 and 26.  With the addition of new civilian investigator positions, restructuring, filling of vacant positions, and intervention by the Court, at the end of this reporting period, PSB had maintained their number of investigators at 44.  The only vacancies in PSB continued to be the three civilian administrative positions.  We are hopeful that maintaining this improved level of staffing, along with other efforts by MCSO, will result in a positive impact on the overall backlog of cases.

## B.      *Investigations to be Conducted by the Independent Investigator and the Independent Disciplinary Authority*

***Paragraph 294.***  *In its Findings of Fact, (Doc. 1677), the Court identified both: (1) internal affairs investigations already completed by the MCSO that were inadequate or insufficient; (see, e.g., Doc. 1677 at ¶ 903), and (2) misconduct or alleged misconduct that had never been investigated by MCSO that should be or should have been investigated.  (Id. at ¶ 904.)*

***Paragraph 295.***  *In light of MCSO's failure to appropriately investigate these matters, the Court appoints an Independent Investigator and an Independent Disciplinary Authority from the candidates set forth by the parties, and vests them with the authority to investigate and decide discipline in these matters.*

WAI 70741

### 1.    The Independent Investigator

***Paragraph 298.***  *In assessing the existence of previously uncharged acts of misconduct that may be revealed by the Findings of Fact, the Independent Investigator does not have authority to investigate acts of misconduct that are not sufficiently related to the rights of the members of the Plaintiff class.  While the Independent Investigator should identify such acts of misconduct and report those acts to the Commander of the Professional Standards Bureau, and to the Monitor for purposes of making the Monitor's assessment identified in ¶¶ 291–93 above, the Independent Investigator may not independently investigate those matters absent the authorization and the request of the Sheriff.*

***Paragraph 300.***  *The following potential misconduct is not sufficiently related to the rights of the members of the Plaintiff class to justify any independent investigation:*

a.    *Uninvestigated untruthful statements made to the Court under oath by Chief Deputy Sheridan concerning the Montgomery investigation.  (Doc. 1677 at ¶ 385).*

b.    *Uninvestigated untruthful statements made to the Court under oath by Chief Deputy Sheridan concerning the existence of the McKessy investigation.  (Id. at ¶ 816).*

c.    *Chief Deputy Sheridan's untruthful statements to Lieutenant Seagraves made during the course of an internal investigation of Detective Mackiewicz to the effect that an investigation into the overtime allegations against Detective Mackiewicz had already been completed.  (Id. at ¶ 823).*

d.    *Other uninvestigated acts of misconduct of Chief Deputy Sheridan, Captain Bailey, Sergeant Tennyson, Detective Zebro, Detective Mackiewicz, or others that occurred during the McKessy investigation.  (Id. at ¶¶ 766–825).*

**Phase 1:** Not applicable

**Phase 2:** Deferred

During our January 2017 site visit, the PSB Commander informed us that all acts of misconduct that we identified and discussed during our October 2016 site visit would be provided to a contracted investigator for investigative purposes.

Since that time, MCSO has contracted with a licensed private investigator.  The contract investigator possesses the requisite qualifications and experience to conduct the investigations of misconduct outlined in Paragraph 300 (a.-c.), and the additional misconduct in the Findings of Fact that directly associates with Paragraph 300 (d).

During our April 2017 site visit, we met with PSB command staff and representatives from the Maricopa County Attorney's Office (MCAO) to verify that all of the acts of misconduct that were identified in the Findings of Fact (FOF) are under investigation, either by the Court-appointed Independent Investigator or the private licensed contract investigator.  Before this meeting, PSB command provided us with a roster of related acts of misconduct that PSB intended to be assigned to the contract investigator.  The roster of intended assignments did not include all of the acts of misconduct that we had discussed.  MCAO and PSB command personnel explained that the Court

WAI 70742

also identified, in Paragraph 301, many of the acts of potential misconduct identified in the FOF as sufficiently related to the rights of members of the Plaintiffs' class.  In Paragraph 301, the Court documented that because of this determination, investigations of the potential misconduct were justified if the Independent Investigator deemed that an investigation was warranted.

The Independent Investigator has completed all 12 of the administrative misconduct investigations specifically identified by the Court in the Second Order, and all other investigations for which he determined an administrative misconduct investigation should be conducted.  The Independent Disciplinary Authority has also completed all of the discipline findings for these cases.  While we did not make compliance findings for these cases, we reviewed them and found that they complied with the direction of the Court.  The contract investigator retained by MCSO is still in the process of investigating several cases that were identified by the Court in 2016.

Our ability to verify that all potential misconduct outlined in the FOF has been investigated by PSB, the PSB contract investigator, or the Independent Investigator remains pending until all the investigations are completed.  Once this occurs, we can determine if there is any additional misconduct identified in the FOF that still requires investigation.  Finally, the PSB Commander and MCAO advised us that the acts of misconduct involving (former) Sheriff Arpaio as identified in the FOF would not be investigated by any entity, as there does not exist any statute that addresses how a Sheriff would be disciplined in the event of a sustained finding resulting from an administrative misconduct investigation.

**Paragraph 310.**   *The Monitor and the parties are directed to promptly comply with the Independent Investigator's requests for information.   The Monitor and the Independent Investigator may communicate to coordinate their investigations.   Nevertheless, each is independently responsible for their respective jurisdiction set forth in this Order, and each should make independent decisions within his own delegated responsibility.*

## 2. The Independent Disciplinary Authority

**Paragraph 337.**   *Nevertheless, when discipline is imposed by the Independent Disciplinary Authority, the employee shall maintain his or her appeal rights following the imposition of administrative discipline as specified by Arizona law and MCSO policy with the following exceptions:*

a.      *When minor discipline is imposed, a grievance may be filed with the Sheriff or his designee consistent with existing MCSO procedure.   Nevertheless, the Sheriff or his designee shall transmit the grievance to the Monitor who shall have authority to decide the grievance. If in resolving the grievance the Monitor changes the disciplinary decision in any respect, he shall explain his decision in writing.*

b.      *A disciplined MCSO employee maintains his or her right to appeal serious discipline to the Maricopa County Law Enforcement Merit System Council to the extent the employee has such a right.   The Council may exercise its normal supervisory authority over discipline imposed by the Independent Disciplinary Authority with one caveat.   Arizona*

WAI 70743

*law allows the Council the discretion to vacate discipline if it finds that the MCSO did not make a good faith effort to investigate and impose the discipline within 180 days of learning of the misconduct.  In the case of any of the disciplinary matters considered by the Independent Disciplinary Authority, the MCSO will not have made that effort.  The delay, in fact, will have resulted from MCSO's bad faith effort to avoid the appropriate imposition of discipline on MCSO employees to the detriment of the members of the Plaintiff class.  As such, the Council's determination to vacate discipline because it was not timely imposed would only serve to compound the harms imposed by the Defendants and to deprive the members of the Plaintiff class of the remedies to which they are entitled due to the constitutional violations they have suffered at the hands of the Defendants.  As is more fully explained above, such a determination by the Council would constitute an undue impediment to the remedy that the Plaintiff class would have received for the constitutional violations inflicted by the MCSO if the MCSO had complied with its original obligations to this Court.  In this rare instance, therefore, the Council may not explicitly or implicitly exercise its discretion to reduce discipline on the basis that the matter was not timely investigated or asserted by the MCSO.  If the Plaintiff class believes the Council has done so, it may seek the reversal of such reduction with this Court pursuant to this Order.*

**In Full and Effective Compliance**

During this reporting period, no grievances were filed that met the criteria for transmitting to the Monitor.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion, and neither the Plaintiffs nor the Plaintiff-Intervenor disagreed with our determination.

WAI 70744

# Third Supplemental Permanent Injunction/Judgment Order

***Paragraph 338.*** *Within 14 days from the date of this order, MCSO will calculate and provide the Court and the parties with the dollar amount required to recruit, hire, train and compensate for one year a single PSB budgeted sergeant position.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

On November 22, 2022, as required, MCSO filed with the Court the cost to the agency for a budgeted Professional Standards Bureau (PSB) sworn sergeant position for one year.  MCSO identified the amount as $191,415.12.  This amount was calculated using the mid-range salary for a sworn sergeant position, associated mandatory retirement contributions, employer taxes, and costs related to benefits.

MCSO is in compliance with this Paragraph.


***Paragraph 339.***  *MCSO must not reduce the staffing levels at PSB below the minimum investigator staffing number identified in ¶ 340 while a backlog in investigations remains.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

PSB personnel include sworn, Detention, and civilian investigators.  In April, PSB had 44 investigators (11 sworn, 17 Detention, and 16 civilian).  In May, PSB had 43 investigators (11 sworn, 17 Detention, and 15 civilian).  In June, PSB had 44 investigators (11 sworn, 17 Detention, and 16 civilian).

PSB is required to have a minimum staffing level of 39 investigators.  We monitor MCSO's compliance with this requirement on a monthly basis, and we will continue to summarize PSB staffing levels in our quarterly status reports.


***Paragraph 340.***  *Within 60 days from the date of this order, MCSO will fill the seven currently budgeted, yet vacant, positions at PSB referred to in Mr. Gennaco's report, through hiring or internal transfers. (Doc. 2790 at 15.) The staffing referred to by Mr. Gennaco, together with the full staffing of the vacant positions, is 39 investigators.  This is the minimum investigator staffing number.  If MCSO fails to fill any one of the seven vacant budgeted staffing positions with an AZPOST sworn investigator who is approved by the Monitor within 60 days of the date of this order, MCSO and/or Maricopa County will pay into a PSB Staffing Fund three times the amount identified by PSB in ¶ 338 above for each vacancy remaining at the MCSO for budgeted investigators.  It shall, thereafter on a monthly basis pay into the Staffing Fund three times the amount identified in ¶ 338 above for every month the number of PSB investigators falls below the minimum investigator staffing number.*

**Phase 1:** Not applicable

WAI 70745

**Phase 2:**  In compliance

MCSO currently meets the required PSB minimum staffing level of 39 investigators.  At the end of this reporting period, MCSO met the minimum investigator staffing number for PSB staffing (with a total of 44 investigators).  Per this Paragraph, if MCSO fails to maintain this minimum PSB investigator staffing level, MCSO and/or Maricopa County shall contribute the costs associated with a sworn sergeant's position into a PSB Staffing Fund three times the amount identified in Paragraph 338, or $191,415.12.

MCSO was not obligated to contribute to the PSB Staffing Fund during this reporting period.  MCSO is in compliance with this Paragraph.

***Paragraph 341.***  *If MCSO desires to fill the positions with new civilian investigators in lieu of sworn officers, it may do so to the extent that it is authorized to do so, consistent with state law. Should it fail to fill any one of the seven vacant positions within 60 days of the date of this order, MCSO and/or Maricopa County will pay into a PSB Staffing Fund three times the amount identified by PSB in ¶ 338 above for each vacancy remaining at the MCSO for budgeted investigators.  It shall, thereafter on a monthly basis pay into the Staffing Fund three times the amount identified in ¶ 338 above for every month the number of PSB investigators falls below the minimum staffing number.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

During this reporting period, MCSO hired a total of three civilian investigators for PSB.  MCSO hired two civilian investigators in April 2023, one civilian investigator was lost in May 2023, and one civilian investigator was hired in June 2023.  PSB investigator staffing has met the minimum investigator staffing number of 39 investigators and ended this reporting period with a total of 44 investigators.

***Paragraph 342.***  *If the MCSO attempts to fill these open positions with a mix of qualified sworn personnel and civilian investigators, it may do so to the extent that it can, consistent with state law.  Nevertheless, if it fails to fill any one of the seven vacant positions within 60 days, the MCSO and/or Maricopa County will pay into the PSB Staffing Fund three times the amount identified in ¶ 338 above for each vacancy remaining.  It shall, thereafter on a monthly basis pay three times the amount identified in ¶ 338 above for every month that the number of PSB investigators falls below the minimum staffing number.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

During this reporting period, PSB hired three civilian investigators.  PSB investigator staffing has met the minimum required number of 39 investigators, and PSB ended this reporting period with 44 investigators.

WAI 70746

Detention Investigators assigned to PSB shoulder a large share of the case workload, but these positions are not specifically listed in the Third Order.  We have recommended that MCSO seek clarification from the Court regarding this issue.  Additionally, the Court requested additional information as to the qualifications of civilian investigators hired to work in PSB during a Court hearing on January 27, 2023.

**Paragraph 343.**  *MCSO is authorized to conduct PSB investigations through approved private contractors if it can do so consistent with state law.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on October 25, 2022.

**Phase 2:**  In compliance

The current version of GH-2 allows for the outsourcing of investigations, and MCSO has had a track record of doing so for years.

During this reporting period, MCSO continued to use the two previously approved contract vendors to conduct administrative misconduct investigations.  Thirteen new investigations were outsourced to an outside vendor, and there was a total of 67 pending outsourced cases.  PSB has informed us that the Bureau is attempting to identify another outside vendor to conduct conflict cases.

**Paragraph 344.**  *MCSO must demonstrate that it is using overtime and other administrative tools to increase the personnel hours committed to investigate all types of complaints.  MCSO shall report its use of these tools to the Monitor on a monthly basis.*

**Phase 1:**  Not applicable

**Phase 2:**  Deferred

MCSO provided reports for April-June 2023 verifying the use of PSB overtime committed to investigating complaints.  The documentation includes the overtime costs for PSB investigators, case reviewers (supervisory/command personnel), and administrative personnel dedicated to investigative activities.  The total PSB combined staffing overtime hours used for April-June 2023 is 3758.00 hours.

MCSO is seeking additional administrative tools and/or technologies designed to increase hours committed to investigating complaints.  We will further assess additional tools identified for PSB use as MCSO's policies are finalized in accordance with the Third Order.

WAI 70747

*Paragraph 345.  MCSO and/or Maricopa County shall hereby establish a PSB Staffing Fund, which shall be a separate account of the MCSO.  The amounts set forth in ¶¶ 340-42 shall be paid directly into this account.  The MCSO, however, is only authorized to withdraw funds from this account for the hiring and payment of PSB investigators or private investigators contracted with PSB who are in compliance with the requirements of state law.  The fund may also be used to hire necessary additional PSB administrative staff and necessary additional PSB supervisory staff only, and for no other purpose.  MCSO is not permitted to offset the amount of any fine from PSB's existing budget or use it to subsidize the number of PSB staff and investigators existing at the time of this Order.  MCSO shall provide an accounting of the PSB Staffing Fund on a monthly basis to the Monitor and the Court.  But, if necessary, MCSO is permitted to augment and/or exceed the salary and incentives normally paid PSB investigators to hire and/or maintain sufficient investigators, whether sworn or civilian, to reduce the backlog.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

On December 7, 2022, the Maricopa County Board of Supervisors held its formal meeting and established the PSB Staffing Fund as required by the Third Order.  The Board set aside $1,148,491 from the General Fund as a contingency, should it be necessary for PSB Staffing Fund.  No funds have actually been transferred to the PSB Staffing Fund, as MCSO has continued to meet the staffing requirements of the Third Order.

MCSO is in compliance with this Paragraph.


*Paragraph 346.  The Court hereby vests the Monitor, Robert Warshaw, with the supplemental authorities set forth in this Order.  The Monitor therefore has immediate authority to oversee all of MCSO's complaint intake and routing.  The Court hereby vacates any previous order that conflicts with this Order, including but not limited to ¶ 292 of the Second Order (Doc. 1765).  In consultation with the PSB Commander, the Monitor shall make determinations and establish policy decisions pertaining to backlog reduction regarding, by way of example, which complaints should be (a) investigated by PSB; (b) sent to the Districts for investigation or other interventions; or (c) handled through other methods, to include diversion and/or outsourcing of cases.  The Monitor must consult with the PSB Commander about these policy decisions but maintains independent authority to make the ultimate decision.  The authority granted to the Monitor in this paragraph shall not be applicable when there is no backlog.  If the backlog is eliminated and then arises again while the Defendants are still subject to monitoring, this authority will be renewed in the Monitor.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

WAI 70748

We and the PSB Commander met a total of 13 times during the second quarter of 2023. For the fourth quarter of 2022 and the first quarter of 2023, we met on 22 additional days. Our regularly scheduled consultation meetings with the PSB Commander occur, on average, once each week. We hold *ad hoc* meetings when additional time is needed, and when it is necessary to follow up on specific complaints prior to a final intake and routing decision.

The consultation meeting process typically includes presentation by the PSB Commander of complaints received since the previous meeting, assigned case numbers, the date the complaint was received, the manner it was reported to MCSO, and the date the complaint was initially assigned. The process also involves preliminary consideration regarding Class Remedial Matter status. Due to the focus on timeliness, complaints are often initially assigned for investigation prior to our discussion. However, the intake category and the investigative routing of the case is subject to change following the presentation. The PSB Commander also provides us with a summary of the complaint and, if known, employment categories of personnel allegedly involved. The presentation also includes the initial classification of alleged policy violations, type, and location of investigation assignment – e.g., Service Complaint in PSB; minor misconduct administrative investigation to a District or Division; outsourced investigation; and, as applicable, Class Remedial Matter status, and PSB Diversion eligibility.

Our discussion and consultation about each complaint typically results in either agreement with the initial intake and routing decisions made by the Commander, or a revision of the intake category and routing of the complaint for investigation. Periodically, the PSB Commander will opt to discuss a variety of circumstances associated with the complaint prior to either a final collaborative decision on intake and routing, or our independent decision and direction.

Our final consultation meeting with the PSB Commander in this second quarter occurred on June 28, 2023. Up to this date and for this second quarter, we discussed 281 complaints. Of those complaints, and after our consultation meetings where final determinations were able to be made, 111 were classified as Service Complaints, and 170 were classified as Administrative Investigations. Of the administrative investigations, a total of 58 complaints were internally generated complaints – that is, initiated by MCSO employees – while 112 were generated by external complainants.

Nine of the complaints were outsourced for investigation, while 30 administrative investigations were routed to MCSO Districts or Divisions. Three complaints were confirmed to be complaint intake tests, and one complaint was routed as a PSB Diversion. One critical incident was discussed. During the second quarter, three complaints that were originally routed to either Districts or Divisions for investigation were returned to PSB for investigation after additional information was discovered, making the complaints ineligible for District/Division-level investigation.

WAI 70749

*Paragraph 347. The Monitor shall revise and/or formalize MCSO's intake and routing processes. The Monitor's authorities shall include, but not be limited to, the power to audit and review decisions made with respect to individual cases and, if necessary, to change such designations. The Sheriff and the MCSO shall expeditiously implement the Monitor's directions or decision with respect to intake and routing, and any other issues raised by the Monitor pertaining to backlog reduction and any other authority granted the Monitor under the Court's orders. The Monitor must consult with the PSB Commander about these processes but maintains independent authority to make the ultimate decision. The authority granted to the Monitor in this paragraph shall not be applicable when there is no backlog. If the backlog is eliminated and then arises again while the Defendants are still subject to monitoring, this authority will be renewed in the Monitor.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

Generally, based upon standardized guidelines, MCSO policy allows for the assignment of minor misconduct allegation investigations to Districts and/or Divisions outside of the PSB structure where sworn employees are assigned. The investigations are performed by supervisors who have received requisite training. If an allegation of misconduct is made against a ranking member, i.e., principal, at a District or Division, the investigation must be conducted by a member holding at least one rank higher than the principal, but no rank lower than sergeant. Between March 1, 2022 and the issuance of the Third Order, PSB did not assign administrative investigations to Districts or Divisions for investigation.

When the Third Order was issued on November 8, 2022, we re-implemented the practice of routing qualified minor misconduct investigations to Districts and Divisions. Given the backlog and timeliness issues associated with administrative investigations, we believe this is a preferred practice. Our direction to assign cases to Districts and Divisions helps to reduce the investigative caseload in PSB, allows utilization of trained supervisors at these locations, and increases supervisory awareness and accountability for their subordinates' job performance. Moreover, we encourage assignment of investigations to Districts and Divisions to facilitate timely access to witnesses and principals. When minor misconduct investigations are completed by sworn supervisors in Districts and Divisions, the investigation is forwarded through the chain of command, up to and including their Chief, before the case is finally submitted to PSB. The routing of cases up the chain of command through managers and executives is done for review and approval purposes. We believe it also facilitates visibility and identification of individual job performance, enhances awareness of possible trends by individuals or District/Division-wide, and promotes opportunities for active leadership, proactive remediation, and training. During this second quarter, 30 minor misconduct investigations were assigned to either Districts or Divisions.

Periodically, the PSB Commander will elect to discuss the intake and routing of a complaint prior to making initial intake and/or routing determinations. We consulted on four such cases during this reporting period. Through our discussion and consultation, a preliminary course of action was arrived at and agreed upon, and the cases were appropriately categorized and routed.

WAI 70750

There was one PSB Diversion during this second quarter.  The PSB Commander consulted with our Team regarding the circumstances of the internal complaint, resulting in a mutual decision regarding the implementation of a PSB Diversion for the principal employee.

**Paragraph 348.**  *The Monitor will evaluate PSB's current investigative practices.  The PSB, under the authority of the Monitor, shall create, and submit for the Monitor's approval, policies and procedures that:*

(a)     *Identify and eliminate unnecessary investigative requirements that may be removed from particular classes of cases;*

(b)     *Provide for the establishment of an investigative plan for each investigation to eliminate unnecessary steps for the investigation of the complaint at issue;*

(c)     *Establish formal internal scheduling expectations and requirements for supervisory interventions;*

(d)     *Establish expectations on the timeline for each step of the review process. The formulated expectations will be consistent with the timeline requirements of this Court's previous orders;*

(e)     *Assess current use of IA Pro as a case management/tracking tool.*

**Phase 1:**  Deferred

**Phase 2:**  Deferred

This Paragraph requires MCSO to create and submit for the Monitor's approval various policies and procedures to assist in the reduction of the investigative backlog.  Pursuant to Paragraph 349, the Monitor shall submit the finalized versions of these policies and procedures to the Court within four months of the entry of the Third Order.

**Paragraph 349.**  *The authority granted to the Monitor in this paragraph shall not be applicable when there is no backlog.  If a backlog is eliminated and then arises again while the Defendants are still subject to monitoring, this authority will be renewed in the Monitor.  Given that the parties have provided the Monitor with feedback on these issues, the Monitor is directed to consider the input already articulated by the parties on these issues and determine, at his discretion, to adopt them or not.  The Monitor may choose, but will not be required, to seek additional input from the parties in the development of the above stated policies.  The Monitor shall finalize and submit such policies to the Court within four months of the date of this order. The parties shall have two weeks thereafter to provide the Court with any comments on the Monitor's final proposed policies.  The Court will, if necessary thereafter, make determinations as to the final policies.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

WAI 70751

The MCSO complaint investigation backlog at the end of this quarter totaled 1,842 cases. The authority granted to the Monitor remains applicable to this Paragraph due to the existing MCSO backlog. The Parties and the Monitor met their obligation pursuant to this Paragraph.

As of this writing, the policies are still being reviewed by the Court.


***Paragraph 350.*** *The Monitor will assess MCSO's compliance with the investigative requirements of this order and shall determine whether training on investigative planning and supervision is needed and implement such training.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

We will assess MCSO's compliance with the investigative requirements of this Order and determine whether training is necessary on investigative planning and supervision when the Court authorizes the final policies for implementation.


***Paragraph 351.*** *The Monitor has the authority to make recommendations to the Court concerning the revision of the Court's orders as it pertains to the investigation of complaints where, in its opinion, such revisions would increase efficiency without impinging on investigations necessary to the operation of a fair and unbiased law enforcement agency.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

The Third Order, entered on November 8, 2022, includes several remedies to assist in the reduction of MCSO's investigative backlog. Per the Order, "to protect the interests of the Plaintiff class (let alone the general public), in ensuring that investigations are completed in sufficient time to administer discipline, the Court will require that the MCSO come into compliance with its reasonable investigative protocols." This Paragraph grants authority to the Monitor to recommend to the Court revisions to "increase efficiency without impinging on investigations necessary to the operation of a fair and unbiased law enforcement agency." The Monitor did not make any such recommendations during this reporting period.


***Paragraph 352.*** *The Monitor may intervene in the course of any investigation for the purpose of facilitating the appropriate operation of the PSB and/or the reduction of the backlog, if he deems it appropriate, and will document his actions in a quarterly report to be submitted to the Court. The authority granted to the Monitor in this paragraph shall not be applicable when there is no backlog. If the backlog is eliminated and then arises again while the Defendants are still subject to monitoring, this authority will be renewed in the Monitor.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

WAI 70752

This Paragraph requires the Monitor to document in a quarterly report to be submitted to the Court any interventions it has taken "for the purpose of facilitating the appropriate operation of the PSB and/or the reduction of the backlog." The Monitor did not take any such actions during this reporting period.

**Paragraph 353.** *The Monitor shall recommend to the Court adjustments in the investigations of the following categories of cases according to the following procedure:*

*MCSO shall, upon the approval of the Monitor:*

(a)   *Create, formalize, and implement a policy regarding whether investigations are necessary when the complaint was submitted to the MCSO more than a year after the last instance of the underlying alleged misconduct reported, or when the MCSO employee involved left MCSO's employ prior to the filing of the complaint.*

(b)   *Create, formalize, and implement a policy regarding when investigations are necessary if the initial complainant is unwilling or unable to cooperate, or if the initial complainant is anonymous.*

(c)   *Create, formalize, and implement a policy regarding when MCSO may investigate health related in-custody jail deaths by County medical staff.*

(d)   *Create, formalize, and implement a policy regarding when an entity other than PSB may investigate internal allegations emanating from workplace relationships.*

(e)   *Create, formalize, and implement a policy regarding when, in cases in which external evidence establishes a violation, the PSB Commander has the discretion to offer principals a mitigated penalty if they accept responsibility. The mitigated penalty shall be no lower than the minimum discipline within the applicable discipline matrix range for the charged offenses.*

(f)   *Create, formalize, and implement a policy regarding when the PSB commander is authorized to handle the alleged minor misconduct through supervisory intervention in lieu of investigation. MCSO shall submit to the Monitor within 15 days, a list of the minor misconduct within the GC-17 (Disciplinary Matrix) which it deems should be considered by the Monitor to be handled as a supervisory intervention. MCSO's list shall exclude allegations concerning the Plaintiff class and allegations of bias.*

*In proposing such policies to the Monitor, the MCSO shall fully and openly consult with the other parties to this litigation. All parties shall move expeditiously to formulate, consult with, and approve these policies. MCSO and the parties shall complete and submit to the Monitor for approval all such proposed policies within three months of this order. As to those issues on which the parties cannot obtain consensus, they shall each submit their proposals to the Monitor. The Monitor shall then, promptly present to the Court the final proposed policies he deems best. The parties will have two weeks thereafter to provide the Court with any comments on the Monitor's final proposed policies. The Court will, thereafter, make determinations as to the final policies.*

**Phase 1:**  Deferred

WAI 70753

**Phase 2:**  Deferred

This Paragraph requires MCSO to create and submit for the Monitor's approval various policies that include "adjustments in the investigations" of several categories of cases, to assist in the reduction of the investigative backlog.  These adjustments include circumstances in which, for example, misconduct was alleged against personnel who "left MCSO's employ prior to the filing of the complaint" and in which anonymous complainants have alleged misconduct.  According to this Paragraph, MCSO was required to submit these policies within three months of the entry of the Third Order.

**Paragraph 355.**  *The Monitor and the PSB shall review the cases in the current backlog that are eligible to be diverted from PSB investigations by ¶ 353 of this order.  It is the expectation of the Court that the diverted cases shall reduce the current backlog.*

**Phase 1:**  Not applicable

**Phase 2:**  Deferred

Members of the Monitoring Team have met with PSB staff to discuss the current backlog.  After discussion, we agreed that backlog cases would be defined as those administrative investigations and critical incidents where required investigative actions were still pending and the investigation had not been completed in accordance with the timelines established in Paragraph 204, and an extension had not been granted as per Paragraph 365.  An investigation is considered complete when all investigative actions have been completed and the PSB commander has signed off in concurrence.  The date the PSB Commander signs off on the investigation is the date the investigation is no longer counted as part of the backlog, irrespective of the findings.  Once the revised policies are in place, we will review and identify the cases in the backlog that may be eligible for any authorized Diversions.

During this reporting period, no review of backlog cases occurred.  The revised policies that will allow potential Diversion of these cases have not yet been finalized and implemented.

**Paragraph 356.**  *Within five business days of the elimination of these cases from the backlog, the Monitor shall certify to the parties and the Court the number of administrative investigations remaining in the backlog that are open and have not been completed within the time limits required by the Court.  At the beginning of each month, the number of open cases whose investigations have exceeded the time by which Doc. 1765 ¶ 204 required that they be completed shall be the remaining backlog.  This backlog shall not include any cases for which the Monitor has granted an extension of the investigative deadline pursuant to ¶ 365 of this Order.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

WAI 70754

Members of the Monitoring Team have met with PSB staff to discuss the current backlog.  Once the revised policies are in place, we will review and identify the cases in the backlog that may be eligible for any authorized Diversions.  Once these determinations have been made, we will provide the Court with the number of cases remaining in the backlog, as required.

During this reporting period, no actions were taken by the Monitoring Team relevant to this Paragraph.

**Paragraph 357.**  *The cases in this remaining backlog should be identified by year, giving priority to the oldest cases, i.e., the cases that were filed first.  The expectation should be to address the oldest cases first, without ignoring the continuing caseload.  For each month in which the PSB cannot reduce the remaining backlog by 20 cases from the previous month's number, the MCSO and/or Maricopa County shall pay into the PSB Staffing Fund two times the amount identified in ¶ 338 above.*

**Phase 1:**  Not applicable

**Phase 2:**  Deferred

Members of the Monitoring Team have met with PSB staff to discuss the current backlog and identified how many cases were pending for each year.  We have agreed that once the revised policies are in place, we would begin identifying and addressing the backlog cases, beginning with the oldest cases first.

During this reporting period, no action relevant to this Paragraph was taken as policy revisions concerning Diversions have not yet been finalized.

**Paragraph 360.**  *The Monitor shall submit a quarterly progress report to the Court and parties describing the rationale for each type of investigative diversion approved, the result of each diversion type, the backlog tally, the number of completed cases, unresolved issues, and further actions required to address the backlog and staffing levels at PSB.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

We submitted our third quarterly progress report to the Court and the Parties on August 30, 2023. The report covered the period of May 1- July 31, 2023.

WAI 70755

***Paragraph 361.*** *Under the direction of the Court, MCSO shall commission an independent study to determine: (1) the most efficient way for MCSO to allocate its personnel in light of existing authorized staffing levels, the requirements and expectations of its served communities, the requirements of this Court's Orders, the timely elimination of the existing backlog of PSB investigations, and state law; (2) the necessary staffing level for MCSO to fulfill these obligations regardless of the existing staffing level; and (3) the PSB staffing level required to maintain the timely completion of PSB investigations in compliance with the Orders of this Court and state law. MCSO shall (1) provide a draft Request for Proposals to the Court, the Monitor, and the parties; (2) disclose credible bids to the Court, the Monitor, and the parties; and (3) obtain Court approval of the methodology for the study. MCSO must ensure that the study is completed within one year of the entry of this Order.*

**Phase 1:** Not applicable

**Phase 2:** Deferred

On July 7, 2022, before the entry of the Third Order, MCSO selected the Center for Public Safety Management (CPSM) to conduct a staffing analysis of its sworn functions. On November 14, 2022, following the entry of the Third Order, CPSM accepted an additional scope of work through the Maricopa County Office of Procurement Services to address the Third Order requirements, including the timely elimination of the existing backlog of PSB investigations.

On November 16, 2022, MCSO filed with the Court a request for approval of its vendor, CPSM, to continue with the independent study and evaluation ordered by the Court under this Paragraph.

At a January 27, 2023 hearing, the Court ruled that it would assess CPSM's staffing study after its completion to determine if it meets the requirements of this Paragraph.


***Paragraph 362.*** *The Court is aware that the MCSO has already engaged a consultant to undertake a similar evaluation. Nevertheless, while the Court will consider both the qualifications of the consultant already hired by MCSO and the outcome of that study, the work of that consultant must comply with the Court's requirements, supra and will not be deemed to satisfy the terms of this Order absent the approval of this Court. If MCSO wishes to obtain Court approval of the consultant it has already hired, it must, as a prerequisite, provide the contracting documents to the Court, the Monitor, and the parties within five business days of the entry of this Order; and it must submit the consultant's draft methodology to the Court, the Monitor, and the parties within 30 days of the entry of this Order.*

**Phase 1:** Not applicable

**Phase 2:** Deferred

On December 8, 2022, MCSO submitted the contracting and methodology documentation for its consultant, the Center for Public Safety Management (CPSM), as required by this Paragraph.

On December 30, 2022, the Plaintiffs and Plaintiff-Intervenor filed their comments and recommendations with the Court regarding MCSO's submission regarding the independent study proposed by CPSM. We will further report on this Paragraph during the next reporting period.

WAI 70756

At a January 27, 2023 hearing, the Court ruled that it would assess CPSM's staffing study after its completion to determine if it meets the requirements of this Paragraph.

On May 19, 2023, members of the Monitoring Team virtually met with the CPSM Project Lead for the MCSO Staffing Study.  He provided the following information:

CPSM initially began the MCSO staffing study by collecting data involving uniformed patrol calls for service.  CPSM also assessed PSB, SWAT, BIO, and Aviation to determine if these units are operating utilizing best practices.

Following the Parties' concerns that CPSM was not doing enough to obtain input from community stakeholders, took steps for the staffing study to meet the Court's direction on considering community feedback in its process.  CPSM conferred with the Community Advisory Board (CAB) to obtain its input.  CPSM also conducted Town Hall-type community meetings, from July 12-14, 2023, in the eastern and western parts of Maricopa County.  The meetings were live streamed, and CPSM distributed community surveys to participants in both English and Spanish. Postcard surveys were provided to community members who did not have the technology to participate in an online survey.

We will report further on CPSM's efforts to obtain community feedback as part of its MCSO staffing study in our next quarterly status report.

**Paragraph 364.**  *To keep the parties and the Court informed, the MCSO shall report monthly on the size of the backlog to the Monitor, the parties, and the Court.  The Monitor's quarterly progress report will further assess the status of the backlog.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

MCSO reports the number of backlog cases each month as required.  At the end of December 2022, they reported 2,074 cases in the backlog.

During this reporting period, MCSO reported 1,958 backlog cases at the end of March 2023.  At the end of April 2023, MCSO reported that 55 of the backlog cases had been completed, and there were 1,930 backlog cases pending.  At the end of May 2023, MCSO reported that the agency had completed an additional 65 backlog cases, and the pending backlog was 1,914 cases.  At the end of June 2023, MCSO reported closing an additional 80 backlog cases, and the remaining backlog was 1,842 cases.

WAI 70757

**Paragraph 365.** *The authority for MCSO to grant itself extensions in investigation deadlines granted in ¶ 204 of Doc. 1765 is revoked. The Monitor shall be authorized to grant reasonable extensions upon reviewing requests submitted to him by the Sheriff.*

**Phase 1:** Deferred

**Phase 2:** Deferred

Following the entry of the Third Order, we communicated, and exchanged draft documents, with the PSB Commander regarding immediate and interim protocols – including our expectations and the documents and information necessary for the Sheriff to notify our Team of requests for extensions of investigation deadlines during the period leading to formalized and approved policy. We addressed the mechanics for communicating the decisions made by our Team back to the Sheriff. During this second quarter, there were eight requests for investigation deadline extensions made by the Sheriff to our Team. Of the eight extension requests, the Monitor approved seven requests and did not approve one request.

**Paragraph 368.** *MCSO will continue to pay into the PSB Staffing Fund pursuant to ¶ 357 until MCSO reports for twelve continuous months that it has no open investigations that have exceeded the time by which Doc. 1765 ¶ 204 required that they be completed. At that time, MCSO may petition the Court to dissolve the PSB Staffing Fund.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

MCSO was not required to contribute to the PSB Staffing Fund during this reporting period due to meeting the staffing minimum requirements. As of June 30, 2023, MCSO's complaint investigation backlog stood at 1,842 cases.

WAI 70758

## Section 18:  Concluding Remarks

We assess compliance with 94 Paragraphs of the First Order; 114 Paragraphs of the Second Order; and 18 of the Third Order, for a total of 226 Paragraphs.  MCSO is in Phase 1 compliance with 80 of the applicable First Order Paragraphs, or 100%; and 104 of the applicable Second Order Paragraphs, or 100%.

Including the Paragraphs in which MCSO is in Full and Effective Compliance, MCSO is in Phase 2, or operational compliance, with 83 of the 94 applicable First Order Paragraphs, or 88%.  This is six percentage points higher than what we found during the last reporting period.  MCSO is in Phase 2 compliance with 106 of the 114 applicable Second Order Paragraphs, or 93%.  This is the same percentage that we found during the last reporting period.

The First Order requires three separate analyses of MCSO's traffic stops:  the annual analysis (TSAR); the quarterly analysis (TSQR); and the monthly analysis (TSMR).  During this reporting period, MCSO published its eighth TSAR, authored by CNA, the agency's statistical consultants.  The CNA team concluded that there is evidence of disparate citation rates, search rates, and stop length by driver race or ethnicity in 2022 traffic stops in the baseline analyses.  This finding is consistent with past studies of traffic stop outcomes in other agencies and in MCSO's previous TSARs.

During this reporting period, MCSO also published the eleventh TSQR, which analyzed the traffic stop activity of low-volume deputies – deputies who made less than 20 traffic stops during the 12-month review period (calendar year 2022).  The report examined whether the traffic stop outcomes of low-volume deputies differs from their high-volume counterparts.  The report found that 41% of deputies make under 20 stops per year, and those stops (970) represent approximately 5% of all traffic stops for the agency during the year.  MCSO found that low-volume deputies had a lower citation rate than their high-volume counterparts (35.88% vs. 52.41%), but low-volume deputies contacted a higher proportion of Hispanic drivers (33.4% vs. 23.50%).  However, these differences did not result in findings of significantly greater disparities in the outcomes of white and Hispanic drivers among low-volume deputies, or, in disparities in comparison to their high-volume counterparts.

As has been previously documented, MCSO has been working collaboratively with us, the Plaintiffs, and the Plaintiff-Intervenor to finalize and operationalize the required monthly analysis, or TSMR.  MCSO began piloting the analysis in April 2021.  The final TSMR methodology was approved approximately one year after the pilot began, and after extensive input from all involved – including several virtual meetings with experts representing MCSO, the Plaintiffs, the Plaintiff-Intervenor, and our Team.  MCSO published the remaining policies with three days left in the last reporting period.

WAI 70759

MCSO continues to work to achieve compliance with the requirement to properly document all seized evidence or contraband on the Vehicle Stop Contact Forms (VSCFs).  Although MCSO is not yet in compliance with this subparagraph, it has demonstrated over recent reporting periods that it can sustain a high compliance rating, which indicates that supervisors and deputies have become more attentive to this issue.  We encourage MCSO to continue to provide guidance to deputies and supervisors on this topic.

In relation to the preparation of the required documentation when deputies have contact with passengers, MCSO is currently below the greater than 94% need to achieve compliance.  We encourage MCSO to continue to stress to the deputies the importance of properly providing the required documentation to the passengers in order to effectively comply with MCSO's policy.  As we have previously noted in prior reporting periods, we continue to identify instances where deputies fail to issue Incidental Contact Receipts to passengers when required.

During this reporting period, the Training Division proposed changes to the manner in which MCSO provides enhanced training in concert with the Constitutional Policing Plan (CPP).  MCSO proposed that the enhanced training currently required by CPP be replaced with training which is reactive to the findings of Traffic Stop Annual Reports as they are produced.  The Training Division believes this approach will address some of the shortfalls of the current CPP enhanced training regimen, which the Division believes has become somewhat rote.  The Training Division contends that a fresh approach will minimize repetitiveness, improve content focus, better address the communities served, and maximize the organizational impact.

PSB investigations continue to be of high quality.  For the second consecutive reporting period, there have been improvements in the investigations conducted by Districts and Divisions outside of PSB, and some have been completed within the required 60-day timeframe.  We are hopeful that these improvements will be sustained and further enhanced.

We have met with PSB and District and Division command personnel multiple times to discuss the need to resolve numerous pending concerns involving training, policy, equipment, and tactics that have identified during administrative misconduct investigations.  MCSO has advised us that a new process is being implemented, and MCSO is focused on resolving those concerns that are pending.  We will continue to closely monitor whether improvements are being made.

Since 2019, MCSO has been making efforts to fill PSB investigator vacancies.  Prior to the entry of the Third Order, MCSO hired five civilian investigators.  Of these five civilian investigators, three were former employees, and two were hired from outside the agency.

Since the entry of the Court's Third Order, we have noted a slight reduction in the number of pending backlog investigations.  That said, at the end of this reporting period, the number of backlog cases still exceeded 1,800.

WAI 70760

# Appendix:  Acronyms

The following is a listing of acronyms frequently used in our quarterly status reports:

| AB | Administrative Broadcast |
|---|---|
| ACJIS | Arizona Criminal Justice Information System |
| ACLU | American Civil Liberties Union |
| ACT | Annual Combined Training |
| AIU | Audits and Inspections Unit |
| AOC | Arizona Office of Courts |
| ARG | Alert Review Group |
| ARS | Arizona Revised Statutes |
| ASU | Arizona State University |
| ATU | Anti-Trafficking Unit |
| BAF | BIO Action Form |
| BB | Briefing Board |
| BIO | Bureau of Internal Oversight |
| BWC | Body-worn camera |
| CAB | Community Advisory Board |
| CAD | Computer Aided Dispatch |
| CBP | Customs and Border Protection |
| CDA | Command Daily Assessment |
| CEU | Criminal Employment Unit |
| CHU | Custody Hospital Unit |
| CID | Court Implementation Division |
| COrD | Community Outreach Division |
| CORT | Court Order Required Training |
| CPSM | Center for Public Safety Management |
| CRM | Class Remedial Matter |
| DOJ | Department of Justice |

WAI 70761

| DSA | Deputy Service Aide |
|-----|---------------------|
| DUI | Driving Under the Influence |
| EEPM | Effective Employee Performance Management |
| EIS | Early Identification System |
| EIU | Early Intervention Unit |
| EPA | Employee Performance Appraisal |
| ESI | Electronically stored information |
| ETSI | Extended Traffic Stop Indicator |
| FBI | Federal Bureau of Investigation |
| ESTI | Extended traffic stop indicator |
| FEC | Full and Effective Compliance |
| FIDM | Fair and Impartial Decision Making |
| FOF | Findings of Fact |
| FTO | Field Training Officer |
| GI | General Instructor |
| ICE | Immigration and Customs Enforcement |
| IIU | Internal Investigations Unit |
| IR | Incident Report |
| IRM | Incident Report Memorialization |
| JED | Judicial Enforcement Division |
| LNET | Long non-extended traffic stop |
| LOS | Length of stop |
| LLS | Legal Liaison Section |
| MCAO | Maricopa County Attorney's Office |
| MCSO | Maricopa County Sheriff's Office |
| NETS | Non-extended traffic stops |
| NOI | Notice of Investigation |
| NTCF | Non-Traffic Contact Form |
| OA | Open Axes |
| OIT | Officer in Training |

WAI 70762

| PAL | Patrol Activity Log |
|---|---|
| PDH | Pre-Determination Hearing |
| POST | Peace Officers Standards and Training |
| PPMU | Posse Personnel Management Unit |
| PSB | Professional Standards Bureau |
| SID | Special Investigations Division |
| SMS | Skills Manager System |
| SPSS | Statistical Package for the Social Science |
| SRT | Special Response Team |
| TraCS | Traffic and Criminal Software |
| TSAR | Traffic Stop Annual Report |
| TSAU | Traffic Stop Analysis Unit |
| TSMR | Traffic Stop Monthly Report |
| TSQR | Traffic Stop Quarterly Report |
| VSCF | Vehicle Stop Contact Form |

WAI 70763