# EXHIBIT 1A

# MCSO OPERATIONS AND DATA ANALYSIS REPORT

## MARICOPA COUNTY SHERIFF'S OFFICE, MARICOPA COUNTY, ARIZONA



# CPSM®

CENTER FOR PUBLIC SAFETY MANAGEMENT, LLC
475 K STREET, NW, STE 702 • WASHINGTON, DC 20001
WWW.CPSM.US • 716-969-1360



Exclusive Provider of Public Safety Technical Services for
International City/County Management Association

C E N T E R   F O R   P U B L I C   S A F E T Y   M A N A G E M E N T,

# THE ASSOCIATION & THE COMPANY

## INTERNATIONAL CITY/COUNTY MANAGEMENT ASSOCIATION (ICMA)

The International City/County Management Association (ICMA) is a 109-year-old, non-profit professional association of local government administrators and managers, with approximately 13,000 members located in 32 countries.

Since its inception in 1914, ICMA has been dedicated to assisting local governments and their managers in providing services to their citizens in an efficient and effective manner. ICMA advances the knowledge of local government best practices with its website, www.icma.org, publications, research, professional development, and membership.

## CENTER FOR PUBLIC SAFETY MANAGEMENT (CPSM)

The ICMA Center for Public Safety Management (ICMA/CPSM was launched by ICMA to provide support to local governments in the areas of police, fire, and Emergency Medical Services.

The Center also represents local governments at the federal level and has been involved in numerous projects with the Department of Justice and the Department of Homeland Security. In 2014, as part of a restructuring at ICMA, the Center for Public Safety Management (CPSM) spun out as a separate company and is now the exclusive provider of public safety technical assistance for ICMA. CPSM provides training and research for the Association's members and represents ICMA in its dealings with the federal government and other public safety professional associations such as CALEA, PERF, IACP, IFCA, IPMA-HR, DOJ, BJA, COPS, NFPA, etc.

The Center for Public Safety Management, LLC, maintains the same team of individuals performing the same level of service that it had for ICMA. CPSM's local government technical assistance experience includes workload and deployment analysis using our unique methodology and subject matter experts to examine department organizational structure and culture, identify workload and staffing needs, and identify industry best practices.

We have conducted more than 400 such studies in 46 states and provinces and more than 275 communities ranging in population size 3,300 (Lewes, DE) to 800,000 (Indianapolis, IN).

Thomas Wieczorek is the Director of the Center for Public Safety Management. Leonard Matarese serves as the Managing Partner for Research and Project Development. Dr. Dov Chelst is the Director of Quantitative Analysis.



# CENTER FOR PUBLIC SAFETY MANAGEMENT PROJECT CONTRIBUTORS

Thomas J. Wieczorek, Director

Leonard A. Matarese, Director, Research & Project Development

Dov Chelst, Director of Quantitative Analysis

Shan Zhou, Data Analyst

Sarita Vasudevan, Data Analyst

Robert Handy, Senior Public Safety Consultant – Team Leader

Craig Junginger, Senior Public Safety Consultant

John Perez, Senior Public Safety Consultant

Jarrod Burguan, Senior Public Safety Consultant

Dennis Kouba, Senior Editor

# CONTENTS

Tables ......................................................................................................................... viii

Figures ....................................................................................................................... xiii

Section 1. Executive Summary ....................................................................................... 1

    General Observations ...................................................................................................... 2

    Recommendations ........................................................................................................... 4

Section 2. Methodology ............................................................................................... 14

Section 3. Community and Department Overview ......................................................... 15

    Community ...................................................................................................................... 15

    Law Enforcement Services ............................................................................................. 15

    Uniform Crime Report/Crime Trends ........................................................................... 15

Section 4. Support Services Division ............................................................................. 19

    Communications/Dispatch ............................................................................................ 19

        Communications Staffing ............................................................................................ 20

        Supervisory Responsibilities ....................................................................................... 22

        Work Schedules .......................................................................................................... 22

        Facilities ...................................................................................................................... 23

        Training ....................................................................................................................... 23

        Call / Workload Demand & Ancillary Duties ............................................................. 24

        Quality Control Audits ............................................................................................... 28

        Special Policing Initiatives Focused on Diverting CFS .............................................. 29

    Property and Evidence ................................................................................................... 34

        Personnel .................................................................................................................... 34

        Storage Facilities ........................................................................................................ 35

    Crime Analysis ................................................................................................................ 37

    Court Security Division .................................................................................................. 38

        Workload ..................................................................................................................... 40

        Case Investigations ..................................................................................................... 41

        Policies, Procedure, and Operational Manuals .......................................................... 42

        Site Inspection, Technology, and Equipment ............................................................. 44

    Records and AFIS ........................................................................................................... 46

        Criminal Records Section ........................................................................................... 46

        Criminal Process Section ............................................................................................ 46

        Departmental Reports Section .................................................................................... 47

        Warrants Section ........................................................................................................ 48

AFIS ............................................................................................................... 48

New Legislation and Challenges ................................................................... 48

## Section 5. Detectives & Investigations Bureau .......................................... 50

Major Crimes Division ....................................................................................... 53

General Crimes Division .................................................................................... 55

Special Investigations Division ......................................................................... 56

Enforcement Support Division .......................................................................... 58

Overview and Analysis of Detectives ............................................................... 60

Work Schedule and Structure ..................................................................... 60

Case Intake and Tracking ............................................................................ 60

Case Management ....................................................................................... 64

Crime Rates and Crime-Fighting Strategies ............................................... 65

Case Clearance Rates ................................................................................. 69

Unsolved Homicides .................................................................................... 71

Policies, Manuals, Training .......................................................................... 71

Facilities ....................................................................................................... 73

Technology and Software ............................................................................ 74

Transcription Workload ................................................................................ 75

Wellness Component ................................................................................... 75

Summary Assessment ................................................................................. 75

Scientific Analysis Division ............................................................................... 79

Staffing & Work Schedules .......................................................................... 79

Training Process and Policy and Procedure Documentation ...................... 83

Specific Court Order Analysis ..................................................................... 85

Augmenting Staffing and Restructure of Division ...................................... 85

Intelligence Information Division ....................................................................... 87

Canine Unit ........................................................................................................ 89

## Section 6. Patrol Resource Bureau .............................................................. 91

Patrol Allocation, Deployment, and Staffing .................................................... 91

Demand Mitigation ...................................................................................... 101

Schedule ...................................................................................................... 107

Countywide Response Times ....................................................................... 110

Lake Patrol ......................................................................................................... 115

DUI Prevention and Enforcement ................................................................ 115

Mounted Unit ............................................................................................... 115

Investigations .............................................................................................. 116

Dive Team .................................................................................................... 116

Staffing.........................................................................................................116

Crime and Workload...............................................................................117

Training........................................................................................................125

Facilities......................................................................................................125

Judicial Enforcement Division....................................................................127

Staffing........................................................................................................127

Sections and Workload...............................................................................129

JED Overtime..............................................................................................131

Schedules....................................................................................................132

Policy............................................................................................................133

Vehicles.......................................................................................................133

JED Training.................................................................................................134

Extradition Unit................................................................................................135

Aviation Unit.....................................................................................................137

Tactical Operations Unit (TOU).....................................................................140

Section 7. Professional Standards Bureau (PSB)..................................141

Background / History.......................................................................................142

Procedural History......................................................................................142

PSB Court Mandated Report.....................................................................143

PSB Semi-Annual Report............................................................................143

PSB Operations / Internal Affairs Investigations........................................143

PSB Policy....................................................................................................143

Complaint Forms.........................................................................................144

PSB Investigator Requirements.................................................................144

Tracking and Managing of Complaints......................................................145

PSB Staffing.................................................................................................146

PSB Workload..............................................................................................147

MCSO Solutions..........................................................................................151

Discipline Matrices......................................................................................153

Early Identification System.........................................................................154

PSB Summary..............................................................................................155

Use of Force....................................................................................................156

MCSO Use of Force Policy.........................................................................156

Duty to Intervene........................................................................................157

De-escalation..............................................................................................157

Documenting Uses of Force......................................................................158

Use of Force Review Committee...............................................................158

Use of Force Incidents..................................................................................158

## Section 8. Training ...................................................................................161

AZPOST Training Requirements .................................................................161
MCSO-Provided Training .............................................................................162
MCSO Training Sections ..............................................................................164
Training Division Staffing .............................................................................166
Sworn Training Academy .............................................................................168
Detention Training Academy ........................................................................170
Officer Field Training (FTO) ..........................................................................170
Miscellaneous Training .................................................................................172
MCSO Training Facilities ..............................................................................173

## Section 9. Court Implementation Division (CID) ............................176

CID Mission and Vision Statement ..............................................................176
Operations Manual .......................................................................................176
Staffing ..........................................................................................................176
Workload .......................................................................................................179

## Section 10. Administration Division ...............................................181

Human Resources .........................................................................................181
Recruitment ..................................................................................................181
Retention ......................................................................................................182
Information and Technology Unit .................................................................185
Bureau of Internal Oversight ........................................................................187
Community Engagement ..............................................................................188
Flyers and Postcards ....................................................................................192

## Section 11. Data Analysis ...............................................................199

Workload Analysis ........................................................................................199
Noncall Activities ..........................................................................................223
Deployment ..................................................................................................229
Response Time ..............................................................................................239
All Calls .........................................................................................................240
High-Priority Calls .........................................................................................246
Workloads and Response Times By District ................................................248
District 1 .......................................................................................................249
District 2 .......................................................................................................264
District 3 .......................................................................................................279
District 4 .......................................................................................................294
District 7 .......................................................................................................309

District 5: Lake Patrol Units ..................................................................................... 324

District 6: Queen Creek ........................................................................................... 339

Contract Areas ........................................................................................................ 351

Guadalupe .............................................................................................................. 351

Carefree .................................................................................................................. 357

Cave Creek .............................................................................................................. 363

Fountain Hills .......................................................................................................... 369

Gila Bend ................................................................................................................ 375

Tonto National Forest ............................................................................................. 381

Youngtown .............................................................................................................. 387

Queen Creek ........................................................................................................... 393

Appendix A: Call Type Classification ....................................................................... 398

Appendix B: Uniform Crime Report Information ..................................................... 403

§ § §

# TABLES

TABLE 3-1: Reported Crime Rates in 2019, by County ................................................. 16
TABLE 3-2: Reported County, State, and National Crime Rates, by Year ......................... 18
TABLE 3-3: Reported County, State, and National Clearance Rates in 2018 ................... 18
TABLE 4-1: Dispatch/Communications Personnel ...................................................... 21
TABLE 4-2: Dispatch Work Schedule ....................................................................... 23
TABLE 4-3: Minimum and Normal Staffing ............................................................... 23
TABLE 4-4: Events per Day, by Initiator .................................................................. 25
TABLE 4-5: Calls per Day, by Category ................................................................... 25
TABLE 4-6: Call Priority Classification .................................................................... 27
TABLE 4-7: Total Calls Received by Priority ............................................................. 27
TABLE 4-8: Total and Daily Average Events and Events with Case Numbers ................... 27
TABLE 4-9: Mental Health-related Events per Day, by Initiator .................................... 30
TABLE 4-10: Mental Health-related Events, Calls, and Workload by Nature ..................... 30
TABLE 4-11: Mental Health-related Calls and Work Hours by District, per Day ................. 30
TABLE 4-12: Average Response Time Components for Mental Health-related Calls, by Nature .... 31
TABLE 4-13: Average Dispatch, Travel, and Response Times, by Priority, for Mental Health-related Calls .......................................................................................................... 31
TABLE 4-14: Court Security Division Staffing ............................................................ 39
TABLE 4-15: CSD Incident Reports .......................................................................... 41
TABLE 5-1: Detectives and Investigations Bureau Staffing. ........................................ 51
TABLE 5-2: Major Crimes Division Staffing .............................................................. 53
TABLE 5-3: Major Crimes Division Staffing by Role ................................................... 53
TABLE 5-4: Special Investigations Division Staffing .................................................. 56
TABLE 5-5: Special Investigations Division Staffing, by Role ....................................... 56
TABLE 5-6: Enforcement Support Division Staffing .................................................... 58
TABLE 5-7: Reported Crime Rates in 2019, by County ............................................... 66
TABLE 5-8: Reported Maricopa, State, and National Crime Rates, by Year ...................... 68
TABLE 5-9: Reported Maricopa County, State, and National Clearance Rates, 2018 ........... 70
TABLE 5-10: Scientific Analysis Division Staffing ...................................................... 80
TABLE 5-11: Workload Analysis, Crime Scene Unit ..................................................... 82
TABLE 5-12: Workload Analysis, Firearms Unit .......................................................... 82
TABLE 6-1: Summary of Workload and Deployment .................................................... 100
TABLE 6-2: Calls for Service, One-Year Study Period .................................................. 102
TABLE 6-3: Average Response Time Components, by Category ...................................... 113
TABLE 6-4: Average Dispatch, Travel, and Response Times, by Priority .......................... 113
TABLE 6-5: Lake Patrol Division Staffing .................................................................. 116
TABLE 6-6: Events, Calls, and Workload by Category, District 5 .................................... 118
TABLE 6-7: Calls per Day by Initiator and Month, District 5 ......................................... 119
TABLE 6-8: Average Response Time Components by Category, District 5 ......................... 121
TABLE 6-9: Average Dispatch, Travel, and Response Times by Priority, District 5 ............. 122

TABLE 6-10: JED Staffing, 2022 ...........................................................................................128
TABLE 6-11: JED Sworn Staffing, 2002–2022 .....................................................................128
TABLE 6-12: Overtime Hours and Cost in the JED, 2019–2022 ......................................132
TABLE 6-13: Rescue Missions and Extradition Trips by the Aviation Unit,  2021–2022YTD................138
TABLE 7-1: PSB Staffing (2024) ...........................................................................................146
TABLE 7-2: Average Number of Cases Completed and Total Investigators, Sworn, by Year ........148
TABLE 7-3: Average Number of Cases Completed and Total Investigators, Detention, by Year .148
TABLE 7-4: Total Completed Cases, by Year.......................................................................148
TABLE 7-5: Caseload of PSB Sworn Investigators, Dec. 2022 ........................................149
TABLE 7-6: Caseload of PSB Detention Investigators, Dec. 2022 ..................................150
TABLE 7-7: PSB Investigations Accepted by MCSO, by Year, 2014–2020 ...................151
TABLE 7-8: PSB Investigations Accepted, 2021 ...............................................................151
TABLE 7-9: Outsourced Investigations Completed by Jensen Hughes ........................152
TABLE 7-10: MCSO Personnel Who Have Had PSB Experience .....................................153
TABLE 7-11: MCSO Discipline Matrix ..................................................................................154
TABLE 7-12: Reported Uses of Force Incidents, 2020–2022 YTD ..................................159
TABLE 7-13: Uses of Force Compared to Calls for Services, 2021 ................................159
TABLE 7-14: Uses of Force by Type Used, 2020–2022 YTD.............................................160
TABLE 8-1: Total Training Hours Provided to MCSO Employees, 2020–2022 YTD ............163
TABLE 8-2: Average Number of Training Hours per Employee, 2020–2022 YTD ............163
TABLE 8-3: Internal vs. External Training...........................................................................164
TABLE 8-4: Court-Ordered Related Training ......................................................................165
TABLE 8-5: Range Staffing (2022) .......................................................................................165
TABLE 8-6: Full-Time Training Staff, 2022 .........................................................................167
TABLE 8-7: Sworn Academy Staffing, 2022 .......................................................................168
TABLE 8-8: MCSO Academy Classes, 2019–2022 ............................................................169
TABLE 8-9: Reasons for Failure to Graduate ....................................................................169
TABLE 8-10: Division Assignments of Field Training Officers.........................................172
TABLE 9-1: Court Implementation Division Staffing, 2022 .............................................177
TABLE 10-1: Home Zip Codes of Survey Respondents.....................................................189
TABLE 10-2: Ranking of MCSO Priorities by Survey and Meeting Respondents ............192
TABLE 11-1: Events per Day, by Initiator............................................................................201
TABLE 11-2: Events per Day, by Category ..........................................................................203
TABLE 11-3: Calls per Day, by Category .............................................................................205
TABLE 11-4: Calls per Day, by Initiator and Month ..........................................................206
TABLE 11-5: Calls per Day, by Category and Months.......................................................208
TABLE 11-6: Primary Unit's Average Occupied Times, by Category and Initiator .........210
TABLE 11-7: Average Number of Responding Units, by Initiator and Category .............212
TABLE 11-8: Number of Responding Units, by Category, Community-initiated Calls ....214
TABLE 11-9: Calls and Work Hours per Day by District, September 1, 2021, through January 10,
2022 ........................................................................................................................................216
TABLE 11-10: Calls and Work Hours per Day, by District, January 11 through August 31, 2022 .....218

TABLE 11-11: Calls and Work Hours per Day, by Category, Winter 2022 ...........................220
TABLE 11-12: Calls and Work Hours per Day, by Category, Summer 2022 ......................222
TABLE 11-13: Activities and Occupied Times by Type .................................................224
TABLE 11-14: Activities per Day, by Month ..............................................................225
TABLE 11-15: Activities per Day, by Day of Week.....................................................226
TABLE 11-16: Activities per Hour, by Hour of Day.....................................................228
TABLE 11-17 Average Response Time Components, by Category ................................242
TABLE 11-18: 90th Percentiles for Response Time Components, by Category ..............243
TABLE 11-19: Average Response Time Components, by District ..................................245
TABLE 11-20: Average Dispatch, Travel, and Response Times, by Priority ....................246
TABLE 11-21: Events, Calls, and Workload by Category, District 1 ..............................249
TABLE 11-22: Calls per Day, by Initiator and Month, District 1 ...................................250
TABLE 11-23: Calls and Work Hours per Day by Beat, District 1 .................................252
TABLE 11-24: Call Responses and Workload per Day by District and Unit Assignment, District 1 ...253
TABLE 11-25: Average Response Time Components by Category, District 1 ..................256
TABLE 11-26: 90th Percentiles for Response Time Components by Category, District 1 .................257
TABLE 11-27: Average Response Time Components by Beat, District 1 ........................258
TABLE 11-28: Average Dispatch, Travel, and Response Times by Priority, District 1 .......................259
TABLE 11-29: Activities and Occupied Times by Description, District 1 .........................260
TABLE 11-30: Events, Calls, and Workload by Category, District 2 ..............................264
TABLE 11-31: Calls per Day by Initiator and Month, District 2 ....................................265
TABLE 11-32: Calls and Work Hours per Day by Beat, District 2 .................................267
TABLE 11-33: Call Responses and Workload per Day by District and Unit Assignment, District 2 ...268
TABLE 11-34: Average Response Time Components by Category, District 2 ..................271
TABLE 11-35: 90th Percentiles for Response Time Components by Category, District 2 .................272
TABLE 11-36: Average Response Time Components by Beat, District 2 ........................273
TABLE 11-37: Average Dispatch, Travel, and Response Times by Priority, District 2 .......................274
TABLE 11-38: Activities and Occupied Times by Description, District 2 .........................275
TABLE 11-39: Events, Calls, and Workload by Category, District 3 ..............................279
TABLE 11-40: Calls per Day by Initiator and Month, District 3 ....................................280
TABLE 11-41: Calls and Work Hours per Day by Beat, District 3 .................................282
TABLE 11-42: Call Responses and Workload per Day by District and Unit Assignment, District 3 ...283
TABLE 11-43: Average Response Time Components by Category, District 3 ..................286
TABLE 11-44: 90th Percentiles for Response Time Components by Category, District 3 .................287
TABLE 11-45: Average Response Time Components by Beat, District 3 ........................288
TABLE 11-46: Average Dispatch, Travel, and Response Times by Priority, District 3.......................289
TABLE 11-47: Activities and Occupied Times by Description, District 3.........................290
TABLE 11-48: Events, Calls, and Workload by Category, District 4 ..............................294
TABLE 11-49: Calls per Day by Initiator and Month, District 4....................................295
TABLE 11-50: Calls and Work Hours per Day by Beat, District 4 .................................297
TABLE 11-51: Call Responses and Workload per Day by District and Unit Assignment, District 4 ...298
TABLE 11-52: Average Response Time Components by Category, District 4 ..................301

TABLE 11-53: 90th Percentiles for Response Time Components by Category, District 4 ................302
TABLE 11-54: Average Response Time Components by Beat, District 4 ...........................................303
TABLE 11-55: Average Dispatch, Travel, and Response Times by Priority, District 4........................304
TABLE 11-56: Activities and Occupied Times by Description, District 4...........................................305
TABLE 11-57: Events, Calls, and Workload by Category, District 7 ...................................................309
TABLE 11-58: Calls per Day by Initiator and Month, District 7........................................................310
TABLE 11-59: Calls and Work Hours per Day by Beat, District 7 ....................................................312
TABLE 11-60: Call Responses and Workload per Day, by District and Unit Assignment, District 7 .313
TABLE 11-61: Average Response Time Components by Category, District 7 ...................................316
TABLE 11-62: 90th Percentiles for Response Time Components by Category, District 7 ................317
TABLE 11-63: Average Response Time Components by Beat, District 7 ...........................................318
TABLE 11-64: Average Dispatch, Travel, and Response Times by Priority, District 7........................319
TABLE 11-65: Activities and Occupied Times by Description, District 7...........................................320
TABLE 11-66: Events, Calls, and Workload by Category, District 5 ...................................................324
TABLE 11-67: Calls per Day by Initiator and Month, District 5........................................................325
TABLE 11-68: Calls and Work Hours per Day by Beat, District 5 ....................................................327
TABLE 11-69: Call Responses and Workload per Day by District and Unit Assignment, District 5 ..328
TABLE 11-70: Average Response Time Components by Category, District 5 ...................................330
TABLE 11-71: 90th Percentiles for Response Time Components by Category, District 5 ................331
TABLE 11-72: Average Response Time Components by Beat, District 5 ...........................................333
TABLE 11-73: Average Dispatch, Travel, and Response Times by Priority, District 5........................334
TABLE 11-74: Activities and Occupied Times by Description, Lake Units .........................................335
TABLE 11-75: Events, Calls, and Workload by Category, District 6 ...................................................339
TABLE 11-76: Calls and Work Hours per Day by Beat, District 6 ....................................................341
TABLE 11-77: Call Responses and Workload per Day by District and Unit Assignment, District 6 ..342
TABLE 11-78: Average Response Time Components by Category, District 6 ...................................344
TABLE 11-79: 90th Percentiles for Response Time Components by Category, District 6 ................345
TABLE 11-80: Average Response Time Components by Beat, District 6 ...........................................346
TABLE 11-81: Average Dispatch, Travel, and Response Times by Priority, District 6........................347
TABLE 11-82: Activities and Occupied Times by Description, District 6...........................................348
TABLE 11-83: Events, Calls, and Workload by Category, Guadalupe ...............................................351
TABLE 11-84: Calls per Day, by Initiator and Month, Guadalupe....................................................352
TABLE 11-85: Average Response Time Components by Category, Guadalupe ...........................354
TABLE 11-86: 90th Percentiles for Response Time Components by Category, Guadalupe...........355
TABLE 11-87: Average Dispatch, Travel, and Response Times by Priority, Guadalupe .................356
TABLE 11-88: Events, Calls, and Workload by Category, Carefree ...................................................357
TABLE 11-89: Calls per Day, by Initiator and Month, Carefree .......................................................358
TABLE 11-90: Average Response Time Components by Category, Carefree ...............................360
TABLE 11-91: 90th Percentiles for Response Time Components by Category, Carefree ..............361
TABLE 11-92: Average Dispatch, Travel, and Response Times by Priority, Carefree .....................362
TABLE 11-93: Events, Calls, and Workload by Category, Cave Creek ...............................................363
TABLE 11-94: Calls per Day, by Initiator and Month, Cave Creek....................................................364

TABLE 11-95: Average Response Time Components by Category, Cave Creek ............................366
TABLE 11-96: 90th Percentiles for Response Time Components by Category, Cave Creek ..........367
TABLE 11-97: Average Dispatch, Travel, and Response Times by Priority, Cave Creek..................368
TABLE 11-98: Events, Calls, and Workload by Category, Fountain Hills ...............................369
TABLE 11-99: Calls per Day, by Initiator and Month, Fountain Hills ....................................370
TABLE 11-100: Average Response Time Components by Category, Fountain Hills.........................372
TABLE 11-101: 90th Percentiles for Response Time Components by Category, Fountain Hills .......373
TABLE 11-102: Average Dispatch, Travel, and Response Times by Priority,  Fountain Hills..............374
TABLE 11-103: Events, Calls, and Workload by Category, Gila Bend ...............................375
TABLE 11-104: Calls per Day, by Initiator and Month, Gila Bend ......................................376
TABLE 11-105: Average Response Time Components by Category, Gila Bend............................378
TABLE 11-106: 90th Percentiles for Response Time Components by Category,  Gila Bend ...........379
TABLE 11-107: Average Dispatch, Travel, and Response Times by Priority, Gila Bend..................380
TABLE 11-108: Events, Calls, and Workload by Category, Tonto National Forest ..........................381
TABLE 11-109: Calls per Day, by Initiator and Month, Tonto National Forest ................................382
TABLE 11-110: Average Response Time Components by Category, Tonto National Forest ..........384
TABLE 11-111: 90th Percentiles for Response Time Components by Category, Tonto National
Forest ..............................................................................................385
TABLE 11-112: Average Dispatch, Travel, and Response Times by Priority, Tonto National Forest 386
TABLE 11-113: Events, Calls, and Workload by Category, Youngtown ...............................387
TABLE 11-114: Calls per Day, by Initiator and Month, Youngtown ....................................388
TABLE 11-115: Average Response Time Components by Category, Youngtown.........................390
TABLE 11-116: 90th Percentiles for Response Time Components by Category, Youngtown .........391
TABLE 11-117: Average Dispatch, Travel, and Response Times by Priority, Youngtown ................392
TABLE 11-118: Events, Calls, and Workload by Category, Queen Creek...............................393
TABLE 11-119: Average Response Time Components by Category, Queen Creek ......................395
TABLE 11-120: 90th Percentiles for Response Time Components by Category, Queen Creek .....396
TABLE 11-121: Average Dispatch, Travel, and Response Times by Priority, Queen Creek ............397
TABLE 11-122: Call Type, by Category ................................................................398
TABLE 11-123: Reported Crime Rates in 2019, by County ...............................................403
TABLE 11-124: Reported Municipal, State, and National Crime Rates, by Year...............................405
TABLE 11-125: Reported Maricopa County, State, and National Clearance Rates in 2018..........405

§ § §

# FIGURES

FIGURE 3-1: Maricopa County Reported Violent and Property Crime Rates, by Year ....................17
FIGURE 3-2: Reported County and State Crime Rates, by Year...........................................................17
FIGURE 5-1: Maricopa County Reported Violent and Property Crime Rates, by Year, 2009–2018.66
FIGURE 5-2: Reported County and State Crime Rates, by Year.............................................................67
FIGURE 6-1: Deployment and Workload, Winter 2022, Weekdays......................................................94
FIGURE 6-2: Workload Percentage by Hour, Winter 2022, Weekdays...............................................94
FIGURE 6-3: Deployment and Workload, Winter 2022, Weekends......................................................96
FIGURE 6-4: Workload Percentage by Hour, Winter 2022, Weekends...............................................96
FIGURE 6-5: Deployment and Workload, Summer 2022, Weekdays...................................................97
FIGURE 6-6: Workload Percentage by Hour, Summer 2022, Weekdays............................................98
FIGURE 6-7: Deployment and Workload, Summer 2022, Weekends....................................................99
FIGURE 6-8: Workload Percentage by Hour, Summer 2022, Weekends............................................99
FIGURE 6-9: Average Deployment Levels in Patrol Districts .............................................................107
FIGURE 6-10: Average Response Time, by Hour of Day, Winter 2022 and Summer 2022 ..............110
FIGURE 6-11: Average Response Time by Category, Winter 2022 ....................................................111
FIGURE 6-12: Average Response Time by Category, Summer 2022 .................................................112
FIGURE 6-13: Calls per Day by Initiator and Month, District 5 ........................................................119
FIGURE 6-14: Average Response Time by Hour of Day, District 5 ....................................................120
FIGURE 6-15: Average Response Time by Category, District 5 .........................................................121
FIGURE 6-16: Deployment and All Workload, District 5 (Lake) Units...............................................122
FIGURE 6-17: Workload Percentage by Hour, District 5 (Lake) Units ..............................................123
FIGURE 6-18: JED Organizational Chart............................................................................................128
FIGURE 6-19: Workload in the Civil Process Section, 2019–2021 ...................................................130
FIGURE 11-1: Percentage Events per Day, by Initiator.....................................................................201
FIGURE 11-2: Percentage Events per Day, by Category....................................................................202
FIGURE 11-3: Percentage Calls per Day, by Category .....................................................................204
FIGURE 11-4: Calls per Day, by Initiator and Month.........................................................................206
FIGURE 11-5: Calls per Day, by Category and Months .....................................................................207
FIGURE 11-6: Primary Unit's Average Occupied Times, by Category and Initiator.........................209
FIGURE 11-7: Average Number of Responding Units, by Initiator and Category..............................211
FIGURE 11-8: Number of Responding Units, by Category, Community-initiated Calls.................213
FIGURE 11-9: Percentage Calls and Work Hours, by District, September 1, 2021, through January 10, 2022 ........................................................................................................................215
FIGURE 11-10: Percentage Calls and Work Hours by District, January 11 through August 31, 2022 ...................................................................................................................................217
FIGURE 11-11: Percentage Calls and Work Hours, by Category, Winter 2022 ...............................219
FIGURE 11-12: Percentage Calls and Work Hours, by Category, Summer 2022.............................221
FIGURE 11-13: Activities per Day, by Month....................................................................................225
FIGURE 11-14: Activities per Day, by Day of Week ..........................................................................226
FIGURE 11-15: Activities per Day, by Hour of Day ...........................................................................227

FIGURE 11-16: Deployed Deputies, Weekdays, Winter 2022.....................................................230
FIGURE 11-17: Deployed Deputies, Weekends, Winter 2022....................................................230
FIGURE 11-18: Deployed Deputies, Weekdays, Summer 2022...................................................231
FIGURE 11-19: Deployed Deputies, Weekends, Summer 2022..................................................231
FIGURE 11-20: Deployment and All Workload, Weekdays, Winter 2022..........................233
FIGURE 11-21: Deployment and All Workload, Weekends, Winter 2022 .........................233
FIGURE 11-22: Deployment and All Workload, Weekdays, Summer 2022 ........................234
FIGURE 11-23: Deployment and All Workload, Weekends, Summer 2022 .......................234
FIGURE 11-24: Workload Percentage by Hour, Weekdays, Winter 2022 ..........................236
FIGURE 11-25: Workload Percentage by Hour, Weekends, Winter 2022 ..........................236
FIGURE 11-26: Workload Percentage by Hour, Weekdays, Summer 2022 ........................237
FIGURE 11-27: Workload Percentage by Hour, Weekends, Summer 2022.........................237
FIGURE 11-28: Average Response Time, by Hour of Day, Winter 2022 and Summer 2022 .............240
FIGURE 11-29: Average Response Time by Category, Winter 2022 ....................................241
FIGURE 11-30: Average Response Time by Category, Summer 2022 ..................................241
FIGURE 11-31: Average Response Time Components, by District ......................................244
FIGURE 11-32: Average Response Time and Dispatch Processing for High-Priority Calls, by Hour 247
FIGURE 11-33: Calls per Day, by Initiator and Month, District 1 ......................................250
FIGURE 11-34: Percentage Calls and Work Hours by Beat, District 1 ..............................251
FIGURE 11-35: Average Response Time by Hour of Day, Winter 2022 and Summer 2022, District 1
....................................................................................................................................................254
FIGURE 11-36: Average Response Time by Category, Winter 2022, District 1 .................255
FIGURE 11-37: Average Response Time by Category, Summer 2022, District 1 ...............255
FIGURE 11-38: Average Response Time Components by Beat, District 1 ..........................258
FIGURE 11-39: Deployment and All Workload, District 1 Units.........................................261
FIGURE 11-40: Workload Percentage by Hour, District 1 Units.........................................261
FIGURE 11-41: Calls per Day by Initiator and Month, District 2 ......................................265
FIGURE 11-42: Percentage Calls and Work Hours by Beat, District 2 .............................266
FIGURE 11-43: Average Response Time by Hour of Day, Winter 2022 and Summer 2022, District 2
....................................................................................................................................................269
FIGURE 11-44: Average Response Time by Category, Winter 2022, District 2 .................270
FIGURE 11-45: Average Response Time by Category, Summer 2022, District 2 ...............270
FIGURE 11-46: Average Response Time Components by Beat, District 2 ..........................273
FIGURE 11-47: Deployment and All Workload, District 2 Units.........................................276
FIGURE 11-48: Workload Percentage by Hour, District 2 Units.........................................276
FIGURE 11-49: Calls per Day by Initiator and Month, District 3 ......................................280
FIGURE 11-50: Percentage Calls and Work Hours by Beat, District 3 .............................281
FIGURE 11-51: Average Response Time, by Hour of Day, Winter 2022 and Summer 2022, District 3
....................................................................................................................................................284
FIGURE 11-52: Average Response Time by Category, Winter 2022, District 3 .................285
FIGURE 11-53: Average Response Time by Category, Summer 2022, District 3 ...............285
FIGURE 11-54: Average Response Time Components by Beat, District 3 ..........................288
FIGURE 11-55: Deployment and All Workload, District 3 Units.........................................291

FIGURE 11-56: Workload Percentage by Hour, District 3 Units ..................................................... 291

FIGURE 11-57: Calls per Day by Initiator and Month, District 4 ................................................... 295

FIGURE 11-58: Percentage Calls and Work Hours by Beat, District 4 ........................................... 296

FIGURE 11-59: Average Response Time, by Hour of Day, Winter 2022 and Summer 2022, District 4 .................................................................................................................................................... 299

FIGURE 11-60: Average Response Time by Category, Winter 2022, District 4 ................................. 300

FIGURE 11-61: Average Response Time by Category, Summer 2022, District 4 .............................. 300

FIGURE 11-62: Average Response Time Components by Beat, District 4 ........................................ 303

FIGURE 11-63: Deployment and All Workload, District 4 Units ..................................................... 306

FIGURE 11-64: Workload Percentage by Hour, District 4 Units ..................................................... 306

FIGURE 11-65: Calls per Day, by Initiator and Month, District 7 .................................................. 310

FIGURE 11-66: Percentage Calls and Work Hours by Beat, District 7 ........................................... 311

FIGURE 11-67: Average Response Time by Hour of Day, Winter 2022 and Summer 2022, District 7 .................................................................................................................................................... 314

FIGURE 11-68: Average Response Time by Category, Winter 2022, District 7 ................................. 315

FIGURE 11-69: Average Response Time by Category, Summer 2022, District 7 .............................. 315

FIGURE 11-70: Average Response Time Components by Beat, District 7 ........................................ 318

FIGURE 11-71: Deployment and All Workload, District 7 Units ..................................................... 321

FIGURE 11-72: Workload Percentage by Hour, District 7 Units ..................................................... 321

FIGURE 11-73: Calls per Day by Initiator and Month, District 5 .................................................. 325

FIGURE 11-74: Percentage Calls and Work Hours by Beat, District 5 ........................................... 326

FIGURE 11-75: Average Response Time by Hour of Day, District 5 ............................................... 329

FIGURE 11-76: Average Response Time by Category, District 5 .................................................... 330

FIGURE 11-77: Average Response Time Components by Beat, District 5 ........................................ 332

FIGURE 11-78: Deployment and All Workload, District 5 (Lake) Units .......................................... 336

FIGURE 11-79: Workload Percentage by Hour, District 5 (Lake) Units .......................................... 336

FIGURE 11-80: Percentage Calls and Work Hours by Beat, District 6 ........................................... 340

FIGURE 11-81: Average Response Time, by Hour of Day, District 6 .............................................. 343

FIGURE 11-82: Average Response Time by Category, District 6 .................................................... 344

FIGURE 11-83: Average Response Time Components by Beat, District 6 ........................................ 346

FIGURE 11-84: Deployment and All Workload, District 6 Units ..................................................... 349

FIGURE 11-85: Workload Percentage by Hour, District 6 Units ..................................................... 349

FIGURE 11-86: Calls per Day, by Initiator and Month, Guadalupe ............................................... 352

FIGURE 11-87: Average Response Time by Hour of Day, Guadalupe ............................................ 353

FIGURE 11-88: Average Response Time by Category, Guadalupe ................................................. 354

FIGURE 11-89: Calls per Day, by Initiator and Month, Carefree .................................................. 358

FIGURE 11-90: Average Response Time by Hour of Day, Carefree ............................................... 359

FIGURE 11-91: Average Response Time by Category, Carefree .................................................... 360

FIGURE 11-92: Calls per Day, by Initiator and Month, Cave Creek .............................................. 364

FIGURE 11-93: Average Response Time by Hour of Day, Cave Creek ........................................... 365

FIGURE 11-94: Average Response Time by Category, Cave Creek ................................................ 366

FIGURE 11-95: Calls per Day, by Initiator and Month, Fountain Hills ........................................... 370

FIGURE 11-96: Average Response Time by Hour of Day, Fountain Hills ........................................ 371

FIGURE 11-97: Average Response Time by Category, Fountain Hills ...................................... 372

FIGURE 11-98: Calls per Day, by Initiator and Month, Gila Bend........................................... 376

FIGURE 11-99: Average Response Time by Hour of Day, Gila Bend ...................................... 377

FIGURE 11-100: Average Response Time by Category, Gila Bend .......................................... 378

FIGURE 11-101: Calls per Day, by Initiator and Month, Tonto National Forest ................................ 382

FIGURE 11-102: Average Response Time by Hour of Day, Tonto National Forest......................... 383

FIGURE 11-103: Average Response Time by Category, Tonto National Forest............................... 384

FIGURE 11-104: Calls per Day, by Initiator and Month, Youngtown ...................................... 388

FIGURE 11-105: Average Response Time by Hour of Day, Youngtown ................................... 389

FIGURE 11-106: Average Response Time by Category, Youngtown ...................................... 390

FIGURE 11-107: Average Response Time by Hour of Day, Queen Creek................................. 394

FIGURE 11-108: Average Response Time by Category, Queen Creek.................................... 395

FIGURE 11-109: Maricopa County Reported Violent and Property Crime Rates, by Year ............ 404

FIGURE 11-110: Reported County and State Crime Rates, by Year.................................... 404

§ § §

# SECTION 1. EXECUTIVE SUMMARY

The Center for Public Safety Management, LLC (CPSM) was commissioned to review the operations of the **Maricopa County Sheriff's Office (MCSO)** in Maricopa County, **Arizona.** While our analysis covered all aspects of the **Office's** operations other than detention, particular areas of focus of this study were identifying appropriate staffing of the department given the workload, community demographics, and crime levels; the effectiveness of the organizational structure; and efficiency and effectiveness of division/unit processes.

We analyzed the d**epartment's** workload by district, using operations research methodology, and compared that workload to staffing and deployment levels. We reviewed other performance indicators that enabled us to understand the implications of service demand on current staffing. Our study involved data collection, interviews with key operational and administrative personnel, focus groups with line-level department personnel, on-site observations of the job environment, community meetings, a community survey, data analysis, comparative analysis, and developing alternatives and recommendations.

One of the driving forces behind the study was direction provided to Maricopa County by a United Sates District Court Judge in the Manuel Melendres v. Maricopa County court case. The court prescribed **a staffing study to evaluate the organization's ability to reorganize staffing** to add resources to the Professional Standards function to eliminate a backlog of administrative cases against deputies. Due to delays with court processes and additional work added to the study, this report was delayed for several months after the initial data collection and site visit in November 2022. Therefore, much of the data in the study is not as current as in typical studies conducted by CPSM.

*(Please note: It was learned that several bureaus and units have changed their names or reporting structures between the time of the site visit and the finalization of this report. The division and unit names contained in the report are reflective of information our consultants learned during their analysis and may not accurately reflect changes made since our site visit in late 2022.)*

Based upon CPSM's detailed assessment of the Maricopa County Sheriff's Office, it is our conclusion that the department overall provides a wide variety of high-quality law enforcement services. **We found many employees dedicated to the mission of the Sheriff's Office** and who take immense pride in serving the diverse communities of Maricopa County. Throughout this report, we will strive to allow the reader to take a look inside the MCSO to understand its strengths and its challenges. The recommendations made in this report offer an opportunity for the MCSO's strengths to become stronger and the challenges to become less challenging. We sincerely hope that all parties utilize the information and recommendations contained herein in a constructive manner to make a good law enforcement agency even better.

A key focus of our work was to determine if there was an ability to move additional staffing to the Professional Standards Bureau. We found staffing was inadequate throughout many areas of the department. MCSO has many vacancies and has been unable to fill those positions at a pace adequate to fully staff the department. We did identify an opportunity to reorganize supervisory and management staff in the Detective and Investigations Division with some personnel who could be moved to the Professional Standards Bureau.

As part of this Executive Summary, below we list general observations that we believe identify some of the more significant issues facing the MCSO. Additionally, in this summary we also include a master list of recommendations for consideration; we believe these recommendations



will enhance organizational effectiveness. Some of these recommendations involve the creation of new job classifications; others involve the reassignment/repurposing of job duties to other sections or units. Oftentimes, the recommendations we make require a substantial financial commitment on the part of a jurisdiction.

## GENERAL OBSERVATIONS

- It became apparent to CPSM during months of remote meetings, focus group interviews, and site visits that the overwhelming majority of the Executive Staff, Command Staff, managers, supervisors, and employees of the MCSO are committed to the mission of the organization, dedicated to their jobs, and work tirelessly to serve the external and internal customers of Maricopa County and the Sheriff's Office.

- **The current administration of the Sheriff's Office assumed an organization in crisis.** Trust by the community was low, the organization was operating under a court order, resources were scarce, and the organization was divided. Although the organization has made progress on reforms in many areas, some necessary changes have been slow in coming to fruition. The COVID-19 pandemic, hiring challenges, and the mandates from the court orders have all **significantly hampered the agency's ability to accomplish some of** its reform goals.

- There have been some changes in the command staff over the last few years; the current leadership team of the department appears to be managing the department well. They have led the agency through difficult times of COVID, several employee deaths, and the public response following the murder of George Floyd.

- Over the last several years, a significant focus of the organization has been on the court order and associated changes in the organization. Several significant changes in policy, procedures, personnel assignments, and technology have been associated with court compliance. However, the personnel complaint investigation process and backlog remain substantially out of compliance and the subject of the court's recent civil contempt order.

- Although not sufficient to eliminate the personnel complaint backlog itself, we identified supervisory and management staff in the Detective and Investigations Bureaus who could be reorganized with some then moved to the Professional Standards Bureau (PSB). We also believe the additional personnel in PSB will allow for the PSB to be split into two units, one focusing on current cases and one focusing on backlogged cases.

- The community input gathered during the project found the majority of Maricopa County residents prioritize response to 9-1-1 calls for service and uniformed patrol above all other MCSO functions.

- As with many law enforcement agencies during this current period, hiring for sworn and civilian positions is a challenge. During CPSM's site visit, MCSO had 131 sworn vacancies and 241 civilian vacancies, excluding detention.

- Employee retention is also a significant challenge for MCSO. In a four-year period from July 1, 2018, through June 30, 2022, MCSO had 100 deputies voluntarily separated from employment. This excludes retirements, trainees, and deputies in training. Therefore, these 100 deputies who left were solo deputies in whom MCSO had made a significant investment to train. This type of turnover is not common in law enforcement, particularly in Arizona. We found the overall salary structure and compensation package for deputies to be below the market rate and not competitive with other Valley agencies. We recommend the County consider

implementing pay steps and other compensation increases to be competitive in the law enforcement labor market.

As noted previously, a master list of recommendations follows; each is covered in detail throughout the report. These recommendations are offered to enhance the operation of the **Maricopa County Sheriff's** Office.

The recommendations are intended to form the basis of a long-term improvement plan for the County and **Sheriff's Office.** It is important that we emphasize that this list of recommendations, though lengthy, is common in our operational assessments of agencies around the country. The mere number of recommendations should not be interpreted as an indictment of what we consider a fine law enforcement agency. The recommendations are aimed at ensuring that law enforcement resources are optimally deployed, operations are streamlined for efficiency, and services provided are cost-effective, all while maintaining a high level of service to the citizens of Maricopa County.

CPSM staff would like to thank Sheriff Paul Penzone and the **Maricopa County Sheriff's Office** staff for their gracious cooperation and assistance during this study.

§ § §

# RECOMMENDATIONS

## Section 4

### Communications Center
*(See pp. 19-33.)*

1.  It is recommended that the MCSO participate in and become an associate member of APCO, as many of the recommendations in this report are well supported by APCO and used by more than 35,000 members.

2.  CPSM recommends MCSO maintain and update the Communications operational manual to ensure ongoing and continuous development of all personnel.

3.  CPSM highly recommends that MCSO replace the supervisor trainers with frontline emergency dispatchers to free up supervisors to serve in their proper positions.

4.  It is recommended that MCSO assess the potential to hire per-diem dispatchers to be used in the event of emergencies, during a need for special staffing, or during periods when personnel shortages occur.

5.  It is recommended that MCSO track specific data related to retention and turnover rates in Communications to benchmark for measuring the effectiveness any recruitment or retention efforts as strategies are developed.

6.  There are no current dictates or policies mandating minimal staffing levels and it is recommended that MCSO develop a written policy with a protocol to maintain the proper level of dispatchers and call takers to maintain operational services for taking in and dispatching calls for service.

7.  It is highly recommended that MCSO hire per-diem dispatchers in order to return to higher staffing levels and maintain the original minimum staffing goals.

8.  It is recommended that MCSO consider providing dispatcher personnel with the opportunity to attend state and national conferences as well as attend regular update training to expand their skills and education in law enforcement dispatching.

9.  CPSM recommends that the MCSO increase deputy rotations through dispatch for probationary officers (upon completion of training) in order for them to become more aware of the dispatch functions and responsibilities.

10. The Communications Center should establish a quarterly meeting between the dispatch supervisors and area sergeants to discuss operations and administration and to enhance communications.

11. It is recommended that supervisors be released of the responsibility of training new dispatchers to free their time to conduct quality assessments and audits; however, with the current number of vacancies this cannot occur.

12. MCSO should develop written quality assessments and audit guidelines with benchmarks to ensure reviews occur with regular frequency. This will enhance professional behaviors and operational performance of all personnel.

13. The quality audits and assessments should be presented to all dispatch and call-taking personnel so they fully understand the purpose of the reviews, so these reviews become mostly supported by all personnel.



14. CPSM recommends that MCSO invest in technology software to assist with an efficient and effective method of conducting internal audits and assessments in order to reduce the time and effort needed, and improve record-keeping while defining quality control standards.

15. It is recommended that MCSO establish an ad-hoc committee of internal personnel with guidance from community organizations to discuss a potential initiative to divert calls.

16. It is recommended that MCSO continue to integrate **dispatchers into MCSO's wellness** initiative to help curb the stress and anxiety associated with a high turnover and vacancy rate.

### Property and Evidence
*(See pp. 34-36.)*

17. CPSM recommends MCSO reevaluate the specific needs and the upgrade the camera systems in the property and evidence warehouse to attain the industry standard for security **outlined in the IAPE's "Professional Standards" publication.**

18. CPSM recommends MCSO undertake a paperless taskforce led by an executive to determine where efficiencies can be had through reliance on technology.

19. CPSM recommends MCSO evaluate the staffing and consider adding a manager, at least one additional supervisor, and up to three additional property evidence technicians.

### Crime Analysis
*(See p. 37.)*

20. CPSM recommends that MCSO consider centralizing the crime analysis functions for more consistent, effective, and reliable crime analysis.

### Court Security Division
*(See pp. 38-45.)*

21. It is recommended that the MCSO work with the federal monitor to address the impact of the court order on staffing levels and develop a realistic approach to the retention, recruitment, and staffing challenges.

22. It is recommended that a force encounter strategy be developed by CSD that is unique to its detention duties, particularly for potential force encounters and de-escalation in confined places.

23. CPSM recommends that MCSO consider decentralizing the deployment of sergeants closer to the courthouses where MCSO deputies are staffed.

24. It is recommended that the Division Commander provide an agenda with listed topics to measure the quality and outcomes of the staff meetings.

25. In order to properly define the absolute number of operational PCN assignments for the **division and identify "true" vacancies, CPSM strongly recommends that MCSO reconcile the** number of actual budgeted PCN assignments with the current divisional deployment in the Court Security Division.

26. It is recommended that CSD develop a database that tracks annual judicial threat investigations for quicker research and trend identification.

27. It is recommended that MCSO review its current workflow of the remand process and estimate if the current staffing levels are appropriate for the growing workload.

28. It is recommended that MCSO develop a written process for case investigation management for sergeants to follow.



29. CPSM recommends MCSO conduct police report work analysis to estimate if more personnel are required or a change in report procedures is needed based on the trend.

30. CPSM recommends that MCSO prioritize and set goals to achieve quarterly active shooter, special response, and critical incident management training for CSD personnel for 2023.

31. It is recommended by CPSM that MCSO consider a rotational cycle for personnel in order to expand the breadth of knowledge and experience of the department.

32. It is recommended that MCSO streamline the policy update process so that all policies and functional manuals reflect the newest federal and state detention laws.

33. It is recommended MCSO conduct a CSD survey to identify the simpler needs of work areas that would increase the efficiency of work that needs to be performed.

### Records
*(See pp. 46-49.)*

34. CPSM recommends MCSO focus on filling the current vacant positions and consider increasing compensation or other benefits to support this effort.

35. CPSM strongly recommends MCSO purchase and implement a new, comprehensive records management system.

36. CPSM recommends MCSO develop and prioritize a plan, with timeline benchmarks, to eliminate the backlog of UCR reporting requirements and begin processing NIBRS entries in order to comply with state and federal mandates.

37. To handle the current needs, address the backlogs, and address the upcoming challenges, CPSM recommends MCSO consider hiring an experienced civilian executive to oversee key civilian functions.

## Section 5

### Detectives and Investigations Bureau
*(See pp. 50-78.)*

38. It is recommended that an examination be completed to match up current divisional PCNs with the budgeted PCNs to reconcile any differences in staffing numbers.

39. The number of civilian personnel has decreased by 6 since the 2020/2021 budget. It is recommended MCSO establish an ad-hoc committee, including civilian personnel, to identify areas where civilians can serve in more valuable positions of the organization.

40. One of the primary recommendations for the Bureau is evaluating how to combine resources and utilize more regional approaches to reduce the number of MCSO deputies needed during this critical time.

41. It is further recommended that MCSO establish a Bureau ad-hoc committee to produce potential retention and recruiting solutions to increase the level of interest in the Bureau, improve quality training, and address concerns regarding competitive detective pay with contemporary pay differentials.

42. It is recommended that the Bureau schedule some of the volunteer reserve deputies and the volunteer posse to assist with patrol or special functions or special details as needed.

43. It is recommended that MCSO establish a rotational schedule for all Bureau assignments so that all personnel have an opportunity to further their development. The rotation process and identification of personnel should be a transparent process that all MCSO personnel can understand and observe.



44. It is recommended that MCSO adopt a protocol assigning cases to Bureau detectives, establishing a reviewable tracking process that is immediate and accessible by other Bureau divisions.

45. It is recommended that MCSO develop an investigative intake and case assignment protocol that can be completed within 24 hours (excluding weekends and holidays). CPSM is aware that an improved RMS system is required to achieve this recommendation.

46. It is recommended that MCSO develop a process to decrease the investigative cases assigned to patrol deputies and develop a process to track and review cases given to patrol deputies.

47. It is recommended that MCSO detective divisions establish a universal computer system that is capable of providing 30-60-90 day reports on investigative reports that are in need of updates on open criminal cases.

48. CPSM recommends that MCSO begin to maintain monthly crime statistics and publicly post the crime data on a monthly schedule for residents to view.

49. It is recommended that MCSO consider integrating its CAD and RMS system to reduce the review hours expended by detective sergeants while also enabling the systems to store and retrieve data instantly.

50. It is recommended that MCSO work with all the Maricopa County police agencies in developing task forces to expand the number of regional police officers to work the Special Investigations and Enforcement Support Divisions. This collaboration would allow MCSO to use deputies to take on investigative workloads, which could improve the violent crime clearance rate.

51. It is also recommended that MCSO develop a universal RMS-based approach to standardize case clearance rates to reduce the error rate as well as improve the quality of reporting. This would provide immediate and updated crime data while ensuring MCSO meets the national and state mandates for crime reporting.

52. Due to the vacancy and retention history within the Bureau, it is recommended that MCSO consider (retired) part-time detectives to review unsolved murders and missing persons cases to help identify leads or other factors to investigate.

53. MCSO would benefit from the services of a professional market-based company for policy development and approval. It is recommended MCSO and the court monitoring team discuss this option, which should also include a knowledge management system to assist with confirmation that all employees are aware of policy updates and changes.

54. The Major Crimes and Scientific Analysis Division manuals were reviewed, and were found to include best practice standards and expectations. However, other Bureau divisions are in need of developing/updating a division operation manual.

55. CPSM recommends that MCSO seek the assistance of the Arizona Association for Property Evidence to conduct a more thorough review of the needs of a VPC.

56. It is recommended that some work areas of the Major Crimes and General Crimes staff be updated and modernized in order to reduce future costs of repairs, updates, and maintenance.

57. It is recommended that MCSO develop a universal database to track all search warrant and special tactical deployment operations for review and assessment.

58. It is also recommended that Major Crimes and General Crimes configure and update one briefing room for each division to include state-of-the-art projectors, writing boards, and



larger monitors to hold intelligence briefings, trainings, and other types of essential information-sharing engagements.

59. CPSM recommends that MCSO develop a training matrix for each division that provides basic, essential, and ongoing training courses for each position and unit of work (squad).

60. **It is recommended that MCSO reduce the use of "silo" data systems and develop a solution** to centralize all Detective and Investigations Bureau data and crime statistics.

61. MCSO investigative divisions would benefit from tracking the number of community meetings frontline personnel attend as well as educational engagements that help educate and expand community partnerships.

62. CPSM recommends MCSO expand its span of control in the Detective and Investigations Bureau from the current 5 deputies per sergeant (139/26) to a contemporary level of 7 deputies per sergeant (139/20). This would equate to a reduction of six sergeants, who can be repurposed to other organizational supervisory priorities.

63. To expand the span of control level CPSM recommends MCSO combine units within the Major Crimes Division as well as within the Special Investigations Division and create an ad-hoc committee to assess the workgroups and the potential to repurpose sergeant and deputy positions to meet the needs of MCSO.

*Scientific Analysis Division*
*(See pp. 79-86.)*

64. It is recommended that MCSO evaluate the ability to change the volunteer status of the SAD personnel and reclassify the position to a per-diem position to reduce the need for a FLU full-time position as well as hire the current vacancy.

65. **CPSM recommends that MCSO evaluate the potential to expand SAD's shift work to nights** and weekends while also considering the expansion of the number of PCNs and use of per-diem personnel.

66. Based on our workload analysis, it is recommended that MCSO fill the current vacancies as SAD prepares for the upcoming laboratory accreditation.

67. It is also recommended that MCSO assess the ability to establish per-diem SAD personnel for crime lab operations to assist with the current future caseloads and unit responsibilities.

68. Considering the supervisor duties, CPSM recommends a second SAD Crime Lab Supervisor while maintaining the current Firearms Unit Supervisor.

69. CPSM recommends that MCSO receive monthly updates and reviews on the progress of the lab accreditation as the new quality management manual is developed during the accreditation process.

70. Based on CPSM research, we find that SAD would benefit from considering the addition of two additional crime lab analysts due to the number of crime scene calls and examination requests.

71. It is recommended that MCSO design a policy update and approval process that is a **modern example of today's law enforcement expectations.**

72. It is recommended that MCSO address the issue of crime lab analyst certification with AZ POST and develop a certification process for crime lab personnel and course reimbursement.

73. Consider appointing a committee to identify strategies and incentives to attract and retain scientific analyst specialists.



74. It is recommended that MCSO undertake an early review of the accreditation process and evaluate the ability to purchase essential crime lab equipment expected of a nationally accredited lab.

### Intelligence Information Division
*(See pp. 87-88.)*

75. It is recommended that MCSO evaluate the value of training crime analysts and consider increasing the division budget to ensure training in the use of analytical software and crime analyst tools.

76. **CPSM's assessment discovered the SILO team is not trained as crime analyst**s and it is recommended that SILO personnel be trained under the MCSO crime analyst training standards.

77. Currently, there are two vacancies within the crime analyst structure and these positions should be filled by advertising the position to attract talented and professionally trained analysts as opposed to hiring unqualified or untrained personnel.

78. It is recommended that MCSO ensure the team of analysts meet bi-weekly to share intelligence and discuss crime trends and other events in order to establish a collaborative working environment.

79. CPSM recommends a more consistent report format be developed for all crime analyst personnel.

80. CPSM found that one of the analyst positions is grant funded at ACTIC and that the position expires in early 2024. CPSM recommends that MCSO begin to develop a funding source to secure this specially trained analyst as an employee of MCSO.

81. The current jail intelligence analyst is a vacant position, and CPSM recommends the position should be considered for transfer, before its filled, to the patrol/counter-terrorism team or the Major Crimes Division-Jail Crimes Unit. This recommendation is based on the current tempo of work performed by the crime analyst as compared to the jail intelligence position that is currently vacant.

### Canine Unit
*(See pp. 89-90.)*

82. CPSM recommends that the Canine Unit trainers and chain of command evaluate all individual canine uses of force. In addition, all canine-related uses of force in the aggregate should be assessed annually for identifying trends and for training purposes.

83. CPSM also recommends all canine teams with a patrol (apprehension) capability be trained and overseen by the Canine Unit.

## Section 6

### Patrol Resource Bureau
*(See pp. 91-114.)*

84. CPSM recommends that MCSO and Maricopa County adopt and enforce an alarm reduction program.

85. CPSM recommends that the policy of responding to and investigating routine traffic accidents (property damage only, no criminality) be minimized or discontinued altogether.

86. CPSM recommends that MCSO develop a plan for expanded and comprehensive use of DSAs, determine the appropriate level or training to ensure DSAs are equipped to effectively



mitigate the patrol workload, and prioritize deployment of additional DSAs to augment patrol.

87. CPSM recommends that patrol deputies in the MCSO minimize making routine traffic stops. Instead, the department should leverage traffic crash data to focus enforcement efforts, or the locations deemed most prone to accidents, and towards drivers deemed to be at the highest risk of causing them.

88. MCSO should develop and use a CAD code that deputies can use to indicate they are **"busy" but** are still available for a call if necessary.

89. CPSM recommends that all cases should be assigned to the Detectives and Investigations Bureau.

90. CPSM recommends that MCSO prioritize the implementation of an online reporting system.

91. CPSM recommends that MCSO explore the opportunity to create a telephone reporting unit (staffed with civilians and supplemented by deputies on short-term modified assignment).

92. MCSO should explore the feasibility of staggering start times for patrol teams by one to two hours, thus providing better overlap coverage and thus minimizing the spikes in response time during shift change.

## Lake Patrol
*(See pp. 115-126.)*

93. CPSM recommends the MCSO and the County engage with a consultant to provide an analysis with recommendations for reported radio and data communications problems in remote areas where Lake Patrol deputies are regularly working.

94. CPSM recommends MCSO create a committee to recommend positions that can be filled by civilians. Some positions would be candidates for civilianization based on the resource-intensive, specialized training provided to deputies who transfer out regularly and must be replaced (such as EMTs, Paramedics). Other candidates for civilianization would be for duties related to equipment maintenance, transportation, and other specialty type auxiliary assignments.

95. We recommend a comprehensive internal analysis of facility needs. Many of the Lake Patrol facilities are in shared or leased space that does not adequately meet the needs of the units assigned. In addition, substantial resources have been invested in specialty equipment that is stored with inadequate security or weather protection.

96. MCSO should examine the possibility of creating a part-time cadre of seasonal employees to assist with peak service demands during the summer months.

## Judicial Enforcement Division
*(See pp. 127-134.)*

97. **CPSM recommends the organization chart be updated to reflect the Division's true makeup.**

98. Based upon staffing numbers, the overtime hours being worked by JED employees, and the increase of workload in the unit, it is imperative that the vacant positions in JED, both sworn (seven deputies) and civilian (three SRS), be filled immediately.

99. Since there can be negative impacts of employees working overtime, the managers and supervisors in JED should remain vigilant of the effects that extended durations of overtime have on their employees.

100. CPSM recommends that when the Division is fully staffed, two additional vehicles be added to its fleet to account for vehicles out of service for maintenance and repair.



101. CPSM recommends that one additional SRS be added to the Writ Unit to handle the General Execution property sales.

102. CPSM recommends three additional SRS positions be added to the Tax Unit.

### Extradition Unit
*(See pp. 135-136.)*

103. Given the backlog of internal personnel investigations pending, CPSM recommends assigning a first-line supervisor to the Extradition Unit as soon as practical.

104. As soon as staffing allows, additional detention and sworn deputies should be assigned full-time to the Extradition Unit.

105. The study recommended for the Aviation Unit should include a cost-benefit analysis of commercial flight extraditions versus MCSO aircraft extraditions.

### Aviation Unit
*(See pp. 137-139.)*

106. CPSM recommends the county engage with a consultant/s to perform a comprehensive study on the Aviation Unit and provide recommendations on the fleet, facility, and staffing (number, sworn/civilian, training, etc.), along with a detailed cost-benefit analysis of the aviation services provided and the potential services that could be added.

### Tactical Operations Unit
*(See p. 140.)*

107. CPSM recommends that, when feasible, MCSO add a sergeant and two operators to the SWAT team to achieve the minimum number of personnel recommended by the NTOA for a Tier 1 Team

108. The fleet for the unit requires updating and should have additional vehicles assigned as spares for continuity of service.

## Section 7
## Professional Standards Bureau
*(See pp. 141-156.)*

109. Continue to fill vacant investigator positions within the PSB when they occur as soon as practical.

110. CPSM recommends folding added supervisory and management personnel from the Detectives and Investigations Bureau into the PSB, and then bifurcating the PSB into two units, one working current cases and one working backlogged cases.

111. CPSM recommends that investigators assigned to PSB be mandatorily rotated out of the unit after four years.

112. CPSM recommends the department continue to work with the judge and court monitors to find an acceptable, corroborated remedy to the issue of selection of investigators.

113. CPSM recommends the department continue to use outside resources for completion of investigations.

114. CPSM recommends, based upon the number of cases received each year and the number of incomplete investigations the MCSO is faced with, that MCSO add an additional 13 investigator positions in PSB.



115. Assign each detention sergeant one of the less serious investigations (one that wouldn't take too much time away from their detention supervisorial responsibilities) and do that on a continual basis as they complete the investigations.

116. Assign each member of the (sworn/detention) department who has worked internal affairs, or who has been provided appropriate training, an investigation on a continual basis regardless of their current rank.

*Use of Force*
*(See pp. 156-160.)*

117. CPSM would recommend the timeline for the organizational review of a use of force be reduced to approximately two weeks total.

118. MCSO should review the uses of force in Districts 1 & 4 to determine the causality of the somewhat greater percentage of incidents.

## Training

*(See pp. 161-175.)*

119. CPSM recommends the department conduct a comprehensive analysis in collaboration with HR to determine if there are commonalities among the deputy recruits who fail to complete the academy and what the department can do to minimize the failure rate.

120. It is recommended the county review and assess the viability of making the necessary upgrades to the Main Training Facility.

121. It is recommended the county review and assess the viability of making the necessary upgrades to the Firing Range Facility.

122. CPSM recommends the department add additional FTOs to meet its training needs.

123. CPSM recommends the department attempt to find ways to mediate the unequal number of FTOs assigned to each district.

124. The department should strive to send command level officers to executive leadership courses.

125. It is recommended the department create a formalized supervisor training manual, check-off book, and supervisor training program.

126. CPSM recommends the two vacant deputy (sworn) positions in CORT be filled as soon as possible.

127. CPSM recommends an additional sergeant position (Detention) be added to the range staff and also the deputy vacancy be filled.

128. The department should look at every special assignment in the department and define the necessary classes for that assignment that will enable the employee to become competent.

129. If additional training mandates are required, additional personnel would be necessary in the Training Unit to ensure those mandates are met.

130. CPSM recommends IT meet with Training Unit members and attempt to determine exactly what their technology needs are.

## Court Implementation Division

*(See pp. 176-180.)*

131. CPSM does not believe that replacing sworn members in the CID with civilian personnel would offer any benefits, and most likely would result in the Division being less effective and efficient.

132. CPSM recommends the Sergeant position be restored in the Division as soon as possible, while the Lieutenant position be restored when staffing allows.

## Section 9
## Administration Division

### Human Resources
*(See pp. 181-184.)*

133. There are a few strategies our consultants have seen recently in other departments that we recommend MCSO consider implementing. They include:

- ☐ Adding a full-time sworn deputy to the recruitment team.

- ☐ Increasing the emphasis on out-of-state marketing and attendance at select out-of-state recruitment events.

- ☐ Implementing a formal, accelerated process for out-of-state recruits.

- ☐ Professional production of short recruitment video clips to be shared on multiple social media platforms.

- ☐ Increased investment in pipeline programs such as Explorer and Cadet programs for young people.

134. CPSM recommends a comprehensive pay study be conducted to determine market rates for deputy salaries and benefits. We recommend Maricopa County examine the following areas and consider a plan to improve those areas where we perceive the agency to be lagging, in some instances substantially lagging, the local law enforcement market:

- ☐ Base salary.

- ☐ Pre-established merit increases according to a predetermined schedule.

- ☐ Create a competitive incentive pay structure (increase existing and add new categories) while considering the following: callout pay, longevity pay, assignment pay, shift differential, education incentives, and bilingual pay.

### Information and Technology
*(See pp. 185-186.)*

135. CPSM recommends the MCSO develop an IT Governance Board that includes executive membership. We also recommend the MCSO hire a firm to assist in developing a multi-year IT Strategic Plan.

136. CPSM recommends the crime analysis function have a central authority that oversees centralized technology and reporting requirements for efficiency and consistency.

### Bureau of Internal Oversight
*(See p. 187.)*

137. CPSM recommends the BIO be evaluated internally to determine if one or more Sergeant positions could be civilianized and sworn positions be reassigned to the Professional Standards backlog.

# SECTION 2. METHODOLOGY

## Data Analysis

CPSM used numerous sources of data to support our conclusions and recommendations for the **Maricopa County Sheriff's Office**. Information was obtained from the FBI Uniform Crime Reporting (UCR) Program, Part I offenses, along with numerous sources of internal information. UCR Part I crimes are defined as murder, rape, robbery, aggravated assault, burglary, larceny-theft, and larceny of a motor vehicle. Internal sources included data from the computer-aided dispatch (CAD) system for information on calls for service (CFS).

All data, analysis, and recommendations, especially for patrol operations, are based upon **CPSM's examination of** 149,287 calls for service during the period of September 1, 2021, through August 31, 2022, **which are those calls handled by the department's patrol** deputies. Also, there were a number of calls not included in the data examination for various reasons, such as no units dispatched or the call being canceled.

## Interviews

This study relied extensively on intensive interviews with personnel. On-site and in-person interviews were conducted with all division commanders regarding their operations.

## Focus Groups

A focus group is an unstructured group interview in which the moderator actively encourages discussion among participants. Focus groups generally consist of eight to ten participants and are used to explore issues that are difficult to define. Group discussion permits greater exploration of topics. For the purposes of this study, focus groups were held with a representative cross-section of employees within the division.

## Document Review

CPSM consultants were furnished with numerous reports and summary documents by the MCSO. Information on strategic plans, personnel staffing, deployment, monthly reports, annual reports, operations manuals, intelligence bulletins, evaluations, training records, and performance statistics were all reviewed by project team staff. Follow-up emails and phone calls were used to clarify information as needed.

## Operational/Administrative Observations

Over the course of the evaluation period, numerous observations were conducted. These included observations of general patrol; investigations; support services such as records, communications, and property and evidence; and administrative functions. CPSM **representatives engaged all facets of department operations from a "participant observation"** perspective.

## Staffing Analysis

In virtually all CPSM studies, we are asked to identify appropriate staffing levels. That is the case in this study as well. In this report we will discuss workload, operational and safety conditions, and other factors to be considered in establishing appropriate staffing levels. Staffing recommendations are based upon our comprehensive evaluation of all relevant factors.



# SECTION 3. COMMUNITY AND DEPARTMENT OVERVIEW

## COMMUNITY

**Maricopa County is Arizona's largest, most populous, and fastest growing county.** It is the fourth largest county in the nation. Maricopa County is home to the City of Phoenix, the nation's fifth-largest city, which also serves as the county seat for Maricopa County. The county is home to 27 cities and towns along with seven unincorporated areas. The county covers an area of 9,224 square miles, including the cities in the greater Phoenix metropolitan area.[1]

Maricopa County is governed by five elected district supervisors who appoint a county manager. The board sets the agenda, approves the budget, and allocates monies to more than 40 departments. The county manager is the chief administrator and oversees the county departments and more than 13,000 employees.[2]

Maricopa County is a diverse county with 26 percent of households speaking a language at home other than English. The population is approximately 53 percent White, 32 percent Hispanic, 6.7 percent African American, 4.8 percent Asian, and 3.5 percent other. The median household income in the county is $67,799 (in 2020 dollars) and the per capita income is $35,090 (in 2020 dollars); 11.6 percent of the population lives in poverty.[3]

## LAW ENFORCEMENT SERVICES

**The Maricopa County Sheriff's Office (MCSO) has approximately 3,500 employees** and is led by an elected Sheriff. The MCSO is responsible for all law enforcement services in the unincorporated areas of the county as well as in several contract cities. It operates an extensive jail/detention system and is responsible for pretrial detention services in the county. The overall budget for MCSO is greater than $430 million.

The department is broken down into five separate divisions reporting though channels to the Sheriff. One of the divisions is detention. For the purposes of this study, CPSM subject matter consultants focused on the four divisions other than the custody division.

## UNIFORM CRIME REPORT/CRIME TRENDS

While communities differ from one another in population, demographics, geographical landscape, and social-economic distinctions, comparisons to other jurisdictions can be helpful in illustrating how crime rates in Maricopa County measure up against those of other local agencies as well as the state of Arizona and the nation overall.

The FBI's Uniform Crime Reporting (UCR) Program assembles data on crime from police departments across the United States: the reports are utilized to measure the extent, fluctuation, and distribution of crime. For reporting purposes, criminal offenses are divided into two

---

1. www.maricopa.gov/5289/Maricopa-County
2. www.maricopa.gov/5289/Maricopa-County
3. https://www.census.gov/quickfacts/maricopacountyarizona



categories: Part 1 offenses and Part 2 offenses. For Part 1 offenses, representing the most serious crimes, the UCR index is split into two categories: violent crimes and property crimes. Violent crimes include murder, rape, robbery, and aggravated assault. Property crimes include burglary, larceny, and motor vehicle theft. Crime rates are expressed (indexed) as the number of incidents per 100,000 population to allow for comparison.

The following tables and figures include the most recent information that is publicly available at the national level. This includes crime reports for 2010 through 2018, along with clearance rates for 2018.

In comparing **Maricopa County's** data with other Arizona counties, one can see that Maricopa County reports a violent crime rate that is lower than both the state and national rates, and a property crime rate that is higher than some other counties, but lower than the state and national rates.

## TABLE 3-1: Reported Crime Rates in 2019, by County

| County | State | Population | Crime Rates | | |
|---|---|---|---|---|---|
| | | | Violent | Property | Total |
| Cochise County | AZ | 51,427 | 97 | 1,052 | 1,149 |
| Coconino County | AZ | 55,654 | 198 | 564 | 762 |
| Graham County | AZ | 20,469 | 73 | 616 | 689 |
| Greenlee County | AZ | 4,943 | 40 | 587 | 627 |
| La Paz County | AZ | 14,664 | 1,050 | 6,028 | 7,079 |
| Mohave County | AZ | 85,944 | 173 | 2,407 | 2,581 |
| Navajo County | AZ | 71,376 | 69 | 488 | 556 |
| Pima County | AZ | 362,047 | 171 | 2,385 | 2,557 |
| Pinal County | AZ | 226,895 | 94 | 801 | 896 |
| Santa Cruz County | AZ | 28,717 | 17 | 505 | 522 |
| Yavapai County | AZ | 93,024 | 256 | 1,037 | 1,293 |
| Yuma County | AZ | 64,893 | 227 | 1,318 | 1,544 |
| Maricopa County | AZ | 404,915 | 330 | 1,353 | 1,683 |
| Arizona | | 7,171,646 | 475 | 2,677 | 3,152 |
| United States | | 327,167,434 | 369 | 2,200 | 2,568 |

Note: Population values reflect the proportion of the county, often living in unincorporated areas, whose primary law enforcement agency is the county sheriff's office.

FIGURE 3-1: Maricopa County Reported Violent and Property Crime Rates, by Year



FIGURE 3-2: Reported County and State Crime Rates, by Year



TABLE 3-2: Reported County, State, and National Crime Rates, by Year

| Year | Maricopa County | | | | Arizona | | | | National | | | |
|------|-----------|---------|----------|-------|-----------|---------|----------|-------|-------------|---------|----------|-------|
| | Population | Violent | Property | Total | Population | Violent | Property | Total | Population | Violent | Property | Total |
| 2009 | 244,834 | 405 | 2,558 | 2,964 | 6,609,085 | 429 | 3,289 | 3,719 | 312,367,926 | 416 | 2,906 | 3,322 |
| 2010 | 354,104 | 279 | 1,445 | 1,724 | 6,404,623 | 403 | 3,229 | 3,632 | 314,170,775 | 393 | 2,833 | 3,225 |
| 2011 | 365,362 | 243 | 1,356 | 1,599 | 6,501,532 | 411 | 3,257 | 3,668 | 317,186,963 | 376 | 2,800 | 3,176 |
| 2012 | 370,046 | 249 | 1,207 | 1,455 | 6,572,455 | 422 | 3,102 | 3,523 | 319,697,368 | 377 | 2,758 | 3,135 |
| 2013 | 387,794 | 284 | 1,348 | 1,632 | 6,646,289 | 398 | 3,331 | 3,729 | 321,947,240 | 362 | 2,627 | 2,989 |
| 2014 | 408,648 | 273 | 1,229 | 1,502 | 6,751,280 | 383 | 3,108 | 3,491 | 324,699,246 | 357 | 2,464 | 2,821 |
| 2015 | 395,937 | 266 | 1,310 | 1,576 | 6,848,298 | 437 | 3,000 | 3,437 | 327,455,769 | 368 | 2,376 | 2,744 |
| 2016 | 403,509 | 284 | 1,330 | 1,614 | 6,951,468 | 458 | 2,959 | 3,417 | 329,308,297 | 383 | 2,353 | 2,736 |
| 2017 | 397,576 | 349 | 1,361 | 1,710 | 7,016,270 | 508 | 2,915 | 3,423 | 325,719,178 | 383 | 2,362 | 2,745 |
| 2018 | 404,915 | 330 | 1,353 | 1,683 | 7,171,646 | 475 | 2,677 | 3,152 | 327,167,434 | 369 | 2,200 | 2,568 |

TABLE 3-3: Reported County, State, and National Clearance Rates in 2018

| Crime | Maricopa County | | | Arizona | | | National | | |
|-------|--------|------------|------|--------|------------|------|-----------|-------------|------|
| | Crimes | Clearances | Rate | Crimes | Clearances | Rate | Crimes | *Clearances | Rate |
| Murder Manslaughter | 21 | 6 | 29% | 331 | 244 | 74% | 14,786 | 9,210 | 62% |
| Rape | 141 | 40 | 28% | 3,201 | 561 | 18% | 127,258 | 42,500 | 33% |
| Robbery | 113 | 32 | 28% | 6,480 | 1,729 | 27% | 260,709 | 79,300 | 30% |
| Aggravated Assault | 1,061 | 538 | 51% | 18,452 | 8,348 | 45% | 745,238 | 391,000 | 53% |
| Burglary | 1,043 | 77 | 7% | 29,986 | 3,036 | 10% | 1,128,351 | 157,000 | 14% |
| Larceny | 3,840 | 460 | 12% | 135,716 | 24,675 | 18% | 4,812,405 | 910,000 | 19% |
| Vehicle Theft | 595 | 60 | 10% | 8,026 | 1,964 | 24% | 701,248 | 96,800 | 14% |

Note: National clearances are not publicly available, and these values were calculated from crimes and clearance rates.

# SECTION 4. SUPPORT SERVICES DIVISION

## COMMUNICATIONS/DISPATCH

Often the first point of contact for a citizen seeking assistance, 911 operators play a significant role in setting the tone for the community's attitude toward the agency. The efficiency with which they collect information from callers and relay that information to responding personnel significantly impacts the safety of citizens and officers alike. For crimes in progress, their work substantially affects the chances of apprehending criminals. For the Maricopa County Sheriffs' Office, that first point of contact is through the dispatch center known as the MCSO Communications Division. As such, this assessment is focused on the dispatch system and the intake of incoming phone calls and dispatching of calls for service for the Maricopa community.

Dispatchers process 9-1-1 calls as well as other emergency calls made to local law enforcement and fire departments that come to public safety answering points (PSAPs) through seven-digit telephone numbers. They also receive many calls that are not true emergencies but may require a public safety response, a transfer to another agency, or simply information. In dealing with emergencies, dispatchers must process calls quickly and accurately, and are usually required to perform several tasks simultaneously under pressure. Calls to PSAPs are recommended to be answered on average within five seconds of the first audible ring, according to PSAP surveys. Unfortunately, the current level of vacancies for the Communications Center is obstructing MCSO from reaching this milestone at the current time.

Our assessment evaluated the operations of the MCSO dispatch center and used the baseline and best practice recommendations from the Association of Public Safety Communications Officials (APCO International). APCO was founded in 1935 and serves as an international best practice platform, offering operational expertise, professional development, and technical assistance for all U.S. law enforcement agencies that participate in APCO. It is recommended that the MCSO participate and become an associate member of APCO, as many of CPSM's recommendations are well supported by APCO and used by over 35,000 members.

The top priorities in regards to national emergency dispatcher best practices include, but are limited to, the following:

- Develop and use standard operating procedures.
- Support a trained and qualified work force.
- Maintain adequate communications and network equipment.
- Consider opportunities for the coordinated use of dispatching equipment and for cooperative dispatching.
- Keep records and measure performance.
- Promote information exchange among public safety response agencies and internal personnel.
- Educate the public on the 9-1-1 system and services.

CPSM reviewed MCSO Communications Center policies and the Unusual Occurrence Manual and found these documents routinely exceed national standards regarding communication centers and 9-1-1 operators. A review of the dispatchers' training manual was also conducted and was found to cover all aspects of a dispatcher's training. Some areas are in need of



updating and the manual is currently ongoing revision. CPSM recommends MCSO maintain and update the **Center's** operational manual to ensure ongoing and continuing development of all personnel. The average training period has recently been reduced from approximately one year to about six months; MCSO should be very proud of this accomplishment and the work it took to achieve.

The division**'s** budget for 2019 through 2020 is listed below; this does not include any increases in staffing levels:

- 2019: $3.3 Million.

- 2020: $3.5 Million.

- 2021: $4.0 Million.

## Communications Staffing

The Communications Center and its personnel operate under the direction of a professional staff (civilian) manager who serves on the executive staff at the equivalent of the sworn rank of Captain and is assisted by an administrator who assumes the commander role when required. The civilian managers are responsible for overall operations, budgets, and oversight, while supervisors are assigned to every shift on this 24/7 operation. The Communications supervisors **are "working" supervisors, staffing a full**-time communications position. Full-time communication dispatchers staff all shifts around the clock; there are no part-time or per-diem dispatchers available on the working roster. MCSO utilizes civilian, **trained "call** takers**" who are part of the** Communications roster.

The current challenges for the Communications Center are the ongoing vacancy level and the attrition rate of personnel. The Communications Center currently has seven probationary dispatchers who are being trained by dispatch supervisors. CPSM holds the position that supervisors training new personnel is not an efficient standard, and this practice should be altered as soon as practical (with consideration to the vacancy rate). CPSM highly recommends that MCSO replace the supervisor trainers with frontline emergency dispatchers to free up supervisors to serve in their proper positions. In order to accomplish that recommendation, MCSO will need to prepare current, less experienced dispatchers as trainers and enhance the position to increase the interest in training. It is recommended that MCSO assess the potential to hire per-diem dispatchers to be used in the event of emergencies, for special staffing needs, or during periods when shortages occur. CPSM understands that MCSO utilizes per-diem dispatchers for reviewing audio recordings and in the discovery motion process; however, the use of per-diem personnel needs to be expanded.

All frontline dispatchers are required to work a mandatory eight-hour overtime shift to backfill the current level of vacancies. To overcome this challenge, it is a critical that MCSO fill the current vacancies and ensure retention levels are maintained. As discussed in the Detective and Investigations Bureau assessment, the use of a wellness program to maintain a staff with a positive mindset helps to reduce stress, anxiety, and error rates. The wellness component of the organization should be carefully used for the Communications personnel during this very difficult period.

It is crucial for MCSO (as an employer) to not just attract but also retain talent for all areas of the organization to ensure continued growth and success. Losing employees can mean losing valuable team knowledge, lowered workplace morale, and decreased employee productivity. Lowering attrition is also crucial for reducing **potential "burnout"** caused by the required backfilling of personnel for frontline dispatch positions.

The challenges for Communications Center staffing(similar to law enforcement officers) are a competitive labor market, employee retention to maintain proper operational tempo, delivering services, and ensuring salaries are competitive with other local and regional Communications Centers. The cost of losing employees has a compounded impact on any organization and the increasing cost of replacing employes also puts pressure on future budgets. It is recommended that MCSO track specific data related to retention and turnover rates to benchmark for measuring the effectiveness of recruitment or retention efforts as these strategies are developed.

It is also recommended that MCSO conduct a dispatch team-building workshop to develop strategies, goals, and objectives to improve the workplace and improve retention while reducing the need over the long-term for constant recruitment.

The following table reflects all authorized (budgeted) staffing assigned to Communications. It shows authorized positions, actual staffing, and vacancies. The level of vacancies is priority number one for the MCSO to resolve. While recruitment and hiring is time-consuming, the situation requires immediate attention. The number of vacancies listed in the table are the **division's estimation of vacancies**: consistent with other divisions it will require the MCSO budget office to reconcile these PCNs with the County budget office.

## TABLE 4-1: Dispatch/Communications Personnel

| Position | 6/19 | 6/20 | 6/21 | 6/22 |
|---|---|---|---|---|
| Captain (or equivalent) | 1 | 1 | 1 | 1 |
| Administrator | 1 | 1 | 1 Vacant | 1 Vacant |
| Supervisor | 6 (1 Vacant) | 7 | 6 (1 Vacant) | 6 (1 Vacant) |
| Dispatcher | 18 (15 Vacant) | 23 (10 Vacant) | 18 (15 Vacant) | 18 (15 Vacant) |
| Per Diem (part-time) dispatchers | 2 (4 Vacant) | 3 (3 Vacant) | 2 (4 Vacant) | 2 (4 Vacant) |
| Specialist (call-takers) | 7 (5 Vacant) | 7 (5 Vacant) | 7 (5 Vacant) | 7 (5 Vacant) |
| Administrative Support | 1 | 1 | 1 | 1 |
| Detention Officers on Special Assignment | 3 (3 Vacant) | 3 | 3 (3 Vacant) | 3 (3 Vacant) |
| Total Authorized Personnel | 39 (+ 28 Vacant) 66 | 46 (+18 Vacant) 64 | 38 (+ 29 Vacant) 67 | 38 (+ 29 Vacant) 67 |

As workload data is discussed and staffing levels reviewed, we will make recommendations regarding staffing adjustments as warranted. These recommendations will be reflected in a staffing summary subsection that will follow our workload assessment.

The position of 911/dispatch operator is challenging, with a fast tempo, high stress, and a constant pace throughout the shift. Virtually every agency studied by CPSM reports that finding qualified applicants who can complete the rigorous training program required to perform these duties is a struggle. Another challenge for MCSO is the high rate of dispatchers lateralling to other police agencies.

MCSO Communications offers upward mobility with the various dispatch leadership positions, and this serves as another highlight of its accomplishments. There are a variety of reasons for civilianization of the Communications Division. These include, but are not limited to, (1) the development of expertise, (2) providing a career ladder for civilian staff, and (3) personnel costs.

Below we will briefly discuss each, along with positive characteristics of the Communications Center and its dispatch culture.

First, relative to expertise, the current administrator overseeing the civilian division has prior dispatch experience and will not rotate from that position. The administrator position is not intended to rotate, which allows consistency in leadership and avoids the rotational schedule that usually accompanies sworn personnel at the management level.

Secondly, under this organization structure, the six dispatch supervisors and frontline dispatchers have future opportunity for upward mobility and professional growth. MCSO's structure provides creativity and innovation for all dispatch personnel.

Finally, ensuring professional staff mobility in dispatch with civilian supervisors and a division civilian command will reduce long-term costs for MCSO.

## Supervisory Responsibilities

As reported, there are presently six supervisory positions in the Communications Center; all hold the rank of civilian supervisor. All perform administrative duties daily and perform direct call-taker or dispatch duties when necessary.

Most law enforcement agencies of this size operate under the same model as the MCSO Communications Center, with civilian commanders, administrators, and dispatch supervisors. It is commonplace in police dispatch centers that dispatch supervisors perform administrative duties in support of the administrative manager, along with some routine dispatch and/or call-taker duties during peak call demand times. MCSO should continue to provide civilian opportunities in leadership. Based on our review, we find the number of dispatch supervisors with one on each shift does not meet the best practice standards for an organization the size of MCSO. It is recommended that as staffing levels are boosted MCSO evaluate the need to expand the number of supervisors when the deployed staffing levels exceed ten dispatchers and call-takers.

Supervisor work hours are not backfilled with overtime, with two supervisors assigned to each shift, and one manager, all trained and capable of filling in during shortages. All schedules are consistent with the frontline dispatch schedules listed in the next section. The schedules for the management team vary during the week to cover the 24/7 work shifts. The role of a manager on every shift is consistent and similar with maintaining a police lieutenant as a watch commander on police deployment shifts.

## Work Schedules

The workweek for Communications operator personnel consists of five 8-hour shifts; the number of dispatchers per shift varies between five and seven. Supervisors will hire overtime based on need and when necessary but they do not follow a universal minimum staffing schedule requirement. As documented earlier in this report, all dispatchers are required to work at least one 8-hour shift to fill vacancies. At the time of the CPSM study there were no operational vacancies due to injuries, medical leave, or administrative reasons. The work shift hours are listed in the following table.



TABLE 4-2: Dispatch Work Schedule

| Dispatch Work Shifts |
| --- |
| Shift One: 6:30 a.m. – 2:30 p.m. |
| Shift Two: 2:30 p.m. – 10:30 p.m. |
| Shift Three: 10:30 p.m. – 6:30 a.m. |

At full staffing, MCSO deploys 9 dispatchers, 3 call takers, and one supervisor per shift; minimum staffing levels are shown in the following table. There are no current dictates or policies mandating minimal staffing levels and it is recommended that MCSO develop a written policy with a protocol to maintain the proper level of dispatch and call takers to maintain operational services for taking in and dispatching calls for service.

TABLE 4-3: Minimum and Normal Staffing

| Minimum Staffing Hours | Normal Staffing Levels |
| --- | --- |
| Minimum staffing levels are generally 3 call takers, 5 radio dispatchers, and one shift supervisor. | 5 call takers<br>7 dispatchers<br>1 dispatcher supervisor |
| Currently and due to vacancy levels, minimum levels are 1 call taker, 2 dispatchers, 1 supervisor. | 6 call takers<br>7 dispatchers<br>2 dispatch supervisors |

The current level of minimum staffing levels based on the operational tempo, call intake, and CFS dispatching is extremely low and is dangerous for field deputies. It is highly recommended that MCSO hire per-diem dispatchers to return to higher staffing levels and maintain the original minimum staffing goals. This recommendation is a very difficult objective to achieve in the immediate future; discussion should include the re-hiring of retired dispatchers to fill the gap.

## Facilities

The dispatch center is located at the Maricopa County Sheriff's Office headquarters within a secured environment internally and externally for parking and walking. The Dispatch Center is located on the second floor and requires entry via though a secure entry point. Each workstation is equipped to enable operators to both provide dispatch services and make and receive telephone calls, including 911 as well as business calls.

The dispatch managers' offices are located directly outside of the dispatch work center and the managers have the capability to listen in on and access the police radios and computers. The Communications Center is equipped for both a Department Operations Center (DOC) as well as an Emergency Operations Center (EOC) with desktop computers, telephone lines, and monitors. We found the work area for dispatch was spacious and the facility has ample room for dispatchers to function in their own workspace. The Center also accommodates the staffing of probation personnel to assist with probation-related tasks 24/7. The facility is clean and organized; CPSM concluded that the MCSO Communications Center work area exceeds national standards.

## Training

The Arizona State Peace Officers Standards and Training Board does not administer any statewide standards for dispatchers and no certifications are required. Training is achieved via

the dispatch training system that has been reduced from close to a year to approximately six months. This is an achievement that MCSO should be very proud of. Per MCSO requirements, all dispatchers are required to complete a 40-hour certified basic dispatch course provided by MCSO. This is another outstanding internal achievement by MCSO and one that holds up as a national standard for communications centers in the United States.

The members of MCSO Communications Center receive initial training and onboarding consisting of the Association Public-Safety Communications Officials (APCO) Public Safety Telecommunicator course delivered by in-house trainers. Additionally, each member is certified in Emergency Medical Dispatching (EMD) and CPR to be able to help provide potentially life-saving instruction over the phone during a medical emergency. Each year all dispatch members receive continuing education in a variety of delivery formats to include:

- In-service training on topics specific to operations.
- County-wide mental health and wellness
- Outside training courses
- Online internal courses.

All dispatchers are trained in receiving call types present at the center through communication by 9-1-1, text to 9-1-1, 10-digit non-emergency, or a responder providing information. When a call arrives for a medical event via phone the dispatchers use national standard emergency medical dispatch medical cards to guide selection of the best response type based on the information provided, with the ability to give the caller additional pre-arrival instructions that can provide life-saving information.

MCSO dispatchers are not trained in dispatching of EMS and fire equipment, which is a universal approach for most U.S.-based law enforcement dispatch centers. One unique process at MCSO is the alert system for the MCSO dispatch center for any emergencies at the Palo Verde generating station (the largest facility in the United States). The system was operational and all dispatchers are trained on the notification and alert system.

Communications operators have the opportunity to receive ongoing advanced professional training through attending regional and internal training; however, based on the current level of vacancies that opportunity has evaporated. It is recommended that MCSO consider providing dispatcher personnel with the opportunity to attend state and national conferences as well as attending regular update training to expand their skills and education in law enforcement dispatching.

The Communications Center is equipped with section manuals, reference books, and additional training material for remedial education for all personnel.

## Call / Workload Demand & Ancillary Duties

The communications function is a vital component of an effective law enforcement agency. 911/communications operators serve in two primary rolls: (1) answering 911 and non-emergency telephone calls, and (2) radio communications operator duties. In the case of the MCSO, all full-time personnel are cross-trained in dispatching and call taking. MCSO also utilizes call takers only who are not trained as emergency dispatchers and who help handle the volume of incoming calls. The following table shows the call for service volume from September 1, 2021, through August 31st, 2022.

TABLE 4-4: Events per Day, by Initiator

| Initiator | No. of Events | Events per Day |
|---|---|---|
| Community-initiated | 88,315 | 242.0 |
| Deputy-initiated | 55,858 | 153.0 |
| Zero on scene | 5,114 | 14.0 |
| Total | 149,287 | 409.0 |

## Observations:

- 3 percent of the events had zero time on scene.

- 37 percent of all events were police-initiated.

- 59 percent of all events were community-initiated.

- There was an average of 409 events per day or 17.0 per hour.

The calls for service are distributed throughout Maricopa County and the various patrol districts and contracted cities that pay for MCSO services. The average CFS per day are categorized in the following table.

TABLE 4-5: Calls per Day, by Category

| Category | No. of Calls | Calls per Day |
|---|---|---|
| Accident | 6,349 | 17.4 |
| Alarm | 7,132 | 19.5 |
| Animal call | 2,028 | 5.6 |
| Assist citizen | 5,361 | 14.7 |
| Assist other agency | 3,288 | 9.0 |
| Civil matter | 1,964 | 5.4 |
| Crime–person | 6,628 | 18.2 |
| Crime–property | 12,410 | 34.0 |
| Directed patrol | 24,144 | 66.1 |
| Follow-up | 10,142 | 27.8 |
| Investigation | 29,050 | 79.6 |
| Miscellaneous | 979 | 2.7 |
| Suspicious incident | 2,375 | 6.5 |
| Traffic enforcement | 17,339 | 47.5 |
| Violation | 1,973 | 5.4 |
| Warrant | 2,018 | 5.5 |
| Welfare check | 16,107 | 44.1 |
| Total | 149,287 | 409.0 |

## Observations:

- On average, there were 409.0 calls per day, or 17.0 per hour.

- The top four categories accounted for 64 percent of calls:

  - 19 percent of events were investigations.

- 16 percent of events were directed patrol.

- 16 percent of events were traffic-related.

- 13 percent of events were crimes.

The data helps us to better understand that most daily calls require some level of police investigations but that only 13 percent conclude with a crime report. This provides a snapshot of the amount of time deputies spend investigating potential crimes based on the information received by dispatch.

MCSO Communications personnel answer both 911 and non-emergency calls for participating jurisdictions 24 hours a day, seven days a week, 365 days a year. The Center uses the Viper 9-1-1 phone system; an Intrado phone system provides the capability to receive text messages to 911. The CAD system is the I/CAD Hexagon system with a fully integrated system of incident management software, call handling, dispatching, and intelligence mapping and analysis capabilities to include access to the NCIC/ACIC and JWI systems. The current CAD system is undergoing a review and approval for an updated version of the Hexagon system. All systems **used by MCSO's Communication**s Center are national standards and exceed industry expectations on technology usage.

To enhance citizen awareness during emergencies, area residents are encouraged to sign up for the ALERT mass notification and warning system and Smart911 community notification system. Smart911 provides localized alerts. It enables residents to sign up for severe weather alerts that are automated and sent to registrants immediately after the National Weather Service issues a severe weather warning. ALERT enables officials to provide critical information directly to residents county-wide via text message, phone, and e-mail as emergencies happen. Individuals and businesses whose information is listed in the white and yellow pages are already included in the ALERT system and will receive emergency notifications through landlines only. Both systems are customizable and allow residents to choose what kind of community notifications they want to receive and how they would like to receive them.

The Communications Center is not required to conduct ancillary duties other than emergency dispatch and administrative Communications Center responsibilities. Dispatchers have access to monitor all cameras in headquarters and other city department and street camera systems, but this is not associated with specific daily reports or responsibilities.

### Calls for Service Workload

As we examine calls for service workload, we consider both the activities that result from a telephone call (community-initiated activity), as well as activities initiated by deputies in the field. The computer-aided dispatch system has been programmed to assign priorities to calls based upon the nature of the call. MCSO assigns calls as priority 1 through priority 3 (and other ancillary types of calls not relevant to this analysis).

Priority 1 calls should be limited to life-safety and in-progress crimes. It is these calls for which it is imperative that officers be dispatched to and arrive on scene without delay.

The Communications Center priority matrix is essential to how calls are dispatched; MCSO uses a three-priority classification as shown in the following table.

## TABLE 4-6: Call Priority Classification

| Category | Emergency | Priority |
|---|---|---|
| Priority One (Emergency) | In progress or just occurred with threat to people and in progress with imminent threat to property. | No delay in assignment. Assign unit at once. Notify a supervisor when appropriate. |
| Priority Two (Urgent) | In progress or just occurred with no imminent threat to people or property. | Maximum delay in assignment |
| Priority Three (Routine) | Not in progress nor just occurred with occurrence over 30 minutes or longer | Maximum delay in assignment Notify a supervisor for disposition. |

In addition to serving as the 911 Public Safety Answering Point (PSAP) where all 911 calls are received, the Communications Center also receives various other calls via the departments' telephone general business telephone lines. This applies 24/7/365.

## TABLE 4-7: Total Calls Received by Priority

| Priority | 2019 | 2020 | 2021 |
|---|---|---|---|
| 1 | 3,401 | 3,396 | 3,218 |
| 2 | 54,482 | 51,253 | 49,923 |
| 3 | 533,894 | 434,783 | 449,637 |
| 4 | 21,348 | 14,236 | 13,823 |

The 2021 and YTD 2022 call data represents a significant increase in total annual events as Maricopa continues to grow in population and furthers its position as a destination location for tourists. The total events were at their height in 2019 and dipped during the 2020 pandemic to their lowest point; however, since that time events have increased by nearly 9 percent. Based on population assumptions and the continued buildout of the Phoenix metro area, MCSO will likely observe similar increases in CFS into the future. In keeping with the fact that MCSO receives general business calls as well, the ratio of 911 calls to non-emergency calls, and of outgoing calls to incoming calls, is generally consistent with other national law enforcement agencies operating under this model.

In the following table we compare call demand from 2019 through June 2020.

## TABLE 4-8: Total and Daily Average Events and Events with Case Numbers

| | 2019 | 2020 | 2021 | Total Ave. |
|---|---|---|---|---|
| Events | 613,125 | 503,670 | 516,607 | 544,467 |
| Event Daily Average | 1,679.8 | 1,379.92 | 1,415.36 | 1,491.69 |
| Case Number Assigned | 39,880 (IRs) | 36,699 (IRs) | 37,260 (IRs) | 37,946 (IRs) |
| Case No. Daily Average | 109.26 | 100.55 | 102.08 | 103.96 |

Another positive aspect of the MCSO Communications Center is the organization's decision to include dispatchers on the press information release email group. This is an approach that is a national model and many law enforcement organizations have yet to implement.

*Communications Staffing Summary*

The MCSO does not use a minimum staffing matrix, but supervisors have the authority to hire as necessary and based on CFS and call-taking workloads; however, with the current level of vacancies it is a difficult challenge to hire overtime efficiently. Minimum staffing is just that, minimum, not optimal, and is the bottom threshold of standard operation during a normal level of calls for service. MCSO's reduction below the usual minimum standard levels is critically dangerous should calls for service peak, a special or unplanned event occur, or should there be an increase in critical incidents.

As previously noted, there are two primary duties in communications centers: one is as a radio communications operator, and one is answering 911 emergency and general telephone calls. Best practices call for (1) communications operators who are responsible for all radio communication between field units, with minimal telephone answering responsibilities, (2) call takers/back-up communications operators whose primary duty is to manage all incoming calls, both 911 and general calls. Given these generally accepted staffing and deployment practices, CPSM asserts that at full staffing (that is, zero vacancies) MCSO has adequate staffing for all communications and ancillary functions; however, currently, staffing levels are dangerously low. Retention and recruitment in the Communications Center needs to be one of MCSO's top priorities in the immediate future.

CPSM recommends that the MCSO increase deputy rotations through dispatch for probationary officers (upon completion of training) in order for them become more aware of dispatch functions and responsibilities. In addition to the officer rotations, the Communications Center should establish a quarterly meeting between the dispatch supervisors and area sergeants to discuss operations, administration, and for enhanced communications. CPSM found that the relationship between the dispatchers and regional sergeants are positive but many are unable to visit for operations discussions due to the workloads and responsibility. Quarterly meetings would ensure ongoing communication and positive relationships to develop based on the constant rate of promotions and internal transfers.

## Quality Control Audits

Periodic reviews of random tape-recorded phone calls and radio dispatched calls handled by each 911dispatcher or call taker is important to ensure quality control and help to identify training and or performance issues. An audit involves a review of tape-recorded conversations between the parties, timeliness of dispatch of the call, etc. This is an important aspect of managing a 911/dispatch operation. Monitoring communication calls for service can also assist in identifying troublesome areas that specific employees may have and provides an opportunity to correct that individual employee's training or performance deficiencies.

Every quality call audit (QCA) should adhere to the following four core objectives necessary for achievement of a credible quality assurance program:

- Ensure that employees understand their duties.

- Measure and evaluate employee compliance relevant to their duties.

- Thoroughly review the effects of compliance, evaluating effectiveness, accuracy, and safety.

- Make the necessary changes and assure subsequent improvements in compliance through continuing education and feedback to both the employee and the supervisor.



Many communication centers have well-written, thorough policies and procedures regarding quality control. CPSM found MCSO does not have written protocols for dispatch audits and this does not meet industry expectations.

In general, and although not a written directive, the communications supervisors possess the authority to conduct random audits as duties permit. Historically, this has not happened with any regularity. At present, the audits are not occurring at any expected standard due to the critical staffing shortages and the current need for dispatcher supervisors to train new personnel.

The issues with the lack of control audits produce a series of CPSM recommendations as follows:

- It is recommended that supervisors are released of the responsibility of training new dispatchers to free their time to conduct quality assessments and audits; however, with the current number of vacancies this cannot occur.

- MCSO should develop written quality assessments and audit guidelines with benchmarks to ensure reviews occur with regular frequency. This will enhance professional behaviors and operational performance of all personnel.

- The quality audit and assessments should be presented to all dispatch and call-taking personnel so they fully understand the purpose of the review and so it is mostly supported by all personnel.

- CPSM recommends that MCSO invest in technology software to assist with an efficient and effective method of conducting internal audits and assessments and which will reduce time and effort, as well as improve record-keeping, while defining quality control standards.

Other concerns to highlight from this review include the current trending increase in domestic violence CFS since the pandemic began in 2020. CPSM has witnessed the trending concern of more public telephone calls regarding complaints as well as unsatisfied residents regarding the national and local election results since 2020. These trends are continuing, and MCSO has the responsibility to review increased calls for service levels on an annual basis to estimate proper staffing levels. With consideration for the court mandates and the difficult internal complaint process, this has increased the workload, job demands, and increased anxiety on all Communications personnel.

## Special Policing Initiatives Focused on Diverting CFS

During our review of **MCSO's CFS volume, CPSM evaluated several** CFS categories related to mental health such as potential suicides and mental health petitions. The call data specifically reviewed is listed in the following table: this data provides insight to the events related to mentally ill subjects. The daily number of events is significant and equally the amount of time **spent by patrol officers on calls related to the mentally ill suggest that MCSO's districts, especially** 1, 2, and 3, are spending a considerable number of hours per day responding to these CFS. In review of the data provided by MCSO, CPSM highly recommends a closer examination by MCSO to determine the need to divert calls to non-profits or other county-based organizations to respond and assess these CFS. Special policing teams should also be considered to divert calls and that aspect of this assessment is reviewed in the patrol segment of the report.

TABLE 4-9: Mental Health-related Events per Day, by Initiator

| Initiator | Count |
|---|---|
| Community-initiated | 779 |
| Deputy-initiated | 33 |
| Zero on scene | 19 |
| Total | 831 |

Source: MCSO

TABLE 4-10: Mental Health-related Events, Calls, and Workload by Nature

| Call Nature | Events | Calls | Work Hours |
|---|---|---|---|
| Mental Health Petition (WARR) | 557 | 540 | 1,350.0 |
| Mentally Ill Person | 217 | 216 | 437.9 |
| Suicide | 57 | 56 | 511.4 |
| Total | 831 | 812 | 2,299.3 |

Source: MCSO

TABLE 4-11: Mental Health-related Calls and Work Hours by District, per Day

| District | Calls | Per Day | |
|---|---|---|---|
| | | Calls | Work Hours |
| 1 | 250 | 0.68 | 1.68 |
| 2 | 131 | 0.36 | 1.15 |
| 3 | 279 | 0.76 | 1.88 |
| 4 | 90 | 0.25 | 0.88 |
| 5 | 5 | 0.01 | 0.11 |
| 6 | 20 | 0.05 | 0.26 |
| 7 | 34 | 0.09 | 0.33 |
| Miscellaneous | 2 | 0.01 | 0.01 |
| Stations | 1 | 0.00 | 0.00 |
| Total | 812 | 2.22 | 6.30 |

Source: MCSO

## Observations:

- There were 831 mental health-related events, or an average of 2.3 events per day.

- 2 percent of the events had zero time on scene.

- 4 percent of all events were deputy-initiated.

- 94 percent of all events were community-initiated.

- Work hours averaged to 2.8 hours per call.

- Total workload averaged 6.3 hours per day, meaning that on average 0.3 units per hour were busy responding to these types of calls.

- District 1 had the most calls and workload. It accounted for 31 percent of total calls and 27 percent of total workload.

TABLE 4-12: Average Response Time Components for Mental Health-related Calls, by Nature

| Nature | Dispatch | Travel | Response | Calls | 90th Percentiles |
|---|---|---|---|---|---|
| Mental Health Petition (WARR) | 30.8 | 24.9 | 55.8 | 369 | 345.2 |
| Mentally Ill Person | 13.7 | 11.5 | 25.1 | 185 | 83.5 |
| Suicide | 2.0 | 10.0 | 12.0 | 54 | 23.2 |
| Weighted Average/Total | 23.1 | 19.5 | 42.6 | 608 | 270.9 |

Source: MCSO

TABLE 4-13: Average Dispatch, Travel, and Response Times, by Priority, for Mental Health-related Calls

| Priority | Dispatch | Travel | Response | Calls | 90th Percentiles |
|---|---|---|---|---|---|
| 1 | 0.7 | 4.0 | 4.7 | 3 | 6.1 |
| 2 | 3.0 | 10.9 | 14.0 | 55 | 28.6 |
| 3 | 25.0 | 20.3 | 45.3 | 542 | 284.8 |
| 4 | 37.5 | 29.4 | 67.0 | 8 | 382.7 |
| Weighted Average/Total | 23.1 | 19.5 | 42.6 | 608 | 270.9 |

Source: MCSO

## Observations:

- Suicide calls had an average response time of 2.0 minutes, lower than the overall average of 23.1 minutes for all calls.

- Average dispatch processing was 0.7 minutes for high-priority calls (priority 1), compared to 23.1 minutes overall.

Based on this evaluation, it is clear that call diversion will require teams of non-profits, county-wide institutions, and Sheriff's deputies working together, as well as a dispatch-based program to divert calls from the regular protocols. MCSO does not have any established programs for diverting calls for service regarding the homeless, mentally ill, or other social and community issues that might be handled by non-profit organizations. It is recommended that MCSO establish an ad-hoc committee of internal personnel with guidance from community organizations to discuss a potential initiative to divert calls. The goal would be to brainstorm on potential response initiatives to better manage this national crisis that has impacted most law enforcement organizations. Over a broader period of time, MCSO would benefit from reducing law enforcement response to non-critical CFS involving this impacted segment of the population in need of support, outreach, and assistance.

One of the more vital aspects of the Communications Center review is the commitment to wellness and the concern for the stress level of dispatch personnel. The MCSO has a dedicated health and wellness division, led by a MCSO Lieutenant. This initiative includes a department-wide peer support group with a leadership structure. This is also inclusive of the Communications Center and the peer support team has two active dispatchers on the team. This is critically important to all of law enforcement and the trauma that has resulted from the global pandemic and a national social justice movement that impacted most people in America. In addition to these challenges is the local and regional challenges that Maricopa has faced with election-related issues. MCSO should be proud of its position on wellness and employee support and it should continue to expand its peer support efforts. It is recommended that MCSO continue

integrating dispatchers into MCSO's wellness initiative to help curb the stress and anxiety associated with a high turnover and vacancy rate.

## Communications Center Recommendations:

- It is recommended that the MCSO participate in and become an associate member of APCO, as many of the recommendations in this report are well supported by APCO and used by more than 35,000 members. (Recommendation No. 1.)

- CPSM recommends MCSO maintain and update the Communications operational manual to ensure ongoing and continuous development of all personnel. (Recommendation No. 2.)

- CPSM highly recommends that MCSO replace the supervisor trainers with frontline emergency dispatchers to free up supervisors to serve in their proper positions. (Recommendation No. 3.)

- It is recommended that MCSO assess the potential to hire per-diem dispatchers to be used in the event of emergencies, when in need of special staffing, or during periods when personnel shortages occur. (Recommendation No. 4.)

- It is recommended that MCSO track specific data related to retention and turnover rates in Communications to benchmark the effectiveness any recruitment or retention efforts as strategies are developed. (Recommendation No. 5.)

- There are no current dictates or policies mandating minimal staffing levels and it is recommended that MCSO develop a written policy with a protocol to maintain the proper level of dispatch and call takers to maintain operational services for taking in and dispatching calls for service. (Recommendation No. 6.)

- It is highly recommended that MCSO hire per-diem dispatchers in order to return to higher staffing levels and maintain the original minimum staffing goals. (Recommendation No. 7.)

- It is recommended that MCSO consider providing dispatcher personnel with the opportunity to attend state and national conferences as well as attend regular update training to expand their skills and education in law enforcement dispatching. (Recommendation No. 8.)

- CPSM recommends that the MCSO increase deputy rotations through dispatch for probationary officers (upon completion of training) in order for them to become more aware of the dispatch functions and responsibilities. (Recommendation No. 9.)

- The Communications Center should establish a quarterly meeting between the dispatch supervisors and area sergeants to discuss operations and administration and to enhance communications. (Recommendation No. 10.)

- It is recommended that supervisors be released of the responsibility of training new dispatchers to free their time to conduct quality assessments and audits; however, with the current number of vacancies this cannot occur. (Recommendation No. 11.)

- MCSO should develop written quality assessments and audit guidelines with benchmarks to ensure reviews occur with regular frequency. This will enhance professional behaviors and operational performance of all personnel. (Recommendation No. 12.)

- The quality audits and assessments should be presented to all dispatch and call-taking personnel so they fully understand the purpose of the reviews and so these reviews become mostly supported by all personnel. (Recommendation No. 13.)

- CPSM recommends that MCSO invest in technology software to assist with an efficient and effective method of conducting internal audits and assessments in order to reduce the time



and effort needed, and improve record-keeping while defining quality control standards. (Recommendation No. 14.)

- It is recommended that MCSO establish an ad-hoc committee of internal personnel with guidance from community organizations to discuss a potential initiative to divert calls. (Recommendation No. 15.)

- **It is recommended that MCSO continue integrating dispatchers into MCSO's wellness initiative** to help curb the stress and anxiety associated with a high turnover and vacancy rate. (Recommendation No. 16.)

§ § §

# PROPERTY AND EVIDENCE

The intake, processing, storage, and disposal of evidence and property are important and high-risk functions of any law enforcement agency. It is especially true for weapons, narcotics and dangerous drugs, currency, and jewelry. Police agencies across the country regularly face consequences of mismanaged property and evidence sections, resulting in terminations and arrests of police employees, from janitors to police chiefs, for thefts of narcotics, cash, jewelry, guns, and other items of value. In some cases, audits revealed unaccounted-for property and evidence that led to the termination of police executives, though they were not suspected of being implicated in the theft/loss of the evidence. Controlling access to the property and evidence areas, inventory control, and regular audits are critical to the effective management of the property and evidence function.

The MCSO Property and Evidence Division is under the leadership of a civilian commander and one supervisor who along with 13 employees manage all of the intake, storage, and disposition of property and evidence taken into the Sheriff's Office. The division manages two warehouses and several auxiliary storage units. The main warehouse and the paper records warehouse are located at the Durango jail complex in Phoenix, just a few miles from Sheriff's headquarters. Several outbuilding auxiliary storage units are located in a secure parking lot behind the main warehouse. The division also manages 18 temporary storage rooms for evidence located in Sheriff's facilities throughout the county.

The property and evidence functions are governed by Sheriff's Office policy and extensive division protocols that were promulgated over the last ten years. The overall property and evidence operation is high functioning and performing well in many areas. That said, there are a few areas in need of upgrading, modernizing, or an increase in resources.

## Personnel

All of the division employees are certified by the International Association of Property and Evidence (IAPE) and the Arizona Association of Property and Evidence. Both associations provide standards, training, certifications, and networking for property and evidence professionals. This is considered a best practice and has clearly contributed to many of the upgraded processes and procedures in place within the division.

In addition to requiring IAPE certifications, new employee training consists of training in the following areas:

- Officer counter.
- Night drop.
- QUETEL property and evidence management system.
- Bar coding.
- Public window.
- Phones.

MCSO has converted many of the positions in the Property and Evidence Division from sworn to civilian positions. The staff reporting structure of the 13-line level employees is divided up between the civilian division commander and a civilian supervisor. In moving to civilian positions, the agency is ahead of the trend when compared to many agencies its size. In addition to the full-time staff, the division uses deputy recruits who have been hired and are awaiting the start of an academy class: they are assigned temporarily to property and evidence, something that



happens several times a year. Such assignments can see 2 to 10 recruits in P&E for a duration of one to several months.

Based on the complexity of the division and the number of staff assigned, the division is short on supervision. The division commander has 10 direct reports and uses rotating temporary employees to accomplish the various demands of the warehouses and temporary property rooms. Access controls, alarm codes, and other security protocols rest with one or two people at most, leaving little room for the occasional period when both the commander and supervisor are unavailable after hours. Succession planning is also an important reason to increase the supervision in the division by at least one supervisor. CPSM recommends MCSO evaluate the staffing and consider adding a manager, at least one additional supervisor, and up to three additional property and evidence technicians.

## Storage Facilities

### Main Warehouse
The main warehouse is the central facility that holds property and evidence for long- and short-term storage. In addition to being a storage facility, the building includes an intake and packaging area for deputies, a release counter for the public, and office space for the 15 employees. The public has access to retrieve property from 9:00 a.m. to 4:00 p.m., Monday through Thursday.

The security of the main warehouse was examined closely during our site visit. The access control system is robust, with key card access, electronic visitor passes, and dual access steps required in the most secure areas (drugs and firearms). There are cameras throughout the warehouse inside and outside. There are some limited views from cameras installed in high-liability areas such as money, firearm, and drug rooms. All of these areas also have separate access controls, which is in accordance with industry standards. The cameras are on an analog system and do not provide complete coverage in all areas. Our team learned of a substantial proposal prepared in 2019 to upgrade the entire camera system. The proposal apparently was not acted upon due to funding constraints. CPSM recommends MCSO reevaluate the specific needs and upgrade the camera systems in the property and evidence warehouse to attain the industry standard for security outlined in the IAPE's "Professional Standards" publication.

The warehouse is a full-service warehouse with industrial equipment one would expect in a large warehouse. The equipment ranges from individual "pickers" that lift employees up to top shelves to retrieve evidence, motorized hand trucks, and large forklifts for heavier loads. Safety procedures and training for equipment appears to be comprehensive.

There are several climate-controlled walk-in units. The units have antiquated alarm systems that notify the commander, but do not have redundancies. The evidence stored in these units includes evidence from some of the most serious crimes that MCSO investigates. CPSM recommends the alarm system for the climate-controlled storage be upgraded to notify the communications center and that there be at least one built-in redundant notification.

Capacity to store evidence is a concern for all police agencies. There is a growing need to hold evidence for longer periods of time because of advances in scientific methods to collect evidence as well as court requirements. It is not uncommon for agencies to be required to keep evidence for multiple decades. With this growth in retention needs, purging property that is eligible for release or destruction is key to keep from having to acquire additional storage space.

MCSO's warehouse was at 65 percent capacity during our site visit. There is a system in place designed to keep up with purging, but the current system is ineffective due to lack of oversight and enforcement. The purging responsibilities are decentralized. Reports go out to notify



employees throughout the agency to verify what property and evidence is eligible to purge. Due to lack of command level oversight, the notices are often not acted upon. It was estimated more than 50 percent of notices are ignored. With the various demands currently on MCSO personnel, it is understandable some responsibilities may be postponed or overlooked. At 65 percent capacity, storage space is not yet a critical issue. However, if the slow pace of purging property continues, eventually MCSO will find itself out of space to store evidence.

### *Secondary Warehouse and Off-Site Property Rooms*

In addition to the main warehouse, MCSO maintains a secondary warehouse and 18 temporary property rooms. The responsibility for these facilities falls under the civilian commander of the property and evidence function. The secondary warehouse is set aside for records storage. Two employees travel around the county every Wednesday to retrieve paper records to be brought back and stored in the secondary warehouse. A visit to the secondary warehouse showed high rows and aisles of boxes full of paper records. Our consultants inquired about the use of digital records and were told despite the county investing in digital systems, some people in **management positions "do not trust technology" and require duplicate paper records to be** completed and stored.

The reliance on paper records creates substantial inefficiencies. The staff time needed to collect, store, and purge records, combined with the expense of a warehouse, are significant. Based on the substantial volume of records our team viewed in the secondary warehouse, MCSO is substantially behind other agencies in the use of technology. It can be assumed there are many areas within the MCSO that could make better use of electronic records, but from our examination of sample paper records in storage, it appeared a substantial portion are from Detention. There are paper records generated for every inmate booked into an MCSO jail facility. CPSM recommends MCSO undertake a paperless taskforce led by an executive to determine where efficiencies can be had through greater reliance on technology. This is a long-term process that will require an organizational commitment to be successful. The leader of the effort should have the authority and influence to see the project through to completion.

The 18 temporary property rooms are maintained in various MCSO facilities throughout the County. Property and Evidence technicians travel the county on a daily rotating basis to retrieve property form the temporary storage rooms for long-term storage in the main warehouse. Although this is an arduous task, it is important for a central authority to remain responsible for property and evidence collected **throughout the Sheriff's Office.**

Multiple redundant procedures, strict access controls, and other policies and procedures reviewed at the warehouse for intake, storage, and purging were found to be excellent. The warehouse was clean, fee of clutter, and well organized. Among peer agencies that CPSM has reviewed, the MCSO Property and Evidence function is well managed and well equipped. Minor additions to staffing and a few other changes would make it a top-tier program in the country.

## Property and Evidence Recommendations:

- CPSM recommends MCSO reevaluate the specific needs and the upgrade the camera systems in the property and evidence warehouse to attain the industry standard for security **outlined in the IAPE's "Professional Standards" publication.** (Recommendation No. 17.)

- CPSM recommends MCSO undertake a paperless taskforce led by an executive to determine where efficiencies can be had through reliance on technology. (Recommendation No. 18.)

- CPSM recommends MCSO evaluate the staffing and consider adding a manager, at least one additional supervisor, and up to three additional property evidence technicians. (Recommendation No. 19.)



## CRIME ANALYSIS

The crime analysis function is currently decentralized throughout the Sheriff's Office, with analysts working in the districts and in the detective bureaus. The work of the analysts appears to be of high quality and very useful to the organization's management in many ways. While decentralization of the analysts has some favorable advantages, there are also several disadvantages to the structure. The command staff of divisions with analysts enjoy their contributions and utilize their work for various crime, administrative, and management-related analyses. The challenges involve equipment and software purchases, lack of standard data collection and reporting, and analysts' services not being readily available to all units in the MCSO. CPSM recommends that MCSO consider centralizing the crime analysts into one unit under one leadership team to improve data consistency, quality, and availability. Centralized services can still be assigned by district and continue to serve the needs of individual district commands.

### Crime Analysis Recommendation:

- CPSM recommends that MCSO consider centralizing the crime analysis functions for more consistent, effective, and reliable crime analysis. (Recommendation No. 20.)

§ § §

# COURT SECURITY DIVISION

Note that the Court Security Division (CSD) is now part of the Patrol Resource Bureau and inclusive of four additional divisions; the CSD is led by one Deputy Chief. The division includes Court Security, Judicial Enforcement, Enforcement Support, Intelligence Information, Aviation, Extraditions, and SWAT.

The CSD Commander is a sworn Deputy Sheriff with the rank of Captain and there is one Deputy Commander (Lieutenant)assigned as well. There are a number of responsibilities of the CSD Commander to include:

- Ensuring adherence to the state and federal laws as well as all Sheriff's Office policies.

  □ CPSM found that the CSD Commander has remained in compliance but has experienced difficulty in updating policies due to the court order requirements.

- Annual review of the of the Operational Manual for compliance.

  □ The last update was performed in June 2022. Based on the staff shortages, this is a difficult task to maintain but achieved well by the CSD leadership team.

- Compliance with federal and state court decision mandates.

  □ The CSD staff has attempted to maintain updates with new laws but with the internal programming system is difficult to achieve this goal regularly.

  □ It is recommended that a force encounter strategy be developed by CSD; it should be unique to its detention duties as related to potential force encounters and de-escalation in confined places.

- Conducting staff meetings as required.

  □ The structure and staffing of CSD means there is limited opportunity at times to hold staffing meetings; however, meetings are conducted.

  □ It is recommended that the Division Commander provide an agenda with listed topics to measure the quality and outcomes of the staff meetings.

- Training compliance requirements are maintained both by the MCSO training records as well as by the Courts Security Division Captain. The records reviewed are updated; however, the consistent challenge with turnaround time due to the court order mandates has created difficulty for staff due to workload levels.

- Performance evaluations are a yearly requirement. The divisional evaluations are maintained and efficiently updated as required by department policy as well as the court order mandates.

§ § §

TABLE 4-14: Court Security Division Staffing

| Position | 2019/2020 | 2020/2021 | 2021/2022 | Vacant |
|---|---|---|---|---|
| Captain | 1 | 1 | 0 | 1 |
| Lieutenant | 0 | 0 | 1 | 0 |
| Sergeant | 3 | 3 | 3 | 1 |
| Deputy (43 PCNs) | 24 | 24 | 18 | 25 |
| Total Sworn | 28 | 28 | 21 | 27 |
| Civilian Specialist/Command | 0 | 0 | 0 | 0 |
| Civilian Administrative Support | 0 | 0 | 0 | 1 |
| Total Civilian | 0 | 0 | 0 | 1 |
| Total Authorized Personnel | 28 | 28 | 28 | 27 |

Source: MCSO

All personnel work a schedule of 5-day/10-hour shifts, with a normal operational time of 7:30 a.m. to 5:30 p.m. (to include a meal period). Due to the current staffing vacancies there is a 10-hour mandated overtime shift for all personnel. An effort to achieve greater staffing is one that will not be resolved in the immediate future and will require constant monitoring.

It is recommended that the MCSO work with the federal monitor to address the impact of the court order on staffing levels and develop a realistic approach to the retention, recruitment, and staffing challenges. The deputy staffing levels are perceived by those in the unit as dangerously low, placing deputies in unsafe situations at times. The constant need to hire overtime is also a concern, as employee fatigue can diminish cognitive and motor skills, which leads to a high concern for safety during critical moments. As a result of the staffing challenges, MCSO is unable to provide force encounter and de-escalation training specific to CSD personnel needs. Therefore, it is recommended, and equally important that a force encounter strategy be developed by CSD that is unique to its detention duties as it relates to potential force encounters and de-escalation in confined places.

It is required that each shift have an administrative Lieutenant (shift commander) and an additional Sergeant. This objective is regularly met through overtime hiring due to the recent challenge of two Sergeants being on medical leave. MCSO provides staffing at the various court facilities in the county and manages, responds, and directly engages in critical events at each court facility. Facility staffing is as follows:

- Old Court House – 1 Deputy.

- Central Court Building, East Court Building, West Court Building – 4 Deputies.

- South Court Tower – 5 Deputies.

- Durango Juvenile Court – 2 Deputies.

- Northeast Regional Court Complex – 2 Deputies.

- Northwest Regional Court Complex – 2 Deputies.

- Southeast Judicial District Complex – 2 Deputies.

- Southeast Juvenile Court -Mesa – 1 Deputy.

- Inmate Transfer and Release (ITR) Facility – Currently staffed by District 2 Deputies.

The deputy staffing level for the courthouses rarely exceeds minimum staffing and the CSD regularly needs to hire on overtime from other MCSO divisions. The supervision of the courthouses and the deputies is difficult at best as the travel time to the courthouses from downtown Phoenix is approximately 45 minutes to an hour (considering traffic flows). All current MCSO sergeants are centrally located at the South Court Tower due to administrative duties and CSD's operational structure. CPSM recommends that MCSO consider decentralizing the deployment of sergeants closer to the courthouses where MCSO deputies are staffed. A decentralized model of supervision allows for quicker responses and support for personnel as well as being available to assist with critical events or developing circumstances requiring supervision and guidance.

The staffing level for CSD is an important element of accomplishing daily security tasks as well as other operational and administrative functions. The staffing table illustrates the current vacant deputies at approximately six; however, the division budget documents a total of 43 staffing positions, referred to as position control numbers (PCN). The position control budget principle is universally defined as an employee assignment for a fiscal year. This is also standard for the State of Arizona General Accounting Office (GAO), which establishes statewide accounting policies and procedures. It is possible with the current number of organizational vacancies at MCSO for PSN assignments at CSD to have been transferred at a previous time without notifications and without reconciling the budget. CSD budgets denote a total of 43 PCN assignments for the budget since at least 2019. In order for the MCSO to properly define the absolute number of operational PCNs for the division and identify "true" vacancies, CPSM strongly recommends that MCSO reconcile the number of actual PCN assignments with the current deployment in the Court Security Division. Reconciling the number of budgeted PCN assignments with the actual authorized positions would provide an ability for MCSO management to better understand vacancy levels as well as provide "real" numbers to management teams to achieve divisional goals and objectives.

A review of the rosters, deployments, and staffing levels made it evident that the vacancy level should be the highest priority for management. The personnel shortages have affected other objectives such as retention rates, ability to regularly train to reduce liability and risks, and other critical operational components of the detention facilities. That said, during the assessment we found employee confidence, enthusiasm, and discipline of CSD to be positive, with a demonstrable level of commitment and care for the work MCSO performs. This assessment recognizes the CSD leadership team for maintaining a positive work environment during difficult times.

## Workload

CSD incorporates a Sergeant and a deputy to each shift to manage the safety and security of the courts to include all judicial threats, with direct notifications to the shift administrator and judicial staff and judges. Over the past three years, there have been approximately three to five threats against judicial staff or judges annually that are initially investigated by CSD and which are forwarded to the Threats Unit for further investigation. It is recommended that CSD develop a database that tracks the annual judicial threat investigations for quicker research and identification of past cases. This recommendation would help with defining the proper staffing of investigative resources at the various facilities. A detective serves as a liaison between the Superior Court and Terrorism Liaison Deputies and conducts initial investigations based on the level of threat. Currently, MCSO policies do not provide benefited on-call status or expected call-backs unless ordered for a special event or circumstance. Considering the assignments and type of work, this approach is universal by law enforcement standards for non-critical assignments or non-special response units. Any specialized investigations would require CSD to notify the General or Major Crimes Division for responses.

All CSD personnel are required to document incident reports for several reasons and the reports are identified in the same methodology as patrol reports. This includes action by law enforcement personnel regarding criminal matters or incidents of maintaining peace to include any criminal arrests. Reports are also written when necessary for a request for deputy assistance depending upon the circumstances. These reports are Incident Reports (IR) and entered in the TraCS case management system. The number of reports by personnel are shown in the following table.

## TABLE 4-15: CSD Incident Reports

| Report Type | 2019 | 2020 | 2021 | 2022 (To date) |
|-------------|------|------|------|----------------|
| Remands | 3,711 | 1,505 | 1,724 | 2,633 |
| Warrants | 1,266 | 282 | 241 | 288 |
| Criminal Warrants | 547 | 133 | 31 | 19 |
| Total | 5,524 | 1,920 | 1,996 | 2,940 |

Source: MCSO Courts Security Division (YTD reflects Jan-Sept Data)

The current workload shows a rise in the number of remands (pre-trial detention) with a trend upward to pre-pandemic levels without the same level of 2019 personnel deployment. The process of remands is time-consuming for staff personnel as opposed to the process of criminal warrants. Remands are normally more time-consuming than warrants for various reasons.

Oftentimes when a subject is remanded and a warrants check is completed, the subject will also have outstanding arrest warrants in addition to the remand. This is coupled with the prior process of conducting remands in both the South Court Tower (SCT) and in the Central Court Building (CCB); however, the intaking has changed to include remands only occurring at the South Court Tower. This requires CCB deputies to walk their in-custodies to SCT for processing, which takes additional time, compounded by the increasing number of remands.

It should also be noted that many remands and in-custodies require the presence of two or more deputies to assure the safety of the deputies and the remanded subject. This approach is a best practice standard to reduce conflict and the risk of force encounters. National standards and review of critical events have demonstrated higher risk factors with noncompliant subjects during fingerprint processing. This issue is compounded by the need to escort remands and warrants from CCB to SCT through the public court, which is not a best practice. Conducting more secluded and thus safer escorts is a standard objective for custody facilities and current practice should be evaluated by MCSO. A solution to this practice may reduce the need for additional personnel and also reduce the level of workload associated with the task.

Our review would indicate that the overall YTD activity is increasing as compared to pre-pandemic levels while the time demands regarding remands continue to expand. Based on this analysis it is recommended that MCSO review its current workflow of the remand process and estimate if the current staffing levels are appropriate for the growing workload.

## Case Investigations

This review found that minor investigations are assigned to CSD deputies and cases are assigned and managed by a CSD Sergeant. Other cases requiring major follow-up are assigned to MCSO major investigation bodies such as General and Major Crime Divisions or the Jail Crimes Detectives. The case management system used by MCSO is a commercial product referred to as the Traffic and Criminal Software (TraCS) and is a data collection and reporting tool for public safety. TraCS is mainly a traffic collision data collection, police incident report writing, and case

management system. MCSO refers to TraCS in various internal department policies and directives that were relevant and up-to-date. More recently, TraCS has developed into a capability for case management.

There is no specific written protocol used for the case investigation management or cases entered into the TraCS system. Investigated cases are assigned to individual deputies by their sergeants for follow-up or assigned to the Major Crimes Division or other unit. It is recommended that MCSO develop a written process for case investigation management for sergeants to follow. The written protocol would provide the ability to audit and assess case management and establish a consistent process to follow.

TraCS is an accomplished and functionable software system to record and retrieve incident information and was developed primarily and specifically for traffic-related events and data tracking. It provides the ability to provide electronic crash reporting and electronic citations for American police departments and has been in use in Arizona for nearly 20 years. Although useful, it is highly recommended that MCSO conduct an analysis to determine if TraCS is efficient for MCSO case management services or if a broader records management system (RMS) is required.

Reports assigned to CSD deputies for 2019 through 2022 YTD as provided by MCSO staff are as follows:

- 2019: 1,122 reports with no reports currently open.

- 2020: 695 reports with no reports currently open.

- 2021: 519 reports with no reports currently open.

- 2022 Year to Date (September): 403 reports with no reports currently open.

The total of CSD reports demonstrates another area of concern in which the deputy activity will likely surpass 2021 levels with approximately 600 police reports. Staffing has gone down since 2019 while the report writing demands have increased over the past year. CPSM recommends MCSO conduct a work analysis in this area to estimate if more personnel are required to meet the workload or if a change in report procedures is needed to maintain manageable work levels.

## Policies, Procedure, and Operational Manuals

A review of the CSD operational manual, procedures, and updated security and safety protocols show they either meet or exceed national standards as promulgated by the National **Center for State Courts (NCSC) and the National Sheriffs' Association (NSA).** The security plans provide security overrides for critical events to include:

- An escaped inmate.

- A homicide suspect.

- An aggravated assault involving serious injury.

The operational manual emergency plans continue to meet or exceed standards by providing duties and responsibilities during a security override that includes communication, radio, and personnel notifications as well as protocols involving court operations, detention officers, court staff, and judicial branch security personnel. MCSO reviewed its policy manual with all relevant

policies receiving a review or update in 2022. The Court Security Division Operational Manual was also reviewed by CPSM: it was last updated in June 2022.

Additional areas of review that meet and exceed standards include:

- Extradition trip protocols.

- Fire alarm, evacuations, and power failures.

- Major fires.

MCSO also has developed written procedures regarding panic alarms installed throughout the Superior Court buildings and primarily located in the courtrooms. The panic alarms do not ring directly into the dispatch center; instead, the alarms are sent to the Judicial Branch Security Operations Center. The Judicial Security Center immediately alerts the Court Security Division, which responds to all activations. The response to alarm activations are provided in policy EC-2 as well as the Court Security Divisional Operational Manual (updated in June 2022).

A review of the MCSO policy and operations manual indicates there is a mandate that all personnel receive medical emergency training as prescribed by law and maintain their certification in:

- Basic first aid.

- Cardiopulmonary resuscitation (CPR).

- Automatic External Defibrillators (AED).

The training records for the MCSO Court Services Division were reviewed, and while we found it is in need of updating, the spreadsheet properly noted training records for all personnel with proper standard training details. The MCSO HUB website provides the majority of internal personnel training and is managed by the Maricopa County government as a learning management system. All other law enforcement training is provided by the MCSO Training Center or at specialized training locations. The CSD conducts regular fire-alarm drill training and is currently developing expanded response training in 2023 to include threat responses and active shooter protocols. CPSM realizes that with the MCSO staffing shortages the ability to conduct regular training regarding unusual and critical events is difficult, but it should remain a priority. CPSM recommends that MCSO prioritize and set goals to achieve quarterly active shooter, special response, and critical incident management training for CSD personnel for 2023.

Currently, there is no rotational cycle for CSD personnel; however, transfers occur due to the current level of vacancies. This requires movement of personnel limited to operational purposes. It is also recommended by CPSM that MCSO consider a rotational cycle for personnel to expand the breadth of knowledge and experience of the department. The process should be a transparent and open process to gain the support of frontline personnel regarding rotation cycles.

The current policies pertinent to the detention facilities were updated in June 2022 and the challenge for the management team was assuring the content in the policies was reflective of the newest federal and state laws. The policies reviewed included GJ-21, Office Duties for Superior Court Buildings: GF-5, Incident Report Guidelines: and GD-1, General Office Procedures. Due to the structure of the court mandates, all policies requiring updates or changes require a strict adherence to review and approval. The turnaround time to ensure updated policies reflect the newest laws and procedures are a challenge for MCSO. In addition, the current operational manual was reviewed: it is currently under revision by MCSO. It is recommended that MCSO

streamline the policy update process so that all policies and functional manuals are reflective of the newest federal and state detention laws.

## Site Inspection, Technology, and Equipment

During the structure inspection, we found the working main facility was in proper working condition and the level of security prevents unapproved vehicle entry, trespassers, and entry into the physical structure. The internal facility provides a safe and secure environment for both prisoners, visitors, and MCSO personnel. The area is clear of debris and boxes; the workspace is secure with open areas of workspace and areas to walk freely. The CSD operational manual was reviewed during the site inspection and the areas that met or exceeded national standards included the following:

- Power outage/power failure.

- Black-out emergencies.

- Radio emergencies.

- Quick Response Team (Response to alarm activations and other critical emergencies to include workplace violence and active shooter).

- Radio Emergencies (switch activation).

- Riot/Crowd Control response to civil disobedience disturbance, or riot.

Overall, the site inspection found conditions well-above average in terms of safety, storage, vehicle security, site control practices, evacuation protocols, external ladders access, first aid, safety equipment, site tidiness, and accessibility. It was noted that the CSD is in need of four updated local printer/scanner deputy workstations. The need to maintain work areas should remain a priority for MCSO. It is recommended MCSO conduct a CSD survey to identify the simpler needs of work areas that would increase efficiency.

The constant concern for upgrades in technology and equipment were constant themes among management and supervision. Most notably, an updated records management system is of the highest priority. The current systems most in need of upgrade and replacement include the criminal booking system: however, the MCSO IT staff appear to be very efficient in their response and development of solutions for deputies.

## Court Security Division Recommendations:

- It is recommended that the MCSO work with the federal monitor to address the impact of the court order on staffing levels and develop a realistic approach to the retention, recruitment, and staffing challenges. (Recommendation No. 21.)

- It is recommended that a force encounter strategy be developed by CSD that is unique to its detention duties, particularly for potential force encounters and de-escalation in confined places. (Recommendation No. 22.)

- CPSM recommends that MCSO consider decentralizing the deployment of sergeants closer to the courthouses where MCSO deputies are staffed. (Recommendation No. 23.)

- It is recommended that the Division Commander provide an agenda with listed topics to measure the quality and outcomes of the staff meetings. (Recommendation No. 24.)



- In order to properly define the absolute number of operational PCN assignments for the division and identify "true" vacancies, CPSM strongly recommends that MCSO reconcile the number of actual budgeted PCN assignments with the current divisional deployment in the Court Security Division. (Recommendation No. 25.)

- It is recommended that CSD develop a database that tracks annual judicial threat investigations for quicker research and trend identification. (Recommendation No. 26.)

- It is recommended that MCSO review its current workflow of the remand process and estimate if the current staffing levels are appropriate for the growing workload. (Recommendation No. 27.)

- It is recommended that MCSO develop a written process for case investigation management for sergeants to follow. (Recommendation No. 28.)

- CPSM recommends MCSO conduct police report work analysis to estimate if more personnel are required or a change in report procedures is needed based on the trend. (Recommendation No. 29.)

- CPSM recommends that MCSO prioritize and set goals to achieve quarterly active shooter, special response, and critical incident management training for CSD personnel for 2023. (Recommendation No. 30.)

- It is recommended by CPSM that MCSO consider a rotational cycle for personnel in order to expand the breadth of knowledge and experience of the department. (Recommendation No. 31.)

- It is recommended that MCSO streamline the policy update process so that all policies and functional manuals reflect the newest federal and state detention laws. (Recommendation No. 32.)

- It is recommended MCSO conduct a CSD survey to identify the simpler needs of work areas that would increase the efficiency of work that needs to be performed. (Recommendation No. 33)

§ § §

## RECORDS AND AFIS

The MCSO Records and Automated Fingerprint Identification System AFIS section has 69 authorized positions, 14 of which were vacant during this assessment (excluding newly authorized vacant Proposition 207 positions). The section is led by a civilian commander who has five supervisors that report to her. Each supervisor is responsible for a unit. Two of the units have 24-hour-a-day, 7-day-per-week responsibilities. The staff members assigned to the section are spread out in various facilities throughout the county, making effective supervision difficult.

Staffing vacancies, high workloads, and supervision challenges were common issues discovered in Records. Determining the appropriate staffing necessary to fulfill the mission of Records is difficult due to the current vacancy rate, the outdated technology, and the manual processes being used by staff. The 20 percent vacancy rate has a substantially magnified negative impact because of the specialized units in Records and the 24/7 schedule.

The most significant technology problem is the lack of a comprehensive records management system (RMS), which is addressed in more detail below. The lack of such an RMS and other modern technology leaves the staff searching multiple data sources for information for reports, warrants, and other routine processes. Employing modern technology would significantly reduce the staff time taken up in nearly every area of Records. CPSM recommends MCSO focus intensely on filling the current vacant positions and also consider increasing compensation or other benefits to support this effort.

## Criminal Records Section

The unit consists of one supervisor position, five records technicians, and seven vacant technician positions recently authorized to fulfill Proposition 207 responsibilities. The section currently processes sex offender registrations and updates, and handles the process for permitting adult business and providers. The County currently has approximately 9,000 sex offenders who must report once annually during the month of their birth to update their registration.

The section is also responsible for the agency compliance with the criminal records provisions of the Prison Rape Elimination Act (PREA), which requires criminal history checks on every employee and volunteer of MCSO every five years. The Criminal Records Section will also soon be responsible for processing records expungement under Proposition 207. The County recently funded seven new positions for Prop 207 duties (allowing people to request marijuana convictions be expunged), but the positions have yet to be filled. The section will begin processing marijuana-related expungements as soon as the staff can be hired and trained.

Recent changes in state law to the sexual offender registration process requires in-person **registration during the month of the offender's birthday. This in**-person process is more onerous than the previous process and requires significantly more time to register each offender. The Records section did not receive any additional resources for this change and the vacancies have put a significant strain on the workload and ability of the staff to comply with all of the new requirements and in-person registration requirements.

## Criminal Process Section

The Criminal Process section handles entering warrants and other court documents. The process of entering each warrant requires researching individuals, records, etc. and takes approximately 20 minutes per warrant to gather the necessary information and enter it into the system properly. MCSO is the central depository for all warrants in Maricopa County. The section receives



warrants from 29 Justice Court Centers. In 2021, the unit processed 46,471 warrants. The unit consists of one supervisor and seven clerks.

The warrants must all be entered into the database promptly and accurately to ensure public safety, accountability, and the safety of law enforcement officers who may encounter a person with a warrant originating in MCSO's jurisdiction. The work is very technical and errors can have significant consequences, resulting in criminals continuing to be free to commit additional crimes (sometimes violent crimes) or wrongful arrests. With COVID-related changes and the many other recent changes to the criminal justice system, many more people are cited and released or released on promises to appear. The volume of warrants is increasing and the vacancies in the section have added additional strain on staff to meet the stringent demands of the process.

## Departmental Reports Section

The Departmental Reports section handles all of the public records requests, Universal Crime Reporting (UCR) coding, and preservation of evidence processes. The unit has four clerks and one supervisor. They handle the public counter, which is open from 7:30 a.m. to 5:00 p.m., Monday through Friday. The unit is housed in the Central Courts building, and its hours of operation mirror the court's. The section handles public walk-in requests for records and fulfils the requests immediately when possible. There are fees for some of the public record requests, and the fees are collected by staff. MCSO has a robust cash handling policy that includes opening and closing procedures that require documentation. There are monthly reports and periodic auditing procedures to ensure the integrity of monies collected form the public. The Finance Department is involved in the process, which appears to have adequate checks and balances.

The Reports Section also handles coding and UCR reporting, which is an arduous process due to the lack of an industry standard records management system (RMS). Staff must search multiple, separate databases for each report, review each report, and manually compile the proper codes for the UCR data. Because of the manual processes and the limited staff in the unit, MCSO is two years behind on UCR reporting and is not current with recent federal mandates to transition to NIBRS reporting. For an agency the size of MCSO with the volume of records processed, the lack of a comprehensive RMS system is a major issue. CPSM recommends the MCSO develop and prioritize a plan, with timeline benchmarks, to eliminate the backlog of UR reporting requirements and begin the processing of NIBRS entries in order to comply with state and federal mandates.

The lack of current, reliable, and reportable data on crime rates is a significant handicap for MCSO that has far-reaching implications. MCSO analysts currently rely upon computer-aided dispatch (CAD) records for analysis of crime trends and other information gathering and reporting. CAD records are based on calls for service and do not include the verified and detailed data from a deputy's crime report. The CAD data can often be unreliable as it is based on initial coding and classifications by dispatchers from caller descriptions of an incident. In addition, the lack of current and reliable data negatively impacts MCSO's ability to be transparent and hold itself accountable. During our site visit, we heard it was not uncommon for reports or other data to slip through gaps in disparate systems or be missing completely.

Contemporary RMS have automated reports and dashboard data systems that assist agencies in not only tracking crime, but preventing or intervening in crime. The lack of reliable real-time data impedes the agency's ability to utilize contemporary crime suppression efforts and limits management's ability to most efficiently and effectively allocate resources. Further, state and federal crime reporting systems that are mandated do not include data from MCSO for the last two years. The lack of reported data to the state and federal governments may adversely impact the agency's ability to obtain certain federal or state funding.

In all of the departments CPSM has studied, we have not observed an agency of MCSO's size or complexity which does not have a comprehensive records management system. The lack of a complete RMS has an agency-wide impact that severely hinders efficiency and effectiveness, preventing modernization and adaption of contemporary practices. CPSM strongly recommends MCSO purchase and implement a new comprehensive records management system.

## Warrants Section

The Warrants Section performs National Crime Information Center (NCIC) warrant verifications for deputies and law enforcement officers encountering a person with a warrant from Maricopa County. This is a 24-hour-a-day, 7-day-per-week operation that handles calls from officers who may have encountered a subject somewhere in the United States and even internationally. Staff uses the information provided by field officers, compares the information to the warrant, and verifies the validity of the warrant in order to enable the law enforcement officer to enforce the warrant. As the official repository of all warrants for Maricopa County, this is a mandated and essential responsibility. The unit clears approximately 300 warrants per day.

The unit also enters information into NCIC and other databases in order to share information on subjects or property with other agencies. For example, missing persons and stolen vehicles are entered into the system so if the person or vehicle is located by another agency, they have the appropriate information. The databases are strictly regulated and require specific training and certifications in order to view or enter information. The Records Manager is responsible for administering all of the training and certifications of MCSO employees for these databases.

## AFIS

The AFIS section consists of 28 analysts and 3 supervisors who perform a variety of fingerprinting responsibilities. Staff are assigned to various areas to perform fingerprint functions, such as fingerprinting incoming inmates, fingerprinting sex offenders, fingerprinting those surrendering on summonses, fingerprinting applicants, etc. The unit has staff spread out in different facilities countywide, working different shifts in separate divisions; this situation can cause some challenges for supervision and communication. The supervisors are divided into three shifts covering a 24-hour period.

## New Legislation and Challenges

A couple of recent legislative changes have posed additional challenges for Records. These challenges, described in more detail below, will require additional middle management and executive level leadership and oversight. Traditionally, MCSO has rotated sworn Deputy Chiefs and others through assignments with civilian bureaus such as Records and Property and Evidence. The effect has been little long-term executive level advocacy, oversight, planning, and implementation. The lack of a modern RMS is an example of the lack of organizational planning and prioritization. To handle the current needs, address the backlogs, and address upcoming challenges, CPSM recommends MCSO consider hiring an experienced civilian executive to oversee key civilian functions.

The process of legalizing marijuana in Arizona also now requires expungements of previous records. There are approximately 250,000 records that need to be researched, examined, and expunged where applicable. The County has added new positions to Records to accomplish this legislative mandate. The positions were yet to be filled during our site visit. This new mandate will require substantial resources and commitment from MCSO to comply with the requirements.

A recent legislative change requires sex offenders to physically report to renew their registration annually. Recently, 60 people showed up at the public counter on one day to renew their registration. The section only has three clerks assigned. Previously, the process was handled by the State of Arizona through the DPS. There are 9,000 registered sex offenders in Maricopa County who will now be required to personally appear to renew their registration during their birth month. Staffing, systems, and processes will have to change in order to accommodate the massive new workload.

## Records Recommendations:

- CPSM recommends MCSO focus on filling the current vacant positions and consider increasing compensation or other benefits to support this effort. (Recommendation No. 34.)

- CPSM strongly recommends MCSO purchase and implement a new, comprehensive records management system. (Recommendation No. 35.)

- CPSM recommends MCSO develop and prioritize a plan, with timeline benchmarks, to eliminate the backlog of UCR reporting requirements and begin processing NIBRS entries in order to comply with state and federal mandates. (Recommendation No. 36.)

- To handle the current needs, address the backlogs, and address the upcoming challenges, CPSM recommends MCSO consider hiring an experienced civilian executive to oversee key civilian functions. (Recommendation No. 37.)

§ § §

# SECTION 5. DETECTIVES & INVESTIGATIONS BUREAU

The Investigations Bureau of the Maricopa County Sheriff's Office includes the following divisions, according to the Bureau's organization chart, updated as of September 2022. Except for the SWAT Division, all other divisions were assessed for this report. In this report, SWAT is now reviewed under the section on the Patrol Resource Bureau. Divisions in the Bureau as of September 2022 are:

- Major Crimes Division.

- General Crimes Division.

- Intelligence Information Division.

- Special Investigations Division.

- Enforcement Support Division.

- Scientific Analysis Division.

- SWAT Division.

CPSM focused on the following top priorities for this assessment:

- The increasing number of sworn and non-sworn vacancies throughout the Bureau.

- Annual employee attrition rate and recruitment within the Bureau.

- Compensation challenges and maintaining organizational optimism.

- The need to update equipment, technology (mainly a records management system), and infrastructure.

- **Assessment of organizational resources and structure to better "fit" today's** twenty-first century policing challenges such as community engagement efforts and building internal trust.

- Meeting the needs of increased workloads and tempo of public safety services to include local and contract jurisdictions, tribal land, as well as upholding mutual aid commitments.

The Bureau serves as the core (traditional) investigative body of the department. Its purpose is to investigate the most serious and significant of crimes, regardless of the category, while other serious crimes are parceled out to the General Crimes Section as well as investigations assigned to the Special Investigations Section and the Enforcement Support Division. Other types of non-series crimes, not part of a series of crime or trending events, can be reassigned to patrol deputies for follow-up investigation. This approach is an MCSO-accepted practice depending on detective availability and individual caseloads. As such, detectives investigate murders, rapes, robberies, aggravated assaults, complex financial crimes, burglaries with significant losses, or any other serious offense as well as officer-involved shootings in coordination with other MCSO resources, the Phoenix Police Department, as well as with regional partners throughout the county.

This section of this report will be a holistic assessment of operations and not intended to repeat divisional reviews unless specific recommendations are made.

The Bureau staffing table shown here reflects an increase in authorized personnel in 2021/2022 due to the realignment of all General Crime detectives into one centralized location in downtown Phoenix. This segment begins with Bureau staffing assessment and a detailed examination of divisional operations and performance.

TABLE 5-1: Detectives and Investigations Bureau Staffing.

| Position | 2019/2020 Budgeted | 2020/2021 Budgeted | 2021/2022 Budgeted | Vacant |
|---|---|---|---|---|
| Executive Chief of Enforcement | 1 | 1 | 1 | 0 |
| Deputy Chief | 1 | 1 | 1 | 0 |
| Captain | 4.5 | 4.5 | 6 | 0 |
| Lieutenant | 10 | 11 | 11 | 1 |
| Sergeant | 20 | 20 | 26 | 3 |
| Deputy | 114 | 110 | 139 | 33 |
| Sworn Total | 150.5 | 147.5 | 182 | 37 |
| Civilian Specialist/Command | 21 | 27 | 23 | 5 |
| Administrative Support Staff | 20 | 20 | 19 | 2 |
| Total Civilian | 41 | 47 | 42 | 7 |
| Total Authorized Personnel | 191.5 | 194.5 | 224 | 44 |

Source: MCSO

In the reporting to follow, each section/unit will be assessed and reported to allow the consumer of this information to better understand how the divisions support the mission of the Maricopa County Sheriff's Office. The number one challenge for the Bureau is the estimated 40-plus vacancies. In evaluating retention rates, defined as the ability to maintain staffing levels with consideration for retirements, resignations, and lateral transfers to other law enforcement agencies, MCSO has similar challenges to those being felt throughout Arizona and the nation. The Bureau's retention factor is 74 percent, much below the U.S. Labor and Statistics best practice of 90 percent. This is not just an MCSO challenge but one that most American law enforcement agencies are struggling with to maintain staffing during and after the global pandemic and social justice movement. The issue of vacancies is a top priority for MCSO as the Bureau incurred unique challenges due to the recent social, political, and economic impacts. Over the past few years, MCSO managed to maintain Bureau staffing numbers and recruitment for the detective assignments. In part, the challenges of the Melendez Court Order required striking a balance in developing responses to the legal restrictions, police reform, and mandated reporting objectives, increasing the tempo and stress on resources for the entire organization.

One such challenge involves reconciling staffing budget numbers with actual division staffing levels. Each MCSO employee is provided a position control number (PCN), assigned by budget to an operational bureau. As CPSM conducted this assessment it included discussions with MCSO personnel, management personnel, and reviewing staffing data: vacancies were at the top of the issues. The PCNs are a continuing challenge for MCSO. In the last few years, MCSO has dealt with attrition rates as employees resigned or transferred to other organizations, requiring MCSO to transfer deputies from one section to another to replace essential positions.

CPSM studied the number of vacancies reported throughout the Bureau and the accuracy of those numbers. It is unclear if the position control numbers shifted to the proper divisions when personnel were transferred to replace essential assignments. In other words, did the physical position transfer but the PCN remain in place and, if so, can it be attributed to the actual

number of Bureau vacancies? An essential management objective is to ensure if personnel are transferred between sections the PCNs should be modified at the county budget office to ensure PCNs match up with MCSO Bureau rosters. It is recommended that an examination be completed of current divisional PCNs with the budgeted PCNs to reconcile any differences in staffing numbers.

The overall budget of the Bureau is approximately $41 million, which includes the various divisions as well as a civilian division of crime lab technicians. Overall, the Bureau has maintained public trust as well as a focused workforce even as the number of vacancies remains an issue MCSO. Staffing numbers for the Bureau prior to the pandemic compared to the current year (2022) show an increase of 29 sworn personnel at the deputy rank and 6 sworn personnel at the sergeant rank. This increase in personnel occurred from combining all regionally assigned MCSO detectives into one hub near the Major Crimes Division in downtown Phoenix. The establishment of a General Crimes Division went "live" on April 18, 2022; therefore, data is limited for prior year comparisons.

Civilian personnel decreased by 6 positions since the 2020/2021 budget and it is recommended MCSO establish an ad-hoc committee of civilian personnel to identify areas where civilians can serve in more valuable positions of the organization. CPSM also recommends the continual priority of reducing the vacancy level and focusing on higher retention levels for the Bureau to maintain a professional working staff. These issues are related to compensation, ability to use personnel leave time, and pay rate scales.

This approach may accelerate the ability to replace sworn vacancies with non-sworn positions as well as lower the cost of filling positions. As recruitment and retention remain a top priority for the entire Sheriff's Office, retention is also a major challenge for the Bureau to maintain skilled and experienced personnel. MCSO will need to keep the reduction of vacancies at the top of its priorities as well as focus on achieving a higher retention level.

As stated, the number one priority for the Bureau is to fill the current vacancies while maintaining retention as new personnel are identified for rotation into the Bureau. This goal will be difficult to achieve as the number of vacancies in the Patrol Bureau remains the top priority for MCSO. Patrol staffing is a process that can require 6 to 10 months to hire a new deputy and without a quicker pace of hiring, rotating personnel into the Investigations Bureau will remain problematic. The impacts of the global pandemic, the national social justice movement, and calls for police reform have made it difficult for law enforcement to recruit and retain personnel. As the law enforcement profession rapidly changes, more is expected from law enforcement in the areas of investigation quality, victim engagement, and increased understanding of mental health. Therefore, the traditional benchmarks on detective performance, closure rates, and length of investigations is shifting as retention and recruitment become critical components of the quality of investigative work.

Staffing by divisions spotlights the challenge of maintain sufficient staffing levels to recruit deputies to apply for detective positions.

§ § §

# MAJOR CRIMES DIVISION

The Major Crimes Division currently has 13 vacancies based on the current position control numbers. These vacancies include 1 lieutenant, 1 sergeant, and 11 deputies. The backbone of MCSO's Detective Bureau is the Major Crimes Division as it investigates all homicides, unsolved murders, and major violent and serious crimes.

## TABLE 5-2: Major Crimes Division Staffing

| Position | 2019/2020 | 2020/2021 | 2021/2022 | Vacant |
|---|---|---|---|---|
| Captain | 1 | 1 | 1 | 0 |
| Lieutenant | 3 | 3 | 2 | 1 |
| Sergeant | 10 | 10 | 9 | 1 |
| Deputy | 53 | 53 | 51 | 11 |
| Total Sworn | 67 | 67 | 63 | 13 |
| Civilian Specialist/Command | 6 | 8 | 8 | 0 |
| Civilian Administrative Support | 2 | 2 | 2 | 0 |
| Total Civilian | 8 | 10 | 10 | 0 |
| Total Authorized Personnel | 75 | 77 | 73 | 13 |

Source: MCSO

## TABLE 5-3: Major Crimes Division Staffing by Role

| Role | Capt. | Lt. | Sgt. | Det. | Spec. | Admin | Vacant |
|---|---|---|---|---|---|---|---|
| Administration | 1 | 2 | | | | 2 | 1 |
| Support Specialist | | | | | | | 0 |
| Homicide-Active, Unsolved, Death | | | 3 | 15 | | | 5 |
| Vehicle Crimes | | | 1 | 6 | | | 1 |
| Cyber Forensic Analysts | | | | | 5 | | 0 |
| Cyber Crimes | | | 1 | 3 | | | 0 |
| Jail Crimes | | | 1 | 6 | | | 2 |
| Special Victims | | | 2 | 11 | | | 3 |
| Death Investigations Unit | | | 1 | 8 | | | 0 |
| Sex Offender Notification Unit | | | | 2 | 1 | | 0 |
| Scientific Analysis Specialists | | | | | | | 0 |
| Crime Analyst | | | | | 2 | | 1 |
| Totals | 1 | 2 | 9 | 51 | 8 | 2 | 13 |

Source: MCSO

The on-call policy is addressed more broadly in the review of each division and that challenge is relevant within the MCD. The Major Crimes Division is a traditional detective division that handles the most serious and most violent crimes in Maricopa County. The case intake process is reviewed later in this assessment and spotlights the struggle with case intake and assignment of investigations.

Most of the Major Crimes Division investigative units are reactive in nature, as their primary objective is to further select investigations initiated by patrol deputies responding to the

community's calls for service. Limited instances of proactive enforcement do occur though, with the Cyber Crimes Unit being most likely to initiate a proactive investigation from information provided by the Internet Crimes Against Children Task Force Program (ICAC). MCSO utilizes a sex offender notification unit of two trained MCSO deputies. Major Crimes has submitted a request to expand this unit with two civilian personnel and the request is under review by MCSO executive command. Suh a move would support CPSM's recommendation of advancing the career path for civilians.

It is also important to be able to combat cybercrimes and ensure law enforcement organizations are capable of investigating such crimes because many times cybercrime has a nexus to violent incidents as well as sex crimes and human trafficking. In addition, the national priority of homeland security includes a commitment to prevent incidents of government hacking that can paralyze a law enforcement agency. MCSO's Cyber Crimes Unit is a national model consisting of two separate components. The first component is made up of highly trained cybercrime detectives who investigate criminal activity related to Internet Crimes Against Children (which typically involves the sexual exploitation of minors on the internet), high-dollar internet-related fraud cases, and other high-profile cyber-related crimes. The second component is comprised of qualified and trained (civilian) certified computer forensic examiners who process and examine all cell phone, digital, and electronic evidence for the Sheriff's Office, including the Major Crimes Division, the Special Investigations Division, and all District Detective Units and patrol squads. It will be important that MCSO continue to advance its national best practice and increase the staffing in these units with civilian personnel and establish a more direct nexus with other investigative divisions and units.

§ § §

## GENERAL CRIMES DIVISION

The General Crimes Division (GCD) was established as a centralized group of detectives in April 2022; prior to that date detectives were assigned to the various districts as station detectives. The General Crimes detectives are responsible for investigating crimes against persons, property, and other mandated duties. GCD is under the command of one Captain (Division Commander) and is composed of two separate sections, each under the command of one Lieutenant (Section Commander). The two sections are the Crimes Against Persons Section and the Property Crimes Section.

The Division requires a minimum staffing of 7 sergeants, 26 detectives, 1 criminal intelligence analyst, and 1 administrative assistant. The crime statistics for the group are limited to June through September 2022 for purposes of this report; this limited sample does not offer enough data for assessment, Based on the number of vacancies the caseload for the General Crimes Division is a challenge for MCSO. CPSM was unable to evaluate the General Crimes clearance rates as the systems to monitor performance and case management were still being developed at the time of the assessment.

§ § §

# SPECIAL INVESTIGATIONS DIVISION

The Special Investigations Division, is a unique and a skilled division; it oversees specialized task force operations comprised of MCSO deputies and supervisors as well as local agency police officers.

## TABLE 5-4: Special Investigations Division Staffing

| Position | 2019/2020 | 2020/2021 | 2021/2022 | Vacant |
|---|---|---|---|---|
| Captain | 1 | 1 | 1 | 0 |
| Lieutenant | 3 | 3 | 2 | 0 |
| Sergeant | 4 | 4 | 3 | 1 |
| Deputy | 26 | 25 | 23 | 8 |
| Total Sworn | 34 | 33 | 29 | 9 |
| Civilian Specialist/Command | - | 4 | 1 | 2 |
| Civilian Administrative Support | 2 | 2 | 2 | - |
| Total Civilian | 2 | 6 | 3 | 2 |
| Total Authorized Personnel | 48 | 50 | 43 | 11 |

## TABLE 5-5: Special Investigations Division Staffing, by Role

| | Capt. | Lt. | Sgt. | Deputy | Spec. | Admin | Vac. |
|---|---|---|---|---|---|---|---|
| Administration | 1 | 2 | | | | 2 | |
| Support Specialists | | | | | 1 | | 2 |
| Rico Asset Invest. & Disruption Sec. | | | 1 | 2 | | | 0 |
| Maricopa County Suppression TF | | | 0/2 | 3/4(MCSO) | | | 2 |
| HIDTA Enforcement Action | | | 1 | 6 | | | 2 |
| Fugitive Apprehension & Tac Enfor. | | | | 6/2 | | | 3 |
| Technical Services Unit | | | | 2 | | | 1 |
| Threats Management Unit | | | 1 | 2 | | | 1 |
| Other Federal Task Forces (DEA) | | | | 2 | | | |
| HQ Security Detail | | | | 3 | | | |
| Totals | 1 | 2 | 3/2 | 26/6 | 1 | 2 | 11 |

The units that track and manage caseloads include the following task forces:

- FATE: The detectives assigned to the unit generate their own work product through proactive searches through JWI for active warrants. They also generate activity through a task force partnership with the FBI to apprehend violent criminal fugitives. FATE is a vital element in stopping violent crime and bringing violent suspects to justice no matter where in the world they may flee.

- Threat Management Unit: This two-detective unit is a responsive team to incidents involving cases under their purview. The intake process involves notification of the initial call for service and supplementing the original report as the unit assumes the investigation. There are incidents involving online events that could generate an informational report and/or criminal report. These can come from initial sources such as ACTIC (where it supplements originals), or

through the C-O-C as one of its mandated duties. In some cases a case is assigned for investigation by a sergeant.

- **Technical Surveillance Unit:** This two-detective unit is purely a supplementary function. They provide services and technology to assist the division (and organization at large) with the tools and maintenance of assets utilized to further criminal investigations to arrest and prosecution.

- Racketeering Influenced and Corrupt Organizations (RICO) Asset Investigation and Disruption.

- **Technical Services Unit:** Offers many unique aspects of policing from drones to specialized scene security, vehicle evidence and processing, and other crime scene and evidence collection. The unit is also trained to remove dangerous or hazardous clandestine drug materials.

- **HIDTA & Maricopa Suppression Team:** This team is essential to tracking and pursuing organized crime, gang elements, and drug cartels, and other criminal organizations. It is tied into a network of law enforcement experts who have resources throughout the nation.

The division has current vacancies in the support specialist unit with two positions and a total of seven deputy vacancies in the HIDTA, Fugitive, and County Suppression taskforces. The Threats Management Unit and the Technical Services Unit have one vacancy in each unit. In total, there are 11 vacancies in the division of 43 total PCNs for 2021/2022 as compared to the previous year of 50 PCNs. One of the primary recommendations for this Division is evaluating how to combine resources and request personnel from local police agencies under a regional agreement to reduce the number of MCSO deputies needed during this critical time.

§ § §

# ENFORCEMENT SUPPORT DIVISION

The Enforcement Support Division has the responsibility of providing services to all districts and investigative units. Additionally, the Enforcement Support Division is available 24/7 (on-call after business hours) to transport and set up command posts and intake arrest processing centers for large-scale events as well as equipment needs for critical incidents, special events, planned or unplanned. CPSM notes that for 2019 to 2021, the ESD captain was shared with the Arizona Counter Terrorism Information Center, also known as an intelligence fusion center connecting local, state, and federal law enforcement agencies to combat public threats and crime trends. CPSM interviewed divisional command personnel and frontline deputies for this assessment. We found the command center was well organized, limited in space, and housed its own crime analyst in the off-site location.

## TABLE 5-6: Enforcement Support Division Staffing

| Position | 2019/2020 | 2020/2021 | 2021/2022 | Vacant |
|---|---|---|---|---|
| Captain | 0.5 | .5 | l | |
| Lieutenant | l | l | l | |
| Sergeant | l | l | 2 | 1 |
| Deputy | 5 | 5 | 6 | 1 |
| Total Sworn | 7.5 | 7.5 | 10 | |
| Civilian Specialist/Command | | | | |
| Civilian Administrative Support | 1 | 1 | 1 | 1 |
| Total Civilian | 1 | 1 | 1 | 1 |
| Total Authorized Personnel | 8.5 | 8.5 | 11 | 4 |

Source: MCSO (represents pre and post pandemic levels).

Currently, ESD staffing includes one deputy vacancy and one sergeant that was transferred in October 2022 to backfill a shortage in another division. EDS requires personnel to serve on-call and call-backs but doesn't provide compensation for the on-call status. CPSM noted that there were no security/surveillance cameras for the off-site location, nor door alarms, as well as open parking with no restricted space for personnel. CPSM discovered it was difficult to obtain consistent mobile service inside the facility. CPSM concluded that there is a need to upgrade site security with vehicle bollards, restrict access to visitors, and other security needs. To achieve a secured working area for the work performed, CPSM recommends that MCSO conduct a site security assessment. This recommendation will be included for the Special Investigations Division as well. ESC requires basic, intermediate, search and rescue, and qualified armed personnel (QAP) for the posse unit deputies and serves as a special response unit for MCSO.

Based on our review of the Enforcement Support Division, CPSM believes the addition of a crime analyst is essential and would follow national best practices for a fusion center. There is a need to better connect all MCSO and joint task force technical crime analysts, but it is suggested these personnel be housed in their respective divisions. Our review of prior cases indicates that ESD has performed essential work to fight crime but which is rarely seen by the public even though it is critical to the national platform on homeland security. The number of personnel is a challenge for the Division as it is staffed to manage its caseloads, but increased staffing will assist in investigating organized crime, divisive political groups, and drug cartels. There are two recommendations for MCSO to consider for the future. It is recommended that MCSO can support the patrol vacancy level by scheduling volunteer reserve deputies and the volunteer posse to assist with patrol or special functions or special details as needed. It is recommended

that MCSO consider establishing a county-wide organized hub of crime analysts as a division without displacing their current assignments at their stations.

§ § §

# OVERVIEW AND ANALYSIS OF DETECTIVES

## Work Schedule and Structure

The Detectives and Investigations Bureau investigates all major and general crimes emanating from within Maricopa County and its contract cities. These are generally cases that are initially handled by a patrol deputy, then referred to detectives for further investigation or a "call-out" for immediate response and investigation where needed. All personnel are assigned four-day, ten-hour shift schedules, with the ability to flex days and times as well as extend hours based on investigative demands. Special shifts are allowed for surveillance and special operations.

As a general rule, assignment to the Detectives Bureau is not set on a rotational scale; assignment can be extended with Bureau approval. It is recommended that MCSO establish a rotational schedule for all Bureau assignments so that all personnel have an opportunity to further their development. As well, there should be continual performance assessments of all current detective personnel. The rotation process and identification of new personnel to transfer into a detective role should be an open and transparent process for all MCSO employees. CPSM realizes the difficulty in achieving this recommendation considering the vacancies throughout the organization.

One of the challenges for MCSO is the requirement that essential Bureau detectives are placed on-call; however, this process is not associated with the contemporary on-call policy with compensation. As CPSM conducted focus group interviews with essential personnel, this issue was at the top of the concerns and likely adding to the difficulty of recruitment and retention in the Bureau. It is recommended that MCSO establish a Bureau ad-hoc committee to produce potential retention solutions to increase the level of interest in the Bureau, improve training, and address concerns regarding competitive detective pay, compensated on-call policy, with contemporary pay differentials. The ad-hoc group should be commissioned for a specific time-period and produce a recommendation report for the MCSO Sheriff to review. Clearly, this type of concern requires Maricopa County Executives to be involved as well as other local government stakeholders.

## Case Intake and Tracking

Law enforcement agencies vary widely in case intake policies and practices relative to investigative division functions. In some agencies, all cases are assigned to detectives for review and follow-up investigation where appropriate. In others, only felony cases are generally referred to detectives, while patrol officers are responsible for the investigation to completion of misdemeanor cases. Various hybrid systems are utilized by others to track cases such as patrol deputies being allowed to forward cases directly for prosecution without detective follow-up. This approach allows intake sergeants to review the cases and approve the process for tracking purposes. Decisions as to the case intake processes are often driven by staffing levels. The MCSO Major and General Crimes Division are the central intake and tracking points for criminal investigations listed as Part I major crimes, which include:

- Robbery / Homicide (includes aggravated assaults).

- Burglary (includes larceny).

- Auto Theft.

- Financial Crimes.

- Sex Crimes.



- Family Crimes.

- Missing Persons.

- Computer Crimes.

- Special circumstances criminal incidents.

- Officer-involved shootings under a regional agreement plan for outside police agencies to assist with OIS and major investigations.

TraCS has been previously introduced in this CPSM report and the system is worth a basic review at this point. TraCS includes case management abilities and its origins nationally is the management and tracking of traffic data and accident statistics. Its use as an RMS is limited or requires the purchase of other components not currently used by MCSO. Through the TraCS software, the review of police reports is completed by MCSO staff and detective sergeants to ensure proper classification and distribution of casework. TraCS is an electronic data collection and reporting software utilized by public safety agencies throughout the nation. TraCS is used in over a dozen states to capture electronic crash and citation reporting. It is a free product used by the State of Arizona Transportation with access by many state-based law enforcement agencies. It has been used by MCSO since Arizona Transportation began using the software in about 2007.

MCSO utilizes a review process by division sergeants, known as TraCS Sergeants, as these sergeants review and assign cases. Based on increased investigative caseloads, lower-level crimes might be returned to patrol for additional investigative efforts, requiring patrol officers to complete additional work before assigning the case to investigations. The patrol case assignments are not tracked, likely due to the infrequency of these assignments. As well, the case work by patrol deputies is not tracked in the computer-aided dispatch system. When a crime occurs in MCSO's jurisdiction, deputies generally serve as the first responder and take the initial report. All Bureau investigative cases are assigned and managed at the small squad (Unit) of work within each section of the various divisions. Each "squad" sergeant is tasked with the responsibility for assigning cases based on the type of crime and level of investigation required. If the case qualifies as a major or serious crime, the case will ultimately be investigated by the General or Major Crimes Divisions.

It should be noted that in April 2022, after a carefully developed approach, the regional General Crimes detectives deployed through the county were reconfigured and reassigned to the MCSO investigative hub near the Major Crimes Division. Essentially, all general crimes detectives were reassigned to one centralized location.

Cases are assigned to detectives based on call type for either Crimes Against Person, Property Crimes, or Fraud. After initial review of a case if there was no call-out, some cases depending upon investigative needs/crime type (misdemeanor or felony) can be reassigned to patrol deputies for completion. The cases will also be reviewed by detective sergeants prior to assignment to a detective/patrol deputy and based on their review the case can be cleared if warranted and not assigned.

Based on our review of the case intake process for MCSO, CPSM concludes that the intake process has challenges; we have a recommendation for reevaluation and correction. The main premise behind this recommendation includes the challenge of using aging technology and current use of software that has an impact on the efficiency of workflow and effectiveness in using crime data for strategic purposes. Case management is meant to be a collaborative process that assesses, plans, implements, coordinates, and monitors the case investigation to

ensure services meet public safety expectations. Those expectations are to bring justice to victims and ensure equitable and fair justice to all those involved inclusive of suspects arrested for crimes.

MCSO has exceeded expectations based on overall crime rates; however, a closer examination of the case intake process is needed as well as a focus on case closure rates. CPSM concluded that MCSO case distribution is appropriate and is well vetted, but the hours spent to achieve this outcome should be reduced with improved technology and software. CPSM discovered It can take up to three days for case review of a police report and detective assignment. This problem cannot be rectified without a new RMS software system so that the TraCS Sergeant positions can be better utilized. There are certain cases in need of special attention and assignment while other cases occur and are solved by patrol deputies over a weekend or during a longer holiday period. It is recommended that MCSO develop an investigative intake and case assignment protocol that is completed within 24 hours (excluding weekends and holidays): CPSM asserts that an improved RMS system is required to achieve this recommendation.

Most of the investigative units in the Bureau are reactive to the cases received (a common standard across the nation). Exceptions to this approach are the special task forces in other **divisions as well as MCD's** Cyber Crimes Unit, which initiates proactive investigations provided by the Internet Crimes Against Children Task Force Program (ICAC). This is a very positive approach and exceeds best practices on proactive investigations.

The typical case intake process for a call for service destined for investigation by the MCD will have the initial incident report **marked as "Original,"** which documents the known information about the event, known involved individuals, and any alleged criminal violations.  Patrol personnel are trained to conduct field investigations and supplemental field work within their skill and ability levels. Patrol investigations are capable of field investigations that occur within 48 hours of a crime investigation. Deputies will author an incident report categorized as a supplemental report. Cases identified as requiring "further investigation" by the MCSO Detectives typically follow one of two processes:

- A threshold for **"Callout"** response by MCD investigative units is met, and an MCD investigator is assigned to the case.

- A review of the investigation and alleged criminal violations is completed by a TraCS **"Detective Sergeant,"** who determines the documented information meets the threshold/requirements for assignment to an MCD investigator.

Cases that fall below the threshold/requirements for further investigation are typically closed by **a TraCS "Detective Sergeant"** user as:

- Cleared by Arrest.

- Exceptionally Cleared.

- Unfounded, Inactive.

If the initial patrol response fails to document sufficient information needed to make an assignment or closure decision, the investigation may be returned to patrol personnel for additional documentation or investigative actions. The cases returned to the patrol deputies are not individually tracked until the investigative cases are returned to the Bureau. This challenge, combined with the previous recommendation, requires a more systematic and universal approach. It is recommended that MCSO adopt a protocol assigning cases to Bureau

detectives, establishing a reviewable tracking process that is immediate and accessible by other bureau divisions.

The MCSO TraCS Sergeants typically review hundreds of MCD and GCD cases per week to ensure that the proper case classifications and the case assignments are appropriate. CPSM visited the worksites at the Major Crimes Division, General Crimes Division, Special Investigations Division, and the Enforcement Support Division. CPSM interviewed command staff, supervisors, and frontline personnel to include civilian personnel working crime analyst and intelligence positions. CPSM found that large portions of the day are spent reviewing patrol reports for investigative intake to ensure CAD classification are appropriate. If cases are found to be misclassified by the initial call for service or at the classification point by MCSO deputies, the detective sergeants (or others), reroute the reports to the proper detective unit while updating the case management system in TraCS.

As it relates to case management, CPSM found the volume of investigative cases being returned to patrol deputies for investigation is a consistent daily occurrence throughout all districts. Case investigations by field deputies is likely causing a decrease in patrol discretionary time and should be a concern for MCSO management. Assigning investigative cases to patrol deputies is not an unusual activity but it is a practice that should be minimized and controlled by policy and process. For a closer examination of patrol discretion time please refer to CPSM's patrol operations segment of the report. It is recommended that MCSO develop a process to decrease the investigative cases assigned to patrol deputies and develop a process to track and review cases given to patrol deputies.

Based on our **review of the TraCS and MCSO's Hexagon I/CAD systems,** CPSM believes MCSO would benefit from an updated CAD system and preferably an overall integrated software system where the CAD and RMS are shared to provide instant updating and classification of cases. This would reduce a large portion of supervisors' time in reviewing caseload while also allowing automatic population for easier review and assignment.

The value of a records management system is perhaps best demonstrated by how effectively it can store and retrieve information. Records are maintained for future use as the data may be needed for other purposes. While quantity can be important, the quality of an RMS is the true measure of its benefit. While the value of holding a quantity of data is important it is more crucial that records are maintained in an organized and readily available format.

When an organization's RMS and CAD utilize a common software program, the ability to retrieve, update, and assess records for detective personnel is also a critical part of case management systems. This dual-purpose software means the data from CAD is instantly cataloged, cross-referenced, and stored in the RMS. There is no need for additional programs or software to link the two systems. MCSO currently allows for each branch of the Bureau to maintain their in-take and management systems as opposed to a universal system that benefits all investigative components to include the Special Investigations, General Crimes, Enforcement Support, and the Intelligence Information Divisions.

As an example, a CAD entry on a call for service can easily be reclassified by a deputy entry or a radio broadcast at the conclusion of a field investigation and a unified system allows for the RSM system to also be updated. This would allow the systems to act as one as real-time data is entered and accessible to detectives immediately. This would enable the detective sergeants to digitally review the police reports the follow morning and would also enable access to the integrated CAD data such as CAD chat history. Other data could be auto-populated, which would aid the quality of reports and the review process.

Additional advantages of a singular software solution for computer-aided dispatch and records management systems include automated shift logs, unit posting assignments, integrated mapping, activity details, and statistics reports for detective review. Ultimately, the case intake process can be a universal tool for all detective personnel in improving the linking mechanism.

It is recommended that MCSO consider integrating its CAD and RMS system so as to reduce the review hours expended by detective sergeants while also enabling the systems to store and retrieve data instantly.

## Case Management

Examination of the types of crimes being investigated provides some insight into the relative workload and associated staffing. All detectives division were reviewed, but caseloads per detective were difficult to ascertain due to the limitation of the TraCS system along with changes in rosters and division vacancies. Overall, the caseloads appear to be efficient based on the various types of investigative units, with lower caseloads for specialized detectives such as sexual crime investigators.

There are no absolute standards to determine appropriate caseloads for police investigators. One murder investigation could occupy the time of several detectives for months, and on the other hand, one detective could handle hundreds of theft cases in a similar period. Nonetheless, the International Association of Chiefs of Police (IACP) suggests that a detective caseload of between 120 and 180 cases per year (10 to 15 per month) is manageable.

Other sources suggest that departments should staff one detective for every 300 UCR Part I Index Crimes recorded each year. However, over the past few years, changes in investigative techniques and mandates have altered the trajectory of investigative works. Many basic search warrants require a much higher level of investigation and time commitment due to the need to examine such things as smartphones and information such as cell tower data from hundreds of cell towers (as an example). This has increased the complexity of investigative work by the number of technology systems utilized. The major national challenge that also exists in Maricopa County is in locating, reviewing, and uploading video from businesses, residential homes, and body-worn cameras, which has become a time-consuming task, especially in light of a lack of personnel to assist in this effort. Therefore, the time required to investigate a case with pursuable leads has likely increased over the past few years with no empirical metric yet developed as a "benchmark" for police agencies in the twenty-first century. The technology systems used by the Bureau to support investigations are listed below: this list offers an indication of the investigative time now required to research, review, and act on investigative data.

- ESRI ArcGIS Pro, mapping and analytic software.

- i2 Analyst Notebook, visual analysis tool for social networks and geospatial/temporal views to connect patterns in data.

- CellHawk, cell phone data analysis system.

- Vigilant License Plate Reader.

- Crystal Reports, customized data reports.

A review of case management assignments showed that the amount of data provided was limited and each division maintains its own style of case management and tracking. As an example, the General Crimes Division has been active as a division since April and working towards capturing case management data.

One of the positive elements of MCD and GCD as well as other divisions that track caseloads is the expectation that detectives provide regular updates on open investigations within 30 days. This process is provided through written policy by requiring detectives to update the TraCS system every 30 days with case updates. However, the challenge is that there is no universal system offered by TraCS or an off-shelf computer program that provides an immediate list of all those in violation of the policy and other benchmarks. Many law enforcement organizations struggle with this aspect of detective accountability, but it is essential to reach social justice and meet public expectations in pursuing justice. It is recommended that MCSO detective divisions establish a universal computer system that can provides 30-60-90 day reports on investigative reports in need of supplemental updates on open criminal cases.

A review of case management noted that MCSO will need to develop a reporting system that captures total cases assigned to detectives for all divisions; however, that cannot be achieved without technology and software updates. In general, as an example, the MCD case intake and assignment for August 2022 was reviewed and there was a total of 1,036 investigative cases assigned to 71 detectives to include Sergeants, Lieutenants, and a Commander. With vacancies, this is an average of 62 cases per detective. A closer examination found that the range varied from as low as 10 to 15 cases per detective for the month to as high as more than 50. Case assignment and management will remain a challenge until TraCS is updated or a modernized RMS system is purchased.

## Crime Rates and Crime-Fighting Strategies

MCSO has continually provided outstanding policing service to the largest county in Arizona during critical times: the crime rate statistics shown in the following tables and figures highlight this dedicated service. The challenge for MCSO and the entire county is the regression in maintaining employee retention rates and an increasing vacancy level that can hamper what has been accomplished over the past several years. Since 2019, every area of the nation has been impacted by the global pandemic, a brief economic recession, and a national social justice movement that is impacting how police services are deployed and how critical community relationships and partnerships are maintained. Crime rates for the years of 2019 to 2022 are unavailable for this assessment. This review will highlight crime statistics and highlights over the past decade through 2019.

To begin, the next table provides a snapshot of the crime rates per 100,000 population in Arizona counties, the state, and the nation. Maricopa County is the most populous area in the state yet it experiences a lower crime rate than some smaller counties in Arizona as well as lower than the national level.

The strong crime data graphed in the following two figures shows little change in violent and property crime over the past decade in Maricopa even as the **county's population** grew. This data suggests that MCSO had adequate staffing and crime-fighting strategies from 2010 through 2018 and was likely one of the safest counties to live in the United States. Currently, however, MCSO is struggling with an increasing employee vacancy rate, diminished retention rates, and technology and software challenges in the face of continuing population increases. CPSM prefers to assess law enforcement organizations based on a 2019–2022 snapshot to include activity prior to, and during, the pandemic, recession, and social justice period in 2020–2021with YTD statistics for 2022. It is recommended that the MCSO begin to develop a strategic approach to capturing crime data from 2019–2022.

TABLE 5-7: Reported Crime Rates in 2019, by County

| County | State | Population | Crime Rates | | |
|--------|-------|-----------|---------|----------|-------|
| | | | Violent | Property | Total |
| Cochise County | AZ | 51,427 | 97 | 1,052 | 1,149 |
| Coconino County | AZ | 55,654 | 198 | 564 | 762 |
| Graham County | AZ | 20,469 | 73 | 616 | 689 |
| Greenlee County | AZ | 4,943 | 40 | 587 | 627 |
| La Paz County | AZ | 14,664 | 1,050 | 6,028 | 7,079 |
| Mohave County | AZ | 85,944 | 173 | 2,407 | 2,581 |
| Navajo County | AZ | 71,376 | 69 | 488 | 556 |
| Pima County | AZ | 362,047 | 171 | 2,385 | 2,557 |
| Pinal County | AZ | 226,895 | 94 | 801 | 896 |
| Santa Cruz County | AZ | 28,717 | 17 | 505 | 522 |
| Yavapai County | AZ | 93,024 | 256 | 1,037 | 1,293 |
| Yuma County | AZ | 64,893 | 227 | 1,318 | 1,544 |
| Maricopa County | AZ | 404,915 | 330 | 1,353 | 1,683 |
| Arizona | | 7,171,646 | 475 | 2,677 | 3,152 |
| United States | | 327,167,434 | 369 | 2,200 | 2,568 |

Source: MCSO

FIGURE 5-1: Maricopa County Reported Violent and Property Crime Rates, by Year, 2009–2018



FIGURE 5-2: Reported County and State Crime Rates, by Year



§ § §

TABLE 5-8: Reported Maricopa, State, and National Crime Rates, by Year

| Year | Maricopa County | | | | Arizona | | | | National | | | |
|------|-----------|---------|----------|-------|-----------|---------|----------|-------|-------------|---------|----------|-------|
| | Population | Violent | Property | Total | Population | Violent | Property | Total | Population | Violent | Property | Total |
| 2009 | 244,834 | 405 | 2,558 | 2,964 | 6,609,085 | 429 | 3,289 | 3,719 | 312,367,926 | 416 | 2,906 | 3,322 |
| 2010 | 354,104 | 279 | 1,445 | 1,724 | 6,404,623 | 403 | 3,229 | 3,632 | 314,170,775 | 393 | 2,833 | 3,225 |
| 2011 | 365,362 | 243 | 1,356 | 1,599 | 6,501,532 | 411 | 3,257 | 3,668 | 317,186,963 | 376 | 2,800 | 3,176 |
| 2012 | 370,046 | 249 | 1,207 | 1,455 | 6,572,455 | 422 | 3,102 | 3,523 | 319,697,368 | 377 | 2,758 | 3,135 |
| 2013 | 387,794 | 284 | 1,348 | 1,632 | 6,646,289 | 398 | 3,331 | 3,729 | 321,947,240 | 362 | 2,627 | 2,989 |
| 2014 | 408,648 | 273 | 1,229 | 1,502 | 6,751,280 | 383 | 3,108 | 3,491 | 324,699,246 | 357 | 2,464 | 2,821 |
| 2015 | 395,937 | 266 | 1,310 | 1,576 | 6,848,298 | 437 | 3,000 | 3,437 | 327,455,769 | 368 | 2,376 | 2,744 |
| 2016 | 403,509 | 284 | 1,330 | 1,614 | 6,951,468 | 458 | 2,959 | 3,417 | 329,308,297 | 383 | 2,353 | 2,736 |
| 2017 | 397,576 | 349 | 1,361 | 1,710 | 7,016,270 | 508 | 2,915 | 3,423 | 325,719,178 | 383 | 2,362 | 2,745 |
| 2018 | 404,915 | 330 | 1,353 | 1,683 | 7,171,646 | 475 | 2,677 | 3,152 | 327,167,434 | 369 | 2,200 | 2,568 |

The challenge for MCSO is providing crime statistics after 2018 and the inability to offer crime rates to CPSM for the past four years. This has limited CPSM's ability to provide a contemporary assessment of current crime rates and activity for the entire county. MCSO has also failed to maintain UCR reporting as well as the FBI requirement to transition to the National Incident Based Reporting System (NIBRS) by January 2021. MCSO is limited by software and technology requirements to maintain updated crime data as well as report crime to the FBI as mandated under the NIBRS system. CPSM strongly recommends that MCSO begin to maintain monthly crime statistics and publicly post the crime data on a monthly schedule for residents to view. CPSM also strongly recommends MCSO update software and technology to be able to report all crime data under the NIBRS requirements as soon as practical. FBI's Uniform Crime Reporting Program website provides the memorandums of requirement as well as the support from the Major Cities Chiefs (MCC), National Sheriffs Association (NSA), Major County Sheriffs Association (MCSA), and the Internal Association of Chiefs of Police (IACP).

## Case Clearance Rates

Clearance rates are an important measure of an individual detective's performance and can lead to the identification of training needs, need for additional supervisory oversight, and in some cases reassignment from the unit. Staff indicated that the Bureau is responsible for maintaining information on clearance rates, managed by office staff, and the crime analysis technicians.

CPSM maintains that while preventing a crime is of utmost importance to any law enforcement agency, solving crime should have parity. The solving of crimes which results in the prosecution of offenders not only prevents future crime, it provides much-needed closure to crime victims. Clearance rates as defined and measured by the FBI Uniform Crime Report (UCR) have been the benchmark for a department's effectiveness in solving crimes.

Historically, the UCR established a strict three-prong criteria for clearing of a case. For UCR reporting purposes, a crime is considered cleared when: (1) a law enforcement agency has arrested the offender; (2) the offender has been charged with the offense; AND (3) the offender is turned over to the court for prosecution (whether following arrest, court summons, or police notice). The arrest of one person may clear several crimes or the arrest of several persons may clear only one crime. Convictions or acquittals are not factored into clearance rates.

In 2016, the Criminal Justice Information Services (CJIS) Advisory Policy Board (APB) decided that the FBI UCR Program would transition to a National Incident-Based Reporting System (NIBRS), with data collection for that system to begin in 2021. All federal, state, local, and tribal agencies were required to implement a transition plan for crime reporting. Police agencies were to begin reporting NIBRS crime statistics in January 2022. The MCSO met that deadline and began to report Part I and Part II crimes into the new group reporting system under the NIBRS data collection system; however, full migration has not occurred. NIBRS requires crimes to be reported under group A or group B types with three classifications:

- Crimes against persons.
- Crimes against property.
- Crimes against society.

The new NIBRS reporting system will likely lead to initial increases in crime reported due to changes from the UCR's summary reporting system to the NIBRS incident-based reporting system. NIBRS allows up to 10 offenses to be reported per incident. Under NIBRS, each crime within an incident is one crime to be counted, potentially leading to a higher reporting number. As discussed throughout this report, MCSO does not utilize an RMS system at this time so the UCR and NIBRS reporting are out of national compliance as required by the FBI.

The overall case clearance rates were obtained by CPSM from MCSO data collection and are presented in the following table.

§ § §



## TABLE 5-9: Reported Maricopa County, State, and National Clearance Rates, 2018

| Crime | Maricopa County | | | Arizona | | | National | | |
|---|---|---|---|---|---|---|---|---|---|
| | Crimes | Clearances | Rate | Crimes | Clearances | Rate | Crimes | *Clearances | Rate |
| Murder Manslaughter | 21 | 6 | 29% | 331 | 244 | 74% | 14,786 | 9,210 | 62% |
| Rape | 141 | 40 | 28% | 3,201 | 561 | 18% | 127,258 | 42,500 | 33% |
| Robbery | 113 | 32 | 28% | 6,480 | 1,729 | 27% | 260,709 | 79,300 | 30% |
| Aggravated Assault | 1,061 | 538 | 51% | 18,452 | 8,348 | 45% | 745,238 | 391,000 | 53% |
| Burglary | 1,043 | 77 | 7% | 29,986 | 3,036 | 10% | 1,128,351 | 157,000 | 14% |
| Larceny | 3,840 | 460 | 12% | 135,716 | 24,675 | 18% | 4,812,405 | 910,000 | 19% |
| Vehicle Theft | 595 | 60 | 10% | 8,026 | 1,964 | 24% | 701,248 | 96,800 | 14% |

Note: National clearances are not publicly available, and these values were calculated from crimes and clearance rates.

The case clearance rate for MCSO is not maintained by an RMS system but rather is manually calculated by each division and section to determine the case clearance rate. This process is subject to human error and potentially inaccurate closure rates. **MCSO's approach to tracking case clearances does not reach national standards** per the best practices of the International Association of Chiefs of Police and the International Association of Sheriffs.

The table shows the MCSO murder and rape clearance rates are below state and national standards; this requires a more careful examination to the low clearance rate. Many different factors can attribute to the lower clearance rates ranging from vacancy level, lack of experienced personnel, challenges with witnesses coming forward, as well as increasing crime, and reaching legal standards for filing criminal charges. MCSO is also in the lower category of clearance in the areas of burglaries, larceny, and vehicle theft, while aggravated assaults are within the national and state averages.

MCSO utilizes the special services of divisions that conduct unique investigatory work such as the Intelligence Division, Special Investigations Division, and Enforcement Support Division. The work conducted in these division is very specific to local, regional, and national crime trends that do not reach the radar of the typical crime data on clearance rates. Their work includes:

- Specialized investigations.
- Fugitive apprehension.
- Threats management.
- Drug suppression.
- Drug cartel and organized crime investigations.
- Domestic and international terrorism.
- Major events, protests, and demonstrations.

These specialized divisions reviewed by CPSM offer case tracking and management of critical and clandestine investigations. This level of work is uniquely vital to the safety of residents, businesses, and visitors to the Maricopa County and should continue but without jeopardizing the need to locate and arrest violent crime suspects.

The prior recommendation for regional agreements to fill task force positions with regional personnel would help to improve clearance rates with higher arrests levels for wanted suspects. This collaboration would allow MCSO to use deputies to take on investigative workloads that can improve the violent crime clearance rate.

It is also recommended that MCSO develop a universal RMS-based approach to standardize case clearance rates to reduce the error rate as well as improve the quality of reporting. This would provide immediate and updated crime data while ensuring MCSO meets the national and state mandates of crime reporting.

### Specialized Assignments

It is common practice in police and sheriff agencies across the country of similar size of MCSO that detective assignment is broken down into two or three categories, such as crimes against persons (homicide, sex offenses, aggravated assaults, etc.); property crimes (burglary, theft, auto theft, etc.); and family crimes (juvenile crime, family-related crime against the elderly, domestic violence, etc.). MCSO is unique in that most police agencies do not encompass an area nearly as large as Maricopa County, which encompasses 9,224 square miles of area. MCSO has used its resources to maintain lower crime rates than most law enforcement agencies patrolling areas the size of Maricopa.

## Unsolved Homicides

With advances in technology and other investigative avenues, there may be opportunities to reexamine unsolved murder (suspended) cases. Any vacancies may provide a suitable opportunity to use salary savings to bring in a part-time, retired detective(s) to reexamine such cases; this work could be combined with missing persons investigations to help elevate the workload for detectives. It is recommended that MCSO consider (retired) part-time detectives to review unsolved murders and other missing persons to help identify leads or other factors to investigate. Those could then be assigned to a major crimes detective for follow-up, which may be as simple as sending biological/trace evidence to the crime lab for analysis or contacting missing people located by the part-time detective via technology or social media platforms. This is a low-cost way to appropriately reexamine these troublesome cases with the hopes of bringing the perpetrators to justice and providing relief and closure to the families of the victims while also locating missing persons. It also allows MCSO to reassign detectives to help improve clearance rates.

## Policies, Manuals, Training

As CPSM explores the various functions of departments, we examine policies that guide department operations and how the department operating units comply with those guidelines. As we examined the Investigations Division, we noted an absence of section procedural manuals to guide personnel through the many facets of section work at the investigative level. Section manuals also assist with the professional development of personnel as this resource offers sample documents and databases available for the investigative process. MCSO does not utilize a market-based policy company such as Lexipol to develop, manage, and provide training for MCSO personnel. Instead, MCSO uses internal personnel for policy updates, management, and tracking. Due to the Melendez court order, all policies are reviewed by the monitoring team for approval. In interviewing several executive, command, and frontline supervisors, the level of frustration with this process was often discussed. The process for policy development, training, and approval is a protracted process that does not provide best practices in managing police policies, manuals, and training bulletins. MCSO would benefit from contracting with a

professional, market-based company to improve policy development and approval and it is recommended MCSO and the court monitoring team discuss this option.

Our review of the Investigations Division's policy development indicates it is well-managed with best practices in place. It would benefit MPD to establish a singular point of policy management with one unit to oversee the leadership and development of policy. As well, the department would benefit from broader policies regarding structured assignments and providing guidance on traditional units of work.

Upon review of the Major Crimes and Scientific Analysis manuals, we found these divisions follow best practice standards and expectations; however, other Bureau divisions are in need of developing/updating their operations manual. This would enhance the quality of work while furthering the development of personnel.

It would also benefit MCSO to develop structured section procedures, inclusive of resources and examples of work, to further the professional development of newly assigned detectives regarding the core functions of investigative responsibilities. For instance, there are no defined procedurals that guide operations outside of the stated policies to further guide and develop MCSO detectives.

The policies of the Investigations Division are contemporary, updated, and reviewed on a regular basis but final approval requires much more time before these policies are operational. MCSO is also in need of an improved knowledge management system (other than the current HUB portal) to assist with confirmation that all employees are aware of updates and changes. There are models that are simpler to use and provide quicker processes to help employees understand policy updates and changes. The constant theme regarding policies was related to requests from management and supervisors for new or updated policies that were difficult and prolonged for approval.

AZPOST does not require specific training certification for detective personnel; however, AZPOST offer a large catalog of investigative courses to further the development and experience of police detectives. AZPOST is not part of this CPSM review and specific recommendations are not provided. There are several areas of concern with the POST commission and how it provides statewide training to reduce risk liability and improve safety, but it is highly recommended that MCSO develop a training matrix for all Bureau Divisions, Sections, and units of work.

Policies reviewed for this assessment include the following: all met or exceeded expectations per the Police Executive Research Forum (PERF), International Association of Police Chiefs (IACP), and the National Sheriffs Association.

- EA-8, Domestic Violence.

- EA-11, Arrest Procedures.

- EA-17, Death Investigations.

- EA-19, Juvenile Operations.

- EA-20, Missing Persons.

- EB-5, Towing and Impounding Vehicles.

- ED-1. Task Forces.

- ED-2, Covert Operations.

- ED-3, Review of Cases Declined for Prosecution.



- ED-4, Pawned Property.
- EE-3, Identity Theft and Forgery Form I-9 Document Use Limitations.
- EJ-1, ACTIC policies.
- GE-3, Property Management and Evidence Control.
- GF-5, Incident Report Guidelines.
- GJ-3, Search and Seizure.
- GJ-5, Crime Scene Management.
- GJ-6, Criminal Investigations Organization and Administrative.
- GJ-7, Criminal Investigations: Operations.
- **GJ-14, Victims' Bill of Rights.**
- GN-8, Informant Management.
- GN-9, Undercover and Investigative Funds Accountability.
- **GJ-14, Victims' Bill of Rights.**

MCSO utilizes a Special Weapons and Tactics team for all high-risk search warrants and special operations. This team has both a regional and statewide reputation as being best-in-class and cooperative with other law enforcement agencies. Internally, MCSO provides policy-driven procedures and expectations as to when non-SWAT components conduct tactical operations. The divisional expectations are defined and represented in evidence-based performance review that demonstrated best practices in operations planning, briefing, deployment, and debriefing events. One area of concern reflected a need to develop and maintain a master log or roster of search warrant service operations. A database would offer management and supervisors the ability to track trends, the number and type of dynamic vs. static warrant service, as well as specialized surveillance (take-down) operations vs. search warrant deployments. It is recommended that MCSO develop a universal database to track all search warrant and special tactical deployment operations for review and assessment.

The Bureau and task force operations have tracking mechanisms through these specialized units but the information is not accessible to management personnel to assess activity and conduct operational assessments. The TraCS systems allows for the tracking of MCSO search warrant service and is helpful; however, it is not the solution for higher-risk management approaches.

As noted in this assessment, MCSO nor the specialized assignments in the Bureau possess a developed training matrix for assignments; however, skilled detective positions are provided unique training for specific disciplines as needed. These courses relate to tactical operations, surveillance, specialized investigations, threat assessments, drug testing, narcotic-related skills, and for desert interdiction and clandestine operations. This also includes specific training in drone use and technology related requirements.

## Facilities

During our review of the various worksites, all of which are offsite, CPSM conducted interviews and walk-throughs of the facilities. The workspace, lockers, and desk availability in investigations are well-designed, organized, and provide for positive workflow with open areas for engagement. Detectives are required to hold briefings and MCSO has numerous private rooms to be used for meetings and interviews. The County of Maricopa has committed to the

development of one facility to house all investigative divisions; however, that initiative is currently on hold. Currently, the General Crimes Division is housed within the Enforcement Support building. CPSM visited the facility and found the facility had limited space for its teams of detectives. The building is not conducive for the current tempo of activity, it is aging, and has limited cellular connectivity throughout the building.

In addition, our assessment concluded that the facility used to process vehicle evidence likely is not meeting national best practices in providing evidence/processing rooms, interview rooms, public holding areas, or adequate workspace for future growth. In addition, the Major Crimes Division is currently spread out throughout the region due to lack of available space for housing all investigators in one location. **This assessment also discovered the MCSO's vehicle processing** center does not meet professional expectations and (without a more in-depth assessment) may not meet the standards expected of a VPC. The VPC is the central location where items of evidence, to include vehicles, are transported to process and collect all types of evidence. The facility did not appear to have the basic equipment and security levels to protect items of evidentiary value from cross-contamination and had poor lighting and ventilation. CPSM recommends that MCSO seek the assistance of the Arizona Association for Property Evidence to conduct a more thorough review of the needs of a VPC. This improvement will improve the quality of investigation and reduce the risk liability so it should be considered a priority action item for MCSO.

It is recommended that Major Crimes and General Crimes work areas be updated and modernized to reduce future costs of repairs, updates, and maintenance. CPSM found that the areas were limited in space with no opportunity for growth and many aspects of the work areas to include carpeting and other areas needed replacement or updating.

A state-of-the-art briefing center would allow for comprehensive briefings of crime trends, operations, or special missions using video and PowerPoint, as well as access to internal systems that produce dashboards, provide mapping, or live video feeds to enhance the quality of investigative work. It is also recommended that Major Crimes and General Crimes configure and update one briefing room for each division to include state-of-the-art projectors, advanced writing boards, and larger monitors as locations to hold intelligence briefings, trainings, and other types of essential information-sharing engagements.

CPSM conducted interviews, reviewed policies and section manuals, and reviewed training records. It was evident that MCSO develops essential personnel in their positions; however, the approach is very limited. CPSM recommends that MCSO develop a training matrix for each division that provides basic, essential, and ongoing training courses for each position and unit of work (squad). A training matrix would provider quicker development of personnel and advance their investigative knowledge base while also providing a better retention level as personnel are motivated and equipped to handle difficult investigations.

## Technology and Software

This area of assessment by CPSM is primarily focused on an outdated computer-aided dispatch system and a case management and tracking software system that is limited in scope but **provides the basic needs for MCSO's Major and General Crimes Division.** The Major and General Crimes Divisions utilize a combination of programs and applications to replicate queries and functions typically provided by a records management system. These programs and applications include the TraCS Case Management System (CMS), query tools and reports **available on the MCSO SharePoint home page, and the Access database "Case Tracking" for** reports that pre-date 2020. The technology and software approach by MCSO is a reoccurring challenge encountered throughout the organization as different databases with expectations of

being sources of accurate data appear to provide conflicting information for the same or similar queries. This can be problematic for publications of crime stats, trends, or statistical narratives used for budget presentations or operational performances.

Lack of modern database tools creates a heightened level of risk liability and potential public criticism of data management and use of data. It is recommended that MCSO reduce the use of "silo" data systems and develop a solution to centralize all Detective and Investigations Bureau data and crime statistics.

One trending challenge for MCSO is the growing workload connected to body-worn camera video and the associated work to download, redact, and categorize video as part of investigations. Although there is no firm recommendation on this finding, it is important that MCSO be aware of this trend and prepare for future workload.

## Transcription Workload

The Bureau has maintained contemporary approaches by utilizing a transcription vendor to reduce the workload for detectives in preparing some types of supplemental reports and investigative interviews. In our review of the transcription process CPSM found that there are detectives who prefer to type their supplemental reports and as the technology continues to advance it would benefit MCSO to provide training for detectives to better understand how transcription can improve their time management.

## Wellness Component

MCSO exceeds national expectations and best practices with its wellness system that has evolved into a separate division of the organization, and which serves both sworn and non-sworn personnel. MCSO's program is a national model and its approach should be replicated throughout the state. The concern for the physical and mental health of public safety personnel, both sworn and non-sworn, is a twenty-first century policing objective; the mental health concerns for law enforcement personnel has reached a heightened level. MCSO has stepped up its commitment by creating a division for wellness; the goal for MCSO is to ensure that wellness is not just an office but that it becomes embedded into a culture of care and responsibility. A job well done!

## Summary Assessment

Our overall assessment of the Detective and Investigations Bureau revealed that frontline personnel and supervisors are extraordinary dedicated and possess unusual resilience in managing through the many issues facing MCSO. The impact of the court orders related to monthly supervisor notes, line-level inspections, the complaint process, and regular review of policy CP-8, as well the slow-down in recommended policy changes, has had an impact on the flow and tempo of the organization. The frustrations and concerns with defining and attaining goals to move MCSO forward was clear; however, MCSO's core values still stood out. Frontline personnel, and divisional Lieutenants and Captains, equally demonstrated a high level of care on the issues they face with dedication and commitment. One area where this commitment can be better measured is the tracking and evidence-based nexus to community engagement and education. MCSO investigative divisions would benefit from tracking the number of community meetings frontline personnel attend as well as educational engagements that help educate and expand community partnerships. Community engagement efforts help to expand partnerships as well as enhance frontline and supervisor communication skills in building stronger relationships.

One of the most difficult recommendations formulated by CPSM is focused on restructuring the investigations division to combine services and allow for personnel to be repurposed based on MCSO's priorities. The following recommendation is intended to be a shorter-term recommendation until vacancies are filled: that is, CPSM recommends MCSO expand the span of control in the Detective and Investigations Bureau from the current 5 deputies per sergeant (139/26) to a contemporary level of 7 deputies per sergeant (139/20). This would equate to a reduction of six sergeants who can be repurposed to other organizational supervisory priorities. To achieve the expansion of the span of control CPSM recommends MCSO combine units within the Major Crimes Division as well as within the Special Investigations Division and create an ad-hoc committee to assess the workgroups and the potential to repurpose sergeant and deputy positions to meet the needs of MCSO.

## Detectives & Investigations Bureau Recommendations:

- It is recommended that an examination be completed to match up current divisional PCNs with the budgeted PCNs to reconcile any differences in staffing numbers. (Recommendation No. 38.)

- The number of civilian personnel has decreased by 6 since the 2020/2021 budget. It is recommended MCSO establish an ad-hoc committee, including civilian personnel, to identify areas where civilians can serve in more valuable positions of the organization. (Recommendation No. 39.)

- One of the primary recommendations for the Bureau is evaluating how to combine resources and utilize more regional approaches to reduce the number of MCSO deputies needed during this critical time. (Recommendation No. 40.)

- It is further recommended that MCSO establish a Bureau ad-hoc committee to produce potential retention and recruiting solutions to increase the level of interest in the Bureau, improve quality training, and address concerns regarding competitive detective pay with contemporary pay differentials. (Recommendation No. 41.)

- It is recommended that the Bureau schedule some of the volunteer reserve deputies and the volunteer posse to assist with patrol or special functions or special details as needed. (Recommendation No. 42.)

- It is recommended that MCSO establish a rotational schedule for all Bureau assignments so that all personnel have an opportunity to further their development. The rotation process and identification of personnel should be a transparent process for all MCSO personnel to understand and observe. (Recommendation No. 43.)

- It is recommended that MCSO adopt a protocol assigning cases to Bureau detectives, establishing a reviewable tracking process that is immediate and accessible by other Bureau divisions. (Recommendation No. 44.)

- It is recommended that MCSO develop an investigative intake and case assignment protocol that can be completed within 24 hours (excluding weekends and holidays). CPSM is aware that an improved RMS system is required to achieve this recommendation. (Recommendation No. 45.)

- It is recommended that MCSO develop a process to decrease the investigative cases assigned to patrol deputies and develop a process to track and review cases given to patrol deputies. (Recommendation No. 46.)

- It is recommended that MCSO detective divisions establish a universal computer system that is capable of providing 30-60-90 day reports on investigative reports in need of updates on open criminal cases. (Recommendation No. 47.)

- CPSM recommends that MCSO begin to maintain monthly crime statistics and publicly post the crime data on a monthly schedule for residents to view. (Recommendation No. 48.)

- It is recommended that MCSO consider integrating its CAD and RMS system to reduce the number of review hours expended by detective sergeants while also enabling the systems to store and retrieve data instantly. (Recommendation No. 49.)

- It is recommended that MCSO work with all the Maricopa County police agencies in developing task forces to expand the number of regional police officers to work the Special Investigations and Enforcement Support Divisions. This collaboration would allow MCSO to use deputies to take on investigative workloads that can improve the violent crime clearance rate. (Recommendation No. 50.)

- It is also recommended that MCSO develop a universal RMS-based approach to standardize case clearance rates to reduce the error rate as well as improve the quality of reporting. This would provide immediate and updated crime data while ensuring MCSO meets the national and state mandates for crime reporting. (Recommendation No. 51.)

- Due to the vacancy and retention history within the Bureau, it is recommended that MCSO consider (retired) part-time detectives to review unsolved murders and missing persons cases to help identify leads or other factors to investigate. (Recommendation No. 52.)

- MCSO would benefit from the services of a professional market-based company for policy development and approval. It is recommended MCSO and the court monitoring team discuss this option, which should also include a knowledge management system to assist with confirmation that all employees are aware of updates and changes. (Recommendation No. 53.)

- The Major Crimes and Scientific Analysis Division manuals were reviewed, and were found to include best practice standards and expectations. However, other Bureau divisions are in need of developing/updating a division operation manual. (Recommendation No. 54.)

- CPSM recommends that MCSO seek the assistance of the Arizona Association for Property Evidence to conduct a more thorough review of the needs of a VPC. (Recommendation No. 55.)

- It is recommended that some areas of the Major Crimes and General Crimes work areas be updated and modernized in order to reduce future costs of repairs, updates, and maintenance. (Recommendation No. 56.)

- It is recommended that MCSO develop a universal database to track all search warrant and special tactical deployment operations for review and assessment. (Recommendation No. 57.)

- It is also recommended that Major Crimes and General Crimes configure and update one briefing room for each division to include state-of-the-art projectors, writing boards, and larger monitors to hold intelligence briefings, trainings, and other types of essential information-sharing engagements. (Recommendation No. 58.)

- CPSM recommends that MCSO develop a training matrix for each division that provides basic, essential, and ongoing training courses for each position and unit of work (squad). (Recommendation No. 59.)



- It is recommended that MCSO reduce the use of "silo" data systems and develop a solution to centralize all Detective and Investigations Bureau data and crime statistics. (Recommendation No. 60.)

- MCSO investigative divisions would benefit from tracking the number of community meetings frontline personnel attend as well as educational engagements that help educate and expand community partnerships. (Recommendation No. 61.)

- CPSM recommends MCSO expand its span of control in the Detective and Investigations Bureau from the current 5 deputies per sergeant (139/26) to a contemporary level of 7 deputies per sergeant (139/20). This would require a reduction of six sergeants to be repurposed to other organizational supervisory priorities. (Recommendation No. 62.)

- To expand the span of control level CPSM recommends MCSO combine units within the Major Crimes Division as well as within the Special Investigations Division and create an ad-hoc committee to assess the workgroups and the potential to repurpose sergeant and deputy positions to meet the needs of MCSO. (Recommendation No. 63.)

§ § §

## SCIENTIFIC ANALYSIS DIVISION

The key to an accomplished Scientific Analysis Division is its journey to accreditation, a process that is based historically on case studies and research outlining the benefits of and value of standards, accreditation, certification, inspection, and testing for a scientific crime lab. The Maricopa County Sheriff's Office has made that journey and as the fourth largest American Sheriff's Office has proven in many ways to be a national best practice. The MCSO's successful accreditations through the American National Standards Institute's (ANSI) National Accreditation Board (ANAB) accreditations include the following:

- Firearms Examination.

- Crime Scene Examination & Evidence Collection.

- Crime Scene Photography.

- Latent Print Processing.

- Biology Evidence.

- Digital, video imaging, & other areas of scientific crime responsibilities.

MCSO has a long history of commitment to the field of forensics science and has received local and regional recognition for its contributions to the field of forensics. The efforts in the field of DNA, crime scene processing, and firearms identification have been well documented over the years and regionally respected by law enforcement agencies as large and complex as Phoenix Police Department and other local agencies. MCSO's Scientific Analysis Division (SAD) includes Crime Lab Unit as well as a Firearm Lab Unit (FLU): these resources exceed the public services provided by the most county sheriff's offices around the country.

MCSO Crime Lab employees respond to crime scenes to document, collect, examine, preserve, and process evidence found at the scene, as well as perform any other pertinent examination as requested. Additional evidence is examined in the laboratory including latent processing: ABIS entries; comparative analysis of fingerprints, latent prints, shoe and tire prints, physical matches, ABIS comparisons, and any other examination related to these components. Employees perform DNA examinations using the RapidHit 200 Instrument, inputting samples into the instrument to obtain profiles, entering those profiles into a local DNA database, and comparing potential matches for positive identification.

Firearm Lab Unit employees will occasionally respond to crime scenes to assist during firearm examinations and trajectory as requested. They perform evidence examinations in the laboratory to include firearms, ammunition, ammunition components, tool marks, microscopic comparisons of fired bullets, cartridge cases, NIBIN entries, distance determination, and other examinations related to these components. All SAD personnel, including supervisors, are required to maintain a curriculum vitae (CV) and update it annually to include their education, work history, training, and professional associations. SAD exceeds national standards by ensuring the CVs are on file with the Maricopa County Attorney's Office for litigation purposes.

## Staffing & Work Schedules

The Scientific Analysis Division functions with a total of 12 employees and one sheriff volunteer. The Division is led by one civilian commander who oversees all administrative, operational, and personnel-related matters with the assistant of one administrative assistant. At full staffing levels SAD includes four crime lab analysts and two senior analysts combined with two firearms examiners; however, the division is currently operating with two vacancies to include one



firearms examiner and one crime lab analyst. The SAD volunteer is the first MCSO citizen to serve in SAD and has specific prior work history with firearm examinations. Currently, the SAD volunteer donates three days a week (approximately 30 hours), performing many duties related to the Firearms Lab Unit. It is recommended that MCSO evaluate the possibility of eliminating the volunteer status of the SAD personnel and reclassify the position to a per-diem position to reduce the need for a FLU full-time position.

The SAD shift schedule is listed below: it is based on a four-day, ten-hour schedule for all personnel. Personnel work day shift-only schedules either Monday through Thursday or Tuesday through Friday:

- 6:00 a.m. – 4:00 p.m.

- 6:30 a.m. – 4:30 p.m.

- 7:00 a.m. – 5:00 p.m.

- 8:00 a.m. – 6:00 p.m.

In examining the work schedule, CPSM identified two areas worth a deeper review for MCSO. The first is there is no coverage on Saturday or Sunday. CPSM also noted the deployment of all day-shift schedules with no night shifts. The current schedule requires two CLU analysts to be on-call after-hours, seven days a week. This likely requires a higher level of overtime use. CPSM recommends that MCSO evaluate the potential to expand SAD's shift work to nights and weekends with consideration for expanding the number of PCNs and the use of per-diem personnel.

## TABLE 5-10: Scientific Analysis Division Staffing

| Position | 2019/2020 | 2020/2021 | 2021/2022 | Vacant |
|---|---|---|---|---|
| Commander | 1 | 1 | 1 | |
| Administrative Assistant | 1 | 1 | 1 | |
| Crime Lab Unit Supervisor | 1 | 2 (1 Acting) | 2 (1 Acting) | |
| Crime Lab Analyst Senior | 2 | 2 | 2 | |
| Crime Lab Analyst | 6 | 5 | 4 | 1 |
| Firearms Lab Unit Supervisor | 1 | 1 | 1 | |
| Firearms Examiner | 0 | 1 | | 1 |
| Volunteer | 0 | 0 | 1 | |
| Total Civilian Positions | 12 | 13 | 11 | 2 |

Source: MCSO Scientific Analysis Division

The staffing of the MCSO's SAD includes the leadership of one MCSO Deputy Police Chief who oversees all aspects of SAD to include the internal leadership of one civilian SAD commander. The SAD commander has the use of one administrator assistant II who performs specific office and management tasks and responsibilities to include the managing of various technology and computer systems. There is also one crime lab supervisor and one firearms lab supervisor who oversee specific duties related to their titles. The crime lab supervisor is responsible for three senior analysts and five crime lab analysts for a total of 8 personnel, while the firearms supervisor works closely with one firearms examiner.

In review and comparison with other similar agencies, the number of firearm examiners is less than most organizations; however, the work is very skilled and there are no national thresholds established for caseloads among forensic specialists. Based on the workload analysis, it is

recommended that MCSO fill the current vacancies as SAD prepares for the upcoming laboratory accreditation. It is also recommended that MCSO assess the ability to establish per-diem SAD personnel for crime lab operations to assist with the current future caseloads and unit responsibilities.

## SAD Supervisors

The Crime Lab Unit Supervisors for MCSO coordinate the operations of the Crime Lab Unit while also overseeing the response to crime scenes and ensuring all personnel maintain their training and credentials. The supervisors also oversee operations of the division pertaining to scene processing, evidence, lab processes, latent comparisons, and perform verification of comparison results. The MCSO SAD supervisors are what is commonly referred to as "working supervisors" who respond to crime scenes to conduct scene evaluations, direct work, firearm processing, and communication with crime scene sergeants.

Quality control checks are also conducted on a bi-annual basis on each SAD employee for crime scene processing, laboratory processing, search warrant quality (orders to obtain evidence), and latent comparisons.

Crime Lab Unit Supervisors have an extensive load of supervisor-level work. Every examination report that is forwarded to detectives for the judicial process must be administratively and technically reviewed by an SAD supervisor. CPSM discovered that every latent processing case, latent comparison case, footwear case, and AFIS case are to be re-examined by a SAD supervisor to ensure that there are no technical errors such as erroneous identifications or exclusions. This amounts to thousands of examinations being conducted by the current CLU and FLU supervisors annually.

The supervisors are also responsible for conducting bi-annual quality control checks on each employee for crime scenes, lab processing, latent comparisons, and search warrants or orders to obtain evidence. The supervisors are required to observe the employee throughout the process, take notes, and complete an evaluation on their performance. In reviewing past activity, CPSM found that quality control checks were not being conducted prior to the addition of a second supervisor to SAD. Currently, the supervisors must also perform monthly audits of all evidence lockers and evidence checked out to the division to ensure evidence is not being held in the division for longer than necessary. This is a national best practice and a standard that the ANSI National Accreditation Board urges law enforcement agencies to audit on a regular basis.

MCSO is also unique in that it requires SAD to inspect MCSO drones, its 3D scanner, a gel scanner, the RapidHIT DNA instrument, Alternate Light Sources within the division, and any other shared piece of equipment. Those audits and review inspections are considered quality assurance checks and required to be entered into Blue Team for annual EPAs, OSHA inspections, and other required verifications.

SAD supervisors are also on-call (non-benefited) and responsible for 365/24/7 phone calls regarding requests for SAD response to crime scenes. The on-call supervisor responsibilities include serving as liaisons between Major Crimes or General Crimes and SAD. Considering the supervisor duties, CPSM recommends a second SAD Crime Lab Supervisor while maintaining the current Firearms Unit Supervisor. It is also recommended that the duty to inspect drones be transferred to another section of the Sheriff's Office to reduce the workload and establish consistency in job-related duties.

Based on the review of caseloads and structure, CPSM recommends MCSO consider a restructure of the current organizational design to establish two crime lab supervisors. The second crime lab supervisor would be appropriate based on the responsibilities of this position to

review, confirm, and finalize crime lab reports, crime scene exams, forensic evidence, fingerprint examinations, as the accreditation process begins in January 2023.

*SAD Personnel*

SAD personnel are sliced into specific areas of responsibility to include crime lab analyst, senior crime scene analyst, and firearms examiner I & II. SAD also includes one administrative assistance specialist who performs many of the administrative needs and who assists with the operations tasks required of the position as well as to respond to and keep records of all Legal Liaison, Maricopa County Attorney, and MCSO employee requests for the division.

The crime lab analysts and senior analysts are trained and certified to respond to major crime scenes and perform specific tasks with defined crime responsibilities listed in both policy and division procedural manuals. The Crime Lab Firearms Examiner I & 2 perform a series of functions to include examination of firearms, ammunitions, and microscopic comparisons of bullets and cartridge cases. These positions also include NIBIN data entry and serial number restoration as well as other firearm-related examinations and analysis.

## TABLE 5-11: Workload Analysis, Crime Scene Unit

| Activity | 2020 | 2021 | 2022 YTD |
|---|---|---|---|
| Crime Scene Calls | 411 | 504 | 480 |
| Examination Requests Received | 998 | 1,282 | 728 |
| Examination Requests Completed | 916 | 995 | 637 |
| ABIS Entries/Searches | 1,842 | 1,357 | 1,199 |
| ABIS Hits | 410 | 291 | 262 |
| RapidHIT Requests | 23 | 33 | 32 |
| RapidHIT IDs | | | |

Source: MCSO Scientific Analysis Bureau

## TABLE 5-12: Workload Analysis, Firearms Unit

| Activity | 2020 | 2021 | 2022 YTD |
|---|---|---|---|
| Examination Requests Received | 85 | 109 | 84 |
| Examination Requests Completed | 29 | 35 | 83 |
| NIBN Entries | 25 | 70 | 213 |
| NIBIN Correlations | 4 | 8 | 44 |

Source: MCSO Scientific Analysis Bureau

The upcoming accreditation of the SAD evidence laboratory will begin in January 2023 and it is vital that this project be on the top of MCSO's priorities to remain aware of milestones as well as challenges that develop. CPSM recommends that MCSO receive monthly updates and reviews on the progress of the lab accreditation.

CPSM's review of the workload of the SAD is difficult as the FBI, IAI, and the ANAB do not suggest best practices in caseload and job analysis responsibilities. Based on CPSM research, SAD would benefit from considering the addition of two additional crime lab analysts due to the number of crime scene calls and examination requests.

## Training Process and Policy and Procedure Documentation

The MCSO's policies as they pertain to the SAD are clearly established and updated; however, one of the challenges for SAD is the process by which policies are updated. Due to the challenges of the Melendez court order and the process designated by the monitor, the length of time and process to adopt new policies or provide updates is difficult. It is recommended that MCSO design a policy update and approval process that is a **modern example of today's law** enforcement expectations.

Based on our examination of **MCSO's training requirement for personnel and** the training process, we found it provides clear expectations for new and experienced personnel.

The training format for SAD is a combination of lectures, hands-on illustration, competency testing, followed by supervised casework in the field. The new employee must successfully complete all aspects prior to being released to work independently in the field. The state of **Arizona's POST does not provide nor require** scientific-based courses for civilian work staff and MCSO only requires eight hours of training for non-sworn staff. SAD counters the challenge of required training by providing scientific crime analysis training from private, certified organizations through the International Association of Identification (IAI) in the following areas for each crime analyst specialist:

- 176 hours – Latent prints.
- 48-144 hours – Crime scene investigations in various areas.
- Recertification every five years for RapidHIT DNA operators.

CPSM recognizes the efforts of MCSO's SAD leadership in surpassing Arizona state training in this professional and scientific field. CPSM concludes that it is a tremendous error by AZ POST not to require certified training for crime lab personnel in order to reduce civil liability, risk exposure, and public criticism. It is recommended that MCSO address this issue with the AZ POST and develop a certification process for crime lab personnel and course reimbursement.

A **review of SAD's training manual** shows it was established with professional guidance and expertise: it exceeds industry standards. Many of the national standards expected by the ANSI National Accreditation Board are included and are contemporary with twenty-first century policing expectations. The following list details the various core lectures and instruction in no particular order and is not meant to include every subject or discussion presented to new employees. SAD trainees are required to pass proficiency tests that includes questions from lectures, radio codes, and other pertinent information. The CPSM assessment identified that all **classroom training is maintained in MCSO's** official employee training files and tracked by SAD supervisors through digital filing systems.

Core classes are:

- Job Requirement and Expectations.
- Lab and Field Safety.
- Ethics in Forensics.
- Guiding Principles in Forensics.
- Criminal Law and Legal Issues.
- Courtroom Issues and Procedures.
- Computer-Assisted Dispatch.



- Blood Borne Pathogens.
- Physical Evidence.
- Evidence Collection and Preservation.
- Drying Room and Storage.
- Fundamentals of Crime Scene Processing.
- Photography.
- Latent Print Processing.
- Lab Processing.
- Swabbing for Evidence.
- Gun Shot Residue Kits.
- Fingernail Scaping Procedures.
- Biological Evidence.
- Presumptive Blood Testing: Phenolphthalein and HeamTrace ABAcard Kits.
- Firearm Evidence and Safety.
- Electrostatic Dust Print Lifter.
- Forensic Vacuum.
- Forensic Light Sources.
- Casting Shoe and Tire Evidence.
- Tool Mark Evidence.
- Ink Print Exemplars.
- Arson Investigations.
- Stress Management: Critical Incidents and Peer Support.
- Report Writing.

Personnel are also required to successfully pass competency testing in the following areas:

- General Photography.
- Injury Photography.
- Comparative Photography.
- Night-time Photography.
- Photography with use of Forensic Light Sources.
- Evidence Collection, Storage, and Packaging.
- Latent Print Processing.
- Tool Mark Casting.
- Shoe or Tire Casting.
- Electrostatic Dust Print Lifter.
- Forensic Vacuum.
- Forensic Light Source.



- Presumptive Blood Testing.
- Swabbing for Evidence.
- Gun Shot Residue Kits.
- Fingernail Evidence Collection.
- Various Mock Scenes: Organization & Processing Methods.
- Courtroom Testimony.

Our review of SAD's internal systems indicates they surpass most crime lab units and exceed many of the best practice standards identified by national forensic organizations. A sampling of systems included the following areas:

- Criminal Justice System databases to include CJIS, ABIS, & NGI.
- DNA Connect (along with RapidHIT DNA).
- The use of property management, digital management, and laboratory information systems.
- The Maricopa training (HUB) portal.
- FARO 3d Scene Software.
- DJI drone software & air data software for drones.
- TraCS case tracking.
- I-NET Viewer/CAD.

## Specific Court Order Analysis

The court order requires SAD to produce monthly supervisor notes, regular line-level inspections of equipment/vehicles, regular review of Critical Policy CP-8 (Biased-Based Policing), and training through The HUB portal, which requires all employees to log in to the portal, read new or changing policies, and acknowledge awareness.

## Augmenting Staffing and Restructure of Division

As noted throughout this segment of the assessment, there are several areas of opportunity for MCSO to improve operational effectiveness in the division. MCSO will need to undertake special reviews to determine if an additional CLU supervisor is possible and reclassify the volunteer position (as well as other positions) as per-diem employees. CPSM's review of caseloads and the work associated with the accreditation process finds this may require an additional three personnel. Two CLU positions are needed to assist with the increasing workload and the workload associated with the accreditation process. In addition, MCSO will need to evaluate the need for an additional crime scene specialist, specifically with the increasing NIBIN firearms work. It is recommended that MCSO undertake an early review of the accreditation process and evaluate the ability to purchase essential crime lab equipment expected of a national accredited lab, which is listed here:

- Ballistic IQ Portable Image Capture Station. This is a cartridge case triage system that provides for quick entry into the National Integrated Ballistic Information Network (NIBIN) of fired cartridge cases at crime scenes to determine how many firearms were involved.
- Training software that expedites the learning process for newer crime lab technicians for latent print comparisons.



- Upgraded and multi-3D scanners to capture three-dimensional, 360-degree images of a crime scene.

It is also recommended that as MCSO begins the accreditation process it consider appointing a committee to identify strategies and incentives to attract and retain scientific analyst specialists. This would help improve retention levels while preparing for future recruitment as the workload increases.

## Scientific Analysis Division Recommendations:

- It is recommended that MCSO evaluate the ability to change the volunteer status of the SAD personnel and reclassify the position to a per-diem position to reduce the need for a FLU full-time position as well as hire the current vacancy. (Recommendation No. 64.)

- CPSM recommends that MCSO evaluate the potential to expand SAD's shift work to nights and weekends while also considering the expansion of the number of PCNs and use of per-diem personnel. (Recommendation No. 65.)

- Based on our workload analysis, it is recommended that MCSO fill the current vacancies as SAD prepares for the upcoming laboratory accreditation. (Recommendation No. 66.)

- It is also recommended that MCSO assess the ability to establish per-diem SAD personnel for crime lab operations to assist with the current future caseloads and unit responsibilities. (Recommendation No. 67.)

- Considering the supervisor duties, CPSM recommends a second SAD Crime Lab Supervisor while maintaining the current Firearms Unit Supervisor. (Recommendation No. 68.)

- CPSM recommends that MCSO receive monthly updates and reviews on the progress of the lab accreditation as the new quality management manual is developed during the accreditation process. (Recommendation No. 69.)

- Based on CPSM research, we find that SAD would benefit from considering the addition of two additional crime lab analysts due to the number of crime scene calls and examination requests. (Recommendation No. 70.)

- It is recommended that MCSO design a policy update and approval process that is a modern example of today's law enforcement expectations. (Recommendation No. 71.)

- It is recommended that MCSO address the issue of crime lab analyst certification with AZ POST and develop a certification process for crime lab personnel and course reimbursement. (Recommendation No. 72.)

- Consider appointing a committee to identify strategies and incentives to attract and retain scientific analyst specialists. (Recommendation No. 73.)

- It is recommended that MCSO undertake an early review of the accreditation process and evaluate the ability to purchase essential crime lab equipment expected of a nationally accredited lab. (Recommendation No. 74.)

§ § §

# INTELLIGENCE INFORMATION DIVISION

MCSO incorporates an intelligence gathering and dissemination mission throughout the organization and this function is primarily included within the Intelligence Information Division, which has an overall budget of $2.3 million. One of our concerns with the budget of the division is that the employee education and training budget is merely $4,000. Although MCSO incorporates a best practice in the development of an intelligence division to include crime analysts, the total training budget is below par. It is recommended that MCSO evaluate the value of training crime analysts and consider increasing the division budget to ensure training in the use of analytical software and crime analyst tools. This would advance the capabilities of the Intelligence Information Division as it collaborates with other MCSO divisions.

MCSO employs civilian crime analysts, two civilian supervisors, and a research team on four-day, ten-hour shifts. Crime analysts are spread out in various parts of the MCSO and separate from other functional elements of the division. These other elements include five civilian employees **who are part of the Sheriff's Intelligence, Leads, and Operations Unit (SILO)**; they gather intelligence and conduct research for operational units belonging to the Arizona Fusion Center known as the Arizona Counter-Terrorism Information Center (ACTIC).

The ACTIC is comprised of two suites; an unclassified environment comprised of multi-public safety agency personnel and a classified environment comprised of FBI Joint Terrorism Task Force (JTTF) personnel.

The ACTIC is a unified effort to secure Arizona, to prevent and deter terrorist attacks and protect against, and respond to, threats and crimes to ensure a safe and secure state while protecting civil rights and liberties of citizens. Through situational awareness, ACTIC provides a higher level of preparedness by disseminating focused, relevant incident alerts, mainly performed by the SILO team. The Center is responsible for sharing early, reliable, and consistent incident information about situations that might affect jurisdictions and review tips from the public. The Center leverages thousands of diverse informational sources to provide early warning of incidents at the local, regional, and state levels. The ACTIC and the SILO unit operate under Policy GI-7, Processing of Bias-free Tips, and ensures the unit utilizes tips from the public, carefully processing the information, and relays it to the appropriate operational divisions, and to the public (as required).

Personnel on the SILO review and assess tips from the public and conduct related research on tips and information received. Based on national standards of teams such as SILO, it is common to train personnel more consistently with the skills of crime analysts. This CPSM assessment discovered the SILO personnel are not trained as crime analysts and it is recommended that SILO personnel are trained under the MCSO crime analyst training standards. This approach will enhance MCSO intelligence capabilities, which will benefit all law enforcement agencies in the region.

The Intelligence Information Division incorporates nine crime analysts who are assigned to the following divisions:

- Major Crimes Division: 2.
- General Crimes Division: 1.
- Special Investigations Division: 1.
- Jail Intelligence: 1.
- Patrol/Counter-Terrorism: 4.



Currently, there are two vacancies within the crime analyst structure. CPSM suggests these positions should be filled by advertising the positions to attract talented and professionally trained analyst as opposed to hiring unqualified or untrained personnel. The crime analysts function with two supervisors, split between the patrol/counter-terrorism units and the other investigative sections. The analysts are not housed under one hub and this approach functions best in consideration for the roles they serve in the various divisions.

It is recommended that MCSO ensure these teams of analysts meet bi-weekly to share intelligence and discuss crime trends and other events in order to establish a collaborative working environment. Our review of the reporting styles of the crime analysts indicates to us that a more consistent report format should be developed for all personnel. Currently, the various division reports differ from one another, and the reporting formats and style are not standard. This is an area of concern: the crime analysts should develop tools and reporting formats that are more consistent and that can be shared easily with other divisions.

CPSM found that one of the analyst positions is grant funded at ACTIC and that the position expires in early 2024. CPSM recommends that MCSO begin to develop a funding source to secure this specially trained analyst as an employee of MCSO.

In addition, CPSM evaluated the various work levels, reports, and activity of where the crime analysts are assigned. The current jail intelligence analyst is a vacant position, and CPSM recommends the position should be considered for transfer, before it is filled, to the patrol/counter-terrorism team or the Major Crimes Division-Jail Crimes Unit. This recommendation is based on the current tempo of work performed by the crime analyst as compared to the jail intelligence position that is currently vacant.

## Intelligence Information Division Recommendations:

- It is recommended that MCSO evaluate the value of training crime analysts and consider increasing the division budget to ensure training in the use of analytical software and crime analyst tools. (Recommendation No. 75.)

- CPSM found the SILO team is not trained as crime analysts. Wes recommend SILO personnel be trained under the MCSO crime analyst training standards. (Recommendation No. 76.)

- Currently, there are two vacancies within the crime analyst structure and these positions should be filled by advertising the position to attract talented and professionally trained analysts as opposed to hiring unqualified or untrained personnel. (Recommendation No. 77.)

- It is recommended that MCSO ensure the team of analysts meets bi-weekly to share intelligence and discuss crime trends and other events in order to establish a collaborative working environment. (Recommendation No. 78.)

- CPSM recommends a more consistent report format be developed for all crime analyst personnel. (Recommendation No. 79.)

- CPSM found that one of the analyst positions is grant funded at ACTIC and that the position expires in early 2024. CPSM recommends that MCSO begin to develop a funding source to secure this specially trained analyst as an employee of MCSO. (Recommendation No. 80.)

- The current jail intelligence analyst is a vacant position. CPSM recommends the position be considered for transfer, before it is filled, to the patrol/counter-terrorism team or the Major Crimes Division-Jail Crimes Unit. This recommendation is based on the current tempo of work performed by the crime analyst as compared to the jail intelligence position that is currently vacant. (Recommendation No. 81.)

# CANINE UNIT

The canines in the Canine Unit are used in a variety of ways. Most dogs and their handlers are assigned to the Canine Unit and some to outlying districts or divisions. The Canine Unit comprises two Lieutenants (each with other responsibilities: TOU and EOD), two Sergeants, nine deputies, and four detention officers, with police canines as partners, forming a team. Thirteen of the dog and handler teams are patrol teams (find and apprehend people) with additional capabilities of other odor detection. Five canines are patrol and explosive detection, and eight are patrol and narcotic detection. Four teams are assigned to the jails, and the others are spread out throughout the rest of the patrol districts.

Four approved vendors supply canines to MCSO, so the unit can be selective on which dogs it purchases. The training is handled in-house with three trainers, one of whom is a supervisor. The training employed is based on operant conditioning and reinforced daily through training performed by the handlers and weekly training organized by the designated trainers.

The basic training lasts 9 to 12 weeks, and in-service training with the dogs occurs every day. The training is logged in a proprietary software system designed to track canine training, monitored by trainers, and signed off on by supervisors. The unit's canine handlers have undergone an extensive selection process, including physical tests, recommendations, oral board, and chain of command approval.

The deputies take the dogs home, where the animals are housed in kennels provided by the County. The handlers are compensated to care for the canines at home in compliance with labor regulations. The teams assigned to the Canine Unit operate in squads and will spend available time in certain parts of the County, but they are available and often respond throughout the County. The canines are used for locating people and contraband. A review of unit-wide data shows an average of approximately seven apprehensions (bites) per year where a service dog was employed as a use of force on a person.

During the calendar year to date, January to October 2022, the canines in the Canine Unit were involved in the following:

- EOD Sweeps: 28.

- Narcotic searches: 169.

- Tracking deployments: 13.

- Public demonstrations: 79.

- Area searches: 20.

- Building Searches: 28.

- Deterrent activities: 214.

- Apprehensions: 35.

- Formal training hours: 759.

- Special details: 33.

Overall, the Canine Unit operates well and consistently, following national association standards (National Police Canine Association, U.S. Police Canine Association, etc.). An area in which there is opportunity for improvement involves the canine teams outside of the Cannie Unit. Lake Patrol has three canine teams (dual-purpose, two bloodhounds), and Special Investigations has



two dual-purpose and three single-purpose canine teams. It was unclear how these teams came to fruition outside of the Canine Unit.

The use of police canines is a highly technical and complex function requiring extensive training and hands-on supervision. The units are high risk, can cause liability issues, and must be managed closely for consistency and accountability. Some single-purpose specialty canine programs, such as bloodhounds, can be managed without concern outside a Canine Unit. However, canine teams with apprehension capabilities should be all under the same training and supervision whenever possible.

Uses of force by canines are not tracked and evaluated in total. They are individually assessed for policy requirements. It was also learned that the uses of force from canines outside of the **Canine Unit are reviewed by the officer's chain of command, not** the Canine Unit's chain of command. Deployments of canines where apprehensions are made (people bitten by a canine) should all be reviewed by the canine training staff, supervisors, and managers through the same chain of command.

## Canine Unit Recommendations:

- CPSM recommends that the Canine Unit trainers and chain of command evaluate all individual canine uses of force. In addition, annually all canine-related uses of force in the aggregate should be assessed for identification of trends and training purposes. (Recommendation No. 82.)

- CPSM also recommends all canine teams with a patrol (apprehension) capability be trained and overseen by the Canine Unit. (Recommendation No 83.)

§ § §

# SECTION 6. PATROL RESOURCE BUREAU

The Maricopa County Sheriff's Office provides the community of Maricopa County (unincorporated areas and contract cities) with a full range of law enforcement services, including responding to emergencies and calls for service (CFS), performing directed activities, and solving problems. The department is service-oriented, and thus provides a high level of service to the community. Every call for service from the public receives a department response and every criminal case receives some level of investigation.

The data contained in this report is from September 1, 2021, through August 31, 2022. Within that time period as well as now, MCSO responds to all calls for service with very little deviation to the practice of sending an MCSO sworn deputy. Alternatives to this philosophy will be addressed in this report. The current model of using sworn deputies for almost all service demands is inefficient and has been replaced with other response models by law enforcement departments throughout the United States. Although making changes to this model would be a deviation from the current way of handling business in the MCSO, it has been the experience of CPSM consultants that the public understands what is happening and why, they are generally supportive of these types of changes, and will adapt to the alternate forms of service such as online reporting or having a civilian employee respond to and handle their needs. These issues are discussed in more detail later in the report.

## PATROL ALLOCATION, DEPLOYMENT, AND STAFFING

Uniformed patrol is considered the "backbone" of American policing. Bureau of Justice statistics indicate that more than 95 percent of police and sheriff's departments in the U.S., including departments in the same size category as the Maricopa County Sheriff's Office, provide uniformed patrol. Deputies assigned to this important function are the most visible members of the department and command the largest share of sworn resources committed by the department. Proper allocation of these resources is critical in order to have officers available to respond to calls for service and provide law enforcement services to the public.

Staffing decisions, particularly for patrol and at the district level, must be based on actual workload. Once the actual workload is determined the amount of discretionary time can be determined and then staffing decisions can be made consistent with the department's policing philosophy and the county's ability to fund services. The MCSO is a full-service sheriff's department and its philosophy is to address essentially all requests for service. With this in mind it is necessary to look at workload to understand the impact of this style of policing in the context of community demand.

To understand actual workload (the time required to complete certain activities) it is critical to review total reported events within the context of how the events originated, such as through directed patrol, administrative tasks, officer-initiated activities, and citizen-initiated activities. Analysis of this type allows for identification of activities that are really "calls" from those activities that are some other type of event.

Understanding the difference between the various types of department events and the resulting staffing implications is critical to determining deployment needs. This portion of the study looks at the total deployed hours of the Sheriff's Office with a comparison to current time spent to provide services.

In general, a "Rule of 60" can be applied to evaluate patrol staffing. This rule has two parts. The first part states that 60 percent of the sworn deputies/officers in a department should be dedicated to the patrol function (patrol staffing) and the second part states that no more than 60 percent of their time should be committed to calls for service, which includes all activities that occupy an officer's time, including calls from the public, self-initiated work, and administrative tasks. This commitment of 60 percent of their time is referred to as the *Patrol Saturation Index* (SI).

The Rule of 60 is not a hard-and-fast rule, but rather a starting point for discussion on patrol deployment. Resource allocation decisions must be made from a policy and/or managerial perspective through which costs and benefits of competing demands are considered. The patrol saturation index indicates the percentage of time dedicated by deputies to public demands for service and administrative duties related to their jobs. Effective patrol deployment would exist at amounts where the saturation index was less than 60.

This Rule of 60 for patrol deployment does not mean the remaining 40 percent of time is downtime or break time. It is a reflection of the extent that deputy time is saturated by calls for service. The time when sworn patrol personnel are not responding to calls should be committed to management-directed operations. This is a more focused use of time and can include supervised allocation of deputy activities toward proactive enforcement, crime prevention, community policing, and citizen safety initiatives. It will also provide ready and available resources in the event of a large-scale emergency.

From an organizational standpoint, it is important to have uniformed patrol resources available to undertake activities such as proactive enforcement, community policing, and emergency response. Patrol is generally the most visible and available resource in law enforcement, and the ability to harness this resource is critical for successful operations.

From a deputy's standpoint, once a certain level of CFS activity is reached, the deputy's focus shifts to a CFS-based reactionary mode. The deputy's mindset begins to shift from one that looks for ways to deal with crime and quality-of-life conditions in the community to one that continually prepares for the next call. After saturation, deputies cease proactive policing and engage in a reactionary style of policing. The outlook becomes "Why act proactively when my actions are only going to be interrupted by a call?" Any uncommitted time is spent waiting for the next call.

## Rule of 60 – Part 1

According to the department personnel data, authorized patrol staff is 319 sworn deputies (District Captains, Lieutenants, Sergeants, and deputies). These 319 of the 715 sworn MCSO positions represent 44 percent of the sworn workforce in the MCSO. The 319 total number represents the five patrol districts that handle traditional patrol responsibilities within Maricopa County. Adding the 51 deputies assigned to the Lake Patrol Division brings this allocation percentage to 51 percent (370 of 715 sworn deputies). It should be noted that the above numbers are based on full staffing (authorized positions within the department and authorized positions at each district). As of the time of this report there are 126 sworn vacancies (17.6 percent of 715 deputies) meaning that at the time of our assessment the department had an actual 589 sworn positions. Vacancies are spread throughout the organization and each patrol district carries several vacancies. Actual patrol staffing at the five districts is 242 sworn deputies (77 vacancies), meaning that currently only 41 percent of existing MCSO sworn personnel are assigned to the patrol function (49 percent when including Lake Patrol).

This part of the "rule" is not hard-and-fast. Taken on its face, however, this part of the "rule" must be considered when examining the operational elements of the department when staffing recommendations are taken into consideration. These models are often applied to municipal

police departments. Sheriff's departments are more complex and often require sworn deputies to fill positions that municipal police departments do not have, such as court security and jail operations. MCSO manages its jail operations with a non-sworn deputy workforce. When factoring in the court security deputies, the percentage of sworn personnel in patrol is still significantly below the 60 percent threshold. The data presented here indicate that the MCSO should consider short-term and long-term plans to rebalance the personnel allocation among units in the department.

## Rule of 60 – Part 2

The second part of the "Rule of 60" examines workload and discretionary time and suggests that no more than 60 percent of time should be committed to calls for service. In other words, CPSM suggests that no more than 60 percent of available patrol officer time be spent responding to the service demands of the community. The remaining 40 percent of the time is the "discretionary time" for officers to be available to address community problems and be available for serious emergencies.

It is CPSM's contention that patrol staffing is optimally deployed when the SI is below the 60 percent range. An SI greater than 60 percent indicates that the patrol manpower is largely reactive, and overburdened with CFS and workload demands. An SI of somewhat less than 60 percent indicates that patrol manpower is optimally staffed. SI levels much lower than 60 percent, however, indicate patrol resources that are underutilized, and signals an opportunity for a reduction in patrol resources or reallocation of sworn personnel.

Departments must be cautious in interpreting the SI too narrowly. One should not conclude that SI can never exceed 60 percent at any time during the day, or that in any given hour no more than 60 percent of any officer's time be committed to CFS. The SI at 60 percent is intended to be a benchmark to evaluate overall service demands on patrol staffing. When SI levels exceed 60 percent for substantial periods of a given shift, or at specific times every day, then decisions should be made to reallocate or realign personnel to reduce the SI to levels below 60.

Resource allocation decisions must be made from a policy and/or managerial perspective through which costs and benefits of competing demands are considered. The patrol saturation index indicates the percentage of time dedicated by peace officers to public demands for service and administrative duties related to their jobs. Effective patrol deployment would exist at amounts where the saturation index was less than 60.

The CPSM data analysis in the second part of this report provides a rich overview of CFS and staffing demands experienced by the Maricopa County Sheriff's Office. The analysis here looks specifically at patrol deployment and how to maximize the personnel resources of the department to meet the demands of calls for service while also engaging in proactive policing to combat crime, disorder, and traffic issues in the community.

Figures 6-1 through 6-8 represent workload, staffing, and the "saturation" of patrol resources in the MCSO during the two eight-week periods on which we focused our workload analysis. By "saturation" we mean the amount of time deputies spend on patrol handling service demands from the community. In other words, how much of the day is "saturated" with workload demands. This "saturation" is the comparison of workload with available manpower over the course of an average day during the months selected. The figures represent the manpower and demand during weekdays and weekends during the months of January / February 2022 and July / August 2022. Examination of these figures permits exploration of the second part of the Rule of 60.

FIGURE 6-1: Deployment and Workload, Winter 2022, Weekdays



FIGURE 6-2: Workload Percentage by Hour, Winter 2022, Weekdays



Workload v. Deployment – Weekdays, Winter

Avg. Deployment        46.8 deputies per hour
Avg. Workload:         29.9 deputies per hour
Peak SI:               72 percent
Peak SI Time:          7:00 p.m.

Figures 6-1 and 6-2 present the patrol workload demands and SI for weekdays in winter (January/February 2022). As Figure 6-2 shows, the SI exceeds the 60 percent threshold beginning at around 7:30 a.m. and stays elevated throughout the day, finally receding at 2:30 a.m. The SI ranges from a low of approximately 50 percent at 6:30 a.m. to a high of 72 percent at 7:30 p.m.

Figure 6-1 illustrates the level of patrol staffing throughout the day. The light green area on the graph shows the amount of basic patrol resources during the day. Combined, patrol deployment averages approximately 46.8 deputies during the weekdays in winter.

The workload demands from Maricopa County present a typical daily distribution in policing. Call volume is low in the early morning hours and increases throughout the day, then peaks in the evening. In most districts, MCSO employs a version of 12-hour shifts; this is largely due to staffing restrictions based on available manpower. The supply of deputies would likely fit a better pattern for deployment with four 10-hour shifts if staffing and manpower allowed. Most districts use a variation of the three-shift / 12-hour schedule because converting to a 4-10 plan would create significant periods of time that the districts would fall below minimum staffing numbers.

The workload, as represented by the Saturation Index, is very high. In fact, in all work periods examined by CPSM (Figures 6-4, 6-6, and 6-8), workload as a percentage of staffing exceeds the acceptable threshold for effective patrol operations. As can be seen by this series of figures, the average workload saturation exceeds or meets the acceptable threshold in all periods, and there are times when the Saturation Index jumps into the 70 percent range. Indexes at these levels suggest that the patrol function is overstressed and steps need to be taken to lower the workload demands on deputies working patrol.

The next two figures represent the patrol workload demands on weekends in winter, and these are followed by figures for weekdays and weekends in summer. They illustrate a similar pattern as the one described above.

§ § §

FIGURE 6-3: Deployment and Workload, Winter 2022, Weekends



FIGURE 6-4: Workload Percentage by Hour, Winter 2022, Weekends



**Workload v. Deployment – Weekends, Winter**

| | |
|---|---|
| Avg. Deployment: | 47.9 deputies per hour |
| Avg. Workload: | 30.7 deputies per hour |
| Peak SI: | 75 percent |
| Peak SI Time: | 7:00 p.m. |

Figures 6-3 and 6-4 show the patrol workload demands and SI for weekends in winter exceed the 60 percent threshold between 7:30 a.m. and about 2:30 a.m. The SI ranges from a low of approximately 50 percent around 6:00 a.m. to a high of 75 percent at 7:00 p.m.

## FIGURE 6-5: Deployment and Workload, Summer 2022, Weekdays



§ § §

FIGURE 6-6: Workload Percentage by Hour, Summer 2022, Weekdays



Workload vs. Deployment – Weekdays, Summer

Avg. Deployment:        47.7 deputies per hour
Avg. Workload:          30.3 deputies per hour
Peak SI:                73 percent
Peak SI Time:           7:30 p.m.

Figures 6-5 and 6-6 present the patrol workload demands and SI for weekdays in summer. The workload exceeds the 60 percent threshold between 7:00 a.m. and about 1:00 a.m. The SI ranges from a low of approximately 50 percent at 6:30 a.m. to a high of 73 percent at 7:30 p.m.

§ § §

FIGURE 6-7: Deployment and Workload, Summer 2022, Weekends



FIGURE 6-8: Workload Percentage by Hour, Summer 2022, Weekends



Workload v. Deployment – Weekends, Summer

Avg. Deployment:        56.2 deputies per hour
Avg. Workload:          35.4 deputies per hour
Peak SI:                70 percent
Peak SI Time:           9:00 p.m.

Figures 6-7 and 6-8 present the patrol workload demands and SI for weekends in summer. The workload exceeds the 60 percent threshold from between 10:00 a.m. until 3:00 a.m. The SI ranges from a low of about 52 percent at 6:30 a.m. to a high of 70 percent at 9:00 p.m.

The following table summarizes the workload and deployment in the four periods observed:

TABLE 6-1: Summary of Workload and Deployment

|  | Winter Weekdays | Winter Weekends | Summer Weekdays | Summer Weekends |
|---|---|---|---|---|
| Avg. Deployment | 46.8 | 47.9 | 47.7 | 56.2 |
| Avg. Workload | 29.9 | 30.7 | 30.3 | 35.4 |
| Peak SI | 72% | 75% | 73% | 70% |
| Peak SI Time | 7:00 p.m. | 7:00 p.m. | 7:30 p.m. | 9:00 p.m. |

When the 60 percent workload threshold is exceeded and workload gets too high, deputies have a tendency to shift their focus from being proactive to being reactive. They do this because they want to be available for calls as they come in from the public, respond to emergencies, and be available to back-up their fellow officers. If service demands from work get high, officers will not seek out self-initiated activities that would occupy their time because they need to be available for other things that might be coming their way.

If the MCSO wants to leverage the patrol function to commit to a strategic approach to issues, engage in crime prevention, traffic enforcement, community engagement, etc., it will fail because officers on patrol will not have the time. While it might appear that they have about 30 percent to 35 percent of their time on patrol available, they will not engage in proactive work because they will want to remain available to perform their primary function of responding to CFS. Essentially, with the saturation indexes at the levels reported here, the patrol function is one-dimensional. The focus is on CFS; other strategic priorities will have limited success getting implemented.

As well, it should also be noted that each district commander felt that total deputy time was not accurately captured in CAD. It was reported to us that deputies do not accurately capture investigative follow-up time, administrative time, or report writing time. If these numbers were captured to the extent that management believes they should be, the SI peaks would be much higher.

The workload demands from Maricopa County present a typical daily distribution in policing. Call volume is low in the early morning hours and increases throughout the day, then peaks in the evening. The supply of officers also fits an expected pattern consistent with the schedules configured in the MCSO. Workload, as represented by the saturation index, however, is very high. In the work periods examined by CPSM, workload as a percentage of staffing exceeds the acceptable threshold for effective patrol operations. The table above indicates that the average workload saturation exceeds the acceptable threshold during the weekends and weekdays in winter and summer periods, and there are times when the Saturation Index jumps

to 75 percent. Indexes at these levels suggest that the patrol function is overstressed and steps need to be taken to lower the workload demands on patrol deputies.

In order to address this situation, there are three "levers" that should be considered. First, workload itself must be examined. What kinds of calls are the deputies handling, can the number of calls they respond to be reduced, and are there other mechanisms the department can take to minimize service demands placed on the patrol function?

The second step would be to examine shift schedules. Are the schedules designed in a way that staffs deputies during the times when they are needed the most? Oftentimes, adjustments can be made to better align the supply and of personnel and the demand for their services.

The last step, after exhausting the first two, is to add personnel to patrol. When workload is too high officers often resist proactive patrol, service quality to reactive CFS suffers, and the general negative outcomes of overwork and burnout manifest themselves in the department.

All three of these steps are considered in the following analysis.

## Demand Mitigation

MCSO's approach to handing calls for service is that no call is too small and if asked it will send an MCSO unit to any request from the public. Part of the reason for this approach is historical in the sense that the department has conducted business like this for many years and part of the approach comes from the fact that the department wants to avoid complaints from the public.

CPSM recognizes that MCSO has unique challenges related to its complaint process and current court-appointed monitor and thus is apprehensive about shifting to a process where the department either chooses to not send an MCSO unit or to enact alternative service delivery options. Although shifting to a practice designed to mitigate the overall workload can be difficult and may result in some service complaints from a small number of people, the experience of CPSM in working with many other agencies is that common sense call mitigation practices can be beneficial and will be embraced by both employees and the public. In a sense, these steps are becoming common practice around the country.

Several options for providing alternatives to handling all calls for service will be discussed in this section of the report. Some options may be more palatable than others and some options may need to wait until the department has a more efficient response in place to handling service complaints. We do believe that changing the current philosophy of "no call is too small" will have an impact in overall workload and thus mitigate the challenge of an overstressed patrol workforce.

The following table shows all calls for service received and handled by MCSO during our 12-month study period. The table denotes the type of call (main categories of calls), the split between community-initiated or deputy-initiated calls, the average number of units required to handle those calls, and the average time it takes for the primary deputy to handle the call. In total, deputies were dispatched to 87,568 calls for service, or approximately 240 calls per day. Deputy-initiated calls represented 34,385 calls or about 94 per day.

## TABLE 6-2: Calls for Service, One-Year Study Period

| Category | Community-Initiated | | | Deputy-Initiated | | |
|---|---|---|---|---|---|---|
| | Minutes | No. Units | Calls | Minutes | No. Units | Calls |
| Accident | 81.8 | 2.1 | 5,760 | 53.3 | 1.7 | 519 |
| Alarm | 22.3 | 1.6 | 6,933 | 12.7 | 1.6 | 30 |
| Animal call | 43 | 1.4 | 1,817 | 38.5 | 1.3 | 104 |
| Assist citizen | 41.9 | 1.4 | 3,125 | 20.2 | 1.2 | 2,041 |
| Assist other agency | 43 | 1.9 | 2,379 | 37.3 | 1.4 | 837 |
| Civil matter | 54.9 | 1.5 | 1,819 | 47.4 | 1.5 | 95 |
| Crime–person | 83 | 2.1 | 6,168 | 77 | 2 | 321 |
| Crime–property | 72.8 | 1.6 | 11,072 | 60.3 | 1.6 | 1,099 |
| Follow-up | 49.5 | 1.2 | 2,755 | 41.7 | 1.1 | 7,187 |
| Investigation | 47.8 | 1.7 | 25,367 | 34.1 | 1.5 | 2,436 |
| Miscellaneous | 42.4 | 1.6 | 807 | 41 | 1.5 | 129 |
| Suspicious incident | 42.1 | 1.6 | 2,078 | 34.2 | 1.6 | 221 |
| Traffic enforcement | 44.9 | 1.5 | 1,074 | 18.6 | 1.2 | 16,116 |
| Violation | 40.1 | 1.3 | 690 | 26.5 | 1.3 | 1,247 |
| Warrant | 102.7 | 2.4 | 994 | 88.9 | 1.6 | 935 |
| Welfare check | 41.6 | 1.8 | 14,730 | 22.6 | 1.5 | 1,068 |
| Weighted Average/ Total Calls | 52.7 | 1.7 | 87,568 | 30.1 | 1.3 | 34,385 |

Later in this section the report we will discuss several areas within these call categories for which MCSO may want to consider alternate responses to mitigate the workload for patrol deputies.

### Alarm Reduction Program

False alarms are a source of inefficiency for patrol operations. The alarm industry is a strong advocate of developing ordinances and procedures to address police response to false alarms and will work closely with any agency exploring this issue. The 98 percent of alarm calls that are false are caused by user error, and in the case of Maricopa County can also be weather-related. This can be addressed by an alarm management program. During the study period the MCSO responded to about 7,000 alarm calls. The response to most of these calls is undoubtedly unnecessary and an inefficient use of department resources.

Maricopa County does not have an alarm reduction program. Although the county does not have a 'countywide' program in the areas for which MCSO has patrol responsibility, some of the contract cities do have a municipal ordinance in place and which is designed to mitigate the number of false alarms that may be occurring within their jurisdiction. However, CPSM was told that although there are some cities that have a program they are not being utilized as designed or intended. This effectively means there is no cohesive mitigation program in place within the areas that MCSO patrols.

An effective alarm mitigation program involves registering every alarm system used in a home or business within the county / city, typically involving a user fee that funds oversight of the program. Then, within the framework of the program the County can set response policies and procedures. The Cunty can set alternate response protocols during high wind events where data shows there is a significant number of false alarms. The County can also determine the number

of MCSO responses that will be allowed at a particular location before imposing restrictions that either cancel a response or impose a fee for false alarms.

Many communities that have enacted an alarm reduction program have experienced a reduced number of calls for service within this call category. If overall calls cannot be reduced significantly through a program, further analysis can be conducted to determine the driver for false alarms and adjustments to the program can be made. Although there are user fees and false alarm fees collected within most of the communities with a program, the intent is not to raise revenue but to fund proper management of the program to effectively save law enforcement resources.

In general, responding to false burglar alarms is an inefficient use of MCSO emergency resources. The county should be more aggressive and should explore avenues to minimize these responses to the greatest extent possible. *CPSM recommends that MCSO and Maricopa County adopt and enforce an alarm reduction program.*

### Automobile Accidents

Automobile accidents are another category of call for which the response by a sworn officer is questionable at times. In the period under observation the MCSO responded to more than 6,300 motor vehicle accidents. *CPSM recommends that the policy of responding to and investigating routine traffic accidents (property damage only, no criminality) be minimized or discontinued altogether.*

Most accidents involve only property damage to vehicles and the role of a deputy is simply report preparation. When injuries occur or vehicles are inoperable and blocking traffic, however, deputy response is important. Proper training of dispatchers and inquiries by dispatchers during the initial call-taking process can easily triage vehicle accident calls to determine which ones require an MCSO response. Law enforcement departments around the country have **discontinued assigning police officers or sheriff's** deputies to handle property damage-only accidents. CPSM supports this development and contends that dispatching sworn deputies to all vehicle crashes is a policy that should be revisited.

### Civilian Response

Departments across the country are utilizing non-sworn uniformed personnel to handle minor non-emergency calls for service. Individuals in these positions can provide support to sworn officers on patrol. Properly trained and equipped civilian personnel can respond to accident scenes, and other non-emergency CFS, and handle the incidents without the need of a sworn deputy.

MCSO does have a civilian position within its organization to handle these types of calls. Deputy Service Aides (DSAs) are assigned to each district, albeit in small numbers, to help mitigate non-emergency call demands. In discussing the DSA program with individual district commanders CPSM learned that DSAs are used in different capacities depending on the priority needs at each district and to some extent based upon the training and capabilities of the DSAs within their assigned district. Although many districts do use DSAs to assist in mitigating calls for service, some are used more exclusively in administrative roles.

CPSM believes that the use and deployment of Deputy Service Aides is an effective program that should be expanded as well as standardized throughout the various districts in Maricopa County.

As noted earlier, the patrol force is overstressed in Maricopa County. Every district reported that they have unfilled positions at the deputy ranks and we believe that those vacancies should be

prioritized and filled to improve service levels for the citizens of Maricopa County. We do understand that MCSO has experienced considerable difficulties in maintaining its deputy ranks and in recruiting sworn deputy positions. The DSA position is less expensive, has a lower barrier for entry in the sense it does not require a sworn officer designation or certification from the state, and does not require the level of training required to become a deputy. It is also true that most of the existing DSA positions in MCSO are filled. Recruiting and hiring DSA positions and allocating those additional DSA positions to each district for specific patrol use can provide faster relief to the workload for sworn deputies than waiting for the process of hiring sworn deputies and making headway against the attrition challenges MCSO is facing.

Law enforcement agencies that employ positions like MCSO's DSA position use those employees in a variety of capacities such as:

- Non-injury and minor injury traffic collisions.

- Crime reports where a suspect is no longer present.

- Auto theft and auto repossession reports.

- CFS such as lost / found property.

- Assistance with traffic control.

- Routine vacation home checks.

- All manner of administrative duties needed from patrol such as delivering and dropping off paperwork.

*CPSM recommends that MCSO develop a plan for expanded and comprehensive use of DSAs, determine the appropriate level or training to ensure DSA are equipped to effectively mitigate the patrol workload, and prioritize deployment of additional DSAs to augment patrol.* The safety of this workforce should be at the forefront of developing a workplan and providing training, and DSAs should be supported in the field by deputies when needed or requested. We do not believe that additional DSAs should supplant existing deputy positions in patrol. Most districts have minimum staffing levels to maintain coverage for emergency calls for service and to provide appropriate safety of its personnel. Adding DSAs should be in addition to existing minimum staffing levels.

### Traffic Enforcement / Traffic Stops

Traffic safety is a part of the core mission of most law enforcement agencies. Complaints about traffic are generally the most frequent kind of complaint that the police receive from the public. Response to traffic and driving issues and reducing traffic crashes are important responsibilities for the police.

During the period studied, the MCSO engaged in more than 17,000 traffic-related CFS. These CFS account for approximately 14 percent of all CFS handled by the department and about one-half of all deputy-initiated activity in Maricopa County. This is an enormous amount of activity, in both sheer numbers and in context of total work and signifies a very robust approach to traffic enforcement. It is not clear, however, if this enforcement is contributing to any improvement in overall traffic safety in the community.

*CPSM recommends that patrol deputies in the MCSO minimize making routine traffic stops. Instead, the department should leverage traffic crash data to focus enforcement efforts, or the locations deemed most prone to accidents, and towards drivers deemed to be at the highest risk of causing them.* Routine, or random, motor vehicle stops should be minimized. Without any

direction about where to focus, or for what types of violations, deputies are left to conduct this enforcement as their shift permits. It is this type of unfocused traffic enforcement that should be minimized. MCSO did advise that each district station did have at least one traffic speed trailer. This equipment is used to collect data on speeding vehicles and that data does sometimes drive enforcement efforts. However, in most cases the speed trailers are deployed to locations that have received citizen complaints and are not necessarily used as part of an overall data-driven approach to traffic safety.

Under a data-driven approach, traffic safety would become part of the strategic emphasis of the entire department. Patrol deputies would need traffic intelligence to focus their enforcement activities. The County's traffic engineer would need to be engaged to assess roadway sections to possibly improve their design or change signage to improve safety. And perhaps most important, at-risk drivers would need to be identified and engaged through both targeted enforcement and education. In addition, traffic safety could be a good opportunity for MCSO personnel to engage the organized community by attending meetings to deliver traffic safety information.

Part of the traffic safety strategy must also include careful attention paid to the demographics of motorists stopped. Not only is it important that enforcement be focused, but it must also be free from discrimination and bias. The MCSO operates under a court-ordered judgement and has a court-appointed monitor to ensure that its policing practices are free of discrimination. There is extensive reporting and tracking of offender demographics to ensure MCSO is not engaged in disparate treatment of any specific group.

### Criminal Investigations

A short time prior to this study, MCSO transferred all district detectives from the individual patrol district stations to a centralized investigative function. Prior to the change, the district had a greater level of autonomy on how investigations were conducted and how crimes were addressed. Under both the old and new system patrol deputies have always had an investigative responsibility. Each deputy is expected to do as much investigative work as possible during an initial call response and investigation. If the case is not 'solved' during the initial call, the deputy may be required to retain the investigation until it can be properly dispositioned. The decision for a case to be transferred to a detective is made by the Investigations Bureau. Investigators effectively decide what cases they want, and the remainder are sent back to the original case deputy to continue to investigate.

This workflow model is used in many departments throughout the country. However, in the case of MCSO, this model is likely exasperating the patrol workload issues discussed earlier. This is especially true if some of the investigative function is not accurately captured in CAD. Many examples were provided of deputies who are often busy doing follow-up telephone calls on investigations, writing reports, or tracking down victims, witnesses, and/or suspects, all the while showing themselves available for a call (not busy on the investigation). MCSO should develop and use a CAD code that deputies can use indicating they are "busy" but still available for a call if necessary.

CPSM attempted to ascertain what the overall investigative caseload is for patrol deputies. We were advised that the information should be captured in TraCS but it was not regularly monitored. Patrol commanders stated that it was the responsibility of each patrol sergeant to know what cases their deputies had and ensure they were managed properly. We attempted to pull caseload reports for several deputies during a site visit. The reports pulled from TraCS were clearly inaccurate, in some cases showing a deputy had a case assigned from several years ago.

CPSM recommends that all cases should be assigned to the detective bureau. Taking the investigative workload away from patrol deputies will help mitigate the patrol workload issue. Additionally, it was evident in this study that MCSO has a myriad of problems related to its CAD / records data and recommendations are being made to alleviate those concerns. Case management is among the concerns related to data and digital records issues. If detectives have been centralized, then it stands to reason that cases should be centralized as well. This can help improve consistency in how cases are treated, and improve case tracking and internal accountability. If detectives are seeing all cases it may assist in clearing more cases by the detectives being able to see all the trend patterns associated with crime in Maricopa County.

### Online Reporting / Telephone Reporting

MCSO does not have an online reporting mechanism available to residents within the MCSO patrol jurisdiction and does not have a dedicated telephone reporting unit. Although field deputies do occasionally resolve calls for service by calling the reporting party and either taking a report over the telephone or otherwise assisting the caller, and MCSO does occasionally have deputies on a modified assignment where they may work a desk and take reports via telephone, there is not a dedicated unit for this task and there is no consistency of when and if a **citizen can make that report via telephone. MCSO's default response model is to send a deputy** to all calls. CPSM believes that MCSO is missing a big opportunity to offset the workload of deputies in the field by not having a more robust approach to this reporting option.

During our site visit CPSM did learn that MCSO has already allocated funds to invest in online reporting but has not yet been able to implement the technology. We understand that there are technology hurdles to making this technology work and properly interface with standard CAD / RMS systems and we understand that this project may be further hampered with MCSO's version of records management (TraCS). We do, however, encourage MCSO to prioritize this project to help alleviate the workload of patrol deputies.

We also encourage MCSO to explore the opportunity of creating a telephone reporting unit. This can be a centralized unit of civilian employees and supplemented by sworn deputies who require a short-term, modified assignment. This unit can triage calls for service that might normally require a deputy response. Similar to using DSAs in the field this unit can handle a significant number of calls and reports to offset patrol workload.

*CPSM recommends that MCSO prioritize the implementation of an online reporting system.*

*CPSM recommends that MCSO explore the opportunity of creating a telephone reporting unit (staffed with civilians and supplemented by deputies on short-term modified assignment).*

§ § §

## Schedule

Patrol scheduling within MCSO varies based on the district station and deployment model implemented by the district commander. Because of staffing vacancies and minimum staffing numbers at each of the districts, most patrol captains have implemented a version of 12- to 13- hour shifts: most districts have mandatory overtime built into the schedule. The schedules for individual district stations are broken down later in this report.

Law enforcement patrol scheduling across the county can vary from five-day / eight-hour shift **workweeks to "4-10s"** and **"3-12s"** to every variation and combination of those options imaginable. CPSM does not recommend any one schedule option over another. There are some concerns that longer shifts can lead to officer fatigue but others may argue that working longer shifts in exchange for additional days off during a pay period can provide benefits to officer wellness, better work / life balance, and better morale.

Best practices would have resources (labor) scale up and down with the workload demand. In other words, have additional deputies working when CFS are heaviest during the 24-hour day and have fewer personnel working when the workload is lighter. This is usually accomplished with staggered shifts throughout the day, meaning that additional deputies should be on duty when calls spike in the afternoon.

Scaling manpower deployment with workload is not done with any consistency throughout the MCSO patrol districts. The following figure shows the typical deployment for each district station.

## FIGURE 6-9: Average Deployment Levels in Patrol Districts



As one can see, patrol deployment is typically flat throughout the 24-hour period. The spikes and drop-offs are usually the times that one shift is ending while the next one is beginning. The average deployment is consistent with minimum staffing numbers that each district has established. The deputy allocation at each district is at minimum just to maintain minimum staffing. There is no staffing overage to allow for an additional cover shift to assist when workload goes up. With minimum staffing numbers there is no ability to divide the manpower differently to create additional shifts.

Almost all districts have unfilled vacancies at the deputy ranks. During our interviews, most of the district Captains said that they would like to adjust scheduling to a "4-10" model vs. the versions of "3-12s" they currently use, but can't do so while also keeping minimum staffing throughout the day. They cited the lack of personnel as the reason they can't make the change. In other words, they have determined that the only way to maintain minimum staffing with the number of available deputies is by using the schedule they use with the mandatory overtime that many deputies have to work. We will explore the minimum staffing numbers in just a moment, but assuming the minimums are reasonable then district management is likely correct in that mandatory overtime is necessary based on allotted personnel.

If and when MCSO is able to hire additional deputies and deploy them to the districts, we encourage each district to modify its existing scheduling and deployment models. The issue of a 4-10 schedule vs. a 3-12 schedule is less important than the need to have a cover shift to increase personnel when call load is at its highest during the day. Even a small squad of deputies with a sergeant that works noon to midnight under the existing 12-hour schedule would help a great deal to both offset workload for each of the primary shifts and alleviate the overtime associated with paperwork for dayshift.

## Minimum Staffing

Many law enforcement agencies with a patrol responsibility have established minimum staffing numbers for each shift for a variety of reasons. Sometimes that reasoning is due to historical and anticipated workload and other times staffing numbers are in place for officer safety reasons. Minimum staffing numbers are often used as a baseline to manage time-off requests from employees. There is typically a small overage from those staffing numbers that allow patrol staff to take vacation days or special request days off.

Although there is usually some flexibility in those numbers that allow shift management to make occasional adjustments or allow the shift to dip below those allowable numbers, the goal is for that to be the exception and not a norm.

When evaluating MCSO's workload there appears to be a possibility to adjust staffing from the existing 12-hour work shifts to a "4-10" or "5-8" shift, which would allow for a "cover" shift that would increase staffing during peak workload times and allow for fewer deputies when workload is lower. As noted earlier, the minimum staffing numbers demand a certain manpower allocation 24-7 and these minimum numbers do not allow for any other schedule than the existing 12-hour shifts.

Naturally, when faced with this dilemma we questioned the rationale behind the minimum staffing numbers and assessed their necessity. In doing so we learned that in Districts 1, 2, and 3 the staffing numbers are set for both contractual obligations from contract cities and also for officer safety. The safety issue is directly connected to the sheer size of the patrol districts and the fact that in many cases, the beats and areas of patrol responsibility are a considerable distance from one another. Although the workload in every 'beat' that is covered by a deputy may not always rise to the need for an FTE deputy to be present, the distance and the ability to provide back-up support to one another mandates the numbers. In short, it's not safe to have a deputy

working alone 45 to 50 minutes away from his or her closest backing unit. For safety reasons, two deputies are typically within a reasonable travel distance for back-up when needed.

District 4 and District 7 are bound by contractual obligations in the MCSO's larger contract cities. Those staffing numbers are reimbursed to the county from the individual cities.

CPSM does not believe that the minimum staffing numbers set by MCSO are unreasonable.

## Crime Report Workflow

One of the challenges observed within MCSO is that a deputy's shift is rarely over when a shift is scheduled to end. MCSO has a practice and court-ordered mandate that all reports and work that a deputy compiles during his or her work shift must be completed in whole before that deputy can go home. Because CFS workload rarely allows deputies to get all paperwork done during their shift they are frequently held over on overtime to complete paperwork. This is especially problematic for shifts that end during the middle of the day when workload and calls are at their highest. There is little to no opportunity for those deputies to get started on their paperwork early because of call demand. The shifts that end in the early morning hours are not as impacted as call load is typically slower at the end of their shift. Because the call load demand is slower in the early morning when the day shift is starting there is some opportunity to allow those deputies to stay in the station and complete non-time-sensitive reports from the previous shift, but that is not allowed by practice and court mandate orders.

Law enforcement industry best practice encompasses a flexible policy that allows for the following:

- All reports involving an "in-custody" person be completed before a deputy goes home.

- Time-sensitive reports must be completed before a deputy goes home

- All non-narrative sections of reports (i.e., victim / witness / suspect information, property, vehicle information, etc.) must be completed before a deputy goes home.

- Narratives from non-custody reports can be held over and completed at the start of the next shift but cannot be held over as a deputy goes on days off.

The following excerpt is from the court order affecting MCSO (page 41, paragraph 93):

> *Absent extraordinary circumstances, MCSO Deputies shall complete all incident reports before the end of shift. MCSO Field Supervisors shall review incident reports and shall memorialize their review of incident reports within 72 hours of an arrest, absent exceptional circumstances.*

The interpretation of this order would not allow MCSO to deviate from the current practice of completing all reports. However, if that section could be modified it could result in considerable overtime savings and thus alleviate some of the fatigue associated with the extended shifts.

## Desired Staffing Levels

Earlier in this section of the report we examined the patrol staffing levels for all combined patrol districts as well as the overall workload for the combined patrol districts. We determined that existing workload frequently exceeds the 60 percent saturation level that is deemed acceptable. We also offered a number of solutions to offset the workload for sworn deputies.

Although a number of solutions have been offered to offset the workload, we do not believe those solutions can be implemented at the expense of removing additional deputies from patrol. In other words, if each district added two additional DSAs to their patrol shifts, it would not

be advisable to add those positions at the expense of existing deputies. In fact, we would suggest growing the patrol force.

In this report we will break down the workload and staffing at each station. In that section we will make suggestions on additional staffing recommendations to better align workload with staffing.

## Countywide Response Times

In a later section of this report we will break down response times for each individual patrol district. However, there are some common themes regarding response times that should be explored on a countywide level. The following figure shows average response time throughout the county in both winter and summer:

FIGURE 6-10: Average Response Time, by Hour of Day, Winter 2022 and Summer 2022



When looking at this graph one might see that average response times approach 45 minutes at certain times of the day; CPSM feels that it is unacceptable for a citizen to wait that long when awaiting help when needed.

It is important to point out a couple of factors. One, the spikes in response times are occurring during the traditional shift changes at each of the districts. That is a time when deputies getting ready to go off shift are headed to the station and since MCSO does not have enough marked units the following shift often has to wait for those units before they can get into the field to handle calls that may have come into dispatch during that time. Because of its minimum staffing challenges and its reliance on the 12-hour shift model, MCSO has very few resources available during those times. Many agencies mitigate this challenge by staggering their shifts to have overlapping coverage, a model that works well with traditional 5-8 or 4-10 schedules. While MCSO uses the 12-hour model where shift staggering is more challenging, in most of the districts

there is a two-team model per shift (one sergeant with four to six deputies). *MCSO should explore the feasibility of staggering the start times for patrol teams by one to two hours, thus allowing better overlap coverage to minimize the response time spikes during shift change.*

The second issue that should be considered when looking at the graph is that it accounts for all calls for service in all priority levels. Law enforcement agencies would like to have an immediate response for all calls for service. However, many agencies have more calls than manpower allows and in response they develop priority systems to ensure the more critical calls are handled first and more routine non-emergency calls can be handled when time allows. The following figures show response times in different call categories in the two seasons during which we examined workload.

FIGURE 6-11: Average Response Time by Category, Winter 2022



§ § §

FIGURE 6-12: Average Response Time by Category, Summer 2022



These figures show that travel time, the time it takes a deputy to drive to a call once dispatched is reasonably consistent in most call categories. What changes significantly in each category is the dispatch processing time. This does not imply that it takes an extended period of time for a dispatcher to receive and enter a call for service into CAD. In fact, modern CAD systems allow that part of the process to take as little time as necessary. Most of the "processing" time is the time the call is held before an available deputy can be dispatched.

§ § §

## TABLE 6-3: Average Response Time Components, by Category

| Category | Winter | | | | Summer | | | |
|---|---|---|---|---|---|---|---|---|
| | Minutes | | | Calls | Minutes | | | Calls |
| | Dispatch | Travel | Response | | Dispatch | Travel | Response | |
| Accident | 9.2 | 12.9 | 22.1 | 762 | 10.2 | 13.4 | 23.6 | 644 |
| Alarm | 7.5 | 12.3 | 19.7 | 795 | 7.9 | 12.9 | 20.8 | 1,061 |
| Animal call | 21.6 | 16.9 | 38.6 | 258 | 21.0 | 16.2 | 37.2 | 175 |
| Assist citizen | 16.9 | 14.3 | 31.1 | 328 | 16.2 | 16.4 | 32.6 | 386 |
| Assist other agency | 9.5 | 14.3 | 23.8 | 329 | 9.4 | 14.7 | 24.1 | 292 |
| Civil matter | 20.3 | 17.6 | 38.0 | 244 | 18.0 | 18.3 | 36.3 | 224 |
| Crime–person | 16.5 | 16.6 | 33.1 | 716 | 15.4 | 14.4 | 29.8 | 812 |
| Crime–property | 20.0 | 17.6 | 37.6 | 1,494 | 20.2 | 17.3 | 37.5 | 1,381 |
| Follow-up | 23.7 | 17.3 | 41.0 | 257 | 21.5 | 14.1 | 35.5 | 282 |
| Investigation | 15.5 | 14.7 | 30.2 | 3,223 | 13.6 | 14.2 | 27.7 | 3,064 |
| Miscellaneous | 21.5 | 16.6 | 38.1 | 106 | 15.0 | 15.8 | 30.8 | 86 |
| Suspicious incident | 16.7 | 14.1 | 30.9 | 261 | 14.8 | 13.6 | 28.3 | 290 |
| Traffic enforcement | 16.2 | 12.2 | 28.4 | 125 | 14.9 | 11.6 | 26.6 | 85 |
| Violation | 20.6 | 15.4 | 36.0 | 97 | 23.6 | 14.5 | 38.2 | 76 |
| Warrant | 22.8 | 21.5 | 44.3 | 113 | 21.3 | 17.4 | 38.7 | 114 |
| Welfare check | 14.6 | 14.9 | 29.6 | 2,035 | 13.6 | 14.7 | 28.3 | 2,034 |
| Total Average | 15.5 | 15.2 | 30.7 | 11,143 | 14.4 | 14.7 | 29.1 | 11,006 |

Note: The total average is weighted according to the number of calls per category.

The following table shows response times by call priorities:

## TABLE 6-4: Average Dispatch, Travel, and Response Times, by Priority

| Priority | Minutes | | | Calls | Minutes, 90th Percentile |
|---|---|---|---|---|---|
| | Dispatch | Travel | Response | | |
| 1 | 2.0 | 9.1 | 11.0 | 2,298 | 21.2 |
| 2 | 10.4 | 13.5 | 23.9 | 26,654 | 65.4 |
| 3 | 18.6 | 16.1 | 34.7 | 46,691 | 130.5 |
| 4 | 31.1 | 21.6 | 52.6 | 20 | 363.7 |
| Weighted Average/Total | 15.2 | 15.0 | 30.2 | 75,663 | 106.1 |
| Accidents with injuries | 3.3 | 10.0 | 13.3 | 1,049 | 27.29 |

Note: The total average is weighted according to the number of calls within each priority level.

The total response time for high-priority calls for service in Maricopa County is 11 minutes on average. Only two minutes of the priority one calls involved dispatch processing time; the remaining nine minutes was the deputy travel time. As priority levels drop the response time continues to go up; this is normal in all departments that use a call priority system.

Two lessons can be gleaned from this data. One, the call mitigation strategies mentioned earlier in this section should reduce the response times for the lower priority calls as those calls would be handled in a different manner. Those reductions should then impact the overall response times for the department, because current response time averages are driven up by the lower priority calls. The second observation is the travel time in Maricopa County is longer than many

jurisdictions would like to see. It is important to highlight the sheer size of Maricopa County and the broken-up areas of patrol responsibility between incorporated cities in each of the districts. This highlights the need to have an appropriate number of deputies distributed around the county beats to minimize those times as much as possible. This is a practice that MCSO already encompasses and which contributes to the minimum staffing numbers at each of the patrol districts.

## Patrol Recommendations:

- CPSM recommends that MCSO and Maricopa County adopt and enforce an alarm reduction program. (Recommendation No. 84.)

- CPSM recommends that the policy of responding to and investigating routine traffic accidents (property damage only, no criminality) be minimized or discontinued altogether. (Recommendation No. 85.)

- CPSM recommends that MCSO develop a plan for expanded and comprehensive use of DSAs, determine the appropriate level or training to ensure DSAs are equipped to effectively mitigate the patrol workload, and prioritize deployment of additional DSAs to augment patrol. (Recommendation No. 86.)

- CPSM recommends that patrol deputies in the MCSO minimize making routine traffic stops. Instead, the department should leverage traffic crash data to focus enforcement efforts, or the locations deemed most prone to accidents, and towards drivers deemed to be at the highest risk of causing them. (Recommendation No. 87.)

- MCSO should develop and use a CAD code that deputies can use indicating they are "busy" but still available for a call if necessary. (Recommendation No. 88.)

- CPSM recommends that all cases should be assigned to the Detectives and Investigations Bureau. (Recommendation No. 89.)

- CPSM recommends that MCSO prioritize the implementation of an online reporting system. (Recommendation No. 90.)

- CPSM recommends that MCSO explore the opportunity of creating a telephone reporting unit (staffed with civilians and supplemented by deputies on short-term modified assignment). (Recommendation No. 91.)

- MCSO should explore the feasibility of staggering start times for patrol teams by one to two hours, thus providing better overlap coverage and thus minimizing the spikes in response time during shift change. (Recommendation No. 92.)

≈ ≈ ≈

# LAKE PATROL

MCSO District 5 is also known as Lake Patrol. The Lake Patrol Division has the responsibility for law enforcement services in the recreational areas of:

- Tonto National Forest.

- Lake Pleasant Regional Park.

- Cave Creek Regional Park.

- Lake Pleasant Saguaro Lake.

- Canyon Lake.

- Apache Lake.

- Bartlett Lake.

- Horseshoe Lake.

- The Lower Salt and Verde River Recreation Areas.

- Four Peaks, Superstition, Mazatzal, Camp Creek, and Seven Springs Recreational and Wilderness Areas.

These areas vary in terrain and range in altitude from 1,300 to 7,650 feet. The total area of responsibility is more than 1,000 square miles of recreational space; the areas see more than 7 million visitors annually. The Lake Patrol Division is composed of deputy sheriffs and volunteer posse members who possess a large variety of skills and abilities such as Scuba Divers, Emergency Medical Technicians, Paramedics, K-9 Handlers, Mounted Officers, and Unmanned Aircraft System (UAS) "drone" pilots. Personnel specialize in the operation of four-wheel drive vehicles, all-terrain vehicles, patrol boats, drones, and air boats. In addition to the specialty areas, all Lake Patrol deputies are trained / certified Emergency Medical Technicians or Paramedics.

## DUI Prevention and Enforcement

The Lake Patrol Division also manages the Sheriff's Office DUI Task Force Operations and DUI training such as HGN, ARIDE, and DRE courses. The division administers the MCSO's state traffic safety grant program and liaisons with outside agencies for regional DUI enforcement activities. The division does a great deal of enforcement for boating while impaired on all of the lakes in the jurisdiction. The administrative responsibilities are handled by the Administrative Lieutenant and his staff. The deputies work the enforcement programs as an auxiliary duty.

## Mounted Unit

The Mounted Unit is another responsibility of the Lake Patrol Division; the unit provides countywide services. This unit assists in search and rescue operations where motorized vehicles cannot get to or are not authorized, such as the wilderness areas of the Tonto National Forest. The unit also assists with patrol operations and crowd control during large sporting events, holiday celebrations, parades, and protests.

The horses are housed on U.S. Forest Service land near the main station. The office employs two horse groomers who work part-time and ensure the basic needs of the horses are met. The riders all participate in the care of the horses as well under the direction of the Administrative

Lieutenant. The unit has a rider selection process and ensures all riders pass an intensive training course that is administered internally before being deployed. Riders are deputies and perform their Mounted Unit duties as an auxiliary responsibility to their normal assignment. The unit coordinator ensures the basic and ongoing training requirements are met before any of the deputies are allowed to ride on a mission.

## Investigations

The division also has detectives who investigate all crimes, deaths, and boating accidents on the lakes and rivers. These detectives work investigations as an auxiliary duty to patrol and other specialty functions as needed. **The Sheriff's Office recently centralized the detective function** and reassigned district detectives to headquarters for all other districts other than Lake Patrol. The model of keeping detectives in division at Lake Patrol seems to be the right decision. The Lake Patrol detectives function differently than other district detectives. They work the assignment in addition to patrol duties and their intimate knowledge of the lake environments and boating is tremendously valuable to the investigations they perform.

## Dive Team

The Lake Patrol Division also operates a dive team that is consistently used in the county and has been called upon for services throughout Arizona, the Western United States, and in Mexico. The team is responsible for search and recovery missions that require diving expertise. The dive team also utilizes a Remote Operating Vehicle to assist in operations at extreme depth, in contaminated waters, or other instances where placing a diver into the water may be hazardous or unnecessary.

**In addition, the Lake Patrol Division is considered the Sheriff's Office primary emergency and** field force response. Division personnel respond to civil unrest, emergency evacuations for floods and fires, and emergencies at the Palo Verde Nuclear Generator Station.

## Staffing

The Lake Patrol Division allocated staff is shown in the following table.

## TABLE 6-5: Lake Patrol Division Staffing

| Classification | Budgeted | Actual | Vacant |
|---|---|---|---|
| Captain | 1 | 1 | 0 |
| Lieutenant | 3 | 3 | 0 |
| Sergeant | 10 | 10 | 0 |
| Deputy | 37 | 30 | 7 |
| Deputy Service Aide | 1 | 1 | 0 |
| Administrative Assistant | 1 | 1 | 0 |
| Horse Groomer | 2 | 2 | 0 |
| Total Sworn | 51 | 44 | 7 |
| Total Civilian | 4 | 4 | 0 |
| Total Staff | 55 | 48 | 7 |

The schedule is mainly three 12-hour shifts with the nights uncovered, since most of the recreation areas are closed after dark. Deputies rotate on-call status and respond from home

when calls for service come in after hours and necessitate a response. The "pay-back" day for the modified work schedule is used as a training day or overlapped coverage in the summer. During the summer, deputies are required to work all weekends plus considerable overtime for adequate coverage.

Due to the unique and varied nature of the responsibilities for Lake Patrol, deputies are often spending time moving, maintaining, or repairing equipment. The unit utilizes off-road all-terrain vehicles (ATVs), three different types of boats, diving equipment, medical equipment, horse-related equipment, rescue equipment, etc. The vast majority of this work is performed by sworn deputies. Non-sworn support is provided with the horses used by the Mounted Unit. MCSO employs two horse groomers, part-time civilian employees who help provide care and maintenance for the horses.

Our consultants have seen other similar law enforcement organizations that use civilian employees as equipment or facility coordinators to perform many of the duties we observed sworn deputies performing. CPSM recommends the MCSO examine the feasibility of using Deputy Service Aides (DSAs) or personnel with a similar civilian classification to assist with moving and maintaining the vast amount of technical equipment in the division.

Another area related to a staffing challenge is the turnover of paramedics in the division. The office pays for the paramedic certification, which takes one year of full-time education and training to complete. Deputies who become paramedics often promote or transfer to other areas of the department and the division then must train another person who will also likely transfer to another position. There is a substantial burden on staffing when a sworn deputy is essentially in school for one year.

Many agencies hire non-sworn paramedics or nurses who are already certified for emergency medical services. These career trained individuals provide for less training costs and turnover than training deputies who are likely to promote or transfer. CPSM recommends the MCSO consider hiring fully trained and certified civilian staff for advanced emergency medical service. This rationale does not apply to training the Lake Patrol deputies as EMTs. This appears to be an essential skill due to the remote nature of the area of responsibility and the high number of injured people they encounter.

The combined visitor count for all of the county recreation and wilderness areas Lake Patrol is responsible for totaled more than 7 million visitors last year. The single highest number of visitors visited Lake Pleasant, with over 1 million visitors, a 32 percent increase over the prior year. The vast number of square miles, varied terrain, specialized functions, and equipment all put a strain on resources. When emergency incidents occur, people throughout the division respond to assist and perform various specialty functions required for the circumstances.

## Crime and Workload

The following table shows the district workload by call type category.

§ § §



TABLE 6-6: Events, Calls, and Workload by Category, District 5

| Category | Events | Calls | Work Hours |
|---|---|---|---|
| Accident | 483 | 478 | 1,339.1 |
| Alarm | 42 | 42 | 15.5 |
| Animal call | 96 | 90 | 95.8 |
| Assist citizen | 943 | 891 | 609.1 |
| Assist other agency | 364 | 359 | 668.5 |
| Civil matter | 46 | 41 | 49.7 |
| Crime–person | 255 | 246 | 691.2 |
| Crime–property | 421 | 406 | 594.7 |
| Directed patrol | 6,827 | NA | NA |
| Follow-up | 439 | 430 | 660.3 |
| Investigation | 1,396 | 1,310 | 2,733.9 |
| Miscellaneous | 29 | 29 | 33.7 |
| Suspicious incident | 62 | 60 | 68.5 |
| Traffic enforcement | 4,676 | 4,648 | 1,886.5 |
| Violation | 705 | 701 | 444.0 |
| Warrant | 70 | 69 | 188.4 |
| Welfare check | 559 | 540 | 736.1 |
| Total | 17,413 | 10,340 | 10,815.0 |

## Observations:

- There were 17,134 events either in District 5 or involving a Lake Patrol unit.

- 964 events were zero-on-scene events.

- On average, there were 28.3 calls per day, or 1.2 per hour.

- Total workload averaged 27 hours per day, meaning that on average 1.2 units per hour were busy responding to calls.

- The top four categories accounted for 81 percent of calls:

  - 50 percent of calls were traffic-related.

  - 13 percent of calls were investigations.

  - 12 percent of calls were assists.

  - 7 percent of calls were violations.

- 6 percent of calls were crimes.

FIGURE 6-13: Calls per Day by Initiator and Month, District 5



TABLE 6-7: Calls per Day by Initiator and Month, District 5

| Initiator | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Community-initiated | 9.0 | 7.8 | 6.1 | 5.0 | 5.9 | 5.9 | 6.3 | 8.2 | 9.3 | 8.8 | 9.1 | 7.9 |
| Deputy-initiated | 25.6 | 11.0 | 12.0 | 21.4 | 18.9 | 15.5 | 16.6 | 22.3 | 31.7 | 28.0 | 29.5 | 17.8 |
| Total | 34.6 | 18.8 | 18.1 | 26.4 | 24.8 | 21.5 | 22.8 | 30.5 | 40.9 | 36.9 | 38.5 | 25.7 |

## Observations:

- The number of calls per day was lowest in November.

- The number of calls per day was highest in May.

- The months with the most calls had 127 percent more calls than the months with the fewest calls.

- May had the most deputy-initiated calls, with 187 percent more than October, which had the fewest.

- May had the most community-initiated calls, with 86 percent more than December, which had the fewest.

FIGURE 6-14: Average Response Time by Hour of Day, District 5



Note: We limited our response time analysis to calls located within District 5.

## Observations:

- Average response time varied by the hour of the day.

- The longest response times were between 5:00 a.m. and 6:00 a.m., with an average of 55.6 minutes.

- The shortest response times were between 4:00 p.m. and 5:00 p.m., with an average of 19.4 minutes.

§ § §

FIGURE 6-15: Average Response Time by Category, District 5



TABLE 6-8: Average Response Time Components by Category, District 5

| Category | Minutes | | | Calls |
|---|---|---|---|---|
| | Dispatch | Travel | Response | |
| Accident | 5.7 | 16.3 | 21.9 | 187 |
| Alarm | 45.0 | 32.7 | 77.7 | 1 |
| Animal call | 13.3 | 19.8 | 33.1 | 35 |
| Assist citizen | 10.5 | 19.4 | 29.9 | 211 |
| Assist other agency | 8.0 | 23.4 | 31.3 | 60 |
| Civil matter | 17.4 | 16.6 | 34.0 | 21 |
| Crime–person | 10.4 | 15.0 | 25.4 | 83 |
| Crime–property | 13.5 | 18.1 | 31.5 | 117 |
| Follow-up | 18.8 | 19.5 | 38.3 | 28 |
| Investigation | 8.8 | 17.3 | 26.1 | 511 |
| Miscellaneous | 17.9 | 20.0 | 37.9 | 6 |
| Suspicious incident | 14.7 | 15.8 | 30.5 | 20 |
| Traffic enforcement | 7.3 | 12.3 | 19.6 | 29 |
| Violation | 12.4 | 18.6 | 31.1 | 19 |
| Warrant | 4.7 | 33.5 | 38.2 | 3 |
| Welfare check | 10.8 | 22.7 | 33.5 | 230 |
| Total Average | 9.9 | 18.5 | 28.3 | 1,561 |

TABLE 6-9: Average Dispatch, Travel, and Response Times by Priority, District 5

| Priority | Minutes | | | Calls | Minutes, 90th Percentile |
|---|---|---|---|---|---|
| | Dispatch | Travel | Response | | |
| 1 | 2.4 | 14.9 | 17.4 | 206 | 31.5 |
| 2 | 8.0 | 17.5 | 25.5 | 1,228 | 68.2 |
| 3 | 12.0 | 19.6 | 31.6 | 1,682 | 83.4 |
| 4 | 45.0 | 27.5 | 72.5 | 6 | 466.3 |
| Weighted Average/Total | 9.9 | 18.5 | 28.3 | 3,122 | 74.2 |
| Accidents with injuries | 3.2 | 16.6 | 19.8 | 50 | 36.6 |

Note: The total average is weighted according to the number of calls within each priority level.

## Observations:

- High-priority calls had an average response time of 17.4 minutes, lower than the overall average of 28.3 minutes for all calls.

- Average dispatch processing was 2.4 minutes for high-priority calls, compared to 9.9 minutes overall.

- Average response time for injury accidents was 19.8 minutes, with a dispatch processing of 3.2 minutes.

FIGURE 6-16: Deployment and All Workload, District 5 (Lake) Units



Note: For this and the next figure and the observations, the analysis only focuses on Lake Patrol units' work and deployment from 7:00 a.m. to 7:00 p.m.

FIGURE 6-17: Workload Percentage by Hour, District 5 (Lake) Units



## Observations:

*Winter:*

- Deployment:
  - The average deployment was 12.9 units per hour in winter.
  - The average deployment was 13.0 units per hour during the week and 12.7 units per hour on the weekend.
  - The average deployment varied from 2.5 to 15.8 units per hour on weekdays and 3.1 to 15.4 units per hour on weekends.
- Community-initiated work:
  - Average community-initiated workload was 0.6 units per hour during the week and 1.1 units per hour on weekends.
  - This was approximately 4 percent of hourly deployment during the week and 9 percent of hourly deployment on weekends.
  - During the week, the workload reached a maximum of 18 percent of deployment between 7:00 p.m. and 7:15 p.m.
  - On weekends, the workload reached a maximum of 26 percent of deployment between 6:30 p.m. and 6:45 p.m.

- All work:

  □ Average workload was 7.3 units per hour during the week and 8.2 units per hour on weekends.

  □ This was approximately 56 percent of hourly deployment during the week and 64 percent of hourly deployment on weekends.

  □ During the week, the workload reached a maximum of 65 percent of deployment between 10:45 a.m. and 11:00 a.m.

  □ On weekends, the workload reached a maximum of 75 percent of deployment between 10:30 a.m. and 10:45 a.m.

*Summer:*

- Deployment:

  □ The average deployment was 16.2 units per hour in summer.

  □ The average deployment was 12.4 units per hour during the week and 23.9 units per hour on the weekend.

  □ The average deployment varied from 2.7 to 15.2 units per hour on weekdays and 4.3 to 28.6 units per hour on weekends.

- Community-initiated work:

  □ Average community-initiated workload was 0.8 units per hour during the week and 1.6 units per hour on weekends.

  □ This was approximately 7 percent of hourly deployment during the week and 7 percent of hourly deployment on weekends.

  □ During the week, the workload reached a maximum of 20 percent of deployment between 7:00 p.m. and 7:15 p.m.

  □ On weekends, the workload reached a maximum of 22 percent of deployment between 6:30 p.m. and 6:45 p.m.

- All work:

  □ Average workload was 6.9 units per hour during the week and 15.1 units per hour on weekends.

  □ This was approximately 56 percent of hourly deployment during the week and 63 percent of hourly deployment on weekends.

  □ During the week, the workload reached a maximum of 70 percent of deployment between 10:00 a.m. and 10:15 a.m.

  □ On weekends, the workload reached a maximum of 74 percent of deployment between 11:15 a.m. and 11:30 a.m.

One of the problems with measuring workload in Lake Patrol, not uncommon in other areas of MCSO, is the lack of reliable data. Lake Patrol particularly operates in the field outside of patrol cars, in boats, on horses, etc. and they are not equipped with mobile computers. Much of their workload is not captured or measured in a way that represents their true workload. However, based on the available data, the variety of functions, and the vast territory covered, it was clear

to our team that additional resources are necessary for Lake Patrol to serve the community at an acceptable level.

In addition to filling vacancies, another way to increase staffing in Lake Patrol would be for MCSO to start a temporary, part-time cadre of civilian employees to assist during the summer months. These employees could be Park Ranger-type classifications, trained in valuable functions to assist deputies in providing for public safety during the peak summer season. Many tourist-based destinations use similar part-time models to bolster staffing during peak seasons. Beach cities often use part-time staff members for lifeguards and other vital services during summer months. They attract college students, teachers, retirees, and others who can perform valuable services when needed the most. The non-benefited, part-time employees can add tremendous value to peak times for much less cost than year-round, full-time employees.

## Training

Lake Patrol personnel all have a base level of training as an Emergency Medical Technician (EMT) and they each are also trained as boat operators through a partnership with the Arizona Game and Fish Department. Most all of the deputies also have one or two additional areas of specialty they train in or for which they hold certification such as Paramedic, Dive Team, Mounted Unit, Drone Operator, etc.

The training for each area of specialty is overseen by a Sergeant or Lieutenant. Each specialty coordinator is responsible to ensure a comprehensive training plan is completed by each of the deputies assigned to the specialty. For example, the Coordinator for the Dive Team ensures all required training is met by each team member before they are allowed to participate in missions. Training is conducted mainly during the non-summer months when coverage can be adjusted to ensure a minimum level of staffing is still on patrol.

## Facilities

The main station for the Lake Patrol is located near the Lower Salt River Recreation Area. Each of the main lakes also has an off-site facility that serves as an aide station. The aide stations are equipped to provide intermediate and advanced first aide to people who become ill or injured at the lake. With the remote nature of each of the lakes, the deputies often perform life-saving assistance until transportation can be arranged to a hospital.

During our site visit, the main station, several aide stations, and equipment storage facilities were toured by our consultants. The majority of facilities were clean, orderly, and in reasonably good condition. The following observations regarding facilities and equipment were noted:

- Communications (radio and internet) at Bartlett Lake are not consistent or reliable. Deputies reported communication system or equipment failures during field operations, which is considered a safety issue.

- Other remote areas were reported to have communication failures. The search and rescue function and some of the remote trail areas have experienced reliability issues with radio and phone communications.

- Lake Patrol deputies assigned to Lake Pleasant have a small office with little storage space in a shared building. Despite having the highest activity of the county lakes and being the only lake in a county park, the facility that deputies work out of is small, over-crowded, and lacks the aide station component.

- The fleet of boats used by deputies to patrol the lakes and rivers are stored in both dry storage and on the lakes in boat houses. The boat houses at each of the lakes were found to be in good condition. The dry storage for the boats was not consistent. Some of the boats were stored under cover, some were not, and some were stored in semi-secure or unsecured areas.

- The boats are currently maintained by county staff in a separate county department. There is a lack of certified technicians to work on boats and there is often a delay in service.

- There is a need for secure storage of large equipment near the main Lake Patrol station. Currently there are boats and other equipment stored under a shade canopy behind a chain link fence in a remote area. The equipment is subject to harsh weather conditions and security vulnerabilities. Building long-term equipment storage that provides security and protection from the elements should be a priority.

- The horse boarding area is provided through a partnership arrangement with the U.S. Forrest Service. The area appears well suited for MCSO needs and is well maintained. The partnership is mutually beneficial and will likely continue to meet the MCSO's needs for the foreseeable future.

## Lake Patrol Recommendations:

- CPSM recommends the MCSO and the county engage with a consultant to provide an analysis with recommendations for reported radio and data communications problems in remote areas where Lake Patrol deputies regularly work. (Recommendation No. 93.)

- CPSM recommends MCSO create a committee to recommend positions performing work that can be done by civilians. Some positions would be candidates for civilianization based on the resource-intensive, specialized training provided to deputies who transfer out regularly and must be replaced (such as EMTs, Paramedics). Other candidates for civilianization would be for duties related to equipment maintenance, transportation, and other specialty type auxiliary assignments. (Recommendation No. 94.)

- We recommend a comprehensive internal analysis of facility needs. Many of the Lake Patrol facilities are in shared or leased space that does not adequately meet the needs of the units assigned. In addition, substantial resources have been invested in specialty equipment that is stored with inadequate security or weather protection. (Recommendation No. 95.)

- MCSO should examine the possibility of creating a part-time cadre of seasonal employees to assist with peak service demands during the summer months. (Recommendation No. 96.)



§ § §

## JUDICIAL ENFORCEMENT DIVISION

The Judicial Enforcement Division (JED) is divided into two functions: (1) the Administrative Section staffed by civilian Records Specialists, and (2) the Operations Section staffed by sworn deputy sheriffs. The division is commanded by a Captain who reports to the Deputy Chief of the Patrol Resource Bureau. The JED performs the following functions within the County of Maricopa:

- Civil and Criminal Process **–** Serves all superior court civil processes such as Civil Summons/Subpoenas, Orders of Protection, Writs of Execution, Garnishment, Restitution, Replevin, Child Custody Warrants, criminal subpoenas, as well as various other in-state and out-of-state court documents and process.

- Tax Collections **–** Collection of delinquent personal property and mobile home taxes including the seizure and sale of personal property/mobile homes/business assets to satisfy the tax bill.

- Pawnshop **–** Issuance of pawnshop licenses; coordination of hearings for suspension or revocation of license. Investigation of recovered stolen property found in any pawnshop and facilitating the release of said property. Investigating administrative and criminal violations regarding the operations of pawnshops.

- Adult Business Licensing **–** Responsible for processing adult business licenses and permits for adult establishments in the unincorporated areas.

- Backgrounds **–** Runs criminal background on licensees for pawnshops and adult businesses, as well as backgrounds on defendants with protective orders.

- BATFE - Receives, reviews, and maintains record of the Chief Law Enforcement Officer (CLEO) copy of Federal Firearms Licenses for all firearms purchased in Maricopa County. The Division provides notification of any potential concerns to the local Bureau of Alcohol, Tobacco, Firearms, and Explosives.

## Staffing

Although the sworn section of the organization chart shows two teams each consisting of a sergeant and 12 deputies, in actuality, there are three sergeants assigned to the division, and three teams within the sworn section. It was learned that the three teams are based upon ensuring an even span of control ratio among the supervisors as opposed to having deputies work assigned specific workloads. CPSM recommends the organization chart be updated to reflect its true makeup.

The same rings true with the civilian staff assigned to the Civil Process Section. The separation of teams seen on the organizational chart is based upon trying to ensure an equitable span of control ratio, as opposed to a specific designated workload.

§ § §

FIGURE 6-18: JED Organizational Chart



The following table shows the JED staffing in 2022.

TABLE 6-10: JED Staffing, 2022

| Sworn Section Position | Budgeted | Vacancies | Actual |
|---|---|---|---|
| Captain | 1 | 0 | 1 |
| Lieutenant | 1 | 0 | 1 |
| Sergeant | 3 | 0 | 3 |
| Deputies | 21 | 7 | 14 |
| Total | 26 | 7 | 19 |
| Civilian Section Position | Budgeted | Vacancies | Actual |
| Records Specialist Manager | 1 | 0 | 1 |
| Records Specialist Supervisor | 4 | 0 | 4 |
| Senior Records Specialist | 4 | 0 | 4 |
| Records Specialist (SRS) | 15 | 3 | 12 |
| Total | 24 | 3 | 21 |

It is important to examine the long-term trend in sworn staffing of the JED as over the last two decades the number of sworn deputy personnel assigned to JED has decreased significantly. The following table shows the staffing numbers from 2002 to 2022.

TABLE 6-11: JED Sworn Staffing, 2002–2022

| Year | Captain | Lieutenant | Sergeant | Deputies | Total |
|---|---|---|---|---|---|
| 2002 | 1 | 2 | 2 | 30 | 35 |
| 2003 | 1 | 2 | 2 | 28 | 33 |
| 2004 | 1 | 2 | 3 | 27 | 33 |
| 2005 | 1 | 2 | 3 | 27 | 33 |
| 2006 | 1 | 2 | 3 | 28 | 34 |
| 2007 | 1 | 2 | 3 | 26 | 32 |
| 2008 | 1 | 2 | 4 | 27 | 34 |
| 2009 | 1 | 2 | 4 | 27 | 34 |
| 2010 | 1 | 2 | 4 | 26 | 33 |

| Year | Captain | Lieutenant | Sergeant | Deputies | Total |
|------|---------|------------|----------|----------|-------|
| 2011 | 1 | 2 | 4 | 28 | 35 |
| 2012 | 1 | 2 | 4 | 28 | 35 |
| 2013 | 1 | 2 | 3 | 27 | 33 |
| 2014 | 1 | 2 | 3 | 24 | 30 |
| 2015 | 1 | 1 | 4 | 25 | 31 |
| 2016 | 1 | 1 | 4 | 22 | 28 |
| 2017 | 1 | 1 | 2 | 20 | 24 |
| 2018 | 1 | 1 | 3 | 21 | 26 |
| 2019 | 1 | 1 | 3 | 20 | 25 |
| 2020 | 1 | 1 | 3 | 20 | 24 |
| 2021 | 1 | 1 | 3 | 16 | 21 |
| 2022 | 1 | 1 | 3 | 14 | 18 |

Note: Disclaimer—with the constant movement of sworn staff and leadership over the last 20 years, this information required meticulous review and piecing together with the assistance of multiple division rosters, two position control number reports, and statistical reports.

As evidenced by the above staffing table, since 2002, sworn staffing has decreased by 49 percent. More importantly, the number of sworn deputies who actually do the field work of serving civil processes, collecting delinquent taxes, issuing pawnshop licenses, and doing inspections, etc. has decreased by 53 percent, or 16 deputies, from 2002. At the same time, the workload has increased significantly.

Based upon these staffing numbers, the overtime hours being worked by JED employees, and the increase of workload in the unit, it is imperative that the vacant positions be filled immediately.

Conversely, the number of civilian administrative staff assigned to the JED has increased by 33 percent from 2002. The assignment of civilian personnel in the unit has changed over the years and has been reorganized to better fit the needs of the unit. The most significant growth of civilian personnel in the unit occurred in 2013 when three additional records specialists were added. It was learned that the increase of civilian personnel in the unit at that time occurred because of a staffing study conducted that year. However, even as the workload has increased since 2013, no new civilian positions had been added.

Based upon data provided to CPSM, there is no doubt that workload in JED has increased dramatically over the last two decades for not only for the sworn deputies in the division, but also for the civilian personnel.

## Sections and Workload

### Civil Process Section

This is the largest of the four areas in the JED: this section has seen the largest increase in workload of all the sections within JED as evidenced by the following figure. With the update of **Arizona's Order of Protection Law (ARS 13**-2602, effective January 1, 2020), JED has experienced a significant increase in workload since 2019. Prior to 2020, Orders of Protection made up 30 percent of the incoming volume for Civil and Family Court service requests. Since the statute change, those requests now make up 60 percent of the volume. Also, the statute change required new processes, which were not **MCSO's responsibility** prior to the change.

FIGURE 6-19: Workload in the Civil Process Section, 2019–2021



- Civil and Family Court Orders have increased 42 percent from 2019, Mental Health subpoenas have increased only marginally at 13 percent, and Writs have increased 23 percent.

- Successfully Served Court Orders: 12,968 (Personal/Subserved Orders: 10,553: Faxed Service: 2,415).

- 11,774 Service Attempts (14 percent increase since 2019).

- 22,327 Total Trips to Attempt/Serve Court Orders (8 percent increase since 2019).

*Pawn Section, ATF, Adult Business Licensing, & Background Unit (2021)*
- New Pawn Licenses: 7.

- Pawn Renewals: 107.

- Pawn tickets received and reviewed for accuracy: 27,949.

- Cases Investigated/Cleared: 17.

- Alcohol, Tobacco, and Firearms (ATF) Forms Processed: 11, 160 (76 percent increase since 2019).

- Background Checks on Protective Orders: 6,140 (180 percent increase since 2019).

- Background Checks on Warrants: 505.

- Adult Business License (ABL) Permit Applications Processed: 280 (15 percent increase since 2019).

- Number of pawnshop inspections conducted: None.

It is clear that certain areas have seen a significant increase in workload since 2019. However, what is significant is that there are services that are no longer being conducted because of lack of personnel, particularly as evidenced by the lack of pawnshop inspections.

*Tax Unit*

Tax data is collected by the fiscal year (not calendar year) to stay aligned with the Maricopa County Treasurer's Office. The following data is from Fiscal Year 2020-2021.

- The lack of deputies has led to a 91 percent decrease in Deputy Postings since 2019; in 2021 there were no deputy postings conducted.

- Between 2020 and 2021, deputy tax collection efforts fell by 95 percent and then fell completely by the end of Fiscal Year 2021-2022, due to inadequate staffing of the Tax Unit.

- Between 2017 and 2020, the average amount recouped through deputy collection efforts was about $1.5 million. In 2021, deputy collection efforts fell to about $80,000. No money based on seizure or sales was collected for 2022.

The three areas highlighted above are directly attributable to the reduction of personnel in the division.

In addition, MCSO receives approximately 24,000 delinquent accounts that the division's SRS personnel must research and process each year. Dependent upon the complexity of the account, it can take up to 45 minutes to research an account and send out demand letters. Without any additional staff, the current backlog will grow, and the county will suffer further decreases in tax revenue. To meet the increased workload, CPSM recommends three additional SRS positions be added to the Tax Unit.

*Writs*

This unit has traditionally been understaffed and various models of staffing have been experimented with over the years. This unit is currently staffed with two Senior Records Specialists and two Records Specialists.

Due to staffing shortages in the unit, the Justice Systems Manager is handling all of the Writs of General Execution that require a sale of property with which to satisfy a judgement. This responsibility had been originally assigned to an SRS; however, when that SRS was promoted to an SRS Supervisor in 2002, that responsibility remained with him and was never delegated back to a line position. The SRS Supervisor was then promoted to the newly created Justice Systems Manager position, and he still continued handling the responsibility. Since then, the Writ of General Execution sales have increased to the point that the Justice Systems Manager is spending 100 percent of his time handling those sales. Thus, he has had to handle his other responsibilities during his personal time, or he delegates them to his subordinates, who should not be responsible for those duties. The responsibility should again be handled by an SRS and not by the Justice Systems Manager. Based upon that, CPSM recommends that one additional SRS position be added to the Writ Unit to handle the General Execution property sales.

## JED Overtime

Overtime is often a necessary aspect in the operation of a law enforcement agency. Use of overtime is caused by various influences, such as additional workload (as in MCSO's case), vacancies (as in MCSO's case), unexpected emergencies, backfilling for court time, vacations, and sick time. Those causes—except for additional workload and vacancies—are most often considered when developing the budget and determining the appropriate number of staff to complete the work. However, in the case of the JED, the overtime is directly attributable to the increased workload and vacancies in the unit.

The following table shows the hours and costs associated with overtime in JED since 2019.



TABLE 6-12: Overtime Hours and Cost in the JED, 2019–2022

|  | 2019 | 2020 | 2021 | 2022 (Oct) |
|---|---|---|---|---|
| Sworn OT Hours | 3,385 | 6,231.25 | 5,819.75 | 4,940.75 |
| Civilian OT Hours | 2,085.85 | 903 | 1,418.5 | 1,629.75 |
| Sworn OT Cost | $189,469 | $354,615 | $336,854 | $298,237 |
| Civilian OT Cost | $54,478 | $25,985 | $43,446 | $53,381 |

In 2022 (as of the site visit), the 14 deputies and 3 Sergeants (17 total sworn) had worked 4,940 hours of overtime in a 41-week time period. That means these 17 employees worked approximately 120 hours per week of overtime. If the 120 hours per week is then divided by the 17 employees, each of the 17 worked about 7 hours per week of overtime. In essence, each employee is working almost the equivalent to an extra workday each week. However, recently, the department ordered all Sergeants and deputies in the JED to work an extra 10-hour shift each week to mitigate the vacancies. Although this may be a short-term solution to the added workload and vacancies, it is not an advisable practice, nor is it sustainable over the long term.

A few of the negative impacts on employees of working overtime on a consistent basis can be:

- Burnout (exhausted and overwhelmed).
- Budget dependency.
- Reduced quality of life.
- Effects on health.
- Occupational Injury.

Since there can be negative impacts on employees working overtime, It is recommended the managers and supervisors in JED remain vigilant as to the effects of consistent overtime work on their employees.

Based upon these staffing numbers, the overtime hours being worked by JED employees, and the increase of workload in the unit, it is imperative that the vacant positions, both sworn and civilian, be filled immediately.

## Schedules

### Sworn

Sworn scheduling within JED is based upon the fundamental principle that service of civil court process must occur at a reasonable hour. The hours of operation for JED personnel are similar to those of the Maricopa County Superior Court operations. That alignment provides JED personnel accessibility to the members of the public who require the services of the court and its official state court process server (MCSO). Deputies work a shift starting at either 6:00 a.m. or 8:00 a.m. The reasons for those hours of service are tied to past court rulings/decisions; Arizona Rules of Criminal & Civil Procedure; and availability/access to courts, judicial officers, and attorneys respective to the Criminal & Civil court process. All deputies work a 4/10 schedule.

### Civilian

All civilian members of the division also work a 4/10 work schedule. Like the sworn personnel, half of them work Monday to Thursday and the other half work Tuesday to Friday. Their work schedules cover the hours of 6:00 a.m. to 6:00 p.m. (usually); however, they are also working overtime to meet the workload demands.

## Policy

The JED has an operational manual that was effective August 3, 2022. The manual is 143 pages in length and is a thorough and comprehensive document governing the operation of the division. Of the studies conducted by CPSM, this operational manual is one of the best seen.

Within the manual, are the following sections:

- 100 Introduction.
- 200 Duties and Responsibilities.
- 300 Procedures.
- 400 Equipment.
- 500 Documentation.
- 600 Training.
- 700 Emergency Procedures.

## Vehicles

All sworn deputies assigned to JED have an assigned vehicle that they drive to and from home. There are pros and cons of having take-home vehicles assigned to deputies. This report will not get into those pros and cons of take-home vehicles, because operationally, having take-home vehicles enables the JED to operate more efficiently and effectively. Deputies schedule their services, processes, etc. based upon a geographic route both to and from the office. Instead of a deputy having to drive into the office, pick up a vehicle, and then drive back out to handle their assignment, they can complete the assignment either on the way to the office or on the way home from the office. It is estimated that because deputies can operate in this way they each save up to two hours of time and 50 miles of travel per day.

At the time of the site visit, the division had enough vehicles to carry out its mission: however, when the division becomes fully staffed there may be a need for several additional vehicles. As it is, at any given time there is the possibility of having several if not more vehicles needing repairs. Now, because of vacancies within the unit, there are extra vehicles available when that occurs. When the unit becomes fully staffed again, those extra vehicles will be assigned to personnel. It is recommended that when the division is fully staffed, two additional vehicles be added to the fleet to compensate for maintenance and repair time.

### *Equipment Assigned to JED*

- 31 vehicles.
- 3 safes.
- 2 Safety First car seats.
- 2 Graco booster seats.
- 2 Remington 870 bean bag shotguns.
- 2 ballistic shields.
- 1 battering ram.



Other equipment utilized by JED includes facsimile machines, printers, time stamps, cash registers, copiers, check scanners, credit card machines, and bar-code readers.

## JED Training

Every employee is required to attend mandatory training as outlined below and as directed.

### Civilians

All civilian employees shall attend a minimum of eight hours of approved training annually according to policy. The Division Commander can approve specialty training which may be substituted for annual training requirements.

### Deputy Sheriffs

All deputies up to and including the rank of Deputy Chief must attend eight hours of continuing training, two hours of judgmental shooting (MILO or other qualifying decision-making training), and firearms qualification annually. Every three years each deputy and deputy sergeant must complete eight hours of proficiency training, as required by or that meets AZ POST standards

Those employees who are required by their job to carry those tools which allow them to successfully complete their task, must recertify in the following areas:

- First aid/CPR and AED, every two years.
- Emergency Medical Technician, every two years.
- MSA Fit Test, annually.
- Pepperball, annually.
- SCBA, every 180 days.
- Taser, annually; TOC, every two years.

## JED Recommendations:

- CPSM recommends the organization chart be updated to reflect the division's true makeup. (Recommendation No. 97.)
- Based upon staffing numbers, the overtime hours being worked by JED employees, and the increase of workload in the unit, it is imperative that the vacant positions in JED, both sworn (seven deputies) and civilian (three SRS), be filled immediately. (Recommendation No. 98.)
- Since there can be negative impacts of employees working overtime, the managers and supervisors in JED should remain vigilant of the effects that extended durations of overtime have on their employees. (Recommendation No. 99.)
- CPSM recommends that when the division is fully staffed, two additional vehicles be added to its fleet to account for vehicles out of service for maintenance and repair. (Recommendation No. 100.)
- CPSM recommends that one additional SRS be added to the Writ Unit to handle the General Execution property sales. (Recommendation No. 101.)
- CPSM recommends three additional SRS positions be added to the Tax Unit. (Recommendation No. 102.)

§ § §

# EXTRADITION UNIT

The Extradition Unit is managed by a Lieutenant, and is composed of nine sworn and civilian line-level people divided into the following functions:

- Extradition Desk (two detention officers).

- Travel Coordinator (one civilian).

- Interstate Agreements (one deputy, one civilian).

- Fugitive Desk (two detention officers).

- Northwest Shuttle Desk (one deputy).

Each year the unit moves many prisoners from all over the United States back to Maricopa County to face criminal charges from local incidents. In 2020, the unit handled the following transports:

- MCSO Aviation Trips: 88.

- Van Trips: 7.

- Commercial Airline Trips: 129.

- Other: 2.

- Total Inmates Moved: 337.

The unit is reliant upon many outside deputies and detention officers for overtime. There is not currently a first-line supervisor assigned to Extraditions. The sworn supervisory position was moved to the Professional Standards Unit for internal investigations. Once the internal investigations backlog is reduced, or whenever feasible, at least one supervisor should be reassigned to the unit. Supervisory oversight is essential, as there is a tremendous amount of paperwork and administrative responsibilities with the unit, and dangerous offenders are moved from throughout the state and nation. The Lieutenant oversees the organizational functions, but there should be more day-to-day and field supervision.

In addition, traveling around the nation to pick up and transport prisoners back to Maricopa County is a high-risk, high-liability function. Having so many detention officers and deputies from various chains of command perform prisoner transports as a collateral duty is a reason for concern. As staffing improves, more full-time personnel should be assigned to the unit for the purposes of consistency, training, and accountability.

The reliance on commercial airlines to transport most long-distance prisoners comes with **increased risks. Some of MCSO's highest**-risk prisoners are moved through the U.S. Marshals Service for a fee. However, they often cannot handle all requests based on timing and volume. With modest upgrades to the existing Aviation Unit the number of inmates transported in MCSO aircraft could be increased significantly. According to an MCSO internal study, the average cost of a commercial airline extradition is $5,200 per prisoner, and the cost of an MCSO aviation extradition is $2,087 per prisoner. A comprehensive cost-benefit analysis of using MCSO aircraft for extraditions should be part of the aviation study recommended in the aviation section of this report. The study should also factor in the risks to the public of commercial travel versus MCSO aircraft travel.

The unit facilitates training for flying armed classes and other training that personnel need to take before embarking on a trip. As with many other units, the Extradition Unit needs additional

vehicles. Two vehicles are assigned to the unit, and cars are consistently borrowed to facilitate routine responsibilities.

## Extradition Unit Recommendations:

- Given the backlog of internal personnel investigations pending, CPSM recommends assigning a first-line supervisor to the Extradition Unit as soon as practical. (Recommendation No. 103.)

- As soon as staffing allows additional detention and sworn deputies should be assigned full-time to the Extradition Unit. (Recommendation No. 104.)

- The study recommended for the Aviation Unit should include a cost-benefit analysis of commercial flight extraditions versus MCSO aircraft extraditions. (Recommendation No. 105.)

§ § §

# AVIATION UNIT

The Aviation Unit for MCSO is overseen by a Captain who is responsible for Aviation and Extraditions. The day-to-day management of the Aviation Unit is the responsibility of a Lieutenant, Sergeant, and chief pilot. The Sergeant is a Tactical Flight Officer (TFO non-pilot observer) and regularly flies as a crew member. The unit has four sworn pilots, including the chief pilot, three TFOs, and two civilian pilots. The unit also employs three mechanics, one of whom functions as the chief mechanic.

The pilots and TFOs work three-day, 13-hour shifts each week. With the current staffing, 28 hours of overtime per week are built into the schedule when the Sergeant is flying as a TFO. Thirty-nine hours per week are built into the schedule to provide minimum coverage when she is not flying as a crew member. Mechanic coverage is also a concern. Many times, mechanics cannot get to routine maintenance or repairs in a timely manner because of delays obtaining parts or specialized repairs. Outside contracts are used for some work, but the delays are even more significant for private contractors. It appears there is a need for at least one additional mechanic, one additional pilot, and one additional TFO to provide adequate coverage. These and potentially other resources are necessary to continue functioning long-term as a full-service law enforcement aviation unit. However, given the various demands of the court order elsewhere in the organization and the need for a broader analysis of the Aviation Unit (see below), CPSM is deferring this recommendation to a later time.

Most flights are mission-specific, taking off from the hanger in response to a call for service or planned mission. Otherwise, when both helicopters are fully operational, they will fly one proactive patrol flight per shift. Air patrols are also regularly incorporated into mission flights. For example, suppose a crew quickly finishes a mission or is canceled before arrival. In that case, they will patrol districts while overhead and respond and assist on ground deputy calls for which they may not otherwise take off to respond to (deputy backups, roof check, search for suspicious vehicles, etc.).

The fleet of aircraft consists of two helicopters (one of which is down for long-term repair at a facility in Calif.) and two fixed-wing airplanes. The helicopters are utilized mainly for police patrols (support of pursuits, suspect searches, etc.) and search and rescue missions. One of the newer helicopters is equipped with a hoist for mountain rescues. The fixed-wing aircraft are used primarily for extraditions and investigation support.

The fleet is split between hangers. The helicopters operate from a hanger leased from the Central Arizona Project (CAP). The lease cost is primarily offset by patrol flights of the canal system operated by CAP. These flights include planned missions where a CAP officer is taken up, and specific patrol or other missions are conducted. The fixed-wing planes are stored in small, leased hangers at Deer Valley Airport. A visit to the CAP hanger revealed that it appears to be small for the unit's operations. There are also operational challenges from operating out of multiple locations. MCSO is on a waiting list for a larger hanger at Deer Valley Airport to house both planes, with room for routine maintenance. A long-term plan should include one consolidated facility to house the entire roto, fixed-wing fleet, and maintenance personnel.

In addition to the physical space challenges, the unit is spread out with support functions with limited vehicles for use. The unit operates and maintains six remote fuel sites where fuel trailers are housed for helicopter refueling during missions. The unit has one truck and pool car for staff to travel between the hangers for maintenance issues and the remote fuel sites. Like many other units we examined, the aviation unit has a shortage of vehicles. At times, staff members must utilize personal vehicles for County business.

Throughout multiple onsite meetings with MCSO staff, the CPSM team repeatedly heard frustration from deputies across the County about the limited support the Aviation Unit can provide due to its limitations. Often, the one functioning helicopter is unavailable for one reason or another. Extradition missions are often done by vehicle or commercial aircraft when an MCSO plane would have been safer, more efficient, and economical. Rescue missions sometimes have to be referred to DPS or other agencies. Based on what we learned during our meeting with the Aviation Unit staff, it appeared the current equipment and personnel cannot support the total demand for air support services for the County.

A high-level review of data regarding missions flown by both fixed-wing and roto-wing aircraft tends to support what our consultants were told by staff. In late 2021, the County added a helicopter with hoist capabilities, significantly expanding its capabilities and making rescues safer. The significant increase in rescues in 2022 demonstrates the limitations of the equipment in 2021. Additional extradition trips could also be provided with an increase or modernization of the fixed-wing fleet. The number of victims rescued by the helicopter during air missions and the number of extradition missions performed by fixed-wing aircraft are shown in the following table.

### TABLE 6-13: Rescue Missions and Extradition Trips by the Aviation Unit, 2021–2022YTD

| Type | 2021 | 2022 YTD (January-October) |
|---|---|---|
| Number of victims rescued during helicopter missions | 43 | 170 |
| Number of extradition trips by MCSO fixed-wing planes | 93 (of 297 total trips) | 89 (of 263 total trips) |

Aviation units for law enforcement agencies can perform critical lifesaving tasks that enhance community and employee safety. It has been established in the profession that agencies of a mid- to larger size, such as MCSO, benefit substantially from an aviation unit. However, aviation units require substantial capital expense, ongoing expenses, and technical and highly trained staff to operate. Much debate in the industry has been over the most efficient and effective model with which to deliver aviation services to law enforcement agencies. From what we learned in meetings before, during, and after our site visit, it appears the Aviation Unit operates with minimal equipment and few staff members for the missions it performs.

The unit could benefit from additional staffing, but how that staffing is provided is a broader question that should be evaluated further. It takes approximately three to five years for a sworn deputy who is not a pilot to train and become a solo commercial helicopter pilot who can perform the complex missions the job requires. Some agencies have been utilizing civilian pilots and pilots who have retired from other law enforcement agencies. MCSO employs two civilian pilots and has discussed more civilianization, but no long-term decisions or plans have been made. CPSM believes MCSO would benefit from utilizing civilian pilots who possess the licenses and certifications required to carry out the complex missions MCSO performs routinely.

It is also evident there are many opportunities for the Aviation Unit to provide enhanced services through the expansion of aircraft and additional staffing. Current services may be improved, made more efficient, or other services provided through acquiring additional aircraft, regional partnerships, changes in staffing schedules, civilianization of pilots, etc. There are many factors to consider when making such decisions. Short- and long-term implementation challenges, service disruptions, and numerous potential ripple effects must be considered and evaluated carefully.

A trend in law enforcement for more than a decade has been to enter mutually beneficial regional partnerships with other agencies. Areas of partnership often include specialized units that require extensive training and are expensive to operate. There are many outstanding regional law enforcement aviation units across the country. MCSO partners with the Arizona National Guard, which supplies one EMT for rescue flights. This partnership has proven to be very beneficial to MCSO. However, there are many additional partnership opportunities with state and local agencies where resources and costs could be shared through regional agreements. The Arizona Department of Public Safety (DPS) and the Phoenix Police Department operate aviation units with similar missions.

At MCSO, as with many law enforcement agencies, assignments change, people rotate in leadership positions, priorities change, etc. The decisions for the Aviation Unit have long-term implementation challenges, both short- and long-term impacts, and require complex analysis. Those types of evaluations and cost-benefit analyses are outside the scope of this project. Rather than making individual recommendations to add a specific aircraft or assign more deputies, CPSM recommends the county engage with a consultant/s to perform a comprehensive study on the Aviation Unit and provide recommendations on the fleet, facility, staffing (number, sworn/civilian, training, etc.), along with a detailed cost-benefit analysis of the aviation services provided and the potential services that could be added through enhancements.

## Aviation Unit Recommendation:

- CPSM recommends the county engage with a consultant/s to perform a comprehensive study on the Aviation Unit and provide recommendations on the fleet, facility, staffing (number, sworn/civilian, training, etc.), along with a detailed cost-benefit analysis of the aviation services provided and the potential services that could be added. (Recommendation No. 106.)

§ § §

# TACTICAL OPERATIONS UNIT (TOU)

A Captain oversees the Special Weapons and Tactics unit under the Patrol Resource Bureau. The unit currently operates with 16 deputies (including a sniper team), two sergeants (one EOD and one tactical), and one lieutenant. The unit combines resources with the Explosive Ordinance Disposal (EOD) and Canine Unit for more complex tactical operations which are overseen by a second Lieutenant. The unit also utilizes staff from various units for containment for more complicated missions. The Crisis Negotiation Team (CNT) is run separately from the tactical team and led by a different lieutenant.

The team has the capabilities of most urban area full-time tactical teams, such as less lethal capabilities, self-contained breathing apparatus (SCBA), snipers, explosive breaching, rappelling, etc. The team also does the department training for active shooter and other in-service and academy personnel tactics. The team routinely conducts high-risk search warrants, apprehensions of high-risk violent offenders, and is the primary tactical response unit to the Palo Verde nuclear power plant.

The National Tactical Officers Association (NTOA) provides nationwide model policies and guidance for SWAT teams. The NTOA categorizes teams by tiers based on their functions and capabilities. These standards are derived from the number of people required to train and deploy with specific capabilities. MCSO, based on its capabilities, falls into the Tier I category (which is necessary for an agency's size and complexity of MCSO). However, the Tier I category recommends 26 team members, including the commander, team leaders, and snipers. MCSO has a total of 23 team members EOD personnel are not counted (which, under NTOA guidelines, would not be).

During our site visit, we learned the Sergeant and Lieutenant are called day and night for consultations and incidents that result in callouts. It was apparent the team is short at least one supervisor for screening calls and managing call-outs. The current Sergeant and Lieutenant need to be always available: the team churns through Sergeants and Lieutenants quickly because of the burnout caused by being on the phone during off hours daily and responding to call-outs weekly.

The SWAT team has a reasonable amount of standard equipment that appears in good shape and is well maintained. The unit has two armored vehicles, rifles that are four to five years old, new sniper rifles, new handguns, and other modern equipment. The area where the equipment for the unit seems to fall short is with vehicles for personnel. Each operator and supervisor take a vehicle home due to the demand for callouts and the amount of equipment they need to carry. There are no spare vehicles for the unit, and many of the cars they currently have are high-mileage and often need maintenance and repair. The unit consistently borrows vehicles from other units or districts and sometimes uses personal cars to do the job.

## Tactical Operations Unit Recommendations:

- CPSM recommends that, when feasible, MCSO add a Sergeant and two operators to the SWAT team to achieve the minimum number of personnel recommended by the NTOA for a Tier I Team. (Recommendation No. 107.)

- The fleet for the unit requires updating and should have additional vehicles assigned as spares for continuity of service. (Recommendation No. 108.)

# SECTION 7. PROFESSIONAL STANDARDS BUREAU (PSB)

## PSB Information Update

*For a variety of reasons outside of CPSM control, production of this report was delayed for months after the data was collected and the onsite research was conducted. With a substantial emphasis from the Court being on PSB and the backlogged cases, CPSM obtained updated information in some areas of PSB but was not able to update the data in all areas due to time and scope of work limitations. The work between the Monitor and MCSO continued while production of this report was delayed. Progress on the backlog of cases and other improvements in PSB between the time of the original work by our consulting team are not fully reflected in this report. Some updates have been added, but a sizeable portion of the data in the analysis is limited to what was available around the time of the site visit in late 2022.*

---

Ensuring a law enforcement agency has the public's trust is vital to the law enforcement mission, and this trust rests on the Sheriff's Office responsiveness to community needs and expectations. The Sheriff's Office must receive commendations and complaints with equal professional interest and courtesy, giving both appropriate supervisory and management attention to foster public confidence and to promote constructive communication.

In fact, the MCSO Professional Standards Bureau's mission statement is as follows:

> *To provide the Maricopa County Sheriff's Office and the citizens of Maricopa County with trained investigators who possess the technical knowledge and expertise to conduct internal administrative and criminal investigations involving employees of the Maricopa County Sheriff's Office;*
>
> *To receive all allegations of employee misconduct, whether internally discovered or based on a civilian complaint;*
>
> *To fully, fairly, and efficiently investigate allegations of misconduct; and to document in writing all investigative findings that are supported by the appropriate standard of proof;*
>
> *To hold employees who commit misconduct accountable to a disciplinary system that is fair, consistent, and unbiased; and provide due process.*

The Maricopa County Sheriff's Office policy, GH-2 (Internal Investigations, effective 11-14-23, governs the process for MCSO to accept, process, and investigate complaints of employee misconduct. The policy states, "*It is the policy of the Office to ensure that all complaints of employee misconduct whether internally discovered and/or alleged by another employee or based on a complaint filed by a member of the public, are fully, fairly, impartially, and efficiently investigated. All investigative findings shall be supported by the appropriate standard of proof and documented in writing; and all employees who commit misconduct shall be held accountable pursuant to a disciplinary system that is fair, consistent, unbiased, and provides due process.*"

*The Arizona Police Officer's Bill of Rights*

Arizona has codified a police officer's "bill of rights," A.R.S. §§ 38-1101–1115. Pursuant to this Arizona law, "[a]n employer shall make a good faith effort to complete any investigation of employee misconduct within 180 calendar days after the employer receives notice of the allegation by a person authorized by the employer to initiate an investigation of the misconduct."

# BACKGROUND / HISTORY

In December 2007, a class-action lawsuit was filed against the MCSO and former Sheriff Joe Arpaio, alleging that MCSO engaged in a custom, policy, and practice of racially profiling Latinos, and a policy of unconstitutionally stopping persons without reasonable suspicion of criminal activity, in violation of their Fourth and Fourteenth Amendment rights. On May 24, 2013, the Court found that MCSO's policies and procedures institutionalized the illegal consideration of race as a factor in its policing practices.

## Procedural History

On July 26, 2016, the Court issued an injunction (the "Second Order") which required reforms to MCSO's internal investigation procedures. The Second Order requires the Sheriff to ensure that "all allegations of employee misconduct, whether internally discovered or based on a civilian complaint, are fully, fairly, and efficiently investigated," and that the Sheriff and MCSO "conduct objective, comprehensive, and timely administrative investigations of all allegations of employee misconduct."

Specifically, per the Order, investigators must complete the administrative investigations "within 85 calendar days of the initiation of the investigation (60 calendar days if within a Division)." Requests for extensions of time must be approved by the Commander of the Professional Standards Bureau ("PSB") and may only be granted if reasonable (extensions were changed and can only be granted by the Monitor under the Third Order). On July 10, 2020, the Monitor sent a letter to Sheriff Penzone expressing continued concern over the growing backlog of complaint investigations. In that letter, in addition to identifying a number of concerns, the Monitor noted the following:

- Staffing in PSB had not increased since 2016, expressly noting that approved budgeted positions for PSB had gone unfulfilled.

- Despite a specific request, MCSO had not prepared detailed suggestions on how the Order might be changed.

On August 12, 2021, the Court granted a motion by the plaintiffs and intervenor United States to show cause as to why Sheriff Penzone and Maricopa County should not be held in contempt for violating the Second Court Order. The Court found that the Sheriff and the County had continually failed to complete internal investigations in a timely manner. The Court further noted that the Monitor found MSCO in non-compliance with the Second Order's paragraph 204 requirements in its November 2020 and February 2021 reports.

On  November 8, 2022, the Honorable G. Murray Snow, held Sheriff Paul Penzone in civil contempt and set forth further appropriate curative orders (aka: Third Court Order) to protect the interests of the Plaintiff class (let alone the general public), in ensuring that investigations are completed in sufficient time to administer discipline, the Court will require that the MCSO come

into compliance with its reasonable investigative protocols. The court then issued many staffing mandates in order for MCSO to come into compliance.

The Court issued an amendment to the Third Order, requiring MCSO to adopt a new policy for internal investigations. As a result of the Monitor working with MCSO under the direction provided in the Third Order, the internal investigations policy was revised and officially adopted by MCSO with an effective date of 11-14-23.

## PSB Court Mandated Report

On September 7, 2021, Michael Gennaco, a court management expert from the OIR Group, was appointed by United States Chief District Judge Murray Snow to provide the court with recommendations on how best MCSO can achieve compliance with the court's order pertaining to the time limits as required by the court's previously issued order. In July 2022, Gennaco authored a report on the untimeliness of internal investigations and discussed the challenges and potential solutions. Based upon the following Gennaco recommendation, CPSM was hired.

> *Recommendation Three: MCSO should commission an independent office-wide staffing study to determine whether the current deployment of line employees and first-level supervisors is "right sized" considering the requirements and expectations of its served communities.*

## PSB Semi-Annual Report

MCSO requires PSB to produce a report on misconduct investigations, including, at a minimum, the following: Summary information about sustained allegations that an employee violated conflict of interest rules; aggregate data on external complaints; analysis of civilian complaints received; aggregate data of internally generated misconduct allegations; aggregate data on misconduct case processing; aggregate data on the outcomes of misconduct investigations; and aggregate data on employees with persistent or serious misconduct problems.

Communities across the country are demanding their law enforcement organizations become more transparent in providing their policies, uses of force data, officer misconduct data, and personnel investigation data. MCSO is to be applauded for providing misconduct information in such a visible and easily accessible manner by providing the report on its website. However, looking at the PSB website, the last semi-annual report posted on the website was for January to June 2023.

## PSB OPERATIONS / INTERNAL AFFAIRS INVESTIGATIONS

## PSB Policy

Maricopa County Sheriff's Office Policy and Procedure GH-2 (Internal Investigation) establishes guidelines and procedures for accepting, processing, and investigating complaints of employee misconduct. Those complaints include, but are not limited to, those brought forward by members of the public, inmates, Maricopa County employees, and Sheriff's Office employees. The most recent revision of the policy was effective on 11-14-23. The policy is a total of 44 pages, a result of the process outlined in the Third Court Order and is one of the most thorough, well-written, comprehensive policies on internal investigations of any law enforcement agency studied by CPSM.

## Complaint Forms

Comment and complaint forms are available in both English and Spanish. The Community Outreach Division is responsible to ensure the forms are available. Those forms can be obtained and accessed in the following ways:

- All deputies shall carry the forms in their vehicles, and upon request shall provide the forms to individuals with information on how to file the complaint, their name and badge number, as well as contact information for their supervisor.

- At the reception desk at Office Headquarters and Districts.

- At the PSB reception desk.

- On the PSB website.

- Can be received on a 24-hour hotline.

- Placards are also posted in public areas in English and Spanish that explain the complaint process.

## PSB Investigator Requirements

When an internal vacancy occurs within PSB, a solicitation for applications is sent out to the department and those applying must meet the requirements below:

- Possesses excellent investigative skills, have a reputation for integrity, possesses the ability to write clear reports, has the ability to be fair and objective in determining whether an employee committed misconduct.

- Does not have a disciplinary history of three or more sustained violations of misconduct, or **does not have one sustained violation of a Category 6 from the Office's disciplinary matrices,** Policy GH-2, Internal Investigations Effective Date: 11-14-23 as specified in Office Policy GC-17, Employee Disciplinary Procedures, and does not have a history of conducting deficient investigations.

- Is not listed in the Law Enforcement Rule 15 Disclosure (Brady List) Database.

MCSO also utilizes civilian investigators and those contracted through a third party. The civilian investigators meet the same applicable requirements as the internal staff.

CPSM learned while conducting this assessment that the restrictions and requirements placed **upon the department for qualified investigators in PSB have hampered the agency's ability to fill** vacant positions. Specifically, there is the issue of personnel who have open personnel investigations and who may not be considered for the position, depending on the severity of that investigation. Unfortunately, it was learned that some personnel have been eliminated from the selection process based upon an uninvestigated complaint that could be several years old, and most likely where the finding would be unfounded if investigated.

The department has consistently worked with the court monitors to find solutions to that problem, but as of yet there has not been an agreement that would allow employees with open investigations to be assigned to PSB.

CPSM recommends the department continue to work with the judge and court monitors to find an acceptable, collaborative remedy to the issue of selection to the PSB.

## Rotation Policy

MCSO currently has no official rotation policy for any of the personnel assigned to PSB. There are both pros and cons to having mandatory rotations in specialty assignments.

### Pros:

- Defined mandatory rotation is impartial, and therefore, seemingly fair, to all those involved in the mandatory rotation process.

- It also automatically factors ongoing change into personnel management.

- There is the belief that mandatory rotation creates a better overall work environment by enriching individual job assignments for deputy sheriffs. Since individual deputies benefit, the Sheriff's Office ultimately benefits as a whole.

- Increases the department's overall efficiency through cross-training of officers.

- The cross-training is thought to provide deputies value-added training and experience that they can use and share with other deputies when they return back to their original assignment.

### Cons:

- Rotation of PSB investigators based upon length of service in a particular assignment is not an effective management principle: rotation should be based upon an individual's actual job performance.

- Specialized training provided to the investigators is wasted when the deputy is returned to patrol.

- The involuntary transfer of motivated, effective employees causes the employee unneeded stress, frustration, needlessly damages morale, and ultimately thwarts a promising career and at the same time undermines the effective operation of a unit.

Gennaco mentions in his report that based upon the unmanageable case load, it breeds feelings of hopelessness about any ability to control one's cases. That eventually erodes even the most committed investigator's dedication to the mission of accountability. The case load that Gennaco mentions is one of the reasons that investigators should be rotated out of the unit to avoid stress and burn out.

CPSM recommends that investigators assigned to PSB be mandatorily rotated out of the unit after four years.

## Tracking and Managing of Complaints

Data regarding administrative investigations and public complaints are valuable as a risk management tool to identify training needs, performance deficiencies, or patterns of misconduct. Many departments have turned, as has MCSO, to software systems to assist in this critical management responsibility, as employing specialized software is an efficient means of producing graphs and reports quickly and with relative ease. Investigations and complaints are logged into the IA Pro Software, which is the most commonly used product by most law enforcement agencies studied. IA Pro is a robust software package that is capable of tracking a variety of information, including personnel complaints, use of force incidents, traffic accidents, and personnel commendations.

## PSB Staffing

The staffing of any unit in a law enforcement organization must be based upon workload (in the case of PSB, the number of complaints to be investigated), and the time frame expectation of the completion of those complaints. Unfortunately, because of the uniqueness of personnel investigations, there is no matrix defining the number of personnel required to complete personnel investigations. It would be easy to staff a unit such as PSB if a matrix existed that defined, *"if the unit receives X number of complaint investigations, the unit must be staffed by X number of investigators to complete those investigations."*

The following table shows the PSB staffing as of January 2024. Of those personnel who conduct the complaint investigations, 12 are sworn investigators, 19 are detention investigators, and 15 are civilian investigators, for a total of 46 investigators. Managers, who act primarily as , and support personnel are not included in these numbers. From previous 2016 data, it appeared there were a total of 26 investigators in PSB at that time, of which 9 were sworn investigators and 15 were detention investigators. Since 2016, the unit has increased in both size and caseload by approximately 50 percent. Staffing numbers have been discussed at length in court documents and Gennaco's report.

### TABLE 7-1: PSB Staffing (2024)

| Position | Enforcement Personnel | Enforcement Vacancies | Detention Personnel | Detention Vacancies |
|---|---|---|---|---|
| Sworn | | | | |
| Captain | 1 | 0 | 0 | 0 |
| Lieutenant | 4 | 0 | 7 | 0 |
| Sergeant | 12 | 0 | 17 | 0 |
| Detention Officer | 0 | 0 | 2 | 0 |
| Civilian Investigator | 13 | 0 | 2 | 0 |
| Total | 28 | 0 | 38 | 0 |

Source: MCSO Internal Employee Roster (January 2024)

The most recent court order requires the department not to reduce the number of investigators while there is a backlog of investigations, but it also requires MCSO to increase the number of investigators to those numbers discussed in Gennaco's study. The new court order requires:

- Within 60 days from the date of the order, MCSO must fill the seven currently budgeted, yet vacant, positions in PSB referred to in Mr. Gennaco's report, through hiring or internal transfers. The staffing referred to by Mr. Gennaco, together with the full staffing of the vacant positions, is 39 investigators.

- MCSO may fill the positions with new civilian investigators in lieu of sworn officers; it may do so to the extent that it is authorized to do so, consistent with state law.

- MCSO may fill these open positions with a mix of qualified sworn personnel and civilian investigators and may do so to the extent that it can, consistent with state law.

- MCSO is authorized to conduct PSB investigations through approved private contractors if it can do so consistent with state law.

Production of this report has been delayed for many months after the data was collected and the onsite research was conducted. With a substantial emphasis from the Court being on PSB

and the backlogged cases, CPSM obtained updated information in some areas of PSB but was not able to update the data in all areas due to time and scope of work limitations.

CPSM recognizes MCSO has added several civilian investigators to PSB since our onsite review: the backlog of cases has been reduced from more than 2,000 to approximately 1,700 cases. We also recognize there are continuing negotiations with the Monitor on policies and procedures on how the backlogged cases are classified, which may impact the time and resources necessary to address the pending cases. However, due to the high number of backlogged cases remaining and the urgent need to investigate the cases, CPSM recommends MCSO continue to add to the number of investigators in PSB. We believe MCSO should add 13 investigators to those personnel who are investigating PSB cases. These investigators can be sworn, detention, civilian, or contract workers based on availability and needs of the PSB. The 13 additional investigator positions should handle primarily the backlog cases that have not been investigated. Once the backlog of cases is eliminated and PSB can maintain a reasonable timeline for investigating internal complaints, the staffing should be reevaluated and potentially reduced.

*Work Schedules*
The work schedule of those assigned to PSB is fluid in order to have coverage 24/7 for response to, or communication about, an incident, and to conduct investigations that may require follow-up outside of normal office hours. However, most of the division typically works a Monday through Friday variation and are usually on duty during the regular business hours that the PSB offices are open. The PSB offices are open from 8:00 a.m. to 5:00 p.m. This work schedule is common among most internal affairs-related units to ensure availability for accommodating complainants' schedules for interviews.

## PSB Workload

*After data collection and the site visit for this study, but before production of the final report, MCSO added additional civilian investigators and assigned investigations to other supervisors, increasing the number of cases assigned and reducing the backlog of cases. Those changes are not reflected in the data below.*

Personnel investigations are unique in that they vary considerably in complexity from one investigation to another. Personnel investigations can range from minor complaints which can be handled with minimal investigative time and effort, to the more complex investigations that require additional investigation work on the part of the investigator, and which often involve multiple interviews with multiple witnesses and multiple department personnel. The time in which a personnel investigation dan be completed is predicated upon the following:

- How quickly the investigation is assigned to an investigator.
- How easily and quickly evidence can be obtained.
- How quickly interviews can be scheduled and conducted.
- How adept the investigator is at authoring the investigation.
- The investigator's caseload (capacity to handle multiple investigations).

The following two tables illustrate the average number of cases completed by MCSO investigators in 2019, 2020, 2021, and 2022 (to date).



TABLE 7-2: Average Number of Cases Completed and Total Investigators, Sworn, by Year

| Year | Average Completed Cases | Total Investigators Who Completed Cases |
|---|---|---|
| 2019 | 3 | 8 |
| 2020 | 6 | 13 |
| 2021 | 8 | 13 |
| 2022 | 5 | 12 |

TABLE 7-3: Average Number of Cases Completed and Total Investigators, Detention, by Year

| Year | Average Completed Cases | Total Investigators Who Completed Cases |
|---|---|---|
| 2019 | 8 | 16 |
| 2020 | 12 | 14 |
| 2021 | 13 | 15 |
| 2022 | 12 | 15 |

Based upon the above numbers supplied by MCSO, the number of investigations completed by year is shown in the following table.

TABLE 7-4: Total Completed Cases, by Year

| Year | Sworn (total) | Detention (total) |
|---|---|---|
| 2019 | 24 | 128 |
| 2020 | 78 | 168 |
| 2021 | 104 | 195 |
| 2022 (through November) | 60 | 180 |

The two following tables show the caseload of the investigators in PSB in December 2022. These investigations may be either internal, external, or critical incidents. (The investigator's name has been replaced by a letter). Those investigators with the higher number of investigations are the more senior investigators in both the sworn and detention units.

§ § §

TABLE 7-5: Caseload of PSB Sworn Investigators, Dec. 2022

| PSB Sworn Investigator | Number of Cases |
|---|---|
| Sworn A | 115 |
| Sworn B | 107 |
| Sworn C | 96 |
| Sworn D | 79 |
| Sworn E | 57 |
| Sworn F | 55 |
| Sworn G | 52 |
| Sworn H | 29 |
| Sworn I | 27 |
| Sworn J | 22 |
| Sworn K | 17 |
| Sworn L | 12 |

Based upon this sworn investigator data regarding open cases assigned to each investigator, there are 668 open investigations (to date) assigned to the sworn investigators. Based upon the data of how many investigations are completed annually by the 13 sworn investigators (using 104 in 2021), they are averaging only 8 completed investigations per investigator. Even if no additional investigations were assigned to the sworn investigators, at the current staffing and completion rate, it would take approximately 6.5 years to investigate and complete the backlog of cases.

The data used to calculate the average time to complete investigations was from the data available at the time the original study was conducted in 2022. Based on data published on MCSO's website, the number of investigations completed has improved. MCSO has added investigators to PSB and has made other improvements. Those additions and improvements are not reflected in the data above. However, the number of additional investigators to be added to PSB was updated based on the additional investigators assigned to PSB since the original study was conducted. Based on the review of the backlog cases underway by MCSO and the Monitor in accordance with the Court's Third Order, the number of cases in the backlog will likely be reduced. However, based on the number of cases currently in the backlog and the previous lack of progress reducing the backlog, CPSM believes MCSO should prioritize the recommendations related to PSB and not wait for further revisions based on what may result from the review.

§ § §

TABLE 7-6: Caseload of PSB Detention Investigators, Dec. 2022

| PSB Detention Investigator | Number of Cases |
|---|---|
| Detention A | 136 |
| Detention B | 123 |
| Detention C | 117 |
| Detention D | 98 |
| Detention E | 97 |
| Detention F | 81 |
| Detention G | 77 |
| Detention H | 72 |
| Detention I | 68 |
| Detention J | 64 |
| Detention K | 61 |
| Detention L | 40 |
| Detention M | 33 |
| Detention N | 23 |
| Detention O | 14 |

At the time of our site visit in 2022, according to the detention investigator data regarding open cases assigned to each investigator, there were 1,104 open investigations (to date) assigned to the detention investigators. Based upon the data of how many investigations are completed annually by the 15 sworn investigators (using 195 from 2021), they are averaging about 13 completed investigations per investigator. Even if no additional investigations were assigned to the detention investigators, at their current staffing and completion time, it would take approximately 5.67 years to investigate and complete the backlog of cases.

It should be noted here that investigators remain in the rotation of cases being assigned to them regardless of how many cases they are carrying. It was learned from one investigator that they may get assigned a priority investigation, and as they are working that investigation, if their time comes up in the rotation and another priority case comes up, they will get that investigation as well. When that occurs, CPSM was told that the other active investigations they had been working on would be put on hold and not touched again because of the new priority investigations.

It was also learned talking to the investigators (sworn/detention) that several of them have all the necessary information to complete an investigation, they just don't have the time to write the analysis and complete the investigation.

It is obvious that the workload in PSB is unmanageable, daunting, and prone to burning out investigators.

TABLE 7-7: PSB Investigations Accepted by MCSO, by Year, 2014–2020

| Year | Number |
|------|--------|
| 2014 | 717 |
| 2015 | 916 |
| 2016 | 847 |
| 2017 | 1,028 |
| 2018 | 1,114 |
| 2019 | 1,072 |
| 2020 | 1,204 |

TABLE 7-8: PSB Investigations Accepted, 2021

| Type of Complaint | Number of Complaints |
|-------------------|----------------------|
| Critical Incident | 42 |
| External Complaint | 456 |
| External Complaint Criminal | 9 |
| Internal Complaint | 200 |
| Internal Complaint Criminal | 17 |
| Service Complaint | 448 |
| Total | 1,172 |

As one can see from the two tables above, personnel complaints accepted by MCSO are increasing annually, and one would assume that 2022 and 2023 will follow suit.

## MCSO Solutions

MCSO is to be commended for continuously attempting to find creative solutions to reduce the number of backlogged investigations. It was learned during the site visit that PSB leadership is trying to find solutions to getting investigations completed.

- MCSO has begun taking one investigator out of the rotation for a month. That investigator can then concentrate on completing investigations without additional investigations being assigned to them for that month.

- MCSO has now assigned two sworn investigators to handle the less serious investigations. Those two investigators are not part of the rotation.

- MCSO is consistently working with the court monitors to find ways to reduce the number of uninvestigated cases.

- MCSO has begun outsourcing cases to a private firm.

### Outsourced Investigations

MCSO began outsourcing some of its internal affair investigations in an attempt to reduce the department's backlog of investigations. The department selected Jensen Hughes, a company that conducts investigations across a wide array of domains. Each of the investigators used by Jensen Hughes to conduct MCSO investigations had to be vetted and approved by the Court Monitor. MCSO employed a strategy of assigning investigations to Jensen Hughes that were less serious investigations, believing that they could be conducted more quickly than other investigations.

The following table illustrates the investigations (cases) assigned to, and completed by, Jensen Hughes.

## TABLE 7-9: Outsourced Investigations Completed by Jensen Hughes

|  | External | Internal | Total Cases | Average Completion Time |
|---|---|---|---|---|
| Cases assigned | 49 | 23 | 72 |  |
| Cases completed | 25 | 7 | 32 |  |
| Average completion time | 165 days | 231 days | - | 179 Days |

As one can see in the above table, Jensen Hughes completed less than half of the investigations assigned to them and averaged five months for each investigation they did manage to complete. This assessment did not investigate the prolonged completion time of the Jensen Hughes investigations, however, an average of five months per investigation seems excessive. Based upon what appears to be an excessive timeline, MCSO should request a more rapid return of the investigations conducted by Jensen Hughes, or evaluate the possibility of locating another vendor who might be able to provide a much timelier turnaround on investigations. With that being said, outsourcing investigations should still be an assistive remedy for the completion of investigations, whether that be with Jensen Hughes or another vendor.

### Hiring of Civilian Investigators

MCSO has hired civilian investigators in an attempt to fill the vacancy gap the department is having with both sworn and detention investigators. At the time of our review, the department had five experienced civilian investigators and expects to hire four more prior to the end of 2022. Due to the vacancy issues in the department as a whole, this appears to be one useful solution to staffing PSB. Each civilian investigator has an average of 46 cases assigned to them. They, as well as the sworn and detention investigators, have a daunting amount of investigations.

### Assigning Cases to Additional Personnel

CPSM believes that there are other opportunities in which to have open case investigations completed. They are as follows.

- Assign each detention sergeant one of the less serious investigations (one that wouldn't take too much time away from their detention supervisorial responsibilities) and do that on a continual basis as they complete the investigations.

- Assign each member of the (sworn/detention) department who has worked internal affairs, or who has been provided training (regardless of their current rank), an investigation on a continual basis.

CPSM was provided the following list of MCSO personnel, who had previous PSB experience but were assigned elsewhere in the organization as of January 2023. As the data is over a year old, the number of personnel available with PSB experience may not be the current. However, the concept of utilizing previous experience within the MCSO to tackle the backlog should be prioritized.

§ § §

TABLE 7-10: MCSO Personnel Who Have Had PSB Experience

| Sgt. ID Number | S1485 |
|---|---|
| Lt. ID Number | S1839 |
| Lt. ID Number | S1833 |
| Lt. ID Number | S1773 |
| Capt. ID Number | S1478 |
| Lt. ID Number | S1819 |
| Lt. ID Number | S1840 |
| Capt. ID Number | S1695 |
| Civilian ID Number | A6659 |
| Civilian ID Number | A7970 |
| Capt. ID Number | A6460 |
| Sgt. ID Number | A5576 |
| Lt. ID Number | A9460 |
| Sgt. ID Number | S1709 |
| Dep. Chf. ID Number | S1054 |
| Dep. ID Number | S1040 |
| ID Number | B3825 |

There are 17 additional members of MCSO who could conduct personnel investigations. Although several are in senior management positions, the solution to clearing up the backlog of cases is an organizational issue, and not just confined to certain ranks. If these personnel were to be assigned less serious investigations, they could probably at minimum conduct an investigation within 2.5 months. If that were to occur, each person could possibly compete five investigations in a year, for a total of 85 additional investigations per year. Although this may not seem to solve the problem, it will at least help some.

## Discipline Matrices

One of the primary goals of a discipline matrix is to make discipline uniform and equitable throughout the department. The MCSO has a very detailed discipline matrix spelled out in Policy GC-17, Employee Disciplinary Procedures. When determining the level of discipline an employee receives, the MCSO must consider the offense, as well as any mitigating and aggravating circumstances surrounding the incident and employee. The matrices establish a presumptive range of discipline dependent on the number of offenses and the duration of time between offenses. The employee's age, nationality/national origin, immigration status, religious beliefs/religion, race, color, gender, culture/cultural group, sexual orientation, gender identity/expression, veteran status, ancestry, physical or mental disability, ethnic background, or socioeconomic status are prohibited considerations when determining discipline.

A review of the MCSO's discipline matrix (see following table) shows it to be fair, impartial, and equitable.

§ § §

## TABLE 7-11: MCSO Discipline Matrix

| Category | First Offense Min. | Pres. | Max. | Second Offense Min. | Pres. | Max. | Third Offense Min. | Pres. | Max. | Fourth Offense Min. | Pres. | Max. | Fifth Offense Min. | Pres. | Max. | Sixth Offense Min. | Pres. | Max. | Seventh Offense Min. | Pres. | Max. | Eighth Offense |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | W.R. | W.R. | | W.R. | 8Hrs | W.R. | 8Hrs | 16Hrs | 8Hrs | 16Hrs | 24Hrs | 16Hrs | 24Hrs | 40Hrs | 24Hrs | 40Hrs | 80Hrs | 40Hrs | 80Hrs | Dis. | Dismissal |
| 2 | | W.R. | 8Hrs | W.R. | 8Hrs | 16Hrs | 8Hrs | 16Hrs | 24Hrs | 16Hrs | 24Hrs | 40Hrs | 24Hrs | 40Hrs | 80Hrs | 40Hrs | 80Hrs | Dis. | Dismissal | | | |
| 3 | W.R. | 8Hrs | 16Hrs | 8Hrs | 16Hrs | 24Hrs | 16Hrs | 24Hrs | 40Hrs | 24Hrs | 40Hrs | 80Hrs | 40Hrs | 80Hrs | Dis. | Dismissal | | | | | | |
| 4 | 8Hrs | 16Hr | 24Hrs | 16Hrs | 24Hrs | 40Hrs | 24Hrs | 40Hrs | 80Hrs | 40Hrs | 80Hrs | Dis. | Dismissal | | | | | | | | | |
| 5 | 16Hrs | 24Hr | 40Hrs | 24Hrs | 40Hrs | 80Hrs | 40Hrs | 80Hrs | Dis. | Dismissal | | | | | | | | | | | | |
| 6 | 24Hrs | 40Hr | 80Hrs | 40Hrs | 80Hrs | Dis. | Dismissal | | | | | | | | | | | | | | | |
| 7 | Dismissal | | | | | | | | | | | | | | | | | | | | | |

# Early Identification System

An Early Identification System (EIS) captures and stores threshold events to help support and improve employee performance through early intervention and/or to identify problematic operating procedures. Such a system can improve employee performance, identify detrimental behavior, recognize outstanding accomplishments, and improve the MCSO's supervisory response. An EIS database is used to collect, maintain, integrate, and retrieve information in order to highlight tendencies in performance, complaints, and other activities. The database enables a law enforcement agency to document appropriate identifying information for involved employees, (and members of the public when applicable), and the actions taken to address the tendencies identified. Blue Team, and IA Pro, are applications of EIS.

The Early Intervention Unit (EIU) is part of the Bureau of Internal Oversight. The EIU is responsible for the implementation, maintenance, and operation of the EIS and for providing training and assistance to the EIS users. The unit conducts data analysis, data input, and review of activities exceeding thresholds to address potentially problematic conduct, operating procedures, and recognizes positive attributes. The MCSO must ensure there is sufficient staff to facilitate EIS input and training.

## Supervisory EIS Alert Notification and Intervention

An alert for supervisory review is generated by the EIS after verification of the employee meeting or exceeding an established threshold. There are five categories of alerts generated by the EIS:

1. Allegation Alert: An alert is generated when the frequency of an allegation reaches the set threshold.

2. Incident Type Alert: An alert is generated when the frequency of an incident type reaches the set threshold.

3. Monitored Status Alert: An alert is generated when a tracked behavior is entered while an employee is in monitored status. Monitored status is used to track employees on Policy GH-5, Early Identification System, Effective Date: 11-14-23, administrative leave or probation.

4. Overall Alert: An alert is generated when the overall frequency of multiple incident types reaches the set threshold.

5. Supervisory Alert: An alert is generated when the frequency of the tracked actions of the employees supervised by the same person reach the set threshold.

## PSB Summary

It is obvious that correcting the problem of the backlog of investigations is not a quick fix, but more likely a multi-year process. While CPSM is recommending 13 additional investigator positions in PSB, we believe some organizational changes can be made with current staffing to help address the problem.

Separately in this report, we recommend a reorganization of the Detective and Investigations Bureau to combine staffing and reduce the span of control for supervisors. Using staff from the reorganization and combining them with current PSB staff would allow for some changes in how cases are worked.

It is our belief the number of cases assigned to each investigator currently is excessive and creates an unmanageable workload. The investigators have a mixed caseload of current high-priority cases and old, stale cases, some with allegations more than a year old with little to no investigation work having been completed. Naturally, the older cases with lower priority allegations are not getting worked. To eliminate the backlog, those older cases must be assigned some type of priority and worked. In addition, the ability for one Captain to manage the workflow and review and approve hundreds of cases is unmanageable.

CPSM recommends utilizing the additional staffing from the Detectives and Investigations Bureau to reorganize PSB and split the case load into two units, with one unit handling current allegations and one unit handling the backlog of allegations. Each team would be led by a Captain who would approve completed investigations for their respective groups. The time frame used to determine a current and backlog investigation would be determined in conjunction with the Monitor, but as an example, all cases over 18 months old could be assigned to the backlog team. It is our belief that many of the older cases are lower priority allegations that have been set aside by investigators in order to work higher priority investigations. With dedicated resources focusing on those older cases, the backlog will be reduced more quickly.

## Professional Standards Bureau Recommendations:

- Continue to fill vacant investigator positions within the PSB when the occur as soon as practical and until the backlog of cases is eliminated. (Recommendation No. 109.)

- CPSM recommends folding in added supervisory and management personnel from the Detectives and Investigations Bureau into the PSB, and then bifurcating the PSB into two units, one working current cases and one working backlogged cases. (Recommendation No. 110.)

- CPSM recommends that investigators assigned to PSB be mandatorily rotated out of the unit after four years. (Recommendation No. 111.)

- CPSM recommends the department continue to work with the judge and court monitors to find an acceptable, collaborative remedy to the issue of selection of investigators. (Recommendation No. 112.)

- CPSM recommends the department continue to use outside resources for completion of investigations. (Recommendation No. 113.)

- CPSM recommends, based upon the number of cases received each year and the number of incomplete investigations the MCSO is faced with, that MCSO add an additional 13 investigator positions in PSB. (Recommendation No. 114.)

- Assign each detention sergeant one of the less serious investigations (one that wouldn't take too much time away from their detention supervisorial responsibilities) and do that on a continual basis as they complete the investigations. (Recommendation No. 115.)

- Assign each member of the (sworn/detention) department who has worked internal affairs, or who has been provided appropriate training, an investigation on a continual basis regardless of their current rank. (Recommendation No. 116.)

## USE OF FORCE

The necessary and appropriate use of force in carrying out a police officer's duties up to and including the taking of a human life is among the most complex and critiqued actions of law enforcement. At no time in the past has the use of force been looked at, examined, and judged as it is today. It is essential and critical that the department have and follow a comprehensive policy on the use of force. Providing relevant training for the use of force is vital for the department. The purpose of comprehensive training in the use of force is to ensure employees are using proper and reasonable applications of force in the performance of their duties. With respect to the use of deadly force, no other responsibility of the county or Sheriff's Office has more importance. Any law enforcement organization must engage in an in-depth review of uses of force by its officers. In President Obama's 21st Century Policing report, it was stated that departments must have in place a review process of uses of force by their officers.

### MCSO Use of Force Policy

The use of force policy which governs all sworn and detention employees is found in Maricopa County Sheriff's Office Critical Policy (CP-1). This policy was last revised in March 2022 and supersedes the revision of January 2021. Use of force policies should be reviewed and, if necessary, be revised each year. It appears that MCSO is in compliance with doing so. The purpose of the policy is to provide employees with guidelines and procedures on de-escalation techniques, authorized use of force or control that objectively reasonable employees would apply in the performance of their lawful duties, and to provide intervention and reporting methods when the use of force employed may be considered excessive.

Employees may use force if they have balanced the need to apprehend or control a subject against the impact of lack of capture. The employee's decision to use force or control shall be based on the totality of circumstances known to the employee at the time of the incident, the employee's training, and the subject's actions. Employees shall only use that amount of force that is objectively reasonable and necessary to address the situation.

Factors to be considered when deciding to use force include:

- The immediate threat to the employee or others.

- A subject who is resisting arrest or attempting to evade arrest by flight.

- A situation that is tense, uncertain, or rapidly evolving.

- The severity of the crime.

- The type of de-escalation techniques available, and the effectiveness of the de-escalation techniques utilized.

**MCSO's Use of Force** Policy is one of the most extensive and thorough policies reviewed by this assessor.

## Duty to Intervene

It is explained early on in the department's policy that employees are required to take immediate intervention action if the amount of force used by another employee is observed to be excessive and it is reasonably safe and practical to do so; the policy also requires employees to report such conduct. The duty to intervene reached the national spotlight in the George Floyd incident in Minneapolis, which really emphasized the need for a policy that holds officers accountable for ensuring the appropriate use of force is used during incidents. The Task Force on Policing stated that the policy is designed to break through what is commonly regarded as a "blue wall of silence" among officers and, by doing so, reduce misconduct as well as injuries and fatalities among members of the public and police officers.

The department's policy clearly spells out the action that employees must take if they witness excessive force being used by another employee.

- Verbal intervention – May include redirecting the employee's actions to prevent escalation or to correct a force technique applied in order to avoid an act of misconduct.

- Physical intervention – May include the intervening employee physically redirecting the involved employees tactical positioning or placement of force technique, or physically intervening, separating the employee from physical contact with the subject by coming between the involved employee and the subject when reasonably safe and practical to do so while preserving officer safety and maintaining a tactical edge on the subject.

### Reporting Requirements (Duty to Intervene)

If the employee is receptive to the intervention and misconduct is avoided, there is no reporting requirement. If the employee is not receptive to the intervention and the misconduct occurs, the reporting employee shall immediately contact a supervisor to respond to the scene.

## De-escalation

As high-profile, deadly confrontations between law enforcement officers and civilians continue to generate widespread public concern, de-escalation training has been hailed as the solution for this seemingly intractable problem. Almost all law enforcement agencies across the U.S. have embraced de-escalation training as the key to safer interactions between police and the public. Studies have shown that de-escalation training can dramatically reduce injuries among civilians and law enforcement officers. The reality is there are many incidents where, no matter what the officer does, the other person will dictate what happens. But agencies have an obligation to try to minimize those incidents and where possibly, produce outcomes that minimize harm.

MCSO describes in its policy the methods in which an employee should try to de-escalate a situation. These are:

- Employee's Presence: Identification of the employee's authority.

- Verbal Direction: Commands of direction or arrest.

- Verbal Warning: Statements describing force that may be taken if necessary.

- Tactical Repositioning: Creating greater distance to limit the threat or repositioning into a less threatening stance when appropriate and practical to do so.

MCSO's policy on de-escalation is through, concise, and leaves no room for misunderstanding. The department is to be commended for its emphasis on de-escalation.

## Documenting Uses of Force

Employees involved in a use of force beyond soft, empty-handed control, or using a use of force option resulting in an injury or complaint of an injury by the subject or employee, shall immediately notify their supervisor. The primary use of force employee must then document the use of force by using the Blue Team in I/A Pro. Employees must also complete an incident report regarding the use of force, and their supervisor must ensure it is documented in Blue Team.

### Routing of Use of Force Reports

Employees must also upload into Blue Team any and all evidence from the use of force incident and forward it to their supervisor within five calendar days of the use of force. Supervisors then must review the use of force in Blue Team within seven calendar days after receiving the use of force report from the employee. Once the use of force is reviewed by the supervisor, they are required to forward it to their shift commander within seven days. Division commanders then must review the use of force within 45 calendar days of the incident. This time frame seems excessive for the use of force review to be completed. CPSM would recommend the review of a use of force be reduced to approximately two weeks *in total*.

## Use of Force Review Committee

The purpose of the use of force committee is to evaluate use of force incidents to ensure that proper actions were taken and to identify any policy violations or training deficiencies. The committee is responsible for reviewing the video recording of the use of force and the Blue Team supporting documentation. Policy, procedure, or training deficiencies, or misconduct identified by the use of force committee, shall be forwarded to the appropriate division or bureau for review and follow-up.

## Use of Force Incidents

As part of this project, CPSM examined the overall statistics on uses of force used by MCSO employees; we did not review any individual reports on the use of force.

The following table shows the total uses of force for MCSO for 2020, 2021, and 2022 (through September).

§ § §



TABLE 7-12: Reported Uses of Force Incidents, 2020–2022 YTD

| Division | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|
| 5007-Bureau of Internal Oversight | | 1 | | 1 |
| 5041-District I | 8 | 26 | 47 | 81 |
| 5042-District II | 22 | 14 | 10 | 46 |
| 5043-District III | 14 | 30 | 11 | 55 |
| 5044-District IV | 7 | 15 | 23 | 45 |
| 5045-District VII | 10 | 14 | 4 | 28 |
| 5046-Lake Division | 14 | 15 | 7 | 36 |
| 5052-Court Security | 3 | 9 | | 12 |
| 5055-Swat | 16 | 22 | 8 | 46 |
| 5062-Special Investigations Div | 5 | 5 | 4 | 14 |
| 5063-Major Crimes Division | 6 | 17 | 5 | 28 |
| 5066-General Crimes | 8 | 13 | 1 | 22 |
| 5073-Training Division | 7 | 3 | | 10 |
| 5083-Judicial Enforcement Division | 2 | 2 | 4 | 8 |
| **Total** | **122** | **186** | **124** | **432** |

The following table shows the number of calls for service in each district compared to the number of uses of force used in those districts for 2021.

TABLE 7-13: Uses of Force Compared to Calls for Services, 2021

| District | Number of Calls for Service | Uses of Force | One Use of Force per Number of Calls | Percentage of Time Force is Used During Citizen Contact |
|---|---|---|---|---|
| 1 | 28,743 | 47 | 611 | .16% |
| 2 | 28,802 | 10 | 2,880 | .034% |
| 3 | 28,103 | 11 | 2,554 | .039% |
| 4 | 13,184 | 23 | 573 | .17% |
| 5 (Lake Division) | 10,340 | 7 | 1,477 | .067 |
| 7 | 11,013 | 4 | 2,753 | .036 |

During 2021, MCSO handled 120,185 calls for service in the six districts we reviewed, and which involved some type of citizen contact. With 102 reportable use of force incidents, the MCSO used force in slightly less than nine one-hundredths of 1 percent (.085) of the calls. In the chart above, Districts 1 and 4 have a somewhat higher percentage of incidents involving the use of force than the other districts reviewed; however, the data is not so detailed as to enable us to do a further examination on that issue. MCSO should review the uses of force in those two districts (1 & 4) to determine the causality of the greater percentage of incidents.

*Type of Force Used*

In the following table, one can see that the greatest number of uses of force involve pointing a **firearm. Many law enforcement agencies don't consider their employees' pointing their** weapons at people a use of force: however, there is case law that states that pointing a firearm

at a person is, in fact, a use of force. MCSO is to be commended for its policy stating that pointing a firearm is indeed a use of force.

TABLE 7-14: Uses of Force by Type Used, 2020–2022 YTD

| Type of force used | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|
| 12Gage ShotgunLessLethal | 2 | 1 | | 3 |
| 37/38/40mm Munitions | 2 | 2 | | 4 |
| Area Saturation (CS) | 3 | 1 | | 4 |
| Area Saturation (OC) | 2 | 1 | | 3 |
| Canine | 10 | 5 | 5 | 20 |
| CEW/Taser | 10 | 17 | 6 | 33 |
| Elbow Strike | 1 | | | 1 |
| Empty Hands | | | 2 | 2 |
| Expandable Baton | | 1 | 1 | 2 |
| Firearm (Discharge) | | 2 | | 2 |
| Firearm (Pointing Only) | 28 | 88 | 76 | 192 |
| Hard, Empty-Hand Control | 12 | 9 | 4 | 25 |
| Kicks | | 2 | | 2 |
| OC | 1 | 1 | | 2 |
| Pepperball | 1 | | | 1 |
| Soft, Empty-Hand Control | 26 | 22 | 5 | 53 |
| Unknown | 24 | 34 | 25 | 83 |
| **Total** | **122** | **186** | **124** | **432** |

## Use of Force Recommendations:

- CPSM would recommend the timeline for the organizational review of a use of force be reduced to approximately two weeks total. (Recommendation No. 117.)

- MCSO should review the uses of force in Districts 1 & 4 to determine the causality of the somewhat greater percentage of incidents. (Recommendation No. 118.)

§ § §

# SECTION 8. TRAINING

Training is one of the most important functions in a law enforcement organization. One of the primary issues being litigated today involving law enforcement is an agency's "failure to train" its personnel. Effective training has a critical role in providing essential information and minimizing risk and liability. The outcome of effective training can be measured in part by such measures as a high level of proactive policing and low level of citizen complaints, low numbers of claims or lawsuits, high citizen satisfaction with the police, well-written and investigated reports, safe driving records, and appropriate implementation and documentation of use of force incidents.

Pursuant to Arizona Revised Statutes 41-1822 and 41-1828.01, The Arizona Peace Officer Standards and Training Board (AZPOST) is responsible for establishing minimum qualifications for the recruitment, appointment, and retention of all peace officers within the state and its political subdivisions. AZPOST is also responsible for increasing professionalism and elevating law enforcement in Arizona through relevant, current, and accessible training.

The MCSO currently has no deputies who are outside of certification with AZPOST. All deputies have met the state's annual standards to maintain their certification.

## AZPOST TRAINING REQUIREMENTS

The following list represents the mandatory courses, frequency, and number of hours required by AZPOST to maintain certification.

### *Continuing Training*

A full-authority, specialty, or limited-authority peace officer shall complete eight hours of continuing training each year beginning January 1 following the date the officer is certified. The course curriculum consists of instruction on topics related to law enforcement operations and peace officer functions and skills. Training is determined by (1) needs of the department, (2) current affairs, and (3) recommendations from command or line level staff.

### *Proficiency Training*

To retain certification, a peace officer who is not in a Sergeant or higher rank within the peace officer's appointing agency shall complete eight hours of proficiency training every year beginning January 1, following the date the peace officer is certified.

The curriculum consists of advanced or remedial instruction on one or more of the following topic areas:

- Arrest and control tactics.

- Tactical firearms (not the annual firearms qualification required under this Section).

- Emergency vehicle operations.

- Pursuit operations.

- First aid and emergency care.

- Physical conditioning.

- High-risk stops.



*Firearms Qualification*

A peace officer authorized to carry a firearm shall qualify to continue to be authorized to carry a firearm each year beginning January 1 following certification by completing a Board-prescribed firearms qualification course, using a service handgun and service ammunition, and a Board-prescribed target identification and judgment course (typically eight hours).

All armed personnel of MCSO, both sworn and civilian, must qualify once a year with not only their sidearm, but their issued rifle as well. The qualification day is an eight-hour day where the designated qualification course is completed, and then additional training is provided based upon current incidents that have occurred or based upon identified training needs. An important aspect in firearm qualification is having members complete some type of decision-based qualification, which MCSO does with every qualification day. It was learned that about 5 percent of the 500 deputies and 900 detention officers who go through the qualification day have to be remediated. That remediation involves the employee returning on another day, receiving one-on-one instruction, and then needing to successfully pass the qualification course.

Most law enforcement agencies studied by CPSM require officers/deputies to qualify twice a year, quarterly, or monthly. However, many of those have ranges within their own facilities making it easier to accommodate the training. However, at MCSO, none of the districts have their own ranges, and all qualification must take place at the main range. For some deputies, it can be over an hour drive to get to the range facility. In discussions with range staff, more range days would be offered if they could, but it is not logistically possible to add even one more qualification day due to the number of personnel who need to qualify. If additional personnel were added to the range staff, and if additional facilities were added, it could be accommodated, but currently they would be unable to have a second qualification day.

# MCSO-PROVIDED TRAINING

Based upon the court order, the Training Division has twelve areas in which it must be compliant. As of the September 30, 2022, (Thirty-Third Quarterly Compliance Report), the Training Division is in Full and Effective Compliance in all but one of the twelve areas. The area not in complete compliance is the selection and hiring of instructors for Supervisor Specific Training Phase 2.

The department is required by the court order to provide 60 percent of its training live and in person, while 40 percent of the training can consist of on-line training. The department has used several platforms to provide the on-line training: E-Learning, Skills Manager Vista, and is currently using TheHUB through Cornerstone.

The following shows **the department's annual training provided to employees:**

*Sworn Supervisory Personnel*

- Six hours of comprehensive and interdisciplinary training on supervision strategies and responsibilities.

- Four hours of supervisor specific training which is identified in relevant court orders.

- Eight hours of training on conducting personnel investigations (after 40-hour training).

- Training related to their obligations as a supervisor to accept public complaints.

*Sworn Office Personnel*

- Training regarding EIS Blue Team.



*Sworn Personnel*

- Court-ordered training on Biased-Based Policing, Fourth Amendment, EIS, Body-Worn Cameras, and TraCS.
- Training on identifying and reporting misconduct, the consequences for failing to report misconduct.
- CPR and First Aid Training.
- Successful completion of a firearms qualification training course and judgmental shooting course.

*Detectives*

Employees working in a detective assignment are required to attain detective status via:

- Instruction and Overview of Criminal Investigations (24-hours).
- Search Warrants or Search and Seizure (16-hours).
- Elective or specialty classes (24-hours).

*Detention Officers*

- Detention officers and the rank of sergeant must attend 40 hours of approved training.
- Lieutenants and Captains must attend 24 hours of approved training.

## Annual Training Hours Provided to Employees by MCSO

AZPOST requires 8 hours of continuing professional training each calendar year for certified officers; in addition, it requires 8 hours of proficiency training every three years.

The following tables show the total and average training hours provided to MCSO employees over a three-year period.

## TABLE 8-1: Total Training Hours Provided to MCSO Employees, 2020–2022 YTD

| Year | Civilian | Detention | Posse | Sworn |
|------|----------|-----------|-------|-------|
| 2020 | 11,216 | 121,104 | 1,496 | 31,332 |
| 2021 | 11,235 | 122,325 | 5,240 | 56,260 |
| 2022 (Oct.) | 11,781 | 97,044 | 3,267 | 32,897 |

The following table shows the average number of hours of training MCSO employees received annually over the last several years. This is based upon 584 sworn personnel, 769 civilian personnel, 1,570 detention personnel, and 161 Posse personnel.

## TABLE 8-2: Average Number of Training Hours per Employee, 2020–2022 YTD

| | Civilian Hours Annually | Detention Deputies Hours Annually | Posse Hours Annually | Sworn Average Hours Annually |
|------|-------------------------|-----------------------------------|----------------------|------------------------------|
| 2020 | 14 | 77 | 9 | 53 |
| 2021 | 14 | 77 | 32 | 96 |
| 2022 (Oct) | 15 | 61 | 20 | 56 |

It is apparent by the average number of training hours provided to each MCSO employee that they are receiving more training each year than is required by AZPOST. In these litigious times

where the training of law enforcement personnel is scrutinized as it never has been before, any training provided above and beyond what is mandated is outstanding and tends to increase the professionalism and discipline of the department. MCSO is to be commended for the amount of training it provides to its personnel.

## TABLE 8-3: Internal vs. External Training

|  | 2020 | Percentage | 2021 | Percentage | 2022 | Percentage |
|---|---|---|---|---|---|---|
| Internal Training Hours | 235 | 29% | 306 | 45% | 452 | 34% |
| External Training Hours | 566 | 71% | 380 | 55% | 894 | 66% |
| Total | 801 |  | 686 |  | 1,347 |  |

# MCSO TRAINING SECTIONS

## Advanced Officer Training (AOT)

Law enforcement agencies have a responsibility to their employees and the community in which they serve to ensure those employees are provided with up-to-date, modern-day training. Maintaining this specialized and integrated body of knowledge is challenging and requires engagement in extended practical instruction and frequent in-service training. That training should consist of training regarding new laws, recent court decisions, officer survival, new concepts, procedures, technology, decision-making, civil liability causations, and ethics.

Currently, MCSO has only one Sergeant and one deputy handling all the training curriculum for the law enforcement side of the agency, which is over 500 personnel. The unit is budgeted for two other deputy positions that are currently vacant. The law enforcement unit of AOT is responsible for providing over 31,000 hours of training to deputies, sergeants, and command staff. The unit is struggling with only two employees in the unit to provide the curriculum necessary to ensure the law enforcement side is provided with the adequate and appropriate training. CPSM recommends that the vacant two positions be filled a soon as possible.

## Detention Continued Professional Training

The unit is currently staffed with one Detention Sergeant, and five Detention officers. The budgeted number for Detention officers is six. Although there is a vacancy in the unit, it has not operationally hindered the ability of the unit to provide the continued professional training to meet state, federal, and court ordered mandates.

## Court-Ordered Related Training (CORT)

This unit handles all of the court-ordered training courses that are developed in direct response to the court's orders in paragraphs 49–53 and 178–82. The unit is currently staffed by one Sergeant (sworn) and one deputy (sworn). Classes developed by the unit most often pertain to misconduct-related training, supervisor and command level training, bias-free policing, and detention, arrests, and enforcement of immigration-related laws. Other individual classes developed by the unit include early intervention systems, complaint intake, BWC, Praxis, performance appraisals, and policy revisions.

The following table shows the court-ordered training provided by the department since 2014

TABLE 8-4: Court-Ordered Related Training

| Subject Matter | Employees | Hours of Training | 2014–2019 Training Hours per Deputy |
|---|---|---|---|
| Bias-Free Policing 12-hours initially, 6 hours per year | 8,548 | 65,550 | 42 |
| Detentions, Arrests, Immigration-Related Laws | 8,548 | 43,692 | 28 |
| Supervisor and Command level | 780 | 7,172 | 30 |
| Misconduct-Related Training | 1,061 | 15,650 | 64 |

Since 2014, CORT has spent 32,000 hours developing court-related training. As is obvious by the data shown above, the unit is busy, and will continue being busy into the future as long as the office is under the court order. This unit's work is critical to the MCSO's work to gain compliance with the court's requirements. It was learned during the site visit that the two current members of the unit are working beyond their capacity to meet the demands. Due to the amount of work and continued training required by the court monitors, CPSM recommends the two vacant deputy (sworn) positions in CORT be filled as soon as possible.

*MCSO Range Unit*

This unit has the responsibility of providing firearms qualification and certification for all MCSO employees who are armed, both sworn and detention, along with all recruits in the academy classes. It was learned that within the last year the department began arming most of the Detention officers, which has created a huge additional workload on the range staff. As can be seen in the following table chart, the range has no Sergeant for the Detention side of the range, and there is currently one vacancy at the deputy rank. It was learned that those employees assigned to the range are working six days a week to meet the workload and are beginning to experience "burn out." Due to the increased demand of range training required due to the addition of the detention officers becoming armed, CPSM recommends an additional sergeant position (Detention) to develop training, and one deputy position to assist with facilitating training. CPSM also recommends the current deputy vacancy be filled.

TABLE 8-5: Range Staffing (2022)

| Position | Budgeted | Vacant |
|---|---|---|
| Law Enforcement Lieutenant – Basic/Range | 1 | 0 |
| Law Enforcement – Basic | 2 | 0 |
| Law Enforcement Deputy – Basic | 4 | 0 |
| Law Enforcement Sergeant – Range | 1 | 0 |
| Law Enforcement Deputy – Range | 3 | 1 |
| Detention Deputy – Range | 3 | 0 |
| General Laborer – Range | 1 | 0 |
| Office Assistant – Range | 1 | 0 |

## TRAINING DIVISION STAFFING

The Training Division is commanded by a Captain who reports directly to the Deputy Chief of Compliance. The Training Captain has the responsibility for the overall management of the Division. Reporting to the Captain are three Lieutenants who are responsible for the following:

*Detention Lieutenant*

■ Detention Academy.

■ Detention Continued Professional Training.

*Sworn Lieutenant*

■ Sworn Basic Academy.

■ Range.

*Sworn Lieutenant*

■ Sworn Advanced Officer Training (AOT).

■ DSA Academy.

■ Court-Ordered Related Training (CORT).

(CORT is training that is required for sworn and civilian employees specified in the Melendres Order)

§ § §

TABLE 8-6: Full-Time Training Staff, 2022

| Position | Budgeted | Vacancies |
|---|---|---|
| Captain | 1 | 0 |
| Admin. Staff Supervisor | 1 | 0 |
| Media Specialist | 1 | 0 |
| Office Asst. Specialized | 1 | 1 |
| Office Assistant | 1 | 0 |
| Detention Lieutenant -Basic/AOT | 1 | 0 |
| Detention Sergeant - Basic | 2 | 1 |
| Detention Officer – Basic | 6 | 1 |
| Admin/Ops Specialist – Basic | 1 | 0 |
| Detention Sergeant – AOT | 1 | 0 |
| Detention Officer – AOT | 5 | 1 |
| Office Asst. Specialized - AOT | 1 | 0 |
| Detention Sergeant – Admin | 1 | 0 |
| Detention Officer – Admin | 3 | 0 |
| Admin/Operations Specialist – Admin | 1 | 0 |
| Law Enforcement Lieutenant – AOT/CORT | 1 | 0 |
| Admin/Operations Specialist – AOT/CORT | 1 | 0 |
| Law Enforcement Sergeant – AOT | 1 | 0 |
| Law Enforcement Deputy – AOT | 3 | 1 |
| Admin/Operations Specialist – AOT | 1 | 0 |
| Law Enforcement Sergeant – CORT | 1 | 0 |
| Law Enforcement Deputy – CORT | 3 | 2 |
| Detention Officer – CORT | 4 | 0 |
| Operations/Program Supervisor – CORT | 1 | 1 |
| Management Analyst | 3 | 0 |
| Law Enforcement Lieutenant – Basic/Range | 1 | 0 |
| Law Enforcement – Basic | 2 | 0 |
| Law Enforcement Deputy – Basic | 4 | 0 |
| Law Enforcement Sergeant – Range | 1 | 0 |
| Law Enforcement Deputy – Range | 3 | 1 |
| Detention Sergeant – Range | 0 | 0 |
| Detention Deputy – Range | 3 | 0 |
| General Laborer – Range | 1 | 0 |
| Office Assistant – Range | 1 | 0 |
| BWC Supervisor | 1 | 0 |
| Law Enforcement Deputy – BWC | 1 | 0 |
| Detention Deputy – BWC | 1 | 0 |
| BWC Specialist | 4 | 2 |
| Program Coordinator | 1 | 0 |
| Law Enforcement Deputy – Program | 1 | 0 |
| Total | 71 | 11 |

According to the Training commander, other than the vacancies identified by this report to be filled, the training unit can adequately meet the needs of providing the current mandated training; however, if mandated training were to increase, additional positions would be required to meet those additional training mandates.

## SWORN TRAINING ACADEMY

The Maricopa County Law Enforcement Training Academy hosts not only MCSO recruits but recruits from various other agencies within the state of Arizona. The Academy involves a series of rigorous educational and physical modules that help prepare potential law enforcement officers for handling the demands of the position. The modules include training such as: Introduction to Law Enforcement, Law and Legal Matters, Patrol Procedures, Traffic Control, Crime Scene Management, Community and Police Relations, Report Writing, and Police Proficiency Skills.

All new entry level officers must complete the 24-week academy to receive peace officer certification. The department's academy is a total of 960 hours, with 930 hours of instruction. The additional hours are due to certifications not required by AZPOST, but which are required by MCSO and other agencies. The Basic Training Curriculum consists of 88 lesson plans, which include classroom instruction, proficiency skills training, and reality-based training scenarios.

Currently, the academy has the largest class sizes in the State of Arizona. Class sizes vary from as few as 8 recruits, to a high of 62 recruits. Five academy classes graduate during a calendar year, and at any given time there are two to three academy classes being run simultaneously.

TABLE 8-7: Sworn Academy Staffing, 2022

| Position | Current | Vacancies |
|---|---|---|
| Sergeant (MCSO) | 1 | 1 |
| Sergeant (Glendale PD) | 1 | 0 |
| Recruit Training Officer (MCSO Deputy) | 2 | 2 |
| Recruit Training Officer (Glendale PD) | 1 | 0 |
| Recruit Training Officer (Coolidge PD) | 1 | 0 |
| Recruit Training Officer (Salt River PD) | 1 | 0 |
| Recruit Training Officer (Scottsdale PD) | 1 | 0 |
| Recruit Training Officer (Goodyear PD) | 1 | 0 |
| Recruit Training Officer (Buckeye PD) | 1 | 0 |
| Total | 10 | 3 |

TABLE 8-8: MCSO Academy Classes, 2019–2022

| Class # | Date Academy Began | Date Academy Graduated | Recruits Who Began Academy | Recruits Who Graduated Academy | MCSO Recruits Who Began Academy | MCSO Recruits Who Passed | Pass Rate of MCSO Recruits |
|---|---|---|---|---|---|---|---|
| 147 | 9/9/2019 | 2/20/2020 | 42 | 35 | 17 | 11 | 64% |
| 148 | 11/4/2019 | 4/16/2020 | 31 | 25 | 14 | 12 | 85% |
| 149 | 3/23/2020 | 9/3/2020 | 47 | 27 | 21* | 9 | 42% |
| 150 | 6/1/2020 | 11/12/2020 | 30 | 27 | 7 | 6 | 85% |
| 151 | 12/7/2020 | 5/20/2021 | 46 | 38 | 23 | 18 | 78% |
| 152 | 1/11/2021 | 6/24/2021 | 41 | 35 | 16 | 12 | 75% |
| 153 | 3/8/21 | 8/19/2021 | 21 | 11 | 16 | 7 | 43% |
| 154 | 8/9/2021 | 1/20/2022 | 45 | 30 | 25 | 14 | 56% |
| 155 | 9/3/2021 | 2/24/2022 | 44 | 36 | 19 | 15 | 78% |
| 156 | 11/1/2021 | 4/14/2022 | 29 | 18 | 8 | 3 | 37% |

Note: *3 recruits moved to class 150, 5 outside agency recruits moved to class 150

According to a U.S. Department of Justice study, 75 percent to 85 percent of recruits who enter a police academy graduate that academy. There are a variety of reasons why **recruits don't complete an academy, such as the job isn't what they thought, not a good fit for them, poor** decision-making, cheating, poor physical fitness, etc. As evidenced by the above table, in some academy classes, the MCSO has a lower pass rate than the study percentages, some are in line with the study, and in some classes the passage rate was much lower. In the classes shown dating back to 2019, the average pass rate was 64 percent. During our site visit, it was learned that the failure rate was primarily due to recruits resigning during the first two weeks of the **academy when they discover they aren't physically prepared, the job isn't what they expected** it to be, or in several cases the recruit self-demoted to a detention position. According to the academy staff, the department seldom washes any recruits out of the academy.

In data provided for the recruits who failed to graduate during the 10 classes in which data was studied the reasons were primarily resigned, removed/dismissed, or self-demoted to a detention position.

TABLE 8-9: Reasons for Failure to Graduate

| Reason | Number | Percentage |
|---|---|---|
| Resigned | 30 | 50% |
| Removed/Dismissed | 15 | 25% |
| Demoted to Detention | 7 | 11% |

CPSM would recommend the department do a comprehensive analysis in collaboration with HR to determine if there are commonalities among the recruits who failed to complete the academy and what the department can do to minimize the failure rate.

In order to facilitate the success of the recruit and successful completion of the academy many departments are now having recruits attend pre-academy training prior to the regular academy. MCSO has recognized that in order for some recruits to be successful, they must attend a pre-academy to prepare them for the rigors of the regular academy. MCSO requires

recruits to attend a three-week pre-academy (120 hours) prior to attending the twenty-four-week academy. The pre-academy introduces the recruit to specific areas that many struggle with during the regular academy. MCSO is to be commended for its use of a pre-training academy class.

## DETENTION TRAINING ACADEMY

Since March 1986, MCSO has trained 458 detention officers. The training has included emergency health procedures, hostage procedures, inmate rights, use of force, suicide prevention, grievance and disciplinary procedures, and contraband control. All training is provided at the training facility. Upon graduation, cadet officers are assigned to an FTO at a facility for four weeks of on-the-job, individualized training. This training includes facility orientation and layout, emergency procedures and evacuation routes, communication and officer safety, visitation procedures, house and floor officer duties, release procedure, documentation, use of force, report writing, federal court mandates, post orders, intake procedures, inmate services, security functions, and inmate housing functions.

The Detention Training Academy is currently staffed by one Lieutenant, two Sergeants, and five Detention officers. There is one Detention officer vacancy. Each academy is graduating approximately 10 to 15 Detention officers, but is suffering from a high attrition rate similar to the sworn academy. The Detention Training Academy is averaging about a 17 percent failure rate for each class. According to the Lieutenant, the unit with its current staffing is adequately staffed to operate the training academy.

## OFFICER FIELD TRAINING (FTO)

The purpose of the Field Training and Evaluation Program is to produce competent peace officers capable of working a solo patrol assignment in a safe, skillful, productive, and professional manner. **The program's goals are:**

- To provide standardized training to all newly assigned law enforcement personnel.

- To provide clear standards for training and evaluation while giving all trainees every reasonable opportunity to succeed.

- To enhance the professionalism, job skills, and ethical standards of the law enforcement community.

**The department's FTO Program is managed by the Sworn Field Training Coordinator who** oversees the development, review, and revision of the standards and practices of the FTO Program. Each district then has a designated supervisor to act as a liaison between the district and the Training Coordinator.

*FTO Selection*

**According to MCSO's Policy GG**-1 (Peace Officer Training Administration) a Field Training Officer (FTO), is a deputy who has received specialized training, has demonstrated a professional demeanor, is able to communicate effectively, has good organizational skills, is self-motivated and decisive, has an above-average knowledge of Office Policy, and who has been delegated the responsibility of guiding a deputy in-training through the Field Training Program.

Requirements to become a sworn FTO are as follows:

a. A written recommendation from the deputy's immediate supervisor, forwarded through the chain of command to the Sworn Field Training Coordinator.

b. A minimum of two years of peace officer experience with the MCSO, or two years of peace officer experience from another agency.

c. A "Meets Minimum Performance Standards" rating on the last two consecutive EPAs. (Policy GG-1, Peace Officer Training Administration Effective Date 03-31-21.)

d. Have current cardiopulmonary resuscitation (CPR) certification.

e. Successful completion of the 40-hour AZPOST-accredited General Instructor School.

f. Successful completion of the 24-hour FTO Academy.

In addition to the requirements listed above, there is a Sworn FTO Misconduct and Disciplinary Review that takes place. If there is a pending administrative investigation for a serious offense, the employee will be ineligible to be an FTO until the investigation has concluded.

For an FTO to remain in that capacity, they are reviewed annually by the Training Division Commander. They must maintain a "Meets Minimum Performance Standards," attend the annual FTO training, and maintain a current CPR certification status.

All FTOs must attend and complete the AZPOST Basic FTO School.

### FTO Staffing

Currently, the department has 53 certified FTOs assigned to the patrol division: however, only 34 FTOs are active while 19 are inactive. Those 19 inactive FTOs are in that status because of issues relating to PSB investigations. It was learned during conversations with employees that the issue of a deputy having an open PSB investigation has barred deputies from applying to become an FTO. During the last FTO school hosted by MCSO, seven FTOs were certified; however, concurrently there were seven FTOs who had to be inactivated due to PSB denials.

MCSO has recently been graduating 15-plus deputies in each Academy class. Each trainee requires at a minimum three FTOs to complete the program's four phases. In order to facilitate the FTO training of those 15 Academy graduates, the department should have a minimum of 45 active FTOs. However, factors such as vacation, military leave, light duty, and extended leave would further deplete that number. Having too few FTOs begins to have a negative effect on those FTOs due to the expanded workload, and could have a negative effect on the training itself. CPSM recommends the department enroll additional FTOs to meet its current needs.

### FTO Training

The department's FTO model adheres to the AZPOST model, which lasts approximately 15 weeks, and consists of four separate phases. Each phase has a different FTO assigned. In any given year, the department can have between 40 and 150 trainees going through the FTO Program. Since 2020, the department has had 123 employees (recruits/lateral deputies) enter the FTO Program. Of those who entered the FTO program, the department was able to successfully pass 101 into a regular assignment. That would put the department's pass rate at about 83.4 percent, which is about the average in departments studied by CPSM.

Currently, the 37 active FTOs are assigned to Divisions as shown in the following table.

TABLE 8-10: Division Assignments of Field Training Officers

| District | FTOs assigned |
|---|---|
| 1 | 5 |
| 2 | 10 |
| 3 | 6 |
| 4 | 7 |
| 7 | 1 |
| Lake Patrol | 7 |
| Training | 1 |

FTOs remain assigned to the district they are in at the time of their appointment to the program and are not reassigned to another district where more FTOs might be needed. Unfortunately, with the FTOs remaining in their assigned district, a situation has been created where some districts have more FTOs than other districts. Consequently, this has had the effect of trainees spending more time in their training phases where fewer FTOs are assigned.

Another issue facing the FTO program is that any FTO selected must meet criteria, to include not having an outstanding PSB investigation on their record. This has severely hampered the department's ability to fill its ranks of FTOs and is a by-product of PSB's failure to complete investigations in a timely manner.

# MISCELLANEOUS TRAINING

## Assignment Training

When an employee is assigned to a new position, there should be some amount of training provided to them in order for them to be able to do their job: ideally, there should be defined training classes that will make them competent in their positions. Many departments have a list of classes for each assignment that are to be taken after an employee is assigned to a new position. For example, if a deputy were to be assigned as a detective, that employee in order to become competent, should attend Basic Investigator's Class, Interview and interrogation Class, Search Warrant Training, Advanced Investigator's Class, etc. The MCSO should look at every special assignment in the department and define the necessary classes for that assignment that will enable the employee to become competent.

## Sworn Sergeant Training

All newly promoted supervisors must attend the Basic Supervisor Class put on at the training center. During that class they are provided with informational sheets and checklists regarding their new position and responsibilities. Unfortunately, those sheets and checklists vary based upon the instructor and the Sergeant's assignment. Most departments studied by CPSM have a formalized supervisor training program similar to the FTO program. MCSO does not have a formalized FTO program for newly promoted sergeants. CPSM recommends the MCSO implement a Sergeant Field Training Program in which the new supervisor would be required to ride along with a more senior supervisor for two weeks and complete a supervisor handbook detailing their proficiency and knowledge in handling different incidents. It is also recommended the MCSO create a formalized supervisor training manual and check-off book for sergeants similar to the one used by the City of San Leandro Police Department.[4]

---

4. https://www.sanleandro.org/DocumentCenter/View/2047/Sergeant-Training-Program-PDF



### Sergeant Leadership Training

CPSM learned the Sheriff's Office will soon be implementing a Sergeant Leadership Class that will meet every two weeks for four sessions. The class will meet in co-horts and it is designed to enable new supervisors the opportunity to share their experiences handling issues such as counseling, teaching, and mentoring. The MCSO is to be commended for developing and implementing a program where sergeants have the opportunity to learn from each other when dealing with issues they will be encountering with employees and incidents.

### Executive Leadership Training

Managing a police organization is a complex process for those tasked with ensuring the department operates at the most effective and efficient level. Those whose job it is to manage the organization must be as well-trained as those officers in the field. It is important to send command level personnel to executive training to ensure they are prepared to lead the department. MCSO currently does not send command level personnel to executive leadership training such as the FBI National Academy, Northwestern Training Institute, FBI LEEDA Trilogy courses, or the National Command and Staff College affiliated with the National Sheriffs Association. The MCSO should strive to send its command level officers to executive leadership courses.

### Technology

The Training Division struggles with adequate databases in which to keep employee training records and accessing data bases. CPSM recommends IT meet with training unit members and attempt to determine exactly what their technology needs are.

## MCSO TRAINING FACILITIES

### Training Academy

The Maricopa County Law Enforcement Training Academy instructs numerous classes at various locations depending on the class.

Most of the class instruction takes place at the Maricopa County Training Center located at 2627 South 35th Avenue, Phoenix, AZ 85009. The facility was built in 2003 when the department put on only one Sworn Academy and Detention Academy at a time. The training center can now see up to three Sworn Academy classes and two Detention Academy classes operating simultaneously. It is apparent that the facility no longer meets the needs of the training center's operational pace.

The following are a few of the aspects of the facility that do not meet current needs:

- Recruit Lockers – There are 83 lockers split between the male and female locker rooms. An academy class can have up to 45 recruits, so any more than two academy classes being run simultaneously creates a locker shortage.

- Showers – The facility has only 15 showers, which becomes problematic during academy classes.

- Mat rooms – The two mat rooms are too small for today's needs, and causes staff to split classes to teach techniques, resulting in shorter teaching and practice time.

- Classrooms – Classrooms are too small for the number of recruits in each class. A larger classroom would allow more scenarios to be performed in the classroom instead of out in the elements.

- Parking – The limited number of parking spaces at the facility causes recruits to have to carpool in order to ensure enough parking is available for everyone coming to the Training Center.

- 400m Track – The area is used for physical fitness and during the summer months the area is too small to accommodate the morning training to avoid the Arizona heat.

- Limited Real Estate – The facility is too small to accommodate the scenario days required during the academies.

- Offices – There are not enough offices to accommodate those (below) who have offices there, which include:

  □ Sworn Basic Academy.

  □ Detention Basic Academy.

  □ Advance Officer Training for Sworn.

  □ Advance Officer Training for Detention.

  □ Sworn Court-Ordered Required Training Division.

  □ Taser and Pepper Ball Coordinator.

  □ Detention FTO Coordinator.

  □ Sworn FTO Coordinator .

  □ Media Coordinator.

  □ Facility Maintenance Officer.

  □ Posse/Coordinator.

  □ Body-worn Camera Coordinator.

  □ Drug Recognition Expert.

  □ Administrative.

  □ Defensive Tactics Coordinator.

*Range*

Firearms, Crowd Control, and Explosive Devices training takes place at the Maricopa County Firearms Range located at 26900 West Buckeye Hills Drive. The range provides training for all of MCSO's firearms certified employees, as well as the Maricopa County Attorney General's Office, and the Maricopa County Constables. The MCSO does not rent the range to other police agencies. The range was built in 2007, and the **Sheriff's Office** can successfully conduct firearms training at the facility, but there are infrastructure needs. The most important are as follows:

- In order to accommodate the added training for certifying Detention personnel the range could use an additional, larger classroom.

- Wi-Fi needs to be updated to allow the use of computers and iPads.

- Security cameras and the alarm system need to be updated.

- Parking lot needs to be graded.



- Audio and visual equipment need to be upgraded.

The Driving Track classes take place at the Glendale Regional Public Safety Training Center located at 11550 West Glendale, or at the Phoenix Driving Track located at 8645 South 87th, Ave., in Tolleson.

Traffic Stops, High-Risk Vehicle Stops, K9, and Traffic Collision training is held at the City of Phoenix Employee Driver Academy located at 3535 South 35th Avenue in Phoenix.

## Training Recommendations:

- CPSM would recommend the department conduct a comprehensive analysis in collaboration with HR to determine if there are commonalities among the deputy recruits who fail to complete the academy and what the department can do to minimize the failure rate. (Recommendation No. 119.)

- It is recommended the county review and assess the viability of making the necessary upgrades to the Main Training Facility. (Recommendation No. 120.)

- It is recommended the county review and assess the viability of making the necessary upgrades to the Firing Range Facility. (Recommendation No. 121.)

- CPSM recommends the department add additional FTOs to meet its training needs. (Recommendation No. 122.)

- CPSM recommends the department attempt to find ways to mediate the unequal number of FTOs assigned to each district. (Recommendation No. 123.)

- The department should strive to send command level officers to executive leadership courses. (Recommendation No. 124.)

- It is recommended the department create a formalized supervisor training manual, check-off book, and supervisor training program. (Recommendation No. 125.)

- CPSM recommends the two vacant deputy (sworn) positions in CORT be filled as soon as possible. (Recommendation No. 126.)

- CPSM recommends an additional sergeant position (Detention) be added to the range staff and also the deputy vacancy be filled. (Recommendation No. 127.)

- The department should look at every special assignment in the department and define the necessary classes for that assignment that will enable the employee to become competent. (Recommendation No. 128.)

- If additional training mandates are required, additional personnel would be necessary in the Training Unit to ensure those mandates are met. (Recommendation No. 129.)

- CPSM recommends IT meet with training unit members and attempt to determine exactly what their technology needs are. (Recommendation No. 130.)

§ § §

# SECTION 9. COURT IMPLEMENTATION DIVISION (CID)

The CID was born out of the Supplemental Permanent Injunction/Judgement Order issued by U.S. District Judge the Honorable G. Murray Snow. This order was signed in October 2013, and Section III (and five subsequent sub-sections) of that order is what defines the Division's responsibilities. Snow ordered:

> *Defendants shall hire and retain or reassign current MCSO employees to form an interdisciplinary unit with the skills and abilities necessary to facilitate implementation of this Order. This unit shall be called the MCSO Implementation Unit[5] and serve as a* **liaison between the Parties and the Monitor and shall assist with the Defendants'** *implementation of and compliance with this Order. At a minimum, this unit shall:* **coordinate the Defendants' compliance and implementation activities; facilita**te **the provision of data, documents, materials, and access to the Defendants'** *personnel to the Monitor and Plaintiffs representatives; ensure that all data, documents, and records are maintained as provided in this Order; and assist in assigning implementation and compliance-related tasks to MCSO Personnel, as directed by the Sheriff or his designee. The unit will include a single person to serve as a point of contact in communications with Plaintiffs, the Monitor, and the Court.*

## CID Mission and Vision Statement

> *The Mission of the CID is to act as a liaison between the MCSO and the Court-appointed Monitor Team (Monitor Team) to streamline the process of achieving full compliance with the Federal Court Orders in Melendres v. Arpaio. The CID Unit is committed to ensuring all compliance activities are produced and implemented in a constitutional, lawful, and bias-free manner.*

> *The CID orchestrates a clear channel of communication between the MCSO and* **the Monitor Team, the Plaintiffs' Representatives, and the MCSO Legal Counsel to** *reach full and effective compliance with the associated Court Orders.*

## Operations Manual

The unit is guided by a CID Operations Manual dated August 30, 2021, and is 29 pages in length. The manual establishes specific instructions governing the organization, supervision, and functional operations of the Court Implementation Division (CID). The CID Operations Manual serves as a basic guide for the duties, responsibilities, and functions performed by the staff assigned to the division. A review of the document found it to be well-written, thorough, clear, concise, and providing clear guidance.

## Staffing

The Division is commanded by a Captain who reports directly to Deputy Chief Ken Booker.

At the current time, the CID is staffed as shown in the following table.

---

5. The division's name was later changed to Court Implementation Division.



## TABLE 9-1: Court Implementation Division Staffing, 2022

| Position | Current | Vacancy |
|---|---|---|
| Captain | 1 | 0 |
| Lieutenant | 0 | 1 |
| Sergeant | 2 | 1 |
| Deputy | 2 | 0 |
| Management Analyst | 5 | 0 |
| Management Assistant | 1 | 0 |
| Civilian Administrative Assistant | 1 | 1 |
| Total | 12 | 3 |

The Captain acts as the main contact point and liaison between the Courts, the Court Monitor, DOJ, ACLU, Command Staff, and the county's legal team. When the CID was begun, all communication between the department, the Court Monitor, and the ACLU had to go through the CID Captain. However, over the years, the court monitor team members and the ACLU have developed relationships that have created communication avenues between themselves and members of the unit without needing to go through the Captain. Those communications are usually rather innocuous informal requests, such as a certain document wasn't received or where the document might be located. However, all formal communications still go through the Captain, and he is copied or notified about the other informal communication requests.

The Division's current sworn vacancies occurred when the Lieutenant (now Captain) was promoted, and that Lieutenant position was not filled. The Sergeant vacancy occurred when the department transferred a Sergeant from CID to the Training Division to work with the recruit classes in the Academy. That position was never transferred back to CID. In studies conducted by CPSM, it is unusual for a promotion to occur within a division and the person who was promoted remains in that same unit; however, because of the complexities of the relationships developed by the Captain, it appears to be operationally effective to have had the Captain remain in the division.

The court order did not specifically address the number of employees the Division should have; however, it did mention that the Division should be commanded by either a Lieutenant or above in rank. The order only stated that there needed to be sufficient staffing to ensure implementation and compliance of the court order.

When the Division was first staffed at the direction of the judge's order (2013), the sworn personnel consisted of one Captain, one Lieutenant, six Sergeants, and two deputies. Since then, the Division has lost half of the Sergeant positions; however, based upon the current workload, the Division clearly would be overstaffed with six Sergeant positions. It seems three is the appropriate number based upon the current workload. However, when the one Sergeant was transferred out of CID and reassigned to the Academy, that position's workload was distributed between the remaining two Sergeants and the two deputies. So, obviously, when that occurred, each of their workloads increased and began stressing their capacity. Based on the workload situation, the vacant Sergeant position should be replaced to relieve that additional workload. Also, at some point the Lieutenant position should be restored to the unit to ensure there is proper management of the unit, and to ensure there is someone who can shoulder the Captain's responsibilities when he is off.

The Division will occasionally, but not often, incur overtime. That overtime is usually attributable to documents requested by the monitoring team in addition to normal documents, and production of the documents in a timely manner. Overtime is not caused by workload.

*Civilianization*

The civilianization of positions in law enforcement has been heralded as a strategy to solve the issues regarding the lack of staffing of sworn officers or deputies in law enforcement organizations. Civilianization quite simply is identifying new or existing work duties that may be handled by civilians rather than sworn personnel. Civilianizing positions traditionally done by sworn personnel can free up the sworn personnel to be used elsewhere within the organization.

At first blush, the CID Division would appear to be one of those divisions of the agency where civilianization could occur and be effective. And, the Division has begun doing so. At the current time the Division has more civilian personnel working in it than it does sworn personnel; however, that is based more upon the lack of sworn personnel available within the agency.

After discussions with the Division's commander and other sworn members of the Division, it is apparent that the functions of the Division are so unique that it would not be as operationally efficient or as effective having civilian employees doing the work of sworn personnel. For example, familiarity with the department (which sworn personnel have) is extremely important when the Division facilitates the in-person site visits of the court monitor and the members of the court monitor team. Members of the Division escort the members of the court monitor team all over the county, facilitate meetings for them, and obtain necessary documents. Familiarity by sworn personnel with department personnel in every district and unit enables them to operate more efficiently. Division members are also well-versed on department policies, procedures, and operational processes, which makes them invaluable when answering questions asked by the monitor team.

The following are just several examples of why the Division should be staffed with some sworn personnel as opposed to civilianizing those sworn positions.

(1) A CID sworn Sergeant reviews all videos required by the court order and may identify a deficiency that had not been identified prior due to being provided to CID. Each time a deficiency is identified by the department prior to it reaching the monitor team, it will not be counted by the monitor team as a deficiency against the department. However, being able to identify that deficiency is based upon years of field experience by that Sergeant. If that position were to be civilianized, that deficiency may not be discovered because of the civilian staff member's lack of law enforcement experience.

(2) Some police reports need to be reviewed for facts, and a civilian who has never written a crime or arrest report would most likely not find the errors in those reports, which a sworn employee would.

(3) The relationships in the department that the sworn members have are based upon years of working together and have enabled the unit to be more efficient when a document/report or information is needed from elsewhere in the department. Due to the loss of the one Sergeant position, the two deputies are now assisting the Sergeant with document production.

Because most, if not all, information required by the court order is patrol-centric, it is important to have members of the unit who operationally understand patrol operations and law enforcement work. Those sworn personnel have worked in the patrol functions that are being measured by the court orders, and they have the experience and a clear understanding of what is being expected and measured. CPSM does not believe that replacing sworn members

within the Division with civilian personnel would offer any benefits, and most likely would result in the Division being less effective and efficient.

## Workload

In divisions such as CID, it is often difficult to determine the appropriate staffing numbers to ensure the division is meeting its expectations. There are no benchmarks in this Division as there are in other divisions within a law enforcement organization, such as number of reports written, number of citations issued, number of calls handled, number of investigations closed, etc. The only benchmark the Division has is simple: Is the Division getting the information to the appropriate people when required and in a timely manner?

The Division is responsible for facilitating meetings and communications, and providing documents required by the court order. All of the documents produced by the department pursuant to the court order come through CID. The Division logs them, tracks them, and retains them for the department. Once those steps are completed, the documents are then forwarded to the Maricopa County Attorney's Office, which archives them and then uploads them into ShareFile. ShareFile is the mechanism the county uses to provide the documents to the monitor team and others.

With CID acting as the gatekeeper of the court order's mandated reports, the Division handles over half a million documents annually. It was learned that this information is equal to about a terabyte of information each month. That terabyte of information includes PSB videos, traffic-stop videos, and all of the paper document reports. In addition, the division provides documents on a monthly, quarterly, annual, and on a special request basis to those whose responsibility it is to review those documents for compliance to the court order.

Although the Division does not author any documents, it does do quality control checks of the documents received by them. They view each document; however, they do this only to ensure that the document is what it is claimed to be, and that is in fact provided in the folder. The Division does not do "fact checking" or "error checking" of the documents provided to them because most all of the documents provided to them are authored by Ph.D.'s or subject matter experts.

The Division has done a very good job of ensuring that all sworn members of the unit are cross-trained in the duties of the other sworn personnel. In a conversation with the Captain, he explained that he has done that because of the unique and nuanced skill set required for the sworn personnel in the division. He also intimated that they are at the point that if CID were to lose one of the current sworn personnel, it would be catastrophic to the Division because of the time it would take to bring someone else in and train them in the intricacies of the work.

The CID Captain has visited and met with personnel from other law enforcement agencies that have been both successful and unsuccessful in navigating court-ordered consent decrees. After doing so, the department determined that the implementation of a patrol analyst program would be an efficient and effective way to ensure the court-ordered documents are produced in a timely manner and produced correctly by the patrol districts. In order to implement the patrol analyst program, the Division increased staffing by four civilian management analysts. An analyst is assigned to each district and has the responsibility to be a compliance liaison coordinator with the district, ensuring that all reports, documents, videos, etc. are provided to CID in the manner required by not only the court orders, but also the court monitor team's wishes. The department is to be commended for its forward thinking in implementing a program to achieve the most effective and efficient way to produce documents for the monitor team.

*Schedule*

Due to the nature of the work being done by the Division, all employees work a daytime, business hours schedule. Again, because of the unit's uniqueness, the Captain allows flexibility, only requiring that the unit be staffed between 8:00 a.m. and 5:00 p.m., Monday through Friday.

## CID Recommendations:

- CPSM does not believe that replacing sworn members in the CID with civilian personnel would offer any benefits, and most likely would result in the Division being less effective and efficient. (Recommendation No. 131.)

- CPSM recommends the Sergeant position be restored in the Division as soon as possible, while the Lieutenant position be restored when staffing allows. (Recommendation No. 132.)

§ § §

# SECTION 10. ADMINISTRATION DIVISION

The Administration Division consists of seven different bureaus or departments and is led by the Chief of Administration. Each of the seven different bureaus or departments are led by a Deputy Chief, Executive Chief, or Commander. This division essentially runs the administrative side of the organization, which includes Finance, Human Resources, Support Services, Technology, and more.

## HUMAN RESOURCES

### Recruitment

Most law enforcement agencies are currently experiencing difficulties hiring new sworn police officers and deputies. This difficulty is not new to the profession as economic conditions can **have a direct correlation to an agency's ability to hire new law enforcement officers.** For instance, the lower the unemployment rate, the more difficult it typically is to hire police officers. However, the current conditions for hiring are more difficult than the industry has seen in recent memory. According to a 2022 Police Executive Research Forum (PERF) survey, nearly 75 percent of agencies are receiving fewer applicants per vacancy. The possible contributors to the nationwide recruitment problem are not the focus of our review; however, it is important to note the current conditions in the law enforcement industry. **Although MCSO's recruitment challenges** are not unique, we examined the recruitment, retention, and hiring practices of MCSO for areas of strength and areas for improvement.

A civilian-level Deputy Chief leads the Human Resources (HR) team, which consists of a pre-employment unit that is responsible for recruitment and hiring. The team attends some traditional recruitment events such as job fairs but has found them to be largely ineffective in **today's** employment environment. The HR team has focused on remaking the entire recruiting and hiring process. Changes to the process include:

- Streamlining internal hiring processes.
  - Applicants receive background questionnaire immediately.
  - Applicants get through the polygraph before physical fitness test.
  - Elimination of oral board process.
  - Use of electronic application/background management system.
  - Elimination of non-detention civilian polygraphs for positions other than civilian investigator.
- Implemented virtual job fairs.
- Implementation of text communication system for communicating with applicants and potential applicants.
- Use of a marketing firm for advertisements, social media positioning, and advertisement maximization.
- Social media team posting recruitment-related posts.
- Developing a social media position in recruitment.
- Trade school recruitment program.



- Implementation of signing bonuses for many new hire positions.

- Implementation of referral bonuses for current employees who recruit new hires.

- Paid advertisements posted on various employment websites.

The changes have resulted in improvements, as the team reports over the two months preceding the site visit an increase in the number of applicants and a reduction of days applicants spend in the hiring process. During the site visit, there were 53 applicants in process for deputy trainee positions and 12 in process for lateral positions. The processing time has been reduced and is currently 75 to 90 days from application to hiring for a deputy sheriff recruit and 14 to 30 days for non-detention civilian applicants. Both of these metrics are the best they have been since the start of the pandemic.

There are a few strategies our consultants have seen recently in other departments that we recommend MCSO consider implementing. They include:

- Add a full-time sworn deputy to the recruitment team.

- Increase emphasis on out-of-state marketing and attendance at select out-of-state recruitment events.

- Implement a formal, accelerated process for out-of-state recruits.

- Professional production of short recruitment video clips to be shared on multiple social media.

- Increase investments in pipeline programs such as Explorer and Cadet programs for young people.

## Retention

The majority of law enforcement officers have traditionally stayed in the profession and with one agency for an entire career of 20 years of more. In recent years, the profession has seen more and more officers move agencies or leave the profession. The movement of officers between agencies has increased in part due to incentives agencies are offering for lateral officers to transfer to another agency. In addition, technology and public records have made salary and benefit packages readily available for all to see, leading to more competition for salary and benefits among agencies at a time when employees are more transitory than ever before.

Although we have seen more officers changing agencies in other jurisdictions in the last two years, the attrition numbers for MCSO are significantly higher than we have seen in other agencies across the country. It has been our experience that a mid- to large-size agency will typically lose a couple to a few officers to other agencies per year. However, the MCSO has lost an average of 20 deputies per year to attrition. These figures exclude all retirees, trainees, and people who left prior to completion of field training. More than 50 percent of the deputies leaving told an HR official in an exit interview they were leaving for another law enforcement agency. Of the remaining 50 percent, many did not provide a reason for leaving or indicate why they were leaving during the exit interview process. The organizational focus on the staffing challenges has been centered around recruitment rather than retention. The cost of recruitment and training is considerable, so CPSM believes the organization must also focus on retention.

During our site visit we heard from multiple sources throughout the organization that the pay and benefits package was a primary reason people were leaving. Although a salary and benefits survey is not part of the scope of this project, we did explore some of the issues that were raised in an effort to more clearly identify the attrition problem. While some agencies may see attrition

because of outside agency oversight, the **duration of MCSO's oversight since 2013 make the** recent attrition problem more complex. As our consultants spoke to people throughout the office asking questions and learning, we found MCSO salary and benefits structure to be different than many other agencies.

In the law enforcement industry, like many other employment sectors, salaries and benefits need to be competitive in the local market for an agency to succeed. With social media, public records, and intense competition, benefits other than base salary can become more and more important for recruitment and retention. CSPM found that MCSO lags substantially in several areas of compensation and benefits. We recommend a comprehensive study be conducted to determine market rates for deputy salaries and benefits. CPSM believes recruitment and retention would improve through changes to compensation and we recommend Maricopa County examine the following areas and consider a plan to improve in some of the following categories where we perceive the agency to be lagging behind the local law enforcement market:

- Base salary.

  - The base salary of deputies appears to be in the lower tier of similar size agencies in Maricopa County.

- Pre-established merit increases for a predetermined length of tenure.

  - Most agencies we review have predetermined benchmarks for salary increases so employees can advance during the earlier portion of their careers to eventually reach the top of the pay range.

  - Annual increases are dependent upon policy makers and economic conditions. In a conservative, highly politicized environment, deputies have often not seen raises for years while peers in similar agencies receive salary increases based on their experience. There are no established step increases and raises in the MCSO, and when they do occur there are often disparities. One sergeant we spoke to has been a sergeant for 18 years and is not topped out in the sergeant pay range while some sergeants promoted after him receive more in salary.

- Competitive incentive pay structure.

  - A review of surrounding agencies revealed different types of incentive pay plans not available in the MCSO, or in the case of the few that are available, MCSO is substantially under market when compared to other agencies. Some of these plans include: callout pay, longevity pay, assignment pay, shift differential, education incentives, and bilingual pay.

The attrition problem is so significant—with approximately 20 sworn deputies leaving per year— that it creates an unsustainable hiring and training problem. The costs alone to recruit, hire, and train the 20 deputies MCSO loses every year to attrition is so substantial, immediate attention should be focused on solving the problem. The organization spends approximately one year hiring and training a deputy to become solo, qualified deputy. Losing approximately 20 of those deputies per year to other agencies is a critical element of the staffing shortages we saw throughout the MCSO.

While the processes created for oversight to comply with the court order may be a factor in some cases of people leaving, the overwhelming reasons we heard throughout the organization concerned compensation. As we examined some of the issues, we agree that pay and compensation is a large portion of the problem. In discussions with middle managers and **executives in the Sheriff's Office, our consultants inquired about what appear to be significant**

pay disparities. Several reasons were reported in multiple conversations and are potential reasons for the current state of compensation for deputies. Some of the potential reasons include the political environment of being under the court order, the County is unwilling to make changes to the system for deputies unless it makes the changes for all County employees (merit steps), and the conservative political environment regarding employee wages and compensation. Whatever the reasons may be, we believe Maricopa County and MCSO officials, both appointed and elected, must lean into the compensation problem and find ways to be more competitive as a department to make a meaningful dent in the agency-wide staffing challenges.

Another key component to retention is employee wellness. MCSO has started several initiatives to improve employee wellness. The wellness team is somewhat new and its activities started to become more of an emphasis during the COVID pandemic. The organization utilizes a wellness app, Bullet Proof, which is offered by a local nonprofit organization. That program has peer support programs, employee assistance programs, and wellness coaches available. While several MCSO efforts deserve recognition, the organizational emphasis and focus is relatively new and employees have been slow to utilize the services, which is not uncommon for newer programs. Wellness in law enforcement is a difficult culture shift for many agencies. We recommend MCSO continue to emphasize and develop its employee wellness programs and services.

## Human Resources Recommendations:

- There are a few strategies our consultants have seen recently in other departments that we recommend MCSO consider implementing. They include: (Recommendation No. 133.)

  - Add a full-time sworn deputy to the recruitment team.

  - Increase the emphasis on out-of-state marketing and attendance at select out-of-state recruitment events.

  - Implement a formal accelerated process for out-of-state recruits.

  - Professional production of short recruitment video clips to be shared on multiple social media platforms.

  - Increase investment in pipeline programs such as Explorer and Cadet programs for young people.

- CPSM recommends a comprehensive pay study be conducted to determine market rates for deputy salaries and benefits. We recommend Maricopa County examine the following areas and consider a plan to improve those areas where we perceive the agency to be lagging, in some instances substantially lagging, the local law enforcement market: (Recommendation No. 134.)

  - Base salary.

  - Pre-established merit increases for a predetermined length of tenure.

  - A competitive incentive pay structure (increase existing and add new categories), which can include the following: callout pay, longevity pay, assignment pay, shift differential, education incentives, and bilingual pay.

# INFORMATION AND TECHNOLOGY UNIT

The MCSO Information and Technology Unit is overseen by a Civilian Deputy Chief and budgeted for 80 full-time positions. Given current budget conditions, 10 percent of vacant positions are frozen, and it takes months to replace a person who leaves. Staffing is a significant challenge. The unit is responsible for all technology within the Sheriff's Office. Following is just a sample of current projects:

- Designing the next generation of technology to be included in a patrol vehicle.
- Diagnosing and solving gaps in radio coverage in remote areas of the County.
- Developing a technology inventory system.
- Improving data collection tools for various units.
- Evaluating computer-aided dispatch (CAD) systems for purchase.
- Evaluating records management systems (RMS) for purchase.
- Creating various data dashboards.

It was reported that many technology decisions are decentralized and do not involve IT. Some technology products that are difficult for current technology to support have been purchased. IT staff often will have to get caught up after purchase is completed and sometimes struggle to support new technology due to how it was acquired.

Many technology decisions appear to address immediate issues, with little long-term planning or regard for the impact on other existing technologies. Many pieces of technology are operated out of units other than IT. For example, body-worn cameras are managed out of another bureau and jail cameras are operated out of facilities. Many software systems are purchased by units without regard to integration with existing technology, resulting in disparate systems that do not integrate. It was reported that much of the technology operated by the County is based on antiquated systems, with much of the IT staff's time spent working on older technology that the manufacturer no longer supports.

The CAD and RMS systems are good examples of the broader IT challenges. The agency has not invested in a robust records management system (RMS), and the IT staff has adopted an older system not designed for the complex records management needs of MCSO. As a result, the agency has not complied with new federal crime reporting requirements and is currently two years behind in the old reporting requirements. Purchasing new CAD and RMS systems is recommended elsewhere in this study.

Many larger, more complex agencies employ a multi-year technology plan. MCSO does not have an overall technology strategic plan. Developing a comprehensive technology plan would mitigate many of the problems described. We were told that an IT Governance Board was also being discussed. CPSM recommends the MCSO develop an IT Governance Board that includes executive membership. We also recommend the MCSO hire a firm to assist in developing a multi-year IT Strategic Plan. The Governance Board and the Strategic Plan will help mitigate the challenges of decentralized operations.

Data collection and analysis for crime prevention and suppression is decentralized and poorly coordinated throughout the agency. Each district collects and analyzes information, but practices are not consistent. There is no central authority guiding the practices of crime analysis. Analysts work for district commanders and often purchase tools to collect the data specific to particular district or division command requirements, and don't necessarily follow overall MCSO

requirements. There is tremendous value in having the analysts decentralized. However, centralized technical oversight is recommended for overall agency efficiency and effectiveness. CPSM recommends the crime analysis function have a central authority that oversees centralized technology and reporting requirements for efficiency and consistency.

## Information and Technology Recommendations:

- CPSM recommends the MCSO develop an IT Governance Board that includes executive membership. We also recommend the MCSO hire a firm to assist in developing a multi-year IT Strategic Plan. (Recommendation No. 135.)

- CPSM recommends the crime analysis function have a central authority that oversees centralized technology and reporting requirements for efficiency and consistency. (Recommendation No. 136.)

§ § §

## BUREAU OF INTERNAL OVERSIGHT

The BIO consists of two units: the Early Intervention Unit and the Audits and Inspections Unit. The units were created in response to the court-ordered oversight of MCSO. The units essentially analyze all data produced by the agency, searching for compliance and non-compliance with policy and procedures. The analysis includes extensive auditing of body-worn camera video and other video of contacts between the public and MCSO employees. The BIO produces correction notices, refers incidents for investigation, authors extensive reports, and works closely with the monitoring team to help MCSO work toward compliance with the court order.

The unit appears to be well-staffed and functioning well, meeting many of the reporting requirements of the court orders. Due to the various entities involved in the monitoring and oversight process, CPSM did not delve deeply into the BIO's functions or work products. Some of the functions the BIO performs are similar to duties performed by robust inspection units of other major city or county law enforcement agencies, while many other responsibilities are related explicitly to the court orders.

The BIO is staffed with three lieutenants, ten sergeants (two currently vacant), and 36 total positions assigned, mostly civilian positions. As one of the early bodies created to address the court order requirements, the BIO has many systems in place and produces high-quality reports for the monitoring team and the agency. Many of its staff members have been through police auditing courses and they perform in-depth analyses of various data. The sworn supervisory influence is vital in the audits and reviews conducted within the unit. Still, now that the BIO has been running for a few years, there may be an opportunity to civilianize a few positions. Recognizing the BIO function is critical to court order compliance, CPSM recommends the unit be evaluated internally to determine if one or more sergeant positions could be civilianized and sworn positions be reassigned to the Professional Standards backlog.

## BIO Recommendation:

- CPSM recommends the BIO be evaluated internally to determine if one or more sergeant positions could be civilianized and sworn positions be reassigned to the Professional Standards backlog. (Recommendation No. 137.)

§ § §

# COMMUNITY ENGAGEMENT

One of the specific tasks the Court Order outlined for this study was to recommend the most efficient way for the Sheriff to organize staff considering existing staffing levels, expectations of communities served, court-ordered requirements, and the timely elimination of the backlog in Professional Standards. As part of accomplishing this requirement, CPSM worked with the County and MCSO to engage the community to determine the community's priorities for MCSO. CPSM developed a short survey to assess the community's priorities for MCSO. Drafts of the survey were sent to the Court's Monitoring Team and the Court's mandated Community Advisory Board (CAB) for input. CPSM held several remote meetings with representatives of both groups to present the survey and solicit feedback on ways to gather input from MCSO's served communities. A primary goal throughout these meetings was to ensure CPSM engaged the affected communities. Multiple offers were made to set up meetings with CAB members or other constituents identified by the CAB to gather input.

The survey was produced in English and Spanish and distributed electronically and on flyers and postcards. The distribution plan included setting up in-person community meetings where possible and distributing the survey to those unable to attend the meetings. The meetings were designed to elicit the same information as the survey. The survey would also be handed out during community meetings if people preferred not to engage directly and submit their feedback another way. CPSM consultants worked with MCSO to set up community meetings from July 12 through July 14, 2023. The meetings listed below were spread throughout the County to ensure people from throughout the community would have the opportunity to attend. CPSM consultants attended and facilitated the meetings to discuss what the community believed should be priorities for MCSO.

- Eastside (canceled due to A/C failure), 415 N. Gilbert Rd., (7/12).

- Westside, 6025 N. 27th Ave., (7/12).

- Gila Bend, 303 E. Pima St. Gila Bend, (7/13).

- Fountain Hills, 13001 N. La Montana Dr., (7/13).

- Sun City, 16824 N. 99th Ave., (7/14).

- Mexican Consul, 320 E. McDowell Rd., (7/14).

- Guadalupe, 9241 Avenida Del Yaqui, (7/14).

The in-person meetings were facilitated by one of three CPSM consultants. MCSO had someone present at each meeting in civilian attire; no MCSO uniforms were present at any of the meetings. The meetings were facilitated to receive the feedback as structured in the printed and digital survey. The overall attendance at the meetings was approximately 125 total community members. Each meeting had Spanish speakers present, and two meetings (Westside and Gila Bend) were translated in real-time.

Remote meetings were also scheduled with the Sheriff's various community advisory boards. Their input was solicited directly and, through the survey, distributed to all the advisory board members. Final versions of the survey and fliers are included in this report. The digital surveys were identical to the postcards in both English and Spanish. They were accessed through two separate QR codes. The electronic data was collected via third-party software through CPSM.

In addition to scheduling the above meetings, CPSM met with the CAB and offered to meet any person or group from the CAB or individual or group recommended by the CAB during the July

visit or other dates before the July community engagement trip. The CAB provided feedback on a draft of the survey, which was incorporated, but there were no individual or group meetings recommended by the CAB. The final survey was distributed to the CAB for distribution to any groups or individuals they felt should have input, and CAB members were invited to the community meetings listed. The surveys were distributed at subsequent community meetings held by MCSO in August 2023.

During the CPSM-facilitated community meetings, we received direct feedback from approximately 125 people. The survey was posted online on MCSO's website and shared via MCSO's social media accounts. Through postcards and online platforms, we received 435 unique survey responses.

The verbal feedback we received during the meetings was primarily consistent with the survey data collected. Respondents indicated the most critical function of MCSO was response to 9-1-1 calls for service. The notable difference was that community engagement was ranked higher in the community meetings than anything other than 9-1-1 response to calls for service. This may be because those ranking community engagement higher were those who came to the community meetings to express their opinions.

The survey included a request to include the respondent's home and work zip codes so that we could evaluate respondents' geographic diversity and primary jurisdiction. A total of 407 surveys indicated a home zip code and 248 indicated a work zip code. The home zip codes and numbers of responses in each are listed in the following table.

## TABLE 10-1: Home Zip Codes of Survey Respondents

| Home Zip Code | Number of Responses |
|---|---|
| 85008 | 1 |
| 85009 | 6 |
| 85017 | 1 |
| 85019 | 1 |
| 85020 | 1 |
| 85022 | 1 |
| 85023 | 1 |
| 85024 | 1 |
| 85031 | 2 |
| 85032 | 3 |
| 85033 | 2 |
| 85034 | 1 |
| 85035 | 2 |
| 85040 | 4 |
| 85041 | 1 |
| 85042 | 14 |
| 85043 | 1 |
| 85044 | 2 |
| 85050 | 1 |
| 85086 | 2 |
| 85121 | 1 |

| Home Zip Code | Number of Responses |
|---|---|
| 85132 | 1 |
| 85142 | 5 |
| 85201 | 1 |
| 85202 | 2 |
| 85202 | 2 |
| 85207 | 3 |
| 85208 | 1 |
| 85210 | 1 |
| 85212 | 2 |
| 85215 | 1 |
| 85225 | 2 |
| 85234 | 1 |
| 85248 | 2 |
| 85249 | 1 |
| 85244 | 1 |
| 85248 | 1 |
| 85249 | 1 |
| 85244 | 1 |
| 85257 | 1 |
| 85260 | 1 |
| 85268 | 30 (Fountain Hills) |
| 85281 | 6 |
| 85282 | 15 |
| 85283 | 71 (Guadalupe) |
| 85286 | 3 |
| 85296 | 1 |
| 85298 | 1 |
| 85301 | 1 |
| 85302 | 1 |
| 85308 | 1 |
| 85320 | 53 (Aguila) |
| 85322 | 1 |
| 85323 | 1 |
| 85331 | 1 |
| 85335 | 2 |
| 85337 | 34 (Gila Bend) |
| 85338 | 3 |

| Home Zip Code | Number of Responses |
|---|---|
| 85339 | 1 |
| 85351 | 61 (Sun City) |
| 85355 | 1 |
| 85363 | 4 |
| 85373 | 17 |
| 85379 | 1 |
| 85382 | 4 |
| 85383 | 2 |
| 85387 | 2 |
| 85390 | 1 |
| 85396 | 2 |
| 86033 | 1 |
| 86283 | 1 |
| 87353 | 1 |
| 95268 | 1 |
| Total | 407 |

§ § §

TABLE 10-2: Ranking of MCSO Priorities by Survey and Meeting Respondents

| Percent Who Ranked Most Important | | Percent Who Ranked Least Important | |
|---|---|---|---|
| Priority | % | Priority | % |
| 911 Response | 35.1 | Community Relations | 29.4 |
| Uniformed Patrol | 17.9 | Investigations of Complaints Against Deputies | 23.9 |
| Follow-Up | 12.9 | Specialized Units | 14.6 |
| Community Relations | 12.1 | Uniformed Patrol | 12.8 |
| Specialized Units | 11.3 | Follow-Up | 10.5 |
| Investigations of Complaints Against Deputies | 10.7 | 911 Response | 8.7 |

CPSM's interpretation of the input received from the community would <u>rank the community's priorities</u> for the MCSO in the following order:

- 1. District uniformed patrol staffing
  (Response to 9-1-1 Calls for service (35.1%) and Uniformed patrol (17.9%).

- 2. Investigations: Detectives following up on crime reports
  (Follow-up Investigations 12.9%)

- 3. Community Engagement
  (Community Relations 12.2%).

- 4. Professional Standards Bureau
  (Timely Investigations of complaints on deputies 10.7%).

- 5. Specialized Units: Proactive crime (narcotics, prostitution, etc.) and
  support units (Aviation, SWAT, K-9)
  (Specialized Units 11.3%).

Community input on an agency's priorities is essential to modern community policing. It is vital for any agency to seek input and have that input inform decisions on staffing allocations. While public input informs the chief executive decision-making, so do other legal, moral, and professional factors that must be considered. Public input should be applied to the complex mix of inputs that help determine where staffing should be allocated. CPSM's recommendations on staffing levels consider the various factors currently affecting MCSO, including public feedback learned during this process.

## Flyers and Postcards

Following are the flyers and postcards distributed by CPSM to encourage public engagement. Each is shown in an English version and a Spanish version.

§ § §

# Maricopa **Sheriff's** Office Community Survey



### The Maricopa County **Sheriff's** Office needs your help!

MCSO has partnered with the Center for Public Safety Management (CPSM) to gain a better understanding of the services that are most important to the community.

Please take a moment to share your thoughts by scanning the QR code below.



**CPSM®**

*Thank you!*

CENTER FOR PUBLIC SAFETY MANAGEMENT, LLC

# Encuesta del
# Alguacilazgo Municipal de Maricopa



## ¡El Alguacilazgo Municipal de Maricopa necesita su ayuda!!

El Alguacilazgo Municipal de Maricopa (MCSO) se ha aliado con el Centro de Administración de Seguridad Pública (*Center for Public Safety Management / CPSM*) para entender mejor qué servicios resultan más importantes para la comunidad.

Por favor, saque un momento para darnos a saber lo que piensa: haga *scan* en el emblema de código QR a continuación..



# CPSM®
## CENTER FOR PUBLIC SAFETY MANAGEMENT, LLC

### ¡Gracias!



# CPSM®

CENTER FOR PUBLIC SAFETY MANAGEMENT, LLC

Mailing Address

> Please take a moment to share your thoughts about the Maricopa County Sheriff's Office. This survey is part of a service review being conducted by the Center for Public Safety Management.

Please share your thoughts about the Maricopa County Sheriff's Office (MCSO and put this card in the mail. How important is it to you that (please circle your response):

| | | | | |
|---|---|---|---|---|
| MCSO deputies respond to calls for service? | Not Important | Somewhat Important | Important | Very Important |
| MCSO deputies conduct uniformed patrol of your neighborhood? | Not Important | Somewhat Important | Important | Very Important |
| MCSO deputies investigate crimes that have occurred? | Not Important | Somewhat Important | Important | Very Important |
| MCSO investigate complaints against deputies in a timely manner? | Not Important | Somewhat Important | Important | Very Important |
| MCSO investigate drug crimes targeting those who sell drugs? | Not Important | Somewhat Important | Important | Very Important |
| MCSO engage in community outreach through events such as hosting meetings, showing up at community events, and partnering with non-law enforcement agencies? | Not Important | Somewhat Important | Important | Very Important |
| MCSO have deputies that support others in emergencies, such as a K9, SWAT, and helicopter pilots? | Not Important | Somewhat Important | Important | Very Important |
| MCSO deputies available to handle civil processes such as evictions, serving protective orders, and warrants? | Not Important | Somewhat Important | Important | Very Important |

Please rank the following functions of MCSO in order of importance from **1** being most important to **6** being least important:

_____ Uniformed Patrol          _____ Specialized Units          _____ Investigations of possible misconduct
_____ Follow Up Investigations          _____ 911 Response          _____ Community Relations

What zip code do you **live** in? _____          What zip code do you **work** in? _____



Dirección

Por favor, tome un momento para darnos a saber lo que piensa del Alguacilazgo Municipal de Maricopa (*Maricopa County Sheriff's Office*). Esta encuesta es parte de una revisión del servicio que está llevando a cabo el Centro de Administración de Seguridad Pública (*Public Safety Management*).

Por favor, denos a saber lo que piensa del Alguacilazgo Municipal de Maricopa (*Maricopa County Sheriff's Office / MCSO*) y envíenos de vuelta esta postal.

Cuán importante le parece a usted que:  (por favor, dibuje un círculo alrededor de su respuesta)

| | | | | |
|---|---|---|---|---|
| ¿Los alguaciles de MCSO acudan a sus llamadas para servicio? | No es importante | Algo importante | Importante | Muy Importante |
| ¿Los alguaciles uniformados de MCSO patrullen por su vecindario? | No es importante | Algo importante | Importante | Muy Importante |
| ¿Los alguaciles de MCSO investiguen delitos sucedidos? | No es importante | Algo importante | Importante | Muy Importante |
| ¿Los alguaciles de MCSO invesHguen puntualmente quejas contra otros alguaciles? | No es importante | Algo importante | Importante | Muy Importante |
| ¿Los alguaciles de MCSO invesHguen los delitos de narcóHcos tomando como objeHvo los que venden drogas? | No es importante | Algo importante | Importante | Muy Importante |
| ¿Los alguaciles de MCSO alcancen a la comunidad mediante eventos como auspiciar juntas, presentarse en otros eventos de la comunidad y aliarse con agencias que no sean de paz y orden público? | No es importante | Algo importante | Importante | Muy Importante |
| ¿Los alguaciles de MCSO que apoyen a otros en emergencias, tales como guardias caninos (K9), fuerza de choque (SWAT) y pilotos de helicópteros? | No es importante | Algo importante | Importante | Muy Importante |
| ¿Los alguaciles de MCSO estén disponibles para encargarse de procesos civiles, tales como desalojos, entregar órdenes de protección y tramitar órdenes de aprehensión? | No es importante | Algo importante | Importante | Muy Importante |

Por favor, díganos el orden de importancia para usted de estas funciones del Alguacilazgo (MCSO), desde la  **1**, la más importante, hasta la **6**, la menos importante:

_____ Patrullas uniformadas  _____ Unidades especializadas  _____ InvesHgaciones de posible conducta indebida de parte de aguacil(es)

_____ Seguimiento de invesHgaciones  _____ Respuesta de 911  _____ Relaciones con la comunidad

¿En qué código postal **vive** usted? _____  ¿En qué código postal **trabaja** usted? _____