# THIRTY-EIGHTH REPORT

Independent Monitor

for the

Maricopa County Sheriff's Office



Reporting Period: Third Quarter 2023

Chief (Ret.) Robert S. Warshaw

Independent Monitor

March 12, 2024

WAI 72568

# Table of Contents

Section 1:  Introduction……………………………………………....…………...3

Section 2:  Methodology and Compliance Summary…………………………............4

Section 3:  Implementation Unit Creation and Documentation Request…………….16

Section 4:  Policies and Procedures……………………..………………………...19

Section 5:  Pre-Planned Operations…………………………..….….…………...38

Section 6:  Training……………………………………………………............43

Section 7:  Traffic Stop Documentation and Data Collection…………….……….54

Section 8:  Early Identification System (EIS)…………….……………….............95

Section 9:  Supervision and Evaluation of Officer Performance……….……...............122

Section 10:  Misconduct and Complaints…………………………………..............146

Section 11:  Community Engagement……………………………………............150

Section 12:  Misconduct Investigations, Discipline, and Grievances………...............157

Section 13:  Community Outreach and Community Advisory Board……………….237

Section 14:  Supervision and Staffing……………………………………..............238

Section 15:  Document Preservation and Production………………………………242

Section 16:  Additional Training……………………………………............247

Section 17:  Complaints and Misconduct Investigations Relating to

Members of the Plaintiff Class……………………………….............248

Section 18: Concluding Remarks……………………………………............280

Appendix:  Acronyms…………………………………………………............281

WAI 72569

## Section 1:  Introduction

This is the thirty-eighth report issued in my capacity as the Court-appointed Monitor in the case of *Manuel de Jesus Ortega Melendres, et al., v. Paul Penzone, et al.* (No. CV-07-02513-PHX-GMS), and documents activities that occurred during the third quarter of 2023, July 1-September 30, 2023.

On May 24, 2013, the Court issued its Findings of Fact and Conclusions of Law after conducting a bench trial in this matter.  On October 2, 2013, the Court issued a Supplemental Permanent Injunction/Judgment Order (First Order) in this case, outlining the requirements which the Maricopa County Sheriff's Office (MCSO) must comply with as a result of the Court's findings.  On May 13, 2016, the Court issued its Findings of Fact in the civil contempt proceedings that commenced in April 2015.  This led to the issuance of a Second Supplemental Permanent Injunction/Judgment Order (Second Order) on July 20, 2016, significantly expanding the duties of the Monitor.  On November 8, 2022, the Court issued its Third Supplemental Permanent Injunction/Judgment Order (Third Order), adding requirements related to MCSO's Professional Standards Bureau (PSB) function, including addressing the backlog of internal investigations.

The Second Order delineates in great detail requirements in the areas of misconduct investigations, training, discipline and discipline review, transparency and reporting, community outreach, document preservation, and misconduct investigations involving members of the Plaintiffs' class.  The Court granted the Monitor the authority to supervise and direct all of the investigations that fall into the latter category.  The Third Order imposes additional requirements on MCSO as they pertain to PSB.

Our reports cover the requirements of all three Orders and document MCSO's compliance efforts with these requirements.  We provide summaries of compliance with the three Orders separately, as well as a summary of MCSO's overall, or combined, compliance.

The compliance Paragraphs of the Second Order commence where the First Order ends, and they are numbered from Paragraph 160 through and including Paragraph 337.  Not all are subject to our review.  The compliance Paragraphs of the Third Order commence where the Second Order ends, and they are numbered from Paragraph 338 through and including Paragraph 368.  Again, not all are subject to our review.

As of the last reporting period, MCSO asserted and was granted Full and Effective Compliance with 155 Paragraphs of the First and Second Orders, as that term is defined in the First Order.  On September 25, 2023, MCSO asserted Full and Effective Compliance with three additional Paragraphs: Paragraphs 22, 74, and 209.  On October 25, 2023, I agreed with all of MCSO's assertions, granting MCSO in Full and Effective Compliance with 158 total Paragraphs.  (See Section 2 of this report.)  MCSO retains the obligation to document that the Office remains in Full and Effective Compliance with the Paragraphs so designated.

WAI 72570

# Section 2: Methodology and Compliance Summary

The Monitor's primary responsibility is to determine the status of compliance of the Maricopa County Sheriff's Office (MCSO) with the requirements in the Orders. To accomplish this, the Monitoring Team makes quarterly visits to Maricopa County to meet with MCSO's Court Implementation Division (CID) and other Office personnel – at Headquarters, in Patrol District offices, or at the office that we occupy when onsite. We also observe Office practices; review Office policies and procedures; collect and analyze data using appropriate sampling and analytic procedures; and inform the Parties and, on a quarterly basis, the Court, about the status of MCSO's compliance.

This report documents compliance with applicable Order requirements, or Paragraphs, in two phases. For Phase 1, we assess compliance according to whether MCSO has developed and approved requisite policies and procedures, and MCSO personnel have received documented training on their contents. For Phase 2 compliance, generally considered operational implementation, MCSO must demonstrate that it is complying with applicable Order requirements more than 94% of the time, or in more than 94% of the instances under review.

We use four levels of compliance: In compliance; Not in compliance; Deferred; and Not applicable. "In compliance" and "Not in compliance" are self-explanatory. We use "Deferred" in circumstances in which we are unable to fully determine the compliance status – due to a lack of data or information, incomplete data, or other reasons that we explain in the narrative of our report. We will also use "Deferred" in situations in which MCSO, in practice, is fulfilling the requirements of a Paragraph, but has not yet memorialized the requirements in a formal policy.

For Phase 1 compliance, we use "Not applicable" for Paragraphs where a policy is not required; for Phase 2 compliance, we use "Not applicable" for Paragraphs that do not necessitate a compliance assessment.

The tables below summarize the compliance status of Paragraphs tracked in this report.[1] During this reporting period, MCSO's Phase 1 compliance rate with the **First and Second Orders** remained the same as the last reporting period, both at 100%. MCSO's Phase 1 compliance rate with the **Third Order** remained the same as the last reporting period, at 25%.

---

[1] The percent in compliance for Phase 1 is calculated by dividing the number of Order Paragraphs determined to be in compliance by the total number of Paragraphs requiring a corresponding policy or procedure. Paragraphs with the status of Deferred are included in the denominator, while Paragraphs with the status of Not Applicable are not included. Therefore, the number of Paragraphs included in the denominator totals 188 for Phase 1; the number of Paragraphs included in the denominator totals 225 for Phase 2.

WAI 72571

During this reporting period, MCSO's Phase 2 compliance rate with the **First Order** increased by five percentage points from the last reporting period, to 93%. This number includes Paragraphs that we consider to be in compliance and those that are now in Full and Effective Compliance (FEC), as described above. (See below for the list of Paragraphs that are in Full and Effective Compliance.) During this reporting period, MCSO's Phase 2 compliance rate with the **Second Order** remained the same as the last reporting period, at 93%. This number also includes Paragraphs that we consider to be in compliance and those that are now in Full and Effective Compliance (FEC), as described above. During this reporting period, MCSO's Phase 2 compliance rate with the **Third Order** remained the same as the last reporting period, at 53%.

| Thirty-Eighth Quarterly Status Report **First Order Summary** | | |
|---|---|---|
| **Compliance Status** | **Phase 1** | **Phase 2** |
| Not Applicable | 20 | 6 |
| Deferred | 0 | 0 |
| Not in Compliance | 0 | 7 |
| In Compliance | 80 | **87**[2] |
| **Percent in Compliance** | **100%** | **93%** |

| Thirty-Eighth Quarterly Status Report **Second Order Summary** | | |
|---|---|---|
| **Compliance Status** | **Phase 1** | **Phase 2** |
| Not Applicable | 19 | 9 |
| Deferred | 0 | 3 |
| Not in Compliance | 0 | 5 |
| In Compliance | 104 | 106[3] |
| **Percent in Compliance** | **100%** | **93%** |

---

[2] This number includes those Paragraphs that are deemed in Full and Effective Compliance.

[3] This number includes those Paragraphs that are deemed in Full and Effective Compliance.

WAI 72572

| Thirty-Eighth Quarterly Status Report | | |
|---|---|---|
| **Third Order Summary** | | |
| **Compliance Status** | **Phase 1** | **Phase 2** |
| Not Applicable | 21 | 8 |
| Deferred | 3 | 8 |
| Not in Compliance | 0 | 0 |
| In Compliance | 1 | 9 |
| **Percent in Compliance** | **25%** | **53%** |

WAI 72573

| MCSO's Compliance with the Requirements of the **First Order** *(October 2, 2013)* | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Report 1 | Report 2 | Report 3 | Report 4 | Report 5 | Report 6 | Report 7 | Report 8 | Report 9 | Report 10 |
| **Phase 1** | 4% | 10% | 44% | 40% | 51% | 57% | 61% | 60% | 67% | 60% |
| **Phase 2** | 0% | 0% | 26% | 25% | 28% | 37% | 38% | 39% | 44% | 49% |

| | Report 11 | Report 12 | Report 13 | Report 14 | Report 15 | Report 16 | Report 17 | Report 18 | Report 19 | Report 20 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Phase 1** | 63% | 79% | 88% | 85% | 85% | 85% | 85% | 97% | 97% | 97% |
| **Phase 2** | 50% | 57% | 67% | 62% | 65% | 64% | 66% | 77% | 75% | 78% |

| | Report 21 | Report 22 | Report 23 | Report 24 | Report 25 | Report 26 | Report 27 | Report 28 | Report 29 | Report 30 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Phase 1** | 96% | 96% | 96% | 96% | 96% | 98% | 98% | 98% | 98% | 99% |
| **Phase 2** | 76% | 77% | 79% | 82% | 81% | 78% | 79% | 77% | 77% | 79% |

| | Report 31 | Report 32 | Report 33 | Report 34 | Report 35 | Report 36 | Report 37 | Report 38 |
|---|---|---|---|---|---|---|---|---|
| **Phase 1** | 99% | 99% | 99% | 99% | 99% | 100% | 100% | 100% |
| **Phase 2** | 81% | 80% | 78% | 79% | 80% | 82% | 88% | 93% |

WAI 72574

| MCSO's Compliance with the Requirements of the **Second Order** *(July 20, 2016)* | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Report 1 | Report 2 | Report 3 | Report 4 | Report 5 | Report 6 | Report 7 | Report 8 | Report 9 | Report 10 |
| **Phase 1** | N/A | | | | | | | | | 1% |
| **Phase 2** | N/A | | | | | | | | | 43% |

| | Report 11 | Report 12 | Report 13 | Report 14 | Report 15 | Report 16 | Report 17 | Report 18 | Report 19 | Report 20 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Phase 1** | 10% | 12% | 72% | 75% | 77% | 77% | 78% | 78% | 99% | 99% |
| **Phase 2** | 46% | 60% | 63% | 66% | 72% | 75% | 80% | 81% | 90% | 89% |

| | Report 21 | Report 22 | Report 23 | Report 24 | Report 25 | Report 26 | Report 27 | Report 28 | Report 29 | Report 30 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Phase 1** | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **Phase 2** | 91% | 90% | 92% | 93% | 90% | 91% | 92% | 90% | 89% | 91% |

| | Report 31 | Report 32 | Report 33 | Report 34 | Report 35 | Report 36 | Report 37 | Report 38 |
|---|---|---|---|---|---|---|---|---|
| **Phase 1** | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **Phase 2** | 92% | 93% | 93% | 93% | 93% | 93% | 93% | 93% |

WAI 72575

| MCSO's Compliance with the Requirements of the **Third Order** *(November 9, 2022)* | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Report 1 | Report 2 | Report 3 | Report 4 | Report 5 | Report 6 | Report 7 | Report 8 | Report 9 | Report 10 |
| **Phase 1** | N/A | | | | | | | | | |
| **Phase 2** | N/A | | | | | | | | | |

| | Report 11 | Report 12 | Report 13 | Report 14 | Report 15 | Report 16 | Report 17 | Report 18 | Report 19 | Report 20 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Phase 1** | N/A | | | | | | | | | |
| **Phase 2** | N/A | | | | | | | | | |

| | Report 21 | Report 22 | Report 23 | Report 24 | Report 25 | Report 26 | Report 27 | Report 28 | Report 29 | Report 30 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Phase 1** | N/A | | | | | | | | | |
| **Phase 2** | N/A | | | | | | | | | |

| | Report 31 | Report 32 | Report 33 | Report 34 | Report 37 | Report 36 | Report 37 | Report 38 |
|---|---|---|---|---|---|---|---|---|
| **Phase 1** | N/A | | | | 25% | 20% | 25% | 25% |
| **Phase 2** | N/A | | | | 53% | 50% | 53% | 53% |

WAI 72576

Below is the list of Paragraphs for which MCSO asserted Full and Effective Compliance, and the Monitor's response to MCSO's assertion.

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|---|---|---|
| 9 | 12/28/18 | Concurred on 1/28/19 |
| 10 | 12/28/18 | Concurred on 1/28/19 |
| 11 | 12/28/18 | Concurred on 1/28/19 |
| 12 | 12/28/18 | Concurred on 1/28/19 |
| 13 | 12/28/18 | Concurred on 1/28/19 |
| 19 | 3/31/23 | Concurred on 4/27/23 |
| 21 | 6/22/20 | Concurred on 7/17/20 |
| 22 | 9/25/23 | Concurred on 10/25/23 |
| 23 | 12/28/18 | Concurred on 1/28/19 |
| 24 | 6/18/21 | Concurred on 7/19/21 |
| 26 | 12/28/18 | Concurred on 1/28/19 |
| 27 | 3/22/19 | Concurred on 4/22/19 |
| 28 | 12/28/18 | Concurred on 1/28/19 |
| 29 | 12/28/18 | Concurred on 1/28/19 |
| 30 | 12/28/18 | Concurred on 1/28/19 |
| 31 | 9/9/19 | Concurred on 10/2/19 |
| 34 | 6/3/19 | Concurred on 6/25/19 |
| 35 | 12/28/18 | Concurred on 1/28/19 |
| 36 | 12/28/18 | Concurred on 1/28/19 |
| 37 | 12/28/18 | Concurred on 1/28/19 |
| 38 | 12/28/18 | Concurred on 1/28/19 |
| 39 | 3/16/21 | Concurred on 4/16/21 |
| 40 | 12/28/18 | Concurred on 1/28/19 |
| 43 | 6/17/22 | Concurred on 7/15/22 |
| 44 | 9/30/22 | Concurred on 10/31/22 |

WAI 72577

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|---|---|---|
| 45 | 12/9/19 | Concurred on 1/6/20 |
| 46 | 12/9/19 | Concurred on 1/6/20 |
| 47 | 6/17/22 | Concurred on 7/15/22 |
| 48 | 4/1/22 | Concurred on 4/29/22 |
| 49 | 4/1/22 | Concurred on 4/29/22 |
| 50 | 4/1/22 | Concurred on 4/29/22 |
| 51 | 4/1/22 | Concurred on 4/29/22 |
| 52 | 6/18/21 | Concurred on 7/19/21 |
| 53 | 6/18/21 | Concurred on 7/19/21 |
| 55 | 12/28/18 | Concurred on 1/28/19 |
| 57 | 12/16/20 | Concurred on 1/15/21 |
| 58 | 6/22/20 | Concurred on 7/17/20 |
| 59 | 12/28/18 | Concurred on 1/28/19 |
| 60 | 12/28/18 | Concurred on 1/28/19 |
| 61 | 12/9/19 | Concurred on 1/6/20 |
| 62 | 1/6/23 | Concurred on 2/6/23 |
| 63 | 6/22/20 | Concurred on 7/17/20 |
| 66 | 3/31/23 | Concurred on 4/27/23 |
| 68 | 12/28/18 | Concurred on 1/28/19 |
| 71 | 12/28/18 | Concurred on 1/28/19 |
| 73 | 10/5/20 | Concurred on 11/4/20 |
| 74 | 9/25/23 | Concurred on 10/25/23 |
| 76 | 12/16/20 | Concurred on 1/15/21 |
| 77 | 12/28/18 | Concurred on 1/28/19 |
| 78 | 3/16/21 | Concurred on 4/16/21 |
| 80 | 9/30/22 | Concurred on 10/31/22 |
| 83 | 9/30/22 | Concurred on 10/31/22 |
| 84 | 9/9/19 | Concurred on 10/2/19 |

WAI 72578

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|---|---|---|
| 85 | 10/5/20 | Concurred on 11/4/20 |
| 86 | 10/5/20 | Concurred on 11/4/20 |
| 88 | 12/28/18 | Concurred on 1/28/19 |
| 89 | 12/9/19 | Concurred on 1/6/20 |
| 91 | 6/23/23 | Concurred on 7/21/23 |
| 93 | 3/17/20 | Concurred on 4/9/20 |
| 101 | 12/28/18 | Concurred on 1/28/19 |
| 102 | 12/16/20 | Concurred on 1/15/21 |
| 104 | 3/17/27 | Concurred on 4/9/20 |
| 105 | 10/5/20 | Concurred on 11/4/20 |
| 106 | 6/3/19 | Concurred on 6/25/19 |
| 113 | 6/17/22 | Concurred on 7/15/22 |
| 114 | 6/17/22 | Concurred on 7/15/22 |
| 167 | 12/23/21 | Concurred on 1/24/22 |
| 168 | 12/23/21 | Concurred on 1/24/22 |
| 169 | 12/23/21 | Concurred on 1/24/22 |
| 170 | 12/23/21 | Concurred on 1/24/22 |
| 171 | 12/23/21 | Concurred on 1/24/22 |
| 172 | 12/23/21 | Concurred on 1/24/22 |
| 174 | 6/17/22 | Concurred on 7/15/22 |
| 177 | 6/18/21 | Concurred on 7/19/21 |
| 178 | 6/17/22 | Concurred on 7/15/22 |
| 179 | 6/17/22 | Concurred on 7/15/22 |
| 180 | 6/17/22 | Concurred on 7/15/22 |
| 182 | 9/24/21 | Concurred on 10/25/21 |
| 184 | 6/18/21 | Concurred on 7/19/21 |
| 185 | 6/18/21 | Concurred on 7/19/21 |
| 186 | 6/18/21 | Concurred on 7/19/21 |

WAI 72579

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|---|---|---|
| 187 | 6/18/21 | Concurred on 7/19/21 |
| 188 | 6/18/21 | Concurred on 7/19/21 |
| 189 | 12/23/21 | Concurred on 1/24/22 |
| 190 | 9/30/22 | Concurred on 10/31/22 |
| 191 | 12/23/21 | Concurred on 1/24/22 |
| 192 | 9/30/22 | Concurred on 10/31/22 |
| 193 | 12/23/21 | Concurred on 1/24/22 |
| 196 | 12/23/21 | Concurred on 1/24/22 |
| 197 | 1/6/23 | Concurred on 2/6/23 |
| 198 | 9/30/22 | Concurred on 10/31/22 |
| 199 | 12/23/21 | Concurred on 1/24/22 |
| 200 | 9/30/22 | Concurred on 10/31/22 |
| 201 | 12/23/21 | Concurred on 1/24/22 |
| 202 | 9/30/22 | Concurred on 10/31/22 |
| 203 | 9/30/22 | Concurred on 10/31/22 |
| 205 | 6/23/23 | Concurred on 7/21/23 |
| 206 | 9/30/22 | Concurred on 10/31/22 |
| 208 | 1/6/23 | Concurred on 2/6/23 |
| 209 | 9/25/23 | Concurred on 10/25/23 |
| 210 | 9/24/21 | Concurred on 10/25/21 |
| 212 | 6/23/23 | Concurred on 7/21/23 |
| 214 | 9/24/21 | Concurred on 10/25/21 |
| 215 | 9/24/21 | Concurred on 10/25/21 |
| 217 | 9/24/21 | Concurred on 10/25/21 |
| 218 | 9/24/21 | Concurred on 10/25/21 |
| 221 | 9/24/21 | Concurred on 10/25/21 |
| 222 | 9/30/22 | Concurred on 10/31/22 |
| 223 | 9/24/21 | Concurred on 10/25/21 |

WAI 72580

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|---|---|---|
| 224 | 9/24/21 | Concurred on 10/25/21 |
| 225 | 9/24/21 | Concurred on 10/25/21 |
| 226 | 1/6/23 | Concurred on 2/6/23 |
| 227 | 3/16/21 | Concurred on 4/16/21 |
| 228 | 3/16/21 | Concurred on 4/16/21 |
| 229 | 3/16/21 | Concurred on 4/16/21 |
| 230 | 3/16/21 | Concurred on 4/16/21 |
| 231 | 3/16/21 | Concurred on 4/16/21 |
| 232 | 3/16/21 | Concurred on 4/16/21 |
| 233 | 3/16/21 | Concurred on 4/16/21 |
| 234 | 3/16/21 | Concurred on 4/16/21 |
| 235 | 3/16/21 | Concurred on 4/16/21 |
| 236 | 3/16/21 | Concurred on 4/16/21 |
| 238 | 3/16/21 | Concurred on 4/16/21 |
| 239 | 3/16/21 | Concurred on 4/16/21 |
| 240 | 3/31/23 | Concurred on 4/27/23 |
| 241 | 1/6/23 | Concurred on 2/6/23 |
| 242 | 3/31/23 | Concurred on 4/27/23 |
| 243 | 9/30/22 | Concurred on 10/31/22 |
| 244 | 12/16/20 | Concurred on 1/15/21 |
| 245 | 12/16/20 | Concurred on 1/15/21 |
| 246 | 1/6/23 | Concurred on 2/6/23 |
| 247 | 12/16/20 | Concurred on 1/15/21 |
| 248 | 12/16/20 | Concurred on 1/15/21 |
| 249 | 12/16/20 | Concurred on 1/15/21 |
| 250 | 4/1/22 | Concurred on 4/29/22 |
| 251 | 4/1/22 | Concurred on 4/29/22 |
| 252 | 4/1/22 | Concurred on 4/29/22 |

WAI 72581

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|---|---|---|
| 253 | 4/1/22 | Concurred on 4/29/22 |
| 254 | 4/1/22 | Concurred on 4/29/22 |
| 255 | 4/1/22 | Concurred on 4/29/22 |
| 256 | 4/1/22 | Concurred on 4/29/22 |
| 257 | 4/1/22 | Concurred on 4/29/22 |
| 258 | 4/1/22 | Concurred on 4/29/22 |
| 259 | 4/1/22 | Concurred on 4/29/22 |
| 264 | 12/16/20 | Concurred on 1/15/21 |
| 266 | 12/16/20 | Concurred on 1/15/21 |
| 268 | 1/6/23 | Concurred on 2/6/23 |
| 272 | 9/30/22 | Concurred on 10/31/22 |
| 273 | 12/16/20 | Concurred on 1/15/21 |
| 276 | 12/16/20 | Concurred on 1/15/21 |
| 278 | 12/16/20 | Concurred on 1/15/21 |
| 279 | 12/16/20 | Concurred on 1/15/21 |
| 282 | 1/6/23 | Concurred on 2/6/23 |
| 284 | 1/6/23 | Concurred on 2/6/23 |
| 286 | 1/6/23 | Concurred on 2/6/23 |
| 287 | 12/16/20 | Concurred on 1/15/21 |
| 292 | 12/16/20 | Concurred on 1/15/21 |
| 337 | 12/16/20 | Concurred on 1/15/21 |

WAI 72582

# First Supplemental Permanent Injunction/Judgment Order

## Section 3: Implementation Unit Creation and Documentation Requests

**COURT ORDER III.  MCSO IMPLEMENTATION UNIT AND INTERNAL AGENCY-WIDE ASSESSMENT** *[Court Order wording in italics]*

*Paragraph 9.  Defendants shall hire and retain, or reassign current MCSO employees to form an interdisciplinary unit with the skills and abilities necessary to facilitate implementation of this Order.  This unit shall be called the MCSO Implementation Unit and serve as a liaison between the Parties and the Monitor and shall assist with the Defendants' implementation of and compliance with this Order.  At a minimum, this unit shall: coordinate the Defendants' compliance and implementation activities; facilitate the provision of data, documents, materials, and access to the Defendants' personnel to the Monitor and Plaintiffs representatives; ensure that all data, documents and records are maintained as provided in this Order; and assist in assigning implementation and compliance-related tasks to MCSO Personnel, as directed by the Sheriff or his designee.  The unit will include a single person to serve as a point of contact in communications with Plaintiffs, the Monitor and the Court.*

**In Full and Effective Compliance**

To verify Phase 2 compliance with this Paragraph, we reviewed the monthly personnel rosters for the Court Implementation Division (CID).  CID is currently staffed with one captain, one lieutenant, three sergeants, two deputies, one management assistant, two administrative assistants, and one management analyst.  CID continues to be supported by Maricopa County Attorney's Office (MCAO) attorneys, as well as outside counsel, who frequently participate in our meetings and telephone calls with Division personnel.

During this reporting period, CID continued to provide documents through MCSO's counsel via an Internet-based application.  We, the Plaintiffs, and the Plaintiff-Intervenor receive all files and documents simultaneously, with only a few exceptions centering on open internal investigations.  CID effectively facilitates our and the Parties' access to MCSO's personnel.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

*Paragraph 10.  MCSO shall collect and maintain all data and records necessary to: (1) implement this order, and document implementation of and compliance with this Order, including data and records necessary for the Monitor to conduct reliable outcome assessments, compliance reviews, and audits; and (2) perform ongoing quality assurance in each of the areas addressed by this Order.  At a minimum, the foregoing data collection practices shall comport with current professional standards, with input on those standards from the Monitor.*

**In Full and Effective Compliance**

WAI 72583

CID continues to be responsive to our requests. CID also addresses with immediacy any issues we encounter in the samples we request – be they technical issues, missing documents, or other problems. MCSO's Bureau of Internal Oversight (BIO) routinely audits the work products of the Office, particularly in the areas that directly affect compliance with the requirements of the Orders. In many instances, BIO will review the same material we request in our samples, and BIO frequently notes – and addresses – the same deficiencies we identify in our reviews.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 11.** *Beginning with the Monitor's first quarterly report, the Defendants, working with the unit assigned for implementation of the Order, shall file with the Court, with a copy to the Monitor and Plaintiffs, a status report no later than 30 days before the Monitor's quarterly report is due. The Defendants' report shall (i) delineate the steps taken by the Defendants during the reporting period to implement this Order; (ii) delineate the Defendants' plans to correct any problems; and (iii) include responses to any concerns raised in the Monitor's previous quarterly report.*

**In Full and Effective Compliance**

See Paragraph 13.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 12.** *The Defendants, working with the unit assigned for implementation of the Order, shall conduct a comprehensive internal assessment of their Policies and Procedures affecting Patrol Operations regarding Discriminatory Policing and unlawful detentions in the field as well as overall compliance with the Court's orders and this Order on an annual basis. The comprehensive Patrol Operations assessment shall include, but not be limited to, an analysis of collected traffic-stop and high-profile or immigration-related operations data; written Policies and Procedures; Training, as set forth in the Order; compliance with Policies and Procedures; Supervisor review; intake and investigation of civilian Complaints; conduct of internal investigations; Discipline of officers; and community relations. The first assessment shall be conducted within 180 days of the Effective Date. Results of each assessment shall be provided to the Court, the Monitor, and Plaintiffs' representatives.*

**In Full and Effective Compliance**

See Paragraph 13.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 72584

*Paragraph 13.  The internal assessments prepared by the Defendants will state for the Monitor and Plaintiffs' representatives the date upon which the Defendants believe they are first in compliance with any subpart of this Order and the date on which the Defendants first assert they are in Full and Effective Compliance with the Order and the reasons for that assertion.  When the Defendants first assert compliance with any subpart or Full and Effective Compliance with the Order, the Monitor shall within 30 days determine whether the Defendants are in compliance with the designated subpart(s) or in Full and Effective Compliance with the Order.  If either party contests the Monitor's determination it may file an objection with the Court, from which the Court will make the determination.  Thereafter, in each assessment, the Defendants will indicate with which subpart(s) of this Order it remains or has come into full compliance and the reasons therefore.  The Monitor shall within 30 days thereafter make a determination as to whether the Defendants remain in Full and Effective Compliance with the Order and the reasons therefore. The Court may, at its option, order hearings on any such assessments to establish whether the Defendants are in Full and Effective Compliance with the Order or in compliance with any subpart(s).*

**In Full and Effective Compliance**

We and CID established that the schedule for the submission of comprehensive annual assessments as required by these Paragraphs will run according to MCSO's fiscal year cycle, July 1-June 30.  MCSO will submit reports on or before September 15 of each year.

Consistent with this agreement, on September 15, 2023, MCSO filed with the Court its 2021 Annual Compliance Report covering the period of July 1, 2022 through June 30, 2023.

MCSO submitted its 38th quarterly compliance report on December 19, 2023.  The report covers the steps MCSO has taken to implement the Court's Orders during the third quarter of 2023.  The report also includes MCSO's plans to correct difficulties encountered during the quarter and responses to concerns raised in our 37th quarterly status report.

In its 38th report, MCSO asserted Full and Effective Compliance (FEC) with three additional Paragraphs: 90; 116; and 207.  Paragraph 90 requires MCSO deputies to submit documentation of all stops and investigatory detentions conducted by their supervisors, which have 72 hours to review the information.  Disciplinary action shall be taken when boilerplate or conclusory language is used by deputies in the documentation submitted.  Paragraph 116 addresses the composition of the CAB.  It requires CAB to have five members: two selected by MCSO; two selected by Plaintiffs' representatives; and one selected by MCSO and the Plaintiffs jointly. Paragraph 207 requires that when assessing an incident in an investigative report for policy, training, tactical, or equipment concerns, investigation reports will include an assessment of whether: a) the law enforcement action was in compliance with training and legal standards; b) the use of different tactics should or could have been employed; c) the incident indicates a need for additional training, counseling, or other non-disciplinary corrective actions; and d) the incident suggests that the MCSO should revise its policies, strategies, tactics, or training.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 72585

## Section 4:  Policies and Procedures

**COURT ORDER V. POLICIES AND PROCEDURES**

*Paragraph 18.  MCSO shall deliver police services consistent with the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order, and with current professional standards.  In conducting its activities, MCSO shall ensure that members of the public receive equal protection of the law, without discriminating based on actual or perceived race or ethnicity, and in a manner that promotes public confidence.*

*Paragraph 19.  To further the goals in this Order, the MCSO shall conduct a comprehensive review of all Patrol Operations Policies and Procedures and make appropriate amendments to ensure that they reflect the Court's permanent injunction and this Order.*

**In Full and Effective Compliance**

MCSO has taken steps toward a comprehensive review of its Patrol Operations Policies and Procedures in four phases.  First, on December 31, 2013, prior to my appointment as Monitor, MCSO filed with the Court all of its policies and procedures, with amendments, that MCSO believed complied with the various Paragraphs of the First Order.  Second, in the internal assessment referenced above, MCSO discussed its ongoing evaluation of Patrol Operations and its development of policies and procedures.  Third, in response to our requests, MCSO provided all of the policies and procedures it maintains are applicable to the First Order for our review and that of the Plaintiffs.  We provided our feedback, which also included the Plaintiffs' comments, on these policies on August 12, 2014.  Based on that feedback, MCSO made adjustments to many of the policies, concentrating first on the policies to be disseminated in Detentions, Arrests, and the Enforcement of Immigration-Related Laws Training; and the Bias Free Policing Training (often referred to as Fourth and Fourteenth Amendment Training) that commenced in early September.  We reviewed MCSO's updated policies and provided our approval for several on August 25, 2014.

Fourth, in discussions during 2016, MCSO requested more specific guidance on what we considered to be Patrol-related policies and procedures.  In response, we provided MCSO with a list of the Patrol-related policies for the purposes of Paragraph 19.  We included on this list policies that were not recently revised or currently under review.  Several policies required changes to comport with the First Order, Second Order, or both.  In 2018, MCSO published the last of the outstanding policies, achieving compliance with this Paragraph.

On March 31, 2023, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

WAI 72586

*Paragraph 20.*  The MCSO shall comply with and operate in accordance with the Policies and Procedures discussed in this Order and shall take all reasonable measures to ensure that all Patrol Operations personnel comply with all such Policies and Procedures.

### a.  Policies and Procedures to Ensure Bias-Free Policing

*Paragraph 21.*  The MCSO shall promulgate a new, department-wide policy or policies clearly prohibiting Discriminatory Policing and racial profiling.  The policy or policies shall, at a minimum:

a.  define racial profiling as the reliance on race or ethnicity to any degree in making law enforcement decisions, except in connection with a reliable and specific suspect description;

b.  prohibit the selective enforcement or non-enforcement of the law based on race or ethnicity;

c.  prohibit the selection or rejection of particular policing tactics or strategies or locations based to any degree on race or ethnicity;

d.  specify that the presence of reasonable suspicion or probable cause to believe an individual has violated a law does not necessarily mean that an officer's action is race-neutral; and

e.  include a description of the agency's Training requirements on the topic of racial profiling in Paragraphs 48–51, data collection requirements (including video and audio recording of stops as set forth elsewhere in this Order) in Paragraphs 54–63 and oversight mechanisms to detect and prevent racial profiling, including disciplinary consequences for officers who engage in racial profiling.

**In Full and Effective Compliance**

MCSO has developed and published the policies required by Paragraph 21.  MCSO distributed these policies and has trained agency personnel during the required Fourth and Fourteenth Amendment training, on an annual basis, since 2014.  MCSO's implementation of these policies is covered in other Paragraphs.

On June 22, 2020, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

WAI 72587

*Paragraph 22.   MCSO leadership and supervising Deputies and detention officers shall unequivocally and consistently reinforce to subordinates that Discriminatory Policing is unacceptable.*

**In Full and Effective Compliance**

With input from the Parties, the reinforcement of CP-8 (Preventing Racial and Other Bias-Based Policing) was modified to a two-step process conducted annually.  MCSO describes Part 1 of the process as the following: "On an annual basis, within the first six months of the calendar year, supervisors shall conduct a group or individual discussion with their assigned employees, reserve deputies, or posse members, which will in part, requires viewing videos from a library created by the Training Division.  The supervisors shall use the message in the video and the approved discussion points, specific to the employee's job classification, to personalize the reinforcement that racial and bias-based profiling and/or discriminatory policing are unacceptable.  The videos shall be announced by the Training Division through The Training Bulletin or an MCSO Administrative Broadcast and be accessible on TheHub." MCSO describes Part 2 of the process as described as the following: "On an annual basis, within the last six months of the calendar year, supervisors shall ensure that all employees, reserve deputies, and posse members assigned to them successfully complete their annual review and acknowledgment of this Office Policy, upon Office distribution through The Briefing Board announcement.  In addition, employees will be required to view a video from the Sheriff or designee, which will reinforce that racial and bias-based profiling and/or discriminatory policing are unacceptable.  Employees, reserve deputies, and posse members shall complete acknowledgement through TheHub."

As an additional measure, supervisors will have the latitude to review and discuss the policy with their employees and document their discussions in BlueTeam.  MCSO will provide proof of compliance biannually, at the end of the six-month periods, when each of the elements of the process is completed.  MCSO will also provide progress reports in the interim.

For the first six months of 2023, MCSO submitted training compliance reports for all classifications.  As noted in our last quarterly status report, the overall compliance rate for this Paragraph for the first half of 2023 was 99.26%.  The training cycle for the second half of 2023 ends on December 31.  We will assess compliance with this Paragraph for the second half of 2023 in our next quarterly status report.  MCSO remains in compliance with this Paragraph.

On September 25, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

*Paragraph 23.  Within 30 days of the Effective Date, MCSO shall modify its Code of Conduct to prohibit MCSO Employees from utilizing County property, such as County e-mail, in a manner that discriminates against, or denigrates, anyone on the basis of race, color, or national origin.*

**In Full and Effective Compliance**

BIO uses a randomizing program to select samples for each inspection.  BIO reviews CAD messages to verify compliance with CP-2 (Code of Conduct), CP-3 (Workplace Professionalism: Discrimination and Harassment), and GM-1 (Electronic Communications, Data and Voice Mail).

WAI 72588

In its submission, MCSO includes the specific nature of any potential concerns identified during the audits. We observed the processes BIO uses to conduct CAD and email audits, to ensure that we thoroughly understand the mechanics involved in conducting these audits. For CAD and email audits, we receive copies of the audits completed by BIO, the details of any violations found, and copies of the memoranda of concern or BIO Action Forms that are completed. Email and CAD/Alpha Paging inspections are completed on a quarterly basis. For email inspections, MCSO will inspect 50 employees per quarter, and for CAD/Alpha Paging, MCSO will inspect 15 days per quarter.

For the third quarter of 2023, we reviewed CAD and Alpha Paging Inspection Report (BI2023-0144) as proof of compliance with this Paragraph. MCSO selected a random sample of 15 days in the quarter for inspection. There was a total of 6,665 CAD and Alpha Paging entries for the selected dates. The inspection found that 100% of the inspected messages were in compliance with policies GM-1 (Electronic Communications, Data and Voice Mail), CP-2 (Code of Conduct), CP-3 (Workplace Professionalism: Discrimination and Harassment), and CP-8 (Preventing Racial and Other Biased-Based Profiling).

For the third quarter of 2023, we reviewed employees' Emails Inspection Report (BI2023-0145), as proof of compliance with this Paragraph. BIO selected a total of 50 employees for review, and inspected a total of 10,176 emails. The inspection found that 10,174, or 99.98% of the emails inspected were in compliance. The inspection found that two Detention employees from the Fourth Avenue Jail sent emails containing profane language. BIO generated Action Forms for the deficiencies.

For the third quarter of 2023, MCSO conducted three Facility and Property inspections. The first inspection (BI2023-0113), for the month of July, was conducted for the Property Management Division (PMD), which is part of the Support Services Bureau. The Division consists of one commander, one supervisor, one detective, and one coordinator. The Division has responsibility for three areas: the 3511 Towing Program; the Off-Site Records Warehouse; and the Property and Evidence Warehouse. There were no deficiencies noted in the inspection, which resulted in an overall compliance rating of 100%.

The second inspection, BI2023-0127, for the month of August, was conducted for the Towers Jail. The Towers Jail consists of six housing units, with each unit having four pods. Each pod has 15 cells. The Towers Jail has a maximum capacity of 720 inmates and houses minimum and medium risk inmates. The jail has an average daily population of 622 inmates. The Towers Jail is staffed by 70 Detention Officers, one civilian employee, four Field Training Officers, and 16 supervisors (captain, lieutenants, and sergeants). The inspection found the facility in full compliance with the Facility and Operations portion of the review, which includes inspections of the physical plant, as well as record-keeping. Only minor inconsistencies were noted in the record-keeping entries. The Property and Evidence section of the inspection found no deficiencies in the tracking system. The inspection of the Towers Jail resulted in an 100% overall compliance finding.

The third inspection, BI2023-0135, for the month of September, was conducted for the General Crimes Division (GCD). The General Crimes Division was established in April 2022, to centralize general crimes investigations. The Division consists of one captain, two lieutenants,

WAI 72589

seven sergeants, 36 detectives, one analyst, and one office assistant.  The Division is comprised of four Units: the Incident Report Review Unit; the Crimes Against Persons Unit; the Property Crimes Unit; and the Financial Crimes Unit.  The inspection of the General Crimes Division found no deficiencies, and resulted in an overall compliance rating of 100%.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 24.**  *The MCSO shall ensure that its operations are not motivated by or initiated in response to requests for law enforcement action based on race or ethnicity.  In deciding to take any law enforcement action, the MCSO shall not rely on any information received from the public, including through any hotline, by mail, email, phone or in person, unless the information contains evidence of a crime that is independently corroborated by the MCSO, such independent corroboration is documented in writing, and reliance on the information is consistent with all MCSO policies.*

**In Full and Effective Compliance**

MCSO created the Sheriff's Intelligence Leads and Operations (SILO) Unit in the first quarter of 2016.  The SILO Unit became operational on September 11, 2017.  GI-7 requires that any tips received by MCSO components be forwarded to the SILO Unit for recording and processing.  The SILO Unit classifies this information by the type of alleged criminal activity, or service requested, and forwards it to the appropriate Unit for action and response.  In some cases, community members email or call with requests for traffic enforcement, or for MCSO to address quality-of-life issues; these are considered calls for service rather than tips on criminal activity.  If the information provided pertains to criminal activity in another jurisdiction, MCSO forwards the information to the appropriate law enforcement agency and documents it in the SILO database. We review a monthly tip list report, noting the date received and a general description of each tip. We also review an audit report showing the disposition of tips received.  If there is any bias noted in the information received for any tip, MCSO generally closes the tip and takes no action.  We review all tips that MCSO closes due to bias.

During the third quarter of 2023, we reviewed 691 tips submitted for July, 866 tips submitted for August, and 763 tips submitted for September.  We reviewed a total of 2,320 tips, which were classified and recorded according to the type of alleged violation or service requested.  We continue to see the same pattern with regard to community concerns.  Firearms-related tips remain at the forefront, with those comprising approximately 38% of the tips received by MCSO. General suspicious activities comprised about 17.5% of the tips received for the quarter.  These were followed by tips related to warrants and fugitives at 9.5%, and drugs at 7.5%.  During the third quarter, MCSO did not close any tips due to bias.

On June 18, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

WAI 72590

**b. Policies and Procedures to Ensure Bias-Free Traffic Enforcement**

**Paragraph 25.**  *The MCSO will revise its policy or policies relating to traffic enforcement to ensure that those policies, at a minimum:*

a.  *prohibit racial profiling in the enforcement of traffic laws, including the selection of which vehicles to stop based to any degree on race or ethnicity, even where an officer has reasonable suspicion or probable cause to believe a violation is being or has been committed;*

b.  *provide Deputies with guidance on effective traffic enforcement, including the prioritization of traffic enforcement resources to promote public safety;*

c.  *prohibit the selection of particular communities, locations or geographic areas for targeted traffic enforcement based to any degree on the racial or ethnic composition of the community;*

d.  *prohibit the selection of which motor vehicle occupants to question or investigate based to any degree on race or ethnicity;*

e.  *prohibit the use of particular tactics or procedures on a traffic stop based on race or ethnicity;*

f.  *require deputies at the beginning of each stop, before making contact with the vehicle, to contact dispatch and state the reason for the stop, unless Exigent Circumstances make it unsafe or impracticable for the deputy to contact dispatch;*

g.  *prohibit Deputies from extending the duration of any traffic stop longer than the time that is necessary to address the original purpose for the stop and/or to resolve any apparent criminal violation for which the Deputy has or acquires reasonable suspicion or probable cause to believe has been committed or is being committed;*

h.  *require the duration of each traffic stop to be recorded;*

i.  *provide Deputies with a list and/or description of forms of identification deemed acceptable for drivers and passengers (in circumstances where identification is required of them) who are unable to present a driver's license or other state-issued identification; and*

j.  *instruct Deputies that they are not to ask for the Social Security number or card of any motorist who has provided a valid form of identification, unless it is needed to complete a citation or report.*

**Phase 1:**  In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on June 15, 2023.

- EB-2 (Traffic Stop Data Collection), most recently amended on February 22, 2023.

- GI-1 (Radio and Enforcement Communications Procedures), most recently amended on December 8, 2021.

WAI 72591

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on October 13, 2022.

- EA-11 (Arrest Procedures), most recently amended on April 5, 2022.

**Phase 2:** In compliance

During the finalization of the Fourth and Fourteenth Amendment training curricula required by the Order, the Parties agreed to a list and/or description of forms of identification deemed acceptable for drivers and passengers, as required by this Paragraph. The data required for verification to ensure compliance with these policies is captured by the Traffic and Criminal Software (TraCS) system. The system documents the requirements of the Order and MCSO policies. MCSO has continued to make technical changes to the TraCS system to ensure that the mandatory fields on the forms used to collect the data are completed and that deputies are capturing the required information. TraCS is a robust system that allows MCSO to make technical changes to improve how required information is captured.

To verify Phase 2 compliance with this Paragraph, we reviewed MCSO's Vehicle Stop Contact Forms (VSCFs), Vehicle Stop Contact Form Supplemental Sheets, Incidental Contact Receipts, Written Warning/Repair Forms, Arizona Traffic Ticket and Complaint Forms, Internet I/Viewer Event Forms, Justice Web Interface Forms, CAD printouts, and any Incident Reports generated by traffic stops. MCSO created many of these forms to capture the requirements of Paragraphs 25 and 54.

Since our July 2015 site visit, there has been significant improvement in the TraCS system that has enhanced the reliability and validity of the data provided by MCSO. This improvement has been buttressed by the introduction of data quality control procedures now being implemented and memorialized in the EIU Operations Manual. (This is further discussed in Paragraph 56, below.) We also compared traffic stop data between Latino and non-Latino drivers in the samples provided to us.

Paragraph 25.a. prohibits racial profiling in the enforcement of traffic laws, including the selection of which vehicles to stop based to any degree on race or ethnicity, even where a deputy has reasonable suspicion or probable cause to believe a violation is being or has been committed. The selection of the sample size and the sampling methodology employed for drawing our sample is detailed in Section 7: Traffic Stop Documentation and Data Collection.

We review a sample of 105 traffic stops each reporting period to assess this requirement. Our review of the sample of 105 traffic stops that occurred during this reporting period in Districts 1, 2, 3, 4, and 7, and Lake Patrol indicated that MCSO was following protocol, and that the stops did not violate the Order or internal policies. The District formerly known as District 6 no longer exists, as it is now patrolled by the Queen Creek Police Department, which commenced operating fully in that area on January 11, 2022.

Paragraph 25.b. requires MCSO to provide deputies with guidance on effective traffic enforcement, including the prioritization of traffic enforcement resources to promote public safety. EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), Sections A-E, address these concerns. The policy specifies that driving under the influence and speeding are

WAI 72592

the main causes of accidents, and should be the focus of traffic enforcement. Based on our review of the data provided for this reporting period, the most common traffic stop violations are as follows: 45 stops for speeding above the posted limit (43%); 12 stops for failure to obey official traffic control devices (11%); 16 stops for failure to possess valid registrations or tags (15%); 18 stops for equipment violations (17%); and 12 stops for other moving violations (11%). There were two additional stops where on-duty law enforcement personnel from another jurisdiction were stopped while operating unmarked patrol vehicles. In one instance, the driver was issued an Incidental Contact Receipt. Regarding the other stop, the driver was not issued an Incidental Contact Receipt, citation, or warning, as required by policy. AIU identified this issue during its inspection and requested that the District document any corrective measures taken on a BIO Action Form.

As the policy specifically identifies speeding violations as one of the contributing factors of traffic accidents, MCSO deputies have targeted this violation. In our review, we break down the specific traffic violation for each stop and use each traffic stop form completed by deputies during the stop to determine if the stop is justified and fulfills the requirements of this Paragraph. MCSO remains in compliance with this Subparagraph.

Paragraph 25.c. requires MCSO to prohibit the selection of particular communities, locations, or geographic areas for targeted traffic enforcement based to any degree on the racial or ethnic composition of the community. During our inspection, we document the location of every stop and note the GPS coordinates if available. Our review of the sample data covering all MCSO Districts during this reporting period did not indicate that MCSO was targeting any specific area or ethnicity to conduct traffic stops.

MCSO remains in compliance with this Subparagraph.

Paragraph 25.d. requires MCSO to prohibit the selection of which motor vehicle occupants to question or investigate based, to any degree, on race or ethnicity. We reviewed the demographic data of Maricopa County (according to 2020 U.S. Census data, 32% of the population is Latino), and found that the ratio of Latino drivers stopped during this reporting period was lower than in the past reporting period in comparison to the ethnicity of the population in the County. (See Paragraph 54.e.)

A review of complaint investigations closed during this reporting period did not reveal that any complaints were filed alleging that MCSO deputies selected motor vehicle occupants for questioning or investigation based on the individual's race or ethnicity.

MCSO has fully implemented body-worn cameras, and we review a sample of the recordings each reporting period to verify if deputies are questioning occupants to determine if they are legally in the country. We did not identify any such events during this reporting period.

During this reporting period, we observed that 30 of the 105 stops occurred during nighttime hours. Our review of the sample data indicated that generally, traffic stops were not based on race or ethnicity and reflected the general makeup of the population of the County. In most instances, the deputies document on the VSCF that they were unable to determine the race/ethnicity and gender of the vehicle occupants prior to the stop. MCSO is in compliance with this Subparagraph.

WAI 72593

Paragraph 25.e. requires MCSO to prohibit the use of particular tactics or procedures on a traffic stop based on race or ethnicity. We reviewed a sample of CAD audio recordings and CAD printouts where the dispatcher entered the reason for the stop when advised by the deputy in the field. We also reviewed body-worn camera recordings of deputies making traffic stops. The methodology that we employed to select our cases is described in detail in Section 7. In the cases we reviewed, the CAD audio recordings and the body-worn camera recordings revealed that deputies were not making traffic stops using tactics based on race or ethnicity. MCSO remains in compliance with this Subparagraph.

Paragraph 25.f. requires deputies at the beginning of each stop, before making contact with the vehicle, to verbally contact dispatch and state the reason for the stop unless exigent circumstances make it unsafe for the deputy to contact Communications. When the deputy advises Communications of the location, tag number, and reason for the stop, this information is digitally logged on the CAD printout and it is audio recorded. (See Paragraph 54.e.) We reviewed 30 CAD audio recordings and the CAD printouts; in each, the deputy advised dispatch of the reason for the stop. Through our reviews of body-worn camera recordings and CAD printouts, we verified that the reason for the stop was voiced prior to making contact with the drivers in 30 of the 30 cases we reviewed. For the 75 other cases that were part of our sample, we reviewed the VSCFs and the CAD printouts to ensure that deputies properly advised dispatch of the reason for the stop prior to making contact with the violator. In all 75 stops, the deputy properly advised dispatch the reason for the stop. MCSO is in compliance with this Subparagraph.

Paragraph 25.g. prohibits deputies from extending the duration of any traffic stop longer than the time that is necessary to address the original purpose for the stop and/or to resolve any apparent criminal violation for which the deputy has or acquires reasonable suspicion or probable cause to believe has been committed or is being committed. MCSO employs a series of seven questions on the VSCF to document the circumstances that might require a stop to be prolonged. Deputies are to indicate whether they experienced technological difficulties; whether the stop required the towing of a vehicle; whether the stop involved training; whether the stop involved a language barrier; whether the stop involved a driving under the influence investigation; or whether the stop involved issues related to the status of the drivers' license, insurance, or registration. In each of the stops where the deputies documented these events, the duration of the stop was determined to be reasonable.

MCSO remains in compliance with this Subparagraph.

Paragraph 25.h. requires the duration of each traffic stop to be recorded. The time of the stop and its termination is now auto-populated on the VSCF by the CAD system. To ensure data entry accuracy, MCSO implemented a technical change to the TraCS system on November 29, 2016. The change automatically creates a red field in the stop contact times if the deputy manually changes these times on the VSCF. In our review, we determined that the duration was recorded accurately in all 105 traffic stops. MCSO is in compliance with this Subparagraph, with a compliance rate of 100%.

Paragraph 25.i. requires that MCSO provide deputies with a list and/or description of forms of identification deemed acceptable for drivers and passengers (in circumstances where identification is required of them) who are unable to present a driver's license or other state-issued

WAI 72594

identification. The Plaintiffs' attorneys and MCSO agreed on acceptable forms of identification, and this information has been included in the Fourth and Fourteenth Amendment training. EA-11 (Arrest Procedures) provides a list of acceptable forms of identification if a valid driver's license cannot be produced. During this reporting period's review of the sample of 105 traffic stops, we identified three cases where the drivers did not present valid driver's licenses to the deputies. In each of the three cases, the drivers either presented an acceptable form of identification or had no identification in their possession; and records checks revealed that the drivers did not have valid driver's licenses.

In our review of the sample of cases to assess compliance with Paragraph 54.k., searches of persons, we identified 23 cases where the drivers did not present a valid driver's license to the deputies. In each of the 23 cases, the drivers either presented an acceptable form of identification or they had no identification in their possession; and a records check revealed that the drivers did not have valid driver's licenses.

In our review of the sample of cases to assess compliance with Paragraphs 25.d. and 54.g., passenger contacts, we identified 39 cases where the drivers did not present a valid driver's license to the deputies. In each of the 39 cases, the drivers either presented an acceptable form of identification or had no identification in their possession; and a records check revealed that the drivers did not have valid driver's licenses.

MCSO remains in compliance with this Subparagraph.

Paragraph 25.j. requires MCSO to instruct deputies that they are not to ask for the Social Security Number or card of any motorist who has provided a valid form of identification, unless it is needed to complete a citation or report. EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) prohibits deputies from asking for the Social Security Number of any motorist who has provided a valid form of identification. During this reporting period's review of the sample of 105 traffic stops, as well as for Paragraph 54.k. and Paragraphs 25.d. and 54.g., we identified that deputies requested a driver's Social Security Number in incidents that either involved the arrest of the driver for the purpose of completing an Incident Report, or incidents where the driver did not produce a valid form of identification, both of which are permissible under this Subparagraph. MCSO remains in compliance with this Subparagraph.

MCSO achieved compliance with each of the components of Paragraph 25 during the previous reporting period. MCSO remains in compliance with Paragraph 25.

WAI 72595

### c. Policies and Procedures to Ensure Bias-Free Detentions and Arrests

**Paragraph 26.**   *The MCSO shall revise its policy or policies relating to Investigatory Detentions and arrests to ensure that those policies, at a minimum:*

a.     *require that Deputies have reasonable suspicion that a person is engaged in, has committed, or is about to commit, a crime before initiating an investigatory seizure;*

b.     *require that Deputies have probable cause to believe that a person is engaged in, has committed, or is about to commit, a crime before initiating an arrest;*

c.     *provide Deputies with guidance on factors to be considered in deciding whether to cite and release an individual for a criminal violation or whether to make an arrest;*

d.     *require Deputies to notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration-Related Crime, or for any crime by a vehicle passenger related to lack of an identity document;*

e.     *prohibit the use of a person's race or ethnicity as a factor in establishing reasonable suspicion or probable cause to believe a person has, is, or will commit a crime, except as part of a reliable and specific suspect description; and*

f.     *prohibit the use of quotas, whether formal or informal, for stops, citations, detentions, or arrests (though this requirement shall not be construed to prohibit the MCSO from reviewing Deputy activity for the purpose of assessing a Deputy's overall effectiveness or whether the Deputy may be engaging in unconstitutional policing).*

### In Full and Effective Compliance

To assess compliance with Paragraph 26, we request documentation of arrests and investigations associated with the requirements specified in this Paragraph.  In addition to the review of any reported cases, we receive booking lists and criminal citation lists for each month of the reporting period and request a random sample of cases to review.

For the third quarter of 2023, MCSO did not submit any investigatory detentions or arrests that fell within the reporting requirements of this Paragraph.  For this reporting period, we also requested and reviewed 20 bookings and 20 criminal citations for each month of the quarter.  In addition, we reviewed 213 Incident Reports for the quarter.  All of the documentation we reviewed during this reporting period indicates that MCSO is in compliance with this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 72596

### d. Policies and Procedures Governing the Enforcement of Immigration-Related Laws

**Paragraph 27.**   *The MCSO shall remove discussion of its LEAR Policy from all agency written Policies and Procedures, except that the agency may mention the LEAR Policy in order to clarify that it is discontinued.*

## In Full and Effective Compliance

MCSO asserts that it does not have an agency LEAR policy.  We have verified through our document reviews and site compliance visits that MCSO does not have a LEAR policy.

On March 22, 2019, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.


**Paragraph 28.**   *The MCSO shall promulgate a new policy or policies, or will revise its existing policy or policies, relating to the enforcement of Immigration-Related Laws to ensure that they, at a minimum:*

a.   *specify that unauthorized presence in the United States is not a crime and does not itself constitute reasonable suspicion or probable cause to believe that a person has committed or is committing any crime;*

b.   *prohibit officers from detaining any individual based on actual or suspected "unlawful presence," without something more; prohibit officers from initiating a pre-textual vehicle stop where an officer has reasonable suspicion or probable cause to believe a traffic or equipment violation has been or is being committed in order to determine whether the driver or passengers are unlawfully present;*

c.   *prohibit the Deputies from relying on race or apparent Latino ancestry to any degree to select whom to stop or to investigate for an Immigration-Related Crime (except in connection with a specific suspect description); prohibit Deputies from relying on a suspect's speaking Spanish, or speaking English with an accent, or appearance as a day laborer as a factor in developing reasonable suspicion or probable cause to believe a person has committed or is committing any crime, or reasonable suspicion to believe that an individual is in the country without authorization;*

d.   *unless the officer has reasonable suspicion that the person is in the country unlawfully and probable cause to believe the individual has committed or is committing a crime, the MCSO shall prohibit officers from (a) questioning any individual as to his/her alienage or immigration status; (b) investigating an individual's identity or searching the individual in order to develop evidence of unlawful status; or (c) detaining an individual while contacting ICE/CBP with an inquiry about immigration status or awaiting a response from ICE/CBP.  In such cases, the officer must still comply with Paragraph 25(g) of this Order.  Notwithstanding the foregoing, an officer may (a) briefly question an individual as to his/her alienage or immigration status; (b) contact ICE/CBP and await a response from federal authorities if the officer has reasonable suspicion to believe the person is in the country unlawfully and reasonable suspicion to believe the person is*

WAI 72597

*engaged in an Immigration-Related Crime for which unlawful immigration status is an element, so long as doing so does not unreasonably extend the stop in violation of Paragraph 25(g) of this Order;*

e.     *prohibit Deputies from transporting or delivering an individual to ICE/CBP custody from a traffic stop unless a request to do so has been voluntarily made by the individual;*

f.     *Require that, before any questioning as to alienage or immigration status or any contact with ICE/CBP is initiated, an officer check with a Supervisor to ensure that the circumstances justify such an action under MCSO policy and receive approval to proceed. Officers must also document, in every such case, (a) the reason(s) for making the immigration-status inquiry or contacting ICE/CBP, (b) the time approval was received, (c) when ICE/CBP was contacted, (d) the time it took to receive a response from ICE/CBP, if applicable, and (e) whether the individual was then transferred to ICE/CBP custody.*

**In Full and Effective Compliance**

For this reporting period, there were no reported instances of deputies having contact with Immigration and Customs Enforcement (ICE) or Customs and Border Protection (CBP) for the purpose of making an immigration status inquiry, and there were no reported arrests stemming from any immigration-related investigations, or for any immigration-related crimes. The reviews of documentation submitted for this reporting period indicate that MCSO has complied with the reporting requirements related to Paragraph 28. In our reviews of incidents involving contact with the public, including traffic stops, arrests, and investigative stops, we monitor deputies' actions to verify compliance with this Order.

In addition to the documentation requested from MCSO to determine compliance with this Paragraph, our reviews of documentation provided for other Paragraphs of the Order have found no evidence to indicate a violation of this Paragraph. For this reporting period, we reviewed a total of 120 Arrest Reports, 277 traffic stops, 55 Non-Traffic Contact Forms (NTCFs), and 213 Incident Reports. We found no issues of concern as it relates to this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

### e. Policies and Procedures Generally

**Paragraph 29.** *MCSO Policies and Procedures shall define terms clearly, comply with applicable law and the requirements of this Order, and comport with current professional standards.*

**In Full and Effective Compliance**

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

See Paragraph 30.

WAI 72598

*Paragraph 30.  Unless otherwise noted, the MCSO shall submit all Policies and Procedures and amendments to Policies and Procedures provided for by this Order to the Monitor for review within 90 days of the Effective Date pursuant to the process described in Section IV.  These Policies and Procedures shall be approved by the Monitor or the Court prior to their implementation.*

### In Full and Effective Compliance

MCSO continues to provide us, the Plaintiffs' attorneys, and the Plaintiff-Intervenor with drafts of its Order-related policies and procedures prior to publication, as required by the Order.  We, the Plaintiffs' attorneys, and the Plaintiff-Intervenor review the policies to ensure that they define terms clearly, comply with applicable law and the requirements of the Order, and comport with current professional standards.  Once drafts are finalized, MCSO incorporates feedback from us, Plaintiffs' attorneys, and the Plaintiff-Intervenor, and then provides them to us for final review and approval.  As MCSO has followed this process for the Order-related policies published thus far, the agency is in compliance with this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

*Paragraph 31.  Within 60 days after such approval, MCSO shall ensure that all relevant MCSO Patrol Operation Personnel have received, read, and understand their responsibilities pursuant to the Policy or Procedure.  The MCSO shall ensure that personnel continue to be regularly notified of any new Policies and Procedures or changes to Policies and Procedures.  The Monitor shall assess and report to the Court and the Parties on whether he/she believes relevant personnel are provided sufficient notification of and access to, and understand each policy or procedure as necessary to fulfill their responsibilities.*

### In Full and Effective Compliance

GA-1 indicates that Office personnel shall be notified of new policies and changes to existing policies via Briefing Boards and via the HUB, Maricopa County's adaptation of the online training software program, Cornerstone, that MCSO implemented in July 2017 to replace its E-Policy system.  Employees are required to complete personal attestations that indicate that they have read and understand policies; the HUB routinely updates recent training and policy reviews for deputies and is visible by immediate supervisors.  Per GA-1, "Prior to some policies being revised, time-sensitive changes are often announced in the Briefing Board until the entire policy can be revised and finalized."  As noted previously, we recognize the authority of Briefing Boards and understand their utility in publishing critical policy changes quickly; but we have advised MCSO that we generally do not grant Phase 1 compliance for an Order requirement until the requirement is memorialized in a more formal policy.

During this reporting period, MCSO did not issue or issue revisions of any Order-related policies, though it did issue several Briefing Boards and Administrative Broadcasts that touched on Order-related topics and revised the language of General Orders.  During this reporting period, MCSO also published a revised version of the Administrative Services Division Operations Manual.

WAI 72599

On September 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 32.** *The MCSO shall require that all Patrol Operation personnel report violations of policy; that Supervisors of all ranks shall be held accountable for identifying and responding to policy or procedure violations by personnel under their command; and that personnel be held accountable for policy and procedural violations. The MCSO shall apply policies uniformly.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on February 14, 2023.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on December 16, 2021.

- CP-5 (Truthfulness), most recently amended on November 17, 2022.

- CP-11 (Anti-Retaliation), most recently amended on January 6, 2022.

- GH-2 (Internal Investigations), most recently amended on November 14, 2023.

- GC-16 (Employee Grievance Procedures), most recently amended on November 14, 2023.

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 15, 2023.

- Administrative Services Division Operations Manual, most recently amended on November 14, 2023.

- Professional Standards Bureau Operations Manual, most recently amended on November 13, 2023.

**Phase 2:** Not in compliance

Since we began reviewing internal investigations conducted by MCSO, we have reviewed hundreds of administrative misconduct investigations submitted to our Team for this Paragraph. During our reviews, we have continued to note that the investigations conducted by PSB have generally been well-written and arrived at the appropriate findings. Investigations conducted by Districts have demonstrated continuing improvement over this and the last two reporting periods.

MCSO has trained all investigators who conduct misconduct investigations; and during our site visits, we have continued to meet with the Professional Standards Bureau (PSB) and District and Division Command personnel to provide them with information regarding the cases that we have found deficient in structure, format, investigation, or reporting requirements.

During this and the last 12 reporting periods, we also met during our site visits with the Deputy Chiefs responsible for oversight of Districts and Divisions outside of PSB to discuss our concerns with the quality of investigations being conducted by their personnel. These meetings have resulted in useful discussion about needed improvement in the quality of investigations. Since these meetings began, District and Division command personnel have provided more oversight on the completion of these cases.

WAI 72600

PSB personnel have remained responsive to our feedback, and the investigations they submit for compliance with this Paragraph continue to be complete and thorough. PSB's reviews of investigations conducted by District personnel continue to be thorough, and PSB has identified and addressed many concerns and deficiencies they have found.

During the last reporting period, we reviewed 52 administrative misconduct investigations to determine overall compliance with this Paragraph and made our compliance findings based on the investigative and administrative requirements for the completion of these investigations. Thirty-six investigations were conducted by District personnel and 16 were conducted by PSB. Based on the identified deficiencies in District investigations and our assessment of the reasonability of the requested extensions, six of the investigations conducted by District personnel were found in full compliance. Only one of the 16 investigations conducted by PSB was in compliance with all requirements for the completion of misconduct investigations. Overall compliance for the 52 investigations we reviewed for this Paragraph was 17%.

During this reporting period, we reviewed 34 administrative misconduct investigations to determine compliance with this Paragraph. PSB conducted 14 of these investigations, and District or Division personnel outside of PSB conducted the remaining 20. Sworn supervisors with the rank of sergeant or higher completed all the investigations conducted at the Division level. Twenty-seven of the investigations resulted from external complaints. Seven were internally generated. All of the investigations were initiated after May 17, 2017, when MCSO revised its internal investigation policies; and all were initiated after the completion of the 40-hour Misconduct Investigative Training that concluded in late 2017.

During the last reporting period, we noted a slight increase in investigative compliance for those investigations reported in this Paragraph. Twenty-two (61%) of the 34 cases we reviewed were found to be in compliance with investigative requirements. This was an increase from 60% investigative compliance the prior reporting period. All of the investigations had been reviewed and approved by one or more District or Division Command personnel prior to the submission of the cases to PSB.

During this reporting period, we reviewed 20 investigations submitted for compliance with this Paragraph that had been completed by District or Division personnel outside PSB. Of the 20, seven investigations involving patrol personnel were conducted by investigative supervisors in other Divisions. These appear to be the cases that PSB sent out to investigative supervisors outside of patrol to help with the backlog. All seven (100%) of these were compliant with all investigative requirements. Of the 13 conducted by patrol supervisors, 10 (77%) were compliant with all investigative requirements. Seventeen (85%) of the total 20 were in investigative compliance, a significant increase from the 61% compliance during the last reporting period. The average time for the submission of a case to PSB was 449 days, an increase from 380 days the last reporting period. As has been the case in past reviews, we identified deficiencies with failure to conduct thorough investigations, and unsupported findings. We did not find any investigations during this reporting period where leading questions were a concern.

Based on the identified deficiencies in these investigations and our assessment of MCSO's requested extensions, eight (40%) of the 20 investigations were in full compliance with all requirements for the completion of misconduct investigations. Nine (45%) were not compliant

WAI 72601

due only to required timelines.  Three (15%) of the investigations were noncompliant based on deficiencies other than timeliness.  The overall compliance for investigations reported in this Paragraph noted significant improvement during this reporting period.

All of the cases that we reviewed for the reporting period were initiated after numerous years of working under the requirements of the Court Orders, after training in how to conduct misconduct investigations (the 40-hour Misconduct Investigative Training completed in late 2017), after numerous site visit meetings where our Team has provided input on identified deficiencies, and after the implementation of additional review and oversight by Command personnel.  This is the second quarter in which we have observed increased improvement from the previous reporting period, and we are encouraged by the outcome of our reviews.

The overall investigative quality for cases investigated by PSB and reviewed by our Team for compliance with this Paragraph has remained high.  For this reporting period, PSB conducted 14 of the investigations we reviewed for compliance with this Paragraph.  With the exception of timely extensions, all 14 were found compliant with those requirements over which the PSB Commander has authority.  Three (21%) were in full compliance including required timelines.  This is an increase in compliance from 7% during the last reporting period.

Of the 34 total investigations we reviewed to determine compliance with this Paragraph, 10 (29%) were submitted within the required 60- or 85-day timeframe, an increase from 19% during the last reporting period.  None of the remaining 24 had a timely, justifiable extension.  Of the total 34 investigations, 11 (34%) were finalized and closed with 180 days.  This is an increase from 25% during the last reporting period.  As we have previously noted in our reports, general workload issues are insufficient justification for the failure to complete investigations in a reasonably timely manner.  To be considered compliant with the requirements for the completion of administrative misconduct investigations, extension requests and justifications must be submitted in a timely manner and be reasonably related to the specific investigation.

Overall compliance for the 34 investigations we reviewed for this Paragraph was 32%, a significant increase from 17% during the last quarter.

As is our practice, we will discuss those cases that we found noncompliant with MCSO personnel during our next site visit.  We encourage District and Division personnel to maintain their current focus on improving their investigations, training those who complete investigations, and completing them in a timely manner.

During our October 2023 site visit, we visited several District facilities.  According to District personnel in attendance at these meetings, they are receiving adequate feedback from PSB on their investigations, the overall process has improved, the investigative template provided by PSB is helpful, and that annual PSB training is important.  In one District, personnel noted that that the lack of experience District supervisors have overall makes the investigations challenging; and in another District, personnel believed that the feedback they received from PSB is not always consistent.

WAI 72602

***Paragraph 33.*** *MCSO Personnel who engage in Discriminatory Policing in any context will be subjected to administrative Discipline and, where appropriate, referred for criminal prosecution. MCSO shall provide clear guidelines, in writing, regarding the disciplinary consequences for personnel who engage in Discriminatory Policing.*

**Phase 1:** In compliance

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on October 13, 2022.

- GH-2 (Internal Investigations), most recently amended on November 14, 2023.

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 15, 2023.

**Phase 2:** Not in compliance

The investigations that we review for compliance with this Paragraph do not include biased policing complaints involving the Plaintiffs' class. Those investigations have additional compliance requirements; we discuss them in Paragraphs 275-283.

During the last reporting period, there were five investigations that were reviewed by our Team that contained allegations of discriminatory policing. All five cases were properly investigated, and we agreed with the findings in all five. None of the five cases were in compliance with the requirements for timely completion of administrative investigations.

During this reporting period, there were nine investigations reviewed where alleged bias did not involve members of the Plaintiffs' class. Five involved allegations of bias by jail personnel. Four of these five cases resulted in sustained findings. In two, the employees resigned prior to the completion of the investigation, in one the employee was dismissed from the agency, and in one the employee received appropriate discipline. One of the five had not sustained findings. Four of the investigations involved alleged bias by a sworn member of the agency; none resulted in sustained findings against any employee.

Of the total nine cases, we identified investigative deficiencies in two of the cases involving Detention personnel. In both, the investigator failed to identify and address all potential misconduct. Two of the nine cases were in full compliance with all requirements for the completion of administrative investigations.

While discriminatory policing allegations that involve members of the Plaintiffs' class are not reported in this Paragraph, we note that MCSO did complete six investigations for this reporting period that were determined to be Class Remedial Matters. (See Paragraphs 275-288.)

WAI 72603

***Paragraph 34.*** *MCSO shall review each policy and procedure on an annual basis to ensure that the policy or procedure provides effective direction to MCSO Personnel and remains consistent with this Order, current law and professional standards. The MCSO shall document such annual review in writing. MCSO also shall review Policies and Procedures as necessary upon notice of a policy deficiency during audits or reviews. MCSO shall revise any deficient policy as soon as practicable.*

**In Full and Effective Compliance**

On an annual basis, MCSO reviews all critical policies and all policies relevant to the Court Orders for consistency with Constitutional policing, current law, and professional standards.

During this reporting period, MCSO continued its annual review, submitting 16 (33%) of the 48 required policies to our Team. MCSO submitted: CP-3 (Workplace Professionalism); CP-8 (Preventing Racial and Other Bias-Based Profiling; CP-11 (Anti-Retaliation); GA-1 (Development of Written Orders); GC-12 (Hiring and Promotional Procedures); GC-16 (Employee Grievance Procedure); GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices); GF-1 (Criminal Justice Data Systems); GF-3 (Criminal History Record Information); GG-1 (Peace Officer Training Administration); GG-2 (Detention/Civilian Training Administration); GI-1 (Radio and Enforcement Communications Procedures); GI-5 (Voiance Language Services); GI-7 (Processing of Bias-Free Tips and Information Process); GJ-24 (Community Relations and Youth Programs); and GJ-26 (Sheriff's Reserve Deputy Program).

On June 3, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 72604

# Section 5: Pre-Planned Operations

**Paragraph 35.** *The Monitor shall regularly review the mission statement, policies and operations documents of any Specialized Unit within the MCSO that enforces Immigration-Related Laws to ensure that such unit(s) is/are operating in accordance with the Constitution, the laws of the United States and State of Arizona, and this Order.*

**In Full and Effective Compliance**

To verify Phase 2 compliance with this Paragraph, we previously verified that the Criminal Employment Unit (CEU) was disbanded and removed from the Special Investigations Division organizational chart. The Human Smuggling Unit (HSU) was also disbanded, and personnel were reassigned to the Anti-Trafficking Unit (ATU).

During our review of the arrests made by the Special Investigations Division ATU between March 2015-March 2017, we did not note any arrests for immigration or human smuggling violations. The cases submitted by MCSO and reviewed for the ATU were primarily related to narcotics trafficking offenses.

MCSO reported in April 2017 that it had disbanded the Anti-Trafficking Unit and formed a new unit, Fugitive Apprehension and Tactical Enforcement (FATE). The primary mission of FATE is to locate and apprehend violent fugitives. We reviewed FATE's mission statement and objectives, as well as the organizational chart for the Special Investigations Division. MCSO had removed the ATU from the organizational chart, and the mission of FATE did not include any reference to the enforcement of Immigration-Related Laws.

The revised organizational chart for SID and documentation MCSO provided regarding the implementation of FATE supported that the ATU no longer existed, and that there were no specialized Units in MCSO that enforced Immigration-Related Laws.

We previously received and reviewed the Special Investigations Division Operations Manual and organizational chart. Both confirmed that MCSO has no specialized Units that enforce Immigration-Related Laws, that the Human Smuggling Unit (HSU) was disbanded, and the Anti-Trafficking Unit (ATU) no longer exists.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 72605

***Paragraph 36.*** *The MCSO shall ensure that any Significant Operations or Patrols are initiated and carried out in a race-neutral fashion. For any Significant Operation or Patrol involving 10 or more MCSO personnel, excluding posse members, the MCSO shall develop a written protocol including a statement of the operational motivations and objectives, parameters for supporting documentation that shall be collected, operations plans, and provide instructions to supervisors, deputies and posse members. That written protocol shall be provided to the Monitor in advance of any Significant Operation or Patrol.*

**In Full and Effective Compliance**

Since the requirements for conducting Significant Operations were implemented, MCSO has reported conducting only one Significant Operation that invoked the requirements of this Paragraph. MCSO conducted "Operation Borderline" from October 20-27, 2014, to interdict the flow of illegal narcotics into Maricopa County. MCSO met all the requirements of this Paragraph during the operation.

In February 2016, we became aware of "Operation No Drug Bust Too Small" when it was reported in the media, and requested details on this operation from MCSO. After reviewing the documentation MCSO provided, we were satisfied that it did not meet the reporting requirements of this Paragraph.

In October 2016, we became aware of "Operation Gila Monster" when it was reported in the media. According to media reports, this was a two-week operation conducted by a special operations Unit in MCSO and was intended to interdict the flow of illegal drugs into Maricopa County. We requested all documentation regarding this operation for review. The documentation indicated that MCSO conducted this operation from October 17-23, 2016. The documentation MCSO provided was sufficient for us to determine that this operation did not meet the reporting criteria for this, or other Paragraphs, related to Significant Operations. The Plaintiffs also reviewed the documentation submitted by MCSO on this operation and agreed that the operation did not invoke the requirements of this Paragraph. We and the Plaintiffs noted that "Operation Gila Monster" involved traffic stops of Latinos, and that those arrested were undocumented Latinos.

Since October 2014, MCSO has continued to report that it has not conducted any Significant Operations. In addition, we have not learned of any potential Significant Operation through media releases or other sources during this reporting period. We will continue to monitor and review any operations we become aware of to ensure continued compliance with this and other Paragraphs related to Significant Operations.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 72606

*Paragraph 37.  The MCSO shall submit a standard template for operations plans and standard instructions for supervisors, deputies and posse members applicable to all Significant Operations or Patrols to the Monitor for review pursuant to the process described in Section IV within 90 days of the Effective Date.  In Exigent Circumstances, the MCSO may conduct Significant Operations or Patrols during the interim period but such patrols shall be conducted in a manner that is in compliance with the requirement of this Order.  Any Significant Operations or Patrols thereafter must be in accordance with the approved template and instructions.*

**In Full and Effective Compliance**

In late 2014, we reviewed all the documentation submitted by MCSO regarding the Significant Operation conducted from October 24-27, 2014.  This operation was intended to interdict the flow of illegal narcotics into Maricopa County and fully complied with the requirements of this Paragraph.

MCSO continues to report that it has not conducted any operations that invoke the requirements of this Paragraph since October 2014.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

During this reporting period, we did not become aware of any Significant Operations conducted by MCSO.

**(Note: Unchanged language is presented in *italicized font*.  Additions are indicated by underlined font.  Deletions are indicated by ~~crossed-out font~~.)**

*Paragraph 38.  If the MCSO conducts any Significant Operations or Patrols involving 10 or more MCSO Personnel excluding posse members, it shall create the following documentation and provide it to the Monitor and Plaintiffs within 30 days after the operation:*

a.     *documentation of the specific justification/reason for the operation, certified as drafted prior to the operation (this documentation must include analysis of relevant, reliable, and comparative crime data);*

b.     *information that triggered the operation and/or selection of the particular site for the operation;*

c.     *documentation of the steps taken to corroborate any information or intelligence received from non-law enforcement personnel;*

d.     *documentation of command staff review and approval of the operation and operations plans;*

e.     *a listing of specific operational objectives for the patrol;*

f.     *documentation of specific operational objectives and instructions as communicated to participating MCSO Personnel;*

WAI 72607

g.      *any operations plans, other instructions, guidance or post-operation feedback or debriefing provided to participating MCSO Personnel;*

h.      *a post-operation analysis of the patrol, including a detailed report of any significant events that occurred during the patrol;*

i.      *arrest lists, officer participation logs and records for the patrol; and*

j.      *data about each contact made during the operation, including whether it resulted in a citation or arrest.*

**In Full and Effective Compliance**

Since the initial publication of GJ-33, MCSO has reported that it has conducted only one Significant Operation, "Operation Borderline," in October 2014.  At the time of this operation, we reviewed MCSO's compliance with policy; attended the operational briefing; and verified the inclusion of all the required protocols, planning checklists, supervisor daily checklists, and post-operation reports.  MCSO was in full compliance with this Paragraph for this operation.  Since October 2014, MCSO has not reported that it conducted any Significant Operations invoking the requirements of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.


**Paragraph 39.**  *The MCSO shall hold a community outreach meeting no more than 40 days after any Significant Operations or Patrols in the affected District(s).  MCSO shall work with the Community Advisory Board to ensure that the community outreach meeting adequately communicates information regarding the objectives and results of the operation or patrol.  The community outreach meeting shall be advertised and conducted in English and Spanish.*

**In Full and Effective Compliance**

The Amendments to the Supplemental Permanent Injunction/Judgment Order (Document 2100) issued on August 3, 2017 returned the responsibility for compliance with this Paragraph to MCSO.

During this reporting period, MCSO did not report conducting any Significant Operations that would invoke the requirements of this Paragraph.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

WAI 72608

***Paragraph 40.***   *The MCSO shall notify the Monitor and Plaintiffs within 24 hours of any immigration related traffic enforcement activity or Significant Operation involving the arrest of 5 or more people unless such disclosure would interfere with an on-going criminal investigation in which case the notification shall be provided under seal to the Court, which may determine that disclosure to the Monitor and Plaintiffs would not interfere with an on-going criminal investigation.  In any event, as soon as disclosure would no longer interfere with an on-going criminal investigation, MCSO shall provide the notification to the Monitor and Plaintiffs.  To the extent that it is not already covered above by Paragraph 38, the Monitor and Plaintiffs may request any documentation related to such activity as they deem reasonably necessary to ensure compliance with the Court's orders.*

**In Full and Effective Compliance**

Since MCSO first developed GJ-33 (Significant Operations) in 2014, MCSO has reported conducting only one operation, "Operation Borderline," that required compliance with this Paragraph.  We verified that MCSO employed the appropriate protocols and made all required notifications.  MCSO was in full compliance with this Paragraph during this operation.

Based on a concern raised by the Plaintiffs, and to provide clarification regarding the portion of this Paragraph that addresses the requirement for MCSO to notify the Monitor and Plaintiffs within 24 hours of any immigration-related traffic enforcement activity or Significant Operations involving "the arrest of or more persons," we requested during our October 2015 site visit that MCSO provide a statement regarding this requirement each month.  MCSO began including this information in November 2015.

MCSO has not reported conducting any operations that meet the reporting requirements for this Paragraph since October 2014.  During this reporting period, we did not learn of any traffic-related enforcement or Significant Operations conducted by MCSO that would invoke the requirements of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

WAI 72609

## Section 6: Training

**COURT ORDER VII.  TRAINING**

*a.  General Provisions*

***Paragraph 41.*** *To ensure that the Policies and Procedures provided for by this Order are effectuated, the MCSO shall implement the following requirements regarding Training.*

***Paragraph 42.*** *The persons presenting this Training in each area shall be competent instructors with significant experience and expertise in the area.  Those presenting Training on legal matters shall also hold a law degree from an accredited law school and be admitted to a Bar of any state and/or the District of Columbia.*

**Phase 1:** In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on October 26, 2023.

- GG-2 (Detention/Civilian Training Administration), most recently amended on October 26, 2023.

- Training Division Operations Manual, most recently amended on April 4, 2022.

**Phase 2:** In compliance

MCSO uses three types of instructors to deliver Order-related training:  They are either assigned to the Training Division as full-time staff; assigned to field assignments outside of the Training Division; or are paid vendors.  We approve instructors presenting training on legal matters for their compliance with the requirements of this Paragraph.  The Training Division electronically maintains individual instructor folders for Training Division staff, field instructors, Field Training Officers (FTOs), and vendors.  MCSO policy requires that instructor folders include annually updated CVs, General Instructor (GI) certificates, and either an annual or 30-day Misconduct and Disciplinary Review, as applicable.  Additionally, instructors who have received prior sustained discipline or who are subject of a pending Professional Standards Bureau (PSB) investigation may request a Waiver of Presumptive Ineligibility for approval to teach from the Training Division Commander.  A waiver request should provide the Training Division Commander with ample justification to overcome presumptive ineligibility.  Waiver requests require the Training Division Commander and the PSB Commander to discuss and produce written justifications for the approval or denial of each request.  We verify compliance with this Paragraph by reviewing all instructor folders, waiver requests, and justifications.

During this reporting period, MCSO submitted 24 individuals for General Instructor (GI) consideration.  All personnel met GG-1 criteria.

One FTO waiver request was received during this reporting period.  The Training Division Captain approved this request.

WAI 72610

Coinciding with recent revisions to GG-1 and changes to the FTO program, MCSO provided the first quarterly PSB Misconduct and Disciplinary Reviews for all active FTOs.  Of 62 identified FTOs, 18 personnel did not pass the required PSB review and are identified as inactive, removing them from Officer in Training (OIT) assignments.

The 2023 Annual FTO Training is scheduled for the fourth quarter of this year.

During this reporting period, the Training Division conducted three instructor observations.

During our October site visit, MCSO informed us of changes to the process for handling and compiling instructor folders for Training Division staff, field instructors, Field Training Officers (FTOs), and vendors.  The responsibility has now been assigned to a single individual within the Training Division.  This produces a more streamlined and accurate accounting of required documents.  All electronic files are organized in the same fashion and contain documentation of all GG-1 required content.  They are held on a secure drive, with limited personnel having authorized access to these documents.  (All paper folders have been archived.)  We verified the status of these folders, and audited the consistency of the documentation.  The Training Division sergeant informed us that the process changes will be included in the next revision to the Training Division Operations Manual.  We also discussed documentation changes to the PSB misconduct and disciplinary review process.  Going forward, all folders will now include documentation of all interactions between the Training Division Captain and the PSB Captain for the approval of FTOs, instructors, and waivers.

MCSO is now in compliance with this Paragraph.


**Paragraph 43.**  *The Training shall include at least 60% live training (i.e., with a live instructor), which includes an interactive component, and no more than 40% on-line training.  The Training shall also include testing and/or writings that indicate that MCSO Personnel taking the Training comprehend the material taught whether via live training or via on-line training.*

**In Full and Effective Compliance**

We verify compliance with this Paragraph by reviewing all individual test failures; individual retests; failure remediation efforts and test analyses by training class, for both live and HUB-delivered Order-related training.

During this reporting period, MCSO delivered the following programs:  2023 Annual Combined Training (ACT); 2022 Fourth and Fourteenth Amendment; 2021 Blue Team 2 Sworn/Detention (BT2); 2021 Body-Worn Camera (BWC); 2023 Early Identification System (EIS); 2023 Effective Employee Performance Management (EEPM); 2017 Employee Performance Appraisals (EPA); 2021 Body-Worn Camera (BWC); 2022 Supervisory Responsibilities Effective Law Enforcement (SRELE); 2023 Supervisory Responsibilities Effective Law Enforcement (SRELE); 2021 Traffic and Criminal Software (TraCS); 2021 TraCS for Supervisors; and the 2023 TraCS for Posse members.

WAI 72611

MCSO delivered the 2023 ACT train-the-trainer and classroom training 14 times during this reporting period to 569 personnel (421 sworn, 21 reserve, 122 Posse, five DSA, one Detention [optional attendance]).  Five personnel needed test remediation.

MCSO delivered the 2022 Fourth and Fourteenth Amendment classroom training once during this reporting period to seven personnel (all sworn).  Two personnel needed test remediation.

MCSO delivered the 2021 BT2 Sworn/Detention classroom training four times during this reporting period to 48 personnel (seven sworn, 31 Detention, 10 civilian).  One individual needed test remediation.

MCSO delivered the 2021 BWC classroom training once during this reporting period to seven sworn personnel.  No personnel needed test remediation.

MCSO delivered the 2023 EEPM classroom training once during this reporting period to 18 sworn personnel.  No personnel needed test remediation.

MCSO delivered the 2023 EIS classroom training twice during this reporting period to 39 personnel (16 sworn, 23 civilian).  One person needed test remediation.

MCSO delivered the 2017 EPA classroom training once during this reporting period to 39 personnel (15 sworn, 24 civilian).  No personnel needed test remediation.

MCSO delivered the 2022 SRELE classroom training once during this reporting period to 16 sworn personnel.  No personnel needed test remediation.

MCSO delivered the 2023 SRELE Train-the-Trainer during this reporting period to 28 sworn personnel.  No personnel needed test remediation.

MCSO delivered the 2021 TraCS classroom training once during this reporting period to seven sworn personnel.  No personnel needed test remediation.

MCSO delivered the 2021 TraCS for Supervisors once during this reporting period to 16 sworn personnel.  One person needed test remediation.

MCSO delivered the 2023 TraCS for Posse once during this reporting period to 24 personnel (seven sworn, 17 Posse).  No personnel needed test remediation.

MCSO delivered 12 of 14 Order-related training programs during this reporting period.  Each of these were delivered in the classroom (100% classroom training).

On June 17, 2022, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

WAI 72612

***Paragraph 44.*** *Within 90 days of the Effective Date, MCSO shall set out a schedule for delivering all Training required by this Order. Plaintiffs' Representative and the Monitor shall be provided with the schedule of all Trainings and will be permitted to observe all live trainings and all on-line training. Attendees shall sign in at each live session. MCSO shall keep an up-to-date list of the live and on-line Training sessions and hours attended or viewed by each officer and Supervisor and make that available to the Monitor and Plaintiffs.*

### In Full and Effective Compliance

The Training Division keeps a three-month Training Calendar. MCSO posts the Master Training Calendar to the agency's website to inform the public of tentative training dates, classes, and locations. The calendar displays 90-day increments and includes a legend specifically identifying Order-related training.

Master Personnel Rosters document the number of personnel requiring Order-related training. MCSO reported that 586 sworn members, 42 reserve members, 166 Posse members, 10 DSAs, 1,452 Detention members, and 836 civilian employees should have received Order-related instruction by the end of this reporting period. These categories vary by reporting period, due to attrition in the organization. All MCSO employee categories are still within compliance assessment levels for all Order-related training.

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 45.*** *The Training may incorporate adult-learning methods that incorporate roleplaying scenarios, interactive exercises, as well as traditional lecture formats.*

### In Full and Effective Compliance

MCSO continues to look for and incorporate adult-learning methods in its curricula – including an increased use of videos, both externally and internally created. We have also noted new learning activities designed to change with each iteration of the curriculum and address issues specific to the Plaintiffs' class and others.

During our October site visit, we and the Parties further discussed MCSO's proposal to change its development and delivery of Constitutional Policing Plan (CPP) enhanced training relative to implicit bias, cultural competency, and fair and impartial decision making. Following those discussions, MCSO submitted for review the TSAR Lesson Plan and accompanying documents. This lesson plan is currently under review.

On December 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 72613

***Paragraph 46.***  *The curriculum and any materials and information on the proposed instructors for the Training provided for by this Order shall be provided to the Monitor within 90 days of the Effective Date for review pursuant to the process described in Section IV.  The Monitor and Plaintiffs may provide resources that the MCSO can consult to develop the content of the Training, including names of suggested instructors.*

**In Full and Effective Compliance**

During our July site visit, we discussed the status of all Order-required training curricula.  The following curricula are under review or development for 2023 delivery:

- The 2022 Fourth and Fourteenth Amendment Training received annual review during this reporting period.

- The 2023 Supervisor Responsibilities:  Effective Law Enforcement (SRELE) classroom training was approved for delivery during this reporting period.

- The 2023 CPP Enhanced TSAR Training is under review.

- The 2021 Complaint Reception and Processing received annual review during this reporting period.

On December 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.


***Paragraph 47.***  *MCSO shall regularly update the Training to keep up with developments in the law and to take into account feedback from the Monitor, the Court, Plaintiffs and MCSO Personnel.*

**In Full and Effective Compliance**

MCSO conducts annual curriculum revisions and updates to keep current with developments in the law and to address feedback from us, the Plaintiffs, the Plaintiff-Intervenor, and MCSO personnel.

The Training Division routinely supplies all new and revised lesson plans for our and the Parties' review.  These reviews address the requirements of this Paragraph.

We will continue to advise MCSO upon first review of a training offering if we do not consider it to be enhanced, as referenced in the current Constitutional Policing Plan.  (See Paragraph 70.)

MCSO should expect that we and the Parties will continue to observe training sessions and provide feedback.

On June 17, 2022, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

WAI 72614

### b. Bias-Free Policing Training

***Paragraph 48.*** *The MCSO shall provide all sworn Deputies, including Supervisors and chiefs, as well as all posse members, with 12 hours of comprehensive and interdisciplinary Training on bias-free policing within 240 days of the Effective Date, or for new Deputies or posse members, within 90 days of the start of their service, and at least 6 hours annually thereafter.*

**In Full and Effective Compliance**

MCSO has combined the Order required Bias-Free Policing Training and the Training on Detentions, Arrests, and the Enforcement of Immigration Laws into a single 20-hour training class titled Fourth and Fourteenth Amendment Training. MCSO mandates that all new deputies, Posse members, and Deputy Service Aides (DSA) receive this Court-ordered training within the first 90 days of their employment or volunteer service.

MCSO delivered the 2022 Fourth and Fourteenth Amendment classroom training once during this reporting period to the required seven sworn personnel.

MCSO delivered the 2023 ACT Train-the-Trainer and 13 classes during this reporting period to 569 personnel (421/586 sworn, 21/42 reserve, 122/166 Posse, five/10 DSA).

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 49.*** *The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:*

a.      *definitions of racial profiling and Discriminatory Policing;*

b.      *examples of the type of conduct that would constitute Discriminatory Policing as well as examples of the types of indicators Deputies may properly rely upon;*

c.      *the protection of civil rights as a central part of the police mission and as essential to effective policing;*

d.      *an emphasis on ethics, professionalism and the protection of civil rights as a central part of the police mission and as essential to effective policing;*

e.      *constitutional and other legal requirements related to equal protection, unlawful discrimination, and restrictions on the enforcement of Immigration-Related Laws, including the requirements of this Order;*

f.      *MCSO policies related to Discriminatory Policing, the enforcement of Immigration-Related Laws and traffic enforcement, and to the extent past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;*

g.      *MCSO's protocol and requirements for ensuring that any significant pre-planned operations or patrols are initiated and carried out in a race-neutral fashion;*

h.      *police and community perspectives related to Discriminatory Policing;*

WAI 72615

i.     *the existence of arbitrary classifications, stereotypes, and implicit bias, and the impact that these may have on the decision-making and behavior of a Deputy;*

j.     *methods and strategies for identifying stereotypes and implicit bias in Deputy decision-making;*

k.     *methods and strategies for ensuring effective policing, including reliance solely on non-discriminatory factors at key decision points;*

l.     *methods and strategies to reduce misunderstanding, resolve and/or de-escalate conflict, and avoid Complaints due to perceived police bias or discrimination;*

m.     *cultural awareness and how to communicate with individuals in commonly encountered scenarios;*

n.     *problem-oriented policing tactics and other methods for improving public safety and crime prevention through community engagement;*

o.     *the benefits of actively engaging community organizations, including those serving youth and immigrant communities;*

p.     *the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;*

q.     *background information on the Melendres v. Arpaio litigation, as well as a summary and explanation of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in Melendres v. Arpaio, the parameters of the Court's permanent injunction, and the requirements of this Order; and*

r.     *Instruction on the data collection protocols and reporting requirements of this Order.*

**In Full and Effective Compliance**

The 2023 ACT was previously approved for delivery.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 72616

### c. *Training on Detentions, Arrests, and the Enforcement of Immigration-Related Laws*

***Paragraph 50.*** *In addition to the Training on bias-free policing, the MCSO shall provide all sworn personnel, including Supervisors and chiefs, as well as all posse members, with 6 hours of Training on the Fourth Amendment, including on detentions, arrests and the enforcement of Immigration-Related Laws within 180 days of the effective date of this Order, or for new Deputies or posse members, within 90 days of the start of their service.  MCSO shall provide all Deputies with 4 hours of Training each year thereafter.*

**In Full and Effective Compliance**

MCSO has combined the Order required Bias-Free Policing Training and the Training on Detentions, Arrests, and the Enforcement of Immigration Laws into a single 20-hour training class titled Fourth and Fourteenth Amendment Training.  MCSO mandates that all new deputies, Posse members, and Deputy Service Aides (DSA) receive this Court-ordered training within the first 90 days of their employment or volunteer service.

MCSO delivered the 2022 Fourth and Fourteenth Amendment classroom training once during this reporting period to the required seven sworn personnel.

As previously reported, the 2023 ACT was approved for delivery.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

***Paragraph 51.*** *The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:*

a.  *an explanation of the difference between various police contacts according to the level of police intrusion and the requisite level of suspicion; the difference between reasonable suspicion and mere speculation; and the difference between voluntary consent and mere acquiescence to police authority;*

b.  *guidance on the facts and circumstances that should be considered in initiating, expanding or terminating an Investigatory Stop or detention;*

c.  *guidance on the circumstances under which an Investigatory Detention can become an arrest requiring probable cause;*

d.  *constitutional and other legal requirements related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, including the requirements of this Order;*

e.  *MCSO policies related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, and the extent to which past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;*

f.  *the circumstances under which a passenger may be questioned or asked for identification;*

WAI 72617

g.   *the forms of identification that will be deemed acceptable if a driver or passenger (in circumstances where identification is required of them) is unable to present an Arizona driver's license;*

h.   *the circumstances under which an officer may initiate a vehicle stop in order to investigate a load vehicle;*

i.   *the circumstances under which a Deputy may question any individual as to his/her alienage or immigration status, investigate an individual's identity or search the individual in order to develop evidence of unlawful status, contact ICE/CBP, await a response from ICE/CBP and/or deliver an individual to ICE/CBP custody;*

j.   *a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause to believe that a vehicle or an individual is involved in an immigration-related state crime, such as a violation of the Arizona Human Smuggling Statute, as drawn from legal precedent and updated as necessary; the factors shall not include actual or apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a Hispanic day laborer;*

k.   *a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause that an individual is in the country unlawfully, as drawn from legal precedent and updated as necessary; the factors shall not include actual or apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a day laborer;*

l.   *an emphasis on the rule that use of race or ethnicity to any degree, except in the case of a reliable, specific suspect description, is prohibited;*

m.   *the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;*

n.   *Provide all trainees a copy of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in Melendres v. Arpaio and this Order, as well as a summary and explanation of the same that is drafted by counsel for Plaintiffs or Defendants and reviewed by the Monitor or the Court; and*

o.   *Instruction on the data collection protocols and reporting requirements of this Order, particularly reporting requirements for any contact with ICE/CBP.*

**In Full and Effective Compliance**

The Fourth and Fourteenth Amendment Training curriculum was previously approved for 2023 delivery.

The 2023 ACT curriculum was previously approved for delivery.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 72618

### d. Supervisor and Command Level Training

*Paragraph 52.   MCSO shall provide Supervisors with comprehensive and interdisciplinary Training on supervision strategies and supervisory responsibilities under the Order.  MCSO shall provide an initial mandatory supervisor training of no less than 6 hours, which shall be completed prior to assuming supervisory responsibilities or, for current MCSO Supervisors, within 180 days of the Effective Date of this Order.  In addition to this initial Supervisor Training, MCSO shall require each Supervisor to complete at least 4 hours of Supervisor-specific Training annually thereafter.  As needed, Supervisors shall also receive Training and updates as required by changes in pertinent developments in the law of equal protection, Fourth Amendment, the enforcement of Immigration-Related Laws, and other areas, as well as Training in new skills.*

**In Full and Effective Compliance**

MCSO delivered the 2022 SRELE once during this reporting period to 16 sworn personnel.  No personnel needed test remediation.

The 2023 SRELE curriculum was approved for delivery during this reporting period.

MCSO delivered the 2023 SRELE Train-the-Trainer during this reporting period to 28 sworn personnel.  No personnel needed test remediation.

On June 18, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.


*Paragraph 53.  The Supervisor-specific Training shall address or include, at a minimum:*

a.      *techniques for effectively guiding and directing Deputies, and promoting effective and constitutional police practices in conformity with the Policies and Procedures in Paragraphs 18–34 and the Fourth and Fourteenth Amendment Training in Paragraphs 48–51;*

b.      *how to conduct regular reviews of subordinates;*

c.      *operation of Supervisory tools such as EIS;*

d.      *evaluation of written reports, including how to identify conclusory, "canned," or perfunctory language that is not supported by specific facts;*

e.      *how to analyze collected traffic stop data, audio and visual recordings, and patrol data to look for warning signs or indicia of possible racial profiling or unlawful conduct;*

f.      *how to plan significant operations and patrols to ensure that they are race-neutral and how to supervise Deputies engaged in such operations;*

g.      *incorporating integrity-related data into COMSTAT reporting;*

h.      *how to respond to calls from Deputies requesting permission to proceed with an investigation of an individual's immigration status, including contacting ICE/CBP;*

WAI 72619

i.  *how to respond to the scene of a traffic stop when a civilian would like to make a Complaint against a Deputy;*

j.  *how to respond to and investigate allegations of Deputy misconduct generally;*

k.  *evaluating Deputy performance as part of the regular employee performance evaluation; and*

l.  *building community partnerships and guiding Deputies to do the Training for Personnel Conducting Misconduct Investigations.*

**In Full and Effective Compliance**

The 2023 SRELE classroom training was approved for delivery during this reporting period.

On June 18, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

WAI 72620

# Section 7: Traffic Stop Documentation and Data Collection

**COURT ORDER VIII.    TRAFFIC STOP DOCUMENTATION AND DATA COLLECTION AND REVIEW**

For Paragraphs 54 and 55, in particular, we request traffic stop data from MCSO. The following describes how we made that request and how we handled the data once we received it. These data may also be referred to in other areas of Section 7 and the report as a whole.

In selecting traffic stop cases for our compliance review, we modified our statistical technique in that, rather than selecting a representative random sample of 100 cases per quarter, we instead pulled a sample of 35 cases per month (or 105 cases per quarter). Our original selection of a sample size of 35 cases was based on information from MCSO TraCS data that reported the average number of traffic stops per month was fewer than 2,000 during the April 2014-June 2015 period when TraCS data were first available. The selection of 35 cases reflects a sample based on this average per month. This gave us a 95 percent confidence level (the certainty associated with our conclusion).

We continue to pull our monthly sample of traffic stop cases from the MCSO's five Districts (Districts 1, 2, 3, 4, and 7) and Lake Patrol. As noted previously, District 6 is no longer operational as of January 11, 2022, as the Queen Creek Police Department commenced full operations and is now the primary law enforcement agency for that jurisdiction. Once we received files each month containing traffic stop case numbers from MCSO, denoting from which area they came, we selected a sample of up to 35 cases representing the areas and then selected a subsample averaging 10 cases, from the 35 selected cases, to obtain CAD audiotapes and body-worn camera recordings. Our sampling process involved selecting a sample of cases stratified by the areas according to the proportion of specific area cases relative to the total area cases. Stratification of the data was necessary to ensure that each area was represented proportionally in our review. Randomization of the cases and the selection of the final cases for CAD review were achieved using a statistical software package (IBM SPSS Version 22), which contains a specific function that randomly selects cases and that also allows cases to be weighted by the areas. Our use of SPSS required that we first convert the MCSO Excel spreadsheet into a format that would be readable in SPSS. We next pulled the stratified sample each month for the areas and then randomly selected a CAD audio subsample from the selected cases.

In February 2016, we began pulling cases for our body-worn camera review from the audio subsample. Since that time, we began pulling additional samples for passenger contacts and persons' searches (10 each per month). The unique identifiers for these two samples were relayed back to MCSO personnel, who produced documentation for the selected sample (including the CAD documentation for the subsample).

On October 10, 2014, the Court issued an Order Granting Stipulation to Amend Supplemental/Permanent Injunction/Judgment Order (Document 748). The stipulation affects Paragraphs 57, 61, 62, and 1.r.xv.; and has been incorporated in the body of this report. The stipulation referenced amends the First Order, and will be addressed in Section 7.

WAI 72621

*a. Collection of Traffic Stop Data*

**Paragraph 54.**  *Within 180 days of the Effective Date, MCSO shall develop a system to ensure that Deputies collect data on all vehicle stops, whether or not they result in the issuance of a citation or arrest.  This system shall require Deputies to document, at a minimum:*

a.     *the name, badge/serial number, and unit of each Deputy and posse member involved;*

b.     *the date, time and location of the stop, recorded in a format that can be subject to geocoding;*

c.     *the license plate state and number of the subject vehicle;*

d.     *the total number of occupants in the vehicle;*

e.     *the Deputy's subjective perceived race, ethnicity and gender of the driver and any passengers, based on the officer's subjective impression (no inquiry into an occupant's ethnicity or gender is required or permitted);*

f.     *the name of any individual upon whom the Deputy runs a license or warrant check (including subject's surname);*

g.     *an indication of whether the Deputy otherwise contacted any passengers, the nature of the contact, and the reasons for such contact;*

h.     *the reason for the stop, recorded prior to contact with the occupants of the stopped vehicle, including a description of the traffic or equipment violation observed, if any, and any indicators of criminal activity developed before or during the stop;*

i.     *time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; time a release was made without citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere or Deputy's departure from the scene;*

j.     *whether any inquiry as to immigration status was conducted and whether ICE/CBP was contacted, and if so, the facts supporting the inquiry or contact with ICE/CBP, the time Supervisor approval was sought, the time ICE/CBP was contacted, the time it took to complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual;*

k.     *whether any individual was asked to consent to a search (and the response), whether a probable cause search was performed on any individual, or whether a pat-and-frisk search was performed on any individual;*

l.     *whether any contraband or evidence was seized from any individual, and nature of the contraband or evidence; and*

m.     *The final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without citation.*

**Phase 1:**  In compliance

WAI 72622

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on October 13, 2022.

- EA-11 (Arrest Procedures), most recently amended on April 5, 2022.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on June 15, 2023.

- EB-2 (Traffic Stop Data Collection), most recently amended on February 22, 2023.

- GI-1 (Radio and Enforcement Communications Procedures), most recently amended on December 8, 2021.

- GJ-3 (Search and Seizure), most recently amended on November 9, 2023.

**Phase 2:**  Not in compliance

To verify the information required for this Paragraph, MCSO created, and we reviewed, the Vehicle Stop Contact Forms (VSCFs), the Vehicle Stop Contact Form Supplemental Sheets, the Incidental Contact Receipts, and the Written Warning/Repair Orders, all in electronic form, for a sample of those motorists who, during this reporting period, committed a traffic violation or operated a vehicle with defective equipment and received a warning.  We also reviewed the Arizona Traffic Ticket and Complaint Forms issued for violations of Arizona Statutes, Internet I/Viewer Event Unit printout, Justice Web Interface printout, and any Incident Report associated with these events.  We selected a sample of 105 traffic stops conducted by deputies from July 1-September 30, 2023 for the purposes of this review; and assessed the collected data from the above-listed documents for compliance with Subparagraphs 54.a.-54.m.   All of the listed documentation was used for our review of the following subsections of this Paragraph.

The Paragraph requires that MCSO create a system for data collection.  The data collected pursuant to this Paragraph is captured in the Early Identification System, which we discuss further in this report.

In our reviews of the following requirements, we consider whether any compliance issues were identified and addressed by supervisory personnel during the regular review of documents by supervisors.  During this reporting period, we identified several instances where supervisors identified compliance and/or policy-related issues and addressed the deputies by way of re-instruction and/or by requiring that the deputies correct the VSCF.  Following are some examples of issues identified:

- In two instances, the supervisors directed the deputies to correct the VSCF field that contained the reason for the traffic stop.

- A supervisor directed a deputy to correct the VSCF regarding whether the voiced reason for the stop was contained on the citation.

- A supervisor identified that the deputy did not issue Incidental Contact Receipt to a passenger who was contacted during a traffic stop and directed the deputy to mail the document to the passenger.

WAI 72623

- A supervisor directed a deputy to correct the VSCF to include that an inventory search of a vehicle was conducted.

- A supervisor directed a deputy to correct the statute information contained on the VSCF as it related to an arrest of the driver.

- A supervisor identified that a deputy deactivated the body-worn camera prior to the end of a traffic stop.  The supervisor documented on the VSCF that a discussion was held with the deputy to remind the deputy of the policy regarding deactivation of the body-worn camera.

- A supervisor directed a deputy to correct the VSCF field containing another deputy's call sign that was present at the traffic stop.

- In two instances, the supervisors directed the deputies to correct the VSCFs to include additional deputies that were present at the traffic stops.

- A supervisor directed a deputy to correct the VSCF to indicate that no search of the driver was conducted, and that the vehicle was searched.

- A supervisor directed a deputy to add information to the VSCF to explain why the stop was extended.

- A supervisor documented on the VSCF that a discussion with the deputy was conducted regarding the failure to obtain the driver's information in relation to a traffic stop for a littering violation in which the passenger was issued a citation.

- A supervisor directed a deputy to correct the VSCF to include the correct number of passengers in the vehicle.

We include these observations in our report as they are examples of effective supervisory oversight.  If MCSO supervisors are consistent in addressing such issues, we anticipate that MCSO will attain, and maintain, compliance with all of the requirements.

Paragraph 54.a. requires MCSO to document the name, badge/serial number, and unit of each deputy and Posse member involved.

For this reporting period, each of the primary deputies documented their own badge numbers, serial numbers, and unit numbers for every stop that they initiated.  We review the VSCF, I/Viewer Event document, the Justice Web Interface, and the CAD printout to determine which additional units were on the scene.  If back-up units arrive on a scene and do not announce their presence to dispatch, CAD does not capture this information.  MCSO made a TraCS change to the VSCF during 2016 to secure this information.  MCSO added a drop-down box so the deputy could enter the number of units on the scene and the appropriate fields would be added for the additional deputies.  While this addition is an improvement, if the deputy fails to enter the number of additional units on the form, the drop-down boxes do not appear.  In addition, MCSO policy requires deputies to prepare the Assisting Employee and/or Volunteer Log in instances where deputies respond and assist at a traffic stop.  The log contains the relevant information required by this Subparagraph for any additional deputies involved in a traffic stop other than the primary

WAI 72624

deputy.   During our April 2019 site visit, we discussed with MCSO, the Plaintiffs, and the Plaintiff-Intervenor the method of evaluating this requirement.  We determined that in instances where a deputy's name, serial number and unit number may have been omitted on the VSCF, yet the deputy prepared the Assisting Employee and/or Volunteer Log, the requirements of this Subparagraph will have been met.

During our review of the sample of 105 vehicle traffic stops, we identified 24 cases where the deputy's unit had another deputy assigned to the vehicle or one or more other deputy units or Posse members were on the scene.  In each of the 24 cases, the deputies properly documented the name, serial number, and unit number of the deputies and Posse members on the VSCF, or the information was captured on the Assisting Employee and/or Volunteer Log.  In one case, the deputy erroneously listed on the VSCF that there was an assisting deputy on the traffic stop, when there was not an additional deputy involved in the traffic stop.  AIU identified this issue during its inspection and requested that the District document any corrective measures taken on a BIO Action Form.

Of the cases we reviewed for passenger contacts under Subparagraph 54.g., there were 40 cases where the deputy's unit had another deputy assigned to the vehicle, or one or more other deputy units or Posse members were on the scene.  In each of the 40 cases, the deputies properly documented the required information on the VSCFs, or the information was captured on the Assisting Employee and/or Volunteer Log.

Of the cases we reviewed for searches of persons under Subparagraph 54.k., there were 65 cases where the deputy's unit had another deputy assigned to the vehicle, or one or more other deputies or Posse members were on the scene.  In each of the 65 cases, the deputies properly documented the required information on the VSCFs, or the information was captured on the Assisting Employee and/or Volunteer Log.

We continue to identify cases where the assisting deputies have not prepared the Assisting Employee and/or Volunteer Log when required by MCSO policy.  We encourage MCSO to provide guidance to supervisors to be attentive to this issue during their reviews of traffic stop documentation.

During this reporting period, MCSO achieved a compliance rating of 100%.  MCSO remains in compliance with this requirement.

Paragraph 54.b. requires MCSO to document the date, time, and location of the stop, recorded in a format that can be subject to geocoding.  Our reviews of the CAD printout for all 105 traffic stops in our sample indicated that the date, time, and location is captured with the time the stop is initiated and the time the stop is cleared.  In previous reporting periods, we noted instances where the GPS coordinates could not be located on the documentation received (CAD printout/I/Viewer).  We contacted MCSO about this issue, and MCSO now provides us with the GPS coordinates via a separate document that lists the coordinates for the traffic stop sample we provide.  MCSO uses GPS to determine location for the CAD system.  GPS collects coordinates from three or more satellites to enhance the accuracy of location approximation.  The data from the satellites can be decoded to determine the longitude and latitude of traffic stop locations should that be necessary.

WAI 72625

MCSO's CAD system was upgraded in 2014 to include geocoding of traffic stops.  CID continues to provide us with a printout of all case numbers in the sample containing the associated coordinates.  For this reporting period, the CAD or I/Viewer system contained the coordinates in 79% of the cases.  In a separate spreadsheet, MCSO provided GPS coordinates for all 105 cases we reviewed, for 100% compliance with this portion of the Subparagraph.

When we review the sample traffic stops from across all Districts, we note the locations of the stops contained on the VSCF, the CAD printout, and the I/Viewer system to ensure that they are accurate.  We continue to identify a limited number of instances where the location of the stop contained on the VSCF and the location of the stop contained on the CAD printout are inconsistent.  We continue to recommend that reviewing supervisors closely review the VSCFs and CAD printouts and address such deficiencies.  The number of inconsistencies did not affect MCSO's rate of compliance.

During our April 2016 site visit, we discussed with MCSO the possibility of using the CAD printout instead of the TraCS data to determine stop times.  We determined that using the CAD system to determine stop end times created additional challenges.  However, MCSO decided to use the CAD printout to determine traffic stop beginning and ending times for data analysis.  MCSO issued Administrative Broadcast 16-62 on June 29, 2016, which indicated that, beginning with the July 2016 traffic stop data collection, the stop times captured on the CAD system would be used for reporting and analytical purposes.

Occasionally, the CAD time of stop and end of stop time do not exactly match those listed on the Vehicle Stop Contact Form, due to extenuating circumstances the deputy may encounter.  During this reporting period, we did not find any instances where the end time on the VSCF Contact differed significantly from the CAD printout.  In monthly audits of traffic stop data, the Audits and Inspections Unit (AIU) reviews the beginning/ending times of the stops and requires that BIO Action Forms are generated by the Districts when there are discrepancies.  The CAD system is more reliable than the VSCF in determining stop times, as it is less prone to human error.  When the deputy verbally advises dispatch that s/he is conducting a traffic stop, the information is digitally time-stamped into the CAD system without human input; and when the deputy clears the stop, s/he again verbally advises dispatch.

MCSO remains in compliance with this Subparagraph.

Paragraph 54.c. requires MCSO to document the license plate and state of the subject vehicle.  During this reporting period, in each of the 105 stops that were reviewed, the deputies properly documented the license plate information on the VSCFs and the citations prepared for the stops.

MCSO remains in compliance with this Subparagraph, with a compliance rate of 100%.

Paragraph 54.d. requires MCSO to document the total number of occupants in the vehicle when a stop is conducted.  The VSCF, completed by the deputy on every traffic stop, is used to capture the total number of occupants and contains a separate box on the form for that purpose.  EB-2 (Traffic Stop Data Collection) requires deputies to collect data on all traffic stops using the VSCF; this includes incidental contacts with motorists.

WAI 72626

In 38 of the 105 traffic stops we reviewed, the driver had one or more passengers in the vehicle (55 total passengers). In each of the 38 cases, our review determined that the deputies properly documented the total number of occupants in the vehicles.

With a compliance rate of 100%, MCSO remains in compliance with this Subparagraph.

Paragraph 54.e. requires MCSO to document the perceived race, ethnicity, and gender of the driver and any passengers, based on the deputy's subjective impression. (No inquiry into the occupant's ethnicity or gender is required or permitted.) In 38 of the 105 stops from the traffic stop data sample, there was more than one occupant in the vehicle (55 total passengers).

Fifty-eight, or 55%, of the 105 traffic stops involved white drivers. Thirty-three, or 31%, of the 105 stops involved Latino drivers. Nine, or 9%, of the 105 traffic stops involved Black drivers. Five, or 5%, of the 105 traffic stops involved Asian or Pacific Islander drivers. Forty-nine traffic stops, or 47%, resulted in citations. The breakdown of those motorists issued citations is as follows: 32 white drivers (65% of the drivers who were issued citations); 14 Latino drivers (29% of the drivers who were issued citations); and three Black drivers (6% of the drivers who were issued citations). Fifty-four, or 51%, of the 105 traffic stops we reviewed resulted in a written warning. The breakdown of those motorists issued warnings is as follows: 24 white drivers (44% of the drivers who were issued warnings); 19 Latino drivers (35% of the drivers who were issued warnings); five Black drivers (9% of the drivers who were issued warnings); and five Asian or Pacific Islander drivers (9% of the drivers who were issued warnings). There were an additional two stops where on-duty law enforcement personnel from another jurisdiction were stopped while operating unmarked patrol vehicles. In one instance, the white driver was issued an Incidental Contact Receipt. Regarding the other stop, the Black driver was not issued an Incidental Contact Receipt, citation, or warning, as required by policy. AIU identified this issue during its inspection and requested that the District document any corrective measures taken on a BIO Action Form.

In our sample of 30 traffic stops that contained body-worn camera recordings, we identified two stops where the passengers in the vehicles were not properly documented on the VSCFs. In one case, the deputy indicated that the passenger was a male on the VSCF; however, based on our review, the passenger appeared to be a female. AIU identified this issue as well and required that a BIO Action Form be prepared documenting any corrective action taken. In one case, the deputy indicated that the passenger was not identified, as the deputy's vision was obstructed. However, based on our review, the passenger appeared to be a male, as the vehicle was stopped during the nighttime in what appeared to be a well-lit parking lot. In our review of cases to assess compliance with Paragraph 54.k., we identified one stop where the deputy indicated that the driver was the only occupant of the vehicle. Based on our review, there were two passengers in the vehicle, a white male and a white female. In our review of cases to assess compliance with Paragraph 25.d. and 54.g., passenger contacts, we identified one stop in which a deputy did not accurately document the perceived gender of the vehicle's occupants. The deputy listed all three occupants of the vehicle as white; however, based on our review, the driver and passengers all appeared to be Hispanic. In addition, as the deputy attempted to communicate with the driver, he discovered that a language barrier existed and that the driver and passengers primarily spoke Spanish.

WAI 72627

This Paragraph requires deputies to document the perceived race, ethnicity, and gender of any passengers whether contact is made with them or not. There were some instances where deputies indicated that they were unable to determine the gender and ethnicity of a passenger and listed the passenger as "unknown-vision obscured." During our review of the body-worn camera recordings, we were also unable to get a clear view of the some of the passengers, often due to vehicle being equipped with dark tinted windows combined with the stop occurring during nighttime hours; or due to vehicle being equipped with dark tinted windows combined with the glare of the sun during daytime hours. In some instances, there are infants in the vehicle that are not easy to observe when they are seated in car seats.

During the second quarter of 2019, AIU commenced conducting the Post-Stop Perceived Ethnicity Inspection. This inspection is conducted on a monthly basis and includes: 1) a review of traffic stops where the deputy documented the driver as being white and the driver's surname is Latino; 2) a review of traffic stops where the deputy documented that the driver has a Latino surname with a passenger listed as "unknown-vision obscured;" and 3) a review of traffic stops where the deputy documented that the driver was Latino and the passengers were listed with a designated ethnicity on the VSCF. AIU continues to conduct these inspections on a monthly basis. AIU requires that the Districts prepare BIO Action Forms to address any issues identified.

MCSO remains in compliance with this requirement.

Paragraph 54.f. requires that MCSO record the name of any individual upon whom the deputy runs a license or warrant check (including the subject's surname). Our review determined that the deputies properly documented the name of each individual on the VSCF when a license or warrant check was conducted.

MCSO's compliance rate with this requirement is 100%. MCSO remains in compliance with this Subparagraph.

Paragraph 54.g. requires the deputy to document whether contact was made with any passengers, the nature of the contact, and the reasons for the contact. During the third quarter of 2019, MCSO requested that we increase the number of cases reviewed to identify additional stops that fit the criteria of this Paragraph. The sample size of cases to be reviewed was increased from 10 stops each month to 35 stops each month, commencing with August 2019. During some months, the number of traffic stops that involve deputies having contact with passenger is fewer than 35 traffic stops.

During our assessment, we specifically review traffic stops that include any instance where the deputy asks any questions of a passenger beyond a greeting, including asking passengers to identify themselves for any reason or requesting that they submit to a Preliminary Breath Test. In such instances, we determine if the passenger was issued one of the following: Incidental Contact Receipt, citation, or a warning. If the passenger was not issued any one of the following documents, it adversely impacts MCSO's compliance with this requirement. It is also important to note that in such instances where a deputy fails to issue one of the required documents after being involved in a passenger contact, it is a violation of MCSO's policy.

WAI 72628

To ensure that deputies are accurately capturing passenger information and to verify if passengers are contacted, we compare the number of passengers listed by the deputy with the number of passengers entered in the passenger drop-down box on the Vehicle Stop Contact Form. We also review any Incidental Contact Receipts, citations, or warnings issued to passengers by deputies. We also review the deputies' notes on the VSCF, the Arizona Citation, and the CAD printout for any information involving the passengers. We review MCSO's I/Viewer System and the Justice Web Interface (JWI) to verify if a records check was requested for the driver or any passengers.

All passenger contacts in the traffic stops we reviewed for Paragraphs 25.d. and 54.g were noted in the VSCFs. For this reporting period, we identified 70 traffic stops where the deputy had interaction with one or more passengers which required the issuance of either an Incidental Contact Receipt, a citation, or a warning. Of the 70 stops, there were 12 stops where we determined that a passenger, or passengers, were not provided with either an Incidental Contact Receipt, a citation, or a warning, as required by MCSO policy. For the remaining 58 stops, the passengers were properly provided with either an Incidental Contact Receipt, a citation, or a warning. In addition, we continue to be provided with Incidental Contact Receipts for some of the stops when, based on our reviews of the body-worn camera recordings, the documents were not provided to the passengers prior to the conclusion of the stop. In these instances, there were no exigent or unusual circumstances that precluded the issuance of the documents during the traffic stop.

We identified 15 cases in the stops that we reviewed for Paragraph 54.k. in which the passengers were contacted which required the issuance of either an Incidental Contact Receipt, a citation, or a warning. In 10 of the 15 stops, we determined that the passenger or passengers were properly provided with either an Incidental Contact Receipt, a citation, or a warning, as required by MCSO policy. In the other five stops, the passengers were not properly provided with either an Incidental Contact Receipt, a citation, or a warning, as required by MCSO policy.

There was one case identified in the stops that we reviewed for Paragraphs 25 and 54 in which passengers were contacted, which required the issuance of either an Incidental Contact Receipt, a citation, or a warning. In that case, there were two passengers who were contacted during the traffic stop. According to the notes by the supervisor on the VSCF, an Incidental Contact Receipt was mailed to the female passenger two days after the traffic stop; however, there was no indication that an Incidental Contact Receipt was provided to the male passenger. Based on our review of the body-worn camera recording, there was no indication that any exigent circumstances existed that precluded the deputy from providing the Incidental Contact Receipts to the passengers during the traffic stop.

MCSO continues to conduct internal inspections to review its own sample of passenger contacts during traffic stops. In any instances where issues are identified, AIU issues BIO Action Forms to the Districts to address those deficiencies.

As noted in some of the cases above, deputies have not been consistent in preparing and providing passengers with Incidental Contact Receipts during traffic stops in which the passenger is contacted and asked by the deputy to provide identification. Supervisors should identify such errors and omissions during their reviews of the VSCFs and take corrective action. In previous reporting periods, MCSO has informed us that some supervisors have identified incidents where

WAI 72629

deputies have failed to provide the Incidental Contact Receipts and then had the deputies mail the receipts. However, the documentation that the receipts have been mailed is not listed on the VSCFs.

During our October 2023 site visit, we discussed the topic of the issuance of Incidental Contact Receipts to passengers with MCSO. MCSO informed us that AIU has identified the same issue as the Monitoring Team regarding this issue. To attempt to address this, MCSO has proposed making modifications to TraCS in relation to passenger contacts. MCSO indicated that it is making the following changes to TraCS, the VSCF, and the Incidental Contact Receipt:

- MCSO will provide clear instructions to the deputies as to the specific types of contact with passengers that require the issuance of an Incidental Contact Receipt.

- MCSO will include a specific listing of the various types of contact that the deputies would select, that would then be populated on the VSCF.

- MCSO will modify TraCs to automatically print an Incidental Contact Receipt each time a deputy prints out a citation or warning in each traffic stop event where a passenger is present.

We will follow up with MCSO regarding the status and impact of these modifications.

During the first quarter of 2023, MCSO provided the Incidental Contact Receipt, a citation, or a warning, when required in 85% of the cases. During the second reporting period of 2023, MCSO provided the Incidental Contact Receipt, a citation, or a warning, when required in 84% of the cases. During this reporting period, MCSO provided the Incidental Contact Receipt, a citation, or a warning, when required in 79% of the cases. MCSO is not in compliance with this Subparagraph.

Paragraph 54.h. requires deputies to record, prior to the stop, the reason for the vehicle stop, including a description of the traffic or equipment violation observed, and any indicators of criminal activity developed before or during the stop. For this reporting period, we identified a random sample of 10 cases from the 35 cases we initially requested each month, and requested CAD audio and body-worn camera footage for those cases. We listened to CAD dispatch audio recordings, reviewed the CAD printouts, and reviewed body-worn camera recordings for 30 traffic stops from the sample of 105 traffic stops used for this review; and found that the deputies advised Communications of the reason for the stop, location of the stop, license plate, and state of registration for all 30 stops.

For the remaining 75 traffic stops where body-worn camera recordings and CAD audiotapes were not requested, we review the CAD printout and the VSCF to ensure that the reason for the stop has been captured. These forms are included in our monthly sample requests. The dispatcher enters the reason for the stop in the system as soon as the deputy verbally advises Communications of the stop, location, and tag number. The VSCF and the CAD printout document the time the stop begins and when it is concluded – either by arrest, citation, or warning. Deputies need to be precise when advising dispatch of the reason for the traffic stop, and likewise entering that information on the appropriate forms.

MCSO's compliance rating for this Subparagraph is 100%.

WAI 72630

Paragraph 54.i. requires deputies to document the time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; the time a release was made without a citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere, or the deputy's departure from the scene.  In our review of the documentation provided by MCSO, the CAD printouts, the Vehicle Stop Contact Forms, along with the E-Ticketing system and the Arizona Ticket and Complaint Form, the information required is effectively captured.  As we noted in Subparagraph 54.b., the stop times on the CAD printout and the Vehicle Stop Contact Form vary slightly on occasion.  We understand that this may occur due to extenuating circumstances, and we will report on those instances where there is a difference of five minutes or more from either the initial stop time or the end time.

We review the circumstances of each stop and the activities of the deputies during each stop to assess whether the length of the stop was justified.  In most instances, deputies generally conclude their contact with the drivers by deactivating their body-worn cameras and notifying Communications that the stop has been concluded.  During this reporting period, we did not identify any stops that were extended for an unreasonable amount of time.

Supervisors are required to conduct reviews of the VSCFs within 72 hours of the stop.  In each of the 105 VSCFs reviewed, the supervisors conducted timely reviews.  Deputies accurately entered beginning and ending times of traffic stops in all 105 cases reviewed.  MCSO accurately entered the time citations and warnings were issued in each of the 105 cases reviewed.

MCSO remains in compliance with this Subparagraph.

Paragraph 54.j. requires MCSO to document whether any inquiry as to immigration status was conducted and whether ICE/CBP was contacted, and if so, the facts supporting the inquiry or contact with ICE/CBP, the time supervisor approval was sought, the time ICE/CBP was contacted, the time it took to complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual.

On November 7, 2014, a United States District Court Judge issued an Order permanently enjoining enforcement of Arizona Revised Statute (A.R.S.) 13-2319, commonly referred to as the Arizona Human Smuggling Act.  On November 17, 2014, MCSO issued Administrative Broadcast 14-75, prohibiting deputies from enforcing the above state statute, including arresting, detaining, or questioning persons for suspected (or even known) violations of the act and from extending the duration of traffic stops or other deputy-civilian encounters to do so.

We reviewed 105 traffic stops submitted for this Paragraph, and found that none of the stops involved any contacts with ICE/CBP.  We identified one traffic stop in which the driver, who had no identification on his person, made a statement to the deputy that he was born in another country; in response, the deputy asked the driver if he was a United States citizen.  The driver stated that he is a United States citizen, and the deputy made no further inquiries, nor did he take any further action regarding the driver's citizenship status.  We informed MCSO of this traffic stop event; and based on MCSO's review, the agency did not find that any policy violation occurred, as the deputy was simply in the process of obtaining the identity of the driver when this exchange took place.  We concur that the actions of the deputy in this instance did not violate the

WAI 72631

requirements of this Paragraph.  None of the remainder of the traffic stops that we reviewed involved any inquiries as to the immigration status of the vehicle occupants.  In addition, our reviews of Incident Reports and Arrest Reports conducted as part of the audits for Paragraphs 89 and 101 revealed no immigration status investigations.  MCSO remains in compliance with this Subparagraph.  In addition, we monitor any complaints involving any traffic stops that contain an allegation that the race/ethnicity of the driver was a factor in how a driver was treated.  There were no such allegations identified during this reporting period.

Paragraph 54.k. requires MCSO to document whether any individual was asked to consent to a search (and the response), whether a probable-cause search was performed on any individual, or whether a pat-and-frisk search was performed on any individual.

MCSO provided training to deputies specific to consent searches during the 2019 Annual Combined Training, which included a video that contained a scenario with a verbal exchange between a driver and a deputy who requested a consent search.  In addition, on March 10, 2020, MCSO issued Administrative Broadcast Number 20-20, which reemphasized the training segment in relation to consent searches.  MCSO's 2022 Annual Combined Training included a lesson plan discussion regarding searches and consent searches; however, the training did not include any specific learning activities or videos specific to consent searches.  We continue to recommend that MCSO consider implementing more comprehensive training to ensure that deputies are aware of the proper procedures for conducting consent searches.

The method MCSO currently employs to identify our sample of cases to review is to identify the population of all traffic stops in which searches of individuals were documented on the VSCF.  Once that population is identified, a random sample of 35 traffic stops from each month is identified for review.  During some months, the number traffic stops that involve searches of persons is less than 35 traffic stops.  In addition, we also review any cases in which deputies performed searches of individuals in the sample of 105 traffic stops reviewed to assess compliance with Paragraphs 25 and 54 and the sample of traffic stops reviewed to assess compliance with Subparagraphs 25.d. and 54.g.  When we identify issues that impact compliance or where MCSO policy was not followed, we provide the list of cases to MCSO for review.

In the sample of traffic stops that we reviewed to assess compliance with Subparagraph 54.k, we identified 11 stops involving the search of the drivers and/or passengers.  In each of the 11 cases, the deputies properly documented the searches on the VSCF.  There was one additional traffic stop in which the deputy documented a consent search of a driver on the VSCF; however, based on our review of the body-worn camera recording, there was no search of the driver conducted.  We informed MCSO of this issue and MCSO reviewed the traffic stop documentation and body-worn camera recording and found that the deputy made the entry in error and had the VSCF corrected.

During this reporting period, there were not any stops involving the search of a person identified in the sample of traffic stops reviewed to assess compliance with Subparagraphs 25.d. and 54.g.

During this reporting period, there were not any stops involving the search of a person identified in the sample of traffic stops reviewed to assess compliance with Paragraphs 25 and 54.

WAI 72632

The total number of searches of persons assessed during this reporting period was 11. In each of the 11 cases, the deputies properly documented the searches of the vehicle occupants on the VSCFs.

MCSO continues to conduct internal inspections to review its own sample of searches of vehicle occupants during traffic stops. In any instances where issues are identified, AIU issues BIO Action Forms to the Districts to address those deficiencies.

During the fourth quarter of 2022, MCSO attained a compliance rating of 100%. During this first quarter of 2023, MCSO attained a compliance rating of 100%. During this second quarter of 2023, MCSO attained a compliance rating of 94%. During this reporting period, MCSO attained a compliance rating of 100%. MCSO remains in compliance with this requirement.

Paragraph 54.l. requires MCSO to document whether any contraband or evidence was seized from any individual, and the nature of the contraband or evidence. Generally, deputies seize the following types of contraband and/or evidence, which is documented on the VSCF, a Property Receipt, and an Incident Report: license plates; driver's licenses; alcoholic beverages; narcotics; narcotic paraphernalia; weapons; and ammunition. We conduct a review of the relevant documents and review the VSCF to ensure that deputies properly document the seizure of the evidence and/or contraband.

During our review of the collected traffic stop data (our sample of 105) during this reporting period, there were five items seized and placed into evidence by deputies. All five of the seized items were properly documented on the VSCFs, as required by MCSO policy.

In the cases we reviewed for searches of individuals under Subparagraph 54.k., there were 46 items seized by deputies and placed into evidence. Of those 46 items, there were four items that were seized and placed into evidence and the items were not properly listed on the VSCFs, as required by MCSO policy.

In the cases we reviewed for passenger contacts under Subparagraph 54.g., there were 15 items seized by deputies and placed into evidence. All 15 of the seized items were properly documented on the VSCFs, as required by MCSO policy.

During the fourth quarter of 2022, MCSO attained a compliance rating of 87%. During the first quarter of 2023, MCSO attained a compliance rating of 88%. During the second quarter of 2023, MCSO attained a compliance rating of 89%. During this reporting period, MCSO attained a compliance rating of 94%. MCSO is in compliance with this requirement.

Paragraph 54.m. requires the documentation of the final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without a citation. In all 105 cases we reviewed, we found documentation indicating the final disposition of the stop; and whether the deputy made an arrest, issued a citation, issued a warning, or made a release without a citation. MCSO remains in compliance with this Subparagraph.

MCSO has failed to achieve compliance with all of the Subparagraphs of Paragraph 54. MCSO is not in compliance with Paragraph 54.

WAI 72633

***Paragraph 55.*** *MCSO shall assign a unique ID for each incident/stop so that any other documentation (e.g., citations, incident reports, tow forms) can be linked back to the stop.*

**In Full and Effective Compliance**

To verify compliance for this Paragraph, we reviewed a sample of the Vehicle Stop Contact Forms, CAD printouts, I/Viewer documentation, citations, warning forms, and any Incident Report that may have been generated as a result of the traffic stop.

The unique identifier "went live" in September 2013 when the CAD system was implemented. This number provides the mechanism to link all data related to a specific traffic stop. The number is automatically generated by the CAD software and is sent to the deputy's MDT at the time the deputy advises Communications of the traffic stop. The unique identifier is visible and displayed at the top of the CAD printout and also visible on the Vehicle Stop Contact Form, the Arizona Traffic Citation, and the Warning/Repair Form.

Once the deputy scans the motorist's driver's license, the system automatically populates most of the information into one or more forms required by the Order. If the data cannot be entered into TraCS from the vehicle (due to malfunctioning equipment), policy requires the deputy to enter the written traffic stop data electronically prior to the end of the shift. The start and end times of the traffic stop are now auto-populated into the Vehicle Stop Contact Form from the CAD system.

Since our first visit for monitoring purposes in June 2014, TraCS has been implemented in all Districts; and the unique identifier (CFS number) is automatically entered from the deputy's MDT. No user intervention is required.

To determine compliance with this requirement, we reviewed 105 traffic stop cases and reviewed the CAD printouts and the Vehicle Stop Contact Forms for all stops. We reviewed the Warning/Repair Forms, when applicable, for those stops where a warning was issued or the vehicle had defective equipment. The unique identification number assigned to each event was listed correctly on all CAD printouts for every stop. A review was conducted of the Tow Sheets prepared by deputies in instances where a driver's vehicle was towed. In each instance, the unique identification number assigned to each event was listed correctly on the Tow Sheet. A review of the Incident Reports prepared by deputies in instances where policy requires the preparation of the report was conducted. In each instance, the unique identification number assigned to each event was listed correctly on the Incident Report. MCSO remains in compliance with this requirement.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 72634

***Paragraph 56.*** *The traffic stop data collection system shall be subject to regular audits and quality control checks. MCSO shall develop a protocol for maintaining the integrity and accuracy of the traffic stop data, to be reviewed by the Monitor pursuant to the process described in Section IV.*

**Phase 1:** In compliance

- EB-2 (Traffic Stop Data Collection), most recently amended on February 22, 2023.
- Traffic Stop Analysis Unit Operations Manual, published on October 13, 2022.

**Phase 2:** In compliance

As discussed in Paragraph 25, improvements since 2015 to the TraCS system have enhanced the reliability and validity of the traffic stop data. These improvements were memorialized in the Traffic Stop Analysis Unit (TSAU) Operations Manual, which was finalized following the successful completion of the TSMR pilot program in October 2022 and the publication of all relevant sections of this document. The most significant portions of the manual that address data quality control processes – Sections 304, 305, and 306 – have been approved since 2018 and 2019. The data quality control processes include three distinct areas. The first is the data-handling procedures (Section 304), which involve the transfer of data files between administrative units with MCSO for the purpose of data analysis and reporting to ensure that data variables are properly understood. The second involves the software change control processes (Section 305), which are used by MCSO's Technology Management Bureau to manage software changes that affect traffic stop data variables. Finally, the third involves the data verification process (Section 306), which involves validating data variables used for the periodic analyses (monthly, quarterly, and annual) discussed in Paragraphs 64, 65, and 66.

The EIU and Technology Management Bureau hold monthly meetings (deconfliction meetings) focused on the data-handling procedures and the software changes. In addition, each month, MCSO produces documents generated from the deconfliction meetings to apprise us and the Parties of any issues or modifications to the data processes. During this quarter, MCSO made minor changes to the citation form to mirror Administrative Office of Courts (AOC) rules and resolve defaults for geo-verifying stop locations. EIU manages the data validation process before running periodic analyses.

With the advent of the TSMR pilot in 2021, EIU refined its data-cleaning procedures to ensure a timelier review of the monthly data to correct problems with certain traffic stop location information (X,Y coordinates). Additionally, following months of discussions between representative experts, in February 2022, MCSO adopted alternative methods for refining stop location and the timing of stops (spline procedures) that make comparisons between deputy stops much more accurate. More recently, MCSO found that special assignment traffic stops were undercounted in past annual reports. In response, MCSO published an analysis (Traffic Stop Quarterly Report 9), discussing the undercount, its impact on past annual and monthly reports, and how to improve training and policy to identify such stops more easily in future analyses. The cleaning procedures MCSO has adopted are an enhancement of the quality control process and ensure timely reviews of data to support monthly analyses of traffic stop data. (See Paragraph 64.) MCSO consistently advises us of problems it identifies from these reviews and actions it

WAI 72635

takes to ensure data veracity following the specific protocols delineated in the TSAU Operations Manual.  As such, based upon findings from prior Quarterly Traffic Stop Reports (TSQRs 3 and 4), MCSO added two new Extended Traffic Stop Indicators (ETSIs) to the drop-down box on VSCFs (license and "other issues") that identify issues that may elongate traffic stops.  MCSO also amended the data dictionary to include a new special assignment field on the VSCF that will more accurately collect special assignment dates.  Deputies are expected to explain these extended stops and special assignment stops with clarifying comments.  We will continue to examine the use of these fields in our reviews of the traffic stop samples selected each month.

MCSO also conducts audits of the 105 traffic stop sample that we request each reporting period.  MCSO conducts more expansive reviews of 30 of the 105 sample pulls we request each reporting period to include passenger contacts and persons' searches.  EB-2 (Traffic Stop Data Collection) also requires regularly scheduled audits of traffic stop data on a monthly basis.  We reviewed BIO's monthly audits of the traffic samples for this quarter and found them to be thorough.  Our compliance calculations for this period were slightly lower, due to the fact that we do not employ a matrix to assess compliance, but rather deem individual cases as deficient if any significant information is determined not to be consistent across traffic stop forms or CAD data.  MCSO reported compliance rates exceeding 99% for the quarter, while our calculations were 88.5%, 97.1%, and 94.3% respectively for July, August, and September.  The deficiencies pertained to reasons for the stop, missing or incorrect contact conclusions, and locations of the stops.

Administrative Broadcast 15-96 addresses the security of paper traffic stop forms.  The procedure requires that paper forms (traffic stop documentation that may be handwritten by deputies in the field if the TraCS system is nonoperational due to maintenance or lack of connectivity) be stored in a locked cabinet and overseen by the Division Commander.  During our October 2023 site visit, we verified the security of and access to these documents and reviewed the logs held at the District offices.  MCSO has a consistent and long-standing track record of complying with this requirement.

***Paragraph 57.***  *MCSO shall explore the possibility of relying on the CAD and/or MDT systems to check if all stops are being recorded and relying on on-person recording equipment to check whether Deputies are accurately reporting stop length.  In addition, MCSO shall implement a system for Deputies to provide motorists with a copy of non-sensitive data recorded for each stop (such as a receipt) with instructions for how to report any inaccuracies the motorist believes are in the data, which can then be analyzed as part of any audit.  The receipt will be provided to motorists even if the stop does not result in a citation or arrest.*

**In Full and Effective Compliance**

To verify compliance for this Paragraph, we reviewed all TraCS forms for each traffic stop that were included in the sample.  In addition, we reviewed a subset of CAD audio recordings and body-worn camera footage of the stops.

WAI 72636

The system for providing "receipts" is outlined in EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) and EB-2 (Traffic Stop Data Collection).  GJ-35 addresses the requirement that supervisors review recordings to check whether deputies are accurately reporting stop length.  In addition to GJ-35, BIO developed a Body-Worn Camera Matrix for its inspectors to review camera recordings.

The deputy should provide every person contacted on a traffic stop with an Arizona Traffic Ticket or Complaint (Citation), a Written Warning/Repair Order (Warning), or an Incidental Contact Receipt.  For this reporting period, in 104 of the 105 cases reviewed, deputies provided either citations, written warnings or Incidental Contact Receipts to each of the drivers.  In one case, the deputy did not provide the driver with a citation, written warning, or an Incidental Contact Receipt, as required.  AIU identified this issue and requested that the District prepare a BIO Action Form to document any corrective actions taken.

For the cases reviewed under Subparagraphs 25.d. and 54.g., contact with passengers, we identified one traffic stop in which the deputy did not obtain the driver's identity, and focused his enforcement activity on the passenger for a littering violation.  In this instance, the passenger was issued a citation; however, the deputy did not provide the driver with a citation, written warning, or an Incidental Contact Receipt, as required.  The deputy's supervisor identified the issue during the review of the traffic stop and discuss the policy requirements with the deputy.  For the remainder of the stops, we did not identify any issues with deputies providing citations, warnings, or Incidental Contact Receipts to drivers.

For the cases reviewed under Subparagraph 54.k., searches of persons, we did not identify any issues with deputies providing citations, warnings, or Incidental Contact Receipts to drivers.

MCSO's compliance rate with this requirement is 99%.  MCSO remains in compliance with this portion of the Subparagraph.

The approved policies dictate that the CAD system will be used for verification of the recording of the initiation and conclusion of the traffic stop and that MCSO will explore the possibility of relying on the body-worn camera recordings to verify that the stop times reported by deputies are accurate.  The deputy verbally announces the stop's initiation and termination on the radio, and then CAD permanently records this information.  In May 2016, MCSO advised us that all deputies and sergeants who make traffic stops had been issued body-worn cameras and that they were fully operational.  We verified this assertion during our July 2016 site visit; and since that time, we have been reviewing the body-worn camera recordings to determine if stop times indicated by CAD were accurate.  MCSO's Audit and Inspections Unit (AIU) conducts monthly inspections of traffic stop data, which includes an assessment as to whether the body-worn camera video captured the traffic stop in its entirety; to verify the time the stop began; and to verify if all information on forms prepared for each traffic stop match the body-worn camera video.  AIU conducts reviews of 30 body-worn camera recordings each reporting period.

WAI 72637

During this reporting period, we requested from MCSO 30 body-worn camera recordings for our review. We are able to use the body-worn camera recordings that were provided for each stop to assess whether deputies are accurately reporting the stop length. The compliance rate for the sample of 30 cases selected from the 105 stops reviewed for using the body-worn camera recordings to determine if deputies are accurately reporting stop length is 100%. MCSO remains in compliance with this requirement.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 58.** *The MCSO shall ensure that all databases containing individual-specific data comply with federal and state privacy standards governing personally identifiable information. MCSO shall develop a process to restrict database access to authorized, identified users who are accessing the information for a legitimate and identified purpose as defined by the Parties. If the Parties cannot agree, the Court shall make the determination.*

**In Full and Effective Compliance**

To verify compliance for this Paragraph, we reviewed the applicable policies and requested that Technology Management Bureau personnel provide us with information regarding any unauthorized access and/or illegitimate access to any of MCSO's database systems that had been investigated by PSB. The policies state that the dissemination of Criminal History Record Information (CHRI) is based on federal guidelines, Arizona statutes, the Department of Public Safety (AZDPS), and the Arizona Criminal Justice Information System (ACJIS); and that any violation is subject to fine. No secondary dissemination is allowed. The policies require that the Professional Standards Bureau (PSB) provide written notification to the System Security Officer whenever it has been determined that an employee has violated the policy by improperly accessing any Office computer database system. Every new recruit class receives three hours of training on this topic during initial Academy training.

During this reporting period, we inquired whether there had been any instances of unauthorized access to and/or any improper uses of the database systems. MCSO informed us that there were two cases identified that met the criteria for this Paragraph. In each of the two cases, there was a finding of improper conduct and discipline was imposed. In one case, the employee was terminated; in the other case, the employee received a suspension.

On June 22, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 72638

*Paragraph 59.  Notwithstanding the foregoing, the MCSO shall provide full access to the collected data to the Monitor and Plaintiffs' representatives, who shall keep any personal identifying information confidential.  Every 180 days, MCSO shall provide the traffic stop data collected up to that date to the Monitor and Plaintiffs' representatives in electronic form.  If proprietary software is necessary to view and analyze the data, MCSO shall provide a copy of the same.  If the Monitor or the Parties wish to submit data with personal identifying information to the Court, they shall provide the personally identifying information under seal.*

**In Full and Effective Compliance**

Electronic traffic stop data capture began on April 1, 2014.  The forms created by MCSO capture the traffic stop details required by MCSO policy and Paragraphs 25 and 54.  BIO provides the traffic stop data on a monthly basis, which includes a spreadsheet of all traffic stops for the reporting period, listing Event Numbers as described at the beginning of Section 7.  All marked patrol vehicles used for traffic stops are now equipped with the automated TraCS system, and all Patrol deputies have been trained in TraCS data entry.  MCSO has provided full access to all available electronic and written data collected since April 1, 2014.  MCSO did not collect electronic data before this time.  During this reporting period, MCSO has continued to provide full access to the traffic stop data.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

### b. Electronic Data Entry

*Paragraph 60.  Within one year of the Effective Date, the MCSO shall develop a system by which Deputies can input traffic stop data electronically.  Such electronic data system shall have the capability to generate summary reports and analyses, and to conduct searches and queries. MCSO will explore whether such data collection capability is possible through the agency's existing CAD and MDT systems, or a combination of the CAD and MDT systems with a new data collection system.  Data need not all be collected in a single database; however, it should be collected in a format that can be efficiently analyzed together.  Before developing an electronic system, the MCSO may collect data manually but must ensure that such data can be entered into the electronic system in a timely and accurate fashion as soon as practicable.*

**In Full and Effective Compliance**

To verify compliance with this Paragraph, we reviewed the documents generated electronically that capture the required traffic stop data.  The electronic data entry of traffic stop data by deputies in the field went online on April 1, 2015.  If TraCS experiences a malfunction in the field, there is a protocol that requires the deputy to electronically enter the traffic stop data prior to the end of the shift.

MCSO continues to conduct monthly traffic stop inspections and forwards them for our review. Initially, the traffic stop data was captured on handwritten forms created by MCSO, completed by the deputy in the field, and manually entered into the database by administrative personnel located at each District.  Now all traffic stop data is entered electronically, whether in the field or

WAI 72639

at MCSO District offices.  Occasionally, connectivity is lost in the field due to poor signal quality, and citations are handwritten.  Per policy, deputies must enter electronically any written traffic stop data they have created by the end of the shift in which the event occurred.  As noted in our Paragraph 90 review, VSCFs are routinely entered into the system by the end of the shift.

Deputies have demonstrated their ability to access and use TraCS, as evidenced by the fact that their total time on a traffic stop averages 16 minutes or less.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

### c. Audio-Video Recording of Traffic Stops

*Paragraph 61.  The MCSO will issue functional video and audio recording equipment to all patrol deputies and sergeants who make traffic stops, and shall commence regular operation and maintenance of such video and audio recording equipment.  Such issuance must be complete within 120 days of the approval of the policies and procedures for the operation, maintenance, and data storage for such on-person body cameras and approval of the purchase of such equipment and related contracts by the Maricopa County Board of Supervisors.  Subject to Maricopa County code and the State of Arizona's procurement law, The Court shall choose the vendor for the video and audio recording equipment if the Parties and the Monitor cannot agree on one.*

**In Full and Effective Compliance**

During our September 2014 site visit, we met with two MCSO Deputy Chiefs and other personnel to discuss MCSO's progress of acquiring in-car video and audio equipment for all patrol vehicles used to conduct traffic stops.  MCSO had initially set out to purchase fixed in-car cameras as required by the Order, but expressed an interest in acquiring body-worn video and audio recording devices for deputies.  The Court issued an Order providing an amendment/stipulation on October 10, 2014, requiring on-body cameras.  This was a prudent decision, in that it allows for capturing additional data, where a fixed mounted camera has limitations.  We have documented MCSO's transition from in-car to body-worn cameras in our previous quarterly status reports.

Records indicate that MCSO began distribution of body-worn cameras on September 14, 2015, and full implementation occurred on May 16, 2016.  The body-worn camera recordings are stored in a cloud-based system (on evidence.com) that can be easily accessed by supervisors and command personnel.  The retention requirement for the recordings is three years.  In July 2019, MCSO began distribution of the newer version of body-worn cameras to deputies.  During our October 2019 site visit, MCSO reported that deputies assigned to the Districts have all been equipped with the new body-worn cameras; and that deputies in specialized assignments were being equipped with the new devices.  The current version of body-worn cameras purchased by MCSO is mounted on the chest area via a magnetic mount.

WAI 72640

To verify that all Patrol deputies have been issued body-worn cameras, and that they properly use the devices, we review random samples of the traffic stops as described in Paragraphs 25 and 54. In addition, during our District visit in October 2023, we observed that deputies were equipped with body-worn cameras.

During our October 2023 site visit, we met with supervisors at Districts 4 and 7 to discuss the procedure for conducting reviews of traffic stop documents and body-worn camera recordings. At District 4, we met with a lieutenant, who provided a detailed overview how an actual review of traffic stop documentation, including a video review, is conducted by supervisors. The lieutenant had recently conducted a review of a traffic stop that was performed by a sergeant. The lieutenant explained the process in detail, including how, if an issue is identified, the information would be documented and entered into Blue Team. The lieutenant explained that the supervisors under his direction make notes on the VSCFs when errors are identified, and corrections are needed. The lieutenant also explained that he reviews any notes that the supervisors include during their reviews so he can be aware of any issues that may exist as it relates to the proper documentation of traffic stops.

At District 7, we met a sergeant, who also provided a detailed overview how an actual review of traffic stop documentation, including a video review, is conducted by supervisors. The sergeant explained the process in detail. The sergeant stated that he reviews the VSCF, citation or warning, CAD document, and body-worn camera videos, and any other documents that may have been generated for the traffic stop. The sergeant explained how he makes notes on the VSCF if there are any errors and/or corrections needed.

Each of the supervisors we met with demonstrated knowledge of MCSO policies, as well as proficiency in the use of the technology, to conduct effective supervisory reviews of the body-worn camera recordings and associated documents for the traffic stops.

On December 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.


**Paragraph 62.**  *Deputies shall turn on any video and audio recording equipment as soon the decision to initiate the stop is made and continue recording through the end of the stop. MCSO shall repair or replace all non-functioning video or audio recording equipment, as necessary for reliable functioning. Deputies who fail to activate and to use their recording equipment according to MCSO policy or notify MCSO that their equipment is nonfunctioning within a reasonable time shall be subject to Discipline.*

**In Full and Effective Compliance**

MCSO evaluated on-person body cameras from other jurisdictions and selected a vendor (TASER International, now known as Axon). Body-worn cameras have been implemented in all Districts since May 2016 and are fully operational. As noted under Paragraph 61, MCSO has obtained, and has equipped the deputies in the Districts with body-worn cameras, provided by Axon.

WAI 72641

To verify compliance for this Paragraph, we reviewed the body-worn camera recordings included in our monthly samples. This includes the stops reviewed each month for Paragraphs 25 and 54; the stops reviewed each month for Subparagraph 54.k.; and the stops reviewed each month for Subparagraph 54.g. For purposes of calculating compliance, we exclude any stops where the deputies documented on the VSCF that the body-worn cameras malfunctioned during the stop.

For our selection of a sample to review body-worn camera recordings, we used the same sample of 30 cases we selected for the CAD audio request. In each of the stops that were reviewed, the deputies properly activated the body-worn cameras during the traffic stop events.

In our sample of body-worn camera recordings reviewed for Subparagraph 54.k., in each of the stops that were reviewed, the deputies properly activated the body-worn cameras during the traffic stop events.

In our sample of body-worn camera recordings for Subparagraph 54.g., in each of the stops that were reviewed, the deputies properly activated the body-worn cameras during the traffic stop events.

MCSO's compliance rate for this requirement is 100%.

There are still a number of instances in which deputies respond to assist at traffic stops and do not complete the Assisting Employee and/or Volunteer Log, as required by MCSO policy. We discussed this issue with MCSO during our October 2023 site visit. MCSO stated that it is exploring the implementation of a program that will identify when a deputy fails to complete the log. Once deputies that did not complete the logs are identified, an email notification would be sent to the Districts to ensure that corrective action is taken and that the logs are prepared. We encourage MCSO to continue identify ways to ensure that this policy requirement is followed by deputies.

Our reviews of the body-worn camera recordings often reveal instances of deputies exhibiting positive, model behavior; and, at times, instances of deputies making errors, or exhibiting less than model behavior – all of which would be useful for training purposes. We also reviewed the Professional Standards Bureau's monthly summaries of closed cases for July-September 2023. There continue to be examples of body-worn camera recordings assisting the investigators in making determinations as to whether deputies acted in accordance with MCSO policy. In some instances, deputies were found to have acted inconsistent with policy; and in some instances, it was determined that the allegations against the deputies were false. Body-worn cameras recordings have proven to be invaluable in resolving complaints alleging misconduct by deputies.

On January 6, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 72642

*Paragraph 63.   MCSO shall retain traffic stop written data for a minimum of 5 years after it is created, and shall retain in-car camera recordings for a minimum of 3 years unless a case involving the traffic stop remains under investigation by the MCSO or the Monitor, or is the subject of a Notice of Claim, civil litigation or criminal investigation, for a longer period, in which case the MCSO shall maintain such data or recordings for at least one year after the final disposition of the matter, including appeals.   MCSO shall develop a formal policy, to be reviewed by the Monitor and the Parties pursuant to the process described in Section IV and subject to the District Court, to govern proper use of the on-person cameras; accountability measures to ensure compliance with the Court's orders, including mandatory activation of video cameras for traffic stops; review of the camera recordings; responses to public records requests in accordance with the Order and governing law; and privacy protections.   The MCSO shall submit such proposed policy for review by the Monitor and Plaintiff's counsel within 60 days of the Court's issuance of an order approving the use of on-body cameras as set forth in this stipulation.   The MCSO shall submit a request for funding to the Maricopa County Board of Supervisors within 45 days of the approval by the Court or the Monitor of such policy and the equipment and vendor(s) for such on-body cameras.*

## In Full and Effective Compliance

MCSO developed and issued a protocol and policy that requires the original hardcopy form of any handwritten documentation of data collected during a traffic stop to be stored at the District level and filed separately for each deputy.  When a deputy is transferred, his/her written traffic stop information follows the deputy to his/her new assignment.  During our October 2023 site visit, we inspected the traffic stop written data files at Districts 1, 2, 3, 4, and 7 to ensure that hardcopies of traffic stop cases are stored for a minimum of five years.  We found that the records were in order and properly secured.

During the October 2023 site visit, we met with MCSO to discuss the retention requirements of the body-worn camera video recordings.  MCSO provided an overview of the storage of the video recordings and how it is programmed with designated retention time periods for various types of video-recorded events.   During the meeting, we requested that specific traffic stop video recordings be identified to ensure that the retention of the recordings is being done consistent with this requirement.  We provided MCSO with three different traffic stop events that took place just less than three years prior, and one traffic stop that took place 13 months prior.  In each of the cases, the video recordings were located and were found to have been retained in accordance with this requirement.

On June 22, 2020, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

WAI 72643

### d. Review of Traffic Stop Data

**Paragraph 64.**  *Within 180 days of the Effective Date, MCSO shall develop a protocol for periodic analysis of the traffic stop data described above in Paragraphs 54 to 59 ("collected traffic stop data") and data gathered for any Significant Operation as described in this Order ("collected patrol data") to look for warning signs or indicia or possible racial profiling or other improper conduct under this Order.*

**Phase 1:**  In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on April 27, 2022.

- EB-2 (Traffic Stop Data Collection), most recently amended on February 22, 2023.

- GJ-33 (Significant Operations), most recently amended on April 6, 2022.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

- GH-5 (Early Identification System), most recently amended on March 28, 2023.

- Traffic Stop Analysis Unit Operations Manual, published October 13, 2022.

**Phase 2:**  In compliance

Due to the incorporation during the first quarter of agreed-upon changes to GH-5 (Early Identification System) that stem from the completion of the TSMR pilot, Attachment A (Event Entry Types), and Attachment C (Supervisor EIS Alert Form), MCSO achieved Phase 1 compliance with this Paragraph.  Since the completion of the TSMR pilot in October 2022, MCSO has continued to share the vetting decisions from the TSMR analysis in a timely fashion, as well as providing documentation each month for closed TSMR cases that proceed beyond the vetting stage.  As a result, MCSO has achieved Phase 2 compliance with this Paragraph.  We will continue to monitor the production of both the vetting and closed case documents as they are produced by MCSO.


**Paragraph 65.**  *MCSO shall designate a group with the MCSO Implementation Unit, or other MCSO Personnel working under the supervision of a Lieutenant or higher-ranked officer, to analyze the collected data on a monthly, quarterly and annual basis, and report their findings to the Monitor and the Parties.  This review group shall analyze the data to look for possible individual-level, unit-level or systemic problems.  Review group members shall not review or analyze collected traffic stop data or collected patrol data relating to their own activities.*

**Phase 1:**  In compliance

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

- GH-5 (Early Identification System), most recently amended on March 28, 2023.

WAI 72644

**Phase 2:**  In compliance

The Traffic Stop Analysis Unit (TSAU) is directly responsible for analyses of traffic stop data on a monthly, quarterly, and annual basis to identify warning signs or indicia or possible racial profiling or other improper conduct as required by Paragraph 64.  MCSO must report TSAU's findings from its analyses to the Monitor and the Parties.

Paragraph 65 requires annual analyses of traffic stop data.  Traffic Stop Annual Report 8 (TSAR8) was published on June 30, 2023; and, as noted in the Sheriff's statement published in conjunction with the analytic report, the findings of disparities continue to identify possible systemic racial bias in MCSO's patrol function.  The Sheriff's statement notes that some of the disparities have been reduced from prior years, and that no disparities were significantly worse than the prior year.  The Sheriff's statement emphasized that investigating the presence of the continued disparities will remain a priority for TSAU in both quarterly and monthly analytic reports.  TSARs are further discussed in Paragraph 66, which requires "one agency-wide comprehensive analysis of the data per year."

Paragraph 65 requires quarterly analyses of traffic stop data.  MCSO completed its first quarterly report (TSQR1) on October 22, 2020.  MCSO has published 10 other quarterly reports since that time.  Due to the complexity of the analysis proposed for TSQR12, we granted approval to MCSO to conduct the analysis and produce only one report during the third and fourth quarters of 2023.

MCSO's latest quarterly report, TSQR11, Low Stop Volume Deputies, was published on June 30, 2023.  The report examines whether the traffic stop outcomes of low-volume deputies differs from their high-volume counterparts.  The report found that 41% of deputies make under 20 stops per year, and those stops (970) represent approximately 5% of all traffic stops for the agency during the year.  MCSO found that low-volume deputies had a lower citation rate than their high-volume counterparts (35.88% vs. 52.41%) but in the process, low-volume deputies contacted a higher proportion of Hispanic drivers (33.4% vs. 23.50%).  However, these differences did not result in findings of significantly greater disparities in the outcomes of white and Hispanic drivers among low-volume deputies, or, in disparities in comparison to their high-volume counterparts.  In essence, the report concluded that any racial or ethnic disparities that do exist, occur amongst both high and low-volume deputies.  MCSO states that the agency intends to continue exploring ways to reduce disparities across ethnicities through its inspections and TSMR reviews.

TSQR10, "Searches," was published on March 31, 2023.  The report indicates that, out of all traffic stops, slightly more than 1.5% result in searches of persons and 1.4% result in searches of vehicles.  More importantly, MCSO found through the examination of body-worn cameras (BWCs) that in a large minority of cases, deputies incorrectly identified searches as discretionary or nondiscretionary.  MCSO used these findings to correct the data that was used in TSAR8.  Additionally, MCSO has modified the VSCF to correctly capture the types of searches being conducted by deputies, provided updated training to deputies regarding searches, had TSAU liaisons attend District roll-calls to summarize the research findings and the changes being made to the VSCFs, and had command staff evaluate potential changes to policy to mitigate future potential disparities without compromising officer safety.  We discussed TSQR10 at length with MCSO and the Parties during our April site visit.

WAI 72645

We have discussed previous TSQRs in detail in our previous quarterly status reports.

Paragraph 65 also requires MCSO to conduct monthly analyses of traffic stop data. MCSO's original monthly process to analyze traffic stop data began in 2015, but was suspended in May 2016 due to our determination that the original process lacked statistical validity and required significant refinement to improve the identification of potential alerts in EIS. That commenced nearly a seven-year effort to identify the best methodology to identify potential bias in traffic stops at the individual deputy level, which is the focus of the monthly analysis. The process to finally arrive at an agreed-upon and approved methodology has been documented in great detail in our prior quarterly status reports.

In April 2021, MCSO began testing what was then the best version of the methodology in a pilot project. One of the key components of the methodology is using the prior 12 months of traffic stop data in the analysis each month. This "rolling" 12-month period was chosen to provide the most recent data available, but also provide a sufficient number of traffic stops for meaningful analysis. MCSO conducted 15 review cycles during the pilot period ending in October 2022. MCSO performed this every month, except when agreed to by us and the Parties so that MCSO could make modifications based upon experiences from earlier cycles. During this time, the methodology was collaboratively modified based on the input of experts from our Team, MCSO, the Plaintiffs, and the Plaintiff-Intervenor.

At the conclusion of the pilot, MCSO began the process of finalizing the policies that govern the implementation of the TSMR process. These policies were approved during the first quarter of 2023, and include updates pertaining to the TSMR process to both the TSAU Operations Manual and GH-5 (Early Identification System).

MCSO continues to share the monthly vetting of traffic stop data with us and the Parties. Although there were some delays in the delivery of the monthly vetting documents during the early post-pilot period, these have not occurred during the last six months. During the current quarter, all vetting materials were received within the timelines laid out in the TSAU Operations Manual. For this reporting period, MCSO evaluated 44 flags pertaining to 35 deputies, as the result of the statistical analysis (monthly vetting). Of these, 11 were forwarded for a more complete review; and 33 were discounted. We concurred with the findings of the vetting process and notified MCSO within days of receiving the vetting materials. We will continue to monitor and report on these issues.

MCSO has also continued sharing the closure documents for those cases that were flagged as a result of the analysis. During the post-vetting review, MCSO can discount additional cases if it determines that the potential bias found in the statistical analysis is explained by a thorough review of similar stops (speeding, non-moving, licensure, etc.) when compared across ethnic/racial categories. However, even for those cases that are discounted, MCSO can recommend that a memo be sent to the District, if the in-depth review discovers minor policy or process issues. These issues, however, cannot be related to the race/ethnicity of the persons stopped. MCSO can recommend an intermediate intervention if the reviewer finds that while the statistical differences are minimized, there are still potential concerns regarding how individual drivers are treated that may be based on race or ethnicity. Finally, MCSO can recommend a full

WAI 72646

intervention if the more in-depth review of stops does not mitigate the potential bias found during the statistical analyses.

During this reporting period, MCSO provided the closure documents for eight cases.  Some of these cases occurred during the pilot process, and some occurred after the pilot closed in October 2022.  Out of these eight cases, MCSO recommended memos in six instances, no intermediate interventions, and a full intervention for a deputy who was flagged in two different TSMR analytic periods.  We evaluated each of the memos, and found that the message to the District was clear and the response by District personnel met the expectations of the review conducted.  In one case, the supervisor decided that circumstances called for an additional Action Plan.  During the Action Plan period, the supervisor rode along with the deputy and reviewed the documentation of the deputy's activity.  The concluding paperwork confirmed the successful completion of the Action Plan.  For the full intervention, we and the Parties received the expected documents, as outlined in the TSAU Operations Manual, as well as an audio-recording of the meeting between TSAU personnel, the deputy, and the deputy's supervisor.  Now that the TSMR process is operational, we will provide specific feedback regarding our review of completed TSMR cases during our site visits, as we have done since April 2023.

Since the TSMR is fully operational and the associated guiding documents were published during the first quarter of 2023, MCSO has achieved Phase 1 compliance.  In addition, due to the timely submission of all vetting materials and closing documents for cases that moved beyond the vetting stage, MCSO achieved Phase 2 compliance with this Paragraph in the second quarter of 2023.

**Paragraph 66.**  *MCSO shall conduct one agency-wide comprehensive analysis of the data per year, which shall incorporate analytical benchmarks previously reviewed by the Monitor pursuant to the process described in Section IV.  The benchmarks may be derived from the EIS or IA-PRO system, subject to Monitor approval.  The MCSO may hire or contract with an outside entity to conduct this analysis.  The yearly comprehensive analysis shall be made available to the public and at no cost to the Monitor and Plaintiffs.*

**In Full and Effective Compliance**

MCSO has completed eight comprehensive Traffic Stop Annual Reports (TSARs) analyzing traffic stop data to look for systemic evidence of racial profiling or other bias-based policing.  MCSO's first contract vendor, Arizona State University, produced the first three TSARs.  MCSO's current vendor, CNA, produced the last five TSARs.

WAI 72647

The most recent TSAR8 was published on June 30, 2023, and, as noted in the Sheriff's statement, published in conjunction with the analytic report, the findings of disparities continue to identify possible systemic racial bias in the patrol function.  The Sheriff's statement notes that some of the disparities were reduced from the prior year, and that there were no significantly worse indicators in comparison to 2021.  The statement emphasizes that investigating the presence of the continued disparities will remain a priority for TSAU in both quarterly and monthly analytic reports.  The statement also notes a dramatic reduction in stop length for Hispanic drivers when compared to white drivers, but we note that two new extended stop indicators were added during 2022.  The addition of these two indicators resulted in a 7% increase in stops being classified as justified extended stops.  Moreover, in the calculation of average stop length, all stops with extended stop indicators are removed from the analysis.  We raised this issue with MCSO during our July site visit, but the agency had not yet conducted an analysis to determine if that was the reason for the reduction in Hispanic stop lengths.

MCSO proposed some changes to the methodology employed in TSAR8 that were accepted by us and the Parties after review.  Many of these changes result from analytic findings from the TSMRs and others have been the result of TSQRs.  The modifications adopted show the ability of MCSO to expand and broaden its methodology when new information uncovers potential improvements in the investigation of disparities in traffic stop outcomes, including findings from TSMR and TSQR analyses.

During our October 2023 site visit, MCSO acknowledged that comments the agency had received regarding TSAR8 had prompted MCSO to plan future TSQR analyses to overcome some of the issues raised – in particular, extended stop indicators, stop length calculations and presentations, and jurisdictional analyses.  (We will explore these in other Paragraphs as they are produced.)  MCSO personnel commented that the agency planned to propose enhanced training for personnel that covers the details of TSAR8.  Additionally, according to MCSO, the agency plans to respond to TSAR8 in ways similar to how the agency has responded to prior TSARs, with a response to any issue(s) stemming from the analysis as well as the potential for additional audits, community outreach, and others.  During our meeting, MCSO personnel appeared open to suggestions, but aside from the potential for additional analyses, and a Town Hall-like training for line personnel that summarized TSAR8, the agency provided no specific initiative, involving policy or practice, that was planned in response to the statistical findings of the report.

On March 31, 2023, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

WAI 72648

***Paragraph 67.***  *In this context, warning signs or indicia of possible racial profiling or other misconduct include, but are not limited to:*

a.  *racial and ethnic disparities in deputies', units' or the agency's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of deputies' duties, or racial or ethnic disparities in traffic stop patterns when compared with data of deputies' peers;*

b.  *evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;*

c.  *a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;*

d.  *indications that deputies, units or the agency is not complying with the data collection requirements of this Order; and*

e.  *other indications of racial or ethnic bias in the exercise of official duties.*

**Phase 1:**  In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on June 15, 2023.

- EB-2 (Traffic Stop Data Collection), most recently amended on February 22, 2023.

- GH-5 (Early Identification System), most recently amended on March 28, 2023.

**Phase 2:**  In compliance

MCSO has conducted monthly and annual analyses of traffic stop data and provided documents discussing how the benchmarks required by this Paragraph are used to set alerts for possible cases of racial profiling or other deputy misconduct involving traffic stops.  (Further discussion on the monthly and annual analyses are incorporated into Paragraphs 65 and 66.)

We have discussed in our previous quarterly status reports that MCSO has achieved Phase 1 compliance with this Paragraph with the publication of appropriate guiding policies.  The benchmarks are highlighted below, and are generally referred to as post-stop outcomes in the TSMR and TSAR methodologies.

Paragraph 67.a. identifies three benchmarks pertaining to racial and ethnic disparities.  The first benchmark references disparities or increases in stops for minor traffic violations (Benchmark 1).  The second benchmark addresses disparities or increases in arrests following traffic stops (Benchmark 2).  The third benchmark addresses disparities or increases in immigration status inquiries (Benchmark 3).  Since these three benchmarks are incorporated into the EIU Operations Manual and are incorporated as post-stop outcomes in the TSMR methodology, MCSO is in compliance with Paragraph 67.a.

WAI 72649

Paragraph 67.b. identifies a benchmark pertaining to evidence of an extended traffic stop involving Latino drivers or passengers (Benchmark 4). Since this benchmark is now incorporated into the EIU Operations Manual and is incorporated in the TSMR methodology, MCSO is in compliance with Paragraph 67.b.

Paragraph 67.c. identifies three benchmarks. The first benchmark pertains to the rate of citations (Benchmark 5): MCSO is required to identify citation rates for traffic stops that are outliers when compared to a deputy's peers. The second benchmark (Benchmark 6) pertains to seizures of contraband. MCSO is required to identify low rates of seizures of contraband following a search or investigation. The third benchmark in Paragraph 67.c. (Benchmark 7) is similar to Benchmark 6, but it pertains to arrests following a search or investigation. Since the three benchmarks are now incorporated into the EIU Operations Manual and are incorporated as post-stop outcomes in the TSMR methodology, MCSO is in compliance with Paragraph 67.c.

Paragraph 67.d. establishes a benchmark pertaining to agency, unit, or deputy noncompliance with the data collection requirements under the First Order (Benchmark 8). This benchmark requires that any cases involving noncompliance with data collection requirements results in an alert in EIS. EIU published an Administrative Broadcast on November 28, 2016 to instruct supervisors how to validate data in TraCS for those cases involving duplicate traffic stop records to deliver timely data validation for our review. MCSO's draft EIS Project Plan 4.0 reported that MCSO began the data validation process for this benchmark on November 28, 2016. Therefore, MCSO is in compliance with Paragraph 67.d.

Paragraph 67.e. allows for other benchmarks to be used beyond those prescribed by Paragraph 67.a.-d. MCSO has three benchmarks under Paragraph 67.e. Benchmark 9 is defined as racial or ethnic disparities in search rates. Benchmark 10 is defined as a racial or ethnic disparity in passenger contact rates. Benchmark 11 is defined for non-minor traffic stops. Benchmarks 9-11 are incorporated into the EIU Operations Manual, as well as the TSMR methodology. Therefore, MCSO is in compliance with Paragraph 67.e.

As noted earlier, the TSMR methodology, which incorporates these benchmarks, was approved following the completion of a lengthy pilot project in October 2022. MCSO finalized the guiding documents (TSAU Operations Manual and GH-5, including Attachment A [Definitions and Event Entry Types] and Attachment C [Supervisor EIS Traffic Stop Alert Form]) late in quarter 1 of 2023. MCSO regularly publishes inspections for several of these benchmarks in addition to continuing to produce the monthly TSMR according to the guiding documents. As a result, MCSO has Phase 2 compliance with this Paragraph.

WAI 72650

***Paragraph 68.*** *When reviewing collected patrol data, MCSO shall examine at least the following:*

a.  *the justification for the Significant Operation, the process for site selection, and the procedures followed during the planning and implementation of the Significant Operation;*

b.  *the effectiveness of the Significant Operation as measured against the specific operational objectives for the Significant Operation, including a review of crime data before and after the operation;*

c.  *the tactics employed during the Significant Operation and whether they yielded the desired results;*

d.  *the number and rate of stops, Investigatory Detentions and arrests, and the documented reasons supporting those stops, detentions and arrests, overall and broken down by Deputy, geographic area, and the actual or perceived race and/or ethnicity and the surname information captured or provided by the persons stopped, detained or arrested;*

e.  *the resource needs and allocation during the Significant Operation; and*

f.  *any Complaints lodged against MCSO Personnel following a Significant Operation.*

**In Full and Effective Compliance**

MCSO has not conducted a Significant Operation that met the requirements of the Order since Operation Borderline in December 2014.  Subsequent activities (i.e., Operation Gila Monster in October 2016) have not met the criteria for review under this or other Paragraphs.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

As a result of this determination, MCSO District command staff – as well as Investigations and Enforcement Support – will no longer be required to submit monthly statements that they have not participated in Significant Operations as defined by this and other Paragraphs; however, MCSO is required to notify us should staff become involved in a Significant Operation.  We will continue to assess Phase 2 compliance through interviews with command and District staff during our site visits.

During our October 2023 site visit, we inquired of administrative staff, District personnel, and the Deputy Chiefs of Patrol Bureaus East and West whether any Significant Operations had occurred since our prior site visit.  There is no indication that MCSO has conducted any operations that meet the reporting requirements for this Paragraph since October 2014.

WAI 72651

*Paragraph 69.  In addition to the agency-wide analysis of collected traffic stop and patrol data, MCSO Supervisors shall also conduct a review of the collected data for the Deputies under his or her command on a monthly basis to determine whether there are warning signs or indicia of possible racial profiling, unlawful detentions and arrests, or improper enforcement of Immigration-Related Laws by a Deputy.  Each Supervisor will also report his or her conclusions based on such review on a monthly basis to a designated commander in the MCSO Implementation Unit.*

**Phase 1:**  In compliance

- EA-3 (Non-Traffic Contact), most recently amended on June 28, 2019.

- GH-5 (Early Identification System), most recently amended on March 28, 2023.

**Phase 2:**  In compliance

MCSO has placed into production database interfaces with EIS, inclusive of Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), Administrative Office of Courts (AOC) records, and the Cornerstone software program (referred to as "the HUB"), that includes training and policy records for MCSO.  Supervisors have demonstrated the ability to access these during our site visits, most recently in October 2023.  Most audits and inspections of supervisory oversight activities indicate compliance, but several continue to show fluctuating trends of use or completion over time which we regularly monitor.

MCSO continues to provide us access each month to all Non-Traffic Contact Forms (NTCFs) involving investigative stops and field information.  At times over the past year, our review of the NTCFs provided each month indicated that a higher proportion of Latinos are being contacted in particular areas of the County for relatively minor infractions.  Our review of NTCFs for this quarter did not raise particular concern about disparate treatment, although the number of bike-related stops for lighting and other issues continue to show that Latinos represent a high proportion of those contacted.

Several months ago, MCSO proposed an initial study of how the form (NTCF) and the related policy are being used across the agency.  Following a conference call between MCSO, us, and the Parties in February 2022, MCSO committed to conducting the first portion of the inquiry.  The initial NTCF study was published in February 2023.  While this analysis did not investigate potential indications of bias in how these stops are conducted by deputies or evaluated by supervisors, it did provide some insight into the modifications needed in both the form and policy going forward.  We have provided MCSO with our comments and concerns regarding the initial study and MCSO has responded.  Currently, MCSO is utilizing the initial study to review the NTCF form and policy (EA-3 [Non-Traffic Contact]) with the intent of suggesting modifications.

During our October 2023 site visit, we discussed MCSO's progress in modifying the Non-Traffic Contact Form (NTCF) and policy.  Following a historical summary of the issues, MCSO gave a PowerPoint presentation outlining its plans going forward.  MCSO proposes to utilize NTCFs only for deputy-initiated, on-sight events.  All calls for service that may have appeared in NTCFs in the past will be handled through Incident Reports or other means in the future.  In addition, the NTCF itself will be modified to resemble the Vehicle Stop Contact Form (VSCF) to ensure that

WAI 72652

analyses can be conducted.  MCSO also believes the best way to analyze the limited number of NTCFs will be to use simple ratio analyses of non-traffic contacts per deputy for minority groups as opposed to whites.  MCSO has advised us that its proposals regarding form changes, policy changes, and proposed analyses will be submitted by the end of December 2023.  We will evaluate these when they are produced.

MCSO also conducts evaluations of supervisory investigations into non-traffic stop alerts each month.  We select a random sample of 15 cases, when the number of completed investigations exceeds that amount; and evaluate the sufficiency of the investigations undertaken.  Over the past year, we have found that most supervisors are completing these investigations in a timely fashion and addressing the deficiencies raised as we have noted above.  MCSO has proposed, and we have agreed in principle, to convert the alert inspection to a quarterly process that includes an evaluation of the effectiveness of the interventions undertaken.  As discussed below, MCSO produced this evaluation for the first time during the third and fourth quarters of 2022, and has continued to provide these to us in 2023.

MCSO has created an EIS Alert Review Group (ARG) that evaluates the investigations of supervisors prior to closing an alert.  The ARG ensures that the reports of the supervisors address all aspects of the assigned investigations and returns those that are deficient to the District for continued revision.  Over the past several months, we have noted that the proportion of completed alert investigations being sent back to the Districts by the ARG is minimal.  MCSO has emphasized supervisory investigations in the past years' training, as well as the creation of liaisons between BIO and the Districts to ensure that supervisors receive the necessary support and information to complete these investigations.

In addition, EIU has developed online supervisory resource material for alert investigations that was placed on the HUB in January 2020.  In the fourth quarter of 2022, MCSO produced an EIS Alerts Inspection, which included a method of evaluating whether the interventions triggered by alert investigations may, or may not, be mitigating the problems resulting in the original alert.  To do this, the agency began with the alerts investigated in the first quarter of 2022, and examined the alerts triggered in the following two quarters to determine if there were any recurring alerts.  AIU found that five deputies had new alerts during the second and third quarters of 2022.  Of these five, four were for new external complaints and one was due to a new BIO Action Form naming the deputy.  The report also indicated that follow-up on the latter case had already occurred but the external complaints were under the purview of PSB so there was no additional investigation conducted.  During the first quarter of 2023, MCSO's EIS Alerts Inspection continued to show that "Meeting With a Supervisor" was the most frequent intervention; but there were also cases handled with reassignment, employee services, training, and referrals to PSB.  During our July site visit, we discussed the inspection and the need to ensure that repeat interventions for any deputy follow the graduated process outlined in policy.

In June 2023, the second quarter inspection showed that four investigations did not meet the 30-day timeframe required by policy even with extensions granted.  Additionally, MCSO found recurring alerts for several deputies; and reported that in two instances, the response to the second alert was multiple interventions – while the response for additional external complaints was "no further action" as the cases were already being processed by PSB.  The graduated use of multiple

WAI 72653

interventions accords with policy. MCSO noted that the agency will continue to evaluate the effect interventions have on the triggering of new alert cases. This addition to the quarterly EIS Alert Inspection fulfills the need to ensure that repetitive problematic behavior is being flagged and addressed appropriately.

The Audit and Inspections Unit (AIU) conducts monthly audits of supervisory oversight via the Supervisor Notes made for each deputy. Minimally, each month, supervisors should be making a performance appraisal note and two Supervisor Note entries, reviewing two body-worn camera recordings, and reviewing the EIS profile of their subordinates. During the third quarter, MCSO reported compliance rates of 98.77% in July, 99.36% in August, and 98.70% in September. MCSO computes its compliance rates based upon a matrix of items, for randomized samples that we provide to them. Our computation of compliance is slightly lower than that reported by MCSO, as we deem an entire case reviewed as noncompliant if any of the key components making up the inspection are late or missing at the time of the inspection. Our computed compliance rate for July is 97.87%; and for August and September, 97.67%. We will continue to monitor these reports.

AIU also conducts three inspections of traffic stop information: two pertain to the timely review and discussion of traffic stops by supervisors for each subordinate; and one inspects the correct completion of traffic forms and the coordination of these forms with databases such as CAD and the review of body-worn camera footage. For this quarter, for the traffic discussion inspections, MCSO reported compliance rates in excess of 99%; and for traffic review inspections, MCSO reported a rate of 100%. We concur with the rates reported by MCSO.

For the traffic data inspection, MCSO reported compliance rates exceeding 99% for the quarter. However, our compliance calculations for this period for the traffic data inspections were slightly lower, due to the fact that we do not employ a matrix to assess compliance; but rather deem individual cases as deficient if any significant information is determined to be inconsistent across traffic stop forms or CAD. Our compliance rates were 88.5%, 97.1%, and 94.3%, respectively. The lapses found for the data inspections were due to incongruent information on the VSCF and CAD for stop location, passenger contact, and correct contact conclusion, among others. All three inspections were based upon a stratified random sample of all traffic stops that our Team provided to MCSO. AIU sent BIO Action Forms to those Districts where it found deficiencies. As noted above, we will continue to monitor these reports; and we will withdraw compliance if our combined computed rates drop below 94%.

WAI 72654

MCSO has developed an Incident Report Inspection that has been approved following several revisions. The inspection should include instances where prosecuting authorities turned cases down due to a lack of probable cause, among other matrix items developed by MCSO. MCSO reported compliance rates exceeding 99% for this quarter, with no instance of a case being turned down due to a lack of probable cause. Our review of the inspections found one instance each of a lack of articulation to support the charge, a failure to provide property receipts for confiscated items, and citing and releasing a person who had no permanent address; in addition, there were several IRs that were not properly submitted. Our compliance rates for the quarter are 95.0%, 97.5%, and 97.5%, respectively. For those deficiencies discovered during the inspection process, AIU sent BIO Action Forms to the appropriate Districts for additional review and action. More importantly, the inspectors noted that there was no indication that the immediate supervisors found these deficiencies within their own review of these IRs.

In our last quarterly status report, we issued a warning regarding compliance with this Paragraph as several inspections showed compliance rates under 94%. In the current quarter, we found that significant improvement with compliance rates for the traffic stop data inspections and supervisor note inspections. We will continue to monitor these trends, and we will withdraw compliance if MCSO fails to meet the requirements of this Paragraph.

**Paragraph 70.** *If any one of the foregoing reviews and analyses of the traffic stop data indicates that a particular Deputy or unit may be engaging in racial profiling, unlawful searches or seizures, or unlawful immigration enforcement, or that there may be systemic problems regarding any of the foregoing, MCSO shall take reasonable steps to investigate and closely monitor the situation. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or of other supervised, monitored, and documented action plans and strategies designed to modify activity. If the MCSO or the Monitor concludes that systemic problems of racial profiling, unlawful searches or seizures, or unlawful immigration enforcement exist, the MCSO shall take appropriate steps at the agency level, in addition to initiating corrective and/or disciplinary measures against the appropriate Supervisor(s) or Command Staff. All interventions shall be documented in writing.*

**Phase 1:** In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on April 27, 2022.

- EB-2 (Traffic Stop Data Collection), most recently amended on February 22, 2023.

- GH-5 (Early Identification System), most recently amended on March 28, 2023.

**Phase 2:** Not in compliance

MCSO has finalized protocol and training-related plans for the Traffic Stop Monthly Reports (TSMRs) and memorialized these in the TSAU Operations Manual. MCSO has also modified GH-5 and incorporated the necessary documents from TSMR into that policy. The TSMR is intended to provide a timelier response to potential indications of bias at the deputy level through

WAI 72655

the examination of a rolling 12 months of traffic stop data for each deputy.  MCSO has refined the vetting process for those cases where a deputy flags in the analysis and has recommended outcomes ranging from the discounting of a flag to the onset of full interventions, which would entail remedies based upon the findings of TSAU.  MCSO has continued producing the monthly vetting analyses for ongoing review, as well as documentation of any cases that are closed as a result of the completion of TSMR processes.  After reviewing the intermediate and full interventions to date, we believe the quality of interventions could be improved with more directed attention to promoting change in the deputy's behavior that resulted in the original disparity.

During the first quarter of 2023, MCSO updated Appendix A "EIS Allegation and Incident Thresholds," as well as conducted threshold analyses for Vehicle Pursuits and Accidents to apply to Appendix A of the EIU Operations Manual.  We will continue to work with MCSO on the refinement of these materials.  MCSO has received approval to move forward on several TSQR projects and published 11 of these reports through the third quarter of 2023.

MCSO published its eighth Traffic Stop Annual Report in June 2023 and continues to find in the examination of traffic stop outcomes disparities "that may indicate a systemic bias within the patrol function" that need to be addressed.  In TSQR5, MCSO further investigated these disparities and found that particular Districts were associated with certain traffic stop outcome disparities.  Subsequently, BIO personnel reported that they held command staff and personnel meetings in each District outlining the particular disparities found for each District.  MCSO has proposed and received approval to conduct another quarterly analysis evaluating the traffic stop outcome disparities within and between Districts.  MCSO will be able to compare the current analysis to that found in TSQR5, published in 2021.  Overall, the analytic methods used in the TSARs are not able to identify individual deputy activity; but should form the basis for organizational strategies to address potential systemic biases through training, practice, and policy.

During our October 2023 site visit, MCSO acknowledged that it had received comments regarding TSAR8 that had prompted the agency to plan future TSQR analyses to overcome some of the issues raised – in particular, extended stop indicators, stop length calculations and presentations, and jurisdictional analyses.  These will be explored in other Paragraphs as they are produced.  In addition, MCSO personnel commented that they would propose enhanced training for personnel that covers the details of TSAR8.  Additionally, according to MCSO, the agency plans to respond to TSAR8 in ways similar to how the agency has responded to prior TSARs, with a response to any issue(s) stemming from the analysis; as well as steps that MCSO has taken in response, including additional audits, community outreach, and others.

MCSO appeared open to suggestions from us and the Parties.  However, while traditionally, MCSO has included a statement in all analytic publications that the agency will continue to study the outcomes of those publications, it has not often followed through with specific actionable processes.

MCSO's Plan to Promote Constitutional Policing (also referred to as the Constitutional Policing Plan, or CPP) was drafted to address systemic issues identified in the Traffic Stop Annual Reports (TSARs).  The CPP includes nine Goals and a timeline for the completion of the Goals.  Our

WAI 72656

comments in this report pertain to compliance with the Plan during the third quarter of 2023. MCSO created an online progress tracking tool (Smartsheet) and provided a link to the application in April 2020. The online spreadsheet is based on the plan originally agreed to by the Parties and approved by the Court. The spreadsheet provides additional details of MCSO's reported progress on each of the nine CPP Goals: the start date; the projected completion date; and the status of sub-Goals and projects.

We determine compliance with the CPP through several means. First, we issue monthly and quarterly document requests pertaining to specific Goals of the CPP, which we review. We have monthly document requests pertaining to projects under Goals 1, 3, 4, and 5. We review meeting agendas and discussion items to verify compliance with the projects noted under those Goals. For the training components of these Goals, MCSO submits training materials that must be reviewed and approved before delivery. We confirm completion of training requirements through HUB reports and reviews of BIO inspections of supervisor notes documenting briefings. Our standing requests for other Paragraphs of the First and Second Orders also provide information related to some of the CPP Goals. For Goal 1, we review MCSO monthly submissions related to supervisory corrective actions. For Goal 2, we review a selected sample of deputy and supervisor Employee Performance Appraisals (EPAs). For Goal 6, we conduct periodic meetings with MCSO, the Plaintiffs, and Plaintiff-Intervenor related to the evaluation of traffic stop data and associated monthly, quarterly, and annual reports. For Goal 9, we request statistical information, and compare these statistics to the previous quarter to determine if MCSO is making progress. We review the progress reported for all Goals and projects in the online spreadsheet and record our findings. We corroborate MCSO's reported progress during our site visits, where we confirm the reported outcomes and ask clarifying questions on projects completed. Our comments below reflect what we learned as a result of our reviews of documentation during the third quarter of 2023, and pursuant to our inquiries following our October 2023 site visit.

Goal 1: Implementing an effective Early Intervention System (EIS) with supervisor discussions. For the third quarter of 2023, MCSO continued to report an overall 99% completion rate for Goal 1, the same as the previous two quarters.

Goal 2: Evaluating supervisors' performances through an effective Employee Performance Appraisal process. For the third quarter 2023, continued to report a 98% completion rate for Goal 2. On the online spreadsheet, the completion date for this Goal was listed as October 16, 2023. During our October site visit, we met with the staff of Human Resources, who advised us that the integration of Blue Team notes into the Perform application was completed. We discussed the deficiencies we found in noncompliant EPAs. MCSO advised that there are two analysts in Human Resources assigned to conduct quality control reviews of EPAs, to ensure that required assessments are included with each EPA. The Human Resources staff stated that they will work with PSB and BIO to address deficiencies found in the assessments of compliance of Paragraph 99. For the third quarter of 2023, MCSO achieved compliance with all EPA-related Paragraphs.

Goal 3: Delivering enhanced implicit bias training. MCSO continued to report a 95% completion rate for Goal 3 during the third quarter. During our October site visit, MCSO presented its proposed changes related to training, relevant to Goals 3, 4, and 5. We and the Parties agreed

WAI 72657

with MCSO's proposal to focus on specific areas of need, based on the findings of its traffic stop analysis reports.

Goal 4: Enhanced Fair and Impartial Decision-Making training (FIDM).  MCSO continued to report a 96% completion rate for Goal 4 during the third quarter.  During our October site visit, MCSO presented its proposed changes to training related to CPP Goals 3, 4, and 5.  We and the Parties agreed with MCSO's proposal to tailor the training for these Goals based on the findings of its traffic stop analysis reports.

Goal 5: Delivering enhanced training on cultural competency and community perspectives on policing.  MCSO continued to report a 93% completion rate for Goal 5, for the third quarter. During our October site visit, MCSO presented its proposed changes to training related to CPP Goals 3, 4, and 5.  We and the Parties agreed with MCSO's proposal to focus on specific areas of need based on the findings of its traffic stop analysis reports.

Goal 6:  Improving traffic stop data collection and analysis.  As of our October review, MCSO continued to report a 98% completion rate for Goal 6.  MCSO continues to refine methodologies when necessary, through collaboration with us and the Parties.  MCSO has also proposed enhanced training as a result of the findings in TSAR 8, published in June 2023.  MCSO continues to propose analysis for TSQRs as they relate to disparate findings emanating from both the TSAR and TSMR analysis.  MCSO continues to share the findings of the TSMR analysis with us and the Parties on a monthly basis.

Goal 7: Encouraging and commending employees' performance and service to the community. This goal has been completed.  This goal was not part of the requirements set by the First Order.

Goal 8: Studying the Peer Intervention Program.  This goal has been completed.  This goal was not part of the requirements set by the First Order.

Goal 9: Building a workforce that provides Constitutional and community-oriented policing and reflects the community we serve.  MCSO's goal is to establish a hiring process that will build a workforce that provides Constitutional policing and reflects the community it serves.  As of our October review, MCSO continued to report a 77% completion rate for Goal 9 on the online spreadsheet.  Following our October site visit, were requested an update on the progress of Goal 9, and MCSO provided a written response to our questions.  MCSO reported that there were five career fair events conducted in the third quarter, in addition to one applicant outreach event conducted in one of the jail facilities.

MCSO had previously considered the EyeDetect system as an alternative to the current polygraph system, but determined that it did not offer any advantages or efficiencies and is no longer considering it.  MCSO reported that starting pay rate for Detention Officer trainees has increased to $25.20 per hour; and after graduating from the Academy, the hourly pay rate increases to $32.00.  Detention Officers will continue to receive a temporary critical staffing differential of 5% for the foreseeable future.  Maricopa County has also introduced a childcare option for all employees.  In addition, eligible Detention Officers and Deputy Sheriffs have received $5,000 in incentives and were scheduled to receive another $5,000 in October.  This state incentive program for Detention and enforcement officers has been extended until August 2024.

WAI 72658

In response to our October site visit request, MCSO reported a total of 1,094 overall vacancies as of September 30, 2023.  MCSO reported 1,069 vacancies for the second quarter of 2023.  MCSO previously reported 999 vacancies in the first quarter of 2023, 971 vacancies in the fourth quarter of 2022, 938 vacancies in the third quarter of 2022, 903 vacancies in the second quarter of 2023, and 838 vacancies in the first quarter of 2022.  The vacancies reported for the third quarter of 2023 were 111 sworn, 724 Detention, and 259 civilian.  MCSO reported 67 voluntary separations during the third quarter.  Of the 67 voluntary separations, eight were sworn personnel.  The demographics for sworn separations were 50% white, 25% Asian, 12.50% Latino, and 12.50% two or more races.  MCSO reported 32 voluntary separations of Detention personnel, of which the demographics were reported as 50% white, 25% Latino, 6.25% American Indian/Alaskan Native, 3.13% Black, 6.25% Asian, and 9.38% two or more races.  MCSO reported 27 voluntary separations of civilian personnel, with the demographics reported as 55.56% white, 22.22% Latino, 11.11% Black, 7.41% two or more races, and 3.70% were unknown.

With regard to the number of new hires for the third quarter of 2023, MCSO reported 88 new employees hired.   Of those 88 new employees, 11 were sworn, 28 were Detention, and 49 were civilian.   The demographics for new sworn personnel were reported as 36.36% white, 18.18% two or more races, 36.36% Latino, and 9.09% Asian.    The demographics for new Detention personnel were reported as 25% white, 35.71% Latino, 14.29% Black, 10.71% Asian, 7.14% two or more races, 3.57% American Indian/Alaskan Native, and 3.57% were not specified.    The demographics for new civilian personnel were reported as 40.82% white, 34.69% Latino, 8.16% Black, 4.08% Asian, 4.08% two or more races, 2.04% Native Hawaiian/Pacific Islander, 2.04% American Indian/Alaskan Native, and 4.08% not specified.

MCSO reported three Academy classes for Detention personnel.    Class 982 was scheduled to graduate five Detention Officers on November 2, 2023.    Class 983 was scheduled to graduate eight Detention Officers on December 21, 2023.    Class 984 was scheduled to graduate five Detention Officers on March 28, 2024.   With regard to sworn Academy classes, Class 161 started on June 19, 2023, and was scheduled to graduate 10 deputies on December 1, 2023.   Class 162 started on September 11, 2023; and is scheduled to graduate seven deputies on February 23, 2024.  Class 163 was planned to start on January 29, 2024, and currently is expected to include six deputies.

Current supervisor demographics for sworn were reported as 75.28% white, 19.66% Latino, 2.81% Black, 1.12% two or more races, and 1.12% Asian.   Supervisor demographics for Detention were reported as 66.14% white, 24.80% Latino, 3.94% Black, 2.36% Asian, 0.79% Native Hawaiian/Pacific Islander, 0.39% American Indian/Alaskan Native, and 1.57% two or more races.   Supervisor demographics for civilian employees were reported as 58.45% white, 23.94% Latino, 8.45% Black, 0.70% American Indian/Alaskan Native, 4.23% Asian, 2.82% two or more races, and 1.41% not specified.

WAI 72659

MCSO and the Parties agreed to the Constitutional Policing Plan in September 2017, in an effort to address disparities found in traffic stops. Even after the implementation of the CPP, TSARs have continued to find disparities impacting members of the Plaintiffs' class. As noted in the Sheriff's statement in response to TSAR8, the disparities that were found "are concerning and require additional review to determine the cause, which may include systemic bias in our patrol function."

During our October site visit, MCSO presented to us and the Parties a proposed change for training, as it relates to MCSO's obligations under Paragraph 70. MCSO proposed that future training would be based on the findings of the traffic stop analysis reports. MCSO stated that the new process will educate deputies on how statistics are done in TSARs and will identify the types of violations drivers are being stopped for. The training will also cover parts of the traffic enforcement policy. The proposed training will also educate deputies on the differences between the TSAR and TSMR. Whether or not the new training will, in fact, impact identified disparities in TSARs, will be assessed at a later time. With regard to the 2024 training cycle, MCSO will not conduct briefings on Implicit Bias, Fair and Impartial Decision Making, and Cultural Competency. MCSO will rely on the results of the TSQRs to determine if there are any actionable items to brief deputies on. MCSO expects future briefings topics will include searches, decision-making, and duration of stops. In addition, MCSO will be conducting Spanish classes to enhance deputies' communications skills. The three-day classes will be on a voluntary basis. We recommended that the information pertaining to the new plan be shared with MCSO's advisory boards.

**Paragraph 71.** *In addition to the underlying collected data, the Monitor and Plaintiffs' representatives shall have access to the results of all Supervisor and agency level reviews of the traffic stop and patrol data.*

### In Full and Effective Compliance

MCSO has provided us with access to existing data from monthly and annual reports.

While we continue to work with both MCSO and the Parties on specific issues of methodology for Non-Traffic Contact Forms, as well as the Annual, Monthly, and Quarterly Reports for traffic stop data, we have nonetheless been afforded complete access to all requests involving data. For example, MCSO has published TSQR9 "2021: Special Assignments" (discussed in Paragraphs 65 and 69), and the agency put into place mechanisms to ensure that the undercounting of stops conducted during special assignments does not reoccur. MCSO has also suggested actions which could improve the consistency of traffic stop actions taken by deputies regardless of assignment. MCSO reported some differences in the magnitude of significant findings between TSAR7 and TSQR9, but otherwise the findings of potential bias were unchanged as it relates to those special assignment stops that were previously undercounted. In TSQR10 (Searches), MCSO found that nearly two dozen searches had been coded incorrectly as either discretionary or non-discretionary searches. This was largely due to a deputy having indicated multiple search types during an incident which the coding syntax could not adequately address. The agency has used this discovery to modify the data prior to any analysis for the eighth annual report. Finally, MCSO's

WAI 72660

latest quarterly report, TSQR11, Low Stop Volume Deputies, was published on June 30, 2023. The report examines whether the traffic stop outcomes of low-volume deputies differ from their high-volume counterparts. The report found that 41% of deputies make under 20 stops per year and those stops (970) represent approximately 5% of all traffic stops for the agency during the year. MCSO found that low-volume deputies had a lower citation rate than their high-volume counterparts (35.88% vs. 52.41%) but in the process low-volume deputies contacted a higher proportion of Hispanic drivers (33.4% vs. 23.50%). However, these differences did not result in findings of significantly greater disparities in the outcomes of white and Hispanic drivers for low-stop deputies, or disparities in comparison to their high-volume counterparts. In essence, the report concluded that any disparities that do arise are not dependent upon the volume of traffic stops made by deputies. MCSO reports that the agency intends to continue exploring ways to reduce disparities across ethnicities through its inspections and TSMR reviews.

MCSO has been forthcoming when the agency recognizes any data deficiencies and has modified data quality procedures when issues arise. We will review additional data quality procedures as they are made available to us.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 72661

## Section 8: Early Identification System (EIS)

**COURT ORDER IX.  EARLY IDENTIFICATION SYSTEM ("EIS")**

### *a. Development and Implementation of the EIS*

***Paragraph 72.*** *MCSO shall work with the Monitor, with input from the Parties, to develop, implement and maintain a computerized EIS to support the effective supervision and management of MCSO Deputies and employees, including the identification of and response to potentially problematic behaviors, including racial profiling, unlawful detentions and arrests, and improper enforcement of Immigration-Related Laws within one year of the Effective Date.  MCSO will regularly use EIS data to promote lawful, ethical and professional police practices; and to evaluate the performance of MCSO Patrol Operations Employees across all ranks, units and shifts.*

**Phase 1:**  In compliance

- EA-3 (Non-Traffic Contact), most recently amended on June 28, 2019.

- GH-5 (Early Identification System), most recently amended on March 28, 2023.

**Phase 2:**  Not in compliance

As a result of interfaces for remote databases introduced in 2017, the Early Intervention System (EIS) now includes Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), records from the Administrative Office of the Courts (AOC), and training completion and policy acknowledgement records from the Cornerstone software (the HUB).  MCSO continues to update the EIU Operations Manual to memorialize the collection, analysis, and dissemination of relevant data, as well as the responsibilities and roles of agency and EIU personnel.  During the first quarter of 2023, MCSO updated Appendix A, "EIS Allegations and Incident Thresholds" following extensive review of the thresholds, as well as EIS Alert Process (302).  In addition, MCSO conducted threshold analyses on vehicle pursuits and deputy accidents and applied the results accordingly to the Appendix.  Going forward, MCSO has produced a plan to modify and review the thresholds on a regular basis.  During the third and fourth quarters of 2022, MCSO also modified the EIS Alert inspection from a monthly to a quarterly report and included in the latter quarter an evaluation of the effectiveness of interventions undertaken.  Each of these additions or modifications has improved the process of oversight and evaluation of potential bias and provides needed tools for early intervention should such issues arise.

To capture the activities of deputies in non-traffic stops of individuals, MCSO created Non-Traffic Contact Forms (NTCFs), which were interfaced with EIS in mid-2017.  MCSO has provided us with access to investigative stops that make up a portion of NTCFs since their inception.  Over the past two years, we have suggested that MCSO create a methodology to statistically examine these civilian contacts to ensure that there is no evidence of bias in the way they are conducted.  Several months ago, MCSO proposed an initial study of how the NTCFs and the related policy are being used across the agency.  Following a conference call among MCSO, us, and the Parties in February 2022, MCSO committed to conducting the first portion of the

WAI 72662

inquiry. The NTCF study was published in February 2023. While this analysis did not investigate potential indications of bias in how these stops are conducted by deputies or evaluated by supervisors, it did provide some insight into the modifications needed in both the form and policy going forward. We have provided MCSO with our comments and concerns regarding the initial study and MCSO has responded. Currently, MCSO is utilizing the initial study to review the NTCF form and policy (EA-3 [Non-Traffic Contact]) with the intent of suggesting modifications. We will evaluate these when they are produced.

During our October 2023 site visit, MCSO presented a preview of an upcoming proposal to limit NTCFs to only deputy-initiated, on-scene events. Examples might include if a deputy observes a person riding a bike without a light or someone lurking behind a business at night. The NTCF will not be used for service calls, as these will be captured on various other forms, like the Incident Report (IR), when required by a call for service. The NTCFs will be modified so that they are similar to Vehicle Stop Contact Forms (VSCFs) to allow analyses that are less than, but approximate, the type of comparative analyses of traffic stops. The analytic approach being investigated, according to MCSO, is outlined on the U.S. Department of Justice website and involves a ratio comparison of deputies' non-traffic contacts (NTCs) for Hispanics, or other minority groups, compared to whites. MCSO responded to questions from us and the Parties, and advised us that the NTCF proposal would be published by the end of 2023. We will evaluate these materials as they are made available to us.

We will continue to work with MCSO to finalize each of these data analytic methods. MCSO continues to regularly publish a number of reports on deputy activity and supervisory oversight that are not tied to the methodologies of the TSMR, TSQR, or TSAR.

The Audits and Inspections Unit (AIU) produces a monthly report evaluating Supervisor Notes based upon a random sample we draw that indicates whether the selected supervisors are reviewing the EIS data of deputies under their command. The inspection looks for indications that supervisors made entries for each person they supervise with regard to two randomly selected BWC videos, provide one EPA note, make two supervisor entries, and indicate that the supervisor has reviewed their deputies' EIS status. The compliance rates reported by MCSO are based on a matrix developed for this inspection. For this quarter, the compliance rates reported by MCSO exceeded 98% for each month. Our calculations differed by less than a single percentage point each month, as we deem individual cases as noncompliant for any missed timeframes or other requirements. For this quarter, our calculated a compliance rates were 97% or higher. Each month, there was one supervisor who missed one component of the requirement for a deputy under his/her supervision. AIU continues to send BIO Action Forms to the Districts with deficiencies, and we have always had the opportunity to review these forms when requested.

WAI 72663

In the Traffic Stop Data Inspection for this quarter, MCSO reported compliance rates in excess of 99%. Our calculations are slightly lower each month due to several missing notations as to how contacts were concluded, the recording of contact with a passenger, and the location for the stop, among others. As a result, our compliance rates are 88.5%, 97.1%, and 94.3%, respectively. The compliance rates for the Traffic Stop Discussion and Review Inspections all exceeded 99% for this quarter. We concur with these findings. All the inspections for traffic stops are based upon stratified random samples that we draw on a monthly basis. The deficiencies noted by the inspectors resulted in BIO Action Forms being sent to the appropriate Districts for this quarter.

While we can look for trends in deficiencies over each quarter, we have suggested to MCSO that AIU conduct an evaluation of all BIO Action Forms sent to Districts to ensure that there are not long-term trends by Districts or supervisors that cannot be distinguished while looking at shorter timeframes. MCSO conducted a preliminary analysis of BIO Action Forms from January to May 2019 and reported these findings during our July 2019 site visit. MCSO found that there was indeed a small number of deputies who had received several BIO Action Forms. With the review of us and the Parties, MCSO produced a methodology to conduct a repeatable inspection of BIO Action Forms. In September 2022, MCSO published the first BAF tracking inspection covering 2021. In May 2023, MCSO published the second BIO Action Form Study. We note similarities between the first and second BAF inspection studies. First, the highest deficiency category is Lack of Documentation. Second, Lake Patrol stood out for problems of incorrect documentation in the Traffic Stop Data Inspection. Finally, the report concluded that IR and Traffic Stop Data Inspections were again in the top three inspections with the most issues. The third inspection related to CP-8 (Preventing Racial and Other Biased-Based Policing). This study was discussed during our July site visit. MCSO concluded that personnel were not meeting deadlines for the required review of CP-8 materials. We also noted that in the discussion of issues potentially causing an increase in BAFs, several Districts were struggling to address the impact of staffing and shift adjustments during the data year. Finally, in the discussion regarding high incident supervisors (those supervisors with a disproportionate number of BAFs), MCSO notes that it does not appear that any one deputy created repetitive problems but that some supervisors had issues arise amongst a number of their subordinates. MCSO has suggested that, rather than have supervisors implement individual interventions, a more effective strategy would be squad interventions. During our July site visit, MCSO noted that the agency continues to study this suggestion. MCSO will conduct the BAF inspection every six months using one year of data that overlaps the prior reporting period by six months.

EIU also produces a monthly report on non-traffic alerts triggered within EIS. EIU personnel review the alerts and disseminate them to supervisors and District command if alerts indicate the potential for biased activity or thresholds are exceeded for particular actions such as external complaints, data validations, and others. Once the supervisors receive the alert investigation, they employ a template (Attachment B of GH-5 [Early Identification System]) to conduct the investigation and report their findings and results to the chain of command through BlueTeam. MCSO has also created an EIS Alert Review Group (ARG) to evaluate the closure of alert investigations. We had no immediate concerns with our review of alert closures for the third quarter.

WAI 72664

***Paragraph 73.***  *Within 180 days of the Effective Date, MCSO shall either create a unit, which shall include at least one full-time-equivalent qualified information technology specialist, or otherwise expand the already existing role of the MCSO information technology specialist to facilitate the development, implementation, and maintenance of the EIS.  MCSO shall ensure that there is sufficient additional staff to facilitate EIS data input and provide Training and assistance to EIS users.  This unit may be housed within Internal Affairs ("IA").*

**In Full and Effective Compliance**

In September 2023, MCSO supplied documentation of its reorganization of the Bureau of Internal Oversight (BIO) and the Court Implementation Division (CID).  The major change moves the Traffic Stop Analysis Unit (TSAU) from BIO to CID without changing the important functions of this unit.

BIO is overseen by a captain and is comprised of two Units designed to achieve different compliance functions.  Each is a fully operational Unit headed by a lieutenant with both sworn and civilian staff responsible for diverse but interrelated oversight functions.

The Early Intervention Unit (EIU) coordinates the daily operation of the EIS.  This Unit evaluates alerts generated by the EIS, reviews them, and sends out investigations to District personnel as prescribed by policy.

The Audits and Inspections Unit (AIU) has developed and carries out ongoing inspections to ensure that deputies and supervisors are using the EIS properly and to the fullest extent possible.  When AIU discovers deficiencies, it sends out BIO Action Forms to the affected Districts and individuals; and ensures the return of the appropriate forms.

The Traffic Stop Analysis Unit (TSAU) was created due to the complexities of generating all the statistical reports related to traffic and patrol functions of MCSO.  TSAU, comprised of both civilian and sworn personnel, responds to specific requests made by us and the Parties; and to answer any questions related to the operation or analysis of data during and between our site visit meetings.

Over the last 18 months, the EIS database has been expanded to include Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), records from the Administrative Office of Courts (AOC), and training and policy receipt records from the Cornerstone software program (the HUB).  Supervisors now have much more information available to them about the deputies under their command than they ever had in the past.

On October 5, 2020, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

WAI 72665

***Paragraph 74.*** *MCSO shall develop and implement a protocol setting out the fields for historical data, deadlines for inputting data related to current and new information, and the individuals responsible for capturing and inputting data.*

**In Full and Effective Compliance**

MCSO has met the requirements of this Paragraph by identifying the data to be collected and the responsibility of persons across the organization to review, verify, and inspect the data making up the early intervention system. These roles and responsibilities are originally developed in GH-5 (Early Identification System) and more comprehensively elaborated in Section 200 (Duties and Responsibilities), approved in August 2019, of the EIU Operations Manual.

MCSO has continually refined the data-handling protocol since the publication of earlier TSARs, which were fraught with problems. These processes have been memorialized in the EIU Operations Manual (Section 306), which was approved in July 2020. Aside from Section 200, noted above, Section 305 (Software Change Control Processes), approved in October 2018, is intended to ensure that all modifications to software or data collection are coordinated in a prospective fashion before any implementation occurs. These software changes are provided to us on a monthly basis through regular document requests and are discussed during the quarterly site visit meetings. For example, during the fourth quarter of 2022, MCSO introduced a Special Assignment update that allows deputies to identify traffic stops that occur during DUI, Aggressive driving, Click It and Ticket, or other special assignment patrols. Deputies are also provided the ability to add clarifying comments to their selections. In the third quarter of 2022, MCSO introduced two new drop-down items for extended stops as a result of findings in prior TSQR analyses. The first is the ability of deputies to note license issues arising during the stop, and the second is a broader "other issue" that may lead to extended stops. The deputies are required to elaborate in comment fields what those issues may involve. Each of these sections of the EIU Operations Manual expands upon policy that has already been approved.

MCSO has also created a committee of personnel from each unit that handles, or adds to, traffic data before it is analyzed. The reports from the regular monthly meetings of this group are made available to us and show the attention to detail and memorialization of changes put in place to improve data processes. During the current quarter, MCSO reported minor updates to TraCS and VSCF forms so that they accord with Arizona Office Court (AOC) guidelines. During our October 2023 site visit, we met with this group and discussed the ongoing nature of the monthly meetings. We found the EIU lieutenant and staff to be well-versed in every aspect about which we inquired.

Additionally, in TSQR10, "Searches," published in March 2023, MCSO found that nearly two dozen searches had been coded incorrectly as either discretionary or non-discretionary searches. This was largely due to a deputy having indicated multiple search types during an incident, which the coding syntax could not adequately address. As a result, MCSO recoded the data prior to any analysis for TSAR8. The agency is also reviewing the training, policy, and analytic syntax related to searches to ensure that such miscoding does not occur again.

WAI 72666

Finally, EIU produces a monthly report for benchmarks not related to the traffic stop methodologies. We routinely use these monthly tables to evaluate compliance with various Paragraphs within the Court Order. For traffic-related Benchmarks 3 and 8 (Paragraph 67), MCSO documents both traffic stops involving immigration inquiries and data validation errors committed by deputies. During this reporting period, there were no immigration inquiries, and there were seven data validation alerts: four in July; two in August; and one in September.

On September 25, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 75.** *The EIS shall include a computerized relational database, which shall be used to collect, maintain, integrate, and retrieve:*

a.  *all misconduct Complaints or allegations (and their dispositions), excluding those made by inmates relating to conditions of confinement or conduct of detention officers (i.e., any complaint or allegation relating to a traffic stop shall be collected and subject to this Paragraph even if made by an inmate);*

b.  *all internal investigations of alleged or suspected misconduct;*

c.  *data compiled under the traffic stop data collection and the patrol data collection mechanisms;*

d.  *all criminal proceedings initiated, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the County and/or its Deputies or agents, resulting from MCSO Patrol Operations or the actions of MCSO Patrol Operation Personnel;*

e.  *all arrests;*

f.  *all arrests in which the arresting Deputy fails to articulate probable cause in the arrest report, or where an MCSO Supervisor, court or prosecutor later determines the arrest was not supported by probable cause to believe a crime had been committed, as required by law;*

g.  *all arrests in which the individual was released from custody without formal charges being sought;*

h.  *all Investigatory Stops, detentions, and/or searches, including those found by the Monitor, an MCSO supervisor, court or prosecutor to be unsupported by reasonable suspicion of or probable cause to believe a crime had been committed, as required by law;*

i.  *all instances in which MCSO is informed by a prosecuting authority or a court that a decision to decline prosecution or to dismiss charges, and if available, the reason for such decision;*

j.  *all disciplinary action taken against employees;*

k.  *all non-disciplinary corrective action required of employees;*

l.  *all awards and commendations received by employees;*

WAI 72667

m.   *Training history for each employee; and*

n.   *bi-monthly Supervisory observations of each employee.*

**Phase 1:**  In compliance

- EA-3 (Non-Traffic Contact), most recently amended on June 28, 2019.

- GC-13 (Awards), most recently amended on February 14, 2023.

- GH-5 (Early Identification System), most recently amended on March 28, 2023.

- EIU Operations Manual, currently under revision.

- Professional Services Bureau Operations Manual, most recently amended on December 21, 2020.

**Phase 2:**  In compliance

Since 2017, MCSO has placed into production data interfaces for Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), Justice Court turndowns (AOC) and the Cornerstone software program (the HUB) that provides reports for training and policy acknowledgment.  MCSO continues to develop some inspections or analytic reports that ensure that personnel are accurately using the EIS data available; however, the data do exist in the EIS and are accessible by personnel we have interviewed during site visits.  We will continue to evaluate and monitor the use of EIS in furtherance of the Orders.  We have noted in previous quarterly status reports that, prior to the onset of the pandemic, we were able to observe data pertaining to each Subparagraph below during site visits.  During our October 2023 site visit, EIU personnel demonstrated how the data for the following Subparagraphs appear on-screen and are accessible to first-line supervisors.  We were able to request and witness how easily the data can be searched for particular deputies, incidents, or groupings (personnel or incident types).  We found no issues of concern during this review.  We anticipate conducting a similar reviews and inquiries during future site visits.

Paragraph 75.a. requires that the database include "all misconduct Complaints or allegations (and their dispositions)," with some exclusions.

EIPro, a web-based software application that allows employees and supervisors to view information in the IAPro case management system, includes the number of misconduct complaints and allegations against deputies.  Since February 2017, both open and closed cases have been viewable by supervisors.  PSB controls the ability to view open cases based upon the parties who may be involved.  PSB personnel developed a protocol to write the summaries for both open and closed cases that appear in the EIS.  This protocol has been approved and incorporated into the PSB Operations Manual that was published on December 13, 2018.  Each month, we receive a spreadsheet of open and closed external complaints as they appear in EI Pro for supervisors to review.  Our examination of these descriptions for July-September found that these summaries met our expectations.

WAI 72668

Additionally, during our October 2023 site visit, we observed that field supervisors could easily access these summaries and understand the types of issues involved in the complaints. Supervisors conducting alert investigations have also routinely referred to a review of complaint summaries as a portion of their investigative process. Supervisors also advised us that they can always contact EIU and PSB for clarification if it is necessary.

MCSO is in compliance with this Subparagraph.

Paragraph 75.b. requires that the database include "all internal investigations of alleged or suspected misconduct."

Corresponding to the discussion above involving external complaints, internal investigation summaries also appear in the IAPro system. All complaint summaries, open and closed, have been viewable since February 2017. PSB uses a standard protocol to develop the case summaries and access limits. We approved this protocol, and it is included in the PSB Operations Manual. Each month, we receive a spreadsheet of internal allegations as they appear to supervisors in EIS. Our review of the summaries for July-September found these summaries to be transparent and easily understandable. During our October 2023 site visit, we have found that line supervisors are also able to easily access the summaries of open and closed internal investigations pertaining to their subordinates. Supervisors also have referred to these summary fields while conducting alert investigations. Field supervisors always have the option of requesting additional information from EIU and PSB should they deem the summaries insufficient.

MCSO is in compliance with this Subparagraph.

Paragraph 75.c. requires that the database include "data compiled under the traffic stop data collection and the patrol data collection mechanisms."

MCSO has created electronic forms to collect data from traffic stops, incidental contacts, and warnings.

MCSO has also created interfaces with EIS for remote databases including Incident Reports (IRs) and Non-Traffic Contact Forms (NTCFs). These reports are readily available to supervisors to review within EIS. During our October 2023 visits to several Districts, field supervisors demonstrated that they have the ability to view IRs and NTCFs. AIU already conducts an inspection of IRs and has revised the methodology to improve and streamline the inspection process. We have suggested that MCSO create a similar inspection for NTCFs, as well as propose an analytical strategy to examine whether any racial or ethnic inconsistencies may exist in the incidents documented on the NTCF. MCSO produced a brief proposal of the methods they would use to analyze NTCFs based upon these ongoing discussions. We, the Plaintiffs, and the Plaintiff-Intervenor provided comments on these proposals in early April 2020. Following several conference calls on both the forms and policy, EA-3 (Non-Traffic Contact), MCSO proposed an initial study that would evaluate how the NTCF form and policy are being used across the agency. The NTCF study was published in February 2023. While this analysis did not investigate potential indications of bias in how these stops are conducted by deputies or evaluated by supervisors, it did provide some insight into the modifications needed in both the form and policy going forward. During our October 2023 site visit, MCSO provided a PowerPoint presentation of the agency's proposed changes to the NTCF, policy, and analytics for non-traffic contacts.

WAI 72669

Currently, MCSO is utilizing the initial study, and the feedback during our site visit, to propose both form and policy modifications. We will evaluate these when they are produced. MCSO has made available all investigative stop and field interview NTCFs each month. Our review of NTCFs for the current quarter did not find any issues of concern, although we continue to notice that most bike-related stops are of Hispanic operators. However, a statistical methodology would allow a more comprehensive examination. We will continue to work with MCSO as this process moves forward.

This Paragraph requires that the data for such activities exists within EIS; however, Paragraphs 72, 81a., and 81b.vi. require an analysis of these stops. Therefore, while MCSO complies with this Subparagraph, MCSO will not achieve compliance for the other Paragraphs until a method of analysis is approved.

MCSO is in compliance with this Subparagraph.

Paragraph 75.d. requires that the database include "all criminal proceedings initiated, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the County and/or its Deputies or agents, resulting from MCSO Patrol Operations or the actions of MCSO Patrol Operation Personnel."

MCSO's Legal Liaison Section receives and forwards this information to EIU for entry into the EIS database. Supervisors have demonstrated the ability to access this information during our October 2023 site visit. During the first quarter of 2023, MCSO also updated Appendix G (Unique Incident Procedures) of the EIU Operations Manual to include instructions on how to handle Notice of Claims.

MCSO is in compliance with this Subparagraph.

Paragraph 75.e. requires that the database include "all arrests."

Arrests may not always occur as a result of a traffic stop. MCSO, therefore, has placed into production an interface between EIS and the Jail Management System (JMS). This interface allows supervisors to easily access information regarding arrests that cannot be viewed through traffic data. During our October 2023 site visit, supervisors demonstrated the ability to access the IRs and related arrest information. The timeliness and sufficiency of that review is evaluated under Paragraph 93.

MCSO is in compliance with this Subparagraph.

Paragraph 75.f. requires that the database include "all arrests in which the arresting Deputy fails to articulate probable cause in the arrest report, or where an MCSO Supervisor, court or prosecutor later determines the arrest was not supported by probable cause to believe a crime had been committed, as required by law."

Incident Reports (IRs) are housed in the TraCS (Traffic and Criminal Software) system. Supervisors must review and sign off on IRs for each deputy involving an arrest or detention of a suspect within 72 hours of the incident. Supervisors are also required to ensure that probable cause exists for each charge or arrest outlined within an IR. AIU additionally conducts an inspection of IRs to ensure that all policy requirements are met. During this quarter, MCSO

WAI 72670

reported IR compliance rates in excess of 99%, using a matrix to assess compliance. Our compliance findings were slightly lower as we deem a case to be non-compliant if any major issues are found during the review. During this quarter, there was one instance of a deputy failing to completely articulate support for the charges indicated, two instances of missing documentation, and one instance of releasing a suspect with no verifiable address. Our compliance rates for the quarter were 95% or greater.

If a court or prosecutor decides not to prosecute a case, both the deputy and their immediate supervisor are notified. In 2019, MCSO created a new inspection that combined IR and County Attorney Turndown inspections. MCSO's intent is to catch instances of reasonable suspicion and probable cause issues earlier in the process. Other deficiencies result in BIO sending Action Forms to the appropriate District personnel.

MCSO is in compliance with this Subparagraph.

Paragraph 75.g. requires that the database include "all arrests in which the individual was released from custody without formal charges being sought."

The ability to capture this information depends upon what actually occurred within the context of the interaction. If the suspect was taken into physical custody but released prior to booking, there would be a JMS record, as indicated in Subparagraph 75.e. above. Therefore, MCSO could use the interface described above to pull the relevant data elements into EIS. However, if the incident does not rise to the point of physical custody and detention, then it would likely yield an Incident Report, covered under Subparagraph 75.f. above or an Investigatory Stop under Subparagraph 75.h. to follow. The interfaces for IR and NTCF data became operational prior to July 1, 2017. The inspection process referred to above will capture elements useful for the evaluation of this Subparagraph.

MCSO is in compliance with this Subparagraph.

Paragraph 75.h. requires that the database include "all Investigatory Stops, detentions, and/or searches, including those found by the Monitor, an MCSO supervisor, court or prosecutor to be unsupported by reasonable suspicion of/or probable cause to believe a crime had been committed, as required by law."

MCSO has created interfaces for both IRs and NTCFs. As noted in 75.f., our compliance calculation for inspection of IRs were slightly lower than those of MCSO. AIU sent BIO Action Forms (BAFs) to Districts with deficiencies. In addition, AIU published two BIO Action Form Tracking Studies that includes an evaluation of IR practices by supervisors. We have discussed that in detail in other Paragraphs, but this inspection does provide additional information for evaluating the compliance of MCSO with this Paragraph.

In July 2017, the interface between EIS and the database for NTCFs was placed into production. MCSO also reissued EA-3 (Non-Traffic Contact) and amended the policy on June 14, 2018 (and further amended it on June 28, 2019). This policy specifies the responsibility of MCSO personnel regarding different types of search occurrences. If the search is related to a traffic stop, it should be captured on the VSCF. Searches occurring within activities resulting in an Incident Report will be captured under Subparagraph 75.e., and NTCF searches fall under this Subparagraph.

WAI 72671

Initially, the number of NTCF reports was insignificant; however, since May 2018, we generally receive between 15-25 NTCFs for investigative stops each month. These are all captured within EIS as required by this Subparagraph (as well as 75.c.). During the last quarter of 2019, we also requested a random sample of Field Information stops that were documented using the NTCF. Our review of these indicated that approximately 80% of civilian stops labeled as Field Information could easily have been labeled as Investigative stops. We apprised MCSO of our findings and have subsequently provided MCSO with our summary evaluation. We have also suggested that MCSO develop a methodology to statistically analyze the collection of NTCFs to look for possible issues of racial or ethnic bias in the way these interactions are conducted. The development of a statistical examination of NTCF stops should be a priority for MCSO now that the Traffic Stop Methodologies for the Monthly Analyses are complete. Such an examination is required by Paragraphs 72 and 81.b.vi. During our October 2023 site visit, MCSO outlined the changes the agency was considering for the NTCF and policy, as well as the creation of a means to analyze NTCFs. We will evaluate this proposal when it is officially published.

Since NTCFs and IRs are included in EIS, MCSO is in compliance with this Subparagraph. Our review of investigative stops and field interviews during this quarter yielded no issues of concern.

MCSO is in compliance with this Subparagraph.

Paragraph 75.i. requires that the database include "all instances in which MCSO is informed by a prosecuting authority or a court that a decision to decline prosecution or to dismiss charges, and if available, the reason for such decision."

The EIS database has included both County Attorney Actions and an interface with the Justice Courts (AOC) since July 2017. MCSO began using a method that merged the County Attorney Turndown Inspection with the IR inspection. The first inspection was produced in August 2019 using July data. For this quarter, our computed compliance rates for the IRs were slightly lower than those of MCSO (Subparagraph 75f). The IR inspection did not include any County Attorney Turndowns, as none were received indicating a problem with probable cause. AIU sent several BIO Action Forms relating to the use of boilerplate language or missing documents to the Districts for review due to the deficiencies found by the inspectors. For this Subparagraph, we also receive a random selection of IRs turned down for prosecution from MCSO and the Justice Courts. Our review of these indicate that most had been turned down using the generic phrases "no reasonable likelihood of conviction," "dismissed to aide in prosecution," or "self-defense/mutual combat." We found no significant problems with the reports reviewed. We will continue to evaluate the inspection and IRs in future quarterly status reports.

MCSO is in compliance with this Subparagraph.

Paragraph 75.j. requires that the database include "all disciplinary action taken against employees."

MCSO currently tracks disciplinary actions in the IAPro system (for this and Paragraphs 26, 28, 69, and 89), which allows supervisors to search the history of their employees in EIS.

WAI 72672

Additionally, the Administrative Services Division replies to a monthly request that incorporates this Subparagraph; and the Division's report indicates that no discipline was imposed for bias-related incidents between July and September 2023. In addition, during our October 2023 site visit, EIU personnel were able to modify the search for this Subparagraph to include all discipline or any subset thereof.

MCSO is in compliance with this Subparagraph.

Paragraph 75.k. requires that the database include "all non-disciplinary corrective action required of employees."

The information required by this Subparagraph is captured in the EIS. MCSO produces a Supervisory Note inspection (in particular, bimonthly reviews of a deputy's performance) and the monthly alert report described in the previous Subparagraph to fulfill the requirements for this Subparagraph. In addition, we also review up to 15 closed alert inspections conducted by supervisors each month. (If there are more than 15, the cases are randomly selected from the total.) As noted previously, the majority of cases are closed through a meeting with a supervisor.

Supervisors also are required to make two comments regarding their subordinates each month in their BlueTeam Notes. In the Supervisor Notes inspections for this quarter, there was one deficiency found for a single, different supervisor each month.

MCSO is in compliance with this Subparagraph.

Paragraph 75.l. requires that the database include "all awards and commendations received by employees."

MCSO first published GC-13 (Awards) on November 30, 2017, and most recently revised this policy on February 14, 2023. With this publication, MCSO created categories for awards or commendations that could be tracked within the EIS database. With the introduction of the newest version of EIPro, these fields are also searchable by supervisors. During our past site visits, supervisors demonstrated how they could search these fields and locate awards of their subordinates in the EIS data. According to the monthly alert inspection reports for July-September, there were four monitored status alerts: one commendation recommendation; two award recipients while on leave; and one higher award nomination.

MCSO is in compliance with this Subparagraph.

Paragraph 75.m. requires that the database include the "[t]raining history for each employee."

MCSO has transitioned from the Skills Manager System to the Cornerstone (the HUB) software program. The HUB has replaced the E-Policy and E-Learning programs. The HUB routinely updates recent training and policy reviews for deputies and is visible by immediate supervisors. MCSO also created an interface between the HUB and EIS.

WAI 72673

During our October 2023 site visit, all field supervisors who we contacted stated that they were familiar with the HUB and were able to access the information contained therein.  Several supervisors noted how they assigned training to particular deputies following alert investigations they completed.  MCSO personnel informed us that supervisors have ready access to the training and policy reviews of their subordinates.  We will continue to evaluate supervisors' ability to easily search and use EIS during future site visits.  As noted above, this will include not only a review with EIU technical staff but field supervisors at the Districts.

MCSO is in compliance with this Subparagraph.

Paragraph 75.n. requires that the database include "bi-monthly Supervisory observations of each employee."

The Audits and Inspections Unit (AIU) conducts a monthly inspection of Supervisor Notes.  One of the indicators AIU evaluates is whether supervisors are making two notes per deputy each month.  For this quarter, AIU reported two instances: one in July and a second in September, where a supervisor failed to make two reviews for each of their subordinates.  BIO issued Action Forms to the relevant Districts for processing.

MCSO is in compliance with this Subparagraph.

With the operationalization of interfaces for Incident Reports, Non-Traffic Contact Forms, the Administrative Office of the Courts, and the HUB, EIS contains the information required by the Order.  MCSO has worked diligently to use some of the data above to investigate compliance rates with the Orders.  MCSO continues to develop other inspections or data analytic methods in response to our recommendations.

**Paragraph 76.**  *The EIS shall include appropriate identifying information for each involved Deputy (i.e., name, badge number, shift and Supervisor) and civilian (e.g., race and/or ethnicity).*

**In Full and Effective Compliance**

MCSO has instituted a quality check process for Vehicle Stop Contact Forms (VSCFs) that requires supervisors to review all traffic stop documents within three days of the stop.  AIU also conducts an inspection of the timeliness of these reviews as well as a second inspection on Traffic Stop Data.  Each of these inspections are based upon a stratified random sample of traffic stops that we conducted.  The Traffic Stop Data inspection employs a matrix that ensures that the name, serial number, and unit of the deputy is included on the VSCF in addition to the identity and race/ethnicity of the driver.  The overall rate of compliance for the Traffic Stop Data inspections reported by MCSO exceeded 99% for this reporting period, and none of the deficiencies involved identification of deputies or drivers.  As previously noted, our compliance calculations for this period were lower, due to the fact that we do not employ a matrix to assess compliance, but rather deem individual cases as deficient if any significant information is determined not to be consistent across traffic stop forms or CAD.

WAI 72674

MCSO has incorporated patrol data into the EIS through the creation of interfaces for Incident Report (IR) and Non-Traffic Contact Form (NTCF) documents.  Each of these documents lists the required name of the deputy and civilian, as well as the ethnicity of the civilian, in accordance with this Paragraph.  AIU conducts an inspection of IRs, including a check for racial/ethnic bias in the reporting documents and the identification of all parties contacted as a result of the incident.  We have found no recent instances where the identity of a deputy or persons contacted was not included on these forms.  Non-Traffic Contact Forms contain the same basic information about the identity of the deputy making the contact and the persons being contacted.  While MCSO does not yet have an inspection of NTCFs, they do provide us with copies of all the documents for investigative stops and field information.  Up to this point, we have not found a repetitive problem with NTCF documentation that includes the criteria required by this Paragraph.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph.  After review we concurred with this assertion.

**Paragraph 77.**  *MCSO shall maintain computer hardware, including servers, terminals and other necessary equipment, in sufficient amount and in good working order to permit personnel, including Supervisors and commanders, ready and secure access to the EIS system to permit timely input and review of EIS data as necessary to comply with the requirements of this Order.*

### In Full and Effective Compliance

Since our earliest site visits in 2014, we have addressed the issue of "necessary equipment, in sufficient amount and in good working order" with MCSO.  As part of our monthly document requests, we receive an accounting, by District, of how many vehicles have functioning TraCS systems.

Since the end of 2015, we have found that all marked patrol vehicles were properly equipped with TraCS equipment.  MCSO developed EB-2 (Traffic Stop Data Collection), which states that in the event that a TraCS vehicle is not operational, or available, each District possesses the necessary equipment at the substation for deputies to input his/her traffic stop information before the end of the shift.  Due to the mountainous regions throughout Maricopa County, there have always been connectivity issues.  However, these areas are well-known to Patrol deputies; and they have demonstrated how they adapt to connectivity problems.  The VSCF also allows deputies to note issues with technology on a traffic stop.

During our past visits to the Districts, we regularly spot-checked the facilities and patrol cars; and found that they had functioning TraCS equipment, and that each District office had available computers for any occurrence of system failures with vehicle equipment.  During our October 2023 site visit, we found that each patrol unit in service had functioning equipment; and the Districts possessed replacement vehicles and body-worn camera batteries in sufficient quantity.

At present, the technology and equipment available at MCSO meet the requirements of the Order.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

WAI 72675

***Paragraph 78.*** *MCSO shall maintain all personally identifiable information about a Deputy included in the EIS for at least five years following the Deputy's separation from the agency. Information necessary for aggregate statistical analysis will be maintained indefinitely in the EIS. On an ongoing basis, MCSO shall enter information into the EIS in a timely, accurate, and complete manner, and shall maintain the data in a secure and confidential manner. No individual within MCSO shall have access to individually identifiable information that is maintained only within EIS and is about a deputy not within that individual's direct command, except as necessary for investigative, technological, or auditing purposes.*

**In Full and Effective Compliance**

GH-5 (Early Identification System) clearly states that employees only have access to EIS in furtherance of the performance of their duties, and that any other unauthorized access will be addressed under MCSO's discipline policy. The policy also notes that access to individual deputy information will be limited to appropriate supervisory/administrative personnel associated with that deputy. In addition, the policy states that personal information will be maintained in the database for at least five years following an employee's separation from the agency; however, all other information will be retained in EIS indefinitely.

As a result of an audit conducted in 2017, MCSO discovered that a substantiated misuse of computer systems occurred in both 2011 and 2015, but had not been effectively communicated between organizational bureaus. As a result, in November 2017, MCSO published a System Log Audit operating procedure that required PSB to notify the Technology Management Bureau of any investigations involving a system breach. We fully vetted this operating procedure (BAS SOP 17-4) during our January 2018 site visit. MCSO reported no system breaches in past reviews for this Paragraph.

In July 2023, MCSO provided its second quarter submission for Paragraphs 58 and 78. During the second quarter, PSB closed three cases relevant to these Paragraphs and notified the Technology Management Bureau of those cases: IA2016-0383 involved a Posse member who utilized CAD to run two record checks on himself; IA2022-0494 involved a Detention Officer who used MCSO data access to locate a former inmate for personal reasons; and IA2022-0504 involved a deputy using MCSO data access regarding a personal relationship. In each case, PSB noted that the offending party resigned before discipline could be imposed.

MCSO's concern for the integrity of information in EIS is further exemplified by the protocols that PSB has created to meet the requirements of Subparagraphs 75.a. and 75.b. regarding purview of open complaints and internal investigations. PSB not only controls who can view summaries of open investigations but has created a protocol for creating the summaries of open investigations to protect the integrity of the cases while they are being processed.

MCSO has also created a work group to ensure the integrity of traffic stop data used for analysis. The protocols used by this work group are incorporated into Section 306 of the EIU Operations Manual. We have approved this section, and it has been incorporated into the manual as finalized.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 72676

***Paragraph 79.***  *The EIS computer program and computer hardware will be operational, fully implemented, and be used in accordance with policies and protocols that incorporate the requirements of this Order within one year of the Effective Date.  Prior to full implementation of the new EIS, MCSO will continue to use existing databases and resources to the fullest extent possible, to identify patterns of conduct by employees or groups of Deputies.*

**Phase 1:**  In compliance

- GH-5 (Early Identification System), most recently amended on March 28, 2023.

**Phase 2:**  Not in compliance

During the fourth quarter of 2022, MCSO completed the pilot project for the Traffic Stop Monthly Report (TSMR); however, the finalization of guiding policies did not take place until late March 2023.  We have also recommended to MCSO that the agency needs to create an analytical plan for the Non-Traffic Contact Forms that have accumulated over the past several years.  During our October 2023 site visit, MCSO presented the outline of its proposal to modify the NTCFs, related policy, and the creation of a new analytic method for NTCFs.  We and the Parties asked clarifying questions and now await the publication of these proposals.  Until this analysis is complete and operational, MCSO will not achieve Phase 2 compliance with this Paragraph.  MCSO did publish the first-stage review of NTCFs in February 2023.  This study focused on how deputies employ the NTCF form and understand the associated policy; however, this analysis did not investigate potential indications of bias in how these stops are conducted by deputies or evaluated by supervisors.  It did, however, provide some insight into the modifications needed in both the form and the policy going forward.   We have provided MCSO with our comments and concerns regarding the initial study, and MCSO has responded.  Currently, MCSO is using the initial study to review the NTCF form and policy (EA-3 Non-Traffic Contact) with the intent of suggesting modifications.  We will evaluate these when they are produced.

MCSO published its eighth Traffic Stop Annual Report (TSAR), which is discussed in other Paragraphs.  Although the report concludes that systemic bias in patrol functions through traffic stop outcomes does appear to exist, they have not yet shown a statistically significant change in the level of potential bias.  For instance, for stop length, MCSO reported a decline from 2018 to 2019 for Latinos and minorities combined, but an increase from 2019 to 2020 and a decrease from 2020 to 2021.  A similar trend was found for searches of Latinos and minorities combined.  Additionally, MCSO reported an increasing citation rate for Latinos from 2018 to 2019 and 2020; however, a decline occurred for 2021 for all minorities grouped together and Latinos compared separately.  In a recent Traffic Stop Quarterly Report (TSQR8) "Disparities Over Time," MCSO investigated the disparities between stop length, citations, arrests, and searches over time.  The agency analyzed data from the time period 2017 to 2021 in a variety of ways and found some positive and some negative changes.  MCSO summarized these findings in the conclusions: "The results of the analyses performed do not demonstrate a clear pattern of disparities consistently increasing or decreasing over time."  MCSO also noted that the agency believes that the lack of longer-term trends may be due to the fact that many changes to practice and policy occurred prior to 2017.  We will continue to work with MCSO on the issue of trend analyses.

WAI 72677

MCSO's plan for the analysis of monthly traffic data also stems from the foundation created by the fourth through the seventh TSARs. MCSO completed a pilot program for TSMR in October 2022. The methodologies and processes have been modified each time a problem with the analysis or interventions occurred. The information from these analyses has been used to inform and refine the vetting processes developed in conjunction with us and the Parties. Based on the vetting processes, TSAU recommends actions ranging from discounting of flags to full intervention processes involving remedies for the particular issues that arose during the vetting process. We and the Parties have been involved in each step of these processes. Additionally, we have begun reviewing the vetting and closure of TSMR cases during our quarterly site visits, most recently in October 2023.

EIU and AIU pull together data to produce reports and inspections of both deputy and supervisor activity. The EIS automatically triggers alerts for repetitive actions, such as receiving multiple BIO Action Forms or external complaints. For the past two years BIO has been reevaluating the threshold levels that trigger several of these alerts and, in some instances, suspended them during this period. During the first quarter of 2023, MCSO published Appendix A (EIS Allegation and Incident Thresholds) to the EIU Operations Manual as well as producing two threshold analyses for vehicle pursuits and accidents. The EIU uses this information to create monthly reports and to determine whether an investigation by a supervisor is required. AIU publishes a quarterly inspection on EIS Alert Processes to ensure that alert investigations are conducted within policy timeframes and to summarize the manner in which investigations were closed. The EIS Alert report for the third and fourth quarters of 2022 noted 100% compliance with the policy timelines. In the second quarter of 2023, MCSO noted that the compliance rate for timely completion of investigations was 90.4%, due to four cases exceeding the policy timeframes. We concurred with these findings. During the fourth quarter, one investigation led to a meeting with a commander; another resulted in the additional training for a deputy; and a third was referred to PSB. In the second quarter of 2023, we noted one case concluding with a meeting with a Commander, another with additional training for the deputy, and one in which the supervisor rode along with the deputy. We have observed that the majority of cases, across all quarters, are resolved with a meeting between the deputy and a supervisor. MCSO has also developed an extension of this inspection, to include an evaluation of the effect of interventions that supervisors recommend and implement. Our review of this inspection for the fourth quarter found that it met expectations. MCSO also published a quarterly report for the first quarter of 2023. The report noted that all EIS Alert investigations were completed within policy timeframes, although three supervisors requested – and were granted – extensions. Similar to the fourth quarter report, the majority of interventions involved meeting with a supervisor, although there was one reassignment, one training, and one supervisor requesting an extended evaluation period for a deputy. The report concluded that of the interventions evaluated, 96% resulted in no new alerts. For the second consecutive quarter, MCSO reported that there were two deputies with recurring alerts which resulted in multiple interventions (a graduated response to the initial intervention); and an additional instance where no further action was taken, as the recurring alert involved external complaints that were being handled by PSB. We concur with the findings of each of these reports.

WAI 72678

AIU also uses the EIS database to generate numerous inspections of traffic stop data, Supervisor Notes, and Incident Report inspections, among many others. When deficiencies are found, AIU sends out BIO Action Forms to the District command to rectify the situation and memorialize what actions are taken. These inspections are critical to evaluate compliance with several Paragraphs in the Order. AIU has already automated an alert threshold for repeated Action Forms for the same types of events. An initial investigation of repetitive Action Forms in 2019 showed that a small number of deputies receive three or more Action Forms, while the vast majority of deputies receive only one Action Form. In May 2023, MCSO published the second BIO Action Form Tracking Study covering the last half of 2021 and the first six months of 2022. The study found that the majority of deputy deficiencies involved the failure to follow approved practices and policies related to data entry, documentation, and time management issues. BIO also examined more closely those deputies and supervisors with the highest rate of deficiencies and recommended reasonable solutions.

### b. Training on the EIS

**Paragraph 80.** *MCSO will provide education and training to all employees, including Deputies, Supervisors and commanders regarding EIS prior to its implementation as appropriate to facilitate proper understanding and use of the system. MCSO Supervisors shall be trained in and required to use EIS to ensure that each Supervisor has a complete and current understanding of the employees under the Supervisor's command. Commanders and Supervisors shall be educated and trained in evaluating and making appropriate comparisons in order to identify any significant individual or group patterns. Following the initial implementation of the EIS, and as experience and the availability of new technology may warrant, MCSO may propose to add, subtract, or modify data tables and fields, modify the list of documents scanned or electronically attached, and add, subtract, or modify standardized reports and queries. MCSO shall submit all such proposals for review by the Monitor pursuant to the process described in Section IV.*

**In Full and Effective Compliance**

MCSO's curriculum for Supervisor Responsibilities: Effective Law Enforcement (SRELE) regularly includes a refresher and updates for supervisors regarding how most effectively to use EIS tools and complete Alert Investigations for their subordinates within policy guidelines. MCSO has modified the Traffic Stop Monthly Report (TSMR) analysis and participated in regular conference calls with us and the Parties during the TSMR pilot, which was completed in October 2022. Additionally, MCSO has published the first 11 Traffic Stop Quarterly Reports (TSQRs). As we have noted in earlier Paragraphs, the conclusions and recommendations of each of these reports could prove useful for the continued refinement of supervisory training conducted by MCSO. We will continue to assist MCSO as it formulates training curriculum to enhance the supervisory functions of the Office.

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 72679

**c. Protocol for Agency and Supervisory Use of the EIS**

**Paragraph 81.**  *MCSO shall develop and implement a protocol for using the EIS and information obtained from it.  The protocol for using the EIS shall address data storage, data retrieval, reporting, data analysis, pattern identification, identifying Deputies for intervention, Supervisory use, Supervisory/agency intervention, documentation and audit.  Additional required protocol elements include:*

a.  *comparative data analysis, including peer group analysis, to identify patterns of activity by individual Deputies and groups of Deputies;*

b.  *identification of warning signs or other indicia of possible misconduct, including, but not necessarily limited, to:*

    i.  *failure to follow any of the documentation requirements mandated pursuant to this Order;*

    ii.  *racial and ethnic disparities in the Deputy's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of Deputies' specific duties, or racial or ethnic disparities in traffic stop patterns when compared with data of a Deputy's peers;*

    iii.  *evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;*

    iv.  *a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;*

    v.  *complaints by members of the public or other officers; and*

    vi.  *other indications of racial or ethnic bias in the exercise of official duties;*

c.  *MCSO commander and Supervisor review, on a regular basis, but not less than bimonthly, of EIS reports regarding each officer under the commander or Supervisor's direct command and, at least quarterly, broader, pattern-based reports;*

d.  *a requirement that MCSO commanders and Supervisors initiate, implement, and assess the effectiveness of interventions for individual Deputies, Supervisors, and units, based on assessment of the information contained in the EIS;*

e.  *identification of a range of intervention options to facilitate an effective response to suspected or identified problems.  In any cases where a Supervisor believes a Deputy may be engaging in racial profiling, unlawful detentions or arrests, or improper enforcement of Immigration-Related Laws or the early warning protocol is triggered, the MCSO shall notify the Monitor and Plaintiffs and take reasonable steps to investigate and closely monitor the situation, and take corrective action to remedy the issue.  Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or other*

WAI 72680

*supervised, monitored, and documented action plans and strategies designed to modify activity.  All interventions will be documented in writing and entered into the automated system;*

f.    *a statement that the decision to order an intervention for an employee or group using EIS data shall include peer group analysis, including consideration of the nature of the employee's assignment, and not solely on the number or percentages of incidents in any category of information recorded in the EIS;*

g.    *a process for prompt review by MCSO commanders and Supervisors of the EIS records of all Deputies upon transfer to their supervision or command;*

h.    *an evaluation of whether MCSO commanders and Supervisors are appropriately using the EIS to enhance effective and ethical policing and reduce risk; and*

i.    *mechanisms to ensure monitored and secure access to the EIS to ensure the integrity, proper use, and appropriate confidentiality of the data.*

**Phase 1:**  In compliance

- GH-5 (Early Identification System), most recently amended on March 28, 2023.

**Phase 2:**  Not in compliance

MCSO completed the Traffic Stop Monthly Report (TSMR) pilot program and published all related documents and protocols during the fourth quarter of 2022 in the TSAU Operations Manual.  Late in the first quarter of 2023, MCSO modified GH-5 (Early Identification System) with the TSMR materials and appendices.  The TSMRs will assist MCSO and its supervisors in evaluating the activity of individual deputies with regard to traffic stops and examine any behaviors that might suggest biased activity.  MCSO will continue to share the results of its monthly vetting analyses with us and the Parties, in addition to providing all documents related to the closing of any cases that have gone beyond the initial vetting process.  During this quarter, MCSO recommended actions ranging from discounting of flags to full interventions.

MCSO has also published 11 TSQRs.  The topics of these analyses and their findings have been discussed in detail in other sections of this report, and in our previous quarterly reports.  Each of these analyses has yielded information that informs the development of training, modification of policy, future analyses, and the dissemination of resources to improve supervisory capabilities and deputy performance.

Paragraph 81.a. requires that MCSO's EIS protocols include "comparative data analysis, including peer group analysis, to identify patterns of activity by individual Deputies and groups of Deputies."

The EIU has conducted monthly and annual analyses looking for outliers that may indicate that an individual is behaving in a biased or unprofessional manner, in accordance with Paragraphs 65, 66, and 67.  The Traffic Stop Monthly Reports had been suspended for several years, beginning in 2016.  However, in conjunction with us and the Parties, MCSO completed an 18-month pilot of the TSMR in October 2022; and finalized all relevant documents and protocols in the TSAU Operations Manual.  As noted above, MCSO has also modified GH-5 (Early

WAI 72681

Identification System) to include those protocols that are pertinent from the completion of the TSMR pilot. Both the TSAR and TSMR employ comparative peer group analyses to identify any indications that deputies may be conducting traffic stops in potentially discriminatory ways.

MCSO has also created an interface for Non-Traffic Contact Forms (NTCFs) to be available in the EIS database; however, MCSO has not yet completed the methodology to investigate whether patterns of problematic behavior, action, or bias might be occurring in the stops these forms document. In February 2023, MCSO had published an initial inquiry into how deputies use NTCFs. We commented on this initial inquiry. There was no evaluation in this initial study evaluating potential bias in the contacts between deputies and citizens. MCSO also reported that an evaluation of EA-3 (Non-Traffic Contact) is underway following this initial investigation. During our October 2023 site visit, MCSO provided form, policy, and analytic proposals to investigate the actions of deputies during non-traffic contact (NTC) events. MCSO is in the process of completing this review. We will evaluate the review of EA-3 and the proposed methodology once they are published.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.b. requires that MCSO's EIS protocols include "identification of warning signs or other indicia of possible misconduct."

GH-5 (Early Identification System) provides significant direction for employees and supervisors alike to understand what type of behaviors will be viewed as problematic. As noted above, the intent of the TSMR is to identify deputies who might be engaged in biased activity regarding who they arrest, cite, warn, or search. MCSO completed the TSMR pilot program in October 2022 and have been providing all expected analyses and documentation since that time.

MCSO has also revised the EIU Operations Manual, which includes sections on data protocols and the several analyses based upon the traffic stop and patrol data. In particular, MCSO has recently modified and published Appendix A (EIS Allegations and Incident Thresholds) along with new threshold analyses for vehicle pursuits and accidents. MCSO has also updated the EIS Alert Process (Section 302) along with several other appendices. We will continue to work with MCSO to refine and implement these new processes, as well as evaluate any additional modifications to the Operations Manual.

Finally, as noted in Subparagraph 81.a. and 81.b.vi, MCSO should utilize all patrol data to evaluate the behavior of deputies in comparison to their peers. While the volume of Non-Traffic Contact Forms (NTCFs) pales in comparison to traffic stops, there are enough accumulated forms for analyses to commence. Following the publication of the initial inquiry into the use of NTCFs by deputies, MCSO reports that the agency has begun an evaluation of EA-3 (Non-Traffic Contact). As noted above, we will review these proposals as they are made available.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.c. requires that MCSO's EIS protocols include "MCSO Commander and Supervisor review, on a regular basis, but not less than bimonthly, of EIS reports regarding each officer under the Commander or Supervisor's direct command and, at least quarterly, broader, pattern-based reports."

WAI 72682

Supervisory Note inspections include four measures to assess how well supervisors are using EIS information to oversee the activity and behavior of their subordinates: making supervisory comments on deputies; reviewing their body-worn camera footage; making Employee Performance Appraisal (EPA) notations; and reviewing subordinates' EIS profiles. The overall compliance rate reported by MCSO for this quarter exceeded 98% for each month. Our calculations are slightly lower, as we evaluate any case as deficient if a significant issue or process is incomplete, whereas MCSO employs a matrix. Our compliance calculations for the quarter are all in excess of 97%. MCSO had been taken out of compliance (below 94% overall) with this Subparagraph due to the low compliance rates for the prior two reporting periods. Given the rates calculate above, we are granting MCSO compliance with this Subparagraph for this reporting period.

When deficiencies are found, AIU sends out BIO Action Forms to those Districts, no matter the level of compliance. We have also repeatedly requested additional information from MCSO when we encounter an issue of concern and MCSO has always willingly provided the needed information or additional data. Rarely have we noted deficiencies involving the same supervisors in consecutive months. MCSO has already included repetitive BIO Action Form (BAF) deficiencies as an alert allegation. AIU has developed and placed into production a means to better track BAFs by type, individual, and District to ensure that any corrective actions are targeted at the most appropriate level and to be able to determine if there are particular supervisors that appear repeatedly within specified timeframes. We have noted in our review of 15 randomly selected alert investigations each month, that there appears to have been an increase in investigations due to repetitive BAFs. We believe the first and second BAF tracking inspections completed in September 2022 and May 2023, discussed in prior Paragraphs, will be instrumental for MCSO in evaluating and adjusting the actions of deputy and supervisory personnel.

MCSO is in compliance with this Subparagraph.

Paragraph 81.d. requires that MCSO's EIS protocols include "a requirement that MCSO Commanders and Supervisors initiate, implement and assess the effectiveness of interventions for individual Deputies, Supervisors, and units, based on assessment of the information contained in the EIS."

The EIS database generates alerts for issues ranging from data entry errors to internal and external complaints. From these alerts, EIU personnel send out for investigation those alerts that are not redundant or mischaracterized in some fashion. Supervisors have a set amount of time – 30 days – to return these investigations with a description of their investigation and the outcome.

MCSO has created an EIS Alert Review Group (ARG) that evaluates the investigations of supervisors prior to closing an alert. The group ensures that the reports of the supervisors address all aspects of the assigned investigation and returns those that are deficient to the District for continued revision. Following the creation of the ARG, we have found the supervisors' investigations and summaries to be more complete and thorough. Over time, the review group's request for additional information has dropped well below one third of the investigations evaluated. MCSO has provided us with the original alert investigation documents (Attachment B of GH-5 [Early Identification System]), as well as modified ones arising from the ARG's requests. Additionally, during our October 2023 site visit, we met with the ARG to discuss the

WAI 72683

processes the ARG employs in evaluating the closure of investigations. The ARG provided invaluable insight into the processes it employs, and we are confident that the ARG is raising the importance of these investigations across the organization.

AIU has also created an inspection for EIS Alert Review Processes. This inspection initially determines whether the investigation was completed within policy timeframes of 30 days. The compliance rate for the third, fourth and first quarters (2022 and 2023, respectively) was 100%; the compliance rate for the second quarter of 2023 was 90.4%. We concur with these findings. In the fourth quarter of 2022, MCSO also produced an EIS Alerts Inspection which included a method of evaluating whether the interventions triggered by alert investigations may, or may not, be mitigating the problematic activity giving rise to the original alert. To do this, they began with the alerts investigated in the first quarter of 2022, and examined the alerts triggered in the following two quarters to determine if there were any recurring alerts. AIU found that five deputies had new alerts during the second and third quarters of 2022. Of these five, four were for new external complaints and one was due to a new BIO Action Form naming the deputy. The report also indicated that follow-up on the latter case had already occurred, but the external complaints were under the purview of PSB, so there was no additional investigation conducted.

MCSO published a quarterly report for the first quarter of 2023 and found that all investigations had been completed within policy timeframes. MCSO also reported that the intervention most often employed was meeting with a supervisor, although there was also one reassignment, one case requiring additional training, and one in which the supervisor suggested additional supervisory oversight. The report also noted that in 96% of all investigations evaluated, there was no reoccurrence of the original alert. In the second quarter of 2023, MCSO reported that there were several recurring alerts. Two of these deputies received multiple interventions (a graduated response to the recurring nature of the alert); and there one case where MCSO did not take any further action, as the recurring alert was for an external complaint that was being handled by PSB. MCSO noted that the agency will continue to evaluate the effect interventions have on the triggering of new alert cases. This addition to the quarterly EIS Alert Inspection fulfills the need to ensure that repetitive problematic behavior is being flagged and addressed appropriately.

MCSO is in compliance with this Subparagraph.

Paragraph 81.e. requires MCSO's EIS protocols to include "identification of a range of intervention options to facilitate an effective response to suspected or identified problems. In any case where a Supervisor believes a Deputy may be engaging in racial profiling, unlawful detentions or arrests, or improper enforcement of Immigration-Related Laws or the early warning protocol is triggered, MCSO shall notify the Monitor and Plaintiffs and take reasonable steps to investigate and closely monitor the situation and take corrective action to remedy the issue. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or other supervised, monitored, and documented action plans and strategies designed to modify activity. All interventions will be documented in writing and entered into the automated system."

GC-17 (Employee Disciplinary Procedures) and GH-5 (Early Identification System) provide a wide range of options for supervisor interventions, as well as practical guidelines about how to employ those options. As noted above, GH-5 includes Attachment B, "Early Identification Alert

WAI 72684

Response Form." This form specifies the responsibility of supervisors and serves as a checklist of processes the supervisor should use. EIU also attaches any documents, citations, or BWC recordings the supervisor might need to conduct an inquiry. We began observing the use of these forms in April 2017. Over the past year, we have found that alert investigations conducted by supervisors has improved. During the fourth quarter of 2022, supervisors recommended over one dozen meetings with a supervisor, one meeting with a commander, and one reassignment of a deputy. In the first quarter of 2023, supervisors recommended over one dozen meetings with a supervisor, one reassignment, one additional training, and one extended supervisor evaluation period. Finally, in the second quarter of 2023, supervisors recommended a meeting with a Commander, additional training, and a supervisor ride-along, in addition to 16 instances of meeting with a supervisor.

MCSO has also created an EIS Alert Review Group (ARG) to ensure that the closure of alerts is supported by documentation from supervisors and responsive to the needs of the organization. MCSO has established an extension protocol for alert investigation timeframes when documentation issues delay the process. During our October 2023 site visit, we found that the ARG group effectively reviewed and responded to the information included by the supervisors regarding the investigations conducted. We will continue to evaluate these as they are produced.

MCSO is in compliance with this Subparagraph.

Paragraph 81.f. requires that MCSO's EIS protocols include "a statement that the decision to order an intervention for an employee or group using EIS data shall include peer group analysis, including consideration of the nature of the employee's assignment, and not solely on the number or percentages of incidents in any category of information recorded in the EIS."

In the development of GH-5 (Early Identification System), MCSO has taken into consideration the nature of the employee's assignment. In prior versions of GH-5, MCSO created an appendix for thresholds that indicated, for example, that the "use of force" threshold was different for Detention and Patrol personnel. Detention personnel are much more likely to need to employ force than their Patrol counterparts. During the first quarter of 2022, MCSO produced a Threshold Analysis Review Proposal which was approved. MCSO used the approved proposal to modify Appendix A (EIS Allegations and Incident Thresholds) to the EIU Operations manual as well as conducting threshold reviews of traffic accident and pursuit policies during the first quarter of 2023.

MCSO and its data analysis vendor proposed and employed an expansion of "peer" comparisons beyond just the location of the traffic stop in the fourth TSAR and has made modifications where necessary in the fifth through the seventh TSARs. MCSO has also concluded the pilot-testing for the TSMR using these new peer comparison strategies. As a result of these experiences, MCSO also added refinements to the time and location of traffic stops that more precisely allows for comparisons of similarly situated deputies through a statistical splining procedure. As a result of the completion of the pilot and operationalization of the TSMR, MCSO is now in compliance with the Subparagraph.

MCSO is in compliance with this Subparagraph.

WAI 72685

Paragraph 81.g. requires that MCSO's EIS protocols include "a process for prompt review by MCSO Commanders and Supervisors of the EIS records of all Deputies upon transfer to their supervision or command."

MCSO has noted the need for a prompt review in both the "Supervisor Responsibilities" and "Command Staff Responsibilities" sections of GH-5 (Early Identification System).   EIU specifically addressed this issue during the EIS and SRELE training completed in November 2017 and updated each year thereafter.   EIU advised supervisors to document when they conducted their review in Supervisor Notes, as well as how long the deputy had been working in their chain of command when the review was conducted.   As noted, this was also reiterated in the SRELE training that was approved on September 30, 2019.   During our visits to several Districts in 2019, 2020, and most recently in October 2023, MCSO personnel informed us that most Command staff attempt to review these materials within the first few days that a deputy, or supervisor, moves to their District.   In no cases have we found information where the 14-day limit outlined in policy has been problematic.

MCSO is in compliance with this Subparagraph.

Paragraph 81.h. requires that MCSO's EIS protocols include "an evaluation of whether MCSO Commanders and Supervisors are appropriately using the EIS to enhance effective and ethical policing and reduce risk."

EIU has improved the processing and tracking of alert investigations.   The development of Attachment B to GH-5 (Early Identification System) and training completed in EIS and SRELE has dramatically improved the information provided by supervisors when closing alerts.   AIU also created an EIS Alert Review Process inspection that specifically looks for indications that supervisors have conducted a thorough examination within policy timeframes and selected appropriate responses to the allegations included in the alert investigation.   Initially, this inspection was limited to reviewing whether supervisors were completing alert investigations within the 30-day policy requirements.   MCSO's compliance rate for EIS inspections for the third and fourth quarter of 2022, and the first quarter of 2023, was 100%; the compliance rate for the second quarter of 2023 was 90.4%, due to four investigations that fell outside the timeline requirements.   This rate matches up with our own review.   AIU sent out BIO Action Forms for those investigations that did not meet the time requirements.

As noted above, MCSO has also implemented a process following the closure of an investigation to ensure that no similar alerts are triggered within the next two quarters.   This inspection will become a valuable component to ensure that supervisors and command staff are using EIS to promote efficiency and ethical policing during the alert investigation process.   We will continue to evaluate these inspections as they become available.

We found no issues with the conclusions used for closing alert investigations during this quarter. In fact, we have noted three instances where the interventions went beyond the normal meeting with a supervisor.   In one instance, the deputy met with Command staff; in another, the deputy received added training; and in a third, the supervisor rode along with the deputy while on patrol.

WAI 72686

MCSO has also created a Post-Stop Perceived Ethnicity Inspection, which looks specifically at traffic stops where the driver has a traditionally Latino surname, but the VSCF indicates a white driver. The inspectors review BWC recordings and evaluate whether the deputy correctly marked the form for the driver and any potential passengers within the vehicle stopped. MCSO reported compliance rates of 94.7%, 93.75% and 94.44% for July through September 2023. We concurred with these findings.

MCSO is in compliance with this Subparagraph.

Paragraph 81.i. requires that MCSO's EIS protocols include "mechanisms to ensure monitored and secure access to the EIS to ensure the integrity, proper use, and appropriate confidentiality of the data."

MCSO has addressed the security and integrity of data in GH-5 (Early Identification System), as well as instituting facility inspections throughout the Districts – including the security of terminals, access to information, and mobile displays. We spot-check technology and security of old forms during our site visits and have found no problems to date. Additionally, on November 6, 2017, MCSO published the operating procedure for System Log Audit Requests; this became effective on November 30, 2017. The procedure outlines how PSB personnel will notify the Technology Management Bureau of any allegations of misuse of MCSO information systems and request an audit of the suspected breach. We discussed this operating procedure, BAS SOP 17-4, during our January 2018 site visit meetings; it meets all of the concerns voiced since the February 2017 discovery of two cases where data was compromised, but no one notified the Technology Management Bureau. We believe this procedure has proven effective to this point, as referenced in Paragraph 78. In addition, we are provided all internal investigation summaries initiated each month. As noted in our Paragraph 78 discussion, three cases required PSB to notify the Technology Management Bureau during the second quarter of 2023. We will continue to evaluate the effectiveness of MCSO's attention to data integrity.

MCSO is in compliance with this Subparagraph.

MCSO meets some of the requirements of Paragraph 81, but there remain a variety of activities that are currently ongoing that need to be completed before MCSO will be fully compliant. AIU has improved the tracking of alert investigations with the creation of the EIS Alert Review Process Inspection; and initiated an analysis of BIO Action Form tracking. Since the fourth quarter of 2022, MCSO has also produced an analysis of whether there are recurring alerts for deputies who have previously experienced an intervention. We will continue to evaluate the new inspections. We have also requested that MCSO devise an audit for the NTCFs that have accumulated over the past several years. MCSO has completed an initial evaluation of how deputies use the NTCF form and is currently evaluating EA-3 (Non-Traffic Contact).

WAI 72687

During our October 2023 site visit, MCSO discussed the upcoming proposal to modify the policy, forms, and analysis related to non-traffic contacts.  We will evaluate these as the proposal is formalized.  Command staff have taken a more active role in evaluating the work of supervisors as evidenced by the number of alert investigations returned to supervisors for revision or additional inquiry.  To comply with this and other Paragraphs, however, the methods would also have to be able to indicate statistically whether potential bias might be occurring with regard to how different ethnicities and races are being selected and treated during these encounters captured on the NTCFs.  We will continue to evaluate MCSO's progress toward the goals outlined in this Paragraph.

WAI 72688

## Section 9: Supervision and Evaluation of Officer Performance

**COURT ORDER X. SUPERVISION AND EVALUATIONS OF OFFICER PERFORMANCE**

***Paragraph 82.*** *MCSO and the County shall ensure that an adequate number of qualified first-line Supervisors are available to provide the effective supervision necessary to ensure that Deputies are following the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order. First-line Supervisors shall ensure that Deputies are policing actively and effectively, are provided with the instruction necessary to correct mistakes, and are held accountable for misconduct. To achieve these outcomes, MCSO shall undertake the following duties and measures:*

### *a. General Duties of Supervisors*

***Paragraph 83.*** *MCSO Supervisors shall provide the effective supervision necessary to direct and guide Deputies. Effective supervision requires that Supervisors: respond to the scene of certain arrests; review each field interview card and incident report; confirm the accuracy and completeness of Deputies' daily activity reports; respond to each Complaint of misconduct; ensure Deputies are working actively to engage the community and increase public trust and safety; provide counseling, redirection, support to Deputies as needed, and are held accountable for performing each of these duties.*

**In Full and Effective Compliance**

We reviewed a sample of 76 Incident Reports for July, for the randomly selected date of July 17, 2023. All of the 76 Incident Reports were submitted before the end of the shift. We confirmed timely supervisory review in 74 of the 76 incident reports. All 12 Arrest Reports received were reviewed and approved by supervisors within the required 72 hours. There were six Vehicle Crash Reports submitted in the July sample, and we verified timely supervisory reviews on all of them. We conducted a review of a 10% sample of the Incident Reports submitted for the date requested, to determine quality and completeness, and found no significant issues of concern. In total, 74 of 76 Incident Reports we reviewed were in compliance, for a compliance rate of 97.37%.

For July, MCSO reported a total of 214 staff hours dedicated to community policing. MCSO reported 170 occasions of community policing throughout its components, with 153 of those attributed to deputies in the Patrol function. The July report from Community Outreach Division (COrD) documented 45 events in which MCSO staff met with and interacted with members of different community organizations. MCSO met with representatives from several community organizations, drug prevention coalitions, and educational institutions. From our reviews of the 20 community policing worksheets selected for the month, Patrol deputies reported 42.12 hours of community policing, with 924 community members involved with those activities. MCSO reported community policing activities in Aguila, Youngtown, Sun City, Guadalupe, Fountain Hills, Mesa, Gilbert, Litchfield Park, and Anthem.

WAI 72689

We reviewed a representative sample of 77 Incident Reports for August for the randomly selected date of August 6, 2023. All 77 Incident Reports were submitted before the end of the shift. Seventy-six of the 77 Incident Reports had proper documentation of timely submission and supervisory review. Of the 77 Incident Reports, 11 were vehicle collisions, of which all had documentation of supervisory review and approval. There were 27 Arrest Reports submitted for the month, and all had proper documentation of supervisory review. The overall compliance rate for timely submission and review of Incident Reports in August was 99%. We conducted a review of a 10% sample of the Incident Reports submitted for the date requested, to determine quality and completeness. Of that sample, one incident report had several spelling and grammar mistakes. No other significant issues were found.

For August, MCSO reported a total of 501 staff hours dedicated to community policing. MCSO reported 228 occasions of community policing throughout its components, with 203 of those attributed to deputies in the Patrol function. The August report from COrD documented 45 events in which MCSO staff met with and interacted with members of several groups from Maricopa County. In our reviews of a sample of 20 community policing worksheets, deputies reported a total of 21.42 hours of community policing, with 899 community members involved with those activities. MCSO reported community policing activities in Mobile, Mesa, Fountain Hills, New River, Litchfield Park, Guadalupe, Tonopah, Peoria, Gila Bend, Youngtown, Sun City West, and Fountain Hills.

We reviewed a representative sample of 60 Incident Reports for September, for the randomly selected date of September 30. Fifty-nine of the 60 Incident Reports had documentation that they had been submitted before the end of the shift, and we confirmed that 58 of the 60 Incident Reports were reviewed and approved by supervisors as required by this Paragraph. The compliance rate for September was 96.67%. All four Vehicle Crash Reports were in compliance. All 17 Arrest Reports were in compliance. We conducted a review of a 10% sample of the Incident Reports submitted to determine quality and completeness. We found no significant issues of concern.

For September, MCSO reported a total of 450 staff hours dedicated to community policing. MCSO reported 252 occasions of community policing throughout its components, with 227 of those attributed to deputies in the Patrol function. The September report from COrD documented 64 instances in which MCSO staff participated in community events. For September, we reviewed a sample of 20 community policing worksheets. On the community policing worksheets, deputies reported 29 hours of community policing, with 1,806 community members involved with those activities. MCSO reported community policing activities in Avondale, Surprise, Mesa, Fountain Hills, Gilbert, Anthem, Sun City West, Laveen, Tonopah, Peoria, and Guadalupe.

For each month of the quarter, we selected a supervisor and a squad of deputies from each District. We requested several documents, including Patrol Activity Logs (PALs), for each deputy. We reviewed PALs for each month of the quarter to assess if deputies turned them in by the end of each shift, and if supervisors reviewed each PAL.

For July, we reviewed PALs for 22 deputies and six supervisors. All 22 deputies' Patrol Activity Logs contained documentation of supervisory review. All six supervisors' Patrol Activity Logs contained documentation of command-level review. For August, we reviewed Patrol Activity

WAI 72690

Logs for 21 deputies and six supervisors.  All 21 deputies' PALs contained documentation of supervisory review.  All six supervisors' PALs contained documentation of command-level review.  For September, we reviewed Patrol Activity Logs for 21 deputies and six supervisors. All 21 deputies' PALs contained documentation of supervisory review; all six sergeants' PALs contained documentation of command-level review.

Based on the review of PAL samples selected for 22 deputies in July, on a daily basis, deputies completed an average of 0.9 Incident Reports, handled an average of 5.05 calls for service, completed an average of 1.95 self-initiated calls, made 0.045 arrests, and traveled an average of 81.18 miles.  There was one community policing event documented in one of the 22 PALs reviewed for July.  Based on the review of PAL samples selected for 21 deputies in August, on a daily basis, deputies completed an average of 0.71 Incident Reports, handled an average of 4.43 calls for service, completed an average of 1.33 self-initiated calls, made 0.14 arrests, and traveled an average of 67.62 miles.  There were no community policing events documented in the PALs reviewed for August.  Based on the review of PAL samples selected for 21 deputies in September, on a daily basis, deputies completed an average of 0.9 Incident Reports, handled an average of 4.76 calls for service, completed an average of 1.24 self-initiated calls, made 0.19 arrests, and traveled an average of 81.81 miles.

We also reviewed deputies' and supervisors' PALs to determine if supervisors provided on-scene supervision, and if those supervisor-deputy contacts were documented.  For the sample dates selected in July, there were 43 supervisor-deputy field contacts reported by deputies and supervisors.  For the sample dates selected in August, there were 18 supervisor-deputy field contacts reported by deputies and supervisors.  For the sample dates selected in September, there were 43 supervisor-deputy field contacts reported by deputies and supervisors.

For July, August, and September, we reviewed selected samples of non-traffic incidents involving stops and detentions, which were recorded on Non-Traffic Contact Forms (NTCFs).  For July, we selected a sample of 15 NTCFs for review.  The compliance rate for timely submission and review of NTCFs in July was 100%.  For August, we selected 20 NTCFs to review.  All 20 NTCFs were submitted prior to the end of the shift, and all 20 NTCFs were reviewed and approved by supervisors within the required timeframe.  The compliance rate in August was 100%.  For September, we selected 20 NTCFs for review.  All 20 NTCFs were submitted prior to the end of the shift, and all 20 NTCFs were reviewed and approved by supervisors within the required timeframe.  The compliance rate for timely submission and timely supervisory review of NTCFs in September was 100%.  For the third quarter of 2023, the compliance rate for timely submission and timely supervisory review of NTCFs was 100%.  For the period in review, MCSO was in compliance with the requirements of this Paragraph.  We assess compliance with this Paragraph as it relates to NTCFs, in conjunction with timely reviews of VSCFs, under Paragraph 90.

Our reviews for this reporting period revealed that in July, of the 15 NTCFs we reviewed, six stops involved white individuals who were contacted in separate incidents.  Eight stops involved Latino individuals who were contacted in separate incidents.  One stop involved a Black individual contacted during the incident.  For August, we reviewed 20 NTCFs.  Of the 20 stops we reviewed, four stops involved white individuals, with a total of six white individuals involved in those incidents.  In one of the four stops, deputies contacted three white individuals.  Fourteen

WAI 72691

stops involved Latino individuals, with a total of 15 Latino individuals contacted during those incidents. One stop involved a Black individual, and one stop involved an Asian-Pacific Islander. For September, we reviewed 20 NTFCs, of which nine stops involved white individuals, with a total of 11 white individuals contacted in those incidents. Eleven stops involved Latino individuals contacted in separate incidents.

Our reviews of NTCFs for this quarter revealed that white individuals were involved in approximately 41.82% of the stops. Latino individuals were involved in approximately 61.82% of the stops. Black individuals were involved in approximately 3.60% of the stops. Asian-Pacific Islanders were involved in 1.80% of the stops.

During our October site visit, we met with MCSO staff assigned to Patrol Districts, including supervisors and command staff from Districts 1, 2, 3, 4, and 7. There were several areas we inquired about in our meeting with District supervisors, as it relates to the requirements of this Paragraph. As expected, the responses to staffing and workload questions we received from Districts 1, 2, and 3 were significantly different from the responses we received from Districts 4 and 7. The responses received from supervisors in Districts 1, 2, and 3 suggest that deputies have a hard time keeping up with calls for service. Supervisors stated that calls that require incident reports are particularly time consuming. In order for deputies to complete their reports by the end of their shifts, on many occasions, they come into the District station after their shifts have ended to complete their reports. We inquired what the biggest factor affecting deputy performance was and we were advised that it was morale and staffing shortages. MCSO advised that staffing shortages in first line supervision have led to shifts where sergeants exceed the span of control. However, MCSO personnel also informed us that no shifts exceeded the 12-person limit. Our reviews for this quarter of District shift rosters and span of control memos indicate that although there have been instances where supervisors exceeded the span of control, overall, MCSO is in compliance with the requirements of Paragraphs 84, 86, and 266. Supervisors and command staff from Districts 1, 2, and 3 suggested that hiring more DSAs would relieve the workload and would leave deputies more time for proactive patrolling. As it relates to first-line supervision, MCSO personnel advised us that sergeants spend a great deal of their time completing administrative duties, but manage to be readily accessible for deputies in the field. The responses received from the staff at Districts 4 and 7 indicate that they have had no span of control issues, and these two Districts are able to manage calls for service and other District needs adequately. Our reviews of shift rosters confirmed that Districts 4 and 7 rarely exceed the span of control.

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion. Following our assessment in our last quarterly status report, we issued a noncompliance warning. For this reporting period, MCSO remains in Full and Effective Compliance with the requirements of this Paragraph.

WAI 72692

***Paragraph 84.*** *Within 120 days of the Effective Date, all patrol Deputies shall be assigned to a single, consistent, clearly identified Supervisor. First-line field Supervisors shall be assigned to supervise no more than twelve Deputies.*

**In Full and Effective Compliance**

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the third quarter of 2023. For July, we reviewed a sample of shift rosters from Districts 1, 2, and 3. For August, we reviewed a sample of shift rosters from Districts 4 and 7, and Lake Patrol. For September, we reviewed a sample of shift rosters from Districts 1, 2, and 3. Our reviews of monthly and daily rosters indicated that deputies were assigned to a single consistent supervisor, and deputies worked the same shifts as their supervisors. There were no shifts where supervisors had responsibility for more deputies than permitted by this Paragraph.

For July, District 1 submitted one span of control memo. In one shift, a supervisor oversaw nine deputies. District 2 submitted two span of control memos. During two shifts on different dates, supervisors had nine deputies each. District 3 submitted two span of control memos. In one shift, a supervisor oversaw eight deputies and one DSA. On another shift, a supervisor oversaw nine deputies. Districts 4 and 7, and Lake Patrol, did not submit any span of control memos for July. Additional reviews of span of control requirements are found under Paragraph 266.

At the end of this reporting period, on September 27, 2023, the Court entered an Order granting MCSO's request to increase the span of control as part of a 12-month pilot program overseen by the Monitor. The pilot program allows Patrol supervisors to oversee eight deputies and four non-sworn personnel (which may include up to two Posse members, and Deputy Service Aides). We will assess the results of this pilot program. We will discuss this further with MCSO during our next site visit.

On September 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 85.*** *First-line field Supervisors shall be required to discuss individually the stops made by each Deputy they supervise with the respective Deputies no less than one time per month in order to ensure compliance with this Order. This discussion should include, at a minimum, whether the Deputy detained any individuals stopped during the preceding month, the reason for any such detention, and a discussion of any stops that at any point involved any immigration issues.*

**In Full and Effective Compliance**

To assess MCSO's compliance with this Paragraph, we requested that MCSO provide copies of reports documenting that supervisors are meeting with and discussing individually the stops made by each deputy, at least once per month. We then requested documentation for one randomly selected supervisor from each District, for each month of the reporting period, and the squad of deputies who reports to that supervisor. Supervisors record the discussion of traffic stops by applying the "Discussed with Deputy" option. MCSO documents supervisor-deputy discussions in a spreadsheet, which it submits for inspection. The spreadsheet also documents timely

WAI 72693

supervisory review of VSCFs.  In addition to the spreadsheet, MCSO submits all VSCFs for the month in review.  We select a 10% random sample of VSCFs from each District to review for content.  We also inspect the sample of VSCFs submitted for review of traffic stops under Paragraphs 25 and 54, as part of compliance with Paragraph 91, to verify if supervisors are addressing deficiencies in the documentation related to the stops.

Paragraph 85 requires that supervisors discuss traffic stops at least once per month with their deputies.  To efficiently manage this requirement along with other administrative and operational duties, supervisors generally conduct several traffic stop-related discussions with each deputy during the month.  Supervisor-deputy discussions of traffic stops that occurred toward the latter part of the month may not get reviewed until the following month.  Our selections for these discussions change every month, so to obtain complete records for each deputy, MCSO holds the submission until all of the information requested for the month is complete.  Accordingly, the documentation of supervisory-deputy discussions of traffic stops is submitted 30 days retroactively.

For July MCSO submitted the June traffic stops for each deputy, by District.  The total number of traffic stops for each District was:  District 1, two; District 2, 33; District 3, four; District 4, 35; Lake Patrol, 20; and District 7, 86.  There was a total of 181 traffic-related events for all Districts, and sergeants discussed all 180 of these events with the deputies who conducted them, for a compliance rate of 99%.

For August, MCSO submitted the July traffic stops for each deputy, by District.  The total number of traffic stops for each District was: District 1, 17; District 2, 32; District 3, 47; District 4, 11; Lake Patrol, 85; and District 7, 17.  There was a total of 209 traffic-related events for all Districts, and sergeants discussed all 209 of these with the deputies that conducted them, for a compliance rate of 100%.

For September, MCSO submitted the August traffic stops for each deputy, by District.  The total number of traffic stops for each District was:  District 1, six; District 2, 51; District 3, nine; District 4, 10; Lake Patrol, 27; and District 7, 53.  There was a total of 156 traffic-related events for all Districts, and sergeants discussed all of 156 these events with the deputies who conducted them, for a compliance rate of 100%.

For this reporting period, there was a total of 546 traffic stops reported.  We received documentation that supervisors discussed 545 of these stops with the deputies that conducted them.  This is a compliance rate of 99.82%.

On October 5, 2020, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

MCSO remains in Full and Effective Compliance with this Paragraph.

WAI 72694

*Paragraph 86. On-duty field Supervisors shall be available throughout their shift to provide adequate on-scene field supervision to Deputies under their direct command and, as needed, to provide Supervisory assistance to other units. Supervisors shall be assigned to and shall actually work the same days and hours as the Deputies they are assigned to supervise, absent exceptional circumstances.*

**In Full and Effective Compliance**

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the third quarter of 2023. For July, we reviewed a sample of shift rosters from Districts 1, 2, and 3. For August, we reviewed a sample of shift rosters from Districts 4 and 7, and Lake Patrol. For September, we reviewed a sample of shift rosters from Districts 1, 2, and 3.

MCSO deputies' and sergeants' activities are captured in Patrol Activity Logs (PALs). We selected a random sample of one day per month, and one squad per District, for review. For July we reviewed PALs for six sergeants and 22 deputies. We noted a total of 43 field supervisor-deputy contacts between the combined deputies' and sergeants' PALs for the selected dates. For August, we requested PALs for six sergeants and 21 deputies. We received and reviewed all requested PALs, and noted a total of 18 field supervisor-deputy contacts between the combined deputies' and sergeants' PALs for the selected dates. For September, we reviewed PALs for six sergeants and 21 deputies. We noted a total of 43 field supervisor-deputy contacts between the combined deputies' and sergeants' PALs for the selected dates.

We reviewed the monthly shift rosters for each month of the reporting period. Our reviews indicate that supervisors are assigned to work the same hours as the deputies under their supervision. Our reviews of Patrol Activity Logs indicate that supervisors have been available to provide on-scene supervision.

On October 5, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

*Paragraph 87. MCSO shall hold Commanders and Supervisors directly accountable for the quality and effectiveness of their supervision, including whether commanders and Supervisors identify and effectively respond to misconduct, as part of their performance evaluations and through non-disciplinary corrective action, or through the initiation of formal investigation and the disciplinary process, as appropriate.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on April 13, 2023.

- GC-4 (S) (Employee Performance Management), most recently amended on April 13, 2023.

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 15, 2023.

**Phase 2:** In compliance

WAI 72695

To assess MCSO's compliance with this Paragraph, we request the names of all deputies and supervisors whose performance appraisals were completed during this reporting period. From the lists of employees submitted, we request a representative sample. The selection of deputies and supervisors whose EPAs are requested is based on the number of requirements set forth in the First and Second Orders. There are a greater number of requirements that supervisor EPAs must address; therefore, we review a greater number of supervisor EPAs.

We requested and reviewed Employee Performance Appraisals submitted for five deputies and 10 supervisors whose EPAs were completed in July. All five deputy EPAs appropriately addressed each employee's performance for the period under review. Nine of the 10 supervisor EPAs met compliance requirements for this Paragraph. All of the 10 supervisor EPAs rated the supervisors on the quality and effectiveness of their supervision, as well as each supervisor's adeptness, as it pertains to identifying and responding to misconduct. Nine of the 10 supervisor EPAs properly addressed the quality of supervisory reviews. One supervisor EPA failed to sufficiently address the quality of supervisory reviews related to the requirements of Paragraphs 92 and 95. This EPA also had deficiencies in addressing the requirements of Paragraph 176. All of the 10 supervisor EPAs met compliance requirements for Paragraph 99. For July, including both deputy and supervisor EPAs, 14 of 15 EPAs, or 93.33%, were in compliance with Paragraph 87.

We requested and reviewed Employee Performance Appraisals submitted for six deputies and seven supervisors whose performance evaluations were completed in August. All six deputy EPAs were in compliance, and all seven supervisor EPAs met Paragraph 87 requirements. Two deputy EPAs did not properly document the rating period, but these deficiencies did not render the EPAs noncompliant. For August, including both deputy and supervisor EPAs, all 13 EPAs reviewed, or 100%, were in compliance with the requirements of this Paragraph.

We requested and reviewed Employee Performance Appraisals submitted for five deputies and 10 supervisors whose EPAs were completed in September. All five deputy EPAs sufficiently addressed all required areas of assessment, and all of the 10 supervisor EPAs met the requirements of Paragraph 87. All 10 supervisor EPAs appropriately rated the employees on the quality and effectiveness of their supervision. Each of the 10 supervisor EPAs included comments related to the supervisor's ability to identify and respond to misconduct. All of the 10 supervisor EPAs sufficiently documented required entries with regard to the quality of reviews of their subordinates' EIS profiles, as required by Paragraphs 92 and 95. For September, including both deputy and supervisor EPAs, all 15 EPAs were in compliance, or 100%.

For the third quarter of 2023, we reviewed EPAs for 16 deputies and 27 supervisors. As it pertains to the requirements of this Paragraph, all 16 deputy EPAs were in compliance, and 26 of the 27 supervisor EPAs were in compliance. For this review period, 42 of the 43 EPAs reviewed were in compliance with the requirements of this Paragraph, for a compliance rate of 97.67%. As noted in our last quarterly status report, we have seen continued improvement in all Paragraphs related to the evaluation of employee performance. During this period of review, MCSO achieved compliance with the requirements of this Paragraph.

WAI 72696

***b. Additional Supervisory Measures***

***Paragraph 88.*** *To ensure compliance with the terms of this Order, first-line Supervisors in any Specialized Units enforcing Immigration-Related Laws shall directly supervise the law enforcement activities of new members of the unit for one week by accompanying them in the field, and directly supervise the in-the-field-activities of all members of the unit for at least two weeks every year.*

**In Full and Effective Compliance**

MCSO does not have any specialized units that enforce immigration-related laws. We continue to monitor arrests and detentions as part of our review process to ensure that MCSO is in compliance with its own directives on this issue.

For this reporting period we received lists containing all incidents involving MCSO arrests and criminal citations. For each month, we requested a random sample of arrests and criminal citations. In total, we reviewed 60 incidents involving arrests and 60 incidents involving criminal citations. We also reviewed a random sample of 213 Incident Reports for this reporting period. During our reviews of the documentation provided for this reporting period, we have found no evidence to indicate any violations of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 89.*** *A Deputy shall notify a Supervisor before initiating any immigration status investigation, as discussed in Paragraph 28. Deputies shall also notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration Related Crime, or for any crime related to identity fraud or lack of an identity document. The responding Supervisor shall approve or disapprove the Deputy's investigation or arrest recommendation based on the available information and conformance with MCSO policy. The Supervisor shall take appropriate action to address any deficiencies in Deputies' investigation or arrest recommendations, including releasing the subject, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative investigation.*

**In Full and Effective Compliance**

To assess MCSO's compliance with this Paragraph, we requested all reports related to immigration status investigations, any immigration-related crimes, or any incidents or arrests involving lack of identity documents. The Incident Reports requested were for the period in review. Any incident wherein a deputy requests a supervisor's permission to contact Immigration and Customs Enforcement (ICE) or Customs and Border Patrol (CBP) – to ascertain the legal status of an individual involved in a stop, detention, or any incident under investigation by MCSO – falls under the reporting requirements of this request.

WAI 72697

For the third quarter of 2023, MCSO did not submit any arrests or investigations pursuant to the reporting requirements of this Paragraph. For this reporting period, we reviewed 60 bookings and 60 criminal citations. In addition, we reviewed 213 Incident Reports for the quarter. Our reviews found no violations of this Paragraph.

On December 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

*Paragraph 90.  MCSO Deputies shall submit documentation of all stops and Investigatory Detentions conducted to their Supervisors by the end of the shift in which the action occurred. Absent exceptional circumstances, within 72 hours of receiving such documentation, a Supervisor shall independently review the information.  Supervisors shall review reports and forms for Boilerplate or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct.  Appropriate disciplinary action should be taken where Deputies routinely employ Boilerplate or conclusory language.*

**Phase 1:**  In compliance

- EA-11 (Arrest Procedures), most recently amended on April 5, 2022.

**Phase 2:**  In compliance

We reviewed 35 incidents involving traffic stops for July 2023. There were 18 stops related to speeding, of which 10 resulted in citations and eight resulted in warnings. Ten stops were for moving violations other than speeding. Three stops related to registration or license plate violations. Four stops were due to equipment violations. Eighteen of the 35 stops resulted in citations, and 16 resulted in written warnings. There was one stop where the deputy did not take any action. All 35 Vehicle Stop Contact Forms we reviewed noted the serial number of the reviewing supervisor, date, and time of supervisory review. For July, MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 210 VSCFs. Supervisors reviewed all 210 VSCFs within 72 hours, for a compliance rate of 100%.

We reviewed 35 incidents involving traffic stops for August 2023. Ten of the 35 traffic stops related to speeding. Of the 10 stops related to speeding, seven drivers received citations, and three received warnings. Four of the stops involved moving traffic infractions other than speeding. Nine stops were due to equipment violations. Twelve stops related to registration or license plate violations. Of the 35 stops, 16 resulted in citations, and 19 resulted in written warnings. For August, MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 179 VSCFs. Supervisors reviewed all 179 VSCFs within 72 hours, for a compliance rate of 100%.

We reviewed 35 incidents involving traffic stops for September 2023. Seventeen of the 35 traffic stops involved speeding violations. Of the 17 stops related to speeding, nine drivers received citations and six drivers received warnings. Five stops involved equipment violations. Eight stops involved traffic violations other than speeding. Five stops involved registration or license plate violations. Of the 35 stops, 13 resulted in citations, 20 resulted in warnings, and two stops

WAI 72698

resulted in no action taken. For September, MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 129 VSCFs. We reviewed the data and supervisors reviewed all 129 VSCFs within 72 hours, for a 100% compliance rate.

For every month of the review period, we reviewed selected samples of non-traffic incidents involving stops and detentions, which were recorded on Non-Traffic Contact Forms (NTCFs). Our assessment of compliance also included reviews of BWC recordings on selected cases, some of which included searches of the individuals detained. For July, we selected a sample of 15 NTCFs to review. All 15 NTCFs had been submitted prior to the end of the shift. All 15 NTCFs were reviewed and approved by supervisors within 72 hours, as required. We reviewed BWC recordings submitted with four of the incidents and noted no issues of concern. The compliance rate for timely submission and timely supervisory review of NTCFs in July was 100%. For August, we selected a sample of 20 NTCFs to review. All 20 NTCFs were turned in before the end of the shift, and all had supervisory reviews documented within 72 hours. We reviewed body-worn camera recordings associated with three cases and noted no issues of concern. The compliance rate for timely submission and timely supervisory review of NTCFs in August was 100%. For September, we reviewed a sample of 20 NTCFs generated during the month. All 20 NTCFs were submitted prior to the end of the shift. All of the 20 NTCFs were reviewed and approved by supervisors within the required timeframe. We reviewed body-worn camera recordings associated with 11 incidents and noted no issues of concern. The compliance rate for timely submission and timely supervisory review of NTCFs in September was 100%. For the third quarter of 2023, all 55 NTCFs reviewed were in compliance with timely supervisory review. The overall compliance rate was 100%.

We take into account all stops and detentions, both traffic and non-traffic, when we determine the compliance rate for this Paragraph. For the third quarter of 2023, all 518 VSCFs reviewed were in compliance, and all 55 NTCFs reviewed were in compliance. The compliance rate for timely reviews of all combined stops and detentions, from the samples chosen for this reporting period, was 100%. For this reporting period, our inspection of the documentation provided did not reveal any evidence of boilerplate or conclusory language, inconsistent or inaccurate information, or lack of articulation, as to the legal basis for stops and detentions.


***Paragraph 91.*** *As part of the Supervisory review, the Supervisor shall document any Investigatory Stops and detentions that appear unsupported by reasonable suspicion or are otherwise in violation of MCSO policy, or stops or detentions that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The Supervisor shall take appropriate action to address all violations or deficiencies in Investigatory Stops or detentions, including recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.*

**In Full and Effective Compliance**

We reviewed traffic stop data reported by MCSO for its July inspection (BI2023-0102). To determine compliance with this Paragraph, we randomly selected 35 traffic-related events, which BIO then audited for compliance. Of the 35 traffic-related events, MCSO reported a 99.36%

WAI 72699

compliance rate. As a result of the inspection, nine BIO Action Forms were generated. The first deficiency was attributed to a District 1 deputy who failed to document an arrest in the VSCF, after having issued a criminal citation to the driver. The second deficiency was attributed to a District 2 deputy who marked on the VSCF that there was an additional employee on the stop, when BWC video confirmed there was not. The third and fourth deficiencies were both attributed to District 4 deputies who failed to conduct license/warrant checks on the drivers. The fifth deficiency was attributed to a District 7 deputy who listed the wrong location for the violation and the wrong gender for the driver. The sixth deficiency was attributed to a District 7 deputy who failed to complete an assisting employee form. The seventh deficiency was attributed to a District 7 deputy who cleared the call with the wrong code. The eighth deficiency was attributed to a Lake Patrol deputy who failed to document contact with a passenger on the VSCF. The ninth deficiency was attributed to a Lake Patrol deputy who failed to provide an incidental contact form to the driver. We do not consider any of these serious deficiencies. For July, all 35 stops we reviewed were in compliance with this Paragraph.

We reviewed a spreadsheet documenting each VSCF by District for July, to determine if supervisors were reviewing VSCFs within the required 72 hours. We reviewed data for 210 traffic stops and determined that supervisors had completed timely reviews of all 210 VSCFs, or 100% of the cases. For July, we requested a sample of 15 NTCFs generated for the month, from the list that MCSO submitted. We reviewed the 15 NTCFs to determine if supervisors were reviewing them within the required 72 hours and determined that all reviews, or 100%, were in compliance.

For July, we requested a sample of 10 corrective actions generated during the month. Corrective actions are documented on BlueTeam Supervisor Notes. Five corrective actions were related to Body-Worn Camera (BWC) issues. All were the result of late activation of the Body-Worn Camera. Three corrective actions were the result of policy violations related to traffic stops. Two corrective actions were related to deficiencies noted with deputy safety during traffic stops. For the month in review, we requested all corrective actions relative to the sample of 35 traffic stops that were selected for the monthly Traffic Stop Data Collection Inspection. There were no BlueTeam corrective actions submitted pertaining to the 35 stops selected for July.

We reviewed traffic stop data reported by MCSO for its August inspection (BI2023-0116). We randomly selected 35 traffic-related events, which BIO then audited for compliance. The inspection resulted in a 98.80% compliance rating. Our review of the inspection report found that three stops were listed as having deficiencies, resulting in three BIO Action Forms. The first deficiency was attributed to a District 2 deputy who failed to complete an Assisting Employee and/or Volunteer Form. The second deficiency was attributed to a District 3 deputy who cleared the call with the wrong code. The third deficiency was attributed to a District 3 deputy who did not provide a self-introduction upon initial contact with the driver. We do not consider any of these to be serious deficiencies. For August, we found all 35 stops reviewed to be in compliance with the requirements of this Paragraph.

We reviewed a spreadsheet documenting each VSCF by District for August, to determine if supervisors were reviewing VSCFs within the required 72 hours. We reviewed 179 VSCFs and determined that supervisors had completed timely reviews of documentation in all 179 stops, for a 100% compliance rating. From the list submitted by MCSO, we requested 20 NTCFs that were

WAI 72700

generated in August. We inspected the NTCFs to determine if supervisors were reviewing them within the required 72 hours. We determined that supervisors had completed timely reviews of all 20 NTCFs, for 100% compliance.

For August, we requested a list of corrective actions. From the list submitted, we selected a sample of 10 corrective actions generated for the month. Four corrective actions were the result of late activation, or policy violations associated with the BWC. Two of the BWC corrective actions were due to late activation, one was the result of failure to activate, and one was due to the use of improper language while the recording was activated. Three corrective actions were the result of erroneous or missing information required on traffic stop documentation. Three corrective actions were the result of policy violations related to traffic stops. For the month in review, we requested all corrective actions relative to the sample of 35 traffic stops that were selected for the monthly Traffic Stop Data Collection Inspection. There were no BlueTeam corrective action notes submitted pertaining to the 35 stops selected for August.

We reviewed traffic stop data reported by MCSO for its September inspection (BI2023-0130). We randomly selected 35 traffic-related events, which BIO then audited for compliance. The inspection resulted in a 99.50% compliance rating. Our review of the inspection report found that seven stops were listed as having deficiencies. As a result of the inspection, seven BIO Action Forms were generated. The first deficiency was attributed to a District 1 deputy whose arrest report lacked articulation to support the charge. The deputy also failed to provide the driver a receipt for the seized driver's license. We consider this a serious deficiency that should have been addressed by the employee's supervisor. The second, third, fourth, and fifth deficiencies were all attributed to District 2 personnel who failed to complete Assisting Employee and/or Volunteer forms. The sixth deficiency was attributed to a District 2 deputy who listed wrong information pertaining to the location of the stop, in the VSCF and Written Warning. The seventh deficiency was attributed to a District 2 deputy who failed to provide the violator a receipt for the seizure of the license plate. Due to past concerns pertaining to improper seizures of driver licenses and license plates, we consider this to be a serious deficiency. For September, we found 33 of the 35 stops in compliance with the requirements of this Paragraph.

For September, we requested a list of corrective actions. From the list submitted, we selected a sample of 10 corrective actions that were generated for the month. Five corrective actions were attributed to BWC policy violations. Four were due to late activation and one was the result of the deputy terminating the BWC recording before the stop was concluded. Four corrective actions were the result of erroneous or missing information required on traffic stop documentation. Three corrective actions were the result of a policy violations related to traffic stops. One corrective action was the result of a deficiency related to deputy performance. There were no documented corrective actions pertaining to any of the 35 stops selected for September.

We reviewed a spreadsheet documenting each VSCF by District. For September, we reviewed 129 VSCFs and determined that supervisors had completed timely reviews of all 129 VSCFs, or in 100% of the cases. For September, we requested 20 NTCFs generated by Patrol deputies. We reviewed all 20 NTCFs to determine if supervisors were reviewing NTCFs within the required 72 hours. We determined that supervisors had completed timely reviews in all 20 NTCFs. This is a compliance rate of 100%.

WAI 72701

Paragraph 90 requires timely supervisory reviews of documentation pertaining to stops and detentions. Paragraph 91 requires supervisors to identify policy violations, deficiencies, and training issues noted in stops and detentions. Of the sample of 105 stops inspected for this reporting period, we found that 103 of 105 stops were in compliance with this Paragraph. The compliance rate for Paragraph 91 for this reporting period was 98.1%.

On June 23, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 92.*** *Supervisors shall use EIS to track each subordinate's violations or deficiencies in Investigatory Stops or detentions and the corrective actions taken, in order to identify Deputies needing repeated corrective action. Supervisors shall notify IA. The Supervisor shall ensure that each violation or deficiency is documented in the Deputy's performance evaluations. The quality and completeness of these Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations. MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct complete, thorough, and accurate reviews of Deputies' stops and Investigatory Detentions.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on April 13, 2023.
- GC-4 (S) (Employee Performance Management), most recently amended on April 13, 2023.

**Phase 2:** In compliance

To determine compliance, we review the EIS and IAPro histories for each of the employees whose EPAs were selected for review under Paragraph 87. We then review the information to determine if all violations, deficiencies, PSB investigations, and corrective actions taken pertaining to stops and detentions, which were listed in the employee's EIS and IAPro resumes, were accurately documented in the employee's EPA. Failure to identify and memorialize any issues and actions taken as noted in the employee's EIS and IAPro resumes reflects on the quality of the supervisor's reviews. By reviewing EIS and IAPro resumes, we also can identify if a deputy has repeated entries of any specific violations, and if subsequent actions taken to correct the issue have been documented in the employee's EPA. For applicable supervisors' EPAs, in addition to the above metric, we review comments made in reference to the quality of supervisory reviews to ensure that the rater has specific comments addressing this Paragraph's requirements. Both of these requirements must be met for compliance. Deficiencies in quality of EIS reviews by supervisors will also impact our assessment of compliance for Paragraph 100. To ensure fairness to the agency, when we assess compliance with this Paragraph, we also look at the performance appraisal as a whole to determine if the intent and spirit of the Paragraph under review was captured.

For July, we reviewed five deputy EPAs and 10 supervisor EPAs. All five deputy EPAs reviewed were in compliance, and nine of the 10 supervisor EPAs were in compliance. One first-line supervisor EPA did not have specific comments addressing EIS reviews, as it pertains to the

WAI 72702

requirements of this Paragraph. For August, we reviewed six deputy EPAs and seven supervisor EPAs. All six deputy EPAs were in compliance, and all seven supervisor EPAs were in compliance. For September, we reviewed five deputy EPAs and 10 supervisor EPAs. All five deputy EPAs were in compliance. All 10 supervisor EPAs addressed the quality and completeness of EIS reviews, which are requirements of this Paragraph.

For this quarter, all 16 deputy EPAs reviewed were in compliance with this Paragraph, for a 100% compliance rate. Of the 27 supervisor EPAs reviewed, 26 or 96.3%, were in compliance. Including deputy and supervisor EPAs, there was a total of 43 EPAs, of which 42 met the requirements of this Paragraph. The compliance rate for this reporting period was 97.67%. For the third quarter of 2023, MCSO was in compliance with the requirements of this Paragraph.

**Paragraph 93.** *Absent extraordinary circumstances, MCSO Deputies shall complete all incident reports before the end of shift. MCSO field Supervisors shall review incident reports and shall memorialize their review of incident reports within 72 hours of an arrest, absent exceptional circumstances.*

### In Full and Effective Compliance

We reviewed a sample of 76 Incident Reports for July, for the randomly selected date of July 17, 2023. All of the 76 Incident Reports were submitted before the end of the shift. We confirmed timely supervisory review in 74 of the 76 incident reports. All 12 Arrest Reports were reviewed and approved by supervisors within the required 72 hours. There were six Vehicle Crash Reports submitted in the July sample, and we verified timely supervisory reviews on all of them. We conducted a review of a 10% sample of the Incident Reports submitted for the date requested, to determine quality and completeness, and found no significant issues of concern. In total, 74 of 76 Incident Reports we reviewed were in compliance, for a compliance rate of 97.37%.

We reviewed a representative sample of 77 Incident Reports for August for the randomly selected date of August 6, 2023. All of the 77 Incident Reports were submitted before the end of the shift. Seventy-six of the 77 Incident Reports had proper documentation of timely submission and supervisory review. Of the 77 Incident Reports, 11 were vehicle collisions, of which all had documentation of supervisory review and approval. There were 27 Arrest Reports submitted for the month, and all had proper documentation of supervisory review. The overall compliance rate for timely submission and review of Incident Reports in August was 99%. We conducted a review of a 10% sample of the Incident Reports submitted for the date requested, to determine quality and completeness. One incident report had several spelling and grammar mistakes. No serious issues were noted.

WAI 72703

We reviewed a representative sample of 60 Incident Reports for September, for the randomly selected date of September 30. Fifty-nine of the 60 Incident Reports had documentation that they had been submitted before the end of the shift, and we confirmed that 58 of the 60 Incident Reports were reviewed and approved by supervisors as required by this Paragraph. The compliance rate for September was 96.67%. All four Vehicle Crash Reports were in compliance. All 17 Arrest Reports were in compliance. We conducted a review of a 10% sample of the Incident Reports submitted to determine quality and completeness. We found no significant issues of concern. For the third quarter of 2023, we found that 208 of 213 Incident Reports were in compliance, or 97.65%.

On March 17, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 94.** *As part of the Supervisory review, the Supervisor shall document any arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The Supervisor shall take appropriate action to address violations or deficiencies in making arrests, including notification of prosecuting authorities, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.*

**Phase 1:**  In compliance

- EA-11 (Arrest Procedures), most recently amended on April 5, 2022.
- GF-5 (Incident Report Guidelines), most recently amended on June 15, 2023.

**Phase 2:**  In compliance

To assess compliance with this Paragraph, we request a list of bookings and criminal citations for the period in review. We randomly select a sample of 20 bookings and 20 criminal citations, which BIO then inspects for compliance. In addition, MCSO reviews all cases involving immigration arrests, and arrests related to lack of identity documents. MCSO also reviews all Maricopa County Attorney's Office (MCAO) turndowns for lack of probable cause and submits those for our review. The total of cases selected per month does not exceed 60. We review Incident Report Inspection reports as part of the documentation to determine compliance with Paragraphs 94 and 96. The BIO inspection covers the selected cases, which are retroactive two months. We review the Incident Report Inspection Report and its corresponding Inspection Matrix for each month of the reporting period. Some inspection points in the matrix are given stronger consideration in our reviews than others, as these are fundamental requirements of Paragraph 94; if deficiencies are noted, they may also impact the successful conclusion of the case. In all the cases described below, we relied on the BIO inspector's notations and observations to determine our findings.

In addition to documentation described above, we review all Incident Report Memorialization (IRM) forms submitted for the quarter. The Incident Report Memorialization form is used by supervisors to document deficient arrests and corrective actions taken. In accordance with this

WAI 72704

Paragraph and MCSO policy, supervisors are required to document arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training. The supervisor generating the IRM, and the commander reviewing the IRM, should ensure that the documentation includes the corrective action taken to resolve issues caused by the deficiency, as well as the remedial action taken to prevent future reoccurrence.

For July, we reviewed the June Incident Report Inspection (BI2022-0082). We selected 20 bookings and 20 criminal citations, which BIO then inspected for compliance. MCSO did not submit any immigration-related arrests, cases involving identity theft investigations, or County Attorney turndowns for lack of probable cause. The inspection resulted in a 99.11% compliance rating. The BIO Inspection Report noted two deficiencies in two cases, which resulted in two BIO Action Forms. Both of these cases involved deputies not providing passengers with incidental contact forms after some type of interaction occurred between the deputies and passengers. As a result of our review of all the documentation submitted, including the matrix, we determined that two cases had serious deficiencies that should have been addressed by first-line supervisors, and therefore were not in compliance with this Paragraph. Our review of the June Incident Inspection Report indicated that the first deficiency was an arrest from District 1 where the arrest report lacked articulation to support the charge. The reviewing supervisor approved the report with the noted deficiency. We consider this case noncompliant. The second deficient case noted in the inspection report was a District 1 arrest where the report was not submitted prior to the end of the shift. We do not consider this a serious deficiency. The third deficiency was an arrest report from District 2 that was not reviewed by a supervisor within 72 hours. We do not consider this a serious deficiency. The fourth deficiency was an arrest from District 2 where the deputy cited and released the subject, when policy requires a booking. This was a serious deficiency that was not addressed by the deputy's supervisor. The fifth deficiency was an arrest from District 2 where the report was not submitted prior to the end of the shift. We do not consider this a serious deficiency. In total, we reviewed 40 cases, of which 38 were in compliance.

For August, we reviewed the July Incident Report Inspection (BI2023-0104). We selected 20 bookings and 20 criminal citations, which BIO then inspected for compliance. There were no immigration-related arrests, and no cases involving identity theft investigations reported by MCSO. There were no County Attorney turndowns for lack of probable cause. The inspection resulted in a 99.73% compliance rating. We reviewed the inspection report, which noted two deficient cases, and reviewed the matrix used by BIO for the inspection. The first deficiency was an arrest from District 2 where the report was not reviewed by a supervisor within the required timeframe. We do not consider this a serious deficiency. The second deficiency was a District 3 arrest where the deputy did not document the circumstances that led to the criminal citation in the citation or in an Incident Report. We believe this is a serious deficiency that the reviewing supervisor should have addressed. This case was not in compliance. In total, we reviewed 40 cases, of which 39 were in compliance.

WAI 72705

For September, we reviewed the August Incident Report Inspection (BI2023-0118). We selected 20 bookings and 20 criminal citations, which BIO then inspected for compliance. There were no immigration-related arrests, and no cases involving identity theft investigations reported by MCSO. There were no County Attorney turndowns for lack of probable cause. The inspection resulted in a 99.63% compliance rating. We reviewed the inspection report, which noted three deficient cases, and reviewed the matrix used by BIO for the inspection. A total of three BIO Action Forms were generated for the deficiencies. As a result of our review of all the documentation submitted, including the matrix, we determined that all three cases had minor deficiencies. The first deficiency was an arrest from District 2 where the report was not submitted prior to the end of the shift. The second deficiency was an arrest from District 3 where the inspector was unable to locate a property receipt for items impounded for safekeeping. The third deficiency was an arrest from District 3 where the report was not submitted prior to the end of the shift. In total, we reviewed 40 cases; and we found all 40 to be in compliance.

There were no Incident Report Memorialization (IRM) forms submitted for the third quarter. After our reviews of the BIO Incident Report inspections for this quarter, as well as the corresponding Inspection Matrices, we determined that three arrest cases were noncompliant. Of the 120 total cases reviewed for this quarter, 117 were in compliance. The compliance rating for the third quarter of 2023 was 97.5%. MCSO remains in compliance with this Paragraph.

**Paragraph 95.** *Supervisors shall use EIS to track each subordinate's violations or deficiencies in the arrests and the corrective actions taken, in order to identify Deputies needing repeated corrective action. The Supervisor shall ensure that each violation or deficiency is noted in the Deputy's performance evaluations. The quality of these supervisory reviews shall be taken into account in the Supervisor's own performance evaluations, promotions, or internal transfers. MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct reviews of adequate and consistent quality.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on April 13, 2023.
- GC-4 (S) (Employee Performance Management), most recently amended on April 13, 2023.

**Phase 2:** In compliance

There are two primary areas of assessment for this Paragraph. The first is to determine if supervisors are tracking subordinates' deficiencies and violations in arrests, and accurately documenting these issues along with corrective actions in employees' EPAs. In addition, repeated corrective actions should be addressed in EPAs. The second is to determine if the quality of supervisory EIS reviews are being addressed in supervisors' EPAs. The quality and effectiveness of interventions, as a result of deficiencies pertaining to stops and detentions, is a requirement which we assess under Paragraph 97.

WAI 72706

To determine compliance, we will review the EIS and IAPro histories for each of the employees whose EPAs were selected for review under Paragraph 87. We will then review the information to determine if all violations, deficiencies, IA investigations, and corrective actions taken pertaining to arrests, which were listed in the employee's EIS and IAPro resumes, were accurately documented in the employee's EPA. Failure to identify and memorialize any issues and actions taken as noted in the employee's EIS and IAPro resumes, reflects on the quality of the supervisor's reviews. By reviewing EIS and IAPro resumes, we are also able to identify if a deputy has repeated entries of any specific violations, and if subsequent actions taken to correct the issue have been documented in the employee's EPA. For applicable supervisors' EPAs, in addition to the above metric, we will review comments made in reference to the quality of supervisory reviews to ensure that the rater has specific comments addressing this Paragraph's requirements. Both of these requirements must be met for compliance.

Deficiencies in quality of EIS reviews by supervisors will also reflect in our assessment of compliance for Paragraph 100. To ensure fairness to the agency, when we assess compliance with this Paragraph, we also try look at the performance appraisal as a whole to determine if the intent and spirit of the Paragraph under review was captured.

For July, we reviewed five deputy EPAs and 10 supervisor EPAs. All five deputy EPAs reviewed were in compliance, and nine of the 10 supervisor EPAs were in compliance. One first-line supervisor EPA did not have specific comments addressing EIS reviews, as it pertains to the requirements of this Paragraph. For August, we reviewed six deputy EPAs and seven supervisor EPAs. All six deputy EPAs were in compliance, and all seven supervisor EPAs were in compliance. For September, we reviewed five deputy EPAs and 10 supervisor EPAs. All five deputy EPAs were in compliance. All 10 supervisor EPAs addressed the quality and completeness of EIS reviews, which are requirements of this Paragraph. For the third quarter of 2023, all 16 deputy EPAs reviewed were in compliance with this Paragraph, for a 100% compliance rate. Of the 27 supervisor EPAs reviewed, 26 or 96.3%, were in compliance. Including deputy and supervisor EPAs, there was a total of 43 EPAs, of which 42 met the requirements of this Paragraph. The compliance rate for this reporting period was 97.67%. For the third quarter of 2023, MCSO was in compliance with the requirements of this Paragraph.

**Paragraph 96.** *A command-level official shall review, in writing, all Supervisory reviews related to arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The commander's review shall be completed within 14 days of receiving the document reporting the event. The commander shall evaluate the corrective action and recommendations in the Supervisor's written report and ensure that all appropriate corrective action is taken.*

**Phase 1:** In compliance

- EA-11 (Arrest Procedures), most recently amended on April 5, 2022.

**Phase 2:** In compliance

WAI 72707

This Paragraph requires that a command-level official review a supervisor's investigation of the circumstances pertaining to any arrest that lacks probable cause, is in violation of policy, or where there is a need for corrective action or review of the agency's policy, strategy, tactics, or training. This Paragraph also requires that the commander evaluate the corrective action and recommendations to ensure that these are appropriate.

Our reviews to determine compliance with this Paragraph are associated with the documentation provided for Paragraph 94. If BIO identifies deficient cases in the Incident Report inspection, and the deficiencies fall within any of the four areas noted in Paragraphs 94 and 96, we will review the documentation to determine compliance. Since this Paragraph pertains to command reviews of supervisory investigations of deficient arrests, we will also review Incident Report Memorialization (IRM) forms to determine compliance. Our reviews for compliance with this Paragraph are determined by the command staff's timely reviews of IRMs once submitted by supervisors, and commanders' evaluation of the corrective actions taken.

For the third quarter of 2023, MCSO did not submit any IRM forms for our review. In our last quarterly status report, we issued a noncompliance warning. During that reporting period, MCSO submitted one IRM form for which the command review did not occur in a timely manner, within the required 14 days, as per policy.

Due to the absence of verifiable data during this reporting period, we will extend our warning until the next reporting period.

***Paragraph 97.*** *MCSO Commanders and Supervisors shall periodically review the EIS reports and information, and initiate, implement, or assess the effectiveness of interventions for individual Deputies, Supervisors, and units based on that review. The obligations of MCSO Commanders and Supervisors in that regard are described above in Paragraphs 81(c)–(h).*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on March 28, 2023.

**Phase 2:** In compliance

As per GH-5 (Early Identification System) and GB-2 (Command Responsibility), supervisors are required to conduct EIS reviews twice per month for sworn members. Command review of EIS profiles of supervisory and command personnel began in February 2017. To assess MCSO's compliance with this Paragraph, for every month of the reporting period, we select a supervisor and a squad of deputies from each District. We then review the documentation provided as verification of compliance with this Paragraph. We also request that EIS reviews of the commanders responsible for the selected personnel be included. The purpose of conducting EIS reviews is for supervisors to oversee the performance of subordinates, and take appropriate action on issues that need to be corrected. This Paragraph also requires that the effectiveness of interventions be evaluated. EIS reviews should be thorough and completed within a timeframe that allows supervisors to monitor performance and address any concerns noted in a timely manner. We believe that periodic EIS reviews should be conducted on a schedule that maximizes their usefulness. We understand that an exact 14-day timeframe may not be possible for all EIS

WAI 72708

reviews; and we will therefore conduct our reviews using a standard of reasonableness. Two EIS reviews conducted within a short time period, on the same employee, lead to questions regarding the purpose and quality of the reviews. EIS reviews conducted too close to each other do not address the intent of this Paragraph. We review documentation to determine if EIS reviews are being conducted in accordance with the requirements of this Paragraph, or if they are being conducted perfunctorily without regard for usefulness or quality.

During the third quarter of 2023, we reviewed eight closed TSMR investigations which resulted in six memos to the District. In one case, the supervisor utilized the memo to create an Action Plan for the deputy and submitted follow-up paperwork addressing the activities during the course of the Action Plan. The other two investigations were for the same deputy and MCSO combined them for a full investigation. We reviewed the materials, documents, and audio recordings for the completed investigations and found that they met expectations. We discussed several of these cases during our October site visit.

For July, we reviewed Supervisor Notes requested as verification of compliance for 47 employees. Of the 47 selected employees, 42 had appropriate documentation of timely EIS reviews, for a compliance rate of 89.36%. One employee had no documented EIS reviews conducted for the month. Four employees had EIS reviews conducted within close proximity. For August, we received Supervisor Notes as verification of compliance of EIS reviews for the selected 43 employees. Of the 43 employees, 41 had appropriate documentation of compliance with this Paragraph, for a compliance rate of 95.35%. One employee had two EIS reviews conducted on the same day. One employee had only one EIS review conducted.

For September, we received Supervisor Notes as verification of compliance of EIS reviews for the selected 43 employees. Of the 43 employees, 38 had appropriate documentation of compliance with this Paragraph, for a compliance rate of 88.37%. One employee had only one EIS review conducted for the month. Four other employees had two EIS reviews conducted within a span of two days. For the third quarter of 2023, we reviewed the documentation provided for 133 employees – which included the ranks of deputy, sergeant, lieutenant, and captain. Of the 133 employees, 121 had documentation that met compliance requirements. The compliance rate for the third quarter was 90.98%. MCSO has been in compliance with this Paragraph since the first quarter of 2023. For this reporting period, MCSO was not in compliance with this Paragraph's requirement that supervisors conduct periodic reviews of their subordinates EIS profiles. We will therefore issue a noncompliance warning. If MCSO fails to meet the requirements of this Paragraph in the next quarter, we will withdraw compliance with this Paragraph.

WAI 72709

### d. Regular Employee Performance Review and Evaluations

**Paragraph 98.**  *MCSO, in consultation with the Monitor, shall create a system for regular employee performance evaluations that, among other things, track each officer's past performance to determine whether the officer has demonstrated a pattern of behavior prohibited by MCSO policy or this Order.*

**Phase 1:**  In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on April 13, 2023.
- GC-4 (S) (Employee Performance Management), most recently amended on April 13, 2023.

**Phase 2:**  In compliance

To assess compliance with this Paragraph, we review a sample of deputy and supervisor EPAs selected on a monthly basis under Paragraph 87.  There are several Paragraphs in the First and Second Orders that have requirements pertaining to the assessment and documentation of performance in Employee Performance Appraisals.  Supervisors have a greater number of requirements that must be met; therefore, we review a greater number of supervisor performance appraisals for compliance.  Command personnel are responsible for completing supervisor EPAs and should ensure that the requirements of all EPA related Paragraphs are addressed.  First-line supervisors are required to identify and track the performance of deputies who have patterns of behavior prohibited by the Orders and MCSO policy.  The methodologies for the assessment of compliance with Paragraphs that require documentation of performance in EPAs are explained under each of those Paragraphs.

We reviewed a total of 43 EPAs for the third quarter of 2023.  Forty-two of the 43 EPAs met compliance requirements with Paragraph 87. This is a compliance rate of 97.67%.  MCSO was also in compliance with Paragraphs 99, 100, and 176.  For the third quarter of 2023, MCSO was in compliance with the requirements of this Paragraph.

**Paragraph 99.**  *The review shall take into consideration all past Complaint investigations; the results of all investigations; Discipline, if any, resulting from the investigation; citizen Complaints and commendation; awards; civil or administrative claims and lawsuits related to MCSO operations; Training history; assignment and rank history; and past Supervisory actions taken pursuant to the early warning protocol.*

**Phase 1:**  In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on April 13, 2023.
- GC-4 (S) (Employee Performance Management), most recently amended on April 13, 2023.

**Phase 2:**  In compliance

WAI 72710

The current EPA form has an acknowledgement at the conclusion that supervisors are required to include in their performance appraisal, affirming that they have done due diligence in researching and documenting the requirements of Paragraph 99. Supervisors completing EPAs are required to document their findings relevant to these areas, if their reviews reveal any applicable events or actions. The areas of review include: complaint investigations and dispositions; discipline; citizen complaints; commendations; awards; civil or administrative claims; and past supervisory actions taken pursuant to EIS Alerts. We do not rely solely on the supervisor's affirmation that a thorough review was completed. We verify supporting documentation to ensure the supervisor has conducted a thorough review and that the information provided under Paragraph 99 is accurate. We review EIS and IAPro resumes for each employee whose EPA we received during the quarter, under Paragraphs 87, 92, and 95. We review these resumes and compare them to the notations listed by the supervisor authoring the EPA, under Paragraph 99. We verify that any past actions noted in the resumes are captured in the EPA. We have emphasized to MCSO the importance of accurate documentation and thorough reviews of EIS profiles.

For this reporting period, we reviewed Employee Performance Appraisals for 16 deputies and 27 supervisors. For July, we found all five deputy EPAs, and all of the 10 supervisor EPAs in compliance. For August, we found all six deputy EPAs and all seven supervisor EPAs in compliance. For September, we found all five deputy EPAs and all 10 supervisor EPAs in compliance. For the third quarter of 2023, of the total 43 EPAs reviewed, all 43 were in compliance. This is a compliance rate of 100%. In our last quarterly status report, we issued a noncompliance warning for this Paragraph. For the period in review, MCSO was once again in compliance with the requirements of this Paragraph.

***Paragraph 100.*** *The quality of Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on April 13, 2023.
- GC-4 (S) (Employee Performance Management), most recently amended on April 13, 2023.

**Phase 2:** In compliance

The current EPA form has a rating dimension where supervisors are required to document the quality of supervisory reviews and supervisor accountability. This Paragraph only pertains to supervisor EPAs, and we review comments to ensure that the rater has addressed all areas associated with the quality of supervisory reviews. We have previously noted that we take into account the requirements of Paragraphs 92 and 95, as it pertains to the quality of supervisory reviews of EIS. The quality of reviews of supervisors' misconduct investigations, as per Paragraph 176, is also factored into the assessment of compliance for this Paragraph.

We reviewed Employee Performance Appraisals for 27 supervisors and commanders who received EPAs during this reporting period. Paragraphs 92 and 95 require supervisors to review and track violations and corrective actions in EIS. For July, our reviews indicated that nine of the

WAI 72711

10 supervisor EPAs were in compliance with the requirements of this Paragraph.  One supervisor EPA failed to document the requirements of Paragraphs 92 and 95 specifically and sufficiently.  For August, all seven supervisor EPAs were in compliance.  For September, all 10 supervisor EPAs were in compliance.  Of the 27 supervisor EPAs reviewed for this quarter, 26 were in compliance with the requirements of this Paragraph, or 96.30%.  For this reporting period, MCSO achieved compliance with the requirements of this Paragraph.

**Paragraph 101.**  *Within 180 days of the Effective Date, MCSO shall develop and implement eligibility criteria for assignment to Specialized Units enforcing Immigration-Related Laws.  Such criteria and procedures shall emphasize the individual's integrity, good judgment, and demonstrated capacity to carry out the mission of each Specialized Unit in a constitutional, lawful, and bias-free manner.  Deputies assigned to a Specialized Unit who are unable to maintain eligibility shall be immediately re-assigned.*

**In Full and Effective Compliance**

MCSO does not have any specialized units that enforce immigration-related laws.  Therefore, by default, MCSO is in Phase 2 compliance with this Paragraph.  We continue to monitor arrests and detentions as part of our review process to ensure that MCSO is in compliance with its own directives on this issue.

For July, August, and September, we received lists containing all incidents involving MCSO arrests and criminal citations.  For each month, we requested a random sample of arrests and criminal citations.  In total, we reviewed 60 incidents involving arrests and 60 incidents involving criminal citations.  We also reviewed a random sample of 213 Incident Reports for this reporting period.  During our reviews of the documentation provided for this reporting period, we found no evidence to indicate any violations of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

WAI 72712

## Section 10: Misconduct and Complaints

**COURT ORDER XI.  MISCONDUCT AND COMPLAINTS**

### a. Internally-Discovered Violations

***Paragraph 102.*** *MCSO shall require all personnel to report without delay alleged or apparent misconduct by other MCSO Personnel to a Supervisor or directly to IA that reasonably appears to constitute: (i) a violation of MCSO policy or this Order; (ii) an intentional failure to complete data collection or other paperwork requirements required by MCSO policy or this Order; (iii) an act of retaliation for complying with any MCSO policy; (iv) or an intentional provision of false information in an administrative investigation or any official report, log or electronic transmittal of information.  Failure to voluntarily report or document apparent misconduct described in this Paragraph shall be an offense subject to Discipline.*

**In Full and Effective Compliance**

During our assessments of compliance with this Paragraph, we have reviewed hundreds of misconduct investigations involving MCSO personnel.  Many of them have been internally generated.

During this reporting period, we reviewed 134 administrative misconduct investigations.  Thirty-two were generated internally.  MCSO has continued to identify and address misconduct that is raised by other employees or identified by supervisory personnel.  While some of these investigations did not meet all requirements for the proper reporting or completion of misconduct investigations, we address these failures in other Paragraphs in this report.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

### b. Audit Checks

***Paragraph 103.*** *Within one year of the Effective Date, MCSO shall develop a plan for conducting regular, targeted, and random integrity audit checks to identify and investigate Deputies possibly engaging in improper behavior, including: Discriminatory Policing; unlawful detentions and arrests; improper enforcement of Immigration-Related Laws; and failure to report misconduct.*

**Phase 1:**  In compliance

- Audits and Inspections Unit Operations Manual, Section 303, published on August 27, 2020.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

**Phase 2:**  In compliance

WAI 72713

Paragraph 103 requires that MCSO conduct "regular, targeted, and random integrity audit checks." MCSO's Audits and Inspections Unit (AIU), a unit of the Bureau of Internal Oversight (BIO), is responsible for these requirements. This Paragraph does not set frequency standards for integrity tests. During this reporting period, AIU published several completed inspection reports to fulfill the "regular" and "random" elements of this Paragraph. AIU's inspections examined complaint intake tests, Early Identification System (EIS) alerts, Supervisor Notes, Patrol Activity Logs, traffic stop data, post-stop ethnicity, passenger contacts, County Attorney turndown dispositions, Patrol Shift Rosters, and others.

For this reporting period, AIU did not submit any inspections to fulfill the "targeted" requirements of Paragraph 103. We will continue to review AIU's tests to verify that MCSO maintains continued compliance with this Paragraph. We will also discuss with AIU its plans for upcoming targeted audits during our next site visit.

### c. Complaint Tracking and Investigations

***Paragraph 104.*** *Subject to applicable laws, MCSO shall require Deputies to cooperate with administrative investigations, including appearing for an interview when requested by an investigator and providing all requested documents and evidence. Supervisors shall be notified when a Deputy under their supervision is summoned as part of an administrative investigation and shall facilitate the Deputy's appearance, absent extraordinary and documented circumstances.*

**In Full and Effective Compliance**

In the fall of 2015, MCSO developed a draft checklist and investigative format for administrative investigations. All the requirements in this Paragraph were included in these protocols and approved for use in 2016. Effective June 1, 2016, all administrative investigations have been required to include these forms. Since that time, the forms have been revised to provide additional clarification on procedural requirements. MCSO has consistently met the requirement to use these forms, and includes the checklists in administrative investigation files forwarded for our review.

During this reporting period, we reviewed 134 administrative misconduct investigations. Sixty-three involved sworn personnel. All 63 included the use of the approved investigative format and checklist. We continue to note that deputies consistently appear for scheduled interviews, provide all required information to investigators, and cooperate with investigations. There were no instances identified where a supervisor failed to facilitate a deputy's attendance at an interview or where an investigator failed to notify the employee's supervisor of an intended administrative interview.

On March 17, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 72714

***Paragraph 105.***  *Investigators shall have access to, and take into account as appropriate, the collected traffic stop and patrol data, Training records, Discipline history, and any past Complaints and performance evaluations of involved officers.*

**In Full and Effective Compliance**

Our reviews of investigations conducted by MCSO have verified that the information required for compliance with this Paragraph is consistently provided in the checklist and investigative reports.

As a result of the Second Order and effective July 20, 2016, the PSB Commander makes all preliminary disciplinary decisions.  The PSB and Administrative Services Division Commanders created a worksheet that provides information regarding how MCSO makes disciplinary decisions, and how MCSO considers employees' work history.  PSB includes this form in the sustained investigation documentation that we receive and review for compliance.

During this reporting period, we reviewed 65 sustained administrative misconduct investigations.  Twenty-five of these involved misconduct by sworn personnel only.  Thirty-two involved misconduct by Detention personnel only, seven involved misconduct by civilian personnel only, and one involved misconduct by both sworn and civilian personnel.  In 25 of the cases, none of the involved employees were still employed by MCSO at the time of the completion of the investigation or the discipline process.  Forty of the sustained investigations identified one or more principal still employed by MCSO at the time final findings or discipline decisions were made.

In all 40 of the sustained investigations involving known MCSO personnel, the PSB Commander determined the findings and presumptive range of discipline for the sustained violations.  We found that generally, where appropriate, discipline history, past complaints, performance evaluations, traffic stop and patrol data, and training records were included in the documents considered for discipline findings.  All 40 were referred for discipline or other corrective action.

On October 5, 2020, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.


***Paragraph 106.***  *Records of Complaints and investigations shall be maintained and made available, un-redacted, to the Monitor and Plaintiffs' representatives upon request.  The Monitor and Plaintiffs' representatives shall maintain the confidentiality of any information therein that is not public record.  Disclosure of records of pending investigations shall be consistent with state law.*

**In Full and Effective Compliance**

MCSO has two obligations under this Paragraph: to maintain and make records available.  The Paragraph also covers the requirement that MCSO make unredacted records of such investigations available to the Plaintiffs' attorneys and Plaintiff-Intervenor as well.

WAI 72715

MCSO has been responsive to our requests, and neither the Plaintiffs nor Plaintiff-Intervenor have raised any concerns related to the requirements of this Paragraph for this or the past several reporting periods.  MCSO, via its counsel, distributes responses to our document and site visit requests via a document-sharing website.  The Plaintiffs' attorneys and Plaintiff-Intervenor have access to this information, including documents applicable to this Paragraph, at the same time as we do.

On June 3, 2019, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

WAI 72716

## Section 11: Community Engagement

**COURT ORDER XII.  COMMUNITY ENGAGEMENT**

### *a. Community Outreach Program*

***Paragraph 107.***  *To rebuild public confidence and trust in the MCSO and in the reform process, the MCSO shall work to improve community relationships and engage constructively with the community during the time that this order is in place.  To this end, the MCSO shall conduct the following district community outreach program.*

***Paragraph 109.***  *The Monitor shall hold at least one public meeting per quarter to coincide with the quarterly site visits by the Monitor in a location convenient to the Plaintiffs class.  The meetings shall be for the purpose of reporting the MCSO' progress in implementing this Order.  These meetings shall be used to inform community members of the policy changes or other significant actions that the MCSO has taken to implement the provisions of this Order.  Summaries of audits and reports completed by the MCSO pursuant to this Order shall be made available.  The meetings shall be under the direction of the Monitor and/or his designee.  The Sheriff and/or the MCSO will participate in the meetings to provide substantive comments related to the Melendres case and the implementation of the orders resulting from it, as well as answer questions related to its implementation, if requested to do so by the Monitor or the community.  If the Sheriff is unable to attend a meeting due to other obligations, he shall notify the Monitor at least 30 days prior to that meeting.  The Monitor shall consult with Plaintiffs' representatives and the Community Advisory Board on the location and content of the meetings.  The Monitor shall clarify for the public at these meetings that MCSO does not enforce immigration laws except to the extent that it is enforcing Arizona and federal criminal laws.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

This Paragraph, per the June 3, 2019 Order (Document 2431), returned the community meetings to the Monitor's supervision and directed the Monitor to hold at least one public meeting per quarter to coincide with the quarterly site visits by the Monitor in a location convenient to the Plaintiffs' class.

The requirements of this Paragraph are not applicable as they apply to actions that the Monitor, not MCSO, is required to take regarding community meetings.  After consulting with the CAB regarding a location that would be convenient and accessible to members of the Plaintiffs' class, we held a community meeting on Thursday, October 19, 2023, at Frank Elementary School in Guadalupe.  The meeting was attended by approximately 40 community members. At the meeting, the Monitor welcomed the attendees and provided an overview of MCSO's compliance with the Court's Orders.  The Monitor noted that, despite the agency's progress, there are still two key requirements in the Court Orders MCSO has struggled to achieve: namely, MCSO's traffic stop studies that have reflected, per the Sheriff's statement, "some disparities in various

WAI 72717

traffic stop outcomes"; and the time it takes MCSO to resolve complaints against its deputies and employees. Representatives of the Sheriff, the Plaintiffs, the Plaintiff-Intervenor, and the CAB also made presentations. The principal representative of the Sheriff noted that MCSO's data analyses have continued to show disparities in citations, searches, and stop times of traffic stops.

During the event, community members shared concerns that included the increase of crime in Guadalupe and MCSO's delayed response time to calls for assistance, the lack of trust that had been generated by what was characterized as the confrontational attitudes of deputies, and the need for deputies to understand community members' culture in order to protect them and be effective.

**Paragraph 110.** *The meetings present an opportunity for the Monitor and MCSO representatives to listen to community members' experiences and concerns about MCSO practices. The Monitor may investigate and respond to those concerns. The Monitor shall inform the public that the purpose of the meeting is to discuss the Melendres case and the orders implementing the relief of that case. To the extent that the Monitor receives concerns at such meetings that are neither within the scope of this order nor useful in determining the Defendant's compliance with this order, it may inform the complainant how to file an appropriate complaint with the MCSO or appropriate law enforcement agency. The Sheriff may respond to non-Melendres questions raised at meetings to the extent, in his sole discretion, if the Sheriff wishes to do so.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

The requirements of this Paragraph are not applicable as they apply to actions that the Monitor, not MCSO, is required to take regarding community meetings. The Monitoring Team held a community meeting on Thursday, October 19, 2023, at Frank Elementary School in Guadalupe. We consulted with the CAB to select a venue for the meeting that was accessible and convenient for members of the Plaintiffs' class. At the meeting, the Monitoring Team informed the attendees that the purpose of the meeting was to discuss the Court Orders implementing the relief of the *Melendres* case. We offered the attendees the opportunity to ask questions or offer comments regarding their experiences and concerns about MCSO practices.

**Paragraph 111.** *English and Spanish-speaking Monitor Personnel shall attend these meetings and be available to answer questions from the public about its publicly available reports concerning MCSO's implementation of this Order and other publicly available information. The Plaintiffs' and Plaintiff-Intervenor's representatives shall be invited to attend and the Monitor shall announce their presence and state their availability to answer questions.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

WAI 72718

The requirements of this Paragraph are not applicable as they apply to actions that the Monitor, not MCSO, is required to take regarding community meetings.  As noted above, the Monitoring Team held a community meeting on Thursday, October 19, 2023, at Frank Elementary School in Guadalupe.  English and Spanish-speaking Monitoring Team personnel attended the meeting, and a professional interpreter provided consecutive Spanish interpretation.  We introduced the Plaintiffs and Plaintiff-Intervenor's representatives, both of whom offered remarks; and we advised the attendees that they were available to answer community members' questions.

***Paragraph 112.*** *At least ten days before such meetings, the Monitor shall widely publicize the meetings in English and Spanish after consulting with Plaintiffs' representatives and the Community Advisory Board regarding advertising methods.  Options for advertising include, but are not limited to, television, radio, print media, internet and social media, and any other means available.  Defendants shall either provide a place for such meetings that is acceptable to the Monitor or pay the Monitor the necessary expenses incurred in arranging for such meeting places.  The Defendants shall also pay the reasonable expenses of publicizing the meetings as required above, and the additional reasonable personnel and expenses that the Monitor will incur as a result of performing his obligations with respect to the Community Outreach Program.  If any party determines there is little interest or participation in such meetings among community members, or that they have otherwise fulfilled their purpose, it can file a request with the Court that this requirement be revised or eliminated.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

The requirements of this Paragraph are not applicable as they apply to actions that the Monitor, not MCSO, is required to take regarding community meetings.  We held our October 19, 2023 community meeting at Frank Elementary School in Guadalupe.  To promote the meeting, we reached out to Guadalupe-area community and non-profit organizations, churches, and schools to request their assistance to inform community members of the meeting.  We distributed English-Spanish flyers throughout the Guadalupe community, and also posted information about the meeting on community calendars and websites.

WAI 72719

**b. MCSO Community Liaison**

***Paragraph 113.*** *MCSO shall select or hire a Community Liaison who is fluent in English and Spanish. The hours and contact information of the MCSO Community Outreach Division ("COD") shall be made available to the public including on the MCSO website. The COD shall be directly available to the public for communications and questions regarding the MCSO.*

**In Full and Effective Compliance**

This Paragraph requires that MCSO select or hire a Community Liaison who is fluent in English and Spanish. MCSO's Community Outreach Division (COrD) has two Community Liaison Officers who are fluent in English and Spanish. The COrD uses the term "Community Liaison" for these two individuals and its other staff members, though not all of them are bilingual.

The MCSO website lists the hours and contact information of the COrD and its staff – as well as the COrD's mission and overarching goals, and frequently asked questions regarding MCSO. Based on a recommendation from the Plaintiff-Intervenor, MCSO recently updated its website to include information about the language abilities of COrD's Community Liaison Officers.

On June 17, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 114.*** *The COD shall have the following duties in relation to community engagement:*

*a.    to coordinate the district community meetings described above in Paragraphs 109 to 112;*

*b.    to provide administrative support for, coordinate and attend meetings of the Community Advisory Board described in Paragraphs 117 to 118; and*

*c.    to compile any complaints, concerns and suggestions submitted to the COD by members of the public about the implementation of this Order and the Court's order of December 23, 2011, and its findings of fact and conclusions of law dated May 24, 2013, even if they don't rise to the level of requiring formal action by IA or other component of the MCSO, and to respond to Complainants' concerns; and*

*d.    to communicate concerns received from the community at regular meetings with the Monitor and MCSO leadership.*

**In Full and Effective Compliance**

Pursuant to the June 3, 2019 Order (Document 2431), Subparagraphs a. and b. of this Paragraph are no longer applicable.

During this reporting period, as in the past, some CAB members participated in a few of our compliance meetings during our October site visit – including meetings on MCSO's interaction with the CAB and community engagement, and MCSO's Constitutional Policing Plan.

MCSO has provided documentation that all current COrD personnel completed an online Complaint Intake and Processing course, to assist them in receiving and appropriately directing any complaints or concerns they receive from community members, including complaints of

WAI 72720

potential employee misconduct.  When new personnel are assigned to the COrD, we request and review documentation that the new staff members have completed this training.  During our most recent site visit, COrD personnel reported that no new personnel were assigned to the Division within the last quarter.

In the past, COrD personnel have reported that when they receive concerns from community members, they forward those that are complaints to PSB; and that they sometimes receive inquiries for which COrD staff believe it is appropriate to direct community members to written materials or MCSO's website.  In addition, COrD has developed a form for capturing information on complaints, concerns, and suggestions submitted by members of the public to the COrD; however, COrD personnel maintain that they did not receive any *Melendres*-related complaints, concerns, or suggestions from the public during this reporting period.  In its submission for this reporting period, COrD personnel wrote, "The Community Outreach Division did not receive any complaints, concerns or suggestions by members of the public regarding the implementation of the Court's Orders during July 1st, through September 30th, 2023.  Therefore, no response was prepared."

During our upcoming site visit, we will discuss with COrD personnel any complaints, concerns, and suggestions it has received from the public; as well as the requirement that COrD communicate any concerns received from the community at regular meetings with the Monitor and MCSO leadership.

On June 17, 2022, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

### c. Community Advisory Board

***Paragraph 115.*** *MCSO and Plaintiffs' representatives shall work with community representatives to create a Community Advisory Board ("CAB") to facilitate regular dialogue between the MCSO and the community, and to provide specific recommendations to MCSO and the Monitor about policies and practices that will increase community trust and ensure that the provisions of this Order and other orders entered by the Court in this matter are met.  The MCSO shall cooperate with the Monitor to assure that members of the CAB are given appropriate access to relevant material, documents, and training so the CAB can make informed recommendations and commentaries to the Monitor.*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, most recently revised on January 3, 2023.

**Phase 2:**  In compliance

MCSO's responsiveness to the CAB's inquiries and requests for information continues to meet the requirements of this Paragraph.  CAB members continue to provide recommendations to MCSO about policies and practices that will increase community trust and ensure that the provisions of the Orders entered by the Court in this matter are met.  During this reporting period,

WAI 72721

CAB members provided feedback on MCSO policies CP-2 (Code of Conduct), CP-8 (Preventing Racial and Other Bias Based Profiling), and CP-11 (Anti-Retaliation).  It is our understanding that while CAB members have, in fact, forwarded to MCSO their commentary on some of the agency's proposed policies, the commentary was never received by the Policy Section.

We continue to closely monitor the measure to which MCSO facilitates a good working relationship with the CAB.

**Paragraph 116.**  *The CAB shall have five members, two to be selected by MCSO and two to be selected by Plaintiffs' representatives.  One member shall be jointly selected by MCSO and Plaintiffs' representatives.  Members of the CAB shall not be MCSO Employees or any of the named class representatives nor any of the attorneys involved in this case.  The CAB shall continue for at least the length of this Order.*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, most recently revised on January 3, 2023.

**Phase 2:**  In compliance

The CAB is a five-member body – with two members selected by MCSO, two members selected by Plaintiffs' attorneys, and one member jointly selected by MCSO and Plaintiffs' attorneys.  None of the CAB members are MCSO employees, named class representatives, or attorneys involved in this case.

**Paragraph 117.**  *The CAB shall hold meetings at regular intervals.  The meetings may be either public or private as the purpose of the meeting dictates, at the election of the CAB.  The Defendants shall provide a suitable place for such meetings.  The Monitor shall coordinate the meetings and communicate with CAB members, and provide administrative support for the CAB.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

The requirements of this Paragraph do not require any action on the part of MCSO; thus, they are not applicable.  During this reporting period, CAB members met regularly as a group, often with members of the Monitoring Team.  A member of the Monitoring Team coordinated the meetings and provided administrative support for the CAB.

In addition, during our October site visit, some CAB members participated in a few of our compliance meetings – including meetings on the Constitutional Policing Plan, community engagement/CAB, and other topics.  In our regular interactions with CAB members via conference calls and virtual meetings, we have provided information about MCSO's progress achieving compliance with the Orders and discussed ways to improve the relationship between the Plaintiffs' class and MCSO.

WAI 72722

**Paragraph 118.** *During the meetings of the CAB, members will relay or gather concerns from the community about MCSO practices that may violate the provisions of this Order and the Court's previous injunctive orders entered in this matter and transmit them to the Monitor and the MCSO for investigation and/or action. The Parties will also be given the CAB's reports and recommendations to the Monitor.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

The requirements of this Paragraph do not require any action on the part of MCSO; thus, they are not applicable. As noted above, during this reporting period, as in the past, some CAB members participated in a few of our compliance meetings during our October site visit.

We requested from MCSO documentation of concerns received from CAB members during their meetings about MCSO practices that may be in violation of the Court's Orders that were transmitted to the MCSO for investigation and/or action during this reporting period. MCSO did not report any such concerns during this reporting period.

During this reporting period, on August 23, 2023, the CAB held a hybrid (Zoom and in-person) meeting to inform community members about the *Melendres* case and the issues that were of primary concern to CAB members – including racial profiling and MCSO's delays in completing PSB investigations. This was the CAB's third such community meeting; and it was attended by approximately 15 community members, as well as a member of the Monitoring Team and Plaintiffs' representatives. In addition, at the CAB's invitation, three COrD personnel attended to listen to the community members' comments and questions.

During our October 2023 site visit, we inquired with the COrD as to how it followed up or shared with MCSO leadership the concerns that were raised during the CAB's community meeting. These concerns included an experience in which a family member was deported after her incarceration at an MCSO jail facility, as well as comments on racial profiling and traffic stops, and questions about MCSO's Spanish-language Community Academy. A COrD staff member who attended the meeting responded that the COrD personnel did share information following the meeting with MCSO personnel. According to a CAB member, some participants at the CAB's community meeting observed that the COrD personnel did not take notes, causing them to wonder if the issues they raised would actually be shared with the Sheriff and MCSO leadership. The meeting was not audio- or video-recorded.

We will continue to encourage the CAB to share community concerns with MCSO. We also will continue to encourage COrD or other MCSO personnel who hear *Melendres*-related concerns from the community at the CAB's meetings to share that information with the Monitor and MCSO leadership for investigation and/or action, as required by this Paragraph – and to more clearly convey to the community members who attend the CAB's meetings that the MCSO representatives intend to share their concerns and questions with the Sheriff and MCSO leadership.

WAI 72723

## Second Supplemental Permanent Injunction/Judgment Order

## Section 12: Misconduct Investigations, Discipline, and Grievances

**COURT ORDER XV.    MISCONDUCT INVESTIGATIONS, DISCIPLINE, AND GRIEVANCES**

*Paragraph 163.  The Sheriff will ensure that all allegations of employee misconduct, whether internally discovered or based on a civilian complaint, are fully, fairly, and efficiently investigated; that all investigative findings are supported by the appropriate standard of proof and documented in writing; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair, consistent, unbiased and provides due process.  To achieve these outcomes, the Sheriff shall implement the requirements set out below.*

### A. Policies Regarding Misconduct Investigations, Discipline, and Grievances

*Paragraph 165.  Within one month of the entry of this Order, the Sheriff shall conduct a comprehensive review of all policies, procedures, manuals, and other written directives related to misconduct investigations, employee discipline, and grievances, and shall provide to the Monitor and Plaintiffs new policies and procedures or revise existing policies and procedures. The new or revised policies and procedures that shall be provided shall incorporate all of the requirements of this Order.  If there are any provisions as to which the parties do not agree, they will expeditiously confer and attempt to resolve their disagreements.  To the extent that the parties cannot agree on any proposed revisions, those matters shall be submitted to the Court for resolution within three months of the date of the entry of this Order.  Any party who delays the approval by insisting on provisions that are contrary to this Order is subject to sanction.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

MCSO provided us with the following:

- CP-2 (Code of Conduct), most recently amended on February 14, 2023.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on December 16, 2021.

- CP-5 (Truthfulness), most recently amended on November 17, 2022.

- CP-8 (Preventing Racial and Other Bias-Based Profiling), most recently amended on October 13, 2022.

- CP-11 (Anti-Retaliation), most recently amended on January 6, 2022.

- EA-2 (Patrol Vehicles), most recently revised on March 16, 2022.

- GA-1 (Development of Written Orders), most recently amended on November 9, 2023.

WAI 72724

- GB-2 (Command Responsibility), most recently amended on December 5, 2023.

- GC-4 (Employee Performance Appraisals), most recently amended on April 13, 2023.

- GC-4 (S) (Employee Performance Management), most recently amended on April 13, 2023.

- GC-7 (Transfer of Personnel), most recently amended on June 15, 2023.

- GC-11 (Employee Probationary Periods and Unclassified Employees), most recently amended on November 30, 2023.

- GC-12 (Hiring and Promotional Procedures), most recently amended on November 17, 2022.

- GC-16 (Employee Grievance Procedures), most recently amended on November 14, 2023.

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 15, 2023.

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on October 26, 2023.

- GE-4 (Use, Assignment, and Operation of Vehicles), most recently amended on June 20, 2023.

- GG-1 (Peace Officer Training Administration), most recently amended on October 26, 2023.

- GG-2 (Detention/Civilian Training Administration), most recently amended on October 26, 2023.

- GH-2 (Internal Investigations), most recently amended on November 14, 2023.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

- GH-5 (Early Identification System), most recently amended on March 28, 2023.

- GI-5 (Voiance Language Services), most recently amended on October 31, 2023.

- GJ-24 (Community Relations and Youth Programs), most recently revised on November 9, 2023.

- GJ-26 (Sheriff's Reserve Deputy Program), most recently amended on March 16, 2023.

- GJ-27 (Sheriff's Posse Program), most recently amended on May 19, 2023.

- GJ-35 (Body-Worn Cameras), most recently amended on May 19, 2023.

- Administrative Services Division Operations Manual, most recently amended on November 14, 2023.

- Audits and Inspections Unit Operations Manual, currently under revision.

- Body-Worn Camera Operations Manual, published on December 22, 2016.

WAI 72725

- Professional Standards Bureau Operations Manual, published on December 13, 2018.

- Training Division Operations Manual, most recently amended on April 4, 2022.

This Paragraph implies that the review process and final adoption of the updated policies would take two months to complete, assuming that the new or revised policies were provided within one month of the issuance of the Second Order.  This is due, in some measure, to researched and well-considered recommendations by the Parties; and robust discussion about policy language, application, and outcomes during our site visit meetings.

We received a majority of the documents listed above within one month of the entry of the Order.  We and the Parties conducted initial reviews and returned the revised documents, with additional recommendations, to MCSO for additional work.  MCSO continues provide us and the Parties with any new and revised policies for review and recommendations.  MCSO remains in compliance with this Paragraph.

**Paragraph 166.**  *Such policies shall apply to all misconduct investigations of MCSO personnel.*

**Paragraph 167.**  *The policies shall include the following provisions:*

a.   *Conflicts of interest in internal affairs investigations or in those assigned by the MCSO to hold hearings and make disciplinary decisions shall be prohibited.  This provision requires the following:*

  i.   *No employee who was involved in an incident shall be involved in or review a misconduct investigation arising out of the incident.*

  ii.   *No employee who has an external business relationship or close personal relationship with a principal or witness in a misconduct investigation may investigate the misconduct.  No such person may make any disciplinary decisions with respect to the misconduct including the determination of any grievance or appeal arising from any discipline.*

  iii.   *No employee shall be involved in an investigation, whether criminal or administrative, or make any disciplinary decisions with respect to any persons who are superior in rank and in their chain of command.  Thus, investigations of the Chief Deputy's conduct, whether civil or criminal, must be referred to an outside authority.  Any outside authority retained by the MCSO must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest.*

b.   *If an internal affairs investigator or a commander who is responsible for making disciplinary findings or determining discipline has knowledge of a conflict of interest affecting his or her involvement, he or she should immediately inform the Commander of the Professional Standards Bureau or, if the holder of that office also suffers from a conflict, the highest-ranking, non-conflicted chief-level officer at MCSO or, if there is no*

WAI 72726

*non-conflicted chief-level officer at MCSO, an outside authority.  Any outside authority retained by the MCSO must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest.*

c.   *Investigations into an employee's alleged untruthfulness can be initiated by the Commander of the Professional Standards Bureau or the Chief Deputy.  All decisions not to investigate alleged untruthfulness must be documented in writing.*

d.   *Any MCSO employee who observes or becomes aware of any act of misconduct by another employee shall, as soon as practicable, report the incident to a Supervisor or directly to the Professional Standards Bureau.  During any period in which a Monitor is appointed to oversee any operations of the MCSO, any employee may, without retaliation, report acts of alleged misconduct directly to the Monitor.*

e.   *Where an act of misconduct is reported to a Supervisor, the Supervisor shall immediately document and report the information to the Professional Standards Bureau.*

f.   *Failure to report an act of misconduct shall be considered misconduct and may result in disciplinary or corrective action, up to and including termination.  The presumptive discipline for a failure to report such allegations may be commensurate with the presumptive discipline for the underlying misconduct.*

g.   *No MCSO employee with a rank lower than Sergeant will conduct an investigation at the District level.*

**In Full and Effective Compliance**

To determine Phase 2 compliance with this Paragraph, we review administrative misconduct investigations.

During this reporting period, we reviewed 134 closed administrative misconduct investigations.  Sworn, Detention, or civilian personnel assigned to PSB conducted 96 of the investigations we reviewed.  PSB outsourced 16 of the investigations to outside vendors.  Sworn supervisors in Districts or Divisions outside of PSB conducted the remaining 22.

Paragraph 167.a.i-iii. prohibits any employee with any conflicts of interest from participating in, holding hearings on, or making any disciplinary decisions in a misconduct investigation.  During this reporting period, there were no instances where a potential conflict of interest was identified and the investigations were outsourced to an outside vendor.

Paragraph 167.b. requires that if the internal affairs investigator or a commander responsible for making disciplinary decisions identifies a conflict of interest, appropriate notifications must be made immediately.  There were no instances during this reporting period where a supervisor failed to identify a conflict of interest and inappropriately conducted an investigation.

Paragraph 167.c. requires that investigations into truthfulness be initiated by the Chief Deputy or the PSB Commander.  MCSO identified four instances during this reporting period where PSB believed that a truthfulness allegation was appropriate and conducted the proper investigation.

WAI 72727

We did not identify any investigations during this reporting period where we believe that MCSO should have initiated an investigation into truthfulness – and failed to do so.

Paragraph 167.d. requires that any MCSO employee who observes or becomes aware of misconduct by another employee shall immediately report such conduct to a supervisor or directly to PSB. Per the requirement, during the period in which the Monitor has authority to oversee any operations of MCSO, any employee may also report alleged misconduct to the Monitor. Of the 134 administrative cases we reviewed for this reporting period, there were 29 investigations where an employee reported potential misconduct by another employee, or a supervisor identified potential employee misconduct. We identified two instances where a supervisor failed to identify and report potential misconduct as required. PSB took appropriate action. There were three complaints sent directly to our Team. These were forwarded to MCSO and investigated as required.

Paragraph 167.e. requires that when supervisors learn of an act of misconduct, the supervisor shall immediately document and report the information to PSB. We identified two instances where a supervisor failed to document and report potential misconduct as required. PSB took appropriate action.

Paragraph 167.f. provides for the potential for a disciplinary sanction or other corrective action if an employee fails to bring forth an act of misconduct. We identified two instances where a supervisor failed to bring forward misconduct as required and appropriate actions were taken by PSB.

Paragraph 167.g. requires that a sergeant or higher-ranking employee conduct all misconduct investigations conducted at the District level. All District-level cases that we reviewed for this reporting period complied with this requirement.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.


***Paragraph 168.*** *All forms of reprisal, discouragement, intimidation, coercion, or adverse action against any person, civilian, or employee because that person reports misconduct, attempts to make or makes a misconduct complaint in good faith, or cooperates with an investigation of misconduct constitute retaliation and are strictly prohibited. This also includes reports of misconduct made directly to the Monitor, during any period in which a Monitor is appointed to oversee any operations of the MCSO.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we reviewed 134 administrative misconduct investigations that were completed during this reporting period.

There was one investigation where allegations applicable to compliance with this Paragraph were made. This investigation had sustained findings. The involved employee resigned prior to the completion of the investigation. We agree with the findings in this investigation.

WAI 72728

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 169.** *Retaliating against any person who reports or investigates alleged misconduct shall be considered a serious offense and shall result in discipline, up to and including termination.*

### In Full and Effective Compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 134 administrative misconduct investigations that were completed during this reporting period.

There was one investigation where allegations applicable to compliance with this Paragraph were made. This investigation had sustained findings. The involved employee resigned prior to the completion of the investigation. We agree with the findings in this investigation.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 170.** *The Sheriff shall investigate all complaints and allegations of misconduct, including third-party and anonymous complaints and allegations. Employees as well as civilians shall be permitted to make misconduct allegations anonymously.*

### In Full and Effective Compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 134 administrative misconduct investigations during this reporting period. Thirty-two were initiated as a result of internal complaints, and 102 were externally generated. We also reviewed nine criminal investigations conducted by MCSO. Six were initiated as a result of an external complaint, and three were internally generated.

Of the 134 administrative misconduct investigations we reviewed for this reporting period, 10 involved anonymous complaints. Eighteen others were complaints from identified third-party complainants. We have not become aware of any evidence indicating that MCSO refused to accept and complete any investigations initiated by third-party or anonymous complainants. None of the 134 administrative misconduct investigations we reviewed during this reporting period included any allegations indicating that any third-party or anonymous complaint was not appropriately accepted and investigated.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 72729

*Paragraph 171.  The MCSO will not terminate an administrative investigation solely on the basis that the complainant seeks to withdraw the complaint, or is unavailable, unwilling, or unable to cooperate with an investigation, or because the principal resigns or retires to avoid discipline. The MCSO will continue the investigation and reach a finding, where possible, based on the evidence and investigatory procedures and techniques available.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we reviewed 134 administrative misconduct investigations during this reporting period.

We determined that 24 of the 134 completed administrative investigations we reviewed involved complainants who sought to withdraw their complaints; or were unavailable, unwilling, or unable to cooperate.  MCSO completed all 24 investigations and reached a finding as required.  We also found that in 43 of the 134 investigations, one or more of the principals left MCSO employment prior to the finalization of the investigation or discipline process.  MCSO completed all of these investigations and reached a finding as required.  Thirty of these 43 investigations resulted in a sustained finding for one or more employees.  The remaining 13 did not result in any sustained findings for any employee.  None of the 134 investigations we evaluated for compliance were prematurely terminated.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

*Paragraph 172.  Employees are required to provide all relevant evidence and information in their custody and control to internal affairs investigators.  Intentionally withholding evidence or information from an internal affairs investigator shall result in discipline.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph during this reporting period, we reviewed 134 completed administrative misconduct investigations.  There were two investigations where PSB identified that an employee had failed to accurately provide all information or evidence required during the investigation.  In both, PSB initiated truthfulness investigations, the allegations were sustained, and the employees were dismissed from MCSO employment.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

*Paragraph 173.  Any employee who is named as a principal in an ongoing investigation of serious misconduct shall be presumptively ineligible for hire or promotion during the pendency of the investigation.  The Sheriff and/or the MCSO shall provide a written justification for hiring or promoting an employee or applicant who is a principal in an ongoing investigation of serious misconduct.  This written justification shall be included in the employee's employment file and, during the period that the MCSO is subject to Monitor oversight, provided to the Monitor.*

**Phase 1:**  In compliance

WAI 72730

- GC-4 (Employee Performance Appraisals), most recently amended on April 13, 2023.

- GC-4 (S) (Employee Performance Management), most recently amended on April 13, 2023.

- GC-11 (Employee Probationary Periods and Unclassified Employees), most recently amended on November 30, 2023.

- GC-12 (Hiring and Promotional Procedures), most recently amended on November 17, 2022.

**Phase 2:**  In compliance

MCSO has established a protocol to address the requirements of this Paragraph.  When a promotion list is established for sworn or Detention personnel, a copy of the list is forwarded to the Professional Standards Bureau (PSB).  Before any promotion is finalized, PSB conducts a check of each employee's disciplinary profile in the automated system (IAPro).  As part of the promotional process, members of MCSO's command staff meet to discuss each employee's qualifications.  During this meeting, the results of the IAPro checks are provided to the staff for review and consideration.  The PSB Commander generally attends the promotion meetings for both Detention and sworn personnel, and clarifies any questions regarding the disciplinary history that the staff may have.  When an employee is moved from a civilian employment position to a sworn employment position, MCSO conducts a thorough background investigation.  The process involves a review and update of the candidate's PSB files, which is completed by Pre-Employment Services.  For Detention employees who are moving to sworn positions, the information in the employee's file is updated to include any revised or new information.  Due to the scheduling of our site visits, we inspect personnel files for employees who were promoted during the last month of the preceding quarter, and the first two months of the current reporting period.  In our reviews, we ensure that the documentation, as it pertains to compliance with this Paragraph, is included in personnel files.

MCSO reported a total of 16 promotions during this review period.  There was one sworn promotion, and 15 civilian promotions.   For the sworn promotion, MCSO provided documentation for the promotion of one Deputy Chief.  We reviewed the documentation provided and noted no issues of concern.  We reviewed the documentation provided for the civilian promotions.  Thirteen of the civilian employees did not have any entries in their disciplinary histories.   One employee promoted to Sheriff's Information Management Services (SIMS) supervisor had one open minor misconduct investigation.  The documentation indicated that the PSB commander stated that if sustained, the allegations would not result in serious discipline.

We had concerns with the promotion of another SIMS supervisor who had five open misconduct investigations, four of which had to do with the late release of inmates and one allegation was a rudeness complaint.  Two of the open allegations are from 2023, one open allegation is from 2020, and two of the open allegations are from 2019.  This same individual had one sustained allegation for a policy violation related to the late release of an inmate in 2017.  Although this Paragraph only requires a justification if the employee has a serious open misconduct investigation, this employee has a pattern of open misconduct allegations that is troublesome.  We

WAI 72731

have previously expressed our concerns with the promotions of employees with open misconduct investigations in the second and fourth quarters of 2022, the third quarter of 2021, the second and fourth quarters of 2018, and we issued a noncompliance warning in the second quarter of 2020. MCSO asserted Full and Effective Compliance with this Paragraph in its 36th quarterly report. We did not concur based on our previous findings, and we continue to have concerns with some of MCSO's promotions.

MCSO reported hiring 26 employees during the third quarter, of which eight were sworn, seven were Detention, and 11 were civilian. Four of the Detention employees were rehires. Nine of the civilian employees were rehires. One civilian who was previously a Detention officer had one open misconduct investigation. The documentation submitted indicates that the PSB commander stated that the open misconduct investigation would not lead to serious discipline, if sustained. We inquired with the PSB commander and were advised that if the open allegation was sustained, the employee would face minor discipline. A second former Detention employee who was rehired as a civilian had two open misconduct investigations. No additional information was provided so we inquired from the PSB commander as to the seriousness of the pending allegations. The PSB Commander informed us that if sustained, the allegations on the second employee would not result in serious discipline.

During our October site visit, we randomly selected and reviewed 45 files of promoted employees and five files of employees who had been transferred into PSB, CID, and BIO between January 2020-June 2023. The list for selected promoted employees included 15 sworn, 15 Detention, and 15 civilian employees. We reviewed the personnel files of all 50 selected employees to ensure that the information submitted, pursuant to the requirements of this Paragraph, was included in each of the employee files. Our reviews indicated that each employee file contained the required information. All 50 personnel files were in compliance.

**Paragraph 174.** *Employees' and applicants' disciplinary history shall be considered in all hiring, promotion, and transfer decisions, and this consideration shall be documented. Employees and applicants whose disciplinary history demonstrates multiple sustained allegations of misconduct, or one sustained allegation of a Category 6 or Category 7 offense from MCSO's disciplinary matrices, shall be presumptively ineligible for hire or promotion. MCSO shall provide a written justification for hiring or promoting an employee or applicant who has a history demonstrating multiple sustained allegations of misconduct or a sustained Category 6 or Category 7 offense. This written justification shall be included in the employee's employment file and, during the period that the MCSO is subject to Monitor oversight, provided to the Monitor.*

**In Full and Effective Compliance**

For employees who are promoted, the documentation submitted by MCSO generally includes the disciplinary history for the previous 10 years and any applicable disciplinary actions. MCSO also provides the disciplinary history of Detention and civilian employees who have been upgraded in classification to sworn status.

WAI 72732

For the third quarter of 2023, MCSO reported hiring 26 new employees. The new hires consisted of eight sworn employees, seven Detention employees, and 11 civilian employees. Of the seven Detention employees, four were rehires, and all of the 11 civilian employees were rehires. We reviewed the documentation provided for all the new employees. Two of the new 26 employees had open misconduct investigations; these are discussed in our reviews of Paragraph 173. Twenty-three of the remaining 24 employees had no record of discipline. One promoted employee had five open misconduct investigations. (This promotion is discussed in Paragraph 173.)

On June 17, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 175.** *As soon as practicable, commanders shall review the disciplinary history of all employees who are transferred to their command.*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on March 28, 2023.
- GC-7 (Transfer of Personnel), most recently amended on October 29, 2021.

**Phase 2:** In compliance

Per policy, MCSO is to conduct an EIS review within 14 days of an affected employee's transfer. We requested a list of employees that were transferred during this reporting period. From the list, we selected a sample of employees to review and verify that there was documentation of the required EIS reviews. To verify compliance with this Paragraph, we review the transfer request documents that MCSO completes for each employee. The documents memorialize the commander's acknowledgment of review of the transferred employee's disciplinary history, as well as the review of the employee's performance appraisals for the previous five years. This review is generally conducted before the gaining commander accepts the transfer, a few days prior to the transfer becoming effective.

For July, we requested a list of all employees who were transferred during the month. MCSO submitted a list, and we selected a sample of 25 employees who would fall under the requirements of this Paragraph. The list we requested was comprised of 24 Detention employees and one sworn employee. Of the 24 Detention employees requested, all had proper documentation of command review of their EIS profiles. The one sworn employee had proper documentation of command review of their EIS profile. For July, all 25 employee transfers were in compliance with timely command review of the employees' EIS profiles. For August, we requested documentation for all 23 employees who were transferred during the month. The list was comprised of 15 Detention employees, four sworn employees, and four civilian employees. We reviewed the documentation submitted for all the transfers. Of the 15 Detention employees requested, all had proper documentation of command review of their EIS profiles. Of the four sworn employees requested, three had proper documentation of command review of their EIS profiles. In one sworn transfer there was no date documented for the gaining commander's date of review; therefore, we could not determine if the EIS review was conducted during the required timeframe. Of the four civilian

WAI 72733

transfers reviewed, three had proper documentation of command review of their EIS profiles. In one civilian transfer there was no date documented for the gaining commander's date of review; therefore, we could not determine if the EIS review was conducted during the required timeframe. For August, 21 of the 23 transfers were in compliance with the requirements of this Paragraph. For September, we requested a list of all employees who were transferred during the month. From the list, we selected all 23 employees to review. This list was comprised of 19 Detention employees and four sworn employees. Eighteen of the 19 Detention employees had proper documentation of command review of their EIS profiles. There was no documentation of EIS reviews provided for one Detention transfer. Of the four sworn employees, three had proper documentation of command review of their EIS profiles. In one sworn transfer there was no date documented for the gaining commander's date of review; therefore, we could not determine if the EIS review was conducted during the required timeframe. For September, 21 of 23 employee transfers reviewed were in compliance.

For the third quarter of 2023, 67 of 71 employees transferred had proper documentation of timely command review of their EIS profiles. The compliance rate for the third quarter was 94.37%. For the period in review, MCSO was in compliance with the requirements of this Paragraph. We recommend that MCSO remind commanders to include the date of review in the signature line for "gaining commander's review."

**Paragraph 176.** *The quality of investigators' internal affairs investigations and Supervisors' reviews of investigations shall be taken into account in their performance evaluations.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on April 13, 2023.
- GC-4 (S) (Employee Performance Management), most recently amended on April 13, 2023.

**Phase 2:** In compliance

This Paragraph requires that employees who conduct misconduct investigations have an assessment on the quality of their investigations documented in their Employee Performance Appraisals. This Paragraph also requires that Commanders who review their subordinates' misconduct investigations be assessed on the quality of those reviews in their own EPAs. To assess compliance with this Paragraph, we look for specific comments by raters completing EPAs. In supervisor EPAs, we look for comments addressing the quality of investigations. In commanders' EPAs, we look for comments assessing the quality of reviews of investigations. In many instances, the employee being rated does not have any subordinates, or has not completed or reviewed any misconduct investigations. In these cases, we look for comments by the rater that indicate why the employee was not rated on this requirement.

WAI 72734

In addition, we review a list of all PSB memos indicating investigative deficiencies in misconduct investigations. If we find any deficiencies that correspond to the employee's evaluation period, we expect those to be identified in the employee's EPA. If we find documented deficiencies for the employee who is being evaluated, and the rater fails to note these deficiencies in the EPA, it will affect compliance with the requirements of this Paragraph.

We reviewed Employee Performance Appraisals for 27 supervisors and commanders who received EPAs during this reporting period. Twenty-six of the 27 supervisor EPAs that we reviewed for this quarter had assessments of the supervisors' quality of internal affairs investigations or the quality of their reviews of internal affairs investigations. For supervisors who did not conduct any internal affairs investigations or reviewed any internal affairs investigations during the appraisal period, this information was appropriately documented on their EPAs. There was one supervisor who had a deficiency memo issued by PSB, related to deficient misconduct investigations. This was for the same supervisor whose EPA we found noncompliant with the requirements of Paragraph 99. The EPA also failed to mention the deficiency memo. For this reporting period, 26 of the 27 supervisor EPAs reviewed were in compliance with the requirements of this Paragraph, for a 96.3% compliance rating.

**Paragraph 177.** *There shall be no procedure referred to as a "name-clearing hearing." All pre-disciplinary hearings shall be referred to as "pre-determination hearings," regardless of the employment status of the principal.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we reviewed 134 administrative misconduct investigations during this reporting period.

In misconduct investigations that resulted in serious discipline and in which the employee was afforded the opportunity for an administrative hearing, the only reference to the hearing was "pre-determination hearing."

On June 18, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

### B.   *Misconduct-Related Training*

**Paragraph 178.** *Within three months of the finalization of these policies consistent with ¶ 65of this Order, the Sheriff will have provided all Supervisors and all personnel assigned to the Professional Standards Bureau with 40 hours of comprehensive training on conducting employee misconduct investigations. This training shall be delivered by a person with subject matter expertise in misconduct investigation who shall be approved by the Monitor. This training will include instruction in:*

a.    *investigative skills, including proper interrogation and interview techniques, gathering and objectively analyzing evidence, and data and case management;*

WAI 72735

b.   the particular challenges of administrative law enforcement misconduct investigations, including identifying alleged misconduct that is not clearly stated in the complaint, or that becomes apparent during the investigation;

c.   properly weighing the credibility of civilian witnesses against employees;

d.   using objective evidence to resolve inconsistent statements;

e.   the proper application of the appropriate standard of proof;

f.   report-writing skills;

g.   requirements related to the confidentiality of witnesses and/or complainants;

h.   considerations in handling anonymous complaints;

i.   relevant MCSO rules and policies, including protocols related to administrative investigations of alleged officer misconduct; and

j.   relevant state and federal law, including Garrity v. New Jersey, and the requirements of this Court's orders.

**In Full and Effective Compliance**

MCSO supplied the PSB40 curriculum to all personnel assigned to PSB and District supervisors when it was first developed.  Subsequently, all promotional candidates receive this curriculum in the Supervisors' Program prior to or shortly after their promotion.

MCSO delivered the 2020 PSB40 curriculum twice during this reporting period to 32 personnel (10 sworn, 16 Detention, six civilian).  No personnel needed test remediation.

This course is reserved for delivery on an as-needed basis to new sergeants and newly hired civilian investigators.

The PSB40 requires revision for consistency with the requirements of Third Order Paragraphs 348 and 353.  On October 12, 2023, the Court reissued GH-2 (Internal Investigations), the PSB Operations Manual, and an attachment to GC-17 (Employee Disciplinary Procedures), to meet these new provisions.  Following this, during our October site visit, we discussed the misconduct investigations foundation that the PSB40 curriculum provides for all new supervisors.  MCSO continues to plan for the revisions to this curriculum to be secondary to the development of the PSB8 Internal and External, which has begun development.  All PSB curriculums are under review for updates to mirror the policy and procedure changes, and investigatory processes as directed by the Third Order.

On June 17, 2022, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.  Despite this finding, we warn MCSO that the agency's continued neglect to update this curriculum with current, relevant concerns we have raised through our review of cases may result in a noncompliant finding in the near future.

WAI 72736

*Paragraph 179.  All Supervisors and all personnel assigned to the Professional Standards Bureau also will receive eight hours of in-service training annually related to conducting misconduct investigations.  This training shall be delivered by a person with subject matter expertise in misconduct investigation who shall be approved by the Monitor.*

**In Full and Effective Compliance**

MCSO supplies the PSB8 External curriculum, which consists of eight hours of annual in-service training, to District supervisors.  Additionally, MCSO supplies the PSB8 Internal curriculum, which consists of eight hours of annual in-service training, to PSB personnel.  External vendors commonly deliver this.  When an external vendor cannot be obtained for any reason, PSB personnel must attend the PSB8 External classroom training.

MCSO did not deliver the PSB8 Internal or the PSB8 External during this reporting period.

At the request of MCSO, just prior to our site visit, we participated in a conference call to discuss compliance concerns with the timely delivery of the PSB8 Internal and External.  MCSO advised us that under regular conditions, the PSB curriculums would have been approved for delivery during the third reporting period, with delivery completed during the fourth reporting period.  Because the Paragraph 348 and 353 policies were not approved until October 2023, MCSO was concerned with the timing of these deliveries and any potential adverse effect on our determination of Full and Effective Compliance for this Paragraph.  To address this concern, MCSO proposed to schedule curriculum updates to occur prior to the end of 2023, and 2023 deliveries to occur during the first quarter of 2024.  The normal return to late quarter deliveries would return for the 2024 requirements.  MCSO cited concerns with the incorporation of extensive changes and a possible need to request technical assistance from the Monitoring Team to complete revisions.  We did not disagree with this assessment, but alerted MCSO that this discussion should occur during our October site visit and involve the Parties, as well.

During our October site visit, we discussed the approval of Third Order policies and the required updates to all PSB training.  MCSO presented its proposal for the training extension.  The Parties recognized the timing concerns presented by MCSO, and did not object to the extension, provided the 2023 training is conducted during the first quarter of 2024.

MCSO intends to deliver a combined PSB8 Internal and External curriculum and is currently developing this training.

On June 17, 2022, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

WAI 72737

*Paragraph 180. Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all employees on MCSO's new or revised policies related to misconduct investigations, discipline, and grievances. This training shall include instruction on identifying and reporting misconduct, the consequences for failing to report misconduct, and the consequences for retaliating against a person for reporting misconduct or participating in a misconduct investigation.*

**In Full and Effective Compliance**

MCSO distributes new or annually revised policies via the HUB, an electronic training management system. This training includes updates to all policies related to misconduct investigations, discipline, and grievances. Each distribution requires all employees to complete personal attestations to indicate that they have read and understand the policy requirements.

To assess compliance with this Paragraph, we review the HUB generated reports of attestations that identify each individual and their dates of review. Compliance assessments for this Paragraph are based on the review of attestations for the following policies: CP-2 (Code of Conduct); CP-3 (Workplace Professionalism: Discrimination and Harassment); CP-11 (Anti-Retaliation); GB-2 (Command Responsibility); GH-2 (Internal Investigations); GC-16 (Employee Grievance Procedures); and GC-17 (Employee Disciplinary Procedures).

During this reporting period, we reviewed the status of individual reviews for Briefing Board (BB) 23-04 (CP-2), BB 21-70 (CP-3), BB 22-01 (CP-11), BB 23-12 (GB-2), BB 22-56 (GH-2), BB 21-66 (GC-16), and BB 22-58 (GC-17). All employee categories remain in compliance.

On June 17, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.


*Paragraph 181. Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all employees, including dispatchers, to properly handle civilian complaint intake, including how to provide complaint materials and information, and the consequences for failing to take complaints.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 15, 2023.

- GH-2 (Internal Investigations), most recently amended on November 14, 2023.

- GG-1 (Peace Officer Training Administration), most recently amended on October 26, 2023.

- GG-2 (Detention/Civilian Training Administration), most recently amended on October 26, 2023.

- Training Division Operations Manual, most recently amended on April 4, 2022.

WAI 72738

**Phase 2:**  In compliance

On January 11, 2023, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we did not concur with this assertion.

MCSO currently delivers the 2021 Complaint Intake and Reception Training via the HUB to all new hires in all personnel categories.  This first training provides important guidance when interacting with members of the public who wish to file a complaint against MCSO personnel.  We discussed this curriculum during our April site visit.  The 2021 Complaint Intake and Reception curriculum previously received annual review.  All employee classes are still in compliance.

***Paragraph 182.***  *Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all Supervisors on their obligations when called to a scene by a subordinate to accept a civilian complaint about that subordinate's conduct and on their obligations when they are phoned or emailed directly by a civilian filing a complaint against one of their subordinates.*

**In Full and Effective Compliance**

This Paragraph requires that all supervisors receive training on their obligations when responding to a scene by a subordinate to accept a civilian complaint, or when they receive a complaint by telephone or email.  All existing and new supervisors receive this first training content within the Misconduct Investigative Training (PSB40) and the Complaint Reception and Processing training; and it is covered in subsequent annual Supervisors' Responsibilities: Effective Law Enforcement (SRELE) and Annual Combined Training (ACT) programs.  All active supervisors receive this training at least once; and in most cases, more than once.

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

***C.***     ***Administrative Investigation Review***

***Paragraph 183.***  *The Sheriff and the MCSO will conduct objective, comprehensive, and timely administrative investigations of all allegations of employee misconduct.  The Sheriff shall put in place and follow the policies set forth below with respect to administrative investigations.*

WAI 72739

**Paragraph 184.**  *All findings will be based on the appropriate standard of proof.  These standards will be clearly delineated in policies, training, and procedures, and accompanied by detailed examples to ensure proper application by internal affairs investigators.*

**In Full and Effective Compliance**

To determine Phase 2 compliance with this Paragraph, we reviewed 134 administrative misconduct investigations during this reporting period.

Of the 134 cases we reviewed, 132 (99%) complied with the requirements of this Paragraph.  In one, we believe findings of sustained should have been made and were not.  In another, we do not believe there was adequate evidence to unfound the allegation and it should have been sustained.  As is our practice, we will discuss these cases with MCSO during our next site visit.

On June 18, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

**Paragraph 185.**  *Upon receipt of any allegation of misconduct, whether internally discovered or based upon a civilian complaint, employees shall immediately notify the Professional Standards Bureau.*

**In Full and Effective Compliance**

To determine Phase 2 compliance with this Paragraph, we reviewed 134 administrative misconduct investigations during this reporting period.  There were two instance where PSB was not appropriately notified at the time of complaint as required.  PSB took appropriate action.  We also reviewed nine criminal misconduct investigations conducted by MCSO.  PSB was appropriately notified in all of these investigations.

On June 18, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

**Paragraph 186.**  *Effective immediately, the Professional Standards Bureau shall maintain a centralized electronic numbering and tracking system for all allegations of misconduct, whether internally discovered or based upon a civilian complaint.  Upon being notified of any allegation of misconduct, the Professional Standards Bureau will promptly assign a unique identifier to the incident.  If the allegation was made through a civilian complaint, the unique identifier will be provided to the complainant at the time the complaint is made.  The Professional Standards Bureau's centralized numbering and tracking system will maintain accurate and reliable data regarding the number, nature, and status of all misconduct allegations, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status, if requested, and final disposition of the complaint.  The system will be used to determine the status of misconduct investigations, as well as for periodic assessment of compliance with relevant policies and procedures and this Order, including requirements of timeliness of investigations.  The system also will be used to monitor and maintain appropriate caseloads for internal affairs investigators.*

WAI 72740

**In Full and Effective Compliance**

During numerous site visits, we have met with PSB personnel to discuss and observe the capabilities of IAPro, which serves as the technology instrument that meets the compliance criteria of this Paragraph.  IAPro logs critical dates and times, alerts regarding timeframes and deadlines, chronological misconduct investigation status, notifications, and dispositions.  The tracking system provides estimates of key timeframes for all investigators to ensure that they learn of previous and upcoming investigative milestones.  PSB has confirmed that civil notice claims are entered in the tracking system.  The IAPro system integrates exceptionally well with the EIS and BlueTeam technology systems and can be remotely accessed.

PSB has a management analyst dedicated to the administration of the centralized tracking system.  The documentation that PSB has provided to us for review, and the direct user access that a member of our Team has to the centralized numbering and tracking system, indicates that the system possesses the functionality as required by this Paragraph and is being used according to the requirements of this Paragraph.

During this reporting period, we found that all 134 administrative misconduct investigations we reviewed were properly assigned a unique identifier.  Of the 134, 102 involved an external complaint requiring that PSB provide the complainant with this unique identifier.  In all of these 102 cases, PSB sent an initial letter to the complainant providing the case number or provided an acceptable reason for not doing so.  In some cases, anonymous complainants do not provide contact information; and in others, known complainants decline to provide MCSO with adequate contact information.  PSB has developed a form that identifies the reason why a required notification letter is not sent and includes this document in the cases it forwards for our review.

On June 18, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.


***Paragraph 187.***  *The Professional Standards Bureau shall maintain a complete file of all documents within the MCSO's custody and control relating to any investigations and related disciplinary proceedings, including pre-determination hearings, grievance proceedings, and appeals to the Maricopa County Law Enforcement Merit System Council or a state court.*

**In Full and Effective Compliance**

To determine compliance with this Paragraph, we have verified that PSB maintains both hardcopy and electronic files intended to contain all the documents required for compliance with this Paragraph.

During our site visits, a member of our Team inspects the file rooms where hardcopies of investigations are stored and randomly reviewed case files to verify compliance.  We have verified that criminal and administrative investigation files are stored in separate rooms, and access to these rooms is restricted.  Our Team member has also used the access granted to IAPro to randomly select internal affairs case files to verify that all information is being maintained electronically.

WAI 72741

In May 2018, PSB relocated to its new offsite facility.  We confirmed at that time that PSB maintained both hardcopy and electronic files intended to contain all documents required for compliance with this Paragraph at the new facility.

During our January 2019 site visit, a member of our Team verified continued compliance at the PSB facility by inspecting both the criminal and administrative investigation file rooms and randomly selecting internal affairs case files to verify that all information was also being electronically maintained in IAPro.

During our October 2019 site visit, a member of our Team verified continued compliance at the PSB facility by inspecting both the criminal and administrative investigation file rooms.  We also randomly reviewed both electronic and hard-copy documents to ensure that all information was being maintained as required for compliance with this Paragraph.

During our October 2023 site visit, members of our Team inspected the file rooms where hardcopies of investigations are stored and randomly reviewed case files to verify compliance.  We verified that criminal and administrative investigation files are stored in separate rooms, and access to these rooms is restricted.  Our Team members also used the access granted to IAPro to randomly select internal affairs case files to verify that all information is being maintained electronically.

On June 18, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

**Paragraph 188.**  *Upon being notified of any allegation of misconduct, the Professional Standards Bureau will make an initial determination of the category of the alleged offense, to be used for the purposes of assigning the administrative investigation to an investigator.  After initially categorizing the allegation, the Professional Standards Bureau will promptly assign an internal affairs investigator.*

### In Full and Effective Compliance

To assess Phase 2 compliance with this Paragraph, we review administrative misconduct investigations, Service Complaints, and PSB Diversions.

We previously concurred with MCSO that Phase 2 compliance with this Paragraph would be based on PSB's determination of the initial allegations, and not which category of offense was determined once the investigation is completed.

During this reporting period, we reviewed 134 administrative misconduct investigations.  All 134 complied with the requirements of this Paragraph.  Thirty-two were internally generated and 102 were externally generated.

WAI 72742

We reviewed 98 Service Complaints during this reporting period.  Ninety-six were externally generated and two were internally generated.  In all of the 98, PSB made the appropriate decision regarding categorizing the complaint.  Nine (9%) were appropriately reclassified to administrative misconduct investigations either by the initiating District or Division, or after the complaints were reviewed by PSB.  In the other 89 complaints, we agree with PSB's determination to address them as Service Complaints; and found them in 100% compliance with the requirements established in the Service Complaint process.

As we have consistently noted in our review of Service Complaints, the majority of these complaints involve laws, policies, or procedures where there is no employee misconduct; or are complaints where it is determined that MCSO employees are not involved.  During this reporting period, 50 (56%) of the 89 closed Service Complaints did not involve misconduct.  Thirty (34%) did not involve MCSO employees, and nine (10%) were closed due to lack of specificity.

In July 2019, we and the Parties approved MCSO's proposal to use an expedited process to handle Service Complaints where it could be immediately determined that the complaint did not involve MCSO personnel, and the Service Complaint form was revised.  PSB also added a signature line to this revised form requiring District and Division Command personnel to review and approve Service Complaints completed by their personnel prior to them being forwarded to PSB for a final review.

Consistent with the provisions of policies on internal investigations and discipline, the PSB Commander has had the discretion to determine if internal complaints alleging minor policy violations could be addressed through the use of a coaching without a formal investigation if certain criteria existed.  If the PSB Commander makes this determination, it must be documented.

In May 2021, revisions to GH-2 (Internal Investigations) modified the authority of the PSB Commander as it relates to internal complaints that meet certain criteria.  The revised policy allows the PSB Commander to address qualifying internal complaints through the use of an approved supervisor-initiated intervention and is no longer limited to only coaching.  This is now referred to as the PSB Diversion process.

During the last reporting period, the PSB Commander used his discretion to determine that one internally generated complaint was eligible for the PSB Diversion process.  We agreed with his decision.

During this reporting period, we reviewed two instances where the PSB Commander determined that an internal complaint could be handled with an approved Diversion.  We found both Diversions to be in compliance.

Compliance with this Paragraph was based on our findings for administrative misconduct investigations (134), Service Complaints (98), and PSB Diversions (2) and was 100%.

On June 18, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

WAI 72743

**Paragraph 189.** *The Professional Standards Bureau shall administratively investigate:*

a.  *misconduct allegations of a serious nature, including any allegation that may result in suspension, demotion, or termination; and*

b.  *misconduct indicating apparent criminal conduct by an employee.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph during this reporting period, we reviewed 134 completed administrative misconduct investigations conducted by MCSO personnel.

Division or District personnel outside of PSB investigated 22 of the 134 administrative misconduct investigations we reviewed during this reporting period. PSB investigators conducted 96 of the investigations, and 16 were outsourced to an outside investigator. PSB also submitted nine criminal investigations for review. We did not identify any misconduct investigations that a District supervisor conducted where we believe that potential additional misconduct discovered during the initial investigation should have resulted in the investigation being forwarded to PSB for completion and was not.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 190.** *Allegations of employee misconduct that are of a minor nature may be administratively investigated by a trained and qualified Supervisor in the employee's District.*

**In Full and Effective Compliance**

To determine Phase 2 compliance with this Paragraph, we reviewed a total of 143 employee misconduct investigations during this reporting period. Of these, 134 were administrative investigations, and nine were criminal investigations. All nine of the criminal investigations were conducted by PSB.

Of the 134 administrative misconduct cases we reviewed for this Paragraph, PSB investigators conducted 96. PSB outsourced 16, and 22 were investigated at the District or Division level. We did not identify any instances where a District or Division supervisor conducted any investigation that should have been conducted by PSB.

MCSO has complied with the requirements to train all supervisors who conduct minor misconduct investigations.

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 72744

**Paragraph 191.** *If at any point during a misconduct investigation an investigating Supervisor outside of the Professional Standards Bureau believes that the principal may have committed misconduct of a serious or criminal nature, he or she shall immediately notify the Professional Standards Bureau, which shall take over the investigation.*

**In Full and Effective Compliance**

To determine Phase 2 compliance with this Paragraph, we reviewed 134 administrative misconduct investigations during this reporting period. Of the 22 administrative misconduct cases investigated at the District or Division level, we did not identify any cases where we believe that potential serious misconduct was discovered by the investigating supervisor and the supervisor failed to forward the case to PSB.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 192.** *The Professional Standards Bureau shall review, at least semi-annually, all investigations assigned outside the Bureau to determine, among the other matters set forth in ¶ 251 below, whether the investigation is properly categorized, whether the investigation is being properly conducted, and whether appropriate findings have been reached.*

**In Full and Effective Compliance**

PSB command personnel advised us that they continue to review investigations in "real time" as they come into the Bureau. During this reporting period, MCSO continued to provide copies of PSB's reviews of completed Division-level misconduct investigations that were assigned outside of the Bureau. The review template used by PSB includes sections that address whether or not the investigation is properly categorized, whether the investigation is properly conducted, and whether appropriate findings have been reached. Additionally, copies of emails detailing the quality of the investigation, identified deficiencies, and required edits sent electronically to affected Division Commanders were provided for each case reviewed.

PSB included the information required by this Paragraph in its semi-annual public Misconduct Investigations Report, which is required under Paragraph 251. The reports have routinely contained an analysis as to whether cases assigned outside of PSB were properly categorized, whether the investigations were properly conducted, and whether appropriate findings have been reached.

In the past, MCSO has published the semi-annual report just over six months from the end of the semi-annual period; however, the June 30-December 31, 2021 report was published in August 2022, over seven months from the end of the semi-annual period. The report for the semi-annual period of January 1-June 30, 2022, was published in March 2023, over eight months after the conclusion of the semi-annual period. MCSO published the report for the period of July 1-December 31, 2022, in August 2023, over seven months from the end of the semi-annual period. We discussed the timeliness issue with MCSO during our July and October 2023 site visits. We informed MCSO that it must ensure that the reports are published in a consistent and timely manner going forward; otherwise, it will affect MCSO's compliance status with this requirement.

WAI 72745

During our October 2023 site visit, MCSO informed us that future reports will be published in a more efficient manner. MCSO informed us that the agency is processing information for the report on an ongoing basis, as opposed to waiting until the end of the semi-annual period. MCSO stated that it anticipates that future reports will be published within four to six months after the conclusion of the semi-annual period using this process.

The most recent semi-annual report, although not issued timely, contained an analysis as to whether cases assigned outside of PSB were properly categorized, whether the investigations were properly conducted, and whether appropriate findings have been reached. MCSO stated that the next semi-annual report is anticipated to be completed before the conclusion of the fourth quarter of 2023.

MCSO remains in compliance with this Paragraph for this reporting period. However, if MCSO's next semi-annual report is not published in a timely manner, it may adversely affect MCSO's Phase 2 compliance with this Paragraph.

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 193.** *When a single act of alleged misconduct would constitute multiple separate policy violations, all applicable policy violations shall be charged, but the most serious policy violation shall be used for determining the category of the offense. Exoneration on the most serious offense does not preclude discipline as to less serious offenses stemming from the same misconduct.*

### In Full and Effective Compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 134 administrative misconduct investigations during this reporting period. Sixty-five had sustained allegations against one or more employees. In 40 of these investigations, at least one principal employee was still an MCSO employee at the time the investigation was completed or discipline decisions were made. In all 40, the most serious policy violation was used to determine the final category of the offense for discipline purposes, if more than one policy violation was sustained.

In cases where multiple violations of policy occurred, this information was listed on the preliminary discipline document. There were no cases where the exoneration of any offense precluded discipline for any sustained allegations.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 72746

***Paragraph 194.*** *The Commander of the Professional Standards Bureau shall ensure that investigations comply with MCSO policy and all requirements of this Order, including those related to training, investigators' disciplinary backgrounds, and conflicts of interest.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on February 14, 2023.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on December 16, 2021.

- CP-5 (Truthfulness), most recently amended on November 17, 2022.

- CP-11 (Anti-Retaliation), most recently amended on January 6, 2022.

- GC-16 (Employee Grievance Procedures), most recently amended on November 14, 2023.

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 15, 2023.

- GH-2 (Internal Investigations), most recently amended on November 14, 2023.

- Administrative Services Division Operations Manual, most recently amended on November 14, 2023.

- Professional Standards Bureau Operations Manual, most recently amended on November 13, 2023.

**Phase 2:** Not in compliance

We determine Phase 2 compliance with this Paragraph by a review of completed misconduct investigations conducted by MCSO, the review of attendance by internal investigators at required Misconduct Investigative Training, the disciplinary backgrounds of internal investigators, and the efforts being made by the PSB Commander to reach compliance.

We reviewed 134 administrative misconduct investigations, five of which were critical incidents, and nine criminal investigations during this reporting period. All nine of the criminal investigations complied with MCSO policy and the requirements of the Second Order.

Administrative investigations are required to be completed within 60 days if completed outside of PSB and within 85 days if completed by PSB personnel. Of the 134 investigations reviewed for this reporting period, 34 (25%) were completed within the required timeframes, the same percentage as the last reporting period.

Of the 134 administrative misconduct cases we reviewed, PSB personnel completed 96. Twenty-six were conducted by sworn investigators. Fifty-seven were conducted by Detention investigators, and 13 were conducted by civilian investigators. We found deficiencies other than extensions in six (6%) of the total 96 investigations. With the inclusion of those investigations that were found noncompliant based on our review of extension requests, 22 (23%) of the 96 investigations conducted by PSB were in overall compliance – a slight increase from 22% in the last reporting period.

WAI 72747

We reviewed 16 investigations that PSB outsourced to an outside investigator.  Of these, only one (6%) was found noncompliant due to investigative concerns.  This is a slight increase in noncompliance from 5% during the last reporting period.  With the inclusion of those investigations found noncompliant due to timelines, six (38%) of the 16 cases were in overall compliance, a notable increase from 15% during the last reporting period.

Districts or Divisions outside of PSB conducted 22 investigations.  We found deficiencies other than timeliness in only three (14%) of the 22 cases we reviewed.  This is a noteworthy reduction in noncompliance from 35% investigative noncompliance during the last reporting period.  This With the inclusion of those investigations found noncompliant due to timelines, 14 (64%) of the 22 cases were not in overall compliance, a decrease from 82% noncompliance during the last reporting period.  We also note that for the second consecutive reporting period, some cases completed by Districts and Divisions were in full compliance.  Eight (35%) were in full compliance with all requirements for the completion of misconduct investigations, an increase in compliance from 18% during the last reporting period.

As a result of both investigative deficiencies and administrative deficiencies, including those related to extension compliance, overall compliance for all administrative investigations conducted by MCSO that are within the purview of the PSB Commander was 27% for this reporting period, an increase from 20% during the last reporting period.

There are many factors that impact the PSB Commander's ability to determine compliance in all cases.  One factor is that the PSB Commander must rely on other PSB staff members to conduct case reviews and ensure proper documentation is completed.  We continue to find that PSB personnel are identifying and ensuring that corrections are made, and all documentation is completed in those cases that they review.  In some cases, deficiencies cannot be corrected after the fact.

Another factor affecting the PSB Commander's ability to ensure that all investigations are properly completed is that the Appointing Authority – not the PSB Commander – determines the final findings and discipline.  During this reporting period, there was one instance where the Appointing Authority changed the findings of an investigation.  There were seven cases where he mitigated the discipline within the range.  We agreed with all but one of these decisions.

The investigative quality of District and Division cases has had an ongoing adverse impact on the ability of the PSB Commander to ensure investigations are properly completed.  During the last reporting period, we observed improvement in the investigative compliance for these cases, from 60% to 65%.  During this reporting period, we noted continued improvement, with investigative compliance reaching 86%.  We also found again this quarter that multiple investigations were in full compliance with all requirements for the administrative investigation of misconduct, including timeliness.  This is a notable improvement, and we are encouraged by this trend in improvement.

Since 2016, PSB has taken a number of actions to address both investigative deficiencies and other concerns with the completion of administrative investigations.  We have continued to meet with PSB and District and Division personnel since that time to update them on our identification of training and performance issues that adversely affect compliance with the Second Order.

WAI 72748

Members of the Monitoring Team also meet with PSB every two weeks to discuss Class Remedial Matters, and we use this opportunity to discuss other ongoing concerns that affect compliance. In our meetings with PSB and the Parties during site visits, we have also discussed additional opportunities and potential remedies to address the challenges of completing quality investigations within the required timelines. The Parties have also addressed this issue in both the meet-and-confer process and litigation. The Court appointed an outside expert to examine issues relevant to the deficiencies associated with PSB investigations. The Parties reviewed the expert's recommendations, and the Court issued its Third Order in November 2022. Since that time, MCSO proposed revised draft policies and procedures; and we and the Parties made many recommendations. The policies became effective in November 2023, and we will discuss them further in our next quarterly status report.

In 2014, PSB initiated 717 internal investigations. In 2015, PSB initiated 916 cases: and in 2016, 847 cases. There were 1,028 cases initiated in 2017. In 2018, there were 1,114 investigations initiated. In 2019, PSB initiated a total of 1,072 investigations and in 2020, PSB opened a total of 1,204 investigations. In 2021, PSB opened a total of 1,172 investigations, a small decrease from 2020. In 2022, PSB opened a total of 1,062 cases.

In 2016, prior to the entry of the Second Order, PSB investigators were carrying an average active caseload of 12-16 cases each month. By the end of 2021, the average monthly caseload in PSB was 74 cases per investigator. The average days to complete an administrative investigation in PSB at the end of 2021 was 704 days. For investigations completed outside of PSB, the average number of days to complete an investigation was 439 days.

The number of pending investigations has continued to increase each year. By the end of 2020, there were 2,010 pending investigations. At the end of 2021, the number of pending investigations had increased to 2,149. While the total numbers included administrative misconduct investigations, Service Complaints, criminal investigations, and critical incident investigations, the majority continued to be administrative misconduct investigations and Service Complaints. By the end of 2022, the total number of pending investigations was 2,375. The vast majority of these cases continue to be assigned to PSB for completion.

Our concerns with the growing number of cases and MCSO's inability to conduct timely investigations has been articulated in our reports for numerous years. Despite training, efforts to streamline processes, and the creation of alternative methods to handle some complaints, the problem has continued to grow. MCSO simply has not had enough personnel assigned to PSB to address these investigations. While some budget requests have been made to increase staffing in PSB, approved requests were often not filled in a timely manner; and even when filled, the number of authorized positions remained insufficient to address the growing need. In late 2022, the Court interceded and placed requirements on MCSO regarding the minimum number of investigative personnel to be assigned to PSB.

WAI 72749

During our April 2023 site visit, PSB advised that the total number of pending investigations was 2,370 for the first quarter of 2023. This was a slight decrease from the 2,375 investigations pending at the end of 2022. Of the 2,370, 2,191 were administrative misconduct investigations. The average completion time for a PSB investigation was 482 days and the average active caseload per investigator was 49 cases per month. During our April site visit, we agreed that future reviews would consider both investigative time and full closure time for misconduct investigations.

During our July 2023 site visit, PSB advised us that the total number of pending investigations was 2,334 at the end of the second quarter of 2023, a decrease from 2,370 at the end of the first quarter. Of the 2,334, 2,206 were administrative misconduct investigations. The average time from initiation of a complaint until full closure, which includes review and associated discipline or other administrative actions, was 542 days, an increase from 494 days at the end of the first quarter. The average investigative time was 489 days. For those cases assigned to PSB, the average investigative time was 511 days, and the average full completion time was 547 days.

During our October 2023 site visit, PSB advised us that the total number of pending investigations for the third quarter of 2023 was 2,322. Of those, 2,138 were administrative misconduct investigations. The average time from initiation of a complaint to full closure increased from 542 days to 699 days. The average investigative time was 602 days. For those cases assigned to PSB, the average completion time was 755 days, and the average investigative time was 671. While these are significant increases, given the number of older cases now being completed, it was not unexpected. As we noted in the last reporting period, whether we consider investigative or full closure times, the amount of time it takes to investigate and close these investigations remains unacceptable.

The average caseload for a PSB investigator at the end of this reporting period was 42 active cases per month, a decrease from 48.5 during the last reporting period.

As a result of the Court's Third Order, we have agreed with MCSO that those cases that would be considered to be administrative misconduct backlog cases would be those administrative investigations and critical incidents where required investigative actions were still pending and the investigation had not been completed in accordance with the timelines established in Paragraph 204, and an extension had not been granted as per Paragraph 365. An investigation would be considered complete when all investigative actions have been completed and the PSB commander has signed off in concurrence. The date the PSB Commander signs off on the investigation would be the date the investigation was no longer counted as part of the backlog, irrespective of the findings. At the end of October 2023, of the total pending administrative misconduct cases, 1,765 met the agreed upon definition for a backlog case.

WAI 72750

During our past site visits, PSB staff have continued to communicate that they are outsourcing those cases where conflicts of interest exist. PSB contracts with a qualified private vendor to conduct these investigations. During our January 2021 site visit, PSB personnel advised us that they were considering retaining additional outside contract investigators but had not identified any who met the hiring criteria. PSB was also considering outsourcing additional investigations to the current contract investigator if he had the staff to accept additional investigations. During our April 2021 site visit, PSB personnel advised us that they had identified another vendor and outsourced 25 cases to this entity as a pilot program. Since April 2021, PSB has continued to outsource investigations to this second vendor.

During this reporting period, PSB advised us that seven new cases had been outsourced to an outside vendor and 59 outsourced cases were pending completion. We received and reviewed 16 cases conducted by one of the outside vendors during this reporting period.

After the entry of the Second Order, PSB reviewed the disciplinary backgrounds of all those who might conduct internal investigations and notified us of those supervisors who would be prohibited from conducting such investigations due to their backgrounds. At that time, MCSO identified two supervisors who were ineligible to conduct internal investigations. Neither of these two employees are still employed at MCSO. MCSO has since identified additional supervisors who are ineligible to conduct administrative investigations. At the end of the last reporting period, one supervisor was on this list.

MCSO reported during this reporting period that two additional supervisors have been added to the list. There are now three supervisors who are ineligible to conduct such investigations.


***Paragraph 195.*** *Within six months of the entry of this Order, the Professional Standards Bureau shall include sufficient trained personnel to fulfill the requirements of this Order.*

**Phase 1:** In compliance

- Professional Standards Bureau Operations Manual, most recently amended on November 13, 2023.

**Phase 2:** Not in compliance

In conjunction with this Paragraph, Paragraph 178 mandates that within three months of the finalization of policies consistent with Paragraph 165, all PSB personnel would receive 40 hours of comprehensive training. Paragraph 178 requires training of all supervisors within three months of the finalization of policies, and further requires sufficient trained personnel in PSB within six months of the entry of the Order. The first week of the required Misconduct Investigative Training commenced on September 18, 2017, and the training was completed prior to the end of 2017.

Between 2016 and 2021, the number of investigators assigned to PSB remained between 24 and 26 – despite an increase in initiated cases that grew from 847 in 2016 to 1,072 in 2021; a backlog of cases that had grown to 2,149 cases; and an average investigator monthly caseload that had grown from 12 cases to 74 cases.

WAI 72751

Between January 2022 and December 2022, the number of pending cases continued to increase. By the end of 2022, the pending case list had grown to 2,375 cases, and the average caseload for an investigator in PSB was 65 cases.

During our January 2023 site visit and after intervention by the Court, PSB advised us that the Bureau's total number of investigators at the end of December 2022 was 40: 12 sworn investigators, 17 Detention investigators, and 11 civilian investigations.  The only vacancies remaining in PSB were three civilian administrative positions.

During our April 2023 site visit, PSB advised that the Bureau's total number of investigators at the end of March 2023 had grown to 44: 12 sworn investigators, 17 Detention investigators, and 15 civilian investigators.  The only vacancies in PSB at the end of March 2023 were the three civilian administrative positions.

During our July 2023 site visit, PSB advised that the Bureau's total number of investigators at the end of June 2023 remained at 44: 11 sworn investigators, 17 Detention investigators, and 16 civilian investigators.  The only vacancies were three civilian administrative positions.

During our October 2023 site visit, PSB advised that the Bureau's total number of investigators at the end of September 2023 was 46: 11 sworn investigators, 17 Detention investigators, and 18 civilian investigators.  PSB noted one Detention lieutenant and seven civilian administrative vacancies.

The Second Order requires that PSB have "sufficient trained personnel to fulfill the requirements of this Order."  MCSO has delivered the required Misconduct Investigative Training, and our focus remains on the ability of PSB staff to carry out its mission.  As we have documented in numerous previous reports, MCSO has remained understaffed for years.  While we continue to acknowledge that staffing levels in PSB have increased, until MCSO is able to demonstrate that this level of staffing is sufficient to address the investigative caseload assigned to their personnel and results in timely investigations, we will not find MCSO in compliance with this Paragraph.

***Paragraph 196.*** *Where appropriate to ensure the fact and appearance of impartiality, the Commander of the Professional Standards Bureau or the Chief Deputy may refer administrative misconduct investigations to another law enforcement agency or may retain a qualified outside investigator to conduct the investigation.  Any outside investigator retained by the MCSO must possess the requisite background and level of experience of Internal Affairs investigators and must be free of any actual or perceived conflicts of interest.*

**In Full and Effective Compliance**

As a result of the Second Order, MCSO retained an outside contractor to conduct some investigations identified in the Court's Findings of Facts and has continued to outsource additional cases to this vendor, primarily those for which a potential conflict of interest exists.  In 2017, the PSB Commander indicated that MCSO did not envision any need to retain additional contract investigators beyond the one investigator that had been already retained.

WAI 72752

In 2021, due to the increasing case backlog, MCSO contracted with a second vendor to assist with reducing the backlog. PSB began outsourcing cases due to both potential conflicts of interest and to assist MCSO in reducing the number of pending cases. This second vendor employs multiple investigators who are assigned cases by PSB. These investigators were initially assigned older cases that had minimal additional follow up needed, but PSB now assigns them current investigations as well.

During our October 2023 site visit, PSB advised us that there were 59 outsourced cases pending. Fifteen are assigned to the original contract investigator, and 44 to the second vendor. We reviewed 16 investigations conducted by the second vendor during this reporting period. While we continue to support PSB's outsourcing cases to outside vendors, we remain concerned about the timeliness of the completion of some of these investigations. We continue to urge PSB to monitor and address the timeliness of investigations conducted by these outside vendors.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 197.** *The Professional Standards Bureau will be headed by a qualified Commander. The Commander of the Professional Standards Bureau will have ultimate authority within the MCSO for reaching the findings of investigations and preliminarily determining any discipline to be imposed. If the Sheriff declines to designate a qualified Commander of the Professional Standards Bureau, the Court will designate a qualified candidate, which may be a Civilian Director in lieu of a sworn officer.*

**In Full and Effective Compliance**

In January 2018, MCSO advised us that due to reorganizations within the Office, the responsibility to serve as the PSB Commander for purposes of compliance with this Order would be transferred to a captain within PSB. An Executive Chief would maintain overall oversight of PSB.

During this reporting period, we continued to interact with the Captain now serving as the PSB Commander. In addition to our regularly scheduled meetings to discuss CRMs and other internal affairs matters, we have had additional meetings to discuss overall concerns with investigations, case specific concerns, and concerns with PSB processes and protocols when appropriate. He continues to discuss with us both his immediate priorities and his continuing efforts to improve processes and quality where necessary. In those cases where we have expressed concerns or requested information, he has provided timely responses.

The revised policies affecting misconduct investigation have been approved by the Court. During the next quarter we will be working closely with PSB to address the backlog cases affected by the revised policies.

During prior site visit discussions, we have noted that this Commander has made numerous efforts to improve and enhance the operations of PSB. These efforts have included staffing changes that allow more personnel to be focused on investigations rather than reviews, development of a strategic plan to guide the Bureau, update of the intake process, implementation of a fast-track

WAI 72753

team to address those incoming cases that can be resolved without a significant amount of investigative time, ensuring that older cases, some initiated as far back as 2016, are being resolved, using administrative staff to assist with case preparation, and examining the Bureau's processes and workflow.  As a result of discussion and direction by the Monitoring Team, PSB also resumed the practice of assigning administrative misconduct investigations to Districts and Divisions outside PSB when appropriate.

During our July 2023 site visit, the PSB Commander informed us that the fast-track team concept continues to work well; administrative personnel in PSB were being sent to the PSB training to give them a broader knowledge base; PSB was continuing to work on hiring employees for the vacant civilian positions; and the Bureau was also creating eligibility lists for sworn and Detention investigators to fill any vacancies that may occur.

During our October 2023 site visit, the PSB Commander again advised us that the fast-track team process is working well.  He informed us that he will be recommending including report-writing training in future PSB8 training, and is continuing to work on filling administrative vacancies.

On January 6, 2023, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.


**Paragraph 198.**   *To promote independence and the confidentiality of investigations, the Professional Standards Bureau shall be physically located in a facility that is separate from other MCSO facilities, such as a professional office building or commercial retail space.  This facility shall be easily accessible to the public, present a non-intimidating atmosphere, and have sufficient space and personnel for receiving members of the public and for permitting them to file complaints.*

**In Full and Effective Compliance**

In May 2018, PSB moved into the first and second floors of 101 West Jefferson Street.  PSB's address is available on the comment and complaint form that is accessible to the public at the Districts and on MCSO's website.  PSB's criminal investigators are housed on the first floor, and administrative investigators are housed on the second floor of the building.  PSB's off-site facility has two dedicated security personnel assigned during normal business hours of 8:00 a.m.-4:00 p.m., Monday-Friday.  MCSO remains in compliance with this requirement.  MCSO informed us during the previous reporting period that a lease for a different location, also an off-site location, is being negotiated for housing PSB.  We discussed this with MCSO during our October 2023 site visit.  The new space, at 4000 North Central Avenue in Phoenix, is currently being adapted for PSB's use; PSB plans to move into the space in May 2024.

We will continue to monitor the plans going forward to ensure that the intended change of location is in compliance with this requirement.

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

WAI 72754

*Paragraph 199. The MCSO will ensure that the qualifications for service as an internal affairs investigator shall be clearly defined and that anyone tasked with investigating employee misconduct possesses excellent investigative skills, a reputation for integrity, the ability to write clear reports, and the ability to be fair and objective in determining whether an employee committed misconduct. Employees with a history of multiple sustained misconduct allegations, or one sustained allegation of a Category 6 or Category 7 offense from MCSO's disciplinary matrices, will be presumptively ineligible to conduct misconduct investigations. Employees with a history of conducting deficient investigations will also be presumptively ineligible for these duties.*

**In Full and Effective Compliance**

This Paragraph requires that any individual who is assigned to investigate employee misconduct meet the qualifications of an internal affairs investigator, as noted in this Paragraph. We verify compliance by reviewing documentation submitted for employees transferred into PSB, as well as employees hired for assignment to PSB as internal affairs investigators. In addition, we ensure that none of the misconduct investigations we review for compliance are completed by any employee on the PSB ineligibility list. Any employee who has a history of conducting deficient investigations, or has multiple sustained misconduct allegations, or has one sustained allegation of a Category 6 or Category 7 offense, is presumptively ineligible to conduct misconduct investigations. GH-2 reflects the directive of this Paragraph, to ensure that only supervisors who meet the criteria established by this Paragraph are assigned misconduct investigations. The PSB Operations Manual, which formalizes the review process, states that if any supervisor is deemed ineligible, the PSB commander will notify the supervisor's commander in writing, and will ensure that a BlueTeam entry is made to memorialize the supervisor's ineligibility to conduct misconduct investigations. A record of supervisors deemed ineligible to conduct misconduct investigations is maintained in PSB. These procedures were finalized and documented in the PSB Operations Manual, published on December 13, 2018.

During the third quarter of 2023, MCSO added two supervisors to the list of employees who are ineligible to conduct internal affairs investigations. The two employees added in the third quarter were due to both having three or more sustained allegations of misconduct. This brings the total to three employees on the ineligibility list. During the third quarter, there were four Detention supervisors transferred into PSB to replace four outgoing employees. These are discussed in our reviews of Paragraph 268.

During the third quarter, MCSO reported the hiring of one PSB civilian investigator, under Paragraph 199. The documentation was also submitted under Paragraphs 173 and 174. This individual retired as a lieutenant from PSB and was rehired as a PSB civilian investigator. We were familiar with the quality of work performed by this individual, since he had been with PSB for several years. We reviewed the documentation provided and noted no issues of concern. In the third quarter, MCSO reported the promotion of one individual to serve as a PSB civilian investigator, under Paragraphs 173 and 174. The promotion date of this individual occurred on the last day of the preceding quarter and was previously submitted under Paragraph 199. We noted our comments pertaining to this promotion in our last quarterly status report.

WAI 72755

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 200.*** *In each misconduct investigation, investigators shall:*

a.  *conduct investigations in a rigorous and impartial manner designed to determine the facts;*

b.  *approach investigations without prejudging the facts and without permitting any preconceived impression of the principal or any witness to cloud the investigation;*

c.  *identify, collect, and consider all relevant circumstantial, direct, and physical evidence, including any audio or video recordings;*

d.  *make reasonable attempts to locate and interview all witnesses, including civilian witnesses;*

e.  *make reasonable attempts to interview any civilian complainant in person;*

f.  *audio and video record all interviews;*

g.  *when conducting interviews, avoid asking leading questions and questions that may suggest justifications for the alleged misconduct;*

h.  *make credibility determinations, as appropriate; and*

i.  *attempt to resolve material inconsistencies between employee, complainant, and witness statements.*

## In Full and Effective Compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 134 administrative misconduct investigations during this reporting period. All but one was initiated and completed after the new IA and discipline policies were effective in May 2017. PSB investigated 96 of the cases, 16 were outsourced, and District or Division supervisory personnel investigated 22 of the cases. Of the cases we reviewed, 102 involved external complaints, and 32 were internally generated.

Paragraph 200.a. requires that misconduct investigations be conducted in a rigorous and impartial manner. During this and the last reporting period, all completed investigation that we reviewed complied with the requirements of this Subparagraph.

Paragraph 200.b. requires that investigations be approached without prejudging the facts or permitting preconceived impressions. The Monitoring Team carefully reviews completed investigations, examining statements made by complainants, witnesses, investigative leads, and principal employees – and reviews available documentation and independent evidence to ensure that allegations of misconduct are properly resolved. We focus on the process followed by the investigators and the completeness of the investigation, and verify that all conclusions are based on the evidence presented. During this and the last five reporting periods, all completed investigations we reviewed complied with the requirements of this Subparagraph.

WAI 72756

Paragraph 200.c. requires that investigators identify, collect, and consider all relevant evidence. During the last four reporting periods, all completed investigations we reviewed complied with the requirements of this Subparagraph.  During this reporting period, two investigations (1%) failed to comply with the requirements of this Subparagraph.

Paragraph 200.d. requires that investigators make reasonable attempts to locate and interview all witnesses.  During the last reporting period, three investigations (2%) we reviewed fell short of compliance with this Subparagraph.  During this reporting period, three (2%) of the completed investigations we reviewed again failed to comply with the requirements of this Subparagraph.

Paragraph 200.e. requires that investigators make reasonable attempts to interview civilian complainants in person.  During this and previous reporting periods, there have been numerous investigations in which investigators did not make attempts to interview complainants in person. Again, this reporting period, there were investigations without attempts to conduct in-person interviews for a variety of appropriate reasons, including: COVID restrictions in place at the time of the investigation; complainants who were out of state; or a criminal interview had already been conducted.  We note that in many cases, though offered an in-person interview, complainants state that they prefer to have the interview conducted by phone.  We identified only two investigations (1%) where appropriate attempts were not made to conduct an in-person interview; and no acceptable explanation was provided.  PSB discontinued the authorization to conduct telephone interviews based on COVID restrictions, effective May 1, 2022.

Paragraph 200.f. requires audio- and video-recording of all interviews.  Of the 134 administrative investigations reviewed for this reporting period, there were 40 cases where interviews were not both audio- and video-recorded.  In all but two (1%), an acceptable explanation was provided by the investigator.

Paragraph 200.g. requires that when conducting interviews, investigators avoid asking leading questions or questions that may suggest justification for the alleged misconduct.  During the last reporting period, two investigations (2%) fell short of compliance with this Subparagraph.  During this reporting period, all investigations reviewed complied with the requirements of this Subparagraph.

Paragraph 200.h. requires that proper credibility determinations be made.  During the last reporting period, all investigation we reviewed complied with the requirements of this Subparagraph.  During this reporting period, one investigation (1%) failed to comply with the requirements of this Subparagraph.

Paragraph 200.i. requires that investigators attempt to resolve all material inconsistencies.  During the last reporting period, one investigation failed to comply with the requirements of this Subparagraph.  During this reporting period, one investigation (1%) again fell short of compliance with this Subparagraph.

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 72757

*Paragraph 201. There will be no automatic preference for an employee's statement over a non-employee's statement. Internal affairs investigators will not disregard a witness's statement solely because the witness has some connection to either the complainant or the employee or because the witness or complainant has a criminal history, but may consider the witness's criminal history or any adjudicated findings of untruthfulness in evaluating that witness's statement. In conducting the investigation, internal affairs investigators may take into account the record of any witness, complainant, or officer who has been determined to have been deceptive or untruthful in any legal proceeding, misconduct investigation, or other investigation.*

**In Full and Effective Compliance**

To determine Phase 2 compliance with this Paragraph, we reviewed 134 administrative misconduct investigations during this reporting period.

Of the 134 investigations, 102 involved complainants that were not identified as MCSO employees. Thirty-two investigations included interviews with witnesses or investigative leads who were not MCSO employees. We did not identify any case where we believe there was an automatic preference for the statement of an employee over a non-employee's statement.

We did not identify any completed investigations where a witness's statement was disregarded solely because of any connection identified in this Paragraph, nor where a witness's criminal history or findings of truthfulness were considered.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.


*Paragraph 202. Internal affairs investigators will investigate any evidence of potential misconduct uncovered during the course of the investigation, regardless of whether the potential misconduct was part of the original allegation.*

**In Full and Effective Compliance**

To determine Phase 2 compliance with this Paragraph, we reviewed 134 administrative misconduct investigations during this reporting period. In 32 of the 134 investigations, MCSO identified additional potential misconduct during the investigations and properly added additional allegations, initiated new investigations, or addressed the violations with an appropriate supervisor intervention. We identified two investigations (1%) during this reporting period where we believe that additional misconduct may have occurred and was not addressed by MCSO.

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 72758

**Paragraph 203.**  *If the person involved in the encounter with the MCSO pleads guilty or is found guilty of an offense, internal affairs investigators will not consider that information alone to be determinative of whether an MCSO employee engaged in misconduct, nor will it by itself justify discontinuing the investigation.  MCSO training materials and policies on internal investigations will acknowledge explicitly that the fact of a criminal conviction related to the administrative investigation is not determinative of whether an MCSO employee engaged in misconduct and that the mission of an internal affairs investigator is to determine whether any misconduct occurred.*

**In Full and Effective Compliance**

To determine Phase 2 compliance with this Paragraph, we reviewed administrative misconduct investigations during this reporting period.

There were no indications in any of the completed investigations we reviewed that any MCSO investigators considered alone any pleading or finding of guilty by any person as a reason to make any determination regarding the potential misconduct of any MCSO personnel, nor were any investigations discontinued for this reason.

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.


**Paragraph 204.**  *Internal affairs investigators will complete their administrative investigations within 85 calendar days of the initiation of the investigation (60 calendar days if within a Division).  Any request for an extension of time must be approved in writing by the Commander of the Professional Standards Bureau.  Reasonable requests for extensions of time may be granted.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on November 14, 2023.

**Phase 2:**  Not in compliance

To determine Phase 2 compliance with this Paragraph, we review administrative misconduct investigations conducted by MCSO.

PSB conducted 96 of the 134 administrative misconduct investigations we reviewed for this reporting period.  Nineteen (20%) of the 96 were completed within the required 85-day timeframe, a decrease from 26% compliance for the last reporting period.  Sixteen investigations were outsourced to an outside entity by PSB.  Six (38%) were completed within the required timeframe, an increase in compliance from 20% during the last reporting period.

Of the 22 investigations completed by Districts and Divisions outside of PSB, eight (36%) were initially submitted to PSB within the required timeframe or had an acceptable extension justification.  This is a significant improvement from the 25% compliance during the previous reporting period.  As has been our practice for numerous reporting periods, we determine the 60-day period compliance findings for those investigations conducted by personnel outside of PSB based on the original date the investigation is approved by the District or Division Commander

WAI 72759

and forwarded to PSB. In those cases where deficiencies are identified, the cases will continue to be found noncompliant in other relevant Paragraphs, and specifically in Paragraph 213, which requires the District or Division Commander ensure that investigations conducted by their personnel are complete and the findings are supported by the evidence prior to their submittal to PSB.

As we noted in Paragraph 194, timely completion of administrative investigations has continued to be of concern for many reporting periods. Of the total 134 administrative misconduct investigations we reviewed during this reporting period, 33 investigations (25%) were completed and submitted by the investigator within the required 60- or 85-day timeframe. This is the same percentage of compliance as the last reporting period.

In addition to those investigations not completed within 60 or 85 days as required by this Paragraph, of the 134 total investigations, 89 (66%) were not completed within 180 days.

During our April 2023 site visit, PSB advised us that the average time for full closure of administrative misconduct investigations was 494 days, a decrease from 593 days in January 2023. We also discussed that the closure numbers we received were from the initiation of the investigation until final disposition, which includes the time needed for review by the Conduct Resolution Section and any associated discipline or other administrative actions. To ensure that we delineate investigative time from full closure time, we agreed that future statistics reported would include both full closure information as well as investigative time.

During our July 2023 site visit, PSB advised us that the average time from initiation of a complaint until full closure, which included review and associated discipline or other administrative actions, was 542 days. This was an increase from 494 days at the end of April 2023. The average investigative time was 489 days. This time period covers the time from the initiation of the investigation until it is approved by the PSB Commander.

During our October 2023 site visit, PSB advised us that the average time from initiation of a complaint until full closure was 699 days, a significant increase from the last reporting period. The average investigative time was 608 days, again a significant increase from the last reporting period. We do note that this increased time may be at least partially a result of the focus placed on the review of older cases, so would not be unexpected.

As we have noted in our last 13 quarterly status reports, we no longer accept workload as the justification for the failure to complete investigations in a timely manner. Regardless of the breakdown between investigative and closure time, it continues to be clear from our reviews during this and prior reporting period that the time it takes to conduct administrative misconduct investigations remains unacceptable.

MCSO is not in Phase 2 compliance for this Paragraph.

WAI 72760

*Paragraph 205.   The Professional Standards Bureau shall maintain a database to track all ongoing misconduct cases, and shall generate alerts to the responsible investigator and his or her Supervisor and the Commander of the Professional Standards Bureau when deadlines are not met.*

**In Full and Effective Compliance**

We determine compliance with this Paragraph by assigning a member of our Team to observe demonstrations of the IAPro database during our site visits or other meetings with PSB throughout the reporting period.  The IAPro technology serves as the centralized electronic numbering and tracking system for all allegations of misconduct, whether internally discovered or based on an external complaint.  This database contains the capacity to manage and store information required for compliance with this Paragraph.

During our site visits, on numerous occasions, we have met with PSB personnel and observed IAPro to ensure that the system generates appropriate alerts to responsible investigators and PSB commanders if deadlines are not met.  We have reviewed emails PSB disseminates each month to Districts and Divisions to identify investigative deadlines.  We have also reviewed the BlueTeam Dashboard, which uses a color-coded system to identify investigations that are nearing deadlines or are past deadlines.  The information appears in each supervisor's BlueTeam account when they are monitoring open cases.

The civilian PSB Special Projects Manager is primarily responsible for administering the centralized tracking system.  In addition, all PSB and Division investigators can access the electronic BlueTeam database – a system that integrates with IAPro – at any time to view the assignment and status of administrative investigations.  PSB has also trained two lieutenants to administer the system.

In May 2018, PSB relocated to an offsite location.  In July 2018, a member of our Team verified that the existing tracking mechanisms continue to be used for the tracking of investigations at the new facility.

During our January, July, and October 2019 site visits, a member of our Team verified that the tracking mechanisms remain in place.  We also continued to receive monthly notifications from PSB regarding closed administrative investigations, and we evaluate these closed investigations for the entirety of a reporting period against a multitude of criteria, including whether the cases were completed in a timely fashion.

During our October 2023 site visit, members of our Team confirmed that tracking mechanisms in IAPro for investigations remain in place.  During our meeting with PSB staff, we observed that there is a tracking sheet maintained for each investigation.  Alerts regarding timelines and deadlines are being made and overdue cases are also tracked.  It is also possible to generate specific reports from the system when needed.

During this reporting period, we continued to receive monthly notifications from PSB regarding closed administrative misconduct investigations; and we continue to evaluate these closed investigations for the entirety of a reporting period against a multitude of criteria, including whether the cases were completed in a timely fashion.  (See Paragraph 204.)

WAI 72761

On June 23, 2023, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

**Paragraph 206.**  *At the conclusion of each investigation, internal affairs investigators will prepare an investigation report.  The report will include:*

a.    *a narrative description of the incident;*

b.    *documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the incident.  In situations in which there are no known witnesses, the report will specifically state this fact.  In situations in which witnesses were present but circumstances prevented the internal affairs investigator from determining the identification, phone number, or address of those witnesses, the report will state the reasons why.  The report will also include all available identifying information for anyone who refuses to provide a statement;*

c.    *documentation of whether employees were interviewed, and a transcript or recording of those interviews;*

d.    *the names of all other MCSO employees who witnessed the incident;*

e.    *the internal affairs investigator's evaluation of the incident, based on his or her review of the evidence gathered, including a determination of whether the employee's actions appear to be within MCSO policy, procedure, regulations, orders, or other standards of conduct required of MCSO employees;*

f.    *in cases where the MCSO asserts that material inconsistencies were resolved, explicit credibility findings, including a precise description of the evidence that supports or detracts from the person's credibility;*

g.    *in cases where material inconsistencies must be resolved between complainant, employee, and witness statements, explicit resolution of the inconsistencies, including a precise description of the evidence relied upon to resolve the inconsistencies;*

h.    *an assessment of the incident for policy, training, tactical, or equipment concerns, including any recommendations for how those concerns will be addressed;*

i.    *if a weapon was used, documentation that the employee's certification and training for the weapon were current; and*

j.    *documentation of recommendations for initiation of the disciplinary process; and*

k.    *in the instance of an externally generated complaint, documentation of all contacts and updates with the complainant.*

**In Full and Effective Compliance**

Paragraph 206.a. requires a written description on the incident be included in the investigative report.  All completed investigations that we reviewed complied with the requirements of this Subparagraph.

WAI 72762

Paragraph 206.b. requires documentation of evidence gathered, including all known information about witnesses.  All but one completed investigation we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.c. requires documentation of whether employees were interviewed, and a transcript or recording of these interviews.  All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.d. requires that the names of all MCSO employees who witnessed the incident be included in the report.  All completed investigations we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.e. requires that the internal affairs investigator's evaluation of the incident includes a determination of whether the employee's actions appear to be within MCSO policy, procedure, regulations, orders, or other standards of conduct required of MCSO employees.  All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.f. requires that when MCSO asserts that material inconsistencies were resolved, explicit credibility findings, including a precise description of the evidence that supports or detracts from the person's credibility must be provided.  During this reporting period, we identified one investigation where we believe MCSO failed to provide sufficient credibility assessments as required.  We continue to meet with PSB Command staff to discuss the importance of continuing to clearly identify these requirements in investigative reports and will continue to closely monitor compliance with this Subparagraph.

Paragraph 206.g. requires that when material inconsistencies must be resolved, a precise description of the evidence be included in the report.  During this reporting period, we did identify one investigation where we believe MCSO failed to properly resolve material inconsistencies when it was possible to do so.  We continue to meet with PSB Command staff to discuss the ongoing importance of clearly identifying these requirements in investigative reports and will continue to closely monitor compliance with this Subparagraph.

Paragraph 206.h. requires that assessment of the incident for policy, training, tactical, or equipment concerns be included in the investigative report, to include any recommendations.  All of the completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.i. requires that if a weapon was used, documentation that the employee's certification and training for the weapon must be included in the investigative written report.  All of the completed investigations we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.j. requires that documentation of the initiation of the disciplinary process be included in the investigation.  Compliance is achieved when the misconduct investigator completes the investigation with a finding of sustained, when applicable, and the PSB Commander subsequently approves the finding.  This is considered the initiation of the disciplinary process.  Forty of the 134 administrative misconduct investigations we reviewed had

WAI 72763

sustained findings against one or more active MCSO employee. All complied with the requirements of this Subparagraph.

Paragraph 206.k. requires that any contacts and updates with the complainant be documented in the investigative report. We did not identify any instances during this reporting period where this did not occur.

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 207.** *In assessing the incident for policy, training, tactical, or equipment concerns, investigation reports will include an assessment of whether:*

a.      *the law enforcement action was in compliance with training and legal standards;*

b.      *the use of different tactics should or could have been employed;*

c.      *the incident indicates a need for additional training, counseling, or other non-disciplinary corrective actions; and*

d.      *the incident suggests that the MCSO should revise its policies, strategies, tactics, or training.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on November 14, 2023.
- Professional Standards Bureau Operations Manual, most recently amended on November 13, 2023.

**Phase 2:** In compliance

During this reporting period, we reviewed 134 administrative misconduct investigations. MCSO properly assessed and documented whether any of the requirements of this Paragraph were relevant in all of the completed cases we reviewed for this reporting period. MCSO identified nine cases where action related to this Paragraph was appropriate. Memorandums of Concern were generated and forwarded to the appropriate Divisions for resolution.

PSB continues to use an internal tracking form to ensure that those concerns that are forwarded to other Divisions within MCSO for action or review are addressed. We receive and review this tracking document each month. During our January 2023 site visit meeting, we discussed our ongoing concerns with the number of issues that had not been addressed, and the way the tracking system was being used. We requested that PSB provide a presentation during our next site visit meeting to clarify the processes involved with addressing these concerns and explain why there is such a large number of concerns that have not yet been resolved.

WAI 72764

During our April 2023 site visit, we met with MCSO Command personnel to discuss our ongoing concerns with the resolution of those issues PSB had documented and forwarded to Divisions outside of PSB. In some cases, MCSO advised us that the concern had been addressed but had just not been documented. In others, there was no explanation for the failure to resolve the noted concern.

During our July 2023 site visit, we again discussed the tracking form used to document and address concerns that have been identified during an investigation. While PSB has continued to properly document the concerns and forward them to the appropriate Division for resolution, there continue to be numerous concerns that have not been properly addressed.

During our October 2023 site visit, we again met with MCSO personnel to discuss the identified concerns tracking. MCSO Command personnel provided updates on what they had found in their reviews of pending concerns. The PSB Commander also discussed the progress that PSB personnel have made in auditing the entire pending list of concerns and their intent to modify the process moving forward.

This Paragraph addresses only the requirement for an assessment and documentation by the investigator of policy, training, tactical, or equipment concerns; and we continue to find this Paragraph in compliance. Our concern with resolution of these concerns, once identified, is addressed in Paragraph 216.

**Paragraph 208.** *For each allegation of misconduct, internal affairs investigators shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation:*

a.  *"Unfounded," where the investigation determines, by clear and convincing evidence, that the allegation was false or not supported by fact;*

b.  *"Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur and justifies a reasonable conclusion of a policy violation;*

c.  *"Not Sustained," where the investigation determines that there is insufficient evidence to prove or disprove the allegation; or*

d.  *"Exonerated," where the investigation determines that the alleged conduct did occur but did not violate MCSO policies, procedures, or training.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we review administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period. We evaluate compliance with this Paragraph against the standard of whether a finding was made, and whether the finding was correct.

During the last reporting period, we concurred with the findings of the PSB Commander in 148 (97%) of the 152 cases that we reviewed.

WAI 72765

During this reporting period, we concurred with the findings of the PSB Commander in 132 (99%) on the 134 investigations we reviewed for compliance with this Paragraph. In one, we believe findings of sustained should have been made and were not. In a second case, we believe the facts of the investigation did not support a finding of unfounded and the finding should have been not sustained. As is our practice, we will discuss these cases with MCSO during our next site visit.

On January 6, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 209.** *For investigations carried out by Supervisors outside of the Professional Standards Bureau, the investigator shall forward the completed investigation report through his or her chain of command to his or her Division Commander. The Division Commander must approve the investigation and indicate his or her concurrence with the findings.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we reviewed 22 administrative misconduct investigations conducted by Districts or Divisions outside of PSB. All 22 were forwarded to PSB as required, and all contained the approval of the responsible District or Division Commander. As noted in previous reporting periods, and again during *this* reporting period, some of the District or Division level investigations were not in compliance with various requirements of the Second Order – as indicated throughout this report. However, we assessed MCSO's compliance with this Paragraph based on these cases being forwarded through the chain of command for approval of the investigation and findings.

On September 25, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 210.** *For investigations carried out by the Professional Standards Bureau, the investigator shall forward the completed investigation report to the Commander.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we reviewed 96 administrative misconduct investigations that were conducted by PSB personnel. All 96 complied with the requirements of this Paragraph. The 16 investigations outsourced by PSB also complied with the requirements of this Paragraph.

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 72766

***Paragraph 211.*** *If the Commander—meaning the Commander of the PSB or the Commander of the Division in which the internal affairs investigation was conducted—determines that the findings of the investigation report are not supported by the appropriate standard of proof, the Commander shall return the investigation to the investigator for correction or additional investigative effort, shall document the inadequacies, and shall include this documentation as an addendum to the original investigation. The investigator's Supervisor shall take appropriate action to address the inadequately supported determination and any investigative deficiencies that led to it. The Commander shall be responsible for the accuracy and completeness of investigation reports prepared by internal affairs investigators under his or her command.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on November 14, 2023.

**Phase 2:** Not in compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 134 administrative misconduct investigations conducted by MCSO and completed during this reporting period.

PSB investigated 96 of the 134 administrative misconduct investigations we reviewed during this reporting period and outsourced an additional 20. In 90 (94%) of the 96 investigations conducted by PSB, we found the investigations to be thorough, the reports well-written and we agreed with the findings. We identified specific concerns with six investigations conducted by PSB. In one, we believe the facts of the investigation did not support a not sustained finding and the allegation should have been sustained. In one, we believe the investigation did not support a finding of unfounded and the allegation should have been not sustained. In three cases, we believe PSB failed to appropriately interview all witnesses or investigative leads, which in these cases could have resulted in additional information being obtained. In one case, PSB failed to identify and address potential additional misconduct, and in another case, failed to properly obtain a video recording that could have provided information relevant to the investigative findings. Based on our review of these cases, which includes all compliance requirements, 22 investigations (23%) of the total investigations are in full compliance, a slight increase from 22% in the last quarter.

PSB outsourced 16 of the completed investigations we reviewed for this reporting period. All 16 were outsourced to the second vendor contracted to assist in reducing the backlog of cases. Six (38%) of the 16 were completed within the required 85-day timeline. Six (38%) were in full compliance with all requirements, including timelines. Nine (56%) were not compliant due only to timeliness. In one (6%), we found multiple investigative deficiencies. We will discuss this case with PSB during our next site visit. During our meetings with the PSB Commander to discuss the quality and timeliness of outsourced cases, he has informed us they continue to have one-on-one meetings with the investigators when deficiencies are identified, and continue to author deficiency memos for investigations conducted by contract vendors when appropriate.

Of the 22 investigations investigated by Districts or Divisions outside of PSB, we identified three investigations (14%) where we had some concerns regarding the investigation. This is a decrease in non-compliance from 35% in the last reporting period. The concerns we identified during this reporting period were unsupported findings and failure to conduct all necessary follow-up. Based on our assessment of these investigations, which includes our assessment of extension requests,

WAI 72767

we found eight investigations (36%) in full compliance with all requirements, including extensions, an increase from 18% during the last reporting period. This is the third consecutive reporting period where we have found increased compliance in those cases investigated by Districts and Divisions outside PSB. While 64% of the cases are still not compliant with the inclusion of timelines, this is a decrease from 82% noncompliance during the last reporting period. We continue to be encouraged by the overall improvement we are seeing in these cases.

In January 2018, we requested that MCSO begin providing us with documentation that reflects the actions being taken to address deficient misconduct investigations. We requested that PSB and command personnel provide a response to this request on a monthly basis. We have consistently received the requested documentation since March 2018.

During this reporting period, we again noted multiple instances where District Command personnel, Deputy Chiefs, or an Executive Chief either identified or addressed deficiencies brought to their attention in response to the protocols put in place to comply with the requirements of Paragraph 211. We also identified some instances where deficiencies in investigations were identified and addressed prior to forwarding the investigations to PSB. While in some cases, the investigations were still not compliant, we continue to be encouraged by the current level of oversight being provided.

We have noted in numerous prior reporting periods that both the supervisors who complete deficient investigations and the command personnel who approve them must be held accountable if MCSO is to achieve Phase 2 compliance with this Paragraph. During this reporting period, our review of cases completed by PSB personnel continues to indicate PSB's ongoing efforts to achieve compliance. PSB's investigative compliance was again 94%. Investigative compliance for those cases investigated by Districts and Divisions outside PSB improved from 65% to 86%. We are hopeful this compliance can be sustained and improved upon.

In previous reporting periods, we have addressed the necessity for MCSO to address deficient investigations in a timely manner. Since then, we have continued to note that identified Commander deficiencies are being properly identified and addressed by the responsible command officers in a timelier manner.

**Paragraph 212.** *Where an internal affairs investigator conducts a deficient misconduct investigation, the investigator shall receive the appropriate corrective and/or disciplinary action. An internal affairs investigator's failure to improve the quality of his or her investigations after corrective and/or disciplinary action is taken shall be grounds for demotion and/or removal from a supervisory position or the Professional Standards Bureau.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we reviewed 134 administrative misconduct investigations during this reporting period.

The 40-hour Misconduct Investigative Training was completed in late 2017. In January 2018, we requested that MCSO begin providing us with a document that reflects what actions are being taken to address deficient misconduct investigations on a monthly basis. As discussed in

WAI 72768

Paragraph 211, we have consistently received documentation since March 2018. During this reporting period, PSB identified and documented some deficiencies with investigations. District Commanders and Division Chiefs also identified and addressed several investigations where deficiencies were found in investigations conducted by their personnel.

PSB investigators consistently complete thorough investigations as has been demonstrated by their high compliance rate over numerous reporting periods. While there are occasional errors made, or disagreements with outcomes, we have not identified any investigator in PSB who we believe does not conduct a quality investigation on any ongoing basis.

In the case of investigations conducted outside of PSB, some Districts use a single supervisor to conduct all investigations for the District when possible to do so. We previously identified that two of these assigned supervisors had completed multiple deficient investigations over several reporting periods. We brought those to the attention of MCSO. One has since left employment with MCSO, and the other is no longer assigned to conduct District investigations.

For this reporting period, we reviewed 22 investigations conducted by supervisors in Districts and Divisions outside of PSB. As some Districts continue to use a single supervisor to investigate misconduct investigations assigned to the District, there were three different supervisors who conducted a total of six of the 22 investigations. Only one of these had any deficiencies. Deficiencies were found in two additional investigations conducted by other District or Division supervisors. In these three cases, deficiencies were addressed and corrected by PSB

As we have previously noted during our reviews over multiple reporting periods, even experienced supervisors sometimes have little experience in conducting administrative misconduct investigations and in other cases, investigations are conducted by newly promoted supervisors, who have no experience in conducting administrative misconduct investigations. We have not observed any instances of repetitive deficiencies by District or Division supervisors who conduct administrative misconduct investigations that we believe would be cause for discipline or other administrative actions.

On June 23, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 213.** *Investigations of minor misconduct conducted outside of the Professional Standards Bureau must be conducted by a Supervisor and not by line-level deputies. After such investigations, the investigating Supervisor's Commander shall forward the investigation file to the Professional Standards Bureau after he or she finds that the misconduct investigation is complete and the findings are supported by the evidence. The Professional Standards Bureau shall review the misconduct investigation to ensure that it is complete and that the findings are supported by the evidence. The Professional Standards Bureau shall order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings. Where the findings of the investigation report are not supported by the appropriate standard of proof, the Professional Standards Bureau shall document the reasons for this determination and shall include this documentation as an addendum to the original investigation.*

WAI 72769

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on November 14, 2023.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 134 administrative misconduct investigations during this reporting period.  Of the 134 investigations, 96 were investigated by PSB personnel, 16 were outsourced, and 22 were investigated by MCSO personnel outside of PSB.

None of the documentation we received regarding investigations conducted outside of PSB indicated that any person below the rank of sergeant was responsible for conducting the investigation.

During the last reporting period, all 40 District or Division-level approved cases were forwarded to, and reviewed by, PSB as required.  Fourteen investigations (35%) had identified investigative deficiencies.

During this reporting period, all 22 District or Division-level investigations we reviewed were forwarded to and reviewed by PSB as required.  Three (14%) of the 22 had identified deficiencies, a decrease from 35% during the last reporting period.  Deficiencies for this reporting period included failure to conduct a thorough investigation and unsupported findings.  All but one of these investigations were initiated in 2020 or 2021, after the increased oversight began; and all were reviewed for compliance by one or more members of District or Division command staff prior to forwarding them to PSB.

During the last reporting period, we noted increased compliance with District and Division investigations, to include finding seven (18%) of the cases in full compliance.  During this reporting period, we again noted increased compliance, with eight cases (36%) being found in full compliance.  Investigative compliance rose from 65% during the last reporting period to 86% this reporting period.  We are encouraged by this continuing trend in compliance.  As is our practice, we will discuss those cases with deficiencies with MCSO during our next site visit.


***Paragraph 214.***  *At the discretion of the Commander of the Professional Standards Bureau, a misconduct investigation may be assigned or re-assigned to another Supervisor with the approval of his or her Commander, whether within or outside of the District or Bureau in which the incident occurred, or may be returned to the original Supervisor for further investigation or analysis.  This assignment or re-assignment shall be explained in writing.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we reviewed 134 administrative misconduct investigations during this reporting period.

Our analysis for this reporting period revealed that of the 22 investigations conducted outside of PSB, two were returned by PSB to the original investigating supervisor for further investigation or analysis, and one was reassigned to a different investigator.

WAI 72770

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 215.** *If, after an investigation conducted outside of the Professional Standards Bureau, an employee's actions are found to violate policy, the investigating Supervisor's Commander shall direct and ensure appropriate discipline and/or corrective action. Where the incident indicates policy, training, tactical, or equipment concerns, the Commander shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we reviewed 22 administrative misconduct investigations conducted by MCSO personnel outside of PSB and completed during this reporting period.

Four of the 22 completed misconduct investigations conducted outside of PSB resulted in sustained findings against personnel still employed by MCSO. In all four, the reports included documentation that discipline or corrective action was taken. There were no instances where other actions by Command personnel were necessary.

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 216.** *If, after an investigation conducted by the Professional Standards Bureau, an employee's actions are found to violate policy, the Commander of the Professional Standards Bureau shall direct and ensure appropriate discipline and/or corrective action. Where the incident indicates policy, training, tactical, or equipment concerns, the Commander of the Professional Standards Bureau shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 15, 2023.
- GH-2 (Internal Investigations), most recently amended on November 14, 2023.
- Professional Standards Bureau Operations Manual, most recently amended on November 13, 2023.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 134 administrative misconduct investigations during this reporting period.

WAI 72771

Ninety-six of the completed investigations were conducted by PSB.  Sixteen outsourced cases are also included here as PSB maintains responsibility for these cases.  Thirty-six of these 112 cases resulted in sustained findings against current MCSO employees.  In all 36, the PSB Commander ensured that appropriate discipline and/or corrective action was recommended for the sustained allegations.

We continue to note that the PSB Commander cannot ensure that appropriate discipline or corrective action are the final outcome of sustained misconduct investigations, as the Appointing Authority makes the final decisions for discipline in both minor misconduct cases and in serious misconduct cases that result in PDHs.  This hearing officer has the authority to change the findings or reduce the discipline.  In 33 of the 40 sustained cases, the final sanction was the presumptive discipline identified by the PSB Commander or another designated employee.  In seven cases, the Appointing Authority mitigated the discipline as allowed by MCSO policy.  In one of these seven, while we disagree that mitigation was appropriate, the final discipline fell within the identified range and is therefore compliant.  We will discuss this case with PSB during our next site visit.

The PSB Commander has consistently ensured that, when appropriate, policy, training, tactical, and equipment concerns are identified.  PSB then forwards these concerns to the appropriate Division for follow-up or resolution.  PSB personnel maintain a list of these concerns and track the progress of each concern that was forwarded.  While investigators have been properly identifying these concerns and authoring appropriate memos of concern, many of the concerns have remained unaddressed by those responsible for doing so.  We have acknowledged that while the nature of some of these concerns, particularly those that may require policy revision, may take a lengthy amount of time to resolve, many of these have remained pending for several years according to the tracking document provided by PSB.  Concerns regarding training, tactical, and equipment have also remained pending for lengthy periods of time.  We have discussed this issue with MCSO during multiple site visit meetings, and we have also discussed this under Paragraph 207.

During our January 2023 site visit, we discussed this concern and urged MCSO to take action on these pending concerns.  We also asked PSB to provide greater detail on the status of these concerns at our April 2023 site visit.

During our April 2023 site visit, we met with MCSO Command personnel to discuss our ongoing concerns with the resolution of those issues PSB had documented and forwarded to Divisions outside of PSB.  In some cases, MCSO advised us that the concern had been addressed but had just not been documented.  In others, there was no explanation for the failure to resolve the noted concern.  The PSB Commander reported that he was reviewing the entire list; he understood that there were more than 99 unresolved concerns; he was working to improve the tracking system; and that he intended to incorporate the use of Blue Team to track these in the future.

During our July 2023 site visit, we met with those MCSO Command personnel who oversee Divisions and Bureaus that have responsibility for resolution of those concerns identified and forwarded to them by PSB.  These personnel provided detailed information on how concerns are addressed, as well as acknowledging that in some cases, there was a lengthy delay in addressing concerns, and in other cases, there did not appear to have been a response as required.

WAI 72772

During this meeting, the two Executive Chiefs with oversight over Divisions and Bureaus provided input on efforts being made to address this issue, along with information on improvements they would be directing to address and resolve these concerns. They also noted that moving forward, all concerns identified would be forwarded directly to Deputy Chiefs to ensure they are properly addressed and resolved in a timely manner. The PSB Commander also advised of the continued efforts being made in PSB to review all pending concerns, research what needed to be done, and ensure that appropriate follow up was conducted and documented. There were 108 pending concerns at the end of the reporting period, as new concerns had been received and PSB was still in the process of reviewing those that were pending.

During our October 2023 site visit, we again met with PSB and Command personnel who oversee Divisions and Bureaus who are responsible for resolving concerns identified and forwarded to them by PSB. At the end of this reporting period, the number of pending concerns was reduced to 76; and many of those remaining involve policy review or training, or personnel no longer employed by MCSO. Most require significant research to determine the history of the concern and the actions that were taken. PSB maintains a tracking document that documents, in detail, this research and the outcomes of those concerns that are being closed. The PSB Commander has advised us that he ensures all actions have been taken prior to approving a closure.

Moving forward, PSB has developed a method to track these concerns using Blue Team, but the Bureau will not likely be able to implement it until the first quarter of 2024. In the interim, the Executive Chiefs are tracking these concerns and ensuring that new ones are addressed in a timely manner.

During the last reporting period, we warned MCSO that should we fail to see both an improved process and a substantial reduction in the number of concerns pending during the next reporting period, we would withdraw MCSO's Phase 2 compliance with this Paragraph. At that time, there were 108 pending concerns. At the end of this quarter, there were 76 pending concerns. We have closely reviewed the pending list of concerns at the end of this quarter, and discussed with the PSB Commander both the processes being used and efforts of PSB to resolve the concerns. It is also clear that MCSO Executive staff are taking an active role in addressing these issues. We are satisfied with the progress being made in addressing these concerns; the reduction in the number of pending concerns; and that PSB has both an interim solution, and a long term one. We will continue to closely monitor MCSO's ongoing efforts in addressing these concerns. MCSO remains in compliance with this Paragraph.

WAI 72773

***Paragraph 217.*** *The Professional Standards Bureau shall conduct targeted and random reviews of discipline imposed by Commanders for min or misconduct to ensure compliance with MCSO policy and legal standards.*

**In Full and Effective Compliance**

Based on the requirements of the Second Order, District and Division Commanders will not impose discipline for minor misconduct.  In all cases, the PSB Commander will determine the final findings for internal investigations and the presumptive range of discipline for those cases with sustained findings.  The Appointing Authority will then make the final determination of discipline.

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 218.*** *The Professional Standards Bureau shall maintain all administrative investigation reports and files after they are completed for record-keeping in accordance with applicable law.*

**In Full and Effective Compliance**

To determine compliance with this Paragraph, we have observed that PSB maintains both hardcopy and electronic files intended to contain all documents required for compliance with this Paragraph.

A member of our Team inspected the file rooms where hardcopies of administrative investigations were stored and randomly reviewed case files to verify compliance on multiple occasions when PSB was housed at MCSO Headquarters.  Our Team member also used the access granted to IAPro to randomly select internal affairs case files to verify that all information was being maintained electronically.

PSB completed the move to its new offsite facility in May 2018.  Subsequent to the move, a member of our Team conducted an inspection of the file rooms in the new facility; and reviewed a random sample of internal investigations in IAPro to verify ongoing compliance.

During our January 2019 site visit, a member of our Team verified continued compliance at the new PSB facility by inspecting both the criminal and administrative investigation file rooms and randomly reviewing internal affairs case files to verify that all information was also being electronically maintained in IAPro.

During our July 2019 site visit, a member of our Team verified, by accessing IAPro and reviewing randomly selected cases, that electronic files were being properly maintained.

During our October 2019 site visit, a member of our Team again verified compliance at the PSB facility by inspecting both the criminal and administrative investigation file rooms and randomly reviewing internal affairs case files to verify that all information is also being electronically maintained in IAPro.

WAI 72774

During our October 2023 site visit, members of our Team again verified compliance at the PSB facility by inspecting both the criminal and administrative investigation file rooms and randomly reviewing internal affairs case files to verify that all information is also being electronically maintained in IAPro.

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

### D.   Discipline

**Paragraph 219.**  *The Sheriff shall ensure that discipline for sustained allegations of misconduct comports with due process, and that discipline is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented regardless of the command level of the principal of the investigation.*

**Paragraph 220.**  *To ensure consistency in the imposition of discipline, the Sheriff shall review the MCSO's current disciplinary matrices and, upon approval of the parties and the Monitor, will amend them as necessary to ensure that they:*

a.    *establish a presumptive range of discipline for each type of violation;*

b.    *increase the presumptive discipline based on an employee's prior violations;*

c.    *set out defined mitigating and aggravating factors;*

d.    *prohibit consideration of the employee's race, gender, gender identity, sexual orientation, national origin, age, or ethnicity;*

e.    *prohibit conflicts, nepotism, or bias of any kind in the administration of discipline;*

f.    *prohibit consideration of the high (or low) profile nature of the incident, including media coverage or other public attention;*

g.    *clearly define forms of discipline and define classes of discipline as used in policies and operations manuals;*

h.    *provide that corrective action such as coaching or training is not considered to be discipline and should not be used as a substitute for discipline where the matrix calls for discipline;*

i.    *provide that the MCSO will not take only non-disciplinary corrective action in cases in which the disciplinary matrices call for the imposition of discipline;*

j.    *provide that the MCSO will consider whether non-disciplinary corrective action is also appropriate in a case where discipline has been imposed;*

k.    *require that any departures from the discipline recommended under the disciplinary matrices be justified in writing and included in the employee's file; and*

WAI 72775

l.    *provide a disciplinary matrix for unclassified management level employees that is at least as demanding as the disciplinary matrix for management level employees.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 15, 2023.

- GH-2 (Internal Investigations), most recently amended on November 14, 2023.

- Administrative Services Division Operations Manual, most recently amended on November 14, 2023.

- Professional Standards Bureau Operations Manual, most recently amended on December 31, 2019.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations.

During this reporting period, the PSB Commander sustained misconduct against one or more identified employees in 65 of the 134 administrative misconduct investigations we reviewed.  In 40 of the sustained investigations, one or more of the known principal employees were still employed at MCSO at the time findings or discipline decisions were made.  Four sustained investigations resulted in the dismissal of an employee, seven resulted in suspensions, 17 in one or more written reprimands, and 12 in coachings.  Compliance for this Paragraph is based on the discipline findings for both minor and serious discipline.  In those cases where only serious discipline is recommended, compliance findings specific to those cases are addressed in Paragraph 226.

Paragraph 220.a. requires a presumptive range of discipline for each type of violation.  Of the 65 total sustained cases, 40 involved known employees still employed by MCSO at the time discipline decisions were made.  The PSB Commander determined and documented the presumptive discipline range in compliance with this Subparagraph in all of these cases.

Paragraph 220.b. requires that presumptive discipline be increased if an employee has prior violations.  In 12 of the 40 sustained investigations, an employee had prior sustained violations. The PSB Commander considered and increased the presumptive discipline based on the Matrices in place at the time of the misconduct.

Paragraph 220.c. requires that mitigating and aggravating factors be defined.  Aggravating and mitigating factors are not specifically defined in the internal affairs investigation or discipline policy in effect prior to May 18, 2017.  The revised discipline policy, effective May 18, 2017, defined these factors.  These aggravating or mitigating factors are not identified by the PSB Commander – but by the Appointing Authority when making the final disciplinary decisions.

WAI 72776

During this reporting period, all of the sustained cases were initiated after May 18, 2017.  In all 40, the Appointing Authority provided justification and documentation for all factors considered when making the final decisions in all of the cases based on the Matrices in place at the time of the misconduct.  We also found that he continues to specifically identify those instances where there are aggravating or mitigating factors in the justification documents when appropriate.

Paragraph 220.d. prohibits the consideration of any prohibited biases when determining discipline.  None of the sustained cases that resulted in discipline that we reviewed during this reporting period included any indication that any biases were considered when determining discipline.

Paragraph 220.e. prohibits any conflicts, nepotism, or bias of any kind in the administration of discipline.  None of the sustained cases we reviewed during this reporting period had any indication of conflicts, nepotism, or bias of any kind when determining the disciplinary sanction.

Paragraph 220.f. prohibits the consideration of the high (or low) profile nature of an incident when determining discipline.  None of the sustained cases we reviewed during this reporting period indicated any consideration of the high- or low-profile nature of the incident when considering discipline.

Paragraph 220.g. requires that clearly defined forms of discipline and classes of discipline be defined.  Phase 2 compliance is not applicable to this Subparagraph.

Paragraph 220.h. requires that corrective action such as coaching or training is not considered to be discipline and should not be used as a substitute for discipline.  There were no instances identified during this reporting period where a coaching was used as a substitute for discipline.

Paragraph 220.i. requires that MCSO will not take only non-disciplinary action in cases where the Discipline Matrices call for the imposition of discipline.  There were no instances during this reporting period where MCSO took non-disciplinary action for an act of misconduct that was ineligible to be handled as a coaching.

Paragraph 220.j. requires that MCSO consider whether non-disciplinary corrective action is also appropriate.  There were no instances during this reporting period where non-disciplinary actions were also found to be appropriate.

Paragraph 220.k. requires that any departure from the discipline recommended under the Discipline Matrices be justified in writing and included in the employee's file.  Forty investigations with sustained findings resulted in employee discipline or other approved corrective action.  Of the 40 cases with discipline or other corrective action, four sustained investigations resulted in the dismissal of an employee, seven resulted in suspensions, 17 in (one or more) written reprimands, and 12 in coachings.

The Appointing Authority overturned two sustained finding made by PSB during this reporting period.  We do not disagree with his decision to do so.  In seven cases, the Appointing Authority mitigated the discipline for the sustained allegations.  The Appointing Authority provided justification and documentation as required.

WAI 72777

As we have previously noted, compliance for this Paragraph is based on the final outcome for all sustained investigations. Those instances that involve only serious discipline are specifically covered in Paragraph 226.

Paragraph 220.l. requires that a Discipline Matrix for unclassified management employees be at least as demanding as the Discipline Matrix for management-level employees. We reviewed the approved policies that affect discipline for unclassified management employees, and they comply with this requirement. During this reporting period, MCSO did not complete or submit any administrative investigations involving unclassified management employees.

During this reporting period, all of the sustained investigations were both initiated and completed after May 18, 2017; and are subject to all the requirements relative to investigations and disciplinary procedures contained in policies revised on that date and have both a discipline range and a presumptive discipline. The Appointing Authority provided a written justification in all sustained cases where he made the final decision.

In 32 of the 40 cases, the final sanction was the presumptive discipline identified by the PSB Commander or another designated employee. In seven cases, the Appointing Authority mitigated the discipline as allowed by MCSO policy. In one of these seven, while we disagree that mitigation was justified, the final discipline fell within the identified range and is therefore compliant. We will discuss this case with PSB during our next site visit. In one additional case, the Appointing Authority aggravated the discipline; and we agree with his decision to do so.

**Paragraph 221.** *The Sheriff shall mandate that each act or omission that results in a sustained misconduct allegation shall be treated as a separate offense for the purposes of imposing discipline.*

## In Full and Effective Compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations.

During this reporting period, we reviewed 40 misconduct investigations with sustained allegations that resulted in the recommendation for corrective action or discipline for MCSO employees. We found that MCSO met the requirements for compliance with this Paragraph.

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 72778

*Paragraph 222.  The Sheriff shall also provide that the Commander of the Professional Standards Bureau shall make preliminary determinations of the discipline to be imposed in all cases and shall document those determinations in writing, including the presumptive range of discipline for the sustained misconduct allegation, and the employee's disciplinary history.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations.

During this reporting period, there were 40 investigations with sustained findings that resulted in recommendations for discipline.  In all 40, the PSB Commander determined and documented in writing the presumptive range of discipline based on the policies and Discipline Matrices in effect at the time of the investigation.  The documentation submitted for this Paragraph included the category, offense number, and employee's discipline history.

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.


*E.*      ***Pre-Determination Hearings***

*Paragraph 223.  If the Commander of the Professional Standards Bureau makes a preliminary determination that serious discipline (defined as suspension, demotion, or termination) should be imposed, a designated member of MCSO's command staff will conduct a pre-determination hearing and will provide the employee with an opportunity to be heard.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel where MCSO holds a Pre-Determination Hearing (PDH).

During this reporting period, 40 administrative misconduct investigations resulted in sustained findings against current MCSO employees.  Twenty of the sustained investigations resulted in recommendations for serious discipline.  In 19 of these, a PDH was held.  In one, the Appointing Authority mitigated the discipline to a written reprimand prior to the PDH, so one was not held.

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 72779

***Paragraph 224.*** *Pre-determination hearings will be audio and video recorded in their entirety, and the recording shall be maintained with the administrative investigation file.*

**In Full and Effective Compliance**

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, in the 19 cases where a Pre-Determination Hearing was held, the hearing was audio- and video-recorded as required, included in the administrative file, and reviewed by a member of our Team.

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 225.*** *If an employee provides new or additional evidence at a pre-determination hearing, the hearing will be suspended and the matter will be returned to the internal affairs investigator for consideration or further investigation, as necessary. If after any further investigation or consideration of the new or additional evidence, there is no change in the determination of preliminary discipline, the matter will go back to the pre-determination hearing. The Professional Standards Bureau shall initiate a separate misconduct investigation if it appears that the employee intentionally withheld the new or additional evidence during the initial misconduct investigation.*

**In Full and Effective Compliance**

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, 19 sustained investigations resulted in a Pre-Determination Hearing and we reviewed all of the recordings of these hearings. There was one instance where the principal made multiple allegations against other employees during the PDH. The Appointing Authority notified the PSB Commander, who reviewed the concerns. There was no change in the sustained allegations against the principal employee as a result of his allegations.

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 72780

**Paragraph 226.** *If the designated member of MCSO's command staff conducting the pre-determination hearing does not uphold the charges recommended by the Professional Standards Bureau in any respect, or does not impose the Commander of the Professional Standards Bureau's recommended discipline and/or non-disciplinary corrective action, the Sheriff shall require the designated member of MCSO's command staff to set forth in writing his or her justification for doing so. This justification will be appended to the investigation file.*

**In Full and Effective Compliance**

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During our site visits, we have met with the Appointing Authority and the Administrative Services Division as necessary to discuss any concerns we have with final outcomes or decisions that result from Pre-Determination Hearings. During these meetings, we have discussed that the Appointing Authority does not have the authority to reduce discipline based only on timeframe concerns when an employee appeals discipline in these cases. It is the Maricopa County Attorney's Office (MCAO) that reviews these cases and determines whether the cases should go forward. Both the Appointing Authority and the representative from the MCAO advised us that they have taken some of these cases forward; but in others, they did not believe it was appropriate to do so, based on the totality of circumstances. The Parties have commented on their concerns regarding cases involving the Plaintiffs' class that might result in reductions in discipline as a result of the failure to complete the case within the 180-day timeframe. We have discussed the specific requirements of Arizona Revised Statutes 38-1101, and that the statute only requires a "good faith" attempt to complete cases that result in suspensions, demotions, or dismissals within the 180-day timeframe. Since the time of our first discussions in 2018, Arizona law has added a definition of good faith. A.R.S. 38-1101 now defines good faith as "honesty of purpose and absence of intent to defraud."

We have also discussed those cases where a decision may be made after a Pre-Determination Hearing that a reduction in discipline will occur, and those cases where a decision to reduce the discipline may occur if an appeal is filed. It is our understanding from our meetings with the Appointing Authority and other staff who have been present that MCSO consults with MCAO attorneys in these cases and their input is related to the final outcomes. We continue to note that all the documentation we receive and review is authored and signed by the Appointing Authority, so our assessment can only consider any final decisions as his.

During the last reporting period, 15 cases forwarded for consideration of serious discipline resulted in serious discipline or dismissal of the employee. In all 15, the Appointing Authority provided a justification for the final decisions; and this information was provided to our Team in the submissions regarding closed internal affairs investigations.

During this reporting period, 20 cases were forwarded for consideration of serious discipline. Eleven resulted in serious discipline. In seven cases, the Appointing Authority mitigated the discipline; in one, he aggravated the discipline; and in one, he overturned the finding. The Appointing Authority provided a justification for all final decisions; and this information was provided to our Team in the submissions regarding closed administrative misconduct investigations.

WAI 72781

On January 6, 2023, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.


***Paragraph 227.***  *The Sheriff shall promulgate MCSO policy which shall provide that the designated member of MCSO's command staff conducting a pre-determination hearing should apply the disciplinary matrix and set forth clear guidelines for the grounds on which a deviation is permitted.  The Sheriff shall mandate that the designated member of MCSO's command staff may not consider the following as grounds for mitigation or reducing the level of discipline prescribed by the matrix:*

*a.    his or her personal opinion about the employee's reputation;*

*b.    the employee's past disciplinary history (or lack thereof), except as provided in the disciplinary matrix;*

*c.    whether others were jointly responsible for the misconduct, except that the MCSO disciplinary decision maker may consider the measure of discipline imposed on other employees involved to the extent that discipline on others had been previously imposed and the conduct was similarly culpable.*

**In Full and Effective Compliance**

To assess compliance with this Paragraph, we review completed misconduct investigations.

During this reporting period, we reviewed 40 administrative misconduct investigations where discipline was recommended.  The serious sustained allegations in 20 of these investigations resulted in their referrals for Pre-Determination Hearings.

Paragraph 227.a. prohibits the designated member of command staff conducting a Pre-Determination Hearing from considering a personal opinion of an employee's reputation when determining discipline.  There were no indications in our reviews of these investigations that any personal opinion was considered in making a disciplinary decision.

Paragraph 227.b. prohibits the consideration of the employee's past disciplinary history (or lack thereof), except as provided in the Discipline Matrix.  There were no instances where we determined that the member of command staff responsible for conducting the Pre-Determination Hearing considered disciplinary history outside of the requirements of this Paragraph.

Paragraph 227.c. prohibits the consideration of others jointly responsible for misconduct, except that the decision-maker may consider such discipline to the extent that discipline on others had been previously imposed and the conduct was similarly culpable.  There were no indications in our reviews that the misconduct of others was improperly considered in the disciplinary decisions that were made.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

WAI 72782

***Paragraph 228.*** *The Sheriff or his designee has the authority to rescind, revoke or alter any disciplinary decision made by either the Commander of the Professional Standards Bureau or the appointed MCSO disciplinary authority so long as:*

a.    *that decision does not relate to the Sheriff or his designee;*

b.    *the Sheriff or his designee provides a thorough written and reasonable explanation for the grounds of the decision as to each employee involved;*

c.    *the written explanation is placed in the employment files of all employees who were affected by the decision of the Sheriff or his designee; and*

d.    *the written explanation is available to the public upon request.*

**In Full and Effective Compliance**

To assess compliance with this Paragraph, we review completed misconduct investigations.

During this reporting period, we did not review any cases where the Sheriff or his designee rescinded, revoked, or altered any disciplinary decision made by either the Commander of the Professional Standards Bureau or the appointed MCSO disciplinary authority.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

### F.    *Criminal Misconduct Investigations*

***Paragraph 229.*** *Whenever an internal affairs investigator or Commander finds evidence of misconduct indicating apparent criminal conduct by an employee, the Sheriff shall require that the internal affairs investigator or Commander immediately notify the Commander of the Professional Standards Bureau. If the administrative misconduct investigation is being conducted by a Supervisor outside of the Professional Standards Bureau, the Sheriff shall require that the Professional Standards Bureau immediately take over the administrative investigation. If the evidence of misconduct pertains to someone who is superior in rank to the Commander of the Professional Standards Bureau and is within the Commander's chain of command, the Sheriff shall require the Commander to provide the evidence directly to what he or she believes is the appropriate prosecuting authority—the Maricopa County Attorney, the Arizona Attorney General, or the United States Attorney for the District of Arizona—without notifying those in his or her chain of command who may be the subject of a criminal investigation.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we review completed criminal misconduct investigations.

During this reporting period, we reviewed nine criminal investigations. Six were externally generated, and three were internally generated. All nine were appropriately assigned to criminal investigators in PSB. The investigations were brought to the attention of the PSB Commander as required and an administrative misconduct investigation was also initiated.

WAI 72783

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

**Paragraph 230.**  *If a misconduct allegation will be investigated criminally, the Sheriff shall require that the Professional Standards Bureau not compel an interview of the principal pursuant to Garrity v. New Jersey, 385 U.S. 493 (1967), until it has first consulted with the criminal investigator and the relevant prosecuting authority.  No other part of the administrative investigation shall be held in abeyance unless specifically authorized by the Commander of the Professional Standards Bureau in consultation with the entity conducting the criminal investigation.  The Sheriff shall require the Professional Standards Bureau to document in writing all decisions regarding compelling an interview, all decisions to hold any aspect of an administrative investigation in abeyance, and all consultations with the criminal investigator and prosecuting authority.*

### In Full and Effective Compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by both criminal and administrative investigators to ensure that they contain appropriate documentation that complies with the requirements of this Paragraph.

We previously determined that in many cases, the administrative investigation is not submitted and reviewed during the same reporting period as the criminal investigation, as generally, administrative investigations are finalized after the completion of the criminal investigation.  We discussed this issue with PSB during our January 2017 site visit.  To resolve the concern, PSB agreed to provide us with a copy of any criminal investigation when PSB submits the administrative misconduct investigation for our review, even if the criminal investigation has been previously submitted.  MCSO has been consistently providing copies of these criminal investigations with the administrative investigation since that time.

During this reporting period, we reviewed six administrative misconduct investigations where criminal conduct may have occurred.  In three, the cases had also been investigated by PSB criminal investigators.  In three others, the criminal investigation was conducted by another law enforcement agency with jurisdiction where the offense was alleged to have occurred.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

**Paragraph 231.**  *The Sheriff shall require the Professional Standards Bureau to ensure that investigators conducting a criminal investigation do not have access to any statements by the principal that were compelled pursuant to Garrity.*

### In Full and Effective Compliance

PSB is divided into criminal and administrative sections.  Criminal investigators and administrative investigators are housed on separate floors of the building.  Criminal investigators do not have access to the IAPro database for administrative investigations, and there are separate

WAI 72784

file rooms for criminal and administrative investigative documents and reports. We have previously verified during our site visits that the required separation of criminal and administrative investigations and restricted access to IAPro is in place.

In May 2018, PSB relocated to a new offsite location. After PSB's move to its new facility, we verified that criminal and administrative investigation files were housed on separate floors in the new facility. Criminal investigators do not have access to the IAPro database for administrative investigations, and there are separate and secured file rooms for criminal and administrative documents and reports.

During our October 2019 site visit, a member of our Team again verified that criminal and administrative investigative files are housed on separate floors, there is restricted access to both file rooms, and restricted access to IAPro remains in place.

During our October 2023 site visit, members of our Team again verified that criminal and administrative investigative files are housed on separate floors, there is restricted access to both file rooms, and restricted access to IAPro also remains in place.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 232.** *The Sheriff shall require the Professional Standards Bureau to complete all such administrative investigations regardless of the outcome of any criminal investigation, including cases in which the prosecuting agency declines to prosecute or dismisses the criminal case after the initiation of criminal charges. The Sheriff shall require that all relevant provisions of MCSO policies and procedures and the operations manual for the Professional Standards Bureau shall remind members of the Bureau that administrative and criminal cases are held to different standards of proof, that the elements of a policy violation differ from those of a criminal offense, and that the purposes of the administrative investigation process differ from those of the criminal investigation process.*

**In Full and Effective Compliance**

To determine MCSO's compliance with this Paragraph, we review administrative misconduct and criminal investigations.

During this reporting period, we reviewed nine criminal misconduct investigations conducted by MCSO personnel. All nine have a companion administrative misconduct investigation, as required; and are in compliance with the requirements of this Paragraph.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 72785

**Paragraph 233.** *If the investigator conducting the criminal investigation decides to close the investigation without referring it to a prosecuting agency, this decision must be documented in writing and provided to the Professional Standards Bureau. The Commander of the Professional Standards Bureau shall separately consider whether to refer the matter to a prosecuting agency and shall document the decision in writing.*

**In Full and Effective Compliance**

To determine MCSO's compliance with this Paragraph, we review criminal misconduct investigations.

During this reporting period, investigators documented their conclusions and decisions to close eight of the nine criminal investigations we reviewed without submittal to a prosecuting agency and the PSB Commander approved these decisions.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 234.** *If the investigator conducting the criminal investigation decides to refer the matter to a prosecuting agency, the Professional Standards Bureau shall review the information provided to the prosecuting agency to ensure that it is of sufficient quality and completeness. The Commander of the Professional Standards Bureau shall direct that the investigator conduct additional investigation when it appears that there is additional relevant evidence that may improve the reliability or credibility of the investigation. Such directions shall be documented in writing and included in the investigatory file.*

**In Full and Effective Compliance**

To determine MCSO's compliance with this Paragraph, we review criminal misconduct investigations.

During this reporting period, we reviewed nine criminal misconduct investigations conducted by PSB personnel. One was reviewed by the PSB Commander and then submitted to a prosecutorial agency for review. The prosecuting agency declined prosecution, citing no reasonable likelihood of conviction. There was no indication that there were any investigative deficiencies or that additional follow-up could have resulted in charges being filed.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 72786

**Paragraph 235.** *If the prosecuting agency declines to prosecute or dismisses the criminal case after the initiation of criminal charges, the Professional Standards Bureau shall request an explanation for this decision, which shall be documented in writing and appended to the criminal investigation report.*

**In Full and Effective Compliance**

To determine MCSO's compliance with this Paragraph, we review criminal misconduct investigations.

During this reporting period, one of the criminal investigations we reviewed was submitted to a prosecutorial agency for review. The prosecuting agency declined prosecution, citing no reasonable likelihood of conviction.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 236.** *The Sheriff shall require the Professional Standards Bureau to maintain all criminal investigation reports and files after they are completed for record-keeping in accordance with applicable law.*

**In Full and Effective Compliance**

To determine compliance with this Paragraph, we have observed that PSB maintains both hardcopy and electronic files that are intended to contain all the documents required per this Paragraph.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

### G. Civilian Complaint Intake, Communication, and Tracking

**Paragraph 237.** *Within six months of the entry of this Order, the Monitor, in consultation with the Community Advisory Board, will develop and implement a program to promote awareness throughout the Maricopa County community about the process for filing complaints about the conduct of MCSO employees.*

**Phase 1**: Not applicable

**Phase 2**: Not applicable

We developed and implemented a Complaint Process Community Awareness Program to promote awareness throughout the Maricopa County community about the process for filing complaints about the conduct of MCSO employees. The program provides for distributing brochures describing the complaint process at quarterly community meetings and using public service announcements – made via local media outlets and social media – to provide basic information (in both English and Spanish) about MCSO's complaint process.

WAI 72787

We contacted faith organizations and civic groups throughout Maricopa County requesting that they make complaint process information forms available to members of their congregations and groups. The Complaint Process Community Awareness Program incorporates input from the CAB, MCSO, and the ACLU of Arizona.

**Paragraph 238.** *The Sheriff shall require the MCSO to accept all civilian complaints, whether submitted verbally or in writing; in person, by phone, by mail, or online; by a complainant, someone acting on the complainant's behalf, or anonymously; and with or without a signature from the complainant. MCSO will document all complaints in writing.*

**In Full and Effective Compliance**

To assess compliance with this Paragraph, we review all new misconduct complaints received each month and completed misconduct investigations conducted by MCSO personnel. In addition, we review many initial complaint documents or initial telephone calls, BWC videos, traffic stop videos, Supervisor Notes, Compliance and BIO reviews, and consider findings in the complaint testing process.

During this reporting period, we reviewed 134 completed administrative misconduct investigations. We identified two instance where an employee did not initiate a complaint from a community member as required. Both were properly addressed by PSB.

Our review of traffic stops for this reporting period did not identify any instances where a subject who was arrested made allegations of misconduct by MCSO personnel during his arrest that went unaddressed. Our review of Supervisor Notes during this reporting period did not identify any incidents where there were indications that a complaint had been made but not properly reported. We reviewed numerous complainant contacts and found no indication that a supervisor initially refused to take a complaint or attempted to dissuade the complainant from making a complaint. Neither CID nor BIO identified any instances in their reviews during this reporting period that indicated that a complainant had attempted to file a complaint and been refused. We did not identify any complaint intake tests for this reporting period where MCSO failed to accept a complaint. (See Paragraph 254.)

We continue to find that MCSO consistently accepts and records complaints as required for compliance with this Paragraph.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 72788

*Paragraph 239.  In locations clearly visible to members of the public at the reception desk at MCSO headquarters and at all District stations, the Sheriff and the MCSO will post and maintain permanent placards clearly and simply describing the civilian complaint process that is visible to the public at all hours.  The placards shall include relevant contact information, including telephone numbers, email addresses, mailing addresses, and Internet sites.  The placards shall be in both English and Spanish.*

**In Full and Effective Compliance**

During our site visit in October, we visited the Fourth Avenue Jail; MCSO Headquarters; and the District 1, 2, 3, 4, and 7 facilities.  At each site, we verified that permanent placards meeting all the requirements of this Paragraph were prominently displayed.  The placards state that anyone who has a concern regarding the performance of any MCSO employee has the right to file a complaint in English or Spanish or their preferred language, to include American Sign Language; in person at any District facility or at the Professional Standards Bureau, by mail, by telephone, by fax, or online.  The placard includes relevant contact information, including telephone numbers, email addresses, mailing addresses, and websites.

During our October site visit, MCSO reported that, during this reporting period, it did not receive any feedback from the community regarding the permanent complaint placards.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

*Paragraph 240.  The Sheriff shall require all deputies to carry complaint forms in their MCSO vehicles.  Upon request, deputies will provide individuals with complaint forms and information about how to file a complaint, their name and badge number, and the contact information, including telephone number and email address, of their immediate supervising officer.  The Sheriff must provide all supervising officers with telephones.  Supervising officers must timely respond to such complaints registered by civilians.*

**In Full and Effective Compliance**

During our October site visit, we visited District offices and verified that MCSO maintained adequate supplies of complaint forms for deputies to carry in their vehicles.  We also verified that supervisors were in possession of MCSO-issued cellular telephones.  MCSO's complaint intake testing program – in which an external vendor conducts 24 complaint intake tests via telephone, email, U.S. Mail, MCSO's website, and in-person tests annually – has mostly found that MCSO personnel respond in accordance with agency policy and in a timely fashion to a diverse group of complainants.  Where the complaint intake tests have identified deficiencies, MCSO has taken appropriate corrective steps, such as issuing BIO Action Forms or conducting other follow-up. (See Paragraphs 254-260.)

On March 31, 2023, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

WAI 72789

**Paragraph 241.** *The Sheriff will ensure that the Professional Standards Bureau facility is easily accessible to members of the public. There shall be a space available for receiving walk-in visitors and personnel who can assist the public with filing complaints and/or answer an individual's questions about the complaint investigation process.*

**In Full and Effective Compliance**

The PSB facility, the former East Court Building Library, located at 101 West Jefferson Street in Phoenix, is easily accessible to members of the public. The County Court facilities in the building are separate from the PSB reception area and offices. The PSB area is accessible from First Avenue, a major thoroughfare; and there is no required security screening of individuals entering the building through the First Avenue entrance.

MCSO's placards and comment and complaint forms – including the complaint form that is accessible via MCSO's website – all reflect PSB's current address.

During our October site visit, we discussed with MCSO personnel PSB's plans to move its facility to a new location, at 4000 North Central Avenue in Phoenix. The new space is currently being adapted for PSB's use; PSB plans to move into the space in May 2024.

On January 6, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 242.** *The Sheriff will also make complaint forms widely available at locations around the County including: the websites of MCSO and Maricopa County government; the lobby of MCSO's headquarters; each patrol District; and the Maricopa County government offices. The Sheriff will ask locations, such as public library branches and the offices and gathering places of community groups, to make these materials available.*

**In Full and Effective Compliance**

MCSO has complaint forms available in English and Spanish on the MCSO and Maricopa County websites. MCSO maintains a list – of MCSO facilities, County offices, and public locations where community groups meet – where Community Outreach Division personnel attempt to make the forms available.

During our October site visit, we visited the Fourth Avenue Jail; MCSO Headquarters; and District 1, 2, 3, 4, and 7 facilities to verify that MCSO Comment and Complaint Forms are available to the public. According to the Community Outreach Division (COrD), there are 122 locations throughout Maricopa County that make these forms accessible to community members. We encourage the COrD to continue to explore other possible locations – as recommended by the Community Advisory Board (CAB) and community organizations – including grocery stores, pharmacies, and other retail stores that are located in communities where members of the Plaintiffs' class live and work.

On March 31, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 72790

***Paragraph 243.*** *The Sheriff shall establish a free, 24-hour hotline for members of the public to make complaints.*

**In Full and Effective Compliance**

In July 2016, MCSO established the free 24-hour hotline for members of the public to make complaints; the hotline continued to be operational during this reporting period. We periodically called the hotline during this reporting period; and verified that the hotline is operational in both English and Spanish, and provides instructions in both languages on how to register a complaint. The recording advises callers that if the call is an emergency, they are to call 911. Callers are requested to provide their name, telephone number, and a brief summary of their complaint. If callers leave a recorded message, they are advised that MCSO will contact them as soon as possible. If callers do not wish to leave a recorded message, they are provided with a telephone number to call to speak to a supervisor. That number connects the callers to the MCSO switchboard operator, who will connect the caller to an appropriate supervisor. Callers are further advised of MCSO's operating hours if they wish to contact PSB directly.

The hotline is housed in PSB, and PSB personnel access any recorded messages at the beginning of each business day. The most recently received hotline complaint that remains open was received on October 18, 2022. Currently, there are nine hotline complaints under investigation, none of which are under Command review. None of the nine complaints are deemed Service Complaints.

The procedures established and followed by PSB provide for creating a record of every complaint received on the hotline and maintaining a log of follow-up actions regarding referral of the complaint.

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 244.*** *The Sheriff shall ensure that the MCSO's complaint form does not contain any language that could reasonably be construed as discouraging the filing of a complaint, such as warnings about the potential criminal consequences for filing false complaints.*

**In Full and Effective Compliance**

Our review of the English and Spanish complaint forms' content did not reveal any language that could reasonably be construed as discouraging the filing of a complaint.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 72791

***Paragraph 245.*** *Within two months of the entry of this Order, complaint forms will be made available, at a minimum, in English and Spanish. The MCSO will make reasonable efforts to ensure that complainants who speak other languages (including sign language) and have limited English proficiency can file complaints in their preferred language. The fact that a complainant does not speak, read, or write in English, or is deaf or hard of hearing, will not be grounds to decline to accept or investigate a complaint.*

### In Full and Effective Compliance

Complaint forms in English and Spanish are accessible on MCSO's website. The complaint form states that anyone who has a concern regarding the performance of any MCSO employee has the right to file a complaint – in English or Spanish or their preferred language, to include American Sign Language – in person at any District facility or at the Professional Standards Bureau, by mail, by telephone, by fax, or online. The forms provide street addresses, contact numbers, and website information.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 246.*** *In the course of investigating a civilian complaint, the Professional Standards Bureau will send periodic written updates to the complainant including:*

a.   *within seven days of receipt of a complaint, the Professional Standards Bureau will send non-anonymous complainants a written notice of receipt, including the tracking number assigned to the complaint and the name of the investigator assigned. The notice will inform the complainant how he or she may contact the Professional Standards Bureau to inquire about the status of a complaint;*

b.   *when the Professional Standards Bureau concludes its investigation, the Bureau will notify the complainant that the investigation has been concluded and inform the complainant of the Bureau's findings as soon as is permitted by law; and*

c.   *in cases where discipline is imposed, the Professional Standards Bureau will notify the complainant of the discipline as soon as is permitted by law.*

### In Full and Effective Compliance

To assess compliance with this Paragraph, we review completed misconduct investigations.

During this reporting period, we reviewed 134 administrative misconduct investigations. Of these, 102 were externally generated.

Paragraph 246.a. requires that a civilian complainant receive a written notice of receipt of his/her complaint within seven days. This letter must include the tracking number, the name of the investigator assigned, and information regarding how the complainant can inquire about the status of his/her complaint. In all but one of the externally generated cases where PSB had contact information for the complainant, the letter was sent within seven days as required. All of the letters sent and reviewed included the name of the investigator and information regarding how the complainant could inquire about the status of the complaint.

WAI 72792

Paragraph 246.b. requires that PSB notify a civilian complainant of the outcome of the investigation. In all of the externally generated complaints, the complainant was provided a notice of the outcome when contact information was known.

Paragraph 246.c. requires that PSB notify a civilian complainant of any discipline imposed as soon as permitted by law. In two of the externally generated complaints with sustained findings, while PSB properly notified the complainant of the sustained findings, the discipline information was not included. We have discussed this with PSB, and it appears to have been a clerical error in both instances.

On January 6, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 247.** *Notwithstanding the above written communications, a complainant and/or his or her representative may contact the Professional Standards Bureau at any time to determine the status of his or her complaint. The Sheriff shall require the MCSO to update the complainant with the status of the investigation.*

**In Full and Effective Compliance**

To assess compliance with this Paragraph, we review completed misconduct investigations.

During this reporting period, we reviewed 134 administrative misconduct investigations. Of these, 102 were externally generated. We did not identify any instances where a complainant was discouraged from, or denied, contact with MCSO investigators to determine the status of his/her complaint, or to request and receive an update. MCSO appropriately had contact with complainants as required in Paragraph 246 in all of these cases where the complainant was known and wished to participate in the investigation. In three of the cases, MCSO personnel reported that they had additional contact with the complainant during the course of the investigation.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 248.** *The Professional Standards Bureau will track, as a separate category of complaints, allegations of biased policing, including allegations that a deputy conducted an investigatory stop or arrest based on an individual's demographic category or used a slur based on an individual's actual or perceived race, ethnicity, nationality, or immigration status, sex, sexual orientation, or gender identity. The Professional Standards Bureau will require that complaints of biased policing are captured and tracked appropriately, even if the complainant does not so label the allegation.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations.

WAI 72793

Each month, PSB provides a list of new complaints alleging biased policing. PSB also provides all closed investigations where biased policing was alleged. For this Paragraph, only allegations of biased policing that do not affect the Plaintiffs' class are reported. Those complaints alleging bias against members of the Plaintiffs' class are captured in a separate category and reported under Paragraphs 275-288.

During this reporting period, we reviewed nine investigations where potential bias was alleged that did not affect members of the Plaintiffs' class. PSB tracked these investigations in a separate category as required by this Paragraph, and reported them in Paragraph 33.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 249.** *The Professional Standards Bureau will track, as a separate category of complaints, allegations of unlawful investigatory stops, searches, seizures, or arrests.*

**In Full and Effective Compliance**

To determine Phase 2 compliance for this Paragraph, we review a monthly report from PSB that provides the information required for compliance.

To ensure that we are consistently informed of complaints relative to this Paragraph, PSB provides information concerning these investigations in its monthly document submission relative to this Paragraph. During this reporting period, there were two investigations submitted for review for this Paragraph. As required, the complaints were tracked in a separate category of complaints.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 250.** *The Professional Standards Bureau will conduct regular assessments of the types of complaints being received to identify and assess potential problematic patterns and trends.*

**In Full and Effective Compliance**

PSB continues to prepare a comprehensive quarterly assessment of the types of complaints received to identify and assess potential problematic patterns or trends. PSB's assessment identifies the Divisions that received the highest number of complaints during the quarter, notable patterns and trends identified within MCSO Divisions, a summary of all of the misconduct allegations made during the quarter, and identifies employees with potentially problematic patterns or trends of misconduct during the quarter. We have noted that the one type of complaint that appears the most frequently is rudeness by MCSO employees. We recommend that MCSO assess whether additional training would be helpful to reduce the number of such complaints. We will follow up with MCSO on this issue.

WAI 72794

The contents of the quarterly assessment are discussed at executive staff meetings.  PSB also includes the information required by this Paragraph in its public Semi-Annual Misconduct Investigations Report, which is required under Paragraph 251.  The most recent Semi-Annual Report for the period of July 1-December 31, 2022, contains the issues identified as potentially problematic patterns or trends.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

### H.    Transparency Measures

*Paragraph 251.*  *The Sheriff shall require the Professional Standards Bureau to produce a semi-annual public report on misconduct investigations, including, at a minimum, the following:*

a.    *summary information, which does not name the specific employees involved, about any sustained allegations that an employee violated conflict-of-interest rules in conducting or reviewing misconduct investigations;*

b.    *aggregate data on complaints received from the public, broken down by district; rank of principal(s); nature of contact (traffic stop, pedestrian stop, call for service, etc.); nature of allegation (rudeness, bias-based policing, etc.); complainants' demographic information; complaints received from anonymous complainants or third parties; and principals' demographic information;*

c.    *analysis of whether any increase or decrease in the number of civilian complaints received from reporting period to reporting period is attributable to issues in the complaint intake process or other factors;*

d.    *aggregate data on internally-generated misconduct allegations, broken down by similar categories as those for civilian complaints;*

e.    *aggregate data on the processing of misconduct cases, including the number of cases assigned to Supervisors outside of the Professional Standards Bureau versus investigators in the Professional Standards Bureau; the average and median time from the initiation of an investigation to its submission by the investigator to his or her chain of command; the average and median time from the submission of the investigation by the investigator to a final decision regarding discipline, or other final disposition if no discipline is imposed; the number of investigations returned to the original investigator due to conclusions not being supported by the evidence; and the number of investigations returned to the original investigator to conduct additional investigation;*

f.    *aggregate data on the outcomes of misconduct investigations, including the number of sustained, not sustained, exonerated, and unfounded misconduct complaints; the number of misconduct allegations supported by the appropriate standard of proof; the number of sustained allegations resulting in a non-disciplinary outcome, coaching, written reprimand, suspension, demotion, and termination; the number of cases in which findings were changed after a pre-determination hearing, broken down by initial finding and final*

WAI 72795

*finding; the number of cases in which discipline was changed after a pre-determination hearing, broken down by initial discipline and final discipline; the number of cases in which findings were overruled, sustained, or changed by the Maricopa County Law Enforcement Merit System Council, broken down by the finding reached by the MCSO and the finding reached by the Council; and the number of cases in which discipline was altered by the Council, broken down by the discipline imposed by the MCSO and the disciplinary ruling of the Council; and similar information on appeals beyond the Council; and*

g.     *aggregate data on employees with persistent or serious misconduct problems, including the number of employees who have been the subject of more than two misconduct investigations in the previous 12 months, broken down by serious and minor misconduct; the number of employees who have had more than one sustained allegation of minor misconduct in the previous 12 months, broken down by the number of sustained allegations; the number of employees who have had more than one sustained allegation of serious misconduct in the previous 12 months, broken down by the number of sustained allegations; and the number of criminal prosecutions of employees, broken down by criminal charge.*

**In Full and Effective Compliance**

The PSB Operations Manual identifies the PSB Commander as responsible for preparing the semi-annual public report on misconduct investigations.  The manual also contains provisions for the production of summary information regarding sustained conflict of interest violations; an analysis of the complaint intake process; and aggregate data on complaints (internal and external), processing of misconduct cases, outcomes of misconduct cases, and employees with persistent misconduct problems.

Since July 2019, PSB has issued and posted on MCSO's website its semi-annual public report.  PSB also incorporates information relevant to Paragraph 192 in its semi-annual report, which requires that PSB review, at least semi-annually, all misconduct investigations that were assigned outside the Bureau to determine whether or not the investigation was properly categorized, whether the investigation was properly conducted, and whether appropriate findings were reached.  PSB also incorporates information relevant to Paragraph 250 in this report, which includes an assessment of potential problematic patterns or trends, based on a review of complaints received.

During our October 2019 site visit, PSB informed us that it developed a voluntary survey for complainants to complete after the conclusion of the investigation; the survey would capture complainants' demographic information.  MCSO utilizes prepaid postage return envelopes when mailing to the surveys to the complainants.  The use of the prepaid postage return envelopes allows the complainants to mail the survey to MCSO without having to incur any fees.  PSB commenced distribution of the surveys to complainants for cases that were closed during January 2020.  In addition, PSB is also informing complainants of a web-based version of the survey that may be completed online.  PSB is now collecting the voluntary surveys that are returned.  PSB continues to include the relevant demographic information in the most recently published semi-annual report.

WAI 72796

In March 2023, PSB issued and posted on the MCSO website its semi-annual public report for period of January 1–June 30, 2022.  The report was prepared consistent with prior reports prepared by PSB and contains the relevant information pertaining to this Paragraph.

In the past, MCSO has published the semi-annual report just over six months from the end of the semi-annual period; however, the June 30-December 31, 2021 report was published in August 2022, over seven months from the end of the semi-annual period.  The report for the semi-annual period of January 1-June 30, 2022, was published in March 2023, over eight months after the conclusion of the semi-annual period.  MCSO published the report for the period of July 1-December 31, 2022, in August 2023, over seven months from the end of the semi-annual period.

During our October 2023 site visit, MCSO informed us that future reports will be published in a more efficient and timely manner.  MCSO informed us that the agency is processing information for the report on an ongoing basis, as opposed to waiting until the end of the semi-annual period.  MCSO stated that it anticipates that future reports will be published within four to six months after the conclusion of the semi-annual period by using this process.

The most recent semi-annual report, although not issued timely, contained an analysis as to whether cases assigned outside of PSB were properly categorized, whether the investigations were properly conducted, and whether appropriate findings have been reached.  MCSO stated that the next semi-annual report is anticipated to be completed before the conclusion of the fourth quarter of 2023.

MCSO remains in compliance with this Paragraph for this reporting period; however, if MCSO's next semi-annual report is not published in a timely manner, it may adversely affect MCSO's Phase 2 compliance with this Paragraph.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

**Paragraph 252.**  *The Sheriff shall require the MCSO to make detailed summaries of completed internal affairs investigations readily available to the public to the full extent permitted under state law, in electronic form on a designated section of its website that is linked to directly from the MCSO's home page with prominent language that clearly indicates to the public that the link provides information about investigations of misconduct alleged against MCSO employees.*

**In Full and Effective Compliance**

PSB publishes detailed summaries each month of completed misconduct investigations in an electronic format that is accessible via MCSO's website.  The following data fields have been identified for public disclosure:  Internal Affairs Number; Date Opened; Incident Type; Original Complaint; Policy Violation(s) Alleged and the Outcome; Discipline; Investigative Summary; and Date Completed.  During our April 2017 site visit, we approved the PSB template containing detailed summaries of completed misconduct investigations for placement on the MCSO website.  Each reporting period, we conduct a review of the detailed summaries of completed misconduct investigations to ensure that the content is consistent with the requirements of this Paragraph.  In

WAI 72797

addition, we verify that the monthly detailed summaries of completed misconduct investigations are posted on MCSO's website for public review.

During this reporting period, PSB made the monthly detailed summaries of completed internal investigations for July, August, and September 2023 available to the public in a designated section on the homepage of MCSO's website. The reports provide significant details regarding alleged misconduct, the findings of the investigation, and, if there is a finding of misconduct, what type of discipline was imposed.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 253.**  *The MCSO Bureau of Internal Oversight shall produce a semi-annual public audit report regarding misconduct investigations. This report shall analyze a stratified random sample of misconduct investigations that were completed during the previous six months to identify any procedural irregularities, including any instances in which:*

a.  *complaint notification procedures were not followed;*

b.  *a misconduct complaint was not assigned a unique identifier;*

c.  *investigation assignment protocols were not followed, such as serious or criminal misconduct being investigated outside of the Professional Standards Bureau;*

d.  *deadlines were not met;*

e.  *an investigation was conducted by an employee who had not received required misconduct investigation training;*

f.  *an investigation was conducted by an employee with a history of multiple sustained misconduct allegations, or one sustained allegation of a Category 6 or Category 7 offense from the MCSO's disciplinary matrices;*

g.  *an investigation was conducted by an employee who was named as a principal or witness in any investigation of the underlying incident;*

h.  *an investigation was conducted of a superior officer within the internal affairs investigator's chain of command;*

i.  *any interviews were not recorded;*

j.  *the investigation report was not reviewed by the appropriate personnel;*

k.  *employees were promoted or received a salary increase while named as a principal in an ongoing misconduct investigation absent the required written justification;*

l.  *a final finding was not reached on a misconduct allegation;*

m.  *an employee's disciplinary history was not documented in a disciplinary recommendation; or*

WAI 72798

n.      no written explanation was provided for the imposition of discipline inconsistent with the disciplinary matrix.

**In Full and Effective Compliance**

On June 26, 2018, we approved the methodology developed by AIU for the inspection that would address the requirements of this Paragraph, which would start with an inspection of investigations that commenced after November 1, 2017. AIU has opted to conduct monthly inspections of misconduct investigations in lieu of conducting a semi-annual audit. During this reporting period, AIU prepared inspection reports for misconduct investigations that closed during the months of May, June, and July 2023.

When perceived deficiencies are identified, AIU requests a BIO Action Form from the specific District/Division Commander to address the issue(s).

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**I.      Testing Program for Civilian Complaint Intake**

**Paragraph 254.** *The Sheriff shall initiate a testing program designed to assess civilian complaint intake. Specifically, the testing program shall assess whether employees are providing civilians appropriate and accurate information about the complaint process and whether employees are notifying the Professional Standards Bureau upon the receipt of a civilian complaint.*

**In Full and Effective Compliance**

To meet the requirements of this Paragraph, for the last several years, AIU has contracted with an external vendor, Progressive Management Resources (PMR), which has been responsible for conducting complaint intake testing via telephone, email, U.S. Mail, MCSO's website, and in-person tests. We have received and reviewed documentation of these tests – including any available audio-recorded documentation – as they were completed, as part of our monthly document requests. Unless the test is an in-person test, PMR did not advise AIU of the tests in advance but instead emailed AIU once a test has been completed with documentation of the test. We evaluate MCSO's compliance with this Paragraph based on how the agency responds to the outcomes of the tests, regardless of whether the tests "succeed" or "fail."

Following our July site visit, PMR advised MCSO that it would not renew its contract for providing complaint intake testing. MCSO informed us that it would begin a new procurement process to select a new vendor. We inquired about the status of this process during our October site visit; and MCSO informed us that, in two separate rounds, it had not received any applications from prospective vendors. MCSO informed us that it intended to reopen the process in November. We will inquire about the status of this effort during our next site visit.

WAI 72799

Following the outcome of several past complaint intake tests in which front-line staff responded inappropriately, AIU developed a useful complaint intake checklist for administrative staff, which we and the Parties reviewed and approved. MCSO distributed the checklist to the Patrol Divisions for dissemination to their personnel who interact with the public, and the checklist is available to all employees via the agency's shared internal hard drive.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 255.** *The testing program is not intended to assess investigations of civilian complaints, and the MCSO shall design the testing program in such a way that it does not waste resources investigating fictitious complaints made by testers.*

**In Full and Effective Compliance**

As noted above, AIU is currently in the process of selecting a new vendor to conduct its complaint intake tests.

AIU had informed its previous complaint intake testing vendor of this requirement. In addition, AIU developed several procedures to ensure that the Complaint Intake Testing Program does not waste resources investigating fictitious complaints made by testers – including setting parameters for the types of inquiries that testers make, and creating official identification cards for testers designating them as such. For in-person tests, AIU required that its vendor inform AIU in advance of all tests; and AIU personnel made themselves available via telephone if testers encountered any issue as they lodged their test complaints.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 256.** *The testing program shall assess complaint intake for complaints made in person at MCSO facilities, complaints made telephonically, by mail, and complaints made electronically by email or through MCSO's website. Testers shall not interfere with deputies taking law enforcement action. Testers shall not attempt to assess complaint intake in the course of traffic stops or other law enforcement action being taken outside of MCSO facilities.*

**In Full and Effective Compliance**

As noted above, AIU is currently in the process of selecting a new vendor to conduct its complaint intake tests.

AIU had advised its previous complaint intake testing vendor that testers shall not interfere with deputies taking law enforcement action, nor shall they attempt to assess complaint intake in the course of traffic stops or other law enforcement action being taken outside of MCSO facilities.

AIU had asked its vendor to inform AIU in advance of all in-person tests, and AIU personnel made themselves available via telephone if testers encountered any issue as they lodged their test complaints.

WAI 72800

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 257.** *The testing program shall include sufficient random and targeted testing to assess the complaint intake process, utilizing surreptitious video and/or audio recording, as permitted by state law, of testers' interactions with MCSO personnel to assess the appropriateness of responses and information provided.*

**In Full and Effective Compliance**

As noted above, AIU is currently in the process of selecting a new vendor to conduct its complaint intake tests.

AIU had informed its previous complaint intake testing vendor of the requirements of this Paragraph. We receive copies of the recordings following the completion of the tests. Per the agreed-upon methodology, all tests conducted via telephone are audio-recorded; and all in-person testers' interactions with MCSO personnel are video-recorded to assess the appropriateness of responses and information provided.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 258.** *The testing program shall also assess whether employees promptly notify the Professional Standards Bureau of civilian complaints and provide accurate and complete information to the Bureau.*

**In Full and Effective Compliance**

As noted above, AIU is currently in the process of selecting a new vendor to conduct its complaint intake tests.

AIU had informed its previous complaint intake testing vendor of the requirements of this Paragraph so that the tests it conducts shall also assess whether employees promptly notify the PSB of civilian complaints and provide accurate and complete information to the Bureau.

As it receives documentation about completed tests, AIU reviews the information; and issues BIO Action Forms, authors memorandums of concern, or takes other appropriate action if a test fails or raises any concerns about the conduct of MCSO employees.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 72801

***Paragraph 259.***  *MCSO shall not permit current or former employees to serve as testers.*

**In Full and Effective Compliance**

As noted above, AIU is currently in the process of selecting a new vendor to conduct its complaint intake tests.

AIU informed its past complaint intake testing vendor of this requirement.  AIU personnel have informed us that no current or former employees have served, or will serve in the future, as testers.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

***Paragraph 260.***  *The MCSO shall produce an annual report on the testing program.  This report shall include, at a minimum:*

a.   *a description of the testing program, including the testing methodology and the number of tests conducted broken down by type (i.e., in-person, telephonic, mail, and electronic);*

b.   *the number and proportion of tests in which employees responded inappropriately to a tester;*

c.   *the number and proportion of tests in which employees provided inaccurate information about the complaint process to a tester;*

d.   *the number and proportion of tests in which employees failed to promptly notify the Professional Standards Bureau of the civilian complaint;*

e.   *the number and proportion of tests in which employees failed to convey accurate information about the complaint to the Professional Standards Bureau;*

f.   *an evaluation of the civilian complaint intake based upon the results of the testing program; and*

g.   *a description of any steps to be taken to improve civilian complaint intake as a result of the testing program.*

**Phase 1:**  In compliance

- Audits and Inspections Unit Operations Manual, Section 304, published on January 30, 2019.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on February 25, 2021.

**Phase 2:**  In compliance

WAI 72802

AIU issued its third annual report on the complaint intake testing program on September 5, 2023. The annual report covers the 25 tests that were completed by its external vendor between July 1, 2022-June 30, 2023.  These tests included: 12 in-person tests; two tests conducted via U.S. Mail; five tests conducted via telephone; three tests conducted via email; and three tests conducted via MCSO's website.  The report summarizes the tests, which we have discussed in our quarterly status reports.  In all tests in which AIU identified deficiencies, it followed up appropriately using BIO Action Forms or other corrective actions.

The report also notes that MCSO and its vendor maintained a good working relationship during the time period covered by the report.  As noted above, we learned recently that PMR advised MCSO that it would not renew its contract for providing complaint intake testing.  MCSO is currently in the process of selecting a new vendor to conduct its complaint intake tests.

While not required by this Paragraph, AIU also continues to issue monthly reports on complaint intake testing.  We review these reports and find that they accurately summarize the results of the complaint intake tests and any follow-up actions taken by AIU.

WAI 72803

## Section 13: Community Outreach and Community Advisory Board

**COURT ORDER XVI.    COMMUNITY    OUTREACH    AND    COMMUNITY ADVISORY BOARD**

**Paragraph 261.** *The Community Advisory Board may conduct or retain a consultant to conduct a study to identify barriers to the filing of civilian complaints against MCSO personnel.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

The CAB continues to explore the possibility of retaining a consultant to conduct a study to identify barriers to the filing of civilian complaints against MCSO personnel. The CAB is particularly interested in learning more about any barriers to filing complaints that may exist for members of the Plaintiffs' class.

**Paragraph 262.** *In addition to the administrative support provided for in the Supplemental Permanent Injunction, (Doc. 670 ¶ 117), the Community Advisory Board shall be provided with annual funding to support its activities, including but not limited to funds for appropriate research, outreach advertising and website maintenance, stipends for intern support, professional interpretation and translation, and out-of-pocket costs of the Community Advisory Board members for transportation related to their official responsibilities. The Community Advisory Board shall submit a proposed annual budget to the Monitor, not to exceed $15,000, and upon approval of the annual budget, the County shall deposit that amount into an account established by the Community Advisory Board for that purpose. The Community Advisory Board shall be required to keep detailed records of expenditures which are subject to review.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

The CAB's approved budget includes categories for expenses including community meetings; video production (to produce a short video in English and Spanish that provides information about the CAB and the MCSO complaint process); marketing materials; stipends for an assistant to help coordinate CAB meeting logistics; and reimbursement for CAB members' meeting expenses.

Following the Monitor's approval of the CAB's budget, the CAB established a bank account, and the County provided the $15,000. CAB members developed procedures for tracking funds and receiving reimbursement. We meet regularly with CAB members to discuss these procedures and review the CAB's expenditures to date; these records appear to be in order.

WAI 72804

## Section 14: Supervision and Staffing

**COURT ORDER XVII.      SUPERVISION AND STAFFING**

*Paragraph 263.  The following Section of this Order represents additions and amendments to Section X of the first Supplemental Permanent Injunction, Supervision and Evaluations of Officer Performance, and the provisions of this Section override any conflicting provisions in Section X of the first Supplemental Permanent Injunction.*

*Paragraph 264.  The Sheriff shall ensure that all patrol deputies shall be assigned to a primary, clearly identified, first-line supervisor.*

**In Full and Effective Compliance**

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the third quarter of 2023.  For July, we reviewed a sample of shift rosters from Districts 1, 2, and 3.  For August, we reviewed a sample of shift rosters from Districts 4 and 7, and Lake Patrol. For September we reviewed a sample of shift rosters from Districts 1, 2, and 3.  Our reviews of monthly and daily rosters indicated that deputies were assigned to a single consistent supervisor, and deputies worked the same shifts as their supervisors.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

*Paragraph 265.  First-line patrol supervisors shall be responsible for closely and consistently supervising all deputies under their primary command.*

**Phase 1:**  In compliance

- GB-2 (Command Responsibility), most recently amended on December 5, 2023.

**Phase 2:**  In compliance

Paragraph 265 is a general directive that covers several aspects of supervision.  There are several requirements covered in other Paragraphs that directly concern this Paragraph; these requirements must be met before MCSO can establish compliance with Paragraph 265.  We have determined that for MCSO to meet the requirements of this Paragraph, MCSO must be in compliance with Paragraphs 83, 85, 89, 90, 91, 93, and 94.  For the third quarter of 2023, MCSO was in compliance with all the required Paragraphs.  MCSO remains in compliance with this Paragraph.

WAI 72805

***Paragraph 266.*** *First-line patrol supervisors shall be assigned as primary supervisor to no more persons than it is possible to effectively supervise. The Sheriff should seek to establish staffing that permits a supervisor to oversee no more than eight deputies, but in no event should a supervisor be responsible for more than ten persons. If the Sheriff determines that assignment complexity, the geographic size of a district, the volume of calls for service, or other circumstances warrant an increase or decrease in the level of supervision for any unit, squad, or shift, it shall explain such reasons in writing, and, during the period that the MCSO is subject to the Monitor, shall provide the Monitor with such explanations. The Monitor shall provide an assessment to the Court as to whether the reduced or increased ratio is appropriate in the circumstances indicated.*

### In Full and Effective Compliance

To assess Phase 2 compliance with this Paragraph, we review a sample of daily shift rosters for the three months of the reporting period. We examine rosters to ensure that Patrol supervisors are not assigned more personnel than they can effectively supervise. We base our findings on the sample of rosters requested for the quarter. We review rosters to ensure supervisors oversee no more than 10 persons; this could include a combination of deputies, Deputy Service Aides (DSAs), and Posse members. We consider any shift where a supervisor had more than 10 persons to be noncompliant, as per this Paragraph's requirement. In addition, we monitor submissions by Patrol supervisors indicating the shifts where the span of control was exceeded. As per MCSO policy, supervisors are required to document shifts where the span of control was exceeded in a memorandum to the District Commander. We review each memo to determine if the reasons for exceeding the span of control were reasonable and unforeseen. If the circumstances leading to the span of control being exceeded are acceptable and correctly documented, we consider that shift to be in compliance.

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the third quarter of 2023. For July, we reviewed a sample of shift rosters from Districts 1, 2, and 3. For August, we reviewed a sample of shift rosters from Districts 4 and 7, and Lake Patrol. For September, we reviewed a sample of shift rosters from Districts 1, 2, and 3. Our reviews of monthly and daily rosters indicated that deputies were assigned to a single consistent supervisor, and deputies worked the same shifts as their supervisors.

For July, our reviews of the sample of 18 shift rosters did not reveal any violations of this Paragraph. For July, District 1 submitted one span of control memo. In one shift, a supervisor oversaw nine deputies. District 2 submitted two span of control memos. During two shifts on different dates, supervisors had nine deputies each. District 3 submitted two span of control memos. In one shift, a supervisor oversaw eight deputies and one DSA. On another shift, a supervisor oversaw nine deputies. Districts 4 and 7, and Lake Patrol, did not submit any span of control memos for July.

For August, our reviews of the sample of 18 shift rosters did not reveal any violations of this Paragraph. District 3 submitted three span of control memos for three different dates. In each one of the shifts documented in the memos, a supervisor had oversight of nine deputies. Districts 1, 2, 4, and 7, and Lake Patrol, did not submit any span of control memos for August.

WAI 72806

For September, our reviews of the sample of 118 shift rosters did not reveal any violations of this Paragraph. District 3 submitted three span of control memos for three different shifts and dates. In the first two shifts documented, two different supervisors had oversight of 10 deputies during each shift. The third memo documented a shift where a supervisor had nine deputies. Lake Patrol submitted one span of control memo for a shift where a supervisor had nine deputies. Districts 1, 2, 4, and 7 did not submit any span of control memos.

For the third quarter of 2023, we reviewed 54 shifts to determine compliance. In our sample reviews, we found that all of the 54 shifts met the requirements of this Paragraph. The compliance rate for this quarter was 100%. For this reporting period, MCSO was in compliance with the requirements of this Paragraph.

At the end of this reporting period, on September 27, 2023, the Court entered an Order granting MCSO's request to increase the span of control as part of a 12-month pilot program overseen by the Monitor. The pilot program allows Patrol supervisors to oversee eight deputies and four non-sworn personnel (which may include up to two Posse members, and Deputy Service Aides). We will assess the results of this pilot program. We will discuss this further with MCSO during our next site visit.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 267.*** *Supervisors shall be responsible for close and effective supervision of deputies under their command. Supervisors shall ensure that all deputies under their direct command comply with MCSO policy, federal, state and local law, and this Court's orders.*

**Phase 1:** In compliance

- GB-2 (Command Responsibility), most recently amended on December 5, 2023.

**Phase 2:** In compliance

Close and effective supervision requires that supervisors consistently apply the concepts established in several Paragraphs of the First Order. There are requirements covered in other Paragraphs that directly concern Paragraph 267, and must therefore be in compliance for MCSO to establish compliance with this Paragraph. We have determined that for MCSO to meet the requirements of this Paragraph, it must achieve compliance with Paragraphs 83, 85, 89, 90, 91, 93, and 96. For this reporting period, MCSO was in compliance with this Paragraph.

In our last quarterly status report, we issued a noncompliance warning for Paragraph 96. For this quarter, MCSO did not submit any IRMs for review for Paragraph 96 compliance. We will carry the noncompliance warning over to our next report. If we withdraw compliance for Paragraph 96 in future reports, it will affect the compliance rating for this Paragraph.

WAI 72807

**Paragraph 268.** *During the term that a Monitor oversees the Sheriff and the MCSO in this action, any transfer of sworn personnel or supervisors in or out of the Professional Standards Bureau, the Bureau of Internal Oversight, and the Court Implementation Division shall require advanced approval from the Monitor. Prior to any transfer into any of these components, the MCSO shall provide the Court, the Monitor, and the parties with advance notice of the transfer and shall produce copies of the individual's résumé and disciplinary history. The Court may order the removal of the heads of these components if doing so is, in the Court's view, necessary to achieve compliance in a timely manner.*

**In Full and Effective Compliance**

During the third quarter of 2023, MCSO requested the transfer of four employees out of PSB, and four employees into PSB. PSB requested the transfers of two Detention lieutenants and two Detention sergeants out of PSB, and the transfers of two Detention lieutenants and two Detention sergeants into PSB to replace the outgoing personnel. We reviewed the documentation for the outgoing employees and found the transfer requests to be for legitimate reasons. We reviewed the documentation provided for each of the employees to be transferred into PSB and noted no issues of concern. All outgoing and incoming transfers were approved. MCSO requested the transfer of one sergeant out of BIO and one replacement sergeant into BIO. We reviewed the documentation provided and approved the transfers.

On January 6, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 72808

## Section 15: Document Preservation and Production

**COURT ORDER XVIII.    DOCUMENT PRESERVATION AND PRODUCTION**

*Paragraph 269.  The Sheriff shall ensure that when the MCSO receives a document preservation notice from a litigant, the MCSO shall promptly communicate that document preservation notice to all personnel who might possibly have responsive documents.*

**Phase 1:**  In compliance

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on September 15, 2021.

- GD-9 User Guide, most recently amended on November 5, 2020.

**Phase 2:**  Deferred

To verify MCSO's Phase 2 compliance with this Paragraph, we reviewed monthly submissions of document preservation notices to MCSO employees.  The data reviewed for this reporting period included June through August 2023, as per an agreement that we reached with MCSO to stagger our document requests for this Paragraph due to the large volume of data that MCSO had to provide prior to our site visits.

Document preservation is set in motion when a party sends a litigation hold notice or written directive to MCSO requesting the preservation of relevant documents or records and electronically stored information (ESI), in anticipation of future litigation against the agency. MCSO's Legal Liaison Section (LLS) manages litigation holds through Open Axes, a software program.  Upon the receipt of a litigation hold, which is usually sent by the Maricopa County Attorney's Office (MCAO), the LLS inputs the data into Open Axes which conducts a search for responsive documents within MCSO computer drives.  The system also identifies potential document custodians, which are later filtered by an LLS employee.  The LLS then serves the custodians with a legal hold in electronic format, known as a Document Preservation Notice, within five business days.  Upon receipt of the Open Axes email with the Document Preservation Notice, MCSO custodians must acknowledge receipt of the request and then complete a questionnaire that identifies responsive documents, both electronic and hardcopies; and preserve them in the manner in which they are kept in the course of business.

For this Paragraph, we reviewed all files provided by MCSO through ShareFile.  We reviewed a sample of the third-party source documents that generate the litigation holds that the LLS receives from MCAO and third parties.  The Document Preservation Notices that were sent out were all distributed in a timely manner to the custodians who may have responsive documents.

The LLS emails the Document Preservation Notice and requests the completion of the Document Preservation Questionnaire via Open Axes.  The Document Preservation Questionnaire requires employees to: 1) acknowledge receipt of the document preservation; 2) acknowledge their responsibility to preserve records; 3) provide details regarding what they have done to research responsive records, documents, or ESI; and 4) identify what records, documents, or ESI they are

WAI 72809

preserving. GD-9 requires that the Document Preservation Questionnaire be completed within 10 business days and provides a warning regarding the consequences of not preserving records. During this reporting period, MCSO employees returned the Document Preservation Questionnaire within the required 10 business days 95% of the time.

In February 2021, MCSO learned that due to a technical issue caused by the migration of data from the legacy system to One Drive and a new, on-premise storage array (Qumulo), Open Axes (OA) was not able to perform searches into the documents moved to One Drive and Qumulo. Consequently, from August 2020-February 2021, documents on these new platforms were not searched by the software for potentially responsive documents to preservation requests. According to MCSO, the data migration was required because legacy hardware had reached the end of its lifecycle and was beginning to degrade. The LLS has been working with the Technology Management Bureau and the vendor; and MCSO informed us that by the end of June 2021, Open Axes would be able to perform the searches in the new systems going forward. To address any potential data that may have been missed in the searches performed between August 2020-June 2021, the LLS opted to rerun all the searches initiated during that time.

In January 2022, MCSO informed us that the agency had a delay in the rerun of searches because it had to wait for the Open Axes vendor to be able to start the refresh, so it could run parallel with the Global Index (previously the U and W drives). The searching of OneDrive accounts had an issue with the filters not showing the files found, although the Open Axes technicians noted that the files existed. In April and July 2022, MCSO informed us that the agency was in the process of indexing the two last folders, and then the agency would begin the rerun of searches once completed. On October 5, 2022, MCSO informed us that it was working with the vendor to address outstanding issues with the search and tagging functions within the system.

During the second quarter of 2022, we warned MCSO that if it failed to complete the indexing of the folders and had not commenced the rerun of searches, we would withdraw compliance for this Paragraph. We withdrew MCSO's compliance during the last quarter of 2022. The reruns commenced on the first quarter of 2023. MCSO has provided a breakdown of the additional data identified through the reruns performed.

MCSO is procuring a different product and vendor for document production and preservation as a result of the problems encountered with Open Axes and its vendor. During our October 2023 site visit, LLS informed us that it had identified a vendor and was in the process of procurement.

Given that MCSO has addressed the reruns and the agency is addressing the vendor issue, we are deferring compliance with this Paragraph until the new vendor has been identified and the process is up and running.

WAI 72810

***Paragraph 270.*** *The Sheriff shall ensure that when the MCSO receives a request for documents in the course of litigation, it shall:*

a.   *promptly communicate the document request to all personnel who might possibly be in possession of responsive documents;*

b.   *ensure that all existing electronic files, including email files and data stored on networked drives, are sequestered and preserved through a centralized process; and*

c.   *ensure that a thorough and adequate search for documents is conducted, and that each employee who might possibly be in possession of responsive documents conducts a thorough and adequate search of all relevant physical and electronic files.*

**Phase 1:**  In compliance

- Administrative Services Division Operations Manual, most recently amended on November 14, 2023.

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on September 15, 2021.

- GD-9 User Guide, most recently amended on November 5, 2020.

- GM-1 (Electronic Communications, Data and Voicemail), most recently amended on January 12, 2022.

**Phase 2:**  Deferred

To verify MCSO's Phase 2 compliance with this Paragraph, we reviewed monthly submissions of requests for documents to MCSO employees for the reporting period, and documents drafted by the LLS in search of documents from other MCSO Divisions.  For this reporting period, we identified a sample of document requests and received a copy of the responsive documents sequestered and/or produced.  The data reviewed for this reporting period included June through August 2023, as per an agreement we reached with MCSO to stagger our document requests for this Paragraph.  This was due to the large volume of data that MCSO had to provide prior to our site visits.

Paragraph 270.a. requires prompt communication of document requests to all personnel who could possibly be in possession of responsive documents.  GD-9 requires the LLS to enter the data into a tracking system within five business days of receipt and to draft a Document Production Notice within five additional business days.  The LLS is required, within five business days, to respond to the request for production if sourced within LLS, or to forward to the required MCSO Division for production.  The Divisions have 10 days to produce the data requested.  During this reporting period, we found that in 99% of the cases, the LLS promptly communicated document requests to personnel who might be in possession of responsive documents.

Our review revealed that MCSO is manually forwarding the Document Production Notices in a timely manner to all of its Divisions.  In addition, MCSO is sending the Document Production Acknowledgement Questionnaire (Attachment B), to all employees.  In 100% of the cases, the personnel who provided responsive documents properly completed Attachment B.

WAI 72811

Paragraph 270.b. requires that all responsive ESI be stored, sequestered, and preserved by MCSO through a centralized process. MCSO performs the searches through a centralized process established by the LLS. The preservation of the data is completed at the Division that has the actual document while the notation is made in the Open Axes program, which aids the LLS in the case management. LLS can create a case, assign a case number, and trigger time alerts to the custodians of documents that LLS identifies through the system. Open Axes performs searches on MCSO's OneDrive and on-premises storage arrays, which are shared among Headquarters and the Districts. Documents found in any additional servers are kept in their servers by the document custodians who notify LLS. MCSO continues to manage litigation hold cases through Open Axes; all cases for this reporting period were managed through Open Axes.

The centralized process established by MCSO requires that all electronic data be sequestered and secured so as not to be purged. For this Paragraph, we review the data and visit MCSO areas to ensure that personnel are informed of the duty to preserve the data in both electronic and paper format, and that the employees are preserving the data. During our October 2023 site visit, we inspected preserved documents in our visits to the following areas: Intake, Transfer, and Release facility; Lower Buckeye Jail; Estrella Jail; the Property and Evidence Unit, the Information Management Services Division; Management Technology Bureau; and Fourth Avenue Jail. We verified that all areas were properly preserving hardcopies for this reporting period.

Paragraph 270.c. requires that MCSO conduct an adequate search for documents, and that each employee who might possibly be in possession of responsive documents conducts a thorough and adequate search of all relevant physical and electronic files. We reviewed a sample of responsive documents for this reporting period, and MCSO identified responsive documents to the document production notices in all cases we reviewed.

Due to technical issues, MCSO has been in deferred compliance with this Paragraph since our twenty-eighth quarterly status report, filed on August 25, 2021. During the second quarter of 2022, we warned MCSO that if it failed to complete the indexing of the folders and had not commenced the rerun of searches, we would withdraw compliance. We withdrew MCSO's compliance during the last quarter of 2022. The reruns commenced on the first quarter of 2023. MCSO has provided a breakdown of the additional data identified through the reruns performed.

MCSO is currently procuring a different product and vendor for document production and preservation as a result of the problems encountered with Open Axes and its vendor. During our October 2023 site visit, LLS advised us that it had identified a vendor and was in the process of procurement.

Given that MCSO has addressed the reruns, and the agency is addressing the vendor issue, we are deferring compliance with this Paragraph until the new vendor has been identified and the process is up and running.

WAI 72812

***Paragraph 271.***  *Within three months of the effective date of this Order, the Sheriff shall ensure that the MCSO Compliance Division promulgates detailed protocols for the preservation and production of documents requested in litigation.  Such protocols shall be subject to the approval of the Monitor after a period of comment by the Parties.*

**Phase 1:**  In compliance

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on September 15, 2021.
- Administrative Services Division Operations Manual, most recently amended on November 14, 2023.

**Phase 2:**  In compliance

On June 17, 2019, MCSO published the Administrative Services Division Operations Manual, which details the protocols for the preservation and production of documents requested in litigation.  The manual was last amended on November 14, 2023.

***Paragraph 272.***  *The Sheriff shall ensure that MCSO policy provides that all employees must comply with document preservation and production requirements and that violators of this policy shall be subject to discipline and potentially other sanctions.*

**In Full and Effective Compliance**

During this reporting period, the data revealed that no internal investigations were completed against any MCSO employee for failure to preserve or produce documents.

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 72813

## Section 16: Additional Training

**COURT ORDER XIX.        ADDITIONAL TRAINING**

***Paragraph 273.*** *Within two months of the entry of this Order, the Sheriff shall ensure that all employees are briefed and presented with the terms of the Order, along with relevant background information about the Court's May 13, 2016 Findings of Fact, (Doc. 1677), upon which this Order is based.*

**In Full and Effective Compliance**

MCSO previously delivered this training on the E-Policy platform.   All personnel (100%) determined to be applicable by CID have received this training.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 72814

## Section 17: Complaints and Misconduct Investigations Relating to Members of the Plaintiff Class

**COURT ORDER XX.       COMPLAINTS AND MISCONDUCT INVESTIGATIONS RELATING TO MEMBERS OF THE PLAINTIFF CLASS**

*Paragraph 274.  In light of the Court's finding that the MCSO, and in particular Sheriff Arpaio and Chief Deputy Sheridan, willfully and systematically manipulated, misapplied, and subverted MCSO's employee disciplinary policies and internal affairs processes to avoid imposing appropriate discipline on MCSO deputies and command staff for their violations of MCSO policies with respect to members of the Plaintiff class, the Court further orders as follows:*

*A.       Investigations to be Overseen and/or Conducted by the Monitor*

*Paragraph 275.   The Monitor is vested with the authority to supervise and direct all of the MCSO's internal affairs investigations pertaining to Class Remedial Matters.  The Monitor is free from any liability for such matters as is set forth in ¶ 144 of the Supplemental Permanent Injunction.*

*Paragraph 276.  The Monitor shall have the authority to direct and/or approve all aspects of the intake and investigation of Class Remedial Matters, the assignment of responsibility for such investigations including, if necessary, assignment to his own Monitor team or to other independent sources for investigation, the preliminary and final investigation of complaints and/or the determination of whether they should be criminally or administratively investigated, the determination of responsibility and the imposition of discipline on all matters, and any grievances filed in those matters.*

**In Full and Effective Compliance**

The Second Order requires oversight by the Monitor for all internal investigations determined to be Class Remedial Matters (CRMs).   The Professional Standards Bureau (PSB) schedules meetings every two weeks to discuss existing and incoming complaints to determine which, if any, could be CRMs.   During these meetings, PSB personnel discuss cases pending a CRM decision, cases determined to be CRMs, and any cases where the decision may be made that the case would not be classified as a CRM.   The PSB Commander determines the classification of the cases.  A member of our Team attends all of these meetings to provide the oversight required for this Paragraph.

At the end of the July-September 2016 reporting period, PSB had reviewed 442 administrative investigations that were open as of July 20, 2016; and determined that 42 of them met the basic criteria for CRMs.  These cases were reviewed during the scheduled CRM meetings.  In addition, we randomly selected an additional 52 cases from the 400 remaining pending cases; and concurred with PSB's assessment that the cases did not meet the basic criteria for CRMs.  In

WAI 72815

addition to the 42 cases determined to be potential CRMs from the pending case list as of July 20, 2016, PSB identified an additional 10 cases that were potential CRM cases. At the end of the first reporting period after the entry of the Second Order, nine cases had been determined to be CRMs; and one other was pending a CRM decision. The remaining cases reviewed were determined not to be CRMs.

At the end of this reporting period, there was a total of 677 cases that have been reviewed as possible CRMs; and 141 cases that have been determined to be CRMs since the entry of the Second Order (July 20, 2016). At the end of this reporting period, MCSO had completed and submitted a total of 136 CRM cases. Five were pending completion.

Of the CRM cases that have been closed to date with findings of sustained misconduct and reviewed by our Team, 15 have involved employees who are deceased or left MCSO employment prior to the completion of the investigation or the disciplinary process. Forty-eight have involved current employees of MCSO. Eight of the cases closed to date involved a sustained finding of misconduct involving bias related to the Plaintiffs' class: six sustained allegations of an inappropriate and biased comment; and two sustained allegations of bias-based policing.

During the scheduled meetings, case investigators continue to provide investigative updates on all cases that could be, or are, CRMs. Their briefings are thorough, and they continue to be responsive to any questions or input from members of our Team. In all cases where we have provided oversight since July 20, 2016, we concurred with the decisions made by the PSB Commander regarding the case classifications and findings based on the briefings provided during the CRM meetings. Where appropriate, we also approved the discipline in these cases. During this reporting period, we have continued discussions with PSB personnel regarding areas of improvement that may enhance investigations, as well as the resolutions of these cases. We plan to continue holding these meetings moving forward.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 277.** *This authority is effective immediately and shall remain vested in the Monitor until the MCSO's internal affairs investigations reach the benchmarks set forth in ¶ 288 below. With respect to Class Remedial Matters, the Monitor has plenary authority, except where authority is vested in the Independent Investigative and Disciplinary Authorities separately appointed by the Court, as is further set forth in ¶¶ 296–337 below.*

**Paragraph 278.** *The Sheriff shall alert the Monitor in writing to all matters that could be considered Class Remedial Matters, and the Monitor has the authority to independently identify such matters. The Monitor shall provide an effective level of oversight to provide reasonable assurance that all Class Remedial Matters come to his attention.*

**In Full and Effective Compliance**

WAI 72816

Since the first CRM meeting held on August 17, 2016, PSB has consistently completed the required notification to us regarding the cases that could be considered CRMs. A Monitoring Team member has attended every CRM meeting with PSB where these matters are discussed and personally reviewed a number of the cases that were pending on July 20, 2016; and our Team member reviews the new cases that are presented at each meeting. There has been no need for us to independently identify CRMs, as PSB consistently properly identifies and reports these cases as required.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 279.** *The Monitor shall have complete authority to conduct whatever review, research, and investigation he deems necessary to determine whether such matters qualify as Class Remedial Matters and whether the MCSO is dealing with such matters in a thorough, fair, consistent, and unbiased manner.*

**In Full and Effective Compliance**

During the scheduled CRM meetings attended by a Monitoring Team member, PSB has consistently properly identified cases that could be, or are, CRMs. PSB personnel brief each case at these meetings, and their briefings have included all appropriate information. They have been responsive to questions from our Team members during the meetings, and they have responded appropriately to the recommendations we have offered. There has been no need for us to independently conduct any review, research, or investigation.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 280.** *The Monitor shall provide written notice to the Court and to the parties when he determines that he has jurisdiction over a Class Remedial Matter. Any party may appeal the Monitor's determination as to whether he has jurisdiction over a Class Remedial Matter to this Court within seven days of the Monitor's notice. During the pendency of any such appeal the Monitor has authority to make orders and initiate and conduct investigations concerning Class Remedial Matters and the Sheriff and the MCSO will fully comply with such action by the Monitor.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

During this reporting period, cases involving both sworn and non-sworn members of MCSO have continued to be reviewed as CRMs when appropriate, and written notice has been provided to the Court. There were no appeals by any Parties regarding any of the CRM classifications.

WAI 72817

*Paragraph 281. Subject to the authority of the Monitor, the Sheriff shall ensure that the MCSO receives and processes Class Remedial Matters consistent with: (1) the requirements of this Order and the previous orders of this Court, (2) MCSO policies promulgated pursuant to this Order, and (3) the manner in which, pursuant to policy, the MCSO handles all other complaints and disciplinary matters. The Sheriff will direct that the Professional Standards Bureau and the members of his appointed command staff arrive at a disciplinary decision in each Class Remedial Matter.*

**Phase 1:** In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on November 14, 2023.

- GC-17 (Employee Disciplinary Procedures), most recently amended on June 15, 2023.

- GH-2 (Internal Investigations), most recently amended on November 14, 2023.

- Administrative Services Division Operations Manual, most recently amended on November 14, 2023.

- Professional Standards Bureau Operations Manual, most recently amended on November 13, 2023.

**Phase 2:** Not in compliance

To evaluate Phase 2 compliance with this Paragraph, a Monitoring Team member has attended each meeting conducted by PSB to discuss Class Remedial Matters.

The Plaintiffs and the Plaintiff-Intervenor have previously forwarded to us concerns about certain CRM investigations submitted by MCSO for our review. Upon further review of some of the cases they provided, we concluded that, in some, additional scrutiny of these investigations by PSB was warranted. We continue to meet with PSB to discuss concerns and provide information regarding areas where we believe improvements can be made. Our discussions continue to include: ensuring that credibility assessments, where appropriate, are conducted and well-documented in reports; that the appropriate standard of proof is considered and properly documented in reports; that in the event disparate treatment is at issue in a case, the employee's history is reviewed to determine if there is any pattern, and where necessary, additional interview questions are asked; and that if a single employee has repeated allegations of similar misconduct, a review is conducted to determine if there is any pattern that needs to be addressed. We have also discussed potential training opportunities for PSB investigators on both disparate treatment and credibility assessments. We were hopeful that some appropriate training could be identified and delivered as part of the required eight-hour training for PSB investigators this year.

In a meeting with PSB in August 2023, the PSB Commander informed us again that the Bureau had not yet located any potential training that he believed would be appropriate regarding either disparate treatment or conducting credibility assessments. He again advised us that the annual training for this year would be dedicated to the new requirements of the Third Order and those policies and protocols that will be revised as a result. We previously had recommended that PSB continue to look for training to address the specific focus areas we have identified. PSB advised that in June 2023, the Training Division reached out to the Parties and the Monitoring Team to

WAI 72818

request input on proposed topics and potential vendors for the 2024 PSB-8 internal training. They have since received potential training recommendations from our Team. The PSB Commander had also previously located one possible training course on credibility assessments that he was researching.

We will continue to meet with PSB to address any concerns we may identify with CRM investigations and to discuss opportunities to improve the overall quality of these and all other administrative investigations.

During the last reporting period, we reviewed six CRM cases completed by MCSO. We concurred with the findings of the PSB Commander in all six of the cases.

During this reporting period, we reviewed six CRM cases completed by PSB. We meet with PSB every two weeks to identify cases that should be considered CRMs. We also track the progress of those cases as they are investigated, reviewed, and finalized. Each step of the process requires review and approval by our Team. None of the six cases we reviewed during this reporting period were completed within the 85-day timeframe. One was finalized within the 180-day statutory timeframe. The average days to complete the investigative portion of these cases was 376 days, an increase from 129 days during the last reporting period. These investigations were finalized in an average of 460 days, an increase from 150 days during the last reporting period. The overall average investigative time for all administrative misconduct investigations at the end of this reporting period was 608 days and the overall average number of days to close an investigation was 699 days. While CRM cases are still not compliant with timelines, it continues to be evident that PSB is prioritizing these cases.

Two of the CRM cases reviewed for this reporting period involved allegations of misconduct by Detention employees in the jail setting.

- The complainant alleged that an employee used profanity, other inappropriate language, and a racial slur; and conducted a cell search in retaliation after an inmate confronted the employee about the language used. A thorough investigation was conducted, an appropriate finding of sustained was made for the inappropriate language, and the employee received appropriate discipline. No evidence of bias was found.

- The complainant alleged that an employee made comments about inmates needing to learn to speak English, and treated Hispanic inmates differently than other inmates. A thorough investigation was conducted, and the allegations were appropriately not sustained.

One of the CRM cases reviewed for this reporting involved allegations of misconduct by a Detention employee while not on duty.

- The complainant alleged that an employee used profanity and made inappropriate racial comments on a personal Facebook page. The allegations were sustained, and the employee received appropriate discipline.

Three of the CRM cases reviewed for this reporting period involved allegations of misconduct by sworn employees.

WAI 72819

- A complaint was internally generated as a result of the review of a traffic accident report where it appeared an improper search may have been conducted.  No external complaint was ever received.  As this contact was determined to be related to a traffic stop, the case was classified as a CRM.  An employee was sustained for conduct related to the search, but retired prior to any disciplinary recommendation.  No evidence of bias was found.

- A complaint was internally generated after review of potential out of policy pursuit.  No external complaint was received.  As this contact was determined to be related to a traffic stop, the case was classified as a CRM.  Multiple policy violations by employees were identified and appropriate discipline assessed.  No evidence of bias was found.

- An external complainant alleged that an employee's decision to contact him in a particular neighborhood was based on his race, he was not advised of his *Miranda* warnings, and his property items were not properly handled.   The contact with the complainant was determined to be both legal and within policy.  Other policy violations were sustained, and the employees received the appropriate discipline.  No bias related to this Paragraph was identified during the investigation.

We concurred with the findings in all six of the investigations we reviewed.


***Paragraph 282.***  *The Sheriff and/or his appointee may exercise the authority given pursuant to this Order to direct and/or resolve such Class Remedial Matters, however, the decisions and directives of the Sheriff and/or his designee with respect to Class Remedial Matters may be vacated or overridden in whole or in part by the Monitor.  Neither the Sheriff nor the MCSO has any authority, absent further order of this Court, to countermand any directions or decision of the Monitor with respect to Class Remedial Matters by grievance, appeal, briefing board, directive, or otherwise.*

**In Full and Effective Compliance**

There were no CRM cases completed during this, or previous reporting periods, in which the Sheriff and/or his appointee exercised their authority to resolve CRMs, which we needed to vacate or override.

On January 6, 2023, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.


***Paragraph 283.***   *The Monitor shall review and approve all disciplinary decisions on Class Remedial Matters.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

At the end of this reporting period, MCSO had completed a total of 136 CRM cases since July 20, 2016.  We reviewed six of these during this reporting period.  Five of the completed cases had sustained findings.  We approved MCSO's disciplinary recommendations in all five.

WAI 72820

*Paragraph 284.  The Sheriff and the MCSO shall expeditiously implement the Monitor's directions, investigations, hearings, and disciplinary decisions.  The Sheriff and the MCSO shall also provide any necessary facilities or resources without cost to the Monitor to facilitate the Monitor's directions and/or investigations.*

**In Full and Effective Compliance**

During this and previous reporting periods, a Monitoring Team member has attended all scheduled CRM meetings conducted in an appropriate location determined by MCSO.  PSB continues to provide a password and access to the IAPro system to a member of our Team so that we can complete independent case reviews if necessary.

PSB personnel continue to be professional and responsive to all input, questions, or concerns we have raised.

On January 6, 2023, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

*Paragraph 285.  Should the Monitor decide to deviate from the Policies set forth in this Order or from the standard application of the disciplinary matrix, the Monitor shall justify the decision in writing and place the written explanation in the affected employee's (or employees') file(s).*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

Since we began monitoring CRM cases in July 2016, there have been numerous cases with sustained findings.  In all cases, we have concurred with the disciplinary findings of MCSO; and there has been no action necessary on our part relative to this Paragraph.

*Paragraph 286.  Should the Monitor believe that a matter should be criminally investigated, he shall follow the procedures set forth in ¶¶ 229–36 above.  The Commander of the Professional Standards Bureau shall then either confidentially initiate a Professional Standards Bureau criminal investigation overseen by the Monitor or report the matter directly and confidentially to the appropriate prosecuting agency.  To the extent that the matter may involve the Commander of the Professional Standards Bureau as a principal, the Monitor shall report the matter directly and confidentially to the appropriate prosecuting agency.  The Monitor shall then coordinate the administrative investigation with the criminal investigation in the manner set forth in ¶¶ 229–36 above.*

**In Full and Effective Compliance**

During this reporting period, there were six CRM cases submitted for our review.  None of them involved potential criminal violations.  No action on our part relative to this Paragraph was necessary.

WAI 72821

On January 6, 2023, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

**Paragraph 287.**  *Any persons receiving discipline for any Class Remedial Matters that have been approved by the Monitor shall maintain any right they may have under Arizona law or MCSO policy to appeal or grieve that decision with the following alterations:*

a.    *When minor discipline is imposed, a grievance may be filed with the Sheriff or his designee consistent with existing MCSO procedure.  Nevertheless, the Sheriff or his designee shall immediately transmit the grievance to the Monitor who shall have authority to and shall decide the grievance.  If, in resolving the grievance, the Monitor changes the disciplinary decision in any respect, he shall explain his decision in writing.*

b.    *disciplined MCSO employee maintains his or her right to appeal serious discipline to the Maricopa County Law Enforcement Merit System Council to the extent the employee has such a right.  The Council may exercise its normal supervisory authority over discipline imposed by the Monitor.*

**In Full and Effective Compliance**

Sixty-three completed CRM cases have had sustained findings of misconduct since the issuance of the Second Order.  We have concurred with all of MCSO's sustained findings.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

**Paragraph 288.**  *The Monitor's authority over Class Remedial Matters will cease when both:*

a,    *The final decision of the Professional Standards Bureau, the Division, or the Sheriff, or his designee, on Class Remedial Matters has concurred with the Monitor's independent decision on the same record at least 95% of the time for a period of three years.*

b.    *The Court determines that for a period of three continuous years the MCSO has complied with the complaint intake procedures set forth in this Order, conducted appropriate internal affairs procedures, and adequately investigated and adjudicated all matters that come to its attention that should be investigated no matter how ascertained, has done so consistently, and has fairly applied its disciplinary policies and matrices with respect to all MCSO employees regardless of command level.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

PSB is responsible for the investigation of all CRM cases and has continued to appropriately identify cases that could be, or are, CRMs.  PSB personnel are responsive to any concerns or questions we have raised, and they provide detailed information and updates in the scheduled briefings.

WAI 72822

During the last reporting period, we reviewed six completed CRM cases.  We found that all six complied with all investigative requirements and concurred with their outcomes.

During this reporting period, we reviewed six completed CRM cases.  We again found that all six complied with all investigative requirements and concurred with their outcomes.

**Paragraph 289.**  *To make the determination required by subpart (b), the Court extends the scope of the Monitor's authority to inquire and report on all MCSO internal affairs investigations and not those merely that are related to Class Remedial Matters.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

During this reporting period, we reviewed 134 administrative misconduct investigations, 98 Service Complaints, two PSB Diversions, and nine criminal misconduct investigations.

We found all nine criminal investigations, all 98 service complaints, and both diversions in compliance with all requirements.  Of the 134 administrative misconduct investigations we reviewed, 34 (25%) were completed and submitted by the investigator within the 60- or 85-day requirement.  This was the same compliance percentage as the last reporting period.

There were two completed administrative misconduct investigations submitted for compliance with Paragraph 249 (investigatory stops).  There were nine investigations we reviewed for compliance with Paragraph 33 (bias policing).  Six were reviewed for compliance with Paragraph 275 (CRMs) during this reporting period.

We found that PSB was in overall compliance in 22 (23%) of the 96 investigations we reviewed.  Of the 16 investigations we reviewed that were conducted by outside vendors, three (36%) were in full compliance.  Of the 22 investigations we reviewed that were conducted by Divisions and Districts outside of PSB, eight (36%) were in full compliance.  Overall compliance for all administrative misconduct investigations reviewed during this reporting period was 27%, an increase from the 20% compliance we found during the last reporting period.

During each of our site visits, we meet with PSB personnel to discuss the deficiencies in those investigations conducted by both their personnel, outside vendors, and Divisions outside PSB.  In July 2020, we also began meeting with the Deputy Chiefs who have oversight for investigations conducted outside of PSB.  Our intent for these meetings is to have meaningful discussion about deficiencies we continue to find, the actions being taken to address the ongoing concerns, and other ideas MCSO might have for addressing future deficiencies.  These meetings have continued to result in good dialogue about our concerns and the efforts of MCSO personnel to correct identified deficiencies.  During this reporting period, we noted continued attention being paid to addressing deficiencies by District and Division Command personnel and notable improvement in investigative compliance in those cases investigated outside of PSB.

WAI 72823

***Paragraph 291.***  *The Monitor shall report to the Court, on a quarterly basis, whether the MCSO has fairly, adequately, thoroughly, and expeditiously assessed, investigated, disciplined, and made grievance decisions in a manner consistent with this Order during that quarter.  This report is to cover all internal affairs matters within the MCSO whether or not the matters are Class Remedial Matters.   The report shall also apprise the Court whether the MCSO has yet appropriately investigated and acted upon the misconduct identified in the Court's Findings of Fact, whether or not such matters constitute Class Remedial Matters.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

This report, including all commentary regarding MCSO's compliance with investigative and disciplinary requirements, serves as our report to the Court on these matters.  An overall summary of our compliance observations and findings is provided below.

During this reporting period, we reviewed 134 administrative misconduct investigations and nine criminal misconduct investigations.  All nine of the criminal investigations were in compliance with the Second Order.  Of the 143 total administrative and criminal misconduct investigations we reviewed, 45 (31%) were in full compliance with the Second Order, an increase in overall compliance from 24% during the last quarter.  Of the 134 administrative investigations, 36 (27%) were in full compliance with the Second Order, an increase from 20% during the last reporting period.

In 2016, PSB provided us with a memorandum describing PSB's efforts in meeting the requirements of this Paragraph related to the Court's Findings of Fact.  MCSO had outsourced three cases to another law enforcement agency, and an additional four investigations were pending outsourcing to an outside investigator.  These cases were outsourced due to the involvement of the former Chief Deputy, or other conflicts of interest identified by MCSO, and included the investigations identified in Paragraph 300.  MCSO processed a Request for Proposal and retained an outside investigator who met the requirements of Paragraphs 167.iii and 196 to conduct the investigations identified.  One potential misconduct case identified in the Court's Findings of Fact was retained and investigated by PSB, as no identifiable conflict of interest appeared to exist.

Since 2016, MCSO has continued to outsource cases to this contract investigator and in 2021 began outsourcing cases to a second outside vendor to assist with the backlog of cases.  During each site visit, we meet with PSB personnel to discuss the status of those cases that have been outsourced to any contract vendor, other law enforcement agency, or other person or entity, so that we can continue to monitor these investigations and ensure that all misconduct cases, including those identified in the Findings of Fact, are thoroughly investigated.  PSB has continued to keep us apprised of the status of all such investigations.

WAI 72824

During our October 2023 site visit, PSB advised us that the Bureau did not outsource any investigations to the initial contract investigator. This investigator still has 15 pending cases. None were completed and forwarded for our review during this reporting period. Seven cases were outsourced to the second vendor being used by MCSO to assist with reduction of the backlog of cases during this reporting period. Sixteen were completed and submitted for our review and 44 were pending. Fifty-nine total cases were pending completion by the two outside vendors at the end of this reporting period.

The Independent Investigator has previously completed all of the investigations identified by the Court, as well as those where he initiated new investigations due to potential misconduct he identified during his reviews. All have been reviewed by our Team to ensure they complied with the Order of Court. The Independent Discipline Authority has also previously submitted his final report on those cases that had sustained findings, and we reviewed these findings. We did not make compliance findings on these cases, but we determined that the 12 investigations specifically directed by the Court for reinvestigation, as well as the additional cases where the Independent Investigator determined an investigation should be conducted, were properly completed, and addressed the concerns identified by the Court.

***Paragraph 292.*** *To make this assessment, the Monitor is to be given full access to all MCSO internal affairs investigations or matters that might have been the subject of an internal affairs investigation by the MCSO. In making and reporting his assessment, the Monitor shall take steps to comply with the rights of the principals under investigation in compliance with state law. While the Monitor can assess all internal affairs investigations conducted by the MCSO to evaluate their good faith compliance with this Order, the Monitor does not have authority to direct or participate in the investigations of or make any orders as to matters that do not qualify as Class Remedial Matters.*

**In Full and Effective Compliance**

PSB personnel continue to inform us of ongoing criminal and administrative misconduct investigations. A member of our Team attends each CRM meeting, reviews the lists of new internal investigations, and has access to PSB's IAPro database. The only cases for which any oversight occurs during the investigative process are those that are determined to be CRMs. We review all other misconduct investigations once they are completed, reviewed, and approved by MCSO personnel.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 72825

*Paragraph 293. The Monitor shall append to the quarterly reports it currently produces to the Court its findings on the MCSO's overall internal affairs investigations. The parties, should they choose to do so, shall have the right to challenge the Monitor's assessment in the manner provided in the Court's previous Order. (Doc. 606 ¶¶ 128, 132.)*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

Since we began reviewing internal investigations conducted by MCSO, we have reviewed hundreds of investigations into alleged misconduct by MCSO personnel. During this reporting period, we reviewed 134 administrative misconduct investigations, 98 Service Complaints, two PSB Diversions, and nine criminal misconduct investigations. All nine criminal investigations, all 98 service complaints and both diversions were in full compliance.

The investigative quality of PSB administrative investigations has remained high for numerous reporting periods, and we noted continued improvement in District and Division cases from the last reporting period. For this reporting period, 19 (86%) of the 22 investigations conducted by District or Division supervisors were found in investigative compliance, an increase from 65% the last reporting period. This is the third consecutive reporting period where we have found an increase in compliant cases conducted by Districts and Divisions outside of PSB.

During our April 2023 site visit, we agreed that moving forward we would review both the amount of time it takes to complete and close an administrative misconduct investigation and the amount of time it takes to complete only the investigative portion of the investigation. The 60- to 85-day time requirement applies only to the actual investigative time – not any review time or disciplinary actions taken by Conduct Resolution once the investigative portion is completed and approved.

During our October 2023 site visit, PSB advised us that the average time from initiation of a complaint until full closure, which includes all review and associated discipline or other administrative actions, was 699 days, a significant increase from 542 during the last quarter. The average investigative time was 608 days, an increase from 489 days. This time period covers the time from the initiation of the investigation until it is approved by the PSB Commander. For investigations conducted by PSB, the average investigative time was 671 days; and the average number of days to full closure was 755 days. For investigations conducted by District and Divisions outside of PSB, the average investigative time was 454 days and the average number of days to full closure was 622. As we have noted previously in this report, given the number of older cases now being completed, these increased numbers are not unexpected.

Regardless of whether we consider only the investigative time or the full closure time of an administrative misconduct investigation, it is clear that misconduct investigations are not being addressed in a timely manner. We continue to note that in some of these delayed investigations, potential evidence has been lost; investigators have been unable to locate and contact complainants, witnesses, and investigative leads; employees' memories have been adversely impacted by the delay in their interviews; and in some cases, serious misconduct had been left unaddressed for lengthy periods of time.

WAI 72826

PSB was responsible for conducting 96 of the 134 total administrative misconduct investigations we reviewed for this reporting period. Of the 96 investigations conducted by PSB, six (6%) had deficiencies not including timeliness. With the inclusion of timeliness, 22 (23%) were found to be in compliance. This is a slight increase from the 22% compliance for the last reporting period. Of the 16 investigations outsourced by PSB, one (6%) had investigative deficiencies. With the inclusion of timeliness, 10 of the 16 investigations were in compliance.

Twenty-two investigations were conducted outside of PSB. For the first time in numerous reporting periods, during the last reporting period, we found multiple District and Division cases to be in full compliance. During this reporting period, we again found multiple cases in full compliance. Of the total 22 cases, eight (36%) were in full compliance, an increase from 18% during the last reporting period. Three (14%) of the 22 cases had investigative deficiencies. This is a notable improvement from the 35% of cases with investigative deficiencies during the last reporting period.

MCSO completed delivery of the 40-hour Misconduct Investigative Training at the end of 2017, and all sworn supervisors who investigate administrative misconduct attended the training. Refresher training on misconduct investigations has also been delivered since the initial 40-hour training. The investigative quality of PSB investigations has remained generally high. Of the 96 investigations completed by PSB, 90 (94%) were in compliance with all requirements other than timelines.

Of the 22 investigations completed outside of PSB, all but one were both initiated and completed after the increased oversight at the District and Division level began in January 2020. Of the 22, (14%) had investigative deficiencies. This is a decrease in deficiencies from 35% during the last reporting period. With the inclusion of extensions and timelines, eight cases (36%) were in full compliance an increase from 18% during the last reporting period.

As we have noted in our previous reports, we must consider all requirements for investigations at the time they are submitted for our review, including their timely completion. MCSO's inability to address timely completion of investigations is an ongoing issue that continues to adversely impact the agency's compliance findings.

PSB personnel continue to be receptive to our input, and we have had many meetings and discussions regarding the investigations being conducted and the compliance for both PSB and District and Division Cases. We also discuss compliance concerns with District and Division Command personnel during our site visits. During our next site visit, we will discuss those cases that are noncompliant with MCSO; and address our concerns about the compliance findings for this reporting period. We continue to stress that compliance is not the sole responsibility of any one individual or Division – but dependent on all those who complete, review, or approve internal investigations.

WAI 72827

Between 2016 and 2021, the number of investigator positions assigned to PSB averaged between 24 and 26.  With the addition of new civilian investigator positions, restructuring, filling of vacant positions, and intervention by the Court, at the end of this reporting period, PSB had 46 investigators, an increase from 44 at the end of the last reporting period.  We remain hopeful that this improved level of staffing, along with other efforts by MCSO, will result in a positive impact on the overall backlog of cases.

**B.     *Investigations to be Conducted by the Independent Investigator and the Independent Disciplinary Authority***

**Paragraph 294.**  *In its Findings of Fact, (Doc. 1677), the Court identified both: (1) internal affairs investigations already completed by the MCSO that were inadequate or insufficient; (see, e.g., Doc. 1677 at ¶ 903), and (2) misconduct or alleged misconduct that had never been investigated by MCSO that should be or should have been investigated.  (Id. at ¶ 904.)*

**Paragraph 295.**  *In light of MCSO's failure to appropriately investigate these matters, the Court appoints an Independent Investigator and an Independent Disciplinary Authority from the candidates set forth by the parties, and vests them with the authority to investigate and decide discipline in these matters.*

**1.     *The Independent Investigator***

**Paragraph 298.**  *In assessing the existence of previously uncharged acts of misconduct that may be revealed by the Findings of Fact, the Independent Investigator does not have authority to investigate acts of misconduct that are not sufficiently related to the rights of the members of the Plaintiff class.  While the Independent Investigator should identify such acts of misconduct and report those acts to the Commander of the Professional Standards Bureau, and to the Monitor for purposes of making the Monitor's assessment identified in ¶¶ 291–93 above, the Independent Investigator may not independently investigate those matters absent the authorization and the request of the Sheriff.*

**Paragraph 300.**  *The following potential misconduct is not sufficiently related to the rights of the members of the Plaintiff class to justify any independent investigation:*

a.     *Uninvestigated untruthful statements made to the Court under oath by Chief Deputy Sheridan concerning the Montgomery investigation.  (Doc. 1677 at ¶ 385).*

b.     *Uninvestigated untruthful statements made to the Court under oath by Chief Deputy Sheridan concerning the existence of the McKessy investigation.  (Id. at ¶ 816).*

c.     *Chief Deputy Sheridan's untruthful statements to Lieutenant Seagraves made during the course of an internal investigation of Detective Mackiewicz to the effect that an*

WAI 72828

*investigation into the overtime allegations against Detective Mackiewicz had already been completed.  (Id. at ¶ 823).*

d.    *Other uninvestigated acts of misconduct of Chief Deputy Sheridan, Captain Bailey, Sergeant Tennyson, Detective Zebro, Detective Mackiewicz, or others that occurred during the McKessy investigation.  (Id. at ¶¶ 766–825).*

**Phase 1:**  Not applicable

**Phase 2:**  Deferred

During our January 2017 site visit, the PSB Commander informed us that all acts of misconduct that we identified and discussed during our October 2016 site visit would be provided to a contracted investigator for investigative purposes.

Since that time, MCSO has contracted with a licensed private investigator.  The contract investigator possesses the requisite qualifications and experience to conduct the investigations of misconduct outlined in Paragraph 300 (a.-c.), and the additional misconduct in the Findings of Fact that directly associates with Paragraph 300 (d).

During our April 2017 site visit, we met with PSB command staff and representatives from the Maricopa County Attorney's Office (MCAO) to verify that all of the acts of misconduct that were identified in the Findings of Fact (FOF) are under investigation, either by the Court-appointed Independent Investigator or the private licensed contract investigator.  Before this meeting, PSB command provided us with a roster of related acts of misconduct that PSB intended to be assigned to the contract investigator.  The roster of intended assignments did not include all of the acts of misconduct that we had discussed.  MCAO and PSB command personnel explained that the Court also identified, in Paragraph 301, many of the acts of potential misconduct identified in the FOF as sufficiently related to the rights of members of the Plaintiffs' class.  In Paragraph 301, the Court documented that because of this determination, investigations of the potential misconduct were justified if the Independent Investigator deemed that an investigation was warranted.

The Independent Investigator has completed all 12 of the administrative misconduct investigations specifically identified by the Court in the Second Order, and all other investigations for which he determined an administrative misconduct investigation should be conducted.  The Independent Disciplinary Authority has also completed all of the discipline findings for these cases.  While we did not make compliance findings for these cases, we reviewed them and found that they complied with the direction of the Court.  The contract investigator retained by MCSO is still in the process of investigating several cases that were identified by the Court in 2016.

Our ability to verify that all potential misconduct outlined in the FOF has been investigated by PSB, the PSB contract investigator, or the Independent Investigator remains pending until all the investigations are completed.  Once this occurs, we can determine if there is any additional misconduct identified in the FOF that still requires investigation.  Finally, the PSB Commander and MCAO advised us that the acts of misconduct involving (former) Sheriff Arpaio as identified in the FOF would not be investigated by any entity, as there does not exist any statute that addresses how a Sheriff would be disciplined in the event of a sustained finding resulting from an administrative misconduct investigation.

WAI 72829

*Paragraph 310.   The Monitor and the parties are directed to promptly comply with the Independent Investigator's requests for information.   The Monitor and the Independent Investigator may communicate to coordinate their investigations.   Nevertheless, each is independently responsible for their respective jurisdiction set forth in this Order, and each should make independent decisions within his own delegated responsibility.*

### 2.  The Independent Disciplinary Authority

*Paragraph 337.   Nevertheless, when discipline is imposed by the Independent Disciplinary Authority, the employee shall maintain his or her appeal rights following the imposition of administrative discipline as specified by Arizona law and MCSO policy with the following exceptions:*

a.   *When minor discipline is imposed, a grievance may be filed with the Sheriff or his designee consistent with existing MCSO procedure.   Nevertheless, the Sheriff or his designee shall transmit the grievance to the Monitor who shall have authority to decide the grievance. If in resolving the grievance the Monitor changes the disciplinary decision in any respect, he shall explain his decision in writing.*

b.   *A disciplined MCSO employee maintains his or her right to appeal serious discipline to the Maricopa County Law Enforcement Merit System Council to the extent the employee has such a right.   The Council may exercise its normal supervisory authority over discipline imposed by the Independent Disciplinary Authority with one caveat.   Arizona law allows the Council the discretion to vacate discipline if it finds that the MCSO did not make a good faith effort to investigate and impose the discipline within 180 days of learning of the misconduct.   In the case of any of the disciplinary matters considered by the Independent Disciplinary Authority, the MCSO will not have made that effort.   The delay, in fact, will have resulted from MCSO's bad faith effort to avoid the appropriate imposition of discipline on MCSO employees to the detriment of the members of the Plaintiff class.   As such, the Council's determination to vacate discipline because it was not timely imposed would only serve to compound the harms imposed by the Defendants and to deprive the members of the Plaintiff class of the remedies to which they are entitled due to the constitutional violations they have suffered at the hands of the Defendants.   As is more fully explained above, such a determination by the Council would constitute an undue impediment to the remedy that the Plaintiff class would have received for the constitutional violations inflicted by the MCSO if the MCSO had complied with its original obligations to this Court.   In this rare instance, therefore, the Council may not explicitly or implicitly exercise its discretion to reduce discipline on the basis that the matter was not timely investigated or asserted by the MCSO.   If the Plaintiff class believes the Council has done so, it may seek the reversal of such reduction with this Court pursuant to this Order.*

**In Full and Effective Compliance**

During this reporting period, no grievances were filed that met the criteria for transmitting to the Monitor.

WAI 72830

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

WAI 72831

## Third Supplemental Permanent Injunction/Judgment Order

**Paragraph 338.**  *Within 14 days from the date of this order, MCSO will calculate and provide the Court and the parties with the dollar amount required to recruit, hire, train and compensate for one year a single PSB budgeted sergeant position.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

On November 22, 2022, as required, MCSO filed with the Court the cost to the agency for a budgeted Professional Standards Bureau (PSB) sworn sergeant position for one year.  MCSO identified the amount as $191,415.12.  This amount was calculated using the mid-range salary for a sworn sergeant position, associated mandatory retirement contributions, employer taxes, and costs related to benefits.

MCSO is in compliance with this Paragraph.


**Paragraph 339.**  *MCSO must not reduce the staffing levels at PSB below the minimum investigator staffing number identified in ¶ 340 while a backlog in investigations remains.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

PSB personnel include sworn, Detention, and civilian investigators.  In July, PSB had 46 investigators (11 sworn, 17 Detention, and 18 civilian).  In August, PSB had 46 investigators (11 sworn, 17 Detention, and 18 civilian).  In September, PSB had 46 investigators (11 sworn, 17 Detention, and 18 civilian).

PSB is required to have a minimum staffing level of 39 investigators.  We monitor MCSO's compliance with this requirement on a monthly basis, and we will continue to summarize PSB staffing levels in our quarterly status reports.


**Paragraph 340.**  *Within 60 days from the date of this order, MCSO will fill the seven currently budgeted, yet vacant, positions at PSB referred to in Mr. Gennaco's report, through hiring or internal transfers. (Doc. 2790 at 15.) The staffing referred to by Mr. Gennaco, together with the full staffing of the vacant positions, is 39 investigators.  This is the minimum investigator staffing number.  If MCSO fails to fill any one of the seven vacant budgeted staffing positions with an AZPOST sworn investigator who is approved by the Monitor within 60 days of the date of this order, MCSO and/or Maricopa County will pay into a PSB Staffing Fund three times the amount identified by PSB in ¶ 338 above for each vacancy remaining at the MCSO for budgeted investigators.  It shall, thereafter on a monthly basis pay into the Staffing Fund three times the amount identified in ¶ 338 above for every month the number of PSB investigators falls below the minimum investigator staffing number.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

MCSO currently meets the required PSB minimum staffing level of 39 investigators.  At the end of this reporting period, MCSO met the minimum investigator staffing number for PSB staffing (with a total of 46 investigators).  Per this Paragraph, if MCSO fails to maintain this minimum PSB investigator staffing level, MCSO and/or Maricopa County shall contribute the costs associated with a sworn sergeant's position into a PSB Staffing Fund three times the amount identified in Paragraph 338, or $191,415.12.

MCSO was not obligated to contribute to the PSB Staffing Fund during this reporting period. MCSO is in compliance with this Paragraph.

***Paragraph 341.***  *If MCSO desires to fill the positions with new civilian investigators in lieu of sworn officers, it may do so to the extent that it is authorized to do so, consistent with state law. Should it fail to fill any one of the seven vacant positions within 60 days of the date of this order, MCSO and/or Maricopa County will pay into a PSB Staffing Fund three times the amount identified by PSB in ¶ 338 above for each vacancy remaining at the MCSO for budgeted investigators.  It shall, thereafter on a monthly basis pay into the Staffing Fund three times the amount identified in ¶ 338 above for every month the number of PSB investigators falls below the minimum staffing number.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

During this reporting period, in July 2023, MCSO hired a total of two civilian investigators for PSB.  PSB investigator staffing has met the minimum investigator staffing number of 39 investigators and ended this reporting period with a total of 46 investigators.

***Paragraph 342.***  *If the MCSO attempts to fill these open positions with a mix of qualified sworn personnel and civilian investigators, it may do so to the extent that it can, consistent with state law.  Nevertheless, if it fails to fill any one of the seven vacant positions within 60 days, the MCSO and/or Maricopa County will pay into the PSB Staffing Fund three times the amount identified in ¶ 338 above for each vacancy remaining.  It shall, thereafter on a monthly basis pay three times the amount identified in ¶ 338 above for every month that the number of PSB investigators falls below the minimum staffing number.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

During this reporting period, PSB hired two civilian investigators.  PSB investigator staffing has met the minimum required number of 39 investigators, and PSB ended this reporting period with 46 investigators.

WAI 72833

Detention investigators assigned to PSB shoulder a large share of the case workload, but these positions are not specifically listed in the Third Order.  We have recommended that MCSO seek clarification from the Court regarding this issue.  Additionally, the Court requested additional information as to the qualifications of civilian investigators hired to work in PSB during a Court hearing on January 27, 2023.

**Paragraph 343.**  *MCSO is authorized to conduct PSB investigations through approved private contractors if it can do so consistent with state law.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on November 14, 2023.

**Phase 2:**  In compliance

The current version of GH-2 allows for the outsourcing of investigations, and MCSO has had a track record of doing so for years.

During this reporting period, MCSO continued to use the two previously approved contract vendors to conduct administrative misconduct investigations.  Seven new investigations were outsourced to the second outside vendor, and there was a total of 59 pending outsourced cases.  PSB has informed us that the Bureau is attempting to identify another outside vendor to conduct conflict cases.

**Paragraph 344.**  *MCSO must demonstrate that it is using overtime and other administrative tools to increase the personnel hours committed to investigate all types of complaints.  MCSO shall report its use of these tools to the Monitor on a monthly basis.*

**Phase 1:**  Not applicable

**Phase 2:**  Deferred

MCSO provided reports for July-September 2023, verifying the use of PSB overtime committed to investigating complaints.  The documentation includes the overtime costs for PSB investigators, case reviewers (supervisory/command personnel), and administrative personnel dedicated to investigative activities.  The total PSB combined staffing overtime hours used for July-September 2023 was 4,037.25 hours.

We will further assess the tools that MCSO identifies for PSB's use in accordance with the approved Third Order policies.

WAI 72834

*Paragraph 345. MCSO and/or Maricopa County shall hereby establish a PSB Staffing Fund, which shall be a separate account of the MCSO. The amounts set forth in ¶¶ 340-42 shall be paid directly into this account. The MCSO, however, is only authorized to withdraw funds from this account for the hiring and payment of PSB investigators or private investigators contracted with PSB who are in compliance with the requirements of state law. The fund may also be used to hire necessary additional PSB administrative staff and necessary additional PSB supervisory staff only, and for no other purpose. MCSO is not permitted to offset the amount of any fine from PSB's existing budget or use it to subsidize the number of PSB staff and investigators existing at the time of this Order. MCSO shall provide an accounting of the PSB Staffing Fund on a monthly basis to the Monitor and the Court. But, if necessary, MCSO is permitted to augment and/or exceed the salary and incentives normally paid PSB investigators to hire and/or maintain sufficient investigators, whether sworn or civilian, to reduce the backlog.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

On December 7, 2022, the Maricopa County Board of Supervisors held its formal meeting and established the PSB Staffing Fund as required by the Third Order. The Board set aside $1,148,491 from the General Fund as a contingency, should it be necessary for PSB Staffing Fund. No funds have actually been transferred to the PSB Staffing Fund, as MCSO has continued to meet the staffing requirements of the Third Order.

MCSO is in compliance with this Paragraph.


*Paragraph 346. The Court hereby vests the Monitor, Robert Warshaw, with the supplemental authorities set forth in this Order. The Monitor therefore has immediate authority to oversee all of MCSO's complaint intake and routing. The Court hereby vacates any previous order that conflicts with this Order, including but not limited to ¶ 292 of the Second Order (Doc. 1765). In consultation with the PSB Commander, the Monitor shall make determinations and establish policy decisions pertaining to backlog reduction regarding, by way of example, which complaints should be (a) investigated by PSB; (b) sent to the Districts for investigation or other interventions; or (c) handled through other methods, to include diversion and/or outsourcing of cases. The Monitor must consult with the PSB Commander about these policy decisions but maintains independent authority to make the ultimate decision. The authority granted to the Monitor in this paragraph shall not be applicable when there is no backlog. If the backlog is eliminated and then arises again while the Defendants are still subject to monitoring, this authority will be renewed in the Monitor.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

WAI 72835

We and the PSB Commander met a total of 13 times during the third quarter of 2023, bringing our meetings with the PSB Commander for this purpose to a total of 48. Our regularly scheduled consultation meetings with the PSB Commander occur, on average, once each week. We hold *ad hoc* meetings when additional time is needed, and when it is necessary to follow up on specific complaints prior to a final intake and routing decision.

The consultation meeting process typically includes presentation by the PSB Commander of complaints received since the previous meeting, assigned case numbers, the date the complaint was received, the manner it was reported to MCSO, and the date the complaint was initially assigned. The process also involves preliminary consideration regarding Class Remedial Matter status. Due to the focus on timeliness, complaints are often initially assigned for investigation prior to our discussion. However, the intake category and the investigative routing of the case is subject to change following the presentation. The PSB Commander also provides us with a summary of the complaint and, if known, employment categories of personnel allegedly involved. The presentation also includes the initial classification of alleged policy violations, type, and location of investigation assignment – e.g., Service Complaint in PSB; minor misconduct administrative investigation to a District or Division; outsourced investigation; and, as applicable, Class Remedial Matter status, and PSB Diversion eligibility.

Our discussion and consultation about each complaint typically results in either agreement with the initial intake and routing decisions made by the Commander, or a revision of the intake category and routing of the complaint for investigation. Periodically, the PSB Commander will opt to discuss a variety of circumstances associated with the complaint prior to either a final collaborative decision on intake and routing, or our independent decision and direction.

Our final consultation meeting with the PSB Commander in this reporting period occurred on September 29, 2023. Up to this date and for this reporting period, we discussed 291 complaints. Of those complaints, and after our consultation meetings where final determinations were able to be made, 75 were classified as Service Complaints, 215 were classified as Administrative Investigations, and one was classified as a Critical Incident. Of the administrative investigations, a total of 111 complaints were internally generated complaints – that is, initiated by MCSO employees – while 105 were generated by external complainants. In addition, during this time period, one case was diverted at intake.

Twelve of the complaints were outsourced for investigation, while 37 administrative investigations were routed to MCSO Districts or Divisions. No complaints were confirmed to be complaint intake tests, and one complaint was routed as a PSB Diversion. One critical incident was discussed. During the third quarter, there were no complaints that were originally routed to either Districts or Divisions for investigation were returned to PSB for investigation after additional information was discovered (which would make the complaints ineligible for District/Division-level investigation).

WAI 72836

**Paragraph 347.** *The Monitor shall revise and/or formalize MCSO's intake and routing processes. The Monitor's authorities shall include, but not be limited to, the power to audit and review decisions made with respect to individual cases and, if necessary, to change such designations. The Sheriff and the MCSO shall expeditiously implement the Monitor's directions or decision with respect to intake and routing, and any other issues raised by the Monitor pertaining to backlog reduction and any other authority granted the Monitor under the Court's orders. The Monitor must consult with the PSB Commander about these processes but maintains independent authority to make the ultimate decision. The authority granted to the Monitor in this paragraph shall not be applicable when there is no backlog. If the backlog is eliminated and then arises again while the Defendants are still subject to monitoring, this authority will be renewed in the Monitor.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

Generally, based upon standardized guidelines, MCSO policy allows for the assignment of minor misconduct allegation investigations to Districts and/or Divisions outside of the PSB structure where sworn employees are assigned. The investigations are performed by supervisors who have received requisite training. If an allegation of misconduct is made against a ranking member, i.e., principal, at a District or Division, the investigation must be conducted by a member holding at least one rank higher than the principal, but no rank lower than sergeant. Between March 1, 2022 and the issuance of the Third Order, PSB did not assign administrative investigations to Districts or Divisions for investigation.

When the Third Order was issued on November 8, 2022, we re-implemented the practice of routing qualified minor misconduct investigations to Districts and Divisions. Given the backlog and timeliness issues associated with administrative investigations, we believe this is a preferred practice. Our direction to assign cases to Districts and Divisions helps to reduce the investigative caseload in PSB, allows utilization of trained supervisors at these locations, and increases supervisory awareness and accountability for their subordinates' job performance. Moreover, we encourage assignment of investigations to Districts and Divisions to facilitate timely access to witnesses and principals. When minor misconduct investigations are completed by sworn supervisors in Districts and Divisions, the investigation is forwarded through the chain of command, up to and including their Chief, before the case is finally submitted to PSB. The routing of cases up the chain of command through managers and executives is done for review and approval purposes. We believe it also facilitates visibility and identification of individual job performance, enhances awareness of possible trends by individuals or District/Division-wide, and promotes opportunities for active leadership, proactive remediation, and training. During this reporting period, 37 minor misconduct investigations were assigned to either Districts or Divisions.

Periodically, the PSB Commander will elect to discuss the intake and routing of a complaint prior to making initial intake and/or routing determinations. We consulted on eight such cases during this reporting period. Through our discussion and consultation, a preliminary course of action was arrived at and agreed upon, and the cases were appropriately categorized and routed.

WAI 72837

There was one PSB Diversion during this reporting period, which was prior to the Court's approval of the Third Order policies.  The PSB Commander consulted with our Team regarding the circumstances of the internal complaint, resulting in a mutual decision regarding the implementation of a PSB Diversion for the principal employee.

**Paragraph 348.**  *The Monitor will evaluate PSB's current investigative practices.  The PSB, under the authority of the Monitor, shall create, and submit for the Monitor's approval, policies and procedures that:*

(a)  *Identify and eliminate unnecessary investigative requirements that may be removed from particular classes of cases;*

(b)  *Provide for the establishment of an investigative plan for each investigation to eliminate unnecessary steps for the investigation of the complaint at issue;*

(c)  *Establish formal internal scheduling expectations and requirements for supervisory interventions;*

(d)  *Establish expectations on the timeline for each step of the review process.  The formulated expectations will be consistent with the timeline requirements of this Court's previous orders;*

(e)  *Assess current use of IA Pro as a case management/tracking tool.*

**Phase 1:**  Deferred

**Phase 2:**  Deferred

This Paragraph requires MCSO to create and submit for the Monitor's approval various policies and procedures to assist in the reduction of the investigative backlog.  Pursuant to Paragraph 349, the Monitor submitted the finalized versions of these policies and procedures to the Court within four months of the entry of the Third Order.

**Paragraph 349.**  *The authority granted to the Monitor in this paragraph shall not be applicable when there is no backlog.  If a backlog is eliminated and then arises again while the Defendants are still subject to monitoring, this authority will be renewed in the Monitor.  Given that the parties have provided the Monitor with feedback on these issues, the Monitor is directed to consider the input already articulated by the parties on these issues and determine, at his discretion, to adopt them or not.  The Monitor may choose, but will not be required, to seek additional input from the parties in the development of the above stated policies.  The Monitor shall finalize and submit such policies to the Court within four months of the date of this order.  The parties shall have two weeks thereafter to provide the Court with any comments on the Monitor's final proposed policies.  The Court will, if necessary thereafter, make determinations as to the final policies.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

WAI 72838

The MCSO complaint investigation backlog at the end of this quarter totaled 1,842 cases. The authority granted to the Monitor remains applicable to this Paragraph due to the existing MCSO backlog. The Parties and the Monitor met their obligation pursuant to this Paragraph.

As of this writing, the policies are still being reviewed by the Court.

**Paragraph 350.** *The Monitor will assess MCSO's compliance with the investigative requirements of this order and shall determine whether training on investigative planning and supervision is needed and implement such training.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

We will assess MCSO's compliance with the investigative requirements of this Order and determine whether training is necessary on investigative planning and supervision when the Court authorizes the final policies for implementation.

**Paragraph 351.** *The Monitor has the authority to make recommendations to the Court concerning the revision of the Court's orders as it pertains to the investigation of complaints where, in its opinion, such revisions would increase efficiency without impinging on investigations necessary to the operation of a fair and unbiased law enforcement agency.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

The Third Order, entered on November 8, 2022, includes several remedies to assist in the reduction of MCSO's investigative backlog. Per the Order, "to protect the interests of the Plaintiff class (let alone the general public), in ensuring that investigations are completed in sufficient time to administer discipline, the Court will require that the MCSO come into compliance with its reasonable investigative protocols." This Paragraph grants authority to the Monitor to recommend to the Court revisions to "increase efficiency without impinging on investigations necessary to the operation of a fair and unbiased law enforcement agency." The Monitor did not make any such recommendations during this reporting period.

**Paragraph 352.** *The Monitor may intervene in the course of any investigation for the purpose of facilitating the appropriate operation of the PSB and/or the reduction of the backlog, if he deems it appropriate, and will document his actions in a quarterly report to be submitted to the Court. The authority granted to the Monitor in this paragraph shall not be applicable when there is no backlog. If the backlog is eliminated and then arises again while the Defendants are still subject to monitoring, this authority will be renewed in the Monitor.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

WAI 72839

This Paragraph requires the Monitor to document in a quarterly report to be submitted to the Court any interventions it has taken "for the purpose of facilitating the appropriate operation of the PSB and/or the reduction of the backlog." The Monitor did not take any such actions during this reporting period.

**Paragraph 353.** *The Monitor shall recommend to the Court adjustments in the investigations of the following categories of cases according to the following procedure:*

*MCSO shall, upon the approval of the Monitor:*

(a) *Create, formalize, and implement a policy regarding whether investigations are necessary when the complaint was submitted to the MCSO more than a year after the last instance of the underlying alleged misconduct reported, or when the MCSO employee involved left MCSO's employ prior to the filing of the complaint.*

(b) *Create, formalize, and implement a policy regarding when investigations are necessary if the initial complainant is unwilling or unable to cooperate, or if the initial complainant is anonymous.*

(c) *Create, formalize, and implement a policy regarding when MCSO may investigate health related in-custody jail deaths by County medical staff.*

(d) *Create, formalize, and implement a policy regarding when an entity other than PSB may investigate internal allegations emanating from workplace relationships.*

(e) *Create, formalize, and implement a policy regarding when, in cases in which external evidence establishes a violation, the PSB Commander has the discretion to offer principals a mitigated penalty if they accept responsibility. The mitigated penalty shall be no lower than the minimum discipline within the applicable discipline matrix range for the charged offenses.*

(f) *Create, formalize, and implement a policy regarding when the PSB commander is authorized to handle the alleged minor misconduct through supervisory intervention in lieu of investigation. MCSO shall submit to the Monitor within 15 days, a list of the minor misconduct within the GC-17 (Disciplinary Matrix) which it deems should be considered by the Monitor to be handled as a supervisory intervention. MCSO's list shall exclude allegations concerning the Plaintiff class and allegations of bias.*

*In proposing such policies to the Monitor, the MCSO shall fully and openly consult with the other parties to this litigation. All parties shall move expeditiously to formulate, consult with, and approve these policies. MCSO and the parties shall complete and submit to the Monitor for approval all such proposed policies within three months of this order. As to those issues on which the parties cannot obtain consensus, they shall each submit their proposals to the Monitor. The Monitor shall then, promptly present to the Court the final proposed policies he deems best. The parties will have two weeks thereafter to provide the Court with any comments on the Monitor's final proposed policies. The Court will, thereafter, make determinations as to the final policies.*

WAI 72840

**Phase 1:** Deferred

**Phase 2:** Deferred

This Paragraph requires MCSO to create and submit for the Monitor's approval various policies that include "adjustments in the investigations" of several categories of cases, to assist in the reduction of the investigative backlog. These adjustments include circumstances in which, for example, misconduct was alleged against personnel who "left MCSO's employ prior to the filing of the complaint" and in which anonymous complainants have alleged misconduct. According to this Paragraph, MCSO was required to submit these policies within three months of the entry of the Third Order. On October 12, 2023, the Court reissued GH-2 (Internal Investigations), the PSB Operations Manual, and an attachment to GC-17 (Employee Disciplinary Procedures).

**Paragraph 355.** *The Monitor and the PSB shall review the cases in the current backlog that are eligible to be diverted from PSB investigations by ¶ 353 of this order. It is the expectation of the Court that the diverted cases shall reduce the current backlog.*

**Phase 1:** Not applicable

**Phase 2:** Deferred

Members of the Monitoring Team have met with PSB staff to discuss the current backlog. After discussion, we agreed that backlog cases would be defined as those administrative investigations and critical incidents where required investigative actions were still pending and the investigation had not been completed in accordance with the timelines established in Paragraph 204, and an extension had not been granted as per Paragraph 365. An investigation is considered complete when all investigative actions have been completed and the PSB commander has signed off in concurrence. The date the PSB Commander signs off on the investigation is the date the investigation is no longer counted as part of the backlog, irrespective of the findings.

The revised policies affecting investigations of complaints have been finalized, as per the Court's approval on October 12, 2023; and we will be working closely with PSB during the next reporting period to review backlog cases.

**Paragraph 356.** *Within five business days of the elimination of these cases from the backlog, the Monitor shall certify to the parties and the Court the number of administrative investigations remaining in the backlog that are open and have not been completed within the time limits required by the Court. At the beginning of each month, the number of open cases whose investigations have exceeded the time by which Doc. 1765 ¶ 204 required that they be completed shall be the remaining backlog. This backlog shall not include any cases for which the Monitor has granted an extension of the investigative deadline pursuant to ¶ 365 of this Order.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

Members of the Monitoring Team have met with PSB staff to discuss the current backlog.  The revised policies became effective November 14, 2023 and we will be working with PSB to review existing backlog cases.

Once we have completed our case reviews, we will provide the Court with the number of cases remaining in the backlog, as required.

**Paragraph 357.**  *The cases in this remaining backlog should be identified by year, giving priority to the oldest cases, i.e., the cases that were filed first.  The expectation should be to address the oldest cases first, without ignoring the continuing caseload.  For each month in which the PSB cannot reduce the remaining backlog by 20 cases from the previous month's number, the MCSO and/or Maricopa County shall pay into the PSB Staffing Fund two times the amount identified in ¶ 338 above.*

**Phase 1:**  Not applicable

**Phase 2:**  Deferred

Members of the Monitoring Team have met with PSB staff to discuss the backlog and identified how many cases were pending for each year.  The revised policies relevant to misconduct investigations have been approved and we will be working with PSB to review the backlog cases.

**Paragraph 360.**  *The Monitor shall submit a quarterly progress report to the Court and parties describing the rationale for each type of investigative diversion approved, the result of each diversion type, the backlog tally, the number of completed cases, unresolved issues, and further actions required to address the backlog and staffing levels at PSB.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

We submitted our fourth quarterly progress report to the Court and the Parties on November 30, 2023.  The report covered the period of August 1-October 31, 2023.

**Paragraph 361.**  *Under the direction of the Court, MCSO shall commission an independent study to determine: (1) the most efficient way for MCSO to allocate its personnel in light of existing authorized staffing levels, the requirements and expectations of its served communities, the requirements of this Court's Orders, the timely elimination of the existing backlog of PSB investigations, and state law; (2) the necessary staffing level for MCSO to fulfill these obligations regardless of the existing staffing level; and (3) the PSB staffing level required to maintain the timely completion of PSB investigations in compliance with the Orders of this Court and state law.  MCSO shall (1) provide a draft Request for Proposals to the Court, the Monitor, and the parties; (2) disclose credible bids to the Court, the Monitor, and the parties; and (3) obtain Court approval of the methodology for the study.  MCSO must ensure that the study is completed within one year of the entry of this Order.*

WAI 72842

**Phase 1:**  Not applicable

**Phase 2:**  Deferred

On July 7, 2022, before the entry of the Third Order, MCSO selected the Center for Public Safety Management (CPSM) to conduct a staffing analysis of its sworn functions.  On November 14, 2022, following the entry of the Third Order, CPSM accepted an additional scope of work through the Maricopa County Office of Procurement Services to address the Third Order requirements, including the timely elimination of the existing backlog of PSB investigations.

On November 16, 2022, MCSO filed with the Court a request for approval of its vendor, CPSM, to continue with the independent study and evaluation ordered by the Court under this Paragraph.

At a January 27, 2023 hearing, the Court determined that it would assess CPSM's staffing study after its completion to determine if it meets the requirements of this Paragraph.

*Paragraph 362.   The Court is aware that the MCSO has already engaged a consultant to undertake a similar evaluation.   Nevertheless, while the Court will consider both the qualifications of the consultant already hired by MCSO and the outcome of that study, the work of that consultant must comply with the Court's requirements, supra and will not be deemed to satisfy the terms of this Order absent the approval of this Court.  If MCSO wishes to obtain Court approval of the consultant it has already hired, it must, as a prerequisite, provide the contracting documents to the Court, the Monitor, and the parties within five business days of the entry of this Order; and it must submit the consultant's draft methodology to the Court, the Monitor, and the parties within 30 days of the entry of this Order.*

**Phase 1:**  Not applicable

**Phase 2:**  Deferred

On December 8, 2022, MCSO submitted the contracting and methodology documentation for its consultant, the Center for Public Safety Management (CPSM), as required by this Paragraph.

On December 30, 2022, the Plaintiffs and Plaintiff-Intervenor filed their comments and recommendations with the Court regarding MCSO's submission regarding the independent study proposed by CPSM.  We will further report on this Paragraph during the next reporting period.

At a January 27, 2023 hearing, the Court determined that it would assess CPSM's staffing study after its completion to determine if it meets the requirements of this Paragraph.

On May 19, 2023, members of the Monitoring Team virtually met with the CPSM Project Lead for the MCSO Staffing Study.  He provided the following information:

CPSM initially began the MCSO staffing study by collecting data involving uniformed patrol calls for service.  CPSM also assessed PSB, SWAT, BIO, and Aviation to determine if these units are operating utilizing best practices.

Following the Parties' concerns that CPSM was not doing enough to obtain input from community stakeholders, CPSM took steps to meet the Court's direction on considering community feedback in its process.  CPSM conferred with the Community Advisory Board (CAB) to obtain its input.

CPSM also conducted Town Hall-type community meetings, from July 12-14, 2023, in the eastern and western parts of Maricopa County.  The meetings were live-streamed, and CPSM distributed community surveys to participants in both English and Spanish.  Postcard surveys were provided to community members who did not have the technology to participate in an online survey.

CPSM received over 380 survey responses after completion of the community meetings.  The staffing study report will include the overall priorities and associated data from the community survey.  According to CSPM, uniformed patrols and 911 response were ranked as the highest priorities for the community.

***Paragraph 364.***  *To keep the parties and the Court informed, the MCSO shall report monthly on the size of the backlog to the Monitor, the parties, and the Court.  The Monitor's quarterly progress report will further assess the status of the backlog.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

MCSO reports the number of backlog cases each month as required.  At the end of December 2022, they reported 2,074 cases in the backlog.

At the end of the first quarter of 2023, MCSO reported 1,958 cases remained in the backlog.  At the end of the second quarter of 2023, MCSO reported 1,842 cases remained in the backlog.  At the end of this, the third quarter of 2023, MCSO reported 1,765 cases remain in the backlog.

***Paragraph 365.***  *The authority for MCSO to grant itself extensions in investigation deadlines granted in ¶ 204 of Doc. 1765 is revoked.  The Monitor shall be authorized to grant reasonable extensions upon reviewing requests submitted to him by the Sheriff.*

**Phase 1:**  Deferred

**Phase 2:**  Deferred

Following the entry of the Third Order, we communicated, and exchanged draft documents, with the PSB Commander regarding immediate and interim protocols – including our expectations and the documents and information necessary for the Sheriff to notify our Team of requests for extensions of investigation deadlines during the period leading to formalized and approved policy.  We addressed the mechanics for communicating the decisions made by our Team back to the Sheriff.  During this reporting period, there were five requests for investigation deadline extensions made by the Sheriff to our Team.  Of the five extension requests, the Monitor approved all five requests.

WAI 72844

***Paragraph 368.***  *MCSO will continue to pay into the PSB Staffing Fund pursuant to ¶ 357 until MCSO reports for twelve continuous months that it has no open investigations that have exceeded the time by which Doc. 1765 ¶ 204 required that they be completed.  At that time, MCSO may petition the Court to dissolve the PSB Staffing Fund.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

MCSO was not required to contribute to the PSB Staffing Fund during this reporting period due to meeting the staffing minimum requirements.  As of September 30, 2023, MCSO's complaint investigation backlog stood at 1,765 cases.

WAI 72845

## Section 18:  Concluding Remarks

We assess compliance with 94 Paragraphs of the First Order; 114 Paragraphs of the Second Order; and 17 of the Third Order, for a total of 225 Paragraphs.  MCSO is in Phase 1 compliance with 80 of the applicable First Order Paragraphs, or 100%; 104 of the applicable Second Order Paragraphs, or 100%; and one of the four applicable Third Order Paragraphs, or 25%.

Including the Paragraphs in which MCSO is in Full and Effective Compliance, MCSO is in Phase 2, or operational compliance, with 87 of the 94 applicable First Order Paragraphs, or 93%. Including the Paragraphs in which MCSO is in Full and Effective Compliance, MCSO is in Phase 2 compliance with 106 of the 114 applicable Second Order Paragraphs, or 93%.  This is the same percentage that we found during the last reporting period.  MCSO is in Phase 2 compliance with nine of the 17 applicable Third Order Paragraphs, or 53%.

During our October site visit, we held a community meeting at an elementary school in Guadalupe.  The meeting was conducted in English with consecutive Spanish interpretation, and was attended by approximately 40 community members. The Community Advisory Board assisted us with the selection of the meeting venue, and advertising for the meeting.

On October 12, 2023, the Court finalized revisions of GH-2 (Internal Investigations), the Professional Standards Bureau Operations Manual, and an attachment to GC-17 (Employee Disciplinary Procedures), mandating that MCSO adopt the new policies within one week.  Since that time, we have been working with MCSO and the Parties to ensure that the new policies, responsive to Paragraphs 348 and 353, are in place and functional.  If the agency is properly committed, the new policies will have a positive impact on the significant backlog of misconduct allegations pending completion.  To that end, we continue to work with MCSO to ensure that we address any issues that may come up, including discussing the implementation of the new processes with PSB and beginning to review backlog cases for eligibility for diversion.

PSB investigations continue to be of good quality.  For the second consecutive reporting period, District and Divisions completed multiple investigations within the required 60-day timeframe. We also noted noteworthy improvement in the overall investigative quality of those investigations being conducted by Districts and Divisions outside of PSB.  We hope that this progress continues.

We have met with PSB and District and Division command personnel multiple times to discuss the need to resolve numerous pending concerns involving training, policy, equipment, and tactics that they have identified during administrative misconduct investigations.  MCSO has advised us that a new process is being implemented, and MCSO is focused on resolving those concerns that are pending.  We have found the efforts to address this issue to be satisfactory and will continue to monitor further progress by MCSO.

MCSO remains vague about how the agency will respond to future Traffic Stop Annual Report (TSAR) and Traffic Stop Quarterly Report (TSQR) findings.  More analysis is appropriate, but it is not sufficient to change the findings of bias.  MCSO needs to plan practical and specific interventions that address the findings.  For example, MCSO could reprioritize the need to conduct traffic stops for minor equipment violations that do not implicate civilian safety.  MCSO could also create a policy of issuing warnings, rather than citations, for licensure issues within

WAI 72846

particular timeframes – for example, less than six months would result in a warning.  Or, alternately, MCSO could begin with a warning with a time limit – that is, if the warned driver does not rectify the license issue within 30 days, a citation would be issued.  The latter requires some follow-up that could also be beneficial for community interaction.

During our October site visit, we had a productive meeting with MCSO and the Parties regarding MCSO's obligations under Paragraph 70.  As a result of traffic data analysis that indicated potential bias in traffic stops, MCSO and the Parties had agreed to the Constitutional Policing Plan (CPP) in 2017.  The Court approved the plan on September 21, 2017, and we have been reporting on the progress of the CPP since its implementation.  During our October site visit meeting, all stakeholders agreed that a change was needed in the approach to address concerns in Traffic Stop Annual Report (TSAR) findings, which continue to indicate potential bias in traffic stops.  MCSO's proposal included a redesign of future training based on the findings of the Traffic Stop Quarterly Reports (TSQRs).  MCSO will review TSQR findings and develop training to specifically address actionable items found in these reports.

We continue to note that some supervisors provide documentation on the VSCFs when mistakes are identified and the actions they took to have the deputies make any corrections to the paperwork associated with traffic stops.  We note that the corrections related to the areas of concern contained in the requirement, such as: the documentation of seized evidence, the correct number of vehicle occupants, the correct number of deputies present at a traffic stop, the type of search conducted, and identifying that an Incidental Contact Receipt was not issued.  Such actions by supervisory personnel reinforces the policies MCSO adopted to ensure compliance with the requirements.

During this reporting period, MCSO achieved compliance with the requirement to properly document all seized evidence or contraband on the VSCFs.  In past reporting periods, MCSO has demonstrated that it can sustain a high compliance rating, which indicates that supervisors and deputies are being more attentive to this issue.  We encourage MCSO to continue to provide guidance to deputies and supervisors on this topic in order to maintain compliance with the requirement.

MCSO must continue to stress to deputies the importance of properly providing the required documentation to passengers to effectively comply with MCSO's policy.  As we have previously noted in prior reporting periods, we continue to identify instances where deputies fail to issue Incidental Contact Receipts to passengers when required.  In addition, as we reported in the previous reporting periods, we continue to identify instances where deputies documented that Incidental Contact Receipts were issued to passengers, however, based on our reviews of the body-worn camera recordings, we determined that the receipts were not provided to the passengers.  We have been informed that in some instances, MCSO instructed the deputies to mail the Incidental Contact Receipts to the passengers once the issue was identified internally or after we informed MCSO of the issue.  We continue to encourage MCSO to continue to provide guidance to deputies and supervisors on this topic to ensure that the receipts are provided to the passengers prior to the conclusion of the traffic stops.

WAI 72847

# Appendix:  Acronyms

The following is a listing of acronyms frequently used in our quarterly status reports:

| | |
|---|---|
| AB | Administrative Broadcast |
| ACJIS | Arizona Criminal Justice Information System |
| ACLU | American Civil Liberties Union |
| ACT | Annual Combined Training |
| AIU | Audits and Inspections Unit |
| AOC | Administrative Office of Courts |
| ARG | Alert Review Group |
| ARS | Arizona Revised Statutes |
| ASU | Arizona State University |
| ATU | Anti-Trafficking Unit |
| BAF | BIO Action Form |
| BB | Briefing Board |
| BIO | Bureau of Internal Oversight |
| BWC | Body-worn camera |
| CAB | Community Advisory Board |
| CAD | Computer Aided Dispatch |
| CBP | Customs and Border Protection |
| CDA | Command Daily Assessment |
| CEU | Criminal Employment Unit |
| CHU | Custody Hospital Unit |
| CID | Court Implementation Division |
| COrD | Community Outreach Division |
| CORT | Court Order Required Training |
| CPSM | Center for Public Safety Management |
| CRM | Class Remedial Matter |
| DOJ | Department of Justice |

WAI 72848

| DSA | Deputy Service Aide |
|-----|---------------------|
| DUI | Driving Under the Influence |
| EEPM | Effective Employee Performance Management |
| EIS | Early Identification System |
| EIU | Early Intervention Unit |
| EPA | Employee Performance Appraisal |
| ESI | Electronically stored information |
| ETSI | Extended Traffic Stop Indicator |
| FBI | Federal Bureau of Investigation |
| ESTI | Extended traffic stop indicator |
| FEC | Full and Effective Compliance |
| FIDM | Fair and Impartial Decision Making |
| FOF | Findings of Fact |
| FTO | Field Training Officer |
| GI | General Instructor |
| ICE | Immigration and Customs Enforcement |
| IIU | Internal Investigations Unit |
| IR | Incident Report |
| IRM | Incident Report Memorialization |
| JED | Judicial Enforcement Division |
| LNET | Long non-extended traffic stop |
| LOS | Length of stop |
| LLS | Legal Liaison Section |
| MCAO | Maricopa County Attorney's Office |
| MCSO | Maricopa County Sheriff's Office |
| NETS | Non-extended traffic stops |
| NOI | Notice of Investigation |
| NTC | Non-Traffic Contact |
| NTCF | Non-Traffic Contact Form |
| OA | Open Axes |

WAI 72849

| OIT | Officer in Training |
|-----|---------------------|
| PAL | Patrol Activity Log |
| PDH | Pre-Determination Hearing |
| POST | Peace Officers Standards and Training |
| PPMU | Posse Personnel Management Unit |
| PSB | Professional Standards Bureau |
| SID | Special Investigations Division |
| SIMS | Sheriff's Information Management Services |
| SMS | Skills Manager System |
| SPSS | Statistical Package for the Social Science |
| SRT | Special Response Team |
| TraCS | Traffic and Criminal Software |
| TSAR | Traffic Stop Annual Report |
| TSAU | Traffic Stop Analysis Unit |
| TSMR | Traffic Stop Monthly Report |
| TSQR | Traffic Stop Quarterly Report |
| VSCF | Vehicle Stop Contact Form |

WAI 72850