Exhibit F

Kristen Clarke
Assistant Attorney General
Steven H. Rosenbaum (NY Bar No. 1901958)
Megan R. Marks (NY Bar No. 5495676)
Nancy Glass (DC Bar No. 995831)
Nabanita Pal (MD Bar No. 1512160166)
Suraj Kumar (NY Bar No. 5620745)

U.S. Department of Justice, Civil Rights Division
Special Litigation Section
150 M Street NE, 10th Floor, Washington, DC 20002

Attorneys for the United States

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF ARIZONA

Manuel de Jesus Ortega Melendres, on
behalf of himself and all others similarly
situated; *et al*.

                         Plaintiffs,

and

United States of America

                     Plaintiff-Intervenor,

     v.

Russell Skinner, in his official capacity as
Sheriff of Maricopa County, AZ; *et al*.

                  Defendants.

No. 2:07-cv-02513-PHX-GMS

**DECLARATION OF HAROLD MEDLOCK IN SUPPORT OF THE UNITED STATES' AND PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR APPROVAL OF STAFFING STUDY**

I, Harold Medlock, declare as follows:

1.      I am a law enforcement leadership expert and consultant.

2.      I serve as a Subject Matter Expert/Strategic Site Liaison for several Department of Justice (DOJ), Bureau of Justice Assistance programs and initiatives.

3.      I was retained by DOJ's Special Litigation Section in 2023 to consult on and review various actions taken by the Maricopa County Sheriff's Office to implement court orders.

4.      From 2013 to 2016, I was the chief of the Fayetteville Police Department (FPD) in North Carolina. In that role, I led several initiatives relevant to this matter.

5.      For example, I directed a staffing study in 2013 to determine the proper staffing levels for officers and support personnel, and I secured 47 additional sworn positions and 11 non-sworn support positions. I also secured funding through DOJ's Community Oriented Policing Services Office for an additional 15 sworn officers for a three-year grant period.

6.      As police chief, I also oversaw a shift in FPD traffic enforcement from regulatory/non-moving violations to moving violations, such as reckless driving or speeding, which led to a reduction in traffic fatalities from 2013 to 2016. During that time, citizen and officer satisfaction improved, and uses of force, injuries to officers and citizens, and complaints against the police department declined.

7.      I also directed a complete overhaul of the FPD discipline process, including revisions to policies, changing the chain of command review process, and the development of a new review board for serious internal charges and citizen complaints. These changes also included more aggressive timelines for completing internal investigations.

8.      Prior to my tenure at FPD, I served as the Deputy Police Chief for the Charlotte-Mecklenburg Police Department in North Carolina from 2008 to 2013. I began my career in this department in 1993, working my way up from officer to Sergeant, Training Director, Division Commander, and Police Major over two different bureaus,

one where I was responsible for hundreds of patrol officers engaged in traffic enforcement, and another where I oversaw several hundred detectives investigating felonies such as homicide, robberies, and auto theft.

9.     And in each of these leadership roles, I had the opportunity to review, and in some cases, conduct internal affairs investigations. For example, as a first line supervisor and district sergeant, I investigated over 200 internal investigations including Use of Force, Police Pursuits, K9 Uses of Force, Rudeness and Courtesy Complaints, and Officer Performance Complaints.  I both conducted these investigations and made recommendations for discipline.  As a Patrol Division Commander and Major, I reviewed and approved every internal investigation at the Division level, made recommendations for discipline and/or returned investigations for additional work.  I counseled and disciplined Division commanders and their sergeants when the investigations were completed late, poorly investigated or incomplete, or the findings were not appropriate or supported.

10.     Based on my experience in a range of leadership roles, I am deeply familiar with the everyday challenges facing law enforcement officers and law enforcement agencies. I am also well versed in effective management strategies that can help law enforcement agencies use their resources effectively while engaging in constitutional policing and earning the trust of the communities they serve.

11.     I have reviewed the Center for Public Safety Management's (CPSM) staffing study, focusing on recommendations that relate to MCSO's patrol operations and deployment, and the allocation of additional resources to the Professional Standards Bureau (PSB).

12.     I agree with CPSM's recommendation that MCSO should direct existing personnel to PSB to help reduce the backlog of cases. The study correctly identifies specific divisions from where staff could be moved. Based on my review, I believe some sworn positions within the Bureau of Internal Oversight and the Court Implementation Division could be civilianized in order to reallocate sworn personnel to PSB. In my

1  opinion, civilian staff can be allocated and trained to handle auditing functions without
2  compromising the quality of internal oversight.

3        13.    At FPD and CMPD, we had automated systems for reviewing internal
4  affairs complaints and traffic stops. For example, I was able to use a dashboard to look
5  daily, weekly, and monthly to see what was in the queue in Internal Affairs, and I was
6  able to review through BlueTeam, the supervision platform we used, what was happening
7  on the street in terms of patrol, to identify trends and problems. These systems promoted
8  and required accountability at every level. For internal investigations, there was a time
9  requirement for each person in the chain of command to review a complaint at different
10 points in the investigative process.

11       14.    Although additional investigators are necessary to help reduce the current
12 PSB backlog, MCSO should take specific steps to direct and manage the workflow of the
13 Bureau and implement clear performance measures. I agree with CPSM that the creation
14 of a group specifically focused on backlog cases could help facilitate progress. MCSO
15 should establish a workplan for that group, identify a cut-off for the number of cases that
16 will be considered part of the backlog (for example, any case that is twelve months or
17 older), and establish a benchmark for the number of cases that should be cleared per
18 month. PSB leadership must monitor progress based on these benchmarks and take action
19 when performance falls below expectations.

20       15.    I also agree with CPSM's recommendations related to traffic enforcement.
21 The study indicates that a significant portion of deputies' time, when they are not
22 responding to calls for service, is spent on nondirected patrol, where deputies may initiate
23 traffic stops without any overarching enforcement priorities or direction. In my
24 experience, a directed patrol strategy that defines clear expectations for performance—for
25 example, to focus on areas with crashes, high complaint areas, or areas known for
26 dangerous driving behavior—can lead to a more effective use of resources and better
27 public safety outcomes. Guiding deputies in their traffic enforcement could also lead to a
28 reduction of citizen complaints and racial disparities in traffic stops—as it did in

4

1  Fayetteville. I have found that an operations plan, which identifies key enforcement
2  priorities, is an effective means of communicating a patrol strategy at the agency level.
3  Operations plans helped me hold commanders accountable for satisfying those priorities
4  and reducing serious traffic crashes, and traffic-related injuries and death.

5       16.    In my experience, law enforcement leaders must hold commanders
6  responsible for implementing an operations plan and ensuring that deputies' activity is
7  consistent with agency-wide enforcement priorities. One critically important and
8  fundamental mechanism is regular command-level meetings during which leaders discuss
9  recent data reflecting patrol districts' enforcement activity, such as traffic stop types,
10 locations, and enforcement outcomes.

11

12      I declare under the penalty of perjury that the foregoing is true and correct to the
13 best of my knowledge, information, and belief, and that this Declaration was executed on
14 the 26th day of March, 2024.

15
16
17      By:   _Harold Medlock_
18            Chief Harold Medlock (retired)
19
20
21
22
23
24
25
26
27
28