UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

---

Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated, et al.,

Plaintiffs,

and

United States Of America,

Plaintiff-Intervenor,

v.

Russ Skinner, in his official capacity as Sheriff of Maricopa County, Arizona, et al.,

Defendants.

2:07-cv-02513-GMS

Phoenix, Arizona
May 2, 2024
2:06 p.m.

**BEFORE: THE HONORABLE G. MURRAY SNOW, CHIEF JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**MOTION HEARING**

Official Court Reporter:
Teri Veres, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 38
Phoenix, Arizona 85003-2151
(602) 322-7251

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

***A P P E A R A N C E S***

ON BEHALF OF THE PLAINTIFFS:

ACLU FOUNDATION OF ARIZONA
By: **Christine K. Wee, Esq.**
P.O. Box 17148
Phoenix, Arizona 85011

ACLU - SAN FRANCISCO, CA (Appearing telephonically)
Immigrants Rights Project
By: **Cecillia D. Wang, Esq.**
39 Drumm Street
San Francisco, California 94111

COVINGTON & BURLING, LLP (Appearing telephonically)
By: **Stanley Young, Esq.**
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, California 94306

ON BEHALF OF THE INTERVENOR PLAINTIFF:

U.S. DEPARTMENT OF JUSTICE - CIVIL RIGHTS DIVISION
BY: **Suraj Kumar, Esq.**
**Megan Marks, Esq.**
150 M Street
Washington, D.C. 20002

U.S. DEPARTMENT OF JUSTICE (Appearing telephonically)
Civil Rights Division
By: **Nancy Glass, Esq.**
150 M Street NE
Washington, D.C. 20001

U.S. DEPARTMENT OF JUSTICE (Appearing telephonically)
Civil Rights Division
By: **Nabanita Pal, Esq.**
150 M Street
Washington, D.C. 20002

***A P P E A R A N C E S C O N T ' D***

ON BEHALF OF DEFENDANT SHERIFF SKINNER:

OSBORN MALEDON, PA
By: **Mary Ruth O'Grady, Esq.**
**Kristin Louise Windtberg, Esq.**
P.O. Box 36379
Phoenix, Arizona 85067-6379

ALSO PRESENT: Sheriff Russell Skinner

ON BEHALF OF DEFENDANT MARICOPA COUNTY:

MARICOPA COUNTY ATTORNEY CIVIL SERVICES DIVISION
By: **Joseph I. Vigil, Esq.**
225 W. Madison Street
Phoenix, Arizona 85003

***P R O C E E D I N G S***

*(Proceedings begin at 2:06 p.m.)*

COURTROOM DEPUTY: This is CV07-2513, Melendres on for motion hearing.

Counsel, please announce your appearances.

MR. KUMAR: Good afternoon, Your Honor, Suraj Kumar for the United States.

MS. MARKS: Megan Marks for the United States.

MS. WEE: Good afternoon, Your Honor, Christine Wee on behalf of the plaintiffs.

THE COURT: Good afternoon.

MR. KUMAR: We're also joined on the phone, Your Honor, by Nancy Glass and Nabanita Pal from DC.

THE COURT: All right, good afternoon.

MS. O'GRADY: Good afternoon, Your Honor, Mary O'Grady and Kristin Windtberg representing the Maricopa County Sheriff; and with us at counsel table we have Maricopa County Sheriff Russ Skinner.

THE COURT: Good afternoon.

MR. VIGIL: Good afternoon, Your Honor, Joseph Vigil on behalf of Maricopa County.

THE COURT: Good afternoon.

MS. WEE: And, Your Honor, on the phone on behalf of plaintiff we have Cecillia Wang, Stanley Young and Eduardo Casas.

THE COURT: Good afternoon.

Before we begin today, I want to -- I need to straighten out a few matters first. I made an error. It was a mistake. I need to disclose it to all parties and let them react to it as they need to.

Several weeks ago I was at a sponsored lecture with some members of my family, and there I ran in to Ms. O'Grady who was also attending the same lecture with members of her family.

In introducing my family to Ms. O'Grady, who, I think she would confirm we're not personal friends, but we've known each other professionally for a number of years, I indicated that she was an attorney on this case; and then I said to Ms. O'Grady something like, "How did that go?" and she shook her head.

I was referring to my appearance that was not quite impromptu at part of the working group that was done during the Monitor's evaluation. It was wrong for me to have said anything to Ms. O'Grady. I knew it was wrong, and I think I just sort of blurted it out. She did not say -- well, I don't recall that she said anything in response other than shaking her head.

I put her in a very bad place because of what I'd done and it was inappropriate. So I want to let all the parties know; and, Ms. O'Grady, if you remember it differently

or if you can add details, please do so.

MS. O'GRADY: Your Honor, that's what I remember as well.

THE COURT: Okay. So I apologize to you. I'll never do that to you again, and if any of the parties want to take any action about it I just thought I'd let you know that it happened.

Several weeks after that, Ms. O'Grady spoke to the Monitor and said something like if I'm going to appear during the Monitor's weekly visits she would like all the parties to be advised that I'm going to appear.

Let me try and work out a compromise solution with you, Ms. O'Grady. I did tell the Monitor last time -- he knew I was going to come, but I asked him to be sure that all attorneys were there because I knew that I wanted to speak a little bit, which I did.

I think if I ever do that again and I want to speak, I'll again make sure all the parties are aware that I'm going to be there and I want to speak; but if I just want to come observe and not communicate to anybody, I think I'm going to reserve the right to pop in on a surprise visit.

Does any party have any concern with that?

MR. KUMAR: No, Your Honor.

MS. O'GRADY: No, Your Honor.

Your Honor, I don't have a problem with the

observation role; but, yeah, speaking would require notice.

THE COURT: Yeah.

MS. O'GRADY: And last time, since we didn't give notice, I know counsel for the County was not aware and not present.

THE COURT: Okay. If that is the case, I apologize. I thought I communicated to the Monitor that I wanted him to communicate to all parties and be sure counsel was there; and, again, if you weren't there, I apologize and we will not repeat that.

Ms. O'Grady, it's your motion. You know, before I let you speak, I want to be sort of a little bit directive about where I want to go from here. You saw yesterday that I kind of put out a very brief thing of what I'd like you to -- like all the parties to address during oral argument, and I want to tell you why.

As you know, even before I entered the contempt order I mused about putting in a staffing study as a result -- as a cure for the contempt order, and I think in good faith the Maricopa County Sheriff began that staffing order before I even entered contempt.

So I didn't want to bless that staffing study until I saw it, and I wanted to indicate what I wanted in it; and so I did that in the contempt order, and I required Maricopa County to provide me with the work methodology, which they

did.

And, you know, without quoting it at any great length, the work methodology indicated they were going to do a very minute staffing study and come up with staffing recommendations for all units and patrols, and that's kind of what I wanted.

And the reason I wanted it, really, is not so much that I have to get into the granular vision of how Sheriff Skinner chooses to run the Maricopa County Sheriff's Office now that he is the Sheriff. It might have been more for Sheriff Penzone, but here's where it comes down to: I need to know -- I think that regardless of -- let's assume there was no backlog at all here. Every sheriff's office has to have a PSB, and they have to have the PSB to keep current on the current complaints that come in and be responsive to the public.

The Sheriff ultimately determines what the law enforcement priorities are going to be, but one of the things they said in the work study is they were going to provide a comprehensive, organizational and operational analysis of staffing levels and operations of the Maricopa County Sheriff's Office and develop options and recommendations to optimize effectiveness and efficiency in the management and delivery of law enforcement services.

The report does much that's good. I think it's a

good faith effort, but it doesn't do that -- at least, you know, I'm going to let you show me where it does that, if it does it; but it says, when it gets down to the PSB stuff that I'm most concerned about, unfortunately, because of the uniqueness of personnel investigations, there is no matrix defining the number of personnel required to complete personnel investigations. It would be easy to staff a unit such as PSB if a matrix existed that defined, quote, "If the unit received X number of complaint investigations, the unit must be staffed by X number of investigators to complete those investigations."

Well, that's exactly what we commissioned the staffing study to tell us, and despite its supposed inability it notes based on 2021 data that 13 sworn investigators are averaging only eight completed investigations per investigator per year, which is 1.5 investigations per month; and what that tells me is -- and what the staffing study actually says, it's not me -- and it's not really a staffing study. It is an operational management study.

Even if MCSO's operations generated no additional complaints at all, it would nevertheless take the sworn investigators 6.5 years to investigate and complete the backlog of cases.

Again, the study tells me that in 2021 data for detention investigators, they average -- they do a little

better than the sworn side. They average about 13 completed investigations per year, so about one per month. It's interesting that the report also says that the International Association of Chiefs of Police suggest that a detective caseload be between 120 and 180 cases per year, which is 10 to 15 per month. So criminal investigators investigating crime do ten times more investigations than what is actually happening in the PSB.

It also goes out to -- goes on to say MCSO employed a strategy of assigning investigations to Jensen Hughes that were less serious investigations believing that they could be conducted more quickly than other investigations. As one can see in the above table, Jensen Hughes completed less than half of the investigations assigned to them and averaged five months for each investigation they did manage to complete.

I don't know what the cost of Jensen Hughes is, but I expect that it costs more to hire Jensen Hughes than it costs to have an employee or a sworn officer do these investigations; and you will tell me, and you will be right, "But you're the one that's making us do these investigations."

And I would say, "Yeah, I am; but every police agency, including the Sheriff's Office, has to have a right-sized PSB," and so when you look at your police resources, you have to adjust them so that your PSB is right sized in light of all the other operations that you want to do

given, you know, the appropriate priorities that Sheriff Skinner will have.

Now, I realize that Sheriff Skinner was not the Sheriff when these -- when these statistics came in. I want to emphasize that, but what the study said -- and the study gave all kinds of options about the way that MCSO is configured that could be configured to save police personnel that might be reallocated to PSB.

Admittedly, also, the study indicated that there were other vacancies that were understaffed. So I realize that I don't have the whole picture and the staffing study didn't provide it, because they didn't go like they said they would on a division-by-division basis and provide the Sheriff with the notion of, "If you do this, this is how many staff you need," so giving him options to reallocate staff.

So, for example, within the period September 2021 through August 31, 2022, as well as presently, MCSO, quote, "Response to all calls for service with very little deviation to the practice of sending an MCSO sworn deputy." The report -- and maybe the MCSO, I don't know, calls it the "no call is too small policy."

Well, in lots of ways that's admirable; and I'm not telling you, Sheriff, you shouldn't do it, but the report notes the alternative to this philosophy will be addressed in this report. The current model of using sworn deputies for

almost all service demands is inefficient and has been replaced with other response models by law enforcement departments throughout the United States.

Then it talks about the vast number of false alarms that MCSO responds to. It talks about the mental health calls that, you know, you could arrange with other health care organizations to respond to those calls. It talks about patrol responding to all auto accidents when civilian response teams could be trained to do that. It talks about traffic enforcement, which amounts to one half of all the deputy-initiated activity in Arizona; and seems to be very minor traffic stops and suggests that you minimize making routine traffic stops and target your data-driven approach. It talks about only 13 percent of all calls seem to conclude with a crime report and suggests that those matters be adopted.

Again, that's the Sheriff's call; but there are options for him to consider in how he wants to allocate his force, and that's what I was looking for to provide not only the Sheriff, but to provide me so I'm aware of the choices he makes. I think that's only fair.

You know, one of the things we discussed in the meeting was my concern about some of the statistics that were sent to the Community Advisory Board under the previous Sheriff that I thought were really manipulated; but even

though I would contest those statistics, I don't contest the concern that the Sheriff's Office, and I assume plaintiffs and plaintiff intervenors have, for doing what we do here in an efficient, responsible manner that's cost-effective to the public and, to the extent possible, and it's not always possible for you, it's not always possible for me, in an open way, as open as possible.

So I just wanted to have those options provided for the Sheriff to look at in a knowledgeable way, and it seems to me that even if all we're doing is looking at the PSB, why didn't they look at what the current number of complaints is that's coming in per month and then look at the number that they have on file; and then, instead of just pulling a number out of a hat, saying 13, why didn't they tell me what, given the actual data is, is needed in PSB to resolve the backlog; and then when the backlog is resolved, the number of investigators needed in PSB to keep above water.

And the other thing they didn't address, which is somewhat of a concern for me, I'll tell you, the state law was revised, I think you know, during the course of this so that now they give six months under state law to resolve it; and if they haven't resolved it, then they dismiss it. It's kind of an officer -- or a deputy-oriented approach, and I understand that.

But my concern -- and it's the concern that gave

rise to this ten years ago is back then under Maricopa County's management, those investigations, as you know, were being postponed so that, according to the agreements that you arrived at with your deputies, no discipline could be enforced -- I think it was after four months. I don't know regardless of what state law is -- and I remember discussing this with you, Mr. Vigil. I don't know what, regardless of what state law is, when those investigations have to be completed to be effective in terms of your agreements with your deputies.

I think all of these things were things that I expected to see in the staffing study. I think, as you can tell, even though I don't claim to have a perfect knowledge of the staffing study, I've read it; and while there is much in it that is praiseworthy, it falls short of what I expected it to be and I think what I required it to be and I think what, in all good faith, MCSO asked for it to be and what they were told it would be that you provided for me in the methodology.

I am not precluding the possibility that any or all of you can convince me that it does, in fact, comply with my order. I'm being honest when I say I think you're going to have an uphill battle. What I think we might want to focus on, though, is what we do if I find it isn't a complying study.

I don't necessarily want to make you go through all

that again and spend money again, especially when I do believe there is valuable information here even though it's dated; but how can we get what I want to get or at least a bare minimum of what will be useful to the Sheriff if he wants to use it and actually tie some of these things down.

In your response -- your reply, sorry. In your reply you note a few of the investigations that the plaintiffs and plaintiff intervenors have noted from the report. You said, "We're not going to follow them. We're not going to accept those." You didn't say that to all of them, and I don't know which ones you may accept and which ones you may not; and, certainly, let me underline, I'm not the Sheriff of Maricopa County. You can make whatever choices you want, but I do want to provide you with information that will inform those choices and, to some degree, hold you accountable for those choices. That's where I want to get.

So long prologue, can the parties discuss -- if you want to convince me that this is a compliant report, I will listen and keep an open mind -- or at least do my best to keep an open mind, but I think it might be more profitable to discuss how do we get that information to be of use for all of us?

And I also noted, as you noted in my order, that the plaintiff and plaintiff intervenors seem to have no objection to the report, despite the fact that I do. So you may want to

convince me that the report is in compliance as well. I'll listen to you, too. Maybe we can have a discussion. Maybe I should just give you the opportunity to be heard. It's your motion, Ms. O'Grady, so I'll let you -- let you decide how you want to handle it.

MS. O'GRADY: Well, interesting. I think what I'd like to do is go ahead and explain why we think it's compliant.

THE COURT: Okay.

MS. O'GRADY: And also give you an update on where we are with the backlog reduction and some of the challenges in -- because this is a rapidly-moving situation.

THE COURT: It is; and one of the reasons, frankly, I read the report is I've made a determination this case is a big time suck, as you might imagine, with my other cases; but I've made a determination I'm going to take all the time it takes to read all this stuff in a way that I hope will be facilitative to all the parties in resolving this and getting where we want to be. So I'm more than happy to be facilitative and listen to you tell me the report is good; and, again, I'm not saying it's bad.

MS. O'GRADY: And before we -- and I would -- it would be helpful after we listen to everybody probably to confer a bit and see if we respond to any other thoughts that you have --

THE COURT: Okay.

MS. O'GRADY: -- before we leave today.

If I may come up here.

So I was going to start with why I think it complies with the requirements of the Third Order, but let me start somewhere else and just give an update on the status of the backlog reduction.

As of -- and they're still kind of doing their confirmation, but as of the end of April the backlog consisted of approximately 1435 cases. So that's down from about 2100 plus when we started this progress.

THE COURT: Is that after I've given you the sort of adjustments you could make? Does that reflect those adjustments?

MS. O'GRADY: That would reflect those adjustments.

Now, in terms of those adjustments, they've had the final meeting with the Monitor to go over what -- do their backlog review, and as a result of that backlog review about 253 cases were removed from the backlog.

So the bulk of the cases that have been removed from the backlog are not from the backlog review process, but from the work of MCSO to investigate the cases; and so by my math that's about 448 some that are -- you know, because of MCSO work and primarily PSB work and overall reduction of 701 cases, about 32 percent.

So that's been a lot of change since the Third Order was approved and most of it -- even the Third Order policies, you know, we've used them for the backlog review. We've used them for the intake process. We just today got -- they're still not fully implemented in terms of the investigation planning and those components. They got -- we got the approval from the Monitor today and thank folks for getting their comments in.

That's gone through a couple of rounds of review so people can be trained on those, and those might bring additional deficiencies to the process and we all -- as of the end of March we are at, I think as I reported in our documents, 46 investigators and as we reported in our reply hope to hire more, need to move to our new office so that PSB can hire more, but that will all happen in July.

So a lot of hard work, good work being done to close investigations and, really, a pretty rapidly-changing evolving process since the Third Order and really from before the Third Order because there was -- as you mentioned, we, you know, got involved with the Staffing Study.

We also -- and PSB leadership has been thinking about how can we do things better, differently with the tools that we have to work more efficiently. The civilian investigators, by all reports, have been a tremendous addition to PSB in terms of providing a more diverse mix of experience

and skill sets; and I think by all reports the leadership is really being very strategic about assigning cases, getting people to collaborate and work together. So there's a lot of process being done on the backlog reduction front.

So in terms of why I think the report satisfies Paragraph 361 -- and there were three issues you wanted us to address. One, the most efficient way for MCSO to allocate its personnel in light of existing staffing levels, requirements and expectations of its served communities, requirements of Court's order, timely elimination of the existing backlog and PSB investigations and state law.

And we think this does that. They do address the personnel in PSB. They do address -- you may not like the quality, Your Honor, of the analysis, but they -- they address -- they are trying to address these issues to get at the issues in the Court's order. They look at every division outside of detention --

THE COURT: Right.

MS. O'GRADY: -- in the office.

THE COURT: But the PSB is the only one I recall they actually gave a staffing level for. They do say sometimes we're gonna accept what MCSO says is the staffing level and there's vacancies here; and you're right, in the PSB they do say 13, although they give no explanation as to how they come up with that number.

MS. O'GRADY: And they make recommendations in terms of whether, you know, civilian versus sworn and whether --

THE COURT: They do make a lot of those recommendations, which is what I was referring to and why I'm not considering the report worthless.

MS. O'GRADY: Uh-huh. And so in terms of -- so it does address the issues in issue one. They address office wide allocation of --

THE COURT: They do address the issue. They just don't draw the conclusions.

MS. O'GRADY: They draw the conclusions as to PSB in terms of the allocation of resources and those decisions -- those comments about, well, can you pull some people, you know, who have PSB experience that are elsewhere in the organization? Maybe not to transfer them back, but to use those resources to help. They make some recommendations on --

THE COURT: They do.

MS. O'GRADY: So they do make those recommendations. Maybe they are not what you -- what the Court had hoped for, but they do address those issues. They do address, you know, the community engagement piece and identify what's most important based on their survey, which is, you know, the response -- the patrol services, responses to calls for service and uniformed patrol and then they -- and then they study, you know, how we are staffing those programs in the --

in the substance of the report, and so there's a lot on how we can more efficiently use our staff I think in the -- in the recommendations there. So I do think they address the points made in issue one.

And I think when I read the report, that it doesn't support transferring. It says there's lots of vacancies, retention issues and they're not -- there's not this pool of personnel out there that they could transfer to MCSO to solve this issue.

THE COURT: You mean to PSB?

MS. O'GRADY: Excuse me, to PSB.

THE COURT: You know what, I understand that and I don't disagree; but if they need to reallocate the resources, I still think we need to know where they're reallocated so we know how big of a PSB we need and how many more people we need.

So if those people rightly need to go elsewhere, fine, but that tells us they aren't going to PSB and whether or not we need to supplement, especially in light of costs -- and I don't know what they are -- but I suspect Jensen Hughes is pretty expensive for a pretty darn low level of production.

MS. O'GRADY: But what I'm saying, there's not in here identified a pool to transfer into PSB.

THE COURT: No, no, I agree.

MS. O'GRADY: And they do the analysis of do we have

enough people to get the work done in those different sections of the report.

THE COURT: So they don't give a staffing number?

MS. O'GRADY: They don't; but if they did, it would be out of date 'cuz it's a -- it's a move -- you know, staffing levels change.

THE COURT: Sure, but it would still be value.

The other thing, I guess, I wanted to ask you, Ms. O'Grady, is why doesn't the MCSO keep crime statistics? Seems to me like that would be something that is very pertinent to any sort of operational decision and, apparently, you don't keep or share crime statistics. That was kind of shocking to me.

MS. O'GRADY: And I'll confer on that -- on that issue. So I think they addressed issue one.

THE COURT: Yes.

MS. O'GRADY: On issue two, necessary staffing level, we've talked about how they recommend the addition of investigators. So they do have a recommended staffing level in the report, and so I think they have addressed issue two. May not be satisfied with the analysis, and part of that is because of the shifting deadlines it doesn't really analyze the work -- the impact of the Third Order policy changes, and so that couldn't be factored into this analysis.

And, also, the third issue that the report was

required to address is the staffing level required to maintain the timely completion of PSB investigations in compliance with the orders of this Court and state law.

Now, they -- what they say on that point is once the backlog of cases is eliminated and PSB can maintain a reasonable time line for investigating the complaints, the staffing should be reevaluated and potentially reduced; and I think right now, honestly, in the context that we are with not having fully felt the impact of the Third Order policies, that's appropriate because you need to understand how they're going to -- you know, the impact they're going to have on the cases coming in the door and on the efficiencies of the work that's being done.

THE COURT: Tell me this: Did I miss anywhere where they come up with a number of how many new complaints are coming in on average every month?

MS. O'GRADY: I don't see that in the report, and I'll double-check to see if I missed it. It was more on work completed, but we have those numbers. That was the other thought. There is a lot of information available.

THE COURT: Well, just so you know where I'm talking --

MS. O'GRADY: Uh-huh --

THE COURT: -- what I'm talking, I want what I told you I want because I think that's what's required to comply

with the report. I would take less, and I don't want to have you redo the report. If you have that number and you can come up with what it's going to take to staff the PSB to reduce the backlog in a reasonable amount of time and then maintain it so that we have a level, that -- that may go a long way to satisfying me without redoing the report without accepting necessarily this one. Do you see what I'm saying?

MS. O'GRADY: Well, and that's why I started with the backlog reduction.

THE COURT: Yeah.

MS. O'GRADY: How significantly it's already been reduced --

THE COURT: Yeah, I get it.

MS. O'GRADY: -- and recognizing that, you know, we haven't felt the full effect of the changes that have been approved.

Also -- and I don't know if I -- you know, at some point the Court's order mentioned in Paragraph -- what was it, 358. We have long wanted to have the Court's time lines correspond more to the State law time lines, and the order had said that not going to entertain -- would consider that only when significant progress is made toward the reduction of the backlog.

THE COURT: Let me tell you my biggest concern. It is regardless of what's -- I don't get to dictate state law,

okay. I don't really care for the state law, but I recognize exactly why you'd ask for it; but the reason I don't care potentially for the state law, and it may be just fine, is the State law may require 180 days, but your agreements or understandings with your deputies may be that they won't be disciplined if the report isn't back within four months.

So what I'm looking at is -- do you understand what I'm saying, Ms. O'Grady? You seem a little perplexed.

MS. O'GRADY: I'm not sure that we have an agreement with the deputies.

THE COURT: I'm not sure either. I talked about this once with Mr. Vigil and he explained it to me, I think, and I don't remember it exactly; and he may not either, I don't know.

But my point is the reason this discipline was imposed and it was imposed with the tighter time level is because back then when the requirement was 120 days under state law, there was an even shorter period or maybe an equivalent period that was the understanding that was applied by the local -- I don't know whether the County Board for appeals for discipline to police officers, and that board would not discipline officers if the reports hadn't been completed and acted upon within four months.

So regardless of what state law is, I want -- and I will consider -- I will consider adjusting to give you more

time, though not more than state law requires, if you convince me that that board is not using a lesser time period as a cutoff for refusing to impose discipline or to uphold discipline that's been found appropriate for deputies.

MS. O'GRADY: I see -- I see that and I think we can address that; and so part of the thing with, you know, how many do you need and -- how many staff do you need? Well, that issue of what the deadline might be at the end of this process also factors in to that whole analysis.

THE COURT: I get that. So I've shared with you what my concern is now so you can address it, and I do want to listen to the plaintiff and plaintiff intervenors if they have other suggestions to make, too.

MS. O'GRADY: I have one other comment on the State law issue.

THE COURT: Uh-huh.

MS. O'GRADY: There's the 180 days and then there's the possibility of extensions up to -- for MCSO it would be 540 -- a total of 540 days before there's dismissal, and we are meeting those deadlines.

THE COURT: Yeah, but you can understand, Ms. O'Grady, why if you make a complaint to MCSO and you don't get a response back for 540 days, I don't think that's being very responsive.

MS. O'GRADY: No, and I'm not advocating. I'm

just -- I wanted to let you know that there's not a cliff after 180 days, it's longer.

THE COURT: I'm just concerned that there's a practical cliff.

MS. O'GRADY: Understood, understood, and I'm not advocating for that. We're working on the Court's deadlines and striving to meet them, and I'm making progress.

THE COURT: Thank you.

All right. Whoever's next from plaintiff or plaintiff intervenor.

MR. KUMAR: Thank you, your Honor.

Your Honor, we really want to keep the focus on moving forward. We don't think the staffing study is perfect. What I point out are two ways in which it may be consistent or it is consistent with parts of the Third Order and the two gaps or deficiencies that we see, one of which relates to Your Honor's comments earlier.

So the staffing study -- the Third Order talks about the necessary staffing levels for PSB to complete timely investigations. The staffing study examined data provided by MCSO and recommended that MCSO add 13 more investigators.

We know from recent history that more investigators will help MCSO reduce the backlog faster, and we can just look at what happened after the Third Order when MCSO filled the vacancies partly as a result of the Third Order and then the

backlog started coming down.

MCSO has reduced the backlog. Our understanding and I know that Ms. O'Grady provided some updated numbers that the backlog is about 1400 cases. Right now -- or at last when we looked at this back in April, the rate at which MCSO was reducing the backlog was around 26 cases per month.

So if the backlog is 1400 cases, we'd probably be talking about the end of 2028 when we eliminated the backlog, which is to say that we don't think that this problem needs to take five years to solve, and there's evidence from the recent history in this case that more investigators will help.

That, I think, is the second respect in which the staffing study is helpful because it talks about the efficient way that MCSO can -- can allocate its resources, which, I think, is sub part one of Paragraph 361.

So the staffing study recommends and we agree forming a team that's dedicated to working on backlog cases, and that would maximize the impact of any additional investigators on bringing the backlog down; and it would also, to Your Honor's point earlier, speed up the process and get us closer to the date when MCSO can redeploy those personnel to other parts of the agency based on community need and public safety priorities.

So one way to think about this is if the backlog is 1400 cases, we know MCSO's current rate -- or approximate

rate. If MCSO could increase that rate to 78 cases or 80 cases, then MCSO could eliminate the backlog by the end of next year, which is still a ways away, but it's very different -- it's a very different situation.So that's a way that the staffing study talks about efficiency.

Another way the staffing study gets at efficiency is by identifying ways that MCSO could right size its patrol practices related to traffic enforcement.

THE COURT: All of those things I appreciate. None of them I can compel, correct?

MR. KUMAR: Well, Your Honor, we think that additional investigators was already something that was ordered as a result of the Third Order.

THE COURT: It was.

MR. KUMAR: And if Your Honor had had this Staffing Study at the time of the Third Order saying not only does MCSO need to fill the vacancies but, also, there's a need for 13 more investigators, the Court would be well within its authority given the contempt and the need to cure the contempt to order further investigators to PSB.

THE COURT: Okay.

MR. KUMAR: So as to traffic enforcement, we made our point in the response that, you know, there's a way in which this could reduce activity at MCSO that's not necessarily contributing to traffic safety and focus

enforcement and potentially reduce not only the unnecessary activity, but also the supervisory activity related to those traffic stops, the supervisors reviewing those stops, potential complaints associated with those stops.

Now, I take MCSO's point in their reply that 18 external complaints related to traffic stops over a one-year period, the number is probably a little higher when you factor in internal complaints, but I think that misses the point.

The point is that each case takes time for PSB to investigate and close; and just to take an example, Your Honor, in January of this year of 2024 PSB, according to its monthly closed case report, closed four cases involving traffic stops, and two of those were from 2017.

THE COURT: Well, you know, I must admit, I was not persuaded by that reply so much either because I view the study after having read it as talking about efficiencies which might free up -- it wasn't talking about complaints so much.

I do find the reply kind of persuasive as it relates to complaints, but I view the study as saying, look, you can operate more efficiently. To the extent you operate more efficiently, you'll free up more officers. I don't know, as Ms. O'Grady said, that means the officers are necessarily going to go to PSB; but if they don't go to PSB and we have a staffing study, we'll still know what we need to put in to PSB to make it functional.

And, you know, I don't know if the Sheriff wants to spend five years and then three more years under the supervision of this Court and the Monitor. I certainly hope he doesn't. So I hope that there's motivation there to move this along as you suggest. Anyway...

MR. KUMAR: Your Honor, well, I think that gets into where the staffing study falls short, which is the staffing study mentions but doesn't necessarily provide recommendations regarding supervision and management practices within PSB.

In other words, ensuring that more resources doesn't become a blank check; and, again, we recognize that MCSO has adopted new written policies that require investigative time lines and investigative plans, but the proof is in the implementation of those policies; but rather than ordering another analysis that would factor that in, what we suggest is regular status conferences where we can keep supervision and accountability within PSB on the agenda.

And, Your Honor, we suggest that -- not to create another burden or another requirement, but as Your Honor knows, having regular status conference, just the regularity of them, can drive the case forward. This is an experience that the United States is familiar with other institutional reform cases involving law enforcement agencies.

So these hearings would be -- or in-chambers meetings would be opportunities to not only identify

challenges that MCSO is facing, but also celebrate successes and recognize where there's been progress in reducing the backlog and keep the case on track.

So we offer that as a way that the Court wouldn't need to order another analysis, but ensure that we're actually working towards some goal because I think part of the problem with picking a number of investigators is -- in some ways it may put the cart before the horse.

By identifying a target by when MCSO is trying to eliminate the backlog, MCSO may be able to work backwards from that and figure out, okay, this is how many investigators we'd need to close cases at a rate to finish the backlog by this date.

And so we're sort of working backwards from where we want to end up, but it's clear -- and I think the Monitor's reports speak to this that -- as to Paragraph 195, for example, the Monitor and we and the Court, I think, want to see a plan to ensure sufficient staffing in PSB.

THE COURT: Well, might I suggest -- I think Ms. O'Grady said it might make sense to have you all consult to see if you can work out something that would make it not necessary for me to order a new staffing study. Maybe you can raise your suggestions and see if the parties can arrive at an agreement. I'll give you a little bit of time to do so before I enter an order making my own determinations.

MR. KUMAR: Yes, Your Honor, and I think that would be consistent with how the Court approached the Third Order. At least the policies, for example, right?

So the Court ordered policies that had to meet certain requirements, and then allowed time for the parties and the Monitor to meet and confer about that; and then the parties were able to submit something to the -- MCSO was able to submit something to the Monitor and then to the Court, and they were approved and the training to implement those policies has been approved; but the bottom line for us is that we don't want the time and expense of the staffing study to have been wasted.

We want some of these recommendations, specifically as to PSB staffing, to be implemented and so I -- you know, we are able to work with MCSO to find a path forward. We'll commit to that, but what we want to make sure is there's a plan for making sure that there's enough investigators in PSB and that this is not a permanent situation, that there can be a temporary surge of resources to PSB; and then once MCSO has eliminated the backlog, the Sheriff and MCSO Command could reassign people within the office as needed.

THE COURT: Okay, thank you.

MR. KUMAR: Thank you, your Honor.

MS. WEE: Good afternoon, Your Honor, Christine Wee on behalf of the plaintiffs.

I just wanted to state very briefly that plaintiffs are in agreement with meeting with the parties to move this forward, as Mr. Kumar just stated.

The reason why plaintiffs also believe that the study needs -- and we're in agreement that it meets with the provisions set forth in Paragraph 361 is because we are focused on moving forward and coming up with a plan to implement the staffing, to increase the staffing within PSB and to come up with ways -- as Mr. Kumar stated and in our joint response also outlined, because from the plaintiffs' perspective it's time that we move forward to reduce the backlog in a meaningful way; and whether that number's 13, if it's more, if it's less, I mean, we prefer that it's more, this is what we need to focus on because --

THE COURT: It does strike me despite the staffing studies -- or it's not really, in my view, a staffing study, but it is valuable. Despite what it says, I think you can arrive at a number that is based on some analysis instead of just sticking a number out there. I think you can arrive on a number that will -- that will get rid of the backlog as, you know, Mr. Kumar suggested, end of next year.

Again, this Sheriff wasn't in charge. I recognize that, Sheriff Skinner, but the MCSO dug itself a pretty big hole. So it might take until the end of next year, but I hope it wouldn't take any longer than that.

MS. WEE: Our position is we want to move forward. We wanted to get this started in earnest, and just one final point, Your Honor.

It's important to note that we would like to have the Community Advisory Board be part of the implementation process as well to make sure there's meaningful consultation with the CAB.

THE COURT: You know, that's something I buy in to, so thank you.

THE COURT: Mr. Vigil, you want to say anything?

MR. VIGIL: Your Honor, may I stand here?

THE COURT: Oh, come on up to the pulpit.

MR. VIGIL: It's comfortable right there, Your Honor.

THE COURT: Is there anything about being in this Court that's supposed to be comfortable, Mr. Vigil?

MR. VIGIL: Not a thing, Your Honor.

Thank you very much. On behalf of the County, and Ms. O'Grady expressed pretty much what I would reemphasize about the staffing study. The County, of course, is worried about the dollars and cents here and the continued spending of money --

THE COURT: Sure.

MR. VIGIL: -- on another staffing study.

So Your Honor knows, the County spent over a hundred

thousand dollars on this staffing study. We don't want to be throwing more money at another study when I do think there can be meetings amongst the parties to determine how to proceed in this particular instance.

We would oppose any additional mandates that could have an impact on fines that are set forth in the Third Order requiring 13 more investigators. Where does that lead? Does that lead to potentially more fines if they're not staffed? Does that lead to a greater number of cases having to be taken off of the backlog on a monthly basis?

So those are the concerns that we have with additional mandates when I think the numbers and the efforts of the Sheriff's Office have really shown that they're taking this serious. The carrot is in the fines, Your Honor, quite honestly; and they are taking this serious and I can tell you from my personal observations and meetings with them, you know, I understand Your Honor's had issues with that in the past and I don't think additional monthly meetings -- we've done that before -- and it was a help in that instance. I don't think that's necessary here for the Court to bring everyone in.

THE COURT: Well, okay. Let me ask the parties.

How long is it going to take you to figure out if you can give me a recommendation that will take -- that will substitute my finding you out of compliance and requiring a

new staffing study?

MS. O'GRADY: Well, I was going to suggest maybe if we take fifteen minutes here, and then we'd have a sense of how we answer that question.

THE COURT: That's fine by me.

MS. O'GRADY: Is that okay?

THE COURT: That's certainly moving the matter along. So you can have fifteen minutes. Call me when you're ready.

MR. VIGIL: Thank you.

THE COURT: Do you know, before we break, I do want to see all the parties at sidebar, please, before we break for the interim preponderance.

(Following discussion held at sidebar.)

REDACTED

REDACTED

(End of discussion at sidebar.)

(Off the record at 2:58 p.m.)

(On the record at 3:30 p.m.)

THE COURT: Who's going to speak to me?

MS. O'GRADY: I think I'll start, and then others may follow up.

We are going to, basically, meet and confer. We don't have -- among ourselves and have some calls and meetings to figure out how -- where we go from here and then -- and

that will begin within the next couple weeks, as soon as we can get things scheduled to start conferring on some of the analysis, and -- and then we were talking about when we get back to the Court.

It's going to take a while for us to do some more internal analysis and -- and we have the other kind of policy issues that we've mentioned. So we were hoping to report back to the Court in 60 days with regard to the proposal or -- hopefully a proposal with at least where we are.

THE COURT: Okay.

MS. O'GRADY: And part of that schedule is recognizing the work that's involved, and part of that schedule is just scheduling needs; but most of it is the work that's involved.

THE COURT: Okay.

MR. KUMAR: Your Honor, of course, we always want to move as fast as possible and eliminate the backlog as fast as possible. We acknowledge PSB's process in doing that. Given our conversation, 60 days was acceptable to us for the next time that we provide an update.

THE COURT: I don't like the "provide an update" stuff. I much prefer Ms. O'Grady's proposal.

MR. KUMAR: Oh, Your Honor, to the extent there was any daylight between that I apologize.

THE COURT: Okay.

MS. O'GRADY: And "proposal" -- you know, we hope we have a proposal. So that was the optimist in me saying "proposal," but it may be an update if we don't have a proposal.

THE COURT: I don't want to give -- I mean, I'll give you 60 days. I don't want to give you any more than 60 days because, frankly, if you can't arrive at an agreement I'm going to enter an order. I think we need to move this along. I do want to encourage your cooperation by all means, but 60 days is the outside.

MS. WEE: And for plaintiffs, Your Honor, we would like a less amount of time. I mean, initially our position is 45 days, but we understand that there is a lot of moving pieces. So we're hopeful that the 60 days will reach finality to the plan. So plaintiffs do see that 60 days we're hoping will reach a conclusion to this time frame.

THE COURT: All right. That's my inclination.

Mr. Vigil.

MR. VIGIL: Your Honor, on a little bit of a different subject. You were talking about the merit commission and the issues that were involved there as far as the timing goes under state law. I'd be more than happy to submit something to the Court to clarify that issue for you, if you would like for us to do that?

THE COURT: That'd be great.

MR. VIGIL: Thank you.

THE COURT: Anything else?

MR. KUMAR: Nothing for the United States, Your Honor.

MS. WEE: Nothing for plaintiffs.

MS. O'GRADY: Nothing for defendants, Your Honor.

MR. VIGIL: Nothing, Your Honor.

THE COURT: Okay. So I'll expect 60 days from -- no later than 60 days from today to get proposals about what I do as opposed to moving forward with a new study.

And, Mr. Vigil, how long will it take you to get your matter briefed for me?

MR. VIGIL: When would you like it, Your Honor?

A couple weeks?

THE COURT: That's fine, whatever time you need.

MR. VIGIL: I'll try to get it as soon as I can, Your Honor. That way you have it when you're making any decisions in the future.

THE COURT: All right, thank you very much.

MS. O'GRADY: Thank you, your Honor.

*(Whereupon the proceedings adjourned at 3:34 p.m.)*

***REPORTER'S CERTIFICATION***

I, TERI VERES, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 6th of May, 2024.

s/Teri Veres
TERI VERES, RMR, CRR