# Maricopa County Sheriff's Office
## Comments on Monitor's Thirty-ninth (39th) Quarterly Draft Report
### October 1, 2023 – December 31, 2023

The Monitor's Thirty-ninth (39th) Quarterly Draft Report covers the time from October 1, 2023, to December 31, 2023 (the "Draft Report"). MCSO continues to work with the Monitor, the American Civil Liberties Union, and the Department of Justice to achieve compliance with the Court's Orders. MCSO is dedicated to following best police practices and gaining full and effective compliance with the Court's Orders.

On April 8, 2024, MCSO submitted and filed with the Court its 39th Quarterly Report (Doc. 2994), which delineates the steps that have been taken to implement the Court's Orders and the plans to address problems and responses to concerns raised in the Monitor's previous Quarterly Report. MCSO requests that the content of its 39th Quarterly Report be considered as comments to the Monitor's Draft Report as it contains relevant feedback. MCSO's additional comments to the Monitor's compliance findings and other issues in the Draft Report are listed below.

**First Order**

**Section 6. Training.**

**Paragraph 42.** The Draft Report notes (at 44) that, at the Monitor's February site visit, the Monitor encouraged MCSO to expand training instructor observations. MCSO has taken this recommendation seriously and is working to ensure evaluations of instructors are spread more evenly across different courses and instructors.

**Section 7. Traffic Stop Documentation and Data Collection.**

**Paragraph 65.** The Draft Report states (at 77) that, in response to TSQR 12, MCSO did not include any statement of action by MCSO. To clarify, MCSO published a statement of action in the following quarter (available at https://www.mcsobio.org/_files/ugd/b6f92b_f6a75b1d9c51421291713d850bb8075f.pdf), and MCSO also undertook body word camera (BWC) reviews to further identify possible explanations for the disparities identified in TSQR 12. The Draft also correctly indicated that MCSO conducted Town Halls in each District regarding the findings.

**Paragraph 70.** MCSO disagrees with the Draft Report's conclusion that MCSO is not in compliance with Paragraph 70.

MCSO requests that the Draft Report clarify the standard for compliance for Paragraph 70. MCSO believes that to comply with Paragraph 70 it must (1) conduct the required traffic-stop analyses; (2) closely monitor disparities identified in the analyses that show evidence of potential bias; and (3) identify and follow through on actions to attempt to reduce disparities. As noted in MCSO's most recent quarterly reports (Docs. 2935, 2952), MCSO is completing all required traffic stop reports and taking actions in response to the information in those reports. Compliance with Paragraph 70 is not measured by whether the disparate outcomes identified in the statistical studies

are reduced or eliminated in subsequent traffic stop analyses. Rather, it requires reasonable monitoring and follow up regarding disparities that are identified. *See* 11/26/2019 Tr. at 36 (noting that if MCSO is "taking all reasonable steps and all actions [MCSO] can in implementing that plan and − . . . the statistics still are not moved, then I think that's something that goes to MCSO's credit, not . . . detriment").

The Draft Report (at 91) asserts that "[b]ased on MCSO's analysis of traffic stop data noted in the agency's TSARs, the steps taken by MCSO have not resulted in the reduction of indicia of disparate treatment of the Plaintiffs' class; therefore, the agency is not in compliance with this Paragraph." MCSO does not believe this statement reflects the proper standard for assessing compliance. As noted previously, compliance should be based on whether MCSO is taking appropriate action in response to disparities that are identified in the traffic stop studies. MCSO asserts that it is doing so, and it described its actions in response to the most recent TSAR in its 39th Quarterly Report. (Doc. 2994-1 at 59-60.) Compliance should not be measured based on whether disparities exist. That standard is not consistent with the language of Paragraph 70, which focuses on taking reasonable actions in response to disparities that are identified.

Based on the appropriate standard, MCSO asserts that it is in compliance with this Paragraph. If the Monitor disagrees, he should nevertheless modify the Draft Report to clarify the applicable standard for assessing compliance and what the Monitor believes MCSO must do to comply.

Finally, the Draft Report's explanation of the two parts of Paragraph 70 overlook a critical difference. The first sentence focuses on when a deputy or unit "*may* be engaging in racial profiling [or other prohibited conduct] . . . or there *may* be systemic problems regarding any of the foregoing." (Emphasis added.) The second sentence addresses when MCSO or the Monitor "concludes that systemic problems of racial profiling [or other prohibited conduct] *exist*." (Emphasis added.) MCSO takes action both at an individual level (through the TSMR process) and organization wide (through the TSAR process) as required based on the first part of Paragraph 70 because the disparities indicate there "may" be systemic problems. (*See* 11/26/2019 Tr. at 16:22-17:25.) Significantly, MCSO has not concluded that racial profiling "exists" at MCSO, and its ongoing investigation and close monitoring indicate that it does not. To MCSO's knowledge, the Monitor has also not concluded that racial profiling exists. This distinction matters because suggesting that MCSO is required to take action under the second part of Paragraph 70 incorrectly suggests that racial profiling exists. Instead, MCSO is required to take action --and is taking action--under the first part of Paragraph 70 because the disparate outcomes indicate there "may" be systemic problems.

Separately, the Draft Report states that "MCSO continues to develop the EIU Operations Manual." (Draft Report at 87.) To be clear, the EIU Operations Manual was finalized in the second quarter of 2023. It is now updated as needed. In the fourth quarter of 2023, Appendix A to the operations manual was updated to reflect the threshold analyses changes for External and Internal Complaint incidents.

The other aspect of compliance with Paragraph 70 is the Constitutional Policing Plan (CPP), approved in 2017. As described in MCSO's 38th and 39th Quarterly Reports, MCSO believes it has completed the goals of the CPP and is in compliance with the goals that require ongoing action.

As to the CPP, in the discussion of Goal 2, the Draft Report states that MCSO identified an issue that "may have led supervisors to not properly document employee information in EPAs, as it pertains to the requirements of Paragraph 99." (Draft Report at 89.) To clarify, the potential issue that MCSO identified is that some information available to the Monitor is not available to a supervisor completing an EPA, such as when a complaint lists a supervisor as a potential witness. In those instances, the Monitor has access to different information than the supervisor completing the EPA. For similar reasons, MCSO believes that other EPAs the Monitor identified as deficient were actually compliant. These issues are discussed further in the comments to the relevant EPA paragraphs. Because of these issues, MCSO recommends that the Monitor reconsider its assessment of certain EPAs and remove the final sentence of the Monitor's Goal 2 discussion from the final report.

MCSO recommends that the discussion in the Draft Report of the enhanced training on the TSAR, described in Goal 3, be modified to more fully address the TSAR training. In addition to explaining the statistics in the TSAR, the training addresses decision-making and implicit bias. The focus on the TSAR was to help deputies better understand the disparities identified in the Report and the tools deputies use to support fair and impartial decision-making. The Draft Report's comment that the training "specifically addressing statistical modeling to make it more comprehensible" understates the scope and purpose of the training.

MCSO also recommends that the Draft Report be modified to reflect that the enhanced trainings under Goals 3, 4 and 5 will focus on the results of the traffic stop reports. This is consistent with the understanding of the Monitor and parties, as described in the Monitor's 38th Quarterly Report. (Doc. 2989 at 90-91.)

The Draft Report indicates that MCSO continued to report a 77% completion rate for Goal 9. (Draft Report at 90.) MCSO records of the Smartsheet indicate that Goal 9 was 100% completed at the end of the Fourth Quarter 2023. Therefore, MCSO recommends that the Draft Report be modified accordingly.

The Draft Report goes on to discuss several hiring events MCSO held in this quarter. (*Id.*) To clarify, MCSO held an on-site, walk-in event in October that generated 36 applicants. A similar event in December generated fewer applicants. No such event was held in November. It should be noted that the Draft Report is not a complete listing of MCSO's activities. Additional activities are included in MCSO's February 2024 response to the Monitor's pre-site visit request.

Finally, the Draft Report notes that state-funded sign-on incentives have been extended to August 2024. For clarity, those incentives have been continued until August 2024 or until funding is exhausted, whichever occurs first.

**Paragraph 72.** The Draft Report states that "MCSO has conducted threshold analyses on vehicle pursuits, deputy accidents, and internal investigations and applied the results accordingly to the

3

Appendix." (Draft Report at 93.) As noted above, MCSO has also completed a threshold analysis on external complaints, and the Draft Report should be corrected to reflect that. Additionally, the threshold that the Monitor describes as "internal investigations" is a threshold for internal complaints. The Draft Report should be corrected to reflect this as well.

**Paragraph 81.** In discussing Paragraph 81(b), the Draft Report notes that MCSO has revised the EIU Operations manual and that it now includes "new threshold analysis for vehicle pursuits, accidents, and internal complaints." (Draft Report at 113.) The EIU Operations Manual also now includes a threshold analysis for external complaints, and the Draft Report should be updated to reflect that.

**Section 9: Supervision and Evaluation of Officer Performance**

**Paragraph 87.** In the Monitor's review of EPAs under this Paragraph, the Monitor found 40 out of the 45 EPAs reviewed were in compliance. After reviewing the EPAs the Monitor found deficient, MCSO believes that three of these EPAs were in compliance and asks that the Draft Report be updated accordingly.

The first EPA MCSO believes should be found in compliance was a deputy EPA in which the Monitor asserts the "EPA failed to note a misconduct investigation that was initiated during the appraisal period." (Draft Report at 127.) However, the allegation involving this deputy was not linked to the employee until after the appraisal period had ended. The fact that the supervisor listed other complaints involving the Deputy but not the one linked on August 10, 2023, is indicative of the supervisor using the information available to them at the time they checked the record in conjunction with their completion of the EPA. As such, this EPA should be found in compliance, particularly when the expectation would be that the next EPA will also mention the complaint as being open/resolved during the subsequent appraisal period.

The second EPA MCSO believes should be found in compliance was a supervisor EPA which the Monitor believed omitted discussion of the quality of supervisory review. (*Id.*) Although the supervisor may not have specifically used the label of "EIS Reviews," the supervisor's narrative regarding the performance of this new sergeant makes clear that the supervisor is conducting the appropriate EIS reviews. For example, the EPA states:

- "On a daily basis he reviews routine documentation authored by employees and tracks employee activities. When necessary, he follows-up with an appropriate response."
- "Sgt. XXX recently discovered an issue with a subordinate's attendance and overall job performance. He has shown to take action appropriate to addressing early identification protocols. He has been actively documenting the employee's activity and will be having further discussions with him in the near future."

A sergeant cannot "take action to address early identification protocols" if they are not reviewing the EIS for awareness. MCSO considers the foregoing as representative of the supervisor recognizing the sergeant's work that involves review of EIS information and therefore requests reassessment of this EPA as compliant.

The final EPA MCSO believes should be found in compliance was a supervisor EPA that the Monitor believed failed to note an open misconduct investigation. (*Id.*) In this instance, the supervisor would not have been able to see that the IA had been opened: both the EPA rater (lieutenant) and the captain were listed as witnesses in the complaint, so the complaint was not visible to them in the EIS. In other words, this EPA addressed all information available to the individual completing the EPA. Instead, the complaint would be referenced in the subject employee(s)' next EPA after it became visible to the individual completing the EPA.

If these EPAs are found in compliance, then the total number of EPAs in compliance for this quarter would be 43 out of 45; 14 out of the 15 deputy EPAs reviewed and 29 of the 30 supervisor EPAs reviewed. MCSO requests that the Monitor reassess these EPAs and update the Draft Report accordingly.

**Paragraph 92.** MCSO's comments regarding Paragraph 87 discuss one of the EPAs found non-compliant under this Paragraph. Accordingly, MCSO requests that this Paragraph be reassessed and updated as well.

**Paragraph 95.** MCSO's comments regarding Paragraph 87 discuss one of the EPAs found non-compliant under this Paragraph. Accordingly, MCSO requests that this Paragraph be reassessed and updated as well.

**Paragraph 99**. MCSO's comments regarding Paragraph 87 discuss two of the EPAs found non-compliant under this Paragraph. Accordingly, MCSO requests that this Paragraph be reassessed and updated as well.

**Paragraph 100.** MCSO's comments regarding Paragraph 87 discuss one of the EPAs found non-compliant under this Paragraph. Accordingly, MCSO requests that this Paragraph be reassessed and updated as well.

**Section 11: Community Engagement**

**Paragraph 115.** The Draft Report (at 156) describes the Monitor's "understanding that while CAB members have, in fact, forwarded to MCSO their commentary on some of the agency's proposed policies, the commentary was never received by the Policy Section in the past." However, the Draft Report does not assert that MCSO is currently not forwarding feedback from the CAB to the Policy Section. Indeed, the Draft Report makes clear that MCSO is relaying the feedback it receives from the CAB, if any, to the Policy Section. As such, MCSO requests that the quoted sentence be deleted from the final report.

**Concluding Remarks**

MCSO notes that if the Monitor reassesses compliance with certain EPAs as MCSO recommends, the compliance percentages in this section of the Draft Report will need to be changed.

MCSO also recommends that the Paragraph regarding training be omitted because it is not accurate. The discussion of the Community Survey incorrectly states that "MCSO decided that the agency would not ultimately pursue this project." To the contrary, although the Monitor and parties objected to the proposal, MCSO decided to proceed with the survey, as described in MCSO's 39th Quarterly Report. (Doc. 2994-1 at 59-60.) MCSO also disagrees with the statement that "MCSO continues to struggle with the creation of 'enhanced training' associated with the CPP." MCSO consistently provides enhanced trainings. This past year, the Monitor agreed with MCSO's proposal to focus the enhanced training on the TSAR 8 results. (Doc. 2989 at 91.)

MCSO recommends that the Paragraph addressing PSB staffing be modified. It currently says that during 2023, "PSB maintained the minimum staffing level of 39 investigators." (Draft Report at 287.) MCSO recommends that "maintained" be replaced with "exceeded" to more accurately reflect the number of PSB investigators.

MCSO further recommends that the Paragraph discussing the EIS system be modified. The Draft Report expresses concern that the "majority of recurring alerts did not result in an enhanced intervention, or any explanation as to why." (Draft Report at 288.) Under GH-5 (Early Identification System), enhanced interventions are not required for reoccurring EIS Alerts. Instead, whether there are reoccurring alerts is one of several factors a supervisor considers in identifying the appropriate intervention. This consideration is further informed by the fact that many of the alert thresholds are sensitive and subject to further review; this process has been completed for vehicle accidents, vehicle pursuits, external complaints, and internal complaints. That said, MCSO is incorporating feedback it has received regarding reoccurring alert analysis and has agreed to incorporate further explanation of secondary interventions.

MCSO recommends that the Paragraph about EPAs be modified in light of MCSO's other comments regarding compliance. MCSO recommends that the Monitor reconsider the sentences in the Draft Report stating "[d]uring this reporting period, again there were a number of deficiencies noted with EPAs; these deficiencies were in areas we have previously discussed with MCSO. We do not believe the deficiencies are a result of process or system failures, but more attributable to the inattentiveness of rating supervisors when completing EPAs." MCSO believes these statements should be omitted from the final report. As previously explained, MCSO believes some of the EPAs identified as deficient should be reassessed and determined to be compliant. MCSO also believes that these statements overstate the extent of the errors, even based on the Monitor's assessment. The implementation of the improved EPA system has been a significant achievement, and these comments are excessively negative and, MCSO believes, inaccurate critique comments that should be deleted.

MCSO further recommends that the comments regarding the average investigative time be omitted, or at least additional information be provided. The Draft Report notes that the average time to full closure and average investigative time increased during this reporting period. The

6

increase in average time to closure does not mean less progress was made. Just the opposite. It means that more old cases are being closed and more old investigations are being completed. (*See* Doc. 2994-1 at 98.) The closure of old cases increases the average days to closure. It is simply part of the process of clearing out the backlog. Rather than highlighting these statistics regarding averages, a more meaningful number to emphasize would be the actual reduction in the backlog which, as noted in Paragraph 364, continues to decline.