**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MANUEL DE JESUS ORTEGA MELENDRES; DAVID RODRIGUEZ; VELIA MERAZ; MANUEL NIETO, Jr.; SOMOS AMERICA, | No. 23-15036 |
| | D.C. No. 2:07-cv-02513-GMS |
| *Plaintiffs-Appellees*, | OPINION |
| UNITED STATES OF AMERICA, | |
| *Intervenor-Plaintiff-Appellee*, | |
| v. | |
| RUSS SKINNER, in his official capacity as Sheriff of Maricopa County, | |
| *Defendant-Appellant*. | |

Appeal from the United States District Court
for the District of Arizona
G. Murray Snow, Chief District Judge, Presiding

Argued and Submitted March 20, 2024
San Francisco, California

Filed August 19, 2024

Before:  J. Clifford Wallace, Susan P. Graber, and Marsha
S. Berzon, Circuit Judges.

Opinion by Judge Wallace

## SUMMARY[*]

### Injunction / Court-Appointed Monitor

The panel affirmed the district court's amended third
supplemental permanent injunction in plaintiffs' class action
alleging that the Maricopa County Sheriff's Office (MCSO)
racially profiled Latino drivers and passengers under the
guise of immigration enforcement.

The district court issued a permanent injunction against
MCSO in 2013, and several months later issued a
supplemental permanent injunction (First Order) appointing
an independent monitor (Monitor) responsible for
monitoring and assessing MCSO's compliance with the
injunction. In 2016, the district court issued a second
supplemental permanent injunction (Second Order)
requiring the Maricopa County Sheriff and MCSO to reform
MCSO's internal misconduct investigation procedures. In
2022, the district court issued a third supplemental
permanent injunction (Third Order), finding the Sheriff in
contempt for non-compliance with the Second Order and

---

[*] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

setting forth curative measures, including creating a Constitutional Policing Authority (CPA) and assigning to the Monitor the CPA's duties.

The panel held that the district court relied on its inherent equitable powers rather than Fed. R. Civ. P. 53 in issuing the Third Order, and therefore Rule 53's limits, if any, do not apply.

The panel rejected the Sheriff's contention that the district court's delineation and assignment of the CPA's duties to the Monitor violated Article III of the Constitution and separation of powers principles.  First, the district court acted within the general bounds of its inherent powers.  In certain circumstances, the district court, relying on its inherent powers, may vest a non-judicial officer with control over narrow areas of a governmental defendant's operations.  Second, the panel held that Paragraphs 346, 347, and 350 of the Third Order do not impermissibly omit a mechanism for judicial review of the Monitor's actions because the First Order provides for adequate judicial review.

Finally, the panel held that Paragraphs 346, 347, and 350 do not contravene Fed. R. Civ. P. 65's requirement that an injunction must state its terms specifically and describe in reasonable detail the act or acts restrained or required.

## COUNSEL

Amy S. Heath (argued), Covington & Burling LLP, San Francisco, California; Stanley Young, Covington & Burling LLP, Palo Alto, California; Natasha Babazadeh (argued) and Elizabeth Hecker, Attorneys, Civil Rights Division, Appellate Section; Kristen Clarke, Assistant Attorney General; United States Department of Justice, Washington, D.C.; Victoria A. Lopez and Christine K. Wee, ACLU Foundation, Phoenix, Arizona; Cecillia D. Wang, ACLU Foundation, San Francisco, California; for Plaintiffs-Appellees.

Eric M. Fraser (argued), Brandon T. Delgado, Joshua J. Messer, Mary O'Grady, and Kristin L. Windtberg, Osborn Maledon PA, Phoenix, Arizona; for Defendant-Appellant.

Gregory C. Champagne and Maurice E. Bostick, St. Charles Parish Sheriff's Office, Luling, Louisiana, for Amici Curiae National Sheriffs' Association and Western States Sheriffs' Association.

## **OPINION**

WALLACE, Circuit Judge:

This appeal relates to a matter with which we are all too familiar, a class action alleging that the Maricopa County Sheriff's Office (MCSO) racially profiled Latino drivers and passengers under the guise of immigration enforcement. Since 2012, we have resolved four appeals arising from this case. *See Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) (*Melendres I*); *Melendres v. Arpaio*, 784 F.3d 1254 (9th Cir. 2015) (*Melendres II*); *Melendres v. Maricopa County*, 815 F.3d 645 (9th Cir. 2016) (*Melendres III*); *Melendres v. Maricopa County*, 897 F.3d 1217 (9th Cir. 2018) (*Melendres IV*).   Current Maricopa County Sheriff Russ Skinner (Sheriff) asks us to do so a fifth time by appealing from certain provisions of the district court's amended third supplemental permanent injunction (Third Order).  We have jurisdiction under 28 U.S.C. § 1291(a), and we affirm.

I.

The facts of this case span more than a decade and a half and are detailed in our prior related opinions.[1]  We recount only the facts relevant to the arguments made in the present appeal.

Plaintiffs filed a class action against former Maricopa County Sheriff Joseph Arpaio in his official capacity, alleging in relevant part that, while claiming to be enforcing federal immigration laws, MCSO engaged in a widespread practice of conducting racially discriminatory traffic stops

---

[1] *See Melendres IV*, 897 F.3d at 1219–20; *Melendres III*, 815 F.3d at 648; *Melendres II*, 784 F.3d at 1258–60; *Melendres I*, 695 F.3d at 994–96.

and "crime suppression sweeps" targeting Latinos. Plaintiffs sought declaratory and injunctive relief to enforce their rights under the Fourth and Fourteenth Amendments.

In 2011, the district court preliminarily enjoined MCSO "from detaining any person based only on knowledge or reasonable belief, without more, that the person is unlawfully present within the United States." The court made that preliminary injunction permanent in 2013 after conducting a bench trial in which it found that MCSO had violated Plaintiffs' constitutional rights.

Several months later, the district court issued a supplemental permanent injunction (First Order), which *inter alia* appointed an independent monitor (Monitor) who is responsible for monitoring and assessing MCSO's compliance with the injunction.[2] One duty assigned to the Monitor was to review MCSO's "policies, procedures, protocols or other materials," and to make "recommendations to the Parties regarding measures necessary to ensure timely, Full and Effective Compliance with [the First] Order and its underlying objectives." Pursuant to the First Order, the Monitor was "subject to the supervision and orders of the Court." The First Order expressly provided that "[i]n any areas where the Parties are not able to resolve issues with the Monitor . . . the Parties may submit their grievances directly to the Court for resolution." In that same paragraph, the First Order underscored that the "ultimate arbiter of compliance is the Court." In total, the First Order contained 159 sequentially numbered paragraphs.

---

[2] By separate order, the district court appointed Robert Warshaw of Warshaw and Associates, Inc. to be the Monitor.

In early 2015, Plaintiffs sought to have the district court hold Sheriff Arpaio and others in civil contempt, in part because Arpaio and MCSO "continued to detain persons solely based on unlawful presence in direct violation of the Court's order."   At that point, the federal government (United States) sought, and was granted permission, to intervene in the case; its expressed concern was Sheriff Arpaio's and MCSO's "intransigence and contempt of the remedial order."**[3]**   After holding twenty-one days of evidentiary hearings, the court found Sheriff Arpaio in civil contempt for "knowingly and intentionally" failing to implement the preliminary injunction.  The court also found that "Sheriff Arpaio and MCSO manipulated all aspects of the internal affairs process to minimize or entirely avoid imposing discipline on MCSO deputies and command staff whose actions violated the rights of the Plaintiff class."

As a remedy, the district court in July 2016 issued a second amended supplemental permanent injunction (Second Order) requiring Sheriff Arpaio and MCSO to reform MCSO's internal misconduct investigation procedures.  Among other remedial measures, the Second Order required that MCSO complete internal investigations within a certain amount of time after initiating them.  The district court also ordered Sheriff Arpaio to conduct a comprehensive review of MCSO's policies, procedures, and other written materials governing internal investigations, and expanded the Monitor's oversight and assessment into various internal investigation processes.  The Second Order stated that the Monitor was to review and approve "[a]ll

---

[3] The United States intervened pursuant to Federal Rule of Civil Procedure 24(a)(1) and the statutory authority provided under section 902 of the Civil Rights Act of 1994, 42 U.S.C § 2000h-2.

policies, procedures, protocols, training materials, and other material required by" the Second Order according to "the same process of review and comment by the parties and approval by the Monitor described in" the First Order. The Second Order's 177 paragraphs were "numbered consecutively to those set forth" in the First Order, which were "incorporated herewith."

In March 2021, Plaintiffs and the United States jointly requested an order to show cause and asked the district court to initiate civil contempt proceedings against then-Sheriff Paul Penzone and MCSO, alleging that MCSO was still not conducting fair investigations in a timely fashion and had allowed "the backlog of open misconduct cases to grow exponentially over the last five years." After the district court indicated that it would likely hold Sheriff Penzone in civil contempt, the parties agreed to focus on how to remedy MCSO's non-compliance with the Second Order.

To assist in the amelioration efforts, the court's management expert recommended appointment of a Constitutional Policing Advisor to streamline MCSO's internal investigations process.[4]  As an alternative to appointing a new individual to this role, the management expert suggested that the Monitor could assume the duties of the Constitutional Policing Advisor. The management expert also recommended that the backlog in internal investigations could be reduced by giving MCSO broader discretion in handling misconduct complaints and in using

---

[4] The management expert, who is distinct from the Monitor, was appointed by the district court to "provide the Court with recommendations on how best the Maricopa County Sheriff's Office can . . . come into compliance with the Court's order pertaining to the time limits for completing internal investigations . . . ."

those complaints to identify potential deficiencies in training, policy, supervision, and guidance. At the same time, the management expert acknowledged that MCSO may not be the right entity to exercise such discretion, given its history of deliberate non-compliance with court orders.

In October 2022, the district court issued a draft third supplemental permanent injunction, finding Sheriff Penzone in civil contempt for non-compliance with the Second Order and setting forth curative measures, which in part modified the Second Order. The draft order, in relevant part, created a Constitutional Policing Authority (CPA) and assigned to the Monitor the CPA's duties, including: (1) "oversee[ing] all of MCSO's complaint intake and routing"; (2) "revis[ing] and/or formaliz[ing] MCSO's intake and routing processes"; and (3) "determin[ing] whether training on investigative planning and supervision is needed and implementing such training."[5]

Shortly after the district court issued the draft order, Sheriff Penzone filed objections. Pertinent to this appeal, Sheriff Penzone objected to the court's "broad grant of authority" to the Monitor acting as CPA over complaint intake and routing, and he requested that the Monitor's authority be limited, consistent with the policies and procedures established in other paragraphs of the Third Order. Sheriff Penzone made no objections related to the Monitor's grant of authority over training on investigative planning and supervision.

---

[5] The district court, unlike the management expert, referred to a Constitutional Policing *Authority* rather than a Constitutional Policing *Advisor*.

In November 2022, the district court issued the Third Order, holding Sheriff Penzone in civil contempt for non-compliance with two provisions in the Second Order related to hiring sufficient trained personnel and completing internal investigations within the prescribed deadlines. The Third Order stated that, although Sheriff Penzone had attempted to address the backlog, the problem had only gotten worse. The court observed that MCSO had 2,137 pending investigations and that the timeline to complete an investigation had grown to approximately 600 days per investigation. The Third Order provided remedies largely consistent with the draft order, including the assignment to the Monitor of additional duties and responsibilities as CPA. Those duties concerned complaint intake, complaint routing, and training for investigative planning and supervision. These remedies, detailed in thirty new paragraphs, were "numbered as to continue from the numbered paragraphs" in the Second Order.

At issue in this appeal are the following three paragraphs of the Third Order:

346.   The Court hereby vests the Monitor, Robert Warshaw, with the supplemental authorities set forth in this Order. The Monitor therefore has immediate authority to oversee all of MCSO's complaint intake and routing. The Court hereby vacates any previous order that conflicts with this Order, including but not limited to ¶ 292 of the Second Order

(Doc. 1765).[6]  In consultation with the [Professional Standards Bureau (PSB)] Commander, the Monitor shall make determinations and establish policy decisions pertaining to backlog reduction regarding, by way of example, which complaints should be (a) investigated by PSB; (b) sent to the Districts for investigation or other interventions; or (c) handled through other methods, to include diversion and/or outsourcing of cases.  The Monitor must consult with the PSB Commander about these policy decisions but maintains independent authority to make the ultimate decision. The authority granted to the Monitor in this paragraph shall not be applicable when there is no backlog.  If the backlog is eliminated and then arises again while the Defendants are still subject to monitoring, this authority will be renewed in the Monitor.

347.  The Monitor shall revise and/or formalize MCSO's intake and routing processes. The Monitor's authorities shall include, but not be limited to, the power to audit and review decisions made with respect to individual cases and, if necessary, to change such designations.  The Sheriff

---

[6] In relevant part, Paragraph 292 limited the scope of the Monitor's authority to review investigations that involved members of the Plaintiff class or remedies to which the class members are entitled.

> and the MCSO shall expeditiously implement the Monitor's directions or decision with respect to intake and routing, and any other issues raised by the Monitor pertaining to backlog reduction and any other authority granted the Monitor under the Court's orders. The Monitor must consult with the PSB Commander about these processes but maintains independent authority to make the ultimate decision. The authority granted to the Monitor in this paragraph shall not be applicable when there is no backlog. If the backlog is eliminated and then arises again while the Defendants are still subject to monitoring, this authority will be renewed in the Monitor.
>
> . . . .
>
> 350. The Monitor will assess MCSO's compliance with the investigative requirements of this order and shall determine whether training on investigative planning and supervision is needed and implement such training.

In January 2023, Sheriff Penzone timely appealed from the district court's Third Order. While the appeal was pending, the newly appointed Sheriff of Maricopa County, Russ Skinner, was substituted in this case for Sheriff Penzone.

## II.

"We review the scope and terms of an injunction for an abuse of discretion." *Melendres IV*, 897 F.3d at 1220, citing *Melendres II*, 784 F.3d at 1260. "A district court abuses its discretion if it does not apply the correct law or if it rests its decision on a clearly erroneous finding of material fact." *Bateman v. U.S. Postal Serv.*, 231 F.3d 1220, 1223 (9th Cir. 2000), citing *United States v. Washington*, 98 F.3d 1159, 1163 (9th Cir. 1996).

A district court's interpretation of the Federal Rules of Civil Procedure is an application of law that we review de novo. *DP Aviation v. Smiths Indus. Aerospace & Def. Sys. Ltd.*, 268 F.3d 829, 846 (9th Cir. 2001).

## III.

This appeal asks us to consider whether certain remedial measures in the Third Order are permissible. We first address what source of authority the district court relied upon in issuing the Third Order, as our later analysis depends in large part on the answer to that question.

The Sheriff argues that Federal Rule of Civil Procedure 53 governs the district court's actions. Under Rule 53, a district court may appoint a special master to "address . . . posttrial matters that cannot be effectively and timely addressed by an available district judge . . . ." Fed. R. Civ. P. 53(a)(1)(C). Although Rule 53 permits the court to grant the special master broad authority, Fed. R. Civ. P. 53(c)(1), the special master may not compel any action by the parties without approval by the district court, *see* Fed. R. Civ. P. 53(f). In the Sheriff's view, the Third Order's grant of authority to the Monitor to make certain decisions and

policies that are binding on MCSO exceeds Rule 53's limitations.

Plaintiffs and the United States, on the other hand, contend that Rule 53 does not apply because the district court relied upon a different source of authority—its inherent equitable powers—in vesting the Monitor with the CPA's responsibilities and delineating those responsibilities. "The inherent powers of federal courts are those that 'are necessary to the exercise of all others.'" *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 648 (9th Cir. 1997), quoting *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980). "This inherent power is codified in the All Writs Act," 28 U.S.C. § 1651(a), which "provides that '[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.'" *Nat'l Org. for the Reform of Marijuana L. v. Mullen* (*NORML*), 828 F.2d 536, 544 (9th Cir. 1987), quoting 28 U.S.C. § 1651(a). "The scope of the district court's power to fashion equitable remedies is highly contextual and fact dependent." *Stone v. City & County of San Francisco*, 968 F.2d 850, 861 (9th Cir. 1992), *as amended on denial of reh'g* (Aug. 25, 1992).

Rule 53 does not apply to the Third Order for several reasons. First, neither the First Order nor the order appointing the Monitor relies upon it. With no indication that the court relied on the authority conferred by Rule 53 to appoint the Monitor in the first place, the Sheriff's remaining arguments fall flat.

For instance, the Sheriff contends that Rule 53 applies because courts have previously used "monitor" and "special master" interchangeably. Yet the cases the Sheriff cites to

illustrate this point undermine his position.  In each of those
cases, unlike here, the court explicitly relied upon Rule 53 in
appointing the non-judicial officer.[7]

The Sheriff's argument that Rule 53 controls because the
Monitor's initially-assigned duties resembled those of a
special master under the Rule fares no better.  We have cited
approvingly to case law from the Second Circuit
acknowledging that "the functions of a monitor differ[]
greatly from those of a special master."  *Plata v.
Schwarzenegger*, 603 F.3d 1088, 1096 (9th Cir. 2010), citing
*Benjamin v. Fraser*, 343 F.3d 35, 45 (2d Cir. 2003),
*overruled on other grounds by Caiozzo v. Koreman*, 581
F.3d 63 (2d Cir. 2009).  Special masters appointed under
Rule 53 possess "the ability to convene and to regulate
hearings, to rule on the admissibility of evidence, to
subpoena and swear witnesses, and to hold non-cooperating
witnesses in contempt."  *Benjamin*, 343 F.3d at 45, citing
Fed. R. Civ. P. 53(c)–(d).  As discussed *infra* pp. 17–21,
those "quasi-judicial" functions differ from the role of the
Monitor here, which is to assure compliance with and
implement the court's remedial directives.  *Id.* (holding that
a court-appointed agent's "monitoring function" differed
from that of a Rule 53 special master).  That the district court
did not direct the Monitor to carry out many of the functions
authorized by Rule 53 reinforces our conclusion that the

---

[7] *See Toussaint v. McCarthy*, 801 F.2d 1080, 1102 n.21 (9th Cir. 1986)
("The Monitor is a special master, appointed pursuant to Fed. R. Civ. P.
53."), *overruled in part on other grounds by Sandin v. Conner*, 515 U.S.
472 (1995); *NORML*, 828 F.2d at 544 ("In addition to invoking Fed. R.
Civ. P. 53, . . . .").

Rule was not the source of the Monitor's authority at any juncture.[8]

Further, with regard to the authorities contested in this appeal, the district court conferred authority on the individual previously appointed as Monitor but did so in a different capacity, as CPA.  So any resemblance in other cases between special masters and monitors is beside the point.

Moreover, even if the district court had appointed the Monitor initially under Rule 53, the court may subsequently rely on its inherent equitable powers to fashion additional remedies.  *See Ruiz v. Estelle*, 679 F.2d 1115, 1161 (5th Cir.) ("[R]ule 53 does not terminate or modify the district court's inherent equitable power to appoint a person, whatever be his title, to assist it in administering a remedy."), *amended in part, vacated in part on other grounds on denial of reh'g*, 688 F.2d 266 (5th Cir. 1982).  Indeed, the district court repeatedly relied on its inherent equitable powers in the subsequent supplemental injunctions.[9]  In the Second Order, the court relied on its "broad and flexible equitable powers

---

[8] We do not share the Sheriff's concern that failing to apply Rule 53 here, when the district court did not rely on it, would allow courts to "avoid Rule 53's limitations" when appointing special masters.  Rule 53 and the district court's inherent equitable powers, while overlapping at times, are distinct tools at the court's disposal.  *See, e.g.*, *NORML*, 828 F.2d at 544 ("[T]he district court's reference to a master was proper under the All Writs Act, as well as under Fed. R. Civ. P. 53, and was therefore not clearly erroneous as a matter of law.").  The court may rely on one tool without invoking the other.

[9] Even in instances where the district court has "failed to specify the authority for its order," we have "assume[d] that the court relied on its inherent powers" if "the district court's inquiry and decision makes the relevant authority clear."  *Primus Auto. Fin. Servs., Inc.*, 115 F.3d at 648.

to remedy past wrongs" and "equitable authority to modify its injunctions in light of changed circumstances." "[D]istrict courts have broad equitable power to order appropriate relief in civil contempt proceedings." *SEC v. Hickey*, 322 F.3d 1123, 1128 (9th Cir. 2003). In the Third Order, at issue here, the district court relied on its "authority to enter civil contempts . . . and to compel appropriate remedial measures" to "ensur[e] that investigations are completed in sufficient time to administer discipline."

In sum, the district court's reliance on its inherent equitable powers in the Second and Third Orders is clear. Accordingly, we conclude that, because the district court issued the Third Order under its inherent equitable powers rather than under Rule 53, the Rule's limits, if any, do not apply.

## IV.

Next, the Sheriff contends that the district court's delineation and assignment of the CPA's duties to the Monitor violated Article III of the Constitution and separation of powers principles in two separate ways.[10] First, the Sheriff contends the court's assignment unconstitutionally delegated to the Monitor authority and control over certain aspects of MCSO's operations.[11]

---

[10] U.S. Const. art. III, § 1 ("The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish.").

[11] Plaintiffs contend that the Sheriff waived any argument as to Paragraph 350 by not objecting in the district court. "Absent exceptional circumstances, we generally will not consider arguments raised for the first time on appeal, although we have discretion to do so." *Baccei v. United States*, 632 F.3d 1140, 1149 (9th Cir. 2011). "We may exercise

Second, the Sheriff contends that the Monitor's decisions under Paragraphs 346, 347, and 350 are not subject to constitutionally-required judicial review. We address each argument in turn.

A.

"The judicial power of the United States must be exercised by courts having the attributes prescribed in Art. III." *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 59 (1982) (plurality opinion). In arguing that the district court impermissibly delegated its adjudicatory function to the Monitor, the Sheriff primarily relies on our decision in *Armstrong v. Brown*, 768 F.3d 975 (9th Cir. 2014). In that case, we vacated an injunction's provisions granting an expert witness, appointed under Federal Rule of Evidence 706, the power to "resolve disputes" between the parties "about whether non-compliance has occurred" and "mak[e] findings of fact and conclusions of law, as necessary to assess noncompliance." *Armstrong*, 768 F.3d at 987. In so ruling, *Armstrong* held that "[t]he dispute resolution authority granted to the expert . . . [was] beyond the scope of the duties that may be assigned to a Rule 706 expert." *Id.*

---

this discretion (1) to prevent a miscarriage of justice; (2) when a change in law raises a new issue while an appeal is pending; and (3) when the issue is purely one of law." *Id.* Before the district court, the Sheriff objected to the Monitor's complaint-handling authority in the Third Order. Although Paragraph 350 relates to the Monitor's authority over MCSO's training on investigative planning and supervision, the substance of the Sheriff's argument against the expansion—that, as written, the district court vested the Monitor with impermissible authority—is the same. Therefore, we exercise discretion to review the Sheriff's argument as to Paragraph 350 given that his challenge to all three provisions of the Third Order is a purely legal one.

*Armstrong* narrowly resolved the permissibility of functions assigned to a Rule 706 expert but, in arriving at its holding, drew on broader principles involving the delegation of judicial responsibilities.  For instance, *Armstrong* cited *Kimberly v. Arms*, 129 U.S. 512, 524 (1889), in which the Supreme Court held that a court "cannot . . . abdicate its duty to determine by its own judgment the controversy presented, and devolve that duty upon any of its officers."  *Id.* at 988. *Armstrong* also found support for its decision in opinions from our sister circuits that "similarly approved the appointment of nonjudicial officers to act in advisory capacities only" on adjudicatory matters.  *Id.* at 987 n.4 (collecting cases discussing appointees other than Rule 706 experts).

Unlike in *Armstrong*, however, the district court in this case assigned to the Monitor additional responsibilities related to the *implementation* of remedial measures—an executive function—rather than the *adjudication* of compliance with the injunction.  After reviewing the management expert's report, the district court found that the "failure to complete investigations in a timely manner has become so extreme as to render investigations completely ineffectual and render no service to either the complainant or MCSO personnel."  To remedy this deteriorating situation, the Third Order assigned the Monitor the CPA's task of overseeing MCSO's complaint intake and routing, as well as conducting training on investigative planning and supervision.[12]  These duties do not implicate *Armstrong*'s

---

[12] The Monitor's authority over this narrow area of MCSO's operations is markedly different than the "broad delegation of power" to release prisoners from administrative segregation in *Toussaint*, which we

concern that the non-judicial officer will "make findings of fact and conclusions of law regarding . . . compliance with the remedial plan." *Id.* at 988. Therefore, Paragraphs 346, 347, and 350 of the Third Order do not unconstitutionally delegate the court's adjudicatory role to the Monitor.

The Sheriff further maintains that MCSO's status as a governmental entity bars the district court from delegating authority over its operations to the Monitor. In so arguing, the Sheriff makes much of *NORML*'s statement that "[m]asters may not be placed in *control* of governmental defendants for the purpose of forcing them to comply with court orders." 828 F.2d at 545, citing *Hoptowit v. Ray,* 682 F.2d 1237, 1263 (9th Cir. 1982), *overruled in part on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995).

*NORML* is not controlling here. Neither it nor *Hoptowit*, the case on which it relies, had reason to address the issue of whether a master may be given authority over a government entity. *See NORML*, 828 F.2d at 545 ("In the instant case, . . . the master has not been given the power to control or administer [the entity subject to the injunction]'s efforts, only to observe them."); *Hoptowit*, 682 F.2d at 1263 ("We read the district court's order of reference, however, to empower the master only to monitor compliance with the court's orders and to approve plans ordered submitted by the court."). *NORML* had no occasion to consider dissimilar circumstances, such as a situation in which, as here, there has been repeated non-compliance with earlier injunctions

---

observed "raise[d] serious constitutional questions," 801 F.2d at 1102 n.23, or the "wide-ranging extrajudicial duties" in *Cobell v. Norton*, 334 F.3d 1128, 1142 (D.C. Cir. 2003), which were "not limited to 'superintending compliance with the district court's decree,'" *id.* at 1143 (quoting *Ruiz*, 679 F.2d at 1162).

and the monitor's authority over the governmental entity's operations is quite narrow. Nor did *NORML* inquire into whether the source of the court's authority to delegate control impacts the analysis. The passing statement in *NORML* relied upon by the Sheriff was non-binding dictum, *see United States v. McAdory*, 935 F.3d 838, 843 (9th Cir. 2019) ("[W]e are not bound by a prior panel's comments 'made casually and without analysis[.]'", quoting *United States v. Ingham*, 486 F.3d 1068, 1078 n.8 (9th Cir. 2007)), and in any event has little bearing on this case.

Plaintiffs, in contrast, urge us to consider cases in which we and sister circuits have upheld a court's appointment of a receivership, "a recognized [equitable] tool for taking over other governmental agencies that could not or would not comply with the law." *Plata*, 603 F.3d at 1093 (collecting cases). To be clear, the record does not indicate that the district court converted the monitorship to a receivership. But the district court's ability to employ more invasive equitable remedies, such as a receivership, with regard to governmental defendants strongly suggests that the court may provide for the less extensive authority conferred on the Monitor in Paragraphs 346, 347, and 350 of the Third Order.

That the district court acted within the general bounds of its inherent powers is consistent with precedent from the Supreme Court, as well as this court. *See Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."); *Stone*, 968 F.2d at 861 ("Federal courts possess whatever powers are necessary to remedy constitutional violations because they are charged with protecting these rights."). We therefore conclude that, in certain

circumstances, the district court, relying on its inherent powers, may vest a non-judicial officer with control over narrow areas of a governmental defendant's operations. As the Sheriff has confined his Article III challenge to broad propositions regarding the propriety of the Monitor's role as CPA and has not challenged the appropriateness of the Third Order's particular remedies in this specific circumstance, this appeal does not require us to inquire further.

B.

Even if the district court may assign the CPA's duties to the Monitor, the Sheriff contends, Paragraphs 346, 347, and 350 impermissibly omit a mechanism for judicial review. We said in *Armstrong* that a lack of "any mechanism for review of the [non-judicial officer's] decisions by the district court" does "risk[] permitting the [non-judicial officer] to 'displace the district court's judicial role.'" 768 F.3d at 988, quoting *A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091, 1097 (9th Cir. 2002). But, as we have discussed, this case does not involve, as did *Armstrong*, the delegation of adjudicatory authority, so *Armstrong*'s observation regarding displacement of the judicial role is not directly applicable.

We nonetheless assume, without deciding, that the delegation in an injunction of executive authority to a judicially appointed individual requires provision for judicial review. Fairly read, the three Orders considered together do provide for judicial review. Plaintiffs so maintain, arguing that the First Order's provisions for judicial review over the Monitor apply with full force to the Third Order. Specifically, Paragraph 126 of the First Order states that "[t]he Monitor shall be subject to the supervision

and orders of the Court."  Two paragraphs below, Paragraph 128, provides:

> The ultimate arbiter of compliance is the Court and Parties may make their own submissions regarding compliance separate from the Monitor's reports.  In any areas where the Parties are not able to resolve issues with the Monitor—including those areas where the Order provides for input from the Monitor—the Parties may submit their grievances directly to the Court for resolution.

We agree that the judicial review process in the First Order applies to the Third Order.  The sequential numbering of the supplemental injunction orders and of the paragraphs within them support a conjunctive reading.  The Third Order also acknowledges that its provisions "in many respects, track over the same territory that the Monitor and the parties have already been over ad nause[a]m."  The Third Order "expand[ed] the Monitor's duties to include those of the [CPA]" due to the "massive existing backlog, and the need to timely correct that backlog."  The district court's recognition within the Third Order of the previous supplemental injunctions and its reference to "expan[sion]" of the Monitor's authority—an inherently relational term— further weigh in favor of reading the three supplemental injunction orders as one.

The Sheriff's trio of arguments to the contrary are not persuasive.  We address them in turn.

First, the Sheriff points out that the Third Order, unlike its predecessor, does not expressly "incorporate herewith"

the paragraphs of the previous supplemental injunctive orders. But the Third Order did not require such text to signify continuity with the First and Second Orders. The district court made clear that the Third Order's curative measures simply "resolve[]" Sheriff Penzone's motion to modify the Second Order. Given its modifying function and sequential numbering, we read the Third Order as reaffirming those provisions in the Second Order left undisturbed.

Second, the Sheriff questions why the Third Order would state explicitly that the Monitor will be paid "consistent with ¶ 123 of the [First Order]" if that provision already applies. But the Third Order gave the Monitor supplemental duties as CPA, a change that necessitates clarification of how the Monitor would be paid in his new role. The mechanism provided for judicial review is not dependent on the specific nature of the Monitor's role, as it includes "any areas" where the parties encounter issues with the Monitor, and therefore does not warrant similar clarification.

Third, the Sheriff asks us to infer that Paragraphs 346, 347, and 350 of the Third Order nullify the judicial review provisions in the First Order, and that, given the wording of Paragraph 353 of the Third Order, the court did not intend for such review of the Monitor's decisions under those three paragraphs. For the reasons that follow, there is no basis for that inference.

In authorizing the Monitor to oversee and revise MCSO's complaint intake and routing processes, Paragraphs 346 and 347 state that the "Monitor must consult with the PSB Commander . . . but maintains independent authority to make the ultimate decision." Wording clarifying the relationship between the Monitor and MCSO does not

displace the court's authority to review the Monitor's actions.

This understanding is confirmed by the court's exchanges with the management expert at a status conference before the issuance of the Third Order. *Cf. United States v. 60.22 Acres of Land*, 638 F.2d 1176, 1178 (9th Cir. 1980) ("It is our responsibility to construe a judgment so as to give effect to the intention of the court . . . ."). The district court had requested the management expert's input on how much authority the court should vest in the CPA. At the status conference, the district court "explore[d]" whether it should appoint a CPA to "have the ultimate authority to dictate classification decisions" rather than to work collaboratively with MCSO. The focus was thus on whether the CPA could make a decision in the face of MCSO's disagreement, not on altering the court's role. To the extent any ambiguity exists, then, a comprehensive reading of the record supports interpreting "ultimate" in Paragraphs 346 and 347 as clarifying only that MCSO cannot reject the Monitor's decision, rather than as precluding judicial review of it. Similarly, Paragraph 350 provides that the Monitor shall determine whether training is needed but does not preclude judicial review of that determination.

The Sheriff posits that, because Paragraph 353 expressly provides for judicial review, the absence of similar wording in Paragraphs 346, 347, and 350 confirms that the Monitor's decisions under those provisions are not subject to judicial review. The Sheriff misreads Paragraph 353, which authorizes the Monitor to "present to the Court" proposed policies concerning investigations of certain categories of cases and provides that "the Court will, thereafter, make determinations as to the final policies." That passage

provides for the court's determination of policy in the first instance, rather than judicial review of the Monitor's decisions.

The absence of such judicial determination wording in Paragraphs 346, 347, and 350—which authorize the Monitor to make certain operational decisions for MCSO in the first instance—does not render those decisions unreviewable by the court. Indeed, when the district court in the Second Order appointed two other individuals—the Independent Investigator and Independent Disciplinary Authority—to investigate, prosecute, and adjudicate misconduct cases within MCSO, the court ordered that, unless otherwise specified, "no party has the right to appeal the decisions of either the Independent Investigator or the Independent Disciplinary Authority." Paragraphs 346, 347, and 350 contain no such constraints on the district court's review. We reject the Sheriff's invitation to read them in. Accordingly, we conclude that the First Order adequately provides a mechanism for judicial review of the Monitor's decisions as CPA.

The Sheriff's logistical concerns as to the timing of the court's review of those decisions, however, do have some salience. Because Paragraph 347 directs MCSO to implement the Monitor's individualized intake and routing decisions "expeditiously," as a practical matter, the court's review of any objection made by MCSO could occur after MCSO has routed the complaint as directed by the Monitor. Thus, MCSO runs the risk of expending additional resources if the court agrees with its objection and the complaint need not be routed as directed. A similar risk exists with respect to any training implemented by the Monitor that the court later determines is not necessary.

In the event that such a dispute arises, no provision in the Third Order or its predecessors precludes an emergency motion to the district court for expeditious judicial review of the Monitor's decision.   Nor is there any provision precluding the parties from raising pragmatic timing concerns with the district court, requesting clarification as to the timing of judicial review.**[13]** *See SEC v. Lincoln Thrift Ass'n*, 557 F.2d 1274, 1280 (9th Cir. 1977) ("[T]he district court is in the best position to clarify . . . its own order . . . ."). Either or both of those procedures can adequately address the Sheriff's timing concerns should the occasion arise to address them.

V.

Lastly, the Sheriff argues that Paragraphs 346, 347, and 350 violate Federal Rule of Civil Procedure 65. Under Rule 65, an injunction order must "state its terms specifically . . . [and] describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d). "The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1047 (9th Cir. 2013), quoting

---

[13] At oral argument, the Sheriff's counsel confirmed that he did not seek guidance from the district court as to these timing issues—or, for that matter, inquire whether the Third Order provided for judicial review of the Monitor's decisions as CPA—before filing this appeal.  To increase the chances that future disputes, if any arise, are expeditiously resolved, we urge the parties to first seek clarification from the district court. Future appeals will be referred to the Ninth Circuit Mediation Office to explore a possible resolution through mediation.

*Fortyune v. Am. Multi–Cinema, Inc.*, 364 F.3d 1075, 1087 (9th Cir. 2004).

Relying on *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 145 (2d Cir. 2011), the Sheriff contends that the paragraphs at issue lack the specificity that Rule 65 requires because they direct the Monitor to tell MCSO what to do. In *Mickalis*, the Second Circuit vacated two injunctions against retail firearm dealers for violating Rule 65. 645 F.3d at 144–46. That case also involved a special master appointed "to implement, and monitor the defendants' compliance with, certain remedial measures contemplated by the injunctions." *Id.* at 142. The Second Circuit took issue with the injunctions primarily because they required defendants to act "in full conformity with applicable laws pertaining to firearms" and to "adopt [ ] appropriate prophylactic measures to prevent violation" of those laws but did not specify which firearm laws applied or how the defendants were to alter their behavior to prevent violations. *Id.* at 144. The Second Circuit concluded that the injunctions were "also problematic because of the extent to which they vest[ed] the [s]pecial [m]aster with discretion to determine the[ir] terms." *Id.* at 145.

The Sheriff's argument that the Monitor's limited authority over MCSO's operations contravenes Rule 65 misses the mark. As an initial matter, if Rule 65 categorically prohibited an injunction from delegating any decision-making authority to a non-judicial officer, receiverships—"a recognized tool for taking over other governmental agencies"—would never be permitted. *Plata*, 603 F.3d at 1093; *see also id.* at 1093–94 ("There can be little question . . . that receiverships are recognized equitable tools available to the courts to remedy otherwise uncorrectable violations of the Constitution or laws."). The

Sheriff's interpretation of Rule 65 is incompatible with courts' assignments of receivers.

Further, the supplemental injunctions' terms in this case are a far cry from the enigmatic ones in *Mickalis*, which essentially commanded the defendant to obey a broad category of laws generally and delegated authority to the special master to fill in the huge gaps created by that vague and general requirement.   Here, the district court's injunctions provide MCSO with specific directives with which to comply.  For instance, Paragraph 204 of the Second Order states that "administrative investigations [must be completed] within 85 calendar days of the initiation of the investigation (60 calendar days if within a Division)."  After holding Sheriff Penzone in contempt for "knowing and continuous" violation of Paragraph 204, the Third Order set forth curative measures to reduce the backlog created by his violation.   Paragraphs 346, 347, and 350 do not create ambiguity as what MCSO must do; these provisions entrust the Monitor with backlog-reduction-related decisions to effectuate compliance with the Second Order's very specific requirements.  In other words, it can hardly be said that the injunction's terms are "too vague to be understood." *Fortyune*, 364 F.3d at 1087, quoting *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974); *see also Napster*, 284 F.3d at 1097 ("We do not set aside injunctions under [Rule 65] 'unless they are so vague that they have no reasonably specific meaning.'", quoting *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1297 (9th Cir. 1992)).

*Fortyune* provides helpful guidance on how to consider Rule 65's specificity requirement.  In *Fortyune*, a district court issued an injunction against a defendant movie theater company requiring it to modify its seating policies to prioritize the companion of a wheelchair-bound patron for

companion seats. 364 F.3d at 1087. Concluding that the "injunction could not have been much clearer in describing what [the defendant] must do to comply with its dictates," *Fortyune* rejected the defendant's argument that Rule 65(d) requires that the court "also elucidate *how* to enforce the injunction." *Id.* In fact, in *Fortyune*, we expressed confidence in the defendant's ability to "devis[e]" the mandated companion policy. *Id.* In this case, the district court's confidence in MCSO's ability to reduce the backlog on its own was waning, as evidenced by the court's decision to entrust the Monitor as CPA with certain operational authority in the Third Order. Taking into account the specificity of the previous supplemental injunctions' terms and MCSO's history of non-compliance with those terms, the paragraphs at issue are not so vague that the Sheriff cannot understand what is required of him. *See Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1133 (9th Cir. 2006) ("Ultimately, there are no magic words that automatically run afoul of Rule 65(d), and the inquiry is context-specific.").

Accordingly, we hold that Paragraphs 346, 347, and 350 do not violate Rule 65's specificity requirement.

## VI.

In sum, we conclude that Rule 53 does not govern the Third Order; that the district court has inherent equitable authority to assign the CPA's responsibilities to the Monitor; that the First Order provides for adequate judicial review of the Monitor's actions under the Third Order; and that Paragraphs 346, 347, and 350 do not contravene Rule 65. For these reasons, we affirm the district court's Third Order.

**AFFIRMED**.