**Maricopa County Sheriff's Office**
**Comments on Monitor's Forty First (41st) Quarterly Draft Report**
**April 1, 2024 – June 30, 2024**

The Monitor's Forty First (41st) Quarterly Draft Report covers the time from April 1, 2024, to June 30, 2024 (the "Draft Report"). MCSO continues to work with the Monitor, the American Civil Liberties Union, and the Department of Justice to achieve compliance with the Court's Orders. MCSO is dedicated to following best police practices and gaining full and effective compliance with the Court's Orders.

On October 1, 2024, MCSO submitted and filed with the Court its 41st Quarterly Report (Doc. 3086), which delineates the steps that have been taken to implement the Court's Orders and the plans to address problems and responses to concerns raised in the Monitor's previous Quarterly Report. MCSO requests that the content of its 41st Quarterly Report be considered as comments to the Monitor's Draft Report as it contains relevant feedback. MCSO's additional comments to the Monitor's compliance findings and other issues in the Draft Report are listed below.

**Section 7.  Traffic Stop Documentation and Data Collection.**

**Paragraph 70.**  MCSO disagrees with the Draft Report's conclusion that MCSO is not in compliance with Paragraph 70.

MCSO requests that the Draft Report clarify the standard for compliance for Paragraph 70. MCSO believes that to comply with Paragraph 70 it must (1) conduct the required traffic-stop analyses; (2) closely monitor disparities identified in the analyses that show evidence of potential bias; and (3) identify and follow through on actions to attempt to reduce disparities. As noted in MCSO's most recent Quarterly Reports (Docs. 2994, 3043, 3086), MCSO is completing all required traffic stop reports and taking actions in response to the information in those reports. Compliance with Paragraph 70 is not measured by whether the disparate outcomes identified in the statistical studies are reduced or eliminated in subsequent traffic stop analyses. Rather, it requires reasonable monitoring and follow up regarding disparities that are identified. *See* 11/26/2019 Tr. at 36 (noting that if MCSO is "taking all reasonable steps and all actions [MCSO] can in implementing that plan and − . . . the statistics still are not moved, then I think that's something that goes to MCSO's credit, not . . . detriment").

Regardless, the Draft Report (at 90) is also wrong to say that MCSO's Traffic Stop Annual Reports ("TSARs") "continue[] to find in the examination of traffic stop outcomes disparities 'that may indicate a systemic bias within the patrol function.'" As MCSO explained in its 41st Quarterly Report, the most recent TSAR (TSAR 9, published June 2024, which examines data from 2023) showed no statistically significant disparity involving the Plaintiffs class in *any* of the benchmarks measured. This means there was a reduction in indicia of disparate treatment of the Plaintiffs class across each metric. The Draft Report is wrong to suggest otherwise.

The Draft Report also does not articulate a standard for compliance with Paragraph 70. The Monitor's prior reports have described compliance as being "[b]ased on the agency's own analysis of traffic stop data." (Monitor's 40th Quarterly Report (Doc. 3074) at 94). As discussed above,

that is an incorrect measure of compliance with Paragraph 70 but, even under that standard, the most recent TSAR should bring MCSO in compliance with Paragraph 70. Yet the Draft Report still finds MCSO out of compliance with this Paragraph but does not provide an appropriate explanation as to why. Accordingly, MCSO requests that the Monitor clarify what, exactly, the bases for its compliance determination under Paragraph 70 is.

Based on the appropriate standard, MCSO asserts that it is in compliance with this Paragraph as explained in more detail in MCSO's 41st Quarterly Report.

The other aspect of compliance with Paragraph 70 is the Constitutional Policing Plan (CPP), approved in 2017. As described in MCSO's recent Quarterly Reports (Docs. 2957, 2994, 3043, 3074), MCSO has completed the goals of the CPP and is in compliance with the goals that require ongoing action.

MCSO recommends that the discussion in the Draft Report of the enhanced training on the TSAR, described in Goal 3, be modified to more fully address the TSAR training. In addition to explaining the statistics in the TSAR, the training addresses decision-making and implicit bias. The focus on the TSAR was to help deputies better understand the disparities identified in the TSAR and the tools deputies use to support fair and impartial decision-making. The Draft Report's comment that the training discusses "the findings of TSAR and TSQR reports during Town Halls" understates the scope and purpose of the training.

As was true of other recent Quarterly Reports, the Monitor notes that MCSO and the other parties have been discussing Paragraph 70 and the CPP. In a prior Quarterly Report, the Monitor stated that "[s]ince the [CPP] was a joint agreement between MCSO and the Parties, [the Monitor] recommend[ed] that the Parties hold additional discussions regarding the [CPP] and the requirements of Paragraph 70 to move forward." Monitor's 37th Quarterly Report (Doc. 2926 at 274). The Draft Report says that "until an agreement is reached with the Parties, and the Court approves a modification to the CPP, we will continue to assess compliance based on the existing [CPP] and the results of the traffic stop data analysis reports."

MCSO recommends that the phrase "until an agreement is reached with the Parties, and the Court approves a modification to the CPP" be deleted. The parties' discussions on the CPP and Paragraph 70 may not result in any agreement or any modification of the CPP that the Court approves. There is no reason to reference such an agreement and Court modification that may never happen, and the Monitor's assessment of MCSO's compliance with Paragraph 70 should not depend on such an agreement. The Monitor need only explain the current standard for compliance and apply that standard. As noted, MCSO believes it is in compliance with the requirements of Paragraph 70, including the CPP, based on an appropriate standard.

**Paragraph 74(l).** The Draft Report (at 107) states that in "monthly alert inspection reports for January through March [2024], there was one recommendation for a commendation." No such EIS alert was triggered, and MCSO requests that this statement be removed from the final report.

**Paragraph 79.** The Draft Report (at 111) states that "Appendix A . . . to the EIU Operations Manual" was updated in "the first quarter of 2023." Appendix A was most recently updated in the third quarter of 2023.

**Paragraph 81(f).** In discussing the EIS under this Paragraph, the Draft Report (at 119) uses the example of a "'use of force' threshold" as between "Detention and Patrol personnel." But MCSO tracks only the number of BIO Action Forms ("BAFs") generated per branch, and the number of BAFs needed to generate an alert varies based on the employee's status (Deputy, Detention, etc.). Accordingly, MCSO requests the Monitor revise its discussion of the EIS threshold by removing the two sentences discussing use of force with the following example:

> MCSO has created an appendix for thresholds based on the number of BAFs generated within a particular branch (Administration, Enforcement, etc.). The number of BAF threshold is set higher for the enforcement branch because of the nature of their duties.

**Section 9:  Supervision and Evaluation of Officer Performance**

**Paragraph 99.** In the Monitor's review of EPAs under this Paragraph, the Monitor found 40 out of the 45 EPAs reviewed in compliance and, consequently, found MCSO out of compliance with this Paragraph. However, two of the EPAs the Monitor found noncompliant were, in fact, in compliance with this Paragraph. Accordingly, MCSO requests that this Paragraph be reassessed and updated accordingly.

MCSO used the information provided by the Monitor to conduct a review of the EPAs the Monitor found deficient, but notes that several of the employee numbers provided by the Monitor were not valid. MCSO identified the closest matches from among the EPAs produced to the Monitor in the second quarter to facilitate its review.

That review showed that two of the EPAs the Monitor found deficient were actually compliant. The first relates to an April supervisor EPA that Monitor asserts "failed to list two misconduct investigations initiated during the review period." (Draft Report at 147.) However, neither misconduct investigation listed was viewable to the reviewer until after the review period had ended. The EPA properly discussed everything that was available to the reviewer at the time the EPA was completed. It was in compliance.

The second is referred to in the Draft Report as one of two "noncompliant supervisor EPAs" that "failed to list misconduct investigations initiated during the review period." In one of these EPAs, the employee being rated was only included as a witness in a pending investigation; they were not identified as an involved employee until after the reporting period closed. In other words, the EPA contained all information relevant to the review period.

The Draft Report's concluding sentence on this Paragraph also bears clarification. The Draft Report (at 147) states that "[C]hain of command officers reviewing the EPA have complete access to the employee's EIPro history and can review and compare the information in the EPA to that which is listed in the employee's EIPro history and make corrections." This is not always true.

3

Depending on the nature or timing of a complaint, chain of command may not always have complete access to all information within EIPro. Moreover, even if a chain of command does have access to that information, correcting an EPA to include that information may not be appropriate because the EPA is presented to the employee, and it may be premature to reveal investigatory steps or notice to the employee. This is why the expectation and best practice is for information like this to be completed in the rating period after the employee's supervisor has access to that information.

Further, chain of command access to EIPro history is limited to only those employees within that chain of command. There are instances, however, where the rater being reviewed is within a chain of command, but the employee being rated is not. This is common, particularly because of staff movement within MCSO. In those instances, the chain of command would not have access to the EIPro history for the employee being rated.

**Section 12:  Misconduct Investigations, Discipline, and Grievances**

**Paragraph 178.** The Draft Report (at 171-72) continues to defer its assessment of Paragraph 178, a Paragraph that MCSO achieved Full and Effective Compliance in June 2022. The Monitor has deferred assessment of this Paragraph based on the assertion that MCSO continues to "neglect to update the PSB40 curriculum with current, relevant concerns" and the "delayed implementation of the 2023 PSB8 Combined Training." Revisions to both PSB40 and PSB8 include incorporation of issues related to the Third Order. MCSO has been working to update these trainings following approval of the Third Order policies and will continue to keep the Monitor apprised of the progress.

**Paragraph 198.** The Draft Report (at 191) expresses concern with the parking available at PSB's new office location. MCSO believes these concerns are misplaced—the parking lot is directly across a narrow street from the office building, and does not require, as the Draft Report states, a credit card to enter. If a visitor to PSB chooses to park in the lot, PSB will validate their parking. Moreover, even if someone were dissuaded from parking in that lot, there is nearby street parking that provides potential complainants with additional options. As the Draft Report notes, PSB's new office space is sufficient, and, MCSO believes, the parking is too. The parking options are superior to the options available at PSB's previous office in downtown Phoenix.

**Third Order**

**Paragraph 344.** The Draft Report (at 271) finds MCSO out of compliance with this Paragraph on the basis that MCSO "has not identified any other administrative tools used by the agency to increase personnel hours dedicated to investigating all types of PSB complaints." MCSO's most recent Quarterly Report, however, identifies the use of administrative support staff to allow investigators more opportunity to focus on investigations, as well efforts to reduce redundant tasks. (Doc. 3068-1 at 130). MCSO believes that the information provided in that Quarterly Report should be sufficient to establish compliance with this Paragraph and requests that the Monitor modify its assessment accordingly. If the Monitor declines to change its finding, MCSO requests that the Monitor clarify what additional information he seeks regarding compliance with this Paragraph, as well as the standard by which compliance is measured.

**Concluding Remarks**

MCSO notes that the reference in the Draft Report (at 288) to "November 16, 2024" should be "November 16, 2023."