**Maricopa County Sheriff's Office**
**Comments on Monitor's Forty Second (42nd) Quarterly Draft Report**
**July 1, 2024 – September 30, 2024**

The Monitor's Forty Second (42nd) Quarterly Draft Report covers the time from July 1, 2024, to September 30, 2024 (the "Draft Report"). MCSO continues to work with the Monitor, the American Civil Liberties Union, and the Department of Justice to achieve compliance with the Court's Orders. MCSO is dedicated to following best police practices and gaining Full and Effective Compliance with the Court's Orders.

On January 9, 2025, MCSO submitted and filed with the Court its 42nd Quarterly Report (Doc. 3315), which delineates the steps that MCSO has taken to implement the Court's Orders and its plans to address problems and responses to concerns raised in the Monitor's previous Quarterly Report. MCSO requests that the content of its 42nd Quarterly Report be considered as comments to the Monitor's Draft Report as it contains relevant feedback. MCSO's additional comments to the Monitor's compliance findings and other issues in the Draft Report are listed below.

**Section 6. Training.**

**Paragraph 47.** The Monitor asserts that Posse personnel (Intermediate and QAP levels) were not versed in the body-worn camera (BWC) activation and deactivation procedures as specified in GJ-27 (Sheriff's Posse Program), and recommended that MCSO revise and expand the BWC Lesson Plan. (Draft Report at 50.). It is MCSO's position that the Monitor's comments are the result of the Monitoring Team's misinterpretation of GJ-27 Attachment A. As discussed and agreed during the site visit on February 5, 2025, MCSO will clarify the policy and any future training will reflect the policy changes.

**Section 7. Traffic Stop Documentation and Data Collection.**

**Paragraph 54.g.** The Monitor asserts that during the Monitor Team's District visits in July and October 2024, the Monitoring Team communicated to MCSO personnel its concerns regarding documenting information on the VSCFs. The Monitor also asserts that it advised sergeants during ride-alongs that deputies do not consistently document information on VSCF. MCSO seeks clarification and requests that the Monitor specify its concerns, in writing, to ensure that MCSO considers and addresses them appropriately.

**Paragraph 54.k.** When discussing this subpart of Paragraph 54, the Monitor remarks that he "will consider whether MCSO implemented the mandatory use of the Consent to Search Forms in all instances where a consent to search is requested in our future reviews." (Draft Report at 67.) The Monitor further stated this was "indicated in [the] previous quarterly report." (*Id.*) MCSO requests that the Monitor delete this portion of the draft quarterly report because it is inaccurate.

First, nothing in the Monitor's Forty-First Quarterly Report (Doc. 3108) shows any indication that the Monitor intended to require the mandatory use of the Consent to Search Form as a measure of compliance. Instead, that report, as have many of the Monitor's reports, notes that "MCSO does not currently require the use of Consent to Search Form[s] in all instances where consent was

requested to search either the driver or passengers(s), or the vehicle, during traffic stops." (Doc. 3108 at 67.) MCSO notes that this is consistent with its Monitor approved Policy GJ-3 which only requires the Consent to Search Form to be used in instances when body worn camera is unavailable. While the Monitor has previously recommended the use of consent forms for all consent searches, it has never imposed it as a mandatory requirement for all consent searches to remain in compliance with Paragraph 54.k. In fact, the Monitor's Thirty-Ninth and Fortieth Reports do not mention the mandatory use of the Consent to Search Form for all consent search requests. Indeed, going as far back as |the Twenty-Ninth Monitor Report for the second quarter of 2021, the Monitor only stated that "[w]e continue to _recommend_ MCSO revisit the requirements of this section of the policy and require deputies to read the Consent to Search Form to the subject and require a signature from the individual for every request for consent to search." (Doc. 2756 at 71 (emphasis added).) Despite this recommendation, the Monitor has held MCSO in compliance with Paragraph 54.k., as well as Full and Effective Compliance with this subparagraph since 2021. Further, despite the Monitor's contention, MCSO has never agreed to the mandatory use of the Consent to Search Form for all consent searches.

Second, this dovetails with another inaccuracy in the Draft Report. Contrary to the Monitor's contention, there is nothing "mandatory" about the use of Consent to Search Form in Paragraph 54.k. Paragraph 54.k. requires deputies "to document . . . whether any individual was asked to consent to a search (and the response)…." Moreover, nothing in the text of Paragraph 54.k. requires that a form be used "to document" a consent search. Nor does any other paragraph related to data collection mandate that a consent form be used "to document" a consent search. (_See e.g.,_ Doc. 606 at ¶¶ 60, 72, 75 or 81.) And to be clear, there is no constitutional requirement that consent for a consent search be memorialized in written form. To that end, MCSO has developed a Monitor approved system pursuant to Paragraph 54.k. which requires deputies to either: (1) record consent on their body-worn camera; _or_ (2) utilize a Consent to Search Form when body-worn camera is unavailable. _See_ MCSO Policy GJ-3. Moreover, neither the Constitution, the laws of the United States and the State of Arizona, the Court's Orders, nor the MCSO-Monitor approved policy require the use of a Consent to Search Form in _all_ instances of consent searches. The Monitor's suggestion that the use of such a form is or should be "mandatory" (even for consent searches unrelated to traffic stops) is unfounded and not in line with "best practices," as the Monitor Team has acknowledged during its February 18, 2025 meeting with MCSO personnel and counsel, local police policy and practice as shared with the Monitor team during that meeting, or other Arizona sheriff offices' policies and practices.

**Paragraph 60.** Despite the Monitor's finding that MCSO is in Full and Effective Compliance of this paragraph, the Monitor remarks in the Draft Report that he "will consider MCSO's use of the Consent to Search Form in our future reviews" of this paragraph. (Draft Report at 75.) MSCO requests that the Monitor delete this comment for the reasons stated above in MCSO's comment to Paragraph 54.k. Again, the Monitor has not required a "Consent to Search Form" in the past seven years, five of which MCSO has been in Full and Effective Compliance with this paragraph. Any data that the Monitor may now desire from the Consent to Search Form is collected on the applicable VSCF, NTCF and/or an incident report.

**Paragraph 70.** MCSO disagrees with the Monitor's conclusion that MCSO is not in compliance with Paragraph 70.

MCSO requests that the Monitor clarify the standard for compliance for Paragraph 70. MCSO believes that to comply with Paragraph 70, it must: (1) conduct the required traffic-stop analyses; (2) closely monitor disparities identified in the analyses that show evidence of potential bias; and (3) identify and follow through on actions to attempt to reduce disparities. As noted in MCSO's most recent Quarterly Reports (Docs. 2994, 3043, 3086, 3315), MCSO is completing all required traffic stop reports and taking actions in response to the information in those reports. Compliance with Paragraph 70 is not measured by whether the disparate outcomes identified in the statistical studies are reduced or eliminated in subsequent traffic stop analyses. Rather, it requires reasonable monitoring and follow up regarding identified disparities. *See* 11/26/2019 Tr. At 36 (noting that if MCSO is "taking all reasonable steps and all actions [MCSO] can in implementing that plan and − . . . the statistics still are not moved, then I think that's something that goes to MCSO's credit, not . . . detriment").

Regardless, the Draft Report (at 91) is inaccurate: MCSO's Traffic Stop Annual Reports ("TSARs") do not "continue[] to find in the examination of traffic stop outcomes disparities 'that may indicate a systemic bias within the patrol function.'" That comment is, at best, outdated, as it refers to findings from TSAR 8, which was published in June 2023—well over a year before the drafting of the Draft Report. Critically, as MCSO explained in its 41st Quarterly Report, the most recent TSAR (TSAR 9, published June 2024, which examines data from 2023) showed no statistically significant disparity involving the Plaintiffs' class in *any* of the benchmarks measured. This means there was a reduction in indicia of disparate treatment of the Plaintiffs' class across each metric. The Monitor is incorrect to suggest otherwise in the Draft Report.

Indeed, the Monitor does not discuss the findings of TSAR 9 in the Draft Report at all. Instead, the Monitor repeats a comment, contained in earlier reports, that the Monitoring Team "will comment on the responses of MCSO to the findings of TSAR9 . . . in subsequent reports as they become available." (Draft Report at 92.) But TSAR 9 has been available since the second quarter of 2024. Indeed, as noted in MCSO's report [Doc. 3156-1 at 55], MCSO published its response to TSAR 9 by the end of the Third Quarter, which is available for the Monitor's review. The time is past due for the Monitor to comment on the findings of MCSO's report and articulate why, even in light of that report, MCSO continues to not be in compliance with Paragraph 70.

In prior reports, the Monitor has described compliance as being "[b]ased on the agency's own analysis of traffic stop data." (Monitor's 40th Quarterly Report (Doc. 3074) at 94). As discussed above, that is an incorrect measure of compliance with Paragraph 70 but, even under that standard, the most recent TSAR should bring MCSO in compliance with Paragraph 70. The Monitor in this Draft Report still finds MCSO out of compliance with Paragraph 70 but does not provide an appropriate explanation as to why.

Based on the appropriate standard, MCSO asserts that it is in compliance with Paragraph 70 as explained in more detail in MCSO's 41st and 42nd Quarterly Reports.

The other aspect of compliance with Paragraph 70 is the Constitutional Policing Plan (CPP), approved in 2017. As described in MCSO's recent Quarterly Reports (Docs. 2957, 2994, 3043, 3074, 3315), MCSO has completed the goals of the CPP and is in compliance with the goals that require ongoing action.

As it has in past comments, MCSO recommends that the discussion in the Draft Report of the enhanced training on the TSAR, described in Goal 3, be modified to address the TSAR training more fully. In addition to explaining the statistics in the TSAR, the training addresses decision-making and implicit bias. The focus on the TSAR was to help deputies better understand the disparities identified in the TSAR and the tools deputies use to support fair and impartial decision-making. The Draft Report's comment that the training discusses "the findings of TSAR and TSQR reports during Town Halls" understates the scope and purpose of the training.

Overarchingly, as in other recent Quarterly Reports, the Monitor notes that MCSO and the other parties have been discussing Paragraph 70 and the CPP. The Draft Report (at 95) says that "until an agreement is reached with the Parties, and the Court approves a modification to the CPP, we will continue to assess compliance based on the existing [CPP] and the results of the traffic stop data analysis reports." Respectfully, discussions between MCSO and the parties have no bearing on MCSO's compliance with Paragraph 70. As the Monitor notes, the Monitor should assess compliance based on what is currently available to him. But that requires actual assessment and despite MCSO's compliance with the CPP, the Monitor continues to find MCSO out of compliance with no explanation as to why. MCSO believes it is in compliance with the requirements of Paragraph 70, including the CPP. MCSO requests that the Monitor articulate the standard by which he is assessing compliance under this Paragraph 70.

**Section 8. Early Identification System**

**Paragraph 72.**  The Monitor flags an issue for phase two compliance on "how MCSO will count and monitor search requests by deputies for those persons they come into contact with during non-traffic contacts" based on MCSO using an acceptance for the search captured on BWCs.  The Draft Report further states "[w]e and the Parties are concerned that without adequate documentation on forms, it would be difficult to accurately capture all events in the database that should be used to analyze non-traffic contacts. Additionally, it may limit the usefulness of NTCFs for supervisory oversight of deputy activity."  As addressed above in Response to Paragraph 54.k., the Monitor and Parties' concern regarding the use of BWC, rather than a consent to search form, to capture consent search authorization is unfounded.

**Paragraph 74.** The Draft Report asserts that the Monitoring Team has approved all changes to the NTCF policy (EA-3) and that they are awaiting its publication. While the Monitoring Team has approved the changes to EA-3, the Monitoring Team has denied approval of publishing this policy until the consent to search procedures are finalized in a completely different policy (GJ-3). MCSO does not agree that it should hold up publishing the NTCF policy based on any issues that the Monitoring Team may have with GJ-3, which as explained above in Response to Paragraph 54.k., are unfounded.

**Paragraph 75.h.**  The Monitor has held MCSO in Full and Effective Compliance with this paragraph.  However, the Monitor continues to raise that "[the Monitor Team's] concern at present involves the ability to ascertain that all search requests during these non-traffic encounters are captured in the data that will be used for analytic purposes. Anything short of that may affect compliance in this and related paragraphs and subparagraphs. We will evaluate this proposal when it is officially published."  To the extent this comment is related to MCSO's policy GJ-3 and its use of body worn camera to capture consent searches, please see the comments to Paragraph 54.k. above.

**Paragraph 75.l.** The Monitor states in the Draft Report (at 110) that according to the "monthly alert inspection reports for July through September [2024], there was one recommendation for a commendation." MCSO seeks clarification. No such EIS alert was triggered, and MCSO requests that this statement be removed from the final report.

**Paragraph 81.f.** In discussing the EIS under this paragraph, the Monitor (at 122) uses the example of a "'use of force' threshold" as between Detention and Patrol personnel. But MCSO tracks only the number of BIO Action Forms ("BAFs") generated per branch, and the number of BAFs needed to generate an alert varies based on the employee's status (i.e., Deputy, Detention Officer, etc.). Accordingly, MCSO requests the Monitor revise his discussion of the EIS threshold by removing the sentences "[i]In prior versions of GH-5, MCSO created an appendix for thresholds that indicated, for example, that the "use of force" threshold was different for Detention and Patrol branches. Therefore, MCSO has incorporated threshold levels based upon the nature of duties in particular areas of the organization" and replace them with the following example:

> MCSO has created an appendix for thresholds based on the number of BAFs generated within a particular branch (Administration, Enforcement, etc.). The number of BAF threshold is set higher for the enforcement branch because of the nature of their duties.

## Section 9: Supervision and Evaluation of Officer Performance

**Paragraph 99.** In the Monitor's review of EPAs under Paragraph 99, the Monitor found 39/45 EPAs reviewed in compliance and, consequently, found MCSO out of compliance with this Paragraph 99. MCSO used the information provided by the Monitor to conduct a review of the EPAs the Monitor found deficient but notes that two employee numbers provided by the Monitor were not valid. MCSO identified the closest matches from among the EPAs produced to the Monitor in the third quarter to facilitate its review.

MCSO conducted research of the issues the Monitor Team identified. Regarding one EPA, MCSO believes the Monitor found the EPA deficient because the "Deficiency Memo" was not mentioned in the assessment of a Sergeant's ability to conduct IA investigations. The rater did comment on the quality of the Sergeant's IA investigations but did not mention any deficiencies. The EIS resume did not mention a PSB deficiency memo, however, the Monitor's report indicates that the memo was noted in the PSB spreadsheet. The remainder of the findings were consistent with that of the findings of the Monitor Team.

MCSO Human Resources continues to review the effectiveness of the EPA forms in its on-going effort to comply with Paragraph 99's requirements. In the Third Quarter 2024, MCSO Human Resources reviewed the language in the EPA's "Internal or External Complaints" section to clarify for the raters what information to be included. MCSO Human Resources anticipates that its EPA review process will result in a beneficial change to the EPA form.

**Section 11: Community Engagement**

**Paragraph 115.** The Monitor stated in the Draft Report (at 161)  that "[d]uring this reporting period, CAB members reviewed and provided feedback on several MCSO policies." MCSO did not receive feedback on policies during the third quarter of 2024. MCSO provided the CAB various policies on May 29, 2024, of which the CAB acknowledged receipt. MCSO also sent a follow-up email to the CAB on August 12, 2024, to see if the CAB had any input on those policies. MCSO did not receive a response from the CAB in the third quarter 2024. The CAB did review the BAF Study for calendar year 2022 and provided MCSO with feedback in the third quarter 2024.

**Section 12: Misconduct Investigations, Discipline, and Grievances**

**Paragraph 178.** The Monitor stated in the Draft Report (at 175-76) that he continues to defer his assessment of Paragraph 178, a paragraph that MCSO achieved Full and Effective Compliance in June 2022. The Monitor has deferred assessment of this paragraph based on the assertion that MCSO continues to "neglect to update the PSB40 curriculum with current, relevant concerns" could result in a noncompliant finding.

MCSO has fully incorporated all Third Order changes into its 2023 PSB-8 training, which was held throughout 2024, and all changes to the PSB-8 training are being incorporated into the 2020 PSB-40 Training. MCSO anticipates providing the Monitor with revisions to the 2020 PSB40 Training in Q4 2024 and will continue to keep the Monitor apprised of its progress.

**Paragraph 198.** The Monitor stated in the Draft Report (at 191) that he expresses concern with the parking available at PSB's new office location. MCSO believes these concerns are misplaced—the parking lot is directly across a narrow street from the office building and does not require, as the Draft Report states, a credit card to enter. If a visitor to PSB chooses to park in the lot, PSB will validate their parking. Moreover, even if someone were dissuaded from parking in that lot, there is nearby street parking that provides potential complainants with additional options. As the Draft Report notes, PSB's new office space is sufficient, and MCSO submits, the associated parking is too. The parking options are superior to the options available at PSB's previous office in downtown Phoenix.

**Paragraph 204:** The Monitor stated in the Draft Report (at 201) that "cases initiated and completed before September 15, 2024, fall under the requirements of Paragraph 204 prior to the amendment of the Fourth Order, and compliance was determined based on this former requirement. There were no cases initiated on or after September 15, 2024, that were completed and forwarded for our review during this reporting period." MCSO requests that the Monitor clarify how he intends to assess compliance with this paragraph. It is MCSO's opinion that the

Court's Fourth Order, filed on August 30, 2024, and its subsequent amendment to that Order, filed on September 4, 2024, mandated an instantaneous change effective on that date of filing.

Additionally, the Monitor stated in the Draft Report (at 201) that "[w]e began the revised assessment of compliance with amended Paragraph 204 requirements for all administrative investigations initiated or completed on or after September 15, 2024." This language contradicts the assessment described at page 201. MCSO further requests clarification whether the amended Paragraph 204 applies to all cases and not just those initiated after the effective date of the Court's Fourth Order and its subsequent amendment.

**Section 14: Supervision and Staffing**

**Section 266.** The Draft Report (at 248) state that "in several incidents Posse members turned off their BWC without any comment or indication that their participation in the event had concluded. We again recommend that this issue be brought to the attention of active Posse members." MCSO submits that no policy requires posse members to make a comment each and every time a BWC is turned off/deactivated. There are only certain instances where an announcement is required in the posse policy procedures. This can be found in GJ-27, Attachment A, Procedure 4.A-M.

**Section 15: Document Preservation and Production**

**Paragraph 269.** The Draft Report (at 251) contains a reference to the LLS using Exterro for documentation matters. MCSO requests that the Monitor remove the Exterro reference as MCSO is not using it for that or any other purpose as it remains in the implementation phase.

**Paragraph 270.** The Draft Report (at 253) references a district supervisor complaining about some personnel preserving documents without properly notifying their supervisor during the Monitor's site visit. MCSO reached out for additional information to follow-up on the matter but the Monitoring Team provided no information to allow MCSO to follow-up effectively.

**Section 17: Complaints and Misconduct Investigations Relating to Members of the Plaintiff Class.**

**Paragraph 355.** See comment for Paragraph 204 above.

**Concluding Remarks**

MCSO recommends deleting the comments about obtaining budget approval for ten additional civilian investigators. The issue with hiring investigators is not a funding issue. The County has been receptive and previously agreed that it would grant as many positions as PSB needed to fulfill the Court's Third Order and avoid fines. MCSO has had authority to hire qualified investigators to address the PSB backlog in addition to positions approved through the formal budget process. The challenge has been attracting and hiring qualified people to perform the rigorous investigations needed and obtaining the Monitor's approval to hire them.

The Draft Report (at 297) states: "We again encourage MCSO to require that deputies use the Consent to Search Form in all instances where consent was requested to search either the driver or passenger(s), or the vehicle, during traffic stops. The required use of the form would ensure that each person is properly informed of his/her rights; and it would ensure that more accurate data is collected by MSCO [sic] in relation to the searches of persons and vehicles, as well as having the data available for review and analysis as required by Paragraph 60." MCSO requests that the above-quoted portion of the Draft Report be deleted from the Report. As repeatedly stated above, the Consent to Search Form has never been mandatory under MCSO policy and any data that the Monitor may want from the Consent to Search Form is collected on the applicable VSCF, NTCF and/or an incident report or otherwise captured on body worn camera.  And again, neither the Constitution, the Court's Orders, nor MCSO-Monitor approved policy require the use of a Consent to Search Form in _all_ instances of consent searches. The Monitor's suggestion that the use of such a form is or should be "mandatory" (even for consent searches unrelated to traffic stops) is entirely unfounded and not in line with best practices, as the Monitor Team has acknowledged during its February 18, 2025 meeting with MCSO personnel and counsel, local police policy and practice as shared with the Monitor team during that meeting, or other Arizona sheriff offices' policies and practices.