Victoria Lopez
vlopez@acluaz.org
Christine K. Wee
cwee@acluaz.org
John M. Mitchell
jmitchell@acluaz.org
ACLU Foundation of Arizona
2712 North 7th Street
Phoenix, AZ 85006
Telephone: (602) 650-1854

*Attorneys for Plaintiffs (Additional attorneys
for Plaintiffs listed on next page)*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, *et al.*, | **CV-07-2513-PHX-GMS** |
| Plaintiffs, | **PLAINTIFFS RESPONSE TO DEFENDANTS' NOTICE TO THE COURT RE: MCSO REPORTING ON HIT RATE (DOC. 3265)** |
| and | |
| United States of America, | |
| Plaintiff-Intervenor, | |
| v. | |
| Gerard A. Sheridan, in his official capacity as Sheriff of Maricopa County, Arizona, *et al.* | |
| Defendants. | |

Additional Attorneys for Plaintiffs:

Cecillia D. Wang*
cwang@aclu.org
ACLU Foundation
425 California Street, Suite 700
San Francisco, CA 94104
Telephone: (415) 343-0775

Jenn Rolnick Borchetta*
jborchetta@aclu.org
American Civil Liberties Union
Criminal Law Reform Project
125 Broad Street
New York NY 10004
Telephone (914) 462-2363

Stanley Young*
syoung@cov.com
Covington & Burling LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306-2112
Telephone: (650) 632-4700

Eduardo Casas*
ecasas@MALDEF.org
Mexican American Legal Defense and
Educational Fund
634 South Spring Street, 11th Floor
Los Angeles, California 90014
Telephone: (213) 629-2512

Sebrina M. Shaw (024545)
Shaw Law Firm, P.L.L.C.
698 Cove Parkway, Suite A
Cottonwood, AZ 86326
Telephone: (928) 646-0369
sshaw@acluaz.org

*Pro Hac Vice

1    On October 13, 2025, Defendants filed a so-called "notice" that was not pursuant to

2    any court-order or related to any motion. *See* Doc. 3265. According to Defendants, they

3    submitted this notice to further expound on a colloquy that occurred during a court

4    conference held on September 12, 2025, more than one-month prior to Defendants'

5    submission. *See* Doc. 326 at 1-2 (*citing* 9/12/2025 Status Conf. Trs. 42:14-43:5). As a

6    threshold matter, Defendants' filing is procedurally inappropriate. *Cf. Nordstrom v.*

7    *Thornell*, 2025 WL 2821279, at *1 (D. Ariz. Oct. 3, 2025) (disregarding a notice of

8    supplemental authority to the extent it contains improper argument "outside of the briefing

9    process set by the [c]ourt"). Putting that aside, Defendants' filing obfuscates data that

10    indicates continued racial disparities in stops, which is centrally relevant to a core reform

11    that remains outstanding in this case: Ensuring that Defendants take sufficient steps to

12    remedy and prevent racial profiling of Latino drivers in Maricopa County.

13    The colloquy at issue concerned Defendants' minimization of disparities in stops,

14    and the need to find ways of looking at disparities that might better reflect the real-world

15    experience of continued racial disparities for Latino drivers. *See* 9/12/2025 Status Conf.

16    Trs. 42:1 – 43:10) (referencing statements from Sheriff Sheridan and the Maricopa County

17    Attorney that together misleadingly suggest that the work of remedying racial disparities

18    in this case is over and that the racial disparities that persist do not cause real harm). The

19    Court noted it had previously invited Defendants to look at "other ways that would

20    demonstrate whether stops really were resulting in discriminatory results." *Id*. at 42:23-25.

21    And the Court further noted that, contrary to a prior representation from Defendants, that

22    type of analysis did not exist in Defendants' reporting on traffic stop data. *Id*. at 42:23-

23    43:5. Nothing in this colloquy was incorrect or in need of clarification. Indeed, as set forth

24    more fully below, Defendants' notice only confirms the problem the colloquy identified.

25    Pursuant to this Court's orders, there are annual and quarterly statistical analyses of

26    traffic stop data, known as the Traffic Stop Annual Report (TSAR) and Traffic Stop

27

28

1

1   Quarterly Report (TSQR), respectively.[1] The most recent TSAR showed, among other

2   things, statistically significant differences in stops of white drivers, on the one hand, and

3   Hispanic, Black, and minority drivers, on the other. TSAR 10 at 2. This included findings

4   that Hispanic individuals were more likely to be arrested; that Black individuals were more

5   likely to be held for a longer time; and that minority drivers were more likely to be searched

6   and arrested. *Id*. The executive summary to TSAR 10 notes that "[t]hese disparities

7   represent potential indicia of bias," such that further action is required under the Court's

8   orders. *Id*.

9         These findings represent only a partial picture of continued racial disparities. The

10  TSAR—which provides the primary analysis of racial disparities in traffic stops—relegates

11  to appendices a significant number of stops where racial disparities exist and appear to be

12  getting worse. In recent years, MCSO began using a form to document extended traffic

13  stops, known as the Extended Traffic Stop Indicator form, or ETSI. *See* TSQR #13. These

14  forms are supposed to be used for atypical traffic stops that take longer than normal to

15  complete. *Id*. at 1. On the ETSI form, deputies record their reason for prolonging stops by

16  selecting from a drop-down menu of reasons for extension that—if true and properly

17  defined—would be an appropriate basis. *Id*. at 1. Extended or prolonged traffic stops are a

18  central issue in this case because Defendants were found to be improperly holding Latino

19  drivers beyond the time reasonably related to the traffic mission, without required cause

20  and based on race. *See* Findings of Fact and Conclusions of Law, Doc. 579 at 131-135.

21  ETSI use right now is high and has been increasing over time, despite that ETSIs are

22  supposed to be atypical. *Compare* TSQR 13, table 3a, *to* TSQR 17, Table 5a. And there

23  are racial disparities within ETSIs, including, for example:

24        • Minority drivers are more likely to have at least one ETSI checked. *See*
25            TSQR 13, Table 3a; TSQR 17, Table 5a.

26

27  ───────────────────

[1] MCSO retained the CNA Center for Justice Research and Innovation to conduct these
28  analyses and issue the reports. *See* TSAR 10 at 1.

2

- In one ETSI category, there are statistically significant disparities in stop length for Black, Hispanic, and minority drivers. *See* TSQR 17, Table 8.

- Even when white and minority drivers had the same ETSI associated with a stop, minority drivers are subjected to significantly longer stops. *See* TSQR 17, Table 8.

- As of 2024, Hispanic drivers had at least one ETSI checked in over 60% of stops. See TSQR 17, table 5a.

The disparate number of ETSIs for Latino, Black, and minority stops is important because ETSIs are by definition prolonged stops, and a central concern of this case is whether MCSO is using prolonged stops to improperly detain Latino drivers. But the disparate number of ETSIs for people of color is also important because the primary analysis of racial disparities in stops within the TSAR excludes ETSIs; the TSARs relegate analyses of ETSIs to appendices. *See* TSARs 8, 9, 10, and, in each, appendices 3 and 4.[2] This means that the TSARs might not accurately or fully capture the reality of racial disparities—just the type of problem at issue in the status conference colloquy.

Despite all the concerning racial disparities that persist in traffic stops, and the need to potentially find other ways to better assess racial profiling in Maricopa County, Defendants used an uninvited, unnecessary filing to artificially focus attention on a metric for which racial disparities have not been found. *See* Doc. 3265 at 2-6 (listing findings related to contraband seizures). The metric Defendants chose to highlight—contraband seizures—is a weak measure of whether racial disparities in stops exist in Maricopa County. Specifically, Defendants' notice lists TSAR results related to hit rates for finding contraband after searches. Doc. 3265 at 2-6. Hit rates are a method of analyzing whether a search was a success. *See e.g.* Emma Pierson et al., *A Large-Scale Analysis of Racial*

---

[2] The purported reason for relegating ETSIs to the TSAR appendix is that officers are properly completing the ETSI form. There are a number of outstanding questions about how the forms are interpreted and completed that makes a conclusion about proper use premature. But regardless, Plaintiffs also do not believe sufficient steps are currently taken to ensure ETSI stops are properly extended, and Plaintiffs believe additional analyses are needed to ensure all stops including ETSIs are not resulting in improper racial disparities.

1    *Disparities in Police Stops Across the United States*, 4 Nature, Hum. Behav. 736 (2020),

2    at 737 (explaining hit rates and providing one example of a hit rate as "the proportion of

3    searches that successfully turn up contraband."). In the context of statistical analyses that

4    examine potential racial profiling, hit rates sometimes look at whether searches resulted in

5    contraband seizures—because such a "hit," *i.e.* finding contraband during the search,

6    suggests the search was more likely based on an appropriate level of suspicion rather than

7    racial bias. *See Id*. Contraband is vaguely defined in the TSAR, and such a vague definition

8    minimizes the utility of understanding whether seizures are a measure of success.

9            Additionally, contraband seizures are a particularly inapt measure for racial

10   profiling in this case because so few contraband seizures occur. Out of approximately

11   20,000 stops each year, there have been only about 100 to 150 contraband seizures

12   annually, including only 122 in TSAR 10. *See* TSAR 10 at 26-27. This is an incredibly

13   small sample size. A finding of no racial disparities in the contraband seizure rate therefore

14   tells us little about continued racial profiling in stops in Maricopa County. *See*, *e.g.*, *Floyd*

15   *v. City of New York*, 959 F.Supp.2d 540, 574 and n. 118 (S.D.N.Y. 2013) (in liability ruling

16   against the New York City Police Department for racial profiling in stops, opining that,

17   "[b]ecause guns were seized in only 0.1% of stops, it is difficult to draw meaningful

18   inferences from the statistics regarding gun seizures."). If anything, the little known about

19   contraband seizures here suggests a reason for concern about potential racial profiling: As

20   indicated in Defendants' notice, members of the plaintiff class have been searched without

21   a contraband seizure—*i.e.,* without success—at a higher rate than white drivers, and that

22   disparity recently worsened for years, after briefly improving. *See* Doc. 3265 at 2-3

23   (*compare* the data highlighted for TSAR 4 (showing the rate at which class members were

24   searched without a seizure as 73%, while the rate for white drivers was 67%) and TSAR 5

25   (75% for class members versus 71% for white drivers), *with* TSAR 8 (71.4% for class

26   members versus 67.5% for white drivers), and TSAR 9 (73.17% for class members versus

27   66.36% for white drivers).

28           In the September 12 colloquy, the Court raised the potential need to look at different

4

1   approaches for assessing the real-world experience of racial profiling in Maricopa County.

2   By submitting a notice focused on a particularly unhelpful metric that technically did not

3   find racial disparities, while ignoring far more relevant metrics that did find racial

4   disparities, Defendants only confirmed that this need exists.

5          Plaintiffs' position is that ETSIs are centrally relevant to understanding whether

6   MCSO is engaged in racial profiling and whether MCSO is taking appropriate and

7   sufficient steps to prevent a recurrence of racial profiling. Plaintiffs have raised this

8   position to Defendants and are engaged with Defendants in a discussion that might identify

9   an agreeable path forward on this area of reform. While Defendants' omission of racial

10  disparities in ETSIs and other metrics in its notice suggests the parties might be far apart,

11  Plaintiffs remain optimistic that further conversation can bridge the gap.

12         Respectfully submitted this 20th day of October, 2025.

13                      By: */s/ Christine K. Wee*

14                          Christine K. Wee
                            Victoria Lopez
15                          John M. Mitchell
                            ACLU Foundation of Arizona
16

17                          Jenn Rolnick Borchetta*
                            Cecillia D. Wang *
18                          ACLU Foundation

19
                            Stanley Young*
20                          Covington & Burling, LLP

21
                            Eduardo Casas*
22                          Mexican American Legal Defense
                            and Educational Fund
23

24                          Sebrina M. Shaw
                            Shaw Law Firm, P.L.L.C.
25

26                      *Attorneys for Plaintiffs*

27                      *\*Pro Hac Vice*

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on October 20, 2025, I electronically transmitted the attached document to the Clerk's office using the CM/ECF System for filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail as indicated on the Notice of Electronic Filing.

*/s/Christine K. Wee*
Christine K. Wee