```
                    UNITED STATES DISTRICT COURT

                   FOR THE DISTRICT OF ARIZONA
                    _____
```

Manuel de Jesus Ortega Melendres,  )
on behalf of himself and all others)
similarly situated, et al.,        )
                                   )
              Plaintiffs,          )  2:07-cv-02513-GMS
                                   )
and                                )  Phoenix, Arizona
                                   )  October 21, 2025
United States of America,          )  3:34 p.m.
                                   )
              Plaintiff-Intervenor,)
v.                                 )
                                   )
Gerard A. Sheridan, in his official)
capacity as Sheriff of Maricopa    )
County, Arizona, et al.,           )
                                   )
              Defendants.          )
_____)


           **BEFORE:  THE HONORABLE G. MURRAY SNOW, SENIOR JUDGE**

               **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

                          **IN-COURT HEARING**




Official Court Reporter:
Teri Veres, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 38
Phoenix, Arizona 85003-2151
(602) 322-7251


Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1           *A P P E A R A N C E S*

2  ON BEHALF OF THE PLAINTIFFS:

3       ACLU FOUNDATION OF ARIZONA
        By:  **Christine Keeyeh Wee, Esq.**
4       2712 N. 7th Street
        Phoenix, Arizona  85006
5

6       ACLU FOUNDATION OF NEW YORK
        By:  **Jennifer Rolnick Borchetta, Esq.**
7       125 Broad Street, 18th Floor
        New York, New York  10004
8

9       ACLU FOUNDATION OF ARIZONA
        By:  **John M. Mitchell, Esq.**
10      77 E. Columbus, Suite 205
        Phoenix, Arizona  85012
11

12      US DEPARTMENT OF JUSTICE - CIVIL RIGHTS DIVISION
        By:  **Suraj Kumar, Esq. (Appearing telephonically)**
13      150 M Street NE
        Washington, DC  20530
14

15  ON BEHALF OF DEFENDANT SHERIFF SHERIDAN:

16      JONES SKELTON & HOCHULI, PLC
        By:  **John T. Masterson, Esq.**
17           **Joseph John Popolizio, Esq.**
             **Justin Michael Ackerman, Esq.**
18      40 N. Central Avenue
        Suite 2700
19      Phoenix, Arizona  85004

20  ON BEHALF OF DEFENDANT MARICOPA COUNTY:

21      MARICOPA COUNTY ATTORNEY CIVIL SERVICES DIVISION
        By:  **Joseph I. Vigil, Esq.**
22      225 W. Madison Street
        Phoenix, Arizona  85003
23

24

25

UNITED STATES DISTRICT COURT

| | |
|---|---|
| 1 | ***P R O C E E D I N G S*** |
| 2 | *(Proceedings begin at 3:34 p.m.)* |
| 3 | COURTROOM DEPUTY:  This is CV07-2513, Melendres v. |
| 4 | Maricopa County on for in-court hearing. |
| 5 | Counsel, please announce your appearances. |
| 6 | MS. BORCHETTA:  Good afternoon, Your Honor, Jen |
| 7 | Rolnick Borchetta with the ACLU.  It's an honor to be here and |
| 8 | -- on behalf of the plaintiffs.  I'm here with my colleagues |
| 9 | Christine Wee and John Mitchell from the ACLU of Arizona. |
| 10 | THE COURT:  Good afternoon. |
| 11 | MR. MASTERSON:  Good afternoon, Judge Snow, John |
| 12 | Masterson, Joe Popolizio and Justin Ackerman for Maricopa |
| 13 | County Sheriff Jerry Sheridan. |
| 14 | THE COURT:  Good afternoon. |
| 15 | MR. VIGIL:  Your Honor, Joseph Vigil on behalf of |
| 16 | Maricopa County. |
| 17 | THE COURT:  Good afternoon. |
| 18 | MR. VIGIL:  Good afternoon. |
| 19 | MR. KUMAR:  Good afternoon, Your Honor, this is |
| 20 | Suraj Kumar for the United States. |
| 21 | THE COURT:  Good afternoon, Mr. Kumar. |
| 22 | MR. KUMAR:  Good afternoon, Your Honor. |
| 23 | THE COURT:  I will address -- I will begin by |
| 24 | addressing your motion to continue.  I only had time to deny |
| 25 | it without explanation.  I am going to offer a brief |

 1    explanation to your concerns and then review a few matters
 2    with you before we go forward.
 3            When you moved for a continuance, you cited the
 4    lapse in appropriations due to the government shutdown.  I
 5    denied your motion.  In your motion you cite the
 6    Anti-Deficiency Act, which states that officers or employees
 7    of the United States Government may not accept the voluntary
 8    services or employ personal services exceeding that authorized
 9    by law except for emergencies.
10            I'm going to make a few observations on that.
11            First, the government has passed a law -- I believe
12    it's called the Government Employee Fair Treatment Act --
13    which provides that you will be paid when the government
14    shutdown's over for your service.  So I don't know that your
15    service today counts as voluntary.  Even if it did, the
16    government cannot undercut its own ability to perform services
17    by not funding the government and then simultaneously claim
18    it's unable to perform such services.
19            So for those reasons and given the level of
20    importance to the case at hand and the availability of back
21    pay for you, I am denying your motion.  I note that according
22    to DOJ policy, as I understand it, if I deny a request to
23    postpone a civil case and order it to continue, the litigation
24    will become an accepted activity that can continue during a
25    lapse as far as your office is concerned.

```
 1              We did -- and I appreciate your courtesy in
 2    suggesting that you wanted to appear telephonically today if I
 3    denied your motion.  We made arrangements for that.  We can
 4    also make arrangements for you to attend the court
 5    session/community meeting tomorrow night by zoom if you wish
 6    to do so, and you can get further instructions on how to do
 7    that from court staff.  Okay?
 8              MR. KUMAR:  Understood.  Thank you, your Honor.
 9              THE COURT:  All right, thank you.
10              I scheduled today's session to begin choosing
11    experts and formulating plans by which we would obtain review
12    of financial reports.  Sheriff Sheridan has filed an emergency
13    motion for extension of time, and so I suppose we ought to
14    hear that first.  Does anybody object to hearing that first?
15              MS. BORCHETTA:  No, Your Honor.
16              THE COURT:  Thank you.
17              All right, who's arguing Sheriff Sheridan's motion?
18              MR. POPOLIZIO:  I will, Your Honor.
19              THE COURT:  All right.  What I intend to do,
20    Mr. Popolizio, is listen to your motion.
21              Are you going to have anything to say, Mr. Vigil?
22              MR. VIGIL:  No, Your Honor.
23              THE COURT:  And then hear from the ACLU.  Then I may
24    have questions for both sides.
25              MR. POPOLIZIO:  Well, Your Honor, the motion was
```

1    pretty lengthy and I think explicit as to our position.  I do

2    think that -- I just would like to reiterate to the Court that

3    the time period that we have requested on behalf of MCSO was

4    one that was reached after consultation with expert -- expert

5    advice on it.

6         It is a 97-page report.  It took a year for the

7    Monitor team and two analysts to put together.  It has

8    something along the lines of 57 tables and whatnot in it.  We

9    don't have the calculations or any of the expert's file.  We

10   would like an expert to be able to review all of that and

11   basically comment and come up with his conclusions, and that

12   might be that there is some agreement; but, of course, there

13   might be some disagreement.

14        We believe that it's necessary so that MCSO,

15   Sheriff, will have due process so that we can basically flush

16   out all these issues.  I know that the counter argument is

17   that MCSO provided the data and information and that's true,

18   but we just got this 97-page report and we never had an

19   inkling as to what any conclusions were going to be.

20        Looking at this report in and of itself, we would

21   like the opportunity to do a little bit of discovery, have

22   some disclosure so we know how everything was arrived at.

23        There is a lot going on always in this case, Your

24   Honor, and it's been -- it's somewhat of a project to come up,

25   and we don't think we can in 30 days.  We think we could come

1  up with something, Your Honor, but not 30 days to sufficient

2  -- to sufficiently and accurately respond as well as we

3  should, and I think that if we're allowed the extension of

4  time that we've requested it could be a very transparent

5  process and we would be able to provide a very detailed report

6  and opinions and our position so that the Special Master and

7  his, I believe, but it could be hers, expert could look at

8  what the Monitor team and the financial analysts for the

9  Monitor provided, what our expert provided, and perhaps have

10  an evidentiary hearing.

11          I don't actually know what the Court has in mind,

12  but that's what our thinking is; and we think that everybody

13  involved, the residents and taxpayers of Maricopa County, the

14  Sheriff's Office and the parties in this lawsuit should be

15  afforded that opportunity so that we can decide once and for

16  all and very clearly and transparently what should have been

17  expended, should be expended and shouldn't have been expended.

18          THE COURT:  Thank you.

19          MR. POPOLIZIO:  Thank you.

20          MS. BORCHETTA:  Thank you, your Honor.

21          First, I'd like to start with the harms to the

22  plaintiffs that we articulated in the brief that we submitted

23  to the Court, but also that I feel like are important for

24  grounding us in considering the extension request today.

25          The plaintiffs will already be paying a price

 1    because of the failure of defendants to maintain financial

 2    records in a manner so that the -- there could have been

 3    transparency about these costs way before today, and it is now

 4    requiring us to go into a side process that will draw

 5    attention away from the reforms in this case; and there are

 6    crucial reforms that remain outstanding and attention to those

 7    is critically important, including to addressing continued

 8    racial disparities, accountability issues internally and the

 9    like.

10         And so in the plaintiffs' interests, while we agree

11    that there needs to be a fair process for addressing and

12    resolving disputes, in plaintiffs' view the requested

13    extension that defendants are seeking is far too protracted.

14         The information is the defendants' information.  The

15    information was compiled by the defendants in preparing to

16    provide that information to the budget analyst and so should

17    be in a form from which they could already be drawing

18    conclusions.

19         It appears that they waited for this analysis to

20    come out and this report to come out rather than taking action

21    to look at their records while they were producing them.

22    There were conversations -- many conversations, according to

23    the budget report, between the budget analyst and the

24    defendants and their representatives, including financial

25    personnel within the defendants' offices, and that should have

1  positioned the defendants to be able to respond swiftly once

2  this report came out, particularly given that the Court noted

3  weeks ago that it would come precisely when it did.

4          And in addition to that, the extension that the

5  defendants are seeking is on top of a discovery period that

6  seems to be widespread -- or I'm sorry, wide ranging and that

7  itself could end up being a protracted delay.

8          The longer that this is not resolved, the longer

9  that questions about this budget report can be used to

10  undermine reforms in this case, just as questions about costs

11  predating the report were used to undermine commitment to

12  reforms in this case.

13          And finally, Your Honor, the defendants' counsel

14  just represented that they might be able to respond in some

15  way more quickly than the extension that they've just

16  requested, and we would submit that the process that the Court

17  has articulated -- has indicated would be provided once we get

18  this initial response from defendants will provide the

19  opportunity that defendants are requesting to do further

20  consultations with whomever they need to do them but those --

21  that time shouldn't be before we even start this process

22  because then it would be protracting -- it would be prolonging

23  this beyond what is fair to the plaintiffs.

24          Thank you, your Honor.

25          THE COURT:  Thank you.

1          MR. POPOLIZIO:  Your Honor, a few things.  Regarding

2    counsel's comments about paying the price for failure to

3    maintain financial records alleging that MCSO did not -- and

4    perhaps the County did not maintain financial records

5    sufficient enough to afford transparency, I will tell you that

6    when I became involved in this case I started going to these

7    meetings that were held by the Monitor via Teams where data

8    would be provided beforehand.

9          The detail of this data and the amount of it was

10   quite shocking to me because it went back to 2014.  Some of

11   the things that were asked about were, like, maybe a trip --

12         THE COURT:  You're talking about those thirteen

13   meetings that occurred after the MCSO couldn't provide data

14   regarding the cost -- the annual cost rating -- cost that they

15   asserted?

16         MR. POPOLIZIO:  No, it could provide data, Your

17   Honor, and it did provide data and it did it the best it

18   could --

19         THE COURT:  Well, here we go, Mr. Popolizio.  You're

20   talking about the meetings -- recent meetings between the

21   Monitor staff and I think you identified the folks

22   Mr. Prindville, Ms. Prindle in which they attempted to

23   reconstruct --

24         MR. POPOLIZIO:  Yes.

25         THE COURT:  -- the billing -- or the attributions

1   made by MCSO back to 2014?

2           MR. POPOLIZIO:  Yes.

3           THE COURT:  Okay.

4           MR. POPOLIZIO:  And going back that far, Your Honor,

5   and having people that weren't around back then, it was quite

6   difficult to do so.  It wasn't a lack of transparency.  It

7   wasn't a lack of record keeping.  Some of the things that were

8   asked were what about this receipt for this tiny amount of,

9   you know, whatever -- what was this for?

10          And people would have to track it down to see

11  because it was, I don't know, some conference or something

12  along those lines; and it was very difficult to go back and

13  get down do that granular level of information, but they did;

14  and as these meetings rolled on and as we were a part of that,

15  as was the County and MCSO and County personnel, the

16  plaintiffs weren't.

17          So I saw this firsthand.  So I can actually comment

18  on this process, and Your Honor knows that in addition to

19  providing information like that there were discovery requests.

20  There were like rolling requests after each meeting, "What

21  about this?  Explain this," as it went on.

22          This was a process that went on for many, many

23  months and now after a year of that process a report was

24  issued.  So it's not a matter of maintaining records, and I

25  have to stick up for my client when it comes to that because I

1    think the records that it maintained and I saw were quite vast

2    and quite detailed with drop-down menus and everything else

3    put together in such a way that the Monitor could be able to

4    understand it.

5            The -- this whole process, Your Honor, you know,

6    they're worried about compliance.  Compliance efforts go on.

7    Yes, it does interfere when you have to have people contribute

8    to this process, but I'd like to just say that --

9            THE COURT:  How many people do you have in your

10   office today working at the -- working across the street since

11   it's a quarterly visit?

12           MR. POPOLIZIO:  In my office just with the visits?

13           THE COURT:  Yeah.

14           MR. POPOLIZIO:  Five to six, I believe.

15           THE COURT:  Okay.  You have five to six people

16   generally assigned to this matter?

17           MR. POPOLIZIO:  Um, in varied degrees.  There are

18   the three that you're familiar with of whom I am one, and the

19   other two are in this courtroom, Mr. Ackerman and

20   Mr. Masterson.  There are others who, you know, do work and

21   research and writing and attend other meetings that aren't at

22   headquarters, site visit meetings that are held elsewhere in

23   districts and whatnot; but, yes, they have lesser

24   participation but yes --

25           THE COURT:  They go out to, like, districts?

```
 1              MR. POPOLIZIO:  Sometimes, uh-huh.

 2              THE COURT:  How about Mr. Vigil, how many attorneys

 3    from Mr. Vigil's office are engaged in --

 4              MR. POPOLIZIO:  I do not know, but I'll leave that

 5    to Mr. Vigil to answer.

 6              MR. VIGIL:  It's myself at this point in time, Your

 7    Honor.

 8              THE COURT:  Just you?

 9              MR. VIGIL:  Since Mr. Branco left, yes.

10              THE COURT:  Okay.

11              MR. VIGIL:  And if I need to pull in other people, I

12    can.

13              THE COURT:  So you can pull in other people to work

14    on this matter?

15              MR. VIGIL:  If it's needed.

16              THE COURT:  Okay.

17              MR. POPOLIZIO:  But these -- these issues are

18    financial issues, Your Honor, and we can't provide the Court

19    with opinion or guidance as to those.  As -- as I always say,

20    as counsel I live vicariously through experts and I will see

21    what they determine to be correct or what is important.

22              The -- the data and info again, yes, that was

23    provided by the County and MCSO, but that's what the Monitor

24    team and its two analysts drew its conclusions from.  We

25    weren't let in, as I said earlier, on any of those conclusions
```

1    or what they were looking at or heading to.

2              In short, the way I look at it, we're not mind

3    readers.  We don't know what's going to come and it's very --

4    in the normal course of litigation, as the Court well knows,

5    you have expert reports that are staggered and then you know

6    what has been focused on and your expert knows maybe what to

7    look at; but even then, files from experts are provided and we

8    get to see how they arrived at their calculations.  We don't

9    have that here.

10             The discovery period that Ms. Borchetta referred to,

11   I think, meant -- was referring to the discovery period this

12   whole process leading up to the report, basically one year.

13   We didn't have the opportunity to participate in discovery.

14   We provided discovery responses.  We couldn't serve any --

15             THE COURT:  Well, let me tell you how I understood

16   her comment --

17             MR. POPOLIZIO:  Okay.

18             THE COURT:  -- and maybe you can help me clarify it.

19             MR. POPOLIZIO:  She could clarify it herself.

20             THE COURT:  Well, it really relates to what I

21   consider to be an unclarity in your motion; and maybe she

22   wasn't addressing this, but it is an unclarity in your motion,

23   I think.

24             You want 180 days after you're -- you've got

25   disclosure from the Monitor's expert, right?

1              MR. POPOLIZIO:  Uh-huh.

2              THE COURT:  You want to do it -- do you anticipate

3    doing a discovery period before that 180 days begins to run?

4    That's what I understood her to be talking about.  There's

5    sort of this amorphous you want to depose, you want to do

6    this, you want all these documents.

7              At what point does the 180 days -- and I doubt that

8    I'm going to give it to you -- but at what point -- I might

9    give you some, but I want to understand at what point does 180

10   days begin to run?

11             MR. POPOLIZIO:  As soon as the Monitor -- the

12   Monitor team and its analysts provide, disclose, give their

13   file, their calculations, their methodologies to us just like

14   it would if we had subpoenaed a file of an expert.  We get

15   that, and then the 180 days could run from that.  During that

16   180 --

17             THE COURT:  So not -- not some sort of discovery

18   period?

19             MR. POPOLIZIO:  Well, we could conduct discovery if

20   necessary, Your Honor, and Your Honor would allow during the

21   180 days.

22             THE COURT:  Okay.  You've already retained an expert

23   in anticipation of the issuance of the report, right?

24             MR. POPOLIZIO:  We have retained a consulting

25   expert, yes.

1          THE COURT:  Yeah.  And do you care to identify this

2    person?

3          MR. POPOLIZIO:  I would not like to identify this

4    person right now.

5          THE COURT:  Okay, that's fine.  But you indicate in

6    your motion that your consulting -- you've consulted this

7    person both about the amount of time that it will take once

8    you get all the materials and about the materials that you

9    want?

10          MR. POPOLIZIO:  Yes.

11          THE COURT:  Okay.  You also indicate, of course, and

12    I think this is very reasonable, that recognized and audited

13    accounting procedures should govern this process?

14          MR. POPOLIZIO:  Yes.

15          THE COURT:  Does your expert -- can your expert know

16    and identify such procedures?  Are there accepted procedures,

17    established procedures, to use your word, that exist now that

18    should govern this process?

19          MR. POPOLIZIO:  Um, without, you know, getting

20    dangerously close to being an expert -- I don't want to -- my

21    understanding is that the answer to that question is "yes."

22          THE COURT:  Okay.  So there's recognized standards

23    for things like accounting, for things like auditing, for

24    things like prorating costs and cost allocations?  There's

25    recognized procedures for that?

 1            MR. POPOLIZIO:  I believe so, Your Honor.

 2            THE COURT:  Okay.  Could your expert provide those

 3    now, what he considers or she considers or they consider to be

 4    the recognized standard?

 5            MR. POPOLIZIO:  Um, I can't answer that question,

 6    Your Honor, 'cuz I didn't ask that question so...

 7            THE DEFENDANT:  Okay.  But if they exist, presumably

 8    your consulting expert could identify them?

 9            MR. POPOLIZIO:  I -- I could presume but I -- I

10    couldn't guarantee, but yes.

11            THE COURT:  Okay.  So you also indicated in your

12    motion that you might need multiple experts?

13            MR. POPOLIZIO:  Perhaps.

14            THE COURT:  Yeah.  And you've already got one?

15            MR. POPOLIZIO:  Yes.

16            THE COURT:  Perhaps you already have multiple, I

17    don't know.

18            MR. POPOLIZIO:  One with other people, maybe a

19    team --

20            THE COURT:  Okay.

21            MR. POPOLIZIO:  -- that an expert will work with.

22            THE COURT:  So I presume if you're going to hire an

23    expert, that the ACLU intends to hire an expert; is that

24    correct -- and/or experts?

25            MS. BORCHETTA:  Yes, Your Honor.

1          THE COURT:  And if we proceed as I suggested, then I

2     was gonna -- I was going to appoint a Special Master and give

3     that Special Master the right to hire an expert.

4          MR. POPOLIZIO:  Right.

5          THE COURT:  And then if you're going to conduct

6     discovery of my Monitor or ask me to allow discovery, we're

7     going to have to figure out hiring a lawyer for the Monitor;

8     and all of a sudden this has become exactly the sort of

9     procedure that I wanted to avoid by talking with you about

10    this weeks and weeks ago.

11         It becomes an extremely expensive procedure for

12    Maricopa County because your predecessors have indicated to me

13    already that you pay ACLU's legal bills, don't you?

14         MR. POPOLIZIO:  Well, yes.

15         THE COURT:  Okay.  So Maricopa County's going to pay

16    your bills and Mr. Vigil's salary.  He's not -- he doesn't

17    receive the -- probably the amount of salary that you receive

18    in billings.

19         You're going to pay the ACLU's bills.  You're going

20    to pay legal authority for my Monitor.  You're going to pay

21    experts.  We're going to expand this thing forever.  That

22    really wasn't what I had in mind because whether fair or not

23    -- and it may be fair -- you -- your clients and

24    representatives of your client are making very loud noises

25    about how much this suit is costing, right?

```
 1            MR. POPOLIZIO:  There have been statements made
 2   about how much this -- this lawsuit is costing and has cost.
 3            THE COURT:  Do you know what those statements are
 4   based on?
 5            MR. POPOLIZIO:  By -- well, if I -- let me finish my
 6   statement.
 7            THE COURT:  Sure.
 8            MR. POPOLIZIO:  And my statement --
 9            THE COURT:  That's only reasonable.
10            MR. POPOLIZIO:  Thank you.
11            My -- my statement, to provide it in full to you,
12   Your Honor, is when -- we are often -- "we" meaning, I think,
13   that this current Sheriff often lumped up in statements of
14   other people who have made statements -- and it's their
15   prerogative to do so -- about the cost of -- of this action
16   and he may or may have not -- he did not participate in those
17   statements or have anything to do with that.
18            In fact, as the Court knows, we didn't publish the
19   number in our annual report, and we had discussion in here --
20   you discussed that with Mr. Ackerman when he informed the
21   Court that we weren't going to do that.
22            That came out of a prior administration, Your Honor,
23   and --
24            THE COURT:  Yeah, and there's nothing -- I -- I
25   never -- well, let me ask you this:  I'm quoting from your
```

```
 1   motion.  "The entire cost issue is the result of a statement
 2   that a former administration, not Sheriff Sheridan, issued
 3   regarding the claimed cost of compliance with this Court's
 4   orders."  That's a quote from your motion.
 5            MR. POPOLIZIO:  That's my statement, Your Honor.  I
 6   put that in there.  I will -- I will tell the Court I did.
 7            THE COURT:  Okay.  What did you mean by it?
 8            MR. POPOLIZIO:  Exactly what that plain language
 9   states.
10            THE COURT:  Okay.  So that it was the previous
11   Sheriff's Office that raised the cost issue?
12            MR. POPOLIZIO:  Administration, not office.
13            THE COURT:  Yeah, 'cuz virtually the entire
14   Sheriff's Office is the same, right?
15            But the Sheriff is different and the Sheriff changes
16   administration -- administrative authorities.
17            MR. POPOLIZIO:  Yes.
18            THE COURT:  But you're saying that it was Sheriff
19   Skinner or perhaps Sheriff Penzone who raised this cost issue?
20            MR. POPOLIZIO:  Correct.
21            THE COURT:  Okay.  And you're saying that -- you're
22   saying you don't necessarily -- the implication is Sheriff
23   Sheridan doesn't necessarily agree with any of that.
24            MR. POPOLIZIO:  No, my implication is --
25            THE COURT:  Do you stand by it?
```

UNITED STATES DISTRICT COURT

 1          MR. POPOLIZIO:  Stand by what?

 2          THE COURT:  Do you stand by the costs that Sheriff

 3   Penzone said in his cost reports were incurred?

 4          MR. POPOLIZIO:  All I stand by, Your Honor, is that

 5   this process has commenced to determine if that is the actual

 6   number and there has been a report issued that stated -- that

 7   states that that isn't the number, according to the Monitor

 8   team --

 9          THE COURT:  Okay.

10          MR. POPOLIZIO:  -- and that this process should

11   reveal what that number is.

12          THE COURT:  Okay.  But who came up with that number

13   in the first place?

14          MR. POPOLIZIO:  I understand that it came from MCSO.

15          THE COURT:  Okay.

16          Can I have you -- can I have you, Muiz, come to the

17   podium.  I'm asking him to put up two slides for you to

18   consider and the first -- not that one.  I want the other one.

19          This is Doc. 606, Paragraph 12.  It is the

20   requirement to issue an annual report to the Sheriff's Office.

21   There is not one thing in it that requires the Sheriff's

22   Office to discuss costs in the annual report; and, in fact,

23   over the weekend I went back and looked at your past annual

24   reports.

25          Now, I may be wrong.  I frequently am, but I looked

1   in 2015, your annual report for 2015, your annual report for

2   2016, your annual report for 2017, '18, '19, '20, '21 and '22,

3   and there was no cost information in any of those reports.

4          It is true that in the end of 2022 Sheriff Penzone

5   was held in contempt for his miserable failure to keep up with

6   the backlog, and it's also true that we imposed at that time a

7   number of different conditions.  We gave the Monitor some

8   supplemental authorities, and we required a staffing study to

9   go forward; and then the next annual report -- next slide --

10   magically appeared in the annual report a cost allocation, and

11   the cost allocation also contains an Exhibit C in it.

12          You can go look yourself.  The numbers are on the

13   top.  2932-1 is 2023's cost allocation, and that's the one I'm

14   talking about.  It not only has a number of costs, it has that

15   number of costs broken down very specifically into years in

16   which they were incurred.

17          MR. POPOLIZIO:  Okay.

18          THE COURT:  When that came across, you may recall --

19   well, you don't recall because you weren't -- you were in the

20   suit and out of the suit but I --

21          MR. POPOLIZIO:  Eight years out.

22          THE COURT:  Yeah.  I attended a meeting with -- over

23   at the Sheriff's in part of the annual visit and I just said

24   based on figures that he had provided to the Community

25   Advisory Board looked to me like he was attributing very many

1    people to the Melendres order in his -- full time to the

2    Melendres order in his organization, and if he was actually

3    doing that I would certainly expect a lot better performance

4    out of the Maricopa County Sheriff's Office than I was seeing;

5    and the numbers were so high, I suggested that he take a look

6    at them and see if they were accurate.

7            And the next thing that happened was we got the 2024

8    annual report, and it again had a year-by-year-by-year cost

9    assessment; and the interesting thing is, if you want to look

10   at these, you'll see that the cost amounts that these reports

11   attribute on a yearly basis are different.

12           They're not -- they're close to the same, but

13   they're not exactly the same numbers.  They're different

14   numbers.  So that suggests very strongly that there was

15   something happening at the MCSO to come up with these numbers

16   both -- now, admittedly, it didn't happen until 2023, but to

17   come up with these numbers both in 2023 and 2024.

18           Now, whose burden is it to justify these numbers

19   on -- on a -- on an annual basis?  You put them in the cost

20   report.  Whose burden is it to justify them?

21           MR. POPOLIZIO:  Well, normally the author of the

22   report.

23           THE COURT:  It is the authors of the report, and

24   it's still the authors of the report.  This is a normal

25   situation, but you can't do that.

1          The next day, the next day after this report was
2     published I asked for the attributions -- the annual
3     attributions and all the supporting information that made up
4     that report, quote, "Because the defendants have already made
5     the analysis and attributions in the process of preparing
6     their annual financial reports, the identification of such
7     costs, their attribution to Melendres and the various amounts,
8     and the financial documentation supporting such costs should
9     not be a time-consuming or otherwise intensive enterprise."
10          I asked for some specific things in the report
11    related to these attributions.  Now, Mr. Popolizio, Maricopa
12    County has never been able to provide that, have they?
13          They have provided -- let me be clear.  As you have,
14    I think, accurately reported, when they could not provide the
15    attributions that resulted in these numbers they said, here is
16    all of the -- all of our financial ledgers, all of our
17    electronic files, everything for the last ten years, figure it
18    out yourself.
19          Now, that's too harsh because, as you say, and for
20    all the Monitor's told me, honestly, Mr. Prindville and
21    Ms. Prindle were very helpful and forthcoming and I'm not
22    saying they weren't, but it's your obligation.  It's your duty
23    to defend these numbers, and you can't do it.
24          You haven't done it.  I gave you time to do it.  You
25    said you couldn't do it, and so we had to resort to the second

1  procedure to see if these figures were anywhere close.

2          Well, we've come up with a determination that

3  suggest -- and I'm not saying it's a final determination by

4  any means -- that they're nowhere close.

5          This requirement is not part of my order.  You

6  raised it.  You are the ones that asserted these costs.

7          MR. POPOLIZIO:  That I understand, Your Honor, and I

8  believe -- and Your Honor reminded me of something that it may

9  have come about as a request because -- from the CAB.

10          So the Community Advisory Board asked about the cost

11  is my understanding, and I can be wrong.  Like Your Honor says

12  you are sometimes, I am too, and that's how this process

13  started.

14          THE COURT:  No.  I mean, what they did is they gave

15  some broad numbers to the Community Advisory Board that were

16  totals, I think, but it doesn't really matter because this is

17  what ended up in the annual report and so here's -- I'm gonna

18  think about this.

19          I am going to give you the relief you've requested

20  but I don't -- I think I'm going to do something very

21  different than what I originally set out to do.

22          I'm not going to command you to do anything, I

23  think.  I'm going to do all this, by the way, in a written

24  order so that I'll be explaining what I'm going to do; but the

25  proposal that you suggest today and in your briefing seems

1    nothing but cost upon cost upon cost to -- for you to disprove

2    something you have the obligation to prove.

3         So the procedure and the time lines for proceeding

4    in the last two paragraphs on Pages 2 and 3 of my October 8th

5    order, Docket 3263, are vacated.  You don't have to worry

6    about those time lines, but within two weeks your expert --

7    well, let me ask the ACLU.

8         Have you engaged an expert yet?

9         MS. BORCHETTA:  Your Honor, we're talking to

10    experts.  They're not yet retained.

11         THE COURT:  Okay.  Well, I want to decide right now

12    what the accepted procedures are for accounting, cost

13    allocation, proration of costs, auditing procedures, what

14    needs to be done to justify and be acceptable evidence on

15    which prorations are based; and I want to come up with that

16    conclusion right now, and that's not just for looking

17    backwards.

18         That's if you're gonna try and do cost allocations

19    in the future, I want standards by which they must be done

20    because they weren't done in this case -- well, I don't know

21    that, but it certainly doesn't appear that you can justify

22    these figures so far.

23         And certainly, if we're going to look back at what

24    the Monitor did and you want to apply that standard to him,

25    it's equally applicable to you; and before we are going to

consider what the Monitor did, I'm going to give you the right
to do what I think you sort of suggested you want to do if you
want to do it, but I'm not going to make you do it.

        Your expert can come up with its own conclusions
that justify these figures, but in the meantime I am making
the judicial determination that you have not and do not --
have not justified your own cost expenses, and to the extent
that the County and others -- County officials and others may
have relied on these figures without looking behind them in
saying what the case costs, they are -- and they may not.

        They may have relied on something else, but if
they're relying on these figures that you supplied, they have
no support; and I am making that determination, too, that you
have provided no support for these figures.

        You can have all the time you want, but the burden
is on you to justify these figures with the standards that we
are going to determine are the appropriate standards.

        You don't have to do it, and I will certainly
consider -- I'm not going to let you depose him or go into any
formal discovery, but to the extent the County's going to have
to pay for the Monitor's work anyway, I'll consider having him
do a substantial report identifying exactly what he did so you
can look at it; but the burden is on you to come up and
justify these figures, and then I will come to the ACLU and
say, "Do you want to challenge these things?"

1              And if they do, we can do this whole process and
2    I'll consider appointing, as I have suggested I would, a
3    Special Master and maybe an expert.

4              I really am rethinking that, though.  I don't want
5    to leave this open ended to you.  You tell me if you want to
6    do that.  Consult with your clients.  Tell me if you want to
7    do it, and if you do, I think six months -- I'll give you the
8    six months, but you're going to have to come up with a
9    justification for these figures.

10             Let me ask you, did anybody -- who is -- who was in
11   charge of the Court Implementation Division in 2023 and 2024?

12             MR. POPOLIZIO:  I don't actually know.  Off the top
13   of my head, I don't know who was head of CID.

14             THE COURT:  Okay.  Well, I'm sure the Monitor can
15   tell me; but whoever it is, they must know why all of a sudden
16   they stuck cost figures in there and they must know where they
17   got those cost figures from; and, please, Mr. Vigil, don't
18   think I don't believe you.  I do believe you.

19             Mr. Vigil, in our last session, said Maricopa
20   County's given everything they got.  So I assume that somebody
21   asked and got no answer or was provided no documents, and so
22   the County and the Monitor went through this very painstaking
23   process in which the Monitor does his best guess at coming up
24   with, with cooperation admittedly from you, with the most
25   basic raw data to come up with what already has been set out

 1    forth here and which you can't defend at this point.

 2            MR. POPOLIZIO:  I don't -- I would disagree

 3    respectfully with the "basic raw data."  I've seen raw data

 4    in -- I'm not a financial person -- but in spreadsheets and

 5    drop-down menus and I've listened to financial professionals

 6    explain things.  So it's not the most basic raw data.

 7            THE COURT:  Okay.

 8            MR. POPOLIZIO:  It's --

 9            THE COURT:  Well, I accept that.

10            MR. POPOLIZIO:  -- a decade worth --

11            THE COURT:  Yeah, no, it clearly is.

12            MR. POPOLIZIO:  -- of detailed data.

13            THE COURT:  Yeah, but somebody had this.  Whoever

14    the Captain was at Court Implementation Division got this from

15    somewhere, and so I want to know why when this is what I

16    specifically asked for on a year-by-year basis you came back

17    and said, "We don't have that."

18            So we had to go through that process and, you know,

19    certainly, I don't think you would misrepresent to me.  I

20    wasn't there.  I'm sure, though, when I say "raw data," you

21    understand what I'm talking about.  It is not this.

22            MR. POPOLIZIO:  No, it's not that.  It's what I saw

23    being presented to the Monitor team.

24            THE COURT:  Yeah, but it is your obligation.  It is

25    your obligation to establish what basis there is for this.

 1          MR. POPOLIZIO:  I may regret asking this, but I'm

 2  going to ask.

 3          THE COURT:  Uh-huh.

 4          MR. POPOLIZIO:  So, yes, a statement was made about

 5  the cost of this which led to Your Honor ordering, "Well, I

 6  want the basis for that."

 7          THE COURT:  Yeah.

 8          MR. POPOLIZIO:  But under the orders themselves they

 9  don't have to provide an accounting to this Court regarding

10  the cost of compliance on a year end --

11          THE COURT:  I don't understand your question so work

12  with me.

13          MR. POPOLIZIO:  So there was a figure provided, but

14  I just want to know -- I'm trying to figure out under the

15  order -- and I might be -- I might have missed something.

16          They're not ordered to do, you know, an accounting

17  yearly or are they?  And that's why I said I might regret

18  saying this, and if that was a detailed cost analysis.

19          THE COURT:  So, it is clear in the order.  The

20  order's 3083 that I'm referring to, the material given in the

21  annual accounting report.

22          In the 2024 Annual Compliance report filed with this

23  Court yesterday defendants indicate they have spent

24  $219,000,732.642 (sic) in department costs attributable to

25  their compliance with the Melendres orders as of June 30,

```
 1   2024.
 2          Defendants broke down the amount spent into fiscal
 3   years with expenditures beginning in fiscal year 2014, two
 4   million -- $219,732,642 represents the total amount of MCSO
 5   department costs spent across all fiscal years since 2014.
 6   The defendant shall thus provide to the Monitor and/or his --
 7   do you want me to keep reading?
 8          MR. POPOLIZIO:  No.
 9          THE COURT:  And/or his -- you got the message?
10          MR. POPOLIZIO:  Yes.
11          THE COURT:  Okay, and/or his budget analysis.  Then
12   I go through seven different kinds of expenditures I want them
13   to provide to back that up.
14          MR. POPOLIZIO:  Yeah, I -- I just -- I guess, Your
15   Honor, my -- and I know we've had conversations before and
16   I've been before the Court so you know I'm -- I'm being honest
17   when I say in the end when it comes about this -- and I don't
18   mean to anger the Court.  When it comes about reaching --
19   reaching the cost of this, I mean, if Maricopa County wanted
20   to throw whatever figure at it for -- meaning this case -- to
21   get into compliance, can't it do that?
22          THE COURT:  I still don't understand what you're
23   getting at.
24          MR. POPOLIZIO:  Could the -- could the County pay
25   what it wants to pay for the compliance efforts in this case?
```

1          That's the question.

2          THE COURT:  The County is obliged to pay whatever

3   they have to pay to comply.

4          MR. POPOLIZIO:  Correct.

5          THE COURT:  Okay.  So where you going with that?

6          MR. POPOLIZIO:  Well, if they spent 219 million or

7   claimed to or if that is the figure, as opposed to 62 million,

8   is it the County's prerogative to do that if it so pleases?

9          I'm just asking.  We're -- we're happy to discuss --

10         THE COURT:  I really don't understand what you're

11  talking about and, unfortunately, Mr. Popolizio, you're not

12  the one that gets to ask me questions.

13         MR. POPOLIZIO:  No, I understand that.

14         THE COURT:  But what I will tell you is this:  There

15  is nothing about my cost orders that required the County to

16  put in costs in the first place.  They did and they did under

17  conditions that are not very propitious to them, I think, but

18  that remains to be seen.

19         You have now put down those cost orders and I'm

20  allowing you, if you want, to attack the Monitor's attempt --

21  or "attack" may be too harsh a word -- to find flaws in the

22  Monitor's attempt; but before you do that, the burden of proof

23  is on you to justify those numbers and you have not done it.

24         So do it.  And if you're going to do it, you got six

25  months to do it but it's certain -- how long do you need

```
 1   before your expert is going to provide me their -- what you
 2   believe -- I'm going to allow the ACLU's expert to provide me
 3   what she or he believes are the recognized standards for cost
 4   allocation, cost attribution, all the categories that I've
 5   mentioned, including auditing and -- under the Court's orders
 6   and financing?
 7           MR. POPOLIZIO:  Could you allow me one moment,
 8   please, Your Honor?
 9           THE COURT:  Sure.
10           (Counsel confer.)
11           MR. POPOLIZIO:  Your Honor, what we could state at
12   this moment is that I will confer with my expert.  I will not
13   take long, and I will get back to you.  If Your Honor would
14   like to put a time limit on that, that's fine but I -- when I
15   mean I will immediately confer and get back to the Court, I
16   will get back to the Court, if that's acceptable?
17           THE COURT:  Yeah.
18           How long is it going to take the ACLU to provide
19   similar information?
20           MS. BORCHETTA:  Your Honor, we will have to ask that
21   question.  I expect that we can do it fairly quickly.
22   Probably, I would expect, in a couple of weeks.
23           THE COURT:  Okay.  Why don't you consult
24   with Mr. Popolizio and Mr. Masterson.  Why don't you consult
25   on a deadline of a couple of weeks.  Why don't you tell me
```

 1    what that's going to be, and then you can jointly submit your

 2    standards.

 3              MR. POPOLIZIO:  That's fine, Your Honor.

 4              THE COURT:  Okay.

 5              MR. POPOLIZIO:  And I -- I hesitate but I'm -- I'm

 6    going to ask one more question, even though the Court said I

 7    can't ask the Court questions, but I have to in this -- in

 8    this -- in this case.

 9              At the end of this, could the Court share what it

10    intends to do?  So at the end of this whole process, is there

11    going to be further injunctive relief?  Is that what the

12    Court's thinking or -- I don't know what the end game is.

13              THE COURT:  You know, Mr. Ackerman asked me that

14    same question.  I really do try to be open with you folks.  I

15    am not -- well, let me think, also.

16              Let me think about that myself because what I

17    told -- what I told Mr. Ackerman at the time was quite true.

18    The only thing that I have an interest in is the public being

19    informed of the truth.

20              Now, I do realize when you get into public

21    financing, you know, there -- there can be some challenging

22    questions, but that was my only original thought.

23              However, sparked by the pleading in this case and in

24    the request for extension I've gone back and looked at the

25    records, and I have some concerns.

1          They aren't concerns that relate so much to any

2    actual expenditures, and so I say I'm perfectly happy if you

3    want to try and reconstruct the expenditures to reconstruct

4    them, and then I'll consult with the ACLU; and if they want to

5    go through this whole process we'll go through it, but I'm not

6    making you go through it and I'm going to put that on the

7    record right now.

8          County doesn't have to go through it.  They can

9    leave it right like it is right now with the Monitor's report

10   challenging what you've done, but if you want to go through

11   and reestablish the figures that you put on the table, I'll

12   let do you it; but I'm also going to not deprive the ACLU to

13   respond in the meantime.

14         As the ACLU says, this is never part of my report.

15   So I am not going to let it sidetrack me from moving forward

16   on attempting to achieve compliance, assuming you're willing

17   to do that.

18         If -- you know, part of your obligation is to --

19   there are all kinds of obligations on MCSO that go in the

20   orders.  If I find in this process -- or if concerns are

21   raised that somebody violated their obligations, that may

22   result in something, but I don't know.  I don't know that now.

23         So you're trying -- I am not going to be tied down

24   to saying if I find misconduct, it won't be investigated.

25         Is that what you're asking?

```
 1          MR. POPOLIZIO:  Well, I'm glad you shared that.
 2          I --
 3          THE COURT:  Well, I have no idea.  I'm trying to
 4  answer your question the best you -- I can.
 5          MR. POPOLIZIO:  What I was asking was what I asked.
 6          Do you see further injunctive relief --
 7          THE COURT:  I don't know what the Auditor General
 8  might do, but I'm not going to -- I have no jurisdiction over
 9  the Auditor General to say sanction MCSO.  It's not my deal.
10  I don't intend to do it, but am I going to listen to what the
11  ACLU might ask?  Certainly I'm going to.
12          MR. POPOLIZIO:  Very well, Your Honor.
13          THE COURT:  Okay.
14          MR. POPOLIZIO:  So I will await the written order.
15          THE COURT:  Okay.  In the meantime, you don't have
16  to wait for the written order to consult with the ACLU and get
17  back with me on the -- on those procedures and recognized
18  authorities.
19          MR. POPOLIZIO:  As to the time period, we will talk
20  with plaintiffs' counsel right here after the hearing.
21          THE COURT:  Yeah.  But in the meantime, your concern
22  about the October 8th order, I'm lifting all deadlines and
23  even the procedure that I'd set forth in that order for the
24  reasons stated on the record.
25          MR. POPOLIZIO:  Thank you, your Honor.
```

1              THE COURT:  Thank you.

2    *(Whereupon the proceedings adjourned at 4:23 p.m.)*

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1                   *REPORTER'S CERTIFICATION*

2

3               I, TERI VERES, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6               I FURTHER CERTIFY that the foregoing pages

7    constitute a full, true, and accurate transcript of all of

8    that portion of the proceedings contained herein, had in the

9    above-entitled cause on the date specified therein, and that

10   said transcript was prepared under my direction and control.

11               DATED at Phoenix, Arizona, this 21st of

12   October, 2025.

13
                                      ____s/Teri Veres____
14                                    TERI VERES, RMR, CRR

15

16

17

18

19

20

21

22

23

24

25