**GREENBERG TRAURIG, LLP**
ATTORNEYS AT LAW
SUITE 800
2375 EAST CAMELBACK ROAD
PHOENIX, ARIZONA 85016
(602) 445-8000

Dominic E. Draye, SBN 0033012, drayed@gtlaw.com
Matthew P. Hoxsie, SBN 034952, hoxsiem@gtlaw.com
*Attorneys for Defendant-Intervenor Maricopa County*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel De Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al., <br><br>                    Plaintiffs, <br><br>and <br><br>United States of America, Plaintiff-Intervenor, <br><br>v. <br><br>Gerard A. Sheridan, in his official capacity as Sheriff of Maricopa County, Arizona, et al., <br><br>                    Defendants. | Case No. CV-07-2513-PHX-GMS <br><br> **DEFENDANT MARICOPA COUNTY'S RESPONSE TO COURT ORDER DATED OCTOBER 31, 2025** <br><br> (Assigned to the Hon. G. Murray Snow) |

Defendant-Intervenor Maricopa County ("the County") hereby provides its response to the Court's Order dated October 31, 2025 (the "October 31 Order"). (Doc. 3301). The October 31 Order concerns the methods by which the County and the Maricopa County Sheriff's Office ("MCSO") allocate costs. Cost allocation, however, comprises no part of Plaintiffs' Complaint in this action. Nor would any method of allocation violate federal law. "[F]ederal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate [federal law] or does not flow from such a violation." *Milliken v. Bradley*, 433 U.S. 267, 282 (1977). For that reason,

the County respectfully declines the invitation to engage in the type of adversarial fact development that would accompany a case or controversy properly before the Court.

## I.     BACKGROUND

This institutional reform litigation began with a complaint against then-Maricopa County Sheriff Joe Arpaio, alleging a "policy and practice of stopping Latino drivers and passengers, pretextually and without individualized suspicion or cause, and [] subjecting them to different, burdensome, stigmatizing and injurious treatment once stopped." (Doc. 26 ¶ 29). Plaintiffs alleged that Arpaio created a "Triple I Unit" and sent more than 200 officers at a time to areas where day laborers tended to congregate. (*Id.* ¶¶ 39-48 (describing targeted actions at "the intersection of 34th Street and Thomas Road in central Phoenix because of the presence of day laborers near Pruitt's Furniture Store"); *id.* ¶ 47 (alleging that on June 26, 2008, Arpaio sent "nearly 200 deputies and posse members" for a "'crime suppression operation' in Mesa, Arizona")).

Since the issuance of the Court's first injunctive order, fourteen years have passed, three new Sheriffs have taken office (from both political parties), MCSO has achieved 100% compliance with required policy changes, and there have been ***zero*** new allegations of targeted immigration enforcement by MCSO. (*See, e.g.*, Doc. 3286-1 at Slide 27 (recognizing that "[p]ursuant to the Court's *Melendres*-orders, MCSO has created 48 new policies, developed a host of operations manuals, and instituted a vast number of new procedures") (emphasis removed from original); *id.* at Slide 32 (noting 100% Phase I compliance)).

MCSO's compliance with the Court's injunctive orders has been subject to oversight by a court-appointed monitor (the "Monitor"), who provides quarterly reports noting MCSO's progress. The Monitor's ongoing oversight includes annual reports from MCSO. The 2023 and 2024 annual reports included the dollar amounts that MCSO has attributed to complying with the Court's orders in this case, prompted by comments from the Community Advisory Board. Neither state nor federal law required financial disclosures. Maricopa County follows accounting standards established by the

2

Governmental Accounting Standards Board ("GASB"), the authoritative standard setter for state and local governments. Additionally, Maricopa County follows standards and guidance required by the Arizona Auditor General pursuant to A.R.S. § 41-1279.07. The Auditor General performs audits annually to determine compliance with all standards and guidance.

On September 17, 2024, the day after MCSO filed its 2024 Annual Report, the Court launched an inquiry into MCSO's figures, complete with the appointment of a budget analyst to scrutinize MCSO's cost allocations. (Doc. 3083 at 2-3). The budget analyst took approximately a year to prepare his analysis, which resulted in thirty-eight alleged findings and contended that up to 72% of the costs attributed to *Melendres* were misattributed. (Doc. 3263).

On October 8, 2025, the Court directed that "Defendants shall have thirty days from the date of this Order to respond to each of the thirty-eight findings in the Report. The Budget Analysts shall have fifteen days thereafter to Reply." (Doc. 3263 at 1). That order included a number of other procedures for the potential appointment of a special master and accounting expert.

On October 21, 2025, the Court held a hearing with the parties. At the hearing, the Court cited "Doc. 606, Paragraph 12," which "is the requirement to issue an annual report to the Sheriff's Office." The Court noted "[t]here is **not one thing in it that requires** the Sheriff's Office to discuss costs in the annual report." (Tr. 10-21-2025 In-Court Hearing at 21:19-22 (emphasis added), attached hereto as **Exhibit A**). The Court contended that it was MCSO's "duty to defend these numbers, and [MCSO] can't do it." (*Id.* at 24:22-23). Nevertheless, the Court repeated that "[t]his requirement is not part of [the] order." (*Id.* at 25:2-6). While the Court stated that it was "not going to command [MSCO] to do anything," the Court also stated that it "want[ed] to decide right now what the accepted procedures are for accounting, cost allocation, proration of costs, auditing procedures, what needs to be done to justify and be acceptable evidence on which

3

prorations are based; and . . . to come up with that conclusion right now, and that's not just for looking backwards." (*Id.* at 26:11-17).

After identifying the detailed evidentiary process likely needed to afford due process to all parties, the Court stated that participation was optional. (*Id.* at 28:4-9; 32:14-23). Due process is only necessary if cost allocation were an issue to be decided on the merits; optional participation makes sense in a lawsuit where no one has alleged that the County's or MCSO's budget procedures are unlawful. And with respect to possible injunctive relief that might come out of the Court's optional process, the Court stated it has "no jurisdiction over the Auditor General." (*Id.* at 36:7-10).

Ten days later, the Court issued the October 31 Order vacating the prior October 8, 2025 order. The Court's October 31 Order explained the Court "declines to compel the Defendants to engage in . . . a process" to justify its costs. (Doc. 3301 at 5:11-13). Nevertheless, the Court ordered the following:

> **IT IS FURTHER ORDERED** that within three weeks of the date of today's order, the Defendants shall inform the Court whether they seek to justify the past operational costs that it has attributed to Melendres compliance set forth in the 2023 and 2024 annual reports from the MCSO. The Court shall thereafter proceed on that notice as identified in this order.
>
> **IT IS FURTHER ORDERED** that within three weeks of the date of today's order, all parties shall submit to the Court their experts' identification of the recognized standards and procedures, if any, that provide the generally accepted accounting principles, procedures and audit standards for cost attribution, proration of an employee's expenses among separate tasks, necessary procedures to audit attributions and prorations and other issues presented by the allocation and proration of costs in this case.

(*Id.* at 7:3-13).

This response follows.

**II.  ARGUMENT**

**A. The Court's Jurisdiction Is Limited to Remedying Specific Constitutional Violations**

In institutional reform litigation, a court's "judicial powers may be exercised only on the basis of a constitutional violation," a remedial authority that "does not put judges

4

automatically in the shoes of [government agencies] whose powers are plenary." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16 (1971). Because "the nature and scope of the remedy are to be determined by the violation," the Supreme Court requires "that federal-court decrees must directly address and relate to the constitutional violation itself." *Milliken*, 433 U.S. at 281-82 (internal citations omitted); *see also Hutto v. Finney*, 437 U.S. 678, 687-88 & n.9 (1978) (upholding remedy in prison conditions case only where necessary to "bring an ongoing violation to an immediate halt").

Federalism makes tailoring particularly important where plaintiffs seek injunctive relief against a state or local government. "Federal courts may not order States or local governments, over their objection, to undertake a course of conduct not tailored to curing a constitutional violation that has been adjudicated." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 389 (1992); *Rizzo v. Goode*, 423 U.S. 362, 378-79 (1976) (rejecting "the District Court's flat pronouncement that a federal court's legal power to 'supervise the functioning of the police department . . . is firmly established'"). The Ninth Circuit recognizes the same rule, holding in *Gilmore v. People of the State of California*, that even "where a court seeks to correct a constitutional violation established in the course of litigation, the court's exercise of equitable discretion must heel close to the identified violation and respect 'the interests of state and local authorities in managing their own affairs, consistent with the Constitution.'" 220 F.3d 987, 1005 (9th Cir. 2000) (quoting *Milliken*, 433 U.S. at 281); *see also Stone v. City of S.F.*, 968 F.2d 850, 860-61 (9th Cir. 1992) ("[F]ederal courts should 'exercise the least possible power adequate to the end proposed'" (quoting *Spallone v. United States*, 493 U.S. 265, 280 (1990))).

Restraint is perhaps most important where budgetary matters are involved because of the "imperative need of a State to administer its own fiscal operations," *Tully v. Griffin*, 429 U.S. 68, 73 (1976), and the fact that "state sovereignty extends to the total conduct of a state's fiscal affairs," *Taub v. Comm. of Kentucky*, 842 F.2d 912, 919 (6th Cir. 1988), *cert. denied*, 488 U.S. 870 (1988).

## B. The Court Lacks Jurisdiction in This Case to Compel an Accounting of Costs or to Order a Change in Accounting Standards at MCSO

Plaintiffs' Complaint alleged Fourth and Fourteenth Amendment violations "to the extent [MCSO] use[d] race as a factor in arriving at reasonable suspicion or forming probable cause to stop or investigate persons of Latino ancestry for being in the country without authorization." (Doc. 579 at 4:22-25). On behalf of a class of "[a]ll Latino persons who, since 2007, have been or will be in the future, stopped, detained, questioned or searched by MCSO agents while driving or sitting in a vehicle on a public roadway or parking area in Maricopa County, Arizona," (Doc. 494 at 37), the Court enjoined defendants from engaging in seven enumerated practices related to racial profiling and the enforcement of immigration law. (Doc. 579 at 141-142).

The proposed order the parties submitted (Doc. 592-1), and the subsequent Supplemental Permanent Injunction (the "First Order") the Court entered (Doc. 606), primarily mirror the initial injunctive relief ordered by the Court as it affects the Plaintiffs' Class. But ***nothing*** in the First Order, let alone the Second Order (Doc. 1765), Third Order (Doc. 2827), or Fourth Order (Doc. 3075) (collectively the "Four Orders"), concerns expenditures or accounting standards. Indeed, the County and MCSO are "obliged to pay whatever they have to pay to comply." (Exhibit A at 32:2-3). And no one contends that MCSO paid less than was necessary for compliance.

During the Community Advisory Board meeting on October 22, 2025, the Court highlighted Paragraph 12 of the Four Orders with respect to the Court's presentation on "Costs." (Doc. 3286-1 at Slides 43-44). Paragraph 12 provides the following:

> The comprehensive Patrol Operations assessment shall include, but not be limited to, an analysis of collected traffic-stop and high-profile or immigration-related operations data; written Policies and Procedures; Training, as set forth in the Order; compliance with Policies and Procedures; Supervisor review; intake and investigation of civilian Complaints; conduct of internal investigations; Discipline of officers; and community relations.

(*See* Doc. 3286-1 at Slide 44). As the Court noted, however, "[t]here is not one thing in [Paragraph 12 of the First Order] that requires the Sheriff's Office to discuss costs in the

6

annual report." (Exhibit A at 21:19-22 (stating the Court was referring to "Doc. 606, Paragraph 12")). Nor is there anything in the Four Orders regarding accounting standards that MCSO should (or must) apply. That makes sense because Plaintiffs did not bring this lawsuit over MCSO's accounting or cost-allocation practices. Nor would an order requiring the County or MCSO—or the Auditor General or anyone else—to adopt ***different*** accounting practices provide redress for the injuries alleged in the Complaint.

Precedent confirms this intuition. The Supreme Court in *Missouri v. Jenkins*, 515 U.S. 70 (1995), rejected a judicial remedy that spanned several school districts for exceeding the district court's jurisdiction to address an intradistrict constitutional violation. In the same vein, the Fourth Circuit vacated a prison injunction that imposed overly detailed management requirements without adequate constitutional justification. *Taylor v. Freeman*, 34 F.3d 266 (4th Cir. 1994); *see also Gasca v. Precythe*, 83 F.4th 705 (8th Cir. 2023) (rejecting judicial remedy requiring revocation hearing within 30 days as "not tailored to the violation and was an abuse of discretion" because longer delays may be reasonable); *Rasho v. Jeffreys*, 22 F.4th 703 (7th Cir. 2022) (holding that specific staffing mandates violated the Prison Litigation Reform Act's narrow tailoring requirements); *M.D. by Stukenberg v. Abbott*, 907 F.3d 237 (5th Cir. 2018) (rejecting injunction provisions because they failed to address the specific problems giving rise to the constitutional violation or went beyond what was minimally required to comport with the Constitution's prohibition on arbitrary deprivation of plaintiff's rights); *Armstrong v. Brown*, 768 F.3d 975 (9th Cir. 2014) (finding that specific dispute resolution provisions of an injunction impermissibly delegated too much authority to a court-appointed expert).

The outer limit of cases upholding a remedy as within a lawsuit's scope further demonstrates the direct connection required to satisfy federalism concerns. In *Sharp v. Weston*, for example, the Ninth Circuit affirmed detailed injunctive provisions such as private visiting rooms and educational opportunities for individuals subject to civil commitment, because although the lack of such amenities did not itself violate the Constitution, their provision would cure the facility's "underlying constitutional

7

violation" of inadequate mental health treatment. 233 F.3d 1166, 1173 (9th Cir. 2000). And in *Gluth v. Kangas*, the Ninth Circuit upheld a comprehensive injunction requiring a prison to provide specific office supplies to incarcerated plaintiffs to remedy the prison's unconstitutional denial of access to the courts. 951 F.2d 1504, 1510 (9th Cir. 1991). Both cases demonstrate the link between injunctive relief and the constitutional violation at issue.

Here, Hispanic residents of Maricopa County concerned with racial profiling are unaffected by how the County and MCSO allocate costs. Unlike an inmate whose access to visitors or educational programs might contribute to improved mental health, a motorist who is stopped by a properly trained Sheriff's Deputy does not care whether the Deputy is coded MEL0 for budgeting purposes or not. Nor does any member of the Class experience a constitutional violation because MCSO purchased a golf cart (a less expensive alternative to a car) to transport personnel to the PSB offices that the Court ordered "shall be physically located in a facility that is separate from other MCSO facilities." (Doc. 1765 at ¶ 198). Even if the County and MCSO changed budgeting practices to conform to the budget analyst's every preference, it would have zero impact on Plaintiffs' constitutional right to race-neutral policing. As a result, the Court lacks jurisdiction over the County's and MCSO's cost allocations, which do not violate federal law. *Milliken*, 433 U.S. at 282.

Nor does inherent authority bridge the gap between the issues in this case and MCSO's accounting practices. The closest the Court's inherent authority comes is fact finding with respect to possible sanctions. *See Primus Auto. Fin. Servs. v. Batarse*, 115 F.3d 644, 649 (9th Cir. 1997) ("The district court has broad fact-finding powers with respect to sanctions, and its findings warrant great deference."). But a court must make an explicit finding of bad faith before imposing sanctions under its inherent authority. *Id.* at 648. Moreover, "bad faith" generally occurs only "where an attorney [or party] knowingly or recklessly raises a frivolous argument," engages in harassing conduct toward an opponent, or delays or disrupts litigation or hampers enforcement of a court

order. *Id.* at 649. Even if the budget analyst believes that MCSO overstated its compliance costs, which the County disputes, the Court has correctly noted that MCSO was not obliged to provide those costs. (*See* Doc. 3301 at 4 ("The Court never required the Defendants to track the costs they attributed to *Melendres*.")). Nor, again, does MCSO's inclusion of costs in its Annual Report (accurately or otherwise) impair compliance with a prior court order aimed at remedying the constitutional violations complained of by Plaintiffs. (*Id.* at 5 ("[T]he litigation of the costs of compliance will only add to that compliance cost *without advancing the goal of compliance*." (emphasis added))). And, in any event, there has been no finding of bad faith to justify sanctions in this case.

To the extent Plaintiffs or the Monitor argue that the Court's October 31 Order could be interpreted as a sanction, that too would place the cart before the horse. An adverse factual finding occurs only ***after*** the submission of evidence and opportunity to be heard by both parties—not before. Here, the Court explicitly stated it was "declin[ing] to compel the Defendants to engage in such a process" (Doc. 3301 at 5:13-15) and had not yet made any "final determination by any means." (Exh. A at 25:3-4). The optional nature of any further inquiry into MCSO's budgeting process and its timing after the October 31 Order confirm that it is not a sanctions proceeding. As a result, any formal fact finding is improper.

To be clear, although Defendants are declining to participate in the Court's voluntary process for contesting the budget analyst's conclusions, they are not forfeiting their First Amendment rights to speak about the County budget, the Auditor General's audits over the past decade, the errors in the budget analyst's report, or anything else. As the Supreme Court's many precedents related to institutional reform litigation note, elected officials are accountable to their constituents. *See, e.g., Horne*, 557 U.S. at 448. Defendants do not read the October 31 Order as attempting to impose a prior restraint on speech, but they note their intent—and duty—to communicate to the people of Maricopa County on any topic of public concern, including the cost of compliance with the Four

9

Orders. *See generally Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976) (explaining the "heavy presumption" against prior restraints).

### III.    CONCLUSION

For the foregoing reasons, Maricopa County declines to participate in further proceedings exploring the County's allocation of costs related to compliance with the Court's orders in this matter. The allocation of expenses cannot violate the Constitution, are not the subject of Plaintiffs' lawsuit, and therefore lie beyond the Court's jurisdiction.

DATED this 21st day of November 2025.

GREENBERG TRAURIG, LLP

By: */s/ Dominic E. Draye*
    Dominic E. Draye
    Matthew P. Hoxsie
    *Attorneys for Defendant-Intervenor*
    *Maricopa County*