1  John T. Masterson, Bar #007447
   Joseph J. Popolizio, Bar #017434
2  Justin M. Ackerman, Bar #030726
   Ashley E. Caballero-Daltrey, Bar #036449
3  JONES, SKELTON & HOCHULI P.L.C.
   40 N. Central Avenue, Suite 2700
4  Phoenix, Arizona 85004
   Telephone:  (602) 263-1741
5  Fax:  (602) 200-7876
   jmasterson@jshfirm.com
6  jpopolizio@jshfirm.com
   jackerman@jshfirm.com
7  adaltrey@jshfirm.com

8  Attorneys for Gerard A. Sheridan, in his official
   capacity as Sheriff of Maricopa County, Arizona

9

10                    **UNITED STATES DISTRICT COURT**

11                         **DISTRICT OF ARIZONA**

12  Manuel De Jesus Ortega Melendres, on          No. CV-07-2513-PHX-GMS
    behalf of himself and all others similarly
13  situated; et al,                              **SHERIFF SHERIDAN'S RESPONSE
                                                  TO THE COURT'S OCTOBER 31,**
14                                  Plaintiffs,   **2025 ORDER**

15              and

16
    United States of America,
17
                          Plaintiff-Intervenor.
18
                v.
19
    Gerard A. Sheridan, in his official capacity
20  as Sheriff of Maricopa County, Arizona, et
    al.,
21
                                  Defendant,
22

23          Defendant Gerard A. Sheridan, in his official capacity as Sheriff of Maricopa

24  County, Arizona ("MCSO") provides this response to the Court's October 31, 2025, Order

25  (Doc. 3301) requiring MCSO to address: (1) whether it will attempt to justify the past

26  operational costs that it is has attributed to *Melendres* compliance efforts set forth in the 2023

27  and 2024 annual reports from MCSO and (2) to provide the Court with recognized standards

28  and procedures for generally accepted accounting principles, procedures, audit standards for

1  cost attribution, proration of an employee's expenses among separate tasks, necessary

2  procedures to audit attributions and prorations, and other issues.   (*Id.* at 6).

3  **I.      THE COURT LACKS AUTHORITY TO ISSUE ANY RELIEF RELATED
          TO   ACCOUNTING   AND   AUDIT   STANDARDS   BY   MCSO   AND**
4  **MARICOPA COUNTY.**

5          As a threshold issue, MCSO objects to the very nature of the Court's Order.

6  As set forth below, the Court's inquiry, potential findings, and potential relief are well outside

7  the boundaries of the constitutional claims brought and the associated relief the Court entered

8  in this case related to racially biased traffic stops and Professional Standards Bureau ("PSB")

9  internal affairs investigations ("IAs").

10         **A.      Relevant Factual and Procedural History.**

11         As the Court well knows, this action stems from allegations of racially motivated

12  traffic stops and biased policing within MCSO. [*See* Doc. 26].  The Court made factual findings

13  after trial and made determinations based on those allegations.  [Doc. 579].   As the Court

14  recently commented, this action later evolved into an assessment of MCSO's handling of IAs

15  to ensure the initial injunctive remedies imposed were properly executed.  [10/22/25 RT at

16  16:4-19, 20:4-21:18; *see also* Docs. 1765, 2830, 3076, attached as **Exhibit 1**].  But the claims

17  presented in this action never addressed, and the Court has never asserted that this action

18  addressed, MCSO's accounting practices, compliance with generally accepted and applicable

19  governmental accounting procedures, or the scope of Maricopa County's supervision and

20  auditing of MCSO.  [*See e.g.,* Docs. 606, 1765, 2827, 3075].  Neither has this Court previously

21  recognized that injunctive relief was warranted because of the County's expenditures and

22  auditing process.  [Doc. 1765 at 4:17-49 (quoting *Melendres v. Arpaio*, 784 F.3d 1254, 1265 (9th

23  Cir. 2015) (holding an "injunction exceeds the scope of a district court's power only if it is

24  aimed at eliminating a condition that does not violate the Constitution or does not flow from

25  such a violation.") (cleaned up)].

26         Despite the foregoing, the inquiry into the cost of MCSO's compliance efforts

27  with the Court's Orders appears to have arisen as a result of Community Advisory Boards'

28  ("CAB") seeking cost information from MCSO, and Sheriff Penzone's and Sheriff Skinner's

119233962.1

1   subsequently placing that information in MCSO's 2023 Annual Report and 2024 Annual

2   Report, respectively. [*See* Doc. 2934-1 at 44, 56, Doc. 3078-1 at 51, 63]. After the 2024 Annual

3   Report's publication, the Court ordered MCSO to provide information to its Monitor

4   regarding its basis for its estimate of the costs of compliance. [*See* Doc. 3083]. As important

5   to the issues present before the Court, the Court's Order did not indicate that the Court would

6   enter any further injunctive relief or action based on MCSO's cost reporting, other than the

7   request for information. [*Id.* at 2 ("It is necessary for the Court to understand where the

8   Operational/Department Costs are being incurred and the reasons for which the Defendants

9   attribute the various costs to the *Melendres* orders."); *see also* Doc. 3102]. The Court's Orders

10  also did not instruct the Monitor to even issue a report, let alone make <u>*any*</u> of the 38 factual

11  findings it subsequently made, including but not limited to its general findings, findings related

12  to positions, findings related to personnel costs (including whether funds were properly

13  attributed to *Melendres* or the General Fund), and findings related to non-personnel costs. [*Id.*].

14           In an effort to comply with the Court's Orders to provide cost information to

15  the Monitor, as partially documented in the Monitor's Report, MCSO endeavored for the

16  better part of a year to provide volumes of data, documents, and information to the Monitor

17  in an attempt to enable the Monitor to understand the basis for MCSO's cost attributions in

18  its 2024 annual report. During the entirety of this process, the Monitor did not apprise MCSO

19  what he would publish in his Report. Perhaps more importantly, neither the Monitor, nor the

20  Court apprised MCSO of what the Court intended to do with the Report.[1]  MCSO even

21  inquired as to the Court's intended purpose during a status hearing before the Report's

22  issuance during a September 12, 2025, status conference. [*See* 9/12/25 RT at 28-34, attached

23  as **Exhibit 2**]. During that conference, the Court was careful to indicate it was not sure what

24  remedies might stem from the Report and repeatedly indicated it did not intend to be

25

26  ────────────────────────

27           [1] References to the "Monitor" in this Response include the named Monitor, Chief
    Robert Warshaw (Ret.), as well as members of his Monitor Team, including two financial
    members of the Monitor Team, William Ansbrow and Eric Melancon, whom the Monitor
28  added as team members specifically to conduct the cost analysis with the assistance of other
    Monitor Team members.

119233962.1

1  retributive to MCSO.  [*Id.* at 33:10-14].  Rather, the Court indicated its intention was to provide

2  "some accuracy and discipline to the process."  [*Id.* at 33:13-14].

3      The Monitor's Report was then published on October 8, 2025.  [Doc. 3263].

4  After the Monitor's Report was issued, the Court gave MCSO 30 days to respond to the

5  Monitor's Report.  [Doc. 3263].  Thereafter, the Court stated it would determine if "the

6  disagreements of the parties regarding the accuracy of the Budget Analysts' report are

7  substantial" and, if so, appoint a special master to resolve the disagreements.  [*Id.*].  MCSO

8  then moved for more time to respond to the Court's Order [Doc. 3277], after which the Court

9  set a status conference on October 21, 2025.[2]  During that conference, the Court made clear

10  that MCSO was not obligated to respond to the Monitor's Report and neither was it a

11  requirement in the Court's Orders.  [*See* 10/21/25 RT at 21:19-22, 29:4-9; 32:14-23, attached

12  as **Exhibit 3**].

13      Then on October 31, 2025, the Court issued a revised Order stating that it

14  "declines to compel the Defendants to engage in . . . a process" to justify its costs.  [Doc. 3301

15  at 5:11-13].  However, the Court stated that "the operational costs that the County Defendants'

16  attribute to *Melendres* compliance are unsupported, unjustified and are not based on discernible

17  fact." [*Id.* at 6:17-19].  Moreover, the Court indicated that it "will…identify the accounting and

18  audit standards by which all future cost allocations to *Melendres* compliance be measured

19  whether those costs be past, present or future attributions." [*Id.* at 6:10-13].  Finally, it ordered

20  MCSO to do the following:

21      IT IS FURTHER ORDERED that within three weeks of the
        date of today's order, the Defendants shall inform the Court
22      whether they seek to justify the past operational costs that it has
        attributed to Melendres compliance set forth in the 2023 and
23      2024 annual reports from the MCSO.  The Court shall thereafter
        proceed on that notice as identified in this order.
24

25      IT IS FURTHER ORDERED that within three weeks of the
        date of today's order, all parties shall submit to the Court their
26      experts' identification of the recognized standards and
        procedures, if any, that provide the generally accepted accounting
27      principles, procedures and audit standards for cost attribution,

28      [2] The Court subsequently denied this motion as moot in light of it vacating the deadline
    it set to respond to the Monitor's Report.  [*See* Doc. 3302].

4

proration of an employee's expenses among separate tasks, necessary procedures to audit attributions and prorations and other issues presented by the allocation and proration of costs in this case.

[*Id.* at 7:3-13].

Given the Court's comments at the September and October status conferences, the Monitor's Report recommendations [*see* Doc. 3263 at 12], and the Court's two recent Orders described above, MCSO for the first time now has some indication of what the Court may intend to do with the Monitor's Report, which raises significant concerns regarding the limits of this Court's authority to act in light of the presented claims and resultant, reflective Orders.

**B.** **The Court Lacks Authority To Order MCSO To Do Anything Related To Costs And Accounting Procedures.**

MCSO has endeavored to do whatever it takes to comply with the Court's Orders, no matter the cost. Even if MCSO was somehow financially overzealous in that endeavor, as the Monitor's Report posits, that *still* is not an issue for this Court to preside over or challenge. Put another way, this Court is not the safeguard of Maricopa County funds and the County's exercise of its budgeting powers. The Maricopa County Board of Supervisors and the State Auditor General's Office establish the relevant accounting and audit procedures, respectively. And by issuing statements on compliance costs and intimating that the Court is inclined to order additional remedies in this case that solely relate to how MCSO and Maricopa County comply with the Arizona state law on budgeting and accounting, the Court *far* exceeds the boundaries of its powers and jurisdiction in this case.

**1.** **The Court Cannot Order Any Relief Related To Costs of Compliance.**

Injunctive relief must be "narrowly tailored to give only the relief to which plaintiffs are entitled." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *GS Holistic, LLC v. Puff N Go Gift Shop LLC*, 2023 WL 4146232, at \*6 (N.D. Cal. June 22, 2023) ("Injunctive relief is a precise tool to fix a precise injury, and should be narrowly tailored to remedy the specific harm a plaintiff has identified rather than to enjoin all possible breaches of the law) (internal quotations omitted); *see also* Fed. R. Civ. P. 65(d) (requiring an order granting an injunction to

5

1    "state its terms specifically" and "describe in reasonable detail--and not by referring to the

2    complaint or other document--the act or acts restrained or required").

3              The Supreme Court has explained that remedies federal courts fashion to

4    address constitutional infirmities "must directly address and relate to the constitutional

5    violation itself," and "federal court decrees exceed appropriate limits if they are aimed at

6    eliminating a condition that does not violate the Constitution or does not flow from such a

7    violation." *Milliken v. Bradley*, 433 U.S. 267, 282 (1977). This Court may not, therefore, "order[

8    ] relief beyond what [is] minimally required to comport with the Constitution's" prohibition

9    on arbitrary deprivation of plaintiffs' substantive due process rights. *Gates v. Collier*, 501 F.2d

10   1291, 1303 (5th Cir. 1974). Accordingly, "[a]n injunction must be "narrowly tailored to remedy

11   the specific harm shown." *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir.

12   2019) (cleaned up).

13             As the Supreme Court has made clear, "institutional reform injunctions often

14   raise sensitive federalism concerns." *Home v. Flores*, 557 U.S. 433, 448 (2009). Such injunctions

15   frequently intrude on "areas of core state responsibility," including the far reaching four

16   injunctive Orders at issue here. *M.D. by Stukenberg v. Abbot*, 907 F.3d 237, 271 (5th Cir.

17   2018) (cautioning that "institutional reform injunctions are disfavored" and that "[a]n

18   intrusion of this scale should not be taken lightly"); *United States v. Mississippi*, 82 F.4th 387,

19   400 (5th Cir. 2023) (noting "[m]icromanagement, enforced upon threat of contempt, does not

20   reflect the principles of comity" in prison context). Those federalism concerns also are

21   heightened" where, as here, "a federal court decree has the effect of dictating state ... budget

22   priorities." *Home*, 557 U.S. at 448. An institutional-reform decree "eviscerates a State's

23   discretionary authority over its own program and budgets and forces state officials to reallocate

24   state resources and funds." *Missouri v. Jenkins*, 515 U.S. 70, 131 (1995) (Thomas, J.,

25   concurring); *see also Home*, 557 U.S. at 448. Those decrees also "interfere with a State's

26   democratic processes" and diminish the political accountability at the heart of our system of

27   government. *Home*, 557 U.S. at 448-50, 453, 471; *Reynolds v. McInnes*, 338 F.3d 1201, 1219 (11th

28

1    Cir. 2003) ("[f]ederal courts should not be in the business of running important functions of

2    state government for decades at a time.").

3         These limits have already been constrained in this case. For example, the Ninth

4    Circuit vacated this Court's permanent injunction to the extent it authorized the Monitor to

5    review whether MCSO officials had committed "any violations of departmental policy" and

6    whether deputies were subject to "misconduct Complaints, civil suits, or criminal charges" for

7    any grounds whatsoever, including even "for off-duty conduct." *Melendres v. Arpaio,* 784 F.3d

8    1524, 1266 (9th Cir. 2015). The Court explained that whether an "officer commits spousal

9    abuse, or clocks in late to work, or faces a charge of driving under the influence of alcohol in

10   another state while on vacation… has no bearing on the constitutional rights at stake here."

11   *Id.* at 1267. In contrast, the Court held that the Monitor's authority to consider citizen

12   complaints was "narrowly tailored to remedying the specific constitutional violations at issue"

13   because the Monitor could only consider complaints about "biased policing or unlawful

14   detentions and arrests by MCSO Patrol/Operation deputies." *Id.*

15        And while a history of non-compliance with this Court's Orders can be relevant

16   to its issuing further injunctive relief, it does not give this district court *carte blanche* to regulate

17   matters irrelevant to the presented claims and corresponding relief in this action. Again, the

18   Ninth Circuit made this point clear. It held that although requiring data collection regarding

19   traffic stops was "typically disfavored," Defendants' history of noncompliance justified this

20   robust remedy. 784 F.3d at 1266. Traffic stops, of course, are intimately connected to the

21   constitutional violations at issue here. But that same history of noncompliance did not stop

22   the Ninth Circuit from invalidating the regulation of Internal Affairs investigations that are

23   unrelated to the violations at issue here. *Id.* at 1267.

24        In sum, the "expansive use of equitable remedies has long been recognized as a

25   threat to federalism," because sweeping institutional-reform injunctions "threaten 'the special

26   delicacy of the adjustment to be preserved between federal equitable power and State

27   administration of its own law.'" *In re Gee*, 941 F.3d 153, 167 (5th Cir. 2019) (quoting *O'Shea v.*

28   *Littleton,* 414 U.S. 448, 500 (1974)). For that reason, "federal courts in devising a remedy must

7

119233962.1

1  take into account the interests of state and local authorities in managing their own affairs,

2  consistent with the Constitution." *Milliken*, 433 U.S. at 280-81.

3          Here, the Court intends to "identify the accounting and audit standards by

4  which all future cost allocations to *Melendres* compliance be measured whether those costs be

5  past, present or future attributions." [Doc. 3301 at 6]. In other words, it appears that the

6  Court intends to enter an order setting forth additional and specific requirements for MCSO

7  and Maricopa County to follow, and adopt some particular accounting and audit standards.

8  But as the Court readily and repeatedly admits, accounting and audit standards are ***not*** at issue

9  in this case. Specifically, the Court cannot use this case as a toehold to mandate its favored

10  reconstruction of any perceived deficiencies in MCSO and Maricopa County's accounting

11  processes and/or audit standards that are unrelated to Plaintiffs' constitutional complaints.

12  Instead, federal courts may "remedy only the specific harms shown by the plaintiffs, rather

13  than to enjoin all possible breaches of the law." *Price v. City of Stockton*, 390 F.3d 1105, 1117

14  (9th Cir. 2004) (quotation marks omitted). The propriety of MCSO's and the County's

15  accounting policies, procedures, and operations writ large is not before the Court, and it has

16  no authority to craft remedies designed to change, or even supposedly improve, that system.

17  *Hoptowit v. Ray*, 682 F.2d 1237, 1251–52 (9th Cir. 1982) (district court in prison conditions case

18  exceeded its authority by issuing orders designed to eliminate racism at the prison where "the

19  district judge did not have any question of racism before him"). And although the district court

20  may compel compliance with federal law by enjoining state laws or practices that violate federal

21  law, it may not, as here, direct state or local officials to enforce State laws more vigorously in

22  order to provide a robust deterrent against the violation of federal law. *Cf. Pennhurst State Sch.*

23  *& Hosp. v. Halderman*, 465 U.S. 89, 104–06 (1984); *Printz v. United States*, 521 U.S. 898, 935

24  (1997).

25          The Court never articulated any factual or legal basis for its foray into the world

26  of MCSO and Maricopa County's accounting practices and the auditing of MCSO's

27  compliance budget and expenditures. Maricopa County has a right to allocate its resources to

28  *Melendres* compliance as it and MCSO see fit in order to enable MCSO to reach the desired

8

119233962.1

1    Full and Effective Compliance with the Court's Orders.  [*See e.g.,* Doc. 3083, 3102].  At best,

2    the Court stated that its cost inquiry will "allow the Court to evaluate MCSO's compliance and

3    any future necessary compliance measures."   [Doc. 3083 at 2].   But the cost of MCSO's

4    compliance with the Court's Orders does not impact its compliance efforts with the Court's

5    Orders. Cost reporting, high, low, or somewhere in between, only indicates how much

6    compliance efforts are *costing*, and how those costs are allocated.  It has absolutely nothing to

7    do with MCSO's concerted efforts to move toward full and effective compliance.  And, as the

8    Court has noted, such expenses are largely irrelevant to this Court because whatever they are,

9    they are required to be paid under Arizona state law.  [Ex. 2, 10/21/25 "RT at 32:2-3; *see also*

10   A.R.S. § 11-444].

11           Finally, the Court seems to be taking the position that MCSO put the costs at

12   issue by placing it in its Annual Report (in response to the Community Advisory Board's

13   ("CAB") request for the total cost of compliance). Even if true, the Court still needs a legal

14   basis to issue any relief based on that response to the CAB's inquiry.  Indeed, if anything

15   MCSO places into its Court ordered reports becomes fair game, then the Court's powers to

16   issue injunctive relief would be essentially limitless. Clearly, that is not the case.

17           Therefore, MCSO objects to the Court's making any factual findings based on

18   the Monitor's Report, that require MCSO to provide the Court any accounting standards or

19   practices, or that the Court has any ability to fashion remedies based on the Report, or any

20   other reason regarding accounting and audit standards by which all future cost allocations to

21   *Melendres* compliance are to be measured, whether those costs be past, present or future

22   attributions.

23           **2.      The Monitor Exceeded Its Authority By Issuing A 97 Page Cost
                       Report And Making 38 Findings The Court Never Directed It To**
24           **Make.**

25           "The judicial power of the United States must be exercised by courts having the

26   attributes prescribed in Art. III." *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50,

27   59 (1982) (plurality opinion). The Supreme Court has thus warned that "[t]he use of masters

28   is to aid judges in the performance of specific judicial duties, as they may arise in the progress

9

1    of a cause, and not to displace the court." *La Buy v. Howes Leather Co.,* 352 U.S. 249, 256 (1957)

2    (cleaned up).  As important here, "[i]f the master makes significant decisions without careful

3    review by the trial judge, judicial authority is effectively delegated to an official who has not

4    been appointed pursuant to article III of the Constitution." *Meeropol v. Meese*, 790 F.2d 942,

5    961 (D.C. Cir. 1986). Neither can masters "be placed in control of governmental defendants

6    for the purpose of forcing them to comply with court orders" and, thus, cannot "control or

7    administer" compliance efforts. *Nat'l Org. For the Reform of Marijuana L. v. Mullen (NORML)*,

8    828 F.2d 536, 545 (9th Cir. 1987); *see also Reynolds v. McInnes*, 338 F.3d 1201, 1219 (11th Cir.

9    2003) ("Federal courts should not be in the business of running important functions of state

10   government for decades at a time.").  In other words, court orders cannot delegate a monitor

11   "with discretion to determine the terms of the injunctions themselves." *Mickalis Pawn Shop,*

12   *LLC*, 645 F.3d at 145 (noting that the injunction at hand overbroadly requires the defendants

13   to adopt "practices" that "*in the opinion of the Special Master*" serve to prevent the illegal sale of

14   firearms and movement of guns into the illegal market). Similarly, a monitor cannot be given

15   "extrajudicial duties" over the government's objections that amount to "an investigative,

16   quasi-inquisitorial, quasi-prosecutorial role." *Cobell v. Norton*, 334 F.3d 1128, 1142 (D.C. Cir.

17   2003).

18              Here, the Court's Orders directed MCSO to produce information to its Monitor

19   solely for the Court to "understand where the Operational/Department Costs are being

20   incurred and the reasons for which the Defendants attribute the various costs to the *Melendres*

21   orders." [Doc. 3083 at 2:1-3; *see also* Doc. 3102].  Indeed, the Court initially contemplated that

22   production of the information it sought "should not be a time-consuming or otherwise

23   intensive enterprise." [*Id.* at 3:18].  What the Court did not order was for its Monitor to

24   conduct a year-long audit of MCSO and Maricopa County and then issue a 97 page report

25   making 38 individualized factual findings on topics and issues that this Court readily admits

26   are not the subject of this litigation.  Neither did the Court order the Monitor to make any

27   recommendations to the Court based on these findings.  Yet, that is what the Monitor did.  In

28   so doing, the Monitor far exceeded any purported authority delegated to it by the Court (which

119233962.1

1    as addressed above was equally improper).  *See supra* § I(A).  Moreover, it does not address any

2    of the remedies regarding the Plaintiffs' class.

3              Therefore, the Monitor exceeded its authority in issuing its Report addressing

4    topics and issues which the Court never ordered it to inquire, let alone on which to make

5    factual findings.  The Monitor's Report then erred equally by giving unsolicited

6    recommendations to the Court.  As a result, the Court must disregard the Monitor's Report,

7    in its entirety.[3]  And to the extent the Court relies on this Report to take any action in this

8    case, including but not limited to making factual determinations or issuing further relief

9    irrelevant to the presented constitutional claims and corresponding relief, that would

10    constitute additional error.

11    **II.    MCSO'S OBJECTION TO THE MONITOR'S REPORT FINDINGS.**

12              Notwithstanding the foregoing issues related to the limits of the Court's powers

13    and potential relief, and without waiving any argument or appellate rights related thereto, in a

14    good faith effort to comply with the Court's October 31, 2025 Order, MCSO responds as

15    follows regarding whether it intends to contest the Monitor's Report.

16         **A.    Sheriff Sheridan Did Not Cause The Cost Inquiry Ordered By The Court.**

17              At the outset, Sheriff Sheridan wishes to make one thing eminently clear; he did

18    not make the assertions that formed the central basis of the Court's cost inquiry and

19    subsequent Monitor Report—i.e., that the cost of compliance was roughly $219,732,642.00.

20    That was Sheriff Penzone in the 2023 Annual Report [Doc. 2934-1 at 44, 56] and then Sheriff

21    Skinner in the 2024 Annual Report filed with the Court.  [Doc. 3078-1 at 51, 63].  Indeed,

22    when it came time for Sheriff Sheridan to file his 2025 Annual Report with the Court, he

23    requested the Court's permission to *remove* the cost of compliance figures from the Report.

24    [9/12/25 RT at 33:22-34:13].[4]  Sheriff Sheridan submits to the Court that he does not intend

25

26    _____

[3] For this same reason, to the extent the Court relies on the Monitor's Report to state that MCSO's cost allocation was unjustified, it erred. [*See* Doc. 3301 at 6:14-22].

27    [4] During the recent October 21, 2025, hearing on the Motion for Extension of Time, in light of the responsibility for the publication of the cost figure in MCSO's Annual Report, the Court implied that although the Sheriff may be different now, the personnel at MCSO remains the same—suggesting that the decision to publish the cost figure was a rank and file decision, as opposed to the decision of the then sitting sheriff. Respectfully, and without

28

119233962.1

1    on including any cost figure in any future annual report, or any other report, filed with this

2    Court.  As the Court recognized, its Orders do not require publication of the cost of *Melendre*s

3    compliance efforts.  [Doc. 3301 at 4; 10/21/25 RT at 32:14-16, 35:1-17].

4    **B.    MCSO Entirely Disputes The Monitor's Report And Its Findings But**
       **Does Not Wish To Waste Substantial Additional Resources Litigating An**
5      **Issue The Court Admits Is Not Part Of Its Orders.**

6           For clarity of the record, MCSO disagrees with the Monitor's Report, findings

7    of "fact," conclusions, and recommendations.[5]   The more compelling issue, however, is

8    whether that disagreement is worth the expenditure of significant county resources to litigate.

9    In order to engage in the fight to show the significant flaws in the Report and its various

10   incorrect findings, the County would be forced to incur substantial and truly unnecessary costs.

11   In addition, MCSO would be distracted from its primary objective of compliance on what, by

12   all appearances, seems to be a sideshow unrelated to the best interests of any of the Parties.

13   Moreover, and as noted above, the Court lacks any authority to make any findings based on

14   this Report because it lacks authority to address the cost issues at hand.  *See supra* § I.  MCSO

15   therefore submits to the Court that it does not seek to further litigate the validity of the

16   Monitor's Report on the costs issue to avoid incurring unnecessary cost.  Rather, MCSO's sole

17   desire is to continue its sustained and relentless efforts to attain Full and Effective Compliance

18   on all aspects of this Court's Orders, so it can function with complete autonomy in all aspects

19   of its duties to taxpayers and residents of Maricopa County.

20   **C.    The Court's Request For Accounting Standards.**

21          For all the same reasons stated above, MCSO objects to the Court's Order

22   requiring it to "submit to the Court … their experts' identification of the recognized standards

23   and procedures, if any, that provide the generally accepted accounting principles, procedures

24   and audit standards for cost attribution, proration of an employee's expenses among separate

25   ―――――――――――――

26   waiving any confidentiality or applicable privilege or protection, the previous sheriffs decided
     to publish the cost figure.  [*See* 10/21/25 RT at 19-22].

27          [5] After reviewing MCSO's request for additional time to respond to the Report, the
     Court required the Monitor to provide a supplemental report to give additional detail beyond
28   the already filed 97 page Report on how the Monitor team reached the results contained within
     the original 97 page Report.  [Doc. 3301 at 6].

12

tasks, necessary procedures to audit attributions and prorations and other issues presented by the allocation and proration of costs in this case." [Doc. 3301 at 6:4-9]. Again, the Court lacks authority to order MCSO to provide such procedures, principles, and standards because it does not have the authority to craft and issue, let alone enforce any such remedies. Moreover, as clearly noted above, MCSO does not wish to engage further in this distracting detour from its desired intent to fully comply with this Court's previous Orders involving the Plaintiffs' class. Finally, as noted in the County's Response, Maricopa County follows standards and guidance required by the Arizona Auditor General, who audited both 2023 and 2024 figures. [*See* Doc. 3319 at 2:28-3:5].

## III.    CONCLUSION.

MCSO respectfully objects to the Court's taking any action based on the Monitor's Report, including entering any additional findings based on the Report and issuing any relief based on any such purported findings or the Report itself.

DATED this 21st day of November, 2025.

JONES, SKELTON & HOCHULI, P.L.C.


By /s/ Joseph J. Popolizio
John T. Masterson
Joseph J. Popolizio
Justin M. Ackerman
Ashley E. Caballero-Daltrey
40 N. Central Avenue, Suite 2700
Phoenix, Arizona 85004
Attorneys for Gerard A. Sheridan, in his
official capacity as Sheriff of Maricopa
County, Arizona

13

119233962.1

**CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of November, 2025, I caused the foregoing document to be filed electronically with the Clerk of Court through the CM/ECF System for filing; and served on counsel of record via the Court's CM/ECF system.


/s/ Megan Axlund

14

119233962.1