1  Dominic E. Draye, SBN 033012
   drayed@gtlaw.com
2  Matthew P. Hoxsie, SBN 034952
   hoxsiem@gtlaw.com
3  Zachary H. Levy, SBN 039323
   zach.levy@gtlaw.com
4  GREENBERG TRAURIG, LLP
5  2375 E. Camelback Road, Suite 800
   Phoenix, AZ 85016
6  (602) 445-8000

7  *Attorneys for Defendant Maricopa County*

8

9              **UNITED STATES DISTRICT COURT**

10                  **DISTRICT OF ARIZONA**

11  Manuel De Jesus Ortega Melendres, on      Case No. CV-07-2513-PHX-GMS
    behalf of himself and all others similarly
12  situated; et al.,                        **DEFENDANT'S MOTION FOR**
                                             **RELIEF FROM JUDGMENT**
13                          Plaintiffs,
                                             (Assigned to the Hon. G. Murray Snow)
14  and
                                             **Oral Argument Requested**
15
16  United States of America, Plaintiff-
    Intervenor,
17
18  v.
19
20  Gerard A. Sheridan, in his official capacity
    as Sheriff of Maricopa County, Arizona, et
21  al.,
22                          Defendants.
23
24
25
26
27
28

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

Defendant-Intervenor Maricopa County moves pursuant to Fed. R. Civ. P. 60 for relief from judgment. The motion is supported by the following memorandum of points and authorities, the appendices attached to this filing, and the pleadings and papers filed in this action.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

## I.    INTRODUCTION

This institutional reform litigation began with a complaint against then-Maricopa County Sheriff Joe Arpaio, alleging a "policy and practice of stopping Latino drivers and passengers, pretextually and without individualized suspicion or cause, and of subjecting them to different, burdensome, stigmatizing and injurious treatment once stopped." (Doc. 26 ¶ 29). Fourteen years, three Sheriffs, and many millions of dollars later, "changed circumstances . . . warrant reexamination of the original judgment." *Horne v. Flores*, 557 U.S. 433, 448 (2009). In *Horne*, the Supreme Court granted Arizona relief from another institutional-reform judgment for reasons that apply here as well. First, circumstances have improved to the point that the purpose of the original judgment is "satisfied" and enforcing what remains "is no longer equitable." Fed. R. Civ. P. 60(b)(5). Second, federalism concerns "are heightened when, as in these cases, a federal court decree has the effect of dictating state or local budget priorities." *Horne*, 557 U.S. at 448. And third, turnover in elected leadership requires a "flexible approach," lest former officials forever saddle their successors with onerous and undeserved federal oversight. *Id.* at 450.

This litigation has been a success. The Maricopa County Sheriff's Office ("MCSO") today looks nothing like the institution against which Plaintiffs brought suit in 2011. Some of that progress is due to this case. According to the federal monitor's (the "Monitor") most recent report, MCSO is in 100% Phase 1 compliance with all four of this Court's orders and between 75% and 94% Phase 2 compliance. (Doc. 3268 at 5-6). For those paragraphs, identified in Appendices A, B, and C, relief is warranted because the judgment has been satisfied. For the remaining paragraphs, MCSO has implemented reforms and documented results that render continued federal monitoring inequitable. *See Horne*, 557 U.S. at 450.

Because "Rule 60(b)(5) serves a particularly important function in . . . institutional reform litigation," *id.* at 447 (citation modified), Maricopa County moves for relief from the judgment so that Defendants may devote their full energy to public safety and the countless other priorities that suffer from the diversion of resources needed to fund federal oversight.

No human organization is perfect, and there will always be bad actors who infiltrate institutions of public trust. In those cases, the measure of the institution is its ability to identify and remove the bad actors. MCSO has reformed its policies, improved its workforce, and implemented mechanisms to assure that racial profiling never occurs. This litigation has been a success, and the time has come to allow MCSO to stand on its own two feet, freed of oversight—but always accountable if it violates the law in the future.

## II.    RELEVANT BACKGROUND

### A.    The Plaintiff Class Complaints

This litigation commenced on December 12, 2007, with a class action complaint by a proposed class of plaintiffs alleging racially motivated detentions as a result of Arpaio's policies to enforce immigration law pursuant to Section 287(g) of the Immigration and Nationality Act, 8 U.S.C. § 1357(g), and Arizona's employer sanctions law, A.R.S. § 23-212. (Doc. 26 ¶¶ 30-48).

Arpaio's actions included creation of a "Triple I" Unit (Illegal Immigration and Interdiction) to investigate tips received on his illegal immigration "hotline." (*Id.* ¶ 16). Arpaio used his Triple I Unit to stage operations for mass detention of individuals he suspected of being illegal immigrants. (*Id.* ¶¶ 30-38 (alleging that Triple I "detained, questioned and arrested at least nine Latino individuals" on September 27, 2007, in Cave Creek and "at least 16 Latino individuals" on October 4, 2007, in the same area)). Arpaio's targeted actions included sending numerous officers (sometimes hundreds of them) to specific areas in which Arpaio believed he might find day laborers. (*Id.* ¶¶ 39-48 (describing targeted actions at "the intersection of 34th Street and Thomas Road in central Phoenix because of the presence of day laborers near Pruitt's Furniture Store")). One of these operations occurred on June 26, 2008, when Arpaio sent "nearly 200 deputies and posse

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

members" for a "'crime suppression operation' in Mesa, Arizona." (*Id.* ¶ 47). Named Plaintiff Ortega Melendres was among those individuals detained and was brought to the Sheriff's office and placed in a holding cell until ICE confirmed the legitimacy of his paperwork establishing his lawful presence in the United States. (*Id.* ¶¶ 53-81). Named Plaintiffs Rodriguez, Meraz, and Nieto were among those individuals who alleged that they were stopped and questioned for the purpose of enforcing immigration law on the sole basis that they were Latino. (*Id.* ¶¶ 82-119).

On December 23, 2011, the Court granted certification of a class of "All Latino persons who, since 2007, have been or will be in the future, stopped, detained, questioned or searched by MCSO agents while driving or sitting in a vehicle on a public roadway or parking area in Maricopa County, Arizona." (Doc. 494 at 37). The Court concluded that while "[t]he likelihood that any particular named Plaintiff will again be stopped in the same way may not be high," there was a "'sufficient likelihood' that Plaintiffs' rights will be violated again" because MCSO affirmatively alleged at the time that "its officers [were] authorized to stop individuals based only on reasonable suspicion or probable cause that a person [was] not authorized to be in the United States." (*Id.* at 17 (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983))). Rejecting that assertion as "wrong as a matter of law," the Court also determined that "named Plaintiffs (and all members of the putative class) [were] entitled to partial summary judgment on their Fourth Amendment claims." (*Id.* at 17-18). Turning to injunctive relief, the Court determined that the named Plaintiffs were entitled to relief to the extent they were detained "without reasonable suspicion that a crime ha[d] been or [was] being committed" based on the evidence of an unconstitutional pattern of conduct on Arpaio's part. (*See id.* at 25-26; *see also id.* at 38 (stating that "[a] policy of detaining people pursuant to laws that MCSO has no authority to enforce, or detaining them without reasonable suspicion that they are violating laws it can enforce constitutes 'continuing, present adverse effects' and therefore merits injunctive relief" (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974))). The Court relied for support on the fact that "Arpaio ha[d] made public statements that a fact finder could interpret as endorsing racial profiling, such as

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

stating that, even lacking 287(g) authority, his officers [could] detain people based upon 'their speech, what they look like, if they look like they came from another country.'" (*Id.* at 27 (citing Doc. 426, Ex. 4 at 274)). And the Court focused on the fact that Arpaio kept a "file containing letters and news clippings that a reasonable fact finder could determine advocate or support racial profiling"—and that Arpaio even "wrote personal thank-you letters to a number of the authors." (*Id.* at 28).

> **B.     The Court's Findings, Proposed Consent Order, and First, Second, Third, and Fourth Orders**

In July 2012, the Court began a seven-day bench trial on Plaintiffs' remaining claims. On May 24, 2013, the Court issued its Findings of Fact and Conclusions of Law. (*See generally* Doc. 579.) The Court held that MCSO's "LEAR" policy "that require[d] a deputy (1) to detain persons she or he believes only to be in the country without authorization, (2) to contact MCSO supervisors, and then (3) to await contact with ICE pending a determination how to proceed, result[ed] in an unreasonable seizure under the Fourth Amendment to the Constitution." (*Id.* at 4). Additionally, the Court found a violation of the Fourth Amendment, Equal Protection Clause, and Title VI of the Civil Rights Act of 1964, "to the extent [MCSO] uses race as a factor in arriving at reasonable suspicion or forming probable cause to stop or investigate persons of Latino ancestry for being in the country without authorization." (*Id.* at 4). The Court further found that MCSO's prolonging of traffic stops due to a "policy and practice [that] allow[s] its officers to consider the race of a vehicle's occupants in determining whether they have reasonable suspicion to investigate the occupants for violations of state laws related to immigration, or to enforce the LEAR policy," violated the Fourth Amendment's prohibition against unreasonable seizures. (*Id.* at 5).

Accordingly, the Court permanently enjoined Defendants from engaging in seven practices related to traffic stops. (Doc. 579 at 141-42). The Court then ordered the parties to lodge a proposed consent decree. (*See generally* Doc. 582). And on August 16, 2013, the parties filed a joint report on the status of their consent-decree negotiations and lodged a proposed order containing both agreed-upon and disputed terms. (Doc. 592 at 4).

The proposed order submitted by the parties totaled 194 paragraphs. (Doc. 592-1). The parties generally agreed that MCSO would: (1) form an interdisciplinary unit—the MSCO Implementation Unit—to assist with Defendants' implementation of the proposed order's requirements; (2) develop and implement policies and procedures to ensure constitutional policing; (3) implement anti-bias and other training for all sworn personnel; (4) develop and implement a system to collect data on all vehicle stops; and (5) provide for the appropriate supervision and evaluation of officer performance. (*See generally id.*)  As to the parties' disagreements: (1) Defendants opposed the appointment of a Monitor to assess and report on the implementation of the order, fearing that the Monitor would become an eternal fixture with an ever-expanding mission; (2) the parties disagreed on whether personnel trainings should occur in-person or online; (3) Defendants opposed the development and implementation of policies and processes governing MCSO hiring, promotion, performance assessment, misconduct investigation, and discipline; and (4) Defendants opposed the establishment of a Community Advisory Board. (Doc. 592 at 5-6, 8-10).

Pursuant to the class definition and the parties proposed consent order, the Court issued a Supplemental Permanent Injunction (the "First Order") on October 2, 2013. (Doc. 606).  The First Order consisted of 159 paragraphs.[1]  The Court agreed with Plaintiffs' proposal to appoint a Monitor to assist with the implementation of the First Order and assess Defendants' compliance. (*Id.* ¶ 119).  The Court also agreed with Plaintiffs' proposals to oversee MCSO's personnel misconduct and complaint tracking and investigation processes and procedures, and to develop and implement a community outreach program and community advisory board to "rebuild public confidence and trust in the MCSO and in the reform process." (*Id.* at 44-45).

Over the following eleven years, federal oversight has extended to 368 paragraphs via

---

[1] Since its entry in October 2013, the First Order has been modified three times. (*See* Docs. 670, 748, 1270).  Where applicable to this Motion, the County refers to the amended versions of the First Order's paragraphs.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

a Second Order dated July 25, 2016 (Doc. 1765), Third Order dated November 8, 2022 (Doc. 2827), and Fourth Order dated August 30, 2024 (Doc. 3075) (the four operative orders, collectively, the "Orders"), expanding to encompass every complaint against MCSO in any capacity—whether related to the Class or the content of the Complaint, or not—and including complaints against MCSO's detention officers.  (*See e.g.,* Doc. 1765 at ¶¶ 163, 183, and 186).

As part of his oversight, the Monitor makes quarterly visits to MCSO's offices to meet with personnel and observe MCSO practices, reviews MCSO's policies and procedures, and collects and analyzes data from the broad range of MCSO activities covered by the Orders. Not all of the Orders' paragraphs require or are subject to the Monitor's assessments—many paragraphs are definitional or explanatory.  In total, the Monitor assesses compliance with 228 paragraphs. The Monitor documents compliance with applicable Order paragraphs in two phases: Phase 1 assesses MCSO's compliance with the development and approval of, and training on, requisite policies and procedures; Phase 2 assesses MCSO's "operational implementation" of the Order's requirements.  (*See* Doc. 3268 at 5).  MCSO is in Phase 2 compliance if it is complying with the applicable Order requirement more than 94% of the time, or in more than 94% of the instances under review.  (*Id.*).[2]

Since September 2024, MCSO has attained 100% Phase 1 compliance.  Importantly, for over a decade there has been **no** illegal immigration hotline, **no** Triple I Unit, **no** targeting (let alone mass targeting) of Latino drivers and passengers, and **no** detention of any Latinos pursuant to attempted enforcement of the AHSA or AESA.  That is welcome news, and it is due in part to this litigation and MCSO's diligent efforts.

**C.    Current Data**

The past two years' Traffic Study Annual Reports ("TSARs") confirm that MCSO has changed for the better.  The 2023 TSAR found "only two disparate outcomes: a 19-second longer stop length and a 2.50 percentage point difference in citation rate for [all]

---

[2] Plaintiff-Intervenor, the United States, has criticized the Monitor's use of a 94% compliance threshold as arbitrary and improper.  (*See* Doc. 3198-3 at 1-3).

minority drivers as a whole group." (Doc. 3035-1 at 9). Importantly, the 2023 TSAR "found no statistically significant differences between White drivers and the plaintiff class (Hispanic drivers) across any of the measured benchmarks." (*Id.* at 10). Indeed, the 2023 TSAR states that there was "No" statistical significance in the stop length difference between "Hispanic vs. White drivers." (*Id.* at 34 (Table 4)). The same is true for citation rates between "Hispanic vs. White drivers." (*Id.* at 35 (Table 5)). Unsurprisingly, the 2023 TSAR concluded that "there is no evidence of disparities in stop lengths, citation rates, arrest rates, search rates, or seizure rates ('hit rates') following a search for Hispanic drivers (compared with White drivers)." (*Id.* at 37).

The 2024 TSAR similarly found no statistically significant differences between White drivers and the plaintiff class except for one difference in arrest rates following a stop. (Doc. 3199-1 at 9). That specific departure from previous years was a result of changing the variables that the TSAR utilized to measure the arrest benchmark, which increased the discrepancy from 0.9% to 3.9%. (*Id.* at 21 n.12, 40 n.24). Even so, the TSAR makes clear that this result "do[es] not directly represent discriminatory policing." (*Id.* at 9). It also highlights that, based on the Traffic Stop Monthly Report ("TSMR") process, which analyzes each individual deputy's traffic stops from the previous 12 months, "the Court Monitor has concurred with MCSO that the inequalities in traffic stop outcomes were not associated with bias." (*Id.* at 10, 41). Hit rates are not part of the TSAR, but they, too, show no statistical disparities. (Doc. 3265).

The Monitor's quarterly reports tell the same story regarding class remedial matters ("CRMs"), which are the subset of complaints filed with MCSO that might implicate discriminatory policing of the sort that is the subject of this litigation.

For example, the Forty-Fourth Monitor's Report identified just **three** possible CRMs among the complaints reviewed by the Professional Services Bureau ("PSB") and submitted for the Monitor's review. The Monitor meets with PSB "every two weeks to identify cases that should be considered CRMs" and "track[s] the progress of those cases as they are investigated, reviewed, and finalized." (Doc. 3268 at 265). Here is the Monitor's disposal of

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

7

the three most recent CRMs:

> Of the CRM cases reviewed for this reporting period, one involved an allegation against an unknown civilian employee. In that case, a complainant alleged that a civilian employee did not assist her during telephone contact because the complainant was a Spanish speaker. Despite efforts to do so, PSB investigators were unable to identify the person who the complainant had spoken to. The allegation was ***properly not sustained***.

> One of the CRM cases reviewed for this reporting period involved allegations of misconduct against a detention employee assigned to a jail facility. In that case, a complainant alleged that a detention officer was disrespectful in dealing with the complainant, made inappropriate comments to her, and was racist. The allegation of inappropriate comments was sustained. The comments, though inappropriate, was ***not found to be racially biased***.

> One of the CRM cases reviewed for this reporting period involved allegations of misconduct by a sworn employee. In that case, a complainant alleged that he was stopped in his vehicle for no reason and illegally searched. During the investigation, PSB added additional allegations to the complaint. The complainant did not allege that any of the alleged misconduct was based on his race, or that deputies made any racial comments. While PSB sustained multiple allegations of misconduct, they found ***no indication that any of the misconduct was based on the complainant's race***.

(*Id.* (emphasis added)).

Important here, the Monitor "concurred with the findings in all three of the investigations." (*Id.* at 266).

Those results are consistent with the preceding quarterly reports, none of which reveal any unconstitutional violations against the Plaintiff Class.

The Forty-Third Quarterly Report had ***no*** CRMs. (Doc. 3198 at 261).

The Forty-Second Quarterly Report included six possible CRMs. ***None*** of the incidents involved racial bias. (Doc. 3142 at 261-62). The Monitor "concurred with the findings in all six of the investigations." (*Id.* at 262).

And the Forty-First Quarterly Report had just three possible CRMs. Once again, ***none*** of these incidents involved racial bias, (*see* Doc. 3108 at 256-57), and once again, the Monitor "concurred" in that finding, (*id.* at 257).

In sum, none of the CRMs over the past year include a single sustained finding of a

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA  85016
(602) 445-8000

8

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

constitutional violation against the Plaintiff Class.  In fact, of the 157 CRM cases since the entry of the Second Order in 2016, just **ten** involved a sustained finding of misconduct involving bias related to the Plaintiff Class—the last being filed in 2022.  (Doc. 3332-1 at 146).  Of those ten, five involved an officer making a decision based on race, including decisions **not** to pursue a law enforcement action because of race.  (*Id.*).  Five others were for inappropriate comments by detention personnel—not the type of biased policing behind Plaintiffs' Complaint.  In each instance, the officer was reprimanded, suspended, or no longer works for MCSO.  Importantly, the Monitor has **never** disagreed with MCSO's treatment of a CRM case: "In all cases where [the Monitor has] provided oversight since July 20, 2016, [the Monitor Team] concurred with the decisions made by the PSB Commander regarding the case classifications and findings based on the briefings provided during the CRM meetings."  (Doc. 3268 at 262).

### D.    The "PSB Backlog"

A primary basis for the Monitor withholding Full and Effective Compliance is the existence of the "PSB Backlog."

The backlog is a later-arising focus in the case.  The Third Order issued on November 8, 2022, required MCSO to reduce the backlog of community complaints by twenty per month or face fines.  Later, on August 30, 2024, the Court issued the Fourth Order, as amended, which placed additional burdens on MCSO to reduce its backlog of internal investigations—whether related to the Class Complaint or not.  (*See* Doc. 3268 at 3).  In particular, Paragraphs 346 and 347 grant the Monitor "immediate authority to oversee all of MCSO's complaint intake and routing" and state the Monitor "shall revise and/or formalize MCSO's intake and routing processes" as long as a "backlog" exists.  And Paragraph 352 allows the Monitor to "intervene in the course of any investigation for the purpose of facilitating the appropriate operation of the PSB and/or the reduction of the backlog."

Not only does the backlog include complaints unrelated to the issues in this case and complaints unrelated to the sworn side of MCSO, but MCSO and PSB "prioritize" CRMs, with the result that there are **no** CRMs on the administrative backlog.  (*Id.* at 265 (noting that

"PSB continues to prioritize [CRM] completion")).  Nevertheless, MCSO and PSB have worked diligently to clear the administrative backlog of complaints unrelated to the issues in this case.  In less than three years, MCSO has reduced the backlog from 2,074 complaints to 547, mostly consisting of detention and civilian cases.  (Doc. 3330 at 2).

But the backlog continues to be the tail that wags the dog.  The only paragraphs in the Third Order that are "not in compliance" are Paragraphs 361 and 362, which relate to reducing the backlog.  (*See* Doc. 3286-1 at Slide 40).  And the single paragraph "not in compliance" from the Fourth Order similarly relates to internal affairs investigations and the requirement that they be complete within 180 days—*i.e.*, not be added to the backlog.  (*Id.* at Slides 25, 41).

## III.   LEGAL STANDARD

Rule 60(b)(5) permits a party to obtain relief from a judgment or order if it "has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable."  Fed. R. Civ. P. 60(b)(5).  The neighboring catch-all provision permits a party to obtain relief from a judgment or order for "any other reason that justifies relief."  Fed. R. Civ. P. 60(b)(6).  The rule permits "a party [to] ask a court to modify or vacate a judgment or order if 'a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to the public interest.'"  *Horne*, 557 U.S. at 447 (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992)).  The moving party under Rule 60(b) bears the burden of identifying changed circumstances warranting relief.  *Rufo*, 502 U.S. at 384.  "[B]ut once a party carries this burden, a court abuses its discretion 'when it refuses to modify an injunction or consent decree in light of such changes.'"  *Horne*, 557 U.S. at 447 (quoting *Agostini v. Felton*, 521 U.S. 203, 215 (1997)).

## IV.   ARGUMENT

This litigation has contributed to important reforms.  MCSO has disbanded no fewer than three units that focused on immigration-related issues.  (Doc. 3198 at 41).  It has created numerous training programs, ranging from anti-bias training to programs designed to

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

produce better managers. (*Id.* at 46-56). The results speak for themselves. The most recent TSAR shows either no statistically significant difference between racial groups or differences that are small and cannot be attributed to bias. The TSMRs similarly demonstrate unbiased policing. (Doc. 3199-1 at 3 ("Upon review of statistically significant TSMR findings from ongoing research, the Court Monitor has concurred with MCSO that the inequalities in traffic stop outcomes were not associated with bias.")).

MCSO's current practices do not violate federal law. But continued federal oversight diverts resources that could be used to serve the people of Maricopa County. It also upsets the democratic process and America's federalist structure by making local officials accountable to a federal court—based on the conduct of a former Sheriff who has been out of office for eight years. The Court should grant relief and return responsibility for lawful policing to the County and its officials. *Frew v. Hawkins*, 540 U.S. 431, 442 (2004).

## A. Changed Circumstances Render Continued Enforcement of the Court's Orders No Longer Equitable

Rule 60(b)(5) provides relief from an order where "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). Relief is appropriate "if 'a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to the public interest.'" *Horne*, 557 U.S. at 447 (quoting *Rufo*, 502 U.S. at 384).

Rule 60(b)(5) serves a "particularly important" function in institutional reform litigation, in which injunctions "remain in force for many years, and the passage of time frequently brings about changed circumstances," which "warrant reexamination of the original judgment." *Id.* at 447-48. Additionally, these cases implicate "sensitive federalism concerns" because they "commonly involve[] areas of core state responsibility," such as a state's law enforcement activities. *Id.* at 448; *see also United States v. California*, 921 F.3d 865, 887 n.11 (9th Cir. 2019) ("A state's ability to regulate its internal law enforcement activities is a quintessential police power."). Thus, courts take a "flexible approach" to Rule 60(b)(5) motions in such cases, reflecting the fact that the injunctions "reach beyond the parties" and impact "the public's right to the sound and efficient operation of its institutions." *Rufo*, 502

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

U.S. at 381 (quoting *Heath v. De Courcy*, 888 F.2d 1105, 1109 (6th Cir. 1989)). To that end, the "critical question" is whether "the objective of the [] order . . . has been achieved," *i.e.* whether "a durable remedy" to the underlying problem has been implemented and "whether ongoing enforcement of the original order [is] supported by an ***ongoing violation of federal law***." *Horne*, 447 U.S. at 450, 454 (emphasis added).

Here, the objectives of the Plaintiffs' Complaint have been achieved, and there is no evidence—let alone sufficient evidence to justify continued federal monitoring—of "an ongoing violation of federal law." *See id.* The Complaint challenged Arpaio's practices of pretextually stopping and/or detaining Latino persons ***in order to enforce immigration law***. Indeed, Arpaio, who "was the final decisionmaker" and was "responsible for setting and implementing the policies and practices of the MCSO," made immigration enforcement a priority and led MCSO to target vehicles for pretextual enforcement of traffic regulations "to investigate the immigration status of all Latino occupants." (Doc. 26 ¶¶ 13, 30-38). Arpaio went so far as to send scores of officers to areas he believed would contain day laborers who were unlawfully present in the United States. (*Id.* ¶¶ 39-48). These facts went further than even "strongly suggest[ing]" racial bias in MCSO's operations; they demonstrated deliberate practices targeting Latino individuals.

Things have changed.

MCSO has achieved 100% Phase I compliance, resulting in a complete change in written and operational policies and practices. None of the offending Arpaio policies remain in effect, nor have they for over a decade.

Nor does bias continue to infect MCSO's operations. The latest monthly, quarterly reports and TSAR annual reviews confirm as much. Indeed, the 2023 TSAR found "no evidence of disparities in stop lengths, citation rates, arrest rates, search rates, or seizure rates (hit rates) following a search for Hispanic drivers (compared with White drivers)." (Doc. 3035-1 at 37). The 2024 TSAR continued that streak, with the exception of a statistically significant difference in arrest rates. (Doc. 3199-1 at 9, 21 n.12, 40 n.24). But even that datum "do[es] not directly represent discriminatory policing." (*Id.* at 9). Moreover, since

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

April of 2021 MCSO has evaluated every deputy's traffic stops each month in the TSMR process across the five benchmarks of stop length, citations, searches, arrests, and seizures following a search ("hit rates"). In all of those reviews, "the Court Monitor has concurred with MCSO that [any potential] inequalities in traffic stop outcomes were not associated with bias." (*Id.* at 9, 10, 41). The Monitor has also affirmed the absence of any CRM complaint, and there are none pending in the backlog.

In addition to policy changes and operational success, MCSO has embraced the "[s]tructural and management reforms" that "constitute another relevant change in circumstances." *Horne*, 557 U.S. at 465. In the twelve years since the initial findings of fact, the MCSO has had three new Sheriffs, two Democrats and one Republican. None of them has waivered from the commitment to unbiased policing. Said differently, Arpaio's policies were the exception rather than the rule, and courts presume elected officials' good faith and lawful performance of their work. *See, e.g., Cruz v. Bondi*, 146 F.4th 730, 739 (9th Cir. 2025).

This "record of sustained good-faith efforts to remedy federal violations" shows that "compliance is more than fleeting." *Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176, 1203 (10th Cir. 2018). Courts regularly recognize progress of this kind to relieve local officials of federal oversight. The Seventh Circuit, for example, held that monitoring was "no longer warranted or tolerable" where "Governor Pritzker has demonstrated substantial compliance with the decree and identified and instituted durable remedies to help ensure that compliance sticks." *Shakman v. Pritzker*, 43 F.4th 723, 731 (7th Cir. 2022). As a result, the Governor "earned the right to make employment decisions for the state on his own" without "the watchful eyes of a special master or the federal court." *Id.*; *see also John B. v. Emkes*, 710 F.3d 394, 412-13 (6th Cir. 2013) (vacating injunction where the defendant complied with all constitutional requirements and evidence gave no reason to doubt future compliance); *Burt v. County of Contra Costa*, No. 73-cv-00906-JCS, 2014 WL 253010, at *20 (N.D. Cal. Jan. 22, 2014) (similar).

Additionally, federalism and democratic accountability favor relief under Rule 60. Absent an ongoing violation of federal law, the federal government does not involve itself in

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

13

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

the decisions of duly elected local officials.  On the rare occasion that federal involvement is necessary, the vertical separation of powers requires that "responsibility for discharging the State's obligations is returned promptly to the State and its officials." *Frew*, 540 U.S. at 442. Rule 60 prevents prior officials' conduct from encumbering their successors' ability to accomplish what the people elected them to do.  *Horne*, 557 U.S. at 449; *Shakman*, 43 F.4th at 732 (noting that continued enforcement "put a federal court in a role tantamount to serving as an indefinite institutional monitor . . . focused much more on ensuring that the Governor implements best practices rather than eliminates 'an ongoing violation of federal law'" (citation omitted)).

Federalism concerns "are heightened when, as in these cases, a federal court decree has the effect of dictating state or local budget priorities." *Horne*, 557 U.S. at 448.  Although the Court has taken issue with the total cost of compliance, no one disputes that the Four Orders "ha[ve] the effect of dictating state or local budget priorities." *Id*.  For example, the Monitor alone has now collected approximately $30 million.  (*See* Doc. 3286-1 at 49).  The preparation of reports and assisting the Monitor in his work have cost many millions more. Decisions about how to spend local tax revenues belong to local elected officials.  "When a federal court orders that money be appropriated for one program, the effect is often to take funds away from other important programs." *Horne*, 557 U.S. at 448.  Prolonging a federally imposed reallocation longer than necessary to end a constitutional violation is inequitable.

Relief under Rule 60(b) is appropriate in this case because the objective of bringing MCSO's policing into constitutional compliance is achieved.  Anything beyond that objective also lies beyond federal courts' jurisdiction, offends federalism, and improperly ties the hands of elected officials who desire only to discharge their duties lawfully.  This lawsuit has been a success, and the time for federal oversight has ended.

**B.**    **Alternatively, Defendants are Entitled to Rule 60(b)(5) Relief for Satisfaction of the Judgment as to the 172 Paragraphs for Which It Has Been in Full and Effective Compliance**

Rule 60(b)(5) also provides relief where "the [order] has been satisfied." "Satisfaction" in institutional reform litigation takes different meanings in different circuits

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

and under different circumstances. The Ninth Circuit construes it to mean "substantial compliance" in the context of consent decrees. *Jeff D. v. Otter*, 643 F.3d 278, 284-85 (9th Cir. 2011). Some circuits apply the same rule to involuntary judgments. *See, e.g., Jackson*, 880 F.3d at 1198 ("[T]he Court considers a consent decree and an injunctive order equivalent for purposes of evaluating a Rule 60(b)(5) motion for modification."). Others require only the elimination of the prior constitutional violation and good faith compliance with prospective requirements. *See Chisom v. Louisiana*, 116 F.4th 309, 318 (5th Cir. 2024) (en banc). Under either standard, MCSO has satisfied numerous paragraphs in the Four Orders. And, to be clear, Rule 60 relief is available on a partial basis if relief from the entire order or judgment is unavailable. *See United Com. Ins. Serv., Inc. v. Paymaster Corp.*, 962 F. 2d 853, 855 (9th Cir. 1992) (affirming grant of motion for partial relief from judgment under Rule 60(b)(5)).

Here, MCSO has fully and unequivocally complied with—*i.e.* "satisfied"—172 paragraphs of the Court's Orders. Indeed, the Monitor has concurred in MCSO's assertions of Full and Effective Compliance as to those paragraphs. (Doc. 3268 at 12-18). A table identifying those 172 paragraphs is attached as **Appendix A** hereto.

But, although those paragraphs are satisfied, the County must still incur expenses assessing and reporting its compliance to the Monitor. This is both onerous and unnecessary. MCSO's "sound and efficient operations" are limited by constant oversight, *see Rufo*, 502 U.S. at 381, and unnecessarily so with respect to requirements that MCSO has been in continuous compliance with for at least three years. The Court should, at a minimum, grant partial relief as to the 172 "satisfied" paragraphs so that MCSO can focus its efforts and resources on achieving and/or maintaining compliance with other provisions of the Orders.

**C.    Defendants are Entitled to Rule 60(b)(5) Relief for Satisfaction of the Judgment as to an Additional Twenty Paragraphs for Which It Has Been in Compliance**

In addition to the 172 paragraphs for which MCSO is in Full and Effective Compliance, the Court's Orders should be deemed satisfied as to an additional twenty (20) paragraphs.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

### 1.    Substantively in Full and Effective Compliance

MCSO has been in complete and continuous compliance for a period of at least three years with the following six paragraphs: 56, 69, 165, 173, 216, and 288. (*See* **Appendix B**; *see also* Doc. 3249-1 at 51-56).   For the same reasons discussed with respect to the 172 paragraphs above, the Court should grant relief as to these paragraphs because they are "satisfied" under Rule 60(b)(5).

### 2.    Monitor Clawback: Paragraphs that Were in Full and Effective Compliance and Are Currently in Compliance

For another four paragraphs, MCSO was in compliance for a continuous period of at least three years, but the Monitor briefly clawed back its determination for improper or arbitrary reasons.[3]  These paragraphs are therefore also satisfied:

Paragraph 25:  Paragraph 25 requires MCSO to "revise its policy or policies relating to traffic enforcement to ensure that those policies" require or prohibit a number of acts relating to traffic enforcement.  The Monitor determined MCSO was in compliance with Paragraph 25 from September 2017 through December 2020.  (*See* Fourteenth through Twenty-Seventh Quarterly Reports).  However, in his Twenty-Eighth Quarterly Report, the Monitor invented a new procedure and "deferred" its compliance determination with respect to Paragraph 25 based on the fact that MCSO had not yet achieved compliance with Paragraph 67.  (Doc. 2687 at 21).  Once MCSO achieved compliance with Paragraph 67, the Monitor reinstated its determination of MCSO's compliance with Paragraph 25.  (*See* Doc. 2952 at 27-30).  At no point during the "deferral" period was MCSO out of compliance with any requirement in Paragraph 25.  In fact, the Monitor "deferred" only one of the ten subparagraphs comprising Paragraph 25.  Accordingly, Paragraph 25 should be deemed "satisfied."

Paragraph 42:  Paragraph 42 requires that persons presenting required training programs be "competent instructors with significant experience and expertise in the area."

---

[3] Paragraphs deemed in compliance, but for less than three consecutive years as of the date of this filing, are included in **Appendix C**.

16

The Monitor determined MCSO was in compliance with Paragraph 42 from September 2018 through December 2021. Yet in the Thirty-Second Quarterly Report, the Monitor took issue with documents provided regarding conformance with the requirements of GG-1 criteria. (Doc. 2802 at 43). MCSO worked to revise its training policies and has been in compliance since March 2024. (Doc. 2989 at 43-44). There is no evidence that MCSO's changes implemented as to measuring compliance with this paragraph resulted in any constitutional violations suffered by the Plaintiff Class.

Paragraph 267: The same rationale discussed above with respect to Paragraph 25 applies to Paragraph 267. Paragraph 267 requires that MCSO "Supervisors . . . be responsible for close and effective supervision of deputies under their command . . . [and] ensure that all deputies under their direct command comply with [applicable law and Orders]." The Monitor determined MCSO was in compliance with Paragraph 267 from March 2020 through September 2023. (*See* Twenty-Fourth through Thirty-Eighth Quarterly Reports). However, in his Thirty-Ninth and Fortieth Reports, the Monitor determined MCSO was not in compliance with Paragraph 267 solely because MCSO was not in compliance with Paragraph 96. (Doc. 3027 at 246; Doc. 3074 at 245). Once MCSO achieved compliance with Paragraph 96, the Monitor reinstated his determination of MCSO's compliance with Paragraph 267. (Doc. 3108 at 244). The Monitor should not be permitted to maintain oversight and control over MCSO by withdrawing compliance determinations based on the requirements of other, independent paragraphs. For the reasons stated above as to Paragraph 25, Paragraph 267 should also be deemed "satisfied."

Paragraph 96: In addition to the preceding three paragraphs, Paragraph 96 should also be deemed satisfied because MCSO's lack of Full and Effective Compliance with Paragraph 96 is due to a ***single*** instance of non-compliance in January 2023. Paragraph 96 requires command-level officials to provide written reviews of problematic supervisory reviews related to arrests and evaluate appropriate corrective actions. The Monitor determined MCSO was in compliance with Paragraph 96 in September 2021. (*See* Doc. 2757 at 143-44). Out of all of the command-level incident reports that the Monitor has reviewed

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

17

since that time, only **one** was not in compliance with Paragraph 96. That report involved a lieutenant who "observed a subject who appeared to be passed out in the driver's seat of a [stolen] vehicle that was parked in a convenience store lot." (Doc. 3027 at 143). This led to a deputy investigating probable cause and other issues, and a patrol supervisor examining the shortcomings of that investigation. (*Id.*). The Monitor found that the supervisor's report failed to "address any correction action taken on the [deputy]" and was not submitted within the required timeframe. (*Id.*). This incident was not a Class Remedial Matter and had nothing to do with the subject of the Complaint or Plaintiff Class. However, this singular incident from almost two years ago is the sole reason the Monitor has not deemed MCSO in Full and Effective Compliance with Paragraph 96.

### 3. Paragraphs in Compliance that Do Not Require Ongoing Assessment

Another four paragraphs from the First and Second Orders and six paragraphs from the Third and Fourth Orders warrant relief because the Monitor has determined that MCSO is in compliance with the paragraphs, and the paragraphs do not provide for ongoing Monitor assessment. The paragraphs are definitional or impose discrete, one-time obligations on MCSO. They are "Phase 1"-only paragraphs. Yet, for reasons unclear to Defendants, the Monitor continues to assess Phase 2 "compliance" with these paragraphs, a concept that does not make sense and might simply reflect an oversight on the Monitor's part[4]:

Paragraph 64: Requires that "MCSO [] **develop** a protocol for periodic analysis of the traffic stop data." All required protocols and manuals were implemented and published no later than October 13, 2022. (*See* Doc. 2952 at 76). By any definition, the required protocol has been "developed."

Paragraph 65: Requires that MCSO "**analyze**" collected data on a monthly, quarterly, and annual basis. MCSO has been analyzing the relevant data with an approved methodology since at least April 2021. (*See* Doc. 2952 at 78). The Monitor took issue with the fact that the

---

[4] The same rationale applies to Paragraph 300, which is currently "deferred." Paragraph 300 merely delineates the "potential misconduct" that "is not sufficiently related to the rights of the members of the Plaintiff class to justify any independent investigations" under Paragraph 295 of the Court Orders. Paragraph 300 imposes no requirement on MCSO.

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

methodology was in pilot form initially, but it is no longer a pilot, and MCSO has been in compliance since December 2023. (*See* Doc. 3027 at 78).

Paragraph 67: Identifies the benchmarks by which the Monitor is to assess MCSO's compliance with Paragraphs 64 and 65. There is no affirmative mandate and no reason not to declare Full and Effective Compliance and, with it, satisfaction of the judgment.

Paragraph 98: Requires MCSO to **create** a system for regular employee performance evaluation. MCSO created the required system by September 2023. (*See* Doc. 2989 at 143).

Paragraph 338: Imposes a one-time requirement that MCSO calculate and provide certain information to the Court by November 25, 2022. MCSO filed as required on November 22, 2022. (Doc. 3268 at 277).

Paragraph 343: "MCSO is authorized to conduct PSB investigations through approved private contractors if it can do so consistent with state law." This mere authorization imposes no obligation for which the Monitor should be assessing compliance. (*See* Doc. 2887 at 274).

Paragraph 348: Requires the PSB to "create, and submit for the Monitor's approval, [certain] policies and procedures." MCSO timely created and submitted to the Monitor for approval all relevant policies and procedures, and the Court has since approved them. (*See* Doc. 3108 at 276).

Paragraph 350: Requires the Monitor to "assess MCSO's compliance with the investigative requirements of this order and [] determine whether training . . . is needed and implement such training." This paragraph does not impose a requirement on MCSO. It merely directs the Monitor to assess compliance with other paragraphs. There is no reason to state that MCSO is not in compliance. (*See* Doc. 3268 at 287).

Paragraph 356: Requires MCSO to provide information to the Monitor within ten business days of entry of the Third Order and defines the backlog. Here again, the paragraph imposes no ongoing obligation on MCSO, and there is no reason to find non-compliance.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

Paragraph 365: Revokes MCSO's authority to grant itself backlog extensions. MCSO has not attempted to do so since the entry of this order and has no intention of doing so, meaning that it is in Full and Effective Compliance.

### D. Defendants are Entitled to Rule 60(b)(5) and Rule 60(b)(6) Relief as to the Remaining 35 Paragraphs of the Orders Because Prospective Application of Those Paragraphs Is Inequitable or Unjustified

Prospective application and assessment of the remaining thirty-five (35) paragraphs is inequitable or unjustified for various reasons. Many of those paragraphs are untethered to any supposed constitutional violation harming the Plaintiff Class and thus exceed the Court's jurisdiction to impose injunctive relief. Others are vague or arbitrarily assessed by the Monitor. Relief is warranted as to these paragraphs as well.

#### 1. Duplication (Paragraph 97)

Paragraph 97 requires MCSO "Commanders and Supervisors [to] periodically review the EIS reports and information, and initiate, implement, or assess the effectiveness of interventions for individual[s] . . . based on that review. *The obligations of MCSO Commanders and Supervisors in that regard are described above in Paragraphs 81(c)-(h).*" (Emphasis added). Compliance with Paragraph 97 is dependent on compliance with certain subparts of Paragraph 81. And MCSO is in compliance with those provisions. (*See e.g.,* Doc. 3268 at 128-131 (holding MCSO in compliance with Paragraphs 81(c)-(h)). Relief is therefore justified as to Paragraph 97.

#### 2. Vague and Untethered from the Claimed Constitutional Violations

Relief is also justified from five paragraphs—Paragraphs 87, 92, 95, 99, and 100—with which MCSO is *already in compliance* and for which continued enforcement is inequitable or unjustified because the Paragraphs are vague or are untethered from the scope of Plaintiffs' claimed Constitutional violations.

Paragraph 87: Requires MCSO to "hold Commanders and Supervisors directly accountable for the quality and effectiveness of their supervision . . . as part of their performance evaluations and through [other] action." The Orders do not define what

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

"hold[ing] [someone] directly accountable" entails, opening the door for the Monitor to imbue them with meaning unintended by the Court and unknown to MCSO. Indeed, in the most recent Quarterly Report, the Monitor stated "three [appraisals] did not include adequate EIS reviews of commendations, awards, civil claims and disciplinary actions," without explanation. (Doc. 3268 at 143). More importantly, Paragraph 87 does not redress the alleged constitutional violations, as it merely requires MCSO to consider the substantive requirements contained in other paragraphs through some additional form of accountability. But if the substantive requirements are satisfied, continuing federal oversight of elected local officials based on an undefined notion of "directness" is inequitable and beyond the Court's jurisdiction.

Paragraphs 92 and 95: Paragraph 92 requires MCSO Supervisors to track and document subordinates' violations or deficiencies in investigatory stops or detentions and mandates that MCSO take appropriate corrective action against Supervisors who fail to do so. Paragraph 95 imposes analogous requirements in the context of arrests. Like those of Paragraph 87, the requirements of Paragraphs 92 and 95 are removed from the alleged constitutional violations. They pertain to performance evaluations for and corrective actions against MCSO personnel who are subject to the Orders' other requirements. Because the unconstitutional policies and practices that were at issue in Plaintiffs' Complaint have been remedied (and MCSO's current policies and procedures will avoid recurrence), continued enforcement of these time-consuming and costly Paragraphs is inequitable and unnecessary.

Paragraph 99: Requires that employee performance evaluations conducted under Paragraph 98 "take into consideration all past Complaint investigations; the results of all investigations; Discipline, if any, resulting from the investigation," and various other factors. The Orders do not define what "tak[ing] into consideration" requires, and the Monitor's reports do not elucidate the language. (*See* Doc. 3268 at 157). Like Paragraph 87, continuing federal oversight based on vague requirements removed from actual constitutional violations is inequitable. Further, the Monitor's determination of Phase 2 compliance with Paragraph 99 makes little sense because Paragraph 99 merely identifies what must be included in the

"system for regular employee performance evaluations" under Paragraph 98.  In other words, the Monitor assesses Phase 2 compliance with Paragraph 99 when Paragraph 99 is merely a Phase 1 corollary to Paragraph 98.

Paragraph 100:  Requires that "[t]he quality of Supervisory reviews [] be taken into account in the Supervisor's own performance evaluations."  Like Paragraph 99, Paragraph 100 does not define what "tak[ing] into account" means, nor does it define the parameters for the "quality of Supervisory reviews."  Paragraph 100 is also multiple steps removed from the substance of Plaintiffs' Complaint.  It is a purely administrative paragraph that is dependent on, or even duplicative of, the requirements of other paragraphs pertaining to performance evaluations (*e.g.,* Paragraphs 92, 95, and 176) (*see* Doc. 3268 at 157-58) and which are themselves removed from any constitutional violations affecting the Plaintiff Class.

### 3. Exceeding the Court's Jurisdiction—Backlog and PSB Investigations

Relief is further justified from (i) twelve paragraphs—Paragraphs 339, 340, 341, 342, 344, 345, 353, 355, 357, 358, 364, and 368—with which MCSO is in compliance and which relate solely to the backlog, and (ii) six additional paragraphs—Paragraphs 194, 195, 204, 211, 361, and 362—which relate broadly to PSB investigations and the staffing study aimed at reducing the PSB backlog.  These paragraphs are outside of the Court's jurisdiction because they extend beyond the Complaint and go far beyond what would be necessary to redress any alleged violation of federal law.

It is a "well-settled principle that the nature and scope of the remedy are to be determined by the violation." *Milliken v. Bradley*, 433 U.S. 267, 281-82 (1977).  Thus, "federal-court decrees must directly address and relate to,"—*i.e.* be "tailored to cure"—the constitutional violation, *id.* at 282, and must fit within the "scope of the case made by the pleadings." *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 525 (1986) (quotation omitted); *see also Gilmore v. California*, 220 F.3d 987, 1005 (9th Cir. 2000) ("[W]here a court seeks to correct a constitutional violation established in the course of litigation, the court's exercise of equitable discretion must heel close to the identified violation and respect 'the interests of state and local authorities in managing their own affairs, consistent with the

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

Constitution.'" (quoting *Milliken*, 433 U.S. at 281)).

The eighteen paragraphs listed above are outside the Court's jurisdiction because they are not tailored to the constitutional violations alleged in the Complaint or "established in the course of litigation." *Id.* As discussed above, the PSB backlog includes complaints unrelated to the issues in this case and many of which stem from MCSO's detention (jail) operations. (*See supra*, Part II(D)). In fact, there are *zero* CRMs in the backlog. That means none of the twelve paragraphs relating solely to the backlog are appropriately "tailored to cure" the constitutional violation. *See Milliken*, 433 U.S. at 282. If they were appropriately tailored, MCSO would be in compliance. Yet the backlog remains the primary driver of continued federal monitoring. That is inequitable.

The same is true for the six other above-listed paragraphs, which impose obligations related to MCSO's PSB/administrative investigations. Those requirements again apply to all MCSO administrative investigations, not only those related to the adjudged constitutional violations. Paragraph 183 makes this clear. It states that "[t]he Sheriff and the MCSO will conduct objective, comprehensive, and timely administrative investigations of *all allegations* of employee misconduct." (Emphasis added). Paragraphs 194, 195, 204, and 211, which further delineate what is required of MCSO with respect to misconduct investigations do nothing to narrow the scope in a manner that "heel[s] close to the identified violation[s]." *Gilmore*, 220 F.3d at 1005. Neither do the paragraphs concerning the Court-imposed staffing study (Paragraphs 361 and 362), which were aimed at generally "reducing the current backlog of complaints" in a manner untailored to the Plaintiffs' Complaint or Class Remedial Matters. (*See* Doc. 3268 at 295).

Because these paragraphs exceed the proper bounds of this Court's jurisdiction by regulating MCSO actions unconnected to the constitutional violation, continued enforcement is inequitable and unjustified.

### 4.    Vague, Untethered from the Claimed Constitutional Violations, and Arbitrarily Assessed

Additional relief is warranted as to eleven paragraphs—Paragraphs 32, 33, 54, 70, 72, 79, 81, 115, 269, 270, and 281—with which MCSO is not currently in compliance or for

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

which the Monitor's compliance assessment is "deferred."  Those eleven are vague or amorphous, compliance is arbitrarily assessed, or the paragraphs exceed jurisdictional bounds.

Paragraph 32:  Provides that "MCSO shall require that all Patrol Operation personnel report violations of policy; that Supervisors of all ranks shall be held accountable for identifying and responding to policy or procedure violations by personnel under their command; and that personnel be held accountable for policy and procedural violations.  The MCSO shall apply policies uniformly."  The Court Orders do not clarify what it means to hold anyone "accountable for" violations, nor does the Monitor independently assess "accountability" under this Paragraph.  Rather, the Monitor assesses compliance with Paragraph 32 by scrutinizing completed administrative misconduct investigations to determine whether those investigations meet the requirements of *other* paragraphs.  (*See* Doc. 3268 at 39 (noting that the Monitor makes "compliance findings based on the investigative and administrative requirements for the completion of [misconduct] investigations")).  This opaque meaning, along with the jurisdictional problem of reaching all misconduct investigations irrespective of whether the underlying complaints relate to the constitutional violation, render continued enforcement with Paragraph 31 inequitable and unjustified.

Paragraph 33:  Provides that "MCSO Personnel who engage in Discriminatory Policing in any context will be subjected to administrative Discipline and, where appropriate, referred for criminal prosecution.  MCSO shall provide clear guidelines, in writing, regarding the disciplinary consequences for personnel who engage in Discriminatory Policing."  The Monitor has made clear that "[t]he investigations that [it] review[s] for compliance with this Paragraph *do not include biased policing complaints involving the Plaintiffs' class*."  (*Id.* at 42).  Instead, the Monitor evaluates those investigations under "Paragraphs 275-283." (*Id.*).  That approach is both logical and a recognition that Paragraph 33 is not tailored to the violation at issue.  *See Milliken*, 433 U.S. at 281-82.  Moreover, MCSO's lack of compliance is apparently due to timeliness issues, (*see* Doc. 3268 at 42), but Paragraph 33 concerns

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

discipline with respect to already-adjudicated findings of discriminatory policing, not investigations that are subject to the Orders' timeliness requirements (*e.g.,* Paragraph 204). In sum, the Monitor is correct that applying Paragraph 33 to the Plaintiff Class does not make sense. But applying it to investigations that are still in progress is equally inapt. Paragraph 33 does not serve an independent purpose, and the Court should grant relief.

Paragraph 54: Requires MCSO to "develop a system to ensure that Deputies collect data on all vehicle stops, whether or not they result in the issuance of a citation or arrest." First, the Monitor's assessment of Phase 2 compliance with Paragraph 54 is unwarranted because Paragraph 54 requires only that MCSO "develop a system," which MCSO did through the creation and adoption of multiple policies and procedures. (*See* Doc. 3268 at 60-61). Paragraph 54 is therefore satisfied. Further, the requirements of Paragraph 54 exceed the scope of Plaintiffs' Complaint. On its face, Paragraph 54 applies to "all vehicle stops," and the Monitor has never confined himself to stops involving members of the Plaintiff Class. (*See id.* at 68). This renders Paragraph 54 overbroad, and continued enforcement therewith unjustified, especially considering that MCSO's last two annual reports showed no inequalities associated with bias against the Class. (*See supra* Part II(C)). That makes continued enforcement inequitable.

Paragraph 70: Requires that MCSO take reasonable and appropriate steps to investigate, monitor, correct, and impose discipline if traffic stop data indicates that a particular deputy is engaging in racial profiling, unlawful searches or seizures, or unlawful immigration enforcement, or if the Monitor concludes that systemic problems of these types exist. MCSO has been compliant with the requirement of this process since April of 2021, when it implemented TSMRs to ensure timelier review of traffic stop data and an earlier opportunity to correct any issues at the patrol level. MCSO conducts monthly TSMR analyses that include stop length for every single deputy.

The last two TSARs—like the TSMRs and TSQRs—confirm that MCSO does not engage in racial profiling or other unlawful policing practices with respect to the Plaintiff Class. As detailed by MCSO in its 45th Quarterly Report: "The TSMRs, TSARs, TSQRs, and

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

1    other accountability measures that are in place have not identified racial profiling, systemic

2    problems with unlawful searches and seizures, or unlawful immigration enforcement. The

3    most common outcome of traffic stops—Citations v. Warnings—found no statistically

4    significant differences between any racial or ethnic group and white drivers." (Doc. 3332-1

5    at 75). The only statistically significant difference between MCSO's treatment of White

6    drivers and members of the Class was for arrest rates following a traffic stop in 2024. (Doc.

7    3199-1 at 9). Even then, the TSAR clarified, and the Monitor concurred, that the difference

8    did not "represent discriminatory policing" or bias. (*Id.* at 10, 41). Moreover, there are no

9    statistically significant disparities in "hit rate." (*See* Doc. 3265). MCSO, as a law enforcement

10   agency, is already doing more to investigate, monitor, evaluate, and intervene when it

11   identifies a disparity than most, if not all, law enforcement agencies in the United States, and

12   more than what is required by the Order in this case. MCSO does so to demonstrate that it

13   sets the standard for all law enforcement agencies in this regard.

14        Paragraph 70 has achieved its purpose, and MCSO has adopted measures to monitor

15   and ensure the continued success of its reforms. Continued assessment and enforcement of

16   Paragraph 70 would be inequitable because MCSO long ago repealed its unlawful policing

17   policies and has implemented—pursuant to the Court's Orders—operational policies and

18   practices aimed at curbing discrimination and ensuring fairness in policing. As discussed in

19   Part II(C), *supra*, these policies and practices have been successful.

20        Paragraph 72: Requires MCSO "to develop, implement and maintain a computerized

21   EIS" to identify "potentially problematic behaviors . . . within one year of the Effective

22   Date" and requires MCSO to use the EIS data to promote best practices and evaluate

23   employee performance. As with Paragraph 54, MCSO has satisfied the requirement that it

24   "develop, implement and maintain" the system required in Paragraph 72. (*See* Doc. 3268 at

25   106). MCSO has also satisfied the use requirement. It regularly uses the EIS to identify and

26   respond to potential problems regarding racial profiling, unlawful detentions and arrests, and

27   improper enforcement of immigration-related laws. (*Id.*). Importantly, those issues no

28   longer plague the MCSO. As discussed in Part II(B) *supra*, there has been no Triple I Unit,

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

no targeting of members of the Class, and no detention of Latinos pursuant to attempted enforcement of immigration laws for **over ten years**. The Monitor's continued finding of non-compliance with this paragraph is impossible to understand and unconnected to any ongoing violation. Continued enforcement of Paragraph 72 is unjustified.

Paragraph 79: Provides that "[t]he EIS computer program and computer hardware will be operational, fully implemented, and be used in accordance with policies and protocols that incorporate the requirements of this Order within one year of the Effective Date." It is undisputed that the MCSO has fully satisfied this requirement. (*See id.* at 122-23). The Monitor has correctly noted that MCSO has published nine comprehensive TSARs using data from its EIS program. (*Id.* at 123). Even more importantly, the data from those TSARs demonstrate that MCSO is not engaged in discriminatory policing against members of the Plaintiff Class. The Monitor's non-compliance assessment appears to be based on his opinion that "modifications [are] needed in both the [non-traffic contact] form and the policy going forward." (*Id.*). But Paragraph 79 does not impose any such conditions. Continued enforcement of Paragraph 79 is unjustified because MCSO has satisfied its terms, and the Monitor lacks constitutional authority to amend them.

Paragraph 81: Requires MCSO to "develop and implement a protocol for using the EIS and information obtained from it" addressing "data storage, data retrieval, reporting, data analysis, pattern identification, identifying Deputies for intervention, Supervisory use, Supervisory/agency intervention, documentation and audit." Once again, MCSO has satisfied this requirement, and once again, the Monitor appears to be augmenting what the Court ordered. The Monitor has deemed MCSO not in compliance with subparagraphs (a) and (b) of Paragraph 81. (*See id.* at 127-28). The obstruction to compliance appears to be MCSO's completion of the Non-Traffic Contact Forms ("NTCF") analytic plan. (*Id.*). But MCSO has "develop[ed] and implement[ed] a protocol" for using relevant EIS data and "continues to provide access each month to all [NTCFs] involving investigative stops and field information," and the Monitor has recognized that the NTCFs do not raise concerns about disparate treatment. (*Id.* at 94). The Monitor's insistence on additional operational

27

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

steps is beyond his constitutional authority and unsupported by—indeed, contrary to—his own finding that the data shows unbiased policing.

Paragraph 115:  Requires the creation of the Community Advisory Board ("CAB"), and requires MCSO to cooperate with the Monitor to assure that members of the CAB are "given appropriate access to relevant materials, documents, and training so the CAB can make informed recommendations and commentaries to the Monitor."  The Monitor has held MCSO not in compliance with Paragraph 115 because "MCSO rescinded its offer to attend [an October 2024 community meeting] once the CAB clarified that it was not interested in a presentation from [MCSO]." (*Id.* at 168-69)  Not only did the Monitor not give any warning that failure to attend a *single* CAB meeting would take MCSO out of compliance, but nothing in Paragraph 115 requires MCSO to attend meetings.  Nevertheless, MCSO attends CAB meetings, works with CAB to foster community relationships with community leaders, and has long been recognized by the Monitor in doing so prior to the singular incident described above. (Doc. 3332-1 at 108-110).  And the Monitor has recognized that MCSO continues to fulfill the responsibilities delineated under Paragraph 115. (Doc. 3268 at 168 ("MCSO, through its appointed liaison to the CAB, continues to respond to the CAB's inquiries and requests for information.")).  Paragraph 115 is therefore satisfied, and continued enforcement is inequitable.  Moreover, in light of the other relief requested in this motion, the CAB's continued existence is mooted.  MCSO will, of course, continue to engage with the constituents it serves.

Paragraphs 269 and 270:  These paragraphs concern MCSO's document preservation practices.  Paragraph 269 requires MCSO to "promptly communicate" document preservation notices it receives from litigants to all appropriate personnel.  Paragraph 270 requires the MCSO to take certain actions when faced with a document preservation notice during litigation, including sequestering and preserving documents and ensuring that an adequate search for responsive documents is conducted.  These paragraphs far exceed the Court's jurisdiction.  They are multiple steps removed from discriminatory policing.  Requiring MCSO to appropriately respond to document preservation notices is not "aimed

at eliminating" the constitutional violation. *Milliken*, 433 U.S. at 282. Moreover, there is nothing to indicate that MCSO does not follow the law regarding document preservation. Accordingly, enforcement of these paragraphs is inequitable and unjustified.

Paragraph 281: States that "the Sheriff shall ensure that the MCSO receives and processes [CRMs] consistent with: (1) the requirements of th[e Court's Orders], (2) MCSO policies promulgated pursuant to [the Third Order], and (3) the manner in which, pursuant to policy, MCSO handles all other complaints and disciplinary matters. The Sheriff will direct that the Professional Standards Bureau and the members of his appointed command staff arrive at a disciplinary decision in each Class Remedial Matter." This paragraph should be deemed satisfied—or, at a minimum, continued enforcement of this paragraph is unjustified—because the Monitor has approved MCSO's handling of all CRMs since the entry of the Second Order in 2016. (*See supra*, Part II(C); Doc. No. 3108 at 253).

For the above reasons, prospective application and assessment of these thirty-five Paragraphs is inequitable or unjustified, and MCSO is entitled to relief under Rule 60(b)(5) and (b)(6).

## V.  CONCLUSION

This litigation has been a success. Policies, personnel, and outcomes have all changed since this suit began. When institutional-reform litigation achieves this level of success, the Supreme Court has consistently held that Rule 60 relief is appropriate. Maricopa County therefore respectfully requests the Court grant the motion providing relief from judgment.

DATED this 13th day of January 2026.

GREENBERG TRAURIG, LLP

By: */s/ Dominic E. Draye*
　　Dominic E. Draye
　　Matthew P. Hoxsie
　　Zachary H. Levy
　　*Attorneys for Defendant Maricopa County*

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000