1  Timothy Sandefur (033670)
2  Jonathan Riches (025712)
   **Scharf-Norton Center for Constitutional Litigation at the**
3  **GOLDWATER INSTITUTE**
   500 E. Coronado Rd.
4  Phoenix, Arizona 85004
   (602) 462-5000
5  litigation@goldwaterinstitute.org
   *Attorneys for Plaintiff*

6

7                    **UNITED STATES DISTRICT COURT**
                        **DISTRICT OF ARIZONA**
8

9  Manuel De Jesus Ortega Melendres, on
   behalf of himself and all others similarly     Case No. 2:07-cv-02513-GMS
   situated; et al.,
10
                                                  **GOLDWATER INSTITUTE'S**
11            Plaintiffs,                          **AMICUS BRIEF IN SUPPORT OF**
                                                  **DEFENDANTS' MOTION FOR**
          vs.                                     **RELIEF FROM JUDGMENT**
12

13 United States of America,

14            Plaintiff-Intervenor,

15 v.

16 Gerard A. Sheridan, in his official capacity
   as Sheriff of Maricopa County, Arizona, et
17 al.,

18            Defendants.

19

20                          **INTRODUCTION**

21       Taxpayers have a right to know how their tax dollars are being spent.  This

22 principle is embodied in Arizona and federal law, which provide that public records—

23 quintessentially including information about government spending—are generally open to

24 inspection by members of the general public.  A.R.S. § 39-121.  Yet for twelve years now,

25 the taxpayers of Maricopa County have been kept in the dark about the expenses of the

26 Court-appointed Monitor and that Monitor's activities.

27       This is not a theoretical concern.  Watchdog groups, including amicus Goldwater

28 Institute ("GI"), frequently employ the public records laws to monitor government

1   spending in order to bring to the public's attention the amount or possible misuse of public

2   funds and to inform the public about "what its government is up to." *Nat'l Archives &*

3   *Recs. Admin. v. Favish*, 541 U.S. 157, 162 (2004) (citation omitted). This plays a critical

4   role in democratic deliberation. But although GI has tried for years now to obtain such

5   records, the orders imposed in this case[1] have kept those documents withheld from the

6   public. The County and the Court-appointed Monitor have refused to provide those

7   documents in response to GI's Public Records Law requests, on the grounds that the May

8   15, 2014 Order supersedes state and federal public records laws. That means taxpayers

9   cannot learn how much of their money has been spent during the years of federal

10  oversight.

11          Such a lack of transparency contradicts both state and federal policy. *See, e.g.,*

12  *Goldwater Institute v. City of Phoenix*, 563 P.3d 656, 661 ¶ 14 (Ariz. App. 2025), *review*

13  *granted* (Sept. 9, 2025) ("Arizona's public records statute 'evince[s] a clear policy

14  favoring disclosure.'" (citation omitted)); *Doe v. Public Citizen*, 749 F.3d 246, 271 (4th

15  Cir. 2014) (court withholding facts of litigation "cannot be squared with the principles of

16  public discourse."); *cf. NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978)

17  ("The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of

18  a democratic society, needed to check against corruption and to hold the governors

19  accountable to the governed.").

20          While amicus takes no position on whether the Sheriff's office "has reformed its

21  policies," as Defendants argue, Defs' Mot. for Relief (Doc. 3368) at 2, it certainly is true

22  that Court-mandated oversight "imposes current burdens and must be justified by current

23  needs." *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009).

24  Moreover, it's crucial that Maricopa County taxpayers be permitted to know where their

25  tax dollars are going—and that's hindered by the existing orders and continued federal

26  oversight without a full public accounting.

27

28

---

[1] Specifically its Order of May 15, 2014 (Doc. No. 696).

**ARGUMENT**

**I.      The existing orders in this case prevent taxpayers from knowing where their money is going.**

Amicus GI takes seriously its duty to help Arizonans monitor how the government spends their money.  For that reason, it regularly files requests under the Freedom of Information Act and the Arizona Public Records Law seeking documents regarding the government's spending of tax dollars.  *See, e.g., City of Phoenix, supra*; *Goldwater Institute v. U.S. Dep't of Health & Hum. Servs.,* 804 Fed. Appx. 661 (9th Cir. 2020).  GI has often used information gleaned in this way in its litigation in defense of taxpayer's rights.  *See, e.g., Rodgers v. Huckelberry*, No. 2 CA-CV 2021-0072, 2022 WL 14972042 (Ariz. App. Oct. 26, 2022); *Schires v. Carlat,* 250 Ariz. 371 (2021); *Paulin v. City of Phoenix* (Ariz. App. Div. 1 No. 1 CA-CV 24-0086) (pending).

Beginning in January 2024, GI has submitted multiple public records requests to Maricopa County seeking records pertaining to expenditures for the monitoring costs in this case—specifically, invoices for services rendered by Warshaw & Associates, Inc., records providing an itemized accounting of those services, and records revealing the salaries of Warshaw & Associates employees working on the monitoring.  Those requests were incompletely answered due to the fact that most of the information is exclusively in possession of the Court-appointed Monitor.  Consequently, on May 19, 2025, GI filed a request with Warshaw & Associates directly.  But Warshaw & Associates also declined to respond to that request.

The reason is because this Court's May 15, 2014 Order (Doc. 696) specifies that the Monitor shall provide "detailed time entries"—that is, the "bills" that "include specific task-oriented time logs for the activities of the monitor team, including backup for support costs"—"to the Court alone."  *Id.* at 1.  That Order further provides that the County's Deputy Manager can review the detailed time sheets only *in camera*, but is "prohibited from communicating or providing or permitting access to any information concerning any

1    aspect of those bills" to "any person or entity" other than the County's own attorney, the

2    Monitor, and the Court itself.  *Id.* at 2.

3           Thus, under the May 15, 2014 Order—which remains in place today[2]—the County

4    itself is not in possession of information (or, if it is in possession, is not allowed to share

5    it) even though that information is normally disclosable to the public.  The Order thus

6    prohibits taxpayers from obtaining "any information concerning any aspect" of the

7    Monitor's activities—even while they're forced to pay for it.  That Order has now been in

8    place for twelve years.

9           Government invoices payable with tax dollars are quintessential public records.

10   *See Carlson v. Pima Cnty.*, 141 Ariz. 487, 490 (1984) ("records reasonably necessary to

11   provide knowledge of all activities they undertake in the furtherance of their duties" are

12   public records); *Mathews v. Pyle*, 75 Ariz. 76, 78 (1952) ("A public record … is one made

13   by a public officer in pursuance of a duty, the immediate purpose of which is to … serve

14   as a memorial of official transactions for public reference." (citation omitted)).  These

15   documents memorialize transactions for public services involving the government—

16   indeed, involving government's core functions of policing and civil rights enforcement.

17   *Cf. Nissen v. Pierce Cnty.*, 357 P.3d 45, 54–55 ¶¶ 24-26 (Wash. 2015) (records relating to

18   use of government facilities or "actions, processes, and functions of government" are

19   public records).

20          The May 15, 2014 Order thus operates as a protective order.  Yet courts "generally

21   disfavor blanket protective orders" absent a showing of good cause.  *Johnson v. City &*

22   *Cnty. of San Francisco*, No. CV 09-5503 JSW (JSC), 2012 WL 104635, at *2 (N.D. Cal.

23   Jan. 12, 2012).  Such a showing requires (a) reason to believe that "*particularized* harm

24   will result from disclosure of information to the public," *Phillips v. Gen. Motors Corp.*,

25   307 F.3d 1206, 1211 (9th Cir. 2002) (emphasis added), and (b) a balance between the

26   public interest in disclosure and the potential for harm.  *In re Roman Catholic Archbishop*

27   _____

28   [2] From time to time, the Court has "temporarily suspended" some of aspects of the Order
     (Doc. 696), but its confidentiality obligations have remained in place.  *See, e.g.,* Doc. No.
     1048 at 1–2; Doc. No. 1147.

4

1    *of Portland*, 661 F.3d 417, 424 (9th Cir. 2011).  The May 15, 2014 Order contains none of

2    these.[3]

3         Whatever the situation may have been in May 2014, when Sheriff Arpaio was still

4    in office, circumstances have obviously changed now.  And that change is relevant not

5    only to the judgment at issue in Defendants' motion, but also to the May 15, 2014 Order.

6    Perhaps there was good cause to keep the general public from seeing the Monitor's

7    invoices in 2014, but the Court should now consider whether the facts still justify

8    concealing this information.

9         It's highly unlikely that the answer to that question is yes.  Taxpayers obviously

10   have a legitimate interest in knowing how the Monitor has been spending his time and

11   their money.  And it simply cannot be the case that the law warrants withholding this

12   information forever.  *See Church of Scientology v. City of Phoenix Police Dep't*, 122 Ariz.

13   338, 339-40 (App. 1979) (rejecting argument that investigatory files should forever

14   remain confidential and citing the federal Freedom of Information Act).  *Cf. Goldwater*

15   *Inst.,* 563 P.3d at 660 ¶ 10, 665 ¶ 34 ("the passage of time" may alter which records are

16   disclosable).

17        A similar issue was raised in *Doe, supra*.  That case involved an online database

18   created by the Consumer Product Safety Commission ("CPSC") for reports of harm

19   relating to consumer products.  A private firm sued to keep the CPSC from publishing a

20   report that had been filed against it in that database.  The trial court chose to keep the

21   entire trial secret, sealing all documents involved.  *See* 749 F.3d at 252.  The firm ended

22   up winning, and the District Court issued a redacted opinion and continued to keep the

23   details under seal.  *Id.* at 253.  Public Citizen then intervened to appeal the sealing order,

24   arguing that the public had a right to know the information involved in the case.  The

25   Court of Appeals ruled that the District Court had erred in keeping the information secret.

26   While a trial court might find good cause to continue withholding certain information, it

27

28   _____
     [3] In 2022, the Court did unseal some documents, but not those relating to the Monitor's
     activities.  *See* Doc. No. 2819.

1    cannot "keep all meaningful facts about the litigation forever concealed from public

2    view." *Id.* at 270.  The court went on to establsh a test for determining whether to keep

3    the files in a case concealed.  It must "(1) provide public notice of the sealing request and

4    a reasonable opportunity for the public to voice objections to the motion; (2) consider less

5    drastic alternatives to closure; and (3) if it determines that full access is not necessary, it

6    must state its reasons—with specific findings—supporting closure and its rejections of

7    less drastic alternatives." *Id.* at 272.

8         Similarly, in *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172 (9th Cir. 2006),

9    a police officer's civil rights lawsuit against his police department ended in a settlement—

10   but the documents involved in the case were subjected to a protective order.  *Id.* at 1176.

11   A newspaper later sought the documents, and after long back-and-forth, the court agreed

12   to release the documents, and the County appealed that ruling.  *See id.* at 1177-78.  The

13   Ninth Circuit affirmed, noting that the public has "a general right to inspect and copy

14   public records and documents, including judicial records and documents," a right that is

15   "justified by the interest of citizens in keeping a watchful eye on the workings of public

16   agencies. Such vigilance is aided by the efforts of newspapers to publish information

17   concerning the operation of government." *Id.* at 1178 (cleaned up).  A party seeking to

18   keep such documents away from the public eye "bears the burden" of overcoming the

19   presumption of access by showing "compelling reasons supported by specific factual

20   findings"—and the court can agree only if it "articulate[s] the factual basis for

21   [concealment], without relying on hypothesis or conjecture." *Id.* at 1178-79 (cleaned up).

22        Similar considerations apply here.  The Monitor's itemized invoices—past, present,

23   and future—are entirely withheld by the May 15, 2014 Order, even though they plainly

24   "implicate public concerns that are at the core of the interests protected by the right of

25   access." *Doe*, 749 F.3d at 271.  Yet the docket reveals no statement by the Court, or *any*

26   specific findings, to support why no less drastic alternative would suffice.

27        The passage of time only worsens the situation.  Whether or not the May 15, 2014

28   Order was justified at the time, the facts have changed.  If some form of confidentiality is

6

1    still warranted, the Court should articulate the reasons with specific findings. *See id.* at

2    272 (a party seeking "continued sealing" must "articulate a compelling interest that

3    outweighs the strong presumption of public access").

4         To justify withholding these documents indefinitely would require an extreme

5    showing, indeed.  Courts typically presume that the public has a right to access case

6    records, and that presumption can only be rebutted "'in light of the relevant facts and

7    circumstances of the particular case.'" *DePuy Synthes Prods., Inc. v. Veterinary*

8    *Orthopedic Implants, Inc.,* 990 F.3d 1364, 1369–70 (Fed. Cir. 2021) (quoting *Nixon v.*

9    *Warner Commc'ns, Inc.,* 435 U.S. 589, 599 (1978)); *accord, In re Gitto Glob. Corp.*, 422

10   F.3d 1, 6 (1st Cir. 2005) (holding that "[o]nly the most compelling reasons can justify non-

11   disclosure of judicial records" (citation omitted) (alteration in original)).

12        Given that the public undeniably has a legitimate interest in knowing how its

13   money is being spent, and what the Court-appointed Monitor has been doing in overseeing

14   the operation of their Sheriff's Department, GI respectfully submits that this Court grant

15   the Defendants' motion, and, with input from all parties, simultaneously reconsider its

16   May 15, 2014 Order, and any other order shielding the Monitor's activities from the

17   taxpayers' eyes.

18   **II.    Federalism requires that a County Sheriff's Department be Overseen by the
         People of the County, Not the Federal Government.**

19

20        Our Constitution leaves local law enforcement to the responsibility of local

21   officials.  Indeed, the federal government has no police power. *United States v. Lopez*,

22   514 U.S. 549, 566 (1995).  While it is certainly responsible for protecting federal civil

23   rights if and when local officials violate those rights, the operation of a Sheriff's

24   Department is a quintessentially local matter. *See The Federalist* No. 45 at 313 (James

25   Madison) (J. Cooke, ed. 1961) ("The powers reserved to the several States will extend to

26   all the objects which, in the ordinary course of affairs, concern the lives, liberties, and

27   properties of the people, and the internal order, improvement, and prosperity of the

28   State.").

7

1      Equally important is federalism's respect for local control over taxing and

2    spending.  It offends constitutional principles for federal authorities to take these matters

3    out of the hands of local voters, as the Supreme Court made clear in *Missouri v. Jenkins*,

4    495 U.S. 33 (1990).  That case, too, involved federal oversight of local entities to ensure

5    civil rights enforcement, and it affirmed a federal District Court's authority to compel

6    local officials to fund programs to address civil rights concerns, *see id.* at 52-58, yet held

7    that this can be done only with due "respect for the integrity and function of local

8    government institutions."  *Id*. at 51.  The District Court had ordered a tax increase, and

9    while the Supreme Court said a District Court's equitable powers are quite extensive in

10   civil rights cases, it said courts should nevertheless impose less-burdensome restrictions

11   because "[a]uthorizing and directing local government institutions to devise and

12   implement remedies not only protects the function of those institutions but, to the extent

13   possible, also *places the responsibility for solutions to the problems of [civil rights*

14   *enforcement] upon those who have themselves created the problems*."  *Id.* (emphasis

15   added).

16       In other words, judicial oversight is indeed warranted sometimes, but *indefinite*

17   control over local policing and taxation—especially in a manner that takes responsibility

18   away from taxpayers on the ground—conflicts with this basic constitutional value, which

19   is rooted in a recognition that the people of a community are most likely to know what

20   their own needs are, and how to tailor government services to meet those needs, and

21   therefore should have the autonomy to do so, combined with the responsibility of doing so

22   within constitutional boundaries.  In short, federal monitoring of the MCSO—*and the*

23   *compulsion of county taxpayers to fund it without a full accounting*—must end at *some*

24   point.

25       A similar question was raised in *Shelby County v. Holder*, 570 U.S. 529 (2013).

26   There, the Court addressed whether the federal government's oversight of elections could

27   go on indefinitely, even though half a century had passed since that oversight began.  *See*

28   *id.* at 535.  Circumstances had changed in the interim, and states and counties operated

8

1   under different policies than they had when federal oversight began.  *Id.* While there was

2   no denial that "discrimination still exists," *id.* at 536, the Court said that "'the [Voting

3   Rights] Act imposes current burdens and must be justified by current needs.'"  *Id.*

4   (quoting *Nw. Austin*, 557 U.S. at 203).  Reiterating the federalist principle that local

5   governments "retain broad autonomy in structuring their governments and pursuing

6   legislative objectives," and recognizing that the federal government has an important role

7   to play in protecting civil rights, it observed that federal intervention that may have been

8   justified decades ago is not necessarily justified today.  *Id.* at 543.  "[H]istory did not end

9   in 1965," and the federal government could not justify its continued oversight based on "a

10  formula based on 40–year–old facts having no logical relation to the present day."  *Id*. at

11  552, 554.  Instead, it was required to "identify those jurisdictions to be [overseen] on a

12  basis that makes sense in light of *current* conditions."  *Id.* at 553.

13       The same is true here.  History did not end in 2014, and continued federal oversight

14  of MCSO cannot be based on decade-old facts.  As in *Holder*, continuing to operate under

15  orders imposed based on outdated facts intrudes on the autonomy of the states and

16  contradicts our federalist system.  The Court should therefore, at a minimum, require a

17  detailed factual showing that continued oversight is warranted.  And that requires granting

18  the Defendants' Motion.

19                                    **CONCLUSION**

20       The Motion for Relief from Judgment should be *granted*.

21       **RESPECTFULLY SUBMITTED** this 20th day of January 2026.

22

23                                    GOLDWATER INSTITUTE

24                                    /s/ *Timothy Sandefur*
                                     Timothy Sandefur (033670)
25                                    Jonathan Riches (025712)
                                     Scharf-Norton Center for
26                                     Constitutional Litigation at the
                                     GOLDWATER INSTITUTE
27                                    500 E. Coronado Rd.
                                     Phoenix, Arizona 85004
28                                    *Attorneys for Plaintiff*

                                          9

**CERTIFICATE OF SERVICE**

ORIGINAL E-FILED this 20th day of January 2026, with a copy served on counsel of record via the Court's CM/ECF system

/s/ *Kris Schlott*
Kris Schlott, Paralegal

10