**Maricopa County Sheriff's Office**
**Comments on Monitor's Forty-Fifth (45th) Quarterly Draft Report**
**April 1, 2025–June 30, 2025**

The Monitor's 44th Quarterly Draft Report covers the time from April 1, 2025, to June 30, 2025. Maricopa County Sheriff's Office ("MCSO") continues to work with the Monitor, the American Civil Liberties Union ("ACLU"), and the United States Department of Justice ("DOJ") to achieve compliance with the Court's Orders. MCSO is dedicated to following best police practices and gaining Full and Effective Compliance with the Court's Orders.

MCSO has submitted and filed with the Court its 45th Quarterly Report, which delineates the steps that MCSO has taken to implement the Court's Orders and its plans to address problems and responses to concerns raised in the Monitor's previous Quarterly Report and during ongoing communications with the Monitor. MCSO requests that the content of that 45th Quarterly Report be considered as comments to the Monitor's Draft Report as it contains relevant feedback. MCSO's additional comments to the Monitor's compliance findings and other issues in the Draft Report are listed below.

## Section 1: Introduction

MCSO again suggests that the Monitor update its table of contents to include specific sections for the Third and Fourth Orders. Doing so will help readers more readily locate the paragraphs subject to those most recent Orders. This simple, requested update will facilitate reader access to and understanding of compliance information.

## Section 2: Methodology and Compliance Summary

In its Comments to the Monitor's 43rd Report, Plaintiff/Intervenor the United States objected "to the 94% compliance threshold. The Monitor's methodology does not provide an objective basis for this required score. At this stage in the case, MCSO submits that the Monitor should reevaluate its compliance methodology and focus resources on the key outstanding areas. Instead of applying a rigid numerical threshold, the Monitor should apply an objective, practical approach to determine whether MCSO has implemented the Orders." (Doc. 3198-3 at 1.) As initially stated in its 44th Quarterly Report, MCSO agrees with the United States that the Monitor should apply an objective, practical approach to determine MCSO's compliance with the Court's Orders. (Doc. 3205-1 at 2.) Under the Court's Orders, MCSO has transformed into an agency that sets national benchmarks in transparency and police practices.

As MCSO has initially commented in its Comments to the Monitor's 43rd Quarterly Report (Doc. 3198-2 at 1) and has continued to do so in each of its Quarterly Reports, including its 44th Quarterly Report (Doc. 3205-1 at 2) and now in this Report, MCSO has requested separately that the Monitor reevaluate its methodology and confine its compliance determination to particular requirements of each individual Paragraph. Prime examples of this involve the Monitor's assessment of MCSO's compliance with Paragraphs 32 and 33 (addressed more fully below), as well as Paragraphs 72, 79, and 81 (addressed more fully below). The Monitor has repeatedly stated in its Report that it documents MCSO's compliance with applicable Order requirements or Paragraphs. Thus, MCSO's position is that the Monitor must address whether MCSO has complied with each individually applicable Paragraph as a distinct Order requirement. MCSO asserts that the Monitor's refusal to do so violates

its own methodology because it conflates the requirements of multiple Paragraphs and imports the requirements of unrelated paragraphs into any given analysis. This means a single dispute over an unrelated issue could unjustifiably hold MCSO out of compliance with multiple Paragraphs. MCSO asks the Monitor to adhere to the Court's Orders and its own methodology, and analyze MCSO's compliance with each particular Paragraph according to that Paragraph's own, unique requirements without reference to unrelated Paragraphs.

**Section 3: Implementation Unit Creation and Documentation Request**

MCSO does not have any comments relevant to the Paragraphs under Section 3. MCSO is in Full and Effective Compliance with all the Paragraphs under Section 3.

**Section 4: Policies and Procedures**

**Paragraph 32.** This Paragraph requires all Patrol Operation personnel to report policy violations and Supervisors to uniformly identify, respond to and hold accountable personnel under their command who violate MCSO Policies and Procedures. As articulated in its Reports to the Court, MCSO satisfies these requirements. (*See e.g.,* 3025-1). MCSO repeats its continued objection to the Monitor's method of assessment for compliance with Paragraph 32 because it far exceeds the actual requirements of Paragraph 32 (*see* Doc. 606 at ¶ 32) and, instead, imports requirements from other, unrelated Paragraphs, including the timeliness requirements of Paragraph 204, as amended.

In its Draft Report at 38, the Monitor stated that it would "continue to closely monitor the impact" MCSO's decision to discontinue Deputy Chief level review of district and division misconduct cases. However, the Court's Order neither requires nor suggests final review by the Deputy Chief. As previously stated, the Professional Standards Bureau ("PSB") Commander should have the responsibility to oversee the district cases in place of the Deputy Chief. Any deficiencies discovered by the PSB Commander and sent back for correction should not be included as a deficient case under this Paragraph because MCSO is identifying any deficiency through its internal control process.

Furthermore, Paragraph 32 does not contain investigative timeliness or quality requirements; nor can these requirements be reasonably be applied to Paragraph 32. Since either PSB or a separately appointed district sergeant conducts the investigations, Patrol Operations personnel and Patrol Operations supervisors do not necessarily have control over investigations into potential policy or procedure violations or control to timely hold those under their command accountable for policy and procedural violations. Thus, imposing timeliness and investigative quality requirements as compliance benchmarks for Paragraph 32 is inappropriate. Thus, MCSO again requests the Monitor amend its Draft Report and find MCSO in Phase 2 compliance with Paragraph 32.

**Paragraph 33.** Like Paragraph 32, MCSO again asserts that the Monitor inappropriately assesses compliance with this Paragraph through references to other, unrelated Paragraphs. Here, the Monitor scrutinizes completed misconduct investigations and whether those investigations met the requirements of other Paragraphs that specifically govern misconduct investigations, including the timeliness requirements of Paragraph 204, as amended. That is an incorrect reading of the Order's requirements. Paragraph 33 only applies to MCSO personnel *after* a completed Discriminatory Policing investigation in which MCSO Personnel were found to have engaged in alleged Discriminatory

Policing. Imposing Paragraph 204's timeliness requirement is illogical and inappropriate, because Paragraph 33 only applies *after* the completion of the investigation. Indeed, by scrutinizing the investigation as to whether Discriminatory Policing occurred via timeliness and other metrics, the Monitor essentially presumes a principal's guilt upon the filing of the complaint, violating the Peace Officer's Bill of Rights. *See* Ariz. Rev. Stat. §§ 28-1101 through 1120.

MCSO has continuously complied with the specifics of Paragraph 33—as the Monitor has found in this and other reports. MCSO asserts that in addition to having clear, written guidelines, MCSO disciplines its personnel who engage in Discriminatory Policing and refers its personnel for criminal prosecution when appropriate. Therefore, MCSO requests that the Monitor find MCSO in Phase 2 compliance with Paragraph 33 and amend its Draft Report accordingly.

### Section 5. Pre-Planned Operations

MCSO does not have any comments relevant to the Paragraphs under Section 5. MCSO is in Full and Effective Compliance with all the Paragraphs under Section 5.

### Section 6. Training

**Paragraph 46.** Since 2019, MCSO had been in Full and Effective Compliance with Paragraph 46. The Monitor again found MCSO to be in full and effective compliance with this Paragraph in his 44th Report (Doc. 3268).

However, MCSO disagreed with the Monitor's comments on several key points in the Monitor's Draft 44th Report on this Paragraph, including comments regarding the activation and de-activation of body-worn camera ("BWC"). As MCSO stated in its Comments to the Monitor's 43rd Report on this topic at Doc. 3198-2 at 3, MCSO disagreed with the Monitor about when Posse personnel must activate their BWC. As previously stated, MCSO interprets Attachment A of the Posse BWC policy to require the Posse member to place the BWC in Event Mode upon arrival at the scene or at the moment public contact or patrol assistance begins. It is common for Posse members to be dispatched to routine functions when there is no member of the public present, no deputy present, and no law enforcement activity is occurring. In such cases, MCSO does not consider the situation to rise to the threshold that necessitates BWC activation.

Interpreted operationally, MCSO submitted that Attachment A required BWC activation with the commencement of active patrol assistance duties—not the mere act of being dispatched or responding to assist on a call. When Posse members are assigned to community-focused efforts or are performing observational patrols where no public contact occurs, those activities are classified as "non-law enforcement activities" under the current policy. Therefore, such activities do not trigger the BWC activation requirements outlined in Attachment A. MCSO previously advised the Monitor that it has reaffirmed and continues to reaffirm with Posse personnel their obligation to place their BWC in Event Mode promptly in the case of a public contact or patrol assistance activity, or if they begin performing a listed patrol assistance function, such as driving a fully marked vehicle, directing traffic, or providing assistance within a patrol district or investigative division. MCSO pointed out that having Posse drive around with their BWC activated is contrary to MCSO Posse/volunteer practice and general volunteer law enforcement practice and did not serve any purpose. Certainly, no other MCSO

personnel equipped with a BWC are required to do so, and it is not standard practice for volunteers of law-enforcement agencies nationwide and provides no operational or compliance value.

Nevertheless, for this reporting period, the Monitor has deferred finding MCSO in compliance, stating that "[w]e continue to express concern about Posse personnel's failure to follow MCSO policy and the lack of knowledge of sworn deputy personnel to direct the assisting Posse personnel's actions. [. . . ] We believe there should be no instance where there is no Posse BWC recording associated with an MC number unless there is a body-worn camera malfunction." **In addition to the above, MCSO submits that nothing in the Court's applicable orders requires the Posse to wear BWC.**

As to the Posse, the Court merely found that the Posse tangentially and occasionally engaged in saturation patrols alongside the Sheriff's paid personnel. (Doc. 579, p. 11:18-19; p. 52:21-28; p. 53:3-17). The Court did not find that the Posse, independent of the Sheriff's paid law enforcement personnel, caused any of Plaintiffs' class's harms or that the harm was caused by the Posse's lack of BWC. Indeed, the only mention of the Posse's required wearing of BWC is in the Court's Order about the span of control study. [Doc. 2937.] Pursuant to that Order, Posse were required to wear BWC when assisting on patrol functions for the duration of that span of control study, which was scheduled to end September 27, 2024 by Court Order.[1] Whether Posse personnel wore BWC and whether they failed to appropriately activate or deactivate their BWC is not something that the Monitor can regulate under the Court's Orders and cannot be the basis for holding MCSO out of compliance with this Paragraph in this Quarter. The Monitor's ability to regulate MCSO's policies and procedures is limited to the Court-Ordered policies and procedures, which does not include BWC activation and deactivation during this reporting Period. In any event, to the extent that the Monitor believes that it is entitled to Posse or DSA camera reviews, such comments must be related to the Paragraph regarding span of control subject to the Court's span of control study. **Accordingly, the Monitor's deferring the finding of FEC for BWC review within this Paragraph is wholly inappropriate.**

MCSO further submits that only the Monitor's Comment regarding its "recommendations to the Training Division to change the BWC training learning activities to be specific to the duties of the DSA and Posse personnel" is the only substantive comment related to this Paragraph and the plain language requirements of the Paragraph. MCSO's Training Division has heard, understood, and previously acknowledged the need for revised learning activities specific to the Posse and the DSA student body.

As previously explained to the Monitoring Team, MCSO is transitioning to a new version of the Axon BWC, the Body 4. MCSO advised the Monitoring Team several times that the addition of the new learning activities would be **incorporated into the new version of the BWC class instead of spending time updating a class that would soon be archived**. MCSO followed through with that commitment with the drop of the revised material on October 6, 2025. The new class included the revised learning activities designed to provide specific instruction to each classification. The class is built on the current policy language and MCSO's interpretation of it. If the Monitoring Team wants to discuss policy interpretations, changes, and or use of Posse by the Sheriff's Office, those are all relevant discussions but have no bearing on the language of this Paragraph. This Paragraph is designed to assess the quality of the training and the instructors, and MCSO strongly disagrees with these points

---

[1]    Although the study should have come to an end at this date, MCSO recognizes that the Court recently extended the span of control study for another year, commencing on November 1, 2025, in addition to the year after the original deadline that passed without Court extension or Monitor comment.  [*See* Doc. 3298].

being assessed in this Paragraph. MCSO continues to teach Monitor Approved classes based on policy, taught by Monitor approved instructors, and updated annually as required. As the Monitoring Team and the Training Division identified a need to revise the material, it was revised and submitted based on discussions to not update a soon to be archived class. Accordingly, MCSO asserts that it should maintain its FEC status for this Paragraph.

Although it is MCSO's position that the Monitor has infused this Paragraph's comments with comments unrelated to the requirements of this Paragraph, MCSO addresses these comments in an effort to clarify some of the Monitor's incorrect statements.

On page 51 of his Draft Report, the Monitor says that "Posse members are volunteers who, by law, do not have enforcement authority." MCSO disagrees with the Monitor's contention and submits that the Monitor exceeds its limited jurisdiction under the Court's Orders when he makes legal determinations about and attempts to enjoin non-Order-related issues, including the ability of the Sheriff to call on the aid of a Posse under A.R.S. § 11-441 and to what authority the Sheriff may give the Posse that he calls. Accordingly, MCSO requests that the Monitor revise its Draft Report to state the following: "Posse members are volunteers who, by law, do not have enforcement authority unless directed by the Sheriff or his law enforcement personnel." This suggested change correctly reflects the function of the Posse under Arizona law.

Also on page 51, the Monitor states that "MCSO allows Qualified Armed Posse (QAP) personnel to carry handguns during patrol support functions, endangering the public to potential deadly force interactions" and states that MCSO Posse are "inexperienced volunteers." MCSO again vehemently disagrees with the Monitor's inflammatory, speculative, and insincere statements. The Monitor knows very well that QAP go through the very same firearms training as sworn personnel. Indeed, if a Posse member wants to carry a sidearm, the Posse member must complete the Arizona Peace Officer Standards and Training ("POST") "Firearms Training-Basic Academy." The training is 70 hours long (including range time) and requires the trainee to fire a minimum of 500 rounds from a service caliber handgun. Upon completion of the 70-hour minimum, the trainee will be able to:

> 1) Identify the four (4) safety rules; 2) Identify the three (3) ways a weapon is discharged; 3) Identify the nomenclature of the service handgun; 4) Demonstrate the ability to render safe, clean and maintain a service handgun; 5) Using the service handgun demonstrate principles of good marksmanship; 6) Using service ammunition, demonstrate the ability to safely qualify with a service handgun on the AZ POST daytime and nighttime firearms qualification courses; 7) Given the stipulated situation in which deadly force may be legally justified, identify the target, issue the "police" command and determine whether to shoot or not shoot; 8) Demonstrate safe handling of handguns while performing certain actions; 9) Demonstrate five shooting positions; 10) Demonstrate the ability to safely and effectively fire the service handgun during tactical situations; and 11) Demonstrate the ability to show proper judgment and accuracy during a shoot, don't shoot, challenge course.

The qualification and target identification and judgmental courses that Posse members must complete complies with or exceeds Arizona POST requirements.

To carry a long gun, QAP members must complete, at a minimum, an additional 40-hour rifle skills training session whereby the QAP members must show a proficiency in being able to do the following objectives:

119227267.1

1) List the 4 firearms safety rules; 2) List the 6 fundamentals of marksmanship; 3) Demonstrate the ability to fire accurately from standing, kneeling, seated, and prone positions under time compression; 4) Demonstrate the ability to fire accurately while moving forward, backward, and latterly to the target; 5) Demonstrate the ability to perform empty gun and tactical reloads with the rifle before, during and after engaging a target(s); 6) Demonstrate the ability to transition from rifle to pistol efficiently clear all rifle malfunctions; 7) Demonstrate the understanding how to quickly and efficiently clear all rifle malfunctions; 8) Perform all drills and practical range exercises utilizing the four firearm safety rules; 9) Successfully pass the 40 round rifle qualification and the 50 question written test.

Furthermore, the QAP must maintain AZPOST certification pursuant to the requirements of R-13A-116(E)(1); R-13-4-111(C) 1, 2, 3; and R13-4-116(E)(1). The Monitor's statements that Posse members' carrying weapons during "patrol support functions" would endanger the public to potential deadly force interactions" is inflammatory and not supported by the findings of fact. MCSO vehemently requests that the above comments be stricken from the Monitor's 45th Quarterly Report.

In sum, the Monitor exceeds his authority under the Court's Orders in deferring compliance for this Paragraph based on non-Order related issues. Accordingly, MCSO requests that the Monitor amend its finding to find MCSO in compliance with this Paragraph and to strike portions of the Draft as requested above.

**Paragraph 47.** The Monitor recognizes that MCSO remains in Full and Effective Compliance with Paragraph 47. Yet the Monitor again states in the Draft Report at page 52:"The recordings revealed that Posse personnel were not versed in the activation and deactivation procedures as specified in GJ-27 (Sheriff's Posse Program), Attachment A." MCSO again requests that the Monitor recognize that MCSO has a different interpretation as to what is required under GJ-27. As stated in its Comment to Paragraph 46 above, MCSO provides substantial training to all Posse members. Moreover, MCSO's Training Division has taken the Monitoring Team's feedback seriously and has committed to amending the BWC training activities for Posse and DSA personnel during the 2025 curriculum cycle. These changes will place increased emphasis on ensuring personnel understand the expectations for BWC use in scenarios that involve discretionary activation, exceptions to deactivation, and appropriate notification practices with the Communications Division.

That said, MCSO repeats that it recognizes that the interpretational divergence between MCSO and the Monitoring Team on the specific timing of activation, as well as on the application of verbal deactivation requirements, may not be fully resolved by training adjustments alone. These areas of difference appear rooted in how each party reads and applies the current written policy. MCSO is committed to amending and updating the policy in a good faith effort to address the Monitor's concerns.

**Section 7. Traffic Stop Documentation and Data Collection.**

**Paragraph 54.a.** On page 63 of the Draft Report, the Monitor states that "we continue to identify *cases* where the assisting deputies have not prepared the Assisting Employee and/or Volunteer Log when required by MCSO policy." (emphasis added) Consistent with the Draft Report at page 62, *the Monitor only identified a <u>single case</u> and not "<u>cases</u>."*

**Paragraph 54.k.** MCSO has raised a litany of concerns regarding the Monitor's comments to Paragraph 54.k in previous Comments. Despite stating at page 69 of the Draft Report that he plans to discuss these matters with MCSO, the Monitor has, to date, not done so. Because the Monitor has not discussed these concerns with MCSO, MCSO must, again, raise the issues with the Monitor in an attempt to engage the Monitor in discussions regarding MCSO's concern with the Monitor's holding MCSO out of compliance for Paragraph 54.k.

First, in the Draft Report at page 69, the Monitor states: "MCSO has only required that deputies to [sic] use the Consent to Search Form in situations where the body-worn camera is not operational. MCSO does not currently require the use of Consent to Search Form in all instances where consent was requested to search either the driver or passenger(s), or the vehicle, during traffic stops. The required use of the form would ensure that more accurate data is collected by MSCO in relation to the searches of persons and vehicles, as well as having the data available for review and analysis as required under Paragraph 60. During this reporting period, we did not identify any stops where the Consent to Search Form was utilized." As the Monitor is aware and consistent with the requirements of MCSO Policy GJ-3, MCSO only requires the Consent to Search Form when BWC is not operational.

In the Draft Report at page 69, the Monitor states: "During our February 2025 site visit, we discussed the use of the Consent to Search Form with MCSO and the Parties in relation to traffic stops. Following our site visit, we held a meeting with MCSO regarding this issue. We plan to discuss this matter further with MCSO." During the First Quarter 2025, MCSO sent a letter to the Monitor after the February 2025 site visit and did not receive a response from the Monitor during the First Quarter 2025 or have a follow up meeting to discuss this issue with the Monitor as MCSO requested and the Monitor pledged. To date, that is still the case. MCSO has been ready, willing, and able to meet with the Monitor on this issue rather than continue to exchange comments in their respective quarterly reports and policy review of GJ-3 on this issue. MCSO also requested that Chief Warshaw personally participate in this requested and pledged discussion and debate, as agreed and described above. During this reporting period, neither Chief Warshaw nor the Monitor Team has engaged in discussion with MCSO and subsequent discussion/debate involving the Parties as agreed.

Second, MCSO reiterates that while the Monitor Team has previously *recommended* the use of consent forms for all consent searches, the Monitor Team has never imposed it as a *mandatory requirement* for all consent searches to remain in compliance with Paragraph 54.k. In fact, the Monitor approved Policy GJ-3 as written, which only requires the Consent to Search Form to be used in instances when BWC is unavailable.[2] Although the Monitor has previously recommended the use of consent forms

---

[2]    The Monitor approved Policy GJ-3 as written and in the format that the Monitor proposed. That proposed and adopted format never resulted in any confusion as to whether the use of the Consent to Search Form was recommended or required, until now, and long after the retirement of Deputy Monitor Girvin (who consistently and steadfastly held that the use of the Consent to Search Form was only recommended and only required when no recording device was available to record the consent search request and response to that request). In addition, the Monitor's position as to the use of the Consent to Search Form is clearly revealed in the Monitor's comments on this issue; the Monitor consistently and repeatedly stated that the form was *recommended* and *not required*. The Monitor Team is

for all consent searches, it has _never_ imposed it as a mandatory requirement for all consent searches. None of the previous Monitor Reports mention the mandatory use of the Consent to Search Form for all consent search requests. Indeed, going as far back as the 29th Monitor Report for the second quarter of 2021, the Monitor only said that "[w]e continue to _recommend_ MCSO revisit the requirements of this section of the policy and require deputies to read the Consent to Search Form to the subject and require a signature from the individual for every request for consent to search." (Doc. 2756 at 71 (emphasis added)). Despite this recommendation, the Monitor has held MCSO in Full and Effective Compliance with this subparagraph the second quarter of 2021 until the fourth quarter of 2024, when the Monitor took MCSO out of compliance for an unrelated reason (which is more fully addressed below).[3]

Third, contrary to the Monitor's contention, there is nothing mandatory about the use of the Consent to Search Form in Paragraph 54.k. Paragraph 54.k. requires deputies "to document whether any individual was asked to consent to a search (and the response)." (_See_ Draft Report at 70.) Nothing in the text of Paragraph 54.k. requires that a form be used to document a consent search. Nor does any other Paragraph related to data collection mandate that a consent form be used to document a consent search. (_See, e.g.,_ Doc. 606 ¶¶ 60, 72, 75, 81.) And to be clear, there is no legal requirement (constitutional or otherwise) that a deputy memorialize the consent for a consent search in written form. Nevertheless, MCSO has developed a monitor-approved system pursuant to Paragraph 54.k., which requires deputies to either: (1) record consent on their body-worn camera; (2) record consent on a recording device in lieu of a BWC; or (3) utilize a Consent to Search Form when body-worn camera or another recording device is unavailable. _See_ MCSO Policy GJ-3.

Fourth, neither the Constitution, the laws of the United States, Arizona law, the Court's Orders, nor the MCSO-Monitor approved policy requires the use of a Consent to Search Form in all instances of consent searches. The United States Supreme Court has made clear that BWC, and not a consent to search form ("CTSF"), is the best evidence of an encounter.[4] A CTSF, on the other hand, merely contains the signature of the searched person with no other corroborating evidence that otherwise proves consent was freely given by that person. Neither is there any "proof" (outside of BWC) that any of the items on the form were discussed with the searched person. Accordingly, it does not avoid litigation over consent. In fact, CTSFs are routinely challenged in Courts on a variety of topics.

---

refusing to acknowledge its longstanding position on this issue, i.e., that the use of this Consent to Search Form is not required as is consistent with Policy GJ-3.

[3]    In fact, the Monitor has merely contended that the use of consent to search forms are "widespread" throughout the country, but has never stated that the _mandatory_ use of consent to search forms is widespread—because it is not. A simple canvassing of area law enforcement agencies, and even research regarding a law enforcement agency with which a member of the Monitor Team (who is suddenly a staunch proponent of the mandatory use of the consent to search form) was associated, reveals otherwise. Last, a comment from an attorney on the Monitor Team during discussions on this topic that MCSO's position on this issue demonstrates a lack of respect for the Fourth Amendment is not only insulting and false, but does nothing to promote appropriate dialogue among the Monitor Team, MCSO career law enforcement personnel, and MCSO counsel.

[4]    In fact, in the Draft Report at page 84 the Monitor recognizes that BWC is invaluable in determining what occurred during traffic stop interactions, saying: "Body-worn cameras recordings have proven to be invaluable in resolving complaints alleging misconduct by deputies."

119227267.1

Litigants often argue that a CTSF itself is in some way defective, or that the circumstances surrounding the form (including its language) were coercive. And although a CTSF might be the "next best" evidence when BWC is not available, it does not avoid a dispute over consent or represent the best evidence on such issues. There is no form of evidence collecting an individual's consent to search that is immune from an after-the-fact judicial challenge, but BWC is recognized as the superior data collection device by our court system. So while MCSO is not required to provide the "best" form of documentation of consent by the Court's orders, under Policy GJ-3, it is doing just that.

Fifth, in the Draft Report at page 61, the Monitor states that "The required use of the form would ensure that more accurate data is collected by MSCO in relation to the searches of persons and vehicles, as well as having the data available for review and analysis as required under Paragraph 60." MCSO disagrees that the CTSF is needed to ensure accurate data collection. To the extent that a CTSF collects data that the BWC or other form cannot collect (with which MCSO disagrees), MCSO stated that it is willing to include the data points in other forms or engage in further training to address any implementation issues. MCSO has already volunteered that it captures the 26 discrete data points currently identified by the Monitoring Team in the CTSF on either body camera, the VSCF or the NTCF, which the Monitor believes are required under the Court's Orders. When MCSO requested that the Monitor identify which data is supposedly not currently tracked by the VSCF or NTCF, the only data point mentioned by the monitoring team during the February site visit was whether consent to search was "revoked" on the CTSF, which is not currently on either the VSCF or the NTCF. But this data point has been added both forms as of August 28, 2025, permitting documentation of all possible outcomes, which the review of the BWC or other digital recording device can confirm. MCSO is currently in the process of implementing this change to these forms.

Last, in the Draft Report at 69, the Monitor also states that the CTSF would ensure deputies are "consistently advising vehicle occupants of the right to refuse the search as well as the right to revoke consent." As background, during a February 18, 2025 telephonic meeting, Major Peters of the Monitoring Team also stated that the "*Person's signature*" could not be captured on either the VSCF or the NTCF. However, as MCSO informed the Monitoring Team via letter and its 44 Quarterly Report, MCSO Policy GJ-3 **requires a deputy to affirmatively inform the person of the right to refuse and to revoke consent at any time**. The request for consent to search, along with the associated response, including any consent or refusal by the person, **shall be captured on a recording device.** Additionally, the deputy is required to complete the search information on the VSCF or NTCF to confirm whether consent or refusal was given. With the addition of the "Revoked" option, the VSCF, NTCF or IR, and the digital recording sufficiently and reasonably meet documentation requirements for capturing all data requirements of the CTSF event and not require the use of the CTSF unless a recording device is unavailable, as the current, Monitor-approved policy indicates. And again, MCSO notes that Paragraph 60 states that "*Data need not all be collected in a single database*" but only that it be "*collected in a format that can be efficiently analyzed together.*" (emphasis added). Perfect data collection is not possible and cannot be the requirement for complying with the Court's orders, the Constitution, or Arizona law. Nevertheless, MCSO can (and does) obtain the data that the Monitoring Team requests without the use of the CTSF.

In sum, MCSO's relevant policy, GJ-3, has never mandated deputies use a CTSF for a consent search. Absent a consent search conducted without a recording device, MSCO stresses that the Monitor should remove any language regarding use of the CTSF in Subparagraph 54.k., throughout its Draft Report, and in its comments to MCSO's requested changes to Policy GJ-3, as it is not supported by the Court's Orders, law, or MCSO policy.

In addition to the CTSF issues described above, MCSO also does not understand how the Monitor is evaluating MCSO's compliance Subparagraph 54.k. In its Draft Report at page 70, the Monitor states: "During this reporting period, MCSO attained a compliance rating of 83%. MCSO is again not in compliance with this requirement." As with other paragraphs, it is MCSO's position that the Monitor's imposition of a 94% compliance requirement is inappropriate for this Paragraph. An explanation from the Monitor is necessary for clarity as MCSO strives to attain the shared goal of the parties and the Monitor: Full and Effective Compliance under the Court's Orders.

**Paragraph 54.l.** On page 71 of the Draft Report, the Monitor states:

> In MCSO's 44th quarterly compliance report, MCSO again expressed its concern that the low volume of contraband/evidence seized during traffic stops leaves little margin for error; and that this issue stands in the way of MCSO achieving and maintaining compliance with this requirement. However, MCSO has demonstrated that it is possible to attain compliance with the requirement and even maintain that compliance. We commend MCSO for its efforts to attain and maintain compliance with this requirement.

MCSO appreciates and acknowledges the Monitor's commendation about MCSO's achieving compliance with Paragraph 54.l, as well as 54.g despite the extremely low margin of error for compliance with both subparts. The work that MCSO's patrol analysts are doing is working. Nevertheless, MCSO maintains its concern that the low volume of certain activities leave little margin of error and that the little margin of error may stand in the way of MCSO's continued compliance. MCSO further maintains that the Monitor employ reasonable, practical approach to determine if MCSO is complying with this subparagraph of the Court's Orders rather than the rigid 94% threshold it currently employs.

**Paragraph 56.** Paragraph 56 requires MCSO's "traffic stop data collection system shall be subject to regular audits and quality control checks. MCSO shall develop a protocol for maintaining the integrity and accuracy of the traffic stop data, to be reviewed by the Monitor pursuant to the process described in Section IV." Paragraph 56 requires high-level institutional functionality and does not require any singular act of data collection. In particular, Paragraph 56 requires MCSO's traffic stop data collection to be subject to regular audits and quality control checks, and for MCSO to develop a "protocol" for maintaining the integrity and accuracy of the traffic stop data. That protocol is to be reviewed by the Monitor pursuant to Section IV. Protocol is not a defined term in the Court's Order, but under ordinary definitions it refers to a procedure or code of conduct to ensure the continuous integrity and accuracy of the traffic stop data. Paragraph 56 simply does not regulate the everyday minutia of deputy and driver interactions.

As stated in its Comment to Paragraphs 54.k, no law or policy mandates that deputies provide a CTSF for each consent search performed. Nor does Paragraph 56 contemplate compliance with Paragraph 54.k. This is another instance of the Monitor's imposing requirements of other unrelated Paragraphs that is not required by the plain language of the Court's Orders. Moreover, the Monitor has continuously recognized the robust protocol that MCSO established to ensure that its traffic-stop data is accurate and true, including the advent of TSMR, TSAU and the Technology Bureau's monthly meeting, its regular audits, and inspections of the searches taken place during traffic stops each month. Indeed, MCSO has developed a robust protocol to ensure that its traffic-stop data is accurate and true.

**Paragraph 60.** Despite the Monitor's finding that MCSO is in Full and Effective Compliance with this Paragraph, the Monitor remarks on page 79 of the Draft Report that "we will consider MCSO's use of the Consent to Search Form in our future reviews" of this Paragraph. MCSO requests that the Monitor remove this comment for the reasons explained above in MCSO's comment to Paragraph 54.k. Again, the Monitor has not required a CTSF at any point in the past *seven years*, and in five of those years, MCSO has been in Full and Effective Compliance with this Paragraph. Any data that the Monitor may now desire from the Consent to Search Form is collected on the applicable VSCF, NTCF, or an incident report. Again, the Monitor's newly desired mandatory use of a CTSF for all consent searches defies the clear language of MCSO's Monitor-approved Policy GJ-3 and the years of MCSO's following this policy which has resulted in the Monitor's long-term finding that MCSO is in compliance under this Paragraph; and finally, the desired mandatory use of a CTSF does not reflect constitutional and legal requirements.

**Paragraph 65.** In the Draft Report at page 85, the Monitor also states the following:

> MCSO also makes a startling claim for this analysis in both the Executive Summary and Introduction, "MCSO does not consider racial/ethnic difference associated with Extended Traffic Stop Indicator use as a measure of potential bias as defined by the Second Order." We agree that one cannot know the extent of potential bias without investigating individual stops; however, while we agree that ETSIs provide the ability to document why stops are extended, this does not mitigate the potential for bias. To begin an analysis with that supposition, we believe, is inappropriate.

MCSO continues to reiterate that the quoted material was made in the TSAR 10's Executive Summary, which summarizes findings; thus, the statement is a conclusion, not a supposition. Indeed, an ETSI is purely for documentation and, therefore, is not a "traffic stop outcome" under the Court's Order. Because it merely describes factors that extended the traffic stop, it provides no value in determining potential bias. Although MCSO recognizes that ETSI use can capture the outcomes that may indicate potential bias, MCSO does not believe that use or nonuse of ETSI could reasonably indicate potential bias. MCSO's statement that that it "does not consider does not consider racial/ethnic difference associated with Extended Traffic Stop Indicator use as a measure of potential bias as defined by the Second Order" merely means that MCSO does not presume, one way or another, whether potential bias exists if it identifies disparities in ETSI use.

Additionally, MCSO clarifies that the purpose of Traffic Stops Quarterly Report ("TSQR") 17 was to describe the use of ETSI's to determine if deputies continued to use ETSIs appropriately, which the study validated. MCSO clarifies that its Traffic Stops Monthly Reports ("TSMRs") and Traffic Stop Annual Reports ("TSARs") are designed to identify and measure disparities in stop length. The purpose of TSQRs, and TSQR 17 specifically, is entirely different.

**Paragraph 66.** In the Draft Report at Page 89, the Monitor states that "TSAR 10, published in June 2025, indicated that the analysis revealed significant disparities in traffic stop outcomes for Hispanic, Black, and all minority drivers compared to white drivers." MCSO suggests modification to state "revealed ***statistically*** significant."

**Paragraph 69.** In the Draft Report at page 94, the Monitor states: "The Audit and Inspections Unit (AIU) also conducts monthly audits of supervisory oversight via the Supervisor Notes made for each deputy. Minimally, each month, supervisors should be making a performance appraisal note and two Supervisor Note entries, reviewing two body-worn camera recordings, and reviewing the EIS profile of their subordinates." This could be read as a suggestion that sworn supervisors have to make a total of three Supervisor Notes. MCSO clarifies that a performance appraisal note and a "Supervisor Note" are the same thing. Under MCSO Office Policy GC-4(S), Sworn Employee Performance Appraisals and Management, Section 6.B:

> Supervisors shall maintain a written record of the performance of each of their sworn employees using Blue Team Supervisor Notes. Performance notes of both supervisors and subordinates should not utilize boilerplate language. The record should reflect the employee's positive traits and accomplishments and any observed deficiencies and corrective actions taken. Supervisor notes should be of sufficient quality and frequency to facilitate constructive performance management and facilitate the preparation of an accurate and detailed performance review. Supervisors shall complete two supervisor notes per month on sworn employees at a minimum.

Additionally, under Office Policy GB-2, Section 7.B.1, "Supervisor notes shall be of sufficient quality and frequency to facilitate the preparation of an accurate and detailed performance review, but at a minimum an entry shall be completed every month. Supervisors shall complete two supervisor notes per month on sworn employees at a minimum," and Section 13.H, "Blue Team Supervisor Notes: Supervisors shall document a minimum of two monthly Blue Team Supervisor Notes regarding performance for each deputy under their command. Blue Team shall be used to report the monthly review to CID." Accordingly, MCSO requests that the Monitor clarify that each month a supervisor must, at a minimum, make two Supervisor Note entries only.

Last, in the Draft Report at page 96, the Monitor states:

> On April 11, 2025, and again on July 25, 2025, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we deferred our determination for this assertion. We noted our concern that searches and seizures can occur both within traffic stops and during non-traffic contacts. We and the Parties need to be confident that all searches will be captured in the database where they can be part of an analysis, if necessary, reviewable by supervisors and retained for future reference. In that vein, we have proposed modifications to GJ-3 that would enhance the ability of supervisors to access and review these events. We have made these same observations in past quarterly reports and note the import of clear and definite responsibilities and duties of supervisory oversight. We have also noted repeatedly, under Paragraph 69, that when AIU inspectors find minor deficiencies in Incident Reports for deputies, the supervisors have failed to address these issues with their subordinate deputies without notification of the inspection deficiencies. Finally, while NTCFs are in the database, MCSO has not yet produced an analysis that would afford the examination of potential bias within and between non-traffic contact events. Given that we do not want to compound problems of oversight, until such time as the processes related to GJ-3 and non-traffic contact events are incorporated into policy and practice, we are deferring our determination of Full and Effective Compliance for Paragraph 69.

119227267.1

The Monitor conflates the Requirements of this Paragraph with perceived requirements of other Paragraphs. This Paragraph requires MCSO supervisors to review collected data for the deputies under their command on a monthly basis for warning signs or indicia of possible racial profiling, unlawful detentions and arrests, or improper enforcement of Immigration-Related Laws. MCSO already does this, has been in compliance with these requirements as determined by the Monitor for over three years, and is therefore entitled to FEC status on this Paragraph. The issue with GJ-3 (whether consent searches are documented by BWC or via a CTSF) has absolutely no impact on compliance with Paragraph 69. To date, the Monitor has not squarely addressed MCSO's objections to the Monitor's incorporation of other Paragraph requirements into this Paragraph. Again, MCSO requests that the Monitor limit its assessment methodology for Paragraph 69 to the specific requirements of Paragraph 69 and not include requirements specifically addressed in other Paragraphs.

Even so, MCSO continues to actively address the Monitor's concerns and has implemented all data points required by the Monitor in MCSO's NTCFs. Although MCSO has agreed to perform the NTCF analysis, MCSO maintains that the analysis required by the Monitor goes beyond the limitations of the Court's Orders, which must be limited to the harms alleged in the initial complaint. (Doc. 606 at , pp. 1–2:21-2:7; Doc. 1765 at , p 6:7-16; see also Docs. 2830 and 3076.). MCSO has and continues to actively engage the Monitor to determine how to analyze the NTCFs.

MCSO submits that it cannot constantly be subject to moving goalposts, such as is the case here. Each time MCSO identifies a new data point to analyze, it cannot be held out of compliance while it produces the analytic framework to review and analyze that particular data point. Indeed, it follows that if MCSO continues to comply with the Court's Order to identify potential issues—including potential data points that could indicate potential biased policing—MCSO will never be found in compliance because uncovering a new data point will necessitate MCSO's creating an additional analytical framework, which would continue to keep MCSO out of compliance. Rather, MCSO submits that the MCSO's continued process of identifying additional points of analysis and identifying an analytical framework in and of itself should put MCSO in Full and Effective Compliance with the requirements of the Paragraph. Accordingly, MCSO requests that the Monitor amend its Draft Report and find that MCSO is in full and effective compliance with Paragraph 69.

**Paragraph 70.** MCSO disagrees with the Monitor's conclusion that MCSO is not in compliance with Paragraph 70. MCSO also requests that the Monitor clarify the standard for compliance for Paragraph 70.

MCSO contends that to comply with Paragraph 70, it must: (1) conduct the required traffic-stop analyses; (2) closely monitor disparities identified in the analyses that show evidence of potential bias; and (3) identify and follow through on actions to attempt to reduce disparities. As discussed in MCSO's most recent Quarterly Reports (Docs. 2994, 3043, 3086, 3115, 3145, 3205), MCSO is completing all required traffic stop reports and taking actions in response to the information in those reports. Compliance with Paragraph 70 is not measured by whether the disparate outcomes identified in the statistical studies are reduced or eliminated in subsequent traffic stop analyses. Rather, it requires reasonable monitoring and follow up regarding identified disparities. [*See* 11/26/2019 Tr. at 36 (Court noting that if MCSO is "taking all reasonable steps and all actions [MCSO] can in implementing that plan and − . . . the statistics still are not moved, then I think that's something that goes to MCSO's credit, not . . . detriment")]. To hold otherwise creates an impossible standard that will all but ensure MCSO will never reach compliance with this Paragraph.

In prior reports, the Monitor has described compliance as "[b]ased on the agency's own analysis of traffic stop data." (Doc. 3074 at 94.) As discussed above, that is an incorrect measure of compliance with Paragraph 70. **Based on the appropriate standard, MCSO asserts that it is in compliance with Paragraph 70 as explained in MCSO's 41st, 42nd, 43rd, and 44th Quarterly Reports** (Docs. 3086, 3115, 3145, and 3205).

Finally, MCSO has some minor comments for the Monitor to consider in its Draft Report on Paragraph 70. In the Draft Report at 100, the Monitor states that "MCSO has received approval to move forward on several TSQR projects and published 16 of these reports through the fourth quarter of 2024." MCSO clarifies that it has published TSQR 17 during the First Quarter 2025; accordingly, MCSO requests that the Monitor update the Report accordingly. On page 100 of the Draft Report, the Monitor states that MCSO "was creating a dashboard of traffic stop activity to allow supervisors to view the accumulated data of their deputies traffic stops." **MCSO had completed the dashboard before the end of the Fourth Quarter of 2024.** The dashboard has been in place for several quarters and since then, MCSO personnel have been using the dashboard. MCSO, therefore, requests that the Monitor amend its Report to reflect that the dashboard was completed in September 2024 and that MCSO has been using the dashboard ever since.

The other aspect of compliance with Paragraph 70 is the CPP, approved in 2017. As described in MCSO's seven, recent Quarterly Reports (Docs. 2957, 2994, 3043, 3074, 3115, 3145, 3205), MCSO has completed the goals of the CPP and is in compliance with the goals that require ongoing action. Nevertheless, the Monitor has not found MCSO in compliance with the CPP. MCSO requests that the Monitor articulate the standard for assessing compliance under Paragraph 70 and the CPP. In the meantime, MCSO offers the following comments on some of the Monitor's assessment of the CPP goals.

Under Goal 1 of the CPP, the Monitor in the Draft Report at page 99 states:

> We questioned the depiction of these meetings as Town Halls since MCSO reported that, in District 1, TSAU provided individual training instances of 28 deputies, six sergeants, two lieutenants, and one captain. In District 2, TSAU provided individual training instances of 38 deputies, six sergeants, one lieutenant, and no captains. In District 3, TSAU provided individual training instances of one Deputy Service Aide, 33 deputies, eight sergeants, two lieutenants, and no captains. In District 4, TSAU provided individual training instances of one Deputy Service Aide, 19 deputies, four sergeants, two lieutenants, and one captain. In District 7, TSAU provided individual training instances of 15 deputies, five sergeants, no lieutenants, and one captain. In Lake Patrol, TSAU provided individual training instances of six deputies, two sergeants, no lieutenants, and no captains. Altogether, the TSAU provided individual training to MCSO personnel across all topics to 182 combined ranks. During our next site visit, we will follow up with MCSO to obtain training records to include the dates and duration of the training, and any testing or confirmation of understanding by deputies and command staff. Additionally, we will seek the PALs of the involved deputies to verify any documentation of the training.

Responsive to the Monitor's previous inquiries, MCSO provided the numbers of people who attended the Town Halls. Indeed, MCSO conducted several Town Halls in each district to arrive at the numbers. The Monitor's insinuation that he does not trust the reports given to them is frustrating.

Previously, the Monitor criticized the small numbers of attendees, so MCSO addressed that concern by conducting them in the districts during shift change. MCSO interprets the increased attendance as a result of adapting to the Monitor's concerns. MCSO submits that it is in compliance with Goal 1 of the CPP.

Under Goal 2 of the CPP, "MCSO will ensure that supervisors are held accountable for deputy outcomes through the Employee Performance Appraisal process." (Doc. 2120-1 at 6.) MCSO continues to hold supervisors accountable through the Employee Performance Appraisal ("EPA") process, with EPAs showing significant improvement. The Employee Retention and Performance Division ("ERPD") continued its review of EPAs for all sworn supervisors and for deputies who received an overall rating of Exceptional, Improvement Needed, or ratings that were inconsistent with individual section scores. These audits provide constructive feedback to raters and their chain of command, ensuring EPAs for sworn employees meet the quality standards outlined in MCSO Policy GC-4(S), Sworn Employee Performance Appraisals and Management, and align with the intended use of the Performance Management Guide.

On page 99 of the Draft Report, the Monitor stated:

> During this reporting period, the Employee Retention and Performance Division (ERPD) audited 127 EPAs of sworn personnel, requiring feedback to approvers on 69 of them. This continues to be significant, considering that 54.3% of audited EPAs required supervisory feedback. During our April and July site visits, we questioned this figure to determine what specific feedback was provided; and we requested follow-up documentation to determine the number of supervisor EPAs reviewed and which specific supervisors were provided with review feedback. We did not receive the requested information. We had also requested the specific feedback provided to raters of record and the specific raters, but MCSO did not provide a spreadsheet in response to this request. We reaffirmed our need for this information to MCSO during both our April and July site visit requests.

MCSO provided the Monitor with the requested information on August 8, 2025. The Monitor's receiving the information in August, and not earlier, was inadvertent. Notwithstanding the above comment, MCSO has implemented a process to ensure "supervisors are held accountable for deputy outcomes through the Employee Performance Appraisal process." Indeed the ERPD providing feedback to the supervisors shows that the process ensures that supervisors are held accountable for deputy outcomes. Thus, MCSO asserts it is in compliance with Goal 2.

Under Goal 3, as it has in past comments, MCSO recommends that the Monitor modify the discussion in Goal 3 to address the TSAR training more thoroughly. In addition to explaining the statistics in the TSAR, MCSO's training addresses decision-making and implicit bias. The focus on the TSAR was to help deputies better understand the disparities identified in the TSAR and the tools deputies use to support fair and impartial decision-making.

Under Goal 4, "MCSO will develop training and roll call briefing that addresses lawful factors to rely on when taking discretionary law enforcement action and the importance of the guardian mindset." MCSO has been consistently providing the required Goal 4 trainings, and it will continue to do so. On page 100 of the Draft Report, the Monitor states that MCSO did not "produce any new materials to support roll call briefing or Captains' meetings materials during this reporting period." MCSO will

look into why the Monitor did not receive the information. In any event, because of its work over the past several years to provide the trainings required by Goal 4, MCSO asserts that it is in compliance with Goal 4 and the Monitor's report does not provide any basis for why it has not held MCSO in compliance with this goal and what basis it is using to measure compliance in this regard.

Under Goal 5, "MCSO will provide deputies and supervisors with enhanced cultural competency training and roll call briefings based on community input." (Doc. 2120-1 at 12.) MCSO's ongoing training, including the trainings described above, fulfills its responsibilities under Goal 5. The Monitor's report states that there were only 18 traffic surveys completed in the Second Quarter 2025. The Draft Report at page 100 states that the Monitor was "unable to figure out how many respondents agreed that deputies treated them without bias and to determine their race from the information provided."

To clarify, MCSO always includes a response to each question and the race of the respondent. However, MCSO accidently did not provide the Monitor with all the information requested by the Monitor as there was an error during the production process and the information was inadvertently left off. MCSO has provided the proper, completed documents to the Monitor. The Monitor's circulating his Draft Report was the first time that the Monitor reported the oversight to MCSO. To avoid this type of confusion, MCSO requests that when the Monitor identifies a potential oversight in MCSO's document production, he inform MCSO of the oversight so that MCSO can ensure that all documents that it intended to provide the Monitor were so provided.

Additionally, the Monitor states and page 100 of the Draft Report that despite the "dismal returns of the traffic survey, MCSO has not changed its distribution method." This is inaccurate. MCSO made several efforts to increase response rate years ago including adding a QR code and providing and bolding an invitation to the survey to every person with whom deputies interact on traffic stops on the citation, warning, and passenger contact receipts and incidental contact forms. But MCSO has no control over whether the general population fills out traffic surveys. Again, the Monitor's report does not provide any basis for why it has not held MCSO in compliance with this goal and what basis it is using to measure compliance in this regard.

Under Goal 6 of the CPP, the Monitor in the Draft Report at page 101 states: "The production of a webpage to deploy Traffic Trends continues to lag." MCSO clarifies that the MCSO published the Traffic Trends to the web in July 2025 and had deployed the Traffic Trends quarterly via email. Additionally, MCSO updated the Traffic Trends again in October 2025.

Also on page 101 of the Draft Report, the Monitor states that "[p]reviously discussed and approved alterations to the VSCF and NTCF did not occur during this reporting period." This is incorrect. MCSO altered the VSCF and NTCF in early April.

Additionally, on page 99 of the Draft Report the Monitor states that "we conduct periodic meetings with MCSO, the Plaintiffs, and Plaintiff-Intervenor related to the evaluation of traffic stop data and associated monthly, quarterly, and annual reports. More specifically, Goal 6 seeks data collection that focuses on the discretionary aspects of law enforcement for further analysis, such as ongoing discussions related to Consent to Search Form and data collection." MCSO seeks clarity regarding the periodic meetings. Additionally, MCSO objects to the Monitor's mention of the disputed Consent to Search Form ("CTSF") regarding this Goal. As discussed above, the CTSF is not required by the

Court's Order, federal or state law, or MCSO policy. Furthermore, MCSO asserts that Goal 6 is redundant to the requirements of Paragraph 65.

The Monitor has found MCSO in compliance with Goals 7-8 and MCSO agrees.

Finally, under Goal 9, "MCSO will support best practices that result in the hiring and retention of personnel who believe in constitutional policing and working to define and deliver a vision of community safety that is shared by Maricopa County's diverse populations." (Doc. 2120-1 at 17.)

MCSO continues its ongoing efforts to address staffing issues. Staffing issues are not peculiar to MCSO but plague agencies across the country. The 10% critical staffing differential (temporary) continued in this Quarter for detention line-level personnel. Employee referral incentives also continue. Command staff continues ongoing discussions with the County related to step-plans and law enforcement/detention compensation increases.

MCSO continues to utilize a variety of advertising venues and markets to enhance and expand recruiting efforts—primarily for Detention Officer and Deputy Sheriff positions. The expansion of digital marketing is working to attract candidates from states bordering Arizona. Pre-Employment staff held successful walk-in processing events in January and February. Additionally, the Community Outreach Unit assumed responsibility for community outreach, engaging new applicants through targeted outreach, and arranging interviews with the Sheriff on new media channels. This extended outreach enables the Sheriff and Undersheriff to encourage more interest in the law enforcement profession overall and continues to encourage applicants. The Community Outreach team conducted several recruiting events at sports venues, schools, and various career fairs.

While the Monitor's report notes a variety of statistics involving MCSO's hiring during the relevant period both in the new employees hired as well as its sworn and detention academy, the Monitor's report does not indicate how or why MCSO is not in compliance with Goal 9. MCSO asserts that it is in compliance with Goal 9 and the Monitor's report does not provide any basis for why it has not held MCSO in compliance with this goal and what basis it is using to hold otherwise. MCSO awaits the Monitor's explanation.

**In sum, MCSO is in compliance with the requirements of Paragraph 70, including the CPP.** As in other recent Quarterly Reports, the Monitor notes that MCSO and the other parties have been discussing Paragraph 70 and the CPP. The Draft Report at page 101 states: "Our compliance assessment remains based on the existing Constitutional Policing Plan and the results of traffic stop data analysis reports, as well as MCSO's response to those reports." As in the last quarter, MCSO has in this quarter again attempted to engage the ACLU and the DOJ in discussions regarding CPP/Paragraph 70. MCSO provided its written position regarding this Paragraph when discussions first started in July of 2024, but has not received any written position from the ACLU or the DOJ *in this Quarter*, despite repeated requests.

MCSO has and continues to complete all required analyses, and has provided written responses to all disparities identified in the analyses. The identified disparities are miniscule and MCSO has taken action to respond to and correct the disparities. The Court's Order does not require reduction or elimination of all disparities. Paragraph 70 requires that MCSO take **_reasonable steps_** to measure, monitor, and intervene, which MCSO has been doing since April of 2021 when the TSMR program was established. Even before then, MCSO complied with all TSAR and TSQR requirements.

Indeed, MCSO is already doing more to evaluate, monitor, and intervene when necessary than most, if not all, other agencies in the United States, and more than that is required by the Court's Orders in this case. MCSO's traffic stop outcomes exceed what typical agencies that attend the National Association for the Civilian Oversight of Law Enforcement Agencies conference have been doing. Those who refuse to believe these contentions have not provided any information to the contrary, despite MCSO's request that they do so. Nevertheless, MCSO's continuing efforts and results should be recognized as part of any critique.

**Paragraph 71.** On page 103 of the Draft Report, the Monitor states that "MCSO claims that the agency 'do[es] not consider racial/ethnic difference associated with Extended Traffic Stop Indicator use as a measure of potential bias as defined by the Second Order.' We do not agree with the placement of this statement at the outset of the investigation and have raised the issue with MCSO. We believe that this is an empirical question that should be answered through analysis – and not something that should be stated as an *a priori decision*."

While MCSO acknowledges and understands the Monitor's concern—preconceived notions can bely empirical evidence—MCSO continues to reiterate that an ETSI is purely for documentation and, therefore, is not a "traffic stop outcome" under the Court's Order.

Indeed, because ETSIs merely describe factors that extended the traffic stop, they provide no value in determining potential bias. Although MCSO recognizes that ETSI use can capture the outcomes that may indicate potential bias, MCSO does not believe that use or nonuse of ETSIs in of itself could reasonably indicate potential bias. MCSO's statement that that it "does not consider racial/ethnic difference associated with Extended Traffic Stop Indicator use as a measure of potential bias as defined by the Second Order" merely means that MCSO does not presume, one way or another, whether potential bias exists as a result of an ETSI's use.

## Section 8. Early Identification System ("EIS")

**Paragraph 72.** MCSO has been and is using the EIS as intended by this Paragraph and continues to make improvements and, therefore, asserts that it is in Phase 2 compliance with this Paragraph. Compliance with Paragraph 72 is not contingent upon completion and implementation of any singular project. Paragraph 72 merely requires MCSO to develop, implement, and maintain a computerized EIS, but does not require specific protocol for using the EIS, which is the subject matter of a different paragraph, Paragraph 81.a. and 81.b.

To date, the Monitor has not adequately addressed MCSO's objections to the Monitor's incorporation of other Paragraphs' requirements into this Paragraph. MCSO again requests that the Monitor limit its assessment methodology for Paragraph 72 to the specific requirements of Paragraph 72 and not include requirements specifically addressed in other Paragraphs. **MCSO therefore requests the Monitor amend its Draft Report and find that MCSO complies with Paragraph 72.**

**Paragraph 74.** MCSO notes that it remains in Full and Effective Compliance with Paragraph 74. But to address the Monitor's comments, it notes as follows.

In the Draft Report at page 110, the Monitor states: "MCSO has continually refined the data-handling protocol since the publication of earlier TSARs, which were fraught with problems. These processes have been memorialized in the EIU Operations Manual (Section 306), which was approved in July 2020. Aside from Section 200, noted above, Section 305 (Software Change Control Processes), approved in October 2018, is intended to ensure that all modifications to software or data collection are coordinated in a prospective fashion before any implementation occurs." MCSO clarifies that the EIU Operations Manual no longer contains sections 305 or 306; those processes are now in the TSAU Operations Manual.

In the Draft Report at page 112–13, the Monitor states:

> We and the Parties have been involved in ongoing discussions with MCSO regarding possible revisions to GJ-3 (Search and Seizure). MCSO's position is that a BWC waiver by a subject should be sufficient – while we and the Plaintiffs maintain that, without a Consent to Search Form, the review and oversight of these events may not be reviewed and evaluated by supervisory personnel since they are only required to review two BWCs for their subordinates each month. We are also concerned about how MCSO will choose to capture these events in the data system to ensure that they are searchable and retrievable for any follow-up, review, and analysis.

As stated above in its Comment to Paragraph 54.k, to the extent that a CTSF collects data that the BWC or other forms cannot collect, MCSO has already informed the Monitor that it is willing to include the data points in other forms or engage in further training to address any implementation issues. Moreover, MCSO has already explained that it captures the 26 discrete data points currently identified by the Monitor Team in the CTSF on either the VSCF or the NTCF, which the Monitor Team believes are required under the Court's Orders. Repeating what is above, when MCSO requested that the Monitor identify which data is supposedly not currently tracked by the VSCF or NTCF, the only data point mentioned by the Monitoring Team during the February site visit was the "Revoked" option on the CTSF, which is not currently on either the VSCF or the NTCF. But MCSO could be easily add and is adding this data point to both to permit documentation of all possible outcomes, which the review of the BWC or other digital recording device can confirm.

**Paragraph 79.** As MCSO has previously commented, most recently to the Monitor's 44th Report, (Doc. 3268-2 at 16-17):

> The Monitor's 39th Quarterly Report identified that MCSO needs an "analytical plan" for its use of Non-Traffic Contact Forms ("NTCFs") to be in compliance with this Paragraph. (Doc. 3027 at 110.) In this Quarter, the Monitor provides no other reason for holding MCSO out of Compliance. Paragraph 79 merely requires that the "EIS computer program and computer hardware will be operational, fully implemented, and be used in accordance with policies and protocols that incorporate the requirements of this Order within one year of the Effective Date." Paragraph 79 does not require specific protocol for using the EIS, which is the subject matter of different Paragraphs 81.a. and 81.b.

To date, the Monitor has not adequately addressed MCSO's objections to the Monitor's incorporating other Paragraphs' requirements into this Paragraph. MCSO again requests that the Monitor limit its assessment methodology for Paragraph 79 to the specific requirements of Paragraph 79 and not

include requirements specifically addressed in other Paragraphs. The Monitor's Draft 44th Report shows how MCSO continues to use the EIS as required by this Paragraph. ***Thus, MCSO requests that the Monitor modify its finding that MCSO is not in compliance with Phase II of this Paragraph to finding that MCSO is in compliance with Phase II of this Paragraph.***

**Paragraph 81.a. and 81.b.** According to the Draft Report, MCSO is in compliance with all subparts of Paragraph 81, except for a and b. The barrier to compliance appears to be MCSO's completion of the NTCF analytical plan. MCSO has been and continues to make progress on the work that needs to be done on the NTCF. MCSO expects finalizing the NTCF and publishing and providing it to patrol deputies for use in the forthcoming quarters.

**Paragraph 81.f.** In the Draft Report at page 131, the Monitor states that "MCSO has also created, in this appendix, a "use of force" threshold that is different for Detention and Patrol branches." MCSO clarifies that there has never been a use of force threshold and that the statement is inaccurate. A more accurate statement would be that MCSO has also created, in the referenced appendix, a "BIO Action Form" threshold that is different for Detention and Patrol branches. The threshold is 5 incidents in 12 months for Patrol branches and 3 incidents in 12 months for all others, including Detention.

## Section 9: Supervision and Evaluation of Officer Performance

MCSO does not have any comments to Section 9 of the Monitor's Draft Report.

## Section 10: Misconduct and Complaints

MCSO does not have any comments to Section 10 of the Monitor's Draft Report.

## Section 11: Community Engagement

**Paragraph 115.** In the Draft Report at page 169 the Monitor explained that, during the last reporting period, it determined that MCSO is not in compliance with this Paragraph, "due to MCSO's failure to attend the CAB's community meeting to hear concerns from the members of the Plaintiffs' class who attended." The Monitor provides no other reason for holding MCSO out of compliance with Paragraph 115.

MCSO disagrees and asserts that not only did it comply with the requirements of this Paragraph in this Quarter, but it should be in Full and Effective Compliance with this Paragraph as stated in its 45th Quarterly Report, Comments to the Monitor's 44th Quarterly Report (Doc 3268-2, pg. 17-18), 44th Quarterly Report (Doc. 3205 at pages 91-93), Comments to the Monitor's 43rd Quarterly Report (3198-2 at 10-13), and 43rd Quarterly Report (3145-1 at 86), and in any other correspondence between MCSO and the Monitoring Team regarding this Paragraph. The fact that MCSO did not attend a CAB meeting in 2024's Fourth Quarter should not mean MCSO is not in compliance with this Paragraph in the Second Quarter 2025. MCSO has not missed a CAB meeting in the relevant Quarter and has engaged with the CAB in various capacities, including continually providing the CAB with Order-related policies. Indeed, during this Quarter alone MCSO provided the CAB with a tour of the new PSB location and provided a recap of the event for those who didn't attend. Moreover, MCSO invited the CAB to attend the MCSO Community Town Hall in Laveen and offered to provide the CAB a presentation of the 10th annual TSAR and the 18th TSQR.

MCSO has recognized and acknowledged the alleged harms to and concerns of the Plaintiffs' class and has spent significant time, effort, resources, and manpower into changing its policies, practices, and analytics to the extent that everything that MCSO does has been informed in some capacity by the Plaintiffs' class and the Court's Orders.

MCSO will continue to engage the CAB and seek the CAB's input regarding its compliance with the Court's Orders and engage with the CAB regarding the CAB's facilitating communications between community members and MCSO, as it has done in this Quarter. MCSO continues to recognize the harms to the Plaintiffs' class with every single policy revision, every update to forms, every traffic stop study, every follow-up, and every misconduct investigation. MCSO further recognizes the diverse voices of the Plaintiffs' class, the CAB, and the community and will continue to engage in an open, honest, and transparent communal dialogue whereby members of the community and MCSO, along with the Monitor, can exchange information and ideas related to the *Melendres* case.

***Accordingly, MCSO requests the Monitor amend its Draft Report and find, at a minimum, that MCSO has complied with the requirements of Paragraph 115 for this Quarter.***

### Section 12: Misconduct Investigations, Discipline, and Grievances

**Paragraph 194.** The Monitor based Phase 2 compliance with this Paragraph on "a review of completed misconduct investigations conducted by MCSO, the review of attendance by internal investigators at required Misconduct Investigative Training, the disciplinary backgrounds of internal investigators, and the efforts being made by the PSB Commander to reach compliance." (Draft Report at 194.) For this Paragraph, which addresses the PSB commander's responsibilities, if PSB is identifying and correcting deficiencies in District investigations, those investigations should be compliant. This Paragraph is not an evaluation of the districts' work, but the work of the PSB Commander. MCSO requests that the Monitor amend its methodology to reflect the requirements of this Paragraph. Based on the Paragraph's requirements, MCSO is in compliance with this Paragraph.

As stated in the Draft Report at 195, the Monitor found only 17 of 177 administrative misconduct investigations non-compliant for deficiencies "other than timeliness." Except for timeliness, MCSO investigations which the Monitor reviewed had a compliance rate of more than 90%. Even so, investigative compliance is not a requirement of this Paragraph. Additionally, it appears that the Monitor bases its non-compliant finding on the timeliness of misconduct investigations. Although timeliness of investigations remain a paramount concern that MCSO has addressed through various proposals to increase PSB personnel working on misconduct cases, Paragraph 204, as amended, establishes the appropriate timeliness requirements and not Paragraph 194. MCSO asserts that the Monitor has and is violating its own methodology by conflating the requirements of multiple Paragraphs and importing the requirements of unrelated Paragraphs into this Paragraph. MCSO asks that the Monitor adhere to the Court's Orders and its own methodology, and analyze MCSO's compliance with each particular Paragraph according to that Paragraph's own, unique requirements without reference to unrelated Paragraphs. ***Based on the Monitor's stated methodology, MCSO asserts that it is in compliance with this Paragraph.***

**Paragraph 211.** MCSO continues to object to the Monitor's method of assessment for compliance with Paragraph 211 because it far exceeds the actual requirements of Paragraph 211 and, instead, imports requirements from other Paragraphs. For example, the Monitor's assessment of compliance

with Paragraph 211 includes a timeline evaluation for completion of administrative investigations, which is a requirement of Paragraph 204, not Paragraph 211.

The Monitor based Phase 2 compliance with this Paragraph on a review of completed misconduct investigations that MCSO conducted. (Draft Report at 214.) As stated in its Draft Report at 214–16, the Monitor reviewed 177 administrative cases and has made the following findings:

> In 129 (96%) of the 134 investigations conducted by PSB, we found the investigations to be thorough, the reports well-written and we agreed with the findings.

> (. . .)

> PSB outsourced two of the completed investigations we reviewed for this reporting period. Both were outsourced to Jensen Hughes, a vendor contracted by MCSO to assist in reducing the backlog of cases. Neither of the cases were in full compliance, due only to timeliness. We found no investigative deficiencies in the investigations we reviewed during this reporting period.

> (. . .)

> Districts and Divisions outside of PSB conducted 41 of the completed investigations we reviewed for this reporting period compared to 25 during the last reporting period. Fifteen (37%) were in full compliance with all requirements, including timeliness, a decrease from 68% during the last reporting period. Nineteen (46%) were forwarded to PSB within the internally mandated timeline of 60-days, and 21 (51%) were not finalized and closed within the 180-day requirement. Twelve investigations (29%) had one or more investigative deficiencies. This is an increase from 16% investigative noncompliance during the last reporting period. These deficiencies included: unsupported findings; leading questions, failure to identify all principals, failure to collect all evidence and failure to conduct a thorough investigation. Twenty-nine (71%) of the 41 investigations met all investigative compliance requirements, a decrease from 84% during the last reporting period.

Of the 177 administrative misconduct cases reviewed, the Monitor found only 1 non-compliant for deficiencies "other than timeliness." Except for timeliness, MCSO had a compliance rate of more than 90%. Furthermore, MCSO is holding both the supervisors who complete deficient investigations and the command personnel who approve them accountable for the deficient investigations.

MCSO maintains that the Monitor is holding MCSO out of compliance based on a timeliness requirement to complete the misconduct investigations. The timely completion of all misconduct investigations is a paramount concern to MCSO. Nevertheless, Paragraph 204 as amended establishes the appropriate timeliness requirements and not Paragraph 211. MCSO asserts that the Monitor has and is violating its own methodology by conflating the requirements of multiple Paragraphs and imports the requirements of unrelated Paragraphs into this Paragraph. MCSO asks that the Monitor adhere to the Court's Orders and its own methodology and analyze MCSO's compliance with each particular Paragraph according to that Paragraph's own, unique requirements without reference to unrelated Paragraphs.

**Section 13: Community Outreach and Community Advisory Board**

MCSO does not have any comments to Section 13.

**Section 14: Supervision and Staffing**

**Paragraph 266.** On page 252 of the Draft Report, the Monitor states that "[d]uring our compliance site visit in July 2025, we reviewed BWC video for incidents in which DSAs and Posse members were involved, to ensure compliance with Order requirements." As addressed above, MCSO clarifies that BWC for Posse members are *not* required under the Court's Orders and that MCSO independently made the decision to continue to equip Posse members with BWC. Indeed, the Court's Orders only required Posse Members and DSAs to wear BWC during a 12-month Span of Control Pilot. Doc. 2937, pg. 4:15-17 ("Posse members assigned to patrol assistance functions and Deputy Services Aides will be required to wear body-worn cameras while in the field, during the 12-month pilot program."). The pilot ended September 27, 2024, as did MCSO's requirement to equip Posse Members and DSAs with BWC. Despite the pilot having ended more than ten months ago and the Monitor's representation to MCSO that it would provide the ordered Report at the end of October 2024, and then shortly after MCSO's inquiry as to its whereabouts in May of 2025, the Monitor did not provide the ordered report and provided no rationale to justify its delay in providing the Report. Although the study should have come to an end per the Court's Order in late September 2024, MCSO recognizes that the Court recently extended the span of control study for another year, commencing on November 1, 2025, in addition to the approximate one year after the original deadline that passed without Court extension or Monitor comment.  [*See* Doc. 3298].

Additionally, on page 254 of the Draft Report, the Monitor stated that "[w]e reviewed 54 PALs for Posse members who were on-duty during the selected incidents. Of the 54 [Patrol Activity Logs] reviewed during the first quarter, 26 did not have any documentation of supervisory review, as required by GB-2 (Command Responsibility). Of the 54 Posse PALs reviewed, only 40 (74.1%) of the Posse members volunteering for the dates in question were documented on the daily rosters." To clarify, MCSO changed processes; as a result, Posse members who were not required to be on shift rosters (per GJ-27) were included in the review. MCSO is working with the Monitoring Team member in charge of this Paragraph to address this mixup.

**Paragraph 268.** On pages 256-257 of the Draft Report, the Monitor states:

> During this quarter, MCSO requested the transfer of the six Patrol sergeants who are responsible for conducting misconduct investigations at the districts into PSB, centralizing all misconduct investigations in the Professional Standards Bureau. After reviewing the documentation and rationale for these transfers, they were not approved. We have consistently opposed the centralization of all internal affairs investigations within PSB. In April 2022, MCSO informed the Monitor that misconduct allegations would no longer be assigned to the Districts or Divisions for investigation; all misconduct cases would be assigned to PSB instead. We expressed our concerns at that time and opposed this change. In our 32nd quarterly status report, we noted serious concerns with the short-term and long-term effects of conducting all investigations in PSB, and that such action would reduce the accountability of field supervisors and negate multiple years of field supervisors gaining experience on how

> to properly conduct investigations. We urged PSB to consider the impacts of such an action. The centralization of misconduct investigations, within PSB, undermines the long-term remedial objective of building investigative capacity at the District level. This model shifts responsibility away from first-line supervisors who play a critical role in fostering accountability within their commands. The Monitoring Team supports additional staffing to PSB, but not at the cost of stopping misconduct investigations from being routed to Districts, pursuant to Paragraph 346. District supervisory staff must be cognizant of the behavior and conduct of their personnel to be able to monitor their performance and also to provide direction and counseling to employees who need assistance. MCSO has already invested significant time and effort in training all sergeants and lieutenants in the investigation of misconduct. Under a centralized approach, this training would be of no practical benefit to the supervisors outside of PSB. Over time, the employees who received this training will eventually forget important principles and lessons learned due to lack of application. This undercuts both the purpose of the training and the sustainability of reforms at the District level.

MCSO disagrees with the Monitor. The misconduct cases investigated at the district level are not done by the principal's direct supervisor.

## Section 15: Document Preservation and Production

**Paragraph 269.** In the Draft 45th Report at page 258, the Monitor states that "[The data reviewed for this reporting period included March through May 2024, as per an agreement that we reached with MCSO to stagger our document requests for this Paragraph due to the large volume of data that MCSO had to provide prior to our site visits." MCSO Comments only that "2024" should be "2025."

## Section 16: Additional Training

MCSO does not have any comments to Section 16.

## Section 17: Complaints and Misconduct Investigations Relating to Members of the Plaintiff Class.

**Paragraph 288.** MCSO acknowledges that the Monitor has issued a noncompliance warning. MCSO intends to rectify any issues that the Monitor identified as they relate to potential span of control issues.

## Fourth Supplemental Permanent Injunction/Judgment Order

**Paragraph 204 as Amended:** MCSO recognizes the need to comply with this Court's Orders regarding timely investigations and continues to make significant progress in this endeavor. MCSO simply has a significant caseload of administrative investigations. MCSO informs the Monitor that reducing that caseload and shortening the time required to complete investigations remains a priority.

Additionally, on page 302 of the Monitor's Draft Report, the Monitor stated that Conduct Resolutions Section of the Administrative Services Division ("CRS") "does not have adequate staffing." This is inaccurate. CRS does have adequate staffing. Each site visit since October 2024, the Monitor has asked if CRS has adequate staffing. As MCSO has stated at every site visit, CRS has adequate staffing to

accommodate the workflow. The team has always appropriately managed the generated workload as supported by MCSO's weekly reports.

Also, as previously reported and commented, during this reporting period MCSO Command Staff determined the need to add an additional captain to PSB. MCSO believed that the additional captain would facilitate a greater PSB efficiency by establishing a dual command, with one captain overseeing investigation of sworn personnel, while the other captain overseeing investigations of civilian and detention personnel. MCSO has also sought to temporarily transfer five district sergeants into PSB to perform district investigations and work on the PSB backlog, rather than patrol duties, when otherwise not focusing on district investigations as stated in MCSO's 44th Quarterly Report. (Doc. 3205-1 at pages 36-37.) The proposed transfer would have hopefully ensured the reduction and elimination of the backlog, while simultaneously improving the quality of district investigations. The dual captain and five additional sergeant proposals presented a win-win situation. The Monitor denied both requests and MCSO sought the Court's intervention.

Although, the Court denied the exact relief requested by MCSO, the Court suggested mechanisms for MCSO to accomplish its requests. First, as to MCSO's request to transfer five sergeants into PSB, "the Court would consider, with the approval of the parties, revising paragraphs 190, 209-17 and any other necessary paragraphs to allow the Sheriff to assign PSB investigations to district investigators whose competency and efficacy has been approved by the Monitor. In that manner, district investigators can do what the Sheriff proposes: they can continue to investigate minor discipline arising from their districts, can be removed from patrol duties, and can be assigned serious cases by the PSB. Discipline in minor cases would still be imposed by district commanders, and in major cases by the PSB commander. In that way, the Court believes at least initially, that the purposes of the Sheriff and the concerns of the Monitor can both be accommodated." [Doc. 3305, pgs. 10-11.].

Next, the Court also found that a Deputy Commander in lieu of or in addition to hiring two lieutenant positions was permissible. [*Id.* at 14.] Since the Court's November 3, 2025, Order, MCSO has requested and the Monitor has approved the transfer of a second captain into PSB to function as a Deputy Commander. Although not part of the reporting period, MSCO continues to take all reasonable steps to ensure Compliance with this Paragraph. Additionally, MCSO would like remind the Monitor and the Parties, in light of the Court's recent Order, the shared goal of compliance with this Paragraph—and others—as the Parties work through "revising paragraphs 190, 209-17 and any other necessary paragraphs to allow the Sheriff to assign PSB investigations to district investigators whose competency and efficacy has been approved by the Monitor."

MCSO would also like to again submit that it is the responsibility of the Monitor and the Parties, when applicable, to correct the false impression that the misconduct cases and the backlog are made up primarily of misconduct investigations involving the Plaintiffs' class. So informing the community is an important and indispensable step toward community healing and establishing a trusting community-MCSO relationship. MCSO is attempting to inform the community accurate facts regarding the backlog in its Town Hall Meetings but is otherwise limited in its ability to communicate at public meetings, including CAB Meetings. The CAB, along with the Monitor, must facilitate communication between MCSO and the community, not hinder or limit it. For just and orderly community dialogue to occur, all Parties and the Monitor must take proactive steps to inform the community about the current status of the MCSO's compliance with the Court's Orders, including permitting MCSO to speak on issues it has identified.

**Section 18 Concluding Remarks**

On page 307 of the Draft Report, the Monitor states:

> As noted throughout this report, EA-3 (Non-Traffic Contact), approved in April 2025, does not specifically address how deputies should fill out the Non-Traffic Contact Form. In two instances, in March and April, there was not enough information provided to determine who the person contacted was. During our July site visit, MCSO stated that the agency planned to propose an Appendix to EA-3 that lays out the requirements of deputies to fill out the personal information of those contacted. Additionally, MCSO has yet to conduct a statistical analysis of NTCFs. Therefore, we have no way of tracking trends over time or how deputies measure up against others making non-traffic contact stops. This analysis is required for MCSO to be compliant with several Paragraphs, including 69, 72, 81."

As stated frequently, MCSO objects that any singular issue can keep MCSO out of compliance with multiple Paragraphs. Furthermore, while MCSO has agreed to the procedures, MCSO maintains that the requirement goes beyond the requirements of the Courts Orders. Last, although not within this reporting period, MCSO has completed a methodology for the type of statistical analysis requested and will be providing it to the Monitor's in Fourth Quarter 2025.

Also on page 307, the Monitor states that "MCSO's newest Annual Report TSAR10, shows that there were significant differences between Hispanic, Black, and all minority drivers in comparison to white drivers. These findings were for arrest, searches and stop length." As stated in the TSAR 10, although there was some comparative difference, the difference was not the result of bias or racial profiling.

As discussed in previous Comments, MCSO also does not agree that the data collected through the CTSF is necessary under the Court's Orders. In addition to BWC that consistently and clearly captures the consent to search, additional MCSO forms capture data that the Monitor requests. MCSO has previously proposed modifying, if need be, any of the additional forms to collect all relevant information required by the Court's Order. Despite the Monitor's silence on this proposal, MCSO is attempting to do so now. Accordingly, MCSO again requests that the Monitor remove any mention of requiring the CTSF for compliance purposes. As repeatedly stated above, the CTSF has never been mandatory under either the Court's Orders or MCSO policy and any data that the Monitor may want from the CTSF is collected on the applicable VSCF, NTCF, and in incident reports, or otherwise captured on BWC. And again, the United States Constitution, the Court's Orders, federal and Arizona law, and MCSO-Monitor approved policy do not require the use of a CTSF in *all* instances of consent searches. The Monitor's suggestion that the use of such a form is or should be "mandatory" (even for consent searches unrelated to traffic stops) is entirely baseless and not in line with best practices, which the Monitor Team acknowledged during its February 18, 2025 meeting with MCSO personnel.

MCSO objects with the Monitor's exceeding his limited jurisdiction under the Court's Orders. As stated above, MCSO specifically opposes the Monitor's exceeding its limited jurisdiction under the Court's Orders when he makes legal determinations about and attempts to enjoin non-Order-related issues related to the Sheriff's ability to call on the aid of a Posse under A.R.S. § 11-441 and to what authority the Sheriff may give the Posse that he calls.

MCSO also generally requests that if the Monitor identifies a potential oversight in MCSO's discovery, he immediately informs MCSO of the potential oversight so that MCSO can ensure that all documents that it intended to provide the Monitor were so provided. Doing so will help ensure that the MCSO and the Monitor engage in a mutual, respectful relationship.

*MCSO reiterates its request that the Monitor ensure that it evaluates MCSO's compliance based on the requirements of each Paragraph, individually, and not to conflate the requirements of multiple, separate Paragraphs. MCSO has identified no less than 7 paragraphs in which it believes that the Monitor has conflated the requirements of a singular Paragraph to include the requirements of other Paragraphs.*

27