1   John T. Masterson, Bar #007447
    Joseph J. Popolizio, Bar #017434
2   Justin M. Ackerman, Bar #030726
    Daniel A. Shudlick, Bar #035950
3   JONES, SKELTON & HOCHULI P.L.C.
    40 N. Central Avenue, Suite 2700
4   Phoenix, Arizona 85004
    Telephone:  (602) 263-1741
5   Fax:  (602) 200-7876
    jmasterson@jshfirm.com
6   jpopolizio@jshfirm.com
    jackerman@jshfirm.com
7   dshudlick@jshfirm.com

8

  Attorneys for Maricopa County
9

10          **UNITED STATES DISTRICT COURT**

11              **DISTRICT OF ARIZONA**

12                          No. CV-07-2513-PHX-GMS

13   Manuel De Jesus Ortega Melendres, on
    behalf of himself and all others similarly       **DEFENDANTS GERARD A.**
14   situated; et al,                          **SHERIDAN'S AND MARICOPA**
                                        **COUNTY'S JOINT MOTION FOR**
15                      Plaintiffs,     **RELIEF FROM THE THIRD AND**
                                        **FOURTH ORDERS**
16                and

17                                       (Oral Argument Requested)
    United States of America,
18

                    Plaintiff-Intervenor.
19

                    v.
20

21   Gerard A. Sheridan, in his official capacity
    as Sheriff of Maricopa County, Arizona, et
22   al.,

23                     Defendant,

24

25

26

27

28

119509146.1

Sheriff Gerard A. Sheridan, in his official capacity as Sheriff of Maricopa County ("MCSO"), and Maricopa County respectfully move this Court for relief from the Third and Fourth Orders' (Docs. 2830 and 3076) requiring paying into the PSB Staffing Fund two times the amount identified in Paragraph 338 ($191,415.12) for the months of October and December of 2025, which would constitute a total sanction of $765,660.48.

The requested relief is warranted because MCSO has made all reasonable efforts to comply with the Court's Injunctive Orders pertaining to the PSB Backlog and completing misconduct investigations, but was simply unable to comply with the rigors of Paragraph 358 in the Fourth Quarter of 2025. MCSO has reduced the backlog by *76.04% (from 2,149 backlog cases to 515 as of December 31, 2025)* since the Court issued its Amended Third Supplemental Permanent Injunction (the "Third Order"). [Doc. 2830 at 4:2-3.] MCSO respectfully requests that the Court consider whether the stringent requirements of the Third and Fourth Order should be modified in light of MCSO's significant and meaningful progress. [*See* Doc. 3076 at 10-11.]

In addition to requesting relief from the $765,660.48 sanction, MCSO further requests that, pursuant to Paragraph 358, the Court modify the requirements of Paragraph 358 to require MCSO to reduce the backlog by 43 cases each month for a quarterly reduction of 129 cases. The reduction is both necessary and fair in that it 1) ensures that MCSO reduces the backlog to 0 or a small number of cases[1] by the end of 2026 and 2) does not impose an impractical, if not impractible, requirement on MCSO.

## I.     RELEVANT FACTUAL AND PROCEDURAL BACKGROUND.

### A.     MISCONDUCT CASES, CLASS REMEDIAL MEASURES, AND THE BACKLOG.

In 2016, this Court issued its Second Order and required that the Sheriff and MCSO "conduct objective, comprehensive, and timely administrative investigations of *all* allegations of employee misconduct." [Doc. 1765, ¶ 183 (emphasis added).] This in turn required MCSO to initiate unnecessary, overly cumbersome PSB investigations for any

---

[1] As stated *infra,* while MCSO aims to entirely clear the backlog by the end of 2026, it can envision extenuating circumstances where it is possible a particular case or cases in the backlog might not be cleared by the end of 2026.

complaint of employee misconduct *of any kind* made by any individual involving both detention and sworn activities in MCSO.  As it related specifically to the Plaintiffs' class, the Court made specific Orders related to "Class Remedial Measures" which are misconduct cases involving members of "the Plaintiff class and the MCSO or the remedies to which such class members are entitled as set forth in the Findings of Fact and various supplemental orders of this Court." [Doc. 1765, ¶ 162(i).] These Orders required MCSO to treat Plaintiffs' class's misconduct cases differently than misconduct cases unrelated to the Plaintiffs' class. [Doc. 1765, ¶¶ 274-337.]

From 2017-2022 and while Sheriff Paul Penzone was in charge, the Court found that MCSO continually failed to comply with the Second Order, including failing to adequately staff PSB. [Doc. 1765, at 2:14-16.] In fact, the Court recognized Sheriff Penzone's failure to staff PSB with the budgeted positions available to him. [Doc. 1765, at 2:24-26.] During this time, the backlog of cases continued to grow. The Court noted that, "[r]ather than taking the necessary substantive steps to resolve the backlog and process the complaints within the time period specified by the Order, however, the MCSO has repeatedly granted itself . . . extensions . . . while the backlogs continued to increase." [Doc. 2576, at 2.]

In August 2021, the Court issued an Order to Show Cause why Sheriff Penzone and Maricopa County should not be held in contempt of court. [Doc. 2681.] During this time, Sheriff Penzone still failed to fill PSB with budgeted possessions, the time to complete a full administrative investigation of a sworn officer took in excess of 800 days, MCSO had 2,137 pending investigations on the backlog, each investigator completed 17 investigations a year, and the failure to complete investigations in a timely manner became so extreme under Sheriff Penzone that it rendered investigations completely ineffectual and no service to either Plaintiffs' class or MCSO personnel. [Doc. 2830, p. 4:1-6.] The Court in its Amended Third Supplemental Order (the "Third Order") found that Sheriff Penzone did not demonstrate that he had taken all reasonable steps to comply with the Court's Order and found him in civil contempt. [Doc. 2830, p. 5:1-7.]

In an attempt to assist in MCSO's timely completion of misconduct cases, Paragraph 348 of the Court's Third Order required MCSO's Professional Standards Bureau ("PSB") to create and submit new policies and procedures related to MCSO's internal investigations to the Monitor. [Doc 2830, ¶ 348.] On October 23, 2023, the Court Ordered MCSO to adopt policies attached to the Order, which included MCSO policy GH-2; *Misconduct Investigations.* [*Id.* at p. 2-99.] The Court-Ordered GH-2 policy, defines minor misconduct as being "Misconduct that, if sustained, would result in discipline or corrective action less severe than a suspension." While MCSO has been able to address certain complaints through the BIO Actions Form process and the Alert Threshold process, certain internal and external complaints cannot be subject to PSB-Directed Supervisory Intervention. [**Exhibit 1**, Policy GC-17, Employee Disciplinary Procedures, Attachment B at 21-22.] Thus, under the Court-Ordered GH-2 policy, a minor misconduct complaint involving minor employee work performance issues or employee conflicts often became full misconduct cases that fell under PSB's investigative purview.

## B.    THE COURT-ORDERED SANCTION

In its Third Order, the Court also created a sanction mechanism to "appropriately support [. . .] compliance efforts." [Doc. 2830, at 5:18-20.] The Court suggested that Defendants could avoid sanctions by "filling vacant positions at PSB, engaging contractors to staff PSB, and steadily decreasing the backlog." [Doc. 2830, at 6:7-15.] In addition, the Court required that MCSO reduce the backlog by a minimum of 20 cases per month. [Doc. 2830, at 6:10.]

The Court then modified its case-reduction requirement as part of its Amended Fourth Amended Supplemental Permanent Injunction (the "Fourth Order"). Pursuant to the Fourth Order, the Court required MCSO to reduce the backlog of misconduct complaints by an escalating amount each quarter as follows:

1.    Q4 2024, the Court required MCSO to reduce the backlog by 45 cases each month for a quarterly reduction total of 135 cases;

119509146.1

2. Q1 2025, the Court required MCSO to reduce the backlog by 50 cases each month for a quarterly reduction total of 150 cases;

3. Q2 of 2025, the Court required MCSO to reduce the backlog by 55 cases each month for a quarterly reduction total of 165 cases;

4. Q3 of 2025 and every Quarter thereafter, the Court required MCSO to reduce the backlog by 60 cases each month for a quarterly reduction total of 180 cases. [Doc. 3076, ¶ 358.]

If at any time MCSO did not meet its *quarterly total*, then MCSO and/or Maricopa County must pay a total of $382,830.24 into the PSB Staffing Fund for each *month* that it failed to comply with the monthly requirement for that quarter. [Doc. 2830, ¶ 338; Doc. 3076, ¶ 358.]

**C.    MCSO'S EFFORTS TO COMPLY WITH THE COURT'S THIRD AND FOURTH ORDERS TO DATE.**

Since the Court's Orders, MCSO has largely maintained compliance with the rigors of Paragraph 358. Indeed, for the first four quarters, MCSO complied with the requirements as follows:

1. **Q4 2022 backlog amount as of December 31, 2022: 2074** [*See* Doc. 2841.]
2. **Q1 2023 reduction: 116 cases** [Docs. 2868, 2872, and 2876.]
   a. January 2023: 59-case reduction [Doc. 2868.]
   b. February 2023: 1-case addition [Doc. 2872.]
   c. March 2023: 58-case reduction [Doc. 2876.]
3. **Q2 2023 reduction: 116 cases** [*See* Docs. 3173, 3194, and 3201.]
   a. April 2023: 28 cases [Doc. 3173, at 2.]
   b. May 2023: 16 cases [Doc. 3194, at 2.]
   c. June 2023: 72 cases [Doc. 3201, at 2.]
4. **Q3 2023 reduction: 77 cases** [*See* Docs. 2928, 2934, and 2940.]
   a. July 2023: 25 cases [Doc. 2928.]
   b. August 2023: 27 cases [Doc. 2934.]
   c. September 2023: 25 cases [Doc. 2940.]
5. **Q4 2023 reduction: 33 cases** [*See* Docs. 2947, 2956, and 2971.]
   a. October 2023: 5 cases [Doc. 2947.]
   b. November 2023: 23 cases [Doc. 2956.]
   c. December 2023: 5 cases [Doc. 2971.]
6. **Q1 2024 reduction: 103 cases** [Docs. 2929, 2990, 2997.]
   a. January 2024: 37 cases [Doc. 2929.]
   b. February 2024: 26 cases [Doc. 2990.]
   c. March 2024: 40 cases [Doc. 2997.]
7. **Q2 2024 reduction: 256 cases** [*See* Docs. 3021, 3028, and 3029.]
   a. April 2024: 194 cases [Doc. 3021.]
   b. May 2024: 30 cases [Doc. 3028.]
   c. June 2024: 32 cases [Doc. 3029.]

119509146.1

8. **<u>Q3 2024 reduction: 66 cases</u>** [*See* Docs. 3065, 3084, and 3097.]
   a. July 2024: 33 cases [Doc. 3065.]
   b. August 2024: 54 cases [Doc. 3084.]
   c. September 2024: 27-case addition [Doc. 3097.][2]
9. **<u>Q4 2024 reduction: 150 cases</u>** [*See* Docs. 3101, 3110, and 3122.]
   a. October 2024: 50 cases [Doc. 3101, at 2.]
   b. November 2024: 52 cases [Doc. 3110, at 2.]
   c. December 2024: 48 cases [Doc. 3122, at 2.]
10. **<u>Q1 2025 reduction: 161 cases</u>** [Docs. 3134, 3138, 3144.]
   a. January 2025: 52 cases [Doc. 3134, at 2.]
   b. February 2025: 56 cases [Doc. 3138, at 2.]
   c. March 2025: 53 cases [Doc. 3144, at 2.]
11. **<u>Q2 2025 reduction: 175 cases</u>** [*See* Docs. 3173, 3194, and 3201.]
   a. April 2025: 57 cases [Doc. 3173, at 2.]
   b. May 2025: 58 cases [Doc. 3194, at 2.]
   c. June 2025: 60 cases [Doc. 3201, at 2.]
12. **<u>Q3 2025 reduction: 182 cases</u>** [*See* Docs. 3216, 3238, and 3262.]
   a. July 2025: 62 cases [Doc. 3216, at 2.]
   b. August 2025: 60 cases [Doc. 3238, at 2.]
   c. September 2025: 60 cases [Doc. 3262, at 2.]

The backlog case reduction since the Third Order has been incredible. The charts below present monthly case closure data from January 2020 through December 2025. The first chart shows the number of administrative cases opened and closed each year, the second chart shows all administrative cases closed each month of each year, and the third chart shows the cases investigated and closed by PSB only[3]:

---

[2] The addition is a direct result of the backlog number being recalculated according to the guidelines adopted in the Court's Fourth Order. [Doc. 3097.]

[3] The following charts are merely graphic representations of the information previously made available for public review in the various reports and notices filed with the Court.

5

119509146.1



Since 2023, MCSO has taken all reasonable steps—and more—to identify and implement ways to better and more efficiently and effectively reduce the PSB backlog. Indeed, current efforts to reduce the backlog involve the following:

1) Increasing the number of investigators in PSB and contracting with outside investigators;
2) Prioritizing CRM cases;
3) Proposing modifications to GH-2 and other policies to reduce the amount of minor misconduct complaints;
4) Implementing the PSB-8 class that had as homework a backlog case;
5) Deploying a volunteer supplemental pay program;
6) Requesting to add a second captain/commander to the Professional Standards Bureau ("PSB") and having one captain/commander oversee sworn investigations and the other captain/commander oversee detention and employees investigations; and
7) Requesting to transfer five sergeants into PSB to work on backlog cases.

6

1   And as more fully detailed below, many of these efforts have been met with resistance from

2   the Monitor and the Plaintiffs, and some were even denied by the Court.

3       **1.    Since The Court's Third Order, MCSO Has Continuously And
            Reasonably Increased PSB Staffing Levels, Appropriately Used
4           Outside Investigators And District Investigators.**

5           *a.    Improved Staffing.*

6           The Court ordered that MCSO increase its minimum number of investigators

7   to 39 until MCSO has completely reduced the backlog. [Doc. 2830, ¶¶ 238-344.] Since then,

8   staffing levels increased with the onboarding of Civilian Administrative Investigators

9   beginning in 2023 and MCSO has maintained a minimum of 39 investigators. In fact, by the

10  end 2023, MCSO employed 43 administrative investigators; by the end of 2024, MCSO

11  employed 47 administrative investigators [Doc. 3198, at 274.]; and by the end of 2025, MCSO

12  employed 48 PSB investigators.

13          To further its efforts to eliminate the backlog and comply with the Court's

14  Orders, MCSO also requested and Maricopa County approved additional funding to increase

15  the number of PSB Civilian Investigators, which was approved. Unfortunately,  obtaining

16  approvals for additional civilian investigators has been stymied by delay. Indeed, the

17  Monitoring Team has on occasion delayed providing responses to MCSO's requests to hire

18  additional civilian investigators. In fact, MCSO requested approval of four civilian

19  investigators in mid-December 2025 and did not receive approval of two of the investigators

20  until nine days after the deadline for the approval and did not receive approval for the other

21  two investigators until 38 days after the deadline, January 26, 2026. These unnecessary delays

22  impede MCSO's ability to obtain additional investigators and delay MCSO's ability to

23  effectively reduce the backlog.

24          *b.    Overtime Hours.*

25          In addition to increasing the number of PSB investigators, MCSO continued to

26  permit investigators to work overtime to conduct investigations and clear the backlog. PSB

7

investigators worked a total of *12,615* overtime hours, the equivalent of 525.63 days, in 2025 alone.

Moreover, as MCSO has previously informed the Court, prior to his leave, Captain Lugo worked over 1,300 hours of overtime over the course of 15 months (for an average of about 87 overtime hours per month for 15 months straight). [*See* Doc. 3217, at 3:20-23.] Furthermore, PSB Commander Deputy Chief Flowers, successor to Captain Lugo, worked so much overtime under intense pressure to clear the backlog and process incoming investigations that he suffered work-related medical-health issues. In Q4 2024, the PSB Commander worked 227.5 overtime hours; in Q1 2025, the PSB Commander worked 202.5 overtime hours; in Q3 2025, the PSB Commander worked 52 overtime hours; in Q3 2025, the PSB Commander worked 144.5 overtime hours; and in Q4 2025, the PSB Commander worked 109 overtime hours.

In Q4 2024, investigators worked a total of 2,954 overtime hours (which is more than 20 overtime hours per investigator per month). In Q1 2025, investigators worked 3,008 overtime hours (which is more than 20 overtime hours per investigator per month). In Q2 2025, investigators worked 3,200 overtime hours (which is more than 21 overtime hours per investigator per month). In Q3 2025, investigators worked 3,461 overtime hours (which is more than 23 overtime hours per investigator per month). Last, in Q4 2025, investigators worked 2,946 overtime hours (which is more than 20 overtime hours per investigator per month during the holiday season).

Simply, the copious overtime hours that the PSB Commander and investigators worked are unsustainable. PSB members have exceeded all reasonable efforts to comply with the Court's Orders.

119509146.1

1      *c.*  *Non-PSB Investigation Closures.*

2    For years, MCSO has also engaged vendor Jensen Hughes to conduct some

3 misconduct investigations with monitor approval. Enlisting a contract investigator frees up

4 time for PSB investigators to clear backlog cases.

5    MCSO also utilizes its district investigators for certain misconduct cases. These

6 investigators, while not members of PSB, have received investigative training and already

7 conduct investigations at the district level. MCSO continues to use these investigators for

8 many investigations. During the second half of 2023, the PSB Commander assigned 34

9 backlog cases to each Sergeant across two divisions, which were included in the total of 860

10 cases closed that year. MCSO continues to rely on district investigators to assist in minor

11 misconduct complaints, and provide PSB investigators with additional time and resources to

12 work on backlog cases. Since 2020, district investigators have closed 684 cases.



24    In 2024, PSB identified 254 backlog cases that were eligible for diversion closure

25 and received monitor approval closure without the completion of a full investigation. As a

26 result, of the 1,272 cases closed in 2024, 254 were resolved through that process. In sum,

27 MCSO has attempted to take all reasonable measures to ensure that it has as many personnel

28 as it can, and whom the Monitor permits, working its misconduct cases and backlog.

119509146.1

2.      **MCSO Prioritizes Class Remedial Measures.**

As set forth in its 45th Quarterly Report, Doc. 3358-1 at pp. 148-149, MCSO works closely with the Monitoring Team on Class Remedial Matters ("CRMs"), which receive investigative priority. Every complaint with a Latino surname goes through the CRM vetting process. The complaint is initially put onto the CRM list, reviewed, and briefed. If MCSO determines that the complaint does not involve either (1) an allegation of bias or (2) a traffic stop, it will suggest to the Monitor that the complaint be removed from the CRM list. After the Monitor Team agrees, MCSO will remove the complaint from the CRM list and investigate in the regular course.

The Monitor Team meets with PSB every two weeks to track the progress of CRMs under investigation, review, and finalization. The Monitor Team must approve all steps of the process. Importantly, the Monitor Team continues to report that investigations involving CRMs are thorough and that the appropriate standard of proof supports PSB's findings. In addition to bi-weekly meetings already in place, MCSO and the Monitor Team meet as necessary to follow up, evaluate, and respond to CRM investigative matters. MCSO prioritizes CRM above all other investigations. <u>Absent unique circumstances,</u> CRM cases do not usually go on the backlog. Accordingly, MCSO submits that it has addressed and remedied the Court's concern about administrative investigations being ineffectual as to the Plaintiffs' Class. MCSO has taken all reasonable steps to ensure that investigations of CRM cases have wholly complied with the Court Order's requirements. [*See id.*]

3.      **Proposed Modifications To GH-2**.

a.      <u>*Types of cases on the backlog.*</u>

As stated above, absent unique circumstances, CRMs do not typically go onto the backlog or remain there. Indeed, CRM cases make up a small number of the total misconduct cases. From July 1, 2016, through September 30, 2025 (Third Quarter of 2025), out of a total of 6,407 complaints, MCSO received 786 complaints involving Latino surnames,

10

which amounts to 12.25% of all complaints received during that quarter. Significantly, of these 786 complaints over this 9 year two month period, only 157 remained CRMs, which comprised only 20% of all complaints involving Latino surnames and 2.45% of all complaints:

| Year Received | Remained with CRM |
|---|---|
| 2016 | 8 |
| 2017 | 25 |
| 2018 | 15 |
| 2019 | 21 |
| 2020 | 29 |
| 2021 | 14 |
| 2022 | 19 |
| 2023 | 11 |
| 2024 | 11 |
| 2025 as of Q2 | 4 |

[Doc. 3358-1, 148.]

While very few criminal cases exist, PSB must investigate misconduct cases and a disproportionate amount of minor employee performance issues and inter-employee complaints. Under the current GH-2 policy, PSB must investigate many complaints that are minor employee performance issues and inter-employee disputes, which drain PSB investigators' limited resources.

In fact, many of these complaints involve driving and rudeness complaints. For each complaint, PSB must open an investigation, conduct interviews, prepare reports which are subject to supervision and review, and, at times, further investigative and reporting actions. When asked, it is MCSO's experience that complainants often desire a supervisor to speak with the deputy, rather than have an overly cumbersome PSB investigation occur. Respectfully, absent extraordinary circumstances, simple driving and rudeness complaints should not be matters for which PSB must devote significant resources to conduct an overly burdensome IA investigations. Instead, those complaints should follow a different process that requires accountability, but permits MCSO to allocate resources to more important matters.

11

119509146.1

1    Also, internal conflicts between employees, unless the alleged complaint reaches

2    a level of workplace harassment, should not be PSB investigations. Too often employees know

3    and use buzzwords that trigger a PSB investigation. In fact, an overly cumbersome PSB

4    investigation of internal employee conflicts do not necessarily correct the subject behavior.

5    Instead, a process that ensures quick feedback or coaching via the chain of command would

6    better address minor employee conflict issues.

7    Last, MCSO receives many complaints from third-parties regarding allegations

8    from the jails, despite the fact that inmates have a grievance process for any issues at the jail.

9    If misconduct is identified within the grievance process MCSO initiates a misconduct

10    investigation. However, too often inmates reach out to family members to file a third-party

11    complaint, subverting the established and well known grievance process. The third-party

12    complainants often have no first-hand knowledge of the underlying events discussed in their

13    complaints. By inappropriately subverting the grievance process, the inmate is able to—

14    through a de facto straw-man—initiate an unnecessary and time consuming PSB investigation

15    for something that would, and should, have been addressed through the jail's grievance

16    process. By intentionally subverting the jail's grievance process, inmates improperly create

17    additional misconduct cases that should not be misconduct cases, take up PSB investigator

18    time and resources, and impede MCSO's compliance with the requirements of the Court's

19    Orders related to reducing the backlog.[4]

---

[4]    For example, an employee used a gloved hand to open a container and then grab a hot dog bun for an inmate with that same gloved hand. The resulting PSB investigation required a 45-page report and sustained finding. PSB should have never investigated that complaint. Another complaint involved an employee mistakenly using too much salt for a recipe. This action, too, should not have been a PSB investigation but was. MCSO provides these examples as a means to show why GH-2 must be modified. To be sure, the exemplar cases are not the only type of complaints that MCSO receives, but the number of those types of complaints do make take up more than a nominal amount of time.

12

b.     *Monitor Delay In Reviewing The Proposed Changes.*

In light of the above, MCSO submitted its proposed modifications to GH-2 (and related policies) to the Monitor, as part of its 2024-2025 annual review process, on June 23, 2025. On August 5, 2025, which happened to be 13 days after the 30-day deadline by which the Monitor must respond, Deputy Monitor Alfred Peters refused to conduct the requested review, commenting:

> On October 12, 2023, the Court ordered the adoption of final internal affairs policies, including this one. Any substantial changes to these policies require prior Court approval.

[**Exhibit 2**, Deputy Monitor Peters August 5, 2025 email.] However, Deputy Monitor Peters provided no feedback regarding how MCSO could obtain that approval. [*Id.*] MCSO asked to meet with the Monitor to discuss GH-2 and how best to move forward. [**Exhibit 3**, Commander Doyle and Attorney Busch-Wheaton Email Exchange.] On August 26, 2025, Monitor Team member, Robin Busch Wheaton made clear that the Monitor refused to discuss, much less review, MCSO's proposed changes to GH-2:

> We reiterate our position that GH-2 (Internal Investigations) was ordered by the Court in October 2023, and thus, the Monitor cannot unilaterally make or approve any substantive changes to the policy. Accordingly, there is no basis for us to meet regarding this matter.

[*Id.*] It seems, then, that this highly experienced Monitor Team is apparently unwilling to work with MCSO on a significant policy. The Monitor was not asked to "unilaterally make or approve" anything but to cooperatively work with MCSO to address any concerns prior to MCSO going to this Court for approval. Again, the Monitoring Team provided no further information regarding its position on the process for MCSO to update GH-2 and related policies and documents. [*Id.*] This appears contrary to the intention of the Court's Orders appointing the Monitor. [*See* Doc. 606 at ¶ 119 ("The Court shall appoint an Independent Monitor *to assist* with implementation of, and assess compliance with, this Order.") (emphasis added).]

13

119509146.1

MCSO made it clear that it understood the Monitor's position that the Court will need to settle any dispute on whether Court approval is required and, if so, to approve MCSO's proposed changes to GH-2 or, at the very least, provide suggestions and input. [**Exhibit 4**, Commander Doyle Email.] However, MCSO believed (and still does believe) that having the Monitor's preliminary approval, or even just suggestions regarding the proposed changes prior to seeking the Court's input, could significantly reduce the burden on the Court and streamline the Court's review of GH-2 (if it felt that was still necessary).

As MCSO informed the Monitor, MCSO believed that the Court would direct MCSO to confer with the Monitor and the Parties about the proposed changes (as is the ordinary process). MCSO believed that proactively conferring before seeking the Court's review and input furthered the intention of the Court's Orders, including the Amended Third Supplemental Order, and was more efficient for the parties of the Court. [*Id.*] Indeed, MCSO's proposition not only followed the regular annual review process, but also substantially complied with the modified review process of the Amended Third Supplemental Order. Plaintiffs could freely comment and discuss MCSO's proposed changes, and the Monitor would have a final opportunity to review and offer any helpful input before any Court intervention.

Nevertheless, the Monitor had refused even to consider discussing Draft GH-2, much less review it, stating in a September 24, 2025 email:

> Given that these policies were issued by an October 12, 2023 Court Order, the Monitor cannot direct any changes to GH-2 (Internal Investigations), the PSB Operations Manual, and GC-17 (Employee Disciplinary Procedures), Categories of Offenses, Attachment B. Accordingly, there is no basis for us to meet regarding this matter.

[**Exhibit 5**, Deputy Monitor-Attorney Busch-Wheaton Email.] The Monitor's refusal to engage in any discussion or review process at all regarding draft GH-2 stalled and frustrated MCSO's attempt to streamline and address the backlog, despite the fact that the Court would certainly consult the Monitor regarding the proposed revisions. Again, the Monitor was not

14

asked to "direct" any changes, but just to work with MCSO to move forward on this policy and the goal of full and effective compliance.  Certainly, the Monitor mut be expected to provide learned advice rather than just say "No."  [Doc. 606, ¶ 119].

The Monitor continued to refuse review of proposed changes until MCSO counsel reached out to the Monitoring Team. And not until the October 2025 site visit did the Monitor finally agree to review informally the proposed revisions at the request of MCSO's counsel.

c.     *Additional Changes To GH-2 And The Monitor's Continued Delay.*

While the initial request for review was first submitted in June 2025, MCSO subsequently provided a revised version of GH-2 after the Monitor had not provided guidance for 5 months. MCSO added detailed processes clearly explain and set forth that certain complaint-types should not presumptively require a misconduct case be opened for a complaint alleging a minor employee conflict or a minor work performance issue. MCSO proposed definitions from the first draft submitted in June of 2025 were as follows:

> **Employee Conflict:** A workplace disagreement or misunderstanding that arises from factors such as miscommunication, differing perspectives, or unclear roles and responsibilities. While generally low in severity, if left unaddressed, these type conflicts may impact overall moral, continuity, and productivity.

> **Performance Issue:** Conduct that is typically addressed with a verbal admonishment, instructions, or expressed expectations that if allowed to continue could develop into a pattern requiring formal intervention or misconduct.

GH-2's second draft made it clear to supervisors that an employee conflict "should not be immediately or presumptively considered misconduct, unless found to exceed activity categorized as an eligible Category 1 or Category 2 Offense of Attachment B, of Office Policy GC-17, Employee Disciplinary Procedures."  MCSO clarified the procedures expected of these minor employee conflict complaints and that the complaints do not require administrative investigations. [**Exhibit 6**, GH-2 Draft 2.] MCSO also proposed an alternative

15

process for a "Minor Employee Work Performance Issue" and proposed that the issue should not "be immediately or presumptively considered misconduct, unless found to exceed activity categorized as an eligible Category 1 or Category 2 Offense of the Attachment B, of Office Policy GC-17, Employee Disciplinary Procedures." [*Id.*]

The proposed changes are intended to promote consistent corrective action for all employees and require supervisors to identify and respond to minor problematic behaviors using supervisor interventions which allow for immediate and prompt resolution instead of time consuming administrative investigations. By reinforcing handling certain employee conflicts and minor employee performance issues through the above proposed procedures, PSB would receive a marked decrease in misconduct cases to investigate. Furthermore, the procedures would ensure supervisors use a quick, reasonable resolution to the complaint to the benefit of the complainant, principal, principal's supervisor and chain of command, as well as MCSO and the community it serves. On January 20, 2026, MCSO received Plaintiffs' counsel's comments to that draft. [**Exhibit 7**, Email from Attorney Shaw.] MCSO has yet to receive Monitor input on the draft. The Monitor's delay in submitting proposed revisions for review and providing comments have negatively affected MCSO's ability to effect reasonable changes calculated to further reduce the backlog and otherwise clarify what should not be an overly cumbersome PSB investigation.

**4.     MCSO Developed And Implemented A PSB-8 Class That Reduced The Backlog And Trained Additional, Qualified Investigators.**

In addition to the foregoing, in an attempt to address the backlog and increase those available within MCSO to conduct an investigation, in the first quarter of 2025, MCSO implemented a PSB-8 training course for personnel outside of PSB to investigate misconduct cases. The training specifically included classroom training in the proper completion and review of administrative misconduct investigations and included an assignment of backlog cases for completion after the training.  District and Division lieutenants and captains also

119509146.1

attended some, or all, of the training. MCSO provided the training in an effort to improve the completion and review of misconduct investigations and the ability for MCSO to fully investigate and close backlog cases.

MSCO's innovative class not only prepared MCSO personnel to handle misconduct cases outside of PSB, ensuring that it has a broad pool from which to identify and select additional investigators, it also directly reduced the backlog. Indeed, the class resulted in



| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PSB | 103 | 95 | 94 | 80 | 74 | 54 | 84 | 82 | 91 | 77 | 85 | 80 |
| District - PSB 8 | | | | | 21 | 19 | 25 | 11 | 5 | 2 | 3 | 3 |
| District | 11 | 3 | 12 | 4 | 7 | 10 | 1 | 2 | 7 | 6 | 6 | 4 |
| Total | 114 | 98 | 106 | 84 | 102 | 83 | 110 | 95 | 103 | 85 | 94 | 87 |

an 89-case backlog reduction by the end of 2025:

### 5.    MCSO Also Developed And Implemented The PSB Supplemental Pay Program To Address The Backlog.

In October of 2025, MCSO proposed and received approval of a PSB Supplemental Pay Program. Under the Program, MCSO will compensate 32 seasoned MCSO detention and sworn lieutenants and captains (the "Volunteers"), to perform one misconduct investigation at a time for an additional pay of $20 per hour for up to 10 hours a week. To be eligible for the Program, the Volunteers must show investigative experience. All sworn lieutenants and captains must have completed the PSB-8 and PSB-40 trainings. The detention lieutenants and captains must have also all completed the PSB-40 training. Additionally, the

119509146.1

1    Volunteers have additional investigative experience on calls for service or other assignments

2    in addition to having previously handled complaints.

3                    The Volunteers must meet all investigative requirements, including the 60-day

4    deadline for investigation completion.  Absent approved extensions; they must also complete

5    30-day check-ins with PSB. What's more, PSB Command will continuously monitor cases to

6    ensure timely completion and adherence to standard procedures. If a Volunteer does not

7    comply with the timeliness requirement, or falls below certain performance metrics, MCSO

8    Command maintains sole discretion to revoke a Volunteer's participation in the Program at

9    any time.

10

11                    As stated in a November 18, 2025 letter to the Monitor,  MCSO developed the

12   Program to address the shared concern of the cost of compliance in this case, along with the

13   goal of backlog reduction and elimination. [**Exhibit 8**, Attorney Popolizio Ltr. to Monitor RE:

14   Supplemental Pay Program.] As the Court is well aware, pursuant to the Fourth Order,

15   MCSO's obligations to reduce the backlog have steadily risen from 45 cases a month to 60

16   cases a month—for a total of 180 cases per quarter. MCSO advised the Monitor that if it were

17   not able to reduce the PSB Backlog by 180 cases in Q4 2025, inclusive of the credit from the

18   previous Quarter, MCSO would have to pay into the PSB Staffing Fund two times

19   $191,415.12, or $382,830.24, for each month that MCSO did not reduce the backlog by 60

20   cases.

21

22                    Thus, this new innovative program not only provides MCSO with another tool

23   in its arsenal to reduce and eliminate the investigation backlog, but also an additional way to

24   avoid much greater staffing penalties should MCSO not reduce the backlog as required each

25   quarter.  This is yet another example of MCSO's attempts to find creative solutions to meet

26   the Court's requirements of clearing the backlog.

27

28

18

119509146.1

1    **6. MCSO Requested To Add A Second PSB Captain/Commander And Subsequently Adding A Second Captain/Deputy Commander.**

2

3    As this Court is aware, as far back as of the second quarter of 2025, MCSO

4    raised concerns with the Monitor that having only one captain/commander overseeing PSB

5    was insufficient to operate PSB properly, given the backlog and the excessive number of hours

6    that one captain/commander must work to run PSB as the Court's Orders require. [*See* Doc.

7    3217, at. 6-9.] Accordingly, MCSO proposed to transfer a second captain/commander into

8    PSB to address the excessive captain's hours and backlog issues. MCSO's proposed dual

9    command sought to establish a dichotomy of authority and responsibility which would

10    simultaneously address PSB's overburdened single commander issue, while streamlining PSB's

11    operation. One captain/commander would oversee sworn investigations, while the other

12    would oversee the civilian and detention investigations and, thus, enhance MCSO's

13    compliance efforts. [*See* Doc. 3217, at 6-9.]

14

15    The Monitor readily rejected MCSO's proposal as not complying with the

16    Court's Order requiring a single PSB commander, which forced MCSO to seek Court

17    intervention. [*See* Doc. 3217, at 6-9.]  In its November 3, 2025, Order the Court determined

18    that MCSO's attempted transfer may have technically or inadvertently failed to comply with

19    the Court's Orders, it nevertheless agreed with the utility of MCSO's request. [*See* Doc. 3305,

20    p. 14.] The Court found that a Deputy Commander in lieu of or in addition to hiring two

21    lieutenant positions was permissible. [*Id.* at 14.] Shortly thereafter, MCSO transferred a second

22    captain/commander into PSB to function as a Deputy Commander per the Court's suggestion

23    as suggested by the Court. [*See* Docs. 3313-3316.]

24

25    The PSB Deputy Commander has only recently been able to assist with

26    managing investigator and lieutenant caseloads and work activity. However, it took MCSO

27    nearly *eight months* to obtain this relief, which impeded MCSO's efforts to reduce the backlog

28    in accordance with the Court's Orders.

19

119509146.1

1

2

**7.    MCSO Requested The Temporary Transfer Of Five Already Trained, Qualified Sergeants Into PSB To Work On Backlog Cases.**

In addition to requesting a second captain/commander to facilitate the oversight of investigations and help clear the backlog, as far back as the beginning of the second quarter of 2025, MCSO requested to transfer, temporarily, five district-level sergeants to PSB, who would split their time between district and PSB backlog investigations to help eliminate the IA backlog. [*See* Doc. 3217, at 9-12.] MCSO viewed this proposal—along with adding an additional PSB captain/commander—as a common-sense proposal that benefits all parties without any detriment and that complied with the Court's Orders. Indeed, under the proposal, the sergeants would have continued to perform district misconduct investigations for the districts separate and apart from their PSB work to assist to eliminate the backlog. MCSO identified no risk that the district sergeants would lose any of their training or otherwise forget how to conduct district investigations. [*See* Doc. 3217, at 9-12.] In fact, these sergeants would conduct investigations under the tutelage and oversight of full-time PSB professionals.

Nevertheless, the Monitor rejected MCSO's proposal and MCSO sought Court intervention once again. [*See* Doc. 3217, at 9-12.] The Court in its November 3, 2025, Order denied MCSO's request to transfer the district investigators into PSB but it did *again* agree with the utility of MCSO's proposal and suggested mechanisms for MCSO to accomplish its request, stating that "the Court would consider, with the approval of the parties, revising paragraphs 190, 209-17 and any other necessary paragraphs to allow the Sheriff to assign PSB investigations to district investigators whose competency and efficacy has been approved by the Monitor." [Doc. 3305 at 10-11].  The Court went on to state that "[i]n that manner, district investigators can do what the Sheriff proposes: they can continue to investigate minor discipline arising from their districts, can be removed from patrol duties, and can be assigned serious cases by the PSB. Discipline in minor cases would still be imposed by district commanders, and in major cases by the PSB commander. In that way, the Court believes at

20

1    least initially, that the purposes of the Sheriff and the concerns of the Monitor can both be

2    accommodated." [*Id.*].[5]

3              Shortly thereafter, MCSO reached out to the parties to discuss the Court's

4    proposal, advising the parties that MCSO's sole intention in attempting to add temporarily add

5    the additional sergeants back in May 2025 was to simply "provide more support to MCSO's

6    PSB division so it can eliminate the existing backlog as expeditiously as possible and comply

7    with the Court's Orders" and maintained doing so was to the benefit of all parties. [**Exhibit**

8    **9**, Emails RE: District Investigators.] The parties met virtually on December 16, 2025, and

9    MCSO, pursuant to input from the United States, provided the following proposal under the

10   authority of Paragraph 214 of the Second Order:

11

12          •    The PSB Commander would assign a non-CRM backlog case[6] to
                 a district investigator with the approval of his or her commander.
13          •    This assignment may involve a PSB backlog case within or
                 outside of the District or Bureau in which the incident occurred.
14          •    This assignment will be explained in writing.
            •    At the conclusion of the investigation, it will then be sent to PSB
15               for review in accordance with existing policies and procedures.
16          •    The Monitor will also review the investigation in accordance with
                 existing PSB practices. [**Exhibit 10**, Attorney Ackerman Email
17               Proposal.]

18            MCSO believed that the proposal afforded it the relief it requested to clear the

19   backlog, while at the same time following the Court's Orders without modifications.

20   Moreover, MCSO assured all parties that the backlog did not contain any CRMs and that

21   MCSO would never assign a CRM outside of PSB. [*Id.*] Despite the United States' agreement

22   to the proposal, counsel for Plaintiffs' class waited over three weeks to respond that the

23   Plaintiffs' class disagreed with the United States and MCSO that Paragraph 214 in conjunction

24   with Paragraphs 213 and 215 of the Court's Orders permitted district investigators to conduct

25   PSB investigations from the PSB backlog. However, nothing in the language of either

26

27   _____
          [5] Please note: MCSO informs the Court that district commanders do not impose
28   discipline; only the appointing authority can impose discipline.

          [6] MCSO notes that there are no CRMs in the backlog.

Paragraph 213 nor 215 preclude this request or the powers granted by Paragraph 214. [**Exhibit 11**, Attorney Wee Response to Attorney Ackerman's Proposal.]

*Thus, for almost three full quarters (9 months),* MCSO has been trying to get additional, experienced investigators to work on backlog cases, to no avail. Despite all reasonable efforts to assign backlog cases to experienced investigators, MCSO has not been able to do so. Because the parties cannot come to an agreement, MCSO requests that the Court review and authorize MCSO to go forward with the process that it and the United States proposed above.

## II.    DESPITE TAKING ALL REASONABLE STEPS, MCSO DID NOT MEET THE REQUIREMENTS SET BY PARAGRAPH 358 FOR THE FOURTH QUARTER OF 2025.

### A.    MCSO Reduced The Backlog In Q4 2025 By 125 Cases.

As of December 31, 2025, MCSO had 515 cases on the backlog, the lowest number of backlog cases since the Court's Third Order. For comparison, as of September 30, 2024, the backlog was 1,307. During Sheriff Penzone's administration, the backlog was 2,149 cases. Despite making enormous strides in reducing the backlog to 515 cases and taking the above steps in an effort to comply with the Court's Orders, MCSO continued to reduce the backlog, but was unable to meet the quarterly reduction requirement of 180 cases for Q4 of 2025:

**Q4 of 2025 reduction: 125 cases** [*See* Docs. 3309, 3330, and 3385.]
- October 2025: 33 cases [Doc. 3309, at 2.]
- November 2025: 60 cases [Doc. 3330, at 2.]
- December 2025: 32 cases [Doc. 3385, at 2.]

Because it did not meet the monthly goal in October and December of 2025, pursuant to the Court's Order MCSO and/or the County must pay two times the amount identified in ¶ 338 ($191,415.12) for the months of October and December of 2025, which would constitute a total sanction of $765,660.48. Despite MCSO's reducing the backlog by 125 cases in Q4 2025

1  and its significant overall reduction of the backlog in 2025, MCSO or the County stands to

2  pay the draconian sanction of $765,660.48.

3      **B.    Increased Difficulty In Closing Cases.**

4          Over the past five years, there has been a significant increase in higher-category

5  offenses (Categories 6–7). The enhanced due diligence and additional resources required for

6  these investigations can extend investigative timelines. These cases remain a high priority for

7  PSB and are frequently more time-intensive than lower-category or non-sustained cases. This

8  is due to the heightened evidentiary standards and the increased number of interviews typically

9  required, given the seriousness of the potential disciplinary outcomes. In some instances, these

10  cases also involve a criminal component, further extending the duration of the investigation.

| 2025 | Q1 | Q2 | Q3 | Q4 | Total |
|---|---|---|---|---|---|
| Category 1 Offense | 5 | 4 | 1 | 3 | 13 |
| Category 2 Offense | 98 | 59 | 58 | 56 | 271 |
| Category 3 Offense | 16 | 10 | 8 | 17 | 51 |
| Category 4 Offense | 4 | | 2 | 1 | 7 |
| Category 5 Offense | 3 | 4 | 2 | 2 | 11 |
| Category 6 Offense | 4 | 7 | 4 | 3 | 18 |
| Category 7 Offense | 14 | 8 | 7 | 14 | 43 |
| **Total** | **144** | **92** | **82** | **96** | **414** |

19          Of the 14 Category 7 cases referenced completed in Q4 of 2025, eight were

20  backlog cases. Moreover, in the final quarter of 2025, the division closed twice as many

21  Category 7 (terminable offense) cases as were closed in each of the previous two quarters.  In

22  addition to administrative investigations, the PSB reviews Service Complaints ("SCs"). While

23  SCs are not classified as administrative investigations and do not make up investigations on

24  the backlog, each requires the initiation of an SC file, the completion of a preliminary

25  investigation, and formal processing and closure. In some instances, following interviews and

26  initial review, an SC may be elevated to a full administrative investigation. The process of an

23

119509146.1

SC requires the dedicated efforts of no less than two-full time investigators. Indeed, during 2025 alone, MCSO has closed 513 service complaints:

**C.     A 60-case Per Month Reduction Of The Backlog Has Been Historically Difficult To Attain.**

From November 9, 2022, through September 30, 2025, MCSO has completed a total of 3,104 misconduct cases, meaning MCSO has completed more than 1,000 misconduct



investigations a year for the three years prior to Q4, 2025. In addition to removing cases from the backlog, MCSO has to ensure the cases are not added to the backlog. The average number of opened cases per month in 2024 was 47 and for 2025 it was 43 cases a month. Thus, to maintain compliance with the Court's 60-case reduction requirement under Paragraph 358—MCSO must complete an average of over 100 investigations per month (at a minimum), which is simply difficult to obtain on a consistent basis:

- In 2020, PSB averaged 20.92 cases per month for their investigations and 32.83 per month when the cases closed outside of PSB were included.
- In 2021, PSB averaged 30.25 cases per month for their investigations and 38.00 per month when the cases closed outside of PSB were included.
- In 2022, PSB averaged 30.33 cases per month for their investigations and 36.42 per month when the cases closed outside of PSB were included.
- In 2023, PSB averaged 60.92 cases per month for their investigations and 71.67 per month when the cases closed outside of PSB were included.
- In 2024, PSB averaged 77.8 cases per month for their investigations and 84 per month when the cases closed outside of PSB were included.
- In 2025, PSB averaged 83.25 cases per month and 96.75 per month when cases closed outside of PSB were included.

24

Of course, 2025 included 89 PSB-8 cases, boosting the total case average. The average without the PSB-8 cases was 89.3.

In sum, for the last two years, PSB has averaged an intake of 45 cases per month. In order to avoid new cases being added to the backlog, PSB must theoretically close 45 cases per month. When this number is added to the 60 required backlog reduction number, PSB must close 105 cases per month. This number was hit twice in 2024 and three times in 2025. Rather, for the last two years, PSB has averaged a monthly total closure rate of 86.65 absent extra sources of help. An investigation clearance amount of more than 100 a month would require MCSO to clear more than 1,200 administrative misconduct cases in a single year, which would be extraordinary.

## III.     RELIEF FROM THE COURT'S ORDERED SANCTION IS WARRANTED.

Sanctions for civil contempt may be imposed to coerce obedience to a court order, or to compensate the party pursuing the contempt action for injuries resulting from the contemptuous behavior, or both. *Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1380 (9th Cir. 1986); *United States v. United Mine Workers*, 330 U.S. 258, 303–04 (1947); see e.g., II C. Wright & A. Miller Federal Practice and Procedure § 2960 at 584 (1973). When the sanction imposed is for the purpose of making a defendant comply with an order it is coercive and the Court must consider the character and magnitude of the harm "threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." *United States v. United Mine Workers*, 330 U.S. at 04.

"[S]ubstantial compliance with a court order is a defense to an action for civil contempt." *Gen. Signal Corp.*, 787 F.2d at 1379; *see also Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 891–92 (9th Cir. 1982). This defense is available to an alleged contemnor that has "taken 'all reasonable steps' to comply" with applicable court orders, resulting in merely "technical or inadvertent [sic] violations" of those orders. *Gen. Signal Corp.*, 787 F.2d at 1379; *see also Lab./Cmty. Strategy Ctr. v. L.A. Cnty. Metro. Transp. Auth.*, 564 F.3d 1115, 1123 (9th

25

Cir. 2009). In other words, the substantial compliance defense excuses an alleged contemnor who, despite not achieving total compliance, has achieved near total compliance through the exhaustion of all reasonable efforts. *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993).

A.     **MCSO Took All Reasonable Steps To Comply With The Court's Third and Fourth Orders To Clear The Backlog.**

Per the Court's Third Order, "the character and magnitude of the harm to Plaintiffs, the general public, and MCSO personnel posed by Defendants' violations establishes the need for a substantial fine. Although MCSO command staff have known about the violations for years, *the backlog continues to grow, and MCSO has not taken meaningful steps to address it.*" [Doc. 2830, at 5:3-6 (emphasis added).] Indeed, imposition of the fine structure necessarily recognized that MCSO—under a previous administration—did not take meaningful steps to address the growing backlog; indeed, the Court noted Sheriff Penzone's failure to fill budgeted positions.

That simply has not been the case since the time that the Court issued its Third Order. Since the Court's Third Order, MCSO has *reduced the backlog by* **76.04%.** Indeed, from September 30, 2024, through September 30, 2025, MCSO maintained compliance with Paragraph 358 and reduced the backlog by 668 cases, or almost 1/3 of the 2,176 backlog cases referenced in the Court's Third Order. By virtue of having reduced the backlog by 76.04% since November 2022 and having reduced the backlog by 33% in a single calendar year, MCSO has substantially complied with the Court's Orders regarding backlog reduction. Moreover, there are no CRM cases on the backlog. MCSO prioritized CRM cases and completes those cases before they are placed on the backlog. *Thus, MCSO has wholly complied with the Court's Orders regarding CRM cases, obviating the Court's concern that MCSO's administrative investigation process was ineffectual as to the Plaintiffs' Class.*

MCSO has continued to make backlog reduction a top priority and has taken more than all reasonable steps to comply with the Court's Orders. Indeed, MCSO has filled

26

119509146.1

the PSB vacancies identified in the Court's Third Order and has hired additional investigators. So much so that the number of PSB investigators is over 25% more than the Court's minimum requirement. MCSO has also used vendor investigators and its district and division investigators as suggested under the Court's Orders. The use of these investigators has directly reduced the backlog as well as permitting PSB investigators to take on more backlog cases.

PSB staff, including the PSB Commander and investigators, worked significant overtime to address the backlog issue. PSB staff pushed themselves over the course of many months in an unprecedented effort to comply with the rigors of the Court's Orders, working, on average, over 20 hours of overtime, including overtime during the holiday season. In 2025 alone, PSB investigators worked a total of 12,615 overtime hours. Additionally, Captain Lugo worked an astounding 1300 overtime hours in a 15-month period and now Chief Flowers has worked significant hours as well. The hard work of PSB investigators and its commanders under the demands placed on them must be recognized and applauded, not denounced as sanctionable.

MCSO, more than any other agency in the valley, sees an extraordinary number of relatively frivolous complaints that are required by this Court's orders to be processed as full administrative investigations. This has the effect of not only draining existing resources, but also decreasing employee morale while increasing the stress of PSB staff. Accordingly, MCSO identified multiple potentialities to reduce the number of administrative cases sent to PSB and has attempted to revise various policies (including GH-2) to ensure that certain complaint types are handled through a better, more efficient process. The proposed changes are quintessential to ensuring that a minor "Employee Conflict" or a "Minor Work Performance Issue" does not become an overly cumbersome PSB investigation. Despite MCSO's recommended, common-sense approach to handling complaints, the Monitor initially refused to review MCSO's proposed policy changes and MCSO is still receiving comments from Plaintiffs' counsel seven months after MCSO provided the Monitoring Team

1    with the proposed changes. This delay has impeded MCSO's ability to reduce the number of

2    complaints that become administrative investigations and has, therefore, impeded MCSO's

3    ability to reduce the backlog.

4            In addition, as far back as the first quarter of 2025, MCSO sought to add a

5    second captain/commander to PSB to alleviate some of the stress and extensive hours worked

6    by the PSB Commander. MCSO believed that the shared responsibility and the proposed

7    dichotomy of command complied with the Court's Orders and requested the additional

8    captain/commander in an effort to further the Court's Orders to streamline the investigative

9    process and reduce the backlog. MCSO further believed the second captain/commander was

10   necessary to ensure that its personnel would not succumb to extreme burnout and to maintain

11   institutional knowledge through minor redundancy. While the Court denied MCSO's

12   requested relief, it did find the utility in its request and proposed an alternative. But this took

13   8 months to resolve, and in that time important efficiencies MCSO wished to utilize to reduce

14   the backlog with a dual-captain/commander approach in PSB was lost.

15

16           Additionally, MCSO has been requesting for the last nine (9) months to be

17   allowed to better use five additional district sergeants—who already conduct investigations at

18   the district and division level—to work on backlog cases. Just as with the request to add an

19   additional captain/commander to PSB, the Court denied this request but proposed an

20   alternative. However, this alternative, unlike the dual-captain/commander request, required

21   discussions with the parties.  MCSO nevertheless endeavored to do so—and despite the

22   United States' agreement with MCSO's proposal—the Plaintiffs rejected MCSO's proposal to

23   achieve this result.

24           MCSO also initiated a Monitor-approved PSB-8 training curriculum for

25   personnel outside of PSB to investigate misconduct cases. The training specifically included

26   classroom training in the proper completion and review of administrative misconduct

27   investigations and included an assignment of backlog cases for completion after the training.

28

28

District and Division lieutenants and captains also attended some, or all, of the training. MCSO provided the training in an effort improvement in the completion and review of misconduct investigations and the ability for MCSO to fully investigate and close backlog cases. Since that training, MCSO has further set up a volunteer program in which trained lieutenants and captains take on a single backlog investigation for overtime compensation. MCSO has worked continuously to identify personnel capable of conducting misconduct investigations in ways that go well beyond the requirements of the Court's Order. Indeed, almost every member of MCSO is eligible to conduct misconduct investigations and who has the approval of the Monitor is conducting misconduct investigations in some capacity and working many overtime hours.

In short, MCSO has substantially complied with the Court's Order regarding reducing the PSB backlog, having reduced it by 76.04% since the Court's Third Order and having decreased the backlog by 793 cases since the Court's Fourth Order. MCSO's steps to reduce the backlog have exceeded what could reasonably be expected under the Court's Orders; it has taken no less than seven discrete and unique steps in an effort to reduce the backlog as required by Paragraph 358. Accordingly, MCSO prays that the Court relieve it of its obligations to pay $765,660.48 which would be a severe, unnecessary, undeserved penalty in light of MCSO's efforts, ingenuity, creativity and success in reducing the backlog substantially.

B.    **A Financial Sanction Will Also Not Effectively Assist MCSO To Reduce The Backlog.**

Another reason warrants the Court's staying its hand to sanction MCSO, a financial sanction in light of all the foregoing will not achieve the desired result – the further clearance of backlog cases.  As stated above, when the sanction imposed is for the purpose of making a defendant comply, it is coercive, and the Court must consider the character and magnitude of the harm "threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." *United States v. United Mine*

29

119509146.1

*Workers*, 330 U.S. at 04. The "contumacy" that the Court desired to curb, as MCSO understands it to be, was MCSO's understaffing PSB, failing to clear misconduct cases equal to a rate in which they came in, and failing to make reasonable efforts to keep cases from getting onto the backlog, much less reducing the backlog in a reasonable time. As shown above, MCSO has taken more than reasonable efforts to comply with the Court's Orders to reduce the backlog.

As to whether the coercive sanction would assist in MCSO's achieving its goal of reducing the backlog, MCSO submits that it clearly would not. As stated in more detail below, MCSO anticipates completely reducing the backlog or otherwise reducing it to a nominal amount by December 31, 2026. While the sanction would effectively permit MCSO to hire an added four PSB investigators, applicant investigators would necessarily require MCSO's vetting before being offered the position, which they may ultimately reject. MCSO would then need to obtain the requisite monitor permission to transfer or hire into PSB an MCSO-approved investigator. Traditionally, this process of identifying a potential investigator, vetting and hiring, and getting PSB approval has taken at least six months.

By the time that the MCSO can effectively hire an additional PSB investigator, appropriately train that investigator to comply with the rigors of this Court's Orders, including the investigator's relationship with the Monitor and investigative requirements, and then provide that investigator with a case load, any benefit from the investigator's hire to reduce the backlog would be obviated by the backlog's reduction during that process. The extreme sanction is simply unhelpful at this stage of the process. Because MCSO has obviated the "contumacy" that served as the intimus for the Court's coercive sanction – there are no CRM's on the backlog – and MCSO has taken more than reasonable steps to reduce the backlog substantially, the sanction would not effectively assist in the reductions backlog.

Rather, instead of sanctioning MCSO and requiring $765,660.48 to go into a fund that could be used to hire four investigators that may not even complete an investigation

119509146.1

by the time that MCSO has completely reduced the backlog, MCSO requests that the Court allow the PSB Commander to assign PSB backlog cases to five sergeants that are already trained to conduct investigations that meet the rigor of the Court's Orders. **Permitting MCSO to assign minor misconduct cases to five trained sergeants instead of levying a draconian, financial sanction on MCSO, saves the people of Maricopa County $765,660.48 and would constitute a practical step to immediately reduce the backlog, which is in the best interests of all, including the Plaintiffs' class.**

Certainly, MCSO has provided an immediate, logical staffing solution with its suggestion to use already trained sergeants. Despite the indisputable, immediate impact of that suggestion, the Monitor and the Plaintiffs rejected it.  However, the sanction under the Court's Order will  require the payment of $765,660.48 to fund the hire of investigators who will not have an immediate impact on the common goal of backlog reduction.  By the time these investigators are ready to process cases under the requirements of the Order, the backlog will either not exist, or be so small that the cost of these investigators would not be justified.

While the Court's sanction may have assisted MCSO in reducing the backlog had MCSO not been taking all reasonable steps and more, MCSO's taking all reasonable steps and more has made Paragraphs 338 and 358's sanction purely punitive and is no help to MCSO, the Plaintiffs' class, or Maricopa County as a whole. As it is now, the extreme sanction structure does not comply with the requirements for a coercive sanction under the rule set forth in *United States v. United Mine Workers*. Therefore, MCSO prays that the Court not require Maricopa County citizens to pay a punitive penalty of $765,660.48 and permit it, instead, to assign backlog cases to the already trained, five sergeants as described above and as the United States and MCSO suggested.

119509146.1

## C.    MCSO FURTHER REQUESTS MODIFICATION OF PARAGRAPH 358's REQUIREMENTS.

Finally, MCSO requests the Court modify the required number of cases for it to clear on a quarterly basis to account for the difficulties described above in having to clear well over 180 cases a quarter to meet the Court's requirements of the Third and Fourth Order.

This is something the Court already recognized MCSO has a right to request. In its Fourth Order, the Court stated that for "good cause shown consider modifications to the payment schedule in this paragraph after October 1, 2025." [Doc. 3076, 11:1-2.] Good cause exists for modifying Paragraph 358 to decrease the reduction requirements to a consistently achievable amount. As stated above, to comply with the Court's 180-case reduction for each quarter moving forward, MCSO will need to clear over 105 cases every month, something which MCSO has done only 5 times in the past two years. Despite taking all the reasonable steps above, MCSO simply could not maintain the workload it had in Q3 of 2025 to comply with the Court's rigorous requirements. To be clear, MCSO absolutely wants to eliminate (and will eliminate) the backlog as expeditiously as possible, and its personnel will continue to work tirelessly and devise all reasonable steps to do so.  However, MCSO simply cannot reasonably comply with the Court's rigorous requirements to reduce the backlog by 180 cases every quarter until the end of the backlog.

MCSO submits that it will assiduously work to reduce the backlog completely or to a small number of cases by the end of 2026 and humbly requests that the Court modify the requirements of Paragraph 358 to align with that goal.[7] With 515 cases on the backlog as of December 31, 2025, MCSO must remove 42.92 cases each month, which amounts to MCSO's having to reduce the backlog by 43 cases for eleven months and 42 cases for one month. Thus, MCSO requests that the Court modify Paragraph 358 to require MCSO reduce

---

[7]    Due to the inherent uncertainty regarding a complex investigation or complex investigations remaining or going onto the backlog in Q4 2026, MCSO realistically acknowledges there is a possibility that a small number of cases may remain at the close of 2026.

119509146.1

the backlog by 43 cases each month for a quarterly backlog reduction requirement of 129. The

43-case reduction requirement in addition to completing an estimated 45 new cases each



month (i.e., 88  cases per month in 2026) is realistic and will allow MCSO to endeavor to

eliminate the backlog, or reduce it to a small number of cases, by December 31, 2026, without

the imposition of an ineffective, undeserved, and severe monetary sanction.

      As stated above, MCSO completed an average of 84 administrative

investigations a month in 2024 and 96.75 cases a month in 2025. While the 96.75 cases a

month included the PSB-8 class, the additional five sergeants added to PSB to conduct backlog

cases, the supplemental pay program, and the second captain/commander in PSB would assist

MCSO to reach its goals of completing 88 cases a month and reducing the backlog by 43 cases

a month to avoid the draconian Paragraph 358 monetary sanction that does not comply with

the requirements for a coercive sanction under the rule set forth in *United States v. United Mine

Workers*. Moreover, an extreme monetary sanction would benefit no one because it would not

accomplish the reduction or elimination of the backlog, and  would ignore MCSO's hard work,

reasonable steps and demonstrated ingenuity to comply with the Court's Order, as well as its

success in substantially reducing the backlog.

## IV.    <u>CONCLUSION.</u>

      MCSO has taken more than all reasonable steps in an attempt to comply with

the rigors of Paragraph 358. Despite taking all reasonable steps, MCSO could not comply with

Paragraph 358 in Q4 of 2025. MCSO requests that the Court relieve it of the obligation to pay

119509146.1

$765,660.48 into the staffing fund because it has substantially complied with the Paragraph's requirement by taking all reasonable steps to reduce the backlog and reducing the backlog by 125 cases. Additionally, the extreme sanction would not provide MCSO with additional investigators in time to assist MCSO in its quest to eliminate or reduce the PSB backlog to a small number of cases by December 31, 2026. Instead, MCSO requests that the Court allow the PSB Commander to assign cases to five sergeants as suggested by the United States and as described above—a move which would have an immediate, positive effect on MCSO's elimination of the backlog and would not require a severe monetary penalty which would produce no immediate results.

Last, in light of MCSO's reducing the backlog by 76.04% since Q4 2022, MCSO's taking all reasonable measures to reduce the backlog, MCSO's creative suggestions to reduce and eliminate the backlog, and MCSO's plan to eliminate or reduce the backlog to a small number of cases by the end of 2026, MCSO and Maricopa County request that the Court modify Paragraph 358 to require MCSO to reduce the backlog by 43 cases per month.

DATED this 30th day of January, 2026.

JONES, SKELTON & HOCHULI, P.L.C.


By /s/ *Joseph J. Popolizio*
  John T. Masterson
  Joseph J. Popolizio
  Justin M. Ackerman
  Daniel A. Shudlick
  40 N. Central Avenue, Suite 2700
  Phoenix, Arizona 85004
  Attorneys for Maricopa County

119509146.1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MARICOPA COUNTY


By /s/ *Joseph I. Vigil*
    Joseph I. Vigil
    Deputy Maricopa County Attorney
    225 West Madison Street
    Phoenix, Arizona 85003
    Attorneys for Maricopa County


GREENBERG TRAURIG, LLP


By /s/ *Matthew P. Hoxsie*
    Dominic E. Draye
    Matthew P. Hoxsie
    Zachary H. Levy
    2375 E. Camelback Road, Suite 800
    Phoenix, Arizona 85016
    Attorneys for Maricopa County


**CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of January, 2026, I caused the foregoing document to be filed electronically with the Clerk of Court through the CM/ECF System for filing; and served on counsel of record via the Court's CM/ECF system.


/s/ Megan Axlund

35

119509146.1