WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al.<br><br>Plaintiffs,<br><br>and<br><br>United States of America,<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>Gerard A. Sheridan, in his official capacity as Sheriff of Maricopa County, Arizona; et al.<br><br>Defendants. | No. CV-07-2513-PHX-GMS<br><br>**ORDER** |

## BACKGROUND

On October 31, 2025, the Court issued a written order setting forth procedures for Defendants to substantiate costs that they previously represented to the Court that they had incurred from their compliance with the Court's orders in this case. (Doc. 3301) (the "October 31 Order"). On November 21, 2025, Defendants filed notice informing this Court that they were declining to participate in that process. (Doc. 3319; Doc. 3320). In light of that declination, the Court, as it said it would, declines to accept Defendants' factual assertions in its Annual Reports regarding the cost of compliance. (*See* Doc. 3301 at 6 ("The Court thus finds that the operational costs that the County Defendants[] attribute to *Melendres* compliance are unsupported, unjustified and are not based on discernible

fact.")). The Monitor's budget analysts have provided the Court with the sole analysis of those figures, which suggests that Maricopa County has overstated such costs by approximately 72%. (Doc. 3263 at 8).

As a part of the October 31 Order, the Court also required all parties to submit their proposed standards and procedures for attributing and prorating costs incurred from compliance with this case to the extent that attribution and proration of costs associated with compliance with the Court's orders remains or again becomes at issue. That requirement was not optional. The Court required "all parties" to submit such standards, "*regardless of whether the County Defendants choose to pursue a reconstruction of their claimed expenses*." (Doc. 3301 at 6 (emphasis added)). Defendants did not submit any standards, averring instead that this Court lacks any jurisdiction to issue any relief related to MCSO and Maricopa County's accounting and audit standards. (Doc. 3319; Doc. 3320). On the other hand, Plaintiffs submitted a framework for assessing cost attribution and proration that identifies (1) overall proposed recognized standards, (2) proposed standards and procedures relevant to cost attribution, and (3) recognized procedures to evaluate and test attribution and proration. (Doc. 3318 at 3-9).

This Court has no desire to dictate accounting or audit standards that the County generally must follow. Rather, it merely seeks to identify the established recognized procedures that will be used in this Court for any cost allocation when both sides have already been consulting with public financing reconstruction experts. Thus, Maricopa County's assertion that this Court was seeking to establish general control over Maricopa County's accounting procedures is meritless. (*See* Doc. 3319). So too is Maricopa County's assertion after the fact that its pleading actually does suggest such cost accounting and audit standards. (*See* Jan. 30, 2026 Tr. at 24:19-25:5).

The underlying dispute[1] stems from two assertions made by MCSO in its Annual Reports to this Court regarding the operational cost of compliance with this Court's orders

---

[1] The Court's October 31 Order—*Melendres v. Sheridan*, 2025 WL 3041847 (D. Ariz. Oct. 31, 2025) (Doc. 3301)—provides a more complete factual background for this dispute and is incorporated here by reference.

- 2 -

1   in this case and repeated public representations made by Defendants' elected officials
2   (which Defendants do not contest) concerning the costs of compliance. (Doc. 2932-1 at 56
3   (asserting *Melendres*-related operational expenses[2] of $184,416,021 from FY 2014 to FY
4   2023); Doc. 3078-1 at 63 (asserting *Melendres*-related operational expenses of
5   $219,732,642 from FY 2014 to FY 2024); Jan. 30, 2026 Tr. at 14:19-15:19). After MCSO
6   filed its 2024 Annual Report, the Court entered an order requiring Defendants to provide
7   their backup and basis for their asserted compliance costs, noting that "[b]ecause the
8   Defendants have already made the analysis and attributions in the process of preparing
9   their annual financial reports, the identification of such costs, their attribution to *Melendres*
10  in the various amounts, and the financial documentation supporting such costs should not
11  be a time-consuming or otherwise intensive enterprise." (Doc. 3083 at 3). Despite the fact
12  that they had supposedly just identified and isolated such expenses, Defendants could
13  provide neither the expenses nor the backup to the Monitor. (*See generally* Doc. 3301).

14  In lieu of compliance, over more than the next year, the Defendants supplied over
15  8,900 digital files and raw financial ledger data to the Monitor team and held thirteen
16  meetings with the Monitor's budget analysts and MCSO budget personnel, Maricopa
17  County financial officers, Defendants' representatives, and Defendants' attorneys to
18  review the submitted data. After receiving Defendants' assertion that they had provided
19  the Monitor team with all information necessary to support Defendants' previously asserted
20  cost figures, the Court received and filed the Monitor's Report analyzing MCSO's asserted
21  operational expenses. (Doc. 3263 at 2). The Report's central finding articulated that
22  Defendants had misattributed or improperly prorated ~72% of their expenditures allocated
23  towards *Melendres* compliance:

> As the findings in this report demonstrate, over $163 million, or 72%, of MCSO's total spending of $226 million [in operational expenses] recorded during [February 1, 2014, through September 29, 2024], was misattributed or improperly prorated to the *Melendres* Fund. These costs, individually or

---

[2] The operational expenses are exclusive of the "legal costs" and "non-attorney related costs"—such as the Monitor's fees—contained in the Annual Report.

- 3 -

> in combination, were unrelated to or unnecessary for *Melendres* compliance; lacked appropriate justification; or resulted from purposeful misrepresentation by MCSO, uninformed approvals by County leadership, or both.

(*Id.* at 8 (emphasis removed)).

The Court, on October 8, 2025, initially ordered Defendants to respond to the Report's findings within thirty days. (Doc. 3263 at 2-3). After Defendants requested at least a six-month extension and a very costly procedure to comply with the Court's order (Doc. 3277), the Court, noting that it was the County's burden to substantiate its cost figures and that it had provided no such support, later made it optional for Defendants to validate the figures the Defendants asserted (Doc. 3301), with the penalty that if it did not do so, the Court would reject such assertions by the County. Still, on October 8, the Court announced its intent to "identify and recommend Generally Accepted Accounting Practices to be used hereafter by Defendants as well as neutral and appropriate auditable procedures for the Defendants to use going forward in attributing costs to compliance with the Court's *Melendres* Orders at the time such costs are incurred." (Doc. 3263 at 2-3). The Court formalized this directive in its October 31 Order, requiring:

> [R]egardless of whether the County Defendants choose to pursue a reconstruction of their claimed expenses, all parties will submit to the Court within three weeks of today's date, their experts' identification of the recognized standards and procedures, if any, that provide the generally accepted accounting principles, procedures and audit standards for cost attribution, proration of an employee's expenses among separate tasks, necessary procedures to audit attributions and prorations and other issues presented by the allocation and proration of costs in this case. The parties may agree on the recognized standards. If they do not, the Court will, if necessary, have a hearing on the issue and identify the accounting and audit standards by which all future cost allocations to *Melendres* compliance be measured whether those costs be past, present or future attributions.

(Doc. 3301 at 6).

Both prior to and after the publication of the Monitor's Report, and even after

Maricopa County declined to provide justification for its claimed *Melendres* expenses, Maricopa County elected officials continued to make statements concerning the costs of compliance that were based on the unsubstantiated assertions, claiming that the total cost of *Melendres*-compliance from fiscal years 2008 to 2026 would reach ~$353 million (with operational costs nearing $289 million over that period).[3]  The publications of these unsubstantiated figures have affected the conduct of other activities required by the Court's orders in this matter.

For example, at the Quarterly Community Meeting held on July 16, 2025, the issue of the cost of compliance was raised by a number of attendees, including members of the Maricopa County Board of Supervisors.[4]  These meetings—which the Monitor has generally had a history of running without incident over the last twelve years—"present an opportunity for the Monitor and MCSO representatives to listen to community members'

---

[3] Maricopa County, *Board of Supervisors Informal Meeting May 19, 2025*, at 1:26:10 (YouTube, May 19, 2025), https://www.youtube.com/watch?v=ALJGK1m3R8w; *Chairman Thomas Galvin Continues Commitment to End Costly Melendres Orders*, Rose L. Grp., https://www.roselawgroup.com/galvin-commits-to-end-costly-melendres-orders/; *Supervisor Lesko Calls for an End to the Melendres Orders*, Maricopa Cnty. (July 17, 2025), https://content.govdelivery.com/accounts/AZMARIC/bulletins/3e9ed42; *Vice Chair Kate Brophy McGee Calls for an End to the Melendres Orders*, Maricopa Cnty. (July 17, 2025), https://content.govdelivery.com/accounts/AZMARIC/bulletins/3e9a692; *Joint Statement from Chairman Thomas Galvin and Vice Chair Kate Brophy McGee on Legal Filing in Melendres*, Maricopa Cnty. (Nov. 21, 2025), https://www.maricopa.gov/m/newsflash/home/detail/3523; *Maricopa County Files Motion to End Federal Oversight of MCSO*, Maricopa Cnty. (Dec. 18, 2025), https://www.maricopa.gov/m/newsflash/home/detail/3550; Matthew Casey, *A U.S. House subcommittee field hearing on the Melendres case is scheduled for Friday in Phoenix*, KJZZ (Feb. 12, 2026, at 05:00 MT), https://www.kjzz.org/kjzz-news/2026-02-12/a-u-s-house-subcommittee-field-hearing-on-the-melendres-case-is-scheduled-for-friday-in-phoenix (quoting Supervisor Debbie Lesko).

[4] Matthew Casey, *Cost of Maricopa County Sheriff's Office federal oversight dominates reform update meeting*, KJZZ (July 17, 2025, at 09:21 MT), https://www.kjzz.org/politics/2025-07-17/cost-of-maricopa-county-sheriffs-office-federal-oversight-dominates-reform-update-meeting; Amy Cutler & Cody Lillich, *$311 million and counting: public questions oversight of Arpaio-era reforms*, Ariz.'s Fam. (July 17, 2025, at 06:00 MT), https://www.azfamily.com/2025/07/17/311-million-counting-public-questions-oversight-arpaio-era-reforms/.

experiences and concerns about MCSO practices." (Doc. 2431 ¶ 110). But given "reports of threats, disruption and armed attendees"[5] at the July 2025 Meeting, the Court issued an order moving the next Quarterly Community Meeting to the Sandra Day O'Connor U.S. Courthouse for increased security protection. (Doc. 3251 at 38-41; Doc. 3257).

At oral argument, held on January 30, 2026, counsel for Defendants framed the difference in the County's figures and the Monitor's audited figures as a disagreement over the method of cost allocation. Counsel at first indicated that the County's cost allocation method was consistent with standards required by the Arizona Auditor General, pursuant to A.R.S. § 41-1279.07. (*See also* Doc. 3319 at 3). But after further inquiry by the Court, counsel admitted that he was unaware whether the Arizona Auditor General specifically looked at and approved *Melendres* cost allocations. (Jan. 30, 2026 Tr. at 18:16-19:15).

## DISCUSSION

In the absence of any alternative proposed by Defendants, the Court adopts Plaintiffs' framework for assessing cost attribution and proration (Doc. 3318), should further disputes arise regarding any costs incurred (past, present, or future) due to compliance with the Court's orders in this case. Adoption of a cost attribution framework creates clear, judicially manageable standards to resolve disputes over cost attributions in this case. It reduces the cost of having to constantly relitigate whether an expenditure claimed by Defendants is supported or not. And it serves the public interest by ensuring that any cost figures raised by Defendants in representations made to the Court in 2023 and 2024 are based on discernible fact, thus maintaining public confidence and ensuring transparency into the cost of reforms necessitated by this lawsuit. It further informs the parties in advance what cost attribution principles will be used.

It is axiomatic that a Court has the authority to oblige a party to verify statements that it makes to the Court. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)

---

[5] Chelsea Curtis, *Safety changes to Maricopa County sheriff meetings in Latino racial profiling case await federal judge's order*, Ariz. Luminaria (Sept. 22, 2025), https://azluminaria.org/2025/09/22/safety-changes-to-maricopa-county-sheriff-meetings-in-latino-racial-profiling-case-await-federal-judges-order/.

(discussing federal courts' implied powers); Fed. R. Civ. P. 11(b)(3) (attorneys, by presenting a pleading to the Court, certify that their "factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery"). The Court's adoption of a cost allocation and attribution framework is a reasonable response to the problems and needs confronting the Court's fair administration of justice—namely, the usage of the issue of costs to call for an end to the Court's orders in this matter.

Defendants' injection of compliance costs into this case by their inclusion in the 2023 and 2024 Annual Reports has raised several issues. As described above, Defendants' representatives have repeatedly called into question the legitimacy of the Court's orders in this case by relying on the purportedly excessive cost figures. While officials duly elected to represent the citizens of Maricopa County certainly are free to exercise their First Amendment rights to speak about the County budget, the Auditor General's audits over the past decade, or any perceived errors in the Monitor's budget analyst's report (*see* Doc. 3319 at 9), Defendants cannot wield the issue of costs as a sword to undermine Court-ordered reforms, while simultaneously refusing to justify the figures and hiding behind the inclusion of the figures in this lawsuit as a decision made by a "former administration." (Doc. 3287 at 19:20-21:15; *see also* Doc. 3320 at 11 ("Sheriff Sheridan wishes to make one thing eminently clear; he did not make the assertions that formed the central basis of the Court's cost inquiry and subsequent Monitor Report—i.e., that the cost of compliance was roughly $219,732,642.00. That was Sheriff Penzone in the 2023 Annual Report and then Sheriff Skinner in the 2024 Annual Report filed with the Court." (citations omitted))).

Agreement on generally accepted accounting and auditing standards ensures the streamlined resolution of future cost disputes—thus avoiding a repeat of the protracted process, that lasted more than one year, required for the Monitor's budget analyst to reconstruct Defendants' claimed expenses. The Court gave Defendants the same opportunity that it afforded to Plaintiffs to submit their proposed accounting and attribution standards. Had Defendants filed their proposal, the Court would have ordered a hearing,

presided over by a separate judge, to resolve any disagreements between the parties. (Doc. 3301 at 6). But because Defendants refused to submit their standards, they have thus forfeited their ability to opine on what the allocation and proration standards should be for any cost representations made to this Court.

Defendants primarily devote their objections to the Court's October 31 Order by arguing that the Court lacks jurisdiction to issue any injunctive relief related to the costs of compliance. (Doc. 3319 at 4-9; Doc. 3320 at 5-9, 12-13). But Defendants fundamentally misunderstand the Court's order requiring them to submit their proposed standards to measure cost allocations. (*See, e.g.*, Doc. 3320 at 8; *id.* at 13). The parties' submission of their allocation standards, and the Court's subsequent adoption of such standards, does not constitute injunctive relief and is not a remedy. The Court is not ordering Defendants to modify their accounting practices. Instead, the Court sets forth certain requirements that will govern cost allocations as it pertains to any filings or statements in this matter in this Court. Defendants fail to cite any case, rule, or statute that expressly limits the Court's ability to set such requirements here under its authority to oblige parties to justify assertions made to the Court.

Defendants' arguments invoking federalism and tailoring concerns are thus largely inapposite, given the lack of any issuance of injunctive relief or the imposition of sanctions. (*See* Doc. 3319 at 4-9; Doc. 3320 at 5-9).[6] But the overarching theme underlying their arguments—that "Hispanic residents of Maricopa County concerned with racial profiling

---

[6] Moreover, the cases cited by Maricopa County to support its argument that this Court's "[r]estraint is perhaps most important where budgetary matters are involved" (Doc. 3319 at 5) miss the mark as well. Those cases support the proposition that States, as sovereigns, are generally free from federal oversight and inquiries into their taxing and spending decisions. *Tully v. Griffin, Inc.*, 429 U.S. 68, 73 (1976) ("A federal district court is under an equitable duty to refrain from interfering with a State's collection of its revenue except in cases where an asserted federal right might otherwise be lost."); *Taub v. Comm. of Kentucky*, 842 F.2d 912, 919 (6th Cir. 1988) ("A sovereign must have the authority to determine how tax revenues are to be spent, or the power to tax is illusory."), *cert. denied*, 488 U.S. 870 (1988). But the Court, in ordering the parties to submit their proposed cost allocation methods, is not directing how Maricopa County should choose to collect and allocate tax revenue to comply with this Court's orders.

are unaffected by how the County and MCSO allocate costs" (Doc. 3319 at 8; *see also* Doc. 3320 at 9)—ignores how the framing of cost allocations by Defendants' representatives has been used to call for an end to the implementation of the reforms ordered by this Court. This call, which Plaintiffs oppose, has occurred prior to the County's full and effective compliance with the Court's orders in this case. While it may be true that "a motorist who is stopped by a properly trained Sheriff's Deputy does not care whether the Deputy is coded MEL0 for budgeting purposes or not" (Doc. 3319 at 8), that motorist still has an interest in ensuring that MCSO achieves full compliance with this Court's orders to properly cure its constitutional violations. And the issue of costs cannot be used as an argument against implementing necessary constitutional reforms. *Watson v. City of Memphis*, 373 U.S. 526, 537 (1963) ("[I]t is obvious that vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them.").

In their reply brief, Plaintiffs ask the Court to order Defendants to submit their costs to the Court, using Plaintiffs' attribution framework, on an annual basis. (Doc. 3331 at 3). While the Court generally does not grant relief first requested in a reply and will not issue such an order today, the Court reserves the right to do so in the future if appropriate. Moreover, to the extent that members of the Plaintiff class wish to further inquire into what expenses Maricopa County is attributing to *Melendres* compliance, they may—as is this right of any Arizona resident—seek inspection of Maricopa County's "public records" under Arizona's Public Records Law. A.R.S. § 39-121 *et seq.* Under the statute, Maricopa County, as a public body, is required to maintain all records "reasonably necessary or appropriate to maintain an accurate knowledge of [its] official activities and of any of [its] activities which are supported by monies from this state or any political subdivision of this state." *Id.* § 39-121.01; *see also Lake v. City of Phoenix*, 222 Ariz. 547, 549, 218 P.3d 1004, 1006 (2009) ("Consistent with the goal of openness in government, Arizona law defines 'public records' broadly and creates a presumption requiring the disclosure of public documents." (citation modified)). If Maricopa County does not timely or fully

respond to the requests, the parties may request this Court to consider future action. And to the extent such costs present an issue as to whether they have been appropriately entered as costs attributable to *Melendres*, this Court has today entered the protocol by which such allocation shall be judged. And, again, the review of such allocation may be requested from this Court.

Lastly, counsel for Defendants are reminded that it is their "job, and indeed their duty as officers of the court, to ensure that the facts they place before us are accurate and not misleading." *Taylor v. AutoZone Inc.*, 2012 WL 4061758, at *3 (D. Ariz. 2012). Indeed, as MCSO has previously recognized, "[t]he Court, the Court appointed Monitor, and the Parties should all have the shared interest of arriving at the truth of this matter." (Doc. 3277 at 10).

**IT IS THEREFORE ORDERED** adopting Plaintiffs' Proposed Standards, Procedures and Scope for Assessing Cost Attribution (Doc. 3318) for any possible further review of the County's cost allocations in this matter as needed.

Dated this 13th day of February, 2026.

_____
G. Murray Snow
Senior United States District Judge