Victoria Lopez
vlopez@acluaz.org
Christine K. Wee
cwee@acluaz.org
John M. Mitchell
jmitchell@acluaz.org
ACLU Foundation of Arizona
2712 North 7th Street
Phoenix, AZ 85006
Telephone: (602) 650-1854

*Attorneys for Plaintiffs (Additional attorneys
for Plaintiffs listed on next page)*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, *et al.*, | **No. CV-07-2513-PHX-GMS** |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR RELIEF FROM JUDGMENT UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)** |
| and | |
| United States of America, | |
| Plaintiff-Intervenor, | |
| v. | |
| Gerard A. Sheridan, in his official capacity as Sheriff of Maricopa County, Arizona | |
| Defendant. | |

Additional Attorneys for Plaintiffs:

Cecillia D. Wang*
cwang@aclu.org
ACLU Foundation
425 California Street, Suite 700
San Francisco, CA 94104
Telephone: (415) 343-0775

Jenn Rolnick Borchetta*
jborchetta@aclu.org
American Civil Liberties Union
Criminal Law Reform Project
125 Broad Street
New York, NY 10004
Telephone (914) 462-2363

Jorge Martin Castillo*
jorgecastillo@aclu.org
American Civil Liberties Union
Criminal Law Reform Project
915 15th Street NW
Washington, D.C. 20005
Telephone: (646) 983-9921

Stanley Young*
syoung@cov.com
Covington & Burling LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306-2112
Telephone: (650) 632-4700

Peter W. Johnston*
pjohnston@cov.com
Adam R. David*
adavid@cov.com
Covington & Burling LLP
415 Mission Street
Suite 5400
San Francisco, CA 94105
Telephone: (415) 591-6000


*Pro Hac Vice

Eduardo Casas*
ecasas@MALDEF.org
Mexican American Legal Defense and
Educational Fund
634 South Spring Street
11th Floor
Los Angeles, California 90014
Telephone: (213) 629-2512

Sebrina M. Shaw (024545)
Shaw Law Firm, P.L.L.C.
698 Cove Parkway, Suite A
Cottonwood, AZ 86326
Telephone: (928) 646-0369
sshaw@acluaz.org

**CONTENTS**

I.    Introduction .................................................................................................... 1

II.   Background ..................................................................................................... 2

III.  Legal standard ............................................................................................... 4

IV.   Argument ........................................................................................................ 5

   A.    Defendants are not entitled to vacate the Court's orders under
         Rule 60(b)(5) because they fail to show that a durable remedy for
         MCSO's unconstitutional policing has been put in place. ........................... 5

      1.    Defendants Fail to Address How Noncompliance and
            Regression with Key Reforms Places the Plaintiff Class at
            an Unacceptable Risk of Discrimination. .......................................... 6

      2.    MCSO's Traffic Stop Data Preclude Defendants From
            Carrying Their Burden to Demonstrate That a "Durable
            Remedy" Has Been Achieved. ............................................................ 9

         (a)    MCSO Data Show, and the Monitor Has Found,
                That Minority Drivers Suffer Significant and
                Persistent Disparities in Traffic Stops.................................... 9

         (b)    Plaintiffs' New, Independent Expert Confirms That
                MCSO's Analysis Fails to Satisfy Defendants'
                Burden to Show That a Durable Reform Has
                Occurred.................................................................................. 12

            (1)    Deficiencies in MCSO's Data Collection and
                   Analysis Design Likely Obscure Greater
                   Disparities and Frustrate the Court's Remedies. ....... 12

            (2)    Plaintiffs' Independent Expert's Analysis that
                   Corrects for Some of These Deficiencies
                   Confirms That the Disparities Suffered by
                   Hispanic Drivers Are Even More Stark. .................... 16

      3.    Sheriff Sheridan's own historical and recent statements and
            actions defeat Defendants' claim that Court supervision is
            currently not necessary to ensure a full remedy for his and
            MCSO's constitutional violations. .................................................... 19

         (a)    MCSO's leadership is not "new" because Sheriff
                Sheridan, while serving as Chief Deputy, himself
                personally committed many of the constitutional
                violations that the Court's injunctions are designed
                to remedy................................................................................. 19

         (b)    Sheriff Sheridan's prior lies and obstruction in the
                service of injury to the Plaintiff class undermine
                Defendants' present assertion of good intentions. ................. 21

         (c)    Sheriff Sheridan's expressions of disdain for this
                Court's orders protecting the constitutional rights of
                the Plaintiff class, including his 2024 statement that
                he is willing to disobey this Court's orders again,

i

rebut Defendants' assertion that MCSO has reformed. ........................................................22

    (d)   Sheriff Sheridan's recent actions detrimental to reform lay bare the work still required to build towards a durable remedy. .....................................24

       (1)   The reinstatements of personnel from Sheriff Arpaio's prior administration contradict Defendants' claim that the Arpaio-era abuses have been left behind. ..........................24

       (2)   Sheriff Sheridan's attempt to transfer Captain Lugo out of PSB shows the need for continued judicial supervision. .................................25

       (3)   Coupled with the attempted Lugo transfer, MCSO's recent violation of the Court's order on PSB backlog reduction and its concurrent motion to negate the Court's remedy for that failure demonstrate the need for continued supervision to make sure that reforms at MCSO will be lasting. ...................................27

    (e)   Current federal immigration enforcement practices make it more likely that MCSO may resume its unconstitutional practices, increasing the need for continued judicial supervision to ensure that the reform of MCSO is enduring. ..........................29

  4.   The contract-law doctrine of "substantial compliance" is inapplicable here, despite the United States' argument to the contrary.........................................32

B.   Defendants are also not entitled to relief under Rule 60(b)(6) because they have entirely failed to show the requisite "extraordinary circumstances." .......................................35

C.   There are no valid federalism concerns that warrant grant of Defendants' motion. ............................................35

D.   The Court Must Reject Partial Termination, But Could Resolve Defendants' Motion with an Order to the Parties to Propose Reduced Monitoring of Certain Provisions, Consistent with the Objects of Its Remedial Orders. ...........................39

V.   CONCLUSION ..........................................................41

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR RELIEF FROM JUDGMENT UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adarand Constructors Inc. v. Romer*,
  174 F.R.D. 100 (D. Colo. 1997) ................................................................................. 33

*BLOM Bank SAL v. Honickman*,
  605 U.S. 204 (2025) ................................................................................................... 4, 35

*Buck v. Davis*,
  580 U.S. 100 (2017) ......................................................................................................... 35

*Coleman v. Brown*,
  922 F. Supp. 2d 1004 (E.D. Cal. & N.D. Cal. 2013) ...................................................... 34

*Coleman v. Newsom*,
  131 F.4th 948 (9th Cir. 2025) ........................................................................................ 34

*Cruz v. Bondi*,
  146 F.4th 730 (9th Cir. 2025) ........................................................................................ 21

*Evans v. Fenty*,
  701 F.Supp.2d 126 (D.D.C. 2010) .................................................................................. 4

*Greenwood v. F.A.A.*,
  28 F.3d 971 (9th Cir. 1994) ........................................................................................... 35

*Hamilton v. Newland*,
  374 F.3d 822 (9th Cir. 2004) ......................................................................................... 35

*Henson v. Fidelity Nat'l Fin., Inc.*,
  943 F.3d 434 (9th Cir. 2019) ......................................................................................... 22

*Horne v. Flores*,
  557 U.S. 433 ............................................................................................................*passim*

*Jeff D. v. Otter*,
  643 F.3d 278 (9th Cir. 2011) ......................................................................................... 33

*Klapprott v. United States.*,
  335 U.S. 601 (1949) ....................................................................................................... 35

*Melendres v. Arpaio*,
  784 F.3d 1254 (9th Cir. 2015) ......................................................................................... 3

*Melendres v. Arpaio*,
    989 F. Supp. 2d 822 (D. Ariz. 2013) ............................................................... 2, 22

*Melendres v. Maricopa Cnty.*,
    897 F.3d 1217 (9th Cir. 2018) ......................................................................... 3, 37

*Melendres v. Maricopa County*,
    815 F.3d 645 (9th Cir. 2016) ............................................................................... 37

*Morgan v. McDonough*,
    540 F.2d 527 (1st Cir. 1976) ................................................................................ 22

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*,
    507 U.S. 380 (1993) .............................................................................................. 5

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
    324 U.S. 806 (1945) ............................................................................................ 28

*Rufo v. Inmates of Suffolk County Jail*,
    502 U.S. 367 (1992) .............................................................................................. 4

*SEC v. Coldicutt*,
    258 F.3d 939 (9th Cir. 2001) ................................................................................ 4

*Sharp v. Weston*,
    233 F.3d 1166 (9th Cir. 2000) .............................................................................. 4

*Shaw v. Allen*,
    771 F. Supp. 760 (S.D. W. Va. 1990) ................................................................. 22

*United States v. Alpine Land & Reservoir Co.*,
    984 F.2d 1047 (9th Cir. 1997) .............................................................................. 4

*United States v. City of Alburquerque*,
    No. 1:14-cv-01025-JB-JFR (D.N.M. Oct. 27, 2023) ......................................... 40

*United States v. City of Seattle*,
    No. C12-1282JLR, 2023 WL 5803364 (W.D. Wash. Sept. 7, 2023) ................. 40

*United States v. Michigan*,
    131 F.4th 409 (6th Cir. 2025) ............................................................................... 4

*Vasquez Perdomo v. Noem*,
    No. 25-CV-05605 (C.D. Cal. Feb. 19, 2026) ..................................................... 31

**Statutes**

42 U.S.C. § 2000h-2 .................................................................................................. 32, 33

## I.    INTRODUCTION

Plaintiffs share Defendants' desire to bring this case to an end.[1]  Plaintiffs wish that the Maricopa County Sheriff's Office ("MCSO") had fully committed to the lasting reforms necessary to prevent a return to the unconstitutional behavior that led to the judgments in this case.  Unfortunately, MCSO has not embraced the required reforms to a degree that would justify relief under Rule 60(b).

Relief is not warranted here because MCSO's work is not complete, and Defendants have not shown otherwise.  Indeed, despite bearing the burden to prove entitlement to relief from court-ordered reforms—which is a significant burden— Defendants offer no factual evidence in support of their motion other than reports from the Monitor that on their face show MCSO is not yet in significant compliance.  There remain essential provisions of the Court's remedial orders that are out of compliance. Moreover, significant backsliding in several areas threatens to undo the compliance that Defendants had achieved in other areas.  The Monitor's oversight and support are still needed to establish the structures that will ensure a durable remedy for the Plaintiff class.

This continuing need for the Court's role in MCSO's reform is underscored by the substantial, statistically significant racially disparate search rates, arrest rates and stop durations from which Hispanic and other minorities continue to suffer.  Contrary to MCSO's assertions of no or minimal disparities, and despite their faulty collection and use of Extended Stop Indicators ("ETSIs") and other data, MCSO traffic-stop data confirms these worrisome outcomes persist.  The Monitor has so found, and Plaintiffs' independent expert analysis demonstrates just how flawed and misleading Defendants' contentions are.

The past and present actions of MCSO leadership also make continued oversight prudent.  Given the history of the current Sheriff, current MCSO leadership's approach to

---

[1] This Oppositions uses "Defendants" to refer to Defendant Maricopa County, which filed Doc. 3368 (earlier lodged as Doc. 3337), and Defendant Gerard A. Sheridan, who in Doc. 3361 indicated that he would join the County's motion in its entirety.

the reform is not encouraging.  Their words and actions raise serious doubts as to their commitment to achieve and maintain reform.  Especially alarming are the changes to process, leadership, and outcomes at the Professional Standards Bureau ("PSB"), spearheaded by the Sheriff, that threaten to reverse hard-won court-ordered Internal Affairs ("IA") reforms.  The larger current immigration enforcement environment, with its threat of a resurgence in unconstitutional racial profiling, further supports the need at this time for continued Court guidance to ensure enduring reform for MCSO post-Monitorship.  Such continued oversight will guard against further backsliding and avert a return to the practices that this Court found harmed the Plaintiff class.

Court-ordered reforms have resulted in significant and necessary changes to MCSO policies and practices, and the Parties should be harnessing that progress at this moment, not abandoning ship midstream.  As Plaintiffs describe more fully below, there are likely whole sections and additional paragraphs as to which lessening or eliminating active monitoring would promote efficiency and not undermine the durability of reforms.  The Parties need to confer about what such changes could look like.  But that is not the aim of the instant motion.  Defendants have not met their high burden of demonstrating that the complete elimination of oversight pursuant to Rule 60 is warranted.  There are important reforms yet to be implemented, and current conditions make regression too likely to occur.  In order to allow MCSO to achieve durable reform, Defendants' Rule 60 motion, Doc. 3368 ("Defs. Mot."), should be denied, and the Court could order the Parties to meet and confer on a plan to reduce monitoring on appropriate compliant paragraphs and focus efforts on still-outstanding areas of noncompliance, which Plaintiffs believe could be productive.

## II.    BACKGROUND

After trial, this Court found that MCSO, then headed by Sheriff Joe Arpaio and Chief Deputy Gerard Sheridan, had violated the constitutional rights of the Plaintiff class, *Melendres v. Arpaio*, 989 F. Supp. 2d 822, 825–912 (D. Ariz. 2013), and issued permanent injunctive relief in a First Order.  Docs. 606, 670.  The Court's order aimed

both to eliminate discriminatory policing and, with the assistance of a Monitor, to help MCSO build the infrastructure (i.e., policies, training, supervision requirements) that would end the institutional problems that drove unconstitutional conduct and would ensure lasting post-Monitorship reform.  The Ninth Circuit affirmed that the remedy properly extended beyond the saturation patrol context that was a focus of the trial and, with minor exceptions, affirmed the provisions of the First Order.  *Melendres v. Arpaio*, 784 F.3d 1254, 1261, 1267 (9th Cir. 2015).

A subsequent contempt trial exposed the fact that violations of the Court's orders had occurred and were continuing, and that MCSO's leadership fostered a culture that rejected the reforms.  The Court found that more robust accountability was needed to ensure that violations of policy or law would be appropriately disciplined in MCSO's internal affairs ("IA") investigation system.  Sheridan was Arpaio's "CEO" during this time; the Court attributed to him myriad specific acts of contempt, dishonesty and IA manipulation (Doc. 1677) and fashioned a further, Second Order (Doc. 1765) focused on reform of the IA system.   The Ninth Circuit again affirmed, finding that "the challenged provisions flow from MCSO's violations of court orders, constitutional violations, or both."  *Melendres v. Maricopa Cnty.*, 897 F.3d 1217, 1222 (9th Cir. 2018).

MCSO made progress on several aspects of the Court's decrees, including policies, training, supervision, and analytics, with Arpaio and Sheridan leaving office at the beginning of 2017.  But, under them and their successors, the reforms' progress fell short of completion in many areas, as chronicled in the Monitor's periodic reports.  Failings in the speed of completing IA investigation led the Court to issue Third (Doc. 2830, *aff'd*, *Melendres v. Skinner*, 113 F.4th 1126 (9th Cir. 2024)) and Fourth (Doc. 3076) Orders.

While much progress has been made, that progress has been hard fought and, until recently, the product of collaborative problem-solving to find ways to achieve compliance.  But noncompliance remains—with MCSO's concurrent motion for relief from the Third and Fourth Orders, Doc. 3388, representing one example—with further

3

regression under the leadership of Maricopa County's new Sheriff Sheridan, Arpaio's former Chief Deputy.

### III.     LEGAL STANDARD

Defendants seek relief under two provisions.  Under the first, Rule 60(b)(5), a party may seek relief from a judgement when "the judgment has been satisfied, released, or discharged . . . or applying it prospectively is no longer equitable."  The moving party "bears the burden of establishing that a significant change in facts or law warrants revision or dissolution of the injunction."  *Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000); *cf. Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 383 (1992) (movant's burden to show a "significant change in circumstances").  "[A]n extended period of compliance is a factor supporting termination of an injunction, but more is required." *SEC v. Coldicutt*, 258 F.3d 939, 943 (9th Cir. 2001).

In what the Supreme Court described as the "institutional reform litigation" context, "a critical question in this Rule 60(b)(5) inquiry is whether the objective of the District Court's [original] order has been achieved.  If a *durable remedy* has been implemented, continued enforcement of the order is not only unnecessary, but improper." *Horne v. Flores*, 557 U.S. 433, 447, 450 (emphasis added) (cleaned up); *accord United States v. Michigan*, 131 F.4th 409, 428–29 (6th Cir. 2025) (quoting *Horne*).  "[A]t a minimum, a 'durable' remedy means a remedy that gives the Court confidence that defendants will not resume their violation of plaintiffs' constitutional rights once judicial oversight ends." *Evans v. Fenty*, 701 F.Supp.2d 126, 171 (D.D.C. 2010).

Under the second provision raised by Defendants' motion, Rule 60(b)(6), a party may seek relief from a judgment for "any other reason that justifies relief."  This rule "should only be applied in extraordinary circumstances," as a "very strict interpretation of Rule 60(b) is essential if the finality of judgements is to be preserved." *BLOM Bank SAL v. Honickman*, 605 U.S. 204, 212–13 (2025) (cleaned up).  The provision is to be used "sparingly as an equitable remedy to prevent manifest injustice." *United States v. Alpine Land & Reservoir Co.*, 984 F.2d 1047, 1049 (9th Cir. 1997).  Relief under Rule

60(b)(6) is "mutually exclusive" with relief under the preceding five paragraphs of Rule 60(b).  *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 393 (1993).

## IV.    ARGUMENT

As shown below, Defendants have not met their burden to demonstrate the satisfaction of the Court's orders or the existence of extraordinary circumstances warranting termination of reforms.  *Horne*, 557 U. S. at 447 ("The party seeking relief bears the burden of establishing that changed circumstances warrant relief.").  There is no reason to short-circuit the compliance-based termination provisions already in the Court's orders.  Doc. 606 ¶¶ 4–5.

> **A.    Defendants are not entitled to vacate the Court's orders under Rule 60(b)(5) because they fail to show that a durable remedy for MCSO's unconstitutional policing has been put in place.**

The Fourth and Fourteenth Amendment rights protected by the Court's program of ongoing oversight remain not fully vindicated in Maricopa County.  Defendants have not carried their burden to show that they have satisfied the goals of the Court's orders, and they offer no factual evidence, beyond the Monitor's reports, that MCSO has achieved full compliance. Although it is not Plaintiffs' burden to submit data on the issue, their statistical expert presents information that raises significant concern that MCSO has not completed key reforms related to properly tracking racial disparities and responding to those disparities and in fact is backsliding, belying any claim of a "durable remedy." *Horne*, 557 U.S. at 450.  The Sheriff's Office is today run by a man with a history of leading the County's unlawful policing practices and flouting this Court's authority.  And recent changes in the overall immigration enforcement environment make ongoing judicial oversight all the more essential to ensure that MCSO does not revert to unconstitutional race-based policing.

**1.    Defendants Fail to Address How Noncompliance and Regression with Key Reforms Places the Plaintiff Class at an Unacceptable Risk of Discrimination.**

Defendants declare victory before several important structures designed to identify and address discrimination are functioning. Defendants fail to acknowledge MCSO's significant noncompliance, much less put forth any argument as to why the Court should dispense with these important remedies. Defendants are not entitled to the termination of judicial oversight until they actually finish creating and sustaining the "necessary remedies" tailored to correct the previous constitutional violations which the Court called "broad in scope" and which, it found, pervaded the agency's command ranks and accountability systems. Second Order 6.

Defendants have significant compliance problems. The Monitor's most recent report identified at least 22 paragraphs that were not compliant, deferred, or "n/a" with critical notes. Doc. 3381 ("45th Monitoring Report") ¶¶ 32, 33, 46, 54, 56, 70, 72, 79, 81, 115, 194, 195, 204, 211, 269, 270, 289, 291, 293, 300, 361, 362. In 2025, the Parties have raised serious concerns with compliance as to at least nine additional paragraphs. *See, e.g.*, Doc. 3268-1 (Plaintiffs asserting noncompliance with ¶¶ 46, 83, 114, 192, and 213); Doc. 3142-3 (DOJ asserting noncompliance with ¶¶ 54, 56, 83, 192, 200, 202, 205, 206, and 216, and raising concerns about ¶ 213). There is also evidence of serious backsliding that is likely to bring Defendants out of compliance with even more paragraphs with which they were earlier complying. MCSO's persistent failure to implement essential provisions of the Court's orders sharply refutes Defendants' conclusory claim that continued federal monitoring is inequitable. Defs. Mot. 1.

For example, MCSO has never—in over ten years of monitoring—demonstrated compliance with Paragraph 70, which requires MCSO to meaningfully and proactively respond to the racial disparities that have arisen in its stop data. Plaintiffs lay out in detail, below, the problems with MCSO's annual data analysis and response, including MCSO's practice of hiding, discounting, and not actively addressing significant racial

disparities in traffic stop outcomes. *See infra* Section IV.A.2(b)(1). But these are not MCSO's only deficiencies. The Monitor and the Parties have also consistently raised concerns of MCSO's flawed responses to officers flagged in MCSO's Traffic Stop Monthly Report ("TSMR"), which analyzes the activities of individual deputies with unusually large racial disparities in enforcement. *See, e.g.*, Doc. 2989 at 279 ("MCSO needs to plan practical and specific interventions that address the findings."); Doc. 3142-3 (criticizing the TSMR design for only targeting individual deputies with the most extreme enforcement patterns). Some of MCSO's alleged "reasonable steps" to "closely monitor" deputy or unit behavior, like the development of a dashboard of deputy traffic stop and patrol activity, appear entirely performative. *See* 45th Monitoring Report 101 ("Patrol supervisors were unable to demonstrate competent use of the dashboard and showed a lack of knowledge of abbreviations and acronyms displayed on the dashboard."). MCSO's ongoing failure to take sufficient steps at the agency level to investigate, closely monitor, and address present indicia of possible unlawful discriminatory policing leaves the Plaintiff class exposed to a significant risk of discrimination.

The centrality of noncompliance with Paragraph 70 to the relief sought illustrates how Defendants' simplistic reference to the percentage of compliant paragraphs is unreliable for evaluating whether the objectives of the constitutional remedies have been met. What service is it for MCSO to have protocols, staff, and reports related to traffic stops data if Defendants are unwilling to recognize that the disparities constitute "warning signs or indicia of possible racial profiling or other misconduct" and refuse to proactively address them? First Order ¶ 67; *compare* 45th Monitoring Report 82–96 & 103–104 (finding compliance with ¶¶ 64–69 & 71, requiring MCSO to develop a protocol and staff a group to conduct specified agency-level and deputy-level analysis of traffic stops data using enumerated indicators and making the underlying data available to the Monitor and Plaintiffs) *with id.* at 97–103 (finding noncompliance with ¶ 70). Similarly, Phase 1 compliance—as to which Defendants have achieved 100%

compliance—is compliance on paper, not proof that Defendants' conduct has changed. *See* 45th Monitoring Report 5 (defining Phase 1 compliance as having approved policies and procedures, and providing training on the same).

That MCSO is still in the process of building the structures and practices needed to ensure that Plaintiff class's constitutional rights are protected is also evident in view of other paragraphs that are either noncompliant or backsliding towards a noncompliance finding. Reform of the internal investigative process is still a work in progress, made apparent by the Monitor's finding that District-level investigations are deficient, PSB's failure to detect deficient investigations, efforts by the Sheriff to disrupt PSB's command structure, and MCSO's failure to meet its Court-ordered quota to reduce the backlog of investigations. 45th Monitoring Report 37–38 (regarding District-level investigations); *infra* Section IV.A.3(d)(2) (regarding PSB command changes); Doc. 3399 (Defs. Mot. for Relief from 3rd and 4th Orders, Feb. 19, 2026) (regarding backlog deficit). As the Monitor noted, "[t]he proper completion of misconduct investigations remains one of the most significant compliance issues still facing MCSO." 45th Monitoring Report 38. The Monitor has also raised several concerns related to supervision, including downgrading a finding of Full and Effective Compliance due to failures to effectively supervise Posse members and consistent (i.e., uncorrected) problems with documentation. *Id.* at 51–52, 257 (regarding posse member supervision) and 107–108 (regarding lack of proper documentation).

These findings confirm that there is still work to do in order to establish a durable remedy. When completed, this work will be the foundation upon which the objects of the Court's orders—constitutional policing—will be sustained. But Defendants seek relief by getting out of, not going through, these necessary reforms. As Defendants do not address these significant concerns, the Court must deny their request and see through to completion the hard-fought relief to which Plaintiffs are entitled.

**2.**    **MCSO's Traffic Stop Data Preclude Defendants From Carrying Their Burden to Demonstrate That a "Durable Remedy" Has Been Achieved.**

Defendants' Rule 60(b) motion rests on the premise that MCSO's reforms have yielded a "durable remedy" sufficient to warrant termination of judicial oversight. Defendants rely heavily on MCSO's Court-ordered analysis of its traffic enforcement operations data to argue that MCSO has eliminated the vestiges of past discrimination.

But the record contradicts that argument.  MCSO's own traffic-stop data, read in full and as consistently interpreted by the Monitor, continue to reflect statistically significant racial disparities across core enforcement outcomes of stop duration, searches, and arrests.  Moreover, Plaintiffs' independent expert's review of MCSO's methodology and analysis of its data further evidence ongoing disparities.  As the expert (whom Plaintiffs initially approached on the issue of ETSIs) explains, MCSO's methodological choices operate to exclude the majority of stop data, including a disproportionate exclusion of racial minority stops, from its analysis, seriously undermining the reliability of Defendants' analyses.  Unsurprisingly, once the expert addressed these exclusions, she discovered statistically significant and substantively relevant disparities by race.

On this record, Defendants have not carried their burden to show that changed circumstances render continued enforcement of the Court's orders inequitable.

(a)    MCSO Data Show, and the Monitor Has Found, That Minority Drivers Suffer Significant and Persistent Disparities in Traffic Stops.

Defendants' own 2024 Traffic Stop Annual Report ("TSAR") findings acknowledge racial disparities and admit the possibility of ongoing bias:

The MCSO and the CNA analysis team conclude that there is evidence of disparity in one traffic stop outcome between White drivers and the plaintiff class (Hispanic drivers), two traffic stop outcomes between White drivers and Black drivers, and two traffic stop outcomes between White drivers and racial/ethnic minority drivers as a whole.  This finding is a deviation from findings from previous court-ordered traffic stop analyses of the MCSO, especially last year's [2023 TSAR] findings.  *Stops involving Hispanic*

9

> *drivers were more likely to result in an arrest than stops involving White drivers.* Stops involving Black drivers were more likely to be longer than stops involving White drivers and more likely to result in an arrest. Stops involving all racial/ethnic minority drivers were more likely to result in a search and an arrest than stops involving White drivers. *These disparities represent potential indicia of bias as described in the First Court Order, but do not directly represent discriminatory policing.*

Doc. 3199-1 at 9 (emphasis added).[2]

Defendants' present motion selectively quotes no less than four times a self-serving and seemingly unsupported claim in their own 2024 Traffic Stop Annual Report ("TSAR") that the Monitor concurs with MCSO that the traffic stop disparities "were not associated with bias." Defs. Mot. 7:15–19, 11:4–6, 13:3–5, 26:6–8. But the quoted TSAR statement does not specify the "statistically significant TSMR [Traffic Stop Monthly Report] findings" associated with this "concurrence" and it does not cite or quote a statement of the Monitor himself. *See* Doc. 3199-1 at 10, 41. Defendants indeed fail to quote any statements of the Monitor himself with regard to the traffic stop data, so it is instructive to look at the Monitor's actual findings.

The Monitor's Forty-Third Report, filed just two days before the corrected 2024 TSAR that Defendants cite, pointed out that MCSO's 2022 TSAR "continued to find in the examination of traffic stop outcomes disparities 'that *may indicate a systemic bias* within the patrol function' that need to be addressed." Doc. 3198 at 94 (emphasis added). The Monitor then noted that the 2023 TSAR, trumpeted by Defendants in their motion, *e.g.*, Defs. Mot. 6–7, 12, "was the *first* annual report that found no significant differences in traffic stop outcomes between Hispanic and white drivers, although MCSO did find significant differences for all minority and white drivers for citation rates and stop length. *Subsequent analyses must continue to show downward trends in disparities between whites and all other drivers.*" Doc. 3198 at 94 (emphasis added). But, disappointing the

---

[2] Defendants artfully quote the latter part of the italicized sentence while omitting the rather important former part. Defs. Mot. 7:14–15.

Monitor's stated expectation, the next (2024) TSAR *again* found a disparity in arrest rates as between whites and Hispanics.  Doc. 3199-1 at 9.  Defendants attempt to dismiss this 2024 "departure" from the 2023 data as the result of a mere variable change.  Defs. Mot. 7:11–14.  But the need to change that variable just means that the uniquely favorable 2023 TSAR result on which Defendants now place so much emphasis was the result of the incorrect use of a control that MCSO should not have used, an error that MSCO fixed in the 2024 TSAR, leading to a reappearance of the racial disparity.  Expert Declaration of Emma Pierson, Ph. D., Ex. B ("Pierson Rpt.") at 15.

The Monitor's subsequent Quarterly reports have made the same observation about the disparities in the traffic stop data as the Forty-Third.  Doc. 3268 ("44th Monitoring Report") at 99.  The most recent quarterly report of the Monitor, the Forty-Fifth (filed on January 26, 2026), notes:

> TSAR10, published in June 2025, indicated that *the analysis revealed statistically significant disparities in traffic stop outcomes for Hispanic, Black, and all minority drivers compared to white drivers.*  Key findings include longer stop lengths and differences in search and arrest rates:
>
> > • Black drivers experienced a 31-second longer stop length compared to white drivers.
> >
> > • All minority drivers had a 0.45 percentage point higher search rate than white drivers.
> >
> > • Arrest rates differed significantly for Hispanic, Black, and all minority drivers compared to white drivers.
>
> While none of these differences *prove* the existence of bias, they do show that traffic stop outcome trends have fluctuated from year to year. *We have not seen a consistent decrease in these trends over the past several years.*

45th Monitoring Report 84 (emphasis added).  The Monitor further states:

> In [2022] TSAR8, published in June 2023, and [2024] TSAR10, published in June 2025, *MCSO reported finding some significant outcome disparities that may indicate bias within the patrol function*.  [The 2023] TSAR9, published in June 2024, was the first annual report that showed no significant disparities between Hispanic and white drivers in terms of outcomes; however, TSAR9 did find significant disparities between all minority drivers and white drivers for citation rates and stop length.

45th Monitoring Report 98 (emphasis added).  Thus, MCSO's own data, as supplemented by the Monitor's analysis, undermines Defendants' contention that a durable remedy has been achieved.

          (b)       Plaintiffs' New, Independent Expert Confirms That MCSO's Analysis Fails to Satisfy Defendants' Burden to Show That a Durable Reform Has Occurred.

At the request of Plaintiffs, Professor Emma Pierson, previously not involved in this case, has been looking at MCSO's data reporting required under ¶¶ 64–69 and examining MCSO's raw traffic stop data.  Prof. Pierson's scholarly work and experience well qualify her for this role.  Prof. Pierson is the Zhang Family Endowed Professor at the University of California, Berkeley Department of Electrical Engineering and Computer Sciences.  She develops machine learning and data science methods to identify and reduce systemic inequalities, focusing on the use of large datasets to analyze disparities in outcomes.  Her most cited first-author paper was a large-scale analysis of traffic stop data to evaluate potential bias in law enforcement.  Emma Pierson *et al.*, *A Large-Scale Analysis of Racial Disparities in Police Stops Across the United States*, 4 Nature Hum. Behavior 736 (2020); Pierson Decl. ¶ 9, Ex. A.

Prof. Pierson's report establishes two key conclusions: First, MCSO's data practices and analytical designs have significant flaws that conceal ongoing disparities and frustrate the Court's oversight.  These analytical flaws show that MCSO still has not developed adequate mechanisms for detecting possible bias and cast doubt upon the reports that Defendants cite to justify the termination of judicial oversight.  Second, once these flawed analytical assumptions are corrected, Prof. Pierson's own analysis shows racial disparities in traffic enforcement that are even more stark than Defendants disclose.

          (1)       Deficiencies in MCSO's Data Collection and Analysis Design Likely Obscure Greater Disparities and Frustrate the Court's Remedies.

MCSO's recent exponentially growing reliance of racially disparate extended stop indicators ("ETSIs") designations makes its findings as to stop duration unreliable.

As explained in greater detail in Section IV.A.2(b)(2) below, Prof. Pierson's analysis uncovers a significantly greater rate of racial disparity in MCSO stop rates than what the County computes in its own analyses. Prof. Pierson identifies two reasons that her findings of disparity as to stop duration differ from MCSO's findings: "First, [MCSO's TSARs] exclude extended stops (ETSIs) from their primary analysis. Second, they control for whether a search or arrest occurred." Pierson Rpt. 15–16. Prof. Pierson "show[s] that these decisions, both of which [she] disagree[s] with, seriously affect the results[] and lead to their much smaller estimates of disparities." Pierson Rpt. 16.

MCSO's analysis design—choosing to control for whether a search or arrest occurred—is improper, given that search and arrest decisions are *themselves* subject to possible racial bias. *See infra* at 15. That presents the question of whether MCSO's ETSI exclusion is appropriate. It is not, due to the inconsistency in the coding of ETSIs and the incorrectness of their use in downstream analysis.

Prof. Pierson begins by noting that "the proportion of stops with ETSIs, searches, or arrests dramatically increases over time: from 29% in 2022 to 39% in 2023 to 52% in 2024." *Id.* This massive increase is "in tension with the claim, made in both [Traffic Stop Quarterly Report (TSQR)] 13 and TSQR 17, that deputies are using ETSIs correctly and with fidelity." Pierson Rpt. 17. "The most plausible explanation is that ETSIs are not being used consistently across years . . . . If ETSIs are not being recorded consistently across years, it means that analyses of disparities using ETSIs will not be comparable across years." *Id.*

Notably, there is substantial racial disparity in the subjective decisions that MCSO deputies are making to select or not select ETSI for each traffic stop. Prof. Pierson states:

> Minority drivers are more likely to have stops marked with ETSIs. TSQR 13 reports that 52% of stops of Black drivers, and 52% of Hispanic drivers, were marked with the seven main ETSIs, searches, or arrests, compared to 32% of white drivers; the corresponding numbers in TSQR 17 are 62% for Black drivers and 64% for Hispanic drivers, compared to 47% of white drivers.

13

> These disparities emerge consistently for almost every type of ETSI and every race group, even for ETSIs where it is very unclear why racial disparities should occur.

Pierson Rpt. 18.[3]  The "Technical Issues" ETSI code is particularly bizarre—if MCSO's 2023 data are to be believed, printers, scanners, and other patrol car technology were more likely to fail during stops of minority drivers than white drivers, a conclusion that strains credulity.  *See id.*  MCSO's own TSQR 17 similarly documents such racial disparities in ETSI use.  *Id.* at 20–21.

As Prof. Pierson states, MCSO's own TSQRs "do not explain these racial disparities" and "explicitly note that more investigation [of ETSIs] is necessary"; she "agree[s] that there is an urgent need for further investigation; absent this, or a plausible innocuous explanation, it is very possible that ETSIs are being inconsistently recorded across race groups."  Pierson Rpt. 18; *see also* Young Decl., Ex. 18 (TSQR 17) at 45 ("Additional investigation is necessary for MCSO to better understand the racial/ethnic differences identified in this report for delays for DUI, Technical Issues, Training, and Other Issues.").  In response to concerns from Plaintiffs about the exclusion of stops not marked as ETSIs from MCSO's review of stop videos, MCSO began including those stops in its video review, but even this change continues to mask problems: MCSO includes only a small sample of those videos in its review and does not quantify the extent to which extended stops are over- or under-reported, and this may obscure racial disparities in their overall analysis.  Pierson Rpt. 19–20.[4]

---

[3] Prof. Pierson cites TSQRs 13 and 17, published in March 2024 and 2025 respectively, because they are the two latest reports focused on ETSIs.  TSQRs are published quarterly, but each edition focuses on different issues.  For example, TSQR 20 examined arrests at traffic stops, TSQR 19 examined citations and warnings, TSQR 18 examined racial disparities in enforcement at the MCSO district level, and TSQR 16 examined traffic stop activity in ten communities that are either unincorporated or contract with MCSO for services.  *See generally Traffic Stop Reports*, Maricopa Cty. Sheriff's Off. Bureau of Int. Oversight, https://www.mcsobio.org/traffic-stop-data.

[4] Plaintiffs have previously notified the Court of the significant racial disparities in ETSI use and the huge, rapid and recent increase in MCSO's use ETSIs.  Doc. 3281 at 2–3. (continued…)

14

The Monitor's January 26, 2026, Quarterly Report contains the following additional criticism of MCSO's most recent ETSI analysis:

> MCSO . . . makes a startling claim for this analysis in both the Executive Summary and Introduction[:] "MCSO does not consider racial/ethnic difference associated with Extended Traffic Stop Indicator use as a measure of potential bias as defined by the Second Order."  We agree that one cannot know the extent of potential bias without investigating individual stops; however, while we agree that ETSIs provide the ability to document why stops are extended, this *does not mitigate the potential for bias*.  To begin an analysis with that supposition, we believe, is inappropriate.

45th Monitoring Report 85 (emphasis added).  At the very least, it would be premature to terminate this case under Rule 60(b) based on stop duration data infected by this as yet suspicious and uninvestigated ETSI racial disparity.

There are other serious flaws in MCSO's statistical methodologies, which effectively conceal or ignore racial bias.  Aside from the problematic use of ETSIs, Professor Pierson also identifies other problems with MSCO's approach to the traffic stop data.  One of them is the exclusion of searches incident to arrest or tow from the search rate analysis, since the arrest decision itself may result from racial bias and MCSO's analysis decision excludes the vast majority of searches.  Pierson Rpt. 14.  MCSO's arrest rate analysis in the 2023 TSAR 9, which aberrantly reported no statistical disparity, suffered from improperly controlling for a variable (Stop Classification, which, as a proxy for arrest, can itself reflect racial bias), "seriously altering their conclusions"; when that error was corrected in the 2024 TSAR 10, the disparity reappeared.  *Id.* at 15.

---

The parties have begun to meet and confer about the ETSI issue, but that discussion has not progressed while the present motion is pending.  Young Decl., Exs. 1–2.  The present motion was filed before the parties could reach agreement on how to deal with the ETSI problem.

Professor Pierson completed and signed her report on March 25, 2026.  On March 31, 2026, MCSO issued "Traffic Stops Quarterly Report 21: 2025 Extended Stop Indicator Use" ("TSQR 21").  TSQR 21 is not a basis for Defendants' motion, which was filed on January 13, 2026.  However, if the Court wishes to have Professor Pierson's views on TSQR 21 and what it says about ETSI use, then Plaintiffs will request additional time for her to consider TSQR 21 and provide those views.

These methodological flaws are not incidental.  Defendants heavily rely upon the TSAR analyses to argue that MCSO has corrected its earlier racially discriminatory policing.  Defs. Mot. 6–7, 12.  But, as Prof. Pierson shows, these analyses are suspect, as to search rates, because they exclude the "vast majority of searches."  Pierson Rpt. 14. MCSO's exclusion of ETSIs as to stop duration is particularly concerning given the substantial, unexplained, and uninvestigated racial disparity in ETSI coding.  *Id.* at 18. These exclusions imply that MCSO's conclusion as to its successful reform is based on only a fraction of its traffic enforcement operations.  Such a flawed analysis cannot meet the County's burden to demonstrate the changed circumstances required for relief under Rule 60(b)(5).

> (2)    Plaintiffs' Independent Expert's Analysis that Corrects for Some of These Deficiencies Confirms That the Disparities Suffered by Hispanic Drivers Are Even More Stark.

In addition to identifying the aforementioned analytical deficiencies in MCSO's methodology, Prof. Pierson conducted her own, independent analysis of MCSO's data. Her corrected analysis reveals substantial ongoing racial disparities, belying Defendants' claim that a durable remedy to MCSO's ongoing violation of federal law has been achieved.

As described in further detail in her report, Prof. Pierson examined the raw data for 2023–24, which gave her a dataset of 38,897 stops (18,632 in 2023 and 20,265 in 2024).  Pierson Rpt. 4.  Applying regression analysis, she "found substantial, statistically significant racial disparities in all three outcomes" that are the focus of MCSO's TSARs: search rates, arrest rates and stop duration.  *Id.* at 2.  Her "conclusions were robust to using alternate statistical models and many sets of controls."  *Id.*

Prof. Pierson "began by considering two sets of controls: first, the set of controls [she and a co-author] have used in [their] past work analyzing disparities across the United States and second, the controls discussed in the most recent TSAR (TSAR 10) in the analysis of the three outcomes we analyze—searches, arrests, and stop duration.  The

16

first set is less detailed than the second because it is limited to the variables that are widely available across states." *Id.* at 8 (footnote omitted). "For each possible control, [she] erred on the side of including it so [she] could examine how results differed depending on whether it was included. [She then] present[s] results with (1) no controls; (2) each control added individually; and (3) all controls together, in order to transparently reveal how results vary depending on which controls are included." *Id.*

(a)     Stop duration

"For all racial groups, and for all sets of controls, [Prof. Pierson's] regression analysis finds statistically significant and substantively large disparities in stop duration. . . . Overall, with no controls, the disparity for Hispanic drivers is 6.6 minutes . . . . With all controls, the disparity for Hispanic drivers is 4.7 minutes . . . ." *Id.* at 10. "These disparities are not only statistically significant but substantively large in magnitude. To quantify this, [Prof. Pierson] computed the *relative disparity*: that is, the ratio of the regression estimate to the average stop duration for white drivers. For example, a relative disparity of 20% for Hispanic drivers would mean that stops are 1.2x longer for Hispanic drivers than for white drivers. *For Hispanic drivers, the relative disparity in stop duration is 33% with all controls and 46% without controls.*" *Id.* at 10–11 (emphasis added).

(b)     Search rates

Prof. Pierson "defined the search rate using both driver and vehicle searches (as does MCSO); importantly, unlike MCSO, [she] did not exclude searches that were incident to arrests or tows" because, among other reasons, "excluding searches incident to arrest risks obscuring important disparities, since the decision to arrest the driver is itself a decision that may result from racial bias." *Id.* at 5. This difference in definition of the search rate results in "significant differences between [Prof Pierson's and MCSO's] conclusions" because "[she] analyze[s] all searches, while MCSO analyses only non-incidental searches." *Id.*

17

Specifically, Prof. Pierson's search rate analysis found:

> With no controls, the disparity for Hispanic drivers is 4.6% . . . . With all controls, the disparity for Hispanic drivers is 3.5% . . . . For Hispanic and all minority drivers, these disparities are large relative to the search rate for white drivers (1.4%). *For Hispanic drivers, the* relative *disparity in search rate* (i.e., the ratio of the Hispanic-white disparity to the white search rate) *is 336% with no controls, and 256% with all controls* . . . . For all minority drivers, the relative disparity is 267% with no controls, and 184% with all controls. For both Hispanic and minority drivers, the disparity in search rate exceeds the search rate for white drivers, indicating a substantively large racial disparity.

*Id.* at 11–12 (emphasis added).

### (c)　Arrest rates

Prof. Pierson "defined the arrest rate using whether the driver was arrested." *Id.* at 5. "For all racial groups, and for all sets of controls, [Prof. Pierson] finds statistically significant and substantively large disparities in arrest rate. With no controls, the disparity in arrest rate for Hispanic drivers is 3.3% . . . . With all controls, the disparity for Hispanic drivers is 2.0% . . . ." *Id.* at 12–13. "These disparities are substantively large relative to the arrest rate for white drivers (4.6%). For Hispanic drivers, the relative disparity in arrest rate is 72% with no controls and 44% with all controls." *Id.* at 13.

* * *

Prof. Pierson's robust independent analysis—using analytically rigorous methods and demonstrating the bias-concealing effects of MCSO's contestable analytical decisions—confirms that substantial racial disparities persist across every outcome MCSO itself defines as central to compliance: stop duration, searches, and arrests. Far from disappearing when appropriate statistical controls are applied, these disparities remain statistically significant and substantively large, often amounting to multiples of the baseline rates for white motorists. These results directly undermine MCSO's assertion that its recent reforms have produced a durable remedy and instead indicate that MCSO's traffic enforcement practices may continue to violate the Equal Protection Clause.

**3.**      **Sheriff Sheridan's own historical and recent statements and actions defeat Defendants' claim that Court supervision is currently not necessary to ensure a full remedy for his and MCSO's constitutional violations.**

Sheriff Sheridan's current command of MCSO is central to the issue of whether Defendants have shown that "circumstances have improved to the point that the purpose of the original judgment is 'satisfied' and enforcing what remains 'is no longer equitable.'" Defs. Mot. 1:14–15.  His past and present leadership does not demonstrate an embrace of reform and gives little confidence that Defendants will not resume their violation of plaintiffs' constitutional rights once judicial oversight ends.  On the contrary, they highlight the continued work Defendants must accomplish to build towards a "durable remedy." *Horne*, 557 U.S. at 450.

> **(a)**      **MCSO's leadership is not "new" because Sheriff Sheridan, while serving as Chief Deputy, himself personally committed many of the constitutional violations that the Court's injunctions are designed to remedy**

The County's motion rests substantially on the assertion that "turnover in elected leadership requires a 'flexible approach,' lest former officials forever saddle their successors with onerous and undeserved federal oversight." Defs. Mot. 1:18–20 (quoting *Horne*, 557 U.S. at 450).  But Sheriff Sheridan is not a mere "successor" office holder who is being "saddled" with "undeserved" oversight due to the wrongs committed by a "former official."  Rather, starting in September 2010 (Doc. 1677 at 16:27), Sheridan was the Chief Deputy and chief executor of Sheriff Arpaio.  As Sheridan himself described his role in a 2016 internal MCSO investigation video, "The sheriff [i.e., Arpaio] is more like the board of directors.  The CEO of the company would be like me [i.e., Sheridan]." Young Decl., Ex. 3 (12 News, *Why Sheriff Candidate Jerry Sheridan Is On the Brady List*, at 1:00–1:07 (Sep. 10, 2024), https://www.youtube.com/watch?v=qH59udhHSb4) ("12 News Segment").

In 2016, the Court held "CEO" Sheridan in civil contempt for failing to obey the Court's December 23, 2011 preliminary injunction barring MCSO from

unconstitutionally detaining Plaintiff class members based solely on suspicion of unlawful presence in the country.  Sheridan "was fully apprised of the terms of the preliminary injunction and fully informed of Sheriff's Arpaio's decision to ignore it.  He was responsible for implementing its terms, and he did nothing to do so."  Doc. 1677 ¶ 92.  As a result of Sheridan's dereliction, MCSO unlawfully detained numerous Plaintiff class members who later had to be compensated monetarily for their detentions.  Doc. 1791.

Moreover, as Chief Deputy to Arpaio, Sheridan himself personally obstructed needed discipline against himself and others at MCSO who violated Plaintiff class members' rights.  "Sheriff Arpaio and MCSO policy delegate[d] to Chief Deputy Sheridan all authority regarding internal affairs investigations," Doc. 1677 at 71:11–14, which they used to shield deputies who stole from and otherwise victimized Plaintiff class members.  As the Court has found, "Sheriff Arpaio and Chief Deputy Sheridan . . . manipulated the IA process at the MCSO to ensure that many employees—including Chief Deputy Sheridan—were disciplined in a relatively lenient manner or not at all for violating the rights of the Plaintiff class."  Doc. 1765 at 15:21–25; *see* Doc. 3305 at 2:20– 4:14.[5]  Because Sheridan himself was an "author[] of the manipulation and misconduct that . . . prevented the fair, uniform, and appropriate application of discipline on MCSO employees as that misconduct pertains to the members of the Plaintiff class," Doc. 1765 at 15:15–18, Defendants cannot shuffle onto "former officials" the blame for the violations that the Court's injunctive orders are intended to fix.

---

[5] Specific examples include (1) Sheridan's creation and personal exploitation of a conflict of interest to subvert the investigation into the MCSO's violation of the December 23, 2011 preliminary injunction and the resulting unconstitutional detentions of numerous Plaintiff class members, Doc. 1677 ¶¶ 405–490, and (2) his "perfunctory whitewash", *id.* ¶ 690, of the investigation into the thefts of Plaintiff class members' property that deputies stored in the garage of Deputy Armendariz, which prevented any discipline for that thievery.  *Id.* ¶¶ 603–692.

       (b)     Sheriff Sheridan's prior lies and obstruction in the service of injury to the Plaintiff class undermine Defendants' present assertion of good intentions.

Defendants do not carry their burden of showing that MCSO has a "commitment to unbiased policing" and has "embraced the '[s]tructural and management reforms' that 'constitute [a] relevant change in circumstances" with the meaning of Rule 60(b). Defs. Mot. 7–11. In evaluating their argument, the Court may properly consider the fact that, as Chief Deputy, "Sheridan made multiple intentional misstatements of fact while under oath" before the Court. Doc. 1677 at 3:1–2 (emphasis added). For example, the Court, for multiple reasons, found to be "demonstrably false" and a "knowing misstatement[]," Doc. 1677 ¶¶ 68, 87, 71–86, Sheridan's denial of knowledge of the Court's December 23, 2011 preliminary injunction; in a subsequent internal MCSO interview video, Sheridan himself admitted, "I could see where you wouldn't [pause] believe me." 12 News Segment at 4:53–5:12. Sheridan also made "deliberate misstatements of fact . . . in bad faith" and "under oath" to the Court about the payments that Sheridan authorized for the "Montgomery investigation" that targeted the Court. *Id.* ¶¶ 384–85. And Sheridan intentionally lied to the Monitor about his actions after being ordered by the Court to collect quietly video recordings that could show further violations of Plaintiff class members' rights. Doc. 1677 ¶¶ 218–237, 244–245, 253; *see also* Doc. 1677 ¶¶ 325, 326, 339 ("knowing misstatement of fact" regarding 1,459 stolen driver's licenses).

Defendants' request for the "presum[ption of] elected officials' good faith and lawful performance of their work" is therefore misplaced. Defs. Mot. 13:12–13 (citing *Cruz v. Bondi*, 146 F.4th 730, 739 (9th Cir. 2025)).[6] Sheriff Sheridan's history of

---

[6] *Cruz v. Bondi*, cited by Defendants, actually concerns the presumption of regularity, a doctrinally distinct evidentiary burden requiring *plaintiffs* suing public officials to provide "clear evidence" that those officials did not properly discharge their official duties. *Cruz*, 146 F.4th at 739. *Cruz* is not immediately relevant for several reasons: First, as mentioned in Section III, here it is *Defendants* who bear the burden to show a change in circumstances. Second, the regularity inquiry is *retrospective*—it imposes an evidentiary burden on plaintiffs, and should plaintiffs fail to carry their burden, the (continued…)

testifying falsely to protect himself and his subordinates, thereby harming the Plaintiff class, should cause the Court to exercise its discretion cautiously.[7]

        (c)       Sheriff Sheridan's expressions of disdain for this Court's orders protecting the constitutional rights of the Plaintiff class, including his 2024 statement that he is willing to disobey this Court's orders again, rebut Defendants' assertion that MCSO has reformed.

While serving as Arpaio's Chief Deputy, Sheridan regarded this lawsuit as "nuisance litigation, whatever you want to call it."  12 News Segment at 2:45–2:52; *see also* Doc. 1677 ¶¶ 88–89 (Sheridan claiming that "the *Melendres* case was not an important matter relative to the other matters he was dealing with, and that he did not pay any attention to it," which the Court found to be "not credible").

Sheridan actively undermined the Court's orders before MCSO deputies:

> Chief Deputy Jerry Sheridan was videotaped during an October 2013 training session for deputies about to engage in a large-scale patrol, where he referred to this Court's order as "ludicrous" and "crap," and incorrectly stated that this Court had found only a small number of officers had unconstitutionally used race as a factor in traffic stops. . . . [B]oth Chief Deputy Sheridan and Sheriff Arpaio are seen apparently directing deputies

---

presumption of regularity improves the reviewing court's perception of defendants' *past* actions.  By contrast, here, Defendants ask for a *prospective* favor.

The fact that Sheriff Sheridan is an elected official is not by itself a factor in the Rule 60(b) decision.  "Elected officials must obey the Constitution." *Morgan v. McDonough*, 540 F.2d 527, 534 (1st Cir. 1976).  "[W]here the actions or omissions of elected public officials . . . impermissibly infringe on the constitutionally protected rights of individuals," federal courts as "protectors of the United States Constitution must act to stop such infringement." *Shaw v. Allen*, 771 F. Supp. 760, 763 (S.D. W. Va. 1990).  If the current state of conditions has not significantly changed, such that Defendants cannot show that terminating the injunctive relief in this case now would be equitable, then the fact that Sheridan is currently the elected Sheriff does not additionally or independently support such termination.

[7] *See Henson v. Fidelity Nat'l Fin., Inc.*, 943 F.3d 434, 443 (9th Cir. 2019) ("[W]e review the denial of a motion for relief from judgment under Rule 60(b) for an abuse of discretion. . . .  [W]e may not reverse absent a definite and firm conviction that the district court committed a clear error of judgment in the conclusion it reached upon a weighing of relevant factors." (cleaned up)).

not to take seriously the Court's requirement that they track the race and ethnicity of individuals whom they stop.

Doc. 880 at 3:1–8; *see also* Young Decl., Exs. 4a (PX 204C, "absurd we're supposed to guess" (:19)) & 4b (PX204D, "It's hard to tell" (:15); "Write down 'unknown'" (:32)).

Further, Sheriff Sheridan's regrettable silence in the face of racial animus at the July 16, 2025 community meeting held under this Court's order (Doc. 2431 ¶ 109) both hobbled the reform process and raises a concern that he might not be committed to a durable remedy.  At that meeting,

> [r]acial epithets were used, offensive and provoking language towards Plaintiff[] community members . . . was used, and threats of violence were witnessed as verbal and physical altercations arose between . . . disruptive audience members and speakers in line waiting to ask their questions [of MCSO].  Impacted community members were afraid to speak and felt unsafe at the community meeting. Further, many of the disrupters in the audience berated the interpreter as she attempted to translate the meeting for Spanish-speaking plaintiff class members.  The interpreter was pleading with those disrupting her job to allow her to continue without interruption. Her requests were not respected, and MCSO or the Sheriff did not help to calm verbal and physical altercations that took place.

Young Decl., Ex. 5 (Plaintiff email, acknowledged but not contradicted or substantively responded to by MCSO).  Personally,

> Sheriff Sheridan took no action to quell the disruption or at least distance himself from it. To the contrary, he effectively endorsed the disruption in the manner that he interacted with the disrupters before the meeting, throughout the meeting, and after the meeting . . . . His inaction could . . . understandably be perceived by class members as an endorsement of the offensive language and physical actions taken against plaintiff class members who were in attendance that night . . . . The Sheriff had an opportunity to tell the audience at the community meeting that racial epithets made against plaintiff class members would not be tolerated by himself nor anyone from MCSO, but that did not happen.

*Id*.; s*ee also* Young Decl., Ex. 6 (Morgan Fischer, *Sheriff's office court-ordered community meeting goes off the rails*, Phoenix New Times (July 17, 2025), https://www.phoenixnewtimes.com/news/maricopa-county-sheriff-court-ordered-meeting-goes-off-rails-22129689/ (one speaker was told "to 'go back to Mexico,' inciting

a brief confrontation"; Sheridan's reaction to the disrupters was, "I was happy to hear some positive things about the Sheriff's Office and myself for a change")).

Significantly, Sheridan appears to still be willing to violate federal court orders protecting the Plaintiff class if he concludes that doing so is "the right thing."  In 2024, when specifically asked about this Court's earlier contempt finding against him, he stated proudly that he had "stood up for [his] deputies" who committed misconduct and that he "is not afraid to do the right thing when the right thing needs to be done, and if that is disagreeing with a federal district court judge and suffering the consequences of that, well, so be it."  Young Decl., Ex. 7 (AZPBS, *AZ Votes Debate: Maricopa County Sheriff*, at 20:20–21:40, 21:07, 21:32 (Sept. 12, 2024), https://www.youtube.com/live/wxw142NpKMg).  In light of the current Sheriff's explicit avowals, Defendants cannot carry their burden of showing that continued court supervision is no longer needed to prevent a reversion to MCSO's earlier constitutional abuses.

> (d)    Sheriff Sheridan's recent actions detrimental to reform lay bare the work still required to build towards a durable remedy.
>
> (1)    The reinstatements of personnel from Sheriff Arpaio's prior administration contradict Defendants' claim that the Arpaio-era abuses have been left behind.

Since taking office at the start of 2025, Sheriff Sheridan has brought back into MCSO many of the very same personnel who, like Sheridan himself, had served Arpaio. *See* Young Decl., Ex. 8 (Stephen Lemons, *The Arpaio All-Stars: Meet the County Sheriff's Sketchy Retreads*, Phoenix New Times (Aug. 13, 2025), https://www.phoenixnewtimes.com/news/maricopa-county-sheriff-fills-command-staff-arpaio-minions-22336568/) (mentioning Paul Chagolla, Jeff Gentry, Steve Bailey, Chad Willems and Rollie Siebert, and attributing to an unnamed retired MCSO "insider" the view that, "You can't say that you're not like your former boss when you're checking all the same exact boxes that your boss checked . . . .  It's the same players, the same

24

roster"). The current positions of Chagolla, Gentry, Bailey, Willems and Seebert appear in an organization chart filed under seal with this brief. *See* Young Decl., Ex. 9.

The Court is familiar with Mr. Bailey from the earlier contempt proceedings. Working with Sheridan after the discovery of the 1459 stolen IDs, Doc. 1677 ¶¶ 295–348, Bailey falsely told the Monitor Team that no further IDs had been found, with "the intention of concealing the existence of the 1459 IDs from the Monitor, the Parties and the Court." *Id.* ¶ 330. In so lying to the Monitor Team, Bailey "knowingly violated the orders of the Court." *Id.* ¶ 348.[8]

As Defendants' present motion recognizes, where there have been "bad actors who infiltrate institutions of public trust, . . . the measure of the institution is its ability to identify and remove the bad actors." Defs. Mot. 2:6–7. Rather than any such "removal," the MCSO under Sheriff Sheridan represents the restoration of a regime that violated the constitutional rights of Plaintiff class members.

> (2)    Sheriff Sheridan's attempt to transfer Captain Lugo out of PSB shows the need for continued judicial supervision.

The integrity of PSB's structure and leadership remains an outstanding issue. Most prominently, MCSO appears to have taken or attempted to take adverse action

---

[8]    Also, as head of PSB, Bailey, who himself was potentially involved in the IA investigation over the stolen property stowed in Deputy Armendariz' garage, Doc. 1677 ¶ 408, approved along with Sheridan the faulty leading questions that "covered up" MCSO policy violations and possibly criminal conduct, demonstrating Bailey's and Sheridan's "lack of good faith in directing the investigation and/or in testifying about it." *Id.* ¶¶ 667–68, 687. Bailey also continued to supervise a seized property investigation which "Bailey had an obvious conflict in supervising . . . –a conflict which the Court pointed out . . . and which . . . Sheridan acknowledged . . . ." *Id.* ¶ 707. "This same conflict pervade[d] almost all of the property investigations on which Captain Bailey signed off." *Id.* ¶ 708. "Moreover, . . . Bailey was himself the principal in such an investigation in which the finding of misconduct was sustained. [He] received a 'coaching' for the violation." *Id.* 709. *See also id.* ¶¶ 766–825 (investigation of Bailey's friend Mackiewicz, in which "Bailey took further steps to subvert any legitimate criminal investigation", *id.* ¶ 824).

against Captain Gregory Lugo, who for five years as captain of the Professional Standards Bureau has overseen the IA process.  On February 26, 2026, the Monitor denied MCSO's request to transfer Captain Lugo out of the PSB and into the Court Security Division.  Young Decl., Ex. 10.  The Monitor noted that Captain Lugo had been placed on administrative leave on April 7, 2025, pending resolution of internal misconduct complaints against him.  *Id.*  The Arizona Department of Public Safety and an Independent Investigator appointed by the Court have found those complaints unmeritorious.  *Id.*

As the Monitor's February 26, 2026, Disapproval of Captain Lugo's transfer states:

> Captain Lugo was placed in a difficult and uncomfortable position when executive command made inquiries about reopening final disciplinary decisions in closed cases adjudicated during previous administrations and took other actions that were inconsistent with MCSO policy.  According to Captain Lugo, he refused to participate in any effort that he believed would violate State law or place him in contempt of the Court Orders, and he declined to engage in conduct that could be unethical or unlawful.

> Under Captain Lugo's leadership, PSB's performance metrics reflected high levels of productivity and compliance, as noted by senior members of the current administration.  His proposed transfer is clearly not related to performance; organizational efficiency; or the needs of the Professional Standards Bureau, the Plaintiffs' class, or the Sheriff's Office.  It is clear that the complaints against Captain Lugo were initiated and pursued as a direct result of his resistance to the administration's attempts to manipulate the PSB process, alter standing policies, and defy the Court Orders.

> Accordingly, we conclude that the stated reasons offered for the transfer of Captain Lugo are inconsistent with the facts and are retaliatory, as defined by Paragraphs 168 and 169 of the Second Order.  Further, Captain Lugo's record of performance, as noted by senior members of the current administration, is worthy of his return to the command of the Professional Standards Bureau.

*Id.*  MCSO has confirmed that, "The [attempted] transfer was simply made at the request of the Sheriff, who has expressed a desire for a change in personnel."  Young Decl., Ex. 11 at 3.

Given that Sheriff Sheridan himself, according to the Monitor, had "credit[ed] [Captain Lugo] with addressing the investigative backlog and advancing the agency toward the end of federal oversight", Young Decl., Ex. 10, Sheridan's effort to get rid of Captain Lugo raises deep concerns.[9] Any attempt to force Captain Lugo to "reopen[] final disciplinary decisions in closed cases adjudicated during previous administrations" could directly harm the class by undermining the IA system that is designed to protect them. Any other degradation of the quality of PSB decision-making through the revision of closed case outcomes could also harm the class and directly undermine a central reform.[10]

(3)    Coupled with the attempted Lugo transfer, MCSO's recent violation of the Court's order on PSB backlog reduction and its concurrent motion to negate the Court's remedy for that failure demonstrate the need for continued supervision to make sure that reforms at MCSO will be lasting.

Defendants' pending Joint Motion for Relief from the Third and Fourth Orders, Doc. 3399, accentuates their continued failure to comply with the Court's remedial orders and supports denial of their Rule 60(b) motion. Rather than complying with the Court's long-standing backlog reduction requirements, MCSO and Sheriff Sheridan chose instead to (a) try to transfer Captain Lugo, who had been contributing to the elimination of the backlog, out of PSB altogether and (b) use their own violation of the Court's backlog reduction requirements as an excuse to request elimination of the Court's reasonable

---

[9] MCSO attempts to undermine the basis for the Monitor's denial of the transfer. Young Decl. Ex. 11 ("Assignment, retention, and rotation of command staff remain the responsibility of the Sheriff absent a substantiated violation of the Court's Orders. No such violation exists here."). But Defendants' own pending motion for relief from the Third and Fourth Orders, Doc. 3399, shows that such a substantial violation (perhaps significantly attributable to Captain Lugo's displacement) does exist.

[10] To the extent that further important information on this incident will become available via the next Monitor report, Plaintiffs may seek to supplement this response with such further information when that becomes available. *See* Doc 3458.

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR RELIEF FROM JUDGMENT UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)

remedies for that violation, while pointing to the earlier rejection of their flawed proposals to change PSB procedures, assignments and command structures as an excuse for their violation.  Doc. 3399 at 6:18–28, 19–20.  MCSO's own violation weakens Defendants' Rule 60(b) motion.  *See Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814–15 (1945) ("[H]e who comes into equity must come with clean hands .  .  .  . Equity require[s] that they shall have acted fairly and without fraud or deceit as to the controversy in issue." (cleaned up)).

Defendants are wrong to argue that the current backlog does not include any Class Remedial Matters ("CRMs").  Doc. 3399 at 10–11, 26.  First, this claim is not substantiated by the data Defendants cite—the table in Defendants' papers only shows the number of cases categorized as CRMs, not whether they went onto the backlog.  *Id.*; *see also* Doc. 3358-1 at 146.  Second, even if Defendants' claim were correct, Defendants' singular focus on CRM complaints evinces their unsustainable focus on ticking compliance boxes and not on addressing systemic problems in the overall internal-affairs system—a system that the CRM process will become part of once the Court's oversight terminates.[11]

MCSO has not yet demonstrated that it has reformed to the point where, unsupervised, it can avoid a return to the time when Sheridan and MCSO "manipulated the timing of investigations . . . to impose either no discipline or less serious discipline on its deputies in those cases in which discipline was warranted," Doc. 2830 at 1:25–2:4

---

[11] Defendants' own description demonstrates that MCSO cannot yet timely handle CRMs *by itself*, but instead currently does so only under the Monitor's close watch:

> MCSO works closely with the Monitoring Team on Class Remedial Matters ("CRMs"), which receive investigative priority.  Every complaint with a Latino surname goes through the CRM vetting process.  The complaint is initially put onto the CRM list, reviewed, and briefed . . . . The Monitor Team meets with PSB every two weeks to track the progress of CRMs under investigation, review, and finalization. The Monitor Team must approve all steps of the process.

Doc. 3399 at 10:2–13.

(footnote omitted), so as "to avoid accountability for themselves, their protégés, and those who ha[d] implemented their flawed policies at the cost of fairness to members of the Plaintiff class."  Doc. 1677 ¶ 889.[12]

The backlog issue and the Lugo incident contradict Defendants' claim that MCSO no longer needs continued supervision to achieve lasting IA reform.  MCSO's IA defects "permeate[d] the internal affairs investigatory processes, which ha[d] been manipulated to provide impunity to those who violate the rights of the Plaintiff class", Doc. 1765 at 2, 11, who "constituted the overwhelming majority of the victims of the multiple acts of misconduct that were the subjects of virtually all the flawed investigations" that the Court examined.  Doc. 1677 ¶ 888. The Court's remedies to PSB operations are "integral to ensuring that Maricopa County can operate a Sheriff's Office in which constitutional rights are protected for all" and serve the goal of fostering the development of "an effectively functioning internal investigations process that will rebuild faith in the MCSO's handling of police misconduct.  Without it, 'the rights of the Plaintiff class are not secure.'"  Doc. 2708 at 6:19–22 (quoting Doc. 1765 at 5).[13]

> (e)   Current federal immigration enforcement practices make it more likely that MCSO may resume its

---

[12] For example, MCSO commenced an internal investigation (IA #2014-543) into its violation of the Court's December 23, 2011, preliminary injunction, which resulted in the unlawful detention of Plaintiff class members.  Sheridan himself was a principal (i.e., a target) in that investigation.  But no disciplinary decision was timely completed in that or in any of the other three investigations relating to the present case.  Doc. 1677 ¶ 579.

[13] Defendants devote most of a page to the Monitor's recitation as to three CRMs, emphasizing the absence of indication of racial motivation. Defs. Mot. 8.  In one of them, the accused MCSO employee could not be identified.  In the second, the "allegation of inappropriate comments was sustained."  In the third, the "complainant did not allege that any of the alleged misconduct was based on his race, or that deputies made any racial comments" though "PSB sustained multiple allegations of misconduct." *Id.* The lack of any indication of a racial motivation in these particular cases and the Monitor's concurrence in their outcomes do not bear on the issue at hand, as they say nothing about how MCSO would handle a case that *does* involve misconduct motivated by race.

unconstitutional practices, increasing the need for continued judicial supervision to ensure that the reform of MCSO is enduring.

The risk that the MCSO will revert to the unconstitutional, race-based policing practices that gave rise to this Court's injunctive relief is heightened by the current federal immigration enforcement environment.  Given this broader context, the need for continued judicial supervision to ensure that MSCO develops a durable ability to comply with the Equal Protection clause is even more apparent.

As the Court discussed in its earlier order granting the preliminary injunction, MCSO's prior section 287(g) agreement with the federal government, which terminated in October 2009, allowed MCSO to enforce federal civil immigration law in the field. Doc. 494 at 2:7–14. Recently the federal government has dramatically expanded local–federal immigration enforcement partnerships.  As of March 2, 2026, Immigration and Customs Enforcement ("ICE") reports 1,499 active 287(g) agreements across 39 states and two U.S. territories, with ten in Arizona, including a Task Force–model ("TFM") agreement in neighboring Pinal County—precisely the type of arrangement that facilitated MCSO's prior unconstitutional practices.  *See* Young Decl., Ex. 12 (*Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act*, I.C.E., https://www.ice.gov/identify-and-arrest/287g).

The expansion of such federal-local partnerships is part of the overall policy of the current federal administration, which on its first day issued Executive Order 14159, "Protecting the American People Against Invasion," expressly directing the Secretary of Homeland Security to expand 287(g) agreements and prioritize "total and efficient enforcement" of immigration laws.  90 Fed. Reg. 8443, 8445 (Jan. 20, 2025).  Consistent with that mandate, the Department of Homeland Security ("DHS") announced in September 2025 that the number of 287(g) partnerships had surged over 641% compared to prior years.  *See* Young Decl., Ex. 13 (Press Release, *DHS 287(g) Reaches More Than 1,000 Partnerships with State and Local Enforcement to Help Remove the Worst of the*

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR RELIEF FROM JUDGMENT UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)

*Worst Criminal Illegal Aliens*, Dep't Homeland Sec. (Sept. 17, 2025)).  The increased federal enforcement heightens the risk of unconstitutional race-based immigration enforcement of the kind that MCSO was found to have committed earlier.[14]

These national developments recreate the same structural pressures that previously helped drive MCSO's earlier unconstitutional conduct.  MCSO was among the first local agencies to adopt a 287(g) Task Force model, and that federal partnership was the central engine of the racial-profiling regime that this Court found unlawful.  Doc. 579 at 1:24–2:8, 3:1–11; *see also* Young Decl., Ex. 17 (Rafael Carranza, *This County Was the "Model" for Local Police Carrying Out Immigration Raids. It Ended in Civil Rights Violations.*, Pro Publica (Oct. 21, 2025)).  Now, with federal immigration enforcement agencies increasing their reliance on local deputies as force multipliers, and not just pursuant to 287(g) agreements, conditions strongly resemble—and in fact are worse than—the larger enforcement environment that prevailed during Arpaio's tenure.

It appears that the existence of this Court's supervision is what prevents Sheriff Sheridan from joining the federal government's immigration enforcement efforts.  A news agency that interviewed Sheridan stated:

> In Maricopa County, home to a majority of Arizona's population, *Sheriff Jerry Sheridan says he's hesitant to have his deputies certified to patrol with ICE, mainly because his office remains under strict court oversight* related to its past experiment with the 287(g) program. But Sheridan has endorsed the ICE program's work inside local jails and said that's where Maricopa County got it right on cooperating with federal immigration enforcement.

---

[14] For example, a federal court in Los Angeles has found that ICE's roving immigration patrols created a substantial and ongoing risk of unlawful ethnicity-based stops and arrests.  *Vasquez Perdomo v. Noem*, No. 25-CV-05605 (C.D. Cal. Feb. 19, 2026).  *See also* Young Decl., Exs 14–16 (*ACLU, ACLU of Minnesota Sue Federal Government to End ICE, CBP's Practice of Suspicionless Stops, Warrantless Arrests, and Racial Profiling of Minnesotans*, ACLU of Mn. (Jan. 15, 2026); J. David McSwane & Hanna Allam, *"They Don't Care About Civil Rights": Trump's Shuttering of DHS Oversight Arm Freezes 600 Cases, Imperils Human Rights*, Pro Publica (Apr. 8, 2025); *US: ICE Abuses in Los Angeles Set Stage for Other Cities*, Hum. Rts. Watch (Nov. 4, 2025)).

31

Young Decl., Ex. 17.  Thus, if such court oversight is removed, as Defendants now request, there is a risk that MCSO may well resume what it was doing in 2009 and, as shown above, it would do so without a durable remedy that would prevent racial targeting of the Plaintiff class.

* * *

Sheriff Sheridan is the same person who oversaw, inflicted, lied about, and tried to conceal the constitutional violations committed by the MCSO prior to his departure from MCSO in 2017.  His attempted subversion of IA reform through the retaliation against Captain Lugo and defiance of the Court's backlog reduction order are daggers pointed at the heart of the Court's remedy for the constitutional violations previously committed by the Arpaio/Sheridan administration.  These facts refute Defendants' assertion that the MCSO "today looks nothing like the institution against which Plaintiffs brought suit" and that, "Things have changed."  Defs. Mot. 1:22, 12:18.  If Sheriff Sheridan and MCSO had succeeded in removing Captain Lugo from PSB, MCSO could have reverted to a regular practice of committing the same kinds of IA investigation abuses that Sheriff Sheridan committed or fostered while he was Chief Deputy, to the detriment of the Plaintiff class.  Plaintiffs are entitled to full implementation of reforms to prevent that from happening.

> **4.      The contract-law doctrine of "substantial compliance" is inapplicable here,  despite the United States' argument to the contrary.**

Plaintiff-intervenor[15] the United States incorrectly argues that the Court should apply the contract-law standard of "substantial compliance" to the County's pending Rule

---

[15] Over the past year, the United States has been acting more like a defendant-intervenor, despite the fact that the Attorney General was granted intervenor status to protect equal protection rights, *see* Docs. 1177, 1239 (motion seeking and order granting the United States intervenor status based on the Attorney General's authority to enforce the Fourteenth Amendment), and despite the fact that the Attorney General has no authority to intervene to defend against enforcement of the Fourteenth Amendment.  *See* 42 U.S.C. § 2000h-2 (granting the United States the right to intervene in a case instituted to enforce the Fourteenth Amendment and "entitl[ing the United States] to the same relief as if it (continued…)

60 motion, citing institutional reform cases involving consent decrees. Doc 3383 ("DOJ Brief") at 6:16–7:8:16, 8 n.4. It wrongly cites the Ninth Circuit case *Jeff D. v. Otter*, 643 F.3d 278, 283–84 (9th Cir. 2011), in which the Idaho official defendants sought relief from a consent order and the courts applied the standard of "substantial compliance" to determine whether to grant Rule 60 relief, DOJ Brief 4:23–5:3, and argues that the County "has achieved substantial compliance." DOJ Brief 6:15–16. Even if the County were correct in finding "substantial compliance", which it is not (*see* Sections IV.A.1–3 *supra*), the law that it cites is inapposite.

In *Jeff D.*, the parties and district court agreed that "substantial compliance" was the relevant standard because "consent decrees have many of the attributes of ordinary contracts and should be construed basically as contracts." *Jeff D.*, 643 F.3d at 283 (cleaned up) (emphasis added); *see also Horne*, 557 U.S. at 447–50 (discussing the dynamics of consent decrees). But the present case differs significantly from *Jeff D.* in a crucial respect: it does not involve a consent decree. In ruling on this Rule 60 motion, the Court should not apply a doctrine grounded in contract law, with attendant assumptions of parties dealing fairly and in good faith, particularly where, as here, one party has acted with "intransigence and contempt of the remedial order." Doc 1177 at 2:10 (the United States' motion to intervene).

The Ninth Circuit has cautioned against the error that the United States now urges, which is confusion between (1) the standard for civil contempt for disobedience of a court order, in which the "substantial compliance" test applies, and (2) the standard for Rule 60 relief from judgement, where it does not. See *Jeff D.*, 643 F.3d at 285 ("The district court's allocation of the burden and [substantial compliance] standard of proof would have been appropriate if the only issue had been whether the Defendants should be had instituted the action"); *see also Adarand Constructors Inc. v. Romer*, 174 F.R.D. 100, 101-102 (D. Colo. 1997) (holding that 42 U.S.C. § 2000h-2 does not give the United States the authority to intervene on behalf of defendants in a case instituted by a plaintiff seeking to enforce the Fourteenth Amendment). Plaintiffs do not waive the right to contest the continued intervenor status of the United States.

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR RELIEF FROM JUDGMENT UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)

held in contempt.  But that framework was not appropriate for determining whether the Defendants had sufficiently complied with the consent decrees so that they were entitled to have the decrees vacated." (footnote omitted)).  In the context of an ordinary injunction, "substantial compliance with a court order is a defense *to an action for civil contempt*."  *Coleman v. Newsom*, 131 F.4th 948, 956 (9th Cir. 2025) (cleaned up) (emphasis added).  But, in the different context of a Rule 60 motion for relief from an injunction, "substantial compliance" is not the proper standard.  *See also Coleman v. Brown*, 922 F. Supp. 2d 1004, 1029 (E.D. Cal. & N.D. Cal. 2013) (declining to apply *Horne* when there is no consent decree more protective than federal law).[16]

---

[16] The United States further cites two institutional-reform cases—*United States v. City of Detroit* and *United States v. City of New Orleans*—in which courts granted joint motions to terminate police-reform decrees.  DOJ Brief 8 n.4.  Both are fundamentally inapposite. In *City of Detroit*, the Monitor's final assessment identified several provisions not yet in full compliance, but those items were narrow, technical, and no longer indicative of any ongoing pattern of unconstitutional policing, and compliance was near-total.  City of Detroit Police Dept., Use of Force Consent Judgment Final Report at 10, No. 03-cv-72258, Doc. 724 (E.D. Mich. Aug. 13, 2014).  And, even so, the parties did not seek immediate termination, but instead jointly requested approval of a Transition Agreement, under which the Department of Justice would continue oversight—though without the Independent Monitor—to ensure the durability of reforms.  Order, *City of Detroit* Doc. 731 (Aug. 25, 2014).  In *City of New Orleans*, the district court granted Rule 60(b) relief only after approving a comprehensive, two-year Sustainment Plan designed to ensure the continued durability of reforms before termination.  Order and Reasons, *City of New Orleans*, No. 12-cv-01924, Doc. 822, at 5–6 (E.D. La. Jan. 14, 2025); *see infra* Section IV.D.  The New Orleans Police Department had become "a far different agency" due to its meaningful implementation of reforms addressing use of force, stops, searches, arrests, crisis intervention, and accountability systems.  *Id.* at 3.  Equally important, the court emphasized NOPD's affirmative commitment to transparency and self-correction, praising the Department's willingness to "take ownership of problems identified by community members" and to raise issues directly with the Monitor and the Court.  *Id.* at 4.  MCSO's record fundamentally distinguishes the present case from *Detroit* and *New Orleans*.

34

**B.      Defendants are also not entitled to relief under Rule 60(b)(6) because they have entirely failed to show the requisite "extraordinary circumstances."**

In addition to failing to meet its burden under Rule 60(b)(5), Defendants completely fail to make an argument justifying "extraordinary" relief under Rule 60(b)(6).  Their failure to advance an argument beyond mere citation of Rule 60(b)(6) is sufficient reason to deny their motion.  *See Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994) ("We will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim, particularly when, as here, a host of other issues are presented for review.").  Relief under Rule 60(b)(6) requires the movant to show "extraordinary circumstances."  *BLOM Bank*, 605 U.S. at 212–13 (9–0) (collecting cases).  There must be truly exceptional circumstances.[17]  Here, no such extraordinary circumstances exist.  Indeed, the County's moving papers characterize the County's conduct as part of a gradual process towards compliance with federal law, which is the ordinary course of conduct expected during institutional reform litigation.  *See* Defs. Mot. 11–14.  The work of complying with an injunction hardly amounts to a "manifest injustice" demanding an "equitable remedy."  *Hamilton v. Newland*, 374 F.3d 822, 825 (9th Cir. 2004) (quoting *Alpine Land*, 984 F.2d at 1049).  The County's motion for relief from the judgment should therefore be denied to the extent that it relies upon Rule 60(b)(6).

**C.      There are no valid federalism concerns that warrant grant of Defendants' motion.**

As the Court has previously observed:

Federalism concerns "are highly contextual and must be evaluated on a case-by-case basis." *Stone v. City & Cty. of S.F.*, 968 F.2d 850, 860 (9th Cir. 1992), *as amended on denial of reh'g* (Aug. 25, 1992).

---

[17] *See, e.g.*, *Klapprott v. United States.*, 335 U.S. 601, 613–14 (1949) (seriously ill, indigent incarcerated individual without counsel in denaturalization proceedings defending himself in multiple parallel cases); *Buck v. Davis*, 580 U.S. 100, 107, 123 (2017) (Black capital defendant whose attorney sought testimony that the defendant's race justified a heightened sentence).

. . . . "In employing their broad equitable powers, federal courts should 'exercise the least possible power adequate to the end proposed.'" *Id.* (quoting *Spallone v. United States*, 493 U.S. 265, 280 (1990)).  However, "when the least intrusive measures fail to rectify the problems, more intrusive measures are justifiable." *Id.*

"Federal courts possess whatever powers are necessary to remedy constitutional violations because they are charged with protecting these rights." *Id.*  "[O]therwise valid state laws or court orders cannot stand in the way of a federal court's remedial scheme if the action is essential to enforce the scheme." *Id.* at 862.

Doc. 1765 at 8:10–26.

The federalism concerns raised by Defendants and amicus Goldwater Institute, Doc. 3378, do not warrant dissolution of the remedial orders in this case at this time. Prior to the Second Order, "[t]he Court [had] previously fashioned less intrusive remedies, but those remedies were not effective due to Defendants' deliberate failures and manipulations." Doc. 1765 at 10:26–28.  The fact that (1) there have been multiple determinations of contempt and four successive remedial orders and (2) all appeals have been denied shows that the Court at all times has done no more than is absolutely necessary to remedy the constitutional violations to which Defendants have subjected the Plaintiff class.[18]

This case will end, of course, but only when there is a "durable remedy." *Horne*, 557 U.S. at 450.  At this time, given all the circumstances described above, such a "durable remedy" has not yet been achieved.  Continuation of the monitorship in this case would not be based on "40-year-old facts", as the Goldwater Institute fears.  Doc. 3378 at 9:10.  Rather, as the attempted Lugo transfer and the data discussed in the Monitor's

---

[18] The Court's gradualism resulted in part from MCSO's improper withholding of evidence prior to the 2012 trial.  Doc. 1677 ¶ 890 ("Had the . . . withheld evidence and the information to which it led been presented at trial, the Court would have entered injunctive relief much broader in scope.").

36

January 26, 2026 Quarterly Report (45th Monitoring Report 84–85, 98–99) illustrates, the facts still unfolding today warrant denial of Defendants' motion.

The general principle that "[d]ecisions about how to spend local tax revenues belong to local elected officials" (Defs. Mot. 15:16; Doc. 3378 at 1–24) does not help Defendants.  The Ninth Circuit addressed the cost issue in its 2018 decision rejecting Maricopa County's appeal of the Second Order.  There, the County contended "that the injunction constitutes an abuse of discretion in light of the costs of the remedies it imposes"; the Ninth Circuit responded:

> We disagree.  "[F]ederal courts have repeatedly held that financial constraints do not allow states to deprive persons of their constitutional rights."  *Stone v. City & County of San Francisco*, 968 F.2d 850, 858 (9th Cir. 1992).  Here, the "less intrusive remedies" in the first injunction "were not effective due to Defendants' deliberate failures and manipulations."  *Melendres*, 2016 WL 3996453, at *6.  Therefore, the additional costs imposed by the [S]econd [Order] were necessary to ensure MCSO's compliance with court orders.

*Melendres v. Maricopa County*, 897 F.3d 1217, 1222 (9th Cir. 2018).  The Ninth Circuit further held that:

> the County previously admitted its responsibility to remedy harm from MCSO's intentional misconduct in [*Melendres v. Maricopa County*, 815 F.3d 645, 650 (9th Cir. 2016)].  There, the County "concede[d] that it [was] required, by Arizona state statute, to provide funding for the massive changes the district court has imposed" and "conceded that . . . it would have . . . to bear the financial costs associated with complying with the district court's injunction."  *Id.*  It cannot change its position now.  See *Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 600–01 (9th Cir. 1996).

The circumstances have not sufficiently changed to make termination of the Court's remedy appropriate under Rule 60(b), for the reasons stated above.  The cost of that remedy provides no independent reason for such termination.[19]

---

[19] Raising an issue that no party asserts, Amicus Goldwater Institute complains about lack of public disclosure of the details of the monitoring costs.  Doc. 3378 at 3–7.  This issue (which is similar to the question of whether a sealed court filing should be unsealed) is (continued…)

Defendants argue in their motion that Court oversight "has the effect of dictating state or local budget priorities." Defs. Mot. 14 (citing *Horne*, 557 U.S. at 448). Defendants further argue "[w]hen a federal court orders that money be appropriated for one program, the effect is often to take funds away from other important programs." Id. But this argument has no factual support. Defendants have not proffered any evidence that oversight has in fact resulted in shifting budget priorities. To the extent Defendants are again seeking to invoke their previously asserted and now debunked assertion of costs in this matter, such argument should be precluded unless and until Defendants justify those expenses to the Plaintiffs and the Court—a justification Defendants have repeatedly declined to proffer.  See Doc. 3396.

Moreover, Defendants' previous misrepresentations as to compliance cost in filings in this case warrant additional skepticism of Defendants' assertion now that implementation of reforms has resulted in forced budget decisions. Defendants are asking the Court to assess the degree to which the injunctions "dictat[e] state or local budget priorities" when Defendants were found to have 1) proffered entirely unsubstantiated numbers regarding compliance costs for previous years, and 2) now refuse to participate in accurate cost allocations.  *See* Doc. 3396 at 4–6.  The Court has noted that "Defendants' arguments invoking federalism and tailoring concerns . . . ignores how the framing of cost allocations by Defendants' representatives has been used to call for an end to the implementation of the reforms ordered by this Court." *Id.* at 8–9.

Defendants' motion is a ripe occasion for the Court to observe that—despite a lengthy order to the contrary (Doc. 3396)—their representatives continue to trumpet demonstrably inflated compliance costs to the detriment of the Plaintiff class. Defendants' actions therefore support a denial of the instant motion not only for their inapposite federalism argument, but also for the ongoing harm they visit upon Plaintiffs

---

not relevant to the separate question, which is the one now posed, of whether Defendants have demonstrated that judicial supervision of the MCSO should be terminated.

at every opportunity outside their filings, thereby underscoring the need for continued court oversight.

**D.    The Court Must Reject Partial Termination, But Could Resolve Defendants' Motion with an Order to the Parties to Propose Reduced Monitoring of Certain Provisions, Consistent with the Objects of Its Remedial Orders.**

While the Court should also reject Defendants' alternative request to terminate individual provisions, a more measured relief could promote efficiency and progress towards establishing a durable remedy.  Plaintiffs respectfully submit that the Court could resolve Defendant's motion with an order directing the parties to meet and confer and, ultimately, report to the Court on a joint proposal for reducing monitoring of the paragraphs enumerated in the Appendix Re Selected Paragraphs From  Injunction Orders at the end of this brief ("Appendix").  Reduced monitoring, at least at first, should include things like less frequent reviews (e.g., once a year), lessening what evidence is necessary to demonstrate continued compliance, or MCSO assessing its own compliance with the Monitor auditing.  If successful, this could be a platform from which the Court can assure oversight and, possibly, further narrow the scope of monitoring as Defendants more successfully fulfill the Court's orders.

Reduced monitoring is the correct course, as opposed to entirely terminating oversight as to individual paragraphs.  First, unlike other police reform cases that address multiple distinct issues of unlawful policing (such as different categories of policing tactics), this case—and the totality of the remedies—focuses on addressing a single category of abuse (specifically unconstitutional stops and attendant searches and arrests). Where courts have proceeded with partial termination, they have found sustained compliance with remedial provisions aimed at distinct problems and concluded that termination of those provisions would not undermine ongoing enforcement of other provisions directed at different problems.[20]  In this case, though, all the remedies work to

---

[20] In the reform of the Alburquerque Police Department, for example, the court partially terminated provisions covering specialized units, hiring, and officer supports while (continued…)

ensure that MCSO's unlawful discrimination in traffic enforcement is sustainably eliminated.  The reforms collectively represent one inter-dependent ecosystem to remedy a singular problem. Second, partial termination is more likely to hurt and not help progress towards compliance.  Many noncompliant paragraphs are logically or procedurally tethered to the compliant ones.[21]  There are also compliant remedies that are fundamental to making monitoring possible.[22]  In other words, continued implementation of compliant paragraphs is necessary to accomplish the outstanding remedies.  Given these realities, partial termination would bring only limited efficiency gains along with a significant risk of undercutting continued needed oversight.

A focus on an appropriate subset of paragraphs enumerated in the Appendix, at least as an initial step, is the right approach to advance reform and avoid potential pitfalls. Plaintiffs propose starting only with paragraphs that are contained within sections or subsections of the Court's orders where all paragraphs are in advanced stages of compliance,[23] as well as paragraphs ordering discrete or technical remedies.[24]  This

---

maintaining authority over others focused on general policing (*e.g.*, use of force, mental health response) and accountability.  *See generally* Jt. Motion, Doc. 1022, *United States v. City of Alburquerque*, No. 1:14-cv-01025-JB-JFR (D.N.M. Oct. 27, 2023); Order, Doc. 1027, *United States v. City of Alburquerque*, No. 1:14-cv-01025-JB-JFR (D.N.M. Dec. 8, 2023) (granting the motion).  In the reform of the Seattle Police Department, the court partially terminated provisions related to "core commitments" (e.g., stops and detentions, crisis intervention) but maintained oversight over officer accountability and police crowd control tactics.  Order, Doc. 769, *United States v. City of Seattle*, No. C12-1282JLR, 2023 WL 5803364 (W.D. Wash. Sept. 7, 2023).

[21] For example, monitoring of MCSO's data protocols, staffing, analysis, and reporting is an essential part of validating Defendants' data monitoring efforts and their response to indicators of disparities. First Order ¶¶ 64–71.

[22] For example, the Compliance Implementation Division, First Order ¶¶ 9–13, is required for practically all other monitoring efforts.

[23] *See* Appendix (referring to ¶¶ 9–13 (Court Implementation Division); 21, 23, 27 (Policies & Procedures); and 35–40 (Pre-Planned Operations)).

[24] *See* Appendix (referring to ¶¶ 31 (P&P, policy delivery mechanism); 60, 61, 63 (Traffic Stop Documentation and Data Collection technical requirements); 77 (EIS, related to providing and maintaining equipment); 88, 101 (Supervision, but only related to specialized units that enforce immigration-related laws); and 273 (one-time training)).

judicious list ensures that regular monitoring continues for compliant paragraphs that are essential to ensure that the remedies they support continue to develop and function properly.  Moreover, having an initial conference limited to this preliminary list of paragraphs could help avoid major disagreements that harm collaboration and derail progress.  The experience of collaboratively narrowing compliance efforts on these paragraphs can also be a springboard from which the Parties and the Monitor learn lessons and develop practices that facilitate future discussions of reducing monitoring for other paragraphs.

## V.    CONCLUSION

The Court should deny Defendants' Rule 60(b) motion.  The time has not yet come to end judicial supervision of MCSO.  However, the Court can start the parties on a process that will result in reduction of monitoring as to those provisions where such reduction will not presage a return to MCSO's prior constitutional violations.

If the Court schedules oral argument on this motion, Plaintiffs respectfully request that there be three weeks or more notice of the hearing date, so that counsel for Plaintiffs who are out of state can arrange travel.

RESPECTFULLY SUBMITTED this 14th day of April 2026.

By: */s/ Stanley Young*
Stanley Young*
Peter W. Johnston*
Adam R. David*
Covington & Burling LLP

Christine K. Wee
Victoria Lopez
John Mitchell
ACLU Foundation of Arizona

Jenn Rolnick Borchetta*
Cecillia D. Wang*
ACLU Foundation

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR RELIEF FROM JUDGMENT UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)

Eduardo Casas*
Mexican American Legal Defense and
Educational Fund

Sebrina M. Shaw
Shaw Law Firm, P.L.L.C.

*Attorneys for Plaintiffs*

*Pro Hac Vice

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR RELIEF FROM JUDGMENT UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)

APPENDIX RE SELECTED PARAGRAPHS FROM INJUNCTION ORDERS

(First Order, Doc. 606, and Second Order, Doc. 1765)

First Order MCSO Implementation Unit and Internal Agency-Wide Assessment: Paragraphs 9-13.

- Paragraph 9 requires MCSO to form a Court Implementation Division (CID) that acts as a liaison between the parties and the Monitor and assists Defendants with implementation of and compliance with the Court's Orders. MCSO has been in full and effective compliance since 2018.
- Paragraph 10 requires the CID division to produce data and records for the Monitor. The CID division continues to provide documentation and is responsive to Monitor requests. MCSO has been in full and effective compliance since 2018.
- Paragraph 11 requires MCSO and the CID unit to file a quarterly report. MCSO has done so and has been in full and effective compliance since 2018.
- Paragraphs 12 and 13 require MCSO and CID to conduct a comprehensive internal assessment of policies and procedures affecting Patrol Operations regarding Discriminatory Policing and unlawful detentions in the field as well as overall compliance with the Court's Orders on an annual basis. MCSO has produced annual assessments with CID according to MCSO's Fiscal Year Cycle July 1 -June 30 and the reports are submitted before the 15th of September each year. MCSO has been in full and effective compliance since 2018.

First Order Policies and Procedures: Paragraphs 21, 23, 27 and 31.

- Paragraph 21 requires MCSO to create a department-wide policy prohibiting discriminatory policing and racial profiling. There has been training for this specific purpose in place since 2014. MCSO was found to be in full effective compliance in 2020.
- Paragraph 23 requires MCSO to ensure no inappropriate or unlawful communications are occurring on the email system and other County property. There have been checks performed to review the electronic communications by the Monitor. MCSO has been in full and effective compliance since 2018.
- Paragraph 27 requires MCSO to remove discussion regarding a specific policy that was removed. MCSO has been in full and effective compliance with this paragraph since 2019.
- Paragraph 31 requires MCSO to ensure all relevant MCSO patrol operation personnel review their responsibilities and any new policy or procedure, or changes to policy or procedure. Employees have access to MCSO's online training

43

software program and are regularly notified of updates. MCSO has been in full and effective compliance with this paragraph since 2019.

First Order Pre-Planned Operations: Paragraphs 35-40.

- Paragraph 35 requires the Monitor to review the mission statement policies and operation documents of any specialized unit within MCSO that enforces immigration-related laws to ensure compliance with the Constitution and the laws of the United States and Arizona. There are no specialized units in MCSO that are enforcing immigration-related laws at this time. MCSO has been in full and effective compliance since 2018 with this paragraph.

- Paragraph 36 requires MCSO to ensure any significant operations or patrols are initiated and carried out in a race neutral fashion. Additional protocol is required and that must be provided to the Monitor in advance of any significant operation or patrol. There have not been such operations since 2014. MCSO has been in full and effective compliance since 2018.

- Paragraph 37 requires MCSO to submit a standard template for operations plans and standard instructions applicable to all significant operations or patrols. There have not been any such operations since 2014. MCSO has been in full and effective compliance with this paragraph since 2018.

- Paragraph 38 requires MCSO to create additional documentation when conducting significant operations or patrols involving 10 or more MCSO personnel excluding posse members. There have not been any such operations since 2014. MCSO has been in full and effective compliance since 2018.

- Paragraph 39 requires MCSO to hold a community outreach meeting after any significant operations or patrols in the affected districts. There have not been any such operations since 2014. MCSO has been in full and effective compliance since 2021.

- Paragraph 40 requires MCSO to notify the Monitor and Plaintiffs within 24 hours of any immigration related traffic enforcement activity or significant operation involving the arrest of five or more people. There have not been any such operations since 2014. MCSO has been in full and effective compliance with this paragraph since 2018.

Traffic Stop Documentation and Data Collection: Paragraphs 60, 61, and 63.

- Paragraph 60 requires MCSO to develop a system to collect traffic stop data electronically and that is capable of certain functions like generating reports and analysis. While there are ongoing issues surrounding what data is being captured

44

in the system, the system exists. MCSO has been in full and effective compliance since 2018.

- Paragraph 61 requires MCSO to issue functional audio and video recording equipment to patrol deputies and sergeants who make traffic stops. Regular maintenance of such equipment is to also be conducted. MCSO has been in full and effective compliance with its issuance of body worn cameras and maintenance of recordings since 2023.

- Paragraph 63 requires MCSO to retain traffic stop written data for a minimum of 5 years after it is created and to retain in car camera recordings for a minimum of three years unless the case involves a traffic stop that remains under investigation. MCSO was to develop a formal policy to ensure proper use of body worn cameras and recordings. MCSO has been in full and effective compliance since 2020 with this requirement.

First Order Early Identification System: Paragraph 77.

- Paragraph 77 requires MCSO to maintain equipment to facilitate its EIS. MCSO has been in full and effective compliance with this paragraph since 2018.

First Order Supervision and Evaluation of Officer Performance: Paragraphs 88 and 101.

- Paragraph 88 requires additional supervisory measures for specialized units enforcing immigration-related laws. MCSO currently does not have any specialized units that enforce immigration related laws. MCSO has been in full and effective compliance since 2018 with this paragraph.

- Paragraph 101 requires MCSO to implement eligibility criteria for assignments to specialized units enforcing immigration-related laws. MCSO currently does not have any specialized units that enforce immigration related laws. MCSO has been in full and effective compliance with this paragraph since 2018.

Second Order Additional Training: Paragraph 273.

- Paragraph 273 requires MCSO to implement additional training within two months to ensure all employees are briefed and presented with terms of the Second Order along with relevant background information about the May 13, 2016 Findings of Fact (Doc. 1677). MCSO provides training to all employees and personnel through CID regarding this information. MCSO has been in full and effective compliance since 2020.

**CERTIFICATE OF SERVICE**

I hereby certify that on April 14, 2026, I had the attached document electronically transmitted to the Clerk's office using the CM/ECF System for filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail as indicated on the Notice of Electronic Filing.

*/s/ Stanley Young*

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR RELIEF FROM JUDGMENT UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)