# EXHIBIT B

# Expert Report of Emma Pierson re *Melendres v. Sheridan*

March 20, 2026

1

**Professional Background:**

I am the Zhang Family Endowed Professor and an assistant professor of computer science at the University of California, Berkeley. I received my PhD in computer science from Stanford University; a MS by research in Statistics from Oxford University; and a BS in Physics from Stanford University. A major thread of my research develops statistical methods to test for bias in decision-making broadly and policing specifically.[1]

**Materials reviewed:**

I reviewed the following materials and resources in preparing this report:

1. MCSO's publicly posted Traffic Stop Annual Reports (TSARs) and Traffic Stop Quarterly Reports (TSQRs), particularly TSARs 9 and 10 (as well as their supplementary appendices) and TSQRs 13 and 17.
2. Other reports of data analysis created by MCSO, including:
   a. MELC1459213-1459286_Para65, 66, 67, 74 FEB16 Items.pdf
   b. MELC1229527-1229531_Para65, 67, 74 OCT15 Memo.pdf
   c. MELC1440358-1440363_Para65, 67, 74 DEC15 Items.pdf
   d. MELC1450118-1450124_Para65, 67, 74 JAN16 Items.pdf
   e. MELC1590273-MELC1590278_P65, 66, 67, 74 JUNE2016 Ret Mem.pdf.pdf
   f. MELC1601770-MELC1601775_Response memorandum to paragraph 65 66 67 74 dtd 08032016.pdf.pdf
   g. MELC1630996-MELC1631002_Response memorandum to paragraph 65 66 67 74 dtd 09132016.pdf.pdf
   h. MELC1642579-MELC1642585_Response memorandum to paragraph 65 66 67 74 dtd 10062016.pdf.pdf
   i. MELC1679483-MELC1679489_Response memorandum to paragraph 65 66 67 74 dtd 11102016.pdf.pdf
   j. MELC1722317-MELC1722323_Response memorandum to paragraph 65 66 67 74 dtd 01092017.pdf.pdf
   k. P65, 66, 67,74 February 2023 EIU Ret Form.pdf
   l. P65, 66, 67,74 February 2024 EIU Ret Form.pdf
   m. P65,66,67,74,MAR2024,BIO,Return.pdf
   n. MELC207410_MAR2015Traffic Stop Matrix Checklist(1).xlsm
3. Raw individual-stop-level monthly Excel data files from 2022 - 2025, as well as an accompanying data dictionary (MELC5082272 2025-04-08_TSAU DATA DICTIONARY 217 Variables.xlsx).

---

[1] Gera and Pierson. "Testing for racial bias using inconsistent perceptions of race." *Science Advances* 11.47 (2025): eadx5829.
Franchi, Zamfirescu-Pereira, Ju, and Pierson. "Detecting disparities in police deployments using dashcam data." *Proceedings of the 2023 ACM Conference on Fairness, Accountability, and Transparency*. 2023.
Pierson et al. "A large-scale analysis of racial disparities in police stops across the United States." *Nature Human Behaviour* 4.7 (2020): 736-745.
Pierson, Corbett-Davies, and Goel. "Fast threshold tests for detecting discrimination." *International Conference on Artificial Intelligence and Statistics*. PMLR, 2018.

4. The ETSI reference sheet
5. Processed individual-stop-level (.dta) files that MCSO relied on in preparing its TSARs, as well as the .do and .R files needed to reproduce their analysis. These were the primary data source I made use of in my report, since they are closest to the data that MCSO uses. My analysis focused on the data underlying TSARs 9 and 10.
6. The following correspondence between MCSO, the Plaintiffs, the Department of Justice, and the Monitor.
   a. 2022.6.30 -- TSQR6 -- DOJ Letter.pdf
   b. 2022.6.30--TSQR 6--DOJ Response Memo.pdf
   c. 2022.10.20-- DOJ to MCSO--TSQR 7.pdf
   d. 2022-11-22 MCSO-Melendres - Response Letter to Nancy Glass re TSQR Issues(9698775.1).pdf
   e. MCSO 2022 Traffic Stops Analysis Report.Plfs' Comments.docx
   f. 2023-12-12 MELC4421208 TSQR13_Proposal_ETSI Use Monitor Plaintiffs DOJ_DR.docx
   g. MELC4877181 TSQR17_Proposal_ETSIs Round 2 12132024_Plaintiffs_Round_2 - Copy.docx
   h. Letter to ACLU Re ETSIs.pdf
   i. MELC5454020 TSQR21_Proposal Round 3_PlaintiffsComments.docx
   j. Plaintiff proposal re ETSIs 12.17.2025.pdf
7. The Motion for Relief from Judgment.
8. I also used standard academic research aids including Google Search and Scholar, OpenAI's ChatGPT and Deep Research; Anthropic's Claude; Cursor's Interactive Development Environment; and Python libraries including pandas, statsmodels, and scikit-learn, among others.

**Summary:**

I examined racial disparities in three outcomes — search rate, arrest rate, and stop duration — by analyzing the raw data, the TSARs, and the TSQRs. I found substantial, statistically significant racial disparities in all three outcomes. These conclusions were robust to using alternate statistical models and many sets of controls. I describe this analysis in detail in Section 1. In Section 2, I critique MCSO's analysis of these three outcomes, explaining how errors and non-standard analytic choices undermine their analyses of each outcome.

Section 1: Analysis of disparities
  Section 1.1: Methodology
    Section 1.1.1: Data analyzed
    Section 1.1.2: Outcomes analyzed
    Section 1.1.3: Statistical modeling
    Section 1.1.4: Racial groups analyzed
    Section 1.1.5: Variables controlled for
  Section 1.2: Results
    Section 1.2.1: Racial disparities in stop duration
    Section 1.2.2: Racial disparities in search rate
    Section 1.2.3: Racial disparities in arrest rate
  Section 1.3: Discussion
Section 2: Critique of methodology in TSARs 9 and 10
  Section 2.1: Analysis of search rate
  Section 2.2: Analysis of arrest rate
  Section 2.3: Analysis of stop duration
    Section 2.3.1: The coding of ETSIs is inconsistent and potentially biased.
      Section 2.3.1.1: Inconsistency across time
      Section 2.3.1.2: Inconsistency across racial groups
      Section 2.3.1.3: Review of body-worn camera (BWC) footage is statistically flawed
      Section 2.3.1.4: Keyword search and stop length analysis identify inconsistencies in ETSI use
      Section 2.3.1.5: Temporal and racial inconsistencies in ETSI use are not explained by stop comments
    Section 2.3.2: Even if ETSIs were consistently coded, MCSO's use of ETSIs in subsequent statistical analysis of stop duration is inappropriate
  Section 2.4: General statistical concerns about MCSO's analysis and reporting
    Section 2.4.1: Analysis and reporting of changes over time are flawed.
    Section 2.4.2: Important details of supplementary analyses are not explained.
  Section 2.5: Summary of concerns
Appendices
  Appendix A: Comparison of propensity score matching and regression
  Appendix B: Analysis using logit models
  Appendix C: Additional analyses of stop duration
  Appendix D: Additional details on ETSI comment model

4

# Section 1: Analysis of disparities

## Section 1.1: Methodology

Here I describe the choices I made in analyzing the data and the motivation for them.

### Section 1.1.1: Data analyzed

I analyzed 2023-2024 stop data using the same datasets MCSO used to produce TSARs 9 and 10: specifically, the .dta files produced by their data processing code.[2] I focused on these datasets for two reasons: first, I wanted to ensure my conclusions were as comparable to MCSO's as possible, and any differences stemmed from decisions around statistical analysis, as opposed to differences in the data we analyzed. Second, I wanted to ensure the data I was working with was as clean and reliable as possible. Policing data often contains many idiosyncrasies and errors, and MCSO has put substantial time and expertise into mitigating these: for example, their data processing code corrects many individual stop records where the deputy incorrectly recorded that a search or arrest was conducted, and I wanted to ensure these corrections were included in my analysis. In total, my analysis dataset consisted of 38,897 stops: 18,632 from 2023 and 20,265 from 2024. These numbers are identical to those reported in TSARs 9 and 10, respectively.

To ensure I was correctly interpreting the data, I verified that I could reproduce many of MCSO's descriptive data statistics. Specifically, I reproduced the figures and tables in TSARs 9 and 10 describing distributions of variables relevant to my analysis, including stops by driver race; by driver gender; by month; by hour; by stop length; by usage of each ETSI; by special assignment status; by stop classification; by violation category; by search and non-incidental search status; and by arrest. I also reproduced various other aspects of MCSO's conclusions; I describe these where relevant below.

The primary focus of my report is MCSO's statistical analysis, not their data processing decisions. However, as one check on their data processing, I did verify that I could closely (though not identically) reproduce many of the descriptive statistics above when I wrote my own code to process the raw monthly data (as opposed to MCSO's processed data). Some discrepancies are expected due to the fact that, as noted above, MCSO made some corrections to the raw data based on review of body-worn camera (BWC) footage and other data sources not present in the raw data; I discuss some other discrepancies where relevant throughout. However, in general, the two datasets are very similar. Overall, I gave MCSO the benefit of the doubt that their data processing is correct and began my analysis from the same data they did.

### Section 1.1.2: Outcomes analyzed

I analyzed disparities in three outcomes: search rates, arrest rates, and stop duration. I analyzed search rate and arrest rate because they are standard outcomes assessed in prior

---

[2] The data files were "MELC4670141 TSAR9_Dataset - AEO - CONFIDENTIAL.dta" and "MELC5125652 TSAR10_Dataset_Cleaned_pscores1-AEO Confidential.dta".

work[3], and also in the TSARs. I analyzed stop duration because it is a major focus of the past TSARs.

I defined the arrest rate using whether the driver was arrested, similar to MCSO. I defined the search rate using both driver and vehicle searches (as does MCSO); importantly, unlike MCSO, I did not exclude searches that were incident to arrests or tows (I refer to these searches, below, as "incidental searches"). I did not exclude incidental searches in computing the search rate for several reasons which I briefly summarize here and discuss in greater detail in Section 2. First, excluding searches incident to arrest risks obscuring important disparities, since the decision to arrest the driver is itself a decision that may result from racial bias. If, for example, racial bias results in an arrest rate that is twice as high for Black drivers as white drivers, but searches incident to arrest are entirely excluded, this racial bias will remain invisible when excluding incidental searches. Second, the vast majority of searches are incidental searches, so excluding these searches means failing to analyze racial disparities in the vast majority of searches. Excluding incidental searches also means that very few searches can be analyzed at all, significantly reducing the ability to meaningfully quantify racial disparities. Because I analyze all searches, while MCSO analyzes only non-incidental searches, there are significant differences in our conclusions.

### Section 1.1.3: Statistical modeling

I used regression models to quantify racial disparities in the aforementioned outcomes with various sets of controls (described below). Regression models are widely used both in econometric and social science modeling generally[4] and in the analysis of policing data specifically[5] due to their transparency, robustness, and convenient and well-understood theoretical properties. MCSO relies on propensity score matching (PSM), as opposed to regression, to control for confounding variables; both these approaches are widely used, conceptually similar in their goals, and acceptable in this setting.[6] Linear regression estimates racial disparities by including race as a predictor of the outcome alongside other factors,

---

[3] Anwar and Fang. "An alternative test of racial prejudice in motor vehicle searches: Theory and evidence." *American Economic Review* 96.1 (2006): 127-151.
Simoiu, Corbett-Davies, and Goel. "The problem of infra-marginality in outcome tests for discrimination." (2017): 1193-1216.
Baumgartner et al. "Targeting young men of color for search and arrest during traffic stops: evidence from North Carolina, 2002–2013." *The Politics of Protest*. Routledge, 2020. 188-212.
Gera and Pierson. "Testing for racial bias using inconsistent perceptions of race." *Science Advances* 11.47 (2025): eadx5829.
Pierson et al. "A large-scale analysis of racial disparities in police stops across the United States." *Nature Human Behaviour* 4.7 (2020): 736-745.
Knowles, Persico, and Todd. "Racial bias in motor vehicle searches: Theory and evidence." *Journal of Political Economy* 109.1 (2001): 203-229.
[4] Angrist and Pischke. *Mostly Harmless Econometrics: An Empiricist's Companion*. Princeton University Press, 2009.
[5] Gelman, Fagan, and Kiss. "An analysis of the New York City police department's "Stop-and-Frisk" policy in the context of claims of racial bias." *JASA* 102.479 (2007): 813-823.
Antonovics and Knight. "A new look at racial profiling: Evidence from the Boston Police Department." *The Review of Economics and Statistics* 91.1 (2009): 163-177.
Goncalves and Mello. "A few bad apples? Racial bias in policing." *American Economic Review* 111.5 (2021): 1406-1441.
Pierson et al. "A large-scale analysis of racial disparities in police stops across the United States." *Nature Human Behaviour* 4.7 (2020): 736-745.
Goel, Rao, and Shroff. "Precinct or prejudice? Understanding racial disparities in New York City's stop-and-frisk policy." (2016): 365-394.
[6] Angrist and Pischke. *Mostly Harmless Econometrics: An Empiricist's Companion*. Princeton University Press, 2009.

attempting to control for those factors to isolate race's association with the outcome. Propensity score matching instead estimates each individual's probability of belonging to a given racial group (their "propensity score") based on observed factors, then matches individuals across racial groups with similar propensity scores so that any remaining difference in outcomes can be more directly attributed to race rather than to differences in other factors. In order to ensure that this difference in methodology (PSM versus regression) was not the primary reason for any discrepancy between my results and MCSO's, I verified that, when using regression and the same set of controls that MCSO does, I achieved qualitatively similar estimates of racial disparities to those MCSO reports[7] in TSAR 10 using PSM. I also verified that my own results remained similar when using PSM as opposed to regression. (See Appendix A for further details.) Overall, this shows that the use of PSM versus regression is not the main reason that my conclusions differ from MCSO's; other analytic decisions (that I describe below) contribute much more significantly to the discrepancies in results.

I used linear regression to model all three outcomes (searches, arrests, and stop duration) because it results in regression coefficients with easily-interpretable units. Because search and arrests are binary outcomes, this corresponds to fitting a linear probability model. (In Appendix B, I verify that using models designed for binary outcomes — specifically, logit models — yields similar results for both these outcomes.)

The model specification I use in my analysis is:

$$y = \alpha + \beta \cdot X + \delta \cdot r + \varepsilon$$

where $y$ is the outcome; $X$ is a vector of controls (discussed below); $r$ is the driver race; $\alpha$ is a fitted intercept; $\beta$ are the coefficients on controls; $\delta$, the coefficient of primary interest, estimates the magnitude of racial disparities; and $\varepsilon$ is a noise term. For race $r$ I test two specifications (described in greater detail below); one in which race is encoded as a categorical variable with one category for each race group (and white as the base level to which all other race groups are compared), and one in which race is a binary variable that encodes whether the driver is a racial minority ($r = 1$) or white ($r = 0$). In all cases, positive values of $\delta$ indicate disparities disfavoring minorities.

Throughout my analysis, I report whether coefficients are statistically significant at the standard threshold of $p < 0.05$. Statistical significance combines two things: how large a disparity is, and how much data is used to measure it. In small samples, even large disparities may not be statistically significant, and in large samples, even tiny disparities that do not matter practically may be statistically significant. For example, even if the search rate for minority drivers is triple that for white drivers (a practically significant disparity) this gap may not be statistically significant if very few searches are conducted; on the other hand, a search rate of 4.0% for minority drivers, and 4.1% for white drivers, may not be a practically important disparity, but will eventually be statistically significant if enough data is gathered.  Because of this, it is generally

---

[7] Specifically, in Tables 4 (stop length) and Table 7 (arrests).

best practice to assess not just statistical significance, but whether a disparity is large enough to matter practically.[8] I do so throughout the report below.

It is also useful to comment briefly on analyses I did *not* perform, and the motivation for excluding them. I did not analyze search outcomes (i.e., whether the search found contraband) because, in performing these analyses, it is standard to filter for non-incidental (discretionary) searches[9], and very few of these occur, making this analysis very imprecise. I did not analyze citations in order to focus in more detail on the three outcomes I do analyze; MCSO's own analysis (see, for example, Figure 14 in TSAR 10) finds disparities in citations that generally disfavor minority drivers after adjustment for controls, though these disparities are not always statistically significant. Although citations would be a useful additional outcome to potentially analyze, the three outcomes analyzed here already provide concerning evidence of disparities.

Finally, I did not analyze stop rates per capita (e.g., the number of stops by race relative to the driving-age population) because simply comparing to the driving-age population does not account for racial differences in driving behavior (e.g., time spent driving or violation of traffic laws), making it a highly imperfect measure of racial disparities. One solution to this issue is the veil-of-darkness test; however, because this test analyzes only a small subset of stops (those that occur near sunset), it yields imprecise results on datasets of this size.[10]

### Section 1.1.4: Racial groups analyzed

I analyzed three types of racial disparities: (1) between Black and white drivers; (2) between Hispanic and white drivers; and (3) between all minority drivers and white drivers. In all three cases, I fit the regression models using data from drivers of all races and reported the regression coefficient that captured the relevant racial comparison.

### Section 1.1.5: Variables controlled for

The question of which factors to control for is core to the analysis of disparities. It is well-appreciated that including too few controls can fail to capture relevant context, and thus fail to provide a meaningful measure of disparities. Less well-appreciated is the fact that including

---

[8] Wasserstein and Lazar. "The ASA statement on p-values: context, process, and purpose." *The American Statistician* 70.2 (2016): 129-133. See in particular principle 5: "**A p-value, or statistical significance, does not measure the size of an effect or the importance of a result.** Statistical significance is not equivalent to scientific, human, or economic significance. Smaller p-values do not necessarily imply the presence of larger or more important effects, and larger p-values do not imply a lack of importance or even lack of effect. Any effect, no matter how tiny, can produce a small p-value if the sample size or measurement precision is high enough, and large effects may produce unimpressive p-values if the sample size is small or measurements are imprecise. Similarly, identical estimated effects will have different p-values if the precision of the estimates differs."

[9] Hetey, Monin, Maitreyi, and Eberhardt. Data for change: A statistical analysis of police stops, searches, handcuffings, and arrests in Oakland, Calif., 2013-2014. Technical report, Stanford University, SPARQ: Social Psychological Answers to Real-World Questions (2016).
Pierson et al. "A large-scale analysis of racial disparities in police stops across the United States." *Nature Human Behaviour* 4.7 (2020): 736-745.

[10] Grogger and Ridgeway. "Testing for racial profiling in traffic stops from behind a veil of darkness." *Journal of the American Statistical Association* 101.475 (2006): 878-887.

*too many controls* ("bad controls"[11]) can also distort conclusions.[12] *Mostly Harmless Econometrics*, a canonical textbook in this area, explains this point:

"More control is not always better. Some variables are bad controls and should not be included in a regression model…bad controls are variables that are themselves outcome variables in the notional experiment at hand. That is, bad controls might as well be dependent variables too."

Applied to our context, this implies that when assessing racial bias in post-stop outcomes, it is imperative to not control for other post-stop outcomes that might themselves be the product of racial bias. For example, one would not be reassured by the declaration that "Disparities in stop lengths disappear when controlling for whether the officer used force," since the latter is a post-stop outcome that might itself be the product of bias. Less hypothetically, MCSO's decision to control for searches and arrests in their analysis of stop duration is a canonical example of this error: searches and arrests are post-stop outcomes that in other analyses are used as dependent variables due to concerns that they may suffer from racial bias.

In determining what controls to include, I followed the following procedure:

1. I began by considering two sets of controls: first, the set of controls we have used in our past work analyzing racial disparities in police stops across the United States[13] and second, the controls discussed in the most recent TSAR (TSAR 10) in the analysis of the three outcomes we analyze — searches, arrests, and stop duration. The first set is less detailed than the second because it is limited to the variables that are widely available across states.
2. For each possible control, I erred on the side of including it so I could examine how results differed depending on whether it was included. Below, I present results with (1) no controls; (2) each control added individually; and (3) all controls together, in order to transparently reveal how results vary depending on which controls are included.
3. I excluded only controls that were inarguably "bad controls" as discussed above – for example, searches and arrests.

This process resulted in the following controls, some of which are more detailed than those MCSO includes:

1. *Stop date and time*. I included categorical variables for stop year; stop month; stop day of week; and stop hour (binned into 8 3-hour categories). This is a more detailed set of

---

[11] Angrist and Pischke. *Mostly Harmless Econometrics: An Empiricist's Companion*. Princeton University Press, 2009.
Jung, Jongbin, et al. "Mitigating included-and omitted-variable bias in estimates of disparate impact." Working paper, 2018.
[12] Acharya, Blackwell, and Sen. "Explaining causal findings without bias: Detecting and assessing direct effects." *American Political Science Review* 110.3 (2016): 512-529.
Montgomery, Nyhan, and Torres. "How conditioning on posttreatment variables can ruin your experiment and what to do about it." *American Journal of Political Science* 62.3 (2018): 760-775.
[13] Gera and Pierson. "Testing for racial bias using inconsistent perceptions of race." *Science Advances* 11.47 (2025): eadx5829.
Pierson et al. "A large-scale analysis of racial disparities in police stops across the United States." Working paper, 2017.

controls than MCSO uses: they control for stop time, but do not include any controls for stop date.

2. *Driver gender and age*. I encoded this as an interaction between driver gender and categorical driver age (divided into 10-year bins). This is a more detailed set of controls than MCSO uses: they control for driver gender but not for driver age.

3. *Stop location*. I included 3rd-order polynomials in latitude and longitude (and all interaction terms). This is similar to MCSO's use of 5th-order splines to flexibly control for location; I confirmed that I got similar results when using 5th-order splines. (I did not use splines in my primary specification because it caused convergence problems for the logistic regression models I use as a robustness check in Appendix B.)

4. *Driver license plate state.* Following MCSO's own convention, I encoded this as whether the driver had an out-of-state plate. Plaintiffs have previously raised the concern that it is unclear why whether the driver has an out-of-state-plate should be related to post-stop outcomes; I agree with this concern, but erred on the side of including this control to assess its effects.

5. *Call sign category.* I used the same six call sign categories used by MCSO, which capture information about the deputy's assignment (e.g., normal patrol, Lake Patrol, or off-duty assignment).

6. *Whether the stop took place as part of a special assignment.* I used the same three special assignment categories used by MCSO: DUI Task Force, Aggressive Driver Task Force, and Click-It-or-Ticket Task Force.

I excluded the following controls that are used in the most recent TSAR (TSAR 10) for analysis of the three outcomes I examine (stop length, searches, and arrests):

1. *Whether the stop involved a search or arrest.* MCSO includes these variables in their analysis of stop duration. I did not include searches and arrests because they are, by the reasoning above, bad controls.

2. *Stop classification.* Stop classification is operationalized by MCSO as civil traffic stops versus all others. MCSO does not use this variable in their analysis of arrests in TSAR 10, although they used it in prior years and continue to use it for analyses of stop duration and searches. Their reason for removing this variable in analyses of arrests is that "all stops classified as criminal are also arrests", meaning that this variable essentially encodes arrests. But if that is the case, this variable should not be included for the same reason that arrests should not be included: both are bad controls. There are also other data quality concerns about this variable, as I discuss further below. For these reasons, I do not believe Stop Classification should be used in analyses of any of the three outcomes; however, as an additional robustness check, I do test the effect of including it in analyses for stop duration and searches, where it does not have a large effect on results. Following MCSO, I do not use this variable in any analyses of arrests.

## Section 1.2: Results

Here, I report the regression results for racial disparities in the three outcomes examined, combining all data across 2023 and 2024.

Section 1.2.1: Racial disparities in stop duration



In this plot, each point shows the regression estimate for racial disparities for one racial group (Black, Hispanic, or all drivers) compared to white drivers. Positive values on the horizontal axes indicate disparities that disfavor minorities; zero indicates no disparities; and negative values (which do not occur in this plot) would indicate disparities that favor minorities. To show how the results vary depending on which controls are included, I plot results with different controls on the vertical axis: "None" includes no controls, corresponding to the raw racial disparities, and "All" includes all controls. The lines around each point indicate the 95% confidence interval for the regression estimate (computed using heteroskedasticity-robust standard errors[14]); if these confidence intervals intersected zero, that would indicate a lack of statistically significant disparities.

**For all racial groups, and for all sets of controls, this regression analysis finds statistically significant and substantively large disparities in stop duration.** These disparities are larger for Hispanic drivers than for Black drivers, with disparities for all minority drivers falling somewhere in between. These disparities are smaller when all controls are included, but remain highly statistically significant. Overall, with no controls, the disparity for Hispanic drivers is 6.6 minutes (95% CI 6.0 minutes - 7.2 minutes, p < 0.001); the disparity for Black drivers is 4.0 minutes (95% CI 3.2 minutes - 4.8 minutes, p < 0.001); and the disparity for all minority drivers is 5.6 minutes (95% CI 5.1 minutes - 6.1 minutes, p < 0.001). With all controls, the disparity for Hispanic drivers is 4.7 minutes (95% CI 4.0 minutes - 5.3 minutes, p < 0.001); the disparity for Black drivers is 1.3 minutes (95% CI 0.5 minutes - 2.2 minutes, p = 0.002); and the disparity for all minority drivers is 3.6 minutes (95% CI 3.1 minutes - 4.1 minutes, p < 0.001). (Appendix A shows that results remain similar when using propensity score matching, as opposed to regression: in particular, the estimated disparities are extremely similar, although the confidence intervals become somewhat wider, so the disparity for Black drivers is no longer statistically significant.)

These disparities are not only statistically significant but substantively large in magnitude. To quantify this, I computed the *relative disparity*: that is, the ratio of the regression estimate to the

---

[14] Angrist and Pischke. *Mostly Harmless Econometrics: An Empiricist's Companion*. Princeton University Press, 2009.

average stop duration for white drivers. For example, a relative disparity of 20% for Hispanic drivers would mean that stops are 1.2x longer for Hispanic drivers than for white drivers. For Hispanic drivers, the relative disparity in stop duration is 33% with all controls and 46% without controls; for Black drivers it is 9% with all controls and 28% without any controls; and for all minority drivers it is 25% with all controls and 39% without any controls.

Two other points on the plot should be highlighted. First, results are similar regardless of whether controlling for latitude and longitude using a cubic regression ("Lat/Long" specification) or a spline, as MCSO does ("Lat/long (spline)"); I thus favor the former because it yields improved convergence for the logistic regression models discussed in Appendix B. Second, inclusion of the "stop classification" variable somewhat reduces, but does not hugely reduce, estimates of disparities. As discussed in Section 1.1.5, I do not believe it is appropriate to include this variable for two reasons: first, MCSO notes that it is essentially a proxy for arrests, meaning that it is a bad control for the same reason that arrests are a bad control. Second, the recording of the Stop Classification variable seems potentially unreliable: the fraction of stops classified as civil versus criminal traffic varied across different versions of the same dataset I was given access to, suggesting discrepancies in how it is recorded, and I was also unable to reproduce MCSO's statement that "all stops classified as criminal are also arrests". For both these reasons, I do not believe that Stop Classification should be used as a control; nonetheless, it is reassuring that its inclusion does not greatly change results.

Section 1.2.2: Racial disparities in search rate



The plot above displays the results of the regression analysis for search rate.

**For Hispanic and all minority drivers, this regression analysis finds statistically significant and substantively large disparities in search rate for all sets of controls; for Black drivers, the disparities are not statistically significant when including all controls.** With no controls, the disparity for Hispanic drivers is 4.6% (95% CI 4.1% - 5.1%, p < 0.001); the disparity for Black drivers is 1.9% (95% CI 1.3% - 2.5%, p < 0.001); and the disparity for all minority drivers is 3.6% (95% CI 3.2% - 4.0%, p < 0.001). With all controls, the disparity for Hispanic drivers is 3.5% (95% CI 3.0% - 4.0%, p < 0.001); the disparity for Black drivers is 0.5%

(95% CI -0.2% - 1.1%, p > 0.05); and the disparity for all minority drivers is 2.5% (95% CI 2.1% - 2.9%, p < 0.001).

For Hispanic and all minority drivers, these disparities are large relative to the search rate for white drivers (1.4%). For Hispanic drivers, the *relative* disparity in search rate (i.e., the ratio of the Hispanic-white disparity to the white search rate) is 336% with no controls, and 256% with all controls – put another way, the Hispanic-white *disparity* in the search rate is more than twice as big as the white search rate. For all minority drivers, the relative disparity is 267% with no controls, and 184% with all controls. For both Hispanic and minority drivers, the disparity in search rate exceeds the search rate for white drivers, indicating a substantively large racial disparity.

Appendix A shows that results remain similar when using propensity score matching, as opposed to regression: the estimated disparities are very similar, and statistically significant for Hispanic and minority drivers but not for Black drivers, as in our primary regression analysis. Because search is a binary outcome, Appendix B repeats this analysis using a logit model rather than a linear model, reaching similar conclusions: the only notable difference is that with the logit model, racial disparities remain statistically significant for Black drivers even when including all controls. Finally, as with stop duration, inclusion of "Stop Classification" as a variable (though not, in my opinion, appropriate) does not greatly change results; similarly, results are similar regardless of whether or not location splines are used.

## Section 1.2.3: Racial disparities in arrest rate



The plot above displays the results of the regression analysis for arrest rate. (In this analysis, I omit stop classification as a control, as does MCSO.)

**For all racial groups, and for all sets of controls, this regression analysis finds statistically significant and substantively large disparities in arrest rate.** With no controls, the disparity for Hispanic drivers is 3.3% (95% CI 2.7% - 3.9%, p < 0.001); the disparity for Black drivers is 3.5% (95% CI 2.5% - 4.5%, p < 0.001); and the disparity for all minority drivers is 3.2% (95% CI 2.7% - 3.7%, p < 0.001). With all controls, the disparity for Hispanic drivers is

2.0% (95% CI 1.3% - 2.7%, p < 0.001); the disparity for Black drivers is 2.0% (95% CI 1.0% - 3.0%, p < 0.001); and the disparity for all minority drivers is 1.9% (95% CI 1.3% - 2.5%, p < 0.001).

These disparities are substantively large relative to the arrest rate for white drivers (4.6%). For Hispanic drivers, the relative disparity in arrest rate is 72% with no controls and 44% with all controls; for Black drivers, 76% and 44%; and for all minority drivers, 69% and 42%. Appendix A shows that results remain similar when using propensity score matching, as opposed to regression: estimated disparities remain similar and statistically significant. Because arrest is a binary outcome, Appendix B repeats this analysis using a logit model rather than a linear model, reaching similar conclusions: for all racial groups, and all sets of controls, there are statistically significant and substantively large disparities in arrest rate.

## Section 1.3: Discussion

My analysis found that statistically and practically significant racial disparities remain in the 2023 - 2024 time period. These disparities occur in all three outcomes examined — search rate, arrest rate, and stop duration — and are robust to alternate statistical models and many sets of controls.

An important consideration in these analyses is that it is difficult to control for all contextual factors ("unobservables") that might produce racial disparities even in the absence of bias. For example, if there are racial differences in the propensity to carry contraband, that might produce disparities in search rate even absent racial bias. As such, this analysis does not by itself prove bias; nonetheless, it indicates the concerning potential that substantial bias may continue to exist.

# Section 2: Critique of methodology in TSARs 9 and 10

I now analyze the methodology employed by MCSO in the 2023 and 2024 TSARs (TSARs 9 and 10). I first discuss the three outcomes analyzed above — search rate (Section 2.1), arrest rate (Section 2.2), and stop duration (Section 2.3). **In all three cases, the TSARs suffer from errors and non-standard analytic decisions that undermine their central conclusions.** In Section 2.4, I discuss concerns that apply to the reporting and analysis in the TSARs more generally (beyond the analysis of any particular outcome).

## Section 2.1: Analysis of search rate

MCSO's analysis of searches reaches very different conclusions than mine does: TSAR 9 finds no statistically significant disparities in searches, and TSAR 10 finds only one statistically significant disparity (between minority and white drivers). This discrepancy occurs because, in analyzing the search rate, both TSARs 9 and 10 exclude *incidental searches:* that is, they exclude all searches incident to arrest or tow.

MCSO's choice to analyze only non-incidental searches[15] when computing the search rate raises three concerns. First, excluding searches incident to arrest risks obscuring racial bias, since the decision to arrest the driver is itself a decision that may result from racial bias: that is the motivation for analyzing the arrest rate in the first place. Second, analyzing only non-incidental searches excludes the vast majority of searches, meaning that MCSO's analysis says nothing about the potential disparate impacts of the vast majority of searches. For example, in TSAR 10, only 0.6% of stops resulted in a non-incidental search (in comparison, 2.7% of stops resulted in any search); in TSAR 9, only 0.3% did (in comparison, 2.7% of stops resulted in any search). Finally, the choice to analyze only non-incidental searches means that very few searches can be analyzed at all, significantly reducing the ability to meaningfully quantify disparities. Because MCSO analyzes so few searches, they find that even large relative racial disparities are not statistically significant. For example, TSAR 10 finds that the Black-white *disparity* in the search rate is almost as large as the *overall* white search rate — and yet concludes that even a relative disparity of this magnitude is not statistically significant. This is a consequence of the decision to exclude the vast majority of searches, rendering this analysis underpowered.

It is true that some past analyses of search rates exclude incidental searches, although the literature is mixed in this regard.[16] However, generally the motivation for excluding incidental searches is to assess whether there are different thresholds in searching for contraband (in which case incidental searches, whose purpose is not to search for contraband, should arguably be excluded). That is not MCSO's purpose here. Further, given the aforementioned drawbacks of only analyzing non-incidental searches, a better solution would be to conduct separate analyses of (1) all searches and (2) non-incidental searches and include both in the report.

Finally, when analyzing non-incidental searches, given the rarity of this outcome, MCSO should pool data across multiple years (3 years or 5 years would be reasonable); otherwise, the analysis is very underpowered to detect even potentially important disparities. While, in this report, I focus on the 2023 - 2024 data (for which I agree with MCSO that the disparities in non-incidental searches are largely not statistically significant when including all controls), I found in preliminary analysis that when pooling data from 2022 - 2025, many disparities in non-incidental searches remained statistically significant. This is because the longer time period provides more data with which to precisely examine rare outcomes, which is very important for non-incidental searches, making it less likely to ignore disparities as non-statistically-significant when they are large enough to be practically meaningful.

---

[15] MCSO's way of defining non-incidental searches is also disputable. For example, in TSAR 9 (Figure 9) they report fewer non-incidental searches of drivers *or* vehicles than non-incidental searches of vehicles alone, which is difficult to reconcile logically.

[16] Hetey, Monin, Maitreyi, and Eberhardt. Data for change: A statistical analysis of police stops, searches, handcuffings, and arrests in Oakland, Calif., 2013-2014. Technical report, Stanford University, SPARQ: Social Psychological Answers to Real-World Questions (2016).

Anwar and Fang. "An alternative test of racial prejudice in motor vehicle searches: Theory and evidence." *American Economic Review* 96.1 (2006): 127-151.

Pierson et al. "A large-scale analysis of racial disparities in police stops across the United States." *Nature Human Behaviour* 4.7 (2020): 736-745.

Simoiu, Corbett-Davies, and Goel. "The problem of infra-marginality in outcome tests for discrimination." (2017): 1193-1216.

**Overall, MCSO's finding that disparities in searches are generally not statistically significant results occurs because their analysis ignores the vast majority of searches, including an important type of search (those incident to arrest) that will be influenced by any racial bias in arrests.** It is imperative to report analyses of all searches, not just of non-incidental searches; further, if MCSO does wish to analyze non-incidental searches, multiple years should be used to improve statistical power, due to their rarity.

## Section 2.2: Analysis of arrest rate

MCSO's analysis of disparities in the arrest rate yields strikingly inconsistent conclusions from TSAR 9 to TSAR 10. TSAR 9 reports no statistically significant disparities for any of the three racial groupings. TSAR 10 reports highly statistically significant, and substantively significant, racial disparities for all three racial groupings: their estimated Hispanic-white disparity (after propensity score matching) is 3.86%; their estimated Black-white disparity is 3.08%; and their estimated minority-white disparity is 3.05%. These gaps are large: for example, they are comparable in magnitude to the overall search rate of 4.78% for white drivers. **MCSO's most recent analysis of the arrest rate, in TSAR 10, therefore agrees with our own conclusions that substantial racial disparities in arrests remain.**

However, the large changes in MCSO's results from year to year also raise concerns about the reliability of their analysis. Indeed, they attribute the discrepancy between TSAR 9 and TSAR 10 to an error in their past analyses: in TSAR 10, they write "MCSO altered the analyses of arrests for this annual report. In previous reports, analyses of arrests included matching on stops that were classified as civil and criminal. Because all stops classified as criminal are also arrests, this variable was removed from the matching process". **In other words, they recognize that their previous reports incorrectly analyzed arrests by improperly controlling for a variable, Stop Classification, that should not have been used, seriously altering their conclusions; TSAR 10 fixes this mistake.** (As discussed above, I also have data quality concerns about the Stop Classification variable, raising further questions about the reliability of this analysis.)

## Section 2.3: Analysis of stop duration

TSARs 9 and 10 find that racial disparities in stop length are always small and often not statistically significant. In particular, TSAR 9 finds no statistically significant disparities for Hispanic or Black drivers (when comparing to white drivers), and a small but statistically significant disparity for all minority drivers (0.28 minutes). TSAR 10 finds no statistically significant disparities for Hispanic and minority drivers, and a small but statistically significant disparity for Black drivers (0.52 minutes). These conclusions differ substantially from my own finding of substantively large and statistically significant racial disparities for all three racial groupings with all sets of controls.

MCSO's conclusions differ from my own for at least two reasons. First, they exclude extended stops (ETSIs) from their primary analysis. Second, they control for whether a search or arrest

occurred. In Appendix C, I show that these decisions, both of which I disagree with, seriously affect their results, and lead to their much smaller estimates of disparities.

**I believe there are two major problems with MCSO's analysis. First, the way that ETSIs are coded in the data is inconsistent and potentially biased** (Section 2.3.1): for example, the frequency of ETSIs varies significantly across time periods and race groups without a clear justification, even when controlling for the comments about the stop. This inconsistency is a problem because MCSO then relies on ETSIs in their primary downstream analysis of stop duration, by filtering out stops when an ETSI occurred. But it is well-known that when a variable is inconsistently recorded, and then used to filter the dataset, biased conclusions can result.[17] For example, if (1) ETSIs are disproportionately likely to be recorded for minority drivers, (2) ETSIs result in longer stops, and (3) all stops with ETSIs are discarded in subsequent analysis of stop duration, this will disproportionately shorten estimates of stop length for minority drivers, and incorrectly shrink estimates of racial disparities. **Importantly, these biases can occur regardless of whether ETSIs are under-reported (i.e., not reported even when they do occur) or over-reported (i.e., reported even when they do not occur): the core point is that, if ETSIs are inconsistently reported, using them to filter the analysis dataset can result in biased conclusions.**

The second problem is that, even if ETSIs were consistently reported, the use of ETSIs, searches, and arrests in downstream analysis is incorrect (Section 2.3.2). In particular, even if ETSIs were perfectly recorded, I would disagree with MCSO's decision to filter them out prior to analyzing disparities in stop duration: this not only excludes the *majority* of stops, but the *longest* stops, where disparities in stop length are most likely to be a concern. MCSO also controls for whether searches or arrests are conducted, but as previously discussed, these are bad controls.

I discuss both these problems in turn. For clarity, I use "ETSIs" to refer to the seven main ETSIs (not including searches and arrests). Where I discuss searches and arrests, I explicitly note it.

## Section 2.3.1: The coding of ETSIs is inconsistent and potentially biased.

I focused my analysis on TSQRs 13 and 17, which are the most recent analyses of ETSI stops and also cover 2023 and 2024. Reviewing these TSQRs, as well as the underlying data, reveals several important ways in which the seven main ETSIs are inconsistently coded.

### Section 2.3.1.1: Inconsistency across time

From MCSO's own analysis, the proportion of stops with ETSIs, searches, or arrests increases markedly over time: from 29% in 2022 to 39% in 2023 to 52% in 2024. (This increase, as I discuss below, has been particularly marked for minority drivers: for example, in 2024, ETSIs, searches, or arrests were used in nearly two-thirds of stops for Hispanic drivers.)

---

[17] Hernán, Hernández-Díaz, and Robins. "A structural approach to selection bias." *Epidemiology* 15.5 (2004): 615-625. Lakkaraju et al. "The selective labels problem: Evaluating algorithmic predictions in the presence of unobservables." *KDD,* 2017.

This increase is driven not only by the introduction of two new ETSI categories in 2022 (Driving Documentation and Other Delay) but by the increasing use of several major ETSI categories. As MCSO reports, the proportion of stops with the "Driving Documentation" ETSI more than tripled from 13% in March 2022 (when the category was added) to 43% in December 2024; the proportion of stops with the "Technical Issues" ETSI more than doubled from 5% in January 2022 to 11% in December 2024; and the proportion of stops with the "Other Delay" ETSI nearly quadrupled from 4% in March 2022 to 15% in December 2024.

The explanation for this increase, in TSQR 17, is that "MCSO has taken action…to increase documentation of delays during traffic stops", including publishing an ETSI cheat sheet. However, the large inconsistencies across time raise several concerns. First, they lie in tension with the claim, made in both TSQR 13 and TSQR 17, that deputies are using ETSIs correctly and with fidelity, both in 2023 and 2024 and in prior years.[18] Given that the use of ETSIs has increased dramatically, there are only two possibilities: either driver or deputy behavior has changed similarly dramatically, or ETSIs are not in fact being used correctly and consistently across years. The first possibility is unlikely, and MCSO provides no evidence that it is the case. The most plausible explanation is that ETSIs are not being used consistently across years — specifically, that there is either underreporting of ETSIs in earlier years, or overreporting in later years.

If ETSIs are not being recorded consistently across years, it means that analyses of disparities using ETSIs will not be comparable across years. For example, it is impossible to reliably conclude that disparities have been reduced, because the underlying data are not comparable. This is a known issue in analyses of policing data, where changes in data recording and analysis practices have contaminated past analyses of racial disparities: for example, when the Texas Department of Public Safety changed its policies for recording driver race in response to public scrutiny, it significantly affected downstream analyses of disparities.[19]

To be clear, the solution to the inconsistent use of ETSIs over time is not necessarily to increase the frequency of ETSI use still further; it is entirely possible that ETSIs are now being *overused*. TSQR 3 states that ETSIs are designed to capture circumstances that "prolong a typical traffic stop" and "extend the stop length beyond what is typical", suggesting that their use was originally intended to be *atypical* (as indeed it was in TSQR 3). But if ETSIs were intended to be atypical, it is odd that they now constitute the majority of stops.

**Overall, then, the inconsistencies across time raise three serious concerns. First, they suggest that MCSO's statement that ETSIs are being consistently and appropriately used is unlikely to be true in every year. Second, they make downstream estimates of**

---

[18] TSQR 13: "This review confirmed that deputies use ETSI indicators appropriately". TSQR 17: "This review confirmed that deputies use ETSI indicators appropriately and with fidelity." TSQR 13 also indicates that ETSIs were used appropriately in prior years: "the research sought to determine whether ETSIs continue to be used appropriately by deputies when documenting delays during traffic stops."

[19] Luh, Elizabeth. "Not so black and white: Uncovering racial bias from systematically misreported trooper reports." *Available at SSRN 3357063* (2022).
Friberg, Ben et al. Texas troopers ticketing Hispanic drivers as white (KXAN News, 2015).
https://www.kxan.com/investigations/texas-troopers-ticketing-hispanic-drivers-as-white/

**disparities incomparable across years, making it impossible to reliably monitor changes in disparities over time. Third, the fact that ETSIs are now used for the majority of stops, when prior framing suggests they were originally intended to capture atypical circumstances, suggests they may now be overused.**

Section 2.3.1.2: Inconsistency across racial groups

Minority drivers are more likely to have stops marked with ETSIs. TSQR 13 reports that 52% of stops of Black drivers, and 52% of Hispanic drivers, were marked with the seven main ETSIs, searches, or arrests, compared to 32% of white drivers; the corresponding numbers in TSQR 17 are 62% for Black drivers and 64% for Hispanic drivers, compared to 47% of white drivers.

These disparities emerge consistently for almost every type of ETSI and every race group, even for ETSIs where it is very unclear why racial disparities should occur. For example, there are statistically significant racial disparities[20] in the use of the "Technical Issues" ETSI, which in 2023 is used for 9% of stops of Black drivers and 9% of Hispanic drivers compared to 7% of white drivers. This ETSI is supposed to document whether there were "any technological issues during the stop…[e.g.] MDC, TraCS, Scanner, Printer failures/resets, etc.)". It is not clear why stops of minority drivers would disproportionately lead to technical equipment failures. Similarly, the "Training" ETSI is marked more often for minority drivers; this ETSI is supposed to document whether "stop duration was impacted due to MCSO personnel training/learning", and it is again unclear why minority drivers would more often be exposed to deputies requiring training. The "Other Delay" ETSI is also marked more often for minority drivers; as I will discuss in greater detail below, there are a number of concerns about the consistent use of this ETSI, and it is unclear why it should disproportionately occur for minority drivers. Finally, the "Driving Documentation" ETSI is used much more frequently for minority drivers — in 2024, for 46% of Black drivers and 47% of Hispanic drivers as compared to 32% of white drivers — which is of concern both due to the frequency of its use, and also because, as discussed below, its use has been acknowledged by MCSO to be somewhat subjective.

TSQRs 13 and 17 do not provide adequate explanations for these racial disparities; on the contrary, they explicitly note that more investigation is necessary.[21] I agree that there is an urgent need for further investigation; absent this, or a plausible innocuous explanation, it is very possible that ETSIs are being inconsistently recorded across race groups.

TSQR 17 notes that "MCSO does not consider racial/ethnic inequality in ETSI use as indicia of potential bias as defined by the Second Order". But the primary concern is not that ETSI use is itself an indicator of racial bias; rather, it is that inconsistent use of ETSIs across race groups *renders downstream analyses of racial disparities that rely on ETSIs unreliable.* Consider a

---

[20] The description of statistical significance provided in both TSQRs 13 and 17 is incorrect - "Reported p-values can be interpreted as the probability there is a relationship between race/ethnicity and ETSI use when no relationship exists". Because this statement does not make sense, I am assuming that it is simply a typographical error and that p-values are computed and should be interpreted in the standard fashion.

[21] TSQR 13: "Additional investigation is necessary for MCSO to better understand the racial/ethnic differences identified in this report for delays for DUI, Technical Issues, Training, and Other Issues". TSQR 17: "Additional investigation is necessary for MCSO to better understand the racial/ethnic differences identified in this report for delays for DUI, Technical Issues, Training, and Other Issues."

hypothetical but plausible example to make this point: imagine that when ETSIs truly occur, they are always correctly recorded for Black and Hispanic drivers, but recorded only 80% of the time for white drivers. (A gap like this would explain the observed pattern of disparities in ETSI use.) MCSO then discards all ETSIs in its primary analyses of stop duration. This will result in disproportionately discarding long stops of Black and Hispanic drivers (who are more likely to have ETSIs correctly marked) relative to white drivers; and that will lead to an underestimate of disparities in stop length.

**Overall, there are unexplained and troubling racial disparities in ETSI use, raising the concern that downstream analyses of stop duration that rely on ETSIs may underestimate racial disparities.**

Section 2.3.1.3: Review of body-worn camera (BWC) footage is statistically flawed

To alleviate concerns about consistency in ETSI use, MCSO reviews BWC footage in both TSQRs 13 and 17. Both these reviews suffer from statistical flaws; I discuss each in turn.

In TSQR 13 (covering 2023), MCSO reviews a random sample of 72 traffic stops with at least one ETSI selected. But this sampling procedure is flawed: it is important to review stops with no ETSIs selected as well for several reasons. First, in 2023, *most* stops had no ETSIs selected, so the BWC review gives us no information about whether ETSIs were reliably recorded in the majority of stops. Further, this biased sampling procedure does not provide an answer to a critical question: how often, when no ETSIs are used, should an ETSI have been used? This failure to measure ETSI underreporting is particularly concerning because, given that ETSI use increased significantly in 2024, it is quite plausible ETSIs were underreported in 2023. Finally, MCSO calculates Cohen's kappa as a measure of agreement between the deputy's ETSI selection and the reviewer's assessment from the BWC; however, it is not standard to use a sample biased in this way in computing Cohen's kappa, and the reported p-values are not valid.

This problem is somewhat alleviated in TSQR 17 (covering 2024), when MCSO reviews several samples of BWC footage, including a sample of 60 stops in which at least one ETSI was selected and 20 in which no ETSIs were selected. While this is an improvement, MCSO still does not quantify potential underreporting of ETSIs — i.e., the fraction of the time that deputies used no ETSIs, but reviewers believed one should've been used. **Overall, both potential underreporting and overreporting of ETSIs are critical to quantify, because both can lead to biased downstream measurements of disparities when ETSIs are excluded in subsequent analysis.** MSCO's sample of BWC stops is also not large enough to allow for precise quantification of underreporting or overreporting, as well as for other concerns like inconsistency in recording across race groups.

A final indication that the reviews of BWC footage are inadequate is the fact that they continually result in the conclusion that ETSIs are being used appropriately; but, as mentioned above, the inconsistencies in ETSI use across years make it very unlikely that this is true every single year.

Beyond these methodological issues and even taking the review of the BWC footage at face value, the review raises several separate concerns. First, the Cohen's kappa values for the "Other Delay" ETSI is lower than that for other ETSI categories, raising concerns about the reliability with which this category is used. MCSO's qualitative analysis of the comments associated with "Other Delay" ETSIs also suggest that this category may sometimes be used inappropriately; for example, TSQR 17 reports that in 6% of cases, no issue at all was identified.

A second category of concern is the "Driving Documentation" ETSI. In TSQR 17, MCSO conducts a review of 100 BWC videos with this ETSI selected. Based on MCSO's review of these videos, they conclude that the deputy must make a "subjective decision about whether this is a Technical Issue, Driving Documentation issue, or Other Delay ETSI". This subjectivity raises concerns about how consistently these ETSIs are coded.

### Section 2.3.1.4: Keyword search and stop length analysis identify inconsistencies in ETSI use

I performed two statistical analyses that corroborated the concerns that ETSIs might be inconsistently recorded.

First, I identified a number of stops where the stop comments included the words "extended" but no ETSI, search, or arrest was recorded. Because keyword search is an imperfect method of filtering the comments, I confirmed via manual inspection of a random sample that many of them did indeed represent cases where an ETSI should have been marked (e.g., "stop extended due to delayed stop for safe area to conduct stop."). This may be a useful, simple audit to clean up ETSI data.

Second, similar to the analysis MCSO suggests in TSQR 17, I examined (1) very short stops where an ETSI was marked and (2) very long stops where an ETSI was not marked. Below, I plot the fraction of stops for which an ETSI, search, or arrest was recorded (y-axis) as a function of stop duration (x-axis), breaking the data down by year.



Both the left and right sides of this graph provide potential cause for concern, as does the inconsistency across years. On the left side, even for very short stops (0-10 minutes, roughly the shortest quarter of stops) ETSIs were recorded a significant fraction of the time (e.g., 20% in 2024, not including searches or arrests). On the right side, even for long stops, ETSIs were not always marked. For example, among stops that were 20-25 minutes long, 18% were not marked with an ETSI, search, or arrest in 2023. (These stops are among the longest of stops: only 13% of stops are longer than 20 minutes, and only 8% are longer than 25). While these do not inherently represent data errors, further examination is warranted. I manually examined a random sample of 20 long stops that did not have ETSIs marked, and did find that several could meet the criteria for ETSIs; for example, "THE DIVER IDENTIFIED HIMSELF AS [redacted], BUT DID NOT HAVE HIS DRIVER'S LICENSE ON HIM. I VERIFIED HIS INFORMATION THROUGH A LAW ENFORCEMENT DATA BASE."

### Section 2.3.1.5: Temporal and racial inconsistencies in ETSI use are not explained by stop comments

It is possible that the temporal and racial disparities in ETSI use highlighted in Sections 2.3.1.1 and 2.3.1.2, respectively, can be explained by the stop comments: in other words, each comment might provide an explanation for why an ETSI was or was not used. If this is *not* the case, it is concerning because it means that there is no documentation for why these disparities arise. I therefore analyzed whether the observed temporal and racial disparities disappeared when controlling for the content of the stop comments (which would indicate they were explained by the comments).

Controlling for stop comments requires a numerical representation of each comment. To produce this, I used a large language model[22] to transform each comment into an *embedding vector* — that is, a long list of numbers that captures the meaning of the comment. Embedding vectors represent similar comments using similar vectors — for example, the vectors for the comments "Printer and scanner would not work" and "printer and scanner issues" would be more similar to each other than to the vector for "Spanish speaker and tow for 3511". Embedding vectors are widely used in the analysis of text data[23] because they translate raw text — which is very difficult to incorporate into downstream statistical analysis — into a mathematical representation that is easy to use in downstream analysis but still captures the text's meaning. For my analysis, I used 768-dimensional vectors, allowing for a rich representation of each comment.

I then trained logistic regression models to predict, from the vector representing each comment, whether an ETSI would be used. I trained a separate model for each type of ETSI. The output of this model, which I will refer to as $p_{ETSI\ given\ comment}$, captures "how likely an ETSI is to be used, based on the stop comment". If the temporal and racial disparities in ETSI use persist when

---

[22] Throughout this analysis, I relied on language models that I could run on my private servers, rather than models from third-party companies like OpenAI, due to the sensitivity of the data. I used the Nomic ModernBERT Embeddings — https://huggingface.co/nomic-ai/modernbert-embed-base — which are widely used. The full technical methodology is described in Nussbaum, Zach, et al. "Nomic embed: Training a reproducible long context text embedder." *TMLR* (2024).
[23] Gentzkow, Kelly, and Taddy. "Text as data." *Journal of Economic Literature* 57.3 (2019): 535-574.
Jurafsky and Martin. "Speech and Language Processing: An Introduction to Natural Language Processing, Computational Linguistics, and Speech Recognition, with Language Models" (2026).

controlling for $p_{ETSI\,given\,comment}$, it indicates that these disparities are not explained by the content in the comments. Because the comment vectors are high-dimensional, I relied on two standard techniques to prevent overfitting (i.e., capturing random noise in the data rather than true patterns) when estimating $p_{ETSI\,given\,comment}$. First, I used *regularized* logistic regression, which reduces overfitting by encouraging small model parameters.[24] Second, I partitioned the data into a train set (which was used to fit model parameters); a validation set (which was used to select the regularization strength); and a test set (which was used to assess final model performance and report all statistics).[25] I used 50% of the datapoints for the train set, 15% for the validation set, and 35% for the test set. I measured model performance using the area under the receiver operating characteristic curve (AUC), a widely-used metric for classification performance.[26] AUC is the probability that a randomly selected positive example (i.e., a stop where an ETSI was recorded) has a higher $p_{ETSI\,given\,comment}$ than a randomly selected negative example; it ranges from 0 to 1, with 0.5 indicating random performance and 1 indicating perfect performance.

Qualitative examination confirmed that the comment model successfully identified phrases in the comments expected to correlate with ETSI use. For example, the comments that my model predicted to be most likely to be marked with a "DUI" ETSI included phrases like "asked driver if consumed alcohol. he said no, however he had glassy / watery eyes" and "moderate odor of alcohol emitting from person"; the comments predicted most likely to be marked with the "Driving Documentation" ETSI included phrases like "Extended waiting for insurance from driver and waiting for driver to find license" and "Driver could not find Insurance card"; and the comments predicted most likely to be marked with the "Language" ETSI included "Language Line utilized" and "Driver did not speak english". Models for other ETSI categories similarly identified expected features. Quantitative performance of the models was also good, with AUCs ranging between 0.84 and 0.98. I provide further details on model performance in Appendix D.

To test whether temporal disparities in ETSI use persisted when controlling for stop comments, for each type of ETSI, I ran the following logistic regression[27]:

$$Pr(ETSI\,used) = logit^{-1}(\alpha + cubic(p_{ETSI\,given\,comment}) + \delta \cdot t)$$

Where the dependent variable was whether an ETSI was used; $\alpha$ was an intercept term; I controlled for a cubic polynomial in $p_{ETSI\,given\,comment}$; $t$ was stop year; and $\delta$, the coefficient of primary interest, captured temporal disparities in ETSI use that persisted when controlling for stop comment.[28]

---

[24]Hastie, Tibshirani, and Friedman. "The elements of statistical learning." (2009).
Bishop and Nasrabadi. "Pattern Recognition and Machine Learning" (2006).
Ng. "Feature selection, L1 vs. L2 regularization, and rotational invariance." *ICML* (2004).
Nigam, Lafferty, and McCallum. "Using maximum entropy for text classification." *IJCAI-99 Workshop on Machine Learning for Information Filtering* (1999).
[25] Hastie, Tibshirani, and Friedman. "The elements of statistical learning." (2009).
Bishop and Nasrabadi. "Pattern Recognition and Machine Learning" (2006).
[26] Hastie, Tibshirani, and Friedman. "The elements of statistical learning." (2009).
[27] For this analysis, I relied on logistic regression because interpretability of coefficients is not a primary goal and some ETSIs occur very rarely, so the misspecification of linear probability models may raise more significant concerns.
[28] I used a higher-order polynomial in $p_{ETSI\,given\,comment}$, rather than just a linear term, to allow for the fact that ETSI usage may depend non-linearly on $p_{ETSI\,given\,comment}$. Results using a linear model are similar.

The regression specification used to test for racial disparities in ETSI use was analogous:

$$Pr(ETSI\ used)\ =\ logit^{-1}(\alpha\ +\ cubic(p_{ETSI\ given\ comment})\ +\ \delta \cdot r)$$

Where here $\delta$, the coefficient of primary interest, estimates the magnitude of racial disparities. For race, I test the same two specifications as above; one in which race is encoded as a categorical variable with one category for each race group (and white as the base level to which all other race groups are compared), and one in which race is a binary variable that encodes whether the driver is a racial minority ($r = 1$) or white ($r = 0$).

The table below reports the results. Each cell reports the estimated odds ratio (i.e., $\exp(\delta)$) and *p*-value, with statistically significant *p*-values ($p < 0.05$) in bold. For racial groups, odds ratios capture how much higher the odds are that an ETSI will be used for that group (after controlling for the comment), with values greater than one indicating that ETSIs are more likely to be used for minorities. For year, odds ratios capture how much the odds of using the given ETSI increases each year (after controlling for the comment), with odds ratios greater than one indicating increases over time. Stars denote statistical significance: * indicates $p < 0.05$, ** $p < 0.01$, and *** $p < 0.001$.

| ETSI Type | Black Drivers | Hispanic Drivers | Minority Drivers | Year |
|---|---|---|---|---|
| DUI | 0.65 (p = 0.322) | 1.23 (p = 0.351) | 1.13 (p = 0.553) | 1.08 (p = 0.700) |
| Language | 1.83 (p = 0.357) | **19.43*** (p < 0.001)** | **14.38*** (p < 0.001)** | 0.77 (p = 0.200) |
| Driving Documentation | **1.38** (p = 0.002)** | **1.18* (p = 0.021)** | **1.19** (p = 0.006)** | **1.36*** (p < 0.001)** |
| Other Delays | 0.86 (p = 0.190) | **0.78** (p = 0.002)** | **0.81** (p = 0.002)** | **1.52*** (p < 0.001)** |
| Technical Issue | 0.90 (p = 0.500) | 1.08 (p = 0.440) | 1.03 (p = 0.765) | **1.22* (p = 0.034)** |
| Training | 0.97 (p = 0.864) | 0.96 (p = 0.682) | 0.93 (p = 0.445) | 1.14 (p = 0.150) |
| Vehicle Tow | 1.36 (p = 0.445) | **2.34*** (p < 0.001)** | **2.18*** (p < 0.001)** | 0.89 (p = 0.552) |

**Many ETSIs show statistically significant temporal and racial disparities that cannot be explained by the stop comment.** For race, four out of seven ETSIs show statistically significant disparities for at least one race group. For year, three out of seven ETSIs show statistically significant disparities. **At minimum, this suggests inadequate documentation of ETSI use in the stop comments.** This makes it unreliable to use the comments to verify that ETSIs are being used correctly, which is concerning both because MCSO is attempting to perform this analysis[29] and because external actors may only have access to the comments, and not the BWC footage. **At worst, it indicates disparities in ETSI use that are not justified by any event that occurred during the stop.**

Finally, I note that this analysis does not test for, or preclude, another type of temporal or racial inconsistency in ETSI use. I can assess only whether the use of the ETSI field is consistent with the comment. But the comments *themselves* may also be inconsistently recorded across years

---

[29] See, e.g., "Other Delay ETSI Comments" in TSQR 17, which qualitatively codes all comments associated with "Other Delay" ETSI stops.

or race groups: for example, deputies may be more likely to write comprehensive comments in some years or for some race groups.

**Overall, my analysis reveals a number of serious concerns about how reliable ETSIs are for use in downstream analysis**. There are large disparities in ETSI use across years and race groups that are not explained by the comments themselves; the review of BWC footage suffers from statistical flaws; keyword search and stop length analysis identify further inconsistencies. The concern is not that ETSIs themselves are a measure of racial bias, but rather that the unreliability with which they're recorded means that they should not be used in downstream analyses of racial bias: specifically, they should not be used to filter stops in analyses of stop duration. It is particularly risky to use ETSIs in downstream analyses that make comparisons across time periods or across racial groups — exactly the comparisons that MCSO seeks to make — due to the unexplained temporal and racial inconsistencies we observe.

Section 2.3.2: Even if ETSIs were consistently coded, MCSO's use of ETSIs in subsequent statistical analysis of stop duration is inappropriate

In this section I argue that, even if none of the problems in the previous section applied, MCSO's subsequent analyses of stop duration would be problematic in several ways. In other words, even if ETSIs were *perfectly recorded*, the downstream analyses making use of them are inappropriate.

First, in their main analyses of stop duration, MCSO excludes ETSIs entirely.[30] This raises several concerns. By 2024, ETSIs constituted the majority of stops, especially for Black drivers and Hispanic drivers. **This means that MCSO's primary analysis of stop duration ignores any disparities in the majority of stops. Their analysis also disproportionately excludes the longest stops, for which stop duration is *likeliest to be a concern*!** This is not a standard analytic decision, and I have never heard of it being done in any other analyses of stop duration. It is analogous to saying "I analyzed disparities in blood pressure, but I excluded everyone with a known cause of high blood pressure (which was the majority of people, particularly in the groups I was concerned about)."

To illustrate how excluding ETSI stops can cause problems in downstream analyses, I looked at the effect of excluding ETSI stops on estimates of disparities for searches and arrests. As discussed above, MCSO and I agree that there are large, statistically significant disparities in arrests. But when excluding ETSIs, these disparities shrink to below 1% for minority drivers and Hispanic drivers (with all controls), a large reduction from my original estimates of approximately 2%; for some sets of controls, the disparities are not even statistically significant. Similarly, when excluding ETSI stops from the search analysis, estimates of disparities in searches become small and non-significant. **This illustrates how excluding ETSIS can significantly alter conclusions and conceal disparities.**

---

[30] See Table 4 in both TSARs 9 and 10.

In their supplementary analyses of stop duration, MCSO reports the results of propensity score matching on ETSIs, as opposed to excluding them entirely.[31] While this is helpful, it raises several further concerns. First, because these analyses are relegated to the supplement, and not described in detail in the report, they are rendered largely invisible to the public; it is also not clear how MCSO decided that some specifications should be discussed in the main report, and others should be relegated to the appendix. Second, the "Language" ETSI appears to be excluded from the propensity score matching analyses without any explanation or justification. One possibility is that this is a coding error on MCSO's part. A second possibility is that MCSO made a deliberate decision to exclude the "Language" ETSI because it is highly correlated with race, and therefore may have caused numerical problems in the propensity score matching. (Substantiating this, TSQR 17 reports that this ETSI was nearly forty times likelier to be used for Hispanic drivers than for white drivers.)

The fact that MCSO's motivation for excluding the "Language" ETSI is ambiguous reinforces the need for greater transparency and documentation of their analytic decisions. But even granting MCSO the benefit of the doubt that this was a deliberate decision, as opposed to an error, highlights a problem with matching on ETSIs: many of them are strongly correlated with race, and some are markers of decisions that, themselves, might be racially biased. For example, DUI enforcement may be racially biased, raising concerns about matching on the "DUI" ETSI.[32] Similarly, the "Other Delay" ETSI captures a plethora of issues (see, for example, Table 16 in TSQR 17, and MCSO's subsequent discussion), many of which — including warrants, DUI or drug investigations, firearms in the vehicle, and physical and mental health delays — could be suspected, recorded, or investigated in a racially biased way.[33] As such, matching on ETSIs, while arguably better than excluding them entirely, represents an example of a "bad control" discussed in Section 1: in other words, controlling for a post-stop outcome that may itself be the product of racial bias.

Overall, ETSIs should not be excluded from analyses of stop duration. If they are matched on, it is important to only match on ETSIs which are not themselves potentially the product of post-stop racial bias. Further, the results of analyses both with and without matching on ETSIs should be clearly reported and described in the main text.

Finally, and very importantly, throughout all MCSO's analyses of stop duration (including the supplementary analyses), they control for whether a search or arrest was conducted (i.e., they include these as matching variables in their propensity score matching analysis). It is not clear why MCSO treats searches and arrests differently than the other ETSIs in their analysis, since in other parts of the report they are grouped together and the same logic — that all these factors result in longer stops — applies equally to ETSIs, searches, and arrests. This inconsistency should be explained. Regardless, however, controlling for searches and arrests in analyses of

[31] See Supplementary Appendices 2, 3, and 4 in both TSARs 9 and 10.
[32] Kagawa et al. "Racial bias and DUI enforcement: comparing conviction rates with frequency of behavior." *Criminology & Public Policy* 20.4 (2021): 645-663.
[33] Lum and Isaac. "To predict and serve?." *Significance* 13.5 (2016): 14-19.
Cooper, Mclearen, and Zapf. "Dispositional decisions with the mentally ill: Police perceptions and characteristics." *Police Quarterly* 7.3 (2004): 295-310.

stop duration is a statistical error because they are, as explained above, canonical examples of bad controls. A fundamental lesson of the statistical literature is that when assessing racial bias in post-stop behavior, it is imperative to not control for other post-stop behaviors that might themselves be the product of racial bias.[34] Searches and arrests are clear examples of such behaviors: the whole reason we are analyzing them is because we are worried they may suffer from bias. If officers are biased in whom they search or arrest, and this leads to longer stops for some groups, we should not be reassured when the disparity in stop length "disappears" when matching on searches and arrests.

**For all the aforementioned reasons, even if ETSIs were reliably recorded, MCSO's subsequent analysis of stop duration would be unreliable.**

## Section 2.4: General statistical concerns about MCSO's analysis and reporting

Here, I discuss my more general concerns about the reporting and analysis in the TSARs, beyond the analysis of any particular outcome.

### Section 2.4.1: Analysis and reporting of changes over time are flawed.

In many cases, MCSO plots and reports results across multiple years using methodology that has changed from year to year.[35] Similarly, MCSO reports analyses using variables that are not consistently measured or reported across years (e.g., downstream analysis using ETSIs). These are apples-to-oranges comparisons that provide misleading conclusions about change over time. To avoid this, any plots or claims about change over time should use consistently defined variables and methodology; for example, in Figure 16 in TSAR 10, the results for earlier years (which were erroneously computed) should be rerun using the updated statistical procedure, rather than merely duplicating erroneous methodology from prior years.

MCSO also frequently highlights whether disparities have changed from statistically significant in one year to non-significant in the next (see, e.g., Table 9 in TSAR 10, as well as sentences like "[the disparity] decreases to a point that is no longer statistically significant"). This is not the correct way to assess whether disparities have changed over time, as highlighted in a famous paper appropriately titled "The Difference Between 'Significant' and 'Not Significant' is not Itself Statistically Significant".[36] As the paper explains, this is true for many reasons: the threshold for statistical significance is arbitrary; even practically large racial disparities may not be statistically significant; and that small changes in estimated effects can lead to large changes in statistical

---

[34] Angrist and Pischke. *Mostly Harmless Econometrics: An Empiricist's Companion*. Princeton University Press, 2009. Jung, Jongbin, et al. "Mitigating included-and omitted-variable bias in estimates of disparate impact." Working paper, 2018. Acharya, Blackwell, and Sen. "Explaining causal findings without bias: Detecting and assessing direct effects." *American Political Science Review* 110.3 (2016): 512-529.
Montgomery, Nyhan, and Torres. "How conditioning on posttreatment variables can ruin your experiment and what to do about it." *American Journal of Political Science* 62.3 (2018): 760-775.
[35] See, e.g., Figure 16 in TSAR 10, which computes arrest rate disparities in 2024 differently than in prior years due to an acknowledged error in methodology in prior years.
[36] Gelman and Stern. "The difference between "significant" and "not significant" is not itself statistically significant." *The American Statistician* 60.4 (2006): 328-331.

significance levels. As one example of this, even if the underlying racial disparities in traffic stops remained unchanged in magnitude, MCSO might observe that effects became non-significant simply if the sample size in one year was smaller (reducing statistical significance) or even if they switched to measuring disparities at the month level rather than the year level. If MCSO wishes to measure whether racial disparities have changed over time, the correct way to do so is by testing for an *interaction term* between race and time.

### Section 2.4.2: Important details of supplementary analyses are not explained.

While MCSO does make reference to some supplemental analyses in the main text of TSARs 9 and 10, in many cases these analyses are not sufficiently described. For example, Supplementary Appendix 2 in TSAR 10 provides eight different specifications for computing propensity scores for the stop length analysis. The main text discusses these alternate specifications only very briefly, and does not provide enough detail for the reader to understand many basic questions, including how the preferred specification was chosen; when findings from alternate specifications were different, exactly how and why they were different; and the methodology underlying each specification. For example, I could not find answers to basic and potentially important methodological questions (like why the Language ETSI was excluded). To avoid these issues, standard academic best practices for supplementary analyses should be followed: supplementary analyses should be described in enough detail that the reader knows what was done; conclusions from each analysis should be summarized (with particular attention to explaining how and why any differences arise); and the motivation for relegating some specifications to supplement, and featuring others in main text, should be provided.

## Section 2.5: Summary of concerns

**MCSO's analyses of all three outcomes — searches, arrests, and stop duration — raise significant concerns.**

The analysis of searches analyzes only non-incidental searches, which constitute only a small share of all searches. This both obscures disparities that occur in the majority of searches and, by excluding searches incident to arrest, risks obscuring racial bias, since the decision to arrest the driver is itself a decision that may result from racial bias.

The analysis of arrest rates yields strikingly inconsistent conclusions in consecutive years – the analysis of 2023 reports no statistically significant racial disparities, and the analysis of 2024 reports large ones for all three racial groupings. This disparity appears to result from an analytic decision (to control for an improper variable) that MCSO acknowledges was an error. These issues raise significant concerns about the reliability of their analysis; and, even if their most recent analysis is correct, it finds large racial disparities.

Finally, the analysis of stop durations raises two concerns: first, it relies on ETSIs when many pieces of evidence suggest that these are not recorded consistently enough across time or race group to be used for downstream analysis. Second, even if ETSIs were reliably recorded,

inappropriate downstream analytic decisions – for example, the decision to control for searches and arrests, and exclude ETSIs from subsequent analyses of stop duration — are made.

# Appendices

## Appendix A: Comparison of propensity score matching and regression

In their primary analysis of disparities, MCSO relies on propensity score matching (PSM) while I rely on regression. While both these methodologies are widely used and generally regarded as acceptable, to ensure that this discrepancy was not the primary factor underlying any differences in results, I performed several analyses.

First, I compared my results using regression to those that MCSO reports in TSAR 10 (using PSM), when using the same set of controls, for both arrests and stop duration (the two outcomes we both analyze). Both methods estimated racial disparities of similar size; however, linear regression sometimes yielded somewhat more statistically significant estimates of racial disparities. One reason for this may be that, in their primary PSM specification, MCSO matches each stop for a minority driver to only *one* stop for a white driver. Because most drivers are not minorities, this results in a considerable reduction in sample size, and thus in statistical significance. Consistent with this hypothesis, when MCSO conducts matching using 5 nearest neighbors (as opposed to only 1, as in their primary specification), their estimates of disparities often become considerably more statistically significant.[37] Specifically, for stop length, their t-statistics increase from 1.7 to 2.7 for Hispanic drivers; remain largely stable for Black drivers (2.3 vs 2.3); and increase from 0.9 to 2.8 for minority drivers. For arrests, their t-statistics are largely stable for Hispanic drivers (6.5 vs 6.4); increase from 2.9 to 3.7 for Black drivers; and increase from 5.3 to 5.7 for minority drivers. These results, as well as the comparison to regression, suggests that the method MCSO has chosen to assess disparities may tend to reduce statistical power, and lead to less statistically significant results, relative to other plausible methods, highlighting the aforementioned importance of clearly and fully describing results from all specifications.

As a second check that PSM and regression generally yielded similar results, I reran my own results in Section 1.2 using PSM as opposed to regression for the specification with all controls. Results remained similar and are shown below for arrest rate, search rate, and stop duration, respectively. As expected, the estimates change slightly: the confidence intervals around the PSM estimates are wider (consistent with the discussion above) and the PSM estimates of disparities are generally slightly larger. However, both methods generally agree on both the approximate magnitude of coefficients, and on their statistical significance. (The one exception is for the Black-white disparity in stop duration, where regression yields statistically significant results and PSM does not.)

---

[37] See Supplementary Appendix 5 in TSAR 10.



Overall, this analysis demonstrates that the use of PSM and regression is not the primary factor underlying any discrepancies in results. In contrast, changing the controls, or the outcome variable analyzed, has a larger effect on the estimates.

## Appendix B: Analysis using logit models

Because searches and arrests are binary outcomes, I repeated the analysis in Section 1.2, which analyzes disparities in search and arrest rates, using a logit model (which is specifically

designed for binary outcomes) rather than a linear probability model. Specifically, I fit the following model:

$$Pr(y) = logit^{-1}(\alpha + \beta \cdot X + \delta \cdot r)$$

Where $y$ is the outcome of interest (search or arrest); $\alpha$ is an intercept term; $X$ is the same vector of controls as in the main text; $\beta$ is the coefficient vector on controls; $r$ is driver race; and $\delta$, the primary coefficient of interest, is the coefficient on driver race.

The figures below plot the results for searches and arrests, respectively. The x-axis plots the odds ratio (that is, $\exp(\delta)$) for Black, Hispanic, and minority drivers relative to white drivers. This captures how much higher the odds are that a driver of this group will be searched or arrested relative to white drivers (after inclusion of controls). For all race groups, both outcomes, and all sets of controls, there are substantively and statistically significant disparities, similar to the conclusions reported in the main text.





## Appendix C: Additional analyses of stop duration

In their primary analysis of stop duration, MCSO excludes extended stops and controls for whether a search or arrest occurred. Here I show that these two decisions (both of which I disagree with) have large effects on their results.



In the plot above, the first two rows reproduce my analysis of racial disparities in stop duration with no controls and all controls, respectively. The third row shows the effect of MCSO's decision to control for searches and arrests (with no other controls). Including these two controls significantly shrinks the estimated racial disparities — for Hispanic and minority drivers, more than every other control combined. The final two rows show the effects of MCSO's decision to remove ETSIs prior to running analysis, both with no controls (fourth line) and with all the controls I use (fifth line). Removing ETSIs has an even larger effect than controlling for searches and arrests, yielding estimated disparities that are very small relative to the original analysis.

## Appendix D: Additional details on ETSI comment model

The table below reports performance metrics for the model that predicted whether an ETSI would be used based on the stop comments. Prediction performance is generally good, but lower for the "Other Delays" ETSI — consistent with observations above that this ETSI may be inconsistently used — and the "Training" ETSI.

| ETSI category | AUC |
|---|---|
| Vehicle Tow | 0.98 |
| DUI | 0.96 |
| Language | 0.96 |
| Technical Issue | 0.94 |
| Driving Documentation | 0.94 |
| Other Delays | 0.88 |
| Training | 0.84 |