# Exhibit 17



Maricopa County Sheriff Jerry Sheridan's belt buckle. Sheridan took office in January, inheriting court mandates to reform the law enforcement agency. Jesse Rieser for ProPublica

# This County Was the "Model" for Local Police Carrying Out Immigration Raids. It Ended in Civil Rights Violations.

by **Rafael Carranza**, **Arizona Luminaria**

Co-published with Arizona Luminaria

October 21, 2025, 5:00 am

*Leer en español.*

*This article was produced for ProPublica's Local Reporting Network in partnership with Arizona Luminaria. Sign up for Dispatches to get our stories in your inbox every week.*

### Reporting Highlights

- **Early Adopter:** The Maricopa County Sheriff's Office was among the first agencies to participate in ICE's 287(g) program, which deputizes local officers to do immigration enforcement.
- **Legal Troubles:** The office's immigration raids and traffic stops under then-Sheriff Joe Arpaio led to racial profiling and the violation of Latinos' constitutional rights.
- **Parallels Today:** As the Trump administration urges police departments to again join the ICE program, some Arizonans expect participating communities will face similar troubles.

These highlights were written by the reporters and editors who worked on this story.

Manuel Nieto Jr. and his sister had just pulled into a gas station to buy cigarettes and Gatorade when he noticed a sheriff's deputy standing over two Latino men on the ground.

Their north Phoenix neighborhood was on alert. Sheriff's deputies had been targeting day-labor centers in the area and making traffic stops — arresting people who couldn't prove their immigration status. They had one thing in common: They looked Latino.

"No diga nada. Pídale un abogado," Nieto's sister, Velia Meraz, yelled to the detained men, according to court testimony. ("Don't say anything. Ask for an attorney.")

The deputy warned Nieto and Meraz: "You need to get out of here, now."

Nieto drove around the corner to his dad's auto repair shop as another deputy on a motorcycle followed him, siren and lights on, and patrol vehicles swarmed. Deputies approached — guns drawn.

Nieto dialed 911 for help: Officers were harassing him, he would later testify in court. One pulled Nieto from his vehicle. Others pinned him to the ground and handcuffed him.

ADVERTISEMENT

Nieto's father came running from his shop.

"Let my children go," Manuel Nieto Sr. said. "They're U.S. citizens. What did they do wrong?"

The raid that ensnared Nieto Jr. and Meraz 17 years ago was carried out under a federal Immigration and Customs Enforcement program that grants local police powers to check immigration status during traffic stops and other routine encounters. The Maricopa County Sheriff's Office, under then-Sheriff Joe Arpaio, was among the first in the nation to test out ICE's 287(g) task force program.

Since President Donald Trump retook office in January, similar scenes of local officers joining in aggressive immigration arrests have multiplied as ICE has rapidly expanded the 287(g) task force program to deputize local police officers as de facto deportation agents.

Moments after Manuel Nieto Sr. stormed out of his north Phoenix auto shop, the deputies left without arresting or citing his children. But Nieto Jr. and Meraz didn't move on. They joined three other county residents in suing the sheriff's office, accusing deputies of targeting them solely because they were Latino.

A federal judge agreed that the task force's traffic stops and raids on Hispanic neighborhoods, day-labor centers and other businesses had violated Latinos' civil and constitutional rights. Even after the ruling, the judge found Arpaio continued to detain people based solely on suspected civil immigration violations.

The U.S. Department of Justice also conducted a civil rights investigation into the sheriff's office's discriminatory practices, and ICE ended Arpaio's 287(g) agreement. In 2012, ICE suspended all local police deportation task forces nationwide, only restarting them after Trump began his second term in January.

Many Arizonans who lived through Arpaio's 287(g)-fueled immigration-enforcement campaign see parallels between what happened in Maricopa County and what's now playing out across the country as local officers join forces with ICE. They also foresee costly troubles for local agencies that follow in Maricopa County's footsteps, including difficulty regaining the trust of Latino residents whose constitutional rights are violated by local officers.

The White House and Immigration and Customs Enforcement did not respond to Arizona Luminaria and ProPublica's questions.

Arpaio told Arizona Luminaria and ProPublica that he became a target of political persecution for helping enforce immigration laws, which he saw as part of his job.

"I'd do it over again," Arpaio said. "I tell everybody: I didn't do anything wrong. I had a federal court who was biased against me. And all they could get me out on was a contempt of court? Think of that."

Meanwhile, Maricopa County continues to reckon with its time allowing deputies to act as immigration officers.

ADVERTISEMENT

Under a settlement agreement, the court mandated broad oversight of the sheriff's office and appointed a monitor to track its compliance. Since then, the law enforcement agency has been required to meticulously document all interactions with the public. In the 12 years since, the department has yet to convince the judge that its deputies don't racially profile Latino drivers and that it adequately investigates deputies' alleged misconduct.

Salvador Reza is a longtime community organizer who advocates for day laborers in Phoenix. He said his work put him in the crosshairs of Arpaio's immigration enforcement, leading to his arrest for obstruction during a protest. (The county declined to pursue charges against him.) Because of what happened in Maricopa County, he believes Latinos, including in the communities whose police departments have joined forces with ICE, are now more likely to be racially profiled.

"At that time, we were a laboratory," Reza said. "They did the experiment, and basically now they're implementing it at the national level."




Guadalupe, Arizona, where most residents are Latino or Native American, became one of Arpaio's targets for immigration enforcement, which escalated under a 287(g) task force agreement with Immigration and Customs Enforcement. Jesse Rieser for ProPublica

# 368 Paragraphs on Required Reforms

The lawsuit brought by Nieto Jr., Meraz and the other county residents became known as Melendres v. Arpaio — for Manuel de Jesus Melendres Ortega, a legal resident who was arrested in one of Arpaio's sweeps.

When U.S. District Judge G. Murray Snow certified it as a class-action suit in December 2011, he indicated racial profiling by the sheriff's office had been so widespread it could have violated the constitutional rights of any Latino in Maricopa County, one-third of the population.

The settlement contains 368 paragraphs outlining reforms. They range from creating a policy that bars racial profiling to developing a system that collects data on traffic stops to identify disparities in the race of motorists who are pulled over.

To end court oversight, the sheriff's office must be in "full and effective compliance" with the reforms continuously for three years. The department currently complies with more than 90% of the requirements, according to the monitor, but falls short in the two areas that most directly impact Latino drivers: eliminating racial bias in traffic stops and quickly investigating allegations of deputy misconduct.

Snow found that traffic stops involving Latino drivers and passengers dragged on "beyond the time necessary to resolve the issue that initially justified the stop."

Ricardo Reyes said he repeatedly endured traffic stops as a young Latino growing up in the Maryvale neighborhood of west Phoenix, where three-quarters of the residents identify as Latino. He drove a nice car and believes deputies under Arpaio racially profiled him.

"They would ask me for my license, they take it and then, 'You're free to go,'" recalled Reyes, who leads an advocacy group for military veterans. "Why was I stopped? I never got an answer."

Snow's order requires deputies to document 13 data points for every traffic interaction, including when a stop began and ended, the reason for the stop, the driver's perceived race and whether the deputy inquired about immigration status.



The settlement overseen by U.S. District Judge G. Murray Snow includes hundreds of pages of reforms that the sheriff's office must implement, including developing a policy to bar racial profiling and to create a data collection system for traffic stops. Obtained by ProPublica

In a preliminary injunction, Snow wrote that sheriff's deputies, "including officers associated with the special operations, circulated emails that compared Mexicans to dogs, ridiculed stereotypical Mexican accents, and portrayed Mexicans as drunks."

He singled out two of the deputies Nieto Jr. and Meraz encountered in north Phoenix for making arrests based on race during 287(g) operations. Roughly 77% of all arrests by the first deputy the siblings saw at the gas station had Hispanic surnames, the judge found. The deputy who pulled over Nieto Jr. arrested only Latinos during the operations he participated in.

Even more concerning to Snow was that Arpaio continued such operations as a matter of policy after ICE pulled its 287(g) agreement in 2009. In other words, deputies continued making immigration arrests without authority from the federal government. The judge said that violated constitutional protections against unreasonable search and seizures.

ADVERTISEMENT



After Arpaio defied the order and refused to implement many of the reforms, Snow issued additional mandates in 2016. He also found Arpaio and three of his aides in civil contempt of court and referred all four to face criminal contempt charges, a misdemeanor. Another federal judge convicted only Arpaio of criminal contempt in 2017 and was set to sentence him to up to six months in jail. Two months before sentencing, Trump pardoned Arpaio. However, voters had already voted Arpaio out of office.

His successors have faced the same oversight and have not fully complied with the court's orders, according to the monitor's reports.

Kevin Johnson, an immigration law author and professor at the University of California, Davis School of Law who runs the Immigration Professor's Blog, said settlements related to discrimination and civil rights violations often take a long time to resolve. He pointed to the 28-year-old Flores settlement, which still dictates the federal government's treatment of children in border and immigration custody. "There may be complaints about the court monitoring, but the burden is on the leaders and the agencies to show that monitoring is no longer necessary," he said.

This January, newly elected Sheriff Jerry Sheridan, a Republican who had worked as Arpaio's second-in-command, inherited the Melendres settlement. He argues the department has made enough progress to end the judge's oversight.

Snow acknowledged recently in court that Sheridan and the Maricopa County Sheriff's Office had made significant gains. "But the areas where he's not in compliance are pretty important areas," he said.

The sheriff's office analyzes traffic stop data quarterly to identify deputies with notable disparities in who they stop. An outside auditor evaluates annually any departmentwide disparities.

The latest annual report shows improvements over the past decade, but also that deputies still arrest Latino drivers at higher rates than white drivers. Data from this past year also show that Black drivers, who are not covered by the Melendres settlement, face longer stop times and higher arrest rates. And all drivers of color are more likely to be searched than white drivers.

In addition, the sheriff's office acknowledged it has not investigated 640 deputy misconduct claims, some dating to 2015, according to the department's most recent court filing. Snow had ordered that the backlog be cleared to hold the sheriff's office more accountable after he found that Arpaio refused to implement many reforms.

Raul Piña, a retired educator, witnessed the fear caused by Arpaio's raids in his Latino-majority school district and surrounding neighborhoods in Maryvale. He has for the past decade served on the court-mandated Community Advisory Board, tasked with relaying to the Maricopa County Sheriff's Office any community concerns about policing that may violate the court orders.

Piña says the department hasn't done enough to regain the trust of Latino residents and its deputies continue targeting Latinos disproportionately. He worries that without court oversight, the department will backslide on policing based on skin color.

"I strongly believe that the only thing holding MCSO back from a very public and enthusiastic participation in workplace raids and other forms of anti-immigrant practices — the only thing holding them back — is Melendres," he said.



David Redpath, research director for the Maricopa County Sheriff's Office's Court Implementation Division, discusses data on traffic stops during a town hall meeting. Jesse Rieser for ProPublica

## "The Model Was Maricopa County"

Nationwide, ICE now has more than a thousand 287(g) agreements with local law enforcement. Half are task force agreements like the one Arpaio deployed.

In May, the Tennessee Highway Patrol was carrying out a task force operation in Nashville when troopers pulled over Edgardo David Campos, who had just left a vigil at his church. Campos pulled into a gas station south of the airport, where a swarm of uniformed and plainclothes immigration officers wearing green vests with the word "police" on the back surrounded his car. One began to pull him out of his vehicle, a video of the incident shows, drawing the attention of people nearby, including Dinora Romero. She grabbed her phone and began to record.

"Si se lo llevan, no diga nada," Romero yelled. ("If they take you, don't say anything.")

ADVERTISEMENT

AFFORDABLE DEGREES. **MEANINGFUL IMPACT.**

ICE touted the Nashville operation as a success, even though the agency's data showed more than half the nearly 200 people arrested had no criminal record.

Advocates accused ICE and the Highway Patrol of using race and ethnicity to target drivers in Nashville's Latino and immigrant neighborhoods. One in four residents of the neighborhood where Campos was stopped is Latino. In August, the Tennessee Immigrant and Refugee Rights Coalition filed a lawsuit against the Highway Patrol seeking access to public records about the May sweeps.

Attorneys for the state argued in court that releasing those records would endanger officers. The Highway Patrol and state attorney general did not respond to requests for comment.

With enforcement expanding, U.S. citizens have been wrongfully detained recently, like Nieto Jr. and Meraz were in 2008. In May, an 18-year-old Latino citizen recorded his arrest during an operation by the Florida Highway Patrol and Border Patrol targeting landscapers in West Palm Beach under a 287(g) agreement. He was released after six hours.

In a statement, DHS said the teen "was part of a group of illegal aliens that resisted arrest during a traffic stop." The Florida Highway Patrol said he "interfered" with a lawful investigation and was charged with obstruction. State prosecutors declined to pursue the charge, citing "insufficient evidence."

The Trump administration is trying to enlist even more local officers to help ICE and is offering financial incentives for departments that participate in the 287(g) program. Starting this month, the federal government will pay the salaries of officers certified under 287(g) agreements and offer "performance awards" of up to $1,000 for helping ICE with arrests and deportations.

Meanwhile, the Trump administration has gutted federal offices that investigate police misconduct and civil rights violations.

Advocates say some of the tactics used by local and federal officers to target Latinos in Trump's deportation effort draw from Arpaio's playbook.



Raul Piña serves on a court-mandated community advisory board tasked with relaying to the sheriff's office any residents' concerns about policing that may violate the court's orders. He said he is worried that without the oversight required by a settlement order, the department will backslide. Jesse Rieser for ProPublica

"The model was Maricopa County," said Piña, the advisory board member in the Maricopa County lawsuit.

"The very public, very humiliating, demoralizing approach to the raids, and the cruelty — more than just the images in the television that were humiliating, it was the cruelty — and the violent apprehension of people in front of children," Piña added. "All of those behaviors. All of those tactics. They stem from Maricopa County."

Arpaio said he did not want to take credit for the Trump administration's work but was proud that deputies under his command were among the first local officers to help ICE make immigration arrests.

ADVERTISEMENT


AFFORDABLE DEGREES. **MEANINGFUL IMPACT.**

In Florida, which has more departments with 287(g) agreements than any other state, Republican Gov. Ron DeSantis has spent $245 million to set up a temporary detention center nicknamed Alligator Alcatraz. There, migrants are housed in chain-link cells inside tents. Some have compared it to Arpaio's "Tent City," where prisoners were held outdoors in sweltering desert temperatures. (It closed after Arpaio lost reelection in 2016.)

In California, federal agents have focused on Home Depot stores, arresting people in parking lots — echoing Arpaio's raids on day laborers. Maricopa County deputies, after getting 287(g) certified in 2007, carried out 11 immigration sweeps within five months outside a former furniture store in Phoenix that

was a popular gathering spot for laborers. Snow noted that nearly everyone arrested there was Latino.

"Trump is creating this complete culture of fear and terror in our community. And I think this is exactly what happened under Arpaio, with the workplace raids and the threat of deportation," said Christine Wee, lead attorney for American Civil Liberties Union of Arizona, which filed the lawsuit on behalf of Nieto Jr., Meraz and Melendres.

 

First image: The courtyard of then-Sheriff Joe Arpaio's "Tent City Jail." Some have compared a Florida detention center nicknamed "Alligator Alcatraz" to Arpaio's notorious jail, which closed after he left office. Second image: Maricopa County sheriff's deputies check the shoes of an individual arrested in an immigration sweep under Arpaio. First image: Charlie Riedel/AP Photo. Second image: AP Photo/Ross D. Franklin.

In July, a group that includes U.S. citizens, detained immigrants and advocacy groups sued the Trump administration, arguing that "indiscriminate" raids in Los Angeles targeted people with brown skin. A federal judge granted a temporary restraining order, barring immigration arrests based on race, speaking Spanish, type of employment or presence at a particular location.

But on Sept. 8, the Supreme Court stayed the order in a 6-3 vote. Justice Brett Kavanaugh was the lone conservative justice to explain his decision. He affirmed the government can use a combination of factors like race and language to establish reasonable suspicion that a person is in the country unlawfully during the operations in Los Angeles. "To be clear, apparent ethnicity alone cannot furnish reasonable suspicion; under this Court's case law regarding immigration stops, however, it can be a 'relevant factor,'" Kavanaugh wrote.

Even though the case continues, immigration advocates and the attorneys who filed the lawsuit said the court's action essentially legalized racial profiling.

Experts say that approach could filter down to local agencies partnering with ICE under the 287(g) program. "When you have ICE relying on racial profiling and promoting it as an effective immigration enforcement strategy, you can expect state local governments that are working with ICE to use race immigration enforcement," said Johnson, the UC Davis law professor.

That idea was echoed in Justice Sonia Sotomayor's dissent to the ruling lifting the order in the Los Angeles case. She argued the decision makes all Latinos, including U.S. citizens, targets and "improperly shifts the burden onto an entire class of citizens to carry enough documentation to prove that they deserve to walk freely." Sotomayor added, "The Constitution does not permit the creation of such a second-class citizenship status."

ADVERTISEMENT

Arpaio said he believes that had the Supreme Court rendered such a decision two decades ago, the Melendres lawsuit and the legal troubles that followed would not have happened.

"I was vindicated by the Supreme Court," Arpaio said. "Everything they went after me is legal."

Civil rights experts dispute that, noting that Arpaio's enforcement relied on race alone, which remains illegal.



Sheridan believes the department has made enough progress to end court oversight stemming from a racial profiling lawsuit. Jesse Rieser for ProPublica

## "It Seems Like It's Never-Ending"

As the Maricopa County Sheriff's Office struggles to fully implement the court-mandated reforms, elected officials are losing patience with the requirements and the costs.

By March, spending on the Melendres case and the implementation of its reforms had surpassed $300 million, the bulk of which — nearly $245 million — has gone to the sheriff's office.

Sheridan, the new sheriff, attributed those expenses to the creation of two divisions for implementing the settlement and the hiring of investigators to tackle the backlog of complaints against deputies. Thirty million dollars has gone to the monitor team since the monitor was appointed in 2013.

In 2024, the last full fiscal year for which data is available, the county spent more than $39 million on the settlement. "That's a recurring cost every year in perpetuity," Sheridan said. Or at least until the settlement ends.

But a report commissioned by Snow last year and published on Oct. 8 found that the sheriff's office had "consistently overstated" costs attributed to compliance under the Melendres settlement.

Sheridan questioned the report, telling Phoenix talk radio station KTAR that its authors "don't have the expertise" to audit a large government agency. He said his office will hire an independent accountant to dispute the findings. "There's no fraud here," he said.

The Republican majority on the county's Board of Supervisors is calling for an immediate end to court oversight.

"We just have to figure out a way to end this because it seems like it's never-ending because the judge, they put on a new order, they change things, they move the goalposts, and so we need to resolve this," Republican Supervisor Debbie Lesko, who represents communities policed by the sheriff's office, told Arizona Luminaria and ProPublica.

But the decision to end court oversight rests solely with Snow. During a recent hearing, the judge was clearly unhappy with a recent community meeting. The court-mandated meetings provide the plaintiffs — all Latino drivers in Maricopa County — a venue to get updates on progress toward reforms and to voice concerns to the sheriff and the monitor team.

ADVERTISEMENT



Gerber Life Insurance

Explore pl

Home Office: White Plain

At the July gathering, Sheridan's supporters packed the room and took control, shouting at speakers and interrupting the interpreter's translations of the discussion into Spanish. The mostly older, white group of Sheridan supporters demanded an end to court oversight, citing the costs. They outnumbered the Latino community members and activists who want to keep the monitor in place until the sheriff's office proves to Snow it no longer discriminates against Latinos.

Snow said he would host the next community meeting inside the federal courthouse in downtown Phoenix.

**Read More**

**Arizona Police Agencies Were Once at the Forefront of Local Immigration Enforcement. Now Most Are Avoiding It.**



Sheridan also wants out of the settlement. He believes the strict mandates hinder deputies' ability to do their jobs. "There's no law enforcement agency that I'm aware of in this country under the same level of scrutiny," Sheridan said.

Latino advocates and community members worry complaints about the court mandates and the price tag will become an excuse, distracting from the root issue — the need to end racial profiling by the sheriff's office.

"When Sheridan tells us that it's done, I'm not going to take his word for it," said Reyes, who endured repeated traffic stops when Arpaio was sheriff. "I'm going to wait on the monitor. I'm going to wait for the judge. And when they say, 'You know what? They are compliant.' Then I'll believe it. And even then, it's going to be suspicious."

Chelsea Curtis of Arizona Luminaria contributed reporting. Gabriel Sandoval of ProPublica contributed research.

**What We're Watching**

During Donald Trump's second presidency, ProPublica will focus on the areas most in need of scrutiny. Here are some of the issues our reporters will be watching — and how to get in touch with them securely.