Dominic E. Draye, SBN 033012
drayed@gtlaw.com
Matthew P. Hoxsie, SBN 034952
hoxsiem@gtlaw.com
Zachary H. Levy, SBN 039323
zach.levy@gtlaw.com
**GREENBERG TRAURIG, LLP**
2375 E. Camelback Road, Suite 800
Phoenix, AZ 85016
(602) 445-8000

*Attorneys for Defendant Maricopa County*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel De Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al., | Case No. CV-07-2513-PHX-GMS |
| Plaintiffs, | **DEFENDANT'S REPLY IN SUPPORT OF RULE 60 RELIEF** |
| and | (Assigned to the Hon. G. Murray Snow) |
| United States of America, Plaintiff-Intervenor, | |
| v. | |
| Gerard A. Sheridan, in his official capacity as Sheriff of Maricopa County, Arizona, et al., | |
| Defendants. | |

GREENBERG TRAURIG
LAW OFFICES
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

## I.  INTRODUCTION

This litigation, combined with the hard work of countless deputies and the three most recent Sheriffs, has transformed MCSO.  The office is now in 100% Phase 1 compliance, meaning it has adopted all the necessary policies and implemented training to effectuate them.  That alone would be a durable remedy in most cases.  But it gets better.  There are no—zero—complaints of immigration enforcement or racially biased policing by MCSO.  Likewise, the Monitor has raised zero disagreement with MCSO's handling of Class Remedial Matters (CRMs) or officer discipline in over a decade of federal oversight.  Indeed, no one points to a single instance of MCSO violating the Fourth or Fourteenth Amendments as alleged in the operative complaint.  To state the obvious, circumstances have changed.  As a result, continued federal oversight is no longer equitable; and, because it replaces a democratically elected local official with unelected federal authority, it is "detrimental to the public interest." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992).  Federal judicial oversight has been a success, but it is not without cost to the democratic process and American federalism.  Because of the former, it is time for relief from the latter.

Disappointingly, Plaintiffs' Opposition continues to rely on facts from over a decade ago.  No one disputes that the Court could take the extraordinary measure of managing the then-troubled MCSO when this litigation began.  But considering the most cited document in Plaintiffs' brief is from 2016, it seems they are more interested in relitigating the past than discussing whether changed circumstances warrant Rule 60 relief.  (Doc. 1677).  The Opposition does not identify a single current constitutional violation.  Nor does it contend that the immigration-enforcement units still exist (they don't), that Sheriff Sheridan has directed officers to enforce immigration policy by targeting Latino drivers (he hasn't), or that any of the conditions underlying their complaint persist (they don't).  Plaintiffs had 45 pages and more than three months to comb through Monitor reports to identify even one instance of a Latino driver being stopped by MCSO to enforce federal immigration law.  They identify none.  That is good news.  And it carries with it the need to return control of MCSO to the elected Sheriff.  Doing so is not surrender; it is success.

1

## II. ARGUMENT

Institutional reform litigation is strong medicine. Although Plaintiffs never grapple with the costs of federal judicial oversight—pecuniary, and more importantly, costs to democratic self-government—the Supreme Court takes those harms very seriously. In *Horne v. Flores*, the Court recognized that the unique circumstances surrounding institutional reform cases mean "courts must take a 'flexible approach' to Rule 60(b)(5) motions addressing such [cases]." 557 U.S. 433, 450 (2009). The "flexible approach" requires discerning "whether the objective of the District Court's [original] order . . . has been achieved" and whether "a durable remedy has been implemented." *Id.* This is a two-part test designed to ensure that "responsibility for discharging the State's obligations is returned promptly to the State and its officials" once "a violation of federal law has been remedied." *Id.* at 450–51; *see also John B. v. Emkes*, 710 F.3d 394, 412 (6th Cir. 2013) (applying the two-part test).

Plaintiffs challenge only the second *Horne* requirement: whether "a durable remedy has been implemented." *Horne*, 557 U.S. at 450. They do not dispute that the constitutional objectives of the Court's Order have been met. What remains is a dispute as to whether MCSO has set appropriate guardrails to ensure future constitutional violations do not occur.

The objective evidence shows that MCSO has durably corrected its previous constitutional violations by overhauling the policies, procedures, and trainings relevant to traffic stops and policing. The results of those efforts are not just hypothetical—they have led to actual changes in the field. The recent Traffic Study Annual Reports ("TSARs") show non-existent or negligible differences in all metrics, and nothing suggests the remaining disparities are attributable to bias. Furthermore, no one has identified even a single complaint alleging immigration enforcement or racially biased policing by MCSO in over a decade of oversight. Preferring the trees to the forest, Plaintiffs seize on several paragraphs of the Court's Orders for which the Monitor has not yet found compliance and misinterpret the TSAR data—in a way contrary to their own previous agreement—to allege incorrectly that MCSO is regressing. (*See* Doc. 3459 at 13–17). These arguments are disconnected from the underlying constitutional violation and therefore say nothing about a durable remedy.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

On the metrics relevant to future compliance, MCSO has demonstrated a commitment to following federal law. Continuing federal oversight until MCSO obtains perfect compliance with the Orders and eliminates any conceivable risk of doing something different in the future is contrary to *Horne*, *Rufo*, and the logic of Rule 60(b).

**A. The Durable Remedy Must Match the Underlying Constitutional Violation**

*Horne* does not define when a durable remedy exists. But it does set the outer bounds of the analysis. "'[F]ederal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate [federal law] or does not flow from such a violation.'" *Horne*, 557 U.S. at 450 (quoting *Milliken v. Bradley*, 433 U.S. 267, 282 (1977)). The reason is that federal judicial oversight is not costless. It "deprive[s] future officials of their designated legislative and executive powers," and, by extension, deprives the people of the ability to elect those who wield such powers. *Id.* (quoting *Frew v. Hawkins*, 540 U.S. 431, 441 (2004)) (citation modified).

Precedent from the circuit courts illustrates the ways in which local governments may establish durability. The analysis focuses on the totality of "defendants' efforts to comply with federal law and [their] commitment to remaining in compliance." *Jackson v. Los Lunas Comty. Program*, 880 F.3d 1176, 1202 (10th Cir. 2018). Thus, policy changes like "a statute designed to cure the specific federal violation" and "sustained good-faith efforts to remedy federal violations" establish a durable remedy. *Id.* at 1203. Other examples include policies, procedures, and trainings designed to correct a previous violation, *see Peery v. City of Miami*, 977 F.3d 1061, 1075–76 (8th Cir. 2020), or credible evidence showing the movant intends to continue its current practices after oversight ends. *John B.*, 710 F.3d at 413.

Importantly, once the movant shows they will follow the law after oversight ends, the litigation must immediately cease, even if the movant has not fully "complied with the specific terms of the . . . court order." *Jackson*, 880 F.3d at 1199. This rule stems from *Horne*'s command that once "a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper." 557 U.S. at 450. The goal is "compliance with federal law," not continued compliance with a prior injunction. *John B.*, 710 F.3d at 413.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

3

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

Indeed, institutional reform litigation must not "take[] on a life of its own and [] advance a purpose removed from remedying the initial violation(s)." *Jackson*, 880 F.3d at 1200. The durable remedy analysis thus focuses on the underlying constitutional violation that brought about the litigation. Anything else is irrelevant. *United States v. Washington*, 573 F.3d 701, 710 (9th Cir. 2009) ("The [Supreme] Court has repeatedly reminded us that institutional reform injunctions were meant to be temporary solutions, not permanent interventions, and c[an] be kept in place only so long as the violation continue[s].").

### B. MCSO Has Shown Durable Reform

Plaintiffs' quest for eternal oversight meets its first barrier in the Monitor's reports. The reports show 100% Phase 1 compliance, reflecting changed policies and training that could alone constitute a durable remedy. But even more encouraging is the objective evidence showing those changes in policy have resulted in operational changes in the field. The 2023 Traffic Study Annual Report ("TSAR") showed "no evidence of disparities in stop length, citation rates, arrest rates, search rates, or seizure rates (hit rates) following a search for Hispanic drivers (compared with White drivers)." (Doc. 3035-1 at 37). And the 2024 TSAR found only one difference for arrest rates following a stop, but noted that the result "do[es] not directly represent discriminatory policing." (Doc. 3199-1 at 9). And there are no class remedial complaints or instances of targeted immigration enforcement affecting the Plaintiff Class. Plaintiffs respond that MCSO "offer[s] no factual evidence, beyond the Monitor's reports, that MCSO has achieved full compliance." (Doc. 3459 at 12). For the side championing more monitoring, that criticism makes no sense. The Monitor exists to review MCSO's compliance. When it comes to the conduct that brought about this lawsuit, MCSO has complied for years. That sustained compliance demonstrates a durable remedy.

### 1. A Durable Remedy Exists Through MCSO's 100% Phase 1 Compliance

In 2013, the Court found Fourth and Fourteenth Amendment violations based on former Sheriff Arpaio's attempts to enforce immigration law through MCSO's LEAR policy. That policy violated the Fourth Amendment by requiring deputies to detain persons they

4

believed to be unlawfully present in the United States and to hold them until Immigration and Customs Enforcement decided how to proceed.  (Doc. 579 at 4).  The Court further held the LEAR policy's use of race as a factor establishing reasonable suspicion of unlawful presence violated the Fourth Amendment, Fourteenth Amendment's Equal Protection Clause, and Title VI of the Civil Rights Act of 1964.  (*Id.*).  And the LEAR policy's similar use of race for reasonable suspicion to "investigate the occupants [of a vehicle] for violation of state law related to immigration, or to enforce the LEAR policy" also violated the Fourth Amendment.  (*Id.* at 5).  Those are the constitutional violations in this case.

MCSO repealed the LEAR policy in 2013.  (*See* Doc. 2756 at 16).  Consistent with Paragraph 19's mandate to amend patrol operations policies "to ensure that they reflect the Court's permanent injunction," MCSO submitted revised policies to the Monitor for feedback in 2014.  (*Id.*); (Doc. 649).  The feedback process took four years, and MCSO achieved compliance with Paragraph 19 in 2018.  (Doc. 2756 at 16).  A similar process occurred for Paragraphs 18 and 20–34 (requirements for policies against discriminatory policing and patrol operations) and Paragraphs 41–53 (requirements for training).  MCSO achieved complete 100% Phase 1 compliance with all orders in 2024.

MCSO's decades-long effort to achieve Phase 1 compliance supports finding a durable remedy.  The constitutional violations in this case concerned unlawful traffic stops resulting from MCSO's LEAR policy.  (Doc. 579 at 4–5).  To eliminate the vestiges of that policy, MCSO undertook a complete overhaul of its policies, procedures, and trainings.  That effort was neither quick nor painless—it required sustained collaboration with the Monitor, repeated revisions, and years of implementation.  Those sustained good faith efforts are precisely the kind of actions demonstrating a durable remedy.  *See Jackson*, 880 F.3d at 1202–03.

Even outside of *Jackson*'s good-faith framework, constitutionally sufficient policies and procedures—standing alone—establish a durable remedy.  Thus, the Eleventh Circuit held that "training on [the consent decree's] requirements," along with body cameras and better documentation, dispelled any fear that the City of Miami would "return to its former

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

ways absent the consent decree." *Peery*, 977 F.3d at 1075 (citation modified). The programs in *Peery* are similar to the systems MCSO created to achieve Phase 1 compliance. And *Peery* arose in the more-demanding context of showing a consent decree's satisfaction rather than changed circumstances for relief from an involuntary order. *See* 11 *Wright & Miller's Federal Practice & Procedure* § 2863 (3d ed. 2012) ("The first of the grounds set out in Rule 60(b)(5), that the judgment has been satisfied released or discharged, has been relied on very rarely."); *United States v. Asarco Inc.*, 430 F.3d 972, 979 (9th Cir. 2005) (explaining Rule 60(b)(5) relief for consent decrees requires the additional step of showing that the parties did not anticipate the changed factual circumstances in question). If materially identical reforms were enough to meet the more difficult satisfaction standard, they are more than enough to show changed circumstances.

### 2. A Durable Remedy is Further Shown Through Recent TSAR Data and MCSO's Handling of CRMs

Because the LEAR policy resulted in unconstitutional traffic stops, the Court ordered MCSO to create a system for collecting and reviewing traffic stop data. (Doc. 606 ¶¶ 54–71). The Court further ordered MCSO to track CRMs in response to former Sheriff Arpaio's failure to follow the Court's first order. (Doc. 1765 ¶¶ 281–337). MCSO has done so, and both metrics are published in TSARs and Monitor reports.

Although the Court did **not** require MCSO to eliminate all statistical disparities, the TSARs reveal that changes in policy have resulted in changes in the field. The 2023 TSAR found "there [was] no evidence of disparities in stop lengths, citation rate, arrest rates, search rates, or seizure rates ('hit rates') following a search of Hispanic drivers (compared with White drivers)." (Doc. 3035-1 at 37). Those results continued into 2024, where the TSAR found there was no statistically significant differences between White drivers and the Plaintiff Class except for one difference in arrest rates following a stop. (Doc. 3199-1 at 9). That difference was the result of MCSO changing the variable utilized to measure arrest benchmarks, which increased the discrepancy from 0.9% to 3.9%. (*Id.* at 18 n.12, 40 n.24). Even then, the 2024 TSAR makes clear the discrepancy "do[es] not directly represent

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

discriminatory policing." (*Id.* at 9). That determination is supported by the Traffic Stop Monthly Reports ("TSMRs"), which look at traffic stops from individual deputies over the past twelve months and have never found a deputy engaging in biased or discriminatory policing. (*Id.* at 10, 41). And, important here, the Monitor "has concurred with MCSO that the inequities in traffic stop outcomes were not associated with bias." (*Id.* at 41).

The Monitor reports tell the same story through CRMs. Over the past decade, there have been 162 CRMs involving the Plaintiff Class. Only ten of those involved a sustained finding of misconduct involving bias—the last being filed in 2022. (Doc. 3358-1 at 149). Attached as **Exhibit A** is a report of all ten sustained CRMs over the past decade. Of those ten, five involved an officer making a decision based on race, including decisions **not** to pursue law enforcement action based on race. (*Id.*). The other five were for inappropriate comments by detention officers—not the type of biased policing in Plaintiff's Complaint. In each instance, the officer was reprimanded, suspended, or no longer works for MCSO. The Monitor has "concurred" with MCSO's handling of all the CRMs. (Doc. 3268 at 262).

The traffic stop and CRM data provide real-world confirmation that MCSO's policy reforms are working. They therefore support the existence of a durable remedy. In *Shakman v. Pritzker*, 43 F.4th 723, 729 (7th Cir. 2022), the Governor of Illinois moved for Rule 60(b) relief based on policy reforms similar to this case. The Seventh Circuit found a durable remedy because the lack of any constitutional violations spoke "to the stability of the state's, and by extension, the Governor's reform measures." *Id.* The same reasoning applies here. No one has identified anything resembling the systemic targeting of Latinos that brought about this litigation. And the TSAR and CRM data further show MCSO's policy reforms have resulted in sustained constitutional policing. That data confirms the success and durability of the policy reforms this Court directed.

### C. Plaintiffs Err by Asking the Court to Focus on Matters Disconnected from the Underlying Constitutional Violation

Plaintiffs' Opposition argues a durable remedy does not exist because: (1) MCSO has not complied with every paragraph of the Court's Orders; (2) the TSAR's methodology is

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

flawed; (3) Sheriff Sheridan personally requires continued federal oversight; and (4) "[c]urrent federal immigration enforcement practices make it more likely that MCSO may resume its unconstitutional practices." (*See* Doc. 3459 at 12, 16, 26, 36).  All four arguments ignore the lack of a current constitutional violation and instead attempt to distract the Court with tangential matters that do not override the changed circumstances or make continued federal oversight, with its attendant costs to democratic self-government, equitable.

### 1.    Plaintiffs Incorrectly Argue MCSO Must Satisfy Every Paragraph of the Court's Orders to Achieve a Durable Remedy

Plaintiffs' first argument is a durable remedy cannot exist because MCSO has not satisfied every paragraph of the Court's Orders.  (*See id.* at 13).  They explain the "Monitor's most recent report identified at least [twenty-two] paragraphs that were not compliant, deferred, or 'n/a' with critical notes" and there have been serious "concerns with compliance as to at least nine additional paragraphs." (*Id.*).  This argument stumbles out of the gate: of the twenty-two paragraphs cited by Plaintiffs, only sixteen involve ongoing requirements for MCSO.[1]

More fundamentally, Plaintiffs' argument has already failed at the Supreme Court. *Horne* specifically rejected the argument that an institutional reform defendant must satisfy every part of a court order to obtain Rule 60 relief.  557 U.S. at 454.  That approach, the Court explained, collapses the satisfaction and changed circumstances inquiries into one analysis. *Id.*  That "turn[s] the risks of institutional reform litigation into reality" by elevating the terms and policies of a court order over an ongoing violation of federal law. *Id.* at 453. An ongoing violation of federal law is what justifies ongoing federal oversight. *See id.* at 453–54.  State officials are free to resolve that violation however they see fit, even if their approach differs from the operative court order. *Shakman*, 43 F. 4th at 731 ("[T]he Constitution presumes that state officials have a high degree of competence in deciding how

---

[1] Three of the cited paragraphs concern duties of the Monitor (¶ 289, ¶ 291, ¶ 293); one concerns Phase 1 and 2 requirements MCSO has already met (¶ 46); and two are deferred while the Monitor awaits more information (¶ 56, ¶ 300).

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

best to discharge their governmental responsibilities, including how to effectuate constitutional compliance." (citation modified)). Indeed, federal oversight must not "take[] on a life of its own and [] advance a purpose removed from remedying the initial violation(s)." *Jackson*, 880 F.3d at 1200. Plaintiffs' argument thus fails as a matter of law.

Even looking at the specific paragraphs Plaintiffs rely upon, their concerns relate to implementation of the policies created under Phase 1. Plaintiffs never attempt to explain how disagreements over methodology create an ongoing constitutional violation.

Take, for example, Paragraphs 32 and 33. The Monitor has withheld full and effective compliance for each paragraph because he believes MCSO has not implemented its Phase 1 policies correctly. The facts around implementation are nuanced. For Paragraphs 32 and 33, the dispute boils down to the Monitor believing he must consider misconduct investigations located in other sections of the Court's Orders when determining full and effective compliance, while MCSO believes the Monitor must interpret the paragraphs based on their plain terms. (*See* Doc. 3358-1 at 52–53). This dispute could be relevant to determining whether MCSO has satisfied the Court's Orders, but it is immaterial to a motion for relief from judgment based on changed circumstances, namely the uncontested fact that MCSO does not target Latino drivers. The dispute over the Orders' precise operation has caused Plaintiffs to lose sight of the Constitution.

Next consider Paragraph 70. Plaintiffs specifically call out this paragraph as suggesting that MCSO has not "meaningfully and proactively respond[ed] to the racial disparities that have arisen in its stop data." (Doc. 3459 at 13). That argument ignores both the "input" of constitutionally compliant policies and the "output" of data and analysis showing there is no racial bias in traffic stops. (Doc. 3035-1 at 37; Doc. 3199-1 at 9). The only dispute between MCSO and the Monitor under Paragraph 70 is the appropriate standard for measuring compliance. (*See* Doc. 3358-1 at 80). MCSO believes that Paragraph 70's plain terms control, while the Monitor believes the paragraph requires "the reduction of indicia of disparate treatment of the Plaintiff[ ] class." (*Id.*). Here again, there could be an interesting debate on what is required for satisfaction of the Court's Orders. But as it relates

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

9

to the underlying constitutional violation, there is no debate. "[I]ndicia" of disparate impact do not violate the Constitution. *See United States v. Ayala-Bello*, 995 F.3d 710, 714 (9th Cir. 2021) ("[D]isparate impact does not prove disparate treatment.").

Finally, Paragraphs 204, 361, and 362 are slightly different because they focus on the "PSB Backlog." The backlog is a later-arising concept in this case concerning community complaints not tied to the Plaintiff class; community complaints tied to the Plaintiff class are CRMs. (Doc. 3268 at 3). MCSO has worked diligently to clear the backlog of non-class complaints. In less than three years, MCSO has reduced the backlog from 2,074 complaints to 371. (Doc. 3495-1). MCSO has not, however, always met the quota for completed investigations proscribed under the Court's Orders, which is the basis of noncompliance under Paragraphs 204, 361, 362.

Plaintiffs would make the PSB backlog the tail that wags the dog. Not only have they failed to identify any CRMs in the backlog, but no one disputes that MCSO will soon eliminate the backlog entirely. It is therefore disconnected from the underlying constitutional violation, and continuing federal oversight based on the (disappearing) backlog is inequitable. It also exceeds federal courts' jurisdiction. "[F]ederal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate [federal law] or does not flow from such a violation." *Horne*, 557 U.S. at 450 (quotation omitted).

Plaintiffs attempt to sidestep the Rule 60 inquiry by pointing out that the Ninth Circuit affirmed various portions of the Court's Orders. (*See* Doc. 3459 at 10). Those affirmances, however, addressed a different question, namely the Court's authority to craft injunctive relief necessary to remedy the underlying constitutional violation. They do not concern what to do once the underlying violation resolves. *Horne* illustrates the difference. There, the State of Arizona was found in contempt for not appropriately funding ELL students within the time proscribed by the court. 577 U.S. at 441–42. Under Plaintiffs' reasoning, that contempt finding would have become part of the underlying constitutional violation. But the Supreme Court, when instructing the district court on how to proceed, did not mention the prior contempt finding, nor did it address the "series of additional orders

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

and injunctions" that brought about compliance. *Id.* at 441. Rather, the Court's direction was for the district court to determine if the underlying constitutional violation had been resolved. *Id.* at 450. If it had, federal oversight needed to cease immediately. *Id.* (stating in the absence of current violation of federal law, courts "must not hesitate in awarding necessary relief").

Ultimately, Plaintiffs' arguments based on satisfaction conflate different provisions of Rule 60(b)(5) and obsess over the details of the Court's Orders while ignoring, if not tacitly admitting, that there is no ongoing constitutional violation.

### 2. Plaintiffs Unconvincingly Challenge the TSAR Methodology They Themselves Proposed

In an attempt to create an issue that might justify extending this litigation, Plaintiffs attack the TSAR methodology that all parties, working with the Monitor and the government, created in a careful and collaborative process. Their attack also fails spectacularly on the merits. Moreover, even if Plaintiffs' new expert could torture the data to create a statistical disparity, the Supreme Court has for decades recognized that statistical disparities do not violate the Constitution.

The TSAR methodology is one of the many successes of this litigation. It was born through collaboration with the Monitor, DOJ, **and Plaintiffs**. As the Court noted more than four years ago, the "statistical apparatus was the culmination of years of effort by Dr. Greg Ridgeway, representing the Plaintiffs and Plaintiff-Intervenor [the United States]; with MCSO being represented at various times throughout this process by ASU, CNA, and then Dr. Andrew Prelog; and Commander John Girvin and Dr. John Carnevale coordinating and implementing this effort on behalf of the Monitor." (Doc. 2718 at 2). It was a "collaborative" process, and the Court "appreciate[d] the efforts expended in getting the TSMR coordinated and functioning." (*Id.*)

But nothing is sacred. Now Plaintiffs attack the very features they agreed to. For example, the government's expert, Dr. Ridgeway, proposed—and Plaintiffs accepted—using

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

propensity score matching rather than regression analysis to ensure that TSARs treat like situations alike. Plaintiffs now call that flawed. (Doc. 3459-3 at 7–8).

Plaintiffs' new expert also argues that the agreed TSAR methodology is wrong to exclude searches incident to arrest or tow from the distinct question of stop length. (*Id.* at 15–16). But there is an easy explanation for why the parties excluded "incidental searches" from the analysis of stop duration: arrests are measured separately, and tows are mandatory. Specifically, Arizona law requires a vehicle to be towed if the driver lacks a license. A.R.S. §§ 28-3151(A), 28-3511(A)(1)(b). Hispanic drivers, through **no** connection to any policy by MCSO, lack a license in about 7% of stops, compared to only 0.5% for white drivers. (Doc. 3199-1 at 32).[2] The parties therefore excluded stops involving a tow from the analysis of stop duration because those stops take longer (waiting for a tow truck, conducting an inventory search, etc.) due to state law over which the officer has no control.[3] The TSAR methodology controls for variables that can affect stop length in order to give the most accurate picture; Plaintiffs' new expert intentionally (and incorrectly) does not.

Arrests and searches incident to arrest raise similar issues. There are a host of reasons why arrest rates (and thus mandatory searches incident to arrest) differ between Hispanic, all minority, and white drivers—none of which has anything to do with discrimination by MCSO. For example, if a driver has an active warrant, arrest is mandatory. *E.g.,*, A.R.S. § 13-3897(A). Hispanic drivers are statistically likelier to have outstanding warrants, so the

___

[2] MCSO devoted an entire quarterly report to investigating the effects of A.R.S. § 28-3151(A), *see* TSQR 15, available at https://www.mcsobio.org/traffic-stop-data, and concluded that "the disparity observed in citation outcomes in TSAR 9 is primarily a function of disparate impact associated with A.R.S. § 28-3151A rather than organizational or individual bias." *Id.* at 23. In that process, MCSO reviewed 60 analyses provided in TSAR 9 and an additional 180 analyses of traffic stops to try to identify inequalities in outcomes. *Id.* Importantly, "when controlling for ARS 28-3151A by forcing matches and by excluding ARS 28-3151A from the analysis, changes in arrest disparity were all less than one percent for each group and these differences were not statistically significant." *Id.* at 22.

[3] To avoid any question whether Hispanic drivers are disproportionately stopped as an initial matter, they are not. The 2024 data contains 20,265 total traffic stops, with 65% of the stops being of white drivers compared to 23% of stops of Hispanics—a 2.8-1 ratio. (Doc. 3199-1 at 9). But Maricopa County's population is approximately 52% white and 31% Hispanic—a 1.6-1 ratio. *See* United States Census Bureau, *QuickFacts, Maricopa County, Arizona* (last visited April 21, 2026) https://www.census.gov/quickfacts/fact/table/maricopacountyarizona/PST045225

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

TSAR process recognizes that "[i]nequality in arrest outcomes from warrant arrests reflects court processing and driver behavior and are not germane to the deputy's duties." (TSQR 20 at 29).

Just as Plaintiffs turn their back on the TSAR methodology they helped create, their new expert turns her back on her previous papers. In her seminal paper, Dr. Pierson **excluded** incidental searches for the very reasons the TSARs do. *See* Emma Pierson et al., *A large-scale analysis of racial disparities in police stops across the United States*, Nature Human Behavior, Vol. 4 pg. 736, 739 (July 2020) ("Implicit in this test is the assumption that officers exercise discretion in whom to search; therefore, when possible, **we exclude non-discretionary searches, such as vehicle impound searches and searches incident to arrest**, as those are often required as a matter of procedure, even in the absence of individualized suspicion." (emphasis added)). Here, however, she includes incidental searches, which allows her to manufacture "significant differences in [her] conclusions." (Doc. 3459-3 at 7). Money talks.

In addition to failing to control for relevant variables, Plaintiffs' new expert also misrepresents the increased use of ETSIs. Two developments account for this trend that, again, have nothing to do with discrimination. The first is the addition of the new "Driving Documentation" code, which accounts for prolonged stops where a driver lacks "the required driving documentation (i.e., license, registration, and insurance)." (Doc. 3199-1 at 37). As noted above, Hispanic motorists are more than ten times likelier to lack a license than white drivers. Previously, many deputies used the "technical issues" code when an officer could not scan a driver's license, for example if there was none, and instead had to manually enter the driver's identification information, (*e.g.*, TSQR 17 at 12); this practice explains why the "technical issues" code appears more often for Hispanic drivers. (*Contra* Doc. 3459 at 21). The second reason that ETSI use has increased is training. Since 2020, MCSO reviewed footage from over 600 body worn cameras and determined that officers were **underutilizing** ETSIs, prompting MCSO to enhance training. (*See* TSQRs 3, 13, 17, and 21).

Finally, the new expert report turns to a "highly misleading" use of statistics that courts universally reject. *Brnovich v. DNC*, 594 U.S. 647, 680 (2021). To make minor differences appear vast, the report divides small percentages. For example, Plaintiffs' new expert declares that the search rate for Hispanic drivers is 256% greater than white drivers. (Doc. 3459-3 at 14). That sounds dire, but Dr. Pierson is comparing 3.5% to 1.4%. Both percentages are very small (even using Dr. Pierson's flawed regression that does not control for incidental searches), but dividing them obscures that fact, which is why the Supreme Court rejects the practice. *Brnovich*, 594 U.S. at 680–81 (rejecting argument that policy was discriminatory when it disqualified "twice" as many minority voters—but the disqualification rates were 1% and 2%); *Frank v. Walker*, 768 F.3d 744, 752 n.3 (7th Cir. 2014) (explaining "we do not divide percentages" because it "mask[s] the fact that the populations were effectively identical"). That Plaintiffs must resort to known mendacity to make even their figures appear consequential only confirms that MCSO has abandoned racial profiling and eliminated the disparities that are within its power to eliminate.

*        *        *

Plaintiffs' late attack on traffic stop data is also notable for what it does not discuss. Paragraph 70 does not require data collection for its own sake. Rather, it charges MCSO with using traffic stop data to identify any deputy or unit that "may be engaging in racial profiling, unlawful searches or seizures, or unlawful immigration enforcement." (Doc. 606 at 33). To that end, MCSO reviews twelve-month data for every deputy and flags any aberrant statistics. Deputies who have been flagged are then investigated by the Traffic Stop Analysis Sergeant, who reviews body worn camera footage in a process agreed to by the parties and the Monitor. Since it began this process in 2021, MCSO has **never** identified discriminatory or biased policing, and neither has the Monitor. (*E.g.*, Doc. 3199-1 at 10). In addition to more than sixty monthly reports, MCSO has produced twenty-one quarterly research reports (the TSQRs). Those reports contain additional, deeper analysis of racial/ethnic disparities, focusing on topics ranging from district-level inequality to the role speed and multiple violations play in generating inequality in citation outcomes. Once again,

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

no one—not MCSO, Plaintiffs, or the Monitor—has found any policy or practice that could be characterized as racial profiling. Even Plaintiffs' new expert concedes that the bare statistical differences she concocts do not "prove bias" and might be explained by unobservable differences in, for example, the "propensity to carry contraband." (Doc. 3459-3 at 15).

Not only does Paragraph 70 require more than bare statistical disparities, but decades of Supreme Court precedent does as well. The Court has long rejected the notion that statistical differences—even stark ones—can establish an equal protection violation. *See Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 270 (1979) (98% of persons eligible for benefit were men); *see also Brnovich*, 594 U.S. at 677 (rejecting argument that "any 'statistically significant' disparity" suffices under Voter Protection Act). While it might be possible to tease out a small but statistically significant difference in arrest rates or stop duration, that is not enough to establish a constitutional violation. Indeed, Plaintiffs' (dubious) statistics are a distraction from the exhaustive analysis MCSO performs and its follow-up examination of deputies with statistical aberrations. That work, which everyone agrees shows an absence of discrimination, is the point of Paragraph 70. It also confirms that circumstances have changed and there has not been a constitutional violation for years.

> **3.    Plaintiffs' Argument About Sheriff Sheridan's History and Current Federal Immigration Enforcement is Disconnected from the Underlying Constitutional Violation and Thus Irrelevant**

> **i.    Plaintiffs resort to attacking Sheriff Sheridan based on a decade-old contempt finding**

Rather than meaningfully grappling with the Monitor-approved evidence demonstrating changed circumstances, Plaintiffs argue that a contempt finding from ten years ago, when Sheriff Sheridan worked under the direction of then-Sheriff Arpaio, precludes Rule 60 relief today. (Doc. 3459 at 26). The failure to address current conditions was precisely the defect in *Horne*, and Plaintiffs' inability to locate any current misconduct speaks volumes.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

The Court's 2016 findings have nothing to do with the 2026 MCSO. As traced at length in the Rule 60 Motion and this brief, MCSO has transformed under this Court's oversight, owing in part to the hard work of MCSO leadership, including Sheriff Sheridan.

By winding back the clock in an attempt to forestall relief, Plaintiffs subvert the premise of Rule 60. Rule 60(b)(5) applies precisely when there was once some misconduct warranting court intervention, but changed circumstances "warrant reexamination of the original judgment." *See Horne*, 557 U.S. at 448. Rule 60 is ineffectual if prior bad acts can deny relief. Instead, the proper focus is both current and prospective—*i.e.* no ongoing violation and a durable remedy—not backward. *See* Fed. R. Civ. P. 60(b)(5) ("[A]pplying [the judgment] prospectively is no longer equitable."); *see also Abbott v. Perez*, 585 U.S. 579, 603 (2018) ("[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." (citation omitted)); *Gilmore v. People of the State of Cal.*, 220 F.3d 987, 1007 (9th Cir. 2000) (stating an "injunction directed to events to come is subject always to adaptation as events may shape the need." (citation omitted)).; *Doe v. Briley*, 511 F. Supp. 2d 904, 916 n.5 (M.D. Tenn. 2007) (noting that plaintiffs may not "forestall inquiry into modification of a consent decree based on prior instances of noncompliance").

Taken to its logical end, Plaintiffs' position would result in oversight until (1) MCSO is purged of all employees who have the "original sin" of working there during the Arpaio administration or ever making a critical comment about this litigation, or (2) voters elect the candidate whom Plaintiffs want as Sheriff. That offends too many constitutional values to count, but federalism, free speech, and democracy stand out. *See Horne*, 557 U.S. at 448–49; *see also Pritzker*, 43 F.4th at 731 (stating a court cannot be "an indefinite institutional monitor . . . focused much more on ensuring that the" defendant "implements best practices rather than eliminates an ongoing violation of federal law" (citation modified)).

While Plaintiffs focus on the past, they fail to identify any current evidence suggesting that Sheriff Sheridan wants to return to an era of Arpaio's constitutional violation. Plaintiffs' only recitations of Sheriff Sheridan's personal views are inaccurate and speculative. First, Plaintiffs reference a comment from Sheriff Sheridan during an October 2013 deputy

16

training session wherein Sheridan referred to the Court's First Order as "ludicrous" and "crap." (Doc. 3459 at 29–30; Doc. 880 at 3). Plaintiffs contend this thirteen-year-old comment "raises a concern that [Sheriff Sheridan] might not be committed to a durable remedy." (Doc. 3459 at 30). However, Plaintiffs' recital of the Sheriff's comments is incomplete and misleading. During the same election debate recording Plaintiffs later rely on, Sheriff Sheridan explained that what he said in 2013 was, "I know this order is ludicrous and crap, and . . . **this is the law of the land and we will comply and do everything we can to comply with that order**." (Doc. 3459-12 at 12:10–12:43) (emphasis added). Sheriff Sheridan explained that the media left out the second half of his statement—the same error Plaintiffs embrace here. (*Id.*). The Court might not relish the criticism, but it is both protected speech and no basis for overlooking the shared commitment to reform.

Next, in their only argument based on the current decade, Plaintiffs refer to Sheriff Sheridan's "regrettable silence in the face of racial animus at the July 16, 2025 community meeting," (Doc. 3459 at 30), and even go as far as citing a July 17, 2025 Phoenix New Times article to imply that Sheriff Sheridan endorsed a comment by an audience member who allegedly told a speaker to "go back to Mexico." (Doc. 3459 at 30–31 (citing Doc. 3459-11). That is not true. The Sheriff never endorsed that statement, and he had no authority to take control of the meeting. (Doc. 2431 at 4–6). If he had done so, Plaintiffs would have been the first to cry foul that he was encroaching on the Monitor's purview. Even the New Times did not link the Sheriff's statement that he "was happy to hear some positive things about the Sheriff's Office and myself for a change" to the audience member's "go back to Mexico" slur. Only Plaintiffs stretch the truth that far.

Indeed, since Sheriff Sheridan assumed office on January 1, 2025, the success story has continued: MCSO maintained 100% Phase 1 compliance with this Court's Orders; there has been no indication of any constitutional violations against the Plaintiff Class; the Monitor has agreed with MCSO's handling of all CRMs; and MCSO has cleared all identified CRMs from the backlog. (*See generally* Docs. 3268 (44th Quarterly Report), 3381 (45th Quarterly Report)). There are no signs of slowing down under Sheriff Sheridan's leadership.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

17

Stated simply, Plaintiffs' speculation is unfounded and detached from the dispositive question before this Court: whether an ongoing constitutional violation continues to exist. It does not. MCSO remains committed to sustaining the remedial measures it has painstakingly implemented over the course of a decade to address the underlying constitutional violations that once—but no longer—affected members of the Plaintiff Class.

### ii. Plaintiffs' allusion to Captain Lugo's leave is baseless

In another attempt to attack Sheriff Sheridan, Plaintiffs argue that "Sheriff Sheridan's attempt to transfer Captain Lugo out of PSB shows the need for continued judicial supervision," (Doc. 3459 at 25:14-15), and claim that "MCSO appears to have taken or attempted to take adverse action against Captain Gregory Lugo." (*Id.* at 25:17-26:1). Those claims are untrue. The attempt to transfer Captain Lugo in December 2025 was not the result of a conspiracy to undermine Court Orders—it is absurd that Plaintiffs even suggest as much—but was solely because Captain Lugo had already served in that role longer than any previous commander, and two Monitor-approved interim commanders were in place.

In search of something nefarious, Plaintiffs point to Captain Lugo's administrative leave and the fact that MCSO leadership asked questions about previous discipline. (Doc. 3459 at 32). There is neither smoke nor fire around these episodes, and they are universally unconnected to the subject of this litigation. Even Plaintiffs cannot devise a whisper of bias-related coverups or inadequate investigation and discipline.

First, Captain Lugo's paid administrative leave was the result of an unrelated administrative and criminal complaint by Sergeant Engelbeck on March 10, 2025 (IA 2025-0111) and Captain Lugo's failure to "stay out of" the file in which **he was the subject** of the investigation (IA 2025-0139). In short, Sergeant Engelbeck's complaint alleged that Captain Lugo retaliated against Sergeant Engelbeck and tampered with his file. (**Exhibit B** (Jaffer Report) at 2–3). Captain Lugo reviewed the complaint during intake and understood that it included claims made against him. (*Id.* at 4; *see also id.* at 17). Nevertheless, Captain Lugo reviewed the file. On March 18, 2025, his supervisor, Executive Chief Palopoli, told him to "stay out of it." (*Id.* at 4–5). Yet Captain Lugo accessed the file twice more on March

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

21 and March 28, 2025, (*id.* at 5–6), and contended that he was not told to "stay out of it" until March 24. Even setting aside the he-said-she-said dispute over **when** Captain Lugo was told to stay out of his own file, he knew there was a conflict and should have "stayed out of it" on his own. Indeed, if MCSO had permitted Captain Lugo to keep tabs on an investigation about himself, Plaintiffs would complain that the lack of ethical walls warrants continued monitoring. (*See* Doc. 2938 (GH-2 prohibits conflicts of interest)). In any event, the substance of Sergeant Engelback's allegations have nothing to do with racial discrimination.

Second, Plaintiffs assert that Captain Lugo was "uncomfortable" because MCSO leadership asked about prior discipline and MCSO policies. (Doc. 3459 at 26). Interviews conducted by the Monitor show this to be another grasp at straws. In one instance, Undersheriff Gentry asked Captain Lugo about the DUI policy due to a detention sergeant that self-reported an off-duty DUI. (**Exhibit C** (Lugo Interview) at 22:1-6). Undersheriff Gentry expressed his view that termination seemed too severe a penalty where the DUI occurred off duty and the officer self-reported. He asked Captain Lugo when the policy changed (it previously did not require termination) and if it could be changed back. (*Id.* at 22:9-15). Captain Lugo stated that he did not "really care to have an opinion at the end of the day." (*Id.* at 23:3-11). That was the extent of the discussion and nothing else happened.

In another example, Sheriff Sheridan and Undersheriff Gentry asked Captain Lugo about two specific cases, and Undersheriff Gentry expressed concern that MCSO terminated someone for clocking in from the district before driving to an off-duty job. (*Id.* at 60:8-15). Captain Lugo informed him that the case involved a number of off-duty jobs, including "others [the officer] never even went to and it's thousands and thousands of dollars." (*Id.* at 60:23-61:2). Undersheriff Gentry accepted that explanation and nothing else happened.

The record does not include a single example of anyone asking Captain Lugo to reopen a final disciplinary proceeding or take action inconsistent with MCSO policy. Surely, asking questions of the type identified above is permissible. Plaintiffs stretch the facts beyond recognition when they seemingly ask the Monitor to make a "finding" (something

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

he cannot constitutionally do) of retaliation based on these events.  For present purposes, however, it suffices that Captain Lugo's complaints have no connection to the constitutional violation in this case.  They are not just too thin a reed to support continued federal judicial oversight; they are no reed at all.

### iii. Plaintiffs cannot merely speculate that MCSO will re-institute illegal policies because of a purported "national" trend

Plaintiffs' reference to national trends (to which Plaintiffs devote a surprising amount of their opposition, (Doc. 3459 at 36–39) is, charitably stated, misplaced.  To the extent Plaintiffs wish to change federal immigration policy, their efforts should be aimed at Congress or the President.  No defendant should have its case decided based on other people's actions.

### D. Defendants Are Entitled to Relief Pursuant to Rule 60(b)(6) or, at Minimum, to Partial Relief.

For similar reasons, the Court should provide relief under Rule 60(b)(6) based on extraordinary circumstances, including prolonged and burdensome processes covering even the most minute aspects of running a democratic institution long after Sheriff Arpaio and his immigration policies are no longer effective.

Plaintiffs' Opposition argues that MCSO is not entitled to relief from any paragraph, because all paragraphs are "tethered" to one another.  (Doc. 3459 at 47).  Their premise is that relief is unwarranted, which MCSO rejects for all the reasons discussed above.

## III.    CONCLUSION

Federal judicial oversight is not the norm, but rather a jaw-dropping exception reserved for cases of absolute necessity.  Here, the success of that exceptional medicine warrants a return to democratic governance.  Plaintiffs' failure to recognize that fact permeates their Opposition and gives rise to a sort of Oversight-Industrial Complex consisting of plaintiffs' attorneys, monitors, and investigators.  Only the Court has the perspective to recognize success freed from the lens of self-interest.  It should do so here and preserve this case as a success story rather than allowing it to become a cautionary tale.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

DATED this 22nd day of May 2026.

**GREENBERG TRAURIG, LLP**


By: /s/ *Dominic E. Draye*
    Dominic E. Draye
    Matthew P. Hoxsie
    Zachary H. Levy
    *Attorneys for Defendant Maricopa County*