# EXHIBIT A

Dominic E. Draye, SBN 033012
drayed@gtlaw.com
Matthew P. Hoxsie, SBN 034952
hoxsiem@gtlaw.com
Zachary H. Levy, SBN 039323
zach.levy@gtlaw.com
**GREENBERG TRAURIG, LLP**
2375 E. Camelback Road, Suite 800
Phoenix, AZ 85016
(602) 445-8000

*Attorneys for Defendant Maricopa County*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel De Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al., | Case No. CV-07-2513-PHX-GMS |
| Plaintiffs, | **DECLARATION OF DOMINIC E. DRAYE IN SUPPORT OF DEFENDANT'S MOTION FOR RULE 60 RELIEF** |
| and | (Assigned to the Hon. G. Murray Snow) |
| United States of America, Plaintiff-Intervenor, | |
| v. | |
| Gerard A. Sheridan, in his official capacity as Sheriff of Maricopa County, Arizona, et al., | |
| Defendants. | |

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

I, Dominic E. Draye, declare:

1. I am over 18 years of age. I am a Shareholder at Greenberg Traurig, LLP and counsel to Defendant Maricopa County. I make this declaration in support of Defendant's motion for Rule 60 relief.

2. Attached as **Exhibit 1** is a listing of the ten (10) Class Remedial Matters ("CRMs") from July 1, 2016 through September 30, 2025 (Third Quarter of 2025), in which there was a sustained allegation of racial bias, out of a total of 162 total CRMs alleging racial bias that were reviewed by the Maricopa County Sheriff Office ("MCSO") during that same time period. The information contained in this paragraph and in Exhibit 1 was produced and verified by MCSO PSB staff. The chart contains a brief description of each sustained CRM complaint with a sustained allegation of racial bias, the year of the complaint/ IA, the principal's classification, and whether the principal is employed by MCSO today.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22nd day of May 2026, in Maricopa County, Arizona.


*/s/ Dominic E. Draye*

Dominic E. Draye

1

# EXHIBIT 1

| Year | Employee Classification | Complaint | Date Sustained | Employed Today? |
|---|---|---|---|---|
| 2017 | Detention | Sustained for stating "My County My Language." IA2017-0036. | | Yes. Received a 40-hour suspension. |
| 2017 | Detention | Sustained for telling an inmate to "Lock your nappy head down!" IA2017-0718. | January 31, 2019 | Yes. Received a written reprimand. |
| 2018 | Sworn | Determined detainees were not citizens and their vehicle should be towed based on not having identification on possession, race, and Spanish speaking. IA2018-0038. | November 18, 2018 | No. |
| 2020 | Sworn | Made a biased-based decision not to take law enforcement action involving an alleged trespass on July 3, 2019 because Deputy believed the suspect did not speak English. IA2020-0537. | September 30, 2021 | Retired as a compensated Deputy in 2020. Currently a Reserve Deputy (Volunteer). |
| 2021 | Detention | Sustained for racially charged comment "Throw their Chancla." IA2021-0632. | May 12, 2022 | No. |
| 2021 | Detention | Sustained for racial comments "You guys are in America; you guys need to speak English." IA2021-0651. | January 26, 2023 | No. |
| 2022 | Detention | Sustained for comments such as "We don't speak Spanish here, it's the United States." IA2022-0549. | April 13, 2023 | No. |
| 2022 | Sworn | Used the driver's religion to make a law enforcement decision. IA2022-0114. | February 16, 2023 | No. |
| 2022 | Sworn | Used the driver's religion and race to make a law enforcement decision. IA2022-0069. | January 19, 2023 | No. |
| 2022 | Sworn | Used the driver's religion and race to make a law enforcement decision. IA2022-0203. | March 2, 2022 | No. |

# EXHIBIT B



100 Pine Street, Suite 3100
San Francisco, California 94111
Direct Dial: 628.201.0793
Fax: 628.221.5828

## MEMORANDUM

**To:**     Captain Aaron Flowers
            Maricopa County Sheriff's Office

**From:**   Shaneeda Jaffer
            Independent Investigator

**Date:**   January 26, 2026

**Subject:** Investigative Report and Recommendation for IA 2025-0111 and IA 2025-
            0165

This Investigative Report and Recommendations ("Report") concerning Internal Affairs Investigations IA 2025-0111 and IA 2025-0139 is provided by the Court Appointed Independent Investigator ("Independent Investigator") pursuant to the Chief Robert Warshaw's (the "Monitor") request on October 30, 2025.

## I.     Introduction

On May 30, 2025, Judge Snow, District of Arizona, appointed Shaneeda Jaffer as Independent Investigator for Maricopa County Sheriff's Office ("MCSO") IA 2025-0185.[1] On October 30, 2025, the Monitor, pursuant to his authority to oversee MSCO's Professional Standards Bureau ("PSB") and Internal Affairs ("IA") investigation, discipline, grievances, policies, procedures, and protocols[2], requested that the Independent Investigator review the record for IA 2025-0111 and IA 2025-0139 and provide recommended findings and conclusions.

Ultimately, two MCSO Complaints are at issue – IA 2025-0111 and IA 2025-0139. These two MCSO IA Complaints led to three distinct investigations completed by the Arizona Department of Public Safety ("APDS"):

- <u>MCSO IA 2025-0111.</u> On March 10, 2025, Sergeant Aaron Engelbeck ("Sergeant Engelbeck") submitted a complaint alleging the destruction and/or withholding of evidence related to his appeal of a prior investigation.[3] This complaint listed Captain Gregory Lugo ("Captain Lugo") and Sergeant Robert Leatham ("Sergeant Leatham") as "Involved Employees."[4]

---

[1] Doc. 3191.
[2] Doc. 1785 at ¶ 276; Doc. 2827 ¶¶ 346-347; 352.
[3] Complaint, IA 2025-0111 at 6 (MELC0005346086). IA2025-0111 is related to the alleged destruction of evidence from IA2020-0555.
[4] *Id.*

o ADPS Agent Patrick Quane conducted a criminal investigation, during which he concluded that no criminal violation occurred.[5]

o Additionally, ADPS Sergeant Robert Olshaskie conducted an internal affairs investigation into these allegations.[6]

- MCSO IA 2025-0139. On or about April 7, 2025, MCSO Executive Chief Melissa Palopoli ("Palopoli") accused Captain Lugo of failing to notify her of the conflict of interest resulting from Engelbeck's March 10, 2025, complaint and of insubordination when Captain Lugo reviewed IA 2025-0111 after instructions to "stay out of it." ADPS Sergeant Craig Baum conducted an internal affairs investigation into the alleged insubordination and failure to notify.

MCSO placed Captain Lugo on administrative leave with pay during the pendency of the criminal and internal affairs investigations. While the criminal investigation related to MCSO IA 2025-0111 conclusively determined that no criminal violations occurred, neither ADPS internal affairs investigation presented findings and recommendations about either administrative matter. Thus, on October 30, 2025, the Monitor requested that the Independent Investigator review all three investigations conducted by ADPS to make findings and recommendations. This report presents the Independent Investigator's findings of facts. Thereafter, this report addresses each of ADPS's investigations, including limited additional factual findings, relevant MCSO policies and Court Orders, and ultimately issues findings and recommendations for each allegation.

As detailed below, the Independent Investigator concurs with the criminal investigation's conclusion that no criminal violations occurred. Therefore, Captain Lugo and Sergeant Leatham are *Exonerated* of the A.R.S. § 38-1106(A)(1) allegation, and the ARS 13-2809(A)(1) allegation is *Unfounded*. The allegation of a violation of CP-2, Code of Conduct, Section 6: Conformance to Established Laws related to MCSO IA 2025-0111 is *Unfounded* as to Captain Lugo and Sergeant Leatham. Finally, with regard to IA 2025-0139, the allegation that Captain Lugo failed to notify Chief Palopoli of his conflict of interest is *Not Sustained*, and Captain Lugo is *Exonerated* of the insubordination allegation.

## II.    Factual Findings

On October 3, 2020, MCSO Professional Standards Bureau ("PSB") initiated an investigation into allegations of insubordination and untruthfulness against Sergeant Aaron Engelbeck.[7] PSB Sergeant Robert Leatham conducted this investigation, which was assigned MCSO case number IA 2020-0555.[8] At the time, Captain Lugo was a Captain in the District 6 Patrol Division and a supervisor to Sergeant Engelbeck.[9] Initially, Captain Lugo submitted a memorandum to the chain of command entitled, "Recommendation for release/demotion from promotional probation" as to Sergeant Engelbeck.[10] Thereafter, PSB initiated the internal affairs investigation into aspects of Sergeant Engelbeck's performance as detailed in Captain Lugo's

---

[5] ADPS Criminal Report I25023143 ("Quane Report").
[6] ADPS IA 2025-165 ("Olshaskie's Report").
[7] IA 2020-0555, Sgt. Leatham's Investigative Report, at 7 (MELC0005345489).
[8] Complaint IA 2025-0111, at 1-2 (MELC0005346080).
[9] *Id.*
[10] Memorandum recommending Engelbeck's demotion, at 1 (MELC0005345855-56).

memorandum.[11]  Sergeant Leatham interviewed Sergeant Engelbeck on October 21, 2020, and January 31, 2024, and interviewed Captain Lugo on October 15, 2020.[12]  The October 24, 2024 final findings indicated two sustained allegations of insubordination, and Sergeant Engelbeck received a 40-hour suspension.[13]  The other allegations were not sustained.[14]

Sergeant Engelbeck appealed his discipline related to IA 2020-0555 in October 2024, claiming that Captain Lugo engaged in misconduct and retaliated against him contrary to policy.[15] On December 9, 2024, Sergeant Engelbeck requested the full case file from the IA 2020-0555 investigation, and on December 20, 2024, Sergeant Engelbeck received documents and records in response.[16]  On January 27, 2025, Sergeant Engelbeck realized that the recordings of his and Captain Lugo's interviews with Sergeant Leatham were not included in the documents and records he received for his appeal.[17]  Also on January 27, 2025, Sergeant Engelbeck contacted Neil Landeen of the Maricopa County Attorney's Office ("MCAO") to inform him that the interview recordings had not been provided.[18]  The following day, January 28, 2025, MCSO Conduct Resolution personnel informed Sergeant Engelbeck that the sustained insubordination charges were being changed to not sustained, and the Appeal of Discipline Hearing was being vacated.[19] Further, Sergeant Engelbeck learned that he would be paid for the 40-hour suspension he had served.[20]

Concerned that misconduct had occurred, on March 10, 2025, Sergeant Engelbeck filed a complaint against the Professional Standards Bureau (PSB) and Captain Lugo.[21]  Sergeant Engelbeck alleged that, in his first interview with Sergeant Leatham, he lodged several complaints against Captain Lugo regarding command responsibility, truthfulness, and retaliation.[22]  The complaints were not investigated, and shortly afterwards, Captain Lugo was promoted to PSB Commander.[23]  Sergeant Engelbeck claimed that Captain Lugo and the PSB had destroyed evidence of the interview and intentionally refused to provide it when Sergeant Engelbeck requested it for his appeal.[24]  Notably, Conduct Resolution, not the PSB, provides documentation in the event of discipline, and Captain Lugo was listed as an "interested party" rather than a principal."[25]  This case was no different: the materials Sergeant Engelbeck received, that he believed to be incomplete, were sent to him by Conduct Resolution, not the PSB.[26]

---

[11] *Id.*
[12] IA 2020-0555 Investigative Report, at 4-5 (MELC0005345486-87).
[13] Letter imposing discipline, at 1 (Oct. 24, 2024) (MELC0005345720-23).
[14] IA 2020-0555 Findings (MELC0005345708-12).
[15] Complaint IA 2025-0111, at 1-2 (MELC0005346080).
[16] *Id.*, at 3-4 (MELC0005346082-83).
[17] *Id.* (MELC00005346083).
[18] *Id.*
[19] *Id.* (MELC00005346083-84).
[20] *Id.; see also* Ken Holmes, *Letter rescinding discipline* (Jan. 28, 2025).
[21] Complaint IA 2025-0111, at 1-2 (MELC0005346080).
[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] Olshaskie's Report, No. 2025-165, at 7 (Oct. 18, 2025); *see also* Policy GH-2, *Internal Investigation*, Section 22 ("The Administrative Services Division may distribute copies of all or any portion of an administrative investigation for administrative or public record purposes[.]").
[26] *Id.,* at 10-12; Quane's Report, at 8-9.

On March 10, 2025, at 4:02 PM, Sergeant Engelbeck emailed the substance of his complaint, along with documents, to Undersheriff Jeff Gentry ("Gentry").[27] At 4:03 PM, Sergeant Engelbeck uploaded his complaint onto IAPro BlueTeam, listing Captain Lugo and Sergeant Leatham as involved parties.[28] At 6:03 PM, Undersheriff Gentry sent Sergeant Engelbeck's email to Chief Palopoli, recommending that an outside agency investigate the incident. Chief Palopoli responded to the email just before 7:00 PM.[29] At 7:03 PM, during a typical review of incoming IA complaints, Captain Lugo viewed the first three paragraphs of the complaint, which, among other things, identified Captain Lugo as an involved party in the complaint and stated that Sergeant Engelbeck had informed Undersheriff Gentry via email of his complaint.[30] Captain Lugo did not notify Chief Palopoli about the complaint that evening.[31]

The next day, March 11, 2025, Chief Palopoli initiated a discussion about the complaint with Captain Lugo via phone call at 11:11 AM.[32] Captain Lugo noted that this indicated to him that Chief Palopoli was aware of the complaint and of his conflict of interest with Sergeant Engelbeck.[33] During the conversation with Chief Palopoli, Captain Lugo also expressed concern that this would essentially reopen a closed case.[34] Captain Lugo requested that it be treated as an investigation against the Conduct Resolution Section or a service complaint to avoid reopening closed cases.[35]

On March 18, at 9:00 AM, Captain Lugo arrived at Headquarters to discuss the investigation with Chief Palopoli.[36] She notified Captain Lugo that an outside agency would investigate the matter.[37] Captain Lugo explained to Chief Palopoli that the investigation had exceeded the seven-day compliance period.[38] During her July 23, 2025, interview with ADPS, Chief Palopoli stated that she decided to formally designate the matter as an Internal Affairs investigation, and that she instructed Captain Lugo to "stay out of it."[39] When asked whether she could remember what she specifically said to Captain Lugo, Chief Palopoli stated,

> Um, what exactly I said no, um, but I do recall that we designated it as an internal investigation involving [Captain Lugo] as a principal, and that he was to stay out of, out of the investigation and to provide me with a lieutenant, um, as my point of contact. So, to me, staying out of the investigation is completely wiping your hands of it, stepping back

---

[27] Email chain re: Request for outside agency criminal investigation sent 4:02 PM (Mar. 10, 2025).
[28] IAPro BlueTeam is web-based software application that is a companion product to the IAPro case management system used by law enforcement agencies.
[29] Email chain re: Request for outside agency criminal investigation, sent 5:03 PM (Mar. 10, 2025).
[30] Capt. Lugo Aug. 12, 2025, Interview Tr. at 5.
[31] *Id.*, at 6.
[32] *Id.*, at 8.
[33] *Id.*, at 8-9.
[34] *Id.*, at 9.
[35] *Id.*, at 9-10.
[36] *Id.*, at 12-13.
[37] *Id.*, at 13.
[38] *Id., see also* Policy GH-2, *Internal Investigation*, Section 2(B)(1)(e).
[39] Chief Palopoli timeline, pg. 1; Chief Palopoli Interview Summary, at 4.

and not having any involvement whatsoever, and recusing yourself at any moment in time that it comes up.[40]

While Chief Palopoli claims that it was during the March 18, 2025, meeting that she ordered Captain Lugo to "stay out of it," Captain Lugo denies that these instructions occurred at this meeting.[41]

On March 21, 2025, Captain Lugo met with Chief Don Anders, a member of the Monitor team, ("Monitor Anders") for their regularly scheduled intake meeting to "go through all the cases from the prior week."[42]  Captain Lugo explained that during these meetings, he and Monitor Anders review all new cases since the last meeting, as required by the Court Orders.[43]  Captain Lugo informed Monitor Anders of Sergeant Engelbeck's complaint against him, later called IA2025-0111.[44]  At Monitor Anders' request, Captain Lugo accessed the BlueTeam log to provide more information about the case, including what the complaint said about the chief deputy, and they discussed the complaint's similarity to the previously investigated case.[45]  The User Log indicates that Captain Lugo only accessed the incident at this time; he did not open any files or attachments associated with the complaint.[46]  This is corroborated by the case note referenced in Sergeant Baum's report:

> *Case Note:* *On August 27, 2025, [ADPS] Legal Counsel spoke with Chief Anders. Chief Anders confirmed that a conversation occurred with Captain Lugo on March 21, 2025. The purpose of that conversation was to discuss newly received cases and the assignment of those cases within the PSB.*[47]

On March 24, 2025, Chief Palopoli informed Captain Lugo that she intended to assign IA 2025-0111 to Jensen Hughes, PSB's conflict investigation firm.[48] Captain Lugo promptly informed Chief Palopoli of a conflict of interest with Jensen Hughes, given Captain Lugo's oversight of their work.[49] Captain Lugo indicated that it was during this March 24, 2025, meeting that Chief Palopoli instructed Captain Lugo to "stay out of it."[50] Captain Lugo also shared Monitor Anders' contact information with Chief Palopoli.[51] Regarding Palopoli's order to "stay out of it," the following exchange took place during Captain Lugo's August 12, 2025, interview:

> **Baum:**        Sir, were you given a direct order to stay out of the investigation by Chief Palopoli?

---

[40] Investigative Narrative: Internal Affairs Complaint #2025-064 ("Baum Report"), at 5; Chief Palopoli Interview Summary, at 6.

[41] Capt. Lugo Aug. 12, 2025, Interview Tr., at 63.

[42] Capt. Lugo Aug. 12, 2025, Interview Transcript, at 18.

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] *See* IA 2025-0111 Access Log (MELC0005344969).

[47] Baum Report, at 6.

[48] Capt. Lugo's Timeline, at 6-7 (MELC0005344957-58).; Capt. Lugo Aug. 12, 2025, Interview Transcript, at 20.

[49] Capt. Lugo Aug. 12, 2025, Interview Transcript, at 20.

[50] Capt. Lugo's Timeline, at 7 (MELC0005344958); Capt. Lugo Aug. 12, 2025, Interview Transcript, at 20.

[51] Capt. Lugo's Timeline, at 7.

| | | |
|---|---|---|
| **Lugo:** | | To stay out of the actual investigative steps?  Yes. |
| **Glueck**[52]**:** | | Including accessing the case in IAPro? |
| **Lugo:** | | No. |
| **Glueck:** | | Okay.  What did her order mean to you then? |
| **Lugo:** | | So, her order which reiterated my statements of stay out of it meant the actual doing anything involving the investigation.  Does not mean anything reference to providing or fulfilling any of my requirements of the court's order such as the dates, the times, the information that the monitor requires of the intake process advising the court appointed monitor of it.  Um, but I would not go in to look at the attachments, of course.  I would not, um, sign off on any memos.  I would not direct any investigation.  Um, I would not, you know, monitor any interviews approve or, uh, review any investigative plans.  I would not direct investigative plans.  Um, that is what I mean in of staying out the actual investigating aspect, the actions, uh, of collecting that information.[53] |

When asked if Chief Palopoli elaborated on her order, Captain Lugo explained that she did not:

> There's no written communication as such, um, of typically when we talk about in our agency of giving orders and making it clear, you know, there's, uh, various mechanisms that it's memorialized, okay, including email, text message, um, supervisor notes, all of that.  And at no time was there any clarification.[54]

On March 25, 2025, Captain Lugo spoke with Monitor Anders to continue the March 21, 2025, call.[55]  The Monitor agreed to handle the conflict-of-interest issue.[56]

On March 27, 2025, Chief Palopoli contacted Captain Lugo regarding the Sergeant Engelbeck matter.[57]  Chief Palopoli asked Captain Lugo who he would recommend to investigate this case.[58]  Captain Lugo said that he declined to recommend anyone.[59]

On March 28, 2025, Captain Lugo attended his regularly scheduled intake meeting with Monitor Anders.[60]  During that call, Monitor Anders asked Captain Lugo for the "assigned date," so Captain Lugo accessed the IAPro log for IA2025-0111 a second time, once again at Monitor

---

[52] ADPS Sergeant Tristan Glueck.
[53] Capt. Lugo Aug. 12, 2025, Interview Transcript, at 46-47.
[54] *Id.* at 47.
[55] *Id.* at 22.
[56] *Id.*
[57] *Id.* at 23; Capt. Lugo's Timeline, at 11 (MELC0005344962).
[58] Capt. Lugo Aug. 12, 2025, Interview Tr., at 24; Capt. Lugo's Timeline, at 11 (MELC0005344962).
[59] *Id.*
[60] Capt. Lugo Aug. 12, 2025, Interview Tr., at 26-27.

Anders' direction.[61]    Captain Lugo later indicated concern about the authenticity of the IAPro access log, as it did not reflect his access that day.[62]

On April 2, 2025, Captain Lugo attended a meeting with Undersheriff Gentry, Chief Palopoli, and others, during which Captain Lugo indicated that his team was notified of IA 2025-0111, and that the case should be locked down.[63]   Also on April 2, 2025, Chief Palopoli accessed the user log in IAPro to see who had viewed IA 2025-0111.[64]   She observed that Captain Lugo accessed the log on March 21, 2025, after Chief Palopoli claims to have ordered him "stay out of it."[65]

Concurrently, Chief Palopoli and Undersheriff Gentry decided to refer the investigation to ADPS, as their normal outside investigator, Jensen Hughes, had a conflict-of-interest.[66]   On April 3, 2025, Undersheriff Gentry sent a letter to Colonel Jeffrey Glover of ADPS requesting external assistance in conducting an internal affairs investigation.

On April 4, 2025, Undersheriff Gentry informed Captain Lugo that he was being placed on administrative leave pending this investigation.[67]   Captain Lugo protested, saying that his case should follow the same procedure as all PSB cases.[68]   On April 7, 2025, MCSO officially placed Captain Lugo on administrative leave. [69]

On April 7, 2025, Chief Palopoli lodged a second internal affairs complaint against Captain Lugo for insubordination when he accessed the online portal associated with IA2025-0111 against orders.[70]   Chief Palopoli also alleged that Captain Lugo failed to notify her of the conflict of interest in Sergeant Engelbeck's complaint.[71]   Chief Palopoli's complaint was ultimately assigned case number IA 2025-0139.

On April 9, 2025, MCSO personnel hosted a meeting with ADPS regarding the referral of Sergeant Engelbeck's and Chief Palopoli's complaints.[72]   Undersheriff Gentry, Chief Palopoli, and Deputy Chief Matt Summers attended for MCSO, while Captain Gunnar Hancock and Sergeant Baum attended for ADPS.[73]   During the meeting, Chief Palopoli "provided [] pertinent documentation" to Sergeant Baum.[74]

---

[61] *Id.* at 27.
[62] *Id.* at 28.
[63] Chief Palopoli July 23, 2025, Interview Summary, at 4-5.
[64] Chief Palopoli's Timeline, at 3.
[65] *Id.*
[66] Baum Report, at 6-7.
[67] Capt. Lugo's Timeline, at 13-17; Chief Palopoli's Timeline, at 3.
[68] Capt. Lugo's Aug. 12, 2025, Interview Transcript, at 33-34.
[69] Capt. Lugo's Suspension Letter (Apr. 7, 2025).
[70] Chief Palopoli's timeline, at 3.
[71] Email from Chief Palopoli to Lieutenant Frederick Porter, sent 2:47 PM (April 7, 2025).
[72] Baum Report, at 1.
[73] *Id.*
[74] *Id.*

### III.    IA 2025-0111 – Criminal Investigation

MCSO referred IA2025-0111 to ADPS for criminal investigation.  ADPS Agent Patrick Quane conducted the investigation and concluded that no criminal violation occurred.

A.    **Allegations and Charges**

1.    <u>MSCO</u>—violation of A.R.S. § 38-1106(A)(1) for failure to provide the respondent's investigative file within 14 calendar days of the request.

2.    <u>MSCO</u>—violation of A.R.S. § 13-2809(A)(1) tampering with physical evidence.

B.    **Relevant Laws and MCSO Policies**

1.    A.R.S. § 38-1106(A)(1)

In any appeal of a disciplinary action by a law enforcement officer, the parties shall cooperate with each other, act in good faith and exchange copies of all relevant documents and a list of all witnesses pursuant to the following time periods and requirements:

Within fourteen calendar days after the employer's receipt of a written request from the law enforcement officer for a copy of the investigative file that is accompanied by a copy of the filed notice of appeal, the employer shall provide a complete copy of the investigative file as well as the names and contact information for all persons interviewed during the course of the investigation.

The proper remedy for a violation is the exclusion of evidence, unless the failure to comply is because of excusable neglect.  A.R.S. § 38-1106(D).

2.    A.R.S § 13-2809(A)(1)

A person commits tampering with physical evidence if, with intent that it be used, introduced, rejected or unavailable in an official proceeding which is then pending or which such person knows is about to be instituted, such person:

Destroys, mutilates, alters, conceals or removes physical evidence with the intent to impair its verity or availability.

3.    Policy GH-2, *Internal Investigations, Sections 22 & 23: Records Disclosure and Retention*

The Administrative Services Division may distribute copies of all or any portion of an administrative investigation for administrative or public record purposes, or as necessary to comply with a judgment of a federal or state court.

In accordance with A.R.S. § 39-128, the Office shall retain all records that are reasonably necessary or appropriate to maintain an accurate knowledge of disciplinary action involving employees of the Office, including the employee's responses to all disciplinary actions.  All administrative investigations shall be maintained for five years after an employee's separation or retirement from Office employment.

9

### C.    Investigation Materials

During his investigation, Agent Quane reviewed the documents and records outlined in his report.[75]  Additionally, Agent Quane interviewed:

- Lieutenant Frederick Porter (April 17, 2025; May 5, 2025);
- Sergeant Robert Leatham (April 21, 2025);
- Sergeant Aaron Engelbeck (April 29, 2025);
- Management Analyst Maria Garcia (April 22, 2025); and
- MSCO Director of Conduct Resolution Tiffani Shaw (May 7, 2025).

### D.    Agent Quane's Findings

Agent Quane concluded that no criminal misconduct occurred in IA 2025-0111.[76]  Not only was it impossible for a criminal violation of A.R.S. § 13-2809(A)(1) to have occurred because no testimony was taken under oath, but no individual suspect was identified.[77]  Accordingly, it was not only impossible to violate the statute and tamper with evidence, but also no tampering occurred.[78]

Even had a violation occurred, Agent Quane concluded that it was unintentional.[79]  Agent Quane contacted Conduct Resolution, the MCSO entity responsible for maintaining and providing IA-related files, and observed the interview that Sergeant Engelbeck claimed was deleted.[80]  Agent Quane found that it was both unmodified and saved within MCSO's systems, contrary to Sergeant Engelbeck's claims.[81]  He also discussed the incident with Tiffani Shaw, the Director of Conduct Resolution.[82]  She explained that if Sergeant Engelbeck did not receive the video, it was merely an oversight on the part of Conduct Resolution.[83]

Accordingly, Agent Quane concluded that no violation of A.R.S. § 13-2809(A)(1) occurred, because (1) no evidence was given under oath, and (2) no intentional modification of evidence occurred.[84]

On the other hand, Agent Quane found that a violation of A.R.S. § 38-1106(A)(1) did occur, because Sergeant Engelbeck did not receive the documentation he requested from Conduct Resolution within the 14-day statutorily required period.[85]  However, Agent Quane concluded that this is an administrative policy, rather than a criminal statute, so no criminal penalties could stem from it.[86]

---

[75] Quane's Report, at 4-7.
[76] Id. at 8-9.
[77] Id.
[78] Id.
[79] Id. at 7-8.
[80] Id. at 8.
[81] Id.
[82] Id.
[83] Id.
[84] Id. at 8-9.
[85] Id.
[86] Id.

10

Further, based on his conversation with Ms. Shaw, Agent Quane concluded that any omissions from Sergeant Engelbeck's file were inadvertent.[87]  As a result, no further criminal investigation was warranted.

### E.      Independent Investigator's Findings

1.      A.R.S. § 38-1106(A)(1)

The Independent Investigator finds that this alleged "criminal" violation is administrative in nature.  Accordingly, no criminal violation occurred.

A.R.S. § 38-1106(a) requires the employer to provide a law enforcement officer who requests his or her administrative file the entire file within fourteen (14) calendar days.[88]  It also states that the proper remedy for a violation is the exclusion of evidence, "unless the failure to comply is because of excusable neglect."[89]

Here, Sergeant Engelbeck submitted his request on December 9, 2025.[90]  He did not receive the entirety of his administrative file within 14 days of the request.  On January 27, 2025, Sergeant Engelbeck notified Neil Landeen from MCAO that he did not receive his first interview with Sergeant Leatham, nor Captain Lugo's interview.  This exceeded the 14-day window, thus violating the statutory mandate.

As Agent Quane found, neither Captain Lugo nor Sergeant Leatham were involved in preparing or sharing Sergeant Engelbeck's file.  Instead, Conduct Resolution stores and provides that information.  Because neither Captain Lugo nor Sergeant Leatham were tasked with providing this information, they cannot be responsible for any violation.

Additionally, the violation (by Conduct Resolution) is likely due to excusable neglect. Agent Quane obtained, and the Independent Investigator reviewed, files from Conduct Resolution. There is no evidence that the interview videos were destroyed, mutilated, altered, or concealed in any way.  After a conversation with Ms. Shaw from Conduct Resolution, Agent Quane concluded that the omission of the interview was an oversight.  This constitutes the excusable neglect contemplated by the statute.

Accordingly, because the failure to provide Sergeant Engelbeck's interview within 14 days was due to excusable neglect by Conduct Resolution and not the willful actions of Captain Lugo or Sergeant Leatham, the Independent Investigator finds that Captain Lugo and Sergeant Leatham are *Exonerated* of this allegation.[91]

---

[87] *Id.* at 8.
[88] A.R.S. § 38-1106(A)(1).
[89] A.R.S. § 38-1106(D).
[90] Complaint IA 2025-0111, at 1-2 (MELC0005346080).
[91] Doc. 1765, at ¶ 208(d); Policy GH-2, *Internal Investigation*, Section 7(A).

11

2.       A.R.S § 13-2809(A)(1)

It was also alleged that Sergeant Leatham and Captain Lugo violated A.R.S § 13-2809(A)(1) and tampered with evidence by destroying and withholding evidence from Sergeant Engelbeck's appeal.  As Agent Quane concluded, an "official proceeding" is one "heard before any legislative, judicial, administrative or other governmental agency or official authorized to hear evidence under oath."[92]  "While a police investigation is arguably an administrative governmental function, no governmental body hears evidence under oath in that context[.]"[93]  Agent Quane repeatedly asked, and was repeatedly informed, that the interviews were not given under oath.[94]  Accordingly, neither Captain Lugo nor Sergeant Leatham could tamper with evidence in violation of the statute, because it did not involve any proceeding that occurred under oath.

Moreover, there is no evidence to suggest that either Captain Lugo or Sergeant Leatham were involved in providing the files to Sergeant Engelbeck.  Both explained that neither of them is involved in providing files on appeal—instead, Conduct Resolution supplies that information.  Further, Agent Quane's investigation revealed that the files Sergeant Engelbeck claimed had been deleted were actually intact and stored along with his file.  Finally, Tiffani Shaw indicated that if Sergeant Engelbeck did not receive all the files he requested, it was likely an error on the part of Conduct Resolution and was unintentional.

Because neither Captain Lugo nor Sergeant Leatham had any role in providing the case file to Sergeant Engelbeck for the purposes of his appeal, the allegation of a violation of A.R.S. § 13-2809(A)(1) for tampering with physical evidence is *Unfounded*.[95]

## IV.    IA 2025-0111 – Internal Affairs Investigation

ADPS Sergeant Olshaskie conducted the internal affairs investigation into the allegations of IA 2025-0111, that Sergeant Leatham and Captain Lugo tampered with Sergeant Engelbeck's record on appeal.

### A.    Policy

1.       MSCO Policy CP-2*, Code of Conduct, Section 6: Conformance to Established Laws.*

Employees shall obey all local ordinances, county and state laws, laws of all states of the United States and subdivisions thereof, and all laws of the United States.  While traveling outside of the continental United States, employees shall abide by all laws of foreign countries not in conflict with the laws of the United States.  Violation of any established ordinance or law may result in disciplinary action, up to dismissal and possible criminal prosecution.  Disciplinary action may be imposed regardless of the outcome of any criminal investigation.

---

[92] A.R.S. § 13-2801(2).
[93] *State v. Larriba-Tucker,* 259 Ariz. 320, 565 P.3d 1072, ¶ 17 (App. 2025).
[94] *Id.* at 5-6.
[95] Doc. 1765, at ¶ 208(a); Policy GH-2, *Internal Investigation*, Section 7(B).

## B.    Investigation Materials

Sergeant Olshaskie reviewed various documents and interviews associated with 2020-0555,[96] related to the investigation into Sergeant Engelbeck's insubordination, and conducted various interviews, including:

- Sergeant Aaron Engelbeck (September 23, 2025);
- Sergeant Robert Leatham (October 6, 2025);
- Captain Greg Lugo (October 9, 2025).

## C.    Sergeant Olshaskie's Investigation

While interviewing Sergeant Engelbeck, Sergeant Olshaskie noted that Captain Lugo and Sergeant Leatham were not principals, but merely "involved employees."[97]  Sergeant Engelbeck stated that he did not have proof that either Captain Lugo or Sergeant Leatham were involved but thought they "had the most to gain."[98]  Sergeant Engelbeck also admitted he was aware, by October 2025, that the files he requested did, in fact, exist and had not been tampered with.[99]  He also admitted that he had no evidence that any of his files were modified.[100]

Sergeant Olshaskie also interviewed Sergeant Leatham.[101]  Sergeant Leatham stated that he has no involvement in the appeals process or the way evidence is gathered, and believed that Captain Lugo did not, either.[102]  Captain Lugo provided the same information in his interview, stating that the PSB has "zero involvement" in providing a case file for appeals.[103]  Captain Lugo stated that he was not involved in providing the case file for Sergeant Engelbeck's appeal.[104]  Ultimately, Sergeant Olshaskie did not issue any findings or recommendations.

## D.    Independent Investigator's Findings

As above in the criminal investigation, there is no evidence to suggest that either Captain Lugo or Sergeant Leatham were involved in providing the files to Sergeant Engelbeck.  Instead, that is a function of the Conduct Resolution Section.  Further, because both Agent Quane and the Independent Investigator concluded that no criminal violation occurred, it follows that neither Captain Lugo nor Sergeant Leatham violated CP-2, Code of Conduct, Section 6: Conformance to Established Laws.  As such, the allegation of a violation of CP-2, Code of Conduct, Section 6: Conformance to Established Laws is *Unfounded*.[105]

---

[96] Olshaskie's Report, at 2.
[97] *Id.*
[98] *Id.* at 8.
[99] *Id.* at 10.
[100] *Id.*
[101] *Id.* at 11.
[102] *Id.* at 11-12.
[103] *Id.* at 14.
[104] *Id.*
[105] Doc. 1765, at ¶ 208(a); Policy GH-2, *Internal Investigation*, Section 7(B).

### V.    IA 2025-0139 – Internal Affairs Investigation

ADPS Sergeant Baum investigated IA 2025-0139, specifically Chief Palopoli's allegations of insubordination and failure to notify against Captain Lugo.  Lieutenant Baum began his investigation on April 9, 2025.

### A.    Allegations and Policies

Chief Palopoli accused Captain Lugo of failing to notify her of his conflict of interest related to Engelbeck's March 10, 2025, complaint in conformance with MCSO GH-2, Section 4(D)(4).  She also alleged insubordination as defined in CP-2, Section 40, for Captain Lugo accessing the IAPro file for Engelbeck's complaint on March 21, 2025.

### B.    Relevant Policies and Court Orders

#### 1.    MCSO Policy GH-2, *Internal Investigations*

Section 2(B)(1)(e): Upon determination by the PSB Commander that an allegation of misconduct requires an investigation, the PSB shall promptly assign an IA Number to the incident and provide it to the complainant.  Within seven days, the PSB shall provide a written update to the complainant which shall include the IA Number and the name of the assigned investigator.  This written update shall also inform the complainant how they may contact the PSB to inquire about the status of the complaint.

Section 4(D): Conflict of interest in administrative investigations is prohibited.  An assigned investigator shall disclose any involvement or relationship which could be perceived to compromise the investigative process to the PSB Commander prior to the start of the investigation.  The PSB Commander shall make a determination as to whether the perception is justified and reassign the investigation, if necessary.

Section 4(D)(4): If an internal affairs investigator or a commander has knowledge of a conflict of interest affecting their involvement, they should immediately inform the PSB Commander or, if the holder of that office also suffers from a conflict, the highest-ranking, non-conflicted chief-level position or, if there is no non-conflicted chief-level position, an outside authority.

#### 2.    MCSO Policy CP-2, *Code of Conduct*

Section 40: Insubordination is the willful refusal to obey a reasonable and lawful order.  A reasonable and lawful order given to a subordinate shall be followed regardless of the method of conveyance, as specified in Office Policy GB-2, *Command Responsibility*.  The willful failure to obey an order constitutes grounds for discipline, up to and including dismissal from employment.

#### 3.    MCSO Policy GB-2, *Command Responsibility*

Section 6: Orders are commands or directives issued by a person with authority.  When orders are given in the form of oral commands, they should be simple and direct and may be followed by a written order.

14

Section 6(A): Written orders should be used when: a situation is complex enough that misunderstanding is reasonably possible; when several persons or units are involved and all must have the same understanding; and when coordination, control, and follow-up are necessary.

1. Such orders permit the recipient to refer to them for details and serve as evidence of precise instructions.

4.    *Ortega Melendres v. Arpaio,* Permanent Injunction Order, Doc. 606 (D. Ariz. Oct. 2, 2013) Supplemental Permanent Injunction/Judgment Order

On October 2, 2013, the Court entered its Supplemental Permanent Injunction/Judgment Order.[106]    Section IV of that order mandates Monitor review and approval of policies and procedures and the process by which policies and procedures are to be submitted for such review and approval.[107]

5.    *Ortega Melendres v. Arpaio,* Second Amended Second Supplemental Permanent Injunction/Judgment Order, Doc. 1765 (D. Ariz. July 26, 2016)

On July 26, 2016, the Court entered its Second Amended Second Supplemental Permanent Injunction/Judgment Order.[108]    Section XV of that order pertains to misconduct investigations, discipline, and grievances.[109]    That order mandates "[a]ll policies, procedures, protocols, training materials, and other material required by this Order are subject to the same process of review and comment by the parties and approval by the Monitor described in Section IV and ¶46 of the first Supplemental Permanent Injunction (Doc. 606)."[110]    It also mandates that conflicts of interest in investigations are strictly prohibited.[111]    It states that retaliating against any person who reports or investigates alleged misconduct shall be considered a serious offense.[112]

6.    *Ortega Melendres v. Penzone,* Order Resolving Order to Show Cause and Civil Contempt Findings, Doc. 2827 (D. Ariz. Nov. 8, 2022)

On November 8, 2022, the Court entered the above-referenced order.  It explained that the MCSO engaged in biased investigations that were delayed to such an extent that the behavior circumvented the Court's orders.[113]    To remedy the violation, the Court granted the Monitor Team "authority to oversee all of MSCO's [PSB] complaint intake and routing."[114]    It also commands the Monitor and the PSB Commander to work together and determine which complaints should be

---

[106] Doc. 606.
[107] *Id.* at ¶¶14-17.
[108] Doc. 1765.
[109] *Id.* at 18.
[110] *Id.* at ¶163-64.
[111] *Id.* at ¶¶ 167(a)(i)-(iii).
[112] *Id.* at ¶ 169.
[113] *Id.* at 1-2.
[114] *Id.* at 8.

15

investigated by the PSB or referred to other agencies.[115]  The Order repeatedly states that the "Monitor must consult with the PSB Commander" about the intake and routing process.[116]

### C.    Investigation Materials

Sergeant Baum reviewed documents provided by MCSO and conducted interviews of:

- Lieutenant Porter (July 20, 2025);
- Chief Palopoli (July 23, 2025 & September 3, 2025); and
- Captain Lugo (August 12, 2025). [117]

### D.    Sergeant Baum's Investigation

Sergeant Baum did not issue conclusions about the allegations, but he created a detailed narrative describing the events related to IA2025-0139.  He specifically noted the following discrepancies between Captain Lugo's and Chief Palopoli's interview testimony:

| Discrepancies between Captain Lugo and Chief Palopoli | | |
|---|---|---|
| Event | Chief Palopoli's Version | Captain Lugo's Version |
| Chief Palopoli orders Captain Lugo to "stay out of it." | March 18, 2025 | March 24, 2025 |
| Chief Palopoli orders Captain Lugo to open an IA number and assign a sergeant | March 18, 2025 | March 24, 2025 |
| Chief Palopoli calls Captain Lugo and asks him who he "recommends" to investigate his case | This did not happen | March 27, 2025 |

In his second interview of Chief Palopoli, Sergeant Baum asked if she was sure that her order to "stay out of it" occurred on March 18, 2025.[118]  She said that she was sure based on her notes.[119]  Sergeant Baum also reviewed and compared Chief Palopoli's and Captain Lugo's timelines.[120]

---

[115] *Id.* at 9.
[116] *Id.*
[117] *See generally*, Baum's Report.
[118] Chief Palopoli Interview Summary, at 7.
[119] *Id.*
[120] Baum Report, at n. 14 & 15.

### E.   Independent Investigator's Findings

#### 1.   Failure to Notify

The language in GH-2 mirrors the Court Order's requirement that "a commander who is responsible for making disciplinary findings or determining discipline" must "immediately inform … the highest-ranking non-conflicted chief-level officer at MSCO."[121]   Similarly, it requires a Supervisor to "immediately document and report information" to the PSB.[122]   In contrast, other language in the Order requires employees to report incidents "as soon as practicable."[123]

Captain Lugo explained that, at approximately 7:03 PM, he accessed the IAPro incoming folder and reviewed the first three paragraphs of Sergeant Engelbeck's complaint.[124]   Significantly, Captain Lugo was not named as a principal in that complaint.[125]   The first three paragraphs detail the events from IA2020-0555, a case that had already closed.[126]   Aware that Sergeant Engelbeck had previously filed complaints about Captain Lugo, and that those complaints were handled, and closed, as service complaints, Captain Lugo believed that the new complaint was an effort by Engelbeck to re-litigate matters already adjudicated.[127]   Further, Captain Lugo observed that the complaint indicated that Sergeant Engelbeck had also emailed the substance of his complaint to Undersheriff Gentry.[128]   These facts, taken together, indicate that Captain Lugo did not believe that Sergeant Engelbeck's complaint necessitated a formal internal affairs investigation, and that his chain of command was already aware of the allegations.   This justifies Captain Lugo's failure to contact Chief Palopoli as soon as he saw the complaint—he believed his chain of command already knew, and he was not named as a principal.

In any event, Captain Lugo did not fail to timely notify Chief Palopoli.   Captain Lugo reviewed Sergeant Engleback's complaint at approximately 7:03 PM on March 10, 2025.[129]   Captain Lugo indicated that he worked later into the evening, from home.[130]   Captain Lugo explained that, during this period, he worked later at night and cared for his children during the morning hours, as his children were on spring break.[131]   As 7:00 PM is after typical working hours, Captain Lugo's failure to call Chief Palopoli that evening is understandable.   The following morning, when Chief Palopoli contacted him at approximately 11:11 AM, Captain Lugo was taking care of his children, which explains his failure to notify her prior to her request for a call—he was not working. [132]

Based on the limited information that Captain Lugo read from Sergeant Engelbeck's complaint, it is reasonable that he believed the complaint was Sergeant Engelbeck's attempt to

---

[121] Doc. 1975 at 19-20.
[122] *Id.* at 20.
[123] *Id.*
[124] Capt. Lugo Aug. 12, 2025, Interview Tr., at 5.
[125] IA 2025-0111 Complaint, at 6 (MELC0005346085).
[126] *Id.* at 1-2 (MELC0005346080-81).
[127] Capt. Lugo Aug. 12, 2025, Interview Tr., at 9-10.
[128] *See* IA2025-0111 Access Log.
[129] *Id.*
[130] Capt. Lugo Aug. 12, 2025, Interview Tr., at 4-5; 8.
[131] *Id.* at 8.
[132] *Id.*

retaliate against him, and that his chain of command was already aware of the substance of the complaint. Further, the approximately 16-hour gap between when he read three paragraphs of the complaint and when he spoke to Chief Palopoli is reasonable, given the late hour that Captain Lugo read the complaint, and his family obligations the following morning. Accordingly, the allegation that Captain Lugo failed to notify Chief Palopoli of his conflict of interest is ***Not Sustained.***[133]

### 2.    Insubordination

Insubordination is the willful refusal to obey a reasonable and lawful order.[134] A willful violation is intentional; not accidental; voluntary; designed.[135] Captain Lugo was not insubordinate for three reasons: (1) the Independent Investigator finds that Chief Palopoli's oral order to "stay out of it" was issued on March 24, 2025, after Captain Lugo accessed the IAPro portal; (2) Chief Palopoli's oral order to "stay out of it" was vague, unreasonable, and unlawful; and (3) Captain Lugo accessed the IAPro portal at the Monitor's direction.

First, the Independent Investigator finds that Chief Palopoli's order was issued on March 24, 2025, after Captain Lugo's access to the IAPro portal, not on March 18, 2025, as Chief Palopoli alleges.[136] The Independent Investigator finds Captain Lugo's interview testimony to be more credible than Chief Palopoli's on this point for several reasons. First, Captain Lugo took contemporaneous notes of all his interactions and conversations with Chief Palopoli and Undersheriff Gentry during this time. Second, Captain Lugo's testimony is supported by corroborating evidence including call logs, text message screen shots, and date-stamped notes. Chief Palopoli's notes were not made contemporaneously and lack detail and support.

Additionally, independent evidence supports that Chief Palopoli gave the "stay out of it" directive to Captain Lugo on March 24, 2025. This evidence shows that Chief Palopoli made the decision to open Sergeant Engelbeck's complaint as an internal affairs investigation on March 24, 2024. During her interview, Chief Palopoli said that it was during the same conversation she instructed Lugo to "stay out of it" that she made the decision to open the complaint as an internal investigation involving Captain Lugo as a principal:

> Um, what exactly I said no, um, but I do recall that we designated it as an internal investigation involving [Captain Lugo] as a principal, and that he was to stay out of, out of the investigation and to provide me with a lieutenant, um, as my point of contact. So, to me, staying out of the investigation is completely wiping your hands of it, stepping back and not having any involvement whatsoever, and recusing yourself at any moment in time that it comes up.[137]

---

[133] Doc. 1765, at ¶ 208(c); Policy GH-2, *Internal Investigation*, Section 7(C).

[134] MCSO Policy CP-2, Code of Conduct, Section 40.

[135] MSCO Policy CP-2, at 2.

[136] Captain Lugo indicated that he also accessed the log on March 28, 2025, although this is absent from the Access Log. (Lugo Interview Tr. at 27-28). As further stated below, this does not change the Independent Investigator's findings, as Chief Palopoli's order was vague and unreasonable.

[137] Baum Report, at 5.

Captain Lugo agreed that this decision was made at the same time as the order to "stay out of it," but stated that the conversation took place on March 24, 2025. Review of the IA 2025-0111 User Log shows only user one access—by Chief Palopoli—on March 18, 2025, at 9:05 AM. This was during her meeting with Captain Lugo in her office. No additional activity followed on March 18, 2025. In contrast, the log shows a flurry of intake and routing activity by PSB administrative staff during the afternoon of March 24, 2025. This activity includes the assignment of case number IA 2025-0111 and several additional early intake tasks. That this activity took place on the afternoon of March 24, 2025, is consistent with Chief Palopoli's statement that she decided to open the case during the same conversation she instructed Captain Lugo to "stay out of it." It follows, then, that the "stay out of it" order came on March 24, 2025. Because Chief Palopoli's order came after Captain Lugo's March 21, 2025 access to the IAPro portal, Captain Lugo did not willfully refuse to obey an order.[138]

Second, Chief Palopoli's oral order to "stay out of it" was vague, unreasonable, and unlawful. The order should have been "followed by a written order" with "precise instructions," and Chief Palopoli's failure to clearly articulate the details and parameters of the oral order renders compliance nearly impossible.[139] To be sure, in his interview, Captain Lugo indicated that he was the first to use the term "stay out of it" on March 24, 2025, when he was explaining to Chief Palopoli that Jensen Hughes could not conduct the investigation because of their own conflict of interest. Specifically, Captain Lugo provided Monitor Anders' contact information to Chief Palopoli so that they could discuss the issue and find an un-conflicted external agency to conduct the investigation. With that information shared, Captain Lugo then told Chief Palopoli that he would "stay out of it."[140]

As the conversation ended, Chief Palopoli parroted Captain Lugo's term back to him when she instructed him to "stay out of it." Chief Palopoli did not elaborate to Captain Lugo what she intended with the instruction. During her July 23, 2025, interview, Chief Palopoli explained that she intended the order to convey that Captain Lugo was to have no involvement whatsoever:

> So, to me, staying out of the investigation is completely wiping your hands of it, stepping back and not having any involvement whatsoever, and recusing yourself at any moment in time that it comes up.[141]

But, importantly, Chief Palopoli then invited Captain Lugo to violate that very order on March 27, 2025, when she asked Captain Lugo who he would recommend to investigate this case.[142] Had

---

[138] During his August 12, 2025, interview, Captain Lugo explained that he accessed the IAPro system again on March 28, 2025, during another regularly scheduled intake meeting with Monitor Anders. During this call, Monitor Anders instructed Captain Lugo to access IAPro to obtain the 'assigned date.' The access log provided to the Independent Investigator does not reflect Captain Lugo's March 28, 2025, access. However, because the Independent Investigator determines that Chief Palopoli's order to "stay out of it" was unreasonable and unlawful, and because Monitor Anders' instruction to access IAPro supersedes Chief Palopoli's order, the March 28, 2025, IAPro access is inconsequential.

[139] *See* Policy GB-2, *Command Responsibility*, Section 6(a).

[140] Later, on March 27, 2025, when Chief Palopoli asked Captain Lugo who he would recommend to investigate the case, Captain Lugo declined to recommend anyone, consistent with his understanding of "stay[ing] out of it."

[141] Investigative Narrative: Internal Affairs Complaint #2025-064 ("Baum Report"), at 5; Chief Palopoli Interview Summary, at 6.

[142] Capt. Lugo Aug. 12, 2025, Interview Tr., at 24; Capt. Lugo's Timeline, at 11 (MELC0005344962).

19

she truly intended for Captain Lugo to "wip[e] [his] hands of it," then it makes no sense that she sought his counsel about it just days later.

Further, Chief Palopoli provided no instruction to Captain Lugo at the time of the order that he was not permitted to access the IAPro portal, as required to fulfill his duties under MCSO policies and the Federal Court Orders. Indeed, such an order from Chief Palopoli prohibiting Captain Lugo from complying with the Federal Court Order would be an unlawful order. As a result, the Independent Investigator finds that Chief Palopoli's oral order to "stay out of it" was vague, unreasonable, and unlawful. Therefore, Captain Lugo's access to the IAPro portal was not a willful refusal to obey a reasonable and lawful order.

Finally, Captain Lugo accessed the IAPro portal on March 21, 2025 at the Monitor's instruction. This is corroborated by Lieutenant Baum's investigation:

> Case Note:    *On August 27, 2025, DPS Legal Counsel spoke with Chief Anders. Chief Anders confirmed that a conversation occurred with Captain Lugo on March 21, 2025. The purpose of that conversation was to discuss newly received cases and the assignment of those cases within the PSB.*

Captain Lugo was required by court order to cooperate with Monitor Anders so he could determine the investigative process for every complaint.[143] Accordingly, Captain Lugo was obligated to comply with Monitor Anders' request for information about an incoming complaint. This applies equally to Captain Lugo's March 28, 2025, access, if that indeed occurred. As a result, Captain Lugo received an order from the Monitor that superseded any order given by Chief Palopoli.

Chief Palopoli's order to "stay out of it" occurred on March 24, 2025, was unreasonably vague, and unlawful. Further, Captain Lugo accessed the IAPro portal on March 21, 2025, at the specific request of the Monitor, in order to comply with the Federal Court Orders. As a result, Captain Lugo did not violate a lawful order and is **Exonerated** of the allegation of insubordination.[144]

---

[143] Doc. 2827, at 8.
[144] Doc. 1765, at ¶ 208(d); Policy GH-2, *Internal Investigation*, Section 7(A).

## VI.    Summary of Findings

| Summary of Findings | | | |
|---|---|---|---|
| **Investigation No.** | **Allegation(s)** | **Principal(s)** | **Independent Investigator's Findings** |
| IA2025-0111 | ARS § 38-1106(a): failure to provide a law enforcement officer who requests his or her administrative file the entire file within fourteen (14) calendar days. | Captain Greg Lugo; Sergeant Robert Leatham | *Exonerated* |
| IA2025-0111 | A.R.S § 13-2809(A)(1): tampering with evidence by destroying and withholding evidence from Sergeant Engelbeck's appeal. | Captain Greg Lugo; Sergeant Robert Leatham | *Unfounded* |
| IA2025-0111 | Failure to follow established laws in violation of Policy CP-2. | Captain Greg Lugo; Sergeant Robert Leatham | *Unfounded* |
| IA2025-0139 | Failure to warn of a conflict of interest in violation of Policy GH-2, Internal Investigations. | Captain Greg Lugo | *Not Sustained* |
| IA2025-0139 | Insubordination for failing to follow a reasonable lawful order in violation of Policy CP-2. | Captain Greg Lugo | *Exonerated* |

21

| Appendix | |
|---|---|
| **Statutes and Codes** | |
| ARS 13-2809 | 3 |
| ARS 38-1106 | 4 |
| CP-2 Code of Conduct | 8 |
| GH-2 Internal Investigations | 30 |
| First Court Order- Doc No. 606 | 74 |
| Second Court Order- Doc No. 1765 | 133 |
| Third Court Order- Doc No. 2827 | 200 |
| **Interviews & Timelines** | |
| Capt. Lugo's Timeline | 216 |
| Capt. Lugo's August 12, 2025, Interview Transcript | 233 |
| Chief Palopoli's Timeline | 297 |
| Chief Palopoli's July 23, 2025, Interview Summary | 301 |
| **Investigative Reports** | |
| Agent Quane's Report | 310 |
| Sgt. Baum's Report | 319 |
| Sgt. Olshaskie's Report | 328 |
| Sgt. Leatham's Report for 2020-0555 | 342 |
| **Miscellaneous Documentation** | |
| 1.28.2025 letter rescinding Sgt. Engelbeck's discipline | 456 |
| IA2025-0111 Complaint | 457 |
| IA2025-0111 Access Log | 464 |
| Suspension Letter sent to Capt. Lugo April 7, 2025 | 474 |
| Sgt. Engelbeck Recommendation for Demotion Memo | 475 |
| Sgt. Engelbeck's Suspension Letter (Oct. 24, 2024) | 486 |
| IA2020-0555 Findings | 490 |
| Signed Letter Rescinding Discipline (Jan. 28, 2025) | 495 |
| 3.10.2025 emails between Undersheriff Gentry, Chief Palopoli, and Sgt. Engelbeck re: Request for outside agency criminal investigation | 496 |
| Email from Chief Palopoli to Lieutenant Frederick Porter, sent 2:47 PM (April 7, 2025). | 503 |

# EXHIBIT C

Reporter's Transcript of Recorded Interview


In the Matter of:


Manuel de Jesus Ortega Melendres, et al.,

and United States of America

vs.

Gerard A. Sheridan, et al.

CV-07-02513-PHX-GMS

_____

*Reporter's Transcript of Recorded Interview*

with GREG LUGO

April 18, 2025

_____




Elaine M. Cropper, RDR, CRR, CRC
Registered Professional Reporter, AZ CSR #51046
E.M. Cropper, LLC

591 E. Plaza Circle, #2535
Litchfield Park, AZ  85340
ecropper24@gmail.com




Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

Gentry was in January after a Captains' meeting at the end of January and there was a brief discussion.  That's not yet to where you're at.

Q.    Okay.

A.    But I can then skip over that interaction.

Q.    Is there something of note in that interaction?

A.    Well, of note in that interaction, it was after the Captains' meeting and I think it was either the third or fourth Monday of January.

Q.    In January.

A.    And what's notable in that is the Sheriff made mention -- it's all the captains and made mention of if there's something -- if there's bad news or there's something -- there's a problem, he needs somebody to tell him.  And I think he gave his crystal ball analogy that gives -- I believe he gave it there that, you know, he's not afraid of any bad news and somebody needs to tell him what's going on.  So that was notable to me because that came into play later.

       But at the end of that meeting there was regular business.  I did actually give a short update about PSB status -- it was sort of when they went around the room -- of backlog and things of that nature.  Gentry said he needed to speak with me and Dave Letourneau after the meeting, so before he dismisses everybody.  And he goes, "And it's not about the same.  They are two separate matters, not related."

So I waited.  He first met with Letourneau and then I sit down with him at one of the tables there in the conference room and Gentry brings up -- he asks about the DUI policy and we had a case that started I believe either the end of December, beginning of January with a detention sergeant who got arrested for DUI and we placed him on administrative leave.  And the investigation was pretty much almost completed.  And that is the case that I know Gentry was referring to saying that, well, he doesn't like the fact that an off-duty DUI results in termination.  He went on to speak about several other things about that and how the Sheriff doesn't like that policy, why did it change?  When did it change?  If they are going to -- he's to work to change the policy and if they change the policy, does that prevent this individual from being terminated.

And I told him it wouldn't because it occurred already and that was the policy in place at the time.  I gave him a little bit of what I knew of when that time frame changed, which I know was under Sheriff Penzone, meaning the discipline, making it.  And Gentry spoke about the ██████ incident, who was a detective I believe that worked with Gentry, and said that, you know, ████████ got a DUI and, you know, he's a great guy.  This was years and years ago.  I don't know if that resulted in the termination of him or not, but he made one mistake and they shouldn't lose their job for making

one mistake.  And so he was going to work with Policy to change it and he said the Sheriff didn't like it either.

So that became noteworthy to me because I did express to him, he said, well -- he asked what my opinion was of that policy and I said I don't really care to have an opinion at the end of the day, but we just -- I need to apply the policy in the matrix in a uniform manner to the facts.  I said, "So you want to do that, you've got to change it."  And I didn't think that the Monitor Team and the parties would be supportive of that; but if that's what he wanted to go ahead and do, that certainly is -- certainly is his choice.

Q.    And as I remember that, that was a policy change that was initiated by Sheriff Penzone?

A.    I believe so.

Q.    And one the Monitoring Team approved when we approved a bunch of other things.

A.    Yes.  And I think I did also bring up with Gentry.  I did years and years ago under the old policy, I actually investigated one of my detectives who got a DUI and I was not in PSB and I did the investigation and he got a suspension but he still works for us to this day.  He was not terminated for it.

So I think I might have brought that up but I said this is the policy at the time.

And he asked for my opinion.  I explained the matrix

and that and I believe he said something to the effect of, well, this officer is a really good guy or something to that and then he says he shouldn't get in trouble for self-reporting because -- he would have never told us, we would have never known.  And this is where I had a disagreement with Chief Gentry.  I said, "We would have found out."  And he questioned on how we would have found out.  And I said, "We would have eventually found out.  Either the law enforcement agency would have called us."  There's -- you know, I know of all of these other things that are in place.  Somebody would have said something.  We do random -- the Records Division does random, you know, criminal history checks on employees, you know, every so many months, you know.  The Court would have been -- we would have found out at some point.  And I said, "I'm very confident we would have found out at some point if he didn't report it."

So he didn't think the person being honest should lose their job.  So he then made mention of he was trying to get to PSB and he's just been too busy because he said, "That was the first time I got a chance to talk to you.  Can I go to PSB?"

Q.   And this is Gentry?

A.   This is Gentry.  This is in that same.  And I said, "You absolutely can come to PSB," and he asked where we were.  And I gave him the rough layout and said I would gladly -- if he

wanted to let me know, I can schedule a time for him to come over and give him a little tour and that if that's what he wanted.

But he didn't -- I didn't ask but he didn't give me his phone number or anything or give me any direction of what, if anything, I needed to call him about at that point.

So then we get -- the next communication I had with him is in February.  There's an email.

Q.    Can we go back to the January, the civilian -- we had had a discussion that there had been an anonymous complaint left on the Sheriff's desk.

A.    I believe it was February.

Q.    Oh, February.

A.    I would have to check the email.

Q.    That's okay.

A.    And I believe it was the beginning of February when that occurred.  That's the anonymous complaint and this was my next communication with Gentry and there's an email about it.  He emails me and it was -- it was early in the week but it was somewhere closer around 4 o'clock in the afternoon and says he wanted the contact information for the independent investigator and I questioned -- I said -- I responded in an email like okay.  I was like independent or contract?  Like what?  And he said, "Well, he has a complaint that he thinks he needs to refer to them," and there was two or three emails going back

Q.   Oh, with just her?

A.   M'hum.  And all of this I repeated with them and I can get into with some slight different specifics.  But I explained this to her and she goes, "Well, we'll have to bring it up," and so that conversation ends with them pretty much walking in the door about 15, 20 minutes later.

Q.   Okay.

A.   Meaning Gentry and the Sheriff and I brief them.  I showed Chief Deputy Gentry the two binders and said here are the two cases and I expressed the concern with the █████ case saying I wanted him to know that that was still open and under appeal and so I just wanted to make that clear to him.  And he made the statement at some point that says he doesn't understand why we terminated somebody for clocking in from the district to drive to an off-duty job.  And I said, "Those are not the facts of that case.  You might want to review the facts before you, you know, get to that."

Q.   Did he say anything that he thought that the employee should not have been terminated?

A.   No.  He just says, "I don't understand why we terminated an employee."

Q.   For that reason.

A.   Yeah, for clocking in and drive time to an off-duty job.  And -- because that case revolves around a whole bunch of off-duty jobs that some he left hours before and that it was

driving but others he never even went to and it's thousands and thousands of dollars.

Q.    Okay.

A.    So I didn't -- yeah.  He made a statement he didn't understand why we terminated an employee for clocking in from the district while going to and from an off-duty job.  I told him those are not the facts of the case and they are more serious matters totaling thousands of dollars of off-duty work.  He didn't work.  I expressed that I was concerned because as an open -- it's under appeal still and I wanted him to know that.

Q.    Did you also discuss the ███████ case?

A.    We did not.  I don't recall us going into any other detail, just that the ██████ case is there.  I believe there was discussion again related a little bit with him.  I don't know if it was that meeting with Gentry or at another meeting but it was just some general things about the Rule 15 list as well, meaning that he didn't understand why people -- we were sending stuff to the Rule 15 list.  I don't recall if it was in that meeting with him or not.

Q.    Did you discuss with Gentry and Sheridan the issue of the attorney being in the interview?

A.    Yes.  So before we get there and I'm going to go in sequential order in that meeting.

Q.    If I missed something, sure.

A.    Well, it's a slightly different topic but the next topic

C E R T I F I C A T E

I, ELAINE M. CROPPER, Registered Professional Reporter, certify that the foregoing is a correct transcript, to the best of my skill and ability, produced via machine shorthand from the audio/video recording of the proceedings in the above-entitled matter.

DATED at Phoenix, Arizona, this 7th day of November, 2025.

s/Elaine M. Cropper

_____

Elaine M. Cropper