**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al. | No. CV-07-2513-PHX-GMS |
| Plaintiffs, | **ORDER** |
| and | |
| United States of America, | |
| Plaintiff-Intervenor, | |
| v. | |
| Gerard A. Sheridan, in his official capacity as Sheriff of Maricopa County, Arizona; et al. | |
| Defendants. | |

Pending before the Court are Defendants' Motion for Relief from the Third and Fourth Orders (Doc. 3399) and Defendants' Renewed Motion for Relief from the Third and Fourth Orders (Doc. 3485). Both motions are granted in part and denied in part.

## I. BACKGROUND

This dispute concerns the application—and requested modification—of paragraph 358 of the Court's Fourth Supplemental Injunctive Order. (*See* Doc. 3076 ¶ 358). The provision sets a schedule for the elimination of the MCSO's Professional Standards Bureau ("PSB") administrative investigation backlog. For each calendar-quarter (i.e., three-month period) the MCSO fails to reduce the PSB backlog by the requisite number of cases specified for that quarter, the MCSO is required to pay into the PSB Staffing Fund

$382,830.24 for *each month* in that quarter in which the PSB did not reduce the backlog by the requisite number of cases specified for that month. Prior to the last quarter of 2025 (October through December), the MCSO had met its PSB backlog reduction target every quarter. MCSO, for the first time, fell short of its target during the last quarter of 2025.

Before turning to the merits of the current dispute, the Court will first briefly summarize the circumstances that necessitated the issuance of the Fourth Supplemental Injunctive Order and ¶ 358 in particular.

### A. The Second Supplemental Injunctive Order

In 2016, after 21 days of evidentiary hearings, the Court issued Findings of Fact that detailed "particularly egregious and extraordinary" conduct by the Defendants. (Doc. 1765 at 2). After finding that then-Sheriff Arpaio and members of his Command Staff—including then-Chief Deputy Sheridan—knowingly failed to implement the Court's preliminary injunction, the Court also determined that Defendants: (i) failed to disclose thousands of relevant items of requested discovery that they were legally obligated to disclose, (ii) deliberately violated court orders after the post-trial disclosure of additional evidence, and (iii) prevented a full recovery of relevant evidence in this case that impeded the litigation, thus "resulting in a trial that did not completely address—and remedies that did not fully repair—the MCSO's violations of Plaintiffs' constitutional rights." (*Id.* at 1–2 (citing Doc. 1677 ¶¶ 165–217, 239–94)).

Upon the Defendants' disclosure to the Court of extensive MCSO misconduct—including their failure to provide evidence to the Plaintiffs under their discovery obligations—the Court suggested that the MCSO should assign the internal investigations of these issues to a separate agency or a third-party, considering the potential conflicts of interest arising from the misconduct. (*Id.* at 2 (citing Doc. 1677 ¶¶ 220–22)). Nonetheless, the Court allowed Defendants, at their insistence, to conduct their own investigations. (*Id.*). Though the MCSO acknowledged that its internal investigations arising from these matters would be closely reviewed by the Court and the Monitor, and both Sheriff Arpaio and Chief Deputy Sheridan agreed to cooperate fully with the Monitor and not withhold information

from him (Doc. 1677 ¶¶ 220–22), "Defendants continued to intentionally withhold relevant evidence during the course of their ensuing investigation and the eventual contempt hearing." (Doc. 1765 at 2 (citing Doc. 1677 ¶¶ 218–386)).

The Court devoted nearly 500 paragraphs of factual findings detailing how Sheriff Arpaio, Chief Deputy Sheridan, and the MCSO, in conducting the internal investigations of the misconduct, "manipulated all aspects of the internal affairs process to minimize or entirely avoid imposing discipline on MCSO deputies and command staff whose actions violated the rights of the Plaintiff class." (*Id.* (citing Doc. 1677 ¶¶ 387–875)). In summary, the Court remarked at the time:

> Defendants also initiated internal investigations designed only to placate Plaintiffs' counsel. Defendants did not make a good faith effort to fairly and impartially investigate and discipline misconduct or to discover other materials responsive to Plaintiffs' pretrial requests. To escape accountability for their own misconduct, and the misconduct of those who had implemented their decisions, Defendants, or their proxies, named disciplinary officers who were biased in their favor and had conflicts, Defendants remained in control of investigations in which they themselves had conflicts, Defendants promulgated special inequitable disciplinary policies pertaining only to *Melendres*-related internal investigations, Defendants delayed investigations so as to justify the imposition of lesser or no discipline, Defendants misapplied their own disciplinary policies, and Defendants asserted intentional misstatements of fact to their own investigators and to the court-appointed Monitor. The Defendants' unfair, partial, and inequitable application of discipline disproportionally damaged members of the Plaintiff class.

(Doc. 1677 at 2).[1]

To properly cure the MCSO's constitutional violations, which were "broad in scope, involve[d] its highest ranking command staff, and flow[ed] into its management of internal

---

[1] The Court, in its November 3, 2025 order denying Sheriff Sheridan's motion to overturn the Monitor's denial of certain PSB transfers, previously summarized at length "the manipulation and misconduct that ha[d] prevented the fair, uniform, and appropriate application of discipline on MCSO employees as that misconduct pertain[ed] to the members of the Plaintiff class." (Doc. 3305 at 2 (quoting Doc. 1765 at 15); *id.* at 2–4).

affairs investigations" (Doc. 1765 at 2), the Court issued the Second Supplemental Injunctive Order in this case.[2] The Order "mandate[s] reforms of the MCSO's internal affairs system in order to ensure the MCSO's continued compliance with the Court's permanent injunction (Doc. 606) and to coerce the MCSO's compliance with the Court's previous orders, as well as with orders the Court may enter in the future as the need arises." (Doc. 1765 at 6). As relevant here, the Court required the Sheriff and the MCSO to:

- "[E]nsure that all allegations of employee misconduct, whether internally discovered or based on a civilian complaint, are fully, fairly, and efficiently investigated; that all investigative findings are supported by the appropriate standard of proof and documented in writing; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair, consistent, unbiased and provides due process." (*Id.* ¶ 163).

- "[C]onduct objective, comprehensive, and timely administrative investigations of all allegations of employee misconduct." (*Id.* ¶ 183).

The Ninth Circuit affirmed the Second Supplemental Injunctive Order in full. *Melendres v. Maricopa County* (*Melendres IV*), 897 F.3d 1217, 1223 (9th Cir. 2018) ("The district court did not abuse its discretion in formulating the terms of the second supplemental injunction."). The Ninth Circuit held that "the district court chose the remedy best suited to cure MCSO's violations of court orders and to supplement prior orders that had proven inadequate to protect the Plaintiff class." *Id.* at 1222 ("Each challenged provision addresses the internal affairs and employee discipline process, which the district

---

[2] *See also* Doc. 1677 ¶ 889 ("An effective and honest internal affairs policy is a necessary element of the MCSO's self-regulation. Thus, MCSO disciplinary policy calls for the administration of 'fair and impartial' investigations and the imposition of 'fair and equitable' discipline. The Plaintiffs brought this suit for the vindication of their constitutional rights. Although the Defendants are no longer detaining members of the Plaintiff class without authorization, they are manipulating the operation of their disciplinary processes to minimize or altogether avoid imposing fair and equitable internal discipline for misconduct committed against members of the Plaintiff class. As is demonstrated above, the internal affairs and PSB operations of the MCSO are under the control of Sheriff Arpaio and his designees including Chief Deputy Sheridan. They have directed this manipulation to avoid accountability for themselves, their protégés, and those who have implemented their flawed policies at the cost of fairness to members of the Plaintiff class. Further, they continue to attempt to conceal additional past mistreatment of the Plaintiff class as it comes to light in order to avoid responsibility for it.").

court found based on ample evidence MCSO had manipulated to minimize or entirely avoid imposing discipline on MCSO deputies and command staff." (citation modified)).

### B. The Third Supplemental Injunctive Order

In 2017, Sheriff Penzone assumed office. His tenure as Sheriff was marred, however, by the MCSO's failure to timely complete the investigations required under the Second Supplemental Injunctive Order. In 2022, the Court remarked:

> Since the Court entered th[e] [Second Supplemental Injunctive] order the Defendants have continually failed to complete their investigations in a timely manner. . . . In 2018, two years after the Court entered its order, the average closure of a case took 204 days—about two and a half times the maximum permitted by this Court's order. This, in itself, violated the Court's order and state law. That number, however, continued to increase. In 2019 the average closure ballooned to 499 days and 552 days in 2020. . . . [T]he timeline to complete an investigation has grown to approximately 600 days per investigation. . . . For full administrative cases involving sworn personnel, the timeline to complete an investigation is now apparently in excess of 800 days. . . . MCSO now has 2,137 pending investigations.

(Doc. 2830 at 2–4 (citations omitted)). Under Sheriff Penzone's leadership, the MCSO's "failure to complete investigations in a timely manner" became "so extreme as to render investigations completely ineffectual and render no service to either the complainant or MCSO personnel." (*Id.* at 4).

The Court thus held Sheriff Penzone in civil contempt for his failure to properly staff the PSB and timely complete internal affairs investigations. To reduce the backlog, the Court ordered the creation of a "PSB Staffing Fund" to ensure Defendants' compliance with the Court's orders. (Doc. 2830 at 5). This involved a complex remedial structure.

First, the Court ordered MCSO to calculate the dollar amount required to recruit, hire, train, and compensate a single PSB budgeted sergeant position over a one-year period. (*Id.* ¶ 338). MCSO calculated that amount as $191,415.12 (the "Yearly PSB Employee Cost Figure") on November 22, 2022. (Doc. 2829). Next, the Court required MCSO to maintain the staffing levels at PSB at or above 39 investigators. (Doc. 2830 ¶¶ 339–40).

For each month that MCSO failed to meet that level of staffing, it would be required to pay into the PSB Staffing Fund, on a monthly basis, three times the amount of the Yearly PSB Employee Cost Figure. (*Id.* ¶¶ 340–42). If any payments were made into the PSB Staffing Fund, the MCSO was only authorized to withdraw funds from the account to hire and pay PSB investigators, private investigators contracting with PSB, and any necessary additional PSB administrative staff and PSB supervisory staff. (*Id.* ¶ 345). Finally, the Court ordered MCSO to reduce the PSB backlog by a net total of 20 cases per month. (*Id.* ¶ 357). For each month that MCSO failed to do so, it was required to pay into the PSB Staffing Fund two times the amount of the Yearly PSB Employee Cost Figure (i.e., $382,830.24). (*Id.*).

At the time, Defendants stated that "Maricopa County's expectation is that these fines are never triggered," but requested that the Court "adjust the fines after considering the secondary effects on County services if they are [triggered]." (Doc. 2824 at 3). Defendants did not appeal the provisions of the Third Supplemental Injunctive Order relating to the PSB Staffing Fund remedial structure. The Ninth Circuit otherwise fully affirmed the Third Supplemental Injunctive Order. *See Melendres v. Skinner* (*Melendres V*), 113 F.4th 1126 (9th Cir. 2024).[3]

### C. The Fourth Supplemental Injunctive Order

Issues with the PSB backlog persisted. On May 2, 2024, the Court observed that "[e]ven if MCSO's operations generated no additional complaints at all, it would nevertheless take the [PSB's] sworn investigators 6.5 years to investigate and complete the backlog of cases." (Doc. 3019 at 9:20–23). Under the Third Supplemental Injunctive Order, MCSO was required to commission an independent study to determine, among other

---

[3] Defendants, in their appeal, challenged three paragraphs in the Third Supplemental Injunctive Order: ¶ 346 (vesting with the Monitor the authority to oversee all of MCSO's complaint intake and routing); ¶ 347 (granting the Monitor the authority to revise and/or formalize MCSO's intake and routing processes, which includes the power to audit and review decisions made with respect to individual cases); and ¶ 350 (requiring the Monitor to assess MCSO's compliance with the investigative requirements of the Third Supplemental Injunctive Order). *Melendres V*, 113 F.4th at 1131–32. The Ninth Circuit upheld each provision. *Id.* at 1132–40.

items, the PSB staffing level required to maintain the timely completion of PSB investigations in accordance with the Court's orders and state law. (Doc. 2830 ¶ 361). Though MCSO submitted a staffing study, the Court determined that the study did not comply with the Court's previous orders. (Doc. 3076 at 1; *see generally* Doc. 3019). The Court, at the time, remarked:

> The failure to submit a compliant study thus frustrated the Court's purposes in reducing the backlog of complaints against the MCSO in a sustainable way, curing the contempt originally imposed, and providing efficient and economic alternatives for the deployment of law enforcement officers to meet the requirements of the state law and the Court's orders.

(Doc. 3076 at 1).

Rather than requiring MCSO to redo the study, the Court granted the parties' request to craft a resolution that would accomplish the purposes of the staffing study, as it pertained to the PSB backlog. (*Id.*). The parties' resolution—submitted on July 1, 2024—advanced two separate proposals that both called for the elimination of the backlog by **March 31, 2026** (a date already gone by). (Doc. 3036). To meet that goal, MCSO agreed to remove an average of 63 cases from the backlog per month—a number far larger than the PSB's pace at the time. (*Id.* at 4).

Towards that end, the MCSO and United States jointly proposed adding ten new investigators to PSB which, at the time, would have raised the number of investigators at the agency from 46 to 56. (*Id.* at 4–5). The Court, nevertheless, declined to order a specific number of investigators to complete the backlog, especially since, based on past performance, ten new investigators would have been wholly inadequate to achieve the backlog reduction that MCSO said it would achieve with such investigators. (*Id.* at 3). (At any rate, the inadequate PSB staffing study had designated the need for 13 additional PSB officers, although it failed to demonstrate why that number would significantly reduce the backlog at the Defendants' pace for backlog reduction at the time.) Rather, the Court noted that it had "already implemented a mechanism"—the PSB Staffing Fund—"by which, in the absence of adequate backlog reduction, additional funding must be provided to increase

PSB personnel." (Doc. 3076 at 4). Thus, mindful of "piecemeal micromanagement" and "being overly involved in matters of MCSO administration," the Court kept in place the general concept of the PSB Staffing Fund remedial structure.

To be more realistic with MCSO's projections of backlog reduction, the Court, without mandating any particular number or mix of investigators, imposed the PSB Staffing Fund payment requirements only if the MCSO could not achieve a specific monthly reduction in the backlog. That required reduction began at a much more manageable 45 cases a month, increasing each quarter by five cases until a maximum of 60 cases per month was required. Specifically, the Court issued, as relevant here, the following modifications in the Fourth Supplemental Injunctive Order:[4]

- Increasing the timeline for the completion of internal affairs investigations from 85 days to 180 days, consistent with Arizona state law. (Doc. 3076 ¶ 204).

- Requiring MCSO, for the last calendar-quarter of 2024, to reduce the PSB backlog by 45 cases per month, for a minimum total reduction of 135 cases for the quarter. (*Id.* ¶ 358).

- Requiring MCSO, for the first calendar-quarter of 2025, to reduce the PSB backlog by 50 cases per month, for a minimum total reduction of 150 cases for the quarter. (*Id.*).

- Requiring MCSO, for the second calendar-quarter of 2025, to reduce the PSB backlog by 55 cases per month, for a minimum total reduction of 165 cases for the quarter. (*Id.*).

- Requiring MCSO, for the third calendar-quarter of 2025, to reduce the PSB backlog by 60 cases per month, for a minimum total reduction of 180 cases for the quarter. (*Id.*).

- Maintaining the backlog reduction number of 60 per month and 180 per quarter as the required minimum backlog caseload reduction for the last calendar-quarter of 2025 and all future calendar-quarters until the backlog is eliminated. (*Id.*).

For each *quarter* the MCSO fails to reduce the PSB backlog by the requisite number of cases specified for that quarter, the MCSO is required to pay into the PSB Staffing Fund two times the amount of the Yearly PSB Employee Cost Figure (i.e., $382,830.24) for *each*

---

[4] Defendants did not appeal any provisions in the Fourth Supplemental Injunctive Order.

*month* in that quarter in which the PSB did not reduce the backlog by the requisite number of cases specified for that month. (*Id.*).

The ramp-up schedule set by the Court granted Defendants significantly more time to eliminate the backlog than they themselves had initially proposed to the Court. (*Compare* Doc. 3076 ¶ 358 *with* Doc. 3036 at 4–7). The Court did not micromanage by what method the MCSO would achieve the required reduction in the backlog. (Doc. 3076 at 4). But as any reasonable observer would have realized, the ramp-up schedule would require a consistent rising level of monthly performance from the PSB to ensure the elimination of the backlog without incurring any Staffing Fund payments, and thus a commensurate commitment of resources to the PSB.

MCSO says it has done everything reasonably necessary to meet these backlog figures—and yet it has not. As of the end of 2025, MCSO employed 48 PSB investigators: only two more than the number employed in July 2024. (*See* Doc. 3399 at 8).[5] Nevertheless, MCSO has made substantial progress in reducing the PSB backlog without hiring more than two additional PSB investigators. (Doc. 3399 at 2; Doc. 3485 at 2). But in October 2025, MCSO began to fail to meet the monthly quotas required by the Court.

### D. The Instant Motions for Relief

On February 19, 2026, Defendants filed their Motion for Relief from the Third and Fourth Orders. (Doc. 3399 (the "Initial Motion")). Defendants ask this Court to relieve them from their obligation to pay $765,660.48 into the PSB Staffing Fund due to their failure to reduce the PSB backlog by 180 cases for the fourth quarter of 2025. (*Id.* at 2). During that quarter, MCSO reduced the PSB backlog by only 125 cases—falling well short of the 60-case reduction per month requirement in October (33 cases) and December (32

---

[5] Defendants note that, as of April 2026, that PSB's staffing level "is at an all-time high with 86 employees excluding vacancies." (Doc. 3485 at 7). At oral argument on May 15, 2026, counsel for MCSO stated that PSB typically has between ten to eleven sworn investigators and 27 civilian investigators, thus totaling 37 or 38 PSB investigators. Presumably, at least ten of the remaining PSB employees are detention officer investigators (*see* May 15, 2026 Oral Arg. Tr. at 25:21–26:03), and the remainder provide administrative support.

cases). (*Id.* at 23). Thus, under ¶ 358, Defendants are obligated to pay into the PSB Staffing Fund two times the amount of the Yearly PSB Employee Cost Figure (i.e., $382,830.24) for each month in the fourth quarter of 2025 in which the PSB did not reduce the backlog by the requisite number of cases specified for that month—resulting in a total required payment of $765,660.48. (*See* Doc. 3076 ¶ 358).

On April 30, 2026, Defendants informed the Court that MCSO again failed to meet the required backlog target reduction for the first quarter of 2026. (Doc. 3485 (the "Renewed Motion")). MCSO reduced the backlog by only 82 cases during the period: 40 cases during January 2026, 40 cases during February 2026, and only 2 cases during March 2026—thus incurring an additional obligation of $1,148,490.72. (*Id.* at 5). In their Renewed Motion, Defendants ask the Court to vacate this additional requirement, averring again that MCSO has taken all reasonable efforts to comply with the Court's orders regarding the backlog. (*Id.* at 7).

In sum, Defendants have now incurred an obligation to pay **$1,914,151.20** into the PSB Staffing Fund, given the mere 207-case reduction in the PSB backlog over the past two calendar-quarters. This dramatic decrease in PSB output is notable. From the fourth quarter of 2024 to the third quarter of 2025 (a full-year period from October 2024 through September 2025), MCSO reduced the backlog by an average of 55.67 cases per month, or 167 cases per quarter. (*See* Doc. 3399 at 6). But over the last two calendar-quarters, from October 2025 to March 2026, MCSO has reduced the backlog by fewer than 35 cases per month.[6]

Defendants seek to excuse their failure to reach the required backlog reduction by raising a litany of defenses. (*See* Doc. 3399 at 8 (citing delay by the Monitor's team in responding to and approving requests to hire civilian investigators);[7] *id.* at 14–17 (citing

___

[6] When excluding the month of March 2026, MCSO still only reduced the backlog by an average of 41 cases per month from October 2025 through February 2026.

[7] Defendants state that "MCSO requested approval of four civilian investigators in mid-December 2025 and did not receive approval of two of the investigators until nine days after the deadline for the approval and did not receive approval for the other two investigators until 38 days after the deadline, January 26, 2026." (Doc. 3399 at 8).

- 10 -

delay by the Monitor's team in reviewing proposed changes to MCSO Internal Investigations Policy GH-2);[8] *id.* at 20 (the Monitor, and later the Court, denied MCSO's request to create a dual-captain structure for PSB);[9] *id.* at 21 (the Monitor, and later the Court, denied MCSO's request to transfer five district-level sergeants into PSB to work on backlog cases);[10] *id.* at 22–23 (Plaintiffs refused to accede to Defendants' proposal to assign non-CRM backlog cases to district investigators); Doc. 3485 at 5–6 (recounting a temporary dispute in February and March 2026 over the leadership of the PSB)[11]). Many

[8] Defendants aver that under the current iteration of GH-2, PSB must investigate many complaints that are minor employee performance issues and inter-employee disputes. (Doc. 3399 at 12). Defendants contend that many of these complaints could be resolved via "coaching," which, in Defendants' opinion, "could achieve the same result in a much shorter timeframe." (Doc. 3485 at 3). Defendants do not ask the Court to issue any order directing MCSO to amend GH-2.

[9] The Court, in its November 3, 2025 order, held that while its previous orders did not allow for the bifurcation of the command of PSB, MCSO still could still appoint a "*true Deputy Commander to PSB.*" (Doc. 3305 at 14 (emphasis added)). The Court set forth the unique substantive responsibilities of the PSB Commander: "(1) [T]he evaluation of whether findings in the investigative reports of serious misconduct are supported by the appropriate standard of proof; (2) the reassignment, in her or his discretion, of any investigations that have been inadequately conducted; and (3) the imposition of appropriate discipline and/or corrective action when a PSB investigation indicates a serious violation of misconduct." (*Id.* at 13 (citing Doc. 1765 ¶¶ 211, 214, 216)). The Court made clear that while a Deputy Commander "may do work and make recommendations on individual investigations, as well as the Commander's other responsibilities," the Deputy Commander was not permitted to "*assume the ultimate responsibility for PSB operations and decisions that lie with the PSB Commander.*" (*Id.* at 14 (emphasis added)).

[10] The Court affirmed the Monitor's denial of the proposed transfers, sharing the Monitor's concerns that the transfers would hinder continuity in district misconduct investigations and diminish direct supervisory accountability within the districts. (Doc. 3305 at 8–11). However, the Court outlined that it would consider, with the approval of the parties, revising certain paragraphs of its previous orders to allow MCSO to assign PSB investigations to district investigators whose competency and efficacy have been approved by the Monitor. (*Id.* at 10–11).

[11] After the Monitor rescinded Captain Flowers's temporary appointment on March 5, 2026, MCSO sought to elevate Captain Reaulo as the head of PSB without the approval of the Monitor. (Doc. 3422 at 2). The Court clarified to the parties that the Monitor must approve the head of PSB, and it held that since Captain Lugo was the only candidate that had been approved by the Monitor to lead PSB, he, and not Captain Reaulo, was the current PSB Commander. (*Id.* at 3–4).

- 11 -

of these defenses, however, are not in accord with the Court's orders in this case. (*See, e.g.*, Doc. 3305). While the Court did not seek to micromanage how MCSO staffed PSB to achieve the results mandated in ¶ 358, Defendants were still required to otherwise comply with the Court's orders in doing so.

Defendants seek three items of relief. First, they ask the Court to vacate the requirement that MCSO pay $1,914,151.20 into the PSB Staffing Fund. Because "MCSO anticipates completely reducing the backlog or otherwise reducing it to a nominal amount by December 31, 2026," Defendants aver that the required payment would not assist MCSO in its goal of reducing the backlog. (Doc. 3399 at 31 (stating the process of identifying a potential PSB investigator, vetting and hiring, and getting approval from the Monitor "has taken at least six months"); Doc. 3485 at 7–8).

Second, Defendants ask for permission from the Court to allow the PSB Commander to assign PSB backlog cases alleging minor misconduct to five sergeants that are already trained to conduct such investigations. (Doc. 3399 at 32). Defendants submit the following proposal:

- The PSB Commander would assign a non-CRM backlog case to a district investigator with the approval of his or her commander.
- This assignment may involve a PSB backlog case within or outside of the District or Bureau in which the incident occurred.
- This assignment will be explained in writing.
- At the conclusion of the investigation, it will then be sent to PSB for review in accordance with existing policies and procedures.
- The Monitor will also review the investigation in accordance with existing PSB practices.

(*Id.* at 22 (citing Doc. 1765 ¶ 214)). The United States supports MCSO's proposal, while Plaintiffs oppose it. (*Id.* at 22–23).

Third, Defendants request that the Court modify the required number of cases that MCSO must clear from the backlog on a quarterly basis from 180 cases per quarter to 129 cases per quarter, or 43 cases per month. (*Id.* at 33). As of December 31, 2025, 515 cases remained on the backlog—thus, to clear the backlog by the end of 2026, Defendants

estimate that they would be able to remove an average of approximately 43 cases each month. (*Id.*). Defendants concede that "MCSO previously estimated that it could reduce the backlog by 63 cases a month." (Doc. 3451 at 5). Additionally, during the first quarter of 2026, MCSO failed to reduce the backlog by greater than 40 cases each month, though Defendants contend in their Renewed Motion that MCSO will exceed the proposed 43-case target for April 2026. (*See* Doc. 3485 at 8).[12] Paragraph 358 provides that the Court may consider modifications to the payment schedule upon "good cause shown." (Doc. 3076 ¶ 358).

## II. DISCUSSION

Defendants' motions are granted in part and denied in part. While the Court is sensitive to Defendants' concern that an overfunded PSB Staffing Fund, at this stage in the litigation, may not necessarily solve the issue of eliminating the backlog by the end of the year, the Court finds that Defendants—contrary to their assertion otherwise—have not taken all reasonable efforts necessary to reduce the backlog in a timely fashion. Nor is the Court convinced that MCSO cannot use at least some of the payments incurred into the Fund to hire additional investigators, expand contracting with outside investigators, or further develop the quality and the financial and other incentives in the PSB-8 training course and the PSB Supplemental Pay Program. Moreover, Defendants fail to adequately explain why PSB investigative capacity has substantially diminished over the past two quarters.

As the Court has described above, the PSB Staffing Fund remedial structure was designed to reduce the backlog of complaints in a sustainable manner, cure the contempt originally imposed on Sheriff Penzone, and ensure that PSB has a durable staffing model that continues to conduct professional, high quality, and timely investigations in both the short and the long run. But even if and when the backlog is eliminated, MCSO's internal affairs system must still meet the requirements outlined in the Second Supplemental

---

[12] At oral argument, counsel for MCSO stated that as of May 15, 2026, 371 cases remained on the PSB backlog. (May 15, 2026 Oral Arg. Tr. at 38:24–39:06).

Injunctive Order. The MCSO must ensure that all allegations of employee misconduct are "fully, fairly, and efficiently investigated," such that "all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair, consistent, unbiased and provides due process." (Doc. 1765 ¶ 163; *see also id.* ¶ 183).

To this end, then, the Court will keep in place the PSB Staffing Fund remedial structure, albeit in a modified form. Though the Court will not completely vacate the PSB Staffing Fund payments that Defendants have incurred through their deficient performance over the past two calendar quarters, the Court recognizes the effort of PSB in substantially reducing the backlog over the last year and a half (mostly it would seem through the commitment of substantial overtime by the PSB staff) and will lower the required payment amount and set forth a reduced monthly case-reduction target. Furthermore, Defendants are permitted to route certain non-CRM backlog cases to district-level sergeants for investigation, as long as the routing is approved by the Monitor.

### A. Defendants Failed to Take Timely Steps to Prevent Incurring PSB Staffing Fund Payments Over the Past Two Quarters.

The Court left it to MCSO to manage the reduction of the backlog in any method it chose, consistent with the Court's orders. It gave Defendants more than an ample amount of time to ramp up PSB's investigative capacity to meet the 60-case per month requirement—a number lower than that proposed by MCSO itself to the Court. Yet Defendants were not prepared to sustainably maintain that case reduction level when the time came.

### 1. Overtime Hours and Hiring New Investigators

Rather than gradually ramp up the number of new PSB investigators, MCSO instead relied extensively on its existing investigators to work overtime hours. From the last calendar-quarter of 2024 through the last calendar-quarter of 2025, PSB investigators worked more than 20 hours of overtime *per investigator* per month. (Doc. 3399 at 8–9). The Court agrees with Defendants' assessment that this level of overtime billing is "unsustainable." (Doc. 3399 at 9). At oral argument, while counsel for MCSO did not know what the exact overtime pay rate was, he estimated that the figure was "probably

time and a half." (May 15, 2026 Oral Arg. Tr. at 8:20–23).

Based on the figures provided by the Defendants, the average PSB investigator—who works 20 hours of overtime per week—currently clears roughly 0.93 cases from the backlog per month.[13] Assuming straight-line depreciation, if PSB investigators instead worked 40 hours per week on average, then an investigator would clear roughly 0.62 cases from the backlog per month. Thus, all else equal, to meet Defendants' requested new target of 43 cases per month, the PSB would need approximately 70 investigators working 40 hours per week[14]—far more than the current number of investigators working at PSB. While it may not be realistic for MCSO to hire that many investigators, the analysis demonstrates that PSB investigators are currently being overworked, and that hiring additional investigators earlier would have alleviated at least some of the issues with unsustainably high overtime levels.

Defendants aver that that "obtaining approvals for additional civilian investigators has been stymied by delay." (Doc. 3399 at 8). But by Defendants' own admission, MCSO only requested approval of four civilian investigations in mid-December 2025 (*id.*)—two months *after* MCSO had already failed to meet the 60-case reduction requirement for October 2025 and thus incurred a payment into the PSB Staffing Fund unless they could clear almost 90 cases from the backlog in December 2025. Defendants also do not explain how they would have reached their monthly target for December 2025 even if the Monitor had approved MCSO's request for new investigators by mid to late December. (*Cf. id.* at 31 (describing the time it takes to hire, train, and onboard an additional PSB investigator)). The Court thus finds that Defendants should have begun the process of requesting approval for new investigators at an earlier time, in accordance with the schedule set forth in ¶ 358. //

---

[13] This assumes a pace of 44.5 cases cleared from the backlog per month, for 48 total investigators, each working 60 hours per week. At oral argument, counsel for MCSO stated that from October 2024 through April 2026, MCSO cleared an average of 44.473 cases per month. (May 15, 2026 Oral Arg. Tr. at 23:19–25).

[14] 43 cases per month divided by 0.62 cases per investigator per month equals 69.35 investigators.

### 2. PSB Supplemental Pay Program

Defendants also point to the creation of the PSB Supplemental Pay Program—under which 32 MCSO detention and sworn lieutenants and captains have signed up to perform one misconduct investigation at a time for an additional payment of $20 per hour for up to 10 hours a week—as an example of "MCSO's attempts to find creative solutions to meet the Court's requirements of clearing the backlog." (Doc. 3399 at 18–10). But at oral argument, Defendants were unable to identify with any particularity the success of the program.[15] There, Chief Kiyler—a member of the Monitoring Team—stated that approximately 16 lieutenants and captains had completed a case or were in the process of doing so, but that the Monitoring Team had only reviewed approximately six cases so far. (May 15, 2026 Oral Arg. Tr. at 33:18–34:09).

Furthermore, the Supplemental Pay Program only began in October 2025 (Doc. 3399 at 18)—the same month that the PSB began failing to meet the caseload reduction schedule under ¶ 358. While the Court agrees with Defendants that the Program is a well-intentioned idea that may prove workable to relieve the burden placed on PSB investigators, the Program was not started early enough for MCSO to avoid incurring any payments into the PSB Staffing Fund. And given the lack of uptake in the Program so far, it may be in the Defendants' interest to use the PSB Staffing Fund to increase the $20 hourly pay rate to better compensate the lieutenants and captains signing up for overtime work.

### 3. PSB-8 Training Course

Defendants cite to the implementation of a "PSB-8" training course for personnel outside of PSB to investigate misconduct cases as another solution to address the backlog. (Doc. 3399 at 17). Under the course, MCSO personnel—including lieutenants and captains—received classroom training in the proper completion and review of administrative misconduct investigations. (*Id.*). The trainees were assigned backlog cases

---

[15] At oral argument, counsel for MCSO stated that he did not know (i) how many people have taken investigations under the Program and (ii) how many cases had been resolved through the Program. (May 15, 2026 Oral Arg. Tr. at 13:03–14:08).

for completion as well. (*Id.*). The course was first offered in February 2024. (May 15, 2026 Oral Arg. Tr. at 35:08–16). Through the course, MCSO was able to reduce the backlog by 89 cases during 2025. (Doc. 3399 at 18).

MCSO's creation of the PSB-8 training course was an innovative idea that has broadened the pool of MCSO personnel that can conduct misconduct investigations. However, the success of the program appears mixed. At oral argument, Chief Kiyler stated that the Monitoring Team had reviewed cases completed as a result of the training course, but that only 73% of the completed cases reviewed were in compliance with the Court's orders. (May 15, 2026 Oral Arg. Tr. at 31:02–32:02). The Court finds that MCSO would benefit from using money in the PSB Staffing Fund to (i) bolster the quality of the PSB-8 training course and (ii) pay already-trained MCSO personnel to continue clearing backlog cases. This should increase the number of cases assigned through the course, thus further reducing the backlog, while improving the investigative quality of those completed cases.

### 4. PSB's Diminished Performance Over the Last Two Quarters

Though Defendants list several reasons as to why they were unable to meet the backlog requirements for the last two quarters, these reasons do not explain why PSB's performance from October 2025 through March 2026 overall was substantially worse than the previous full calendar year. Even though some of MCSO's requests were not fulfilled either by the Monitor or the Court—such as amending GH-2 (which the Monitor cannot do), adding a second captain to PSB, or transferring district-level sergeants to PSB—those reasons provide no insight into MCSO's failure to maintain the status quo of their investigative progress, in which it was able to reduce the backlog by nearly 56 cases per month from October 2024 through September 2025. Defendants do not adequately explain why MCSO has seen such a stark reduction in the efficiency of the PSB (even excluding March 2026). The Court thus finds unpersuasive most of MCSO's arguments about why it was unable to meet the requirements of ¶ 358 over the last two quarters.

### B. The Court Will Provide Defendants with Some Relief from the Third and Fourth Supplemental Injunctive Orders.

While Defendants have failed to demonstrate that good cause exists to completely

relieve them of their burden to pay into the PSB Staffing Fund, they have demonstrated that good cause exists to abate some of the required payment. Prior to oral argument, the Court asked Defendants to prepare an evidence-based estimate, based on past performance, demonstrating when the backlog will be eliminated. (Doc. 3488 at 1). MCSO counsel stated that based on historical backlog clearance rates from October 2024 through April 2026—in which MCSO cleared an average of 44.473 cases per month—MCSO would eliminate the backlog sometime mid to late January. (May 15, 2026 Oral Arg. Tr. at 23:13–25). And when proceeding at Defendants' proposed rate of 43 cases per month, MCSO would eliminate the backlog sometime in early February. (*Id.* at 24:01–03).

Thus, because MCSO expects to eliminate the backlog within the next nine months, the Court finds that a payment of $1,914,151.20 into the PSB Staffing Fund would not be adequately tailored to MCSO's goal of eliminating the backlog, given the number of cases remaining. Instead, the Court will greatly reduce the amount that Defendants must pay into the Fund:

- For the month of October 2025, the Court will order Defendants to pay only the Yearly PSB Employee Cost Figure ($191,415.12), rather than two times that amount as currently required under ¶ 358, based on MCSO's performance that month in clearing only 33 cases from the backlog.

- For the month of December 2025, the Court will order Defendants to pay $191,415.12, based on MCSO's performance that month in clearing only 32 cases from the backlog.

- For the month of March 2026, the Court will order Defendants to pay $191,415.12, based on MCSO's performance that month in clearing only 2 cases from the backlog.

Thus, Defendants are required to pay **$574,245.36** into the PSB Staffing Fund—a *seventy percent reduction* from their existing obligation. This payment will be due within seven days of the date of this order. And because the MCSO came close to reaching their proposed target of 43 cases per month in January 2026 (40 cases) and February 2026 (40 cases), the Court will not require any payment into the Fund for those two months.

With these additional funds, Defendants can: (i) hire more PSB investigators and supervisory staff; (ii) increase contracting with outside investigators; (iii) increase the

payments for the PSB Supplemental Pay Program; and (iv) continue implementing PSB-8 training courses and paying trained MCSO personnel to investigate backlog cases. The Court will explicitly amend ¶ 345—which defines what Defendants can and cannot do with the money in the PSB Staffing Fund—to reflect this understanding.

Moving forward to the second quarter of 2026 and onward, the Court will also modify Defendants' obligations under ¶ 358. First, the Court will reduce the monthly backlog case reduction requirement from 60 cases each month to 43 cases each month. Second, if the PSB fails to meet its quarterly target of a 129-case reduction, Defendants will still be required to pay into the PSB Staffing Fund, but at a reduced amount. Instead, for each month in which the PSB fails to clear at least 30 cases from the backlog, Defendants are required to pay the Yearly PSB Employee Cost Figure ($191,415.12), rather than twice that amount. And for each month in which the PSB clears at least 30 cases from the backlog, but fewer than 43 cases, Defendants are required to pay half of the Yearly PSB Employee Cost Figure ($95,707.56).

Thus, under this modified arrangement, there is still some form of an enforcement mechanism to remedy non-compliance with the Court's backlog reduction timelines (which are now in line with those proposed by Defendants), but the payment amounts are lowered to reflect the reality that Defendants have made a substantial improvement with the PSB backlog. And upon elimination of the PSB backlog, if there are any remaining funds in the PSB Staffing Fund, the Court will authorize the Defendants to return those funds to their source of origination.

**C.    The PSB Staffing Fund Payment Requirements are Self-Executing.**

Additionally, the parties omit any discussion as to whether the required payments into the PSB Staffing Fund are self-executing. But Paragraph 358 simply states that for each calendar-quarter in which PSB cannot reduce the remaining backlog by the required target, "the MCSO and/or Maricopa County shall pay" the required amount "into the PSB Staffing Fund." (Doc. 3076 ¶ 358; *see also* Doc. 2830 ¶ 345). The provision does not require any motion to the Court or define any other procedural mechanism to be utilized

before Defendants must make their required payments into the Fund. At oral argument, Defendants did not provide any reason for not having made their required payments, other than stating that they sought to abate the requirement through the instant motions. (*See* May 15, 2026 Oral Arg. Tr. at 36:23–38:02). To the extent the Court's previous orders do not specify when the required payments must be disbursed into the Fund, the Court specifies that such payments must be disbursed within seven business days of the end of a calendar-quarter in which MCSO did not meet its quarterly requirements.

### D. Defendants May Assign PSB Backlog Cases to District-Level Sergeants Trained to Conduct Misconduct Investigations, Provided That the Monitor Approves the Assignments.

Finally, as the Court remarked in its November 3, 2025 order, it was amenable to revising certain paragraphs of its past orders "to allow the Sheriff to assign PSB investigations to district investigators whose competency and efficacy has been approved by the Monitor." (Doc. 3305 at 10–11). Defendants and the United States now propose assigning non-CRM backlog cases to district investigators with the approval of their commander. Once completed, the investigations will be sent to PSB for review and will also be reviewed by the Monitor's team. (Doc. 3399 at 22).

Defendants argue that ¶ 214 already provides the authority for them to assign cases to district-level sergeants. The provision states:

> At the discretion of the Commander of the Professional Standards Bureau, a misconduct investigation may be assigned or re-assigned to another Supervisor with the approval of his or her Commander, whether within or outside of the District or Bureau in which the incident occurred, or may be returned to the original Supervisor for further investigation or analysis. This assignment or reassignment shall be explained in writing.

(Doc. 1765 ¶ 214). In their Initial Motion, Defendants provide an email communication from Plaintiffs' counsel, in which she states that that Plaintiffs "do not believe Paragraph 214 authorizes using district investigators to conduct investigations from the PSB backlog as this provision must be ready in tandem with Paragraphs 213 and 215 and only involve investigations of minor misconduct." (Doc. 3399-3 at 129).

But Plaintiffs, in their response, do not discuss paragraphs 213, 214, or 215 at all, nor do they seriously engage with Defendants' request to assign backlog case to district-level sergeants. Instead, Plaintiffs generally state that "MCSO's staffing request to transfer five district-level sergeants to PSB to work on backlog cases continues to be objectionable to Plaintiffs because removing investigators from the Districts, even temporarily, runs the risk of removing accountability from the frontline deputies." (Doc. 3428 at 6).[16] But Defendants, in their Initial Motion, do not repeat their prior request to transfer district-level sergeants *to* PSB. Instead, Defendants ask to *assign cases* to the district-level sergeants. The sergeants would still remain within their Districts.

While ¶ 214 provides a plausible basis for the PSB Commander to route certain non-CRM backlog cases to district-level sergeants for investigation, as long as the backlog persists, any such routing must still be approved by the Monitor. (*See* Doc. 2830 ¶ 346 ("In consultation with the PSB Commander, the Monitor shall make determinations and establish policy decisions pertaining to backlog reduction regarding, by way of example, which complaints should be . . . (b) sent to the Districts for investigation or other interventions . . . . The Monitor must consult with the PSB Commander about these policy decisions but maintains independent authority to make the ultimate decision."); *id.* ¶ 347).

Defendants, in their Initial Motion, do not indicate whether they have corresponded with the Monitor's team regarding their new proposal to assign backlog cases to district-level sergeants. Furthermore, while Defendants state that they would be assigning "*minor* misconduct cases to five trained sergeants" (Doc. 3399 at 32 (emphasis added)), it is unclear how Defendants are defining the term "minor" in relation to PSB backlog cases, given that PSB handles allegations of serious misconduct (*see* Doc. 3305 at 8–10; *id.* at 11 (suggesting that district investigators "can be assigned serious cases" if the investigators'

---

[16] Plaintiffs additionally claim that "[i]t is not necessary for Plaintiffs to go through each step put forth by the Defendants and explain their individual or collective deficiencies, as MCSO has limited itself to one reform goal: reducing the backlog." (Doc. 3428 at 7). Plaintiffs may be better served by fully engaging with Defendants' arguments in the future, so that the Court has a more developed record to rule on Defendants' requests.

"competency and efficacy [have] been approved by the Monitor")).

As the Court has previously indicated, to the extent that MCSO wishes to assign PSB cases—and thus other than minor-discipline cases—to district-level sergeants, those sergeants must be approved by the Monitor to conduct such investigations. But if the Monitor approves the sergeants, then the MCSO is permitted to route cases to them.

### III.     CONCLUSION

While Defendants have made significant gains in reducing the PSB backlog, Defendants have not demonstrated that they have taken all reasonable steps necessary to comply with the Court's orders. Thus, the Court will not completely vacate Defendants' existing payment obligation, but it will substantially reduce the obligation. Defendants should use the dollars in the PSB Staffing Fund to ensure that PSB is adequately staffed, properly managed, and has the capacity to complete full, fair, and efficient investigations in the long run.

Accordingly,

**IT IS THEREFORE ORDERED** that Defendants' Motion for Relief from the Third and Fourth Orders (Doc. 3399) is **GRANTED in part and DENIED in part**.

**IT IS FURTHER ORDERED** that Defendants' Renewed Motion for Relief from the Third and Fourth Orders (Doc. 3485) is **GRANTED in part and DENIED in part**.

**IS IT FURTHER ORDERED** modifying Defendants' obligation under Paragraph 358 of Doc. 3076 to pay $1,914,151.20 in the PSB Staffing Fund based on MCSO's backlog reduction performance for the last calendar-quarter of 2025 and the first calendar-quarter of 2026. Instead, Defendants will be required to pay **$574,245.36** into the PSB Staffing Fund. Defendants must make this payment within seven days of the date of this order. Defendants shall file notice with the Court upon making this payment.

**IT IS FURTHER ORDERED** amending Paragraph 345 of Doc. 2830 as follows:

345.    MCSO and/or Maricopa County shall hereby establish a PSB Staffing Fund, which shall be a separate account of the MCSO. The amounts set forth in ¶¶ 340-42 and 358 shall be paid directly into this account. The MCSO, however, is only authorized

to withdraw funds from this account for the hiring and payment of PSB investigators or private investigators contracted with PSB who are in compliance with the requirements of state law. The fund may also be used to (i) hire necessary additional PSB administrative staff and necessary additional PSB supervisory staff; (ii) increase contracting with approved outside investigators; (iii) increase the payments for the PSB Supplemental Pay Program; and (iv) continue implementing PSB-8 training courses and paying trained MCSO personnel to investigate backlog cases. MCSO is not permitted to offset the amount of any fine from PSB's existing budget or use it to subsidize the number of PSB staff and investigators existing at the time of this Order. MCSO shall provide an accounting of the PSB Staffing Fund on a monthly basis to the Monitor and the Court. But, if necessary, MCSO is permitted to augment and/or exceed the salary and incentives normally paid PSB investigators to hire and/or maintain sufficient investigators, whether sworn or civilian, to reduce the backlog.

**IT IS FURTHER ORDERED** amending Paragraph 358 of Doc. 3076 as follows:

358. Beginning on April 1, 2026, the MCSO will be required to reduce the backlog number remaining on the last day of the previous calendar-quarter (March 31, 2026) by 43 cases per month for a minimum total reduction of 129 cases during the second calendar-quarter of 2026. This backlog reduction number of 43 per month and 129 per quarter will remain the required minimum backlog caseload reduction per quarter from the backlog number on the last day of the previous quarter until the backlog is eliminated. For each calendar-quarter in which PSB cannot reduce the remaining backlog by the requisite number of cases from the number of the backlog existing on the last day of the previous quarter, the MCSO and/or Maricopa County shall pay into the PSB Staffing Fund the amount identified in ¶ 338 ($191,415.12) for each month in that quarter in which the PSB did not reduce the backlog by at least 30 cases, and they shall pay one-half of that amount ($95,707.56) for each month in that quarter in which the PSB reduced the backlog by 30 cases or more but

fewer than 43 cases. For each calendar-quarter that MCSO reduces the remaining backlog by more than the minimum backlog reduction required to avoid the assessment to the PSB Staffing Fund, Defendants may credit the excess cases toward any month or months in the following quarter's minimum backlog case reduction. The Defendants may apply excess credits only to months in the quarter immediately following the quarter in which the Defendants accrued the credits. If Defendants incur an obligation to pay into the PSB Staffing Fund, such payment must be disbursed within seven business days of the end of a calendar-quarter in which MCSO did not meet its quarterly requirements. Upon elimination of the PSB backlog, if the balance of the PSB Staffing Fund is greater than zero dollars, Defendants are authorized to return any remaining funds to their source of origination. The Court may for good cause shown consider modifications to the payment schedule in this paragraph.

**IT IS FURTHER ORDERED** that Defendants are permitted to route PSB backlog cases to district-level sergeants, in accordance with Paragraphs 346 and 347, provided that the sergeants have been approved by the Monitor to conduct PSB investigations.

Dated this 22nd day of May, 2026.

_____
G. Murray Snow
Senior United States District Judge