John T. Masterson, Bar #007447
Joseph J. Popolizio, Bar #017434
Justin M. Ackerman, Bar #030726
Daniel A. Shudlick, Bar #035950
JONES, SKELTON & HOCHULI P.L.C.
40 N. Central Avenue, Suite 2700
Phoenix, Arizona 85004
Telephone: (602) 263-1741
Fax: (602) 200-7876
jmasterson@jshfirm.com
jpopolizio@jshfirm.com
jackerman@jshfirm.com
dshudlick@jshfirm.com

Attorneys for Gerard A. Sheridan, in his official
capacity as Sheriff of Maricopa County, Arizona

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

|  |  |
|---|---|
| Manuel De Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al, <br><br> Plaintiffs, <br><br> and <br><br> United States of America, <br><br> Plaintiff-Intervenor. <br><br> v. <br><br> Gerard A. Sheridan, in his official capacity as Sheriff of Maricopa County, Arizona, et al., <br><br> Defendant, | No. CV-07-2513-PHX-GMS <br><br> **DEFENDANTS SHERIFF SHERIDAN AND MARICOPA COUNTY'S OBJECTION TO THE APPOINTMENT OF INDEPENDENT INVESTIGATOR SHANEEDA JAFFER** |

120075803.1

Sheriff Gerard A. Sheridan, in his official capacity as Sheriff of Maricopa County, Arizona ("MCSO") and Maricopa County jointly object to: (1) the general appointment of an alternative independent investigator for MCSO conflict investigations when MCSO already has a Monitor-approved outside conflicts investigator for that purpose and (2) the appointment of Shaneeda Jaffer as the independent investigator given a documented history of investigative and other deficiencies, which are outlined below.

This Motion is not made lightly. The Court, through its enforcement of various remedies designed to alleviate the underlying constitutional violations it found, created a system within MCSO's Professional Standards Bureau ("PSB") to ensure that the Monitor oversees internal affair investigations ("IAs") and that MCSO properly conducts them. If a PSB investigation involves a conflict, the Monitor-approved outside investigator must handle it according to this Court's Orders and MCSO Policy, GH-2. However, if an outside conflict investigator fails to adequately conduct an investigation, the process fails and can unfairly impact MCSO's compliance status with this Court's Orders. MCSO is deeply concerned because this has occurred; from information now available to MCSO, it is clear that Ms. Jaffer failed to adequately conduct two IAs, and the Court has now assigned her additional IAs to conduct. In addition, there are additional concerns of the appearance of conflict as well.

This Court is the sole safeguard to ensure the Court-mandated IA process in MCSO is not abused. This is not only important to ensure the proper implementation of the Court's existing Orders, but also to ensure the Court's Monitor is accurately assessing MCSO's compliance with the Court's Orders in its public reporting. MCSO, therefore, requests the Court's assistance to ensure the Court-ordered and designed system operates correctly. As more fully detailed below, this requires the removal of Ms. Jaffer as an outside investigator, the preclusion of any prior findings she has made as a basis to assess MCSO's compliance with the Court's orders, and the assignment of any pending or future investigations to MCSO's Monitor-approved outside conflict investigators, AZ Truth Finder.

1

I.     **THIS MOTION SETS FORTH SERIOUS ISSUES THAT MUST BE ADDRESSED UNDER THE COURT'S ORDERS.**

The Court has empowered itself through its various Orders over the past decade with, among other things, the authority to do the following: (1) select an independent investigative authority (over MCSO's prior objection). [Docs. 3172, 3191, 3448; *see also* Doc. 1765 at ¶¶ 296-319]; (2) authorize the independent investigator to conduct investigations of MCSO employees (without MCSO's knowledge) of the basis for the investigation or input into its scope or procedures. [Docs. 3172, 3191, 3448; *see also* Doc. 1765 at ¶¶ 296-319]; (3) authorize the independent investigator to self-direct additional investigations [Doc. 3191 at ¶ 10] and empower her with "the sole authority to determine whether charges arising from the Findings of Fact should or should not be pursued." [*Id.* at ¶ 12; *see also* Doc. 3448]; (4) limit MCSO's ability to screen attorney-client privileged material from the Independent Investigator. [Docs. 3261, 3307, and 3334]; (5) appoint an independent disciplinary authority to exercise the Sheriff's authority to impose discipline. [Doc. 3297; *see also* Doc. 1765 at ¶¶ 320-327]; and (6) authorize the independent disciplinary authority to conduct pre-determination hearings on discipline. [Doc. 1765 at 14-16; Doc. 3297].

Under these expansive powers, the Court-appointed independent investigator effectively has the ability to terminate any member of MCSO (except the duly elected Sheriff) should their conduct be deemed, *at her sole and unchecked discretion*, to rise to such a level.[1] And should the Sheriff utilize his undisputed power as the appointing authority to modify discipline in the event he disagrees with the independent investigator, the Court has authorized its Monitor to penalize MCSO in its assessment of MCSO's compliance efforts with the Court's Orders if the Monitor disagrees with the Sheriff's use of his lawful and duly authorized statutory powers. [Doc. 3448 at 3:5-20].

---

[1] Although the independent investigator does not determine the ultimate discipline imposed, the independent investigator does determine whether policy violations will be investigated and have occurred. She, therefore, controls what potential discipline is at issue for the independent disciplinary authority to impose.

2

Given the monumental power the Court has directly and implicitly given to the independent investigator, that person's investigative prowess and objectivity must be beyond reproach. Yet, MCSO has serious questions on both accounts that the Court must resolve before the independent investigator conducts any further investigations or continues with investigations that the Court has already assigned to her. When MCSO validly raised its initial concerns regarding Ms. Jaffer during a March 25, 2026 hearing,[2] the Court immediately and summarily dismissed them:

> MR. MASTERSON: Judge, what I would like to do is -- and I will tell you up front. We -- we have consulted with an outside firm to review Ms. Jaffer's report and her investigation, and I would like to have the opportunity to brief -- file a brief on the conclusions, the expert opinions we have based upon that consultant's findings. We do not yet have a report from that expert, but it is, in my understanding, forthcoming.
>
> THE COURT: I doubt that I'll perceive that. I'm not going to multiply these proceedings by having you hire experts on the experts I approve. If you have any basis to challenge Ms. Jaffer that you want to raise to me, I'll consider it; but I'm not gonna – I'm not going to pay any attention to an expert you pay to review somebody I've appointed.
>
> MR. MASTERSON: Okay. Judge, well, we will --
>
> THE COURT: You can file whatever you want. I don't think it's going to be very well received.

[*See* **Exhibit 1,** 3/25/26 RT at 25:22-26:14].

---

[2] On March 20, 2026, the Court gave notice it was setting a status conference for March 25, 2026 at 2:00 p.m. [Doc. 3429]. This notice did not inform MCSO of the content of the hearing, but only that counsel shall set aside one hour for the conference and that a separate order "regarding the topic(s) the parties should be prepared to discuss" would be forthcoming. [Doc. 3429]. On March 23, 2026, at 2:34 p.m., the Court issued a three-page Order indicating "at least" three significant topics would be discussed. [Doc. 3434]. Although counsel diligently prepared as well as possible between 2:34 p.m. on March 23, 2026 and 2:00 p.m. on March 25, 2026 to discuss the issues the Court set *sua sponte*, MCSO had less than two days to do so. The Court-ordered timeline did not afford counsel sufficient opportunity to address the significant issues the Court raised with no prior briefing on the topics at issue. During that hearing, MCSO objected and indicated that further briefing was necessary. [*See* 3/25/26 RT at 25:22-26:14]. In addition, undersigned counsel had not yet received a finalized report from its expert on the issues related to Ms. Jaffer's investigation, but informed the Court that MCSO had initial concerns on Ms. Jaffer's investigative prowess and that a motion would be forthcoming. This Motion is that result.

3

As more fully detailed below, legitimate concerns about the quality of Ms. Jaffer's investigations exist, and the Parties, the Monitor, and most importantly, the Court should take them seriously. Thus, given the power the Court has bestowed upon the outside independent investigator, the Court must address MCSO's valid concerns to ensure that it affords MCSO fundamental fairness and due process for this Court's assessment of MCSO's institutional compliance with its Orders.

## II.     NO JUSTIFICATION EXISTS FOR THE COURT TO SET ASIDE MCSO'S CHOSEN AND PREVIOUSLY APPROVED OUTSIDE CONFLICT INVESTIGATOR.

MCSO objects to the appointment of a new outside conflict investigator over MCSO's own, Monitor approved, outside conflict investigator capable of handling conflict investigations – AZ Truth Finder.

As part of the Court's Orders to remedy the constitutional violations it found, it required MCSO to ensure an appropriate outside conflicts investigator exists when circumstances conflicted MCSO from conducting an internal affairs investigation. [*See e.g.,* Doc. 1765 at ¶ 167]. MCSO therefore amended its policies to ensure an outside conflicts investigator handles all conflict investigations. [*See* Doc. 2938, GH-2, ¶ 4(D)(4)-(6)]. In part, these Court-Ordered policy reforms require MCSO to refer conflicted investigations to an outside investigator who "must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest." [Doc. 1765 at ¶¶ 167(a)(iii), (b); **Doc. 2938,** GH-2, ¶¶ 21-23]. Thus, the Court's Orders require MCSO to retain an outside investigator to perform this kind of work (subject to Monitor approval) – the very work for which Ms. Jaffer is now appointed.

As the Court is aware, its Orders impose expansive remedies on MCSO. In various ways, these remedies disrupt the Sheriff's ordinary authority under Arizona law to operate MCSO. The Court's reasoning for its broad federal incursion into state sovereignty has been largely based on the Court's need to remedy the constitutional violations it has

4

previously found. MCSO respects this history, the Court's prior findings, and its determinations on what remedies were necessary to vindicate the rights of the Plaintiffs' class. However, these remedies, as MCSO has repeatedly stated, must always remain limited in scope and narrowly tailored to address the specific constitutional injuries the Court found. *See Milliken v. Bradley*, 433 U.S. 267, 282 (1977) (explaining that remedies fashioned by the federal courts to address constitutional infirmities "must directly address and relate to the constitutional violation itself," and "federal court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation."); *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (injunctive relief must be "narrowly tailored to give only the relief to which plaintiffs are entitled"); *see also*, Fed. R. Civ. P. 65(d) (requiring an order granting an injunction to "state its terms specifically" and "describe in reasonable detail--and not by referring to the complaint or other document--the act or acts restrained or required"). Indeed, institutional reform injunctions "often raise sensitive federalism concerns" that commonly involve areas of core state or county responsibilities. *Horne v. Flores*, 557 U.S. 433, 448 (2009). Because an institutional reform order "eviscerates a State's discretionary authority over its own program and budgets and forces state officials to reallocate state resources and funds," *see Missouri v. Jenkins*, 515 U.S. 70, 131 (1995) (Thomas, J., concurring), federal courts must "take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution" in devising a remedy, *Milliken*, 433 at 280–81.

Here, although Ms. Jaffer may have been necessary for the initial investigations she conducted due to the temporary absence of an active, Monitor-approved conflicts investigator, that is simply no longer the case. Moreover, the Court's current perceived conflict with AZ Truth Finder has no basis in fact or law. Thus, MCSO objects to the Court overriding its chosen outside investigator with the appointment of Ms. Jaffer as it constitutes an unwarranted inquisition into MCSO's authority to manage its own affairs.

5

### A.    <u>MCSO Did Not Have An Available Conflicts Investigator At The Time Of Ms. Jaffer's Initial Appointment, But Now Does.</u>

When IAs 2025-0111 and 2025-0139 were initiated, consistent with GH-2, the Court's Monitor requested MCSO assign them to MCSO's previously authorized conflict investigator. [**Exhibit 2**, Palopoli Dec. at ¶ 3]. However, MCSO's then Monitor-approved conflicts investigator, Baseline Investigations, declined to take on these investigations because at that time it was at the very end of its contract, which was not renewing. [*Id.* at ¶ 4]. That turndown necessitated MCSO to send those investigations to the Arizona Department of Public Safety ("ADPS"). [*Id.* at ¶ 5]. Later, the Monitor recommended that another IA be opened, IA 2025-0185. At that time, MCSO still did not have a replacement conflicts investigator, and the Court appointed the Monitor-recommended investigator, Ms. Jaffer, to conduct IA 2025-0185 over the five investigators that MCSO proposed. [Doc. 3191]. Thereafter, the Monitor took IAs 2025-0111 and 2025-0139 from ADPS and gave them to Ms. Jaffer.

Circumstances have now changed, and there is no longer <u>*any*</u> need for Ms. Jaffer. MCSO now has a Monitor-approved independent investigator to handle conflicts investigations. Specifically, in late July 2025, the Monitor gave verbal approval of AZ Truth Finder as MCSO's outside conflicts investigator to Capt. Flowers. [**Exhibit 2**, at ¶ 10]. Later, on August 11, 2025, the Monitor memorialized its approval of AZ Truth Finder as MCSO's outside conflicts investigator. [*Id.* at ¶ 11 and Exhibit B].

Consistent with MCSO policy and this Court's Orders, as the Monitor-approved conflicts investigator, Arizona Truth Finder is required to be "free of any actual or perceived conflicts of interest." Indeed, unlike MCSO's other private investigators, i.e., Jensen Hughes, investigations that AZ Truth Finder conducts are entirely independent from MCSO, with final approval by the Monitor. Just like Ms. Jaffer, AZ Truth Finder conducts and finalizes investigations for disciplinary determinations (if appropriate) and sends them directly to the appointing authority. In addition, there is no evidence in the record that IA 2026-0084 (or any

6

other IA Ms. Jaffer has been assigned or has requested to open) have been designated as a class remedial matter ("CRM"). Moreover, Ms. Jaffer's investigations have not been revealed to stem from any of the underlying constitutional violations this Court has found, nor does it relate to any investigation the Court has ordered as a result of any evidentiary hearing. [*See e.g.,* Doc. 1765 at ¶ 296]. As a result, there is now simply no need for this federal court to inject itself into MCSO for the appointment of *any* independent investigator, as MCSO's Monitor-approved conflicts investigator, AZ Truth Finder, is ready, willing and able to conduct any and all conflicts investigations. *Milliken*, 433 at 280–81.

### B.    AZ Truth Finder Has No Conflict.

The Court has also not articulated a sufficient reason why there is any "perceived conflict" with AZ Truth Finder. [*See* Doc. 3434 at 1]. The Court appeared to base this determination on its concern that MCSO command staff oversees the contract with AZ Truth Finder. [**Exhibit 1**, 3/25/26 RT at 24:9-22 ("that's my concern, okay. When MCSO and their executive command staff, or not their executive command staff, contracts out with independent entities and they're investigating the people who may be giving them contracts, it's a concern. Ms. Jaffer doesn't have that because I appointed Ms. Jaffer.")]. Based on this *potential* concern, the Court held there was a conflict and MCSO's established conflict investigator could not perform IA 2026-0084 (or any other IA Ms. Jaffer has been assigned or requested to open). [*See* **Exhibit 1**, 3/25/26 RT at 28:10-24].

Now that MCSO has had an opportunity to understand and explore the Court's concern, it submits that the Court's perceived conflict does not exist. Arizona law establishes that the power to contract lies with a county board of supervisors, not an Arizona sheriff (or his executive command staff). *See* A.R.S. § 11-201(A)(3); *see also* A.R.S. § 11-251. To this end, Maricopa County has enacted an extensive procurement code governing contracting by county officials. *See e.g.,* Maricopa County Procurement Code, Article 3.[3] Here, MCSO initially

---

[3] Available at: https://www.maricopa.gov/685/Procurement-Code.

7

solicited bids for an independent conflicts investigator via Maricopa County's procurement code. [*See* **Exhibit 2,** ¶ 8, Ex. A]. MCSO had initial authority under the County's procurement code to accept AZ Truth Finder's initial bid due to it involving services for less than $100,000). [*See* **Exhibit 2,** ¶ 9]. *See* Maricopa County Procurement Code, Art. 3, MC1-347(A), MC1-352. However, once AZ Truth Finder's services exceeded $100,000 in 2025, the County then had to approve AZ Truth Finder's additional work. [*Id.* at ¶¶ 13-15]. Moreover, the County's approval of an outside independent investigator is currently underway. [*Id.* at ¶¶ 14]. Thus, to the extent the Court is concerned about MCSO reviewing and approving AZ Truth Finder's contract, that is simply not the case as it is the County that is currently reviewing and approving MCSO's conflict investigator.

But even assuming MCSO had sole approval of AZ Truth Finder's contract (which is not the case), there is still no conflict of interest precluding AZ Truth Finder from conducting a conflict investigation. Arizona has specific laws governing conflicts of interest. *See e.g.,* A.R.S. § 38-503(A), (B). Section 38-503(A) covers substantial interests in contracts, sales, purchases, or services to a public agency, while § 38-503(B) provides that "[a]ny public officer or employee who has, or whose relative has, a substantial interest in any decision of a public agency shall make known such interest in the official records of such public agency and shall refrain from participating in any manner as an officer or employee in such decision." This two-part obligation—disclosure and recusal—is the foundation of Arizona's conflict of interest regime. The threshold concept of a "substantial interest" is defined in A.R.S. § 38-502 as "any nonspeculative pecuniary or proprietary interest, either direct or indirect, other than a remote interest." Critically, this definition confines conflicts of interest to financial and property-based interests; it does not encompass mere personal relationships, sympathies, or bias in the abstract sense. The statute further defines "remote interest" to include, among other things, a minor ownership stake in a publicly traded corporation or an interest shared equally by a large class of persons, neither of which constitutes a disqualifying conflict.

8

The Arizona Supreme Court authoritatively construed this statutory framework in *Hughes v. Jorgenson*, 203 Ariz. 71 (2002), a case arising from a county sheriff's participation in a criminal investigation involving his own sister. The court held that to violate the conflict of interest statute, a public official must have "a non-speculative, non-remote pecuniary or proprietary interest in the decision at issue," and further clarified that "[p]ecuniary means money and proprietary means ownership." *Hughes*, 203 Ariz. at 74, ¶ 16. The court expressly rejected the State's argument that the sheriff's reputational or electoral interest—the possibility that voters would refuse to re-elect him if he appeared to give special treatment to a family member—constituted a substantial interest under the statute. The court noted that such an interest was "speculative" and that "the term [pecuniary interest] refers to a pecuniary or proprietary interest by which a person will gain or lose something, as contrasted to general sympathy, feeling or bias." 203 Ariz. at 74 (cleaned up). Thus, an outside internal affairs investigator's personal feelings about the officer under investigation, or even a pre-existing friendship or animosity, would not, standing alone, constitute a statutory conflict of interest under A.R.S. § 38-503.

Here, there is no pecuniary interest involving AZ Truth Finder. Nor has the Court been presented with any indicia of sympathy, feeling or bias by AZ Truth Finder – which itself would *still* not be a basis for a conflict. *Hughes*, 203 Ariz. at 74. Rather, this Court appears to find a conflict simply because AZ Truth Finder's would be performing its agreed upon contractual duties – to conduct independent conflicts investigations. That is not a conflict under Arizona law. Once again, the Court's Monitor has approved AZ Truth Finder for that very purpose. Therefore, a conflict does not exist simply because AZ Truth Finder was contracted pursuant to longstanding, procurement procedures that *Maricopa County* developed and approved. *See Berenter v. Gallinger*, 173 Ariz. 75, 82 (App. 1992) ("Administrative officers are presumed to be fair and can be disqualified only upon a showing of actual bias."). To hold otherwise would be to seemingly prohibit *any* payment to the investigator, even Ms.

Jaffer here, or to hold that a conflict exists in and of itself anytime that a contract is signed to effectuate payment from the County to the investigator. Neither can be the case.

In sum, the Court should not have assigned IA 2026-0084 to Ms. Jaffer and, instead, should allow AZ Truth Finder to perform this IA (and any future IA in which MCSO has a conflict) pursuant to its original, and Monitor-approved assignment. This affords MCSO the ability to operate without unnecessary and unlawful judicial intervention by following MCSO's previously established, Court-Ordered policy regarding conflicts investigations. [*See* Doc. 2938]. For the Court to require otherwise constitutes an unnecessary and unlawful invasion into MCSO's conflict investigation processes. *See Milliken*, 433 U.S. at 282.

## III.     MCSO ALSO HAS SIGNIFICANT AND LEGITIMATE CONCERNS REGARDING MS. JAFFER'S INVESTIGATIVE CAPABILITIES AND OBJECTIVITY.

Aside from the reasons why *any* court-appointed, independent conflicts investigator is warranted, serious concerns exist to demonstrate Shaneeda Jaffer should not conduct conflict investigations for MCSO. As part of the Court's Orders appointing Ms. Jaffer, the Court required Ms. Jaffer to "conduct the investigation in compliance with the best investigative practices and in compliance with the processes and standards set forth in the Court's previous Orders and which govern the operations of MCSO's Professional Standards Bureau." [Doc. 3191 at ¶ 4]. Ms. Jaffer was also required to follow MCSO policy on investigations. [*Id*]. MCSO Policy GH-2 provides the following with respect to investigation of Complaints:

> **Investigation of Complaints:** The investigation of allegations is a critical part of the complaint and discipline process. *A decision to exonerate, unfound, not sustain*, or sustain a charge *must be based upon actual and reliable information*. The investigation shall consist of gathering and reporting facts related to the allegation. Credibility determinations *shall be* based upon *all* known facts….
>
> A. Investigations must be viewed by the public and Office employees as diligent, thorough, and impartial. The investigation *shall be* conducted in a manner that *shall reveal the facts*. In each misconduct investigation, investigators *shall*:
>
> 1. Conduct investigations in a *rigorous and impartial manner* designed to determine the facts;

10

2. Approach the investigation *without prejudging the facts* and *without permitting any preconceived impression* of the principal, investigative lead, witness, or complainant to cloud the investigations;

3. *Identify, collect, and consider all relevant, circumstantial, direct, and physical evidence*, including any audio or video recordings while ensuring evidence is collected in a timely fashion and in accordance with Office Policy GE-3, *Property Management and Evidence Control*;

4. *Make reasonable attempts to locate and interview all witnesses*, including members of the public. Leaving voice mail messages and sending certified letters is not sufficient. Reasonable attempts may include, but are not limited to, neighborhood canvasses, checking with the Post Office, accessing open Internet resources, and completing Department of Motor Vehicle checks. All attempts shall be documented in the investigative report with the date, time, where, when, and who was contacted, to include all reasons why an interview was not conducted;

6. *Audio and video record all interviews.* Exceptions to a recorded interview may include, but are not limited to, the fact that the member of the community does not wish to be audio and/or video recorded, or that the member of the community resides outside of Maricopa County. If an interview is not audio and video recorded, all reasons shall be documented in the investigative report;

7. *Avoid asking leading questions and questions that may suggest justifications for the alleged misconduct*;

8. Attempt to resolve material inconsistencies between employee, complainant, investigative lead, and witness statements, and make credibility determinations *as appropriate*;

…

[**Doc. 2938,** GH-2, § 5, p. 27 (emphasis added)].

Now that MCSO has had the opportunity to see *one* of Ms. Jaffer's completed reports regarding the closed IAs 2025-0111 and 2025-0139, attached as **Exhibit 3** (Report) and **Exhibit 4** (Appendix), MCSO has significant concerns and justifiable apprehensions, as detailed within MCSO's consulting expert's Report, attached as **Exhibit 5, Ex. A**. These concerns exist not only for the past investigations Ms. Jaffer has completed, but for the currently pending IA she was initially appointed to investigate (IA 2025-0185) and the new IAs the Court has assigned to her. [*See* Doc. 3448; Doc. 3473].

**A.    Ken Miller And His Team At ISS Agency Are Experts On Administrative Investigations And Administrative Investigation Processes.**

MCSO engaged US ISS Agency, LLC, DBA Investigative Security Services Agency in AZ ("ISS Agency") to complete an independent review and investigative analysis of Ms. Jaffer's Report related to MCSO case files IA 2025-0139, IA2025-0111 and, by extension, IA2020-0555. [**Exhibit 5, Ex. A**, pgs. 1-2]. ISS Agency is not simply an expert hired by MCSO. It has incredible experience handling misconduct investigations. [**Exhibit 5, Ex. A**, pgs. 2-4]. In fact, in his 40 years of law enforcement leadership, Chief Ken Miller (ret.) has led the development of administrative management systems, early intervention/misconduct reduction strategies, and policy and process improvements in Charlotte, North Carolina; Greensboro, North Carolina, and Greenville, South Carolina. [**Exhibit 5, Ex. A**, pgs. 3-4].[4]

More importantly, the four members of the ISS Agency Team have over 100 years of law enforcement experience—including many years in internal affairs investigations and/or management—in addition to many years of private investigative work. [**Exhibit 5, Ex. A**, pgs. 2-4]. The ISS Team has completed *thousands* of investigations, involving many complex administrative and criminal investigations for law enforcement agencies, including a combined experience of more than 75 years investigating law enforcement personnel, as well as complex workplace investigations for large private institutions, universities, and local government,

---

[4] For example, in Charlotte and Greensboro, Chief Miller revised workplace investigation processes, which reduced average case resolution (investigation to adjudication) days from 270 in Charlotte and 189 in Greensboro to under 45 days. [**Exhibit 5, Ex. A**, at 3]. The Charlotte-Mecklenburg Police Department is one of the largest 25 police departments in the United States and has an average case resolution rate of under 45 days which makes Chief Miller an incredibly valuable and reliable source on the subject of administrative misconduct cases, but also on the processes of expeditiously ensuring completion of administrative misconduct cases. [*See* **Exhibit 5, Ex. A**, pgs. 3-4]. In Greenville, he completely overhauled the disciplinary and administrative investigation processes in collaboration with the City Human Resources director. [**Exhibit 5, Ex. A**, pgs. 3-4]. Chief Miller has testified on national policing issues at hearings of the United States Senate Committee on the Judiciary/Subcommittee on Crime and Terrorism and The President's Taskforce on 21st Century Policing. [**Exhibit 5, Ex. A**, at 4]. Also, ISS Agency Director of Investigations, Dave Poston, reshaped and modernized the Albemarle Police Department's internal affairs department to foster more accountability and trust. [**Exhibit 5, Ex. A**, pgs. 2-3].

including but not limited to retaliation, untruthfulness, and hostile workplace claims. [**Exhibit 5, Ex. A**, pgs. 2-4]. The collective knowledge, education, professional experience, skill, and proven work-product make Chief Miller and his ISS Team an incredibly valuable resource to ensure the investigative rigor of each administrative conduct case as well as providing general PSB guidance on how MCSO routes, investigates, and concludes its investigations. *See* Fed. R. Evid. 702. [**Exhibit 5, Ex. A**, pgs. 2-4].

> **B.** **Chief Miller and ISS Agency Identified Serious Deficiencies In Ms. Jaffer's Two Closed Investigations.**[5]

MCSO tasked Chief Miller and his team to review relevant state law, Court Orders, and MCSO policy and procedures and provide an analysis of the thoroughness, veracity, and objectivity of Mrs. Jaffer's investigation and findings. [*See* **Exhibit 5, Ex. A**, pgs. 1-2,-4-6]. The ISS Agency's analysis revealed investigative deficiencies in IAs 2025-0139 and IA2025-0111 that Ms. Jaffer failed to identify in her review and report. Specifically, Ms. Jaffer: (1) recommended incorrect dispositions in some of the most serious allegations, including conflict of interest and insubordination; (2) failed to identify investigative deficiencies; and (3) lacked an objective analysis of available evidence. Before explaining these deficiencies in more detail, an explanation of the underlying investigations is necessary for background purposes.

> **1.** **The Relevant Investigations.**

In early 2020, then-Lieutenant Aaron Engelbeck was assigned to Patrol District VI in Queen Creek. Captain Gregory Lugo was the District VI Commander. [**Exhibit 4**, at 349]. During Sgt. Engelbeck's probationary period as a lieutenant, Capt. Lugo documented performance concerns, including Sgt. Engelbeck's repeated absence from his assigned patrol district during duty hours despite Capt. Lugo's directives that lieutenants remain physically

---

[5] While MCSO has identified significant flaws with Ms. Jaffer's prior, closed investigations, it does not seek at this time for them to be redone or for any further review of them to occur. Rather, MCSO has highlighted those deficiencies solely to demonstrate that the Monitor's or the Court's reliance on them would be improper as a basis assess MCSO's compliance with this Court's Orders and why Ms. Jaffer should not do any further conflict investigatory work.

within district boundaries. [**Exhibit 4**, at 349-353]. Based on the alleged absences, Capt. Lugo submitted a memorandum recommending Sgt. Engelbeck's demotion, and MCSO demoted Sgt. Engelbeck shortly thereafter. [**Exhibit 4**, at 349-353]. In addition to the demotion, an internal affairs ("IA") case 2020-0555 was opened against Sgt. Engelbeck that contained allegations of insubordination and untruthfulness related to Sgt. Engelbeck's location reporting in the CAD system. The investigation was assigned to PSB Sergeant Michael Leatham. [**Exhibit 4**, at 349].

Sgt. Leatham interviewed both Capt. Lugo and Sgt. Engelbeck. [**Exhibit 4**, at 354-372]. Although he acknowledged being instructed to remain within Queen Creek during duty hours, Sgt. Engelbeck disputed that the instruction constituted a direct order. [**Exhibit 4**, at 374]. Following his interview, Sgt. Engelbeck provided documents to Sgt. Leatham, including a twelve-page written memorandum disputing the allegations and asserting misconduct by Capt. Lugo and others. [**Exhibit 4**, at 377]. Sgt. Leatham declined to treat the memorandum as a formal complaint or include it in the IA file. [**Exhibit 4**, at 377-378].

The investigation remained pending for several years. In December 2023, Sgt. Leatham resumed investigative activity after discovering GPS-related issues and added an additional truthfulness allegation. [**Exhibit 4**, at 397]. A follow-up interview of Sgt. Engelbeck occurred in January 2024. [**Exhibit 4**, at 398-401]. Sgt. Leatham ultimately recommended that three insubordination allegations be sustained and that truthfulness allegations be not sustained. [**Exhibit 4**, at 417-428].

Those recommendations were approved by Executive Chief Michael Caputo. Because Capt. Lugo had been the Commander of the PSB since February 2021, he could not perform the review due to conflict. Following a pre-determination hearing, the Appointing Authority sustained two insubordination allegations and imposed a forty-hour suspension without pay. [**Exhibit 4**, at 430-434]. Sgt. Engelbeck appealed. [**Exhibit 4**, at 457-458]. When Sgt. Engelbeck received access to the investigative file for appeal purposes, he noticed that the

14

file omitted audio-video recordings of his interview and Capt. Lugo's 2020 interviews. [**Exhibit 4**, at 460]. He immediately notified County officials of the omission. [**Exhibit 4**, at 460]. Shortly thereafter, MCSO rescinded Sgt. Engelbeck's discipline, reimbursed his lost pay, and vacated the appeal under A.R.S. § 38-1106. [**Exhibit 4**, at 461].

On March 10, 2025, Sgt. Engelbeck filed a new internal complaint, later designated IA 2025-0111, alleging intentional destruction or withholding of evidence and requesting an outside investigation, knowing that Capt. Lugo was the PSB Commander. [**Exhibit 4**, at 457-463]. That evening, Capt. Lugo accessed the IAPro system and reviewed the incident summary, which identified him as an involved employee. [**Exhibit 4**, at 237, 464]. Capt. Lugo did not immediately notify his supervisor, Executive Chief Melissa Palopoli, as MCSO policy requires. [**Exhibit 4**, at 238]. The following morning, Chief Palopoli contacted Capt. Lugo after learning he had accessed the complaint. [**Exhibit 4**, at 240]. In the days that followed, Chief Palopoli and Capt. Lugo discussed the complaint and Capt. Lugo's potential conflict. [**Exhibit 4**, at 238-241, 301-304]. The two disputed the date on which Chief Palopoli issued a verbal order directing Capt. Lugo to stay out of the investigation—Chief Palopoli asserts March 18, 2025; Capt. Lugo asserts March 24, 2025. [**Exhibit 4**, at 293, 301-304]. No one disputes that Capt. Lugo was aware that he personally was the subject of the investigation.

On March 21, 2025, Capt. Lugo discussed the Sgt. Engelbeck complaint with a member of the Court-appointed monitor team, Chief Anders, during a routine PSB intake meeting and accessed IAPro in connection with that discussion. [**Exhibit 4**, at 250, 465]. Chief Palopoli later reviewed audit logs and concluded that Capt. Lugo accessed the complaint after being ordered to remain uninvolved. [**Exhibit 4**, at 303-241, 465]. In another meeting with Chief Anders, which occurred after Capt. Lugo agreed that Chief Palopoli told him to stay out of the IA, Capt. Lugo stated that he briefly accessed the IA at the behest of Chief Anders. [**Exhibit 4**, at 258-259].

15

On April 7, 2025 Chief Palopoli filed an official complaint against Capt. Lugo, IA 2025-0139, alleging failure to timely disclose a conflict of interest and insubordination, [**Exhibit 4**, *see, e.g.*, pg. 503.] and Capt. Lugo was placed on paid administrative leave as a result of the allegations contained in Chief Palopoli's complaint. [**Exhibit 4**, *see, e.g.*, 474.] Both IAs 2025-0111 and 2025-0139 were referred to ADPS for investigation. [**Exhibit 4**, *see* at 319]. ADPS then opened three separate investigations into these matters.[6] In May 2025, this Court appointed Shaneeda Jaffer as Independent Investigator for a different investigation. [Doc. 3191]. In October, the Monitor pulled the investigations from ADPS and gave it to Ms. Jaffer. Ms. Jaffer issued her report in January 2026, concluding as follows:

| Investigation No. | Allegations | Principal(s) | Independent Investigator's Findings |
|---|---|---|---|
| IA 2025-0111 | A.R.S. § 38-1106(a): failure to provide a law enforcement officer who requests his or her administrative file the entire file within fourteen (14) calendar days. | Captain Greg Lugo; Sergeant Robert Leatham | Exonerated |
| IA 2025-0111 | A.R.S. § 13-2809(A)(1): tampering with evidence by destroying and withholding evidence from Sergeant Engelbeck's appeal. | Captain Greg Lugo; Sergeant Robert Leatham | Unfounded |
| IA 2025-0111 | Failure to follow establish laws in violation of Policy CP-2 | Captain Greg Lugo; Sergeant Robert Leatham | Unfounded |
| IA 2025-0139 | Failure to warn of a conflict of interest in violation of Policy GH-2, Internal Investigations. | Captain Greg Lugo | Not Sustained |
| IA 2025-0139 | Insubordination for failing to follow a reasonable lawful order in violation of Policy CP-2. | Captain Greg Lugo | Exonerated |

---

[6] On April 9, 2025, ADPS investigated allegations filed against Capt. Lugo regarding to insubordination and failure to notify his chain of command of a possible conflict of interest as MCSO IA 2025-0139. On April 14, 2025, ADPS investigated allegations that members of the MCSO had violated state laws governing the Tampering with Physical Evidence (ARS 13-2809) and Appeal of Disciplinary Action (ARS 38-1106). These investigations were initiated to determine if laws had been violated in the failure to produce all available evidence required by Leatham's appeal. On September 4, 2025, ADPS investigated allegations that members of the MCSO violated Code of Conduct Section 6, Conformance to Laws when they failed to provide all the legally required documents to Sgt. Engelbeck for his merit appeal.

16

**2.        The Deficiencies In Ms. Jaffer's Investigations and Findings.**

**a.        Ms. Jaffer Erred In Not Sustaining The Allegation Against Capt. Lugo Involving A Conflict Of Interest.**

Perhaps the most glaring issue with Ms. Jaffer's investigation is that she ignored Capt. Lugo's clear violation of CP-2. Specifically, Capt. Lugo had a 16-hour window to notify Chief Palopoli of his conflict of interest in IA 2025-0111 and failed to do so. In relevant part, CP-2, *Code of Conduct*, requires: (1) "Employees *shall not* involve themselves in any matter that may involve a conflict of interest or appear to be a conflict of interest"; (2) "Should a conflict of interest arise, employees *shall notify their supervisor as soon as practical*"; (3) "*If the PSB Commander also suffers from a conflict, the highest-ranking, non-conflicted Office chief or, if there is no non-conflicted Office chief, an outside authority shall make the determination.*" [**Exhibit 6,** CP-2, Code of Conduct, at 3 (emphasis added)]. The policy also defines a conflict of interest as "A conflict that involves, but is not limited to, nepotism, bias of any kind, an external business relationship, a close personal relationship, or superiority in rank in an individual's chain of command." [*Id.*].

Ms. Jaffer wholly ignored CP-2 in coming to her conclusions, disregarding Capt. Lugo's own testimony that CP-2—and not GH-2—governed. [**Exhibit 4**, at 277]. Ms. Jaffer not only failed to make this determination, but she also failed to note in her report that Capt. Lugo revealed his conflict of interest to Chief Palopoli *after she contacted him*. This was despite the fact that Capt. Lugo had access to email, text, and telephone, yet made absolutely no effort to give the mandatory notification of a clear conflict of interest to his supervisor, Chief Palopoli, over the course of a 16-hour window. [*Compare Exhibit 3*, passim, *with* **Exhibit 5, Ex. A**, at 36-40]. Indeed, a simple text message, telephone call, or email to Chief Palopoli would have easily met any requirement. This is true especially in light of Capt. Lugo's admitting to working a non-traditional workday the very next day. Regardless of the time of day, Capt. Lugo recognized the conflict of interest and was obligated under CP-2 to immediately inform his supervisor—meaning at the time of his reading the IA, not many hours later or the next day. Ms. Jaffer's failure to analyze CP-2's conflict notification requirements was simply

17

untenable and inexcusable and seriously calls into question her investigative expertise. [*See* **Exhibit 5, Ex. A**, at 36-42]. Nonetheless, Capt. Lugo did not avail himself to these practical measures to satisfy policy requirements.

Thus, Ms. Jaffer improperly ignored not only the requirements of CP-2 but also the ease of communication available to Capt. Lugo in making her finding of not sustained. [*Compare Exhibit 3*, passim, *with* **Exhibit 5, Ex. A**, at 36-42]. This deficiency seriously calls into question her investigatory prowess and the accuracy of her findings in her reports.

> **b.    Ms. Jaffer Also Ignored Capt. Lugo's Clear Insubordination In IA 2025-0139.**

Ms. Jaffer's report also improperly exonerated Capt. Lugo for ignoring a clear and unconditional order to stay out of his IA—something he should have known as the Commander of PSB to do. Under MCSO policy, insubordination is defined as: "the willful refusal to order a reasonable and lawful order." [**Exhibit 6**, CP-2, *Code of Conduct*, § 40]. Furthermore, "[a] reasonable and lawful order given to a subordinate shall be followed regardless of the method of conveyance, as specified in Office Policy GB-2, Command Responsibility." [*Id.*].

As the Court is aware, the Second Order mandates that conflicts of interest in investigations are prohibited. [**Doc. 1765**, ¶ 167]. Indeed, an employee "shall not involve themselves in any matter that may involve a conflict of interest or appear to be a conflict of interest." [**Exhibit 6**, CP-2, Code of Conduct, at 3]. As Capt. Lugo's direct supervisor, Chief Palopoli was obligated to ensure Capt. Lugo was responsible for complying with the MCSO policy and, of course, the Court's Orders. [*See* **Exhibit 7,** GB-2, *Command Responsibility*, at 7]. Thus, Chief Palopoli was obligated to tell Capt. Lugo to stay out of IA 2025-0111, which she did. [*See e.g.,* **Doc. 1765**, ¶ 167(a), (b), (d), and (f); **Exhibit 6**, CP-2, §4, at 3; **Doc. 2938,** GH-2, *Internal Investigations*, § 4(D)(4)-(6), at 25; and **Exhibit 7,** GB-2, *Command Responsibility*, at 7].

On March 18, 2025, Chief Palopoli met with Capt. Lugo and advised Capt. Lugo that the investigation will go forward and that he needed to "stay out of it". [**Exhibit 4**, at

302]. Capt. Lugo disputes that Chief Palopoli told him to "stay out of it" on March 18, 2025, claiming that she told him to stay out of it on March 24, 2025. [*See* **Exhibit 4**, at 221-222]. Chief Palopoli also requested that Capt. Lugo assign a PSB lieutenant to be her direct point of contact for the IA, which he never did. [*Id*]. After her meeting with Capt. Lugo on March 18. 2025, Chief Palopoli contacted Director Tiffany Shaw who provided Chief Palopoli with contact information for MCSO's outside investigator, Jensen Hughes. [*Id.* at 303]. Despite Chief Palopoli's conversation with Capt. Lugo to stay out of the IA, Capt. Lugo accessed the IA on March 21, 2025, and despite admitting that Chief Palopoli ordered him to "stay out of the IA on March 24, 2025, did so again on March 28, 2025. [*See, e.g., Id.* at 202, 303, 465]. In both instances, Chief Anders as well as Capt. Lugo should have known better than to have Capt. Lugo access IA 2025-0111 at their weekly meeting.

Thus, *even assuming Capt. Lugo's timeline to be true*, Capt. Lugo ignored Chief Palopoli's orders to "stay out of it" and to put her in touch with someone at PSB who will handle IA 2025-0111 in light of Capt. Lugo's conflict of interest, and accessed the IA on March 28, 2025—which Capt. Lugo said was at the behest of Monitor Anders.[7] [**Exhibit 4**, at 258-259]. Moreover, on March 25, 2025, Chief Palopoli explicitly emailed Monitor Anders and advised Monitor Anders about this issue and her desire to send the investigation to an independent Monitor approved investigator. [*See id.* at 303]. Despite both Monitor Anders and Capt. Lugo being wholly aware of the conflict of interest, Capt. Lugo *again* accessed the IA on March 28, 2025, [*id.* at 258-59] and neither Monitor Anders nor Capt. Lugo informed Chief Palopoli of Capt. Lugo's March 28, 2025 access. [*See id.* at 303-304].

Ms. Jaffer's Report attempts to sidestep this issue by determining that Chief Palopoli's order for Capt. Lugo to "stay out of it" was "vague", "unreasonable", and

---

[7]     Again, MCSO neither implies nor infers that Capt. Lugo was maliciously insubordinate or had some greater motive not to comply with Chief Palopoli's order. However, MCSO recognizes and requires that its employees must follow orders, no matter an employee's rank and importance to the agency. Capt. Lugo's position as PSB Commander does not make him impervious to the chain of command.

19

"unlawful." [**Exhibit 3**, at 18]. Ms. Jaffer's determination is incredulous under the circumstances and her finding is inexplicable in light of MCSO policy, the Court's Orders, and any reasonable interpretation of the facts.

First, there was simply no validity to Ms. Jaffer's claiming that Chief Palopoli's order was vague. Ms. Jaffer's conclusion that it was vague reflects her complete lack of law enforcement experience and training. Ms. Jaffer's determination that Chief Palopoli's order was vague, completely disregards Capt. Lugo's experience, training, command positions, knowledge of MCSO policies, and longstanding position as the Professional Standards Bureau Commander. As Chief Miller states:

> Under the doctrine of objective reasonableness, even a new sworn officer should understand the meaning of 'stay out of it' and need no clarification. Captain Lugo is a senior command level officer in charge of the Professional Standards Bureau which oversees discipline for MCSO and is clearly familiar with the requirements of CP-2, GH-2, the Court's Orders, and claims of insubordination. To qualify an order to him to "stay out of it" as vague brings into question the overall ability, knowledge and decision-making capability required to properly function in the position.

[**Exhibit 5, Ex. A**, at 43-46]. Ms. Jaffer's citation to GB-2, Command Responsibility, claiming that Chief Palopoli's order to "stay out of it" should have been "followed by a written order" with "precise instructions," simply misapplies and cherry picks from MCSO's policies. Again, as explained by Miller:

> 1.  Jaffer is citing GB-2, Command Responsibility, and is selective in her reference to that policy.

It must be noted that "should" does not mean "shall."

> 2.  The policy also states that, "When orders are given in the form of oral commands, they should be simple and direct and <u>may</u> be followed by a written order." [GB-2, *Command Responsibility*, at 7. (emphasis added)]

Chief Palopoli was within her authority to issue a verbal order that she felt was clear: "stay out of it".

> 3.  GB-2 also states, "Oral orders shall be binding for compliance on an individual or groups of individuals when they receive or are made aware of them."

Once again, the policy confirms that a verbal order is binding and must be obeyed.

[**Exhibit 5, Ex. A**, at 52]. Contrary to Ms. Jaffer's contention, there was simply no reason for Chief Palopoli to follow up on a clear, unambiguous order for Capt. Lugo to have understood that he should not have accessed his own IA.

Next, Ms. Jaffer improperly concluded that Chief Palopoli's order to Capt. Lugo to stay out of IA 2025-0111 was unreasonable, despite Capt. Lugo's admission that he had a conflict of interest. It simply makes no sense how Ms. Jaffer could find the order to stay out of an IA that presents an admitted conflict of interest to be unreasonable. Considering the nature of the complaint, Sgt. Engelbeck's demotion as a result of Capt. Lugo's 2020 complaint, and MCSO policies meant to avoid the appearance of impropriety or manipulation of IA investigations, it was not only reasonable for MCSO executive command to require Capt. Lugo to stay out of the IA, *it was required*. [*See* **Exhibit 5, Ex. A**, pgs. 43-46; *see also* **Doc. 1765**, ¶ 167(a), (b), (d), and (f); **Exhibit 6**, CP-2, §4, at 3; **Doc. 2938,** GH-2, *Internal Investigations*, § 4(D)(4)-(6), at 25; and **Exhibit 7,** GB-2, *Command Responsibility*, at 7]. Capt. Lugo should not have expressed and did not express that he needed amplification of such a simple order from his direct supervisor to "stay out of it." Instead, with their combined experience, both Capt. Lugo and Monitor Anders should have come to that conclusion on their own. MCSO is flabbergasted that Ms. Jaffer found Chief Palopoli's simple, direct order pursuant to MCSO policy and Court Order to be unreasonable, and Commander Lugo's failure to follow that order as anything but insubordinate.

Last, Ms. Jaffer incorrectly determined that Chief Palopoli's simple, direct order was also unlawful due to the Court Orders requiring the PSB Commander to update the monitoring team on new cases. As Chief Miller properly articulates, there was no basis for Ms. Jaffer to reach this determination: "This premise was based upon the Court Order for the PSB commander to update the monitoring team. It does not specify that requirement by individual

21

name. The same notification process in place for times of absence of the PSB commander for vacation, sick leave, training, or other routine times of leave would be more applicable in instances of cases involving conflict of interest. This should have been known and honored by both the PSB commander and the monitoring team. Again, the Court Order also mandates that the PSB commander not engage in conflicts of interest. **An order to 'stay out of it' is not only lawful but should be considered legally required by Court Order.**" [**Exhibit 5, Ex. A**, at 46 (emphasis in original)].

Indeed, Chief Palopoli needed to ensure that Capt. Lugo performed his duties appropriately, including recognizing when he could not participate at all in reviewing a complaint due to a conflict of interest. [*See e.g.,* **Doc. 1765**, ¶ 167(a), (b), (d), and (f); **Exhibit 6**, CP-2, §4, at 3; **Doc. 2938,** GH-2, *Internal Investigations*, § 4(D)(4)-(6), at 25; and **Exhibit 7,** GB-2, *Command Responsibility*, at 7]. Monitor Anders had the same responsibility as Chief Palopoli in this regard because Paragraph 119 of the Court's Order requires the Monitor "to assist with the implementation of, and assess compliance with" the Court's Orders. [*See* **Doc. 606, ¶ 119**]. Thus, Ms. Jaffer's conclusion that Chief Palopoli's order was unlawful because it conflicted with the Second Court Order that requires the PSB Commander to work under the direction of the court-appointed monitor is simply wrong. [**Exhibit 4**, at 20 (referring to the **Doc. 2827**, at 8.)]. Moreover, Ms. Jaffer did not even consider the obvious and logical alternative – to have Capt. Lugo's superior access the IA with Monitor Anders in light of the unmistakable conflict.

Even so, Capt. Lugo was obligated to explain any purported conflict of orders—had he believed one to exist—but failed to do so. Again, as Mr. Miller properly notes: "GB-2 states that 'When a conflict of orders occurs, employees shall respectfully call the conflicting order to the attention of the supervisor giving the new order.'" [**Exhibit 5, Ex. A**, at 52]. In his interview, Capt. Lugo stated that he did not share any information about his perceived duties under the Orders with Chief Palopoli when she told him to stay out of it.

22

[**Exhibit 5, Ex. A**, at 53]. Had Capt. Lugo shared any alleged concern as required under GB-2, Chief Palopoli could have addressed the conflict by working with the monitor to temporarily assign someone else at MCSO to perform these functions while the investigation was underway. [*Id.*]. As a matter of professional responsibility, policy requirement, and Court Orders, Capt. Lugo had an obligation to communicate necessary information to his chain of command and his failure to do so could be considered an act of insubordination. [*Id.*]. Ms. Jaffer's conclusion that the Chief Palopoli's order was "unlawful" is simply nonsensical.

Finally, Ms. Jaffer's failure to inquire or address Captain Lugo's failure to provide critical, necessary information to his chain of command exhibits a critical omission in her report. [*Id.*]. Indeed, the Court's Orders did not remove Capt. Lugo from MCSO's chain of command. Instead, Capt. Lugo had an obligation as MCSO's PSB Commander to share with other MCSO employees, especially in his chain of command, the necessary processes to comply with MCSO policies and the Court's Orders.

Based on the foregoing and Chief Miller's experienced opinions, Ms. Jaffer erred in not finding: 1) that Capt. Lugo improperly accessed IA 2025-0111 when ordered not to do so due to his conflict; 2) that Chief Palopoli's simple, direct order to stay out of that investigation was somehow vague, unreasonable, and unlawful; and 3) that Capt. Lugo was not insubordinate in failing to follow that straightforward, simple order. Ms. Jaffer has demonstrated that she does not possess this requisite understanding required of an independent investigator.

### c.    Ms. Jaffer Failed To Identify That The Investigations Into IAs 2025-0111 And 2025-0139 Were Incomplete.

Ms. Jaffer also failed to collect and provide all available evidence in her report. The glaring shortcomings resulted in an incomplete record upon which to determine both IAs 2025-0111 and 2025-0139. [**Exhibit 5, Ex. A**, at 46]. As Chief Miller opines: "Findings in any investigation must also be predicated upon facts established through relevant and reliable evidence. Personnel, units, and agencies with responsibility for investigations of any type,

23

including administrative or workplace investigations, are charged with developing an impartial and relevant factual record to support findings on the complaints or claims they investigate. An investigator must be unbiased, objective and thorough. He or she must lack advocacy or interest in any party to a matter, identify and make every effort to obtain all relevant evidence, and ensure all findings are clearly supported by material, relevant and reliable evidence." [**Exhibit 5, Ex. A**, at 34-36]. Here, Ms. Jaffer's failure to conduct additional investigation, request additional information, and appropriately resolve conflicts in testimony through documentary evidence is inexcusable and even further calls doubt to her findings and the veracity of testimony on which she alleges to rely to reach her findings. *See* **Doc. 2938,** GH-2, *Internal Investigations*, § 5(A)(1), (3), (4), (8), and (10).

Examples of Ms. Jaffer's investigative incompleteness for IA 2025-0139, as Chief Miller identified in his report, are as follows:

- Ms. Jaffer failed to validate—or otherwise indicate that she did—Capt. Lugo's timeline by review of phone logs, calendar entries, and meeting logs despite clear conflicts both within Capt. Lugo's testimony and between Capt. Lugo's and Chief Palopoli's respective testimony, and failed to ensure such evidence remained with the investigative file, violating GH-2, § 5(A) (1), (3), (4), (8), § 8(A)(1), (2), and § 22. [**Exhibit 5, Ex. A**, 34-35].
- Ms. Jaffer failed to comply with core requirements of GH-2, Internal Investigations, by not obtaining, retaining, or including critical investigative materials—such as notes, emails, meeting records, a Teams recording involving Chief Anders and Capt. Lugo, the video of Capt. Lugo's interviews, and an email between Executive Chief Palopoli and Director Shaw—resulting in an incomplete investigation and/or investigative file, violating GH-2, § 5(A) (1), (3), (8). [**Exhibit 5, Ex. A**, at 34, 37, 39;
- Ms. Jaffer failed to reconcile a discrepancy between Capt. Lugo's claimed system access and the absence of corroborating audit logs or to take appropriate investigative steps to resolve that conflict, violating GH-2, § 5(A) (3), (4), (8). [**Exhibit 5, Ex. A**, at 47].[8]

---

[8] ISS Agency confirmed with IAPro (Versaterm) that cases cannot be opened without a time and date stamp, and the logs are read-only and unalterable (per Versaterm Account Manager Kalle White). Ms. Jaffer failed to seek further clarity regarding Capt. Lugo's timeline despite this discrepancy.

- Ms. Jaffer misstated the dates of Capt. Lugo's discussions with Monitor Anders, collectively reflecting deficiencies in evidence collection, accuracy, and investigative thoroughness in violation of GH-2 § 5(A)(1), (3), (4), (8). [**Exhibit 5, Ex. A**, at 47].
- Ms. Jaffer's report fails to cite to Chief Palopoli's interview transcripts while citing to Capt. Lugo's interview; indeed, Ms. Jaffer only refers to the ADPS summary of Chief Palopoli's interviews, calling into doubt whether Ms. Jaffer appropriately obtained, reviewed, and analyzed all information available to her, violating GH-2, § 5(A) (3), (4), (8), § 8(A)(1), (2), and § 22 . [**Exhibit 5, Ex. A**, at 48].[9]
- Ms. Jaffer failed to independently conduct or otherwise include in the investigative file an interview with Monitor Anders to compare timelines with Capt. Lugo, relying only on a third-hand statement that confirmed a conversation about new cases and assignments took place but did not confirm the conversation's content, violating GH-2, § 5(A) (1), (3), (4), (8), § 8(A)(1), (2), and § 22. [**Exhibit 5, Ex. A**, at 34].
- Ms. Jaffer failed to independently conduct or otherwise include in the investigative file an interview with Undersheriff Gentry to identify if and what conversations Chief Palopoli held with him about the conflict of interest and the substance and timing of orders given, violating *See* GH-2, § 5(A) (3), (4), (8), § 8(A)(1), (2), and § 22. [*See* **Exhibit 5, Ex. A**, at 34].
- Ms. Jaffer failed to independently conduct or otherwise include in the investigative file an interview with Dir. Tiffany Shaw to corroborate the timing of outside agency contact from Chief Palopoli, violating GH-2, § 5(A) (3), (4), (8), § 8(A)(1), (2), § 22. [*See* **Exhibit 5, Ex. A**, at 34;].
- Ms. Jaffer failed to conduct or otherwise include in the complete investigative file an interview of intake personnel at Jensen Hughes to validate timing of outside agency contact from PSB and who contacted them, violating GH-2, § 5(A) (3), (4), (8), (10), § 8(A)(1), (2), and § 22. [**Exhibit 5, Ex. A**, at 34].
- Ms. Jaffer failed to verify that Capt. Lugo only viewed the first three paragraphs of IA 2025-0111 despite Capt. Lugo's inconsistent testimony about how much of the complaint that he read— which even if just looking at the "Summary Tab" in IAPro, Capt. Lugo could have read the complete investigation—violating GH-2, § 5(A) (3), (4), (8), (10), § 8(A)(1), (2), and § 22. [**Exhibit 5, Ex. A**, at 34, 48-49].

Ms. Jaffer's investigative incompleteness was not limited to IA 2025-0139. Some examples of her investigative incompleteness for IA 2025-0111 are as follows:

- Ms. Jaffer failed to include the audio and video of the interviews in her investigative file or otherwise include photographs taken by Sgt. Quane documenting that the subject videos were included in IAPro, violating GH-2, § 5(A) (3), (4), (8), (10), § 8(A)(1), (2), and § 22. [**Exhibit 5, Ex. A**, at 35].

---

[9] Ms. Jaffer's failure to cite to or otherwise refer to Chief Palopoli's interview makes it impossible to determine if Ms. Jaffer reasonably weighed evidence, violating GH-2, Internal Investigations, § 5(A) (3), (4), and (8), § 8(A)(1) and (2), and § 22 . [*See* **Exhibit 5, Ex. A**, at 48].

25

- Ms. Jaffer failed to investigate and identify the person(s) responsible for compiling and transmitting the complete investigation file, violating GH-2, § 5(A) (3), (4), (8) and (10), § 8(A)(1), (2), and § 22. [**Exhibit 5, Ex. A**, at 35].

- Ms. Jaffer failed to obtain or otherwise include in her complete investigative file for IA 2025-0111 an audit trail for IA 2025-0555, violating GH-2, § 5(A) (3), (4), (8), (10), § 8(A)(1), (2), and § 22. [**Exhibit 5, Ex. A**, at 35].[10]

- Ms. Jaffer failed to conduct or otherwise include with the complete investigative file an interview with Dir. Shaw to identify the process and exact person(s) responsible for failing to provide the full case file to Sgt. Engelbeck, violating GH-2, § 5(A) (3), (4), (8), (10), § 8(A)(1), (2), and § 22. [**Exhibit 5, Ex. A**, at 58-59].

In sum, too much in IAs 2025-0139 and 2025-111 was left unknown and unverified. Her investigations were unacceptable and do both Chief Palopoli and Capt. Lugo a disservice. Indeed, Ms. Jaffer appears to have simply chosen the notetaker with the greatest quantity of notes (Capt. Lugo) without review on the qualitative veracity of the notes themselves. [**Exhibit 5, Ex. A**, at 35]. Ms. Jaffer failed to conduct a thorough investigation by: 1) failing to validate Capt. Lugo's and/or Chief Palopoli's timelines; 2) failing to conduct or otherwise include in her investigative file interviews with Director Shaw, Undersheriff Gentry, Jensen and Hughes, and others; 3) failing to review or otherwise include in her investigative file Capt. Lugo's and Chief Ander's respective notes, emails, and phone logs; and 4) failing to obtain or otherwise provide in her investigative file full transcripts and all video and audio recordings of interviews taken.

These deficiencies not only call the veracity of her report into question, but, more critically, calls into question her ability to function as an objective investigator. For an objective, fact-based investigation, an investigator would have made additional inquiries to verify timelines. [**Exhibit 5, Ex. A**, at 34, **Doc. 2938,** GH-2, Internal Investigations, § 5(A) (3), (4), (8) and (10), § 8(A)(1) and (2), and § 22]. Ms. Jaffer failed to do so. This is yet another reason why MCSO is seriously concerned about her conducting ongoing investigations.

---

[10] This audit trail should show all employees who touched that file from the time it was requested until it was released to Sgt. Engelbeck without all the recordings. [**Exhibit 5, Ex. A**, at 35; Doc. 2938, GH-2, Internal Investigations].

#### d.    Ms. Jaffer's Report Also Exhibited A Lack Of Objective Analysis Of Available Evidence.

In addition to failing to investigate and obtain critical information necessary for her investigation's completion, Jaffer's Report also exhibits a lack of objective analysis of the available evidence. For instance, as it relates to IA 2025-0139, the following issues exist:

- Ms. Jaffer failed to recognize that Capt. Lugo was wholly inaccurate when denied being the complainant in IA 2020-0555. [**Exhibit 5, Ex. A**, at 46].

- Ms. Jaffer incorrectly determined that Capt. Lugo accessed the IAPro portal on March 21, 2025, as requested by the Monitor to comply with Federal Court Orders. However, Capt. Lugo did not confirm opening the IA at Monitor Anders' request, nor does the supporting Case Note indicate Anders instructed him. [**Exhibit 5, Ex. A**, at 53-54].

- Ms. Jaffer failed to recognize or address Chief Palopoli's contacting Director Tiffany Shaw immediately after her March 18th meeting with Capt. Lugo, which indicates that "Chief Palopoli had the "stay out of it" conversation on the 18th." [**Exhibit 5, Ex. A**, at 47, 51].

- Ms. Jaffer failed to document or address further acts of insubordination by Capt. Lugo, including failure to provide Chief Palopoli with the name of a PSB lieutenant and his admitted accessing IA 2025-0111 on March 28, 2025. [**Exhibit 5, Ex. A**, at 47].

- Ms. Jaffer failed to document and report that Monitor Anders facilitated Capt. Lugo's continued access to IA 2025-0111, which violated a direct command from his superior. [**Exhibit 5, Ex. A**, at 44].

- Ms. Jaffer failed to take Capt. Lugo's advice and consider that CP-2 applied to the allegation of conflict of interest. [*Compare* **Exhibit 4** *with* **Exhibit 5, Ex. A**].

In addition, Ms. Jaffer makes similar, critically subjective determinations during IA 2025-0111:

- Ms. Jaffer incorrectly determined that the interviews that were not provided to Sgt. Engelbeck in the IA 2020-0555 matter were not taken under oath and, therefore, not subject to A.R.S. § 13-2809.

- Ms. Jaffer failed to recognize that (1) A.R.S. § 13-2809 refers to tampering with physical evidence that "*is intended to be used* in an official proceeding which is then pending." (2) a Merit Board Appeal hearing is a hearing where testimony would be taken under oath and (3) that the Merit Board hearing was an "official proceeding" where testimony would be taken under oath. [**Exhibit 5, Ex. A**, at 57-58].

- Ms. Jaffer failed to recognize that the responsible employees would nevertheless be in violation of CP-2.20(E), regardless of whether the failure to provide the interviews was excusable neglect. [**Exhibit 5, Ex. A**, at 59].

- Ms. Jaffer failed to identify the need to further investigate to identify the responsible employee(s)—or identify other potential violations of misconduct—in her findings exhibits the limited, subjective scope of her investigation and desired findings. [**Exhibit 5, Ex. A**, at 54].

27

These analytical gaps in Ms. Jaffer's analyses, both on their own and in totality, create significant concern that her ultimate conclusions involving IA 2025-0139 and 2025-0111 were improperly reached.

*** 

Based on the foregoing, MCSO has significant concerns regarding Ms. Jaffer's findings and the quality of her investigations supporting them. The deficiencies of reasoning in Ms. Jaffer's dispositions are troubling. MCSO is simply perplexed as to the outcomes and failure to note policy violations.[11] While Ms. Jaffer relied on Capt. Lugo for almost all factual findings, she did not rely on him when determining what MCSO policy to apply to the allegation of conflict of interest. MCSO is also concerned that the selective nature of Ms. Jaffer's investigation, findings, and dispositions show a clear, unambiguous intent to protect a specific individual within MCSO and target the organization—or certain MCSO employees. The bias is clear in the failure to finish the ADPS investigations and failure to objectively review the known evidence in coming to her determinations. Perhaps worse, these investigative deficiencies are only for _one_ completed report. As it currently stands, Ms. Jaffer has completed at least one other investigation and is in the process of conducing more. For these reasons, MCSO requests that Ms. Jaffer cease conducting any current or future outside conflict investigations, that they immediately be turned over to AZ Truth Finder, and that _none_ of Ms. Jaffer's investigatory findings provide the basis for the Monitor or the Court's assessment of MCSO's compliance with this Court's Orders.

---

[11] For instance, in his interview with Olshaskie, Capt. Lugo denied he filed the complaint (0555) on Sgt. Engelbeck and stated he did not know who filed it. However, the original paperwork on the 0555 case in the Addendum listed Capt. Lugo as the complainant. The suspension letter to Sgt. Engelbeck dated October 24, 2024, which is included in Ms. Jaffer's report, specifically states: "On October 3, 2020, Captain G. Lugo entered an internal complaint alleging you were insubordinate…" The clear conflict creates potential Brady/Giglio questions and merits further investigation. However, Ms. Jaffer failed to recognize or acknowledge this discrepancy in testimony and the possible untruthfulness.

28

IV.    **MS. JAFFER HAS THE APPEARANCE OF BIAS THAT MCSO POLICY REQUIRED HER TO AVOID.**

A.    **Ms. Jaffer's Objections To MCSO's Pleadings After Her Appointment As An Independent Investigator Raise Serious Questions On Her Impartiality And Her Role As An Independent Investigator.**

Ms. Jaffer's prior objections to MCSO's positions taken in this case, even if solicited by this Court, implicate serious concerns about her impartiality in this matter. The Court appointed Ms. Jaffer to fulfill the role of an outside, independent PSB investigator on certain matters within MCSO. [*See* Docs. 3172, 3191]. Although Ms. Jaffer is an attorney, she is not licensed in Arizona, is not fulfilling the role of an advocate in this action, does not represent any party in this litigation, and is not a part of the Court-appointed Monitor Team. Rather, as this Court has repeatedly stated, she is supposed to be simply carrying the charge of conducting an independent PSB investigation as assigned by the Court and its Monitor. [Docs. 3191; 3448]. Indeed, when the issue of attorney-client privilege related to Ms. Jaffer's requested production from MCSO came up, the Court repeatedly ruled that disclosure of relevant documents to Ms. Jaffer's investigation was necessary despite the attorney-client privilege and work product doctrine precisely because she is acting solely as a member of MCSO. [*See* Docs. 3307, 3322, 3487].

Despite the Court's clear delineations of Ms. Jaffer's role and responsibilities in this matter, the Court invited Ms. Jaffer to object to MCSO on privilege issues related to her investigation. [*See* Doc. 3245, 3324, 3465]. Ms. Jaffer accepted the Court's invitation and *opposed* MCSO's position on several occasions. [*See* Docs. 3271, 3328, 3329]. This was highly inappropriate as it amounted to the equivalent of a MCSO investigator filing a legal briefing opposing MCSO's position in Court. Indeed, MCSO policy, to which Ms. Jaffer is supposed to adhere, requires her investigations to be "viewed by the public and Office employees as diligent, thorough, and impartial." [GH-2, at 27, § 5(A)]. Had Ms. Jaffer appropriately taken her role into consideration, the appropriate method for her to raise any issue with MCSO's production of materials to her would have been to raise these issues with the Court and leave

29

it to the Court and the Parties to resolve those issues. But she did not, and instead, she actively litigated issues *against* MCSO. This was entirely improper for someone purportedly acting as an MCSO PSB Investigator.[12]

In addition, given that Ms. Jaffer's sole role is that of an independent PSB investigator, it is entirely improper for her to provide any comments on any pleadings filed in this Court. To state plainly, no member of MCSO has a right to file pleadings in this action other than the Sheriff in his official capacity. This action is brought against the Sheriff in his official capacity and he is represented by undersigned counsel. [*See* Doc. 26 (First Amended Complaint) at ¶¶ 13, 18, 19]. Suing the Sheriff in his official capacity is analogous to a plaintiff suing a corporation given that a suit against the Sheriff in his official capacity is against the Maricopa County Sheriff's Office and not the Sheriff individually. *Sanchez v. Maricopa Cnty.,* 572 P.3d 101, 110 (Ariz. 2025) ("Properly understood, '[a] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.'" (citing *Citizens for Growth Mgmt. v. Groscost*, 199 Ariz. 71, 74 ¶ 15, 13 P.3d 1188, 1191 (2000))). In this context, this Court has recognized that only counsel can represent the interests of the defendant corporation, not an employee of that corporation. *Nat'l Union Fire Ins. Co. of*

---

[12] The Court brushed aside these concerns in its May 7, 2026, Order when it held it was appropriate for it to request Ms. Jaffer to weigh in on production issues because: (1) Ms. Jaffer is not taking a position adverse to MCSO when she seeks to comply with the Court's mandate that MCSO has an obligation to conduct full, thorough, and fair investigations; (2) Ms. Jaffer's view of what is necessary to fulfill this obligation may be different than that of the MCSO command staff which, when she is investigating, will commonly have members who are either the subject(s) of the investigation or will have brought it; and (3) the Court invited Ms. Jaffer to weigh in to ensure that any issues preventing her from conducting full, fair, and efficient internal affairs investigations—as required under the Court's injunctive Orders—are raised and addressed by the Court. [Doc. 3487 at 4, n. 3]. MCSO disagrees on all three grounds. As noted above, Ms. Jaffer's prior briefing with the Court went well beyond simply voicing whether she was being provided adequate production from MCSO. Rather she actively opposed MCSO's legal arguments on the scope of privilege. [*See* Docs. 3271, 3328, 3329]. And while Ms. Jaffer argued no privilege issues existed at all with producing privileged information to her, this Court ultimately concluded there were. [*See* Docs. 3307, 3334 and 3487]. Again, Ms. Jaffer could have raised these issues with the Court and then the Court could have directed the parties to address them. It did not require Ms. Jaffer to be permitted to actively brief legal arguments in opposition to MCSO's stated position.

30

*Pittsburgh, PA v. Excel Staffing Services, Inc.*, MC-09-00087-PHX-GMS, 2011 WL 31192, at \*1 (D. Ariz. Jan. 5, 2011) ("Only licensed attorneys may represent a corporation in federal court.") (citing *Rowland v. Cal. Men's Colony, Unit II Men's Advisory Counsel*, 506 U.S. 194, 201–02 (1993) ("It has been the law for the better part of two centuries . . . that a corporation may appear in federal courts only through licensed counsel."); *see also United States v. High Country Broad. Co.*, 3 F.3d 1244, 1245 (9th Cir. 1993) (holding that a corporation's president and sole shareholder could not make an "end run around" the counsel requirement by intervening pro se rather than retaining counsel to represent the corporation).

In this regard, counsel for the Sheriff in his official capacity are the only individuals entitled to speak for the Sheriff in filings with this Court on behalf of MCSO. It is, therefore, entirely improper for Ms. Jaffer, as a Court-Ordered member of MCSO, to comment orally or in writing to this Court on anything MCSO has filed or on which it has taken a position, let alone object to MCSO's filings, as she has done so in the past. [*See e.g.,* Docs. 3271, 3328, 3329]; *High Country Broad. Co.*, 3 F.3d at 1245 (citing 28 U.S.C. § 1654).

At a minimum, Ms. Jaffer's decision to act as an attorney and advocate against MCSO and not simply fulfil her role as an investigator creates the appearance of partiality – something she must have avoided as an outside independent investigator.[13] [*See* MCSO Policy GH-2, § 4(D)(5) (requiring PSB commander to assign administrative misconduct investigations to another law enforcement agency or retain a qualified outside investigator to conduct an investigation in order to avoid the "appearance of impartiality")]. For this additional reason, pursuant to the very policies ordered by the Court, she should not continue with any future investigation involving MCSO.

_____

[13] Ms. Jaffer's recent filing agreeing with MCSO on some of the issues related to production of materials to her as part of her new investigations does not absolve her of this apparent conflict. [*See* Doc. 3480]. MCSO notes that Ms. Jaffer's recently filing agreeing with MCSO came *after* MCSO formally objected to Ms. Jaffer's providing any briefing to the Court on the continued issue of privilege and production, after noting her previous objections created the appearance of impropriety, and after MCSO indicated it would be filing this Motion challenging Ms. Jaffer's appointment as the independent investigator. [*See* Doc. 3467].

31

**B.**     **The Court's Inquiry On The Adequacy Of Ms. Jaffer's Investigatory Skills, Outside Of MCSO's Presence, Deprived MCSO Of A Meaningful Opportunity to Object To Ms. Jaffer's Appointment.**

Independent of the deficiencies identified above, yet another reason supports not having Ms. Jaffer conduct any additional investigations – MCSO's inability to participate in the Court's inquiry on the adequacy of Ms. Jaffer's investigative skills. The Court's prior Orders instituting an independent investigator made clear it would appoint an independent investigator from "candidates set forth by the parties." [Doc. 1765 at 295]. Ms. Jaffer was not provided as a candidate from either MCSO or the Plaintiffs – but the Court's Monitor. [Doc. 3172 at 1:22-24]. Yet, the Monitor failed to provide any foundation as to why Ms. Jaffer would be qualified to conduct the necessary independent investigations pursuant to the Court's requirements to engage an outside authority. [*See* Doc. 3184 at 3:17-4:16]. As a result, MCSO initially raised objections to Ms. Jaffer's appointment. [*Id.*]. And as set forth above, those concerns were well founded. *See supra* § III.

In its Order appointing Ms. Jaffer, the Court stated that it "consulted with its counterpart in the Northern District of California in which Ms. Jaffer has been involved in internal affairs investigations" was "assured by the Court in the Northern District of California of the competence, professionalism, and objectivity of those investigations" and therefore "[t]he Court [rejected] MCSO's concerns to the contrary." [Doc. 3191 at 2:3-7]. This was shocking to MCSO. By the time that the Court made MCSO aware of its intention to conduct its own investigation into MCSO's concerns regarding Ms. Jaffer's qualifications, the Court had already done so and had further determined the factual issue of Ms. Jaffer's qualifications without permitting MCSO any opportunity to participate or respond. MCSO's not being present for the Court's communications stripped MCSO of its right to review and respond to the alleged facts that purportedly support the Court's appointment of Ms. Jaffer. [Doc. 3191].

In addition, to date, MCSO still has not been made aware of the substance of the Court's communications with its counterpart that go to the substantive issues of Ms.

Jaffer's experience and qualifications to perform independent investigations for MCSO. The Court's independent investigation into establishing Ms. Jaffer's qualifications under Paragraph 167 needed to be done on the record, before all Parties, and with a suitable time for MCSO to both participate and respond. Indeed, the Court's requirement that the parties provide candidates obviated the need for the Court to conduct its own investigation and establish the requisite factual foundation for its Monitor's suggested independent investigator, Ms. Jaffer.

MCSO's inability to participate in the Court's inquiry deprived it of an essential right to object to Ms. Jaffer's appointment and creates a further reason to avoid her reappointment for future investigations.

**C.** **Jaffer's Prior Work With The Monitor Was Not Adequately Disclosed And Raises Additional Questions Regarding Her Impartiality.**

Finally, MCSO previously raised concern with Ms. Jaffer conducting an investigation in Oakland where the Court's Monitor also serves. Specifically, the Court's Order was also entirely silent on Ms. Jaffer's involvement with Clarence Dyer & Cohen LLP's investigation into the then Oakland Chief of Police LeRonne Armstrong, which was signed off by Monitor Robert Warshaw. [**Exhibit 8**, Jaffer Involved Oakland Investigation]. Although the Court has recently stated that the Monitor did not previously "direct" Ms. Jaffer's investigations, it is unclear if that is accurate. [**Exhibit 2**, 3/25/26 RT at 25:8-21]. From what is publicly available, the Monitor directly signed off on the investigation conducted by Ms. Jaffer's firm, much like the Monitor must do in Maricopa County. [**Exhibit 8**, Jaffer Involved Oakland Investigation, at 56]. Given the Monitor signed off on this investigation, there are significant questions on his involvement, direction, and approval that remain unanswered and create the appearance of a conflict of interest in that Ms. Jaffer has a continued financial incentive to coordinate an investigation to the best interests of the Monitor. MCSO submits that the prescient conflict *is the very reason why the Court had the parties propose an independent investigator* in the first place. [Doc. 1765 at 295]. Thus, Ms. Jaffer's failure

33

to fully disclose her involvement with the Monitor for her work in the Oakland Police Department is a substantive, factual omission justifying revisiting Ms. Jaffer's appointment.

***

For these and the above reasons, MCSO requests that the Court remove Ms. Jaffer as the independent investigator. Once again, the need to avoid any appearance of impropriety in Ms. Jaffer's investigations is paramount.

## V.   MS. JAFFER'S REQUEST TO INITIATE NEW INVESTIGATIONS SHOULD BE HALTED FOR ALL THE REASONS STATED ABOVE.

In light of the issues raised above, Ms. Jaffer's recommendation for three new investigations, which allegedly stem from her prior deficient investigations, should be halted at this time pending the Court's ruling on these issues. [*See* 3/24/26 Letter]. At a bare minimum, MCSO's approved conflicts investigator, AZ Truth Finder, should review these recommendations to independently assess whether such investigations are warranted, and if so, to conduct them. Finally, the Court should resubmit IA 2026-0084 to Arizona Truth Finder for investigation and recommendations consistent with the Court's Orders and MCSO policy. But even if the Court is entirely disinclined to take any action based on the foregoing, MCSO offers one last reason for it to do so – the mere avoidance of impropriety in investigations of MCSO command staff. When it comes to the careers of law enforcement at MCSO, investigations surrounding its current PSB commander and other command staff, and the Monitor's assessment on MCSO's compliance with the Court's Orders, there must be assurances that Ms. Jaffer's investigations are beyond reproach. There is simply *no* harm in having a different, Monitor-approved and credentialed, independent investigator conduct the investigations at issue. AZ Truth Finder is ready and capable to do so at a moment's notice. To continue to insist that Ms. Jaffer is the *only* person whatsoever who can handle selected conflict investigations that can clearly be handled by AZ Truth Finder, only further raises the specter of impropriety that MCSO seeks to avoid – and simply cannot be the case. Thus, for this reason alone, MCSO's requested relief should be granted.

34

## VI.    CONCLUSION.

As set forth above, there is no justification for any Court appointed independent investigator and legitimate concerns with Ms. Jaffer's existing (and pending) work exist. Specifically, Ms. Jaffer: (1) recommended incorrect dispositions in some of the most serious allegations, including conflict of interest and insubordination; (2) failed to identify investigative deficiencies; and (3) lacked an objective analysis of available evidence. Moreover, Ms. Jaffer's objectivity based on her prior objections to MCSO's positions and her prior work with the Monitor cast a large shadow over objectivity of her work product. Given the totality of what has been set forth above, the only reasonable result to ensure the sanctity of the investigative process that this Court's Orders require, and effective evaluation of MCSO's compliance with this Court's Orders, is to have Ms. Jaffer abstain from conducting any current or future investigations involving MCSO. Finally, for all the same reasons, the Court (and its Monitor) should abstain from utilizing *any* of Ms. Jaffer's investigative findings as a basis for MCSO's compliance with this Court's Orders or determining the pending Rule 60 motion.

DATED this 29th day of May, 2026.

JONES, SKELTON & HOCHULI, P.L.C.


By /s/ Joseph J. Popolizio
    John T. Masterson
    Joseph J. Popolizio
    Justin M. Ackerman
    Daniel A. Shudlick
    40 N. Central Avenue, Suite 2700
    Phoenix, Arizona 85004
    Attorneys for Gerard A. Sheridan, in his
    official capacity as Sheriff of Maricopa
    County, Arizona

GREENBERG TRAURIG, LLP


By /s/ Dominic E. Draye (w/ permission)
    Dominic E. Draye
    Matthew P. Hoxsie
    Zachary H. Levy
    2375 E. Camelback Road, Suite 800
    Phoenix, Arizona 85016
  Attorneys for Defendant Maricopa County


**CERTIFICATE OF SERVICE**

I hereby certify that on this 29th day of May, 2026, I caused the foregoing document to be filed electronically with the Clerk of Court through the CM/ECF System for filing; and served on counsel of record via the Court's CM/ECF system.


/s/ Megan Axlund

36